Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM

**IN THE CIRCUIT COURT OF COLE COUNTY
STATE OF MISSOURI**

| | |
|---|---|
| SHONDEL CHURCH; RANDALL LEE DALTON; DORIAN SAMUELS; VIOLA BOWMAN; and BRIAN RICHMAN, on behalf of themselves and all others similarly situated,<br><br>         Plaintiffs,<br><br>v.<br><br>STATE OF MISSOURI; ERIC R. GREITENS, in his official capacity as Governor of Missouri; MICHAEL BARRETT, in his official capacity as Director of the Missouri State Public Defender Office; H. RILEY BOCK, in his official capacity as Chair of the Missouri State Public Defender Commission; CHARLES R. JACKSON, in his official capacity as Vice Chair of the Missouri State Public Defender Commission; CRAIG CHVAL, in his official capacity as Secretary of the Missouri State Public Defender Commission; and A. CRISTA HOGAN, in her official capacity as a Member of the Missouri State Public Defender Commission,<br><br>         Defendants. | Case No. _____<br><br>Division: _____ |

## CLASS ACTION PETITION FOR INJUNCTIVE AND DECLARATORY RELIEF

      Plaintiffs Shondel Church, Randall Lee Dalton, Dorian Samuels, Viola Bowman, and Brian Richman, on behalf of themselves and all others similarly situated, by and through the undersigned counsel, upon knowledge with respect to their own acts and on information and belief as to other matters, hereby allege for this class action petition for injunctive and declaratory relief:

CLASS ACTION PETITION FOR INJUNCTIVE AND DECLARATORY RELIEF

## INTRODUCTION

1.     More than 50 years ago, the Supreme Court, in *Gideon v. Wainwright*, 372 U.S. 335 (1963), held that the United States Constitution requires every State to provide counsel for criminal defendants who are unable to afford an attorney.  As the Supreme Court has since explained, "Lawyers in criminal cases are necessities, not luxuries. . . .  Without counsel, the right to a trial itself would be of little avail."  *United States v. Cronic*, 466 U.S. 648, 653 (1984) (internal quotation marks omitted).

2.     But the constitutional right to counsel is not merely the right to a warm body licensed to practice law at one's side once trial begins.  The right attaches well before trial, because "certain pretrial events may so prejudice the outcome of the defendant's prosecution that, as a practical matter, the defendant must be represented at those events in order to enjoy genuinely effective assistance at trial."  *Rothgery v. Gillespie Cty., Tex.*, 554 U.S. 191, 217 (2008).  And the right encompasses more than "counsel in name only," *see State ex rel. Missouri Pub. Def. Comm'n v. Waters*, 370 S.W.3d 592, 597 (Mo. 2012), because unless a lawyer provides *meaningful* assistance, "there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable."  *Cronic*, 466 U.S. at 659.

3.     Despite these well-established and long-standing principles, the State of Missouri has failed to meet its constitutional obligation to provide indigent defendants with meaningful representation.  For more than two decades, Defendants have failed to provide the resources required to adequately represent poor people accused of crimes in Missouri, leading to the actual and constructive denial of counsel for, and ineffective representation of, indigent defendants across the State.

2

CLASS ACTION PETITION FOR INJUNCTIVE AND DECLARATORY RELIEF

4.    The State's indigent defense budget is shockingly inadequate.  At an average of only $356 per case, Missouri ranks 49th out of 50 states in per capita indigent defense funding.

5.    Without sufficient funding, overstretched and under-resourced Missouri State Public Defender (MSPD) attorneys are forced to handle far too many cases and to devote far too few hours to each case.  Public defenders average just 8.7 hours on the most serious non-homicide felonies, amounting to less than 20 percent of the minimum time recommended by the American Bar Association (ABA).  Overall, they are forced to devote fewer than the minimum hours recommended by the ABA in more than 97 percent of their cases.

6.    The consequences for indigent criminal defendants such as Plaintiffs—who must wait, often in jail, while their public defenders scramble to find even minimal time to devote to their cases—are devastating.  An MSPD attorney told Plaintiff Shondel Church that his case was winnable but that Mr. Church would have to sit in jail for six months before the attorney would have time to prepare the case.  Even though Mr. Church decided to take an unjustified plea, he had to wait in jail for nearly three months before he was able to enter the plea—months of incarceration for which he will now be required to pay over $2,600.  The MSPD attorney representing Plaintiff Randall Lee Dalton did not meet with him or return his sister's desperate phone calls for weeks, and so did not know the extent of his client's mental impairment or need of medication.  Plaintiff Dorian Samuels' lawyer seemed entirely unprepared to advocate for a bond reduction or to cross-examine a crucial prosecution witness, at least in part because he did not have time for a substantive conversation with Mr. Samuels in advance of the hearing. Plaintiff Viola Bowman has been incarcerated for more than two years as her attorney seeks continuance after continuance to buy time to adequately investigate her case while he simultaneously manages his district's entire office.  Hearings in Plaintiff Brian Richman's case

3

Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM

have repeatedly occurred in front of the judge but without Mr. Richman present; Mr. Richman's attorney waived Mr. Richman's constitutional right to appear on his own behalf at those hearings without even consulting with Mr. Richman.

7.      As the experiences of Plaintiffs indicate, despite the best efforts of MSPD's dedicated attorneys and support staff, MSPD's crushing workloads result in indigent defendants throughout this state being actually or constructively denied their right to counsel at critical stages of their cases.

8.      Indigent defendants are frequently denied any representation whatsoever at arraignments and other initial hearings, leaving them to fend for themselves when bond determinations and other critical decisions are made.

9.      Even when a public defender is present, she is often ill-equipped to advocate effectively for her client.  Public defenders have little time to meet and consult with their clients, and this lack of consultation precludes indigent defendants from participating meaningfully in their own defense.  It also impedes public defenders from investigating their clients' family and community ties in order advocate for pretrial release and to develop alternatives to detention.  Plaintiff Samuels, for instance, did not even meet with his public defender before his re-arraignment— which occurred more than two months after Mr. Samuels' arrest—meaning that the public defender did not have any information with which to argue for a bond reduction.  Plaintiff Dalton's sister ultimately interceded in an effort to obtain a furlough on his behalf because his public defender did not have time to investigate Mr. Dalton's history of mental health issues, let alone seek out alternative placements.

10.     Public defenders' unmanageable workloads force them to triage, performing too little investigation too late to effectively identify exculpatory evidence, reviewing discovery only as

Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM

time allows, rarely taking advantage of defendants' statutory right to depositions, and seeking continuance after continuance of their clients' trial dates. For example, Plaintiff Bowman's trial date has been continued for over two years as her attorney struggles to find the time to adequately investigate her case.

11. Because of these deficiencies, indigent criminal defendants who might otherwise be released on bond remain in pretrial detention unnecessarily. This leads many defendants to plead guilty just to get out of jail, irrespective of the merits of the State's case against them. For example, though Plaintiff Church was told his was a winnable case, he felt compelled to plead guilty just to avoid remaining in jail for months awaiting trial.

12. When they exercise their right to a trial, defendants frequently cannot present their defenses effectively, because MSPD attorneys have not had the time to investigate potential defenses, interview key witnesses, review discovery materials, or even communicate consistently with their clients. After trial, indigent defendants are more likely to receive harsher sentences than the facts of their case warrant, given their lawyer's inability to explore and advocate for reduced sentences or alternatives to imprisonment.

13. Taken separately, any one of these consequences would indicate that public defenders are not equipped with the tools necessary to fulfill their role as zealous advocates. Together, these deficiencies ensure that the meaningful adversarial testing on which the just operation of our legal system depends—and which the United States and Missouri Constitutions demand—is often absent in Missouri criminal courts.

14. Defendants and their predecessors have been on notice for decades that, starved of necessary resources, training, and supervision, MSPD cannot provide constitutionally adequate legal representation to Missouri's indigent criminal defendants. But, despite every opportunity

Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM

to do so, Defendants have failed to rectify the grave problems in Missouri's public defender system.

15.    The same problems that plague the indigent criminal defense system also infect Missouri's juvenile court system.  Although the Supreme Court has declared that a juvenile "requires the guiding hand of counsel at every step in the proceedings against him," *In re Gault*, 387 U.S. 1, 36 (1967), Missouri's indigent juveniles are often left without the meaningful guidance that the Constitution demands, again due to lack of resources for MSPD and resulting high workloads.  Indeed, according to a recent report from the United States Department of Justice, a staggering 60 percent of juveniles accused of crimes in Missouri proceed without appointed counsel.  When MSPD attorneys do represent juveniles, they spend an average of just 4.6 hours on each case, less than one quarter of the minimum time recommended by the ABA.  As a result, indigent juvenile respondents often have no effective advocate standing between them and detention, or at the very least, a record that could follow them into adulthood.

16.    The lack of funding for MSPD has created an environment in which no public defender in this State can provide constitutionally adequate representation for all of their clients, including Plaintiffs.

17.    The State of Missouri faces an urgent constitutional crisis.  As demonstrated by the cases of each of the named Plaintiffs, that crisis will only worsen until MSPD attorneys are equipped with the tools and resources they need to provide indigent defendants with the level of representation to which they are constitutionally entitled.

18.    Plaintiffs, on behalf of themselves and a class of similarly situated persons, seek to vindicate their constitutional and statutory rights to be guided by competent counsel at all critical stages of their criminal and juvenile delinquency proceedings, as required by the Fifth, Sixth, and

Fourteenth Amendments, the United States Supreme Court's decisions in *Gideon*, *Cronic*, *Gault*, and their progeny, and all applicable state constitutional and statutory provisions. Plaintiffs ask this Court to issue a judgment declaring Missouri's public defense system unconstitutional, and to order Defendants to take whatever steps are necessary to bring the system into compliance with federal and state law.

## JURISDICTION AND VENUE

19. This Court maintains original subject-matter jurisdiction over this action under Sections 526.030 and 527.010 of the Missouri Revised Statutes and Missouri Rule of Civil Procedure 87.01.

20. Venue is proper in this Court because Governor Eric R. Greitens maintains an office in Cole County, Missouri.

## PARTIES

### A. Plaintiffs

21. Plaintiff SHONDEL CHURCH is a resident of Kansas City, Missouri. Mr. Church was arrested on or about July 19, 2016, and charged with felony theft. Mr. Church was deemed indigent following his arrest and was therefore entitled to representation by MSPD. Mr. Church pled guilty to misdemeanor theft on November 21, 2016, after approximately four months' pre-trial incarceration. He received two years' probation and a suspended six-month jail sentence.

22. Plaintiff RANDALL LEE DALTON was arrested on or about January 30, 2017, and charged with felony possession of a controlled substance. Mr. Dalton was deemed indigent following his arrest, and was therefore entitled to representation by MSPD. Mr. Dalton was briefly released on a furlough from pretrial detention, only to be returned to jail after his

Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM

Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM

alternative placement fell through. He currently remains in pretrial detention awaiting resolution of his criminal case. During this time, he lost his residence in Laurie, Missouri.

23. Plaintiff DORIAN SAMUELS is a resident of Joplin, Missouri. Mr. Samuels was arrested on or about May 30, 2016, and charged with second-degree assault. Mr. Samuels was deemed indigent following his arrest, and was therefore entitled to representation by MSPD. Mr. Samuels remains in pretrial detention on $20,000 cash bond.

24. Plaintiff VIOLA BOWMAN lived in Warsaw, Missouri, before her arrest. Ms. Bowman was arrested on or about January 6, 2015, and charged with first-degree murder and armed criminal action. Ms. Bowman was deemed indigent following her arrest and was therefore entitled to representation by MSPD. Ms. Bowman remains in pretrial detention on $1,000,000 cash bond.

25. Plaintiff BRIAN RICHMAN is a resident of Ozark, Missouri. Mr. Richman was arrested on or about June 26, 2016, and charged with a series of felony drug offenses. Mr. Richman was deemed indigent following his arrest, and was therefore entitled to representation by MSPD. Mr. Richman remains in pretrial detention on a bond of over $100,000.

### B.    Defendants

26. Defendant STATE OF MISSOURI has violated and continues to violate the Missouri and United States Constitutions, which require it to ensure that adequate representation is provided to indigent defendants across the State.

27. Defendant ERIC R. GREITENS is sued in his official capacity as Governor of the State of Missouri. As chief executive of the State, Governor Greitens bears ultimate responsibility for the provision of constitutionally mandated services, including indigent defense, to the people of Missouri. The Governor of Missouri appoints the members of the Missouri State Public

Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM

Defender Commission, with the advice and consent of the Senate. The Governor has claimed the authority to withhold money budgeted to the Missouri State Public Defender's Office and has exercised that claimed authority in recent years, including fiscal year 2017.

28. Defendant MICHAEL BARRETT is sued in his official capacity as Director of the Missouri State Public Defender Office. In his capacity as Director of MSPD, Defendant Barrett maintains responsibility for ensuring the adequate provision of indigent defense services across the State of Missouri.

29. Defendant H. RILEY BOCK is sued in his official capacity as Chair of the Missouri State Public Defender Commission. The Commission governs the Missouri State Public Defender system by, among other things, promulgating rules needed for the administration of the system, monitoring the performance of the Public Defender Office, and receiving complaints from MSPD clients. The Commission also has the authority to appoint and remove MSPD's Director and Deputy Director. Defendant Bock was appointed to the Commission in January 2014 and is currently Chair of the Commission.

30. Defendant CHARLES R. JACKSON is sued in his official capacity as Vice Chair of the Missouri State Public Defender Commission. Defendant Jackson was appointed to the Commission in July 2014 and is currently Vice Chair of the Commission.

31. Defendant CRAIG CHVAL is sued in his official capacity as Secretary of the Missouri State Public Defender Commission. Defendant Chval was appointed to the Commission in July 2014.

32. Defendant A. CRISTA HOGAN is sued in her official capacity as a Member of the Missouri State Public Defender Commission. Defendant Hogan was appointed to the Commission in July 2014.

Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM

## GENERAL FACTUAL ALLEGATIONS

### Indigent Defense in Missouri

33.     The State of Missouri relies almost exclusively on local MSPD offices to provide indigent defense services in all 114 counties and St. Louis City.

34.     MSPD comprises three distinct parts: the Trial Division, subdivided into 33 district offices across the State; the Appellate/Post-Conviction Division, subdivided into six offices; and the Capital Division, subdivided into three offices.  State of Missouri Public Defender Commission Fiscal Year 2016 Annual Report 5, attached as Ex. 1.

35.     MSPD employs approximately 376 attorneys—including approximately 313 in the Trial Division—and approximately 200 administrative staff, support staff, paralegals, and investigators to represent indigent defendants in more than 100,000 cases each year, counting both newly opened cases and cases carried over from previous years.  Ex. 1 at 5.

36.   Since the establishment of MSPD in its current form in 1989, there have been at least 10 independent evaluations of Missouri's public defense system that put state officials on notice that a constitutional crisis was looming.[1]

### Chronic Underfunding of MSPD

37.     MSPD is funded almost exclusively from Missouri's general revenue.  The level of funding provided by the State, however—less than one half of one percent of the State's general

---

[1]  These include assessments conducted in 1993 (The Spangenberg Group); 2005 (The Spangenberg Group); 2006 (Missouri Senate Interim Committee); 2009 (The Spangenberg Group and the Center for Law, Justice, and Society at George Mason University); 2010 (U.S. Department of Justice – Bureau of Justice Statistics); 2010 (American Bar Association); 2013 (National Juvenile Defender Center); 2014 (American Bar Association and RubinBrown); 2015 (U.S. Department of Justice); and 2016 (Sixth Amendment Center).

Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM

revenue—has long been insufficient to allow MSPD to satisfy the State's constitutional

obligation to provide effective assistance of counsel to every indigent criminal defendant.

38.    In fiscal year 2016, for example, the MSPD Trial Division alone handled more than

75,000 cases—which, given the State's abysmal funding for indigent defense, equated to an

average of only $356 per case.  Ex. 1 at 14, 23.

39.    In August 2015, Defendant Michael Barrett wrote to then-Governor Jay Nixon,

pleading for additional funds.  Barrett noted that, "[f]or years, the Missouri State Public

Defender (MSPD) has warned that the rights of poor Missourians are being violated throughout

the state because MSPD's resources are too few and the caseloads too high," but nothing had

been done to rectify the situation.  Letter from M. Barrett to Hon. Nixon, at 1 (Aug. 7, 2015),

attached as Ex. 8.  He pointed to recent reports by the National Juvenile Defender Center (NJDC)

and the ABA making clear that existing funding was "woefully inadequate to guarantee the

constitutional rights of indigent[ ]" defendants in Missouri.  *Id.* at 2.  As such, Barrett requested a

$10 million supplemental budget to provide some of the resources that MSPD urgently needed to

"meet[] its obligations to its citizens under the U.S. and Missouri Constitutions."  *Id.* at 3.  His

request was denied.

40.    In 2016, a study conducted by the Sixth Amendment Center determined that Missouri's

per capita spending on indigent defense is approximately one-third of the average of the 35 states

the Center surveyed.  According to the study, in fiscal year 2015, Missouri spent just $6.20 per

resident for indigent defense services, compared to an average of $18.41 per capita among the

other States in the study.

41.    It is not surprising, then, that Missouri currently ranks 49th among the 50 states in

funding for indigent defense and that "a stark discrepancy" exists between the work that is

necessary to provide the "proper defense of constitutional liberty" and what MSPD is currently able to do with the "limited resources on hand." Ex. 1 at 1, 17.

42.    Moreover, even when the legislature has taken steps to increase funding, these attempts have been thwarted by the Governor.  In 2015, for example, the legislature approved an additional $3.4 million in funding to MSPD.  *Id.* at 7.  Then-Governor Nixon vetoed the funding. *Id.*  The legislature overrode that veto.  *Id.*  Governor Nixon nevertheless withheld the funds from MSPD.  *Id.*

43.    Likewise, when the legislature approved $4.5 million in additional funding for caseload relief in fiscal year 2017, Governor Nixon directed that all but $1 million of those funds be withheld from MSPD.  *Id.*

44.    In January 2017, Missouri's new governor, Defendant Greitens, pledged to restore an additional $2.5 million in the next budget, for a total of $3.5 million, still short of the prior year's allocation of an additional $4.5 million, and far shorter still of the amount necessary to bring Missouri up to the constitutionally required minimum standard for indigent defense.

45.    Upon information and belief, the vast majority of the proposed additional funding, if granted, will go toward hiring private attorneys to represent defendants in cases where MSPD attorneys are conflicted out (for example, in cases involving indigent codefendants).  Such private attorneys are generally paid a low, flat fee.  This means that these attorneys have little incentive to devote sufficient resources to the case, making it unlikely that they will provide constitutionally adequate representation for their indigent clients.  For the vast majority of indigent defendants, who have no codefendants, that funding will barely move the needle in bringing Missouri into compliance with its constitutional obligation to provide counsel.

Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM

Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM

46.   Upon information and belief, it would take an additional $20 million or more per year for MSPD to meet the constitutional floor of providing minimally adequate representation to indigent defendants.

***Excessive Workloads***

47.   The chronic underfunding of and lack of support for MSPD has led to a staffing crisis that means that MSPD attorneys typically operate at more than double the maximum workload capacity that would allow for the consistent provision of constitutionally adequate representation.

48.   Plaintiffs distinguish between caseloads, which refer only to the raw number of cases on a public defender's docket, and workloads, which provide a broader and more accurate view of a public defender's competing responsibilities.  As the U.S. Department of Justice noted in 2013, "caseload limits are no replacement for a careful analysis of a public defender's *workload*, a concept that takes into account all of the factors affecting a public defender's ability to adequately represent clients, such as the complexity of cases on a defender's docket, the defender's skill and experience, the support services available to the defender, and the defender's other duties."  Statement of Interest of the United States at 9, *Wilbur v. City of Mount Vernon*, No. C11-01100, Dkt. 322 (W.D. Wash. Aug. 14, 2013) (emphasis added), attached as Ex. 2.

49.   These extraordinarily high workloads have characterized indigent defense in Missouri for decades.  In 1993, the Missouri State Public Defender Commission sought the assistance of The Spangenberg Group (TSG) in studying the internal operations of the Missouri public defense system, including issues related to budgeting, staffing, and allocation of resources.  TSG's report was damning.  It concluded that MSPD "lack[ed] the necessary resources to provide competent representation," and that "[t]he legal staff needs to be increased as soon as possible."  *A Report*

Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM

*on the Operation of the Missouri State Public Defender*, The Spangenberg Group, 6 (June 1993), attached as Ex. 3.

50. Despite the report's warning of a "near-crisis situation in the [public defender] system," *id.* at 8, the State failed to address the systemic problems plaguing MSPD and thus failed to mitigate the serious harm being inflicted upon indigent defendants in Missouri.

51. More than a decade later, the Missouri Bar Association formed a Public Defender Task Force to work in conjunction with the Missouri State Public Defender Commission in an effort to address those deficiencies. In 2005, the task force commissioned TSG to conduct another study into the state of MSPD.

52. Again, TSG's findings were bleak. TSG's report warned that Missouri's public defender system was on the verge of collapse and that, despite the best efforts of MSPD's attorneys, many public defenders were routinely failing to comply with MSPD's Public Defender Guidelines for Representation and the Missouri Rules of Professional Conduct. *Assessment of the Missouri State Public Defender System*, The Spangenberg Group, 3 (Oct. 26, 2005), attached as Ex. 4.

53. In January 2007, an interim committee of the Missouri Senate released its report on MSPD. The committee found that the caseloads of public defenders were "too large," and recommended that "caseloads . . . be reduced, support staff be increased, the number of public defenders be increased . . . [and] the base salary of public defenders be[ ] increased." *Corrected Report of the Senate Interim Committee on the Missouri State Public Defender System* (Jan. 2007), attached as Ex. 5.

54. In 2009, TSG was again retained by the Missouri Bar Association to assess the State's public defender system. In its 2009 report, TSG concluded that public defender workloads had

CLASS ACTION PETITION FOR INJUNCTIVE AND DECLARATORY RELIEF

only worsened since its 2005 report and, as a result of those workloads, public defenders were failing to (1) conduct prompt interviews of their clients following arrest, (2) spend sufficient time interviewing and counseling their clients, (3) advocate effectively for pretrial release, (4) conduct thorough investigations of their cases, (5) pursue formal and informal discovery, (6) file appropriate and essential pleadings and motions, (7) conduct necessary legal research, and (8) prepare adequately for pretrial hearings, trial, and sentencing. *Assessment of the Missouri State Public Defender System*, The Spangenberg Group (Oct. 2009), attached as Ex. 6.

55.   In other words, MSPD lawyers—even the best among them—did not have time to perform even the most basic representational duties for their clients.  Despite this clear indication that the State was still falling short of its constitutional obligations, Missouri again failed to take the necessary action to remedy the situation.

56.   In June 2014, the ABA, in collaboration with the prominent accounting firm RubinBrown LLP, released the most comprehensive study to date of Missouri's public defender system.  The study included an in-depth assessment of public defender workloads for both adult and juvenile matters.  *See The Missouri Project: A Study of the Missouri Public Defender System and Attorney Workload Standards* (June 2014), attached as Ex. 7.

57.   ABA and RubinBrown researchers calculated the minimum number of hours (excluding court time, travel, and administrative tasks) that an attorney would need to devote to a range of different types of cases in order to provide constitutionally adequate representation.  The study determined that a constitutionally adequate attorney would need to spend a minimum of 106.6 hours on a non-capital murder/homicide case; at least 47.6 hours on an A/B felony; at least 25.0 hours on a C/D felony; at least 63.8 hours on a felony sex offense; at least 11.7 hours on a

Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM

misdemeanor; at least 9.8 hours on a probation violation; and at least 19.5 hours on a juvenile case. Ex. 7 at 6.

58.    But because MSPD attorneys are forced to take on workloads well above what any attorney could reasonably handle, those attorneys are unable to spend anywhere near the requisite number of hours on each case. In 2015, for example, unreasonably high workloads meant that MSPD attorneys were able to spend, on average, only 84.5 hours on each non-capital murder/homicide case; 8.7 hours on each A/B felony; 4.4 hours on each C/D felony; 25.6 hours on each felony sex offense; 2.3 hours on each misdemeanor; 1.4 hours on each probation violation; and 4.6 hours on each juvenile case. Ex. 7 at 15.

59.    Thus, in 2015, under the ABA's empirical analysis, "attorneys in the St. Louis County office [were] at 265% workload capacity," and throughout the state, MSPD attorneys were similarly overworked: "239% capacity for the Springfield office, 254% for Jefferson City, and 254% for Farmington, to name just a few." Ex. 8 at 1.

60.    As demonstrated by the average case-related hours recorded by MSPD attorneys in 2015, MSPD attorneys are forced to triage their cases, paying especially short shrift to cases in which defendants face what their attorneys deem to be relatively less serious charges. Thus, while MSPD attorneys were able to spend the minimum of 106.6 hours in just one-fifth of the non-capital murder/homicide cases to which they were assigned in 2015, the numbers were far worse for non-homicide felonies. That same year, MSPD Trial Division attorneys were able to devote the minimum required hours to only 2.4% of all A/B felony cases (or 97 out of 4,127 total A/B felony cases) and 1.4% of C/D felony cases (or 311 out of 21,491 total C/D felony cases). Letter from J. Shipma to J. Williamson, at 2-4 (July 25, 2016), attached as Ex. 10.

Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM

61.    With so little time to spend on each case, it is virtually impossible for MSPD attorneys to provide even basic elements of constitutionally effective assistance.  And with their public defenders overextended by extremely heavy workloads, indigent defendants like Plaintiffs often appear before the court unrepresented during initial hearings, including those in which bond is set; cannot communicate effectively or confidentially with their attorneys; are forced to make important decisions about their cases—including whether to enter into a plea agreement— without the benefit of advice from an attorney who is fully apprised of the relevant facts and the strength of the State's case; do not receive the benefit of pretrial motions, including motions to suppress illegally obtained evidence; and go to trial without their attorney having thoroughly reviewed the available discovery, taken necessary depositions, or obtained all relevant evidence, including any exculpatory evidence.

62.    In February 2017, Defendant Michael Barrett testified before the state legislature that MSPD would need 333 more lawyers to provide even minimally adequate representation to indigent defendants.

63.    The State has ignored the recommendations put forward by study after study over the past decade.  Many public defenders have felt compelled to resign rather than continue to work in these untenable conditions.  This has only further exacerbated an already desperate situation. And while MSPD would still be grossly understaffed if it were able to fill all of its recent attrition-related vacancies, lack of adequate funding has prevented it from doing even that.

64.    In 2012, the Missouri Supreme Court, in *State ex rel. Missouri Public Defender Commission v. Waters*, 370 S.W.3d 592 (Mo. 2012), upheld the validity of a rule promulgated by the Missouri Public Defender Commission that "permit[ted] a district defender office to decline

additional appointments when it ha[d] been certified as being on limited availability after exceeding its caseload capacity for at least three consecutive calendar months." *Id.* at 597.

65.   Upon information and belief, in the immediate aftermath of *Waters*, public defenders who attempted to turn away cases faced tremendous resistance from prosecutors, judges, and legislators.  In some circuits, MSPD agreed not to assign attorneys to cases where prosecutors promised that defendants would face no jail time, only to find that these no-jail-time agreements were routinely ignored.  In other circuits, cases that were turned away were assigned to non-MSPD attorneys with no criminal defense experience who were not compensated for their time.  For example, in Boone County, approximately 100 cases were assigned to attorneys who worked for state agencies or had ties to other state officials, putting additional political pressure on MSPD to stop turning away cases.  None of those attorneys specialized in criminal law.  These attorneys lacked the resources, experience, or wherewithal to represent clients zealously.

66.   On information and belief, MSPD attorneys in nearly all circuits faced disapproval for even attempting to turn away cases.  The then-head of MSPD was told that if local offices continued to turn away cases, the legislature would pass a bill to privatize the entire system.  And within months of the *Waters* decision, the legislature passed Missouri Revised Statutes § 600.062, which prevents the director of MSPD or the Missouri State Public Defender Commission from "limit[ing] the availability of a district office or any division director, district defender, deputy district defender, or assistant public defender to accept cases based on a determination that the office has exceeded a caseload standard."  Under section 600.062, MSPD "may not refuse to provide representation" unless it receives "prior approval from a court of competent jurisdiction."

Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM

67.   Upon information and belief, since the legislature's enactment of section 600.062, no MSPD office has refused cases in any consistent or systematic way.  MSPD attorneys are understandably worried about what will happen to their clients if they are turned away, as Defendants have put in place no plan for providing meaningful representation to indigent defendants turned away by MSPD.  Moreover, some MSPD offices fear reprisals if they turn away cases, including further budget cuts.

***Lack of Representation at Critical Stages***

68.   In 2008, the United States Supreme Court, in *Rothgery v. Gillespie County, Texas*, reaffirmed that the right to counsel attaches when "formal judicial proceedings have begun." 554 U.S. 191, 211.  For a person who is arrested, the beginning of formal judicial proceedings is at the "criminal defendant's initial appearance before a judicial officer, where he learns the charge against him and his liberty is subject to restriction."  *Id.* at 213.  "Once attachment occurs, the accused at least is entitled to the presence of appointed counsel during any 'critical stage' of the post-attachment proceedings."  *Id.* at 212 (footnote omitted).

69.   In Missouri, however, attorneys are routinely unavailable to represent each eligible indigent defendant at every critical stage of the criminal process—including at their arraignment, where bond is determined—resulting in the actual denial of counsel to indigent defendants across the State.

70.   Public defenders routinely do not meet their clients until several weeks after the client's arrest and arraignment.  As a result, bond determinations, which normally occur at the defendant's initial appearance before the court, are almost always made without the benefit of advocacy from counsel.  Without that advocacy, bond may be set based on inappropriate factors, or the court may make its bond determination without the benefit of facts critical to such a

Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM

determination. In many cases, overworked public defenders waive the preliminary hearing altogether, sometimes without discussing the decision with their client.

71. Unrepresented indigent defendants are therefore often forced to remain in jail simply because they are unable to advocate effectively on their own for release on their own recognizance or a reasonable reduction in their bond amount.

72. Moreover, the United States Supreme Court has ruled that an attorney must be present at any post-arraignment lineup because such a "confrontation compelled by the State between the accused and the victim or witnesses to a crime to elicit identification evidence is peculiarly riddled with innumerable dangers and variable factors which might seriously, even crucially, derogate from a fair trial." *United States v. Wade*, 388 U.S. 218, 228 (1967). But defendants in Missouri are routinely placed in lineups after arraignment without the benefit of counsel, even though the prejudice that results from an improper lineup cannot be cured later in the criminal process. *See id.* at 236-37.

***Unnecessary Delays and Prolonged Pretrial Detention***

73. Excessively high workloads also result in unnecessary and needlessly prolonged detention prior to trial.

74. As discussed *supra*, because indigent defendants are often unrepresented at critical bond determinations, they may remain in jail for extended periods of time, unable to effectively advocate for themselves at their bond determinations.

75. In addition, because MSPD attorneys' workloads require them to "triage" cases, they are often forced to seek multiple or extended continuances in cases they deem less urgent, or when they need additional time to prepare adequately for more serious cases. Because of these delays, irrespective of the merits of the case against them, defendants are often forced to choose

Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM

between either consenting to the continuances, thereby waiving their right to a speedy trial and remaining in jail for an extended period of time, or taking their chances at trial with an attorney who has had little or no time to prepare.

***Guilty Pleas Are Not Fully Knowing or Voluntary***

76.   The vast majority of defendants in Missouri plead guilty.  Many of these are MSPD clients, but MSPD attorneys are unable to ensure that those who plead guilty do so knowingly and voluntarily.

77.   Excessive pretrial detention—often due to public defenders' inability to represent defendants at bond hearings or their need for repeat continuances—put virtually unbearable pressure on many defendants to plead guilty merely to get out of jail and avoid losing a job or their housing, or to resume meaningful contact with their children and families.

78.   Many other defendants, like Plaintiff Church, plead guilty in spite of a valid and potentially effective defense because a public defender is unable to adequately evaluate or investigate that defense, or simply because it will take months or even years for their public defender to be ready for trial.

79.   Many MSPD clients who plead guilty do so without a full understanding of the strengths and weaknesses of their case, and absent counseling regarding the serious consequences that may attend even a misdemeanor plea.  In particular, public defenders are unable to advise their clients of the immigration consequences of their plea because MSPD does not have the resources to provide any training in the intersection of criminal law and immigration law.

Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM

***Lack of Investigation***

80.   The ability to thoroughly prepare for a case is crucial to MSPD attorneys' ability to effectively advocate on their clients' behalf; yet MSPD attorneys do not have the time or resources to investigate adequately the charges against their clients.

81.   Because of the lack of sufficient resources, most MSPD attorneys do not conduct appropriate discovery and are rarely able to analyze the discovery they do receive early enough in the proceedings to make important investigative decisions, including which key witnesses to depose and whether or not an expert witness is necessary for the client's defense.

82.   Defendants' inadequate funding of MSPD means that investigators are not staffed on every case—or even every serious felony—to which an office is assigned.  Rather, individual defenders, regardless of their level of experience, are asked to use their discretion in selecting which cases will be formally investigated and which will not.

83.   Even when an attorney determines that investigation is necessary, investigators often do not have time to review discovery or gather other background information on the cases that they do investigate.  And given their overwhelming workloads, the attorneys themselves have little time to conduct any in-depth investigation on their own.

84.   MSPD attorneys also frequently do not have the time to identify experts or conduct expert consultations.  Even when MSPD attorneys identify the need for an expert, they are often unable to secure the resources necessary to retain an appropriate expert.  MSPD's grossly inadequate budget is supposed to cover not only attorney and support staff salaries but also the cost of experts, investigations, and any other costs associated with a case.  Ex. 1 at 9.  Instead, it cannot even cover salaries for a sufficient number of attorneys, let alone adequately cover the other costs associated with a case.

Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM

85.   Time constraints also mean attorneys are often unable to meet with witnesses or take other important investigatory steps to prepare adequately for trial or to negotiate a more favorable plea bargain.  With no option but to triage and cut corners, MSPD attorneys are forced to make strategic decisions without a complete understanding of the nature and strength of the case against their clients.

86.   For example, many defenders take depositions in just a small fraction of their cases, thus leaving on the table the valuable information that is likely to be gleaned from such depositions—information that, at the very least, would help counsel and their clients better evaluate the strengths and weaknesses of the State's case, as well as the reasonableness of any plea offer from the government.

87.   MSPD attorneys are rarely able to file suppression motions because they lack the investigative resources to identify unconstitutional police conduct, the time to review pertinent discovery, and the resources and experience to conduct appropriate legal research.  As a result, evidence obtained in violation of the Fourth, Fifth, and Sixth Amendments can be used against defendants at trial or to extract guilty pleas.

88.   At sentencing, because MSPD attorneys are unable to gather or prepare mitigating evidence, their clients often receive harsher sentences than might be warranted.

*Lack of Attorney-Client Communication*

89.   A defendant's right to consult with his attorney is an integral component of the right to assistance of counsel.  *See Geders v. United States*, 425 U.S. 80, 88-91 (1976).  But MSPD attorneys' excessive workloads mean that they are unable to meet with clients on a regular basis. In some instances, MSPD attorneys are only able to have a substantive meeting with a client for the first time a few weeks before trial.

90.   Confidential, two-way communication between the accused and his attorney is a critical predicate for counsel's meaningful participation in the adversarial process, as well as the indigent defendant's meaningful participation in his own defense.  But because MSPD attorneys are often too busy to adequately consult with clients, they are simply unable to provide that meaningful assistance.

91.   Without their clients' input, it is impossible for MSPD attorneys to investigate their clients' cases adequately or properly prepare for trial, plea negotiations, or sentencing.  Nor is it possible, under such circumstances, for indigent defendants to participate meaningfully in their own defense.

92.   Moreover, many defendants are ill-equipped to understand the inner workings of the criminal justice system without a lawyer's guidance.  The principles of due process and individual dignity are violated when an individual is deprived of life or liberty by means of a process he does not adequately comprehend.  *See Faretta v. California*, 422 U.S. 806, 834 (1975) (noting society's interest in avoiding a criminal justice system that leads a defendant "to believe that the law contrives against him.").  The lack of resources provided to MSPD leaves many defendants without this critical guide.

***Lack of Training and Supervision***

93.   Given the overwhelming volume of work faced by MSPD attorneys, even the most experienced public defender is unable to engage in the basic requirements of effective representation.  But MSPD's high rate of attrition—a turnover rate of almost 15 percent in 2016, Ex. 1 at 8, due to low salaries and crushingly high workloads—means that few experienced public defenders continue to work at MSPD for any extended period of time.  On those occasions where MSPD can even afford to hire new attorneys to replace those who have left, those

Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM

positions are often filled by recent law school graduates with little to no experience in criminal law, juvenile law, or trial practice. Indeed, in some districts the large majority of defenders are recent law school graduates or lawyers with little, if any, experience with criminal defense.

94.    To make matters worse, time and resource constraints mean that inexperienced junior attorneys are unable to receive the critical training they need to do their jobs effectively. For example, even though the Supreme Court has made clear that counseling regarding the immigration consequences of a plea or conviction is an integral part of the right to counsel, *see Padilla v. Kentucky*, 559 U.S. 356 (2010), MSPD attorneys receive no training in immigration law and its potential implications for their clients.

95.    Due to the intolerable workloads faced by MSPD attorneys and the lack of sufficient staff to meet those workloads, supervising attorneys in district offices are forced to take on an active docket of cases in addition to their administrative and supervisory responsibilities, leaving those supervisors unable to provide adequate mentoring and oversight to the inexperienced attorneys under their supervision.

96.    The combination of lack of experience and lack of training, coupled with the enormous volume of cases that MSPD attorneys are forced to take on, leaves defenders ill-equipped to perform even the most basic tasks necessary to provide adequate representation.

*Juvenile Defense*

97.    Like indigent adult criminal defendants, minors in juvenile delinquency proceedings are entitled to meaningful representation. *See In re Gault*, 387 U.S. 1 (1967).

98.    Following the Supreme Court's recognition of the right to counsel for juvenile defendants in *Gault*, the Missouri legislature amended the Juvenile Code to provide children with a statutory right to representation in juvenile court proceedings. Ultimately, Missouri codified

this right to representation in Missouri Revised Statutes § 211.211, which provides indigent youth with the right to court-appointed counsel "prior to the filing of a petition" and "for all stages of the proceedings" thereafter.

99.    The Missouri Supreme Court also promulgated specialized Rules of Practice and Procedure in Juvenile Courts and Family Court Divisions.  These rules reflected the notion that, because children are particularly vulnerable, they need representation throughout all stages of the juvenile process. *See, e.g.*, Mo. R. Juv. Pro. 116.01 (effective through 2010).

100.  In 1997, Missouri created a Youth Advocacy Unit within MSPD to provide the constitutionally required zealous representation for court-involved minors in St. Louis City and St. Louis County.  *Missouri: Justice Rationed,* National Juvenile Defender Center, at 25 (Spring 2013), attached as Ex. 9.  A similar unit, based in Kansas City, began serving several other counties a few years later.  The Youth Advocacy Unit was staffed by public defenders well-trained in adolescent development and other issues unique to juvenile prosecutions, including child interrogations and the law governing certifying juveniles as adults.  *Id.*, at 36.

101.  In 2007, however, due to funding cuts, the Youth Advocacy Unit was dismantled. Juvenile cases in St. Louis City and St. Louis County, as well as cases previously handled by the Kansas City Youth Advocacy Unit, were lumped in with MSPD's general adult workload.  Still more juveniles therefore joined the ranks of defendants to whom Missouri has not met its constitutional obligations as a result of its overextended public defenders.

102.  In 2013, the National Juvenile Defender Center (NJDC) deployed a dozen experts in to Missouri to study its juvenile court system and assess the extent and quality of representation being provided to children in the State.

Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM

103. The NJDC report concluded that, after "endur[ing] at least two decades of crushing caseloads and inadequate resources to provide its mandated services," Missouri's juvenile indigent defense system is "broken" and is improperly "forced to ration services." Ex. 9 at 7.

104. The NJDC report found that juvenile respondents throughout the State have systematically been denied counsel and have therefore been left on their own to negotiate the juvenile court process. The report concluded that approximately 60 percent of court-involved children in Missouri do not receive appointed counsel. Ex. 9 at 35.

105. For example, in Fiscal Year 2012, the Missouri Supreme Court reported a total of 4,631 new juvenile delinquency and status offense petitions statewide. Ex. 9 at 34. But MSPD attorneys were assigned only 1,923 of those cases, and only 24 cases were contracted out to private counsel. As its funding has declined, the number of cases MSPD has taken on has halved, from 3,380 juvenile cases in Fiscal Year 2007 to only 1,677 juvenile cases in Fiscal Year 2016. Ex. 1 at 6.

106. The NJDC report further concluded that even when Missouri children are represented by public defenders, they receive only "rationed" assistance of counsel. Ex. 9, at 55. For example, the Report noted that detention hearings are largely overlooked by court actors as a critical stage in the proceedings. Like their adult counterparts, youths accused of crimes often go without any representation during their first hearings before the court—hearings at which the decision to detain a respondent is made and thus at which the respondent's liberty is at stake.

107. In addition, the NJDC report found that juveniles' public defenders frequently were unable to adequately investigate cases prior to adjudication, file motions to challenge charges or evidence, develop meaningful dispositional advocacy presentations, or continue to represent their

Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM

Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM

clients after disposition during probation review hearings or in seeking an appeal. *See generally id.*

108. In 2015, following an in-depth investigation of the St. Louis County Family Court system, the DOJ determined that the constitutional rights of indigent children were routinely being violated in that county's juvenile delinquency proceedings. *Investigation of the St. Louis County Family Court, St. Louis, Missouri*, U.S. Dep't of Justice Civil Rights Division (July 31, 2015), attached as Ex. 11. The report found that these violations were due at least in part to "the staggering caseload of the sole public defender assigned to handle all indigent juvenile delinquency cases" in St. Louis County. *Id.* at 2.

109. In 2014, that lone defender handled nearly 400 juvenile cases. *Id.* at 9. Given these overwhelming numbers, it is not surprising that DOJ further found that during the same period the public defender's office in St. Louis County appeared to engage in little investigation, resolved 277 of the cases but took only three to trial, filed just seven pretrial motions, never challenged probable cause during detention hearings, never called a defense witness other than, in one instance, the child respondent, and did not hire a single expert witness. *Id.* at 15-18.

110. On December 14, 2016, the DOJ's investigative work culminated in a Memorandum of Agreement between the DOJ and the St. Louis County Family Court. The Agreement sought to address in St. Louis some of the very deficiencies that are also plaguing juvenile respondents in counties across the State. Among other things, the Agreement requires prompt appointment of counsel, particularly for children who are detained; specific and ongoing training for juvenile defenders "addressing matters of best practices and procedures for juvenile delinquency defense"; and an assurance that the St. Louis County Family Court will "secure the equivalent of at least two publicly-funded full-time juvenile defense counsel for the Court's delinquency

Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM

cases." Memorandum of Agreement Between DOJ and St. Louis County Family Court, at 6-7 (Dec. 14, 2016), attached as Ex. 12.

111. In addition, the Agreement requires the St. Louis County Family Court to monitor juvenile defender caseloads; make efforts to ensure that juveniles accused of crimes receive representation at their initial detention hearing; and provide ample notice and opportunity for attorney-client meetings to be held in advance of initial detention hearings. *Id.* at 9. Even with this Agreement in place, however, juveniles in St. Louis County are still not receiving the constitutional minimum of adequate representation.

112. St. Louis County is not an outlier. The same issues that led the DOJ to conclude that the constitutional rights of indigent juvenile respondents were being violated in St. Louis County are currently occurring in juvenile courts across the State.

113. In some instances, this results in MSPD attorneys without any training whatsoever in juvenile defense handling juvenile delinquency matters of all kinds, including those involving complex, juvenile-specific legal issues.

114. Children who are certified to adult court frequently fall into a no-representation zone for several weeks while the juvenile court public defender ends representation and the child must seek adult court representation anew. This leaves these children—who are housed in adult jails—vulnerable to interrogation, inadvertent or inappropriate waivers of their rights, and other dangers that adequate representation would mitigate.

115. Accordingly, 50 years after *Gault*, indigent children who have been charged with crimes in Missouri are being deprived of meaningful legal representation in violation of the state and federal constitutions, as well as state statutory law.

CLASS ACTION PETITION FOR INJUNCTIVE AND DECLARATORY RELIEF

## HARM TO NAMED PLAINTIFFS

116. All of the above-mentioned issues have combined to cause tremendous harm to Plaintiffs and to the Class as a whole.

***Shondel Church***

117. On or about July 19, 2016, Plaintiff Shondel Church was arrested in Kansas City for allegedly stealing a generator and tool box from the property of his stepmother, Ms. Sharon Church, who resides in Lafayette County.

118. Mr. Church was subsequently charged with Class C felony theft, under R.S. Mo. 570.030, which carries a maximum sentence of up to seven years in prison.

119. On or about July 22, 2016, Mr. Church was transferred to the Lafayette County Jail. Mr. Church did not see a judge or speak to a lawyer before his transfer.

120. Following his arrest and transfer to Lafayette County, Mr. Church appeared before the court on two occasions without an attorney—first, for his arraignment on July 27, 2016, during which his bond was set at $5,000 cash or surety, and second, for a subsequent hearing on August 3, 2016.

121. Because Mr. Church was without counsel at his July 27, 2016 hearing, had no legal training of his own, and received no explanation from the court or prosecutor as to how the bond process worked, he was unable to argue for a bond reduction at his arraignment. Because Mr. Church could not afford to pay his bond, he remained in custody following his arraignment.

122. At his July 27, 2016 hearing, Mr. Church was provided a form to seek representation from the public defender. He filled it out and returned it to a guard at the Lafayette County Jail later that same day.

Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM

123. At his hearing on August 3, 2016, while he was still without counsel, Mr. Church was informed that he was eligible for a public defender. His case was then continued again to September 7, 2016.

124. On August 8, 2016, nearly a month after Mr. Church was arrested, Assistant Public Defender Matthew Gass first entered his appearance on behalf of Mr. Church.

125. Mr. Church did not meet his attorney, Mr. Gass, until his September 7, 2016 hearing. Mr. Church did not have a conversation with Mr. Gass about his case until after the hearing, when Mr. Gass visited Mr. Church at the Lafayette County Jail on September 8, 2016. By that time, Mr. Church had already spent more than 40 days in custody without ever communicating with an attorney.

126. During their meeting, Mr. Gass indicated to Mr. Church that he was frustrated with the fact that, as a public defender, he was unable to do his job effectively because of his overwhelming workload. Mr. Gass indicated that Lafayette County had a workload that required at least three or four public defenders, and Mr. Gass was currently the only attorney serving that county. Mr. Gass informed Mr. Church that he might not continue working as a public defender for much longer because of these impossible working conditions.

127. At their meeting on September 8, 2016, Mr. Gass told Mr. Church that, after reviewing Mr. Church's file, Mr. Gass believed he could win his case, but that fighting the charges could mean Mr. Church would spend another six months in jail awaiting trial, since Mr. Gass would need additional time to investigate the case and prepare for trial. Mr. Gass also told Mr. Church that, instead of going to trial, he could likely get a misdemeanor plea deal and Mr. Church could be released and return to his family in a much shorter amount of time. At the end of the meeting,

and particularly because he had already spent nearly six weeks in custody, Mr. Church concluded that entering a plea was the best option for him and his family at the time.

128. Mr. Church lives with his wife and four children. At the time of his arrest and incarceration in July 2016, his wife was not working and he was the primary breadwinner for his family.

129. Mr. Church also asked his attorney to file a motion to reduce his bond amount. Mr. Gass indicated that he would look into a bond reduction, but no such motion was ever filed. As a result, Mr. Church remained incarcerated.

130. Soon after the first meeting between Mr. Gass and Mr. Church, Mr. Gass resigned from the public defender's office and did not speak with Mr. Church before resigning. Though Mr. Gass told Mr. Church he would resolve the case before leaving, Mr. Church never spoke to Mr. Gass again after their first and only meeting.

131. On October 5, 2016, Mr. Church was transported to his next pretrial hearing, at which he expected to see Mr. Gass. Instead, because Mr. Gass had resigned, Mr. Church was represented by a new public defender, Max Mitchell. Mr. Mitchell never entered a formal appearance on behalf of Mr. Church and appeared in court on his behalf only at the October 5, 2016 hearing. Mr. Church was not given the opportunity to discuss the case—or communicate in any meaningful way at all—with Mr. Mitchell.

132. Although Mr. Mitchell did not speak to Mr. Church at the October 5, 2016 hearing, Mr. Church did hand Mr. Mitchell a list of the various reasons he believed that the State's case was without merit. Mr. Mitchell accepted the list from Mr. Church, but did not discuss it with him. The prosecutor immediately requested that a preliminary hearing be set, and Mr. Mitchell turned his attention to the next client. A preliminary hearing was set for November 16, 2016.

Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM

Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM

133.  Before the October 5, 2016 hearing, Mr. Church believed he was going to enter a plea and be released that day.  Instead, Mr. Mitchell did not speak to Mr. Church at all, a preliminary hearing was set, and Mr. Church was returned to jail without further explanation from his attorney or the court.

134.  On October 11, 2016, Mr. Gass filed a motion to withdraw, and Bradley Taylor entered his appearance as Mr. Church's newly assigned public defender.

135.  Mr. Taylor did not meet with Mr. Church before his next hearing.  In fact, Mr. Church never had a conversation longer than 30 seconds with Mr. Taylor during the course of Mr. Taylor's representation of Mr. Church.  Mr. Taylor never visited Mr. Church in jail and spoke to him only briefly in court directly before his hearings.

136.  On November 16, 2016, Mr. Church appeared for his preliminary hearing.  Mr. Taylor appeared on his behalf at the hearing but spoke to Mr. Church only briefly before the hearing to inform him that he would try to talk to Mr. Church's former attorney (Mr. Gass) about his case.

137.  Also at the November 16, 2016 hearing, Mr. Church was able to speak directly to the judge while his lawyer was speaking with the prosecutor.  Mr. Church informed the judge that he had now spent over 100 days in jail on a charge that he believed should never have been filed.  After Mr. Church's uncounseled conversation with the judge, the case was transferred to a different court and a hearing was set for the following week, on November 21, 2016.

138.  November 21, 2016, was just a few days before Thanksgiving, and Mr. Church was worried that he would remain in jail through Thanksgiving and perhaps Christmas if he did not accept a plea deal.

139.  Therefore, on November 21, 2016, after spending five months in pretrial detention, and after losing hope that his case would be appropriately investigated or litigated in a timely

Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM

fashion, Mr. Church pled guilty to misdemeanor theft and was sentenced to two years of probation, with a suspended jail term of six months. While this plea was entered approximately ten weeks after Mr. Church's meeting with Mr. Gass on September 8, 2016, it is the same deal that Mr. Gass indicated would be available to Mr. Church in September and that Mr. Church thought he was going to enter at his October 5, 2016 hearing.

140. Although Mr. Church has been released, he remains on probation, with a six-month suspended jail sentence that will be executed should he violate the terms of his probation. Mr. Church understands his probation terms to include repaying a bill of $2,605.94 to cover the cost of his pretrial detention.

*Randall Lee Dalton*

141. Until January 2017, Randall Lee Dalton, a physically disabled, mentally impaired man, was living at a nursing home in Laurie, Missouri. He had been there for several months under the supervision of staff and medical professionals, who provided care and counseling and prescribed medication to ensure Mr. Dalton's stability and daily functioning.

142. On January 30, 2017, law enforcement officials entered Mr. Dalton's nursing home facility to investigate the alleged overdose of another resident. While there, they allegedly found Mr. Dalton in possession of a single pill of Lorazepam (Ativan), arrested him, forcibly removed him from the facility, transported him to the Morgan County Detention Center, and charged him with felony possession of a controlled substance, a D felony.

143. In processing Mr. Dalton, law enforcement learned that Mr. Dalton had an outstanding warrant for failing to appear in court after allegedly passing a bad check for $73.48 at the Jiffy Stop Food Mart in May 2016.

Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM

144.   In addition, after his arrest, Mr. Dalton—who had been convicted of misdemeanor sexual contact in 1994 and initially granted a suspended imposition of sentence—was further charged on February 1, 2017, with the Class D felony of failing to register as a sex offender within his county of residence.

145.   On January 31, 2017, although Mr. Dalton had not yet seen a judge or a public defender, an order was entered holding him on $30,000 bond in each of his felony matters. While incarcerated, he was unable to access his medication, and he was both confused and scared.

146.  On February 7, 2017, an attorney from the Public Defender's Office ultimately entered her appearance on behalf of Mr. Dalton.  She appeared in court on his behalf on February 15, 2017, waived his appearance, and reset his case until March.  Mr. Dalton was entirely unaware of this court date.

147.   Following Mr. Dalton's arrest, his sister, a retired Juvenile Court probation officer, also tried repeatedly to contact Mr. Dalton's public defender.  She was desperate to learn about his case and to share information with the public defender regarding Mr. Dalton's limited functioning, ongoing mental health issues, and immediate need for medication.

148.   After leaving many messages that went unreturned by Mr. Dalton's public defender, his sister found a new residential treatment program on her own that would accept her brother as an alternative to confinement.  Mr. Dalton's sister also contacted the prosecutor's office directly to advocate on Mr. Dalton's behalf.

149. In March 2017, Mr. Dalton was finally brought to court for the first time.  It was also the first time he saw his public defender, who did not speak to him until he was brought into the

Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM

court room.  Prior to his delivery to court for his March court date, Mr. Dalton had not been contacted by counsel to inform him of the court date.

150.  In court, Mr. Dalton's assigned public defender did not seem familiar with his case. Instead, Mr. Dalton's sister asked to approach the bench to make a bond application for him, which was ultimately joined by the public defender and prosecutor.

151.  Without any meaningful assistance from the public defender system, Mr. Dalton's family was able to obtain a furlough on his behalf enabling him to enter a residential treatment facility while his case was pending.  Unfortunately, Mr. Dalton's placement at the residential treatment facility subsequently fell through and he was returned to jail, where he currently awaits resolution of his case.

***Dorian Samuels***

152.  Plaintiff Dorian Samuels was arrested in Joplin, Missouri, on or about May 30, 2016, and charged with first-degree assault, exposing him to as much as 30 years in prison if convicted. Upon arrest, Mr. Samuels was transported to the Joplin City Jail, where he was held in custody for the next two days.

153.  Shortly after arriving at the Joplin City Jail, Mr. Samuels was interviewed, without counsel present, by Detective Justin Ellison of the Joplin Police Department.  According to a police report, Detective Ellison read Mr. Samuels his *Miranda* rights and presented him with a corresponding written waiver form, which Mr. Samuels allegedly signed prior to the interview. Mr. Samuels was intoxicated at the time the alleged waiver was signed and has no recollection of this initial interview by Detective Ellison.  As such, Mr. Samuels was unable to provide a voluntary, knowing, and intelligent waiver of his right to an attorney or his right to remain silent.

Nevertheless, upon information and belief, Mr. Samuels subsequently spoke with Detective Ellison in detail regarding the incident that ultimately lead to his arrest.

154.  Mr. Samuels was transferred from the Joplin City Jail to the Jasper County Jail on or about June 1, 2016.

155.  On June 2, 2016, Mr. Samuels appeared before the court by video from the Jasper County Jail, without counsel, and was informed that his bond had been set at $20,000 cash. Without the guiding hand of counsel, Mr. Samuels was unable to advocate effectively for a reduction in his bond or address the *Miranda* violation that occurred when he was improperly interrogated.  Since he was unable to afford bond, Mr. Samuels has remained in pretrial detention since his arrest more than nine months ago.

156.  Mr. Samuels' case was initially assigned to Assistant Public Defender Craig Lowe, who entered his appearance in the case on June 8, 2016, and was scheduled to represent Mr. Samuels at his subsequent preliminary hearing on June 15, 2016. Prior to the June 15 court proceeding, Mr. Lowe visited Mr. Samuels at the Jasper County Jail and met with him for approximately 10 minutes to discuss the hearing set for later that day.  Ultimately, the preliminary hearing was rescheduled for the following week.

157.  Upon information and belief, between June 8, 2016, when Mr. Lowe filed his notice of appearance, and June 22, 2016, Mr. Samuels' attorney did not engage in any investigation and failed to file any pretrial motions—including any motion for bond reduction or motion for discovery—and spoke with Mr. Samuels privately on just one occasion, during his visit to the jail on June 15, 2016.

158.  On June 22, 2016, Mr. Lowe withdrew from the case at the request of Mr. Samuels, who expressed frustration about his inability to communicate in any meaningful way with Mr.

Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM

Lowe, as well as his lawyer's failure to begin investigating the case. The court granted Mr. Lowe's request to withdraw and continued the proceedings to the following week, thereby further delaying Mr. Samuels' preliminary hearing.

159. Mr. Samuels was subsequently assigned a new public defender, J.D. Hatcher, who he met for the first time in court on June 29, 2016, shortly before his preliminary hearing was scheduled to begin. Because Mr. Hatcher had not had time to meet with Mr. Samuels, or otherwise prepare, in advance of the hearing, he sought a continuance from the court. That request was denied, however, and the hearing went forward.

160. During Mr. Samuels' preliminary hearing, the State called just two witnesses to testify against him: the alleged victim and Detective Ellison, who had interviewed Mr. Samuels—in the absence of counsel and while Mr. Samuels was intoxicated—at the Joplin City Jail soon after his arrest. Mr. Hatcher failed to question Detective Ellison regarding the nature, scope, and propriety of the interview at the jail, because, upon information and belief, he had been unable to prepare for the hearing in any meaningful way. Following the testimony, the court found probable cause to proceed with felony charges against Mr. Samuels and bound his case over to circuit court.

161. On August 1, 2016, Mr. Samuels appeared by video and was re-arraigned—this time with his public defender, Mr. Hatcher, present in the courtroom. Due at least in part to the fact that he was unable to meet with Mr. Samuels at any point between his preliminary hearing and re-arraignment, Mr. Hatcher was unprepared to advocate for any bond reduction on his client's behalf.

162. Since he first met Mr. Hatcher on June 29, 2016, Mr. Samuels saw Mr. Hatcher on only four occasions, all of which were immediately *following* pretrial court proceedings on October

Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM

Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM

17, 2016; November 21, 2016; December 5, 2016; and January 9, 2017. None of those meetings lasted more than a few minutes. On at least three of those occasions, Mr. Hatcher appeared before the court alone and requested a continuance, while Mr. Samuels remained in a holding cell near the courtroom. Mr. Hatcher did not meet with Mr. Samuels prior to any of these hearings to discuss his plan for the hearing or request Mr. Samuels's permission to seek a continuance. In fact, Mr. Hatcher did not even notify Mr. Samuels that he planned to seek a continuance at these hearings. Instead, following each of those proceedings, Mr. Hatcher informed Mr. Samuels that the case had been continued, but engaged in no substantive discussion about the status of the case or his investigation of the facts surrounding Mr. Samuels' arrest.

163. Mr. Hatcher never visited Mr. Samuels in jail, nor did he ever speak with him by phone. Upon information and belief, this was due to Mr. Hatcher's overwhelming workload and competing responsibilities to other clients.

164. In his most recent motion for continuance, dated January 6, 2017, less than a week before Mr. Samuels' scheduled trial date, Mr. Hatcher stated that, since he began representing Mr. Samuels on June 29, 2016, "the number and effectiveness of attorney-client communications has been limited for multiple reasons that are outside of Mr. Samuels' control." Motion for Continuance (Jan. 6, 2017), attached as Ex. 13. As such, he asked that Mr. Samuels' trial date be rescheduled for a fourth time.

165. Mr. Hatcher also stated in his motion that he received certain electronic discovery from the State in late December 2016, including "audio and visual recordings of client interviews, communications with emergency dispatch, and other photographic images—that require the making of special accommodations in order to be viewed by Mr. Samuels at the Jasper County

jail." *Id.* As of the filing of this petition, however, Mr. Samuels has yet to be given the opportunity to review these electronic discovery materials, and his public defender has not had the time to take the steps necessary to ensure that his client is able to do so.

166. Finally, Mr. Hatcher stated that he is seeking a continuance in part because he was representing another defendant who had invoked their right to a speedy trial. Because that trial was set for January 12, 2017, the motion noted that "it is improbable that Mr. Hatcher will be able to adequately prepare for both trials simultaneously." The motion thus highlights the inherent conflict of interest that arises when public defenders face overwhelming workloads and are forced to prioritize some of their clients at the expense of others.

167. Upon information and belief, Mr. Hatcher recently resigned from the public defender's office and now works as a prosecutor in Jasper County.

168. On March 1, 2017, Mr. Samuels was appointed yet another public defender, Richard King, the third attorney assigned to his case since his arrest in May 2016. On or about March 6, 2017, Mr. King visited Mr. Samuels in jail and presented Mr. Samuels with a letter stating that he would be unable to represent Mr. Samuels due to his overwhelming workload, which includes more than 200 cases. Mr. King indicated that his workload would make it impossible for him to investigate adequately or otherwise prepare the case. As of the filing of this petition, however, Mr. King remains the attorney of record on Mr. Samuels' case.

169. Mr. Samuels is currently scheduled for trial on June 1, 2017, a full year after his arrest.

***Viola Bowman***

170. Plaintiff Viola Bowman was arrested on or about January 6, 2015, in Clay County, and charged with first-degree murder and armed criminal action for killing her husband. Ms. Bowman has maintained her innocence since her arrest.

Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM

Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM

171. On January 15, 2015, Ms. Bowman appeared before the court for her arraignment, without counsel.  Her bond had been set at $1,000,000 and, because she was not accompanied by counsel, Ms. Bowman was unable to advocate for a reduction in her bond amount.  Records reflect that bond had been set before her first appearance.  Because Ms. Bowman is indigent and could not possibly post the required bond, she has been sitting in jail since her arrest over two years ago.

172. A week after her arraignment, on January 22, 2015, Ms. Bowman appeared before the court again, this time with a public defender, and was re-arraigned.  The public defender who represented Ms. Bowman at this proceeding, however, did not continue her representation of Ms. Bowman beyond this hearing and did not do any substantive work on the case at that stage, including any investigation or motion practice.

173. On January 28, 2015, Ms. Bowman's current attorney, Anthony Cardarella, entered his appearance in the case.  Mr. Cardarella is the District Defender for MSPD's District 7 office, which includes Clay County.  Despite his many management responsibilities as District Defender, Mr. Cardarella took Ms. Bowman's case because none of the public defenders in his office with sufficient experience to handle a first-degree murder case had any more time to devote to the case than did Mr. Cardarella.

174. Mr. Cardarella met with Ms. Bowman for the first time the same week as her next hearing, which was on February 19, 2015, more than one month after her arrest.  The meeting lasted approximately ten minutes.  Ms. Bowman was shocked at how short the meeting was. Because the meeting was so short, Mr. Cardarella did not have time to explain very much about the case to Ms. Bowman.  Mr. Cardarella did inform Ms. Bowman that his office was very busy and that he was the lead attorney for the district.

175. Since taking over the case, other responsibilities, including other cases, have prevented Mr. Cardarella from remaining in consistent contact with Ms. Bowman. Over the course of the more than two years Ms. Bowman has been in pretrial detention, she has met with her attorney an average of once every two months for approximately 10-15 minutes per meeting.

176. Since January 2015, the public defender's office has asked the court to continue Ms. Bowman's case on at least 10 occasions, and to continue the scheduled trial date twice, due at least in part to Mr. Cardarella's inability to prepare adequately for trial and other proceedings. This has led to Ms. Bowman remaining in pretrial detention for over two years.

177. Additionally, while Mr. Cardarella has been Ms. Bowman's attorney since January 2015, he has had other attorneys from his office appear on his behalf for at least nine of the 27 hearings that have occurred to this point. Upon information and belief, none of those other attorneys have had sufficient time to familiarize themselves adequately with Ms. Bowman's case, in which she faces a potential sentence of life imprisonment.

178. Ms. Bowman's trial was first set for June 20, 2016. On May 11, 2016, pursuant to Mr. Cardarella's request, the trial was continued to January 23, 2017. The continuance was requested in large part due to Mr. Cardarella's other administrative and managerial job responsibilities. On September 29, 2016, the trial was again continued at Mr. Cardarella's request to June 5, 2017. In his motion for a continuance, Mr. Cardarella again noted his many responsibilities related to administrative tasks and managing the district office.

179. Ms. Bowman's case involves a voluminous amount of discovery and the need for extensive investigation and case preparation. Upon information and belief, very little of that work occurred during the first year after her arrest.

Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM

180. Ms. Bowman believes that her case is often not considered a priority for Mr. Cardarella because of his overwhelming caseload and the seriousness and complexity of her charges. Ms. Bowman is frustrated because her meetings with her attorney are often very short and she does not feel that her questions are answered in a meaningful way, leaving more questions for the next visit.

181. Additionally, because of the many continuances in her case, she has now been incarcerated in the Clay County jail for over 800 days pretrial.

*Brian Richman*

182. Plaintiff Brian Richman has been incarcerated at the Christian County Detention Center since his arrest on or about June 26, 2016, on a series of felony drug charges exposing him to many years in prison.

183. Mr. Richman's bond was set at over $100,000. Because he was unable to afford bond, Mr. Richman has remained in pretrial detention since his arrest more than eight months ago.

184. Mr. Richman's public defender has never visited him at the Christian County Detention Center.

185. In fact, there is not even a room for MSPD public defenders to conduct attorney-client visits at the Christian County Detention Center. Rather, the jail's general practice is to shackle defendants to a rail in a public area and allow attorneys to briefly stand and talk with clients there, surrounded by jail officials and other detainees. Upon information and belief, Christian County's public defenders have not attempted to challenge the jail's policy or arrange for an alternative venue because they do not have the resources to do so, given their overwhelming caseload and lack of funding.

43

Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM

Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM

186. The first time Mr. Richman saw his assigned public defender was in court, on or about June 28, 2016, when his attorney waived Mr. Richman's preliminary hearing without meaningfully consulting with Mr. Richman.

187. To date, no preliminary hearing has been held in Mr. Richman's Christian County cases, and no indictment has been delivered by a grand jury to support the charges against Mr. Richman. He remains incarcerated on a bond of over $100,000.

188. Since July 14, 2016, Mr. Richman has only seen his attorney on a handful of occasions. These visits have always occurred at the courthouse, involved rushed conversations, and transpired in a public courtroom where other persons were present and confidentiality was not assured.

189. On some occasions, hearings in Mr. Richman's case have occurred in front of the judge without Mr. Richman present. Mr. Richman's public defender unilaterally waived Mr. Richman's constitutional right to appear on his own behalf at those hearings and participated in them without obtaining Mr. Richman's consent to do so.

190. Mr. Richman has found it to be nearly impossible to get in contact with his public defender; upon information and belief, this lack of communication is due to his public defender's overwhelming workload.

191. Given his inability to communicate consistently and confidentially with his attorney, as well as the fact that his public defender has neither conducted any meaningful investigation on his case nor filed critical motions on his behalf, Mr. Richman has felt the need over the last several months to write letters to the judge presiding over his case. He has done so both to advocate for himself in the context of his cases and to make the court aware of the deplorable conditions at the Christian County Detention Center.

## **DEFENDANT LIABILITY**

192. Defendants have not provided Plaintiffs, or those similarly situated, with the representation to which they are constitutionally and statutorily entitled.  Plaintiffs have been denied representation altogether at some critical stages of their proceedings, have been constructively denied counsel at others because MSPD's excessive workloads would hamstring even the best of lawyers, and have not received the basic investigation and counseling that the Sixth Amendment demands.

193. Upon information and belief, absent this Court's intervention, Defendants will continue to fail to provide Plaintiffs with the representation to which they are entitled.

194. The representation provided to the named Plaintiffs is illustrative and typical of the representation provided to indigent defendants throughout the State of Missouri and results from the lack of sufficient funding, inflated workloads, and structural deficiencies that have been identified repeatedly by every entity that has assessed Missouri's public defender system over the last 25 years.

195. As a result of the State's failure to remedy this workload problem, public defenders are unable to prepare for and attend every critical stage of their clients' proceedings.  As such, many defendants unnecessarily spend prolonged periods of time in pretrial detention or feel coerced into pleading guilty to charges against which they have a valid and potentially effective defense, merely to get out of jail and avoid losing a job or meaningful contact with their children and families.

196. As a result of their crushing workloads and lack of support, MSPD attorneys do not have the time or resources to communicate with their clients consistently and effectively, making

Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM

Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM

it difficult, if not impossible, for indigent defendants to participate actively in their defense or make sound strategic decisions with respect to their case.

197. The excessive workloads also have made it impossible for MSPD attorneys to investigate and otherwise prepare all of their cases thoroughly and effectively. This, in turn, harms indigent defendants by stripping them of any chance they may have had to secure helpful witnesses, collect valuable evidence, establish an alibi, or otherwise contest the charges against them or obtain lighter or alternative sentences.

198. Defendants have been on notice for decades that the State's public defender system is failing to provide constitutionally sufficient representation. Numerous studies, reports, and recommendations have been presented to state officials over the years; the Missouri Supreme Court's decisions in *State ex rel. Missouri Pub. Def. Comm'n v. Waters*, 370 S.W.3d 592 (Mo. 2012), and *State ex rel. Missouri Pub. Def. Comm'n v. Pratte*, 298 S.W.3d 870 (Mo. 2009), raised serious concerns about Missouri's public defender system; and Defendant Michael Barrett and former Governor Nixon have corresponded directly in recent months about MSPD's dire needs.

199. Despite being on notice of the many deficiencies plaguing Missouri's indigent defense system, Defendants have failed to take sufficient action to remedy the deficiencies.

200. Defendants' failure to take sufficient steps to remedy the deficiencies of Missouri's indigent defense system is the proximate cause of the harm suffered by indigent criminal defendants throughout Missouri—including the named Plaintiffs and the Class they seek to represent.

CLASS ACTION PETITION FOR INJUNCTIVE AND DECLARATORY RELIEF

## **CLASS ALLEGATIONS**

201. Plaintiffs file this class action lawsuit pursuant to Missouri Supreme Court Rule 52.08 on behalf of all indigent persons who are now, or who will be during the pendency of this litigation, under formal charge before a state court in Missouri of having committed any offense, the penalty for which includes the possibility of confinement, incarceration, imprisonment, or detention (regardless of whether actually imposed), and who are eligible to be represented by MSPD.

202. Plaintiffs in this case represent a Class, and this action should be certified as a class action under Missouri Supreme Court Rule 52.08.

203. Every day, hundreds of individuals who are unable to afford an attorney and who depend on MSPD to provide them with effective legal representation are criminally prosecuted in this State. As such, the Class is so numerous that joinder of all members is impractical.

204. There are important questions of law and fact raised in this case that are common to the Class, including:

    a. Whether Defendants are required under the United States and Missouri Constitutions and under Missouri law to provide indigent defendants with effective legal representation;

    b. Whether Defendants have systemically denied Plaintiffs actual representation at critical stages of their trial;

    c. Whether Defendants have created circumstances such that even where counsel is nominally available, "the likelihood that any lawyer, even a fully competent one, could provide effective assistance is small," constructively depriving Plaintiffs of counsel in violation of *United States v. Cronic*;

Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM

    d.   Whether MSPD is able to adequately communicate with clients, investigate cases, and counsel clients regarding guilty pleas;

    e.   Whether Defendants have violated the United States and Missouri Constitutions, as well as Missouri law, by failing to implement, administer, and oversee an adequate public defense system; and

    f.   Whether Defendants' failure to adequately fund the delivery of public defense services impedes the provision of effective legal representation to indigent defendants.

205. The claims of the Class representatives are typical of the claims of the Class as a whole. Like all of the Class members, the Class representatives are being denied their right to counsel, in violation of the federal and state constitutions, as well as Missouri statutes, as a direct result of Defendants' ongoing failure to adequately fund, supervise, and administer public defense services in Missouri.

206. The Class representatives will fairly and adequately protect the interests of the Class. The interests of the Class representatives are not in conflict with the interests of any other indigent defendant, and the Class representatives have every incentive to pursue this litigation vigorously on behalf of themselves and the Class as a whole.

207. The Class representatives are being represented by experienced, well-resourced counsel in this matter, including the national American Civil Liberties Union's Criminal Law Reform Project, the American Civil Liberties Union of Missouri, the MacArthur Justice Center at St. Louis, and Orrick, Herrington & Sutcliffe LLP, each of whose attorneys possess extensive litigation experience. The attorneys for the Class representatives have substantial expertise in litigating class action lawsuits generally and in public defense reform litigation in particular.

208. The prosecution of separate actions by individual members of the Class would create a risk of adjudications with respect to individual Class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications.

209. Defendants have failed to adequately administer indigent defense services in Missouri, thereby violating the rights of indigent defendants across the State.  As such, these Defendants have acted and refused to act on grounds generally applicable to the entire Class, thereby making it appropriate for this Court to issue final declaratory and injunctive relief for all Class members.

## CLAIMS FOR RELIEF

### First Claim for Relief
### Violation of the Sixth and Fourteenth Amendments to the United States Constitution
### (Right to Counsel)

210. Plaintiffs reallege and incorporate by reference as if fully set forth herein the allegations contained in all preceding paragraphs of this Petition.

211. The Sixth Amendment to the United States Constitution, as applied to the States through the Fourteenth Amendment, requires the State of Missouri to ensure that all indigent defendants in criminal or juvenile delinquency proceedings receive meaningful and effective legal representation.

212. 42 U.S.C. § 1983 provides for suit against individual government officials—here, Defendants Greitens, Barrett, Bock, Jackson, Chval, and Hogan—for constitutional violations.

213. Defendants have violated and continue to violate the Sixth and Fourteenth Amendments to the United States Constitution because they have failed to ensure that all Plaintiffs and Class Members—indigent defendants across the State who are entitled to representation by MSPD— receive meaningful legal representation, resulting in the actual and constructive denial of their right to counsel.

Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM

Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM

## Second Claim for Relief
### Violation of Article 1, Section 18(a) of the Missouri Constitution
### (Right to Counsel)

214. Plaintiffs reallege and incorporate by reference as if fully set forth herein the allegations contained in all preceding paragraphs of this Petition.

215. The Missouri Constitution requires the State of Missouri to ensure that all indigent defendants in criminal or juvenile delinquency proceedings receive meaningful and effective legal representation.

216. Defendants have violated and continue to violate Article I, Section 18(a), of the Missouri Constitution because they have failed to ensure that Plaintiffs and Class Members—indigent defendants across the State who are entitled to representation by MSPD—receive meaningful legal representation, resulting in the actual and constructive denial of their right to counsel.

## Third Claim for Relief
### Violation of the Fifth and Fourteenth Amendments to the United States Constitution
### (Due Process)

217. Plaintiffs reallege and incorporate by reference as if fully set forth herein the allegations contained in all preceding paragraphs of this Petition.

218. The Due Process Clause of the Fifth Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment, requires the State of Missouri to ensure that all indigent defendants in criminal or juvenile delinquency proceedings receive meaningful legal representation.

219. 42 U.S.C. § 1983 provides for suit against individual government officials—here, Defendants Greitens, Barrett, Bock, Jackson, Chval, and Hogan—for constitutional violations.

Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM

220. Defendants have violated and continue to violate the Fifth and Fourteenth Amendments of the United States Constitution, because they have failed to ensure that all Plaintiffs and Class Members—indigent defendants across the State who are entitled to representation by MSPD—receive meaningful legal representation, resulting in the actual and constructive denial of their right to counsel.

**Fourth Claim for Relief**
**Violation of Article 1, Section 10 of the Missouri Constitution**
**(Due Process)**

221. Plaintiffs reallege and incorporate by reference as if fully set forth herein the allegations contained in all preceding paragraphs of this Petition.

222. Under Article 1, Section 10 of the Missouri Constitution, the State of Missouri is required to ensure that all indigent defendants in criminal or juvenile delinquency proceedings receive meaningful and effective legal representation.

223. Defendants have violated and continue to violate Article I, Section 10 of the Missouri Constitution because they have failed to ensure that Plaintiffs and Class Members—indigent defendants across the State who are entitled to representation by MSPD—receive meaningful legal representation, resulting in the actual and constructive denial of their right to counsel.

**Fifth Claim for Relief**
**Violation of Missouri Criminal and Juvenile Codes**
**(Right to Counsel)**

224. Plaintiffs reallege and incorporate by reference as if fully set forth herein the allegations contained in all preceding paragraphs of this Petition.

225. The right to counsel under the United States and Missouri Constitutions is also embodied in the Missouri Criminal and Juvenile Codes, which requires the State of Missouri to appoint counsel for indigent defendants in criminal, probation, civil confinement, and juvenile

Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM

delinquency proceedings. *See* Mo. Rev. Stat. §§ 600.042, 600.048, 211.061, 211.211; Mo. R. Juv. P. 126.01.

226. Defendants have violated and continue to violate the Missouri Criminal and Juvenile Codes because they have failed to ensure that Plaintiffs and Class Members—indigent defendants across the State who are entitled to representation by MSPD—receive meaningful legal representation, resulting in the actual and constructive denial of their right to counsel.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request that this Court:

A) Certify this case as a class action pursuant to Rule 52.08 of the Missouri Rules of Civil Procedure;

B) Declare that Defendants are obligated to provide constitutionally adequate representation to indigent criminal defendants and juvenile respondents, including at their initial appearances;

C) Declare that the constitutional and statutory rights of Missouri's indigent criminal defendants and juvenile respondents are currently being violated by Defendants on an ongoing basis;

D) Enjoin Defendants from continuing to violate the rights of indigent defendants by providing constitutionally deficient representation;

E) Enter an injunction that requires Defendants to propose and implement, subject to this Court's approval and monitoring, a plan to ensure that all indigent criminal defendants and juvenile respondents in the State of Missouri are provided with constitutionally adequate legal representation;

F) Award Plaintiffs and the Class reasonable attorneys' fees and costs incurred during the course of this litigation pursuant to 42 U.S.C. § 1988 and other applicable law; and

G) Grant any other relief the Court deems necessary and proper to protect Plaintiffs and the Class from further harm.

//
//
//
//
//
//

CLASS ACTION PETITION FOR INJUNCTIVE AND DECLARATORY RELIEF

Respectfully submitted this 9th day of March, 2017.

/s/ Anthony Rothert_____
Anthony Rothert
Missouri Bar #44827
ACLU OF MISSOURI FOUNDATION
906 Olive Street, Suite 1130
St. Louis, MO 63101
Telephone: (314) 652-3114
Facsimile: (314) 652-3112
Email: arothert@aclu-mo.org

Gillian Wilcox
Missouri Bar #61278
ACLU OF MISSOURI FOUNDATION
406 West 34th Street, Suite 420
Kansas City, MO 64111
Telephone: (816) 470-9933
Facsimile: (314) 652-3112
Email: gwilcox@aclu-mo.org

Jason D. Williamson
*Pro hac vice application pending*
ACLU FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004

Mae Quinn
Missouri Bar #61584
Amy Breihan
Missouri Bar #65499
MACARTHUR JUSTICE CENTER AT ST. LOUIS
3115 South Grand Boulevard, Suite 300
St. Louis, MO 63118
Telephone: (314) 254-8540
Facsimile: (314) 254-8547
Email: mae.quinn@macarthurjustice.org

Robert Sills
Aaron Scherzer
Matthew R. Shahabian
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019

Evan Rose
Easha Anand
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105

*Attorneys for Plaintiffs*

Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM

# Exhibit 1

Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM

# State of Missouri
# Public Defender Commission



*"Thou shalt not ration justice."*
*Judge Learned Hand*

# Fiscal Year 2016
# Annual Report

The Right to Counsel and the State Public Defender System in Missouri

**Michael Barrett, Director, Missouri State Public Defender**
Joel Elmer, Deputy Director
Greg Mermelstein, Deputy Director
Kathleen Lear, Comptroller

Http://www.publicdefender.mo.gov

# Table of Contents

**Message from the Director**

Who We Are & What We Do ........................................................................................................... 1

PUBLIC DEFENDER COMMISSION ............................................................................................... 2

History of Public Defender Cases Assigned by Case Type ............................................................ 6

Caseload Relief Efforts Timeline .................................................................................................... 7

Salary Informa.on ......................................................................................................................... 8

Appropriations and Expenditures
      Public Defender Appropriations ............................................................................................ 9
      House Bill 2012 ..................................................................................................................... 13
      Cost Per Case ........................................................................................................................ 14

Trial Division
      Description of Tasks & Types of Cases ................................................................................. 18
      Map of Trial Division Districts .............................................................................................. 23
      Trial Division Roster .............................................................................................................. 26
      Opened and Closed by District .............................................................................................. 29
      Opened and Closed by County ............................................................................................. 41
      Opened and Closed by County—15 Year Comparison ......................................................... 43

Table of Contents—Continued Next Page

Image on the cover used by permission of the Florida Public Defender Association, Inc.,
103 N Gadsden St, Tallahassee, FL 32301
www.f pda.org

Appellate Division

    Description of Tasks and Types of Case.....................................................58

    Appellate Opened by Fiscal Year ...........................................................59

    Appellate Division Roster .......................................................................59

    Appellate Opened and Closed by District.............................................60

Capital Division

    Description of Tasks and Caseload .........................................................63

    Opened & Closed by Capital Division District Office ............................63

    Capital Cases by Fiscal Year ...................................................................64

    Capital Division Roster...........................................................................64

Commitment Defense Unit

    Cases Opened ........................................................................................65

    CDU Roster ............................................................................................66

Public Defender Case Contracting

    Description of Program .........................................................................67

    Contract Rates .......................................................................................68

    Fiscal Year 2016 Cases Assigned to Outside Entities by District & County................69

    Conflicts  Assigned by Case Type ..........................................................70

Local Office Pages—Caseloads—Locations—District Defender        71—113

Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM

### *A message from the Director….*

The foremost principles embodied in the U.S. Cons. tution are individual liberty and equal rights under the law. These essential guarantees, embedded in the Bill of Rights, is what binds us as Americans.  Throughout our lives, we may each come to know varied degrees of advancement, education, and wealth, but it is equality under the law and freedom that makes us uniquely American.



**Michael Barrett**
**State Public Defender**

And that's precisely what the Missouri State Public Defender was established to ensure - that these rights remain guaranteed for poor persons, as well as the well-resourced, so that an individual is not deprived of his or her liberty without f rst receiving competent counsel and the due process that is required by the U.S. and Missouri Constitutions.  Quite simply, our attorneys and staff work tirelessly to ensure that everyone is treated equally under the law.

And while these principles of freedom and equality are often touted by elected leaders, Missouri regretfully continues to rank 49th out of 50 states in the public support it provides for indigent criminal defense.  Not only has this lack of resources resulted in shockingly high caseloads and signif cant turnover among staff given the low salaries and workload stress, it has also resulted in a continued increase in the state's prison population despite the opposing national trend.  These realities have been affirmed by both an independent review by the American Bar Association (The Missouri Project, 2014) and a recent report by the U.S. Department of Justice, Civil Rights Division.

Challenging the government's evidence and presenting a substantial defense for every individual defendant is not only our constitutional obligation, it is necessary to ensure that people are not wrongfully convicted of a crime.  Given the high caseloads carried by each MSPD attorney, courts and policymakers must recognize that this is not only a realistic possibility, but a substantial likelihood.

But it is not always about guilt or innocence.  Oftentimes, the public defender works to come up with an alternative plan to incarceration when someone can be managed in the community, saving taxpayers millions and helping the client stay connected with both family and employer in order to re-establish him or herself as a contributing member of society.  These efforts are often aimed at addressing the very issue that is precipitating the alleged misconduct, such as the alcoholic who is not paying his child support or the military veteran who needs treatment for post-dramatic stress disorder.

As Director of the Missouri State Public Defender System, it is my honor to not only advocate on behalf of the tens of thousands of Missourians that we represent each year, but also on behalf of the hundreds of attorneys and support staff who work every day to protect liberty and ensure equality under the law.

# Missouri Public Defenders:

# Who We Are & What We Do…

**What is the Missouri Public Defender System?**

The Missouri State Public Defender System [MSPD] is a statewide system that provides legal representa.on to poor persons who are accused or convicted of state crimes in Missouri's trial, appellate, and Supreme courts. Carrying out these functions fulf lls the state's obligation to provide the right to counsel under the state and U.S. Constitutions to those who cannot afford it.

MSPD is an independent department of state government, located within, but not supervised by, the judicial branch. Instead, it is governed by a seven-member Public Defender Commission, each of whom is appointed by the governor. Commissioners serve six year terms and no more than four may be of the same political party. The Director of the Missouri State Public Defender System, Michael Barrett and Deputy Director, Joel Elmer, are appointed by the Public Defender Commission.

**Who qualifies for a public defender?**

The standard to qualify for public defender representation is a creature of both statute and rule that includes a number of objective and discretionary factors to determine whether someone can afford an attorney. The rule promulgated by the Public Defender Commission would deem someone eligible if their income was less than 100% of the Federal Poverty Guidelines. Other factors are also considered such as debt, assets, ability to post bond, public assistance, and dependents. If MSPD determines that an applicant is not indigent, he or she has the right to appeal to the court for an independent review of their eligibility.

**Who works for MSPD?**

MSPD employs 587 employees, 376 of whom are attorneys. The department is divided into a Trial Division, an Appellate/Post-Conviction Division, and a Capital Division, each of which is described in greater detail on pages 18, 57, and 62, respectively.

Other staff includes investigators, capital mitigation specialists, paralegals, legal assistants and clerks. An operations staff provides centralized information technology support, f scal, and human resources services to the 44 district offices located around the state, as well as managing MSPD's contracting of conf ict cases to private counsel, which is described in more detail on page 66.

## _Mission Statement_

*The mission of the Missouri State Public Defender System is to provide high quality, zeal-ous advocacy for indigent people who are accused of crime in the State of Missouri.*

*The lawyers, administrative staff, and support staff of the Public Defender System will ensure that this advocacy is not compromised.*

*To provide this uncompromised advocacy, the Missouri State Defender System will supply each client with a high-quality, competent, ardent defense team at every stage of the process in which public defenders are necessary.*

Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM

# THE MISSOURI PUBLIC DEFENDER COMMISSION



**H. Riley Bock
Chair**

**H. Riley Bock, Chair**—A f . h-generation attorney, Riley Bock is a life-long resident of New Madrid, MO, a graduate of the University of Missouri, and a former Captain in the Missouri National Guard. He served as the New Madrid County elected Prosecuting Attorney for four terms while also maintaining a small civil practice representing a number of county and regional public entities. After retirement, Mr. Bock served as the New Madrid County Public Administrator for f ve years and taught American History, English Composition, and Literature at the New Madrid County Central High School. He has also served on a number of boards and commissions, including The State Historical Society of Missouri, the Trail of Tears National Advisory Board, the Board of Directors for Camp Marymount, The Optimist Club, and the New Madrid Historical Museum. He is currently the president of the Three Rivers College Foundation Trust and serves as both volunteer and chair of the Higgerson School Historical Site, a one-room school that once served the Higgerson Landing community along the Mississippi River. Mr. Bock was appointed to the Public Defender Commission in January, 2014, and is in his f rst term as Chair.

**Charles R. Jackson**—One of Missouri's f rst African-American highway patrolmen, Charles Jackson spent 30 years in law enforcement. During that time, he rose to serve as the Captain and Commanding Officer of Troop F, the Patrol's Director of Public Information, and Director of the State Traffic Division before topping off his career with a gubernatorial appointment to serve as Missouri's Director of the Department of Public Safety. In that role, he oversaw 15,000 employees and administered a $600 million budget spanning Missouri's Highway Patrol, Water Patrol, Capitol Police, State Fire Marshall, Alcohol and Tobacco Control Division, Veteran's Commission, Gaming Commission, the State Emergency Management Agency, and the Missouri National Guard. He also developed Missouri's statewide "Amber Alert" system and was granted national security secret clearance from the Department of Homeland Security. A graduate of the FBI National Academy and the U.S. Army War College as well as Lincoln University, Mr. Jackson is a past President of the Association of Retired Missouri State Employees and served on Advisory Boards to both Fulton State Hospital and the University of MO School of Social Work. He currently resides in Jefferson City, MO and is the founder and



**Charles R. Jackson
Vice Chair**

current pastor of The Guiding Light Missionary Baptist Church of Christ in Fulton, MO. Mr. Jackson was appointed to the Public Defender Commission in July, 2014, and is in his f rst term as Vice Chair.

# THE MISSOURI PUBLIC DEFENDER COMMISSION



**Craig Chval**
**Secretary**

**Craig Chval—**A graduate of the University of Notre Dame and Illinois Institute of Technology/Chicago-Kent College of Law, Craig Chval is Associate General Counsel for Veterans United Home Loans in Columbia, MO. He began his practice of law as a civil trial associate in Chicago, before joining the prosecuting attorney's office in Illinois' second-largest county of DuPage, where he became chief of the gang crimes prosecution unit. He went on to serve as Special Counsel and Criminal Justice Policy Advisor to the Illinois Attorney General, and staffed the Governor's Commission on Street Gangs, ultimately becoming the first executive director of the Illinois Gang Prevention Center, which developed and implemented pilot gang-prevention programs across Illinois. In 2002, he accepted a position with the National Association of Attorneys General in Washington, D.C., where he reviewed and developed legislative proposals for Congress and assisted in the development of cybercrime training for prosecuting attorneys. When his wife accepted a faculty position at the University of Missouri, he joined the Office of the Missouri Attorney General. There he led a unit specializing in the investigation and prosecution of computer-related crimes. A founding member of the National Steering Committee for the FBI's Regional Computer Forensic Laboratory program, he became a well-known author and presenter on topics pertaining to cybercrime, electronic discovery, and data management and security. Upon leaving the Attorney General's Office, he co-founded the Chval Law Group in Columbia, MO specializing in legal issues pertaining to computer security. In 2011, he made the move to Veterans United. Mr. Chval was appointed to the Public Defender Commission in July, 2014, and is in his first term as Secretary.

**Douglas A. Copeland—**A founding member and principal in the St. Louis law firm of Copeland, Thompson, and Farris, where his primary concentrations are in education law, estate planning, probate and trust, commercial real estate, and copyright infringement litigation. He also serves as general counsel to Missouri Baptist University, Missouri Baptist Children's Home, St. Louis Metro Baptist Association, the Webster Groves and Valley Park School Districts, and the Midwest Theological Seminary. He has been very active in the Missouri Bar, serving over the course of his career as Chair of the Young Lawyers Section, Vice Chair of the Education Committee, and Chair of the Public Information Committee, as well as Trustee for the Missouri Bar Foundation. He was a member of the Board of Governors for 11 years, serving on the Executive Committee and as Vice President before being elected to serve as President of the Missouri Bar for 2005-2006. In that role, he chaired what would become the first of several Mo Bar Task Forces on the Public Defender and became an active advocate on behalf of Missouri's Public Defender System. He is a past president of the St. Louis County Bar Association and a Life Fellow of the American Bar



**Douglas Copeland**
**Member**

Association, where he served in the House of Delegates from 2009-2013. A two-time winner of the Missouri Bar President's Award of Merit and recipient of the Dunlop Distinguished Service Award from the St. Louis County Bar Association, he was named a recipient of the 2014 Missouri Bar ProBono Award. Mr. Copeland has served on a number of boards and commissions, including the Board of Trustees of the Missouri Baptist Medical Center, the Pillsbury Foundations, the St. Louis Sigma Chi Alumni Association, the Endowment Council of the St. Louis Art Museum, and the Howard Park Early Childhood Center, which provides therapeutic services to children with special needs. He is a former Chair of the Board of Trustees for the Missouri Baptist Healthcare Foundation and the Council of School Attorneys of the Missouri School Boards Association and the current chair of the Missouri Baptist Center Community Advisory Board. Mr. Copeland holds degrees from the University of Missouri and St. Louis University School of Law. He was appointed to the Public Defender Commission in April, 2008 and served as Chair from July 2011 to June 2016.

# THE MISSOURI PUBLIC DEFENDER COMMISSION



**A. Crista Hogan
Member**

Named one of Springfield's 20 Most Influential Women by the Springfield Business Journal, Crista Hogan is the Executive Director of the Springfield Metropolitan Bar Association. Prior to accepting that appointment in 2001, Crista served as Vice President of Hogan Land Title Company and as Corporate Counsel for O'Reilly Automotive. She also owned and operated RCT Realty as well as maintaining a solo legal practice for three years, where she specialized in real estate, estate planning, and probate. She taught Managerial Economics and Personal Effectiveness as an adjunct professor in Webster University's MBA program and served on Webster University's Advisory Board. She is a past President of the Springfield Junior League, PAGE (Parents and Advocates of Gifted Education), and the Kitchen Foundation, as well as former Chair of the Greene County Young Republicans. She has served on the Board of Directors for the Ozarks Literacy Council, Habitat for Humanity, TARGET, and the National Alliance for the Mentally Ill, and was appointed by Governor Blunt to the Hispanic Business Trade and Culture Commission. She is the recipient of a Luminary Award from the National Association of Bar Executives and a Community Leader Award from the Daughters of the American Revolution. Ms. Hogan holds degrees from George Washington University and Tulsa University and is a graduate of the Greater Ozarks Leadership Development Program. She was appointed to the Public Defender Commission in July, 2014.

**Correspondence to the Public Defender Commission may be sent to:**

**Public Defender Commission
231 East Capitol
Jefferson City, MO  65101**

**Missouri State Public Defender Web Site
http://www.publicdefendermo.gov**

Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM



| Trial Division | |
|---|---|
| # of Offices | 33 |
| Cases Carried Forward into Fiscal Year 2016 | 31,738 |
| # of Assigned Cases | 76,150 |
| # of Attorney FTE | 313.00 |

| Appellate/PCR Division | |
|---|---|
| # of Offices | 6 |
| Cases Carried Forward into Fiscal Year 2016 (Does not include those waiting opinions) | 1,827 |
| # of Assigned Cases | 1,630 |
| # of Attorney FTE | 36.50 |





| Capital Division | |
|---|---|
| # of Offices | 3 |
| Cases Carried Forward into Fiscal Year 2016 | 84 |
| # of Assigned Cases | 34 |
| # of Attorney FTE | 16.00 |

# Missouri State Public Defender System
## Cases Assigned by Case Type

| Fiscal Year | Murder 1st | Other Homicide | Felony | Murder + Felony Caseload | Misdemeanor | Juvenile | PCR | Other | Probation Violation | Appeals | Total Opened | Total Closed |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FY16 | 187 | 138 | 42,276 | 42,601 | 16,121 | 1,677 | 829 | 204 | 18,557 | 766 | 80,755 | 71,934 |
| FY15 | 167 | 148 | 37,879 | 38,194 | 14,853 | 1,831 | 916 | 174 | 16,831 | 799 | 73,598 | 71,464 |
| FY14 | 129 | 138 | 38,554 | 38,821 | 15,228 | 1,830 | 939 | 166 | 17,460 | 752 | 75,196 | 72,197 |
| FY13 | 152 | 207 | 38,785 | 39,144 | 16,692 | 1,670 | 986 | 238 | 18,477 | 792 | 77,999 | 79,985 |
| FY12 | 121 | 197 | 38,551 | 38,869 | 20,948 | 1,923 | 1,212 | 159 | 20,320 | 966 | 84,397 | 81,871 |
| FY11 | 148 | 149 | 35,753 | 36,050 | 22,767 | 1,893 | 1,088 | 119 | 20,066 | 913 | 82,896 | 80,137 |
| FY10 | 161 | 164 | 34,781 | 35,106 | 24,768 | 2,393 | 1,141 | 131 | 20,147 | 930 | 84,616 | 81,346 |
| FY09 | 121 | 180 | 33,226 | 33,527 | 25,181 | 2,513 | 1,264 | 181 | 19,518 | 898 | 83,082 | 81,704 |
| FY08 | 158 | 154 | 34,766 | 35,078 | 26,098 | 2,715 | 1,061 | 182 | 19,555 | 716 | 85,405 | 85,116 |
| FY07 | 174 | 161 | 35,109 | 35,444 | 27,816 | 3,380 | 828 | 129 | 19,157 | 743 | 87,497 | 85,133 |
| FY06 | 138 | 146 | 35,339 | 35,623 | 28,227 | 3,676 | 838 | 46 | 19,412 | 710 | 88,532 | 83,260 |
| FY05 | 156 | 124 | 33,282 | 33,562 | 28,931 | 3,881 | 937 | 120 | 20,012 | 688 | 88,131 | 87,180 |
| FY04 | 154 | 140 | 34,422 | 34,716 | 28,018 | 4,258 | 807 | 98 | 20,263 | 756 | 88,916 | 86,356 |
| FY03 | 195 | 114 | 35,425 | 35,734 | 25,807 | 4,147 | 806 | 103 | 18,479 | 832 | 85,908 | 81,059 |
| FY02 | 163 | 132 | 33,183 | 33,478 | 25,147 | 3,918 | 802 | 64 | 18,047 | 750 | 82,206 | 77,165 |
| FY01 | 182 | 125 | 29,934 | 30,241 | 22,903 | 4,488 | 711 | 82 | 17,663 | 698 | 76,786 | 73,438 |
| FY00 | 147 | 109 | 28,019 | 28,275 | 24,119 | 4,998 | 763 | 76 | 16,768 | 739 | 75,738 | 69,591 |
| FY99 | 182 | 108 | 28,892 | 29,182 | 23,721 | 4,629 | 797 | 112 | 14,488 | 809 | 73,738 | 74,570 |
| FY98 | 196 | 87 | 31,591 | 31,874 | 24,676 | 4,270 | 674 | 138 | 14,141 | 689 | 76,462 | 74,495 |
| FY97 | 169 | 79 | 29,663 | 29,911 | 21,912 | 4,075 | 513 | 156 | 13,437 | 839 | 70,843 | 67,870 |
| FY96 | 175 | 88 | 30,198 | 30,461 | 23,069 | 3,612 | 707 | 178 | 11,444 | 1,038 | 70,509 | 70,664 |
| FY95 | 256 | 109 | 27,688 | 28,053 | 17,696 | 3,916 | 719 | 165 | 9,362 | 1,138 | 61,049 | 61,710 |
| FY94 | 255 | 152 | 25,338 | 25,745 | 17,852 | 3,374 | 682 | 201 | 8,225 | 1,017 | 57,096 | 52,453 |
| FY93 | 301 | 136 | 24,402 | 24,839 | 15,883 | 3,146 | 766 | 249 | 7,301 | 872 | 53,056 | 52,363 |
| FY92 | 282 | 37 | 25,458 | 25,777 | 19,974 | 3,372 | 1,129 | 167 | 5,321 | 569 | 56,309 | 55,651 |
| FY91 | 193 | 63 | 21,304 | 21,560 | 13,941 | 2,713 | 588 | 169 | 5,051 | 820 | 44,842 | 49,038 |
| FY90 | 227 | 109 | 23,336 | 23,672 | 14,627 | 3,300 | 732 | 369 | 5,834 | 1,094 | 49,628 | 46,425 |
| FY89 | 193 | 149 | 20,838 | 21,180 | 12,902 | 3,298 | 1,342 | 418 | 5,074 | 1,243 | 45,457 | 42,532 |
| FY88 | 202 | 161 | 20,640 | 21,003 | 12,427 | 3,455 | 1,006 | 470 | 4,475 | 920 | 43,756 | 40,117 |
| FY87 | 199 | 145 | 19,254 | 19,598 | 11,736 | 3,564 | 755 | 443 | 4,308 | 728 | 41,132 | 37,081 |
| FY86 | 166 | 175 | 17,042 | 17,383 | 10,602 | 3,328 | 612 | 611 | 3,815 | 608 | 36,959 | 34,491 |
| FY85 | 152 | 172 | 15,397 | 15,721 | 9,126 | 3,500 | 543 | 522 | 3,293 | 632 | 33,337 | 32,410 |
| FY84 | 176 | 175 | 15,048 | 15,399 | 9,256 | 3,058 | 534 | 499 | 2,878 | 506 | 32,130 | 31,730 |

6

07/21/16

| | Missouri Public Defender<br>Caseload Relief Efforts Timeline |
|---|---|
| 2005 | MO Bar Task Force on the Public Defender was created in response to years of increasing caseload and turnover rates with no corresponding increase in staffing |
| 2006 | American Bar Association Ethics Advisory Opinion on Public Defender Caseload; Senate Interim Committee on the Public Defender |
| | MO Bar Volunteer Attorney Program Instituted |
| | Mo Personnel Advisory Board report shows MO PD salaries approximately 35% lower than comparable positions in surrounding states |
| 2007 | Exploration of Court Operating Rule to Limit Public Defender Appointment |
| | $1.15M to contract case overload was added to PD budget by Legislature |
| 2008 | PD Commission enacts administrative rule regarding excessive caseload. |
| | Springfield Metropolitan Bar Association initiates volunteer attorney project |
| | Western District Court of Appeals rules Public Defenders enjoy no immunity from malpractice liability lawsuits by virtue of being state employees |
| 2009 | Mo Legislature adopts and Governor vetoes – caseload Limit legislation |
| | Legislature authorizes conversion of contracting funds to hire 12 new attorneys |
| | Second MO Bar study completed |
| | US Attorney General cites MO as an example of a broken indigent defense system |
| | Mo Supreme Court rules Public Defenders can refuse excess cases, but not by type of case |
| 2010 | MSPD receives $250,000 in additional funds to hire support staff. |
| | Notice of impending defender unavailability given to 22 Judicial Circuits. |
| | First Public Defender Offices refuse new cases. Litigation ensues. |
| 2011 | MSPD receives an additional $250,000 to hire support staff |
| | Office closures to new cases on hold pending outcome of writ litigation |
| 2012 | MSPD receives $441,941 in additional contracting funds |
| | Missouri Supreme Court Rules Judge erred in overriding Public Defender's notice of unavailability for additional cases |
| 2013 | MSPD begins limiting availability of offices to take on new cases under new Supreme Court ruling. 25 Judicial Circuits adopted administrative orders to triage cases. |
| | Auditor releases audit critical of PD reliance on "unsupported" national caseload standards for determining office closures to new cases. |
| | Legislation enacted that voids the Public Defender Commission's excessive caseload rule and establishes a new procedure that requires judicial approval for public defenders to turn away excess cases. |
| | National Juvenile Defender Center Assessment of Missouri reveals significant deficiencies in juvenile defense representation. |
| 2014 | $700,000 of contracting funds moved from MSPD to OSCA for pilot projects. OSCA declines to spend funds citing conflict of interest. |
| | RubinBrown completes ABA funded MSPD Workload Study. The Missouri Project. |
| 2015 | MSPD receives $3.4 million from General Assembly for contracting out conflicts to Private Attorneys. Vetoed by the Governor. Veto override by the General Assembly. Funds withheld by Governor. |
| 2016 | General Revenue Appropriations Core Cut by $3.47 million |
| 2017 | $4.5 million added to General Revenue Appropriations - $3.5 million withheld by the Governor |

# Missouri Public Defenders:
# Salary Information

| Assistant Public Defender Starting Salaries July 1, 2016 | |
| --- | --- |
| Assistant Public Defender  I | $39,708 |
| Assistant Public Defender  II | $46,992 |
| Assistant Public Defender III | $52,116 |
| Assistant Public Defender IV | $69,528 |
| | |

Providing effec.ve assistance of counsel in each case demands a well-trained, highly experienced corps of dedicated attorneys and support staff. However, excessive caseloads and low salaries lead to a high turnover rate among attorney staff, which makes fulf lling this important mission difficult, if not impossible. After MSPD began hitting turnover rates of 20-22% in the mid-2000's, repositioning salary adjustments were enacted to bring salaries to the levels shown above. The fact that just these small changes were enough to make MSPD's attorney turnover drop several signif cant percentage points -- though still among the highest turnover classif cations in state government – is proof that most public defenders do want to remain in public service if at all possible. However, staggering student debt loans ($60,000—$200,000) make it extremely difficult for even those who are passionate about public interest work to continue with MSPD if they want to also make loan payments and provide for their families.



The recession that hit in 2008 was actually much more effective in reducing attorney turnover.  Private law f rms stopped hiring and senior attorneys on the verge of setting up their own private practice put plans on hold, given the state of the economy. This combination gave MSPD a temporary reprieve from the revolving door, dropping turnover as low as 7.5%; but the reprieve was only temporary.  The underlying factors that have perennially caused high attorney turnover continue. Missouri's public defenders still struggle with staggering student loan debt and much lower salaries than what other government lawyers receive.  Caseloads are still overwhelming and lawyers still enjoy no immunity from either civil liability or disciplinary action for their failures to handle that caseload effectively, no matter how impossible that task might be.

The District Defenders who head each of MSPD's District offices around the state are equally far behind their counterparts, both within the Missouri criminal justice system and in the f eld of public defense nationally.  Missouri's full time elected prosecuting attorneys are required by state statute to be paid the same as an Associate Circuit Judge, $136,402.  By comparison their Public Defender counterparts are paid an average of a mere $79,601.  This level of pay inequity between the defense and prosecution sides of the criminal justice system is neither equitable nor sustainable.

# Public Defender Appropriations

General Revenue:  Missouri State Public Defender (MSPD) funding is almost en. rely from state general revenue.  It comes in three appropriations:

**Personal Service:**  Used to pay the salaries of all MSPD employees.

**Expense & Equipment:**   Used to pay the overhead costs of operations, such as office supplies and equipment, employee travel expenses, and rent and utilities for the statewide offices.

**Litigation & Contracting Expenses:**  Used to pay the cost of contracting cases out to private counsel and litigation expenses on both MSPD cases and those cases contracted out to private counsel.  Litigation expenses include the cost of experts, depositions, transcripts, exhibits, independent testing of evidence, etc.

**Legal Defense and Defender Fund:**  This appropriation is not money given to MSPD but the authorization to spend money collected by MSPD up to the ceiling of the appropriation.  The collections associated with this fund are the result of Section 600.090 RSMo, which requires public defenders to collect fees from clients receiving public defender service.  Fees are deposited into the Legal Defense and Defender Fund and used to fund all public defender training as well as pay for such miscellaneous expenditures as computer lines, WestLaw, bar dues for the system's 376 attorneys, etc.  In FY16 MSPD collected $1.361 million through client payments.

The personal service component of the LDDF appropriation authorizes MSPD to pay the salaries of two employees, the system's Director of Training and the Training Assistant, out of the moneys collected rather than through the general revenue personal service appropriation.

**Debt Offset Escrow Fund:**  This is not an appropriation of actual money, but an authorization for MSPD to collect funds through the state's debt offset program.  Under this program, taxpayers due a refund of state income tax who owe a debt to the state may have their refund intercepted and used to pay down the debt instead.  MSPD participates in this program to collect payments on the fees described above.  The money collected through this program is not in addition to the LDDF collections, but a subset thereof.

**Grants:**  Another 'permission' appropriation, rather than actual money appropriation, this authorizes MSPD to collect up to $125,000 in grants from the federal government or other sources.  The last time MSPD collected a federal grant was in the mid-1990's to help start-up an Alternative Sentencing Program of social workers to develop client-specif c sentencing plans as a way to reduce recidivism.  That program proved successful and was picked up and funded by the state after the federal grant expired.  Unfortunately, the growing caseload crisis and attorney shortage this past decade required MSPD to dismantle the program in order to turn the social worker FTE  into more attorney positions.

Actual Funding:  In all, in FY16, MSPD received a total of $37.381 million from the combination of general revenue ($36,422,010) and actual collections under the LDDF program ($1,361,017).

## State Public Defender General Revenue Appropriations

| Fiscal Year | Total Amount | Total FTE |
|---|---|---|
| 1994 | $13,770,464 | 410.38 |
| 1995 | $15,744,183 | 424.38 |
| 1996 | $18,480,875 | 437.88 |
| 1997 | $22,354,019 | 478.38 |
| 1998 | $22,935,946 | 507.13 |
| 1999 | $26,918,367 | 527.38 |
| 2000 | $28,473,301 | 548.88 |
| 2001 | $29,713,513 | 556.13 |
| 2002 | $29,808,922 | 556.13 |
| 2003 | $29,808,922 | 556.13 |
| 2004 | $28,111,874 | 558.13 |
| 2005 | $28,463,282 | 558.13 |
| 2006 | $28,463,282 | 558.13 |
| 2007 | $30,493,582 | 558.13 |
| 2008 | $32,680,606 | 558.13 |
| 2009 | $34,069,815 | 558.13 |
| 2010 | $34,207,100 | 570.13 |
| 2011 | $34,707,100 | 570.13 |
| 2012 | $34,707,100 | 585.13 |
| 2013 | $36,321,545 | 585.13 |
| 2014 | $35,290,793 | 585.13 |
| 2015* | $39,739,909 | 585.13 |
| 2016 | $36,422,010 | 585.13 |

\* $2,972,238 Withheld by the Governor and Not Released

Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM



Fiscal Year 2016
Total State of Missouri
General Revenue Appropriations

Public Defender,
$36,422,010,
0.41%

All Other State
Departments,
$8,938,450,848,
99.59%

Note: Public Defender General Revenue Appropriation is less than 1/2 of 1% of the State's
General Revenue Appropriations.



Fiscal Year 2016
Public Defender Expenditures

Training/One
Time Payments,
$1,282,645,
3.40%

Personal Service
Does not include any
Fringe Benefits,
$27,865,646, 73.91%

Litigation
Expense/Conflicts,
$3,721,071, 9.87%

Expenses &
Equipment,
$4,835,292,
12.82%

Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM

Collections from clients for the indigent defense services provided to them are generally collected through two revenue streams. Approximately 40% of collections comes through state income tax refund intercepts by the Department of Revenue. The remainder is generally collected by courts who collect payments of the Public Defender fees along with court costs at the close of a case.



Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM

# HOUSE BILL NO 12

## 98TH GENERAL ASSEMBLY

### Fiscal Year 2016

Section 12.400. To the Office of the State Public Defender

For the purpose of funding the State Public Defender System

| | |
|---|---|
| Personal Service and/or Expense and Equipment | $32,700,939 |
| Personal Service $28,778,492 – E & E $3,922,447 | |

For payment of expenses as provided by Chapter 600, RSMo, associated with the defense of violent crimes and/or the contracting of criminal representation with entities outside of the Missouri State Public Defender System                      $3,721,071

From General Revenue Fund                      $36,422,010

For expenses authorized by the Public Defender Commission as provided by Section 600.090, RSMo

|  |  |
|---|---|
| Personal Service | $132,537 |
| Expense and Equipment | $2,850,756 |

From Legal Defense and Defender Fund                      $2,983,293

For refunds set-off against debts as required by RSMo 143.786, From Debt Offset Escrow Fund                      $1,200,000

For all grants and contributions of funds from the federal government or from any other source which may be deposited in the State Treasury for the use of the Office of the State Public Defender
From Federal Funds                      $125,000

Total (Not to exceed 587.13 F.T.E.)                      $40,730,303

The average direct cost of all cases disposed by the State Public Defender (including Death Penalty Representation) in Fiscal Year 2016 was $434.69. The Trial Division Average was just $355.87.

Total costs include personal service, travel, supplies, expert witnesses, copier costs, postage, voice/data communications and some building costs.

## Fiscal Year 2016
## Trial Division Average Cost Per Case

| District | Location | Total Costs | FY16 Cases Assigned | Cost Per Assignment | FY16 Cases Disposed | Cost Per Disposition |
|---|---|---|---|---|---|---|
| 2 | Kirksville | $279,692.85 | 636 | $439.77 | 612 | $457.01 |
| 4 | Maryville | $291,578.49 | 655 | $445.16 | 608 | $479.57 |
| 5 | St. Joseph | $598,795.50 | 1,962 | $305.20 | 1,885 | $317.66 |
| 7 | Liberty | $914,655.13 | 3,173 | $288.26 | 2,704 | $338.26 |
| 10 | Hannibal | $457,229.19 | 1,370 | $333.74 | 1,245 | $367.25 |
| 11 | St. Charles | $626,609.13 | 1,685 | $371.87 | 1,531 | $409.28 |
| 12 | Fulton | $498,776.74 | 1,655 | $301.38 | 1,467 | $340.00 |
| 13 | Columbia | $1,022,428.23 | 3,586 | $285.12 | 3,573 | $286.15 |
| 14 | Moberly | $473,636.80 | 1,686 | $280.92 | 1,643 | $288.28 |
| 15 | Sedalia | $530,537.61 | 2,266 | $234.13 | 2,215 | $239.52 |
| 16 | Kansas City | $2,514,390.91 | 4,437 | $566.69 | 3,806 | $660.64 |
| 17 | Harrisonville | $657,755.21 | 2,559 | $257.04 | 2,271 | $289.63 |
| 19 | Jefferson City | $578,592.23 | 2,044 | $283.07 | 1,950 | $296.71 |
| 20 | Union | $494,251.16 | 1,290 | $383.14 | 1,051 | $470.27 |
| 21 | St. Louis County | $1,498,635.42 | 4,273 | $350.72 | 4,051 | $369.94 |
| 22 | St. Louis City | $2,204,461.88 | 4,199 | $525.00 | 3,724 | $591.96 |
| 23 | Hillsboro | $471,832.48 | 1,730 | $272.74 | 1,757 | $268.54 |
| 24 | Farmington | $764,068.18 | 2,763 | $276.54 | 2,653 | $288.00 |
| 25 | Rolla | $1,007,884.88 | 3,582 | $281.37 | 3,018 | $333.96 |
| 26 | Lebanon | $616,450.22 | 2,280 | $270.37 | 2,100 | $293.55 |
| 28 | Nevada | $464,378.22 | 1,295 | $358.59 | 1,384 | $335.53 |
| 29 | Carthage | $1,203,761.18 | 3,437 | $350.24 | 3,261 | $369.14 |
| 30 | Bolivar | $533,996.70 | 1,594 | $335.00 | 1,423 | $375.26 |
| 31 | Springfield | $1,524,020.77 | 6,161 | $247.37 | 5,357 | $284.49 |
| 32 | Jackson | $904,666.45 | 2,908 | $311.10 | 2,759 | $327.90 |
| 34 | Caruthersville | $330,238.49 | 1,188 | $277.98 | 1,199 | $275.43 |
| 35 | Kennett | $402,774.34 | 1,728 | $233.09 | 1,682 | $239.46 |
| 36 | Poplar Bluff | $593,051.32 | 2,252 | $263.34 | 1,940 | $305.70 |
| 37 | West Plains | $413,441.87 | 1,342 | $308.08 | 1,166 | $354.58 |
| 39 | Monett | $575,055.87 | 1,924 | $298.89 | 1,852 | $310.51 |
| 43 | Chillicothe | $777,205.05 | 2,198 | $353.60 | 2,128 | $365.23 |
| 44 | Ava | $330,082.70 | 1,218 | $271.00 | 1,154 | $286.03 |
| 45 | Troy | $433,898.86 | 1,074 | $404.00 | 1,050 | $413.24 |
| | Trial Division Totals | $24,988,834 | 76,150 | $328.15 | 70,219 | $355.87 |

Cost variances between offices o. en occur due to the range of conf ict county assignments.

## Fiscal Year 2016
## Commitment Defense Unit Average Cost Per Case

| District | Location | Total Costs | FY16 Cases Assigned | Cost Per Assignment | FY16 Cases Disposed | Cost Per Disposition |
|---|---|---|---|---|---|---|
| | | | | | | |
| 71 | Civil Commitment Unit | $496,394.83 | 48 | $10,341.56 | 34 | $14,599.85 |
| | | | | | | |

## Fiscal Year 2016
## Appellate Division Average Cost Per Case

| District | Location | Total Costs | FY16 Cases Assigned | Cost Per Assignment | FY16 Cases Disposed | Cost Per Disposition |
|---|---|---|---|---|---|---|
| 50 | Columbia Appellate | $680,935.23 | 332 | $2,051.01 | 388 | $1,754.99 |
| 51 | St. Louis Appellate | $690,256.29 | 341 | $2,024.21 | 344 | $2,006.56 |
| 52 | Kansas City Appellate | $392,864.36 | 178 | $2,207.10 | 172 | $2,284.10 |
| 67 | Appellate/PCR Central A | $732,866.60 | 355 | $2,064.41 | 262 | $2,797.20 |
| 68 | Appellate/PCR Eastern B | $344,068.90 | 262 | $1,313.24 | 337 | $1,020.98 |
| 69 | Appellate/PCR Western B | $240,245.22 | 162 | $1,483.00 | 135 | $1,779.59 |
| | Appellate Division Totals | $3,081,237 | 1,630 | $1,890.33 | 1,638 | $1,881.10 |

## Fiscal Year 2016
## Capital Division Average Cost Per Case

| District | Location | Total Costs | FY16 Cases Assigned | Cost Per Assignment | FY16 Cases Disposed | Cost Per Disposition |
|---|---|---|---|---|---|---|
| 53 | Columbia Capital | $897,098.73 | 20 | $44,854.94 | 22 | $40,777.22 |
| 54 | St. Louis Capital | $1,143,211.20 | 9 | $127,023.47 | 12 | $95,267.60 |
| 55 | Kansas City Capital | $662,426.63 | 5 | $132,485.33 | 9 | $73,602.96 |
| | | $2,702,737 | 34 | $79,492.25 | 43 | $62,854.34 |
| | | | | | | |

Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM

# FY16
# Time-Keeping

| Attorney Tasks | % of Time per task |
|---|---|
| Administrative Tasks /Special Projects | 11.76% |
| Clerical | 1.20% |
| Client/Family | 14.48% |
| Fact Finding | 9.63% |
| In Court | 18.46% |
| Legal Research & Writing | 7.08% |
| Management | 6.96% |
| Other Case Prep | 16.84% |
| Training/Mentoring | 6.12% |
| Travel | 7.47% |
| **Grand Total** | **100.00%** |

On March 1, 2013, MSPD began recording . me according to task and case type.  While public defender time-keeping had been instituted once before, in 2006, as part of a twelve-week workload study, this new time-keeping approach is not a one-time study, but a permanent change in MSPD's way of doing business.  Employee time-logs are kept in f ve-minute increments and are completed by MSPD attorneys, investigators and mitigation specialists.

The time-keeping program allows MSPD management to expand or collapse the number of categories and tasks tracked.  This f exibility permits the periodic collection of much more detailed data for use in workload studies or tracking a particular issue of concern, while also permitting the collapse of multiple tasks into simpler-to-use broader categories for the ongoing tracking of time.



On July 31, 2014, RubinBrown, one of the nation's leading accounting f rms, working on behalf of the of the ABA's Standing Committee on Legal Aid and Indigent Defendants, released its data-driven report, "The Missouri Project: A Study of the Missouri Public Defender System and Attorney Workload Standards."  In arriving at its workload standards, RubinBrown used MSPD's time-keeping data as well as surveys of both MSPD practitioners and private criminal defense attorneys in Missouri to identify case-related tasks that MSPD attorneys had either sufficient or insufficient time to perform based upon current practices and staffing levels.  With that time-keeping data and survey results in hand, the Missouri Project then utilized a Delphi method, a business forecasting tool, to estimate the amount of time that should be allotted for those tasks with reasonable effectiveness.  The workload standards developed provide empirical evidence that there are not enough public defenders in Missouri to meet its constitutional mandate of providing effective assistance of counsel to indigent persons charged with criminal offenses.  Since its release, The Missouri Project has served as a model for other attorney workload standards in the indigent defense community across our nation.

The workload standards developed by RubinBrown are below:

| | Client Communication[1] | Discovery/Investigation[2] | Case Preparation[3] | Total |
|---|---|---|---|---|
| Murder/Homicide | 34.6 | 33.5 | 38.5 | 106.6 |
| AB Felony | 13.1 | 18.3 | 16.2 | 47.6 |
| CD Felony | 6.3 | 8.4 | 10.3 | 25.0 |
| Sex Felony | 22.5 | 17.8 | 23.6 | 63.8 |
| Misdemeanor | 3.5 | 4.1 | 4.1 | 11.7 |
| Juvenile | 5.4 | 6.8 | 7.3 | 19.5 |
| Appellate/PCR | 20.3 | 31.5 | 44.7 | 96.5 |
| Probation Violation | 2.9 | 2.6 | 4.2 | 9.8 |

Comparing the above standards to the below table of average case-related hours recorded through MSPD's time keeping system, the crisis facing Missouri's indigent defense system is apparent:

| | Client Communication[1] | Discovery/Investigation[2] | Case Preparation[3] | Total |
|---|---|---|---|---|
| Murder/Homicide | 14.8 | 33.5 | 36.2 | 84.5 |
| AB Felony | 3.0 | 2.1 | 3.6 | 8.7 |
| CD Felony | 1.8 | 0.8 | 1.7 | 4.4 |
| Sex Felony | 6.0 | 7.3 | 12.4 | 25.6 |
| Misdemeanor | 0.9 | 0.4 | 0.9 | 2.3 |
| Juvenile | 1.4 | 1.0 | 2.1 | 4.6 |
| Appellate/PCR | 3.1 | 7.5 | 19.6 | 30.3 |
| Probation Violation | 0.7 | 0.2 | 0.5 | 1.4 |

[1.] The client communication Case Task group includes:  in person conversations, phone calls, written communication, and communication with family.

[2.] The discovery/investigation Case Task group includes: State's discovery disclosures, records and transcripts, depositions and witness interviews, and expert and technical research.

[3.] The case preparation Case Task group includes: legal research, drafting and writing, plea negotiations, alternative sentencing research, court preparation, and case management.

The stark discrepancy between what work must be done in the proper defense of constitutional liberty and what is being done with the limited resources at hand reveals that MSPD is in need of 169.50 additional attorneys to meet constitutional requirements.

# Missouri Public Defenders:
# Trial Division

These are the trial lawyers, the ones Missouri's indigent defendants f rst turn to upon being arrested and charged with a crime.  The lawyers usually enter on their cases at or soon a. er a defendant's f rst appearance in associate circuit court following an arrest and will continue representing the defendant through the entire associate and circuit court process – up to and including any plea or trial and, if convicted, the sentencing hearing.  The division consists of 33 district trial offices providing representation in 94.5% of the cases that make up the system's caseload.

MSPD's Trial Division attorneys handle every type of state criminal case in which the law includes a possible jail sentence among the penalty options for the court to consider -- from traffic offenses, conservation, and 'Minor in Possession of Alcohol' offenses up to and including non-capital murder cases.  (Capital Murder cases are handled by the MSPD Capital Division.)  The Trial Division also provides representation in petitions for release from the Department of Mental Health which is discussed further below.

A MSPD Trial Division Attorney's practice will generally include:

- bond hearings for those defendants who are conf ned pre-trial and seeking release, which can include verifying a place to stay, f nding a sponsor the court is likely to trust, verifying an employer will take them back to work, etc.;
- preliminary hearings;
- tracking down and reviewing all of the state's discovery – police reports, lab reports, witness statements, hospital records, etc.;
- interviewing or deposing the key state's witnesses;
- locating and interviewing potential defense witnesses;
- tracking down records and evidence that may help establish the defendant's innocence;
- visiting crime scenes or re-enacting a described crime to see if the real thing matches up with what witnesses described;
- reviewing the results and original notes and data from forensic tests conducted by the state, determining whether an independent analysis by an expert who doesn't work for the state is warranted, and if so, f nding that expert and arranging for the testing of the evidence;
- making initial assessments of the defendant's ability to understand the legal proceedings and, when the defendant exhibits developmental or mental disabilities, arranging for an expert to evaluate the defendant to make that determination;
- researching the law applicable to the defendant's case and litigating motions where it appears the defendant has not been properly charged, the law has not been followed, or the state is seeking to put on evidence of questionable admissibility or reliability;
- negotiating plea agreements with the prosecutor, as well as locating and litigating for sentencing options that could effectively address the problems that resulted in the defendant getting into trouble in the f rst place and thus reduce the likelihood of recidivism; or

Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM

- if the case is one that goes to a trial, conducting that trial, before either a judge or jury, as well as being present and advising the client concerning all the court appearances a defendant will be required to make as his case progresses through the criminal justice system;
- and of course meeting with and advising the client, and perhaps the client's family members if the client requests it, throughout each of the above processes.

As the above list indicates, an attorney's appearance in court on behalf of a defendant is a very small portion of the work they must do on a case.  When they have too many cases, some of these steps are skipped or fall by the way side.  The state's evidence is taken at face value, assumed by all to be accurate and mistakes fall through the cracks, uncaught and uncorrected.  The result is that individual defendants and justice as a whole suffers.

# Types of Cases Handled by the Trial Division

FELONY OFFENSES:  As the pie chart on the following page shows, 52.24% of the Trial Division caseload in FY15 was made up of felony offenses.  These are charges which carry penitentiary time, ranging from one to four years of imprisonment for the lowest level felonies up to life in prison without the possibility of probation or parole for the most serious offenses.

MISDEMEANOR OFFENSES:  Misdemeanor offenses are those which carry jail time as a possible sentence, but any jail time imposed would be served in the county jail rather than the state's penitentiary.  The maximum sentence on the highest level misdemeanor offenses is one year incarceration.

JUVENILE CASES:   Missouri's juvenile courts have jurisdiction over anyone under the age of 17 who is accused of committing an offense that would be a crime if that person were an adult.  They also have jurisdiction over various 'status offenses' – things that apply only to juveniles and not to adults.  Examples of these would be Truancy and Incorrigibility.   Some Missouri courts appoint private attorneys for juveniles who cannot hire their own attorneys, but a number of counties, particularly those in the urban areas with more signif cant juvenile caseloads, continue to rely on the public defender to provide defense representation to these children.

PROBATION VIOLATION CASES:  These are cases in which the defendant has already been through the court system on an underlying charge and placed on probation.  The new case arises from the allegation that the defendant has in some way violated the conditions of his/her probation.  Violations can arise from new criminal behavior, whether or not any criminal charges were f led; so an arrest alone can be grounds for a probation violation.  A defendant may also face a violation proceeding for what are known as technical violations, which are violations of conditions put in place at the time of the probation.  These can include such things as failing a drug test, failure to report to the probation officer as instructed, failure to complete an ordered treatment or education program, etc.

Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM

PETITIONS FOR RELEASE: Another type of civil commitment in which the public defender is involved are those following a f nding of Not Guilty by Reason of Insanity [NGRI]. A defendant found to be NGRI is automatically committed to the Department of Mental Health for treatment. Petitions for Release are the requests by those so committed to now be released from the Department of Mental Health. Some who have already been released from the mental institution on a conditional release are asking to be unconditionally released, free of the ongoing supervision and conditions of the Department of Mental Health. The issue in both such petitions is whether the defendant's mental illness is sufficiently under control that he or she no longer poses a threat to themselves or to others. These petitions are litigated before a judge, rather than a jury.



FAQ: Why does MSPD count probation violations as separate cases when the courts and prosecutors do not?

It is the practice of Missouri's prosecutors and courts to hold open the original case out of which probation arose, for the duration of the probationary period. As a result, they then treat probation violations as simply another proceeding within the original case.

By contrast, it is the practice of MSPD and the defense bar as a whole to close out a case once the defendant is placed on probation. Neither group of defense attorneys, private or public, is willing or able to commit to continuing to represent, counsel, or maintain contact with that client over the course of his / her probation (which on a felony case can last up to f ve years) as would be ethically required of them as defense counsel if they maintained these as open cases for the duration of the probationary period.

If a probation violation is later f led, private defense attorneys generally expect a separate retainer in order to represent the defendant on that probation violation. This is why MSPD winds up with many probation violation cases in which the defendant had private counsel on the underlying charge. The defendant cannot come up

Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM

with the additional money to pay the private attorney to handle the new probation violation matter.  By the same token,  MSPD is seldom in a position to re-assign to the defendant the same attorney who handled the underlying charge in his case.  In either situation, therefore, a new attorney-client relationship must be established just as in any other new case.

Any evidence of a probation violation is gathered and reported to the court and prosecutor by the probation officer.  The review of that evidence, investigation of its accuracy, the review of the law that applies to the circumstances of this revocation proceeding and the investigation into and presentation to the judge of other sentencing alternatives in lieu of revocation is the obligation of defense counsel.  If done correctly, this is very comparable to the work that is required in any other criminal case and therefore MSPD counts it as a case in its own right.

COUNTY VS CIRCUIT SYSTEMS

Missouri's 33 trial offices provide defense representation to indigent defendants in all of Missouri's 114 counties plus the City of St. Louis.  Some of the urban offices serve only one county, but most of the offices serving rural counties are responsible for several counties.  The office with the largest geographic spread is District 43, located in Chillicothe, which serves eleven counties.  Most offices, however, cover between three and f ve counties.

Currently, the geographic areas covered by defender offices do not coincide with Missouri's judicial circuits, even though the district numbers assigned to each office will often be the same as that of one of the judicial circuits the office serves.  For example, one public defender office may serve only two of the three counties in a particular judicial circuit, while also providing service in two counties from an adjoining judicial circuit.

This arrangement will be changing as the result of legislation enacted in the Spring of 2013.   HB215 requires that the Missouri Public Defender Commission, which is responsible for determining where public defender offices are established and their boundaries of service, begin the move toward making public defender districts congruent with judicial circuits.  A plan for implementing that change was submitted to the Legislature on December 2015 and f nal implementation of the revised districts is to be completed by December 31, 2021.  Under the legislation, one district office may serve more than one judicial circuit, but circuits may not be split between more than one district office.

Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM

# Public Defender Trial Division
# District Map
# Fiscal Year 2016



January 2016

## Fiscal Year 2016
## - Trial Division -
## Cases by Case Type

| Case Type | Description | Opened Cases | Closed Cases |
|---|---|---:|---:|
| 15 | Murder - 1st Degree | 147 | 123 |
| 20 | Other Homicide | 133 | 132 |
| 30D | A - B Felony Drug | 2,704 | 2,591 |
| 30F | A - B Felony Other | 4,277 | 3,790 |
| 30X | A - B Felony Sex | 677 | 640 |
| 35D | C - D Felony Drug | 10,006 | 8,478 |
| 35F | C - D Felony Other | 22,357 | 20,815 |
| 35X | C - D Felony Sex | 300 | 270 |
| 45M | Misdemeanor | 13,557 | 12,749 |
| 45T | Misd. - Traffic | 2,057 | 1,988 |
| 50N | Juvenile Non-violent | 912 | 924 |
| 50S | Juvenile Status | 81 | 81 |
| 50V | Juvenile Violent | 625 | 598 |
| 60 | Mental Health Release Petitions | 9 | 25 |
| 65F | Probation Violation - Felony | 14,880 | 13,814 |
| 65M | Probation Violation - Misd. | 3,350 | 3,133 |
| 75 | Special Writ | 10 | 5 |
| 82 | Appeal - Other | 3 | 5 |
| 99 | Unknown | 65 | 58 |
| | | 76,150 | 70,219 |

Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM



MSPD tracks both assigned and disposed of cases for each fiscal year, and both of those numbers for FY2016 can be found within this Annual Report.     However, those two numbers are generally not tracking the same cases.  Many cases take more than a year from assignment to disposition and many more do not fall neatly, start to finish, within a single fiscal year.  The above chart reflects the reality that no lawyer begins the fiscal year with an empty file drawer.  At the start of FY2016, Missouri's Trial Division public defenders had over 31,738 pending cases already on their desks, to which another 76,150 new cases were assigned over the course of the fiscal year.

## MISSOURI STATE PUBLIC DEFENDER SYSTEM
## Trial Division Offices

**Area 2 -- Adair, Knox, Schuyler, Scotland Counties**
Kevin Locke, District Defender
905 E. George
Kirksville, MO  63501
660-785-2445          FAX: 660-785-2449

**Area 4 -- Andrew, Atchison, Gentry, Holt,**
**Nodaway, Worth Counties**
Michelle Davidson, District Defender
305 North Market
Maryville, MO  64468
660-582-3545          FAX: 660-562-3398

**Area 5 -- Buchanan County**
Sue Rinne, District Defender
120 South 5th Street, 2nd Floor
St. Joseph, MO  64501
816-387-2026          FAX: 816-387-2786

**Area 7 – Clay, Clinton, Platte Counties**
Anthony Cardarella, District Defender
234 West Shrader
Liberty, Missouri  64068
816-792-5394          FAX: 816-792-8267

**Area 10 -- Clark, Lewis, Marion, Monroe,**
**Ralls, Shelby Counties**
Todd Schulze, District Defender
201 North Third Street
Hannibal, MO  63401
573-248-2430          FAX: 573-248-2432

**Area 11 -- St. Charles, Warren Counties**
Tara Crane, District Defender
300 N. Second Street, Suite 264
St. Charles, MO  63301
636-949-7300          FAX: 636-949-7301

**Area 12 -- Audrain, Callaway,**
**Montgomery Counties**
Mary Jo Smith, District Defender
2800 Cardinal Drive
Suite B
Fulton, MO  65251
573-592-4155          FAX: 573-642-9528

**Area 13 -- Boone County**
David Wallis, District Defender
601 E. Walnut
Columbia, MO  65201
573-882-9701          FAX: 573-882-9147

**Area 14 -- Chariton, Howard, Linn,**
**Macon, Randolph Counties**
Ed Guinn, District Defender
3029 County Road 1325
Moberly, MO  65270
660-263-7665          FAX: 660-263-2479

**Area 15 -- Cooper, Lafayette, Pettis,**
**Saline Counties**
Max Mitchell, District Defender
110 S. Limit
Sedalia, MO  65301
660-530-5550          FAX: 660-530-5545

**Area 16 -- Jackson County**
Ruth Petsch, District Defender
Oak Tower, 20th Floor
324 E. 11th Street
Kansas City, MO  64106-2417
816-889-2099          FAX: 816-889-2999

As of August  1, 2016

## MISSOURI STATE PUBLIC DEFENDER SYSTEM
## Trial Division Offices

**Area 17 -- Bates, Cass, Henry,**
**Johnson, St. Clair Counties**
Jeffrey Mar. n, District Defender
502 Westchester Avenue
Harrisonville, MO 64701
816-380-3160      FAX: 816-380-7844

**Area 19 -- Cole, Miller, Moniteau Counties**
Justin Carver, District Defender
210 Adams Street
Jefferson City, MO 65101
573-526-3266      FAX: 573-526-1115

**Area 20 -- Franklin, Gasconade, Osage Counties**
Lisa Preddy, District Defender
300 East Main Street
Union, MO 63084
636-583-5197      FAX: 636-583-1740

**Area 21 -- St. Louis County**
Stephen Reynolds, District Defender
100 S. Central, 2nd Floor
Clayton, MO 63105
314-615-4778      FAX: 314-615-0128

**Area 22 -- St. Louis City**
Mary Fox, District Defender
Mel Carnahan Courthouse
1114 Market Street, Suite 602
St. Louis, MO 63101
314-340-7625      FAX: 314-340-7595

**Area 23 -- Jefferson County**
Courtney Goodwin, District Defender
P.O. Box 156
116 Main Street
Hillsboro, Missouri 63050
636-789-5254      FAX: 636-789-5267

**Area 24 -- Iron, Madison, Reynolds,**
**St. Francois, Ste. Genevieve,**
**Washington Counties**
Wayne Williams, District Defender
Liberty Hall Professional Building
400 N. Washington Street, Suite #232
Farmington, MO 63640
573-218-7080      FAX: 573-218-7082

**Area 25 -- Crawford, Dent, Maries,**
**Phelps, Pulaski, Texas Counties**
Matthew Crowell, District Defender
901 Pine, Suite 200
Rolla, MO 65401
573-368-2260      FAX: 573-364-7976

**Area 26 -- Camden, Laclede, Morgan Counties**
Karie Comstock, District Defender
288 Harwood
Lebanon, MO 65536
417-532-6886      FAX: 417-532-6894

**Area 28 -- Barton, Cedar, Dade, Vernon Counties**
Renee GotviAgehya, District Defender
329 C North Barrett
Nevada, MO 64772
417-448-1140      FAX: 417-448-1143

**Area 29 -- Jasper, McDonald, Newton Counties**
Darren Wallace, District Defender
115 Lincoln Street
Carthage, MO 64836
417-359-8489      FAX: 417-359-8490

As of August 1, 2016

## MISSOURI STATE PUBLIC DEFENDER SYSTEM
## Trial Division Offices

**Area 30 -- Benton, Dallas, Hickory,**
**Polk, Webster Counties**
Dewayne Perry, District Defender
1901 South Wommack, Suite B
Bolivar, Missouri  65613
417-777-8544        FAX: 417-777-3082

**Area 31 -- Christian, Greene, Taney Counties**
Rodney Hackathorn, District Defender
630 North Robberson
Springf eld, MO  65806
417-895-6740        FAX: 417-895-6780

**Area 32 -- Bollinger, Cape Girardeau,**
**Mississippi, Perry, Scott Counties**
Christopher Davis, District Defender
215 North High Street
Jackson, MO  63755
573-243-3949        FAX: 573-243-1613

**Area 34 -- New Madrid,**
**Pemiscot Counties**
Susan Warren, District Defender
48 East State Highway 162
Portageville, MO  63873
573-379-9308        FAX 573-379-9309

**Area 35 -- Dunklin, Stoddard Counties**
Patti Tucka, District Defender
P.O. Box 648
1087 Commerce Drive
Kennett, MO  63857
573-888-0604        FAX: 573-888-0614

**Area 36 -- Butler, Carter, Ripley, Wayne Counties**
Steven Lynxwiler, District Defender
2323 North Main
Poplar Bluff, MO  63901
573-840-9775        FAX: 573-840-9773

**Area 37 -- Howell, Oregon, Shannon Counties**
Donna Anthony, District Defender
1314 Webster Street
West Plains, MO  65775
417-257-7224        FAX: 417-257-7692

**Area 39 -- Barry, Lawrence, Stone Counties**
Pamela Musgrave, District Defender
P.O. Box 685
305 Dairy
Monett, MO  65708-0685
417-235-8828        FAX: 417-235-5140

**Area 43 -- Caldwell, Carroll, Daviess, DeKalb,**
**Grundy, Harrison, Livingston, Mercer,**
**Putnam, Ray, Sullivan Counties**
Kelly Miller, District Defender
500 Youssef
Chillicothe, MO  64601
660-646-3343        FAX: 660-646-4228

**Area 44 -- Douglas, Ozark, Wright Counties**
Kate Welborn, District Defender
P.O. Box 951
404 East Washington Street
Ava, MO  65608
417-683-5418        FAX: 417-683-5820

**Area 45 -- Lincoln, Pike Counties**
Tom Crocco, District Defender
240 West College
Troy, MO  63379
636-528-5084        FAX: 636-528-5086

As of August  1, 2016

| District # | District Name | Cases Assigned | Cases Disposed |
|---|---|---|---|
| | **Fiscal Year 2016<br>Trial Division Cases<br>Assigned and Disposed** | | |
| 2 | Kirksville | 636 | 612 |
| 4 | Maryville | 655 | 608 |
| 5 | St. Joseph | 1,962 | 1,885 |
| 7 | Liberty | 3,173 | 2,704 |
| 10 | Hannibal | 1,370 | 1,245 |
| 11 | St. Charles | 1,685 | 1,531 |
| 12 | Fulton | 1,655 | 1,467 |
| 13 | Columbia | 3,586 | 3,573 |
| 14 | Moberly | 1,686 | 1,643 |
| 15 | Sedalia | 2,266 | 2,215 |
| 16 | Kansas City | 4,437 | 3,806 |
| 17 | Harrisonville | 2,559 | 2,271 |
| 19 | Jefferson City | 2,044 | 1,950 |
| 20 | Union | 1,290 | 1,051 |
| 21 | St. Louis County | 4,273 | 4,051 |
| 22 | St. Louis City | 4,199 | 3,724 |
| 23 | Hillsboro | 1,730 | 1,757 |
| 24 | Farmington | 2,763 | 2,653 |
| 25 | Rolla | 3,582 | 3,018 |
| 26 | Lebanon | 2,280 | 2,100 |
| 28 | Nevada | 1,295 | 1,384 |
| 29 | Carthage | 3,437 | 3,261 |
| 30 | Bolivar | 1,594 | 1,423 |
| 31 | Springfield | 6,161 | 5,357 |
| 32 | Cape Girardeau | 2,908 | 2,759 |
| 34 | Portageville | 1,188 | 1,199 |
| 35 | Kennett | 1,728 | 1,682 |
| 36 | Poplar Bluff | 2,252 | 1,940 |
| 37 | West Plains | 1,342 | 1,166 |
| 39 | Monett | 1,924 | 1,852 |
| 43 | Chillicothe | 2,198 | 2,128 |
| 44 | Ava | 1,218 | 1,154 |
| 45 | Troy | 1,074 | 1,050 |
| | **Trial Division Totals** | 76,150 | 70,219 |

Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM

# Cases Assigned and Disposed – By District
## Fiscal Year 2010 to Fiscal Year 2016

**■ Opened  □ Closed**





District 2—Kirksville





District 4—Maryville





District 5—St. Joseph

Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM

## Cases Assigned and Disposed – By District
## Fiscal Year 2010 to Fiscal Year 2016



Opened    Closed





District 7—Liberty





District 10—Hannibal





District 11—St. Charles

Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM

# Cases Assigned and Disposed – By District
## Fiscal Year 2010 to Fiscal Year 2016

■ Opened  □ Closed



### District 12—Fulton





### District 13—Columbia





### District 14—Moberly



Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM

## Cases Assigned and Disposed – By District
## Fiscal Year 2010 to Fiscal Year 2016



**Opened** **Closed**





District 15—Sedalia





District 16—Kansas City





District 17—Harrisonville

# Cases Assigned and Disposed – By District
## Fiscal Year 2010 to Fiscal Year 2016

Opened  Closed





District 19—Jefferson City





District 20—Union





District 21—St. Louis County



Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM

# Cases Assigned and Disposed – By District
## Fiscal Year 2010 to Fiscal Year 2016

**Opened** **Closed**



District 22—St. Louis City





District 23—Hillsboro





District 24—Farmington



Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM

# Cases Assigned and Disposed – By District
## Fiscal Year 2010 to Fiscal Year 2016


Opened | Closed




District 25—Rolla




District 26—Lebanon




District 28—Nevada



# Cases Assigned and Disposed – By District
## Fiscal Year 2010 to Fiscal Year 2016

**Opened** | **Closed**



District 29—Carthage





District 30—Bolivar





District 31—- Springf eld



Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM

## Cases Assigned and Disposed – By District
## Fiscal Year 2010 to Fiscal Year 2016

Opened    Closed





District 32—Jackson





District 34—Portageville





District 35—Kenne.

Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM

## Cases Assigned and Disposed – By District
## Fiscal Year 2010 to Fiscal Year 2016

**Opened** **Closed**





District 36—Poplar Bluff





District 37—West Plains





District 39—Monett

Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM

# Cases Assigned and Disposed – By District
## Fiscal Year 2010 to Fiscal Year 2016

**Opened** | **Closed**



District 43—Chillicothe



District 44—Ava





District 45—Troy



| Fiscal Year 2016 Trial Division Opened and Closed by County | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| County | Opened | Closed | County | Opened | Closed | County | Opened | Closed |
| ADAIR | 445 | 436 | GREENE | 4,008 | 3,372 | OZARK | 181 | 148 |
| ANDREW | 183 | 165 | GRUNDY | 236 | 237 | PEMISCOT | 647 | 665 |
| ATCHISON | 42 | 46 | HARRISON | 193 | 166 | PERRY | 287 | 271 |
| AUDRAIN | 675 | 558 | HENRY | 474 | 355 | PETTIS | 1,013 | 949 |
| BARRY | 684 | 665 | HICKORY | 114 | 95 | PHELPS | 912 | 684 |
| BARTON | 138 | 117 | HOLT | 44 | 42 | PIKE | 256 | 265 |
| BATES | 454 | 381 | HOWARD | 184 | 173 | PLATTE | 799 | 729 |
| BENTON | 293 | 263 | HOWELL | 1,098 | 919 | POLK | 417 | 367 |
| BOLLINGER | 213 | 193 | IRON | 134 | 127 | PULASKI | 998 | 840 |
| BOONE | 3,093 | 3,156 | JACKSON | 4,660 | 3,913 | PUTNAM | 91 | 95 |
| BUCHANAN | 2,022 | 1,968 | JASPER | 2,209 | 2,002 | RALLS | 206 | 199 |
| BUTLER | 1,261 | 1,024 | JEFFERSON | 1,873 | 1,878 | RANDOLPH | 761 | 740 |
| CALDWELL | 203 | 182 | JOHNSON | 580 | 589 | RAY | 355 | 306 |
| CALLAWAY | 883 | 785 | KNOX | 41 | 38 | REYNOLDS | 104 | 75 |
| CAMDEN | 798 | 783 | LACLEDE | 843 | 842 | RIPLEY | 383 | 352 |
| CAPE GIRARDEAU | 1,182 | 1,129 | LAFAYETTE | 520 | 552 | SALINE | 340 | 364 |
| CARROLL | 154 | 146 | LAWRENCE | 736 | 776 | SCHUYLER | 71 | 81 |
| CARTER | 152 | 141 | LEWIS | 171 | 164 | SCOTLAND | 70 | 63 |
| CASS | 810 | 723 | LINCOLN | 782 | 768 | SCOTT | 803 | 733 |
| CEDAR | 197 | 220 | LINN | 309 | 292 | SHANNON | 210 | 209 |
| CHARITON | 145 | 143 | LIVINGSTON | 514 | 537 | SHELBY | 99 | 84 |
| CHRISTIAN | 989 | 922 | MACON | 306 | 334 | ST. CHARLES | 1,200 | 1139 |
| CLARK | 156 | 140 | MADISON | 258 | 278 | ST. CLAIR | 159 | 145 |
| CLAY | 1,824 | 1,578 | MARIES | 75 | 67 | ST. FRANCOIS | 1,299 | 1270 |
| CLINTON | 222 | 203 | MARION | 780 | 669 | ST. LOUIS CITY | 3,778 | 3270 |
| COLE | 1,407 | 1,382 | MCDONALD | 374 | 376 | ST. LOUIS COUNTY | 4,278 | 4083 |
| COOPER | 560 | 521 | MERCER | 87 | 67 | STE. GENEVIEVE | 354 | 360 |
| CRAWFORD | 716 | 668 | MILLER | 624 | 491 | STODDARD | 697 | 666 |
| DADE | 127 | 134 | MISSISSIPPI | 440 | 438 | STONE | 424 | 393 |
| DALLAS | 149 | 133 | MONITEAU | 203 | 192 | SULLIVAN | 119 | 116 |
| DAVIESS | 211 | 215 | MONROE | 70 | 68 | TANEY | 1,409 | 1239 |
| DEKALB | 200 | 197 | MONTGOMERY | 231 | 206 | TEXAS | 614 | 548 |
| DENT | 436 | 354 | MORGAN | 423 | 345 | VERNON | 889 | 973 |
| DOUGLAS | 287 | 257 | NEW MADRID | 546 | 511 | WARREN | 473 | 375 |
| DUNKLIN | 1,094 | 1,076 | NEWTON | 978 | 947 | WASHINGTON | 440 | 433 |
| FRANKLIN | 1,192 | 998 | NODAWAY | 243 | 213 | WAYNE | 484 | 453 |
| GASCONADE | 121 | 108 | OREGON | 193 | 183 | WEBSTER | 457 | 414 |
| GENTRY | 66 | 51 | OSAGE | 82 | 70 | WORTH | 18 | 9 |
| | | | | | | WRIGHT | 635 | 661 |
| | | | | | | | 76,150 | 70,219 |

Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM

# 15 YEAR COMPARISON—TRIAL DIVISION CASELOAD—
## CLOSED CASES BY COUNTY

















# 15 YEAR COMPARISON—TRIAL DIVISION CASELOAD— CLOSED CASES BY COUNTY

















Segment.

Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM

# 15 YEAR COMPARISON—TRIAL DIVISION CASELOAD—
## CLOSED CASES BY COUNTY



CARROLL



CARTER



CASS



CEDAR



CHARITON



CHRISTIAN



CLARK



CLAY

# 15 YEAR COMPARISON—TRIAL DIVISION CASELOAD— CLOSED CASES BY COUNTY

















Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM

Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM

## 15 YEAR COMPARISON—TRIAL DIVISION CASELOAD— CLOSED CASES BY COUNTY



DENT

531, 498, 314, 332, 363, 406, 347, 368, 299, 295, 328, 285, 440, 371, 354



DOUGLAS

264, 276, 256, 257, 201, 206, 209, 223, 237, 243, 169, 147, 219, 205, 212



DUNKLIN

1034, 1106, 996, 969, 825, 983, 1076, 1114, 1023, 1001, 966, 786, 822, 781, 756



FRANKLIN

1938, 1508, 1444, 1546, 1269, 1304, 998, 1630, 1319, 1187, 1263, 1427, 1516, 888, 872



GASCONADE

275, 239, 250, 211, 237, 228, 204, 231, 218, 195, 194, 181, 97, 108, 85



GENTRY

80, 79, 70, 96, 69, 62, 55, 62, 71, 74, 56, 57, 58, 40, 51



GREENE

3752, 3739, 3090, 3427, 3079, 3205, 3045, 3372, 3076, 3168, 3041, 3020, 2835, 2690, 2345



GRUNDY

271, 226, 253, 238, 240, 234, 237, 256, 216, 226, 200, 217, 205, 197, 166

# 15 YEAR COMPARISON—TRIAL DIVISION CASELOAD—
## CLOSED CASES BY COUNTY

















Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM

Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM

# 15 YEAR COMPARISON—TRIAL DIVISION CASELOAD— CLOSED CASES BY COUNTY

















Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM

# 15 YEAR COMPARISON—TRIAL DIVISION CASELOAD— CLOSED CASES BY COUNTY

















# 15 YEAR COMPARISON—TRIAL DIVISION CASELOAD— CLOSED CASES BY COUNTY

















Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM

## 15 YEAR COMPARISON—TRIAL DIVISION CASELOAD—
## CLOSED CASES BY COUNTY



NEWTON



NODAWAY



OREGON



OSAGE



OZARK



PEMISCOT



PERRY



PETTIS

## 15 YEAR COMPARISON—TRIAL DIVISION CASELOAD— CLOSED CASES BY COUNTY

















## 15 YEAR COMPARISON—TRIAL DIVISION CASELOAD— CLOSED CASES BY COUNTY

















Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM

Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM

# 15 YEAR COMPARISON—TRIAL DIVISION CASELOAD— CLOSED CASES BY COUNTY



SHELBY



STE. GENEVIEVE



STODDARD



STONE



ST. CHARLES



ST. CLAIR



ST. FRANCOIS



ST. LOUIS CITY

## 15 YEAR COMPARISON—TRIAL DIVISION CASELOAD— CLOSED CASES BY COUNTY

**ST. LOUIS COUNTY**



**SULLIVAN**



**TANEY**



**TEXAS**



**VERNON**



**WARREN**



**WASHINGTON**



**WAYNE**



Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM

## 15 YEAR COMPARISON—TRIAL DIVISION CASELOAD—
## CLOSED CASES BY COUNTY







## Public Defender
## Appellate/Post Conviction Relief Division

MSPD's Appellate/PCR Division consists of six offices, with two offices located in St. Louis, two in Columbia, and two in Kansas City. In St. Louis and Kansas City, both offices do both appeals and PCR's and handle conf ict cases for one another. Having a second office down the hall avoids having to transfer conf ict cases to an a. orney on the other side of the state. In Columbia, one office handles exclusively appeals and the other office handles exclusively post-conviction cases.

**Appeals:** Direct appeals are the f rst step in seeking to set aside or overturn a conviction after a trial. The process involves asking the Court of Appeals and /or the Missouri Supreme Court, to review and grant relief because of mistakes made by the trial court. The attorneys review the trial transcript, the trial court f le, all the legal documents, and evidence introduced in the case and then present to the appellate courts, through written briefs and oral argument, the errors that were made in the lower court and the law supporting relief. MSPD's appellate attorneys handle cases in the Eastern, Western, and Southern Districts and in both the Missouri and U.S. Supreme Court.

**Post-conviction Cases:** Post-Conviction cases (or PCR's) are collateral attacks on a conviction after the appellate process has been exhausted, and can include challenges to the legitimacy of the appellate process in a case as well as the trial court proceedings. Unlike an appeal, which can only follow a trial, a PCR can also be f led after a guilty plea. These proceedings are conducted in the circuit courts in all 114 counties across the state and the City of St. Louis and include capital as well as non-capital cases.

In a post-conviction case, the focus is on constitutional violations that could not be corrected at the appellate level. For example, if an attorney fails to object at the right time at a trial, the trial court's mistake is not preserved for appeal and the appellate court will usually not review it. However, through a PCR proceeding , a court can examine the attorney's failure to make the right objection and the likelihood the defendant would have gotten relief on appeal had the attorney done it correctly. If the court in the PCR hearing f nds that, but for the attorney's ineffectiveness, the defendant likely would have had a different result, relief may be granted.

Attorneys handling PCR cases must do much of the same work as their appellate counterparts -- reviewing the trial transcript, the trial court f le, all the legal documents, and evidence introduced in the case; but instead of then writing briefs and doing oral arguments for the appellate court, they draft motions to set aside the conviction and conduct evidentiary hearings at the circuit court level. To prepare for these, the PCR attorneys must f gure out what the trial attorney should have done, but didn't, and then do it themselves. This can include a fair amount of case re-investigation, such as locating and presenting witnesses the trial attorney failed to locate or present, presenting the testimony of an expert the trial attorney failed to obtain, or putting on new evidence of innocence that was never provided by the state prior to trial. If a post-conviction claim is denied at the lower court level, there is a right to an appeal of that denial.

**Private Attorney Cases:** In addition to the direct appeals and post-conviction matters arising out of cases initially handled at the trial level by public defenders, our Appellate/PCR attorneys get many cases from the private bar. It is frequently the case that the money to pay counsel has run out by the time a trial is complete and the appellate and post-conviction processes therefore fall back to the public defender.

Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM



## MISSOURI STATE PUBLIC DEFENDER SYSTEM
## Appellate Division

**Appellate Central District 50**
Ellen Flo man, District Defender
Woodrail Centre
1000 West Nifong—Building 7, Suite 100
Columbia, MO 65203
573-882-9855        FAX: 573-882-4793

**PCR Central District 69**
Steve Harris, District Defender
Woodrail Centre
1000 West Nifong—Building 7, Suite 100
Columbia, MO 65203
573-882-9855        FAX: 573-882-9468

**Appellate/PCR Eastern District 51 (A)**
Kristina Olson, District Defender
1010 Market Street—Suite 1100
St. Louis, MO 63103
314-340-7662        FAX: 314-340-7685

**Appellate/PCR Eastern District 68 (B)**
Renee Robinson, District Defender
1010 Market Street—Suite 1100
St. Louis, MO 63103
314-340-7662        FAX: 314-421-7685

**Appellate/PCR Western District 52 (A)**
Susan Hogan, District Defender
920 Main Street, Suite 500
Kansas City, MO 64105
816-889-7699        FAX: 816-889-2001

**Appellate/PCR Western District 69 (B)**
Laura Martin, District Defender
920 Main Street, Suite 500
Kansas City, MO 64105
816-889-7699        FAX: 816-889-2001

As of August 1, 2016

| | Central | | Eastern | | Western | | Totals |
|---|---|---|---|---|---|---|---|
| | Columbia | | St. Louis | | Kansas City | | |
| | Area 50 | Area 67 | Area 51 | Area 68 | Area 52 | Area 69 | |
| **Death Penalty** | | | | | | | |
| **Opened** | | | | | | | **0** |
| **Closed** | | 1 | | | 1 | | **2** |
| | | | | | | | |
| **Felony Appeals** | | | | | | | |
| **Opened** | 223 | | 48 | 29 | 28 | 29 | **357** |
| **Closed** | 296 | | 64 | 50 | 32 | 28 | **470** |
| | | | | | | | |
| **Misdemeanor Appeals** | | | | | | | |
| **Opened** | 19 | | | 1 | | 1 | **21** |
| **Closed** | 10 | | 1 | 1 | | | **12** |
| | | | | | | | |
| **Juvenile Appeals** | | | | | | | |
| **Opened** | | | 0 | | | | **0** |
| **Closed** | | | | | 1 | | **1** |
| | | | | | | | |
| **Post Plea PCR** | | | | | | | |
| **Opened** | | 218 | 106 | 74 | 74 | 75 | **547** |
| **Closed** | | 162 | 122 | 101 | 66 | 55 | **506** |
| | | | | | | | |
| **Post Trial PCR** | | | | | | | |
| **Opened** | | 91 | 55 | 57 | 28 | 31 | **262** |
| **Closed** | | 75 | 62 | 78 | 29 | 21 | **265** |
| | | | | | | | |
| **PCR Appeals** | | | | | | | |
| **Opened** | 68 | 40 | 110 | 96 | 44 | 23 | **381** |
| **Closed** | 64 | 21 | 80 | 101 | 42 | 29 | **337** |
| | | | | | | | |
| **Other** (DNA, 29.07, 29.13, Rule 87, State's Appeals, 29.27, Writs, CDUs, etc) | | | | | | | |
| **Opened** | 22 | 6 | 22 | 5 | 4 | 3 | **62** |
| **Closed** | 18 | 3 | 15 | 6 | 1 | 2 | **45** |
| | | | | | | | |
| **Appellate Division Totals** | | | | | | | |
| **Opened** | 332 | 355 | 341 | 262 | 178 | 162 | **1,630** |
| **Closed** | 388 | 262 | 344 | 337 | 172 | 135 | **1,638** |
| | | | | | | | |
| **Totals** | | | | | | | |
| **Opened** | 687 | | 603 | | 340 | | **1,630** |
| **Closed** | 650 | | 681 | | 307 | | **1,638** |
| | Central | | Eastern | | Western | | |
| | Columbia | | St. Louis | | Kansas City | | |

Table title: **Fiscal Year 2016 — APPELLATE DIVISION CASELOAD — Cases Opened and Closed**

Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM

Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM

# Cases Opened and Closed – By District
## Fiscal Year 2010 to Fiscal Year 2016

■ Opened　　□ Closed



District 50

Columbia

Central Appellate



District 67

Columbia

Central Post Conviction



District 51

St. Louis

Eastern Appellate/
Post Conviction A



# Cases Opened and Closed – By District
## Fiscal Year 2010 to Fiscal Year 2016

**Opened** | **Closed**



District 68

St. Louis

Eastern Appellate/
Post Conviction B



District 52

Kansas City

Western Appellate/
Post Conviction A



District 69

Kansas City

Western Appellate/
Post Conviction B

# Missouri Public Defenders
# Capital Division

MSPD's Capital Division provides defense representa. on in f rst degree murder cases in which the state is seeking the death penalty, as well as for juveniles facing the possibility of life without parole in non-capital murder f rst degree cases.  They also handle direct appeals in cases in which a sentence of death has been imposed.  If their caseloads permit, they may occasionally also take on a non-capital murder case from an overloaded trial office.

The division consists of three offices, one in St. Louis, one in Columbia, and one in Kansas City.   Because of the complexity of death penalty cases, attorneys handling capital cases are limited to no more than six open capital cases at a time.  Two attorneys, an investigator, and a mitigation specialist are assigned to each case.

| Fiscal Year 2016 CAPITAL DIVISION Caseload | | | | |
|---|---|---|---|---|
| | FY15 Carryover into FY2016 | Assigned | Disposed | Current as of June 30, 2015 |
| **Central Office - Columbia** | | | | |
| Death Penalty Trial Cases | | 10 | 5 | 6 |
| Non- Death Penalty Trial | | 1 | 3 | 1 |
| Juvenile Murder 1st | | | | 1 |
| Miller Cases | | | | 6 |
| Appeals - Death Penalty | | 0 | 1 | 2 |
| Appeals Other | | 10 | 1 | 2 |
| Juvenile Appeals | | | 13 | 11 |
| **Totals** | 38 | 21 | 23 | 29 |
| **Eastern Office - St. Louis City** | | | | |
| Death Penalty Trial Cases | | 8 | 7 | 14 |
| Non- Death Penalty Trial | | 1 | 5 | 7 |
| Juvenile Murder 1st | | | | 1 |
| Miller Cases | | | | 1 |
| Appeals - Death  Penalty | | 0 | 0 | 0 |
| Appeals Other | | 0 | 0 | 0 |
| **Totals** | 26 | 9 | 12 | 23 |
| **Western Office - Kansas City** | | | | |
| Death Penalty Trial Cases | | 2 | 0 | 5 |
| Non- Death Penalty Trial | | 2 | 3 | 0 |
| Juvenile Murder 1st | | | | 4 |
| Miller Cases | | | | 4 |
| Appeals - Death Penalty | | 0 | 1 | 0 |
| Appeals - Other | | | 4 | 3 |
| **Totals** | 20 | 4 | 8 | 16 |
| **Total Capital Division** | | | | |
| Death Penalty Trial Cases | | 20 | 12 | 25 |
| Non- Death Penalty Trial | | 4 | 11 | 8 |
| Juvenile Murder 1st | | | | 6 |
| Miller Cases | | | | 11 |
| Appeals - Death Penalty | | 0 | 2 | 2 |
| Appeals - Other | | 10 | 5 | 5 |
| Juvenile Appeals | | | | 11 |
| | | | | |
| **Division Totals** | 84 | 34 | 43 | 68 |



Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM

## MISSOURI STATE PUBLIC DEFENDER SYSTEM

### Capital Division

**Central District**
Donald Catlett, District Defender
Woodrail Centre
1000 West Nifong—Building 7, Suite 100
Columbia, MO 65203
573-882-9855        FAX: 573-884-4921

**Eastern District**
Sharon Turlington, District Defender
1010 Market Street—Suite 1100
St. Louis, MO 63103
314-340-7662        FAX: 314-340-7666

**Western District**
Thomas Jacquinot, District Defender
920 Main Street, Suite 500
Kansas City, MO 64105
816-889-7699        Fax: 816-889-2001

As of August 1, 2016

Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM

# Missouri Public Defenders
# Commitment Defense Unit

MSPD's Civil Commitment Defense Unit was created 2003 in response to Missouri's adop. on of new 'Sexually Violent Predator' civil commitment laws. After a person convicted of certain sexual offenses has completed his prison sentence, the state may seek to have him adjudicated as a 'sexually violent predator' and have him civilly committed to the state's Sex Offender Rehabilitation and Treatment Services institution. The public defenders working in MSPD's Civil Commitment Defense Unit [CDU] provide defense representation to these defendants during both their initial commitment hearing and jury trial and thereafter, to determine whether he or she remains a danger to the community.

At the time this program was created, MSPD received two additional attorneys to handle the anticipated increase in workload from these new commitment proceedings. Today, MSPD has had to pull three more lawyers from the overloaded Trial Division to help handle the growing CDU caseload.

## Fiscal Year 2016
## Commitment Defense Unit
## Caseload Statistics

|  | FY15 Carryover into FY16 | # of Cases Assigned in FY2016 |
|---|---|---|
| Petitions for Commitment | 33 | 20 |
| Petitions for Release | 65 | 28 |
| Total Opened for 2016 |  | 48 |

|  |  | # of Cases Closed in FY2016 |
|---|---|---|
| Jury Trials |  | 14 |
| Bench Trials |  | 3 |
| Dismissal: Not Adjudicated |  | 9 |
| Release Petition (Withdrawn) |  | 8 |
| Total Closed for 2015 |  | 34 |

Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM





## MISSOURI STATE PUBLIC DEFENDER SYSTEM

## Civil Commitment Unit

**COMMITMENT DEFENSE UNIT**

Amy Clay, District Defender
1010 Market Street, Suite 1100
St. Louis, MO 63101
314-340-7662      FAX: 314-340-7666

As of September 1, 2016

# Missouri Public Defender
# Case Contracting

Historically, MSPD has contracted approximately 5 percent of its annual caseload to private a. orneys. Contracted cases generally fall into one of two categories:

(1) **Conflicts:**  The majority of the cases contracted out to private attorneys are second and third-level conf ict cases.  A conf ict case is one in which the local defender office ethically cannot provide representation – usually because they already represent a co-defendant or perhaps a witness in the same case.  In that circumstance, the local office sends the client they cannot represent to one of the next nearest defender offices for representation.  These are called f rst-level conf ict cases.  Where there are more than just two individuals needing representation who are involved in a conf ict, (i.e. second and third level conf icts), representation of the additional clients is more likely to be provided by private panel attorneys, who are paid to provide representation on a case-by-case basis.  This is more practical and efficient than assigning these clients to yet other defender offices which are even further away from the county in which the case is being heard.

(2) **Caseload Relief:**  Occasionally, MSPD is able to use vacancy savings to contract out excess cases to private counsel to give especially overloaded or short-staffed offices some workload relief.  Funds for these kinds of contracts are not sufficient to solve the work overload, but when available, can provide some relief in especially pressurized offices.

Private criminal defense practitioners can apply to be a panel attorney for MSPD, designating both the counties in which they practice and the types of cases for which they are qualif ed.  Once accepted onto the Panel, they are asked to enter into a Panel Attorney Memorandum of Agreement with MSPD, after which they will be placed in the rotation to receive case assignments in their areas of availability.  More information for those interested in participating in MSPD's Panel Attorney Program can be found at http://publicdefender.mo.gov/contracts/MSPD_Contracting.html.

*Fee Schedule for Contracting*

MSPD utilizes a modifed fat fee rate for contract cases.  This is a base fee corresponding to the type of case with provisions for additional payment if the case should go to trial. The base fee may also be negotiated upward if the case is a particularly complex one or has special circumstances that may require work above and beyond the norm for its case type or if we are unable to locate a qualifed attorney who will take the case at the rate on the schedule, as does sometimes happen.  The typical contract fee schedule used by MSPD in FY16 is shown below:

Litigation expenses  (expert witness fees and travel costs, depositions, transcripts, case investigation, etc)  are not included in the attorney's fee.  Those types of expenditures are approved separately and must each be submitted to MSPD for approval by MSPD's Deputy Director prior to being incurred.

| Missouri State Public Defender Private Counsel Fee Schedule | | |
|---|---|---|
| Case Type | Description | Contract Rates |
| 15 | Murder 1st Degree | $10,000 |
| 20 | Other Homicide | $6,000 |
| 30D | AB Felony Drug | $750 |
| 30F | AB Felony Other | $1,500 |
| 30X | AB Felony Sex | $2,000 |
| 35D | CD Felony Drug | $750 |
| 35F | CD Felony Other | $750 |
| 35X | CD Felony Sex | $1,500 |
| 45M | Misdemeanor | $375 |
| 45T | Misdemeanor - Traffic | $375 |
| 50N | Juvenile - Non Violent | $500 |
| 50S | Juvenile - Status | $500 |
| 50V | Juvenile - Violent | $750 |
| 65F | Probation Violation - Felony | $375 |
| 65M | Probation Violation - Misdemeanor | $375 |
| 110F | Direct Appeals - Felony | $3,750 |
| 110S | Direct Appeal - Misdemeanor | $3,750 |
| 124A | Rule 24.035 Appeal | $500 |
| 124M | Rule 24.035 Motion | $500 |
| 129A | Rule 29.15 Appeal | $1,875 |
| 129M | Rule 29.15 Motion | $1,000 |
| | | |

Note:  MSPD will pay additional compensation in cases resolved by:

Jury Trial     $1,500 for the first day and $750 for each additional day
Bench Trial   $750 per day - prorated

In FY16, MSPD contracted approximately 3.58% of its total caseload to the private bar.   In FY16, MSPD spent $2,143,298.22 to contract out 2,893 cases, at an average cost per case of $740.86.

.

During the 2014 Legislative Session, the legislature truly agreed to and fnally passed $3,472,238 to permit MSPD to contract out ALL of its confict cases, including frst-level conficts, to private counsel as part of its FY2015 budget.  The Governor line item vetoed these additional funds.  During the Legislative Veto Session, this line item veto was overridden by the General Assembly and the funds were added to MSPD's core budget.  During FY2015, the Governor released only $500,000 of these funds.  Note: In Fiscal Year 2016, MSPD Appropriations Core was cut by the $3,472,238.  In Fiscal Year 2017, $4,500,000 was added to MSPD's budget.  As of August 1, 2016, the Governor is withholding $3,500,000 of these funds.

**FISCAL YEAR 2016**
**NUMBER OF CASES TO PRIVATE COUNSEL**
**BY DISTRICT AND COUNTY**

| County | District # | Total | District Totals | County | District # | Total | District Totals | County | District # | Total | District Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ADAIR | 02 | 13 | | BATES | 17 | 12 | | CHRISTIAN | 31 | 78 | |
| CLARK | 02 | 1 | | CLAY | 17 | 1 | | DALLAS | 31 | 1 | |
| MACON | 02 | 3 | | HENRY | 17 | 19 | | GREENE | 31 | 57 | |
| MERCER | 02 | 1 | | JOHNSON | 17 | 51 | | STONE | 31 | 4 | |
| PUTNAM | 02 | 1 | | PLATTE | 17 | 1 | | TANEY | 31 | 15 | |
| SCOTLAND | 02 | 2 | | VERNON | 17 | 6 | | | | | 155 |
| | | | 21 | | | | 90 | BUTLER | 32 | 14 | |
| ANDREW | 04 | 7 | | COLE | 19 | 30 | | CAPE GIRARDEAU | 32 | 22 | |
| ATCHISON | 04 | 1 | | MILLER | 19 | 8 | | DUNKLIN | 32 | 2 | |
| BUCHANAN | 04 | 11 | | MONITEAU | | 2 | | MADISON | 32 | 2 | |
| GENTRY | 04 | 4 | | | | | 40 | MISSISSIPPI | 32 | 24 | |
| NODAWAY | 04 | 4 | | FRANKLIN | 20 | 53 | | NEW MADRID | 32 | 2 | |
| WORTH | 04 | 1 | | GASCONADE | 20 | 21 | | PERRY | 32 | 7 | |
| | | | 28 | OSAGE | 20 | 17 | | SCOTT | 32 | 23 | |
| ANDREW | 05 | 2 | | WARREN | 20 | 6 | | STODDARD | 32 | 1 | |
| BUCHANAN | 05 | 12 | | | | | 97 | | | | 97 |
| GENTRY | 05 | 1 | | ST. LOUIS COUNTY | 21 | 53 | | DUNKLIN | 34 | 7 | |
| NODAWAY | 05 | 2 | | | | | 53 | MISSISSIPPI | 34 | 10 | |
| | | | 17 | ST. FRANCOIS | 22 | 9 | | NEW MADRID | 34 | 14 | |
| CLAY | 07 | 7 | | ST. LOUIS CITY | 22 | 19 | | PEMISCOT | 34 | 27 | |
| CLINTON | 07 | 7 | | | | | 28 | SCOTT | 34 | 1 | |
| DEKALB | 07 | 1 | | JEFFERSON | 23 | 23 | | | | | 59 |
| HARRISON | 07 | 1 | | | | | 23 | DUNKLIN | 35 | 23 | |
| JACKSON | 07 | 2 | | BOLLINGER | 24 | 1 | | PEMISCOT | 35 | 4 | |
| PLATTE | 07 | 1 | | CAPE GIRARDEAU | 24 | 5 | | STODDARD | 35 | 13 | |
| RAY | 07 | 1 | | CRAWFORD | 24 | 10 | | | | | 40 |
| | | | 20 | DENT | 24 | 3 | | BUTLER | 36 | 30 | |
| CLARK | 10 | 10 | | IRON | 24 | 21 | | CARTER | 36 | 1 | |
| LEWIS | 10 | 9 | | MADISON | 24 | 6 | | OREGON | 36 | 3 | |
| MARION | 10 | 20 | | PERRY | 24 | 3 | | REYNOLDS | 36 | 1 | |
| MONROE | 10 | 3 | | REYNOLDS | 24 | 1 | | RIPLEY | 36 | 49 | |
| RALLS | 10 | 2 | | ST. FRANCOIS | 24 | 11 | | SCOTT | 36 | 10 | |
| SCOTLAND | 10 | 1 | | STE. GENEVIEVE | 24 | 2 | | SHANNON | 36 | 11 | |
| SHELBY | 10 | 4 | | WASHINGTON | 24 | 47 | | WAYNE | 36 | 9 | |
| | | | 49 | WAYNE | 24 | 7 | | | | | 114 |
| LINCOLN | 11 | 2 | | | | | 117 | HOWELL | 37 | 41 | |
| ST. CHARLES | 11 | 2 | | CRAWFORD | 25 | 23 | | OREGON | 37 | 5 | |
| ST. LOUIS CITY | 11 | 4 | | DENT | 25 | 18 | | OZARK | 37 | 2 | |
| ST. LOUIS COUNTY | 11 | 1 | | MARIES | 25 | 8 | | SHANNON | 37 | 15 | |
| WARREN | 11 | 11 | | PHELPS | 25 | 52 | | WAYNE | 37 | 1 | |
| | | | 20 | PULASKI | 25 | 64 | | | | | 64 |
| AUDRAIN | 12 | 29 | | REYNOLDS | 25 | 2 | | BARRY | 39 | 33 | |
| CALLAWAY | 12 | 5 | | TEXAS | 25 | 54 | | JASPER | 39 | 18 | |
| MONTGOMERY | 12 | 5 | | | | | 221 | LAWRENCE | 39 | 33 | |
| | | | 39 | CAMDEN | 26 | 112 | | MCDONALD | 39 | 2 | |
| AUDRAIN | 13 | 5 | | LACLEDE | 26 | 77 | | STONE | 39 | 19 | |
| BOONE | 13 | 324 | | MILLER | 26 | 7 | | | | | 105 |
| CALLAWAY | 13 | 8 | | MORGAN | 26 | 61 | | CALDWELL | 43 | 4 | |
| COLE | 13 | 11 | | PHELPS | 26 | 1 | | CARROLL | 43 | 6 | |
| COOPER | 13 | 2 | | PULASKI | 26 | 1 | | DAVIESS | 43 | 6 | |
| MONITEAU | 13 | 1 | | WRIGHT | 26 | 5 | | DEKALB | 43 | 1 | |
| PETTIS | 13 | 12 | | | | | 264 | GRUNDY | 43 | 4 | |
| RANDOLPH | 13 | 8 | | BARTON | 28 | 1 | | HARRISON | 43 | 2 | |
| | | | 371 | BATES | 28 | 6 | | LIVINGSTON | 43 | 5 | |
| ADAIR | 14 | 4 | | CEDAR | 28 | 17 | | PUTNAM | 43 | 4 | |
| CHARITON | 14 | 1 | | DADE | 28 | 5 | | RAY | 43 | 4 | |
| HOWARD | 14 | 8 | | VERNON | 28 | 25 | | | | | 36 |
| LINN | 14 | 8 | | | | | 54 | CHRISTIAN | 44 | 1 | |
| LIVINGSTON | 14 | 2 | | BARRY | 29 | 8 | | DOUGLAS | 44 | 12 | |
| MACON | 14 | 7 | | BARTON | 29 | 1 | | HOWELL | 44 | 2 | |
| MONROE | 14 | 3 | | JASPER | 29 | 73 | | OZARK | 44 | 16 | |
| RANDOLPH | 14 | 16 | | LAWRENCE | 29 | 8 | | TANEY | 44 | 12 | |
| SHELBY | 14 | 2 | | MCDONALD | 29 | 12 | | WRIGHT | 44 | 45 | |
| | | | 51 | NEWTON | 29 | 248 | | | | | 88 |
| COOPER | 15 | 17 | | STONE | 29 | 1 | | LINCOLN | 45 | 17 | |
| HOWARD | 15 | 2 | | | | | 351 | MARION | 45 | 1 | |
| LAFAYETTE | 15 | 9 | | BENTON | 30 | 6 | | MONTGOMERY | 45 | 1 | |
| PETTIS | 15 | 26 | | DALLAS | 30 | 2 | | PIKE | 45 | 9 | |
| SALINE | 15 | 9 | | GREENE | 30 | 18 | | RALLS | 45 | 3 | |
| | | | 63 | POLK | 30 | 1 | | | | | 31 |
| JACKSON | 16 | 29 | | WEBSTER | 30 | 11 | | APPELLATE | | 20 | |
| | | | 29 | | | | 38 | | | | 20 |
| | | | | | | | | | | 2,893 | 2,893 |

| | | # of Conflict Cases Contracted | # of Overload Cases Contracted | Total |
|---|---|---|---|---|
| | **Fiscal Year 2016** **CONFLICT and CONTRACT ASSIGNMENTS** **- By Case Type -** | | | |
| **Code** | **Case Type Description** | | | |
| 110F | Direct Appeal - Felony | | | 0 |
| 110I | Direct Appeal - Interlocutory | | | 0 |
| 110J | Direct Appeal - Juvenile | | | 0 |
| 110S | Direct Appeal - Misdemeanor | | | 0 |
| 124A | Rule 24.035 Appeal - PCR Appeal | | | 0 |
| 124M | Rule 24.035 Motion - Post Plea PCR | 1 | 17 | 18 |
| 124SA | Rule 24.035 Appeal - State's Appeal | | | 0 |
| 129A | Rule 29.15 Appeal - PCR Appeal | | | 0 |
| 129M | Rule 29.15 Motion - Post Trial PCR | 2 | | 2 |
| 175T | Writ Trial | | | 0 |
| | | | | |
| 10 | Murder 1 - Death Penalty | | | 0 |
| 15 | Murder 1 - Non-Death Penalty | 14 | 4 | 18 |
| 20 | Other Homicide | 2 | 1 | 3 |
| 30D | A - B Felony Drug | 207 | 1 | 208 |
| 30F | A - B Felony Other | 259 | 6 | 265 |
| 30X | A - B Felony Sex | 34 | | 34 |
| 35D | C - D Felony Drug | 542 | 7 | 549 |
| 35F | C - D Felony Other | 842 | 51 | 893 |
| 35X | C - D Felony Sex | 5 | 1 | 6 |
| 45M | Misdemeanor (other than Traffic) | 437 | 21 | 458 |
| 45T | Misd. - Traffic (RSMo. 301-307) | 42 | 7 | 49 |
| 50N | Juvenile Non-violent (all other) | 32 | 11 | 43 |
| 50S | Juvenile Status | 2 | | 2 |
| 50V | Juvenile Violent (crimes against persons) | 9 | 5 | 14 |
| 62 | Sexual Predator Trial | | | 0 |
| 65F | Probation Violation - Felony | 241 | 11 | 252 |
| 65M | Probation Violation - Misdemeanor | 75 | | 75 |
| 99 | None | 4 | | 4 |
| | | 2750 | 143 | |
| | Total Private Counsel Conflict & Contract Assignments | | | 2893 |





**District 2**
**Public Defender's Office**
**905 East George**
**Kirksville, MO 63501**
**660-785-2445**

**Kevin Locke**
**District Defender**





10 Year Progression of Cases Assigned

FY07 660, FY08 505, FY09 601, FY10 608, FY11 696, FY12 725, FY13 780, FY14 622, FY15 598, FY16 636



**District 2 Fiscal Year 2016 Opened by Case Type**

C-D Felony 44.18%
Misdemeanor 16.51%
A-B Felony 9.59%
Probation Violations 24.53%
Juvenile 0.79%
Misd-Traffic 4.40%

| FY2016 Cases Assigned By Case Type | |
|---|---|
| A - B Felony Drug | 29 |
| A - B Felony Other | 26 |
| A - B Felony Sex | 6 |
| C - D Felony Drug | 81 |
| C - D Felony Other | 195 |
| C - D Felony Sex | 5 |
| Misdemeanor | 105 |
| Misd. - Traffic | 28 |
| Juvenile Non-Violent | 3 |
| Juvenile Violent | 2 |
| Probation Violation - Felony | 130 |
| Probation Violation - Misd. | 26 |
| **Total** | **636** |



**District 4**
**Public Defender's Office**
**305 North Market**
**Maryville, MO 64468**
**660-582-3545**



**Michelle Davidson**
**District Defender**





10 Year Progession of Cases Assigned

FY07 585 | FY08 594 | FY09 539 | FY10 671 | FY11 732 | FY12 691 | FY13 632 | FY14 494 | FY15 512 | FY16 655



**District 4**
**Fiscal Year 2016**
**Opened by Case Type**

C-D Felony 43.97%
A-B Felony 13.13%
Probation Violations 16.49%
Juvenile 2.14%
Misd.-Traffic 4.43%
Misdemeanor 19.85%

| FY2016 Cases Assigned By Case Type | |
|---|---|
| A - B Felony Drug | 33 |
| A - B Felony Other | 46 |
| A - B Felony Sex | 7 |
| C - D Felony Drug | 83 |
| C - D Felony Other | 203 |
| C - D Felony Sex | 2 |
| Misdemeanor | 130 |
| Misd. - Traffic | 29 |
| Juvenile Non-Violent | 9 |
| Juvenile Status | 0 |
| Juvenile Violent | 5 |
| Probation Violation - Felony | 90 |
| Probation Violation - Misd. | 18 |
| **Total** | **655** |



**District 5**
**Public Defender's Office**
**120 S. 5th Street, 2nd Floor**
**St. Joseph, MO 64501**
**816-387-2026**



**Sue Rinne**
**District Defender**





10 Year Progression of Cases Assigned

| FY07 | FY08 | FY09 | FY10 | FY11 | FY12 | FY13 | FY14 | FY15 | FY16 |
|------|------|------|------|------|------|------|------|------|------|
| 2,287 | 2,040 | 2,307 | 2,245 | 2,265 | 1,991 | 1,887 | 1,671 | 1,696 | 1,962 |



**District 5**
**Fiscal Year 2016**
**Opened by Case Type**

Misdemeanor 29.66%
C-D Felony 32.47%
A-B Felony 4.64%
Probation Violations 30.12%
Juvenile 2.85%

| FY2016 Cases Assigned By Case Type | |
|---|---|
| A - B Felony Drug | 41 |
| A - B Felony Other | 38 |
| A - B Felony Sex | 12 |
| C - D Felony Drug | 114 |
| C - D Felony Other | 520 |
| C - D Felony Sex | 3 |
| Misdemeanor | 582 |
| Misd. - Traffic | 5 |
| Juvenile Non-Violent | 13 |
| Juvenile Status | 22 |
| Juvenile Violent | 21 |
| Probation Violation - Felony | 465 |
| Probation Violation - Misd. | 126 |
| **Total** | **1,962** |





**District 7**
**Public Defender's Office**
**234 West Shrader**
**Liberty, MO 64068**
**816-792-5394**

**Anthony Cardarella**
**District Defender**




### 10 Year Progression of Cases Assigned

| FY | Cases |
|---|---|
| FY07 | 3,298 |
| FY08 | 3,118 |
| FY09 | 2,993 |
| FY10 | 3,071 |
| FY11 | 2,929 |
| FY12 | 3,009 |
| FY13 | 2,775 |
| FY14 | 2,764 |
| FY15 | 2,902 |
| FY16 | 3,173 |



**District 7 Fiscal Year 2016 Opened by Case Type**

- C-D Felony 35.93%
- Misdemeanor 23.23%
- Probation Violations 25.53%
- Misd.-Traffic 8.41%
- A-B Felony 6.74%
- Juvenile 0.16%

| FY2016 Cases Assigned By Case Type | |
|---|---|
| A - B Felony Drug | 43 |
| A - B Felony Other | 152 |
| A - B Felony Sex | 19 |
| C - D Felony Drug | 331 |
| C - D Felony Other | 805 |
| C - D Felony Sex | 4 |
| Misdemeanor | 737 |
| Misd. - Traffic | 267 |
| Juvenile Non-Violent | 4 |
| Juvenile Status | 1 |
| Juvenile Violent | |
| Probation Violation - Felony | 527 |
| Probation Violation - Misd. | 283 |
| **Total** | **3,173** |

Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM





**District 10
Public Defender's Office
201 North Third Street
Hannibal, MO 63401
573-248-2430**

**Todd Schulze
District Defender**





10 Year Progression of Cases Assigned

FY07 1,615; FY08 1,432; FY09 1,467; FY10 1,441; FY11 1,325; FY12 1,372; FY13 1,264; FY14 1,101; FY15 1,203; FY16 1,370



**District 10
Fiscal Year 2016
Opened by Case Type**

C-D Felony 35.55%; Misdemeanor 25.55%; A-B Felony 10.58%; Probation Violations 25.33%; Juvenile 1.46%; Misd.-Traffic 1.53%

| FY2016 Cases Assigned By Case Type | |
|---|---|
| A - B Felony Drug | 83 |
| A - B Felony Other | 48 |
| A - B Felony Sex | 14 |
| C - D Felony Drug | 221 |
| C - D Felony Other | 252 |
| C - D Felony Sex | 14 |
| Misdemeanor | 350 |
| Misd. - Traffic | 21 |
| Juvenile Non-Violent | 2 |
| Juvenile Status | 15 |
| Juvenile Violent | 3 |
| Probation Violation - Felony | 267 |
| Probation Violation - Misd. | 80 |
| **Total** | **1,370** |



**District 11
Public Defender's Office
300 N. 2nd Street,
Suite 264
St. Charles, MO 63301
636-949-7300**



**Tara Crane
District Defender**





10 Year Progession of Cases Assigned

| FY07 | FY08 | FY09 | FY10 | FY11 | FY12 | FY13 | FY14 | FY15 | FY16 |
|------|------|------|------|------|------|------|------|------|------|
| 1,943 | 1,881 | 1,932 | 1,999 | 2,019 | 1,843 | 1,360 | 1,474 | 1,445 | 1,685 |



**District 11
Fiscal Year 2016
Opened by Case Type**

C-D Felony 40.77%
Misdemeanor 14.30%
A-B Felony 9.67%
Probation Violations 29.20%
Juvenile 3.50%
Misd.-Traffic 2.55%

| FY2016 Cases Assigned By Case Type | |
|---|---|
| A - B Felony Drug | 70 |
| A - B Felony Other | 79 |
| A - B Felony Sex | 14 |
| C - D Felony Drug | 174 |
| C - D Felony Other | 503 |
| C - D Felony Sex | 10 |
| Misdemeanor | 241 |
| Misd. - Traffic | 43 |
| Juvenile Non-Violent | 28 |
| Juvenile Status | 5 |
| Juvenile Violent | 26 |
| Probation Violation - Felony | 436 |
| Probation Violation - Misd. | 56 |
| **Total** | **1,685** |

Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM



**District 12**
**Public Defender's Office**
**2800 Cardinal Dr., Suite B**
**Fulton, MO  65251**
**573-592-4155**



**District Defender**





10 Year Progression of Cases Assigned

| FY07 | FY08 | FY09 | FY10 | FY11 | FY12 | FY13 | FY14 | FY15 | FY16 |
|------|------|------|------|------|------|------|------|------|------|
| 1,658 | 1,651 | 1,734 | 1,548 | 1,500 | 1,527 | 1,592 | 1,949 | 1,702 | 1,655 |



**District 12**
**Fiscal Year 2016**
**Opened by Case Type**

C-D Felony 39.27%
Misdemeanor 25.26%
A-B Felony 8.40%
Probation Violations 20.30%
Juvenile 1.39%
Misd.-Traffic 5.38%

| FY2016 Cases Assigned By Case Type | |
|---|---|
| A - B Felony Drug | 34 |
| A - B Felony Other | 88 |
| A - B Felony Sex | 17 |
| C - D Felony Drug | 164 |
| C - D Felony Other | 480 |
| C - D Felony Sex | 6 |
| Misdemeanor | 418 |
| Misd. - Traffic | 89 |
| Juvenile Non-Violent | 12 |
| Juvenile Status | - |
| Juvenile Violent | 11 |
| Probation Violation - Felony | 243 |
| Probation Violation - Misd. | 93 |
| **Total** | **1,655** |



**District 13**
**Public Defender's Office**
**601 East Walnut**
**Columbia, MO 65201**
**573-447-8087**



**David Wallis**
**District Defender**





10 Year Progression of Cases Assigned

| FY | Cases |
|---|---|
| FY07 | 4,524 |
| FY08 | 4,473 |
| FY09 | 4,255 |
| FY10 | 4,552 |
| FY11 | 4,104 |
| FY12 | 4,101 |
| FY13 | 3,741 |
| FY14 | 3,584 |
| FY15 | 3,362 |
| FY16 | 3,586 |



**District 13**
**Fiscal Year 2016**
**Opened by Case Type**

- C-D Felony 34.30%
- Misdemeanor 29.28%
- Misd.-Traffic 3.56%
- Juvenile 2.65%
- Probation Violations 21.58%
- A-B Felony 9.48%

| FY2016 Cases Assigned By Case Type | |
|---|---|
| A - B Felony Drug | 94 |
| A - B Felony Other | 223 |
| A - B Felony Sex | 23 |
| C - D Felony Drug | 339 |
| C - D Felony Other | 876 |
| C - D Felony Sex | 15 |
| Misdemeanor | 1,050 |
| Misd. - Traffic | 97 |
| Juvenile Non-Violent | 59 |
| Juvenile Status | 4 |
| Juvenile Violent | 32 |
| Probation Violation - Felony | 471 |
| Probation Violation - Misd. | 303 |
| **Total** | **3,586** |





**District 14**
**Public Defender's Office**
**3029 County Road 1325**
**Moberly, MO  65270**
**660-263-7665**

**Ed Guinn**
**District Defender**





10 Year Progession of Cases Assigned

FY07 1,825 · FY08 1,759 · FY09 1,566 · FY10 1,517 · FY11 1,506 · FY12 1,461 · FY13 1,644 · FY14 1,479 · FY15 1,372 · FY16 1,686



**District 14**
**Fiscal Year 2016**
**Opened by Case Type**

C-D Felony 40.93% · Misdemeanor 20.82% · A-B Felony 11.51% · Probation Violations 17.91% · Juvenile 0.59% · Misd.-Traffic 8.24%

| FY2016 Cases Assigned By Case Type | |
|---|---|
| A - B Felony Drug | 96 |
| A - B Felony Other | 89 |
| A - B Felony Sex | 9 |
| C - D Felony Drug | 208 |
| C - D Felony Other | 463 |
| C - D Felony Sex | 19 |
| Misdemeanor | 351 |
| Misd. - Traffic | 139 |
| Juvenile Non-Violent | 3 |
| Juvenile Status | 6 |
| Juvenile Violent | 1 |
| Probation Violation - Felony | 229 |
| Probation Violation - Misd. | 73 |
| **Total** | **1,686** |

Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM



**District 15
Public Defender's Office
110 South Limit
Sedalia, MO 65301
660-530-5550**



**Max Mitchell
District Defender**





10 Year Progession of Cases Assigned

| FY07 | FY08 | FY09 | FY10 | FY11 | FY12 | FY13 | FY14 | FY15 | FY16 |
|---|---|---|---|---|---|---|---|---|---|
| 1,861 | 1,796 | 1,823 | 1,890 | 1,963 | 2,060 | 2,010 | 2,245 | 2,090 | 2,266 |



**District 15
Fiscal Year 2016
Opened by Case Type**

C-D Felony 43.47%
Misdemeanor 27.05%
Probation Violations 19.33%
A-B Felony 9.66%
Juvenile 0.09%
Misd.-Traffic .4%

| FY2016 Cases Assigned By Case Type | |
|---|---|
| A - B Felony Drug | 100 |
| A - B Felony Other | 100 |
| A - B Felony Sex | 19 |
| C - D Felony Drug | 316 |
| C - D Felony Other | 659 |
| C - D Felony Sex | 10 |
| Misdemeanor | 613 |
| Misd. - Traffic | 9 |
| Juvenile Non-Violent | 1 |
| Juvenile Status | 1 |
| Juvenile Violent | - |
| Probation Violation - Felony | 364 |
| Probation Violation - Misd. | 74 |
| **Total** | **2,266** |



**District 16**
**Public Defender's Office**
**Oak Tower—20th Floor**
**324 East 11th Street**
**Kansas City, MO 64106**
**816-889-2099**



**Ruth Petsch**
**District Defender**





10 Year Progression of Cases Assigned

| FY07 | FY08 | FY09 | FY10 | FY11 | FY12 | FY13 | FY14 | FY15 | FY16 |
|---|---|---|---|---|---|---|---|---|---|
| 7,963 | 8,470 | 8,077 | 6,978 | 6,433 | 6,157 | 5,236 | 4,418 | 4,417 | 4,437 |



**District 16**
**Fiscal Year 2016**
**Opened by Case Type**

C-D Felony 48.91%
A-B Felony 16.34%
Misdemeanor 4.33%
Probation Violations 24.21%
Misd.-Traffic 1.08%
Juvenile 5.14%

| FY2016 Cases Assigned By Case Type | |
|---|---|
| A - B Felony Drug | 119 |
| A - B Felony Other | 529 |
| A - B Felony Sex | 77 |
| C - D Felony Drug | 676 |
| C - D Felony Other | 1,483 |
| C - D Felony Sex | 11 |
| Misdemeanor | 192 |
| Misd. - Traffic | 48 |
| Juvenile Non-Violent | 100 |
| Juvenile Status | 11 |
| Juvenile Violent | 117 |
| Probation Violation - Felony | 932 |
| Probation Violation - Misd. | 142 |
| **Total** | **4,437** |

Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM



**District 17**
**Public Defender's Office**
**502 Westchester Avenue**
**Harrisonville, MO 64701**
**816-380-3160**



**Jeffrey Martin**
**District Defender**





10 Year Progression of Cases Assigned

| FY07 | FY08 | FY09 | FY10 | FY11 | FY12 | FY13 | FY14 | FY15 | FY16 |
|------|------|------|------|------|------|------|------|------|------|
| 2,721 | 2,549 | 2,623 | 2,643 | 2,291 | 2,205 | 2,174 | 2,375 | 2,147 | 2,559 |



**District 17**
**Fiscal Year 2016**
**Opened by Case Type**

C-D Felony 42.36%
Misdemeanor 17.00%
A-B Felony 7.66%
Probation Violations 30.64%
Misd.-Traffic 2.34%

| FY2016 Cases Assigned By Case Type | |
|---|---|
| A - B Felony Drug | 47 |
| A - B Felony Other | 118 |
| A - B Felony Sex | 31 |
| C - D Felony Drug | 352 |
| C - D Felony Other | 726 |
| C - D Felony Sex | 6 |
| Misdemeanor | 435 |
| Misd. - Traffic | 60 |
| Juvenile Non-Violent | - |
| Juvenile Status | - |
| Juvenile Violent | - |
| Probation Violation - Felony | 687 |
| Probation Violation - Misd. | 97 |
| **Total** | **2,559** |

<br>Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM



**District 19
Public Defender's Office
210 Adams Street
Jefferson City, MO 65101
573-526-3266**



**Justin Carver
District Defender**





10 Year Progression of Cases Assigned

| FY07 | FY08 | FY09 | FY10 | FY11 | FY12 | FY13 | FY14 | FY15 | FY16 |
|---|---|---|---|---|---|---|---|---|---|
| 2,220 | 2,347 | 2,093 | 2,285 | 2,686 | 2,661 | 2,710 | 2,710 | 2,067 | 2,044 |



**District 19
Fiscal Year 2016
Opened by Case Type**

- C-D Felony 41.54%
- Misdemeanor 19.13%
- A-B Felony 10.52%
- Probation Violations 23.78%
- Juvenile 0.78%
- Misd.-Traffic 4.26%

| FY2016 Cases Assigned By Case Type | |
|---|---|
| A - B Felony Drug | 102 |
| A - B Felony Other | 98 |
| A - B Felony Sex | 15 |
| C - D Felony Drug | 276 |
| C - D Felony Other | 565 |
| C - D Felony Sex | 8 |
| Misdemeanor | 391 |
| Misd. - Traffic | 87 |
| Juvenile Non-Violent | 11 |
| Juvenile Status | - |
| Juvenile Violent | 5 |
| Probation Violation - Felony | 424 |
| Probation Violation - Misd. | 62 |
| **Total** | **2,044** |





**District 20**
**Public Defender's Office**
**300 East Main Street**
**Union, MO  63084**
**636-583-5197**

**Lisa Preddy**
**District Defender**





10 Year Progession of Cases Assigned

| FY07 | FY08 | FY09 | FY10 | FY11 | FY12 | FY13 | FY14 | FY15 | FY16 |
|------|------|------|------|------|------|------|------|------|------|
| 1,381 | 1,497 | 1,672 | 1,611 | 1,722 | 1,576 | 1,157 | 843 | 912 | 1,290 |



**District 20**
**Fiscal Year 2016**
**Opened by Case Type**

C-D Felony 46.51%
Misdemeanor 27.05%
A-B Felony 8.37%
Probation Violations 14.57%
Juvenile 0.85%
Misd.-Traffic 2.64%

| FY2016 Cases Assigned By Case Type | |
|---|---|
| A - B Felony Drug | 50 |
| A - B Felony Other | 48 |
| A - B Felony Sex | 10 |
| C - D Felony Drug | 245 |
| C - D Felony Other | 352 |
| C - D Felony Sex | 3 |
| Misdemeanor | 349 |
| Misd. - Traffic | 34 |
| Juvenile Non-Violent | 5 |
| Juvenile Status | - |
| Juvenile Violent | 6 |
| Probation Violation - Felony | 147 |
| Probation Violation - Misd. | 41 |
| **Total** | **1,290** |



Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM

**District 21
Public Defender's Office
100 S. Central, 2nd Floor
Clayton, MO 63105
314-615-4778**



**Stephen Reynolds
District Defender**





10 Year Progession of Cases Assigned

| FY | Cases |
|---|---|
| FY07 | 3,889 |
| FY08 | 4,217 |
| FY09 | 3,922 |
| FY10 | 4,386 |
| FY11 | 4,958 |
| FY12 | 5,262 |
| FY13 | 5,054 |
| FY14 | 4,913 |
| FY15 | 4,407 |
| FY16 | 4,273 |



**District 21 Fiscal Year 2016 Opened by Case Type**

| FY2016 Cases Assigned By Case Type | |
|---|---|
| A - B Felony Drug | 57 |
| A - B Felony Other | 395 |
| A - B Felony Sex | 39 |
| C - D Felony Drug | 440 |
| C - D Felony Other | 1,574 |
| C - D Felony Sex | 19 |
| Misdemeanor | 108 |
| Misd. - Traffic | 3 |
| Juvenile Non-Violent | 198 |
| Juvenile Status | 4 |
| Juvenile Violent | 112 |
| Probation Violation - Felony | 1,313 |
| Probation Violation - Misd. | 11 |
| **Total** | **4,273** |



**District 22**
**Public Defender's Office**
**Mel Carnahan Courthouse**
**1114 Market St., Suite 602**
**St. Louis, MO 63101**
**314-340-7625**



Mary Fox
District Defender





10 Year Progression of Cases Assigned

| FY07 | FY08 | FY09 | FY10 | FY11 | FY12 | FY13 | FY14 | FY15 | FY16 |
|---|---|---|---|---|---|---|---|---|---|
| 6,323 | 6,626 | 6,247 | 5,904 | 6,085 | 6,245 | 4,875 | 3,521 | 3,274 | 4,199 |



District 22 Fiscal Year 2016 Opened by Case Type

C-D Felony 44.56%
Misdemeanor 11.10%
A-B Felony 13.98%
Probation Violations 23.08%
Juvenile 7.14%

| FY2016 Cases Assigned By Case Type | |
|---|---|
| A - B Felony Drug | 107 |
| A - B Felony Other | 439 |
| A - B Felony Sex | 41 |
| C - D Felony Drug | 571 |
| C - D Felony Other | 1,285 |
| C - D Felony Sex | 15 |
| Misdemeanor | 466 |
| Misd. - Traffic | 6 |
| Juvenile Non-Violent | 182 |
| Juvenile Status | 2 |
| Juvenile Violent | 116 |
| Probation Violation - Felony | 922 |
| Probation Violation - Misd. | 47 |
| **Total** | **4,199** |



**District 23**
**Public Defender's Office**
**PO Box 156**
**116 Main Street**
**Hillsboro, MO 63050**
**636-789-5254**



**Courtney Goodwin**
**District Defender**





10 Year Progression of Cases Assigned

| FY07 | FY08 | FY09 | FY10 | FY11 | FY12 | FY13 | FY14 | FY15 | FY16 |
|------|------|------|------|------|------|------|------|------|------|
| 1,820 | 1,463 | 1,626 | 1,707 | 1,285 | 1,821 | 1,401 | 1,159 | 1,539 | 1,730 |



**District 23**
**Fiscal Year 2016**
**Opened by Case Type**

Misdemeanor 21.85%
C-D Felony 34.22%
A-B Felony 6.53%
Probation Violations 32.72%
Juvenile 4.51%

| FY2016 Cases Assigned By Case Type | |
|---|---|
| A - B Felony Drug | 56 |
| A - B Felony Other | 48 |
| A - B Felony Sex | 9 |
| C - D Felony Drug | 257 |
| C - D Felony Other | 334 |
| C - D Felony Sex | 1 |
| Misdemeanor | 378 |
| Misd. - Traffic | 3 |
| Juvenile Non-Violent | 54 |
| Juvenile Status | 1 |
| Juvenile Violent | 23 |
| Probation Violation - Felony | 443 |
| Probation Violation - Misd. | 123 |
| **Total** | **1,730** |



**District 24**
**Public Defender's Office**
**Liberty Hall Building**
**400 N. Washington Street**
**Farmington, MO 63640**
**573-218-7080**



**Wayne Williams**
**District Defender**





10 Year Progression of Cases Assigned

| FY | Cases |
|---|---|
| FY07 | 2,123 |
| FY08 | 2,443 |
| FY09 | 2,073 |
| FY10 | 2,220 |
| FY11 | 2,751 |
| FY12 | 2,723 |
| FY13 | 3,009 |
| FY14 | 2,504 |
| FY15 | 2,387 |
| FY16 | 2,763 |



**District 24**
**Fiscal Year 2016**
**Opened by Case Type**

C-D Felony 42.60%
Misdemeanor 19.33%
A-B Felony 12.41%
Probation Violations 22.69%
Juvenile 2.21%
Misd.-Traffic .76%

| FY2016 Cases Assigned By Case Type | |
|---|---|
| A - B Felony Drug | 137 |
| A - B Felony Other | 175 |
| A - B Felony Sex | 31 |
| C - D Felony Drug | 373 |
| C - D Felony Other | 790 |
| C - D Felony Sex | 14 |
| Misdemeanor | 534 |
| Misd. - Traffic | 21 |
| Juvenile Non-Violent | 33 |
| Juvenile Status | |
| Juvenile Violent | 28 |
| Probation Violation - Felony | 545 |
| Probation Violation - Misd. | 82 |
| **Total** | **2,763** |





**District 25
Public Defender's Office
901 North Pine
Suite 200
Rolla, MO 65401
573-368-2260**



Matthew Crowell
District Defender





10 Year Progression of Cases Assigned

FY07 3,459; FY08 3,365; FY09 3,147; FY10 3,771; FY11 3,541; FY12 4,219; FY13 3,516; FY14 3,367; FY15 3,381; FY16 3,582



**District 25 Fiscal Year 2016 Opened by Case Type**

C-D Felony 43.91%
Misdemeanor 11.53%
A-B Felony 11.89%
Misd.-Traffic 2.46%
Probation Violations 29.93%
Juvenile 0.28%

| FY2016 Cases Assigned By Case Type | |
|---|---|
| A - B Felony Drug | 167 |
| A - B Felony Other | 226 |
| A - B Felony Sex | 33 |
| C - D Felony Drug | 560 |
| C - D Felony Other | 987 |
| C - D Felony Sex | 26 |
| Misdemeanor | 413 |
| Misd. - Traffic | 88 |
| Juvenile Non-Violent | 8 |
| Juvenile Status | - |
| Juvenile Violent | 2 |
| Probation Violation - Felony | 914 |
| Probation Violation - Misd. | 158 |
| **Total** | **3,582** |

Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM





**District 26**
**Public Defender's Office**
**288 Harwood**
**Lebanon, MO  65536**
**417-532-6886**

Karie Comstock
District Defender





10 Year Progression of Cases Assigned

| FY07 | FY08 | FY09 | FY10 | FY11 | FY12 | FY13 | FY14 | FY15 | FY16 |
|------|------|------|------|------|------|------|------|------|------|
| 1,800 | 1,782 | 1,889 | 1,999 | 1,876 | 2,037 | 1,918 | 1,884 | 1,861 | 2,280 |



**District 26 Fiscal Year 2016 Opened by Case Type**

C-D Felony 36.18%
Misdemeanor 20.44%
Misd.-Traffic 4.69%
Probation Violations 29.96%
A-B Felony 7.41%
Juvenile 1.32%

| FY2016 Cases Assigned By Case Type | |
|---|---|
| A - B Felony Drug | 71 |
| A - B Felony Other | 87 |
| A - B Felony Sex | 11 |
| C - D Felony Drug | 357 |
| C - D Felony Other | 462 |
| C - D Felony Sex | 6 |
| Misdemeanor | 466 |
| Misd. - Traffic | 107 |
| Juvenile Non-Violent | 22 |
| Juvenile Status | 4 |
| Juvenile Violent | 4 |
| Probation Violation - Felony | 521 |
| Probation Violation - Misd. | 162 |
| **Total** | **2,280** |

Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM



**District 28**
**Public Defender's Office**
**329 C North Barrett**
**Nevada, MO 64772**
**417-448-1140**



**Renee GotviAgehya**
**District Defender**





10 Year Progession of Cases Assigned

FY07 1,247 · FY08 1,288 · FY09 1,336 · FY10 1,524 · FY11 1,472 · FY12 1,733 · FY13 1,480 · FY14 1,621 · FY15 1,523 · FY16 1,295



**District 28 Fiscal Year 2016 Opened by Case Type**

- Misdemeanor 27.80%
- C-D Felony 33.90%
- A-B Felony 5.48%
- Probation Violations 29.58%
- Misd.-Traffic 3.24%

| FY2016 Cases Assigned By Case Type | |
|---|---|
| A - B Felony Drug | 18 |
| A - B Felony Other | 41 |
| A - B Felony Sex | 12 |
| C - D Felony Drug | 91 |
| C - D Felony Other | 340 |
| C - D Felony Sex | 8 |
| Misdemeanor | 360 |
| Misd. - Traffic | 42 |
| Juvenile Non-Violent | - |
| Juvenile Status | - |
| Juvenile Violent | - |
| Probation Violation - Felony | 321 |
| Probation Violation - Misd. | 62 |
| **Total** | **1,295** |

Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM



**District 29**
**Public Defender's Office**
**115 Lincoln Street**
**Carthage, MO 64836**
**417-359-8489**



**Darren Wallace**
**District Defender**



10 Year Progession of Cases Assigned

| FY07 | FY08 | FY09 | FY10 | FY11 | FY12 | FY13 | FY14 | FY15 | FY16 |
|------|------|------|------|------|------|------|------|------|------|
| 4,063 | 3,896 | 3,926 | 4,014 | 3,153 | 2,830 | 2,779 | 2,899 | 3,099 | 3,437 |



**District 29**
**Fiscal Year 2016**
**Opened by Case Type**

C-D Felony 50.10%
Misdemeanor 14.90%
A-B Felony 9.75%
Probation Violations 18.50%
Misd.-Traffic 6.72%

| FY2016 Cases Assigned By Case Type | |
|---|---|
| A - B Felony Drug | 125 |
| A - B Felony Other | 174 |
| A - B Felony Sex | 36 |
| C - D Felony Drug | 502 |
| C - D Felony Other | 1,211 |
| C - D Felony Sex | 9 |
| Misdemeanor | 512 |
| Misd. - Traffic | 231 |
| Juvenile Non-Violent | 1 |
| Juvenile Status | - |
| Juvenile Violent | - |
| Probation Violation - Felony | 492 |
| Probation Violation - Misd. | 144 |
| **Total** | **3,437** |

Electronically Filed - Cole Circuit - March 09, 2017 - 12:01 AM



**District 30
Public Defender's Office
1901 South Wommack
Suite B
Bolivar, MO 65613
417-777-8544**



**Dewayne Perry
District Defender**





10 Year Progession of Cases Assigned

1,693 1,514 1,724 1,710 1,582 1,471 1,508 1,454 1,266 1,594
FY07 FY08 FY09 FY10 FY11 FY12 FY13 FY14 FY15 FY16



**District 30
Fiscal Year 2016
Opened by Case Type**

C-D Felony 58.53%
A-B Felony 10.60%
Probation Violations 9.60%
Juvenile 2.51%
Misd.-Traffic 1.69%
Misdemeanor 17.06%

| FY2016 Cases Assigned By Case Type | |
|---|---|
| A - B Felony Drug | 48 |
| A - B Felony Other | 110 |
| A - B Felony Sex | 11 |
| C - D Felony Drug | 295 |
| C - D Felony Other | 632 |
| C - D Felony Sex | 6 |
| Misdemeanor | 272 |
| Misd. - Traffic | 27 |
| Juvenile Non-Violent | 26 |
| Juvenile Status | - |
| Juvenile Violent | 14 |
| Probation Violation - Felony | 134 |
| Probation Violation - Misd. | 19 |
| **Total** | **1,594** |



**District 31**
**Public Defender's Office**
**630 North Robberson**
**Springfield, MO 65806**
**417-895-6740**



**Rodney Hackathorn**
**District Defender**





10 Year Progression of Cases Assigned

| | FY07 | FY08 | FY09 | FY10 | FY11 | FY12 | FY13 | FY14 | FY15 | FY16 |
|---|---|---|---|---|---|---|---|---|---|---|
| Cases | 5,745 | 5,573 | 4,555 | 4,812 | 5,067 | 5,465 | 4,548 | 5,280 | 4,843 | 6,161 |



**District 31**
**Fiscal Year 2016**
**Opened by Case Type**

- C-D Felony 42.80%
- Misdemeanor 23.50%
- A-B Felony 7.79%
- Probation Violations 22.22%
- Juvenile 1.56%
- Misd.-Traffic 2.13%

| FY2016 Cases Assigned By Case Type | |
|---|---|
| A - B Felony Drug | 148 |
| A - B Felony Other | 290 |
| A - B Felony Sex | 42 |
| C - D Felony Drug | 636 |
| C - D Felony Other | 1,982 |
| C - D Felony Sex | 19 |
| Misdemeanor | 1,448 |
| Misd. - Traffic | 131 |
| Juvenile Non-Violent | 56 |
| Juvenile Status | |
| Juvenile Violent | 40 |
| Probation Violation - Felony | 1,031 |
| Probation Violation - Misd. | 338 |
| **Total** | **6,161** |