**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**
**CENTRAL DIVISION**

| | | |
|---|---|---|
| SHONDEL CHURCH, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 17-cv-04057-NKL |
| | ) | |
| STATE OF MISSOURI, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**ORDER**

Pending before the Court are Defendants Eric Greitens and State of Missouri's Motions to Dismiss, [Docs. 18, 20]. For the following reasons, Defendants' Motions are granted in part and denied in part.

## I.    Background[1]

This lawsuit challenges the adequacy of the Missouri State Public Defender (MSPD), which provides legal representation to all indigent citizens accused or convicted of crimes in Missouri state court. Plaintiffs filed this putative class action alleging Missouri "has failed to meet its constitutional obligation to provide indigent defendants with meaningful representation." Plaintiffs filed for injunctive and declaratory relief in Missouri state court. Defendants removed this action pursuant to 28 U.S.C. §§1331, 1441, and 1446.

---

[1]     The facts are found in Plaintiffs' Class Action Petition for Injunctive and Declaratory Relief. [Doc. 1-2.]  For purposes of deciding the Defendants' Motions to Dismiss, the Court accepts the Plaintiffs' factual allegations as true and construes them in the light most favorable to them.  *See Stodghill v. Wellston Sch. Dist.,* 512F.3d 472, 476 (8th Cir. 2008).

*A. Missouri Indigent Defense Overview*

The State of Missouri relies almost exclusively on local MSPD offices to provide indigent defense services in all 114 counties and St. Louis City. MSPD comprises three distinct parts: the Trial Division, subdivided into 33 district offices across the State; the Appellate/Post-Conviction Division, subdivided into six offices; and the Capital Division, subdivided into three offices. MSPD employs approximately 376 attorneys—including roughly 313 in the Trial Division—and approximately 200 administrative staff, support staff, paralegals, and investigators. The MSPD represents indigent defendants in over 100,000 cases each year, counting new cases and cases carried over from previous years.

*1. Funding*

MSPD is funded almost exclusively from Missouri's general revenue. The level of funding provided by the State is less than one half of one percent of the State's general revenue. In fiscal year 2016, the MSPD Trial Division handled more than 75,000 cases; with its funding, the MSPD spent an average of $356 per case.

Since the establishment of MSPD in its current form in 1989, there have been at least ten independent evaluations of Missouri's public defense system, including assessments conducted by The Spangenberg Group in 1993 and 2005; the Missouri Senate Interim Committee in 2006; The Spangenberg Group and the Center for Law, Justice, and Society at George Mason University in 2009; the U.S. Department of Justice – Bureau of Justice Statistics in 2010; the American Bar Association in 2010; the National Juvenile Defender Center in 2013; the American Bar Association and RubinBrown in 2014; the U.S. Department of Justice in 2015; and the Sixth Amendment Center in 2016.[2]

The Sixth Amendment Center's study determined that Missouri's per capita spending on

---

[2] The reports from those studies are in the record at [Docs. 1-3, 1-4].

2

indigent defense is approximately one-third of the average of the 35 states surveyed. According to the study, in fiscal year 2015 Missouri spent $6.20 per resident for indigent defense services, compared to an average of $18.41 per capita among the other States in the study. Missouri currently ranks 49th among the 50 states in funding for indigent defense.

In August 2015, Defendant Michael Barrett—Director of MSPD—wrote to then-Governor Jay Nixon requesting additional funds. Barrett noted that, "[f]or years, the Missouri State Public Defender (MSPD) has warned that the rights of poor Missourians are being violated throughout the state because MSPD's resources are too few and the caseloads too high." Barrett pointed to recent reports by the National Juvenile Defender Center (NJDC) and the ABA making clear that existing funding was "woefully inadequate to guarantee the constitutional rights of indigent[]" defendants in Missouri. As such, Barrett requested a $10 million supplemental budget to provide some of the resources that MSPD urgently needed to "meet[] its obligations to its citizens under the U.S. and Missouri Constitutions." His request was denied.

In 2015, the Missouri legislature approved an additional $3.4 million in funding to MSPD. Then-Governor Nixon vetoed the funding. The legislature overrode that veto, but Governor Nixon nevertheless withheld the funds from MSPD. The legislature approved $4.5 million in additional funding for caseload relief in fiscal year 2017, but Governor Nixon directed that the MSPD receive only $1 million.

Plaintiffs estimate it would take an additional $20 million or more per year for MSPD to meet the constitutional floor of providing minimally adequate representation to indigent defendants.

### 2. Workloads

In 1993, the Missouri State Public Defender Commission sought the assistance of The

Spangenberg Group (TSG) in studying the internal operations of the Missouri public defense system, including issues related to budgeting, staffing, and allocation of resources. TSG's report concluded that MSPD "lack[ed] the necessary resources to provide competent representation," and that "[t]he legal staff needs to be increased as soon as possible." [Doc. 1-3, pp. 86–106 of 150].

In 2005, the Missouri Bar Association formed a Public Defender Task Force to work in conjunction with the MSPD Commission to address those deficiencies. The task force commission TSG to conduct another study into the MSPD. The report warned that Missouri's public defender system was "on the verge of collapse" and that, despite the best efforts of MSPD's attorneys, many public defenders were routinely failing to comply with MSPD's Public Defender Guidelines for Representation and the Missouri Rules of Professional Conduct. [Doc. 1-3, pp. 111–138 of 150].

In January 2007, an interim committee of the Missouri Senate released its report on MSPD. The committee found that the caseloads of public defenders were "too large," and recommended that "caseloads . . . be reduced, support staff be increased, the number of public defenders be increased . . . [and] the base salary of public defenders be[ ] increased." [Docs. 1-3, pp. 140–150 of 150; 1-4, pp. 1–4 of 290].

In 2009, the Missouri Bar Association retained TSG for another report. TSG concluded that public defender workloads had worsened since its 2005 report and, as a result of those workloads, public defenders were failing to (1) conduct prompt interviews of their clients following arrest, (2) spend sufficient time interviewing and counseling their clients, (3) advocate effectively for pretrial release, (4) conduct thorough investigations of their cases, (5) pursue formal and informal discovery, (6) file appropriate and essential pleadings and motions, (7)

conduct necessary legal research, and (8) prepare adequately for pretrial hearings, trial, and sentencing. [Doc. 1-4, pp. 6–73 of 290].

In June 2014, the ABA and accounting firm RubinBrown released a study of Missouri's public defender system, which included an assessment of public defender workloads for both adult and juvenile matters. [Doc. 1-7]. The researchers calculated the minimum number of hours (excluding court time, travel, and administrative tasks) that an attorney would need to devote to different types of cases in order to provide constitutionally adequate representation. The study determined that a constitutionally adequate attorney would need to spend a minimum of 106.6 hours on a non-capital murder/homicide case; at least 47.6 hours on an A/B felony; at least 25.0 hours on a C/D felony; at least 63.8 hours on a felony sex offense; at least 11.7 hours on a misdemeanor; at least 9.8 hours on a probation violation; and at least 19.5 hours on a juvenile case. [Doc. 1-4, pp. 75–121 of 290].

In 2015, MSPD attorneys were able to spend, on average, 84.5 hours on each non-capital murder/homicide case; 8.7 hours on each A/B felony; 4.4 hours on each C/D felony; 25.6 hours on each felony sex offense; 2.3 hours on each misdemeanor; 1.4 hours on each probation violation; and 4.6 hours on each juvenile case. *Id.* Under the ABA's analysis, "attorneys in the St. Louis County office [were] at 265% workload capacity," and throughout the state, for example: "239% capacity for the Springfield office, 254% for Jefferson City, and 254% for Farmington." [Doc. 1-4, pp. 124–126 of 290]. MSPD Trial Division attorneys were able to devote the minimum required hours to only 2.4% of all A/B felony cases (or 97 out of 4,127 total A/B felony cases) and 1.4% of C/D felony cases (or 311 out of 21,491 total C/D felony cases). [Doc. 1-4, pp. 189–199 of 290].

In February 2017, Defendant Barrett testified before the state legislature that MSPD

would need 333 more lawyers to provide minimally adequate representation to indigent defendants.

In 2012, the Missouri Supreme Court upheld the validity of a rule promulgated by the Missouri Public Defender Commission that "permit[ted] a district defender office to decline additional appointments when it ha[d] been certified as being on limited availability after exceeding its caseload capacity for at least three consecutive calendar months." *State ex rel. Missouri Public Defender Commission v. Waters*, 370 S.W.3d 592, 597 (Mo. 2012). After that decision, however, public defenders who attempted to turn away cases faced resistance from prosecutors, judges, and legislators. In some circuits, cases that were turned away were assigned to non-MSPD attorneys with no criminal defense experience who were not compensated for their time.

The then-head of MSPD was told that if local offices continued to turn away cases, the legislature would pass a bill to privatize the entire system. The legislature passed Mo. Rev. Stat. § 600.062, which prevents the director of MSPD or the MSPD Commission from "limit[ing] the availability of a district office or any division director, district defender, deputy district defender, or assistant public defender to accept cases based on a determination that the office has exceeded a caseload standard." Under section 600.062, MSPD "may not refuse to provide representation" unless it receives "prior approval from a court of competent jurisdiction." Since the legislature's enactment of 600.602, no MSPD office has refused cases in any consistent or systematic way.

### 3. Representation

As a result of funding deficiency and resulting workloads, Plaintiffs point to deficiencies in representation at several stages throughout a case: lack of representation at arraignment and bond determinations, prolonged pretrial detention, guilty pleas that are not fully knowing or

6

voluntary, lack of investigation during discovery, and lack of attorney-client communication.

In 2008, the U.S. Supreme Court reaffirmed that the right to counsel attaches when "formal judicial proceedings have begun." *Rothgery v. Gillespie County, Texas*, 554 U.S. 191, 211. For a person who is arrested, the beginning of formal judicial proceedings is at the "criminal defendant's initial appearance before a judicial officer, where he learns the charge against him and his liberty is subject to restriction." *Id.* at 213. "Once attachment occurs, the accused at least is entitled to the presence of appointed counsel during any 'critical stage' of the post-attachment proceedings." *Id.* at 212.

In Missouri, however, attorneys are often unavailable to represent each eligible indigent defendant at every critical stage of the criminal process—including at their arraignment, where bond is determined. Public defenders routinely do not meet their clients until several weeks after the client's arrest and arraignment. As a result, bond determinations, which normally occur at the defendant's initial appearance before the court, are almost always made without the benefit of advocacy from counsel. Unrepresented indigent defendants are therefore often forced to remain in jail simply because they are unable to advocate effectively on their own for release on their own recognizance or a reasonable reduction in their bond amount.

The U.S. Supreme Court has also ruled that an attorney must be present at any post-arraignment lineup because such a "confrontation compelled by the State between the accused and the victim or witnesses to a crime to elicit identification evidence is peculiarly riddled with innumerable dangers and variable factors which might seriously, even crucially, derogate from a fair trial." *United States v. Wade*, 388 U.S. 218, 228 (1967). However, defendants in Missouri are routinely placed in lineups after arraignment without the benefit of counsel, even though the prejudice that results from an improper lineup cannot be cured later in the criminal process. *See*

*id.* at 236-37.

Because indigent defendants are often unrepresented at critical bond determinations, they may remain in jail for extended periods of time. MSPD attorneys' workloads often require them to seek multiple or extended continuances in cases they deem less urgent, or when they need additional time to prepare adequately for more serious cases. Because of these delays, irrespective of the merits of the case against them, defendants are often forced to choose between either consenting to the continuances, thereby waiving their right to a speedy trial and remaining in jail for an extended period of time, or taking their chances at trial with an attorney who has had little or no time to prepare.

The vast majority of defendants in Missouri plead guilty. Many of these are MSPD clients, but MSPD attorneys are unable to ensure that those who plead guilty do so knowingly and voluntarily. Excessive pretrial detention—often due to public defenders' inability to represent defendants at bond hearings or their need for repeat continuances—put virtually unbearable pressure on many defendants to plead guilty merely to get out of jail. Many MSPD clients who plead guilty do so without a full understanding of the strengths and weaknesses of their case. In particular, public defenders are unable to advise their clients of the immigration consequences of their plea because MSPD does not have the resources to provide any training in the intersection of criminal law and immigration law.

Most MSPD attorneys and unable to analyze the discovery they receive early enough in the proceedings to make important investigative decisions, including which key witnesses to depose and whether or not an expert witness is necessary for the client's defense. Investigators are not staffed on every case—or even every serious felony—to which an office is assigned. Rather, individual defenders, regardless of their level of experience, are asked to use their

discretion in selecting which cases will be formally investigated. Even when an attorney determines that investigation is necessary, investigators often do not have time to review discovery or gather other background information on the cases that they do investigate. Additionally, MSPD attorneys also frequently do not have the time to identify experts or conduct expert consultations. Even when MSPD attorneys identify the need for an expert, they are often unable to secure the resources necessary to retain an appropriate expert.

Time constraints also mean attorneys are often unable to meet with witnesses or take other important investigatory steps to prepare adequately for trial or to negotiate a more favorable plea bargain. Many MSPD attorneys take depositions in just a small fraction of their cases, thus leaving on the table the valuable information that is likely to be gleaned from such depositions. MSPD attorneys are rarely able to file suppression motions because they lack the investigative resources to identify unconstitutional police conduct, the time to review pertinent discovery, and the resources and experience to conduct appropriate legal research. As a result, evidence obtained in violation of the Fourth, Fifth, and Sixth Amendments can be used against defendants at trial or to extract guilty pleas.

Finally, a defendant's right to consult with his attorney is an integral component of the right to assistance of counsel. *See Geders v. United States*, 425 U.S. 80, 88-91 (1976). But MSPD attorneys' excessive workloads mean that they are unable to meet with clients on a regular basis. In some instances, MSPD attorneys are only able to have a substantive meeting with a client for the first time a few weeks before trial. Without their clients' input, it is impossible for MSPD attorneys to investigate their clients' cases adequately or properly prepare for trial, plea negotiations, or sentencing. Nor is it possible, under such circumstances, for indigent defendants to participate meaningfully in their own defense.

### 4. *Juvenile Defense*

Minors in juvenile delinquency proceedings are entitled to meaningful representation. *See In re Gault*, 387 U.S. 1 (1967). Following *Gault*, the Missouri legislature amended the Missouri Juvenile Code to provide children with a statutory right to representation in juvenile court proceedings. This right is codified at Mo. Rev. Stat. § 211.211, which provides indigent youth with the right to court-appointed counsel "prior to the filing of a petition" and "for all stages of the proceedings" thereafter. The Missouri Supreme Court also promulgated specialized Rules of Practice and Procedure in Juvenile Courts and Family Court Divisions. These rules reflected the notion that, because children are particularly vulnerable, they need representation throughout all stages of the juvenile process. *See, e.g.*, Mo. R. Juv. Pro. 116.01.

In 1997, Missouri created a Youth Advocacy Unit within MSPD to provide the required representation for court-involved minors in St. Louis City and St. Louis County. A similar unit, based in Kansas City, began serving several other counties a few years later. The Youth Advocacy Unit was staffed by public defenders well trained in adolescent development and other issues unique to juvenile prosecutions, including child interrogations and the law governing certifying juveniles as adults. In 2007, the Youth Advocacy Unit was dismantled due to funding cuts and previously handled by the Youth Advocacy Units were brought in with MSPD's general adult workload.

In 2013, the National Juvenile Defender Center (NJDC) studied Missouri's juvenile court system to assess the extent and quality of representation being provided to children in the State. The NJDC report concluded that, after "endur[ing] at least two decades of crushing caseloads and inadequate resources to provide its mandated services," Missouri's juvenile indigent defense system is "broken" and is improperly "forced to ration services." [Doc. 1-4, pp. 128–186 of 290].

The report concluded that approximately 60 percent of court-involved children in Missouri do not receive appointed counsel. In Fiscal Year 2012, the Missouri Supreme Court reported a total of 4,631 new juvenile delinquency and status offense petitions statewide. MSPD attorneys were assigned only 1,923 of those cases, and only 24 cases were contracted out to private counsel. The report also noted deficiency in those cases that do include representation similar to those discussed above, specifically regarding lack of representation at detention hearings, lack of investigations, failure to file motions or challenge charges or evidence, and failure to represent clients after disposition during probation review or on appeal.

In 2015, following an investigation of the St. Louis County Family Court system, the U.S. Department of Justice determined that the constitutional rights of indigent children were routinely being violated in that county's juvenile delinquency proceedings. The report found that these violations were due at least in part to "the staggering caseload of the sole public defender assigned to handle all indigent juvenile delinquency cases" in St. Louis County. In 2014, that lone defender handled nearly 400 juvenile cases. The DOJ further found that during the same period the public defender's office in St. Louis County appeared to engage in little investigation, resolved 277 of the cases but took only three to trial, filed just seven pretrial motions, never challenged probable cause during detention hearings, never called a defense witness other than, in one instance, the child respondent, and did not hire a single expert witness. [Doc. 1-4, pp. 201–259 of 290].

B. *Plaintiffs' Factual Allegations*

1. *Shondel Church*

On July 19, 2016, Plaintiff Shondel Church was arrested in Kansas City for allegedly stealing a generator and tool box from the property of his stepmother. Mr. Church was

subsequently charged with Class C felony theft under Mo. Rev. Stat. § 570.030, which carries a maximum sentence of up to seven years in prison. Following his arrest and transfer to the Lafayette County Jail, Mr. Church appeared before the court on two occasions without an attorney—first, for his arraignment on July 27, 2016, during which his bond was set at $5,000 cash or surety, and second, for a subsequent hearing on August 3, 2016.

Mr. Church received no explanation from the court or prosecutor as to how the bond process worked and he was unable to argue for a bond reduction at his arraignment. Because Mr. Church could not afford to pay his bond, he remained in custody following his arraignment. At that hearing, Mr. Church filled out the form to seek public defender representation and returned it to a guard at the Lafayette County Jail that same day. At his hearing on August 3, 2016, while he was still without counsel, Mr. Church was informed that he was eligible for a public defender. His case was then continued again to September 7, 2016.

On August 8, 2016, Assistant Public Defender Matthew Gass first entered his appearance on behalf of Mr. Church. By the time Mr. Church met with his attorney, he had already spent more than 40 days in custody. During their meeting, Mr. Gass indicated that Lafayette County had a workload that required at least three or four public defenders, but Mr. Gass was currently the only attorney serving that county.

Mr. Gass told Mr. Church that, after reviewing Mr. Church's file, Mr. Gass believed he could win his case, but that fighting the charges could mean Mr. Church would spend another six months in jail awaiting trial, since Mr. Gass would need additional time to investigate the case and prepare for trial. Mr. Gass also told Mr. Church that, instead of going to trial, he could likely get a misdemeanor plea deal and Mr. Church could be released and return to his family in a much shorter amount of time. At the end of the meeting, Mr. Church concluded that entering a

plea was the best option for him and his family at the time, as he was the primary breadwinner for his wife and four children.

Mr. Church also asked his attorney to file a motion to reduce his bond amount. Mr. Gass indicated that he would look into a bond reduction, but no such motion was ever filed. As a result, Mr. Church remained incarcerated. Soon after the first meeting between Mr. Gass and Mr. Church, Mr. Gass resigned from the public defender's office and did not speak with Mr. Church before resigning. Though Mr. Gass told Mr. Church he would resolve the case before leaving, Mr. Church never spoke to Mr. Gass again after their first and only meeting.

On October 5, 2016, Mr. Church was transported to his next pretrial hearing, at which he expected to see Mr. Gass. Instead, Mr. Church was represented by a new public defender, Max Mitchell. Mr. Mitchell never entered a formal appearance on behalf of Mr. Church and appeared in court on his behalf only at the October 5, 2016 hearing. Mr. Church was not given the opportunity to discuss the case—or communicate in any meaningful way at all—with Mr. Mitchell. Mr. Church did give Mr. Mitchell a written list of the various reasons he believed that the State's case was without merit. Mr. Mitchell accepted the list from Mr. Church, but did not discuss it with him. A preliminary hearing was set for November 16, 2016. Mr. Church believed he was going to enter a plea and be released that day. Instead, Mr. Mitchell did not speak to Mr. Church at all, a preliminary hearing was set, and Mr. Church was returned to jail without further explanation from his attorney or the court.

On October 11, 2016, Mr. Gass filed a motion to withdraw, and Bradley Taylor entered his appearance as Mr. Church's newly assigned public defender. Mr. Taylor did not meet with Mr. Church before his next hearing. Mr. Taylor never visited Mr. Church in jail and spoke to him only briefly in court directly before his hearings.

13

On November 16, 2016, Mr. Church appeared for his preliminary hearing. Mr. Taylor appeared on his behalf at the hearing but spoke to Mr. Church only briefly before the hearing to inform him that he would try to talk to Mr. Church's former attorney (Mr. Gass) about his case.

Also at the November 16, 2016 hearing, Mr. Church was able to speak directly to the judge while his lawyer was speaking with the prosecutor. Mr. Church informed the judge that he had now spent over 100 days in jail on a charge that he believed should not have been filed. After Mr. Church's uncounseled conversation with the judge, the case was transferred to a different court and a hearing was set for the following week, on November 21, 2016.

On November 21, 2016, after spending five months in pretrial detention, Mr. Church pled guilty to misdemeanor theft and was sentenced to two years of probation, with a suspended jail term of six months. While this plea was entered approximately ten weeks after Mr. Church's meeting with Mr. Gass on September 8, 2016, it is the same deal that Mr. Gass indicated would be available to Mr. Church in September and that Mr. Church thought he was going to enter at his October 5, 2016 hearing. Although Mr. Church has been released, he remains on probation with a six-month suspended jail sentence that will be executed should he violate the terms of his probation. Mr. Church understands his probation terms to include repaying a bill of $2,605.94 to cover the cost of his pretrial detention.

### 2. Randall Lee Dalton

Until January 2017, Randall Lee Dalton, a physically disabled, mentally impaired man, was living at a nursing home in Laurie, Missouri. He had been there for several months under the supervision of staff and medical professionals, who provided care and counseling and prescribed medication to ensure Mr. Dalton's stability and daily functioning. On January 30, 2017, law enforcement officials entered Mr. Dalton's nursing home facility to investigate the alleged

14

overdose of another resident. While there, they allegedly found Mr. Dalton in possession of a single pill of Lorazepam (Ativan), arrested him, forcibly removed him from the facility, transported him to the Morgan County Detention Center, and charged him with felony possession of a controlled substance, a D felony.

In processing Mr. Dalton, law enforcement learned that Mr. Dalton had an outstanding warrant for failing to appear in court after allegedly passing a bad check for $73.48 at the Jiffy Stop Food Mart in May 2016. In addition, after his arrest, Mr. Dalton—who had been convicted of misdemeanor sexual contact in 1994 and initially granted a suspended imposition of sentence—was further charged on February 1, 2017, with the Class D felony of failing to register as a sex offender within his county of residence.

On January 31, 2017, although Mr. Dalton had not yet seen a judge or a public defender, an order was entered holding him on $30,000 bond in each of his felony matters. While incarcerated, he was unable to access his medication. On February 7, 2017, an attorney from the Public Defender's Office ultimately entered her appearance on behalf of Mr. Dalton. She appeared in court on his behalf on February 15, 2017, waived his appearance, and reset his case until March. Mr. Dalton was entirely unaware of this court date.

Following Mr. Dalton's arrest, his sister tried repeatedly to contact Mr. Dalton's public defender to share information regarding Mr. Dalton's limited functioning, ongoing mental health issues, and immediate need for medication. After leaving a number of messages that went unreturned by Mr. Dalton's public defender, his sister found a new residential treatment program on her own that would accept her brother as an alternative to confinement. Mr. Dalton's sister also contacted the prosecutor's office directly to advocate on Mr. Dalton's behalf.

In March 2017, Mr. Dalton was finally brought to court for the first time. It was also the

first time he saw his public defender, who did not speak to him until he was brought into the court room. Prior to his delivery to court for his March court date, Mr. Dalton had not been contacted by counsel to inform him of the court date. Mr. Dalton's assigned public defender did not seem familiar with his case, so Mr. Dalton's sister asked to approach the bench to make a bond application for him, which was ultimately joined by the public defender and prosecutor.

Mr. Dalton's family was able to obtain a furlough on his behalf enabling him to enter a residential treatment facility while his case was pending. However, this placement subsequently fell through and he was returned to jail, where he currently awaits resolution of his case.

### 3. Dorian Samuels

Plaintiff Dorian Samuels was arrested in Joplin, Missouri, on or about May 30, 2016, and charged with first-degree assault, exposing him to as much as 30 years in prison if convicted. Upon arrest, Mr. Samuels was transported to the Joplin City Jail.

Shortly after arriving at the Joplin City Jail, Mr. Samuels was interviewed, without counsel present, by Detective Justin Ellison of the Joplin Police Department. According to a police report, Detective Ellison read Mr. Samuels his Miranda rights and presented him with a corresponding written waiver form, which Mr. Samuels allegedly signed prior to the interview. Mr. Samuels was intoxicated at the time the alleged waiver was signed and has no recollection of this initial interview by Detective Ellison. As such, Mr. Samuels was unable to provide a voluntary, knowing, and intelligent waiver of his right to an attorney or his right to remain silent. Nevertheless, Mr. Samuels subsequently spoke with Detective Ellison in detail regarding the incident that ultimately lead to his arrest.

On June 2, 2016, Mr. Samuels appeared before the court by video from the Jasper County Jail, without counsel, and was informed that his bond had been set at $20,000 cash. Without

counsel, Mr. Samuels was unable to advocate effectively for a reduction in his bond or address the *Miranda* violation that occurred. Since he was unable to afford bond, Mr. Samuels has remained in pretrial detention since his arrest more than a nine months ago at the date of Plaintiffs' filing.

Mr. Samuels' case was initially assigned to Assistant Public Defender Craig Lowe, who entered his appearance in the case on June 8, 2016, and was scheduled to represent Mr. Samuels at his subsequent preliminary hearing on June 15, 2016. Prior to the June 15 court proceeding, Mr. Lowe visited Mr. Samuels at the Jasper County Jail and met with him for approximately 10 minutes to discuss the hearing set for later that day. Ultimately, the preliminary hearing was rescheduled for the following week. Between June 8, 2016, when Mr. Lowe filed his notice of appearance, and June 22, 2016, Mr. Samuels' attorney did not engage in any investigation and failed to file any pretrial motions—including any motion for bond reduction or motion for discovery—and spoke with Mr. Samuels privately on just one occasion, during his visit to the jail on June 15, 2016.

On June 22, 2016, Mr. Lowe withdrew from the case at the request of Mr. Samuels, who expressed frustration about his inability to communicate in any meaningful way with Mr. Lowe, as well as his lawyer's failure to begin investigating the case. The court granted Mr. Lowe's request to withdraw and continued the proceedings to the following week.

Mr. Samuels was subsequently assigned a new public defender, J.D. Hatcher, who he met for the first time in court on June 29, 2016, shortly before his preliminary hearing was scheduled to begin. Because Mr. Hatcher had not had time to meet with Mr. Samuels, or otherwise prepare, in advance of the hearing, he sought a continuance from the court. That request was denied, however, and the hearing went forward.

During the hearing, the State called just two witnesses to testify against him: the alleged victim and Detective Ellison. Mr. Hatcher failed to question Detective Ellison regarding the nature, scope, and propriety of the interview at the jail. Following the testimony, the court found probable cause to proceed with felony charges against Mr. Samuels and bound his case over to circuit court.

On August 1, 2016, Mr. Samuels appeared by video and was re-arraigned—this time with his public defender, Mr. Hatcher, present in the courtroom. He was unable to meet with Mr. Samuels at any point between his preliminary hearing and re-arraignment and Mr. Hatcher was unprepared to advocate for any bond reduction on his client's behalf.

Since he first met Mr. Hatcher on June 29, 2016, Mr. Samuels saw Mr. Hatcher on only four occasions, all of which were immediately *following* pretrial court proceedings. None of those meetings lasted more than a few minutes. On at least three of those occasions, Mr. Hatcher appeared before the court alone and requested a continuance, while Mr. Samuels remained in a holding cell near the courtroom. Mr. Hatcher did not meet with Mr. Samuels prior to any of these hearings to discuss his plan for the hearing or request Mr. Samuels's permission to seek a continuance. In his most recent motion for continuance, dated January 6, 2017, less than a week before Mr. Samuels' scheduled trial date, Mr. Hatcher stated that, since he began representing Mr. Samuels on June 29, 2016, "the number and effectiveness of attorney-client communications has been limited for multiple reasons that are outside of Mr. Samuels' control."

Mr. Hatcher recently resigned from the public defender's office and now works as a prosecutor in Jasper County. On March 1, 2017, Mr. Samuels was appointed another public defender, Richard King, the third attorney assigned to his case since his arrest in May 2016. On or about March 6, 2017, Mr. King visited Mr. Samuels in jail and presented Mr. Samuels with a

letter stating that he would be unable to represent Mr. Samuels due to his overwhelming workload, which includes more than 200 cases. Mr. King indicated that his workload would make it impossible for him to investigate adequately or otherwise prepare the case. As of the filing of this petition, however, Mr. King remains the attorney of record on Mr. Samuels' case. At the time of Plaintiffs' filing, Mr. Samuels was currently scheduled for trial on June 1, 2017.

### 4. Viola Bowman

Plaintiff Viola Bowman was arrested on or about January 6, 2015 in Clay County and charged with first-degree murder and armed criminal action for killing her husband. Ms. Bowman has maintained her innocence since her arrest.

On January 15, 2015, Ms. Bowman appeared before the court for her arraignment, without counsel. Her bond had been set at $1,000,000 and, unrepresented, Ms. Bowman was unable to advocate for a reduction in her bond amount. Ms. Bowman has remained in jail since her arrest over two years ago.

A week after her arraignment, on January 22, 2015, Ms. Bowman appeared before the court again, this time with a public defender, and was re-arraigned. The public defender who represented Ms. Bowman at this proceeding, however, did not continue her representation of Ms. Bowman beyond this hearing and did not do any substantive work on the case at that stage, including any investigation or motion practice.

On January 28, 2015, Ms. Bowman's current attorney, Anthony Cardarella, entered his appearance in the case. Mr. Cardarella is the District Defender for MSPD's District 7 office, which includes Clay County. Despite his responsibilities as District Defender, Mr. Cardarella took Ms. Bowman's case because none of the public defenders in his office with sufficient experience to handle a first-degree murder case had any more time to devote to the case than did

Mr. Cardarella.

Mr. Cardarella met with Ms. Bowman for the first time the same week as her next hearing, which was on February 19, 2015, more than one month after her arrest. The meeting lasted approximately ten minutes. Since taking over the case, other responsibilities, including other cases, have prevented Mr. Cardarella from remaining in consistent contact with Ms. Bowman. Over the course of Ms. Bowman's pretrial detention, she has met with her attorney an average of once every two months for approximately 10-15 minutes per meeting. Since January 2015, the public defender's office has asked the court to continue Ms. Bowman's case on at least 10 occasions, and to continue the scheduled trial date twice.

Ms. Bowman's trial was first set for June 20, 2016. On May 11, 2016, pursuant to Mr. Cardarella's request, the trial was continued to January 23, 2017. The continuance was requested in large part due to Mr. Cardarella's other administrative and managerial job responsibilities. On September 29, 2016, the trial was again continued at Mr. Cardarella's request to June 5, 2017. At the time of Plaintiffs' filing, Ms. Bowman has been incarcerated in the Clay County jail for over 800 days pretrial.

### 5. Brian Richman

Plaintiff Brian Richman has been incarcerated at the Christian County Detention Center since his arrest on or about June 26, 2016, on a series of felony drug charges exposing him to many years in prison. Mr. Richman's bond was set at over $100,000. Because he was unable to afford bond, Mr. Richman has remained in pretrial detention since his arrest more than eight months ago as of the date of Plaintiffs' filing.

Mr. Richman's public defender has never visited him at the Christian County Detention Center. There is not even a room for MSPD public defenders to conduct attorney-client visits at

the Christian County Detention Center. Rather, the jail's general practice is to shackle defendants to a rail in a public area and allow attorneys to briefly stand and talk with clients there, surrounded by jail officials and other detainees. Christian County's public defenders have not attempted to challenge the jail's policy or arrange for an alternative venue.

The first time Mr. Richman saw his assigned public defender was in court, on or about June 28, 2016, when his attorney waived Mr. Richman's preliminary hearing without meaningfully consulting with Mr. Richman. To date, no preliminary hearing has been held in Mr. Richman's Christian County cases, and no indictment has been delivered by a grand jury to support the charges against Mr. Richman.

Since July 14, 2016, Mr. Richman has only seen his attorney on a handful of occasions. These visits have always occurred at the courthouse, involved rushed conversations, and transpired in a public courtroom where other persons were present and confidentiality was not assured. On some occasions, hearings in Mr. Richman's case have occurred in front of the judge without Mr. Richman present. Mr. Richman's public defender unilaterally waived Mr. Richman's constitutional right to appear on his own behalf at those hearings and participated in them without obtaining Mr. Richman's consent to do so.

Mr. Richman has found it to be nearly impossible to get in contact with his public defender. Given his inability to communicate consistently and confidentially with his attorney, as well as the fact that his public defender has neither conducted any meaningful investigation on his case nor filed critical motions on his behalf, Mr. Richman has felt the need over the last several months to write letters to the judge presiding over his case. He has done so both to advocate for himself in the context of his cases and to make the court aware of the conditions at the Christian County Detention Center.

*C. Plaintiffs' Claims for Relief*

Plaintiffs seek prospective relief on behalf of themselves and "on behalf of all indigent persons who are now, or who will be during the pendency of this litigation, under formal charge before a state court in Missouri of having committed any offense, the penalty for which includes the possibility of confinement, incarceration, imprisonment, or detention (regardless of whether actually imposed), and who are eligible to be represented by" the MSPD.

Plaintiffs' Class Action Petition for Injunctive and Declaratory Relief, [Doc. 1-2], includes five claims for relief, as follows: (I) Violation of the Sixth and Fourteenth Amendments to the U.S. Constitution; (II) Violation of Article 1, Section 18(a) of the Missouri Constitution; (III) Violation of the Fifth and Fourteenth Amendments to the United States Constitution; (IV) Violation of Article 1, Section 10 of the Missouri Constitution; and (V) Violation of Missouri Criminal and Juvenile Codes.

As relevant to this Motion,[3] Plaintiffs ask this Court to: "Declare that Defendants are obligated to provide constitutionally adequate representation to indigent criminal defendants and juvenile respondents, including at their initial appearances;" "Declare that the constitutional and statutory rights of Missouri's indigent criminal defendants and juvenile respondents are currently being violated by Defendants on an ongoing basis;" "Enjoin Defendants from continuing to violate the rights of indigent defendants by providing constitutionally deficient representation;" and "Enter an injunction that requires Defendants to propose and implement, subject to this Court's approval and monitoring, a plan to ensure that all indigent criminal defendants and juvenile respondents in the State of Missouri are provided with constitutionally adequate legal representation." [Doc. 1-2, p. 52].

On July 5, 2017, the Court held oral argument on Defendants' Motions. The certified

---

[3]     Plaintiffs also seek class certification. [Doc. 52]. That motion is currently pending.

transcript is in the record, [Doc. 64].

## II. Discussion

Defendants move to dismiss under Fed. R. Civ. Pro. 12(b)(1) for lack of subject matter jurisdiction and under Fed. R. Civ. Pro. 12(b)(6) for failure to state a claim upon which relief can be granted. Federal courts consider motions to dismiss for failure to state a claim and for lack of subject matter jurisdiction under the same standard. *Vankempen v. McDonnell Douglas Corp.*, 923 F. Supp. 146 (E.D. Mo. 1996). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Zink v. Lombardi*, 783 F.3d 1089, 1098 (8th Cir. 2015) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A complaint must do more than allege labels and conclusions or a formulaic recitation of the elements of a cause of action." *Zink*, 783 F.3d at 1098 (quotations omitted).

### A. Defendants' Motion to Dismiss under 12(b)(1)

Defendants moves to dismiss under Fed. R. Civ. Pro. 12(b)(1) for lack of subject matter jurisdiction. Defendants argue three distinguishable bases for the motion: (1) the doctrine of sovereign immunity bar all claims against the State of Missouri and Governor Greitens; (2) Plaintiffs' claims are not justiciable because it is speculative whether they will sustain future cognizable injuries; and (3) Plaintiffs lack standing to bring their claims because relief against Defendants would not redress their alleged injuries. [Doc. 19].

### 1. Sovereign Immunity

Sovereign immunity bars actions against a state or its agencies unless the state waives its immunity, or it is abrogated by Congress. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 66 (1989). Both Parties distinguish between claims against Missouri and those against Gov.

Case 2:17-cv-04057-NKL   Document 69   Filed 07/24/17   Page 23 of 48

Greitens in his official capacity. The State of Missouri can only be sued if it or Congress has abrogated sovereign immunity for claims of this nature. Conversely, exceptions may apply that allow a suit to proceed against state officials—including Gov. Greitens—even in the absence of abrogation.

### a. Missouri

"[A]n unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another state." *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984) (internal quotation omitted). The U.S. Supreme Court has adopted a strict standard to evaluate claims that Congress or a respective state has abrogated sovereign immunity. *Port Auth. Trans-Hudson Corp. v. Feeney*, 495 U.S. 299, 305–06 (1990). "The Court will give effect to a State's waiver of . . . immunity only where stated by the most express language or by such overwhelming implication from the text as will leave no room for any other reasonable construction." *Id.*

Missouri argues it has not consented to Plaintiffs' suit. [Doc. 19, pp. 1–3]. If sovereign immunity would have barred claims against the State in state court, then the State may still invoke it in federal court after removal. *See, e.g.*, *Bergemann v. Rhode Island Dep't of Envt'l Mgmt.*, 665 F.3d 336, 342 (1st Cir. 2011); *Stewart v. North Carolina*, 393 F.3d 484, 489-90 (4th Cir. 2005). Conversely, if a State has waived its immunity for state-law claims in state court, it ordinarily cannot invoke immunity against those claims after removing the case to federal court. *Lapides v. Bd. of Regents*, 535 U.S. 613, 617 (2002).

Plaintiffs contend the claims would not be barred against Missouri in state court. In 1977, the Missouri Supreme Court prospectively abrogated the common law doctrine of sovereign immunity for tort actions. *Jones v. State Highway Comm'n*, 557 S.W.2d 225 (Mo. banc 1977).

24

In response, the Missouri Legislature enacted Mo. Rev. Stat. §§ 537.600–.650 (1978), which reinstated portions of the doctrine. The issue here is whether, considering *Jones* and Mo. Rev. Stat. § 537.600, Missouri has abrogated sovereign immunity for equitable relief. Defendants maintain Mo. Rev. Stat. § 537.600 applies only to claims for damages and does not affect common law sovereign immunity, which Missouri argues bars claims even for injunctive relief. Plaintiffs contend "Missouri has no sovereign immunity under state law for claims seeking *equitable* relief, rather than damages." [Doc. 44, pp. 2–3].[4]

Plaintiffs primarily rely on *Wyman v. Mo. Dep't of Mental Health*, 376 S.W.3d 16, 23-24 (Mo. Ct. App. 2012). In *Wyman*, state employees filed suit in Missouri state court against the Missouri Department of Mental Health and one state official alleging that the defendants retaliated against the plaintiffs for exercising their rights under Missouri's Workers' Compensation Law. The court found that plaintiffs' claims for damages were barred, but concluded "that sovereign immunity does not necessarily bar a claim for injunctive relief which seeks to reverse a state agency's prior violation of its statutory obligations, or to prevent future violations." *Id.*

Defendants argue *Wyman* is inapplicable because "[t]he sole basis on which the [defendant] moved for dismissal of the injunction claim was the sovereign immunity recognized in § 537.600." [Doc. 49, p. 5] (citing *Wyman*, 376 S.W.3d at 23). Defendants contend *Wyman* does not support Plaintiffs' argument that Missouri abrogated sovereign immunity from suits

---

[4]       As Plaintiffs note, "many other jurisdictions hold that sovereign immunity does not apply when constitutional violations are alleged, as a contrary rule would render constitutional rights meaningless." *Tucker v. State*, 394 P.3d 54, 61 (Idaho 2017) (citing *Columbia Air Servs., Inc. v. Conn. Dep't of Transp.*, 293 Conn. 342, 977 A.2d 636, 645 (2009); *Fla. Dep't of Revenue v. Kuhnlein*, 646 So.2d 717, 721 (Fla. 1994); *Corum v. Univ. of N.C. Through Bd. of Governors*, 330 N.C. 761, 413 S.E.2d 276, 292 (1992); *Ashton v. Brown*, 339 Md. 70, 660 A.2d 447, 463 (Md. Ct. App. 1995); *Kilgo v. Ga. Dep't of Corrs.*, 202 Ga.App. 50, 413 S.E.2d 507, 508 (1991)). To the Court's knowledge, Missouri has not adopted such a policy.

seeking equitable relief generally, but rather recognized the legislature's abrogation only within the narrow context of Mo. Rev. Stat. § 537.600. *Id.*

During oral argument, Defendants argued Mo. Rev. Stat. § 537.600 "doesn't define the metes and bounds of Missouri's sovereign immunity doctrine," which "was established at common law." [Doc. 64, p. 9]. Defendants contend that, when the legislature enacted § 537.600, it "overrule[d], basically, the [Missouri] Supreme Court . . . it only overruled what the court had done, and the only thing the court had done was to abrogate sovereign immunity with respect to tort damages, but it didn't abrogate any other sovereign immunity that existed at common law. And since immunity from suit for injunctive relief did exist at common law, it continues to exist today." *Id.* at 11.

However, as Plaintiffs argue, Missouri "made the same arguments to the Missouri Court of Appeals in *Wyman*, and the *Wyman* court correctly rejected them." *Id.* at 26. There, as here, Missouri argued that a claim for injunctive relief "is contrary to the fundamental principle of sovereign immunity and the State's right to determine what types of lawsuits may be brought against the State. Fundamentally, sovereign immunity concerns the State's ability to consent or refuse to consent to sue or be sued." Brief for Appellee-Respondant, *Wyman v. Mo. Dep't of Mental Health*, No. WD74062, 2011 MO App. Ct. Briefs (Dec. 27, 2011) [Doc. 44-3, p. 19]. Nevertheless, the Missouri Court of Appeals explained that as long as the State violates some "duty and obligation," a plaintiff may seek equitable relief against the State, "even though the State may not be subject to the 'civil action for damages.'" *Wyman*, 376 S.W.3d at 24.

Defendants also argue that, under *Carson v. Sullivan,* 223 S.W. 571 (Mo. banc 1920), the State itself cannot be enjoined. [Doc. 49, p. 6]; [Doc. 64, pp. 9]. However, the defendants in *Carson* were Missouri state officers, not the state itself, and the Missouri Supreme Court upheld

the availability of an injunction against them. Thus, as Plaintiffs argue, "the *Carson* court never [directly] addressed the scope of the State's sovereign immunity. The only case that does is *Wyman*, and *Wyman* holds there is no sovereign immunity." [Doc. 64, p. 26].

Defendants also cite to *State ex rel. Kansas City Symphony v. State*, 311 S.W.3d 272 (Mo. App. W.D. 2010) and *Goines v. Department of Social Services*, 364 S.W.3d 684 (Mo. App. W.D. 2012) for support. However, in *Kansas City Symphony,* the plaintiffs sought a declaration that the State is required, pursuant to Mo. Rev. Stat. § 143.183.5, to provide tax revenue funding and sought orders compelling the State and the Legislature to comply with the statute. Although the court found that a declaratory judgment was barred by sovereign immunity, it did so by analyzing § 143.183.5, which has no applicability here. *Goines* is likewise distinguishable; there, the suit was brought under Mo. Rev. Stat. § 207.020, which relates to the Missouri Family Support and Children's Divisions. The court there found that sovereign immunity had been waived by statute.

Conversely, Plaintiffs cite cases in which the Missouri Supreme Court upheld injunctions against the State itself. [Doc. 64, p. 27] (citing *Weinschenk v. State*, 203 S.W.3d 201, 205 (Mo. 2006) (affirming the trial court's judgment enjoining enforcement of a voter–ID requirement); *Brooks v. State*, 128 S.W.3d 844, 847 (Mo. 2004), as modified on denial of reh'g (Mar. 30, 2004) (entering judgment enjoining the state of Missouri from enforcing a conceal-carry law because it constituted "an unfunded mandate" in certain counties).

Under Missouri law, the State is not entitled to sovereign immunity in this suit.

### b. Gov. Greitens

Although the State cannot be sued without its consent, "the failure of officials to perform a duty [is not an act] of the state and proceedings seeking injunctive or other proper relief under

27

appropriate facts are considered not to be suits against the state within the principles of the immunity of the sovereign from suit." *Kleban v. Morris*, 363 Mo. 7, 16, 247 S.W.2d 832, 837 (1952). The doctrine of sovereign immunity "does not prohibit certain suits seeking declaratory and injunctive relief against state officers." *Dakota, Minn. & Eastern R.R. Corp. v. South Dakota*, 362 F.3d 512, 516 (8th Cir. 2004) (internal quotations and citation omitted). Under *Ex parte Young* and its progeny, "a private party may seek prospective injunctive relief in federal court against a state official, even if the state is otherwise protected by Eleventh Amendment immunity." *Randolph v. Rodgers*, 253 F.3d 342, 345 (8th Cir. 2001). A court "need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (quoting *Coeur d'Alene*, 521 U.S. at 296); *see also Mo. Child Care Ass'n v. Cross*, 294 F.3d 1034, 1042 (8th Cir. 2002).

For *Ex Parte Young* to apply, however, the named state official "must have some connection with the enforcement" of the challenged statute. *Ex parte Young*, 209 U.S. at 157; *see also Digital Recognition Network, Inc. v. Hutchinson*, 803 F.3d 952, 960 (8th Cir. 2015). Because Plaintiffs have sued Governor Greitens only for injunctive and declaratory relief, whether sovereign immunity bars their claims depends on whether the Governor has a sufficient "connection with" the challenged conduct to bring him within *Ex Parte Young*. Defendants argue "Governor Greitens lacks a sufficient connection to the challenged conduct," [Doc. 19, p. 5], and thus contend sovereign immunity bars claims against him.

To state a sufficient connection, the official "does not need to be primary authority to enforce the challenged law," and the official need not "have the full power to redress a plaintiff's injury in order to have 'some connection' with the challenged law." *281 Care Comm. v. Arneson*,

638 F.3d 621, 632-33 (8th Cir. 2011). Where the law involved is an affirmative constitutional obligation of the State itself, a state official is a proper defendant under *Ex parte Young* if he has a responsibility to "give[] effect" to the obligation. *L.A. Cty. Bar Ass'n v. Eu*, 979 F.2d 697, 704 (9th Cir. 1992).

In *Luckey v. Harris*, the Eleventh Circuit allowed indigent defendants bringing a Sixth Amendment claim to sue the governor of Georgia for prospective equitable relief. 860 F.2d 1012, 1016 (11th Cir. 1988). The Eleventh Circuit held that the governor was a proper defendant because "[a]ccording to the Georgia constitution, the governor is responsible for law enforcement in that state and is charged with executing the laws faithfully," "has the residual power to commence criminal prosecutions," and "has the final authority to direct the Attorney General to 'institute and prosecute' on behalf of the state." *Id.* at 1016 (citations omitted).

Defendants cite a number of cases to support the argument that Governor Greitens does not have a sufficient connection to the MSPD system to fall within *Ex Parte Young*. Each case is easily distinguishable. In *McCoy v. Carter-Jones Timber Co.*, 352 F. App'x 119 (8th Cir. 2009), the appellants sought redress from decisions from the Arkansas judicial branch; the Governor could not effect the injunctive relief requested because he had no power to direct the courts to reverse their decisions or hold them in abeyance. In *Okpalobi v. Foster*, 244 F.3d 405 (5th Cir. 2001), the challenged statute made abortion providers liable to patients in tort for any damage occasioned by abortions. The Fifth Circuit found that the Governor had no enforcement mechanism for this statute, which did not implicate a public duty undertaken on behalf of the statute, but a private right of action in tort. In *Gras v. Stevens*, 415 F. Supp. 1148, 1151-52 (S.D.N.Y. 1976), the court found *Ex Parte Young* inapplicable because "[t]he Attorney General has no interest in the outcome of a *divorce suit* and no duty to enforce any order made in it."

29

(emphasis added). Although *D.G. ex rel. Stricklin v. Henry*, 591 F. Supp.2d 1186, 1190 (N.D. Okla. 2008), rejected the notion that the Governor could be a proper defendant "simply because he is the head of the executive branch," that is not all that Plaintiffs allege.

Governor Greitens "is responsible for law enforcement . . . and is charged with executing the laws faithfully," "has the residual power to commence criminal prosecutions," and "has the final authority to direct the Attorney General to 'institute and prosecute' on behalf of the state." Mo. Const. art. IV, §§1-2; Mo. Rev. Stat. § 27.030. Governor Greitens's predecessor, Governor Nixon, affirmatively used his executive authority to withhold roughly $7 million in funding allocated by the Missouri Legislature to the MSPD, thereby demonstrating an even more direct "connection" to the challenged conduct. [Doc. 1-2, ¶¶ 42-43]. Governor Greitens has since upheld Governor Nixon's withholding of funds allocated to the MSPD. *Id.* ¶ 44; [Doc. 17 ¶ 45]. Finally, the Governor appoints all seven members of the MSPD Commission. *See* Mo. Rev. Stat. § 600.015(1); *Eu*, 979 F.2d at 704 (holding California governor's power to appoint judges was a sufficient "connection" to the challenged statute limiting the number of judges in Los Angeles County).

Plaintiffs have alleged a sufficient connection regarding Gov. Greitens to place him squarely within *Ex Parte Young*. As a result, claims against Gov. Greitens are not barred by sovereign immunity.

### 2. Standing

"[I]f a plaintiff lacks standing, the district court has no subject matter jurisdiction. Therefore, a standing argument implicates Rule 12(b)(1)." *Faibisch v. U. of Minnesota*, 304 F.3d 797, 801 (8th Cir. 2002) (internal citation omitted). The party invoking federal jurisdiction bears the burden of establishing standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

The burden corresponds with the degree of evidence required at the relevant stage of litigation. *Id.* "At the pleading stage . . . general factual allegations of injury . . . may suffice." *Id.*; *Iowa League of Cities v. E.P.A.*, 711 F.3d 844, 869 (8th Cir. 2013).

The determination of whether a particular plaintiff has standing is a two-part inquiry involving constitutional and prudential standing considerations. First, to demonstrate Article III standing, a plaintiff must show: (1) he has "suffered an injury-in-fact"; (2) the injury is "fairly . . . trace[able] to the challenged action of the defendant"; and (3) it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Balogh v. Lombardi*, 816 F.3d 536, 541 (8th Cir. 2016) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). Second, in order to meet the prudential limitations on standing, a plaintiff must ordinarily "assert his own legal interests rather than those of third parties." *Gladstone Realtors v. Vill. of Bellwood,* 441 U.S. 91, 100 (1979).

Defendants argue Plaintiffs do not face an actual and imminent threat of sustaining a concrete and particularized injury in fact and that relief against defendants would not redress any plaintiffs' alleged injuries.

### a. Injury-in-fact

To obtain the prospective relief sought, Plaintiffs must demonstrate that they are "likely to suffer future injury from" the conduct that he seeks to have enjoined or declared unlawful. *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983). The U.S. Supreme Court has "repeatedly reiterated that 'threatened injury must be certainly impending to constitute injury in fact,' and that 'allegations of possible future injury' are not sufficient." *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147 (2013) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).

### i. Plaintiff Church

Defendants first argue Plaintiff Church—who ultimately pled guilty to the charges brought against him—lacks standing because he does not face any pending criminal prosecution and is no longer subject to any ongoing deprivation of the right to effective counsel. [Doc. 19, p. 7]. Plaintiff Church states he has standing because he "seeks to vindicate his right to counsel at any future proceeding seeking to revoke his probation and impose his suspended six-month sentence." [Doc. 44, p. 18].

Any allegations surrounding Church's prosecution and plea cannot provide injury-in-fact standing for the prospective relief sought. *See O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . ."); *Adarand Constrs., Inc. v. Pena*, 515 U.S. 200, 210-11 (1995) ("[T]he fact of past injury . . . does nothing to establish a real and immediate threat that [the plaintiff] would again suffer similar injury in the future.") (quotation omitted). Likewise, the Court cannot presume Mr. Church will face another prosecution in the future. *See Murphy v. Hunt*, 455 U.S. 478, 482-83 (1982).

Plaintiffs distinguish *Murphy* from Mr. Church's factual allegations. In *Murphy*, the U.S. Supreme Court found that the petitioner's controversy over pretrial bail was moot once he was convicted. In analyzing whether the case was "capable of repetition but evading review," the Supreme Court noted:

> All we know from the record is that Hunt has been convicted on three separate offenses and that his counsel was willing to stipulate that, for the purposes of Hunt's eligibility for bail, the proof of guilt was evident and the presumption great. Based on these two facts, we cannot say that there exists a "reasonable expectation" or "demonstrated probability" that Hunt will ever again be in this position. There is no reason to expect that all three of Hunt's convictions will be overturned on appeal.

*Id.* at 483. In this case, "[t]he conditions of Mr. Church's probation prohibit him from drinking

alcohol or associating with any person convicted of a felony or misdemeanor, and require him to pay $200 per month, in restitution, $30 per month for the privilege of being supervised on probation, and 'court costs,' which Mr. Church understands to include repaying a bill of $2,605.94 to cover the cost of his more than four months of pretrial detention." [Doc. 44, p. 19] (citing [Doc. 1-2]). Thus, Plaintiffs argue "[i]n light of the trial court's discretion to revoke Mr. Church's probation, the draconian conditions of his probation, and Mr. Church's inability to pay the massive fines associated with probation, Mr. Church has plausibly alleged a 'credible threat' of future imprisonment that is 'sufficiently imminent' to satisfy standing." *Id.*

For support, Plaintiffs cite *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2342 (2014). There, the U.S. Supreme Court noted that "[a]n allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur." *Id.* (citation omitted). However, the U.S. Supreme Court has "repeatedly reiterated that 'threatened injury must be certainly impending to constitute injury in fact,' and that 'allegations of possible future injury' are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citation omitted).

In *Mempa v. Rhay*, 389 U.S. 128, 137 (1967), and again in *Gagnon v. Scarpelli*, 411 U.S. 778, 781 (1973), the U.S. Supreme Court held that a probationer is entitled to be represented by appointed counsel at a proceeding to revoke a defendant's probation and impose a criminal sentence. Presently, however, no such proceeding is underway and the Court cannot assume Plaintiff Church will violate the terms of his probation, even considering the payments required and his alleged inability to pay them. Plaintiffs have not cited any authority for the argument that potential or even probable probation violations are "certainly impending" to constitute injury in fact. As a result, Plaintiff Church lacks standing to bring this suit.

33

### ii. Plaintiffs Dalton, Samuels, Bowman, and Richman

Defendants separately argue the remaining Plaintiffs lack standing despite the fact that their prosecutions are ongoing. The crux of Defendants' argument is any Sixth Amendment claim requires a conviction to be justiciable. As a result, besides Plaintiff Church, Defendants argue Plaintiffs lack standing because they have not yet been found guilty or pled guilty.

Defendants are correct that there can be no Sixth Amendment claim without prejudice. *Lockhart v. Fretwell*, 506 U.S. 364, 369 n.2 (1993). That does not, however, support Defendants' repeated claim that "[a] person claiming ineffective assistance of counsel does not sustain 'prejudice' unless she is found guilty or pleads guilty." [Doc. 19, p. 10]; [Doc. 49, pp. 8–9] ("As the State Defendants explained, the Sixth Amendment and its Missouri equivalent simply do not protect against harms from deficient legal representation unless a defendant has been convicted."). That is incorrect. In fact, it is "'well settled' that the Sixth Amendment right to counsel is broader than the question of whether a court must retrospectively set aside a judgment due to ineffective assistance of counsel." *State ex rel. Mo. Pub. Def. Comm'n v. Waters*, 370 S.W.3d 592, 607 (Mo. banc 2012). The Missouri Supreme Court noted that the right to counsel "is affirmative and prospective." *Id.*

Defendants seem to argue that Plaintiffs cannot plausibly allege Sixth Amendment violations and, moreover, cannot have standing to sue unless they are proven or plead guilty under the framework set out in *Strickland v. Washington,* 466 U.S. 668 (1984). However, *Strickland* authorizes relief in individual criminal cases by, *inter alia*, allowing courts to vacate convictions due to counsel's ineffective assistance. The U.S. Supreme Court in *Strickland* was very clear about the individualized analysis it was creating. *Id.* at 690. "*Strickland*, therefore, is inapplicable when systemic deficiencies in the provision of public defense are at issue." *Tucker*

34

*v. State*, 394 P.3d 54, 62 (Idaho 2017). As the Missouri Supreme Court outlined:

> [T]he Sixth Amendment right to counsel is broader than the question of whether a court must retrospectively set aside a judgment due to ineffective assistance of counsel. The constitutional right to effective counsel applies to all critical stages of the proceeding; it is a prospective right to have counsel's advice during the proceeding and is not merely a retrospective right to have a verdict or plea set aside if one can prove that the absence of competent counsel affected the proceeding.

*Waters,* 370 S.W.3d at 608 (citations omitted).

As in *Tucker*, the issues raised in Plaintiffs' Petition do not implicate *Strickland*. There, the Idaho Supreme Court explained:

> Appellants alleged systemic, statewide deficiencies plaguing Idaho's public defense system. Appellants seek to vindicate their fundamental right to constitutionally adequate public defense at the State's expense, as required under the Sixth Amendment to the U.S. Constitution, and Article I, Section 13 of the Idaho Constitution. They have not asked for any relief in their individual criminal cases. Rather, they seek to effect systemic reform. Their allegations find support in both *Gideon v. Wainwright*, 372 U.S. 335, 342, 83 S.Ct. 792, 795, 9 L.Ed.2d 799, 803–04 (1963), and *State v. Montroy*, 37 Idaho 684, 690, 217 P. 611, 614 (1923), which make clear that it is the State's obligation to provide constitutionally adequate public defense at critical stages of the prosecution. Alleging systemic inadequacies in a public defense system results in actual or constructive denials of counsel at critical stages of the prosecution suffices to show an injury in fact to establish standing in a suit for deprivation of constitutional rights.

*Tucker*, 394 P.3d at 62–63. The Supreme Court of Pennsylvania also confronted this issue and found:

> The question that we confront today is whether a cause of action exists entitling a class of indigent criminal defendants to allege prospective, systemic violations of the right to counsel due to underfunding, and to seek and obtain an injunction forcing a county to provide adequate funding to a public defender's office. Pursuant to *Gideon* and its progeny, and because remedies for Sixth Amendment violations need not await conviction and sentencing, we hold that such a cause of action exists, so long as the class action plaintiffs demonstrate 'the likelihood of substantial and immediate irreparable injury, and the inadequacy of remedies at law.'

*Kuren v. Luzerne Cty.*, 146 A.3d 715, 718 (Pa. 2016) (quoting *O'Shea v. Littleton*, 414 U.S. 488,

502 (1974). *See also Hurrell-Harring v. State*, 930 N.E.2d 217, 227 (N.Y. 2010) ("We have consistently held that enforcement of a clear constitutional or statutory mandate is the proper work of the courts, and it would be odd if we made an exception in the case of a mandate as well-established and as essential to our institutional integrity as the one requiring the State to provide legal representation to indigent criminal defendants at all critical stages of the proceedings against them.") (internal citations omitted).

In *Hurrell-Harring*, the U.S. Department of Justice filed a statement of interest pursuant to 28 U.S.C. § 517. U.S. Statement of Interest, Case No. 8866-07. The United States explained the cognizable obstacles to indigent defense outside of the *Strickland* context:

> Substantial structural limitations force even otherwise competent and well-intentioned public defenders into a position where they are, in effect, a lawyer in name only. Such limitations essentially require counsel to represent clients without being able to fulfill their basic obligations to prepare a defense, including investigating the facts of the case, interviewing witnesses, securing discovery, engaging in motions practice, identifying experts when necessary, and subjecting the evidence to adversarial testing.

*Id.* at 11–12. Collecting cases, the United States noted that "[t]he absence of traditional markers of representation has led courts to find non-representation in violation of the Sixth Amendment." *Id.* at 13 (citing *Wilbur v. City of Mount Vernon*, 989 F.Supp.2d 1122, 1137 (W.D. Wash. 2013); *United States v. Cronic,* 466 U.S. 648 (1984); *Avery* v. *Alabama,* 308 U.S. 444, 446 (1940); *Pub. Defender v. State,* 115 So. 3d 261 (Fla. 2013); *State v. Citizen*, 898 So. 2d 325 (La. 2005); *State v. Peart,* 621 So. 2d 780 (La. 1993)).

In addition to the allegations of systemic constitutional inadequacy addressed by the *Tucker, Kuren,* and *Hurrell-Harring* courts, Plaintiffs Dalton, Samuels, Bowman, and Richman set forth two specific arguments regarding their respective injuries, either of which would be sufficient to satisfy the injury-in-fact prong of Article III standing. First, "Plaintiffs allege that

they have waited longer than necessary for acquittal or trial, resulting in increased anxiety, the collateral consequences that attend the pendency of a criminal case, and—the paradigmatic Article III injury—loss of liberty in the form of prolonged pretrial detention." [Doc. 44, p. 10] (citing *Barker v. Wingo*, 407 U.S. 514, 532-33 (1972) (detailing injuries caused by pretrial delay)). Second, "Plaintiffs have alleged that, due to deficient counsel, they are unable to 'compete on an equal footing' in the criminal process, regardless of whether they in fact lose at trial." [Doc. 44, p. 11] (citing *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993)).

Therefore, Plaintiffs Dalton, Samuels, Bowman, and Richman have satisfied the injury-in-fact prong of the Court's standing inquiry.

### b. Redressability

To establish standing, a plaintiff must also demonstrate that his or her "injury will likely be redressed by a favorable decision." *Bennett v. Spear*, 520 U.S. 154, 162 (1997). Defendants contend "Plaintiffs also lack standing to assert any of their claims, because relief against Defendants would not redress their alleged injuries." [Doc. 19, p. 13]. Specifically, "individual Defendants in this case lack legal authority to unilaterally increase the funding available to the public-defender system without the concurrence of the Missouri General Assembly." *Id.* Plaintiffs "need not show that a favorable decision will 'ensure' redress; it is enough that a decision is likely to result in redress." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

Plaintiffs argue "the Governor himself can, without the participation of the legislature, rectify or exacerbate some portion of Plaintiffs' constitutional deprivation." [Doc. 44, p. 20]. Governor Greitens and his predecessor each withheld funds appropriated by the legislature for the MSPD. Although Defendants concede the Court could enjoin the Governor from withholding

Case 2:17-cv-04057-NKL   Document 69   Filed 07/24/17   Page 37 of 48

any funds—contingent on Defendants' legislative immunity arguments addressed below—Plaintiffs plead "it would take an additional $20 million or more per year for MSPD to meet the constitutional floor of providing minimally adequate representation to indigent defendants." [Doc. 1-2 § 46]. Therefore, even if the Court issued an injunction prohibiting the Governor from withholding funds, Defendants argue the Court could not mandate an "additional $20 million or more per year" which Plaintiffs' cite as the funding required. [Doc. 49, p. 11].

However, Plaintiffs do not ask the Court to order Governor Greitens to affirmatively introduce legislation or grant specific funding requests. Plaintiffs ask this Court to: "Declare that Defendants are obligated to provide constitutionally adequate representation to indigent criminal defendants and juvenile respondents, including at their initial appearances;" "Declare that the constitutional and statutory rights of Missouri's indigent criminal defendants and juvenile respondents are currently being violated by Defendants on an ongoing basis;" "Enjoin Defendants from continuing to violate the rights of indigent defendants by providing constitutionally deficient representation;" and "Enter an injunction that requires Defendants to propose and implement, subject to this Court's approval and monitoring, a plan to ensure that all indigent criminal defendants and juvenile respondents in the State of Missouri are provided with constitutionally adequate legal representation." [Doc. 1-2, p. 52]. Such declarations and injunctions may have a "substantial ancillary effect on the state treasury," but that does not prohibit the Court from granting Plaintiffs' requested relief. *Randolf v. Rogers*, 253 F.3d 342, 348 (8th Cir. 2001).

Nothing in Plaintiffs' Petition requests the Court enter an injunction forcing the Governor to direct specific funds, but rather asks the Court to "[e]nter an injunction that requires Defendants to propose and implement, subject to this Court's approval and monitoring, a plan to

ensure that all indigent criminal defendants and juvenile respondents in the State of Missouri are provided with constitutionally adequate legal representation." [Doc. 1-2, p. 52]. Such an injunction is likely to redress Plaintiffs' claims and Plaintiffs Dalton, Samuels, Bowman, and Richman have standing to sue.

### B. Defendants' Motion under Rule 12(b)(6)

Defendants also move to dismiss Plaintiffs' Petition under Fed. R. Civ. Pro. 12(b)(6), arguing (1) absolute legislative immunity bars all claims against Gov. Greitens; (2) Plaintiffs have adequate alternative legal remedies; (3) Plaintiffs have failed to state a plausible constitutional claim for relief against Gov. Greitens because Plaintiffs have failed to establish that Gov. Greitens is causally linked to or directly responsible for any alleged constitutional violations; (4) that Plaintiffs' claims brought under various Mo. Rev. Stat. provisions fail to state a claim against Missouri or Gov. Greitens; and (5) that *Heck v. Humphrey* bars all claims brought by Plaintiff Church. Finding Plaintiff Church lacks standing to bring his claims, the Court will address Defendants' remaining arguments.

#### 1. Legislative Immunity

Absolute legislative immunity bars all claims against a governmental actor based on his or her "legislative activities." *See Bogan v. Scott-Harris*, 523 U.S. 44, 54-55 (1998); *Young v. Mercer Cnty. Comm'n*, 849 F.3d 728, 733-34 (8th Cir. 2017). The absolute immunity applies both to claims for damages and to those for prospective relief. *Supreme Court of Va. v. Consumers Union of the U.S., Inc.*, 446 U.S. 719, 732-33 (1980).

In *Bogan*, the U.S. Supreme Court held that city council members were entitled to absolute immunity from § 1983 liability for "actions taken in the sphere of legitimate legislative activity." 523 U.S. at 53–54. The *Bogan* Court found that the council's action in eliminating

certain services was legislative in substance because their action "reflected a discretionary, policymaking decision implicating the budgetary priorities of the city and the services the city provides to its constituents." *Id.* at 55–56. This absolute legislative immunity does not apply only to legislators; the Supreme Court acknowledged that executive branch officials are entitled to legislative immunity when they perform legislative functions such as making discretionary policy decisions that implicate budgetary priorities. *Id.* at 55–56.

Whether an act is legislative turns on the "nature of the act." *Bogan*, 523 U.S. at 54–55. Legislative immunity protects acts "integral" to the legislative process, which Plaintiffs argue covers only "'formally legislative' acts like introducing, signing, vetoing legislation, and the like." [Doc. 44, p. 8] (citing *Bogan*, 523 U.S. at 54–55). Plaintiffs state that the challenged actions taken by the Governor are actions taken "in what he himself has argued is his *executive* capacity," thus arguing legislative immunity is inapplicable to this case.

One of the actions Plaintiffs challenge is the Governor's decision to direct his executive branch's Office of Administration to withhold money already allocated to the MSPD by legislation. Plaintiffs contend that the withholding of allocated funds is not a "legislative" act, but an executive act. [Doc. 44, p. 9] (citing [Doc. 1-2, ¶ 16]; *Barrett v. Nixon*, No. 16ACCC00290 (Mo. Cir. Ct. July 13, 2016), Rothert Decl. Ex. 3).

When MSPD sued Governor Nixon in 2016 for withholding funds that had been allocated by the Missouri legislature, Plaintiffs contend the Governor contended that his authority to withhold funding were *executive* powers. [Doc. 44, p. 9] (citing Def.'s Renewed Motion to Dismiss at 9-10, *Barrett v. Nixon*, No. 16AC-CC00290 (Mo. Cir. Ct. Oct. 13, 2016), Rothert Decl. Ex. 5). Plaintiffs argue that, because Governor Nixon argued his authority was an executive function, "Judicial estoppel precludes the Governor from now arguing a contrary

40

position to this Court." [Doc. 44, p. 9]. *See New Hampshire v. Maine*, 532 U.S. 742, 749-51 (2001); *Shockley v. Dir., Div. of Child Support Enf't*, 980 S.W.2d 173, 175 (Mo. Ct. App. 1998). Plaintiffs noted "that case is on appeal in Missouri Court of Appeals, and the Attorney General's Office is still defending that decision on behalf of Governor Greitens, who is substituted now as the appropriate party in that case. So [counsel's] understanding is . . . that Governor Greitens has not disclaimed Governor Nixon's position in that case." [Doc. 64, p. 23].

Defendants argue this position is not inconsistent and that Plaintiffs mischaracterize the Governor's position: "In *Barrett*, the former Governor did not argue that withholding funds is an executive function. Rather, [he] argued that his authority to withhold funds could not violate the Missouri Constitution's separation-of-powers doctrine, because the authority to withhold funds is itself expressly provided by the Constitution." [Doc. 49, pp. 2-3].

The Court agrees; the Missouri Constitution includes a separation-of-powers provision which expressly permits the Executive Branch to exercise legislative power. MO. CONST. Art. II, § 1. Thus, the Governor's argument that withholding funds does not violate the separation-of-powers provision does not mean the Governor argued the function was executive. Judicial estoppel does not bar Gov. Greitens from asserting legislative immunity.

Defendants cite four cases in which legislative immunity has barred claims against governors. Three of these cases are clearly distinguishable. In *Torres-Rivera v. Calderon-Serra*, 412 F.3d 205, 213 (1st Cir. 2005), the Governor of Puerto Rico was entitled to legislative immunity for his act of signing a particular piece of legislation into law. Plaintiffs concede that type of act is "integral to the legislative process." [Doc. 44, p. 8]. Here, conversely, Plaintiffs challenge withholding of funds already allocated by the legislature, and *Torres-Rivera* is not applicable. In *Peter B. v. Sanford*, No. 6:10-767, 2012 WL 2149784 (D.S.C. June 13, 2012),

plaintiffs sued the former governor in his individual capacity only. In *E.C. v. Blunt*, No. 05-0726-cv-W-SOW, 2006 WL 44318, at *1 (W.D. Mo. Jan. 9, 2006), the court based its decision on the Eleventh Amendment's sovereign immunity, and noted in dicta that "a governor cannot be sued for signing a bill into law due to his absolute legislative immunity." As a result, *Blunt* is also inapplicable.

However, in *Abbey v. Rowland*, 359 F. Supp.2d 94, 99-100 (D. Conn. 2005), former state employees, whose jobs were eliminated during budget cuts, brought action against governor of State of Connecticut. There, the court held the governor's discretionary choice on exactly how to cut the state budget, which had an adverse impact on some employment within the agency, was a legislative function entitled to legislative immunity to suit. Thus, although it is not binding authority, *Abbey* supports Defendants' argument that Gov. Greitens' withholding of funds is a legislative function entitled to legislative immunity.

However, Plaintiffs clarified that withholding of funds pursuant to Missouri's budgetary process is not the only challenged action under their petition for relief. Plaintiffs noted that "at this point" there is no specific request that Defendants release money from withholding. Rather, Plaintiffs "have pleaded . . . a general claim for equitable relief to remedy the ongoing violation." Plaintiffs' requested remedy "may include an order that the governor release or in the future not impound money allocated to the MSPD, which may be one way in which remedial reform can actually happen here, that the governor cannot interfere with an attempt to bring the State into compliance." [Doc. 64, p. 31].

At this stage of litigation, because it is unclear what the terms of any injunction entered would include, the Court does not find that claims against Gov. Greitens are barred by legislative

immunity. That finding is subject to change should the Plaintiffs request any remedies that would violate Gov. Greitens' immunity from acts "integral" to the legislative process.

### 2. Alternative Legal Remedies

Under Missouri law, any party seeking an injunction or declaratory relief must establish that she lacks an adequate remedy at law. *See*, *e.g.*, *Farm Bureau Town & Country Ins. Co. v. Angoff*, 909 S.W.2d 348, 354 (Mo. banc 1995); *Foster v. State*, 352 S.W.3d 357, 359 (Mo. banc 2011). Similarly, a plaintiff seeking an injunction under § 1983 must "meet the usual requirements for injunctive relief." *Edwards v. Balisok*, 520 U.S. 641, 648 (1997). One of these requirements is that a party must demonstrate that she lacks an adequate remedy at law. *See*, *e.g.*, *Taylor Corp. v. Four Seasons Greetings, LLC*, 403 F.3d 958, 967 (8th Cir. 2005) ("It is well-established that a party is entitled to equitable relief only if there is no adequate remedy at law.").

Defendants argue Plaintiffs have alternative remedies available, specifically in a state-court post-conviction review ("PCR") proceeding and, if necessary, a federal habeas corpus proceeding. [Doc. 21, pp. 3–4] (citing Mo. R. Crim. P. 29.15(a) (state PCR review); 28 U.S.C. § 2254 (federal habeas corpus review)). This argument lacks merit because—as Defendants argue elsewhere—only Plaintiff Church has plead guilty and none of the other named Plaintiffs stated an intention to plead guilty. As explained above, *Strickland* is not the appropriate standard in this case. Post-conviction *Strickland* claims do not constitute adequate remedies at law because they cannot adequately protect the entirety of the Sixth Amendment right to counsel and because they "cannot provide systemic structural relief that will help fix the problem of under-funded and under-resourced public defenders." [Doc. 44, p. 20].

"[F]ederal courts should not interfere in state criminal court proceedings when state and federal law provide adequate legal remedies *and* when intervention needlessly threatens the

Case 2:17-cv-04057-NKL   Document 69   Filed 07/24/17   Page 43 of 48

principle of comity." *Smith v. Bacon*, 699 F.2d 434, 437 (8th Cir. 1983) (emphasis added); *accord Rogers v. Bruntrager*, 841 F.2d 853, 856 (8th Cir. 1988). In this case, however, neither state nor federal habeas relief provides an adequate remedy for Plaintiffs' claims. Both *Smith* and *Rogers* involved plaintiffs bringing post-conviction claims and, in both cases, the plaintiffs had pending state post-conviction relief motions. *Smith,* 699 F.2d at 438; *Rogers*, 841 F.2d at 856.

That is not the case here, where all named Plaintiffs besides Plaintiff Church are awaiting trial. Plaintiffs in this case seek prospective relief to remedy ongoing and future violations of their right to adequate counsel, not retrospective vacatur of existing convictions. Plaintiffs argue "post-conviction relief cannot provide prospective relief, cannot provide systemic relief, cannot protect the full scope of the Sixth Amendment right, and cannot protect the Sixth Amendment rights of those whose evidence of guilt is overwhelming." [Doc. 44, p. 21].

Because "[t]he right to counsel is the lifeblood of our system of criminal justice," "nothing in our legal tradition or precedents requires a person seeking to vindicate that right to wait until he or she has been convicted and sentenced." *Kuren*, 146 A.3d at 747. Therefore, Plaintiffs do not have adequate legal remedies at law.

### 3. Causation & Governor Greitens

Similar but distinguishable from Defendants' arguments surrounding redressability, Defendants contend Plaintiffs "have failed to establish that Governor Greitens is causally linked to or directly responsible for any alleged constitutional violations." [Doc. 21, p. 5].

#### a. Federal Constitutional Claims

Plaintiffs' claims brought pursuant to the U.S. Constitution are brought under 42 U.S.C. § 1983. "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was

44

committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). "Liability under section 1983 requires a causal link to, and direct responsibility for, the deprivation of rights." *Mayorga v. Missouri*, 442 F.3d 1128, 1132 (8th Cir. 2006).

As noted above, Governor Greitens "is responsible for law enforcement . . . and is charged with executing the laws faithfully," "has the residual power to commence criminal prosecutions," and "has the final authority to direct the Attorney General to 'institute and prosecute' on behalf of the state." Mo. Const. art. IV, §§1-2; Mo. Rev. Stat. § 27.030. Governor Greitens's predecessor, Governor Nixon, affirmatively used his executive authority to withhold roughly $7 million in funding allocated by the Missouri Legislature to the MSPD, thereby demonstrating an even more direct "connection" to the challenged conduct. [Doc. 1-2, ¶¶ 42-43]. Governor Greitens has since upheld Governor Nixon's withholding of funds allocated to the MSPD. *Id.* ¶ 44; [Doc. 17 ¶ 45]. Finally, the Governor appoints all seven members of the MSPD Commission. *See* Mo. Rev. Stat. § 600.015(1); *Eu*, 979 F.2d at 704 (holding California governor's power to appoint judges was a sufficient "connection" to the challenged statute limiting the number of judges in Los Angeles County).

Plaintiffs have alleged a sufficient connection regarding Gov. Greitens to place him squarely within *Ex Parte Young*. For the same reasons, Plaintiffs have plausibly alleged "a causal link to, and direct responsibility for, the deprivation of rights." *Mayorga v. Missouri*, 442 F.3d 1128, 1132 (8th Cir. 2006).

### b. Missouri Constitutional Claims

Plaintiffs' Second and Fourth Claims seek relief against the Governor under Missouri law. Under Missouri law, a plaintiff must bring suit against "the state official charged with the duty to enforce" the state law at issue. *Midwest Freedom Coalition, LLC v. Koster*, 398 S.W.3d

45

23, 27 (Mo. Ct. App. 2013); *see also State ex rel. Reeves v. Brady*, 303 S.W.3d 22, 25 (Mo. banc 1957). Plaintiffs note that "it is Governor Greitens's role to ensure that the State fulfills its affirmative constitutional obligations, just as the Eleventh Circuit held that it was the governor of Georgia's role to do so in *Luckey*." [Doc. 44, p. 8].

In *Luckey v. Harris*, the Eleventh Circuit allowed indigent defendants bringing a Sixth Amendment claim to sue the governor of Georgia for prospective equitable relief. 860 F.2d 1012, 1016 (11th Cir. 1988). The Eleventh Circuit held that the governor was a proper defendant because "[a]ccording to the Georgia constitution, the governor is responsible for law enforcement in that state and is charged with executing the laws faithfully," "has the residual power to commence criminal prosecutions," and "has the final authority to direct the Attorney General to 'institute and prosecute' on behalf of the state." *Id.* at 1016 (citations omitted).

For the reasons discussed above, Plaintiffs have plausibly alleged Governor Greitens is "the state official charged with the duty to enforce" the provisions of the Missouri State Constitution dealing with indigent defense, the right to counsel, and due process. *See Midwest Freedom Coalition, LLC v. Koster*, 398 S.W.3d 23, 27 (Mo. Ct. App. 2013).

### 4. Claims brought under Missouri Criminal & Juvenile Code Provisions

Plaintiffs' Fifth Claim for Relief alleges Defendants have violated Mo. Rev. Stat. §§ 600.042, 600.048, 211.061, and 211.211, and Missouri Rule of Juvenile Procedure 126.01. [Doc. 1-2, ¶¶ 224-226.] Under Missouri law, declaratory judgments and injunctive relief constitute remedies, not independent causes of action. *See Goerlitz v. City of Maryville*, 333 S.W.3d 450, 455 (Mo. banc 2011) ("[A]n injunction is a remedy and not a cause of action[.]"); *ABB, Inc. v. Securitas Sec. Servs. USA, Inc.*, 390 S.W.3d 196, 203 (Mo. Ct. App. 2012) (explaining that a declaratory judgment "is but one of several remedies, not a substantive claim" (quotation

46

omitted)). Thus, a request for such remedies "must be based on some recognized and pleaded legal theory." *Goerlitz*, 333 S.W.3d at 455.

Section 600.042 imposes a number of duties on the director of the Public Defender's Office (Defendant Barrett) and the public defenders who operate under him. *See* Mo. Rev. Stat. § 600.042. But the statute imposes no obligations on Governor Greitens. *Id.* Similarly, § 600.048 imposes a number of duties on public defenders, courts, and those who operate jails, police stations, constables' offices, sheriffs' offices, and detention facilities. *See* Mo. Rev. Stat. § 600.048. Again, § 600.048 imposes no duties on Governor Greitens. *Id.* Likewise, neither § 211.061, § 211.211, nor Missouri Rule of Juvenile Procedure 126.01 imposes any duties on Governor Greitens. Defendants thus move to dismiss these claims against Gov. Greitens. Plaintiffs concede to dismissal of Count V against Gov. Greitens. [Doc. 44, p. 7 n.4].

Plaintiffs argue Missouri is a proper defendant under the cited code provisions and oppose that portion of Defendants' motion on Count V. *Id.* Defendants argue that Missouri courts "will not interpret a statute to establish a private cause of action without clear implication of the legislature's intent to do so." *Byrne & Jones Enters., Inc. v. Monroe City R-1 Sch. Dist.*, 493 S.W.3d 847, 856 (Mo. 2016). But, as Plaintiffs point out, that is true only "[w]hen the legislature has established other means of enforcing [the] statute[.]" *Dierkes v. Blue Cross & Blue Shield of Mo.*, 991 S.W.2d 662, 667 (Mo. 1999). Defendants have pointed to no other means of enforcement here besides post-conviction relief, which the Court already found is an inadequate remedy for the alleged violations.

Plaintiffs have plausibly alleged violations of the Missouri Criminal and Juvenile codes and Defendants have not convinced the Court that the legislature has established other means of enforcing the statute. Therefore, Count V is dismissed against Governor Greitens but is not

Case 2:17-cv-04057-NKL   Document 69   Filed 07/24/17   Page 47 of 48

dismissed against the State of Missouri.


**III.     Conclusion**

For the foregoing reasons, Defendants' Motion to Dismiss under Fed. R. Civ. P. 12(b)(1),

[Doc. 18], is granted as to Plaintiff Church and denied to all other claims. Defendants' Motion to

Dismiss under Fed. R. Civ. P. 12(b)(6), [Doc. 20], is granted as to Count V against Governor

Greitens and denied as to all other claims.


                                        s/ Nanette K. Laughrey
                                        NANETTE K. LAUGHREY
                                        United States District Judge

Dated:  July 24, 2017
Jefferson City, Missouri