## UNITED STATES DISTRICT COURT FOR THE

## WESTERN DISTRICT OF MISSOURI

## CENTRAL DIVISION

| | | |
|---|---|---|
| SHONDEL CHURCH, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 17-04057-CV-C-NKL |
| | ) | |
| STATE OF MISSOURI, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## **EXPERT REPORT OF ROBERT C. BORUCHOWITZ**

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION AND SCOPE OF THE REPORT..........................................1

II.     OVERVIEW OF OPINIONS .................................................................1

III.    QUALIFICATIONS INCLUDING A LIST OF ALL PUBLICATIONS
        AUTHORED IN THE PREVIOUS 10 YEARS .................................................4

IV.     COMPENSATION...........................................................................12

V.      THE MISSOURI AND UNITED STATES CONSTITUTIONS REQUIRE
        EFFECTIVE ASSISTANCE OF COUNSEL ....................................................12

VI.     RULES OF PROFESSIONAL CONDUCT REQUIRE COMPETENT AND
        THOROUGH REPRESENTATION.................................................................13

VII.    DEVELOPMENTS SINCE THE HINKEBEIN DECISION.............................14

VIII.   THE MSPD HAS ADMITTED IT IS UNABLE CONSISTENTLY TO
        PROVIDE EFFECTIVE REPRESENTATION TO ITS CLIENTS ..................16

IX.     LACK OF FINANCIAL PARITY AND INADEQUATE SALARIES ............25

X.      THE MISSOURI DEFENDERS HAVE EXCESSIVE CASELOADS.............28

XI.     EFFECTIVE ADVOCACY WITH REASONABLE CASELOADS CAN
        MAKE A DIFFERENCE AND CASELOADS CAN BE LIMITED ................39

XII.    MSPD ROUTINELY PRACTICES TRIAGE TO THE DETRIMENT OF ITS
        CLIENTS...........................................................................................42

XIII.   MSPD DOES NOT COMPLY WITH ABA GUIDELINES ON EXCESSIVE
        WORKLOADS......................................................................................45

XIV.    GEOGRAPHICAL CHALLENGES UNDERCUT DEFENDERS' ABILITY
        TO PROVIDE EFFECTIVE REPRESENTATION ...........................................46

XV.     MSPD'S CONFLICTS POLICY PRESENTS MULTIPLE PROBLEMS.........49

XVI.    THE STATUTORY PROVISION FOR SEEKING APPROVAL TO DECLINE
        CASES IS UNWORKABLE....................................................................52

XVII.   EFFECTS OF EXCESSIVE CASELOAD AND LACK OF RESOURCES......54

        A.      District 7, Site of Plaintiff Bowman's Case, Is Committing Malpractice
                Every Day ................................................................................54
        B.      The Missouri Defenders Do Not Provide Counsel at Arraignment and  ...57
        C.      Because of Excessive Caseload, Defenders Are Unprepared and Seek
                Multiple Continuances ..............................................................60
        D.      Because of the Excessive Caseload, Missouri Defenders Rarely Go to
                Trial.........................................................................................61
        E.      Missouri Defenders Are Not Able to Have Adequate Communication
                With Their Clients.....................................................................62
        F.      Missouri Defenders Have Little Time for Effective Motion Practice .......64

# TABLE OF CONTENTS
(continued)

G.      MSPD Lawyers Have Inadequate Investigation and Support Resources .. 65

H.      MSPD Does Not Make Adequate Use of Expert Witnesses ..................... 67

I.      MSPD Suffers From Inadequate Supervision of Its Staff ......................... 72

J.      Missouri's Public Defenders Are Unable Consistently to Meet Their Ethical Obligations ...................................................................................... 75

XVIII.    THE MSPD IS NOT PROVIDING EFFECTIVE REPRESENTATION TO ITS JUVENILE CLIENTS ......................................................................................... 82

XIX.      CONCLUSION ................................................................................................. 86

## I. INTRODUCTION AND SCOPE OF THE REPORT

1. I was requested to provide an opinion about public defense services in Missouri in the context of the claim by the Plaintiffs in this case that Missouri "has failed to meet its constitutional obligation to provide indigent defendants with meaningful representation."

2. I am Director of The Defender Initiative and Professor from Practice, Seattle University School of Law. I joined the faculty in January 2007. I was Director of The Defender Association in Seattle for 28 years, and was a staff attorney at that office for nearly five years before that. I have been an expert witness in systemic litigation in New York and Louisiana. A full description of my qualifications appears below at paragraph 18 et. seq.

3. **A list of the materials I have reviewed is attached as Appendix A.** I have also reviewed this Court's ruling on the Defendants' Motions to Dismiss. *Church v. Missouri*, 17-CV-04057-NKL, 2017 WL 3383301 (W.D. Mo. July 24, 2017). I recognize that for purposes of deciding that motion, the Court "accept[ed] the Plaintiffs' factual allegations as true and construe[d] them in the light most favorable to them." *Id.* at *1 n.1. Because this Court's recounting of the history of studies of public defense in Missouri and the funding of public defense is concise and is consistent with my understanding of them, I have cited and relied upon this Court's account at various places in my report.

4. Based on my experience in public defense, my understanding of the relevant constitutional and ethical standards, and my review of the materials in this case, I have been able to reach a conclusion on the systemic ability of the Missouri State Public Defender (MSPD) to fulfill Missouri's constitutional obligation to provide counsel to indigent defendants.

## II. OVERVIEW OF OPINIONS

5. In my expert opinion, Missouri's public defenders operate in circumstances such that even where counsel is nominally available, "the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small," that Plaintiffs are constructively denied counsel in violation of the 6th Amendment. *See United States v. Cronic*, 466 U.S. 648, 659-60 (1984).

6. Missouri's system for providing defense counsel for the poor fails to meet Constitutional and professional standards and creates an unacceptable risk that indigent defendants throughout the State who are charged with crimes carrying a threat of imprisonment will be denied effective representation by counsel. Missouri's public defenders consistently are failing to subject the cases against such defendants to meaningful adversarial testing, and, as a result, the State is failing to meet its foundational constitutional obligation to provide counsel to eligible persons.

7. There are numerous structural and systemic causes for the Missouri public defender system's failure to meet Constitutional and professional standards and statutory requirements: inadequate and inconsistent funding; excessive caseloads; inability to devote the necessary time to each client's case that results in triage representation; a major disparity of resources between prosecution and defense; insufficient supervision and training; insufficient attorney-client communications; and inadequate support from or access to investigators, experts,

Boruchowitz Report Page 1

social workers and other necessary support personnel; significant travel requirements because of the geographic size of their districts and up until quite recently, the MSPD's conflict counsel policy that required defenders to take cases in other counties; and a wholly ineffective statutory remedy for declining cases for which MSPD defenders have feared reprisals.

8.     Public defenders in Missouri regularly fail to provide adequate counsel at every critical stage of the criminal process, including arraignment, particularly where the initial bail amount is set by the court.  Further, MSPD attorneys routinely fail to engage in sufficient attorney-client communications to prepare an adequate defense; conduct meaningful factual investigations; engage in necessary motions practice; prepare for and take cases to trial; and utilize the services of expert witnesses and social workers.  Because of the pressures of excessive caseload, public defenders in Missouri frequently seek long and repeated continuances that leave their clients in jail, forced to choose either to waive their speedy trial rights or give up their trial and accept plea deals to obtain earlier release.

9.     These failures exist in the MPSD's responsibilities to defend indigent clients in adult criminal proceedings and in juvenile proceedings.

10.     This Court has outlined the claimed inability of the Missouri Defender system to provide counsel consistently at every critical stage of the criminal process:

> In Missouri, however, attorneys are often unavailable to represent each eligible indigent defendant at every critical stage of the criminal process—including at their arraignment, where bond is determined. Public defenders routinely do not meet their clients until several weeks after the client's arrest and arraignment. As a result, bond determinations, which normally occur at the defendant's initial appearance before the court, are almost always made without the benefit of advocacy from counsel. Unrepresented indigent defendants are therefore often forced to remain in jail simply because they are unable to advocate effectively on their own for release on their own recognizance or a reasonable reduction in their bond amount.

*Church v. Missouri*, 2017 WL 3383301, at *3.

11.     This Court noted that there is a right to counsel at post-arraignment lineups.  The complaint, however, alleges that:

> …defendants in Missouri are routinely placed in lineups after arraignment without the benefit of counsel, even though the prejudice that results from an improper lineup cannot be cured later in the criminal process.

*Id.* at *4

12.     This Court described the dilemma faced by clients whose lawyers cannot prepare for their cases:

Boruchowitz Report Page 2

...defendants are often forced to choose between either consenting to the continuances, thereby waiving their right to a speedy trial and remaining in jail for an extended period of time, or taking their chances at trial with an attorney who has had little or no time to prepare.

*Id.*

13. This Court discussed the alleged failures of counsel caused by inadequate resources:

> MSPD attorneys are unable to ensure that those who plead guilty do so knowingly and voluntarily. Excessive pretrial detention—often due to public defenders' inability to represent defendants at bond hearings or their need for repeat continuances—put virtually unbearable pressure on many defendants to plead guilty merely to get out of jail. Many MSPD clients who plead guilty do so without a full understanding of the strengths and weaknesses of their case.

*Id.* at 4.

14. As discussed more fully below, an indication that the Missouri defenders are not able consistently to subject the state's case to meaningful adversarial testing is that there are few cases that are taken to trial. For example, in 2015, MSPD lawyers tried only 18 cases out of 12,327 total Trial Division misdemeanor cases. July 25, 2016. Letter from Jacqueline Shipma to Jason Williamson (July 25, 2016).

15. Many defenders rarely investigate the facts in their cases. Many defenders do not conduct motion hearings to the extent that they should, and most defenders rarely use expert witnesses.

16. Almost none of the districts use social workers. Although social workers and careful preparation by counsel can significantly improve plea bargaining results and result in better sentences for the defendants, they are rarely available as a resource to MSPD lawyers or their clients.

17. The situation in Missouri has grown to be so serious that the defenders and judges have come to accept routinely and openly a pattern of practice regarding indigent accused persons that falls well below what the Missouri Rules of Professional Conduct require and effectively disregards the ethical responsibilities of both lawyers and judges. The defenders have changed their approach to the excessive caseload in the wake of the recent *Hinkebein* state Supreme Court disciplinary decision. As detailed below, there are a range of problems raising serious ethical concerns.

### III. QUALIFICATIONS INCLUDING A LIST OF ALL PUBLICATIONS AUTHORED IN THE PREVIOUS 10 YEARS

18.     I am an attorney licensed to practice law in the State of Washington, admitted to practice before the United States District Court for the Western District of Washington, the United States Court of Appeals for the 9th Circuit and the Supreme Court of the United States. I am an inactive member of the California Bar Association. I am certified under the Washington State Superior Court Special Proceedings Rules as qualified to be appointed as counsel in capital appeals and post-conviction proceedings.

19.     I graduated from Kenyon College in 1970 with a degree in Political Science and from Northwestern University School of Law in 1973.

20.     For 28 years, I served as Director of The Defender Association in Seattle, a non-profit public defender program. In that role, I administered an office of as many as 125 staff, including as many as 90 lawyers. Among my duties as Director, I was responsible for negotiating our contracts with government funders at the city, county and state level, advocating for resources from local government, seeking foundation and other private funding, negotiating building and equipment leases, recruiting and hiring staff, addressing personnel and labor issues, and supervising and participating in training of staff. I also developed a successful proposal for a state capital defense assistance center funded by the Washington Office of Public Defense. I obtained grant funding to begin a Racial Disparity Project in the office.

21.     As Director, I was co-counsel in two hearings in King County Superior Court that resulted in increased payments to The Defender Association for work in Wash. Rev. Stat. § 71.09 (i.e., sex offender commitment) cases. Our presentation included an analysis of the staffing requirements for and the financial impact of handling those cases, including extensive discussion of the budget.

22.     My office had contracts with local government that had performance guidelines informed by the King County Bar Association Guidelines, Washington Defender Association Standards, Washington State Bar Association Standards, National Legal Aid and Defender Association Performance Guidelines, and Wash. Rev. Stat. § 10.101.

23.     As a staff attorney with The Defender Association, I worked in misdemeanor, juvenile, felony, and appellate divisions. While in the appellate division, I was co-counsel on a trial-level capital case.

24.     I have represented clients at every level of state and federal courts.

25.     I have participated in state and national efforts to develop public defender standards and a model defender services contract, which have been published by the Washington State Bar Association ("WSBA"), the American Bar Association ("ABA"), and the National Legal Aid and Defender Association.

26.     For many years, I have been a member of the ABA's Indigent Defense Advisory Group. I have also served on other ABA committees and a working group and on a number of state and local committees, all relating to criminal justice and public defense.

27.     I was chairperson of the WSBA Criminal Law Section in 1981-1982 and 1984-1985. For more than ten years, I have served on the WSBA Committee on Public Defense and its successor Council on Public Defense.

28.     I have been co-chair of a committee for the Council on Public Defense assigned to review standards and to develop performance guidelines. In that role, I have co-led an effort to amend the WSBA Indigent Defense Standards and to develop defender performance standards. The Council on Public Defense approved both the resulting amended Standards and the Performance Guidelines and recommended that the WSBA Board of Governors endorse them, which it did. The State Supreme Court has incorporated key parts of the WSBA Indigent Defense Standards into court rules.

29.     I helped to draft the Washington State law requiring local governments to develop standards for public defense (enacted as Wash. Rev. Stat. § 10.101), initially passed in 1989. The law requires, among other things, that:

> Each county or city . . . shall adopt standards for the delivery of public defense services, whether those services are provided by contract, assigned counsel, or a public defender office. Standards shall include the following: Compensation of counsel, duties and responsibilities of counsel, case load limits and types of cases, responsibility for expert witness fees and other costs associated with representation, administrative expenses, support services, reports of attorney activity and vouchers, training, supervision, monitoring and evaluation of attorneys, substitution of attorneys or assignment of contracts, limitations on private practice of contract attorneys, qualifications of attorneys, disposition of client complaints, cause for termination of contract or removal of attorney, and nondiscrimination.

Wash. Rev. Stat. § 10.101.030.

The law provides that the WSBA Standards "should serve as guidelines to local legislative authorities in adopting standards" under § 10.101.

30.     In 1983, I helped to establish The Washington Defender Association (the "WDA") and for 20 years served as its Founding President. During that time, the WDA established staff attorney positions providing technical assistance to defenders throughout the state and developed a legislative advocacy program working with the Washington Association of Criminal Defense Lawyers.

31.     In 2007, I led a committee for the American Council of Chief Defenders ("ACCD") that wrote a Statement on Caseloads and Workloads (the "ACCD Statement on Caseloads and Workloads").

32.     I currently lead a Washington Council of Public Defense committee that developed proposed Performance Guidelines for Juvenile Defense Representation in

Boruchowitz Report Page 5

Washington. The Council has adopted the Guidelines and is recommending their adoption by the Washington State Bar Board of Governors and sending them to the Washington Supreme Court.

33.    For many years I have been a member of the Washington State Minority and Justice Commission, a commission of the Supreme Court of the state of Washington that is charged with the mission of ensuring that all courts in the state of Washington remain free of bias so that justice may be adjudicated in a neutral and fair manner. I have participated with prosecutors, defenders, and judges in developing successful proposals for amendments to court rules and in presenting training programs.

34.    I am a Professor from Practice at the Seattle University School of Law (the "School of Law") where I have been on the faculty since January 2007. I have taught a seminar on Right to Counsel, Law and Lawyering, a Clinic on Right to Counsel, and in the Youth Advocacy Clinic and Criminal Procedure Adjudicative classes. My teaching in the clinics has included classroom training on trial practice and ethical considerations, discussion of related criminal procedure issues, and representation of clients in prosecutions in King County Superior Court, in a misdemeanor appeal in Kittitas County, and in two habeas corpus proceedings in Snohomish County Superior Court (in Washington State).

35.    I also serve as the Director of The Defender Initiative at the School of Law. The Initiative's first project was a comprehensive investigation of misdemeanor public defense in the United States conducted with the National Association of Criminal Defense Lawyers ("NACDL"). I was the primary researcher and co-author of a report published by NACDL in 2009 entitled *Minor Crimes, Massive Waste, The Terrible Toll of America's Broken Misdemeanor Courts* that surveyed the law on right to counsel in misdemeanor cases and examined actual representation across the country. For that project, I reviewed recent case law and ethical opinions relating to caseloads and conducted site visits in Pennsylvania, Arizona, and Washington State. The report analyzed issues relating to caseloads, available resources, and the components of effective representation, including use of investigation, training, supervision and compensation. The report discussed diversion of cases and ethical issues. The report has been cited in more than 60 law review and journal articles.

36.    In 2009, The Defender Initiative received a grant from the Foundation to Promote an Open Society (the "Foundation") to advocate for increased provision of counsel in Washington's misdemeanor courts. The Foundation provided additional funding for 2010-2011 and 2011-2012, which allowed me to expand the work into Kentucky, New Hampshire, and South Carolina. The Defender Initiative receives grant funding from the U.S. Department of Justice to provide technical assistance on public defense.

37.    Working with The Sixth Amendment Center, a sub-awardee from The Defender Initiative, I conducted site visits in a number of Utah counties culminating in a report to the Utah Judicial Council entitled *The Right to Counsel in Utah: An Assessment of Trial-Level Indigent Defense Services* (2015). The Defender Initiative and the Sixth Amendment Center are preparing a similar report for the Mississippi Supreme Court Task Force on Public Defense and the Mississippi Office of the State Public Defender for which I have conducted site visits in a number of Mississippi counties. We also are consulting with the staff of the Michigan Indigent Defense Commission. I recently visited and wrote a short report on the Berrien County,

Boruchowitz Report Page 6

Michigan, Public Defender office. And I observed hearings and wrote a report about three courts in Michigan. In another project with The Sixth Amendment Center, I helped to research and write a report on compensation for assigned counsel in Wisconsin entitled *Justice Shortchanged, Assigned Counsel Compensation in Wisconsin* (2015). We recently received a grant from the Michigan Indigent Defense Commission to do a study of the Wayne County State Defender office.

38.     I have participated in site-visit evaluations of public defender programs for the National Legal Aid and Defender Association in Idaho, Michigan, Louisiana (in Orleans and Avoyelles Parishes), Nevada, and Washington, D.C.

39.     I serve as the Public Defense Assessor, City of Edmonds, Washington, January 2016—present.  I also consulted for Edmonds in 2015 on the selection of its current public defense provider.

*I will include here a list of all other cases in which I testified as an expert at trial or by deposition.*

40.     I have previously provided expert testimony and/or reports in several actions in state and federal courts relating to the ability of public defenders to provide effective assistance of counsel to indigent defendants.

In 2005, I served as an expert witness in a class action seeking injunctive relief from systemic ineffective assistance of counsel in Grant County, Washington. I provided deposition testimony, and, after depositions and motion hearings, the parties entered into a settlement that established per-attorney caseload limits and other requirements.

In 2009, I submitted an affidavit as an expert witness in support of a summary judgment motion filed by the Kentucky Public Advocate in a declaratory judgment action involving excessive public defender caseloads. I concluded that the defenders had excessive caseloads and inadequate resources. Although the trial court dismissed the lawsuit on ripeness grounds, the Kentucky Governor shortly thereafter announced a new $2 million allocation for public defense.

I submitted a declaration as an expert witness in support of a motion filed by the Miami Dade County Public Defender in *State of Florida v. Bowens*, 39 So. 3d 479 (Fla. Dist. Ct. App. 2010), to withdraw because of excessive caseloads. The Florida Supreme Court agreed that the Public Defender had demonstrated cause for withdrawal based on his office's excessive caseloads. *Public Defender v. State*, 115 So. 3d 261, 279 (Fla. 2013). My declaration is available at http://www.pdmiami.com/ExcessiveWorkload/Mo_to_Withdraw_Exhibit_D.pdf.

I was qualified as an expert witness by the New York Supreme Court, Appellate Division, Third Judicial Department in a class action litigation styled as *Hurrell- Harring v. State of New York,* 119 A.D. 3d 1052,1054 (N.Y. App. Div. 2014). In 2014, the parties entered into a settlement that included an agreement by the state of New York to develop caseload standards, provide counsel at all arraignment hearings, and improve the quality of public defense representation in five counties. As part of my work in that case, I

conducted observations and interviews in Suffolk County and Washington County, New York.

In November 2015, I testified (by video) as an expert witness in the Orleans Parish Criminal District Court in support of a motion filed by the Orleans Public Defender to suspend the assignment of new cases. I testified that the defenders' excessive caseloads undercut their ability to provide effective representation to their clients.

In May 2017, I provided an expert witness report on public defense in Louisiana. That report was filed in support of a motion for class certification in *Allen v. Edwards* in court in Baton Rouge Louisiana, in a lawsuit that alleges that Louisiana has failed systemically to provide a constitutionally acceptable public defense system.

In August, 2017, I provided an expert witness report on a question regarding the timing of appointment of public defenders in Contra Costa County, California. That is for litigation in United States District Court.

In October 2017, I testified in a deposition in the Contra Costa County case referenced above.

41.  I have also served as an expert witness in cases involving claims by individual defendants of ineffective assistance of counsel.

In 2007, I served as an expert witness regarding effective assistance of counsel on behalf of the defendant in an evidentiary hearing before King County Superior Court in Washington. The Court of Appeals granted the petition to withdraw the guilty plea. *In re Pers. Restraint of Gay*, 142 Wash. App. 1001 (Wash. Ct. App. 2007).

I served as an expert witness regarding effective assistance of counsel on behalf of the defendant in a federal habeas corpus proceeding challenging a persistent offender conviction. *Thorne v. DuCharme*, C97-1280Z (W. D. Wash.) (2001). After my report, the parties stipulated to an order to issue a writ of Habeas Corpus and to direct the Superior Court of the State of Washington to vacate the judgment and conviction in the state trial court.

42.  I was invited to and did testify before the United States Senate Judiciary Committee at a hearing on Protecting the Constitutional Right to Counsel for Indigents Charged with Misdemeanors on May 13, 2015. My written testimony is available at https://www.judiciary.senate.gov/download/05-13-15-boruchowitz-testimony.

43.  I have spoken at many continuing legal education seminars and public fora, including the following:

Lawsuits, Bail Reform, and Standards--Report on National and State Developments and work of The Defender Initiative, The Defender Initiative Seventh Annual Conference on Public Defense, Seattle University School of Law, March 3, 2017.

Lawyers for Misdemeanors - *When Will Judges Stop Taking Guilty Pleas without Valid Waivers of Counsel*?, The Defender Initiative Sixth Annual Conference on Public Defense, Seattle University School of Law, March 4, 2016.

Invited Witness, Ad Hoc Committee to Review Criminal Justice Program, U.S. District Court, Portland, Oregon, February 3, 2016.

Panelist, "Where's My Attorney? Providing Counsel at Three Stages, First Appearance", National Legal Aid and Defender Association Annual Conference, New Orleans, November 6, 2015.

 "National Trends and Their Impact in Washington", Conference on Public Defense, Seattle University School of Law, March 5, 2015.

Moderator, "State Bar Involvement: The Washington Experience", ABA Indigent Defense Summit, Chicago, Illinois, February 8, 2014.

"Washington State - Leading the Way on Public Defense," Conference on Public Defense, Seattle University School of Law, March 7, 2014.

"Development of Standards in Washington State," Harvard Law School Symposium on Gideon's Promise and Peril: Meeting the Mandate for Indigent Defense, October 11, 2013.

Small group leader at the Washington Defender Association's CLE on "Creating Structure to Meet Constitutional Obligations and the Requirements of CrR 3.1" at Sun Mountain, April 25-26, 2013.

"Misdemeanors 41 Years after Argersinger - Guiding Hand of Counsel in the Gateway to Justice." Seattle University, March 8, 2013.

Presenter, "The Right to Counsel: Why It's Important and How It Serves the Interests of all the Stakeholders in the Criminal Justice System."  Argersinger Undone - The Challenges in Implementing the Right to Counsel in Misdemeanor Courts in South Carolina, Charleston School of Law, Charleston, South Carolina, June 15, 2012.

Presenter and leader of discussion, "Misdemeanor Roundtable— Compliance with Caseload Limits, Denial of Counsel in Probation Revocation Hearings, and Other Challenges." Washington Defender Association annual conference, Sun Mountain, April 27, 2012.

Organizer and speaker, "Misdemeanor Right to Counsel—When will they ever learn? And how can staff lawyers persuade their supervisors that the issue is worth fighting for?" Defender Initiative's Second Annual Conference on Public Defense, Seattle University, March 2, 2012.

Speaker, "The Right to Counsel: Why It's Important and How It Serves the Interests of all the Stakeholders in the Criminal Justice System and How to save taxpayer money with

misdemeanor diversion programs that safeguard the public, protect the rights of the accused, reduce recidivism and conserve limited resources." Louisville Bar Foundation, Louisville, Kentucky, January 27, 2012.

Speaker, "Using Defender Standards: Reviewing the Washington Experience in a National Context, and Right to Counsel in Misdemeanors--How to Implement Argersinger and Shelton." National Legal Aid and Defender Association Centennial Conference in Washington, D.C., December 8, 2011.

Speaker and facilitator, ABA NATIONAL DEFENDER TRAINING PROGRAM, Indianapolis, Las Vegas, Austin, summer and fall 2011.

44.     I have written extensively on subjects relating to public defense, including the following:

"Justice Shortchanged--Assigned Counsel Compensation in Wisconsin", co-author, Sixth Amendment Center, May 2015

"SU Study Assesses Costs of Seeking Death Penalty", King County Bar Bulletin March 2015.

Co-author, AN ANALYSIS OF THE ECONOMIC COSTS OF SEEKING THE DEATH PENALTY IN WASHINGTON STATE, January 2015, available at http://www.law.seattleu.edu/Documents/korematsu/deathpenalty/The_Economic_Costs_ of_Seeking_the_Death_Penalty_in_WA_FINAL.pdf.

"Major Public Defense Changes Postponed", King County Bar Bulletin, January 2015.

"Fifty Years after Gideon: It is Long Past Time to Provide Lawyers for Misdemeanor Defendants Who Cannot Afford to Hire Their Own", Seattle Journal for Social Justice, Vol. 11, Issue 3 (2013).

"Division Autonomy Crucial in Defender Restructuring", co-author, King County Bar Bulletin, October 2013.

"The Right to a Lawyer", Louisville (KY) Courier Journal, March 17, 2013.

"50 years later, fulfilling right to counsel", Everett (WA) Herald, with Bob Ferguson, March 18, 2013.

"50 Years after Gideon v. Wainwright...County Plan Would End Nonprofit Defender Program", King County Bar Bulletin, February 2013.

"State Supreme Court Issues Historic Order on Defender Standards", King County Bar Bulletin, September 2012.

"Caseload limits a win for public defenders, clients - and justice", Seattle Times, July 19, 2012.

"Defenders Spread Thin by Budget Crunch", Bar Bulletin, March 2011.

"Diverting and Reclassifying Misdemeanors Could Save $1 Billion per Year: Reducing the Need For and Cost of Appointed Counsel" (American Constitution Society, 2010).

"HJR 4220 goes too far in response to tragic Lakewood police murders", op ed with Neil Fox, Tacoma News Tribune October 27, 2010.

"You (might) have a right to a lawyer...", King County Bar Bulletin, July 2010.

On Public Defenders and Excessive Caseloads, July 10, 2010 as a guest blogger for CrimProf Blog, a member of the Law Professor Blogs Network.

"Citizen's Voice: Public defenders underfunded in Tennessee", Knoxville News Sentinel, June 5, 2010.

"The Defender Association Celebrates 40 Years", King County Bar Bulletin, September 2009.

"At 45, Gideon Right to Counsel Remains Elusive", King County Bar Bulletin, March, 2008.

"Right to Counsel Remains Threatened in Washington," Washington Bar News, February, 2007.

Op Ed, "Lawyers for juveniles not automatic", Seattle Post Intelligencer, January 2, 2008.

"Enough is Enough! Defenders Act on Excessive Caseloads", 29 NLADA Cornerstone, Jan-Apr 2008, at 12.

45.    I have received the following awards and honors:

Champion of Justice award, Washington Association of Criminal Defense Lawyers (2014).

Certificate of Appreciation, Washington Defender Association, 2014.

Champion of Indigent Defense Award, National Association of Criminal Defense Lawyers (2006) awarded in August, 2007.

Paul Robeson Peace and Justice Award, Mothers for Police Accountability, 2007.

"Super Lawyer," Washington Law and Politics, 2006.

Professionalism Award, Washington State Bar Association, 2004.

Gideon Award, Washington Defender Association, 2004.

Senior Fellow, Open Society Institute, February, 2003, to January, 2004.

Friend of the Profession, King County Bar Association, 2000.

William O. Douglas Award, Washington Association of Criminal Defense Lawyers, 1993.

Order of the Coif, University of Washington Law School, 1991.

Civil Libertarian Award, American Civil Liberties Union of Washington, 1990.

Certificate of Appreciation, Washington Association of Criminal Defense Lawyers, 1990.

Reginald Heber Smith Award, National Legal Aid and Defender Association, 1987.

John Henry Wigmore Key, Northwestern University School of Law, 1973.

## IV.    COMPENSATION

46.    I have agreed to be compensated at the rate of $200 per hour for the work in this case including testimony.

## V.    THE MISSOURI AND UNITED STATES CONSTITUTIONS REQUIRE EFFECTIVE ASSISTANCE OF COUNSEL

47.    The Missouri Constitution provides: "in criminal prosecutions the accused shall have the right to appear and defend, in person and by counsel." Mo. Const. art. I, § 18(a).

48.    The Missouri Supreme Court has emphasized that "Effective, not just pro forma, representation is required by the Missouri and federal constitutions." *State ex. Rel. Missouri Pub. Def. Comm'n v. Waters*, 370 S.W. 3d 592, 607 (2012).

49.    The Sixth Amendment to the United States Constitution provides in part: "In all criminal prosecutions, the accused shall enjoy the right to …have the assistance of counsel for his defense."

50.    Counsel must be "reasonably effective". *Strickland v. Washington*, 466 U.S. 668, 687-89 (1984) (citing the "[p]revailing norms of practice as reflected in the American Bar Association standards and the like" as "guides to determining what is reasonable").

51.    The United States Supreme Court has made clear that "The right to the effective assistance of counsel is thus the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing." *Cronic*, 466 U.S. at 656.

52.    The *Cronic* Court held that there are "some occasions when although counsel is available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial." 466 U.S. 648, 659-60, 104 S.Ct. 2039, 2047.

VI. RULES OF PROFESSIONAL CONDUCT REQUIRE COMPETENT AND THOROUGH REPRESENTATION

53.     Missouri Rule of Professional Conduct RULE 4-1.1: COMPETENCE states:

>       A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation.

Available at https://www.courts.mo.gov/courts/ClerkHandbooksP2RulesOnly.nsf/c0c6ffa99df4993f86256ba50057dcb8/20fd60132de3411886256ca6005211b4?OpenDocument.

54.     The Comment to Rule 4-1.1 states in part:

>       <u>Thoroughness and Preparation</u>
>
>       [5] Competent handling of a particular matter includes inquiry into and analysis of the factual and legal elements of the problem and use of methods and procedures meeting the standards of competent practitioners. It also includes adequate preparation. The required attention and preparation are determined in part by what is at stake; major litigation and complex transactions ordinarily require more extensive treatment than matters of lesser complexity and consequence.

55.     Rule of Professional Conduct RULE 4-1.3: DILIGENCE provides: "A lawyer shall act with reasonable diligence and promptness in representing a client." The Comment to the rule states in part: "[2] A lawyer's work load must be controlled so that each matter can be handled competently."

56.     Rule of Professional Conduct RULE 4-1.4: COMMUNICATION provides:

>       (a) A lawyer shall:
>
>       (1) keep the client reasonably informed about the status of the matter;
>       (2) promptly comply with reasonable requests for information; and
>       (3) consult with the client about any relevant limitation on the lawyer's conduct when the lawyer knows the client expects assistance not permitted by the Rules of Professional Conduct or other law.
>
>       (b) A lawyer shall explain a matter to the extent reasonably necessary to    permit the client to make informed decisions regarding the representation.

Boruchowitz Report Page 13

57.     Because of excessive caseload, Missouri's defenders are not able consistently to meet these ethical obligations articulated in the Missouri Rules of Professional Conduct, including Rules 4-1.1, 4-1.3, 4-1.4, and 4-1.7.

## VII.     DEVELOPMENTS SINCE THE HINKEBEIN DECISION

58.     The Missouri Supreme Court recently suspended a defender who was unable to meet all of his obligations because of an excessive caseload. The Court stayed the suspension and placed the defender on probation. This case, and the defenders' response to it, have increased attention to the structural deficiencies of the Missouri public defender system. The defenders are addressing the ethical issues raised by their excessive caseload. Chief Public Defender Michael Barrett wrote about the ethical obligations of his lawyers and the burdens on them:

> It was during oral argument where the Supreme Court again made itself clear – that there were no carve-out exceptions in the Rules for public defenders, and then stated that defenders have a choice to make when he/she has too many cases: (1) quit; or (2) refuse to accept more cases.  Many have chosen the first option. We have a 25% turnover rate and given our starting salary of $39k, there is no line around the block of people looking to join our ranks. We received a number of resignations in the hours following oral argument in that disciplinary case.

Letter to Boone County Bar Association, Boone County Bar Association Newsletter, October 2, 2017, Joel Elmer Deposition, October 4, 2017, Ex. at 5.

59.     Mr. Barrett was quoted in a public radio story, discussing the untenable situation he feels his lawyers face:

> If I was a cartoonist for a newspaper, I'd draw a picture of a public defender whose [sic] got two guns pointed at him from either side of their head: On one side, the (Office of Chief Disciplinary Counsel) and the Supreme Court saying, 'I dare you to take that case and I'm going to take your law license.' On the other side is the local court who says, 'I dare you to not take that case. And I'll hold you in contempt.' That's our world right now.

"Many Missouri Public Defenders Decline New Cases After State Supreme Court Disciplines Lawyer", By DAN MARGOLIES, St. Louis Public Radio (October 6, 2017), available at http://news.stlpublicradio.org/post/many-missouri-public-defenders-decline-new-cases-after-state-supreme-court-disciplines-lawyer#stream/0.

60.     Mr. Barrett reported that some lawyers had resigned from the MSPD after the Supreme Court argument and before his September 11 letter, citing caseload and "their inability to practice within the—the rules." After the letter, a manager announced her November departure.  Michael Barrett Deposition, October 4, 2017, at 80.

Boruchowitz Report Page 14

61.     John G. Mermelstein, the MSPD deputy director of specialty practice and resources, has posted for all MSPD attorneys to use

> a sample motion to withdraw from cases due to excessive caseload and a sample letter to – to the Office of Chief Disciplinary Counsel which our attorneys could send to them to report an excessive caseload. I also posted before September 11th the American Bar Association ethical opinion 06441 regarding excessive attorney caseloads. Now, after September 11th I have since posted a sample writ of prohibition and mandamus to allow us to litigate at an appellate level a court's failure to allow us to withdraw from an excessive caseload….

John G. Mermelstein Deposition, October 4, 2017, at 21.

62.     As of October 4, 2017, at least several offices and individual lawyers in several counties had indicated their unavailability to take new cases. Barrett Deposition, at 80-81.

63.     According to Mr. Mermelstein, in some counties when the defenders indicated their inability to take new cases, "The judges are frankly not reacting positively." Mermelstein Deposition, at 25.

64.     According to a public radio story, the district defender in the "Liberty office, says he sent a letter on Monday to judges in Clay, Platte and Clinton counties informing them that his office would no longer accept new cases." **"Many Missouri Public Defenders Decline New Cases After State Supreme Court Disciplines Lawyer"**, supra.

65.     The public radio story reported that Boone County Presiding Judge Kevin Crane "has since appointed more than three dozen" private lawyers to take cases without pay. *Id.*

66.     It appears that the lawyers appointed in Boone County are not experienced criminal defense lawyers. Mr. Barrett testified:

A. I am not aware of whether Judge Crane or any other judge who is contemplating appointing private counsel, whether they are going to appoint someone who is competent to provide representation in the area of criminal defense.
Q. So these private attorneys are not necessarily criminal defense attorneys?
A. The one appointment that I was aware of, one individual in Boone County, worked for a private business I believe as a regulatory attorney, and had no experience in criminal defense matters.

Barrett Deposition, at 89.

*Causes of the Systemic Deficiencies of Missouri's Public Defense Program*

VIII.   THE MSPD HAS ADMITTED IT IS UNABLE CONSISTENTLY TO PROVIDE EFFECTIVE REPRESENTATION TO ITS CLIENTS

67.     In a September 11, 2017, letter to MSPD staff, Chief Defender Michael Barrett recognized that public defenders in Missouri continue to be overburdened and encouraged his staff to abide by their ethical obligations to their clients. He told his lawyers:

> … it is a violation of the Rules of Professional Conduct for me or anyone else to impose on you more cases than you can handle within the Rules…. In the event I do, it is part of your sworn obligation to file a bar complaint against me.  You simply have to say that you are not available. It is not just what you should say, it is what you are <u>required</u> to say.

Elmer Deposition, Exhibit 2.

Mr. Barrett added:

> Tomorrow I will be addressing the Presiding Judges at the Judicial Conference. I will be making clear that we have too many cases, and that the Supreme Court has made it quite clear that public defenders are risking their own professional lives when appointed to an excessive number of cases.

*Id.*

68.     Mr. Barrett emphasized a statement from the Missouri Supreme Court: ""No exception exists **t**o the ethics rules for lawyers who represent indigent persons." *Id.*, citing *Waters*, supra.

69.     Mr. Barrett has explained the ethical conflict caused by excessive caseload:

> There's also a conflict when if a lawyer accepts an additional case and fulfilling the obligation to that new defendant in any way takes away or it deprives the lawyer of competently representing their existing clients because foremost an attorney has an obligation to their existing clients.

Barrett Deposition, at 74.

70.     Mr. Barrett explained his purpose in writing the letter to his staff:

> I wanted to provide whatever relief I could that -- that I would not impose as a condition of their employment the acceptance of cases beyond which in their individual determination they felt they couldn't handle or would put them in jeopardy of violating the

rules of professional conduct, and that if I did, that it would be
their obligation to file a bar complaint against me.

*Id.* at 78.

71.     Mr. Barrett testified that he needed more than 300 additional lawyers to meet the
caseload needs. *Id.* at 96.

72.     On September 26, 2017, District 13 Defender David Wallis and his deputy Sarah
Aplin wrote to the Boone County and Cooper County judges that their lawyers were violating
ethical rules because of excessive caseloads:

> As of today's date, Ms. Aplin and myself believe every attorney
> under our supervision is currently violating the Rules of
> Professional Conduct. Their current individual caseloads create a
> conflict of interest with existing clients because they are forced to
> chose effective representation of one client to the detriment of
> other clients. It is also our belief that assigning any new cases to
> any individual attorneys would create a conflict of interest because
> they would have no ability to adequately represent either their
> current or prospective clients.

Letter from David Wallis to Circuit Judges September 26, 2017.

73.     On September 27, 2017, Boone County Presiding Judge Crane wrote an email to
the Boone County Bar that the Court would begin assigning criminal cases to the private bar, for
an unknown period of time.  Email from Judge Crane to Boone County Bar.

74.     The President of the Missouri State Bar, Morry Cole, sent a letter to Boone
County attorneys in which he recognized "that appointing lawyers without criminal defense
experience is not a long-term solution as the appointments are challenging to individual attorneys
and may be problematic for defendants and the public." Elmer Deposition, Exhibit 20.

75.     Chief Defender Michael Barrett wrote an op-ed in the St. Louis Post Dispatch
published September 27, 2017, in which he discussed the problems facing "the tens of thousands
of poor people who face incarceration each year" for whom "investigations are far less
thorough":

> Defendants go days, sometimes weeks, without talking to an
> attorney. And if they want their constitutional right to a trial, most
> are forced to sit in jail and wait until the system gets around to
> them.

See, Michael Barrett, "A great system of justice — for some", By Michael Barrett, St.
Louis Post Dispatch (September 27, 2017), available at
http://www.stltoday.com/opinion/columnists/a-great-system-of-justice-for-
some/article_bf2ee8c1-2814-5bab-b43c-4a784b45b2b9.html.

76.     In a spreadsheet detailing the caseload for MSPD for the first three months of 2017, MSPD reported that its trial division lawyers on average were operating at 248.5% of capacity and its appellate division lawyers at 273.1% of capacity.  All of the offices were over capacity. Barrett Deposition, Exhibit 4.

77.     In its Legislative Budget Request for FY 2018, the MSPD requested an additional $22,600,965, which it "thought would be necessary in order to have attorneys meeting the kind of constitutionally mandated case load caps more or less." Deposition of Kathleen Lear, October 6, 2017, at 50.

78.     That request was based on all the attorneys working 2080 hours a year, no vacations, and 333 additional attorneys would be needed. *Id.*, at 51.

79.     In an April 25, 2016, letter to Governor Jay Nixon, the Missouri Public Defender Commission recounted the five studies of MSPD that had concluded that the office "does not have near enough resources to meet its constitutional responsibilities" and cited the most recent study's conclusion that "the system's caseload requires more than 250 new lawyers."

80.     In that letter, the Commission noted that MSPD had "not received any additional funding to account for the rising costs of practicing law (e.g., hiring experts) over the past decade." It reported that to address a forecasted deficit by the end of fiscal year 2016, "MSPD was forced in January to place a moratorium on hiring any new staff to fill existing vacancies until the new fiscal year.  Forty-one vacancies coupled with a projected 7% increase in cases for 2016 is nothing short of unsustainable."

81.     MPDC acknowledged that the combination of inadequate resources, rising costs, and increases in cases "forces Missourians who are too poor to post bail to sit in jail for weeks, months or even years until their cases can be resolved, which too often prompts them to accept a plea simply to secure their release despite the merits of their case." *Id.*

82.     In an email dated May 3, 2016, the MSPD Comptroller wrote that the office was holding 41 positions vacant "to have dollars available to transfer to our expense and equipment appropriation", which was "necessary to meet required 2016 case related expenditures."  She noted that the vast majority of those costs were required for capital cases and CDU [commitment of sex offender] cases. She added, "We are balancing MSPD's budget at the expense of our employees and clients."  Email from Kathleen Lear to Tony Roberts, May 3, 2016.

83.     Ms. Lear testified that MSPD knew they were going to be approximately a million dollars short in litigation costs that year, and "in order to meet the demands of our case load and the cases that were open and pending" she knew how many positions they needed to keep vacant. Deposition of Kathleen Lear, October 6, 2017, at 46.

84.     The Missouri Public Defender Commission (MPDC) in its Annual Report for fiscal year 2016 admits that it is not able consistently to provide effective representation for its clients. The message from the Director admits that there is a substantial likelihood of wrongful convictions because of the high caseloads carried by each of his attorneys:

Challenging the government's evidence and presenting a substantial defense for every individual defendant is not only our constitutional obligation, it is necessary to ensure that people are not wrongfully convicted of a crime. Given the high caseloads carried by each MSPD attorney, courts and policymakers must recognize that this is not only a realistic possibility, but a substantial likelihood.

85.     In a press release about the MPDC lawsuit challenging the governor's withholding of $3.5 million in caseload relief funding, Riley Bock, Chair of the Public Defender Commission, said, "The Missouri Public Defender System, because of inadequate funding, is beginning to unravel." Press Release, Missouri State Public Defender, (July 13, 2016) , available at http://www.publicdefender.mo.gov/Newsfeed/20160713_PDFilesLegalChallenge.html (last visited October 15, 2017).

86.     The July 13, 2016, press release added: "Because MSPD attorneys are well above 200% of caseload capacity, it is nearly impossible to investigate and competently defend each case." *Id.*

87.     In the lawsuit about the governor's withholding of funding, the Public Defender Commission claimed:

> …the specific areas which were immediately impacted include, but are not limited to the following: the Office of State Public Defender is unable to proceed with case contracting to reduce caseload to ethically permissible levels, unable to fill vacant attorney positions, limited in its ability to pay litigation costs and unable to provide necessary technology for effective client representation.

First Amended Petition for Declaratory Judgment and Injunctive Relief, CASE NO. 16AC-CC00290, Circuit Court of Cole County, available at http://www.publicdefender.mo.gov/Newsfeed/FIRST%20AMENDED%20PETITION%20FOR%20DECLARATORY%20JUDGMENT%20AND%20INJUNCTIVE%20RELIEF.pdf (last visited August 23, 2017).

88.     The FY 2016 MPDC Annual Report at page 8 states:

> Providing effective assistance of counsel in each case demands a well-trained, highly experienced corps of dedicated attorneys and support staff. However, excessive caseloads and low salaries lead to a high turnover rate among attorney staff, which makes fulfilling this important mission difficult, if not impossible.

89.     In the FY 2016 Report, Director Barrett analyzed the time records kept by his staff in comparison to the conclusions reached by the 2014 American Bar Association-

commissioned study by the RubinBrown accounting firm of how many hours are needed to provide effective representation in different categories of cases. FY 2016 Report at 17.

90. For example, RubinBrown found that an A/B felony requires 47.6 hours of attorney time, but the MSPD attorneys in 2016 were spending 8.7 hours. All of these hours were exclusive of court time, travel, and administrative tasks.

91. For misdemeanors, RubinBrown found that attorneys should spend 11.7 hours per case, and in 2016, MSPD lawyers were spending only 2.3 hours, of which only .9 hours was for client communication, .4 for discovery and investigation, and .9 for case preparation, which includes research and writing. *Id.*

92. Mr. Barrett wrote:

> The stark discrepancy between what work must be done in the proper defense of constitutional liberty and what is being done with the limited resources at hand reveals that MSPD is in need of 169.50[1] additional attorneys to meet constitutional requirements. *Id.*

93. It is helpful, in understanding why the time the MSPD lawyers are spending is insufficient, to review the list of duties MSPD prescribes for its trial division attorneys:

- bond hearings for those defendants who are confined pre-trial and seeking release, which can include verifying a place to stay, finding a sponsor the court is likely to trust, verifying an employer will take them back to work, etc.;

- preliminary hearings;

- tracking down and reviewing all of the state's discovery - police reports, lab reports, witness statements, hospital records, etc.;

- interviewing or deposing the key state's witnesses;

- locating and interviewing potential defense witnesses;

- tracking down records and evidence that may help establish the defendant's innocence;

- visiting crime scenes or re-enacting a described crime to see if the real thing matches up with what witnesses described;

- reviewing the results and original notes and data from forensic tests conducted by the state, determining whether an independent analysis by an expert who

---

[1] According to Mr. Barrett's recent deposition testimony, the MSPD is now in need of more than 300 additional attorneys. Michael Barrett deposition October 4, 2017, at 90.

Boruchowitz Report Page 20

doesn't work for the state is warranted, and if so, finding that expert and
arranging for the testing of the evidence;

- making initial assessments of the defendant's ability to understand the legal
  proceedings and, when the defendant exhibits developmental or mental
  disabilities, arranging for an expert to evaluate the defendant to make that
  determination;

- researching the law applicable to the defendant's case and litigating motions
  where it appears the defendant has not been properly charged, the law has not
  been followed, or the state is seeking to put on evidence of questionable
  admissibility or reliability;

- negotiating plea agreements with the prosecutor, as well as locating and
  litigating for sentencing options that could effectively address the problems
  that resulted in the defendant getting into trouble in the first place and thus
  reduce the likelihood of recidivism; or

- if the case is one that goes to a trial, conducting that trial, before either a judge
  or jury, as well as being present and advising the client concerning all the court
  appearances a defendant will be required to make as his case progresses
  through the criminal justice system;

- and of course meeting with and advising the client, and perhaps the client's
  family members if the client requests it, throughout each of the above
  processes.

FY 2016 Report at 18-19.

94.    In my opinion, an initial client interview generally requires about an hour, longer
if the client has mental health issues or needs an interpreter. Discussing possible defenses,
identifying witnesses and other avenues of investigation, explaining plea offers from the
prosecutor and sentencing options, understanding the client's history and the client's objectives
in the case, all require time with the client. Reviewing the police report, developing
investigation, preparing and arguing motions, and preparing and conducting trials and any
sentencing, add considerably to the time required. In my opinion, having .9 hour to communicate
with a client and a total of 2.3 hours for the work on a case is simply not sufficient and does not
permit providing effective representation on a consistent basis.

95.    MSPD has acknowledged that its lawyers are not meeting the duties MSPD has
described. In the FY 2016 Report, at 19, MSPD wrote:

> As the above list indicates, an attorney's appearance in court on
> behalf of a defendant is a very small portion of the work they must
> do on a case. When they have too many cases, some of these steps
> are skipped or fall by the way side. The state's evidence is taken at
> face value, assumed by all to be accurate and mistakes fall through

Boruchowitz Report Page 21

the cracks, uncaught and uncorrected. The result is that individual defendants and justice as a whole suffers.

96.     Given the amount of time that Missouri defenders spend on misdemeanor cases, it is clear that they do not have adequate time to communicate with their clients, to investigate cases, to conduct a significant motion practice, to prepare for and go to trial, and to prepare for sentencing by developing alternatives and written material for the court to consider.  I discuss below a similar review of the felony and juvenile practice.

97.     In his opinion finding that two cities had systematically denied the assistance of counsel to indigent defendants, U.S. District Court Judge Robert Lasnik could have been describing the Missouri Defenders' misdemeanor practice:

> Most interactions occurred in the courtroom: discussions regarding possible defenses, the need for investigation, existing physical or mental health issues, immigration status, client goals, and potential dispositions were, if they occurred at all, perfunctory and/or public. There is almost no evidence that Sybrandy and Witt [the defenders] conducted investigations in any of their thousands of cases, nor is there any suggestion that they did legal analysis regarding the elements of the crime charged or possible defenses or that they discussed such issues with their clients. Substantive hearings and trials during that era were rare. In general, counsel presumed that the police officers had done their jobs correctly and negotiated a plea bargain based on that assumption.

*Wilbur v. City of Mount Vernon*, 989 F. Supp. 2d 1122, 1124 (W.D. Wash. 2013).

98.     In a letter to Governor Nixon, dated August 2, 2016, MPDC Director Michael Barrett recounted that the governor seven years earlier had "acknowledged that MSPD was operating 'under significant stresses' and committed to working with the General Assembly to fix the problem, but never did."

99.     Mr. Barrett wrote based on the consumer price index that his current budget had less value than it did in 2009. Because of that, he had to hold open a significant number of vacant positions.

100.     In his letter, Mr. Barrett wrote that the governor's action came

> …even after the Civil Rights Division of the Department of Justice found that poor black children are being systematically deprived of their rights in Missouri due in large part to the lack of public defenders. Choosing in the wake of that report to further debilitate the very organization that ensures an equal system of justice only adds to the escalating sentiment that the poor and disenfranchised do not receive a fair shake in Missouri's criminal justice system.

Case 2:17-cv-04057-NKL   Document 151-1   Filed 02/09/18   Page 25 of 104

101.    In a previous letter to Governor Nixon, dated August 7, 2015, Michael Barrett had noted the conclusions of the DOJ report and asked for "a $10 million supplemental budget to provide adequate resources to the state's public defender system."  He wrote:

> In FY 2014, MSPD's trial division alone handled more than 70,000 cases.  Given our appropriation for that year, that's an average of just $345 per case.  No reasonable person can conclude that $345 is adequate to defend someone charged with a criminal offense.

Letter available at http://www-old.publicdefenders.us/?q=node/862

102.    I note that in 2012, the Missouri Court of Appeals found that $100 per hour for an entry level lawyer was a reasonable attorney fee. *Hill v. City of St. Louis*, 371 S.W.3d 66, 81 (Mo. Ct. App. 2012).

103.    Mr. Barrett added in his August 7, 2015, letter:

> Just as the DOJ found that the St. Louis County's juvenile caseload is nearly double the widely-accepted standard, 25 of MSPD's 33 trial offices are similarly situated, with the remaining offices so nearly equal in caseload distress that moving FTEs to mitigate the most overburdened offices would equate to reorganizing deck chairs on the Titanic.

*Id*.

104.    In a more recent letter dated March 15, 2017, to current Governor Greitens, explaining why he would not extend parental leave to his employees as the Governor was recommending, Mr. Barrett described the defenders' crushing caseloads and the limited time they could spend on their clients' cases:

> Because of crushing caseloads, MSPD attorneys are only able to spend 8.7 hours on each class A/B felony, where clients often face life in prison, just 4.4 hours on a C/D felony, 2.3 hours for a misdemeanor, and 1.4 hours for a probation violation, which is a driving force behind Missouri's artificially inflated prison population.  These dedicated and skilled attorneys for the poor know that for each additional hour they take as leave, it further reduces the amount of time that can be spent on a client's case, thus increasing the rate at which defendants plead guilty so that they can be released from county jail in hopes that their jobs and housing are still in place.  Public defenders know that more time off, without expanding the current cadre of public defenders, only increases the chances of a wrongful conviction and enhances the likelihood that a person convicted of a non-violent offense will be sentenced to state prison (47% of Missouri's prison population is incarcerated for a non-violent offense).

Boruchowitz Report Page 23

March 15, 2017 letter from Michael Barrett to Governor Eric Greitens, available at https://bloximages.chicago2.vip.townnews.com/joplinglobe.com/content/tncms/assets/v3/editorial/9/77/977af4d4-0b49-11e7-b700-cb06fb1ef256/58cc3cb6a2c60.pdf.pdf.

105.    Mr. Barrett also noted that "an alarming percentage" of his attorneys do not take the leave to which they are entitled. In 2016, 79 of them forfeited a total of 3431 hours of annual leave. [That is about one week each on average.] He noted that his clients face loss of liberty and excessive fines and fees, "including having to pay for the cost of their pre-trial jail stay because they are too poor to post bond during a time when they are presumed innocent." *Id.*

106.    Mr. Barrett wrote that he believed that his attorneys would prefer that he work "to alleviate their impossible caseload burden and deliver them a salary that is worthy of their contribution to the state and its citizens." He noted that the attorneys "are drastically underpaid", with a starting salary of $39,708, and that many have student loans in excess of $100,000. The maximum salary for the most senior attorney classification is $63,912. *Id.*

107.    Mr. Barrett noted that the low salary contributes to the high turnover rate among his attorneys, hovering around 20 per cent. MSPD has to spend a disproportionate amount of its budget training new employees. He wrote, "While employees regularly leave for higher pay and better benefits, the number one reason we lose experienced attorneys is because they do not have the time to do what needs to be done on their clients' cases." *Id.*

108.    Comptroller Kathleen Lear testified: "…when you're paying attorneys less than $40,000 they're not going to stay for a long period time with the case load and the types of cases they have to provide representation in." Kathleen Lear Deposition, October 6, 2017, at 64.

109.    Mr. Barrett wrote that the governor's suggested FY 2018 budget equals only what the legislature passed in CY 2014 and that MSPD's caseload had increased more than 13 per cent since then. March 15, 2017, letter, supra.

110.    In his draft budget request document for FY 2018, Defender Director Barrett discussed the five different studies of its workload conducted in the past couple of decades: "Each of these investigations reached the same conclusion: Missouri's public defenders have too many cases and not enough lawyers or support staff to fulfill the state's constitutional obligations."

Fiscal Year 2018 DRAFT Legislative Budget Request, Michael Barrett, Director, Commission Meeting, September 21, 2016 (hereinafter FY 2018 Draft budget request).

111.    In the draft budget request, Mr. Barrett applied the ABA case weights to MSPD's caseload and determined that he needed 332.9 additional attorneys to meet the existing caseload. Of those, 311 were for "Constitutionally Mandated Representation" and 11.5 for a requested Juvenile Advocacy team in two District offices. And 10.5 were to replace the positions restricted by Governor Nixon. *Id.*

112.    Mr. Barrett, using the ABA case weights, said that his lawyers were operating at 240.1 per cent of capacity. *Id.*, at 14.

Boruchowitz Report Page 24

113.    Mr. Barrett ultimately requested a budget of $70 million. Brian Hauswirth, "Missouri State Public Defender requests $70 million in funding", Missourinet, February 28, 2017, available at http://www.missourinet.com/2017/02/28/missouri-state-public-defender-requests-70-million-in-funding/.

IX.    LACK OF FINANCIAL PARITY AND INADEQUATE SALARIES

114.    The Missouri Public Defender system does not comply with the American Bar Association principle regarding parity with the prosecution. Principle 8 of the ABA Ten Principles of a Public Defense Delivery System states:

> **There is parity between defense counsel and the prosecution with respect to resources and defense counsel is included as an equal partner in the justice system.** There should be parity of workload, salaries and other resources (such as benefits, technology, facilities, legal research, support staff, paralegals, investigators, and access to forensic services and experts) between prosecution and public defense….

115.    As the MSPD Commission's annual report states:

> Missouri's full time elected prosecuting attorneys are required by state statute to be paid the same as an Associate Circuit Judge, $136,402. By comparison their Public Defender counterparts are paid an average of a mere $79,601. This level of pay inequity between the defense and prosecution sides of the criminal justice system is neither equitable nor sustainable.

2016 Annual Report at 8.

116.    The salaries for line defender attorneys are also significantly lower than those for prosecutors.

117.    Salaries for defenders as reported in the 2016 Report were as follows:

| Assistant Public Defender Starting Salaries July 1, 2016 | |
|---|---|
| Assistant Public Defender  I | $39,708 |
| Assistant Public Defender  II | $46,992 |
| Assistant Public Defender III | $52,116 |
| Assistant Public Defender IV | $69,528 |
| | |

Boruchowitz Report Page 25

118.    As of August 19, 2017, the Boone County Prosecutor was advertising an assistant prosecution attorney II position with a salary range of $52,624 – $87,131.  Missouri Association of Prosecuting Attorneys, Job Openings at http://www.prosecutors.mo.gov/employment.

119.    Greene County was advertising for an assistant prosecutor with a salary of $48,235.20.  *Id.*

120.    Cape Girardeau County was advertising for an assistant prosecuting Attorney, with a starting salary of $42,000.  *Id.*

121.    On the same date, the Columbia, Missouri trial defender office was advertising openings as follows:

**Assistant Public Defender**

Salary:

- APD I: $3,309/month (starting salary)
- APD II: $3,916/month (eligible for consideration after 1 years' successful service)
- APD III-IV: $4,343-$5,326/month (eligible for consideration after continued highly successful performance)

Web site at http://www.publicdefender.mo.gov/employment/job_descriptions/apd.htm.

122.    Clay County, Missouri, reports having three assistant prosecutor II positions at salaries of more than $60,000, including one of $71,399.9. The prosecuting attorney's salary is listed as $137,744.88.

Web site at https://www.claycountymo.gov/Transparency/Salaries (last visited August 31, 2017).

123.    As of September 21, 2016, Mr. Barrett reported having no attorneys at the Assistant Defender Attorney V and VI salary levels. Fiscal Year 2018 Draft Budget Request at 19.  He was proposing to add 60 attorneys at level V and 15 at level VI, at salaries of $65,364 and $71,100 respectively.  *Id.*

124.    As of September 2016, MSPD had 153 attorneys whose salary was below $47,476, the new proposed U.S. Department of Labor threshold regarding overtime exemptions. *Id.*, at 24.

125.    The low salaries contribute to high turnover of staff, which, in turn, undercuts the ability of the defenders to provide effective representation. Mr. Barrett wrote in his Fiscal Year 2018 Draft Budget Request that the high turnover rate:

> makes it more likely that innocent persons will be incarcerated, that clients will languish in jail waiting until someone can get to their cases, and that non-violent offenders will be unnecessarily sent to prison, all at an extraordinarily high cost to Missouri's citizens, a much higher cost than what it would take to provide

salary parity and greater retention for our employees. Every time an attorney leaves, his or her cases are reassigned and an already overloaded attorney adds the case to his or her existing backlog. With MSPD operating at one quarter the support staff needed, it also is critical that MSPD is able to retain the existing investigators, paralegals, legal assistants, mitigation specialists, and other clerical staff.

Fiscal Year 2018 Draft Budget Request at 18.

126.    Law graduates often have considerable debt from their law school education. The University of Missouri School of Law notes that "nearly 80% of law school students rely on student loans as their primary source for financing their J.D. The more a student borrows, the longer the debt will have an impact on life after law school." University of Missouri School of Law web page at http://law.missouri.edu/financialaid/.

127.    The University of Missouri School of Law tuition and fees for in-state residents are $21,406/87 for the 2017-18 year, and the estimated living expenses are $19,610, for a yearly cost of $41,016.87. University of Missouri School of Law web page at http://law.missouri.edu/financialaid/cost/. The cost of three years of law school can easily exceed $123,000, and many law graduates are carrying undergraduate school debt as well. The MSPD salaries make it difficult for lawyers to accept and maintain positions as defenders.

128.    An example of the financial challenges facing the district defenders is District 14. For FY 2016, the MSPD reported spending only $280.92 per assigned case in District 14. FY 2016 Report at 14. This was below the already low state average of $328.15 per case.

129.    If the defenders in District 14 averaged 150 felony cases per year, which is the American Council of Chief Defenders recommended caseload limit and far above the limit recommended by the American Bar Association Rubin Brown study, the office would have only $42,138 available per attorney. $42,138 per year is inadequate to fund a fully-functioning defender attorney. The actual starting salary of a defender attorney is $39,708.

130.    The financial strain goes beyond salaries to the equipment available to the defenders. Comptroller Kathleen Lear testified:

You know, we're running with copy machines that are ten years old. We're running with laptops that are seven years old. We hold a lot of things together with spit and glue just to make them last longer. I think public defender mentality is that if it's -- if it's not total trash, make do with it. I'm appalled when I go to some of the offices and they're sitting in chairs that really I want to towel before I sit down. They're that nasty.

Deposition of Kathleen Lear, October 6, 2017, at 98.

X.    THE MISSOURI DEFENDERS HAVE EXCESSIVE CASELOADS

131.    The local district defenders are carrying caseloads that make it impossible to provide constitutionally required effective assistance of counsel.

132.    Mr. Barrett has stated that his lawyers average double the nationally recommended maximum of 150 felony cases per attorney per year. "The ABA has endorsed a maximum caseload of no more than 150 felonies a year per attorney. We are currently more than double that number." Letter to Boone County Bar Association, Boone County Bar Association Newsletter, October 2, 2017, Elmer Deposition, Exhibit 5, at 5.

133.    Mr. Barrett testified that the most pervasive problem in the system is high caseloads. Barrett Deposition, at 45.

134.    Excessive caseloads are a primary reason why Missouri's defenders quit their jobs. Mr. Barrett testified:

> when someone leaves the system if they are willing to subject themselves to a -- an exit interview, it's what is almost always what they cite as the reason for leaving. Not -- may not be the exclusive reason, but it's the driver.

Barrett Deposition, at 45.

135.    Mr. Barrett added:

> …the common reasons for leaving are that in the opinion of the departing attorney they're not able to do what they need to do for their client and are either leaving because of fear that their law license is in jeopardy or because there is some guilt associated with not being able to do what they need to do for their client. The other reasons that are most typical are salary.

*Id*. at 167.

136.    Excessive caseloads prevent defenders from adequately representing their clients. High caseloads prevent lawyers from having enough time to provide effective representation because attorneys are unable to interview clients effectively, conduct investigations, counsel clients about pleas offered at arraignment, and do other necessary preparation.  The ABA Criminal Justice Section Defense Function Standard 4-1.3(e) states:

> (e) Defense counsel should not carry a workload that, by reason of its excessive size, interferes with the rendering of quality representation, endangers the client's interest in the speedy disposition of charges, or may lead to the breach of professional obligations.

137.    The U.S. District Court in the instant case, in ruling on a motion to dismiss, cited the long history of reports documenting the inadequate resources available to the MSPD, and quoted the 2009 report by The Spangenberg Group.

> TSG concluded that public defender workloads had worsened since its 2005 report and, as a result of those workloads, public defenders were failing to (1) conduct prompt interviews of their clients following arrest, (2) spend sufficient time interviewing and counseling their clients, (3) advocate effectively for pretrial release, (4) conduct thorough investigations of their cases, (5) pursue formal and informal discovery, (6) file appropriate and essential pleadings and motions, (7) conduct necessary legal research, and (8) prepare adequately for pretrial hearings, trial, and sentencing..

*Church v. Missouri*, 2017 WL 3383301, at *(citation omitted).

138.    The Court wrote:

> MSPD Trial Division attorneys were able to devote the minimum required hours to only 2.4% of all A/B felony cases (or 97 out of 4,127 total A/B felony cases) and 1.4% of C/D felony cases (or 311 out of 21,491 total C/D felony cases).

*Id.* at *3

139.    This Court added: "In February 2017, Defendant Barrett testified before the state legislature that MSPD would need 333 more lawyers to provide minimally adequate representation to indigent defendants." *Id.*

140.    An example of the excessive workloads that Missouri defenders carry is the schedule of attorney Craig Lowe, counsel for Plaintiff Dorian Samuels.  In the period from September 5, 2017, to September 7, 2017, Mr. Lowe had 23 hearings scheduled for 21 clients. [Data gathered from Case Net.] Four hearings were set for Carthage and the rest for Joplin. Four of the hearings were for pre-trial conferences.

141.    It is about a 25- minute drive each way from Mr. Lowe's office in Carthage to the courthouse in Joplin.

142.    The American Council of Chief Defenders (ACCD) Statement on Caseloads and Workloads "recommends that public defender and assigned counsel caseloads not exceed the [National Advisory Commission on Criminal Justice Standards and Goals ("NAC")] recommended levels of 150 felonies, 400 non-traffic misdemeanors, 200 juvenile court cases, 200 Mental Health Act cases, or 25 non-capital appeals per attorney per year." If a public defender or assigned counsel is carrying a "mixed caseload," including cases from more than one category of cases, "these standards should be applied proportionally. (For example, under the NAC standards a lawyer who has 75 felony cases should not be assigned more than 100 juvenile cases and ought to receive no additional assignments.)" Id.

143.    "These caseload limits reflect the maximum caseloads for full-time defense attorneys, practicing with adequate support staff, who are providing representation in cases of average complexity in each case type specified." ACCD Resolution, available at http://www.oregon.gov/OPDS/docs/CBS/ACCD%20Caseloads%20Report%20Final.pdf. The maximum number of cases must be reduced when the lawyers have inadequate resources and when they have other obligations in addition to caseload representation, such as supervision or appearing at court calendars representing groups of clients. In addition, caseload numbers should be reduced when there is significant travel time required for the lawyers.

144.    The ACCD strongly recommends development of local standards informed by careful case weighting, as was done in the RubinBrown study:

> The ACCD recommends that defenders, contract and assigned counsel, and bar association leaders in each state review local practice conditions and consider developing standards that adjust attorney caseloads when the types and nature of the cases handled warrant it. The increased complexity of practice in many areas will require lower caseload ceilings. The ACCD recommends that each jurisdiction develop caseload standards for practice areas that have expanded or emerged since 1973 and for ones that develop because of new legislation. Case weighting studies must be implemented in a manner which is consistent with accepted performance standards and not simply institutionalize existing substandard practices.

ACCD Statement, supra.

145.    The ABA 10 Principles of a Public Defense Delivery System, Principle 5 states:

> **Defense counsel's workload is controlled to permit the rendering of quality representation.** Counsel's workload, including appointed and other work, should never be so large as to interfere with the rendering of quality representation or lead to the breach of ethical obligations, and counsel is obligated to decline appointments above such levels. **National caseload standards should in no event be exceeded, but the concept of workload (i.e., caseload adjusted by factors such as case complexity,**

> **support services, and an attorney's nonrepresentational duties) is a more accurate measurement.**

(emphasis added and footnotes omitted).

146.     There is the potential for a conflict of interest when a public defender with an excessive caseload decides to accept additional cases because the lawyer will not have time to provide effective representation to all of the clients.

147.     MSPD opened 80,755 new cases in FY 2016 with 349.5 attorneys. They needed 332.9 new attorneys to meet the Rubin Brown/ABA standard. Fiscal Year 2018 Draft Budget Request at 15,25.

148.     More than half, 53.32 per cent, of the MSPD cases are felonies. FY 2016 Report at 5. The attorneys averaged 231 cases each. Appellate and post-conviction attorneys handled far fewer cases. 53.32 per cent of 231 is 123 felonies. That number of felonies is 82 per cent of a full caseload using the American Council of Chief Defenders recommended maximum caseload. And 123 felonies is far above what the ABA RubinBrown study concluded should be a maximum caseload. An attorney who had 123 felonies and then a mixture of misdemeanor, juvenile, and probation violations cases would have far too many cases.



149.     The ABA RubinBrown study concluded that A/B felonies require an average of 47.6 attorney hours per case, and C/D felonies 25 hours per case. The Missouri Project, at 21. Even if an attorney had only 123 C/D felonies, that workload would require 3,075 hours per year, at least 50 per cent more than a workable maximum. A lawyer who has a significant number of A/B felonies and has to travel considerable distances would have an even more crushing workload and be even less able to provide effective representation to his/her clients.

48.     As outlined below, in my opinion defenders should not "bill" more than 1800 hours a year.

150.     According to a recent article in the Columbia Tribune, the Boone County defenders "regularly juggle 100 or more cases at once". Alan Burdziak, "Barrett takes creative approach to public defender system", Columbia Daily Tribune, June 26,2017, available at http://www.columbiatribune.com/news/20170626/barrett-takes-creative-approach-to-public-defender-system.

151.     In the 2015 Fiscal Year Report (at 24 and 5), MSPD pointed out that their lawyers carry over significant numbers of cases into the following year. They included these tables:



| Trial Division | |
|---|---|
| # of Offices | 33 |
| Cases Carried Forward into Fiscal Year 2015 | 27,051 |
| # of Assigned Cases | 68,071 |
| # of AΣorney FTE | 313.00 |

152.    The trial division attorneys had an average pending caseload of 86.4 at the beginning of the fiscal year and they received an average of 217 new cases. If 52% of those new cases were felonies, that would be an average of 113 new felonies per lawyer, which is 75 % of a full caseload using the ACCD number, leaving only 25% of their time for the remaining 104 misdemeanor and juvenile cases.  (In FY 2016, 53.32 per cent of the cases were felonies. FY 2016 Report at 4.)

153.    Using the Missouri Project numbers, which concluded that a lawyer needs 25 hours to do a C/D felony, 113 felonies would require at least 2825 hours. In FY 2015, there were 253 homicide cases, 6362 A/B felonies and 28,345 C/D felonies.  [FY 2015 Report at 23.] If a lawyer had one murder case (requiring 106 hours), 10 A/B felonies (requiring 476 hours), and 102 C/D felonies (requiring 2550 hours), the yearly requirement would be 3132 hours before even starting the misdemeanor and juvenile and probation violation cases on that workload of 217 new cases.  This is an unworkable caseload. More experienced lawyers carrying a heavier mix of homicide and A/B felonies would be under an even more crushing workload.

154.    In FY 2016, the office had even more cases carried over and more new cases assigned than in FY 2015. FY 2016 Report at 5. The trial division lawyers had an average of 101 pending cases at the beginning of the fiscal year, and received an average of 243 new cases.

| Trial Division | |
|---|---|
| # of Offices | 33 |
| Cases Carried Forward into Fiscal Year 2016 | 31,738 |
| # of Assigned Cases | 76,150 |
| # of Attorney FTE | 313.00 |

155.    District 22 Defender Mary Fox, City of St. Louis, discussed the crushing caseload her lawyers carry.

On average, public defenders in District 22 handle between 80-90 cases per attorney at any given time. While this may be fewer than attorneys in some other districts across the state, almost three-fourths of the cases on the District 22 defenders' dockets are felonies, many of which must be prepared for trial because the prosecutor's office does not provide recommendations for resolution on such cases. This is consistent with the recent trend in District 22 on the whole, where we currently have approximately 2,200 open cases, of which roughly 1,600 are pending adult felonies, 50 are pending juvenile felonies, and 300 are pending felony probation violations. And of those nearly 2,000 felonies, approximately 60 are homicides and an additional roughly 400 are serious (A/B) felonies.

Affidavit of Mary Fox ¶ 8, September 29, 2016.

156.    Ms. Fox noted that she has a high turnover of lawyers in her office because of the large caseload:

The District 22 caseload also increased by 28% since 2015, without a corresponding increase in the number of public defenders hired to handle such cases. In 2015 and 2016, twelve attorneys resigned from the District 22 office. Most of those attorneys identified the personal stress caused by the large caseload as a reason for leaving MSPD.

*Id.* at ¶ 9.

157.    A turnover of 12 lawyers out of 29 practicing staff attorneys in two years, which is a 20.5% annual turnover rate, can be crippling to an office, particularly one that has primarily felony cases and 60 open homicides at one time.

158.    Ms. Fox described the impact of this turnover that exacerbates the workload problem:

The vast majority of my attorneys are recent law school graduates or lawyers with very little previous criminal defense experience, who require ongoing and robust training—training which often cannot be provided in a timely fashion, given our lack of adequate resources.

*Id.* at ¶ 10.

159.    Ms. Fox has considered declining conflict cases in her five conflict counties because of the large caseload.

The challenge of handling the number of cases opened in District 22 has caused me to consider denying applicants for services in

Boruchowitz Report Page 33

misdemeanor cases, even where the defendants are in custody. I have also considered refusing incoming conflict cases because of the need to assign a dedicated attorney to the conflict counties who are then unable to assist in handling the St. Louis City cases.

*Id*. at ¶ 14

160.    District 16 Team Leader Devon Pasley has seven attorneys under her supervision who each carry approximately 90 trial cases at any given time. "This does not include probation violation or appellate cases, which would add anywhere from 15-70 cases to each attorney's caseload count." She added, "Attorneys often meet clients with probation violations for the first time in court and are required to be prepared to resolve it in a short time frame." Affidavit of Devon Pasley, February 7, 2017.

161.    District 19 Assistant Public Defender Walter Stokely stated:

To put it simply, I have more cases than I can deal with. I handle both misdemeanors and serious and complex felonies, such as sexual assaults, in which my clients face the possibility of serving significant time in prison if convicted. I often handle these cases concurrently even though I graduated from law school just four years ago.

Affidavit of Walter Stokely ¶ 4, October 5, 2016.

162.    Mr. Stokely added: "I am in court nearly every day, often for extended periods of time, and sometimes all day. This has made it very difficult to research, investigate, and prepare my clients' cases." *Id.* at ¶ 5.

163.    Former Kansas City defender Joshua Peter estimated that in 11 years as a defender, he handled more than 8000 cases. Affidavit of Joshua Peter ¶ 2, December 21, 2016.

164.    Assistant Defender Ruth Russell, who on the date for which MSPD reported open cases for attorneys had 156 open cases, wrote: "I have been a public defender for almost seven years. I am starting to burn out. I feel like I'm sinking. One of the other attorneys in my office was recently brought to the brink of tears because of the enormous caseload." Affidavit of Ruth Russell ¶ 2, October 27, 2016.

165.    On a single date in 2016, some MSPD attorneys had more than 200 open cases, including the following:

| 7 | Bates Nicholas | 337 |
| 7 | Hustead Michael | 250 |
| 16 | McGinnis Patricia | 361 |
| 17 | Anderson Nathaniel D. | 113 |
| 17 | Fry Angela Weatherford | 265 |
| 17 | Napier Jr. Norman Craig | 209 |
| 17 | Wasson Alice | 244 |

Boruchowitz Report Page 34

| | | |
|---|---|---|
| 22 | Mahaffey Matthew | 252 |
| 29 | Hatcher John | 209 |
| 31 | Chastain Charlton | 221 |
| 31 | Coulter Daniel | 200 |
| 31 | Egan James | 284 |
| 31 | Markin Shawn | 300 |
| 31 | Sawyer Christina L | 405 |
| 31 | Smith David B. | 304 |
| 36 | Cartwright Adam | 239 |
| 36 | Lynxwiler Steven | 230 |
| 36 | New Katie | 237 |
| 37 | Turner Bethany | 217 |

Spreadsheet attached to July 25, 2016, Letter to Mr. Williamson from Ms. Shipma.

166.    The average open caseload of the 351 attorneys was 91.93. *Id.* This is approximately double what a workable caseload would be.

167.    A lawyer with 200 open cases who works 40 hours a week on cases every week for a month would have less than one hour per client each month. A lawyer with 300 open cases who works 40 hours a week every week would have about 40 minutes per client per month. With numbers like that, it is inevitable that lawyers go months at a time without meeting with their clients and that they seek continuances because they are not prepared.

168.    Defender Director Mr. Barrett was quoted in a news article as saying, "A lawyer can probably only handle 40, maybe 50 cases at any one time." He added, "Our lawyers have three times that amount, and people are taking pleas because they're sitting in local jail waiting for their lawyer to get to them." Matt Ford, "A 'Constitutional Crisis' in Missouri", The Atlantic (March 14, 2017), available at https://www.theatlantic.com/politics/archive/2017/03/missouri-public-defender-crisis/519444/

169.    With their excessive caseloads, the Missouri defenders are not able to comply with The MSPD Guidelines for Representation, Trial, Section 10-10-20-60, regarding consultation with clients, which state in part:

> (d) A Public Defender should make every effort to arrange for prompt and timely consultation with the client in an appropriate and private setting. Such consultation should occur within a week after representation of the client is undertaken, and must occur prior to the conduct of any preliminary hearing in the case. The Public Defender should maintain frequent contact with the client and keep the client apprised concerning developments in the case. At a minimum, the Public Defender must have contact with the client once per month during the pendency of the representation.

Boruchowitz Report Page 35

170.    With 91.93 open cases, even if a defender could productively work on cases 160 hours per month every month, which in my opinion is more "billable" hours than attorneys should sustain, the defender would have only 1.74 hours per month per client. If the defender were to meet the requirement of the Guidelines and meet each client once per month, even if the meeting were only half an hour including travel and waiting time, that would leave only 1.24 hour per client to go to court, meet with prosecutors, research and write motions, prepare for hearings, consult with investigators and expert witnesses and supervisors, and otherwise prepare for cases.  For the attorneys who had more than 200 open cases, they would have .8 hour available per client, and if they were to see their clients every month even for only half an hour per client, that would leave them about 20 minutes per client for all the rest of their work that month.  And if the lawyers took any vacation or sick time or did not work on a holiday that month, they would have even less time.

171.    It is no wonder that District 31 clients told an HBO VICE reporter that they had talked to him more than they had talked to their lawyers in a year.



HBO VICE, "Last Line of Defense", June 30, 2017, available at http://www.hbo.com/vice/episodes/05/68-68-last-line-of-defense-and-el-rostro/index.html.

172.    The District 31 office did a performance review of their assistant PD IV attorneys in March 2017. In one review of a veteran attorney, the reviewer found "gaps of 3 months, 3 months, 5 months, 6 months, 6 months, 8 months, and even 13 months between qualifying contacts" with clients. The reviewer told the attorney:

> … given the huge caseloads, we understood that every 30 days may not be attainable. I asked him what he felt with his experience was attainable, and he replied that every 60 days could likely be done. I told him I agreed with that and asked him to devise a method to ensure he was seeing his clients at the jail, and contacting those in DOC, every 60 days regardless of whether there had been new developments in the case. He agreed…. For the most part, it appears that he is either visiting with clients within 7 days of receiving the file or, at the very least, visiting with them prior to the first court date. D said he does try hard to make sure

those initial contacts are done right away not just because of our
guideline but also because it helps set a positive tone for the future
attorney/client relationship.

Performance Review PD00292 3/2/2017.

173.     This performance review demonstrates the untenable situation faced by the
District 31 defenders. A veteran attorney had cases in which he had not seen the clients for six
months or longer. The supervisors have come to accept that meeting with clients in jail every
60 days is acceptable, even though their guidelines for representation require a meeting every
30 days. They recognize that an early meeting with a new client helps to set a positive tone for
the relationship, but they are willing to accept that an early meeting is one within seven days or
at least before the first court date. And it appears that there are numerous cases in which there is
no activity for three to six months at a time, indicating that the lawyers have done no work on the
cases as there are no new developments to discuss with the client, or if they have done work on
the case, their clients have not been informed and are not actively participating in their own
defense.

174.     The HBO reporter interviewed a defender named Brian Delleville after watching
him represent 25 clients in about two hours. He asked Mr. Delleville if he had enough time.
Mr. Delleville paused and sighed and answered,

>   No. In a perfect world it would be best, you know, if I had enough
>   time to meet with each of them well in advance of this hearing
>   rather than those who are out of custody - a lot of times this [court
>   proceeding] is their appointment. Unfortunately you almost have to
>   pick and choose some of the cases you spend the most amount of
>   time on. I'd love to be able to do that on every single case. I don't
>   want to be somebody that's just standing next to somebody."

*Id.*

175.     In his office, Mr. Delleville showed the reporter his piles and drawers of files and
said it was "about 200 or so" open cases.

176.     The HBO report showed a meeting at Mr. Delleville's defender office led by lead
public defender Rod Hackathorn. Mr. Hackathorn told his staff that "everybody was somewhere
between 400 to 600 per cent of capacity." *Id.*

177.     On the one date in 2016 for which MSPD provided open caseload information,
there were four attorneys in District 31 with more than 200 open cases and another four with
open caseloads between 100 and 200.

178.     Anna Moench was a defender in District 31 until she resigned in June 2016. She
resigned "due mostly to my unmanageable caseload.  I was no longer able to provide my clients
the kind of representation they deserved.  I did not believe I could ethically continue to represent
indigent defendants under those circumstances."  Affidavit of Anna Moench ¶ 18, December 21,
2016.

179.     Ms. Moench stated that her office had a policy of meeting in-custody clients within seven days of being appointed and out-of-custody clients within 30 days.  She wrote, "I tried my best to adhere to this policy, but I frequently could not." *Id.* at ¶ 9.

180.     Ms. Moench originally worked in the District 30 office.  That office covers five counties, as indicated below.  The District office in Bolivar is about a one hour drive from the Benton County courthouse, as shown below.

 

181.     Ms. Moench stated that in Bolivar she had an open caseload of between 80 and 100 clients at a time, and that it was difficult to manage because it was spread over multiple counties and it was mostly felony cases.  *Id.* at ¶ 4.

182.     Ms. Moench said that in the Springfield office in District 31, she had a combination of felonies, misdemeanors, and probation violations and had between 150-200 cases at any given time.  *Id.* at ¶ 6.

183.     She stated that in Springfield, she spent most of her time "either in court or visiting clients in jail every day." She also "spent a fair amount of time on administrative tasks. This left little time, if any, for legal research and motion practice." *Id.* at 7.

184.     Sarah Johnson, director of juvenile defense and policy for the public defender system, testified:

> Q. Have you handled cases of juveniles while you feel like your case load was too high for you to really manage effectively?
> A. Yes.

She added:

> I think that time is a big issue. So doing all of the detention hearings and ensuring that each client receives the effective representation, I think that sometimes the case loads are too high to be doing every single thing that I would like to do.

And she added about the cases that involve possibly sending children to adult court:

> Q. You don't feel like you met your ethical obligations to your clients with regard to certification procedures?
> A. Not in every case, no.

Sarah Johnson Deposition, October 6, 2017, at 119,134,170.

185.    Because the Missouri public defense lawyers do not have adequate support staff, and some of them have long distances to travel between courts and between their offices and the jails incarcerating their clients, their caseload numbers should be lower than the recommended limits.  Nevertheless, many districts have caseloads more than double the recommended limits.

186.    In a 2015 Texas report, the researchers concluded that, "for the delivery of reasonably effective representation attorneys should carry an annual full-time equivalent caseload of no more than" the numbers in the chart below:



Figure 8-5.  Final Recommended Caseload Guidelines for Texas
(Based on Delphi Time Estimates and FY 2014 Trial Rates)

Texas A&M University, Public Policy Research Institute, Guidelines for Indigent Defense Caseloads,(2015) at 34, available at http://tidc.texas.gov/media/31722/150114_WCL-Final_Reduced-file-size.pdf.

## XI.    EFFECTIVE ADVOCACY WITH REASONABLE CASELOADS CAN MAKE A DIFFERENCE AND CASELOADS CAN BE LIMITED

187.    Effective advocacy by lawyers with reasonable caseloads can make a difference. Washington State examples provide insight.  For example, in 2011, in Seattle Municipal Court, where caseloads are limited by local law to 380 per lawyer per year, 24.7 percent of charges resulted in guilty findings, whereas in Mount Vernon in the same state, where the lawyer caseloads were in the range of 2,000 per lawyer per year, 50.3 percent resulted in guilty findings.

188.    Courts in other states have been successful in reducing public defender caseloads when they were excessive.  For example, a court rule in Washington State limits defender caseloads to 400 misdemeanor cases or 150 felony cases per lawyer per year, which is consistent with NAC standards. CrR 3.1 STANDARDS FOR INDIGENT DEFENSE Standard 3.3 provides in part that "[c]aseload limits reflect the maximum caseloads for fully supported full-time defense

attorneys for cases of average complexity and effort in each case type specified. Caseload limits assume a reasonably even distribution of cases throughout the year."

189. Standard 3.3 specifically addresses the need to reduce caseloads when cases are more demanding:

> The increased complexity of practice in many areas will require lower caseload limits. The maximum caseload limit should be adjusted downward when the mix of case assignments is weighted toward offenses or case types that demand more investigation, legal research and writing, use of experts, use of social workers, or other expenditures of time and resources.

https://www.courts.wa.gov/court_rules/?fa=court_rules.list&group=sup&set=CrR

190. The New York Office of Indigent Legal Services has recognized the critical importance of limiting caseloads. In a recent statement on its web site relating to an upcoming request for proposals for funding, it wrote:

> Excessive caseloads impair the quality of legal representation that indigent legal service lawyers can provide. Indeed, it is widely and properly recognized that maintaining reasonable public defender and assigned counsel caseloads is the *sine qua non* of effective representation. See Justice Denied: America's Continuing Neglect of Our Constitutional Right to Counsel (The Constitution Project, 2009) at 192, Recommendation 6; and Securing Reasonable Caseloads: Ethics and Law in Public Defense (American Bar Association, 2011) at 200 ("caseload limits . . . are the very bedrock of quality control").

> No lawyer, however well qualified, can provide the effective assistance of counsel that our Constitution requires if he or she is saddled with an excessive caseload.

NYS Office of Indigent Legal Services, Upstate Quality Improvement and Caseload Production, https://www.ils.ny.gov/content/upstate-quality-improvement-and-caseload-reduction.

191. In New York State, the Administrative Rules of the Unified Court System & Uniform Rules of the Trial Courts, Rules of the Chief Administrative Judge have the same maximum caseload numbers as Washington and the ACCD, and they became binding in New York effective April 1, 2014:

> **127.7 Workload of Attorneys and Law Offices Providing Representation to Indigent Clients in Criminal Matters in New York City**

(a) The number of matters assigned in a calendar year to an attorney appointed to represent County Law in New York City shall not exceed 150 felony cases; or 400 misdemeanor cases; or a proportionate combination of felony and misdemeanor cases (at a ratio of 1:2.66). Where staff attorneys employed by an indigent defense organization within the City of New York are appointed to represent clients in criminal matters pursuant to Article 18-B of the County Law, these limits shall apply as an average per staff attorney within the organization, so that the organization may assign individual staff attorneys cases in excess of the limits to promote the effective representation of clients.

(b) The Chief Administrator of the Courts shall annually, at the time of the preparation and submission of the judiciary budget, review the workload of such organizations and attorneys, and shall take action to promote compliance with this rule. In undertaking such review, the Chief Administrator may consider: (1) differences among categories of cases that comprise the workload of the defense organization; (2) the level of activity required at different phases of the proceeding; (3) local court practice, including the duration of a case; and (4) any other factor the Chief Administrator deems relevant.

(c) These workload indigent clients in criminal matters pursuant to Article 18-B of the standards shall constitute non-binding guidelines between April 1, 2010 and March 31, 2014, and shall be binding effective April 1, 2014.

https://www.nycourts.gov/rules/chiefadmin/127.shtml

192. There is a maximum number of human beings that a lawyer can meet and effectively represent in a year. In my opinion, criminal defense lawyers should not exceed 1,800 hours per year directly representing clients, and a more realistic number is 1,650 hours per year. When a lawyer has 231 cases per year, even at 1800 hours, the lawyer has an average of 7.79 hours available for the work for each client. At a more reasonable year of 1,650 hours, the lawyer with 231 cases has only 7.14 hours per client. This is far below the time required as found by the Missouri Project study.

193. A study for the Massachusetts Committee for Public Counsel Services determined that an appropriate number of hours to spend directly representing clients per year is 1,662 hours:

| Case Available Hours | | | |
|---|---|---|---|
| Description | Hours | Days | Total |
| Non-weekend days | 8 | 260 | 2080 |
| Holidays | 8 | 11 | 88 |
| Training | 8 | 3 | 24 |
| Annual Conference | 8 | 1 | 8 |
| Vacation (less than 5 yrs) | 8 | 15 | 120 |
| Personal | 8 | 5 | 40 |
| Sick (estimate) | 8 | 5 | 40 |
| Non case duties | 2 | 49 | 98 |
| total non case time | | | 418 |
| **Available case time** | | | **1662** |

Center for Court Innovation, The Committee for Public Counsel Services Answering Gideon's Call Project (2012-DB-BX-0010) Attorney Workload Assessment, October 2014, at https://www.publiccounsel.net/cfo/wp-content/uploads/sites/8/2014/12/Attorney-Workload-Assessment.pdf

194.    The Washington Defender Association standards recommend 1,650 hours directly representing clients per year.  *See* Washington Defender Association, Standards for Public Defense Services, Standard Three, Commentary.  The Office of Management and Budget ("OMB") has advised agencies that of the 2,088 hours attributable on an annual basis to a federal employee, each employee works only 1,744 hours per year, which reflects hours worked after the average amount of annual, sick, holiday, and administrative leave used. Performance of Commercial Activities, OMB Cir. No. A-76 (Revised) (Aug. 1983), at p. IV-8.

195.    MSPD itself has calculated that an attorney has 1752 available hours per year to work on client cases. Defender Caseload Standards (2009) at 5.

196.    The National Association for Law Placement ("NALP") reported in its May 2006 document, Billable Hours Requirements at Law Firms, NALP Bulletin that "[a]lthough billable hour requirements ranged from 1,400 to 2,400 hours per year in 2004, most offices reporting a minimum require either 1,800 or 1,900 hours (24 percent and 21 percent of offices, respectively)."  A more recent report stated: "reporting of billable hours requirements in the 2013-2014 Directory of Legal Employers reveals an average requirement of 1,884 hours per year overall. . . ."  *NALP Bulletin*, May 2014, at http://www.nalp.org/0514research.  This average is brought higher by the 1,918 hours average of firms with more than 700 lawyers.  The average for firms of 100 or fewer lawyers was 1,809 hours.

197.    Taking reasonable standards for total hours of representation into account, Missouri defenders cannot, in my opinion, effectively represent their clients while carrying the caseloads currently imposed upon them.

XII.    MSPD ROUTINELY PRACTICES TRIAGE TO THE DETRIMENT OF ITS CLIENTS

198.    Ms. Moench's experience demonstrates the problems caused by an excessive caseload. She wrote:

My caseload in Springfield was too much to bear. I was forced to do the bare minimum on many of my clients' cases. I would triage cases by placing misdemeanor and non-felony cases at the bottom of my priority list, regardless of the strength or weakness of the state's evidence in those cases, or the consequences of a misdemeanor conviction for my clients. I simply did not have the time or resources to give each of my cases the attention they deserved.

Moench Affidavit ¶ 8.

199. Former District 15 assistant defender attorney Matthew Gass wrote:

When I left the Public Defender's office, I had a caseload of 110-120 cases. Lafayette County handles approximately 500 Public Defender-cases each year. On average, I would be assigned over 40 new cases per month.

Before I resigned, I was the only MSPD attorney covering all of Lafayette County. Historically, two attorneys had always served Lafayette County. As of the date of my resignation, I had been the only public defender in the county for approximately seven months.

Affidavit of Matthew Gass ¶ 7-8, October 31, 2016.

200. Mr. Gass also stated:

I did not have sufficient time to thoroughly review each client's discovery or investigate all of the issues in each case to my satisfaction. I could issue spot but did not have time to do the type of investigating each case and each client deserved. The situation was legal triage; almost without exception, my work was centered on dealing with the biggest crisis at the moment.

*Id.* at ¶ 16.

201. District 22 Defender Mary Fox also described triage in her office:

Despite seemingly carrying a lighter workload than other offices across the state, the District 22 office is currently operating 165% above its caseload capacity. This means that we have been forced to triage our cases on a daily basis. Our attorneys are unable to spend an adequate amount of time consulting with clients, researching the relevant law, conducting factual investigation, reviewing discovery, engaging in motion practice, or otherwise litigating each of their cases so that they and their clients can make fully informed decisions as to how best to proceed.

Fox Affidavit ¶ 7.

202.    Public Defender Devon Pasley, in the District 16 office, stated that during her time as a staff attorney, she handled misdemeanor and felony cases in juvenile and adult court, maintaining a caseload of approximately 90 cases at any given time. She said, "Because of my caseload, I often had to triage my cases rather than spend the necessary time investigating my cases, communicating with my clients, or otherwise preparing to challenge the state's case against my clients." Affidavit of Devon Pasley, February 7, 2017.

203.    Assistant Defender Ruth Russell wrote: "This summer, I was scheduled for eight weeks of back-to-back jury trials. I remember thinking, "when am I going to have time to prep these jury trials? I'm going to have to triage." Nobody should have their cases triaged." Russell Affidavit ¶ 6.

204.    District 16 Defender Ruth Petsch stated: "Although our attorneys are doing the best they can with the resources they have, we are unable to consistently provide constitutionally-sufficient representation to our clients." She added:

> The Jackson County office is currently 160% above its caseload capacity, which means we have become a "triage" office, like so many others across the state, and are forced to pick and choose which cases to prioritize and which to put on the back burner. It alsomeans that our attorneys are unable to spend an adequate amount of time researching the relevant law, conducting factual investigation, reviewing discovery, engaging in motion practice, or otherwise litigating each of their cases so that they and their clients can make fully informed decisions as to how best to proceed.

Affidavit of Ruth Petsch ¶ 6, October 3, 2016.

205.    Ms. Petsch was quoted in a National Public Radio story about public defense in Missouri.

> MOXLEY: Ruth Petsch, a public defender in Kansas City, says the job can already be overwhelming.
> RUTH PETSCH: I think that's a real fear for people in my office. I didn't find that witness, or I didn't find that information. And I'm pushed to trial 'cause this is the date, and I don't - I'm not going to do the job I should do.

Elle Moxley, "Overwhelmed Mo. Public Defender Office Appoints Governor To Handle A Case", National Public Radio (August 4, 2016), available at http://www.npr.org/2016/08/04/488722448/overwhelmed-mo-public-defender-office-appoints-governor-to-handle-a-case.

206.    The use of the word "triage" as applied to defender clients is jarring, and in my opinion, results from the recognition by the Defenders that their workloads are too high to provide adequate representation to indigent clients.

Boruchowitz Report Page 44

207. For example, the Florida Supreme Court identified the public defender's office's high caseload as resulting in a practice of "'triage' with the clients who are in custody or who face the most serious charges getting priority to the detriment of other clients." *Public Defender v. State*, 115 So. 3d 261, 274 (Fla. 2013) (footnotes omitted). The court called this "a damning indictment of the poor quality of trial representation that is being afforded indigent defendants by the Public Defender." Id.

208. "Triage" has connotations better suited to a battlefield or an emergency room. The dictionary definition of triage is:

> *Noun*
> 1. the process of sorting victims, as of a battle or disaster, to determine medical priority in order to increase the number of survivors.
> 2. the determination of priorities for action in an emergency.
> *Adjective*
> 3. of, pertaining to, or performing the task of triage: *a triage officer.*
> *Verb* (used with object)
> 4. to act on or in by triage: *to triage a crisis.*

Dictionary.com Unabridged, Based on the Random House Dictionary, 2013.

209. In my opinion, defenders should not liken their work to sorting victims in a disaster or an emergency room. A more appropriate medical analogy would be an internal medicine doctor greeting each patient individually and assessing their medical needs in a private, quiet room that inspires the patient's confidence in the doctor, rather than the fear that a person would have on a battlefield or surrounded by noise and chaos in an emergency room.

XIII. MSPD DOES NOT COMPLY WITH ABA GUIDELINES ON EXCESSIVE WORKLOADS

210. MSPD fails to follow the ABA Eight Guidelines of Public Defense Related to Excessive Workloads (2009), available at https://www.americanbar.org/content/dam/aba/administrative/legal_aid_indigent_defendants/ls_s claid_def_eight_guidelines_of_public_defense.authcheckdam.pdf.

211. Guideline 1 states: "The Public Defense Provider avoids excessive lawyer workloads and the adverse impact that such workloads have on providing quality legal representation to all clients." The Guideline then lists a series of tasks lawyers should provide. Because this list is useful to understanding the deficiencies of the MSPD and because it is similar to MSPD's own performance guidelines, I reproduce it here:

> In determining whether these objectives are being achieved, the Provider considers whether the performance obligations of lawyers who represent indigent clients are being fulfilled, such as:

- Whether sufficient time is devoted to interviewing and counseling clients;
- Whether prompt interviews are conducted of detained clients and of those who are released from custody;
- Whether pretrial release of incarcerated clients is sought;
- Whether representation is continuously provided by the same lawyer from initial court appearance through trial, sentencing, or dismissal;
- Whether necessary investigations are conducted;
- Whether formal and informal discovery from the prosecution is pursued;
- Whether sufficient legal research is undertaken;
- Whether sufficient preparations are made for pretrial hearings and trials; and
- Whether sufficient preparations are made for hearings at which clients are sentenced.

212.    Based on the information I have reviewed, MSPD lawyers routinely do not devote enough time to interviewing and counseling clients; they routinely do not promptly interview their clients; they often do not conduct necessary investigations; they often do not pursue discovery; they often do not prepare sufficiently for hearings and trials; they often do not do sufficient legal research; and they often do not prepare adequately for hearings.

## XIV.    GEOGRAPHICAL CHALLENGES UNDERCUT DEFENDERS' ABILITY TO PROVIDE EFFECTIVE REPRESENTATION

213.    An example of the problems caused when one district office has to provide representation in multiple counties is the challenge facing District 14. According to the MSPD FY 2016 Report (at 40), the office opened 1705 cases in FY 2016 in those five counties.

214.    As of April 2016, MPDC reported having only five attorneys in District 14. They reported one investigator and two other support staff. It is my understanding that in the past year they have had as many as seven attorneys in that District, including the chief defender.

215.    I am placing below a portion of the MPDC map of the districts, showing District 14's five counties. The map also shows some of the adjacent counties in which the Defender had conflict cases.

Boruchowitz Report Page 46



Map available at http://www.publicdefender.mo.gov/about/map_of_districts.htm (last visited August 23, 2017).

The District's office is in Moberly, Missouri. The Linn County courthouse is in Linneus, which is 67.5 miles from the Defender office. It is more than 60 miles to the Saline County court in a different direction.

 

216.     The District 14 office also handles conflict cases in Livingston, Shelby, and Adair Counties. The Livingston County Court is more than an hour drive from the Defender office.



217.     In the nine counties covered in some way by District 14, MPDC for FY 2016 reported 51 cases being sent to the private bar in conflict cases. FY 2016 Report at 67. Keeping track of those cases and the quality of the representation is an extra burden for the chief Defender who already has too much to do.

218.     Former Defender Matthew Gass reported that "District 15 had been understaffed for some time due to a hiring freeze because of budget issues. Our office was supposed to have

Boruchowitz Report Page 47

seven attorneys, but during the summer of 2016, we were working with just four attorneys to serve all four counties." Affidavit of Matthew Gass October 31 ¶ 10, 2016. He wrote: "Because the area where I worked was in rural Missouri, I spent a great deal of my time traveling to court, to three separate county jail facilities to see clients, and to my office in Sedalia." *Id.*

219.    I am including here a map of District 15 and a map showing the driving time of more than one hour each way from the Defender Office to the court in Lafayette County.



220.    District 43 has eleven counties. I am including here a map from the FY 2016 Report at p. 39. In FY 2016 the office opened 2,198 cases. In April 2016, the office listed nine attorneys, one investigator, and four other support personnel on staff. The District office is in Chillicothe, in Livingston County. Depending on the route, it is about 70 miles and about a one hour, 20 minutes' drive one-way between the courthouses in Livingston and Putnam Counties. To have one investigator to cover 2,198 cases in 11 counties over that kind of distance means that only a tiny fraction of the cases can be investigated effectively.



221.    The post-conviction attorneys also are seriously affected by the need to travel. Mr. Mermelstein testified:

> So our Columbia attorneys have to drive literally from Iowa -- the
> Iowa border to the Arkansas border and like over to the Oklahoma
> border and over to the Illinois border. Our St. Louis office covers
> cases mostly from St. Louis south all the way to, again, Arkansas,

so they cover all the Mississippi River counties kind of from St. Louis to Arkansas.

And our Kansas City office covers the counties from Iowa sort of down to a little bit south of Kansas City. So they travel that western Missouri border quite a bit. There's lots of driving if you're an appellate post-conviction attorney.

Mermelstein Deposition at 43.

For reference, I am placing here a portion of a Google map of the region.



## XV.    MSPD'S CONFLICTS POLICY PRESENTS MULTIPLE PROBLEMS

222.    The Missouri Supreme Court recently reaffirmed that "the right to unconflicted counsel is an essential aspect of the Sixth Amendment right to counsel…." *DePriest v. State*, 510 S.W.3d 331, 339 (Mo. 2017). The Court, in vacating a denial of motions for post-conviction relief for a brother and sister who had been represented by the same lawyer at their guilty pleas, wrote:

Boruchowitz Report Page 49

A *potential* conflict of interest nearly always exists when one counsel represents two or more criminal defendants facing charges arising out of the same facts and circumstances. … " '[A]n actual, relevant conflict of interests [arises] if, during the course of the [concurrent] representation, the defendants' interests do diverge with respect to a material factual or legal issue or to a course of action.' "

*Id.* at 338(citation omitted).

223.    MSPD Director Barrett has explained that his office was assigning the first conflict of interest in a case to other district defenders and additional ones to private counsel. He recognizes that this is not a cost-effective approach

because it pulls lawyers out of their primary jurisdictions and requires them to drive significant distances to appear in court, conduct investigations, witness interviews and depositions, visit their clients in jail, all in a distant county. It is not uncommon for each trip to take a day of the attorney's time to deal with one or two cases. Instead, economies of scale suggest it is more cost-effective and efficient to contract all trial level conflict cases to local attorneys in the private bar and allow the defender offices to concentrate on effectively representing the cases that arise within the counties they are designated to serve.

FY 2018 Draft Budget Request at 8.

224.    In fiscal year 2016, MSPD attorneys had to handle more than 7000 conflict cases, including 24 first degree murder cases, in other districts than their own. *Id.* at 10.

225.    As of July 1, 2017, MSPD is no longer assigning first level conflict cases to their staff attorneys, but sending them to conflict panel counsel. Deposition of Joel Elmer, at 9. Because this is a new policy, I will outline below problems caused by the former policy, as well as problems that remain with how the conflict panel is administered.

226.    There are issues with the way MSPD administers the conflict panel.  There is no substantive assessment of the ability of the lawyers who apply for the panel and no tracking of how many cases they are doing in their private practice. Deposition of Joel Elmer, at 11,15.

227.    The conflict panel fee schedule has not been adjusted in years, it is a fixed fee, and requests for extraordinary compensation are rare and often denied. Deposition of Joel Elmer, at 16.

| Description | Contract Guideline |
| --- | --- |
| Murder 1st Degree | $10,000 |
| Sexual Predator Trial | $8,000 |
| Other Homicide | $6,000 |
| AB Felony Drug | $750 |
| AB Felony Other | $1,500 |
| AB Felony Sex | $2,000 |
| CD Felony Drug | $750 |
| CD Felony Other | $750 |
| CD Felony Sex | $1,500 |
| Misdemeanor | $375 |
| Juvenile - Non Violent | $500 |
| Juvenile - Violent | $750 |
| Probation Violation | $375 |
| PCR Rule 24.035 Motion | $500 |
| PCR Rule 24.035 Evidentiary Hearing | $250 |
| PCR Rule 24.035 Appeal | $500 |
| PCR Rule 29.15 Motion | $1,000 |
| PCR Rule 29.15 Evidentiary Hearing | $500 |
| PCR Rule 29.15 Appeal | $1,875 |
| Direct Appeal | $3,750 |

228.    The compensation rates are "ridiculously low" according to the attorneys who have commented about them. *Id.* at 24.

229.    This is the fee schedule, produced in Elmer Deposition, Exhibit 7.

230.    Director Barrett described one of the problems with a flat fee compensation plan: "there's con -- some consensus around the idea that when you give an attorney a flat amount regardless of the amount of work that they do, it will encourage them to do the least amount of work to receive those funds." Barrett Deposition, at 120.

231.    District 22 Defender Mary Fox reports that conflict cases have undercut her main office's representation.

> The fact that District 22 defenders are required to cover conflict cases in surrounding counties only makes the workload that much more unreasonable. It is especially problematic for our office since I have assigned four of my more senior attorneys to the conflict cases, given the complexity of such cases.

Fox Affidavit ¶ 13.

232.    MPDC reported that for Boone County in District 13, it sent 324 conflict cases to private counsel. FY 2016 Report at 67. In April 2016 MPDC reported having 13 trial lawyers, one investigator, and five support staff in District 13. For FY 2016, MSPD reported Boone County as having opened 3093 cases. FY 2016 Report at 40. That would leave 2769 cases for the staff defender attorneys, an average of 214 per attorney.

233.    Districts other than 13 would have benefited from sending more conflicts cases to the private bar.

234.     In addition to the logistical challenges, there are other issues presented by the former MSPD approach to conflicts, that is, having neighboring districts take cases for their colleagues.  One is that lawyers are transferred from one district to the other periodically.  It is unclear what kind of "walls" are established to make sure that they have no involvement with cases from their previous district that may present conflicts of interest.

235.     More systemically, Director Barrett oversees the entire MSPD, and theoretically could be in a position of consulting with lawyers or their supervisors about cases in which confidential information would need to be revealed to him. Such a situation could involve personnel issues concerning how a case is handled or even strategy in the case.  Those issues may not be readily identified when the conflicts case is first assigned to the neighboring district.

## XVI.   THE STATUTORY PROVISION FOR SEEKING APPROVAL TO DECLINE CASES IS UNWORKABLE

236.     This Court has explained what the Plaintiffs report happened after the *Waters* decision when defenders tried to limit their caseloads.

> …[P]ublic defenders who attempted to turn away cases faced resistance from prosecutors, judges, and legislators. In some circuits, cases that were turned away were assigned to non–MSPD attorneys with no criminal defense experience who were not compensated for their time.
>
> The then-head of MSPD was told that if local offices continued to turn away cases, the legislature would pass a bill to privatize the entire system.

*Church v. Missouri*, 2017 WL 3383301, at *3.

237.     Missouri's Legislature passed the following law after the *Waters*, supra, decision:

> 600.062. Acceptance of cases
>
> Notwithstanding the provisions of sections 600.017 and 600.042 to the contrary, neither the director nor the commission shall have the authority to limit the availability of a district office or any division director, district defender, deputy district defender, or assistant public defender to accept cases based on a determination that the office has exceeded a caseload standard. The director, commission, any division director, district defender, deputy district defender, or assistant public defender may not refuse to provide representation required under this chapter without prior approval from a court of competent jurisdiction.

238.     District Defender Cardarella pointed out one reason why this statutory process is not workable:

According to recent legislation here in Missouri, public defenders can go to a judge and request case relief based on reaching an ethical limit. However, since we do not know how many active cases our attorneys have, this form of relief has become an impractical remedy.

Cardarella Affidavit ¶ 11, December 1, 2016.

239.     Former Kansas City Team Leader Joshua Peter stated:

In my office, we did not have the option of refusing cases. While attorneys could complain about their caseloads and not get assigned new cases for a while, this was not a real solution. These cases would simply be assigned to another overworked attorney.

Everyone's caseload in the office was simply too much to handle.

Peter Affidavit ¶ 14-15.

240.     As this Court has pointed out, "Since the legislature's enactment of 600.602, no MSPD office has refused cases in any consistent or systematic way." *Church v. Missouri*, 2017 WL 3383301, at *3.

241.     Mr. Barrett described what happened when his office attempted to respond to the *Waters* decision by declining cases:

And so the system acted in 2012 and started to not accept every case that came in the door. The response was political backlash. Efforts to blow up the system were made and so MSPD attorneys stood down, the risk to their licenses notwithstanding.

Letter to Boone County Bar Association, Boone County Bar Association Newsletter, October 2, 2017, Elmer Deposition, Exhibit 5, at 5

242.     Mr. Barrett added: "That said, the lawyers in MSPD are boxed in – on the one hand, if we accept every case that comes in the door, OCDC and the Court have told us that our licenses are in jeopardy; however, if we do NOT accept every case, our jobs are in jeopardy." *Id.*

243.     Mr. Barrett understood from conversations with his predecessor, Cat Kelly, that her "decision to reverse course and not refuse cases was tied to concern about privatizing the system." Barrett Deposition, at 68.

244.     An elected prosecutor recently conveyed an implied threat to Mr. Barrett in a telephone conversation about defenders declining new cases: "Russ Oliver made comments related to privatization and good luck this legislative session." *Id.*, at 69-70.

245.     Because of his determination that privatization would not improve the provision of the right to counsel, Mr. Barrett said, "I endeavored to improve the -- the system

Boruchowitz Report Page 53

incrementally through making -- trying to secure more funding and then reporting back to the legislature on how I spent that funding and making a case for the benefit to the State of Missouri." *Id.*, at 72.

246. While he acknowledges that individual lawyers have an obligation to refuse to accept cases when their caseload is too high, Mr. Barrett testified: "I will say that in the aftermath of the -- the refusing to accept cases that turn into a threat of privatization, I'm not aware of any lawyer asserting that, that type of conflict until recently I should say." *Id.*, at 75.

## XVII.  EFFECTS OF EXCESSIVE CASELOAD AND LACK OF RESOURCES

A. **District 7, Site of Plaintiff Bowman's Case, Is Committing Malpractice Every Day**

247. District 7 has excessive caseloads and had to represent clients in 12 counties.



District 7 includes three primary counties and at least until July 1, 2017, was covering conflicts in nine more, including Caldwell, Cass, Davies, DeKalb, Grundy, Harrison, Jackson, Lafayette, and Ray. Affidavit of Anthony Cardarella, December 1, 2016 ¶ 1.

248. District 7 Director Anthony Cardarella stated:

> Unfortunately, I do not believe that my office is providing quality representation to our indigent clients. In fact, I believe that, despite our best efforts, my office is committing malpractice every single day and has been for well over a decade.

*Id.* at ¶ 8

249. In December 2016, Mr. Cardarella had an active caseload of 224 cases, including two criminal dockets. *Id.* He also was responsible for supervising the entire office, which had 12 attorneys, two investigators, one legal assistant, and four clerks.  *Id.* This is an impossible workload. As outlined below, a supervisor with ten or more attorneys should not carry a caseload.

250. In 2015, Mr. Cardarella was assigned 186 cases. Spreadsheet attached to July 25, 2016 Letter to Mr. Williamson from Ms. Shipma.

251. Mr. Cardarella said of his office, "Our attorneys are overworked and have excessively high caseloads." Cardarella affidavit at ¶ 9.

252. Mr. Cardarella stated: "Because of severe time constraints, our attorneys do not have enough time to write motions or to even inventory, catalogue, or review discovery in a professional and timely manner." *Id.* at ¶ 12.

253. He added:

> Since reviewing discovery in a timely manner is absolutely critical
> for intelligently approaching any case investigation, very few of
> our clients actually have their cases thoroughly investigated.   In
> fact, our attorneys are rarely able to analyze their discovery early
> enough to make important investigative decisions, including which
> key witnesses to depose and whether or not an expert witness is
> necessary for the client's defense.

*Id.* at ¶ 13-14.

254. Because of time constraints, Mr. Cardarella stated, "crime scene visits are virtually non-existent in our office." *Id.* at ¶ 15.

255. Mr. Cardarella is counsel for the plaintiff Viola Bowman, who is charged with murder. Her case, which has been continued multiple times since her arrest in January 2015, was set for trial September 18, 2017. But on September 7, 2017, on an oral motion by the state, the court continued the matter until November 20, 2017, for a discovery hearing. On September 29, 2017, the court issued a certificate for attendance of an out-of-state witness to appear on November 20, 2017.

256. According to CaseNet, attorney Bates appeared for Mr. Cardarella at hearings on August 9, 2017, and August 17, 2017.

257. Ms. Bowman appeared at her arraignment, in custody, January 15, 2015, with no lawyer representing her. She requested a public defender. She had been in jail at that point for eight days.

258. Attorney Cathy Noble appeared for Ms. Bowman on January 22, 1015. Two other attorneys have appeared on the case in the intervening months.

259. Mr. Cardarella filed a notice of appearance and request for discovery for Ms. Bowman January 28, 2015.

260. As far as I can tell from CaseNet, the only motions Mr. Cardarella has filed for Ms. Bowman are for continuances and bond reduction.

261. On September 28, 2016, Mr. Cardarella moved for a continuance, citing his vast duties as Director and a health-related issue. He also stated:

> Undersigned counsel is presently still amidst efforts review the voluminous amount of discovery existing in this case as well as to continue to conduct relevant case investigation - - including the commencement of depositions of key members of law enforcement entrusted with the investigation of this case together with key lay witnesses - - in order to provide the effective assistance of counsel.

Defense Second Application for Continuance, September 28, 2016.

262.    Mr. Cardarella had cited the same reasons for a continuance in his prior motion of March 2016:

> 6.    Undersigned counsel is presently still amidst efforts review the voluminous amount of discovery existing in this case as well as to continue to conduct relevant case investigation - - including the commencement of depositions of key members of law enforcement entrusted with the investigation of this case together with key lay witnesses - -  in order to provide the effective assistance of counsel.

Defendant's Application for Continuance, March 23, 2016.

263.    In the March 2016 motion, Mr. Cardarella mentioned his responsibilities as Director as well as his having taken on additional caseload responsibilities in two counties because of the sudden departure of one of his assistant public defenders in early November of 2015. He added that the very recent sudden and unexpected passing of a senior member of his staff had added "an overwhelming burden of stress upon the entire staff." *Id.*

264.    These motions for continuance indicate the inability of Mr. Cardarella and his staff to provide effective representation for their clients. Based on the motions, Mr. Cardarella had not begun depositions of key witnesses either in March 2016 or in September 2016, even though he had had the case since January 2015.

265.    While the sudden departure of an assistant defender in November 2015 certainly would have put extra burden on him, to have that be a factor four months later in not being prepared for a murder case raises questions about his office's ability to hire replacement staff and to reassign cases internally to provide some relief for Mr. Cardarella. If Mr. Cardarella had not had an existing caseload, it would have been more feasible for him to take on the emergency allocation of cases. But as he already had an excessive caseload in addition to his supervisory responsibilities, he was not able to be prepared for Ms. Bowman's trial. His motions indicate that he had not done significant work on the case in the first ten months that he was representing Ms. Bowman. The recent sudden and unexpected passing of a colleague in March 2016 would have been a sufficient reason for a continuance, but not for a continuance of six months.

Boruchowitz Report Page 56

266.    The situation described by Mr. Cardarella could have supported a motion for caseload relief, but as he stated in his affidavit, he does not know how many cases his lawyers have, making it more difficult to support a motion for caseload relief. It is not clear why he does not know how many cases the lawyers have.

**B.    The Missouri Defenders Do Not Provide Counsel at Arraignment and Are Limited in Their Ability to Seek Pre-trial Release of Clients**

267.    There is a right to counsel at critical stages of cases. *Hamilton v. State of Ala.*, 368 U.S. 52, 54, 82 S. Ct. 157, 159, 7 L. Ed. 2d 114 (1961).

268.    The United States Supreme Court "has held that the right to counsel guaranteed by the Sixth Amendment applies at the first appearance before a judicial officer at which a defendant is told of the formal accusation against him and restrictions are imposed on his liberty." *Rothgery v. Gillespie Cty., Tex.*, 554 U.S. 191, 194 (2008). (citations omitted.).

269.    The United States Supreme Court held that Alabama's preliminary hearing was a critical stage requiring counsel in part because "counsel can also be influential at the preliminary hearing in making effective arguments for the accused on such matters as the necessity for an early psychiatric examination or bail." *Coleman v. Alabama*, 399 U.S. 1, 9, 90 S. Ct. 1999, 2003, 26 L. Ed. 2d 387 (1970).

270.    District 19 Assistant Defender Walter Stokely pointed out one of the problems with late appointment of the defenders. He wrote:

> There is a Missouri Supreme Court rule that requires preliminary hearings to be held within one week following arrest. The fact that public defenders are not assigned until clients fill out the indigent paperwork hinders the ability of public defenders to provide adequate and timely pretrial representation. Most often, Defendants are provided the paperwork to seek appointment of a public defender at their first court appearance.

Stokely Affidavit ¶ 10.

271.    Mr. Stokely added that he is unable to provide effective advocacy for bail and pretrial release.

> It is very difficult and often impossible to zealously represent people during bail and pretrial release. This is because initial bail determinations are based solely on the prosecutor's recommendation, which happens before people even fill out applications seeking a public defender. Therefore, I am not even appointed to represent these defendants at their bail hearing. After bail is set, a reduction can be difficult to obtain and seeking one takes time away from working on their underlying case.

*Id.* at ¶ 9.

272. Mr. Stokely pointed out a serious negative impact of not being able to provide effective advocacy for pre-trial release and of having too much work to be able to advocate for system change:

> The difficulties of providing zealous representation at all phases of a trial are compounded in counties like Miller County, which has procedures in place that make the process much more difficult for defendants. For instance, Miller County requires those who post bond to be placed under court supervision. Those who are unable to post bond choose between accepting a plea offer and going to trial. However, the two judges in Miller County have only two jury trial dates every year, so some of these clients must wait in jail for years before their case will go to trial. As a result, a lot of people arrested and charged in Miller County plead guilty to crimes that they tell us they did not commit, but we do not have the capacity or resources to challenge this process.

*Id.* at ¶ 12.

273. Assistant Defender Ruth Russell also noted challenges in providing effective pre-trial release advocacy:

> It can be difficult to adequately represent clients during the pretrial and bond phase due to procedural restrictions. For example, it takes a week or two to open a case, at which point I am left with just seven days to meet with the client under the MSPD's Guidelines for Representation. However, there is a suggested bail schedule that is often followed and bail is routinely set before I am appointed counsel on a case, after which, courts require ten days' notice for bond modification hearings.

Russell Affidavit ¶ 11.

274. A recent report by the New York Office of Indigent Legal Services provided anecdotal support for the benefits of counsel at the first appearance.

> At arraignment, attorneys are often able to successfully argue for release on recognizance, release under supervision, or lower bail amounts that defendants can pay. …Attorneys generally report that in some cases their ability to argue deficiencies in the accusatory instrument have resulted in immediate dismissal of at least some charges, and hence led to release or lower bails….

> Attorneys have reminded us of the significant case implications of being released instead of detained while a case is pending. Research consistently shows that case outcomes are significantly better for defendants who are released.

Boruchowitz Report Page 58

…Attorneys have also told us of instances in which their advocacy at arraignment has meant that innocent people are not incarcerated or that clients are not detained because of mistaken information.

…Attorneys told us of several instances in which being at arraignment allowed them to conduct a quick and immediate fact investigation into the case, with positive case outcomes.

…Many attorneys who spoke to ILS about the impact of counsel at arraignment emphasized the positive impact that it has on their ability to build better relationships and communicate more effectively with their clients. At arraignment, attorneys are able to explain the process and proceedings to their clients, prevent clients from making incriminating statements, and assist them in making a favorable impression. From the beginning of the case, clients sense that their attorney is helping them to navigate the court system. Even more importantly, they see the attorney representing their interests and often engaging in zealous advocacy.

Implementing the Counsel at Arraignment Obligations in the *Hurrell-Harring v. The State of New York* Settlement, 2016 Update, available at https://www.ils.ny.gov/files/Hurrell-Harring/Counsel%20At%20Arraignment/Hurrell-Harring%20Updated%20Counsel%20At%20Arraignment%20Plan%2011016.pdf.

275.    The Missouri Defenders do not provide counsel at arraignment and are not able to provide the benefits to their clients identified in the New York report. I provide here several examples drawn from Case Net of accused persons appearing alone at arraignment.

a.    Plaintiff Dorian Samuels was arraigned without counsel on June 2, 2016. He was in custody and appeared by video. He had been arrested May 31, 2016. His attorney, Craig Lowe, entered a notice of appearance June 8, 2016, and did not appear with him in court until June 15, 2016.

b.    James L. Wainwright, Case No. 17AO-CR01041, was arraigned in-custody without counsel on August 17, 2017. His attorney, Craig Lowe, entered a notice of appearance August 25, 2017.

c.    Quincy Earl Richards, Case No. 17AP-CR00643, was arraigned without counsel June 12, 2017.  He had been arrested June 8, 2017. His attorney, Larry Dale Maples, filed a notice of appearance June 15, 2017. Mr. Maples appeared in court July 11, 2017. On August 1, 2017, attorney Richard King appeared for Mr. Maples. On August 3, 2017, Craig Lowe entered a notice of appearance for Mr. Richards. Mr. Richards was charged with felony possession of marijuana.

276.    Without counsel at arraignment, the accused person is not able effectively to advocate for pre-trial release or to challenge the probable cause to detain him or her. A delay of

one or two weeks before counsel meets with the client can result in a variety of harms, including losing evidence and not addressing mental and physical health needs of the client.

### C. Because of Excessive Caseload, Defenders Are Unprepared and Seek Multiple Continuances

277.    Ms. Moench said that occasionally she would meet her clients for the first time at their preliminary hearing, which sometimes would be several weeks after their arrest and arraignment. "In the meantime, many of my clients would sit in jail, unable to advocate for a reduction in their bond amount." Moench Affidavit ¶ 10.

278.    Ms. Moench added, "In addition to sitting in jail longer than necessary, many of my clients risked losing their jobs or had difficulty attending to their significant childcare and healthcare needs. This also put a serious strain on my clients' personal relationships." *Id.* at ¶ 11.

279.    Ms. Moench stated: "Because of my heavy workload, I often felt unprepared for trial—sometimes requiring me to seek multiple continuances—and was unable to negotiate a more favorable plea bargain for my clients." *Id.* at ¶ 12.

280.    Ms. Moench added: "I only had time to skim discovery on some cases and would have to do so on the eve of many misdemeanor and some felony bench trials." *Id.* at ¶ 13.

281.    Ms. Moench wrote: "I rarely had the time to take depositions, even in serious felony cases. I can count on one hand the number of depositions I took in my three and a half years as a public defender." *Id.* at ¶ 14

282.    Ms. Moench stated that she "lacked the time and resources to track down witnesses or take other investigatory steps." She added, "I also did not use investigators as often as I should have, since my office had only two investigators for a staff of twenty attorneys. And, for several months in 2015, my office had only one investigator on staff." She said, "Many attorneys in the office, including myself, filed multiple motions for continuances in cases based on a lack of investigatory resources, which left us unprepared to proceed." *Id.* at ¶ 15-16.

283.    Ms. Moench also said, "I rarely used expert witnesses in my cases." *Id.* at ¶ 15.

284.    Assistant Defender Ruth Russell discussed having regularly to seek continuances even for clients in custody.

> While I was a public defender in District 17, I had approximately 150 to 200 cases on my docket at any given time. I never refused a case because of my caseload, but I had to regularly ask for continuances. This happened even when I had clients in custody. I recently had a close call in a shaken baby case. I almost didn't get a continuance to get a radiologist. If I hadn't, my innocent client would have been convicted and probably received a life sentence.
>
> Russell Affidavit ¶ 3.

Boruchowitz Report Page 60

285. District 16 Team Leader Devon Pasley reported that her overall workload, including her managerial and administrative responsibilities, "still makes it difficult for me to spend the time necessary to defend my clients effectively." She gave an example of a first-degree sodomy case set for trial in less than two weeks that, "Because of my other professional obligations, I just began to prepare for trial this week." Affidavit of Devon Pasley, February 7, 2017.

286. Ms. Pasley discussed another case in which her lack of time to prepare prevented her from being able to call an alibi witness.

> I recently tried a murder case involving a potential alibi witness. I did not have time to interview the witness prior to trial, but asked one of our investigators to do so. Based on the information gleaned from the investigators interview, I initially chose not to call the witness at trial. After speaking with the witness myself on the morning of trial, however, I realized that the witness's testimony could have been quite helpful to my client. The Judge did not allow me to call the witness due to the late endorsement. My client was convicted and sentenced to life in prison without the possibility of parole.

> Affidavit of Devon Pasley.

## D. Because of the Excessive Caseload, Missouri Defenders Rarely Go to Trial

287. According to an evaluation of a District Defender, "The Sedalia Office tried 6 cases in FY 2014, 10 cases in FY 2015 and only 3 cases in FY 2016." This is an office with seven attorneys. Appraisal of Max Mitchell. That office disposed of 2215 cases in 2016. FY 2016 Report at 28. That district had two counties with the highest rate of sending non-violent felony offenders to prison. Appraisal of Max Mitchell.

288. Director Michael Barrett testified in deposition that in the last two years only one percent of the state defender cases go to trial. Barrett Deposition, at 38.

289. Ms. Moench said, "Almost none of my cases went to jury trial. I have first chaired only two jury trials in the last three years." Moench Affidavit ¶ 17.

290. Former District 15 assistant defender Matthew Gass stated:

> I tried just one case to a jury while working in District 15. The only reason I had time to properly prepare for this trial was because I had just moved over to Lafayette County and my caseload had not yet exceeded a manageable number.

> In other cases, I have had to ask for continuances of trial dates because I did not have the time to adequately prepare for trial. While the cases are continued, my clients have to sit in jail. I felt that these requests were in my client's interest at the time because I

owed a duty to the client to make sure I was thoroughly prepared before taking the case before a jury.

Gass Affidavit ¶ 17-18.

E. **Missouri Defenders Are Not Able to Have Adequate Communication With Their Clients**

291.     In many cases, the defenders do not have timely and confidential communications with their clients and they cannot exercise informed judgment on the type of investigation needed in their cases.

292.     This Court described the claimed impact of the excessive workload on client communication:

> Finally, a defendant's right to consult with his attorney is an integral component of the right to assistance of counsel. ... But MSPD attorneys' excessive workloads mean that they are unable to meet with clients on a regular basis. In some instances, MSPD attorneys are only able to have a substantive meeting with a client for the first time a few weeks before trial. Without their clients' input, it is impossible for MSPD attorneys to investigate their clients' cases adequately or properly prepare for trial, plea negotiations, or sentencing. Nor is it possible, under such circumstances, for indigent defendants to participate meaningfully in their own defense.
>
> *Church v. Missouri*, 2017 WL 3383301, at *5 (citation omitted).

293.     District 16 Defender Ruth Petsch stated:

> Attorney workloads also make it very difficult for public defenders in Jackson County to maintain consistent contact with clients and their family members, including those in custody. Many attorneys are forced to choose between conducting regular jail visits on the one hand, and preparing for trial or other court proceedings on the other.
>
> Petsch Affidavit ¶ 7.

294.     Former Defender attorney Matthew Gass wrote: "MSPD's Guidelines for Representation state that we should meet with a client within seven to ten days of being assigned a case. I tried to do this whenever possible, though I was rarely successful." Gass Affidavit ¶ 12.

295.     Assistant Defender Ruth Russell wrote:

> I don't have time to regularly speak with my clients, especially those who are not in custody. I spend a significant amount of time

in my office returning calls to my clients and their families. Despite this effort, I am often unable to get in touch with each of my clients every 30 days, in violation of MSPD's Guidelines for Representation.

Russell Affidavit ¶ 4.

296.    Ms. Russell added:

Because I spend so much time in court, I often have difficulty establishing the type of relationships with my clients I believe are needed for effective representation. For example, I sometimes cannot meet with a client until a few weeks before their trial because my schedule sometimes prevents me from attending that client's previous pretrial court proceedings. In such instances, I have to rely on other attorneys in my office to appear on behalf of my clients. Clients frequently believe that they don't have good attorneys because they don't hear from their attorneys and assume that their attorneys are not working on their cases.

*Id.* at ¶ 7.

297.    Defender Devon Pasley stated:

One of the most significant implications of our large caseloads is that they make it virtually impossible to maintain regular contact with clients, including those in custody. This lack of consistent communication makes it very difficult to establish a rapport between attorney and client. Because of that lack of rapport, clients often do not trust their lawyer or feel comfortable sharing all pertinent information with them.

Affidavit of Devon Pasley, February 7, 2017.

298.    Former Kansas City Team Leader Joshua Peter stated: "I now work in private practice. I have significantly more time with clients than I used to. In fact, I now do free consultations for longer amounts of time than my previous jail visits as a public defender." Affidavit of Joshua Peter, December 21, 2016.

299.    District 19 assistant public defender Walter Stokely stated:

My workload also makes it impossible for me to spend adequate time working on cases, especially serious and complex cases. It is difficult to find the time to communicate with clients or even meet with some clients face-to-face, especially those clients who are being held in facilities several hours away from my office. It is also difficult to find time to conduct investigations, identify and interview witnesses, and meet with experts.

Boruchowitz Report Page 63

Stokely Affidavit ¶ 6.

300.     Mr. Stokely explained the negative consequences of poor communication with clients:

> My workload has made it difficult, and in some cases impossible, to establish trust with my clients. Indeed, many never come to trust me as their advocate in court. This is partly because, due to the lack of resources and burdensome workload, we are not always able to do a good job on their cases and they do not feel as if we are adequately representing them. An inability to establish a trusting relationship makes it very hard to strategize with my clients about their cases.

> *Id.* at ¶ 7.

301.     The Missouri Defenders are not able consistently to comply with their own office's policy regarding client communication.

### F.     Missouri Defenders Have Little Time for Effective Motion Practice

302.     Matthew Gass worked for slightly more than two years as a defender in District 15, until he resigned in September 2016. He wrote: "I spent very little time writing motions, briefs, or working on discovery. I simply did not have time to do this type of work."  Gass Affidavit ¶ 6.

303.     Mr. Gass added:

> Criminal defense attorneys are often expected to file a variety of different motions in order to protect our client's rights and represent them effectively. In practice, however, I found I rarely had time to prepare and file these motions, or they were routinely generic in form when they were filed. At one litigation training I attended, I left realizing all of the things I could be doing for my clients that I simply did not have the time or resources to do.

> *Id.* at ¶ 19.

304.     In a performance review of a District 31 defender, the reviewer wrote:

> D wishes he had more time available for creative motion practice. His caseload and busy court schedule usually only allow for the doctoring of our boilerplate motions. He also only has time to prepare and submit suggestions in support when specifically requested by the judge. I noticed while doing the file reviews that the request for discovery was either filed late or not at all in several cases.

Performance Review of PD00292 (2017).

### G.     MSPD Lawyers Have Inadequate Investigation and Support Resources

305.     This Court recited the complaint that most MSPD attorneys are

> unable to analyze the discovery they receive early enough in the
> proceedings to make important investigative decisions, including
> which key witnesses to depose and whether or not an expert
> witness is necessary for the client's defense. … Even when an
> attorney determines that investigation is necessary, investigators
> often do not have time to review discovery or gather other
> background information on the cases that they do investigate.

> *Church v. Missouri*, 2017 WL 3383301, at *4.

306.     The Court added the complaint that many MSPD attorneys rarely take depositions
and MSPD attorneys rarely file suppression motions:

> Time constraints also mean attorneys are often unable to meet with
> witnesses or take other important investigatory steps to prepare
> adequately for trial or to negotiate a more favorable plea bargain.
> Many MSPD attorneys take depositions in just a small fraction of
> their cases, thus leaving on the table the valuable information that
> is likely to be gleaned from such depositions. MSPD attorneys are
> rarely able to file suppression motions because they lack the
> investigative resources to identify unconstitutional police conduct,
> the time to review pertinent discovery, and the resources and
> experience to conduct appropriate legal research. As a result,
> evidence obtained in violation of the Fourth, Fifth, and Sixth
> Amendments can be used against defendants at trial or to extract
> guilty pleas.

> *Id.* at *4 .

307.     In the MSPD FY 2012 Report at 10, the MSPD noted that a recent survey by the
Missouri Office of Prosecution Services "showed that most prosecutor's offices have 1 support
staff person for every 1 or 2 attorneys, while some have significantly more support staff than
they have attorneys, a ratio more in accordance with the practice of most private law firms."

Report available at http://www.publicdefender.mo.gov/about/FY2012AnnualReport2.pdf.

308.     Sarah Johnson testified that she would like to delegate to her legal assistant
scanning of large volumes of documents but she has to do the scanning herself because the
assistant has so much work to do for other lawyers as well.

Sarah Johnson Deposition at 178.

309.    The FY 2012 Report included the following charts that demonstrated the defenders did not have enough investigators or other support staff.

| Trial and Appellate Divisions | | | | | | 09/24/20121 |
|---|---|---|---|---|---|---|
| | Paralegal | Investigator | Legal Assistant | Secretary | Mitigation Specialist | Totals |
| Current Support Staff | 6.50 | 56.50 | 43.00 | 67.50 | 3.00 | 176.50 |
| Ratio of Support Staff to Attorney Staff of 348.50 | 1 for Every 53+ Attorneys | 1 for Every 6+ Attorneys | 1 for Every 8+ Attorneys | 1 for Every 5+ Attorneys | 1 for Every 116+ Attorneys | 2 Attorneys to Every Support Staff |
| Ratio of Support Staff To Caseload 82,575 Trial & Appellate Division Cases | 1 for Every 12,703 Cases | 1 for Every 1,461 Cases | 1 for Every 1,920 Cases | 1 for Every 1,223 Cases | 1 for Every 27,525 Cases | 1 for Every 468 Cases |

| Trial and Appellate Divisions | Investigator | Legal Assistant | Secretary |
|---|---|---|---|
| Appropriate Support Staff for 348.50 Trial Division & Appellated Division Attorneys | 116.00 | 116.00 | 116.00 |
| Current Staff | 56.50 | 43.00 | 67.50 |
| Need | 59.50 | 73.00 | 48.50 |

310.    MSPD reported that as of April 6, 2016, it had a total of 53 investigators (fewer than in 2012), 45 of whom were assigned to trial offices. Only three district offices, St. Louis City, Clayton, and Kansas City had more than two investigators. 24 trial offices had only one investigator.

311.    The defenders are not able to comply consistently with their own policy on investigation:

> Once the Public Defender has obtained information concerning the prosecution's version of the case and discussed the case with the client, the Public Defender should promptly conduct that investigation which he deems appropriate to allow for the fullest possible understanding of the facts, circumstances and merits of the case, as well as any penalty which might be imposed in the event of conviction.
>
> Guidelines for Representation, Pretrial Preparation, Investigation, Section 10-10-50-20 (11/01/92), Approval Date 11/09/2001.

312.    District 16 Team Leader Devon Pasley stated:

> Our one investigator and one legal assistant are assigned to assist 8 attorneys with all of their cases. This limits the ability to sufficiently investigate cases and prepare for trial. Attorneys are required to maintain their own files and are responsible for doing much of their own clerical work.

Affidavit of Devon Pasley.

313.    22nd District Defender Mary Fox stated that her lawyers do not fully investigate cases:

> Although our attorneys are doing the best they can with the resources they have, we are unable to consistently provide constitutionally-sufficient representation to our clients. Because of the crushing workloads handled by public defenders in District 22, attorneys have cut corners in their representation. For instance, my attorneys often do not have the time to fully investigate cases, forcing them and their clients to make strategic decisions about how to move forward (including whether to plead guilty) without a full understanding of the nature and strength of the state's case.

Fox Affidavit at ¶ 6.

314.    Assistant Public Defender Walter Stokely in Jefferson City stated that he rarely deposes witnesses.

> Missouri public defenders are allowed to depose the state's witnesses prior to trial. I would request depositions in every case if I had the resources and the time. As it stands, I'm rarely able to depose witnesses in my cases. Additionally, depositions cost money, and therefore eat into an already depleted budget.

Stokely Affidavit at ¶ 11.

315.    Assistant Defender Ruth Russell does fewer depositions than she used to and fewer than she would like. "Up until a couple of years ago, my usual practice was to depose every witness for a jury trial. Now I only have time to depose around half of the witnesses in any given case. I will do an informal interview with the rest of the witnesses." Russell Affidavit at ¶ 5.

## H.    MSPD Does Not Make Adequate Use of Expert Witnesses

316.    In my opinion, the rate of expert usage by Missouri Defenders is far too low.

317.    This Court noted this complaint in its July 24, 2017, order:

> Additionally, MSPD attorneys also frequently do not have the time to identify experts or conduct expert consultations. Even when

Boruchowitz Report Page 67

MSPD attorneys identify the need for an expert, they are often unable to secure the resources necessary to retain an appropriate expert.

*Church v. Missouri*, 2017 WL 3383301, at *4.

318.   District 22 Defender Mary Fox stated that in St. Louis, the largest city in the state,

The public defenders in District 22 seek out or retain expert witnesses in a limited number of cases. This is primarily because they are often too inexperienced to comfortably and competently utilize an expert witness to their advantage, or they are unaware of the need for an expert in a given case because they were unable to prepare a defense strategy until the eve of trial.

Fox Affidavit at ¶ 12.

319.   District 16 Defender Ruth Petsch stated:

The Jackson County office is also quite deficient in its use of expert witnesses. This is primarily because defenders, having been unable to review discovery materials in a timely manner, often do not realize the need for an expert witness until almost the eve of trial. This leaves little (if any) time for the attorneys to identify and secure an appropriate expert.

Petsch Affidavit at ¶ 11.

320.   Assistant Defender Ruth Russell reported difficulty in obtaining funds for experts:

Recently, I requested funds from the Missouri State Public Defender central office for a ballistics expert in a murder case I was handling. I anticipated that the expert would spend approximately 20 hours on the case at a rate of $200 per hour. In response to my request, I was asked why I could not simply rely on the testimony of the state's ballistics expert.

Russell Affidavit at ¶ 9.

321.   Ms. Russell also noted that delay in discovery affects her ability to obtain experts:

In my experience, there is a big problem in Missouri in obtaining timely discovery. Sometimes it does not come for months. Attorneys in my office routinely have to file motions to exclude evidence or witnesses because of delays in receiving discovery. In addition, some of the cases have a lot of discovery materials. I have a big stack of discovery that I haven't been able to go through. Due to delays and the amount of information I receive, I

Boruchowitz Report Page 68

am often unable to identify and secure expert witnesses until
rightbefore a client's trial.

*Id.* at ¶ 8.

322.    Mr. Mermelstein testified that he considers monetary resources in deciding
whether to approve expert witness requests:

> Q. Okay. And have you -- have you denied
> 5 requests that you think are reasonable and necessary
> 6 solely based on lack of monetary resources?
> 7 A. Yes.

John Mermelstein Deposition at 34.

323.    In its FY 2016 Report (at page 11), MSPD reported spending $3,721,071 on
litigation expense and conflicts, which includes expert witnesses. These "expenses include the
cost of experts, depositions, transcripts, exhibits, independent testing of evidence, etc." FY 2016
Report at 9.

324.    I do not have a breakdown of this expense total, but expert witness expenditures
clearly were less than $3,721,071 on the total caseload of 80,755 opened and 71,934 cases closed
in FY 2016. FY 2016 Report at 6.

325.    As a comparison, in 2016, the King County (Washington) Department of Public
Defense, when it assigned 5,941 new felony cases to public defenders and assigned counsel,
spent $1,962,547 on expert witnesses. This was for 2,206 requests for experts in 707 cases. The
Defenders were obtaining experts in approximately 11.9 per cent of all their felony cases. The
Department estimated that it declined 3-4% of the requests made by defenders in all program
areas. The county spent a total of $2,357,162 in all practice areas, including misdemeanor,
juvenile, and civil commitment. The expert witness expenditure for felony cases amounted to a
per capita expense of $330.33, dividing the expenditure for felony case expert witnesses by the
total number of new felony assignments.

326.    Even if Missouri spent all of its litigation expense budget on expert witnesses,
dividing that expenditure by the total number of newly opened cases would yield an average of
$46.07 per case.

327.    It is critical for defenders to be able to use expert witnesses both to challenge the
prosecution's case and to be able to present affirmative defenses. In recent years, it has become
increasingly clear that much of the forensic evidence presented by the prosecution may be
subject to effective challenge.

328.    The National Research Council published a report entitled Strengthening Forensic
Science in the United States: A Path Forward (2009), which documented that:

> in some cases, substantive information and testimony based on
> faulty forensic science analyses may have contributed to wrongful

convictions of innocent people. This fact has demonstrated the
potential danger of giving undue weight to evidence and testimony
derived from imperfect testing and analysis. Moreover, imprecise
or exaggerated expert testimony has sometimes contributed to the
admission of erroneous or misleading evidence.

A Path Forward, at p. 4. [Report is available at
https://www.nap.edu/catalog/12589/strengthening-forensic-science-in-the-united-states-a-
path-forward.]

329.    The Innocence Project has reported: "Misapplication of forensic science is the
second most common contributing factor to wrongful convictions, found in nearly half (46%) of
DNA exoneration cases." See, Innocence Project web page at
http://www.innocenceproject.org/causes/misapplication-forensic-science/.

330.    In September 2016, a report by the President's Council of Advisors on Science
and Technology indicated the importance of challenging forensic evidence with expert witnesses.

Starting in 2012, the Department of Justice (DOJ) and FBI
undertook an unprecedented review of testimony in more than
3,000 criminal cases involving microscopic hair analysis. Their
initial results, released in 2015, showed that FBI examiners had
provided scientifically invalid testimony in more than 95 percent
of cases where that testimony was used to inculpate a defendant at
trial . . . .

PCAST finds that latent fingerprint analysis is a foundationally
valid subjective methodology—albeit with a false positive rate that
is substantial and is likely to be higher than expected by many
jurors based on longstanding claims about the infallibility of
fingerprint analysis.

President's Council report at 3 and 9. There have been numerous instances of forensic
experts' misconduct, poor performance, or lack of qualifications. *See, e.g.*, Rene Stutzman and
Gail Tziperman Lotan, "More than 2,600 Orlando-area lawyers get letters warning about
fingerprint expert," Orlando Sentinel, February 6, 2017, available at
http://www.orlandosentinel.com/news/breaking-news/os-marco-palacio-fingerpring-
investigation-20170206-story.html?ct=t(DNA_Newsletter_144_28_2015); *see also* Tony
Plohetski, "2,200 convicted persons to be notified of Austin DNA lab problems", KVUE News,
February 9, 2017, available at http://www.mystatesman.com/news/200-convicted-persons-
notified-austin-dna-lab-
problems/jMMDFsc0HNNKSRU4S9sn4M/?ct=t(DNA_Newsletter_144_28_2015); Report,
*Forensic Science in Criminal Courts: Ensuring Scientific Validity of Feature-Comparison
Methods* (Sept. 2016).

331.    In an article that concluded that "forensic science is in crisis", three British
authors wrote:

Boruchowitz Report Page 70

> *De facto* deference to the weight ascribed to forensic evidence in
> the courtroom or indeed to the opinions of experts is being
> consigned to the past. Shortfalls inherent in the current system
> include operational problems related to the efficiency of the justice
> system and the way it is administered [1], the admissibility of
> expert evidence [2], reliability tests [3] and structural problems
> including the influence of the evidence tendered by experts on the
> jurors [4], the adversarial nature of the system in common law
> jurisdictions [5], the bias of legal representatives [6] and flawed
> assumptions in forensic sciences [7–10].

Eadaoin O'Brien, Niamh Nic Daeid and Sue Black, "Science in the court: pitfalls, challenges and solutions", Philos Trans R Soc Lond B Biol Sciv.370(1674) (August 5, 2015), (footnotes omitted) available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4581010/.

332.     Expert testimony about the mental health of the client, for example, could be used both to establish a defense, including the absence of an intent element, and to provide mitigation for sentencing.  It might also help to persuade a district attorney to offer a reduced charge. Failure to request an expert witness can indicate "a serious dereliction of his duty to investigate the facts and circumstances" of the client's case.  See ABA Standards for Criminal Justice 4-4.1 (4th ed. 2015) ("Defense counsel's investigative efforts should commence promptly and should explore appropriate avenues that reasonably might lead to information relevant to the merits of the matter . . . .  Counsel's investigation should also include evaluation of the prosecution's evidence (including possible re-testing or re-evaluation of physical, forensic, and expert evidence) . . . .

333.     It appears that, in most of Missouri, Defenders make little or no effort to engage mental health experts, including mitigation specialist social workers, to assist them in their cases.

334.     District 22, City of St. Louis, had only one social worker (who also was an attorney) in September 2016, in an office that in fiscal year 2016 was assigned 4,199 cases. Fox Affidavit ¶ 5, Fiscal Year 2016 Annual Report at 28.

335.     Sarah Johnson from District 22 testified that there is only one social worker in the City of St. Louis office for 27 attorneys.  She testified that all of her juvenile cases would benefit from the assistance of a social worker but she is not able to have that assistance. Sarah Johnson Deposition, October 6, 2017, at 93.

336.     Assistant defender Walter Stokely wrote:

> One of the legal assistants in our office has a master's degree in
> social work and helps clients connect with social support services.
> Because support staff cannot work more than 40 hours per week,
> however, I am forced—when I can—to pick up the slack and play
> the role of social worker in helping people get their licenses

reinstated, or find housing or addiction treatment facilities, among other things.

Stokely Affidavit ¶ 8.

I.    **MSPD Suffers From Inadequate Supervision of Its Staff**

337.    MSPD has recognized the need for effective supervision. In its Public Defender Caseload Standards document dated June 19, 2009, at 5, the Commission wrote:

> MSPD's experience has shown that effective management and supervision within a district office require an average of 1.5 hours per week of supervisor time per employee supervised. E.g., in an office of 3 attorneys and 2 support staff, the District Defender should expect to spend an average of 7.5 hours per week [5 employees x 1.5 hours] on management and supervisory responsibilities.

338. There should be one full-time lawyer supervisor with no caseload for every ten attorneys supervised. *See, e.g.*, the Washington State Bar Association Standards For Indigent Defense Services (2011):

> STANDARD TEN: Supervision
>
> Each agency or firm providing public defense services should provide one full-time supervisor for every ten staff lawyers or one half-time supervisor for every five lawyers. Supervisors should be chosen from among those lawyers in the office qualified under these guidelines to try Class A felonies. Supervisors should serve on a rotating basis, and except when supervising fewer than ten lawyers, should not carry caseloads.

http://www.wsba.org/~/media/Files/Legal%20Community/Committees_Boards_Panels/Council%20on%20Public%20Defense/Standards%20for%20Indigent%20Defense%20Services%20Approved%20by%20BOG%20as%20of%209%2022%2011.ashx.

338.    A supervisor who carries a caseload should reduce his or her caseload by the amount of time that is required for supervision.  For example, if a supervisor is supervising six attorneys, the supervisor should carry no more than 4/10 of a caseload.  National Study Commission on Defense Services Guideline 4.1 includes numerical staffing ratios, e.g., there must be one supervisor for every 10 attorneys, or one part-time supervisor for every 5 attorneys. I interpret this to mean that if there are six attorneys to be supervised, that requires a .6 FTE supervisor.

339.    Missouri Rule of Professional Conduct 4-5.1 states in part:

> (b) A lawyer having direct supervisory authority over another lawyer shall make reasonable efforts to ensure that the other lawyer conforms to the Rules of Professional Conduct.

Boruchowitz Report Page 72

(c) A lawyer shall be responsible for another lawyer's violation of the Rules of Professional Conduct if:

(1) the lawyer orders or, with knowledge of the specific conduct, ratifies the conduct involved; or
(2) the lawyer is a partner or has comparable managerial authority in the law firm in which the other lawyer practices, or has direct supervisory authority over the other lawyer, and knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action.

339. The ABA Opinion 06-441 makes clear an ethical responsibility for supervisors regarding workload:

Lawyer supervisors, including heads of public defenders' offices and those within such offices having intermediate managerial responsibilities, must make reasonable efforts to ensure that the other lawyers in the office conform to the Rules of Professional Conduct. To that end, lawyer supervisors must, working closely with the lawyers they supervise, monitor the workload of the supervised lawyers to ensure that the workloads do not exceed a level that may be competently handled by the individual lawyers.

ABA Ethics Opinion 06-441, supra.

340. MSPD and its supervisors, as detailed in this report, understand that the caseloads carried by Missouri defenders do not permit them consistently to conform to the Rules of Professional Conduct and provide competent, diligent representation to their clients and maintain adequate communication with them. While some of the supervisors have made some efforts to comply with the requirements of ABA Ethics Opinion 06-441, more could be done.

341. As outlined above, District 7 Defender Mr. Cardarella at the end of 2016 was responsible for supervising 12 attorneys, two investigators, one legal assistant, and four clerks. In my opinion, he should not have had an assigned caseload. According to the MSPD's own calculations, he should have been spending 28.5 hours per week in management and supervision, which should have reduced his caseload accordingly. Yet he had 224 open cases. There was no way he could provide either effective management and supervision or client representation with that workload.

342. Mr. Cardarella is not alone in the state in having too many cases to be able to supervise his staff. On the day of the snapshot of caseload provided by MSPD, District 32 Director Christopher Davis had 105 open cases. Spreadsheet of open cases April 4, 2016, attached to July 25, 2016 Letter to Mr. Williamson from Ms. Shipma. As of April 2016, MSPD reported that District 32 had 11 attorneys. In my opinion, a District Defender supervising 11 attorneys should have no assigned caseload.

343. District 2 Defender Kevin Locke had 141 open cases. *Id.*

344. District 26 Defender Karie Comstock had 122 open cases. *Id.* As of April 2016, MSPD reported that District 26 had seven attorneys.

345. District 37 Defender Donna Anthony had 86 open cases. *Id.* As of April 2016, MSPD reported that District 37 had four attorneys.

346. District 30 Defender Dewayne Perry had 111 open cases. *Id.* As of April 2016, MSPD reported that District 30 had seven attorneys.

347. District 22 Defender Mary Fox in September 2016 was supervising 30 attorneys and 13 support staff, yet she had six open homicide cases on her own caseload. Ms. Fox stated: "If I was not forced to maintain a docket of cases, I would be able to provide more consistent and in-depth training, mentoring, and supervision for my attorneys. Fox Affidavit ¶ 4.

348. Devon Pasley is a team leader in District 16. In addition to her managerial and administrative duties, and her supervision of seven junior attorneys, she maintains her own caseload of approximately 25 cases, "all of which involve serious felonies or other complex legal issues." She says, "I am required to maintain an active caseload because our office does not employ a sufficient number of trial attorneys to handle the number of cases to which we are assigned." Affidavit of Devon Pasley, February 7, 2017.

349. It appears that there is minimal supervision of the work of the Missouri defender attorneys and while the MSPD Guidelines outline a comprehensive approach to the practice, in reality there are minimal expectations of what the attorneys can do for their clients.

350. The State's failure to provide adequate oversight and supervision of the management of the caseload and to respond to the requests for more attorneys results in the District Defenders violating their ethical obligation to limit caseloads to what the attorneys can reasonably handle. See, RPC 4-5.1.

351. An example of the failure to provide adequate supervision is reflected in the appraisal of Mr. M, District Defender in Area 15.

352. In a December 2016 appraisal of Mr. M's work an MSPD official wrote: "Your approach to the District Defender position is not within the range of other MSPD District Defenders in that there is no identifiable focus on management responsibilities or on caseload." [The appraisal is dated December 2017 but it appears that it was written in December 2016.]

353. While recognizing that his office had a caseload at 236% of capacity, MSPD criticized Mr. M because he did "not regularly review performance" and had "few if any systems or expectations for timely identifying strengths, weaknesses, opportunities and need for intervention and change, and accountability." *Id.*

354. MSPD criticized Mr. M for not having done timely appraisals of staff who could be eligible for promotion. *Id.*

355.    MSPD wrote: "…this lack of effective leadership diminishes morale and the ability of the lawyers in the office to do their best work for clients in a collaborative, efficient, client centered environment, focusing on aggressive litigation." *Id.*

356.    MSPD noted that Director Barrett had

> let you know that if your lawyers believed they were significantly overworked, it would be an opportunity to invoke the rules on behalf of your lawyers as part of an effort to address their workload. You agreed that your lawyers were in fact overworked, that you would follow up with them about using the rules on their behalf but then you never followed up with Director Barrett.

*Id.*

357.    Noting that the District Defender had long experience in the Trial Lawyer College, MSPD criticized him because he had "no regular, structured case review with individuals or groups within the office using the skills and techniques that" he had learned over the years. *Id.*

358.    MSPD criticized the District Defender because "new lawyers are going to handle depositions on serious sex cases alone." In addition, even though he had second chaired seven jury trials in five years, he had not provided written assessments of the lawyers' work. And, "There is no identifiable system in place or expectation so that you ensure that lawyers who try cases in your office are adequately prepared and have 2nd chairs appropriate given the nature of the case and level of experience of the lawyer." *Id.*

359.    MSPD criticized the District Defender because "You do not have an identifiable plan or strategy to address some of the systemic issues in your jurisdiction and have made no effort in this area." *Id.*

360.    Apparently, the District Defender had been counseled in November 2015 and May 2016 and had made no improvements. *Id.*

361.    This appraisal of a District Defender indicates both that that district had weak supervision for a period of years and that MSPD allowed that weakness to continue.

362.    In my opinion, the lack of effective supervision in Public Defenders' Offices in Missouri violates Principle 10 of the ABA 10 Principles: "Defense counsel is supervised and systematically reviewed for quality and efficiency according to nationally and locally adopted standards." It also raises questions about the supervisors' compliance with Rule 4-5.1 of the Missouri Supreme Court's Rules of Professional Conduct.

J.    **Missouri's Public Defenders Are Unable Consistently to Meet Their Ethical Obligations**

363.    The Missouri Supreme Court has emphasized the ethical responsibilities of public defenders:

Boruchowitz Report Page 75

This Court's Rules of Professional Conduct also impose on all counsel an "ethical duty to provide effective assistance of counsel to [their] clients." *Pratte,* 298 S.W.3d at 890; *see also* Rules 4–1.1, 4–1.3, 4–1.4., 4-5.1 Counsel violates these rules if she accepts a case that results in a caseload so high that it impairs her ability to provide competent representation, to act with reasonable diligence and to keep the client reasonably informed. *See* Rules 4–1.1, 4–1.3 and 4–1.4.

*Waters, supra*, 370 S.W. 3d at 607.

364.     The Supreme Court emphasized "counsel's ethical obligation not to accept work that counsel does not believe he or she can perform competently." *Id.*

365.     The Court held that the Sixth Amendment and ethics rules require that "counsel consider whether accepting an appointment will cause counsel to violate the Sixth Amendment and ethical rules, before determining whether to accept or challenge an appointment." *Id.* at 609.

366.     The Court explained that "an attorney's acceptance of a new case violates Rule 4–1.7 if it compromises her ability to continue to provide effective assistance to her other clients." *Id.* at 607

367.     The *Waters* Court cited with approval a California case noting that "a conflict of interest is inevitably created when a public defender is compelled by his or her excessive caseload to choose between the rights of the various indigent defendants he or she is representing." *Id.* at 608 (citation omitted).

368.     The National Association for Public Defense has recognized that "Excessive workloads in public defense delivery systems are an ethical issue." NAPD Statement on the Necessity of Meaningful Workload Standards for Public Defense Delivery Systems (March 19, 2015), available at http://www.publicdefenders.us/files/NAPD_workload_statement.pdf.

369.     The American Bar Association has a formal ethics opinion that lawyers with workloads that prevent competent and diligent representation should not accept new clients.

All lawyers, including public defenders and other lawyers who, under court appointment or government contract, represent indigent persons charged with criminal offenses, must provide competent and diligent representation. If workload prevents a lawyer from providing competent and diligent representation to existing clients, she must not accept new clients. If the clients are being assigned through a court appointment system, the lawyer should request that the court not make any new appointments. Once the lawyer is representing a client, the lawyer must move to withdraw from representation if she cannot provide competent and diligent representation.

Boruchowitz Report Page 76

Formal Opinion 06-441 Ethical Obligations of Lawyers Who Represent Indigent Criminal Defendants When Excessive Caseloads Interfere With Competent and Diligent Representation, May 13, 2006, Available at https://www.americanbar.org/content/dam/aba/administrative/legal_aid_indigent_defenda nts/ls_sclaid_def_ethics_opinion_defender_caseloads_06_441.authcheckdam.pdf.

370.    Missouri defenders, as recounted above, recognize that they have too many cases but, at least until quite recently, they continue to carry them or they resign. Former defender attorney Matthew Gass wrote: "Because of the extremely high volume of cases and shortage of attorneys in District 15, I believe that we were rarely providing the type of quality representation to our clients, as a whole, that they are entitled to." Affidavit of Matthew Gass.

49. Mr. Gass added:

> I joined the public defender's office because I truly care about helping indigent defendants who cannot afford representation. The reality I found was that due to extremely high caseloads, understaffed office, and lack of resources, I was not able to provide the level of representation I believed was my duty to provide. I felt obligated to resign as a result. Since July of 2015, I am the fourth attorney from the District 15 office to resign.

Gass Affidavit ¶ 20.

371.    Missouri's public defenders are not able consistently to comply with Missouri Rule of Professional Conduct **4-1.1: COMPETENCE**:

> A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation.

372.    The Commentary to RPC 4-1.1 provides in part:

> [1] In determining whether a lawyer employs the requisite knowledge and skill in a particular matter, relevant factors include the relative complexity and specialized nature of the matter, the lawyer's general experience, the lawyer's training and experience in the field in question, the preparation and study the lawyer is able to give the matter, and whether it is feasible to refer the matter to, or associate or consult with, a lawyer of established competence in the field in question. In many instances, the required proficiency is that of a general practitioner. Expertise in a particular field of law may be required in some circumstances….

> [4] A lawyer may accept representation where the requisite level of competence can be achieved by reasonable preparation. This

applies as well to a lawyer who is appointed as counsel for an unrepresented person. See also Rule 4-6.2.

[5] Competent handling of a particular matter includes inquiry into and analysis of the factual and legal elements of the problem and use of methods and procedures meeting the standards of competent practitioners. It also includes adequate preparation. The required attention and preparation are determined in part by what is at stake; major litigation and complex transactions ordinarily require more extensive treatment than matters of lesser complexity and consequence. An agreement between the lawyer and the client regarding the scope of the representation may limit the matters for which the lawyer is responsible.

373.    Missouri's public defenders do not fully comply with Rule of Professional Conduct 4-6.2: ACCEPTING APPOINTMENTS which is referenced in the rule on competence:

[2] For good cause a lawyer may seek to decline an appointment to represent a person who cannot afford to retain counsel or whose cause is unpopular. **Good cause exists if the lawyer could not handle the matter competently, see Rule 4-1.1,** or if undertaking the representation would result in an improper conflict of interest, for example, when the client or the cause is so repugnant to the lawyer as to be likely to impair the client-lawyer relationship or the lawyer's ability to represent the client. A lawyer may also seek to decline an appointment if acceptance would be unreasonably burdensome, for example, when it would impose a financial sacrifice so great as to be unjust. [Emphasis added.]

374.    When lawyers have too many cases to be able to investigate and prepare their cases appropriately, they are not able to comply with the ethical rule on competence.

375.    Missouri's public defenders are not able consistently to comply with Missouri RULE of Professional Conduct 4-1.3: DILIGENCE, which provides: "A lawyer shall act with reasonable diligence and promptness in representing a client." The commentary provides in part:

[2] A lawyer's work load must be controlled so that each matter can be handled competently.

[3] Perhaps no professional shortcoming is more widely resented than procrastination. A client's interests often can be adversely affected by the passage of time or the change of conditions; in extreme instances, as when a lawyer overlooks a statute of limitations, the client's legal position may be destroyed. Even when the client's interests are not affected in substance, however, unreasonable delay can cause a client needless anxiety and undermine confidence in the lawyer's trustworthiness. A lawyer's

duty to act with reasonable promptness, however, does not preclude the lawyer from agreeing to a reasonable request for a postponement that will not prejudice the lawyer's client.

376. Missouri's public defenders generally do not have a controlled workload that allows them to handle each matter competently.

377. Missouri's public defenders often seek continuances of their clients' cases because they are not prepared. In many cases, these continuances adversely affect their clients and cause their clients needless anxiety and undermine confidence in the lawyer's trustworthiness.

378. On September 7, 2017, the Missouri Supreme Court heard oral arguments on a case involving bar discipline for a public defender who had, according to the chief disciplinary counsel, failed to communicate with six of his clients. As the Supreme Court summary of the case noted, "circuit courts had found Hinkebein had abandoned these clients after failing to file an amended motion for postconviction relief on the clients' behalf, despite having received extensions of time to do so." *In re: Karl William Hinkebein*, Summary Case No.SC96089, formerly available at https://www.courts.mo.gov/file.jsp?id=115188.[2]

379. The Court's summary continued:

> Evidence also was presented that Hinkebein suffers from chronic, severe health problems that detrimentally affected his performance in the time frame in question; has a strong work ethic and a high-quality work product; and was carrying a large workload with little flexibility for the office to refuse to accept cases. In its October 2016 decision, the hearing panel concluded Hinkebein failed to represent his clients diligently, violating Rule 4-1.3, and failed to keep his clients reasonably informed about the status of their cases, violating Rule 4-1.4. The panel recommended he be placed on probation for one year with certain conditions. The chief disciplinary counsel now asks this Court to suspend Hinkebein's law license with no leave to apply for reinstatement for one year; Hinkebein argues a reprimand is the appropriate sanction.

*Id.*

380. The defender attorney admitted that he violated Rule 4-1.3 in that he did not diligently represent his clients, and that he violated Rule 4-1.4(a) in that he failed to keep his clients reasonably informed about the status of their cases. Respondent's Brief (May 17, 2017), available at https://www.courts.mo.gov/file.jsp?id=115189.

381. The defender's attorney argued for him: "Respondent's violations of the diligence and communications rules are primarily attributable to his severe health problems and excessive

---

[2] I had read this summary from the Supreme Court's web page. I can no longer find it on their web page.

caseload. Both are factors outside Respondent's control. Respondent had no viable options related to his workload." *Id.* at 8.

382.     The attorney noted the defender's supervisor's testimony:

> I made a poor assumption and probably did a very poor job of deadline with that because my impression was -- or else I was turning a blind eye to his ability to continue on. Karl, out of all the people in our office, may be the last person to ask for help. He just doesn't function that way. He is dedicated and has a very good work ethic. It's just his personality. I think I made a poor assumption that he was able to keep up and he wasn't and ultimately things snowballed from there to where we realized there were several cases in trouble.

*Id.* at 9.

383.     The appellate attorney added:

> Respondent does not have the option to reject assignments, unless he has a conflict of interest. If he refused an assignment, he believes he would be fired.
>
> If Respondent had gone to the District Defender and informed him that Respondent was missing deadlines, the District Defender really would not have had any options. Individual public defenders are trapped.

*Id.* at 10 (citation omitted)

384.     The appellate attorney also argued:

> During the time frame in question, MSPD was using the Public Defender Commission Caseload Crisis Protocol as its caseload standard. During the time frame in question, MSPD was over the caseload standard 46 of the 48 months in Area 67. MSPD was taking in more cases than it believed it could handle and this was a period of very high workload.

*Id.*

385.     Appellate counsel also pointed out the extensive travel the defender had to do. *Id.*

386.     Appellate counsel emphasized the heavy caseload that the defender carried and recounted the supervisor's experience of assigning him more cases than other attorneys received.

> Respondent testified that he puts his best effort into every case, even though no one would probably know if he did less than his

best. Respondent is always looking for an edge for his clients and trying to challenge the law and raise claims to the benefit of his clients. As of the date of the hearing, Respondent's caseload was approximately 110, which was higher than anyone else in his office. The District Defender believes that he cheated on his normal approach to caseload parity regarding Respondent and assigned Respondent a heavier caseload because it included a lot of serious cases, based on Respondent's work ethic and willingness to work. Respondent typically works more hours than any other attorney in the office. From 2010 until 2014 when the cases at issue were reassigned, Respondent believes he had an unreasonable number of cases assigned to him.

*Id.* at 12 (citations omitted)

387.    The appellate attorney added: "Respondent was working far beyond what should have been expected of him in an effort to do his best to represent all of his clients, despite his health and unreasonable caseload." *Id.* at 15. The attorney concluded: "Respondent had no intent to violate the rules. Respondent was doing the best he could under impossible circumstances." *Id.* at 21

388.    This discipline case presents several problems. First, it appears that at least in part, the defender's struggle with an excessive caseload, (110 open post-conviction cases), resulted in a court finding that he had abandoned his clients, in violation of ethical rules.

389.    Second, the defender's supervisor admitted that he did not pay close enough attention to the lawyer's ability to meet his workload obligations. See RPC 4-5.1.

390.    Third, the supervisor apparently assigned the defender more cases than his colleagues were receiving.

391.    Fourth, the defender thought he would be fired if he declined to accept a case.

392.    Fifth, the defender felt trapped by his caseload situation.

393.    Sixth, it appears that MSPD and the District in question were taking on more cases than they felt they could effectively handle.

394.    This case supports the conclusion that the defenders routinely accept caseloads that they know they cannot effectively represent, that the supervision system is not effective, and that the defenders see no way to address their ethical concerns.

395.    This case also supports the conclusion that the defenders are not able to comply with their ethical responsibilities to their clients regarding diligence and communication.

396.    This case also supports the conclusions identified elsewhere in this report that the MSPD does not comply with Principles 5 (controlled workload) and 10 (supervision) of the ABA Ten Principles of a Public Defense Delivery System.

397.     This case also demonstrates MSPD's failure to follow the ABA Eight Guidelines of Public Defense Related to Excessive Workloads (2009), available at https://www.americanbar.org/content/dam/aba/administrative/legal_aid_indigent_defendants/ls_sclaid_def_eight_guidelines_of_public_defense.authcheckdam.pdf.  I will highlight several of the Guidelines here that apply to this case.

398.     Guideline 1 states: "The Public Defense Provider avoids excessive lawyer workloads and the adverse impact that such workloads have on providing quality legal representation to all clients." The Guideline then lists a series of tasks lawyers need to complete for their clients.

399.     Guideline 2 states: "The Public Defense Provider has a supervision program that continuously monitors the workloads of its lawyers to assure that all essential tasks on behalf of clients, such as those specified in Guideline 1, are performed."

400.     Guideline 3 states: "The Public Defense Provider trains its lawyers in the professional and ethical responsibilities of representing clients, including the duty of lawyers to inform appropriate persons within the Public Defense Provider program when they believe their workload is unreasonable." As it appears the defender in this case thought he would be fired if he declined a case and that bringing his workload issues to the supervisor would have led to no remedy, it appears that MSPD, prior to the Court's decision in this case, had not been training its lawyers on their duty to report unreasonable workload.

401.     Because the supervisor was not paying attention to the defender's failure to meet his obligations to his clients, MSPD was not complying with Guideline 4: "Persons in Public Defense Provider programs who have management responsibilities determine, either on their own initiative or in response to workload concerns expressed by their lawyers, whether excessive lawyer workloads are present." See also, RPC 4-5.1.

402.     The Missouri Supreme Court suspended Mr. Hinkebein indefinitely but stayed the suspension and placed him on probation for one year.  Supreme Court Order, Supreme Court No. SC96089, September 12, 2017, available at https://www.courts.mo.gov/page.jsp?id=117575.

XVIII. THE MSPD IS NOT PROVIDING EFFECTIVE REPRESENTATION TO ITS JUVENILE CLIENTS

403.     This Court noted the 2013 report by the National Juvenile Defender Center that "concluded that approximately 60 percent of court-involved children in Missouri do not receive appointed counsel."   The Court added:

> The report also noted deficiency in those cases that do include representation similar to those discussed above, specifically regarding lack of representation at detention hearings, lack of investigations, failure to file motions or challenge charges or evidence, and failure to represent clients after disposition during probation review or on appeal.

*Church v. Missouri*, 2017 WL 3383301, at *5.

404.     On July 31, 2015, the United States Department of Justice issued "Investigation of the St. Louis County Family Court St. Louis, Missouri". Available at https://sites.ed.gov/underservedyouth/files/2017/01/Report-Investigation-of-the-St-Louis-County-Family-Court.pdf

405.     The Report found that children in delinquency proceedings in St. Louis were denied their due process right to adequate representation, for a variety of reasons including the "staggering caseload of the sole public defender assigned to handle all indigent juvenile delinquency cases in St. Louis County". In addition, there was "an arbitrary system of determining eligibility for public defender representation", and significant gaps in representation between detention hearings and subsequent court appearances." *Id.* at 2.

406.     The Justice Department also found equal protection violations, finding that "Black children are subjected to harsher treatment because of their race. *Id.* at 3.

407.     The Justice Department wrote that "The MSPD continues to be stretched beyond reasonable capacity" and cited the MSPD 2012 Annual Report that stated: "We now face the situation where there are many more cases than there are lawyers to handle them." *Id.* at 9.

408.     As of the date of the Justice Department report, "there continues to be just one public defender assigned to handle all juvenile cases in St. Louis County." *Id.* at 12.  It is my understanding that in 2017 there now are two defenders to represent  juveniles, including on diversions and on possible certifications to adult court.

409.     Sarah Johnson, director of juvenile defense and policy for the MSPD and Deputy District Defender for the city of St. Louis trial office, testified that there are now two "defender type attorneys," one of whom is paid from funds outside of the MSPD budget, in St. Louis County. Deposition of Sarah Johnson, October 6, 2017, at 43.

410.     Ms. Johnson testified that some young people who are entitled to counsel are going without counsel in Missouri's juvenile courts. Id at 24.

411.     Ms. Johnson testified that for the most part the NJDC Report's conclusions "ring true" today.  Deposition at 28.

412.     This Court cited the Justice Department report on the deficiencies of the one defender's practice:

> In 2014, that lone defender handled nearly 400 juvenile cases. The DOJ further found that during the same period the public defender's office in St. Louis County appeared to engage in little investigation, resolved 277 of the cases but took only three to trial, filed just seven pretrial motions, never challenged probable cause during detention hearings, never called a defense witness other than, in one instance, the child respondent, and did not hire a single expert witness.

*Church v. Missouri*, 2017 WL 3383301, at *5 (citation omitted).

413.     According to the MSPD FY 2016 Report, statewide the defenders did not open a single juvenile appeal that year and closed only one. FY 2016 Report at 58.  The office was assigned 1,677 juvenile cases that year. FY 2016 Report at 6.

414.     The state reported 2,615 delinquency and 638 status offense cases—for a total of 3,253 juvenile cases— being filed in FY 2016. Missouri Judicial Report Supplement Fiscal Year 2016 at 161.

415.     These statistics suggest two major disturbing conclusions: 1) More than 900 children likely went unrepresented that year and 2) Almost none of the juvenile delinquency cases went to trial, as no appeals were filed.

416.     MSPD recognized the need to have a specialized approach to juvenile representation, having established Youth Advocacy Unit attorney positions in St. Louis and Kansas City. MSPD website at http://www.publicdefender.mo.gov/legal/youth_advocacy.htm (last visited August 27,2017). The Unit's attorneys, according to the web page, "participate in a variety of national training opportunities that specifically address the special issues involved in juvenile defense." One can infer that the other districts in the web page did not provide this specialized training. But "Missouri's ongoing budget crisis resulted in the elimination of the MSPD Juvenile Advocacy Units in 2007." MISSOURI: JUSTICE RATIONED, An Assessment of Access to Counsel and Quality of Juvenile Defense Representation in Delinquency Proceedings (Spring 2013), at 25, available at http://njdc.info/wp-content/uploads/2013/11/Missouri-Assessment.pdf

417.     According to the web page, the unit had "staff disposition specialists" with master's degrees in social work and counseling who "conduct social investigations and locate available resources to help the client with treatment needs." One can infer that the other districts in the state did not have these disposition specialists available.

418.     Mr. Barrett cited the findings of the 2013 National Juvenile Defender Center Report in his Fiscal Year 2018 Draft Budget Request (at 21):

> …children facing criminal or status offenses in Missouri's juvenile justice system frequently do so without the benefit of counsel or without adequate representation through all critical stages.  There are significant gaps in both access to and quality of representation provided to youth….

419.     Mr. Barrett reported that in 2012 approximately 4000 children went unrepresented in offender cases. *Id.*

420.     Mr. Barrett's 2018 draft budget sought $1,055.751 to reinstate the two juvenile units in St. Louis and Kansas City, as well as "one additional attorney in each office to represent juveniles certified to stand trial as an adult and to serve as a statewide juvenile resource attorney to assist local offices across the rest of the state." *Id.*

421.     Sarah Johnson testified about the specialized requirements of representing youth:

> Juvenile defense is an absolute specialty. It requires knowledge in adolescent brain development. It requires knowledge in specific laws. It requires knowledge in procedural rules that are different. It requires an ability to work with families to a greater extent in my opinion than in other cases. It also requires a knowledge of disposition resources and it requires an ability to work with and understand children.

Deposition of Sarah Johnson, October 6, 2017, at 18-19.

422.    There is minimal training for MSPD attorneys about juvenile practice. In the two training sessions for new attorneys, there is no juvenile specific component. *Id.*, at 50.

423.    There is an annual juvenile training session, but it is not mandatory and only a small percentage of MSPD attorneys have attended it. In 2017, 20-25 attorneys attended. *Id.*, at 52.

424.    Five MSPD attorneys have attended a juvenile immersion training program organized by Georgetown University and the National Juvenile Defender Center. *Id.*, at 53.

425.    Even though Ms. Johnson and St. Louis City defenders seek to be a model for other attorneys doing juvenile public defense in the state, Ms. Johnson is not able to do everything she thinks she needs to do on her cases. *Id.*, at 61.

426.    Ms. Johnson gave an example of what she is not always able to do for her clients because she does not have enough time or sufficient support staff:

> Q. Are there things that you would like to do in cases, but are unable to do?
> A. Yes.
> Q. And why are you unable to do things that you would like to do in other cases?
> A. Because of time constraints, because of obligations to other clients and limitation. When you are tasked with a child who is sitting in a detention center, a number of children who are sitting in a detention center, you know, you don't want them to languish.
> 12 Q. Can you give me one example of something that you can think of that goes by the wayside because of time?
> A. I was asked specifically about placement in inpatient or residential facilities.
> My ability to investigate options such as those, I'm not able to do on every single case.
> Q. Why don't you assign that task to someone else to investigate?
> A. Because they -- either the investigator or the social worker who would be doing that is also over loaded.

Sarah Johnson Deposition at 179.

Boruchowitz Report Page 85

## XIX.  CONCLUSION

427.    This Court has cited with approval the U.S. Department of Justice Statement of Interest in the New York case of *Hurrell-Harring*, the language of which applies to Missouri:

> The United States explained the cognizable obstacles to indigent defense outside of the *Strickland* context:
>
> Substantial structural limitations force even otherwise competent and well-intentioned public defenders into a position where they are, in effect, a lawyer in name only. Such limitations essentially require counsel to represent clients without being able to fulfill their basic obligations to prepare a defense, including investigating the facts of the case, interviewing witnesses, securing discovery, engaging in motions practice, identifying experts when necessary, and subjecting the evidence to adversarial testing.

*Church v. Missouri*, 2017 WL 3383301, at *19 (citing U.S. Statement of Interest, Case No. 8866–07,  Hurrell–Harring v. State, 15 N.Y.3d 8, 904 N.Y.S.2d 296, 930 N.E.2d 217, 227 (2010)).

428.    The statement of District 16's Team Leader could apply to most of the practice of Missouri defenders:

> While I am familiar with the MSPD's Guidelines for Representation and support the model of representation that they reflect, the realities of our day-to-day practice in District 16— including having to manage overwhelming workloads—make it very difficult for me and the attorneys I supervise to meet those requirements.

Affidavit of Devon Pasley, February 7, 2017.

429.    Since the recent state Supreme Court disciplinary decision in *Hinkebein,* defenders and their supervisors have begun to confront and to challenge their inability to meet their own office's standards and their ethical obligations. Until the caseloads are dramatically reduced and the support resources significantly increased, it is likely the defenders will be unable to provide consistently effective representation to their clients.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

*[signature: Robert C. Boruchowitz]*

Robert C. Boruchowitz      Seattle, Washington  October 16, 2017

**Appendix A**

**Documents Considered**

Please note that, while I consulted the following documents in drafting my expert report, in some instances I did not review the entire document. Thus, I am not representing that I am familiar with every part of every one of the following documents.

**Cases**

*Church et al. v. Missouri et al.*, 17-CV-04057-NKL, 2017 WL 3383301 (W.D. Mo. July 24, 2017).

*DePriest v. State*, 510 S.W.3d 331, 339 (Mo. 2017).

First Amended Petition for Declaratory Judgment and Injunctive Relief, CASE NO. 16AC-CC00290, Circuit Court of Cole County, available at http://www.publicdefender.mo.gov/Newsfeed/FIRST%20AMENDED%20PETITION%20FOR%20DECLARATORY%20JUDGMENT%20AND%20INJUNCTIVE%20RELIEF.pdf (last visited August 23, 2017).

*Hamilton v. State of Ala.*, 368 U.S. 52, 54, 82 S. Ct. 157, 159, 7 L. Ed. 2d 114 (1961).

*Hill v. City of St. Louis*, 371 S.W.3d 66, 81 (Mo. Ct. App. 2012).

*Hurrell–Harring v. State*, 15 N.Y.3d 8, 904 N.Y.S.2d 296, 930 N.E.2d 217, 227 (2010).

*In re: Karl William Hinkebein,* Summary Case No.SC96089, formerly available at https://www.courts.mo.gov/file.jsp?id=115188.

*In re: Karl William Hinkebein*, Respondent's Brief (May 17, 2017), available at https://www.courts.mo.gov/file.jsp?id=115189.

*Public Defender v. State*, 115 So. 3d 261, 274 (Fla. 2013).

*Rothgery v. Gillespie Cty., Tex.*, 554 U.S. 191, 194 (2008).

*State ex. Rel. Missouri Pub. Def. Comm'n v. Waters*, 370 S.W.3d 592, 607 (2012).

*Strickland v. Washington*, 466 U.S. 668, 687-89 (1984).

*United States v. Cronic*, 466 U.S. 648, 659-60 (1984).

*Wilbur v. City of Mount Vernon,* 989 F. Supp. 2d 1122, 1124 (W.D. Wash. 2013).

**Bates Stamped Documents**

| Identifier | Begin | End |
|---|---|---|
| Church, et al. v. State of Missouri et al. | 1 | 316 |

1

| Identifier | Begin | End |
| --- | --- | --- |
| Church, et al. v. State of Missouri et al. | 1508 | 1547 |
| Church, et al. v. State of Missouri et al. | 2427 | 2427 |
| Church, et al. v. State of Missouri et al. | 2478 | 2479 |
| Church, et al. v. State of Missouri et al. | 2484 | 2487 |
| Church, et al. v. State of Missouri et al. | 2488 | 2491 |
| Church, et al. v. State of Missouri et al. | 2630 | 2632 |
| Church, et al. v. State of Missouri et al. | 2637 | 2638 |
| Church, et al. v. State of Missouri et al. | 2760 | 2764 |
| Church, et al. v. State of Missouri et al. | 2883 | 2892 |
| Church, et al. v. State of Missouri et al. | 3160 | 3160 |
| Church, et al. v. State of Missouri et al. | 3162 | 3162 |
| Church, et al. v. State of Missouri et al. | 3164 | 3164 |
| Church, et al. v. State of Missouri et al. | 3165 | 3165 |
| Church, et al. v. State of Missouri et al. | 3238 | 3238 |
| Church, et al. v. State of Missouri et al. | 3239 | 3239 |
| Church, et al. v. State of Missouri et al. | 3240 | 3240 |
| Church, et al. v. State of Missouri et al. | 3243 | 3245 |
| Church, et al. v. State of Missouri et al. | 3246 | 3246 |
| Church, et al. v. State of Missouri et al. | 3247 | 3247 |
| Church, et al. v. State of Missouri et al. | 3248 | 3248 |
| Church, et al. v. State of Missouri et al. | 3249 | 3249 |
| Church, et al. v. State of Missouri et al. | 3252 | 3252 |
| Church, et al. v. State of Missouri et al. | 3253 | 3253 |
| Church, et al. v. State of Missouri et al. | 3312 | 3312 |
| Church, et al. v. State of Missouri et al. | 3354 | 3354 |
| Church, et al. v. State of Missouri et al. | 3646 | 3650 |
| Church, et al. v. State of Missouri et al. | 3655 | 3655 |
| Church, et al. v. State of Missouri et al. | 4214 | 4215 |
| Church, et al. v. State of Missouri et al. | 4216 | 4216 |
| Church, et al. v. State of Missouri et al. | 4530 | 4531 |
| Church, et al. v. State of Missouri et al. | 4546 | 4547 |
| Church, et al. v. State of Missouri et al. | 4548 | 4548 |
| Church, et al. v. State of Missouri et al. | 4555 | 4556 |
| Church, et al. v. State of Missouri et al. | 4559 | 4560 |
| Church, et al. v. State of Missouri et al. | 4566 | 4568 |
| Church, et al. v. State of Missouri et al. | 4573 | 4574 |
| Church, et al. v. State of Missouri et al. | 4851 | 4851 |
| Church, et al. v. State of Missouri et al. | 4852 | 4852 |
| Church, et al. v. State of Missouri et al. | 4863 | 4864 |
| Church, et al. v. State of Missouri et al. | 4869 | 4871 |
| Church, et al. v. State of Missouri et al. | 6304 | 6379 |
| MSPD | 52 | 86 |
| MSPD | 210 | 263 |
| MSPD | 690 | 759 |

Boruchowitz Report Appendix A

| Identifier | Begin | End |
|---|---|---|
| MSPD | 802 | 836 |
| MSPD | 920 | 984 |
| MSPD | 1005 | 1059 |
| MSPD | 1109 | 1137 |
| MSPD | 1185 | 1317 |
| MSPD | 1319 | 1403 |
| MSPD | 1780 | 1839 |
| MSPD | 1886 | 1945 |
| MSPD | 1994 | 1994 |
| MSPD | 1995 | 2059 |
| MSPD | 2083 | 2083 |
| MSPD | 2084 | 2158 |
| MSPD | 2178 | 2178 |
| MSPD | 2179 | 2179 |
| MSPD | 2180 | 2229 |
| MSPD | 2270 | 2272 |
| MSPD | 2273 | 2274 |
| MSPD | 2277 | 2278 |
| MSPD | 2301 | 2304 |
| MSPD | 2305 | 2306 |
| MSPD | 2448 | 2455 |
| MSPD | 2663 | 2834 |
| MSPD | 6006 | 6008 |
| MSPD | 6194 | 6194 |
| MSPD | 6196 | 6196 |
| MSPD | 6265 | 6266 |
| MSPD | 6330 | 6331 |
| MSPD | 6383 | 6384 |
| MSPD | 6387 | 6390 |
| MSPD | 6880 | 6883 |
| MSPD | 6951 | 6953 |
| MSPD | 12601 | 12645 |
| MSPD | 13479 | 13573 |
| MSPD | 14127 | 14127 |
| MSPD | 14150 | 14153 |
| MSPD | 14154 | 14159 |
| MSPD | 14160 | 14163 |
| MSPD | 14164 | 14167 |
| MSPD | 14168 | 14171 |
| MSPD | 14172 | 14175 |
| MSPD | 14176 | 14179 |
| MSPD | 14180 | 14183 |
| MSPD | 14184 | 14187 |
| MSPD | 14188 | 14191 |

Boruchowitz Report Appendix A

| Identifier | Begin | End |
|---|---|---|
| MSPD | 14192 | 14195 |
| MSPD | 14196 | 14199 |
| MSPD | 14200 | 14204 |
| MSPD | 14205 | 14209 |
| MSPD | 14210 | 14221 |
| MSPD | 14222 | 14225 |
| MSPD | 14228 | 14229 |
| MSPD | 14463 | 14472 |
| MSPD | 14475 | 14475 |
| MSPD | 14476 | 14485 |
| MSPD | 14487 | 14493 |
| MSPD | 14494 | 14494 |
| MSPD | 14495 | 14495 |
| MSPD | 14496 | 14496 |
| MSPD | 14497 | 14497 |
| MSPD | 14498 | 14498 |
| MSPD | 14499 | 14499 |
| MSPD | 14500 | 14500 |
| MSPD | 14501 | 14501 |
| MSPD | 14502 | 14502 |
| MSPD | 14503 | 14503 |
| MSPD | 14504 | 14504 |
| MSPD | 14508 | 14514 |
| MSPD | 14515 | 14521 |
| MSPD | 14531 | 14544 |
| MSPD | 14613 | 14657 |
| MSPD | 14689 | 14691 |
| MSPD | 14692 | 14693 |
| MSPD | 14695 | 14695 |
| MSPD | 14712 | 14712 |
| MSPD | 14723 | 14724 |
| MSPD | 14854 | 14854 |
| MSPD | 14856 | 14857 |
| MSPD | 14858 | 14859 |
| MSPD | 14860 | 14909 |
| MSPD | 15201 | 15203 |
| MSPD | 15381 | 15383 |
| MSPD | 15444 | 15507 |
| MSPD | 15695 | 15696 |
| MSPD | 15710 | 15713 |
| MSPD | 15719 | 15721 |
| MSPD | 15736 | 15738 |
| MSPD | 15739 | 15753 |
| MSPD | 15768 | 15768 |

Boruchowitz Report Appendix A

| Identifier | Begin | End |
|---|---|---|
| MSPD | 15769 | 15770 |
| MSPD | 15801 | 15806 |
| MSPD | 15807 | 15808 |
| MSPD | 15809 | 15812 |
| MSPD | 15896 | 15900 |
| MSPD | 15906 | 15906 |
| MSPD | 15915 | 15918 |
| MSPD | 15919 | 15925 |
| MSPD | 15951 | 15952 |
| MSPD | 15956 | 15957 |
| MSPD | 15974 | 15975 |
| MSPD | 15997 | 15999 |
| MSPD | 16003 | 16008 |
| MSPD | 16356 | 16357 |
| MSPD | 16387 | 16387 |
| MSPD | 16427 | 16430 |
| MSPD | 16434 | 16435 |
| MSPD | 16439 | 16457 |
| MSPD | 16462 | 16488 |
| MSPD | 16489 | 16489 |
| MSPD | 16501 | 16541 |
| MSPD | 18137 | 18155 |
| MSPD | 18156 | 18174 |
| MSPD | 18175 | 18229 |
| MSPD | 18324 | 18338 |
| MSPD | 18339 | 18361 |
| MSPD | 18362 | 18401 |
| MSPD | 19279 | 19330 |
| MSPD | 19330 | 19349 |
| MSPD | 19370 | 19390 |
| MSPD | 19391 | 19411 |
| MSPD | 19476 | 19507 |
| MSPD | 19508 | 19539 |
| MSPD | 19540 | 19579 |
| MSPD | 19580 | 19619 |
| MSPD | 19620 | 19659 |
| MSPD | 19662 | 19703 |
| MSPD | 19704 | 19760 |
| MSPD | 19761 | 19817 |
| MSPD | 19818 | 19852 |
| MSPD | 19875 | 19931 |
| MSPD | 19932 | 19990 |
| MSPD | 19991 | 20040 |
| MSPD | 20333 | 20408 |

Boruchowitz Report Appendix A

| Identifier | Begin | End |
|---|---|---|
| MSPD | 20409 | 20453 |
| MSPD | 20582 | 20616 |
| MSPD | 20688 | 20742 |
| MSPD | 20779 | 20828 |
| MSPD | 20863 | 20907 |
| MSPD | 20967 | 21016 |
| MSPD | 21078 | 21122 |
| MSPD | 21203 | 21257 |
| MSPD | 21318 | 21362 |
| MSPD | 21439 | 21483 |
| MSPD | 21557 | 21601 |
| MSPD | 21672 | 21700 |
| MSPD | 21701 | 21720 |
| MSPD | 21721 | 21727 |
| MSPD | 21728 | 21782 |
| MSPD | 21803 | 21834 |
| MSPD | 21851 | 21858 |
| MSPD | 21859 | 21866 |
| MSPD | 21867 | 21873 |
| MSPD | 21874 | 21880 |
| MSPD | 21881 | 21941 |
| MSPD | 21952 | 21957 |
| MSPD | 21958 | 21958 |
| MSPD | 21962 | 21969 |
| MSPD | 21970 | 21997 |
| MSPD | 22027 | 22034 |
| MSPD | 22039 | 22040 |
| MSPD | 22041 | 22042 |
| MSPD | 22043 | 22044 |
| MSPD | 22083 | 22084 |
| MSPD | 22088 | 22089 |
| MSPD | 22090 | 22091 |
| MSPD | 22092 | 22093 |
| MSPD | 22098 | 22102 |
| MSPD | 22103 | 22115 |
| MSPD | 22119 | 22120 |
| MSPD | 22131 | 22134 |
| MSPD | 22142 | 22191 |
| MSPD | 22220 | 22238 |
| MSPD | 22245 | 22245 |
| MSPD | 22246 | 22246 |
| MSPD | 22247 | 22247 |
| MSPD | 22248 | 22248 |
| MSPD | 22249 | 22249 |

Boruchowitz Report Appendix A

| Identifier | Begin | End |
| --- | --- | --- |
| MSPD | 22250 | 22250 |
| MSPD | 22251 | 22251 |
| MSPD | 22252 | 22252 |
| MSPD | 22253 | 22253 |
| MSPD | 22254 | 22254 |
| MSPD | 22256 | 22256 |
| MSPD | 22257 | 22257 |
| MSPD | 22258 | 22258 |
| MSPD | 22259 | 22259 |
| MSPD | 22260 | 2260 |
| MSPD | 29941 | 29942 |
| MSPD | 29943 | 29945 |
| MSPD | 29946 | 29948 |
| MSPD | 29949 | 29950 |
| MSPD | 29951 | 29953 |
| MSPD | 29954 | 29958 |
| MSPD | 29959 | 29959 |
| MSPD | 29966 | 29968 |
| MSPD | 29971 | 29973 |
| MSPD | 29979 | 29981 |
| MSPD | 29982 | 29982 |
| MSPD | 30482 | 30491 |
| MSPD | 30495 | 30496 |
| MSPD | 30533 | 30536 |
| MSPD | 32973 | 32973 |
| MSPD | 32974 | 32974 |
| MSPD | 32975 | 32975 |
| MSPD | 32981 | 32982 |

**Produced Documents**

| Control Number | File Name |
| --- | --- |
| CTRL0000000858 | 01. Code 40 Project - FY15 $700,000 Core Transfer Contracting Pilot Project.docx |
| CTRL0000000854 | 02. Code 40 Project - FY15 Partial Extension of Code 40 Contracting Project Through End of FY15.docx |
| CTRL0000000862 | 03. Code 49 Project - FY15 $500,000 Expansion of Code 49 Contracting Project Through End of FY15.docx |
| CTRL0000000857 | 05. Code 49 Project - FY16 Code 49 Project.docx |
| CTRL0000000863 | 07. Code 49 Project 2016-12-12.docx |
| CTRL0000000861 | 08. Code 49 Project 2017-01-10.docx |
| CTRL0000000860 | 09. Code 49 Project 2017-05-03.docx |
| CTRL0000000850 | 2. Facts & Figures.docx |

Boruchowitz Report Appendix A

| Control Number | File Name |
|---|---|
| CTRL0000000023 | **2007 Caseload Time Survey Summary Reports.xls** |
| CTRL0000001178 | **2015 Appraisal of_ Lowe, Craig_Redacted.pdf** |
| CTRL0000000567 | **24.035 Forms.docx** |
| CTRL0000000541 | **29.15 Forms.docx** |
| CTRL0000000093 | **Appellate_Workload_Caseload.xlsx** |
| CTRL0000000911 | **Appraisal_Promotion Process--APD III_IV.eml** |
| CTRL0000001071 | **Area 50 Intake Report Recommendations.eml** |
| CTRL0000000096 | **Assn_Conf_Workload_Caseload.xlsx** |
| CTRL0000001091.0001 | **BazellFormLetter09.28.16.docx** |
| CTRL0000000094 | **Capital_Workload_Caseload.xlsx** |
| CTRL0000000714 | **Case Investigation (TMcGlinn).ppt** |
| CTRL0000000105 | **CaseLoad Metrics Report  20140701 to 20140930.xlsx** |
| CTRL0000000108 | **CaseLoad Metrics Report  2014-10-01 to 2014-12-31.xlsx** |
| CTRL0000000107 | **CaseLoad Metrics Report  2015-01-01 TO 2015-03-31E.xlsx** |
| CTRL0000000106 | **CaseLoad Metrics Report  2015-04-01 TO 2015-06-30.xlsx** |
| CTRL0000000181 | **CaseLoad Metrics Report  2015-07-01 TO 2015-09-30.xlsx** |
| CTRL0000000180 | **CaseLoad Metrics Report  2015-10-01 TO 2015-12-31.xlsx** |
| CTRL0000000182 | **CaseLoad Metrics Report  2016-01-01 TO 2016-03-31.xlsx** |
| CTRL0000000183 | **CaseLoad Metrics Report  2016-04-01 TO 2016-06-30.xlsx** |
| CTRL0000000118 | **CaseLoad Metrics Report  2016-07-01 TO 2016-09-30.xlsx** |
| CTRL0000000117 | **CaseLoad Metrics Report  2016-10-31 TO 2016-12-31.xlsx** |
| CTRL0000000119 | **CaseLoad Metrics Report  2017-01-01 TO 2017-03-31.xlsx** |
| CTRL0000000110 | **CaseLoad Metrics Report 20140101 - 20140331.xlsx** |
| CTRL0000000112 | **CaseLoad Metrics Report 20140401 - 20140630.xlsx** |
| CTRL0000000127 | **CaseLoad Protocol Report - 3 mo detail 20080801 - 20081031.xlsx** |
| CTRL0000000126 | **CaseLoad Protocol Report - 3 mo detail 20081001 - 20081231.xlsx** |
| CTRL0000000129 | **CaseLoad Protocol Report - 3 mo detail 20091001 - 20091231.xlsx** |
| CTRL0000000115 | **CaseLoad Protocol Report - 3 mo detail 20101001 - 20101231.xlsx** |
| CTRL0000000116 | **CaseLoad Protocol Report - 3 mo detail 20110101 - 20110331.xlsx** |
| CTRL0000000113 | **CaseLoad Protocol Report - 3 mo detail 20110401 - 20110630.xlsx** |
| CTRL0000000136 | **CaseLoad Protocol Report - 3 mo detail 20120101 - 20120331.xlsx** |
| CTRL0000000121 | **CaseLoad Protocol Report 20120701 - 20120930.xlsx** |
| CTRL0000000120 | **CaseLoad Protocol Report 20121001 - 20121231.xlsx** |
| CTRL0000000123 | **CaseLoad Protocol Report 20130101 - 20130331.xlsx** |
| CTRL0000000122 | **CaseLoad Protocol Report 20130401 - 20130630.xlsx** |
| CTRL0000000111 | **CaseLoad Protocol Report 20130701 - 20130930.xlsx** |
| CTRL0000000109 | **CaseLoad Protocol Report 20131001 - 20131231.xlsx** |

Boruchowitz Report Appendix A

| Control Number | File Name |
|---|---|
| CTRL0000000177 | Cert Calc Form Ap PCR Nov 2012.xlsx |
| CTRL0000000817 | CONFLICT CODES.docx |
| CTRL0000000031 | Copy Std Calc 3.xls |
| CTRL0000000838 | Defender Management Workshop 2015 - Deputy Director's Report (Joel Elmer) - Case Contracting only.pptx |
| CTRL0000000046 | E_enbanc022205.doc |
| CTRL0000000199 | Enum_Data.xlsx |
| CTRL0000001259 | Final Report of Criminal Justice Task Force.doc |
| CTRL0000001132 | FY09 Total Costs.xlsx |
| CTRL0000001131 | FY11 Total Costs.xlsx |
| CTRL0000001129 | FY12 Total Costs.xlsx |
| CTRL0000001130 | FY13 Total Costs.xlsx |
| CTRL0000001127 | FY14 Total Costs.xlsx |
| CTRL0000001128 | FY15 Total Costs.xlsx |
| CTRL0000000851 | FY16 ClassCodes-Effective July 1, 2015.pdf |
| CTRL0000001133 | FY16 Total Costs.xlsx |
| CTRL0000000613 | Guidelines.doc |
| CTRL0000000034 | IC_Dan on the Interim Committee.doc |
| CTRL0000000526 | INDEX OF PCR ISSUES.DOC |
| CTRL0000000874.0001 | Memo E Requests 3-7-08.docx |
| CTRL0000000818 | NO CHANGES IN AUTOMATIC CONFLICT RULE as of JANUARY 1, 2014.eml |
| CTRL0000000688 | Outline for Bond Reduction.doc |
| CTRL0000000689 | Outline for Deposition.doc |
| CTRL0000000677 | Outline for Release from State Hospital.doc |
| CTRL0000001079 | Panel Attorney MOA_15-02-10.doc |
| CTRL0000001047 | Panel Attorney MOA_15-03-17.doc |
| CTRL0000001108 | Panel Attorney MOA_15-11-24.doc |
| CTRL0000001054 | Panel Attorney MOA_17-1-4.doc |
| CTRL0000001052 | Panel_Attorney_Disposition_Form-4-21-16.docx |
| CTRL0000001081 | Panel_Attorney_PCR_Outcome_Form.docx |
| CTRL0000000612 | PCR Handbook - Missouri Cases 2009.doc |
| CTRL0000001113 | PCR Outcome Form 15-03-18.docx |
| CTRL0000000948 | Re_Court usurpin__.igency determination.eml |
| CTRL0000000951 | Re_Update on application process.eml |
| CTRL0000001062 | situation in cass co.eml |
| CTRL0000001098 | Team Meeting Notes - Policy Review .eml |
| CTRL0000000022 | Time_Log_Preliminary.xlsx |
| CTRL0000000092 | Trial_Workload_Caseload.xlsx |

Boruchowitz Report Appendix A

**Depositions**

Deposition of Michael K. Barrett dated October 4, 2017 and Exhibits

Deposition of Joel R. Elmer dated October 4, 2017 and Exhibits

Deposition of J. Gregory Mermelstein dated October 4, 2017 and Exhibits

Deposition of Sarah Johnson dated October 6, 2017 and Exhibits

Deposition of Kathleen L. Lear dated October 6, 2017 and Exhibits

**Statutes**

Mo. Const. art. I, § 18(a).

Mo. Rev. Stat. § 600.062

**Professional Rules**

Missouri Rule of Professional Conduct 4-1.1

Missouri Rule of Professional Conduct 4-1.3

Missouri Rule of Professional Conduct 4-1.4

Missouri Rule of Professional Conduct 4-1.5

Missouri Rule of Professional Conduct 4-1.7

Missouri Rule of Professional Conduct 4-6.2

**Other Documents**

Affidavit of Anthony Cardarella, December 1, 2016.

Affidavit of Mary Fox, dated September 29, 2016.

Affidavit of Matthew Gass, dated October 31, 2016.

Affidavit of Anna Moench, dated December 21, 2016.

Affidavit of Devon Pasley, dated February 7, 2017.

Affidavit of Joshua Peter, dated December 21, 2016.

Affidavit of Ruth Petsch, October 3, 2016.

Affidavit of Ruth Russell, dated October 27, 2016.

Affidavit of Walter Stokely, dated October 5, 2016.

American Bar Association Study entitled "The Missouri Project: A Study of the Missouri Public Defender System and Attorney Workload Standards, dated June 2014 prepared by RubinBrown LLP.

American Bar Association Eight Guidelines of Public Defense Related to Excessive Workloads (2009), available at https://www.americanbar.org/content/dam/aba/administrative/legal_aid_indigent_defendants/ls_s claid_def_eight_guidelines_of_public_defense.authcheckdam.pdf.

American Bar Association Opinion 06-441 Ethical Obligations of Lawyers Who Represent Indigent Criminal Defendants When Excessive Caseloads Interfere With Competent and Diligent Representation, May 13, 2006, Available at https://www.americanbar.org/content/dam/aba/administrative/legal_aid_indigent_defendants/ls_s claid_def_ethics_opinion_defender_caseloads_06_441.authcheckdam.pdf.

American Council of Chief Defenders (ACCD) Statement on Caseloads and Workloads, available at http://www.oregon.gov/OPDS/docs/CBS/ACCD%20Caseloads%20Report%20Final.pdf.

Appraisal of District Defender M dated December 2017.

Barrett, Michael, "A great system of justice — for some", St. Louis Post Dispatch (September 27, 2017), available at http://www.stltoday.com/opinion/columnists/a-great-system-of-justice-for-some/article_bf2ee8c1-2814-5bab-b43c-4a784b45b2b9.html

Bock, Riley, Chair of the Public Defender Commission, Press Release, Missouri State Public Defender, (July 13, 2016) , available at http://www.publicdefender.mo.gov/Newsfeed/20160713_PDFilesLegalChallenge.html (last visited October 15, 2017).

Burdziak, Alan, "Barrett takes creative approach to public defender system", Columbia Daily Tribune (June 26, 2017), available at http://www.columbiatribune.com/news/20170626/barrett-takes-creative-approach-to-public-defender-system.

Center for Court Innovation, The Committee for Public Counsel Services Answering Gideon's Call Project (2012-DB-BX-0010) Attorney Workload Assessment, October 2014, at https://www.publiccounsel.net/cfo/wp-content/uploads/sites/8/2014/12/Attorney-Workload-Assessment.pdf.

Clay County Missouri Job Advertisement, as of August 31, 2017, at https://www.claycountymo.gov/Transparency/Salaries.

Dictionary.com Unabridged, Based on the Random House Dictionary, 2013.

Email from Boone County Presiding Judge Crane to Boone County Bar, dated September 27, 2017.

Boruchowitz Report Appendix A

Case 2:17-cv-04057-NKL   Document 151-1   Filed 02/09/18   Page 100 of 104

Email from Kathleen Lear to Tony Roberts, dated May 3, 2016.

Ford, Matt, "A 'Constitutional Crisis' in Missouri", The Atlantic (March 14, 2017), available at https://www.theatlantic.com/politics/archive/2017/03/missouri-public-defender-crisis/519444/.

Fiscal Year 2018 DRAFT Legislative Budget Request, Michael Barrett, Director, Commission Meeting, September 21, 2016.

Hauswirth, Brian, "Missouri State Public Defender requests $70 million in funding", Missourinet, February 28, 2017, available at http://www.missourinet.com/2017/02/28/missouri-state-public-defender-requests-70-million-in-funding/.

HBO VICE, "Last Line of Defense", June 30, 2017, available at http://www.hbo.com/vice/episodes/05/68-68-last-line-of-defense-and-el-rostro/index.html.

Implementing the Counsel at Arraignment Obligations in the *Hurrell-Harring v. The State of New York* Settlement, 2016 Update, available at https://www.ils.ny.gov/files/Hurrell-Harring/Counsel%20At%20Arraignment/Hurrell-Harring%20Updated%20Counsel%20At%20Arraignment%20Plan%2011016.pdf.

Letter to Boone County Attorneys from Morry Cole, President of Missouri State Bar dated October 3, 2017.

Letter to Boone County Bar Association, Boone County Bar Association Newsletter, dated October 2, 2017.

Letter to Governor Jay Nixon from the Missouri Public Defender Commission, dated April 25, 2016.

Letter to Governor Jay Nixon from MPDC Director Michael Barrett dated August 7, 2015, Letter available at http://www-old.publicdefenders.us/?q=node/862.

Letter to Governor Nixon from MPDC Director Michael Barrett dated August 2, 2016.

Letter to Governor Eric Greitens, from Michael Barrett, dated March 15, 2017, available at https://bloximages.chicago2.vip.townnews.com/joplinglobe.com/content/tncms/assets/v3/editorial/9/77/977af4d4-0b49-11e7-b700-cb06fb1ef256/58cc3cb6a2c60.pdf.pdf.

Letter from David Wallis to Circuit Judges, dated September 26, 2017.

Letter from Jacqueline Shipma to Jason Williamson dated July 25, 2016, including attachments.

Morgolies, Dan, "Many Missouri Public Defenders Decline New Cases After State Supreme Court Disciplines Lawyer", St. Louis Public Radio (October 6, 2017), available at http://news.stlpublicradio.org/post/many-missouri-public-defenders-decline-new-cases-after-state-supreme-court-disciplines-lawyer#stream/0.

Boruchowitz Report Appendix A

Moxley, Elle, "Overwhelmed Mo. Public Defender Office Appoints Governor To Handle A Case", National Public Radio (August 4, 2016), available at http://www.npr.org/2016/08/04/488722448/overwhelmed-mo-public-defender-office-appoints-governor-to-handle-a-case.

MSPD Guidelines for Representation, Trial, Section 10-10-20-60.

MSPD Youth Advocacy Unit webpage, at http://www.publicdefender.mo.gov/legal/youth_advocacy.htm (last visited August 27, 2017).

Misapplication of Forensic Science, The Innocence Project, available at web page at http://www.innocenceproject.org/causes/misapplication-forensic-science/.

MISSOURI: JUSTICE RATIONED, An Assessment of Access to Counsel and Quality of Juvenile Defense Representation in Delinquency Proceedings (Spring 2013), available at http://njdc.info/wp-content/uploads/2013/11/Missouri-Assessment.pdf

Missouri Public Defender Commission Annual Report FY 2012.

Missouri Public Defender Commission Annual Report FY 2015.

Missouri Public Defender Commission Annual Report FY 2016.

Missouri Public Defender Commission Annual Report FY 2017.

Missouri Public Defender Office, Map of Districts, http://www.publicdefender.mo.gov/about/map_of_districts.htm (last visited August 23, 2017).

Missouri Public Defender Caseload Standards, dated June 19, 2009.

Missouri Association of Prosecuting Attorneys, Job Openings at http://www.prosecutors.mo.gov/employment, as of August 19, 2017.

National Advisory Commission on Criminal Justice Standards and Goals, The Defense 1973, CrR 3.1 Standards for Indigent Defense, available at http://www.nlada.org/defender-standards/national-advisory-commission.

National Association for Public Defense, NAPD Statement on the Necessity of Meaningful Workload Standards for Public Defense Delivery Systems (March 19, 2015), available at http://www.publicdefenders.us/files/NAPD_workload_statement.pdf.

National Research Council, Strengthening Forensic Science in the United States: A Path Forward (2009), available at https://www.nap.edu/catalog/12589/strengthening-forensic-science-in-the-united-states-a-path-forward.

National Association for Law Placement ("NALP") reported in its May 2006 document, Billable Hours Requirements at Law Firms, NALP Bulletin May 2014, at http://www.nalp.org/0514research.

Boruchowitz Report Appendix A

New York State Office of Indigent Legal Services, Upstate Quality Improvement and Caseload Production, https://www.ils.ny.gov/content/upstate-quality-improvement-and-caseload-reduction.

New York State, the Administrative Rules of the Unified Court System & Uniform Rules of the Trial Courts, Rules of the Chief Administrative Judge, effective April 1, 2014, https://www.nycourts.gov/rules/chiefadmin/127.shtml.

O'Brien, Eadaoin, Niamh Nic Daeid, and Sue Black, "Science in the court: pitfalls, challenges and solutions", Philos Trans R Soc Lond B Biol Sciv.370 (1674) (August 5, 2015), (footnotes omitted) available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4581010/.

Office of Management and Budget ("OMB") Performance of Commercial Activities, OMB Cir. No. A-76 (Revised) (Aug. 1983).

Plohetski, Tony, "2,200 convicted persons to be notified of Austin DNA lab problems", KVUE News (February 9, 2017), available at http://www.mystatesman.com/news/200-convicted-persons-notified-austin-dna-lab-problems/jMMDFsc0HNNKSRU4S9sn4M/?ct=t(DNA_Newsletter_144_28_2015); Report, Forensic Science in Criminal Courts: Ensuring Scientific Validity of Feature-Comparison Methods (Sept. 2016).

Performance Review PD00292 3/2/2017.

Stutzman, Rene and Gail Tziperman Lotan, "More than 2,600 Orlando-area lawyers get letters warning about fingerprint expert," Orlando Sentinel (February 6, 2017), available at http://www.orlandosentinel.com/news/breaking-news/os-marco-palacio-fingerpring-investigation-20170206-story.html?ct=t(DNA_Newsletter_144_28_2015).

Texas A&M University, Public Policy Research Institute, Guidelines for Indigent Defense Caseloads,(2015) at 34, available at http://tidc.texas.gov/media/31722/150114_WCL-Final_Reduced-file-size.pdf.

U.S. Department of Justice, "Investigation of the St. Louis County Family Court St. Louis, Missouri" dated July 31, 2015. Available at https://sites.ed.gov/underservedyouth/files/2017/01/Report-Investigation-of-the-St-Louis-County-Family-Court.pdf

U.S. Department of Labor, Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees, 81 Fed. Reg. 32391 (May 23, 2016), available at https://www.federalregister.gov/documents/2016/05/23/2016-11754/defining-and-delimiting-the-exemptions-for-executive-administrative-professional-outside-sales-and.

University of Missouri School of Law website, http://law.missouri.edu/financialaid/.

Washington State Bar Association Standards For Indigent Defense Services (2011), http://www.wsba.org/~/media/Files/Legal%20Community/Committees_Boards_Panels/Council

%20on%20Public%20Defense/Standards%20for%20Indigent%20Defense%20Services%20Approved%20by%20BOG%20as%20of%209%2022%2011.ashx.

Washington Supreme Court Standards for Indigent Defense, Washington Court Rule 3.1, adopted October 1, 2012, available at http://www.courts.wa.gov/court_rules/?fa=court_rules.list&group=sup&set=CrR

## Pleadings

Notice of Removal from Cole County, dated April 7, 2017 (Dkt. 1)

Answer to Complaint, dated April 21, 2017 (Dkt. 17)

Motion to Dismiss Under Rule 12(b)(1) of Defendants State of Missouri and Governor Eric Greitens, dated April 21, 2017 (Dkt. 18)

Suggestions in Support of Motion to Dismiss Under Rule 12(b)(1) of Defendants State of Missouri and Governor Eric Greitens, dated April 21, 2017 (Dkt. 19)

Motion of Joinder Mo. S. Ct. Rule 52.04, dated May 1, 2017

Plaintiff's Response to Motion for Joinder, dated May 16, 2017 (Dkt. 39)

The State Defendants' Suggestions in Opposition to the Pro Se Motion for Joinder of 290 Individuals, dated May 16, 2017 (Dkt. 41)

Suggestions in Opposition to the State Defendants' Motions to Dismiss Under Rule 12(b)(1) and 12(b)(6), dated May 19, 2017 (Dkt. 44)

Order Denying Pro Se Motion for Joinder, dated May 31, 2017 (Dkt. 45)

Reply Suggestions in Support of Motion to Dismiss Under Rules 12(b)(1) and 12(b)(6) of Defendants State of Missouri and Governor Eric Greitens, dated June 2, 2017 (Dkt. 49)

Plaintiffs' Motion to Certify a Class Pursant to FRCP 23, dated June 8, 2017 (Dkt. 52)

(Corrected) Defendants State of Missouri and Governor Eric Greitens Suggestions in Opposition to Plaintiffs' Motion to Certify a Class Pursuant to FRCP 23, dated July 6, 2017 (Dkt. 63)

Plaintiffs' Supplemental Suggestions Regarding Burford Abstention, dated July 12, 2017 (Dkt. 67)

Reply Suggestions in Support of Plaintiffs' Motion to Certify a Class Pursuant to FRCP 23, dated July 20, 2017 (Dkt. 68)

Order Denying Motion to Dismiss, dated July 24, 2017 (Dkt. 69)

Notice of Appeal to the U.S. Court of Appeals for the Eight Circuit, dated August 18, 2017 (Dkt. 70)

Boruchowitz Report Appendix A