**UNITED STATES DISTRICT COURT FOR THE**
**WESTERN DISTRICT OF MISSOURI**
**CENTRAL DIVISION**

| | | |
|---|---|---|
| SHONDEL CHURCH, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 17-04057-CV-C-NKL |
| | ) | |
| STATE OF MISSOURI, et al., | ) | |
| | ) | |
| Defendants. | ) | |


**EXPERT REPORT OF RODNEY J. UPHOFF**


October 16, 2017

# TABLE OF CONTENTS

**Page**

I.  QUALIFICATIONS ....................................................................................... 1

II. ASSIGNMENT ........................................................................................... 2

III. BACKGROUND .......................................................................................... 3

A.  Structure of the Indigent Defense System in Missouri ...................... 3

B.  The obligation to provide adequate counsel ...................................... 3

C.  What constitutes competent criminal defense lawyering ..................... 4

1.  Standard 4-1.3: Continuing Duties of Defense Counsel ........................... 5

2.  Standard 4-1.8: Appropriate Workload ........................................... 5

3.  Standard 4-1.9: Diligence, Promptness and Punctuality ........................... 6

4.  Standard 4-3.1: Establishing and Maintaining An Effective Client Relationship ........................................... 6

5.  Standard 4-3.3: Interviewing the Client ........................................... 6

6.  Standard 4-3.7: Prompt and Thorough Actions to Protect the Client ........ 7

7.  Standard 4-4.1: Duty to Investigate and Engage Investigators ................. 8

8.  Standard 4-4.3: Relationship With Witnesses ............................................. 9

9.  Standard 4-4.6: Preparation for Court Proceedings, and Recording and Transmitting Information ........................................... 9

10. Standard 4-5.1: Advising the Client .................................................. 9

11. Standard 4-5.4: Consideration of Collateral Consequences ................... 10

12. Standard 4-6.2: Negotiated Disposition Discussions ............................ 10

13. Standard 4-8.3: Sentencing ..................................................... 10

IV. HISTORY OF CONSTITUTIONALLY DEFICIENT DEFENSE IN MISSOURI: ...... 11

V.  EMPIRICAL OBSERVATIONS .............................................................. 21

A.  Boone County ..................................................................... 21

B.  Cole County ........................................................................ 22

C.  Audrain County ................................................................... 23

D.  Morgan County ................................................................... 24

E.  Recent Contacts with Missouri public defenders ............................ 24

VI. CONCLUSIONS ....................................................................... 24

A.  Lack of Representation at Initial Appearances and Failure to Conduct Prompt Interviews of Detained & Released Clients ........................... 25

# TABLE OF CONTENTS
(continued)

B.     Sufficiency of Time to Communicate with and Counsel Clients ...................... 26

C.     Justice Delayed Can Be Justice Denied ................................................................. 27

D.     Completion of Necessary Investigation and Discovery Practice ...................... 28

E.     Completion of Legal Research .............................................................................. 29

F.     Pre-hearing/Pre-trial Preparation ...................................................................... 30

G.     Pre-Sentence Preparation ..................................................................................... 30

H.     Lack of Essential Supervision .............................................................................. 31

## I.    Qualifications[1]

I am the Elwood Thomas Emeritus Professor of Law at the University of Missouri School of Law, where I have taught courses in Criminal Procedure, Professional Responsibility, Trial Practice, Criminal Litigation Skills, and Wrongful Convictions since 2000. Prior to that I taught similar courses and ran a criminal defense clinic at the University of Oklahoma College of Law from 1990-2000. I also directed a criminal defense clinic at the University of Wisconsin Law School from 1984-1988.

I was a public defender from 1978-1984 in the Milwaukee office of the Wisconsin State Public Defender. I was the Chief Staff Attorney for the last three years while at the office. Together with the Director of the office, I was responsible for supervising 42 trial lawyers and 6 investigators. I carried a reduced case load so that I could provide training, second chair trials of young lawyers, and help manage the office.

In the early 1980s I became active in the National Association of Criminal Defense Lawyers and attended the National College of Criminal Defense Lawyers in Houston. I also became active in the American Bar Association ("ABA") Criminal Justice Section. Later, while teaching at Wisconsin, I served as the Vice Chair of the ABA Defense Services Committee and interacted with public defender administrators from around the country.

When I moved to Oklahoma, I became active in the Oklahoma Criminal Defense Lawyers Association. Together with Bob Ravitz, who ran the Oklahoma County Public Defender Office, we started an annual Continuing Legal Education ("CLE") which brought public defenders and defense lawyers from around the state to Norman for a 2-day conference. In 1995, I was appointed by Oklahoma Governor Frank Keating to the Indigent Defense System board. This five person board was responsible for oversight of the Oklahoma Indigent Defense System (OIDS) that provided capital trial representation and appellate representation in capital and non-capital cases in all counties except Tulsa and Oklahoma counties. In addition, the OIDS board awarded contracts to private lawyers who handled trial cases in all counties other than Tulsa and Oklahoma counties, which were served by county financed Public Defender offices. After leaving the board, I was appointed to be part of the state defense team that represented Terry Nichols, one of those accused and convicted of the 1995 bombing of the Murrah Federal Building in Oklahoma City.

Since becoming a law professor, I have written a series of articles involving criminal defense practice, ethical issues and various aspects of the criminal defense system, including the delivery of defense services. In 1995, I edited a book for the ABA entitled "Ethical Problems

---

[1] *See* Appendices A and B for a complete list of qualifications.

Case 2:17-cv-04057-NKL   Document 151-2   Filed 02/09/18   Page 4 of 36

Facing the Criminal Defense Lawyer" that included a chapter on dealing with excessive caseloads. I met with and talked often with Robert Spangenberg, the president of the Spangenberg Group, which had studied the indigent defense system in almost every state in the nation when he came to assess the indigent systems in Oklahoma and Missouri.

I have presented at numerous CLEs across the country and have taught regularly at Harvard Law School's Trial Advocacy Workshop. Since moving to Missouri, I have frequently presented at Missouri State Public Defender workshops or conferences. In September 2016, I facilitated a workshop for Missouri District Defenders and supervisors on the ethical challenges for supervisors of attorneys handling excessive caseloads. I will conduct a similar workshop in Indiana in December 2017. In my teaching, writing and CLE presentations, I frequently have addressed the ethical issues that confront criminal defense lawyers struggling to provide competent representation while juggling crushing caseloads. I am familiar with the problems at the national level and in Missouri based on my own research, reading many studies and reports on the subject of indigent defense, conversations with lawyers and public defender administrators at conferences and seminars, discussions with my students who are or have been Missouri public defenders or prosecutors, and my own court observations.

In addition, I organized a symposium on the crisis in indigent defense at the University of Missouri School of Law in February 2010. That symposium, "Broke and Broken: Can We Fix Our State Indigent Defense System," brought scholars and practitioners from across Missouri, and around the country, to Columbia in order to grapple with this issue. The problems with the Missouri State Public Defender System ("MSPD") were a focus of the discussion that day. Indeed, Cat Kelly, then Deputy Director of the Missouri State Public Defender office, presented at the symposium. She lamented the ongoing crisis facing her office and their efforts to rally support for the MSPD. I was also on the team that studied the operation of the death penalty system in Missouri on behalf of the ABA. That team produced a lengthy report in 2012 entitled "The Missouri Death Penalty Assessment Report." Finally, since 2010, I have been a member of the Missouri Supreme Court Criminal Procedure Committee.

## II.      Assignment

I have been asked to evaluate whether, on a systemic, i.e., non-individualized basis, the State of Missouri, through the MSPD, is failing to meet its constitutional obligation to provide counsel to indigent defendants.[2]  I have agreed to be compensated at the rate of $200 per hour for the work in this case, including testimony.

---

[2] *See* Appendix C for list of materials considered in forming this opinion.

### III.    Background

#### A.    Structure of the Indigent Defense System in Missouri

The MSPD is an independent department of state government that provides trial and appellate representation for indigent defendants across the state. The MSPD is overseen by the Public Defender Commission ("PDC"), whose seven members are appointed by the governor. The PDC appoints the director of the MSPD, a post currently held by Michael Barrett.

The MSPD is divided into a Trial Division, an Appellate/Post-Conviction Division and a Capital Division. The MSPD's 2016 Annual Report noted that the department employed 587 employees, 376 of whom were lawyers. These lawyers were spread across 44 district offices around the state. A District Defender heads up each of the MSPD's District Offices. The District Defenders not only must carry a caseload and generally travel between three to five counties to represent clients, he or she also must effectively manage the lawyers and staff coping with high caseloads and deal with high turnover rates. High turnover means more time spent on reassigning the cases of the departing lawyer, filling the vacant position and then training the new lawyer once the position is filled. The District Defender also must manage the assignment of conflict counsel. According to its 2016 Annual Report, the MSPD contracts with private attorneys to handle about 5% of its annual caseload. Most of these cases involve what the MSPD describes as second- and third-level conflicts. The MSPD handles first-level conflict cases by having the local office send the client that the local office cannot represent to the next nearest defender office for representation. This practice exacerbates the MSPD caseload problem by adding more cases to an already full caseload and increasing time spent traveling by MSPD lawyers.

#### B.    The obligation to provide adequate counsel

As the U.S. Supreme Court recognized in *Gideon v. Wainwright*, 372 U.S. 335, 344 (1963):  "The right of one charged with crime to counsel may not be deemed fundamental and essential to fair trials in some countries, but it is in ours. From the very beginning, our state and national constitutions and laws have laid great emphasis on procedural and substantive safeguards designed to assure fair trials before impartial tribunals in which every defendant stands equal before the law. This noble ideal cannot be realized if the poor man charged with crime has to face his accusers without a lawyer to assist him."

The 6th Amendment right to counsel does not mean merely that a defendant has a lawyer assigned or appointed to his or her case. Rather, a defendant is entitled to the effective assistance of counsel. *McMann v. Richardson*, 397 U.S. 759, 771 (1970). Although the Court in *Strickland v. Washington*, 466 U.S. 668, 688 (1984), declined to adopt any specific guidelines in assessing whether defense counsel was constitutionally deficient, it did point to the ABA

Standards for Criminal Justice, Defense Function, as guides to determine whether counsel's performance was reasonable. The Court did not want to mandate specific guidelines for fear that such guidelines might "distract counsel from the overriding mission of vigorous advocacy of the defendant's cause." *Strickland*, 466 U.S. at 688-89.

The Supreme Court of Missouri also has acknowledged that the right to counsel includes the effective assistance of counsel. *State ex rel. Missouri Public Defender Comm'n v. Waters*, 370 S.W.3d 592, 597 (Mo. 2012) (en banc). Moreover, to pass constitutional muster, effective representation requires appropriate investigation, preparation and presentation of the client's case. *Taylor v. State*, 262 S.W.3d 231, 249 (Mo. 2008) (en banc). Following *Gideon*, indigent defendants in Missouri were initially represented by unpaid court-appointed counsel. After the Missouri Supreme Court's decision in *State v. Green*, 470 S.W. 2d 571, 573 (Mo. 1971) (en banc) holding it would no longer compel Missouri attorneys to carry the burden of defending indigents, the Missouri legislature established a blended system of local public defender offices and appointed counsel. 470 S.W. 2d at 573. In 1982, in the face of funding shortfalls, the legislature enacted Section 600.011 et seq. of the Missouri code creating the Office of the State Public Defender under the control of the Public Defender Commission. MO. REV. STAT. §§ 600.11 *et seq.* (1982). The Missouri State Public Defender System was reorganized in 1989 and since then, assistant public defenders have represented the vast majority of indigent defendants in Missouri.

Unquestionably, indigent defendants, like those represented by private lawyers, are entitled to competent counsel. Public defenders are ethically held to the same standards as private lawyers in the performance of their duties. And in Missouri, as around the country, a public defender is not excused from his or her duties to provide competent representation simply because he or she is handling a high caseload. *State ex rel. Missouri Public Defender Comm'n v. Pratte*, 298 S.W, 3d 870, 880 (Mo. 2009) (en banc); In re *Karl Williams Hinkebein*, Case No. SC 96089 (Mo. Sept. 12, 2017) (order); ABA, COMM. ON ETHICS & PROF'L RESPONSIBILITY, Formal Op. 06-441 (2006); Norman Lefstein, *Securing Reasonable Caseloads: Ethics and Law in Public Defense* (2011).

### C.     What constitutes competent criminal defense lawyering

As already noted, the *Strickland* Court did not spell out exactly what steps a lawyer must take to be a vigorous advocate on behalf of a criminal defendant. Nevertheless, the ABA Criminal Justice Standards for the Defense Function (4th edition) (2005) represent the best guide to the basic duties of a criminal defense lawyer responsible for providing vigorous advocacy to a client charged with a crime. The MSPD Guidelines for Representation (1992), which specifically set forth what is expected of Missouri public defenders, largely tracks the ABA Standards. I have

included excerpts from those ABA Standards that identify the actions that any competent, conscientious criminal defense lawyer would take in defending any serious criminal case.

### 1. Standard 4-1.3: Continuing Duties of Defense Counsel

Some duties of defense counsel run throughout the period of representation, and even beyond. Defense counsel should consider the impact of these duties at all stages of a criminal prosecution and on all decisions and actions that arise in the course of performing the defense function. These duties include:

a) a duty of confidentiality regarding information relevant to the client's representation which continues after the representation ends;

b) a duty of loyalty toward the client;

c) a duty of candor toward the court and others, tempered by the duties of confidentiality and loyalty;

d) a duty to communicate and keep the client informed and advised of significant developments and potential options and outcomes;

e) a duty to be well-informed regarding the legal options and developments that can affect a client's interests during a criminal representation;

f) a duty to continually evaluate the impact that each decision or action may have at later stages, including trial, sentencing, and post-conviction review;

g) a duty to be open to possible negotiated dispositions of the matter, including the possible benefits and disadvantages of cooperating with the prosecution;

h) a duty to consider the collateral consequences of decisions and actions, including but not limited to the collateral consequences of conviction.

### 2. Standard 4-1.8: Appropriate Workload

Defense counsel should not carry a workload that, by reason of its excessive size or complexity, interferes with providing quality representation; endangers a client's interest in independent, thorough, or speedy representation; or has a significant potential to lead to the breach of professional obligations. A defense counsel whose workload prevents competent representation should not accept additional matters until the workload is reduced, and should work to ensure competent representation in counsel's existing matters. Defense counsel within a supervisory structure should notify supervisors when counsel's workload is approaching or exceeds professionally appropriate levels.

### 3. Standard 4-1.9: Diligence, Promptness and Punctuality

Defense counsel should act with diligence and promptness in representing a client, and should avoid unnecessary delay in the disposition of cases. But defense counsel should not act with such haste that quality representation is compromised. Defense counsel and publically-funded defense entities should be organized and supported with adequate staff and facilities to enable them to represent clients effectively and efficiently.

### 4. Standard 4-3.1: Establishing and Maintaining An Effective Client Relationship

a) Immediately upon appointment or retention, defense counsel should work to establish a relationship of trust and confidence with each client. Defense counsel should explain, at an appropriate time, the necessity for frank and honest discussion of all facts known to the client in order to provide an effective defense. Defense counsel should explain that the attorney-client privilege protects the confidentiality of communications with counsel except in exceptional and well-defined circumstances, and explain what the client can do to help preserve confidentiality.

b) At an early stage, counsel should discuss with the client the objectives of the representation and through what stages of a criminal matter the defense counsel will continue to represent the accused. An engagement letter as described in Standard 4-3.5 should also be provided.

c) Counsel should consider whether the client appears to have a mental impairment or other disability that could adversely affect the representation. Even if a client appears to have such a condition, this does not diminish defense counsel's obligations to the client, including maintaining a normal attorney-client relationship in so far as possible. In such an instance, defense counsel should also consider whether a mental examination or other protective measures are in the client's best interest.

d) In communicating with a client, defense counsel should use language and means that the client is able to understand, which may require special attention when the client is a minor, elderly, or suffering from a mental impairment or other disability.

e) Defense counsel should ensure that space is available and adequate for confidential client consultations.

f) Defense counsel should actively work to maintain an effective and regular relationship with all clients. The obligation to maintain an effective client relationship is not diminished by the fact that the client is in custody.

### 5. Standard 4-3.3: Interviewing the Client

a) In the initial meeting with a client, defense counsel should begin the process of establishing an effective attorney-client relationship. This includes assuring the client of

6

confidentiality, establishing trust, explaining the posture of the matter, discussing fees if applicable, and inquiring about the client's objectives for the representation. Counsel may also discuss available evidentiary materials with the client, seek information from the client as to the facts and other potential sources of information, and ask what the client's immediate objectives and needs are and how to fulfill them.

b) Counsel should interview the client as many times as necessary for effective representation, which in all but the most simple and routine cases will mean more than once. Defense counsel should make every reasonable effort to meet in person with the client. Consultation with the client regarding available options, immediately necessary decisions, and next steps, should be a part of every meeting.

c) As early as practicable in the representation, defense counsel should also discuss with the client:

    i.    evidentiary materials relevant to the matter (consistent with the terms of any applicable protective order), and, after sharing such materials with the client, determine in depth the client's view of the facts and other relevant facts known to the client;

    ii.    the likely length and course of the pending proceedings;

    iii.    potential sources of helpful information, evidence, and investigation;

    iv.    the client's wishes regarding, and the likelihood of and steps necessary to gain, release or reduction of supervisory conditions;

    v.    likely legal options such as motions, trial, and potential negotiated dispositions;

    vi.    the range of potential outcomes and alternatives, and if convicted, possible punishments;

    vii.    the possibility and potential costs and benefits of a negotiated disposition, if appropriate, including one that might include cooperation with the government; and

    viii.    relevant collateral consequences resulting from the current situation as well as from possible resolutions of the matter.

## 6.    Standard 4-3.7: Prompt and Thorough Actions to Protect the Client

a) Many important rights of a criminal client can be protected and preserved only by prompt legal action. Defense counsel should inform the client of his or her rights in the criminal process at the earliest opportunity, and timely plan and take necessary actions to vindicate such rights within the scope of the representation.

b) Defense counsel should promptly seek to obtain and review all information relevant to the criminal matter, including but not limited to requesting materials from the

7

prosecution. Defense counsel should, when relevant, take prompt steps to ensure that the government's physical evidence is preserved at least until the defense can examine or evaluate it.

c) Defense counsel should work diligently to develop, in consultation with the client, an investigative and legal defense strategy, including a theory of the case. As the matter progresses, counsel should refine or alter the theory of the case as necessary, and similarly adjust the investigative or defense strategy.

### 7. Standard 4-4.1: Duty to Investigate and Engage Investigators

a) Defense counsel has a duty to investigate in all cases, and to determine whether there is a sufficient factual basis for criminal charges.

b) The duty to investigate is not terminated by factors such as the apparent force of the prosecution's evidence, a client's alleged admissions to others of facts suggesting guilt, a client's expressed desire to plead guilty or that there should be no investigation, or statements to defense counsel supporting guilt.

c) Defense counsel's investigative efforts should commence promptly and should explore appropriate avenues that reasonably might lead to information relevant to the merits of the matter, consequences of the criminal proceedings, and potential dispositions and penalties. Although investigation will vary depending on the circumstances, it should always be shaped by what is in the client's best interests, after consultation with the client. Defense counsel's investigation of the merits of the criminal charges should include efforts to secure relevant information in the possession of the prosecution, law enforcement authorities, and others, as well as independent investigation. Counsel's investigation should also include evaluation of the prosecution's evidence (including possible re-testing or re-evaluation of physical, forensic, and expert evidence) and consideration of inconsistencies, potential avenues of impeachment of prosecution witnesses, and other possible suspects and alternative theories that the evidence may raise.

d) Defense counsel should determine whether the client's interests would be served by engaging fact investigators, forensic, accounting or other experts, or other professional witnesses such as sentencing specialists or social workers, and if so, consider, in consultation with the client, whether to engage them. Counsel should regularly re-evaluate the need for such services throughout the representation.

e) If the client lacks sufficient resources to pay for necessary investigation, counsel should seek resources from the court, the government, or donors. Application to the court should be made ex parte if appropriate to protect the client's confidentiality. Publicly funded defense offices should advocate for resources sufficient to fund such investigative expert services on a regular basis. If adequate investigative funding is not provided, counsel may advise the court that the lack of resources for investigation may render legal representation ineffective.

8

### 8.      Standard 4-4.3: Relationship With Witnesses

a)   "Witness" in this Standard means any person who has or might have information about a matter, including victims and the client.

b)   Defense counsel should know and follow the law and rules of the jurisdiction regarding victims and witnesses. In communicating with witnesses, counsel should know and abide by law and ethics rules regarding the use of deceit and engaging in communications with represented, unrepresented, and organizational persons.

c)   Defense counsel or counsel's agents should seek to interview all witnesses, including seeking to interview the victim or victims, and should not act to intimidate or unduly influence any witness.

### 9.      Standard 4-4.6: Preparation for Court Proceedings, and Recording and Transmitting Information

Defense counsel should prepare in advance for court proceedings. Adequate preparation depends on the nature of the proceeding and the time available, and will often include: reviewing available documents; considering what issues are likely to arise and the client's position regarding those issues; how best to present the issues and what solutions might be offered; relevant legal research and factual investigation; and contacting other persons who might be of assistance in addressing the anticipated issues. If defense counsel has not had adequate time to prepare and is unsure of the relevant facts or law, counsel should communicate to the court the limits of the defense counsel's knowledge or preparation.

### 10.      Standard 4-5.1: Advising the Client

a)   Defense counsel should exercise independent professional judgment when advising a client.

b)   Defense counsel should keep the client reasonably and regularly informed about the status of the case. Before significant decision-points, and at other times if requested, defense counsel should advise the client with candor concerning all aspects of the case, including an assessment of possible strategies and likely as well as possible outcomes. Such advisement should take place after counsel is as fully informed as is reasonably possible in the time available about the relevant facts and law. Counsel should act diligently and, unless time does not permit, advise the client of what more needs to be done or considered before final decisions are made.

c)   Defense counsel should promptly communicate to the client every plea offer and all significant developments, motions, and court actions or rulings, and provide advice as outlined in this Standard.

d) In rendering advice to the client, counsel should consider the client's desires and views, and may refer not only to law but also to other considerations such as moral, economic, social or political factors that may be relevant to the client's situation. Counsel should attempt to distinguish for the client between legal advice and advice based on such other considerations.

e) Defense counsel should provide the client with advice sufficiently in advance of decisions to allow the client to consider available options, and avoid unnecessarily rushing the accused into decisions.

### 11. Standard 4-5.4: Consideration of Collateral Consequences

Defense counsel should identify, and advise the client of, collateral consequences that may arise from charge, plea or conviction. Counsel should investigate consequences under applicable federal, state, and local laws, and seek assistance from others with greater knowledge in specialized areas in order to be adequately informed as to the existence and details of relevant collateral consequences. Such advice should be provided sufficiently in advance that it may be fairly considered in a decision to pursue trial, plea, or other dispositions.

### 12. Standard 4-6.2: Negotiated Disposition Discussions

a) As early as practicable, and preferably before engaging in disposition discussions with the prosecutor, defense counsel should discuss with and advise the client about possible disposition options.

b) Once discussions with the prosecutor begin, defense counsel should keep the accused advised of relevant developments. Defense counsel should promptly communicate and explain to the client any disposition proposals made by the prosecutor, while explaining that presenting the prosecution's offer does not indicate counsel's unwillingness to go to trial.

c) Defense counsel should ensure that the client understands any proposed disposition agreement, including its direct and possible collateral consequences.

d) Defense counsel should not recommend to a defendant acceptance of a disposition without appropriate investigation. Before accepting or advising a disposition, defense counsel should request that the prosecution disclose any information that tends to negate guilt, mitigates the offense or is likely to reduce punishment.

### 13. Standard 4-8.3: Sentencing

a) Early in the representation, and throughout the pendency of the case, defense counsel should consider potential issues that might affect sentencing. Defense counsel should become familiar with the client's background, applicable sentencing laws and rules, and what options might be available as well as what consequences might arise if the client is convicted. Defense counsel should be fully informed regarding available sentencing

alternatives and with community and other resources which may be of assistance in formulating a plan for meeting the client's needs. Defense counsel should also consider whether consultation with an expert specializing in sentencing options or other sentencing issues is appropriate.

b) Defense counsel's preparation before sentencing should include learning the court's practices in exercising sentencing discretion; the collateral consequences of different sentences; and the normal pattern of sentences for the offense involved, including any guidelines applicable for either sentencing and, where applicable, parole. The consequences (including reasonably foreseeable collateral consequences) of potential dispositions should be explained fully by defense counsel to the client.

## IV. History of constitutionally deficient defense in Missouri:

As the reports prepared by the Spangenberg Group in 2005 and 2009, the Senate Interim Committee in 2007, National Juvenile Defender Center in 2013, and RubinBrown in 2014 document, the MSPD has been underfunded almost from its inception. Approximately four years after the 1989 elimination of the contract system and the establishment of a statewide system of full-time defenders, The Spangenberg Group ("TSG") was asked to conduct a study of the State Public Defender System for the MSPD and the PDC, under the auspices of the ABA Bar Information Program. The 1993 study focused on the operation of the Public Defender System, the internal allocation of resources, and the overall budgeting and staffing situation compared with other states in terms of caseload and funding of statewide programs. TSG found that the MSPD was clearly underfunded compared to other state public defender programs.

The 1993 report concluded:

> [T]he increased caseload and the low salaries have led to a high turnover of staff over the last two years and several additional experienced attorneys indicated that they may also leave. The effect of the workload, the low salary and the turnover has not surprisingly resulted in morale problems in some offices. Many attorneys feel that without additional resources, they will not be able to provide competent representation to all of their clients. We echo this sentiment in very strong terms.
>
> TSG, *Report on the Operation of the Missouri State Public Defender* (1993).

In 2005, in light of rising caseloads and the continuing budget problems, the MSPD approached the Missouri Bar for assistance. The Missouri Bar urged its members across the state to sign up to accept public defender appointments on a pro bono basis because of MSPD's serious case overload. The incoming president of the Missouri Bar (and recently-retired member

of the PDC), Douglas A. Copeland, subsequently created a Public Defender Task Force to work with the PDC, the bench, and the bar to identify solutions to address the problems the MSPD faced.

The Public Defender Task Force contracted with TSG to conduct a limited assessment of the MSPD. TSG's 2005 findings were "dire," concluding that the MSPD and its lawyers were operating in a crisis mode. TSG, *Assessment of the Missouri State Public Defender System* (2005) ("2005 Report") at 2; TSG, *Assessment of the Missouri State Public Defender System* (2009) ("2009 Report") at 6. TSG stated that "in our opinion, the [MSPD] is on the verge of collapse." 2005 Report at 24. TSG also noted that the PDC had itself reported on June 10, 2005, that "the situation is already at a crisis level, with trends pointing to an impending disaster in Missouri's criminal justice system." *Id*. As a result, TSG opined that there was reason to believe that some public defender attorneys were not complying with either the Public Defender Guidelines for Representation or the Missouri Supreme Court Rules of Professional Conduct and that attorneys were failing to provide the effective assistance of counsel to their clients.

TSG's 2005 study found among other things:

a)  Staffing

TSG stated that the MSPD turnover exceeded that of any other public defender system in the country. An extremely high level of turnover among staff attorneys created serious problems. With many experienced attorneys leaving, cases were being distributed to the few remaining experienced attorneys or to new attorneys who were not yet ready for either a significant caseload or serious felony cases. The turnover problem was causing the remaining lawyers to shoulder the burden, further contributing to a sense of overload and burnout. Additionally, the turnover problem was creating a serious risk that newly-assigned attorneys would be unprepared or inexperienced.

High turnover also adversely affected supervision because most supervisors and district defenders were consumed with the burdens of their own ever-increasing caseloads. Finally, experienced lawyers were leaving the MSPD not only because of burnout and caseload pressures, but also because salaries were capped at $52,452 for all trial attorneys, which was the lowest that TSG had encountered in the country.

b)  Quality of Representation

The combination of oppressive caseloads and turnover led some public defenders to describe their practice as triage in which defenders were forced to choose between providing adequate assistance to some clients by neglecting others. TSG reported that several defenders

admitted that the volume of cases was so high that some public defenders could not provide effective assistance of counsel to many of their clients. In particular, TSG's 2005 findings reported serious problems with client contact, including lack of timely communication.

c) Funding

Despite rising caseloads, the Missouri State Public Defender had gone through several budget cycles without an increase in full-time equivalent positions. There was also a substantial lack of non-attorney support staff. TSG reported that Missouri had the lowest per capita expenditures of any statewide public defender program in the country. Missouri ranked 47th in terms of cost per capita for indigent defense.

d) Indigency Determinations

In 2005, TSG warned that public defenders were too quick to find defendants ineligible for counsel when in fact, some of these people were unable to retain counsel. TSG concluded that there were substantial problems with indigency determinations, noting in particular the presumption that a defendant was ineligible for MSPD services if the defendant had been released on a bail of $5,000 or more. TSG observed that some public defenders were finding a defendant ineligible if such a bond had been made, without regard to other factors, such as whether a small percentage of the bail was paid to a bondsmen or whether a friend or family member posted the bond but could not also afford to hire counsel for the defendant.

e) Representation in Conflict Cases

In 2005, TSG criticized MSPD's handling of conflict cases, echoing its concerns raised in 1993. Most conflict cases were referred within the MSPD to another office. TSG concluded that public defender handling of conflict cases, including co-defendants, created an appearance of a conflict in the same manner that attorneys from the same law firm handling conflict cases would create such an appearance. TSG also noted that conflict cases were taking too long to transfer from the originating office to the conflict office or for assignment to private counsel.

f) Comparison with Ten Principles of a Public Defense Delivery System

In its 2005 Report, TSG referred to the ABA's "The Ten Principles of a Public Defense Delivery System" (2002). TSG noted that these principles have been generally accepted and used

13

as guidelines to assess indigent defense systems across the country. TSG's 2005 Report concluded that the MSPD failed to meet seven of the ten principles:

i. Principle 2 – Where caseload is sufficiently high, the public defense delivery system consists of both a defender office and the active participation of the private bar.

ii. Principle 4 – Defense counsel is provided sufficient time and a confidential space with which to meet with the client.

iii. Principle 5 – Defense counsel's workload is controlled to permit the rendering of quality representation.

iv. Principle 6 – Defense counsel's ability, training, and experience match the complexity of the case.

v. Principle 7 – The same attorney continuously represents the client until completion of the case.

vi. Principle 8 – There is parity between defense counsel and the prosecution with respect to resources and defense counsel is included as an equal partner in the justice system.

vii. Principle 10 – Defense counsel is supervised and systematically reviewed for quality and efficiency according to nationally and locally adopted standards.

As a result of the efforts of the Missouri bar and the growing recognition of the MSPD problems, the Missouri Senate established an Interim Committee on the MSPD system. In 2007, following its review which included taking testimony, the Interim Committee issued a report. That report concluded:

> The Senate Interim Committee on the Public Defender System recommends that the caseloads of public defenders be reduced, support staff be increased, the number of public defenders be increased, whether through FTE or contract counsel, along with the base salary of public defenders being increased and funding being added through supplanting unconstitutional court costs and providing additional appropriations. The Committee believes that these goals can be attained using or implementing the aforementioned programs and recommendations.

> Senate Interim Committee Report at 15.

The PDC's 2007 annual report echoed the concerns expressed by the Interim Committee's report and stressed that the severity of the crisis left open only one viable option. Public defenders would have to start refusing to accept cases thereby precipitating a constitutional crisis in Missouri's courts. Then Chief Justice of the Missouri Supreme Court, Laura Denvir Stith, responded to the crisis in her 2008 State of the Judiciary Address, by urging legislative action.

The Missouri legislature did act. Senate Bill 37 was introduced which proposed to set caseload maximums and contract with private attorneys to handle cases exceeding those maximums. Although the bill passed unanimously in the Senate and with a substantial majority in the House, on July 13, 2009, Governor Nixon vetoed the bill.

The MSPD did not limit its efforts to the legislature. It sought relief in the courts as well. In November 2007, the PDC voted to adopt 18 C.S.R. § 10-4.010 ("the rule") which set out a procedure by which public defenders could refuse new cases. The rule authorized the MSPD director to declare an office of limited availability when its caseload became excessive. That determination was to be based on an office exceeding the maximum caseload standard for a period of three consecutive calendar months.

On October 6, 2008, the District Public Defender notified the presiding judge of the Thirteenth Judicial Circuit that the District 13 Office had been certified as having limited availability. The District Defender informed the court that the District 13 Office would not accept probation violation proceedings pursuant to a suspended execution of sentence until the District 13 Office was reinstated to full availability. When a public defender attempted to put this policy into practice, however, filing a written notice with the court that the public defender was unavailable to represent a defendant in a probation revocation matter, the judge refused, appointing the public defender to the case, despite the rule and the notice.

The PDC, the Director of the MSPD, and the individual public defender subsequently filed a petition for a writ of prohibition with the Court of Appeals for the Western District, seeking to restrain the trial judge from appointing the public defender to the indigent probationer's case. That case, along with two others, ultimately went to the Missouri Supreme Court. In *Pratte*, 298 S.W.3d at 877-78, the Court acknowledged that the MSPD caseload crisis continued to grow and that crisis raised the question of whether public defenders were fully meeting their ethical duties to their clients. Nonetheless, the Court found that the PDC rule relied upon to declare that an office was of limited availability denied an indigent of the right to representation contrary to Section 600.086. The court concluded that the PDC did not have the authority by rule to eliminate a category of defendants—in this case those facing a probation violation—that by statute the public defender is required to represent. In the companion case, the court did find that the trial judge lacked the authority to appoint a public defender to a case in his

private capacity when that public defender declined the case because of his office's limited availability status.

The Court in *Pratte* went on to clarify, however, that the PDC rule could be properly used to manage its caseload problems as long as the MSPD did not reject categorically a class of cases. It encouraged public defenders to work with judges and prosecutors to reduce the demand for public defender services. The court also discussed, but did not resolve, the troubling question of under what circumstances private lawyers could be conscripted to deal with the MSPD caseload problems.

In 2008, SPG was retained by the Missouri bar to again assess the MSPD. TSG, working in conjunction with the Center for Justice, Law and Society at George Mason University authored a report in 2009 assessing the MSPD. In its report, TSG referenced the ABA's Eight Guidelines of Public Defense Related to Excessive Workloads ("Eight Guidelines") issued in August 2009.[3]

In establishing these Guidelines, the ABA relied on ABA Committee on Ethics and Professional Responsibility, Formal Opinion 06-441 (2006), which addressed the obligations of indigent defenders burdened with excessive caseloads. TSG utilized these Eight Guidelines in evaluating the MSPD. Specifically, TSG stated that, "the Eight Guidelines point to a growing crisis of constitutional magnitude, which despite MSPD's longstanding, systematic efforts, has been permitted to worsen, placing indigents persons accused of crimes, victims of crime, and the larger system of criminal justice in great peril." 2009 Report at 13 (sic).

Among the major findings detailed in TSG's 2009 Report was that MSPD was facing a resource crisis after a decade of underfunding. As of 2008, based upon preliminary data from the 50 states, Missouri now had the lowest per-capita expenditures of all states, except for Mississippi. Before the staff attorney additions in July of 2009, there had been no increase in the number of full time employees for six years, though MSPD's caseload had risen by over 12,000 cases. The report highlighted the low salaries that contributed along with high caseload and bad working conditions to high turnover. For some lawyers who stayed with the MSPD, especially those with staggering law school debt, current salaries simply were not high enough to cover all expenses so some even worked second jobs.

TSG noted that in terms of excessive workloads, since 2005 the situation had become even more severe. TSG's 2009 Report describes frustrated and disgruntled public defenders who reported feeling trapped and unable to discharge the kinds of fundamental obligations described by the ABA in its Eight Guidelines because of an impossible volume of cases they were being

---

[3] *See* http://www.abanet.org/legalservices/sclaid/defender/downloads/eight_guidelines_of_public_defense.pdf.

required to handle. The report also described at length how high caseloads adversely affected the ability of public defenders to represent their clients competently.

As TSG observed in its report, the Eight Guidelines stress the importance of adequate supervision to ensure that public defenders are not overwhelmed by an excessive caseload. As the 2009 Report documented, most supervisors simply did not have the time to do the job they were being asked to do. The demands of the supervisors' own caseloads resulted in inadequate mentoring, training and supervision of the lawyers working for them.

At a symposium at the University of Missouri School of Law in February 2010, numerous speakers identified Missouri as one of the most underfunded public defender programs in the country. Speakers described the host of problems confronting underfunded public defenders grappling with excessive caseloads. In an article that I authored as the foreword to the symposium edition to the summer 2010 edition of the Missouri Law Review, I addressed the longstanding problems with MSPD. I also looked at the Missouri Supreme Court's decision in *Pratte*. I opined that the court's efforts to deal with the MSPD's caseload crisis in *Pratte* would prove unworkable and not resolve the systemic deficiencies. Uphoff, *Foreword*, 75 MO. L.REV. 667, 677 (2010).

Following the *Pratte* decision, the MSPD continued to rely on PDC Rule 18 C.S.R. 10-4.010 to cope with their caseload crisis. In January 2010, the public defender office notified 38th Circuit Presiding Judge Orr that the public defender district office assigned to represent defendants in that circuit had exceeded the maximum caseload permitted under the caseload protocol for three consecutive months and, therefore, was at risk of being certified for limited availability. In accordance with the requirements of 18 C.S.R. 10-4.010, meetings were held in March and April 2010 that included Judge Orr, local prosecutors, and personnel from both the state and district public defender's office. Those meetings failed to produce any agreement that would reduce the local office's caseload. Accordingly, the MSPD director certified the district defender's office as on limited availability as of July 1, 2010. After the district office was certified and, as permitted by 18 C.S.R. 10-4.010(2)(A), the state public defender declared the district defender office as unavailable to accept additional cases until August 2010.

On July 28, 2010, Jared Blacksher appeared for his initial arraignment before Judge Waters who, over objection, appointed "the public defender's office" to represent him. On August 2, 2010, the state public defender's office filed a motion to set aside the appointment because it violated 18 C.S.R. 10-4.010. After holding a hearing, Judge Waters stated he felt he had no choice but to appoint the public defender to represent Blacksher. The PDC, MSPD and the district defender sought relief from the Missouri Supreme Court.

In *Waters*, the Missouri Supreme Court again confronted the question of "whether the duty of public defenders to provide a defense to indigent criminal defendants as set out in section 600.042.4 requires them to accept a judge's appointment to act as counsel no matter the size of their existing caseload and their ability to provide effective representation to their existing or any additional clients and despite the mechanisms contained in 18 C.S.R. 10-4.010." 370 S.W. 3d at 605. The *Waters* Court reiterated what it had said in *Pratte* that even if the resources provided for indigent defense are inadequate, a judge nevertheless has the duty to ensure that the defendant receives the effective assistance of counsel. As the *Waters* Court stressed, "[s]imply put, a judge may not appoint counsel when the judge is aware that, for whatever reason, counsel is unable to provide effective representation to a defendant. Effective, not just pro forma, representation is required by the Missouri and federal constitutions." *Id.* at 607.

The Court also reiterated that a defender cannot ethically take on a new case if doing so will adversely affect counsel's ability to competently defend existing clients. The Court went on to recognize that 18 C.S.R. 10-4.010 was designed to aid judges, prosecutors and public defenders in ensuring that effective representation is not compromised by excessive caseloads. It noted, however, that it was not faced in this case, nor in *Pratte*, with the issue of deciding whether the PDC had the authority to promulgate a rule governing the management of its caseload or whether the protocol it adopted was valid. Because Judge Waters did not find the PDC rule invalid, he erred in ordering the public defender to disobey it and appointing the office to this case in the face of the rule. Nonetheless, the court held that trial judges have the inherent authority over their docket to work cooperatively with prosecutors and public defender and play a management role to craft solutions that avoid or limit the need to have public defender offices certified as having limited availability.

Other national groups have confirmed the serious funding deficiencies in Missouri. In the spring of 2013, the National Juvenile Defender Center ("NJDC") released a report declaring that the Missouri indigent defense system was "in crisis" after enduring years of crushing caseloads with inadequate resources to provide its services. *Missouri: Justice Rationed; An Assessment of Access to Counsel and Quality of Juvenile Defense Representation in Delinquency Proceedings*, THE NATIONAL JUVENILE DEFENSE CENTER 7 (2013). In 2014, RubinBrown issued a report on behalf of the ABA's Standing Committee on Legal Aid and Indigent Defenders. *The Missouri Project: A Study of the Missouri Public Defender System and Attorney Workload Standards*, RUBINBROWN (2014). RubinBrown assessed the MSPD workload data after the MSPD public defenders became the first defenders nationally to track time in five-minute increments. The RubinBrown report shows that MSPD lawyers were not spending the amount of time needed to perform the tasks identified as necessary to provide competent representation.

Certainly, that is the case for the sole public defender assigned to represent juvenile defendants in St. Louis County. A scathing report issued by the Department of Justice on July

31, 2015, found "substantial deficiencies in the State's system of ensuring that indigent juveniles in St. Louis County receive meaningful access to counsel." The DOJ report described the single public defender handling juvenile cases as having an excessive caseload. The DOJ concluded that the "failings reflect a system devoid of adversarial process. When no motions or appeals are filed, when no independent investigation takes place, when the actions of the police go unexamined, when all but a handful of cases result in a guilty plea to all counts and when DOJ recommended dispositions are almost always accepted without challenge, the only possible conclusion is that children in St. Louis County do not receive adequate or effective representation in delinquency proceedings, in violation of the Constitution." *Investigation of the St. Louis Family Court, St. Louis, Missouri*, U.S. DEP'T OF JUSTICE (2015).

The Missouri Legislature's reaction to the MSPD's funding crisis has been mixed in recent years. The Legislature responded to *Waters* by enacting Section 600.062, which blocked the PDC or MSPD director from declaring an office unavailable and denied public defenders the ability to refuse a case without prior court approval. Nevertheless, the Legislature has approved budget increases for the MSPD. Yet even when the Legislature has taken steps in recent years to increase funding, the governor has thwarted these efforts. In 2014, the Missouri legislature appropriated $3,472,238 to permit the MSPD to contract out all conflict cases as part of its FY2015 budget. Although Governor Nixon line item vetoed this funding, that veto was overridden and the funds were added to MSPD's core budget. However, Governor Nixon only released $500,000 of those funds during FY2015.

Shortly after the release of the DOJ report criticizing the representation of juveniles in St. Louis County, MSPD Director Michael Barrett sent a letter to Governor Nixon highlighting the MSPD's funding woes and requesting a $10 million supplemental budget. Letter from Michael Barrett, Director, MSPD, to Governor Nixon (August 7, 2015) (*see* Appendix D). Not only was no budget increase forthcoming, but in FY2016, MSPD's appropriations core was cut by $3,472,238. On August 2, 2016, Barrett made national news by appointing Governor Nixon to represent an indigent defendant in Cole County. Letter from Michael Barrett, Director, MSPD, to Governor Nixon (August 2, 2016) (*see* Appendix E). Governor Nixon successfully challenged that appointment when the trial court ruled that Barrett lacked the authority to assign a public defender case to a private lawyer.

In FY2017, $4,500,000 was added to MSPD's core budget but Governor Nixon directed that all but $1 million of those funds be withheld from the MSPD. In January 2017, Missouri's new governor, Defendant Greitens, pledged to restore an additional $2.5 million in the next budget, for a total of $3.5 million, still short of the prior year's allocation of an additional $4.5 million. As of the date of this report, Greitens has still not released the $3 million that Nixon withheld from the MSPD's FY2017 budget.

On or around September 27, 2017, David Wallis, District Defender of Trial District 13 sent an email to local judges saying that the public defenders in Boone and Cooper County would be violating ethical rules if they continued to take new cases. According to Wallis, "every attorney under our supervision is currently violating the Rules of Profession Conduct. Their current individual caseloads create a conflict of interest with existing clients because they are forced to choose effective representation of one client to the detriment of other clients." Ex. 3 to Michael Barrett's Deposition Testimony, *Church v. Missouri*, No. 17-04057-CV-C-NKL (Oct. 4, 2017) ("Barrett Deposition Testimony") (*see* Appendix I). Presiding Judge Kevin Crane responded to the Wallis email by emailing the members of the Boone County bar on September 27, 2017 and saying that the Boone county judges would be appointing private lawyers to represent indigent defendants starting that day.

Undoubtedly, Wallis wholeheartedly believes the public defenders under his supervision have caseloads that are so high that they cannot take on additional case without violating their ethical obligations to existing clients. David Wallis is not the only District Defender who has recently notified a local judge about the ethical dilemma confronting public defenders. In a story on NPR, Dan Margolies reported that other public defenders already have or are planning to notify their local judges that they cannot take on any new cases. Margolies, *Many Missouri Public Defenders Decline New Cases After State Supreme Court Disciplines Lawyer*, NPR (Oct. 6, 2017).) (*see* Appendix F). In that story, Michael Barrett is quoted as saying:

> If I was a cartoonist for a newspaper, I'd draw a public defender whose got two guns pointed at him from either side of their head: On one side, the (Office of Chief Disciplinary Counsel) and the Supreme Court saying "I dare you to take that case and I'm going to take your law license." On the other side is the local court who says, "I dare you to not take that case. And I'll hold you in contempt." That is our world right now.
>
> *Id.*

Given the dilemma facing the MSPD lawyers, Barrett sent a letter on September 11, 2017, to all MSPD lawyers reminding them that they are ethically obligated to decline cases if, because of high caseloads, they cannot competently represent their clients consistent with those ethical obligations. Ex. 2 to Barrett Deposition Testimony (*see* Appendix H). Barrett also reassured public defenders that they would not be fired for refusing a case consistent with their ethical obligations. *Id.* In the face of excessive caseloads, low salaries and the threat of disciplinary action, the turnover rate for MSPD lawyers has risen to "upwards of 25 percent." Barrett Deposition Testimony at 167:1-16 (*see* Appendix G). That, of course, will only make a bad situation even worse for MSPPD clients.

g)    Excessive Caseloads

The 2014 Delphi study conducted by RubinBrown demonstrated that with the number of lawyers employed by the MSPD, the Missouri public defenders lacked sufficient time to perform the tasks necessary to competently represent their clients given the volume of cases they are required to handle. Since that report, the number of cases has risen but the number of staff lawyers has remained virtually the same. The affidavits on file in this case reflect what the past reports in Missouri also have consistently shown. Missouri public defenders struggling with excessive caseloads operate in a triage fashion that ultimately adversely affects their clients' right to effective representation.

Not surprisingly, excessive caseloads result in defenders being underprepared for trial that not only deprives defendants of their right to a fair trial but also increases the risk of wrongful convictions. Perhaps even more significant is the fact that excessive caseloads adversely affect a public defender's ability to obtain a favorable plea bargain or a good sentence result. Finally, excessive caseloads lead to poor and limited client communication, which contributes to the pressure on neglected clients simply to plead guilty regardless of their guilt or innocence, or the strengths and weaknesses of the state's case against them.

## V.    Empirical Observations

In addition to reviewing affidavits, exhibits, and reports, I visited a small sample of courts in central Missouri to observe to what extent, if any, the MSPD caseload pressures were impacting indigent clients.

### A.    Boone County

I went to Boone County on September 7, 25, and 28, 2017. In Boone County, indigent defendants generally appear at their initial appearance without counsel. During my visits, most of the defendants who were in custody appeared on video and were not present in the courtroom. None of the defendants who appeared on video were represented by a public defender except for one defendant in a misdemeanor case whose public defender happened to be in court on several other matters. That public defender advised the court that a plea bargain had been worked out and asked that the matter be set for a pretrial date.

For those in custody facing a felony charge, no public defender was available at the initial appearance to make a bail argument. Defendants were advised to apply for a public defender and cases were adjourned for a week to two weeks for a status conference. In many instances, the judge ordered a bond investigation but the unrepresented defendants had no opportunity to request a personal recognizance bond or argue for lower bail. Indeed, the judge cut off one defendant trying to explain that his arrest on a warrant was a mistake and told him he could

21

explain things once he had counsel. His case, however, was continued for twenty-two days until the next court appearance. Another defendant, appearing without counsel, asked the court for a recognizance bond which was summarily denied.

Several defendants in custody on misdemeanors were advised that the prosecutor was willing to offer a fine with credit for time served to satisfy the fine and court costs if the defendant was willing to plead guilty. As with misdemeanor defendants who appeared in person for their initial appearance, the judge announced to all defendants that if the prosecutor was waiving jail, they would be ineligible for public defender services. Those defendants who did not want to plead guilty, or those defendants for whom the prosecutor was unwilling to waive jail were told to go to the public defender to apply if they lacked funds to hire counsel. Several indicated that they had already been to the public defender office but had not heard anything about their application. These defendants were given a status date several weeks later and urged to again follow up with the public defender office.

Most of the defendants in custody as well as those who had bonded out and walked into court, accepted the prosecutor's offer of no jail time and entered a guilty plea. Others who had posted bond and showed up for their initial appearance in felony cases were advised to apply for the public defender and report back one month later. Several defendants who appeared reported that they had gone to the public defender after their initial appearance but were deemed ineligible for a public defender. These defendants were told to seek private counsel and given another status date a month later. For defendants with jobs, multiple court appearances not only cost the defendant money, but also may threaten the defendant's employment.

During my visits, I observed several public defenders speaking to their clients in the spectators' gallery and in the jury box where defendants in custody were seated waiting for their case to be called. These communications were not in a confidential setting. Rather, others were sitting close and clearly within earshot of these attorney-client communications.

### B.    Cole County

I visited Jefferson City on September 29, 2017, to observe the proceedings that morning. I also spoke to the presiding judge after the morning session. The judge, who had been on the bench for over twenty years, stated he had noted a significant difference in his court in the last 2 or 3 years with respect to the availability of public defenders. He said public defenders used to appear at initial appearances but no longer do so unless they are already representing a defendant on another matter. He also indicated that Cole County created a pretrial release program because of the significant lag time between initial appearance and the appointment of a public defender.

22

I also spoke with the judge's bailiff who stated they have video arraignments for those in custody. The public defenders do not appear with such defendants so the cases are set over for a week for appointment of counsel. The bailiff said it was usually two or three weeks before a public defender was actually appointed for those in custody.

As in Boone County, those who had posted bond and were appearing for their initial appearance were told to apply for a public defender and given a date of November 3 to report back. Both the bailiff and the prosecutor, Tristin Estep, indicated that the public defenders do not appear at initial appearance with defendants who have posted bond. They stated it usually takes 30 to 60 days before a public defender is appointed because the office is so "backed up."

During my visit, one defendant complained he had applied for a public defender while in jail but had heard nothing. The judge advised him to go back to the public defender's office. In addition, as in Boone County, after the prosecutor waived jail time, many misdemeanor defendants plead guilty in exchange for a sentence of time served or a fine.

### C.    Audrain County

Audrain County Courthouse is located in Mexico, a small city of about 12,000 people about forty-four miles from Columbia. I observed court there on the morning of September 12, 2017. Unlike in Boone or Cole County, indigent defendants do sometimes appear at initial appearances with public defenders if they have completed an application and been found indigent. A paralegal from the public defender office was in court during my visit and assisted the public defender in interviewing defendants in custody in the jury box. As in Boone County, these attorney-client communications were not confidential in that other defendants were seated nearby. The public defender and paralegal also interviewed defendants who walked in and requested counsel. Again, those conversations were conducted amid other people in the audience. Nonetheless, unlike Boone County, I witnessed public defenders in some cases make bail arguments at initial appearances.

Assistant Prosecutor Scott Fox confirmed that public defenders frequently argued for lower bail or a recognizance bond at initial appearances except on those cases where he would object because the victim in the case had not been given appropriate notice. As in Boone and Cole County, several defendants who walked in after posting bond were referred to the public defender office and given a new status date over a month away. One defendant informed the judge that he had been to the public defender and was advised he did not qualify because of his disability income.  When the defendant told the court he had no money to have counsel, his case was set for an indigency hearing.

23

### D.    Morgan County

On October 3, 2017, I went to Versailles to observe the Morgan County Court. However, there were not any arraignments that day nor were any scheduled that week. I spoke with the court clerk Pat Wasdyke, who said they usually set all of the public defender cases on Wednesdays. After a defendant is arrested, the defendant is given a public defender application. If the defendant qualifies, then a public defender will appear with the defendant at the initial appearance.

Wasdyke noted that if the defendant posts high bond, then that defendant will likely lose his or her public defender. If a person bonds out and walks in for an initial appearance, that defendant is given a public defender application, asked to fill it out, and then her office faxes the completed application to the public defender office. The defendant is then given a court date several weeks away for a status conference.

### E.    Recent Contacts with Missouri public defenders

As already noted, I met with the MSPD district defenders and office supervisors in September 2016 at a training focused on the ethical challenges public defenders supervisors face when they and their lawyers struggle with excessive caseloads. The supervising public defenders to a person complained that the lawyers they were supervising did not have enough time to perform consistent with what is required by the MSPD Guidelines for Representation and thereby provide competent representation to all or even most of their clients. The supervisors were especially worried for the younger, inexperienced lawyers in their office who were ill equipped to deal with the crush of cases they were being asked to handle.

I also conducted phone interviews within the past month with Josh Peter, Matt Gass, and Patrick Kutz, three lawyers who left the public defender office within the past year. Both Gass and Peter also submitted affidavits on file in this case. I spoke to all three of them about their experiences with the MSPD, their observation about their fellow public defenders, and the extent to which their high caseloads affected their ability to effectively represent their clients.

While in the past, I have talked with many public defenders about their work and I would have liked to speak to current PDs, I was unable to do so given the pending litigation.

## VI.    Conclusions

Based on conversations at the District Defenders workshop in September 2016, the affidavits and reports on file in this case, my observation during my court visits, frequent conversations with Missouri public defenders over the years including Kutz, Peter and Gass, and

my own professional experiences, I conclude that: Missouri public defenders are handling too many cases leaving defenders insufficient time or the resources to do all of the tasks needed to adequately defend their clients. The reoccurring problems caused by excessive caseloads are as follows:

### A. Lack of Representation at Initial Appearances and Failure to Conduct Prompt Interviews of Detained & Released Clients

Although the MSPD Guidelines and the ABA Standards discuss the role of the defender at the initial appearance in felony cases, it appears that many Missouri defendants are unrepresented at this critical stage of a criminal case. Not only are defenders not available to argue for a client's release on a personal recognizance bond, but there often is a serious delay before public defenders ever meet their clients. This leads to unnecessary jail time for clients who might have been released if the court were presented with information justifying a personal recognizance bond or at least a lower bond. In Lafayette County, Matt Gass stated that his excessive caseload backed up the system to the point that the local jail in Lexington was filled and some of his clients had to be shipped to Saline and Johnson County. That only exacerbated Gass's time problems because he was the only attorney in Lafayette County and then had to travel over an hour to these adjoining counties to visit his clients.

In many counties in Missouri, public defender caseloads prevent those public defenders from seeing defendants within ten days of their initial appearance. Rather, as the affidavits, my court visits and my conversations with Peter, Kutz and Gass reflect, there is often a significant lag time between arrest and when counsel is able to schedule and advocate for a defendant's release on bail. As a result of this delay, defendants and their families may suffer severe consequences—loss of job, loss of transportation, eviction. This is especially troubling for those who have been wrongfully arrested—on a stale or recalled warrant for example.

In addition, the long lag time between a defendant's initial appearance and the appointment of counsel, coupled with a failure to conduct prompt interviews of defendants in custody, contributes to cases of unnecessary incarceration for Missouri citizens arrested or being held wrongfully. Stories in the Saint Louis Post-Dispatch, *see, e.g.*, Robert Patrick & Jennifer S. Mann, *Jailed by Mistake*, St Louis Post-Dispatch (Oct. 26, 2013) (*see* Appendix J), have documented many such cases and Patrick Kutz confirmed this problem. The TSG 2009 Report also discussed this problem.

The failure to do timely first interviews also means that investigations are often delayed weeks and or even months before being initiated. Such a delay often can negatively affect the attorney- client relationship. Both clients in custody, as well those who have been released on bond may be adversely affected if counsel waits weeks to start any investigation. Indeed, a

delayed investigation ultimately may compromise counsel's ability to successfully defend the case. The award winning documentary "Murder on a Sunday Morning" recounts the true story of two Jacksonville, Florida public defenders successfully winning an acquittal of a 15-year-old defendant charged with murder. One of the key factors for the defense was that a defense investigator was able to take photos of the young defendant's facial bruising right after the initial appearance, which corroborated the defendant's claim that his confession was beaten out of him. It is highly unlikely those photos would ever have been taken by a Missouri public defender.

Peter, Gass, Kutz and other Missouri public defenders spoke to the common experience of those lawyers who have to cope with excessive caseloads: the need to deal with the press of the cases on the docket that day so that the needs of other clients, especially the newest clients are put off. Inevitably, that means that investigations are virtually always launched after a significant delay. In turn, that means witnesses never located, critical surveillance tapes taped over, and important evidence never discovered.

### B.    Sufficiency of Time to Communicate with and Counsel Clients

Central to meaningful representation in criminal case is establishing a good attorney-client relationship built on trust. It is difficult to build that trust when the client is already frustrated waiting weeks before first seeing his or her public defender. A thorough initial interview is critical to launching a timely, effective case investigation but such thorough interviews cannot be done if counsel has too many cases and feels pressured to do a rushed interview. Moreover, even if one starts out with a good relationship, that trust will be quickly eroded if the defender is tied up in so many cases he or she cannot continue to keep the client informed of case developments. The TSG reports mirror what is reported in the affidavits and in my conversations with public defenders. Excessive caseloads severely limit time needed to build and maintain good lines of communication with so many clients.

A public defender intern laughed in my law school criminal litigation skills course when I demonstrated how to conduct a meaningful initial interview. He said he had seen many of the public defenders in the Columbia trial office interview clients and none had spent more than a fraction of the time I spent or covered the areas covered in my interview. Again, the TSG reports and my conversations with public defenders reveal that Missouri public defenders often put client communication on the back burner as they struggle to deal with day-to-day problems. Many Missouri public defenders reported an inability to follow through on office policies requiring  seeing clients at least once every 30 to 60 days depending on whether the client was in custody or not. Moreover, when defenders finally see their clients after long periods of no contact, they often face angry clients who have little confidence in their defenders and do not trust the recommendations they make.

26

Communication issues are compounded by the high turnover in the public defender office and by the fact that the public defender conflict procedures, at least up until July 1, 2017, require travel to adjoining counties. Clients get frustrated telling their stories to a second and sometimes third public defender. That leads to more requests for continuances, as the new lawyer needs time to catch up on that case while trying to do so in a host of other cases as well. This shuffling of cases often further delays case investigation and complicates client communication, but also it increases the pressure on defendants to simply plead guilty to get the case over. Thus, poor client communication can interfere with a client's right to effective assistance of counsel in many ways. Defendants may not learn of plea offers in a timely manner. *See Missouri v. Frye*, 566 U.S. 134, 145-46 (2012). Rushed discussion of plea deals often will not include any discussion of the collateral consequences of the pleading guilty. Perhaps most importantly, poor communication and limited contact can cause innocent defendants to accept guilty pleas because they have no confidence in their lawyer's ability or will to defend them. It also can affect a client's sense that he or she was fairly treated by the system.

### C.     Justice Delayed Can Be Justice Denied

In its 2009 Report, TSG noted that defendants were filing pro se motions in order to ensure that their speedy trial rights were not jeopardized by the problems with public defender representation. TSG noted that in *State ex rel. McKee v. Riley*, a defendant charged with several counts of tampering with motor vehicles was detained for approximately a year and a half, with his case continued five times. 240 S.W.3d 720, 730 (Mo. 2007). Though he was represented by the public defender, he repeatedly filed speedy trial motions, pro se, as his case was continued time after time. The Supreme Court directed the trial court to immediately convene a hearing to determine whether the defendant's speedy trial rights had been violated, observing that:

> In considering how to weigh any delay caused by crowded dockets, this Court and Respondents must take into consideration that the delay in this case is not unique. Numerous other petitions for writs have been filed in this Court by persons incarcerated while awaiting disposition of their charges in this and on some occasions in other jurisdictions, similarly alleging lengthy delays. The right to a speedy trial is an important right that the courts of this state are duty-bound to honor, even in the face of heavy trial dockets and competing demands for trial. Protracted and unreasonable delays in criminal cases due to crowded dockets cannot become routine. Neither is it acceptable for the prosecuting attorney and defense counsel to accept or request such routine continuances without objection. The defendant's right to a speedy trial and the public's interest in timely resolution of criminal cases demands that this and other similar cases receive more expeditious treatment, even in the face of competing demands on counsels' and the court's time.

27

> This Court does not mean to suggest that any party to this proceeding has intended to violate any defendant's speedy trial rights, but—unreasonable delay in run-of-the-mill criminal cases cannot be justified by simply asserting that the public resources provided by the State's criminal-justice system are limited and that each case must await its turn. [The defendant] is entitled to a prompt hearing on his claim that his constitutional rights have been violated and, if they have not yet been, then he is entitled to a prompt trial on the merits of these charges.

> *Id.* at 731-32 (citations omitted).

The affidavits, depositions, and other exhibits on file in this case show that excessive caseloads and high turnover continue to plague the MSPD and the criminal justice system. As Patrick Kutz and Matt Gass described to me in our phone interviews, the number of cases to be handled required constant triaging. Trying to pull everything together for a trial in one case meant putting virtually every other case on hold. Admittedly, that tension exists to some degree in every public defender office in the country. However, the problem is exacerbated in a program like the MSPD where excessive caseloads compromise the ability of defenders to provide many of their clients with constitutionally adequate representation. Indeed, the sheer volume of cases inevitably leads to long delays before one's public defender finally has the time to fully review one's case.

In addition to compromising the defendant's right to a speedy, fair trial, such delays increase the risk of wrongful convictions as evidence disappears, memories fade, and witnesses move never to be found. Moreover, these delays coupled with poor communication pressure frustrated defendants to accept plea deals just to get the case finished. The collateral consequences to defendant's families—and those of victims—while cases drag on are also significant.

### D. Completion of Necessary Investigation and Discovery Practice

The TSG reports, public defender affidavits, and my recent conversations with former public defenders also reveal that excessive caseloads and limited investigative staff adversely affect their ability to adequately investigate most of their cases. Again, defenders are forced to pick only a few cases upon which to focus their investigative resources. That means that misdemeanors, except in truly unusual circumstances, simply are not investigated. In fact, most investigation is done only in serious felonies, particularly aggravated sex offenses, which take a substantial amount of time. Lesser felonies, like misdemeanors, are put at the bottom of the list and rarely investigated. Moreover, since lawyers and investigators are both pressed for time, even those cases that are investigated may suffer because investigators may rely on phone

interviews instead of interviewing witnesses in person. In addition, given the sheer volume of cases investigators are asked to handle, rarely can investigators devote the time needed to conduct a thorough investigation, particularly in terms of locating essential witnesses, which can be very time-consuming. Nor do defenders in most cases have time to visit the crime scene.

The volume of cases public defenders are handling means that much investigation is not done until shortly before trial. That increases the chances that witnesses are not located or evidence overlooked. The TSG reports also describe a willingness to shut down all investigation once a client signals a willingness to plead guilty. Given the crushing caseloads defenders are coping with, this form of triage is understandable. Yet it runs contrary to what is demanded of conscientious defense counsel under the ABA standards. Indeed, the evidence on file in this case reflects what I heard at the district defenders workshop last August and was confirmed by Josh Peter. That is, with such excessive caseloads, defenders were all too willing to plead their clients guilty even before they had collected and read discovery in a case or had done any investigation or legal research.

Excessive caseloads also limit the extent to which most public defenders engage in litigating discovery issues. Discovery is often limited to a one-time, formal boilerplate request, rather than more extensive motions practice (e.g., motions to compel) and hearings on questions of discovery. Kutz noted that it often took weeks or even months to get discovery from prosecutors in St Louis City. Their office policy, unlike many other offices, was not to enter into a plea bargain until reviewing discovery. However, since there was a long lag time in getting discovery, in part due to dealing with so many other cases, incarcerated clients sometimes waited a considerable amount of time before a plea bargain could be finalized even when the result was a sentence of probation.

### E.    Completion of Legal Research

Aggressive motion practice is hallmark of good defense lawyering in a criminal case. Sometimes good motions can lead to a case being dismissed. Good motion practice can also increase pressure on prosecutors to offer more favorable peal bargains. Yet effective motion practice demands time to do legal research and craft effective arguments.

Caseload pressures, and the corresponding time crunch Missouri public defenders routinely struggle with, however, severely limit time for legal research. In turn, that means public defenders generally have little time to draft and litigate suppression motions or file other motions. As Matt Gass explained, when he went to a public defender training he learned all of the things he should be doing to competently defend his clients including filing various motions. But the daily press of business, especially appearing in court, traveling to court and to jail, and negotiating with prosecutors left little time for investigation, legal research, or motion practice.

Gass also mentioned that one of the judges and some of the prosecutors he dealt with made it clear that setting a case for trial and filing motions would result in plea offers being withdrawn. So without time to research the viability of potential issues, he tended after consulting with clients not to file motions because his clients were not willing to take the risk. Excessive caseloads often cause this kind of shortcutting. Excessive caseloads, therefore, negatively affect counsel's leverage to negotiate favorable plea bargains for his or her clients.

### F. Pre-hearing/Pre-trial Preparation

The reports and affidavits on file in this case indicate that the deficiencies of Missouri public defenders mirror what happens in other jurisdictions with public defenders struggling with excessive caseloads.

Public defenders with too many cases headed for trial at roughly the same time must do the best they can by spreading their limited time around. Therefore, some cases get modestly more attention and others not much at all. Thus, as Kutz noted, he might do depositions in a case that was headed for trial, but in many others, he simply did not have the time to do any depositions.

As TSG noted in its 2009 Report, "[t]rial preparation, moreover, is inextricably intertwined with investigation and legal research, two areas where attorneys report they are consistently failing." 2009 Report at 26. TSG's 2009 Report noted that overworked public defenders failed to file necessary documents like alibi notices As any experienced lawyer knows, gathering information and proper preparation are critical parts of performing well at trial such as conducting an effective cross examination. Especially for inexperienced lawyers, lack of supervision and of the time to conduct research before trial can doom one's client. Failing to raise a viable motion may be the difference between getting a case dismissed and a client being convicted and receiving a lengthy prison sentence for a client.

### G. Pre-Sentence Preparation

From my own experience as a public defender and office supervisor, I know the value in many cases of working with the client before negotiating a plea or arguing at a sentencing hearing. Indeed, I am aware of many cases in which presenting a good mitigation package to the prosecutor and/or the court made the difference between probation and a long term in prison for a client. Given the inadequate contact most Missouri defenders have with their clients, however, it is difficult for defenders to conduct a thorough sentencing investigation and put together a sentencing memorandum tailored to the background and personal characteristics of the client. Thus, even though the vast majority of clients ultimately plead guilty, excessive caseloads leave little time for developing creative sentencing alternatives or being prepared to make effective

sentencing presentations in cases calling for such a presentation. In addition, Missouri defenders have limited access to social workers or resources that might aid defenders in this aspect of their representation.

### H.  Lack of Essential Supervision

The evidence in this case confirms what I learned at the District Defender workshop last September. Even though supervisors were given reduced caseloads in order to spend time managing the office, training the inexperienced lawyers, offering advice on cases and overseeing the work of lawyers and investigators, the volume and complexity of cases they handle leave insufficient time to supervise. The problem is compounded because of the frequent turnover and relative inexperience of the new lawyers who come into the office.  As Josh Peter, among others, noted, the supervisor ends up taking the most serious and time-consuming cases in the office. Turnover also means more time that the supervisor must spend dealing with client complaints and shuffling cases among remaining staff while vacancies are filled. When a vacancy is finally filled, the supervisor often needs to devote even more time to that lawyer while other lawyers with only slightly more experience are left largely unsupervised. Both Josh Peter from Jackson County and Patrick Kutz in St Louis City spoke of the lack of supervision and the large number of inexperienced lawyers in their respective offices. As a result, inexperienced lawyers were too quickly assigned to handle serious felony cases that were over their heads and had to do so without much guidance at all from their supervisors, who were themselves struggling with their own caseloads. TSG's 2009 Report observed that "[s]upervisees conveyed a sense of near-panic at the lack of supervision provided in the face of overwhelming caseloads." 2009 Report at 30. Over the years, and well before being retained as an expert in this case, I have talked with many current and former MSPD attorneys who found themselves handling serious felonies less than a year after graduating from law school, and who often felt overwhelmed and under supervised during their time at the MSPD. Certainly, the district defenders at the September 2016 workshop lamented the lack of time they had to do the kind of supervision that they felt was needed.

Based on my observations, conversations, professional experience, and the reports and evidence on file in this case, it is my professional opinion that the MSPD fails consistently to provide the effective assistance of counsel to which all of their clients are constitutionally entitled. These failures stem from the MSPD's systemic deficiencies, which in turn result in Missouri public defenders having insufficient time, too many cases, too few resources, too much travel, and too little supervision to comply with their own Guidelines, the ABA Standards, ethical norms, or the Missouri and U.S. Constitutions. These systemic failures are not the product of the MSPD's operational inefficiencies. Rather, as TSG's reports and the RubinBrown study clearly demonstrate, the MSPD has been severely underfunded for years. Simply put, the MSPD lacks the funding to hire the number of lawyers needed to handle the number of defendants the MSPD is being asked to represent.

As Matt Gass, a manpower officer in the Air Force before becoming a public defender explained in our conversation, he was very familiar from his work in the Air Force of how to budget his time as efficiently as possible to cope with a heavy workload. There comes a point, however, when the amount of work simply is too much for a person or a unit to shoulder. He and one other lawyer handled about 90% of almost 1,300 felony cases a year in Pettis County. He closed about 800 felony cases in a little over two years, an extraordinary number. He stated he was overwhelmed from the start and could do little preparation in any case because he was focused on moving cases and trying to stay up with communicating with over a hundred clients. As he said, recognizing he could not keep up, he went up the chain of command as he was trained to do in the military, and ultimately raised his concerns with Michael Barrett. He told Barrett that, with the number of cases he was juggling, he was struggling to perform consistent with his ethical obligations.

When he moved to Lafayette County, his caseload for a short time was manageable. He was soon overwhelmed and things went from bad to worse when a 90-day hiring freeze went into effect and he was alone in Lafayette County. Again, he spoke to Barrett and told him either he had to fill the vacancy or he would have to stop taking cases. Gass finally quit because he knew he could not do his job properly and he saw no relief in sight.

The ethical and moral dilemma that Gass faced, and his fellow public defenders continue to face, is real. With excessive caseloads, defenders must stretch themselves to the breaking point trying to serve too many clients. They can only provide competent representation to some of their existing clients by neglecting other clients which generally means their newest clients. This puts them in violation of Missouri Rule of Professional Conduct 4-1.7 because they have an actual conflict of interest. Without the option of refusing new clients, the only options are to quit or to struggle on in Sisyphean fashion, hoping that what happened to Karl Hinkebein does not happen to them. Not surprisingly, more public defenders are leaving because, as Barrett observed, they're "not [] able to do what they need to do for their clients." Barrett Deposition Testimony at 167:14 (*see* Appendix G).

For public defender clients, the choices are very stark. Fire your public defender and hope you, your family or friends can scrape up enough money to hire a private lawyer to negotiate a plea. Or plead guilty, even if innocent, to whatever deal your beleaguered public defender can negotiate. Alternatively, you can languish in jail for months or even a year or more until your trial is finally held, taking your chances with your lawyer despite knowing he or she is likely unprepared and your case not adequately investigated.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Date: October 16, 2017

RODNEY J. UPHOFF