**UNITED SATES DISTRICT COURT**
**WESTERN DISTRICT OF MISSOURI**
**CENTRAL DIVISION**

| | | |
|---|---|---|
| SHONDEL CHURCH, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 17-04057-CV-C-NKL |
| | ) | |
| STATE OF MISSOURI, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' SUGGESTIONS IN SUPPORT OF THEIR**
**MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

I.    INTRODUCTION ............................................................................................ 1

II.    STATEMENT OF UNCONTROVERTED MATERIAL FACTS ...................................... 5

MSPD's Workloads Are Extraordinarily High, Well Exceeding Any Nationally Accepted Limit. 7

Thanks to Their High Workloads, MSPD Attorneys Are Unable to Advocate for Each Defendant in the Manner that Prevailing Professional Norms Require .................................... 18

MSPD Attorneys Are Forced to Triage Cases, Pitting One Defendant's Interests Against Another's ....................................................................................................................... 20

MSPD's High Workloads Prevent MSPD Attorneys from Performing Even the Most Basic Tasks of Legal Representation ............................................................................................. 23

This Inability to Advocate for Defendants Has Dramatic Consequences on the Outcomes of Cases 44

Missouri's Indigent Defense Deficits Have Reached a Crisis Point ......................................... 47

III.    SUMMARY JUDGMENT STANDARD ......................................................... 56

IV.    ARGUMENT ................................................................................................ 56

A.    The Uncontroverted Evidence Demonstrates that Missouri's Public Defenders Are So Hamstrung by their Workloads that They Are Unable to Meaningfully Serve as an Adversary to the State, Constructively Depriving Plaintiffs of Counsel .................................................... 58

B.    There Is No Dispute that MSPD Attorneys Labor Under an Actual and Perpetual Conflict of Interest, Constantly Triaging Cases and Taking Time from One Defendant to Represent Another. ............................................................................................................... 63

C.    Plaintiffs Have Produced Uncontroverted Evidence of Specific Deficits in Representation that Render MSPD Attorneys' Representation Unreasonable Under Prevailing Professional Norms. ..................................................................................................... 66

D.    Because Plaintiffs Seek Only Injunctive Relief, They Need Only Show a Risk of Prejudice, Which the Uncontroverted Evidence Easily Establishes. ......................................... 75

E.    Defendants Do Not Dispute that Some Plaintiffs Are Denied Counsel Altogether at Critical Stages and that These Deprivations Cannot Be Rectified Without Reductions in Workloads. ............................................................................................................................ 77

F.    The Sixth Amendment Must Allow for Prospective Relief. ......................................... 81

G.    Plaintiffs Are Entitled to Summary Judgment on Their Claims Under the Due Process Clause, the Missouri Constitution, and Various Missouri Statutes. .......................................... 84

IV.    CONCLUSION ............................................................................................. 89

CERTIFICATE OF SERVICE ................................................................................ 91

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Avery v. Alabama*,
   308 U.S. 444 (1940) ....................................................................................................... 59, 61

*Barker v. Wingo*,
   407 U.S. 514 (1972) ................................................................................................................ 67

*Beets v. Scott*,
   65 F.3d 1258 (5th Cir. 1995) ................................................................................................ 66

*Braden v. 30th Judicial Circuit Court of Kentucky*,
   410 U.S. 484 (1973) ................................................................................................................ 67

*Caban v. United States*,
   281 F.3d 778 (8th Cir. 2002) ................................................................................................ 66

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ................................................................................................................ 56

*Covey v. United States*,
   377 F.3d 903 (8th Cir. 2004) ................................................................................................ 66

*Cuyler v. Sullivan*,
   446 U.S. 335 (1980) ................................................................................................................ 66

*In re D.J.M.*,
   259 S.W.3d 533 (Mo. 2008) ................................................................................................. 88

*de Jesus Ortega Melendres v. Arpaio*,
   695 F.3d 990 (9th Cir. 2012) ................................................................................................ 75

*In re Edward S.*,
   92 Cal. Rptr. 3d 725 (Cal. Ct. App. 2009) ........................................................................ 64

*Estelle v. Smith*,
   451 U.S. 454 (1981) ......................................................................................................... 79, 80

*Evitts v. Lucey*,
   469 U.S. 387 (1985) ................................................................................................................ 86

*Farrow v. Lipetzky*,
   637 F. App'x 986 (9th Cir. 2016) ........................................................................................ 80

*Forest Park II v. Hadley*,
 336 F.3d 724 (8th Cir. 2003) ...........................................................................75

*Gabaree v. Steele*,
 792 F.3d 991(8th Cir. 2015) ............................................................................73

*Gagnon v. Scarpelli*,
 411 U.S. 799 (1973).........................................................................................86

*Gardner v. Florida*,
 430 U.S. 349 (1977).........................................................................................79

*In re Gault*,
 387 U.S 1 (1967)...................................................................................57, 84, 88

*Geders v. United States*,
 425 U.S. 80 (1976)...........................................................................................81

*Gerstein v. Pugh*,
 420 U.S. 103 (1975).........................................................................................67

*Glasser v. United States*,
 315 U.S. 60 (1942).....................................................................................63, 65

*Gonzalez v. Comm'r of Corr.*,
 68 A.3d 624 (Conn. 2013) ...............................................................................78

*Green v. Norris*,
 394 F.3d 1027 (8th Cir. 2005) .........................................................................73

*United States ex rel. Green v. Washington*,
 917 F. Supp. 1238 (N.D. Il. 1996) ...................................................................64

*Grey v. City of Oak Grove*,
 396 F.3d 1031 (8th Cir. 2005) .........................................................................56

*Helling v. McKinney*,
 509 U.S. 25 (1993)...........................................................................................75

*Holloway v. Arkansas*,
 435 U.S. 475 (1978).....................................................................................63, 65

*Hurrell-Harring v. State*,
 930 N.E.2d 217 (N.Y. 2010)...........................................................60, 62, 68, 82

*Kent v. United States*,
 383 U.S. 541 (1966).........................................................................................86

*Kimmelman v. Morrison*,
    477 U.S. 365 (1986)................................................................................72

*Kuren v. Luzerne County*,
    146 A.3d 715 (Pa. 2016) ...............................................................60, 62, 82

*Lavallee v. Justices in Hampden Superior Court*,
    812 N.E.2d 895 (Mass. 2004) .......................................76, 78, 79, 80, 82

*Lockhart v. Fretwell*,
    506 U.S. 364 (1993)................................................................................83

*Luckey v. Harris*,
    860 F.2d 1012 (11th Cir. 1988) ............................................60, 67, 68, 82

*Luckey v. Miller*,
    976 F.2d 673 (11th Cir. 1992) ...............................................................82

*Malcolm v. Houston*,
    518 F.3d 624 (8th Cir. 2008) .................................................................79

*Marcrum v. Luebbers*,
    509 F.3d 489 (8th Cir. 2007) .................................................................74

*State ex rel. Marshall v. Blauer*,
    709 S.W.2d 111 (Mo. 1986) .................................................................88

*McClain v. Swenson*,
    435 F.2d 327 (8th Cir 1970) .................................................................80

*McQueen v. Swenson*,
    498 F.2d 207 (8th Cir. 1974) .................................................................75

*Mempa v. Rhay*,
    389 U.S. 128 (1967)................................................................................79

*State ex rel. Missouri Pub. Def. Comm'n v. Pratte*,
    298 S.W.3d 870 (Mo. 2009) .................................................................86

*State ex re. Missouri. Pub. Defender Comm. v. Waters*,
    370 S.W.3d 592 (Mo. 2012) .................................................18, 58, 64, 82, 83

*Missouri v. Frye*,
    132 S. Ct. 1399 (2012)..............................................35, 71, 76, 79, 80

*New York Lawyers' Ass'n v. State*,
    763 N.Y.S.2d 397 (N.Y. Sup. Ct. 2003) ..............................................82

*State ex rel. O'Brien v. Ely*,
    718 S.W.2d 177 (Mo. Ct. App. 1986) ...................................................88

*Padilla v. Kentucky*,
    559 U.S. 356 (2010) ...............................................................................71, 72

*Paulson v. Newton Corr. Facility, Warden*,
    773 F.3d 901 (8th Cir. 2014) ...................................................................73

*Penson v. Ohio*,
    488 U.S. 75 (1988) ...................................................................................59

*People v. Roberts*,
    321 P.3d 581 (Colo. App. 2013) ...............................................................64

*Powell v. Alabama*,
    287 U.S. 45 (1932) ...................................................................59, 60, 85, 86

*Public Defender, Eleventh Judicial Circuit of Fla. v. State*,
    115 So. 261, 267 (Fla. 2013) ....................................................................64

*Raymond v. Weber*,
    552 F.3d 680 (8th Cir. 2009) ...................................................................80

*Reagan v. Norris*,
    365 F.3d 616 (8th Cir. 2004) ...................................................................73

*Roe v. Flores-Ortega*,
    528 U.S. 470 (2000) .................................................................................59

*Roe v. Operation Rescue*,
    919 F.2d 857 (3d Cir. 1990) .....................................................................75

*Rothgery v. Gillespie Cty., Tex.*,
    554 U.S. 191 (2008) .................................................................................80

*Sigler v. Bird*,
    354 F.2d 694 (8th Cir. 1966) ...................................................................79

*Simmons v. State Pub. Def.*,
    791 N.W.2d 69 (Iowa 2010) ...................................................................82

*Smith v. Lockhart*,
    923 F.2d 1314 (8th Cir. 1991) .............................................................79, 81

*State v. Green*,
    470 S.W.2d 571 (Mo. 1971) ...................................................................87

Case 2:17-cv-04057-NKL   Document 153   Filed 02/09/18   Page 6 of 100

*State v. Nathan*,
    522 S.W.3d 881 (Mo. 2017) ...................................................................87

*State v. Peart*,
    621 So. 2d 780 (La. 1993) ......................................................................82

*State v. Young*,
    172 P.3d 138 (N.M. 2007) .....................................................................82

*Stiers v. Dir. of Revenue*,
    477 S.W.3d 611 (Mo. 2016) ...................................................................88

*Strickland v. Washington*,
    466 U.S. 668 (1984).............................................................3, 57, 67, 69, 76

*Tucker v. State*,
    394 P.3d 54 (Idaho 2017).............................................................58, 60, 82

*United States v. Coutentos*,
    651 F.3d 809 (8th Cir. 2011) .................................................................73

*United States v. Cronic*,
    466 U.S. 648 (1984)...................................................................59, 61, 68

*United States v. Gonzalez-Lopez*,
    548 U.S. 140 (2006)............................................................................83, 84

*United States v. Gonzalez-Marichal*,
    317 F. Supp. 2d 1200 (S.D. Cal. 2004)..................................................68

*United States v. Green*,
    835 F.3d 844 (8th Cir. 2016) .................................................................68

*United States v. Jones*,
    403 F.3d 604 (8th Cir. 2005) .................................................................73

*United States v. Laerdal Mfg. Corp.*,
    73 F.3d 852 (9th Cir. 1995) ...................................................................76

*United States v. Lee*,
    715 F.3d 215 (8th Cir. 2013) .................................................................84

*United States v. Love*,
    329 F.3d 981 (8th Cir. 2003) .................................................................68

*United States v. Orr*,
    636 F.3d 944 (8th Cir. 2011) .................................................................73

Case 2:17-cv-04057-NKL   Document 153   Filed 02/09/18   Page 7 of 100

*United States v. Swift*,
    720 F. Supp. 2d 1048 (E.D. Ark. 2010) ..................................................................68

*United States v. W.T. Grant Co.*,
    345 U.S. 629 (1953) ..............................................................................................75

*White v. Luebbers*,
    307 F.3d 722 (8th Cir. 2002) ...............................................................................79

*White v. Roper*,
    416 F.3d 728 (8th Cir. 2005) ...............................................................................71

*Wilbur v. City of Mount Vernon*,
    989 F. Supp. 2d 1122 (W.D. Wash. 2013) .................................................60, 62, 82

**Statutes**

Mo. R. Juv. P. 126.01 .................................................................................................56, 89

Mo. Rev. Stat § 211.061 ...........................................................................................56, 86, 87

Mo. Rev. Stat § 211.211 .......................................................................................43, 58, 88, 89

Mo. Rev. Stat. § 600.042 .........................................................................................58, 87, 88

Mo. Rev. Stat. § 600.048 .........................................................................................58, 87, 88

Mo. Rev. Stat. § 600.063 .............................................................................................53, 57

**Rules**

Missouri Rule of Professional Conduct Rule 4-1.3 ....................................................47

Missouri Rule of Professional Conduct 4-1.4(a) .......................................................46

Missouri Supreme Court Rule 4-1.7(a)(2) .................................................................63

Rules of Professional Conduct 1.3(c) ........................................................................72

Rules of Professional Conduct 4-1.1 .........................................................................50

Rules of Professional Conduct 4-1.3 ....................................................................46, 50

Rules of Professional Conduct 4-1.4 .........................................................................50

Rules of Professional Conduct 4-1.7 .........................................................................50

**Other Authorities**

LaFave, Criminal Procedure § 11.10(c)...........................................................................................71

Missouri State Public Defender, Benefits,
    http://www.publicdefender.mo.gov/employment/benefits.htm (accessed Feb.
    7, 2018) ...........................................................................................................................13

Model Rules of Prof'l Conduct R. 1.14(a) (Am. Bar Ass'n 2017)................................................85

Model Rules of Prof'l Conduct R. 2.1 (2010) ............................................................................86

Norman Lefstein, Securing Reasonable Caseloads: Ethics and Law in Public
    Defense 43–48 (2011).............................................................................................................8

# I.     INTRODUCTION

Missouri's indigent defense system is a sinking ship.

The attorneys of the Missouri State Public Defender ("MSPD") are "drowning in cases." Ex. A (Carver Dep.) at 71:25-72:23.   Each member of Plaintiffs' putative class (indigent defendants in Missouri who have not yet been convicted and sentenced) must share the attention of her MSPD attorney with, on average, hundreds of other defendants—caseloads that, as one MSPD attorney put it, have "blown all of those [national standards] out of the water."  Ex. A at 165:4-17.   MSPD's workloads are so high that even if every single one of MSPD's attorneys worked 100 hours per week, with zero time off for vacation, illness, or training, MSPD would *still* not be able to provide minimally adequate representation to Plaintiffs, as measured by the key metric of prevailing professional norms presented in this case.   Ex. B (Missouri State Public Defender Cumulative Caseload Metrics); Ex. R (American Bar Association and RubinBrown, The Missouri Project (2014)) at 23.  *Infra*, ☐☐ 11-43.

As a result, MSPD attorneys do not have the time to perform the most basic tasks of representation.  They must triage their cases, knowing that minutes spent interviewing a key alibi witness on one case are minutes taken away from another case, such that they will be unable to visit a client for many months or perform even a perfunctory review of discovery.  They must "tread[] water," Ex. C (Hackathorn Dep.) at 73:10-22, taking continuance after continuance while their clients remain behind bars, evidence disappears, and memories fade.  And they must negotiate plea agreements essentially blind, with virtually no information about their clients or their clients' cases.   The experts in this case all agree that MSPD attorneys fail to live up to the basic expectations of an attorney—and that caseloads are so high that even the most competent attorney could not meet those expectations.  *Infra*, ☐☐ 44-118.

The consequences for indigent defendants are dire. Without adequate investigation, prosecutors have no incentive to offer better pleas. Without consistent client communication, Plaintiffs are forced to make life-altering decisions about their cases without the guiding hand of counsel. And without adequate time to prepare for court hearings and trials, MSPD attorneys leave key defenses and evidence on the table. *Infra*, □□ 119-123.

In recent months, in the wake of a Missouri Supreme Court opinion disciplining one of their colleagues for failing to meet his professional obligations in part due to his excessive workload, MSPD attorneys have started to take drastic measures to secure their own law licenses, all at the expense of Plaintiffs. Some MSPD offices have instituted "waitlists" for counsel, as though Plaintiffs were seeking admission to a selective college, not standing on their constitutional rights. Other jurisdictions have unilaterally decided not to appoint counsel in whole categories of cases, an effort that one MSPD attorney likened to "tak[ing] an ice cream scoop to the iceberg that sank the Titanic"—"the ship is still probably going to go down." Ex. A at 49:20-50:10. And one judge has even floated the idea of a "pro se felony docket," in which indigent defendants would face off against the State without even an attorney in name. *Infra*, □□ 124-54.

The evidence for every chapter of this remarkable story is uncontroverted. It shows astronomical caseloads that surpass any nationally accepted measure of an acceptable caseload. *Infra*, □□ 11-43. It shows that those caseloads hobble MSPD attorneys, rendering them unable to provide meaningful representation and forcing them to ration justice, picking and choosing which clients will receive even pro forma investigation. *Infra*, □□ 44-118. It shows that this deficient representation leads to worse outcomes for indigent defendants in Missouri, who are deprived of any leverage with which to negotiate with prosecutors and who sit behind bars for weeks, months, or even years waiting their turn for attention from an attorney. *Infra*, □□ 119-23. And it shows

that the situation in Missouri has reached a crisis point, as MSPD attorneys worried about their bar cards turn away the very indigent defendants they are professionally obligated to serve. *Infra*, □□ 124-54.

Defendants have not adduced any evidence that would undermine these conclusions. They have not deposed Plaintiffs' expert witnesses, produced their own expert witnesses, or supplied any reason to doubt Plaintiffs' experts' conclusions. They have not supplied any alternative to Plaintiffs' measure of prevailing professional norms, a study relying on the judgment of expert criminal defense lawyers in Missouri. They have not elicited any testimony that would call Plaintiffs' deposed witnesses' assertions into question. Named Defendant Michael Barrett has even admitted, time and again, that his office is unable to provide representation to indigent defendants that complies with the requirements of the Constitution. *E.g.*, Ex. G (Barrett Dep.) at 98:19-99:2.

Only systemwide, prospective relief can right the ship in Missouri. Dkt. 69, at 34-37. Any effort to require any one deficient MSPD lawyer to devote more time to a single defendant's case ensures that the same lawyer will shortchange other indigent defendants still further. And the deficiencies in MSPD's representation are clear from the outset of a case, such that waiting until after conviction to right the Sixth Amendment wrong in this context would be to condone an ongoing constitutional violation that is impacting indigent defendants statewide. The safety valve of *Strickland v. Washington*, 466 U.S. 668 (1984)—which provides a mechanism, but only on an individual basis and only after a defendant has already been convicted—is simply inadequate to this task, as this Court recognized in denying State Defendants' motion to dismiss. Dkt. 69, at 34-37.

The undisputed evidence in this case entitles Plaintiffs to summary judgment. Specifically:

- System-wide constraints ensure that even where a lawyer is nominally appointed to represent a member of Plaintiffs' class, she is unable to subject the prosecution's case to meaningful adversarial testing, constructively denying indigent defendants their right to counsel. § IV.A.

- Virtually every MSPD attorney operates under an actual and perpetual conflict of interest, triaging cases such that providing constitutionally adequate representation to one client necessarily means providing constitutionally deficient representation to another. § IV.B.

- MSPD attorneys routinely fail to perform the basic functions of representation, including but not limited to interviewing potentially exculpatory witnesses, communicating with defendants about their cases, preparing adequately for a trial or hearing, reviewing discovery in a timely manner, and securing essential expert witnesses. § IV.C.

- Plaintiffs face a serious risk of conviction of a harsher offense or service of a longer sentence as a direct result of MSPD's deficiencies—a risk serious enough to warrant injunctive intervention by this Court. § IV.D.

- New MSPD policies, such as refusing appointments and placing indigent defendants on waitlists until an attorney becomes available, combine to ensure that Plaintiffs are deprived of counsel—both constructively and actually—during critical stages of their criminal cases. § IV.E.

Any one of those showings alone would entitle Plaintiffs to summary judgment on their state and federal constitutional claims.[1]  Taken together, the undisputed material facts reveal an

---

[1] For similar reasons, Plaintiffs are entitled to summary judgment on their Due Process Clause, Missouri Constitution, and Missouri statutory claims.  *See infra*, § III.G.

alarmingly dysfunctional system for providing representation to indigent defendants in Missouri—a system that the Constitution requires repairing.

## II.   STATEMENT OF UNCONTROVERTED MATERIAL FACTS

1. The State of Missouri relies virtually exclusively[2] on local MSPD offices to provide indigent defense services across the State. Ex. D (Missouri Public Defender Commission, Fiscal Year 2017 Annual Report) at 1.

2. MSPD is composed of the Trial Division, at issue in this case and subdivided into 33 district offices; the Appellate/Post-Conviction Division; and the Capital Division. *Id.*

3. About 52 percent of the Trial Division's cases are felonies. Ex. D at 16-17. The rest are misdemeanors, juvenile cases, probation violation cases, or petitions for release from civil commitment. *Id.* at 15.

4. Each of the 33 Trial Division district offices serves between one and 11 counties and is headed by a "district defender"—a senior attorney who supervises the other attorneys and support staff. *E.g.*, Ex. D at 17; Ex. E (Crowell Dep.) at 10:4-11.

5. Each of the 33 district offices draws from a single pool of funding, which must be allocated by the Central Office to district offices around the State; each district must make requests to the Central Office for litigation expenses of over $500. Ex. F (Lear Dep. Day 1) at 16:12-24:15; Ex. E at 15:1-21.

6. The uncontroverted evidence in this case comes from three sources.

7. First, Plaintiffs present evidence from 18 depositions.

---

[2] Ninety-five percent of cases in Missouri in which defendants are indigent are handled by MSPD. Ex. D at 66. The remainder are handled by conflict counsel, who are paid from the same source of funding as MSPD lawyers. Ex. G (Barrett Dep.) at 17:23-18:12; Ex. F (Lear Dep. Day 1) at 18:11-17.

a. Among Plaintiffs' deponents were 10 district defenders from district offices around the State, including rural,[3] urban,[4] and suburban[5] jurisdictions.

b. Six of the district defenders that Plaintiffs deposed supervise offices that are less overloaded than the median office. Ex. B. Four of those district defenders supervise offices that are more overloaded than the median office. *Id.* Plaintiffs' uncontroverted facts do not include testimony from attorneys in any of the three most overloaded offices in the State and do include testimony from the head of the least overloaded district office in the State. *Id.*

8. Second, Plaintiffs present unrebutted expert testimony from three witnesses. Defendants have not identified any expert witnesses, nor did they seek to depose Plaintiffs' experts.

a. Bob Boruchowitz, Professor from Practice and Director of the Defender Initiative at the Seattle University School of Law, led The Defender Association—a public defender in Seattle—for 28 years; has represented criminal defendants at every level of state and federal court; and has led various American Bar Association and Washington State Bar Association committees, including, most recently, the Washington State Bar Association Council on Public Defense. Ex. H (Expert Report of Robert C. Boruchowitz, Oct. 16, 2017) at ☐☐ 18-39.

b. Rodney Uphoff is an Emeritus Professor of Law at the University of Missouri School of Law and has taught criminal defense clinics for 30 years. Mr. Uphoff has been active in the National Association of Criminal Defense Lawyers and the American

---

[3] *E.g.*, Ex. I (Guinn Dep.) at 13:1-23; Ex. J (Martin Dep. Day 1) at 11:7-22; Ex. A (Carver Dep.) at 16:20-23; Ex. E (Crowell Dep.) at 8:14-18.
[4] *E.g.*, Ex. K (Petsch Dep.) at 11:9-23; Ex. A at 16:20-23; Ex. L (Fox Dep.) at 12:5-13.
[5] *E.g.*, Ex. M (Cardarella Dep.) at 17:18- 18:7; Ex. N (Wallis Dep.) at 9:18-20.

Bar Association Criminal Justice Section and is a member of the Missouri Supreme

Court Criminal Procedure Committee. Ex. O (Expert Report of Rodney J. Uphoff,

Oct. 16, 2017) at 1-2.

    c. Stephen Gillers is the Elihu Root Professor of Law at New York University School of

Law and has spent 39 years teaching, speaking, and writing about the ethical

obligations of lawyers; his publications include many editions of a widely used

casebook on legal ethics. Ex. P (Expert Report of Stephen Gillers, Oct. 16, 2017) at

1.

9. Finally, Plaintiffs present documentary evidence obtained in discovery and from publicly

available sources.

10. Taken as a whole, Plaintiffs' evidence paints a portrait of a dysfunctional public defender—

one in which workloads are astronomical, high workloads lead to unreasonably deficient

advocacy, and deficient advocacy leads to systemically worse outcomes for indigent

defendants.

**MSPD'S WORKLOADS[6] ARE EXTRAORDINARILY HIGH, WELL EXCEEDING ANY NATIONALLY
ACCEPTED LIMIT.**

11. In Fiscal Year 2017, MSPD's Trial Division provided representation on 79,714 new cases,

plus 30,611 cases carried over from the previous year. Ex. D at 4.

---

[6] Plaintiffs distinguish between caseloads, which refer only to the raw number of cases on a
public defender's docket, and workloads, which provide a broader and more accurate view of a
public defender's competing responsibilities by taking into account the complexity of the cases,
the defender's skill and experience, the support services available to the defender, and the
defender's other duties, among other factors. Ex. Q (Statement of Interest of the United States,
*Wilbur v. City of Mt. Vernon*, (W.D. Wash. Aug. 14, 2013)) at 9.

12. Of those newly opened cases, 334 were murder or homicide cases, 6,349 were A/B felonies other than sex felonies, 35,284 were C/D felonies other than sex felonies, and 993 were sex felonies. Ex. D at 20.

13. In Fiscal Year 2017, MSPD employed 384 attorneys, 320 of them in the Trial Division. *Id.*

14. In FY2017, an average MSPD attorney handled 350 cases in total; she would have started the year with 73 felonies pending and had 183 new felonies added to her desk during the year. Ex. D at 21.

15. These workload numbers well exceed, by any metric, the number of criminal cases a public defender can carry while still providing effective representation to each of their clients. Ex. A at 165:4-17 ("[M]y caseload was not in compliance with what I felt like it ought to be with any of our ABA, NAC standards, RubinBrown metric, whatever. I mean, I had kind of blown all of those out of the water.").

    a. The National Advisory Commission on Criminal Justice Standards and Goals recommends that an attorney carry no more than 150 felonies per year, and no other cases. Alternatively, an attorney may carry 400 non-traffic misdemeanors, 200 juvenile court cases, *or* 200 Mental Health Act cases per attorney per year, and no other cases. This recommendation has been endorsed by the American Council of Chief Defenders and adopted as a legal limit on workload caps by several states, including New York. Ex. H at ☐☐ 142-91.[7]

---

[7] In recent years, experts in the field have suggested that the National Advisory Commission standards are outdated and fail to account for the added complexities that have been infused into criminal defense practice over the last 40 years. As such, commentators have argued that the caseload recommendations allow for far too many cases. *See* Norman Lefstein, Securing Reasonable Caseloads: Ethics and Law in Public Defense 43–48 (2011).

b. A 2015 report by Texas A&M University recommended that a public defender carry no more than 77 Felony 1, 105 Felony 2, 144 Felony 3, 174 State Jail Felony, 216 Misdemeanor A, *or* 236 Misdemeanor B cases.  Ex. H at ☐ 186.

16. Over the past 25 years, report after report has found that MSPD's workloads are too high to allow for constitutionally adequate representation.  *See e.g.,*  The Spangenberg Group,  A Report on the Operation of the Missouri State Public Defender (1993); The Spangenberg Group, Assessment of the Missouri Public Defender System Final Report (Oct. 26, 2005); The Missouri Senate Interim Committee, Report of Senate Interim Committee on the Missouri State Public Defender System (January 2007); The Spangenberg Group & Center for Justice, Law and Society at George Mason University, Assessment of the Missouri State Public Defender System (Oct. 2009); National Juvenile Defender Center, Missouri:  Justice Rationed (Spring 2013); American Bar Association and RubinBrown, The Missouri Project (2014); U.S. Department of Justice, Civil Rights Division, Investigation of the St. Louis County Family Court, St. Louis, Missouri (July 31, 2015).

17. The "watershed moment" came in 2014, with the release of The Missouri Project, a report drafted by the American Bar Association's Standing Committee on Legal Aid and Indigent Defendants and RubinBrown, a certified public accounting firm.  Ex. R.

18. The Missouri Project had two components.  First, every attorney employed by MSPD entered time into an MSPD database during the 25-week period.  Missouri Project at 16.  Time was recorded across eight different types of cases and 19 different types of tasks.  Ex. R at 14-15.

19. Second, the study used a well-respected and often-duplicated forecasting process, known as the Delphi method, in order to provide a consensus estimate on the amount of time defense counsel should expect to spend on a case in order to provide representation in accordance

with prevailing professional norms. Ex. R at 17-21; Ex. E at 142:18-143:7. The method combined multiple surveys and in-person focus groups with both private and public criminal defense lawyers across the State (including public defenders). *Id.* Ultimately, the researchers were able to compare the estimates from the Delphi study to the actual hours logged by public defenders during the 25-week period in question. Ex.R at 17-21.

20. The methodology used in The Missouri Project has been widely recognized and replicated. The Texas legislature mandated a similarly structured study be conducted in that State. *See* http://www.tidc.texas.gov/media/31818/150122_weightedcl_final.pdf. The president of the American Bar Association said, "It can now be more reliably demonstrated than ever before that for decades the American legal profession has been rendering an enormous disservice to indigent defendants and to the criminal justice system in a way that can no longer be tolerated." *Id.*

21. The results of The Missouri Project were startling. In 97 percent of cases, MSPD attorneys spent fewer (sometimes far fewer) hours than the Delphi panel agreed were necessary to provide minimally adequate representation. Dkt. 1, Exh. 1 (Complaint), Exh. 10 at 2-4.

22. The panel of expert criminal defense attorneys estimated that, to provide adequate counsel, a lawyer would need to spend the following number of hours on each phase of a case of a given type:

|  | Client Communication[1] | Discovery/Investigation[2] | Case Preparation[3] | Total |
|---|---|---|---|---|
| Murder/Homicide | 34.6 | 33.5 | 38.5 | 106.6 |
| AB Felony | 13.1 | 18.3 | 16.2 | 47.6 |
| CD Felony | 6.3 | 8.4 | 10.3 | 25.0 |
| Sex Felony | 22.5 | 17.8 | 23.6 | 63.8 |
| Misdemeanor | 3.5 | 4.1 | 4.1 | 11.7 |
| Juvenile | 5.4 | 6.8 | 7.3 | 19.5 |
| Appellate/PCR | 20.3 | 31.5 | 44.7 | 96.5 |
| Probation Violation | 2.9 | 2.6 | 4.2 | 9.8 |

23. By contrast, MSPD attorneys spent the following number of hours on each phase of a case of a given type:

| | Client Communication[1] | Discovery/Investigation[2] | Case Preparation[3] | Total |
|---|---|---|---|---|
| Murder/Homicide | 14.8 | 33.5 | 36.2 | 84.5 |
| AB Felony | 3.0 | 2.1 | 3.6 | 8.7 |
| CD Felony | 1.8 | 0.8 | 1.7 | 4.4 |
| Sex Felony | 6.0 | 7.3 | 12.4 | 25.6 |
| Misdemeanor | 0.9 | 0.4 | 0.9 | 2.3 |
| Juvenile | 1.4 | 1.0 | 2.1 | 4.6 |
| Appellate/PCR | 3.1 | 7.5 | 19.6 | 30.3 |
| Probation Violation | 0.7 | 0.2 | 0.5 | 1.4 |

Given current workloads, if MSPD were to spend the number of hours per case required to provide adequate assistance per the Missouri Project study, and even assuming every attorney spends 2,080 hours per year just investigating and preparing cases (and no time on, for instance, administrative tasks), MSPD would need a total of 347 additional attorneys to provide representation consistent with the prevailing professional norms in Missouri. Ex. S (Missouri Public Defender Commission, Budget Request Fiscal Year 2019) at 4.

24. According to the Missouri Project estimates of how many hours each case type minimally requires, every district office in Missouri is far over capacity. Ex. B; Ex. T (Missouri Public Defender Commission, Fiscal Year 2018, Draft Legislative Budget Request, Sept. 21, 2016 (Lear Dep. Ex. 33)) at 14. The district offices are operating at between 153 and 340 percent of their capacity. Ex. B. The average MSPD lawyer is operating at 248.5 percent of her capacity. *Id.*

25. Per the Missouri Project numbers, an individual attorney in a given office might be operating at as much as 500 percent of her capacity, and lawyers are often operating at between 300 and 400 percent of their capacity. Ex. C at 73:2-9 & Ex. U (Missouri Public Defender

Commission, Fiscal Year 2018, Approved – October 25, 2017, Supplemental Legislative Budget Request, Oct. 25, 2017 (Hackathorn Dep Ex. 50)) at 7.

26. The Missouri Project estimates are borne out by the real-life experiences of district defenders across the state. District defenders testified that their offices were well over capacity—at least as over capacity as The Missouri Project numbers suggested. *E.g.*, Ex. C at 124:20-125:10; Ex. M at 50:23-52:16 ("sure feels like a lot more than that" when told his office was operating at 253 percent capacity); Ex. L at 35:21-36:8; Ex. II at 34:7-36:5, 47:4-48:8 (agreement with Missouri Project conclusions based on 45 years of experience with public defender system); Ex. Y (Reynolds Dep) at 43:2-45:18; Ex. E at 63:2-7; Ex. A at 159:24-160:9; Ex. L at 35:21-36:8, 188:4-19. Most of the district defenders estimated that they would need to roughly double their current legal staff to effectively handle their workloads. Ex. M at 21:3-12; Ex. C at. 131:10-14; Ex. A at 146:7-21; Ex. E at 71:9-22.

27. Using the time estimates given by the Missouri Project study and assuming that MSPD attorneys are able to spend 2080 hours per year on case-related tasks to calculate the above capacity numbers likely far underestimates how overloaded MSPD district offices are:

   a. First, the Missouri Project numbers do not account for administrative tasks, which could constitute a sizable fraction of a public defender's day, and they assume no attorney (not even the district defenders) spends any time on supervising other attorneys. Ex. A at 63:9-25; Ex. E at 64:1-17; Ex. J at 40:22-43:10; Ex. Y at 27:11-21, 162:4-24, 169:5-12.

   b. Second, a 2080-hour year assumes no vacation time, no medical leave, no training, and no time spent on non-case duties. Ex. F at 45:15-46:8.

c. That's even though MSPD attorneys, as state employees, are entitled to three weeks per year of vacation time, plus paid holidays. Ex. E at 64:10-12; Missouri State Public Defender, Benefits, http://www.publicdefender.mo.gov/employment/benefits.htm (accessed Feb. 7, 2018).

d. Estimates more in line with what public defenders would be expected to spend on case-related tasks range from 1,662 hours per year (the estimate used by a study for the Massachusetts Committee for Public Counsel Services) to 1,800 hours (one expert's opinion). Ex. H at ☐☐ 192-94.

e. Third, the panel of criminal defense attorneys were told to assume "adequate support staff." Missouri Project at 39. As several district defenders testified, MSPD does not have adequate support staffing. *E.g.*, Ex. L at 20:7-9, 64:9-12. 98:10-21, 99:5-22 (insufficient number of investigators and insufficient administrative staff); Ex. E at 71:23-72:19 (office needs at least double the number of investigators to have sufficient support); Ex. C at 124:15-19, 125:4-13 (office needs triple number of investigators and double the support staff); Ex. M at 24:11-21, 25:16-13, 27:1-19, 33:3-34:24 (insufficient support staff, including investigators, legal assistants and clerks); Ex. J at 35:6-39:8; Ex. K at 39:22-43:9; Ex. Y at 24:4-23, 29:25-30:19.

f. Fourth, the estimates do not account for MSPD's high turnover rate. For instance, the Area 25 district office's capacity was calculated assuming 14 attorneys; in 2017, 10 of those attorneys were replaced, and each required a ramp-up time until they were carrying a full workload. Ex. E at 64:18-66:1.

g. Fifth, the Missouri Project estimates for each case type struck many MSPD attorneys as too low.

   i. To take one example, the Columbia Police Department mandates body camera usage for its police officers.  Assuming three officers go out to respond to an average misdemeanor assault, and it takes one hour to clear the case, simply watching the body camera footage should take a reasonable attorney three hours in that type of case.  Ex. N at 24:2-16.  But the Delphi panel accorded only 4.1 hours to review of discovery and investigation in a misdemeanor case.

   ii. The expert panel also gave a time per case estimate assuming one charge—an A/B felony, for instance—and did not account for the fact that many cases feature four, five, or six counts, each of which may require independent investigation.  Ex. L at 179:3-180:7.

   iii. Finally, District Defender Crowell testified that he was among the least experienced individuals in the Delphi group.  Ex. E at 155:9-156:3.  Accordingly, the Delphi group's recommendations reflected the time that an experienced attorney would spend on a particular task.

   iv. But the MSPD attorneys—on average, less experienced than Crowell, *see infra*, ⯀⯀ 101-13—would, if anything, require more time per case task than Crowell and his more experienced colleagues.

28. MSPD attorneys must also travel extensively, due to the geographic size of their districts.  Ex. H at  ⯀⯀ 7, 185, 218-20; Ex. C at 22:4-7, 31:3-18; Ex. E at 38:16-39:4; Ex. M at 14:19-15:4, 18:25-19:6; Ex. I at 15:12-16:12.

29. Until recently, MSPD's policy on handling conflicts exacerbated the travel problem: Where two indigent co-defendants were appointed counsel in one district, an MSPD attorney from a second district would represent one of the co-defendants, to avoid a conflict of interest. Ex. J 17:1-18:12.

   a. This necessitated extensive travel not only within geographically large districts, but across several such districts. *Id.*

   b. Although MSPD currently receives funding to send such cases to private conflict counsel for a flat fee (exclusive of mileage and litigation costs), such funding has been inconsistent and was withheld for two legislative cycles recently. *Id.*; Ex. F at 19:10-15; Ex. V (Elmer Dep. Day 1) at 17:8-16; Ex. J at 12:12-13:11 (does not expect funding to be renewed next fiscal year).

   c. Flat fees range from $375 for a misdemeanor to $10,000 for a first-degree murder case, with an average of $700 per case—nearly twice the amount MSPD spends on each case. Ex. F at 19:10-15; Ex. V at 17:8-16, 76:15-22.

30. Two factors govern MSPD's workloads. The first is the number of prosecutions in Missouri, which determines how many cases MSPD must handle. Missouri has the eighth highest number of prosecutions per capita of any State in the country. Ex. D (unnumbered page, A Message from the Director). The number of prosecutions is to some extent correlated with the number of prosecutors in a given office. Ex. C at 131:2-9.

31. The second is the funding allocated to MSPD, which in turn governs how many attorneys MSPD can hire.

32. In FY17, a total of $42.9 million was allocated to the MSPD, of which $39.4 million was released to the office ($3.5 million was withheld by Governor Nixon). Ex. D at 8.

33. That budget covers salaries, conflict counsel (private attorneys who take on cases where MSPD is representing a codefendant), statewide expenses, litigation expenses (such as expert witness payments, depositions, and so on), and local offices' operating expenses. Ex. F at 16:12-17:13.

34. In total, MSPD spends $325.13 per case in the Trial Division. Ex. D at 13.

35. In FY 2015, MSPD was 49th out of 50 States in the per capita funding it receives for indigent defense. Ex. W (Missouri State Public Defender System – By the Numbers) at 1.

36. MSPD stretches every dollar it receives, saving money in every conceivable way so as to hire as many MSPD attorneys as possible. Ex. F at 105:20-108:11.

37. MSPD salaries are very low, starting at $39,708, even though many of its lawyers graduate with significant student debt. Ex. D at 7.

    a. A lawyer with 20 years' experience may make only $63,912. Ex. A at 31:2-32:1 ("They could have tried a hundred murder cases, and we'll still pay them $65,000 a year or whatever it is."); Ex. X (Letter from Michael Barrett, Missouri Public Defender, to Hon. Eric Greitens, Governor of Missouri, Mar. 15, 2017) at 1.

    b. MSPD attorney salaries are so low that they lead to high turnover rates, as attorneys quit because they cannot afford to remain public defenders. Ex. II (Lear Dep. Day 2) at 16:13-18, 17:4-8, 24:7-27:24, 29:23-24, 70:8-15; *see also infra*, ¶¶ 101-13.

    c. For comparison, an elected prosecuting attorney in Missouri is required by state statute to earn $136,402; a District Defender, of equivalent stature in the public defender's office, will earn $79,601. Ex. D at 7.

    d. Given the number of hours MSPD attorneys usually work, one district defender calculated that the salary amounted to $15.00 per hour. Ex. E at 159:6-160:18.

38. The public defenders are incredibly dedicated and resilient. Ex. I at 23:23-24:13; Ex. M at 57:25-58:5. They often work nights and weekends without overtime pay. Ex. L at 3:5-13, 33:11-15; Ex. A at 235:22-236:13; Ex. N at 21:8-22. An "alarming percentage" of MSPD's attorneys routinely forfeit their vacation time in order to do more work on cases. Ex. X; Ex. L at 3:5-13, 33:11-15. And MSPD has chosen not to extend paid parental leave to its attorneys, because so doing would further exacerbate an "impossible workload burden." Ex. X.

39. MSPD also limits the amount it spends on contracting with private conflict counsel—its rates are so low as to be "kind of a joke." Ex. E at 93:9-15.

40. MSPD keeps its operating expenses to a shoestring.

   a. MSPD's Internet bandwidth is so low that attorneys cannot download and view police videos. Ex. G at 50:5-11.

   b. Many district offices are so loathe to buy new furniture that their chairs and other equipment are filthy from years of overuse. Ex. F at. 107:14-17.

41. MSPD is sometimes forced to save money in ways that harm its clients.

   a. For instance, attorneys are often encouraged to find an expert who is located nearby or who charges less, rather than the best expert for a given case. Ex. C at 47:12-24; Ex. L at 60:11-23.

   b. Sometimes, attorneys, anxious to conserve limited dollars, are encouraged to take depositions only when an investigator cannot interview a witness. Ex. A at 211:25-213:16.

42. As MSPD's comptroller summarized: "You know, we're running with copy machines that are ten years old. We're running with laptops that are seven years old. We hold a lot of

things together with spit and glue just to make them last longer.  I think public defender

mentality is that if it's—if it's not total trash, make do with it.  I mean, I'm appalled when I

go to some of the offices and they're sitting in chairs that really I want to towel before I sit

down.  They're that nasty."  Ex. F at 107:4-17.

43. Since every office and every lawyer is incredibly overextended, reallocating resources among

the 33 MSPD districts would be akin to "rearranging the deck chairs on the Titanic."  *State ex*

*re. Mo. Pub. Defender Comm. v. Waters*, 370 S.W.3d 592, 599 n.10 (Mo. 2012); *see also*

Carver Dep. 102:11-103:2 ("Every office is underwater; it's just a matter of how far

underwater they are.").

**THANKS TO THEIR HIGH WORKLOADS, MSPD ATTORNEYS ARE UNABLE TO ADVOCATE FOR**

**EACH DEFENDANT IN THE MANNER THAT PREVAILING PROFESSIONAL NORMS**

**REQUIRE.**

44. Expert testimony establishes that MSPD attorneys routinely represent defendants in a manner

that is not professionally competent.  Plaintiffs' experts—whose testimony was undisputed—

found that MSPD attorneys:

   a.  Work "in circumstances such that even where counsel is nominally available, the

       likelihood that any lawyer, even a fully competent one," could provide effective

       assistance is small.   Ex. H at ☐ 5; *see also* Ex. E at 61:2-20; Ex. A at 85:1-21

       ("[R]ight now, my knowledge of criminal law on your average day is generally

       useless because I don't have time to -- I don't have time to pursue it.").  They

       consistently fail to subject the cases against indigent defendants to "meaningful

       adversarial testing," and their workloads make it impossible to provide

       constitutionally effective assistance of counsel.  *Id.* at ☐☐ 6, 131.

b. Operate under an actual and perpetual "conflict of interest because [t]hey can only provide competent representation to some of their existing defendants by neglecting other defendants." Ex. O at 32.

c. Are unable to comply with a variety of professional rules, including MSPD's own guidelines, the American Bar Association standards, ethical norms, and Missouri's Rules of Professional Conduct, violations of which can result in disbarment. Ex. H at ☐☐ 210, 370-71, 396, 428.

d. Admit their inability to consistently provide professionally appropriate representation to defendants. Ex. H at ☐☐ 72, 76-79, 84, 92 (citing letters from district defenders and MSPD publications); Ex. S ("Unfortunately, the Missouri State Public Defender is not currently able to meet many of these standards because it is staffed to handle only a percentage of the total workload assigned to it this last year.").

e. Do not devote enough time to interview defendants, do not conduct necessary investigations, do not prepare sufficiently for hearings and trials, do not conduct sufficient legal research, and do not prepare adequately for hearings. Ex. H at ☐ 212.

45. In short, MSPD attorneys do not consistently provide effective assistance of counsel as required by the Constitution. Ex. O at 31; *see also* Ex. K at 174:12-24.

46. These failures stem directly from MSPD's high workloads and not from any operational inefficiencies. Ex. O at 31 (failures "stem from the MSPD's systemic deficiencies, which in turn result in Missouri public defenders having insufficient time, too many cases, too few resources, too much travel, and too little supervision to comply with their own Guidelines, the American Bar Association (ABA) Standards, ethical norms, or the Missouri and U.S. Constitutions"); Ex. H at ☐☐ 7, 131 (failures have numerous "structural and systemic

-19-

causes," primarily "inadequate and inconsistent representation funding" and "excessive workloads"); *see also* Ex. E at 60:21-61:1; Ex. C at 74:25-75:3; Ex. M at 35:6-16, 54:2-20, 162:5-8; Ex. I at 77:17-21; Ex. A at 104:3-19; Ex. L at 45:1-11.

47. The undisputed facts documented below buttress Plaintiffs' experts' conclusions that MSPD's high workloads have had a devastating impact on MSPD's ability to represent indigent defendants across the State.

### MSPD Attorneys Are Forced to Triage Cases, Pitting One Defendant's Interests Against Another's.

48. The most immediate consequence of these high workloads is that MSPD attorneys must choose which defendants will receive constitutionally adequate counsel. MSPD attorneys around the State agree that, for them and for other attorneys in their offices, providing the constitutional minimum to one defendant means that another defendant will receive constitutionally deficient representation. Ex. H at ¶¶ 174 (MSPD attorneys must "pick and choose" which cases they will spend time on), 198-209; Ex. E at 22:25-23:5, 120:18-121 ("[W]hen you're prioritizing, you're cutting corners."; triage occurs "every day"); Ex. C at 103:11-16 ("doing less on one case so they can do enough on another . . . happens every day"); Ex. M at 177:1-15, 177:22-179:25 206:3-207:3, 209:9-14; Ex. J at 83:16-85:12, 85:19-86:10 (describing triage as "shortcuts"); Ex. K at 55:1-4; Ex. N at 44:5-9; Ex. I at 44:3-18, 79:20-80:23.

49. Choosing which defendants' cases to pursue fully at the expense of other defendants' cases creates a conflict of interest and is in violation of the ABA and Missouri Rules of Professional Conduct. Ex. O at 32; Ex. H at ¶¶ 146, 206-08; *see also* Ex. E at 30:25-31:7, 91:1-18 ("[E]verything you do is sacrificing time for another client"; requests that waitlist

cases be assigned to conflict counsel because accepting these cases would violate ethical rules); Ex. C at 85:3-4, Ex. PP (Missouri State Public Defender Commission, Notice Pursuant to 18 CSR 10-4.010 of Pending Certification of Public Defender Limited Availability, Dec. 20, 2017 (Hackathorn Dep Ex. 52)) at 1 (every attorney in office has workload that creates conflict of interest with existing defendants "because they are forced to choose effective representation of one defendant to the detriment of other defendants"); Ex. K at 55:1-4; Ex. A at 88:4-9; Ex. I at 44:3-18, 79:20-80:23; Ex. BB (Motion to Withdraw Due to Excessive Caseload, *Woodham v. Missouri*, No. SD35211, Nov. 6, 2017).

50. Attorneys "triage" their cases—that is, decide which clients will receive constitutionally adequate assistance at any given moment—in different ways.

   a. In some offices, attorneys focus on preparing cases that are going to trial, while entirely ignoring their other cases in the meantime. Ex. C at 58:18-59:2, 59:3-60:1, 103:6-10; Ex. E at 120:4-17; Ex. H at □ 293 (attorneys must choose between preparing for trial and conducting regular jail visits).

   b. In other offices, defendants charged with more serious crimes, like rape and murder, are "neglected"—"the defendants don't get visited, discovery doesn't get reviewed"—in favor of defendants charged with low-level felonies. Ex. Y at 31:1-32:6.

   c. And in still other offices, district defenders, in an effort to avoid violating their ethical obligations by assigning line attorneys more cases than those attorneys can competently handle, take on enormous workloads, even though they will not be able to do any work on the vast majority of those cases. Ex. A at 74:4-12, 103:21-104:2, 140:3-24 ("As between all of us practicing ineffectively or just me, I'd rather it just

be me."); *see also* Ex. E at 12:9-15; Ex. M at 44:1-21 (caseload of 400, ranging from

speeding cases to murder cases; not realistic to give to other attorneys in office

because of inexperience); Ex. I at 48:4-10, 59:15-60:18; Ex. I at 74:14-53.

51. Though every office handles their case overload differently—there are no rules or policies

about how to triage cases, *see* Ex. M at 207:4-209:14 ("[b]y definition, triage is without any

rules, so there's no policies")—every office must cut corners as to some defendants' cases if

they want to ensure that other defendants receive adequate representation. This "Catch 22"

puts MSPD attorneys in the untenable position of robbing Peter to pay Paul, stealing hours

they should spend on one defendant's case for another defendant's. *E.g.*, Ex. A at 170:6-

171:14; Ex. E at 120:18-121:1; Ex. M at 177:1-15, 206:3-209:8.

52. As one of Plaintiffs' experts noted, the use of the word "triage" to describe day-to-day

practice in Missouri is "jarring"—"triage" is a word more appropriately reserved for the

battlefield than for the constitutional guarantee of the assistance of counsel. Ex. H at □□

206, 208-09; *see also* Ex. M at 177:22-179:25 (comparing triage in office to "a MASH

unit").

53. MSPD attorneys have been engaging in these sorts of triage efforts for decades. Ex. AA

(The Spangenberg Group & Center for Justice, Law and Society at George Mason

University, Assessment of the Missouri State Public Defender System, Oct. 2009) at 8 (2009

report that high workloads "require[] public defenders to divvy effective legal representation

to a narrowing group of clients" and individual public defenders are "forced to choose among

clients as to who will receive effective legal assistance"). More recently, several attorneys

and offices, rather than violate their ethical duties to avoid conflicts of interest, have filed

motions to withdraw from cases, turned down new cases, or reported themselves to the

Office of the Chief Disciplinary Counsel, the agency of the Missouri Supreme Court charged with investigating misconduct by lawyers. Ex. A at 165:4-17 (self-reported to Office); Ex. K at 117:16 – 118:18 (self-reported to Office); Ex. BB; Ex. CC (Letter from Justin Carver, Missouri Public Defender, to Office of the Chief Disciplinary Counsel, Oct. 30, 2017); *see also infra*, ¶¶ 124-54.

54. MSPD is not forced to triage because attorneys are inefficient.  Ex. O at 32 (former Air Force officer and MSPD attorney explained that applying efficiency skills learned in military service did not make a dent in workload).  Instead, triaging is a product of multiplication:  By any measure, MSPD attorneys have more cases than they can provide minimally adequate assistance on, so even the most efficient attorney would have to triage cases with MSPD's workload.  *See supra*, ¶¶ 11-43, 48-54.

### MSPD's High Workloads Prevent MSPD Attorneys from Performing Even the Most Basic Tasks of Legal Representation.

55. As both Plaintiffs' experts and MSPD attorneys from around the State testified, MSPD attorneys are routinely unable to engage in the basic functions of representation, lacking the time to communicate with defendants, investigate cases, review pretrial discovery, or file motions.  They negotiate and advise defendants on pleas with virtually no information about their clients or cases, and on the rare occasions when they go to trial, they are unable to adequately prepare.  They are unable to even be present at key stages of the trial process, let alone get ready for those key stages.  Coupled with a lack of training and supervision, and massively high turnover, these failings ensure that indigent defendants do not receive representation that accords with prevailing professional norms.  In each instance, deficits in representation exist across the class and are directly traceable to the high workloads.

56. **Defendant Communication:**  MSPD attorneys and expert witnesses agree that public defenders in Missouri are unable to communicate with their clients to the extent each case necessitates.  Ex. H at ¶¶ 94, 291-301; Ex. E at 22:10-23:5, 27:20-28:9, 28:17-20, 76:14-77:4; Ex. C at 23:9-24:5, 35:22-24, 132:22-133:4; Ex. M at 81:5-11, 82:25-83:3, 83:12-16; Ex. K at 61:5-62:3; Ex. A. at 78:22-79:11, 183:9-24; Ex. Y at 62:11-13; Ex. J at 83:2-8.

57. Indigent defendants routinely go many days after they are assigned a public defender without meeting their attorney.

    a. MSPD's guidelines state that each attorney should meet with her assigned defendant within seven days if the defendant is in custody—a number that one district defender noted was significantly higher than what he would want were he being represented. Ex. E at 76:14-77:4 ("The idea that I could be sitting in jail for seven days and not be – not see an attorney, that's crazy.  That's absolutely crazy, but that's what we have accepted as okay."); Ex. V (Elmer Dep. Day 1) at 102:1-11.

    b. Nevertheless, MSPD attorneys routinely violate the seven-day rule, waiting longer than a week to meet with most of their clients.  Ex. C at 26:14-24; Ex. E at 76:14-77:4; Ex. H at ¶ 294 (rarely saw within 7-10 days).

    c. Many MSPD attorneys do not meet with defendants prior to key preliminary hearings.  Ex. C at 19:21-20:4.

    d. In some cases, more than a month will lapse before an MSPD attorney finally meets her client.  Ex. Y at 58:6-12 (six weeks); Ex. DD (Appraisal Form for Dawn Calvin, Nov. 7, 2016 (Hackathorn Dep. Ex. 48)) at 1 (102 days).

    e. Sometimes, these initial meetings take place in or just outside of a courtroom right before a hearing.  Ex. E at 22:10-24; Ex. I at 37:22-38:13; *see also* Ex. M at 69:9-

72:14 (because more hearings are occurring by video, attorneys lose even in-court opportunities to communicate with clients).

    f.  In some counties, no initial meeting ever takes place if a defendant is not in custody. Ex. C at 18:1-13.

58. After the initial meeting, MSPD attorneys are unable to communicate with their clients with any degree of regularity.

    a.  Although MSPD's guidelines require attorneys to meet with their clients every 30 days, very few attorneys in the MSPD system are able to do so. Ex. C at 26:10-24; Ex. EE (Email from Joel Elmer to Service List, Oct. 13, 2002 (Petsch Dep. Ex. 1)); Ex. Y at 59:18-60:9 (difficult to meet even every 60 days); Ex. E at 76:14-77:4; Ex. H at ¶¶ 295, 301; Ex. V at 103:1-13.

    b.  Many offices have decreased their expectations, such that attorneys are not required to meet with their clients less frequently than every 30 days, but MSPD attorneys still have trouble complying. Ex. C at 14:13-15:1, 37:10-22; Ex. Y at 164:22-165:13.

    c.  Gaps of between three and 13 months between communications are routine, and in egregious cases, a defendant may wait three or four years with no word from her attorney. Ex. FF (Performance & Issues Entry Form, Mar. 2, 2017 (Hackathorn Dep. Ex. 49)) at 1; Ex. C at 37:23-38:4; Ex. Y at 87:8-88:3, 88:13-89:24; Ex. A at 71:25-72:23, 74:13-76:19, 77:12-78:21 (one indigent defendant sat in jail for three years with no contact from attorney; another sat in jail for four years with only one attorney contact, then had his case dismissed after five years and nine months of custody).

59. Even when MSPD attorneys do communicate with their clients, they are not always able to do so confidentially.

a. Sometimes, MSPD attorneys are forced to talk to their clients in courthouses or courtrooms. Ex. Y at 88:13-89:24; Ex. E at 22:10-24.

b. Sometimes, MSPD attorneys must visit their clients in jails that do not have private, soundproof rooms. Ex. E at 24:25-26:4 (visitation rooms in Phelps and Dent counties are private only if both parties whisper; in Pulaski County, visitation is by phone, which may be recorded); Ex. L at 44:12-45:18 (one jail has visitation rooms where either defendant or attorney can be heard; another places a correctional officer within earshot of attorney-client conversation); Ex. O at 23.

60. Perhaps as a result, MSPD attorneys' communications with their defendants tend to be perfunctory.

a. Though experts recommend at least one hour for an initial interview with a new client, MSPD attorneys rarely spend that time (and, in fact, would not have time to do such an interview with each defendant even if they did nothing else). Ex. H at ¶¶ 91, 94 (noting that MSPD attorneys spend, on average, only .9 hours in total on defendant communication, including an initial interview, in a misdemeanor case); Ex. E at 27:20-28:9; Ex. DD at 2; Ex. M at 102:8-104:11.

b. Conversations are often snatched in the back hallway of a courthouse or the back of a courtroom. Ex. E at 22:10-24; Ex. I at 37:22-38:13; *see also* Ex. M at 69:9-72:14 (because more hearings are occurring by video, attorneys lose even in-court opportunities to communicate with clients).

c. Even those courthouse conversations may not be with the same attorney each time; because MSPD attorneys frequently cover each others' pretrial appearances, a

defendant's appointed lawyer may not meet her until shortly before trial. Ex. H at ¶ 296.

    d.   One former MSPD attorney noted that, in private practice, he will spend more time on a free consultation for someone who is not yet his client than he spent at MSPD on interviews with his actual clients. Ex. H at ¶ 298.

    e.   Qualifying contacts—actual, substantive conversations that do not take place in a courtroom—do not occur in all MSPD cases. Ex. E at 28:13-20 (qualifying contacts in only 25 percent of cases); *see* Ex. C at 36:21-37:1 (defining "qualifying contact").

61. These deficits in defendant communication are largely due to MSPD attorneys' workloads. Ex. Y at 165:7-13; Ex. E at 27:5-28:9, 76:14-77:4; Ex. J at 47:9-51:5, 83:2-8; Ex. A at 71:25-72:23.

62. Because many defendants are incarcerated, a single visit takes far longer than if a defendant were able to come to the MSPD office to meet with her attorney.

    a.   MSPD attorneys must work around jails' and prisons' limited hours of operation. Ex. Y at 63:16-64:6; Ex. C at 23:8-24:5.

    b.   In some cases, the only confidential spaces available are difficult to schedule. Ex. C at 22:10-20; Ex. M at 102:8-104:11.

63. MSPD attorneys' inability to communicate consistently with defendants negatively impacts those defendants' cases because MSPD attorneys are unable to build trusting relationships and therefore cannot get information that may be crucial to making informed decisions about how to litigate a defendant's case. Ex. C at 132:22-133:13; Ex. K at 62:4-12; Ex. A at 71:25-72:23, 77:12-78:21; Ex. Y at 59:17-60:9, 62:4-64:12; Ex. H at ¶¶ 291-301; Ex. I at 81:22-82:21, 83:2-8.

64. **Investigation:** Across the State, MSPD attorneys confirm that only a fraction of their cases receive any investigation at all, let alone meaningful investigation. Ex. E at 28:21-29:22 (attorneys in district conduct adequate investigation in less than 25 percent of cases); Ex. Y at 69:13-71:23; Ex. C at 41:17-24, 48:3-6 (attorneys in district investigate in "around maybe ten percent" of cases); Ex. K at 69:14-71:3; Ex. O at 28-30; Ex. H at ¶¶ 15, 305-315 (MSPD attorneys "rarely investigate the facts in their cases"); Ex. Y at 59:17-71:5; Ex. I at 83:9-15.

65. Misdemeanors and low-level felonies rarely receive *any* investigation, and virtually all investigation ceases when defendants show any willingness to plead guilty. Ex. O at 28-29; Ex. K at 88:9-18, 93:5-19. *See also* Ex. B, at 23-24 (finding that MSPD attorneys spend only 0.4 hours on all investigation and discovery for misdemeanor cases, 0.2 hours for probation violations, and 0.8 hours for C/D felonies, in each case less than one-tenth of the recommended number of hours; spend 2.1 hours, less than one-eighth the recommended time, on investigation and discovery in A/B felonies; and spend less than half the recommended time on discovery and investigation in sex felonies and juvenile cases).

66. Ultimately, MSPD attorneys rely largely on the prosecution's version of events to shape their defense strategy and rarely have the time or resources to call that recitation of the facts into question. Ex. N at 14:17-15:3 ("We rely almost entirely on police reports and body cam videos that are provided to us to conduct an investigation or, at least, to steer it in the way we want it to go."); Ex. L at 54:21-55:3 (MSPD identifies witnesses not mentioned in police report in only 25 percent of cases that go to trial).

67. Experts confirm that MSPD's slapdash investigatory efforts are well below prevailing professional norms. Ex. O at 28-30; Ex. H at ☐☐ 305-315.

68. MSPD attorneys rarely have time to even identify what investigation needs to be done.

a. Attorneys do not have enough time to talk in any depth with their clients, meaning that defendants are unable to supply leads regarding key witnesses and evidence. *Supra*, ⁋⁋ 56-63; Ex. Y at 173:23-174:8.

b. They do not have the bandwidth to issue spot and identify evidence that ought to be collected. Ex. E at 23:6-24:9, 28:25-29:15.

c. Sometimes, they are too busy to even supply enough detail to request the necessary investigation from staff investigators. Ex. Y at 173:23-174:8.

69. Even when MSPD attorneys can identify what investigation needs doing, they are rarely able to actually conduct that investigation. Ex. A at 73:17-23 ("[E]ven when I can get to talk to a client, commonly, I will identify work that needs to be done on the case, investigation, things to pursue. Actually doing it is a whole other matter.").

a. Witnesses—even witnesses specifically identified by the defendant, and even complaining witnesses—routinely go uninterviewed. Ex. L at 54:21-55:3 (complaining witness interviewed 30 percent of time; other witnesses, less than 30 percent); Ex. C at 42:18-43:14; Ex. N at 14:17-15:3; Ex. K at 64:13-65:7; Ex. M at 84:19-85:21; Ex. GG (Performance & Issues Entry Form, Mar. 13, 2017); Ex. Y at 59:17-71:5.

b. Crime scenes are rarely visited. Ex. L at 55:18-20 (crime scene visited in fewer than 20 percent of cases); Ex. K at 67:16-68:9; Ex. N at 14:17-15:3; Ex. M at 84:19-85:21; Ex. Y at 59:17-71:5; Ex. O at 29.

c. Depositions, to which defendants are entitled by right in Missouri, are rarely taken, even when the case demands it; in particular, this means police conduct is rarely questioned. Ex. M at 87:20-90:7; Ex. K at 65:8-67:14; Ex. H at ⁋⁋ 281, 314-15 (one

former MSPD attorney "can count on one hand" the number of depositions she took in 3.5 years); Ex. O at 30; Ex. A at 243:3-25; Ex. C at 47:25-48:6 (depositions in roughly 10 percent of cases); Ex. L at 56:18-23, 195:24-196:21.

   d.  And mitigating evidence is virtually ignored, even though such evidence may make the difference between probation and a long term in prison.  Ex. O at 30; Ex. N at 28:4-29:3; Ex. E at 55:15-57:18 (consulted with mitigation expert twice in career).

70. On the rare occasion where an MSPD attorney is both able to identify the need for investigation and has the time to perform the requisite investigation, the investigation is often too late to be of use.  Ex. O at 29.

   a.  Surveillance videos, for example, are often deleted before attorneys can secure and review them.  Ex. Y at 29:7-22; Ex. A at 121:16-123:9.

   b.  Witnesses become less credible the later they are interviewed.  Ex. M at 87:7-19. Depositions are most effective when a witness' memory is fresh, but MSPD attorneys rarely have time to do depositions until a month or two before a trial date. Ex. C at 48:7-19; Ex. Y at 67:14-68:1143:4-16.

   c.  Sometimes, witnesses become unavailable before they can be interviewed.  *E.g.*, Ex. I at 92:16-93:5.

   d.  Physical evidence, such as blood, can deteriorate to the point where it is no longer testable or becomes stale.  Ex. A at 121:16-123:9; Ex. N at 50:1-3.

   e.  And sometimes, a witness is interviewed too late to be called at trial—with devastating consequences.  Ex. H at □ 286 (describing incident where MSPD attorney did not interview alibi witness until morning of trial and was not allowed to call witness; defendant sentenced to life without parole).

71. Attorneys also do not have the requisite support staff to whom they can delegate investigative tasks. Ex. J at 35:6-39:8; Ex. Y at 21:17-22, 22:18-20, 27:22-29:6, 171:9-14; Ex. H at ☐☐ 309-310. Across the State, attorneys must either "get in line" to utilize investigators, Ex. M at 27:1-19, 33:4-34:24; or else the office's policy limits those cases on which investigators are able to work, Ex. Y at 171:9-14.

72. In Plaintiffs' expert's undisputed opinion, the rate of expert usage at MSPD is "far too low." Ex. H at ☐☐ 316, 323-336; *see also* Ex. L at 195:24-196:21; Ex. V at 30:19-32:16 (availability of funds affects expert witness usage).

73. Because MSPD attorneys are unable to identify key investigative points or conduct investigation early in a case, they are also unable to utilize expert witnesses, because they either do not recognize the utility of an expert until too late in a case, because they do not have the time to find an expert or to gather salient evidence to present to an expert witness, or simply because they do not have the travel time to work with an expert. Ex. M at 28:9-15, 28:23-29:6, 213:11-214:10; Ex. C at 45:12-23 (no expert request except in most complicated cases); Ex. A at 185:19-186:7, 244:7-20, 245:2-5; Ex. E at 34:17-35:9; Ex. J at 36:4, 89:6-19; Ex. K at 71:22-73:7, 74:11-19; Ex. H at ☐☐ 283, 318-321.

74. **Discovery Review:** Expert witnesses who have reviewed the evidence and public defenders around the State agree that MSPD attorneys are unable to review discovery to the extent each case requires and that this inability is directly traceable to a lack of time. Ex. A at 185:6-18; Ex. L at 61:22-62:15; Ex. H at ☐☐ 200, 212, 251, 280, 427; Ex. O at 29; Ex. M at 93:21-94:1; Ex. Y at 186:23-187:9.

75. In some offices, attorneys are not able to file even basic requests for discovery in a timely fashion. *See, e.g.*, Ex. C at 54:22-56:1, Ex. FF at 2.

76. Even in offices where discovery is routinely requested, attorneys are sometimes unable to file follow-up motions to obtain missing documents, generally limiting their discovery practice to a "one-time, formal boilerplate request."  Ex. O at 29; *see* Ex. E at 31:11-13 (discovery-related motions are "rarely" filed).

77. Even when attorneys obtain complete discovery, they are rarely able to review it in any depth, let alone to issue-spot and track evidentiary leads in a way that would allow development of a robust defense.  Ex. C at 43:18-45:3 (95-99 percent of the time, pretrial discovery in misdemeanor or probation violation cases is being reviewed on the day of the hearing; C or D stealing or tampering offenses are given "one quick reading and that's about it"); Ex. L at 61:24-61:9 (attorneys do not have time and resources to obtain and review discovery in the manner each case requires).

78. And even when discovery is reviewed carefully, it is often not reviewed until late in the life cycle of a case, too late to file suppression motions, for instance, or to use the discovery as a basis for a trial defense.  Ex. A at 118:12-18 ("On my desk, I've got a stack of CDs and DVDs that have been sitting there for a couple of weeks; haven't looked at them, don't know what's in them. Not going to have a chance to look at them anytime soon. I mean, any of the substantive legal work that I should be doing, right now, there isn't time to get it done."); Ex. Y at 73:6-20 (attorneys worry they plead defendants to charges without adequately reviewed discovery); Ex. O at 29 (conversely, attorneys who wait to fully review discovery before pleading defendants often consign defendants to unnecessary jail time); Ex. K at 79:6-82:4 (suppression motions may not get filed because review of discovery that could reveal suppression issues is untimely); Ex. L at 146:14, 147:4-23 (MSPD attorneys must routinely continue cases because they have not reviewed discovery); Ex. H at ☐☐ 319, 321 (discovery

materials are often reviewed on "the eve of trial" and don't allow MSPD attorneys time to hire an expert witness).

79. **Legal Research and Motions Practice:** Experts and district defenders around the State agree that MSPD attorneys should be doing far more legal research and filing far more pretrial motions than their workload currently allows. Ex. C at 50:24-51:13, 52:20-53:10; Ex. FF at 2 (attorneys in district file pretrial motions in only 10 percent of cases); Ex. M at 106:20-108:9; Ex. A at 186:8-22; Ex. H at □□ 302-04.

80. Where pretrial motions are filed, they are usually boilerplate motions with little case-specific information or motions that rely on an attorney's experience, rather than legal research. Ex. C at 50:24-51:13, 52:20-53:10; Ex. E at 40:5-41:1.

81. Time constraints are the primary reason so few pretrial motions are filed. Ex. C at 51:6-13; Ex. E at 40:22-41:1, 42:18-28; Ex. M at 106:20-108:9; Ex. K at 79:6-82:4.

   a. Because MSPD attorneys don't have time to investigate cases or review discovery, they often do not learn of the facts that should trigger, for instance, a motion to suppress. Ex. H at □□ 305-306, 310-15.

   b. Even where MSPD attorneys identify the need for a pretrial motion, they sometimes do not have time to draft the motion. Ex. H at □□ 302-04.

   c. And even where MSPD attorneys are able to draft motions, they frequently do not have time to do the legal or factual research to support such motions. Ex. C at 50:24-51:13, 52:20-53:101; Ex. U at 133:14-134:4.

82. **Plea Negotiations and Counseling:** MSPD attorneys are unable to either negotiate pleas or counsel defendants on whether to accept pleas in the manner each case demands. Ex. C at 60:17-20, 61:24-62:2; Ex. E at 49:23-51:19; Ex. A at 187:7-21; Ex. H at □ 8; Ex. O at 27.

**83.** A defendant's plea offer will often improve if an attorney investigates a case, helps the defendant obtain pretrial release, asks a social worker to assess sentencing alternatives, and communicates adequately with a defendant—all tasks MSPD attorneys rarely have time to do.  Ex. A at 187:22-188:13; Ex. H at ¶ 16; Ex. O at 29.

84. First, because MSPD attorneys have not spoken with defendants about their cases and have not adequately investigated those cases, they have very little leverage and give prosecutors very little reason to fear going to trial.  Ex. C at 61:24-62:2; Ex. H at ¶¶ 97, 279; Ex. Y at 145:6-21.

85. Defendants who remain in custody have even less leverage, as they must remain behind bars until trial, meaning that a failure to get a defendant out of custody may result in her taking an inappropriately harsh plea deal.  Ex. E at 40:1-43:24, 132:13-21; Ex. H at ¶¶ 8, 168, 272; Ex. I at 92:16-93:5 ("[E]motionally, it's not good for the clients to have these cases hanging over their heads for long periods of time.").

86. Second, absent sufficient information about a case, a trusting relationship with a defendant, and the time to talk a defendant through the consequences of a plea, plea counseling is ineffective; high workloads foreclose MSPD attorneys from having any of those three prerequisites.  Ex. C at 24:6-25:17, 60:17-20 ("The majority of our clients are uneducated.  A lot of them have difficulty reading and writing.  Many of them have mental health issues.  It takes so much more time to explain complex legal matters to them.  Sometimes you need to reexplain, reexplain, and reexplain to them, and they deserve that kind of attention and they do not – they do not get it."); Ex. H at ¶¶ 94, 136, 313; Ex. O at 6, 24, 30.

a. In particular, MSPD attorneys do not have the time to identify and make sure their clients understand the collateral consequences of a plea deal. Ex. N at 49:7-25; Ex. C at 24:6-25:17; Ex. O at 27, 30.

b. Because MSPD attorneys do not have time to acquire immigration expertise, consult with immigration experts, or even identify which of their clients may have immigration status concerns, MSPD attorneys frequently cannot adequately counsel defendants as to the immigration consequences of a plea agreement. Ex. C at 63:23-64:11; Ex. E at 53:8-55:11; Ex. A at 187:22-188:13, 188:20-24; Ex. H at □ 97.

87. This deficient representation during plea agreements is compounded by the fact that MSPD attorneys must plead out the vast majority of their cases, as they do not have the bandwidth to take many cases to trial. Ex. N at 49:7-25; Ex. H at □□ 14, 287-90; Ex. C at 56:2-57:2, 122:16-123:4; Ex.E at 40:1-44:16; Ex. J at 90:13-19, 92:1-16; Ex. K at 82:5-19. One percent of MSPD's cases go to trial, as compared to six percent of state-court cases nationwide. Barrett Dep. 43:13-18; *Missouri v. Frye*, 132 S. Ct. 1399, 1407 (2012).

88. **Preparation for trial and hearings:** As a result of high workloads, MSPD attorneys are unable to prepare for trials and hearings in the manner those court appearances warrant. Ex. C at 57:3-12; Ex. E at 46:21-47:1 ("not enough hours in the day"); Ex. K at 83:23-84:1; Ex. M at 116:6-117:10 (there may be outlier trials for which an attorney is prepared, but that preparation comes at the detriment of all other defendants); Ex. A at 186:23-187:6.

89. The sheer number of cases that MSPD attorneys must prepare for trials or other hearings— even if those cases wind up in plea agreements before the court appearance—would alone foreclose adequate preparation. Ex. L at 70:2-21, 93:12-19 (prepared 20 felony cases for trial

and tried 18); Ex. H at □ 203 (one MSPD defender's eight weeks of back-to-back jury trials required extensive triage.).

90. On top of the cases that are set for trials or hearings, of course, MSPD attorneys must juggle hundreds of other court appearances and client meetings, meaning that one or the other will get neglected.  Ex. C at 57:3-12; Ex. M at 11:6-117:10; Ex. L at 70:2-21.

91. MSPD attorneys attempt to ameliorate this dilemma by taking continuance after continuance; at a certain point, however, continuance motions become ineffective, as MSPD attorneys worry about the time expenditure of preparing a continuance motion or about how much longer they can shortchange their other cases.  Ex. M at 100:6-101:10; Ex. N at 30:19, 30:23-31:17; Ex. E at 37:17-38:15.

92. MSPD attorneys spend very limited time preparing a direct and cross examination, an opening and closing statement, or voir dire.  Ex. E at 47:2-18.

93. However little time they spend preparing themselves for trial, MSPD attorneys spend even less time preparing their clients for trial, sometimes preparing a defendant to testify in just one conversation.  Ex. C at 58:5-17.

94. Even with adequate time to prepare before a trial or hearing, however, MSPD's cases suffer from pretrial investigative deficits:

   a. By the time MSPD attorneys are preparing for trial, they should have completed all their investigation and depositions.  Ex. E at 47:2-18.  But because of their caseloads, they are unlikely to have done so.  *See infra*, □□ 64-73.

   b. And the deficits in investigation described *supra* mean that MSPD attorneys are hamstrung at trial—they can't do an effective cross-examination because they haven't

Case 2:17-cv-04057-NKL   Document 153   Filed 02/09/18   Page 45 of 100

gathered impeachment evidence, or they must overcome inadmissible and prejudicial evidence because they haven't filed motions to suppress in time.  Ex. O at 30.

95. In some districts, these failures of preparation are still more acute in less serious cases.  Ex. C at 79:22-80:5 (for misdemeanor and probation violation defendants, no "real attention"; "basically a warm body in there making an off-the-cuff argument").

96. **Absence at Key Stages:**  Public defenders in Missouri are routinely absent during important stages of their clients' proceedings.  Ex. H at ☐ 8; Martin Dep. 54:25-55:25; Ex. E at 18:10-18, 19:10-20; Ex. M at 64:21-66:25.

97. MSPD attorneys often are not appointed until after a defendant is brought before a judge for the first time.  They miss counsel status hearings, bond hearings, and arraignments.  Ex. J at 54:25-55:25; Ex. L at 52:7-18; Ex. E at 18:10-18, 19:10-20; Ex. J at 52:10-53:5; Ex. K at 49:24-52:9; Ex. A at 182:3-183:4; Ex. H at ☐ 271-76.

98. The consequences of being unrepresented at these initial appearances can be significant for defendants:

    a. Sometimes, defendants waive defenses available to them, such as the right to a change of venue or the right to remain silent.  Ex. M at 64:21-66:25; Ex. E at 18:18-19:20.

    b. Even where a defense is not waived as a procedural matter, a defense may be effectively waived by the passage of time, as witnesses disappear and memories go stale before an attorney is appointed to a case.  *E.g.*, Ex. M at 64:21-66:25; Ex. A at 79:1-80:24, 81:13-17, 82:8-14; Ex. N at 50:1-3; Ex. I at 89:16-90:5.

c. In egregious cases, defendants will even plead guilty before seeing an attorney—a phenomenon that has become more common since the implementation of waitlists. *See infra*, ⬚⬚ 124-54; Ex. E at 18:18-19:20; Ex. A at 123:20-124:11.

d. Since the institution of the waitlists, defendants sometimes must attend court hearings before an attorney is assigned to their case. *Infra*, ⬚⬚ 124-54; Ex. C at 92:23-93:7.

e. Defendants will sometimes say things in open court that they should not have and that will hamstring their case at a later date. Ex. E at 14:24-15:11.

f. Without an attorney to advocate for them, defendants are often detained pre-trial or face exorbitant bond requirements. Although such detention could theoretically be remedied in some cases by a bond reduction motion, MSPD attorneys rarely have time to seek such a remedy, thanks to their high caseloads, and even where they do seek such a remedy, they don't have time to paint a full picture about a client's flight risk by interviewing family members, gathering records, and so on. Instead, MSPD attorneys often just make "very quick off-the-cuff arguments" and "just a paragraph that kind of references the law." Ex. C at 133:14-134:14; Ex. E at 44:17-45:20, 46:11-47:18; Ex. M at 76:25-77:3, 78:18-79:5; Ex. J 56:1-58:3.

99. Even after an MSPD attorney is appointed to a case, she may not have time to attend all of the important proceedings that comprise a criminal case.

a. In some districts, attorneys do not attend all psychiatric evaluations. Ex. M at 142:11-13.

b. In other districts, attorneys do not attend crucial interviews that will produce sentencing recommendations. Ex. M at 145:14-147:24; Ex. L at 74:5-20.

c. In juvenile cases, MSPD attorneys do not attend lineups, and MSPD attorneys are not assigned counsel for the period between certification of a juvenile as an adult and their first appearance, even though that time period is crucial for investigation.  Ex. JJ (Johnson Dep.) at 129:25-130:16.

100.    In order to continue moving caseloads, judges sometimes force whole categories of defendants to proceed without counsel at any phase of their trial.  In Cole County, for instance, there is an unwritten rule that criminal nonsupport cases—for which a defendant might face between four and seven years in prison—do not get assigned counsel because the judges are wary of further overburdening MSPD.  Ex. A at 51:10-52:3, 59:13-60:22, 60:23-61:2.

101.    **Turnover, Training, and Supervision:**  MSPD has unusually high turnover that is due primarily to massive caseloads and low salaries.  Ex. II at 16:13-18, 17:4-8, 29:23-24 (exit interviews always focus on caseloads and salary); Ex. V at 105:22-106:8; Ex. Y at 136:3-15; Ex. M at 21:24-22:4 ("Every day that no one leaves is a good day."); Ex. J at 15:23-17:12 (lose one attorney out of eight every nine months); Ex. D at 7; Ex. I at 62:23-63:7 (four out of five line attorneys have changed recently); Ex. A at 26:17-19, 27:5-12, 27:21-28:3 (five out of seven left within last year).

102.    The upshot is that many district offices within MSPD are staffed primarily with inexperienced attorneys.  *E.g.*, Ex. L at 84:6-23 (half of lawyers in office have been practicing law one year or less); Ex. E at 66:2-16 (a "senior" lawyer would be one with a year of experience and would be expected to mentor more junior lawyers); Ex. Y at 135:12-21 (between five and seven of 20 attorneys in district are new hires); Ex. E at 13:17-14:6,

64:23-65:3 (eight or nine attorneys in district have less than one year of experience; office has made 10 new hires in last 18 months).

103.    Turnover has gotten worse in recent years.  Ex. E at 68:21-69:6; Ex. Y at 136:3-4; Ex. A at 25:2-3.

104.    Many MSPD attorneys leave the office to become prosecutors, because they are burnt out from being public defenders and crave a job where they are respected and can control their caseloads.  One district defender even said that he feels like he is training young MSPD attorneys to become prosecutors and hopefully become "a little more human in the process." Ex. E at 144:13-23; 69:7-70:18, 159:6-160:18 ("You don't get paid very well for what you do and you lose that fire that you had when you were in law school about wanting to help people or fight injustice or defend the constitution or whatever it was that motivated you to become a public defender in this first place."); Ex. A at 27:5-12; Ex. V at 106:9-23.

105.    The consequences of an attorney's departure for members of the Plaintiff class are legion.

   a.    The departing attorney's cases must be reassigned to others within the district, each of whom is likely already overwhelmed with her own cases.  *Id.*; Ex. M at 23:5-13; Ex. K at 21:24-22:4; Ex. N at 40:14; Ex. A at 28:16-29:4, 82:1-7 ("train wreck" when multiple lawyers leave office and cases must be redistributed); Ex. E at 106:3-108:4.

   b.    Many cases—particularly serious cases—are thus handled by four and five attorneys sequentially, as the original attorneys assigned to the case leave; this kind of turnover makes it virtually impossible to build a trusting client relationship.  Ex. E at 106:3-108:4; Ex. A at 28:16-29:4, 29:5-23, 34:3-9.

   c.    Every time an attorney leaves MSPD, the next attorney assigned to a case must get up to speed on the case, further delaying progress.  Ex. E at 106:3-108:4; Ex. I at 64:8-

15; Ex. A at 29:5-23 ("[Y]ou know, frankly, if it were my kid who kept getting a new lawyer every two or three months and the lawyer says, Look, hey, give me some time; I've got to get up to speed. You know, I'll look at the thing, I'll come talk to your child in jail, and they get up to speed, and they go talk to the child in jail, and then they leave, and then the case gets reassigned -- I mean, if that had been my child, I would be furious.").

    d.   In addition, the replacement attorney must duplicate all the work that the departing attorney performed, further stretching the office's bandwidth. Ex. A at 29:24-30:12.

    e.   Several attorneys, including the district defenders themselves, must take time out of their schedules to interview and hire replacement attorneys, further reducing the number of hours spent on actual case work. Ex. E at 106:3-108:4.

    f.   Positions often remain open for many weeks or months, which means that MSPD must operate with even less manpower and must lower its standards to make new hires. Ex. C at 12:4-14; Ex. E at 106:3-108:4, 108:24-109:8, 121:24-123:7, 124:25-125:15; Ex. L at 96:15-19; Ex. V at 79:7-14.

106.   Although MSPD attorneys are often inexperienced, they are frequently placed on cases that call for more seasoned attorneys, with negative consequences for their clients.

    a.   Because there are so few experienced lawyers, inexperienced lawyers are often assigned complex rape and murder cases. Ex. A at 86:9-87:17; Ex. L at 95:15-96:7.

    b.   Inexperienced lawyers have very little leverage in plea negotiations, in part because they do not know what would qualify as a good plea and in part because prosecutors know that these new attorneys are afraid to go to trial. Ex. E at 56:21-58:4.

c.  An inexperienced lawyer is less likely to identify a key issue—such as a motion to suppress—in a case.  Ex. L at 67:8-15.

107.  Even the most passionate, committed, and experienced in MSPD's ranks are considering leaving public defense.  Ex. A at 85:22-86:8 ("2017 has certainly made me consider other employment options.  Yeah. I mean, I'm not -- I'm certainly not practicing the way I want to be.  My clients are given the short end of the stick. It's not fair to them. I would not want me as a lawyer right now.  And -- I'm not sure how long I'm going to do this.  Give me a rational caseload, I'll retire with the agency. 200 cases, I don't know how much longer ...")

108.  The frequent turnover in MSPD's ranks is exacerbated by a lack of training and supervision.

109.  MSPD attorneys have a difficult time carving out the hours for formal training, so much of the job entails learning on the job (and therefore at the expense of actual clients).  Ex. E at 66:2-68:1; Ex. M at 90:8-91:5, 139:7-13.

110.  MSPD attorneys must ramp up quickly, rapidly going from a low initial caseload to a caseload fit for a far more seasoned attorney.  Ex. Y at 17:14-18:1; Ex. A at 46:16-47:6.

111.  Even the most talented attorneys come in with a knowledge deficit about how the system works—which courtrooms are which, how to handle procedural issues, and so forth.  Ex. E at 66:24-68:1.

112.  In part because there are very few senior attorneys and in part because the district defenders do not have the bandwidth to do so, new attorneys receive very little mentorship or supervision.  Ex. C at 80:17-20; Ex. M at 47:7-17; Ex. K at 23:9-24:21, 28:1-15; Ex. E at 66:2-68:12, 61:9-62:9.

113.	Finally, it is difficult to justify the investment in training, since constant turnover means that as soon as a new attorney is trained, it's time to train another.  Ex. E at 66:24-68:1; Ex. A at 28:16-29:4.

114.	**Juveniles:**  MSPD also represents juvenile defendants in both juvenile and criminal proceedings, pursuant to Missouri Revised Statutes § 211.211, which provides indigent youth with the right to court-appointed counsel "prior to the filing of a petition" and "for all stages of the proceedings" thereafter.  In Fiscal Year 2017, MSPD was appointed to represent juveniles in 1,556 cases, including violent, non-violent, and status offenses.  Ex. D at 20.

115.	As recently as 2013, the National Juvenile Defender Center (NJDC) deployed dozens of experts in Missouri to study its juvenile court system and assess the extent and quality of representation being provided to children in the State.  Ex. KK (National Juvenile Defender Center, Missouri:  Justice Rationed, Spring 2013 (Johnson Dep. Ex. 22)).  The NJDC Report concluded that, after "endur[ing] at least two decades of crushing caseloads and inadequate resources to provide its mandated services," Missouri's juvenile indigent defense system is "broken" and is improperly "forced to ration services."  *Id.* at 7.

116.	Moreover, like their adult counterparts, juveniles accused of crimes in Missouri often go unrepresented at critical stages of their cases.  Ex. JJ at 80:12-81:5 (describing lack of representation for juveniles in co-defendant cases in the days/weeks following initial detention hearing).  The report concluded that nearly 60 percent of court-involved children in Missouri go without a public defender entirely.  NJDC Report at 35.  MSPD's Director of Juvenile Defense and Policy testified that she did not disagree with any of NJDC's findings.  Ex. JJ at 32:18-22.

117.  Several districts do not have any attorneys with specialized training in juvenile

proceedings.  *E.g.*, Ex. E at 53:10-16; Ex. K at 108:22-109:5 (decision to close juvenile

office was based solely on money).

118.  Many of the same time constraints that hamstring MSPD attorneys in representing adults

also hamper their ability to represent juveniles; these issues are exacerbated by the facts that,

first, juveniles who are "certified" (tried as adults) are often placed in custody quite far away

from the MSPD office that represents them, and second, communicating with juvenile clients

requires more time.  Ex. E at 59:17-60:20; Ex. M at 154:6-23, 155:1-24.

**THIS INABILITY TO ADVOCATE FOR DEFENDANTS HAS DRAMATIC CONSEQUENCES ON THE**

**OUTCOMES OF CASES**

119.  Perhaps unsurprisingly, expert witnesses and MSPD attorneys around the State agree that

these deficits in representation have a dramatic impact on the outcomes of cases, routinely

resulting in MSPD attorneys overlooking evidence, legal theories, or witnesses and

defendants taking pleas to harsher sentences or more serious charges or missing a chance at

exoneration as a result.  Ex. H at □□ 187, 190; Ex. J at 96:1-9; Ex. K at 191:18-192:1.

120.  Deficits in representation at every stage of the process often turn out to be outcome-

determinative.  For example:

a.  MSPD's absence at an initial appearance may mean that a defendant will make a

damning statement, hamstringing a defense going forward.  Ex. E at 18:15-19:20;

Ex. K at 52:10-53:7.

b.  Defendants also lose their opportunity to move to change judges or venues

because they do not have counsel to guide them.  Ex. E at 19:8-20, 19:24-20:15.

c. When an MSPD attorney is unable to get her client out on bond and the defendant is detained pretrial, the defendant is much less likely to fight their charges and more likely to quickly take a plea, even if the defendant could have secured a better plea deal had she been willing to wait. Ex. E at 44:11-16 ("[T]he jails are miserable . . . [T]hey don't even treat [defendants] like people. So all that - their whole being is how do I get out of this situation. What's the fastest route to get me out of custody. If that's pleading guilty, they'll plead guilty."); Ex. I at 93:23-94:4.

d. An inability to consistently communicate with defendants forecloses a trusting relationship between a defendant and her attorney, meaning that a defendant is unlikely to rely on an attorney's advice about, for instance, whether to take a plea; brief communications often mean that defendants—particularly those with mental health issues or difficulties reading or writing—do not fully understand the consequences of their decisions to plead guilty. Ex. C at 79:22-80:5, 24:6-23, 38:9-39:2, 39:16-24; Ex. E at 23:6-24:9.

e. Because they do not have time to investigate the foundations of an indictment, MSPD attorneys lose the opportunity to dismiss cases early in their proceedings. Ex. E at 41:10-42:5.

f. When MSPD attorneys are unable to investigate their cases or file suppression motions, they lose leverage with prosecutors in plea negotiations and cannot present a robust defense at trial. Ex. O at 29-30; Ex. A at 185:6-18, 186:8-22.

g.   When MSPD attorneys must rely on boilerplate motions, judges often recognize that the motions plead no case-specific information and are disinclined to grant relief.  Ex. C at 53:3-10.

h.   In cases that end in pleas—the vast majority of MSPD's cases—MSPD attorneys could have negotiated better plea deals had they come with "ammunition," such as exonerating evidence, legal defenses, or successful motions or had the plea negotiations not taken weeks (or months or years) to get underway, leaving defendants too anxious to hold out for a better offer.  Ex. Y at 145:6-21, 146:6-22, 149:9-150:12, 223:18-224:2 ("[s]everal times a month per attorney," he is told that a lawyer is uncomfortable with a guilty plea but defendant cannot wait in jail long enough for attorney to work up a case); Ex. O at 29-30.

i.   In the few cases that go to trial, MSPD attorneys often realize that their case is missing a key component—a deposition of an important witness, for instance— too late to do anything about it, resulting in a diminished chance that a defendant will be acquitted.  Ex. E at 30:5-31:7; Ex. K at 69:25-70:5.

j.   Defendants will often get better outcomes where attorneys are able to prepare for sentencing, including investigating sentencing alternatives.  *See, e.g.*, Ex. K at 84:2-85:12; Ex. E at 55:15-56:20; Ex. I at 97:5-21; Ex. A at 117:16-118:18 (ability to coordinate treatment programs that might allow clients to reduce time in custody is "virtually zero").

121.   MSPD attorneys must routinely ask for continuances and other allowances for delay, because they are unable to consistently prepare cases in a timely fashion, often leaving their clients to wait further in pretrial detention.  That reliance often backfires at the further

expense of defendants. Ex. H at □ 286 (defendant sentenced to life without parole because overburdened MSPD attorney identified alibi witness too late to be allowed to call witness at trial); Ex. E at 36:10-37:8 (did not receive continuance to secure mental health expert on PTSD; as a result, defendant was convicted of statutory rape).

122. MSPD attorneys describe natural experiments—time periods during which for, whatever reason, they are able to fully work up a case—that prove the obvious: Cases where attorneys do some work see better outcomes for defendants. For instance, one office that has placed new defendants on a waiting list to more fully serve existing defendants has seen an uptick in depositions and motions and, correspondingly, better outcomes for defendants. Ex. E at 32:11-33:6, 42:18-25, Ex. QQ (Affidavits of Current and Former Public Defenders, Oct. 31, 2017 (Carver Dep Ex. 26.)). In that same district, attorneys have begun filing motions to dismiss indictments, to good effect. Ex. E at 41:2-42:25.

123. Finally, the inordinate wait times for cases to get any attention from their assigned MSPD attorney—wait times that have only increased with the implementation of wait lists around the State, *see infra*, □□ 124-54—often lead to worse outcomes because defendants are willing to bargain away a better result in order to leave jail. Some feel pressured to plead guilty well before MSPD attorneys can complete an investigation or discovery; others will waive their right to counsel in order to move proceedings along, and in some cases, desperate defendants will even negotiate their own plea deals, obviously resulting in worse pleas than those that an MSPD attorney with the benefit of time to investigate the case might produce. Ex. C at 95:12-96:9; Ex. A at 66:6-68:23; Ex. C at 79:22-80:5; Ex. L at 63:13-65:2.

MISSOURI'S INDIGENT DEFENSE DEFICITS HAVE REACHED A CRISIS POINT.

124.    On September 12, 2017, the Missouri Supreme Court issued an order in the matter of *In re Hinkebein*, affirming the recommendations of the state Disciplinary Hearing Panel and finding that Karl William Hinkebein, a senior attorney for the Appellate/PCR Division of the Missouri Public Defender Office, violated Rules 4-1.3 and 4-1.4(a) of the Rules of Professional Conduct and should be disciplined, including by suspending Mr. Hinkebein's law license indefinitely.[8]  Order, *In re Hinkebein*, SC96089 (Mo. Sept. 12, 2017).

125.    Specifically, the Disciplinary Hearing Panel determined that, in the course of his representation of several different indigent defendants, Mr. Hinkebein failed to keep his clients adequately informed about their cases, in violation of Missouri Rule of Professional Conduct 4-1.4(a) and failed to act with reasonable diligence and promptness in the representation of his clients, in violation of Missouri Rule of Professional Conduct Rule 4-1.3. *See* Ex. Z (Disciplinary Hearing Panel Decision, *In re Hinkebein,* No. DHP-16-004, (Mo. Nov. 2, 2016)).

126.    Among other things, the Panel found that, with respect to at least six of his former clients, Mr. Hinkebein had gone months—sometimes years—without communicating with them; missed critical filing deadlines; and failed to file significant motions and other documents on behalf of his clients.  *Id.* at ¶¶ 13-121.

127.    Notably, the Panel reached its conclusions notwithstanding Mr. Hinkebein's contention that his inability to remain in consistent contact with his clients, and his failure to take timely action on their behalf, were the result of ongoing health problems between 2010 and 2014, *Id.* at ¶¶ 147-148, and, more significantly, his overwhelming workload. *Id.* at ¶¶ 151-152.

---

[8] The Court ultimately stayed the suspension and placed Mr. Hinkebein on probation for one year.

128.    Mr. Hinkebein noted that he had approximately 110 cases on his docket at the time of the

disciplinary hearing, while his supervisor admitted that he was forced to assign an

unreasonable number of cases to Mr. Hinkebein in light of the office's heavy workload.  *Id.*

at 152, 160.

129.    MSPD senior staff testified that a number of studies had already found that the state's

public defense system is saddled with more cases than it can "ethically, reasonably, or

effectively handle," *id.* at 161.  Nevertheless, the court found that Mr. Hinkebein violated his

ethical obligations to his clients and deserved to be disciplined as a result.

130.    In the wake of the *Hinkebein* decision, MSPD district offices across Missouri were

thrown into a state of uncertainty and panic, as public defenders sought guidance from their

supervisors, the courts, and the Office of Chief Disciplinary Counsel to determine the

implications for their own careers.  *See* Ex. V at 99:6-14 ("Alarm, fear. Attorneys

quitting…"); Ex. C at 81:7-13; Ex. E 77:14-20; Ex. M at 172:25-173:10; Ex. J at 66:9-69:17;

Ex. K at 117:15-118:18, 138:15-140:16.

131.    Indeed, public defenders in MSPD district offices around the state, who, like their

colleague, Mr. Hinkebein, are laboring under crushing workloads and, as a result, are

providing similarly deficient representation to their clients, expressed profound concern

about their own professional lives following the *Hinkebein* decision.  *Id.*

132.    In the days and weeks that followed, public defenders in a number of districts informed

their supervisors that they were overwhelmed by their current workloads, and could not

ethically continue to take on additional cases. Ex. E at 77:14-20; Ex. C at 81:14-82:3; Ex. J at

66:9-69:17; Ex. K at 114:22-115:15, 117:16-118:18; Ex. I at 46:17-22, 90:22-91:6, 126:12-

127:4.

133.    Some defenders have resigned, or have expressed their intent to resign, from their

positions if they continue to be unable to do their jobs in a way that complies with their

ethical and constitutional obligations.  Ex. A at 167:13-169:11; Ex. E at 95:24-96:14; Ex. M

at 173:3-10.

134.    Beginning in late September 2017, MSPD District Defenders in a number of jurisdictions

took steps, formal and informal, to inform the courts in their respective areas that their

offices could no longer continue to accept appointments, unless and until their workloads

diminish.

135.    Those steps included sending letters to the applicable judges alerting them that MSPD

attorneys do not have the capacity to accept any more cases.  Ex. LL (Email from Rod

Hackathorn, District Defender, to Hon. Thomas Mountjoy, Hon. David Jones & Hon. Calvin

Holden, Oct. 10, 2017 (Hackathorn Dep. Ex. 53)) (informing judges of waitlist); Ex. E at

77:21-78:5; Ex. MM (Letter from Anthony Cardarella, District Defender, to Hon. Janet

Sutton, Hon, James Van Amburg & Hon. Thomas Chapman, Oct. 2, 2017 (Cardarella Dep.

Ex. 15)); Ex. M at 168:20-169:13; Ex. K at 134:18-21), and filing motions to withdraw from

certain cases or for writs of prohibition preventing judges from continuing to appoint MSPD

attorneys to additional cases.  Ex. BB.; Ex. NN (Petition for Writ of Prohibition and

Suggestions in Support, *State ex rel. Petsch v. Hon. Patrick W. Campbell*, (Mo. Ct. App. Oct.

25, 2017) (Petsch Dep. Ex. 7)); Ex. BB; Ex. E at 104:19-105:4; Ex. A at 109:3-110:25,

123:20-124:11; Ex. HH (Draft Motion to Withdraw Due to Excessive Caseload (Crowell

Dep. Ex. 54)).

136.    Indeed, the MSPD administration provided templates and model motions for public

defenders to use in the event that they needed to refuse cases going forward or seek

withdrawal from any current cases.  Ex. OO (Draft Suggestions in Support of Writ of Prohibition and/or Mandamus); Ex. K at 125:1-126:4.

137.     On October 11, 2017, Area 35 District Defender Leslie Hazel and Defendant Michael Barrett, in his capacity as MSPD Director, filed a Petition for Writ of Prohibition in the Missouri Court of Appeals to prevent the further appointment of MSPD attorneys in the 35th Judicial Circuit.

   a.  The Relators noted that District Defender Hazel had informed the circuit court on September 28, 2017, that "'[i]n light of the recent OCDC recommendation that a public defender's license be suspended due to his alleged failure to comply with the Rules of Professional Conduct,' and after consulting with the individual attorneys in her office regarding workload, case type, experience level and other work requirements, 'every attorney in the Area 35 Public Defender's Office, including myself, is currently unable to accept additional cases while also providing ethical, effective and competent representation to our existing defendants'"  Hazel Pet. for Writ of Prohibition ¶ 7.

   b.  The Relators further noted that Ms. Hazel had made clear to the circuit court that continuing to accept appointments in light of the current workload crisis would force public defenders to violate, or risk violating, the Rules of Professional Conduct, including Rules 4-1.1 (competence), 4-1.3 (diligence), 4-1.4 (communication), and 4-1.7 (conflict of interest), as well as the Sixth Amendment right to effective assistance of counsel.  *Id.* at ¶ 10.

   c.  The circuit court was unmoved and appointed the public defender's office to additional cases.  *Id.* at ¶ 15.

d.   Following the appointments, Defendant Barrett wrote a letter to the court further objecting to the appointments, also citing the relevant Rules of Professional Conduct, and informed the court that the MSPD intended to file a writ to prohibit the appointments. *Id.* at ¶ 16.

e.   The petition was ultimately denied by both the Missouri Court of Appeals and the Missouri Supreme Court.  Ex. UU (Denial, *State ex rel. Hazel and Barrett v. Hon. Robert Mayer*, No. SC96736 (Mo. Oct. 17, 2017) and Order, *State ex rel. Hazel and Barrett v. Hon. Robert Mayer*, No. SD35176 (Mo. Ct. App. Oct. 13, 2017)).

138.    But perhaps most disturbing was the decision made by numerous District Defenders to begin placing indigent defendants on waiting lists.

139.    District Defenders across the state communicated with the criminal court judges in their districts to inform them of the implications of the *Hinkebein* decision and the MSPD's intention to begin refusing cases and establishing waiting lists for indigent defendants whose cases have been assigned to MSPD attorneys—all in a desperate effort to comply with both the criminal courts' orders appointing them to represent new defendants *and* the Missouri Supreme Court's finding that attorneys are ethically required to refuse representation if they do not have the capacity to provide an adequate defense. Ex. C at 81:8-82:3, 85:14-86:7; Ex. PP; Ex. B; Ex. M at 181:4-183:12; 184:4-9, 183:13-17; Ex. J at 69:24-70:1; Ex. K at 126:5-8; Ex. N at 44:20-45:23, 66:9-24; Ex. I at 90:6-15; Ex. A at 105:1-108:24.

140.    The waiting lists in the various districts statewide include hundreds, if not thousands, of individuals, Ex. C at 86:8-23; Ex. E at 79:7-11; Ex. J at 77:9-15; Ex. K at 127:9-15; Ex. N at 45:9-10, many of whom have been charged with serious felonies and will remain in pretrial detention, without access to counsel, until an MSPD attorney is available to provide

constitutionally sufficient representation. Ex. E at 81:22-82:17; Ex. J at 79:4-10; Ex. K at 127:19-128:6.

141.    The waiting lists in some districts are still growing and will continue to do so as workloads continue to rise. Ex. C at 91:7-11; Ex. E at 127:21-128:10.

142.    Moreover, because their criminal cases are proceeding notwithstanding the fact that they have been placed on a waiting list, some indigent defendants have been required to appear before the court without counsel. Ex. C at 92:23-93:7.

143.    District defenders also noted that continuing to add cases to their already overwhelming workloads would constitute an inherent conflict of interest since any significant time or resources a public defender spends on one case further limits that defender's ability to devote the necessary time and resources to other cases. Ex. K at 55:1-4; Ex. E at 91:12-18, 120:4-121:1; Ex. PP at 1; Ex. M at 177:1-15; Ex. N at 44:5-9. This is particularly true given the "triage" nature of MSPD representation. Ex. J at 83:16-85:12.

144.    In response to the complaints from district defenders, a number of courts urged the MSPD to simply comply with Mo. Rev. Stat. § 600.063 if they believed that an attorney's individual workload was too high. Crowell Dep. 101:22-102:9, 102:20-103:7; Ex. M at 232:7-13. Sec. 600.063 states, in relevant part:

> Upon approval by the director or the commission, any district defender may file a motion to request a conference to discuss caseload issues *involving any individual public defender or defenders, but not the entire office*, with the presiding judge of any circuit court served by the district office. The motion shall state the reasons why the individual public defender or public defenders will be unable to provide effective assistance of counsel due to caseload concerns.

Mo. Rev. Stat. § 600.063 (emphasis added).

145.    As the language of the statute suggests, § 600.063 is not designed to address systemic

deficiencies in the delivery of indigent defense services.  A number of district defenders

nonetheless have filed motions seeking a meeting with the relevant judges, pursuant to §

600.063, but noted that the workload problem in their office goes well beyond that of any one

attorney. Ex. RR (Motion Requesting Conference to Discuss Caseload Issues, *In re Area 16*

*Public Defender Office*, No. 1716-MC13258 (Mo. Cir. Ct., Nov. 1, 2017) (Petsch Dep. Ex..

8)); Ex. E at 101:22-102:9, 102:20-103:7, 103:11-104:4; Ex. M at 232:7-13, 233:18-235:24.

146.    Because § 600.063 was crafted specifically to address workload complaints by individual

attorneys, however, the courts, by and large, have refused to engage with the district

defenders with respect to the alleged systemic problem.  Ex. K at 137:2-138:14; Ex. J at

75:16-77:6; Ex. E at 101:22-102:16.

147.    Despite the objections articulated by district defenders through their informal

communications with the court, as well as through formal legal filings, and notwithstanding

their acknowledgment that a workload problem exists, at least with respect to particular

attorneys,  Ex. E at 101:22-102:16, criminal court judges around the state continue to appoint

MSPD attorneys—including the district defenders themselves—to additional cases.  Ex. SS

(Email from Christopher Piatt, Assistant Public Defender, to Michael Barrett, Missouri

Public Defender, Nov. 20, 2017); Ex. E at 118:7-120:3; Ex. A at 82:25-83:11.

148.    This has made it even more difficult for district defenders to supervise their less

experienced attorneys and further exacerbates the workload problem for all involved.  Ex. J

at 64:12-20.

149.    One judge suggested that MSPD attorneys continue to take cases, but string their clients along by taking many continuances.  Ex. A at 126:14-127:1.

150.    Another judge recommended that MSPD attorneys no longer wait to receive complete discovery before pleading clients and that a "pro se docket" of felony charges be implemented.  Ex. TT (Finding and Order, *In re Area 25 Public Defender Office,* No. 17PH-CV02226 (Mo. Cir. Ct., Jan. 11, 2018)).

151.    Indeed, in light of the courts' insistence that she continue to represent indigent defendants under the current circumstances, District Defender Ruth Petsch took the extraordinary step of self-reporting to the Office of Chief Disciplinary Counsel, noting that she was in violation of not only the ethical rules governing representation of defendants, but also the rules governing her responsibilities as an attorney supervisor.  Ex. K at 139:3-140:16.

152.    District Defender Justin Carver also chose to self-report since he continues to receive appointments (over his objection) despite his admission that he is "definitely not providing competent representation" to all 213 of the defendants he currently represents.  Ex. A at 165:4-17.

153.    According to a number of district defenders, courts are not appointing members of the private bar in any significant number in an effort to help alleviate the workload problem, and there are few lawyers in the rural parts of Missouri with the capacity to take on pro bono appointments.  Ex. A at 83:12-84:19, 113:4-114:24; Ex. E at 84:12-24, 99:6-9, 99:17-20, 105:9-106:2.

154.    Particularly following the fallout from the *Hinkebein* decision, district defenders from across the state have acknowledged that, under the circumstances, the public defenders in

their offices—including themselves—are unable to provide constitutionally sufficient representation to their clients.  Ex. A at 189:15-190:11; Ex. K at 113:2-15.

### III.     SUMMARY JUDGMENT STANDARD

This Court should grant summary judgment to Plaintiffs because, viewing the uncontroverted evidence in the light most favorable to Defendants, there is no genuine issue of material fact and Plaintiffs are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Grey v. City of Oak Grove*, 396 F.3d 1031, 1034 (8th Cir. 2005).

### IV.     ARGUMENT

The uncontroverted facts amassed from documents, depositions, and expert analysis demonstrate, and as MSPD's own director has admitted, that Defendants are continually violating Plaintiffs' right to counsel.  Ex. G at 93:1-8, 95:19-24.  Plaintiffs' uncontroverted evidence show a violation of their right to counsel in at least five different ways, any one of which would be sufficient to entitle Plaintiffs to summary judgment on their constitutional claims:

First, the evidence shows that substantial structural limitations ensure that even the most competent attorney could not provide adequate representation and that the State's cases are not subjected to adversarial testing; as this Court noted in denying State Defendants'[9] motion to dismiss, courts around the country have held that such a showing is sufficient to prove a Sixth Amendment violation on a systemwide basis.  § IV.A; Dkt. 69, at 36.

---

[9] Plaintiffs will refer to Governor Greitens and the State of Missouri as "State Defendants" and to MSPD Director Michael Barrett and the MSPD Commissioners as "MSPD Defendants."

Second, Defendants cannot and do not dispute that MSPD attorneys operate under an actual and perpetual conflict of interest, pitting each client's interest in constitutionally adequate representation against other defendants', such that an hour spent on one case is an hour further from effective representation on another—a Sixth Amendment violation no matter the consequences for the outcome of a defendant's case. § IV.B.

Third, per the uncontroverted facts in this case, MSPD attorneys perform their duties at a standard well below prevailing professional norms. § IV.C.

Fourth, Plaintiffs are entitled to injunctive relief on their claims to prevent the high risk of a conviction or a plea deal that might have been staved off or mitigated by constitutionally competent counsel. § IV.D.

And finally, the uncontroverted evidence shows that indigent defendants around the State are routinely being denied the prompt appointment of counsel, going unrepresented during crucial periods of their case, and, in some cases, never receiving counsel at all—actual deprivations of the right to counsel that cannot be remedied without lowering workloads at MSPD. § IV.E[10]

Any one of these theories, standing alone, would entitle Plaintiffs to relief. That relief must be prospective and systemwide. § IV.F. This Court has rejected State Defendants' assertions in prior filings that any relief under the Sixth Amendment must come from the framework set out in *Strickland v. Washington*, 466 U.S. 668 (1984), and therefore is not available on a classwide basis or before conviction. Dkt. 69, at 34-36. As this Court explained,

---

[10] MSPD's representation of juveniles deprives them of their right to counsel for the same reason that its representation of adults is constitutionally deficient. *In re Gault*, 387 U.S. 1, 36 (1967) ("no material difference" in constitutional requirements for representation of adults and juveniles).

"In fact, it is 'well settled' that the Sixth Amendment right to counsel is broader than the question of whether a court must retrospectively set aside a judgment due to ineffective assistance of counsel." *Id.* at 34 (quoting *State ex rel. Mo. Pub. Def. Comm'n v. Waters*, 370 S.W. 3d 592, 607 (Mo. 2012)). The right is "affirmative and prospective," and "*Strickland* is inapplicable when systemic deficiencies in the provision of public defense are at issue." *Id.* at 34 (quoting *Waters*, 370 S.W.3d, at 607, and *Tucker v. State*, 394 P.3d 54, 62 (Idaho 2017)).

Plaintiffs also seek summary judgment as to their claims under the Due Process Clause of the Federal Constitution; Article I, sections 10 and 18(a) of the Missouri Constitution; Mo. Rev. Stat. §§ 600.042, 600.048, 211.061, 211.211; and Mo. R. Juv. P. 126.01.[11] As explained in § IV.G, Plaintiffs are entitled to summary judgment on these claims for the same reasons they are entitled to summary judgment on their Sixth Amendment claim.

A. **THE UNCONTROVERTED EVIDENCE DEMONSTRATES THAT MISSOURI'S PUBLIC DEFENDERS ARE SO HAMSTRUNG BY THEIR WORKLOADS THAT THEY ARE UNABLE TO MEANINGFULLY SERVE AS AN ADVERSARY TO THE STATE, CONSTRUCTIVELY DEPRIVING PLAINTIFFS OF COUNSEL.**

The Sixth Amendment treats a lawyer so hamstrung by circumstances as to be unable to meaningfully advocate as no lawyer at all. Accordingly, criminal defendants "constructively" denied counsel, like defendants literally denied counsel, need not make any showing of "prejudice" to prove a Sixth Amendment claim. Courts from New York to Florida to Washington have recognized such constructive denials on a system-wide basis. The uncontroverted facts about MSPD attorneys—their sporadic communication with defendants, the frequency with which they must rely on the State's version of events, the pressure they feel to

---

[11] Plaintiffs previously consented to the Court's dismissal of their claims under Mo. Rev. Stat. §§ 600.048, 600.042, 211.211, and 211.061 and under Mo. R. Juv. P. 126.01 against Governor Greitens. Dkt. 69, at 47.

plead out as many defendants as quickly as possible, and the enormous workloads at the root of all those deficiencies—establish that defendants assigned to MSPD, including Plaintiffs and the putative class they represent, are constructively denied counsel as a result of MSPD's massive workloads.

The United States Supreme Court has long recognized that formal appointment alone does not mean that an accused is receiving the right to counsel. Even where counsel in name accompanies a defendant through the criminal process, a defendant may be "constructively" denied the right to counsel. For instance, in *Powell v. Alabama*, 287 U.S. 45, 58 (1932), a lawyer assigned the morning of trial was not considered to be counsel within the meaning of the Sixth Amendment. In *Avery v. Alabama*, 308 U.S. 444, 446 (1940), an attorney denied the opportunity "to confer, to consult with the accused and to prepare his defense" is "a sham." And in *United States v. Cronic*, 466 U.S. 648, 654 (1984), the Supreme Court listed circumstances that would amount to constructive denial of counsel. As relevant here, the Supreme Court offered as examples cases in which "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing" and where "although counsel is available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance" is miniscule. *Id.* at 659-60.

Crucially, a claim of constructive denial of counsel is conceptually distinct from a *Strickland* claim of ineffective assistance of counsel. The former alleges *no* representation—a lawyer in name only—while the latter alleges specific errors in the course of representation. *See Roe v. Flores-Ortega*, 528 U.S. 470, 483 (2000); *Penson v. Ohio*, 488 U.S. 75, 88 (1988). Where counsel is constructively absent—as when counsel is actually absent—no showing of prejudice is required. *See Cronic*, 466 U.S. at 659 n. 25 ("The Court has uniformly found constitutional error

without any showing of prejudice when counsel was either totally absent, or prevented from assisting the accused during a critical stage of the proceeding."). There is therefore no reason that a completed prosecution is necessary for a defendant to make out a constructive denial of counsel claim—the claim requires no showing of prejudice, so there can be no argument that it must be raised post-conviction.

Courts around the country have acknowledged that, upon a proper evidentiary showing, indigent defendants are entitled to relief for system-wide claims of constructive denial of counsel. *See, e.g.*, *Tucker v. Idaho*, No. 43922, 2017 Opinion No. 38, 394 P.3d 54 (Idaho Apr. 28, 2017); *Kuren v. Luzerne County*, 146 A.3d 715 (Pa. 2016); *Wilbur v. City of Mount Vernon*, 989 F. Supp. 2d 1122 (W.D. Wash. 2013); *Hurrell-Harring v. State*, 930 N.E.2d 217, 222 (N.Y. 2010); *Luckey v. Harris*, 860 F.2d 1012, 1018 (11th Cir. 1988). Although these cases vary in their particulars, each identified two general conditions for a finding of constructive denial of counsel: first, "on a system-wide basis, the traditional markers of representation" are absent or significantly compromised; and second, "substantial structural limitations" cause that absence or limitation. *Tucker v. Idaho* Amicus Brief by the United States, at 25, available at https://www.justice.gov/opa/file/850831/download (synthesizing existing case law).

The undisputed facts of this case make clear that Plaintiffs are being constructively denied their right to counsel. As in *Powell*, a defendant's MSPD attorney may not have "any opportunity to acquaint himself with the facts or law of the case"—though MSPD attorneys are not assigned cases on the morning of trial, they admit to going to trial with little to no preparation and, in the vast majority of cases, to advising defendants to plead guilty without having done any meaningful investigation or significant legal research. *Powell*, 287 U.S. at 59. As contemplated by *Avery*, MSPD attorneys are denied the opportunity to "confer, to consult

with the accused and to prepare his defense"—communication between MSPD attorneys and their defendants is late, limited, and infrequent. *Avery*, 308 U.S., at 446.

Indeed, Plaintiffs have demonstrated that the situation in Missouri is analogous to two of the examples of constructive deprivation of counsel given in *Cronic*. First, MSPD attorneys routinely "entirely fail[] to subject the prosecution's case to meaningful adversarial testing," as Plaintiffs' experts concluded, without dispute; MSPD attorneys must rely on police reports to at best shape and at worst substitute for their own research and investigation. *Cronic*, 466 U.S., at 659-60. MSPD attorneys routinely plead defendants guilty without having conducted any witness interviews, engaged in any legal research, or even reviewed the discovery in the case. *Supra*, ☐☐ 64-87. And second, extraordinarily high workloads make it exceedingly unlikely that "any lawyer, even a fully competent one, could provide effective assistance" to her clients; Plaintiffs' experts testified as much, and district defenders—MSPD's most experienced attorneys and the "fully competent" attorneys contemplated by *Cronic*—testified without dispute that they were exceedingly unlikely to be able to provide effective assistance of counsel as a result of their enormous workloads. *Supra*, ☐☐ 44-47.

Missouri's uncontrovertibly dysfunctional indigent defense system also resembles the systems identified by other courts around the country as amounting to a constructive denial of counsel. As one expert put it, a judge in one case where relief was granted for the constructive denial of counsel "could have been describing" MSPD's misdemeanor practice when he wrote that "[t]here is almost no evidence that [the public defenders] conducted investigations in any of their thousands of cases, nor is there any suggestion that they did legal analysis regarding the elements of the crime charged or possible defenses or that they discussed such issues with their defendants" and that "[i]n general, counsel presumed that the police officers had done their jobs

correctly and negotiated a plea bargain based on that assumption."  Ex. H at □ 97 (quoting

*Wilbur v. City of Mount Vernon*, 989 F. Supp. 2d 1122, 1124 (W.D. Wash. 2013)).

The United States Department of Justice has endorsed prospective relief on the basis of a

constructive denial of counsel in several amicus briefs and has identified two indicia necessary to

make out such a claim:  an absence of traditional markers of representation and substantial

structural limitations.  *See Tucker v. Idaho*, Amicus Brief by the United States, at 25.  Both are

hallmarks of MSPD's representation.  As to the first, MSPD attorneys are rarely able to

communicate with their clients; their conversations are sporadic, non-substantive, brief, and

often less-than-confidential.  *Supra*, □□ 56-63; *see Kuren*, 146 A.3d, at 730 (identifying "timely

and confidential communication with defendant" as a traditional marker of representation);

*Wilbur*, 989 F. Supp. 2d, at 1124 (noting "[a]lmost complete absence of opportunities for the

accused to confer with counsel"); *Hurrell-Harring*, 930 N.E.2d, at 224 (constructive denial of

counsel where counsel was uncommunicative).  Attorneys for indigent defendants interview

witnesses in only a fraction of their cases, interview all witnesses identified by a defendant or a

police report in still fewer, and identify new witnesses in fewer still.  *Supra*, □□ 64-73; *Kuren*,

146 A.3d, at 744 ("appropriate investigation" is hallmark of representation); *Wilbur*, 989 F.

Supp. 2d, at 1124 ("no evidence of investigation"); *Hurrell-Harring*, 930 N.E. 2d, at 224

(counsel makes "virtually no efforts on behalf of nominal defendants").  There is little evidence

of legal analysis and "substantive hearings and trials are rare."  *Wilbur*, 989 F. Supp. 2d, at 1124;

*supra*, □□ 79-95.  And Missouri's indigent defense system encourages quick pleas, made

without full investigation or counseling.  *Supra*, □□ 79-87; *Wilbur*, 98 F. Supp. 2d, at 1124

(system "amount[s] to little more than a 'meet and plead' system).

As to the second indicator identified by the Department of Justice, MSPD has been laboring under "substantial structural limitations" for decades. Report after report, from outside entities, respected accounting firms, professional associations, and MSPD itself, has chronicled MSPD's lack of resources. *Supra*, ⬜⬜ 11-43. Workloads exceed national recommendations by two- and threefold. *Id.* MSPD attorneys, both current and former, noted that resource constraints were the single biggest determinant of how they approached cases. *Supra*, ⬜⬜ 55-118. And given the ratio of indigent defendants to public defenders, there simply aren't enough hours in the day for MSPD attorneys to subject the accusations against their clients to meaningful adversarial testing. *Supra*, ⬜⬜ 44-47.

In short, there is no dispute that the conditions of MSPD's representation indicate a complete breakdown of the adversarial system and are analogous to those identified by other courts as indicia of a constructive denial of counsel.

**B.    THERE IS NO DISPUTE THAT MSPD ATTORNEYS LABOR UNDER AN ACTUAL AND PERPETUAL CONFLICT OF INTEREST, CONSTANTLY TRIAGING CASES AND TAKING TIME FROM ONE DEFENDANT TO REPRESENT ANOTHER.**

Given the ongoing scarcity of time and resources at MSPD attorneys' disposal, providing constitutionally adequate representation to one defendant of necessity requires foregoing constitutionally adequate representation to others. Such a conflict of interest violates the Sixth Amendment whether or not there is any showing of prejudice. *See Holloway v. Arkansas*, 435 U.S. 475, 484 (1978) (Sixth Amendment violation whether conflict had any impact on outcome of case).

The Sixth Amendment guarantee of the assistance of counsel is a guarantee of "untrammeled and unimpaired" loyalty; representation by an attorney "struggl[ing] to serve two masters" amounts to a denial of counsel for purposes of the Sixth Amendment. *Glasser v.*

*United States*, 315 U.S. 60, 70, 75 (1942). In other words, an attorney forced to choose between the interests of two clients—codefendants with conflicting defenses, for instance, or a current and a former client—is no attorney at all as far as the Constitution is concerned.

Such a conflict of interest is created by constitutionally intolerable workloads. Where an attorney is unable to provide constitutionally adequate representation to all her clients, her clients' interest are in opposition: doing the constitutional minimum for one defendant necessarily takes time that could be spent providing the constitutional minimum to another. *Public Defender, Eleventh Judicial Circuit of Fla. v. State*, 115 So. 3d 261, 267 (Fla. 2013); s*ee also People v. Roberts*, 321 P.3d 581, 589 (Colo. App. 2013) (finding defense counsel's workload was sufficiently excessive to "allow the trial court to determine that a potential conflict of interest existed"); *State ex rel. Missouri Public Defender Comm'n v. Waters*, 370 S.W. 3d 592, 609 (Mo. 2012) (accepting too many appointments is a violation of ethical rules and the Sixth Amendment); *In re Edward S.*, 92 Cal. Rptr. 3d 725, 746-47 (Cal. Ct. App. 2009) ("[A] conflict of interest is inevitably created when a public defender is compelled by his or her excessive caseload to choose between the rights of the various indigent defendants he or she is representing."); *United States ex rel. Green v. Washington*, 917 F. Supp. 1238, 1275 (N.D. Il. 1996) ("[C]onflicts of interest are necessarily created as a surfeit of clients compete for the scarce resources of available attorney time and attention."); Missouri Supreme Court Rule 4-1.7(a)(2) (conflict of interest where "there is a significant risk that the representation of one or more defendants will be materially limited by the lawyer's responsibilities to another defendant [or] a former defendant").

The undisputed facts show that MSPD attorneys operate under just such constraints, routinely pitting the constitutional demands of each defendant against several others. *Supra*, ☐☐

48-54. As the uncontested expert testimony in this case indicates, the triage required by MSPD's workloads creates a potential and actual conflict of interest. *Id.* Although MSPD offices around the State juggle those constraints in different ways—some neglect all their defendants except the ones going to trial, others prioritize their less serious felony cases over their more serious cases, and still others overload the managing district defenders so that other attorneys can adequately attend to their cases—all offices must triage across defendants and cases, picking and choosing which defendants receive something approaching constitutionally adequate representation. *Id.*

Where, as here, a conflict of interest is raised before trial and conviction, no showing of prejudice is necessary to make out a Sixth Amendment violation. *Holloway*, 435 U.S. at 487. Once a conflict of interest is established, prejudice is presumed, and courts need not undertake "nice calculations as to the amount of prejudice arising from its denial." *Glasser*, 315 U.S. at 76. Establishing prejudice would, after all, be impossible: In a conflict of interest case, "the evil … is in what the advocate finds himself compelled to *refrain* from doing." *Holloway*, 435 U.S., at 490. While "it may be possible in some cases to identify from the record the prejudice resulting from an attorney's failure to undertake certain trial tasks," to "judge intelligently the impact of a conflict on the attorney's [total] representation of a client," including such matters as potential plea negotiations, "would be virtually impossible." *Id.*, at 490-491. Because every member of Plaintiffs' putative class , by definition, has yet to have their cases resolved, proof of MSPD attorneys' conflicts of interest is enough to prove that Plaintiffs' Sixth Amendment rights are being violated.

Even if Plaintiffs had not raised their claims prior to the resolution of their cases—which they have—the Sixth Amendment still would not require a showing of prejudice. Rather, a defendant alleging a Sixth Amendment violation need only show that a conflict of interest

"actually affected the adequacy of his representation"—it needn't have rendered representation constitutionally deficient under the *Strickland* standard, and it needn't affect the outcome of the case. *Cuyler v. Sullivan*, 446 U.S. 335, 349-50 (1980).[12] Here, defender after defender testified without dispute that the conflict of interest affects every aspect of their representation. They give short shrift to some cases because they are trying to investigate others, advise defendants to accept plea deals because they know they will have to go to trial on other defendants' cases, prepare for some defendants' hearings at the expense of visiting other defendants, and make decisions about which witnesses to interview in one case on the basis of how much time they must allocate to their other cases. *Supra*, ¶¶ 48-54. Plaintiffs' conflicting interests, in other words, "actually affect[] the adequacy of [their] representation."

There is no dispute, in sum, that members of Plaintiffs' class have not received their Sixth Amendment due because their attorneys' loyalties are hopelessly divided.

**C. PLAINTIFFS HAVE PRODUCED UNCONTROVERTED EVIDENCE OF SPECIFIC DEFICITS IN REPRESENTATION THAT RENDER MSPD ATTORNEYS' REPRESENTATION UNREASONABLE UNDER PREVAILING PROFESSIONAL NORMS.**

In order to *overturn* a conviction under the Sixth Amendment, a defendant must show, first, deficient performance—that "counsel's representation fell below an objective standard of reasonableness . . . under prevailing professional norms"—and, second, prejudice—that the

---

[12] Although the Supreme Court and other courts have found that this rule does not apply to every possible conflict of interest, courts agree that *Cuyler* supplies the appropriate standard at least where the conflict arises between the interest of two co-defendants rather than in part from the self-interest of an attorney. *See Beets v. Scott*, 65 F.3d 1258, 1265 (5th Cir. 1995). So, for instance, *Cuyler* would not govern a case where defense counsel advised defendant on the conduct giving rise to the charge, *see Covey v. United States*, 377 F.3d 903, 907 (8th Cir. 2004), because the potential conflict of interest is between the defendant's interest and the defense attorney's self-interest, but it would apply to cases of multiple or serial representation, *see Caban v. United States*, 281 F.3d 778, 782 (8th Cir. 2002), because the conflict of interest in such cases is between two defendants. Here, MSPD attorneys face a conflict of interest between multiple defendants—time spent on one defendant's case is time not spent on another's—and *Cuyler* governs.

-66-

"deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 688. But *before* a defendant is convicted, she must only show the former (deficient performance) to make out a Sixth Amendment violation, which Plaintiffs have done along every possible measure of prevailing professional norms.

*Strickland*'s "prejudice" prong is designed to measure whether counsel's deficient performance would "warrant *setting aside* the judgment of a criminal proceeding" and to identify principles that "should apply in federal collateral proceedings as they do on direct appeal or in motions for a new trial"—in post-conviction contexts, in other words. *Strickland*, 466 U.S. at 691, 697 (emphasis added). The considerations limiting relief where a defendant seeks to overturn a conviction—concerns for finality and judicial economy—simply do not apply when prospective relief is sought. *Luckey*, 860 F.2d at 1017.

In that sense, the Sixth Amendment resembles every other trial-related constitutional right. A court may require proof that the deprivation of the right had an impact on the outcome of a trial in order to grant the remedy of vacating a conviction, but vindicating the constitutional right *before* trial simply requires proof that the constitutional minimum is not being met. Thus, a defendant seeking to *overturn* her conviction on the ground that her constitutional right to a speedy trial was violated typically must demonstrate prejudice, *see Barker v. Wingo*, 407 U.S. 514, 530 (1972), while a defendant suing prospectively to obtain a speedier trial need not, *see Braden v. 30th Judicial Circuit Court of Kentucky*, 410 U.S. 484, 488 (1973). A defendant may file a § 1983 suit to demand a judicial determination of probable cause prior to detention even if that illegal detention would not void a subsequent conviction. *See Gerstein v. Pugh*, 420 U.S. 103, 119 (1975). And a defendant filing a pre-trial motion to suppress evidence or confront a witness need not show that inclusion of the evidence or a lack of cross-examination would result in conviction, even though

such a showing would be required after conviction. *Compare United States v. Green*, 835 F.3d 844, 853 (8th Cir. 2016) *and United States v. Love*, 329 F.3d 981, 985-86 (8th Cir. 2003) *with United States v. Swift*, 720 F. Supp. 2d 1048, 1058-60 (E.D. Ark. 2010) *and United States v. Gonzalez-Marichal*, 317 F. Supp. 2d 1200, 1203 (S.D. Cal. 2004). Since other rights relating to criminal trials can be enforced prospectively, without a showing of prejudice, the Sixth Amendment right to the effective assistance of counsel—"by far the most pervasive" of "all the rights that an accused person has," *Cronic*, 466 U.S. at 654—can as well. *See Luckey*, 860 F.2d at 1017.

To require a showing of prejudice for every Sixth Amendment claim would also mean that defendants whose evidence of guilt is overwhelming would have no entitlement to the effective assistance of counsel. After all, such defendants will never be able to show "a reasonable probability that if counsel had performed adequately, the result would have been different"—overwhelming evidence of guilt may guarantee a conviction even if counsel performs spectacularly. But "*Gideon*'s guarantee to the assistance of counsel does not turn upon a defendant's guilt or innocence, and neither can the availability of a remedy for its denial." *Hurrell-Harring*, 930 N.E.2d at 227. No court could have assigned David Washington subpar counsel because he had confessed to the murders at issue in *Strickland*, and no one argued that Clarence Gideon's Sixth Amendment right was meaningless because he had surely broken into that pool hall. Although a showing of prejudice may be necessary to overturn a conviction after the fact, a Sixth Amendment violation is complete the moment a defendant is deprived of constitutionally adequate counsel, whether or not that deprivation affects the outcome of her case.

-68-

The second prong of the *Strickland* test, then, simply does not apply to a Sixth Amendment claim raised *before trial*. Instead, the only question in a prospective deprivation-of-counsel claim is whether Plaintiffs have demonstrated the first prong—that the representation provided by MSPD attorneys is unreasonable in light of prevailing professional norms. Here, Plaintiffs have shown that, from the moment they are appointed to a case, MSPD attorneys are unable to operate within the "range of competence demanded of attorneys in criminal cases." *Strickland*, 466 U.S. at 687.

As a starting point, Plaintiffs presented undisputed evidence from The Missouri Project study showing that MSPD attorneys spend far fewer hours per case—and far fewer hours per case task—than prevailing professional norms dictate. Using a process known as the "Delphi process," the study surveyed both private practitioners and public defenders in Missouri to pinpoint the amount of time defense counsel would need to spend on a particular case or task to comport with prevailing professional norms. Ex. R at 18.

The results are stark: On virtually every case type and task, MSPD attorneys spend a fraction of the time that actual practitioners estimated would be necessary to litigate a case according to the prevailing professional norms in Missouri. According to actual Missouri practitioners, who reached a consensus estimate using a forecasting method that Defendants have not challenged and that has been endorsed by the only experts who have provided opinions in this case, MSPD attorneys put in between 10 and 25 percent of the time they would need to prepare a C/D felony (1.7 hours versus 10.3), an A/B felony (8.7 hours versus 47.6 hours), a misdemeanor (2.3 hours versus 11.7 hours), or a juvenile offense (4.6 hours versus 19.5 hours) according to prevailing professional norms. *Id.* at 24. MSPD attorneys spend less than one-tenth the time that prevailing professional norms would dictate on investigating C/D felonies and misdemeanors. And prevailing professional norms require spending more than double the amount of time MSPD

attorneys spend on crucial tasks in certain types of cases, such as communicating with defendants in murder or homicide cases (14.8 versus 34.6), investigating sex felony cases (25.6 versus 63.8 hours), or preparing juvenile cases for trial (2.1 versus 7.3). *Id.*

As further detailed *supra*, ¶¶ 11-43, according to the only measurement of prevailing professional norms supplied in this case—what actual practicing professionals tell us is the prevailing norm—MSPD attorneys spend a fraction of the time on each case type and task as that case requires. Short of being between two and ten times as efficient as the average attorney, MSPD attorneys cannot possibly live up to the prevailing professional norms on their cases, in light of the vast gaps between the time spent by MSPD attorneys working up a case and the time it would take to work up a case according to prevailing professional norms.

Moreover, three experts in the prevailing professional norms for public defenders have opined, without dispute, that MSPD's handling of cases is below objectively reasonable standards. As further detailed *supra*, ¶¶ 44-47, Plaintiffs' experts have opined that MSPD attorneys' workloads "make it impossible to provide constitutionally effective assistance of counsel"; allow "competent representation to some of their existing defendants by neglecting other defendants"; and foreclose necessary investigations, sufficient preparation for hearings and trials, and sufficient legal research. Defendants have challenged neither the qualifications of Plaintiffs' experts nor their conclusions about prevailing professional norms and the gap between those prevailing professional norms and the assistance of counsel provided in Missouri. The State Defendants have also failed to identify any experts of their own or any alternative to the data and conclusions produced by The Missouri Project.

Finally, "although they are 'only guides,' and not 'inexorable commands,'" codified standards of professional practice "may be valuable measures of the prevailing professional norms

of effective representation." *Padilla v. Kentucky*, 559 U.S. 356 (2010); *see also Frye*, 132 S. Ct,
at 1408. As Plaintiffs' experts concluded, MSPD attorneys are unable to comply with their own
guidelines, with the ABA standards, and with the Model and Missouri Rules of Professional
Conduct. *Supra*, ⁇⁇ 44-47. And this failure to comply is not as a result of strategic
decisionmaking, but rather because of time and workload constraints. *See id*.

For instance, the ABA Criminal Justice Standard 4-4.1 (cited in *Strickland* itself) holds
that the prevailing professional norms include a "duty to investigate in all cases," a duty that is
"not terminated by factors such as the apparent force of the prosecution's evidence" or "a
defendant's expressed desire to plead guilty." As documented *supra*, ⁇⁇ 64-73, MSPD
attorneys routinely stop investigation once a defendant expresses a willingness to plead. *Cf*.
Criminal Justice Standards 4-6.2(d) (Am. Bar Ass'n 1980) ("CJS Standards") (attorney should
not advise guilty plea without adequate investigation). MSPD attorneys are routinely unable to
interview key witnesses, even witnesses identified by their client. Courts are in agreement on an
"almost absolute duty to investigate known (and readily available) sources of exculpatory
evidence that would be consistent with the defendant's explanation of his innocence." LaFave,
Criminal Procedure § 11.10(c) & nn.205-09 (collecting cases); *White v. Roper*, 416 F.3d 728 (8th
Cir. 2005) (deficient performance where lawyer did not interview or call key witness and
conducted only "superficial" investigation); Ex. P at Situation 3 (a lawyer too busy to interview
an alibi witness "should not have accepted the case"); CJS Standard 4-4.3(c). They do not use
expert witnesses, investigate sentencing alternatives, or take depositions nearly often enough.
CJS Standards 4-4.1(d), 4-3.2Ex. P at Situation 4, 7.

Various professional standards also require sufficient consultation with defendants, which
includes "adequate and available space for confidential defendant communication," keeping the

defendant "informed and advised" about representation, building "a relationship of trust and confidence immediately upon retention," and consulting with defendants before important hearings. CJS Standards 4-3.1(a), (e), 4-3.9; Ex. P at Situation 1, 9 ("too busy" is not a sufficient justification for a prolonged failure to communicate). Plaintiffs' uncontroverted evidence shows that MSPD attorneys routinely lapse in living up to this professional norm, often communicating with defendants in unsecured spaces, failing to update defendants for months at a time, meeting with the defendant for the first time far too late to build any rapport, and lacking the time to talk with defendants before important hearings. *Supra*, ¶¶ 56-63. As part of their general failure to communicate with defendants the way prevailing professional norms dictate, MSPD attorneys are not able to counsel their clients about plea bargains, a process which requires an explanation of the strengths and weaknesses of the defendant's case and a discussion of legal options and collateral consequences. Ex. P at Situation 13; CJS Standards 4-3.3(c), 4-5.4, 4-5.5, 4-6.2(d). Glaringly, MSPD attorneys often neglect to advise their clients of the immigration consequences of a potential plea agreement, thereby directly violating the Supreme Court's ruling in *Padilla*, 559 U.S. at 357, which held that "[t]he weight of prevailing professional norms supports the view that counsel must advise her client regarding the risk of deportation."

MSPD attorneys' pretrial practice fails to live up to the prevailing professional norms in myriad other ways. MSPD attorneys have a duty to request and review discovery as soon as practicable. *See* CJS Standard 4-3.7 (emphasizing "promptness" in reviewing pretrial discovery); *Kimmelman v. Morrison*, 477 U.S. 365 (1986) (not reviewing discovery until after deadline for filing motions to suppress was constitutionally ineffective performance). Yet MSPD attorneys often wait to review discovery until shortly before trial. *Supra*, ¶¶ 74-78. MSPD attorneys routinely fail to perform basic legal research or present affirmative defenses

even where there is clear and supportive law. When they do file motions, they are often generic, boilerplate motions, which are "almost always (if not always)" inconsistent with satisfying the duty of competence.  Ex. P at Situation 8; *see also* Ex. P at Situation 6; CJS Standards 4-1.5, 4-8.1 (post-trial motions); *United States v. Coutentos*, 651 F.3d 809 (8th Cir. 2011); *United States v. Jones*, 403 F.3d 604 (8th Cir. 2005).

MSPD attorneys' preparation for and handling of court appearances and trials similarly is well below prevailing professional norms.  The prevailing professional norms for court appearances and trials require having the same attorney handle all (or most) court appearances, adequately preparing for all court proceedings, and being prepared to make legal arguments on everything from jury issues to post-trial motions.  *See, e.g.*, CJS Standards 4-4.6(a)-(b), 4-7.3, 4-8.1.  A failure to object to key testimony, to impermissible judicial conduct, or to flawed jury instructions, or a failure to adequately prepare to examine or cross-examine a witness (for instance, by failing to amass impeaching evidence) all are unreasonable.  *See Gabaree v. Steele*, 792 F.3d 991(8th Cir. 2015); *Paulson v. Newton Corr. Facility, Warden*, 773 F.3d 901 (8th Cir. 2014); *United States v. Orr*, 636 F.3d 944 (8th Cir. 2011); *Green v. Norris*, 394 F.3d 1027 (8th Cir. 2005); *Reagan v. Norris*, 365 F.3d 616 (8th Cir. 2004).  In other words, in a situation where someone has done "almost nothing" until a few days before a felony trial, it is "hard to imagine a situation" where the lawyer could deliver adequate assistance of counsel.  Gillers Report Situation 10.  Yet MSPD attorneys of necessity go to trial without more than a few days of preparation.  *Supra*, ☐☐ 88-95.

Similarly, professional standards lay out guidelines for sentencing proceedings—namely, that attorneys should investigate sentencing alternatives and prepare for sentencing early in their representation of a defendant.  CJS Standards 4-3.2, 4-8.3(a).  A failure to do the factual

investigation and research necessary to advocate for a sentencing alternative is a failure to live up to the prevailing professional norms. Gillers Report Situation 11. Yet MSPD attorneys are unable to investigate sentencing alternatives, don't have time to do *any* work "early in their representation," let alone begin preparing for sentencing, and often cannot present more than boilerplate arguments at sentencing. *Supra*, ⬜⬜ 88-95.

To take one final example, excessive delay alone can violate professional norms. The Rules of Professional Conduct require attorneys to act "with reasonable promptness in representing a defendant," and an attorney who seeks multiple continuances simply because she has no time to work on a case, or a lawyer who forfeits the opportunity to make certain arguments on her client's behalf because she waited too long to investigate is by definition acting unreasonably. Rules of Professional Conduct 1.3(c); Ex. P at Situation 5; *Marcrum v. Luebbers*, 509 F.3d 489 (8th Cir. 2007). MSPD attorneys rely on continuances to manage their massive workloads, meaning they place their clients' cases at the mercy of a judge's discretion; when a continuance is denied, the consequences for the defendant are dire. *Supra*, ⬜⬜ 64-73, 88-95. Such delays also require defendants to wait to receive any assistance from MSPD attorneys, even while they sit in jail. In the meantime, key evidence is lost, memories fade, and attorneys lose valuable time to make legal arguments. *Supra* ⬜⬜ 64-73.

Finally, as noted above, the Missouri Supreme Court recently upheld the finding of its Disciplinary Hearing Panel, which had determined that the conduct of at least one MSPD attorney, Karl Hinkebein, had fallen below prevailing professional norms and suspended his bar license as a result. *Supra*, ⬜⬜ 124-54. As documented *supra*, *id.*, MSPD attorneys from around the State worry about suffering the same fate as Mr. Hinkebein—and think their representation is just as deficient as his was. In addition to the uncontroverted evidence adduced from the only

expert witnesses in this case, the Missouri Project study, and the facts surrounding representation, the *Hinkebein* decision makes clear that the state's highest court believes that neglecting to visit clients, filing boilerplate motions, and missing critical deadlines constitute inadequate representation—missteps that many of MSPD's attorneys believe that they, too, are making.

Plaintiffs have thus shown deficient performance—an "abdication—not an exercise—of [] professional judgment"—the entirety of the showing they must make to prove a Sixth Amendment violation prior to conviction. *See McQueen v. Swenson*, 498 F.2d 207, 216 (8th Cir. 1974).

**D.     BECAUSE PLAINTIFFS SEEK ONLY INJUNCTIVE RELIEF, THEY NEED ONLY SHOW A RISK OF PREJUDICE, WHICH THE UNCONTROVERTED EVIDENCE EASILY ESTABLISHES.**

The purpose of prospective relief is, of course, to "prevent future violations." *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953); *Forest Park II v. Hadley*, 336 F.3d 724, 731 (8th Cir. 2003) (courts must consider only the *threat* of irreparable harm—not actual harm—to issue a permanent injunction). That's why a prisoner "need not await a tragic event" to receive an injunction against unsafe prison conditions, *see Helling v. McKinney*, 509 U.S. 25, 33 (1993); an injunction may issue preventing law enforcement officers from illegally stopping plaintiffs in the future, whether or not the plaintiffs have yet been stopped, *see de Jesus Ortega Melendres v. Arpaio*, 695 F.3d 990, 998-99 (9th Cir. 2012); and a court can prevent a stranger from entering private property even if no trespass has yet occurred, *see Roe v. Operation Rescue*, 919 F.2d 857, 864-65 (3d Cir. 1990).

Because an injunction "can be utilized even without a showing of past wrongs"—to prevent an unlawful act that is "about to be committed"—Plaintiffs need only show that that their Sixth Amendment rights will be violated imminently, not that those rights have already been violated.

*See United States v. Laerdal Mfg. Corp.*, 73 F.3d 852, 855 (9th Cir. 1995). "Because the petitioners are seeking redress for the ongoing violation of their fundamental constitutional right that affects the manner in which the criminal case against them will be prosecuted and defended, it is enough that they have shown a violation of that right that may likely result in irremediable harm if not corrected." *See Lavallee v. Justices in Hampden Superior Court*, 812 N.E.2d 895, 905 (Mass. 2004).

Thus, even assuming Plaintiffs' Sixth Amendment rights have not yet been violated,[13] Plaintiffs are *still* entitled to summary judgment. Rather than waiting for their Sixth Amendment rights to be violated, they need only show a *likely* violation of their constitutional rights—that is, that there is a risk that MSPD attorneys' deficient performance will prejudice their cases.

The uncontroverted evidence demonstrates that Plaintiffs face an imminent risk of prejudice in the form of a worse plea offer, a foregone trial, or a botched trial that results in a longer sentence, among other possibilities. For the 98 percent of MSPD defendants who plead guilty, prejudice amounts to "a reasonable probability that the end result of the criminal process would have been more favorable by reason of a plea to a lesser charge or a sentence of less prison time." *Frye*, 132 S. Ct at 1409. And for the small fraction of MSPD defendants who go to trial or face a sentencing court, prejudice means "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

It is virtually self-evident that Plaintiffs represented by attorneys handling double or triple the recommended workload will see worse outcomes, and Plaintiffs have also amassed

---

[13] But note that, first, as explained *supra*, § III.C, prejudice is not necessary to make out a Sixth Amendment violation, and, second, Plaintiffs have already suffered the requisite prejudice thanks to the excessive pretrial detention and delay attributable to MSPD's excessive workloads.

uncontroverted evidence to that effect. *Supra*, ☐☐ 119-23. MSPD attorneys, overloaded by cases, aren't in a position to adequately negotiate pleas for their defendants. They don't have the investigative or legal research bandwidth to identify defenses that might put pressure on the prosecution. Because defendants must wait so long to get any attention from their MSPD attorneys, they have less leverage in plea negotiations than a defendant represented by a constitutionally adequate attorney, as they are often more desperate to leave custody by the time an offer is on the table. And given that MSPD attorneys prepare for trials and sentencing proceedings in a fraction of the time recommended by experts in the field, their clients risk being convicted of a more serious offense or facing a longer sentence. *Supra*, ☐☐ 88-95.

Because Plaintiffs seek merely prospective relief, the risk of a longer sentence or more serious charge as a result of MSPD attorneys' deficient performance is sufficient to entitle Plaintiffs to summary judgment on their Sixth Amendment claim.

**E.  DEFENDANTS DO NOT DISPUTE THAT SOME PLAINTIFFS ARE DENIED COUNSEL ALTOGETHER AT CRITICAL STAGES AND THAT THESE DEPRIVATIONS CANNOT BE RECTIFIED WITHOUT REDUCTIONS IN WORKLOADS.**

The current state of affairs in Missouri also violates the Sixth Amendment because MSPD attorneys are entirely absent for crucial portions of defendants' representation. First, thanks to the MSPD attorneys' general overload and the recent institution of "waitlists" to receive counsel, defendants around the State languish in jail for weeks or months after they are arraigned but before any attorney begins work on their case, in blatant contravention of the guarantees of the Sixth Amendment. Second, MSPD attorneys are not present during critical stages of the pretrial process. And third, in at least one district, an entire category of defendants are processed through the system with no attorney at all, at any point.

There are currently thousands of indigent defendants across Missouri who have been charged with a crime, held in custody and brought before the court, all without access to an

attorney. Though MSPD's recent "waitlists" have formalized this deprivation of counsel, systemwide delays in beginning work on a defendant's case mean that many more defendants are delayed in receiving counsel than appear on waitlists. *See Lavallee*, 812 N.E.2d at 903 (designating a case to a public defender office not sufficient under Sixth Amendment; office must actually assign an individual attorney to work on case).

When cases lie dormant for months before public defenders actually begin work on them—whether defendants are formally on a waitlist or not—it becomes virtually impossible for a defendant to receive a fair trial. A significant number of defendants have pled guilty without ever receiving legal representation, preferring to start serving a sentence than to wait weeks or months for someone to take even a perfunctory look at their case. *Supra* ☐ 98(c). Other defendants have been forced to appear in court, where they could waive important rights or make damning admissions, without counsel present to advise them. *Supra*, ☐☐ 96-100. Moreover, witnesses move, memories are lost, and physical evidence deteriorates before a public defender turns attention to a case. *Lavallee*, 812 N.E.2d, at 903-04 ("The effects of the passage of time on memory or the preservation of physical evidence are so familiar that the importance of prompt pretrial preparation cannot be overstated.").

These waitlists violate the Sixth Amendment in at least four ways, any one of which would suffice to entitle Plaintiffs to relief. First, because some defendants do not receive the assistance of counsel at all for weeks or months after being arraigned, they remain in custody for longer than they otherwise would, a Sixth Amendment violation has occurred even without any further harm to their case. *Gonzalez v. Comm'r of Corr.*, 68 A.3d 624, 637, 655 n.9 (Conn. 2013).

Second, the time immediately after arraignment constitutes a "critical stage." For Sixth Amendment purposes, a "critical stage" is any portion of a criminal proceeding where the "substantial rights of the criminal accused may be affected." *Mempa v. Rhay*, 389 U.S. 128, 134 (1967). Plea bargaining, post-arraignment lineups, psychiatric evaluations, pretrial hearings at which bail is set, voir dire, sentencing and, of course, the trial itself are all such "critical stages." *See Missouri v. Frye*, 132 S. Ct. 1399, 1406 (2012); *Estelle v. Smith*, 451 U.S. 454, 470-71 (1981); *Gardner v. Florida*, 430 U.S. 349, 358 (1977); *White v. Luebbers*, 307 F.3d 722, 729 (8th Cir. 2002); *Smith v. Lockhart*, 923 F.2d 1314, 1319-20 (8th Cir. 1991). Where counsel has been denied to a defendant at a critical stage, no showing of prejudice is necessary. *Malcolm v. Houston*, 518 F.3d 624, 627 (8th Cir. 2008). Here, the time period immediately following arraignment is such a critical stage, because the substantial rights of the accused are affected—if investigation is not done during this time, crucial evidence and testimony can be lost, hamstringing the defendant throughout the trial process. *See Lavallee*, 812 N.E.2d at 904. The deprivation of counsel during this time violates the Sixth Amendment, with or without a showing of prejudice.

Third, during the time they are unrepresented, defendants are routinely forced to attend court proceedings without counsel; because they may waive constitutional rights or make incriminating statements at such proceedings, these proceedings qualify as critical stages, and having no counsel at such proceedings violates the Sixth Amendment. *Supra*, ¶¶ 96-100; *see Sigler v. Bird*, 354 F.2d 694, 697 (8th Cir. 1966) (any proceeding at which defendant may make statement that will impair defense at a later date is a critical stage).

And fourth, the Sixth Amendment requires appointment within a "reasonable time after attachment to allow for adequate representation at any critical stage before trial, as well as the

trial itself." *Rothgery v. Gillespie Cty., Tex.*, 554 U.S. 191, 212 (2008).[14]  Waiting weeks to

receive an attorney—or months for an attorney to even begin work on a case—does not amount

to such a "reasonable time."  *See Lavallee*, 812 N.E.2d at 234-37 (accepting petitioners'

argument that "the designation of a case to" public defender is not the same as "actual

assignment of an individual attorney to represent each petitioner" for purposes of the

Constitution).

Moreover, as a result of the waitlists and other delays in receiving the assistance of

counsel, some indigent defendants are forced to negotiate and accept guilty pleas without the

benefit of counsel.  *Supra*, □ 98(c).  The plea bargaining process is a critical stage of the

criminal proceeding—"plea bargains have become so central to the administration of the

criminal justice system that defense counsel have responsibilities in the plea bargain process,

responsibilities that must be met to render the adequate assistance of counsel that the Sixth

Amendment requires in the criminal process at critical stages."  *Frye*, 132 S. Ct. at 1407;

*McClain v. Swenson*, 435 F.2d 327, 332 (8th Cir 1970).  Defendants forced to negotiate pleas pro

se, as a result either of being placed on waitlists or the standard delays that result from MSPD's

ongoing crush of cases, must face a critical stage in the criminal proceeding without the guiding

hand of counsel, a violation of the Sixth Amendment even absent prejudice.

Missouri's indigent defendants face other critical stages without counsel as well.  For

instance, MSPD's clients sometimes must undergo psychiatric examinations without any

representation—a critical stage of the criminal process, since competency is often determined at

these evaluations.  *Supra*, □□ 96-100; *Estelle*, 451 U.S. at 470-71; *Raymond v. Weber*, 552 F.3d

---

[14] A claim that counsel has not been appointed within a reasonable time does not require a
showing of prejudice.  *See, e.g.*, *Farrow v. Lipetzky*, 637 F. App'x 986, 988 (9th Cir. 2016), *cert
denied*, 137 S. Ct. 82 (2016).

680, 684 (8th Cir. 2009). Some defendants are not accompanied by counsel when they attend the interview used to recommend a sentence in their case, another stage that can prove outcome-determinative. *Supra*, ☐☐ 96-100. MSPD defendants rarely have representation at initial appearances, during which bail is set and there is an opportunity to dismiss charges, yet another critical stage. *Supra*, ☐☐ 96-100; *Lockhart*, 923 F.2d at 1319-20. And many clients are deprived of the ability to communicate confidentially with their attorneys. *Supra*, ☐☐ 56-63; *Geders v. United States*, 425 U.S. 80, 92 (1976).

Finally, some categories of defendants do not receive counsel at all, at any point, despite meeting Missouri's indigency requirements and despite facing actual prison time. For instance, in Cole County, an informal administrative order dictates that defendants facing criminal nonsupport cases—who could face four years in custody (seven years if they have a prior felony conviction)—will not receive counsel. Ex. A at 51:10-55:19. Other defendants are told that if they want to exercise their right to trial, they must either hire a private lawyer or represent themselves. Ex. A at 59:13-60:22. If the Sixth Amendment is to have any meaning, this Court must find that these defendants' rights have been violated and construct relief that will remedy this ongoing deprivation.

Because Defendants have disputed none of the evidence showing that members of the Plaintiffs' putative class are not appointed counsel within a reasonable time after arraignment, are deprived of counsel at critical stages before trial, and, in at least one category of cases in one district, go without counsel altogether, Plaintiffs are entitled to summary judgment on their Sixth Amendment claim.

F.     THE SIXTH AMENDMENT MUST ALLOW FOR PROSPECTIVE RELIEF.

Every court to consider the question—including the Missouri Supreme Court—has held that the Sixth Amendment can be violated—and relief accorded—even before a defendant is convicted.  *See, e.g.*, *Luckey v. Harris*, 860 F.2d 1012 (11th Cir. 1988); *Wilbur v. City of Mount Vernon*, 989 F. Supp. 2d 1122 (W.D. Wash. 2013); *Tucker v. Idaho*, 394 P.3d 54 (Idaho 2017); *Simmons v. State Pub. Def.*, 791 N.W.2d 69 (Iowa 2010); *State v. Peart*, 621 So. 2d 780 (La. 1993); *Lavallee v. Justices In Hampden Superior Court*, 812 N.E. 2d 895 (Mass. 2004); *State v. Young*, 172 P.3d 138 (N.M. 2007); *Hurrell-Harring v. State*, 930 N.E.2d 217 (N.Y. 2010); *New York Lawyers' Ass'n v. State*, 763 N.Y.S.2d 397 (N.Y. Sup. Ct. 2003); *Kuren v. Luzerne County*, 146 A.3d 715 (Pa. 2016); *State ex rel. Missouri Public Defender Comm'n v. Waters*, 370 S.W. 3d 592, 607 (Mo. 2012) ("The constitutional right to effective counsel … is a prospective right….").[15]

Yet State Defendants' motion to dismiss claimed that the Sixth Amendment right to counsel could only be raised after a defendant was convicted.  On the State's theory of the Sixth Amendment, courts must sit idly by and watch constitutionally ineffective counsel hamstring defendants' cases.  Only *after* a conviction or guilty plea can a court intervene, and then only to overturn a conviction, and only on a showing of prejudice.  Per the State, the Sixth Amendment's *only* role is to provide a mechanism for overturning convictions.  But the Sixth Amendment guarantees each defendant "the Assistance of Counsel for his defence," not "the right to overturn a conviction upon a showing of prejudice."  It is thus unsurprising that "[n]o case suggests that a

---

[15] Prospective challenges to state indigent defense systems cannot be litigated in federal court because of the doctrine of *Younger* abstention, unless, as in this case, defendants remove the case from state court, thereby waiving *Younger* abstention.  *See Luckey v. Miller*, 976 F.2d 673, 677-79 (11th Cir. 1992).  And systemwide, prospective challenges to the federal indigent defense system are rare, as federal public defender organizations tend to be better funded and enjoy lower caseloads than their state counterparts.  As a result, very few federal courts have weighed in on the question; the few that have confirm a prospective Sixth Amendment right.

court analyze whether the Sixth Amendment right to counsel has been preserved at all critical stages only by retrospectively determining that the lack of such counsel deprived a defendant of a fair trial"; "[t]o the contrary," as this Court has recognized, it is "well settled that the Sixth Amendment right to counsel is broader than the question of whether a court must retrospectively set aside a judgment due to ineffective assistance of counsel."  Dkt. 69, at 34 (quoting *Waters*, 370 S.W.3d at 607 (internal quotations omitted)).

The quotations cited by the State Defendants in their motion to dismiss for the proposition that the Sixth Amendment cannot be violated until after conviction—that Plaintiffs must prove *Strickland*'s "prejudice" prong—are inapposite dicta.  In *Lockhart v. Fretwell*, 506 U.S. 364, 369 n.2 (1993), a criminal defense attorney failed to make an objection that, under then-governing Arkansas caselaw, would have prevented a conviction.  Later, the Arkansas case in question was overturned.  The Supreme Court held that the defendant's conviction should not be overturned *even though* the defendant satisfied *Strickland*'s prejudice prong:  It was undisputed in that case that the outcome of a trial would have been different had counsel made the objection in question; the question in that case was whether such proof that the defendant was convicted because of counsel's errors was *sufficient* to prove a Sixth Amendment violation, not whether such proof was *necessary*.  *Id.* at 368, 369-70.  *Fretwell* thus demonstrates that the sine qua non of a Sixth Amendment violation is not whether a petitioner was convicted as a result of an attorney's incompetence, but rather what effect an attorney's conduct had on "the reliability of the trial process," conviction or no.  *Id.* at 369.

The State Defendants also quoted *United States v. Gonzalez-Lopez*, 548 U.S. 140 (2006), a case in which the Supreme Court held the defendant need not establish prejudice to make out the kind of Sixth Amendment violation at issue in that case.  In that case, the Court stated that

"the violation of [the right to effective assistance of counsel] *generally* requires a defendant to establish prejudice." *Id.* at 146 (emphasis added). But this is not the "general[]" case, in which a defendant is seeking to overturn a conviction. And *Gonzalez-Lopez* says nothing about the rare case of systemwide, prospective relief.

Finally, *United States v. Lee*, 715 F.3d 215 (8th Cir. 2013), dealt with a post-conviction *Strickland* challenge. Defense counsel struck jurors on account of their race; despite the difficulty of making such a showing, the Eighth Circuit held the defendant must show—as in virtually every case where a defendant is seeking to overturn an already imposed conviction—a reasonable probability that the outcome of the trial may have been different. Here, of course, Plaintiffs are not seeking to overturn any already imposed convictions.

Dicta in a case where a showing of prejudice was insufficient (*Fretwell*), in a case finding a Sixth Amendment violation with no showing of prejudice (*Gonzalez-Lopez*), and in a case straightforwardly applying *Strickland* post-conviction (*Lee*) have no bearing on whether Plaintiffs can raise a Sixth Amendment claim prospectively or whether Plaintiffs have raised claims for the actual or constructive denial of counsel. As explained *supra*, § IV.A-E, there are many Sixth Amendment violations that do not require a showing of prejudice, and Plaintiffs have demonstrated a Sixth Amendment violation in at least five different ways.

## G. PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON THEIR CLAIMS UNDER THE DUE PROCESS CLAUSE, THE MISSOURI CONSTITUTION, AND VARIOUS MISSOURI STATUTES.

In addition to their Sixth Amendment claim, the uncontroverted evidence amassed by Plaintiffs proves that Defendants have violated others of Plaintiffs' constitutional and statutory rights.

**Due Process Clause:** The Due Process Clause provides additional protection of the right to counsel for both juveniles and adults. As to juveniles: *In re Gault*, 387 U.S. 1 (1967), held

-84-

that juveniles accused of crimes in delinquency proceedings must be afforded the same rights as adults, including the right to counsel. Juvenile delinquency cases require, at minimum, the same amount of time and resources to defend as do criminal cases. In fact, representing children accused of crimes often demands *more* attention than a normal criminal case due to the defendant's age, relative lack of mental capacity, and the specialized nature of juvenile proceedings. *See* National Juvenile Defender Center, *National Juvenile Defense Standards*, 9 (2013). The Supreme Court in *In Re Gault* held that defense counsel's representation in a juvenile delinquency case should be the same as it would be in a traditional criminal case. *See In re Gault*, 387 U.S. at 36 (finding that "there is no material difference" between representation for adult and juvenile proceedings). Juveniles require their attorney's assistance, and by extension, their attorney's time and resources, "at every step in the proceedings" to examine the facts and develop potential defenses on behalf of the juvenile. *Id.* (quoting *Powell v. Alabama*, 287 U.S. 45, 69 (1932)). The defendant's age does not change the nature of the attorney-client relationship. *See* Model Rules of Prof'l Conduct R. 1.14(a) (Am. Bar Ass'n 2017) (even if the defendant's mental and decision-making capacity is diminished, "as far as reasonably possible, [attorneys shall] maintain a *normal* client-lawyer relationship with the client" (emphasis added)). A normal relationship should be maintained for "children as young as five or six years of age, and certainly those of ten or twelve." Model Rules of Prof'l Conduct R. 1.14(a) cmt. 1. Moreover, due to the "diminished capacity" of juvenile defendants and unique nature of the proceedings, delinquency representation often requires more specialized training and knowledge than criminal cases, particularly among attorneys who do not represent children on a regular basis. Among other things, attorneys must understand adolescent development to effectively interview and communicate complex legal principles to juveniles in an age-appropriate manner.

*See National Juvenile Defense Standards*, 22 (2013). Additionally, defense counsel must specialize in, or at least be familiar with, juvenile case terminology, procedures, statutes, and relevant case law. *Id*. (citing Model Rules of Prof'l Conduct R. 2.1 (2010)).

Finally, it is worth noting that, to the extent that juveniles are represented by public defenders in transfer proceedings, where the court determines whether the juvenile should be tried as an adult, the stakes of such proceedings are exceedingly high and therefore require extra attention. *See Kent v. United States*, 383 U.S. 541, 553-54 (1966) (holding that a juvenile transfer proceeding is a "critically important" action and that the proceedings must satisfy basic due process and fairness requirements). As a result, representing children in transfer proceedings can be particularly demanding on an attorney's time. The undisputed facts regarding the violations of adult Plaintiffs' Sixth Amendment rights therefore also establish a violation of the Due Process rights of juvenile Plaintiffs, because the representation of juveniles requires, if anything, more time and care.

In addition, the Due Process Clause provides residual protection to adult criminal defendants in criminal justice and related proceedings. *See Powell v. Alabama*, 287 U.S. 45 (1932); *Gagnon v. Scarpelli*, 411 U.S. 799 (1973); *Evitts v. Lucey*, 469 U.S. 387 (1985). For the same reasons that MSPD's representation of indigent defendants violates the Sixth Amendment, it also violates the Due Process Clause.

**Missouri Constitution**: The Missouri Constitution provides "[t]hat in criminal prosecutions the accused shall have the right to appear and defend, in person and by counsel." MO. Const. art. I, §18(a). Missouri's courts have interpreted § 18(a) to require the same things as the Sixth Amendment of the United State Constitution, namely appropriate investigation, preparation and presentation of each defendant's case. *See State ex rel. Missouri Pub. Def.*

*Comm'n v. Pratte*, 298 S.W.3d 870, 874 & n.4 (Mo. 2009). Providing representation of counsel to indigent defendants is "a duty which constitutionally is the burden of the State." *State v. Green*, 470 S.W.2d 571, 573 (Mo. 1971) (internal citation omitted). For the same reasons Plaintiffs are entitled to summary judgment on their Sixth Amendment claim, therefore, they are also entitled to summary judgment on their claim under Article I, section 18(a) of the Missouri Constitution.

The Missouri Constitution also provides, nearly identically to the Fourteenth Amendment to the United States Constitution, "[t]hat no person shall be deprived of life, liberty or property without due process of law." MO. Const. art. I, §10. Under section 10, the State of Missouri is required to ensure that all indigent defendants in criminal or juvenile delinquency proceedings receive meaningful and effective legal representation. Courts analyze constitutionality under section 10 of the Missouri Constitution the same way they analyze federal Fourteenth Amendment claims. *State v. Nathan*, 522 S.W.3d 881, 882 (Mo. 2017). The same uncontroverted facts that make out Plaintiffs' federal Due Process Clause claim therefore establish Plaintiffs claim to relief under Article I, Section 10 of the Missouri Constitution.

**Missouri Criminal Codes: Mo. Rev. Stat. §§ 600.042, 600.048:** Mo. Rev. Stat. section 600.042 provides in relevant part, "[t]he director and defenders shall provide legal services to an eligible person . . . [f]or whom the federal constitution or the state constitution requires the appointment of counsel." Mo. Rev. Stat. § 600.042(4)(5). "A person who is charged or detained in any case listed in section 600.042 or who appears in court without counsel at any stage of a case, or any other person on behalf of such person, may request that legal representation be furnished to him or her by the state." Mo. Rev. Stat. § 600.048(2). "[T]he public defender system was a response to [the Missouri Supreme Court's] opinion in *State v. Green*, 470 S.W.2d

571 (Mo. 1971) that it was the duty of the State to provide legal services to an indigent accused of crime, so that § 600.042.3, taken in terms of that antecedent history and its own context, indicates that it is intended to require a public defender *in the guilt determination stages of prosecution*." *State ex rel. O'Brien v. Ely*, 718 S.W.2d 177, 180 (Mo. Ct. App. 1986) (citing *State ex rel. Marshall v. Blauer*, 709 S.W.2d 111, 112 (Mo. 1986)).

The legislative intent behind the statutes is clear by their plain language; the statutes were meant to codify criminal defendants' constitutional right to effective assistance of counsel. *Stiers v. Dir. of Revenue*, 477 S.W.3d 611, 615 (Mo. 2016) ("When interpreting a statute, the primary goal is to give effect to legislative intent as reflected in the plain language of the statute.") (citation omitted). For the same reasons that Defendants' conduct has violated the Sixth Amendment of the United States Constitution, it has also violated the statutory codifications of the right to counsel under Mo. Rev. Stat. sections 600.042 and 600.048.

**Missouri Criminal Codes and Juvenile Codes: Mo. Rev. Stat. §§ 211.061, 211.211; Mo. R. Juv. P. 126.01:** Juveniles are entitled to appointed counsel if they cannot afford an attorney. *In re Gault*, 387 U.S. at 42. Missouri's criminal code and juvenile codes codify this right. Mo. Rev. Stat. section 211.061 states in relevant part that when a juvenile is subject to a detention hearing, "[n]otice of the date, time and place of a detention hearing, and of the right to counsel, shall be given to the juvenile and his or her custodian in person, by telephone, or by such other expeditious method as is available." Similarly, under Missouri law, juveniles have a statutory right to counsel in all delinquency proceedings. Mo. Rev. Stat. § 211.211. Section 211.211 also requires the appointment of counsel for the juvenile, if a request is made and the juvenile is indigent. Mo. Rev. Stat. § 211.211.2. *See also In re D.J.M.*, 259 S.W.3d 533, 536 (Mo. 2008) (trial court committed reversible error because it did not appoint counsel for juvenile

without a full record supporting waiver of right to counsel). Mo. R. Juv. P. 126.01 requires that juveniles shall be advised, prior to any in-custody interrogation that "the juvenile has the right to an attorney, and if the juvenile is unable to afford an attorney, that one will be provided." Mo. R. Juv. P. 126.01.2. For the reasons explained *supra*, § IV.A-E, juvenile members of the Plaintiff class are not receiving their constitutionally mandated right to counsel; for that reason, Mo. Rev. Stat. § 211.211 is violated. And because the requirement to advise juveniles of the right to counsel is rendered hollow by the reality that the right will not be honored in Missouri state courts, the uncontroverted evidence shows that Mo. Rev. Stat. §§ 211.061 and Mo. R. Juv. P. 126.01 have been violated as well.

## IV.    CONCLUSION

For the reasons discussed above, Plaintiffs are entitled to summary judgment on all their claims. This Court should grant Plaintiffs' motion for summary judgment, hold that the Defendants are violating Plaintiffs' constitutional right to counsel, and issue an order requiring that Defendants propose a plan within 30 days to ensure that all indigent criminal defendants in the State of Missouri are provided with constitutionally adequate legal representation.

Respectfully submitted,

/s/Anthony E. Rothert                       Amy Breihan
Anthony E. Rothert                          MACARTHUR JUSTICE CENTER
Jessie Steffan                                    AT ST. LOUIS
ACLU OF MISSOURI                        3115 South Grand Boulevard
   FOUNDATION                             Suite 300
906 Olive Street                            St. Louis, MO  63118
Suite 1130
St. Louis, MO  63101
(314) 652-3114
arothert@aclu-mo.org

Jason D. Williamson
ACLU FOUNDATION
125 Broad Street
18th Floor
New York, NY 10004

Robert Sills
Aaron Scherzer
Matthew R. Shahabian
Camille J. Rosca
ORRICK, HERRINGTON &
    SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019

Will Melehani
Easha Anand
ORRICK, HERRINGTON &
    SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105

James Maune
ORRICK, HERRINGTON &
    SUTCLIFFE LLP
2050 Main Street
Suite 1100
Irvine, CA 92614

Gillian Wilcox
ACLU OF MISSOURI FOUNDATION
406 West 34th Street
Suite 420
Kansas City, MO 64111

Anthony Tartaglio
Annie Prasad
ORRICK, HERRINGTON &
    SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA 94025

**CERTIFICATE OF SERVICE**

I hereby certify that on February 9, 2018, I electronically filed the foregoing with the United States District Court for the Western District of Missouri and a copy was served electronically on all counsel of record through the court's CM/ECF filing system.


/s/Anthony E. Rothert