# Exhibit G

Page 1

```
1              UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF MISSOURI
2                   CENTRAL DIVISION
3
4    SHONDEL CHURCH, et al.,   )
                               )
5         Plaintiffs,          )
                               )
6         vs.                  ) Case No.
                               ) 17-04057-CV-C-NKL
7    STATE OF MISSOURI, et al., )
                               )
8         Defendants.          )
9
10
11
12
13
14     VIDEO-RECORDED DEPOSITION OF MICHAEL K. BARRETT
15          TAKEN ON BEHALF OF THE PLAINTIFFS
16                  OCTOBER 4, 2017
17
18
19
20        (Starting time of the deposition:  8:10 a.m.)
21
22
23
24
25
```

Page 2

```
1                    I N D E X
2    QUESTIONS BY:                        PAGE
3    MR. WILLIAMSON                         7
4    MR. QUINLAN                          101
5    MS. SHIPMA                           164
6    MR. QUINLAN                          169
7
8
9                  E X H I B I T S
10   EXHIBIT                              PAGE
11   Exhibit 1   Notice of deposition      10
12   Exhibit 2   9-11-17 Barrett letter to MSPD   76
13               attorneys
14   Exhibit 3   Judge Crane e-mail response      80
15   Exhibit 4   Cumulative caseload metrics      89
16               spreadsheet
17   Exhibit 5   Boone County Bar Association      99
18               October 2017 Newsletter
19
20   (The original exhibits were retained by the court
     reporter to be attached to the original and copies
21   of the transcript.)
22
23
24
25
```

Page 3

```
1              UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF MISSOURI
2                   CENTRAL DIVISION
3
4    SHONDEL CHURCH, et al.,   )
                               )
5         Plaintiffs,          )
                               )
6         vs.                  ) Case No.
                               ) 17-04057-CV-C-NKL
7    STATE OF MISSOURI, et al., )
                               )
8         Defendants.          )
9
10       VIDEO-RECORDED DEPOSITION OF MICHAEL K. BARRETT,
11   produced, sworn and examined on October 4, 2017,
12   between the hours of eight o'clock in the forenoon
13   and one o'clock in the afternoon of that day, at the
14   ACLU of Missouri Foundation, Suite 1130, 906 Olive
15   Street, St. Louis, Missouri 63101, before William L.
16   DeVries, a Certified Court Reporter (MO), Registered
17   Diplomate Reporter, and Certified Realtime Reporter,
18   in a certain cause now pending in the United States
19   District Court, Western District of Missouri,
20   Central Division, between SHONDEL CHURCH, et al.,
21   Plaintiffs, vs. STATE OF MISSOURI, et al.,
22   Defendants; on behalf of the Plaintiffs.
23
24
25
```

Page 4

```
1
2                  A P P E A R A N C E S
3
     For the Plaintiffs:
4      Mr. Jason D. Williamson
       American Civil Liberties Union
5      Foundation
       125 Broad Street, 18th Floor
6      New York, New York 10004-2400
       (212) 284-7340
7      jwilliamson@aclu.org
8
9      Mr. James J. Maune
       Orrick
10     2050 Main Street, Suite 1100
       Irvine, California 92614
11     (949) 491-5616
       jmaune@orrick.com
12
       Mr. Matthew R. Shahabian
13     Orrick
       51 West 52nd Street
14     New York, New York 10019
       (212) 506-3750
15     mshahabian@orrick.com
16
17
18   For the Public Defender Defendants:
19     Ms. Jacqueline Shipma
       Missouri State Public Defender
20     Woodrail Center
       1000 West Nifong
21     Building 7, Suite 100
       Columbia, Missouri 65203
22     (573) 525-5212
       jacqueline.shipma@mspd.mo.gov
23
24
25
```

1 (Pages 1 to 4)

**MIDWEST LITIGATION SERVICES**
**www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334**
Case 2:17-cv-04057-NKL   Document 153-8   Filed 02/09/18   Page 2 of 77

## Page 5

Midwest Litigation Services.

```
 1    For the State of Missouri and
 2    Governor Greitens:
 3        Mr. Michael Quinlan
          State of Missouri
          Attorney General's Office
 4        815 Olive Street, Suite 200
          St. Louis, Missouri 63101
 5        (314) 340-7861
          michael.quinlan@ago.mo.gov
 6
 7    Mr. Steven R. Ramsey
          State of Missouri
          Attorney General's Office
 8        221 West High
          Jefferson City, Missouri 65102
 9        (573) 751-1024
          steven.ramsey@ago.mo.gov
10
11
12    Also present:
13        Mr. John Niehaus, Videographer
          Midwest Litigation Services
14        711 North Eleventh Street
          St. Louis, Missouri 63101
15        (314) 644-2191
          1-800-280-3376
16
17        Mr. Anthony Rothert, ACLU
18
19
20
21
      Court Reporter:
22        William L. DeVries, RDR/CRR
          Missouri CCR #566
23        Midwest Litigation Services
          711 North Eleventh Street
24        St. Louis, Missouri 63101
          (314) 644-2191
25        1-800-280-3376
```

## Page 6

```
 1        IT IS HEREBY STIPULATED AND AGREED by
 2    and between counsel for the Plaintiffs and counsel
 3    for the Defendants that this deposition may be taken
 4    in shorthand by William L. DeVries, RDR/CRR, a
 5    Certified Court Reporter and Certified Shorthand
 6    Reporter, and afterwards transcribed into
 7    typewriting; and the signature of the witness is
 8    expressly reserved.
 9            *   *   *   *   *
10        MICHAEL K. BARRETT,
11    of lawful age, produced, sworn and examined on
12    behalf of the Plaintiffs, deposes and says:
13        (Starting time of the deposition:  8:10 a.m.)
14        VIDEOGRAPHER:  We're on the record.
15    Today's date is October 4th, 2017, and the time is
16    approximately 8:10 a.m.  This is the video-recorded
17    deposition of Michael K. Barrett in the matter of
18    Shondel Church, et al., versus State of Missouri,
19    et al., Case Number 17-04057-CV-C-NKL, in the United
20    States District Court for the Western District of
21    Missouri, Central Division.
22        This deposition is being held at ACLU
23    of Missouri Foundation in St. Louis, Missouri.  The
24    reporter's name is Bill DeVries.  My name is John
25    Niehaus.  I'm the legal videographer.  We are with
```

## Page 7

```
 1    Midwest Litigation Services.
 2        Will counsel please introduce yourself
 3    for the record?
 4        MR. WILLIAMSON:  Jason Williamson for
 5    the plaintiffs.
 6        MR. SHAHABIAN:  Matt Shahabian for the
 7    plaintiffs.
 8        MR. MAUNE:  James Maune for the
 9    plaintiffs.
10        MR. RAMSEY:  Steven Ramsey for the
11    state.
12        MR. QUINLAN:  Michael Quinlan for the
13    State of Missouri and Governor Greitens.
14        MS. SHIPMA:  Jacqueline Shipma for the
15    public defender defendants.
16        VIDEOGRAPHER:  Can you please swear in
17    the witness?
18        COURT REPORTER:  Do you swear or affirm
19    that the testimony you are about to give in this
20    proceeding will be the truth, the whole truth, and
21    nothing but the truth?
22        THE WITNESS:  I do.
23            EXAMINATION
24    QUESTIONS BY MR. WILLIAMSON:
25        Q.  Good morning, Mr. Barrett.
```

## Page 8

```
 1        A.  Good morning.
 2        Q.  My name is Jason Williamson.  I
 3    represent the plaintiffs in this case.  Mr. Barrett,
 4    have you ever been deposed before?
 5        A.  Never.
 6        Q.  So we'll just go over a couple of quick
 7    ground rules so that we're on the same page.  I'm
 8    going to ask you a number of questions that are
 9    relevant to this case and you're required to answer
10    those questions truthfully to the best of your
11    ability.  Remember that your testimony is under
12    oath.  So it is just as if you were testifying in
13    court.  Do you understand that?
14        A.  I do.
15        Q.  The deposition today will last no more
16    than seven hours.  I do not expect us to need that
17    much time, but we will take breaks as appropriate,
18    and please let me know if you need to take a break
19    for the restroom or -- or any other reason.
20        VIDEOGRAPHER:  One moment.
21        Q.  (By Mr. Williamson)  Your attorneys may
22    object to one or more of my questions, but except in
23    limited circumstances you're still required to
24    answer the question truthfully and to the best of
25    your ability.  Is that clear?
```

2 (Pages 5 to 8)

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com       Phone: 1.800.280.3376       Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-8   Filed 02/09/18   Page 3 of 77

Page 9

1     A.  That's clear.
2     Q.  Okay.  And if you don't understand my
3  question or you have trouble hearing me, please just
4  feel free to let me know and I will rephrase or
5  repeat -- repeat the question as necessary, okay?
6     A.  Okay.
7     Q.  When you answer the question, just
8  please make sure to speak clearly and loudly enough
9  for our court reporter, and when you answer please
10  make sure you answer verbally as opposed to nodding
11  your head or shrugging your shoulders, etc.  Is that
12  clear?
13     A.  That's clear.
14     Q.  And then finally just if you could
15  allow me to finish answering my question before you
16  answer just so that we can have a -- have a clean
17  record here, make things easier for our court
18  reporter.  Okay?
19     A.  Okay.
20     Q.  Mr. Barrett, you are aware that you
21  were identified by your attorneys in this case as
22  one of the Missouri State Public Defender employees
23  designated to provide deposition testimony under
24  Federal Rules of Civil Procedure 30(b)(6); is that
25  correct?

Page 10

1     A.  I'm aware.
2     Q.  Okay.  And did you receive a copy of
3  that deposition notice?
4     A.  I believe I have, yes.
5     Q.  Okay.  Did you have a chance to review
6  it before this deposition?
7     A.  Generally, yes, I did read through it.
8        (WHEREIN, Exhibit 1, Notice of
9  deposition, was marked for identification.)
10        MR. WILLIAMSON:  Okay.  I'm going to
11  hand you a document that is marked Exhibit 1 for
12  identification.  Copy to the -- sorry, I only have
13  one.  One copy.
14        MR. QUINLAN:  This is one?
15     Q.  (By Mr. Williamson)  Is that a copy of
16  the deposition notice that you reviewed?
17     A.  I believe it is.
18     Q.  And you see attachment A there as well?
19     A.  I do.
20     Q.  Okay.  My understanding is that you
21  will be prepared to testify today with respect to at
22  least numbers 6 and 13 on attachment A.  Is that
23  your understanding?
24     A.  Six.  And what was the other one?
25     Q.  Why don't we do this?  Can you -- can

Page 11

1  you read the description of item number six there?
2  I'm sorry, for the record.
3     A.  Yes.
4     Q.  Can you read it out loud, please?
5     A.  Oh.
6     Q.  Sorry.
7     A.  (Quote as read):
8        Policies and procedures relating to the
9        circumstances under which and process
10        by which MSPD attorneys are permitted
11        or required to refuse case
12        appointments.
13     Q.  Are you prepared to answer questions
14  related to that subject?
15     A.  Yes.
16     Q.  And can you read the description of
17  item number 13?
18     A.  Number 13.  (Quote as read):
19        Information regarding MSPD budget
20        allocations and expenditures, including
21        the amount or proportion spent on
22        expert witnesses, investigators, and
23        social workers respectively.
24     Q.  And are you prepared to answer that --
25  questions about that subject?

Page 12

1     A.  Yes.
2     Q.  If there are any questions that I ask
3  you that you are not prepared to answer, please feel
4  free to let me know.
5     A.  Okay.
6     Q.  Okay?  Mr. Barrett, did you prepare for
7  the deposition today?
8     A.  Yes.
9     Q.  How did you prepare?
10     A.  I reviewed some old budget books.  I
11  reviewed a study pulled together by the accounting
12  firm of RubinBrown.  I reviewed to some degree our
13  previous year operating budgets.
14     Q.  Did you meet with your attorneys?
15     A.  Yes.
16     Q.  Did you meet with any MSPD district
17  defenders in preparation for the deposition today?
18     A.  No.
19     Q.  Did you meet with any assistant public
20  defenders?
21     A.  Not in preparation for this deposition
22  today.
23     Q.  Okay.  Did you meet with any other MSPD
24  staff as part of your preparation?
25     A.  Yes, we -- I talked with deputies.

3 (Pages 9 to 12)

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-8    Filed 02/09/18    Page 4 of 77

Page 13

1          Q.   Okay.  And particular people -- you
2    said deputies that work in your office?
3          A.   Yes.
4          Q.   Who are those individuals?
5          A.   Deputy director Greg Mermelstein.
6    Deputy director Joel Elmer.
7          Q.   Okay.  And besides the documents that
8    you've already named, did you review any other
9    documents?
10         A.   No.
11         Q.   Okay.  Mr. Barrett, are -- by whom are
12   you employed?
13         A.   State of Missouri, Missouri State
14   Public Defender system.
15         Q.   And what is your official title?
16         A.   I'm the director of the Missouri State
17   Public Defender system.
18         Q.   And how long have you served as
19   director of the Missouri State Public Defender
20   system?
21         A.   I began in this role on or about June 1
22   of 2015.
23         Q.   And can you describe for us your
24   professional responsibility prior to joining the
25   public defender's office?

Page 14

1          A.   Prior to joining the public defender's
2    office?
3          Q.   Correct.
4          A.   Well, I held another position within
5    the system prior to being director.  Would you like
6    me to speak to that?
7          Q.   Please.
8          A.   I was for about a period of one year
9    before being appointed as the director, served as
10   general counsel.
11         Q.   And prior to that?
12         A.   I worked for the State Emergency
13   Management Agency.
14         Q.   Okay.  How long did you work for that
15   agency?
16         A.   Approximately seven months.
17         Q.   And prior to joining that agency were
18   you working here in Missouri?
19         A.   I was.  I was working in the office of
20   the governor.
21         Q.   Okay.  And what was your job title in
22   the governor's office?
23         A.   Deputy general counsel.
24         Q.   How long did you hold that position?
25         A.   A little more than two years, including

Page 15

1    a brief stint as deputy chief of staff when there
2    was a vacancy.
3          Q.   And who was the governor when you
4    worked in that office?
5          A.   Jeremiah "Jay" Nixon.
6          Q.   Can you describe your current job
7    responsibilities as director of the state public
8    defender's office?
9          A.   Sure.  I have to -- part of my
10   responsibilities is to implement the operating
11   budget.  That is pulled together by the comptroller
12   of the public defender system, passed by the general
13   assembly.
14              I have to allocate resources throughout
15   the state to make sure to the best of our ability
16   that there is lawyers to handle cases that come in
17   through the door in order to fulfill the rights of
18   indigent accused.
19              I have to make sure that the lawyers
20   under my charge practice within the rules of
21   professional responsibility.  I have to make sure
22   that we are following state and federal law as
23   relates to employees.
24              I have to report out to the Public
25   Defender Commission, who I report to on -- at least

Page 16

1    on a quarterly basis.  Those are my general -- I am
2    responsible for hiring and firing decisions.
3          Q.   And when you report to the Public
4    Defender Commission, what kinds of things are you
5    sharing with -- with the commission?
6          A.   Sure.  So the general practice is we
7    have a quarterly meeting that is noticed up to the
8    public pursuant to the sunshine law.  The -- there's
9    currently -- there's seven positions, three of which
10   are vacant.  So there's four active members of the
11   Public Defender Commission.
12              When we pull together an agenda I
13   propose it to the chair of the commission for his
14   approval.  Those things typically include caseload
15   reports, whether cases are going up or down, such
16   things as current operating budget, how we're doing
17   this far into the fiscal year.
18              Are we ahead, are we behind in terms of
19   projections?  Some personnel issues with say for
20   closed session, of course.  Other -- other issues
21   that are relevant to that date and time, whether
22   it's our participation in certain initiatives or
23   cases that we're dealing with.
24              Other issues could be facility reports
25   for the reason that we do not control where our

4 (Pages 13 to 16)

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-8   Filed 02/09/18   Page 5 of 77

Page 17

1 offices are. Those are controlled by the
2 jurisdictions that we serve and presents a number of
3 problems.
4        So we report out on that. Each one of
5 the division directors and deputies will report out.
6 For instance, we have a trial division director.
7 She will report out on what's going on in her
8 division.
9        Deputy will report out on what's going
10 on in appellate or PCR as well as juvenile cases.
11 These are the types of things that regularly occur
12 on the agenda for commission meetings.
13    Q. So I want to return to the structure of
14 the public defender's office in a minute, but first
15 you were hired by the Public Defender Commission; is
16 that correct?
17    A. That is correct.
18    Q. And what role, if any, does the
19 commission play in the day-to-day operations of your
20 office?
21    A. They don't play a large role in the
22 day-to-day operations. When there's something going
23 on that -- that I'd like to keep the commission
24 informed on, I will -- if nothing else, a courtesy
25 to the chair, brief him, but they are really

Page 18

1 responsible statutorily for approving the budget,
2 and they have a number of other statutory
3 requirements, such as to do some advocacy for us and
4 our mission, as well as to prove some pay structure
5 within the system.
6    Q. And is that advocacy with respect to
7 the legislature or the general public or -- or some
8 other --
9    A. I think it's all-encompassing, but I
10 think the legislature is, if my memory serves me,
11 specifically enumerated in the statute.
12    Q. Now, is the commission responsible for
13 evaluating your job performance?
14    A. Well, I can say this. They have --
15 they hired me and they have the ability to fire me
16 for cause.
17    Q. Did they conduct any kind of formal
18 evaluations of -- of your work or of the work of the
19 office?
20    A. I have not received a formal
21 evaluation. They have shared in the past when you,
22 know, we -- they think we are doing something well
23 and when they think we're -- we can improve. So to
24 that extent they share those things during the
25 commission meeting, but I have not received a formal

Page 19

1 evaluation.
2    Q. You do receive verbal feedback, though,
3 from the commission?
4    A. Yes.
5    Q. So let's talk a little bit about the
6 structure of the office which you refer to in
7 your -- one of your previous answers. Can you talk
8 about how the office, the district offices are set
9 up and what their relationship is to the central
10 office?
11    A. Sure. So we are a statewide system.
12 Not all public defender systems are statewide. And
13 so we have several divisions. Let's start with
14 central management. We have several divisions.
15        We have a trial division, which
16 represents the lion's share of our cases. We have
17 an appellate PCR division. We have a capital and
18 division that also includes juvenile LWOP cases.
19        (Court reporter interruption.)
20        THE WITNESS: I'm sorry, life without
21 parole cases, LWOP. My bad, sorry.
22        MR. QUINLAN: I'm sorry. I apologize.
23 Can you just start that -- the name of that office
24 again over for me?
25    A. Sure. My apologies. The last is the

Page 20

1 capital division, which also handles juvenile life
2 without parole cases, and that's because both of
3 those cases, capital and juvenile, LWOP, require
4 mitigation.
5        So underneath me in the organizational
6 chart you'll -- you'll see those three divisions
7 listed. Within those divisions, as I mentioned,
8 trial division is our largest division.
9        We have 30 some odd trial division --
10 offices throughout the state and some areas where
11 there is -- where it is highly populated, for
12 instance, St. Louis or St. Louis County, Greene, or
13 Kansas City. The -- the local office, what's
14 referred to as the area, area, and then a number
15 will handle just one county.
16        However, in some other areas of the
17 state that are less populated one area office will
18 handle any number of counties. Could be up to nine
19 I think is our maximum. The local office is -- is
20 run or managed by a position called a district
21 defender. District defender is responsible for the
22 local office, including assignment of cases,
23 managing their local office budget, etc.
24    Q. And there are 114 counties in Missouri?
25    A. Including -- and then the state -- city

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-8    Filed 02/09/18    Page 6 of 77

Page 21

1  of St. Louis.
2      Q.  And there are 33 separate areas or
3  district offices?
4      A.  I believe that's correct, yes.
5      Q.  Okay.  And can you talk a little bit
6  about how your office handles conflict cases?
7      A.  Yes.  So we have -- when there's a
8  conflict -- by way of an example, if there's a
9  robbery, arrest for a robbery involving two
10  defendants in Columbia, for example.  Obviously that
11  local office, the Columbia trial office can only
12  represent one individual.
13          That second defendant would ordinarily
14  be represented by the public defender system if they
15  are indigent, but by another public defender office.
16  Whether it's the Cole County office, the Fulton
17  office, or the Sedalia office.
18          When we have the funds, we contract out
19  that second defendant to the extent that we are able
20  to to a private lawyer who practices in the
21  jurisdiction where the crime allegedly occurred.
22  This keeps the public defender who -- in that second
23  office from having to drive to another county to
24  represent one, two, or a handful of individuals.
25      Q.  And how often generally speaking is it

Page 22

1  the case that you have the -- the funds to hire
2  contract lawyers as opposed to having lawyers in
3  other districts handle conflict cases?
4      A.  So going back two years to 2015, we
5  were set to receive funds, additional funds to the
6  tune of $3.47 million that was appropriated by the
7  legislature for the purposes of handling these types
8  of conflict cases.  I believe this program that we
9  run is called Code 49.
10          Deputy director Joel Elmer will be able
11  to speak more specifically on that program.  At the
12  time we were -- there were several counties in our
13  Code 49 program, but it was not a robust program.  I
14  don't know how many counties were in it, but when we
15  were set to receive the 3.47 million, it was for the
16  purposes of putting more counties in Code 49.
17          That means more counties were going to
18  have their conflict cases contracted out to private
19  counsel.  That money, that funding was vetoed.  The
20  legislature overrode the veto, but then those funds
21  were withheld.
22          We did not receive additional funds the
23  second -- the subsequent year for purposes of Code
24  49 or contracting out conflict cases, but in the
25  last legislative cycle we did receive additional

Page 23

1  funds to essentially contract out all conflict cases
2  to the extent that lawyers, private lawyers are
3  available and willing to take the cases in the
4  state.  We are currently in the process of
5  administering that effort.
6      Q.  So as it stands today, do you know how
7  many districts or areas are participating in this
8  Code 49 program?
9      A.  I believe that all of them are.
10      Q.  Okay.
11      A.  It is fluid in that from week to week
12  we have new private lawyers enter the program and
13  withdraw from the program.  As I stated, deputy
14  director Joel Elmer will be able to speak more
15  specifically on Code 49.
16      Q.  Okay.  And just to be clear, outside of
17  the Code 49 program, when -- when one district is --
18  or area is responsible for handling conflict cases
19  in -- in other counties, is it true that the -- the
20  districts are assigned specific counties to handle
21  in the event that conflicts arise?
22      A.  Yes.  For instance, one office will be
23  responsible for their -- the county in which they
24  sit, and if it's a rural area additional counties,
25  but then above and beyond that as you stated, there

Page 24

1  are additional counties that they are responsible
2  for handling conflict cases in.
3      Q.  And you said that a -- any particular
4  district office could have up to nine I think you
5  said counties that encompass the -- a district?
6      A.  My recollection is the Chillicothe
7  office handles nine counties.  I could be mistaken,
8  but that's my recollection is the most number of
9  counties covered by an area office.
10      Q.  Okay.  And then those offices will have
11  a number -- multiple counties that they're -- where
12  they're responsible for handling conflicts above and
13  beyond the -- however many counties encompass that
14  district?
15      A.  I believe that's the case, but it
16  varies for each --
17      Q.  Sure.
18      A.  -- office.
19      Q.  Right.  Okay.  I just want to return
20  for a second to -- I asked you about the
21  commission's role in -- in your office's work.  Are
22  there any other state officials outside of the MSPD
23  office that have any kind of authority over the work
24  that you do?
25      A.  I should mention that by statute we are

6 (Pages 21 to 24)

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com     Phone: 1.800.280.3376     Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-8    Filed 02/09/18    Page 7 of 77

Page 25

1   an independent department within the judicial
2   branch.  So we have some relationship to the
3   judiciary, but the statute also states that we are
4   independent.  I receive no operational control from
5   any other entity other than the Public Defender
6   Commission.
7        Q.  Okay.  Can you talk a little bit about
8   your -- the MSPD's relationship with the governor's
9   office with respect to budgeting or other
10  operational issues?
11       A.  Yes, I can.  It's -- and the person
12  who's most prepared to talk about this is the
13  comptroller Kathy Lear, but sometime in the process
14  for budgeting is MSPD prepares a draft budget
15  request to submit to the Public Defender Commission,
16  which we typically do at the September meeting.
17            The Public Defender Commission then
18  votes on whether to approve or not approve or make
19  changes to the draft budget request.  Once approved,
20  that draft budget request is then submitted to the
21  legislature and to the governor's office.
22            I believe then the governor's office
23  uses these submittals in order to prepare the -- the
24  recommend -- budget recommendations, the governor's
25  budget recommendations to the legislature.

Page 26

1        Q.  Okay.  Do you receive any feedback from
2   the governor's office regarding your proposal or do
3   they just receive it and --
4        A.  I have not.  In my experience I
5   typically just receive it.  I don't think that
6   prevents the governor's office from having
7   conversations, but I have not -- in my experience I
8   have not had conversations.
9        Q.  Okay.  Now, is it your responsibility
10  as director to determine how to allocate the funds
11  to the various district offices around the state?
12       A.  Yes.
13       Q.  Okay.  How do you go about making those
14  allocation decisions?
15       A.  Well, this is something I task the
16  comptroller with, Kathy Lear, and I believe she
17  looks at prior year cases to pull together a budget.
18  That also includes funding for anticipated travel to
19  the extent that they have to cover -- that office
20  has to cover a number of counties.
21            She prepares a budget for each office.
22  That then goes to each district defender who
23  administers.  And the primary driver of that budget
24  is the caseload.  Another factor is the available
25  space, the office space for that office.

Page 27

1            Sometimes the number of cases would
2   suggest to me that an additional position is
3   necessary, but there is no space in that office to
4   put another person.
5        Q.  So in that instance even if you have
6   the funding to hire an additional attorney for that
7   office, you're not able to make that hire?
8        A.  Right.  That's one instance.  Another
9   instance is approving a position for an office, but
10  being unable to hire a person for that position.
11  For instance, we've had at least one office where
12  we've had a vacancy for a year because of the lack
13  of interest in applicants.
14       Q.  Okay.  And do the district offices
15  provide any kind of budget proposals to Kathy Lear
16  or to you, anyone in your office?
17       A.  Not directly to me.  That might be a
18  question for Kathy Lear.
19       Q.  I want to ask you just a couple of
20  questions about the district defenders.  All of the
21  district defenders ultimately report to you,
22  correct?
23       A.  Well, from the organizational chart and
24  chain of command they would report -- for instance,
25  the trial division, they would report to the trial

Page 28

1   division director.
2        Q.  And the trial division director would
3   then report to you?
4        A.  In the ordinary course she would report
5   to a deputy, but in practice, in practice she
6   typically reports directly to me because the way the
7   work is assigned.
8        Q.  And who is the trial division director?
9        A.  Her name is Ellen Blau.  E-L-L-E-N.
10  Blau, B-L-A-U.
11       Q.  Okay.  And are you involved at all in
12  the supervision of those district defenders?
13       A.  Not by -- not direct supervision by
14  design of the position.  However, I make it a
15  practice to travel to local offices, sit in on staff
16  meetings, listen to concerns.  When I learn that
17  there's an issue in an office, I will often directly
18  interact with the management in that office, but not
19  by design, but by practice.
20       Q.  How often are you able to make those --
21  those kind of visits?
22       A.  It occurs more frequently when the
23  legislature is not in session.  There is no normal
24  from week to week.  In one week I could visit
25  upwards of three offices.  In another week none

7 (Pages 25 to 28)

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com      Phone: 1.800.280.3376      Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-8   Filed 02/09/18   Page 8 of 77

1   depending where -- what I'm facing in terms of my
2   schedules or to dos, but I try to at least visit an
3   office a week.
4       Q.   And you said you -- you would
5   typically, in terms of deciding what offices to
6   visit, if you're made aware of an issue in a
7   particular office, that may be one that -- that you
8   prioritize; is that right?
9       A.   Yes.
10      Q.   And how -- how would you generally be
11  made aware of -- of an issue that would require your
12  intervention?
13      A.   It can happen any number of ways, but
14  the management of that office may call our central
15  office.  We refer to it as Woodrail because that's
16  the name of the office complex, either by call from
17  the local office to Ms. Shipma, our general counsel,
18  or to our human resources department, or vis-à-vis
19  an e-mail from a local office or a phone call
20  directly to me or to Ms. Blau saying there are
21  concerns, or employees sometimes could use a little
22  pep talk, and -- and then I try to make an effort to
23  visit or call in during a -- or -- scheduled staff
24  meeting.
25      Q.   Okay.  This may be a question that --

1   that should be directed to Ms. Blau, but is it your
2   understanding that district defenders are expected
3   to carry their own caseload?
4       A.   They oftentime -- they -- in all but
5   one circumstance I believe they do.  I as director
6   do not impose any requirements on a division -- on a
7   district defender in terms of you must carry a
8   caseload and you must carry caseload that looks --
9   that has X number of cases.
10          Because we have small, medium, and
11  large offices they have varied management
12  responsibilities.  They also have responsibilities
13  under the rules of professional conduct to oversee
14  the lawyers in their charge.
15          Given the number of cases their office
16  handles, the number of counties their office
17  handles, whether they have new attorneys or senior
18  attorneys, these are all factors that go into the
19  size of their caseload, but I will say that all the
20  district defenders save one has an active caseload
21  that I'm aware of.
22      Q.   Do you -- do you know which one does
23  not?
24      A.   I believe Kansas City district defender
25  does not.  I can't say with a hundred percent

1   certainty, but if my recollection serves me, that's
2   the case.
3       Q.   One other funding question.  Do the
4   district offices receive any funding whatsoever from
5   any other source besides the -- the central office?
6       A.   I don't believe so.  I know that the
7   St. Louis office participates in several grants.  I
8   think most of those grants, if not all of them,
9   involve not funds but, for instance, a social worker
10  to help with cases.
11          The legislature I believe imposes a
12  limit on the number of dollars that we can bring in
13  from outside resources.  I believe that's 125,000 or
14  150,000.  I'm not sure.
15          Kathy Lear would know for sure.  But I
16  don't -- I do not think that we receive any outside
17  funds for, say, a private organization or federal
18  government.
19      Q.   And/or local government, county
20  government or --
21      A.   Well, we -- we do receive the office
22  space.
23      Q.   The office space, okay.
24      A.   And I believe in Kansas City we have
25  some involvement in drug court, and I believe the --

1   the local jurisdiction may cover that cost or some
2   cost associated with that if I'm not mistaken.
3       Q.   And to be clear, the -- the counties
4   are providing the office space, they're not paying
5   for overhead, or are they?
6       A.   I don't believe they're paying for
7   overhead.
8       Q.   So just the space itself?
9       A.   I -- I believe so.  As to electricity,
10  I don't know the answer to that.  That's a Kathy
11  Lear question.
12      Q.   Okay.
13      A.   It might -- I will say this.  It might
14  vary from jurisdiction to jurisdiction.  In some
15  jurisdictions we -- we do not have privity of
16  contract on the -- on the lease, and so we don't
17  always know what the terms are as to who's paying
18  for what.  It varies by jurisdiction.
19      Q.   How much discretion do chief -- or
20  district defenders have with respect to setting
21  policy in their respective offices?
22      A.   They have some because each circuit,
23  judicial circuit has its own culture.  I'll give you
24  by way of example, if a given circuit starts -- has
25  court earlier than other jurisdictions they could

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com     Phone: 1.800.280.3376     Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-8   Filed 02/09/18   Page 9 of 77

1 amend policies to require attorneys to be there
2 earlier.
3     We generally require I believe approval
4 before they impose policy, but there are a number of
5 policies that existed in local offices prior to my
6 joining the system.  So I'm not always aware of the
7 local policies that are in place, but they have
8 some.
9     **Q.   Do they have discretion around how --**
10 **how they allocate the funds that are given to them**
11 **from the central office?**
12     A.   I believe that Kathy Lear comes up with
13 a budget for each one of them that is lined out.
14 The -- we have -- Missouri State Public Defender
15 system has a hundred percent flexibility in our
16 budget.  It's not commonplace, but it gives us the
17 ability to get through the fiscal year.
18     I believe the district defender works
19 directly with Kathy Lear in the event that they need
20 to make changes to how their local budget is
21 administered, but there is some flexibility, yes.
22     **Q.   And so you said that the public**
23 **defender's office has 100 percent flexibility say to**
24 **move funds from here to there as necessary?**
25     A.   Yes, we -- I believe Kathy Lear needs

1 to get -- provide notification to the office of
2 administration.  There is a budget analyst who is
3 assigned to each department in the state and it
4 requires their approval, but yes, we have -- the
5 hundred percent flexibility that we've had is
6 probably our best tool for getting through each year
7 because we can't predict with much accuracy whether
8 litigation expenses in the coming fiscal year will
9 be higher or lower than we anticipated.
10     It's based on, you know, how quickly
11 cases go to trial, particularly cases that involve a
12 lot of litigation expenses, death penalty cases, sex
13 offender type cases.  So we need that flexibility.
14     **Q.   And you said that that flexibility is**
15 **rare among agencies, among state agencies?**
16     A.   I believe so.  I know the court system
17 has some flexibility, but not as much as we do.
18     **Q.   And is it your understanding that the**
19 **reason that you have that flexibility are for the**
20 **reasons that you just stated, the uncertainties**
21 **around caseloads?**
22     A.   Yeah.  We don't know how many cases are
23 going to come in through the door.
24     **Q.   Okay.  Back to the district defenders**
25 **for a second.  Is there -- in your understanding, is**

1 there discretion with respect to staffing, either
2 the number of attorneys or support staff,
3 investigators?
4     A.   That goes through me.
5     **Q.   Okay.**
6     A.   If they need additional staffing, they
7 will need to make the request.  It's not just a
8 question of whether there is money -- money
9 available.  In addition to providing funds, the
10 legislature also sets a cap on how many what's
11 called full-time equivalents or FTEs we're able to
12 use.  And so we need to make sure that there's a FTE
13 available.
14     And so if a -- if an office, if an area
15 needs an additional FTE, whether it's an attorney,
16 whether it's a support staff position, to include an
17 investigator, they'll make their case to me.  And
18 there's a number of factors that we look at to
19 determine whether it's approved.  It's very rare
20 that they get additional staffing.
21     **Q.   Do you -- let me back up.**
22     **I assume it is the legislature that**
23 **created these limitations, the FTE limitations?**
24     A.   Yes.
25     **Q.   Do you -- do you know what the**

1 rationale was behind those limitations?
2     A.   Well, I think the legislature, it's --
3 it's their responsibility to control the size of
4 state government, and in addition, the one thing
5 that our budget does not cover is fringe benefits,
6 pension, insurance.
7     And so if we had the cash and we just
8 added people, that would essentially add obligations
9 on the state.  And for that reason I believe that
10 they control additionally the number of FTEs.
11     **Q.   Understood.  Because employees who are**
12 **not full-time do not get those fringe benefits?**
13     A.   Well, I think there's a threshold for
14 when someone is eligible for benefits.  But if I
15 added five people tomorrow, that would be five
16 additional people that the state would have to pay
17 insurance for, pensions for, etc., and so for that
18 reason they control the number of FTEs.
19     **Q.   Okay.  Do district defenders have**
20 **discretion with respect to the use of investigators**
21 **in their office?**
22     A.   The use of investigators?
23     **Q.   Correct.**
24     A.   Yes.
25     **Q.   So not just the -- whether or not**

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com    Phone: 1.800.280.3376    Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-8   Filed 02/09/18   Page 10 of 77

Page 37

1  investigators or how many investigators are on
2  staff, but how those investigators are used?
3      A.  Yes.
4      Q.  Yes.  And do the district defenders
5  have discretion with respect to when it is
6  appropriate or not to refuse to -- refuse case
7  appointments from a court?
8      A.  Well, it's a bottom-up type thing in
9  that each lawyer is responsible to practice within
10 the rules of professional responsibility or
11 professional conduct.  Additionally, managers have
12 responsibilities under the rules of professional
13 conduct as well as it relates to competence,
14 diligence, etc.
15         (Court reporter interruption.)
16     A.  Competence, diligence, etc.
17     Q.  (By Mr. Williamson)  And if an
18 individual lawyer raises a concern about taking
19 additional cases, are they required to take that
20 concern to the district defender?
21     A.  That's my understanding.
22     Q.  And then it's up to the district
23 defender to decide how to proceed?
24     A.  Within the rules of professional
25 conduct, yes.

Page 38

1      Q.  Does the district defender have to give
2  that lawyer permission to refuse cases?
3      A.  No.  They shouldn't.  It's the
4  individual lawyer's obligation.  I believe there is
5  some flexibility for the manager to engage the
6  person to make sure that they're working hard,
7  they're working sufficient number of hours, to see
8  if they can do things better, etc., to make sure
9  that they are unable to take additional cases, but
10 ultimately it's my understanding under the rules
11 that that obligation rests on the individual
12 attorney.
13     Q.  And those individual attorneys cannot
14 be fired by the district defender as a result of
15 refusing to take cases?
16     A.  They should not be fired for
17 practicing -- an effort to attempt to practice
18 ethically.  If they are -- if they can take more
19 cases and they simply are not pulling their weight,
20 assuming there's room within the rules to -- for
21 additional work, then yes, you can terminate -- you
22 can in turn terminate an employee for not working
23 hard enough, not being diligent in the number -- in
24 the cases that they have.
25         But I would not authorize a termination

Page 39

1  for someone who says that they are not available
2  because they have -- their caseload is such that
3  they can't take any more work.
4      Q.  And can assistant public defenders only
5  be terminated with your approval?
6      A.  Yes.  That's my communication to staff,
7  yeah.
8      Q.  Okay.  Is it your understanding that
9  these internal policies within the district offices
10 are -- are all in writing?
11     A.  There might be cultural policies as
12 well that date back to a time that no one can put
13 their finger on, but -- but I know a number of
14 offices have written policies.
15     Q.  And those policies don't necessarily
16 have to be approved by your office or do they?
17     A.  I don't remember communicating a
18 directive on -- that I have to approve all local
19 policies for the simple reason that I've approved
20 very few.  One of the ones that I do approve and we
21 do have a policy on that I'm regularly engaged in is
22 when we hire someone, one -- one of the questions we
23 ask is are you able to wind down your existing
24 practice, dispose of your existing cases before
25 joining the public defender system.  That is the

Page 40

1  preferred situation.
2          There are sometimes instances where
3  someone is unable to wind down a case and they will
4  seek approval to bring that case with them, provided
5  that they don't use any MSPD time or resources to
6  work on that case, that they share with us the
7  extent of their representation, and that the scope
8  of that representation does not widen after
9  approval.  Those are instances where they will need
10 to get our approval.
11     Q.  Thank you.  I want to ask you just a
12 few questions about the assistant public defenders,
13 although I realize you -- you may not have a whole
14 lot of contact with -- with them individually.  And
15 we've touched on some of this already.  How much
16 discretion are individual assistant public defenders
17 given to determine the best way to represent their
18 client in a particular case?
19     A.  Well, as it relates to me there's a
20 statute.  I don't know the number, but it prohibits
21 me from directing a lawyer in any way, shape, or
22 form with respect to their representation of an
23 individual.
24         So as it relates to the director, I
25 don't have the ability to direct them, just that

10 (Pages 37 to 40)

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com    Phone: 1.800.280.3376    Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-8   Filed 02/09/18   Page 11 of 77

1   they follow the rules, professional response --
2   conduct which requires certain things, such as
3   seeing your clients, investigating the case, etc.
4       Q.   Do you know whether that statute
5   prohibits just you from -- from directing those
6   attorneys or does that also include the district
7   defender?
8       A.   My recollection is that it's -- it just
9   states me.
10      Q.   And those assistant public defenders
11  are generally supervised by -- you made reference
12  earlier to a manager in those district offices?
13      A.   Well, in -- in a large office like
14  Kansas City they will be under a team leader.  They
15  have a team leader in Kansas City.  In some offices
16  that are more medium-sized or even -- and larger
17  will have both a district defender and a deputy
18  district defender.
19          It's up to them how they divide their
20  responsibilities.  So some will break up their staff
21  and have half report to a deputy, half report to the
22  district defender.  But it's up to them.
23      Q.   And in terms of what that oversight
24  includes, would we need to talk with individual
25  district defenders to determine the kinds of things

1   assistant public defenders are evaluated on?  Does
2   that vary from office to office?
3       A.   Yes.  I mean, there's -- there's more
4   uniformity when it comes to being approved for
5   promotion.
6       Q.   What kinds of things do you consider in
7   that instance?
8       A.   Well, one of the things is client
9   contact.  Do you talk to your client?  How often do
10  you see your client?  I believe we have a standard
11  of within the first seven days is initial conduct --
12  contact, and then to the best of my recollection
13  it's every 30 days after.
14      Q.   And -- and that is in your mind the --
15  the most important criteria?
16      A.   It's one of the few things that we
17  could evaluate from an objective standpoint.  And
18  also the rules of professional conduct require, you
19  know, regular contact with your client.
20          Other things are skills which are more
21  subjective, your ability to handle more serious
22  types of cases, but probably the most objective
23  thing is do you follow office rules and procedures
24  and do you see your client.
25      Q.   Do you consider the number of cases

1   taken to trial by an individual attorney?
2       A.   In the trial division we want -- when
3   someone -- there's four different levels for
4   attorneys who are nonmanagement positions.  There's
5   assistant public defender I, APD II, APD III, and
6   APD IV.
7           When you get to the higher levels,
8   three and four, we want to see that you are able to
9   go to trial and have the skills to go to trial
10  because you're in the trial division and -- and we
11  don't want to promote someone to a higher level
12  within the system unless they have trial skills.
13          This proves sometimes to be a challenge
14  because in some jurisdictions it's the culture or
15  the practice that very few cases actually go to
16  trial.  My understanding of our numbers is that in
17  the last two years only one percent of cases of
18  among our total number go to trial.
19      MR. QUINLAN:  I'm sorry, you say one
20  percent?
21      A.   One percent.
22      Q.   (By Mr. Williamson)  How do you factor
23  in caseloads in your evaluation of individual public
24  defenders?
25      A.   I'm not sure that I'm aware that we do.

1       Q.   Okay.  And you talked about criteria
2   for -- for promotion.  Does that suggest then that
3   assistant public defenders are not promoted just
4   based on number of years in the system or other
5   criteria?
6       A.   I believe the first promotion to APD II
7   is primarily tenure driven.  Obviously if you're
8   creating mischief in the office or something like
9   that, that would be at play as well, or not
10  following policies, not showing up on time, not
11  calling in or those things.  But it's largely tenure
12  driven and not skill driven.  APD III and IV are --
13  by contrast have both a tenure component as well as
14  a skill component.
15      MS. SHIPMA:  Jason, I'd like to point
16  out Joel Elmer will be able to give you more of the
17  details of this.
18      MR. WILLIAMSON:  Okay.  Fair enough.
19      Q.   (By Mr. Williamson)  And let me know if
20  this is something that Mr. Elmer can or should speak
21  to.  If an assistant public defender has a complaint
22  regarding the size of their caseload, for example,
23  are they encouraged to submit those complaints to
24  the district defender or do those complaints come
25  directly to your office or is it some combination

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-8   Filed 02/09/18   Page 12 of 77

1  of -- of both?

2      A.  I think that takes a number of forms.

3  I mean, it's our most pervasive problem in the

4  system, high caseloads.  It's my understanding that

5  APDs throughout the state regularly make mention of

6  the fact that they have too many cases.  Not in

7  every instance, of course, when they make mention of

8  their high caseloads is it to me.

9          It's primarily in their local office.

10  I am fully aware, and when I meet with them it's

11  typically brought up if I don't already concede

12  knowing that it's a concern, and when someone leaves

13  the system if they are willing to subject themselves

14  to a -- an exit interview, it's what is almost

15  always what they cite as the reason for leaving.

16  Not -- may not be the exclusive reason, but it's the

17  driver.

18      Q.  Okay.  And is there a formal -- I

19  understand it may not happen formally all the time,

20  but is there a formal complaint process for public

21  defenders?

22      A.  I don't believe there is.  We -- in

23  training, I know as part of training we say you --

24  you need to report certain things to the HR

25  department when there's concerns about harassment or

1  discrimination or those types of things, that we say

2  you have to report these type of things, but not as

3  it relates to caseload.

4      Q.  Does your office receive complaints

5  directly from indigent defendants regarding the --

6  the quality of their representation?

7      A.  Yes, we do.  We in addition to calls

8  that the individual -- the indigent defendant often

9  makes to their local office to the attorney who

10  represents them and as well as to the district

11  defender or deputy district defender, we utilize an

12  ombudsman program.

13          Deputy director Greg Mermelstein is in

14  charge of the ombudsman program, where indigent

15  defendants will call -- will call the Woodrail

16  office, either talking to Marsha Plank or Greg

17  Mermelstein or Greg Mermelstein's assistant Lisa

18  McGee, and we will try to resolve the complaint to

19  the best of our ability.

20          A lot of times it has to do with not

21  seeing the client for some time, not filing or not

22  following the direction of the client as relates to

23  filing certain motions.  We will try to resolve it

24  by Greg calling or e-mailing the specific attorney

25  as well as the district defender for that office.

1      Q.  And do you have any follow-up

2  correspondence with the indigent defendant involved?

3      A.  That's a question for Greg Mermelstein.

4  I believe we also utilize a database for tracking

5  complaints that come in through the ombudsman

6  program.

7      Q.  So let's talk a little more

8  specifically about the funding that your office has

9  received.  What is the -- your current operating

10  budget?

11      A.  The specific number, I don't know.  I

12  think -- I believe it's around 40 million.  Kathy

13  Lear would know specifics.  In terms of my

14  perspective on the budget, I think of it in terms of

15  how many more dollars do I have this year than I did

16  last year.

17      Q.  So can -- can you speak to that?

18      A.  Yeah.  So I began in 2015.  That

19  legislative cycle we were appropriated additional

20  $3.47 million from the legislature for purposes of

21  having a more robust Code 49 program as I alluded to

22  earlier.

23          As I also mentioned, that increase in

24  funding was vetoed by the then governor.  The

25  legislature overrode that veto, and then the

1  governor exercised his withhold authority on that

2  additional funds.

3          I believe the next year, 2016 calendar

4  year, we were flat.  We did not receive an increase,

5  I believe.  I believe that's the case.  You know, I

6  believe we received an additional million.  Might

7  have received an additional million dollars is my

8  recollection.

9          MR. QUINLAN:  Fiscal 2016?

10          THE WITNESS:  I get them confused.

11  That might have been fiscal 2017.

12          MR. QUINLAN:  And that's -- I'm sorry.

13          THE WITNESS:  The fiscal is a little

14  ahead --

15          MR. QUINLAN:  As I understand it,

16  fiscal year runs from July 1st to June 30th.

17          THE WITNESS:  July 1, yeah.

18          MR. QUINLAN:  So -- so 2016 fiscal year

19  would run from July 1st of '15 to July 30th of '16,

20  right?

21          THE WITNESS:  I think that's correct.

22          MR. QUINLAN:  So when you said -- when

23  you started in -- I'm sorry.

24          MR. WILLIAMSON:  No, that's fine.

25          MR. QUINLAN:  When you started in 2015,

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com      Phone: 1.800.280.3376      Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-8   Filed 02/09/18   Page 13 of 77

Page 49

1    are you talk -- were you talk -- and the 3.74, was
2    that the 2015 or 2016 budget?
3         THE WITNESS:  I think it was the 2016
4    fiscal year budget.
5         (Court reporter interruption.)
6         THE WITNESS:  2016 fiscal year budget.
7         MR. QUINLAN:  I've had to deal with
8    that, so I thought it may help you.
9         MR. WILLIAMSON:  No, I understand.
10   **Q.   (By Mr. Williamson)  So the**
11   **$40 million -- roughly $40 million budget that you**
12   **just mentioned that you're working with now is the**
13   **-- is the FY18 budget, correct?**
14   A.   Yes.  Yes.  I think it might be a
15   little more than that.  Kathy Lear would know, and I
16   think it's in -- might be in our operating budget,
17   but we received an additional $4.5 million.
18        Now, the $3.5 million as I mentioned
19   that we received in 2015 we never received.  We
20   are -- we filed a lawsuit on that and we're still
21   litigating it.  But for -- for this fiscal year that
22   we're operating in we have an additional
23   $4.5 million.
24        We are doing three things with that
25   additional money.  We are endeavoring to put every

Page 50

1    county in the state in that Code 49 program to the
2    extent as I mentioned earlier there are private
3    attorneys who are in the panel attorney program
4    willing to take cases.
5         Separately we are using a set amount of
6    funds to improve our IT infrastructure to include
7    wide area network, which I believe is broadband.
8    The reason we're doing that is we don't have
9    sufficient broadband to download a discovery or, for
10   instance, a police body cam video without disrupting
11   every computer in the -- in the office.
12        In addition, we are trying to hire ten
13   additional positions.  We were given ten positions,
14   ten FTEs in 2015 as a part of that increase, which
15   was made part of our core budget going forward.
16        Although we were given the FTEs, we
17   were not given -- as I mentioned, we're -- the money
18   that was supposed to be used to fulfill those
19   positions was withheld.  This is the first year that
20   we had the money to -- to fill those positions.  Not
21   all of those positions have been filled.
22   **Q.   Do you attribute the changes to your**
23   **budgetary needs from year to year to increases in**
24   **caseload or -- or other factors?**
25   A.   I can't -- I -- it would be speculative

Page 51

1    for me to guess as to the motivating factor or
2    factors in the legislature making the decision, but
3    one of the things that I did communicate to them was
4    the increase in caseload that occurred from 2015 to
5    present day.
6         I think there was a one-year jump of,
7    if memory serves me, 12 percent, bringing us from
8    74,000 cases a year, rough number, to north of
9    80,000, I think closer to 82,000 cases.
10        And then in the subsequent year we
11   received an additional increase to the tune of a few
12   percentage points above and beyond that 12 percent
13   increase.  And so any additional funds that we
14   received are in the context of more work having to
15   be done.
16   **Q.   Do you have any sense of what is**
17   **driving the -- the increase in the caseloads?**
18   A.   I can't speculate as to -- on that.  I
19   would imagine it varies from jurisdiction to
20   jurisdiction.  I can by way of one personal
21   experience answer that question.  I recently visited
22   our Union office.
23        Although we had a statewide increase of
24   12 percent, the Union office jumped off the charts
25   because it had a -- I believe a two-year increase of

Page 52

1    60 percent increase in the number of cases that we
2    received.  I went there to try to kind of suss out
3    what was driving it.
4         I met with the local prosecutor in
5    addition to district defender Lisa Preddy, and he
6    told me that in part he was able to hire two
7    additional prosecutors.  If memory serves me, that
8    allowed him to file more cases to include
9    misdemeanor cases that they previously were not able
10   to move forward on.
11        So I could say that in that
12   jurisdiction, based on the communication that I had
13   with the local prosecutor, that it had something to
14   do with being able to hire additional prosecutors.
15   I can't speculate as to what's driving it in other
16   jurisdictions.
17        I know in Springfield, which is the
18   office that we had the second highest increase in
19   our caseload, I believe it was around 25 or
20   26 percent memory serves me, they had recently
21   passed a one percent sales tax for the increase for
22   the purpose of public safety, hiring more law
23   enforcement officers, hiring more prosecutors.
24        The -- the consensus in the local
25   office from what I've heard from others and my own

13 (Pages 49 to 52)

**MIDWEST LITIGATION SERVICES**
**www.midwestlitigation.com       Phone: 1.800.280.3376       Fax: 314.644.1334**
Case 2:17-cv-04057-NKL   Document 153-8   Filed 02/09/18   Page 14 of 77

Page 53

1  opinion, that this has driven an increase in more
2  filings in that office.
3        Of course, in both the Union office and
4  the Greene County office or the Springfield office,
5  as well as other offices, we did not receive any
6  corresponding funding to -- to match what was going
7  on in the local jurisdictions beyond the funding
8  that I mentioned earlier.
9        Q.  Based on some of your prior responses,
10  I'm assuming that Kathy Lear would be the best
11  person to talk to about the budget proposal process?
12  Is that fair?
13        A.  Yeah.  Yes, I spoke to it a little bit
14  earlier based in terms of the commission approval,
15  then the submission to the governor and the
16  legislature, but in terms of specifics, how she
17  pulls together the numbers that she does, it would
18  be questions related to her.
19        In terms of what priorities are or in
20  what the overarching budget should look like, I play
21  a role in that.  For instance, we had a study done
22  that was completed I believe in 2014 which was an
23  empirical data-driven study called the Missouri
24  Project Report performed by RubinBrown, accounting
25  firm, that established thresholds for how many hours

Page 54

1  we're supposed to spend on given cases by case type.
2        That -- that report provides some sort
3  of calculation where we could input our current
4  number or the last year's -- the previous fiscal
5  year's cases and by case type, then subtract out the
6  current resources we have, and that would yield how
7  many additional resources we need.  That is the
8  primary driver of our budget formation is the
9  RubinBrown calculus.
10        Q.  And is the -- is it your understanding
11  that the legislature has accepted those standards as
12  reasonable?
13        A.  I can't opine on that.  I will say
14  two -- two things to that.  There was some criticism
15  that preceded my involvement with MSPD as to how
16  these -- how our then numbers were calculated.  We
17  received criticism in auditor Schweich's finding
18  about how numbers were pulled together.
19        In addition, I know that the Senate
20  budget chair at the time had concerns because
21  Missouri was the only state I believe that had two
22  Supreme Court -- state Supreme Court cases that
23  discussed our caseload as well as an auditor finding
24  that challenged or raised some concerns related to
25  our -- our caseload standards at the time.

Page 55

1        The American Bar Association thought
2  that Missouri was the -- the right state to have the
3  first caseload objectively -- objective data-driven
4  caseload study performed in to formulate new
5  data-driven empirically based caseload numbers.
6        When that report came out, that is the
7  year, the next legislative cycle that we received
8  the increase of 3.47 million.  So I will just put
9  those two together to suggest that it held some
10  weight.  Separately, part of the budget process is
11  the House will pass -- there's two houses, the House
12  and the Senate.
13        The House will pass its budget bill
14  first and then it will go to the Senate.  Because
15  the number of budget bills and lines on budget bills
16  that the Senate has to review and make decisions on,
17  they will speed up the process by in Senate budget
18  committee looking at, one, the governor's
19  recommendation for each budget request, what the
20  House passed, and what the department requested.
21        Typically when you sit in on that
22  budget hearing you will hear either House and close,
23  which means the Senate budget committee will go with
24  the House version and then move on to the next, or
25  governor's recommendation and closed, and more

Page 56

1  rarely go with the department request.
2        This past year the Senate budget
3  committee or Senate appropriations I should say,
4  that's the appropriate name for the committee, did
5  not go with the -- in committee did not go with the
6  House recommendation or the House-passed budget bill
7  for MSPD.
8        It did not go with the governor's
9  recommendation, but went with the departmental
10  request given that the departmental request was
11  based in large part on the RubinBrown numbers.
12        You may be able to make -- there might
13  be a tacit acknowledgment that they accepted the
14  numbers, but again, I'd only be speculating as to
15  what's in their -- their minds.  After that point
16  because the House and the Senate differed on their
17  positions, it goes to a joint budget committee where
18  they reconcile their differences.
19        Q.  And during this process you advocate at
20  the legislature for that additional funding; is that
21  correct?
22        A.  Yes.  I -- I provide testimony both in
23  legislative budget committee hearings and I meet
24  privately with staffers and key members on
25  appropriations in the legislature.

14 (Pages 53 to 56)

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-8   Filed 02/09/18   Page 15 of 77

Page 57

1     Q.   And have you been asked formally or
2  informally about the RubinBrown study generally or
3  its role in -- in your development of your budget?
4     A.   Yes.  It's always a part of my
5  proposal, my written remarks, my -- my oral remarks,
6  as well as individual conversations when -- when I'm
7  asked how did you arrive at this number.
8     Q.   And has anyone ever challenged
9  explicitly or implicitly the -- the legitimacy of
10 those numbers?
11    A.   Yes.  Conversations with prosecutors.
12 Again, they will -- I know the comments have been
13 made questioning the report.  What the specific
14 concerns are, I don't recall.
15    Q.   You said prosecutors have raised
16 concerns?
17    A.   Yes, I don't remember which ones, but I
18 remember having conversations.
19    Q.   Any legislators raise concerns?
20    A.   Perhaps -- not to me directly, but
21 perhaps.
22    Q.   Okay.  And you said it's your job to
23 prioritize your budget or your -- your line items;
24 is that correct?
25    A.   Yeah.

Page 58

1     Q.   How do you go about that -- that
2  process?
3     A.   Well, I should say that in addition to
4  generating a number that -- that's based on
5  RubinBrown calculus, there are things that we
6  additionally asked for in our budget.  IT is an
7  example.
8     Also, we do not have a -- an appellate
9  office in the southern district.  We have the
10 Southern District Court of Appeals, but we do not
11 have a southern district appellate office.
12 Therefore, our attorneys in our central office or
13 our western appellate office have to drive a long
14 way to handle these types of cases.
15    Also, we have asked for juvenile
16 advocacy units, which the system previously had, but
17 had to get rid of in order to handle our rising
18 adult caseload.  They preceded me.
19    So we've asked for these types of
20 things in our budget above and beyond what
21 RubinBrown says we need to provide constitutionally
22 competent representation for the number and types of
23 cases that we have.
24    Q.   Is it your understanding that Sarah
25 Johnson will be able to talk about the juvenile

Page 59

1  advocacy units?
2     A.   I believe so, yes.
3     Q.   Okay.
4     MS. SHIPMA:  And Joel Elmer.
5     MR. WILLIAMSON:  And Joel Elmer.
6     Q.   (By Mr. Williamson)  And -- and does
7  the Public Defender Commission play any role in
8  determining priorities within your -- your budget?
9     A.   Well, yeah, we propose the budget to
10 them and they have to approve it, and there will be
11 questions as to, you know, specific things and
12 what's -- what I would -- it's always a question in
13 the legislature of, okay, this is what you say you
14 need, but what would you prioritize?
15    And in -- recently we have prioritized
16 getting out of conflict cases because it's the
17 most -- it's the thing that we can do to provide
18 relief statewide in addition to make us more
19 efficient because we're -- it reduces our travel
20 time.
21    Q.   At what point in the course of a given
22 prosecution is the public defender's office
23 typically assigned or appointed to represent an
24 indigent defendant?
25    A.   So again, it -- it will vary by

Page 60

1  jurisdiction in terms of how or when an individual
2  receives an application for public defender's
3  services.  There are times when they are
4  incarcerated pretrial and receive an application in
5  the jail, and then the jail will by arrangement send
6  us the application.
7     There are also times when the defendant
8  is in court and will apply and the defendant may be
9  approved or qualify for defender services there or
10 the application may be taken back for clerical staff
11 or someone else to assess the application for
12 services.  So it varies.
13    Q.   But in every jurisdiction it is the
14 public defender's office that makes the decision --
15    A.   By statute.
16    Q.   -- with respect to -- okay.  And what
17 is the basis for that decision?
18    A.   So it's a little bit complicated.
19 There was both a statute and a rule on this.  And
20 the ultimate goal is determine whether they can
21 afford a lawyer for the charges that they are
22 facing, but the calculus for it is -- is a little
23 complex.
24    We use -- we are one of I believe 21
25 states that use as an objective component the

15 (Pages 57 to 60)

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-8    Filed 02/09/18    Page 16 of 77

Page 61

1  federal poverty guidelines, and I believe the
2  threshold is a hundred percent of the federal
3  poverty guidelines, and they would not qualify, I
4  believe, which means that theoretically because food
5  stamps qualifications I believe is 125 percent, you
6  could qualify theoretically for food stamps and not
7  qualify for our services.
8          There are additional subjective
9  components.  For instance, if the individual bonds
10  out, posts their own bail or bond, and that amount
11  is -- suggests to our office that they have access
12  to resources, for instance if they post a $10,000
13  bond or a $5,000 bond, we would inquire as to
14  whether that individual has access to other
15  resources, either physical property that can be
16  liquidated to -- to hire an attorney or cash or
17  liquid assets.
18          There are other things that are
19  considered.  For instance, whether the person is
20  employed, whether they are -- how many dependents
21  they have, whether they are receiving government
22  assistance.
23          I believe if they are both unemployed
24  and receiving governmental assistance, with the
25  exception of disability, I think that's a per se

Page 62

1  quali -- qualified for public defender services.  If
2  we make a determination that the person is not
3  indigent, also by statute the person can appeal to
4  the judge who is then in a position to overrule our
5  determination of indigence.
6      Q.  And if -- if a -- if a defendant
7  appeals that decision is there a hearing that's
8  held?
9      A.  I think the statute requires a hearing.
10  I think in practice it's very different from that.
11      Q.  And to the extent that a hearing occurs
12  or that there's some sort of proceeding in front of
13  a court, would the public defender's office appear
14  in that proceeding?
15      A.  I will say that it appears that that's
16  the design, but I don't think it happens that -- I
17  think it happens like that very rarely.  I think the
18  judge asks the individual a few questions, there's
19  not a lot of investigation that's done by MSPD for
20  the simple reason that it's not a good use of our
21  time in light of our existing caseload.
22          And it's our experience that if the
23  individual tells the judge that they can't afford an
24  attorney, then the judge will find indigent and
25  appoint us.  So it's just our practice at that point

Page 63

1  to accept the representation.  There are -- there
2  are instances where we don't, but commonplace is we
3  accept the appointment.
4      Q.  Okay.  To what extent formally or
5  informally does your budget limitation factor in to
6  the decision about whether or not someone is
7  determined to be indigent?
8      A.  It shouldn't.  It shouldn't.  I will
9  use that to point something out, though.  When our
10  commission -- when the Public Defender Commission
11  was made aware of a report that we had -- MSPD had
12  one of the -- if not the most strict standard, and
13  by that I mean you could theoretically qualify for
14  indigent representation in the 49 other states but
15  not in Missouri, they endeavored to review what
16  other states did and consider expanding our
17  eligibility for services.
18          They decided not to given the fact that
19  we didn't have the resources to handle our existing
20  caseload at the time, but we wanted to make sure
21  that no one would was falling through the cracks.
22  And one of the things that we identified was how
23  bond was used locally to make a determination of
24  indigence.
25          I'm aware that prior to me and a little

Page 64

1  bit into my tenure there was a per se determination
2  that if you made five -- if you posted $5,000 bond,
3  you did not qualify for public defender services.
4  This had a number of drawbacks as it relates to
5  making sure that people get a lawyer.
6          One, some judges would post bond just
7  underneath $5,000 for the purposes of making sure
8  they qualify.  In other jurisdictions, this rule
9  failed to account for instances where a relative
10  would post bond, but they would not -- that same
11  relative would not be willing to hire counsel.
12          So it's not a good basis for a
13  determination.  And so what we decided was to
14  instruct local offices to use the bond amount as --
15  as a factor and a reason to make further inquiries
16  as to the person's access to resources.
17      Q.  Okay.  And once it has been determined
18  that a particular person does qualify for public
19  defender services, is there a particular person that
20  is then responsible for determining whether there
21  are any conflicts?
22      A.  I -- I think Joel Elmer would be able
23  to speak to that, and I think who makes that
24  determination may depend on staffing of local
25  office.

16 (Pages 61 to 64)

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-8    Filed 02/09/18    Page 17 of 77

Page 65

1      Q.   And do you have any insight into the
2    process that -- and I imagine it could probably vary
3    from office to office, but the process by which
4    district offices determine which individual public
5    defender will be handling a particular case?
6      A.   Yes, it's -- it's by office.  Some
7    offices like the Chillicothe office that I refer to
8    earlier, which covers a number of counties, lawyers
9    are sometimes assigned to a county.  In other
10   jurisdictions there may be multiple lawyers assigned
11   to the same county, so it will vary depending on the
12   office who gets what case.
13            MR. WILLIAMSON:  Can we go off the
14   record for one minute?
15            VIDEOGRAPHER:  We're going off the
16   record at approximately 9:37 a.m.
17            (WHEREIN, a recess was taken.)
18            VIDEOGRAPHER:  We're back on the record
19   at approximately 9:51 a.m.
20      Q.   (By Mr. Williamson)  Mr. Barrett, are
21   you familiar with the Missouri Supreme Court case
22   captioned Missouri Public Defender Commission versus
23   Waters?
24      A.   Yes.
25      Q.   What is your general understanding of

Page 66

1    the -- of that case?
2      A.   I get that case and the Pratt case
3    confused.  One relates to the promulgation of a
4    rural -- this all preceded me, my time at MSPD, but
5    the promulgation of a rule involving an office
6    can essentially refuse to accept new cases if that's
7    correct.
8      Q.   And even though the Waters case
9    preceded you, do you have an understanding of what
10   the -- the practical impact of that decision was on
11   -- on your office?
12      A.   Well, my understanding is the
13   promulgation of that rule would provide a mechanism
14   that would allow a local office to essentially not
15   accept or not be available to receive additional
16   cases because a determination had been made that
17   that office has too many cases.
18      Q.   And are you aware of any steps taken by
19   the Missouri legislature to -- to codify the
20   decision in Waters?
21      A.   I don't know if it was to codify.  I
22   would frame it as to nullify the -- the rule that
23   was promulgated by enacting a statute that it would
24   appear to me to be -- although I never administered
25   it, more onerous than what was promulgated by MSPD

Page 67

1    prior to my joining the department.
2            MS. SHIPMA:  And again, Greg
3    Mermelstein and Joel Elmer both lived through that
4    time with MSPD, so they can speak in more detail
5    about the specifics.
6            MR. WILLIAMSON:  Okay.  That's helpful.
7            MR. QUINLAN:  I -- there's a word that
8    I missed.  You said you never utilized the statute.
9            THE WITNESS:  Not during my tenure.
10            MR. QUINLAN:  I'm trying to remember
11   what the word was you used.  Do you remember?
12            THE WITNESS:  Administer.
13            MR. QUINLAN:  Administer.  Okay.  And I
14   apologize.
15      Q.   (By Mr. Williamson)  Is it your
16   understanding that your predecessor, Catherine
17   Kelly?
18      A.   Yes.
19      Q.   Was told that if offices continue -- or
20   started to turn down cases that the legislature
21   would attempt to privatize the public defender
22   system?
23      A.   Secondhand coming -- information came
24   to me that a -- that during a time when the office,
25   or at least the Boone County office, utilized the

Page 68

1    rule that was promulgated and affirmed by the
2    Supreme Court a judge by the name of Oxenhandler
3    began appointing.
4            This stirred up some political backlash
5    in Jefferson City.  I was told that a representative
6    from the House of Representatives, I believe it was
7    Kelly who represented at the time Boone County or an
8    area within Boone County, I believe, visited Cat
9    Kelly.
10            I don't know the specifics of their
11   conversation, but it was told to me that during this
12   conversation the communication was stand down, stop
13   refusing cases, or the legislature will proceed with
14   plans to privatize.  I don't know what happened
15   after that, other than the legislature didn't pass
16   the privatization bill, but --
17      Q.   Did you ever have a conversation with
18   Ms. Kelly specifically about this?
19      A.   No.  Not regarding details.  And not
20   even as to her being visited by representative Kelly
21   on this point, just that in more general terms the
22   decision to reverse course and not refuse cases was
23   tied to concern about privatizing the system.
24      Q.   Did you ever receive a similar warning
25   from anyone?

17 (Pages 65 to 68)

**MIDWEST LITIGATION SERVICES**
**www.midwestlitigation.com**      **Phone: 1.800.280.3376**      **Fax: 314.644.1334**
Case 2:17-cv-04057-NKL   Document 153-8   Filed 02/09/18   Page 18 of 77

1    A.  Yeah, recently as yesterday.  I was on
2  a conference call with several judges and a
3  prosecutor and the district defender of my Kennett
4  office.  The judge -- the presiding judge --
5        (Court reporter interruption.)
6    A.  Kennett office, K-E-N-N-E-T-T.  Leslie
7  Hazel is the district defender's name.  She was
8  following the direction of lawyers in her office
9  that they were not available and she communicated
10 that to the court.
11       She received I think some hostile
12 treatment locally and I asked to be included on the
13 conversations.  The call was had yesterday at
14 three o'clock which Judge Mayer, M-A-Y-E-R, I
15 believe, who I think is the presiding judge.
16       Judge Satterfield, who I believe is an
17 associate judge.  As well as a prosecutor, elected
18 prosecutor named Russ Oliver.  I believe he
19 represents Stoddard County.
20       They -- we talked through what
21 directives I'd given or not given with respect to
22 Ms. Hazel's decision, the events that led to it,
23 what my position was on the law.
24       During the course -- I think it was at
25 the end of the conversation Russ Oliver made

1  comments related to privatization and good luck this
2  legislative session.
3        And previous to that call it was
4  related to me by a number of employees that Russ
5  Oliver -- and I have no direct knowledge as to
6  whether he did or did not -- was communicating with
7  the Speaker of the House about reviving the
8  privatization bill and was -- and having back
9  channel communications with prosecutors on that
10 subject.  I cannot testify about whether that's
11 accurate, just that it was related to me.
12   Q.  We'll come back to -- to that shortly.
13 Did the prospect of case refusal come up during the
14 process of your -- your application for this job?
15   A.  No, I don't think it -- during my
16 interview?
17   Q.  Right.
18   A.  I don't think it came up.  I don't
19 recall it.
20   Q.  Was it your understanding as you went
21 through that interview process that the public
22 defender's office was in the midst of a budget
23 crisis at that time?
24   A.  Yes.
25   Q.  And did you talk with members of the

1  staff or whoever was interviewing you about that
2  problem?
3    A.  Yeah, the lay of the land at the time
4  within the system, which was my impression of the
5  system, was that turning away cases, whether based
6  on ethical obligations or otherwise, would result in
7  privatization, and that made it all the more dire to
8  try to get as many additional resources as possible.
9    Q.  So is it fair to say that you didn't
10 believe at the time that you took the job that
11 refusing cases was a viable alternative?
12   A.  I remember from day one to now being
13 extremely conflicted because the proverbial rock and
14 a hard place with what I know to be our ethical
15 obligations, including my ethical obligations as a
16 manager in the legal setting to what, you know,
17 provided -- making sure -- doing what I needed to do
18 to make sure that everyone received competent
19 representation pursuant to the Sixth Amendment.
20       The -- I remember having some
21 understanding of the privatization proposal, and it
22 was my determination that it would -- it would -- it
23 would not be an improvement on the current situation
24 in terms of providing the right to counsel to the
25 indigent accused.

1        For that reason I endeavored to improve
2  the -- the system incrementally through making --
3  trying to secure more funding and then reporting
4  back to the legislature on how I spent that funding
5  and making a case for the benefit to the state of
6  Missouri.
7    Q.  And can you talk a little bit about
8  what -- can you talk a little bit about your
9  understanding of -- of what that privatization
10 proposal entailed?
11   A.  I don't really recall.  I think it was
12 a hybrid where MSPD would continue to take certain
13 cases, but other cases would be privatized.
14   Q.  In other words, assigned to private
15 counsel?
16   A.  Yeah.  By -- by means that I'm not
17 familiar with, whether it was -- I don't know
18 whether MSPD would contract out those cases, whether
19 it would be done through the court system or office
20 administration.  I think -- I don't even know
21 whether that was determined.
22       MS. SHIPMA:  Once again, Joel or Greg
23 would have probably more details on that having been
24 part of those discussions.
25   Q.  (By Mr. Williamson)  So I want to talk

18 (Pages 69 to 72)

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com     Phone: 1.800.280.3376     Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-8   Filed 02/09/18   Page 19 of 77

1  a little bit about the public defender's office, the
2  current case refusal policy.  What are the criteria,
3  if there are a specific set of criteria, that would
4  justify a public defender in Missouri refusing to --
5  to take a particular case?
6          MS. SHIPMA:  Jason, I'm going to
7  object.  Just the way you phrased the question,
8  assuming -- assume that there is a case refusal
9  policy.
10          MR. WILLIAMSON:  Okay.
11          MS. SHIPMA:  So --
12          MR. WILLIAMSON:  Let me back up.
13      Q.  (By Mr. Williamson)  Does your office
14  maintain a formal case refusal policy?
15      A.  No.
16      Q.  Do you know whether the district
17  offices maintain their own case refusal policy?
18      A.  I do not believe they do.
19      Q.  So separate from any formal or informal
20  policy, what in your mind would justify a public
21  defender choosing to refuse a case appointment?
22      A.  That there's a conflict.  Conflict can
23  be achieved I think in two ways.  One, whether the
24  -- representing the case to be received in any way
25  conflicts with an obligation to an existing or

1  previous client.
2          There's also a conflict when if a
3  lawyer accepts an additional case and fulfilling the
4  obligation to that new defendant in any way takes
5  away or it deprives the lawyer of competently
6  representing their existing clients because foremost
7  an attorney has an obligation to their existing
8  clients.
9      Q.  And what documentation, if any, would
10  that public defender have to provide, excuse me, in
11  order to demonstrate that such a conflict exists?
12      A.  Other than the rules of professional
13  conduct, nothing that I'm aware of was generated by
14  MSPD.
15      Q.  And how does this generally work in a
16  -- in a particular district.  If a -- if an
17  assistant public defender determines that there's a
18  conflict and they feel the need to turn down a case,
19  what happens then?
20      A.  Well, taking the first type of
21  conflicts, when taking -- representing a particular
22  defendant would conflict with the duty to an
23  existing or previous client, they would send it to
24  either another office to represent that individual
25  or to Joel Elmer to contract out pursuant to our

1  Code 49.  That's the one type of conflict.
2          The second type, when -- that pertains
3  more to caseload, I believe that it's the lawyer's
4  obligation to refuse to accept that case.  I will
5  say that in the aftermath of the -- the refusing to
6  accept cases that turn into a threat of
7  privatization, I'm not aware of any lawyer asserting
8  that, that type of conflict until recently I should
9  say.
10      Q.  Which I'll ask you about shortly.  Are
11  there -- you may have answered this, but are there
12  circumstances in your mind under which a public
13  defender in Missouri is required to refuse an
14  appointment?
15      A.  Yes, pursuant to the rules of
16  professional conduct.
17      Q.  But not necessarily pursuant to any
18  policy or directive of the office?
19      A.  None that I created or are aware of.
20      Q.  Okay.  Are you aware of any instances
21  either before or during your tenure where public
22  defenders refuse appointment as conflict counsel in
23  other counties?
24      A.  Can you say that again?
25      Q.  You talked earlier about the -- how

1  conflict cases are handled in your office and that
2  one district office will be responsible for handling
3  conflict cases --
4      A.  Yes.
5      Q.  -- in other counties.  Are you aware of
6  instances where public defenders from that district
7  because of caseload issues have refused to take
8  those conflict cases?
9      A.  As it relates to the counties that they
10  have been assigned as an office to represent --
11      Q.  Correct.
12      A.  -- no, I'm not familiar with that.
13      Q.  Do you have a sense of how such a
14  situation would be handled, which is to say who
15  would be next on the list if that -- if a public
16  defender refused to take a conflict case, how would
17  the court handle it?
18      A.  I think Joel Elmer is in the best
19  position because it gets into second- and
20  third-level conflicts, and Joel Elmer is an expert
21  on that issue.
22          (WHEREIN, Exhibit 2, 9-11-17 Barrett
23  letter to MSPD attorneys, was marked for
24  identification.)
25      Q.  (By Mr. Williamson)  Handing you a

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com       Phone: 1.800.280.3376       Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-8   Filed 02/09/18   Page 20 of 77

Page 77

1  document marked Exhibit 2 for identification. Do
2  you recognize that document?
3      A.  Yes.
4      Q.  And can you describe what it is?
5      A.  It's a letter that I crafted to be
6  distributed to attorneys throughout the system
7  following oral argument in a disciplinary case
8  before the Missouri Supreme Court related to a MSPD
9  attorney by the name of Karl Hinkebein who practices
10  in our central PCR office or post conviction relief
11  office.
12      Q.  So I'm going to ask you about that
13  disciplinary proceeding in a moment, but can you
14  just talk about what motivated you to write this
15  letter?
16      A.  Sure.  During oral argument in the case
17  there -- the Supreme Court made comments related to
18  what the expectations that -- on a lawyer who is in
19  a position where they cannot take too many cases,
20  and suggested that the lawyer, paraphrasing here,
21  has two options.
22          To essentially tell their manager,
23  assuming their manager is the one assigning the
24  cases, that they are not available, or to resign,
25  leave -- leave that employment.  There were

Page 78

1  resignations by a few members -- a few lawyers
2  around that time.
3          My concern was -- because I know that
4  many, if not most, public defenders were listening
5  or did listen to the oral argument, that there would
6  be a concern that the employer would -- would insist
7  that they take all the cases that came to them as a
8  condition of employment, and that they could be --
9  I'm speculating.
10          Their concern might be that they would
11  be expected to take the cases regardless of the
12  condition of their employment.  And on the other
13  hand, if they did, that OCDC, the Office of Chief
14  Disciplinary Counsel, would nonetheless hold them
15  accountable for their practice under the rules.
16          I wanted to provide whatever relief I
17  could that -- that I would not impose as a condition
18  of their employment the acceptance of cases beyond
19  which in their individual determination they felt
20  they couldn't handle or would put them in jeopardy
21  of violating the rules of professional conduct, and
22  that if I did, that it would be their obligation to
23  file a bar complaint against me.
24      Q.  Did you receive any responses to this
25  letter specifically?

Page 79

1      A.  I spoke to several offices in the
2  aftermath of this letter to answer questions,
3  provide further guidance, reiterate what I said in
4  the letter in terms of whether someone picked -- I
5  don't remember anyone picking up the phone and
6  calling, but we had a defender management training
7  that district defenders and deputy district
8  defenders attend that was already calendared for the
9  following week or two weeks later, and we provide
10  further guidance as to obligations under the rules
11  for each office, but one of the other communications
12  was that -- that I'm not issuing any directives
13  related to turning away cases, but that they follow
14  the rules of professional conduct.
15      Q.  And that message was relayed at this
16  subsequent meeting that you mention?
17      A.  I think to include this letter, but
18  yes, at that meeting, yes.
19      Q.  Do you recall the date of that meeting
20  by chance?
21      A.  The defender management meeting?
22      Q.  Right.
23      A.  It was last week over the course of
24  three days.  Last Tuesday through Thursday.  I don't
25  know the dates.

Page 80

1      Q.  And you said that there had been some
2  resignations prior to you writing this letter to the
3  staff?
4      A.  Yes.  Citing -- resignations that cited
5  caseload and their -- their inability to practice
6  within the -- the rules.
7      Q.  And do you have a sense of how many
8  resignations have occurred since you wrote this
9  letter?
10      A.  I know one manager has communicated to
11  me that she will be leaving the system I believe in
12  November.  That's the head of the Union trial
13  office.
14      Q.  And is that the only other that you're
15  aware of?
16      A.  That I'm aware of.
17      Q.  How was this letter communicated to
18  your staff by the way?
19      A.  I believe by e-mail.
20      Q.  By e-mail.
21          (WHEREIN, Exhibit 3, Judge Crane e-mail
22  response, was marked for identification.)
23      Q.  (By Mr. Williamson)  Going to hand you
24  another document marked Exhibit 3 for
25  identification.  Do you recognize that document?

20 (Pages 77 to 80)

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-8   Filed 02/09/18   Page 21 of 77

1    A.   Yes, I do.
2    Q.   Can you describe what it is?
3    A.   Yes.  It appears to be a communication
4 between district defender of the Columbia trial
5 office David Wallis and his deputy Sarah Aplin to
6 judges in that circuit or Boone County regarding the
7 unavailability of their lawyers to take additional
8 cases.
9    Q.   And this is an e-mail communication?
10    A.   Yes.
11    Q.   Can you tell me the date of that, of
12 this communication?
13    A.   September 27th, 2017.
14    Q.   Do you also see the response from
15 presiding Judge Crane in this document?
16    A.   Yes.  And I think the date that I just
17 gave you September 27th, 2017, that appears to be
18 tied to the response from Judge Crane.  There
19 doesn't seem to be a date tied to the underlying
20 e-mail from Mr. Wallis.
21    Q.   Can you take a look at the -- first
22 sentence of the judge's response?
23    A.   Yes.  Due to the correspondence
24 received yesterday, September 26.  That would
25 indicate that the -- that Mr. Wallis communicated

1 or -- or that Judge Crane received the e-mail from
2 Mr. Wallis on the day prior, September 26th.
3    Q.   Do you know whether that communication
4 was sent before or after the district defender
5 management meeting that you mentioned?
6    A.   It's my understanding that it occurred
7 before.
8    Q.   Okay.  What is your understanding of
9 the import of -- of this e-mail from Mr. Wallis to
10 the court?
11    A.   I recognize the e-mail.  I haven't read
12 it from beginning to end in more than a week, but my
13 understanding of the import is that the attorneys in
14 Mr. Wallis's office had communicated either to him
15 or to Ms. Aplin or both that given their caseloads,
16 types of cases, severity of those cases, complexity
17 of those cases, that they were unable to handle
18 additional assignments.
19    Q.   And were you made aware beforehand of
20 Mr. Wallis's intention to send this e-mail to --
21    A.   No.
22    Q.   -- the court?  When did you find out
23 about it?
24    A.   I don't know when I received it, but I
25 remember being aware of it on the Monday which would

1 be the day prior.  I may have received it earlier,
2 but I -- that's when I remember reviewing it.
3    Q.   And was this decision by Mr. Wallis
4 consistent with the guidance that you provided in
5 your September 11 letter?
6    A.   I believe it was.
7    Q.   To your knowledge, what is the current
8 status of representation in Boone County by the
9 public defender's office?
10    A.   That -- I can't speak to -- I know that
11 we had a meeting with Judge Crane at the end of that
12 week on Friday.  Judge Crane made a request to
13 Mr. Wallis that if he could somehow prioritize the
14 in-custody cases, that Judge Crane would appoint
15 lawyers private -- from the private bar on the
16 out-of-custody cases.
17         With me present Mr. Wallis said that --
18 that that's going to entirely depend on whether
19 lawyers in his office were available, and the last
20 communication he had with the lawyers in his office
21 that they were unavailable, but that he would go
22 back and sit down with them and discuss their
23 caseloads individually.
24         As I sit here today, my understanding
25 is that the lawyers in the Boone County office are

1 not available and that the -- Judge Crane has been
2 assigning cases to the members of the private bar of
3 Boone County.
4         MR. QUINLAN:  Just if you don't mind,
5 you said in custody and not in custody.
6         THE WITNESS:  Yes.  When I say --
7         MR. QUINLAN:  That means they're in
8 pretrial detention?
9         THE WITNESS:  They're in local jail,
10 yes.
11         MR. QUINLAN:  Okay.
12    Q.   (By Mr. Williamson)  Do you have any
13 idea how many private attorneys are available to
14 take cases in Boone County?
15    A.   I am not.
16    Q.   Do you have any idea how many have been
17 appointed to this point?
18    A.   I am not.
19    Q.   Do you know how many -- approximately
20 how many additional attorneys would be required in
21 order for area 13 to -- to be able to provide
22 competent representation to all defendants in -- in
23 that district?
24    A.   I do not.
25    Q.   Have you discussed with Mr. Wallis or

Page 85

1  anyone else in Boone County of the possibility of
2  placing indigent defendants on waiting lists until
3  attorneys in that office become available?
4      A.  Yes.  Both at the defender management
5  training where we try -- one of the things we did
6  was try to discuss practically and procedurally how
7  we were going to deal with clients who would
8  otherwise come to us.
9          We discussed with Judge Crane how we
10 would handle it and that we would receive
11 applications and essentially have a waiting list
12 that we would communicate with the court.
13     Q.  And has that -- has that happened?
14     A.  I don't know.
15     Q.  Since this decision was made by
16 Mr. Wallis and the attorneys at his office, are you
17 aware of other district offices that either have
18 already or that intend to begin refusing case
19 appointments?
20     A.  I alluded to earlier conversation or
21 phone conference I had yesterday involving the --
22 our Kennett trial office.  It's my understanding
23 that the Kennett trial office has communicated to
24 the local judges their unavailability.  I know the
25 head of our St. Louis city trial office district

Page 86

1  defender Mary Fox has communicated to at least one
2  judge --
3          MR. QUINLAN:  That's city or county?
4      A.  City.  I'm not sure whether she has
5  communicated that they are unavailable, but they had
6  discussion with respect to the process in the event
7  they're unavailable.
8          I know I received calls yesterday from
9  district defender Steven Lynxwiler who covers the
10 Poplar Bluff office, and there -- I believe at least
11 one attorney was unavailable to handle cases, and I
12 believe the counties were Butler and Ripley.
13         I also received a call yesterday from a
14 deputy district defender in our Jackson office.  She
15 was asking for direction on a -- for an attorney who
16 said they were no longer available to take new
17 cases, and a client they had already had picked
18 up additional charges and wanted direction on that.
19         So I'm aware of at least one lawyer in
20 that office.  Whether they handle a specific county,
21 I don't know who's unavailable.  So there are a
22 number of other counties where this is happening.
23     Q.  And do you have a sense at this point
24 of how things have played out in each of those
25 counties?

Page 87

1      A.  It has varied.  As we discussed -- as I
2  mentioned, Judge Crane has expressed that he either
3  has begun or is going to appoint lawyers.  I'm aware
4  of at least one case where a private lawyer was
5  appointed.
6          In other jurisdictions, to include
7  Kennett, they were making arguments that we needed
8  to do -- or the public defender system -- at
9  least the Kennett office needed to do additional
10 steps before in their minds this was a legal thing.
11         The reports that I received from other
12 district defenders were that judges were accepting
13 that there was unavailability, but didn't say
14 whether they were going to appoint private
15 attorneys.  So it's -- the response has been varied.
16     Q.  And in Boone County is it your
17 understanding that the private attorneys that are
18 being appointed are not being compensated for that
19 representation?
20     A.  That is my understanding.
21     Q.  Are you aware of any counties, either
22 among the ones that you mentioned or others, where
23 private attorneys are being compensated for taking
24 these cases?
25     A.  I'm not aware.

Page 88

1      Q.  Have you had any other interactions
2  with judges in these other counties similar to the
3  interactions that you've had with the -- the -- the
4  court in Kennett county and --
5      A.  No.  I haven't.  I've -- some local
6  management has expressed to me that judges are in
7  their words not happy, and I -- I said that to give
8  the judge my cell phone number, which I -- one of
9  the things that I reference in this letter is
10 presenting to the presiding judges at the judicial
11 conference, which was part of the Missouri Bar's
12 annual meeting.
13         I also handed out -- I discussed the
14 Hinkebein matter and the effect it was having on the
15 system, and I provided judges with my cell phone
16 number at that point as well.
17     Q.  Have you gotten any phone calls from
18 judges?
19     A.  No.
20     Q.  And -- and one other question about the
21 private attorneys.  Do you as the director of this
22 office see appointment of private counsel as a
23 viable alternative here?
24     A.  No.
25     Q.  Can you say a little bit about why?

22 (Pages 85 to 88)

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-8   Filed 02/09/18   Page 23 of 77

Page 89

1     A.  I am not aware of whether Judge Crane
2   or any other judge who is contemplating appointing
3   private counsel, whether they are going to appoint
4   someone who is competent to provide representation
5   in the area of criminal defense.
6         Q.  So these private attorneys are not
7   necessarily criminal defense attorneys?
8     A.  The one appointment that I was aware
9   of, one individual in Boone County, worked for
10  a private business I believe as a regulatory attorney,
11  and had no experience in criminal defense matters.
12        Q.  And as far as you know, there is no
13  screening mechanism to determine which private
14  attorneys might be qualified to take these cases and
15  which are not?
16    A.  I'm not aware of any.
17        (WHEREIN, Exhibit 4, Cumulative
18  caseload metrics spreadsheet, was marked for
19  identification.)
20        Q.  (By Mr. Williamson)  Handing you a
21  document marked Exhibit 4, for identification.  Do
22  you recognize this document?
23    A.  I recognize what this document
24  represents.
25        Q.  What is the heading at the top of the

Page 90

1   document?
2     A.  Missouri State Public Defender
3   Cumulative Caseload Metrics for the period beginning
4   January 1, 2017 through March 31st, 2017.
5         Q.  Do you know who created this document?
6     A.  I do not.  When I request this
7   document, I request it from our IT department.
8         Q.  And how often do you request these
9   sorts of reports?
10    A.  It's -- when -- I request it prior to
11  any time I'm visiting or talking to a local office
12  when I want to be educated on the most up-to-date
13  metrics concerning that office, this is one of the
14  documents that I request.
15        Q.  And do you normally use this document
16  then just for internal purposes?
17    A.  We've shared this document both outside
18  of Woodrail with the local offices, and I'm not shy
19  about sharing it with outside persons or entities to
20  include legislature or others.
21        Q.  So I just want to -- we don't need to
22  go through the numbers necessarily, but I want to
23  just make sure I understand exactly what we're
24  looking at here.  So first of all, is it -- is it
25  fair to say that this is a ranking of -- or an

Page 91

1   ordering of counties by the county that's got -- or
2   the area that's got the highest caseload or the
3   highest percentage of -- strike that.
4         This -- it is an ordering of counties
5   that have the highest percentage -- or that are the
6   furthest beyond their capacity from the highest to
7   lowest, and the county that is at the top of the
8   list is Kennett county, which we talked about a few
9   minutes ago?
10    A.  Yes.  I would describe this as a
11  ranking of -- as the most overloaded --
12        Q.  Most overloaded?
13    A.  -- offices using thresholds, workload
14  thresholds established by RubinBrown and made part
15  of the Missouri Project Report.
16        Q.  Okay.  So just so that I understand
17  what each column represents, the column that is
18  labeled cases initiated --
19        (Court reporter interruption.)
20        Q.  (By Mr. Williamson)  Cases initiated --
21    MS. SHIPMA:  And Jason, can I just --
22  you are probably going to get better, more thorough
23  answers from Joel --
24    MR. WILLIAMSON:  Okay.
25    MS. SHIPMA:  -- on this.  That's not to

Page 92

1   say that Michael doesn't know what it means --
2     MR. WILLIAMSON:  Right.
3     MS. SHIPMA:  -- but if you want to get
4   into the, you know, nuts and bolts of where that
5   number comes from, what that number is drawn from,
6   what it means, Joel will be the person to best tell
7   you that.
8     MR. WILLIAMSON:  Got it.  Okay.
9         Q.  (By Mr. Williamson)  Have you shared
10  these reports with the legislature?  I know you said
11  you shared --
12    A.  I'm sure I have.  I provide packets and
13  materials and charts and supporting documentation.
14  I certainly don't consider this privileged in any
15  way, and I readily share it with whomever I come in
16  contact with when discussing caseloads.
17        Q.  And is it fair to say that this --
18  this -- these rankings are not static?
19    A.  Right.
20        Q.  And that a county or an area office
21  that in this report is listed as say one of the top
22  ten most overloaded could over the next several
23  months drop down on this list and be replaced by
24  area offices that are currently within the bottom
25  ten let's say?

23 (Pages 89 to 92)

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-8   Filed 02/09/18   Page 24 of 77

Page 93

1    A.  I don't know if it's that volatile.
2   Certainly an office can move a few spots if the --
3   volatility would come if -- if someone leaves a
4   position in a given office and I decide to relocate
5   that position to another office you'll have the
6   volatility.
7        Q.  And without getting into the details,
8   is it fair to say that according to this document,
9   during the first three months of 2017 none of the
10  area offices were operating within their capacity?
11       A.  Because none of the offices are within
12  a hundred percent capacity, that is true.
13       Q.  Okay.  And tell me if this is a
14  question for -- for Joel, and if so we can -- we can
15  wait and share it with him.  If you look at those --
16  those top ten counties or area offices on this list,
17  are you able to go down this list and tell me which
18  counties you would consider to be more urban areas
19  versus those counties that you would characterize as
20  more rural or less populated?
21       A.  It's a subjective term, but I can --
22  yes.
23       Q.  Fair enough.
24       A.  I can do that.
25       Q.  That sounds fair.  So the Kennett

Page 94

1   office?
2        A.  I would describe the Kennett office as
3   a rural office.
4        Q.  St. Charles?
5        A.  I would describe the St. Charles office
6   as a suburban office.
7        Q.  Sedalia?
8        A.  I would describe the Sedalia office as
9   a rural office.
10       Q.  Harrisonville?
11       A.  I would describe it as a more rural
12  office.
13       Q.  Jackson?
14       A.  I would describe it as a urban office.
15       Q.  Ava?
16       A.  Rural office.
17       Q.  Union?
18       A.  More rural office.
19       Q.  Monett?
20       A.  A rural office.
21       Q.  And Springfield?
22       A.  I would describe that as more of an
23  urban office.
24       Q.  Is it fair to say that the caseload
25  problems that are facing your office are not limited

Page 95

1   to any particular type of office within the system?
2        A.  That's right.
3        Q.  It's a statewide problem?
4        A.  That's right.
5        Q.  And if we look on this -- this same
6   document, Exhibit 4, can you find Boone County?  So
7   I guess it would be the Columbia office.
8        A.  Yes.
9        Q.  And where is that located on this list
10  if you can.
11       MR. QUINLAN:  23.  Item 23.
12       A.  According to the caseload metrics
13  report for the period January 1 to March 31st, 2017,
14  it appears that the Columbia trial office ranks 19th
15  in the system -- in the MSPD in terms of caseload or
16  percent of capacity.
17       Q.  (By Mr. Williamson)  And do you have
18  any idea where that office falls currently?
19       A.  As I sit here today, no.
20       Q.  I think you may have answered this
21  already, but have you encouraged any district
22  offices to begin refusing cases beyond the
23  September 11 letter?
24       A.  At defender management training we
25  stressed -- I stressed, others stressed that

Page 96

1   everyone has a present obligation under the rules of
2   professional conduct.
3        To the extent that there's two
4   mechanisms, at least two mechanisms to bring
5   yourself within competent -- or ethical
6   representation, a move to withdraw and in addition
7   to declining to accept new cases, that if someone
8   had -- were presently overloaded and were not in
9   comport with the rules, that they would have an
10  obligation to move to withdraw in existing cases.
11       Q.  And do you -- as it stands right now,
12  do -- how many additional lawyers statewide do you
13  believe would be needed in order for the trial
14  division offices to be able to operate within their
15  capacity?
16       A.  A precise number I do not know, but I
17  know that given the number of cases and the type of
18  cases for the last fiscal year, it was north of --
19  it was in excess of 300 additional lawyers.
20  According to RubinBrown metrics.
21       MS. SHIPMA:  Can I -- was that
22  additional trial division lawyers or additional
23  lawyers systemwide?
24       THE WITNESS:  I think it was additional
25  lawyers systemwide, but that's a good point.  I'm

24 (Pages 93 to 96)

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-8    Filed 02/09/18    Page 25 of 77

Page 97

```
1   not a hundred percent sure on that.
2        MS. SHIPMA:  Because the question was
3   about trial division.  That's why I wanted to make
4   sure.
5        THE WITNESS:  Thank you.
6        MS. SHIPMA:  Uh-huh.
7        MR. QUINLAN:  You don't have a number
8   for trial lawyers?
9        THE WITNESS:  Not off the top of my
10  head.
11       Q.  (By Mr. Williamson)  And by the way,
12  I'm going to -- and we can ask Joel about this, but
13  do you know whether these -- I see cases initiated
14  here and then new net cases.  Do you know whether
15  this includes conflict cases?
16       MS. SHIPMA:  That's a Joel question.
17       A.  That's a Joel question.
18       Q.  (By Mr. Williamson)  Okay.  Is there
19  anything else that you'd like to share with regard
20  to what you expect going forward with respect to
21  case refusal or generally how your office intends to
22  handle the caseload situation?
23       A.  Well, it's -- my experience over the
24  last week has been that it's fluid.  As these issues
25  arise in the local offices, I have been interfacing
```

Page 98

```
1   with both the local offices and some of the local
2   judiciary as well as members of the private bar in
3   Boone County.
4        Sharing both what -- what I know about
5   our obligations and -- but my expectation would be
6   that the lawyers in -- that I'm responsible for
7   overseeing practice within the rules of professional
8   conduct, and if they are unable to provide
9   representation for their existing clients, that they
10  have an obligation under the rules to move to
11  withdraw.
12       If they cannot accept new cases, to
13  notify their management that that's the case, and I
14  would expect if -- if no one is available for those
15  reasons in a local office that the district defender
16  or the deputy district defender would notify me so
17  that I'm aware what offices in the state are not
18  accepting new cases.
19       Q.  And -- and what in your view is the
20  impact of all of this on indigent defendants in
21  Missouri?
22       A.  I think it's -- it's impacting their
23  rights under the Sixth Amendment to have effective,
24  competent representation that's not conflicted that
25  they're entitled to prior to -- as part of due
```

Page 99

```
1   process and prior to their liberty being taken from
2   them.
3        MR. WILLIAMSON:  Just give me one
4   minute.
5        (WHEREIN, Exhibit 5, Boone County Bar
6   Association October 2017 Newsletter, was marked for
7   identification.)
8        Q.  (By Mr. Williamson)  I'm just going to
9   show you one last document.  It will be marked as
10  Exhibit 5.  Do you recognize this document?
11       A.  I don't.  I know it to be the Boone
12  County Bar Association's newsletter.  I've received
13  this before, but I did not receive -- I did not read
14  this -- this number or this volume.
15       Q.  Can you turn to page five of this
16  document?
17       A.  I have turned to page five.
18       Q.  And can you read the heading on that
19  page?
20       A.  Letter to BCBA from the director of the
21  Missouri State Public Defender's office.
22       Q.  And this is a roughly two-page letter
23  that purports to have been written by you; is that
24  correct?
25       A.  Yes.
```

Page 100

```
1        Q.  And did you in fact write this letter?
2        A.  Yes.
3        Q.  And did you send it to the Boone County
4   Bar Association?
5        A.  I sent it to the chair of -- I think
6   the committee is criminal defense committee within
7   the Boone criminal law committee it might be.  The
8   individual's name is Jeff Hilbrenner.
9        Q.  Okay.  And do you recall when you sent
10  this letter?
11       A.  I don't precisely.
12       Q.  Have you written any similar letters to
13  other officials in other counties around the state?
14       A.  No.
15       MR. WILLIAMSON:  I think I'm done.  I
16  don't know whether Mr. Quinlan has questions or
17  whether Ms. Shipma has questions.  I will --
18       THE WITNESS:  Can we take a bathroom
19  break?
20       MR. WILLIAMSON:  -- reserve the right
21  to respond to that.  Yes, why don't we go off
22  record?
23       VIDEOGRAPHER:  We're going off the
24  record at approximately 10:47 a.m.
25       (WHEREIN, a recess was taken.)
```

25 (Pages 97 to 100)

**MIDWEST LITIGATION SERVICES**
**www.midwestlitigation.com      Phone: 1.800.280.3376      Fax: 314.644.1334**
Case 2:17-cv-04057-NKL   Document 153-8   Filed 02/09/18   Page 26 of 77

Page 101

1     VIDEOGRAPHER:  We're back on the record
2  at approximately 10:53 a.m.
3           EXAMINATION
4  QUESTIONS BY MR. QUINLAN:
5     Q.  Mr. Barrett, I'll reintroduce myself.
6  I'm Michael Quinlan, and I'm the chief of the
7  litigation section for the Missouri Attorney
8  General's office representing the State of Missouri
9  and Governor Greitens.  Listening to your testimony
10  this morning it's -- my takeaway is that you view
11  the -- the principal concern in your office
12  statewide is the caseloads?
13     A.  Yes.
14     Q.  Okay.  And it's the caseloads that are
15  presenting the concern in your mind as to the
16  constitutional adequacy of representation of
17  indigent defendants that are represented by your
18  office?
19     A.  Yes.
20     Q.  And I know we've spoken before, and I
21  don't want to -- but I think we've -- one of the
22  things we've talked about in other context is that
23  there are two ways to reduce caseloads or reduce --
24  or to solve the problem of a caseload problem.  One
25  you've identified already, I think you said we need

Page 102

1  to have more lawyers in your office?
2     A.  Have I said that before?  Is that your
3  question?
4     Q.  Well, you said -- you said you need
5  north of 300 lawyers and you weren't sure whether
6  that was all for trial counsel or statewide?
7     A.  Yes.
8     Q.  But statewide you need more lawyers?
9     A.  That's one way to solve it, yes.
10     Q.  Okay.  And then the other one we
11  discussed in the past is to reduce the number of
12  clients by I think we had talked about changing laws
13  to -- to reduce who gets charged with crimes?
14     A.  Conceivably, yes.
15     Q.  And you've kind of experienced that as
16  I understand your testimony today in a couple of
17  counties, I think you said Greene County and Union,
18  in which prosecutors made some changes, added some
19  personnel, were able to bring more cases.  So
20  that -- that increased your caseload problem in
21  those jurisdictions, correct?
22     A.  I don't know if that's the only thing
23  that caused those caseloads to go up in that
24  jurisdiction, but I would -- I would say that yes,
25  that's contributed to the caseload increase.

Page 103

1     Q.  So if prosecutors would -- in those
2  cases anyway as I understand, that prosecutors have
3  brought more cases in those -- in those counties?
4     A.  Yes.
5     Q.  And by -- by on the same token if they
6  were to bring fewer cases you'd have fewer cases in
7  your caseload?
8     A.  Mathematically, yes.
9     Q.  Yes.  And one of the things that we
10  spent some time talking about this morning is --
11  well, we can just go to the issue raised by I
12  think it was the oral argument in -- in the Supreme
13  Court case referred to in Exhibit 2, your -- your
14  letter.  Do you have that in front of you?  And --
15     A.  I do.
16     Q.  -- what's happening in -- for example,
17  in one particular instance is Boone County, where
18  that office has indicated that they're not going to
19  accept any more cases?
20     A.  You started off talking about the
21  letter and then you went to Boone County.
22     Q.  Right.
23     A.  What's the question?
24     Q.  Well, I think that -- I thought there
25  was a temporal correspondence between when you

Page 104

1  issued the letter and then this e-mail regarding
2  Boone County?  But --
3     A.  Yes, there's -- the Boone County action
4  seemed to be subsequent to my letter.
5     Q.  And -- and your letter was basically a
6  reassurance of the assistant public defenders in the
7  system that you're responsible for that they had the
8  freedom -- in fact, I think you said the obligation
9  to turn down cases if they felt their caseloads were
10  too high?
11     A.  That's my understanding of the rules of
12  professional conduct, yes.
13     Q.  I understand.  That's my understanding
14  as well.  So what we have happening apparently in --
15  according to is it Judge Crane in Boone County is a
16  partial privatization of the representation of
17  indigent defendants; is that a fair statement?
18     A.  I think it's a fair statement.  I don't
19  know to the extent to which Judge Crane has taken
20  action toward that end.  As I mentioned earlier, I'm
21  aware of one -- one specific individual who received
22  an appointment.
23     Q.  Well, in Exhibit 3 he says due to the
24  correspondence received today, so on --
25     MS. SHIPMA:  You're referring to

26 (Pages 101 to 104)

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com     Phone: 1.800.280.3376     Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-8   Filed 02/09/18   Page 27 of 77

Page 105

1 Exhibit 3 now?
2          MR. QUINLAN:  I'm referring to
3 Exhibit 3, right.
4          Q.  (By Mr. Quinlan)  Okay.  (Quote as
5 read):
6                Due to the correspondence received
7                today, September 6 from Boone County
8                public defender Wallis, the Boone
9                County Court will begin effective today
10               at 1:30 p.m. dockets to appoint members
11               of the private bar to represent
12               criminal defendants.
13               Is that an indication there's at least
14 a partial privatization of the representation of
15 indepen -- indigent defendants in Boone County?
16         A.  It seems to represent what Judge
17 Crane's intent is.  I just can't testify as to the
18 extent to which he's carried that out.
19         Q.  He's carried that out.  But that is one
20 of the solutions to the caseload problem that your
21 office -- that indigent defendants in Missouri face,
22 isn't it?
23         A.  Can you restate the question, please?
24         Q.  Partial privatization is one solution
25 to the -- the issue or the problem, the concern

Page 106

1 faced by indigent defendant -- indigent defendants
2 in Missouri based on the caseload issues that your
3 office is having?
4          A.  I can't say that that's the case.  I
5 don't know whether Judge Crane's actions toward the
6 end that he stated is going to provide adequate or
7 competent representation for these individuals.
8          Q.  But that's not your role, is it?
9          A.  But you asked the question of whether
10 that was a solution.
11         Q.  That's one possible solution, correct?
12         A.  I don't know the answer to that.
13         Q.  Well, if Judge Crane as the chief --
14 apparently the chief judge of Boone County is able
15 to assure to his satisfaction the satisfaction of
16 the courts the competent nonconflicted
17 representation of indigent defendants through this
18 private appoint -- appointment of private counsel,
19 that would be a -- a solution to the -- the problem
20 you identify in Missouri of -- of indigent
21 defendants having representation?
22         A.  Judge Crane wouldn't to my
23 understanding be an arbiter on the issue of
24 conflicted representation.  That would be borne by
25 the individual attorney.

Page 107

1          Q.  No, but I'm asking you, though, is --
2 are you telling me that you don't believe that --
3 that the courts have the obligation to assure that
4 the defendant has competent nonconflicted
5 representation, whether private or public?
6          A.  I believe that that's part of the
7 court's obligation is that someone has competent
8 nonconflicted representation, yes.
9          Q.  It's part of the court's job to
10 ensure that each defendant has competent
11 nonconflicted representation whether public or
12 private?
13         A.  I believe that's part of the court's
14 duty.
15         Q.  And that's -- so therefore that's --
16 that's something that is at least conceptually
17 possible to have competent, nonconflicted
18 representation, whether public or private?
19         A.  I'm not being coy.  I'm -- just my
20 knowledge the public defender world is a small world
21 and I'm aware of practices in other states.  I'm not
22 aware of any privatization, a state that's
23 privatized that is achieving the ends of -- of
24 competent representation.
25         Q.  And again, that's not your job, that's

Page 108

1 the court's job to achieve that end?
2          A.  Yes.
3          Q.  Okay.  So that's not really something
4 you need to worry about?
5          A.  But I don't know whether -- I don't
6 know whether it's possible.
7          Q.  Okay.  Well, apparently Judge Crane
8 thinks it is.
9          A.  I can't testify as to what Judge Crane
10 thinks.
11         Q.  I believe your testimony was that you
12 stated -- are you saying that you're not able to say
13 whether partial privatization is a viable option
14 conceptually?
15         A.  To achieve competent representation,
16 I'm not -- I'm not sure there are the number of
17 lawyers in the private bar who practice criminal
18 defense to take these cases competently given the
19 number of cases that exist from year to year, so I
20 can't say that that's a viable option, no.
21         Q.  So if there was a -- if there was a
22 system, say a voucher system in which the state gave
23 a voucher to an indigent defendant and said find a
24 private lawyer or the court appointed them a private
25 lawyer from which they would be paid, are you saying

27 (Pages 105 to 108)

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-8    Filed 02/09/18    Page 28 of 77

1  that -- that conceptually speaking that it's
2  impossible for that -- those criminal defendants to
3  get competent representation?
4      A.  I won't -- I won't testify as to
5  whether it is possible or impossible.  I will say
6  this.  We have areas of the state that are lawyer
7  deserts, and one of the -- the things that we employ
8  to get lawyers to certain areas of the court is if
9  they're looking for a job in MSPD and there's not a
10 position available in the office of their
11 preference, we ask them to come to join the system
12 and go to an underutilized area of the state for a
13 period of two years, and that at which point they
14 can be eligible for a transfer into another office.
15 This is a tool that we use to get lawyers to
16 counties where there are otherwise not a lot of --
17 or any criminal defense lawyers.
18      Q.  Are you suggesting that the only way
19 for indigent defendants in Missouri to get competent
20 legal representation is through your system?
21      A.  I'm not -- I'm not saying that, but I
22 am saying I'm not sure that your suggestion I can
23 state on the record is a viable alternative.
24      Q.  Are you able to say definitively that
25 it is not viable?

1      A.  Can you make another go at that one?
2      Q.  You just testified that you're not able
3  to say that a -- that conceptually a --
4      A.  I understand.
5      Q.  -- program of partial privatization,
6  what I understand you to be saying is that
7  conceptually you're not able to say, again,
8  conceptually that a -- a system of partial
9  privatization would provide effective assistance of
10 counsel to indigent defendants.  Are you able to
11 rule it out categorically?
12     A.  Yes, because I don't have an answer for
13 how you would otherwise get lawyers to certain areas
14 of the state who would be willing to take these
15 cases in the volume that they're coming in because I
16 don't have confidence on that.  I can't -- I
17 can't -- I can't -- I can't acknowledge that.
18     Q.  So that's in those areas that you
19 called I think lawyer deserts?
20     A.  Yes.
21     Q.  And those are rural areas?
22     A.  Yes, I would categorize most of them as
23 rural areas.
24     Q.  Are there any urban or suburban areas
25 according to the usage that you made with respect to

1  Exhibit 4 that are -- that are deserts?
2      A.  Can you restate the question, please?
3      Q.  Yeah, are there any -- are there any
4  suburban or urban areas as you used those terms in
5  -- in relationship to your questions regarding
6  Exhibit 4 that you would consider to be lawyer
7  deserts?
8      A.  I would not consider any of those areas
9  that I've either previously labeled my term suburban
10 or urban that are lawyer deserts.
11     Q.  And so you would be limiting this con
12 -- this idea of the lawyer desert to only those
13 which you would characterize as rural?
14     A.  No.
15     Q.  Okay.  What others besides the rural?
16 Let me ask you this first.  Would you consider
17 rural -- are you saying then that not all rural --
18 let's just start over again, shall we?
19          Are you saying that not all rural
20 offices are deserts?
21     A.  I think that's true.  Can I restate
22 your question so I make sure I understand it?
23     Q.  Sure.
24     A.  Just because a rural -- an area is
25 rural doesn't mean it's a desert.

1      Q.  You understood my question.
2      A.  Yes.
3      Q.  And so there -- so these -- these
4  lawyer deserts that you refer to are -- are some of,
5  but not all, of the rural offices that you have?
6      A.  I think that's right.
7      Q.  Okay.  But with respect to the offices
8  in the state that are not lawyer deserts --
9      A.  Yes.
10     Q.  -- conceptually a program of partial
11 privatization is -- is potentially viable?
12     A.  I don't know -- I don't know -- I don't
13 know whether that's the case.  There's other
14 obstacles that I'm aware of.
15     Q.  You can't say one way or the other?
16     A.  I can't -- I don't know -- there's no
17 particulars that you've provided of what
18 privatization looks like for me to make an
19 assessment as to whether it's viable or not.
20     Q.  And I'm trying to be general on
21 purpose --
22     A.  I understand.
23     Q.  -- because what I'm saying is
24 conceptually -- because what we have apparently
25 happening already in Boone County is a form of

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com     Phone: 1.800.280.3376     Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-8   Filed 02/09/18   Page 29 of 77

1  privatization.
2     A.  We don't know whether --
3     Q.  Would you agree with that?
4     A.  We don't know whether that's working.
5     Q.  We don't -- agreed.  We don't know that
6  that's working yet, but we don't know that it won't
7  work either, do we?
8     A.  I don't know one way or the other.
9     Q.  You know, I've often referred to this
10  -- this phrase as -- adage necessity is the mother
11  of invention.  It could be that the necessity that's
12  created by what's happening with your local office
13  in -- in Boone County could lead to the invention of
14  some -- some solution that could be translated
15  statewide, would you agree?
16     A.  No, I wouldn't agree.  I don't -- I
17  don't know the answer to that.
18     Q.  You don't know one way or the other?
19     A.  I don't know one way or the other.
20     Q.  Okay.  So you're not able to say
21  whether conceptually speaking -- and as I said
22  before, I'm using that broadly because I think that
23  there are a lot of potential proposals if you will
24  for -- for partial privatization.  In fact, I think
25  you use one, don't you?  Your Code 49 program is --

1  could be characterized as a form of partial
2  privatization, isn't it?
3     A.  Yes, to the extent that we contract
4  with private lawyers to provide services --
5     Q.  When you have conflict, right?
6     A.  When there's a conflict.
7     Q.  Right.
8     A.  We would not label this program as
9  ideal.  It's got pluses and minuses.
10     Q.  As all programs do?
11     A.  Yes.
12     Q.  In fact, your -- I mean, the Missouri
13  public defender system is just such a system.  It's
14  got pluses and it's got its minuses?
15     A.  As everything does.
16     Q.  And I don't know whether you can answer
17  this question.  When I was doing a little bit of
18  preparation, I was looking at the -- the lawsuit
19  paper here, and -- pleading, the complaint in this
20  case.  And I know it's not your -- your document,
21  but one of the allegations is is the public -- the
22  public defender system as currently constituted over
23  which you now preside was established in 1989.  Is
24  that your understanding?
25     A.  Are you asking me as to what the

1  complaint says or whether that is indeed accurate?
2     Q.  Let's go over the facts regardless of
3  what the pleadings are.  I'm assuming the pleading
4  is accurate and that, but if you -- if you have a
5  different answer, let's go with that.
6     A.  I -- I would refer you to either
7  Mr. Elmer or Mr. Mermelstein, preferably
8  Mr. Mermelstein.  I heard another date, but I can't
9  attest to whether one is accurate or another.
10     Q.  What is the date that you heard?
11     A.  I thought it was earlier in the
12  eighties to be --
13     Q.  But sometime in the 1980s?
14     A.  I believe so.
15     Q.  Okay.  The reason I bring that up is
16  because it seems like in paragraph 49 of the
17  complaint, as early as 1993 we were already getting
18  Spangenberg Group reports finding fault with the --
19  with the way the Missouri public defender system was
20  -- was not providing adequate representation?
21     MS. SHIPMA:  I'm going to -- if you're
22  going to refer him to specific paragraphs in the
23  petition, can we please provide that to him?
24     MR. QUINLAN:  Sure I did.
25     MS. SHIPMA:  He doesn't have that in

1  front of him.
2     MR. QUINLAN:  Paragraph 49.
3     MS. SHIPMA:  He doesn't have the
4  petition in front of him.
5     MR. QUINLAN:  I'm happy to show this.
6  I'm going to move on from this.  It's really an
7  embellishment of my earlier question.
8     MR. WILLIAMSON:  Are you entering this
9  as an exhibit?
10     MR. QUINLAN:  No, it's on the -- it's a
11  matter of record in the case.  So 49 --
12     MS. SHIPMA:  But it's not -- it's not
13  an exhibit to the deposition, so if you need him to
14  refer to it --
15     MR. QUINLAN:  I can just withdraw it.
16  If you don't know whether there was a 1993
17  Spangenberg report --
18     MS. SHIPMA:  That's not what you asked
19  him.  You asked him what paragraph 49 referred to.
20     MR. QUINLAN:  No, I referred -- no, no,
21  no.  I referred to paragraph 49 --
22     MS. SHIPMA:  Yes.
23     MR. QUINLAN:  -- and the report that's
24  referred to there.
25     MS. SHIPMA:  So is your question

29 (Pages 113 to 116)

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com      Phone: 1.800.280.3376      Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-8   Filed 02/09/18   Page 30 of 77

Page 117

1   whether there was a 1993 Spangenberg report?
2       Q.  (By Mr. Quinlan)  Yeah, I can -- are
3   you aware that there was a 1993 Spangenberg report
4   that found fault with a representation being
5   provided to indigent defendants in Missouri --
6           (Court reporter interruption.)
7       Q.  (By Mr. Quinlan)  That found fault with
8   deficiencies in the public defender system as it's
9   currently constituted in Missouri?
10      A.  Counsel, I'm -- I'm familiar -- I'm
11  aware that there's been several Spangenberg reports
12  that study the public defender system.  I cannot
13  tell you what years they were.  Just that they were
14  over a period of a number of years and they made a
15  number of findings, and I can't specifically state
16  whether that Spangenberg report made that
17  conclusion.
18      Q.  Have you ever seen a Spangenberg report
19  that gave a clean bill of health to the Missouri
20  public defender system?
21      A.  I don't know what you mean by clean
22  bill of health.
23      Q.  That said that they were doing
24  everything right, that they were providing adequate
25  assistance to indigent defendants?

Page 118

1       A.  To the extent that I'm familiar with
2   that conclusion, it is my understanding that the
3   Spangenberg report tied that conclusion in some way
4   to the unavailability of resources.
5       Q.  And my question, though, was are you
6   aware of any Spangenberg report which basically said
7   that the -- that the public defender system was
8   functioning properly and appropriately in providing
9   in all respects representation to indigent
10  defendants?
11      A.  Given the number of reports that
12  started in the early eighties with the legislative
13  report, I have to tell you, Counsel, I'm not being
14  coy, they bleed together for me.
15      Q.  Get it.
16      A.  And to the -- my answer is to the
17  extent that I'm aware of deficiencies of the MSPD as
18  pointed out by any number of reports, that that
19  conclusion is always in my memory tied to
20  unavailability of the requisite resources to fulfill
21  the charge of the --
22      Q.  So what you're saying, though, is of
23  these reports and they're -- and they're cataloged
24  in the complaint in this case, the -- the diagnosis
25  of the problem is is that the Missouri public

Page 119

1   defender system doesn't have enough resources?
2       A.  That's my understanding of the -- of
3   the general conclusions of each one of these reports
4   over the course of a period beginning in the
5   eighties.
6       Q.  And is it your position as the director
7   of the Missouri public defender's system the only
8   solution to the caseload problem is an increase in
9   funding?
10      A.  No.
11      Q.  What other solutions?
12      A.  Fewer cases.
13      Q.  Fewer cases.  And achieving fewer
14  cases, one of the ways of achieving fewer cases
15  within your office is to -- to appoint other
16  attorneys outside of your office to represent those
17  indigent -- indigent defendants, correct?
18      A.  No.  No.
19      Q.  That's not one of the solutions to --
20      A.  I'm sorry, I thought you said the
21  solution.  My fault.
22      Q.  One solution to reduce the number of
23  cases that come into your office is to have a system
24  by which indigent defendants are appointed an
25  attorney outside of your system?

Page 120

1       A.  That's the mechanism we currently
2   utilize to handle conflict cases to the extent to
3   which we are funded to do so.
4       Q.  Right.  And so -- right.  And so -- and
5   you talked about that.  There's -- there's been
6   funding allowed for your office to retain
7   independent private counsel to represent indigent
8   defendants whose case presents a conflict with cases
9   that your office is handling, correct?
10      A.  Notwithstanding the warts of that
11  system, yes.
12      Q.  And what are the warts of that system?
13      A.  There are several.  The research that
14  I'm familiar with in the area of defense
15  representation informs me that public defenders do
16  as well as skilled criminal defense practitioners,
17  what I would characterize my words as high dollar
18  practitioners.
19          But where the results drop off
20  significantly is utilizing what's referred to as
21  flat fee contract lawyers because there's con --
22  some consensus around the idea that when you give an
23  attorney a flat amount, regardless of the amount of
24  work that they do, it will encourage them to do the
25  least amount of work to receive those funds.  For

30 (Pages 117 to 120)

**MIDWEST LITIGATION SERVICES**
**www.midwestlitigation.com**       **Phone: 1.800.280.3376**       **Fax: 314.644.1334**
Case 2:17-cv-04057-NKL   Document 153-8   Filed 02/09/18   Page 31 of 77

1  that reason the outcomes are not as good than using
2  public defenders.
3      **Q.   And are you saying that that creates a**
4  **distinction between the quality of work that the**
5  **lawyers in your system provide compared to private**
6  **lawyers?**
7      A.   We haven't measured that, but that's
8  what the -- the research that I'm familiar with
9  shows.  I'm also familiar with, although I don't
10  know the states, I believe they're in the western
11  part of the country, at least in two states I
12  believe have determined that flat fee contract
13  lawyers are not appropriate or maybe it's even
14  unconstitutional in capital cases because it
15  encourages the least amount of work for the money
16  received.
17      **Q.   So your -- so your position would be**
18  **that the service that your Missouri public defender**
19  **system lawyers provide to the indigent defendants**
20  **entrusted to your service is at least as good if not**
21  **better than services provided by private counsel at**
22  **least in a flat fee arena?**
23      A.   As a general statement I would say
24  that.
25      **Q.   Okay.  So -- and is that the basis --**

1  **as I gather what you -- what you said is that that's**
2  **one of the reasons you don't feel like your -- I**
3  **should put it this way.  That's what you've**
4  **identified as one of the warts with your Code 49**
5  **system?**
6      A.   There -- there are at least two others
7  that come to mind.
8      **Q.   Okay.  But that's one of them?**
9      A.   That's one of them.
10      **Q.   Okay.  And -- what are the others?**
11      A.   Oversight, quality.  We provide
12  managerial oversight to the lawyers that we employ.
13  If a lawyer who is part of our panel program, which
14  is the contracting program, the Code 49 program, if
15  they are not meeting with their client, if they are
16  not reviewing the sufficiency of the accusing
17  documentation or asking for discovery, we would not
18  know unless someone in our local office or a judge
19  as -- as occurs from time to time picks up the phone
20  and raises concerns as it relates to that private
21  attorney.  So there are quality assurance issues.
22      **Q.   And what you're saying -- is it fair, I**
23  **understand you correctly, what you're saying is that**
24  **in your office you have supervising attorneys that**
25  **-- that see to the -- the quality of services being**

1  **provided by your APDs?**
2      A.   I will say that at least they endeavor
3  to do that.
4      **Q.   They endeavor to do that.  And that's**
5  **one of the -- that's one of the bases in which you**
6  **believe that the service provided by APDs in your**
7  **system is superior to that provided by private**
8  **counsel retained through your Code 49 system?**
9      A.   That's -- that's one reason, yes.
10      **Q.   Okay.  So you've given me two now.**
11  **You've given me the flat fee issue I think?**
12      A.   Yeah.
13      **Q.   And then you've given me the**
14  **supervision.**
15      A.   Quality assurance.
16      **Q.   And you said there was one other or is**
17  **there more?**
18      A.   Yeah, there's -- there's several
19  others.  One other is that if they decide to
20  withdraw, if the private attorney withdraws for any
21  reason, they take another job, they decide that
22  there's a conflict, a lot of times they're not
23  getting along with their client.  And --
24      **Q.   Which is probably not an infrequent**
25  **occurrence in the criminal practice?**

1      A.   Not an infrequent occurrence, I concede
2  that point.  And judge allows them withdraw, we
3  don't get that money back.  And Mr. Elmer can go
4  into more details on that.
5      **Q.   In that situation when they withdraw,**
6  **apart from your not getting the money back then do**
7  **you -- does your system then provide for the**
8  **retention of a new counsel for that conflict client?**
9      A.   Mr. Elmer would probably be in the best
10  position --
11      **Q.   You don't know one way or the other?**
12      A.   I have some indication.  I can answer
13  to the -- to the extent that I'm able to, but I
14  would refer you to Mr. Elmer to be expert on that
15  question.
16      **Q.   And is it -- and -- and again,**
17  **deferring to Mr. Elmer, but just for my purposes**
18  **presently, you have contracts with these attorneys?**
19      A.   Yes.
20      **Q.   Okay.  And --**
21      A.   Agreements, yes.  They're essentially
22  contracts.
23      **Q.   Contract.  I think you used the word**
24  **they're contracted attorneys, but that's --**
25      A.   Yes, my phraseology.

31 (Pages 121 to 124)

**MIDWEST LITIGATION SERVICES**
**www.midwestlitigation.com**    **Phone: 1.800.280.3376**    **Fax: 314.644.1334**
Case 2:17-cv-04057-NKL   Document 153-8   Filed 02/09/18   Page 32 of 77

1     Q.   Agreements are contracts.  That's the
2  way I learned it in law school.
3     But -- so you -- are these -- are these
4  code 59 -- 49 --
5     A.   49.
6     Q.   And by the way, what's the origin of
7  that name?
8     A.   When you find out from Mr. Elmer, if
9  you'd let me know, I'd appreciate that.
10     Q.   I will.  You can stay and listen if you
11  want.  You have -- is it your understanding you have
12  like a stable of attorneys that --
13     A.   Yeah.
14     Q.   -- you have a contract with?
15     A.   Yeah.
16     Q.   And they agree to take a number of
17  cases?
18     A.   Yeah.
19     Q.   And you have a contract rate with them?
20     A.   The contract rate, which I believe
21  is -- I believe is promulgated in a rule is tied to
22  the type of offense, seriousness of the charge, A, B
23  felonies, C, D felonies, sex case, probation
24  violation.
25     (Court reporter interruption.)

1     A.   Tied to the severity of the charge.
2  For instance, an A, B felony would -- would yield a
3  higher contract rate than a C, D felony or an E
4  felony.
5     Q.   (By Mr. Quinlan)  Do you know what any
6  of those rates are offhand?
7     A.   I don't.  Mr. Elmer would.
8     Q.   And is it -- is it -- is it always a
9  fixed fee or is it hourly, do you know?
10     A.   It's a fixed fee, but there is some
11  nuance there.
12     Q.   Okay.
13     A.   I think there's some nuance as it
14  relates to complexity, going to trial, which
15  would -- and that nuance would tie into some
16  discretion by Mr. Elmer.
17     Q.   And if there was a withdrawal from --
18  from a client, is there a provision in that contract
19  for a recapture of fees paid that were earned?
20     A.   I'd refer you to Mr. Elmer.
21     Q.   Okay.  So I think you've -- you've
22  counted three for me, three warts as you
23  characterized them on your -- your Code 49 process.
24  Are there any others?
25     A.   I would say that public defenders

1  exclusively do public defense.  That is not
2  necessarily the case with the contract attorneys.  I
3  would also say that they do not receive the training
4  that we receive, that public defenders receive as
5  part of the MSPD.
6     Q.   Is that -- is that just a way of saying
7  that you have higher-quality lawyers representing
8  the -- the clients in your system?
9     A.   As a general rule, in addition to I
10  have an obligation to train the lawyers and make
11  sure that they can competently handle to the extent
12  that that's a reasonable expectation in cases that
13  they receive.
14     Q.   So that's another distinction between
15  the representation provided by your office and that
16  provided by the Code 49 attorneys, the private
17  placed attorneys?
18     A.   As a general statement.
19     Q.   Okay.  So -- now, I want to back up a
20  little bit, though.  When you say an attorney
21  withdraws, you identify the problem as not getting a
22  refund of the fee or --
23     A.   The extent that I'm familiar with is we
24  have no way as a department of state government to
25  receive these funds, and it's my understanding --

1  and I would refer you to Mr. Elmer for -- for
2  precision on this, that the money reverts back to
3  the state of Missouri, and that Mr. Elmer then must
4  employ other means by which to balance out the till.
5     Q.   He doesn't have the ability as far as
6  you know to go to the office of administration and
7  say funnel that money back to us?
8     A.   I don't know whether there's a legal
9  mechanism for that, but I will testify that that's
10  never -- I don't believe that's ever been done
11  before, and I -- I don't think there's a mechanism
12  in place to do that.
13     MS. SHIPMA:  That would be a Kathy Lear
14  question.
15     Q.   (By Mr. Quinlan)  Okay.  And is that
16  the only drawback in regard to the withdrawal of
17  private counsel?
18     A.   No.
19     Q.   Okay.  What other drawback is there?
20     A.   It presents the question then what
21  happens to the client who has previously been
22  determined to be indigent.
23     Q.   Define --
24     A.   There's oftentimes a push and pull that
25  occurs with the judge who, again, I'd refer you to

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com     Phone: 1.800.280.3376     Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-8   Filed 02/09/18   Page 33 of 77

Page 129

```
1   Mr. Elmer, but I'm aware of these instances where
2   the judge would want us to take the case again.
3           We had this -- something of an
4   elaborate fashion occur recently in Harrisonville
5   where we contracted out a case and the judge took
6   the lawyer off the case and gave the case back to us
7   notwithstanding a conflict occurring.
8       Q.  In that case you would either -- you
9   have -- you still would have available to you,
10  wouldn't you, that you appoint -- you'd assign it to
11  another contract attorney or one in another district
12  office?  You'd be able to get coverage in other
13  words for that client?
14      A.  Possibly.  It would depend on whether
15  there are other attorneys in the panel, the panel
16  program who have agreed to take clients in that
17  circuit.  Sometimes in these lawyer deserts if
18  there's a contract attorney or attorney wants to
19  participate in the program, and they want to
20  participate only as it relates to county A, but we
21  need coverage in county B, we will ask them to cover
22  county B if they want to be in the program as a way
23  to making more lawyers available.
24      Q.  Do you have a method of collecting data
25  on the incidents of that sort of thing happening?
```

Page 130

```
1       A.  I don't know the answer to that.
2       Q.  Who would?
3       A.  Joel Elmer would be the first person
4   that I would ask about the capabilities on that.
5       Q.  In your view as a -- are -- are you
6   ruling out of order from the beginning any
7   possibility of a partial privatization as a solution
8   to the indigent --
9           MR. WILLIAMSON:  Michael, I'm going to
10  object.  This question has been asked and
11  answered --
12          MR. QUINLAN:  I haven't finished it.  I
13  haven't finished the question.
14          MR. WILLIAMSON:  -- three times.
15          MR. QUINLAN:  May I?
16          MR. WILLIAMSON:  Sure.
17      Q.  (By Mr. Quinlan)  Are you ruling out as
18  taking off the table the possibility of any form of
19  privatization as a partial solution to the -- the
20  plight of indigent defendants in Missouri?
21          MS. SHIPMA:  And this question has been
22  asked and answered at least four times.
23          MR. QUINLAN:  I don't think it's been
24  answered, but --
25          MS. SHIPMA:  He has told you what his
```

Page 131

```
1   answer is.  Perhaps he hasn't given you the answer
2   you want, but he hasn't -- but he has given you his
3   answer.
4           MR. QUINLAN:  He's either taking it off
5   the table or he's not.  And I don't think he's been
6   clear on that.
7       Q.  (By Mr. Quinlan)  In your -- in your
8   judgment, is -- is any kind of program of partial
9   privatization off the table?
10          MS. SHIPMA:  And he has answered that.
11  He's told you you're not giving him enough details.
12          MR. QUINLAN:  So are you instructing
13  him not too answer?
14          MS. SHIPMA:  No, I'm making an
15  objection because you've asked the question.
16          MR. QUINLAN:  Then your objection is
17  noted.  You may answer.
18      A.  I think we've covered that.  We
19  currently employ utilizing to a limited extent
20  private attorneys for the purposes of attempting to
21  carry out our mission.
22          I've testified that that program, while
23  necessary given our current resources, has a number
24  of deficiencies that in my estimation limit the
25  ability to meet the -- the goals of competent
```

Page 132

```
1   representation under the Sixth Amendment.
2       Q.  Then my next question is is it your
3   view that the only solution to the -- and I think
4   it's referred to in the -- the pleading as the
5   crisis of representation for indigent defendants in
6   Missouri, is the only solution to that problem
7   increased funding for your office?
8       A.  No.
9       Q.  What other solutions are there?
10      A.  Fewer cases.
11      Q.  Fewer cases.  And how would you
12  recommend that that take place?
13      A.  Prosecutors are more selective in the
14  types of cases they file.
15      Q.  So you want prosecutors to file fewer
16  cases?
17      A.  Ideally, yes, that would be part of the
18  solution.
19      Q.  And is that -- okay.  Is that the only
20  mechanism that you would recommend for the decrease
21  of cases in your office?
22      A.  Say that again.
23      Q.  Is that the only mechanism that you
24  recommend, to -- to not file as many -- prosecute as
25  many cases?
```

33 (Pages 129 to 132)

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-8   Filed 02/09/18   Page 34 of 77

1    A.  Is that the only mechanism I recommend?
2    Q.  Yeah.  See, I asked you -- my question
3  was -- my first question was is increasing your
4  funding the only answer to this problem and you said
5  no, and I said what are the others, and you said not
6  filing as many cases.
7    A.  I'm stumped because I just thought -- I
8  thought we were over this earlier.
9    Q.  Okay.  Other than prosecutors not
10 filing other cases and increasing your -- what other
11 mechanisms are there that you would recommend to
12 solve the crisis of indigent defense representation
13 in Missouri besides increasing funding for your
14 office?
15   A.  As I sit here, I don't have any other
16 ideas to some other structure or -- or system that
17 could given the number of cases in Missouri, the
18 availability of attorneys who practice criminal law
19 statewide, or in specific jurisdictions, that that's
20 a viable alternative without knowing more specifics.
21   Q.  Well, what more would you need to know?
22   A.  We need to know -- I would need to know
23 a lot more.  Where -- where are the attorneys that
24 are raising their hand to take these cases and what
25 are their qualifications and how many cases can they

1  take, for instance?
2    Q.  If there was a mechanism to pay private
3  lawyers, there would be -- wouldn't you -- wouldn't
4  you agree with me, there would be lawyers willing to
5  take cases?
6    A.  I can't say that for sure.
7    Q.  Well, that's your experience with the
8  Code 49 cases, isn't it?
9    A.  We have --
10   Q.  Leaving aside the deserts?
11   A.  But there's other things that we have
12 done that I've alluded to earlier.  For instance, a
13 lawyer, private lawyer only raises his hand for two
14 counties in a five-county circuit.
15       Mr. Elmer makes efforts to condition
16 their involvement in the program on receiving cases
17 in all the counties in the circuit.  So there's
18 steps that -- that I know that -- that I'm aware of
19 that Mr. Elmer takes to achieve that.
20   Q.  Are there any privatization proposals
21 that you would find acceptable?
22       MR. WILLIAMSON:  Objection.
23   A.  I -- I don't know how to answer that.
24   Q.  (By Mr. Quinlan)  Apart from Code 49
25 because you obviously find that acceptable.

1    A.  That's not true.  I -- I already
2  testified I think on a couple occasions that there
3  are deficiencies related to Code 49 that as director
4  of MSPD gives me serious concern about whether for
5  those individuals their constitutional rights are
6  being upheld.
7    Q.  Are you aware of any indigent defendant
8  that your office has placed in a Code 49
9  representation who has received ineffective
10 assistance of counsel?
11   A.  I'm aware of quite recently a matter
12 in, I alluded to it, in Harrisonville where a case
13 was scheduled for trial.  I'm going to do my best
14 here to give you the facts as I'm aware of them.
15       That with trial imminent, that is to
16 say the next week or so, according to the judge the
17 private attorney with whom we've contracted the case
18 had not seen his client in some time, had not --
19 that I'm aware provided discovery to that client,
20 and with trial imminent the judge made the decision
21 to take that lawyer off that case, give the case
22 back to us.  The judge made a determination -- oh, I
23 thought it was odd because the case was not disposed
24 of yet that the person was not competent.
25   Q.  So the person that was assigned by your

1  office under your Code 49 proceeding was deemed by
2  the trial court to be incompetent?
3    A.  According to the judge.
4    Q.  Okay.  And removed him from the case
5  prior to trial?
6    A.  Yes.
7    Q.  And appointed your office to represent
8  the defendant in the trial?
9    A.  Yes.  That decision was --
10   Q.  Was the trial continued?
11   A.  I'm not aware.  I'm aware that that
12 decision has since been reversed.  I think the
13 terminology is ordered vacated perhaps and that
14 Mr. Elmer may know more on that, but that's the --
15 that's all I know on it.
16   Q.  The order removing the incompetent
17 counsel has been reversed?
18   A.  I believe.
19   Q.  Or the reassignment -- the reassignment
20 to your office has been reversed?
21   A.  I know the reassignment to my office
22 has been reversed.  I do not believe that we are in
23 on that case.
24   Q.  Do you know whether or not that
25 defendant has suffered any prejudice as a result of

34 (Pages 133 to 136)

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-8   Filed 02/09/18   Page 35 of 77

## Page 137

1  the court's removal of the attorney?
2      A.  I don't know if -- I don't think -- I'm
3  not aware that the case has been resolved yet.
4      Q.  Okay.  So my question was are you aware
5  of any case in which an attorney appointed by your
6  office pursuant to your Code 49 program has -- has
7  suffered an ineffective assistance of counsel
8  whereby he was or she was prejudiced, wrongfully
9  convicted?
10     A.  I'm not aware one way or the other.
11     Q.  Are you aware more generally in your
12  office in -- either in your tenure or any
13  information you have about issues prior to your
14  tenure whether any public defender has been found to
15  have ineffectively -- rendered ineffective
16  assistance to a defendant?
17     A.  Yes.
18     Q.  In which there's been prejudice,
19  wrongful conviction?
20     A.  These -- these occur --
21     Q.  I don't -- I don't need -- by the way,
22  I don't need you to go through the cases one by one.
23  Just are you aware?
24     A.  Right.  Where -- where there's been
25  determination of a wrongful conviction.

## Page 138

1      Q.  There's been a determination of
2  ineffective assistance of counsel?
3      A.  Not to my knowledge.  Mr. Mermelstein
4  may know more on that.
5      Q.  And -- and how far back does your
6  knowledge reach?
7      A.  Well, temporally it would go back
8  between two and three years, but that's not to say
9  that just given that time period that I'd be aware
10  of all instances that occurred during that time
11  period.
12     Q.  And you're talking about your tenure as
13  the -- as the -- both the general counsel and the
14  director?
15     A.  Yes.
16     Q.  Okay.  And you've not been informed of
17  incidents of -- of findings of ineffective
18  assistance of counsel by attorneys in your office
19  for anything happening prior to your tenure?
20     A.  No final determinations on that have
21  come to mind, no.
22     Q.  And the ordinary mechanism for -- for
23  determination would be a post-conviction relief
24  proceeding?
25     A.  Right.  I believe so.  I mean, I -- I

## Page 139

1  know that the post-conviction relief units regularly
2  get relief in whatever form they get relief in.  It
3  varies.  And I'm aware of generally that they
4  receive relief for their clients.  The specifics
5  regarding any one of them is not something I keep
6  tabs on.
7      Q.  But -- but does your post-conviction
8  relief office team, function within your office,
9  represent claims of ineffective assistance of
10  counsel by MSPD lawyers?
11     A.  Yes, and I'd refer you to Greg
12  Mermelstein on that.  He'll be able to answer those
13  questions.
14     Q.  But they also represent indigent
15  defendants in post-conviction relief cases for
16  indigent defendants not previously represented by
17  the public defender system?
18     A.  I'd refer you to Mr. Mermelstein on
19  that.
20     Q.  But whatever post-conviction relief may
21  -- may be achieved in your office, you're not aware
22  of any of that having ever been achieved because of
23  a finding of ineffective assistance of counsel by a
24  public defender?
25     A.  I'd refer you to Mr. Mermelstein.  I'm

## Page 140

1  not --
2      Q.  You're not aware, though?
3      A.  I'm not aware.
4      Q.  Okay.  Prior to your tenure I guess
5  with the public defender system, I guess as general
6  counsel, what was your -- you were with the
7  governor's office?  I believe you said that --
8      A.  The -- the immediate job I had prior to
9  joining general counsel was a tenure at the State
10  Emergency Management Agency.
11     Q.  Okay.  I've got that here.  And then
12  prior to that you were with the office of the
13  governor, deputy general counsel?
14     A.  Yes.
15     Q.  And a -- a brief stint as -- or you
16  said including as deputy chief of staff?
17     A.  Yes.  Brief.
18     Q.  When -- when did you begin in your --
19  your work with the office of the governor in any
20  role?
21     A.  It lasted for a period between two to
22  three years.  The start date.
23     Q.  Year, you can put a year.
24     A.  I can back into it.  I think it was '12
25  to '14, 2012 to 12 -- '14 generally.  Generally.

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com     Phone: 1.800.280.3376     Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-8   Filed 02/09/18   Page 36 of 77

1      Q.  Okay.  And prior to that what did you
2  do?
3      A.  I worked for a period of time at
4  Department of Natural Resources, then the Department
5  of Economic Development.
6      Q.  So natural resources, then prior to
7  that economic development?
8      A.  Yes.
9      Q.  And prior to that what did you do?
10     A.  I was new to the state at that time.  I
11 worked previously as the deputy commissioner for
12 criminal justice programs, public safety in the
13 state of New York.
14     Q.  Okay.  And did -- and that -- what did
15 you do in that capacity?
16     A.  I ran statewide programs on juvenile
17 justice, reentry, crimes against revenue.
18     Q.  Crimes against what?
19     A.  Revenue.
20     Q.  Tax evasion?
21     A.  You know, frauding workman's comp.
22     Q.  Okay.
23     A.  Not paying your taxes, a restaurant not
24 paying taxes, that stuff.
25     Q.  Okay.  I understand.  Anything else?

1      A.  Anything else as to?
2      Q.  In that position.
3      A.  Brief the governor and the deputy
4  secretary for public safety on public safety issues.
5  Was a counselor on efforts to combat crime in New
6  York State and administration of general programs to
7  assist localities in combatting violent crime.
8      Q.  And prior to that what did you do?
9      A.  I -- I worked as an attorney for the
10 New York State general assembly in the majority
11 caucus on the codes committee.
12     Q.  And prior to that?
13     A.  You're killing me here.
14     Q.  I'm trying to get back to law school
15 here.  I guess what I'm getting at, is your tenure
16 with the public defender's office your first work
17 experience in the defense of criminal defendants?
18     A.  You just had to go back one job prior
19 and I was a public defender.
20     Q.  Okay.
21     A.  Before joining the New York State
22 general assembly in the codes committee, I worked
23 for the Albany County Public Defender's Office, and
24 I also represented clients, criminal defense clients
25 in private capacity.  You were allowed to do both.

1      Q.  Okay.  And how long were you doing
2  that?
3      A.  I think over a period of between two
4  and -- two and three years.
5      Q.  Okay.  That's what I was getting back.
6  Sorry to walk you back all the way back like that.
7      A.  And I don't know the precise time
8  period for that.
9      Q.  And I'm not going to hold you to it.
10     A.  Yeah.
11     Q.  We'll ask you for your resumé if we
12 need it.
13     A.  Yeah.
14     Q.  You mentioned that -- I guess you have
15 did you say quarterly meeting of the commission that
16 you attend?
17     A.  Yes.
18     Q.  You report --
19     A.  We calendar out four quarterly meetings
20 a year.  In addition, as the need arises we'll have
21 phone calls to discuss matters that require
22 discussing.
23     Q.  And are those proceedings recorded,
24 taken down, minutes?
25     A.  I don't know -- minutes, yes.

1      Q.  Okay.  So minutes for the formal
2  meetings?
3      A.  Yes.  Required by the -- the open
4  meetings law, also known as the sunshine law.
5      Q.  Okay.  And -- and the phone meetings
6  you have, are those formal meetings for which
7  document --
8      A.  When you say formal, I don't know what
9  you're talking about.
10     Q.  Well, is there a process whereby the
11 commission can meet by telephone rather than in
12 person and carry out its business?
13     A.  Yes.  Yes.
14     Q.  And those would also be subject to the
15 same sunshine law requirements for documentation?
16     A.  Yes, appropriate notice is given, etc.
17         (Court reporter interruption.)
18         MR. QUINLAN:  Requirements for
19 documentation.
20         THE WITNESS:  And I said yes,
21 appropriate notice is required, etc.
22         MR. QUINLAN:  You have two
23 Northeasterners here going at it.  We're very fast
24 talkers.
25         THE WITNESS:  I'm making efforts to

36 (Pages 141 to 144)

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com       Phone: 1.800.280.3376       Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-8   Filed 02/09/18   Page 37 of 77

Page 145

1  slow down.
2      Q.  (By Mr. Quinlan)  You mention -- I just
3  -- some questions I have in my margins from my
4  notes.  You indicated that -- that $3.74 million was
5  appropriated.  I don't have in my notes what year it
6  was.
7          I'm not sure that -- I mean, the record
8  will -- will speak for itself on that.  That was
9  first vetoed by the governor and then put back into
10  the budget by veto override, and then it was again
11  withheld by the governor?
12     A.  Yeah, I just correct you.  It's
13  3.47 million.  Not 74 million.
14     Q.  47 million, okay.
15     A.  Yes.  Yeah, that's my correction.  And
16  I believe it was two budget cycles ago.
17     Q.  Okay.
18     A.  So whether you want to use calendar
19  year or fiscal year, it was two years ago.
20     Q.  That's fine.  But my question is do you
21  know why the money was ultimately withheld?
22     A.  Well, I know insofar as to state why
23  money was withheld generally, and that's because
24  according to the governor, Nixon, revenues were not
25  coming in as projected.  As it relates to the

Page 146

1  specific withhold, pertaining to the public defender
2  system, I can't say.
3      Q.  So you've been in the general counsel's
4  office of the governor.  What is your understanding
5  of that, the -- the broader withholding you refer
6  to?  What's the origin of that?
7      A.  Revenue.
8      Q.  Right.  By what authority does the
9  governor have ability to do that?
10         MS. SHIPMA:  You know, I'm going to
11  object.  This is a subject matter of current pending
12  litigation --
13         MR. QUINLAN:  Okay.
14         MS. SHIPMA:  -- to which he is a party
15  and so I don't want him answering.  I'm going to
16  instruct him not to answer questions regarding this
17  matter.
18         MR. QUINLAN:  Sure.  And any that you
19  find, we can do that.  I'm just trying to get some
20  background.
21         MS. SHIPMA:  This is one.  Do not
22  believe there is -- we do not believe there is --
23         (Court reporter interruption.)
24         MS. SHIPMA:  Yes, our contention in the
25  litigation is there is not constitutional

Page 147

1  authority --
2          MR. QUINLAN:  Okay.
3          MS. SHIPMA:  -- for the governor to do
4  that withhold.  So any questions regarding his
5  understanding --
6          MR. QUINLAN:  Okay.
7          MS. SHIPMA:  -- of that I'm going to
8  object and instruct him not to answer.
9          MR. QUINLAN:  No, fair enough.  And I'm
10  not -- and I'm not trying to invade anything.
11     Q.  (By Mr. Quinlan)  So it's your
12  understanding that the -- that what the governor
13  said, what the governor's position was was that he
14  had constitutional authority to make a withholding
15  because revenues did not -- were not sufficient to
16  meet appropriations?
17     A.  I'm trying to state what I believe he
18  thought.
19     Q.  Exactly.  That's what I'm asking.  I'm
20  not asking to invade --
21     A.  Yeah.
22     Q.  -- anything that's -- would prejudice
23  your litigation.  Is that correct then?
24     A.  That -- limited to that, yes.
25     Q.  Yeah, okay.  And again, you don't --

Page 148

1  you don't have any specific information about why
2  $3.47 million appropriation for the public defender
3  system was among that?
4          MS. SHIPMA:  I'm going to object to
5  that question.  That's the subject matter of our
6  litigation.  Michael, I'm going to instruct you not
7  to answer.
8          THE WITNESS:  Okay.
9      Q.  (By Mr. Quinlan)  You going to follow
10  your attorney's instruction?
11     A.  Yes.
12     Q.  Okay.  Did I understand your testimony
13  correctly that your requested appropriation -- or I
14  should say the appropriation made in the current
15  fiscal year is fully funded, it's not been withheld?
16     A.  Can I just take a step back so I
17  understand your question?
18     Q.  Sure.
19     A.  You're talking about the budget that
20  was pulled together as part of the last legislative
21  budget cycle and is now in operation for the current
22  fiscal year?
23     Q.  Yes.
24     A.  All the money that we were appropriate
25  -- appropriated that can be expended at this point

37 (Pages 145 to 148)

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-8   Filed 02/09/18   Page 38 of 77

1 in the fiscal year to my understanding has been
2 expended to our department.
3     **Q.  Okay.  And that's your overall budget?**
4     A.  Yeah, I don't know there's a difference
5 between them.
6     **Q.  I -- you know, I'm asking you for my**
7 **benefit because I have Code 49 program in my note.**
8     A.  Okay.
9     **Q.  But I think my question was broader**
10 **than that.  And that was the question you answered,**
11 **right?**
12     A.  Yes.
13     **Q.  So you're -- you're basically -- I**
14 **understand your answer, okay.  You mentioned that**
15 **the operational control over the public defenders,**
16 **your office, is held by the commission.**
17     A.  No.
18     **Q.  Okay.  You're -- my note -- and correct**
19 **-- and my notes say that -- that Missouri public**
20 **defender system is an independent department within**
21 **the judicial branch and it's only operationally**
22 **controlled by the commission.  Is that --**
23     A.  By the department.  By the department.
24     **Q.  The department.**
25     A.  Not the commission.

1     **Q.  Okay.**
2     A.  For instance, if I wanted to move an
3 FTE from one office to the next, that's an
4 operational decision.  I take that to be an
5 operational decision.  That's not one that I would
6 require commission approval.
7     **Q.  I understand.  So -- and the -- what is**
8 **then the authority of the commission?**
9     A.  So it's statutory.  There's a number of
10 enumerated responsibilities that they have.  The one
11 in addition to hiring me and firing, terminating the
12 director, to approve the budget request that goes to
13 the legislature and the governor.
14     To do some advocacy for the mission of
15 the public defender system, and I believe there's
16 something in there too about the approval of a pay
17 structure for our org. chart.
18     **Q.  Okay.  But your salary is fixed by**
19 **statute?**
20     A.  Yes.  I believe it says not more than
21 what a judge makes.  I don't remember whether it's
22 an associate circuit judge or a circuit judge.
23     **Q.  But other executives in your department**
24 **that you hire, they have different -- they can be**
25 **paid what you and the board determine, commission?**

1     A.  Yes, I think I have say.  I think I
2 drive that decision.  But as a matter of practice,
3 as a matter of courtesy, I will share and get their
4 approval or I have shared and got their approval in
5 establishing salaries for what I would describe as
6 senior staff, deputy directors, trial division
7 directors.
8     **Q.  And you also have -- so just so I**
9 **understand, you -- you basically are the focus of**
10 **the operational control department?**
11     A.  I would say that's an accurate
12 statement.
13     **Q.  Okay.  And so you are the one**
14 **ultimately responsible for the pay scale for your**
15 **APDs?**
16     A.  I think so.  I think -- yes, I
17 think that's -- I think that's -- I think we need --
18 there's some nuance there that I just can't
19 willy-nilly make stuff up.  I think we borrow --
20     **Q.  Don't I know that from my position.**
21     A.  We borrow I think -- I don't know
22 whether it's compulsory or not a structure that OA
23 creates.  I don't know whether that's a guideline as
24 I sit here or whether that's mandatory, but that's
25 what we utilize.

1     MS. SHIPMA:  Kathy Lear can speak --
2     A.  Yeah.
3     MR. QUINLAN:  Understood.
4     **Q.  (By Mr. Quinlan)  What is the**
5 **authority, if any, that the Supreme Court has over**
6 **your office as you're in the judicial department,**
7 **and my understanding is constitutionally the Supreme**
8 **Court is the supreme head of the judicial**
9 **department?**
10     A.  Counselor, that's unclear to me.  I've
11 never been able to reconcile what it means to be in
12 the -- in the judicial branch but at the same time
13 be independent, the same end achieved by us being a
14 stand-alone.  I don't know the answer to that.
15     **Q.  Okay.  I just want to confirm that you**
16 **set the salaries for your APDs and your support**
17 **staff and your organization -- but you don't**
18 **have budgetary responsibility for funding their --**
19 **their fringe benefits?**
20     A.  So if I understand your -- your
21 question, their fringe benefits are not paid for out
22 of my operating budget.
23     **Q.  That was my question.  Okay.**
24     A.  And I believe the same is true for all
25 departments, I believe.

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com    Phone: 1.800.280.3376    Fax: 314.644.1334

Page 153

1    Q.   I don't know.  There was some
2  discussion about -- I don't remember whether it was
3  the district offices or the system as a whole, but
4  -- and I'm just going to ask the question.  Are
5  there restrictions on the ability of your department
6  to raise funds from sources other than an
7  appropriation by the legislature?
8    A.   I believe there is.  Kathy Lear would
9  be expert to answer that question.
10   Q.   So would that -- does that rule out to
11 your understanding private fundraising to fund
12 different programs?
13   A.   I believe it does.
14   Q.   Okay.
15   A.   I know that -- I'm mindful that if
16 there's grant opportunities out there, and there
17 seldom are, that we're somewhat limited as to what
18 we can bring in from outside sources, but again
19 Kathy Lear would be expert on that.
20   Q.   But you -- but you are allowed to
21 collect fees from clients?
22   A.   Yes.
23   Q.   Okay.  You have a system for assigning
24 a value to a representation and -- and charging your
25 client for that?

Page 154

1    A.   We have -- yes, I believe the amounts
2  are promulgated by rule if I'm not mistaken.  I
3  didn't set them.  They're -- they're assessed as a
4  fee to clients, yes.
5    Q.   And do you know what the destination is
6  of those fees when they're paid?  Do they come in to
7  your budget?
8    A.   Kathy Lear would be expert on that.
9    Q.   All right.  And I presume you have a
10 system in place to -- for billing and collections
11 and keeping track of how successful you are in
12 collecting those fees?
13   A.   I -- to the extent that we are
14 successful, I have general understanding of -- of
15 what comes in the door, how it comes in the door,
16 yes, but Kathy Lear would know more.
17   Q.   And Kathy would be --
18        MS. SHIPMA:  Or Joel Elmer would
19 also --
20        MR. QUINLAN:  Okay.
21        MS. SHIPMA:  -- be able to speak to
22 that as well.
23   Q.   (By Mr. Quinlan)  And as I understand
24 it, the office space occupied by your defenders in
25 the counties and the district offices is provided by

Page 155

1  the counties?
2    A.   Yeah.  Perhaps I should've provided
3  more nuance to that.  In the cities I believe -- I
4  think those are provided out of our budget if I'm
5  not mistaken.  I'd refer you to Kathy Lear on that.
6    Q.   And I have that in my notes to talk to
7  Kathy Lear about.  And did I understand you
8  correctly that the number of FTEs that you have is
9  restricted by the legislature?
10   A.   Yes.
11   Q.   So -- and you mention that you had
12 received an authorization to hire -- to add ten FTEs
13 recently?
14   A.   Two budget cycles ago in the same
15 budget cycle that had that 3.47 million, I believe
16 in that budget cycle we were authorized as part of
17 that 3.47 million for ten additional FTEs.  We
18 didn't have the money to -- to hire those positions,
19 but because it was passed by the legislature that
20 becomes part of your core funding for subsequent
21 years.
22   Q.   Okay.  So that has been continued, that
23 authorization has continued subsequently?
24   A.   Yes.
25   Q.   And you say you haven't filled all

Page 156

1  those?
2    A.   That is correct.
3    Q.   Have you requested since then
4  additional FTEs for your department through the
5  legislative process?
6    A.   We have submitted our -- our two
7  thousand -- fiscal year 2019 budget proposal, which
8  was approved by the Public Defender Commission at
9  our September Public Defender Commission meeting.
10 That has now been provided to the legislature, the
11 governor's office, and additionally I believe the
12 Supreme Court.
13   Q.   And does that provide for more FTEs
14 beyond the ten of the prior --
15   A.   Yes.
16   Q.   How many?
17   A.   I don't know without looking at it.
18   Q.   More than ten?
19   A.   Yes.
20   Q.   More than 20?
21   A.   Keep going.
22   Q.   More than 300?
23   A.   That would be the number that I would
24 give you.
25   Q.   Okay.  So -- so you're asking for what

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com     Phone: 1.800.280.3376     Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-8   Filed 02/09/18   Page 40 of 77

Page 157

1  you say you need, you expect that that will be
2  trimmed back?
3       A.  I asked for what RubinBrown tells me I
4  need based on the thresholds that they pulled
5  together using evidence-based data.
6       Q.  And that's the RubinBrown report that's
7  specific to Missouri that's attached to the
8  complaint in this case?
9       A.  Yes.
10      Q.  And my recollection is -- and I confess
11  I -- I haven't studied it meticulously.  That was
12  based in part on anecdotal information supplied by
13  public defenders as well as some limited initial
14  data from a new hour -- hour keeping system?
15      A.  I think that's partially correct.  I'd
16  refer you to Joel Elmer, but I can speak to this.
17  This predated me, but I --
18      Q.  And exactness is not what I'm looking
19  for.  Because what I'm asking is my recollection of
20  that report was that the the -- the there was a
21  timekeeper system that was recently put in place?
22      A.  Yes.
23      Q.  Do you know when that was?
24      A.  It was --
25      Q.  2015?

Page 158

1       A.  It preceded -- since the report came
2  out in '14, it preceded that.  So I would say
3  sometime between 2012 and 2014.
4       Q.  Okay.  And has there been any
5  subsequent data analysis based on the actual
6  experience and history recorded from your mature use
7  of your hour -- hourly keeping system?
8       A.  I'd refer you to Joel on that one.
9       Q.  Okay.  You testified that one of the
10  criteria for evaluating assistant public defenders
11  that's an objective criteria is client contact?
12      A.  Yes.
13      Q.  So do you have a -- a data collection
14  or recordkeeping system that -- that captures those
15  client contacts for the purposes of your evaluation?
16      A.  Yeah, I believe we do.  I think that's
17  captured in different ways.  For instance, a -- to
18  have a local office to measure that, you can choose
19  to look at a -- some sort of database or pull a
20  file.  So you can do it manually or electronically.
21  I think Joel would be able to give you more
22  information on that.
23      Q.  Okay.  And in that connection the
24  client contact criteria, is that -- is that
25  something that is promulgated on a district office

Page 159

1  basis or is that systemwide?
2       A.  To the extent -- I don't understand
3  your question.  There is not differing standards I
4  don't think.
5       Q.  Well, I think you mentioned something
6  about a visit is expected within first seven days of
7  appointment and then every thirty days thereafter.
8  Is that -- is that criteria one that is -- that is
9  promulgated systemwide?
10      A.  I believe that's a systemwide criteria.
11      Q.  Okay.
12      A.  I'd refer you to Joel Elmer.
13      Q.  Okay.  Mentioned that -- I don't
14  remember whether this is a broader historical
15  perspective or just the last year, you said one
16  percent of all cases go to trial.  So that means
17  99 percent plead or are otherwise disposed of?
18      A.  Can I take the first part of your
19  question?
20      Q.  Yes.
21      A.  Yes.  It's my understanding that for
22  the last two years, whether fiscal or calendar, that
23  the -- the data that we recorded and was
24  communicated to me, that in each of those years we
25  only went to trial on one percent of our cases.  And

Page 160

1  to the second part of your question, the 99 percent
2  would also include such things like dismissals.
3       Q.  Exactly.  Okay.  Nolle pros and things
4  like that?  Yeah.  You have to answer out loud.
5       A.  My first -- yes.
6       Q.  And when you use the term caseload in
7  your testimony, you're referring to that phrase as
8  it's used in the RubinBrown report?
9       A.  No.
10      Q.  Do you have a different understanding
11  of caseload than is in the RubinBrown report?
12      A.  Yeah.  There's -- there's two different
13  words that I use.  Mr. Mermelstein and Mr. Elmer may
14  differ.  I use caseload and workload.  Caseload
15  would be raw number of cases without taking into
16  account the complexity of the case or the severity
17  of that case, whether it's an A, a B, a felony, or
18  otherwise.
19          Workload would be a different number.
20  Workload would take those things into account
21  because as part of the RubinBrown process they
22  assigned higher thresholds or more hours required to
23  work on cases of greater severity.  For instance, an
24  A -- according to RubinBrown an A felony would
25  require more hours worked generally than a C felony.

40 (Pages 157 to 160)

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-8   Filed 02/09/18   Page 41 of 77

1      Q.  Okay.  And I'm -- and I'm just not
2  remembering.  My notes show that you said caseloads
3  are most critical concern.  Did I --
4      A.  Yeah.
5      Q.  Did I write that down correctly?
6      A.  I think -- I think you did because I
7  think that's what I said.  If I could nuance that by
8  saying I'm using caseload as an umbrella term there
9  to include both caseload and workload.  The number
10 and severity of -- and seriousness of the cases that
11 are assigned to a given lawyer.
12     Q.  And -- and I gather that the assignment
13 of cases within your office is -- is balanced based
14 on severity so that you may have some lawyers that
15 have -- with less severe cases, who would have more
16 or less severe cases, whereas other lawyers with
17 more severe cases would have fewer cases?
18     A.  That's going to vary by office.  There
19 are other things at play.  For instance, if it's a
20 rural area, and they have several attorneys but
21 those attorneys handle exclusively a county, they
22 may get both severe --
23     Q.  Right.
24     A.  -- and less severe cases.  So it -- it
25 would depend on the jurisdiction.

1      Q.  Okay.  We talked about the ombudsman
2  complaints, and then you mentioned that there's a
3  database for tracking complaints?
4      A.  Yes.  If the complaint comes in through
5  ordinary channels and not the phone is picked up by
6  some other secretary and rerouted in an errant way,
7  formal process is to record the -- or input the data
8  concerning that call into some sort of database.
9      Q.  Okay.  So -- and that's a computerized
10 system?
11     A.  Yes.  But that would only be calls that
12 come to our office.  That would not include calls by
13 a client complaining to the local office.
14     Q.  Or to their lawyer?
15     A.  Or to their lawyer.
16     Q.  Or to their lawyer.  Do you have a
17 mechanism for capturing the incidents of those kinds
18 of complaints?
19     A.  I don't believe we do.
20     Q.  Okay.  Even -- just practically
21 speaking, I can understand as a practicing attorney
22 you get a complaint from a client, you deal with it,
23 you're not going to doc -- necessarily document that
24 unless it's a letter or something like that, but
25 when the complaint comes above so to speak over the

1  attorney's head to the -- the management -- office
2  management, is there any way of capturing those
3  complaints?
4      A.  To the former, I think the
5  determination is that the utility of recording it
6  for the sake of recording it is outweighed by the
7  time that it takes to do so.  So the latter, if it
8  comes -- the call comes in to our ombudsman
9  program --
10     Q.  Which is centrally located?
11     A.  Which is centrally located.  It is part
12 of practice or procedure that we use to record it.
13     Q.  Okay.  What you're saying, though --
14 let me make sure I understand.  If I'm a lawyer and
15 I get a complaint from a client, I want to make some
16 documentation that satisfied that complaint, do you
17 know where that happens at the line level in your
18 offices?
19     A.  I don't -- I don't know that it does.
20     Q.  Okay.  One way or the other?
21     A.  I don't know that it does one way or
22 the other.
23     Q.  Okay.
24     A.  I would imagine it varies by lawyer.
25         MR. QUINLAN:  All right.  I went

1  through my notes and I wrote that $3.47 million
2  number down wrong every time.  I'm getting close
3  here.  If you don't mind, we take a break.  I'll
4  check with Steven and see if we have anything more
5  and wrap it up.
6         THE WITNESS:  That's fine with me.
7         VIDEOGRAPHER:  We're going off the
8  record at approximately 12:08 p.m.
9         (WHEREIN, a recess was taken.)
10        VIDEOGRAPHER:  We're back on the record
11 at approximately 12:16 p.m.
12        MR. QUINLAN:  Thank you for the break
13 to consider that.  Having done so, we have no
14 further questions.
15            EXAMINATION
16 QUESTIONS BY MS. SHIPMA:
17     Q.  I do have a few questions.  Okay.
18 Michael, I'll try not to prolong this any more than
19 necessary.  Do you have any concept of on average
20 the cost for the public defender system to defend a
21 case?
22     A.  I do have a concept --
23     Q.  And what is that?
24     A.  -- on average.  I believe, and I'd
25 refer you to Kathy Lear for a more precise answer,

41 (Pages 161 to 164)

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com      Phone: 1.800.280.3376      Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-8   Filed 02/09/18   Page 42 of 77

1 but in looking at trial division cases, when you
2 take the number of cases and do some division as it
3 relates to the total amount budgeted for those trial
4 division cases, it comes out to be somewhere between
5 350 and 365 to the best of my recollection per case,
6 and that includes some overhead.
7         I think -- I believe it includes
8 litigation expenses as well.  But I think there's
9 certain overhead that's not included, but that's my
10 understanding.  Somewhere between 350 and $365 per
11 case on average.
12         Q.   And does that include the APD salary or
13 the attorney's salary?
14         A.   I believe it does.  I believe it does,
15 but I'd refer you to Kathy Lear for a more precise
16 answer.
17         Q.   And this -- do you -- are you aware of
18 the amount of the fees that are paid -- the fees
19 that are paid to contract counsel for specific types
20 of cases, do you know what the dollar figure is for
21 a misdemeanor, for instance?
22         A.   I'd refer you to Joel Elmer.
23         Q.   Okay.  There were some questions about
24 the various different reports that have been done of
25 the public defender system.  Are you aware of any

1 findings in any of those reports that talk about
2 fundamental problems with the system other than not
3 enough resources?
4         A.   That are not tied to resources?
5         Q.   Right.
6         A.   I am not.
7         Q.   You referred to the fact that we --
8 that MSPD was given ten additional FTEs a couple of
9 budget cycles ago and that those haven't been
10 filled.  What's the reason for not having filled
11 those?
12         A.   Some of them have been filled.  Not all
13 of them.  The offices that I would provide one of
14 those additional FTEs to are unable at the present
15 day to fulfill their existing FTEs.  So I'm holding
16 back on assigning them as of yet.
17         Q.   So there are vacancies in FTEs, not
18 just those ten additional?
19         A.   Correct.
20         Q.   And what -- do you know, do you have a
21 concept of what -- the reason for those vacancies?
22         A.   That there's no person occupying the
23 position.
24         Q.   Do you know why the position is not
25 filled?

1         A.   Not as to each specific position.  I
2 will -- I can say that the comptroller and the HR
3 department has informed me that last year our
4 turnover rate was around 17 percent for the year,
5 and that that has increased and is projected to be
6 upwards of 25 percent for this year.
7         We do do departure interviews, exit
8 interviews with willing ex-employees, and the common
9 reasons for leaving are that in the opinion of the
10 departing attorney they're not able to do what they
11 need to do for their client and are either leaving
12 because of fear that their law license is in
13 jeopardy or because there is some guilt associated
14 with not being able to do what they need to do for
15 their client.  The other reasons that are most
16 typical are salary.
17         Q.   Not enough salary?
18         A.   Salaries are low.
19         Q.   Your duties as director of the public
20 defender system are set by statute, correct?
21         A.   Well, there are duties above and beyond
22 statute, but there are specific duties that I must
23 do, I believe.
24         Q.   Okay.  And are you -- I'm not asking
25 you to quote the statute, but are you familiar with

1 those duties that the statute sets out in general?
2         A.   In general, yes.
3         Q.   Can you tell me what those are?
4         A.   Yeah.  I have statutory obligation --
5 again, paraphrasing that -- specifics here to make
6 sure that people who are charged with a criminal
7 offense and who are otherwise unable to retain a
8 lawyer receive competent representation by a member
9 of MSPD or an MSPD attorney to ensure due process
10 and -- under the law.
11         (Court reporter interruption.)
12         A.   I'm sorry.  Due process under the law.
13         Q.   (By Ms. Shipma)  So it's not only the
14 judge's duty to worry about whether defendants are
15 getting -- indigent accused are getting competent
16 representation, that's something that you're tasked
17 with as well; is that correct?
18         A.   Yes, I would say that that's my primary
19 purpose.
20         MS. SHIPMA:  Thank you.  I don't have
21 any further questions.
22         MR. WILLIAMSON:  None for me.
23         MR. QUINLAN:  Just have a couple
24 questions about the -- the FTEs.
25         FURTHER EXAMINATION

1  QUESTIONS BY MR. QUINLAN:
2      Q.  Do you know how many of the ten -- do
3  you know how many of the ten authorized FTEs have
4  remained vacant, have not been utilized?
5      A.  I want to say -- I want to say four.
6      Q.  And each of those four cases, does that
7  relate to an office in which you intended those to
8  go to offices which still have vacancies that
9  haven't been filled?
10     A.  Yes.
11     Q.  So in other words, you have an office
12 that -- that has had one vacancy and you don't want
13 to -- you don't want to assign another FTE to that
14 office, there's just going to be a second vacancy in
15 that office?
16     A.  I don't see the utility in doing that,
17 yes.
18     Q.  Do you see utility in utilizing those
19 FTEs in venues or jurisdictions, offices, districts
20 where you can recruit attorneys and -- and filling
21 those?
22     A.  I do see utility, and there's a second
23 obstacle.  And the second obstacle is that next tier
24 of offices that are in most need of an additional
25 person are also those offices where they don't have

1  at least space to have another person in them.
2      So they would -- so the high-need
3  offices would either fall into one of the two
4  categories, either they're unable to recruit or
5  they're able to recruit, but there's no room in the
6  office.
7      Q.  And -- and in those offices where you
8  lack space, have you -- have you made inquiry of the
9  local county to obtain that space?
10     A.  Yeah, it's both the responsibility of
11 the local district defender as well as Kathy Lear,
12 who is the point of contact with the localities
13 regarding facilities.
14     Q.  So have they categorically refused to
15 give you additional space?
16     A.  In every instance I would not say that
17 they have categorically refused.  It's complicated
18 from -- from a number of perspectives.  One because
19 most cases -- excuse me -- it's an office that
20 handles a number of different counties, although the
21 office would be located in a single county.
22     Each one of the counties served would
23 contribute a pro rata dollar amount to the cost of
24 that office and would be involved in -- in the
25 decision.  A number of instances we're in space

1  that's owned by a county and so we're currently in
2  free space, and if we move to a different space it
3  would not be free space and it would be a cost for
4  the county.
5      Q.  Well, in those cases where you don't
6  even have -- not only do you -- why don't you just
7  move that FTE to one -- to another office in the
8  state some -- because according to Exhibit 4 all of
9  your offices have workloads or caseloads multiple
10 levels beyond a hundred percent?
11     A.  And I very well may do that.  The
12 beginning of the fiscal year, as you alluded to
13 earlier, was July 1.  We're not too far into the
14 fiscal year and I've started off by posting in those
15 offices that were both high need, had the room, and
16 was able to recruit.
17     I'm now at the point of having to make
18 a decision to utilize those positions
19 notwithstanding they may ultimately go to -- to an
20 office that's not among the top four in need, but as
21 you pointed out, all the offices have a need for
22 those positions.
23     Q.  And as far as the desert areas if you
24 will or the other -- other offices where you're
25 having difficulty recruiting, you mentioned that you

1  had a hundred percent flexibility in the use of your
2  funds with -- with approval by OA.  Are you aware of
3  any incidents in which you haven't received approval
4  from OA for flexibility -- flexibility move you'd
5  like to make?
6      A.  I'm -- I'm not.  That's a Kathy Lear
7  question, and those decisions typically come at the
8  end of the fiscal year as we spend down the lines.
9      Q.  Would it not be within your flexibility
10 to offer salary incentives or other financial
11 incentives for -- for the desert offices in order to
12 get people to work there, something akin to like
13 hazardous duty pay or something like that?  Do you
14 understand what I'm saying?
15     A.  We've had that conversation.  There's
16 some factors that go into that that create other
17 inequities that I'm fearful of how they would
18 resonate in the system and establishing precedent.
19     The things that swirl around in my
20 mind, Counselor, is it's my experience painting with
21 a broad brush that although it's difficult to
22 recruit to the rural areas, that when were
23 successful a lot of times in recruiting to rural
24 areas it's because someone has a tie, a family tie
25 to that area, and they stay for much longer.

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-8   Filed 02/09/18   Page 44 of 77

Page 173

1    The reality in more the urban areas,
2  for instance, St. Louis, there's a dearth of -- of
3  lawyers available who are interested in applying,
4  but because of the proximity to other more
5  high-paying legal jobs, they leave more frequently.
6    So that -- that concept that you
7  mention has interested us.  I don't know if it has
8  as I sit here a greater utility in the urban areas
9  or the rural areas given their different dynamics.
10    MR. QUINLAN:  Okay.  That's all I have.
11  Off the record.
12    VIDEOGRAPHER:  We're going off record
13  at approximately 12:28 p.m.
14    COURT REPORTER:  Signature of the
15  witness?
16    MS. SHIPMA:  Yes.
17    COURT REPORTER:  And then transcript
18  orders for all the depos today?  Full-size,
19  condensed, or E-tran?
20    MR. QUINLAN:  Get an e-mail.
21    MR. WILLIAMSON:  E-mail yes.
22    MS. SHIPMA:  E-mail.
23    (WHEREIN, the deposition was concluded
24  at 12:28 p.m.)
25

---

Page 174

1
2    CERTIFICATE OF REPORTER
3    I, William L. DeVries, a Certified
4  Court Reporter (MO), Certified Shorthand Reporter
5  (IL), Registered Diplomate Reporter, and a Certified
6  Realtime Reporter, do hereby certify that the
7  witness whose testimony appears in the foregoing
8  deposition was duly sworn by me pursuant to Section
9  492.010 RSMo; that the testimony of said witness was
10  taken by me to the best of my ability and thereafter
11  reduced to typewriting under my direction; that I am
12  neither counsel for, related to, nor employed by any
13  of the parties to the action in which this
14  deposition was taken, and further that I am not a
15  relative or employee of any attorney or counsel
16  employed by the parties thereto, nor financially or
17  otherwise interested in the outcome of the action.
18
19
20    _____
21    Certified Court Reporter
22    within and for the State of Missouri
23
24
25

---

Page 175

1    MIDWEST LITIGATION SERVICES
2  October 9, 2017
3  Ms. Jacqueline Shipma
   Missouri State Public Defender
4  Woodrail Center
   1000 West Nifong
5  Building 7, Suite 100
   Columbia, Missouri 65203
6
7  IN RE: SHONDEL CHURCH, et al. vs. STATE OF
          MISSOURI, et al.
8
   Dear Ms. Shipma,
9
   Please find enclosed your copies of the deposition of
10  MICHAEL R. BARRETT taken on October 4, 2017 in the
   above-referenced case. Also enclosed is the original
11  signature page and errata sheets.
12  Please have the witness read your copy of the
   transcript, indicate any changes and/or corrections
13  desired on the errata sheets, and sign the signature
14  page before a notary public.
15
16  Please return the errata sheets and notarized
17  signature page within 30 days to our office at 711 N
18  11th Street, St. Louis, MO 63101 for filing.
19
20  Sincerely,
21
22
23  William L. DeVries, RDR/CRR
24
25  35446

---

Page 176

1    ERRATA SHEET
   Witness Name: MICHAEL R. BARRETT
2  Case Name: SHONDEL CHURCH, et al. vs. STATE OF
          MISSOURI, et al.
3  Date Taken: OCTOBER 4, 2017
4
5  Page #_____  Line #_____
6  Should read: _____
7  Reason for change: _____
8
9  Page #_____  Line #_____
10  Should read: _____
11  Reason for change: _____
12
13  Page #_____  Line #_____
14  Should read: _____
15  Reason for change: _____
16
17  Page #_____  Line #_____
18  Should read: _____
19  Reason for change: _____
20
21  Page #_____  Line #_____
22  Should read: _____
23  Reason for change: _____
24
25  Witness Signature: _____

44 (Pages 173 to 176)

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com    Phone: 1.800.280.3376    Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-8   Filed 02/09/18   Page 45 of 77

Page 177

```
 1    STATE OF _____)
 2
 3    COUNTY OF _____)
 4
 5    I, MICHAEL R. BARRETT, do hereby certify:
 6        That I have read the foregoing deposition;
 7        That I have made such changes in form
 8    and/or substance to the within deposition as might
 9    be necessary to render the same true and correct;
10        That having made such changes thereon, I
11    hereby subscribe my name to the deposition.
12        I declare under penalty of perjury that the
13    foregoing is true and correct.
14        Executed this _____ day of _____,
15    20___, at _____.
16
17
18
19        _____
20           MICHAEL R. BARRETT
21
22        _____
23           NOTARY PUBLIC
24    My Commission Expires:
25
```

45 (Page 177)

**MIDWEST LITIGATION SERVICES**
**www.midwestlitigation.com**     **Phone: 1.800.280.3376**     **Fax: 314.644.1334**
Case 2:17-cv-04057-NKL   Document 153-8   Filed 02/09/18   Page 46 of 77

**A**

ability 8:11,25
  15:15 18:15
  33:17 40:25
  42:21 46:19
  128:5 131:25
  146:9 153:5
  174:10
able 21:19 22:10
  23:14 27:7
  28:20 35:11
  39:23 43:8
  44:16 52:6,9
  52:14 56:12
  58:25 64:22
  84:21 93:17
  96:14 102:19
  106:14 108:12
  109:24 110:2,7
  110:10 113:20
  124:13 129:12
  139:12 152:11
  154:21 158:21
  167:10,14
  170:5 171:16
above-referen...
  175:10
accept 63:1,3
  66:6,15 75:4,6
  96:7 98:12
  103:19
acceptable
  134:21,25
acceptance
  78:18
accepted 54:11
  56:13
accepting 87:12
  98:18
accepts 74:3
access 61:11,14
  64:16
account 64:9
  160:16,20
accountable
  78:15

accounting
  12:11 53:24
accuracy 34:7
accurate 70:11
  115:1,4,9
  151:11
accused 15:18
  71:25 168:15
accusing 122:16
achieve 108:1,15
  134:19
achieved 73:23
  139:21,22
  152:13
achieving
  107:23 119:13
  119:14
acknowledge
  110:17
acknowledgm...
  56:13
ACLU 3:14 5:17
  6:22
action 104:3,20
  174:13,17
actions 106:5
active 16:10
  30:20
actual 158:5
adage 113:10
add 36:8 155:12
added 36:8,15
  102:18
addition 35:9
  36:4 46:7
  50:12 52:5
  54:19 58:3
  59:18 96:6
  127:9 143:20
  150:11
additional 22:5
  22:22,25 23:24
  24:1 27:2,6
  35:6,15,20
  36:16 37:19
  38:9,21 47:19

48:2,6,7 49:17
  49:22,25 50:13
  51:11,13 52:7
  52:14 54:7
  56:20 61:8
  66:15 71:8
  74:3 81:7
  82:18 84:20
  86:18 87:9
  96:12,19,22,22
  96:24 155:17
  156:4 166:8,14
  166:18 169:24
  170:15
additionally
  36:10 37:11
  58:6 156:11
adequacy
  101:16
adequate 106:6
  115:20 117:24
Administer
  67:12,13
administered
  33:21 66:24
administering
  23:5
administers
  26:23
administration
  34:2 72:20
  128:6 142:6
adult 58:18
advocacy 18:3,6
  58:16 59:1
  150:14
advocate 56:19
affirm 7:18
affirmed 68:1
afford 60:21
  62:23
aftermath 75:5
  79:2
afternoon 3:13
age 6:11
agencies 34:15

34:15
agency 14:13,15
  14:17 140:10
agenda 16:12
  17:12
ago 91:9 145:16
  145:19 155:14
  166:9
agree 113:3,15
  113:16 125:16
  134:4
agreed 6:1 113:5
  129:16
Agreements
  124:21 125:1
ahead 16:18
  48:14
akin 172:12
al 1:4,7 3:4,7,20
  3:21 6:18,19
  175:7,7 176:2
  176:2
Albany 142:23
allegations
  114:21
allegedly 21:21
allocate 15:14
  26:10 33:10
allocation 26:14
allocations
  11:20
allow 9:15 66:14
allowed 52:8
  120:6 142:25
  153:20
allows 124:2
alluded 47:21
  85:20 134:12
  135:12 171:12
all-encompass...
  18:9
alternative
  71:11 88:23
  109:23 133:20
amend 33:1
Amendment

71:19 98:23
  132:1
American 4:4
  55:1
amount 11:21
  50:5 61:10
  64:14 120:23
  120:23,25
  121:15 165:3
  165:18 170:23
amounts 154:1
analysis 158:5
analyst 34:2
and/or 31:19
  175:12 177:8
anecdotal
  157:12
annual 88:12
answer 8:9,24
  9:7,9,10,16
  11:13,24 12:3
  32:10 51:21
  79:2 106:12
  110:12 113:17
  114:16 115:5
  118:16 124:12
  130:1 131:1,1
  131:3,13,17
  133:4 134:23
  139:12 146:16
  147:8 148:7
  149:14 152:14
  153:9 160:4
  164:25 165:16
answered 75:11
  95:20 130:11
  130:22,24
  131:10 149:10
answering 9:15
  146:15
answers 19:7
  91:23
Anthony 5:17
anticipated
  26:18 34:9
anyway 103:2

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-8   Filed 02/09/18   Page 47 of 77

apart 124:6
134:24
APD 43:5,5,6
44:6,12 165:12
APDs 45:5
123:1,6 151:15
152:16
Aplin 81:5 82:15
apologies 19:25
apologize 19:22
67:14
apparently
104:14 106:14
108:7 112:24
appeal 62:3
appeals 58:10
62:7
appear 62:13
66:24
appears 62:15
81:3,17 95:14
174:7
appellate 17:10
19:17 58:8,11
58:13
applicants 27:13
application 60:2
60:4,6,10,11
70:14
applications
85:11
apply 60:8
applying 173:3
appoint 62:25
83:14 87:3,14
89:3 105:10
106:18 119:15
129:10
appointed 14:9
59:23 84:17
87:5,18 108:24
119:24 136:7
137:5
appointing 68:3
89:2
appointment

63:3 73:21
75:14,22 88:22
89:8 104:22
106:18 159:7
appointments
11:12 37:7
85:19
appreciate
125:9
appropriate
8:17 37:6 56:4
121:13 144:16
144:21 148:24
appropriated
22:6 47:19
145:5 148:25
appropriately
118:8
appropriation
148:2,13,14
153:7
appropriations
56:3,25 147:16
approval 16:14
33:3 34:4 39:5
40:4,9,10
53:14 150:6,16
151:4,4 172:2
172:3
approve 25:18
25:18 39:18,20
59:10 150:12
approved 25:19
35:19 39:16,19
42:4 60:9
156:8
approving 18:1
27:9
approximately
6:16 14:16
65:16,19 84:19
100:24 101:2
164:8,11
173:13
arbiter 106:23
area 20:14,14,17

23:18,24 24:9
35:14 50:7
68:8 84:21
89:5 91:2
92:20,24 93:10
93:16 109:12
111:24 120:14
161:20 172:25
areas 20:10,16
21:2 23:7
93:18 109:6,8
110:13,18,21
110:23,24
111:4,8 171:23
172:22,24
173:1,8,9
arena 121:22
argument 77:7
77:16 78:5
103:12
arguments 87:7
arises 143:20
arrangement
60:5
arrest 21:9
arrive 57:7
aside 134:10
asked 24:20
57:1,7 58:6,15
58:19 69:12
106:9 116:18
116:19 130:10
130:22 131:15
133:2 157:3
asking 86:15
107:1 114:25
122:17 147:19
147:20 149:6
156:25 157:19
167:24
asks 62:18
assembly 15:13
142:10,22
asserting 75:7
assess 60:11
assessed 154:3

assessment
112:19
assets 61:17
assign 129:10
169:13
assigned 23:20
28:7 34:3
59:23 65:9,10
72:14 76:10
135:25 160:22
161:11
assigning 77:23
84:2 153:23
166:16
assignment
20:22 161:12
assignments
82:18
assist 142:7
assistance 61:22
61:24 110:9
117:25 135:10
137:7,16 138:2
138:18 139:9
139:23
assistant 12:19
39:4 40:12,16
41:10 42:1
43:5 44:3,21
46:17 74:17
104:6 158:10
associate 69:17
150:22
associated 32:2
167:13
Association 2:17
55:1 99:6
100:4
Association's
99:12
assume 35:22
73:8
assuming 38:20
53:10 73:8
77:23 115:3
assurance

122:21 123:15
assure 106:15
107:3
attached 2:20
157:7
attachment
10:18,22
attempt 38:17
67:21
attempting
131:20
attend 79:8
143:16
attest 115:9
attorney 5:3,8
27:6 35:15
38:12 43:1
46:9,24 50:3
61:16 62:24
74:7 77:9
86:11,15 89:10
101:7 106:25
119:25 120:23
122:21 123:20
127:20 129:11
129:18,19
135:17 137:1,5
142:9 162:21
167:10 168:9
174:15
attorneys 2:13
8:21 9:21
11:10 12:14
30:17,18 33:1
35:2 38:13
41:6 43:4 50:3
58:12 76:23
77:6 82:13
84:13,20 85:3
85:16 87:15,17
87:23 88:21
89:6,7,14
119:16 122:24
124:18,24
125:12 127:2
127:16,17

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com      Phone: 1.800.280.3376      Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-8   Filed 02/09/18   Page 48 of 77

129:15 131:20
133:18,23
138:18 161:20
161:21 169:20
**attorney's**
148:10 163:1
165:13
**attribute** 50:22
**auditor** 54:17,23
**authority** 24:23
48:1 146:8
147:1,14 150:8
152:5
**authorization**
155:12,23
**authorize** 38:25
**authorized**
155:16 169:3
**Ava** 94:15
**availability**
133:18
**available** 23:3
26:24 35:9,13
39:1 66:15
69:9 77:24
83:19 84:1,13
85:3 86:16
98:14 109:10
129:9,23 173:3
**average** 164:19
164:24 165:11
**aware** 9:20 10:1
29:6,11 30:21
33:6 43:25
45:10 63:11,25
66:18 74:13
75:7,19,20
76:5 80:15,16
82:19,25 85:17
86:19 87:3,21
87:25 89:1,8
89:16 98:17
104:21 107:21
107:22 112:14
117:3,11 118:6
118:17 129:1

134:18 135:7
135:11,14,19
136:11,11
137:3,4,10,11
137:23 138:9
139:3,21 140:2
140:3 165:17
165:25 172:2
**a.m** 1:20 6:13,16
65:16,19
100:24 101:2

---

### B

**B** 2:9 125:22
126:2 129:21
129:22 160:17
**back** 22:4 34:24
35:21 39:12
60:10 65:18
70:8,12 72:4
73:12 83:22
101:1 124:3,6
127:19 128:2,7
129:6 135:22
138:5,7 140:24
142:14,18
143:5,6,6
145:9 148:16
157:2 164:10
166:16
**background**
146:20
**backlash** 68:4
**bad** 19:21
**bail** 61:10
**balance** 128:4
**balanced** 161:13
**bar** 2:17 55:1
78:23 83:15
84:2 98:2 99:5
99:12 100:4
105:11 108:17
**Barrett** 1:14
2:12 3:10 6:10
6:17 7:25 8:3
9:20 12:6

13:11 65:20
76:22 101:5
175:10 176:1
177:5,20
**Bar's** 88:11
**based** 34:10
44:4 52:12
53:9,14 55:5
56:11 58:4
71:5 106:2
157:4,12 158:5
161:13
**bases** 123:5
**basically** 104:5
118:6 149:13
151:9
**basis** 16:1 60:17
64:12 121:25
159:1
**bathroom**
100:18
**BCBA** 99:20
**began** 13:21
47:18 68:3
**beginning** 82:12
90:3 119:4
130:6 171:12
**begun** 87:3
**behalf** 1:15 3:22
6:12
**believe** 10:4,17
21:4 22:8 23:9
24:15 25:22
26:16 30:5,24
31:6,11,13,24
31:25 32:6,9
33:3,12,18,25
34:16 36:9
38:4 42:10
44:6 45:22
47:4,12 48:3,5
48:5,6 50:7
51:25 52:19
53:22 54:21
59:2 60:24
61:1,4,5,23

68:6,8 69:15
69:16,18 71:10
73:18 75:3
80:11,19 83:6
86:10,12 89:10
96:13 107:2,6
107:13 108:11
115:14 121:10
121:12 123:6
125:20,21
128:10 136:18
136:22 138:25
140:7 145:16
146:22,22
147:17 150:15
150:20 152:24
152:25 153:8
153:13 154:1
155:3,15
156:11 158:16
159:10 162:19
164:24 165:7
165:14,14
167:23
**benefit** 72:5
149:7
**benefits** 36:5,12
36:14 152:19
152:21
**best** 8:10,24
15:15 34:6
40:17 42:12
46:19 53:10
76:18 92:6
124:9 135:13
165:5 174:10
**better** 38:8
91:22 121:21
**beyond** 23:25
24:13 51:12
53:7 58:20
78:14 91:6
95:22 156:14
167:21 171:10
**bill** 6:24 55:13
56:6 68:16

70:8 117:19,22
**billing** 154:10
**bills** 55:15,15
**bit** 19:5 21:5
25:7 53:13
60:18 64:1
72:7,8 73:1
88:25 114:17
127:20
**Blau** 28:9,10
29:20 30:1
**bleed** 118:14
**Bluff** 86:10
**board** 150:25
**body** 50:10
**bolts** 92:4
**bond** 61:10,13
61:13 63:23
64:2,6,10,14
**bonds** 61:9
**books** 12:10
**Boone** 2:17
67:25 68:7,8
81:6 83:8,25
84:3,14 85:1
87:16 89:9
95:6 98:3 99:5
99:11 100:3,7
103:17,21
104:2,3,15
105:7,8,15
106:14 112:25
113:13
**borne** 106:24
**borrow** 151:19
151:21
**bottom** 92:24
**bottom-up** 37:8
**branch** 25:2
149:21 152:12
**break** 8:18
41:20 100:19
164:3,12
**breaks** 8:17
**brief** 15:1 17:25
140:15,17

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-8   Filed 02/09/18   Page 49 of 77

142:3
**bring** 31:12 40:4
96:4 102:19
103:6 115:15
153:18
**bringing** 51:7
**broad** 4:5
172:21
**broadband** 50:7
50:9
**broader** 146:5
149:9 159:14
**broadly** 113:22
**brought** 45:11
103:3
**brush** 172:21
**budget** 11:19
12:10 15:11
16:16 18:1
20:23 25:14,19
25:20,24,25
26:17,21,23
27:15 33:13,16
33:20 34:2
36:5 47:10,14
49:2,4,6,11,13
49:16 50:15
53:11,20 54:8
54:20 55:10,13
55:15,15,17,19
55:22,23 56:2
56:6,17,23
57:3,23 58:6
58:20 59:8,9
63:5 70:22
145:10,16
148:19,21
149:3 150:12
152:22 154:7
155:4,14,15,16
156:7 166:9
**budgetary** 50:23
152:18
**budgeted** 165:3
**budgeting** 25:9
25:14

**budgets** 12:13
**Building** 4:20
175:5
**business** 89:10
144:12
**Butler** 86:12
**B-L-A-U** 28:10

**C**

**C** 4:1 125:23
126:3 160:25
**calculated** 54:16
**calculation** 54:3
**calculus** 54:9
58:5 60:22
**calendar** 48:3
143:19 145:18
159:22
**calendared** 79:8
**California** 4:10
**call** 29:14,16,19
29:23 46:15,15
69:2,13 70:3
86:13 162:8
163:8
**called** 20:20
22:9 35:11
53:23 110:19
**calling** 44:11
46:24 79:6
**calls** 46:7 86:8
88:17 143:21
162:11,12
**cam** 50:10
**cap** 35:10
**capabilities**
130:4
**capacity** 91:6
93:10,12 95:16
96:15 141:15
142:25
**capital** 19:17
20:1,3 121:14
**captioned** 65:22
**captured** 158:17
**captures** 158:14

**capturing**
162:17 163:2
**carried** 105:18
105:19
**carry** 30:3,7,8
131:21 144:12
**case** 1:6 3:6 6:19
8:3,9 9:21
11:11 22:1
24:15 31:2
35:17 37:6
40:3,4,6,18
41:3 48:5 54:1
54:5 65:5,12
65:21 66:1,2,2
66:8 70:13
72:5 73:2,5,8
73:14,17,21,24
74:3,18 75:4
76:16 77:7,16
85:18 87:4
97:21 98:13
103:13 106:4
112:13 114:20
116:11 118:24
120:8 125:23
127:2 129:2,5
129:6,6,8
135:12,17,21
135:21,23
136:4,23 137:3
137:5 157:8
160:16,17
164:21 165:5
165:11 175:10
176:2
**caseload** 2:15
16:14 26:24
30:3,8,8,19,20
39:2 44:22
46:3 50:24
51:4 52:19
54:23,25 55:3
55:4,5 58:18
62:21 63:20
75:3 76:7 80:5

89:18 90:3
91:2 94:24
95:12,15 97:22
101:24 102:20
102:25 105:20
106:2 119:8
160:6,11,14,14
161:8,9
**caseloads** 34:21
43:23 45:4,8
51:17 82:15
83:23 92:16
101:12,14,23
102:23 103:7
104:9 161:2
171:9
**cases** 15:16
16:15,23 17:10
19:16,18,21
20:2,3,22 21:6
22:3,8,18,24
23:1,3,18 24:2
26:17 27:1
30:9,15 31:10
34:11,11,12,13
34:22 37:19
38:2,9,15,19
38:24 39:24
42:22,25 43:15
43:17 45:6
50:4 51:8,9
52:1,8,9 54:1,5
54:22 58:14,23
59:16 66:6,16
66:17 67:20
68:13,22 71:5
71:11 72:13,13
72:18 75:6
76:1,3,8 77:19
77:24 78:7,11
78:18 79:13
81:8 82:16,16
82:17 83:14,16
84:2,14 86:11
86:17 87:24
89:14 91:18,20

95:22 96:7,10
96:17,18 97:13
97:14,15 98:12
98:18 102:19
103:2,3,6,6,19
104:9 108:18
108:19 110:15
119:12,13,14
119:14,23
120:2,8 121:14
125:17 127:12
132:10,11,14
132:16,21,25
133:6,10,17,24
133:25 134:5,8
134:16 137:22
139:15 159:16
159:25 160:15
160:23 161:10
161:13,15,16
161:17,17,24
165:1,2,4,20
169:6 170:19
171:5
**cash** 36:7 61:16
**Cat** 68:8
**cataloged**
118:23
**categorically**
110:11 170:14
170:17
**categories** 170:4
**categorize**
110:22
**Catherine** 67:16
**caucus** 142:11
**cause** 3:18 18:16
**caused** 102:23
**CCR** 5:22
**cell** 88:8,15
**Center** 4:19
175:4
**central** 1:2 3:2
3:20 6:21 19:9
19:14 29:14
31:5 33:11

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-8    Filed 02/09/18    Page 50 of 77

58:12 77:10
**centrally** 163:10
  163:11
**certain** 3:18
  16:22 41:2
  45:24 46:23
  72:12 109:8
  110:13 165:9
**certainly** 92:14
  93:2
**certainty** 31:1
**CERTIFICA...**
  174:1
**Certified** 3:16
  3:17 6:5,5
  174:3,4,5,21
**certify** 174:6
  177:5
**chain** 27:24
**chair** 16:13
  17:25 54:20
  100:5
**challenge** 43:13
**challenged**
  54:24 57:8
**chance** 10:5
  79:20
**change** 176:7,11
  176:15,19,23
**changes** 25:19
  33:20 50:22
  102:18 175:12
  177:7,10
**changing** 102:12
**channel** 70:9
**channels** 162:5
**characterize**
  93:19 111:13
  120:17
**characterized**
  114:1 126:23
**charge** 15:20
  30:14 46:14
  118:21 125:22
  126:1
**charged** 102:13

168:6
**charges** 60:21
  86:18
**charging** 153:24
**Charles** 94:4,5
**chart** 20:6 27:23
  150:17
**charts** 51:24
  92:13
**check** 164:4
**chief** 15:1 32:19
  78:13 101:6
  106:13,14
  140:16
**Chillicothe** 24:6
  65:7
**choose** 158:18
**choosing** 73:21
**Church** 1:4 3:4
  3:20 6:18
  175:7 176:2
**circuit** 32:22,23
  32:24 81:6
  129:17 134:14
  134:17 150:22
  150:22
**circumstance**
  30:5
**circumstances**
  8:23 11:9
  75:12
**cite** 45:15
**cited** 80:4
**cities** 155:3
**Citing** 80:4
**city** 5:9 20:13,25
  30:24 31:24
  41:14,15 68:5
  85:25 86:3,4
**Civil** 4:4 9:24
**claims** 139:9
**clean** 9:16
  117:19,21
**clear** 8:25 9:1,12
  9:13 23:16
  32:3 131:6

**clearly** 9:8
**clerical** 60:10
**client** 40:18 42:8
  42:9,10,19,24
  46:21,22 74:1
  74:23 86:17
  122:15 123:23
  124:8 126:18
  128:21 129:13
  135:18,19
  153:25 158:11
  158:15,24
  162:13,22
  163:15 167:11
  167:15
**clients** 41:3 74:6
  74:8 85:7 98:9
  102:12 127:8
  129:16 139:4
  142:24,24
  153:21 154:4
**close** 55:22
  164:2
**closed** 16:20
  55:25
**closer** 51:9
**code** 22:9,13,16
  22:23 23:8,15
  23:17 47:21
  50:1 75:1
  113:25 122:4
  122:14 123:8
  125:4 126:23
  127:16 134:8
  134:24 135:3,8
  136:1 137:6
  149:7
**codes** 142:11,22
**codify** 66:19,21
**Cole** 21:16
**collect** 153:21
**collecting**
  129:24 154:12
**collection**
  158:13
**collections**

154:10
**Columbia** 4:21
  21:10,11 81:4
  95:7,14 175:6
**column** 91:17,17
**combat** 142:5
**combatting**
  142:7
**combination**
  44:25
**come** 15:16
  34:23 44:24
  47:5 70:12,13
  85:8 92:15
  93:3 109:11
  119:23 122:7
  138:21 154:6
  162:12 172:7
**comes** 33:12
  42:4 92:5
  154:15,15
  162:4,25 163:8
  163:8 165:4
**coming** 34:8
  67:23 110:15
  145:25
**command** 27:24
**comments** 57:12
  70:1 77:17
**commission**
  15:25 16:4,5
  16:11,13 17:12
  17:15,19,23
  18:12,25 19:3
  25:6,15,17
  53:14 59:7
  63:10,10 65:22
  143:15 144:11
  149:16,22,25
  150:6,8,25
  156:8,9 177:24
**commissioner**
  141:11
**commission's**
  24:21
**committee** 55:18

55:23 56:3,4,5
  56:17,23 100:6
  100:6,7 142:11
  142:22
**common** 167:8
**commonplace**
  33:16 63:2
**communicate**
  51:3 85:12
**communicated**
  69:9 80:10,17
  81:25 82:14
  85:23 86:1,5
  159:24
**communicating**
  39:17 70:6
**communication**
  39:6 52:12
  68:12 81:3,9
  81:12 82:3
  83:20
**communicatio...**
  70:9 79:11
**comp** 141:21
**compared** 121:5
**compensated**
  87:18,23
**competence**
  37:13,16
**competent** 58:22
  71:18 84:22
  89:4 96:5
  98:24 106:7,16
  107:4,7,10,17
  107:24 108:15
  109:3,19
  131:25 135:24
  168:8,15
**competently**
  74:5 108:18
  127:11
**complaining**
  162:13
**complaint** 44:21
  45:20 46:18
  78:23 114:19

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com    Phone: 1.800.280.3376    Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-8   Filed 02/09/18   Page 51 of 77

115:1,17
118:24 157:8
162:4,22,25
163:15,16
**complaints**
44:23,24 46:4
47:5 162:2,3
162:18 163:3
**completed** 53:22
**complex** 29:16
60:23
**complexity**
82:16 126:14
160:16
**complicated**
60:18 170:17
**component**
44:13,14 60:25
**components**
61:9
**comport** 96:9
**comptroller**
15:11 25:13
26:16 167:2
**compulsory**
151:22
**computer** 50:11
**computerized**
162:9
**con** 111:11
120:21
**concede** 45:11
124:1
**Conceivably**
102:14
**concept** 164:19
164:22 166:21
173:6
**conceptually**
107:16 108:14
109:1 110:3,7
110:8 112:10
112:24 113:21
**concern** 37:18
37:20 45:12
68:23 78:3,6

78:10 101:11
101:15 105:25
135:4 161:3
**concerning**
90:13 162:8
**concerns** 28:16
29:21 45:25
54:20,24 57:14
57:16,19
122:20
**concluded**
173:23
**conclusion**
117:17 118:2,3
118:19
**conclusions**
119:3
**condensed**
173:19
**condition** 78:8
78:12,17
134:15
**conduct** 18:17
30:13 37:11,13
37:25 41:2
42:11,18 74:13
75:16 78:21
79:14 96:2
98:8 104:12
**conference** 69:2
85:21 88:11
**confess** 157:10
**confidence**
110:16
**confirm** 152:15
**conflict** 21:6,8
22:3,8,18,24
23:1,18 24:2
59:16 73:22,22
74:2,11,18,22
75:1,8,22 76:1
76:3,8,16
97:15 114:5,6
120:2,8 123:22
124:8 129:7
**conflicted** 71:13

98:24 106:24
**conflicts** 23:21
24:12 64:21
73:25 74:21
76:20
**confused** 48:10
66:3
**connection**
158:23
**consensus** 52:24
120:22
**consider** 42:6,25
63:16 92:14
93:18 111:6,8
111:16 164:13
**considered**
61:19
**consistent** 83:4
**constituted**
114:22 117:9
**constitutional**
101:16 135:5
146:25 147:14
**constitutionally**
58:21 152:7
**contact** 40:14
42:9,12,19
92:16 158:11
158:24 170:12
**contacts** 158:15
**contemplating**
89:2
**contention**
146:24
**context** 51:14
101:22
**continue** 67:19
72:12
**continued**
136:10 155:22
155:23
**contract** 21:18
22:2 23:1
32:16 72:18
74:25 114:3
120:21 121:12

124:23 125:14
125:19,20
126:3,18 127:2
129:11,18
165:19
**contracted**
22:18 124:24
129:5 135:17
**contracting**
22:24 122:14
**contracts** 124:18
124:22 125:1
**contrast** 44:13
**contribute**
170:23
**contributed**
102:25
**control** 16:25
25:4 36:3,10
36:18 149:15
151:10
**controlled** 17:1
149:22
**conversation**
68:11,12,17
69:25 85:20
172:15
**conversations**
26:7,8 57:6,11
57:18 69:13
**convicted** 137:9
**conviction** 77:10
137:19,25
**copies** 2:20
175:9
**copy** 10:2,12,13
10:15 175:12
**core** 50:15
155:20
**correct** 9:25
14:3 17:16,17
21:4 27:22
36:23 48:21
49:13 56:21
57:24 66:7
76:11 99:24

102:21 106:11
119:17 120:9
145:12 147:23
149:18 156:2
157:15 166:19
167:20 168:17
177:9,13
**correction**
145:15
**corrections**
175:12
**correctly** 122:23
148:13 155:8
161:5
**correspondence**
47:2 81:23
103:25 104:24
105:6
**corresponding**
53:6
**cost** 32:1,2
164:20 170:23
171:3
**counsel** 6:2,2 7:2
14:10,23 22:19
29:17 64:11
71:24 72:15
75:22 78:14
88:22 89:3
102:6 106:18
110:10 117:10
118:13 120:7
121:21 123:8
124:8 128:17
135:10 136:17
137:7 138:2,13
138:18 139:10
139:23 140:6,9
140:13 165:19
174:12,15
**counselor** 142:5
152:10 172:20
**counsel's** 146:3
**counted** 126:22
**counties** 20:18
20:24 22:12,14

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com     **Phone: 1.800.280.3376**     **Fax: 314.644.1334**
Case 2:17-cv-04057-NKL   Document 153-8   Filed 02/09/18   Page 52 of 77

22:16,17 23:19
23:20,24 24:1
24:5,7,9,11,13
26:20 30:16
32:3 65:8
75:23 76:5,9
86:12,22,25
87:21 88:2
91:1,4 93:16
93:18,19
100:13 102:17
103:3 109:16
134:14,17
154:25 155:1
170:20,22
**country** 121:11
**county** 2:17
20:12,15 21:16
21:23 23:23
31:19 50:1
53:4 65:9,11
67:25 68:7,8
69:19 81:6
83:8,25 84:3
84:14 85:1
86:3,20 87:16
88:4 89:9 91:1
91:7,8 92:20
95:6 98:3 99:5
99:12 100:3
102:17 103:17
103:21 104:2,3
104:15 105:7,9
105:15 106:14
112:25 113:13
129:20,21,22
142:23 161:21
170:9,21 171:1
171:4 177:3
**couple** 8:6 27:19
102:16 135:2
166:8 168:23
**course** 16:20
28:4 45:7 53:3
59:21 68:22
69:24 79:23

119:4
**court** 1:1 2:20
3:1,16,19 5:21
6:5,20 7:18
8:13 9:9,17
19:19 31:25
32:25 34:16
37:7,15 49:5
54:22,22 58:10
60:8 62:13
65:21 68:2
69:5,10 72:19
76:17 77:8,17
82:10,22 85:12
88:4 91:19
103:13 105:9
108:24 109:8
117:6 125:25
136:2 144:17
146:23 152:5,8
156:12 168:11
173:14,17
174:4,21
**courtesy** 17:24
151:3
**courts** 106:16
107:3
**court's** 107:7,9
107:13 108:1
137:1
**cover** 26:19,20
32:1 36:5
129:21
**coverage** 129:12
129:21
**covered** 24:9
131:18
**covers** 65:8 86:9
**coy** 107:19
118:14
**cracks** 63:21
**crafted** 77:5
**Crane** 2:14
80:21 81:15,18
82:1 83:11,12
83:14 84:1

85:9 87:2 89:1
104:15,19
106:13,22
108:7,9
**Crane's** 105:17
106:5
**create** 172:16
**created** 35:23
75:19 90:5
113:12
**creates** 121:3
151:23
**creating** 44:8
**crime** 21:21
142:5,7
**crimes** 102:13
141:17,18
**criminal** 89:5,7
89:11 100:6,7
105:12 108:17
109:2,17
120:16 123:25
133:18 141:12
142:17,24
168:6
**crisis** 70:23
132:5 133:12
**criteria** 42:15
44:1,5 73:2,3
158:10,11,24
159:8,10
**critical** 161:3
**criticism** 54:14
54:17
**cultural** 39:11
**culture** 32:23
43:14
**Cumulative**
2:15 89:17
90:3
**current** 15:6
16:16 47:9
54:3,6 71:23
73:2 83:7
131:23 146:11
148:14,21

**currently** 16:9
23:4 92:24
95:18 114:22
117:9 120:1
131:19 171:1
**custody** 84:5,5
**cycle** 22:25
47:19 55:7
148:21 155:15
155:16
**cycles** 145:16
155:14 166:9

———————
**D**

**D** 2:1 4:4 125:23
126:3
**data** 129:24
157:5,14 158:5
158:13 159:23
162:7
**database** 47:4
158:19 162:3,8
**data-driven**
53:23 55:3,5
**date** 6:15 16:21
39:12 79:19
81:11,16,19
115:8,10
140:22 176:3
**dates** 79:25
**David** 81:5
**day** 3:13 51:5
71:12 82:2
83:1 166:15
177:14
**days** 42:11,13
79:24 159:6,7
175:17
**day-to-day**
17:19,22
**deal** 49:7 85:7
162:22
**dealing** 16:23
**Dear** 175:8
**dearth** 173:2
**death** 34:12

**decide** 37:23
93:4 123:19,21
**decided** 63:18
64:13
**deciding** 29:5
**decision** 51:2
60:14,17 62:7
63:6 66:10,20
68:22 69:22
83:3 85:15
135:20 136:9
136:12 150:4,5
151:2 170:25
171:18
**decisions** 16:2
26:14 55:16
172:7
**declare** 177:12
**declining** 96:7
**decrease** 132:20
**deemed** 136:1
**defend** 164:20
**defendant** 21:13
21:19 46:8
47:2 59:24
60:7,8 62:6
74:4,22 106:1
107:4,10
108:23 135:7
136:8,25
137:16
**defendants** 1:8
3:8,22 4:17 6:3
7:15 21:10
46:5,15 84:22
85:2 98:20
101:17 104:17
105:12,15,21
106:1,17,21
109:2,19
110:10 117:5
117:25 118:10
119:17,24
120:8 121:19
130:20 132:5
139:15,16

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-8   Filed 02/09/18   Page 53 of 77

142:17 168:14
**defender** 4:17
4:19 7:15 9:22
13:14,17,19
15:12,25 16:4
16:11 17:15
19:12 20:21,21
21:14,15,22
25:5,15,17
26:22 30:7,24
33:14,18 37:20
37:23 38:1,14
39:25 41:7,17
41:18,22 43:5
44:21,24 46:11
46:11,25 52:5
59:7 60:9 62:1
63:10 64:3,19
65:5,22 67:21
69:3 73:4,21
74:10,17 75:13
76:16 79:6,21
81:4 82:4 85:4
86:1,9,14 87:8
90:2 95:24
98:15,16 105:8
107:20 114:13
114:22 115:19
117:8,12,20
118:7 119:1
121:18 137:14
139:17,24
140:5 142:19
146:1 148:2
149:20 150:15
156:8,9 164:20
165:25 167:20
170:11 175:3
**defenders** 12:17
12:20 27:20,21
28:12 30:2,20
32:20 34:24
36:19 37:4
39:4 40:12,16
41:10,25 42:1
43:24 44:3

45:21 75:22
76:6 78:4 79:7
79:8 87:12
104:6 120:15
121:2 126:25
127:4 149:15
154:24 157:13
158:10
**defender's** 13:25
14:1 15:8
17:14 33:23
59:22 60:2,14
62:13 69:7
70:22 73:1
83:9 99:21
119:7 142:16
142:23
**defense** 89:5,7
89:11 100:6
108:18 109:17
120:14,16
127:1 133:12
142:17,24
**deferring**
124:17
**deficiencies**
117:8 118:17
131:24 135:3
**Define** 128:23
**definitively**
109:24
**degree** 12:12
**demonstrate**
74:11
**departing**
167:10
**department**
25:1 29:18
34:3 45:25
55:20 56:1
67:1 90:7
127:24 141:4,4
149:2,20,23,23
149:24 150:23
151:10 152:6,9
153:5 156:4

167:3
**departmental**
56:9,10
**departments**
152:25
**departure** 167:7
**depend** 64:24
83:18 129:14
161:25
**dependents**
61:20
**depending** 29:1
65:11
**depos** 173:18
**deposed** 8:4
**deposes** 6:12
**deposition** 1:14
1:20 2:11 3:10
6:3,13,17,22
8:15 9:23 10:3
10:6,9,16 12:7
12:17,21
116:13 173:23
174:8,14 175:9
177:6,8,11
**deprives** 74:5
**deputies** 12:25
13:2 17:5
**deputy** 13:5,6
14:23 15:1
17:9 22:10
23:13 28:5
41:17,21 46:11
46:13 79:7
81:5 86:14
98:16 140:13
140:16 141:11
142:3 151:6
**describe** 13:23
15:6 77:4 81:2
91:10 94:2,5,8
94:11,14,22
151:5
**description** 11:1
11:16
**desert** 111:12,25

171:23 172:11
**deserts** 109:7
110:19 111:1,7
111:10,20
112:4,8 129:17
134:10
**design** 28:14,19
62:16
**designated** 9:23
**desired** 175:13
**destination**
154:5
**detail** 67:4
**details** 44:17
68:19 72:23
93:7 124:4
131:11
**detention** 84:8
**determination**
62:2,5 63:23
64:1,13,24
66:16 71:22
78:19 135:22
137:25 138:1
138:23 163:5
**determinations**
138:20
**determine** 26:10
35:19 40:17
41:25 60:20
65:4 89:13
150:25
**determined** 63:7
64:17 72:21
121:12 128:22
**determines**
74:17
**determining**
59:8 64:20
**development**
57:3 141:5,7
**DeVries** 3:16
5:22 6:4,24
174:3 175:23
**diagnosis**
118:24

**differ** 160:14
**differed** 56:16
**difference** 149:4
**differences**
56:18
**different** 43:3
62:10 115:5
150:24 153:12
158:17 160:10
160:12,19
165:24 170:20
171:2 173:9
**differing** 159:3
**difficult** 172:21
**difficulty** 171:25
**diligence** 37:14
37:16
**diligent** 38:23
**Diplomate** 3:17
174:5
**dire** 71:7
**direct** 28:13
40:25 70:5
**directed** 30:1
**directing** 40:21
41:5
**direction** 46:22
69:8 86:15,18
174:11
**directive** 39:18
75:18
**directives** 69:21
79:12
**directly** 27:17
28:6,17 29:20
33:19 44:25
46:5 57:20
**director** 13:5,6
13:16,19 14:5
14:9 15:7 17:6
22:10 23:14
26:10 28:1,2,8
30:5 40:24
46:13 88:21
99:20 119:6
135:3 138:14

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-8   Filed 02/09/18   Page 54 of 77

150:12 167:19
**directors** 17:5
　151:6,7
**disability** 61:25
**disciplinary**
　77:7,13 78:14
**discovery** 50:9
　122:17 135:19
**discretion** 32:19
　33:9 35:1
　36:20 37:5
　40:16 126:16
**discrimination**
　46:1
**discuss** 83:22
　85:6 143:21
**discussed** 54:23
　84:25 85:9
　87:1 88:13
　102:11
**discussing** 92:16
　143:22
**discussion** 86:6
　153:2
**discussions**
　72:24
**dismissals** 160:2
**dispose** 39:24
**disposed** 135:23
　159:17
**disrupting**
　50:10
**distinction**
　121:4 127:14
**distributed** 77:6
**district** 1:1,1 3:1
　3:1,19,19 6:20
　6:20 12:16
　19:8 20:20,21
　21:3 23:17
　24:4,5,14
　26:11,22 27:14
　27:20,21 28:12
　30:2,7,20,24
　31:4 32:20
　33:18 34:24

36:19 37:4,20
37:22 38:1,14
39:9 41:6,12
41:17,18,22,25
44:24 46:10,11
46:25 52:5
58:9,10,11
65:4 69:3,7
73:16 74:16
76:2,6 79:7,7
81:4 82:4
84:23 85:17,25
86:9,14 87:12
95:21 98:15,16
129:11 153:3
154:25 158:25
170:11
**districts** 22:3
　23:7,20 169:19
**divide** 41:19
**division** 1:2 3:2
　3:20 6:21 17:5
　17:6,8 19:15
　19:17,18 20:1
　20:8,8,9 27:25
　28:1,2,8 30:6
　43:2,10 96:14
　96:22 97:3
　151:6 165:1,2
　165:4
**divisions** 19:13
　19:14 20:6,7
**doc** 162:23
**dockets** 105:10
**document** 10:11
　77:1,2 80:24
　80:25 81:15
　89:21,22,23
　90:1,5,7,15,17
　93:8 95:6 99:9
　99:10,16
　114:20 144:7
　162:23
**documentation**
　74:9 92:13
　122:17 144:15

144:19 163:16
**documents** 13:7
　13:9 90:14
**doing** 16:16
　18:22 49:24
　50:8 71:17
　114:17 117:23
　143:1 169:16
**dollar** 120:17
　165:20 170:23
**dollars** 31:12
　47:15 48:7
**door** 15:17
　34:23 154:15
　154:15
**dos** 29:2
**download** 50:9
**draft** 25:14,19
　25:20
**drawback**
　128:16,19
**drawbacks** 64:4
**drawn** 92:5
**drive** 21:23
　58:13 151:2
**driven** 44:7,12
　44:12 53:1
**driver** 26:23
　45:17 54:8
**driving** 51:17
　52:3,15
**drop** 92:23
　120:19
**drug** 31:25
**due** 81:23 98:25
　104:23 105:6
　168:9,12
**duly** 174:8
**duties** 167:19,21
　167:22 168:1
**duty** 74:22
　107:14 168:14
　172:13
**dynamics** 173:9

———————
**E**
———————

**E** 2:1,9 4:1,1
　126:3
**earlier** 32:25
　33:2 41:12
　47:22 50:2
　53:8,14 65:8
　75:25 83:1
　85:20 104:20
　115:11 116:7
　133:8 134:12
　171:13
**early** 115:17
　118:12
**earned** 126:19
**easier** 9:17
**economic** 141:5
　141:7
**educated** 90:12
**effect** 88:14
**effective** 98:23
　105:9 110:9
**efficient** 59:19
**effort** 23:5 29:22
　38:17
**efforts** 134:15
　142:5 144:25
**eight** 3:12
**eighties** 115:12
　118:12 119:5
**either** 29:16
　35:1 46:16
　55:22 61:15
　74:24 75:21
　82:14 85:17
　87:2,21 111:9
　113:7 115:6
　129:8 131:4
　137:12 167:11
　170:3,4
**elaborate** 129:4
**elected** 69:17
**electricity** 32:9
**electronically**
　158:20
**Eleventh** 5:14
　5:23

**eligibility** 63:17
**eligible** 36:14
　109:14
**Ellen** 28:9
**Elmer** 13:6
　22:10 23:16
　44:16,20 59:4
　59:5 64:22
　67:3 74:25
　76:18,20 115:7
　124:3,9,14,17
　125:8 126:7,16
　126:20 128:1,3
　129:1 130:3
　134:15,19
　136:14 154:18
　157:16 159:12
　160:13 165:22
**embellishment**
　116:7
**Emergency**
　14:12 140:10
**empirical** 53:23
**empirically** 55:5
**employ** 109:7
　122:12 128:4
　131:19
**employed** 13:12
　61:20 174:12
　174:16
**employee** 38:22
　174:15
**employees** 9:22
　15:23 29:21
　36:11 70:4
**employer** 78:6
**employment**
　77:25 78:8,12
　78:18
**enacting** 66:23
**enclosed** 175:9
　175:10
**encompass** 24:5
　24:13
**encourage**
　120:24

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com　　　Phone: 1.800.280.3376　　　Fax: 314.644.1334
Case 2:17-cv-04057-NKL　　Document 153-8　　Filed 02/09/18　　Page 55 of 77

encouraged
  44:23 95:21
encourages
  121:15
endeavor 123:2
  123:4
endeavored
  63:15 72:1
endeavoring
  49:25
ends 107:23
enforcement
  52:23
engage 38:5
engaged 39:21
ensure 107:10
  168:9
entailed 72:10
enter 23:12
entering 116:8
entirely 83:18
entities 90:19
entitled 98:25
entity 25:5
entrusted
  121:20
enumerated
  18:11 150:10
equivalents
  35:11
errant 162:6
errata 175:11,13
  175:16 176:1
essentially 23:1
  36:8 66:6,14
  77:22 85:11
  124:21
established
  53:25 91:14
  114:23
establishing
  151:5 172:18
estimation
  131:24
et 1:4,7 3:4,7,20
  3:21 6:18,19

175:7,7 176:2
  176:2
ethical 71:6,14
  71:15 96:5
ethically 38:18
evaluate 42:17
evaluated 42:1
evaluating 18:13
  158:10
evaluation 18:21
  19:1 43:23
  158:15
evaluations
  18:18
evasion 141:20
event 23:21
  33:19 86:6
events 69:22
evidence-based
  157:5
exactly 90:23
  147:19 160:3
exactness
  157:18
EXAMINATI...
  7:23 101:3
  164:15 168:25
examined 3:11
  6:11
example 21:8,10
  32:24 44:22
  58:7 103:16
exception 61:25
excess 96:19
exclusive 45:16
exclusively
  127:1 161:21
excuse 74:10
  170:19
Executed 177:14
executives
  150:23
exercised 48:1
exhibit 2:10,11
  2:12,14,15,17
  10:8,11 76:22

77:1 80:21,24
  89:17,21 95:6
  99:5,10 103:13
  104:23 105:1,3
  111:1,6 116:9
  116:13 171:8
exhibits 2:20
exist 108:19
existed 33:5
existing 39:23
  39:24 62:21
  63:19 73:25
  74:6,7,23
  96:10 98:9
  166:15
exists 74:11
exit 45:14 167:7
expanding
  63:16
expect 8:16
  97:20 98:14
  157:1
expectation 98:5
  127:12
expectations
  77:18
expected 30:2
  78:11 159:6
expended
  148:25 149:2
expenditures
  11:20
expenses 34:8
  34:12 165:8
experience 26:4
  26:7 51:21
  62:22 89:11
  97:23 134:7
  142:17 158:6
  172:20
experienced
  102:15
expert 11:22
  76:20 124:14
  153:9,19 154:8
Expires 177:24

explicitly 57:9
expressed 87:2
  88:6
expressly 6:8
extent 18:24
  21:19 23:2
  26:19 40:7
  50:2 62:11
  63:4 96:3
  104:19 105:18
  114:3 118:1,17
  120:2 124:13
  127:11,23
  131:19 154:13
  159:2
extremely 71:13
ex-employees
  167:8
E-L-L-E-N 28:9
e-mail 2:14
  29:19 80:19,20
  80:21 81:9,20
  82:1,9,11,20
  104:1 173:20
  173:21,22
e-mailing 46:24
E-tran 173:19

_____
   F
_____
face 105:21
faced 106:1
facilities 170:13
facility 16:24
facing 29:1
  60:22 94:25
fact 45:6 63:18
  100:1 104:8
  113:24 114:12
  166:7
factor 26:24
  43:22 51:1
  63:5 64:15
factors 30:18
  35:18 50:24
  51:2 172:16
facts 115:2

135:14
failed 64:9
fair 44:18 53:12
  71:9 90:25
  92:17 93:8,23
  93:25 94:24
  104:17,18
  122:22 147:9
fall 170:3
falling 63:21
falls 95:18
familiar 65:21
  72:17 76:12
  117:10 118:1
  120:14 121:8,9
  127:23 167:25
family 172:24
far 16:17 89:12
  128:5 138:5
  171:13,23
fashion 129:4
fast 144:23
fault 115:18
  117:4,7 119:21
fear 167:12
fearful 172:17
federal 9:24
  15:22 31:17
  61:1,2
fee 120:21
  121:12,22
  123:11 126:9
  126:10 127:22
  154:4
feedback 19:2
  26:1
feel 9:4 12:3
  74:18 122:2
fees 126:19
  153:21 154:6
  154:12 165:18
  165:18
felonies 125:23
  125:23
felony 126:2,3,4
  160:17,24,25

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-8   Filed 02/09/18   Page 56 of 77

felt 78:19 104:9
fewer 103:6,6
  119:12,13,13
  119:14 132:10
  132:11,15
  161:17
figure 165:20
file 52:8 78:23
  132:14,15,24
  158:20
filed 49:20
filing 46:21,23
  133:6,10
  175:18
filings 53:2
fill 50:20
filled 50:21
  155:25 166:10
  166:10,12,25
  169:9
filling 169:20
final 138:20
finally 9:14
financial 172:10
financially
  174:16
find 62:24 82:22
  95:6 108:23
  125:8 134:21
  134:25 146:19
  175:9
finding 54:17,23
  115:18 139:23
findings 117:15
  138:17 166:1
fine 48:24
  145:20 164:6
finger 39:13
finish 9:15
finished 130:12
  130:13
fire 18:15
fired 38:14,16
firing 16:2
  150:11
firm 12:12 53:25

first 17:14 42:11
  44:6 50:19
  55:3,14 74:20
  81:21 90:24
  93:9 111:16
  130:3 133:3
  142:16 145:9
  159:6,18 160:5
fiscal 16:17
  33:17 34:8
  48:9,11,13,16
  48:18 49:4,6
  49:21 54:4
  96:18 145:19
  148:15,22
  149:1 156:7
  159:22 171:12
  171:14 172:8
five 36:15,15
  64:2 99:15,17
five-county
  134:14
fixed 126:9,10
  150:18
flat 48:4 120:21
  120:23 121:12
  121:22 123:11
flexibility 33:15
  33:21,23 34:5
  34:13,14,17,19
  38:5 172:1,4,4
  172:9
Floor 4:5
fluid 23:11
  97:24
focus 151:9
follow 41:1
  42:23 79:13
  148:9
following 15:22
  44:10 46:22
  69:8 77:7 79:9
follow-up 47:1
food 61:4,6
foregoing 174:7
  177:6,13

foremost 74:6
forenoon 3:12
form 40:22
  112:25 114:1
  130:18 139:2
  177:7
formal 18:17,20
  18:25 45:18,20
  73:14,19 144:1
  144:6,8 162:7
formally 45:19
  57:1 63:4
formation 54:8
former 163:4
forms 45:2
formulate 55:4
forward 50:15
  52:10 97:20
found 117:4,7
  137:14
Foundation 3:14
  4:5 6:23
four 16:10 43:3
  43:8 130:22
  143:19 169:5,6
  171:20
Fox 86:1
frame 66:22
frauding 141:21
free 9:4 12:4
  171:2,3
freedom 104:8
frequently 28:22
  173:5
Friday 83:12
fringe 36:5,12
  152:19,21
front 62:12
  103:14 116:1,4
FTE 35:12,15,23
  150:3 169:13
  171:7
FTEs 35:11
  36:10,18 50:14
  50:16 155:8,12
  155:17 156:4

156:13 166:8
166:14,15,17
168:24 169:3
169:19
fulfill 15:17
  50:18 118:20
  166:15
fulfilling 74:3
fully 45:10
  148:15
Full-size 173:18
full-time 35:11
  36:12
Fulton 21:16
function 139:8
functioning
  118:8
fund 153:11
fundamental
  166:2
funded 120:3
  148:15
funding 22:19
  26:18 27:6
  31:3,4 47:8,24
  53:6,7 56:20
  72:3,4 119:9
  120:6 132:7
  133:4,13
  152:18 155:20
fundraising
  153:11
funds 21:18 22:1
  22:5,5,20,22
  23:1 26:10
  31:9,17 33:10
  33:24 35:9
  48:2 50:6
  51:13 120:25
  127:25 153:6
  172:2
funnel 128:7
further 64:15
  79:3,10 164:14
  168:21,25
  174:14

furthest 91:6
FY18 49:13

— G —

gather 122:1
  161:12
general 14:10,23
  15:12 16:1,6
  18:7 29:17
  65:25 68:21
  112:20 119:3
  121:23 127:9
  127:18 138:13
  140:5,9,13
  142:6,10,22
  146:3 154:14
  168:1,2
generally 10:7
  21:25 29:10
  33:3 41:11
  57:2 74:15
  97:21 137:11
  139:3 140:25
  140:25 145:23
  160:25
General's 5:3,8
  101:8
generated 74:13
generating 58:4
getting 34:6
  59:16 93:7
  115:17 123:23
  124:6 127:21
  142:15 143:5
  164:2 168:15
  168:15
give 7:19 32:23
  38:1 44:16
  88:7 99:3
  120:22 135:14
  135:21 156:24
  158:21 170:15
given 30:15
  32:24 33:10
  40:17 50:13,16
  50:17 54:1

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com   Phone: 1.800.280.3376   Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-8   Filed 02/09/18   Page 57 of 77

56:10 59:21
63:18 69:21,21
82:15 93:4
96:17 108:18
118:11 123:10
123:11,13
131:1,2,23
133:17 138:9
144:16 161:11
166:8 173:9
**gives** 33:16
135:4
**giving** 131:11
**go** 8:6 26:13
30:18 34:11
43:9,9,15,18
55:14,23 56:1
56:5,5,8 58:1
65:13 83:21
90:22 93:17
100:21 102:23
103:11 109:12
110:1 115:2,5
124:3 128:6
137:22 138:7
142:18 159:16
169:8 171:19
172:16
**goal** 60:20
**goals** 131:25
**goes** 26:22 35:4
56:17 150:12
**going** 8:8 10:10
16:15 17:7,9
17:22 22:4,17
34:23 50:15
53:6 65:15
73:6 77:12
80:23 83:18
85:7 87:3,14
89:3 91:22
97:12,20 99:8
100:23 103:18
106:6 115:21
115:22 116:6
126:14 130:9

135:13 143:9
144:23 146:10
146:15 147:7
148:4,6,9
153:4 156:21
161:18 162:23
164:7 169:14
173:12
**good** 7:25 8:1
62:20 64:12
70:1 96:25
121:1,20
**gotten** 88:17
**government**
31:18,19,20
36:4 61:21
127:24
**governmental**
61:24
**governor** 5:1
7:13 14:20
15:3 47:24
48:1 53:15
101:9 140:13
140:19 142:3
145:9,11,24
146:4,9 147:3
147:12 150:13
**governor's**
14:22 25:8,21
25:22,24 26:2
26:6 55:18,25
56:8 140:7
147:13 156:11
**grant** 153:16
**grants** 31:7,8
**greater** 160:23
173:8
**Greene** 20:12
53:4 102:17
**Greg** 13:5 46:13
46:16,17,24
47:3 67:2
72:22 139:11
**Greitens** 5:1
7:13 101:9

**ground** 8:7
**Group** 115:18
**guess** 51:1 95:7
140:4,5 142:15
143:14
**guidance** 79:3
79:10 83:4
**guideline** 151:23
**guidelines** 61:1
61:3
**guilt** 167:13

─────────
**H**
─────────
**H** 2:9
**half** 41:21,21
**hand** 10:11
78:13 80:23
133:24 134:13
**handed** 88:13
**handful** 21:24
**Handing** 76:25
89:20
**handle** 15:16
20:15,18 22:3
23:20 42:21
58:14,17 63:19
76:17 78:20
82:17 85:10
86:11,20 97:22
120:2 127:11
161:21
**handled** 76:1,14
**handles** 20:1
21:6 24:7
30:16,17
170:20
**handling** 22:7
23:18 24:2,12
65:5 76:2
120:9
**happen** 29:13
45:19
**happened** 68:14
85:13
**happening**
86:22 103:16

104:14 112:25
113:12 129:25
138:19
**happens** 62:16
62:17 74:19
128:21 163:17
**happy** 88:7
116:5
**harassment**
45:25
**hard** 38:6,23
71:14
**Harrisonville**
94:10 129:4
135:12
**hazardous**
172:13
**Hazel** 69:7
**Hazel's** 69:22
**head** 9:11 80:12
85:25 97:10
152:8 163:1
**heading** 89:25
99:18
**health** 117:19,22
**hear** 55:22
**heard** 52:25
115:8,10
**hearing** 9:3
55:22 62:7,9
62:11
**hearings** 56:23
**held** 6:22 14:4
55:9 62:8
149:16
**help** 31:10 49:8
**helpful** 67:6
**He'll** 139:12
**high** 5:8 45:4,8
104:10 120:17
171:15
**higher** 34:9 43:7
43:11 126:3
160:22
**higher-quality**
127:7

**highest** 52:18
91:2,3,5,6
**highly** 20:11
**high-need** 170:2
**high-paying**
173:5
**Hilbrenner**
100:8
**Hinkebein** 77:9
88:14
**hire** 22:1 27:6,7
27:10 39:22
50:12 52:6,14
61:16 64:11
150:24 155:12
155:18
**hired** 17:15
18:15
**hiring** 16:2
52:22,23
150:11
**historical**
159:14
**history** 158:6
**hold** 14:24 78:14
143:9
**holding** 166:15
**hostile** 69:11
**hour** 157:14,14
158:7
**hourly** 126:9
158:7
**hours** 3:12 8:16
38:7 53:25
160:22,25
**House** 55:11,11
55:13,20,22,24
56:6,16 68:6
70:7
**houses** 55:11
**House-passed**
56:6
**HR** 45:24 167:2
**human** 29:18
**hundred** 30:25
33:15 34:5

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com      Phone: 1.800.280.3376      Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-8   Filed 02/09/18   Page 58 of 77

61:2 93:12
97:1 171:10
172:1
**hybrid** 72:12

**I**

**idea** 84:13,16
95:18 111:12
120:22
**ideal** 114:9
**Ideally** 132:17
**ideas** 133:16
**identification**
10:9,12 76:24
77:1 80:22,25
89:19,21 99:7
**identified** 9:21
63:22 101:25
122:4
**identify** 106:20
127:21
**II** 43:5 44:6
**III** 43:5 44:12
**IL** 174:5
**imagine** 51:19
65:2 163:24
**immediate**
140:8
**imminent**
135:15,20
**impact** 66:10
98:20
**impacting** 98:22
**implement**
15:10
**implicitly** 57:9
**import** 82:9,13
**important** 42:15
**impose** 30:6
33:4 78:17
**imposes** 31:11
**impossible**
109:2,5
**impression** 71:4
**improve** 18:23
50:6 72:1

**improvement**
71:23
**inability** 80:5
**incarcerated**
60:4
**incentives**
172:10,11
**incidents** 129:25
138:17 162:17
172:3
**include** 16:14
35:16 41:6
50:6 52:8
79:17 87:6
90:20 160:2
161:9 162:12
165:12
**included** 69:12
165:9
**includes** 19:18
26:18 41:24
97:15 165:6,7
**including** 11:20
14:25 20:22,25
71:15 140:16
**incompetent**
136:2,16
**increase** 47:23
48:4 50:14
51:4,11,13,17
51:23,25 52:1
52:18,21 53:1
55:8 102:25
119:8
**increased**
102:20 132:7
167:5
**increases** 50:23
**increasing** 133:3
133:10,13
**incrementally**
72:2
**indepen** 105:15
**independent**
25:1,4 120:7
149:20 152:13

**indicate** 81:25
175:12
**indicated** 103:18
145:4
**indication**
105:13 124:12
**indigence** 62:5
63:24
**indigent** 15:18
21:15 46:5,8
46:14 47:2
59:24 62:3,24
63:7,14 71:25
85:2 98:20
101:17 104:17
105:15,21
106:1,1,17,20
108:23 109:19
110:10 117:5
117:25 118:9
119:17,17,24
120:7 121:19
128:22 130:8
130:20 132:5
133:12 135:7
139:14,16
168:15
**individual** 21:12
37:18 38:4,11
38:13 40:16,23
41:24 43:1,23
46:8 57:6 60:1
61:9,14 62:18
62:23 65:4
74:24 78:19
89:9 104:21
106:25
**individually**
40:14 83:23
**individuals** 13:4
21:24 106:7
135:5
**individual's**
100:8
**ineffective** 135:9
137:7,15 138:2

138:17 139:9
139:23
**ineffectively**
137:15
**inequities**
172:17
**informal** 73:19
**informally** 57:2
63:5
**information**
11:19 67:23
137:13 148:1
157:12 158:22
**informed** 17:24
138:16 167:3
**informs** 120:15
**infrastructure**
50:6
**infrequent**
123:24 124:1
**initial** 42:11
157:13
**initiated** 91:18
91:20 97:13
**initiatives** 16:22
**input** 54:3 162:7
**inquire** 61:13
**inquiries** 64:15
**inquiry** 170:8
**insight** 65:1
**insist** 78:6
**insofar** 145:22
**instance** 17:6
20:12 23:22
27:5,8,9,11,24
31:9 42:7 45:7
50:10 53:21
61:9,12,19
103:17 126:2
134:1,12 150:2
158:17 160:23
161:19 165:21
170:16 173:2
**instances** 40:2,9
63:2 64:9
75:20 76:6

129:1 138:10
170:25
**instruct** 64:14
146:16 147:8
148:6
**instructing**
131:12
**instruction**
148:10
**insurance** 36:6
36:17
**intend** 85:18
**intended** 169:7
**intends** 97:21
**intent** 105:17
**intention** 82:20
**interact** 28:18
**interactions**
88:1,3
**interest** 27:13
**interested** 173:3
173:7 174:17
**interfacing**
97:25
**internal** 39:9
90:16
**interruption**
19:19 37:15
49:5 69:5
91:19 117:6
125:25 144:17
146:23 168:11
**intervention**
29:12
**interview** 45:14
70:16,21
**interviewing**
71:1
**interviews** 167:7
167:8
**introduce** 7:2
**invade** 147:10
147:20
**invention**
113:11,13
**investigating**

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-8   Filed 02/09/18   Page 59 of 77

41:3
**investigation**
62:19
**investigator**
35:17
**investigators**
11:22 35:3
36:20,22 37:1
37:1,2
**involve** 31:9
34:11
**involved** 28:11
47:2 170:24
**involvement**
31:25 54:15
134:16
**involving** 21:9
66:5 85:21
**in-custody** 83:14
**Irvine** 4:10
**issue** 28:17 29:6
29:11 76:21
103:11 105:25
106:23 123:11
**issued** 104:1
**issues** 16:19,20
16:24 25:10
76:7 97:24
106:2 122:21
137:13 142:4
**issuing** 79:12
**item** 11:1,17
95:11
**items** 57:23
**IV** 43:6 44:12

**J**

**J** 4:8
**Jackson** 86:14
94:13
**Jacqueline** 4:18
7:14 175:3
**jacqueline.shi...**
4:22
**jail** 60:5,5 84:9
**James** 4:8 7:8

**January** 90:4
95:13
**Jason** 4:4 7:4
8:2 44:15 73:6
91:21
**Jay** 15:5
**Jeff** 100:8
**Jefferson** 5:9
68:5
**jeopardy** 78:20
167:13
**Jeremiah** 15:5
**jmaune@orri...**
4:11
**job** 14:21 15:6
18:13 57:22
70:14 71:10
107:9,25 108:1
109:9 123:21
140:8 142:18
**jobs** 173:5
**Joel** 13:6 22:10
23:14 44:16
59:4,5 64:22
67:3 72:22
74:25 76:18,20
91:23 92:6
93:14 97:12,16
97:17 130:3
154:18 157:16
158:8,21
159:12 165:22
**John** 5:13 6:24
**Johnson** 58:25
**join** 109:11
**joining** 13:24
14:1,17 33:6
39:25 67:1
140:9 142:21
**joint** 56:17
**judge** 2:14 62:4
62:18,23,24
68:2 69:4,4,14
69:15,16,17
80:21 81:15,18
82:1 83:11,12

83:14 84:1
85:9 86:2 87:2
88:8 89:1,2
104:15,19
105:16 106:5
106:13,14,22
108:7,9 122:18
124:2 128:25
129:2,5 135:16
135:20,22
136:3 150:21
150:22,22
**judges** 64:6 69:2
81:6 85:24
87:12 88:2,6
88:10,15,18
**judge's** 81:22
168:14
**judgment** 131:8
**judicial** 25:1
32:23 88:10
149:21 152:6,8
152:12
**judiciary** 25:3
98:2
**July** 48:16,17,19
48:19 171:13
**jump** 51:6
**jumped** 51:24
**June** 13:21
48:16
**jurisdiction**
21:21 32:1,14
32:14,18 51:19
51:20 52:12
60:1,13 102:24
161:25
**jurisdictions**
17:2 32:15,25
43:14 52:16
53:7 64:8
65:10 87:6
102:21 133:19
169:19
**justice** 141:12
141:17

**justify** 73:4,20
**juvenile** 17:10
19:18 20:1,3
58:15,25
141:16
**jwilliamson@...**
4:7

**K**

**K** 1:14 3:10 6:10
6:17
**Kansas** 20:13
30:24 31:24
41:14,15
**Karl** 77:9
**Kathy** 25:13
26:16 27:15,18
31:15 32:10
33:12,19,25
47:12 49:15
53:10 128:13
152:1 153:8,19
154:8,16,17
155:5,7 164:25
165:15 170:11
172:6
**keep** 17:23
139:5 156:21
**keeping** 154:11
157:14 158:7
**keeps** 21:22
**Kelly** 67:17 68:7
68:9,18,20
**Kennett** 69:3,6
85:22,23 87:7
87:9 88:4 91:8
93:25 94:2
**key** 56:24
**killing** 142:13
**kind** 18:17
24:23 27:15
28:21 52:2
102:15 131:8
**kinds** 16:4 41:25
42:6 162:17
**know** 8:18 9:4

12:4 18:22
22:14 23:6
30:22 31:6,15
32:10,17 34:10
34:16,22 35:25
39:13 40:20
41:4 42:19
44:19 45:23
47:11,13 48:5
49:15 52:17
54:19 57:12
59:11 66:21
68:10,14 71:14
71:16 72:17,20
73:16 78:3
79:25 80:10
82:3,24 83:10
84:19 85:14,24
86:8,21 89:12
90:5 92:1,4,10
93:1 96:16,17
97:13,14 98:4
99:11 100:16
101:20 102:22
104:19 106:5
106:12 108:5,6
112:12,12,13
112:16 113:2,4
113:5,6,8,9,17
113:18,19
114:16,20
116:16 117:21
121:10 122:18
124:11 125:9
126:5,9 128:6
128:8 130:1
133:21,22,22
134:18,23
136:14,15,21
136:24 137:2
138:4 139:1
141:21 143:7
142:5 144:8
145:21,22
146:10 149:4,6
151:20,21,23

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-8   Filed 02/09/18   Page 60 of 77

153:15 154:5
154:16 156:17
157:23 163:17
163:19,21
165:20 166:20
166:24 169:2,3
173:7
**knowing** 45:12
133:20
**knowledge** 70:5
83:7 107:20
138:3,6
**known** 144:4
**K-E-N-N-E-T-T**
69:6

_____

**L**

**L** 3:15 5:22 6:4
174:3 175:23
**label** 114:8
**labeled** 91:18
111:9
**lack** 27:12 170:8
**land** 71:3
**large** 17:21
30:11 41:13
56:11
**largely** 44:11
**larger** 41:16
**largest** 20:8
**lasted** 140:21
**law** 15:22 16:8
52:22 69:23
100:7 125:2
133:18 142:14
144:4,4,15
167:12 168:10
168:12
**lawful** 6:11
**laws** 102:12
**lawsuit** 49:20
114:18
**lawyer** 21:20
37:9,18 38:2
40:21 60:21
64:5 74:3,5

75:7 77:18,20
86:19 87:4
108:24,25
109:6 110:19
111:6,10,12
112:4,8 122:13
129:6,17
134:13,13
135:21 161:11
162:14,15,16
163:14,24
168:8
**lawyers** 15:16
15:19 22:2,2
23:2,2,12
30:14 65:8,10
69:8 78:1 81:7
83:15,19,20,25
87:3 96:12,19
96:22,23,25
97:8 98:6
102:1,5,8
108:17 109:8
109:15,17
110:13 114:4
120:21 121:5,6
121:13,19
122:12 127:7
127:10 129:23
134:3,4 139:10
161:14,16
173:3
**lawyer's** 38:4
75:3
**lay** 71:3
**lead** 113:13
**leader** 41:14,15
**Lear** 25:13
26:16 27:15,18
31:15 32:11
33:12,19,25
47:13 49:15
53:10 128:13
152:1 153:8,19
154:8,16 155:5
155:7 164:25

165:15 170:11
172:6
**learn** 28:16
**learned** 125:2
**lease** 32:16
**leave** 77:25,25
173:5
**leaves** 45:12
93:3
**leaving** 45:15
80:11 134:10
167:9,11
**led** 69:22
**legal** 6:25 71:16
87:10 109:20
128:8 173:5
**legislative** 22:25
47:19 55:7
56:23 70:2
118:12 148:20
156:5
**legislators** 57:19
**legislature** 18:7
18:10 22:7,20
25:21,25 28:23
31:11 35:10,22
36:2 47:20,25
51:2 53:16
54:11 56:20,25
59:13 66:19
67:20 68:13,15
72:4 90:20
92:10 150:13
153:7 155:9,19
156:10
**legitimacy** 57:9
**Leslie** 69:6
**letter** 2:12 76:23
77:5,15 78:25
79:2,4,17 80:2
80:9,17 83:5
88:9 95:23
99:20,22 100:1
100:10 103:14
103:21 104:1,4
104:5 162:24

**letters** 100:12
**let's** 19:5,13
47:7 92:25
111:18 115:2,5
**level** 43:11
163:17
**levels** 43:3,7
171:10
**Liberties** 4:4
**liberty** 99:1
**license** 167:12
**life** 19:20 20:1
**light** 62:21
**limit** 31:12
131:24
**limitation** 63:5
**limitations**
35:23,23 36:1
**limited** 8:23
94:25 131:19
147:24 153:17
157:13
**limiting** 111:11
**line** 57:23
163:17 176:5,9
176:13,17,21
**lined** 33:13
**lines** 55:15
172:8
**lion's** 19:16
**liquid** 61:17
**liquidated** 61:16
**Lisa** 46:17 52:5
**list** 76:15 85:11
91:8 92:23
93:16,17 95:9
**listed** 20:7 92:21
**listen** 28:16 78:5
125:10
**listening** 78:4
101:9
**lists** 85:2
**litigating** 49:21
**litigation** 5:13
5:23 7:1 34:8
34:12 101:7

146:12,25
147:23 148:6
165:8 175:1
**little** 14:25 19:5
21:5 25:7
29:21 47:7
48:13 49:15
53:13 60:18,22
63:25 72:7,8
73:1 88:25
114:17 127:20
**lived** 67:3
**local** 20:13,19
20:22,23 21:11
28:15 29:17,19
31:19 32:1
33:5,7,20
39:18 45:9
46:9 52:4,13
52:24 53:7
64:14,24 66:14
84:9 85:24
88:5 90:11,18
97:25 98:1,1
98:15 113:12
122:18 158:18
162:13 170:9
170:11
**localities** 142:7
170:12
**locally** 63:23
69:12
**located** 95:9
163:10,11
170:21
**long** 13:18 14:14
14:24 58:13
143:1
**longer** 86:16
172:25
**look** 35:18 53:20
81:21 93:15
95:5 158:19
**looking** 55:18
90:24 109:9
114:18 156:17

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-8    Filed 02/09/18    Page 61 of 77

157:18 165:1
**looks** 26:17 30:8
112:18
**lot** 34:12 40:14
46:20 62:19
109:16 113:23
123:22 133:23
172:23
**loud** 11:4 160:4
**loudly** 9:8
**Louis** 3:15 5:4
5:14,24 6:23
20:12,12 21:1
31:7 85:25
173:2 175:18
**low** 167:18
**lower** 34:9
**lowest** 91:7
**luck** 70:1
**LWOP** 19:18,21
20:3
**Lynxwiler** 86:9

**M**

**Main** 4:9
**maintain** 73:14
73:17
**majority** 142:10
**making** 26:13
51:2 64:5,7
71:17 72:2,5
87:7 129:23
131:14 144:25
**managed** 20:20
**management**
14:13 19:14
28:18 29:14
30:11 79:6,21
82:5 85:4 88:6
95:24 98:13
140:10 163:1,2
**manager** 38:5
41:12 71:16
77:22,23 80:10
**managerial**
122:12

**managers** 37:11
**managing** 20:23
**mandatory**
151:24
**manually**
158:20
**March** 90:4
95:13
**margins** 145:3
**marked** 10:9,11
76:23 77:1
80:22,24 89:18
89:21 99:6,9
**Marsha** 46:16
**Mary** 86:1
**match** 53:6
**materials** 92:13
**Mathematically**
103:8
**Matt** 7:6
**matter** 6:17
88:14 116:11
135:11 146:11
146:17 148:5
151:2,3
**matters** 89:11
143:21
**Matthew** 4:12
**mature** 158:6
**Maune** 4:8 7:8,8
**maximum** 20:19
**Mayer** 69:14
**McGee** 46:18
**mean** 42:3 45:3
63:13 111:25
114:12 117:21
138:25 145:7
**means** 22:17
55:23 61:4
72:16 84:7
92:1,6 128:4
152:11 159:16
**measure** 158:18
**measured** 121:7
**mechanism**
66:13 89:13

120:1 128:9,11
132:20,23
133:1 134:2
138:22 162:17
**mechanisms**
96:4,4 133:11
**medium** 30:10
**medium-sized**
41:16
**meet** 12:14,16
12:19,23 45:10
56:23 131:25
144:11 147:16
**meeting** 16:7
18:25 25:16
29:24 79:16,18
79:19,21 82:5
83:11 88:12
122:15 143:15
156:9
**meetings** 17:12
28:16 143:19
144:2,4,5,6
**member** 168:8
**members** 16:10
56:24 70:25
78:1 84:2 98:2
105:10
**memory** 18:10
51:7 52:7,20
118:19
**mention** 24:25
45:5,7 79:16
145:2 155:11
173:7
**mentioned** 20:7
47:23 49:12,18
50:2,17 53:8
82:5 87:2,22
104:20 143:14
149:14 159:5
159:13 162:2
171:25
**Mermelstein**
13:5 46:13,17
47:3 67:3

115:7,8 138:3
139:12,18,25
160:13
**Mermelstein's**
46:1
**message** 79:15
**met** 52:4
**method** 129:24
**meticulously**
157:11
**metrics** 2:15
89:18 90:3,13
95:12 96:20
**Michael** 1:14
3:10 5:2 6:10
6:17 7:12 92:1
101:6 130:9
148:6 164:18
175:10 176:1
177:5,20
**michael.quinl...**
5:5
**midst** 70:22
**Midwest** 5:13,23
7:1 175:1
**million** 22:6,15
47:12,20 48:6
48:7 49:11,11
49:17,18,23
55:8 145:4,13
145:13,14
148:2 155:15
155:17 164:1
**mind** 42:14
73:20 75:12
84:4 101:15
122:7 138:21
164:3 172:20
**mindful** 153:15
**minds** 56:15
87:10
**minuses** 114:9
114:14
**minute** 17:14
65:14 99:4
**minutes** 91:9

143:24,25
144:1
**mischief** 44:8
**misdemeanor**
52:9 165:21
**missed** 67:8
**mission** 18:4
131:21 150:14
**Missouri** 1:1,7
3:1,7,14,15,19
3:21 4:19,21
5:1,3,4,7,9,14
5:22,24 6:18
6:21,23,23
7:13 9:22
13:13,13,16,19
14:18 20:24
33:14 53:23
54:21 55:2
63:15 65:21,22
66:19 72:6
73:4 75:13
77:8 88:11
90:2 91:15
98:21 99:21
101:7,8 105:21
106:2,20
109:19 114:12
115:19 117:5,9
117:19 118:25
119:7 121:18
128:3 130:20
132:6 133:13
133:17 149:19
157:7 174:22
175:3,6,7
176:2
**mistaken** 24:7
32:2 154:2
155:5
**mitigation** 20:4
**MO** 3:16 174:4
175:18
**moment** 8:20
77:13
**Monday** 82:25

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-8   Filed 02/09/18   Page 62 of 77

**Monett** 94:19
**money** 22:19
  35:8,8 49:25
  50:17,20
  121:15 124:3,6
  128:2,7 145:21
  145:23 148:24
  155:18
**months** 14:16
  92:23 93:9
**morning** 7:25
  8:1 101:10
  103:10
**mother** 113:10
**motions** 46:23
**motivated** 77:14
**motivating** 51:1
**move** 33:24
  52:10 55:24
  93:2 96:6,10
  98:10 116:6
  150:2 171:2,7
  172:4
**mshahabian@...**
  4:15
**MSPD** 2:12
  11:10,19 12:16
  12:23 24:22
  25:14 40:5
  54:15 56:7
  62:19 63:11
  66:4,25 67:4
  72:12,18 74:14
  76:23 77:8
  95:15 109:9
  118:17 127:5
  135:4 139:10
  166:8 168:9,9
**MSPD's** 25:8
**multiple** 24:11
  65:10 171:9
**M-A-Y-E-R**
  69:14

**N**

**N** 2:1 4:1 175:17

**name** 6:24,24
  8:2 19:23 28:9
  29:16 56:4
  68:2 69:7 77:9
  100:8 125:7
  176:1,2 177:11
**named** 13:8
  69:18
**natural** 141:4,6
**necessarily**
  39:15 75:17
  89:7 90:22
  127:2 162:23
**necessary** 9:5
  27:3 33:24
  131:23 164:19
  177:9
**necessity** 113:10
  113:11
**need** 8:16,18
  33:19 34:13
  35:6,7,12 40:9
  41:24 45:24
  54:7 58:21
  59:14 74:18
  90:21 101:25
  102:4,8 108:4
  116:13 129:21
  133:21,22,22
  137:21,22
  143:12,20
  151:17 157:1,4
  167:11,14
  169:24 171:15
  171:20,21
**needed** 71:17
  87:7,9 96:13
**needs** 33:25
  35:15 50:23
**neither** 174:12
**net** 97:14
**network** 50:7
**never** 8:5 49:19
  66:24 67:8
  128:10 152:11
**new** 4:6,6,14,14

23:12 30:17
  55:4 66:6 74:4
  86:16 96:7
  97:14 98:12,18
  124:8 141:10
  141:13 142:5
  142:10,21
  157:14
**newsletter** 2:18
  99:6,12
**Niehaus** 5:13
  6:25
**Nifong** 4:20
  175:5
**nine** 20:18 24:4
  24:7
**Nixon** 15:5
  145:24
**nodding** 9:10
**Nolle** 160:3
**nonconflicted**
  106:16 107:4,8
  107:11,17
**nonmanagem...**
  43:4
**normal** 28:23
**normally** 90:15
**north** 5:14,23
  51:8 96:18
  102:5
**Northeasterne...**
  144:23
**notarized**
  175:16
**notary** 175:14
  177:23
**note** 149:7,18
**noted** 131:17
**notes** 145:4,5
  149:19 155:6
  161:2 164:1
**notice** 2:11 10:3
  10:8,16 144:16
  144:21
**noticed** 16:7
**notification** 34:1

**notify** 98:13,16
**notwithstandi...**
  120:10 129:7
  171:19
**November** 80:12
**nuance** 126:11
  126:13,15
  151:18 155:3
  161:7
**nullify** 66:22
**number** 6:19 8:8
  11:1,17,18
  17:2 18:2
  20:14,18 24:8
  24:11 26:20
  27:1 29:13
  30:9,15,16
  31:12 33:4
  35:2,18 36:10
  36:18 38:7,23
  39:13 40:20
  42:25 43:18
  44:4 45:2
  47:11 51:8
  52:1 54:4
  55:15 57:7
  58:4,22 64:4
  65:8 70:4
  86:22 88:8,16
  92:5,5 96:16
  96:17 97:7
  99:14 102:11
  108:16,19
  117:14,15
  118:11,18
  119:22 125:16
  131:23 133:17
  150:9 155:8
  156:23 160:15
  160:19 161:9
  164:2 165:2
  170:18,20,25
**numbers** 10:22
  43:16 53:17
  54:16,18 55:5
  56:11,14 57:10

90:22
**nuts** 92:4

**O**

**OA** 151:22
  172:2,4
**oath** 8:12
**object** 8:22 73:7
  130:10 146:11
  147:8 148:4
**objection** 131:15
  131:16 134:22
**objective** 42:17
  42:22 55:3
  60:25 158:11
**objectively** 55:3
**obligation** 38:4
  38:11 73:25
  74:4,7 75:4
  78:22 96:1,10
  98:10 104:8
  107:3,7 127:10
  168:4
**obligations** 36:8
  71:6,15,15
  79:10 98:5
**obstacle** 169:23
  169:23
**obstacles** 112:14
**obtain** 170:9
**obviously** 21:10
  44:7 134:25
**occasions** 135:2
**occupied** 154:24
**occupying**
  166:22
**occur** 17:11
  129:4 137:20
**occurred** 21:21
  51:4 80:8 82:6
  138:10
**occurrence**
  123:25 124:1
**occurring** 129:7
**occurs** 28:22
  62:11 122:19

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-8   Filed 02/09/18   Page 63 of 77

128:25
**OCDC** 78:13
**October** 1:16
  2:18 3:11 6:15
  99:6 175:2,10
  176:3
**odd** 20:9 135:23
**offender** 34:13
**offense** 125:22
  168:7
**offer** 172:10
**offhand** 126:6
**office** 5:3,8 13:2
  13:25 14:2,19
  14:22 15:4,8
  17:14,20 18:19
  19:6,8,10,23
  20:13,17,19,22
  20:23 21:6,11
  21:11,15,16,17
  21:17,23 23:22
  24:4,7,9,18,23
  25:9,21,22
  26:2,6,19,21
  26:25,25 27:3
  27:7,9,11,16
  28:17,18 29:3
  29:7,14,15,16
  29:17,19 30:15
  30:16 31:5,7
  31:21,23 32:4
  33:11,23 34:1
  35:14 36:21
  39:16 41:13
  42:2,2,23 44:8
  44:25 45:9
  46:4,9,16,25
  47:8 50:11
  51:22,24 52:18
  52:25 53:2,3,4
  53:4 58:9,11
  58:12,13 59:22
  60:14 61:11
  62:13 64:25
  65:3,3,6,7,12
  66:5,11,14,17

67:24,25 69:4
69:6,8 70:22
72:19 73:1,13
74:24 75:18
76:1,2,10
77:10,11 78:13
79:11 80:13
81:5 82:14
83:9,19,20,25
85:3,16,22,23
85:25 86:10,14
86:20 87:9
88:22 90:11,13
92:20 93:2,4,5
94:1,2,3,5,6,8
94:9,12,14,16
94:18,20,23,25
95:1,7,14,18
97:21 98:15
99:21 101:8,11
101:18 102:1
103:18 105:21
106:3 109:10
109:14 113:12
119:15,16,23
120:6,9 122:18
122:24 127:15
128:6 129:12
132:7,21
133:14 135:8
136:1,7,20,21
137:6,12
138:18 139:8,8
139:21 140:7
140:12,19
142:16,23
146:4 149:16
150:3 152:6
154:24 156:11
158:18,25
161:13,18
162:12,13
163:1 169:7,11
169:14,15
170:6,19,21,24
171:7,20

175:17
**officers** 52:23
**offices** 17:1 19:8
  20:10 21:3
  24:10 26:11
  27:14 28:15,25
  29:5 30:11
  31:4 32:21
  33:5 39:9,14
  41:12,15 53:5
  64:14 65:4,7
  67:19 73:17
  79:1 85:17
  90:18 91:13
  92:24 93:10,11
  93:16 95:22
  96:14 97:25
  98:1,17 111:20
  112:5,7 153:3
  154:25 163:18
  166:13 169:8
  169:19,24,25
  170:3,7 171:9
  171:15,21,24
  172:11
**office's** 24:21
**official** 13:15
**officials** 24:22
  100:13
**oftentime** 30:4
**oftentimes**
  128:24
**oh** 11:5 135:22
**okay** 9:2,5,6,18
  9:19 10:2,5,10
  10:20 12:5,6
  12:23 13:1,7
  13:11 14:14,21
  21:5 23:10,16
  24:10,19 25:7
  26:1,9,13
  27:14 28:11
  29:25 31:23
  32:12 34:24
  35:5 36:19
  39:8 44:1,18

45:18 57:22
59:3,13 60:16
63:4 64:17
67:6,13 73:10
75:20 82:8
84:11 91:16,24
92:8 93:13
97:18 100:9
101:14 102:10
105:4 108:3,7
111:15 112:7
113:20 115:15
121:25 122:8
122:10 123:10
124:20 126:12
126:21 127:19
128:15,19
132:19 133:9
136:4 137:4
138:16 140:4
140:11 141:1
141:14,22,25
142:20 143:1,5
144:1,5 145:14
145:17 146:13
147:2,6,25
148:8,12 149:3
149:8,14,18
150:1,18
151:13 152:15
152:23 153:14
153:23 154:20
155:22 156:25
158:4,9,23
159:11,13
160:3 161:1
162:1,9,20
163:13,20,23
164:17 165:23
167:24 173:10
**old** 12:10
**Olive** 3:14 5:4
**Oliver** 69:18,25
  70:5
**ombudsman**
  46:12,14 47:5

162:1 163:8
**once** 25:19
  64:17 72:22
**onerous** 66:25
**ones** 39:20 57:17
  87:22
**one-year** 51:6
**open** 144:3
**operate** 96:14
**operating** 12:13
  15:10 16:16
  47:9 49:16,22
  93:10 152:22
**operation**
  148:21
**operational** 25:4
  25:10 149:15
  150:4,5 151:10
**operationally**
  149:21
**operations**
  17:19,22
**opine** 54:13
**opinion** 53:1
  167:9
**opportunities**
  153:16
**opposed** 9:10
  22:2
**option** 108:13
  108:20
**options** 77:21
**oral** 57:5 77:7
  77:16 78:5
  103:12
**order** 15:17
  25:23 58:17
  74:11 84:21
  96:13 130:6
  136:16 172:11
**ordered** 136:13
**ordering** 91:1,4
**orders** 173:18
**ordinarily** 21:13
**ordinary** 28:4
  138:22 162:5

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com      Phone: 1.800.280.3376      Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-8   Filed 02/09/18   Page 64 of 77

org 150:17
organization
  31:17 152:17
organizational
  20:5 27:23
origin 125:6
  146:6
original 2:20,20
  175:10
Orrick 4:9,13
outcome 174:17
outcomes 121:1
outside 23:16
  24:22 31:13,16
  90:17,19
  119:16,25
  153:18
outweighed
  163:6
out-of-custody
  83:16
overall 149:3
overarching
  53:20
overhead 32:5,7
  165:6,9
overloaded
  91:11,12 92:22
  96:8
override 145:10
overrode 22:20
  47:25
overrule 62:4
oversee 30:13
overseeing 98:7
oversight 41:23
  122:11,12
owned 171:1
Oxenhandler
  68:2
o'clock 3:12,13
  69:14

———————
P
P 4:1,1
packets 92:12

page 2:2,10 8:7
  99:15,17,19
  175:11,14,17
  176:5,9,13,17
  176:21
paid 108:25
  126:19 150:25
  152:21 154:6
  165:18,19
painting 172:20
panel 50:3
  122:13 129:15
  129:15
paper 114:19
paragraph
  115:16 116:2
  116:19,21
paragraphs
  115:22
paraphrasing
  77:20 168:5
parole 19:21
  20:2
part 12:24 15:9
  45:23 50:14,15
  52:6 55:10
  56:11 57:4
  72:24 88:11
  91:14 98:25
  107:6,9,13
  121:11 122:13
  127:5 132:17
  148:20 155:16
  155:20 157:12
  159:18 160:1
  160:21 163:11
partial 104:16
  105:14,24
  108:13 110:5,8
  112:10 113:24
  114:1 130:7,19
  131:8
partially 157:15
participate
  129:19,20
participates

31:7
participating
  23:7
participation
  16:22
particular 13:1
  24:3 29:7
  40:18 64:18,19
  65:5 73:5
  74:16,21 95:1
  103:17
particularly
  34:11
particulars
  112:17
parties 174:13
  174:16
party 146:14
pass 55:11,13
  68:15
passed 15:12
  52:21 55:20
  155:19
pay 18:4 36:16
  134:2 150:16
  151:14 172:13
paying 32:4,6,17
  141:23,24
PCR 17:10
  19:17 77:10
penalty 34:12
  177:12
pending 3:18
  146:11
pension 36:6
pensions 36:17
people 13:1 36:8
  36:15,16 64:5
  168:6 172:12
pep 29:22
percent 30:25
  33:15,23 34:5
  43:17,20,21
  51:7,12,24
  52:1,20,21
  61:2,5 93:12

95:16 97:1
  159:16,17,25
  160:1 167:4,6
  171:10 172:1
percentage
  51:12 91:3,5
performance
  18:13
performed
  53:24 55:4
period 14:8 90:3
  95:13 109:13
  117:14 119:4
  138:9,11
  140:21 141:3
  143:3,8
perjury 177:12
permission 38:2
permitted 11:10
person 25:11
  27:4,10 38:6
  53:11 61:19
  62:2,3 64:18
  64:19 92:6
  130:3 135:24
  135:25 144:12
  166:22 169:25
  170:1
personal 51:20
personnel 16:19
  102:19
persons 90:19
person's 64:16
perspective
  47:14 159:15
perspectives
  170:18
pertaining 146:1
pertains 75:2
pervasive 45:3
petition 115:23
  116:4
phone 29:19
  79:5 85:21
  88:8,15,17
  122:19 143:21

144:5 162:5
phrase 113:10
  160:7
phrased 73:7
phraseology
  124:25
physical 61:15
picked 79:4
  86:17 162:5
picking 79:5
picks 122:19
place 33:7 71:14
  128:12 132:12
  154:10 157:21
placed 127:17
  135:8
placing 85:2
plaintiffs 1:5,15
  3:5,21,22 4:3
  6:2,12 7:5,7,9
  8:3
Plank 46:16
plans 68:14
play 17:19,21
  44:9 53:20
  59:7 161:19
played 86:24
plead 159:17
pleading 114:19
  115:3 132:4
pleadings 115:3
please 7:2,16
  8:18 9:3,8,9
  11:4 12:3 14:7
  105:23 111:2
  115:23 175:9
  175:12,16
plight 130:20
pluses 114:9,14
point 44:15
  56:15 59:21
  62:25 63:9
  68:21 84:17
  86:23 88:16
  96:25 109:13
  124:2 148:25

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com     Phone: 1.800.280.3376     Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-8   Filed 02/09/18   Page 65 of 77

170:12 171:17
pointed 118:18
171:21
points 51:12
police 50:10
policies 11:8
33:1,5,7 39:9
39:11,14,15,19
44:10
policy 32:21
33:4 39:21
73:2,9,14,17
73:20 75:18
political 68:4
Poplar 86:10
populated 20:11
20:19 93:20
position 14:4,24
20:20 27:2,9
27:10 28:14
35:16 62:4
69:23 76:19
77:19 93:4,5
109:10 119:6
121:17 124:10
142:2 147:13
151:20 166:23
166:24 167:1
positions 16:9
43:4 50:13,13
50:19,20,21
56:17 155:18
171:18,22
possibility 85:1
130:7,18
possible 71:8
106:11 107:17
108:6 109:5
Possibly 129:14
post 61:12 64:6
64:10 77:10
posted 64:2
posting 171:14
posts 61:10
post-conviction
138:23 139:1,7

139:15,20
potential 113:23
potentially
112:11
poverty 61:1,3
practical 66:10
practically 85:6
162:20
practice 15:20
16:6 28:5,5,15
28:19 37:9
38:17 39:24
43:15 62:10,25
78:15 80:5
98:7 108:17
123:25 133:18
151:2 163:12
practices 21:20
77:9 107:21
practicing 38:17
162:21
practitioners
120:16,18
Pratt 66:2
preceded 54:15
58:18 66:4,9
158:1,2
precedent
172:18
precise 96:16
143:7 164:25
165:15
precisely 100:11
precision 128:2
predated 157:17
Preddy 52:5
predecessor
67:16
predict 34:7
preferably
115:7
preference
109:11
preferred 40:1
prejudice
136:25 137:18

147:22
prejudiced
137:8
preparation
12:17,21,24
114:18
prepare 12:6,9
25:23
prepared 10:21
11:13,24 12:3
25:12
prepares 25:14
26:21
present 5:12
51:5 83:17
96:1 166:14
presenting
88:10 101:15
presently 96:8
124:18
presents 17:2
120:8 128:20
preside 114:23
presiding 69:4
69:15 81:15
88:10
presume 154:9
pretrial 60:4
84:8
prevents 26:6
previous 12:13
19:7 54:4 70:3
74:1,23
previously 52:9
58:16 111:9
128:21 139:16
141:11
primarily 44:7
45:9
primary 26:23
54:8 168:18
principal 101:11
prior 13:24 14:1
14:5,11,17
26:17 33:5
53:9 63:25

67:1 80:2 82:2
83:1 90:10
98:25 99:1
136:5 137:13
138:19 140:4,8
140:12 141:1,6
141:9 142:8,12
142:18 156:14
priorities 53:19
59:8
prioritize 29:8
57:23 59:14
83:13
prioritized
59:15
private 21:20
22:18 23:2,12
31:17 50:2
72:14 83:15,15
84:2,13 87:4
87:14,17,23
88:21,22 89:3
89:6,10,13
98:2 105:11
106:18,18
107:5,12,18
108:17,24,24
114:4 120:7
121:5,21
122:20 123:7
123:20 127:16
128:17 131:20
134:2,13
135:17 142:25
153:11
privately 56:24
privatization
68:16 70:1,8
71:7,21 72:9
75:7 104:16
105:14,24
107:22 108:13
110:5,9 112:11
112:18 113:1
113:24 114:2
130:7,19 131:9

134:20
privatize 67:21
68:14
privatized 72:13
107:23
privatizing
68:23
privileged 92:14
privity 32:15
pro 170:23
probably 34:6
42:22 65:2
72:23 91:22
123:24 124:9
probation
125:23
problem 45:3
71:2 95:3
101:24,24
102:20 105:20
105:25 106:19
118:25 119:8
127:21 132:6
133:4
problems 17:3
94:25 166:2
procedurally
85:6
procedure 9:24
163:12
procedures 11:8
42:23
proceed 37:23
68:13
proceeding 7:20
62:12,14 77:13
136:1 138:24
proceedings
143:23
process 11:9
23:4 25:13
45:20 53:11
55:10,17 56:19
58:2 65:2,3
70:14,21 86:6
99:1 126:23

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-8   Filed 02/09/18   Page 66 of 77

144:10 156:5
160:21 162:7
168:9,12
**produced** 3:11
6:11
**professional**
13:24 15:21
30:13 37:10,11
37:12,24 41:1
42:18 74:12
75:16 78:21
79:14 96:2
98:7 104:12
**program** 22:8
22:11,13,13
23:8,12,13,17
46:12,14 47:6
47:21 50:1,3
110:5 112:10
113:25 114:8
122:13,14,14
129:16,19,22
131:8,22
134:16 137:6
149:7 163:9
**programs**
114:10 141:12
141:16 142:6
153:12
**prohibits** 40:20
41:5
**Project** 53:24
91:15
**projected**
145:25 167:5
**projections**
16:19
**prolong** 164:18
**promote** 43:11
**promoted** 44:3
**promotion** 42:5
44:2,6
**promulgated**
66:23,25 68:1
125:21 154:2
158:25 159:9

**promulgation**
66:3,5,13
**properly** 118:8
**property** 61:15
**proportion**
11:21
**proposal** 26:2
53:11 57:5
71:21 72:10
156:7
**proposals** 27:15
113:23 134:20
**propose** 16:13
59:9
**pros** 160:3
**prosecute**
132:24
**prosecution**
59:22
**prosecutor** 52:4
52:13 69:3,17
69:18
**prosecutors**
52:7,14,23
57:11,15 70:9
102:18 103:1,2
132:13,15
133:9
**prospect** 70:13
**prove** 18:4
**proverbial**
71:13
**proves** 43:13
**provide** 9:23
27:15 34:1
56:22 58:21
59:17 66:13
74:10 78:16
79:3,9 84:21
89:4 92:12
98:8 106:6
110:9 114:4
115:23 121:5
121:19 122:11
124:7 156:13
166:13

**provided** 40:4
71:17 83:4
88:15 112:17
117:5 121:21
123:1,6,7
127:15,16
135:19 154:25
155:2,4 156:10
**provides** 54:2
**providing** 32:4
35:9 71:24
115:20 117:24
118:8
**provision**
126:18
**proximity** 173:4
**public** 4:17,19
7:15 9:22
12:19 13:14,17
13:19,25 14:1
15:7,12,24
16:3,8,11
17:14,15 18:7
19:12 21:14,15
21:22 25:5,15
25:17 33:14,22
39:4,25 40:12
40:16 41:10
42:1 43:5,23
44:3,21 45:20
52:22 59:7,22
60:2,14 62:1
62:13 63:10
64:3,18 65:4
65:22 67:21
70:21 73:1,4
73:20 74:10,17
75:12,21 76:6
76:15 78:4
83:9 87:8 90:2
99:21 104:6
105:8 107:5,11
107:18,20
114:13,21,22
115:19 117:8
117:12,20

118:7,25 119:7
120:15 121:2
121:18 126:25
127:1,4 137:14
139:17,24
140:5 141:12
142:4,4,16,19
142:23 146:1
148:2 149:15
149:19 150:15
156:8,9 157:13
158:10 164:20
165:25 167:19
175:3,14
177:23
**pull** 16:12 26:17
128:24 158:19
**pulled** 12:11
15:11 54:18
148:20 157:4
**pulling** 38:19
**pulls** 53:17
**purports** 99:23
**purpose** 52:22
112:21 168:19
**purposes** 22:7
22:16,23 47:20
64:7 90:16
124:17 131:20
158:15
**pursuant** 16:8
71:19 74:25
75:15,17 137:6
174:8
**push** 128:24
**put** 27:4 39:12
49:25 55:8
78:20 122:3
140:23 145:9
157:21
**putting** 22:16
**p.m** 105:10
164:8,11
173:13,24

**quali** 62:1
**qualifications**
61:5 133:25
**qualified** 62:1
89:14
**qualify** 60:9
61:3,6,7 63:13
64:3,8,18
**quality** 46:6
121:4 122:11
122:21,25
123:15
**quarterly** 16:1,7
143:15,19
**question** 8:24
9:3,5,7,15
27:18 29:25
31:3 32:11
35:8 47:3
51:21 59:12
73:7 88:20
93:14 97:2,16
97:17 102:3
103:23 105:23
106:9 111:2,22
112:1 114:17
116:7,25 118:5
124:15 128:14
128:20 130:10
130:13,21
131:15 132:2
133:2,3 137:4
145:20 148:5
148:17 149:9
149:10 152:21
152:23 153:4,9
159:3,19 160:1
172:7
**questioning**
57:13
**questions** 2:2
7:24 8:8,10,22
11:13,25 12:2
27:20 39:22
40:12 53:18
59:11 62:18

———————
**Q**

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-8   Filed 02/09/18   Page 67 of 77

79:2 100:16,17
101:4 111:5
139:13 145:3
146:16 147:4
164:14,16,17
165:23 168:21
168:24 169:1
**quick** 8:6
**quickly** 34:10
**Quinlan** 2:4,6
5:2 7:12,12
10:14 19:22
43:19 48:9,12
48:15,18,22,25
49:7 67:7,10
67:13 84:4,7
84:11 86:3
95:11 97:7
100:16 101:4,6
105:2,4 115:24
116:2,5,10,15
116:20,23
117:2,7 126:5
128:15 130:12
130:15,17,23
131:4,7,12,16
134:24 144:18
144:22 145:2
146:13,18
147:2,6,9,11
148:9 152:3,4
154:20,23
163:25 164:12
168:23 169:1
173:10,20
**quite** 135:11
**quote** 11:7,18
105:4 167:25

**R**

**R** 4:1,12 5:7
175:10 176:1
177:5,20
**raise** 57:19
153:6
**raised** 54:24

57:15 103:11
**raises** 37:18
122:20 134:13
**raising** 133:24
**Ramsey** 5:7 7:10
7:10
**ran** 141:16
**ranking** 90:25
91:11
**rankings** 92:18
**ranks** 95:14
**rare** 34:15 35:19
**rarely** 56:1
62:17
**rata** 170:23
**rate** 125:19,20
126:3 167:4
**rates** 126:6
**rationale** 36:1
**raw** 160:15
**RDR/CRR** 5:22
6:4 175:23
**reach** 138:6
**read** 10:7 11:1,4
11:7,16,18
82:11 99:13,18
105:5 175:12
176:6,10,14,18
176:22 177:6
**readily** 92:15
**reality** 173:1
**realize** 40:13
**really** 17:25
72:11 108:3
116:6
**Realtime** 3:17
174:6
**reason** 8:19
16:25 34:19
36:9,18 39:19
45:15,16 50:8
62:20 64:15
72:1 115:15
121:1 123:9,21
166:10,21
176:7,11,15,19

176:23
**reasonable**
54:12 127:12
**reasons** 34:20
98:15 122:2
167:9,15
**reassignment**
136:19,19,21
**reassurance**
104:6
**recall** 57:14
70:19 72:11
79:19 100:9
**recapture**
126:19
**receive** 10:2
19:2 22:5,15
22:22,25 25:4
26:1,3,5 31:4
31:16,21 46:4
48:4 53:5 60:4
66:15 68:24
78:24 85:10
99:13 120:25
127:3,4,4,13
127:25 139:4
168:8
**received** 18:20
18:25 47:9
48:6,7 49:17
49:19,19 51:11
51:14 52:2
54:17 55:7
69:11 71:18
73:24 81:24
82:1,24 83:1
86:8,13 87:11
99:12 104:21
104:24 105:6
121:16 135:9
155:12 172:3
**receives** 60:2
**receiving** 61:21
61:24 134:16
**recess** 65:17
100:25 164:9

**recognize** 77:2
80:25 82:11
89:22,23 99:10
**recollection** 24:6
24:8 31:1 41:8
42:12 48:8
157:10,19
165:5
**recommend**
25:24 132:12
132:20,24
133:1,11
**recommendati...**
55:19,25 56:6
56:9
**recommendati...**
25:24,25
**reconcile** 56:18
152:11
**record** 6:14 7:3
9:17 11:2
65:14,16,18
100:22,24
101:1 109:23
116:11 145:7
162:7 163:12
164:8,10
173:11,12
**recorded** 143:23
158:6 159:23
**recording** 163:5
163:6
**recordkeeping**
158:14
**recruit** 169:20
170:4,5 171:16
172:22
**recruiting**
171:25 172:23
**reduce** 101:23
101:23 102:11
102:13 119:22
**reduced** 174:11
**reduces** 59:19
**reentry** 141:17
**refer** 19:6 29:15

65:7 112:4
115:6,22
116:14 124:14
126:20 128:1
128:25 139:11
139:18,25
146:5 155:5
157:16 158:8
159:12 164:25
165:15,22
**reference** 41:11
88:9
**referred** 20:14
103:13 113:9
116:19,20,21
116:24 120:20
132:4 166:7
**referring** 104:25
105:2 160:7
**refund** 127:22
**refusal** 70:13
73:2,8,14,17
97:21
**refuse** 11:11
37:6,6 38:2
66:6 68:22
73:21 75:4,13
75:22
**refused** 76:7,16
170:14,17
**refusing** 38:15
68:13 71:11
73:4 75:5
85:18 95:22
**regard** 97:19
128:16
**regarding** 11:19
26:2 44:22
46:5 68:19
81:6 104:1
111:5 139:5
146:16 147:4
170:13
**regardless** 78:11
115:2 120:23
**Registered** 3:16

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-8   Filed 02/09/18   Page 68 of 77

174:5
**regular** 42:19
**regularly** 17:11
39:21 45:5
139:1
**regulatory**
89:10
**reintroduce**
101:5
**reiterate** 79:3
**relate** 169:7
**related** 11:14
53:18 54:24
70:1,4,11 77:8
77:17 79:13
135:3 174:12
**relates** 15:23
37:13 40:19,24
46:3,22 64:4
66:3 76:9
122:20 126:14
129:20 145:25
165:3
**relating** 11:8
**relationship**
19:9 25:2,8
111:5
**relative** 64:9,11
174:15
**relayed** 79:15
**relevant** 8:9
16:21
**relief** 59:18
77:10 78:16
138:23 139:1,2
139:2,4,8,15
139:20
**relocate** 93:4
**remained** 169:4
**remarks** 57:5,5
**remember** 8:11
39:17 57:17,18
67:10,11 71:12
71:20 79:5
82:25 83:2
150:21 153:2

159:14
**remembering**
161:2
**removal** 137:1
**removed** 136:4
**removing**
136:16
**render** 177:9
**rendered** 137:15
**repeat** 9:5,5
**rephrase** 9:4
**replaced** 92:23
**report** 15:24,25
16:3 17:4,5,7,9
27:21,24,25
28:3,4 41:21
41:21 45:24
46:2 53:24
54:2 55:6
57:13 63:11
91:15 92:21
95:13 116:17
116:23 117:1,3
117:16,18
118:3,6,13
143:18 157:6
157:20 158:1
160:8,11
**reporter** 2:20
3:16,17,17
5:21 6:5,6 7:18
9:9,18 19:19
37:15 49:5
69:5 91:19
117:6 125:25
144:17 146:23
168:11 173:14
173:17 174:1,4
174:4,5,6,21
**reporter's** 6:24
**reporting** 72:3
**reports** 16:15,24
28:6 87:11
90:9 92:10
115:18 117:11
118:11,18,23

119:3 165:24
166:1
**represent** 8:3
21:12,24 40:17
59:23 74:24
76:10 105:11
105:16 119:16
120:7 136:7
139:9,14
**representation**
40:7,8,22 46:6
58:22 63:1,14
71:19 83:8
84:22 87:19
89:4 96:6 98:9
98:24 101:16
104:16 105:14
106:7,17,21,24
107:5,8,11,18
107:24 108:15
109:3,20
115:20 117:4
118:9 120:15
127:15 132:1,5
133:12 135:9
153:24 168:8
168:16
**representative**
68:5,20
**Representatives**
68:6
**represented**
21:14 68:7
101:17 139:16
142:24
**representing**
73:24 74:6,21
101:8 127:7
**represents** 19:16
46:10 69:19
89:24 91:17
**request** 25:15,19
25:20 35:7
55:19 56:1,10
56:10 83:12
90:6,7,8,10,14

150:12
**requested** 55:20
148:13 156:3
**require** 20:3
29:11 33:1,3
42:18 143:21
150:6 160:25
**required** 8:9,23
11:11 37:19
75:13 84:20
144:3,21
160:22
**requirements**
18:3 30:6
144:15,18
**requires** 34:4
41:2 62:9
**requisite** 118:20
**rerouted** 162:6
**research** 120:13
121:8
**reserve** 100:20
**reserved** 6:8
**resign** 77:24
**resignations**
78:1 80:2,4,8
**resolve** 46:18,23
**resolved** 137:3
**resonate** 172:18
**resources** 15:14
29:18 31:13
40:5 54:6,7
61:12,15 63:19
64:16 71:8
118:4,20 119:1
131:23 141:4,6
166:3,4
**respect** 10:21
18:6 25:9
32:20 35:1
36:20 37:5
40:22 60:16
69:21 86:6
97:20 110:25
112:7
**respective** 32:21

**respectively**
11:23
**respects** 118:9
**respond** 100:21
**response** 2:14
41:1 80:22
81:14,18,22
87:15
**responses** 53:9
78:24
**responsibilities**
15:7,10 30:12
30:12 37:12
41:20 150:10
**responsibility**
13:24 15:21
26:9 36:3
37:10 152:18
170:10
**responsible** 16:2
18:1,12 20:21
23:18,23 24:1
24:12 37:9
64:20 76:2
98:6 104:7
151:14
**restate** 105:23
111:2,21
**restaurant**
141:23
**restricted** 155:9
**restrictions**
153:5
**restroom** 8:19
**rests** 38:11
**result** 38:14
71:6 136:25
**results** 120:19
**resumé** 143:11
**retain** 120:6
168:7
**retained** 2:20
123:8
**retention** 124:8
**return** 17:13
24:19 175:16

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-8   Filed 02/09/18   Page 69 of 77

revenue 141:17
141:19 146:7
revenues 145:24
147:15
reverse 68:22
reversed 136:12
136:17,20,22
reverts 128:2
review 10:5 13:8
55:16 63:15
reviewed 10:16
12:10,11,12
reviewing 83:2
122:16
reviving 70:7
rid 58:17
right 24:19 27:8
29:8 48:20
55:2 70:17
71:24 79:22
92:2,19 95:2,4
96:11 100:20
103:11,22
105:3 112:6
114:5,7 117:24
120:4,4 137:24
138:25 146:8
149:11 154:9
161:23 163:25
166:5
rights 15:17
98:23 135:5
Ripley 86:12
rising 58:17
robbery 21:9,9
robust 22:13
47:21
rock 71:13
role 13:21 17:18
17:21 24:21
53:21 57:3
59:7 106:8
140:20
room 38:20
170:5 171:15
Rothert 5:17

rough 51:8
roughly 49:11
99:22
RSMo 174:9
RubinBrown
12:12 53:24
54:9 56:11
57:2 58:5,21
91:14 96:20
157:3,6 160:8
160:11,21,24
rule 60:19 64:8
66:5,13,22
68:1 110:11
125:21 127:9
153:10 154:2
rules 8:7 9:24
15:20 30:13
37:10,12,24
38:10,20 41:1
42:18,23 74:12
75:15 78:15,21
79:10,14 80:6
96:1,9 98:7,10
104:11
ruling 130:6,17
run 20:20 22:9
48:19
runs 48:16
rural 23:24 66:4
93:20 94:3,9
94:11,16,18,20
110:21,23
111:13,15,17
111:17,19,24
111:25 112:5
161:20 172:22
172:23 173:9
Russ 69:18,25
70:4

_____

**S**

S 2:9 4:1
safety 52:22
141:12 142:4,4
sake 163:6

salaries 151:5
152:16 167:18
salary 150:18
165:12,13
167:16,17
172:10
sales 52:21
Sarah 58:24
81:5
satisfaction
106:15,15
satisfied 163:16
Satterfield
69:16
save 30:20
saying 29:20
108:12,25
109:21,22
110:6 111:17
111:19 112:23
118:22 121:3
122:22,23
127:6 161:8
163:13 172:14
says 6:12 39:1
58:21 104:23
115:1 150:20
scale 151:14
scheduled 29:23
135:13
schedules 29:2
school 125:2
142:14
Schweich's
54:17
scope 40:7
screening 89:13
se 61:25 64:1
second 21:13,19
21:22 22:23
24:20 34:25
52:18 75:2
76:19 160:1
169:14,22,23
Secondhand
67:23

secretary 142:4
162:6
section 101:7
174:8
secure 72:3
Sedalia 21:17
94:7,8
see 10:18 20:6
38:7 42:10,24
43:8 81:14
88:22 97:13
122:25 133:2
164:4 169:16
169:18,22
seeing 41:3
46:21
seek 40:4
seen 117:18
135:18
seldom 153:17
selective 132:13
Senate 54:19
55:12,14,16,17
55:23 56:2,3
56:16
send 60:5 74:23
82:20 100:3
senior 30:17
151:6
sense 51:16
76:13 80:7
86:23
sent 82:4 100:5
100:9
sentence 81:22
separate 21:2
73:19
Separately 50:5
55:10
September
25:16 81:13,17
81:24 82:2
83:5 95:23
105:7 156:9
serious 42:21
135:4

seriousness
125:22 161:10
serve 17:2
served 13:18
14:9 170:2
serves 18:10
31:1 51:7 52:7
52:20
service 121:18
121:20 123:6
services 5:13,23
7:1 60:3,9,12
61:7 62:1
63:17 64:3,19
114:4 121:21
122:25 175:1
session 16:20
28:23 70:2
set 19:8 22:5,15
50:5 73:3
152:16 154:3
167:20
sets 35:10 168:1
setting 32:20
71:16
seven 8:16 14:16
16:9 42:11
159:6
severe 161:15,16
161:17,22,24
severity 82:16
126:1 160:16
160:23 161:10
161:14
sex 34:12 125:23
Shahabian 4:12
7:6,6
shape 40:21
share 18:24
19:16 40:6
92:15 93:15
97:19 151:3
shared 18:21
90:17 92:9,11
151:4
sharing 16:5

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-8   Filed 02/09/18   Page 70 of 77

90:19 98:4
**SHEET** 176:1
**sheets** 175:11,13
175:16
**Shipma** 2:5 4:18
7:14,14 29:17
44:15 59:4
67:2 72:22
73:6,11 91:21
91:25 92:3
96:21 97:2,6
97:16 100:17
104:25 115:21
115:25 116:3
116:12,18,22
116:25 128:13
130:21,25
131:10,14
146:10,14,21
146:24 147:3,7
148:4 152:1
154:18,21
164:16 168:13
173:22 175:3,8
**Shondel** 1:4 3:4
3:20 6:18
175:7 176:2
**shorthand** 6:4,5
174:4
**shortly** 70:12
75:10
**shoulders** 9:11
**should've** 155:2
**show** 99:9 116:5
161:2
**showing** 44:10
**shows** 121:9
**shrugging** 9:11
**shy** 90:18
**sign** 175:13
**signature** 6:7
173:14 175:11
175:13,17
176:25
**significantly**

120:20
**similar** 68:24
88:2 100:12
**simple** 39:19
62:20
**simply** 38:19
**Sincerely** 175:20
**single** 170:21
**sit** 23:24 28:15
55:21 83:22,24
95:19 133:15
151:24 173:8
**situation** 40:1
71:23 76:14
97:22 124:5
**six** 10:24 11:1
**Sixth** 71:19
98:23 132:1
**size** 30:19 36:3
44:22
**skill** 44:12,14
**skilled** 120:16
**skills** 42:20 43:9
43:12
**slow** 145:1
**small** 30:10
107:20
**social** 11:23 31:9
**solution** 105:24
106:10,11,19
113:14 119:8
119:21,22
130:7,19 132:3
132:6,18
**solutions** 105:20
119:11,19
132:9
**solve** 101:24
102:9 133:12
**somewhat**
153:17
**sorry** 10:12 11:2
11:6 19:20,21
19:22 43:19
48:12,23
119:20 143:6

168:12
**sort** 54:2 62:12
129:25 158:19
162:8
**sorts** 90:9
**sounds** 93:25
**source** 31:5
**sources** 153:6,18
**southern** 58:9
58:10,11
**space** 26:25,25
27:3 31:22,23
32:4,8 154:24
170:1,8,9,15
170:25 171:2,2
171:3
**Spangenberg**
115:18 116:17
117:1,3,11,16
117:18 118:3,6
**speak** 9:8 14:6
22:11 23:14
44:20 47:17
64:23 67:4
83:10 145:8
152:1 154:21
157:16 162:25
**Speaker** 70:7
**speaking** 21:25
109:1 113:21
162:21
**specific** 23:20
46:24 47:11
57:13 59:11
73:3 86:20
104:21 115:22
133:19 146:1
148:1 157:7
165:19 167:1
167:22
**specifically**
18:11 22:11
23:15 47:8
68:18 78:25
117:15
**specifics** 47:13

53:16 67:5
68:10 133:20
139:4 168:5
**speculate** 51:18
52:15
**speculating**
56:14 78:9
**speculative**
50:25
**speed** 55:17
**spend** 54:1
172:8
**spent** 11:21 72:4
103:10
**spoke** 53:13
79:1
**spoken** 101:20
**spots** 93:2
**spreadsheet**
2:16 89:18
**Springfield**
52:17 53:4
94:21
**St** 3:15 5:4,14,24
6:23 20:12,12
21:1 31:7
85:25 94:4,5
173:2 175:18
**stable** 125:12
**staff** 12:24 15:1
28:15 29:23
35:2,16 37:2
39:6 41:20
60:10 71:1
80:3,18 140:16
151:6 152:17
**staffers** 56:24
**staffing** 35:1,6
35:20 64:24
**stamps** 61:5,6
**stand** 68:12
**standard** 42:10
63:12
**standards** 54:11
54:25 159:3
**standpoint**

42:17
**stands** 23:6
96:11
**stand-alone**
152:14
**start** 19:13,23
111:18 140:22
**started** 48:23,25
67:20 103:20
118:12 171:14
**Starting** 1:20
6:13
**starts** 32:24
**state** 1:7 3:7,21
4:19 5:1,3,7
6:18 7:11,13
9:22 13:13,13
13:16,19 14:12
15:7,15,22
20:10,17,25
23:4 24:22
26:11 33:14
34:3,15 36:4,9
36:16 45:5
50:1 54:21,22
55:2 72:5 90:2
98:17 99:21
100:13 101:8
107:22 108:22
109:6,12,23
110:14 112:8
117:15 127:24
128:3 140:9
141:10,13
142:6,10,21
145:22 147:17
171:8 174:22
175:3,7 176:2
177:1
**stated** 23:13,25
34:20 106:6
108:12
**statement**
104:17,18
121:23 127:18
151:12

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-8   Filed 02/09/18   Page 71 of 77

states 1:1 3:1,18
6:20 25:3 41:9
60:25 63:14,16
107:21 121:10
121:11
statewide 19:11
19:12 51:23
59:18 95:3
96:12 101:12
102:6,8 113:15
133:19 141:16
static 92:18
status 83:8
statute 18:11
24:25 25:3
40:20 41:4
60:15,19 62:3
62:9 66:23
67:8 150:19
167:20,22,25
168:1
statutorily 18:1
statutory 18:2
150:9 168:4
stay 125:10
172:25
step 148:16
steps 66:18
87:10 134:18
Steven 5:7 7:10
86:9 164:4
steven.ramsey...
5:10
stint 15:1 140:15
STIPULATED
6:1
stirred 68:4
Stoddard 69:19
stop 68:12
Street 3:15 4:5,9
4:13 5:4,14,23
175:18
stressed 95:25
95:25,25
strict 63:12
strike 91:3

structure 17:13
18:4 19:6
133:16 150:17
151:22
studied 157:11
study 12:11
53:21,23 55:4
57:2 117:12
stuff 141:24
151:19
stumped 133:7
subject 11:14,25
45:13 70:10
144:14 146:11
148:5
subjective 42:21
61:8 93:21
submission
53:15
submit 25:15
44:23
submittals 25:23
submitted 25:20
156:6
subscribe
177:11
subsequent
22:23 51:10
79:16 104:4
155:20 158:5
subsequently
155:23
substance 177:8
subtract 54:5
suburban 94:6
110:24 111:4,9
successful
154:11,14
172:23
suffered 136:25
137:7
sufficiency
122:16
sufficient 38:7
50:9 147:15
suggest 27:2

44:2 55:9
suggested 77:20
suggesting
109:18
suggestion
109:22
suggests 61:11
Suite 3:14 4:9,20
5:4 175:5
sunshine 16:8
144:4,15
superior 123:7
supervised
41:11
supervising
122:24
supervision
28:12,13
123:14
supplied 157:12
support 35:2,16
152:16
supporting
92:13
supposed 50:18
54:1
supreme 54:22
54:22 65:21
68:2 77:8,17
103:12 152:5,7
152:8 156:12
sure 9:8,10 15:9
15:15,19,21
16:6 19:11,25
24:17 31:14,15
35:12 38:6,8
43:25 63:20
64:5,7 71:17
71:18 77:16
86:4 90:23
92:12 97:1,4
102:5 108:16
109:22 111:22
111:23 115:24
127:11 130:16
134:6 145:7

146:18 148:18
163:14 168:6
suss 52:2
swear 7:16,18
swirl 172:19
sworn 3:11 6:11
174:8
system 13:14,17
13:20 14:5
15:12 18:5
19:11 21:14
33:6,15 34:16
39:25 43:12
44:4 45:4,13
58:16 67:22
68:23 71:4,5
72:2,19 77:6
80:11 87:8
88:15 95:1,15
104:7 108:22
108:22 109:11
109:20 110:8
114:13,13,22
115:19 117:8
117:12,20
118:7 119:1,7
119:23,25
120:11,12
121:5,19 122:5
123:7,8 124:7
127:8 133:16
139:17 140:5
146:2 148:3
149:20 150:15
153:3,23
154:10 157:14
157:21 158:7
158:14 162:10
164:20 165:25
166:2 167:20
172:18
systems 19:12
systemwide
96:23,25 159:1
159:9,10

**T**
T 2:9
table 130:18
131:5,9
tabs 139:6
tacit 56:13
take 8:17,18
23:3 37:19
38:9,15,18
39:3 50:4
72:12 73:5
76:7,16 77:19
78:7,11 81:7
81:21 84:14
86:16 89:14
100:18 108:18
110:14 123:21
125:16 129:2
129:16 132:12
133:24 134:1,5
135:21 148:16
150:4 159:18
160:20 164:3
165:2
takeaway
101:10
taken 1:15 6:3
43:1 60:10
65:17 66:18
99:1 100:25
104:19 143:24
164:9 174:10
174:14 175:10
176:3
takes 45:2 74:4
134:19 163:7
talk 19:5,7 21:5
25:7,12 29:22
41:24 42:9
47:7 49:1,1
53:11 58:25
70:25 72:7,8
72:25 77:14
155:6 166:1
talked 12:25
44:1 69:20

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-8   Filed 02/09/18   Page 72 of 77

75:25 91:8
101:22 102:12
120:5 162:1
**talkers** 144:24
**talking** 46:16
90:11 103:10
103:20 138:12
144:9 148:19
**task** 26:15
**tasked** 168:16
**tax** 52:21 141:20
**taxes** 141:23,24
**team** 41:14,15
139:8
**telephone**
144:11
**tell** 77:22 81:11
92:6 93:13,17
117:13 118:13
168:3
**telling** 107:2
**tells** 62:23 157:3
**temporal** 103:25
**temporally**
138:7
**ten** 50:12,13,14
92:22,25 93:16
155:12,17
156:14,18
166:8,18 169:2
169:3
**tenure** 44:7,11
44:13 64:1
67:9 75:21
137:12,14
138:12,19
140:4,9 142:15
**term** 93:21
111:9 160:6
161:8
**terminate** 38:21
38:22
**terminated** 39:5
**terminating**
150:11
**termination**

38:25
**terminology**
136:13
**terms** 16:18 29:1
29:5 30:7
32:17 41:23
47:13,14 53:14
53:16,19 60:1
68:21 71:24
79:4 95:15
111:4
**testified** 110:2
131:22 135:2
158:9
**testify** 10:21
70:10 105:17
108:9 109:4
128:9
**testifying** 8:12
**testimony** 7:19
8:11 9:23
56:22 101:9
102:16 108:11
148:12 160:7
174:7,9
**Thank** 40:11
97:5 164:12
168:20
**theoretically**
61:4,6 63:13
**thereon** 177:10
**thereto** 174:16
**thing** 36:4 37:8
42:23 59:17
87:10 102:22
129:25
**things** 9:17 16:4
16:14,16 17:11
18:24 38:8
41:2,25 42:6,8
42:16,20 44:11
45:24 46:1,2
49:24 51:3
54:14 58:5,20
59:11 61:18
63:22 85:5

86:24 88:9
101:22 103:9
109:7 134:11
160:2,3,20
161:19 172:19
**think** 18:9,10,22
18:23 20:19
24:4 26:5 31:8
31:16 36:2,13
45:2 47:12,14
48:21 49:3,14
49:16 51:6,9
61:25 62:9,10
62:16,17,17
64:22,23 69:11
69:15,24 70:15
70:18 72:11,20
73:23 76:18
79:17 81:16
95:20 96:24
98:22 100:5,15
101:21,25
102:12,17
103:12,24
104:8,18
110:19 111:21
112:6 113:22
113:24 123:11
124:23 126:13
126:21 128:11
130:23 131:5
131:18 132:3
135:2 136:12
137:2 140:24
143:3 149:9
151:1,1,16,16
151:17,17,17
151:19,21
155:4 157:15
158:16,21
159:4,5 161:6
161:6,7 162:2
163:4 165:7,8
**thinks** 108:8,10
**third-level** 76:20
**thirty** 159:7

**thorough** 91:22
**thought** 49:8
55:1 103:24
115:11 119:20
133:7,8 135:23
147:18
**thousand** 156:7
**threat** 75:6
**three** 16:9 20:6
28:25 43:8
49:24 69:14
79:24 93:9
126:22,22
130:14 138:8
140:22 143:4
**threshold** 36:13
61:2
**thresholds** 53:25
91:13,14 157:4
160:22
**Thursday** 79:24
**tie** 126:15
172:24,24
**tied** 68:23 81:18
81:19 118:3,19
125:21 126:1
166:4
**tier** 169:23
**till** 128:4
**time** 1:20 6:13
6:15 8:17
16:21 22:12
39:12 40:5
44:10 45:19
46:21 54:20,25
59:20 62:21
63:20 66:4
67:4,24 68:7
70:23 71:3,10
78:2 90:11
103:10 122:19
122:19 135:18
138:9,10 141:3
141:10 143:7
152:12 163:7
164:2

**timekeeper**
157:21
**times** 46:20 60:3
60:7 123:22
130:14,22
172:23
**title** 13:15 14:21
**today** 8:15 10:21
12:7,17,22
23:6 83:24
95:19 102:16
104:24 105:7,9
173:18
**Today's** 6:15
**token** 103:5
**told** 52:6 67:19
68:5,11 130:25
131:11
**tomorrow** 36:15
**tool** 34:6 109:15
**top** 89:25 91:7
92:21 93:16
97:9 171:20
**total** 43:18
165:3
**touched** 40:15
**track** 154:11
**tracking** 47:4
162:3
**train** 127:10
**training** 45:23
45:23 79:6
85:5 95:24
127:3
**transcribed** 6:6
**transcript** 2:21
173:17 175:12
**transfer** 109:14
**translated**
113:14
**travel** 26:18
28:15 59:19
**treatment** 69:12
**trial** 17:6 19:15
20:8,9 21:11
27:25,25 28:2

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-8   Filed 02/09/18   Page 73 of 77

28:8 34:11
43:1,2,9,9,10
43:12,16,18
80:12 81:4
85:22,23,25
95:14 96:13,22
97:3,8 102:6
126:14 135:13
135:15,20
136:2,5,8,10
151:6 159:16
159:25 165:1,3
**trimmed** 157:2
**trouble** 9:3
**true** 23:19 93:12
111:21 135:1
152:24 177:9
177:13
**truth** 7:20,20,21
**truthfully** 8:10
8:24
**try** 29:2,22
46:18,23 52:2
71:8 85:5,6
164:18
**trying** 50:12
67:10 72:3
112:20 142:14
146:19 147:10
147:17
**Tuesday** 79:24
**tune** 22:6 51:11
**turn** 38:22 67:20
74:18 75:6
99:15 104:9
**turned** 99:17
**turning** 71:5
79:13
**turnover** 167:4
**two** 14:25 21:9
21:24 22:4
43:17 52:6
54:14,14,21
55:9,11 73:23
77:21 79:9
96:3,4 101:23

109:13 121:11
122:6 123:10
134:13 138:8
140:21 143:3,4
144:22 145:16
145:19 155:14
156:6 159:22
160:12 170:3
**two-page** 99:22
**two-year** 51:25
**type** 34:13 37:8
46:2 54:1,5
74:20 75:1,2,8
95:1 96:17
125:22
**types** 17:11 22:7
42:22 46:1
58:14,19,22
82:16 132:14
165:19
**typewriting** 6:7
174:11
**typical** 167:16
**typically** 16:14
25:16 26:5
28:6 29:5
45:11 55:21
59:23 172:7

---

**U**

**Uh-huh** 97:6
**ultimate** 60:20
**ultimately** 27:21
38:10 145:21
151:14 171:19
**umbrella** 161:8
**unable** 27:10
38:9 40:3
82:17 98:8
166:14 168:7
170:4
**unavailability**
81:7 85:24
87:13 118:4,20
**unavailable**
83:21 86:5,7

86:11,21
**uncertainties**
34:20
**unclear** 152:10
**unconstitutio...**
121:14
**underlying**
81:19
**underneath** 20:5
64:7
**understand** 8:13
9:2 45:19
48:15 49:9
90:23 91:16
102:16 103:2
104:13 110:4,6
111:22 112:22
122:23 141:25
148:12,17
149:14 150:7
151:9 152:20
154:23 155:7
159:2 162:21
163:14 172:14
**understanding**
10:20,23 30:2
34:18,25 37:21
38:10 39:8
43:16 45:4
54:10 58:24
65:25 66:9,12
67:16 70:20
71:21 72:9
82:6,8,13
83:24 85:22
87:17,20
104:11,13
106:23 114:24
118:2 119:2
125:11 127:25
146:4 147:5,12
149:1 152:7
153:11 154:14
159:21 160:10
165:10
**understood**

36:11 112:1
152:3
**underutilized**
109:12
**unemployed**
61:23
**uniformity** 42:4
**Union** 4:4 51:22
51:24 53:3
80:12 94:17
102:17
**United** 1:1 3:1
3:18 6:19
**units** 58:16 59:1
139:1
**upheld** 135:6
**upwards** 28:25
167:6
**up-to-date** 90:12
**urban** 93:18
94:14,23
110:24 111:4
111:10 173:1,8
**usage** 110:25
**use** 29:21 35:12
36:20,22 40:5
60:24,25 62:20
63:9 64:14
90:15 109:15
113:25 145:18
158:6 160:6,13
160:14 163:12
172:1
**uses** 25:23
**utility** 163:5
169:16,18,22
173:8
**utilize** 46:11
47:4 120:2
151:25 171:18
**utilized** 67:8,25
169:4
**utilizing** 120:20
131:19 169:18

---

**V**

**vacancies**
166:17,21
169:8
**vacancy** 15:2
27:12 169:12
169:14
**vacant** 16:10
169:4
**vacated** 136:13
**value** 153:24
**varied** 30:11
87:1,15
**varies** 24:16
32:18 51:19
60:12 139:3
163:24
**various** 26:11
165:24
**vary** 32:14 42:2
59:25 65:2,11
161:18
**venues** 169:19
**verbal** 19:2
**verbally** 9:10
**version** 55:24
**versus** 6:18
65:22 93:19
**veto** 22:20 47:25
145:10
**vetoed** 22:19
47:24 145:9
**viable** 71:11
88:23 108:13
108:20 109:23
109:25 112:11
112:19 133:20
**video** 50:10
**videographer**
5:13 6:14,25
7:16 8:20
65:15,18
100:23 101:1
164:7,10
173:12
**video-recorded**
1:14 3:10 6:16

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-8   Filed 02/09/18   Page 74 of 77

view 98:19
101:10 130:5
132:3
violating 78:21
violation 125:24
violent 142:7
visit 28:24 29:2
29:6,23 159:6
visited 51:21
68:8,20
visiting 90:11
visits 28:21
vis-à-vis 29:18
volatile 93:1
volatility 93:3,6
volume 99:14
110:16
votes 25:18
voucher 108:22
108:23
vs 1:6 3:6,21
175:7 176:2

**W**

wait 93:15
waiting 85:2,11
walk 143:6
Wallis 81:5,20
81:25 82:2,9
83:3,13,17
84:25 85:16
105:8
Wallis's 82:14
82:20
want 17:13
24:19 27:19
40:11 43:2,8
43:11 72:25
90:12,21,22
92:3 101:21
125:11 127:19
129:2,19,22
131:2 132:15
145:18 146:15
152:15 163:15
169:5,5,12,13

wanted 63:20
78:16 86:18
97:3 150:2
wants 129:18
warning 68:24
warts 120:10,12
122:4 126:22
Waters 65:23
66:8,20
way 21:8 28:6
32:24 40:17,21
51:20 58:14
73:7,24 74:4
80:18 92:15
97:11 102:9
109:18 112:15
113:8,18,19
115:19 118:3
122:3 124:11
125:2,6 127:6
127:24 129:22
137:10,21
143:6 162:6
163:2,20,21
ways 29:13
73:23 101:23
119:14 158:17
week 23:11,11
28:24,24,24,25
29:3 79:9,23
82:12 83:12
97:24 135:16
weeks 79:9
weight 38:19
55:10
went 52:2 56:9
70:20 103:21
159:25 163:25
weren't 102:5
West 4:13,20 5:8
175:5
western 1:1 3:1
3:19 6:20
58:13 121:10
we'll 8:6 70:12
143:11,20

we're 6:14 8:7
16:16,23 18:23
35:11 49:20,22
50:8,17 54:1
59:19 65:15,18
90:23 100:23
101:1 144:23
153:17 164:7
164:10 170:25
171:1,13
173:12
we've 27:11,12
34:5 40:15
58:19 90:17
101:20,21,22
131:18 135:17
172:15
whatsoever 31:4
wide 50:7
widen 40:8
William 3:15
5:22 6:4 174:3
175:23
Williamson 2:3
4:4 7:4,4,24
8:2,21 10:10
10:15 37:17
43:22 44:18,19
48:24 49:9,10
59:5,6 65:13
65:20 67:6,15
72:25 73:10,12
73:13 76:25
80:23 84:12
89:20 91:20,24
92:2,8,9 95:17
97:11,18 99:3
99:8 100:15,20
116:8 130:9,14
130:16 134:22
168:22 173:21
willing 23:3
45:13 50:4
64:11 110:14
134:4 167:8
willy-nilly

151:19
wind 39:23 40:3
withdraw 23:13
96:6,10 98:11
116:15 123:20
124:2,5
withdrawal
126:17 128:16
withdraws
123:20 127:21
withheld 22:21
50:19 145:11
145:21,23
148:15
withhold 48:1
146:1 147:4
withholding
146:5 147:14
witness 6:7 7:17
7:22 19:20
48:10,13,17,21
49:3,6 67:9,12
84:6,9 96:24
97:5,9 100:18
144:20,25
148:8 164:6
173:15 174:7,9
175:12 176:1
176:25
witnesses 11:22
Woodrail 4:19
29:15 46:15
90:18 175:4
word 67:7,11
124:23
words 72:14
88:7 120:17
129:13 160:13
169:11
work 13:2 14:14
18:18,18 24:21
24:23 28:7
38:21 39:3
40:6 51:14
74:15 113:7
120:24,25

121:4,15
140:19 142:16
160:23 172:12
worked 14:12
15:4 89:9
141:3,11 142:9
142:22 160:25
worker 31:9
workers 11:23
working 14:18
14:19 38:6,7
38:22 49:12
113:4,6
workload 91:13
160:14,19,20
161:9
workloads
171:9
workman's
141:21
works 33:18
world 107:20,20
worry 108:4
168:14
wouldn't 106:22
113:16 129:10
134:3,3
wrap 164:5
write 77:14
100:1 161:5
writing 39:10
80:2
written 39:14
57:5 99:23
100:12
wrong 164:2
wrongful 137:19
137:25
wrongfully
137:8
wrote 80:8
164:1

**X**

X 2:1,9 30:9

**Y**

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-8   Filed 02/09/18   Page 75 of 77

**yeah** 34:22 39:7
47:18 48:17
53:13 57:25
59:9 69:1 71:3
72:16 111:3
117:2 123:12
123:18 125:13
125:15,18
133:2 143:10
143:13 145:12
145:15 147:21
147:25 149:4
152:2 155:2
158:16 160:4
160:12 161:4
168:4 170:10
**year** 12:13 14:8
16:17 22:23
26:17 27:12
33:17 34:6,8
47:15,16 48:3
48:4,16,18
49:4,6,21
50:19,23,23
51:8,10 55:7
56:2 96:18
108:19,19
140:23,23
143:20 145:5
145:19,19
148:15,22
149:1 156:7
159:15 167:3,4
167:6 171:12
171:14 172:8
**years** 14:25 22:4
43:17 44:4
109:13 117:13
117:14 138:8
140:22 143:4
145:19 155:21
159:22,24
**year's** 54:4,5
**yesterday** 69:1
69:13 81:24
85:21 86:8,13

**yield** 54:6 126:2
**York** 4:6,6,14
4:14 141:13
142:6,10,21

———————

**$**

**$10,000** 61:12
**$3.47** 22:6 47:20
148:2 164:1
**$3.5** 49:18
**$3.74** 145:4
**$365** 165:10
**$4.5** 49:17,23
**$40** 49:11,11
**$5,000** 61:13
64:2,7

———————

**#**

**#566** 5:22

———————

**1**

**1** 2:11 10:8,11
13:21 48:17
90:4 95:13
171:13
**1st** 48:16,19
**1-800-280-3376**
5:15,25
**1:30** 105:10
**10** 2:11
**10:47** 100:24
**10:53** 101:2
**100** 4:20 33:23
175:5
**1000** 4:20 175:5
**10004-2400** 4:6
**10019** 4:14
**101** 2:4
**11** 83:5 95:23
**11th** 175:18
**1100** 4:9
**1130** 3:14
**114** 20:24
**12** 51:7,12,24
140:24,25
**12:08** 164:8
**12:16** 164:11

**12:28** 173:13,24
**125** 4:5 61:5
**125,000** 31:13
**13** 10:22 11:17
11:18 84:21
**14** 140:25,25
158:2
**15** 48:19
**150,000** 31:14
**16** 48:19
**164** 2:5
**169** 2:6
**17** 167:4
**17-04057-CV-...**
1:6 3:6 6:19
**18th** 4:5
**19th** 95:14
**1980s** 115:13
**1989** 114:23
**1993** 115:17
116:16 117:1,3

———————

**2**

**2** 2:12 76:22
77:1 103:13
**20** 156:20
177:15
**200** 5:4
**2012** 140:25
158:3
**2014** 53:22
158:3
**2015** 13:22 22:4
47:18 48:25
49:2,19 50:14
51:4 157:25
**2016** 48:3,9,18
49:2,3,6
**2017** 1:16 2:18
3:11 6:15
48:11 81:13,17
90:4,4 93:9
95:13 99:6
175:2,10 176:3
**2019** 156:7
**2050** 4:9

**21** 60:24
**212** 4:6,14
**221** 5:8
**23** 95:11,11
**25** 52:19 167:6
**26** 52:20 81:24
**26th** 82:2
**27th** 81:13,17
**284-7340** 4:6

———————

**3**

**3** 2:14 80:21,24
104:23 105:1,3
**3.47** 22:15 55:8
145:13 155:15
155:17
**3.74** 49:1
**30** 20:9 42:13
175:17
**30th** 48:16,19
**30(b)(6)** 9:24
**300** 96:19 102:5
156:22
**31st** 90:4 95:13
**314** 5:5,15,24
**33** 21:2
**340-7861** 5:5
**350** 165:5,10
**35446** 175:25
**365** 165:5

———————

**4**

**4** 1:16 2:15 3:11
89:17,21 95:6
111:1,6 171:8
175:10 176:3
**4th** 6:15
**40** 47:12
**47** 145:14
**49** 22:9,13,16,24
23:8,15,17
47:21 50:1
63:14 75:1
113:25 115:16
116:2,11,19,21
122:4,14 123:8
125:4,5 126:23

**127**:16 134:8
134:24 135:3,8
136:1 137:6
149:7
**491-5616** 4:10
**492.010** 174:9

———————

**5**

**5** 2:17 99:5,10
**506-3750** 4:14
**51** 4:13
**52nd** 4:13
**525-5212** 4:21
**573** 4:21 5:9
**59** 125:4

———————

**6**

**6** 10:22 105:7
**60** 52:1
**63101** 3:15 5:4
5:14,24 175:18
**644-2191** 5:15
5:24
**65102** 5:9
**65203** 4:21
175:6

———————

**7**

**7** 2:3 4:20 175:5
**711** 5:14,23
175:17
**74** 145:13
**74,000** 51:8
**751-1024** 5:9
**76** 2:12

———————

**8**

**8:10** 1:20 6:13
6:16
**80** 2:14
**80,000** 51:9
**815** 5:4
**82,000** 51:9
**89** 2:15

———————

**9**

**9** 175:2

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-8   Filed 02/09/18   Page 76 of 77

**9-11-17** 2:12
  76:22
**9:37** 65:16
**9:51** 65:19
**906** 3:14
**92614** 4:10
**949** 4:10
**99** 2:17 159:17
  160:1

**MIDWEST LITIGATION SERVICES**
**www.midwestlitigation.com**    **Phone: 1.800.280.3376**    **Fax: 314.644.1334**
Case 2:17-cv-04057-NKL   Document 153-8   Filed 02/09/18   Page 77 of 77