# Exhibit K

## Page 1

```
 1    UNITED STATES DISTRICT COURT FOR THE
           WESTERN DISTRICT OF MISSOURI
 2             CENTRAL DIVISION
 3
      SHONDEL CHURCH, et al.,   )
 4                             )
           Plaintiffs,         )
 5                             ) Case No.
      vs.            ) 17-04057-CV-C-NKL
 6                             )
      STATE OF MISSOURI, et al.,  )
 7                             )
           Defendants.         )
 8
 9
10
11       VIDEO DEPOSITION OF RUTH PETSCH
12      TAKEN ON BEHALF OF THE PLAINTIFFS
13            December 5, 2017
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 2

```
 1              I N D E X
 2    WITNESS:              PAGE
 3    RUTH PETSCH
 4    EXAMINATION BY MR. WILLIAMSON        7
 5    EXAMINATION BY MR. RAMSEY          145
 6    EXAMINATION BY MS. SHIPMA          198
 7    EXAMINATION BY MR. RAMSEY          206
 8    EXAMINATION BY MR. WILLIAMSON      208
 9
10            E X H I B I T S
11    NO.      DESCRIPTION        PAGE
12    Exhibit 1  Client Contact Policy E-mail   58
13    Exhibit 2  Duties Under Missouri v. Frye   88
14    Exhibit 3  10/2/2017 Letter       123
15    Exhibit 4  Rules of Professional
                  Responsibility E-mail    124
16
      Exhibit 5  Suggestions in Support of Writ
17         of Prohibition and/or Mandamus  124
18    Exhibit 6  MCRC - Notification of Case
                  Assignment           129
19
      Exhibit 7  Petition for Writ of
20         Prohibition and Suggestions    136
21    Exhibit 8  Motion Requesting Conference to
                  Discuss Caseload Issues  137
22
      Exhibit 9  Complaint Form          139
23
      Exhibit 10  Guidelines for Determination of
24                Indigence              199
25
```

## Page 3

```
 1         E X H I B I T S   C O N T.
 2    NO.      DESCRIPTION         PAGE
 3    Exhibit 11  Application for Services and
                   Promise to Pay          201
 4
      Exhibit 12  Instructions for Determining
 5                Indigence              203
 6    (Original exhibits attached to original transcript.)
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1    UNITED STATES DISTRICT COURT FOR THE
           WESTERN DISTRICT OF MISSOURI
 2             CENTRAL DIVISION
 3
      SHONDEL CHURCH, et al.,   )
 4                             )
           Plaintiffs,   )
 5                             ) Case No.
      vs.            ) 17-04057-CV-C-NKL
 6                             )
      STATE OF MISSOURI, et al.,  )
 7                             )
           Defendants.   )
 8
 9        VIDEO DEPOSITION OF RUTH PETSCH, produced,
10    sworn and examined on December 5, 2017, at the
11    offices of the American Civil Liberties Union of
12    Missouri Foundation, 406 West 34th Street, Suite 420,
13    Kansas City, Missouri 64111, before Emily S. Hughes, a
14    Certified Court Reporter and Notary Public within and
15    for the State of Missouri, in a certain cause now
16    pending in the United States District Court, Western
17    District of Missouri, between SHONDEL CHURCH, et al.,
18    Plaintiffs, vs. STATE OF MISSOURI, et al., Defendants;
19    on behalf of the Plaintiffs.
20
21
22
23
24
25
```

1 (Pages 1 to 4)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-12   Filed 02/09/18   Page 2 of 93

## Page 5

```
1              A P P E A R A N C E S
2
3    APPEARING FOR THE PLAINTIFFS:
4        Mr. Jason D. Williamson
         ACLU FOUNDATION
5        125 Broad Street
         18th Floor
6        New York, New York 10004
         212.607.3300
7        jwilliamson@aclu.org
8
     APPEARING FOR THE STATE OF MISSOURI
9    AND GOVERNOR GREITENS:
10       Mr. Steven Alan Ramsey
         STATE OF MISSOURI ATTORNEY GENERAL'S OFFICE
11       207 West High Street
         Jefferson City, Missouri 65102
12       573.751.3321
         Steven.Ramsey@ago.mo.gov
13
14   APPEARING FOR THE MSPD DEFENDANTS:
15       Ms. Jacqueline Shipma
         MISSOURI STATE PUBLIC DEFENDER'S OFFICE
16       1000 West Nifong
         Building 7, Suite 100
17       Columbia, Missouri 65203
         573.526.5212
18       jacqueline.shipma@mspd.mo.gov
19
     Videographer:
20   Ryan Gray
21   Court Reporter:
     Emily S. Hughes, RPR, CRR, MO CCR #1353
22
     Alaris Litigation Services
23   1608 Locust Street
     Kansas City, Missouri 64108
24   816.221.1160
25   1.800.280.3376
```

## Page 6

```
1        IT IS HEREBY STIPULATED AND AGREED by and between
2    counsel for the Plaintiffs and counsel for the
3    Defendants that this deposition may be taken in
4    shorthand by Emily S. Hughes, RPR, CRR, MO CCR #1353,
5    and Missouri Notary Public, and afterwards transcribed
6    into typewriting; and the signature of the witness is
7    expressly reserved.
8              *  *  *  *  *
9        (Deposition commenced at 9:05 a.m.)
10       VIDEOGRAPHER:  We are on the record.
11   Today's date is December 5, 2017, and the time is
12   9:05 a.m.  This is the video recorded deposition of
13   Ruth Petsch in the matter of Shondel Church, et al.,
14   versus State of Missouri, et al, Case Number
15   17-04057-CV-C-NKL in the United States District Court
16   for the Western District of Missouri, Central
17   Division.  This deposition is being held at the
18   American Civil Liberties Union of Missouri Foundation.
19   The reporter's name is Emily Hughes.  My
20   name is Ryan Gray.  I'm the legal videographer.  We
21   are with Alaris Litigation Services.
22       Would the attorneys present please
23   introduce themselves?
24       MR. WILLIAMSON:  Jason Williamson, ACLU,
25   for the plaintiffs.
```

## Page 7

```
1        MS. SHIPMA:  Jacqueline Shipma for the MSPD
2    defendants.
3        MR. RAMSEY:  Steven Ramsey for the State of
4    Missouri and Governor Greitens.
5        VIDEOGRAPHER:  Would the court reporter
6    please swear in the witness?
7              RUTH PETSCH,
8    of lawful age, produced, sworn and examined on behalf
9    of the Plaintiffs, deposes and says:
10             EXAMINATION
11   BY MR. WILLIAMSON:
12       Q.  Good morning, Ms. Petsch.
13       A.  Good morning.
14       Q.  How are you?
15       A.  Good.
16       Q.  My name is Jason Williamson.  I represent
17   the plaintiffs in this case.  Have -- have you ever
18   been deposed before?
19       A.  I don't think I have.
20       Q.  Okay.  Well, it's pretty straightforward,
21   but I'm going to ask you a few questions relevant to
22   this case.  You're required to answer those questions
23   truthfully and to the best of your ability.  Remember
24   that your testimony here is under oath, so it's just
25   as if you were testifying in court.  Do you understand
```

## Page 8

```
1    that?
2        A.  Yes.
3        Q.  Your attorney may object to one or more of
4    my questions, but except in limited circumstances,
5    you're still required to answer the question; okay?
6        A.  (Nonverbal response.)
7        Q.  If you do not hear or understand my
8    question, just let me know, and I can ask a -- a
9    better question or rephrase the question; okay?
10       A.  Okay.
11       Q.  And a few things that I think will help our
12   court reporter here today:  First of all, when you are
13   answering questions, just be sure to -- to speak
14   clearly and loudly enough for her to hear you.  Also
15   make sure you answer each question verbally as opposed
16   to using body movements so that she can record that
17   for the record.  And also, I'd like to ask to let one
18   another finish before -- so allow me to finish my
19   question before you answer.  I'll do my very best to
20   let you finish your answer before I ask you another
21   question; okay?
22       A.  Okay.
23       Q.  Did you prepare for the deposition today?
24       A.  Yes.
25       Q.  How did you prepare?
```

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-12   Filed 02/09/18   Page 3 of 93

## Page 9

1    A.   Yesterday, I met with Jackie for, you know,
2   45 minutes, something like that.  I read back over
3   some affidavits that my attorneys had written about
4   their case overload, and I looked -- I looked at the
5   time frame, because in speaking with Jackie, I
6   wasn't -- I wasn't sure -- a -- a lot of things have
7   happened recently, and I -- and I wanted to be more
8   clear on the time frame, because it -- if you -- it
9   feels like they happened all at once, so --
10       Q.   And did you -- did you bring any or all of
11  those documents with you today?
12       A.   No.
13       Q.   Okay.  Ms. Petsch, by whom are you
14  employed?
15       A.   Missouri State Public Defender.
16       Q.   And what is your current title?
17       A.   I'm the district defender for the
18  Kansas City trial office.
19       Q.   And how long have you served as district
20  defender?
21       A.   I became district defender in, I believe
22  March of '11.
23       Q.   Have you served with the MSPD in any other
24  capacity?
25       A.   Yes.  I was assistant public defender.  I

## Page 10

1   started in January of 1998, and then I held the -- I
2   held -- well, there's different levels of assistant
3   public defender, but I was assistant public defender
4   in one level or another until I became district
5   defender.
6        Q.   Okay.  And the Kansas City trial office is
7   part of District 16?
8        A.   Yes.  We -- we're all of District 16 for
9   the most part.
10       Q.   And I want to get this right.  Do you refer
11  to it as Area 16 or District 16, or are those
12  interchangeable?
13       A.   MSPD calls it Area 16.  It is the 16th
14  Judicial Circuit in -- in Kansas City, the circuit
15  matches up with the office.  We only cover one county,
16  which is the 16th Judicial Circuit.  So they get
17  called a lot of things, but I think internally, we
18  call it Area 16.
19       Q.   So we'll come back to your experience
20  within the Kansas City office, but can you describe
21  your professional experience prior to coming to the
22  Missouri State Public Defender?
23       A.   As far as professional legal experience, I
24  didn't have any.  I -- I interned in the Saint Louis
25  City office, and I did some internships while through

## Page 11

1   law school, but I graduated law school in 1997, took
2   the bar, and my first legal job was with MSPD.
3        Q.   What did you do prior to law school?
4        A.   Well, I was an undergrad.  I mean, I -- I
5   did a lot of catering.
6        Q.   So you went straight from undergrad to law
7   school?
8        A.   Yes.
9        Q.   Now, you mentioned that Area 16 encompasses
10  Kansas City.  Are there any other counties that are
11  part of Area 16?
12       A.   Well, we -- Area 16 is strange in that
13  there's two courthouses.  There's one in Kansas City;
14  there's one in Independence.  So we go to both
15  courthouses.  And then I do have some lawyers that are
16  doing some conflicts.  That's dying out because we got
17  conflict funds this year, so in some of the
18  surrounding counties like Platte, Clay, Cass, I feel
19  like Clinton.  But again, most of that is -- since
20  July 1, most of that, we're cutting back on because
21  those cases are being contracted, but I do have some
22  lawyers who do conflict cases in some of the
23  surrounding counties.
24       Q.   Is it your understanding that your office,
25  going forward, will no longer be required or expected

## Page 12

1   to -- to cover conflicts in these other counties?
2        A.   Well, that's my hope.  I've been with the
3   system long enough to know that that -- that doesn't
4   always happen.  Since July 1, we have gotten a few
5   cases from -- conflict cases mostly because we've had
6   an attorney who already represented that client, and
7   they had another case pop up, and they were sent to
8   us.  But yes, my -- my hope would be that my -- my
9   office, every MSPD office is out of the conflict
10  business, and we can focus on the 16th Judicial
11  Circuit.
12       Q.   How much time were your lawyers spending on
13  conflict cases prior to July 1?
14       A.   Well, I had one lawyer, that was his -- his
15  entire job was to do conflicts, and I had a second
16  lawyer who -- who probably 50 to 75 percent of her
17  caseload was conflicts, so if you --
18       Q.   Okay.
19       A.   -- you know, can put that into attorney
20  hours, but I basically had almost two lawyers devoted
21  to doing conflict work.
22       Q.   And were other lawyers doing cases here and
23  there, conflict cases here and there, or were -- or
24  were all the conflict cases being handled by those two
25  attorneys?

3 (Pages 9 to 12)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-12   Filed 02/09/18   Page 4 of 93

## Page 13

1    A. With the exception of I rotated -- the
2  conflicts -- the person I have had on conflicts, he --
3  he's been with us 29 years, so he's been in conflicts,
4  I want to say -- he was doing it when I took over
5  management position, so he's been on conflicts the
6  entire time. I've rotated people in and out, so I
7  might have had one or two other people who had sort of
8  residual cases, but for just -- just ease of use, it
9  was easier to have a consistent person going to the
10  various counties.
11    Q. Okay. How many attorneys do you currently
12  have on staff in your office?
13    A. Including myself, 35.
14    Q. And how many of those 35 handle felony
15  cases?
16    A. All of them.
17    Q. How many handle misdemeanors?
18    A. All of them.
19    Q. How many handle juvenile cases?
20    A. I think -- one of my conflict lawyers does
21  not, so I would say -- and I would say myself and my
22  deputy do not handle juvenile cases. I mean, we've
23  handled them, but right now, I would say we -- we
24  don't handle juvenile cases, so 32.
25    Q. How many of your lawyers handle probation

## Page 14

1  revocation cases?
2    A. Every one.
3    Q. And how many of them do direct appeals?
4    A. I have one -- I have one lawyer -- excuse
5  me -- doing work at -- he kind of has a lot of the
6  Bazell cases, which is this -- a case that came down
7  that they did a lot of felony stealings, misdemeanors,
8  so -- and it created a lot of chaos for a while, so he
9  has a -- has a bunch of those, so I have maybe one
10  who's doing that. Direct appeals are generally
11  handled by our appellate office.
12    Q. Are there any other types of cases that are
13  handled by your office that I haven't named?
14    A. Again, there's -- there's different levels
15  of post-conviction for that Bazell lawyer, which I --
16  I couldn't even tell you what they are, but I -- I
17  think that about covers it, yes.
18    Q. Now, you have -- let me rephrase.
19    How long has the most experienced lawyer in
20  your office been practicing, as far as you know?
21    A. 29 years.
22    Q. Okay. And that's the conflicts --
23    A. Yes.
24    Q. -- attorney?
25    And how long has the least experienced

## Page 15

1  attorney in your office been practicing?
2    A. Since September 18.
3    Q. And even that attorney is carrying felony
4  cases on his or her caseload?
5    A. Yes.
6    Q. Do you make distinctions between A, B
7  felonies and C, D felonies when you're assigning the
8  cases to your lawyers?
9    A. Yes.
10    Q. All right. How many investigators do you
11  have on staff right now?
12    A. Well, currently staffed, I have three. I
13  have -- I'm in the process of hiring a fourth. Full
14  staff, we're at four.
15    Q. Do you have any social workers on staff?
16    A. No.
17    Q. How many paralegals do you have?
18    A. I don't have any paralegals.
19    Q. Do you have any legal assistants?
20    A. I do. I have five.
21    Q. And what -- what role do they play?
22    A. The legal assistants, they screen all of
23  the clients who are in custody and a number of out of
24  custody. So they go to the jail. We have an
25  application, you have to qualify for the public

## Page 16

1  defender's office, they fill out those. And then they
2  open every file, so that's, you know, a -- right
3  around -- give or take right around 6,000, 5,000 --
4  6,000 cases a year, and more applications, because
5  some of those folks are denied or some of those folks
6  hire counsel in the meantime. We'll screen them in
7  jail, and then their family will hire someone. And
8  then there are also -- I have a team structure. I
9  have four teams in the office. They're assigned to a
10  trial team, so they do get requests from attorneys to
11  do things like edit video, show -- there's a
12  tremendous amount of video. Most of our -- all of our
13  discovery comes on disk, and there's a lot of witness
14  interviews. Most cases -- a lot of cases have hours
15  and hours of video between witness interviews and dash
16  cam and the like, so they do a lot of showing videos
17  to clients in the jail.
18    Q. Along with the attorney, or just the --
19    A. Usually, just the legal assistant.
20  Attorneys sometimes do that as well, but they -- they
21  don't do it together.
22    Q. And is that because you just don't have the
23  capacity for them --
24    A. Right.
25    Q. -- to do it together?

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 17

1    A.  So yeah.  We'd see that as a waste of
2  resources.
3    Q.  Understood.
4      How many attorneys are on each trial team?
5    A.  Around eight.  Everyone is on a team except
6  for myself and my deputy, Joseph Megerman, so
7  everyone else -- and I have team leaders for the
8  teams, but everyone is on a team.
9    Q.  And you said the legal assistants are
10 assigned to a trial team; correct?
11   A.  Yes.
12   Q.  So does that mean that individual lawyers
13 are not -- individual lawyers don't request assistance
14 from the legal assistant, or is that -- or -- or do
15 they?
16   A.  They do.
17   Q.  Okay.
18   A.  They have -- the teams meet, and each of
19 the individual teams sort of allocates the best use of
20 the resources they have.  So some teams have attorneys
21 doing requests of legal assistants as part of their
22 team structure, and some of them have set duties for
23 the team, and it does vary -- the time kind of on
24 votes on it and decides what's the best use of
25 resources, so --

## Page 18

1    Q.  And each team has the discretion to do
2  that?
3    A.  Yes.
4    Q.  You're not involved in that process?
5    A.  Well, if -- if it's something that goes
6  outside the legal assistant job duty entirely, I'd
7  probably have a discussion with them about it, so I --
8  I will ask the team leaders, what are you having --
9  what are you having your support staff do, what are
10 you -- you know, how -- how are you best utilizing
11 your team members?  And so I have a feel for what each
12 team is doing at a given time or what their game plan
13 is.  Sometimes they plan things, and it doesn't come
14 to fruition, but that's -- but that's how they divide
15 it.
16   Q.  Okay.  So aside from the 35 attorneys, four
17 investigators, five legal assistants, are there any
18 other staff in your office?
19   A.  Yes.  I have -- there's one administrative
20 assistant who acts more like an office manager, and I
21 have four office support assistants.
22   Q.  And the office support assistants do
23 strictly administrative work, clerical work?
24   A.  Yes.  They -- they man our phones, they
25 close every file, and they're also assigned to teams

## Page 19

1  as well, so some of them write letters for lawyers or
2  mail letters, but yes, all strictly clerical.
3    Q.  Do you have a sense of what the turnover
4  rate is among attorneys in your office?
5    A.  Well, last year, I hired -- I had nine
6  people start out of the 35, so I don't -- I haven't
7  done that math.
8    Q.  Does that mean, were those nine people who
9  replaced nine other people who resigned?
10   A.  Left, yes.
11   Q.  And do you have any opinion as to what the
12 cause of those departures may have been?
13   A.  Well, I -- I can tell -- I do an exit
14 meeting when people depart so I can talk about what --
15 a lot of people leave for private practice.  A lot
16 of -- a lot of people leave to make more money, and
17 then a number of people leave because of the work, the
18 grind.
19   Q.  Is the -- is the turnover rate concerning
20 at all to you?
21   A.  Absolutely.  It's -- I do all the hiring,
22 and between attorneys and support staff, I -- I
23 literally don't remember the last time I wasn't
24 engaged in hiring, whether I'm reading resumes or I'm
25 interviewing, or right now, I'm checking references.

## Page 20

1  I -- it -- I am constantly doing that.  It's a
2  tremendous drain on my time as well as, I have to have
3  a lawyer what is a trainer, so we're sort of
4  constantly training people.  And obviously, trial work
5  isn't a -- you don't walk into it easily and
6  naturally.  It requires a lot of training and it
7  requires a lot of time and development, so there's --
8  it's a constant question/answer, constant -- I believe
9  in open door, so I have a constant stream of people at
10 my door.  Most of my core work that I do, I do at
11 home.
12   Q.  We'll come back to that --
13   A.  Sure.
14   Q.  -- shortly.
15     Is the -- when someone leaves your office,
16 do you -- are you generally -- strike that.
17     When someone leaves your office, how long
18 does it generally take you to fill that position?
19   A.  At least six weeks.  It has to post for two
20 weeks.  I generally do two rounds of interviews, so
21 you know, you have to give people notice to get there.
22 And I do it as efficiently as possible.  One, I fear
23 losing -- I've lost positions before, so I'm always
24 afraid of losing a spot.  And two, that workload goes
25 somewhere, so it's really -- I think it's really

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

1   demoralizing for the staff to have people out.  When
2   someone leaves, their cases get disbursed, and you
3   know, they -- they feel the pain instantly.
4       Q.  And how do you handle the caseload for that
5   six weeks or however along the intervening period is
6   to make sure that those cases, the -- the lawyer's
7   cases are covered?
8       A.  Well, we reassign the cases immediately, so
9   that means lawyers who thought they had set schedules
10  will now get trial cases dropped in their lap and
11  trial settings dropped in their lap that they weren't
12  anticipating.  It's -- there's a lot of things that
13  bug the lawyers, but that really bugs the lawyers.
14      Q.  How do you choose who gets the pleasure of
15  having cases dropped in their lap?
16      A.  So one of the -- and I -- Joseph Megerman
17  does most of the assigning, but I've been the assigner
18  in the office before.  Sometimes you look at -- we
19  have the ability to look at people's trial schedules,
20  see and look when people have availability.  You
21  will -- obviously, the type of case is important.  I'm
22  not going to give new lawyers murder 1.  And some of
23  it is, it just has to go somewhere.
24      Q.  Is it fair to say that that is one of the
25  implications of -- of a high turnover rate, that you

Page 22

1   have lawyers taking on -- lawyers who are already very
2   busy taking on additional cases, at least in the
3   interim?
4       A.  Yes.
5       Q.  You mentioned that you are always afraid of
6   losing a spot?
7       A.  Right.
8       Q.  Can you explain what you mean?
9       A.  Well, we -- so the system, you know, we're
10  a statewide system, so there are attorney positions.
11  You know, they look at offices that are overload and
12  positions -- I've -- I -- I think I've lost two, and
13  then gained one.  But positions will go to other
14  offices who are considered more overloaded, so you'll
15  lose someone, and then you don't get to fill it.  I've
16  lost attorney positions that way, and I've lost
17  support staff positions that way.
18      Q.  Are the majority of the new hires
19  relatively inexperienced lawyers?
20      A.  Yes.  I do -- I've -- I've definitely hired
21  transfers.  I'm trying to think in the past year if
22  I've hired any transfers.  Maybe -- I think maybe two
23  of the nine were transfers; although, one came in with no
24  trial experience, so it wasn't -- you know, I mean, it
25  wasn't like going -- the other did come with some

Page 23

1   trial experience, so -- but for the most part, most of
2   my new hires are brand new.
3       Q.  Right out of law school?
4       A.  Yes.  Or this is their first legal job.
5   I've hired some people -- I hired a guy who just
6   worked in a start-up for a two years just doing IT
7   stuff, but he wasn't -- it didn't help his legal
8   acumen any.
9       Q.  And when those new lawyers come on board,
10  is there a period of time that they have to spend in
11  training before they are assigned clients?
12      A.  No.
13      Q.  Do they -- do they receive any training as
14  new attorneys in the office?
15      A.  Yes.  Well, I have a training person,
16  and -- and she had a baby this summer, so it made for
17  hectic times for the people who started this summer.
18  But -- and then we -- I actually moved her position.
19  She wanted to move positions when she came back.  So I
20  have a new training person.  He goes to the jail with
21  them, he goes to court dates with them until he's
22  confident that they're able to handle certain types of
23  things.  That being said, three people start in
24  September.  One person started in August.  It would be
25  physically impossible for him to attend every dep --

Page 24

1   every first for all of -- all of that group, so I do
2   have training, and we do work with it, but again, it
3   fluctuates based on training.  It's not -- I can't add
4   other trainers.  I don't have the resources for that.
5       Q.  So to be clear, the training person is not
6   conducting day-long trainings, for example, for a
7   group of lawyers; this person is shadowing lawyers
8   in -- in their work on a daily basis?
9       A.  Right.  Well, he's meeting with them,
10  discussing their cases, he'll go to the jail with them
11  for their first client, you know, sitting in on client
12  interviews, sort of working with them.  All of our
13  training is on the job for the most part as far as
14  that goes.  I do -- once a month, I do have a -- we
15  call it our second Friday CLE.  It's not a real CLE,
16  but it's sort of things that we see that lawyers have
17  issues with, and then it's generally in-house people
18  talking about voir dire, talking about other topics,
19  making a record things like that, to get -- but it's
20  usually over lunch, and it's usually an hour to an
21  hour and a half long.
22      Q.  Is that mandatory for people to attend?
23      A.  It's mandatory -- I make it mandatory for
24  ones and twos, but I mean, if someone is on vacation,
25  I'm not going to hold them.  So -- and ones and twos,

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-12   Filed 02/09/18   Page 7 of 93

## Page 25

1  APD 1s and 2s, because I just want them to have that
2  experience, and I'm -- it's open to the whole office,
3  and depending on the topic and the speaker, we have a
4  fair number of people.  I will also say the state has
5  statewide training, but that isn't -- I'm not in
6  charge of that.
7      Q.  Are your lawyers required to attend the
8  statewide training?
9      A.  The new lawyers are, yes.  And most lawyers
10 want to in some capacity because it gets them their
11 CLE hours, so --
12     Q.  You referenced APDs -- APD 1 and 2s?
13     A.  Uh-huh.
14     Q.  Can you just explain what you mean?
15     A.  So a new hire is an APD 1, and you're an
16 APD 1 -- you're eligible to be promoted after a year
17 of practice and successful performance, and then you
18 become an APD 2.
19         I write -- I personally write every review
20 in the office, so the attorneys are reviewed, and then
21 they become APD 2s.  And you're an APD 2 -- you're not
22 eligible to move up for two years in successful
23 practice including trial practice.  We have -- we have
24 a form for it, and I -- I review every -- all reviews
25 are written by me in my office, so most attorneys,

## Page 26

1  unless they've not had trial experience or they've had
2  issues that we're working on, move up to ADP 3 at
3  about the three-year mark.
4      Q.  Does every attorney start as an APD 1, or
5  does it depend on your level --
6      A.  Every attorney starts as an APD 1.  Oh,
7  well, no.  I guess that's not true.  There -- if we
8  have experienced people, they can be waived in.
9      Q.  Okay.
10     A.  So I've -- certainly, the transfers -- with
11 transfers, it's easy.  They -- they're already at a
12 level, and they transfer at the same level.  But I
13 have hired people with experience who were -- their
14 experience was given weight, so they came in as twos.
15 I just had -- I just had a lawyer who had some
16 experience, so they -- they had me promote him six
17 months early.  Normally, you'd be eligible at a year,
18 and I promoted him at six months, so there are some
19 concessions made when people have experience.
20     Q.  And can -- can you just sort of name what
21 the other levels of promotion are after AP -- APD 3?
22     A.  Well, there's APD 4.
23     Q.  Okay.
24     A.  So -- and that, again, is another two
25 years -- you have to have at least two years of highly

## Page 27

1  successful performance in A and B felony.  So for me,
2  my four standard is you should be able to take any
3  type of case.  If you got to each of the marks and got
4  promoted in the timliest manner possible, the soonest
5  you could reach that is five years, and that is our --
6  that's our top level of trial attorney.  Obviously, we
7  have management positions, but that is where attorneys
8  top out.
9      Q.  And in order to be a trial team leader, do
10 you have to be an APD 4?
11     A.  No.  I -- the trial team leader is sort of
12 my own organizational tool.  It's not MSPD.  Because
13 it's basically impossible for myself and my deputy to
14 effectively supervise and mentor 33 people.  So I do
15 interviews, I have a form, I meet with attorneys.  So
16 I've made -- I've definitely made threes team leaders
17 before.
18     Q.  Okay.
19     A.  Obviously, I'd prefer a four, but when you
20 have turnover, sometimes you don't have that many
21 fours or you don't have that many interested fours.
22     Q.  And does -- since it's not tied to any MSPD
23 requirements, is it -- is there any -- is there a
24 salary implication for becoming a team leader?
25     A.  No.

## Page 28

1      Q.  And just -- I just want to clarify one
2  thing.  You mentioned that the -- your -- your trainer
3  shadows the -- the lawyers.  So does that mean that
4  that person is really only training one lawyer a day
5  or a couple of lawyers a day?
6      A.  I think it varies.  And it depends --
7  you -- it depends how their -- their court is
8  scheduled, so he -- I think he'll meet with them sort
9  of informally as a group to talk about -- let's talk
10 about offers today.  But I would say -- the truth is
11 I -- I don't know.  I think there are days when he
12 probably touches base with everybody on the training
13 team, and there are probably days when he doesn't
14 touch base with any of them.  It just varies depending
15 on what they have going on and what their needs are.
16     Q.  So you mentioned that, at least at the
17 moment, you're doing a lot of hiring?
18     A.  Yes.
19     Q.  Can you just talk a little bit about
20 your -- your other day-to-day responsibilities as
21 district defender?
22     A.  Along with hiring, I would say I'm
23 constantly promoting with -- with the turnover, I'm
24 constantly, I think I've promoted 15 people this year.
25 The upper level promotions take me 20 to 40 hours to

7 (Pages 25 to 28)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-12   Filed 02/09/18   Page 8 of 93

## Page 29

1  write, I think. And an APD 1 is a little shorter,
2  because there's not as much to look into. What else
3  do I do? I -- I'm in charge of approving all
4  encumbrance requests, all requests for depositions. I
5  approve all leave, so that's probably five or six
6  requests a day for leave. I have been carrying two
7  probation violation dockets. I do -- I do the HR for
8  the office, so if -- obviously, we have an HR, but,
9  you know, I have to do whatever claims come in,
10 whatever investigation. I deal directly with the
11 courts, so if there are complaints that way, I'm on --
12 I have to -- there's meetings set up with the
13 presiding judge, things like that. I do those things.
14      Q. You mentioned that you also write every
15 review --
16      A. Yes.
17      Q. -- for your attorneys?
18      A. That's part of the promotions, yes.
19      Q. Oh, part of the promotions process?
20      A. Uh-huh.
21      Q. What is the basis for that review? In
22 other words, are you getting reports from supervising
23 attorneys about the other attorneys, or are you doing
24 the initial supervision?
25      A. So there's a variety of things. I do talk

## Page 30

1  to the team leaders about how people are doing, and I
2  do try -- occasionally, I get to second chair somebody
3  in trial. It's not very often, and -- but I do try if
4  someone's in trial to get over there to catch part of
5  their trial so that I can see their trial performance
6  for myself. But I -- I request cases. I go through
7  their cases. I go through their entire caseload. I
8  check all of their client contact, whether they're
9  seeing their clients -- we have a requirement with
10 MSPD that you're supposed to see your client within
11 seven days of receiving a case, as well as monthly
12 contact after that. So for a number of files, I look
13 at every contact. For all of their open cases, I look
14 at first and last contacts. When I look through their
15 files, I look for what kind of motions they're doing,
16 general -- kind of what you'd expect a defense
17 attorney, what -- how you evaluate a defense attorney,
18 what their writing is, and that, for the most part, is
19 kind of the bulk of -- looking through files. And
20 then I do talk to team leaders and anyone who has
21 second chaired. I ask team leaders who second chair
22 trials, because they are -- they are -- I hope that
23 they do a bulk of the second chairing to fill out an
24 evaluation. Some of them are better at that than
25 others in doing that in a timely manner, so sometimes

## Page 31

1  it's sitting down with them and asking them about
2  specific trial skills and where people are at.
3      Q. You mentioned that you do carry your own
4  caseload; correct?
5      A. Well, I carry a case -- I'm doing only
6  probation violations at the time, so yes. I'm not
7  carrying a trial caseload.
8      Q. And -- and why only probation cases?
9      A. Well, probation violations are set at more
10 predictable times, and while they can require -- I
11 mean, I've taken depositions. I've done real work on
12 probation violations. They don't -- it's a more
13 predictable amount of time that you can devote to it
14 than trial cases, which are all over the place, and
15 then you have -- it really, for me, I'm a resource for
16 the office, and then trying to split up what is more
17 valuable, being a resource for the office or my -- my
18 legal obligations to a client when you undertake
19 representation that way is -- especially when you have
20 a trial case, I just -- I tried to keep some cases
21 when I became district defender, and eventually had to
22 assign them out because I wasn't seeing the clients
23 and I wasn't getting any work done on it, so I found
24 that split very difficult. But with probation
25 violations, I can -- plus, they're -- you know, we

## Page 32

1  have a lot of divisions, and it means -- I mean, when
2  I have turnover, I don't have enough lawyers to take a
3  division. The -- usually, lawyers have trial
4  assignments, and then they're assigned to a division,
5  and they get all the probation violations that come to
6  that division. But when I run out of lawyers, I'm
7  looking at either doubling up on some lawyers who
8  already have too many cases, or just taking them
9  myself.
10      Q. How long has it been since you've had a
11 trial docket?
12      A. I think I -- probably about six months into
13 when I took over, so 2011.
14      Q. And -- and when you refer to a trial
15 docket, does that include any and all felonies?
16      A. Yes.
17      Q. And all misdemeanors?
18      A. Yes.
19      Q. Which is to say those cases could go to
20 trial? In other words, you're characterizing --
21 characterizing them as a trial docket because those
22 are cases that could conceivably go to trial?
23      A. Yes, correct. And I -- I should --
24 recently, a number of the Jackson County judges have
25 ordered me to enter on a number of cases, which I have

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-12   Filed 02/09/18   Page 9 of 93

## Page 33

1   done so, so I guess you could say I'm entered on some
2   cases that could go to trial at this point, but I'm
3   also having -- other attorneys are also entering,
4   so --
5        Q.   And we will return to that --
6        A.   Sure.
7        Q.   -- in a bit.
8        Does the MSPD central office play any role
9   at all in -- in performance evaluations of your
10  lawyers -- of the lawyers in your office?
11       A.   Yes.  Well, I write them, and for APD, the
12  one to two is based on my evaluation solely.  That
13  doesn't get run by anyone.  But all the other
14  evaluations do.  So I write an evaluation, and then I
15  send it -- right now, Ellen supervises me, and I think
16  Joel Elmer also, he looks at -- I know he looks at all
17  the fours.  We just had a supervisor leave, so some of
18  that is up in the air, but I've always sent it to a
19  supervisor and then gotten feedback about sometimes
20  add something, sometimes -- you know, or this isn't
21  very good client contact.  What can you do to motivate
22  this person?  Feedback about whether I need to change
23  the review or work with the attorney in some way.  So
24  ultimately, I don't approve the promotions to three
25  and four.  That's -- I write them, submit them, and

## Page 34

1   then get feedback, and that comes from upper
2   management.
3        Q.   And when you refer to "Ellen," that's
4   Ellen Blaugh?
5        A.   Right.
6        Q.   How long does is generally take for the
7   central office to make those ultimate decisions?
8        A.   Of -- it's -- it's varied over the time
9   I've had the position.  Of recent, not -- not very
10  long at all; although, I am not afraid to pester
11  people, so I definitely will.  Because I'm cognizant
12  of when pay periods hit, so I -- I know if I can get
13  it approved before the next pay period, that means
14  that it will become effective sooner, so I tend to
15  gently hound people to get them to look at it.
16  Because I see my role as I also advocate for the
17  lawyers in my office, and if I have good lawyers, I
18  certainly want to get -- them to get promoted in a
19  timely manner, and I try and advocate for them as much
20  as possible.
21       Q.   When you are evaluating the performance of
22  any of your lawyers, to what extent do you consider
23  their caseload in -- in assessing the quality of their
24  work?
25       A.   Well, it -- it's impossible not to.

## Page 35

1   Because as I say, I don't think I have a single lawyer
2   who is meeting their client contact ever.  I've never
3   had anyone be 100 percent for -- definitely for
4   certain, and I would say most people have a fair -- a
5   fair number of not seeing clients on time or not
6   seeing them regularly.  So I do -- to me, I feel like
7   I have to take that into account.  You know, if you
8   have someone with 100 cases, that's very different
9   than if they had 30.
10       Q.   But it's -- there's no particular formula
11  that you can use to --
12       A.   No.
13       Q.   Okay.  Do you -- do you manage the budget
14  in your office?
15       A.   Yes.
16       Q.   So you make decisions about how much money
17  goes where?
18       A.   Well, I approve the expenses.
19       Q.   I see.
20       A.   The ultimate budget that's handed to me
21  comes from upper management, so I don't -- I approve
22  expenses within that budget, but I sign off on
23  every staples request we make, every -- and I do sign
24  off on all the trial -- we call them encumbrance
25  requests.  Although, some of them, if there above

## Page 36

1   $500, if they're on a murder, some of them go --
2   they're approved by the central office.  I approve
3   only my local budget numbers, so -- but I don't -- I
4   mean, I'm given a certain amount of money.  I don't --
5   and I keep it within that.
6        Q.   And how do you make decisions about how to
7   use that -- how to allocate that -- that pool of money
8   that you have to depositions versus experts versus
9   other things that your office may need?
10       A.   Well, most of the depositions and experts
11  come from the central level.  And again, my -- my
12  budget, you know, there's a supplies section.  I don't
13  get to borrow from supplies to pay for depos.  It --
14  it's already delineated, so -- or if I -- if I have
15  that power, I don't -- I'm unaware of it.  I don't do
16  that.
17       Q.   So when you say that the -- so even the
18  pool of money that you're given for your office is
19  already itemized in terms of how much you can spend on
20  what?
21       A.   Yes.
22       Q.   Okay.  And it's your understanding that
23  that's how it works for every district?
24       A.   Yes.
25       Q.   Okay.  How much discretion do you have in

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-12    Filed 02/09/18    Page 10 of 93

## Page 37

1  setting policy for your office?
2      A.  I feel like I have a fair amount.
3  Although, I'm not -- Joel Elmer was my boss my entire
4  14 years before I ended up taking his job, so there
5  are district defenders who are more leery about
6  talking to upper management.  I am not one of them.
7  So for the most part, when I'm thinking about policy,
8  I want to discuss it with experienced people who --
9  who have been through it or have ideas about it.  So I
10  don't know that I've ever implemented a policy that
11  upper management said, "You shouldn't do that.
12  Reverse that."  That's never happened to me.  But I
13  have a pretty -- I have a pretty comfortable
14  relationship with upper management.  I'm not afraid to
15  call anybody.  I'm not afraid to ask advice.  They
16  probably say I call them too much.
17      Q.  And -- and in your opinion, why are some
18  district defenders leery of speaking with upper
19  management?
20      A.  Well, I think there's -- I think there are
21  people who think, like, I want to do it on my own.
22  This is all mine.  I'm separate.  I mean, I think I've
23  always grown up with the concept -- or grown up --
24  grown up through the law and grown up through the
25  system with the concept that it's -- you know, we're a

## Page 38

1  statewide system; that, you know, our goals are that
2  everyone do well, that everything -- you know, I know
3  with Joel and hiring, when he was -- supervised me
4  would say, like, well, let the rural office -- you
5  know, people who are candidates in multiple offices,
6  let the rural offices choose first because it's much
7  harder to fill those spots, and I really -- although,
8  I have a lot of turnover, I generally have big pools,
9  and I'm -- I've not had a pool yet where I've closed
10  it and reopened, that I've found candidates that I
11  thought would be successful in the office.  But I do
12  think that there are people who -- they want to run
13  their own thing, and then I think there are people who
14  are -- you know, management wants to push the
15  envelope, wants to serve clients better, and I think
16  when you're already overwhelmed, people see that as
17  sort of a hostile directive to a certain extent.
18  And -- yeah.  I mean, we'd have to get deep into
19  management theory.
20      But some of it is also that, you know,
21  people really -- there are managers who really want
22  their lawyers to like them, so they'll choose
23  friendships with lawyers over they'll choose being
24  client centered, or you know, like, oh, we'll let
25  everyone leave at 2:00, or we'll let -- and I have

## Page 39

1  always said, as an office, I'm going to -- and it
2  being a big office, I have to.  I have to be really
3  firm about hours.  I have to be really firm about how
4  policies go out, and -- and I -- I really think
5  keeping the client in mind -- I think a small office
6  to attract attorneys will sometimes weigh to keep you,
7  I will give you these breaks, and I don't have the
8  option of giving people breaks, because everyone would
9  get a break, so I -- it's complex, and it probably
10  varies office to office.
11      But I know in general, there's sort of a
12  feeling of -- there can be disconnect.  And that's not
13  true -- I mean, I certainly am friends with DDs in
14  rural offices who have no issue.  But for me, it's
15  especially easy, because my boss was -- like, Joel was
16  my boss forever, and I'm very -- I was very
17  comfortable being supervised by him before.  I'm very
18  comfortable being supervised by him now.  And when I
19  have tough times, I can call him, and he's easy to
20  talk to and he -- he's been there.  He ran the
21  Kansas City trial office for 20 years, so --
22      Q.  A couple of other budget questions.
23  Generally speaking, you have 35 attorneys in your
24  office.  Do you think that's enough?
25      A.  No.  No, I don't.

## Page 40

1      Q.  In your ideal world, how many additional
2  attorneys do you think you would like to have?
3      A.  15 to 20.
4      Q.  And -- and what's the -- the basis for that
5  number?
6      A.  Well, I think it would get attorneys down
7  to a caseload of the 30 to 40, which I think is really
8  sort of an optimal caseload; and again, it varies
9  depending on type of case.  We have a lot of serious
10  cases in this -- in my office, so the -- it -- you
11  know, I -- I don't know if you have a bunch of murders
12  and drive-by shootings and things like that that you
13  should -- you probably shouldn't have more than 25 or
14  20 -- you know, it's hard to say what that -- exactly
15  what that number is.  But when I look at getting
16  people the caseloads, controllable caseloads,
17  that's -- that's a number I would come to.
18      Q.  And you have four investigators on staff.
19  Is that enough?
20      A.  No.
21      Q.  So how many -- how many additional
22  investigators do you think you would need right now
23  for the 35 --
24      A.  For the 35?
25      Q.  -- lawyers?  Yes.

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

Case 2:17-cv-04057-NKL   Document 153-12   Filed 02/09/18   Page 11 of 93

## Page 41

1   A.   That -- I -- I think -- and I -- I don't
2   know about an ideal world.  I mean, it would be great
3   to have an investigator per two attorneys.
4         Q.   Okay.
5   A.   Which is a lot more investigators.
6         Q.   What do you -- what would you consider a
7   reasonable caseload for an investigator?
8   A.   Honestly, I -- it's -- that's a hard
9   question, because I've never -- we've never even been
10  a stone's throw away from it.  Maybe 50 cases as far
11  as, again, with -- at least the structure I have,
12  investigators, they don't enter on a case when it
13  comes in, so they solely work on attorney requests.
14  So if that structure were the same, which I don't
15  think is an ideal structure, honestly.  I think having
16  an investigator assigned to a case with an attorney as
17  they come in would be a more ideal structure.  If that
18  were the case, you'd want to keep it to basically the
19  level of where an attorney is at or maybe twice that
20  if they're assigned two attorneys, so maybe 50, 60,
21  cases, but it -- obviously, I have -- right now, we
22  have about 4100 cases that people are entered in, so
23  my attorneys -- or my investigators potentially, when
24  I'm full staff, working on potentially 1,000 cases at
25  the time, which is just -- it's ridiculous.

## Page 42

1         Q.   If you had the number of investigators that
2   you needed, do you think you would still need your
3   legal assistants?
4   A.   Yes.  The legal assistants -- there's a
5   little overlap, but they do a completely different
6   job.
7         Q.   And you have five of them in your office
8   right now?
9   A.   Right.
10        Q.   Is -- is that enough?
11  A.   No.
12        Q.   How many legal assistants do you -- do you
13  think would be ideal?
14  A.   I'd say -- well, fairly similar.  I'd say
15  an legal assistant to every two lawyers, maybe three
16  lawyers, something like that.
17        Q.   And could you use any additional clerical
18  staff?
19  A.   Yes.  Well, I -- you know, I have an office
20  manager, so I don't -- I don't have an administrative
21  assistant.  I don't -- I do all of my own typing.  I
22  do all my own faxing.  I do all of my own filing.  I
23  do all of my administrative work, with the exception
24  of the office manager does -- she does -- she helps
25  with bills, like, she codes bills and gives them to me

## Page 43

1   to sign, but she really doesn't provide me any
2   administrative support, and it's not that she's not
3   working.
4         Q.   Right.
5   A.   But it's also -- I feel like the things I
6   have her doing office-wide are more useful than having
7   her for myself, but I -- I don't -- she does -- when
8   I'm hiring, she does -- she does arrange interviews,
9   so she does assist me in that way.
10        Q.   If you had to guess, and I think you
11  alluded to this a little earlier, roughly how much
12  time would you say you spend on administrative work
13  versus substantive legal work?
14  A.   75 percent.  I mean, if you count -- I got
15  to make tables when I write reviews.  You know, if --
16  if I had someone who could -- a lot of what I do when
17  I review people as far as client contact, that
18  doesn't -- that wouldn't necessarily have to be done
19  by me.  It's a -- it's a huge chunk.
20        Q.   All right.  How many -- approximately, how
21  many cases per year does your office handle?
22  A.   It varies year to year, and I -- that
23  number, I didn't look at.  But I feel like we're right
24  around 5,000 cases.
25        Q.   Do you have any sense of roughly what

## Page 44

1   percentage of those are felonies?
2   A.   The majority of them are felony.  We -- we
3   carry not a lot of misdemeanors.  We -- I don't even
4   know if we carry 500 a year.
5         Q.   And I know you mentioned that you're only
6   carrying a couple of probation violation cases right
7   now yourself?
8   A.   Uh-huh.
9         Q.   How many cases would you say you handle per
10  year?
11  A.   Not more than 100.  Maybe 80, 90, something
12  like that.  It kind of depends on whatever comes up in
13  the division.  But that's loose, so please don't --
14        Q.   No.  I understand.
15  A.   Don't impeach me with that number.  I -- I
16  didn't look at that at all.
17        Q.   So I just wanted to ask you a few questions
18  just about procedure, criminal procedure here.  At
19  what point is a defendant generally brought before a
20  judge for the first time after arrest?
21  A.   It's usually within a day or two of arrest.
22  It's usually -- sometimes it's the next day.  I mean,
23  the -- our courts do what they call an initial
24  appearance, which -- initial arraignment daily, so
25  every day, they bring in whoever was arrested, and on

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

Case 2:17-cv-04057-NKL   Document 153-12   Filed 02/09/18   Page 12 of 93

## Page 45

1 Monday, they bring whoever was arrested over the
2 weekend.
3    Q.  And when does a formal arraignment happen?
4    A.  A formal first arraignment would happen at
5 that first court date.
6    Q.  Okay.  And is bail set at that initial
7 hearing?
8    A.  Yes.
9    Q.  Is that -- is bail generally based on a
10 bail schedule?
11    A.  It goes judge to judge.  In Jackson County,
12 years ago, a number of people got together and put
13 recommended bail amounts on what's called a blue
14 sheet.  It was printed out on blue sheets, and it -- a
15 lot of judges follow that, but that was really just
16 sort of a bunch of people's best guess.  In the last
17 couple years, the Court hired some folks to come in
18 and do a risk assessment instrument, which they --
19 they put in the -- when someone is brought into jail,
20 they put it -- the questions are derived from
21 questions asked at booking at the jail, and some
22 judges are better about following the risk assessment
23 instrument than others.  But it really --
24 individually, I mean, it's completely whatever the
25 judge -- they also have a bond sheet where the

## Page 46

1 prosecutor can write whatever they want on it, so --
2    Q.  And the bond sheet is submitted to the
3 Court?
4    A.  Yes.  It's filed usually the same time
5 the -- the complaint is, and we'll list priors, and
6 there's usually a recommendation.
7    Q.  Can the bail amount be changed after that
8 point?
9    A.  Yes.
10    Q.  Defendants are entitled to a preliminary
11 hearing; correct?
12    A.  Yes.
13    Q.  If a preliminary hearing occurs, when --
14 when would it occur?
15    A.  It would occur -- generally, at that
16 initial appearance setting, the judge will set it out
17 for a prelim setting; although, the expectation
18 generally is not that a prelim is going to happen
19 at -- at that time.  Clients are unrepresented at that
20 point, so there's often a request for the public
21 defender to screen, which can we do -- sometimes we do
22 in court that day.  And then -- so usually the prelim
23 setting is set a couple of weeks out, and then if a
24 client requests a prelim, it's usually set within a
25 month after that, I would say.  It kind of -- it

## Page 47

1 depends on availability of the Court, and sometimes
2 the state has concerns about their witnesses or when
3 they can bring them in.  Again, 99 percent of our
4 cases are grand juried, so the prelim setting is
5 really just sort of a --
6    Q.  I see.
7    A.  -- formal --
8    Q.  So at what point does the indictment
9 occur -- you're saying it goes to the grand jury at
10 some point between that initial hearing and the
11 whatever --
12    A.  No, not usually.
13    Q.  Okay.
14    A.  What happens is you go to your first prelim
15 setting, the State sends us a list of offers.
16 Sometimes there's negotiations; sometimes it -- it can
17 be continued over if you're wanting to engage in a
18 plea agreement early or at that step in the process.
19 And sometimes it gets sent over because we're looking
20 at whether people qualify for a diversion, things like
21 that.  But if you have a client who says, "I want a
22 trial no matter what," and you request a prelim at
23 that point, the judge would set it over usually about
24 three weeks, depending on what -- what the --
25 sometimes a prosecutor will say, "Well, we're going to

## Page 48

1 grand jury this."  They grand jury every drug case.
2 There's a whole set.  They grand jury every sex case,
3 every murder.  There are sets of case they always
4 grand jury, and then there's some -- sometimes they'll
5 have a prelim; sometimes they won't.  But for the most
6 part, they'll request time and tell the Court
7 they're -- they're going to send it to the grand jury.
8    Q.  Does the timing of the prelim, or at least
9 the date that's set out for the prelim depend at all
10 on whether the person is in custody?
11    A.  I do think there are some judges whose --
12 who do these -- the associate judges who handle this,
13 I think there are some who -- I think they pretty
14 standardly set it out, but I don't know for that first
15 setting if judges do that or not.  I know for
16 continuances, they often won't continue something
17 longer when someone's in custody.  That, I don't know.
18    Q.  Okay.  Are there any other kinds of
19 pretrial hearings that generally occur in a -- in a
20 criminal case?
21    A.  Like, preindictment or pre --
22    Q.  Let's start with preindictment.  Sorry.
23    A.  Okay.  We'll start with preindictment.  So
24 they have -- the judges will also set things for
25 settlement that we've -- and I'm not sure if she's

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

Case 2:17-cv-04057-NKL   Document 153-12   Filed 02/09/18   Page 13 of 93

1   doing this right now, but we've had settlement
2   conferences before they get indicted. So mostly, I
3   think because judges sort of want to clear off the
4   prelim document and sort of group these people that
5   people have indicated might be pleas. And sometimes
6   to give people time -- you know, there are people --
7   if you -- some people, if they have a DUI, if they get
8   their license back, they might get one deal; they
9   might get another. If they can pay back restitution,
10  they might get one deal; they might get another. Some
11  of it is sometimes giving clients to either make
12  restitution payments, do things like that, get medical
13  records, things that would be persuasive to the
14  prosecutor to change the offer that they are initially
15  giving.
16          And sometimes the Courts -- historically,
17  they always did. Now, there's -- Missouri has
18  judicial time standards, and most judges won't let
19  anything set beyond three months over an associate.
20  And then if -- you know, a client can waive, have a
21  prelim, be bound over, and -- or be indicted, and then
22  they'll go -- they'll be arraigned, and the judges
23  will often then -- there's -- in that same division
24  where they're doing arraignments, he also has a
25  settlement docket, and he'll set cases sometimes by

1   request, and sometimes it's cases the judge just
2   thinks should settle that they will just set, because
3   I have attorneys who get really frustrated about,
4   well, I -- I just wanted to send it to a trial
5   division, and now, I have an extra appearance. So
6   sometimes it's cases they think should settle where
7   they'll put them on a settlement docket before it
8   moves. After that, it would move to circuit court,
9   and that's when you'd have a pretrial. But the first
10  pretrial is usually -- that's where you pick a trial
11  date, which is generally sometimes six months -- we
12  have judges who will set things out nine months to a
13  year for a trial date.
14          Q. Is that after arraignment?
15          A. Yes.
16          Q. Okay. Is it possible for a defendant to
17  plead guilty at their initial appearance?
18          A. We don't staff it, so I don't know if it --
19  honestly, I don't know if there are people who --
20  it's -- I would hope not, because they're all
21  unrepresented. I don't -- I don't know if I've ever
22  seen or heard of a lawyer doing that. Certainly, it
23  better not be my staff.
24          Q. And -- and is the -- so the -- the
25  defendants are unrepresented at that point. Are the

1   public defenders generally in the room at the initial
2   appearance?
3          A. No.
4          Q. No?
5          A. It -- it depends how and when it's done,
6   but no. And if they are, they're not attentive to
7   what's going on because sometimes they'll have an
8   initial appear -- they'll do an initial appearance at
9   the beginning of a prelim docket, but usually, public
10  def -- if public defender's in the room, they are
11  talking to prosecutors, they're talking to their
12  client, they're -- they're not at the bench with
13  clients. Except, on a rare case, you know, if we have
14  a client who picked up a second case, there's
15  sometimes the attorney assigned to his cases will show
16  up.
17          Q. Do you think it would be helpful to have
18  attorneys at initial appearance -- representing
19  clients at initial appearance?
20          A. I think it's better for the clients.
21          Q. Realistically, would your office be able to
22  staff initial appearances?
23          A. No. I mean, we've tried that, and it is --
24  when you weigh the attorney time versus -- you know,
25  we weren't really getting bond reductions, we really

1   weren't getting those things. That discontinued
2   before I took over supervision. But I -- I've
3   staffed -- as an attorney, I've staffed initial
4   appearances before. But I -- I mean, I think it's an
5   opportunity for bond. I think it's an opportunity for
6   your client to say a bunch of stuff that hurts them.
7   I think there's a lot of potentially negative things
8   that could happen by being upper -- unrepresented at
9   really any court appearance.
10          Q. So I wanted to ask you a little bit about
11  that. What are some other things that a client
12  could -- could say or do at that initial appearance
13  that could be harmful to them?
14          A. They could admit facts of what they're
15  charged with, and they do. It's -- all of those --
16  those judges don't have record -- or they don't have
17  court reporters, but they do -- they tape it, so
18  really, the client could say almost anything. And
19  there is a discussion where they bond, and clients
20  will say, "Oh, but I could stay with my sister," or
21  there's a discourse that sometimes happen. Sometimes
22  not, and it really depends on the judge. But yeah,
23  there are clients who could admit facts of their case,
24  give up their right to remain silent.
25          Q. Are -- are there -- that being one of them,

13 (Pages 49 to 52)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-12   Filed 02/09/18   Page 14 of 93

1 **are there constitutional rights that -- that a**
2 **defendant could waive in that proceeding?**
3      A.  I suspect there are, and again, I haven't
4 witnessed an initial appearance in some time.  But
5 yeah.  I mean, there -- there are clients who have
6 said, "I did it."  There are clients who make all
7 kinds of admissions, which clearly is a problem.
8      **Q.  And your office is generally appointed at**
9 **that initial appearance or -- let me -- let me**
10 **rephrase that.**
11      A.  Well, right now --
12      **Q.  Let me rephrase that.  At what point in the**
13 **process is your office generally appointed to the**
14 **case?**
15      A.  So it varies.  Before the last two months,
16 which we'll talk about later.  Before the last two
17 months, generally, at that hearing, they -- the judge
18 asked the public defender to screen, so we would
19 screen the clients.  And prior to the last -- I guess
20 maybe now it's three months, we would -- anyone who
21 qualified, we'd enter on pretty much at -- you know,
22 we'd take the case, open it, and assign it.  Because
23 we've had so many concerns about Rule 4, we -- are
24 not entering until the Court is appointing us.
25      **Q.  What is Rule 4?**

1      A.  Rule 4 is -- is the Missouri ethical rule
2 that -- well, there's a series of them.  There's .1
3 dash one.  But -- but our main concerns, you know,
4 we've had -- we have an attorney disciplined and --
5 who's on probation, and he was told that caseload
6 didn't matter.  Under the rules, we're supposed to do
7 diligence, which means we're supposed to timely work
8 out these cases, which is impossible if you have
9 100 cases.  Communications, which I've already touched
10 on in my reviews.  You know, we're supposed to --
11 there's no set amount, but you know, is it a
12 reasonable amount and with promptness?  Which none of
13 my lawyers are able to go to the jail promptly or
14 respond to most clients' requests in a -- in a prompt
15 manner.  So it also covers competence, getting
16 yourself up to speed on the law, getting yourself --
17 you know, if you get a case that involves shot
18 splatter, you should be able to get yourself up to
19 speed and work on that.  Most of my lawyers have cases
20 six, nine months before they're even looking for an
21 expert.  There's a whole host of areas that we're
22 falling down under Rule 4.
23      So we had an attorney disciplined.  A
24 number of my attorneys immediately e-mailed me and
25 said, "I can't take more cases.  I'm ethically at an

1 overload."  Rule 4 also says that if -- you should
2 stop taking cases if you can't -- if you can't handle
3 any more.  And in fact, taking on more cases is a
4 conflict of interest for the current clients you have.
5 A lot of my attorneys expressed to me -- and I
6 actually ended up having a meeting with every attorney
7 individually, and we got to a point where we --
8 everyone said, "I can't take more cases," at which
9 point I wrote the presiding judge and told him I was
10 going to put clients on a postponement list.  The
11 ethical rules indicate if -- if you are in a spot
12 where you can't take more cases, that you should
13 postpone representation, which I'm -- I've tried to
14 do.  Our courts have not -- are upset about us doing
15 that and have started to appoint us on -- I think
16 we're -- I want to say we're up to 110 appointments.
17      **Q.  Okay.  So I have more questions for you**
18 **about that.**
19      A.  Sure.
20      **Q.  The -- the -- when you -- when you**
21 **mentioned screening the cases --**
22      A.  Uh-huh.
23      **Q.  -- that your office is asked to screen the**
24 **cases, does that mean that you're making indigency**
25 **determinations --**

1      A.  Yes.
2      **Q.  -- at that point?**
3      A.  Right.
4      **Q.  Okay.  And you're saying that the -- all of**
5 **the Rule 4 requirements, to your mind, are implicated**
6 **in making decisions about how many of those cases you**
7 **can actually handle or -- or how many of those**
8 **appointments you can actually accept?**
9      A.  Right.  Well, I -- at this point, I have
10 every lawyer in my office saying they're at capacity
11 for what they can ethically handle.  I -- so for me --
12 I mean, the reason they say they can't handle more
13 cases is because of their ethical obligations under
14 Rule 4.  If -- if they enter a case, and they're
15 already at overload, they're in a conflict with their
16 current clients, so I would say by entering a case,
17 I -- I would say that that's when -- at least for the
18 individual attorneys, that's when Rule 4 is -- is --
19 would be triggered.  I know about that.  I'm
20 not the ethics guru, but at least, that's at least the
21 approach that we've taken; that right now, we're not
22 going to enter on cases to keep us from being in an
23 ethical conflict, and you know, possibly looking at
24 issues with our license.
25      **Q.  Okay.  Just a couple of other procedural**

14 (Pages 53 to 56)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-12    Filed 02/09/18    Page 15 of 93

## Page 57

1  questions: The -- once you're appointed to -- once
2  your office is appointed to a case, are your attorneys
3  always present for any preliminary hearing if it
4  happens?
5      A.  They're not always present for any -- I
6  guess maybe trial, but aside from that, no.  I mean,
7  it's ideal.  They try to be.  But if someone is in
8  trial, and a prelim is set, the judge is not going to
9  move a preliminary hearing, so they will get coverage
10  from another lawyer.
11      Q.  And if coverage is required, does that
12  usually lead to a continuance, or does -- do those
13  proceedings tend to go forward?
14      A.  If it -- if it's a prelim setting --
15      Q.  Right.
16      A.  -- and the state actually brought their
17  witnesses, it will go forward.
18      Q.  All right.  Is the same true for
19  arraignment in circuit court; which is to say, are
20  lawyers present for those arraignments?
21      A.  Not all the time, no.
22      Q.  Okay.  Are there times when -- would an
23  arraignment ever go forward without any attorney
24  present?
25      A.  I don't believe so.

## Page 58

1      Q.  Okay.  And it would be the judge that would
2  make the decision to not go forward if there was no
3  attorney?
4      A.  Right.  But I -- I would say that, you
5  know, we have -- the arraignment docket has usually
6  20 people on it or more, and we probably have multiple
7  public defenders present, so likely, if we had a
8  client there whose attorney was somewhere else, they
9  would step in, or attorneys arrange coverage for their
10  cases all the time.
11      Q.  Okay.
12      COURT REPORTER:  If you get to a stopping
13  point --
14      MR. WILLIAMSON:  We can go off the record
15  now.
16      VIDEOGRAPHER:  Off the record, 10:17 a.m.
17      (A brief recess was taken.)
18      VIDEOGRAPHER:  On the record, 10:27 a.m.
19      Q.  (By Mr. Williamson)  Ms. Petsch, I'm going
20  to hand you a document that I'm going to mark as
21  Exhibit 1 for identification.
22      (Petsch Exhibit 1 was marked for
23  identification.)
24      Q.  Just have a clarifying question.
25      A.  Uh-huh.

## Page 59

1      Q.  Do you recognize this document?
2      A.  Yes.
3      Q.  And what is it?
4      A.  It's one of the local Kansas City policies
5  from our -- our policies and procedures database.
6      Q.  Okay.  And this is an e-mail from
7  Joel Elmer; correct?
8      A.  Uh-huh.
9      Q.  And was this sent to all the district
10  defenders?
11      A.  No.  This was when Joel was the district
12  defender in Kansas City.  It was sent to the lawyers
13  in the office.
14      Q.  Okay.  And this is -- what -- what was the
15  date of this e-mail?
16      A.  The date is October 13 of 2002.
17      Q.  And if you go to the second -- third page
18  of this document --
19      A.  Uh-huh.
20      Q.  -- you'll see a document that is labeled
21  "MSPD Local Office Policy"?
22      A.  Uh-huh.
23      Q.  And what is the effective date of that
24  pol -- at the top there?
25      A.  Oh, five -- is that a -- 6/14 of '06.

## Page 60

1      Q.  So I -- do you -- what is the -- and -- and
2  what's the date of -- it looks like the same date;
3  correct?  Of the -- e-mail?
4      A.  The e-mail, yes.
5      Q.  Right.  Is this -- is this a notice that
6  was sent out when this policy was created, the -- the
7  client contact policy was created, or --
8      A.  Yeah.  So in Kansas City, we have our
9  own -- or our own policies and procedures database.
10  The other one looks like it's the MSPD, the statewide
11  policies and procedures database.
12      Q.  Okay.
13      A.  So my guess is Joel sent out that e-mail,
14  added it to our local database, and then it was later
15  added to the -- well, so Joel had sort of been on the
16  forefront, I guess.  He -- he'd had his own policies
17  and procedures database before we had a statewide
18  local one, so I think he added it.  I'm not sure of
19  the timing of when the local office policy database
20  started, but my guess is that's a discrepancy.
21      Q.  Okay.
22      A.  There was a point when they wanted to move
23  everything off the local servers into a statewide
24  server, I think.  Joel really would be the person to
25  ask about the timing of that.

ALARIS LITIGATION SERVICES
www.alaris.us    Phone: 1.800.280.3376    Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-12   Filed 02/09/18   Page 16 of 93

## Page 61

```
 1        Q.  Okay.  Thank you.
 2             Now, you've talked a bit about client
 3   contact already.
 4        A.  Uh-huh.
 5        Q.  And you mentioned that your lawyers are not
 6   able to meet with the MSPD requirement of -- not
 7   always able to meet the MSPD requirement with respect
 8   to client contact; correct?
 9        A.  Correct.
10        Q.  When that client contact does occur, where
11   does it usually occur?
12        A.  We have what we called our qualifying
13   contact, so if someone's in jail, it should occur in
14   jail.  If you have someone out of custody, it can be
15   by phone, by letter, office meeting.
16        Q.  And are those meetings confidential?
17        A.  They likely should be.  I don't -- I --
18   it's almost impossible to have a confidential meeting
19   at the jail.  The jail is not set up in such a way
20   that -- they have some attorney rooms.  Some of them
21   are permanently locked.  They're difficult to get to.
22   But most of the time, you have a meeting in a room
23   close to this size.  The jail has professional
24   visitation, but it's very rare that you're in a
25   professional visitation room alone, so --
```

## Page 62

```
 1        Q.  So those conversations tend to be within
 2   earshot of other people?
 3        A.  Yes.
 4        Q.  So without getting into specifics or -- or
 5   compromising any attorney-client privilege, are you
 6   aware of any situations where the representation of
 7   the client by an attorney in your office was -- was
 8   hampered by their inability -- the lawyer's inability
 9   to communicate consistently with the client?
10        A.  Yes -- well, I -- I mean, it -- a lot of
11   the problem is intangible, so if you're seeing a
12   client regularly, you're building client relationship,
13   they trust you, you -- you come back when you say
14   you're going to come back, you follow through when you
15   say you're going to, and if you're unable to do those
16   things, there's a lot of -- there there's a lot of
17   mistrust with our clients and a government lawyer
18   anyway, so that is always on the table.  And most of
19   my attorneys sort of -- well, triage their cases.  So
20   they're working on the cases that are coming to trial.
21   They have a whole host of people who have trials nine
22   months out who they're virtually ignoring.  You know,
23   they're not seeing consistently.  They're calling all
24   the time.  And they're focused on the clients that are
25   coming to trial.  So they're constantly -- when you
```

## Page 63

```
 1   have clients coming up to trial, you're seeing them
 2   more, you're wanting information, you're doing the
 3   investigation that you should have been doing all
 4   along; and some clients are okay with that, and some
 5   clients, you've already broken it.  You've broken what
 6   should be an attorney-client relationship, and you
 7   will probably never repair that.  So then you -- your
 8   client then won't trust you when you say an offer is
 9   good.  They won't trust you when you say, I talked to
10   this witness, and they're saying something contrary to
11   what you think you're saying.  They just stop
12   believing you, and that happens all the time.
13        Q.  Have you ever had such an experience
14   yourself in -- in any cases that you were handling?
15        A.  It's been a while since I've handled trial
16   cases, so I'm thinking back.  Sure, yes.  I've
17   definitely had clients who were -- you know, you said
18   you'd be here next week, and it's just sort of fed
19   into that level of distrust.
20        Q.  And you testified earlier that part of why
21   you stopped taking trial cases was that you felt like
22   you couldn't provide the kind of representation that
23   you thought was necessary?
24        A.  Right.
25        Q.  Would that include communication with
```

## Page 64

```
 1   clients?
 2        A.  Yes.
 3        Q.  Okay.
 4        A.  Well, the clients I eventually handed over,
 5   I hadn't seen in three or four months, and I -- I
 6   really with the best of intentions thought I was going
 7   to see them, and then --
 8        Q.  And this --
 9        A.  -- and everything else filled that time.
10        Q.  And this was an experienced attorney;
11   correct?
12        A.  Yes.
13        Q.  Okay.  You just mentioned investigation.  I
14   understand this may be a little hard to -- to
15   quantify, so I'll ask you to just do the best you can.
16   But it -- in what fraction or percentage of -- of the
17   cases that come into your office do your attorneys
18   interview all of the necessary witnesses?
19        A.  I -- I really -- it would really be a stab,
20   but --
21        Q.  Would you say --
22        A.  I'm guessing -- I'm guessing people don't
23   interview all the necessary witnesses unless they're
24   going to trial.  So last year, we tried 59 cases, so
25   59 of those however many thousand cases we had, I
```

16 (Pages 61 to 64)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-12   Filed 02/09/18   Page 17 of 93

## Page 65

1    can't even say that they interviewed every necessary
2    witness in those trials.  Now, we have a number of
3    trials that either get dismissed or get pled the day
4    of trial, so if I were to presume that they were
5    interviewing every necessary witness, which I can't be
6    100 percent sure of, you know, that's, like, one
7    percent.
8         Q.  How often do your attorneys depose
9    witnesses?
10        A.  I'm told we depose them more than other
11   offices, but I don't -- I don't think it's more than
12   five percent of our cases.
13        Q.  Is that because attorneys don't have time
14   to depose witnesses?
15        A.  Well, I think it's -- yeah.  Part of triage
16   that they don't have time, or by the time -- you know,
17   there's a game that's played, so you talk to the
18   State, and you want them to produce people, and the
19   State says, "Oh, we have these people.  We'll produce
20   them."  And then you get closer and closer to a trial
21   setting, and then sometimes, they'll say, "Oh, we
22   can't find them.  You'll have to do it," and then -- I
23   mean, you have to give them -- you have -- there's a
24   seven-day notice requirement, and if you want
25   paperwork, there's a ten-day notice requirement.  You

## Page 66

1    you start pushing up to your trial dates.  And again,
2    I mean, it's not as if the attorneys are doing nothing
3    while their -- you know, they're in court or --
4    they're very busy.  These dates sneak up on people all
5    the time, yes.  And so then they get to a point
6    where -- I mean, strategically, if the State waits,
7    they can control whether you take a depo or not just
8    by the timing of it and if they can sort of -- and I
9    have attorneys who notice it up, but it also means --
10   noticing up a depo means you have to serve them, so it
11   means you have to find them.  Hopefully, the discovery
12   response is adequate.  We get a lot of discovery
13   responses that the -- all these witnesses live at the
14   Jackson County Prosecutor's Office, and -- and then
15   it's -- you have to hope that they'll produce folks.
16   So there's a lot of logistics to even getting a
17   person -- having a depo set and getting a person that
18   takes time and energy and advanced notice and advanced
19   preparation.
20        Q.  How important do you think depositions are
21   to a case, criminal case?
22        A.  I would -- given my druthers, I would have
23   deposed every witness in every trial I ever had, and I
24   would encourage every lawyer to do that if they have
25   that possibility.

## Page 67

1         Q.  Why is that?
2         A.  Because if -- there's no better way to
3    impeach someone if they change their statement, and
4    people change their statements all the time.
5         Q.  Do you think there is sufficient money
6    available for depositions if your lawyers were able to
7    take more of them?
8         A.  That's really an upper level call.  I mean,
9    I've not been refused a deposition.  I've not -- I've
10   not had an attorney refuse a deposition in my
11   experience in management.  I -- I don't -- I -- that
12   would be a -- you know, Kathy Leer question.  How many
13   depositions can the -- if everybody took them, how
14   many could the system absorb?  I have no idea.
15        Q.  Okay.  Got it.
16             How often would you say that your lawyers
17   visit crime scenes?
18        A.  Not -- I wouldn't say often.  I mean, I
19   definitely encourage people to go, and certainly, if
20   they're in trial.  But again, like I said, we're
21   trying less than one percent of our cases, and I
22   don't -- I don't know that every lawyer -- when I
23   second chair lawyers, I insist on it.  I've drug them
24   out to all kinds of places, but they -- I don't think
25   every lawyer goes to visit a crime scene in every

## Page 68

1    trial.
2         Q.  Is that one of the things that you tried to
3    do when you were handling a trial docket?
4         A.  Yes.
5         Q.  Was it difficult to do that on all your
6    cases?
7         A.  On every case, yeah.  It was impossible to
8    do on every case.  But yes, I -- I definitely --
9    there's a lot to be learned by going to a crime scene.
10        Q.  To what extent do your lawyers depend on
11   investigators to identify witnesses, for example?
12        A.  Identify them?
13        Q.  Identify -- to -- to find witnesses that
14   are not --
15        A.  Okay.
16        Q.  -- mentioned in the police report.
17        A.  Probably to some -- investigators generally
18   do what is requested.  So, you know, if you meet with
19   a client who says, "Here are these witnesses.  Find
20   them" -- I mean, I certainly would recommend that
21   investigators talk to the client, because a lot of
22   times, directions are, like, you know, the yellow
23   house down the street from this liquor store or
24   something.  But I think -- I -- there are
25   investigators who do, while interviewing a witness,

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 69

1 uncover that there are other witnesses or there's
2 someone in the house that they would sort of on their
3 own follow through, but I would say that's a very
4 small number.
5     Q.  So do investigators generally talk to --
6 interview clients without the lawyer present?
7     A.  I don't know about generally.  They
8 certainly can -- you know, no lawyer has ever said,
9 you can't -- and I certainly -- when I was busy would
10 say, "Oh, well" -- you know, an investigator would
11 say, "I went here, this didn't work out."  And I'm
12 like, "Well, just go and talk to the client yourself
13 and see what they have to say about that."
14     Q.  Okay.  So generally speaking, do attorneys
15 in your office have the time and resources to
16 investigate cases in the way that you think is
17 required?
18     A.  No.
19     Q.  And -- and is that opinion based on your
20 personal experience?
21     A.  My personal -- my personal experience as a
22 lawyer and my personal experience of supervising and
23 reviewing and looking at the work that my own lawyers
24 do.
25     Q.  Okay.  Again, without getting into any

## Page 70

1 specifics, are you aware of cases in which the
2 representation of the client by an attorney in your
3 office was -- was hampered by their inability to
4 investigate a case sufficiently?
5     A.  Yes.
6     Q.  Do you think that happens regularly?
7     A.  Depends what your definition of "regularly"
8 is.  I would say -- and if we're just purely talking
9 investigate -- you know, when someone goes to trial,
10 there's -- you know, investigation is an aspect,
11 talking to people, and then there's the prep that
12 comes out of the investigation or getting exhibits
13 that you otherwise wouldn't have.  I would say that
14 that happens regularly, that -- that attorneys go to
15 trial not fully prepared.
16         The investigation aspect of it, I would
17 probably say maybe ten percent, five to ten percent,
18 somewhere in there if I were to give a rough estimate,
19 and that's really just from talking to team leaders to
20 say, like, "Oh, so-and-so hadn't talked to this
21 person."  It -- it's more feedback when I have team
22 leaders who are like, I'm second chairing this person
23 in trial, and I'm somewhat alarmed by the -- the lack
24 of level of preparation, both investigation-wise, and
25 sometimes they haven't developed a theory of the case.

## Page 71

1 Sometimes they haven't -- you know, they don't have a
2 closing written out.  They have -- you know,
3 there's -- there's other areas on that as well.
4     Q.  How frequently do attorneys in your office
5 request discovery from the State?
6     A.  Well, we always file a general request at
7 arraignment time, which is what the rules say, and
8 then I have other -- you know, I have other lawyers
9 who will file further requests.  I have lawyers who
10 move for sanctions.  I have lawyers who, you know,
11 will ask for a bill of particulars, which I think
12 falls somewhat in line with the discovery request, but
13 probably not to the level -- I mean, there's also a
14 lot of informal, do you have this, do you -- can you
15 get this?  And they're, oh, yeah, well, that's -- you
16 didn't get that -- I mean, there's a lot of sort of
17 informal talking with the State about what people do
18 and don't have.  But the -- the number of motions to
19 compel, I wouldn't say it's a significant number, but
20 there are definitely lawyers who -- some lawyers who
21 do file them.
22     Q.  Okay.  I want to talk just a little bit
23 about expert witnesses, so you testified earlier
24 that -- I believe you testified that often, attorneys
25 don't realize they need an expert until late in the

## Page 72

1 case?
2     A.  Right.
3     Q.  How often do you think that occurs?  And
4 again, I understand that you can't quantify.
5     A.  Right.  Well, it's hard, because usually,
6 you already have to be trial bound.  And again, a lot
7 of -- if you knew you needed an expert sooner, more
8 cases might be trial bound.  If -- and so this is only
9 the cases that are already trial bound that you'll
10 meet with someone, and you'll talk about -- you'll be
11 looking at the case with them.  And I know more than
12 once, I've -- we've continued cases because it's like,
13 well, maybe you need an eyewitness ID expert.
14 Maybe -- you know, maybe that's something you should
15 look at.
16         And with newer attorneys, some of them
17 don't even know that's possible.  They're just, I'm
18 going to -- I didn't -- oh, I didn't realize.  And
19 then, you know, there's a scramble to find one.
20 Experts are difficult to match up their availability
21 with whatever the care -- Court has already set or
22 getting the Court to set something or continue it to
23 that availability.  So I don't know the number we miss
24 because people aren't spotting the issue that it's a
25 possibility.  But I've definitely had, in the last

18 (Pages 69 to 72)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-12    Filed 02/09/18    Page 19 of 93

## Page 73

1   year, at least two people that I talked to about, as
2   they -- I'm like, "Oh, tell me about your trial case."
3   And as we're talking about it, "Well, have you
4   considered this?"  "Oh."  It definitely happens.  I
5   can only -- and I don't -- it would be more of -- I
6   guess I'd have to talk to my team leaders about how
7   many times they push people toward experts.
8        Q.   And those requests go through the central
9   office?
10       A.   Right.  Well, they -- they get prove --
11  approved at a preliminary level by myself, and then
12  generally, Ellen Blaugh approves most of the -- I
13  think the experts.  But there were certain people, we
14  have a -- our training director has done a lot of
15  eyewitness, so there are certain people that you talk
16  to if you have certain issues or are helpful pointing
17  you towards experts.
18       Q.   Do you have a sense of over the course of a
19  year, how many experts are retained by -- by your
20  office, generally?
21       A.   I key -- I keep a spreadsheet, but it -- it
22  also -- it includes all the experts, so it includes
23  court reporters and interpreters and people that we
24  use all the time.
25       Q.   I see.

## Page 74

1        A.   So I don't -- I couldn't tell you, like,
2   specialized experts.  I mean, I could go back and look
3   at the spreadsheet and see when entries were made.
4   But also, I get a lot of requests that people don't
5   actually use the expert, because they'll get an offer,
6   and then they'll plead it without ever ac -- actually
7   engaging and using those funds.
8        Q.   Okay.
9        A.   But true experts, not as many as you would
10  think with the number of cases.
11       Q.   And would you say there are instances where
12  an attorney will decide not to pursue an expert
13  because they just don't have the time?
14       A.   I believe that happens, yes.
15       Q.   And would the failure to retain an expert
16  be included in the -- in the sort of list of things
17  you mentioned that hamper representation by your
18  attorneys?
19       A.   Yes.
20       Q.   You mentioned that you don't have any
21  social workers on staff; correct?
22       A.   Correct.
23       Q.   Are there resources available for attorneys
24  to assist them in -- in locating resources for their
25  clients?

## Page 75

1        A.   You mean, like, housing and things like
2   that?
3        Q.   Correct.
4        A.   So some of our investigators end up
5   doing -- you know, they'll have a -- a connection at
6   the Salvation Army, they'll have something like that.
7   Years ago, we -- well, we had a alternative sentencing
8   expert, who I believe is a master's in social work,
9   who I don't -- I don't -- I was -- I didn't
10  supervise -- I wasn't the supervisor at the office at
11  the time.  I don't think he was technically on staff.
12  He was supposed to be shared by a region, which -- and
13  you could get him to write reports, you know, to make
14  arguments to the judge, and we have nothing like that
15  any more; which for the attorneys that used them, and
16  again, that was a smaller number of people who were
17  aware -- aware and planned ahead to use that resource,
18  they were very disappointed when, money-wise, he got
19  cut.
20       Q.   Okay.  You mentioned interpreters.  Are
21  interpreters generally provided by the Court?
22       A.   When you're in court.
23       Q.   When you're not in court, do lawyers have
24  access to interpreters in order to communicate with
25  their clients?

## Page 76

1        A.   We hire them, so yes.  I mean, they have to
2   request funds, and they have to set up a meeting, and
3   they have to -- but yes.  They do have interpreters,
4   provided you can find an interpreter in the -- I mean,
5   we have some languages where we really struggle to
6   even find an interpreter to communicate.
7        Q.   What's the most common foreign language
8   that you encounter?
9        A.   Spanish.
10       Q.   And what are the other, if you can think of
11  them, the other languages that tend to --
12       A.   Well, in sign language, we have client --
13  we've definitely hired sign language.  Vietnamese, we
14  had a client who -- diga (phonetic).  So Kansas City
15  has a pretty -- there's a lot of people from a lot of
16  countries.  I had a Korean -- for example, I had a
17  Korean client, and the interpreter we found was really
18  bad, and I lucked out in that I had a law student that
19  summer who was born in Korea and spoke Korean fluently
20  and would tell me how horrible the interpreters were.
21  Because there's interpreters, and then there's
22  certified interpreters, none of whom a lot of the --
23  they don't understand legal terms.  There's a lot
24  of -- so you can hire someone and still have them not
25  be very good.  I know for trial dates, the Court was

19 (Pages 73 to 76)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-12   Filed 02/09/18   Page 20 of 93

## Page 77

1   plan -- flying in someone from DC and somewhere else
2   so that -- that we had qualified interpreters for
3   those languages, but there's a variety of -- of
4   languages. Spanish, again, is the most prevalent.
5       Q.   Are you aware of any cases where you needed
6   an interpreter, but you weren't able to get one?
7       A.   Well, I think we've always gotten someone
8   to be able to show up. A lot of people have question
9   as to how the interpreter -- whether what they were
10  saying was actually being interpreted or not.
11      Q.   Okay. You said that you -- you can't
12  recall ever having a request for a deposition turned
13  down for money reasons?
14      A.   Not that I recall, no.
15      Q.   Are there other requests that you can
16  recall having been denied for resource reasons?
17      A.   Yes.
18      Q.   What kinds of requests might you get a
19  denial on?
20      A.   So I've been denied on forensic testing
21  because they -- our IT department has gone through
22  different incarcerate -- incarcerations --
23  different -- different staffings and people with -- so
24  I've had people ask for sort of forensic -- computer
25  forensic stuff or phone forensics, and they've said,

## Page 78

1   "use in-house people" or things along those lines.
2   But you have to craft your requests very specifically,
3   so I've definitely had people turned down because they
4   didn't craft it correctly, or they couldn't -- and
5   then I've also had people where -- but in -- in
6   general, I -- my feeling is that MSPD tries to get you
7   the resources that they can, but they are going to try
8   to do it in the most economical way possible, so --
9   you know, there's a list of court reporters, and we're
10  supposed to call the cheapest one first, which can be
11  really -- my -- my lawyers probably -- one of those
12  things that people complain about -- upper management
13  about because it is -- it can be very time-consuming
14  to go through a list of three people, when you kind of
15  know that this court reporter is always available or
16  something along those lines.
17      Q.   And -- and do attorneys in your office
18  receive any guidance about when it's appropriate to
19  make some sort of expense request, given the budgetary
20  constraints?
21      A.   Well, I encourage people to request -- I --
22  I don't really factor budget into it. I tell people
23  to request -- if you think it's necessary for a case,
24  I'll tell them to request it.
25      Q.   And have you -- have you noticed any change

## Page 79

1   in the -- the -- the rate at which those requests are
2   being approved in -- in recent months?
3       A.   No.
4       Q.   Okay.
5       A.   I don't think so.
6       Q.   Okay. On average, how frequently would you
7   say your attorneys file suppression motions in their
8   cases?
9       A.   I think they file them pretty regularly on
10  cases that are in the process of going to trial. I
11  don't -- there are people who spot suppression issues
12  that they think are sort of definitive for the case,
13  you know, either suppressed, and you have a case --
14  you have an issue for trial or you don't.
15      Q.   So when you say they're filed -- often
16  filed in cases that are headed for trial, does that
17  mean that the suppression motions are generally not
18  filed early on in the case?
19      A.   Yes.
20      Q.   Okay. And do you think that's because
21  lawyers don't realize early in the case that a
22  suppression motion might be appropriate, or are there
23  other reasons?
24      A.   Yeah. I think sometimes it's a -- they
25  just haven't looked at all the discovery and watched

## Page 80

1   all the dash cam. You know, some of it -- I mean,
2   usually, a police report is written in a way that is
3   more positive -- or what the police -- police
4   officer's version of events are. And then to have --
5   take the time to watch the video and listen to how
6   things are actually said. Because the police officer
7   will just say, "he consented," and then it's like,
8   well, but how was the timing of consent? How did --
9   you know, sometimes that -- and -- and also sometimes
10  getting air tapes, because that matters too. So those
11  levels of investigation are the details, especially on
12  something like suppression where, is there consent,
13  how did that happen, the time line is very important.
14      I think attorneys just don't have time to
15  dig into the discovery until they have this pressure
16  of a trial sort of looming on them. I mean, there are
17  judges who set deadlines, as far as suppression
18  motions should be filed by this date, and I --
19  attorneys will then use that as their deadline if they
20  think they're going that route.
21      Q.   And is -- is the same generally true for
22  other pretrial motions?
23      A.   Yes.
24      Q.   Let me rephrase. Are -- how frequently
25  would you say your attorneys file other pretrial

20 (Pages 77 to 80)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-12    Filed 02/09/18    Page 21 of 93

## Page 81

1   motions aside from suppression motions?
2       A.  I'd say the bulk of them are filed in the
3   month of trial or the month before.  I mean, there are
4   some exceptions, but those are exceptions.
5       Q.  And when you were handling your own cases,
6   was the same true for you in terms of the timing of
7   filing?
8       A.  Yes.
9       Q.  Again, without getting into any kind of
10  specifics or asking you to -- not asking you to
11  compromise any attorney-client privilege, can you
12  think of any instances where representation by one of
13  your attorneys was -- was hampered by their inability
14  to file necessary motions, pretrial motions?
15      A.  Yes.  Well, that's a common client
16  complaint, I mean, when clients call.  Clients have a
17  lot of ideas about what you should file.  Some of them
18  are on point; some of them are not.  But there's a lot
19  of -- and even sometimes bond motions.  Filing motions
20  indicates the client as a tangible sort of evidence
21  that you're -- you're fighting that your -- you are
22  lawyering for that client.  And if the client is not
23  seeing any of that for months and months, it certainly
24  affects the relationship.
25      Q.  And to the extent that your lawyers are not

## Page 82

1   filing necessary pretrial motions, would you say that
2   that's because they don't have the time or resources
3   to make that happen?
4       A.  Yes.
5       Q.  You said that your office took 59 cases to
6   trial last year?
7       A.  Last -- in '16.  I think we're -- we're
8   down -- I have two people in trial.  I think we're at
9   around 49, 48, something, this year, and that's
10  adult -- I mean, that doesn't include our juvenile
11  trial, which is a bench trial.
12      Q.  Uh-huh.
13      A.  But -- and that's only jury trials.  We
14  don't do a lot of bench trials.  But 59 in 2016,
15  correct.
16      Q.  And are those mostly A, B felonies?
17      A.  Mostly, but we certainly have tried some
18  C and D, and actually, we get the best results out of
19  C and D felonies, but we don't try very many of them.
20      Q.  How often to you go to trial on
21  misdemeanors?
22      A.  I don't know -- I don't know if we tried a
23  misdemeanor case this year or last year.  We had a
24  felony that became a misdemeanor, but I don't -- a
25  standalone misdemeanor -- well, we -- yeah, we had a

## Page 83

1   DUI, so maybe one.
2       Q.  Okay.  And how about felony sex offenses?
3   How often do those go to trial?
4       A.  More frequently.
5       Q.  Okay.  And those are A, B felonies; right?
6       A.  Usually, yeah.  I mean, we do have some,
7   you know, child pornography -- there's some stuff that
8   are, but for the most part, they are serious, or in
9   Missouri, they're unclassified, which is --
10      Q.  Okay.  To your knowledge, has an attorney
11  in your office ever waived an opening or closing
12  argument?
13      A.  I'm not aware of anyone who has waived a
14  closing argument.  I do believe I've had attorneys
15  waive opening argument before.  They're supposed to
16  let me know if they're doing that, because I
17  discourage that, but I think there are attorneys who
18  have done that, yes.
19      Q.  Is that something that you ever did when
20  you -- in your -- in your trial practice days?
21      A.  Never.  I've never waived an opening or a
22  closing.
23      Q.  So in your opinion, do you believe that the
24  attorneys in your office have the time and resources
25  to prepare adequately for trial?

## Page 84

1       A.  No.
2       Q.  Do you believe that they have adequate
3   resources and time to prepare for sentencings?
4       A.  No.
5       Q.  What kind of work might go into preparing
6   for a sentencing in an ideal case?
7       A.  An ideal case?  Well, I mean, there are
8   sentencing experts.  I think bringing in a sentencing
9   expert would be ideal.  I mean, I would do that every
10  time if the resources were available and -- and you
11  could do that.  I think developing a sentencing
12  memorandum.  I know a lot of federal public defenders
13  will do video, which we -- I don't -- I don't have a
14  single lawyer who has ever done that.  But also, you
15  know, contacting witnesses that can talk about your
16  client's background, that can bring a different
17  perspective to the jury, getting to them ahead of
18  time, subpoenaing them, having time to really develop
19  what they would actually say.
20      Q.  And how much of that work tends to actually
21  happen on a -- among your -- your lawyers?
22      A.  Very little.
23      Q.  And would you say that there have been
24  instances where an attorney's representation at
25  sentencing was adversely affected by their inability

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 85

1　to -- to prepare for the sentencing adequately?
2　　　A.　Yes.
3　　　Q.　And you believe that some of your clients
4　could have gotten better outcomes had their attorneys
5　been able to prepare?
6　　　A.　Yeah.  Obviously, that's -- that's a
7　prediction, but I think especially when we have jury
8　sentencing, and we have the ability to -- I think you
9　have a lot of opportunity -- a lot of judges kind of
10　will decide this case deserves this, or that deserves
11　that.  But when you have jury sentencing, I think
12　those witnesses really matter.
13　　　Q.　You talked a little bit earlier about
14　guilty pleas or offers for plea deals.  How much time
15　would you say your lawyers spend working on a case
16　before advising a client about whether or not to plead
17　guilty?
18　　　A.　Well, that would vary.  But I can tell you,
19　the State e-mails us the offers before prelim,
20　probably sometimes before our attorneys have met with
21　clients.  At the prelim docket, the judge will ask on
22　the record what the offer is, so I assume most
23　attorneys are conveying a plea offer their initial
24　meeting.  One, because it's there, and they feel some
25　legal obligation.  And two, if they don't, and the

## Page 86

1　judge springs it on your client for the first time in
2　court, your client is going to think you withheld
3　something.  So whether they even -- I mean, they're
4　obligated to convey plea offers, but -- especially in
5　Jackson County, the -- what is the offer is very
6　central to what our Courts expect.
7　　　Q.　And -- and do the prosecutors e-mail you
8　those orders in all types of cases, or are we talking
9　just felonies?
10　　　A.　I would say all types -- I mean, they just
11　go through the docket sheet, and they give you a list.
12　Now, some serious case, they'll write "no offer," or
13　something like that.  But I mean, they -- they all get
14　personally e-mailed to me, which I then send out to
15　the office.  But it's -- it generally -- most types of
16　cases.  Some serious -- at a prelim docket, you're
17　probably not going to get a sex case offer, you're
18　probably not going to get a murder offer, things like
19　that.  But you're going to get -- the felonies
20　might -- and most misdemeanors, I would -- yeah.
21　　　Q.　And do you -- is it your understanding that
22　when those offers are conveyed by your lawyers of --
23　that they are explaining to clients that they have not
24　had a chance to investigate the case up to that point?
25　　　A.　I would hope that they're doing that, yes.

## Page 87

1　　　Q.　Are -- are they instructed to do that, as
2　far as you know?
3　　　A.　I don't -- I don't know about instructed,
4　but I -- I certainly, you know, don't encourage
5　pressuring your client to plead on a case you've done
6　no work on.
7　　　Q.　Okay.
8　　　A.　And I -- I -- I have -- I have what's
9　called a first-time felon policy for -- that
10　attorneys, before they plead someone to a felony who
11　is not already a felon, they have to actually meet
12　with me and talk to me about what work they've done.
13　And the Courts hate it, and the judges complain about
14　me micromanaging and the prosecutors, everybody hates
15　it.  Although, for me, I like it.  As a manager, I
16　like to see what -- what people are doing and how
17　they're evaluating cases.  But I also think becoming a
18　felon is a life-changing event, and it's pretty
19　important.  In an ideal world, I'd meet with every
20　lawyer before they plead anyone to any felony to have
21　an idea of what they were doing on cases.  I
22　personally don't have time to do that.
23　　　Q.　Is that --
24　　　A.　So --
25　　　Q.　Sorry.  Go ahead.

## Page 88

1　　　A.　Go ahead.  No.  That's fine.
2　　　Q.　Once that initial plea offer is made by the
3　prosecutor's office, do your lawyers tend -- tend to
4　take steps to negotiate plea deals?
5　　　A.　I don't think they negotiate before having
6　a conversation with the client, but I think
7　negotiation some -- is, at times, done at that level,
8　yes, or that stage.
9　　　Q.　So assuming they've spoken to the client,
10　there may be some plea negotiation that happens prior
11　to any investigation in the case?
12　　　A.　Yes.  I think that happens a fair amount.
13　I mean, it was one of the reasons I instituted the
14　policy, is that I felt a lot of people were pleading
15　people early on without any sense of -- you know, we
16　have police officers get disciplined all the time.  We
17　have witnesses that dis -- without any sense of
18　whether the State could actually make their case.
19　　　Q.　I'm going to hand you a document that I'm
20　finally marking as Exhibit 2.
21　　　　　(Petsch Exhibit 2 was marked for
22　identification.)
23　　　Q.　Do you recognize that document?
24　　　A.　Yes.
25　　　Q.　What is it?

22 (Pages 85 to 88)

ALARIS LITIGATION SERVICES
www.alaris.us　　　　Phone: 1.800.280.3376　　　　Fax: 314.644.1334
Case 2:17-cv-04057-NKL　　Document 153-12　　Filed 02/09/18　　Page 23 of 93

## Page 89

1    A.  Well, it's an e-mail -- it's put, again, in
2    Missouri -- or the Kansas City policies and procedures
3    database.  E-mail from Leon Munday, who, at the time,
4    was my -- well, let me look at the date.  Yes.  At the
5    time was my assistant district defender to me, which
6    then one of us posted on the database.
7         Q.  And this is an e-mail about the United
8    States Superior Court decision in Missouri versus
9    Frye?
10    A.  That's correct.
11         Q.  And what was Mr. Munday's ultimate takeaway
12    regarding your office's obligations under Frye?
13    A.  I'm sorry.  I'm going to -- I need to read
14    it.
15         Q.  No.  Please.
16    A.  Well, he says pretty clearly that he
17    thinks, under Frye, we have the duty to communicate
18    the offers to our clients and to protect the
19    attorney-client privilege unless waived.
20         Q.  Do you recall having any further
21    communications with Mr. Munday about this?
22    A.  Well, it -- when Frye came out, there was a
23    lot of discussion, because the -- the prosecutor
24    started doing Frye hearings, which is having --
25    reading the offer into the record.  And I -- I think

## Page 90

1    they were under the impression we weren't conveying
2    offers.  I -- I -- I'm not under that impression.
3    Every -- I'm not under the impression that lawyers in
4    my office don't convey offers.  But there were, you
5    know, judges who would try to then talk to your
6    client, "Do you understand that's the offer?"  Or I'd
7    hear judges say, "Oh, well, your client reacted like
8    they'd never heard it," and things like that.  So I
9    know for us, we didn't --
10    We have judges who try and make records all
11    the time.  They want your client to ask -- you know,
12    if they're in trial, and your client doesn't testify,
13    they want your client to answer affirmatively that,
14    do they understand their rights to -- you know, the
15    right to remain silent and their right to -- that
16    they're waiving their right to testify, and sort of
17    fight this fight.  The judges spend a lot of time
18    trying to make records where our client are supposed
19    to speak and respond to them, and it's awkward,
20    because if your client loses at trial, they're going
21    to be sentenced by this judge, and then they look like
22    they aren't agreeable, and they look like they're
23    negative, and the judge is really imposing on their
24    rights and really trying to litigate the
25    post-litigation stuff during their trial.  And Frye is

## Page 91

1    similar in that respect, that judges want to be sure
2    that people know what their offers are.
3    In Jackson County, we struggle a lot.  The
4    judges are very, very concerned with moving cases and
5    people pleading, and the feeling that the client knows
6    their offer.  And I don't think it's done out of an
7    interest that a client might miss an offer, because we
8    usually get offers back even the day of trial if we
9    want them.  I think it's done out of a desire for
10    efficiency and fewer cases to move through the courts.
11    So I think in Leon's discussion of this,
12    it's -- you know, went to want to protect our clients
13    from records being made and them being encouraged to
14    speak on the record.
15         Q.  Was this information or guidance
16    disseminated to the -- all the attorneys on staff?
17    A.  I assume it was.  In general, when we add
18    something to the policies and procedures database, we
19    send it around and say, "This has been added."
20    It's a big database, and quite honestly,
21    there's some -- there's some things that are in there
22    that are antiquated that, because I'm too busy, I
23    haven't -- I've cleaned out some things, but there are
24    other things that -- it's, you know, eighth on my list
25    of things that I'd like to update.

## Page 92

1    But this isn't -- this is something that
2    would have been sent out to everybody and accessible.
3    Everyone has the ability to look and read this any
4    time they want.
5         Q.  Okay.  And was any additional training
6    conducted related to this as far as you know?
7    A.  Well, I -- I do recall discussing Frye at
8    staff meetings, especially when it came out.  We have
9    a weekly staff meeting where we kind of discuss what's
10    going on.  And when they started doing Frye hearings
11    all the time everywhere in every case, so there was a
12    lot of discussion about Frye popping up and
13    prosecutors doing that.
14         Q.  And are Frye hearings not happening as much
15    now?
16    A.  I think they are.  Obviously, when the law
17    came in -- you know, but they'll do a Frye hearing
18    right before trial.  They'll do it -- it was happening
19    in basically every case when the law went into effect,
20    so it seemed like more because the ones that were
21    going on weren't current.  I think -- I think they
22    happen.  Now, obviously, if there are negotiations
23    going on, the prosecutor's is presuming you've -- I
24    don't know, that they'd have a Frye hearing, but I
25    don't -- I know they still happen.

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-12    Filed 02/09/18    Page 24 of 93

1    Q.  Okay.
2    A.  But I can't tell you with a great
3  frequency.  It's just not brought up.  And maybe it
4  it's just not brought up because it's commonplace.
5    Q.  So in your opinion, did the attorneys in
6  your office have the time and resources to negotiate
7  plea deals for your clients with all of the necessary
8  information?
9    A.  Well, I think there's a -- when people get
10  pled early, I think there's a lot of -- there's a lot
11  of -- you don't get video, you don't get dash cam.
12  There's a lot of things that you just don't get.  So
13  are there plea deals that happen without all
14  discovery?  Absolutely.
15    Q.  Okay.  Do you think there have been
16  situations where a client could have gotten a better
17  plea deal had the lawyer had the time to investigate
18  the case first?
19    A.  Absolutely, yeah.
20    Q.  What steps do the attorneys in your office
21  do to evaluate the immigration consequences for
22  clients?
23    A.  So we contract with an immigration lawyer,
24  and he's sort of a flat fee to consult, and then if
25  he's going to do more, it's a different fee.  So the

1  attorneys have to request funds in order to contract,
2  so I -- I could look -- I mean, I have a spreadsheet.
3  I could count that number of the times we've used that
4  person in the last year.  I don't know off the top of
5  my head.  There is a means -- and I've had that
6  immigration attorney come to speak at one of our first
7  Friday CLEs, mostly just sort of terrify my lawyers
8  about if -- if you don't call him, even pleas that
9  seem like they wouldn't effect your immigration
10  consequences really can.  It's certainly encouraged,
11  and the resource is there.
12    Q.  Have the lawyers in your office received
13  any additional training on immigration consequences?
14    A.  Well, aside from having the immigration
15  attorney come and speak to us, I know there's -- there
16  have been tracks at statewide training that talked
17  about that.  I don't think that I've specifically had a
18  sit-down where I've said, so you have a client with --
19  you know, who isn't is a citizen where -- how does
20  that go, aside from having that attorney come in.
21    Q.  So do you think that, in your opinion, the
22  attorneys in your office have the time and resources
23  to adequately advise clients on immigration
24  consequences?
25    A.  I would say -- I'm sort of split there.  I

1  think -- I think there are a number of attorneys who
2  are.  I think there are some who aren't, and probably
3  time and overload feeds into that.
4    MS. SHIPMA:  Could we go off the record for
5  just a second?
6    MR. WILLIAMSON:  Sure.
7    VIDEOGRAPHER:  Off the record, 11:21 a.m.
8    (A brief recess was taken.)
9    VIDEOGRAPHER:  On the record, 11:25 a.m.
10    Q.  (By Mr. Williamson)  So just one last
11  question on the -- on immigration consequences.
12    A.  Uh-huh.
13    Q.  Are you aware of any cases where, because
14  of the attorney's inability to advise their client
15  about the immigration consequences, that the case
16  resulted in a -- in an adverse consequence for the
17  client with respect to their immigration status?
18    A.  I'm not aware of a case that -- I probably
19  wouldn't -- I mean, once the client is gone, if they
20  get -- or they get picked up by ICE, we generally -- I
21  wouldn't probably know, but I'm not aware of any.
22    Q.  Okay.  Are retainers generally placed on
23  your clients -- immigration retainers placed on your
24  clients when they're in custody?
25    A.  Yes.

1    Q.  Is -- is ICE ever in touch with your office
2  for any reason?
3    A.  No.  No, I -- I'm not aware of anyone who
4  has ever talked to an ICE person.
5    Q.  Do indigent defendants in your district
6  ever undergo psychiatric evaluations?
7    A.  Yes.
8    Q.  Does that generally happen after your
9  office has been appointed to the case?
10    A.  Generally.  I mean, there are Courts that
11  order evaluations just based on behaviors they see the
12  first time they see them in court.  But generally, the
13  bulk of evaluations are done when we're on the case.
14    Q.  Do you -- do you or your lawyers ever
15  request those evaluations?
16    A.  Yes, they do.  I mean, we do a number of
17  private evaluations, and honestly, it's my preferred
18  method.  I know it's expensive and -- but, you know,
19  clients can say a lot of things, and if it's a
20  court-ordered mental evaluation, it's not -- there's
21  nothing confidential about anything they're saying.
22  So we'd had a rule for a while that we only did
23  private mentals.  That has loosened up, I think
24  because of costs.  That's not my role, so I -- I can't
25  speak to why that loosened up.  So some are done.

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-12    Filed 02/09/18    Page 25 of 93

## Page 97

1     And Jackson County also has sort of an
2  out-of-custody diversion, mental health diversion,
3  so -- and they insist if your client is going to enter
4  into that, then they have to do a court-ordered eval.
5     The State also has the option of not
6  accepting our private eval, and they can get a second
7  opinion through the Court as well.
8     So we do request some, and then we do get a
9  number of our clients also evaluated at our -- at our
10  cost.
11     Q.  If -- if a psych evaluation is ordered by
12  the Court prior to your office being appointed,
13  would -- and I -- let me rephrase that.
14     In a case where you are actually appointed
15  to -- appointed to represent the person, and the
16  Court -- but the Court orders an evaluation, let's say
17  at the initial appearance --
18     A.  Uh-huh.
19     Q.  -- what role, if any, would your lawyers
20  play in that process in -- in that evaluation process?
21  Would -- would your lawyer be at the file -- at the
22  competence -- competency hearing that followed the
23  evaluation?
24     A.  Yes.
25     Q.  Okay.

## Page 98

1     A.  They would.
2     Q.  Okay.  Would they be involved in any other
3  capacity with the evaluation process?
4     A.  Generally not.  I mean, if we're doing a
5  private evaluation, sometimes, you know, we set that
6  up, we have a client come -- if they're out of
7  custody, come to the officer.  And if we want a
8  private person to go to the jail, we have to write a
9  letter and get clearance for that person to go to the
10  jail.  Most of the mental health folks don't want
11  anyone else in the room, so you're not present for the
12  evaluation.  And -- and I've -- I've had lawyers try
13  and get -- even if the Court has ordered one, our
14  evaluations are so backed up in Jackson County, that
15  you could likely get a private one done.  They use --
16  they're supposed to get done in 30 days, but they
17  almost always ask for extensions, so it usually takes
18  more like the 90 days for someone to get a mental
19  health evaluation.  And sometimes they'll rush people
20  who the jail have said are -- you know, they think
21  they're actively a danger to themselves or others,
22  something along those limes, but sometimes they'll
23  intervene that way.
24     And obviously, if it's a private mental,
25  the results are only known to us, so if we want to --

## Page 99

1  we have the option of sharing that or not sharing
2  that.  If we want to share it or if someone comes back
3  incompetent, you know, we'd file a motion with the
4  Court to -- to have them found incompetent.
5     Q.  Do attorneys in your office attend lineups
6  that include the client?
7     A.  I've never known anyone who did.  And
8  generally, I don't think -- generally, lineups are
9  done before we'd get the case, so I don't -- we do
10  have clients who come in as suspects who, I guess
11  there's that potential.  They'll say, "The police want
12  to talk to me."  In general, we tell them -- our
13  advice is not to talk to the police, so I've never
14  known anyone who has been at a lineup.
15     Q.  Okay.  The lineups are not videotaped, are
16  they?
17     A.  I don't -- we very rarely get a live
18  lineup.  There's a lot of pictures --
19     Q.  Photos?
20     A.  -- and there's a lot of -- here are two
21  pictures.  And there's a lot of driving by the guy as
22  he sits in the cop car and having the witness identify
23  him that way.  I actually don't even remember the last
24  lineup -- I don't recall anyone ever having a live
25  lineup.

## Page 100

1     Q.  Do you -- do your lawyers ever conduct
2  Wade hearings related to these on-the-scene
3  identifications?
4     A.  We don't call it a Wade hearing, but yeah,
5  I mean, they do a motion to suppress the
6  identification and -- and have a hearing along those
7  lines, so -- and that's what we would call it.  I
8  assume that's along the lines of what you're --
9     Q.  Correct.
10     A.  -- getting at.
11     Q.  When a client -- and I apologize for
12  jumping around here.  I'm trying to make sure we get
13  through everything but --
14     A.  That's fine.
15     Q.  When a presentence investigation report is
16  created for --
17     A.  Uh-huh.
18     Q.  -- a client, does the public defender play
19  any role in that process?
20     A.  Generally, no.  I mean, we've had it where
21  we've had clients insist we there.  They call it a
22  sentencing research report.  The person from
23  probation and parole who generally goes and interviews
24  a client, generally, they don't want us there.  But I
25  have had attorneys who were able to be there through

ALARIS LITIGATION SERVICES
www.alaris.us       Phone: 1.800.280.3376       Fax: 314.644.1334

## Page 101

1   that questioning process.  The bulk of them, no.
2       Q.  It's your understanding though that the --
3   the clients do not have a right to have their attorney
4   there for these interviews?
5       A.  That's a good question.  I don't -- I don't
6   know that I've -- sadly, I don't think I've ever
7   thought about.  I -- I mean, I think that's what --
8   when the lawyers are there for the sentencing and
9   assessment report, I think that's what we're
10  advocating, is that they do have a right.  I don't
11  know that -- I don't -- honestly, I don't know legally
12  where -- where that stands.
13      Q.  Do you recall ever attending any of those
14  interviews in any of your own cases?
15      A.  No.
16      Q.  Okay.  If you have a client who pleads
17  guilty, but then decides that they want to withdraw
18  their plea, what steps do the attorneys -- or are the
19  attorneys in your office directed to -- to take in
20  that instance?
21      A.  Well, I don't know that there's a firm
22  direction one way -- I mean, I think you meet with the
23  client, you talk to them about it, and if -- in
24  general, I think most attorneys try to file a motion
25  to withdraw if -- if that's what the client wants.  We

## Page 102

1   have a lot of Courts who don't grant it, so --
2       Q.  All right.  When your cases do go to trial,
3   is it your understanding that your lawyers will always
4   engage in voir dire?
5       A.  Yes.
6       Q.  Are you aware of any situations in which
7   they have not?
8       A.  No.
9       Q.  Okay.
10      A.  I mean, I'm aware of situations where it
11  wasn't the most -- the best or most effective voir
12  dire, but I've never known an attorney to not ask any
13  questions -- and I assume you're saying ask any
14  questions during voir dire?
15      Q.  Correct.
16          So at what point does representation by the
17  trial office end officially?
18      A.  Well, that, of course, depends on who you
19  ask.  So as far as after a trial, if you win, you win.
20  If you -- if you lose at trial, we're expected to do
21  motion for new trial.  In Jackson County, you do
22  motion for new trial, you have sentencing, and we're
23  expected to file the notice of appeal.
24      Q.  Okay.
25      A.  And then after notice of appeal is filed,

## Page 103

1   then appellate would resume those duties.  After plea,
2   you know, there's some -- we have the Courts right now
3   telling us if we didn't move to withdraw after a plea,
4   that we're on the civil probation violation, which I
5   think is crazy, but some of the Courts are saying
6   that.  But we would say it's concluded after the plea.
7           Now, I would say to my lawyers, if there's
8   some natural -- you know, you have a client call --
9   like, for example, we had a client who pled, and the
10  judge put him on probation to accompanies, and says,
11  we don't take that type of felony, we can't supervise
12  him, I would say that -- you know, I would expect us
13  to represent that person or file something for them
14  because I think that's a continuation of the
15  representation of the plea.  And so there's some -- a
16  little maybe wiggle room in there.  But for the most
17  part, after the plea is concluded, we're done.
18      Q.  And you mentioned that your office would
19  file -- or the lawyer from your office would file the
20  notice of appeal; correct?
21      A.  Yes.
22      Q.  So does that mean that that lawyer is
23  responsible for communicating to the defendant that
24  they have a right to appeal the decision?
25      A.  Yes.  And we pretty routinely file it.  And

## Page 104

1   in -- what I always tell the client is that you can
2   talk to the appellate attorney, and if you want to
3   dismiss it, then you can always dismiss it.  I can't
4   not -- I can't unfile the -- you know, there's time
5   lines in place for that.  So I think maybe two cases,
6   we haven't filed them, and it was because of
7   specific -- you know, the State agreed to not -- to
8   dismiss a case, so the client wasn't on the hook for
9   that any more.  There was -- it was for specific
10  reasons that were discussed with the client.
11  Otherwise, we always file it.
12      Q.  Okay.
13      A.  In adult cases.  Now, juvenile cases are
14  different.
15      Q.  Excellent segue.  I was going to ask you to
16  tell me a bit about how you handle juvenile cases.  So
17  do you have attorneys in your office who specialize in
18  juvenile cases?
19      A.  Nope.
20      Q.  Are there trainings that are provided for
21  staff on how to litigate a juvenile delinquency case?
22      A.  So there's statewide training.  There's a
23  juvenile statewide training every year, but I probably
24  have one lawyer who goes to it a year.  There is --
25  I've had -- I usually have specific -- so my training

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 105

1    team leader right now is also my juvenile coordinator,
2    so he's responsible for -- you know, paperwork is sent
3    to him. He's responsible for going to juvenile court
4    and second chairing juvenile trials, things like that,
5    and he does some more informal training.
6          I've had -- I think at one of our Friday
7    CLEs, I had the juvenile coordinator, who is woman who
8    is not a juvenile coordinator anymore, give a talk on
9    handling maybe certification, things along those
10   lines. So I haven't done a lot of formal training.
11         And honestly, I think I've handed two
12   juvenile cases in my life. It's an area that I'm not
13   an expert in. We had a separate office for juvenile
14   when I -- when I was a trial attorney most of the
15   time. I don't remember what year they merged, but it
16   was not that -- it was only a couple years before I
17   became district defender, and I've never -- you know,
18   I think I had maybe two juvenile case, so I would say
19   my level of expertise in that area is very low.
20         Q.  Are -- are juvenile cases assigned to your
21   office in the same way that adult cases are assigned?
22         A.  Yeah. Well, they send -- yes.
23         Q.  Okay. And is it your office that makes the
24   indigency determination on juveniles?
25         A.  Yes.

## Page 106

1          Q.  How many juvenile cases, by the way, would
2    you say your office handles in the course of a -- a
3    year --
4          A.  About 100.
5          Q.  -- of that 5,000?
6          A.  About 100.
7          Q.  About 100. Okay.
8          A.  A pretty low, because I know when -- there
9    was a discussion, should we specialize or not? And
10   given what our caseloads are, I -- I didn't have -- I
11   remember looking at it and saying, I can't justify
12   putting two people solely in juvenile because their
13   caseloads be so much lower than everyone else's,
14   and one person would never have coverage. It would be
15   a mess. So that number, I do know, because I -- I
16   sort of debated, how do I deal with juvenile.
17         Q.  And when you make a -- an indigency
18   determination for a juvenile, what's the basis for
19   that determination? In other words, are you looking
20   at parent/guardian income? What things are you
21   factoring in?
22         A.  Yes.
23         Q.  Okay.
24         A.  That is -- I mean, we have a sheet on it;
25   although, there is -- you know, if the parent or

## Page 107

1    guardian is an alleged victim, that -- and truth be
2    told, anyone we deny, the Court pretty much always
3    appoints us on anyway regardless of what our income
4    determination is.
5          Q.  If there's a conflict in a juvenile case,
6    would it be handled in the same way that your other
7    conflicts are handled?
8          A.  Well, historically, yes. Although,
9    recently, no -- or well, historically, no; recently,
10   yes. So it used to be that in juvenile court, there's
11   a lot of firms that, it's kind of their sole pro bono
12   hours or -- so they kind of staff different things in
13   juvenile court for pro bono hours for the firm, so it
14   used to be if we had a conflict, they would assign it
15   to someone at the firm. Recently though, they've
16   started telling us that they want us to assign them,
17   or we want -- they want us to conflict it.
18         Q.  Do you know why that changed as occurred?
19         A.  I -- that, I don't know. The first time
20   Judge Byrne did it -- or actually, the second time he
21   did it, I went and met with him, and he just said,
22   "Well, I think this is better with the public
23   defender." Although, right now, our conflict cases
24   aren't going to public defenders. They're going
25   private counsel. So I've not spoken to him. Given

## Page 108

1    the climate of all the appointments right now, it's --
2    the judiciary is fairly hostile, so I don't -- I don't
3    know that having a conversation with him would matter.
4    Although, he may be saying now, "I want the public
5    defender to absorb the cost of conflicts in juvenile."
6          Q.  Okay. Do you have a sense of what
7    attorneys do -- what kind of work attorneys tend to do
8    to prepare for certification proceedings?
9          A.  I -- I mean, I get a sense that they'll
10   look into some background information, arguments along
11   those lines. When had we had a separate juvenile
12   office, they had a social worker, one that was a
13   much -- you know, the ratio was better, and they had a
14   social worker who could prepare reports for the Court.
15   I think I've had maybe one lawyer do that on a
16   certification; hire someone to write a report. We do
17   have hearings, and you know, they follow the law, and
18   they -- they point out why, you know, a certain client
19   shouldn't be certified, but they don't do the legwork
20   that we used to do when there was a separate juvenile
21   office.
22         Q.  And how long ago was that, that the
23   juvenile office closed?
24         A.  I feel like it was '09, '10. I mean, it --
25   it's -- it was certainly -- I became district defender

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 109

1  in '11, and it's certainly been closed for some years.
2  I don't remember.
3       Q.   And I'm -- I'm sorry.  Do you have a sense
4  of why that decision was made?
5       A.   My understanding was all money.
6       Q.   Okay.  I know you said you -- you've only
7  handled a couple of juvenile cases in your career.  Do
8  you -- in your opinion, is representing a juvenile in
9  a delinquency case a -- does it require specialized
10  knowledge in -- in juvenile court?
11      A.   Yes.  I would -- I think ideally.  I know
12  in the cases I got, I found extremely frustrating.  I
13  didn't know the language.  I didn't know -- I didn't
14  know the outcomes, I didn't know available outcomes, I
15  didn't know alternatives.  I found it extremely
16  frustrating, and I felt very inept.
17      Q.   Have you had any complaints from any of
18  your lawyers on your staff now about difficulty
19  representing clients in juvenile court?
20      A.   I've had complaints.  Largely, they've
21  circulated -- you know, a juvenile trial is a bench
22  trial, and it moves in about six weeks, so most of the
23  complaints come with, I have to take these cases, it
24  interrupts my schedule that I already have, I -- you
25  know, I -- I haven't had anyone talk about the feeling

## Page 110

1  of lack of resources that I did; although, they
2  probably aren't aware.  I mean, I saw that they had
3  resources, and then I saw that I was -- I didn't.  So
4  some of it is just a lack of awareness of -- sometimes
5  you don't know what you don't know.
6       Q.   In your experience or based on your
7  observations, how do attorneys in your office prepare
8  for detention hearings?
9       A.   Well, usually, they don't get a list of
10  who's on the detention hearing until the day before,
11  and then I think they try -- you know, I think they
12  meet with the clients the same day.  Sometimes the day
13  they get the -- the list of who's on it and who's our
14  client, and then they make what arguments they can
15  make.  There's -- I don't -- there's not a lot of
16  prep.  I don't think witnesses are called, generally.
17      Q.   And without the services of a social
18  worker, what -- what resources are available to the
19  attorneys to identify alternatives to detention for
20  their clients?
21      A.   Almost none.  Their own legwork.
22      Q.   Are you aware of how often the attorneys in
23  your office file review -- or detention review
24  motions?
25      A.   I don't know anyone who ever has.

## Page 111

1       Q.   Are there separate -- or I guess specific
2  diversion options available for juveniles?
3       A.   Yes.
4       Q.   And are there proceedings that occur where
5  a judge is trying to determine whether those
6  alternatives are available, or does -- or appropriate,
7  or does that happen outside of the -- the courtroom?
8       A.   I think generally, they put them into
9  diversion before.  Generally, our clients --
10  occasionally, we get a juvenile put into diversion,
11  but for the most part, I think they try and earmark
12  and select those folks before they were involved, is
13  my understanding.
14      Q.   And once a juvenile is in a diversion
15  program, are they still being represented at that
16  point?
17      A.   No.
18      Q.   So when they -- when a juvenile in a
19  diversion program goes before the Court for a review,
20  would one of your lawyers be present for that hearing?
21      A.   No.  I don't know the -- the diversion at
22  juvenile court is fairly new, and actually, when they
23  were forming it, it was when Judge Delmuro was there,
24  so it was probably five or six years ago, and she
25  actually asked the public defender to be involved, and

## Page 112

1  I didn't have resources to devote to doing that.  So I
2  don't know if they have somebody from a firm that
3  helps run that.  I -- I'm inclined to think they do,
4  and whether the people -- the pro bono people from the
5  firms represent the clients, that, I don't know.
6       Q.   Okay.  We talked generally earlier about
7  the use of expert witnesses.
8       A.   Uh-huh.
9       Q.   How frequently would you say the attorneys
10  in your office work with experts in juvenile cases?
11      A.   Not very often.  I mean, we've -- we've
12  hired specific experts for mental evaluations on some
13  of our juvenile clients, and I feel like I had at
14  least one attorney hire someone for -- for
15  certification.  But aside from that, not very often.
16  Like, I don't think we've ever had an eyewitness ID
17  expert or something like that.
18      Q.   Okay.  Or even an expert on what it means
19  to be a juvenile?
20      A.   Well, I do -- in the certification, I do
21  think she hired someone who talked about adolescent
22  brain development --
23      Q.   Right.
24      A.   -- and that sort of the thing, but I -- I
25  think that's happened -- well, maybe it's happened

28 (Pages 109 to 112)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-12   Filed 02/09/18   Page 29 of 93

## Page 113

1    twice, but I can only think of one time.
2        Q.  Okay.  Generally speaking, in your opinion,
3    can the attorneys in your office adequately represent
4    all of the clients on their docket?
5        A.  No.
6        Q.  And what is the basis for your opinion?
7        A.  Well, my own personal experience, my
8    observation -- observation of my lawyers, when I talk
9    to them about cases, when I've second chaired them in
10   trial, when I've talked to their supervisors, as well
11   as just the sheer number.  It's -- there aren't enough
12   hours in the day.
13       Q.  And that's true no matter how experienced
14   the lawyer may be?
15       A.  Correct.
16       Q.  All right.  So you talked earlier about a
17   lawyer in your office being disciplined?
18       A.  Well, a lawyer in the appellate office.
19       Q.  Appellate?
20       A.  So not a Kansas City lawyer, yes.
21       Q.  And -- and this is Mr. Hinkebein?
22       A.  Yes.
23       Q.  Okay.  So -- well, first, can you just say
24   a word about your understanding of the -- the decision
25   in the Hinkebein case?

## Page 114

1        A.  Well, I know that his -- his ethical
2    violations generally fell under Rule 4, the
3    communication diligence.  My understanding from
4    reading the decision was, you know, that he missed
5    deadlines, that he was not communicating with his
6    clients in a timely manner, so diligence, competence,
7    communication, things along those lines.  And my
8    understanding is -- I mean, every -- everyone -- every
9    public defender in Missouri, I'm fairly certain, has
10   either red or listened to the comments made by
11   Judge Fisher saying that, you know, why didn't -- one
12   of the things he said is, I mean, I understand he had
13   health problems.  I don't know anything about his
14   health problems.  But that he also said, I have this
15   big caseload, and it's tough to stay on top of
16   everything, and you know, he said, tell your
17   supervisor you can't take any more cases or quit.  I
18   mean, the bottom line, you know, that's what -- what
19   my lawyers repeat is, you know, tell your supervisors
20   you can't take more cases or quit.  Or be open to
21   having your law license compromised.
22       Q.  So I'm going to ask you a little bit more
23   about that.  But -- so prior to the Hinkebein
24   decision, were attorneys in your office permitted to
25   refuse cases if they thought it was appropriate?

## Page 115

1        A.  No one really tried.  I mean, it -- you
2    were conditioned to such that this is what it is, so
3    no one ever -- I certainly had plenty of lawyers
4    telling me --
5        Q.  Take your time.
6        A.  Telling me they were overwhelmed.  But I
7    don't think -- those of us who've done it a while, I
8    mean, you're always overwhelmed, so I don't think
9    anyone ever put it in context of, I'm ethically
10   putting myself in jeopardy, I'm putting my clients in
11   jeopardy.  But I -- I mean, I probably can't count the
12   number of people who have cried in my office.  I've
13   had people threaten self-harm.  I've had people need
14   to leave immediately to take mental health breaks.
15   It's -- it's a horrible thing to watch.
16       Q.  Did anyone in your office just resign as a
17   result of this?
18       A.  Has anyone resigned as a result of
19   Hinkebein?
20       Q.  As far as you know?
21       A.  No.  Not yet.  No one has resigned as of
22   yet, but I -- I mean, within days of the decision, I
23   got multiple e-mails saying they weren't going to
24   take -- that they ethically -- you know, they're --
25   they're saying, "Well, Judge Fisher says, tell your

## Page 116

1    supervisor, no, and I'm -- I'm going to tell you no."
2    And ultimately, every lawyer got there.
3        Q.  Do you have a sense of what the reaction
4    was of -- from the local Bar outside of the public
5    defender's office?
6        A.  I don't.  I don't have much of a reaction.
7    I mean, I think -- I -- it's hard -- you know, we
8    bring up caseload, we don't bring up caseload,
9    everybody is sort of like, public defender is
10   overworked, yeah, yeah, yeah.  I don't think -- but it
11   sort of dies down after a while, and I -- I don't know
12   if people assume it got better or things resolved.
13   But the -- I've -- I worked there 20 years in January,
14   and the caseload has always been its own sort of crazy
15   pressure, and it's always been relentless, and it's
16   always -- it's always been one of those things that
17   when people leave, sometimes it's this or that, but
18   they -- you know, often when they're out, they talk
19   about how it's so nice.  I don't feel like I have to
20   be 100 places.  I don't feel like I dropped a bunch of
21   balls, and just a weird -- you know, like, their own
22   version of post-traumatic stress.
23       Q.  How did the central office respond to --
24   this -- to the decision?
25       A.  I mean, I think they made everyone aware of

ALARIS LITIGATION SERVICES
www.alaris.us    Phone: 1.800.280.3376    Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-12   Filed 02/09/18   Page 30 of 93

## Page 117

1  it because -- and I know Michael sent out a memo, just
2  talking -- I mean, I think -- well, I mean, I think,
3  one, people were upset that one of their own was
4  facing a lifetime suspension.  That's frustrating.
5  And it appeared that the Courts were fairly
6  indifferent.  You know, like, knowing budget-wise how
7  much we struggled, and the -- I guess we all assume
8  the Courts know how much we struggled that, you know,
9  we didn't get funding or we did, and the governor
10  withheld it, and that a lot of those issues weren't of
11  our own doing or choosing.  It wasn't for want of
12  asking or wanting.
13          I don't know if I answered your question.
14  I'm sorry.
15      Q.  No.  That's helpful.
16          Would you say that the -- well, did -- did
17  the central office provide any specific guidance about
18  how to move forward as -- you know, either as
19  individual attorneys or as district offices to handle
20  this?
21      A.  Well, they certainly said you -- I don't
22  think there he was a specific, you should do this; you
23  should file this.  As we requested things, you know,
24  we certainly -- we said that -- they said that we'd be
25  supported -- supported and that, you know, if we

## Page 118

1  wanted to make assertions based on our attorneys -- I.
2  Mean, honestly, I didn't have a choice.  My
3  lawyers were -- were very -- and understandably so.
4  Very adamant that they weren't taking -- I mean, I
5  have people -- you know, they said, if you assign me a
6  case, I'm filing a Bar complaint against you.
7  There -- it wasn't -- for me, there wasn't wiggle
8  room.  My attorneys were like, no, I'm not -- I'm not
9  doing that, and I don't think you can make me.  So I
10  know for me, when I asserted my office being at a
11  point where we couldn't ethically take more cases,
12  it's because I met with every single lawyer, and they
13  had all been very clear that they were there.  Some
14  more adamant than others, but a number of them just --
15  we don't have to do this.  You know, the -- the
16  Supreme Court says I have the same ethical duties as
17  any other lawyer, and I should not have to have this
18  caseload.
19      Q.  We'll talk shortly about the specific steps
20  that your office took.  But in your experience,
21  what -- what has been the response from -- from the
22  Courts, generally, in -- in your district?
23      A.  They -- they don't believe it's real.
24  They -- I mean, I've had to -- e-mail exchange with
25  Judge Torrence where he's basically said it's a bunch

## Page 119

1  of dicta, and you are either overreacting or you're
2  pulling a stunt.  They are condescending.  And my
3  lawyers will go to court, and they'll say things like,
4  "Oh, are you going to work today?"  Or "Oh, how are
5  you feeling?"  It's been largely -- it's been very
6  disappointing.  I would say that, that we really --
7  you know, you practice in front of these judges for a
8  long time, and they tell you what a good job you're
9  doing, and they are -- there's a sense that you have a
10  camaraderie with you, and it's been no -- my
11  understanding -- like, I talked to someone with
12  Missouri Lawyers Weekly, and you know, report it.
13  She'll go to the court and bank meetings, and they've
14  joked about how we're the black knight, and they've
15  cut her arms and legs off and --
16      Q.  Now, you mentioned that you have been in
17  touch with the Court --
18      A.  Uh-huh.
19      Q.  -- in your district.  Are you aware of
20  other district officers communicating with the Courts
21  in their districts?
22      A.  Yes.
23      Q.  Have you been in communications with other
24  district offices about how to respond to this?
25      A.  Yes.  Well, shortly after Hinkebein came

## Page 120

1  out, we had our yearly management conference, so there
2  were a lot of district defenders there, and it was a
3  large part of the discussion about how people were
4  dealing with it.  And a multiple -- I mean, asserting
5  this and staying on top of it is a full-time job on
6  top of your full-time job, so -- and we've -- we've
7  made efforts to get caseload relief before through the
8  years, and it -- I mean, it's -- it's exhausting.  It
9  it's -- you have all this animosity.  You work a ton
10  of hours to litigate all this stuff on top of all the
11  work you're supposed to be doing.  So I'm somewhat
12  understanding of district defenders who are like, oh,
13  yeah, my attorneys have 300 case, but they think
14  that's fine.  And in my head, I'm like, that's insane.
15  My attorneys have 100 cases, and I think that's
16  insane.  So there's -- there's a sort of a wide
17  variety of responses.  So I have talked to other
18  district defenders, and I've -- I've talked with --
19  well, Anthony in Liberty.  I've talked with Jeff
20  Martin in Harrisonville.
21          Justin Carver, because Justin Carver is the
22  only one has had a Chapter 600 hearing; mostly to say,
23  like, "How did your hearing go?  What did it entail?"
24  Oh, just questions about, "What evidence did you put
25  on?"  Because all of the Chapter 600 hearings under

30 (Pages 117 to 120)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-12   Filed 02/09/18   Page 31 of 93

## Page 121

1  Chapter 600.063 had never done -- been done before, so
2  it was sort of uncharted territories.  And my -- my
3  judges aren't interested in arguments under Rule 4.
4  They really want everything to be litigated -- well,
5  they say they want everything to be litigated under
6  Chapter 600.063.  I've filed two motions, both of
7  which have been denied, so how serious they are about
8  that -- and I can tell you, Jeff City filed the exact
9  same motion.  I filed mine first, he filed his.
10  His -- his judge granted part and denied part, and had
11  a hearing.  My judge denied it.
12      Q.   Now, the Chapter 600 -- let me back up.
13      You -- you're aware of the Missouri Supreme
14  Court's decision in Waters; correct?
15      A.   Correct.
16      Q.   And you were employed with the MSPD at that
17  time?
18      A.   Yes.
19      Q.   So that -- you were district defender at
20  the time?
21      A.   I think it was 2012.  Is that -- yeah.  I
22  was the district defender at the time.
23      Q.   Was it your -- what was your understanding
24  of that decision when it came out as it relates to
25  what we're talking about right now and what your

## Page 122

1  options were as -- as district defender in refusing
2  cases?
3      A.   I don't -- back in 2012, we weren't -- one,
4  we were at a very low cycle for filings.  So we
5  actually -- our office wasn't refusing cases at the
6  time because we weren't numbers-wise there, or we
7  didn't feel we were numbers-wise there.  So I -- I was
8  less involved in how Waters went just because my
9  office wasn't -- hadn't been certified.  A number of
10  things -- you know, under -- back then, there were
11  certifying offices, and you had to be a percentage
12  overloaded on a certain scale, so -- and we would be
13  over two months and under a month, and you had to be
14  there for three consecutive months, so while that was
15  going on, we hadn't met that.  But there was clearly a
16  backing off of talking about caseload and talking
17  about the ethics of caseload, or that's what it felt
18  like.
19      Q.   A backing off, meaning --
20      A.   Well, we were no longer going through -- we
21  weren't certifying offices.  I mean, my understanding
22  was that the 063 was created sort of as a response to
23  offices being certified and efforts to stop that, and
24  it seemed to effectively do that.
25      MR. WILLIAMSON:  Can we go off the record

## Page 123

1  for just one minute?
2      VIDEOGRAPHER:  Off the record, 12:08 p.m.
3      (A brief recess was taken.)
4      VIDEOGRAPHER:  On the record, 12:08 p.m.
5      (Petsch Exhibit 3 was marked for
6  identification.)
7      Q.   (By Mr. Williamson)  I'm going to hand you
8  a document I'm marking Exhibit 3 for identification.
9  Do you recognize that letter?
10      A.   I don't.
11      Q.   Can you take a -- a moment and just review
12  it for me?
13      Who is the author of that letter?
14      A.   It looks like Bethany Turner.
15      Q.   Do you know Ms. Turner?
16      A.   I mean, I know of her, but I don't know
17  her.
18      Q.   Okay.  And do you, having reviewed the --
19  the letter, do you agree with the sentiments in the
20  letter?
21      A.   Yes.
22      Q.   And are you aware of whether similar
23  letters have been sent by other district defenders to
24  the judges in their districts?
25      A.   I'm aware a number have, yes.  It's similar

## Page 124

1  to the Boone County letter, which I had read before,
2  so yes, I'm aware that other letters have been sent
3  that are similar.
4      (Petsch Exhibit 4 was marked for
5  identification.)
6      Q.   I'm going to hand you what's been marked as
7  Exhibit 4 for identification.  Do you recognize that?
8      A.   No.  I don't believe I've seen the letter,
9  this particular letter.
10      Q.   Is it similar to the letter that you were
11  just reviewing?
12      A.   Yes.
13      Q.   Who is the author of this letter?
14      A.   Pamela Musgrave.
15      Q.   Okay.  And Ms. Musgrave is a district
16  defender in Area 39?
17      A.   Yes.
18      Q.   And do you agree with the sentiments in
19  this letter as well?
20      A.   Yes.  I mean, obviously, I don't work in
21  Area 39, so I can't is specifically talk to -- but I
22  don't know a single office that doesn't have Rule 4
23  issues, so --
24      (Petsch Exhibit 5 was marked for
25  identification.)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 125

1  Q.  I'm handing you what's been marked
2  Exhibit 5 for identification.  What is that document?
3      A.  It is -- it looks like a template for
4  suggestions in support of writ of prohibition and/or
5  mandamus.
6      Q.  Who created this document, as far as you
7  know?
8      A.  I'm assuming Greg Mermelstein did, but I
9  don't know for sure.
10     Q.  And why do you assume that Greg Mermelstein
11 created it?
12     A.  It just looks like Greg's writing, and he
13 has a number of motions.  I think this one -- that are
14 available for other lawyers to look at on the website.
15     Q.  And was that -- as far as you know, was
16 that template placed on -- is it -- is it in a
17 database for MSPD?
18     A.  Right.  We sort of have a -- a resources --
19 we have a lot of databases, but one of them is a
20 resources one.
21     Q.  And so any lawyer in the system could go in
22 and access this template?
23     A.  Yes.
24     Q.  Okay.  And do you think that's a -- it is
25 a -- has been a helpful resource for lawyers at the

## Page 126

1  public defender's office?
2      A.  The database?
3      Q.  The database.
4      A.  Yes.
5      Q.  Has your office created a waiting list for
6  defendants who -- whose cases can't be covered by your
7  lawyers?
8      A.  I call it a postponement list, but yes.
9      Q.  Okay.  And -- and how does the postponement
10 list work?
11     A.  We screen people, and then we enter them
12 into a -- we have a client database.  It's marked in
13 such a way that we can tell who screened what day.
14 And then as attorneys have come to us to say, "I can
15 take more cases," we take whoever is next on the list.
16 Well, historically.  Now, we're being appointed, so we
17 aren't even getting to the list because we have so
18 many appointments coming in, but that was -- that's
19 how we started out, and we did -- I think it took
20 seven days to remove the first person off of the
21 postponement list.
22     Q.  So as of right now, does the postponement
23 list still exist?
24     A.  Yes.
25     Q.  It's just that it's taking longer to get to

## Page 127

1  it?
2      A.  I don't think we've gotten to it -- I think
3  we probably took five cases off it in order.  Now, a
4  lot of -- almost everyone that we're being appointed
5  on is also on that list, so people are coming off the
6  list; they're just not coming in any certain order.
7  It is not first come, first served any more.  It's
8  just however the Courts are appointing us.
9      Q.  And do you know how many people are on the
10 waiting list right now.
11     A.  Not exactly, because people are added every
12 day.
13     Q.  Sure.
14     A.  But the last time I looked, which was last
15 Thursday, I want to say it was about 250 people.
16     Q.  And -- and this was -- when was the -- the
17 list first set up?
18     A.  October 16.
19     Q.  October 16.  Okay.  Do you have a sense of
20 that roughly 250, how many of those people are in
21 custody?
22     A.  No.
23     Q.  You don't have a sense, or none of them
24 are?
25     A.  Some of them are.  I don't have a -- I

## Page 128

1  don't know what percentage are in custody of --
2  because we take applications in custody, and because
3  the law says that we can't -- we have -- we can't --
4  we can't only accept or reject or promote classes of
5  people.  So they're on the list, we're taking it as
6  they come.
7      Q.  And people are coming off the list in
8  order?
9      A.  Yes.  Ideally, they were, yes.
10     Q.  So it is -- as far as the Court is
11 concerned, it is of no moment whether the person is in
12 custody or not when determining who's next to come off
13 of the waiting list?
14     A.  Well, they don't -- one, I don't think they
15 even acknowledge my list as anything valid or real or
16 legal, so -- and they're just appointing who they want
17 to appoint, so -- without any regard to what the list
18 is or anything about it.
19     Q.  And from -- from your perspective in
20 putting the list together or maintaining the list, how
21 do you account for if -- if you can at all, the fact
22 that some of -- some of the people on the list -- are
23 on the waiting list, are they prioritized in any way?
24     A.  No.
25     Q.  No?

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

Case 2:17-cv-04057-NKL   Document 153-12   Filed 02/09/18   Page 33 of 93

## Page 129

1    And are you -- are you personally sort of
2    administering this list, or is there someone else in
3    your office that's doing that?
4        A.  Joseph Megerman is -- is the list person,
5    yes.
6        Q.  Okay.
7        A.  Well, I mean, we have -- we have a way in
8    the database that's market so that we can see how the
9    list is kept, and then Joseph also has a spreadsheet
10   that he's maintaining of the appointments and as
11   people come off the list.  But when people -- when we
12   had the ability to remove people from the list, we
13   didn't have so many appointments coming in, he would
14   look at the list, and then assign the cases.
15       Q.  At this stage, are the Courts in your
16   district appointing private attorneys at all to
17   represent --
18       A.  Not at all.  We had one judge who was, and
19   then she was told that she could not do that any more.
20       Q.  Okay.  You're familiar with -- well --
21           (Petsch Exhibit 6 was marked for
22   identification.)
23       Q.  I'm handing you what's been marked
24   Exhibit 6 for identification.  Do you recognize that?
25       A.  Yes.

## Page 130

1        Q.  What is it?
2        A.  This is an e-mail and documents pertaining
3    to assignment of cases through the Missouri Coalition
4    for the Right to Counsel.
5        Q.  And can you -- you're familiar with the --
6    we'll call it the MCRC?
7        A.  Yes.
8        Q.  Can you describe what the MCRC is?
9        A.  And again, I didn't found -- I -- I'm a cog
10   in -- in the system, but my understanding is it's a
11   nonprofit that's set up to get cases to firms who want
12   to try them.  I know I've -- for my part, I've helped
13   get cases to firms.  I've participated in two
14   trainings of attorneys from the firms who are --
15   who -- the firms were taking cases, and those
16   attorneys specifically were taking cases.
17       Q.  Do you know how many firms are involved?
18       A.  I don't.  On the Saint Louis side, I have
19   no idea.
20       Q.  Okay.
21       A.  I think on the Kansas City side, I feel
22   like the number of firms that have taken cases from us
23   is probably around a dozen.
24       Q.  And the Kansas City area doesn't only
25   include district -- or Area 16; correct?

## Page 131

1        A.  I don't know that -- well, I think they've
2    taken some appeals from central.  I don't know that
3    any other office has sent cases to the firms aside
4    from mine.
5        Q.  Okay.  So --
6        A.  I'm not aware of that.
7        Q.  So is it your sense that the program is
8    really focused on the -- the bigger offices around the
9    state?
10       A.  I -- I -- I think the -- the program is
11   fo -- focused on where -- the firms -- the firms who
12   have agreed to participate are at, and it appears that
13   it is in the -- in the cities, so I think the thought
14   is, we don't want to have these firm lawyers who are
15   taking cases for free to drive to Chillicothe, but I
16   don't have a firm grasp.  All I know is when they ask
17   me for cases, I provide them cases.
18       Q.  And what -- what kinds of cases are being
19   assigned to those firms?
20       A.  A variety.  Everything from possession to
21   murder.
22       Q.  And this program has been operating for how
23   long?
24       A.  I think the first cases I sent out were in
25   May.  I think there was a training either in April or

## Page 132

1    May of this year.
2        Q.  And since the program began, approximately
3    how many of your cases have been reassigned to MCRC
4    attorneys?
5        A.  I would say between -- between 15 and 20.
6    I have a couple out right now that are doing conflict
7    checks.  So not -- not a huge number.
8        Q.  Is your office involved at all in
9    monitoring that representation?
10       A.  It depends what you -- I -- I don't know
11   that I'd use the word "monitor."  I -- I regularly --
12   I'm a resource for the lawyers.  I mean, I have talked
13   to three of them in the last three days, so they
14   regularly call with questions, they want to talk about
15   plea offers, they want to talk about, this is what we
16   do in civil; is there something equivalent in -- in
17   criminal?  Some of them communicate more.  There's
18   not a requirement, I would say, about how much
19   communication is happening or how much oversight the
20   firms are engaging representation, and I -- I consider
21   myself more as a resource than a monitor, if that
22   makes sense.
23       Q.  And the -- and the firm is making the
24   decision about which individual lawyers are taking
25   these cases; correct?

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 133

1    A.  Yes.  But I -- I think we've asked that all
2  the lawyers go to our trainings, so we're meeting and
3  talk -- you know, talking to the lawyers.  But yes,
4  the firm -- I mean, I think most of the lawyers are at
5  the mercy of what their firm will or won't let them
6  do --
7    Q.  Right.
8    A.  -- since they're using the firm's resources
9  and working for free.
10    Q.  And aside from the outreach that they may
11  do to you for answers to you to particular
12  questions, the -- the supervision of those attorneys
13  is being done by the firms?
14    A.  Yes.
15    Q.  And so a total of 15 or 20 cases since May;
16  right?
17    A.  Yes.
18    Q.  So has the -- has the -- the MCRC program
19  relieved your district's caseload in any significant
20  way?
21    A.  No.
22    Q.  Okay.
23    A.  And I'll tell you, when I assign cases, I
24  usually -- I've done it with people who are leaving,
25  so I was giving them clients that were already going

## Page 134

1  to have a change in attorney anyway because the -- the
2  attorneys were leaving for one reason or another,
3  so -- and it -- most of the firms are wanting trial
4  experience, so it's easier to tell when someone is
5  exiting, when a case a little further along, how
6  they -- but that -- that's been my selection process.
7  So attorneys have enjoyed the fact that they haven't
8  had to absorb those cases that are set for trial
9  fairly soon and would sort of wreak havoc in their
10  schedule, but as far as -- their caseloads aren't
11  significantly lower or anything like that.
12    Q.  Okay.  Okay.  Almost done.
13    I -- you talked quite eloquently about, you
14  know, your and your attorneys' response to the
15  Hinkebein decision, generally.  I wanted to talk a
16  little bit about the -- the sort of formal steps you
17  took in the wake of that decision.
18    At what point did you first take action in
19  court to -- to try to deal with the situation?
20    A.  Well, I wrote the letter, I believe,
21  October 13, to Judge Torrence.  That following Monday,
22  the 15th, you know, we had an attorney who the judge
23  wanted to appoint a probation violation and have her
24  handle it right there, and she asserted her ethics
25  under Rule 4.  He tried to appoint her personally, she

## Page 135

1  brought up the case that says he can't appoint her
2  personally, and then he set it for Thursday and sent
3  an order over basically appointing and saying someone
4  must show or something along those lines, and I
5  handled that case.  I went to court that day, so that
6  would have been the 18th, I believe.
7    Q.  And -- and you went before the Court?
8    A.  Yes.
9    Q.  And what happened at that hearing?
10    A.  Well, I tried to make a record.  I have
11  filed a motion.  A number of my lawyers were there to
12  testify about their -- their conflicts under Rule 4.
13  I was not allowed to make a record.  I was personally
14  appointed.  It was -- it was talked over a fair
15  amount, and -- and then we set it over so I could writ
16  the judge.
17    Now, at the same time, a district defender
18  had filed work.  Leslie Hazel had filed a case that --
19  a writ that had gone up through I believe the southern
20  district and the Missouri Supreme Court and was denied
21  under the Rule 4, and there's basic instruction on the
22  order saying that we need to file an individual case
23  that's under Chapter -- Chapter 600.036.  So our writ
24  didn't encompass that level because we figured Courts
25  would rule on that.  It was on that personal

## Page 136

1  appointment, which that western district denied.
2    (Petsch Exhibit 7 was marked for
3  identification.)
4    Q.  So I'm going to hand you what I've marked
5  as Exhibit 7.  Is that the writ that you're referring
6  to?
7    A.  Yes.
8    Q.  And you're saying that this was filed --
9  was it filed before the Hazel decision?
10    A.  (Nonverbal response.)
11    Q.  It was filed after?
12    A.  Correct.
13    Q.  And what was the response to your petition?
14    A.  So this writ was denied, and then I'd
15  already entered under objection, so the case was set
16  the following Thursday.  The writ was denied in, I
17  think, an hour's time or something.  Something crazy
18  fast for the Court of Appeals, and -- and I
19  represented the client on this case.
20    Q.  So do you recall what -- what you filed
21  next?  Did you -- so this was the -- the Nevels case?
22    A.  Uh-huh.  Keith Nevels.  Well, I
23  represent -- Keith Nevels was a guy who was on
24  probation in the wrong place, so he really wasn't in
25  any jeopardy.  The judge just changed the -- the

ALARIS LITIGATION SERVICES
www.alaris.us            Phone: 1.800.280.3376            Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-12    Filed 02/09/18    Page 35 of 93

## Page 137

1  company that was monitoring him, and it was continued,
2  so I didn't file anything else on Nevels.  And then I
3  think -- well, November 1, I filed a -- a motion under
4  Chapter 600.063 in suggestions and support.
5       (Petsch Exhibit 8 was marked for
6  identification.)
7       **Q.  Handing you Exhibit 8 for identification.**
8       A.  Uh-huh.
9       **Q.  Is that the motion that you just referred**
10 **to?**
11      A.  Yes.
12      **Q.  Okay.**
13           MR. WILLIAMSON:  Do you want this, Jackie?
14           MS. SHIPMA:  No.  That's fine.
15      **Q.  (By Mr. Williamson)  And what was the**
16 **result of that motion?**
17      A.  It was denied.
18      **Q.  What did you do after that motion was**
19 **denied?**
20      A.  I -- I think a week later, I filed a second
21 motion under Chapter 600.063.  I think that was
22 November 8.
23      **Q.  And what -- what was the -- what was the**
24 **difference between that motion and the initial motion**
25 **you filed?**

## Page 138

1       A.  Well, the judge's denial on the first
2  motion was very -- I'm trying to think of a nice term
3  for it.  Scathing.  And it was clear he had a lot of
4  issues with my bringing Rule 4 into a Chapter 600
5  hearing, so I -- I had -- I filed a more bare bones
6  motion, which I assumed was what the Court wanted.
7       **Q.  Okay.  And how did the Court respond to**
8  **that second motion?**
9       A.  He denied it and accused me of bad faith --
10 or actually, he found me in bad faith.
11      **Q.  Okay.  So -- so you sought a conference**
12 **with the Court on two occasions; both of those**
13 **requests were denied?**
14      A.  Correct.
15      **Q.  Did you take any further actions in court**
16 **at that point?**
17      A.  I -- well, the judges were appointing the
18 office on a lot of things, and it was clear from my
19 first hearing in Nevels that if I wasn't going
20 forward, he was going to set a contempt hearing.  I --
21 I've not abandoned any -- I think -- I think our
22 Rule 4 issues are legitimate and concerning.  However,
23 the judge -- I also don't want myself or attorneys
24 held in contempt.  I don't think that is the route.
25 Even under orders that I think are unlawful or against

## Page 139

1  our ethics, we're going to try and comply with them.
2       So my office started assigning cases.
3  Fairly quickly after that, I self-reported to the Bar,
4  because I believe it's an ethics violation for me to
5  be assigning cases, and it was at my direction that my
6  deputy was doing that, and -- and then I had some
7  attorneys who were not appearing who -- who actually
8  wanted to be -- my understanding is they wanted to be
9  personally appointed.  On one of their
10 non-appearances, the judge issued a show cause order
11 for me as to why I should be not be held in contempt,
12 and we had a hearing on that last -- was that last
13 Monday?  I think it was last Monday.  It's all
14 happening very quickly, so --
15      **Q.  Have you gotten a response?**
16      A.  Yeah.  She -- she quashed her motion.  I --
17 I got counsel, and she quashed it base -- basically
18 based on specificity, because she didn't name me,
19 personally.  And since then, a majority of the judges
20 are now ordering me, personally, into almost every
21 case.
22      (Petsch Exhibit 9 was marked for
23 identification.)
24      **Q.  Okay.  I'm handing you Exhibit 9 for**
25 **identification.**

## Page 140

1       A.  Yes.
2       **Q.  Is that the complaint that you just**
3  **mentioned?**
4       A.  Yes.  This is my self-report to the Office
5  of Chief Disciplinary Counsel.
6       **Q.  And you -- you indicate that you felt some**
7  **obligation to file this, to -- to self-report?**
8       A.  Yes.  I'm, in fact, on a regional
9  disciplinary council.  I'm a member.  But I -- I think
10 by assigning cases to my lawyers, I am in violation of
11 Rule 4.  I'm in violation of my supervisory duties.
12 And so if you look at what I write, I -- you can also
13 ask for guidance, as I asked the -- I asked the Office
14 of the Chief Disciplinary Counsel for guidance,
15 because I -- I am not sure what I should be doing
16 here.
17      **Q.  And this was filed on November 20?**
18      A.  Right.
19      **Q.  Okay.  Did you -- have you received a**
20 **response to your --**
21      A.  No.
22      **Q.  In your experience, how long does it**
23 **generally take to get a response from --**
24      A.  It takes -- well, generally, I'm not the
25 person who receives it.  I'm only on a committee, so

35 (Pages 137 to 140)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-12    Filed 02/09/18    Page 36 of 93

## Page 141

1    we only get sent the things that come to committee. I
2    don't have a sense of how long that will take.
3         Q.   But this is -- this is the same office that
4    evaluated Mr. Hinkebein's situation?
5         A.   Yes.  And went for it and made arguments in
6    front of the Supreme Court on them, yes, correct.
7         Q.   Against Mr. Hinkebein?
8         A.   Right.  Against him.
9         Q.   Okay.  You -- you attach the letter that
10   you referred to earlier, the October 13, letter to
11   Judge Torrence?
12        A.   Uh-huh.
13        Q.   Did -- did he response by letter to this?
14        A.   Well, by e-mail.
15        Q.   By e-mail?
16        A.   He -- it was a Word document that looks
17   like a letter.
18        Q.   Okay.
19        A.   But he responded by e-mail, and which I
20   attached that -- that --
21        Q.   Okay.  So that's the October 17 letter?
22        A.   Correct.
23        Q.   Okay.  So as of right now, you -- well,
24   hold on.  Let me back up.
25             You also attached the transcript of a

## Page 142

1    hearing where you moved to withdraw from --
2         A.   Yeah.  I just really wanted -- I wanted
3    them to see that I really -- he mentioned the
4    contempt, and I wanted the Court to -- or I wanted
5    OCDC to understand that my assignment is not -- is
6    because I -- I have a good faith belief that will be
7    held in contempt.  It's only been underlined by the
8    fact that -- I sent -- I sent this in on the 20th, the
9    order that came out.  The show cause order came out on
10   the 21st.  I had no idea that that would be coming out
11   obviously, but I -- I wanted them to be aware that I'm
12   not just assigning cases because I feel compelled to
13   under penalty of going to jail.
14        Q.   So -- and so do you right now currently
15   still represent Mr. Nevels?
16        A.   I -- I don't think so.  I -- we concluded
17   the matter.  He was continued on probation.  If you
18   ask the Courts, they'll probably think I'll represent
19   him in perpetuity.  I have no idea.
20        Q.   And as far as you know, how many cases are
21   you assigned to right to tie it up?
22        A.   My myself, personally?
23        Q.   Right.
24        A.   I probably -- open cases, I probably have
25   about 40; although, as an office, we're reassigning

## Page 143

1    most of my cases just because, when I go to court, the
2    judges are making records with me about
3    representation, and if it -- it feels like they are
4    trying to set up a contempt hearing.  They're not
5    doing that to the rest of my lawyers, which is
6    unfortunate, because I would like to be more helpful,
7    but I don't -- I'm concerned -- and I'm concerned that
8    all of this is affecting clients and representation as
9    well.  But I'm also concerned that I -- you know, the
10   judges are all sending the orders to me personally, so
11   the last time I was in court, she said, "Did you
12   receive this order?"  I sent it to you personally."
13   It -- it feels -- quite frankly, it feels like a
14   setup.  It feels like a setup to have me held in
15   contempt.
16        Q.   Okay.  And so as of right now, you're
17   just -- you're waiting for a response to your Bar
18   complaint that you're self--reporting?
19        A.   Yes.
20        Q.   Okay.  And continuing to accept those cases
21   as necessary?
22        A.   Yes.  I mean, I've -- I've gotten orders
23   that are giving me five days to enter.  I'm getting
24   orders that are saying, "Ruth Petsch must enter in
25   five days."  I'm complying with that.  I am also

## Page 144

1    assigning them to lawyers because --
2         Q.   Right.
3         A.   I -- I'm complying because the Court is
4    ordering me to do it.  So -- but like I said before, I
5    have cases where I'm entered, not because I'm really
6    representing those clients, but because the Court is
7    ordering me to do so, and I firmly believe they will
8    hold me in contempt if I do not, so -- and I'm waiting
9    to hear back from the Office of Chief Disciplinary
10   Counsel.  That's correct.
11        Q.   Are you doing -- are there any cases where,
12   for whatever reason, you are actually having to do
13   work on the case aside from entering your --
14        A.   Yeah.  Well, I mean, I was working -- so I
15   appeared in court last Wednesday.  I had multiple
16   probation violation clients that I represented.  I
17   have a few, and -- and I have -- for the -- the
18   probation violation docket that I'm shifting over to
19   another attorney, I mean, I had mental done on the
20   guy, I've arranged -- so I'm doing some
21   representation, sort of trying to tie it up.
22        Q.   Okay.  But those are -- that's on cases
23   that you already had --
24        A.   Right.
25        Q.   -- on your docket?

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 145

1    A.  Right.  I'm not -- I'm not going to
2  undertake -- aside from entering --
3    **Q.  Right.**
4    A.  -- I've not really been representing any of
5  those folks.  I'm just complying with the Court's
6  orders.
7    **Q.  And -- and you're being appointed to all**
8  **manner of cases; right?  Not just probation?**
9    A.  Yes.
10    **Q.  Okay.  Is there anything else that you**
11  **think we should know regarding your ability or your**
12  **office's ability to provide representation to your**
13  **clients?**
14    A.  Not that I can think of, no.
15    MR. WILLIAMSON:  I know we've covered a lot
16  of ground.  All right.  I think that's all I have.
17  Thank you.
18    MR. RAMSEY:  Can we go off the record for
19  just a minute?
20    VIDEOGRAPHER:  Off the record, 12:42 p.m.
21    (Off the record.)
22    VIDEOGRAPHER:  On the record, 12:42 p.m.
23    EXAMINATION
24  BY MR. RAMSEY:
25    **Q.  Good afternoon.**

## Page 146

1    A.  Good afternoon.
2    **Q.  So again, my name is Steven Ramsey, and I**
3  **represent the State of Missouri and Governor Greitens.**
4  **I have a number of questions for you.  Feel free at**
5  **any point, if we need a break, let me know, because I**
6  **know we've been at this for some time.**
7    A.  Sure.
8    **Q.  I want to go back quite a ways, back to,**
9  **like, almost 9:00-ish or so and understand the**
10  **district a bit more.**
11    **Right now, do you have a sense of how many**
12  **criminal cases come in in Jackson County total?**
13    A.  No.  I mean, there's data on that.  I
14  haven't -- I haven't looked at that.
15    **Q.  Okay.**
16    A.  But I mean, that's achievable data.  The
17  courts keep records.  I think the prosecutors keep
18  records of filing.
19    **Q.  And District 16 encompasses all of**
20  **Jackson County?**
21    A.  Yes.
22    **Q.  And there aren't any differences between**
23  **how your office handles a case that occurs in**
24  **Kansas City versus Independence; is there's just one**
25  **concerted district, or are there any, I guess,**

## Page 147

1  **discernible differences?**
2    A.  No.  I don't -- I don't know that
3  there's -- the prosecutor's office runs differently in
4  both places, but -- as far as how they handle cases
5  and how they go forward.  But our representation -- I
6  mean, there may be some reaction to those changes,
7  but, you know, we're --
8    **Q.  But the public defender's office that**
9  **you're covering with your district --**
10    A.  Uh-huh.
11    **Q.  -- there's no discernible difference**
12  **between how you would handle a case in Jackson County**
13  **versus -- or I'm sorry.  In Kanas City versus**
14  **Independence?**
15    A.  Right.
16    **Q.  Now, this is a question as to your**
17  **experience:  Is there a trend of -- of crimes, of**
18  **felonies, of misdemeanors that you see very frequently**
19  **as opposed to crimes of potentially those who are not**
20  **indigent would commit?**
21    **I can clarify that question.**
22    A.  Okay.
23    **Q.  What types of felonies did -- does your**
24  **office not see frequently, if there are any?**
25    A.  Well, I -- I think there are a bunch.  I

## Page 148

1  mean, when I talk to rural offices, we don't have --
2  like, when people will shoot a deer from a car or
3  steal cattle.  Things -- we don't have really any of
4  those.  I don't -- I mean, it's hard for me say
5  compared with the private Bar.  I think if you go
6  prelim dockets, and you look at what types of cases
7  have more private attorneys, because they -- they set
8  up prelim dockets by the type of case, so more private
9  attorneys go to DUI, driving dockets, which kind of
10  makes sense, because if you can afford a car, then you
11  may -- and you're in risk of losing your license, you
12  probably can afford a lawyer.  I don't -- I mean,
13  everybody gets charged with stealing.  Everybody
14  gets charge -- like, there's a lot of drug crimes.
15  There's a lot of -- and a lot of -- in Jackson County,
16  it's a lot of serious felonies, rob 1s, assault 1s.
17    **Q.  Forgive my ignorance.  Would the -- the**
18  **broad category of white collar crimes, would that ever**
19  **come across your -- your purview?**
20    A.  Probably not.  I mean, I know that the
21  prosecutor's office had a white collar crime guy who
22  per -- or prosecuted a lot of stealing from
23  unemployment, which didn't feel very white collar to
24  me, but we represent those all the time.  I mean, not
25  all the time, but it goes -- it seems to go cyclical

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-12   Filed 02/09/18   Page 38 of 93

## Page 149

1    how -- how many of these they file, but we certainly
2    represent the -- the stealing by omission, as I call
3    it, so stealing from unemployment, stealing food
4    stamps, that sort of -- things along those like lines,
5    but I wouldn't say true white collar.  I feel like
6    most white collar crime, at least in Jackson County,
7    goes to the feds.
8        Q.  In my 20-plus years of experience, have
9    you seen a trend in -- in receiving the same types of
10   cases, or has there been a -- an uptick in a
11   particular type of -- of felony, or I guess over the
12   course of your -- your time with the Missouri Public
13   Defender system, how -- what trends have you seen just
14   in terms of the types of cases, if any?
15       A.  Well, I think there's more -- they say the
16   violent crime is up, so I mean, we have a lot of
17   murders.  We have a lot more weird Internet-related
18   things than when I -- we didn't really have much
19   Internet when I started.  But we've always had
20   robberies.  There's a lot that's consistent.  The type
21   of -- the type of possession.  I mean, when I started
22   years ago, there was a lot of crack, there was a lot
23   of meth; and now, you have a lot more -- I mean, crack
24   and meth are still there, absolutely, but you have a
25   lot more pills, you have a lot more opioid, so there

## Page 150

1    have been trends sort of -- the drug crimes definitely
2    trend different ways.  I can't think -- I mean, but --
3    guns -- well, now, we have fewer guns because carrying
4    a concealed weapon is legal, so we have a whole host
5    of gun cases that we routinely tried that aren't
6    prosecuted any more.
7        Q.  Two steps back, I remember you testifying
8    earlier too that you had conversations with Counsel in
9    terms of your preparation for this deposition?
10       A.  Uh-huh.
11       Q.  Have you also been in contact with other
12   individuals or organizations about the -- I guess
13   about the content of this litigation or just caseloads
14   and workloads generally?
15       A.  Not about the content of this litigation.
16   Caseload, workload, absolutely.  I mean, there was a
17   fair amount of press surrounding our Rule 4
18   initiative, and I've had -- I mean, I had counsel
19   represent me at my show cause hearing.  I've had
20   multiple firms talk to me about public defender issues
21   as well as things along those lines, but I've -- I've
22   never discussed this particular lawsuit.  But
23   there's -- I mean, there's a lot of talk around sort
24   of -- and there's a lot of stuff in the newspaper, so
25   there's a lot of people you run into that talk to you

## Page 151

1    about our caseloads.
2        Q.  So it may be difficult because there are so
3    many, but what types of organizations, if you can --
4        A.  Oh, organizations?  Well --
5        Q.  Organizations, outlets, firms.
6        A.  I don't know about organizations.  German
7    May represented me on my contempt hearing.  I've
8    certainly -- I have a lot of friends who are lawyers,
9    so I have friends -- I've talked to people at Husch.
10   I've talked to people at Stinson.  I've talked to
11   people at Shook.  I've talked to -- I've -- I mean,
12   part of it is I also do MCRC, so I'll drop off files,
13   and then they'll say, "I saw you in the paper," and
14   there's a discussion about what's going on.  But as
15   far as I -- it's -- I don't think there's been any --
16   you know, well, a number of people told me to reach
17   out to the ACLU with regard to my Rule 4 litigation;
18   however, they're currently suing us, so that isn't
19   happening.
20       MR. WILLIAMSON:  No comment.
21       A.  But I don't know what -- like, specific --
22   I mean, I'm not -- look, I'm a mom of three kids, so I
23   literally work, you know, a dozen to 15 hours a day,
24   and I try to spend time with my kids.  I don't -- I'm
25   not a member of a bunch of Bar organizations.  I'm not

## Page 152

1    a member -- I -- I don't have time for any of it,
2    quite frankly.  So I -- yeah.  I'm not a member of a
3    bunch of organized groups.  I don't -- I don't have
4    time.  And it's -- to me, that's one of the things
5    that hurts public defenders more, is that we don't --
6    we're really isolated, and it's really easy for us to
7    sort of get stuck, because we don't have -- we don't
8    join Bar organizations.  Well, a lot of my attorneys
9    can't afford it, but I also -- they don't have the
10   time to do it.  They're going to be in trial, or
11   they're going to be in jail, or they're going to be
12   all these other places.
13       Q.  (By Mr. Ramsey)  Switching gears a bit in
14   terms of how your office determines whether a
15   particular criminal defendant is indigent --
16       A.  Okay.
17       Q.  -- walk me through that process, if you
18   could.
19       A.  So generally, a legal assistant is going to
20   either meet them over in court, meet them over in
21   jail.  We take walk-ins.  And really, any attorney in
22   court if asked to screen someone -- I mean, I -- when
23   I'm in court, I screen people all the time.  We have
24   an application.  We follow the federal poverty
25   guidelines.  I mean, our application is on our

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 153

1   website.  It's not at all a secret.  And you fill out
2   the application, they qualify or they don't, you mark
3   them indigent, you let them know the determination,
4   and you go back to the office and -- and -- and you
5   either have a file.  Right now, you might be on the
6   postponement list, something along those lines.  So
7   it's really sort of self-reporting.  I mean, a big
8   chunk of our folks are in jail, so they're not
9   working.  If they have a home, they're not going to --
10  it's usually -- there's -- it's usually not very
11  tricky in Jackson County, the poverty.  I know rural
12  offices have people who they think are hiding assets.
13  I don't get that sense here.  But it's true we
14  don't -- we don't double check, and we don't have the
15  resources to do that, so if someone says they have no
16  assets, I don't run a search of their personal
17  property tax.  I don't run a search -- I don't -- that
18  would be 20 minutes we don't have.
19      Q.  So if I'm understanding you correctly, the
20  screening process is the application?
21      A.  Yep.
22      Q.  And you all follow the federal poverty
23  guidelines?
24      A.  Uh-huh.
25      Q.  And if a person says, "Hey, I make under

## Page 154

1   those," they will receive representation if you're
2   able?
3       A.  Right.  You have to be poor enough to
4   qualify, basically.
5       Q.  And did I hear you correctly that there are
6   no controls for that or there's no monitoring; it's a
7   self-monitoring type of a system?
8       A.  It's -- yes.  It's generally
9   self-reporting.  I mean, I guess if we suspected
10  someone, we could look at it.  I've certainly had
11  clients who have bonded or something happened where I
12  moved to withdraw based on I -- I don't think they
13  apply -- or they don't qualify for us, that we weren't
14  aware of funding or somehow, you know, they made a
15  $20,000 bond, and they have the resources to hire
16  counsel if that happened, but it generally has to sort
17  of come up on us.
18      Q.  Now, this may be difficult to ascertain
19  just sitting here, but do you have a sense of the
20  rejection rate for those who apply?  And I know you
21  mentioned that if they fill out the application, they
22  generally come in.
23      A.  Uh-huh.
24      Q.  But is that close to 100 percent, bright
25  line rule, if you're under the federal poverty lines,

## Page 155

1   that you're in, that you will receive representation
2   if the system is able?
3       A.  Well, in general, I mean, there's --
4   Chapter 600 has guidelines on it, so you also take
5   into account assets.  You take into account other
6   things.  I don't know the number.  I mean, I --
7   there -- we -- we keep the data.  I have a -- I have a
8   drawer full of denied applications.  We keep those
9   app -- you know, they get archived.  They get sent
10  places.  So we certainly -- people get denied all the
11  time.  Now, that being said, the majority of our
12  denied applications, we are then appointed -- the
13  judge will make their own determination.  A client is
14  and allowed to appeal our findings to the Court, and
15  nine times out of ten, even the people we denied
16  become our clients because the judges find them
17  indigent and appoint us anyway.
18      Q.  Now, does that happen at a hearing?  Like,
19  do you have an opportunity to say, "Here's why we made
20  this determination," or is that held outside of the
21  courtroom?
22      A.  Sometimes.  Sometimes they -- generally,
23  we're there.  Sometimes the judges do it when we're
24  not there.
25      Q.  Uh-huh.

## Page 156

1       A.  They just say, "Were you screened?"  And
2   the client says, "Yes, and I was denied."  And hen
3   they'll say, "Do you have a house, do you have
4   some" -- in court the other day, somebody's mom
5   stood -- or we don't even know how she was related to
6   the client, and was like, "He doesn't have money."
7   Because he's like, "I'm going to hire someone."  She
8   goes, "No, he doesn't have money."  And my lawyers
9   were just aghast, because they were like, how -- they
10  don't even who that woman is who is answering his
11  financial questions to have him found indigent, which
12  the judge did.  The judges appoint us a lot, and did
13  before -- even before now, where they're appointing us
14  all the time.
15      Q.  So I'm understanding two different tracks
16  here.  One is the determination but the Missouri
17  Public Defender's system?
18      A.  Uh-huh.
19      Q.  And then the second is the consideration
20  of, even when we reject some, we'll get appointed
21  there?
22      A.  Yes.
23      Q.  Focusing on the former --
24      A.  Uh-huh.
25      Q.  -- so if I heard you correctly, you all do

39 (Pages 153 to 156)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-12   Filed 02/09/18   Page 40 of 93

## Page 157

 1  reject applicants, and I think you said all the time.
 2      A.  Well, I don't -- I can't tell you what
 3  percent, but we definitely do.  We have a drawer full
 4  of rejected applications.
 5      Q.  Okay.  So there's -- and if you're unable
 6  to, let me know, and I'll just move on.
 7      A.  Uh-huh.
 8      Q.  Would you peg it at 80 percent approval --
 9  acceptance rate or 90?
10      A.  I would definitely say it's high.  I don't
11  know the percentage.
12      Q.  Okay.  Okay.  Here's a -- a question, and
13  it's related to what goes into the -- the
14  determination.  And let me know if this never happens.
15  But say a criminal defendant has multiple cases --
16      A.  Uh-huh.
17      Q.  -- and in -- you know, let's say he has
18  four cases.  Out of the three cases, he has private
19  counsel?
20      A.  Right.
21      Q.  On the fourth --
22      A.  Yeah.
23      Q.  -- he wants to have --
24      A.  Uh-huh.
25      Q.  -- a public defender represent him because

## Page 158

 1  I guess his assets have been --
 2      A.  Depleted, yeah, sure.
 3      Q.  By funding the former cases.  Is that a
 4  relevant factor in whether or not the public defender
 5  system ascertains whether he would -- reaches that
 6  poverty line for -- for representation?
 7      A.  I think it's -- people bring it into
 8  consideration, but I mean, we used to reject -- anyone
 9  who had a private attorney, we rejected outright, and
10  then there was some changes in the law saying we
11  couldn't do that.  So we definitely -- well, one, we
12  try to get -- it's -- it's a mess.  One, it's legally
13  a mess, just because you're supposed to now -- if
14  there's any plea that's going to happen, you have to
15  consult with that lawyer.  But I -- I wouldn't say --
16  it used to be a very strong factor, and it no longer
17  is.
18      Q.  I see.  And that's due to some legal
19  considerations that --
20      A.  Yes.
21      Q.  Same type of question, different scenario.
22  Case and chief is over, and now, we're talking about
23  probation revocation.
24      A.  Uh-huh.
25      Q.  So say someone had private counsel before,

## Page 159

 1  is that a determination that goes into whether or not
 2  they're represented during their --
 3      A.  No.
 4      Q.  No?  Okay.
 5      A.  It hasn't been, to my knowledge.
 6      Q.  Okay.
 7      A.  If people are screening that out -- you
 8  know, crazy things happen all the time, but I -- I
 9  mean, it -- we can -- it's supposed to be a civil
10  matter.  It's supposed to be completely separate.  So
11  we screen people in new even if they had a private
12  attorney on the underlying case.
13      Q.  And now, I'm not trying to trick you on
14  this one.
15      A.  Sure.
16      Q.  I'm just trying to understand that if it's
17  a fairly bright line rule for who qualifies for public
18  defender representation, of these various factors, how
19  would they have been taken into consideration?
20          Said another way, if I fill out the
21  application, and I would normally -- normally would be
22  eligible, but there are these other things going on,
23  when does that -- when do the other things going on
24  come into play in terms of whether you accept or
25  reject a particular candidate?

## Page 160

 1      A.  Well, I think if you qualify under the
 2  numbers, you'd probably be accepted --
 3      Q.  Okay.
 4      A.  -- whether you had a private attorney on
 5  another case or not.
 6      Q.  Got it.  Thank you.
 7          Are there any situations where the public
 8  defender system will enter before they have been --
 9  before you all have been -- well, your district,
10  pardon me.  In your district, are there situations
11  where you all will enter before being appointed or
12  before a determination is made for indigency?
13      A.  Only if we're forced to enter.  I mean,
14  we're going to make a -- an indigency determination
15  before we enter.  Juvenile court appoints us all the
16  time without any application ever being taken.  And
17  what we try and do is contact them and get an
18  application before we have to make it a legal deal.  I
19  mean, a lot of the clients are indigent, and we're
20  certainly not fighting representing qualifying
21  clients.  Or we haven't, just like -- now, we are
22  because of our ethics.  But before that, we pretty
23  much took everybody, but you have to be qualified.
24  You can't physically open a file in our computer
25  without an application.

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

1    Q.  Now, say, the system accepts a particular
2  criminal defendant, and then after the fact, right, a
3  prosecutor -- or it comes to your knowledge that the
4  person may have considerably more assets.
5    A.  Sure.
6    Q.  And I know you alluded to this before.  How
7  does that process work?  Is that upon -- is that
8  burden upon the individual attorney who is
9  representing the case to say, "This seems a little --
10 little funny to me," and to make a motion to withdraw,
11 or how does that process work?
12   A.  Right.  So if -- if during the course of
13 representation, people become aware that the person
14 has assets or didn't disclose assets, something --
15   Q.  Uh-huh.
16   A.  -- they'll move to withdraw.  Or a lot --
17 what happens most commonly is they make a large bond,
18 which sometimes indicates that, you know, they have
19 disposable income.  But we -- we definitely have
20 attorneys move to withdraw in those cases.
21   Q.  Next wave, if you will, after the -- those
22 determinations have been made --
23   A.  Uh-huh.
24   Q.  -- and the cases come to your, I guess your
25 desk, and you're deciding how to -- to divvy them up,

1  and I believe you said your deputy takes care of most
2  of that --
3    A.  Uh-huh.
4    Q.  -- that process.  Are there any local
5  policies in place for how you divvy them up, or is it
6  more or less discretionary?
7    A.  It's pretty discretionary.  I know
8  historically, we can pull up individual caseloads.  I
9  do have -- I guess I do.  So I have -- my attorneys
10 are on teams, and each team has an on week so that
11 they're not running around like crazy.  So there's
12 four teams, so each week, they -- they get a --
13 assigned the cases that are going to be prelimed
14 during that week.  So teams may get some of an
15 overload because it's their on week, and then the next
16 week, it will be a different team's on week.  So we do
17 try and do that mostly for the efficiency of the
18 lawyers so that they can -- so that it groups their --
19 their prelim court dates together during a week out of
20 the month instead of just on any given day.
21   Q.  Concerning your particular office, and I'm
22 speaking specifically, pardon me, of the turnover
23 rate, and I believe you said that nine people had been
24 replaced in 2016?
25   A.  '17.

1    Q.  2017.  Pardon me.
2    A.  Uh-huh.
3    Q.  Do you have any sense for how you stack up
4  compared to other offices within Missouri that are
5  comparable in size?
6    A.  There's not many offices that are -- I
7  mean, we're the largest -- Kansas City is the largest
8  in the state.  I think Saint Louis has maybe four
9  fewer attorneys, and then you go down to, like, 24, so
10 I think Saint Louis has a fairly high turnover rate as
11 well.  I know for us, I'm lucky that I get to fill,
12 because we have rural offices who have had positions
13 open for a year that they can't fill, so I'm lucky in
14 that sense.  But I don't think I'm -- I mean, I think
15 that 20 to 30 percent is pretty normal.  It slowed
16 down a little around, like, 2009 when there weren't
17 any jobs, but aside from that, it's been -- it's been
18 pretty consistent, and on the higher end.
19   Q.  And you had testified earlier as to a
20 number of educated guesses on what you think would be
21 necessary to fill these positions in a sense -- in a
22 way that would be ethical and --
23   A.  Uh-huh.
24   Q.  -- and would be reasonable.  Are those
25 determinations -- and I -- I remember you were saying

1  that they were based upon your experience.
2    A.  Sure.
3    Q.  Are they based on anything else, like
4  comparable offices in Missouri, private practice
5  across the states, or is this -- or were those guesses
6  your --
7    A.  Well, I haven't -- I guess I'm -- I've not
8  reached out to private attorneys on the number of
9  cases they have.  I mean, whenever I talk to the firms
10 about our numbers, they shake their heads.  I think it
11 was more, okay, we have -- we're entered on 4100 open
12 cases.  If, you know, I want to get that number down
13 to a reasonable -- it was more sort of math.  But --
14 and that's me presuming that 40 cases is a reasonable
15 caseload for people.  I -- that's not -- I don't think
16 40 murders a reasonable caseload for someone, so -- or
17 40 all serious crimes.  So again, take that with the
18 caveat that it depends on the caseload, it depends the
19 level on -- of the level of experience of the
20 attorney, it depends on all of those factors.  Yeah.
21 He just said, how many would you like?  And I was
22 like, oh, I'll take that.  I mean, if you gave me
23 100 lawyers, I'd be thrilled, but -- and I -- I think
24 they'd all work.
25   Q.  When you receive these cases, just another

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-12    Filed 02/09/18    Page 42 of 93

1  question here, do you track them by the charges that
2  are on a particular case or by criminal defendant?
3      A.  Well, we have multiple views in our system,
4  so I -- most people look up by name or case number,
5  but I can look up by primary charge.  I mean, we have
6  a lot of cases with multiple charges, so we usually
7  list the primary charge as the most serious or one of
8  the most serious, and so I can look at the type of
9  case under primary charge.  I can search that way.  I
10  mean, I could -- I search -- when the Bazell news came
11  out, I searched "stealing," and I think I had 10,000
12  cases.  So there are ways to search other things in
13  the database, if that makes sense.  There's a variety
14  of views and search methods.
15      Q.  Now -- so I -- I understand that the system
16  at large has annual trainings for various defenders,
17  and those are mandated upon particular assistant
18  public defenders?
19      A.  Right.
20      Q.  In your office, you had mentioned that
21  there are the additional trainings over the lunchtime
22  period?
23      A.  Uh-huh.
24      Q.  Were any of these additional lunchtime
25  period trainings focused on workload or -- or caseload

1  management issues, or any other training for that
2  matter?
3      A.  I don't think I've done an internal
4  caseload management issue.  I mean, the statewide
5  training has a variety of tracks just with hundreds of
6  people going.  So I do think there are -- I think
7  there have been sessions on keeping yourself
8  organized, relaxation, you know.  I mean, there's a
9  variety of people that come and -- and talk in a
10  three-day training.  What all of those are, I don't
11  know, but I -- I tend to be more of a law nerd, and I
12  tend to track toward less about self-care and more
13  about where -- where the legal issues, and those would
14  be the tracks that I would go to.
15      Q.  What other areas of focus in your district
16  have you seen fit to train your district defenders --
17  or pardon me, your assistant public defenders in your
18  district on?  And who makes that call?  I apologize
19  for interrupting.
20      A.  No.  I understand.  So sometimes new
21  things -- so, you know, I had one of my lawyers
22  present on Daughbert, because that's a new area of
23  criminal law, and it's a significant shift from Frye
24  to Daughbert.  You know, the problem with our
25  statewide trainings is, you know, someone goes to

1  trial skills, you can start in October; you may not
2  have trial skills until nine months in.  You might
3  have trial in that amount of time.  So there's a lot
4  of -- I mean, we do a lot of stuff that is pretty
5  basic.  Like, here's impeachment, here's -- or here
6  are the discovery rules, and here's how to enforce
7  them.  And because we have -- you know, basically
8  chronic turnover, we're sort of constantly -- you only
9  hit this section, and then some of them are gone, and
10  then new people are in.
11      Q.  Concerning the funds for representation;
12  right?  So after you bring someone into the system,
13  and they -- they're eligible, that's a -- is that a
14  flat fee for the criminal defendants?
15      A.  The fee?
16      Q.  Yes, ma'am.
17      A.  That's my understanding, yes.
18      Q.  So it's not a sliding scale of various
19  folks on the various levels of the --
20      A.  Well, the fee is depending on the type of
21  case.
22      Q.  Okay.
23      A.  There used to be more of a sliding skill
24  about whether you took it to trial or not or
25  whether -- but the fee is charged -- yeah.  So I think

1  an A felony is one thing, a probation violation is one
2  thing.  That's my understanding.
3      Q.  Okay.  And in juvenile cases, does the
4  parent or guardian pay that or --
5      A.  There's no fee for clients under -- we
6  don't charge clients who cannot enter into a contract.
7      Q.  Turning to the use of funds for depositions
8  and discovery --
9      A.  Uh-huh.
10      Q.  -- and I believe you had mentioned it was
11  the encumbrance for a fund or the encumbrance level?
12      A.  Right.
13      Q.  Are there any policies guiding -- any local
14  district policies guiding how many depositions one may
15  take if they have the time?
16      A.  Well, I don't think there's -- there's a
17  policy on it.  I mean, in general, people discuss with
18  their team leader, and they can discuss with me, here
19  are the people.  I mean, I've never had a trial where
20  I deposed every single person.  I would have liked to,
21  but I also get that there's some witnesses that --
22  that people would consider less important or less --
23  you know, that a dep -- deposition is less necessary.
24  So -- and actually, the only time I've ever seen
25  anyone request all the people is when they're unable

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 169

1    to contact any of them, and they think, the only way
2    I'm going to get to talk to these people is if I
3    subpoena them for deposition because I've not been
4    able to get them to talk to me voluntarily.
5         Q.   In your career up until this point, have
6    you ever been denied a deposition that you wanted to
7    take?
8         A.   No.
9         Q.   Have you ever denied a deposition for one
10   of the attorneys who you supervised that they wanted
11   to take?
12        A.   I -- I have.  Not very many.  Although, it
13   generally wasn't based -- maybe I've had one or two
14   that were based on, you don't need to do a deposition
15   there.  More based on sometimes new attorneys have
16   some sort of farfetched ideas about how things go, and
17   it's more of a, like, are you sure you want to do
18   this?  Are you sure this the route you want to get?
19   Or sometimes, are you sure you want to create bad
20   evidence?
21        Q.   Same question, slightly different topic.
22   Have you, personally, ever been denied an expert
23   witness that you felt was necessary for your case?
24        A.   No.
25        Q.   And have you denied an expert to one of the

## Page 170

1    attorneys that you supervised that they felt was
2    necessary to their case?
3         A.   No.  I don't -- I'm just the mid level
4    approver for that, so I have seen people get denied.
5    However, I generally punt it up if -- if there's
6    something I -- I'm usually a "yes," and then if it
7    gets denied, it's at the -- the higher level.
8         Q.   And do you have a sense for why those were
9    denied?  And I know that -- the systemwide question,
10   that's not what I'm asking you.  But do you have any
11   personal knowledge for why requests from your office
12   for expert testimony --
13        A.   Uh-huh.
14        Q.   -- were denied in the past?
15        A.   It's usually money.
16        Q.   Money?
17        A.   Well, could you get a cheaper expert, could
18   you get someone who's local, could you -- you know, we
19   think maybe we could do this in-house.  But it's all
20   about saving money, or that's been my impression.
21   I'm -- I've -- I don't know everyone that's obviously
22   been denied statewide, but if I had somebody who -- I
23   send back requests all the time to say, this is isn't
24   on point, or this isn't something -- I have people
25   edit -- probably one a day, I have people edit

## Page 171

1    encumbrance requests, so denials, like an official
2    denial on the computer would be very rare.  Then I do
3    unofficial, "edit this," all the time.  Probably
4    daily.
5         Q.   Do you have a sense for if I -- and I know
6    you -- you had mentioned and you had testified earlier
7    that you don't have a -- a ton of misdemeanors that
8    you all --
9         A.   Right.
10        Q.   -- are handling, but is there any
11   limitations for wanting to use an expert in a
12   misdemeanor case as opposed to a felony case?
13        A.   Nope.
14        Q.   Okay.
15        A.   I -- I say, "There are no small cases," and
16   I say that to my lawyers who say, "I don't want
17   misdemeanors."  I'm like, it's important -- they're
18   all important to the client.
19        Q.   Step back, the policy procedure, when you
20   want to -- to implement or promulgate is probably the
21   improper word.  But when you want to implement a
22   policy in your district --
23        A.   Uh-huh.
24        Q.   -- what goes into that?  Is it merely a
25   decision based upon your judgment, and you send an

## Page 172

1    e-mail to everyone and say, "Here's the new policy,"
2    or walk me through that.
3         A.   Yes.  Although, I -- I don't think I've
4    ever implemented a policy with not -- without
5    talking -- like I said, I have a pretty good
6    relationship with upper management, and I appreciate
7    their feedback and their thoughts about how things go.
8    As well as, I don't want to -- I've not memorized
9    every policy, local policy necessarily, and I
10   certainly haven't memorized every MSPD policy, and
11   it's good to know if there's a conflict.  But I
12   don't -- I've only -- aside from minor things, we're
13   going to screen this person now, I've probably only
14   implemented three probably major policies in my
15   tenure.  And that's first-time felon, vertical
16   representation, I don't even know what the third would
17   be.  Maybe this -- the Rule 4.  So to say that I'm
18   implementing new policies all the time, I'm not.
19        Q.   I guess my question is:  Could you if you
20   wanted to implement --
21        A.   I think I probably could.
22        Q.   Okay.  And so those questions when you were
23   reaching out to central -- to central management or
24   upper management, that's just because you have that
25   relationship and you want their input versus having to

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 173

1   seek approval from them; is that --
2       A.   Right.  I think --
3       **Q.   Okay.**
4       A.   Let me think.  I know when we went forward
5   on first-time felon, in fact, my deputy who then
6   became my supervisor tried to make it statewide, and
7   it didn't become a -- a policy statewide.  Other
8   people opposed it.  So I have a local office policy
9   that didn't succeed statewide.
10      **Q.   And would -- could you tell me more about**
11  **the -- the first time felony policy?  And I'll ask**
12  **about the vertical --**
13      A.   Sure.
14      **Q.   -- representation in just a moment.**
15          **But my understanding was that if someone is**
16  **going to plead a felony for the first time, and**
17  **they're not currently a felon --**
18      A.   Uh-huh.
19      **Q.   -- they have to have a conversation with**
20  **you first?**
21      A.   Correct.
22      **Q.   Is that a -- they have to seek approval?**
23  **You have to say, "Yes, you may proceed," or is it just**
24  **a conversation that --**
25      A.   Well, I do have to say, "Yes --

## Page 174

1       **Q.   Okay.**
2       A.   -- you can proceed."  And so I have a
3   conversation.  And largely, I ask them what they've
4   investigated.  If someone's going to trial, and it's
5   the morning of trial, and the client says, "I want the
6   deal," and we've investigated the case, that is the
7   client's call.  What I think we can't do is plead
8   people to felon -- well, really, we shouldn't do it on
9   any case, but first-time felon is the only one I have
10  a policy on that and that I check.  We should not be
11  pleading people and saying we're competent counsel
12  when we're not.  Representing theirselves as competent
13  counsel and standing there is a problem to me.  Have
14  we pled first-time felons that we've done -- not done
15  work on?  Well, historically, many.  And more
16  recently, yes.  Some -- we've had judges order people
17  to plead people, because the client says, "I want it."
18  What -- what we've done, generally, is if a client
19  wants it, and we've done no work, we've asked to move
20  to withdraw and let client plead pro se, which the
21  Courts are really uncomfortable with; although,
22  they're not uncomfortable with us saying we've done
23  nothing on the case, and we're essentially a potted
24  plant.
25          But that's -- the first-time felon was

## Page 175

1   really to keep us from making people felons who
2   don't -- you know, making a decision either to get out
3   of jail or some -- because often, first-time felons
4   get probation office -- offers, and they really want
5   to get out, and getting the protection of a lawyer
6   who's not really a lawyer.  You know, we're not
7   meeting any of our ethical standards there either,
8   so --
9       **Q.   And then vertical representation, I presume**
10  **that's from beginning to end --**
11      A.   Uh-huh.
12      **Q.   -- of a particular case that was produced**
13  **to you all?**
14      A.   Right.  When I started, we had docket
15  attorneys -- we had vertical representation on serious
16  cases only, and we had docket attorneys.  So if you
17  had a tampering case and, you know, stealing of a car,
18  you would get a separate lawyer at prelim, you'd get a
19  separate lawyer at the -- and "separate" meaning they
20  represented everybody on that docket, so 20 to 30
21  people.  So -- who you were supposed to have read
22  their police reports and have a client relationship
23  with, and that attorney wasn't entering.  So you'd get
24  a separate lawyer at prelim, a separate lawyer at the
25  settlement conference, a separate lawyer at

## Page 176

1   arraignment, a separate lawyer at the second
2   settlement conference that generally happens, and then
3   the case would be assigned after you got sent to a
4   trial division, which -- so you would have gone
5   through a handful of court dates, probably four months
6   to eight months of representation without a single
7   lawyer entering, very little investigation.  Hopefully
8   you got police reports.  And so what I did is said,
9   "You're going to assign this person from beginning to
10  end," which is what the ABA guidelines say, and it's
11  really the only sensical way to practice.
12      **Q.   Do you have a sense for whether most**
13  **districts or any districts that you're aware of**
14  **outside of District 16 follow the vertical**
15  **representation as opposed to horizontal or --**
16      A.   I think all of them do.  I mean, in most
17  rural counties, you have one lawyer per county, so
18  whether it be by intention or by convenience, that
19  attorney is going to follow every case in that county
20  from beginning to end.  I would -- ours was one of the
21  last offices to have docket attorneys.  And that was
22  in 20 -- I mean, we went vertical in 2012, so we've
23  been vertical almost five years.
24      **Q.   Returning to experts, and -- and those**
25  **funds utilized for them, is there a time-keeping or**

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 177

1   time tracking system for the use of experts?
2        A.   I'm not sure the -- that we're tracking
3   their time?
4        Q.   Yes, ma'am.
5        A.   Well, they are supposed to bill by the
6   hour.  When we do a request, in the request, we are
7   supposed to put the expert's hourly rate in their
8   estimates of hours.  And if they need more hours, we
9   are supposed to do an updated request that talks about
10  approximate hours.  The request should have their
11  hourly rate.  I mean, if we're talking about
12  testimony, sometimes testimony is a different rate for
13  certain experts, things like that.  All of that should
14  be in the request.
15       Q.   And does your office -- or do you maintain
16  a list of potential experts for your attorneys, or is
17  that a burden on the actual attorney to research and
18  find an expert?
19       A.   Well, we have -- we have an expert witness
20  database for experts we have used.  Obviously, I
21  don't -- I mean, I wouldn't recommend just pulling any
22  old person off that, because the -- they may not have
23  testified well.  But then sometimes, I think you can
24  contact the money people and say, "Who has used these
25  experts?"  So you can get in communication with them

## Page 178

1   of whether they would be a valuable expert or not.
2        Q.   Was there ever a time -- were you -- were
3   you, personally, ever coerced into utilizing an expert
4   when you thought you did not need one?
5        A.   No.
6        Q.   Have you ever coerced any of your attorneys
7   into utilizing an expert when they thought they didn't
8   need one?
9        A.   I would hope not.  I mean, I talk to my
10  lawyers pretty much every appraisal, and almost every
11  time, my suggestions are, you know, look into what
12  experts are out there, because so many of my lawyers
13  use so few experts.
14       Q.   Switching gears again, does your office
15  oversee the collection of funds that are outstanding,
16  or is that a central office mechanism?
17       A.   Fee funds?
18       Q.   Yes.
19       A.   No.  I mean, I don't.  I -- upper
20  management, I believe, has a system.  I don't.
21       Q.   Okay.  So the districts do --
22       A.   I personally -- yeah.  We don't take
23  checks.  We don't -- that would be a nightmare.
24       Q.   In your office currently, are you all
25  tracking time for particular tasks in -- in cases?

## Page 179

1        A.   Currently, no.  Have we for years?  Yes.
2        Q.   Did you have a sense for when that began
3   and ended?
4        A.   No.  I really don't.  I mean, it's been in
5   the last five years, I think.  But I don't -- we spent
6   years time tracking.  I don't recall the -- I -- not
7   at all.
8        Q.   When you were tracking time -- well, two
9   steps back:  As a district defender -- well, before
10  you were district defender, pardon me, and that -- was
11  that 201?
12       A.   Uh-huh.
13       Q.   Did you track time before that?
14       A.   For periods, yes.
15       Q.   Okay.  And in the most recent period after
16  you were district defender, and you were tracking
17  time --
18       A.   Uh-huh.
19       Q.   -- do you know if that was by charge, by
20  case, by criminal defendant, by task?
21       A.   So when you tracked, you went in, and there
22  was case specific and not case specific, and I think
23  there was administrative.  So if you were doing work
24  on a particular client's case, you tracked that.  If
25  you were waiting in court at a docket, that's hard to

## Page 180

1   track to a specific case.  If you did administrative
2   tasks sometimes -- some of them could be tracked to a
3   case; some of them could not.  So you'd go in, you'd
4   select that, and then under that, you'd select, you
5   know, whether you were doing investigation on a
6   specific case, whether -- I mean, I did a lot of -- I
7   have a lot of -- I mean, a lot of what I do is talk to
8   people about stuff most of my day, so I do a lot of,
9   like, general management that sort of thing.  But some
10  of it fairly got specific.  I mean, we had to -- we
11  had a special database we went into to track.
12       Q.   Do you recollect if there was any, like,
13  type of time management controller or any type of
14  control or monitoring of how individuals were entering
15  their time?
16       A.   I'm not exactly sure what you mean.
17       Q.   Yeah.  Was there a dedicated position in
18  your district in your experience to someone managing
19  the -- the time that people said that they were doing?
20  So in other words, was there any oversight to the
21  timekeeping?
22       A.   No.  I -- I mean, if anything, I was always
23  of the opinion my lawyers underreported because
24  timekeeping was fairly arduous, and I don't know many
25  of them said, "Well, I could be working on more cases

45 (Pages 177 to 180)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-12    Filed 02/09/18    Page 46 of 93

1   if you didn't make me track time."  So I never worried
2   about over-reporting.  I did worry about
3   under-reporting because I felt like a lot of my
4   lawyers were doing work that they weren't tracking
5   because they would -- the input took a lot of time.
6       Q.  Do you remember if that time system, that
7   time tracking system -- and forgive me if -- if you
8   answered this already -- if it tracked by a particular
9   charge.  So a felony A, I put -- I put in this much
10  work on a felony A versus a felony B as opposed to --
11      A.  I think it did.
12      Q.  -- this criminal defendant?
13      A.  I -- I think -- well, I think you track by
14  client and case number, because you could do it -- you
15  could input it, and you could also go to the client's
16  case, and then hit the button to add hours, and it
17  would then specifically put in that case.  Now, if
18  there was multiple counts within a case, that's a --
19  there's no idea what you could do, but I think you
20  could do it both client and case specific.  That's my
21  recollection.
22      Q.  Do you remember if there was ever a
23  training on how to track your time, or was it a --
24  just something, an e-mail that was sent out that said,
25  "Hey track your time from -- from here on out"?

1       A.  So I've tracked time multiple times, and I
2   don't -- and because it's -- it's been several years,
3   I don't really remember.  I mean, I remember
4   personally with my staff having it on the overhead and
5   saying, "What do you think?"  And constantly either
6   looking it up or e-mailing somebody and saying, "What
7   does this count as?"  What -- you know, we did this.
8   Does that count as this?  Does that count -- how do we
9   track that?  There was a lot of resource that way.  I
10  don't -- I don't recall -- I don't recall there not
11  being one.  I don't recall there being one.
12      Q.  Within similar types of cases, is it fair
13  to suggest that different cases have different needs?
14      A.  Sure, yeah.
15      Q.  So a -- a criminal -- or sorry.  A felony A
16  is not a felony A is not a felony A, said another way?
17      A.  Right.
18      Q.  In your personal experience, is it typical
19  for a criminal defendant to only be charged with a
20  single count or a single charge?
21      A.  It happens.  You mean a -- one case with
22  one count?
23      Q.  Uh-huh.
24      A.  It happens.  I don't know what percentage
25  that would be.  It definitely happens in some cases,

1   but we also have, you know, cases with 18, 35 counts.
2   We -- I mean, the opposite happens a lot too.
3       Q.  Is it more or less likely for a
4   multiple-count criminal defendant to appear as opposed
5   to a single-count defendant?
6       A.  I feel like in Jackson County, more.  But I
7   also think Jackson County prosecutors really
8   consolidate -- consolidate as much as possible, or
9   that's what my attorneys want to believe because they
10  think that their cases are not being counted fairly,
11  but when you have -- and in -- so if you have a
12  robbery, you're going to have an ACH.  I mean, if
13  there's a -- like, the ACA is everywhere, especially
14  if there's any sort of gun around, so I feel like more
15  often than not, we have multiple counts.  Or you know,
16  a burglary almost always has a stealing, because
17  that's why it's a burglary.  There are a lot things
18  that go in pairs.
19      Q.  Turning to the budget and how the budget
20  operates with you as a district defender, I'm
21  recalling that you testified that you -- there are
22  various earmarks for how much money you can utilize
23  for certain things?
24      A.  Uh-huh.
25      Q.  In your experience, have you ever run out

1   of funds during a fiscal year and had to ask for
2   supplemental funds from -- from upper management?
3       A.  I've definitely run out of funds, and I've
4   definitely said, "Hey, there's this going on.  What do
5   you want me to do?"
6       Q.  And when that occurs, is it in a particular
7   line item, such as by encumbrances or personnel?
8       A.  Yes.  Well, usually -- well, I personnel
9   is -- I don't have a personnel budget.  That's
10  completely Central.
11      Q.  Okay.
12      A.  So small encumbrances are called local
13  encumbrances, and I've definitely had issues with
14  that.  There's certain amount of billing that comes
15  out of travel.  Attorneys, investigators, people
16  having to drive.  I feel like I've definitely gone
17  over that.  There are -- there are some things I have
18  more control over.  I mean, If someone has to drive to
19  prison and depose people, and there's a lot of travel
20  going on, I have less control over that than I do over
21  ordering supplies, say, like -- or we will get the
22  cheap pens.  So -- but I -- I'm cognizant of it.  I
23  mean, I look at it, and January 1, we'll be halfway
24  through the fiscal year, and I'll look at where we're
25  at and how much money we have in a given -- and I -- I

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-12   Filed 02/09/18   Page 47 of 93

## Page 185

1   notice when the new budget -- they send us a
2   spreadsheet, and I always compare it to the old one,
3   so I look at it, and I'm cognizant of areas where
4   we've had problems.
5       Q.   Now, when you send the -- so your
6   supplemental request -- and I'm unsure if that's the
7   appropriate vernacular.
8       A.   Uh-huh.
9       Q.   But would that go to the controller, and
10  she would figure out how to proceed from there, or how
11  involved in you -- how involved are you in that
12  budgetary process after you submit a supplementary --
13  or supplementary request?
14      A.   Well, it -- it is not that formal of a
15  process.  It's more like, oh, I think I'm screwing up.
16  How bad is this going to be?  So I've never -- I don't
17  submit a budget.  It's more of an allowance to me, you
18  know.  They're like, here you go.  Here's your chunk
19  of money.  Stay within that, and it's more of a, like,
20  I don't -- I'm concerned -- in more of an alert to,
21  like, why is our office spending more money than you
22  thought historically would -- we would, and how will
23  that go.  But I -- there is -- I don't have -- I've
24  never done a formal -- formal request for more funding
25  to my office budget.

## Page 186

1       Q.   How often would you say you run into that
2   type of -- of snag, if you will, in terms of you
3   looking at the -- your numbers and saying, I think we
4   need a little bit more here?  Is that an every year
5   thing, or is that a --
6       A.   I would say I -- we pretty much exhaust our
7   budget every year.
8       Q.   Okay.
9       A.   Well, and, I mean, I know centrally they
10  watch it, so if I have an overflow, that will be gone
11  the next budget year, but it won't be -- you know, it
12  will go somewhere.
13      Q.   As the district defender, do you discern
14  any type of difference between cases who are
15  constitutionally mandated to take versus permissive
16  ones?
17      A.   I'm not even sure what a -- what would be
18  permissive.  I'd like to know if there was an option.
19  I -- I mean, we -- we take criminal cases we get
20  appointed.  At my office, I don't handle -- I mean,
21  all we handle are crimes, so have you -- if there's a
22  permissive one, let me know.  I have no idea.
23      Q.   Speaking about the Chapter 600
24  conference --
25      A.   Uh-huh.

## Page 187

1       Q.   -- when did you become aware that that
2   particular section existed?  Was it upon passage or --
3       A.   I -- I think so.  I mean, it seemed to be
4   part of that, which killed -- because at the time,
5   people were certifying offices based on caseload,
6   so -- and again, this is my understanding of it, and
7   if legally, I'm wrong, I'm wrong.  But they -- it
8   seemed to pass to undercut that certification, because
9   the certification was -- whole offices were certifying
10  based on these numbers, no one in my office can take a
11  case.  In Chapter 600.063, clearly it says it can't be
12  the entire office.  I mean, it was clearly designed to
13  sort of undercut that process.
14      Q.   So you had potentially knowledge of the
15  passage from that -- and I believe that was the
16  2012 --
17      A.   Uh-huh.
18      Q.   -- 2013 area up until present?
19      A.   Right.
20      Q.   Are you familiar with that statute?
21      A.   Pretty -- I mean, I can't recite it to you,
22  but I'm fairly familiar.
23      Q.   Before the two motions that you filed under
24  that Chapter --
25      A.   Uh-huh.

## Page 188

1       Q.   -- had you -- have you -- had you ever
2   utilized that chapter before or that particular
3   section before?
4       A.   No.  And honestly, I -- I'm only filing
5   because the judges want me to.  I don't think it's
6   relevant for -- under Rule 4 at all, so I mean, I --
7   one, I -- I think it's a trick statute that's not
8   meant to really provide us any relief.  And two, I
9   don't think it encompasses our duties under Rule 4.
10  The standard is ineffective assistance of counsel,
11  which doesn't talk about the competence, diligence,
12  and I think it's unconstitutional.  I think it's -- I
13  think that saying that only public defenders cannot --
14  cannot put limits on their caseload is -- it's
15  disgusting.  I mean, to say that my license isn't any
16  more worthwhile than yours; and somehow, there's a
17  carved exception that allows me to not have caseload
18  control, when every other lawyer has that -- so I'm
19  aware of it, I think -- I don't know.  Okay.  I'll
20  step off the soap box for you; okay?
21      Q.   Was that a -- a decision that you made to
22  not foresee it under that statute, was that based upon
23  your experience and your understanding of that
24  statute, or were there conversations with other
25  district defenders, with upper management concerning

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

Case 2:17-cv-04057-NKL   Document 153-12   Filed 02/09/18   Page 48 of 93

## Page 189

1   whether or not you should you utilize that
2   particular --
3       A.  Well, Chapter 600 says it's based on
4   caseload standards.  The assertion I made is based on
5   the rules of professional conduct and my lawyers
6   asserting -- plain reading, it didn't seem to apply.
7   I know the judges -- when I went around, the judges
8   were like, well, we think this is it.  And I was like,
9   how does that encompass our concerns under Rule 4?  It
10  doesn't meet them at all.  So I think I probably had
11  multiple discussions with different -- I think -- I
12  think office-wide, one, it's -- it's -- having filed
13  under it, I didn't even know where to file.  It just
14  says, "File something with the circuit court."  Well,
15  is it a criminal case?  Is it a civil case?  It's --
16  it's a very confusing statute.  But where it is clear
17  is that it's based on caseload standards, which is not
18  what I -- I've been asserting under my Rule 4
19  concerns.
20      Q.  And is that understanding what led you to
21  proceed the writing letters and communicating in other
22  ways outside of that statute?
23      A.  Yes.  And I will say, before I sent that
24  letter to Judge Torrence, I met with him personally
25  and said, "Hey, if you have other suggestions, let me

## Page 190

1   know."  I didn't just send him a letter and be like,
2   "Hey, we don't take cases Monday."  I met with him
3   probably a week prior in his chambers and had a
4   discussion to just say, "Hey, I'm -- I'm reaching
5   capacity."  The only reason I wasn't at capacity is I
6   had three attorneys who had started the month before,
7   and were like, "No, we still -- we're still fine."
8   I'm like, "Great.  We'll assign you" -- I mean, they
9   were getting every case because I had 30 lawyers who
10  said they couldn't take any.  So I filed well after a
11  number of offices, because I couldn't
12  intellectually -- I couldn't honestly say that we were
13  at overload until every lawyer said they were there.
14      Q.  What were some of those suggestions that
15  were made by the Court when you went in and had that
16  conversation?  Was it, "Hey, write a letter and -- and
17  stop taking cases on" or --
18      A.  No.  He didn't say much, other than he
19  said, "I think this is self-inflicted because you have
20  vertical representation.  I think that's increasing
21  your caseload."  And -- and Judge Torrence tells me
22  that he all the time.  He didn't -- he didn't
23  practice -- he practiced in the eighties, and they
24  did -- had docket attorneys, and he felt like -- and
25  that's what the prosecutor's office does, even though

## Page 191

1   they don't have the same ethical obligations under
2   Rule 4 I do, and he -- that's what he -- he basically
3   was like, I -- I think you're full of it, and -- was
4   not all that concerned about my lawyers and their
5   ethics.  Let's say that.  Well, and then he was
6   annoyed.  I can't believe Fisher said that.  I can't
7   believe -- you know, he was just, you know, talking
8   out of his rear end basically.  You know, basically
9   saying that, "No, Fisher said that on the record, and
10  I have to -- you guys are blowing it up into something
11  it shouldn't be, and I don't -- and now, I have to
12  deal with it."  He did not offer solutions.  Let's say
13  that.
14      Q.  Have you in your career with the public
15  defender system ever been judicially determined to
16  have provided ineffective assistance of counsel?
17      A.  No.
18      Q.  Have any of your attorneys that have
19  worked -- that you have supervised, have they been
20  judicially determined to have provided ineffective
21  assistance of counsel?
22      A.  Yes.
23      Q.  Do you have a sense for how many?
24      A.  No, I don't.  I -- I don't know.  I don't
25  have a sense for how many.  I mean, I -- it's not

## Page 192

1   50 percent.  I mean, it's probably one a year.
2       Q.  And I apologize, I'm going to be jumping
3   all over the place.  I'm going to be doing coverage to
4   complete --
5       A.  Sure.
6       Q.  Earlier, you testified that forensic
7   testing was one of the areas where it was denied a
8   request for --
9       A.  Uh-huh.
10      Q.  -- for an expert.  Are there any other
11  examples of, I guess, categories that tend to get
12  rejected?
13          MS. SHIPMA:  And you're talking about from
14  her office; right?
15          MR. RAMSEY:  Yes.
16      A.  Yeah.  I can't know statewide, obviously.
17  Well, I've had some experts, specific experts that
18  people wanted that they were like, can you get
19  cheaper?  Can you get -- I'm -- I can't think of any
20  right now.
21      Q.  (By Mr. Ramsey)  Now, turning to the
22  exhibits very briefly.  I'm looking at exhibit that
23  Plaintiffs have marked as 2, and it's entitled,
24  "Duties under Missouri v. Frye"?
25      A.  Uh-huh.

ALARIS LITIGATION SERVICES
www.alaris.us        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-12    Filed 02/09/18    Page 49 of 93

1  Q.  Do you remember receiving this document, or
2  did you receive this document?
3  A.  I assume I did.  It's sent to me.  Do I
4  remember receiving it?  No.  I mean, it was sent to me
5  in, I don't know, 2013; right?
6  Q.  And presumably, the last time you saw this
7  was whenever you had presumably seen it before?
8  A.  Yeah.  Or I mean, I may have forwarded it
9  to the office.  We may have discussed it at staff
10  meeting.  I don't -- I mean, I haven't pulled it out
11  recently.
12  Q.  Turning to Exhibit 3, what's been marked as
13  Plaintiff's Exhibit 3 --
14  A.  Uh-huh.
15  Q.  -- it was already mentioned, but you did
16  not draft this letter, did you?
17  A.  No.
18  Q.  Were you involved in drafting this letter
19  at all?
20  A.  No.
21  Q.  Did you have any knowledge beforehand that
22  this letter was being drafted?
23  A.  No.
24  Q.  Turning to Plaintiff's Exhibit 4, did you
25  have any knowledge that this was being drafted?

1  A.  No.
2  Q.  Were you involved in the drafting process
3  for this?
4  A.  No.
5  Q.  Were you consulted in any other way in the
6  creation of that document?
7  A.  I don't believe so.  I mean, Pamela is
8  someone that I do know who I chat with occasionally,
9  but I don't have any recollection of talking to her
10  about this.
11  Q.  Okay.  Turning to Plaintiff's Exhibit 6, so
12  skipping over 5 --
13  A.  Uh-huh.
14  Q.  -- you were not familiar with the Missouri
15  Coalition for the Right to Counsel's decision to draft
16  this letter, were you?
17  A.  The -- this, I'm not as sure.  I mean,
18  there was a point when Joel sent something out and
19  asked for input, and I don't know -- honestly, I don't
20  know if this is it or not.  But it had to do with
21  counsel.  It may have had to do with this letter; it
22  may not have.
23  Q.  Have you had any other conversations with
24  MCRC?
25  A.  Well, MCRC really isn't -- there's -- the

1  guy who administrates it is -- he's officed in Saint
2  Louis, and I'm not remembering his name.  I don't know
3  if it's in here.
4  MR. WILLIAMSON:  Sherrer?
5  THE WITNESS:  I'm sorry?
6  MR. WILLIAMSON:  Sherrer?
7  THE WITNESS:  Yeah.  Michael Sherrer.
8  A.  So Michael occasionally e-mails me just,
9  "How many cases have you sent?  What stage are things
10  in?"  Shook had their first two trials in the last
11  month, and I think I e-mailed him, you know, their
12  first trial went this way, something along those
13  lines.  I don't -- I don't -- it's not -- there's not,
14  like, this corporate entity that reaches out.  I mean,
15  the e-mail, itself, is from Joel Elmer, who's our
16  deputy director, so I -- Joel communicates on a
17  regular -- he sends me all his old E-notices almost
18  every other day so -- so I'm not sure -- I -- I guess
19  I don't know what you mean by, "communicate with
20  MCRC."
21  Q.  (By Mr. Ramsey)  Sure.  I was unclear, but
22  I'll move on.
23  A.  Sure.  Okay.
24  Q.  It's not a big --
25  Shortly after, I believe it was the

1  Hinkebein decision --
2  A.  Uh-huh.
3  Q.  -- where the district defenders met and I
4  believe it was some type of a conference --
5  A.  Uh-huh.
6  Q.  -- or a conversation?
7  Did I understand your testimony correctly
8  to suggest that central office didn't provide a -- a
9  list of, "Here are the three or four different things
10  you can do to manage your -- your caseload or workload
11  concerns"?
12  A.  I wouldn't say -- I mean, they -- I think
13  there was a presentation about what are the coverage
14  of a Rule 4, what are the caseloads, stuff that talks,
15  I -- there wasn't a directive that, you have to do
16  these things and these things.  There was -- there's,
17  like, a sample Bar complaint against Michael Barrett
18  if -- you know, if people wanted to do that, but it
19  wasn't -- there wasn't a directive.  In 2012, when
20  people were being certified, there was a directive of
21  how you were supposed to do it.  You were supposed to
22  meet with judges in a certain way.  You're supposed to
23  do these things.  Your numbers had to be this level.
24  There wasn't anything like that.  But was it a large
25  part of discussions at the management conference?

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-12    Filed 02/09/18    Page 50 of 93

## Page 197

1  Certainly.
2      Q.  And that discussion was amongst the
3  district defenders --
4      A.  Uh-huh.  And --
5      Q.  Or was it across --
6      A.  Yeah.  There were -- I -- there were
7  presentations on it.  There were district defenders
8  that talked about it.  We had small groups.  I mean,
9  people were very worried and upset about it.  People
10  were very concerned, and I was -- I mean, I was --
11  had -- before I went to the conference, I was
12  getting -- I had multiple e-mails from my lawyers
13  refusing cases, so it wasn't -- there was no way it
14  wasn't going to be talked about.
15      Q.  Again, I apologize for jumping around.  I'm
16  focusing on the second Chapter 600 motion that was
17  filed on your behalf or that you filed.
18      A.  Uh-huh.
19      Q.  After that was denied, it's my
20  understanding of your testimony that you did not
21  appeal that particular denial; is that correct?
22      A.  I have not.  It was just denied a couple
23  weeks ago, but yes.
24      MR. RAMSEY:  Okay.  I believe that's it for
25  me.

## Page 198

1      MR. WILLIAMSON:  I have two follow-ups.
2  Did you want --
3      MS. SHIPMA:  I have some follow-ups too.
4      MR. WILLIAMSON:  Go.
5      MS. SHIPMA:  But I need to get -- I had
6  Jillian -- or Gillian print out some documents for
7  me --
8      MR. WILLIAMSON:  Oh, okay.
9      MS. SHIPMA:  -- for mine, so do you want
10  to -- I'll just go off the record and go get those.
11      MR. WILLIAMSON:  Sure.  That's fine.
12      VIDEOGRAPHER:  Off the record, 1:49 p.m.
13      (A brief recess was taken.)
14      VIDEOGRAPHER:  On the record, 1:52 p.m.
15          EXAMINATION
16  BY MS. SHIPMA:
17      Q.  Okay.  Ruth, I have just a few follow-up
18  questions for you.
19      When Mr. Ramsey was asking you about
20  organizations you've communicated with, I -- I did
21  you communicate with NACDL, N-A-C-D-L?
22      A.  I did.  Yes, I did.  Well, Judge O'Malley
23  asked me to participate a conference call, which I
24  did.  Sorry.
25      Q.  And do you know what N-A-C-D-L stands for?

## Page 199

1      A.  The National Association of Criminal
2  Defense Lawyers.
3      Q.  Okay.  All right.  I just wanted to make
4  sure that --
5      A.  Yes, thank you.
6      Q.  -- we had that on the record, because I
7  knew you were forgetting that.
8      A.  I was.
9      Q.  And just -- do you know -- and if you don't
10  know this, that's fine.  I just want to ask.  Do you
11  know if there is -- if -- if failure to be -- to act
12  diligently is the same as ineffective assistance of
13  counsel?  Are those the same standards?
14      A.  My understanding is they're very different
15  standards.
16      Q.  And is that the same for not communicating
17  regularly with your client under the ethics rules, is
18  that the same standard as ineffective assistance of
19  counsel?
20      A.  No.  They're different standard.
21      Q.  Okay.  Thank you.
22      (Petsch Exhibit 10 was marked for
23  identification.)
24      Q.  Now, I want to hand you what's been marked
25  Exhibit 10.  Can you tell me what that is?

## Page 200

1      A.  It's the first page of the Public Defender
2  18 CSR10-3.010.
3      Q.  Flip it over.
4      A.  Oh.
5      Q.  It's on the back.
6      A.  Thank you.  That makes more sense.
7  Guidelines for Determination of Indigence.
8      Q.  And are you familiar with those?
9      A.  Yeah.  Again, I can't recite them, but if I
10  go back to them -- and they're used regularly in my
11  office.
12      Q.  And who promulgates these?  Are these
13  created by your office?
14      A.  No.  Not by my office.
15      Q.  Do you know who creates those?
16      A.  I assume -- I guess that -- in my head, it
17  was the legislature.  I don't know if the commission
18  does that or not.
19      Q.  Okay.  So if you don't know the answer to
20  that --
21      A.  I don't.
22      Q.  -- that's fine.
23      Okay.  But you have seen those before?
24      A.  Yes.
25      Q.  And you're familiar with those?

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 201

1  A. Yes.
2  Q. And do those contain, as far as you are
3  aware, the factors that are to be considered in
4  determining indigency?
5  A. Yes.
6  (Petsch Exhibit 11 was marked for
7  identification.)
8  Q. Okay. All right. So now, I want to hand
9  you Exhibit 11, and I believe the sticker is on the
10  front page of that one --
11  A. Okay.
12  Q. -- so you don't have to turn it over. Can
13  you tell me what that is?
14  A. This is an application for public defender
15  services and the promise to pay.
16  Q. And when you were talking earlier about
17  determining indigency and making that determination in
18  court or maybe it comes back to the office, is this
19  the form that you were referring to?
20  A. Yes.
21  Q. Okay. Actually, I do want you to look at
22  the back page of this document for just a moment. Do
23  you see the section that's entitled "Acknowledgement
24  and Promise to Pay"?
25  A. Yes.

## Page 202

1  Q. And can you read the first sentence of that
2  to me?
3  A. "I understand that lying on this
4  application constitutes a crime."
5  Q. And is there a place for the applicant's
6  signature and date below that?
7  A. Yes.
8  Q. So applicants know when they are filling
9  this out that if they don't give correct information,
10  that could result in their being further charged; is
11  that correct?
12  A. Yes. They should know.
13  Q. At least they're put on notice of that?
14  A. Right.
15  Q. And do you believe that the people who are
16  going over these applications with the defendants
17  point that out to them?
18  A. Yes. Most of time, they read it to them,
19  and then have them -- I mean, a lot of our clients are
20  in cuffs, so they read the entire application and fill
21  in the answers, and then have them sign.
22  Q. Okay.
23  A. They allow them to review it. They don't
24  fill it out in secret or anything, but a lot of it's
25  read.

## Page 203

1  (Petsch Exhibit 12 was marked for
2  identification.)
3  Q. Okay. Now, I'm going to hand you what's
4  been marked Exhibit 12. Can you tell me what that is,
5  please?
6  A. Instructions for determining indigence.
7  Q. Have you ever seen this document before?
8  A. I have.
9  Q. And what is this document used for?
10  A. It's basically instructions on how to
11  figure out whether someone -- well, to take an
12  application.
13  Q. And --
14  A. Or assistance in doing that.
15  Q. Is this something that's used internally
16  rather than something that's given to applicants?
17  A. I don't think -- yeah. I don't -- I -- we
18  do not give this to applicants.
19  Q. Okay. Look at the second paragraph. Can
20  you read that second paragraph to me?
21  A. "If the applicant's income level is at or
22  below federal poverty guidelines, there is a
23  presumption of eligibility unless other factors such
24  as assets indicate the ability to hire a private
25  attorney."

## Page 204

1  Q. And I apologize. That was my fault. I
2  didn't realize that the paragraph I was intending for
3  you to read doesn't really have a number on it, but it
4  is the second -- if you look --
5  A. Oh, the second -- oh, not number 2. Sure.
6  Q. The first paragraph, not number 2. But the
7  second paragraph.
8  A. "If the applicant is unemployed and
9  receiving public assistance, he or she is eligible for
10  services. No further inquiry need be made. This is
11  true even if the applicant has posted bond."
12  Q. So that's a bright line; is that correct?
13  A. Yes.
14  Q. Now, let's look at paragraph number 2.
15  A. Okay.
16  Q. The one that's numbered 2 --
17  A. Uh-huh.
18  Q. -- that you read to me before. It -- does
19  that implicate a bright line?
20  A. Well, it says other factors -- to me, it
21  wouldn't, but I mean, it tells you what factors you
22  can consider. If -- I don't -- I guess I don't --
23  if -- if you indicate -- call that a bright line or
24  not.
25  Q. Okay. And then look at the paragraph

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-12   Filed 02/09/18   Page 52 of 93

Page 205

1  numbered 3.  Can you read that?
2      A.  "An income level above federal poverty
3  guidelines gives rise to a presumption of
4  ineligibility" --
5      (Reporter admonishment.)
6      THE WITNESS:  Sorry.
7      A.  "An income level above federal poverty
8  guidelines gives rise to a presumption of
9  ineligibility unless individual circumstances such as
10  debt level indicates an inability to hire a private
11  attorney."
12      Q.  (By Ms. Shipma)  Okay.  And I believe that
13  that is also -- as I'm understanding these
14  instructions, the only presumption, the only bright
15  line presumption --
16      A.  Uh-huh.
17      Q.  -- is if you're unemployed and receiving
18  some sort of public assistance, you're automatically
19  eligible for services?
20      A.  Right.
21      Q.  In all other case, even if you're at the
22  federal -- or even if you're at or below the poverty
23  guidelines, you're not automatically presumed eligible
24  for services.  You have to look at these other
25  factors; is that correct?

Page 206

1      A.  Right.
2      Q.  In your opinion, with your office, do your
3  attorneys represent many people who aren't eligible
4  for services who have the ability to hire private
5  attorneys?
6      A.  No.
7      Q.  So there isn't this rash of -- of
8  eligible -- or of -- of people who are able to hire
9  attorneys snookering the system and getting our
10  attorneys all bogged down in all their cases; is that
11  correct?
12      A.  That's not my understanding.  I mean, most
13  of our clients think it's -- they don't -- they think
14  we're really bad lawyers, so if they have the ability
15  to not have us represent them, they try very hard to
16  get out of it.
17      MS. SHIPMA:  Okay.  That's all I have.
18      MR. RAMSEY:  I have a very few brief
19  follow-ups, if I can.
20      MR. WILLIAMSON:  I do, but go ahead.
21      MR. RAMSEY:  I can wait.
22      MR. WILLIAMSON:  No.  Go ahead.
23      EXAMINATION
24  BY MR. RAMSEY:
25      Q.  Very briefly, questions concerning

Page 207

1  Defendant's -- or Plaintiff's 12.  Where did this
2  document come from?
3      A.  Well, I think this was sent out, if I
4  recall correctly -- they update the application, and
5  they've updated it many times frequently, as well as
6  how it should be looked at.  I think it's been updated
7  twice in the last two years.  So I think it was sent
8  out as an assistant, because it -- because some
9  things -- there were other bright line tests that
10  were -- like, it used to be if you maid made a $5,000
11  bond, you were ineligible.  It didn't -- it didn't
12  matter how poor you were or things like that.  So with
13  that, there's often sort of assistive documents that
14  are sent out to help -- like, my legal assistants who
15  do the bulk of filling this out, to help them come to
16  the right conclusions, because I still have lawyers
17  who I'm like, no, $5,000 doesn't -- that's not a --
18  that's not a consideration any more, but it was in our
19  office probably for ten years.  And the private
20  attorney that we talked about, like, you -- we used to
21  automatically disqualify people if they had a private
22  attorney, and then that changed.
23      Q.  And this is coming from central office?
24      A.  Yes.
25      Q.  Okay.  And then just the second question

Page 208

1  and my last question, and I'll be done.
2      A.  Uh-huh.
3      Q.  Concerning how you would know the financial
4  affluence of a particular defendant, how would know if
5  there's not a control mechanism after the fact, or is
6  that just your sense of -- of who's coming in and out?
7      A.  Yeah.  I mean, based on -- I mean, we have
8  a number of people who are homeless who don't have
9  phones that we can't contact.  I guess they could lie
10  about it.  But we also have people who clearly haven't
11  showered, who are missing teeth, who -- you know, I
12  mean, we have a lot of people who, if you had funds,
13  and you had the kind of funds that you could hold
14  an -- have an attorney, you probably wouldn't be
15  living your life the way you are.  You wouldn't be
16  showing up for court.  So I mean, there's some extreme
17  poverty that people just wear.
18      MR. RAMSEY:  I'm done.
19      MR. WILLIAMSON:  Fewer than five minutes.
20      EXAMINATION
21  BY MR. WILLIAMSON:
22      Q.  If the public defender's office determines
23  that a person is not eligible for its services, can
24  that decision be appealed by the defendant?
25      A.  Yes.

52 (Pages 205 to 208)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-12   Filed 02/09/18   Page 53 of 93

1    Q.   To the trial judge?
2    A.   Or to the -- I mean, the associates.
3  Any -- really, any judge they're in front of, and
4  it -- if they want us, it normally is.
5    Q.   And is that the context in which judges end
6  up appointing you, even to cases where you've
7  determined that the person is not eligible?
8    A.   Yes.
9    Q.   Do judges make that determination even when
10 there's not a formal appeal filed by the defendant?
11   A.   Well, they -- they almost never file
12 anything.  They -- they walk up to the bunch, "Do you
13 have a lawyer?"  "No."  "Did you apply for the public
14 defender?"  "I did, but they said I don't qualify,"
15 and then a lot of times, the judges go right into,
16 "Well, how much money do you make?"  "Why can't you
17 afford someone?"  It's almost always fewer than ten
18 questions; a lot of times, fewer than five questions.
19 And they almost always appoint us anyway.  So I know
20 the last time we were audited, the auditors asked me
21 over and over, "Why did the judge even appoint you?"
22 And I'm like, "I am not the judge.  I have no idea."
23 But we get appointed a lot.
24   Q.   And do you ever find or do your lawyers
25 ever find themselves in adversarial proceedings

1  against indigent defendants who they then end up
2  representing?
3    A.   It's definitely happened.  I mean, I --
4  personally, I'd move to withdraw.  I was allowed to
5  withdraw on a murder where -- we had two murder cases
6  he bonded, and I ended up on the stand with him
7  questioning me for an hour about policies.  So it's
8  certainly happened, and it's certainly bad for the
9  relationship.  But less so -- and I mean, I would say
10 that our guidelines -- we have fewer bright line rules
11 than we used to, and our guidelines don't -- you know,
12 the bond isn't a rule any more.  The private attorney
13 isn't a rule any more, and those things probably
14 provided more of the -- and truth be told, it -- you
15 can say, "I have this," but ultimately, the judge can
16 appoint you anyway.  Unless you're going appeal that
17 appointment or you're going to writ the judge on it,
18 there's not much we can do.
19   Q.   And does your office ever take that route
20 of appealing the judge?
21   A.   We writted once.  We had an attorney who I
22 think the Friday before trial hired a private
23 attorney, and they ordered us to stay on, and we
24 writted the judge on that, and we were successful in
25 that writ.  Mostly because my lawyer is like, I'm --

1  now, I'm not ready to try the -- but I don't -- I
2  don't know that we've ever -- I -- I'm sure we have.
3  I just -- in recent history, I don't know the last
4  time we writted a judge on that.
5    Q.   Final thing, you testified earlier that
6  you've never had a request for a deposition denied?
7    A.   I don't -- well, again, tweaked -- me,
8  personally, have a request for a deposition --
9    Q.   So let's start there.
10   A.   I don't -- no.  I don't think I've ever
11 personally had a request for a deposition denied.
12   Q.   And -- and you have never outright denied
13 an applicant -- or a request from one of your
14 attorneys for a deposition?
15   A.   No.  I mean, I've asked them to edit it,
16 I've asked them to -- more information, to change
17 things, but I've -- I've never just said, "denied"
18 without -- I don't -- the only time -- the only
19 denials I have are usually if they have a request that
20 I've asked them to edit, because I'll have some
21 denials come up in the computer, but it's generally
22 because they then pled the case, didn't spend any
23 money, and they did -- they didn't make the edits in a
24 timely manner, so now, it's moved because the case is
25 done, and I'll deny it.  But I haven't -- I don't -- I

1  have no memory of ever just outright denying a
2  deposition request.
3    Q.   And you -- and you've -- have personally
4  never been denied an expert request either?
5    A.   Not -- no.  Not to my -- I don't ever
6  remember that.
7    Q.   And to your knowledge, none of the lawyers
8  in your office have ever been denied an expert?
9    A.   Well, they've had requests denied.  I
10 mentioned that forensic expert.  And again, I'm --
11 things have been denied.  It's usually due to cost.
12 Now, the question is, did they then not get another
13 expert that was affordable or something along those
14 lines?  And that, I don't know.  If it's a flat --
15 I -- I assume you're saying, flat-out denial; now, I
16 don't have an expert.
17   Q.   Right.
18   A.   That, I'm not as clear on.
19   Q.   Okay.  And is it fair to say that -- well,
20 strike that.
21        You've also testified here today that you
22 believe that your office ideally should be retaining
23 many more experts than it actually does?
24   A.   Yes.
25   Q.   You also testified that your lawyers should

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-12   Filed 02/09/18   Page 54 of 93

## Page 213

1    be taking many more depositions than they do?

2        A.  Yes.

3        Q.  Okay.  So is it fair to say to that there

4    are certain -- there are a significant number of

5    requests for experts that simply -- that would be

6    appropriate, but that are just not made?

7        A.  Right.

8        Q.  And is it also true that there are a

9    significant number of requests for depositions that

10   would be appropriate, but are not made?

11       A.  Right.

12           MR. WILLIAMSON:  That's all I've got.

13           VIDEOGRAPHER:  Off the record.  2:08 p.m.

14           MS. SHIPMA:  Read and sign.

15           (Deposition concluded at 2:08 p.m.)

16

17

18

19

20

21

22

23

24

25

## Page 215

1        Alaris Litigation Services
2           1608 Locust Street
3        Kansas City, Missouri 64108

4    December 19, 2017
5
6    Ms. Jacqueline Shipma
7    MISSOURI STATE PUBLIC DEFENDER'S OFFICE
8    1000 West Nifong
     Building 7, Suite 100
9    Columbia, Missouri 65203
10   In Re:  SHONDEL CHURCH, et al., v.
             STATE OF MISSOURI, et al.
11

12   Dear Ms. Shipma:

13   Please find enclosed your copy of the deposition of
     RUTH PETSCH taken on December 5, 2017, in the
14   above-referenced case.  Also enclosed is the original
     signature page and errata sheet.
15   Please have the witness read your copy of the
     transcript, indicate any changes and/or corrections
16   desired on the errata sheet, and sign the signature
     page before a notary public.
17
     Please return the errata sheet and notarized signature
18   page to Alaris Litigation Services for filing prior to
     trial date.
19
     Thank you for your attention to this matter.
20
     Sincerely,
21
22
     Emily S. Hughes, RPR, CRR, MO CCR #1353
23   Enclosures
     cc: Mr. Jason D. Williamson
24
25

## Page 214

1            CERTIFICATE OF REPORTER

2

3        I, Emily S. Hughes, a Certified Court

4    Reporter within and for the State of Missouri, do

5    hereby certify that the witness whose testimony

6    appears in the foregoing deposition was duly sworn by

7    me; that the testimony of said witness was taken by me

8    to the best of my ability and thereafter reduced to

9    typewriting under my direction; that I am neither

10   counsel for, related to, nor employed by any of the

11   parties to the action in which this deposition was

12   taken, and further that I am not a relative or

13   employee of any attorney or counsel employed by the

14   parties thereto, nor financially or otherwise

15   interested in the outcome of the action.

16

17   _____

18        Emily S. Hughes, RPR, CRR, CCR #1353

19

20

21

22

23

24

25

## Page 216

1    STATE OF            )

2                        )

3    COUNTY OF           )

4

5    I, RUTH PETSCH, do hereby certify:

6        That I have read the foregoing deposition;

7        That I have made such changes in form and/or

8    substance to the within deposition as might be

     necessary to render the same true and correct;

9        That having made such changes thereon, I hereby

     subscribe my name to the deposition.

10       I declare under penalty of perjury that the

     foregoing is true and correct.

11

12

             RUTH PETSCH

13

14       Executed this       day of         ,

15   2017, at                    .

16

17

18   Notary Public:

19   My Commission Expires:

20

21   Signature page to:  Ms. Jacqueline Shipma

22

23

24

25

ALARIS LITIGATION SERVICES
www.alaris.us            Phone: 1.800.280.3376            Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-12   Filed 02/09/18   Page 55 of 93

Page 217

```
 1              WITNESS ERRATA SHEET
       Witness Name:  RUTH PETSCH
 2     Case Name:  SHONDEL CHURCH, et al., v.
                   STATE OF MISSOURI, et al.
 3
 4     Date Taken:  DECEMBER 5, 2017

 5     Page #_____  Line #_____
       Should Read: _____
 6     Reason for Change: _____

 7     Page #_____  Line #_____
 8
       Should Read: _____
 9
10     Reason for Change: _____

11
       Page #_____  Line #_____
12
       Should Read: _____
13
14     Reason for Change: _____
15
16     Page #_____  Line #_____
17     Should Read: _____
18     Reason for Change: _____
19
20     Page #_____  Line #_____
21     Should Read: _____
22     Reason for Change: _____
23
24     Witness Signature: _____
25
```

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

**A**

a.m 6:9,12
58:16,18 95:7
95:9
ABA 176:10
abandoned
138:21
ability 7:23
21:19 85:8
92:3 129:12
145:11,12
203:24 206:4
206:14 214:8
able 23:22 27:2
51:21 54:13,18
61:6,7 67:6
77:6,8 85:5
100:25 154:2
155:2 169:4
206:8
above-refere ...
215:13
absolutely 19:21
93:14,19
149:24 150:16
absorb 67:14
108:5 134:8
ac 74:6
ACA 183:13
accept 56:8
128:4 143:20
159:24
acceptance
157:9
accepted 160:2
accepting 97:6
accepts 161:1
access 75:24
125:22
accessible 92:2
accompanies
103:10
account 35:7
128:21 155:5,5
accused 138:9
ACH 183:12

achievable
146:16
acknowledge
128:15
Acknowledge ...
201:23
ACLU 5:4 6:24
151:17
act 199:11
action 134:18
214:11,15
actions 138:15
actively 98:21
acts 18:20
actual 177:17
acumen 23:8
adamant 118:4
118:14
add 24:3 33:20
91:17 181:16
added 60:14,15
60:18 91:19
127:11
additional 22:2
40:1,21 42:17
92:5 94:13
165:21,24
adequate 66:12
84:2
adequately
83:25 85:1
94:23 113:3
administering
129:2
administrates
195:1
administrative
18:19,23
42:20,23 43:2
43:12 179:23
180:1
admissions
53:7
admit 52:14,23
admonishment
205:5
adolescent

112:21
ADP 26:2
adult 82:10
104:13 105:21
advanced 66:18
66:18
adversarial
209:25
adverse 95:16
adversely
84:25
advice 37:15
99:13
advise 94:23
95:14
advising 85:16
advocate 34:16
34:19
advocating
101:10
affidavits 9:3
affirmatively
90:13
affluence 208:4
afford 148:10,12
152:9 209:11
affordable
212:13
afraid 20:24
22:5 34:10
37:14,15
afternoon
145:25 146:1
age 7:8
aghast 156:9
ago 45:12 75:7
108:22 111:24
149:22 197:23
agree 123:19
124:18
agreeable
90:22
agreed 6:1
104:7 131:12
agreement
47:18
ahead 75:17

84:17 87:25
88:1 206:20
206:22
air 33:18 80:10
al 1:3,6 4:3,6,17
4:18 6:13,14
215:10,10
217:2,2
Alan 5:10
Alaris 5:22 6:21
215:1,18
alarmed 70:23
alert 185:20
alleged 107:1
allocate 36:7
allocates 17:19
allow 8:18
202:23
allowance
185:17
allowed 135:13
155:14 210:4
allows 188:17
alluded 43:11
161:6
alternative 75:7
alternatives
109:15 110:19
111:6
American 4:11
6:18
amount 16:12
31:13 36:4
37:2 46:7
54:11,12 88:12
135:15 150:17
167:3 184:14
amounts 45:13
and/or 2:17
125:4 215:15
216:7
animosity 120:9
annoyed 191:6
annual 165:16
answer 7:22
8:5,15,19,20
90:13 200:19

answered 117:13
181:8
answering 8:13
156:10
answers 133:11
133:11 202:21
Anthony 120:19
anticipating
21:12
antiquated
91:22
anybody 37:15
anymore 105:8
anyway 62:18
107:3 134:1
155:17 209:19
210:16
AP 26:21
APD 25:1,12,15
25:16,18,21,21
26:4,6,21,22
27:10 29:1
33:11
APDs 25:12
apologize
100:11 166:18
192:2 197:15
204:1
app 155:9
appeal 102:23
102:25 103:20
103:24 155:14
197:21 209:10
210:16
appealed
208:24
appealing
210:20
appeals 14:3,10
131:2 136:18
appear 51:8
183:4
appearance
44:24 46:16
50:5,17 51:2,8
51:18,19 52:9
52:12 53:4,9

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-12   Filed 02/09/18   Page 57 of 93

97:17
appearances
    51:22 52:4
appeared 117:5
    144:15
appearing 5:3,8
    5:14 139:7
appears 131:12
    214:6
appellate 14:11
    103:1 104:2
    113:18,19
applicant 204:8
    204:11 211:13
applicant's
    202:5 203:21
applicants 157:1
    202:8 203:16
    203:18
application 3:3
    15:25 152:24
    152:25 153:2
    153:20 154:21
    159:21 160:16
    160:18,25
    201:14 202:4
    202:20
    203:12 207:4
applications
    16:4 128:2
    155:8,12 157:4
    202:16
apply 154:13,20
    189:6 209:13
appoint 55:15
    128:17 134:23
    134:25 135:1
    155:17 156:12
    209:19,21
    210:16
appointed 53:8
    53:13 57:1,2
    96:9 97:12,14
    97:15 126:16
    127:4 135:14
    139:9 145:7
    155:12 156:20

160:11 186:20
    209:23
appointing
    53:24 127:8
    128:16 129:16
    135:3 138:17
    156:13 209:6
appointment
    136:1 210:17
appointments
    55:16 56:8
    108:1 126:18
    129:10,13
appoints 107:3
    160:15
appraisal 178:10
appreciate
    172:6
approach 56:21
appropriate
    78:18 79:22
    111:6 114:25
    185:7 213:6,10
approval 157:8
    173:1,22
approve 29:5
    33:24 35:18
    35:21 36:2
approved 34:13
    36:2 73:11
    79:2
approver 170:4
approves 73:12
approving 29:3
approximate
    177:10
approximately
    43:20 132:2
April 131:25
archived 155:9
arduous 180:24
area 10:11,13,18
    11:9,11,12
    105:12,19
    124:16,21
    130:24,25
    166:22 187:18

areas 54:21 71:3
    166:15 185:3
    192:7
argument 83:12
    83:14,15
arguments
    75:14 108:10
    110:14 121:3
    141:5
arms 119:15
Army 75:6
arraigned
    49:22
arraignment
    44:24 45:3,4
    50:14 57:19
    57:23 58:5
    71:7 176:1
arraignments
    49:24 57:20
arrange 43:8
    58:9
arranged
    144:20
arrest 44:20,21
arrested 44:25
    45:1
ascertain 154:18
ascertains
    158:5
aside 18:16 57:6
    81:1 94:14,20
    112:15 131:3
    133:10 144:13
    145:2 163:17
    172:12
asked 45:21
    53:18 55:23
    111:25 133:1
    140:13,13
    152:22 174:19
    194:19 198:23
    209:20 211:15
    211:16,20
asking 31:1
    81:10,10 117:12
    170:10 198:19

aspect 70:10,16
assault 148:16
asserted 118:10
    134:24
asserting 120:4
    189:6,18
assertion 189:4
assertions 118:1
assessing
    34:23
assessment
    45:18,22
    100:22 101:9
assets 153:12,16
    155:5 158:1
    161:4,14,14
    203:24
assign 31:22
    53:22 107:14
    107:16 118:5
    129:14 133:23
    176:9 190:8
assigned 16:9
    17:10 18:25
    23:11 32:4
    41:16,20 51:15
    105:20,21
    131:19 142:21
    162:13 176:3
assigner 21:17
assigning 15:7
    21:17 139:2,5
    140:10 142:12
    144:1
assignment
    2:18 130:3
    142:5
assignments
    32:4
assist 43:9
    74:24
assistance 17:13
    188:10 191:16
    191:21 199:12
    199:18 203:14
    204:9 205:18
assistant 9:25

10:2,3 16:19
    17:14 18:6,20
    42:15,21 89:5
    152:19 165:17
    166:17 207:8
assistants 15:19
    15:22 17:9,21
    18:17,21,22
    42:3,4,12
    207:14
assistive 207:13
associate 48:12
    49:19
associates
    209:2
Association
    199:1
assume 85:22
    91:17 100:8
    102:13 116:12
    117:7 125:10
    193:3 200:16
    212:15
assumed 138:6
assuming 88:9
    125:8
attach 141:9
attached 3:6
    141:20,25
attend 23:25
    24:22 25:7
    99:5
attending 101:13
attention 215:19
attentive 51:6
attorney 5:10
    8:3 12:6,19
    14:24 15:1,3
    16:18 22:10,16
    26:4,6 27:6
    30:17,17 33:23
    41:13,16,19
    51:15,24 52:3
    54:4,23 55:6
    57:23 58:3,8
    61:20 62:7
    64:10 67:10

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-12    Filed 02/09/18    Page 58 of 93

70:2 74:12
83:10 94:6,15
94:20 101:3
102:12 104:2
105:14 112:14
134:1,22
144:19 152:21
158:9 159:12
160:4 161:8
164:20 175:23
176:19 177:17
203:25 205:11
207:20,22
208:14 210:12
210:21,23
214:13
**attorney's**
84:24 95:14
**attorney-client**
62:5 63:6
81:11 89:19
**attorneys** 6:22
9:3 12:25 13:11
16:10,20 17:4
17:20 18:16
19:4,22 23:14
25:20,25 27:7
27:15 29:17
29:23,23 33:3
39:6,23 40:2
40:6 41:3,20
41:23 50:3
51:18 54:24
55:5 56:18
57:2 58:9
62:19 64:17
65:8,13 66:2
66:9 69:14
70:14 71:4,24
72:16 74:18,23
75:15 78:17
79:7 80:14,19
80:25 81:13
83:14,17,24
85:4,20,23
87:10 91:16
93:5,20 94:1

94:22 95:1
99:5 100:25
101:18,19,24
104:17 108:7,7
110:7,19,22
112:9 113:3
114:24 117:19
118:1,8 120:13
120:15 126:14
129:16 130:14
130:16 132:4
133:12 134:2,7
138:23 139:7
148:7,9 152:8
161:20 162:9
163:9 164:8
169:10,15 170:1
175:15,16
176:21 177:16
178:6 183:9
184:15 190:6
190:24 191:18
206:3,5,9,10
211:14
**attorneys'**
134:14
**attract** 39:6
**audited** 209:20
**auditors**
209:20
**August** 23:24
**author** 123:13
124:13
**automatically**
205:18,23
207:21
**availability**
21:20 47:1
72:20,23
**available** 67:6
74:23 78:15
84:10 109:14
110:18 111:2,6
125:14
**average** 79:6
**aware** 62:6 70:1
75:17,17 77:5

83:13 95:13,18
95:21 96:3
102:6,10 110:2
110:22 116:25
119:19 121:13
123:22,25
124:2 131:6
142:11 154:14
161:13 176:13
187:1 188:19
201:3
**awareness**
110:4
**awkward** 90:19

___

**B**
**B** 2:10 3:1 15:6
27:1 82:16
83:5 181:10
**baby** 23:16
**back** 9:2 10:19
11:20 20:12
23:19 49:8,9
62:13,14 63:16
74:2 91:8 99:2
121:12 122:3
122:10 141:24
144:9 146:8,8
150:7 153:4
170:23 171:19
179:9 200:5
200:10 201:18
201:22
**backed** 98:14
**background**
84:16 108:10
**backing** 122:16
122:19
**bad** 76:18 138:9
138:10 169:19
185:16 206:14
210:8
**bail** 45:6,9,10,13
46:7
**balls** 116:21
**bank** 119:13
**bar** 11:2 116:4

118:6 139:3
143:17 148:5
151:25 152:8
196:17
**bare** 138:5
**Barrett** 196:17
**base** 28:12,14
139:17
**based** 24:3
33:12 45:9
69:19 96:11
110:6 118:1
139:18 154:12
164:1,3 169:13
169:14,15
171:25 187:5
187:10 188:22
189:3,4,17
208:7
**basic** 135:21
167:5
**basically** 12:20
27:13 41:18
92:19 118:25
135:3 139:17
154:4 167:7
191:2,8,8
203:10
**basis** 24:8
29:21 40:4
106:18 113:6
**Bazell** 14:6,15
165:10
**becoming**
27:24 87:17
**began** 132:2
179:2
**beginning** 51:9
175:10 176:9
176:20
**behalf** 1:12 4:19
7:8 197:17
**behaviors** 96:11
**belief** 142:6
**believe** 9:21
20:8 57:25
71:24 74:14

75:8 83:14,23
84:2 85:3
118:23 124:8
134:20 135:6
135:19 139:4
144:7 162:1,23
168:10 178:20
183:9 187:15
191:6,7 194:7
195:25 196:4
197:24 201:9
202:15 205:12
212:22
**believing** 63:12
**bench** 51:12
82:11,14
109:21
**best** 7:23 8:19
17:19,24 18:10
45:16 64:6,15
82:18 102:11
214:8
**Bethany** 123:14
**better** 8:9
30:24 38:15
45:22 50:23
51:20 67:2
85:4 93:16
107:22 108:13
116:12
**beyond** 49:19
**big** 38:8 39:2
91:20 114:15
153:7 195:24
**bigger** 131:8
**bill** 71:11 177:5
**billing** 184:14
**bills** 42:25,25
104:16 114:22
134:16 146:10
152:13 186:4
**black** 119:14
**Blaugh** 34:4
73:12

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-12   Filed 02/09/18   Page 59 of 93

**blowing** 191:10
**blue** 45:13,14
**board** 23:9
**body** 8:16
**bogged** 206:10
**bond** 45:25
46:2 51:25
52:5,19 81:19
154:15 161:17
204:11 207:11
210:12
**bonded** 154:11
210:6
**bones** 138:5
**bono** 107:11,13
112:4
**booking** 45:21
**Boone** 124:1
**born** 76:19
**borrow** 36:13
**boss** 37:3 39:15
39:16
**bottom** 114:18
**bound** 49:21
72:6,8,9
**box** 188:20
**brain** 112:22
**brand** 23:2
**break** 39:9
146:5
**breaks** 39:7,8
115:14
**brief** 58:17 95:8
123:3 198:13
206:18
**briefly** 192:22
206:25
**bright** 154:24
159:17 204:12
204:19,23
205:14 207:9
210:10
**bring** 9:10
44:25 45:1
47:3 84:16
116:8,8 158:7
167:12

**bringing** 84:8
138:4
**broad** 5:5
148:18
**broken** 63:5,5
**brought** 44:19
45:19 57:16
93:3,4 135:1
**budget** 35:13
35:20,22
36:3,12 39:22
78:22 183:19
183:19 184:9
185:1,17,25
186:7,11
**budget-wise**
117:6
**budgetary**
78:19 185:12
**bug** 21:13
**bugs** 21:13
**building** 5:16
62:12 215:8
**bulk** 30:19,23
81:2 96:13
101:1 207:15
**bunch** 14:9
40:11 45:16
52:6 116:20
118:25 147:25
151:25 152:3
209:12
**burden** 161:8
177:17
**burglary** 183:16
183:17
**business** 12:10
**busy** 22:2 66:4
69:9 91:22
**button** 181:16
**Byrne** 107:20

——— C ———
**C** 3:1 5:1 15:7
82:18,19
**call** 10:18 24:15
35:24 37:15

37:16 39:19
44:23 67:8
78:10 81:16
94:8 100:4,7
100:21 103:8
126:8 130:6
132:14 149:2
166:18 174:7
198:23
204:23
**called** 10:17
45:13 61:12
87:9 110:16
184:12
**calling** 62:23
**calls** 10:13
**cam** 16:16 80:1
93:11
**camaraderie**
119:10
**candidate**
159:25
**candidates**
38:5,10
**capacity** 9:24
16:23 25:10
56:10 98:3
190:5,5
**car** 99:22 148:2
148:10 175:17
**care** 72:21 162:1
**career** 109:7
169:5 191:14
**carry** 31:3,5
44:3,4
**carrying** 15:3
29:6 31:7 44:6
150:3
**carved** 188:17
**Carver** 120:21
120:21
**case** 1:5 2:18
4:5 6:14 7:17
7:22 9:4 12:7
14:6 21:21
27:3 30:11
31:5,20 40:9

41:12,16,18
48:1,2,3,20
51:13,14 52:23
53:14,22
54:17 56:14,16
57:2 66:21,21
68:7,8 70:4
70:25 72:1,11
73:2 78:23
79:12,13,18,21
82:23 84:6,7
85:10,15 86:12
86:17,24 87:5
88:11,18 92:11
92:19 93:18
95:15,18 96:9
96:13 97:14
99:9 104:8,21
105:18 107:5
109:9 113:25
118:6 120:13
134:5 135:1,5
135:18,22
136:15,19,21
139:21 144:13
146:23 147:12
148:8 158:22
159:12 160:5
161:9 165:2,4
165:9 167:21
169:23 170:2
171:12,12 174:6
174:9,23
175:12,17
176:3,19
179:20,22,22
179:24 180:1,3
180:6 181:14,16
181:17,18,20
182:21 187:11
189:15,15
190:9 205:21
211:22,24
215:13 217:2
**caseload** 2:21
12:17 15:4 21:4
30:7 31:4,7

34:23 40:7,8
41:7 54:5
114:15 116:8,8
116:14 118:18
120:7 122:16
122:17 133:19
150:16 164:15
164:16,18
165:25 166:4
187:5 188:14
188:17 189:4
189:17 190:21
196:10
**caseloads**
40:16,16
106:10,13
134:10 150:13
151:1 162:8
196:14
**cases** 11:21,22
12:5,5,13,22
12:23,24 13:8
13:15,19,22,24
14:1,6,12 15:4
15:8 16:4,14,14
21:2,6,7,8,10
21:15 22:2
24:10 30:6,7
30:13 31:8,14
31:20 32:8,19
32:22,25
33:2 35:8
40:10 41:10,21
41:22,24
43:21,24 44:6
44:9 47:4
49:25 50:1,6
51:15 54:8,9
54:19,25 55:2
55:3,8,12,21
55:24 56:6,13
56:22 58:10
62:19,20
63:14,16,21
64:17,24,25
65:12 67:21
68:6 69:16

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-12   Filed 02/09/18   Page 60 of 93

70:1 72:8,9,12
74:10 77:5
79:8,10,16
81:5 82:5
86:8,16 87:17
87:21 91:4,10
95:13 101:14
102:2 104:5,13
104:13,16,18
105:12,20,21
106:1 107:23
109:7,12,23
112:10 113:9
114:17,20,25
118:11 120:15
122:2,5 126:6
126:15 127:3
129:14 130:3,11
130:13,15,16
130:22 131:3
131:15,17,17,18
131:24 132:3
132:25 133:15
133:23 134:8
139:2,5 140:10
142:12,20,24
143:1,20 144:5
144:11,22
145:8 146:12
147:4 148:6
149:10,14
150:5 157:15
157:18,18
158:3 161:20
161:24 162:13
164:9,12,14,25
165:6,12 168:3
171:15 175:16
178:25 180:25
182:12,13,25
183:1,10 186:14
186:19 190:2
190:17 195:9
197:13 206:10
209:6 210:5
**Cass** 11:18
**catch** 30:4

**categories**
192:11
**category** 148:18
**catering** 11:5
**cattle** 148:3
**cause** 4:15 19:12
139:10 142:9
150:19
**caveat** 164:18
**cc** 215:23
**CCR** 5:21 6:4
214:18 215:22
**centered** 38:24
**central** 1:2 4:2
6:16 33:8 34:7
36:2,11 73:8
86:6 116:23
117:17 131:2
172:23,23
178:16 184:10
196:8 207:23
**centrally** 186:9
**certain** 4:15
23:22 35:4
36:4 38:17
73:13,15,16
108:18 114:9
122:12 127:6
177:13 183:23
184:14 196:22
213:4
**certainly** 26:10
34:18 39:13
50:22 67:19
68:20 69:8,9
81:23 82:17
87:4 94:10
108:25 109:1
115:3 117:21,24
149:1 151:8
154:10 155:10
160:20 172:10
197:1 210:8,8
**CERTIFICATE**
214:1
**certification**
105:9 108:8,16

112:15,20
187:8,9
**certified** 4:14
76:22 108:19
122:9,23
196:20 214:3
**certify** 214:5
216:5
**certifying** 122:11
122:21 187:5,9
**chair** 30:2,21
67:23
**chaired** 30:21
113:9
**chairing** 30:23
70:22 105:4
**chambers**
190:3
**chance** 86:24
**change** 33:22
49:14 67:3,4
78:25 134:1
211:16 217:6,10
217:14,18,22
**changed** 46:7
107:18 136:25
207:22
**changes** 147:6
158:10 215:15
216:7,9
**chaos** 14:8
**chapter** 120:22
120:25 121:1,6
121:12 135:23
135:23 137:4
137:21 138:4
155:4 186:23
187:11,24
188:2 189:3
197:16
**characterizing**
32:20,21
**charge** 25:6
29:3 148:14
165:5,7,9
168:6 179:19
181:9 182:20

**charged** 52:15
148:13 167:25
182:19 202:10
**charges** 165:1,6
**chat** 194:8
**cheap** 184:22
**cheaper** 170:17
192:19
**cheapest** 78:10
**check** 30:8
153:14 174:10
**checking** 19:25
**checks** 132:7
178:23
**chief** 140:5,14
144:9 158:22
**child** 83:7
**Chillicothe**
131:15
**choice** 118:2
**choose** 21:14
38:6,22,23
**choosing** 117:11
**chronic** 167:8
**chunk** 43:19
153:8 185:18
**Church** 1:3 4:3
4:17 6:13
215:10 217:2
**circuit** 10:14,14
10:16 12:11
50:8 57:19
189:14
**circulated**
109:21
**circumstances**
8:4 205:9
**cities** 131:13
**citizen** 94:19
**City** 4:13 5:11,23
9:18 10:6,14
10:20,25 11:10
11:13 39:21
59:4,12 60:8
76:14 89:2
113:20 121:8
130:21,24

146:24 147:13
163:7 215:3
**civil** 4:11 6:18
103:4 132:16
159:9 189:15
**claims** 29:9
**clarify** 28:1
147:21
**clarifying** 58:24
**classes** 128:4
**Clay** 11:18
**CLE** 24:15,15
25:11
**cleaned** 91:23
**clear** 9:8 24:5
49:3 118:13
138:3,18
189:16 212:18
**clearance** 98:9
**clearly** 8:14
53:7 89:16
122:15 187:11
187:12 208:10
**clerical** 18:23
19:2 42:17
**CLEs** 94:7 105:7
**client** 2:12 12:6
24:11,11 30:8
30:10 31:18
33:21 35:2
38:24 39:5
43:17 46:24
47:21 49:20
51:12,14 52:6
52:11,18 58:8
60:7 61:2,8,10
62:7,9,12,12
63:8 68:19,21
69:12 70:2
76:12,14,17
81:15,20,22
81:22 85:16
86:1,2 87:5
88:6,9 90:6,7
90:11,12,13,18
90:20 91:5,7
93:16 94:18

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-12    Filed 02/09/18    Page 61 of 93

95:14,17,19
97:3 98:6
99:6 100:11,18
100:24 101:16
101:23,25
103:8,9 104:1
104:8,10
108:18 110:14
126:12 136:19
155:13 156:2,6
171:18 174:5,17
174:18,20
175:22 181:14
181:20 199:17
client's 84:16
174:7 179:24
181:15
clients 15:23
16:17 23:11
30:9 31:22
35:5 38:15
46:19 49:11
51:13,19,20
52:19,23 53:5
53:6,19 55:4
55:10 56:16
62:17,24 63:1
63:4,5,17 64:1
64:4 69:6
74:25 75:25
81:16,16 85:3
85:21 86:23
89:18 91:12
93:7,22 94:23
95:23,24
96:19 97:9
99:10 100:21
101:3 109:19
110:12,20 111:9
112:5,13 113:4
114:6 115:10
133:25 143:8
144:6,16
145:13 154:11
155:16 160:19
160:21 168:5,6
202:19 206:13

clients' 54:14
climate 108:1
Clinton 11:19
close 18:25
61:23 154:24
closed 38:9
108:23 109:1
closer 65:20
65:20
closing 71:2
83:11,14,22
Coalition 130:3
194:15
codes 42:25
coerced 178:3,6
cog 130:9
cognizant 34:11
184:22 185:3
collar 148:18,21
148:23 149:5
149:6
collection
178:15
Columbia 5:17
215:9
come 10:19
18:13 20:12
22:25 23:9
29:9 32:5
36:11 40:17
41:17 45:17
62:13,14 64:17
94:6,15,20
98:6,7 99:10
109:23 126:14
127:7 128:6,12
129:11 141:1
146:12 148:19
154:17,22
159:24 161:24
166:9 207:2
207:15 211:21
comes 16:13
34:1 35:21
41:13 44:12
70:12 99:2
161:3 184:14

201:18
comfortable
37:13 39:17,18
coming 10:21
62:20,25 63:1
126:18 127:5,6
128:7 129:13
142:10 207:23
208:6
commenced
6:9
comment
151:20
comments
114:10
commission
200:17 216:19
commit 147:20
committee
140:25 141:1
common 76:7
81:15
commonly
161:17
commonplace
93:4
communicate
62:9 75:24
76:6 89:17
132:17 195:19
198:21
communicated
198:20
communicates
195:16
communicating
103:23 114:5
119:20 189:21
199:16
communication
63:25 114:3,7
132:19 177:25
communicati...
54:9 89:21
119:23
company 137:1
comparable

163:5 164:4
compare 185:2
compared
148:5 163:4
compel 71:19
compelled
142:12
competence
54:15 97:22
114:6 188:11
competency
97:22
competent
174:11,12
complain 78:12
87:13
complaint 2:22
46:5 81:16
118:6 140:2
143:18 196:17
complaints
29:11 109:17
109:20,23
complete 192:4
completely
42:5 45:24
159:10 184:10
complex 39:9
comply 139:1
complying
143:25 144:3
145:5
compromise
81:11
compromised
114:21
compromising
62:5
computer 77:24
160:24 171:2
211:21
concealed
150:4
conceivably
32:22
concept 37:23
37:25

concerned 91:4
128:11 143:7,7
143:9 185:20
191:4 197:10
concerning
19:19 138:22
162:21 167:11
188:25
206:25 208:3
concerns 47:2
53:23 54:3
189:9,19
196:11
concerted
146:25
concessions
26:19
concluded
103:6,17
142:16 213:15
conclusions
207:16
condescending
119:2
conditioned
115:2
conduct 100:1
189:5
conducted
92:6
conducting
24:6
conference
2:21 120:1
138:11 175:25
176:2 186:24
196:4,25
197:11 198:23
conferences
49:2
confident
23:22
confidential
61:16,18 96:21
conflict 11:17,22
12:5,9,13,21
12:23,24

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-12    Filed 02/09/18    Page 62 of 93

13:20 55:4 56:15,23 107:5,14,17,23 132:6 172:11
conflicts 11:16 12:1,15,17 13:2 13:2,3,5 14:22 107:7 108:5 135:12
confusing 189:16
connection 75:5
consecutive 122:14
consent 80:8,12
consented 80:7
consequence 95:16
consequences 93:21 94:10,13 94:24 95:11,15
consider 34:22 41:6 132:20 168:22 204:22
considerably 161:4
consideration 156:19 158:8 159:19 207:18
considerations 158:19
considered 22:14 73:4 201:3
consistent 13:9 149:20 163:18
consistently 62:9,23
consolidate 183:8,8
constant 20:8,8 20:9
constantly 20:1 20:4 28:23 28:24 62:25

167:8 182:5
constitutes 202:4
constitutional 53:1
constitutionally 186:15
constraints 78:20
consult 93:24 158:15
consulted 194:5
contact 2:12 30:8,12,13 33:21 35:2 43:17 60:7 61:3,8,10,13 150:11 160:17 169:1 177:24 208:9
contacting 84:15
contacts 30:14
contain 201:2
contempt 138:20,24 139:11 142:4,7 143:4,15 144:8 151:7
content 150:13 150:15
context 115:9 209:5
continuance 57:12
continuances 48:16
continuation 103:14
continue 48:16 72:22
continued 47:17 72:12 137:1 142:17
continuing 143:20
contract 93:23

94:1 168:6
contracted 11:21
contrary 63:10
control 66:7 180:14 184:18 184:20 188:18 208:5
controllable 40:16
controller 180:13 185:9
controls 154:6
convenience 176:18
conversation 88:6 108:3 173:19,24 174:3 190:16 196:6
conversations 62:1 150:8 188:24 194:23
convey 86:4 90:4
conveyed 86:22
conveying 85:23 90:1
coordinator 105:1,7,8
cop 99:22
copy 215:12,15
core 20:10
corporate 195:14
correct 17:10 31:4 32:23 46:11 59:7 60:3 61:8,9 64:11 74:21,22 75:3 82:15 89:10 100:9 102:15 103:20 113:15 121:14 121:15 130:25 132:25 136:12 138:14 141:6

141:22 144:10 173:21 197:21 202:9,11 204:12 205:25 206:11 216:8,10
corrections 215:15
correctly 78:4 153:19 154:5 156:25 196:7 207:4
cost 97:10 108:5 212:11
costs 96:24
council 140:9
counsel 6:2,2 16:6 107:25 130:4 139:17 140:5,14 144:10 150:8 150:18 154:16 157:19 158:25 174:11,13 188:10 191:16 191:21 194:21 199:13,19 214:10,13
Counsel's 194:15
count 43:14 94:3 115:11 182:7,8,8,20 182:22
counted 183:10
counties 11:10 11:18,23 12:1 13:10 176:17
countries 76:16
counts 181:18 183:1,15
county 10:15 32:24 45:11 66:14 86:5 91:3 97:1 98:14 102:21 124:1 146:12

146:20 147:12 148:15 149:6 153:11 176:17 176:19 183:6,7 216:3
couple 28:5 39:22 44:6 45:17 46:23 56:25 105:16 109:7 132:6 197:22
course 73:18 102:18 106:2 149:12 161:12
court 1:1 4:1,14 4:16 5:21 6:15 7:5,25 8:12 23:21 28:7 45:5,17 46:3 46:22 47:1 48:6 50:8 52:9,17 53:24 57:19 58:12 66:3 72:21,22 73:23 75:21 75:22,23 76:25 78:9,15 86:2 89:8 96:12 97:7,12 97:16,16 98:13 99:4 105:3 107:2,10,13 108:14 109:10 109:19 111:19 111:22 118:16 119:3,13,17 128:10 134:19 135:5,7,20 136:18 138:6,7 138:12,15 141:6 142:4 143:1,11 144:3,6,15 152:20,22,23 155:14 156:4 160:15 162:19 176:5 179:25 189:14 190:15

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-12   Filed 02/09/18   Page 63 of 93

201:18 208:16
214:3
Court's 121:14
145:5
court-ordered
96:20 97:4
courthouses
11:13,15
courtroom 111:7
155:21
courts 29:11
44:23 49:16
55:14 86:6
87:13 91:10
96:10 102:1
103:2,5 117:5
117:8 118:22
119:20 127:8
129:15 135:24
142:18 146:17
174:21
cover 10:15 12:1
coverage 57:9
57:11 58:9
106:14 192:3
196:13
covered 21:7
126:6 145:15
covering 147:9
covers 14:17
54:15
crack 149:22,23
craft 78:2,4
crazy 103:5
116:14 136:17
159:8 162:11
create 169:19
created 14:8
60:6,7 100:16
122:22 125:6
125:11 126:5
200:13
creates 200:15
creation 194:6
cried 115:12
crime 67:17,25
68:9 148:21

149:6,16
202:4
crimes 147:17,19
148:14,18 150:1
164:17 186:21
criminal 44:18
48:20 66:21
132:17 146:12
152:15 157:15
161:2 165:2
166:23 167:14
179:20 181:12
182:15,19
183:4 186:19
189:15 199:1
CRR 5:21 6:4
214:18 215:22
CSR10-3.010
200:2
cuffs 202:20
current 9:16
55:4 56:16
92:21
currently 13:11
15:12 142:14
151:18 173:17
178:24 179:1
custody 15:23
15:24 48:10,17
61:14 95:24
98:7 127:21
128:1,2,12
cut 75:19 119:15
cutting 11:20
cycle 122:4
cyclical 148:25

D

D 2:1 5:4 15:7
82:18,19
215:23
daily 24:8
44:24 171:4
danger 98:21
dash 16:15 54:3
80:1 93:11
data 146:13,16

155:7
database 59:5
60:9,11,14,17
60:19 89:3,6
91:18,20
125:17 126:2,3
126:12 129:8
165:13 177:20
180:11
databases
125:19
date 6:11 45:5
48:9 50:11,13
59:15,16,23
60:2,2 80:18
89:4 202:6
215:18 217:4
dates 23:21
66:1,4 76:25
162:19 176:5
Daughbert
166:22,24
day 28:4,5 29:6
44:21,22,25
46:22 65:3
91:8 110:10,12
110:12 113:12
126:13 127:12
135:5 151:23
156:4 162:20
170:25 180:8
195:18 216:14
day-long 24:6
day-to-day
28:20
days 28:11,13
30:11 83:20
98:16,18
115:22 126:20
132:13 143:23
143:25
DC 77:1
DDs 39:13
deadline 80:19
deadlines 80:17
114:5
deal 29:10 49:8

49:10 93:17
106:16 134:19
160:18 174:6
191:12
dealing 120:4
deals 85:14
88:4 93:7,13
Dear 215:11
debated 106:16
debt 205:10
December 1:13
4:10 6:11 215:4
215:13 217:4
decide 74:12
85:10
decides 17:24
101:17
deciding 161:25
decision 58:2
89:8 103:24
109:4 113:24
114:4,24
115:22 116:24
121:14,24
132:24 134:15
134:17 136:9
171:25 175:2
188:21 194:15
196:1 208:24
decisions 34:7
35:16 36:6
56:6
declare 216:10
dedicated
180:17
deep 38:18
deer 148:2
def 51:10
defendant
44:19 50:16
53:2 103:23
152:15 157:15
161:2 165:2
179:20 181:12
182:19 183:4,5
208:4,24
209:10

Defendant's
207:1
defendants 1:7
4:7,18 5:14 6:3
7:2 46:10
50:25 96:5
126:6 167:14
202:16 210:1
defender 9:15
9:17,20,21,25
10:3,3,5,22
28:21 31:21
46:21 53:18
59:12 89:5
100:18 105:17
107:23 108:5
108:25 111:25
114:9 116:9
121:19,22
122:1 124:16
135:17 149:13
150:20 157:25
158:4 159:18
160:8 179:9,10
179:16 183:20
186:13 191:15
200:1 201:14
209:14
defender's 5:15
16:1 51:10
116:5 126:1
147:8 156:17
208:22 215:7
defenders 37:5
37:18 51:1
58:7 59:10
84:12 107:24
120:2,12,18
123:23 152:5
165:16,18
166:16,17
188:13,25
196:3 197:3,7
defense 30:16
30:17 199:2
definitely 22:20
27:16 34:11

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-12    Filed 02/09/18    Page 64 of 93

35:3 63:17
67:19 68:8
71:20 72:25
73:4 76:13
78:3 150:1
157:3,10 158:11
161:19 182:25
184:3,4,13,16
210:3
**definition** 70:7
**definitive** 79:12
**delineated**
36:14
**delinquency**
104:21 109:9
**Delmuro** 111:23
**demoralizing**
21:1
**denial** 77:19
138:1 171:2
197:21 212:15
**denials** 171:1
211:19,21
**denied** 16:5
77:16,20 121:7
121:10,11
135:20 136:1
136:14,16
137:17,19
138:9,13 155:8
155:10,12,15
156:2 169:6,9
169:22,25
170:4,7,9,14
170:22 192:7
197:19,22
211:6,11,12,17
212:4,8,9,11
**deny** 107:2
211:25
**denying** 212:1
**dep** 23:25
168:23
**depart** 19:14
**department**
77:21
**departures**

19:12
**depend** 26:5
48:9 68:10
**depending**
25:3 28:14
40:9 47:24
167:20
**depends** 28:6,7
44:12 47:1
51:5 52:22
70:7 102:18
132:10 164:18
164:18,20
**Depleted** 158:2
**depo** 66:7,10,17
**depos** 36:13
**depose** 65:8,10
65:14 184:19
**deposed** 7:18
66:23 168:20
**deposes** 7:9
**deposition** 1:11
4:9 6:3,9,12,17
8:23 67:9,10
77:12 150:9
168:23 169:3
169:6,9,14
211:6,8,11,14
212:2 213:15
214:6,11 215:12
216:6,8,9
**depositions**
29:4 31:11
36:8,10 66:20
67:6,13 168:7
168:14 213:1,9
**deputy** 13:22
17:6 27:13
139:6 162:1
173:5 195:16
**derived** 45:20
**describe** 10:20
130:8
**DESCRIPTION**
2:11 3:2
**deserves** 85:10
85:10

**designed**
187:12
**desire** 91:9
**desired** 215:16
**desk** 161:25
**details** 80:11
**detention** 110:8
110:10,19,23
**determination**
2:23 105:24
106:18,19
107:4 153:3
155:13,20
156:16 157:14
159:1 160:12
160:14 200:7
201:17 209:9
**determinations**
55:25 161:2
163:25
**determine** 111:5
**determined**
191:15,20
209:7
**determines**
152:14 208:22
**determining** 3:4
128:12 201:4
201:17 203:6
**develop** 84:18
**developed**
70:25
**developing**
84:11
**development**
20:7 112:22
**devote** 31:13
112:1
**devoted** 12:20
**dicta** 119:1
**dies** 116:11
**difference**
137:24 147:11
186:14
**differences**
146:22 147:1
**different** 10:2

14:14 35:8
42:5 77:22,23
77:23 84:16
93:25 104:14
107:12 150:2
156:15 158:21
162:16 169:21
177:12 182:13
182:13 189:11
196:9 199:14
199:20
**differently** 147:3
**difficult** 31:24
61:21 68:5
72:20 151:2
154:18
**difficulty** 109:18
**dig** 80:15
**diga** 76:14
**diligence** 54:7
114:3,6 188:11
**diligently**
199:12
**dire** 24:18 102:4
102:12,14
**direct** 14:3,10
**directed** 101:19
**direction** 101:22
139:5 214:9
**directions**
68:22
**directive** 38:17
196:15,19,20
**directly** 29:10
**director** 73:14
195:16
**dis** 88:17
**disappointed**
75:18
**disappointing**
119:6
**disbursed** 21:2
**discern** 186:13
**discernible**
147:1,11
**disciplinary**
140:5,9,14

144:9
**disciplined**
54:4,23 88:16
113:17
**disclose** 161:14
**disconnect**
39:12
**discontinued**
52:1
**discourage**
83:17
**discourse** 52:21
**discovery** 16:13
66:11,12 71:5
71:12 79:25
80:15 93:14
167:6 168:8
**discrepancy**
60:20
**discretion** 18:1
36:25
**discretionary**
162:6,7
**discuss** 2:21
37:8 92:9
168:17,18
**discussed**
104:10 150:22
193:9
**discussing**
24:10 92:7
**discussion** 18:7
52:19 89:23
91:11 92:12
106:9 120:3
151:14 190:4
197:2
**discussions**
189:11 196:25
**disgusting**
188:15
**disk** 16:13
**dismiss** 104:3,3
104:8
**dismissed** 65:3
**disposable**
161:19

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-12   Filed 02/09/18   Page 65 of 93

disqualify
207:21
disseminated
91:16
distinctions
15:6
district 1:1,1 4:1,1
4:16,17 6:15,16
9:17,19,21 10:4
10:7,8,11 28:21
31:21 36:23
37:5,18 59:9
59:11 89:5
96:5 105:17
108:25 117:19
118:22 119:19
119:20,24
120:2,12,18
121:19,22
122:1 123:23
124:15 129:16
130:25 135:17
135:20 136:1
146:10,19,25
147:9 160:9,10
166:15,16,18
168:14 171:22
176:14 179:9
179:10,16
180:18 183:20
186:13 188:25
196:3 197:3,7
district's 133:19
districts 119:21
123:24 176:13
176:13 178:21
distrust 63:19
diversion 47:20
97:2,2 111:2,9
111:10,14,19,21
divide 18:14
division 1:2 4:2
6:17 32:3,4,6
44:13 49:23
50:5 176:4
divisions 32:1
divvy 161:25

162:5
docket 32:11,15
32:21 49:25
50:7 51:9
58:5 68:3
85:21 86:11,16
113:4 144:18
144:25 175:14
175:16,20
176:21 179:25
190:24
dockets 29:7
148:6,8,9
document 49:4
58:20 59:1,18
59:20 88:19
88:23 123:8
125:2,6 141:16
193:1,2 194:6
201:22 203:7
203:9 207:2
documents 9:11
130:2 198:6
207:13
doing 11:16
12:21,22 13:4
14:5,10 17:21
18:12 20:1
23:6 28:17
29:23 30:1,15
30:25 31:5
43:6 49:1,24
50:22 55:14
63:2,3 66:2
75:5 83:16
86:25 87:16
87:21 89:24
92:10,13 98:4
112:1 117:11
118:9 119:9
120:11 129:3
132:6 139:6
140:15 143:5
144:11,20
179:23 180:5
180:19 181:4
192:3 203:14

door 20:9,10
double 153:14
doubling 32:7
dozen 130:23
151:23
draft 193:16
194:15
drafted 193:22
193:25
drafting 193:18
194:2
drain 20:2
drawer 155:8
157:3
drive 131:15
184:16,18
drive-by 40:12
driving 99:21
148:9
drop 151:12
dropped 21:10
21:11,15 116:20
drug 48:1 67:23
148:14 150:1
druthers 66:22
due 158:18
212:11
DUI 49:7 83:1
148:9
duly 214:6
duties 2:13
17:22 103:1
118:16 140:11
188:9 192:24
duty 18:6 89:17
dying 11:16

E
E 2:1,10 3:1 5:1,1
e-mail 2:12,15
59:6,15 60:3
60:4,13 86:7
89:1,3,7
118:24 130:2
141:14,15,19
172:1 181:24
195:15

e-mailed 54:24
86:14 195:11
e-mailing 182:6
e-mails 85:19
115:23 195:8
197:12
E-notices
195:17
earlier 43:11
63:20 71:23
85:13 112:6
113:16 141:10
150:8 163:19
171:6 192:6
201:16 211:5
early 26:17
47:18 79:18,21
88:15 93:10
earmark 111:11
earmarks
183:22
earshot 62:2
ease 13:8
easier 13:9
134:4
easily 20:5
easy 26:11
39:15,19 152:6
economical
78:8
edit 16:11 170:25
170:25 171:3
211:15,20
edits 211:23
educated
163:20
effect 92:19
94:9
effective 34:14
59:23 102:11
effectively
27:14 122:24
efficiency 91:10
162:17
efficiently
20:22
efforts 120:7

122:23
eight 17:5 176:6
eighth 91:24
eighties 190:23
either 32:7
49:11 65:3
79:13 114:10
117:18 119:1
131:25 152:20
153:5 175:2,7
182:5 212:4
eligibility
203:23
eligible 25:16
25:22 26:17
159:22 167:13
204:9 205:19
205:23 206:3
206:8 208:23
209:7
Ellen 33:15 34:3
34:4 73:12
Elmer 33:16
37:3 59:7
195:15
eloquently
134:13
else's 106:13
Emily 4:13 5:21
6:4,19 214:3
214:18 215:22
employed 9:14
121:16 214:10
214:13
employee
214:13
enclosed
215:12,13
Enclosures
215:23
encompass
135:24 189:9
encompasses
11:9 146:19
188:9
encounter 76:8
encourage

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

66:24 67:19
78:21 87:4
encouraged
91:13 94:10
encumbrance
29:4 35:24
168:11,11 171:1
encumbrances
184:7,12,13
ended 37:4
55:6 179:3
210:6
energy 66:18
enforce 167:6
engage 47:17
102:4
engaged 19:24
engaging 74:7
132:20
enjoyed 134:7
entail 120:23
enter 32:25
41:12 53:21
56:14,22 97:3
126:11 143:23
143:24 160:8
160:11,13,15
168:6
entered 33:1
41:22 136:15
144:5 164:11
entering 33:3
53:24 56:16
144:13 145:2
175:23 176:7
180:14
entire 12:15 13:6
30:7 37:3
187:12 202:20
entirely 18:6
entitled 46:10
192:23 201:23
entity 195:14
entries 74:3
envelope 38:15
equivalent
132:16

errata 215:14,16
215:17 217:1
especially 31:19
39:15 80:11
85:7 86:4
92:8 183:13
essentially
174:23
estimate 70:18
estimates 177:8
et 1:3,6 4:3,6,17
4:18 6:13,14
215:10,10
217:2,2
ethical 54:1
55:11 56:13,23
114:1 118:16
163:22 175:7
191:1
ethically 54:25
56:11 115:9,24
118:11
ethics 56:20
122:17 134:24
139:1,4 160:22
191:5 199:17
eval 97:4,6
evaluate 30:17
93:21
evaluated 97:9
141:4
evaluating
34:21 87:17
evaluation
30:24 33:12
33:14 96:20
97:11,16,20,23
98:3,5,12,19
evaluations
33:9,14 96:6
96:11,13,15,17
98:14 112:12
event 87:18
events 80:4
eventually 31:21
64:4
everybody

28:12 67:13
87:14 92:2
116:9 148:13,13
160:23 175:20
evidence 81:20
120:24 169:20
exact 121:8
exactly 40:14
127:11 180:16
EXAMINATION
2:4,5,6,7,8
7:10 145:23
198:15 206:23
208:20
examined 4:10
7:8
example 24:6
68:11 76:16
103:9
examples 192:11
Excellent
104:15
exception 13:1
42:23 188:17
exceptions 81:4
81:4
exchange
118:24
excuse 14:4
Executed
216:14
exhaust 186:6
exhausting
120:8
exhibit 2:12,13
2:14,15,16,18
2:19,21,22,23
3:3,4 58:21,22
88:20,21
123:5,8 124:4
124:7,24
125:2 129:21
129:24 136:2
136:5 137:5,7
139:22,24
192:22 193:12
193:13,24

194:11 199:22
199:25 201:6
201:9 203:1,4
exhibits 3:6
70:12 192:22
exist 126:23
existed 187:2
exit 19:13
exiting 134:5
expect 30:16
86:6 103:12
expectation
46:17
expected 11:25
102:20,23
expense 78:19
expenses 35:18
35:22
expensive
96:18
experience
10:19,21,23
22:24 23:1
25:2 26:1,13
26:14,16,19
63:13 67:11
69:20,21,22
110:6 113:7
118:20 134:4
140:22 147:17
149:8 164:1,19
180:18 182:18
183:25 188:23
experienced
14:19,25 26:8
37:8 64:10
113:13
expert 54:21
71:23,25 72:7
72:13 74:5,12
74:15 75:8
84:9 105:13
112:7,17,18
169:22,25
170:12,17 171:11
177:18,19 178:1
178:3,7 192:10

212:4,8,10,13
212:16
expert's 177:7
expertise
105:19
experts 36:8,10
72:20 73:7,13
73:17,19,22
74:2,9 84:8
112:10,12
176:24 177:1
177:13,16,20
177:25 178:12
178:13 192:17
192:17 212:23
213:5
Expires 216:19
explain 22:8
25:14
explaining
86:23
expressed 55:5
expressly 6:7
extensions
98:17
extent 34:22
38:17 68:10
81:25
extra 50:5
extreme 208:16
extremely
109:12,15
eyewitness
73:15 112:16
eyewitnesss
72:13

**F**

facing 117:4
fact 55:3 128:21
134:7 140:8
142:8 161:2
173:5 208:5
factor 78:22
158:4,16
factoring 106:21
factors 159:18

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-12   Filed 02/09/18   Page 67 of 93

203:23
204:20,21
205:25
facts 52:14,23
failure 74:15
199:11
fair 21:24 25:4
35:4,5 37:2
88:12 135:14
150:17 182:12
212:19 213:3
fairly 42:14
108:2 111:22
114:9 117:5
134:9 139:3
159:17 163:10
180:10,24
183:10 187:22
faith 138:9,10
142:6
falling 54:22
falls 71:12
familiar 129:20
130:5 187:20
187:22 194:14
200:8,25
family 16:7
far 10:23 14:20
24:13 41:10
43:17 80:17
87:2 92:6
102:19 115:20
125:6,15
128:10 134:10
142:20 147:4
151:15 201:2
farfetched
169:16
fast 136:18
fault 204:1
faxing 42:22
fear 20:22
fed 63:18
federal 84:12
152:24 153:22
154:25
203:22 205:2

205:7,22
feds 149:7
fee 93:24,25
167:14,15,20
167:25 168:5
178:17
feedback 33:19
33:22 34:1
feeds 95:3
feel 11:18 18:11
21:3 35:6 37:2
43:5,23 85:24
108:24 112:13
116:19,20
122:7 130:21
142:12 146:4
148:23 149:5
183:6,14
184:16
feeling 39:12
78:6 91:5
109:25 119:5
feels 9:9 143:3
143:13,13,14
fell 114:2
felon 87:9,11,18
172:15 173:5
173:17 174:8,9
174:25
felonies 15:7,7
32:15 44:1
82:16,19 83:5
86:9,19 147:18
147:23 148:16
felons 174:14
175:1,3
felony 13:14 14:7
15:3 27:1 44:2
82:24 83:2
87:10,20
103:11 149:11
168:1 171:12
173:11,16 181:9
181:10,10
182:15,16,16
felt 63:21 88:14

109:16 122:17
140:6 169:23
170:1 181:3
190:24
fewer 91:10
150:3 163:9
208:19 209:17
209:18 210:10
fight 90:17,17
fighting 81:21
160:20
figure 185:10
203:11
figured 135:24
file 16:2 18:25
71:6,9,21 79:7
79:9 80:25
81:14,17 97:21
99:3 101:24
102:23 103:13
103:19,19,25
104:11 110:23
117:23 135:22
137:2 140:7
149:1 153:5
160:24 189:13
189:14 209:11
filed 46:4 79:15
79:16,18 80:18
81:2 102:25
104:6 121:6,8
121:9,9 135:11
135:18,18
136:8,9,11,20
137:3,20,25
138:5 140:17
187:23 189:12
190:10 197:17
197:17 209:10
files 30:12,15,19
151:12
filing 42:22 81:7
81:19 82:1
118:6 146:18
188:4 215:18
filings 122:4
fill 16:1 20:18

22:15 30:23
38:7 153:1
154:21 159:20
163:11,13,21
202:20,24
filled 64:9
filling 202:8
207:15
Final 211:5
finally 88:20
financial 156:11
208:3
financially
214:14
find 65:22 66:11
68:13,19 72:19
76:4,6 155:16
177:18 209:24
209:25 215:12
findings 155:14
fine 88:1 100:14
120:14 137:14
190:7 198:11
199:10
200:22
finish 8:18,18,20
firm 39:3,3
101:21 107:13
107:15 112:2
131:14,16
132:23 133:4
133:5
firm's 133:8
firmly 144:7
firms 107:11
112:5 130:11,13
130:14,15,17
130:22 131:3,11
131:11,19
132:20 133:13
134:3 150:20
151:5 164:9
first 8:12 11:2
23:4 24:1,11
30:14 38:6
44:20 45:4,5
47:14 48:14

50:9 78:10
86:1 93:18
94:6 96:12
107:19 113:23
121:9 126:20
127:7,7,17
131:24 134:18
138:1,19 173:11
173:16,20
195:10,12
200:1 202:1
204:6
first-time 87:9
172:15 173:5
174:9,14,25
175:3
fiscal 184:1,24
Fisher 114:11
115:25 191:6,9
fit 166:16
five 15:20 18:17
27:5 29:5
42:7 59:25
65:12 70:17
111:24 127:3
143:23 176:23
179:5 208:19
209:18
fives 143:25
flat 93:24
167:14 212:14
flat-out 212:15
Flip 200:3
Floor 5:5
fluctuates 24:3
fluently 76:19
flying 77:1
fo 131:11
focus 12:10
166:15
focused 62:24
131:8,11 165:25
focusing 156:23
197:16
folks 16:5,5
45:17 66:15
98:10 111:12

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-12   Filed 02/09/18   Page 68 of 93

145:5 153:8
167:19
follow 45:15
62:14 69:3
108:17 152:24
153:22 176:14
176:19
follow-up 198:17
follow-ups 198:1
198:3 206:19
followed 97:22
following 45:22
134:21 136:16
food 149:3
forced 160:13
forefront 60:16
foregoing 214:6
216:6,10
foreign 76:7
forensic 77:20
77:24,25
192:6 212:10
forensics 77:25
foresee 188:22
forever 39:16
forgetting 199:7
forgive 148:17
181:7
form 2:22
25:24 27:15
201:19 216:7
formal 45:3,4
47:7 105:10
134:16 185:14
185:24,24
209:10
former 156:23
158:3
forming 111:23
formula 35:10
forward 11:25
57:13,17,23
58:2 117:18
138:20 147:5
173:4
forwarded
193:8

found 31:23
38:10 76:17
99:4 109:12,15
130:9 138:10
156:11
Foundation
4:12 5:4 6:18
four 15:14 16:9
18:16,21 27:2
27:19 33:25
40:18 64:5
157:18 162:12
163:8 176:5
196:9
fours 27:21,21
33:17
fourth 15:13
157:21
fraction 64:16
frame 9:5,8
frankly 143:13
152:2
free 131:15 133:9
146:4
frequency 93:3
frequently 71:4
79:6 80:24
83:4 112:9
147:18,24
207:5
Friday 24:15
94:7 105:6
210:22
friends 39:13
151:8,9
friendships
38:23
front 119:7 141:6
201:10 209:3
fruition 18:14
frustrated 50:3
frustrating
109:12,16 117:4
Frye 2:13 89:9
89:12,17,22
89:24 90:25
92:7,10,12,14

92:17,24
166:23 192:24
full 15:13 41:24
155:8 157:3
191:3
full-time 120:5
120:6
fully 70:15
fund 168:11
funding 117:9
154:14 158:3
185:24
funds 11:17 74:7
76:2 94:1
167:11 168:7
176:25 178:15
178:17 184:1,2
184:3 208:12
208:13
funny 161:10
further 71:9
89:20 134:5
138:15 202:10
204:10 214:12

## G

gained 22:13
game 18:12
65:17
gears 152:13
178:14
general 30:16
39:11 71:6
78:6 91:17
99:12 101:24
155:3 168:17
180:9
GENERAL'S
5:10
generally 14:10
20:16,18,20
24:17 34:6
38:8 39:23
44:19 45:9
46:15,18 48:19
50:11 51:1 53:8
53:13,17 68:17

69:5,7,14
73:12,20
75:21 79:17
80:21 86:15
95:20,22
96:8,10,12
98:4 99:8,8
100:20,23,24
110:16 111:8,9
112:6 113:2
114:2 118:22
134:15 140:23
140:24 150:14
152:19 154:8
154:16,22
155:22 169:13
170:5 174:18
176:2 211:21
gently 34:15
German 151:6
getting 29:22
31:23 40:15
51:25 52:1
54:15,16 62:4
66:16,17
69:25 70:12
72:22 80:10
81:9 84:17
100:10 126:17
143:23 175:5
190:9 197:12
206:9
Gillian 198:6
give 16:3 20:21
21:22 39:7
49:6 52:24
65:23 70:18
86:11 105:8
202:9 203:18
given 18:12
26:14 36:4,18
66:22 78:19
106:10 107:25
162:20 184:25
203:16
gives 42:25
205:3,8

giving 39:8
49:11,15
133:25 143:23
go 11:14 15:24
21:23 22:13
24:10 30:6,7
32:19,22 33:2
36:1 39:4
47:14 49:22
54:13 57:13,17
57:23 58:2,14
59:17 67:19
69:12 70:14
73:8 74:2
78:14 82:20
83:3 84:5
86:11 87:25
88:1 94:20
95:4 98:8,9
102:2 119:3,13
120:23 122:25
125:21 133:2
143:1 145:18
146:8 147:5
148:5,9,25
153:4 163:9
166:14 169:16
172:7 180:3
181:15 183:18
185:9,18,23
186:12 198:4
198:10,10
200:10
206:20,22
209:15
goals 38:1
goes 18:5
20:24 23:20
23:21 24:14
35:17 45:11
47:9 67:25
70:9 100:23
104:24 111:19
148:25 149:7
156:8 157:13
159:1 166:25
171:24

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-12   Filed 02/09/18   Page 69 of 93

going 7:21 11:25
13:9 21:22
22:25 24:25
28:15 39:1
46:18 47:25
48:7 51:7
55:10 56:22
57:8 58:19,20
62:14,15 64:6
64:24 68:9
72:18 78:7
79:10 80:20
86:2,17,18,19
88:19 89:13
90:20 92:10
92:21,23
93:25 97:3
104:15 105:3
107:24,24
114:22 115:23
116:1 119:4
122:15,20
123:7 124:6
133:25 136:4
138:19,20
139:1 142:13
145:1 151:14
152:10,11,11,19
153:9 156:7
158:14 159:22
159:23 160:14
162:13 166:6
169:2 172:13
173:16 174:4
176:9,19
183:12 184:4
184:20 185:16
192:2,3 197:14
202:16 203:3
210:16,17
good 7:12,13,15
33:21 34:17
63:9 76:25
101:5 119:8
142:6 145:25
146:1 172:5,11
gotten 12:4

33:19 77:7
85:4 93:16
127:2 139:15
143:22
government
62:17
governor 5:9
7:4 117:9 146:3
graduated 11:1
grand 47:4,9
48:1,1,2,4,7
grant 102:1
granted 121:10
grasp 131:16
Gray 5:20 6:20
great 41:2 93:2
190:8
Greg 125:8,10
Greg's 125:12
Greitens 5:9
7:4 146:3
grind 19:18
ground 145:16
group 24:1,7
28:9 49:4
groups 152:3
162:18 197:8
grown 37:23,23
37:24,24
guardian 107:1
168:4
guess 26:7 33:1
43:10 45:16
53:19 57:6
60:13,16,20
73:6 99:10
111:1 117:7
146:25 149:11
150:12 154:9
158:1 161:24
162:9 164:7
172:19 192:11
195:18 200:16
204:22 208:9
guesses 163:20
164:5
guessing 64:22

64:22
guidance 78:18
91:15 117:17
140:13,14
guidelines 2:23
152:25 153:23
155:4 176:10
200:7 203:22
205:3,8,23
210:10,11
guiding 168:13
168:14
guilty 50:17
85:14,17 101:17
gun 150:5
183:14
guns 150:3,3
guru 56:20
guy 23:5 99:21
136:23 144:20
148:21 195:1
guys 191:10

**H**

H 2:10 3:1
half 24:21
halfway 184:23
hamper 74:17
hampered 62:8
70:3 81:13
hand 58:20
88:19 123:7
124:6 136:4
199:24 201:8
203:3
handed 35:20
64:4 105:11
handful 176:5
handing 125:1
129:23 137:7
139:24
handle 13:14,17
13:19,22,24
13:25 21:4
23:22 43:21
44:9 48:12
55:2 56:7,11

56:12 104:16
117:19 134:24
147:4,12
186:20,21
handled 12:24
13:23 14:11,13
63:15 107:6,7
109:7 135:5
handles 106:2
146:23
handling 63:14
68:3 81:5
105:9 171:10
happen 12:4
45:3,4 46:18
52:8,21 80:13
82:3 84:21
92:22,25
93:13 96:8
111:7 155:18
158:14 159:8
happened 9:7,9
37:12 112:25
112:25 135:9
154:11,16 210:3
210:8
happening
92:14,18
132:19 139:14
151:19
happens 47:14
57:4 63:12
70:6,14 73:4
74:14 88:10,12
157:14 161:17
176:2 182:21
182:24,25
183:2
hard 40:14 41:8
64:14 72:5
116:7 148:4
179:25 206:15
harder 38:7
harmful 52:13
Harrisonville
120:20
hate 87:13

hates 87:14
havoc 134:9
Hazel 135:18
136:9
he'll 24:10 28:8
49:25
head 94:5
120:14 200:16
headed 79:16
heads 164:10
health 97:2
98:10,19 114:13
114:14 115:14
hear 8:7,14 90:7
144:9 154:5
heard 50:22
90:8 156:25
hearing 45:7
46:11,13 47:10
53:17 57:3,9
92:17,24
97:22 100:4,6
110:10 111:20
120:22,23
121:11 135:9
138:5,19,20
139:12 142:1
143:4 150:19
151:7 155:18
hearings 48:19
89:24 92:10
92:14 100:2
108:17 110:8
120:25
hectic 23:17
held 6:17 10:1,2
138:24 139:11
142:7 143:14
155:20
help 8:11 23:7
207:14,15
helped 130:12
helpful 51:17
73:16 117:15
125:25 143:6
helps 42:24
112:3

ALARIS LITIGATION SERVICES
www.alaris.us    Phone: 1.800.280.3376    Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-12    Filed 02/09/18    Page 70 of 93

hen 156:2
Hey 153:25
    181:25 184:4
    189:25 190:2
    190:4,16
hiding 153:12
high 5:11 21:25
    157:10 163:10
higher 163:18
    170:7
highly 26:25
Hinkebein
    113:21,25
    114:23 115:19
    119:25 134:15
    141:7 196:1
Hinkebein's
    141:4
hire 16:6,7
    25:15 76:1,24
    108:16 112:14
    154:15 156:7
    203:24
    205:10 206:4
    206:8
hired 19:5
    22:20,22
    23:5,5 26:13
    45:17 76:13
    112:12,21
    210:22
hires 22:18
    23:2
hiring 15:13
    19:21,24 28:17
    28:22 38:3
    43:8
historically
    49:16 107:8,9
    126:16 162:8
    174:15 185:22
history 211:3
hit 34:12 167:9
    181:16
hold 24:25
    141:24 144:8
    208:13

home 20:11
    153:9
homeless
    208:8
honestly 41:8,15
    50:19 91:20
    96:17 101:11
    105:11 118:2
    188:4 190:12
    194:19
hook 104:8
hope 12:2,8
    30:22 50:20
    66:15 86:25
    178:9
Hopefully 66:11
    176:7
horizontal
    176:15
horrible 76:20
    115:15
host 54:21
    62:21 150:4
hostile 38:17
    108:2
hound 34:15
hour 24:20,21
    177:6 210:7
hour's 136:17
hourly 177:7,11
hours 12:20
    16:14,15 25:11
    28:25 39:3
    107:12,13
    113:12 120:10
    151:23 177:8,8
    177:10 181:16
house 68:23
    69:2 156:3
housing 75:1
HR 29:7,8
huge 43:19
    132:7
Hughes 4:13
    5:21 6:4,19
    214:3,18
    215:22

hundreds 166:5
hurts 52:6
    152:5
Husch 151:9

——————I——————

ICE 95:20 96:1
    96:4
ID 72:13 112:16
idea 67:14 87:21
    130:19 142:10
    142:19 181:19
    186:22
    209:22
ideal 40:1 41:2
    41:15,17 42:13
    57:7 84:6,7,9
    87:19
ideally 109:11
    128:9 212:22
ideas 37:9 81:17
    169:16
identification
    58:21,23
    88:22 100:6
    123:6,8 124:5
    124:7,25
    125:2 129:22
    129:24 136:3
    137:6,7 139:23
    139:25 199:23
    201:7 203:2
identifications
    100:3
identify 68:11,12
    68:13 99:22
    110:19
ignorance
    148:17
ignoring 62:22
immediately
    21:8 54:24
    115:14
immigration
    93:21,23 94:6
    94:9,13,14,23
    95:11,15,17,23

impeach 44:15
    67:3
impeachment
    167:5
implement
    171:20,21
    172:20
implemented
    37:10 172:4,14
implementing
    172:18
implicate
    204:19
implicated 56:5
implication
    27:24
implications
    21:25
important 21:21
    66:20 80:13
    87:19 168:22
    171:17,18
imposing 90:23
impossible
    23:25 27:13
    34:25 54:8
    61:18 68:7
impression 90:1
    90:2,3 170:20
improper 171:21
in-house 24:17
    78:1 170:19
inability 62:8,8
    70:3 81:13
    84:25 95:14
    205:10
incarcerate
    77:22
incarcerations
    77:22
inclined 112:3
include 32:15
    63:25 82:10
    99:6 130:25
included 74:16
includes 73:22
    73:22

including 13:13
    25:23
income 106:20
    107:3 161:19
    203:21 205:2
    205:7
incompetent
    99:3,4
increasing
    190:20
Independence
    11:14 146:24
    147:14
indicate 55:11
    140:6 203:24
    204:23 215:15
indicated 49:5
indicates 81:20
    161:18 205:10
indicted 49:2,21
indictment 47:8
indifferent 117:6
indigence 2:24
    3:5 200:7
    203:6
indigency
    55:24 105:24
    106:17 160:12
    160:14 201:4
    201:17
indigent 96:5
    147:20 152:15
    153:3 155:17
    156:11 160:19
    210:1
individual 17:12
    17:13,19 56:18
    117:19 132:24
    135:22 161:8
    162:8 205:9
individually
    45:24 55:7
individuals
    150:12 180:14
ineffective
    188:10 191:16
    191:20 199:12

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL     Document 153-12     Filed 02/09/18     Page 71 of 93

199:18
ineligibility
  205:4,9
ineligible 207:11
inept 109:16
inexperienced
  22:19
informal 71:14,17
  105:5
informally 28:9
information
  63:2 91:15
  93:8 108:10
  202:9 211:16
initial 29:24
  44:23,24 45:6
  46:16 47:10
  50:17 51:1,8,8
  51:18,19,22
  52:3,12 53:4,9
  85:23 88:2
  97:17 137:24
initially 49:14
initiative 150:18
input 172:25
  181:5,15 194:19
inquiry 204:10
insane 120:14
  120:16
insist 67:23
  97:3 100:21
instance 101:20
instances 74:11
  81:12 84:24
instantly 21:3
instituted 88:13
instructed 87:1
  87:3
instruction
  135:21
instructions 3:4
  203:6,10
  205:14
instrument
  45:18,23
intangible 62:11
intellectually

190:12
intending
  204:2
intention 176:18
intentions 64:6
interchangea ...
  10:12
interest 55:4
  91:7
interested
  27:21 121:3
  214:15
interim 22:3
internal 166:3
internally 10:17
  203:15
interned 10:24
Internet 149:19
Internet-related
  149:17
internships
  10:25
interpreted
  77:10
interpreter 76:4
  76:6,17 77:6,9
interpreters
  73:23 75:20
  75:21,24 76:3
  76:20,21,22
  77:2
interrupting
  166:19
interrupts
  109:24
intervene
  98:23
intervening
  21:5
interview 64:18
  64:23 69:6
interviewed
  65:1
interviewing
  19:25 65:5
  68:25
interviews 16:14

16:15 20:20
  24:12 27:15
  43:8 100:23
  101:4,14
introduce 6:23
investigate
  69:16 70:4,9
  86:24 93:17
investigated
  174:4,6
investigation
  29:10 63:3
  64:13 70:10,12
  70:16 80:11
  88:11 100:15
  176:7 180:5
investigation- ...
  70:24
investigator
  41:3,7,16
  69:10
investigators
  15:10 18:17
  40:18,22 41:5
  41:12,23 42:1
  68:11,17,21,25
  69:5 75:4
  184:15
involved 18:4
  98:2 111:12,25
  122:8 130:17
  132:8 185:11,11
  193:18 194:2
involves 54:17
isolated 152:6
issue 39:14
  72:24 79:14
  166:4
issued 139:10
issues 2:21
  24:17 26:2
  56:24 73:16
  79:11 117:10
  124:23 138:4
  138:22 150:20
  166:1,13 184:13
item 184:7

itemized 36:19

—— J ——

Jackie 9:1,5
  137:13
Jackson 32:24
  45:11 66:14
  86:5 91:3 97:1
  98:14 102:21
  146:12,20
  147:12 148:15
  149:6 153:11
  183:6,7
Jacqueline 5:15
  7:1 215:6
  216:21
jacqueline.shi ...
  5:18
jail 15:24 16:7,17
  23:20 24:10
  45:19,21 54:13
  61:13,14,19,19
  61:23 98:8,10
  98:20 142:13
  152:11,21 153:8
  175:3
January 10:1
  116:13 184:23
Jason 5:4 6:24
  7:16 215:23
Jeff 120:19 121:8
Jefferson 5:11
jeopardy 115:10
  115:11 136:25
Jillian 198:6
job 11:2 12:15
  18:6 23:4
  24:13 37:4
  42:6 119:8
  120:5,6
jobs 163:17
Joel 33:16 37:3
  38:3 39:15
  59:7,11 60:13
  60:15,24
  194:18 195:15
  195:16

join 152:8
joked 119:14
Joseph 17:6
  21:16 129:4,9
judge 29:13
  44:20 45:11,11
  45:25 46:16
  47:23 50:1
  52:22 53:17
  55:9 57:8
  58:1 75:14
  85:21 86:1
  90:21,23
  103:10 107:20
  111:5,23 114:11
  115:25 118:25
  121:10,11
  129:18 134:21
  134:22 135:16
  136:25 138:23
  139:10 141:11
  155:13 156:12
  189:24 190:21
  198:22 209:1
  209:3,21,22
  210:15,17,20
  210:24 211:4
judge's 138:1
judges 32:24
  45:15,22 48:11
  48:12,15,24
  49:3,18,22
  50:12 52:16
  80:17 85:9
  87:13 90:5,7
  90:10,17 91:1,4
  119:7 121:3
  123:24 138:17
  139:19 143:2
  143:10 155:16
  155:23 156:12
  174:16 188:5
  189:7,7
  196:22 209:5
  209:9,15
judgment
  171:25

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-12    Filed 02/09/18    Page 72 of 93

**judicial** 10:14,16
    12:10 49:18
**judicially** 191:15
    191:20
**judiciary** 108:2
**July** 11:20 12:4
    12:13
**jumping** 100:12
    192:2 197:15
**juried** 47:4
**jury** 47:9 48:1,1
    48:2,4,7 82:13
    84:17 85:7,11
**justify** 106:11
**Justin** 120:21,21
**juvenile** 13:19
    13:22,24
    82:10 104:13
    104:16,18,21
    104:23 105:1,3
    105:4,7,8,12
    105:13,18,20
    106:1,12,16,18
    107:5,10,13
    108:5,11,20,23
    109:7,8,10,19
    109:21 111:10
    111:14,18,22
    112:10,13,19
    160:15 168:3
**juveniles**
    105:24 111:2
**jwilliamson@ ...**
    5:7

— K —
**Kanas** 147:13
**Kansas** 4:13
    5:23 9:18 10:6
    10:14,20 11:10
    11:13 39:21
    59:4,12 60:8
    76:14 89:2
    113:20 130:21
    130:24 146:24
    163:7 215:3
**Kathy** 67:12

**keep** 31:20
    36:5 39:6
    41:18 56:22
    73:21 146:17
    146:17 155:7,8
    175:1
**keeping** 39:5
    166:7
**Keith** 136:22,23
**kept** 129:9
**key** 73:21
**kids** 151:22,24
**killed** 187:4
**kind** 14:5 17:23
    30:15,16,19
    44:12 46:25
    63:22 78:14
    81:9 84:5
    85:9 92:9
    107:11,12 108:7
    148:9 208:13
**kinds** 48:18
    53:7 67:24
    77:18 131:18
**knew** 72:7
    199:7
**knight** 119:14
**know** 8:8 9:1
    12:3,19 14:20
    16:2 18:10
    20:21 21:3
    22:9,11,24
    24:11 28:11
    29:9 31:25
    33:16,20
    34:12 35:7
    36:12 37:10
    37:25 38:1,2,2
    38:5,14,20,24
    39:11 40:11,11
    40:14 41:2
    42:19 43:15
    44:4,5 48:14
    48:15,17 49:6
    49:20 50:18
    50:19,21 51:13
    51:24 53:21

    54:3,10,11,17
    56:23 58:5
    62:22 63:17
    65:6,16 66:3
    67:12,22
    68:18,22 69:7
    69:8,10 70:9
    70:10 71:1,2,8
    71:10 72:11,14
    72:17,19,23
    75:5,13 76:25
    78:9,15 79:13
    80:1,9 82:22
    82:22 83:7,16
    84:12,15 87:2
    87:3,4 88:15
    90:5,9,11,14
    91:2,12,24
    92:6,17,24,25
    94:4,15,17,19
    95:21 96:18,18
    98:5,20 99:3
    101:6,11,11,21
    103:2,8,12
    104:4,7 105:2
    105:17 106:8
    106:15,25
    107:18,19
    108:3,13,17,18
    109:6,11,13,13
    109:14,14,15,21
    109:25 110:5,5
    110:11,25 111:21
    112:2,5 114:1,4
    114:11,13,16,18
    114:19 115:20
    115:24 116:7,11
    116:18,21 117:1
    117:6,8,8,13,18
    117:23,25
    118:5,10,15
    119:7,12 122:10
    123:15,16,16
    124:22 125:7
    125:9,15 127:9
    128:1 130:12,17
    131:1,2,16

    132:10 133:3
    134:14,22
    142:20 143:9
    145:11,15 146:5
    146:6 147:2,7
    148:20 151:6
    151:16,21,23
    153:3,11 154:14
    154:20 155:6
    155:9 156:5
    157:6,11,14,17
    159:8 161:6,18
    162:7 163:11
    164:12 166:8,11
    166:21,24,25
    167:7 168:23
    170:9,18,21
    171:5 172:11,16
    173:4 175:2,6
    175:17 178:11
    179:19 180:5
    180:24 182:7
    182:24 183:1
    183:15 185:18
    186:9,11,18,22
    188:19 189:7
    189:13 190:1
    191:7,7,8,24
    192:16 193:5
    194:8,19,20
    195:2,11,19
    196:18 198:25
    199:9,10,11
    200:15,17,19
    202:8,12
    208:3,4,11
    209:19 210:11
    211:2,3 212:14
**knowing** 117:6
**knowledge**
    83:10 109:10
    159:5 161:3
    170:11 187:14
    193:21,25
    212:7
**known** 98:25
    99:7,14 102:12

**knows** 91:5
**Korea** 76:19
**Korean** 76:16,17
    76:19

— L —
**labeled** 59:20
**lack** 70:23 110:1
    110:4
**language** 76:7
    76:12,13
    109:13
**languages** 76:5
    76:11 77:3,4
**lap** 21:10,11,15
**large** 120:3
    161:17 165:16
    196:24
**largely** 109:20
    119:5 174:3
**largest** 163:7,7
**late** 71:25
**law** 11:1,1,3,6
    23:3 37:24
    54:16 76:18
    92:16,19
    108:17 114:21
    128:3 158:10
    166:11,23
**lawful** 7:8
**lawsuit** 150:22
**lawyer** 12:14,16
    14:4,15,19
    20:3 26:15
    28:4 35:1
    50:22 56:10
    57:10 62:17
    66:24 67:22
    67:25 69:6,8
    69:22 84:14
    87:20 93:17
    93:23 97:21
    103:19,22
    104:24 108:15
    113:14,17,18,20
    116:2 118:12,17
    125:21 148:12

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-12    Filed 02/09/18    Page 73 of 93

158:15 175:5,6
175:18,19,24
175:24,25
176:1,7,17
188:18 190:13
209:13 210:25
**lawyer's** 21:6
62:8
**lawyering** 81:22
**lawyers** 11:15,22
12:12,20,22
13:20,25 15:8
17:12,13 19:1
21:9,13,13,22
22:1,1,19 23:9
24:7,7,16 25:7
25:9,9 28:3,5
32:2,3,6,7
33:10,10 34:17
34:17,22
38:22,23
40:25 42:15
42:16 54:13,19
57:20 59:12
61:5 67:6,16
67:23 68:10
69:23 71:8,9
71:10,20,20
75:23 78:11
79:21 81:25
84:21 85:15
86:22 88:3
90:3 94:7,12
96:14 97:19
98:12 100:1
101:8 102:3
103:7 109:18
111:20 113:8
114:19 115:3
118:3 119:3,12
125:14,25
126:7 131:14
132:12,24
133:2,3,4
135:11 140:10
143:5 144:1
151:8 156:8

162:18 164:23
166:21 171:16
178:10,12
180:23 181:4
189:5 190:9
191:4 197:12
199:2 206:14
207:16
209:24 212:7
212:25
**lead** 57:12
**leader** 27:9,11
27:24 105:1
168:18
**leaders** 17:7
18:8 27:16
30:1,20,21
70:19,22 73:6
**learned** 68:9
**leave** 19:15,16
19:17 29:5,6
33:17 38:25
115:14 116:17
**leaves** 20:15,17
21:2
**leaving** 133:24
134:2
**led** 189:20
**Leer** 67:12
**leery** 37:5,18
**Left** 19:10
**legal** 6:20
10:23 11:2
15:19,22 16:19
17:9,14,21 18:6
18:17 23:4,7
31:18 42:3,4
42:12,15 43:13
76:23 85:25
128:16 150:4
152:19 158:18
160:18 166:13
207:14
**legally** 101:11
158:12 187:7
**legislature**
200:17

**legitimate**
138:22
**legs** 119:15
**legwork** 108:19
110:21
**Leon** 89:3
**Leon's** 91:11
**Leslie** 135:18
**let's** 28:9 48:22
97:16 157:17
191:5,12
204:14 211:9
**letter** 2:14 61:15
98:9 123:9,13
123:19,20
124:1,8,9,10,13
124:19 134:20
141:9,10,13,17
141:21 189:24
190:1,16
193:16,18,22
194:16,21
**letters** 19:1,2
123:23 124:2
189:21
**level** 10:4 26:5
26:12,12 27:6
28:25 36:11
41:19 63:19
67:8 70:24
71:13 73:11
88:7 105:19
135:24 164:19
164:19 168:11
170:3,7
196:23 203:21
205:2,7,10
**levels** 10:2 14:14
26:21 80:11
167:19
**Liberties** 4:11
6:18
**Liberty** 120:19
**license** 49:8
56:24 114:21
148:11 188:15
**lie** 208:9

**life** 105:12
208:15
**life-changing**
87:18
**lifetime** 117:4
**liked** 168:20
**limes** 98:22
**limitations** 171:11
**limited** 8:4
**limits** 188:14
**line** 71:12 80:13
114:18 154:25
158:6 159:17
184:7 204:12
204:19,23
205:15 207:9
210:10 217:5,7
217:11,16,20
**lines** 78:1,16
100:7,8 104:5
105:10 108:11
114:7 135:4
149:4 150:21
153:6 154:25
195:13 212:14
**lineup** 99:14,18
99:24,25
**lineups** 99:5,8
99:15
**liquor** 68:23
**list** 46:5 47:15
55:10 74:16
78:9,14 86:11
91:24 110:9,13
126:5,8,10,15
126:17,21,23
127:5,6,10,17
128:5,7,13,15
128:17,20,20
128:22,23
129:2,4,9,11,12
129:14 153:6
165:7 177:16
196:9
**listen** 80:5
**listened** 114:10
**literally** 19:23

151:23
**litigate** 90:24
104:21 120:10
**litigated** 121:4,5
**litigation** 5:22
6:21 150:13,15
151:17 215:1,18
**little** 28:19 29:1
42:5 43:11
52:10 64:14
71:22 84:22
85:13 103:16
114:22 134:5
134:16 161:9,10
163:16 176:7
186:4
**live** 66:13 99:17
99:24
**living** 208:15
**local** 36:3 59:4
59:21 60:14,18
60:19,23 116:4
162:4 168:13
170:18 172:9
173:8 184:12
**locating** 74:24
**locked** 61:21
**Locust** 5:23
215:2
**logistics** 66:16
**long** 9:19 12:3
14:19,25 20:17
24:21 32:10
34:6,10
108:22 119:8
131:23 140:22
141:2
**longer** 11:25
48:17 122:20
126:25 158:16
**look** 21:18,19,20
22:11 29:2
30:12,13,14,15
34:15 40:15
43:23 44:16
72:15 74:2
89:4 90:21,22

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-12   Filed 02/09/18   Page 74 of 93

92:3 94:2
108:10 125:14
129:14 140:12
148:6 151:22
154:10 165:4,5
165:8 178:11
184:23,24
185:3 201:21
203:19 204:4
204:14,25
205:24
**looked** 9:4,4
79:25 127:14
146:14 207:6
**looking** 30:19
32:7 47:19
54:20 56:23
69:23 72:11
106:11,19
182:6 186:3
192:22
**looks** 33:16,16
60:2,10 123:14
125:3,12 141:16
**looming** 80:16
**loose** 44:13
**loosened** 96:23
96:25
**lose** 22:15
102:20
**loses** 90:20
**losing** 20:23,24
22:6 148:11
**lost** 20:23
22:12,16,16
**lot** 9:6 10:17 11:5
14:5,7,8 16:13
16:14,16 19:15
19:15,16 20:6
20:7 21:12
28:17 32:1
38:8 40:9
41:5 43:16
44:3 45:15
52:7 55:5
62:10,16,16
66:12,16 68:9

68:21 71:14,16
72:6 73:14
74:4 76:15,15
76:22,23 77:8
81:17,18 82:14
84:12 85:9,9
88:14 89:23
90:17 91:3
92:12 93:10,10
93:12 96:19
99:18,20,21
102:1 105:10
107:11 110:15
117:10 120:2
125:19 127:4
138:3,18
145:15 148:14
148:15,15,16
148:22 149:16
149:17,20,22
149:22,23,25
149:25 150:23
150:24,25
151:8 152:8
156:12 160:19
161:16 165:6
167:3,4 180:6
180:7,7,8 181:3
181:5 182:9
183:2,17
184:19 202:19
202:24
208:12 209:15
209:18,23
**loudly** 8:14
**Louis** 10:24
130:18 163:8
163:10 195:2
**low** 105:19
106:8 122:4
**lower** 106:13
134:11
**lucked** 76:18
**lucky** 163:11,13
**lunch** 24:20
**lunchtime**
165:21,24

**lying** 202:3

**M**
**ma'am** 167:16
177:4
**maid** 207:10
**mail** 19:2
**main** 54:3
**maintain** 177:15
**maintaining**
128:20 129:10
**major** 172:14
**majority** 22:18
44:2 139:19
155:11
**making** 24:19
55:24 56:6
132:23 143:2
175:1,2 201:17
**man** 18:24
**manage** 35:13
196:10
**management**
13:5 27:7 34:2
35:21 37:6,11
37:14,19 38:14
38:19 67:11
78:12 120:1
166:1,4 172:6
172:23,24
178:20 180:9
180:13 184:2
188:25 196:25
**manager** 18:20
42:20,24
87:15
**managers** 38:21
**managing**
180:18
**mandamus** 2:17
125:5
**mandated**
165:17 186:15
**mandatory**
24:22,23,23
**manner** 27:4
30:25 34:19

54:15 114:6
145:8 211:24
**March** 9:22
**mark** 26:3
58:20 153:2
**marked** 58:22
88:21 123:5
124:4,6,24
125:1 126:12
129:21,23
136:2,4 137:5
139:22 192:23
193:12 199:22
199:24 201:6
203:1,4
**market** 129:8
**marking** 88:20
123:8
**marks** 27:3
**Martin** 120:20
**master's** 75:8
**match** 72:20
**matches** 10:15
**math** 19:7
164:13
**matter** 6:13
47:22 54:6
85:12 108:3
113:13 142:17
159:10 166:2
207:12 215:19
**matters** 80:10
**MCRC** 2:18
130:6,8 132:3
133:18 151:12
194:24,25
195:20
**mean** 11:4 13:22
17:12 19:8
22:8,24 24:24
25:14 28:3
31:11 32:1 36:4
37:22 38:18
39:13 41:2
43:14 44:22
45:24 51:23
52:4 53:5

55:24 56:12
57:6 62:10
65:23 66:2,6
67:8,18 68:20
71:13,16 74:2
75:1 76:1,4
79:17 80:1,16
81:3,16 82:10
83:6 84:7,9
86:3,10,13
88:13 94:2
95:19 96:10,16
98:4 100:5,20
101:7,22
102:10 103:22
106:24 108:9
108:24 110:2
112:11 114:8,12
114:18 115:1,8
115:11,22 116:7
116:25 117:2,2
118:2,4,24
120:4,8 122:21
123:16 124:20
129:7 132:12
133:4 143:22
144:14,19
146:13,16
147:6 148:1,4
148:12,20,24
149:16,21,23
150:2,16,18,23
151:11,22
152:22,25
153:7 154:9
155:3,6 158:8
159:9 160:13
160:19 163:7
163:14 164:9
164:22 165:5
165:10 166:4,8
167:4 168:17
168:19 176:16
176:22 177:11
177:21 178:9
178:19 179:4
180:6,7,10,16

ALARIS LITIGATION SERVICES
www.alaris.us        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-12   Filed 02/09/18   Page 75 of 93

180:22 182:3
182:21 183:2
183:12 184:18
184:23 186:9
186:19,20
187:3,12,21
188:6,15 190:8
191:25 192:1
193:4,8,10
194:7,17
195:14,19
196:12 197:8
197:10 202:19
204:21 206:12
208:7,7,12,16
209:2 210:3,9
211:15
**meaning** 122:19
175:19
**means** 21:9 32:1
34:13 54:7
66:9,10,11
94:5 112:18
**meant** 188:8
**mechanism**
178:16 208:5
**medical** 49:12
**meet** 17:18
27:15 28:8
61:6,7 68:18
72:10 87:11,19
101:22 110:12
152:20,20
189:10 196:22
**meeting** 19:14
24:9 35:2
55:6 61:15,18
61:22 76:2
85:24 92:9
133:2 175:7
193:10
**meetings** 29:12
61:16 92:8
119:13
**Megerman** 17:6
21:16 129:4
**member** 140:9

151:25 152:1,2
**members** 18:11
**memo** 117:1
**memorandum**
84:12
**memorized**
172:8,10
**memory** 212:1
**mental** 96:20
97:2 98:10,18
98:24 112:12
115:14 144:19
**mentals** 96:23
**mentioned** 11:9
22:5 28:2,16
29:14 31:3
44:5 55:21
61:5 64:13
68:16 74:17
74:20 75:20
103:18 119:16
140:3 142:3
154:21 165:20
168:10 171:6
193:15 212:10
**mentor** 27:14
**mercy** 133:5
**merely** 171:24
**merged** 105:15
**Mermelstein**
125:8,10
**mess** 106:15
158:12,13
**met** 9:1 85:20
107:21 118:12
122:15 189:24
190:2 196:3
**meth** 149:23,24
**method** 96:18
**methods** 165:14
**Michael** 117:1
195:7,8 196:17
**micromanaging**
87:14
**mid** 170:3
**mind** 39:5 56:5
**mine** 37:22

121:9 131:4
198:9
**minor** 172:12
**minute** 123:1
145:19
**minutes** 9:2
153:18 208:19
**misdemeanor**
82:23,24,25
171:12
**misdemeanors**
13:17 14:7
32:17 44:3
82:21 86:20
147:18 171:7,17
**missed** 114:4
**missing** 208:11
**Missouri** 1:1,6
2:13 4:1,6,12
4:13,15,17,18
5:8,10,11,15,17
5:23 6:5,14,16
6:18 7:4 9:15
10:22 49:17
54:1 83:9
89:2,8 114:9
119:12 121:13
130:3 135:20
146:3 149:12
156:16 163:4
164:4 192:24
194:14 214:4
215:3,7,9,10
217:2
**mistrust** 62:17
**MO** 5:21 6:4
215:22
**mom** 151:22
156:4
**moment** 28:17
123:11 128:11
173:14 201:22
**Monday** 45:1
134:21 139:13
139:13 190:2
**money** 19:16
35:16 36:4,7

36:18 67:5
77:13 109:5
156:6,8 170:15
170:16,20
177:24 183:22
184:25 185:19
185:21 209:16
211:23
**money-wise**
75:18
**monitor** 132:11
132:21
**monitoring**
132:9 137:1
154:6 180:14
**month** 24:14
46:25 81:3,3
122:13 162:20
190:6 195:11
**monthly** 30:11
**months** 26:17,18
32:12 49:19
50:11,12 53:15
53:17,20
54:20 62:22
64:5 79:2
81:23,23
122:13,14
167:2 176:5,6
**morning** 7:12,13
174:5
**motion** 2:21
79:22 99:3
100:5 101:24
102:21,22
121:9 135:11
137:3,9,16,18
137:21,24,24
138:2,6,8
139:16 161:10
197:16
**motions** 30:15
71:18 79:7,17
80:18,22 81:1,1
81:14,14,19,19
82:1 110:24
121:6 125:13

187:23
**motivate** 33:21
**move** 23:19
25:22 26:2
50:8 57:9
60:22 71:10
91:10 103:3
117:18 157:6
161:16,20
174:19 195:22
210:4
**moved** 23:18
142:1 154:12
211:24
**movements**
8:16
**moves** 50:8
109:22
**moving** 91:4
**MSPD** 5:14 7:1
9:23 10:13 11:2
12:9 27:12,22
30:10 33:8
59:21 60:10
61:6,7 78:6
121:16 125:17
172:10
**multiple** 38:5
58:6 115:23
120:4 144:15
150:20 157:15
165:3,6 181:18
182:1 183:15
189:11 197:12
**multiple-count**
183:4
**Munday** 89:3,21
**Munday's** 89:11
**murder** 21:22
36:1 48:3
86:18 131:21
210:5,5
**murders** 40:11
149:17 164:16
**Musgrave**
124:14,15

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-12   Filed 02/09/18   Page 76 of 93

**N**

N 2:1 3:1 5:1
N-A-C-D-L
  198:21,25
NACDL 198:21
name 6:19,20
  7:16 26:20
  139:18 146:2
  165:4 195:2
  216:9 217:1,2
named 14:13
National 199:1
natural 103:8
naturally 20:6
necessarily
  43:18 172:9
necessary
  63:23 64:18
  64:23 65:1,5
  78:23 81:14
  82:1 93:7
  143:21 163:21
  168:23 169:23
  170:2 216:8
need 33:22
  36:9 40:22
  42:2 71:25
  72:13 89:13
  115:13 135:22
  146:5 169:14
  177:8 178:4,8
  186:4 198:5
  204:10
needed 42:2
  72:7 77:5
needs 28:15
  182:13
negative 52:7
  90:23
negotiate 88:4
  88:5 93:6
negotiation
  88:7,10
negotiations
  47:16 92:22
neither 214:9

nerd 166:11
Nevels 136:21
  136:22,23
  137:2 138:19
  142:15
never 35:2
  37:12 41:9,9
  63:7 83:21,21
  90:8 99:7,13
  102:12 105:17
  106:14 121:1
  150:22 157:14
  168:19 181:1
  185:16,24
  209:11 211:6
  211:12,17 212:4
new 5:6,6 21:22
  22:18 23:2,2
  23:9,14,20
  25:9,15 102:21
  102:22 111:22
  159:11 166:20
  166:22 167:10
  169:15 172:1,18
  185:1
newer 72:16
news 165:10
newspaper
  150:24
nice 116:19
  138:2
Nifong 5:16
  215:8
nightmare
  178:23
nine 19:5,8,9
  22:23 50:12
  54:20 62:21
  155:15 162:23
  167:2
non-appeara ...
  139:10
nonprofit 130:11
Nonverbal 8:6
  136:10
Nope 104:19
  171:13

normal 163:15
normally 26:17
  159:21,21
  209:4
notarized
  215:17
notary 4:14 6:5
  215:16 216:18
notice 20:21
  60:5 65:24
  65:25 66:9,18
  102:23,25
  103:20 185:1
  202:13
noticed 78:25
noticing 66:10
Notification
  2:18
November
  137:3,22
  140:17
number 6:14
  15:23 19:17
  25:4 30:12
  32:24,25
  35:5 40:5,15
  40:17 42:1
  43:23 44:15
  45:12 54:24
  65:2 69:4
  71:18,19 72:23
  74:10 75:16
  94:3 95:1
  96:16 97:9
  106:15 113:11
  115:12 118:14
  122:9 123:25
  125:13 130:22
  132:7 135:11
  146:4 151:16
  155:6 163:20
  164:8,12 165:4
  181:14 190:11
  204:3,5,6,14
  208:8 213:4,9
numbered
  204:16 205:1

numbers 36:3
  160:2 164:10
  186:3 187:10
  196:23
numbers-wise
  122:6,7

**O**

O 3:1
O'Malley
  198:22
oath 7:24
object 8:3
objection
  136:15
obligated 86:4
obligation
  85:25 140:7
obligations
  31:18 56:13
  89:12 191:1
observation
  113:8,8
observations
  110:7
obviously 20:4
  21:21 27:6,19
  29:8 41:21
  85:6 92:16,22
  98:24 124:20
  142:11 170:21
  177:20 192:16
occasionally
  30:2 111:10
  194:8 195:8
occasions
  138:12
occur 46:14,15
  47:9 48:19
  61:10,11,13
  111:4
occurred 107:18
occurs 46:13
  72:3 146:23
  184:6
OCDC 142:5
October 59:16

127:18,19
  134:21 141:10
  141:21 167:1
offenses 83:2
offer 49:14 63:8
  74:5 85:22,23
  86:5,12,17,18
  88:2 89:25
  90:6 91:6,7
  191:12
offers 28:10
  47:15 85:14,19
  86:4,22 89:18
  90:2,4 91:2,8
  132:15 175:4
office 5:10,15
  9:18 10:6,15
  10:20,25 11:24
  12:9,9 13:12
  14:11,13,20 15:1
  16:1,9 18:18,20
  18:21,22 19:4
  20:15,17 21:18
  23:14 25:2,20
  25:25 29:8
  31:16,17 33:8
  33:10 34:7,17
  35:14 36:2,9
  36:18 37:1
  38:4,11 39:1,2
  39:5,10,10,21
  39:24 40:10
  42:7,19,24
  43:21 51:21
  53:8,13 55:23
  56:10 57:2
  59:13,21 60:19
  61:15 62:7
  64:17 66:14
  69:15 70:3
  71:4 73:9,20
  75:10 78:17
  82:5 83:11,24
  86:15 88:3
  90:4 93:6,20
  94:12,22 96:1
  96:9 97:12

ALARIS LITIGATION SERVICES
www.alaris.us        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-12   Filed 02/09/18   Page 77 of 93

99:5 101:19
102:17 103:18
103:19 104:17
105:13,21,23
106:2 108:12
108:21,23
110:7,23 112:10
113:3,17,18
114:24 115:12
115:16 116:5,23
117:17 118:10
118:20 122:5,9
124:22 126:1,5
129:3 131:3
132:8 138:18
139:2 140:4,13
141:3 142:25
144:9 146:23
147:3,8,24
148:21 152:14
153:4 162:21
165:20 170:11
173:8 175:4
177:15 178:14
178:16,24
185:21,25
186:20 187:10
187:12 190:25
192:14 193:9
196:8 200:11
200:13,14
201:18 206:2
207:19,23
208:22 210:19
212:8,22
215:7
**office's** 89:12
145:12
**office-wide**
43:6 189:12
**officed** 195:1
**officer** 80:6
98:7
**officer's** 80:4
**officers** 88:16
119:20
**offices** 4:11

22:11,14 38:5
38:6 39:14
65:11 117:19
119:24 122:11
122:21,23
131:8 148:1
153:12 163:4,6
163:12 164:4
176:21 187:5,9
190:11
**official** 171:1
**officially** 102:17
**oh** 26:6 29:19
38:24 52:20
59:25 65:19
65:21 69:10
70:20 71:15
72:18 73:2,4
90:7 119:4,4
120:12,24
151:4 164:22
185:15 198:8
200:4 204:5
204:5
**okay** 7:20 8:5,9
8:10,21,22
9:13 10:6 12:18
13:11 14:22
17:17 18:16
26:9,23 27:18
35:13 36:22
36:25 41:4
45:6 47:13
48:18,23
50:16 55:17
56:4,25 57:22
58:1,11 59:6,14
60:12,21 61:1
63:4 64:3,13
67:15 68:15
69:14,25
71:22 74:8
75:20 77:11
79:4,6,20
83:2,5,10 87:7
92:5 93:1,15
95:22 97:25

98:2 99:15
101:16 102:9
102:24 104:12
105:23 106:7
106:23 108:6
109:6 112:6,18
113:2,23
123:18 124:15
125:24 126:9
127:19 129:6
129:20 130:20
131:5 133:22
134:12,12
137:12 138:7,11
139:24 140:19
141:9,18,21,23
143:16,20
144:22 145:10
146:15 147:22
152:16 157:5
157:12,12
159:4,6 160:3
164:11 167:22
168:3 171:14
172:22 173:3
174:1 178:21
179:15 184:11
186:8 188:19
188:20 194:11
195:23 197:24
198:8,17 199:3
199:21 200:19
200:23 201:8
201:11,21
202:22 203:3
203:19 204:15
204:25
205:12 206:17
207:25 212:19
213:3
**old** 177:22
185:2 195:17
**omission** 149:2
**on-the-scene**
100:2
**once** 9:9 24:14
57:1,1 72:12

88:2 95:19
111:14 210:21
**ones** 24:24,25
92:20 186:16
**open** 16:2 20:9
25:2 30:13
53:22 114:20
142:24 160:24
163:13 164:11
**opening** 83:11
83:15,21
**operates**
183:20
**operating**
131:22
**opinion** 19:11
37:17 69:19
83:23 93:5
94:21 97:7
109:8 113:2,6
180:23 206:2
**opioid** 149:25
**opportunity**
52:5,5 85:9
155:19
**opposed** 8:15
147:19 171:12
173:8 176:15
181:10 183:4
**opposite** 183:2
**optimal** 40:8
**option** 39:8
97:5 99:1
186:18
**options** 111:2
122:1
**order** 27:9
75:24 94:1
96:11 127:3,6
128:8 135:3
135:22 139:10
142:9,9 143:12
174:16
**ordered** 32:25
97:11 98:13
210:23
**ordering** 139:20

144:4,7 184:21
**orders** 86:8
97:16 138:25
143:10,22,24
145:6
**organizational**
27:12
**organizations**
150:12 151:3,4
151:5,6,25
152:8 198:20
**organized**
152:3 166:8
**original** 3:6,6
215:13
**out-of-custody**
97:2
**outcome** 214:15
**outcomes** 85:4
109:14,14
**outlets** 151:5
**outreach** 133:10
**outright** 158:9
211:12 212:1
**outside** 18:6
111:7 116:4
155:20 176:14
189:22
**outstanding**
178:15
**over-reporting**
181:2
**overflow** 186:10
**overhead** 182:4
**overlap** 42:5
**overload** 9:4
22:11 55:1
56:15 95:3
162:15 190:13
**overloaded**
22:14 122:12
**overreacting**
119:1
**oversee** 178:15
**oversight**
132:19 180:20
**overwhelmed**

ALARIS LITIGATION SERVICES
www.alaris.us        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-12   Filed 02/09/18   Page 78 of 93

38:16 115:6,8
overworked
116:10

**P**

P 5:1,1
p.m 123:2,4
145:20,22
198:12,14
213:13,15
page 2:2,11 3:2
59:17 200:1
201:10,22
215:14,16,18
216:21 217:5,7
217:11,16,20
pain 21:3
pairs 183:18
Pamela 124:14
194:7
paper 151:13
paperwork
65:25 105:2
paragraph
203:19,20
204:2,6,7,14
204:25
paralegals 15:17
15:18
pardon 160:10
162:22 163:1
166:17 179:10
parent 106:25
168:4
parent/guardi...
106:20
parole 100:23
part 10:7,9 11:11
17:21 23:1
24:13 29:18,19
30:4,18 37:7
48:6 63:20
65:15 83:8
103:17 111:11
120:3 121:10
121:10 130:12
151:12 187:4

196:25
participate
131:12 198:23
participated
130:13
particular 35:10
124:9 133:11
149:11 150:22
152:15 159:25
161:1 162:21
165:2,17
175:12 178:25
179:24 181:8
184:6 187:2
188:2 189:2
197:21 208:4
particulars 71:11
parties 214:11,14
pass 187:8
passage 187:2
187:15
pay 3:3 34:12,13
36:13 49:9
168:4 201:15
201:24
payments 49:12
peg 157:8
penalty 142:13
216:10
pending 4:16
pens 184:22
people 13:6,7
19:6,8,9,14,15
19:16,17 20:4
20:9,21 21:1
21:20 23:5,17
23:23 24:17
24:22 25:4
26:8,13,19
27:14 28:24
30:1 31:2 34:11
34:15 35:4
37:8,21 38:5
38:12,13,16,21
39:8 40:16
41:22 43:17
45:12 47:20

49:4,5,6,6,7
50:19 58:6
62:2,21 64:22
65:18,19 66:4
67:4,19 70:11
71:17 72:24
73:1,7,13,15,23
74:4 75:16
76:15 77:8,23
77:24 78:1,3,5
78:12,14,21,22
79:11 82:8
87:16 88:14,15
91:2,5 93:9
98:19 106:12
112:4,4 115:12
115:13,13
116:12,17 117:3
118:5 120:3
126:11 127:5,9
127:11,15,20
128:5,7,22
129:11,11,12
133:24 148:2
150:25 151:9
151:10,11,16
152:23 153:12
155:10,15
158:7 159:7,11
161:13 162:23
164:15 165:4
166:6,9 167:10
168:17,19,22
168:25 169:2
170:4,24,25
173:8 174:8,11
174:16,17 175:1
175:21 177:24
180:8,19
184:15,19
187:5 192:18
196:18,20
197:9,9
202:15 206:3
206:8 207:21
208:8,10,12,17
people's 21:19

45:16
percent 12:16
35:3 43:14
47:3 65:6,7,12
67:21 70:17,17
154:24 157:3
157:8 163:15
192:1
percentage
44:1 64:16
122:11 128:1
157:11 182:24
performance
25:17 27:1
30:5 33:9
34:21
period 21:5
23:10 34:13
165:22,25
179:15
periods 34:12
179:14
perjury 216:10
permanently
61:21
permissive
186:15,18,22
permitted
114:24
perpetuity
142:19
person 13:2,9
23:15,20,24
24:5,7 28:4
33:22 48:10
60:24 66:17
66:17 70:21
70:22 94:4
96:4 97:15
98:8,9 100:22
103:13 106:14
126:20 128:11
129:4 140:25
153:25 161:4
161:13 168:20
172:13 176:9
177:22

208:23 209:7
personal 69:20
69:21,21,22
113:7 135:25
153:16 170:11
182:18
personally
25:19 86:14
87:22 129:1
134:25 135:2
135:13 139:9
139:19,20
142:22 143:10
143:12 169:22
178:3,22
182:4 189:24
210:4 211:8,11
212:3
personnel 184:7
184:8,9
perspective
84:17 128:19
persuasive
49:13
pertaining
130:2
pester 34:10
petition 2:19
136:13
Petsch 1:11 2:3
4:9 6:13 7:7,12
9:13 58:19,22
88:21 123:5
124:4,24
129:21 136:2
137:5 139:22
143:24 199:22
201:6 203:1
215:13 216:5
216:12 217:1
phone 61:15
77:25
phones 18:24
208:9
phonetic 76:14
Photos 99:19
physically

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-12   Filed 02/09/18   Page 79 of 93

pick 50:10
picked 51:14
    95:20
pictures 99:18
    99:21
pills 149:25
place 31:14
    104:5 136:24
    162:5 192:3
    202:5
placed 95:22
    95:23 125:16
places 67:24
    116:20 147:4
    152:12 155:10
plain 189:6
Plaintiff's 193:13
    193:24 194:11
    207:1
plaintiffs 1:4,12
    4:4,18,19 5:3
    6:2,25 7:9,17
    192:23
plan 18:12,13
    77:1
planned 75:17
plant 174:24
Platte 11:18
play 15:21 33:8
    97:20 100:18
    159:24
played 65:17
plea 47:18 85:14
    85:23 86:4
    88:2,4,10 93:7
    93:13,17 101:18
    103:1,3,6,15,17
    132:15 158:14
plead 50:17
    74:6 85:16
    87:5,10,20
    173:16 174:7,17
    174:20
pleading 88:14
    91:5 174:11
pleads 101:16
pleas 49:5

85:14 94:8
please 6:22 7:6
    44:13 89:15
    203:5 215:12
    215:15,17
pleasure 21:14
pled 65:3 93:10
    103:9 174:14
    211:22
plenty 115:3
plus 31:25
point 33:2
    44:19 46:8,20
    47:8,10,23
    50:25 53:12
    55:7,9 56:2,9
    58:13 60:22
    66:5 81:18
    86:24 102:16
    108:18 111:16
    118:11 134:18
    138:16 146:5
    169:5 170:24
    194:18 202:17
pointing 73:16
pol 59:24
police 68:16
    80:2,3,3,6
    88:16 99:11,13
    175:22 176:8
policies 39:4
    59:4,5 60:9,11
    60:16 89:2
    91:18 162:5
    168:13,14
    172:14,18
    210:7
policy 2:12 37:1
    37:7,10 59:21
    60:6,7,19 87:9
    88:14 168:17
    171:19,22 172:1
    172:4,9,9,10
    173:7,8,11
    174:10
pool 36:7,18
    38:9

pools 38:8
poor 154:3
    207:12
pop 12:7
popping 92:12
pornography
    83:7
position 13:5
    20:18 23:18
    34:9 180:17
positions 20:23
    22:10,12,13,16
    22:17 23:19
    27:7 163:12,21
positive 80:3
possession
    131:20 149:21
possibility
    66:25 72:25
possible 20:22
    27:4 34:20
    50:16 72:17
    78:8 183:8
possibly 56:23
post 20:19
post-conviction
    14:15
post-litigation
    90:25
post-traumatic
    116:22
posted 89:6
    204:11
postpone 55:13
postponement
    55:10 126:8,9
    126:21,22
    153:6
potential 99:11
    177:16
potentially
    41:23,24 52:7
    147:19 187:14
potted 174:23
poverty 152:24
    153:11,22
    154:25 158:6

203:22 205:2
    205:7,22
    208:17
power 36:15
practice 19:15
    25:17,23,23
    83:20 119:7
    164:4 176:11
    190:23
practiced
    190:23
practicing 14:20
    15:1
pre 48:21
predictable
    31:10,13
prediction 85:7
prefer 27:19
preferred 96:17
preindictment
    48:21,22,23
prelim 46:17,18
    46:22,24 47:4
    47:14,22 48:5
    48:8,9 49:4,21
    51:9 57:8,14
    85:19,21 86:16
    148:6,8 162:19
    175:18,24
prelimed 162:13
preliminary
    46:10,13 57:3
    57:9 73:11
prep 70:11
    110:16
preparation
    66:19 70:24
    150:9
prepare 8:23
    8:25 83:25
    84:3 85:1,5
    108:8,14 110:7
prepared 70:15
preparing 84:5
present 6:22
    57:3,5,20,24
    58:7 69:6

98:11 111:20
    166:22 187:18
presentation
    196:13
presentations
    197:7
presentence
    100:15
presiding 29:13
    55:9
press 150:17
pressure 80:15
    116:15
pressuring 87:5
presumably
    193:6,7
presume 65:4
    175:9
presumed
    205:23
presuming
    92:23 164:14
presumption
    203:23 205:3
    205:8,14,15
pretrial 48:19
    50:9,10 80:22
    80:25 81:14
    82:1
pretty 7:20
    37:13,13 48:13
    53:21 76:15
    79:9 87:18
    89:16 103:25
    106:8 107:2
    160:22 162:7
    163:15,18
    167:4 172:5
    178:10 186:6
    187:21
prevalent 77:4
primary 165:5,7
    165:9
print 198:6
printed 45:14
prior 10:21 11:3
    12:13 53:19

ALARIS LITIGATION SERVICES
www.alaris.us        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-12    Filed 02/09/18    Page 80 of 93

88:10 97:12 114:23 190:3 215:18
**prioritized** 128:23
**priors** 46:5
**prison** 184:19
**private** 19:15 96:17,23 97:6 98:5,8,15,24 107:25 129:16 148:5,7,8 157:18 158:9 158:25 159:11 160:4 164:4,8 203:24 205:10 206:4 207:19,21 210:12,22
**privilege** 62:5 81:11 89:19
**pro** 107:11,13 112:4 174:20
**probably** 12:16 18:7 28:12,13 29:5 32:12 37:16 39:9 40:13 58:6 63:7 68:17 70:17 71:13 78:11 85:20 86:17,18 95:2 95:18,21 104:23 110:2 111:24 115:11 127:3 130:23 142:18,24,24 148:12,20 160:2 170:25 171:3,20 172:13,14,21 176:5 189:10 190:3 192:1 207:19 208:14 210:13
**probation** 13:25 29:7 31:6,8,9

189:5
**program** 111:15 111:19 131:7,10 131:22 132:2 133:18
**prohibition** 2:17 2:20 125:4
**promise** 3:3 201:15,24
**promote** 26:16 128:4
**promoted** 25:16 26:18 27:4 28:24 34:18
**promoting** 28:23
**promotion** 26:21
**promotions** 28:25 29:18 29:19 33:24
**prompt** 54:14
**promptly** 54:13
**promptness** 54:12
**promulgate** 171:20
**promulgates** 200:12
**property** 153:17
**prosecuted** 148:22 150:6
**prosecutor** 46:1 47:25 49:14 89:23 161:3
**prosecutor's** 66:14 88:3 92:23 147:3 148:21 190:25
**prosecutors** 51:11 86:7 87:14 92:13 146:17 183:7
**protect** 89:18 91:12
**protection** 175:5

31:12,24 32:5 44:6 54:5 100:23 103:4 103:10 134:23 136:24 142:17 144:16,18 145:8 158:23 168:1 175:4
**problem** 53:7 62:11 166:24 174:13
**problems** 114:13 114:14 185:4
**procedural** 56:25
**procedure** 44:18,18 171:19
**procedures** 59:5 60:9,11 60:17 89:2 91:18
**proceed** 173:23 174:2 185:10 189:21
**proceeding** 53:2
**proceedings** 57:13 108:8 111:4 209:25
**process** 15:13 18:4 29:19 47:18 53:13 79:10 97:20 97:20 98:3 100:19 101:1 134:6 152:17 153:20 161:7,11 162:4 185:12 185:15 187:13 194:2
**produce** 65:18 65:19 66:15
**produced** 4:9 7:8 175:12
**professional** 2:15 10:21,23 61:23,25

**prove** 73:10
**provide** 43:1 63:22 117:17 131:17 145:12 188:8 196:8
**provided** 75:21 76:4 104:20 191:16,20 210:14
**psych** 97:11
**psychiatric** 96:6
**public** 4:14 5:15 6:5 9:15,25 10:3,3,22 15:25 46:20 51:1,9,10 53:18 58:7 84:12 100:18 107:22 107:24 108:4 111:25 114:9 116:4,9 126:1 147:8 149:12 150:20 152:5 156:17 157:25 158:4 159:17 160:7 165:18 166:17 188:13 191:14 200:1 201:14 204:9 205:18 208:22 209:13 215:7 215:16 216:18
**pull** 162:8
**pulled** 193:10
**pulling** 119:2 177:21
**punt** 170:5
**purely** 70:8
**pursue** 74:12
**purview** 148:19
**push** 38:14 73:7
**pushing** 66:1
**put** 12:19 45:12 45:19,20 50:7 55:10 89:1

103:10 111:8,10 115:9 120:24 177:7 181:9,9 181:17 188:14 202:13
**putting** 106:12 115:10,10 128:20

---

## Q

**qualified** 53:21 77:2 160:23
**qualifies** 159:17
**qualify** 15:25 47:20 153:2 154:4,13 160:1 209:14
**qualifying** 61:12 160:20
**quality** 34:23
**quantify** 64:15 72:4
**quashed** 139:16 139:17
**question** 8:5,8 8:9,9,15,19,21 41:9 58:24 67:12 77:8 95:11 101:5 117:13 147:16 147:21 157:12 158:21 165:1 169:21 170:9 172:19 207:25 208:1 212:12
**question/ans...** 20:8
**questioning** 101:1 210:7
**questions** 7:21 7:22 8:4,13 39:22 44:17 45:20,21 55:17 57:1 102:13,14 120:24 132:14 133:12 146:4

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-12    Filed 02/09/18    Page 81 of 93

156:11 172:22
198:18 206:25
209:18,18
**quickly** 139:3,14
**quit** 114:17,20
**quite** 91:20
134:13 143:13
146:8 152:2

## R

**R** 5:1
**Ramsey** 2:5,7
5:10 7:3,3
145:18,24
146:2 152:13
192:15,21
195:21 197:24
198:19 206:18
206:21,24
208:18
**ran** 39:20
**rare** 51:13 61:24
171:2
**rarely** 99:17
**rash** 206:7
**rate** 19:4,19
21:25 79:1
154:20 157:9
162:23 163:10
177:7,11,12
**ratio** 108:13
**reach** 27:5
151:16
**reached** 164:8
**reaches** 158:5
195:14
**reaching** 172:23
190:4
**reacted** 90:7
**reaction** 116:3,6
147:6
**read** 9:2 89:13
92:3 124:1
175:21 202:1
202:18,20,25
203:20 204:3
204:18 205:1

213:14 215:15
216:6 217:5,8
217:12,17,21
**reading** 19:24
89:25 114:4
189:6
**ready** 211:1
**real** 24:15 31:11
118:23 128:15
**Realistically**
51:21
**realize** 71:25
72:18 79:21
204:2
**really** 20:25,25
21:13 28:4
31:15 38:7,21
38:21 39:2,3,4
40:7 43:1
45:15,23 47:5
50:3 51:25,25
52:9,18,22
60:24 64:6,19
64:19 67:8
70:19 76:5,17
78:11,22 84:18
85:12 90:23
90:24 94:10
115:1 119:6
121:4 131:8
136:24 142:2
142:3 144:5
145:4 148:3
149:18 152:6,6
152:21 153:7
174:8,21 175:1
175:4,6 176:11
179:4 182:3
183:7 188:8
194:25 204:3
206:14 209:3
**rear** 191:8
**reason** 56:12
96:2 134:2
144:12 190:5
217:6,10,14,18
217:22

**reasonable** 41:7
54:12 163:24
164:13,14,16
**reasons** 77:13
77:16 79:23
88:13 104:10
**reassign** 21:8
**reassigned**
132:3
**reassigning**
142:25
**recall** 77:12,14
77:16 89:20
92:7 99:24
101:13 136:20
179:6 182:10
182:10,11
207:4
**recalling** 183:21
**receive** 23:13
78:18 143:12
154:1 155:1
164:25 193:2
**received** 94:12
140:19
**receives** 140:25
**receiving** 30:11
149:9 193:1,4
204:9 205:17
**recess** 58:17
95:8 123:3
198:13
**recite** 187:21
200:9
**recognize** 59:1
88:23 123:9
124:7 129:24
**recollect** 180:12
**recollection**
181:21 194:9
**recommend**
68:20 177:21
**recommenda...**
46:6
**recommended**
45:13
**record** 6:10 8:16

8:17 24:19
52:16 58:14,16
58:18 85:22
89:25 91:14
95:4,7,9
122:25 123:2
123:4 135:10
135:13 145:18
145:20,21,22
191:9 198:10
198:12,14
199:6 213:13
**recorded** 6:12
**records** 49:13
90:10,18 91:13
143:2 146:17
146:18
**red** 114:10
**reduced** 214:8
**reductions**
51:25
**refer** 10:10
32:14 34:3
**referenced**
25:12
**references**
19:25
**referred** 137:9
141:10
**referring** 136:5
201:19
**refuse** 67:10
114:25
**refused** 67:9
**refusing** 122:1,5
197:13
**regard** 128:17
151:17
**regarding** 89:12
145:11
**regardless**
107:3
**region** 75:12
**regional** 140:8
**regular** 195:17
**regularly** 35:6
62:12 70:6,7

70:14 79:9
132:11,14
199:17 200:10
**reject** 128:4
156:20 157:1
158:8 159:25
**rejected** 157:4
158:9 192:12
**rejection**
154:20
**related** 92:6
100:2 156:5
157:13 214:10
**relates** 121:24
**relationship**
37:14 62:12
63:6 81:24
172:6,25
175:22 210:9
**relative** 214:12
**relatively** 22:19
**relaxation**
166:8
**relentless**
116:15
**relevant** 7:21
158:4 188:6
**relief** 120:7
188:8
**relieved** 133:19
**remain** 52:24
90:15
**remember** 7:23
19:23 99:23
105:15 106:11
109:2 150:7
163:25 181:6
181:22 182:3,3
193:1,4 212:6
**remembering**
195:2
**remove** 126:20
129:12
**render** 216:8
**reopened** 38:10
**repair** 63:7
**repeat** 114:19

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-12    Filed 02/09/18    Page 82 of 93

rephrase 8:9
14:18 53:10,12
80:24 97:13
replaced 19:9
162:24
report 68:16
80:2 100:15
100:22 101:9
108:16 119:12
reporter 4:14
5:21 7:5 8:12
58:12 78:15
205:5 214:1,4
reporter's 6:19
reporters 52:17
73:23 78:9
reports 29:22
75:13 108:14
175:22 176:8
represent 7:16
97:15 103:13
112:5 113:3
129:17 136:23
142:15,18
146:3 148:24
149:2 150:19
157:25 206:3
206:15
representation
31:19 55:13
62:6 63:22
70:2 74:17
81:12 84:24
102:16 103:15
132:9,20
143:3,8 144:21
145:12 147:5
154:1 155:1
158:6 159:18
161:13 167:11
172:16 173:14
175:9,15 176:6
176:15 190:20
represented
12:6 111:15
136:19 144:16
151:7 159:2

175:20
representing
51:18 109:8,19
144:6 145:4
160:20 161:9
174:12 210:2
request 17:13
30:6 35:23
46:20 47:22
48:6 50:1 71:5
71:6,12 76:2
77:12 78:19,21
78:23,24 94:1
96:15 97:8
168:25 177:6
177:6,9,10,14
185:6,13,24
192:8 211:6,8
211:11,13,19
212:2,4
requested
68:18 117:23
Requesting
2:21
requests 16:10
17:21 29:4,4,6
35:25 41:13
46:24 54:14
71:9 73:8 74:4
77:15,18 78:2
79:1 138:13
170:11,23 171:1
212:9 213:5,9
require 31:10
109:9
required 7:22
8:5 11:25 25:7
57:11 69:17
requirement
30:9 61:6,7
65:24,25
132:18
requirements
27:23 56:5
requires 20:6,7
research 177:17
reserved 6:7

residual 13:8
resign 115:16
resigned 19:9
115:18,21
resolved 116:12
resource 31:15
31:17 75:17
77:16 94:11
125:25 132:12
132:21 182:9
resources 17:2
17:20,25 24:4
69:15 74:23
74:24 78:7
82:2 83:24
84:3,10 93:6
94:22 110:1,3
110:18 112:1
125:18,20
133:8 153:15
154:15
respect 61:7
91:1 95:17
respond 54:14
90:19 116:23
119:24 138:7
responded
141:19
response 8:6
66:12 118:21
122:22 134:14
136:10,13
139:15 140:20
140:23 141:13
143:17
responses
66:13 120:17
responsibilities
28:20
Responsibility
2:15
responsible
103:23 105:2
105:3
rest 143:5
restitution 49:9
49:12

result 115:17,18
137:16 202:10
resulted 95:16
results 82:18
98:25
resume 103:1
resumes 19:24
retain 74:15
retained 73:19
retainers 95:22
95:23
retaining
212:22
return 33:5
215:17
Returning
176:24
Reverse 37:12
review 25:19,24
29:15,21
33:23 43:17
110:23,23
111:19 123:11
202:23
reviewed 25:20
123:18
reviewing
69:23 124:11
reviews 25:24
43:15 54:10
revocation 14:1
158:23
ridiculous 41:25
right 10:10 13:23
15:10,11 16:2,3
16:24 19:25
22:7 23:3
24:9 33:15
34:5 40:22
41:21 42:8,9
43:4,20,23
44:6 49:1
52:24 53:11
56:3,9,21
57:15,18 58:4
60:5 63:24
72:2,5 73:10

83:5 90:15,15
90:16 92:18
101:3,10 102:2
103:2,24 105:1
107:23 108:1
112:23 113:16
121:25 125:18
126:22 127:10
130:4 132:6
133:7,16
134:24 140:18
141:8,23
142:14,21,23
143:16 144:2
144:24 145:1,3
145:8,16 146:11
147:15 153:5
154:3 157:20
161:2,12
165:19 167:12
168:12 171:9
173:2 175:14
182:17 187:19
192:14,20
193:5 194:15
199:3 201:8
202:14
205:20 206:1
207:16 209:15
212:7 213:7,11
rights 53:1
90:14,24
rise 205:3,8
risk 45:18,22
148:11
rob 148:16
robberies
149:20
robbery 183:12
role 15:21 33:8
34:16 96:24
97:19 100:19
room 51:1,10
61:22,25 98:11
103:16 118:8
rooms 61:20
rotated 13:1,6

ALARIS LITIGATION SERVICES
www.alaris.us        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-12   Filed 02/09/18   Page 83 of 93

rough 70:18
roughly 43:11
    43:25 127:20
rounds 20:20
route 80:20
    138:24 169:18
    210:19
routinely
    103:25 150:5
RPR 5:21 6:4
    214:18 215:22
rule 53:23,25
    54:1,1,22 55:1
    56:5,14,18
    96:22 114:2
    121:3 124:22
    134:25 135:12
    135:21,25
    138:4,22
    140:11 150:17
    151:17 154:25
    159:17 172:17
    188:6,9 189:9
    189:18 191:2
    196:14 210:12
    210:13
rules 2:15 54:6
    55:11 71:7
    167:6 189:5
    199:17 210:10
run 32:6 33:13
    38:12 112:3
    150:25 153:16
    153:17 183:25
    184:3 186:1
running 162:11
runs 147:3
rural 38:4,6
    39:14 148:1
    153:11 163:12
    176:17
rush 98:19
Ruth 1:11 2:3 4:9
    6:13 7:7
    143:24 198:17
    215:13 216:5
    216:12 217:1

Ryan 5:20 6:20

                S

S 2:10 3:1 4:13
    5:1,21 6:4
    214:3,18
    215:22
sadly 101:6
Saint 10:24
    130:18 163:8
    163:10 195:1
salary 27:24
Salvation 75:6
sample 196:17
sanctions 71:10
saving 170:20
saw 110:2,3
    151:13 193:6
saying 47:9
    56:4,10 63:10
    63:11 77:10
    96:21 102:13
    103:5 106:11
    108:4 114:11
    115:23,25
    135:3,22
    136:8 143:24
    158:10 163:25
    174:11,22
    182:5,6 186:3
    188:13 191:9
    212:15
says 7:9 47:21
    55:1 65:19
    68:19 89:16
    103:10 115:25
    118:16 128:3
    135:1 153:15
    153:25 156:2
    174:5,17 187:11
    189:3,14
    204:20
scale 122:12
    167:18
Scathing 138:3
scenario 158:21
scene 67:25

68:9
scenes 67:17
schedule 45:10
    109:24 134:10
scheduled 28:8
schedules 21:9
    21:19
school 11:1,1,3,7
    23:3
scramble 72:19
screen 15:22
    16:6 46:21
    53:18,19
    55:23 126:11
    152:22,23
    159:11 172:13
screened
    126:13 156:1
screening
    55:21 153:20
    159:7
screwing 185:15
se 174:20
search 153:16
    153:17 165:9
    165:10,12,14
searched 165:11
second 12:15
    24:15 30:2,21
    30:21,23 51:14
    59:17 67:23
    70:22 95:5
    97:6 105:4
    107:20 113:9
    137:20 138:8
    156:19 176:1
    197:16 203:19
    203:20 204:4
    204:5,7
    207:25
secret 153:1
    202:24
section 36:12
    167:9 187:2
    188:3 201:23
see 17:1 21:20
    24:16 30:5,10

34:16 35:19
38:16 47:6
59:20 64:7
69:13 73:25
74:3 87:16
96:11,12 129:8
142:3 147:18
147:24 158:18
201:23
seeing 30:9
    31:22 35:5,6
    62:11,23 63:1
    81:23
seek 173:1,22
seen 50:22
    64:5 124:8
    149:9,13
    166:16 168:24
    170:4 193:7
    200:23 203:7
segue 104:15
select 111:12
    180:4,4
selection 134:6
self--reporting
    143:18
self-care 166:12
self-harm 115:13
self-inflicted
    190:19
self-monitoring
    154:7
self-report
    140:4,7
self-reported
    139:3
self-reporting
    153:7 154:9
send 33:15 48:7
    50:4 86:14
    91:19 105:22
    170:23 171:25
    185:1,5 190:1
sending 143:10
sends 47:15
    195:17
sense 19:3

43:25 73:18
88:15,17 108:6
108:9 109:3
116:3 119:9
127:19,23
131:7 132:22
141:2 146:11
148:10 153:13
154:19 163:3
163:14,21
165:13 170:8
171:5 176:12
179:2 191:23
191:25 200:6
208:6
sensical 176:11
sent 12:7 33:18
    47:19 59:9,12
    60:6,13 92:2
    105:2 117:1
    123:23 124:2
    131:3,24 135:2
    141:1 142:8,8
    143:12 155:9
    176:3 181:24
    189:23 193:3
    193:4 194:18
    195:9 207:3,7
    207:14
sentence 202:1
sentenced
    90:21
sentencing
    75:7 84:6,8,8
    84:11,25 85:1
    85:8,11 100:22
    101:8 102:22
sentencings
    84:3
sentiments
    123:19 124:18
separate 37:22
    105:13 108:11
    108:20 111:1
    159:10 175:18
    175:19,19,24
    175:24,25

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-12    Filed 02/09/18    Page 84 of 93

176:1
September 15:2
    23:24
series 54:2
serious 40:9
    83:8 86:12,16
    121:7 148:16
    164:17 165:7,8
    175:15
serve 38:15
    66:10
served 9:19,23
    127:7
server 60:24
servers 60:23
services 3:3
    5:22 6:21
    110:17 201:15
    204:10 205:19
    205:24 206:4
    208:23 215:1
    215:18
sessions 166:7
set 17:22 21:9
    29:12 31:9
    45:6 46:16,23
    46:24 47:23
    48:2,9,14,24
    49:19,25 50:2
    50:12 52:19
    54:11 57:8
    61:19 66:17
    72:21,22 76:2
    80:17 98:5
    127:17 130:11
    134:8 135:2,15
    136:15 138:20
    143:4 148:7
sets 48:3
setting 37:1
    46:16,17,23
    47:4,15 48:15
    57:14 65:21
settings 21:11
settle 50:2,6
settlement
    48:25 49:1,25

50:7 175:25
    176:2
setup 143:14,14
seven 30:11
    126:20
seven-day
    65:24
sex 48:2 83:2
    86:17
shadowing
    24:7
shadows 28:3
shake 164:10
share 99:2
shared 75:12
sharing 99:1,1
She'll 119:13
sheer 113:11
sheet 45:14,25
    46:2 86:11
    106:24 215:14
    215:16,17 217:1
sheets 45:14
Sherrer 195:4,6
    195:7
shift 166:23
shifting 144:18
Shipma 2:6
    5:15 7:1,1 95:4
    137:14 192:13
    198:3,5,9,16
    205:12 206:17
    213:14 215:6,11
    216:21
Shondel 1:3 4:3
    4:17 6:13
    215:10 217:2
Shook 151:11
    195:10
shoot 148:2
shootings 40:12
shorter 29:1
shorthand 6:4
shortly 20:14
    118:19 119:25
    195:25
shot 54:17

show 16:11 51:15
    77:8 135:4
    139:10 142:9
    150:19
showered
    208:11
showing 16:16
    208:16
side 130:18,21
sign 35:22,23
    43:1 76:12,13
    202:21 213:14
    215:16
signature 6:6
    202:6 215:14
    215:16,17
    216:21 217:24
significant 71:19
    133:19 166:23
    213:4,9
significantly
    134:11
silent 52:24
    90:15
similar 42:14
    91:1 123:22,25
    124:3,10
    182:12
simply 213:5
Sincerely
    215:20
single 35:1
    84:14 118:12
    124:22 168:20
    176:6 182:20
    182:20
single-count
    183:5
sister 52:20
sit-down 94:18
sits 99:22
sitting 24:11 31:1
    154:19
situation 134:19
    141:4
situations 62:6
    93:16 102:6,10

160:7,10
six 20:19 21:5
    26:16,18 29:5
    32:12 50:11
    54:20 109:22
    111:24
size 61:23 163:5
skill 167:23
skills 31:2 167:1
    167:2
skipping 194:12
sliding 167:18
    167:23
slightly 169:21
slowed 163:15
small 39:5 69:4
    171:15 184:12
    197:8
smaller 75:16
snag 186:2
sneak 66:4
snookering
    206:9
so-and-so
    70:20
soap 188:20
social 15:15
    74:21 75:8
    108:12,14
    110:17
sole 107:11
solely 33:12
    41:13 106:12
solutions 191:12
somebody 30:2
    112:2 170:22
    182:6
somebody's
    156:4
someone's
    30:4 48:17
    61:13 174:4
somewhat
    70:23 71:12
    120:11
soon 134:9
sooner 34:14

72:7
soonest 27:4
sorry 48:22
    87:25 89:13
    109:3 117:14
    147:13 182:15
    195:5 198:24
    205:6
sort 13:7 17:19
    20:3 24:12,16
    26:20 27:11
    28:8 38:17
    39:11 40:8
    45:16 47:5
    49:3,4 60:15
    62:19 63:18
    66:8 69:2
    71:16 74:16
    77:24 78:19
    79:12 80:16
    81:20 90:16
    93:24 94:7,25
    97:1 106:16
    112:24 116:9,11
    116:14 120:16
    121:2 122:22
    125:18 129:1
    134:9,16
    144:21 149:4
    150:1,23 152:7
    153:7 154:16
    164:13 167:8
    169:16 180:9
    183:14 187:13
    205:18 207:13
sought 138:11
southern 135:19
Spanish 76:9
    77:4
speak 8:13
    90:19 91:14
    94:6,15 96:25
speaker 25:3
speaking 9:5
    37:18 39:23
    69:14 113:2
    162:22 186:23

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-12    Filed 02/09/18    Page 85 of 93

special 180:11
specialize
    104:17 106:9
specialized
    74:2 109:9
specific 31:2
    104:7,9,25
    111:1 112:12
    117:17,22
    118:19 151:21
    179:22,22
    180:1,6,10
    181:20 192:17
specifically
    78:2 94:17
    124:21 130:16
    162:22 181:17
specificity
    139:18
specifics 62:4
    70:1 81:10
speed 54:16,19
spend 23:10
    36:19 43:12
    85:15 90:17
    151:24 211:22
spending 12:12
    185:21
spent 179:5
splatter 54:18
split 31:16,24
    94:25
spoke 76:19
spoken 88:9
    107:25
spot 20:24
    22:6 55:11
    79:11
spots 38:7
spotting 72:24
spreadsheet
    73:21 74:3
    94:2 129:9
    185:2
springs 86:1
stab 64:19
stack 163:3

staff 13:12 15:11
    15:14,15 18:9
    18:18 19:22
    21:1 22:17
    40:18 41:24
    42:18 50:18
    50:23 51:22
    74:21 75:11
    91:16 92:8,9
    104:21 107:12
    109:18 182:4
    193:9
staffed 15:12
    52:3,3
staffings 77:23
stage 88:8
    129:15 195:9
stamps 149:4
stand 210:6
standalone
    82:25
standard 27:2
    188:10 199:18
    199:20
standardly
    48:14
standards 49:18
    175:7 189:4,17
    199:13,15
standing 174:13
stands 101:12
    198:25
staples 35:23
start 19:6 23:23
    26:4 48:22,23
    66:1 167:1
    211:9
start-up 23:6
started 10:1
    23:17,24
    55:15 60:20
    89:24 92:10
    107:16 126:19
    139:2 149:19
    149:21 175:14
    190:6
starts 26:6

state 1:6 4:6,15
    4:18 5:8,10,15
    6:14 7:3 9:15
    10:22 25:4
    47:2,15 57:16
    65:18,19 66:6
    71:5,17 85:19
    88:18 97:5
    104:7 131:9
    146:3 163:8
    214:4 215:7,10
    216:1 217:2
statement 67:3
statements
    67:4
states 1:1 4:1,16
    6:15 89:8
    164:5
statewide 22:10
    25:5,8 38:1
    60:10,17,23
    94:16 104:22
    104:23 166:4
    166:25 170:22
    173:6,7,9
    192:16
status 95:17
statute 187:20
    188:7,22,24
    189:16,22
stay 52:20
    114:15 185:19
    210:23
staying 120:5
steal 148:3
stealing 148:13
    148:22 149:2
    149:3,3 165:11
    175:17 183:16
stealings 14:7
step 47:18 58:9
    171:19 188:20
steps 88:4
    93:20 101:18
    118:19 134:16
    150:7 179:9
Steven 5:10 7:3

    146:2
Steven.Rams...
    5:12
sticker 201:9
Stinson 151:10
STIPULATED
    6:1
stone's 41:10
stood 156:5
stop 55:2 63:11
    122:23 190:17
stopped 63:21
stopping 58:12
store 68:23
straight 11:6
straightforward
    7:20
strange 11:12
strategically
    66:6
stream 20:9
street 4:12 5:5
    5:11,23 68:23
    215:2
stress 116:22
strictly 18:23
    19:2
strike 20:16
    212:20
strong 158:16
structure 16:8
    17:22 41:11,14
    41:15,17
struggle 76:5
    91:3
struggled 117:7
    117:8
stuck 152:7
student 76:18
stuff 23:7 52:6
    77:25 83:7
    90:25 120:10
    150:24 167:4
    180:8 196:14
stunt 119:2
submit 33:25
    185:12,17

submitted 46:2
subpoena
    169:3
subpoenaing
    84:18
subscribe 216:9
substance
    216:8
substantive
    43:13
succeed 173:9
successful
    25:17,22 27:1
    38:11 210:24
sufficient 67:5
sufficiently 70:4
suggest 182:13
    196:8
suggestions
    2:16,20 125:4
    137:4 178:11
    189:25 190:14
suing 151:18
Suite 4:12 5:16
    215:8
summer 23:16
    23:17 76:19
Superior 89:8
supervise 27:14
    75:10 103:11
supervised
    38:3 39:17,18
    169:10 170:1
    191:19
supervises
    33:15
supervising
    29:22 69:22
supervision
    29:24 52:2
    133:12
supervisor
    33:17,19 75:10
    114:17 116:1
    173:6
supervisors
    113:10 114:19

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-12    Filed 02/09/18    Page 86 of 93

supervisory 140:11
supplemental 184:2 185:6
supplementary 185:12,13
supplies 36:12 36:13 184:21
support 2:16 18:9,21,22 19:22 22:17 43:2 125:4 137:4
supported 117:25,25
supposed 30:10 54:6,7 54:10 75:12 78:10 83:15 90:18 98:16 120:11 158:13 159:9,10 175:21 177:5,7 177:9 196:21 196:21,22
suppress 100:5
suppressed 79:13
suppression 79:7,11,17,22 80:12,17 81:1
Supreme 118:16 121:13 135:20 141:6
sure 8:13,15 9:6 20:13 21:6 33:6 48:25 55:19 60:18 63:16 65:6 91:1 95:6 100:12 125:9 127:13 140:15 146:7 158:2 159:15 161:5 164:2 169:17 169:18,19 173:13 177:2

180:16 182:14 186:17 192:5 194:17 195:18 195:21,23 198:11 199:4 204:5 211:2
surrounding 11:18,23 150:17
suspect 53:3
suspected 154:9
suspects 99:10
suspension 117:4
swear 7:6
Switching 152:13 178:14
sworn 4:10 7:8 214:6
system 12:3 22:9,10 37:25 38:1 67:14 125:21 130:10 149:13 154:7 155:2 156:17 158:5 160:8 161:1 165:3,15 167:12 177:1 178:20 181:6,7 191:15 206:9
systemwide 170:9

## T

T 2:10 3:1,1
table 62:18
tables 43:15
take 16:3 20:18 27:2 28:25 32:2 34:6 35:7 53:22 54:25 55:8,12 66:7 67:7 80:5 88:4 101:19 103:11 109:23 114:17 114:20 115:5,14

115:24 118:11 123:11 126:15 126:15 128:2 134:18 138:15 140:23 141:2 152:21 155:4,5 164:17,22 168:15 169:7,11 178:22 186:15 186:19 187:10 190:2,10 203:11 210:19
takeaway 89:11
taken 1:12 6:3 31:11 56:21 58:17 95:8 123:3 130:22 131:2 159:19 160:16 198:13 214:7,12 215:13 217:4
takes 66:18 98:17 140:24 162:1
talk 19:14 28:9,9 28:19 29:25 30:20 39:20 53:16 65:17 68:21 69:5,12 71:22 72:10 73:6,15 84:15 87:12 90:5 99:12,13 101:23 104:2 105:8 109:25 113:8 116:18 118:19 124:21 132:14,15 133:3 134:15 148:1 150:20 150:23,25 164:9 166:9 169:2,4 178:9 180:7 188:11
talked 61:2 63:9 70:20 73:1 85:13

94:16 96:4 112:6,21 113:10 113:16 119:11 120:17,18,19 132:12 134:13 135:14 151:9,10 151:10,11 197:8 197:14 207:20
talking 24:18,18 37:6 51:11,11 70:8,11,19 71:17 73:3 86:8 117:2 121:25 122:16 122:16 133:3 158:22 172:5 177:11 191:7 192:13 194:9 201:16
talks 177:9 196:14
tampering 175:17
tangible 81:20
tape 52:17
tapes 80:10
task 179:20
tasks 178:25 180:2
tax 153:17
team 16:8,10 17:4,5,7,8,10 17:22,23 18:1 18:8,11,12 27:9 27:11,16,24 28:13 30:1,20 30:21 70:19,21 73:6 105:1 162:10 168:18
team's 162:16
teams 16:9 17:8 17:18,19,20 18:25 162:10 162:12,14
technically 75:11
teeth 208:11

tell 14:16 19:13 48:6 73:2 74:1 76:20 78:22 78:24 85:18 93:2 99:12 104:1,16 114:16 114:19 115:25 116:1 119:8 121:8 126:13 133:23 134:4 157:2 173:10 199:25 201:13 203:4
telling 103:3 107:16 115:4,6
tells 190:21 204:21
template 125:3 125:16,22
ten 70:17,17 155:15 207:19 209:17
ten-day 65:25
tend 34:14 57:13 62:1 76:11 88:3,3 108:7 166:11,12 192:11
tends 84:20
tenure 172:15
term 138:2
terms 36:19 76:23 81:6 149:14 150:9 152:14 159:24 186:2
terrify 94:7
territories 121:2
testified 63:20 71:23,24 163:19 171:6 177:23 183:21 192:6 211:5 212:21,25
testify 90:12,16 135:12
testifying 7:25

ALARIS LITIGATION SERVICES
www.alaris.us        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-12   Filed 02/09/18   Page 87 of 93

150:7
testimony 7:24
170:12 177:12
177:12 196:7
197:20 214:5
214:7
testing 77:20
192:7
tests 207:9
thank 61:1
145:17 160:6
199:5,21
200:6 215:19
theirselves
174:12
theory 38:19
70:25
thereon 216:9
thereto 214:14
they'd 90:8
92:24 164:24
thing 28:2
38:13 112:24
115:15 168:1,2
180:9 186:5
211:5
things 8:11 9:6
10:17 16:11
18:13 21:12
23:23 24:16
24:19 29:13,13
29:25 36:9
40:12 43:5
47:20 48:24
49:12,13 50:12
52:1,7,11 62:16
68:2 74:16
75:1 78:1,12
80:6 86:18
90:8 91:21,23
91:24,25
93:12 96:19
105:4,9
106:20 107:12
114:7,12 116:12
116:16 117:23
119:3 122:10

138:18 141:1
148:3 149:4,18
150:21 152:4
155:6 159:8
159:22,23
165:12 166:21
169:16 172:7
172:12 177:13
183:17,23
184:17 195:9
196:9,16,16,23
207:9,12
210:13 211:17
212:11
think 7:19 8:11
10:17 13:20
14:17 20:25
22:12,21,22
28:6,8,11,24
29:1 32:12
33:15 35:1
37:20,20,21
37:22 38:12
38:13,15 39:4
39:5,24 40:2
40:6,7,22 41:1
41:15,15 42:2
42:13 43:10
48:11,13,13
49:3 50:6
51:17,20 52:4
52:5,7 55:15
60:18,24 63:11
65:11,15 66:20
67:5,24 68:24
69:16 70:6
71:11 72:3
73:13 74:10
75:11 76:10
77:7 78:23
79:5,9,12,20
79:24 80:14
80:20 81:12
82:7,8 83:17
84:8,11 85:7,8
85:11 86:2
87:17 88:5,6

88:12 89:25
91:6,9,11 92:16
92:21,21 93:9
93:10,15 94:21
95:1,1,2 96:23
98:20 99:8
101:6,7,9,22
101:24 103:5
103:14 104:5
105:6,11,18
107:22 108:15
109:11 110:11,11
110:16 111:8,11
112:3,16,21,25
113:1 115:7,8
116:7,10,25
117:2,2,22
118:9 120:13
120:15 121:21
125:13,24
126:19 127:2,2
128:14 130:21
131:1,10,13,24
131:25 133:1,4
136:17 137:3
137:20,21
138:2,21,21,24
138:25 139:13
140:9 142:16
142:18 145:11
145:14,16
146:17 147:25
148:5 149:15
150:2 151:15
153:12 154:12
157:1 158:7
160:1 163:8,10
163:14,14,20
164:10,15,23
165:11 166:3,6
166:6 167:25
168:16 169:1
170:19 172:3
172:21 173:2,4
174:7 176:16
177:23 179:5
179:22 181:11

181:13,13,19
182:5 183:7,10
185:15 186:3
187:3 188:5,7
188:9,12,12,13
188:19 189:8
189:10,11,12
190:19,20
191:3 192:19
195:11 196:12
203:17 206:13
206:13 207:3
207:6,7
210:22 211:10
thinking 37:7
63:16
thinks 50:2
89:17
third 59:17
172:16
thought 21:9
38:11 63:23
64:6 101:7
114:25 131:13
178:4,7 185:22
thoughts 172:7
thousand 64:25
threaten 115:13
three 15:12
23:23 33:24
42:15 47:24
49:19 53:20
64:5 78:14
122:14 132:13
132:13 151:22
157:18 172:14
190:6 196:9
three-day
166:10
three-year 26:3
threes 27:16
thrilled 164:23
throw 41:10
Thursday
127:15 135:2
136:16
tie 144:21

tied 27:22
time 6:11 9:5,8
12:12 13:6
17:23 18:12
19:23 20:2,7
23:10 31:6,13
34:8 35:5
41:25 43:12
44:20 46:4,19
48:6 49:6,18
51:24 53:4
57:21 58:10
61:22 62:24
63:12 64:9
65:13,16,16
66:5,18 67:4
69:15 71:7
73:24 74:13
75:11 80:5,13
80:14 82:2
83:24 84:3,10
84:18,18 85:14
86:1 87:22
88:16 89:3,5
90:11,17 92:4
92:11 93:6,17
94:22 95:3
96:12 104:4
105:15 107:19
107:20 113:1
115:5 119:8
121:17,20,22
122:6 127:14
135:17 136:17
143:11 146:6
148:24,25
149:12 151:24
152:1,4,10,23
155:11 156:14
157:1 159:8
160:16 167:3
168:15,24
170:23 171:3
172:18 173:11
173:16 177:1,3
178:2,11,25
179:6,8,13,17

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-12   Filed 02/09/18   Page 88 of 93

180:13,15,19
181:1,5,6,7,23
181:25 182:1
187:4 190:22
193:6 202:18
209:20 211:4
211:18
time-consumi ...
78:13
time-keeping
176:25
timekeeping
180:21,24
timely 30:25
34:19 54:7
114:6 211:24
times 23:17
31:10 39:19
57:22 68:22
73:7 88:7
94:3 155:15
182:1 207:5
209:15,18
timing 48:8
60:19,25 66:8
80:8 81:6
timliest 27:4
title 9:16
today 8:12,23
9:11 28:10
119:4 212:21
Today's 6:11
told 54:5 55:9
65:10 107:2
129:19 151:16
210:14
ton 120:9 171:7
tool 27:12
top 27:6,8
59:24 94:4
114:15 120:5,6
120:10
topic 25:3
169:21
topics 24:18
Torrence 118:25
134:21 141:11

189:24 190:21
total 133:15
146:12
touch 28:14
96:1 119:17
touched 54:9
touches 28:12
tough 39:19
114:15
track 165:1
166:12 179:13
180:1,11 181:1
181:13,23,25
182:9
tracked 179:21
179:24 180:2
181:8 182:1
tracking 177:1,2
178:25 179:6
179:8,16 181:4
181:7
tracks 94:16
156:15 166:5
166:14
train 166:16
trainer 20:3
28:2
trainers 24:4
training 20:4,6
23:11,13,15,20
24:2,3,5,13
25:5,8 28:4
28:12 73:14
92:5 94:13,16
104:22,23,25
105:5,10
131:25 166:1,5
166:10 181:23
trainings 24:6
104:20 130:14
133:2 165:16
165:21,25
166:25
transcribed 6:5
transcript 3:6
141:25 215:15
transfer 26:12

transfers 22:21
22:22,23
26:10,11
travel 184:15,19
tremendous
16:12 20:2
trend 147:17
149:9 150:2
trends 149:13
150:1
triage 62:19
65:15
trial 9:18 10:6
16:10 17:4,10
20:4 21:10,11
21:19 22:24
23:1 25:23
26:1 27:6,9,11
30:3,4,5,5
31:2,7,14,20
32:3,11,14,20
32:21,22 33:2
35:24 39:21
47:22 50:4,10
50:13 57:6,8
62:20,25 63:1
63:15,21
64:24 65:4
65:20 66:1,23
67:20 68:1,3
70:9,15,23
72:6,8,9 73:2
76:25 79:10
79:14,16 80:16
81:3 82:6,8,11
82:11,20 83:3
83:20,25
90:12,20,25
91:8 92:18
102:2,17,19,20
102:21,22
105:14 109:21
109:22 113:10
134:3,8 152:10
167:1,2,3,24
168:19 174:4,5
176:4 195:12

209:1 210:22
215:18
trials 30:22
62:21 65:2,3
82:13,14 105:4
195:10
trick 159:13
188:7
tricky 153:11
tried 31:20
51:23 55:13
64:24 68:2
82:17,22 151:1
134:25 135:10
150:5 173:6
tries 78:6
triggered 56:19
true 26:7 39:13
57:18 74:9
80:21 81:6
113:13 149:5
153:13 204:11
213:8 216:8,10
trust 62:13 63:8
63:9
truth 28:10 107:1
210:14
truthfully 7:23
try 30:2,3 34:19
57:7 78:7
82:19 90:5,10
98:12 101:24
110:11 111:11
130:12 134:19
139:1 151:24
158:12 160:17
162:17 206:15
211:1
trying 22:21
31:16 67:21
90:18,24
100:12 111:5
138:2 143:4
144:21 159:13
159:16
turn 201:12
turned 77:12

78:3
Turner 123:14,15
turning 168:7
183:19 192:21
193:12,24
194:11
turnover 19:3,19
21:25 27:20
28:23 32:2
38:8 162:22
163:10 167:8
tweaked 211:7
twice 41:19 113:1
207:7
two 11:13 12:20
12:24 13:7
20:19,20,24
22:12,22 23:6
25:22 26:24
26:25 29:6
33:12 41:3,20
42:15 44:21
53:15,16 73:1
82:8 85:25
99:20 104:5
105:11,18
106:12 121:6
122:13 130:13
138:12 150:7
156:15 169:13
179:8 187:23
188:8 195:10
198:1 207:7
210:5
twos 24:24,25
26:14
type 21:21 27:3
40:9 103:11
148:8 149:11
149:20,21
154:7 158:21
165:8 167:20
180:13,13
186:2,14 196:4
types 14:12
23:22 86:8,10
86:15 147:23

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-12   Filed 02/09/18   Page 89 of 93

148:6 149:9,14
151:3 182:12
**typewriting** 6:6
214:9
**typical** 182:18
**typing** 42:21
_____

**U**

**Uh-huh** 25:13
29:20 44:8
55:22 58:25
59:8,19,22
61:4 82:12
95:12 97:18
100:17 112:8
119:18 136:22
137:8 141:12
147:10 150:10
153:24 154:23
155:25 156:18
156:24 157:7
157:16,24
158:24 161:15
161:23 162:3
163:2,23
165:23 168:9
170:13 171:23
173:18 175:11
179:12,18
182:23 183:24
185:8 186:25
187:17,25
192:9,25
193:14 194:13
196:2,5 197:4
197:18 204:17
205:16 208:2
**ultimate** 34:7
35:20 89:11
**ultimately**
33:24 116:2
210:15
**unable** 62:15
157:5 168:25
**unaware** 36:15
**uncharted** 121:2
**unclassified**

83:9
**unclear** 195:21
**uncomfortable**
174:21,22
**unconstitutio ...**
188:12
**uncover** 69:1
**under-reporti ...**
181:3
**undercut** 187:8
187:13
**undergo** 96:6
**undergrad** 11:4
11:6
**underlined**
142:7
**underlying**
159:12
**underreported**
180:23
**understand**
7:25 8:7 44:14
64:14 72:4
76:23 90:6,14
114:12 142:5
146:9 159:16
165:15 166:20
196:7 202:3
**understanda ...**
118:3
**understanding**
11:24 36:22
86:21 101:2
102:3 109:5
111:13 113:24
114:3,8 119:11
120:12 121:23
122:21 130:10
139:8 153:19
156:15 167:17
168:2 173:15
187:6 188:23
189:20 197:20
199:14 205:13
206:12
**Understood**
17:3

**undertake** 31:18
145:2
**unemployed**
204:8 205:17
**unemployment**
148:23 149:3
**unfile** 104:4
**unfortunate**
143:6
**Union** 4:11 6:18
**United** 1:1 4:1,16
6:15 89:7
**unlawful** 138:25
**unofficial** 171:3
**unrepresented**
46:19 50:21
50:25 52:8
**unsure** 185:6
**update** 91:25
207:4
**updated** 177:9
207:5,6
**upper** 28:25
34:1 35:21
37:6,11,14,18
52:8 67:8
78:12 172:6
172:24 178:19
184:2 188:25
**upset** 55:14
117:3 197:9
**uptick** 149:10
**use** 13:8 17:19
17:24 35:11
36:7 42:17
73:24 74:5
75:17 78:1
80:19 98:15
112:7 132:11
168:7 171:11
177:1 178:13
**useful** 43:6
**usually** 16:19
24:20,20
32:3 44:21,22
46:4,6,22,24
47:12,23

50:10 51:9
57:12 58:5
61:11 72:5
80:2 83:6
91:8 98:17
104:25 110:9
133:24 153:10
153:10 165:6
170:6,15 184:8
211:19 212:11
**utilize** 183:22
189:1
**utilized** 176:25
188:2
**utilizing** 18:10
178:3,7
_____

**V**

**v** 2:13 192:24
215:10 217:2
**vacation** 24:24
**valid** 128:15
**valuable** 31:17
178:1
**varied** 34:8
**varies** 28:6,14
39:10 40:8
43:22 53:15
**variety** 29:25
77:3 120:17
131:20 165:13
166:5,9
**various** 13:10
159:18 165:16
167:18,19
183:22
**vary** 17:23 85:18
**verbally** 8:15
**vernacular**
185:7
**version** 80:4
116:22
**versus** 6:14
36:8,8 43:13
51:24 89:8
146:24 147:13
147:13 172:25

181:10 186:15
**vertical** 172:15
173:12 175:9
175:15 176:14
176:22,23
190:20
**victim** 107:1
**video** 1:11 4:9
6:12 16:11,12
16:15 80:5
84:13 93:11
**videographer**
5:19 6:10,20
7:5 58:16,18
95:7,9 123:2,4
145:20,22
198:12,14
213:13
**videos** 16:16
**videotaped**
99:15
**Vietnamese**
76:13
**views** 165:3,14
**violation** 29:7
44:6 103:4
134:23 139:4
140:10,11
144:16,18 168:1
**violations** 31:6
31:9,12,25
32:5 114:2
**violent** 149:16
**virtually** 62:22
**visit** 67:17,25
**visitation** 61:24
61:25
**voir** 24:18 102:4
102:11,14
**voluntarily**
169:4
**votes** 17:24
**vs** 1:5 4:5,18
_____

**W**

**Wade** 100:2,4
**wait** 206:21

**ALARIS LITIGATION SERVICES**
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-12   Filed 02/09/18   Page 90 of 93

waiting 126:5
127:10 128:13
128:23 143:17
144:8 179:25
waits 66:6
waive 49:20
53:2 83:15
waived 26:8
83:11,13,21
89:19
waiving 90:16
wake 134:17
walk 20:5
152:17 172:2
209:12
walk-ins 152:21
want 10:10 13:4
25:1,10 28:1
34:18 37:8,21
38:12,21 41:18
46:1 47:21
49:3 55:16
65:18,24
71:22 90:11,13
91:1,9,12 92:4
98:7,10,25
99:2,11 100:24
101:17 104:2
107:16,17,17
108:4 117:11
121:4,5 127:15
128:16 130:11
131:14 132:14
132:15 137:13
138:23 146:8
164:12 169:17
169:18,19
171:16,20,21
172:8,25
174:5,17 175:4
183:9 184:5
188:5 198:2,9
199:10,24
201:8,21
209:4
wanted 9:7
23:19 44:17

50:4 52:10
60:22 118:1
134:15,23
138:6 139:8,8
142:2,2,4,4,11
169:6,10
172:20 192:18
196:18 199:3
wanting 47:17
63:2 117:12
134:3 171:11
wants 38:14,15
101:25 157:23
174:19
wasn't 9:6,6
19:23 22:24
22:25 23:7
31:22,23
75:10 102:11
104:8 117:11
118:7,7 122:5
122:9 136:24
138:19 169:13
175:23 190:5
196:15,19,19
196:24 197:13
197:14
waste 17:1
watch 80:5
115:15 186:10
watched 79:25
Waters 121:14
122:8
wave 161:21
way 22:16,17
29:11 31:19
33:23 43:9
61:19 67:2
69:16 78:8
80:2 98:23
99:23 101:22
105:21 106:1
107:6 126:13
128:23 129:7
133:20 159:20
163:22 165:9
169:1 176:11

182:9,16 194:5
195:12 196:22
197:13 208:15
ways 146:8
150:2 165:12
189:22
we'll 10:19 16:6
20:12 38:24
38:25 46:5
48:23 53:16
65:19 118:19
130:6 156:20
184:23 190:8
we're 10:8 11:20
15:14 20:3
22:9 26:2
37:25 43:23
47:19,25 54:6
54:7,10,21
55:16,16 56:21
67:20 70:8
73:3 78:9
82:7,7,8 96:13
98:4 101:9
102:20,22
103:4,17 119:14
121:25 126:16
127:4 128:5
133:2 139:1
142:25 147:7
152:6 155:23
155:23 158:22
160:13,14,19
163:7 164:11
167:8 172:12
174:11,12,23
175:6 177:2,11
184:24 190:7
206:14
we've 12:5
13:22 41:9
48:25 49:1
51:23 53:23
54:4 56:21
72:12 76:13
77:7 94:3
100:20,21

112:11,11,16
120:6,6 127:2
133:1 145:15
146:6 149:19
174:6,14,16,18
174:19,19,22
176:22 185:4
211:2
weapon 150:4
wear 208:17
website 125:14
153:1
Wednesday
144:15
week 63:18
137:20 162:10
162:12,14,15,16
162:16,19
190:3
weekend 45:2
weekly 92:9
119:12
weeks 20:19,20
21:5 46:23
47:24 109:22
197:23
weigh 39:6
51:24
weight 26:14
weird 116:21
149:17
went 11:6 69:11
91:12 92:19
107:21 122:8
135:5,7 141:5
173:4 176:22
179:21 180:11
189:7 190:15
195:12 197:11
weren't 21:11
51:25 52:1
77:6 90:1
92:21 115:23
117:10 118:4
122:3,6,21
154:13 163:16
181:4

West 4:12 5:11
5:16 215:8
western 1:1 4:1
4:16 6:16 136:1
white 148:18,21
148:23 149:5
149:6
who've 115:7
wide 120:16
wiggle 103:16
118:7
Williamson 2:4
2:8 5:4 6:24
6:24 7:11,16
58:14,19 95:6
95:10 122:25
123:7 137:13
137:15 145:15
151:20 195:4,6
198:1,4,8,11
206:20,22
208:19,21
213:12 215:23
win 102:19,19
withdraw 101:17
101:25 103:3
142:1 154:12
161:10,16,20
174:20 210:4
210:5
withheld 86:2
117:10
witness 2:2 6:6
7:6 16:13,15
63:10 65:2,5
66:23 68:25
99:22 169:23
177:19 195:5,7
205:6 214:5,7
215:15 217:1,1
217:24
witnessed 53:4
witnesses 47:2
57:17 64:18,23
65:9,14 66:13
68:11,13,19
69:1 71:23

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-12    Filed 02/09/18    Page 91 of 93

84:15 85:12
88:17 110:16
112:7 168:21
**woman** 105:7
156:10
**word** 113:24
132:11 141:16
171:21
**words** 29:22
32:20 106:19
180:20
**work** 12:21 14:5
18:23,23 19:17
20:4,10 24:2
24:8 31:11,23
33:23 34:24
41:13 42:23
43:12,13 54:7
54:19 69:11,23
75:8 84:5,20
87:6,12 108:7
112:10 119:4
120:9,11
124:20 126:10
135:18 144:13
151:23 161:7,11
164:24 174:15
174:19 179:23
181:4,10
**worked** 23:6
116:13 191:19
**worker** 108:12
108:14 110:18
**workers** 15:15
74:21
**working** 24:12
26:2 41:24
43:3 62:20
85:15 133:9
144:14 153:9
180:25
**workload** 20:24
150:16 165:25
196:10
**workloads**
150:14
**works** 36:23

**world** 40:1 41:2
87:19
**worried** 181:1
197:9
**worry** 181:2
**worthwhile**
188:16
**wouldn't** 43:18
67:18 70:13
71:19 94:9
95:19,21 149:5
158:15 177:21
196:12 204:21
208:14,15
**wreak** 134:9
**writ** 2:16,19
125:4 135:15
135:19,23
136:5,14,16
210:17,25
**write** 19:1 25:19
25:19 29:1,14
33:11,14,25
43:15 46:1
75:13 86:12
98:8 108:16
140:12 190:16
**writing** 30:18
125:12 189:21
**writted** 210:21
210:24 211:4
**written** 9:3
25:25 71:2
80:2
**wrong** 56:19
136:24 187:7,7
**wrote** 55:9
134:20

---

**X**

**X** 2:1,10 3:1

---

**Y**

**yeah** 17:1 38:18
52:22 53:5
60:8 65:15
68:7 71:15

79:24 82:25
83:6 85:6
86:20 93:19
100:4 105:22
116:10,10,10
120:13 121:21
139:16 142:2
144:14 152:2
157:22 158:2
164:20 167:25
178:22 180:17
182:14 192:16
193:8 195:7
197:6 200:9
203:17 208:7
**year** 11:17 16:4
19:5 22:21
25:16 26:17
28:24 43:21
43:22,22 44:4
44:10 50:13
64:24 73:1,19
82:6,9,23,23
94:4 104:23
104:24 105:15
106:3 132:1
163:13 184:1
184:24 186:4
186:7,11 192:1
**yearly** 120:1
**years** 13:3 14:21
23:6 25:22
26:25,25
27:5 37:4
39:21 45:12,17
75:7 105:16
109:1 111:24
116:13 120:8
149:8,22
176:23 179:1,5
179:6 182:2
207:7,19
**yellow** 68:22
**Yep** 153:21
**Yesterday** 9:1
**York** 5:6,6

---

**Z**

---

**0**

**06** 59:25
**063** 122:22
**09** 108:24

---

**1**

**1** 2:12 11:20 12:4
12:13 21:22
25:12,15,16
26:4,6 29:1
54:2 58:21,22
137:3 184:23
**1,000** 41:24
**1.800.280.33 ...**
5:24
**1:49** 198:12
**1:52** 198:14
**10** 2:23 108:24
199:22,25
**10,000** 165:11
**10/2/2017** 2:14
**10:17** 58:16
**10:27** 58:18
**100** 5:16 35:3,8
44:11 54:9
65:6 106:4,6,7
116:20 120:15
154:24 164:23
215:8
**1000** 5:16 215:8
**10004** 5:6
**11** 3:3 9:22 109:1
201:6,9
**11:21** 95:7
**11:25** 95:9
**110** 55:16
**12** 3:4 203:1,4
207:1
**12:08** 123:2,4
**12:42** 145:20,22
**123** 2:14
**124** 2:15,17
**125** 5:5
**129** 2:18
**13** 59:16 134:21

141:10
**1353** 5:21 6:4
214:18 215:22
**136** 2:20
**137** 2:21
**139** 2:22
**14** 37:4
**145** 2:5
**15** 28:24 40:3
132:5 133:15
151:23
**15th** 134:22
**16** 10:7,8,11,11,13
10:18 11:9,11,12
82:7 127:18,19
130:25 146:19
176:14
**1608** 5:23 215:2
**16th** 10:13,16
12:10
**17** 141:21 162:25
**17-04057-CV- ...**
1:5 4:5 6:15
**18** 15:2 183:1
200:2
**18th** 5:5 135:6
**19** 215:4
**198** 2:6
**199** 2:24
**1997** 11:1
**1998** 10:1
**1s** 25:1 148:16,16

---

**2**

**2** 2:13 25:18,21
88:20,21
192:23 204:5
204:6,14,16
**2:00** 38:25
**2:08** 213:13,15
**20** 28:25 39:21
40:3,14 58:6
116:13 132:5
133:15 140:17
153:18 163:15
175:20 176:22
**20-plus** 149:8

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-12    Filed 02/09/18    Page 92 of 93

**20,000** 154:15
**2002** 59:16
**2009** 163:16
**201** 3:3
**2011** 32:13
  179:11
**2012** 121:21
  122:3 176:22
  187:16 196:19
**2013** 187:18
  193:5
**2016** 82:14
  162:24
**2017** 1:13 4:10
  6:11 163:1
  215:4,13
  216:15 217:4
**203** 3:5
**206** 2:7
**207** 5:11
**208** 2:8
**20th** 142:8
**212.607.3300**
  5:6
**21st** 142:10
**24** 163:9
**25** 40:13
**250** 127:15,20
**29** 13:3 14:21
**2s** 25:1,12,21

---

### 3

**3** 2:14 26:2,21
  123:5,8 193:12
  193:13 205:1
**30** 35:9 40:7
  98:16 163:15
  175:20 190:9
**300** 120:13
**32** 13:24
**33** 27:14
**34th** 4:12
**35** 13:13,14 18:16
  19:6 39:23
  40:23,24
  183:1
**39** 124:16,21

---

### 4

**4** 2:15 26:22
  27:10 53:23
  53:25 54:1,22
  55:1 56:5,14
  56:18 114:2
  121:3 124:4,7
  124:22 134:25
  135:12,21
  138:4,22
  140:11 150:17
  151:17 172:17
  188:6,9 189:9
  189:18 191:2
  193:24 196:14
**40** 28:25 40:7
  142:25 164:14
  164:16,17
**406** 4:12
**4100** 41:22
  164:11
**420** 4:12
**45** 9:2
**48** 82:9
**49** 82:9

---

### 5

**5** 1:13 2:16 4:10
  6:11 124:24
  125:2 194:12
  215:13 217:4
**5,000** 16:3
  43:24 106:5
  207:10,17
**50** 12:16 41:10
  41:20 192:1
**500** 36:1 44:4
**573.526.5212**
  5:17
**573.751.3321**
  5:12
**58** 2:12
**59** 64:24,25
  82:5,14

---

### 6

**6** 2:18 129:21,24

  194:11
**6,000** 16:3,4
**6/14** 59:25
**60** 41:20
**600** 120:22,25
  121:12 138:4
  155:4 186:23
  189:3 197:16
**600.036**
  135:23
**600.063** 121:1,6
  137:4,21 187:11
**64108** 5:23
  215:3
**64111** 4:13
**65102** 5:11
**65203** 5:17
  215:9

---

### 7

**7** 2:4,19 5:16
  136:2,5 215:8
**75** 12:16 43:14

---

### 8

**8** 2:21 137:5,7
  137:22
**80** 44:11 157:8
**816.221.1160**
  5:24
**88** 2:13

---

### 9

**9** 2:22 139:22
  139:24
**9:00-ish** 146:9
**9:05** 6:9,12
**90** 44:11 98:18
  157:9
**99** 47:3

**ALARIS LITIGATION SERVICES**
www.alaris.us    Phone: 1.800.280.3376    Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-12   Filed 02/09/18   Page 93 of 93