# Exhibit L

## Page 1

1          UNITED STATES DISTRICT COURT
         WESTERN DISTRICT OF MISSOURI
2              CENTRAL DIVISION
3
4   SHONDEL CHURCH, et al.,  )
                  )
5      Plaintiffs,  )
                  )
6      vs.      ) Case No.
           ) 17-04057-CV-C-NKL
7   STATE OF MISSOURI, et al., )
                  )
8      Defendants.  )
9
10
11
12
13
14     VIDEO-RECORDED DEPOSITION OF MARY FOX
15     TAKEN ON BEHALF OF THE PLAINTIFFS
16         DECEMBER 19, 2017
17
18
19
20   (Starting time of the deposition:  8:57 a.m.)
21
22
23
24
25

## Page 2

1         I N D E X
2   QUESTIONS BY:         PAGE
3   MR. MAUNE            7
4   MR. MOORE           103
5   MS. SHIPMA          187
6   MR. MOORE           193
7   MS. SHIPMA          194
8   MR. MOORE           195
9        E X H I B I T S
10   EXHIBIT            PAGE
11   Exhibit 11  Previously marked exhibit    25
12   Exhibit 12  Previously marked exhibit    25
13   Exhibit 28  Previously marked exhibit    29
14   Exhibit 21  Previously marked exhibit    32
15   Exhibit 32  Order Concerning Probation    35
16          Revocation Hearing
17   Exhibit 1   Previously marked exhibit    42
18   Exhibit 6   Previously marked exhibit    77
19   Exhibit 5   Previously marked exhibit    89
20   Exhibit 33  State of Missouri Public    100
21          Defender Commission Fiscal Year
22          2017 Annual Report
23   Exhibit 34  St. Louis Post-Dispatch article  102
24   (The original exhibits were retained by the court
    reporter to be attached to the original and copies
25   of the transcript.)

## Page 3

1         UNITED STATES DISTRICT COURT
        WESTERN DISTRICT OF MISSOURI
2             CENTRAL DIVISION
3
4   SHONDEL CHURCH, et al.,  )
                )
5      Plaintiffs,  )
                )
6      vs.     ) Case No.
          ) 17-04057-CV-C-NKL
7   STATE OF MISSOURI, et al., )
                )
8      Defendants.  )
9
10     VIDEO-RECORDED DEPOSITION OF MARY FOX,
11   produced, sworn and examined on December 19, 2017,
12   between the hours of eight o'clock in the forenoon
13   and two o'clock in the afternoon of that day, at the
14   ACLU of Missouri Foundation, Suite 1130, 906 Olive
15   Street, St. Louis, Missouri 63101, before William L.
16   DeVries, a Certified Court Reporter (MO), Registered
17   Diplomate Reporter, and Certified Realtime Reporter,
18   in a certain cause now pending in the United States
19   District Court, Western District of Missouri,
20   Central Division, between SHONDEL CHURCH, et al.,
21   Plaintiffs, vs. STATE OF MISSOURI, et al.,
22   Defendants: on behalf of the Plaintiffs.
23
24
25

## Page 4

1        A P P E A R A N C E S
2   For the Plaintiffs:
3     Mr. James J. Maune
    Orrick, Herrington & Sutcliffe LLP
4     2050 Main Street, Suite 1100
    Irvine, California 92614
5     (949) 491-5616
    jmaune@orrick.com
6
7     Ms. Camille Joanne Rosca
    Orrick, Herrington & Sutcliffe LLP
8     51 West 52nd Street
    New York, New York 10019
9     (212) 506-3750
    crosca@orrick.com
10
11   For the Public Defender Defendants:
12
    Ms. Jacqueline Shipma
13     Missouri State Public Defender
    Woodrail Center
14     1000 West Nifong
    Building 7, Suite 100
15     Columbia, Missouri 65203
    (573) 525-5212
16     jacqueline.shipma@mspd.mo.gov
17
18   For the State of Missouri and
  Governor Greitens:
19
    Mr. Justin C. Moore
20     State of Missouri
    Attorney General's Office
21     815 Olive Street, Suite 200
    St. Louis, Missouri 63101
22     (314) 340-3447
    justin.moore@ago.mo.gov
23
24
25

1 (Pages 1 to 4)

**ALARIS LITIGATION SERVICES**
**www.alaris.us**        **Phone: 1.800.280.3376**        **Fax: 314.644.1334**
Case 2:17-cv-04057-NKL   Document 153-13   Filed 02/09/18   Page 2 of 85

## Page 5

1
2          Also present:
           Mr. David Doell, Videographer
           Alaris Litigation Services
3          711 North Eleventh Street
           St. Louis, Missouri 63101
4          (314) 644-2191
           1-800-280-3376
5
6
7
8
9
10
11
12         Court Reporter:
           William L. DeVries, RDR/CRR
13         Missouri CCR #566
           Alaris Litigation Services
14         711 North Eleventh Street
           St. Louis, Missouri 63101
15         (314) 644-2191
           1-800-280-3376
16
17
18
19
20
21
22
23
24
25

## Page 6

1          IT IS HEREBY STIPULATED AND AGREED by
2   and between counsel for the Plaintiffs and counsel
3   for the Defendants that this deposition may be taken
4   in shorthand by William L. DeVries, RDR/CRR, a
5   Certified Court Reporter and Certified Shorthand
6   Reporter, and afterwards transcribed into
7   typewriting: and the signature of the witness is
8   expressly reserved.
9                *  *  *  *  *
10         MARY FOX,
11  of lawful age, produced, sworn and examined on
12  behalf of the Plaintiffs, deposes and says:
13         (Starting time of the deposition:  8:57 a.m.)
14         VIDEOGRAPHER:  We are now on the
15  record.  Today's date is December the 19th, 2017.
16  The time is approximately 8:57 a.m.  This is the
17  video-recorded deposition of Mary Fox in the matter
18  of Church, et al., versus the State of Missouri,
19  et al., case number 17-04057-CV-C-NKL, in the United
20  States District Court for the Western District of
21  Missouri.
22         This deposition is being held at the
23  St. Louis ACLU.  The reporter's name is Bill
24  DeVries.  My name is David Doell, and I'm the legal
25  videographer.  We are here with Alaris Litigation

## Page 7

1   Services.
2          Would the attorneys present please
3   introduce yourselves?
4          MR. MAUNE:  James Maune for plaintiffs.
5          MS. ROSCA:  Camille Rosca for
6   plaintiffs.
7          MR. MOORE:  Justin Moore for the
8   Attorney General's Office.
9          MS. SHIPMA:  Jacqueline Shipma for the
10  MSPD defendants.
11         VIDEOGRAPHER:  The court reporter
12  please swear in the witness and we may proceed.
13         COURT REPORTER:  Do you swear or affirm
14  that the testimony you are about to give in this
15  proceeding will be the truth, the whole truth, and
16  nothing but the truth?
17         THE WITNESS:  I do.
18              EXAMINATION
19  QUESTIONS BY MR. MAUNE:
20       Q.  Morning, Ms. Fox.
21       A.  Good morning.
22       Q.  Have you had your deposition taken
23  before?
24       A.  I have.
25       Q.  I'll just cover a few basic ground

## Page 8

1   rules.  If you could please answer your questions
2   with a verbal response, not with hand gestures or
3   head shakes.
4        A.  Okay.
5        Q.  We'll try and avoid talking over each
6   other.  I'll try -- and if you let me try and
7   complete the question before answering, even if you
8   can anticipate the answer, and I'll try not to talk
9   over you by asking another question.  Does that
10  sound reasonable?
11       A.  That sounds reasonable.
12       Q.  If you don't understand one of my
13  questions, please let me know and I'll rephrase or
14  be more specific as necessary, and if -- we'll
15  frequently take breaks during this as we need to,
16  and if you could please answer any pending questions
17  prior to the break.
18       A.  All right.
19       Q.  All sound agreeable?
20       A.  Yes.
21       Q.  All right.  How did you prepare for
22  this deposition today?
23       A.  I met with Ms. Shipma yesterday.
24       Q.  And who else was present?
25       A.  No one.

2 (Pages 5 to 8)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-13   Filed 02/09/18   Page 3 of 85

## Page 9

1  Q.  How long did you meet for?
2  A.  Maybe an hour.
3  Q.  Did you review any documents in
4  preparation for this deposition?
5  A.  Not while she was present, but I did
6  look at the case management database.
7  Q.  Okay.  Did you bring any of those
8  documents with you today?
9  A.  I did not.
10  Q.  Did any of those documents refresh your
11  recollection in preparation for offering testimony
12  here today?
13  A.  I don't -- I already knew the facts
14  that were in them.  I was just looking at the actual
15  numbers.
16  Q.  Besides your counsel, did you speak
17  with anyone else to prepare to testify here today?
18  A.  No.
19  Q.  And can you please state your position?
20  A.  I'm the district defender for the
21  St. Louis City trial office of the Missouri State
22  Public Defender System.
23  Q.  And how long have you held that
24  position?
25  A.  Ten years.

## Page 10

1  Q.  And what was your position prior to
2  that?
3  A.  Prior to that I was in private practice
4  doing contract work for the St. Louis city juvenile
5  court representing parents who were facing the loss
6  of their children in care and protection cases.  And
7  in addition doing some other legal work, mainly
8  around juvenile court.
9  Q.  And how long were you in private
10  practice for?
11  A.  So in that position I was there from
12  2000 until 2007.
13  Q.  And what was your employment prior to
14  the year 2000?
15  A.  So from 1994 until 2006 I was the
16  traffic commissioner for the 21st Judicial Circuit.
17  That was a part-time job.  So part of the time that
18  was all that I was doing and another part of the
19  time I was also handling the contract work.
20  And then prior to that -- or during
21  that same time I should say I was also serving as a
22  hearing officer for the St. Louis Metropolitan
23  Police Department internal affairs division hearing
24  disciplinary cases for the Board of Police
25  Commissioners.

## Page 11

1  Q.  And prior to 1994 did you have any
2  other legal jobs?
3  A.  Yes.  From nineteen eighty -- 1981
4  until 1987 I was a assistant public defender
5  initially in the Clayton office and then in 1986 I
6  transferred to the St. Louis City trial office.  And
7  prior to that I was an associate at a small civil
8  firm named Kanefield, K-A-N-E-F-I-E-L-D, and Mohme,
9  M-O-H-M-E.
10  Q.  Okay.  So you said from -- you
11  testified that 1981 to 1987 you were an assistant
12  public defender in the Clayton office.  Did you have
13  any legal jobs prior to 1981?
14  A.  Yes.  At Kanefield & Mohme.
15  Q.  Okay.  Kanefield & Mohme.  And when did
16  you start at Kanefield Mohme?
17  A.  Right after I was sworn in.  So
18  October 1980.
19  Q.  Okay.  Great.
20  A.  But I was in the Clayton office and the
21  St. Louis City office.  From '86 to '87 it was the
22  St. Louis City office.
23  Q.  And when you were at Kanefield & Mohme
24  did you handle criminal defense?
25  A.  No, I did not.

## Page 12

1  Q.  What type of practice did you maintain?
2  A.  It was civil.
3  Q.  Civil.
4  A.  Small civil actions generally.
5  Q.  Which counties are included in your
6  district?  That would be area 22, correct?
7  A.  So the district covers the City of
8  St. Louis.
9  Q.  Okay.
10  A.  Prior to July of 2017 we also handled
11  conflict cases from the surrounding jurisdictions.
12  And we still have many of those conflict cases
13  pending.
14  Q.  And so after July 2017 any new conflict
15  cases are no longer handled by public defenders in
16  the St. Louis City office; is that correct?
17  A.  Unless the new conflict case is for a
18  client that we currently represent in one of those
19  conflict counties, then we get the new case also.
20  Q.  We'll talk about conflicts more later
21  on.  How is -- how is your office organized?  How
22  many -- we'll start off with how many district
23  public defenders do you have in your office,
24  attorneys?
25  A.  So there are 30 attorneys in the

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

Page 13

1 office.
2    **Q.**  Okay.  And do you organize by case team
3 or do you have an assistant and -- and how -- are
4 those attorneys broken up into different teams or
5 are they just assigned individual dockets?
6    A.  They are assigned to cases.
7    **Q.**  Assigned to cases.  And do you handle
8 that assignment yourself?
9    A.  I do.
10    **Q.**  Do -- do you have any -- an assistant
11 district defender in area 22?
12    A.  I do.
13    **Q.**  And what does -- do you task the
14 assistant district defender with?
15    A.  Currently she is -- it is Sarah Johnson
16 is the deputy district defender.
17    Q.  Okay.
18    A.  And she is also MSPD's director of
19 juvenile justice and policy.  So she spends about
20 50 percent of her time on that responsibility.  The
21 other 50 percent of her time is spent training the
22 new attorneys.
23    **Q.**  Does she maintain a docket of cases?
24    A.  She had a docket prior to assuming this
25 position, and she is still resolving many of those

Page 14

1 cases.  The hope is that she will not have a docket
2 once those cases are resolved.
3    **Q.**  Okay.  Do you maintain a docket of
4 cases?
5    A.  I don't maintain a docket, but I have
6 clients who have cases.
7    **Q.**  Okay.  Do you know how many clients who
8 have cases that you handle in any given year on
9 average?
10    A.  I would say it averages anywhere
11 between 15 to 30.  Open at one time.
12    **Q.**  Right.
13    A.  So over the course of a year maybe 20
14 to 40.
15    **Q.**  Do all -- so that would leave 28
16 additional public defenders in your office; is that
17 correct?
18    A.  Correct.
19    **Q.**  And do all the public defenders handle
20 felony cases?
21    A.  Yes.
22    **Q.**  And all of them handle misdemeanor
23 cases?
24    A.  Yes.
25    **Q.**  And how do you assign juvenile cases?

Page 15

1    A.  So Sarah Johnson was our juvenile
2 specialist.  She's been trained as a juvenile
3 specialist.  So we're in the midst of a transition.
4 Prior to her assuming this new position the cases
5 were assigned either to her or to another attorney
6 who had been trained in juvenile.
7    We're now training an additional group
8 of attorneys and I actually have a meeting today
9 with those who are interested in becoming juvenile
10 practitioners.
11    **Q.**  So currently aside from Sarah Johnson,
12 are there any attorneys that are specifically
13 designated to handle juvenile cases?
14    A.  Not only juvenile cases.  So they would
15 have juvenile cases, but also adult cases.
16    **Q.**  Okay.  And you're anticipating the
17 number of attorneys trained specifically for
18 juvenile cases to increase after further training?
19    A.  Correct.
20    **Q.**  And -- but you don't anticipate having
21 any of those attorneys exclusively working on
22 juvenile cases, it will be in addition to adult
23 cases, correct?
24    A.  Correct.
25    **Q.**  Okay.  How many of your attorneys

Page 16

1 handle probation revocation cases?
2    A.  All of them.
3    **Q.**  All of them.
4    A.  Including myself.
5    **Q.**  How many handle direct appeals?
6    A.  We seldom handle direct appeals.  There
7 are times when there is a case that we lose at trial
8 that we choose to keep the appeal ourself.  I think
9 we've done that three times in the last year.
10    **Q.**  So normally in cases that your public
11 defenders have handled, your representation would
12 end after filing the notice of appeal; is that
13 correct?
14    A.  Correct.
15    **Q.**  And then the appellate division would
16 normally take over the case if it were to continue?
17    A.  Correct.
18    **Q.**  Correct.  Are there any other types of
19 cases that are handled by your office that I have
20 not mentioned?
21    A.  We've filed several writs that have
22 come out of felony cases.
23    Q.  Okay.
24    A.  We have handled some unconditional
25 release cases and we have handled some habeas cases

4 (Pages 13 to 16)

**ALARIS LITIGATION SERVICES**
www.alaris.us      Phone: 1.800.280.3376      Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-13   Filed 02/09/18   Page 5 of 85

## Page 17

1   as a result of mental health confinement.  And then
2   we also have a few cases that we classify them as
3   either witness or possible case where someone comes
4   and applies for services, but a case has not yet
5   been issued.
6           Q.   Okay.  Trying to get a feeling for the
7   experience level of the attorneys in your office.
8   How -- how long is the most experienced lawyer in
9   your office been practicing law?
10          A.   So that would be me.
11          Q.   Correct.
12          A.   Since 1980.
13          Q.   And then how about after you, who is
14  the -- I guess the second most experienced?
15          A.   That would be Matthew Waltz, and he has
16  been practicing for 13 years.
17          Q.   And then how long has the least
18  experienced attorney in your office been practicing
19  law?
20          A.   So we have three attorneys who were
21  just licensed in October.  Or September.  I think
22  they moved it up to September.
23          Q.   And how do the other attorneys fall in?
24  Would you say the majority have more -- the majority
25  of the rest of the attorneys have more or less than

## Page 18

1   ten years of experience practicing?
2           A.   Significantly less.
3           Q.   Significantly less.  Okay.  When you're
4   assigning cases, can you go over how when new cases
5   come in your process for assigning them to the
6   attorneys in area 22?
7           A.   So when an application comes in it goes
8   to a legal assistant.
9           Q.   Okay.
10          A.   And the legal assistant evaluates the
11  application and does a Case.net search to find out
12  more information about that case and about that
13  person.  Such as do we already represent them, do we
14  represent a co-defendant, does that case -- that
15  person have another case in which a private attorney
16  is involved?
17               And then based upon the information in
18  the application and that Case.net search, that legal
19  assistant makes an indigence determination.  Once
20  the indigence determination is made, the application
21  as well as the complaint or information or
22  indictment and the Case.net entries is provided to
23  me and then I assign off of a rolling assignment
24  sheet.
25          Q.   Do you base your assignment in part on

## Page 19

1   the seriousness of the charges in -- in that case?
2           A.   Yes.
3           Q.   And do you also base your assignment on
4   the experience level of the attorneys in your office
5   that are receiving the case?
6           A.   Yes.
7           Q.   How about paralegals, how many
8   paralegals do you have on staff in area 22?
9           A.   None.
10          Q.   None.  How many investigators do you
11  have on staff?
12          A.   Four.
13          Q.   Do the investigators work directly for
14  the attorneys on a rolling basis as needed?
15          A.   The investigators are assigned to
16  cases.  So if an attorney requests investigation
17  that is assigned to one of the investigators, and
18  then that investigator remains the investigator for
19  that case for any future investigation.
20          Q.   Are the investigators assigned to the
21  case when the case is opened or is it assigned to
22  the case on an as-needed basis?
23          A.   On an as-needed basis.
24          Q.   Okay.
25          A.   It has to be done by a request from the

## Page 20

1   attorney.
2           Q.   Okay.  How many administrative
3   assistants do you have working in area 22?
4           A.   How do you define administrative
5   assistants?  So I have them classified in different
6   positions.
7           Q.   Please discuss like how would -- how
8   would your office, an employee that would handle
9   administrative actions, I don't know if that's a
10  clerk or what might have been a legal secretary or
11  assistant --
12          A.   So I have an office manager.
13          Q.   Okay.
14          A.   And then five of our support staff are
15  legal assistants and three are clerks.
16          Q.   Okay.  So can you describe the
17  responsibilities for the -- of the office manager?
18          A.   The office manager takes care of all
19  the budgetary issues in terms of approving bills for
20  payment by the office in Columbia, does all the
21  contact with the building in terms of maintenance,
22  keeps track of people's comings and goings, and also
23  does some docket management for our felony docket in
24  circuit court.
25          Q.   And your five support staff, how are

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

Page 21

1  they assigned?  Are they assigned to work on cases?
2      A.  No.  They are -- the legal assistants
3  and the clerks all have specific jobs, which include
4  docket management if they're a legal assistant, and
5  then secretarial support to attorneys.  And then we
6  have one clerk who does the file closing, the
7  archiving of files and several other
8  responsibilities.
9      Q.  Are the -- who does the initial -- I
10  guess if the right word is screening for indigency
11  requirements, is that one of those five support
12  staffs or three legal clerks?
13      A.  It's one of the legal assistants.
14      Q.  One of the legal assistants, okay.  Are
15  there any other employees that we have not mentioned
16  that work in area 22?
17      A.  No.  One of our attorneys is classified
18  as a JDMSW.
19      Q.  Okay.  What does the abbreviation JDMSW
20  mean?
21      A.  So he is an attorney, but he is also --
22  has a master's in social work.
23      Q.  Oh.
24      A.  So we transitioned an attorney position
25  to that position so that we would have some social

Page 22

1  work services within the office.
2      Q.  Does the JDMSW position carry a
3  normal -- well, carry a caseload?
4      A.  He carries the caseload of any of our
5  clients who are currently in treatment or diversion
6  court, as well as he assists the attorneys who are
7  dealing with either mental health issues or
8  mitigation issues for their clients.
9      Q.  Can you describe your day-to-day
10  responsibilities as district defender for area 22?
11      A.  Combination of client contact, case --
12  personal case management, taking care of the
13  administrative responsibilities in the office of
14  authorizing payment of bills, approving E requests,
15  assigning action items to investigators, speaking
16  with attorneys concerning their cases, and working
17  along with the circuit on circuit-wide issues.
18      Q.  Do you attend trials or I guess observe
19  trials for any of your district defenders for
20  evaluation purposes?
21      A.  I do.
22      Q.  And do you -- are you in charge of
23  approving encumbrance requests?
24      A.  I am.
25      Q.  Do you approve requests for depositions

Page 23

1  for --
2      A.  I do.
3      Q.  Do you approve leave for your office?
4      A.  I do.
5      Q.  I didn't hear mention, do you have a
6  specific position as a human resources manager, or
7  does that fall within your purview as well?
8      A.  We have a human resources manager in
9  Columbia.
10      Q.  Okay.
11      A.  But all of the hiring work that occurs
12  in the local office, the deputy district defender
13  and I do.
14      Q.  Do you draft attorney performance
15  reviews?
16      A.  I do.
17      Q.  And how much time do you spend on
18  administrative tasks versus substantive legal work?
19      A.  Can you define substantive legal work?
20      Q.  So if you're working with clients
21  themselves and their legal issues or working either
22  for yourself, clients that you're handling or
23  clients that your attorneys are handling as opposed
24  to running and administering the office from a
25  budgeting, a scheduling, a hiring, a performance

Page 24

1  review, that would be more administrative.
2      A.  I would estimate 70 percent
3  administrative, 30 percent client or legal.
4      Q.  Do you have some discretion with
5  respect to setting policies in your office?
6      A.  Yes.
7      Q.  What kind of policies do you have
8  discretion in setting?
9      A.  Dress code, coming and going, like
10  office hours.  Second chair expectations, things
11  like that.
12      Q.  Are these policies written down and
13  promulgated to your employees or -- or in a -- in a
14  set -- I'm aware that the public defenders office
15  sends things out to the various offices that they
16  want policies they want set.  Do you have any
17  subsequent set of policies that get promulgated to
18  the attorneys in your office?
19      A.  There's some local area policies that
20  are available to all of the staff on the computer.
21      Q.  And how are the policies in your office
22  developed?
23      A.  Through experience.
24      Q.  If I use the term vertical
25  representation, do you have an understanding what

6 (Pages 21 to 24)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-13   Filed 02/09/18   Page 7 of 85

## Page 25

1  that means?
2      A.  Yes.
3          Q.  And do -- does area 22 currently
4  utilize vertical representation for clients?
5      A.  Yes.
6  (Exhibit 11, Previously marked exhibit.)
7  (Exhibit 12, Previously marked exhibit.)
8          MR. MAUNE:  Produce previously
9  introduced exhibits 11 and 12.
10         MS. SHIPMA:  What did you say?
11         MR. MAUNE:  I'm going to produce
12  previously used exhibits that are marked as Petsch
13  Exhibit 11 and -- give you a copy.  And then Petsch
14  Exhibit 12.  Take a minute to review and let me know
15  when.
16         THE WITNESS:  Okay.
17         Q.  (By Mr. Maune)  I'll start with
18  Exhibit 11.  Is this the -- a form that area 22 uses
19  to screen potential clients for indigency?
20     A.  We've altered it a little bit.
21         Q.  Can you explain how it was altered?
22     A.  We put a really big arrow where it says
23  applicant signature, and I think wrote something
24  like you must sign here.
25         Q.  Okay.

## Page 26

1      A.  And then I believe because we receive
2  many of our applications by mail there was
3  information added as to how to return the
4  application to us.
5          Q.  Okay.  You've added mailing address
6  for --
7      A.  Yes.
8          Q.  How do potential clients first get
9  ahold of this form to complete if they're seeking
10  representation?
11     A.  So they can download it off the web,
12  off the public website.  They can request it from
13  the court or they can request it from a social
14  worker at jail or they can come to the office if
15  they are not in custody and ask for an application.
16         Q.  If the potential clients are in
17  custody, does the jail mail or fax these back to
18  your office for consideration?
19     A.  We pick up mail from the jail daily.
20         Q.  Okay.
21     A.  With no postage requirement.
22         Q.  Okay.  And then one of the clerks
23  reviews this form and makes a determination --
24     A.  Yes.
25         Q.  -- whether or not the potential client

## Page 27

1  is indigent or not indigent?
2      A.  Correct.
3          Q.  And after this is completed, if they're
4  determined to be indigent, a case would be opened?
5      A.  Yes.
6          Q.  And do you have an estimate of how many
7  forms you receive that the case is determined that
8  the potential client is not indigent or not
9  qualified?
10     A.  I do not have that figure off the top
11  of my head.  I would tell you that there are a
12  number of cases that are initially denied for
13  probation violations because the court has not yet
14  made a due process determination, and then the
15  person may eventually be -- the court may eventually
16  make that determination and be accepted, but I do
17  not have a figure for how many are denied.
18         Q.  Does the court determination for due
19  process violation put this determination on hold for
20  determining indigency?
21     A.  The indigence determination is made.
22         Q.  Okay.
23     A.  The eligibility determination is that
24  they're not eligible.
25         Q.  Okay.  And do judges in area 22 assign

## Page 28

1  your office to represent defendants even in cases
2  where you've made a determination at least as to
3  this form that they're not indigent?
4      A.  They don't assign -- they don't appoint
5  us on anything.
6          Q.  They don't appoint you on anything.
7      A.  We do have an indigence docket in which
8  they consider the appeals of our indigence
9  determination.
10         Q.  And how often -- is it frequent that
11  the indigence docket will determine that the
12  potential defendant is -- is qualified for services
13  from the public defenders office when a
14  determination has been previously made that the
15  potential client is not indigent?
16     A.  So we have the docket about once -- we
17  have it once a month.
18         Q.  Okay.
19     A.  And at each docket approximately five
20  to ten applicants are determined to be eligible that
21  had not previously been determined to be eligible.
22         Q.  And on that docket or hearing of the
23  five to ten that are determined to be eligible, how
24  many were considered, estimate?
25     A.  I don't understand.

7 (Pages 25 to 28)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-13   Filed 02/09/18   Page 8 of 85

## Page 29

1   Q.  How many -- how many potential cases
2   for that docket are heard where five to ten --
3       A.  Probably ten to 20.  So about
4   50 percent of the cases.
5       Q.  Okay.  You previously stated you handle
6   15 to 30 cases open at any one time; is that
7   correct?
8       A.  Personally?
9       Q.  Personally.
10      A.  Yes.
11      Q.  And are these particular types of cases
12  that you handle?
13      A.  They tend to be.  I mean, there's not a
14  preplan that this is the type of case I will get,
15  but I tend to have the cases where there are serious
16  mental health issues and there's questions of
17  whether or not the person is competent to proceed,
18  and because we have so few attorneys with experience
19  I have a large number of homicide cases.
20  (Exhibit 28, Previously marked exhibit.)
21      MR. MAUNE:  This has previously been
22  introduced as Wallace Exhibit Number 28.
23      THE WITNESS:  Do you want these back?
24      MR. MAUNE:  You can keep them there.
25  Wallace Number 28.  Do you have that?

## Page 30

1       MS. SHIPMA:  Let me see.  Yeah.
2       MR. MOORE:  Thanks.
3       Q.  (By Mr. Maune)  Have you seen this
4   document before?
5       A.  I have.
6       Q.  And what is this document?
7       A.  The Missouri State Public Defender
8   caseload crisis protocol that was issued in 2007.
9       Q.  Did you participate in this commission
10  study in any way?
11      A.  The 2006 study?  No.
12      Q.  I guess you didn't start until 2007.
13      A.  Right.
14      Q.  Okay.  On page five, if you can turn to
15  page five, it lists attorney hours available for
16  casework, and it comes up with a figure of 1,752
17  average available hours per attorney per year.
18  Would you -- do you believe this is an accurate
19  number of attorney hours for the attorneys in area
20  22?
21      A.  The 2340 or the 1752?
22      Q.  1752.
23      A.  And what do you mean by accurate?
24      Q.  Do you find that your attorneys spend
25  more or less than 1752 average hours per attorney

## Page 31

1   per year on cases?
2       A.  Depends on where the attorney is in
3   their stage.  So if it's an attorney who is trying a
4   lot of cases they probably spend more than that.  If
5   it's an attorney who is brand-new they might spend
6   close to that.
7       Q.  And so the attorneys -- how long do you
8   think -- back up.
9           How long do you think attorneys in your
10  office would be prepared or trained to try many
11  cases?  How long do you think that process takes?
12      MR. MOORE:  I guess I'll object to the
13  form of the question, but you can go ahead and --
14      Q.  (By Mr. Maune)  Yeah.
15      A.  And I'm -- I'm not certain I understand
16  your question.
17      Q.  So from when a new public defender
18  starts as a one, how long before they are
19  significantly trained and ready to handle a
20  significant number of cases where you think they
21  might be exceeding that 1752 number?
22      A.  How long do I think they should be
23  trained before they're significantly ready?  About a
24  year to 18 months.  How long do they practice before
25  they begin trying cases, often less than that,

## Page 32

1   sometimes that amount of time.  So we've had
2   attorneys in their first year in the office try
3   five, six, seven jury trials.  In their first year
4   of practice also.
5       Q.  And do you find it common for attorneys
6   in your office to work overtime or exceed the 1750
7   number?
8       A.  Yes.
9       Q.  Do you find it's common for them to
10  work on weekends?
11      A.  Yes.
12      Q.  Do attorneys in your office receive
13  extra compensation for either overtime or working
14  weekends?
15      A.  No.
16  (Exhibit 21, Previously marked exhibit.)
17      MR. MAUNE:  I'm going to use previously
18  marked Exhibit 21, although we're trying to give the
19  previous copy we used.  I'll produce both.  Had a
20  typographical -- the printout didn't go well, so
21  it's the same document, but I have a better produced
22  copy.
23      THE WITNESS:  Okay.
24      MR. MOORE:  Is this all the same thing?
25      MR. MAUNE:  Yeah.  It should be.

8 (Pages 29 to 32)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-13   Filed 02/09/18   Page 9 of 85

## Page 33

1    MR. MOORE: Is this the same thing?
2    MR. MAUNE: It's the same. It's just
3  the cover.
4    MR. MOORE: Okay. Oh, I got you. All
5  right.
6    Q. (By Mr. Maune) Have you seen this
7  document before?
8    A. Not in the complete form, no.
9    Q. Do you provide any information that
10  gets incorporated into these reports?
11    A. Our database does. So we provide -- we
12  put -- input information into the database, which is
13  then used in these reports.
14    Q. Okay. I'd like to turn to page seven.
15  It says title State Public Defender Cumulative
16  Caseload Metrics Fiscal Year 2017. And -- and if I
17  -- I look at -- there's a column that has District
18  22 listed, St. Louis City, and it states 30
19  attorneys. Is that accurate?
20    A. That's accurate.
21    Q. And it says -- this is for last fiscal
22  year, right?
23    A. Yes.
24    Q. So for fiscal year '17. There were
25  4262 cases initiated. Does that appear accurate?

## Page 34

1    A. It does.
2    Q. And has a number of new cases and then
3  it comes up with a net case units. Do you see that?
4  It says 89,515?
5    A. Yes.
6    Q. Do you know how that number or what --
7  or what the term net case unit means?
8    A. I believe it's the number of cases
9  initiated minus the number of cases withdrawn from
10  within the first 30 days times the RubinBrown metric
11  for number of hours per case.
12    Q. Okay. And then there's a column that
13  says -- it's third to the last, and it says
14  capacity, and it says 62,400. Do you know how that
15  number is calculated?
16    A. Number of attorneys times a number of
17  hours per year.
18    Q. And does that number at least seem
19  accurate?
20    A. Yes.
21    Q. And finally, it has a number or
22  percentage of capacity and it's 163.5 percent. Does
23  that -- do you understand what that's trying to
24  portray?
25    A. That we are 163.5 percent of the

## Page 35

1  capacity of 62,400 hours.
2    Q. Do you believe that figure to
3  accurately portray the workload for your office?
4    MR. MOORE: Just object to the form of
5  the question. I think it's pretty vague. Subject
6  to that, you can respond of course.
7    A. We're overloaded, so it accurately
8  portrays that, yes.
9    Q. (By Mr. Maune) Okay. Do you receive
10  reports quarterly that would show the district
11  defender this figure for their particular office?
12    A. No.
13    MR. MAUNE: This would be the first new
14  document, so it would be Fox 32. I'm introducing
15  what is identified as Public Defender document Bates
16  number 0039426. It's titled Order Concerning
17  Probation Revocation Hearing.
18    (WHEREIN, Exhibit 32, Order Concerning
19  Probation Revocation Hearing, was marked for
20  identification by the Court Reporter.)
21    Q. (By Mr. Maune) Are you familiar with
22  this form?
23    A. I am.
24    Q. Can you please explain what it is?
25    A. We call it the due process order that

## Page 36

1  the 22nd Judicial Circuit uses to make a -- to
2  notify us of a determination they have made whether
3  or not the defendant in a probation violation
4  hearing is entitled to counsel.
5    Q. And did you have a role in creating
6  this -- this form?
7    A. I did.
8    Q. And can you briefly explain how the
9  process works for using this form?
10    A. If a judge has a probationer who he
11  would like to call before him for a violation of his
12  probation conditions, the judge makes a
13  determination based on one of the factors included
14  in this form as to whether or not that probationer
15  needs counsel. And then files this form in the
16  probationer's case and sends it to our office.
17    Q. And the judge that is filing this form
18  or -- or using this form does so without at least
19  initially the public defender reviewing the form, so
20  the -- so the judge would have the case come in that
21  they have a probation -- or that they want to
22  consider revoking the probation, they would look at
23  the facts of the case, the judge would complete this
24  form, and then what happens to the form after that?
25    MR. MOORE: Also object to the form of

**ALARIS LITIGATION SERVICES**
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-13   Filed 02/09/18   Page 10 of 85

Page 37

1    the question. I think it's compound and vague.
2    Subject to that, you can respond.
3              A.   So hopefully they send it to us.
4              Q.   (By Mr. Maune)  Okay.
5              A.   And if we have an application from that
6    probationer and we have determined that they are
7    indigent, then we would assign an attorney to the
8    case who would enter their appearance.
9              Q.   And you would only assign them an
10   attorney if one of the boxes is checked in the upper
11   portion of the form under label one; is that
12   correct?
13             A.   Correct.
14             Q.   So if -- is it any -- would you only --
15   would the -- would you assign an attorney if any one
16   of the boxes is checked or could there be multiple
17   boxes checked or -- I mean, I assume it could be
18   that the defendant does not appear to -- capable of
19   speaking effectively and they made a timely or
20   culpable claim.  It just has to be one of these; is
21   that correct?
22             A.   It's usually just one, but it can
23   sometimes be more than one.
24             Q.   If -- does -- are there any times that
25   you receive this form from a judge where one of the

Page 38

1    boxes is checked below, but the facts of the case
2    suggest that the person on probation should have an
3    attorney present?
4              MR. MOORE:  Also objection to the form
5    of the question.  I think that's vague,
6    argumentative, calls for speculation as well.
7    Subject to that, you can respond.
8              A.   So we wouldn't have contact with that
9    probationer to know that fact.  If we are
10   representing the probationer on another case, we may
11   then bring this to the court's attention that we
12   would like them to make a due process determination,
13   but if the person has just a probation revocation,
14   we wouldn't know about it.
15             Q.   (By Mr. Maune)  Okay.  So you
16   wouldn't -- you wouldn't know about it because you
17   wouldn't have received an indigency request from
18   them yet or --
19             A.   Well, we may have received an indigence
20   request and we would -- if we did not have this form
21   with one of the boxes in number one checked, we
22   would tell the applicant to speak to the judge about
23   whether or not due process requires counsel.  And we
24   would initially turn them down, not because they're
25   not indigent, but because they're not eligible.

Page 39

1              Q.   On the first line in the first box it
2    says (quote as read):
3                   Defendant is currently on an SIS
4                   probation which the court may revoke.
5              Can you explain what SIS probation is?
6              A.   Suspended imposition of sentence, so
7    the court has not given the person a sentence.
8    There's been no formal sentencing of the
9    probationer.
10             Q.   Okay.  And then in the boxes in box two
11   below it has the term SES.  (Quote as read):
12                   Defendant has an SES and agrees that he
13                   violated his probation.
14                   Can you please explain for the record
15   what SES is?
16             A.   Suspended execution of sentence where
17   the court has imposed a sentence but has not yet
18   executed it.  So there would be a term of years or a
19   fine or a term of days which the court has imposed
20   but has not executed.
21             Q.   How did you come up with the different
22   conditions for I guess blocks one and two?
23             A.   I didn't come up with them.  Judge
24   Julian Bush and Judge Philip Heagney are the two who
25   actually created the form, and they created the form

Page 40

1    based upon the case law.
2              Q.   Has this form ever been challenged
3    subsequently to its use?
4              A.   No.
5              Q.   And how long have these forms been in
6    use for?
7              A.   The initial one was created in 2012
8    after the Waters hearing.  It was a little bit
9    different at that time because at that time we were
10   also limiting probation violation cases being
11   accepted for other reasons.
12             Q.   And what was area 22's policies prior
13   to the Waters decision?
14             A.   On probation violation cases?
15             Q.   Of probation violation cases.
16             A.   That if the person applied and was
17   indigent, that we would enter an attorney's
18   appearance.
19             Q.   And then subsequent to the Waters
20   decision?
21             A.   Well, it didn't just come from the
22   Waters decision.  It came from the change in the
23   statute in terms of what cases were eligible for
24   public defender representation.  So when 600 I think
25   it's 046, 042 was changed, then this was consistent

10 (Pages 37 to 40)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-13    Filed 02/09/18    Page 11 of 85

## Page 41

1  with that.
2      Q.   To your knowledge, do any other areas
3  use either this form or a version of this form in
4  making decisions regarding probation revocation
5  hearings?
6      A.  I don't know.  I know we have provided
7  it to judges in other circuits when we have been
8  asked to handle conflict cases in those circuits
9  that were probation violations.
10     Q.   Has the -- the implementation of these
11 procedures with using this form and the initial
12 determinations reduced attorney workload for area 22
13 public defenders?
14     A.  So prior to the use of this form we
15 opened approximately a thousand probation violation
16 cases a year.  After this form was implemented that
17 number was reduced to about 500.  It has slowly
18 crept back up, and I believe now we're on pace to
19 open probably 750 to 800 probation violations a
20 year.
21     Q.   And when the number of probation
22 violation cases that you have opened this year is
23 creeping up, do you have a sense whether that's
24 because more defendants have a right to an attorney
25 and according to this determination or is it just

## Page 42

1  the number of cases that the courts are seeing are
2  going up?
3          MR. MOORE:  Just object to the form and
4  also to the foundation, I think calls for
5  speculation, but you can go ahead.
6      A.  I think it's a combination of two
7  things.  One is that we've had a substantial number
8  of experienced judges retire and the judges who are
9  newer to the bench would rather have an attorney
10 there, and then also because the number of cases has
11 increased.
12     Q.   (By Mr. Maune)  Do you have any way to
13 monitor the outcome for probation revocation
14 hearings for cases in which attorneys are not
15 assigned?
16     A.  No.
17 (Exhibit 1, Previously marked exhibit.)
18         MR. MAUNE:  I'll introduce what's been
19 previously introduced as Petsch Document 1.
20         MR. MOORE:  Can I get a copy of that
21 probation form, not now necessarily, but at a break
22 or something?
23         MR. MAUNE:  Yeah.
24     Q.   (By Mr. Maune)  Have you seen this
25 document before?

## Page 43

1      A.  No.
2      Q.   Having reviewed the con -- the content
3  of it, does this document specify the minimum client
4  contact times promulgated by the Missouri Public
5  Defenders Office?
6      A.  Yes.
7      Q.   Do you monitor client contact time for
8  the attorneys in area 22?
9      A.  I don't monitor on a daily basis, no.
10 The attorneys are aware of the client contact
11 requirements.  When they're reviewed for appraisal I
12 review their -- some of their cases randomly, but I
13 do not look on a daily basis to see if they are
14 meeting this requirement.  If I have a complaint
15 from a client about lack of contact, then I would
16 review it.
17     Q.   What do you consider a qualifying
18 contact?  And I'll start off with a client that's in
19 custody.
20     A.  Seeing the client in jail.
21     Q.   And how about a client that's out of
22 custody?
23     A.  Seeing the client either in office or
24 for a meeting.  Sometimes we go to their home, but
25 generally it would be in the office.

## Page 44

1      Q.   To the best of your knowledge, do the
2  public defenders in area 22 meet the expectations
3  that are delineated in this memo?
4      A.  No.
5      Q.   And do you have an idea why they cannot
6  meet these limitations?
7      A.  Because the amount of time they spend
8  either in court on cases that are before the court
9  or in preparation for cases that are assigned out to
10 trial or in other client contacts, it's -- it's not
11 possible.
12     Q.   Do the -- for the -- for the clients
13 that are in custody, is there a confidential place
14 in the jails that are in St. Louis city for the
15 attorneys to meet with their clients?
16     A.  There is a place.  The jail has deemed
17 it confidential, but it is not confidential.
18     Q.   And to your best of your ability, why
19 is that place not confidential?
20     A.  So we have two jails in the city of
21 St. Louis.  One is the St. Louis City Justice
22 Center.  And the professional visiting booth there,
23 you can hear what is being said in the booth either
24 outside in the social visiting area or inside in the
25 cell area depending on which side you're on.

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-13   Filed 02/09/18   Page 12 of 85

1    So you can either hear what the
2  defendant is saying or what the attorney is saying.
3  There is also a space for contact visits, but the
4  jail staff has access to those contact visit rooms
5  and can listen in to those contact visit rooms.
6    In the other jail, which is the
7  St. Louis medium security institution, the -- there
8  are two professional booths that have been there for
9  a significant period of time and directly behind
10  them sits a correctional officer from the jail who
11  can hear everything that is being said, as well as a
12  number of other defendants who are waiting to see
13  their attorney.
14    That's in the two good booths.  In the
15  other booths you're literally talking through
16  cardboard and there can be eight or nine attorneys
17  in there at one time.  And so you can hear anything
18  that anybody is saying.
19    Q.  Is there a way for an attorney who is
20  not at the jail to contact a client in custody via a
21  phone?
22    A.  It -- it happens on rare occasion where
23  you can reach their social worker and set up a phone
24  call to the social worker's phone.
25    Q.  The social worker that's in the prison?

1    A.  The jail social worker, yes.
2    Q.  Okay.  Do the clients in custody have
3  an ability to call their attorney from jail the
4  opposite?  So one is the attorney calling in and --
5    A.  No.
6    Q.  They don't have any way to contact
7  their attorney?
8    A.  No.
9    Q.  And is that due to cost or just they're
10  prohibited from using any form of communication?
11    A.  The phone system is set up so it will
12  not ring into our office.
13    Q.  So will it ring into -- so will the
14  phone system in the jail ring into other attorney --
15  private counsel office?
16    A.  Yes.
17    Q.  But it's -- so what you're saying is
18  there's a technical limitation on the phone system
19  that prohibits phone calls from either prison --
20    A.  Jail.
21    Q.  -- either jail in St. Louis city from
22  ringing into the area 22 office?
23    A.  It's not technical.  It was done -- I
24  mean, it's done technically, but it was done on
25  purpose.

1    Q.  And have you communicated this issue
2  with jail supervisor or --
3    A.  We requested it.
4    Q.  Oh, you requested it.
5    A.  Yes.
6    Q.  And what was the purpose of the
7  request?
8    A.  The phones rang nonstop with persons
9  calling in with the exact same question, and it took
10  an entire support staff person's day simply to
11  answer those phone calls, and as a result no other
12  phone calls could get into our office and attorneys
13  could not use the phone system to make calls out
14  because the phones were clogged from the phone calls
15  from the jail.  And there was no limitation in the
16  jail as to how often a person could use the phones.
17    Q.  Oh.  So the -- there was -- there's no
18  limitation to how many times they could call and
19  keep calling your office, so the phones would --
20  before the -- the limitation was put in place would
21  literally be ringing off the hook with or clogging
22  all the lines?
23    A.  Yes.
24    Q.  While your support staff try and manage
25  who the calls are going to or deal with the calls?

1    A.  Correct.
2    Q.  Do you know if any other district
3  defenders have implemented similar procedures?
4    A.  I don't believe so, but I don't know
5  for certain.
6    Q.  If -- if a -- an attorney in your
7  office is calling to reach a client that's
8  incarcerated and it's set up by a social worker, is
9  that phone call confidential?
10    A.  No.
11    Q.  And why not?
12    A.  The social worker is present.
13    Q.  Do you know if anyone else is present
14  during that call?
15    A.  Not to my knowledge.
16    Q.  Do you know if that call is monitored
17  at all by the jail?
18    A.  It's not on the jail monitoring system.
19  It's on the private line -- not a private line, but
20  a jail line.
21    Q.  Okay.  Does area 22 have any procedures
22  in place for dealing with immigration consequences
23  for criminal charges for your clients?
24    A.  So we do education on immigration
25  issues on a regular basis, and we have contact with

12 (Pages 45 to 48)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-13   Filed 02/09/18   Page 13 of 85

## Page 49

1 Catholic Legal Assistance Ministries, which is
2 located at Saint Louis University Law School, and
3 their immigration attorney provides assistance to us
4 for our clients at no cost.
5      Q.  How would immigration issues arise with
6 dealing with your clients or your attorneys'
7 clients?
8      A.  They could have collateral consequences
9 of deportation.
10      Q.  And how available are these legal
11 assistants or -- are there attorneys at Saint Louis
12 University that help you out?
13      A.  Yes.
14      Q.  How available are they to help?
15      A.  They're pretty good about returning
16 calls, and they've also provided us with an
17 educational document that we have available for the
18 attorneys.
19      Q.  How often do immigration issues arise
20 for your clients?
21      A.  I would probably say less than five
22 percent of the cases.
23      Q.  Do you have any interpreters on staff
24 at the public defenders office?
25      A.  No, not on staff.

## Page 50

1      Q.  How often do you have a need for
2 interpreters when dealing with your clients?
3      A.  Not that frequently.  I do have one
4 attorney who speaks Spanish who is new to the office
5 who I'm attempting to assign some of the Spanish
6 speaking clients to.  I would say ten to 15 clients
7 a year in need of interpreters.
8      Q.  And are there any other languages other
9 than Spanish that you encounter for clients in your
10 office?
11      A.  Bosnian, Vietnamese.  We've had some
12 African dialects that have been difficult to find
13 interpreters for.  Those are the main ones.
14      Q.  And if you have a client that comes in
15 that speaks Vietnamese, do you -- do the attorneys
16 submit a request to -- to get an interpreter to be
17 able to prepare the case?
18      A.  Yes.
19      Q.  And how often are those requests
20 approved?
21      A.  They're always approved if they're
22 made.
23      MR. MAUNE:  Okay.  We've been going
24 about an hour.  Good time for a break?
25      THE WITNESS:  Sure.

## Page 51

1      MR. MAUNE:  All right.
2      VIDEOGRAPHER:  The time is 9:58.  We
3 are off the record.
4      (WHEREIN, a recess was taken.)
5      VIDEOGRAPHER:  The time is 10:09.  We
6 are back on the record.
7      Q.  (By Mr. Maune)  I'd like to talk about
8 initial hearings for a little bit.  At what point is
9 a defendant first brought before a judge?
10      A.  For the initial hearing, which is
11 usually 24 hours after they are booked on a case.
12 It can be longer than that if they're booked on a
13 Friday night or Friday day.
14      Q.  And are they -- if they are indigent,
15 do they have a defendant representing them at this
16 initial hearing?
17      A.  They do not have an attorney at the
18 initial hearing.
19      Q.  Is bail set at this initial hearing in
20 area 22?
21      A.  The bail already is set at the time
22 that the warrant is issued.  So when the case is
23 issued it is taken to the judge who is on duty to
24 sign a warrant and to set bail.
25      Q.  And does the judge use a bail schedule?

## Page 52

1      A.  No.  There's no official bail schedule.
2 There is some informal bail schedules for certain
3 crimes.
4      Q.  Can the bail amount be changed after
5 that point?
6      A.  Yes.
7      Q.  And how would that bail amount be
8 changed?
9      A.  By a motion to review the conditions of
10 release.
11      Q.  And is that motion filed after the
12 initial hearing?
13      A.  Yes.  If the person had an attorney it
14 could be filed at that point.
15      Q.  Right.
16      A.  So some private counsel make requests
17 at that point.
18      Q.  Can defendants plead guilty at their
19 initial hearing if they're unrepresented?
20      A.  No.  They can't plead guilty even if
21 they're represented at their initial hearing.
22      Q.  Okay.
23      A.  Or they could.  There just wouldn't be
24 anybody paying attention to it.
25      Q.  Are all these initial hearings live or

13 (Pages 49 to 52)

**ALARIS LITIGATION SERVICES**
**www.alaris.us**          **Phone: 1.800.280.3376**          **Fax: 314.644.1334**
Case 2:17-cv-04057-NKL    Document 153-13    Filed 02/09/18    Page 14 of 85

## Page 53

1  are any done by video?
2      A.  They're all done by video.
3      Q.  They're all done by --
4      A.  With the exception of sometimes if
5  there is someone who is clearly mentally ill the
6  court tries to bring them in to court in person.
7      Q.  Who makes the determination that the
8  client is clearly mental ill?
9      A.  Evidently there's communication between
10  the jail and the court.  And it doesn't happen very
11  often.
12      Q.  So at what point after this initial
13  hearing does your office get involved with a case?
14      A.  After we receive an application and
15  determine that the person is indigent.
16      Q.  We'll talk a little bit about
17  discovery.  Do you have any sense for the percentage
18  of cases that your attorneys handle in which they
19  interview witnesses?
20      A.  I would guess 25 percent, maybe
21  30 percent.
22      Q.  Interview the victim or the complaining
23  witness?
24      A.  Are you -- when you say witnesses --
25      Q.  How often -- yeah, how --

## Page 54

1      A.  -- you're -- you're differentiating
2  from complaining witness?
3      Q.  Right.  Initially the witnesses who
4  might be witnesses, but they're not the complaining
5  witness or victim.
6      A.  So witnesses who are not the
7  complaining witness, it's probably less than
8  30 percent then.
9      Q.  Okay.
10      A.  And then in cases where they're
11  interviewing the complaining witness, I would say
12  it's about 30 percent.
13      Q.  About 30 percent.
14      A.  Of the cases that have complaining
15  witnesses.  We have a large number of gun and drug
16  case in which the only witnesses are police
17  officers.
18      Q.  Okay.  How often do your attorneys in
19  -- in area 22 visit the crime scene?
20      A.  I would say fewer than 20 percent.
21      Q.  How often do your attorneys and/or
22  investigators identify witnesses not previously
23  mentioned in a police report?
24      A.  In cases overall or in cases that
25  actually go to trial?

## Page 55

1      Q.  Cases that go to trial?
2      A.  In cases that go to trial, probably
3  25 percent of those cases.
4      Q.  How often in cases that go to trial do
5  your attorneys or investigators investigate a
6  client's alibi?
7      A.  Whenever one is provided.
8      Q.  How often do attorneys in your office
9  investigate police conduct in cases that go to
10  trial?
11      A.  When you say police conduct, what are
12  you talking about?
13      Q.  If there's any improprieties alleged by
14  the defendant, does your office have the ability to
15  investigate those allegations?
16      A.  So we do depositions of police
17  officers --
18      Q.  Okay.
19      A.  -- who are main witnesses in cases on a
20  pretty regular basis, and file motions to suppress
21  based upon, you know, Fourth Amendment violations,
22  Fifth Amendment violations by those police officers.
23  We do not -- we have not been successful I should
24  say in obtaining internal affairs reports about
25  those officers, but we have attempted.

## Page 56

1      Q.  How often do your attorneys conduct
2  depositions in cases that go to trial?
3      A.  Oh, the cases that go to trial, I would
4  say 80 to 90 percent.  And when you're talking about
5  that 25 to 30 percent, are those for cases that go
6  to trial in terms of talking to the witnesses or
7  complaining witnesses or just in all cases?
8      Q.  Well, if you give both, so in all cases
9  was that less than 30 percent and greater than
10  30 percent for --
11      A.  Significantly greater than 30 percent
12  in cases that go to trial.
13      Q.  Okay.
14      A.  I would say we don't have a case that
15  goes to trial where there is a nonpolice officer
16  complaining witness where that person has not either
17  been interviewed or deposed.
18      Q.  How often -- in cases that do not go to
19  trial, how often do your attorneys take depositions?
20      A.  We did 300 depositions in fiscal year
21  2017 and had 150 cases sent out to trial.  So
22  percentage wise, I don't know, but about a hundred,
23  150 depositions in cases that did not go to trial.
24      Q.  And that's out of roughly --
25      A.  Well, it's not out of that number

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

Page 57

1  because that number includes cases that can't go to
2  a jury trial.
3      Q.  Right.  Do you have a sense out of the
4  -- I guess the 4,262 cases that were initiated, what
5  percentage of those are -- can go to a jury trial?
6      A.  So you would subtract probation
7  violations and juvenile cases.
8      Q.  Okay.
9      A.  And then you would also have to
10  subtract the cases where we withdrew before
11  adjudication.  And I would guess that those three
12  figures come to 1,200 to 1,500.  Probably closer to
13  1,200.  About 3,000 cases left.
14      Q.  Of the cases that go to trial, how
15  often do your attorneys utilize expert witnesses?
16      A.  Not often.  We've utilized iden --
17  eyewitness identification experts and mental health
18  experts.  I think we have secured some medical
19  experts and some fingerprint analysis.
20      Q.  When you say not often, is that -- is
21  there a reason why experts are not utilized?
22      A.  They don't add value to the case.
23      Q.  Besides eyewitness identification
24  experts and mental health experts, are there any
25  other types of experts that your attorneys would --

Page 58

1  could utilize on a case?
2      A.  So we've -- we have utilized also
3  medical experts, so in shaken baby cases, for
4  instance, or child death cases.  DNA, we've had
5  cases reviewed for DNA analysis.  We have had hired
6  experts to look at handwriting.
7      We've hired experts to look at
8  ballistics and we have hired experts to look at
9  fingerprints.  Those are the only ones that come to
10  mind.  And then mitigation is another area, which
11  could involve a mental health person or could
12  involve other type of expert.
13      Q.  For a mitigation expert, would that
14  utilize a social worker?
15      A.  A social worker or someone who's in the
16  community, those are used most often in juvenile
17  certification cases or in Miller cases.
18      Q.  Do you have a specific budget for area
19  22 for the hiring of experts?
20      A.  The system comes up with a budget, but
21  the money then goes through the Columbia office.  So
22  it's not a budget that we keep close tabs on.  I
23  think there were different budgets.  There's one for
24  homicide cases and one for nonhomicide cases.
25      Q.  Do you have to approve the hiring of

Page 59

1  experts for cases?
2      A.  Yes.
3      Q.  Is there a monetary amount or is it for
4  all experts?
5      A.  For all experts.  Some of them then
6  require second-level approval if they are over $500
7  or if it's a homicide case.
8      Q.  And who approves the secondary --
9  second-level approval for those types of cases?
10      A.  The division director.
11      Q.  Have you had cases where you've
12  requested experts that require secondary approval
13  that were denied for some reason?
14      A.  Yes.
15      Q.  And what were the reasons stated for
16  those denials?
17      A.  Generally they're in the mental health
18  area, and it's usually a request to look for an
19  expert who is not as expensive.  There's fortunately
20  -- in St. Louis there's a number of experts
21  available, so we try and use the ones who do not
22  cost as much.  And sometimes it's because of a lack
23  of a clear reason for the mental health expert.
24      Q.  Do you have a list of experts for your
25  attorneys to use?

Page 60

1      A.  The system has a database of experts.
2      Q.  And who comes up with the experts that
3  are in your system?
4      A.  So once somebody has used somebody
5  they're in the system.
6      Q.  Okay.
7      A.  We've gone beyond what's in the system
8  when there's no one in the system that meets what we
9  need.
10      Q.  Does the system provide any details on
11  the quality of the experts or is it just a --
12      A.  No.
13      Q.  -- contact information?
14      A.  Just contact information.
15      Q.  How frequently do you request -- do
16  your attorneys request discovery from the state in
17  your cases?
18      A.  In a hundred percent of the cases with
19  the exception of probation violations.
20      Q.  How frequently do your attorneys file
21  discovery-related motions?
22      A.  All of the cases other than probation
23  violations.
24      Q.  In your opinion, do your attorneys have
25  the time and resources to obtain and review the

15 (Pages 57 to 60)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-13    Filed 02/09/18    Page 16 of 85

Page 61

1      discovery in the manner each case requires?
2          A.  No.
3          Q.  And what is the reason they don't have
4      the time?
5          A.  The number of cases that they're
6      handling, and in addition so many of the cases now
7      have electronic discovery, such as jail phone calls
8      or cell phone data, both of which are very
9      time-consuming to go through.
10         Q.  Do your attorneys review camera footage
11     from police cameras and police vehicles?
12         A.  If we receive it and if we do not
13     receive it and believe it exists, we -- we have
14     requested it.
15         Q.  Are officers in St. Louis city wearing
16     personal body cameras?
17         A.  I don't think so.  We're not getting
18     any -- any data from them.
19         Q.  Okay.
20         A.  There may be a few who are
21     experimenting with it.
22         Q.  At what point in a case would attorneys
23     request the hiring of an expert?  How long before
24     trial?
25         A.  Generally once discovery is received

Page 62

1      and reviewed.  So it takes a long time for a case to
2      get to trial in the city of St. Louis.  So it could
3      be a year before trial.  It could be six months
4      before trial.
5          Q.  Do you have a sense how long before
6      trial discovery is received from -- from the state?
7          A.  So it's supposed to be received within
8      ten days of arraignment.  Full discovery usually
9      occurs throughout the course of the case.
10         Q.  Do you believe it's the case that your
11     attorneys decide against using an expert because of
12     the time required in working with that expert?
13         A.  I think there are not enough attorneys
14     with experience to understand when an expert could
15     have value to their case.
16         Q.  You previously testified that you have
17     four investigators in your office; is that correct?
18         A.  Correct.
19         Q.  And that those investigators are
20     assigned to cases, but only when requested by the
21     attorneys; is that correct?
22         A.  Correct.
23         Q.  Do you believe that based on your
24     experience that your attorneys have the experience
25     necessary to fully utilize the abilities of their

Page 63

1      investigators?
2              MR. MOORE:  Also object to the form of
3      the question.  I think it's kind of vague.  Subject
4      to that, you can respond.
5          A.  I think some of the more experienced
6      attorneys do, but we have a large number of
7      inexperienced attorneys in the office, so the
8      majority of the attorneys do not.
9          Q.  (By Mr. Maune)  Do you believe you have
10     the -- an adequate number of investigators to handle
11     the cases that are staffed?
12         A.  No.
13         Q.  Do attorneys in your district regularly
14     seek continuances?
15         A.  Yes.
16         Q.  And if so, what do you think is the
17     reason?
18         A.  The general reasons are discovery is
19     incomplete.  Defense investigation is ongoing.
20     Competence of defendant is being evaluated or the
21     attorney's trial schedule is such that they do not
22     have time to prepare the case for trial.
23         Q.  Are these continuances often granted by
24     the courts?
25         A.  And I'm sorry, can I add one more?

Page 64

1          Q.  Go ahead.
2          A.  The -- the case was recently
3      transferred to the attorney and the attorney has not
4      had time to meet the client.  Yes, the continuances
5      are regularly granted.
6          Q.  What is the impact of these
7      continuances on your clients?
8          A.  Our clients are confined a very long
9      period of time before they get their case to trial,
10     and in a large number of the cases that we do take
11     to trial we have success in which the person is
12     either found not guilty or the case is dismissed,
13     yet they've had to sit in jail for one to
14     three years waiting to get their case to trial.
15         Q.  What is the impact on these
16     continuances on the trust the clients have with your
17     attorneys?
18         A.  It diminishes it.  And it makes the --
19     the attorney caseload more complex because if you're
20     going to meet a client every 30 days and the case
21     lasts for six months, that's six visits.  If the
22     case lasts for three years, that's 36 visits.  With
23     not much happening for most of them.
24             And there are many cases that proceed
25     to trial that by the time the case goes to trial

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 65

1  it's the second, third, sometimes fourth attorney
2  assigned to the case.
3      Q.   Talk about traveling.  How much time do
4  your attorneys spend in traveling for conflict cases
5  currently?
6      A.   So currently we have three attorneys
7  who handle conflict cases.  One of them handles
8  Jefferson County and St. Francois County.  So that
9  person spends a significant amount of time traveling
10  to those jurisdictions.
11         One of the persons handles Franklin
12  County, and again, that's about a 40 to -- minute to
13  an hour drive each way.  The third person handles
14  St. Louis County and St. Charles County.  So that
15  person travels, but not as frequently because those
16  jurisdictions are closer.
17      Q.   How long does the person who's handling
18  the Jefferson, St. Francois County on average, how
19  long is their travel time?
20      A.   From the city to Jefferson County is
21  about an hour.  From the city to St. Francois County
22  is about an hour and a half.
23      Q.   And have all new cases that -- new
24  conflict cases been assigned to contract attorneys
25  since July 1st of 2017?

## Page 66

1      A.   With the exception of those where we
2  already represent the defendant in another case.
3      Q.   Okay.  How often do your attorneys file
4  suppression motions?
5      A.   Generally in any case that is going to
6  trial.  And in a small percentage of the cases that
7  do not go to trial.
8      Q.   Are there times that you believe a
9  suppression motion may be warranted, but your
10  attorneys did not have time to investigate or draft
11  such a motion?
12      A.   There are times when I believe it is
13  warranted, but the attorney did not have the
14  experience to realize it was warranted and did not
15  seek out assistance.
16      Q.   How often do your attorneys file other
17  types of pretrial motions?
18      A.   We file discovery motions to compel on
19  a pretty consistent basis.  And we file motions to
20  review conditions of bond on a consistent basis.
21  Other motions are as the attorney deems necessary.
22      Q.   Other than we just discussed
23  suppression motions, are there motions that you
24  believe -- pretrial motions that you believe your
25  attorney should be filing but did not have time to

## Page 67

1  investigate or draft such a motion?
2      A.   There probably are, yes.  I'd have to
3  know the specifics of the case to know what motions.
4      Q.   Regarding such motions, aside from
5  suppression motions do you believe there are motions
6  that your attorneys -- motions that may be warranted
7  by the case, but your attorneys did not have the
8  experience to realize that such motions may be
9  warranted?
10      A.   Yes.
11      Q.   Do you have a sense for how often in
12  area 22 your attorneys take noncapital homicide
13  cases to trial on an annual basis?
14      A.   We probably try ten to 15 homicides a
15  year.
16      Q.   And for A/B felonies, not including
17  homicide?
18      A.   Well, we try 90 -- 90 to a hundred
19  cases per year, and in Missouri they'll say 50 percent of those
20  are homicides or serious felonies and 50 percent are
21  what we would label gun or drug case or misdemeanor.
22  And other jury trials.
23      Q.   And out of those 90 to a hundred cases,
24  do you have an estimate how many are juvenile cases?
25      A.   So juvenile cases don't get a jury

## Page 68

1  trial.
2      Q.   Don't get a jury trial.
3      A.   Many of them, however, are
4  17-year-olds, which in most of the country are
5  juveniles, but in Missouri they're automatically
6  transferred to adult court.
7      Q.   How many juvenile cases per year do
8  your attorneys assist in?
9      A.   I believe about 300 was the fiscal year
10  2017.  It has decreased this year significantly.
11      Q.   Do you have an understanding of why
12  that number has decreased?
13      A.   Juvenile court has stopped issuing as
14  many cases, so we litigated pretty heavily in fiscal
15  year 2017 and many cases resulted in a finding of no
16  guilt or dismissal, so I think they've reevaluated
17  what they issue.
18      Q.   Is that the prosecutor's discretion to
19  bring less cases or is that the court's discretion
20  to --
21      A.   In juvenile court?
22      Q.   In juvenile court.
23      A.   It is -- it is the juvenile officer's
24  discretion.  So the juvenile officer is represented
25  by legal counsel who is not the prosecutor for the

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-13   Filed 02/09/18   Page 18 of 85

## Page 69

1  City of St. Louis.
2      Q.  In your opinion, do your attorneys have
3  the time and resources to adequately prepare for
4  trial?
5      A.  They do if that was all they were
6  doing.
7      Q.  What are the other -- what are the
8  other things your attorneys are doing, is it
9  preparing for other cases that are not going to
10  trial?
11      A.  Right.  So we have attorneys who on a
12  pretty consistent basis have a trial set every week
13  for a period of five or six weeks.  So if they're
14  spending the time they need to prepare those cases
15  for trial, they're not paying attention to any of
16  their other clients.
17          And when they should be preparing for
18  next week's trial they're in trial this week.  So if
19  you just took the number of cases we took to trial
20  and gave us responsibility for those, we would have
21  plenty of time and resources.
22      Q.  If -- how often do you have
23  second-chair attorneys participate in trial?
24      A.  Our policy is first misdemeanor jury
25  trial, first two felony jury trials, first sex

## Page 70

1  offense jury trial, and first homicide jury trial.
2  We have not been able to meet that requirement
3  consistently this year because we haven't had enough
4  attorneys who have had trial experience to do those
5  second chairs.
6      Q.  How does your office prioritize having
7  second trial, is it by the seriousness of the
8  charges?
9      A.  You mean how do we prioritize who gets
10  the second chair?
11      Q.  Correct.
12      A.  No.  It's generally the place that we
13  are lacking is in the more serious cases.  So to get
14  an attorney to second chair a homicide case makes
15  sense that you've tried a homicide case, and we
16  don't have enough attorneys who have done that.  So
17  sometimes the second chair has been a person who
18  themselves has never tried a homicide case.  And the
19  same -- same issue with sex offenses.
20      Q.  How much time do your attorneys spend
21  working up a case before the attorneys advise a
22  client of whether or not to take a guilty plea?
23      A.  So the attorney should have had an
24  initial meeting with the client, and that would
25  usually be before the attorney had any discovery,

## Page 71

1  and then the attorney would have a second meeting
2  with the client after they've received discovery.
3  So that would be the minimal time before a case
4  would be resolved with a plea.
5      Q.  And do you have any local procedures
6  for counseling your attorneys prior to accepting --
7  to discussing the case with you or a more serious --
8  experienced attorney in the office before counseling
9  that client on accepting a guilty plea?
10      A.  So the newest attorneys meet with the
11  deputy district defender, and one of the purposes is
12  to discuss their cases that are coming to resolution
13  and get advice on whether or not it's a good
14  resolution.
15      Q.  How are plea offers communicated with
16  your clients?
17      A.  So in our jurisdiction there aren't
18  very many plea offers.  Most pleas are open pleas
19  where the range of punishment is available to the
20  court and based upon evidence presented by the state
21  and the defense the court makes a decision.  If we
22  receive a plea offer, then they're usually
23  communicated in person.  Sometimes through letters.
24      Q.  In your opinion, do your attorneys have
25  the time and resources to adequately negotiate plea

## Page 72

1  deals and counsel their clients on whether or not to
2  accept a plea?
3      A.  No.  In large part because negotiation
4  has not occurred.  So there's literally no one in
5  the office who has experience negotiating plea deals
6  because they've all been open pleas.
7      Q.  Is that -- has that been consistent
8  since you started as the district defender in 2007?
9      A.  Yes.  Yeah.  There is a new circuit
10  attorney as of this year, and she has informed the
11  court that she intends to move towards pursuing
12  negotiated pleas, but it hasn't happened in her
13  first year in office.  But as a result, those
14  attorneys have to prepare a lot more cases for trial
15  in order to be able to determine what's a reasonable
16  resolution.
17      Q.  Do your attorneys request psychiatric
18  evaluations for your clients?
19      A.  Yes.
20      Q.  Are these private evaluations?
21      A.  Sometimes.
22      Q.  Do your attorneys attend lineups?
23      A.  If it is a person that we are already
24  representing and we are informed of it, yes.  And if
25  it's in juvenile court, we do.

18 (Pages 69 to 72)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-13    Filed 02/09/18    Page 19 of 85

Page 73

1          Q.  Are the lineup's videotaped?
2          A.  No.
3          Q.  Are they live or are they picture?
4          A.  They're live.  Usually.
5          Q.  Do your clients ever participate in
6    interviews for presentence investigation reports?
7          A.  Very rarely.
8          Q.  And do attorneys in your office
9    represent clients for such interviews?
10         A.  I think there's been maybe one or two
11   occasions in the ten years I've been there where an
12   attorney participated.
13         Q.  Are there attorneys notified of these
14   proceedings?
15         A.  They're notified that an investigation
16   is going to happen, but not when it is going to
17   happen.  So the burden is on the attorney to find
18   out when it's going to happen and to let the
19   investigator know they'd like to be present.
20         Q.  If one of your clients decides to
21   withdraw a plea in the rare cases that pleas are
22   available, what steps do your attorneys take?
23         A.  To withdraw a plea?
24         Q.  Yes.
25         A.  You'd have to demonstrate some manifest

Page 74

1    injustice.  So you would have to file a motion to
2    accomplish it.
3          Q.  Would an indigent defendant represented
4    by your office ever withdraw a plea without legal
5    representation?
6          A.  Not that I know of.
7          Q.  Have your attorneys for area 22 ever
8    waived or skipped voir dire during trial?
9          A.  No.
10         Q.  Who will notify a defendant of his or
11   her right to an appeal after trial?
12         A.  The trial counsel.
13         Q.  We've covered a lot of these, so I'm
14   just going through.  How are indigency
15   determinations made for juveniles?
16         A.  In juvenile court, the court makes a
17   determination that the child needs counsel and
18   notifies us.  We go ahead and enter an appearance
19   and then the attorney will look to see if there is a
20   concern that the child is not indigent, but in the
21   last three years I can't think of any case that we
22   asked to get off of because the child was not
23   indigent.  In ten years there's been maybe four or
24   five.
25         Q.  Do you know if they use the parents'

Page 75

1    income to make that determination?
2          A.  In juvenile court in St. Louis city the
3    court's position is that every child is indigent.
4          Q.  Have your attorneys expressed any
5    concerns with representing clients in juvenile
6    court?
7          A.  Can you be more specific?
8          Q.  Have your attorneys expressed any
9    concerns with their experience or training with
10   representing juveniles in juvenile court?
11         A.  No, because we've had a juvenile
12   specialist, and the attorneys who are now being
13   trained are being mentored through the process.
14         Q.  How do your attorneys in your office
15   prepare for detention hearings?
16         A.  Meet the child.  We obtain the
17   petition, the probable cause statement, what's
18   called the juvenile summary, and the juvenile
19   detention alternatives score sheet, and make contact
20   with family if able to.
21         Q.  What resources are available to your
22   attorneys to identify alternatives to detention for
23   juvenile clients?
24         A.  I'm not sure what you mean.  We
25   generally advocate for release from detention and

Page 76

1    that release would either be to parents' home or to
2    another relative's home.  So that would be the
3    investigation that we do.
4          Q.  How do your attorneys in your office
5    prepare to advocate for informal adjustment?
6          A.  We do not handle informal adjustments.
7          Q.  And why is that?
8          A.  They're not eligible under the Chapter
9    600.
10         Q.  Okay.  Are attorneys from your office
11   present at all diversion conferences for juvenile
12   clients?
13         A.  What do you mean by diversion
14   conferences?
15         Q.  Are there -- are there conferences in
16   St. Louis city for diversion from -- diversion
17   programs for juvenile clients?
18         A.  So there was a drug court in juvenile
19   court, so we would have been -- we would have been
20   present at that, had been part of the conversation,
21   disposition of the child's case.
22         Q.  But there's no longer a drug court in
23   St. Louis; is that correct?
24         A.  At the end of the year it's ending.
25         Q.  Do you know why it's ending?

19 (Pages 73 to 76)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-13    Filed 02/09/18    Page 20 of 85

## Page 77

1  A.  It was a terrible program.  No child
2  succeeded and it was a program that was created for
3  adults and didn't work with children who were
4  smoking marijuana.
5        MR. MAUNE:  Talk a little bit about the
6  Missouri Coalition for the Right to Counsel.
7  (Exhibit 6, Previously marked exhibit.)
8        Q.  (By Mr. Maune)  Handing you a document
9  that's been previously marked Petsch Document Number
10  6.  Have you seen this document before?
11       A.  I have.
12       Q.  And what is it?
13       A.  It's the notification of case
14  assignment to a volunteer attorney through the
15  Missouri Coalition for the Right to Counsel.
16       Q.  And can you tell me a little bit about
17  the Missouri Coalition for the Right to Counsel
18  program?
19       A.  So an attorney who was retiring from
20  Armstrong Teasdale I think spoke to the director of
21  the public defender system about providing
22  assistance to the public defender system by
23  involving private attorneys from large civil firms
24  to give the public defender the benefit of
25  additional counsel and to give the firms benefit

## Page 78

1  of getting their associates trial experience.  And
2  the Missouri Coalition was formed and we have
3  participated in it since it has been formed.
4        Q.  Do you know how long ago it was formed?
5        A.  The initial training session was in
6  April 2017.  So it was formed right about that time.
7  There were meetings about it prior to then, but I
8  think it had to be chartered or --
9        Q.  Do you know how many firms participate
10  in the Missouri Coalition for the Right to Counsel?
11       A.  I do not have the number of firms, no.
12  I think we have about 60 to a hundred attorneys
13  maybe signed up.
14       Q.  Do you know how many cases are referred
15  to pro bono attorneys as part of the Missouri
16  Coalition for the Right to Counsel?
17       A.  So from our office we have referred
18  36 cases.
19       Q.  And those 36 cases are all since April
20  of 2017?
21       A.  Correct.
22       Q.  Are there particular types of cases
23  that are assigned to the Missouri Coalition for the
24  Right to Counsel?
25       A.  We try to find cases that we believe

## Page 79

1  will go towards jury trial, but they've ranged from
2  low level felonies up to homicide cases that we have
3  assigned out.
4        Q.  What type of training is done for the
5  pro bono counsel that are handling these cases?
6        A.  They're -- the public defender system
7  put on a two-day training for the initial group in
8  January -- I mean -- I'm sorry, in April of 2017 in
9  St. Louis.
10       Then there was another training in
11  October 2017 in Kansas City as well as a half-day
12  training here in St. Louis at the same time.  And
13  then there's another training coming up in January.
14  And the training involves the skills necessary to
15  handle a jury trial.
16       Q.  Do you anticipate having to -- strike
17  that.
18       Who from your office conducts the
19  training?
20       A.  I have participated in the training.
21  Rick Kroger, who was the deputy district defender,
22  participated.  Megan Beesley and Erika Wurst and
23  Matthew Mahaffey, who are all assistant public
24  defenders in our office, have been involved in the
25  training.

## Page 80

1        Q.  Do you anticipate continuing this
2  initial training on an annual basis for private
3  counsel?
4        A.  I don't know if the ones who have
5  already been trained will come back, but I know that
6  there's training for new attorneys in January.
7        Q.  Right.  And aside from St. Louis and
8  Kansas City, are any other districts looking to
9  implement a similar program?
10       A.  So St. Louis County also participated
11  in the one --
12       Q.  Okay.
13       A.  -- that St. Louis City was involved in,
14  and then some of the attorneys, the volunteer
15  attorneys took appellate cases.  So some of the
16  appellate offices have sent cases to them.
17       Q.  How -- what has been the impact of the
18  MCRC program on attorney caseload for your office?
19       A.  It hasn't had a significant one since
20  we've only sent out 36 cases.  The benefit that we
21  have seen, though, is that most of those 36 cases
22  were cases from an attorney who was leaving the
23  office, so that keeps an attorney in the office from
24  inheriting a stale case and having to prepare it in
25  a shorter period of time.

20 (Pages 77 to 80)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-13    Filed 02/09/18    Page 21 of 85

Page 81

1     Q.   Have any of the 36 cases that have been
2   assigned to pro bono counsel gone to trial?
3     A.   Yes.
4     Q.   Do you have an idea how many?
5     A.   Two.  Two went to trial to a jury
6   verdict.  Three went to trial and were dismissed at
7   the time they were sent out to trial.
8     Q.   Are the rest of the cases still
9   pending?
10    A.   No.  There are I believe eight or
11   nine cases that either plead or are now
12   participating in diversion court.
13    Q.   How are resources -- I'll be more
14   specific.
15         How are experts compensated for these
16   types of cases, do those expert -- those requests
17   for funding for experts still go to the public
18   defenders office?
19    A.   I believe they can make that request,
20   but I think there was also a hope that the private
21   firm would take care of that expense when possible.
22    Q.   Do you know if that's occurred to this
23   point?
24    A.   I know the private firms have paid for
25   their own depositions through the assistance of

Page 82

1   Midwest Litigation.  I know they have -- they have
2   hired their own investigators in some cases.  At
3   times they've asked us to assist them in serving
4   subpoenas or finding witnesses.
5         And I don't know that anyone has hired
6   an expert witness, although I take that back.  I
7   think we had a case recently where a mental health
8   expert was retained by one of the firms to present
9   mitigation evidence, and I believe the firm paid for
10   that.
11    Q.   How about for the use of social
12   workers, do such firms have access to that type of
13   experience?
14    A.   In the case that I'm thinking of where
15   they wanted to present mitigation evidence they
16   spoke with our social worker, and then I think the
17   social worker put them in connection with services
18   in the community.
19    Q.   Okay.  And do you monitor the
20   disposition of those cases after they're assigned to
21   the pro bono counsel?
22    A.   At the conclusion of the case they are
23   supposed to send a document back to the contracting
24   office in Columbia who monitors that.  But the ones
25   that are in the city of St. Louis, they generally

Page 83

1   tell me what happened.
2     Q.   Do you anticipate the number of cases
3   being assigned to pro bono counsel in area 22 to
4   change over the next several years?
5     A.   I would like to see it increase.
6     Q.   Talk a little bit about training and
7   development of your new attorneys.  You said you
8   have several new attorneys in your office.  What
9   type of training do those attorneys first receive
10   when they're hired on?
11    A.   So we've hired 15 attorneys in this
12   last year.  So 15 of our 30 attorneys have been
13   there one year or less.  And when they initially
14   join the office they are placed on what we call the
15   green team because they are the green attorneys, and
16   once a week they meet with the deputy district
17   defender.
18         The previous deputy district defender
19   was a more informal discussion about cases.  The
20   current deputy district defender is trying to create
21   a curriculum so that as attorneys cycle through the
22   office we'll have the curriculum prepared and
23   they'll have access to it.
24    Q.   So these 15 new attorneys that you've
25   hired in the last year, are they all new attorneys

Page 84

1   right out of law school?
2     A.   No.  So one of them is a transfer from
3   another office.  One is a former prosecutor.  One is
4   a former public defender.  One worked at Lewis Rice.
5   One had worked in Missouri government, but not
6   really as an attorney.  I think more as a policy
7   person.
8         And the rest would be right out of law
9   school.  Some of them did a clerkship for a judge
10   before they came to us, so they may have gone from
11   law school to clerkship to our office.  I think that
12   was two of them.
13    Q.   And does the Missouri State Public
14   Defenders Office offer training for new attorneys --
15    A.   Yes.
16    Q.   -- that they go to?
17    A.   Yes.
18    Q.   How often does the Missouri State
19   Public Defenders Office offer that new training for
20   their attorneys?
21    A.   So once a year there's training called
22   new defender training, and once a year there is a
23   trial skills training.  There's also a new employee
24   orientation.
25         And then once a year there's a system

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 85

1  wide training that the new attorneys would also
2  attend. So in their first year they could attend
3  four trainings. But if you get hired immediately
4  after one of those trainings, you have to wait a
5  year to take it.
6       Q.  If -- if a attorney is hired right
7  after the Missouri State Public Defenders Office has
8  hired new -- or has handled new attorney training,
9  how does that impact your assignment of cases for
10 that attorney over the year till they can get that
11 training?
12      A.  It doesn't. They -- they generally get
13 new cases their first day on the job. Or they get
14 cases that already exist and the previous attorney
15 left are transferred to them their first day on the
16 job.
17      Q.  What are your policies and procedures
18 for -- for supervising these new attorneys that have
19 started in your office?
20      A.  I don't know that we have any formal
21 policies. I mean, other than if they take a case to
22 a jury trial they need a second chair for their
23 first misdemeanor and first two felony trials, first
24 sex and homicide. But hopefully that wouldn't
25 happen in their first year. And they're evaluated

## Page 86

1  at the end of that first year.
2       Q.  Do you have any mechanisms for
3  attorneys to raise concerns about their caseloads?
4       A.  Yes.
5       Q.  And can you please describe those
6  mechanisms or policies or procedures that you have?
7       A.  We've met with all of the attorneys in
8  the office and discussed their ethical obligations
9  and informed them of their duty to bring their
10 attention -- to bring to our attention if they
11 believe their caseload is too high. And I also
12 monitor their caseloads on a regular basis to see if
13 I believe there is concerns with it being too high.
14      Q.  Can attorneys refuse cases because they
15 believe their caseload is too high?
16      A.  They could. They have not had to
17 because any attorney who has requested that they not
18 receive new cases, that request has been honored.
19      Q.  And what happens to the case if it was
20 refused by an attorney because their current
21 caseload is too high?
22      A.  It goes to another attorney within the
23 office at this point.
24      Q.  What have -- have there been any
25 changes in policy that you've implemented in light

## Page 87

1  of the in re Hinkebein decision?
2       A.  We had individual meetings with every
3  attorney to evaluate their caseloads and to find out
4  from them whether or not they felt their caseload
5  was too high, and if they did, then we added
6  additional information to the case assignment sheet
7  to stop them from receiving any new assignments
8  until that changed.
9       Q.  In your experience, what has been the
10 response from the courts in -- in your district with
11 respect to this decision?
12      A.  I've spoken to the presiding judge who
13 is very empathetic with our position and who wants
14 to make certain that our caseloads remain
15 reasonable. I've spoken to the -- what we call the
16 criminal assignment judge who manages the criminal
17 docket. He's been less empathetic, but is willing
18 to talk if we get to the point where we have to put
19 people on wait list.
20      Q.  Do you currently have a wait list?
21      A.  No.
22      Q.  Have you ever had a wait list in your
23 previous ten years?
24      A.  Back in 2012 we had a wait list, I
25 believe.

## Page 88

1       Q.  And in 2012 who decided what clients
2  would go on a wait list?
3       A.  I did based upon an administrative
4  order that was issued by the court.
5       Q.  How did clients get off the wait list
6  for representation?
7       A.  I don't remember the specifics of how
8  it worked, but my recollection is that the wait list
9  ended when the public defender system decided to not
10 use the certification protocol. And I believe --
11 and I would have to double-check this, but I
12 believed we used that indigence docket also as a way
13 for cases to come off the wait list.
14      Q.  Have there been any changes in the
15 number of attorneys in your office that helped
16 alleviate the need for a wait list?
17      A.  We actually took on a heavier caseload
18 during the last several years so that we could free
19 up a position for another office. So in -- when I
20 began in 2007 we handled first-level conflicts for
21 St. Francois County, Jefferson County, and St. Louis
22 County, and second-level conflicts for Franklin
23 County and St. Charles County.
24         We took on first-level conflicts for
25 Franklin County and St. Charles County, which is

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 89

1   basically a position.  And St. Louis County lost
2   that responsibility.  So we didn't change the number
3   of attorneys, but we changed the responsibilities,
4   and I think that happened in 2011 or '12.  I think
5   maybe that happened in 2013.
6       Q.   Have you drafted or I guess sent any
7   memoranda to the courts concerning the in re
8   Hinkebein decision?
9       A.   No.
10      Q.   Has there been a reaction to the best
11  of your knowledge from the local bar association in
12  your district regarding this decision?
13      A.   No.
14          MR. MAUNE:  It's a good place for a
15  break.
16          VIDEOGRAPHER:  The time is 11:06.  We
17  are off the record.
18          (WHEREIN, a recess was taken.)
19          VIDEOGRAPHER:  The time is 11:15.  We
20  are back on the record.
21  (Exhibit 5, Previously marked exhibit.)
22      Q.   (By Mr. Maune)  I've handed you what's
23  been previously marked as Exhibit Number 5
24  Cardarella.  Can you please take a few minutes to
25  review this document, let me know when you're ready

## Page 90

1   to proceed.
2       A.   Okay.
3       Q.   Have you seen this document before?
4       A.   I have -- I believe it's in our
5   litigation, but I'm not positive but I've looked at
6   it.  It's in our litigation board.
7       Q.   Do you know what it -- what it is?
8       A.   It is a proposed writ for an attorney
9   who wants to be able to withdraw from a case and the
10  court will not allow them to.
11      Q.   Have any attorneys in area 22 utilized
12  this sample writ?
13      A.   No.
14      Q.   Is this example available for your
15  attorneys to use if required?
16      A.   I believe it's on the litigation board.
17  They -- they know the litigation board exists.  I
18  think if we got to the point where one of them
19  wanted to withdraw, it would be going through me as
20  opposed to them as an individual.
21      Q.   Let's talk about turnover in your
22  office for a minute.  You said you have 15 new
23  attorneys start in your office as of this year; is
24  that correct?
25      A.   Correct.

## Page 91

1       Q.   And was that due to 15 openings that
2   happened in your office previous to them starting?
3       A.   Yes.
4       Q.   Is that number of openings in a single
5   year unusual for area 22?
6       A.   It's higher than it has been I believe
7   in ten years, but it's generally between eight and
8   12 a year.
9       Q.   What do you believe is the cause for
10  this turnover rate?
11      A.   The high workload, the high trial
12  calendar -- or difficult trial calendar in the city
13  of St. Louis.  And the low pay.
14      Q.   Can you expand on what you mean by a
15  difficult trial calendar in the city of St. Louis?
16      A.   So our office tries more cases to a
17  jury trial than any other office in the state, and
18  that's consistent with our circuit.  Our circuit
19  does that more than any other circuit in the state.
20          And because there are no plea
21  negotiations, many more cases are prepared for trial
22  and then resolved at the time the case is sent to
23  trial or dismissed by the state at the time that a
24  case is sent to trial.
25          So in addition to the -- about a

## Page 92

1   hundred cases that are sent out to trial and go to
2   trial, there's an additional 60 a year, 50 to 60 a
3   year that are sent out to trial and the state
4   dismisses them after you've spent time preparing the
5   case for trial.
6           And the way the trial docket is set up,
7   if you are suddenly available and have another case
8   on that trial docket, you could then immediately be
9   sent out on a second case.  So we've had attorneys
10  sent out to trial on multiple cases within one week.
11  It's difficult to do that.
12      Q.   Do you have an idea of how -- the
13  highest number of cases a single attorney has had to
14  prepare for in say a given year?
15      A.   I can tell you the highest number of
16  cases that a single attorney has tried in a given
17  year is 18 felonies.  But in addition to those 18,
18  that attorney would have prepared probably an
19  additional 20.
20      Q.   In your -- from your previous
21  experience as a public defender I believe in Clayton
22  County; is that correct?
23      A.   In St. Louis County and St. Louis City.
24      Q.   During that time, were there plea
25  arrangements in St. Louis County or St. Louis City?

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

Case 2:17-cv-04057-NKL   Document 153-13   Filed 02/09/18   Page 24 of 85

## Page 93

1  A. In St. Louis County there have always
2  been plea negotiations. In St. Louis City plea
3  negotiations ended when Jennifer Joyce became the
4  circuit attorney, and I believe that was 2000.
5  Shortly after she -- she took office.
6  **Q. And has the lack of plea**
7  **arrangements --**
8  A. I'm sorry, can I correct that? I'm
9  wrong.
10  **Q. Yes, go ahead.**
11  A. She took office in 2000, and pursuant
12  pleas stopped happening after she took office
13  because her recommendations were so high. I think
14  she did not stop making recommendations until 2012
15  or 2013. But even when there were recommendations,
16  most pleas were -- were open.
17  **Q. So when you say her recommendations**
18  **were so high, does that mean that the -- the**
19  **penalties were very high for those crimes?**
20  A. Yes. And higher than the court thought
21  was appropriate.
22  **Q. And what has been the impact on your**
23  **office from St. Louis City stopping plea**
24  **negotiations on your attorneys' workload?**
25  A. It means that you -- it is much more

## Page 94

1  difficult first of all to gain your client's trust,
2  that they can plead open in front of a judge they
3  have never met and their case has never been in
4  front of before and that you can accurately predict
5  what that judge will do with their case.
6  So when they're entering a plea of
7  guilty they have to state that they know the court
8  has the full range of punishment in front of them,
9  and the attorney has to be able to counsel them on
10  what they believe the result will be.
11  And generally we're right, but
12  obviously it requires a lot of trust for someone to
13  believe that you're right in that situation and to
14  decide that a plea is in their best interest.
15  **Q. What are the kind of problems for your**
16  **office are caused by such a high turnover rate?**
17  A. We don't have enough experienced
18  attorneys to try the serious cases. So I have --
19  some of those 15 attorneys that were hired this year
20  already have homicide cases assigned to them. I --
21  this year we had two attorneys we labeled APD2, so
22  that means they had been with the system for more
23  than one year, less than three years, who both tried
24  murder first cases this year.
25  Now, fortunately both of them obtained

## Page 95

1  a not guilty verdict, but that's a lot of -- that's
2  a very serious responsibility to give to an attorney
3  with that little experience.
4  So we generally have 60 plus homicides
5  pending at any one time. And currently in the
6  office we have five attorneys who have tried a
7  homicide. Six, I'm sorry. Six.
8  **Q. Do you -- do you know where the**
9  **attorneys who are leaving your office, do they go**
10  **into private practice?**
11  A. Some go into private criminal practice.
12  Several have gone to civil firms. Some have
13  transferred to other public defender offices and
14  some have left the practice of law.
15  **Q. And when someone -- when an attorney**
16  **leaves your -- your office, is their position filled**
17  **right away?**
18  A. We have to go through the hiring
19  process, so it takes probably minimal three months
20  to get filled.
21  **Q. How does your office advertise its open**
22  **attorney positions?**
23  A. That's done through the HR office in
24  Columbia. I think they use some of those computer
25  websites, but I don't know which ones specifically.

## Page 96

1  **Q. Has -- has area 22 ever lost positions**
2  **because they have not been timely filled?**
3  A. No.
4  **Q. Is that a possibility if a position is**
5  **not filled in a sufficient number of months that the**
6  **position would be moved to another office?**
7  MR. MOORE: I'll just -- sorry. I'll
8  just object, it calls for speculation, but you can
9  go ahead.
10  A. Not to my knowledge.
11  **Q. (By Mr. Maune) Since you've been the**
12  **district defender, are you aware of any cases in**
13  **which one of -- a court has found that one of**
14  **indigent defendants have received insufficient --**
15  MR. MOORE: Ineffective.
16  **Q. (By Mr. Maune) -- ineffective**
17  **assistance of counsel?**
18  A. Yes.
19  **Q. And how often has that occurred?**
20  A. There have been two cases that have
21  come out of my office to -- to my knowledge. One
22  was for lack of investigation and one was for
23  conveying incorrect information.
24  **Q. After the in re Hinkebein decision,**
25  **have your attorneys expressed concern regarding this**

24 (Pages 93 to 96)

ALARIS LITIGATION SERVICES
www.alaris.us                    Phone: 1.800.280.3376                    Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-13    Filed 02/09/18    Page 25 of 85

1  decision?
2      A.  They've discussed it, yes.  They're
3  concerned.  They were concerned for Mr. Hinkebein.
4  They were concerned for what it means for
5  themselves.
6      Q.   Is there anything else you think we
7  should know regarding your office's ability --
8  strike that.
9      A.  Excuse me.
10      Q.   Do you believe you have a sufficient
11  number of investigators?
12      A.  No.
13      Q.   Do you have an idea how -- what the
14  ratio of attorney to investigator should be?
15      A.  No, but I can tell you that trying a
16  hundred plus cases a year, we never have an
17  investigator at the trial.  The investigators are
18  continually interviewing and investigating future
19  cases and/or serving subpoenas.  So when an attorney
20  goes to trial, they do not have an investigator with
21  them.
22      Q.   So -- so how do the investigators
23  receive feedback from the trial as to the
24  effectiveness of their investigation or --
25      A.  Hope the attorney has enough time to

1  send a nice e-mail or to stop by and tell them.
2      Q.   How about administrative staff, do you
3  have sufficient --
4      A.  Excuse me.
5      Q.   Do you have sufficient administrative
6  staff?
7      A.  We are pretty well staffed
8  administratively.  And I say that, but -- but at the
9  same time our attorneys still do a lot of their own
10  work.  So while our staff, our administrative staff
11  do our initial pleadings, get our discovery, scan
12  the discovery in, anything beyond that, any motion
13  that's created beyond that the attorney is creating
14  it themselves, filing it themselves, sending letters
15  to their clients themselves.
16      So it's not like any of us have a
17  support staff person who is available to do all of
18  those tasks.  So if I'm sending letters to my
19  clients I'm typing them, I'm creating an envelope,
20  I'm placing them in the mail.  So I think where I'm
21  just so used to it I don't even realize that we
22  don't have enough administrative staff.
23      Q.   Is there -- is it a -- for the
24  administrators that you do have, is it more of a
25  pool situation that you look for who is available or

1  are they assigned to --
2      A.  They're assigned to --
3      (Court reporter interruption.)
4      A.  -- attorneys.
5      Q.   (By Mr. Maune)  And do you know what --
6  is there -- what the current ratio, I guess, if it's
7  five administrative staff; is that correct?
8      A.  Well, no.  It's one, two, three,
9  four -- there's four who are assigned just to
10  attorneys.  There are others who have other
11  responsibilities and/or assigned to attorneys.  So
12  for instance, the legal assistant who have done our
13  indigence applications is also the secretary for
14  several attorneys.
15      The legal assistant who manages our
16  front office and handles all the incoming people and
17  phone calls also is assigned to certain attorneys.
18  The legal assistant who handles our juvenile docket
19  also has certain attorneys.  So there's only two
20  support staff who do nothing but have attorneys.
21      Q.   So it's roughly -- roughly seven to
22  one, seven attorneys for each assistant, but it's
23  not directly correspondent because some are assigned
24  solely for juvenile?
25      A.  Correct.

1      MR. MAUNE:  Okay.  I should be done.  I
2  just want to go off record for a minute and let's
3  make sure I got everything cleaned up and then we'll
4  be done.
5      VIDEOGRAPHER:  The time is 11:30.  We
6  are off the record.
7      (WHEREIN, a recess was taken.)
8      VIDEOGRAPHER:  The time is 11:32.  We
9  are back on the record.
10      MR. MAUNE:  I'm handing you -- handing
11  the court reporter a document that's entitled State
12  of Missouri Public Defender Commission Fiscal Year
13  2017 Annual Report.  That will be marked as
14  Plaintiffs' Exhibit Fox 33.
15      (WHEREIN, Exhibit 33, State of Missouri
16  Public Defender Commission Fiscal Year 2017 Annual
17  Report, was marked for identification by the Court
18  Reporter.)
19      Q.   (By Mr. Maune)  Please take a look at
20  it.
21      A.  I have seen it before.
22      Q.   You've seen it before?
23      A.  Yeah.
24      Q.   Okay.  If you could turn to page 82 of
25  the report.

25 (Pages 97 to 100)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-13   Filed 02/09/18   Page 26 of 85

## Page 101

1    A.  Okay.
2    Q.  And I'm looking at the box in the
3  center where it says St. Louis City cases assigned,
4  and it starts with fiscal year '08 and it goes to
5  fiscal year '17.  And it looks like it starts with
6  over 6,600 cases assigned in the beginning and then
7  there's a pretty sharp I guess reduction in the
8  number of cases starting in '13 continue --
9  continuing through '14 and '15, and then beginning
10  to rise again.  Do you have an idea why the number
11  of cases sharply went down and then maybe why
12  they're coming up again?
13    A.  So fiscal year '12 was pre-Waters.
14  When Waters came out our circuit had a meeting as
15  Waters directed and the court issued an
16  administrative order to assist with caseload relief.
17  So fiscal year '13 reflects that change -- those
18  changes in part.  Part of fiscal year '13 was
19  pre-Waters and part of fiscal year '13 was
20  post-Waters.
21      So fiscal year '14 and '15 pretty
22  accurately reflect the reduction in caseload as a
23  result of the administrative order, and then fiscal
24  year '16 and '17, it's a combination of we took
25  those additional conflict responsibilities and

## Page 102

1  probation violations began to increase and more
2  change in the judges who are handling the
3  misdemeanor cases so that more misdemeanor
4  defendants were coming up and applying for our
5  services.
6      In fiscal year '14 or '15 there was a
7  misdemeanor judge who appointed private counsel on
8  some of those misdemeanor cases that then in '16 and
9  '17 came to us.  So if you look at our case numbers,
10  '14 and '15 pro revs and misdemeanors go down.  '16
11  and '17 they go up.
12      MR. MAUNE:  Okay.  I'm handing to the
13  court reporter a document that's an article in the
14  St. Louis Post-Dispatch.  It's entitled "Public
15  defenders in Missouri say caseloads have them
16  overworked and discipline has some scared."  It will
17  be marked as Fox 34.
18      (WHEREIN, Exhibit 34, St. Louis
19  Post-Dispatch article, was marked for identification
20  by the Court Reporter.)
21      MR. MOORE:  Do you have another article
22  by chance?
23      MR. MAUNE:  I will get you one.
24      MS. SHIPMA:  We can share.
25      MR. MAUNE:  Yeah.

## Page 103

1      THE WITNESS:  Okay.
2      Q.  (By Mr. Maune)  Have you seen this
3  document before?
4      A.  Not in this form.  I saw it when it was
5  in the newspaper.
6      Q.  Okay.  Were you interviewed for this
7  article?
8      A.  I was.
9      Q.  And are your statements to the reporter
10  accurately captured?
11      A.  They are.  I'm sorry.
12      Q.  As we stand here today I guess a little
13  over a month -- almost a month later, do your
14  opinions remain the same that are portrayed in this
15  article?
16      A.  Yes.
17      Q.  All right.  Is there anything else that
18  you think we should know regarding your office's
19  ability or your attorneys' abilities to provide
20  effective representation?
21      A.  Nothing that's coming to mind.
22      MR. MAUNE:  Pass the witness.
23      EXAMINATION
24  QUESTIONS BY MR. MOORE:
25      Q.  Very good.  So my name is Justin Moore.

## Page 104

1  And earlier I said I was for the Attorney General's
2  Office.  That's not exactly correct.  Can you hear
3  me okay?
4      So earlier I said I was for the
5  Attorney General's Office.  That's not exactly
6  correct.  I'm from the Attorney General's Office,
7  but I represent the State of Missouri and the
8  Governor.
9      So I'm just going to be following up on
10  some of the questioning that's been taking place
11  today.  Let's just kind of go through and fill in a
12  little bit of the background information.  So if you
13  could please just tell me about your educational
14  background, where did you go to undergrad and then
15  law school?
16      A.  Undergraduate, Saint Louis University.
17  Graduated in 1976 with a degree in urban affairs.
18  And law school, Saint Louis University School of
19  Law, graduated in 1980.
20      Q.  Okay.  Are you from the St. Louis area?
21      A.  I am.
22      Q.  Where did you go to high school at?
23      A.  Incarnate Word Academy.
24      Q.  Oh, very good.  Private schooler.  Very
25  good.  Okay.  So let me see.  And did you go

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

Page 105

1  straight through high school, undergraduate, law
2  school, or did you take some time off in there to
3  work?
4            (Court reporter interruption.)
5        Q.  (By Mr. Moore)  Did you go straight
6  through education or did you take any time off
7  in-between to work a job or anything of that nature?
8        A.  I worked between college and law
9  school.
10       Q.  And what did you do in-between?
11       A.  Initially I had a job as a writer for a
12 public relations firm.  And then I worked as an
13 administrative assistant for LIFE Skills Foundation,
14 which was a social service agency that served
15 developmentally disabled adults.
16       Q.  Okay.  And how long did you serve in
17 those roles?
18       A.  So in the public relations firm I
19 believe I was only there maybe three or four months.
20 For LIFE Skills I worked there until I started law
21 school, and then I remained there through my I
22 think -- I think through the second year in law
23 school, and then I took a legal job for the summer
24 after second year.
25       Q.  Okay.

Page 106

1        A.  And then stopped third year.
2        Q.  And so do you know like what kind of
3  period of time you took off between undergraduate
4  and law school?
5        A.  A year.
6        Q.  Oh, it's one year.  Okay.  And you
7  worked at a -- I think you said a private firm of
8  some kind.  I'm looking for the name of that firm
9  whenever you first got out of school; is that right?
10       A.  Correct.
11       Q.  What was the name of that firm again?
12       A.  Kanefield & Mohme.
13       Q.  Okay.  And what kind of work did they
14 do?
15       A.  Civil.
16       Q.  Just like civil litigation or family
17 stuff or what kind of --
18       A.  It was a little small firm, did a
19 little bit of everything.  I -- I can't remember to
20 tell you the truth what I did it was so many years
21 ago.
22       Q.  Okay.  How big was that firm?
23       A.  There was Kanefield and Mohme and there
24 was me.
25       Q.  Very good.  So outside of that one

Page 107

1  private firm, have you worked for any other private
2  firms in the St. Louis area or anywhere else?
3        A.  No.
4        Q.  Okay.  So during this deposition you
5  kind of expressed some concerns, I guess, about
6  public defender workload and caseload, right?
7        A.  Correct.
8        Q.  Who all have you spoken to other than
9  the people we've already talked about about these
10 concerns?
11       A.  Well, I speak to the attorneys in my
12 office on a pretty regular basis.  I've spoken to
13 Mr. Patrick from the Post-Dispatch.  I've spoken to
14 management within the public defender system.  And
15 I've spoken to the judges within the circuit.
16       Q.  So question for you is how do you
17 define a case or a matter in your system?
18       A.  When the state initiates a proceeding
19 against a person.  So if it's -- if it's one count
20 with three co-defendants, it would be three cases.
21 If it's one defendant with three charges, it would
22 be one case.
23       Q.  Okay.  So it's kind of like by
24 defendant for each matter?
25       A.  Correct.

Page 108

1        Q.  Okay.  Is there a situation where one
2  case could become two different cases?
3        A.  It does not generally happen that way.
4        Q.  Okay.  Can you think of a situation
5  where it would happen that way?
6        A.  The court could sever and assign a new
7  case number to part of the case, but I've -- I've
8  never seen that happen in ten years.  I think the
9  court has the authority to do that.
10       Q.  How about for charges that are filed
11 subsequent to you guys already representing a
12 particular client, would that be a different case or
13 the same case?
14       A.  If it's the same events it's the same
15 case.
16       Q.  Okay.
17       A.  If some new crime happens or new
18 charges occur that have nothing to do with the first
19 case, then that would be a separate case with
20 separate discovery.
21       Q.  Okay.  Have you noticed any recent
22 trends in how your district is defending cases, for
23 example, trending towards more depositions, more
24 experts, less plea deals, anything of that nature?
25       A.  We have retained an eyewitness

27 (Pages 105 to 108)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-13    Filed 02/09/18    Page 28 of 85

## Page 109

1    identification expert this year in several cases,
2    and I don't think we had ever retained an eyewitness
3    identification expert prior to this time.
4            The number of trials and number of
5    cases that get resolved by plea have remained
6    relatively consistent.  There have been a larger
7    number of cases that have been sent out to trial in
8    which the state has dismissed the case this year.
9        Q.  Any other trends that you've noticed?
10       A.  Nothing I can think of off the top of
11   my head.
12       Q.  Okay.  So tell me about this eyewitness
13   ID expert, any particular reason why this person or
14   set of persons is being utilized more than in the
15   past?
16       A.  Because of the change in the law in
17   terms of eyewitness identification.  Missouri's case
18   law saying eyewitness identification experts are not
19   allowed in was made in 1988, and that law has
20   changed throughout the states since that time period
21   and as a result we are pursuing that issue.
22           And the Missouri Supreme Court issued
23   an eyewitness identification instruction which did
24   not previously exist.  So the expert testimony is
25   consistent with the eyewitness identification

## Page 110

1    instruction.
2        Q.  Okay.  So it has to do with the change
3    that took place in the law, not a change to the
4    defenders' budget or anything of that nature; is
5    that right?
6        A.  Correct.
7        Q.  Okay.  You talked a little bit about
8    how you guys track cases in the public defenders
9    office.  Is there any kind of mechanism, any other
10   mechanism we haven't discussed that you guys would
11   use to track your cases or to monitor your cases?
12       A.  So everything is contained in Lotus,
13   which is our database.  From Lotus I sometimes
14   create other spreadsheets.  So I have created a
15   travel spreadsheet that shows which cases went to
16   trial and what the verdicts were in more detail than
17   what the Lotus notes show.
18           So for instance, it may show guilty and
19   not guilty in the Lotus database and in our
20   spreadsheet it might show not guilty of murder
21   first, guilty of trespassing.  So it would
22   demonstrate that it was not just a half guilty, half
23   not guilty, but a very successful half guilty, half
24   not guilty.
25       Q.  Very good.  And so when you're looking

## Page 111

1    at Lotus, what all is included in there is just the
2    case disposition or is there other stuff in Lotus
3    that you can look at?
4        A.  In terms of what?
5        Q.  So as like a case tracking system, so
6    like a live case you would be able to pull up Lotus
7    and look at what's going on or is it simply some
8    kind of mechanism where you can look at statistics
9    on cases that have already been closed?
10       A.  No.  It's a case database, so it would
11   show the case, any pleadings filed in the case that
12   were -- where Lotus was used.  Letters to the
13   client, notes from the attorney.
14       Q.  And you would be able --
15       A.  Hopefully the discovery would be
16   scanned into the electronic file.
17       Q.  Okay.  Sorry to interrupt there.
18       A.  That's all right.
19       Q.  So you'd be able to pull those
20   documents up directly in Lotus if you wanted to,
21   right?
22       A.  Correct.
23       Q.  Are there any public defenders on call
24   24 hours a day for like emergencies?
25       A.  No.

## Page 112

1        Q.  So we talked about -- a little bit
2    about determining indigency for defendants, right?
3        A.  Correct.
4        Q.  And is there any mechanism in place to
5    kind of revisit the determination of indigency later
6    on in the case to make sure that, you know, you guys
7    aren't being bamboozled or kind of fooled by
8    defendants who maybe want to get representation but
9    might not be entitled to it?
10       A.  Yes.
11       Q.  And what kind of safeguards are in
12   place for that?
13       A.  So there is section 600.086 that allows
14   counsel to file a motion in front of the court to
15   have the defendant determined to be not indigent.
16   So for instance, one time a client canceled an
17   office appointment because they were going on a
18   cruise, so we filed a motion and asked the court to
19   determine that the person was not indigent because
20   if they could afford a cruise, they could certainly
21   afford private counsel.  And the court granted the
22   motion.
23       Q.  Oh, very good.  That was a section
24   600.086?
25       A.  I believe it's 086, yes.

28 (Pages 109 to 112)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-13   Filed 02/09/18   Page 29 of 85

Page 113

```
1        Q.   Okay.  Now, you've cited one example of
2   such a motion being filed by your office.  Do you
3   happen to know like how many of those motions
4   typically get filed in a year?
5        A.   Very few.  Maybe five.  And it usually
6   has to do with something much less obvious such as
7   posting a very large bond or hiring a private
8   counsel in another case.
9        Q.   Okay.  So your attorneys just kind of
10  keep an eye out for things that stick out to them
11  and if they notice it, then that's when they'll
12  consider filing the motion?
13       A.   They'll come to me and we do all that
14  sort of motions at the indigence docket once a
15  month.
16       Q.   Okay.  Do you know if they perform any
17  kind of independent investigation as to the
18  indigency determination other than just kind of
19  things that pop out at them?
20       A.   Well, the legal assistant reviews the
21  application.  If the person indicates that they own
22  a house, then she'll go on the assessor's website to
23  see what the value is of the house.  If they
24  indicate they own a car, then she'll look for the
25  Blue Book value of their car and take those things
```

Page 114

```
1   into consideration.
2        Q.   Okay.  And let's say somebody applies
3   and they don't, you know, list that house to raise
4   that red flag, is there still somebody kind of
5   looking into whether they have these assets prior to
6   the determination being made or is it kind of taking
7   at face value whatever they put on the application?
8        A.   If they do not indicate they have a
9   house, we do not do a search to see if they own real
10  estate.
11       Q.   Okay.  That would only be if something
12  tips you guys off is when you would do that
13  investigation?
14       A.   If it's brought to our attention, yes.
15       Q.   So we also talked earlier a little bit
16  about the procedure for obtaining discovery and
17  experts in your cases, right?  For the record, you
18  have to --
19       A.   Yes.
20       Q.   So have you ever had a request for a
21  deposition been rejected because of financial
22  reasons by the office?
23       A.   No.
24       Q.   And have you ever denied any of your
25  defenders the -- not the right to get a deposition,
```

Page 115

```
1   but the request to get a deposition on the basis of
2   like financial reasons?
3        A.   No.
4        Q.   Have you ever heard of that happening
5   for any other public defenders having their request
6   to take a deposition being denied because of
7   financial reasons?
8        A.   I only know it's in my office.  I don't
9   know about the other offices.  I haven't heard of
10  that, no.
11       Q.   Okay.  Are any of your depositions
12  taken outside of the state of Missouri?
13       A.   We have depositions where the witness
14  may be outside of the state of Missouri, but we do
15  it with the attorney here and the court reporter
16  where the witness is via video.
17       Q.   Okay.  So that's my next question.  So
18  I think --
19       A.   And actually, I misspoke.  Via phone.
20       Q.   Via phone?
21       A.   Yeah.
22       Q.   So I think you stated that those
23  depositions do take place sometimes if the witness
24  is out of state, but if it is required it would be
25  done via telephone, right?
```

Page 116

```
1        A.   That's how we've done it in the past,
2   yes.
3        Q.   Okay.
4        A.   Usually through an agreement with the
5   prosecutor's office.
6        Q.   Okay.
7        A.   I mean, they've agreed to produce the
8   witness out of state if we agree that the attorneys
9   can remain in St. Louis for the deposition.
10       Q.   Okay.  Are there any policies or
11  procedures that guide or limit, you know, how many
12  depositions can be taken for a case?
13       A.   No.  I mean, there's -- there's
14  policies as to when to take a deposition and what
15  information is necessary.
16       Q.   Uh-huh.  But there's no rule like you
17  can only take three depositions per X type of case,
18  right?
19       A.   Not that I'm aware of.
20       Q.   It's pretty much just, you know, do
21  what you have to do to get the case ready for trial,
22  right?
23       A.   Take the depositions that you think are
24  necessary.
25       Q.   And are there any policies mandating a
```

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

Page 117

1  certain amount of depositions or investigators be
2  used for certain types of cases?
3      A.  No.
4      Q.  Now, we talked just a little bit about
5  obtaining experts and situations where experts have
6  and have not been approved, right?
7      A.  We talked about experts, yes.
8      Q.  Okay.  We can start off there.  That's
9  fine.
10      A.  Okay.
11      Q.  I think you said earlier that there
12  have been a couple times where there's like a higher
13  level of review that comes after your approval of
14  using an expert, right?
15      A.  Yes.
16      Q.  And sometimes at that level there has
17  been kind of a second look at which experts are
18  being used because of financial reasons, right?
19      A.  Correct.
20      Q.  Has there ever been a situation where
21  you said we need to have an expert for this case and
22  the people above you said you can't have an expert
23  of any kind for that case?
24      A.  No.
25      Q.  Okay.  Because it seems like they have

Page 118

1  tried to just find more fiscally conservative
2  methods or fiscally conservative experts, I guess,
3  but they've never denied you using experts; is that
4  right?
5      A.  I don't recall ever being denied an
6  expert, no.
7      Q.  And have you ever heard of, you know,
8  any other defenders having their request for an
9  expert denied based on financial reasons?
10      MR. MAUNE:  Objection, calls for
11  speculation.
12      Q.  (By Mr. Moore)  Just what you've heard
13  of, not speculation.
14      A.  Not that I've heard of.
15      Q.  Okay.  And we may have gone over this
16  ground already, but are you aware of any policies or
17  procedures that state like when and how much experts
18  can be appointed or not appointed in cases?
19      A.  Well, they're not appointed.  They're
20  -- they're retained by us.
21      Q.  Right.
22      A.  So yes, there are -- there are policies
23  and what information you need to provide to request
24  an expert.  Generally we -- before an attorney in
25  the office is going to request an expert, we would

Page 119

1  vet the case and discuss it and discuss what value
2  the expert would bring to the case before they would
3  ever submit any request.
4      Q.  Okay.
5      A.  So by the time they submit an E request
6  we've already pretty much decided that that would
7  bring value to the case.
8      Q.  Okay.  So yeah, I guess what is the
9  procedure for requesting an expert, you mentioned an
10  E request?
11      A.  Yes.
12      Q.  So what -- how does that process work
13  from start to finish, I guess?
14      A.  Within the case in Lotus the attorney
15  submits a request stating what -- who they are
16  asking to retain, what the anticipated cost is, and
17  what the reason is that they're asking for the -- to
18  retain the expert.
19      That's submitted through the database
20  system.  I either approve or disapprove, and if I
21  approve and it's over $500, which most experts would
22  be, it then requires division director approval.
23      Q.  And you also mentioned that some kind
24  of conversation would happen before this request
25  goes through, right?

Page 120

1      A.  Generally, yes.
2      Q.  Okay.  And that would just kind of be
3  like a sit-down meeting with your associates to
4  discuss the case and why it needed an expert?
5      A.  Correct.
6      Q.  Okay.  So I think we discussed earlier
7  about when a trial would be and would not be
8  assigned a second-chair attorney by your office?
9      A.  Yes.
10      Q.  Is there like any kind of a rule that
11  you're aware of in your office for a, you know, we
12  must have a second-chair attorney here for these
13  types of cases or is it more like a discretion of
14  management?
15      A.  No.  There is a rule, and actually I
16  forgot one category.  So you need to have a second
17  chair for first misdemeanor trial, first two
18  felonies.  Now mind you if you have your first two
19  felony trials before you have your first misdemeanor
20  trial, then you don't need an expert -- a second
21  chair for your first misdemeanor trial.
22      Q.  Okay.
23      A.  And then a second chair for your first
24  sex case.  So case in which it's allegations of
25  sexual assault.  And a second chair -- you got me

30 (Pages 117 to 120)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-13    Filed 02/09/18    Page 31 of 85

Page 121

```
1    stuck on experts.  A second chair for your first
2    homicide case.
3         Q.  Okay.
4         A.  And also a second chair for your first
5    juvenile court certification hearing or transfer
6    hearing.
7         Q.  Okay.  And that's like an internal
8    policy of the MSPD; is that right?
9         A.  That's a local area 22 policy.
10        Q.  Okay.  But that's not based on any like
11   statute or case law or anything of that nature; is
12   that right?
13        A.  It's based upon the -- the public
14   defender requirements of how to run a public
15   defender office and on the ethical obligations to,
16   you know, provide sufficient supervision.
17        Q.  Okay.  And so -- so are you saying
18   there's particular ethical rule that discusses like
19   the second chair assignments?
20        A.  No, no, no.
21        Q.  Okay.
22        A.  No.
23        Q.  There's just -- there's a general
24   ethical rule about adequate supervision, and so the
25   public defenders office in attempting to comply with
```

Page 122

```
1    that has made their own rule regarding second
2    chairing trials, right?
3         A.  So again, this is my personal office
4    policy.  It's not an MSPD policy.
5         Q.  Okay.
6         A.  And it's because we try a large number
7    of cases, and sometimes people would try a lot of
8    drug cases and then suddenly have a homicide case
9    and they would not have a second chair, and there's
10   a significant difference between defending a
11   homicide case and defending a drug case.
12        Q.  Okay.  So yeah, this is my
13   misunderstanding of the rule.  So this is a rule
14   that you put into place for your district, right?
15        A.  Correct.
16        Q.  It's not a rule that the whole public
17   defender system has in place, right?
18        A.  No.
19        Q.  And as far as you know, that's not a
20   rule that is embodied in any like statute or like
21   specific ethical rule anywhere that you have to
22   second chair these types of cases or anything,
23   right?
24        A.  Correct.
25        Q.  Okay.  Do you track your time?
```

Page 123

```
1         A.  No.
2         Q.  No.  Does anybody in your office track
3    their time?
4         A.  No.  We track it through time sheets.
5    We don't track it per case.
6         Q.  So tell me specifically what you mean
7    by that.
8         A.  So each employee is to record daily how
9    much time they spent working.
10        Q.  So they just kind of put in a chunk of
11   time like eight hours or something like that, right?
12        A.  Or whatever amount of time they spent
13   working.
14        Q.  Okay.  Has there ever been a time when
15   you guys have tracked your time in smaller
16   increments like five minutes or by tenths of an hour
17   or anything like that?
18        A.  Yes.
19        Q.  And when was that?
20        A.  I don't remember when it began.  It
21   ended October 1st, 2016.
22        Q.  And there's much celebration I'm sure,
23   right?
24        A.  I actually enjoyed it.  It made you
25   feel you had -- you had been productive during the
```

Page 124

```
1    day when you could look back and see exactly what
2    you had done.
3         Q.  I've never heard an attorney say that
4    they enjoyed billing by tenths of an hour ever.
5         A.  I wasn't billing.  I was only tracking.
6         Q.  Oh, that's the difference I guess then.
7    Okay.  Fair enough.  So it ended October 2016.
8    Can't really recall when it started, right?
9         A.  Correct.
10        Q.  And I'm guessing that was in connection
11   with some particular like a study that was going on;
12   is that right?
13        A.  Correct.
14        Q.  And which study was that?
15        A.  I couldn't tell you which one it was.
16        Q.  Okay.  But in any event, you're not --
17        A.  It was connected to the RubinBrown
18   study.
19        Q.  Okay.  Good.  But you guys aren't
20   currently tracking your time in those increments
21   anymore, right?
22        A.  No, we are not.
23        Q.  Do you recall like what kind of period
24   of time you had to track your time?
25        A.  If I was going to guess, I would say it
```

**ALARIS LITIGATION SERVICES**
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

Case 2:17-cv-04057-NKL   Document 153-13   Filed 02/09/18   Page 32 of 85

Page 125

1   was 2014 to 2016.
2        Q.  Like a couple years?
3        A.  Yes.  And then there was an earlier
4   period of time tracking, but it was before I was
5   with the system.
6        Q.  Okay.  Now, prior to that had you had
7   any experience, you know, billing your time in that
8   manner?
9        A.  Back when I was with Kanefield & Mohme.
10       Q.  Back in the day?
11       A.  Yes.
12       Q.  Okay.
13       A.  1980.
14       Q.  Okay.  And so other than those two
15  instances, I guess three, you mentioned another one,
16  any other times when you had to bill your time in
17  that manner?
18       A.  Actually I did when I did termination
19  of parental rights cases in juvenile court.  The
20  court would pay per statute by hour.  So I did have
21  to track my time in those cases --
22       Q.  Okay.
23       A.  -- in both the trials and appeals.
24       Q.  So I guess tell me a little bit about
25  when you were keeping your time in those increments.

Page 126

1        Whenever you started doing that for the public
2   defender, was there any kind of a training about how
3   you should bill your time.  For example, like the
4   way you write the entries or tasks that you bill for
5   and don't bill for?
6        A.  So we -- it was I believe presented at
7   one of our training workshops as to how to use the
8   system.
9        Q.  And so as I understand it, this study
10  was performed by like some third-party researcher;
11  is that correct?
12       A.  What study?
13       Q.  The one that you were tracking your
14  time for, 2014 to 2016?
15       A.  So was the RubinBrown study done by a
16  third-party researcher?
17       Q.  Right.
18       A.  I don't think they were researchers.  I
19  think they were accountants.
20       Q.  Okay.  But it wasn't done by like -- it
21  wasn't a study that was prepared by the public
22  defender, right?
23       A.  The -- RubinBrown is the person who
24  created the report, but the public defender
25  participated in the input of information.

Page 127

1        Q.  Right.  And so my question is basically
2   just like who put on the training for how to bill
3   your time, was that a public defender or did some
4   third party put the training on?
5        A.  So the public defender put on the
6   training on how to track your time.  We never
7   billed.
8        Q.  Okay.  Right.  But the public defender
9   had not really tracked their time previously; is
10  that right?
11       A.  No.  I think the training was on here
12  are the categories, here's where you click.  This is
13  how it will show up in the database.  Here's how you
14  can read it if you want to know.
15       Q.  Okay.  And if you can recall back to
16  that training, I mean, did they tell you, you know,
17  there's your task that you can't bill for or was it
18  all pretty much just track whatever you're doing and
19  put the time in?
20       A.  It was learn the categories and see if
21  your work that you were doing fits into one of those
22  categories and track it as the category.  If it's
23  not in those categories, then it's probably not work
24  because the categories covered everything.
25       Q.  Okay.  So have you done anything as a

Page 128

1   district defender to kind of prepare your offices
2   for what I think you testified earlier was kind of a
3   higher caseload?
4        A.  To prepare them for a higher caseload?
5        Q.  Yeah, or to prepare your office, you
6   know, for the -- this high caseload?
7        A.  I'm -- I'm not sure I understand your
8   question.
9        MS. SHIPMA:  I was just like -- don't
10  have the microphone, but I object.  I think that
11  question is vague.
12       Q.  (By Mr. Moore)  I'll go ahead and
13  strike that one.  That was vague.
14        Have you held any training sessions on
15  managing dockets for your attorneys?
16       A.  So my attorneys don't have dockets.
17  They have cases.  So the city of St. Louis court
18  system is set up differently than most of the other
19  courts in the state of Missouri.  So we do not have
20  dockets.
21       Q.  And I guess --
22       A.  We have dockets.  Just not dockets that
23  you're thinking of.
24       Q.  Change the word dockets to caseload --
25        (Court reporter interruption.)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 129

1       Q.  (By Mr. Moore)  Do you have any
2  training sessions on -- for your attorneys on how to
3  manage their caseloads?
4       A.  So I mean, most of the training is on
5  how to represent your client and what the law is, so
6  by learning those things you learn how to manage
7  your caseload.  I'm just confused.  I'm not sure
8  exactly what you're asking me.
9       Q.  So I imagine there are trainings on
10  like the substance of law and sort of pleadings and
11  things that they'll be filing as they represent
12  these defendants, right?
13       A.  Correct.
14       Q.  Is there any training more on the
15  administrative side where you say you're going to
16  have a lot of cases so here's the way that you
17  manage them all?  You do this task and this task or
18  you don't do this or that, stuff like that.
19       A.  Okay.  I understand now.  Thank you.  I
20  think it's more informal.  We sit down with
21  attorneys when they begin and talk to them about
22  calendaring so that they make certain that they make
23  all their court dates and how to keep track of them.
24      We explain the trial docket that
25  happens in the city of St. Louis so that they can

## Page 130

1  learn when their cases will be right for trial and
2  when they'll be probably able to obtain
3  continuances.  And then we work with those who --
4  who need it on just being more organized.
5       Q.  Okay.  Now, do you provide any
6  resources concerning their ability to like deny
7  further cases if the caseload becomes too much at
8  those initial trainings or conversations?
9       A.  So we've always talked at office
10  meetings about if you feel like you have too much,
11  come see us.  In an office meeting after the
12  Hinkebein decision came out we let the attorneys
13  know that we were going to be meeting with each of
14  them individually.
15      We provided them with information on
16  their ethical obligations and on the supervisor's
17  ethical obligations, and then we had individual
18  meetings with every attorney to see how they felt
19  and whether they felt that they were not meeting
20  their ethical obligations.
21       Q.  So did the way that you trained change
22  post-Hinkebein at all or is it pretty much the same
23  that you were doing pre-Hinkebein?
24       A.  More formal post-Hinkebein.
25  Pre-Hinkebein it was -- it was more my watching to

## Page 131

1  see if I felt like somebody was slipping behind too
2  far and my taking the initial action and now I think
3  the attorneys are comfortable that they can take
4  that initial step and come and ask for assistance.
5       Q.  Okay.  Are you aware of section
6  600.063?
7       A.  Sure.
8       Q.  And what is that?
9       A.  It's a statute about asking for meeting
10  with the presiding judge concerning caseload.
11       Q.  Okay.  Have you ever utilized that
12  particular statute?
13       A.  So I have spoken to the presiding judge
14  about that statute and the way the statute is
15  written, and I don't have it in front of me, but is
16  that the one that talks about an individual
17  attorney?
18       Q.  I believe so, but I -- I think you have
19  the right statute.
20       A.  Okay.  So I have told the court that
21  there are times when I have stopped assigning cases
22  to an individual attorney and I have asked the court
23  do they want me to bring that to their attention
24  under 063 or not bring it to their attention unless
25  it becomes an issue that we cannot take any more

## Page 132

1  cases in the entire office?
2       Q.  Okay.  And so I guess you've never
3  reached that point where the entire office cannot
4  accept more cases; is that right?
5       A.  Correct.  Well, I think we reached that
6  point back in 2011 and '12 prior to the Waters
7  decision.
8       Q.  Okay.  But you know, since then haven't
9  filed any of these kind of motions 600.063?
10       A.  The circuit put in caseload crisis
11  intervention actions which have remained in effect
12  since 2012, so it's been more informal with the
13  judges of the circuit.
14       Q.  Okay.  But you haven't filed any such
15  motion --
16       A.  No, I have not.
17       Q.  -- because it hasn't been necessary, I
18  guess, right?  Have you ever been judicially
19  determined to provide ineffective assistance of
20  counsel?
21       A.  Personally?  No.
22       Q.  I think you mentioned a couple times
23  where you have had that take place with attorneys in
24  your office -- or your district, right?
25       A.  Correct.

33 (Pages 129 to 132)

ALARIS LITIGATION SERVICES
www.alaris.us      Phone: 1.800.280.3376      Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-13   Filed 02/09/18   Page 34 of 85

Page 133

1      Q.   One time was for lack of investigation
2  and one was for conveying incorrect information?
3      A.   Correct.
4      Q.   So without going into too many details
5  I guess for the lack of investigation case do you
6  recall generally what the -- what kind of
7  investigation was omitted?
8      A.   The attorney did not obtain the
9  dispatch tapes from the police vehicle and the
10 dispatch tapes showed that the police officer's
11 testimony was not credible.
12      That case had a co-defendant and
13 co-defendant's counsel did obtain those dispatch
14 tapes and the case was I think -- I believe he went
15 to trial and was found not guilty.  So at that point
16 the post-conviction attorney filed a post-conviction
17 action raising that point.
18      Q.   And do you recall if the co-defendant
19 was represented by the public defender?
20      A.   Co-defendant was represented by a
21 volunteer attorney who was an associate at Thompson
22 Coburn who was placed in our office for one year.
23      Q.   Placed in your office for a year.  What
24 do you mean by that exactly?
25      A.   During the recession, 2008, 2009 when

Page 134

1  the private firms could not afford to bring their
2  associates on --
3      Q.   Ah.
4      A.   -- they placed some of their associates
5  at a lower salary in either judicial positions as
6  clerks or in not-for-profits, and we benefited from
7  having one of those attorneys in our office.
8      Q.   Okay.  So this was an attorney who was
9  actually working in your office just like any of
10 your other defenders would have been working in your
11 office with the same resources and access to staff
12 and everything as the other defenders, right?
13      A.   Except that he had a significantly
14 smaller caseload and only handled misdemeanors.
15      Q.   Okay.
16      A.   Because he was only going to be there
17 for one year.
18      Q.   Okay.  But it sounded like he was --
19 you said it was Thompson Coburn, I think?
20      A.   Yes.
21      Q.   He wasn't like at Thompson Coburn's
22 offices working with their staff and their resources
23 on these cases, right?
24      A.   No.
25      Q.   And as far as the attorney who was

Page 135

1  found to have rendered ineffective assistance of
2  counsel, is there -- was there a reason given why
3  these tapes were not obtained, if you can recall?
4      A.   I did not attend the post-conviction
5  hearing, so I can't tell you what he testified to,
6  but I think my recollection is that he just -- it
7  wasn't something that he did in his cases in terms
8  of pretrial investigation.
9      Q.   Just as a matter of course, it wasn't a
10 step that he took for his cases --
11      A.   Correct.
12      Q.   Didn't have anything to do with like a
13 lack of resources or anything for why he didn't
14 obtain those tapes; is that right?
15      A.   I think it was because he had so many
16 cases that it wasn't a step that he took on a
17 regular basis.  At that point he would've had a
18 caseload of probably over a hundred cases, most of
19 which would have been felonies.
20      Q.   So is that speculation or do you know
21 for certain that's why he didn't get the -- didn't
22 get the tapes in that case?
23      A.   I don't -- I don't know that it's -- I
24 don't know that it's for certain, but I don't think
25 it's speculation.  It's based upon conversations

Page 136

1  with him about the case.
2      Q.   Okay.  And how about the other
3  ineffective assistance case involving conveying
4  incorrect information?
5      A.   Correct.
6      Q.   Do you know in a general sense what
7  that had to do with?
8          MS. SHIPMA:  I'm going to object to any
9  kind of recitation of communication between the
10 attorney and the client.
11      Q.   (By Mr. Moore)  That's fair enough.
12 I'll just ask, did it have to do with like incorrect
13 legal analysis?
14      A.   Yes.
15      Q.   Okay.  And do you know if that had to
16 do with any claimed lack of resources or anything or
17 was it simply just an incorrect legal analysis on an
18 issue?
19      A.   Well, again, that was an attorney who
20 at that time had over a hundred cases, so I don't
21 know exactly why he provided that information.
22      Q.   So you don't know for sure, but nobody
23 has told you that it was because of like a lack of
24 resources or anything, right?
25      A.   Correct.

34 (Pages 133 to 136)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-13    Filed 02/09/18    Page 35 of 85

## Page 137

1    Q.   So I believe there's a statutory
2  section 600.090.2 that authorizes public defender to
3  file a lien with the court in order to recover
4  payment for their services.  Does that sound
5  familiar?
6    A.   Yeah.
7       MS. SHIPMA:  I'm going to object.  Do
8  you have a copy of that that you can show her if
9  you're going to ask her to testify about the
10  contents of the statute?
11      MR. MOORE:  No, I don't, but I just
12  asked her if she was familiar with it.  I think you
13  said yes, right?
14   A.   I know we can file a lien.  Is it in --
15  is it in 090?  That doesn't sound like a statute
16  that I read on a regular basis, and I read a lot of
17  600 on a regular basis.
18   Q.   (By Mr. Moore)  We can forget the
19  specific section by the way.
20   A.   Okay.
21   Q.   The bigger question is whether you're
22  familiar that there is a statute out there --
23      (Court reporter interruption.)
24   Q.   (By Mr. Moore)  Are you aware that
25  there is a statute out there that authorizes the

## Page 138

1  public defender to file a lien with a court in order
2  to recover payment for their services?
3    A.   Correct.
4    Q.   Okay.  Now, do you file such liens in
5  every case?
6    A.   Yes.
7    Q.   Okay.
8    A.   Unless we opened up the case and then
9  we discover after opening it that a private counsel
10  has entered before we had an opportunity to do any
11  work on the case other than opening it.
12   Q.   And so why would that change whether
13  you filed the lien?
14   A.   Because we didn't do any work on the
15  case.
16   Q.   Oh, okay.  Fair enough.  Otherwise, you
17  say that you file such a lien on every single case,
18  right?
19   A.   Yes.  There's a few circumstances where
20  a person doesn't get a lien, such as they died in
21  the course of the representation or their mental
22  health keeps them from being competent, we do not
23  file liens on those cases.  And we do not file liens
24  in the cases of juveniles or applicants with adult
25  cases who are under 18.

## Page 139

1    Q.   Okay.  Now, you stated earlier I think
2  that you have about 30 attorneys or so in your
3  office?
4    A.   Correct.
5    Q.   And are all their caseloads pretty
6  comparable or is there kind of discrepancy or
7  difference between some attorney's caseloads versus
8  other attorney's caseloads?
9    A.   There's a big discrepancy right now
10  because two of the attorneys just started within the
11  last two weeks, three weeks.  And four of the
12  attorneys started like maybe a month or so before
13  that.
14      So their caseloads are building up.
15  And then there are attorneys who have been there
16  longer whose caseloads are larger, and there's
17  attorneys who have very serious cases.  So their
18  case numbers may be lower, but the case severity is
19  higher.
20   Q.   And for the attorneys who work in the
21  more serious cases, what kind of discrepancy would
22  you be looking at as far as caseloads are concerned?
23   A.   Maybe five to ten fewer cases.
24   Q.   Okay.  Do you guys ever do limited
25  entries of appearance for defendants in order to

## Page 140

1  represent them at bond hearings?
2    A.   No.
3    Q.   And why is that?
4    A.   Because we request bond reductions for
5  our clients with a full entry of appearance.
6    Q.   Okay.  I think you testified earlier
7  that there's no wait list currently, right?
8    A.   Correct.  Yes.
9    Q.   Can you talk to me a little bit about
10  the procedure for closing cases?  How does that go
11  and is there ever a situation where case is pretty
12  much done but stays open?
13   A.   There shouldn't be.  So when the case
14  is resolved the attorney puts the file with a
15  closing sheet that we have created with the
16  appropriate disposition code in the closing clerk's
17  box so it may remain open a week or so as he gets
18  through them if there's a large number, but the
19  attorneys are supposed to close them quickly and I
20  monitor their cases.
21      If their caseload is extremely high I
22  look to see if they have open cases that should be
23  closed.  The one exception is the conflict attorneys
24  are often not in the office physically for a period
25  of time, so their cases may close and they don't

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-13   Filed 02/09/18   Page 36 of 85

## Page 141

1  bring them back to the office until they physically
2  get back to the office.
3      Q.  And how long could it be before they
4  show back up to the office to close the file out?
5      A.  Like a week or so.
6      Q.  Okay.  Do defenders ever attend trials
7  not as a second chair, but just to kind of spectate,
8  kind of watch the trials?
9      A.  No.  They may stop in for a closing
10 argument or we may send a new attorney to observe a
11 voir dire, but they don't just sit around and watch
12 trials, no.
13     Q.  So are there circumstances where a
14 closed case could be reopened?
15     A.  Yes.
16     Q.  What kind of situations would that be?
17     A.  Where it was closed because a private
18 attorney entered and then the private attorney is
19 allowed to withdraw and the court makes a
20 determination that the person is indigent and we
21 accept the case back.
22     Q.  Okay.  And so when the case is reopened
23 does it count as a new case or is it just the same
24 case?
25     A.  No, it's the same case.

## Page 142

1      Q.  Okay.  As far as like the statistics or
2  whatever, would it still be counted as a new case
3  that gets opened?
4      A.  No.
5      Q.  So I think earlier we talked about a
6  coalition -- I forget the name of the coalition now.
7  But it's kind of a group of private attorneys who
8  are assisting the public defender on some criminal
9  cases, right?
10     A.  Correct.
11     Q.  What is the name of that coalition?
12     A.  Missouri Coalition for the Right to
13 Counsel.
14     Q.  Okay.  Are there any kind of similar
15 groups out there that also provide those kind of
16 services for the public defender and their clients?
17     A.  Not that I'm aware of.
18     Q.  Okay.  Have you ever tried to
19 collaborate with the prosecutors in your
20 jurisdiction on, you know, the caseloads and kind of
21 determine if anything can be done in a cooperative
22 manner about caseloads?
23     A.  When we had our Waters meeting in 2012
24 after the Waters decision, the prosecutors attended
25 and participated.

## Page 143

1      Q.  Okay.  Anything else since then?
2      A.  We've asked them to stop issuing cases
3  that they can't win.
4      Q.  Very good.  And anything else other
5  than that?
6      A.  Nothing I can think of.
7      Q.  Okay.  So earlier we talked a little
8  bit about how some of your attorneys are kind of
9  inexperienced, I guess; is that right?
10     A.  Are kind of inexperienced?
11     Q.  Inexperienced.
12     A.  Yes.
13     Q.  Right?  And as a result of that
14 inexperience they sometimes don't like recognize
15 when to use experts; is that right?
16     A.  Correct.
17     Q.  So it's not that they're being denied
18 experts because of financial reasons, it's simply
19 that they are unable to recognize when they need
20 them, right?
21     A.  Correct.
22     Q.  And so is there any kind of training
23 whenever they start out to help them identify when
24 they would need to consider getting an expert?
25     A.  Yes.  So generally the expert that a

## Page 144

1  new attorney would see the need for on their cases
2  would be a mental health expert.  So there is
3  training to help them identify the signs of a person
4  not being competent to proceed to trial.
5      Q.  And so all the new attorneys receive
6  that training, right?
7      A.  Well, the most recent group hasn't yet.
8  That -- that's part of the problem is that there's
9  always new attorneys and they don't come in in one
10 large group.  They trickle in on a regular basis.
11     Q.  And there's just the four annual
12 trainings, I guess, that we discussed earlier?
13     A.  There are some other trainings the
14 training department puts on, but the ones that the
15 new attorneys attend are the two for new attorneys
16 and then the new employee orientation, which I think
17 is more administrative and it's just a day long.
18     Q.  Okay.
19     A.  Like here's how to do your time sheet,
20 here's how to request leave.
21     Q.  Uh-huh.
22     A.  Those sort of things.
23     Q.  Okay.  So as far as, you know, training
24 on when to use experts, I mean, is that something
25 that could be done via like a brochure or some kind

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

Case 2:17-cv-04057-NKL   Document 153-13   Filed 02/09/18   Page 37 of 85

Page 145

1  of new attorney packet whenever they each answer
2  them they kind of leaf through and apprise
3  themselves of the way the cases are kind of run?
4      A.  I don't think a brochure is going to
5  educate an attorney.  An attorney just has to gain
6  the experience to be able to evaluate the case and
7  know when it's good.
8      Q.  Okay.  And these new attorneys, they
9  could -- they could always come and ask you, you
10  know, if they -- you know, they think an expert
11  would be required, right?
12      A.  Yes, and they often do.
13      Q.  And they could go ask some of the more
14  senior attorneys whether they thought such an expert
15  would be needed as well, right?
16      A.  Right.  The issue isn't their ability
17  to go ask.  The issue is their ability to recognize
18  that they need to go ask.
19      Q.  Right.  And we talked a little bit
20  earlier about continuances in the criminal cases.
21  Do you recall that conversation?
22      A.  Yes.
23      Q.  I think you said that they are often
24  requested and they're regularly granted, right?
25      A.  Correct.

Page 146

1      Q.  Now, getting continuances in a case is
2  pretty typical of the legal process, right?
3      A.  Yes.
4      Q.  And do you have any kind of awareness
5  of how private criminal defense attorneys operate?
6      A.  In terms of getting continuances?
7      Q.  Yeah, we'll get to that too, but just
8  generally speaking do you have a general knowledge
9  of how private criminal defense attorneys operate?
10      A.  Generally.
11      Q.  And they ask for continuances too,
12  right?
13      A.  Sure.
14      Q.  And so it's just kind of part of the
15  legal process, not really anything specific to like
16  the public defender, right?
17      A.  Well, except that a large number of our
18  continuances are because we are not yet prepared.
19  We either haven't reviewed the discovery provided to
20  us by the state or haven't had an opportunity to do
21  independent investigation.  So those continuance
22  requests generally are related to the fact that the
23  attorneys have too many cases.
24      Q.  But the fact that you're getting a
25  continuance is no different from, you know, any

Page 147

1  other private practice's attorney asking for a
2  continuance, right?
3      A.  So if you look at the docket in the
4  city of St. Louis what you'll find is that towards
5  the top of the docket the old cases are the public
6  defender cases that are heading to trial that they
7  have not yet had time to prepare for trial.
8      Q.  Are you saying --
9      A.  So we're still asking for continuances.
10      Q.  Sorry to interrupt.
11      A.  That's okay.
12      Q.  Are you saying the public defender asks
13  for more continuances than private attorneys or are
14  you just saying that --
15      A.  I can only speak to the city --
16      (Court reporter interruption.)
17      Q.  (By Mr. Moore)  That's okay.  You can
18  go ahead.
19      A.  I can only speak to the continuance
20  request that I see in the city of St. Louis, and the
21  private attorney generally asks for a continuance
22  until they are paid and then they resolve the case
23  with a plea of guilty.
24      Q.  Okay.
25      A.  So the continuance request reasons are

Page 148

1  different.
2      Q.  Uh-huh.  But the fact of just getting a
3  continuance, you wouldn't say that's atypical of
4  how, you know, cases -- it's not atypical in
5  criminal cases, right?
6      A.  To get a continuance?
7      Q.  Right.
8      A.  No.
9      Q.  And I don't do criminal work, but does
10  the city utilize a rolling docket for the criminal
11  stuff as well?
12      A.  Yes.
13      Q.  Okay.  So that's the docket they'll
14  just keep putting up for trial every 30 days and
15  then you'll kind of move your way up the docket,
16  correct?
17      A.  It's a little bit different than the
18  civil -- civil docket.
19      Q.  Okay.
20      A.  So in the criminal docket there's one
21  criminal assignment division.  The cases are on a
22  six-week rotation and the motions are heard in the
23  criminal assignment division as opposed to being
24  sent out to the equity divisions.
25      Q.  So you're saying that the same division

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

Case 2:17-cv-04057-NKL   Document 153-13   Filed 02/09/18   Page 38 of 85

## Page 149

1  will hear the motions as it administers the docket?
2      A.  Correct.
3      Q.  Okay.  So I think civil they split that
4  up?
5      A.  Correct.
6      Q.  Which I -- never mind.  Okay.  But is
7  the rolling docket every you said 60 days?
8      A.  Every six weeks.
9      Q.  Six weeks, okay.
10     A.  Every six weeks minus any nonjury
11 weeks.
12     Q.  Okay.  Now, we discussed earlier, you
13 know, particular motions.  And I think there was
14 some speculation about when time or experience would
15 have kept defenders from filing motions.  Do you
16 recall that?
17     A.  Yes.
18     Q.  Are you aware of any specific instance
19 where a defender said to you I was unable to file
20 this motion because I didn't have the time or
21 experience to do it?
22     A.  No.
23     Q.  It's just kind of guess -- guessing
24 based on your knowledge of what you believe to be
25 the caseloads and things of that nature, right?

## Page 150

1      A.  No.  I mean, I've had specific
2  instances where I've talked to an attorney about a
3  case after it's resolved and discover there may have
4  been a suppression issue that they didn't litigate.
5  There may have been a speedy trial issue that they
6  didn't litigate or a docket issue that they didn't
7  litigate.
8          So it's generally because they didn't
9  recognize it as an issue.  Or it's because the
10 defendant wanted to just resolve the case with a
11 plea of guilty because they couldn't make bond.
12     Q.  Okay.  Not necessarily because they
13 didn't have time or the financial support to file
14 those motions, right?
15     A.  I don't know if time would be the
16 reason.  Financial would not be the reason, but it's
17 -- it's more the experience issue.
18     Q.  Okay.  And the experience issue has to
19 do with the amount of turnover in the office, I
20 guess; is that right?
21     A.  But the turnover has to do with the
22 caseload.  So because people have so many cases and
23 so many cases have to be prepared for trial you can
24 only keep up with that frantic pace for so long and
25 then people move to other jobs.

## Page 151

1      Q.  That may be true.  My question was more
2  just about you said that the reason these motions
3  wouldn't get filed because they didn't recognize
4  sometimes that they should be filed, right?
5      A.  Correct.
6      Q.  And that would be based on like the
7  experience of the attorney and how some of them are
8  inexperienced and new to the job, right?
9      A.  Correct.
10     Q.  Do you have any awareness of like what
11 turnover is like in private firms or other
12 governmental agencies that employ attorneys?
13     A.  I have no idea.
14     Q.  Do you know whether the amount of
15 turnover in the public defender system is any
16 different than those private firms?
17     A.  I don't know.
18     Q.  So it could be just the same as any
19 other firm, you just don't know for sure; is that
20 right?
21     A.  So most of the criminal defense firms
22 in the city of St. Louis are one-person firms.
23     Q.  Uh-huh.  Like --
24     A.  So they don't have turnover amongst
25 themselves.

## Page 152

1      Q.  Well, and -- like just private firms,
2  so civil included in that, right?  Do you have
3  any --
4      A.  So I have no idea what their turnover
5  is.
6      Q.  Okay.  I think you were talking earlier
7  about like the amount of juvenile cases that are
8  coming through in the last couple years, right?
9      A.  Yes.
10     Q.  I think you said something like there
11 are less juvenile cases getting filed because public
12 defender was successful in 2017 in winning those
13 cases, right?
14     A.  I think fiscal year 2017 is what I
15 referred to.
16     Q.  Okay.  But that's -- that's correct,
17 right?
18     A.  I think that was one of the factors
19 that played into the lack of issuance of cases.
20     Q.  Okay.
21     A.  During that time was the first time we
22 had a juvenile specialist in juvenile court.
23     Q.  Okay.  Talk to me a little bit about
24 the open pleas.  Is that what they're called?
25     A.  Yes, open pleas are blind pleas.

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-13   Filed 02/09/18   Page 39 of 85

Page 153

1      Q.   Heard a little bit about that.  Again,
2  I don't do criminal practice.  My understanding is
3  that, correct me if I'm wrong, but you just kind of
4  show up at court and your clients are agreeing to
5  plea guilty, right, but there's not really any plea
6  deal on the table, right?  Maybe it's wrong.  Just
7  tell me how it works.
8      A.   No, I'm just laughing because you don't
9  just show up in court.  I mean, we don't get to the
10  point of where you're in front of a judge for a plea
11  of guilty until you've had communication and counsel
12  with your client and your client has determined that
13  it's in the decision they've made is to enter a plea
14  of guilty to the charge.
15          So it's more than just showing up.
16  You're not the first person who has used that
17  phrase, and having done them I can assure you it's a
18  lot more than just showing up.
19      Q.   Fair enough.  Fair enough.  Just tell
20  me how this blind plea stuff works exactly, I guess.
21      A.   So in court -- let's just talk about
22  the in-court procedure.
23      Q.   Okay.
24      A.   You would have notified the court that
25  you want the case assigned to a judge for a plea of

Page 154

1  guilty.  The court would assign it to a judge.  You
2  would schedule it within a week's time period
3  because they're assigned by weeks.
4          And then you would appear before the
5  court, and each judge does it differently.  Some
6  will meet with you ahead of time and the prosecutor
7  and want to hear the facts of the case and what both
8  sides are asking for.  Some will take the bench and
9  start the on-the-record proceedings.
10          So as the attorney in those cases, you
11  need to be able to navigate what judge the case is
12  going to be in front of and you need to be able to
13  advise your client what the possible outcomes are
14  and what the probable outcome is, and that's the
15  really hard part is advising somebody what the
16  probable outcome is because you can't read a judge's
17  mind.  And you may think you know what's going to
18  happen, but you don't always know.
19      Q.   And that -- the whole open plea thing
20  is as a result of a policy by the St. Louis City
21  prosecutor's office; is that correct?
22      A.   It is a result of the recommendations
23  that the circuit attorney's office makes on their
24  cases and their refusal to provide timely
25  recommendations or any recommendations on cases.

Page 155

1      Q.   Okay.  But the issues with the open
2  pleas and all that sort of thing, that's not as a
3  result of any like lack of funding to the public
4  defender or time of resources.  The issues inherent
5  in that process appear to be as a result of this
6  policy by the circuit attorney; is that right?
7      A.   But the result, which is more important
8  in my mind, is that it adds an additional burden to
9  the attorney.  So whereas in a different
10  jurisdiction you may be able to say to your client
11  the state is recommending this sentence if you
12  choose to enter a plea of guilty --
13      Q.   Uh-huh.
14      A.   -- would you like it or would you not
15  like it, case resolved, you go to court.
16      Q.   Okay.
17      A.   That what could be 30 to one hour
18  conference now could become two to three or four
19  meetings with a client to get to the point where the
20  client trusts you that you know what you're talking
21  about and to get the case in a position where you
22  can get it in front of a judge and get a reasonable
23  outcome.
24      Q.   Okay.  But you said it was a burden, an
25  initial burden, right?

Page 156

1      A.   Correct.
2      Q.   And that would be a burden that was
3  imposed as a result of this circuit attorney policy,
4  right?
5      A.   Yes.
6      Q.   And I think you said also that they're
7  maybe going to change that policy with a new circuit
8  attorney that had come in; is that right?
9      A.   That was part of her campaign promise,
10  but it's not yet been fulfilled.
11      Q.   Okay.  It's coming down the pipeline
12  probably?
13      A.   We're a year in already.
14      Q.   Okay.  And so as far as the resources
15  your attorneys have in the office to work their
16  cases up, I understand that they have access to
17  Westlaw?
18      A.   Correct.
19      Q.   And are there any limitations on
20  Westlaw that are really cumbersome or onerous that
21  you're aware of?
22      A.   There's a couple things.  You know,
23  whenever you want to click on a -- a larger article,
24  you can't get it.  It's always not in our
25  subscription.  I don't think -- is Missouri practice

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 157

1    I don't think is in our subscription.  All the stuff
2    over on the right is not in our subscription.
3         Q.   Okay.  The stuff on the right.  So
4    other than in those limitations, I mean, are you
5    aware of anything else that's really, you know,
6    onerous about your access to legal resources, legal
7    research resources?
8         A.   Westlaw -- no Westlaw is easily
9    accessible.
10        Q.   Okay.  And do you have any kind of
11   internal servers or anything where prior pleadings
12   or examples would be stored?
13        A.   Yes.
14        Q.   And all your attorneys have access to
15   those prior pleadings and examples?
16        A.   They do.
17        Q.   Any other resources that your attorneys
18   can utilize whenever they're working these cases up
19   other than of course, you know, investigators and
20   experts and things we've already discussed?
21        A.   I would say those are the main ones.
22   We also have what we call an area 22 database where
23   somebody does something that we think will need to
24   be used again, we try to preserve it in there.
25        Q.   And so that's like another database

## Page 158

1    with like pleadings and examples of things that --
2         A.   Not pleadings, but you know, if there's
3    -- somebody has attended a training and there's
4    information they think would be helpful to others in
5    the office, we keep it in there.
6         Q.   Okay.  And this is something that all
7    the public defenders in your district would have
8    access to no problem, right?
9         A.   Yes.
10        Q.   Tell me again why the -- you said the
11   St. Louis City trial docket is different than other
12   divisions, right?
13        A.   Correct.
14        Q.   So why is it so much higher than other
15   divisions?
16        (Court reporter interruption.)
17        Q.   (By Mr. Moore)  Why is it so much
18   different than other divisions in your opinion?
19        A.   Well, it's a combination of things.
20   One, it's a rolling docket as you described.  So
21   you're -- every six weeks you're required to appear
22   to request a continuance if you're not ready.
23        The other thing is that you're not
24   assigned to your trial division until you're
25   assigned out to trial.  So if, you know, I'm

## Page 159

1    preparing a case in front of judge A and I know
2    judge A will rule a certain way on things and judge
3    B won't, I don't know who the judge is until I get
4    there.  So it affects -- that can affect your
5    preparation.  And because we have been successful
6    more cases go to trial.
7         Q.   So the rolling docket -- strike that.
8         Is there an informal time for
9    criminal cases, where you can go in for informals?
10        A.   You can always show up in Division 16
11   if there's a judge there.  You can do an informal.
12        Q.   Okay.
13        A.   It's not -- it's not like the civil
14   docket.
15        Q.   Okay.  Would there be anything
16   preventing the public defender from just en masse
17   filing a motion to continue all at one time at some
18   informal docket if they know like a certain batch of
19   cases isn't going to go to trial the next docket?
20        A.   So the -- the docket call for the
21   criminal trial docket happens every Wednesday
22   morning, and so any continuance request is made at
23   that docket.
24        Q.   I'm saying could you just, you know,
25   show up with a bunch of requests to continue for a

## Page 160

1    period of, you know, 90 days or something instead of
2    showing up at the docket every six weeks or whatever
3    the -- or every Wednesday you said?
4         A.   No, because you don't know which case
5    is going to be ready until you show up at that
6    Wednesday docket.  So the first question is the
7    state ready?  Or is the state asking for a
8    continuance.
9         Q.   Uh-huh.
10        A.   So you need to be there with the state.
11   You can't ex parte the judge for a continuance
12   request.  You have to have the other side there.
13   And then the court wants to hear the reasons and the
14   court makes the determination as to whether or not
15   to grant it.  So there's also continuances that are
16   denied.
17        Q.   Right.  Could you coordinate with the
18   prosecutors' office to get a joint continuance in
19   advance of that Wednesday hearing for a period of
20   time that was greater than like the week, the
21   rolling docket?
22        A.   Generally not because the attorneys are
23   always in court.  I mean, there's times that that
24   happens, but if you want a continuance on your case
25   you should be there Wednesday at the trial docket,

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 161

1   and I handle the continuances for our office.  So
2   every attorney from the office isn't there.  I'm
3   present.
4       Q.   Okay.  So it sounds like it would be
5   possible to kind of -- kind of like a joint
6   continuance on file instead of showing up at the
7   dockets, but it's just not something that you feel
8   is really feasible?
9       A.   No, it's not possible.  Maybe I'm not
10  explaining clearly, but if you want a continuance on
11  your case, you need to be at the Wednesday docket.
12      Q.   You actually have to appear?
13      A.   Someone on your behalf.  So as I said,
14  I appear on behalf of our attorneys.
15      Q.   Okay.  So --
16      A.   Could be like the Monday morning civil
17  docket in Division 1.  You need to appear.
18      Q.   We talked earlier about how your office
19  doesn't have any paralegals, right?
20      A.   Correct.
21      Q.   But we also talked about how you do
22  have sufficient administrative staff, right?
23      A.   We have good amount of administrative
24  staff, but I'm not sure it's sufficient.  It's
25  sufficiently -- we're operating the office based on

## Page 162

1   what we have, but the attorneys are doing
2   administrative work.
3       Q.   Okay.  I just think earlier you -- I
4   think you used the word sufficient administrative
5   staff.  I guess my question is what would a
6   paralegal do that the administrative staff doesn't
7   do?  Like what would a paralegal add to the office?
8       A.   I would think they could do legal
9   research.  So we often utilize interns for legal
10  research.  So if we had a paralegal that would add
11  some consistency to legal research.
12      Q.   Okay.  Any other tasks that you feel a
13  paralegal would do that the current staff can't or
14  doesn't do?
15      A.   I think they could draft pleadings.  I
16  don't think our support staff could draft pleadings
17  right now other than form pleadings.
18      Q.   I'm sorry, you said your staff can
19  draft pleadings now?
20      A.   No, they use form pleadings.  So an
21  entry of appearance or a request for discovery.
22      Q.   And so you think paralegals would be
23  able to draft like substantive like legal motions
24  and things of that nature?
25      A.   I think if they did legal research they

## Page 163

1   could also probably assist in preparing, you know,
2   files for trial.  So when the attorney general goes
3   to trial you would have well-prepared binders and
4   you have a paralegal who is there with you and has
5   your exhibits organized and available to produce on
6   screen.  When the public defender goes to trial they
7   show up with cardboard box and a lot of paper.
8       Q.   So that goes for like preparing the --
9   the, you know, materials and organizing the
10  materials that are going to be taken into trial.
11  But it sounds like the administrative staff that you
12  have could probably do the same thing, right?
13      A.   I don't think they have the legal
14  knowledge to do it.  Most of our administrative
15  staff does not -- do not have any advanced degrees.
16      Q.   So they couldn't like just print the
17  exhibits out and like organize the exhibits and put
18  them in the binder you don't think?
19      A.   Not unless you marked them all and told
20  them what they were.  I mean, they -- they haven't
21  worked the case up with you.
22      Q.   Okay.  Are there any other tasks that
23  you feel a paralegal would be able to do that the
24  current administrative staff cannot do?
25      A.   Nothing that's coming to mind.

## Page 164

1       Q.   Let me see.  Let me talk to you quickly
2   about a couple of exhibits that were cited earlier.
3   Exhibit 32, this is the order concerning probation
4   revocation hearing.  It is 32, right?
5       MR. MAUNE:  Yep, Fox 32.
6       Q.   (By Mr. Moore)  So you're taking a look
7   at the exhibit and you're familiar with the exhibit
8   that we'd like to discuss?
9       A.   I am.
10      Q.   So tell me a little bit more about your
11  role in preparing this order.  I think you said
12  earlier that you had assisted in the creation of the
13  order; is that correct?
14      A.   Right.  So when the initial
15  conversations occurred in terms of caseload relief,
16  probation revocations, in which the court was just
17  intending to continue someone on probation was an
18  area that we looked at where a public defender did
19  not need to be involved.
20      Q.   So I guess tell me a little bit more
21  about the history of this document.  You're saying
22  there was a group at some point convened that
23  discussed these issues and then generated this
24  document?
25      A.   So the Supreme Court decision in Waters

**ALARIS LITIGATION SERVICES**
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-13   Filed 02/09/18   Page 42 of 85

## Page 165

1  directed the courts to meet with the public
2  defenders and the prosecutors and to come up with
3  resolutions for the case crisis.
4      Q.  Okay.
5      A.  Pursuant to that directive the 22nd
6  Judicial Circuit had a meeting, and this was one of
7  the things that came as a result of those meetings.
8      Q.  Okay.  And so you -- did you actually
9  like yourself draft the documents or like --
10     A.  No.
11     Q.  -- approve it or anything like that?
12     A.  I think Judge Bush is the one who
13  drafted it.
14     Q.  Okay.  Do you feel there are any
15  constitutional issues involving this document?
16     A.  Constitutional issues?
17     Q.  Uh-huh.  Or issues generally, just
18  anything wrong, like with this -- this order that
19  was generated as a result of the meeting?
20     A.  No.
21     Q.  All right.  Very good.  I'd like to
22  look now at -- I might mispronounce this, Petsch, is
23  it Petsch 1?
24     A.  Okay.
25     Q.  This appears to be an internal

## Page 166

1  memorandum amongst the public defenders regarding
2  certain policies for public defender office; is that
3  correct?
4      A.  I think it's an e-mail within the area
5  16 district office.
6      Q.  Okay.
7      A.  So the attorneys listed were all area
8  16 attorneys, and it's from the person who at that
9  time was the area 16 district defender.
10     Q.  I remember.  This is not an e-mail that
11  you were personally sent, right?
12     A.  No.  I wasn't with the public defender
13  system in 2002.
14     Q.  Okay.  And you didn't have any
15  participation in like drafting these policies that
16  are mentioned in this e-mail, right?
17     A.  No.  No.
18     Q.  I believe you said earlier I think that
19  you did agree that -- you did agree with the
20  policies that are contained in this e-mail; is that
21  right?
22     A.  I agreed that the visitation policy of
23  the public defender system is that you are to have
24  contact with your clients within seven days of
25  assignment and thereafter at least every 30 days.

## Page 167

1      Q.  Okay.  Very good.  So the seven days,
2  that's fine.  As to the 30-day --
3      A.  Unless you're the person sitting in
4  jail for seven days without a lawyer.
5      Q.  Just like to talk about the 30-day
6  contact requirement, right?
7      A.  Okay.
8      Q.  So the public defender actually
9  requires a physical visit every 30 days to wherever
10  the defendant is kept; is that right?
11     A.  If they're confined in the local jail,
12  yes.
13     Q.  Only if they're confined in the local
14  jail?
15     A.  Well, so if they're in the Department
16  of Corrections that contact can be by phone call.
17     Q.  Okay.  So the contact doesn't
18  necessarily need to be physical, it can also be via
19  telephone?
20     A.  Only if they're confined in the
21  Department of Corrections.
22     Q.  Okay.  And so in your experience have
23  the public defenders been able -- have your
24  defenders been able to comply with this requirement?
25     A.  No.

## Page 168

1      Q.  They're not able -- they're not able to
2  make a telephone call every 30 days to their client
3  while they're in jail?
4      A.  That's not what I said.
5      Q.  Okay.  Fair enough.  What manner are
6  they not able to comply?
7      A.  They're not able to meet with all of
8  their confined clients within seven days of
9  assignment of the file and they're not able to meet
10  with all of their clients thereafter at least every
11  30 days.
12     Q.  Okay.  Just speaking to the 30-day
13  requirement, though, they're able to make a phone
14  call to them, right?  It doesn't have to be an
15  in-person visit?
16     A.  No, you cannot -- you cannot call
17  somebody in jail.
18     Q.  I thought you said they were able to
19  make a telephone call as opposed to visiting in
20  person for the 30-day contact requirement?
21     A.  No.  So if a person is confined in the
22  Missouri Department of Corrections --
23     Q.  Uh-huh.
24     A.  -- so the Missouri penitentiary system,
25  they've been sentenced on something else, they're in

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-13    Filed 02/09/18    Page 43 of 85

Page 169

1 prison as opposed to in jail waiting trial.
2 Q. Okay.
3 A. Okay. So if they're in the Department
4 of Corrections and they as a result of that could be
5 anywhere within the state of Missouri.
6 Q. Uh-huh.
7 A. Or if they're in a federal
8 penitentiary, which could be anywhere in the
9 country, or if they're in a state penitentiary in
10 another state, you do not have the ability to get to
11 all of those locations throughout the state and the
12 country.
13 Q. Okay.
14 A. So in that instance your contact can at
15 some point be by phone.
16 Q. Okay.
17 A. But you can't only meet a client by
18 phone and then be prepared to represent them at
19 trial.
20 Q. Right. Just as to these requirements,
21 so they're able to do the telephone every 30 days
22 for Department of Corrections and federal
23 penitentiaries you're saying; is that right?
24 A. Correct.
25 Q. Now, the ones that they're not able to

Page 170

1 complete would be when they're in local jail, right?
2 A. Those are the ones that are more
3 difficult, yes.
4 Q. Okay. And you say you can't make a
5 call into the jail?
6 A. You cannot.
7 Q. And is that in relation to the
8 defenders' policy earlier where they cut off that
9 access or is that something else?
10 A. Our clients don't have phones in the
11 jail. So there's no number to call them.
12 Q. That wouldn't have anything to do with
13 like public defender resources or whatnot, this has
14 to do with the way the jails are administrated or
15 the resources of the jails I guess?
16 A. But it has an effect on public defender
17 resources because as a result we need to go to the
18 jails to see our clients and that usually takes
19 quite a bit of time between waiting for the client,
20 seeing the client, and if it's one of our jails that
21 is not next to our building, driving to the jail.
22 Q. Now, as far as the 30-day contact
23 requirement in this e-mail, do you know what that
24 30 days is based off of, that policy?
25 A. The guidelines for representation that

Page 171

1 are -- the public defender system has.
2 Q. Is it based on any kind of like
3 constitutional decision or any statute or anything?
4 A. No. Other than the ethical obligation
5 to communicate regularly with your client.
6 Q. Okay. Do you know whether it's typical
7 to meet with -- in person with your client every 30
8 days in other types of cases?
9 A. I missed the first thing you said.
10 Q. Do you know whether it's typical in
11 other types of cases to meet in person with your
12 client every 30 days?
13 A. Do you mean like in civil cases?
14 Q. Yeah, civil cases or --
15 A. I have no idea.
16 Q. -- other -- any other kind of legal
17 matter?
18 A. I don't know. I can tell you in cases
19 that I represented people in that were not criminal
20 we met on a pretty regular basis.
21 Q. Do you think it's necessary to meet in
22 person with criminal defendants every 30 days?
23 A. I think it is essential to have regular
24 consistent contact with your clients especially if
25 they are confined so that you can create a

Page 172

1 relationship in which they trust your counsel and in
2 which they accept your counsel.
3 Q. Do you think that like a status letter
4 to your client every 30 days would suffice?
5 A. No.
6 Q. And why is that?
7 A. Because they want to see you. They
8 have questions. And your status letter can't answer
9 their questions.
10 Q. Well, I mean, in theory I guess if the
11 public defenders' phone lines were opened up and
12 they could ask the questions, then you could
13 respond --
14 (Court reporter interruption.)
15 Q. (By Mr. Moore) In theory, right, if
16 there was -- if the public defenders' phone lines
17 would allow the inmates to call their offices, then
18 they could ask you their questions and you could
19 answer those questions over the phone, right?
20 A. If the phones could accommodate that.
21 Q. Right.
22 A. And if there was some sort of way to
23 get the persons actually through to their attorneys.
24 Q. Right. Do the public defenders have
25 like a voicemail for each defender?

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-13    Filed 02/09/18    Page 44 of 85

Page 173

1    A.  We do.
2    Q.  So the inmates, if the phones -- if
3  they were allowed to, they could call and leave a
4  voicemail for their defender --
5    A.  That was another problem is that
6  voicemails got filled by one person and then other
7  persons could not leave voicemails.
8    Q.  Right.  But just in theory if the phone
9  lines were opened up, then the inmates could -- the
10  defendants could call their attorney, leave them a
11  voicemail, and that attorney could send a letter
12  replying to their inquiries, right?
13    A.  Correct.
14    Q.  But that's not possible now because the
15  public defender cut off that line of communication
16  due to the burdens involved in the multiple phone
17  calls, right?
18    A.  Correct.
19    Q.  Do you know if the defendants have any
20  access to like e-mails while they're in jail?
21    A.  No, they don't.
22    Q.  Are they able to send letters while
23  they're in jail?
24    A.  Yes, they are.  And without postage.
25    Q.  Without postage?

Page 174

1    A.  To us without postage, yes.
2    Q.  Okay.  Also distinguishes clients from
3  trial caseload clients, do you see that?
4    A.  I did see that.
5    Q.  What does that mean exactly?  How --
6  how does it determine if a client is a trial
7  caseload client versus not a trial caseload
8  client within I guess whenever you get assigned a case?
9    A.  I think this referred to dockets that
10  existed in Kansas City back in 2002 that don't exist
11  anymore.
12    Q.  Okay.
13    A.  I think at that point they had -- cases
14  went to two different types of dockets.  One was
15  called something, I don't know what it was called,
16  and the other one was called a trial caseload or
17  trial docket.  So I think that's what he's referring
18  to, but I don't know for certain.
19    Q.  Okay.  But in your opinion it would be
20  all clients, they would all get the initial
21  in-person visit in seven days of assignment; is that
22  right?
23    A.  Correct.
24    Q.  Would there be any exceptions to that
25  requirement for any other -- you know, any other

Page 175

1  cases like probation violations or things of that
2  nature, low-level stuff?
3    A.  No.  They're supposed to meet those
4  clients also.
5    Q.  Okay.  What if there's just nothing
6  going on in the case except for just typical
7  discovery, people are sending documents and things
8  back and forth, do you think the 30-day in-person
9  meeting would still be required?
10    A.  Yeah, because you don't know what's
11  going on with the client.  I mean, the client could
12  be having some issues that they need to discuss with
13  you.
14    Q.  I'd like to ask you a couple questions
15  about the fiscal year 2018 supplemental legislative
16  budget request document, and my version I was given
17  doesn't have the exhibit number.
18    MS. SHIPMA:  It's Exhibit 21.
19    MR. MOORE:  Okay.  Thank you.
20    THE WITNESS:  Is it this one?
21    MR. MOORE:  2018, yeah.
22    THE WITNESS:  Mine doesn't have a
23  number on it either.
24    MR. MAUNE:  It's a replacement for one
25  previously marked.

Page 176

1    THE WITNESS:  Okay.
2    Q.  (By Mr. Moore)  Very good.  So I think
3  the questioning kind of centered on page seven.  So
4  would you turn to page seven?  Whenever you're ready
5  we can just kind of go over a couple things on
6  there.
7    A.  I'm ready.
8    Q.  Okay.  So we were looking at this chart
9  on page seven, and you were kind of citing off the
10  way that some of these columns were calculated,
11  right?
12    A.  Correct.
13    Q.  And I did not quite catch the formulas.
14  So I think the first one was net case units.  That's
15  the 89,515 figure.  Do you see that?
16    A.  Yes.
17    Q.  What's the formula that you had cited
18  for calculating that one?
19    A.  So you have to go back to page --
20    Q.  It's contained somewhere in this?
21    A.  It's not in here.  You need to go back
22  to the RubinBrown study and the RubinBrown study
23  gives case units to different case categories.  Then
24  you would multiply the number of cases times that
25  case unit.  So if you had 300 felonies and felonies

44 (Pages 173 to 176)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-13    Filed 02/09/18    Page 45 of 85

Page 177

1  got a 14-case unit, that would be 300 times 14.
2      Q.  Okay.  So this is all based off of the
3  RubinBrown study then?
4      A.  Correct.  That's my understanding,
5  especially since it says RB up at the top.
6      Q.  Very good.  Then we also looked at the
7  column third from the right that says capacity,
8  right?
9      A.  Right.
10     Q.  And I think you had a formula for that
11  as well?
12     A.  I think it was number of attorneys
13  times available hours within the year.
14     Q.  And that -- those metrics would also be
15  based on the RubinBrown study and its conclusions, I
16  guess, right?
17     A.  I think so, yes.
18     Q.  And percent of capacity?
19     A.  That's just a calculation.
20     Q.  Same kind of deal based on RubinBrown
21  statistics?
22     A.  No.  I think percent of capacity is
23  just a mathematical computation.
24     Q.  Okay.  So do you have any background in
25  like statistical analysis or sociological studies of

Page 178

1  any kind?
2      A.  No.
3      Q.  Do you have any opinions or are you
4  able to give any testimony today about whether the
5  RubinBrown study and its methodology are accurate?
6      A.  So I've always complained that the
7  RubinBrown study does not take into consideration
8  the number of cases that get tried in the city of
9  St. Louis.  So we're always towards the bottom of
10  the list, but I don't feel like that accurately
11  reflects the case overload crisis within our office.
12     Q.  Okay.
13     A.  So it's made for the system and I think
14  it needs to be, you know, changed for individual
15  offices for specific issues.
16     Q.  Okay.
17     A.  So for instance, a felony gets the same
18  amount of time and a lot of our felonies are assault
19  first degree.
20     Q.  Okay.
21     A.  And a lot of our felonies are, you
22  know, four, five, six counts in one case.
23     Q.  Okay.
24     A.  But that only gets 14 hours credit.  So
25  I don't feel like the RubinBrown gives us enough

Page 179

1  credit for the type of cases that we handle, the
2  severity of the cases, and the number of cases that
3  have to be prepared for trial and the number of
4  cases that go to trial.
5      Q.  Okay.  Any other issues you have with
6  the RubinBrown study or --
7      A.  No.
8      Q.  No.  But you again are not really
9  familiar with like their methodology for collecting
10  the data or analyzing the data in that study, right?
11     A.  I was around when they did it.  I mean,
12  I know basically what -- how they did it.
13     Q.  Fair enough.  But like you don't have a
14  background in statistics you said, right?
15     A.  No.
16     Q.  So whether they're using the correct
17  metrics or formulas or whatever else, you wouldn't
18  be able to testify about that, right?
19     A.  No.
20     Q.  And as far as the data collection, do
21  you have any knowledge about how they collected all
22  of their data in the RubinBrown study?
23     A.  Just general.
24     Q.  Okay.  So you wouldn't be able to say
25  specifically if like they did everything correct as

Page 180

1  far as the data collection was concerned, right?
2      A.  No.
3      Q.  I think you said that you put data in
4  for this; is that correct?
5      A.  Well, the data comes from our case
6  database.
7      Q.  Okay.  Just tell me a little bit about
8  how -- how that worked.
9      A.  So you create a case, it goes into the
10  case database.  The case code is in there, so it
11  tells you what type of case it is, which would
12  impact the net case units, and the -- whether you
13  withdrew or conflicted the case out within the first
14  30 days would go in, which would impact the third
15  row minus cases withdrawn.
16     Q.  Okay.
17     A.  And the number of attorneys you have
18  would also go in.  And the -- the number of
19  attorneys does not reflect -- I guess this is one
20  other complaint.  The number of attorneys does not
21  reflect the reality of number of attorneys you have.
22        So while I have 30 attorneys assigned
23  to the office, I am fully staffed right now for the
24  first time in I think a year and a half, and I have
25  an attorney who's leaving at the end of the month.

45 (Pages 177 to 180)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-13    Filed 02/09/18    Page 46 of 85

Page 181

1  So I've never really had 30 attorneys.
2      Q.  Okay.  Okay.  And so if I'm
3  understanding correctly, this was -- you would be
4  inputting this data into some kind of computer
5  program or something?
6      A.  Right.
7      Q.  Okay.  It was like a case database --
8      A.  Right.
9      Q.  -- is that right?  That's not Lotus,
10  though, right, it's some other thing?
11      A.  Right.  No, it's Lotus.
12      Q.  Oh, it is Lotus, okay.  So the
13  RubinBrown used the Lotus data as far as you know to
14  generate their statistics and stuff?
15      A.  Part of it, yes.
16      Q.  Okay.  I think I have just a couple
17  more.  So I think you testified earlier that there's
18  a high turnover and that you hired a bunch of new
19  attorneys who just graduated the bar in October,
20  right?
21      A.  Correct.
22      Q.  Do you recall how many of those there
23  are, like the really fresh ones?
24      A.  There's three who just -- just were
25  licensed.

Page 182

1      Q.  Okay.  And then you said there were
2  some other ones who had worked in other capacities
3  prior to joining the public defender, right?
4      A.  Correct.
5      Q.  Kind of walk me through their
6  backgrounds a little bit more.
7      A.  You talking about the 15 that were
8  hired this year?
9      Q.  We'll go through them, yeah.
10      A.  Okay.  So we'll start with December
11  last year.  Attorney number one was a new attorney
12  in December and hired.  Attorney number two was a
13  new attorney in December and hired.  Attorney number
14  three was a new attorney in October and hired in
15  February.
16          Attorney number four had passed the bar
17  in October and I think we were first place he was
18  hired.  So he was hired in March.  Attorney number
19  five passed the February bar and was hired in April.
20  So he was a brand-new attorney at that time.
21          Attorney number six was a new attorney
22  this year and we hired her.  Attorney number seven
23  had passed the bar the year before but had been
24  working in document review for one of the larger
25  firms.  Attorney number eight had been an associate

Page 183

1  at Lewis Rice, so had several years' experience in
2  civil litigation and came to us.
3      Q.  Do you know how many years' experience?
4      A.  I want to say two to three.  Attorney
5  number nine was -- passed the bar in October and
6  came to work for us.  Attorney number ten passed the
7  bar in October and came to us.  So actually I was
8  wrong, there were more than three.
9          Attorney number 11 passed the bar about
10  ten years ago and did policy work and just came back
11  to St. Louis and came to us.  Attorney number 12 was
12  a transfer from the West Plains office.  Attorney
13  number 13 --
14      Q.  Oh, sorry, the transfer, how long --
15  were they a new attorney or they had been doing it a
16  while?
17      A.  No, no.  He had been doing it for a
18  while.
19      Q.  Okay.
20      A.  Attorney -- he had been there for two
21  years.
22      Q.  Okay.
23      A.  Attorney number 13 was -- was I already
24  on 13?
25      Q.  Yeah.

Page 184

1      A.  So this is attorney 14.
2      Q.  Oh, I think we --
3      A.  Are we on 13?
4      Q.  I think we're on 13.
5      A.  Okay.  We're missing somebody in there.
6  Attorney 13 was an attorney in our Springfield
7  office and then went into private practice and moved
8  to St. Louis, and I recruited her to come back to
9  us.  She came back with experience.
10      Q.  Okay.
11      A.  And attorney 14 was a prosecutor in the
12  circuit attorney's office who left that office and
13  joined us.  And there's one more person who I feel
14  terrible I've forgotten.
15      Q.  We'll just keep this transcript
16  private.  You don't have to worry about hurting her
17  feelings.  Okay.
18          So in any event, it sounds like you do
19  have some fresh faces, but also some faces that have
20  been out and they were practicing law for a number
21  of years, and I think you said ten to ten years of
22  years of experience, though not in criminal law,
23  right?
24      A.  Not in law.  He was doing policy work.
25      Q.  For the entire ten years or --

**ALARIS LITIGATION SERVICES**
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-13    Filed 02/09/18    Page 47 of 85

Page 185

1   A.  Yeah.
2       Q.  Do you know how long the prosecutor had
3   been out practicing as a prosecutor?
4       A.  She began as a prosecutor in 2008
5   or '9.
6       Q.  Okay.  Very good.  So as to the -- the
7   really new ones, right, they all went to a law
8   school and passed the bar exam, right?
9       A.  Yes.
10      Q.  And as part of their law school
11  curriculum they all, you know, took criminal law and
12  evidence and did all the things you're supposed to
13  do in law school, correct?
14      A.  I hope so.
15      Q.  Right.  And the, you know, ethical
16  obligations and requirements for a new attorney
17  aren't really any different than for attorneys who
18  have been out there for 30 plus years, right?
19      A.  Correct.
20      Q.  And I think, you know, as a new
21  attorney you're still deemed to be competent just
22  like an attorney of 30 plus years when it comes to,
23  you know, the services you're supposed to render to
24  your client, right?
25      A.  Correct.

Page 186

1       MR. MOORE:  Sorry, you're going to --
2       MS. SHIPMA:  I don't know that the
3   rules of evidence deem you competent just because
4   you're an attorney.  They say you have the
5   obligation to be competent, but the rules of
6   evidence don't deem someone competent.
7       MR. MOORE:  Okay.  That's fair enough.
8   RubinBrown study.
9       MS. ROSCA:  So Justin, it's one o'clock
10  and Mr. Reynolds is here.  So I just want you to --
11      MR. MOORE:  No, that's good.
12      MS. ROSCA:  You've been going for over
13  an hour and a half.
14      MR. MOORE:  This is going to be it, I
15  think.
16      Q.  (By Mr. Moore)  And so these are people
17  that also went through the interview process with
18  your office, right?
19      A.  Correct.
20      Q.  And they met all the requirements you
21  would expect for someone to work in your office and
22  they were hired, right?
23      A.  Correct.
24      MR. MOORE:  I think that's all I have.
25      MS. SHIPMA:  Okay.  Mary, I just have

Page 187

1   some follow-up.
2           EXAMINATION
3   QUESTIONS BY MS. SHIPMA:
4       Q.  I have a few follow-up questions.  I
5   think I'm going to go backwards just for the fun of
6   it.  I won't speak backwards.  I'm just going -- so
7   you were talking about the RubinBrown numbers and I
8   believe you said in your opinion they're not fair to
9   your office.  I don't think those were your exact
10  words, but that was the meaning that -- that you
11  gave that they don't --
12      A.  Correct.
13      Q.  -- accurately reflect the reality in
14  your office?
15      A.  Yes.
16      Q.  Now, is -- does that mean that the
17  RubinBrown numbers appear to place your office at a
18  lower percentage of capacity than you think is fair?
19      A.  Yes.
20      Q.  The attorneys from Thompson Coburn that
21  are -- that you had, you had talked about having an
22  attorney --
23      A.  Yes.
24      Q.  -- from Thompson Coburn, did that
25  attorney have a lesser caseload than the other

Page 188

1   public defenders in your office?
2       A.  Yes.
3       Q.  Do you know about what his or her
4   caseload was?
5       A.  I believe he had about 30 to 40
6   misdemeanors at a time.
7       Q.  Do you remember when the RubinBrown
8   study -- when the report came out?
9       A.  2016, '15.
10      Q.  And I believe you said that in your
11  memory that the public defender system was tracking
12  their time from 2014 to 2016?
13      A.  I don't remember when it began.  I know
14  it ended October 2016.
15      Q.  Did the ending of it coincide with
16  completion of the RubinBrown study?
17      A.  The RubinBrown study was completed,
18  yes.
19      Q.  Did the -- did keeping time continue
20  for a period after RubinBrown was completed?
21      A.  I don't know the answer to that
22  question.
23      Q.  All right.  Of the cases that are
24  handled in your office during a year, a typical
25  year, what would you estimate the percentage of

47 (Pages 185 to 188)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-13   Filed 02/09/18   Page 48 of 85

Page 189

1    cases that utilize experts to be?
2         A.  Probably under five percent.
3         Q.  And the same question for depositions,
4    what would you estimate the number of cases that
5    utilize depositions to be?
6         A.  Well, we -- we've asked for 300
7    depositions in fiscal year 2017.
8         Q.  And that was about 4,200 cases; is that
9    correct?
10        A.  Correct.
11        Q.  Now, if there are no rules that limit
12   the taking of depositions, to what do you attribute
13   this low number of depositions?
14        A.  That the cases are being prepared
15   quickly and resolved quickly.
16        Q.  And the same with the use of experts,
17   why -- why are only five percent of cases have
18   experts?
19        A.  I -- I attribute that more to our lack
20   of experience and attorneys able to determine when
21   an expert would add value to the case.
22        Q.  And in your experience, are defendants
23   out there bamboozling the system to try to get
24   public defender representation?
25        A.  No, not at all.

Page 190

1         Q.  And I know --
2         A.  The people we represent are very poor.
3         Q.  I know you gave a couple of -- you gave
4    an example and then said maybe five times when your
5    office has gone back to court and said we don't
6    think this person -- you know, because the person
7    was going on a cruise or whatever.
8         A.  Right.
9         Q.  But that in your opinion, do you see
10   that -- do you believe that that's happening more
11   often than your people are catching?
12        A.  No.  And usually if the person posts a
13   high bond, which may cause us to question their
14   indigence, it's a family member who has posted it
15   for them.
16        Q.  So doing further investigation on the
17   financial means of these folks wouldn't result in a
18   substantial decrease in the number of cases handled
19   by the -- or by the public defenders office; is that
20   correct?
21        MR. MOORE:  Sorry.  I'll just object,
22   calls for speculation.  Subject to that, you can go
23   ahead and respond.
24        A.  I doubt it if it would decrease it at
25   all.

Page 191

1         Q.  (By Ms. Shipma)  And you talked about
2    how a case or a matter was defined?
3         A.  Yes.
4         Q.  To your knowledge, is the -- the
5    description that you gave, is that consistent
6    throughout the public defender system or is that --
7    does that just apply to your district?
8         A.  It's how I was trained as a district
9    defender to do it, so I would assume so, but I
10   haven't looked at other people's databases.
11        Q.  I believe Mr. Moore asked you a
12   question about who you've spoken to regarding
13   concerns about your caseload without giving you a
14   time frame for that, and you answered you talked to
15   the attorneys in the office, the Post-Dispatch, MSPD
16   management, some judges.  What time frame were you
17   giving your answer for?
18        A.  For the last several months.  So since
19   the Hinkebein decision came out.
20        Q.  You said that you have three attorneys
21   right now who handle conflicts?
22        A.  Correct.
23        Q.  Is that all they handle --
24        A.  Yes.
25        Q.  -- conflicts?  And is that --

Page 192

1         A.  One of the attorneys has a few
2    St. Louis City cases.
3         Q.  And has that been your practice to have
4    attorneys who handle conflicts only handle conflict
5    cases?
6         A.  Generally because they have tended to
7    be experienced attorneys, they've also had maybe a
8    St. Louis City homicide also.
9         Q.  You've spoken a couple of times about
10   someone not being eligible as opposed to not being
11   indigent.  I took it that's what you were meaning.
12   Can you explain the difference in those two terms,
13   if there is a difference?
14        A.  There is a difference.  So there are
15   indigent people, which is a determination based upon
16   their income and assets, and then there are eligible
17   cases.  So you can be indigent and not have an
18   eligible case.  So if you're indigent and you're
19   charged with municipal code violation, you would not
20   be eligible.
21        Q.  Thank you.  When you said that you have
22   15 to 30 open cases, I wasn't certain because you
23   had been asked about the number of clients that you
24   have as well.  And so I just wanted to make sure
25   that we get the -- the answers correct.  How many

48 (Pages 189 to 192)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-13   Filed 02/09/18   Page 49 of 85

Page 193

1  open cases do you have right now?
2      A.  Currently right now, 20.
3          Q.  For yourself?
4      A.  Yes.
5          Q.  And do you know about how many clients
6  that represents?
7      A.  One client has two cases.  So 19.
8          MS. SHIPMA:  That's all the questions I
9  have.
10         MR. MAUNE:  I have nothing further.
11             FURTHER EXAMINATION
12  QUESTIONS BY MR. MOORE:
13         Q.  Just one last question.  As far as like
14  use of experts and amount of depos you guys are
15  taking, would you say that you pretty much do
16  whatever the case requires to the extent that you're
17  able?
18     A.  We do what the attorney thinks is
19  appropriate, the assigned attorney.
20         Q.  Right.  So I mean, not every case is
21  going to require an expert, right?
22     A.  Right.
23         Q.  And any cases that require an expert
24  may be the case that it gets plead out or doesn't
25  reach that stage where an expert becomes necessary,

Page 194

1  right?
2      A.  Correct.  But -- but you would have
3  already retained the expert even if it results in a
4  plea.
5          Q.  Depending on where the case is at,
6  right --
7      A.  Yeah.
8          Q.  -- wherever -- and the same thing with,
9  you know, depositions and other types of discovery,
10  right?
11     A.  What was the question?
12         Q.  The question was you do whatever like
13  amount of discovery or consulting with experts or
14  retaining experts that is necessary for the cases,
15  but sometimes just because of the way the cases get
16  resolved there are times whenever those -- you don't
17  quite get to those steps where you would then be
18  retaining the expert or be doing the deposition; is
19  that fair?
20     A.  Correct.  Yes.
21         MR. MOORE:  That's all.
22             FURTHER EXAMINATION
23  QUESTIONS BY MS. SHIPMA:
24         Q.  Now I have a follow-up.  Mary, in your
25  opinion are there instances where cases could have

Page 195

1  benefited from the use of -- of an expert, but an
2  expert wasn't requested?
3          MR. MOORE:  Call for -- I'll object.
4  It calls for speculation, but you can answer.
5      A.  Yes.
6          Q.  (By Ms. Shipma)  And the same with
7  depositions, are there cases where there should have
8  been depositions taken in a case but they were not?
9      A.  The case would have benefited from
10  depositions.
11         Q.  And what is -- in your opinion, what
12  has been the reason for these either experts not
13  being used or depositions not being taken in those
14  cases?
15     A.  Lack of experience of the attorneys,
16  lack of continuity of the attorneys in the office,
17  and lack of time.
18         Q.  Every case that comes through your
19  office, is it fully worked up to the extent it
20  should be?
21     A.  No.
22         MS. SHIPMA:  Nothing further.
23             FURTHER EXAMINATION
24  QUESTIONS BY MR. MOORE:
25         Q.  And just to clarify, you also discussed

Page 196

1  another reason for not doing the discovery of the
2  experts, which was that sometimes the case gets
3  resolved prior to the stage in the litigation where
4  you would be retaining the expert or doing a
5  discovery, right?
6      A.  Yes, but when the case gets resolved
7  early you want to know why?  It's because the person
8  is in jail and we have not been able to get together
9  the resources to do a bond reduction to get the
10  person out of jail.
11         Q.  Or they got a good deal, right?
12     A.  No, because we don't get any deals.
13         Q.  No defendant ever gets a plea deal of
14  any kind in the city?
15     A.  Very seldom.
16         Q.  So it does happen sometimes, though?
17     A.  It's beginning to happen.
18         Q.  Okay.  And I know it may be a little
19  hyperbole or whatever else, but I mean, there are --
20  plea deals do take place and defendants do plead
21  guilty in exchange for, you know --
22         MS. ROSCA:  Objection, calls for
23  speculation.
24         Q.  (By Mr. Moore)  I'm asking whether this
25  does happen.  They do make deals or whatever else

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 197

1  whereby they plead guilty and then they receive a
2  reduction in the possible sentence that they could
3  receive, right?
4      A.  Right.  Yeah.
5      Q.  And sometimes that happens before you
6  would get to the stage where experts are required,
7  right?
8      A.  It could.
9      Q.  Has that happened?  I mean, does that
10  happen?
11      A.  I can't tell you a specific case off
12  the top of my head, no.
13      MR. MOORE:  Okay.  I think that's good
14  enough.  Done.
15      VIDEOGRAPHER:  The time is 1:14.  We
16  are off the record.  This concludes our deposition
17  of Mary Fox.
18      COURT REPORTER:  Signature?
19      MS. SHIPMA:  Yeah, just like before I'm
20  going to read and sign.
21      COURT REPORTER:  And counsel, can I
22  just get on the record that everybody is going to
23  duplicate transcript orders from the last time we
24  had depositions in October?  Is that a yes?
25      MS. SHIPMA:  Yes.

## Page 198

1      MR. MOORE:  That's a yes for me.
2      MR. MAUNE:  Yes.
3      (WHEREIN, the deposition was concluded
4  at 1:14 p.m.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 199

1      CERTIFICATE OF REPORTER
2
3      I, William L. DeVries, a Certified
4  Court Reporter (MO), Certified Shorthand Reporter
5  (IL), Registered Diplomate Reporter, and a Certified
6  Realtime Reporter, do hereby certify that the
7  witness whose testimony appears in the foregoing
8  deposition was duly sworn by me pursuant to Section
9  492.010 RSMo; that the testimony of said witness was
10  taken by me to the best of my ability and thereafter
11  reduced to typewriting under my direction; that I am
12  neither counsel for, related to, nor employed by any
13  of the parties to the action in which this
14  deposition was taken, and further that I am not a
15  relative or employee of any attorney or counsel
16  employed by the parties thereto, nor financially or
17  otherwise interested in the outcome of the action.
18
19
20  _____
21      Certified Court Reporter
22      within and for the State of Missouri
23
24
25

## Page 200

1      Alaris Litigation Services
       (314) 644-2191
2
3  December 26, 2017
4  Ms. Jacqueline Shipma
   Missouri State Public Defender
5  1000 West Nifong
   Building 7, Suite 100
6  Columbia, Missouri 65203
   (573) 525-5212
7  jacqueline.shipma@mspd.mo.gov
8  In Re:  SHONDEL CHURCH, et al. vs. STATE OF
   MISSOURI, et al.
9
   Dear Ms. Shipma:
10
   Please find enclosed your copy of the deposition of
11  MARY FOX taken on December 19, 2017 in the
   above-referenced case.  Also enclosed is the
12  original signature page and errata sheets.
13  Please have the witness read your copy of the
   transcript, indicate any changes and/or corrections
14  desired on the errata sheets, and sign the signature
   page before a notary public.
15
   Please return the errata sheets and notarized
16  signature page to Alaris Litigation Services, 711
   North Eleventh Street, St. Louis, Missouri 63101
17  within 30 days of receipt.
18
   Thank you for your attention to this matter.
19
   Sincerely,
20
21
   William L. DeVries, CCR(MO)/CSR(IL)/RDR/CRR
22  Enclosures
23
24
25

50 (Pages 197 to 200)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-13   Filed 02/09/18   Page 51 of 85

## Page 201

```
 1              WITNESS ERRATA SHEET
 2    Witness Name:  MARY FOX
 3    Case Name:  SHONDEL CHURCH, et al. vs. STATE OF
      MISSOURI, et al.
 4
      Date Taken:  DECEMBER 19, 2017
 5
 6    Page #_____  Line #_____
 7    Should Read: _____
 8    Reason for Change: _____
 9
      Page #_____  Line #_____
10
      Should Read: _____
11
      Reason for Change: _____
12
13    Page #_____  Line #_____
14    Should Read: _____
15    Reason for Change: _____
16
      Page #_____  Line #_____
17
      Should Read: _____
18
      Reason for Change: _____
19
20    Page #_____  Line #_____
21    Should Read: _____
22    Reason for Change: _____
23
24
25    Witness Signature: _____
```

## Page 202

```
 1        STATE OF              )
                                )
 2        COUNTY OF             )
 3
          I, MARY FOX, do hereby certify:
 4            That I have read the foregoing deposition:
              That I have made such changes in form and/or
 5        substance to the within deposition as might be
          necessary to render the same true and correct:
 6            That having made such changes thereon, I
          hereby subscribe my name to the deposition.
 7            I declare under penalty of perjury that the
          foregoing is true and correct.
 8
 9
                         MARY FOX
10
11            Executed this      day of          ,
12        20___, at                  .
13
14
15        Notary Public:
16        My Commission Expires:
17
18
19
20
21
22
23
24
25
```

**ALARIS LITIGATION SERVICES**
**www.alaris.us**          **Phone: 1.800.280.3376**          **Fax: 314.644.1334**

## A

**a.m** 1:20 6:13,16
**A/B** 67:16
**abbreviation** 21:19
**abilities** 62:25 103:19
**ability** 44:18 46:3 55:14 97:7 103:19 130:6 145:16 145:17 169:10 199:10
**able** 50:17 70:2 72:15 75:20 90:9 94:9 111:6,14,19 130:2 145:6 154:11,12 155:10 162:23 163:23 167:23 167:24 168:1,1 168:6,7,9,13 168:18 169:21 169:25 173:22 178:4 179:18 179:24 189:20 193:17 196:8
**above-refere...** 200:11
**Academy** 104:23
**accept** 72:2 132:4 141:21 172:2
**accepted** 27:16 40:11
**accepting** 71:6 71:9
**access** 45:4 82:12 83:23 134:11 156:16 157:6,14 158:8 170:9 173:20
**accessible** 157:9

**accommodate** 172:20
**accomplish** 74:2
**accountants** 126:19
**accurate** 30:18 30:23 33:19 33:20,25 34:19 178:5
**accurately** 35:3 35:7 94:4 101:22 103:10 178:10 187:13
**ACLU** 3:14 6:23
**action** 22:15 131:2 133:17 199:13,17
**actions** 12:4 20:9 132:11
**actual** 9:14
**add** 57:22 63:25 162:7 162:10 189:21
**added** 26:3,5 87:5
**addition** 10:7 15:22 61:6 91:25 92:17
**additional** 14:16 15:7 77:25 87:6 92:2,19 101:25 155:8
**address** 26:5
**adds** 155:8
**adequate** 63:10 121:24
**adequately** 69:3 71:25
**adjudication** 57:11
**adjustment** 76:5
**adjustments** 76:6
**administering**

23:24
**administers** 149:1
**administrated** 170:14
**administrative** 20:2,4,9 22:13 23:18 24:1,3 88:3 98:2,5,10,22 99:7 101:16,23 105:13 129:15 144:17 161:22 161:23 162:2,4 162:6 163:11,14 163:24
**administrativ...** 98:8
**administrators** 98:24
**adult** 15:15,22 68:6 138:24
**adults** 77:3 105:15
**advance** 160:19
**advanced** 163:15
**advertise** 95:21
**advice** 71:13
**advise** 70:21 154:13
**advising** 154:15
**advocate** 75:25 76:5
**affairs** 10:23 55:24 104:17
**affect** 159:4
**affirm** 7:13
**afford** 112:20,21 134:1
**African** 50:12
**afternoon** 3:13
**age** 6:11
**agencies** 151:12
**agency** 105:14
**ago** 78:4 106:21

183:10
**agree** 116:8 166:19,19
**agreeable** 8:19
**agreed** 6:1 116:7 166:22
**agreeing** 153:4
**agreement** 116:4
**agrees** 39:12
**Ah** 134:3
**ahead** 31:13 42:5 64:1 74:18 93:10 96:9 128:12 147:18 154:6 190:23
**ahold** 26:9
**al** 1:4,7 3:4,7,20 3:21 6:18,19 200:8,8 201:3 201:3
**Alaris** 5:2,13 6:25 200:1,16
**alibi** 55:6
**allegations** 55:15 120:24
**alleged** 55:13
**alleviate** 88:16
**allow** 90:10 172:17
**allowed** 109:19 141:19 173:3
**allows** 112:13
**altered** 25:20 25:21
**alternatives** 75:19,22
**Amendment** 55:21,22
**amount** 32:1 44:7 52:4,7 59:3 65:9 117:1 123:12 150:19 151:14 152:7 161:23

178:18 193:14 194:13
**analysis** 57:19 58:5 136:13,17 177:25
**analyzing** 179:10
**and/or** 54:21 97:19 99:11 200:13 202:4
**annual** 2:22 67:13 80:2 100:13,16 144:11
**answer** 8:1,8,16 47:11 145:1 172:8,19 188:21 191:17 195:4
**answered** 191:14
**answering** 8:7
**answers** 192:25
**anticipate** 8:8 15:20 79:16 80:1 83:2
**anticipated** 119:16
**anticipating** 15:16
**anybody** 45:18 52:24 123:2
**anymore** 124:21 174:11
**APD2** 94:21
**appeal** 16:8,12 74:11
**appeals** 16:5,6 28:8 125:23
**appear** 33:25 37:18 154:4 155:5 158:21 161:12,14,17 187:17
**appearance** 37:8 40:18

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-13   Filed 02/09/18   Page 53 of 85

74:18 139:25
140:5 162:21
**appears** 165:25
199:7
**appellate** 16:15
80:15,16
**applicant** 25:23
38:22
**applicants**
28:20 138:24
**application** 18:7
18:11,18,20
26:4,15 37:5
53:14 113:21
114:7
**applications**
26:2 99:13
**applied** 40:16
**applies** 17:4
114:2
**apply** 191:7
**applying** 102:4
**appoint** 28:4,6
**appointed**
102:7 118:18,18
118:19
**appointment**
112:17
**appraisal** 43:11
**apprise** 145:2
**appropriate**
93:21 140:16
193:19
**approval** 59:6
59:9,12 117:13
119:22
**approve** 22:25
23:3 58:25
119:20,21
165:11
**approved**
50:20,21 117:6
**approves** 59:8
**approving**
20:19 22:14
22:23

**approximately**
6:16 28:19
41:15
**April** 78:6,19
79:8 182:19
**archiving** 21:7
**area** 12:6 13:11
18:6 19:8 20:3
21:16 22:10
24:19 25:3,18
27:25 30:19
40:12 41:12
43:8 44:2,24
44:25 46:22
48:21 51:20
54:19 58:10,18
59:18 67:12
74:7 83:3
90:11 91:5
96:1 104:20
107:2 121:9
157:22 164:18
166:4,7,9
**areas** 41:2
**argument**
141:10
**argumentative**
38:6
**Armstrong**
77:20
**arraignment**
62:8
**arrangements**
92:25 93:7
**arrow** 25:22
**article** 2:23
102:13,19,21
103:7,15
156:23
**as-needed**
19:22,23
**aside** 15:11 67:4
80:7
**asked** 41:8
74:22 82:3
112:18 131:22

137:12 143:2
189:6 191:11
192:23
**asking** 8:9
119:16,17 129:8
131:9 147:1,9
154:8 160:7
196:24
**asks** 147:12,21
**assault** 120:25
178:18
**assessor's**
113:22
**assets** 114:5
192:16
**assign** 14:25
18:23 27:25
28:4 37:7,9,15
50:5 108:6
154:1
**assigned** 13:5,6
13:7 15:5 19:15
19:17,20,21
21:1,1 42:15
44:9 62:20
65:2,24 78:23
79:3 81:2
82:20 83:3
94:20 99:1,2
99:9,11,17,23
101:3,6 120:8
153:25 154:3
158:24,25
174:8 180:22
193:19
**assigning** 18:4
18:5 22:15
131:21
**assignment**
13:8 18:23,25
19:3 77:14
85:9 87:6,16
148:21,23
166:25 168:9
174:21
**assignments**

87:7 121:19
**assist** 68:8
82:3 101:16
163:1
**assistance** 49:1
49:3 66:15
77:22 81:25
96:17 131:4
132:19 135:1
136:3
**assistant** 11:4,11
13:3,10,14 18:8
18:10,19 20:11
21:4 79:23
99:12,15,18,22
105:13 113:20
**assistants** 20:3
20:5,15 21:2
21:13,14 49:11
**assisted** 164:12
**assisting** 142:8
**assists** 22:6
**associate** 11:7
133:21 182:25
**associates** 78:1
120:3 134:2,4
**association**
89:11
**assume** 37:17
191:9
**assuming** 13:24
15:4
**assure** 153:17
**attached** 2:24
**attempted**
55:25
**attempting**
50:5 121:25
**attend** 22:18
72:22 85:2,2
135:4 141:6
144:15
**attended**
142:24 158:3
**attention** 38:11
52:24 69:15

86:10,10
114:14 131:23
131:24 200:18
**attorney** 4:20
7:8 15:5 17:18
18:15 19:16
20:1 21:21,24
23:14 30:15,17
30:19,25 31:2
31:3,5 37:7,10
37:15 38:3
41:12,24 42:9
45:2,13,19
46:3,4,7,14
48:6 49:3
50:4 51:17
52:13 64:3,3
64:19 65:1
66:13,21,25
70:14,23,25
71:1,8 72:10
73:12,17 74:19
77:14,19 80:18
80:22,23
84:6 85:6,8
85:10,14 86:17
86:20,22 87:3
90:8 92:13,16
92:18 93:4
94:9 95:2,15
95:22 97:14
97:19,25
98:13 104:1,5
104:6 111:13
115:15 118:24
119:14 120:8
120:12 124:3
130:18 131:17
131:22 133:8
133:16,21
134:8,25
136:10,19
140:14 141:10
141:18,18 144:1
145:1,5,5 147:1
147:21 150:2

151:7 154:10
155:6,9 156:3
156:8 161:2
163:2 173:10,11
180:25 182:11
182:11,12,13,13
182:14,16,18
182:20,21,21
182:22,25
183:4,6,9,11,12
183:15,20,23
184:1,6,6,11
185:16,21,22
186:4 187:22
187:25 193:18
193:19 199:15
**attorney's**
  40:17 63:21
  139:7,8
  154:23 184:12
**attorneys** 7:2
  12:24,25 13:4
  13:22 15:8,12
  15:17,21,25
  17:7,20,23,25
  18:6 19:4,14
  21:5,17 22:6
  22:16 23:23
  24:18 29:18
  30:19,24 31:7
  31:9 32:2,5,12
  33:19 34:16
  42:14 43:8,10
  44:15 45:16
  47:12 49:11,18
  50:15 53:18
  54:18,21 55:5
  55:8 56:1,19
  57:15,25
  59:25 60:16
  60:20,24
  61:10,22 62:11
  62:13,21,24
  63:6,7,8,13
  64:17 65:4,6
  65:24 66:3,10

66:16 67:6,7
67:12 68:8
69:2,8,11,23
70:4,16,20,21
71:6,10,24
72:14,17,22
73:8,13,22
74:7 75:4,8,12
75:14,22 76:4
76:10 77:23
78:12,15 80:6
80:14,15 83:7
83:8,9,11,12,15
83:21,24,25
84:14,20 85:1
85:18 86:3,7
86:14 88:15
89:3 90:11,15
90:23 92:9
94:18,19,21
95:6,9 96:25
98:9 99:4,10
99:11,14,17,19
99:20,22
107:11 113:9
116:8 128:15
128:16 129:2
129:21 130:12
131:3 132:23
134:7 139:2,10
139:12,15,17
139:20 140:19
140:23 142:7
143:8 144:5,9
144:15,15
145:8,14 146:5
146:9,23
147:13 151:12
156:15 157:14
157:17 160:22
161:14 162:1
166:7,8
172:23 177:12
180:17,19,20
180:21,22
181:1,19 185:17

187:20 189:20
191:15,20
192:1,4,7
195:15,16
**attorneys'** 49:6
  93:24 103:19
**attribute** 189:12
  189:19
**atypical** 148:3,4
**authority** 108:9
**authorizes**
  137:2,25
**authorizing**
  22:14
**automatically**
  68:5
**available** 24:20
  30:15,17 49:10
  49:14,17 59:21
  71:19 73:22
  75:21 90:14
  92:7 98:17,25
  163:5 177:13
**average** 14:9
  30:17,25
  65:18
**averages** 14:10
**avoid** 8:5
**aware** 24:14
  43:10 96:12
  116:19 118:16
  120:11 131:5
  137:24 142:17
  149:18 156:21
  157:5
**awareness**
  146:4 151:10

---

**B**

**B** 2:9 159:3
**baby** 58:3
**back** 26:17
  29:23 31:8
  41:18 51:6
  80:5 82:6,23
  87:24 89:20

100:9 124:1
125:9,10
127:15 132:6
141:1,2,4,21
174:10 175:8
176:19,21
183:10 184:8,9
190:5
**background**
  104:12,14
  177:24 179:14
**backgrounds**
  182:6
**backwards**
  187:5,6
**bail** 51:19,21,24
  51:25 52:1,2,4
  52:7
**ballistics** 58:8
**bamboozled**
  112:7
**bamboozling**
  189:23
**bar** 89:11 181:19
  182:16,19,23
  183:5,7,9
  185:8
**base** 18:25 19:3
**based** 18:17
  36:13 40:1
  55:21 62:23
  71:20 88:3
  118:9 121:10,13
  135:25 149:24
  151:6 161:25
  170:24 171:2
  177:2,15,20
  192:15
**basic** 7:25
**basically** 89:1
  127:1 179:12
**basis** 19:14,22
  19:23 43:9,13
  48:25 55:20
  66:19,20
  67:13 69:12

80:2 86:12
107:12 115:1
135:17 137:16
137:17 144:10
171:20
**batch** 159:18
**Bates** 35:15
**becoming** 15:9
**Beesley** 79:22
**began** 88:20
  102:1 123:20
  185:4 188:13
**beginning** 101:6
  101:9 196:17
**behalf** 1:15 3:22
  6:12 161:13,14
**believe** 26:1
  30:18 34:8
  35:2 41:18
  48:4 61:13
  62:10,23 63:9
  66:8,12,24,24
  67:5 68:9
  78:25 81:10,19
  82:9 86:11,13
  86:15 87:25
  88:10 90:4,16
  91:6,9 92:21
  93:4 94:10,13
  97:10 105:19
  112:25 126:6
  131:18 133:14
  137:1 149:24
  166:18 187:8
  188:5,10
  190:10 191:11
**believed** 88:12
**bench** 42:9
  154:8
**benefit** 77:24
  77:25 80:20
**benefited** 134:6
  195:1,9
**best** 44:1,18
  89:10 94:14
  199:10

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-13    Filed 02/09/18    Page 55 of 85

better 32:21
beyond 60:7
  98:12,13
big 25:22
  106:22 139:9
bigger 137:21
bill 6:23 125:16
  126:3,4,5
  127:2,17
billed 127:7
billing 124:4,5
  125:7
bills 20:19 22:14
binder 163:18
binders 163:3
bit 25:20 40:8
  51:8 53:16
  77:5,16 83:6
  104:12 106:19
  110:7 112:1
  114:15 117:4
  125:24 140:9
  143:8 145:19
  148:17 152:23
  153:1 164:10
  164:20 170:19
  180:7 182:6
blind 152:25
  153:20
blocks 39:22
Blue 113:25
board 10:24
  90:6,16,17
body 61:16
bond 66:20
  113:7 140:1,4
  150:11 190:13
  196:9
bono 78:15
  79:5 81:2
  82:21 83:3
Book 113:25
booked 51:11,12
booth 44:22,23
booths 45:8,14
  45:15

Bosnian 50:11
bottom 178:9
box 39:1,10
  101:2 140:17
  163:7
boxes 37:10,16
  37:17 38:1,21
  39:10
brand-new 31:5
  182:20
break 8:17
  42:21 50:24
  89:15
breaks 8:15
briefly 36:8
bring 9:7 38:11
  53:6 68:19
  86:9,10 119:2
  119:7 131:23
  131:24 134:1
  141:1
brochure
  144:25 145:4
broken 13:4
brought 51:9
  114:14
budget 58:18
  58:20,22
  110:4 175:16
budgetary
  20:19
budgeting
  23:25
budgets 58:23
building 4:14
  20:21 139:14
  170:21 200:5
bunch 159:25
  181:18
burden 73:17
  155:8,24,25
  156:2
burdens 173:16
Bush 39:24
  165:12

---

**C**

C 4:1,19
calculated
  34:15 176:10
calculating
  176:18
calculation
  177:19
calendar 91:12
  91:12,15
calendaring
  129:22
California 4:4
call 35:25 36:11
  45:24 46:3
  47:18 48:9,14
  48:16 83:14
  87:15 111:23
  157:22 159:20
  167:16 168:2
  168:14,16,19
  170:5,11 172:17
  173:3,10 195:3
called 75:18
  84:21 152:24
  174:15,15,16
calling 46:4
  47:9,19 48:7
calls 38:6 42:4
  46:19 47:11,12
  47:13,14,25
  47:25 49:16
  61:7 96:8
  99:17 118:10
  173:17 190:22
  195:4 196:22
camera 61:10
cameras 61:11
  61:16
Camille 4:7 7:5
campaign
  156:9
canceled 112:16
capable 37:18
capacities
  182:2

capacity 34:14
  34:22 35:1
  177:7,18,22
  187:18
captured
  103:10
car 113:24,25
Cardarella
  89:24
cardboard
  45:16 163:7
care 10:6 20:18
  22:12 81:21
carries 22:4
carry 22:2,3
case 1:6 3:6
  6:19 9:6 12:17
  12:19 13:2 16:7
  16:16 17:3,4
  18:12,14,15 19:1
  19:5,19,21,21
  19:22 22:11,12
  27:4,7 29:14
  34:3,7,11
  36:16,20,23
  37:8 38:1,10
  40:1 50:17
  51:11,22 53:13
  54:16 56:14
  57:22 58:1
  59:7 61:1,22
  62:1,9,10,15
  63:22 64:2,9
  64:12,14,20
  64:22,25
  65:2 66:2,5
  67:3,7,21
  70:14,15,18,21
  71:3,7 74:21
  76:21 77:13
  80:24 82:7,14
  82:22 85:21
  86:19 87:6
  90:9 91:22,24
  92:5,7,9 94:3
  94:5 102:9

107:17,22
108:2,7,7,12,13
108:15,19,19
109:8,17 111:2
111:5,6,10,11,11
112:6 113:8
116:12,17,21
117:21,23 119:1
119:2,7,14
120:4,24,24
121:2,11 122:8
122:11,11 123:5
133:5,12,14
135:22 136:1,3
138:5,8,11,15
138:17 139:18
139:18 140:11
140:13 141:14
141:21,22,23
141:24,25
142:2 145:6
146:1 147:22
150:3,10
153:25 154:7
154:11 155:15
155:21 159:1
160:4,24
161:11 163:21
165:3 174:8
175:6 176:14
176:23,23,25
178:11,22
180:5,9,10,10
180:11,12,13
181:7 189:21
191:2 192:18
193:16,20,24
194:5 195:8,9
195:18 196:2,6
197:11 200:11
201:3
Case.net 18:11
  18:18,22
caseload 22:3
  22:4 30:8
  33:16 64:19

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-13   Filed 02/09/18   Page 56 of 85

80:18 86:11,15
86:21 87:4
88:17 101:16
101:22 107:6
128:3,4,6,24
129:7 130:7
131:10 132:10
134:14 135:18
140:21 150:22
164:15 174:3,7
174:7,16
187:25 188:4
191:13
**caseloads** 86:3
86:12 87:3,14
102:15 129:3
139:5,7,8,14
139:16,22
142:20,22
149:25
**cases** 10:6,24
12:11,12,15 13:6
13:7,23 14:1,2
14:4,6,8,20,23
14:25 15:4,13
15:14,15,15,18
15:22,23 16:1
16:10,19,22,25
16:25 17:2
18:4,4 19:16
21:1 22:16
27:12 28:1
29:1,4,6,11,15
29:19 31:1,4,11
31:20,25
33:25 34:2,8
34:9 40:10,14
40:15,23 41:8
41:16,22 42:1
42:10,14 43:12
44:8,9 49:22
53:18 54:10,14
54:24,24 55:1
55:2,3,4,9,19
56:2,3,5,7,8
56:12,18,21,23

57:1,4,7,10,13
57:14 58:3,4,5
58:17,17,24,24
59:1,9,11 60:17
60:18,22 61:5
61:6 62:20
63:11 64:10,24
65:4,7,23,24
66:6 67:13,19
67:23,24,25
68:7,14,15,19
69:9,14,19
70:13 71:12
72:14 73:21
78:14,18,19,22
78:25 79:2,5
80:15,16,20,21
80:22 81:1,8,11
81:16 82:2,20
83:2,19 85:9
85:13,14 86:14
86:18 88:13
91:16,21 92:1
92:10,13,16
94:18,20,24
96:12,20
97:16,19 101:3
101:6,8,11
102:3,8
107:20 108:2
108:22 109:1,5
109:7 110:8,11
110:11,15 111:9
114:17 117:2
118:18 120:13
122:7,8,22
125:19,21
128:17 129:16
130:1,7 131:21
132:1,4 134:23
135:7,10,16,18
136:20 138:23
138:24,25
139:17,21,23
140:10,20,22
140:25 142:9

143:2 144:1
145:3,20
146:23 147:5
147:6 148:4,5
148:21 150:22
150:23 152:7
152:11,13,19
154:10,24,25
156:16 157:18
159:6,9,19
171:8,11,13,14
171:18 174:13
175:1 176:24
178:8 179:1,2
179:2,4 180:15
188:23 189:1,4
189:8,14,17
190:18 192:2,5
192:17,22
193:1,7,23
194:14,15,25
195:7,14
**casework** 30:16
**catch** 176:13
**catching** 190:11
**categories**
127:12,20,22
127:23,24
176:23
**category**
120:16 127:22
**Catholic** 49:1
**cause** 3:18
75:17 91:9
190:13
**caused** 94:16
**CCR** 5:13
**CCR(MO)/CS—**
200:21
**celebration**
123:22
**cell** 44:25 61:8
**center** 4:13
44:22 101:3
**centered** 176:3
**Central** 1:2 3:2

3:20
**certain** 3:18
31:15 48:5
52:2 87:14
99:17,19 117:1
117:2 129:22
135:21,24
159:2,18 166:2
174:18 192:22
**certainly** 112:20
**CERTIFICATE**
199:1
**certification**
58:17 88:10
121:5
**Certified** 3:16
3:17 6:5,5
199:3,4,5,21
**certify** 199:6
202:3
**chair** 24:10
70:10,14,17
85:22 120:17
120:21,23,25
121:1,4,19
122:9,22 141:7
**chairing** 122:2
**chairs** 70:5
**challenged**
40:2
**chance** 102:22
**change** 40:22
83:4 89:2
101:17 102:2
109:16 110:2,3
128:24 130:21
138:12 156:7
201:8,11,15,18
201:22
**changed** 40:25
52:4,8 87:8
89:3 109:20
178:14
**changes** 86:25
88:14 101:18
200:13 202:4

202:6
**Chapter** 76:8
**charge** 22:22
153:14
**charged** 192:19
**charges** 19:1
48:23 70:8
107:21 108:10
108:18
**Charles** 65:14
88:23,25
**chart** 176:8
**chartered** 78:8
**checked** 37:10
37:16,17 38:1
38:21
**child** 58:4 74:17
74:20,22 75:3
75:16 77:1
**child's** 76:21
**children** 10:6
77:3
**choose** 16:8
155:12
**chunk** 123:10
**Church** 1:4 3:4
3:20 6:18
200:8 201:3
**circuit** 10:16
20:24 22:17
36:1 72:9
91:18,18,19
93:4 101:14
107:15 132:10
132:13 154:23
155:6 156:3,7
165:6 184:12
**circuit-wide**
22:17
**circuits** 41:7,8
**circumstances**
138:19 141:13
**cited** 113:1 164:2
176:17
**citing** 176:9
**city** 9:21 10:4

**ALARIS LITIGATION SERVICES**
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-13   Filed 02/09/18   Page 57 of 85

11:6,21,22 12:7
12:16 33:18
44:14,20,21
46:21 61:15
62:2 65:20,21
69:1 75:2
76:16 79:11
80:8,13 82:25
91:12,15 92:23
92:25 93:2
93:23 101:3
128:17 129:25
147:4,15,20
148:10 151:22
154:20 158:11
174:10 178:8
192:2,8 196:14
**civil** 11:7 12:2,3
12:4 77:23
95:12 106:15
106:16 148:18
148:18 149:3
152:2 159:13
161:16 171:13
171:14 183:2
**claim** 37:20
**claimed** 136:16
**clarify** 195:25
**classified** 20:5
21:17
**classify** 17:2
**Clayton** 11:5,12
11:20 92:21
**cleaned** 100:3
**clear** 59:23
**clearly** 53:5,8
161:10
**clerk** 20:10 21:6
**clerk's** 140:16
**clerks** 20:15
21:3,12 26:22
134:6
**clerkship** 84:9
84:11
**click** 127:12
156:23

**client** 12:18
22:11 24:3
26:25 27:8
28:15 43:3,7
43:10,15,18,20
43:21,23
44:10 45:20
48:7 50:14
53:8 64:4,20
70:22,24 71:2
71:9 108:12
111:13 112:16
129:5 136:10
153:12,12
154:13 155:10
155:19,20
168:2 169:17
170:19,20
171:5,7,12
172:4 174:6,7
174:7 175:11,11
185:24 193:7
**client's** 55:6
94:1
**clients** 14:6,7
22:5,8 23:20
23:22,23 25:4
25:19 26:8,16
44:12,15 46:2
48:23 49:4,6
49:7,20 50:2
50:6,6,9 64:7
64:8,16 69:16
71:16 72:1,18
73:5,9,20
75:5,23 76:12
76:17 88:1,5
98:15,19 140:5
142:16 153:4
166:24 168:8
168:10 170:10
170:18 171:24
174:2,3,20
175:4 192:23
193:5
**clogged** 47:14

**clogging** 47:21
**close** 31:6
58:22 140:19
140:25 141:4
**closed** 111:9
140:23 141:14
141:17
**closer** 57:12
65:16
**closing** 21:6
140:10,15,16
141:9
**co-defendant**
18:14 133:12,18
133:20
**co-defendant's**
133:13
**co-defendants**
107:20
**coalition** 77:6
77:15,17 78:2
78:10,16,23
142:6,6,11,12
**Coburn** 133:22
134:19 187:20
187:24
**Coburn's** 134:21
**code** 24:9
140:16 180:10
192:19
**coincide** 188:15
**collaborate**
142:19
**collateral** 49:8
**collected**
179:21
**collecting** 179:9
**collection**
179:20 180:1
**college** 105:8
**Columbia** 4:15
20:20 23:9
58:21 82:24
95:24 200:6
**column** 33:17
34:12 177:7

**columns** 176:10
**combination**
22:11 42:6
101:24 158:19
**come** 16:22
18:5 26:14
36:20 39:21
39:23 40:21
57:12 58:9
80:5 88:13
96:21 113:13
130:11 131:4
144:9 145:9
156:8 165:2
184:8
**comes** 17:3 18:7
30:16 34:3
50:14 58:20
60:2 117:13
180:5 185:22
195:18
**comfortable**
131:3
**coming** 24:9
71:12 79:13
101:12 102:4
103:21 152:8
156:11 163:25
**comings** 20:22
**commission**
2:21 30:9
100:12,16
202:16
**commissioner**
10:16
**Commissione...**
10:25
**common** 32:5
32:9
**communicate**
171:5
**communicated**
47:1 71:15,23
**communicati...**
46:10 53:9
136:9 153:11

173:15
**community**
58:16 82:18
**comparable**
139:6
**compel** 66:18
**compensated**
81:15
**compensation**
32:13
**Competence**
63:20
**competent**
29:17 138:22
144:4 185:21
186:3,5,6
**complained**
178:6
**complaining**
53:22 54:2,4
54:7,11,14
56:7,16
**complaint** 18:21
43:14 180:20
**complete** 8:7
26:9 33:8
36:23 170:1
**completed**
27:3 188:17
188:20
**completion**
188:16
**complex** 64:19
**comply** 121:25
167:24 168:6
**compound** 37:1
**computation**
177:23
**computer**
24:20 95:24
181:4
**con** 43:2
**concern** 74:20
96:25
**concerned**
97:3,3,4

**ALARIS LITIGATION SERVICES**
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-13   Filed 02/09/18   Page 58 of 85

139:22 180:1
**concerning**
2:15 22:16
35:16,18 89:7
130:6 131:10
164:3
**concerns** 75:5
75:9 86:3,13
107:5,10
191:13
**concluded**
198:3
**concludes**
197:16
**conclusion**
82:22
**conclusions**
177:15
**conditions**
36:12 39:22
52:9 66:20
**conduct** 55:9,11
56:1
**conducts** 79:18
**conference**
155:18
**conferences**
76:11,14,15
**confidential**
44:13,17,17,19
48:9
**confined** 64:8
167:11,13,20
168:8,21
171:25
**confinement**
17:1
**conflict** 12:11,12
12:14,17,19
41:8 65:4,7,24
101:25 140:23
192:4
**conflicted**
180:13
**conflicts** 12:20
88:20,22,24

191:21,25
192:4
**confused** 129:7
**connected**
124:17
**connection**
82:17 124:10
**consequences**
48:22 49:8
**conservative**
118:1,2
**consider** 28:8
36:22 43:17
113:12 143:24
**consideration**
26:18 114:1
178:7
**considered**
28:24
**consistency**
162:11
**consistent**
40:25 66:19
66:20 69:12
72:7 91:18
109:6,25
171:24 191:5
**consistently**
70:3
**constitutional**
165:15,16 171:3
**consulting**
194:13
**contact** 20:21
22:11 38:8
43:4,7,10,15
43:18 45:3,4,5
45:20 46:6
48:25 60:13
60:14 75:19
166:24 167:6
167:16,17
168:20 169:14
170:22 171:24
**contacts** 44:10
**contained**

110:12 166:20
176:20
**content** 43:2
**contents** 137:10
**continually**
97:18
**continuance**
146:21,25
147:2,19,21,25
148:3,6
158:22 159:22
160:8,11,18,24
161:6,10
**continuances**
63:14,23 64:4
64:7,16 130:3
145:20 146:1,6
146:11,18 147:9
147:13 160:15
161:1
**continue** 16:16
101:8 159:17
159:25 164:17
188:19
**continuing** 80:1
101:9
**continuity**
195:16
**contract** 10:4,19
65:24
**contracting**
82:23
**convened**
164:22
**conversation**
76:20 119:24
145:21
**conversations**
130:8 135:25
164:15
**conveying**
96:23 133:2
136:3
**cooperative**
142:21
**coordinate**

160:17
**copies** 2:24
**copy** 25:13
32:19,22
42:20 137:8
200:10,13
**correct** 12:6,16
14:17,18 15:19
15:23,24 16:13
16:14,17,18
17:11 27:2 29:7
37:12,13,21
48:1 62:17,18
62:21,22 70:11
76:23 78:21
90:24,25
92:22 93:8
99:7,25 104:2
104:6 106:10
107:7,25 110:6
111:22 112:3
117:19 120:5
122:15,24
124:9,13 126:11
129:13 132:5
132:25 133:3
135:11 136:5
136:25 138:3
139:4 140:8
142:10 143:16
143:21 145:25
148:16 149:2,5
151:5,9 152:16
153:3 154:21
156:1,18
158:13 161:20
164:13 166:3
169:24 173:13
173:18 174:23
176:12 177:4
179:16,25
180:4 181:21
182:4 185:13
185:19,25
186:19,23
187:12 189:9

189:10 190:20
191:22 192:25
194:2,20
202:5,7
**correctional**
45:10
**corrections**
167:16,21
168:22 169:4
169:22 200:13
**correctly** 181:3
**correspondent**
99:23
**cost** 46:9 49:4
59:22 119:16
**counsel** 6:2,2
9:16 36:4,15
38:23 46:15
52:16 68:25
72:1 74:12,17
77:6,15,17,25
78:10,16,24
79:5 80:3
81:2 82:21
83:3 94:9
96:17 102:7
112:14,21 113:8
132:20 133:13
135:2 138:9
142:13 153:11
172:1,2 197:21
199:12,15
**counseling** 71:6
71:8
**count** 107:19
141:23
**counted** 142:2
**counties** 12:5
12:19
**country** 68:4
169:9,12
**counts** 178:22
**County** 65:8,8
65:12,14,14,18
65:20,21
80:10 88:21,21

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-13   Filed 02/09/18   Page 59 of 85

88:22,23,23
88:25,25 89:1
92:22,23,25
93:1 202:2
**couple** 117:12
125:2 132:22
152:8 156:22
164:2 175:14
176:5 181:16
190:3 192:9
**course** 14:13
35:6 62:9
135:9 138:21
157:19
**court** 1:1 2:24
3:1,16,19 5:12
6:5,20 7:11,13
10:5,8 20:24
22:6 26:13
27:13,15,18
35:20 39:4,7
39:17,19 44:8
44:8 53:6,6
53:10 68:6,13
68:21,22
71:20,21 72:11
72:25 74:16
74:16 75:2,6
75:10 76:18,19
76:22 81:12
88:4 90:10
93:20 94:7
96:13 99:3
100:11,17
101:15 102:13
102:20 105:4
108:6,9
109:22 112:14
112:18,21
115:15 121:5
125:19,20
128:17,25
129:23 131:20
131:22 137:3
137:23 138:1
141:19 147:16

152:22 153:4
153:9,21,24
154:1,5 155:15
158:16 160:13
160:14,23
164:16,25
172:14 190:5
197:18,21
199:4,21
**court's** 38:11
68:19 75:3
**courts** 42:1
63:24 87:10
89:7 128:19
165:1
**cover** 7:25 33:3
**covered** 74:13
127:24
**covers** 12:7
**create** 83:20
110:14 171:25
180:9
**created** 39:25
39:25 40:7
77:2 98:13
110:14 126:24
140:15
**creating** 36:5
98:13,19
**creation** 164:12
**credible** 133:11
**credit** 178:24
179:1
**creeping** 41:23
**crept** 41:18
**crime** 54:19
108:17
**crimes** 52:3
93:19
**criminal** 11:24
48:23 87:16
87:16 95:11
142:8 145:20
146:5,9 148:5
148:9,10,20,21
148:23 151:21

153:2 159:9,21
171:19,22
184:22 185:11
**crisis** 30:8
132:10 165:3
178:11
**crosca@orric...**
4:9
**cruise** 112:18,20
190:7
**culpable** 37:20
**cumbersome**
156:20
**Cumulative**
33:15
**current** 83:20
86:20 99:6
162:13 163:24
**currently** 12:18
13:15 15:11
22:5 25:3
39:3 65:5,6
87:20 95:5
124:20 140:7
193:2
**curriculum**
83:21,22
185:11
**custody** 26:15
26:17 43:19
43:22 44:13
45:20 46:2
**cut** 170:8 173:15
**cycle** 83:21

--------

**D**

**D** 2:1
**daily** 26:19 43:9
43:13 123:8
**data** 61:8,18
179:10,10,20
179:22 180:1,3
180:5 181:4,13
**database** 9:6
33:11,12 60:1
110:13,19 111:10

119:19 127:13
157:22,25
180:6,10 181:7
**databases**
191:10
**date** 6:15 201:4
**dates** 129:23
**David** 5:2 6:24
**day** 3:13 47:10
51:13 85:13,15
111:24 124:1
125:10 144:17
202:11
**day-to-day**
22:9
**days** 34:10
39:19 62:8
64:20 148:14
149:7 160:1
166:24,25
167:1,4,9
168:2,8,11
169:21 170:24
171:8,12,22
172:4 174:21
180:14 200:17
**deal** 47:25
153:6 177:20
196:11,13
**dealing** 22:7
48:22 49:6
50:2
**deals** 72:1,5
108:24 196:12
196:20,25
**Dear** 200:9
**death** 58:4
**December** 1:16
3:11 6:15
182:10,12,13
200:3,11 201:4
**decide** 62:11
94:14
**decided** 88:1,9
119:6
**decides** 73:20

**decision** 40:13
40:20,22
71:21 87:1,11
89:8,12 96:24
97:1 130:12
132:7 142:24
153:13 164:25
171:3 191:19
**decisions** 41:4
**declare** 202:7
**decrease**
190:18,24
**decreased**
68:10,12
**deem** 186:3,6
**deemed** 44:16
185:21
**deems** 66:21
**defendant**
28:12 36:3
37:18 39:3,12
45:2 51:9,15
55:14 63:20
66:2 74:3,10
107:21,24
112:15 150:10
167:10 196:13
**defendants** 1:8
3:8,22 4:11 6:3
7:10 28:1
41:24 45:12
52:18 96:14
102:4 112:2,8
129:12 139:25
171:22 173:10
173:19 189:22
196:20
**defender** 2:21
4:11,13 9:20
9:22 11:4,12
13:11,14,16
22:10 23:12
30:7 31:17
33:15 35:11,15
36:19 40:24
71:11 72:8

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-13   Filed 02/09/18   Page 60 of 85

77:21,22,24
79:6,21 83:17
83:18,20 84:4
84:22 88:9
92:21 95:13
96:12 100:12
100:16 107:6
107:14 121:14
121:15 122:17
126:2,22,24
127:3,5,8
128:1 133:19
137:2 138:1
142:8,16
146:16 147:6
147:12 149:19
151:15 152:12
155:4 159:16
163:6 164:18
166:2,9,12,23
167:8 170:13
170:16 171:1
172:25 173:4
173:15 182:3
188:11 189:24
191:6,9 200:4
**defenders**
12:15,23 14:16
14:19 16:11
22:19 24:14
28:13 41:13
43:5 44:2
48:3 49:24
79:24 81:18
84:14,19 85:7
102:15 110:8
111:23 114:25
115:5 118:8
121:25 134:10
134:12 141:6
149:15 158:7
165:2 166:1
167:23,24
172:24 188:1
190:19
**defenders'**

110:4 170:8
172:11,16
**defending**
108:22 122:10
122:11
**defense** 11:24
63:19 71:21
146:5,9 151:21
**define** 20:4
23:19 107:17
**defined** 191:2
**degree** 104:17
178:19
**degrees** 163:15
**delineated**
44:3
**demonstrate**
73:25 110:22
**denials** 59:16
**denied** 27:12,17
59:13 114:24
115:6 118:3,5,9
143:17 160:16
**deny** 130:6
**department**
10:23 144:14
167:15,21
168:22 169:3
169:22
**depending**
44:25 194:5
**Depends** 31:2
**deportation**
49:9
**depos** 193:14
**deposed** 56:17
**deposes** 6:12
**deposition** 1:14
1:20 3:10 6:3
6:13,17,22
7:22 8:22 9:4
107:4 114:21
114:25 115:1,6
116:9,14 194:18
197:16 198:3
199:8,14

200:10 202:4
202:5,6
**depositions**
22:25 55:16
56:2,19,20,23
81:25 108:23
115:11,13,23
116:12,17,23
117:1 189:3,5,7
189:12,13
194:9 195:7,8
195:10,13
197:24
**deputy** 13:16
23:12 71:11
79:21 83:16,18
83:20
**describe** 20:16
22:9 86:5
**described**
158:20
**description**
191:5
**designated**
15:13
**desired** 200:14
**detail** 110:16
**details** 60:10
133:4
**detention** 75:15
75:19,22,25
**determination**
18:19,20
26:23 27:14
27:16,18,19,21
27:23 28:2,9
28:14 36:2,13
38:12 41:25
53:7 74:17
75:1 112:5
113:18 114:6
141:20 160:14
192:15
**determinations**
41:12 74:15
**determine** 28:11

53:15 72:15
112:19 142:21
174:6 189:20
**determined**
27:4,7 28:20
28:21,23 37:6
112:15 132:19
153:12
**determining**
27:20 112:2
**developed**
24:22
**development**
83:7
**development...**
105:15
**DeVries** 3:16
5:12 6:4,24
199:3 200:21
**dialects** 50:12
**died** 138:20
**difference**
122:10 124:6
139:7 192:12
192:13,14
**different** 13:4
20:5 39:21
40:9 58:23
108:2,12
146:25 148:1
148:17 151:16
155:9 158:11
158:18 174:14
176:23 185:17
**differentiating**
54:1
**differently**
128:18 154:5
**difficult** 50:12
91:12,15 92:11
94:1 170:3
**diminishes**
64:18
**Diplomate** 3:17
199:5
**dire** 74:8 141:11

**direct** 16:5,6
**directed** 101:15
165:1
**direction** 199:11
**directive** 165:5
**directly** 19:13
45:9 99:23
111:20
**director** 13:18
59:10 77:20
119:22
**disabled** 105:15
**disapprove**
119:20
**disciplinary**
10:24
**discipline**
102:16
**discover** 138:9
150:3
**discovery** 53:17
60:16 61:1,7
61:25 62:6,8
63:18 66:18
70:25 71:2
98:11,12
108:20 111:15
114:16 146:19
162:21 175:7
194:9,13 196:1
196:5
**discovery-rel...**
60:21
**discrepancy**
139:6,9,21
**discretion** 24:4
24:8 68:18,19
68:24 120:13
**discuss** 20:7
71:12 119:1,1
120:4 164:8
175:12
**discussed**
66:22 86:8
97:2 110:10
120:6 144:12

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-13    Filed 02/09/18    Page 61 of 85

149:12 157:20
164:23 195:25
**discusses**
121:18
**discussing** 71:7
**discussion**
83:19
**dismissal** 68:16
**dismissed**
64:12 81:6
91:23 109:8
**dismisses** 92:4
**dispatch** 133:9
133:10,13
**disposition**
76:21 82:20
111:2 140:16
**distinguishes**
174:2
**district** 1:1,1 3:1,1
3:19,19 6:20
6:20 9:20
12:6,7,22 13:11
13:14,16 22:10
22:19 23:12
33:17 35:10
48:2 63:13
71:11 72:8
79:21 83:16,18
83:20 87:10
89:12 96:12
108:22 122:14
128:1 132:24
158:7 166:5,9
191:7,8
**districts** 80:8
**diversion** 22:5
76:11,13,16,16
81:12
**division** 1:2 3:2
3:20 10:23
16:15 59:10
119:22 148:21
148:23,25
158:24 159:10
161:17

**divisions**
148:24 158:12
158:15,18
**DNA** 58:4,5
**docket** 13:23
13:24 14:1,3,5
20:23,23 21:4
28:7,11,16,19
28:22 29:2
87:17 88:12
92:6,8 99:18
113:14 129:24
147:3,5 148:10
148:13,15,18
148:20 149:1,7
150:6 158:11
158:20 159:7
159:14,18,19
159:20,21,23
160:2,6,21,25
161:11,17 174:17
**dockets** 13:5
128:15,16,20
128:22,22,24
161:7 174:9,14
**document** 30:4
30:6 32:21
33:7 35:14,15
42:19,25 43:3
49:17 77:8,9
77:10 82:23
89:25 90:3
100:11 102:13
103:3 164:21
164:24 165:15
175:16 182:24
**documents** 9:3
9:8,10 111:20
165:9 175:7
**Doell** 5:2 6:24
**doing** 10:4,7,18
69:6,8 126:1
127:18,21
130:23 162:1
183:15,17
184:24 190:16

194:18 196:1,4
**double-check**
88:11
**doubt** 190:24
**download** 26:11
**draft** 23:14
66:10 67:1
162:15,16,19
162:23 165:9
**drafted** 89:6
165:13
**drafting** 166:15
**Dress** 24:9
**drive** 65:13
**driving** 170:21
**drug** 54:15
67:21 76:18
76:22 122:8,11
**due** 27:14,18
35:25 38:12
38:23 46:9
91:1 173:16
**duly** 199:8
**duplicate**
197:23
**duty** 51:23 86:9

---

### E

**E** 2:1,9 4:1,1
22:14 119:5,10
**e-mail** 98:1
166:4,10,16,20
170:23
**e-mails** 173:20
**earlier** 104:1,4
114:15 117:11
120:6 125:3
128:2 139:1
140:6 142:5
143:7 144:12
145:20 149:12
152:6 161:18
162:3 164:2,12
166:18 170:8
181:17
**early** 196:7

**easily** 157:8
**educate** 145:5
**education**
48:24 105:6
**educational**
49:17 104:13
**effect** 132:11
170:16
**effective**
103:20
**effectively**
37:19
**effectiveness**
97:24
**eight** 3:12 45:16
81:10 91:7
123:11 182:25
**eighty** 11:3
**either** 15:5 17:3
22:7 23:21
32:13 41:3
43:23 44:8,23
45:1 46:19,21
56:16 64:12
76:1 81:11
119:20 134:5
146:19 175:23
195:12
**electronic** 61:7
111:16
**Eleventh** 5:3,14
200:16
**eligibility** 27:23
**eligible** 27:24
28:20,21,23
38:25 40:23
76:8 192:10,16
192:18,20
**embodied**
122:20
**emergencies**
111:24
**empathetic**
87:13,17
**employ** 151:12
**employed**

199:12,16
**employee** 20:8
84:23 123:8
144:16 199:15
**employees**
21:15 24:13
**employment**
10:13
**en** 159:16
**enclosed**
200:10,11
**Enclosures**
200:22
**encounter**
50:9
**encumbrance**
22:23
**ended** 88:9
93:3 123:21
124:7 188:14
**enjoyed** 123:24
124:4
**enter** 37:8
40:17 74:18
153:13 155:12
**entered** 138:10
141:18
**entering** 94:6
**entire** 47:10
132:1,3 184:25
**entitled** 36:4
100:11 102:14
112:9
**entries** 18:22
126:4 139:25
**entry** 140:5
162:21
**envelope** 98:19
**equity** 148:24
**Erika** 79:22
**errata** 200:12
200:14,15
201:1
**especially**
171:24 177:5
**essential** 171:23

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-13   Filed 02/09/18   Page 62 of 85

estate 114:10
estimate 24:2
  27:6 28:24
  67:24 188:25
  189:4
et 1:4,7 3:4,7,20
  3:21 6:18,19
  200:8,8 201:3
  201:3
ethical 86:8
  121:15,18,24
  122:21 130:16
  130:17,20
  171:4 185:15
evaluate 87:3
  145:6
evaluated
  63:20 85:25
evaluates 18:10
evaluation
  22:20
evaluations
  72:18,20
event 124:16
  184:18
events 108:14
eventually
  27:15,15
everybody
  197:22
evidence 71:20
  82:9,15 185:12
  186:3,6
Evidently 53:9
ex 160:11
exact 47:9
  187:9
exactly 104:2,5
  124:1 129:8
  133:24 136:21
  153:20 174:5
exam 185:8
EXAMINATION
  7:18 103:23
  187:2 193:11
  194:22 195:23

examined 3:11
  6:11
example 90:14
  108:23 113:1
  126:3 190:4
examples
  157:12,15 158:1
exceed 32:6
exceeding
  31:21
exception 53:4
  60:19 66:1
  140:23
exceptions
  174:24
exchange
  196:21
exclusively
  15:21
Excuse 97:9
  98:4
executed 39:18
  39:20 202:11
execution
  39:16
exhibit 2:10,11,11
  2:12,12,13,13
  2:14,14,15,17
  2:17,18,18,19
  2:19,20,23
  25:6,6,7,7,13
  25:14,18
  29:20,20,22
  32:16,16,18
  35:18 42:17,17
  77:7,7 89:21
  89:21,23
  100:14,15
  102:18 164:3,7
  164:7 175:17
  175:18
exhibits 2:24
  25:9,12 163:5
  163:17,17
  164:2
exist 85:14

109:24 174:10
existed 174:10
exists 61:13
  90:17
expand 91:14
expect 186:21
expectations
  24:10 44:2
expense 81:21
expensive
  59:19
experience 17:7
  18:1 19:4
  24:23 29:18
  62:14,24,24
  66:14 67:8
  70:4 72:5
  75:9 78:1
  82:13 87:9
  92:21 95:3
  125:7 145:6
  149:14,21
  150:17,18 151:7
  167:22 183:1,3
  184:9,22
  189:20,22
  195:15
experienced
  17:8,14,18
  42:8 63:5 71:8
  94:17 192:7
experimenting
  61:21
expert 57:15
  58:12,13 59:19
  59:23 61:23
  62:11,12,14
  81:16 82:6,8
  109:1,3,13,24
  117:14,21,22
  118:6,9,24,25
  119:2,9,18
  120:4,20
  143:24,25
  144:2 145:10
  145:14 189:21

193:21,23,25
  194:3,18 195:1
  195:2 196:4
experts 57:17
  57:18,19,21,24
  57:24,25 58:3
  58:6,7,8,19
  59:1,4,5,12,20
  59:24 60:1,2
  60:11 81:15,17
  108:24 109:18
  114:17 117:5,5
  117:7,17 118:2
  118:3,17 119:21
  121:1 143:15,18
  144:24 157:20
  189:1,16,18
  193:14 194:13
  194:14 195:12
  196:2 197:6
Expires 202:16
explain 25:21
  35:24 36:8
  39:5,14
  129:24 192:12
explaining
  161:10
expressed 75:4
  75:8 96:25
  107:5
expressly 6:8
extent 193:16
  195:19
extra 32:13
extremely
  140:21
eye 113:10
eyewitness
  57:17,23
  108:25 109:2
  109:12,17,18
  109:23,25

―――――――――
F
―――――――――
face 114:7
faces 184:19,19

facing 10:5
fact 38:9
  146:22,24
  148:2
factors 36:13
  152:18
facts 9:13 36:23
  38:1 154:7
fair 124:7 136:11
  138:16 153:19
  153:19 168:5
  179:13 186:7
  187:8,18
  194:19
fall 17:23 23:7
familiar 35:21
  137:5,12,22
  164:7 179:9
family 75:20
  106:16 190:14
far 122:19 131:2
  134:25 139:22
  142:1 144:23
  156:14 170:22
  179:20 180:1
  181:13 193:13
fax 26:17
feasible 161:8
February
  182:15,19
federal 169:7
  169:22
feedback
  97:23
feel 123:25
  130:10 161:7
  162:12 163:23
  165:14 178:10
  178:25 184:13
feeling 17:6
feelings 184:17
felonies 67:16
  67:20 79:2
  92:17 120:18
  135:19 176:25
  176:25 178:18

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-13   Filed 02/09/18   Page 63 of 85

178:21
**felony** 14:20
16:22 20:23
69:25 85:23
120:19 178:17
**felt** 87:4 130:18
130:19 131:1
**fewer** 54:20
139:23
**Fifth** 55:22
**figure** 27:10,17
30:16 35:2,11
176:15
**figures** 57:12
**file** 21:6 55:20
60:20 66:3,16
66:18,19 74:1
111:16 112:14
137:3,14 138:1
138:4,17,23,23
140:14 141:4
149:19 150:13
161:6 168:9
**filed** 16:21 52:11
52:14 108:10
111:11 112:18
113:2,4 132:9
132:14 133:16
138:13 151:3,4
152:11
**files** 21:7 36:15
163:2
**filing** 16:12
36:17 66:25
98:14 113:12
129:11 149:15
159:17
**fill** 104:11
**filled** 95:16,20
96:2,5 173:6
**finally** 34:21
**financial** 114:21
115:2,7 117:18
118:9 143:18
150:13,16
190:17

**financially**
199:16
**find** 18:11 30:24
32:5,9 50:12
73:17 78:25
87:3 118:1
147:4 200:10
**finding** 68:15
82:4
**fine** 39:19 117:9
167:2
**fingerprint**
57:19
**fingerprints**
58:9
**finish** 119:13
**firm** 11:8 81:21
82:9 105:12,18
106:7,8,11,18
106:22 107:1
151:19
**firms** 77:23,25
78:9,11 81:24
82:8,12 95:12
107:2 134:1
151:11,16,21,22
152:1 182:25
**first** 26:8 32:2,3
34:10 35:13
39:1,1 51:9
69:24,25,25
70:1 72:13
83:9 85:2,13
85:15,23,23
85:23,25 86:1
94:1,24 106:9
108:18 110:21
120:17,17,18,19
120:21,23 121:1
121:4 152:21
153:16 160:6
171:9 176:14
178:19 180:13
180:24 182:17
**first-level**
88:20,24

**fiscal** 2:21 33:16
33:21,24
56:20 68:9,14
100:12,16
101:4,5,13,17
101:18,19,21,23
102:6 152:14
175:15 189:7
**fiscally** 118:1,2
**fits** 127:21
**five** 20:14,25
21:11 28:19,23
29:2 30:14,15
32:3 49:21
69:13 74:24
95:6 99:7
113:5 123:16
139:23 178:22
182:19 189:2
189:17 190:4
**flag** 114:4
**folks** 190:17
**follow-up** 187:1
187:4 194:24
**following** 104:9
**fooled** 112:7
**footage** 61:10
**foregoing**
199:7 202:4,7
**forenoon** 3:12
**forget** 137:18
142:6
**forgot** 120:16
**forgotten**
184:14
**form** 25:18 26:9
26:23 28:3
31:13 33:8
35:4,22 36:6
36:9,14,15,17
36:18,19,24
36:24,25
37:11,25 38:4
38:20 39:25
39:25 40:2
41:3,3,11,14,16

42:3,21 46:10
63:2 103:4
162:17,20
202:4
**formal** 39:8
85:20 130:24
**formed** 78:2,3
78:4,6
**former** 84:3,4
**forms** 27:7 40:5
**formula** 176:17
177:10
**formulas** 176:13
179:17
**forth** 175:8
**fortunately**
59:19 94:25
**found** 64:12
96:13 133:15
135:1
**foundation** 3:14
42:4 105:13
**four** 19:12 62:17
74:23 85:3
99:9,9 105:19
139:11 144:11
155:18 178:22
182:16
**fourth** 55:21
65:1
**Fox** 1:14 3:10
6:10,17 7:20
35:14 100:14
102:17 164:5
197:17 200:11
201:2 202:3,9
**frame** 191:14,16
**Francois** 65:8
65:18,21 88:21
**Franklin** 65:11
88:22,25
**frantic** 150:24
**free** 88:18
**frequent** 28:10
**frequently** 8:15
50:3 60:15,20

65:15
**fresh** 181:23
184:19
**Friday** 51:13,13
**front** 94:2,4,8
99:16 112:14
131:15 153:10
154:12 155:22
159:1
**fulfilled** 156:10
**full** 62:8 94:8
140:5
**fully** 62:25
180:23 195:19
**fun** 187:5
**funding** 81:17
155:3
**further** 15:18
130:7 190:16
193:10,11
194:22 195:22
195:23 199:14
**future** 19:19
97:18

---

**G**

**gain** 94:1 145:5
**general** 63:18
121:23 136:6
146:8 163:2
179:23
**General's** 4:20
7:8 104:1,5,6
**generally** 12:4
43:25 59:17
61:25 66:5
70:12 75:25
82:25 85:12
91:7 94:11
95:4 108:3
118:24 120:1
133:6 143:25
146:8,10,22
147:21 150:8
160:22 165:17
192:6

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-13    Filed 02/09/18    Page 64 of 85

generate 181:14
generated
164:23 165:19
gestures 8:2
getting 61:17
78:1 143:24
146:1,6,24
148:2 152:11
give 7:14 25:13
32:18 56:8
77:24,25 95:2
178:4
given 14:8 39:7
92:14,16 135:2
175:16
gives 176:23
178:25
giving 191:13,17
go 18:4 31:13
32:20 42:5
43:24 54:25
55:1,2,4,9
56:2,3,5,12,18
56:23 57:1,5
57:14 61:9
64:1 66:7
74:18 79:1
81:17 84:16
88:2 92:1
93:10 95:9,11
95:18 96:9
100:2 102:10
102:11 104:11
104:14,22,25
105:5 113:22
128:12 140:10
145:13,17,18
147:18 155:15
159:6,9,19
170:17 176:5
176:19,21
179:4 180:14
180:18 182:9
187:5 190:22
goes 18:7 56:15
58:21 64:25

86:22 97:20
101:4 119:25
163:2,6,8
180:9
going 24:9
25:11 32:17
42:2 47:25
50:23 64:20
66:5 69:9
73:16,16,18
74:14 90:19
104:9 111:7
112:17 118:25
124:11,25
129:15 130:13
133:4 134:16
136:8 137:7,9
145:4 154:12
154:17 156:7
159:19 160:5
163:10 175:6,11
186:1,12,14
187:5,6 190:7
193:21 197:20
197:22
goings 20:22
good 7:21 45:14
49:15 50:24
71:13 89:14
103:25 104:24
104:25 106:25
110:25 112:23
124:19 143:4
145:7 161:23
165:21 167:1
176:2 177:6
185:6 186:11
196:11 197:13
government
84:5
governmental
151:12
Governor 4:18
104:8
graduated
104:17,19

181:19
grant 160:15
granted 63:23
64:5 112:21
145:24
Great 11:19
greater 56:9,11
160:20
green 83:15,15
Greitens 4:18
ground 7:25
118:16
group 15:7 79:7
142:7 144:7,10
164:22
groups 142:15
guess 17:14
21:10 22:18
30:12 31:12
39:22 53:20
57:4,11 89:6
99:6 101:7
103:12 107:5
118:2 119:8,13
124:6,25
125:15,24
128:21 132:2
132:18 133:5
143:9 144:12
149:23 150:20
153:20 162:5
164:20 170:15
172:10 174:8
177:16 180:19
guessing
124:10 149:23
guide 116:11
guidelines
170:25
guilt 68:16
guilty 52:18,20
64:12 70:22
71:9 94:7 95:1
110:18,19,20
110:21,22,23
110:23,24

133:15 147:23
150:11 153:5,11
153:14 154:1
155:12 196:21
197:1
gun 54:15 67:21
guys 108:11
110:8,10 112:6
114:12 123:15
124:19 139:24
193:14

### H

H 2:9
habeas 16:25
half 65:22
110:22,22,23
110:23 180:24
186:13
half-day 79:11
hand 8:2
handed 89:22
handing 77:8
100:10,10
102:12
handle 11:24
13:7 14:8,19
14:22 15:13
16:1,5,6 20:8
29:5,12 31:19
41:8 53:18
63:10 65:7
76:6 79:15
161:1 179:1
191:21,23
192:4,4
handled 12:10
12:15 16:11,19
16:24,25 85:8
88:20 134:14
188:24 190:18
handles 65:7,11
65:13 99:16,18
handling 10:19
23:22,23 61:6
65:17 79:5

102:2
handwriting
58:6
happen 53:10
73:16,17,18
85:25 108:3,5
108:8 113:3
119:24 154:18
196:16,17,25
197:10
happened
72:12 83:1
89:4,5 91:2
197:9
happening
64:23 93:12
115:4 190:10
happens 36:24
45:22 86:19
108:17 129:25
159:21 160:24
197:5
hard 154:15
head 8:3 27:11
109:11 197:12
heading 147:6
Heagney 39:24
health 17:1 22:7
29:16 57:17
57:24 58:11
59:17,23 82:7
138:22 144:2
hear 23:5
44:23 45:1,11
45:17 104:2
149:1 154:7
160:13
heard 29:2
115:4,9 118:7
118:12,14 124:3
148:22 153:1
hearing 2:16
10:22,23
28:22 35:17
35:19 36:4
40:8 51:10,16

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-13    Filed 02/09/18    Page 65 of 85

51:18,19 52:12
52:19,21 53:13
121:5,6 135:5
160:19 164:4
**hearings** 41:5
42:14 51:8
52:25 75:15
140:1
**heavier** 88:17
**heavily** 68:14
**held** 6:22 9:23
128:14
**help** 49:12,14
143:23 144:3
**helped** 88:15
**helpful** 158:4
**Herrington** 4:3
4:7
**high** 86:11,13,15
86:21 87:5
91:11,11 93:13
93:18,19 94:16
104:22 105:1
128:6 140:21
181:18 190:13
**higher** 91:6
93:20 117:12
128:3,4 139:19
158:14
**highest** 92:13
92:15
**Hinkebein** 87:1
89:8 96:24
97:3 130:12
191:19
**hired** 58:5,7,8
82:2,5 83:10
83:11,25 85:3
85:6,8 94:19
181:18 182:8,12
182:13,14,18,18
182:19,22
186:22
**hiring** 23:11,25
58:19,25
61:23 95:18

113:7
**history** 164:21
**hold** 27:19
**home** 43:24
76:1,2
**homicide** 29:19
58:24 59:7
67:12,17 70:1
70:14,15,18
79:2 85:24
94:20 95:7
121:2 122:8,11
192:8
**homicides**
67:14,20 95:4
**honored** 86:18
**hook** 47:21
**hope** 14:1 81:20
97:25 185:14
**hopefully** 37:3
85:24 111:15
**hour** 9:2 50:24
65:13,21,22
123:16 124:4
125:20 155:17
186:13
**hours** 3:12
24:10 30:15,17
30:19,25 34:11
34:17 35:1
51:11 111:24
123:11 177:13
178:24
**house** 113:22
113:23 114:3,9
**HR** 95:23
**human** 23:6,8
**hundred** 56:22
60:18 67:18
67:23 78:12
92:1 97:16
135:18 136:20
**hurting** 184:16
**hyperbole**
196:19

**I**
**ID** 109:13
**idea** 44:5 81:4
92:12 97:13
101:10 151:13
152:4 171:15
**iden** 57:16
**identification**
35:20 57:17
57:23 100:17
102:19 109:1,3
109:17,18,23
109:25
**identified** 35:15
**identify** 54:22
75:22 143:23
144:3
**IL** 199:5
**ill** 53:5,8
**imagine** 129:9
**immediately**
85:3 92:8
**immigration**
48:22,24 49:3
49:5,19
**impact** 64:6,15
80:17 85:9
93:22 180:12
180:14
**implement**
80:9
**implementati...**
41:10
**implemented**
41:16 48:3
86:25
**important** 155:7
**imposed** 39:17
39:19 156:3
**imposition** 39:6
**improprieties**
55:13
**in-between**
105:7,10
**in-court** 153:22
**in-person**

168:15 174:21
175:8
**incarcerated**
48:8
**Incarnate**
104:23
**include** 21:3
**included** 12:5
36:13 111:1
152:2
**includes** 57:1
**including** 16:4
67:16
**income** 75:1
192:16
**incoming** 99:16
**incomplete**
63:19
**incorporated**
33:10
**incorrect** 96:23
133:2 136:4,12
136:17
**increase** 15:18
83:5 102:1
**increased** 42:11
**increments**
123:16 124:20
125:25
**independent**
113:17 146:21
**indicate** 113:24
114:8 200:13
**indicates** 113:21
**indictment**
18:22
**indigence** 18:19
18:20 27:21
28:7,8,11
38:19 88:12
99:13 113:14
190:14
**indigency** 21:10
25:19 27:20
38:17 74:14
112:2,5 113:18

**indigent** 27:1,1
27:4,8 28:3,15
37:7 38:25
40:17 51:14
53:15 74:3,20
74:23 75:3
96:14 112:15
112:19 141:20
192:11,15,17,18
**individual** 13:5
87:2 90:20
130:17 131:16
131:22 178:14
**individually**
130:14
**ineffective**
96:15,16
132:19 135:1
136:3
**inexperience**
143:14
**inexperienced**
63:7 143:9,10
143:11 151:8
**informal** 52:2
76:5,6 83:19
129:20 132:12
159:8,11,18
**informals** 159:9
**information**
18:12,17,21
26:3 33:9,12
60:13,14 87:6
96:23 104:12
116:15 118:23
126:25 130:15
133:2 136:4,21
158:4
**informed** 72:10
72:24 86:9
**inherent** 155:4
**inheriting**
80:24
**initial** 21:9 40:7
41:11 51:8,10
51:16,18,19

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-13   Filed 02/09/18   Page 66 of 85

52:12,19,21,25
53:12 70:24
78:5 79:7
80:2 98:11
130:8 131:2,4
155:25 164:14
174:20
**initially** 11:5
27:12 36:19
38:24 54:3
83:13 105:11
**initiated** 33:25
34:9 57:4
**initiates** 107:18
**injustice** 74:1
**inmates** 172:17
173:2,9
**input** 33:12
126:25
**inputting** 181:4
**inquiries** 173:12
**inside** 44:24
**instance** 58:4
99:12 110:18
112:16 149:18
169:14 178:17
**instances**
125:15 150:2
194:25
**institution** 45:7
**instruction**
109:23 110:1
**insufficient**
96:14
**intending**
164:17
**intends** 72:11
**interest** 94:14
**interested** 15:9
199:17
**internal** 10:23
55:24 121:7
157:11 165:25
**interns** 162:9
**interpreter**
50:16

**interpreters**
49:23 50:2,7
50:13
**interrupt** 111:17
147:10
**interruption**
99:3 105:4
128:25 137:23
147:16 158:16
172:14
**intervention**
132:11
**interview** 53:19
53:22 186:17
**interviewed**
56:17 103:6
**interviewing**
54:11 97:18
**interviews** 73:6
73:9
**introduce** 7:3
42:18
**introduced**
25:9 29:22
42:19
**introducing**
35:14
**investigate**
55:5,9,15
66:10 67:1
**investigating**
97:18
**investigation**
19:16,19 63:19
73:6,15 76:3
96:22 97:24
113:17 114:13
133:1,5,7
135:8 146:21
190:16
**investigator**
19:18,18 73:19
97:14,17,20
**investigators**
19:10,13,15,17
19:20 22:15

54:22 55:5
62:17,19 63:1
63:10 82:2
97:11,17,22
117:1 157:19
**involve** 58:11,12
**involved** 18:16
53:13 79:24
80:13 164:19
173:16
**involves** 79:14
**involving** 77:23
136:3 165:15
**Irvine** 4:4
**issuance** 152:19
**issue** 47:1 68:17
70:19 109:21
131:25 136:18
145:16,17
150:4,5,6,9,17
150:18
**issued** 17:5
30:8 51:22,23
88:4 101:15
109:22
**issues** 20:19
22:7,8,17
23:21 29:16
48:25 49:5,19
155:1,4 164:23
165:15,16,17
175:12 178:15
179:5
**issuing** 68:13
143:2
**items** 22:15

---

**J**

**J** 4:3
**Jacqueline** 4:12
7:9 200:4
**jacqueline.sh...**
4:16 200:7
**jail** 26:14,17,19
43:20 44:16
45:4,6,10,20

46:1,3,14,20
46:21 47:2,15
47:16 48:17,18
48:20 53:10
61:7 64:13
167:4,11,14
168:3,17 169:1
170:1,5,11,21
173:20,23
196:8,10
**jails** 44:14,20
170:14,15,18
170:20
**James** 4:3 7:4
**January** 79:8,13
80:6
**JDMSW** 21:18
21:19 22:2
**Jefferson** 65:8
65:18,20
88:21
**Jennifer** 93:3
**jmaune@orri...**
4:5
**Joanne** 4:7
**job** 10:17 85:13
85:16 105:7,11
105:23 151:8
**jobs** 11:2,13 21:3
150:25
**Johnson** 13:15
15:1,11
**join** 83:14
**joined** 184:13
**joining** 182:3
**joint** 160:18
161:5
**Joyce** 93:3
**judge** 36:10,12
36:17,20,23
37:25 38:22
39:23,24 51:9
51:23,25 84:9
87:12,16 94:2
94:5 102:7
131:10,13

153:10,25
154:1,5,11
155:22 159:1,2
159:2,3,11
160:11 165:12
**judge's** 154:16
**judges** 27:25
41:7 42:8,8
102:2 107:15
132:13 191:16
**judicial** 10:16
36:1 134:5
165:6
**judicially** 132:18
**Julian** 39:24
**July** 12:10,14
65:25
**jurisdiction**
71:17 142:20
155:10
**jurisdictions**
12:11 65:10,16
**jury** 32:3 57:2,5
67:22,25
68:2 69:24
69:25 70:1,1
79:1,15 81:5
85:22 91:17
**justice** 13:19
44:21
**Justin** 4:19 7:7
103:25 186:9
**justin.moore...**
4:22
**juvenile** 10:4,8
13:19 14:25
15:1,2,6,9,13
15:14,15,18,22
57:7 58:16
67:24,25 68:7
68:13,21,22
68:23,24
72:25 74:16
75:2,5,10,11,18
75:18,23 76:11
76:17,18 99:18

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-13   Filed 02/09/18   Page 67 of 85

99:24 121:5
125:19 152:7,11
152:22,22
**juveniles** 68:5
74:15 75:10
138:24

**K**

**K-A-N-E-F-I-E...**
11:8
**Kanefield** 11:8
11:14,15,16,23
106:12,23
125:9
**Kansas** 79:11
80:8 174:10
**keep** 16:8
29:24 47:19
58:22 113:10
129:23 148:14
150:24 158:5
184:15
**keeping** 125:25
188:19
**keeps** 20:22
80:23 138:22
**kept** 149:15
167:10
**kind** 24:7 63:3
94:15 104:11
106:2,8,13,17
107:5,23 110:9
111:8 112:5,7,11
113:9,17,18
114:4,6 117:17
117:23 119:23
120:2,10
123:10 124:23
126:2 128:1,2
132:9 133:6
136:9 139:6,21
141:7,8,16
142:7,14,15,20
143:8,10,22
144:25 145:2
145:3 146:4,14

148:15 149:23
153:3 157:10
161:5,5 171:2
171:16 176:3,5
176:9 177:20
178:1 181:4
182:5 196:14
**knew** 9:13
**know** 8:13 14:7
20:9 25:14
34:6,14 38:9
38:14,16 41:6
41:6 48:2,4,13
48:16 55:21
56:22 67:3,3
73:19 74:6,25
76:25 78:4,9
78:14 80:4,5
81:22,24 82:1
82:5 85:20
89:25 90:7,17
94:7 95:8,25
97:7 99:5
103:18 106:2
112:6 113:3,16
114:3 115:8,9
116:11,20 118:7
120:11 121:16
122:19 125:7
127:14,16
128:6 130:13
132:8 135:20
135:23,24
136:6,15,21,22
137:14 142:20
144:23 145:7
145:10,10
146:25 148:4
149:13 150:15
151:14,17,19
154:17,18
155:20 156:22
157:5,19 158:2
158:25 159:1,3
159:18,24
160:1,4 163:1,9

170:23 171:6
171:10,18
173:19 174:15
174:18,25
175:10 178:14
178:22 179:12
181:13 183:3
185:2,11,15,20
185:23 186:2
188:3,13,21
190:1,3,6
193:5 194:9
196:7,18,21
**knowledge**
41:2 44:1
48:15 89:11
96:10,21 146:8
149:24 163:14
179:21 191:4
**Kroger** 79:21

**L**

**L** 3:15 5:12 6:4
199:3 200:21
**label** 37:11 67:21
**labeled** 94:21
**lack** 43:15
59:22 93:6
96:22 133:1,5
135:13 136:16
136:23 152:19
155:3 189:19
195:15,16,17
**lacking** 70:13
**languages**
50:8
**large** 29:19
54:15 63:6
64:10 72:3
77:23 113:7
122:6 140:18
144:10 146:17
**larger** 109:6
139:16 156:23
182:24
**lasts** 64:21,22

**laughing** 153:8
**law** 17:9,19 40:1
49:2 84:1,8,11
95:14 104:15
104:18,19
105:1,8,20,22
106:4 109:16
109:18,19
110:3 121:11
129:5,10
184:20,22,24
185:7,10,11,13
**lawful** 6:11
**lawyer** 17:8
167:4
**leaf** 145:2
**learn** 127:20
129:6 130:1
**learning** 129:6
**leave** 14:15 23:3
144:20 173:3,7
173:10
**leaves** 95:16
**leaving** 80:22
95:9 180:25
**left** 57:13 85:15
95:14 184:12
**legal** 6:24 10:7
11:2,13 18:8,10
18:18 20:10,15
21:2,4,12,13,14
23:18,19,21
24:3 49:1,10
68:25 74:4
99:12,15,18
105:23 113:20
136:13,17
146:2,15 157:6
157:6 162:8,9
162:11,23,25
163:13 171:16
**legislative**
175:15
**lesser** 187:25
**let's** 90:21
100:2 104:11

114:2 153:21
**letter** 172:3,8
173:11
**letters** 71:23
98:14,18 111:12
173:22
**level** 17:7 19:4
79:2 117:13,16
**Lewis** 84:4
183:1
**licensed** 17:21
181:25
**lien** 137:3,14
138:1,13,17,20
**liens** 138:4,23
138:23
**LIFE** 105:13,20
**light** 86:25
**limit** 116:11
189:11
**limitation** 46:18
47:15,18,20
**limitations** 44:6
156:19 157:4
**limited** 139:24
**limiting** 40:10
**line** 39:1 48:19
48:19,20
173:15 201:6,9
201:13,16,20
**lines** 47:22
172:11,16 173:9
**lineup's** 73:1
**lineups** 72:22
**list** 59:24 87:19
87:20,22,24
88:2,5,8,13,16
114:3 140:7
178:10
**listed** 33:18
166:7
**listen** 45:5
**lists** 30:15
**literally** 45:15
47:21 72:4
**litigate** 150:4,6

**ALARIS LITIGATION SERVICES**
**www.alaris.us**          **Phone: 1.800.280.3376**          **Fax: 314.644.1334**
Case 2:17-cv-04057-NKL   Document 153-13   Filed 02/09/18   Page 68 of 85

150:7
**litigated** 68:14
**litigation** 5:2,13
  6:25 82:1
  90:5,6,16,17
  106:16 183:2
  196:3 200:1,16
**little** 25:20
  40:8 51:8
  53:16 77:5,16
  83:6 95:3
  103:12 104:12
  106:18,19
  110:7 112:1
  114:15 117:4
  125:24 140:9
  143:7 145:19
  148:17 152:23
  153:1 164:10
  164:20 180:7
  182:6 196:18
**live** 52:25 73:3
  73:4 111:6
**LLP** 4:3,7
**local** 23:12
  24:19 71:5
  89:11 121:9
  167:11,13 170:1
**located** 49:2
**locations** 169:11
**long** 9:1,23 10:9
  17:8,17 31:7,9
  31:11,18,22,24
  40:5 61:23
  62:1,5 64:8
  65:17,19 78:4
  105:16 141:3
  144:17 150:24
  183:14 185:2
**longer** 12:15
  51:12 76:22
  139:16
**look** 9:6 33:17
  36:22 43:13
  58:6,7,8
  59:18 74:19

98:25 100:19
102:9 111:3,7,8
113:24 117:17
124:1 140:22
147:3 164:6
165:22
**looked** 90:5
  164:18 177:6
  191:10
**looking** 9:14
  80:8 101:2
  106:8 110:25
  114:5 139:22
  176:8
**looks** 101:5
**lose** 16:7
**loss** 10:5
**lost** 89:1 96:1
**lot** 31:4 72:14
  74:13 94:12
  95:1 98:9
  122:7 129:16
  137:16 153:18
  163:7 178:18
  178:21
**Lotus** 110:12,13
  110:17,19 111:1
  111:2,6,12,20
  119:14 181:9,11
  181:12,13
**Louis** 2:23 3:15
  4:21 5:3,14
  6:23 9:21 10:4
  10:22 11:6,21
  11:22 12:8,16
  33:18 44:14,21
  44:21 45:7
  46:21 49:2,11
  59:20 61:15
  62:2 65:14
  69:1 75:2
  76:16,23 79:9
  79:12 80:7,10
  80:13 82:25
  88:21 89:1
  91:13,15 92:23

92:23,25,25
93:1,2,23
101:3 102:14
102:18 104:16
104:18,20
107:2 116:9
128:17 129:25
147:4,20
151:22 154:20
158:11 178:9
183:11 184:8
192:2,8
200:16
**low** 79:2 91:13
  189:13
**low-level** 175:2
**lower** 134:5
  139:18 187:18

---

## M

**M-O-H-M-E** 11:9
**Mahaffey** 79:23
**mail** 26:2,17,19
  98:20
**mailing** 26:5
**main** 4:4 50:13
  55:19 157:21
**maintain** 12:1
  13:23 14:3,5
**maintenance**
  20:21
**majority** 17:24
  17:24 63:8
**making** 41:4
  93:14
**manage** 47:24
  129:3,6,17
**management**
  9:6 20:23
  21:4 22:12
  107:14 120:14
  191:16
**manager** 20:12
  20:17,18 23:6
  23:8
**manages** 87:16

99:15
**managing**
  128:15
**mandating**
  116:25
**manifest** 73:25
**manner** 61:1
  125:8,17
  142:22 168:5
**March** 182:18
**marijuana** 77:4
**marked** 2:11,12
  2:13,14,17,18
  2:19 25:6,7,12
  29:20 32:16
  32:18 35:19
  42:17 77:7,9
  89:21,23
  100:13,17
  102:17,19
  163:19 175:25
**Mary** 1:14 3:10
  6:10,17 186:25
  194:24 197:17
  200:11 201:2
  202:3,9
**masse** 159:16
**master's** 21:22
**materials** 163:9
  163:10
**mathematical**
  177:23
**matter** 6:17
  107:17,24
  135:9 171:17
  191:2 200:18
**Matthew** 17:15
  79:23
**Maune** 2:3 4:3
  7:4,4,19 25:8
  25:11,17 29:21
  29:24 30:3
  31:14 32:17,25
  33:2,6 35:9,13
  35:21 37:4
  38:15 42:12,18

42:23,24
50:23 51:1,7
63:9 77:5,8
89:14,22 96:11
96:16 99:5
100:1,10,19
102:12,23,25
103:2,22
118:10 164:5
175:24 193:10
198:2
**MCRC** 80:18
**mean** 21:20
  29:13 30:23
  37:17 46:24
  70:9 75:24
  76:13 79:8
  85:21 91:14
  93:18 116:7,13
  123:6 127:16
  129:4 133:24
  144:24 150:1
  153:9 157:4
  160:23 163:20
  171:13 172:10
  174:5 175:11
  179:11 187:16
  193:20 196:19
  197:9
**meaning** 187:10
  192:11
**means** 25:1
  34:7 93:25
  94:22 97:4
  190:17
**mechanism**
  110:9,10 111:8
  112:4
**mechanisms**
  86:2,6
**medical** 57:18
  58:3
**medium** 45:7
**meet** 9:1 44:2,6
  44:15 64:4,20
  70:2 71:10

**ALARIS LITIGATION SERVICES**
**www.alaris.us**    **Phone: 1.800.280.3376**    **Fax: 314.644.1334**
Case 2:17-cv-04057-NKL   Document 153-13   Filed 02/09/18   Page 69 of 85

75:16 83:16
154:6 165:1
168:7,9 169:17
171:7,11,21
175:3
**meeting** 15:8
43:14,24
70:24 71:1
101:14 120:3
130:11,13,19
131:9 142:23
165:6,19 175:9
**meetings** 78:7
87:2 130:10,18
155:19 165:7
**meets** 60:8
**Megan** 79:22
**member** 190:14
**memo** 44:3
**memoranda**
89:7
**memorandum**
166:1
**memory** 188:11
**mental** 17:1 22:7
29:16 53:8
57:17,24 58:11
59:17,23 82:7
138:21 144:2
**mentally** 53:5
**mention** 23:5
**mentioned**
16:20 21:15
54:23 119:9
119:23 125:15
132:22 166:16
**mentored** 75:13
**met** 8:23 86:7
94:3 171:20
186:20
**methodology**
178:5 179:9
**methods** 118:2
**metric** 34:10
**metrics** 33:16
177:14 179:17

**Metropolitan**
10:22
**microphone**
128:10
**midst** 15:3
**Midwest** 82:1
**Miller** 58:17
**mind** 58:10
103:21 120:18
149:6 154:17
155:8 163:25
**Mine** 175:22
**minimal** 71:3
95:19
**minimum** 43:3
**Ministries** 49:1
**minus** 34:9
149:10 180:15
**minute** 25:14
65:12 90:22
100:2
**minutes** 89:24
123:16
**misdemeanor**
14:22 67:21
69:24 85:23
102:3,3,7,8
120:17,19,21
**misdemeanors**
102:10 134:14
188:6
**mispronounce**
165:22
**missed** 171:9
**missing** 184:5
**Missouri** 1:1,7
2:20 3:1,7,14
3:15,19,21 4:13
4:15,18,20,21
5:3,13,14 6:18
6:21 9:21 30:7
43:4 68:5
77:6,15,17
78:2,10,15,23
84:5,13,18
85:7 100:12,15

102:15 104:7
109:22 115:12
115:14 128:19
142:12 156:25
168:22,24
169:5 199:22
200:4,6,8,16
201:3
**Missouri's**
109:17
**misspoke**
115:19
**misundersta...**
122:13
**mitigation** 22:8
58:10,13 82:9
82:15
**MO** 3:16 199:4
**Mohme** 11:8,14
11:15,16,23
106:12,23
125:9
**Monday** 161:16
**monetary** 59:3
**money** 58:21
**monitor** 42:13
43:7,9 82:19
86:12 110:11
140:20
**monitored**
48:16
**monitoring**
48:18
**monitors** 82:24
**month** 28:17
103:13,13
113:15 139:12
180:25
**months** 31:24
62:3 64:21
95:19 96:5
105:19 191:18
**Moore** 2:4,6,8
4:19 7:7,7
30:2 31:12
32:24 33:1,4

35:4 36:25
38:4 42:3,20
63:2 96:7,15
102:21 103:24
103:25 105:5
118:12 128:12
129:1 136:11
137:11,18,24
147:17 158:17
164:6 172:15
175:19,21
176:2 186:1,7
186:11,14,16,24
190:21 191:11
193:12 194:21
195:3,24
196:24 197:13
198:1
**morning** 7:20
7:21 159:22
161:16
**motion** 52:9,11
66:9,11 67:1
74:1 98:12
112:14,18,22
113:2,12 132:15
149:20 159:17
**motions** 55:20
60:21 66:4,17
66:18,19,21,23
66:23,24 67:3
67:4,5,5,6,8
113:3,14 132:9
148:22 149:1
149:13,15
150:14 151:2
162:23
**move** 72:11
148:15 150:25
**moved** 17:22
96:6 184:7
**MSPD** 7:10
121:8 122:4
191:15
**MSPD's** 13:18
**multiple** 37:16

92:10 173:16
**multiply** 176:24
**municipal**
192:19
**murder** 94:24
110:20

---

### N

**N** 2:1 4:1
**name** 6:23,24
103:25 106:8
106:11 142:6,11
201:2,3 202:6
**named** 11:8
**nature** 105:7
108:24 110:4
121:11 149:25
162:24 175:2
**navigate** 154:11
**necessarily**
42:21 150:12
167:18
**necessary** 8:14
62:25 66:21
79:14 116:15
116:24 132:17
171:21 193:25
194:14 202:5
**need** 8:15 50:1
50:7 60:9
69:14 85:22
88:16 117:21
118:23 120:16
120:20 130:4
143:19,24
144:1 145:18
154:11,12
157:23 160:10
161:11,17
164:19 167:18
170:17 175:12
176:21
**needed** 19:14
120:4 145:15
**needs** 36:15
74:17 178:14

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-13    Filed 02/09/18    Page 70 of 85

negotiate 71:25
negotiated
72:12
negotiating
72:5
negotiation
72:3
negotiations
91:21 93:2,3
93:24
neither 199:12
net 34:3,7
176:14 180:12
never 70:18
94:3,3 97:16
108:8 118:3
124:3 127:6
132:2 149:6
181:1
new 4:8,8 12:14
12:17,19 13:22
15:4 18:4 31:17
34:2 35:13
50:4 65:23
65:23 72:9
80:6 83:7,8
83:24,25
84:14,19,22
84:23 85:1,8,8
85:13,18 86:18
87:7 90:22
108:6,17,17
141:10,23
142:2 144:1,5
144:9,15,15,16
145:1,8 151:8
156:7 181:18
182:11,13,14,21
183:15 185:7
185:16,20
newer 42:9
newest 71:10
newspaper
103:5
nice 98:1
Nifong 4:14

200:5
night 51:13
nine 45:16 81:11
183:5
nineteen 11:3
noncapital
67:12
nonhomicide
58:24
nonjury 149:10
nonpolice
56:15
nonstop 47:8
normal 22:3
normally 16:10
16:16
North 5:3,14
200:16
not-for-profits
134:6
notarized
200:15
notary 200:14
202:15
notes 110:17
111:13
notice 16:12
113:11
noticed 108:21
109:9
notification
77:13
notified 73:13
73:15 153:24
notifies 74:18
notify 36:2
74:10
number 6:19
15:17 27:12
29:19,22,25
30:19 31:20,21
32:7 34:2,6,8
34:9,11,15,16
34:16,18,21
35:16 38:21
41:17,21 42:1,7

42:10 45:12
54:15 56:25
57:1 59:20
61:5 63:6,10
64:10 68:12
69:19 77:9
78:11 83:2
88:15 89:2,23
91:4 92:13,15
96:5 97:11
101:8,10 108:7
109:4,4,7
122:6 140:18
146:17 170:11
175:17,23
176:24 177:12
178:8 179:2,3
180:17,18,20
180:21 182:11
182:12,13,16,18
182:21,22,25
183:5,6,9,11,13
183:23 184:20
189:4,13
190:18 192:23
numbers 9:15
102:9 139:18
187:7,17

─────────
**O**
o'clock 3:12,13
186:9
object 31:12
35:4 36:25
42:3 63:2
96:8 128:10
136:8 137:7
190:21 195:3
objection 38:4
118:10 196:22
obligation 171:4
186:5
obligations
86:8 121:15
130:16,17,20
185:16

observe 22:18
141:10
obtain 60:25
75:16 130:2
133:8,13
135:14
obtained 94:25
135:3
obtaining
55:24 114:16
117:5
obvious 113:6
obviously 94:12
occasion 45:22
occasions 73:11
occur 108:18
occurred 72:4
81:22 96:19
164:15
occurs 23:11
62:9
October 11:18
17:21 79:11
123:21 124:7
181:19 182:14
182:17 183:5,7
188:14 197:24
offense 70:1
offenses 70:19
offer 71:22
84:14,19
offering 9:11
offers 71:15,18
office 4:20 7:8
9:21 11:5,6,12
11:20,21,22
12:16,21,23
13:1 14:16
16:19 17:7,9,18
19:4 20:8,12
20:17,18,20
22:1,13 23:3
23:12,24 24:5
24:10,14,18,21
26:14,18 28:1
28:13 31:10

32:2,6,12 35:3
35:11 36:16
43:5,23,25
46:12,15,22
47:12,19 48:7
49:24 50:4,10
53:13 55:8,14
58:21 62:17
63:7 70:6 71:8
72:5,13 73:8
74:4 75:14
76:4,10 78:17
79:18,24
80:18,23,23
81:18 82:24
83:8,14,22
84:3,11,14,19
85:7,19 86:8
86:23 88:15
88:19 90:22
90:23 91:2,16
91:17 93:5,11
93:12,23
94:16 95:6,9
95:16,21,23
96:6,21 99:16
104:2,5,6
107:12 110:9
112:17 113:2
114:22 115:8
116:5 118:25
120:8,11 121:15
121:25 122:3
123:2 128:5
130:9,11 132:1
132:3,24
133:22,23
134:7,9,11
139:3 140:24
141:1,2,4
150:19 154:21
154:23 156:15
156:5 160:18
161:1,2,18,25
162:7 166:2,5
178:11 180:23

**ALARIS LITIGATION SERVICES**
**www.alaris.us**          **Phone: 1.800.280.3376**          **Fax: 314.644.1334**
Case 2:17-cv-04057-NKL   Document 153-13   Filed 02/09/18   Page 71 of 85

183:12 184:7
184:12,12
186:18,21
187:9,14,17
188:1,24 190:5
190:19 191:15
195:16,19
**office's** 97:7
103:18
**officer** 10:22
45:10 56:15
68:24
**officer's** 68:23
133:10
**officers** 54:17
55:17,22,25
61:15
**offices** 24:15
80:16 95:13
115:9 128:1
134:22 172:17
178:15
**official** 52:1
**Oh** 21:23 33:4
47:4,17 56:3
104:24 106:6
112:23 124:6
138:16 181:12
183:14 184:2
**okay** 8:4 9:7
11:10,15,19
12:9 13:2,17
14:3,7 15:16
15:25 16:23
17:6 18:3,9
19:24 20:2,13
20:16 21:14,19
23:10 25:16
25:25 26:5
26:20,22
27:22,25
28:18 29:5
30:14 32:23
33:4,14 34:12
35:9 37:4
38:15 39:10

46:2 48:21
50:23 52:22
54:9,18 55:18
56:13 57:8
60:6 61:19
66:3 76:10
80:12 82:19
90:2 100:1,24
101:1 102:12
103:1,6 104:3
104:20,25
105:16,25
106:6,13,22
107:4,23 108:1
108:4,16,21
109:12 110:2,7
111:17 113:1,9
113:16 114:2,11
115:11,17 116:3
116:6,10 117:8
117:10,25
118:15 119:4,8
120:2,6,22
121:3,7,10,17
121:21 122:5,12
122:25 123:14
124:7,16,19
125:6,12,14,22
126:20 127:8
127:15,25
129:19 130:5
131:5,11,20
132:2,8,14
134:8,15,18
136:2,15
137:20 138:4,7
138:16 139:1
139:24 140:6
141:6,22 142:1
142:14,18 143:1
143:7 144:18
144:23 145:8
147:11,17,24
148:13,19
149:3,6,9,12
150:12,18

152:6,16,20
152:23 153:23
155:1,16,24
156:11,14 157:3
157:10 158:6
159:12,15
161:4,15 162:3
162:12 163:22
165:4,8,14,24
166:6,14 167:1
167:7,17,22
168:5,12 169:2
169:3,13,16
170:4 171:6
174:2,12,19
175:5,19 176:1
176:8 177:2,24
178:12,16,20
178:23 179:5
179:24 180:7
180:16 181:2,2
181:7,12,16
182:1,10
183:19,22
184:5,10,17
185:6 186:7
186:25 196:18
197:13
**old** 147:5
**Olive** 3:14 4:21
**omitted** 133:7
**on-the-record**
154:9
**once** 14:2 18:19
28:16,17 60:4
61:25 83:16
84:21,22,25
113:14
**one-person**
151:22
**onerous**
156:20 157:6
**ones** 50:13
58:9 59:21
80:4 82:24
95:25 144:14

157:21 169:25
170:2 181:23
182:2 185:7
**ongoing** 63:19
**open** 14:11 29:6
41:19 71:18
72:6 93:16
94:2 95:21
140:12,17,22
152:24,25
154:19 155:1
192:22 193:1
**opened** 19:21
27:4 41:15,22
138:8 142:3
172:11 173:9
**opening** 138:9
138:11
**openings** 91:1,4
**operate** 146:5
146:9
**operating**
161:25
**opinion** 60:24
69:2 71:24
158:18 174:19
187:8 190:9
194:25 195:11
**opinions** 103:14
178:3
**opportunity**
138:10 146:20
**opposed** 23:23
90:20 148:23
168:19 169:1
192:10
**opposite** 46:4
**order** 2:15
35:16,18,25
72:15 88:4
101:16,23
137:3 138:1
139:25 164:3
164:11,13
165:18
**orders** 197:23

**organize** 13:2
163:17
**organized** 12:21
130:4 163:5
**organizing**
163:9
**orientation**
84:24 144:16
**original** 2:24,24
200:12
**Orrick** 4:3,7
**ourself** 16:8
**outcome** 42:13
154:14,16
155:23 199:17
**outcomes**
154:13
**outside** 44:24
106:25 115:12
115:14
**overall** 54:24
**overload** 178:11
**overloaded**
35:7
**overtime** 32:6
32:13
**overworked**
102:16

_____
**P**

**P** 4:1,1
**p.m** 198:4
**pace** 41:18
150:24
**packet** 145:1
**page** 2:2,10
30:14,15 33:14
100:24 176:3
176:4,9,19
200:12,14,16
201:6,9,13,16
201:20
**paid** 81:24 82:9
147:22
**paper** 163:7
**paralegal** 162:6

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-13   Filed 02/09/18   Page 72 of 85

162:7,10,13
163:4,23
**paralegals** 19:7
19:8 161:19
162:22
**parental** 125:19
**parents** 10:5
**parents'** 74:25
76:1
**part** 10:17,18
18:25 72:3
76:20 78:15
101:18,18,19
108:7 144:8
146:14 154:15
156:9 181:15
185:10
**part-time** 10:17
**parte** 160:11
**participate**
30:9 69:23
73:5 78:9
**participated**
73:12 78:3
79:20,22
80:10 126:25
142:25
**participating**
81:12
**participation**
166:15
**particular** 29:11
35:11 78:22
108:12 109:13
121:18 124:11
131:12 149:13
**parties** 199:13
199:16
**party** 127:4
**Pass** 103:22
**passed** 182:16
182:19,23
183:5,6,9
185:8
**Patrick** 107:13
**pay** 91:13

125:20
**paying** 52:24
69:15
**payment** 20:20
22:14 137:4
138:2
**penalties** 93:19
**penalty** 202:7
**pending** 3:18
8:16 12:13 81:9
95:5
**penitentiaries**
169:23
**penitentiary**
168:24 169:8
169:9
**people** 87:19
99:16 107:9
117:22 122:7
150:22,25
171:19 175:7
186:16 190:2
190:11 192:15
**people's** 20:22
191:10
**percent** 13:20
13:21 24:2,3
29:4 34:22,25
49:22 53:20
53:21 54:8,12
54:13,20 55:3
56:4,5,9,10,11
60:18 67:19
67:20 177:18
177:22 189:2
189:17
**percentage**
34:22 53:17
56:22 57:5
66:6 187:18
188:25
**perform** 113:16
**performance**
23:14,25
**performed**
126:10

**period** 45:9
64:9 69:13
80:25 106:3
109:20 124:23
125:4 140:24
154:2 160:1,19
188:20
**perjury** 202:7
**person** 18:13,15
27:15 29:17
38:2,13 39:7
40:16 47:16
52:13 53:6,15
56:16 58:11
64:11 65:9,13
65:15,17 70:17
71:23 72:23
84:7 98:17
107:19 109:13
112:19 113:21
126:23 138:20
141:20 144:3
153:16 166:8
167:3 168:20
168:21 171:7,11
171:22 173:6
184:13 190:6,6
190:12 196:7
196:10
**person's** 47:10
**personal** 22:12
61:16 122:3
**personally** 29:8
29:9 132:21
166:11
**persons** 47:8
65:11 109:14
172:23 173:7
**petition** 75:17
**Petsch** 25:12,13
42:19 77:9
165:22,23
**Philip** 39:24
**phone** 45:21,23
45:24 46:11,14
46:18,19 47:11

47:12,13,14
48:9 61:7,8
99:17 115:19
115:20 167:16
168:13 169:15
169:18 172:11
172:16,19
173:8,16
**phones** 47:8,14
47:16,19
170:10 172:20
173:2
**phrase** 153:17
**physical** 167:9
167:18
**physically**
140:24 141:1
**pick** 26:19
**picture** 73:3
**pipeline** 156:11
**place** 44:13,16
44:19 47:20
48:22 70:12
89:14 104:10
110:3 112:4,12
115:23 122:14
122:17 132:23
182:17 187:17
196:20
**placed** 83:14
133:22,23
134:4
**placing** 98:20
**Plains** 183:12
**plaintiffs** 1:5,15
3:5,21,22 4:2
6:2,12 7:4,6
**Plaintiffs'**
100:14
**played** 152:19
**plea** 70:22 71:4
71:9,15,18,22
71:25 72:2,5
73:21,23 74:4
91:20 92:24
93:2,2,6,23

94:6,14
108:24 109:5
147:23 150:11
153:5,5,10,13
153:20,25
154:19 155:12
194:4 196:13
196:20
**plead** 52:18,20
81:11 94:2
193:24 196:20
197:1
**pleadings** 98:11
111:11 129:10
157:11,15 158:1
158:2 162:15
162:16,17,19
162:20
**pleas** 71:18,18
72:6,12 73:21
93:12,16
152:24,25,25
155:2
**please** 7:2,12
8:1,13,16 9:19
20:7 35:24
39:14 86:5
89:24 100:19
104:13 200:10
200:13,15
**plenty** 69:21
**plus** 95:4 97:16
185:18,22
**point** 51:8 52:5
52:14,17 53:12
61:22 81:23
86:23 87:18
90:18 132:3,6
133:15,17
135:17 153:10
155:19 164:22
169:15 174:13
**police** 10:23,24
54:16,23 55:9
55:11,16,22
61:11,11 133:9

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-13    Filed 02/09/18    Page 73 of 85

133:10
**policies** 24:5,7
  24:12,16,17,19
  24:21 40:12
  85:17,21 86:6
  116:10,14,25
  118:16,22
  166:2,15,20
**policy** 13:19
  69:24 84:6
  86:25 121:8,9
  122:4,4
  154:20 155:6
  156:3,7
  166:22 170:8
  170:24 183:10
  184:24
**pool** 98:25
**poor** 190:2
**pop** 113:19
**portion** 37:11
**portray** 34:24
  35:3
**portrayed**
  103:14
**portrays** 35:8
**position** 9:19
  9:24 10:1,11
  13:25 15:4
  21:24,25 22:2
  23:6 75:3
  87:13 88:19
  89:1 95:16
  96:4,6 155:21
**positions** 20:6
  95:22 96:1
  134:5
**positive** 90:5
**possibility** 96:4
**possible** 17:3
  44:11 81:21
  154:13 161:5,9
  173:14 197:2
**post-convicti...**
  133:16,16
  135:4

**Post-Dispatch**
  2:23 102:14,19
  107:13 191:15
**post-Hinkeb...**
  130:22,24
**post-Waters**
  101:20
**postage** 26:21
  173:24,25
  174:1
**posted** 190:14
**posting** 113:7
**posts** 190:12
**potential** 25:19
  26:8,16,25
  27:8 28:12,15
  29:1
**practice** 10:3,10
  12:1 31:24
  32:4 95:10,11
  95:14 153:2
  156:25 184:7
  192:3
**practice's** 147:1
**practicing** 17:9
  17:16,18 18:1
  184:20 185:3
**practitioners**
  15:10
**pre-Hinkebein**
  130:23,25
**pre-Waters**
  101:13,19
**predict** 94:4
**preparation** 9:4
  9:11 44:9
  159:5
**prepare** 8:21
  9:17 50:17
  63:22 69:3,14
  72:14 75:15
  76:5 80:24
  92:14 128:1,4
  128:5 147:7
**prepared** 31:10
  83:22 91:21

92:18 126:21
  146:18 150:23
  169:18 179:3
  189:14
**preparing** 69:9
  69:17 92:4
  159:1 163:1,8
  164:11
**preplan** 29:14
**present** 5:1 7:2
  8:24 9:5 38:3
  48:12,13 73:19
  76:11,20 82:8
  82:15 161:3
**presented**
  71:20 126:6
**presentence**
  73:6
**preserve**
  157:24
**presiding** 87:12
  131:10,13
**pretrial** 66:17
  66:24 135:8
**pretty** 35:5
  49:15 55:20
  66:19 68:14
  69:12 98:7
  101:7,21 107:12
  116:20 119:6
  127:18 130:22
  139:5 140:11
  146:2 171:20
  193:15
**preventing**
  159:16
**previous** 32:19
  83:18 85:14
  87:23 91:2
  92:20
**previously** 2:11
  2:12,13,14,17
  2:18,19 25:6,7
  25:8,12 28:14
  28:21 29:5,20
  29:21 32:16,17

42:17,19
  54:22 62:16
  77:7,9 89:21
  89:23 109:24
  127:9 175:25
**print** 163:16
**printout** 32:20
**prior** 8:17 10:1,3
  10:13,20 11:1,7
  11:13 12:10
  13:24 15:4
  40:12 41:14
  71:6 78:7
  109:3 114:5
  125:6 132:6
  157:11,15 182:3
  196:3
**prioritize** 70:6
  70:9
**prison** 45:25
  46:19 169:1
**private** 10:3,9
  18:15 46:15
  48:19,19 52:16
  72:20 77:23
  80:2 81:20,24
  95:10,11 102:7
  104:24 106:7
  107:1,1 112:21
  113:7 134:1
  138:9 141:17,18
  142:7 146:5,9
  147:1,13,21
  151:11,16 152:1
  184:7,16
**pro** 78:15 79:5
  81:2 82:21
  83:3 102:10
**probable** 75:17
  154:14,16
**probably** 29:3
  31:4 41:19
  49:21 54:7
  55:2 57:12
  67:2,14 92:18
  95:19 127:23

130:2 135:18
  156:12 163:1
  163:12 189:2
**probation** 2:15
  16:1 27:13
  35:17,19 36:3
  36:12,21,22
  38:2,13 39:4,5
  39:13 40:10,14
  40:15 41:4,9
  41:15,19,21
  42:13,21 57:6
  60:19,22 102:1
  164:3,16,17
  175:1
**probationer**
  36:10,14 37:6
  38:9,10 39:9
**probationer's**
  36:16
**problem** 144:8
  158:8 173:5
**problems** 94:15
**procedure**
  114:16 119:9
  140:10 153:22
**procedures**
  41:11 48:3,21
  71:5 85:17
  86:6 116:11
  118:17
**proceed** 7:12
  29:17 64:24
  90:1 144:4
**proceeding**
  7:15 107:18
**proceedings**
  73:14 154:9
**process** 18:5
  27:14,19 31:11
  35:25 36:9
  38:12,23
  75:13 95:19
  119:12 146:2
  146:15 155:5
  186:17

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-13   Filed 02/09/18   Page 74 of 85

produce 25:8
  25:11 32:19
  116:7 163:5
produced 3:11
  6:11 32:21
productive
  123:25
professional
  44:22 45:8
program 77:1,2
  77:18 80:9,18
  181:5
programs 76:17
prohibited
  46:10
prohibits 46:19
promise 156:9
promulgated
  24:13,17 43:4
proposed 90:8
prosecutor
  68:25 84:3
  154:6 184:11
  185:2,3,4
prosecutor's
  68:18 116:5
  154:21
prosecutors
  142:19,24
  165:2
prosecutors'
  160:18
protection 10:6
protocol 30:8
  88:10
provide 33:9,11
  60:10 103:19
  118:23 121:16
  130:5 132:19
  142:15 154:24
provided 18:22
  41:6 49:16
  55:7 130:15
  136:21 146:19
provides 49:3
providing 77:21

psychiatric
  72:17
public 2:20 4:11
  4:13 9:22 11:4
  11:12 12:15,23
  14:16,19 16:10
  24:14 26:12
  28:13 30:7
  31:17 33:15
  35:15 36:19
  40:24 41:13
  43:4 44:2
  49:24 77:21
  77:22,24 79:6
  79:23 81:17
  84:4,13,19
  85:7 88:9
  92:21 95:13
  100:12,16
  102:14 105:12
  105:18 107:6
  107:14 110:8
  111:23 115:5
  121:13,14,25
  122:16 126:1
  126:21,24
  127:3,5,8
  133:19 137:2
  138:1 142:8,16
  146:16 147:5
  147:12 151:15
  152:11 155:3
  158:7 159:16
  163:6 164:18
  165:1 166:1,2
  166:12,23
  167:8,23
  170:13,16 171:1
  172:11,16,24
  173:15 182:3
  188:1,11 189:24
  190:19 191:6
  200:4,14
  202:15
pull 111:6,19
punishment

71:19 94:8
purpose 46:25
  47:6
purposes
  22:20 71:11
pursuant 93:11
  165:5 199:8
pursuing 72:11
  109:21
purview 23:7
put 25:22 27:19
  33:12 47:20
  79:7 82:17
  87:18 114:7
  122:14 123:10
  127:2,4,5,19
  132:10 163:17
  180:3
puts 140:14
  144:14
putting 148:14

_____

        Q
_____

qualified 27:9
  28:12
qualifying 43:17
quality 60:11
quarterly 35:10
question 8:7,9
  31:13,16 35:5
  37:1 38:5 47:9
  63:3 107:16
  115:17 127:1
  128:8,11 137:21
  151:1 160:6
  162:5 188:22
  189:3 190:13
  191:12 193:13
  194:11,12
questioning
  104:10 176:3
questions 2:2
  7:19 8:1,13,16
  29:16 103:24
  172:8,9,12,18
  172:19 175:14

187:3,4 193:8
  193:12 194:23
  195:24
quickly 140:19
  164:1 189:15
  189:15
quite 170:19
  176:13 194:17
quote 39:2,11

_____

        R
_____

R 4:1
raise 86:3 114:3
raising 133:17
randomly 43:12
rang 47:8
range 71:19
  94:8
ranged 79:1
rare 45:22
  73:21
rarely 73:7
rate 91:10 94:16
ratio 97:14 99:6
RB 177:5
RDR/CRR 5:12
  6:4
reach 45:23
  48:7 193:25
reached 132:3
  132:5
reaction 89:10
read 39:2,11
  127:14 137:16
  137:16 154:16
  197:20 200:13
  201:7,10,14,17
  201:21 202:4
ready 31:19,23
  89:25 116:21
  158:22 160:5
  160:7 176:4,7
real 114:9
reality 180:21
  187:13
realize 66:14

67:8 98:21
really 25:22
  84:6 124:8
  127:9 146:15
  153:5 154:15
  156:20 157:5
  161:8 179:8
  181:1,23 185:7
  185:17
Realtime 3:17
  199:6
reason 57:21
  59:13,23 61:3
  63:17 109:13
  119:17 135:2
  150:16,16
  151:2 195:12
  196:1 201:8,11
  201:15,18,22
reasonable
  8:10,11 72:15
  87:15 155:22
reasons 40:11
  59:15 63:18
  114:22 115:2,7
  117:18 118:9
  143:18 147:25
  160:13
recall 118:5
  124:8,23
  127:15 133:6
  133:18 135:3
  145:21 149:16
  181:22
receipt 200:17
receive 26:1
  27:7 32:12
  35:9 37:25
  53:14 61:12,13
  71:22 83:9
  86:18 97:23
  144:5 197:1,3
received 38:17
  38:19 61:25
  62:6,7 71:2
  96:14

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-13   Filed 02/09/18   Page 75 of 85

receiving 19:5
87:7
recess 51:4
89:18 100:7
recession
133:25
recitation 136:9
recognize
143:14,19
145:17 150:9
151:3
recollection
9:11 88:8
135:6
recommenda...
93:13,14,15,17
154:22,25,25
recommending
155:11
record 6:15
39:14 51:3,6
89:17,20
100:2,6,9
114:17 123:8
197:16,22
recover 137:3
138:2
recruited 184:8
red 114:4
reduced 41:12
41:17 199:11
reduction 101:7
101:22 196:9
197:2
reductions
140:4
reevaluated
68:16
referred 78:14
78:17 152:15
174:9
referring 174:17
reflect 101:22
180:19,21
187:13
reflects 101:17

178:11
refresh 9:10
refusal 154:24
refuse 86:14
refused 86:20
regarding 41:4
67:4 89:12
96:25 97:7
103:18 122:1
166:1 191:12
Registered 3:16
199:5
regular 48:25
55:20 86:12
107:12 135:17
137:16,17
144:10 171:20
171:23
regularly 63:13
64:5 145:24
171:5
rejected 114:21
related 146:22
199:12
relation 170:7
relations 105:12
105:18
relationship
172:1
relative 199:15
relative's 76:2
relatively 109:6
release 16:25
52:10 75:25
76:1
relief 101:16
164:15
remain 87:14
103:14 116:9
140:17
remained
105:21 109:5
132:11
remains 19:18
remember 88:7
106:19 123:20

166:10 188:7
188:13
render 185:23
202:5
rendered 135:1
reopened
141:14,22
rephrase 8:13
replacement
175:24
replying 173:12
report 2:22
54:23 100:13
100:17,25
126:24 188:8
reporter 2:24
3:16,17,17 5:12
6:5,6 7:11,13
35:20 99:3
100:11,18
102:13,20
103:9 105:4
115:15 128:25
137:23 147:16
158:16 172:14
197:18,21 199:1
199:4,4,5,6,21
reporter's 6:23
reports 33:10
33:13 35:10
55:24 73:6
represent 12:18
18:13,14 28:1
66:2 73:9
104:7 129:5,11
140:1 169:18
190:2
representation
16:11 24:25
25:4 26:10
40:24 74:5
88:6 103:20
112:8 138:21
170:25 189:24
represented
52:21 68:24

74:3 133:19
133:20 171:19
representing
10:5 38:10
51:15 72:24
75:5,10 108:11
represents
193:6
request 19:25
26:12,13 38:17
38:20 47:7
50:16 59:18
60:15,16 61:23
72:17 81:19
86:18 114:20
115:1,5 118:8
118:23,25
119:3,5,10,15
119:24 140:4
144:20 147:20
147:25 158:22
159:22 160:12
162:21 175:16
requested 47:3
47:4 59:12
61:14 62:20
86:17 145:24
195:2
requesting
119:9
requests 19:16
22:14,23,25
50:19 52:16
81:16 146:22
159:25
require 59:6,12
193:21,23
required 62:12
90:15 115:24
145:11 158:21
175:9 197:6
requirement
26:21 43:14
70:2 167:6,24
168:13,20
170:23 174:25

requirements
21:11 43:11
121:14 169:20
185:16 186:20
requires 38:23
61:1 94:12
119:22 167:9
193:16
research 157:7
162:9,10,11,25
researcher
126:10,16
researchers
126:18
reserved 6:8
resolution 71:12
71:14 72:16
resolutions
165:3
resolve 147:22
150:10
resolved 14:2
71:4 91:22
109:5 140:14
150:3 155:15
189:15 194:16
196:3,6
resolving 13:25
resources 23:6
23:8 60:25
69:3,21 71:25
75:21 81:13
130:6 134:11
134:22 135:13
136:16,24
155:4 156:14
157:6,7,17
170:13,15,17
196:9
respect 24:5
87:11
respond 35:6
37:2 38:7
63:4 172:13
190:23
response 8:2

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-13   Filed 02/09/18   Page 76 of 85

87:10
**responsibilities**
20:17 21:8
22:10,13 89:3
99:11 101:25
**responsibility**
13:20 69:20
89:2 95:2
**rest** 17:25 81:8
84:8
**result** 17:1 47:11
72:13 94:10
101:23 109:21
143:13 154:20
154:22 155:3
155:5,7 156:3
165:7,19 169:4
170:17 190:17
**resulted** 68:15
**results** 194:3
**retain** 119:16,18
**retained** 2:24
82:8 108:25
109:2 118:20
194:3
**retaining** 194:14
194:18 196:4
**retire** 42:8
**retiring** 77:19
**return** 26:3
200:15
**returning** 49:15
**review** 9:3 24:1
25:14 43:12,16
52:9 60:25
61:10 66:20
89:25 117:13
182:24
**reviewed** 43:2
43:11 58:5
62:1 146:19
**reviewing**
36:19
**reviews** 23:15
26:23 113:20
**revisit** 112:5

**revocation** 2:16
16:1 35:17,19
38:13 41:4
42:13 164:4
**revocations**
164:16
**revoke** 39:4
**revoking** 36:22
**revs** 102:10
**Reynolds**
186:10
**Rice** 84:4 183:1
**Rick** 79:21
**right** 8:18,21
11:17 14:12
21:10 30:13
33:5,22 41:24
51:1 52:15
54:3 57:3
69:11 74:11
77:6,15,17
78:6,10,16,24
80:7 84:1,8
85:6 94:11,13
95:17 103:17
106:9 107:6
110:5 111:18,21
112:2 114:17,25
115:25 116:18
116:22 117:6,14
117:18 118:4,21
119:25 121:8
121:12 122:2,14
122:17,23
123:11,23
124:8,12,21
126:17,22
127:1,8,10
129:12 130:1
131:19 132:4,18
132:24 134:12
134:23 135:14
136:24 137:13
138:18 139:9
140:7 142:9,12
143:9,13,15,20

144:6 145:11,15
145:16,19,24
146:2,12,16
147:2 148:5,7
149:25 150:14
150:20 151:4,8
151:20 152:2,8
152:13,17
153:5,6 155:6
155:25 156:4
156:8 157:2,3
158:8,12
160:17 161:19
161:22 162:17
163:12 164:4
164:14 165:21
166:11,16,21
167:6,10
168:14 169:20
169:23 170:1
172:15,19,21
172:24 173:8
173:12,17
174:22 176:11
177:7,8,9,16
179:10,14,18
180:1,23 181:6
181:8,9,10,11
181:20 182:3
184:23 185:7
185:8,15,18,24
186:18,22
188:23 190:8
191:21 193:1,2
193:20,21,22
194:1,6,10
196:5,11 197:3
197:4,7
**rights** 125:19
**ring** 46:12,13,14
**ringing** 46:22
47:21
**rise** 101:10
**role** 36:5 164:11
**roles** 105:17
**rolling** 18:23

19:14 148:10
149:7 158:20
159:7 160:21
**rooms** 45:4,5
**Rosca** 4:7 7:5,5
186:9,12
196:22
**rotation** 148:22
**roughly** 56:24
99:21,21
**row** 180:15
**RSMo** 199:9
**RubinBrown**
34:10 124:17
126:15,23
176:22,22
177:3,15,20
178:5,7,25
179:6,22
181:13 186:8
187:7,17 188:7
188:16,17,20
**rule** 116:16
120:10,15
121:18,24 122:1
122:13,13,16
122:20,21
159:2
**rules** 8:1 186:3
186:5 189:11
**run** 121:14 145:3
**running** 23:24

─────────
**S**

**S** 2:9 4:1
**safeguards**
112:11
**Saint** 49:2,11
104:16,18
**salary** 134:5
**sample** 90:12
**Sarah** 13:15 15:1
15:11
**saw** 103:4
**saying** 45:2,2
45:18 46:17

109:18 121:17
147:8,12,14
148:25 159:24
164:21 169:23
**says** 6:12 25:22
33:15,21 34:4
34:13,13,14
39:2 101:3
177:5,7
**scan** 98:11
**scanned** 111:16
**scared** 102:16
**scene** 54:19
**schedule** 51:25
52:1 63:21
154:2
**schedules** 52:2
**scheduling**
23:25
**school** 49:2
84:1,9,11
104:15,18,18
104:22 105:1,2
105:9,21,23
106:4,9 185:8
185:10,13
**schooler**
104:24
**score** 75:19
**screen** 25:19
163:6
**screening** 21:10
**search** 18:11,18
114:9
**second** 17:14
24:10 65:1
70:5,7,10,14,17
71:8 85:22
92:9 105:22
105:24 117:17
120:16,20,23
120:25 121:1,4
121:19 122:1,9
122:22 141:7
**second-chair**
69:23 120:8

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-13    Filed 02/09/18    Page 77 of 85

120:12
**second-level**
59:6,9 88:22
**secondary**
59:8,12
**secretarial** 21:5
**secretary** 20:10
99:13
**section** 112:13
112:23 131:5
137:2,19 199:8
**secured** 57:18
**security** 45:7
**see** 30:1 34:3
43:13 45:12
74:19 83:5
86:12 104:25
113:23 114:9
124:1 127:20
130:11,18 131:1
140:22 144:1
147:20 164:1
170:18 172:7
174:3,4 176:15
190:9
**seeing** 42:1
43:20,23
170:20
**seek** 63:14
66:15
**seeking** 26:9
**seen** 30:3 33:6
42:24 77:10
80:21 90:3
100:21,22
103:2 108:8
**seldom** 16:6
196:15
**send** 37:3
82:23 98:1
141:10 173:11
173:22
**sending** 98:14
98:18 175:7
**sends** 24:15
36:16

**senior** 145:14
**sense** 41:23
53:17 57:3
62:5 67:11
70:15 136:6
**sent** 56:21
80:16,20 81:7
89:6 91:22,24
92:1,3,9,10
109:7 148:24
166:11
**sentence** 39:6
39:7,16,17
155:11 197:2
**sentenced**
168:25
**sentencing**
39:8
**separate** 108:19
108:20
**September**
17:21,22
**serious** 29:15
67:20 70:13
71:7 94:18
95:2 139:17,21
**seriousness**
19:1 70:7
**serve** 105:16
**served** 105:14
**servers** 157:11
**service** 105:14
**services** 5:2,13
7:1 17:4 22:1
28:12 82:17
102:5 137:4
138:2 142:16
185:23 200:1
200:16
**serving** 10:21
82:3 97:19
**SES** 39:9,11,12,15
**session** 78:5
**sessions** 128:14
129:2
**set** 24:14,16,17

45:23 46:11
48:8 51:19,21
51:24 69:12
92:6 109:14
128:18
**setting** 24:5,8
**seven** 32:3
33:14 99:21
99:22 166:24
167:1,4 168:8
174:21 176:3,4
176:9 182:22
**sever** 108:6
**severity** 139:18
179:2
**sex** 69:25
70:19 85:24
120:24
**sexual** 120:25
**shaken** 58:3
**shakes** 8:3
**share** 102:24
**sharp** 101:7
**sharply** 101:11
**she'll** 113:22,24
**sheet** 18:24
75:19 87:6
140:15 144:19
201:1
**sheets** 123:4
200:12,14,15
**Shipma** 2:5,7
4:12 7:9,9
8:23 25:10
30:1 102:24
128:9 136:8
137:7 175:18
186:2,25
187:3 191:1
193:8 194:23
195:6,22
197:19,25
200:4,9
**SHONDEL** 1:4
3:4,20 200:8
201:3

**shorter** 80:25
**shorthand** 6:4
6:5 199:4
**Shortly** 93:5
**show** 35:10
110:17,18,20
111:11 127:13
137:8 141:4
153:4,9 159:10
159:25 160:5
163:7
**showed** 133:10
**showing** 153:15
153:18 160:2
161:6
**shows** 110:15
**side** 44:25
129:15 160:12
**sides** 154:8
**sign** 25:24
51:24 197:20
200:14
**signature** 6:7
25:23 197:18
200:12,14,16
201:25
**signed** 78:13
**significant**
31:20 45:9
65:9 80:19
122:10
**significantly**
18:2,3 31:19
31:23 56:11
68:10 134:13
**signs** 144:3
**similar** 48:3
80:9 142:14
**simply** 47:10
111:7 136:17
143:18
**Sincerely**
200:19
**single** 91:4
92:13,16
138:17

**SIS** 39:3,5
**sit** 64:13 129:20
141:11
**sit-down** 120:3
**sits** 45:10
**sitting** 167:3
**situation** 94:13
98:25 108:1,4
117:20 140:11
**situations** 117:5
141:16
**six** 32:3 62:3
64:21,21 69:13
95:7,7 149:8,9
149:10 158:21
160:2 178:22
182:21
**six-week**
148:22
**skills** 79:14
84:23 105:13
105:20
**skipped** 74:8
**slipping** 131:1
**slowly** 41:17
**small** 11:7 12:4
66:6 106:18
**smaller** 123:15
134:14
**smoking** 77:4
**social** 21:22,25
26:13 44:24
45:23,24,25
46:1 48:8,12
58:14,15 82:11
82:16,17
105:14
**sociological**
177:25
**solely** 99:24
**somebody**
60:4,4 114:2,4
131:1 154:15
157:23 158:3
168:17 184:5
**sorry** 63:25

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-13    Filed 02/09/18    Page 78 of 85

79:8 93:8
95:7 96:7
103:11 111:17
147:10 162:18
183:14 186:1
190:21
**sort** 113:14
129:10 144:22
155:2 172:22
**sound** 8:10,19
137:4,15
**sounded** 134:18
**sounds** 8:11
161:4 163:11
184:18
**space** 45:3
**Spanish** 50:4,5
50:9
**speak** 9:16
38:22 107:11
147:15,19
187:6
**speaking** 22:15
37:19 50:6
146:8 168:12
**speaks** 50:4,15
**specialist** 15:2
15:3 75:12
152:22
**specific** 8:14
21:3 23:6
58:18 75:7
81:14 122:21
137:19 146:15
149:18 150:1
178:15 197:11
**specifically**
15:12,17 95:25
123:6 179:25
**specifics** 67:3
88:7
**specify** 43:3
**spectate** 141:7
**speculation**
38:6 42:5
96:8 118:11,13

135:20,25
149:14 190:22
195:4 196:23
**speedy** 150:5
**spend** 23:17
30:24 31:4,5
44:7 65:4
70:20
**spending** 69:14
**spends** 13:19
65:9
**spent** 13:21
92:4 123:9,12
**split** 149:3
**spoke** 77:20
82:16
**spoken** 87:12
87:15 107:8,12
107:13,15
131:13 191:12
192:9
**spreadsheet**
110:15,20
**spreadsheets**
110:14
**Springfield**
184:6
**St** 2:23 3:15
4:21 5:3,14
6:23 9:21 10:4
10:22 11:6,21
11:22 12:8,16
33:18 44:14,21
44:21 45:7
46:21 59:20
61:15 62:2
65:8,14,14,18
65:21 69:1
75:2 76:16,23
79:9,12 80:7
80:10,13
82:25 88:21
88:21,23,25
89:1 91:13,15
92:23,23,25
92:25 93:1,2

93:23 101:3
102:14,18
104:20 107:2
116:9 128:17
129:25 147:4
147:20 151:22
154:20 158:11
178:9 183:11
184:8 192:2,8
200:16
**staff** 19:8,11
20:14,25
24:20 45:4
47:10,24
49:23,25
98:2,6,10,10
98:17,22 99:7
99:20 134:11
134:22 161:22
161:24 162:5,6
162:13,16,18
163:11,15,24
**staffed** 63:11
98:7 180:23
**staffs** 21:12
**stage** 31:3
193:25 196:3
197:6
**stale** 80:24
**stand** 103:12
**start** 11:16 12:22
25:17 30:12
43:18 90:23
117:8 119:13
143:23 154:9
182:10
**started** 72:8
85:19 105:20
124:8 126:1
139:10,12
**starting** 1:20
6:13 91:2 101:8
**starts** 31:18
101:4,5
**state** 1:7 2:20
3:7,21 4:13,18

4:20 6:18 9:19
9:21 30:7
33:15 60:16
62:6 71:20
84:13,18 85:7
91:17,19,23
92:3 94:7
100:11,15
104:7 107:18
109:8 115:12
115:14,24 116:8
118:17 128:19
146:20 155:11
160:7,7,10
169:5,9,10,11
199:22 200:4
200:8 201:3
202:1
**stated** 29:5
59:15 115:22
139:1
**statement**
75:17
**statements**
103:9
**states** 1:1 3:1,18
6:20 33:18
109:20
**stating** 119:15
**statistical**
177:25
**statistics** 111:8
142:1 177:21
179:14 181:14
**status** 172:3,8
**statute** 40:23
121:11 122:20
125:20 131:9
131:12,14,14,19
137:10,15,22
137:25 171:3
**statutory** 137:1
**stays** 140:12
**step** 131:4
135:10,16
**steps** 73:22

194:17
**stick** 113:10
**STIPULATED**
6:1
**stop** 87:7 93:14
98:1 141:9
143:2
**stopped** 68:13
93:12 106:1
131:21
**stopping** 93:23
**stored** 157:12
**straight** 105:1,5
**Street** 3:15 4:4
4:8,21 5:3,14
200:16
**strike** 79:16
97:8 128:13
159:7
**stuck** 121:1
**studies** 177:25
**study** 30:10,11
124:11,14,18
126:9,12,15,21
176:22,22
177:3,15 178:5
178:7 179:6,10
179:22 186:8
188:8,16,17
**stuff** 106:17 111:2
129:18 148:11
153:20 157:1,3
175:2 181:14
**Subject** 35:5
37:2 38:7
63:3 190:22
**submit** 50:16
119:3,5
**submits** 119:15
**submitted**
119:19
**subpoenas**
82:4 97:19
**subscribe**
202:6
**subscription**

**ALARIS LITIGATION SERVICES**
**www.alaris.us**          **Phone: 1.800.280.3376**          **Fax: 314.644.1334**
Case 2:17-cv-04057-NKL   Document 153-13   Filed 02/09/18   Page 79 of 85

156:25 157:1,2
**subsequent**
24:17 40:19
108:11
**subsequently**
40:3
**substance**
129:10 202:5
**substantial**
42:7 190:18
**substantive**
23:18,19
162:23
**subtract** 57:6
57:10
**succeeded**
77:2
**success** 64:11
**successful**
55:23 110:23
152:12 159:5
**suddenly** 92:7
122:8
**suffice** 172:4
**sufficient** 96:5
97:10 98:3,5
121:16 161:22
161:24 162:4
**sufficiently**
161:25
**suggest** 38:2
**Suite** 3:14 4:4
4:14,21 200:5
**summary** 75:18
**summer** 105:23
**supervising**
85:18
**supervision**
121:16,24
**supervisor** 47:2
**supervisor's**
130:16
**supplemental**
175:15
**support** 20:14
20:25 21:5,11

47:10,24
98:17 99:20
150:13 162:16
**supposed** 62:7
82:23 140:19
175:3 185:12
185:23
**suppress**
55:20
**suppression**
66:4,9,23
67:5 150:4
**Supreme**
109:22 164:25
**sure** 50:25
75:24 100:3
112:6 123:22
128:7 129:7
131:7 136:22
146:13 151:19
161:24 192:24
**surrounding**
12:11
**Suspended**
39:6,16
**Sutcliffe** 4:3,7
**swear** 7:12,13
**sworn** 3:11 6:11
11:17 199:8
**system** 9:22
46:11,14,18
47:13 48:18
58:20 60:1,3
60:5,7,8,10
77:21,22 79:6
84:25 88:9
94:22 107:14
107:17 111:5
119:20 122:17
125:5 126:8
128:18 151:15
166:13,23
168:24 171:1
178:13 188:11
189:23 191:6

**T**

**T** 2:9
**table** 153:6
**tabs** 58:22
**take** 8:15 16:16
25:14 56:19
64:10 67:12
70:22 73:22
81:21 82:6
85:5,21 89:24
100:19 105:2
105:6 113:25
115:6,23 116:14
116:17,23 131:3
131:25 132:23
154:8 178:7
196:20
**taken** 1:15 6:3
7:22 51:4,23
89:18 100:7
115:12 116:12
163:10 195:8
195:13 199:10
199:14 200:11
201:4
**takes** 20:18
31:11 62:1
95:19 170:18
**talk** 8:8 12:20
51:7 53:16
65:3 77:5
83:6 87:18
90:21 129:21
140:9 152:23
153:21 164:1
167:5
**talked** 107:9
110:7 112:1
114:15 117:4,7
130:9 142:5
143:7 145:19
150:2 161:18
161:21 187:21
191:1,14
**talking** 8:5
45:15 55:12

56:4,6 152:6
155:20 182:7
187:7
**talks** 131:16
**tapes** 133:9,10
133:14 135:3
135:14,22
**task** 13:13 127:17
129:17,17
**tasks** 23:18
98:18 126:4
162:12 163:22
**team** 13:2 83:15
**teams** 13:4
**Teasdale** 77:20
**technical** 46:18
46:23
**technically**
46:24
**telephone**
115:25 167:19
168:2,19
169:21
**tell** 27:11 38:22
77:16 83:1
92:15 97:15
98:1 104:13
106:20 109:12
123:6 124:15
125:24 127:16
135:5 153:7,19
158:10 164:10
164:20 171:18
180:7 197:11
**tells** 180:11
**ten** 9:25 18:1
28:20,23
29:2,3 50:6
62:8 67:14
73:11 74:23
87:23 91:7
108:8 139:23
183:6,10
184:21,25
**tend** 29:13,15
**tended** 192:6

**tenths** 123:16
124:4
**term** 24:24 34:7
39:11,18,19
**termination**
125:18
**terms** 20:19,21
40:23 56:6
109:17 111:4
135:7 146:6
164:15 192:12
**terrible** 77:1
184:14
**testified** 11:11
62:16 128:2
135:5 140:6
181:17
**testify** 9:17
137:9 179:18
**testimony** 7:14
9:11 109:24
133:11 178:4
199:7,9
**Thank** 129:19
175:19 192:21
200:18
**Thanks** 30:2
**theory** 172:10
172:15 173:8
**thereon** 202:6
**thereto** 199:16
**they'd** 73:19
**thing** 32:24
33:1 154:19
155:2 158:23
163:12 171:9
181:10 194:8
**things** 24:10,15
42:7 69:8
113:10,19,25
129:6,11
144:22 149:25
156:22 157:20
158:1,19 159:2
162:24 165:7
175:1,7 176:5

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-13   Filed 02/09/18   Page 80 of 85

**think** 16:8 17:21
25:23 31:8,9
31:11,20,22
35:5 37:1 38:5
40:24 42:4,6
57:18 58:23
61:17 62:13
63:3,5,16
68:16 73:10
74:21 77:20
78:8,12 81:20
82:7,16 84:6
84:11 89:4,4
90:18 93:13
95:24 97:6
98:20 103:18
105:22,22
106:7 108:4,8
109:2,10
115:18,22
116:23 117:11
120:6 126:18
126:19 127:11
128:2,10
129:20 131:2
131:18 132:5
132:22 133:14
134:19 135:6
135:15,24
137:12 139:1
140:6 142:5
143:6 144:16
145:4,10,23
149:3,13 152:6
152:10,14,18
154:17 156:6
156:25 157:1
157:23 158:4
162:3,4,8,15
162:16,22,25
163:13,18
164:11 165:12
166:4,18 171:21
171:23 172:3
174:9,13,17
175:8 176:2,14

177:10,12,17
177:22 178:13
180:3,24
181:16,17
182:17 184:2,4
184:21 185:20
186:15,24
187:5,9,18
190:6 197:13
**thinking** 82:14
128:23
**thinks** 193:18
**third** 34:13 65:1
65:13 106:1
127:4 177:7
180:14
**third-party**
126:10,16
**Thompson**
133:21 134:19
134:21 187:20
187:24
**thought** 93:20
145:14 168:18
**thousand** 41:15
**three** 16:9
17:20 20:15
21:12 57:11
64:14,22 65:6
74:21 81:6
94:23 95:19
99:8 105:19
107:20,20,21
116:17 125:15
139:11 155:18
181:24 182:14
183:4,8 191:20
**till** 85:10
**time** 1:20 6:13
6:16 10:17,19
10:21 13:20,21
14:11 23:17
29:6 32:1
40:9,9 43:7
44:7 45:9,17
50:24 51:2,5

51:21 60:25
61:4 62:1,12
63:22 64:4,9
64:25 65:3,9
65:19 66:10
66:25 69:3,14
69:21 70:20
71:3,25 78:6
79:12 80:25
81:7 89:16,19
91:22,23 92:4
92:24 95:5
97:25 98:9
100:5,8 105:2
105:6 106:3
109:3,20
112:16 119:5
122:25 123:3
123:4,9,11,12
123:14,15
124:20,24,24
125:4,7,16,21
125:25 126:3
126:14 127:3,6
127:9,19 133:1
136:20 140:25
144:19 147:7
149:14,20
150:13,15
152:21,21
154:2,6 155:4
159:8,17
160:20 166:9
170:19 178:18
180:24 182:20
188:6,12,19
191:14,16
195:17 197:15
197:23
**time-consumi...**
61:9
**timely** 37:19
96:2 154:24
**times** 16:7,9
34:10,16
37:24 43:4

47:18 66:8,12
82:3 117:12
125:16 131:21
132:22 160:23
176:24 177:1
177:13 190:4
192:9 194:16
**tips** 114:12
**title** 33:15
**titled** 35:16
**today** 8:22 9:8
9:12,17 15:8
103:12 104:11
178:4
**Today's** 6:15
**told** 131:20
136:23 163:19
**top** 27:10
109:10 147:5
177:5 197:12
**track** 20:22
110:8,11
122:25 123:2
123:4,5
124:24 125:21
127:6,18,22
129:23
**tracked** 123:15
127:9
**tracking** 111:5
124:5,20
125:4 126:13
188:11
**traffic** 10:16
**trained** 15:2,6
15:17 31:10,19
31:23 75:13
80:5 130:21
191:8
**training** 13:21
15:7,18 75:9
78:5 79:4,7,10
79:12,13,14,19
79:20,25
80:2,6 83:6,9
84:14,19,21,22

84:23 85:1,8
85:11 126:2,7
127:2,4,6,11,16
128:14 129:2,4
129:14 143:22
144:3,6,14,23
158:3
**trainings** 85:3,4
129:9 130:8
144:12,13
**transcribed** 6:6
**transcript** 2:25
184:15 197:23
200:13
**transfer** 84:2
121:5 183:12,14
**transferred** 11:6
64:3 68:6
85:15 95:13
**transition** 15:3
**transitioned**
21:24
**travel** 65:19
110:15
**traveling** 65:3
65:4,9
**travels** 65:15
**treatment** 22:5
**trending**
108:23
**trends** 108:22
109:9
**trespassing**
110:21
**trial** 9:21 11:6
16:7 44:10
54:25 55:1,2
55:4,10 56:2
56:3,6,12,15
56:19,21,23
57:2,5,14
61:24 62:2,3,4
62:6 63:21,22
64:9,11,14,25
64:25 66:6,7
67:13 68:1,2

**ALARIS LITIGATION SERVICES**
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-13   Filed 02/09/18   Page 81 of 85

69:4,10,12,15
69:18,18,19,23
69:25 70:1,1,4
70:7 72:14
74:8,11,12 78:1
79:1,15 81:2,5
81:6,7 84:23
85:22 91:11,12
91:15,17,21,23
91:24 92:1,2,3
92:5,6,8,10
97:17,20,23
109:7 110:16
116:21 120:7,17
120:20,21
129:24 130:1
133:15 144:4
147:6,7 148:14
150:5,23
158:11,24,25
159:6,19,21
160:25 163:2
163:3,6,10
169:1,19 174:3
174:6,7,16,17
179:3,4
**trials** 22:18,19
32:3 67:22
69:25 85:23
109:4 120:19
122:2 125:23
141:6,8,12
**trickle** 144:10
**tried** 70:15,18
92:16 94:23
95:6 118:1
142:18 178:8
**tries** 53:6 91:16
**true** 151:1 202:5
202:7
**trust** 64:16 94:1
94:12 172:1
**trusts** 155:20
**truth** 7:15,15,16
106:20
**try** 8:5,6,6,8

31:10 32:2
47:24 59:21
67:14,18
78:25 94:18
122:6,7
157:24 189:23
**trying** 17:6 31:3
31:25 32:18
34:23 83:20
97:15
**turn** 30:14 33:14
38:24 100:24
176:4
**turnover** 90:21
91:10 94:16
150:19,21
151:11,15,24
152:4 181:18
**two** 3:13 39:10
39:22,24 42:6
44:20 45:8,14
69:25 73:10
81:5,5 84:12
85:23 94:21
96:20 99:8,19
108:2 120:17
120:18 125:14
139:10,11
144:15 155:18
174:14 182:12
183:4,20
192:12 193:7
**two-day** 79:7
**type** 12:1 29:14
58:12 79:4
82:12 83:9
116:17 179:1
180:11
**types** 16:18
29:11 57:25
59:9 66:17
78:22 81:16
117:2 120:13
122:22 171:8,11
174:14 194:9
**typewriting** 6:7

199:11
**typical** 146:2
171:6,10 175:6
188:24
**typically** 113:4
**typing** 98:19
**typographical**
32:20

_____

## U

**Uh-huh** 116:16
144:21 148:2
151:23 155:13
160:9 165:17
168:23 169:6
**unable** 143:19
149:19
**unconditional**
16:24
**undergrad**
104:14
**undergraduate**
104:16 105:1
106:3
**understand**
8:12 28:25
31:15 34:23
62:14 126:9
128:7 129:19
156:16
**understanding**
24:25 68:11
153:2 177:4
181:3
**unit** 34:7 176:25
177:1
**United** 1:1 3:1,18
6:19
**units** 34:3
176:14,23
180:12
**University** 49:2
49:12 104:16
104:18
**unrepresented**
52:19

**unusual** 91:5
**upper** 37:10
**urban** 104:17
**use** 24:24 32:17
40:3,6 41:3,14
47:13,16 51:25
59:21,25
74:25 82:11
88:10 90:15
95:24 110:11
126:7 143:15
144:24 162:20
189:16 193:14
195:1
**uses** 25:18 36:1
**usually** 37:22
51:11 59:18
62:8 70:25
71:22 73:4
113:5 116:4
170:18 190:12
**utilize** 25:4
57:15 58:1,14
62:25 148:10
157:18 162:9
189:1,5
**utilized** 57:16
57:21 58:2
90:11 109:14
131:11

_____

## V

**vague** 35:5 37:1
38:5 63:3
128:11,13
**value** 57:22
62:15 113:23
113:25 114:7
119:1,7 189:21
**various** 24:15
**vehicle** 133:9
**vehicles** 61:11
**verbal** 8:2
**verdict** 81:6
95:1
**verdicts** 110:16

**version** 41:3
175:16
**versus** 6:18
23:18 139:7
174:7
**vertical** 24:24
25:4
**vet** 119:1
**victim** 53:22
54:5
**video** 53:1,2
115:16
**video-record...**
1:14 3:10 6:17
**videographer**
5:2 6:14,25
7:11 51:2,5
89:16,19
100:5,8 197:15
**videotaped**
73:1
**Vietnamese**
50:11,15
**violated** 39:13
**violation** 27:19
36:3,11 40:10
40:14,15 41:15
41:22 192:19
**violations** 27:13
41:9,19 55:21
55:22 57:7
60:19,23 102:1
175:1
**visit** 45:4,5
54:19 167:9
168:15 174:21
**visitation**
166:22
**visiting** 44:22
44:24 168:19
**visits** 45:3
64:21,22
**voicemail**
172:25 173:4
173:11
**voicemails**

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-13   Filed 02/09/18   Page 82 of 85

173:6,7
voir 74:8 141:11
volunteer 77:14
  80:14 133:21
vs 1:6 3:6,21
  200:8 201:3

— W —

wait 85:4 87:19
  87:20,22,24
  88:2,5,8,13,16
  140:7
waiting 45:12
  64:14 169:1
  170:19
waived 74:8
walk 182:5
Wallace 29:22
  29:25
Waltz 17:15
want 24:16,16
  29:23 36:21
  100:2 112:8
  127:14 131:23
  153:25 154:7
  156:23 160:24
  161:10 172:7
  183:4 186:10
  196:7
wanted 82:15
  90:19 111:20
  150:10 192:24
wants 87:13
  90:9 160:13
warrant 51:22
  51:24
warranted 66:9
  66:13,14 67:6
  67:9
wasn't 124:5
  126:20,21
  134:21 135:7,9
  135:16 166:12
  192:22 195:2
watch 141:8,11
watching

130:25
Waters 40:8,13
  40:19,22
  101:14,15
  132:6 142:23
  142:24 164:25
way 30:10
  42:12 45:19
  46:6 65:13
  88:12 92:6
  108:3,5 126:4
  129:16 130:21
  131:14 137:19
  145:3 148:15
  159:2 170:14
  172:22 176:10
  194:15
we'll 8:5,14
  12:20,22
  53:16 83:22
  100:3 146:7
  182:9,10
  184:15
we're 15:3,7
  32:18 35:7
  41:18 61:17
  94:11 147:9
  156:13 161:25
  178:9 184:4,5
we've 16:9,21
  25:20 32:1
  42:7 50:11,23
  57:16 58:2,4,7
  60:7 74:13
  75:11 80:20
  83:11 86:7
  92:9 107:9
  116:1 119:6
  130:9 143:2
  157:20 189:6
wearing 61:15
web 26:11
website 26:12
  113:22
websites 95:25
Wednesday

159:21 160:3,6
  160:19,25
  161:11
week 69:12,18
  83:16 92:10
  140:17 141:5
  160:20
week's 69:18
  154:2
weekends
  32:10,14
weeks 69:13
  139:11,11 149:8
  149:9,10,11
  154:3 158:21
  160:2
well-prepared
  163:3
went 81:5,6
  101:11 110:15
  133:14 174:14
  184:7 185:7
  186:17
West 4:8,14
  183:12 200:5
Western 1:1 3:1
  3:19 6:20
Westlaw 156:17
  156:20 157:8
  157:8
whatnot 170:13
wide 85:1
William 3:15
  5:12 6:4 199:3
  200:21
willing 87:17
win 143:3
winning 152:12
wise 56:22
withdraw 73:21
  73:23 74:4
  90:9,19 141:19
withdrawn 34:9
  180:15
withdrew 57:10
  180:13

witness 6:7 7:12
  7:17 17:3 25:16
  29:23 32:23
  50:25 53:23
  54:2,5,7,11
  56:16 82:6
  103:1,22 115:13
  115:16,23
  116:8 175:20
  175:22 176:1
  199:7,9
  200:13 201:1,2
  201:25
witnesses
  53:19,24 54:3
  54:4,6,15,16
  54:22 55:19
  56:6,7 57:15
  82:4
Woodrail 4:13
word 21:10
  104:23 128:24
  162:4
words 187:10
work 10:4,7,19
  19:13 21:1,16
  21:22 22:1
  23:11,18,19
  32:6,10 77:3
  98:10 105:3,7
  106:13 119:12
  127:21,23
  130:3 138:11,14
  139:20 148:9
  156:15 162:2
  183:6,10
  184:24 186:21
worked 84:4,5
  88:8 105:8,12
  105:20 106:7
  107:1 163:21
  180:8 182:2
  195:19
worker 26:14
  45:23,25 46:1
  48:8,12 58:14

58:15 82:16,17
worker's 45:24
workers 82:12
working 15:21
  20:3 22:16
  23:20,21
  32:13 62:12
  70:21 123:9,13
  134:9,10,22
  157:18 182:24
workload 35:3
  41:12 91:11
  93:24 107:6
works 36:9
  153:7,20
workshops
  126:7
worry 184:16
would've 135:17
wouldn't 38:8
  38:14,16,16,17
  52:23 85:24
  148:3 151:3
  170:12 179:17
  179:24 190:17
writ 90:8,12
write 126:4
writer 105:11
writs 16:21
written 24:12
  131:15
wrong 93:9
  153:3,6 165:18
  183:8
wrote 25:23
Wurst 79:22

— X —

X 2:1,9 116:17

— Y —

yeah 30:1 31:14
  32:25 42:23
  53:25 72:9
  100:23 102:25
  115:21 119:8
  122:12 128:5

**ALARIS LITIGATION SERVICES**
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-13   Filed 02/09/18   Page 83 of 85

137:6 146:7
171:14 175:10
175:21 182:9
183:25 185:1
194:7 197:4,19
**year** 2:21 10:14
14:8,13 16:9
30:17 31:1,24
32:2,3 33:16
33:22,24
34:17 41:16,20
41:22 50:7
56:20 62:3
67:15,19 68:7
68:9,10,15
70:3 72:10,13
76:24 83:12
83:13,25
84:21,22,25
85:2,5,10,25
86:1 90:23
91:5,8 92:2,3
92:14,17 94:19
94:21,23,24
97:16 100:12
100:16 101:4,5
101:13,17,18,19
101:21,24
102:6 105:22
105:24 106:1,5
106:6 109:1,8
113:4 133:22
133:23 134:17
152:14 156:13
175:15 177:13
180:24 182:8
182:11,22,23
188:24,25
189:7
**years** 9:25
17:16 18:1
39:18 64:14
64:22 73:11
74:21,23 83:4
87:23 88:18
91:7 94:23

106:20 108:8
125:2 152:8
183:10,21
184:21,22,25
185:18,22
**years'** 183:1,3
**Yep** 164:5
**yesterday** 8:23
**York** 4:8,8

---

## Z

---

## 0

**0039426** 35:16
**042** 40:25
**046** 40:25
**063** 131:24
**08** 101:4
**086** 112:25
**090** 137:15

---

## 1

**1** 2:17 42:17,19
161:17 165:23
**1-800-280-3...**
5:4,15
**1,200** 57:12,13
**1,500** 57:12
**1,752** 30:16
**1:14** 197:15
198:4
**10:09** 51:5
**100** 2:20 4:14
200:5
**1000** 4:14
200:5
**10019** 4:8
**102** 2:23
**103** 2:4
**11** 2:11 25:6,9,13
25:18 183:9
**11:06** 89:16
**11:15** 89:19
**11:30** 100:5
**11:32** 100:8
**1100** 4:4
**1130** 3:14

**12** 2:12 25:7,9
25:14 89:4
91:8 101:13
132:6 183:11
**13** 17:16 101:8,17
101:18,19
183:13,23,24
184:3,4,6
**14** 101:9,21
102:6,10 177:1
178:24 184:1,11
**14-case** 177:1
**15** 14:11 29:6
50:6 67:14
83:11,12,24
90:22 91:1
94:19 101:9,21
102:6,10 182:7
188:9 192:22
**150** 56:21,23
**16** 101:24 102:8
102:10 159:10
166:5,8,9
**163.5** 34:22,25
**17** 33:24 101:5
101:24 102:9
102:11
**17-04057-CV...**
1:6 3:6 6:19
**17-year-olds**
68:4
**1750** 32:6
**1752** 30:21,22
30:25 31:21
**18** 31:24 92:17
92:17 138:25
**187** 2:5
**19** 1:16 3:11
193:7 200:11
201:4
**193** 2:6
**194** 2:7
**195** 2:8
**1976** 104:17
**1980** 11:18 17:12
104:19 125:13

**1981** 11:3,11,13
**1986** 11:5
**1987** 11:4,11
**1988** 109:19
**1994** 10:15 11:1
**19th** 6:15
**1st** 65:25 123:21

---

## 2

**20** 14:13 29:3
54:20 92:19
193:2 202:12
**200** 4:21
**2000** 10:12,14
93:4,11
**2002** 166:13
174:10
**2006** 10:15
30:11
**2007** 10:12
30:8,12 72:8
88:20
**2008** 133:25
185:4
**2009** 133:25
**2011** 89:4 132:6
**2012** 40:7
87:24 88:1
93:14 132:12
142:23
**2013** 89:5
93:15
**2014** 125:1
126:14 188:12
**2016** 123:21
124:7 125:1
126:14 188:9
188:12,14
**2017** 1:16 2:22
3:11 6:15 12:10
12:14 33:16
56:21 65:25
68:10,15 78:6
78:20 79:8,11
100:13,16
152:12,14

189:7 200:3,11
201:4
**2018** 175:15,21
**2050** 4:4
**21** 2:14 32:16,18
175:18
**212** 4:9
**21st** 10:16
**22** 12:6 13:11
18:6 19:8 20:3
21:16 22:10
25:3,18 27:25
30:20 33:18
41:12 43:8
44:2 46:22
48:21 51:20
54:19 58:19
67:12 74:7
83:3 90:11
91:5 96:1 121:9
157:22
**22's** 40:12
**22nd** 36:1
165:5
**2340** 30:21
**24** 51:11 111:24
**25** 2:11,12 53:20
55:3 56:5
**26** 200:3
**28** 2:13 14:15
29:20,22,25
**29** 2:13

---

## 3

**3,000** 57:13
**30** 12:25 14:11
24:3 29:6
33:18 34:10
53:21 54:8,12
54:13 56:5,9
56:10,11 64:20
83:12 139:2
148:14 155:17
166:25 167:9
168:2,11
169:21 170:24

**ALARIS LITIGATION SERVICES**
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-13   Filed 02/09/18   Page 84 of 85

171:7,12,22
172:4 180:14
180:22 181:1
185:18,22
188:5 192:22
200:17
**30-day** 167:2,5
168:12,20
170:22 175:8
**300** 56:20
68:9 176:25
177:1 189:6
**314** 4:22 5:4,15
200:1
**32** 2:14,15 35:14
35:18 164:3,4
164:5
**33** 2:20 100:14
100:15
**34** 2:23 102:17
102:18
**340-3447** 4:22
**35** 2:15
**36** 64:22 78:18
78:19 80:20
80:21 81:1

--- 4 ---

**4,200** 189:8
**4,262** 57:4
**40** 14:14 65:12
188:5
**42** 2:17
**4262** 33:25
**491-5616** 4:5
**492.010** 199:9

--- 5 ---

**5** 2:19 89:21,23
**50** 13:20,21
29:4 67:19,20
92:2
**500** 41:17 59:6
119:21
**506-3750** 4:9
**51** 4:8
**525-5212** 4:15

200:6
**52nd** 4:8
**566** 5:13
**573** 4:15 200:6

--- 6 ---

**6** 2:18 77:7,10
**6,600** 101:6
**60** 78:12 92:2,2
95:4 149:7
**600** 40:24 76:9
137:17
**600.063** 131:6
132:9
**600.086** 112:13
112:24
**600.090.2**
137:2
**62,400** 34:14
35:1
**63101** 3:15 4:21
5:3,14 200:16
**644-2191** 5:4,15
200:1
**65203** 4:15
200:6

--- 7 ---

**7** 2:3 4:14
200:5
**70** 24:2
**711** 5:3,14
200:16
**750** 41:19
**77** 2:18

--- 8 ---

**8:57** 1:20 6:13
6:16
**80** 56:4
**800** 41:19
**815** 4:21
**82** 100:24
**86** 11:21
**87** 11:21
**89** 2:19
**89,515** 34:4

176:15

--- 9 ---

**9** 185:5
**9:58** 51:2
**90** 56:4 67:18
67:18,23 160:1
**906** 3:14
**92614** 4:4
**949** 4:5

**ALARIS LITIGATION SERVICES**
**www.alaris.us**       **Phone: 1.800.280.3376**       **Fax: 314.644.1334**
Case 2:17-cv-04057-NKL   Document 153-13   Filed 02/09/18   Page 85 of 85