# Exhibit M

## Page 1

```
 1            UNITED STATES DISTRICT COURT
              WESTERN DISTRICT OF MISSOURI
 2                  CENTRAL DIVISION
 3
 4    SHONDEL CHURCH, et al.,   )
                                )
 5        Plaintiffs,           )
                                )
 6        vs.          ) Case No. 17-04057-CV-C-NKL
                                )
 7    STATE OF MISSOURI, et     )
      al.,                      )
 8                              )
          Defendants.          )
 9
10
11
12
13
14        VIDEOTAPED DEPOSITION OF ANTHONY C. CARDARELLA
15              TAKEN ON BEHALF OF PLAINTIFFS
16                  DECEMBER 7, 2017
17                9:01 A.M. TO 2:35 P.M.
18        BETH A. KALTENBERGER, CCR, CSR, RPR, CRR
19
20
21
22
23
24
25
```

## Page 3

```
 1            UNITED STATES DISTRICT COURT
              WESTERN DISTRICT OF MISSOURI
 2                  CENTRAL DIVISION
 3
 4    SHONDEL CHURCH, et al.,   )
                                )
 5        Plaintiffs,           )
                                )
 6        vs.          ) Case No. 17-04057-CV-C-NKL
                                )
 7    STATE OF MISSOURI, et     )
      al.,                      )
 8                              )
          Defendants.          )
 9
10
11
12        VIDEOTAPED DEPOSITION OF ANTHONY C.
13    CARDARELLA, produced, sworn, and examined on
14    December 7, 2017, between the hours of 9:01 a.m. and
15    2:35 p.m. of that day, at American Civil Liberties
16    Union of Missouri, 406 West 34th Street, Kansas City,
17    Missouri, before Beth A. Kaltenberger, a Certified
18    Court Reporter, Certified Shorthand Reporter,
19    Registered Professional Reporter and Certified
20    Realtime Reporter, in a certain cause now pending in
21    the United States District Court, Western District of
22    Missouri, Central Division, wherein SHONDEL CHURCH, et
23    al., are the Plaintiffs and STATE OF MISSOURI, et al.,
24    are the Defendants.
25
```

## Page 2

```
 1                I N D E X
 2
 3                              PAGE
 4    DEPOSITION INFORMATION           3
 5
 6    APPEARANCES                      4
 7
      VIDEOTAPED DEPOSITION OF ANTHONY C. CARDARELLA
 8
 9        Examination by Ms. Wilcox         6
          Examination by Mr. Ramsey       187
10        Examination by Ms. Shipma       238
          Further Examination by Ms. Wilcox   240
11
12
13    DEPOSITION EXHIBITS
14    Exhibit 5  Suggestions in Support of Writ    175
                 of Prohibition and/or Mandamus
15
      Exhibit 14  Missouri State Public Defender    50
16                Cumulative Caseload Metrics
17    Exhibit 15  October 2, 2017 letter to       170
                  Judges from Anthony C. Cardarella
18
      Exhibit 16  Motion to Withdraw due to       176
19                Excessive Caseload
20
21
22    CERTIFICATE OF REPORTER           244
23
24
25
```

## Page 4

```
 1                A P P E A R A N C E S
 2    For the Plaintiffs:
 3    MS. GILLIAN R. WILCOX
      ACLU OF MISSOURI FOUNDATION
 4    406 West 34th Street
      Suite 420
 5    Kansas City, Missouri 64111
      (816) 470-9938
 6    gwilcox@aclu-mo.org
 7
      For the Defendant Missouri State
 8    Public Defender:
      MS. JACQUELINE SHIPMA
 9    GENERAL COUNSEL
      MISSOURI STATE PUBLIC DEFENDER
10    1000 West Nifong
      Building 7, Suite 100
11    Columbia, Missouri 65203
      (573) 526-5212
12    jacqueline.shipma@mspd.mo.gov
13
      For the Defendants State of Missouri
14    and Governor Eric Greitens:
15    MR. STEVEN ALAN RAMSEY
      STATE OF MISSOURI ASSISTANT ATTORNEY GENERAL
16    221 West High Street
      Jefferson City, Missouri 65101
17    (573) 751-9167
      steven.ramsey@ago.mo.gov
18
19
20    Court Reporter:
      MS. BETH A. KALTENBERGER
21    CSR, RPR, CRR, CCR MO #1335, KS #1714
      Alaris Litigation Services
22    1608 Locust Street
      Kansas City, Missouri 64108
23    (816) 221-1160
      www.alarislitigation.us
24
      Videographer:
25    Mr. Christopher Wright
```

ALARIS LITIGATION SERVICES
www.alaris.us        Phone: 1.800.280.3376        Fax: 314.644.1334

## Page 5

1    IT IS HEREBY STIPULATED AND AGREED by and
2  between counsel for the Plaintiffs and counsel for
3  the Defendants that this deposition may be taken in
4  machine shorthand by Beth A. Kaltenberger, a
5  Certified Court Reporter, Certified Shorthand
6  Reporter, Registered Professional Reporter and
7  Certified Realtime Reporter, and afterwards
8  transcribed into typewriting; and the signature of
9  the witness is expressly reserved.
10    *  *  *  *  *
11    (Deposition commenced at 9:01 a.m.)
12    THE VIDEOGRAPHER:  We're now on the
13  record.  Today's date is December 7th, 2017.  The
14  time is 9:01 a.m.  This is the video-recorded
15  deposition of Anthony Cardarella in the matter of
16  Shondel Church, et al., versus State of Missouri, et
17  al., Case Number 17-0405-CV-C-NKL in the U.S.
18  District Court for the Western District of Missouri,
19  Central Division.  This deposition is being held at
20  American Civil Liberties Union, a Missouri
21  Foundation.  The reporter's name is Beth
22  Kaltenberger.  My name is Chris Wright.  I'm the
23  legal videographer.  We're with Alaris Litigation
24  Services.
25    Will the attorneys present please

## Page 6

1  introduce themselves.
2    MS. WILCOX:  My name is Gillian Wilcox
3  for the plaintiffs.
4    MR. RAMSEY:  Steven Alan Ramsey for
5  the State of Missouri and Governor Greitens.
6    MS. SHIPMA:  Jacqueline Shipma for
7  MSPD defendants.
8    THE VIDEOGRAPHER:  Will the court
9  reporter please swear in the witness.
10    ANTHONY C. CARDARELLA,
11  of lawful age, produced, sworn and examined on behalf
12  of the Plaintiffs, deposes and says:
13    EXAMINATION
14  BY MS. WILCOX:
15    Q.  Mr. Cardarella.
16    A.  Good morning.
17    Q.  Hi.  Could you state your name for the
18  record and spell your last name?
19    A.  Sure.  Anthony Cardarella.  Last name
20  is spelled C-A-R-D-A-R-E-L-L-A.
21    Q.  Thank you.  Have you ever been deposed
22  before?
23    A.  Yes.
24    Q.  How many times, do you think?
25    A.  Oh, probably no more than a handful,

## Page 7

1  maybe.
2    Q.  Okay.  Is it safe to assume you have
3  taken depositions?
4    A.  Not nearly enough, but, yes.
5    Q.  Okay.  Do you remember the last time
6  you were deposed?
7    A.  I might have been deposed for a
8  postconviction relief hearing, in all likelihood.  If
9  not, it would have been even farther back than that
10  when I would have been the deponent.  I think we were
11  suing a bank, but that was not work related.
12    Q.  Okay.  So over five years ago?
13    A.  At least, I think so.
14    Q.  Okay.  So you know these rules, but I
15  will very briefly go through the ground rules, partly
16  so I remember them as well.  Verbal responses.
17    A.  Yes.
18    Q.  "Yes" or "no."  We will try not to
19  interrupt each other.
20    A.  Okay.
21    Q.  It's probably more important for me
22  than for you.
23    Unless you're instructed not to answer
24  by your attorney, provide an answer to the question,
25  even if there is an objection.  If you don't

## Page 8

1  understand a question, let me know.  I will do my
2  best to rephrase or we will move on.
3    If you need a break -- if anyone needs
4  a break, just let us know, but make sure it's not
5  when a question is pending.
6    A.  Okay.
7    Q.  Did you review any documents in
8  preparation for today's deposition?
9    A.  I took -- I began to take another look
10  at the petition.  I wasn't able to finish it
11  entirely, but I think I have -- once I received it
12  much earlier, I probably read the entire thing, I
13  think.
14    Q.  Okay.
15    A.  But in terms of prep for the
16  deposition, I would have reviewed portions of the
17  petition.
18    Q.  Did you look at anything else?
19    A.  Not in preparation for this
20  deposition, no.
21    Q.  Did you bring any documents with you
22  today?
23    A.  Not with me.
24    Q.  And besides your attorney, Ms. Shipma,
25  have you talked to anyone else or met with anyone

2 (Pages 5 to 8)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-14    Filed 02/09/18    Page 3 of 107

## Page 9

1  else in preparation for today's deposition?
2      A.   Other than telling people I was going
3  to be deposed by the ACLU, I don't believe there's
4  anything in addition to that.
5      Q.   Okay.  And who would you have told?
6      A.   Oh, probably a long list of people.
7  My co-manager would have been one of them, probably
8  secretaries in terms of having to cancel things that
9  were over-calendared.  I'm sure I told my wife.  The
10  list is probably longer than that, but, really, it's
11  inconsequential.  I didn't tell anybody at a retail
12  store or anything.
13      Q.   Okay.  We'll talk about education and
14  employment.  Tell me about your current employment,
15  where you work, your title, and how long you've been
16  there.
17      A.   Okay.  My title is district defender.
18  I'm employed by the Missouri State Public Defender
19  Trial Division.  My office is physically located at
20  234 West Shrader in Liberty, Missouri.  We cover more
21  counties than the county that resides, which is
22  Clay.
23          And if there was more to that
24  question, I've already forgotten it.
25      Q.   How long have you been the district

## Page 10

1  defender?
2      A.   You know, I was trying to think about
3  that this morning because I figured that would be one
4  of the questions.  I'm going to say around 15 years,
5  but that's an estimate.
6      Q.   And does your district have a number?
7      A.   07.
8      Q.   Do you also call it Area 7 sometimes?
9      A.   I think the system does, yes.
10      Q.   Okay.  So today we may refer to it as
11  District 7 or Area 7.
12      A.   Oh, yes.
13      Q.   How long have you worked for MSPD,
14  total?
15      A.   I started in August of 1989, and with
16  the exception of being out of the system in private
17  practice with a law firm for approximately 24 months,
18  the entirety of my career since that date, time
19  frame.
20      Q.   When was the two-year period when you
21  were in private practice?
22      A.   I was with -- I started in August of
23  1989.  I was with the system for four years and 11
24  months.  I know that because I didn't plan my vesting
25  very well.  I was away for 24 months and then came

## Page 11

1  back.  When I returned, I was into management.
2      Q.   Okay.  So let's talk a little bit,
3  then, about what other roles you have been in with
4  MSPD before you were district defender.
5      A.   Okay.  That would have been my first
6  approximate five years with the public defender
7  system.  I began in appellate/post-conviction relief
8  where I did three years and two weeks, not that
9  anyone was counting, before I transferred over into
10  the trial division.  And both of those were in the
11  Kansas City, Missouri location.  I remained, like I
12  said, just shy of five years before I went with the
13  law firm.
14      Q.   And when you came back from the law
15  firm, what position did you start in?
16      A.   After two years with the law firm, I
17  returned to the public defender system as a manager,
18  district defender in Area District 5, Buchanan
19  County, St. Joseph, Missouri, where I remained for
20  about six or seven years.
21      Q.   And from that position, did you take
22  the position in District 7 as the district defender?
23      A.   That's correct.
24      Q.   Okay.  And what district is Kansas
25  City?

## Page 12

1      A.   16.
2      Q.   So you worked at three different
3  districts?
4      A.   Yes.
5      Q.   Okay.
6      A.   Trial and appellate in Kansas City.
7  Just trial in Areas 5 and 7.
8      Q.   Okay.
9      A.   As management.
10      Q.   And not as management in Kansas City
11  in the appellate and trial?
12      A.   Never.
13      Q.   Is there a central office at MSPD?
14      A.   Yes.  The central office is now in
15  Columbia, Missouri, as I understand it.
16      Q.   And who runs that office?
17      A.   Our director, Michael Barrett.
18      Q.   Who do you report directly to as a
19  district defender for Area 7?
20      A.   Well, we have a hierarchy of managers.
21  Most recently the assistant trial division director
22  retired, and the public defender system did not fill
23  that position, so it's the head of the trial
24  division, Ellen Blaugh, would be who I report most
25  directly to now.

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-14    Filed 02/09/18    Page 4 of 107

1    Q.    And you did report to the person who
2  retired?
3    A.    She had an assistant, Leon Munday, who
4  had recently retired, so I would typically go to her
5  assistant, or I may just e-mail both of them.  I
6  considered, obviously, both of them my managers.
7    Q.    And where were their offices located?
8    A.    Ellen Blaugh, St. Louis, Missouri, and
9  Leon Munday, Kansas City, Missouri.
10    Q.    Okay.  And do you know why the
11  positions were not filled when those people retired?
12    A.    It's just the one person that retired.
13  The assistant trial division director, Leon Munday.
14  I don't have personal knowledge as to why it was.  I
15  can only speculate, but I'll choose not to do that.
16    Q.    What direction, if any, related to the
17  work you do as the district defender, do you receive
18  from the central office or from the people that you
19  reported directly to?
20    A.    I'm not sure I understand your
21  question.
22    Q.    I assume you have a lot of discretion
23  in your office for how things run, but did you
24  receive directions as to how your area -- the work
25  should be done in your area from anyone in the

1  central office?
2    A.    I do have a lot of discretion.  I'm
3  not sure what you mean by -- if I spend money, if I
4  do something that I believe requires management
5  review or approval, I always contact them, so I
6  just -- in terms of day-to-day, no.
7    Q.    Okay.  So there are certain things
8  that you would go to them for.  Those are things that
9  you understand that you would go to them for based on
10  your experience as the district defender?
11    A.    That's correct.  Or perhaps legal
12  advice if I know that one of them has a specialty or
13  something like that or has dealt with something
14  recently or may have as a result of them supervising
15  the rest of the state.
16    Q.    For either a case you're working on or
17  someone in your office?
18    A.    Correct.
19    Q.    You said that District 7 has several
20  counties, one of them is Clay County?
21    A.    Yes.
22    Q.    What other counties are covered?
23    A.    Our three primary counties remain Clay
24  County, Platte County and Clinton County.  Clay
25  County is 7, Area 7.  Platte County is Area 6, and

1  Clinton County is a part of the 43rd Judicial
2  Circuit.  There's another trial office that handles
3  the majority of the remaining counties of the 43rd
4  Judicial Circuit.
5    Now, that being said, those are our
6  three primary counties.  That's where we are
7  responsible now as of fairly recent.  Prior to that,
8  we were -- we probably would, at any given time, have
9  those primary counties, as well as anywhere from 10
10  to 12 to 15 additional surrounding counties, some of
11  which were not very close in proximity.
12    Q.    How recently did that change?
13    A.    Oh, boy.  Probably inside of a year, I
14  think.
15    Q.    Do you know why it changed?
16    A.    My understanding is that the public
17  defender system utilized funds that were part of its
18  budget to assist trial and appellate offices dealing
19  with conflict counties.  And by "conflict," that
20  necessarily or often necessarily meant that it would
21  be greater distances to cover, jails that were
22  farther away, prisons that were farther away,
23  courthouses that were farther away, defendants that
24  were farther away, so to lighten the load, if you
25  will, was the goal.

1    Q.    And if those -- when you said there
2  were a lot of other counties that you had been
3  covering --
4    A.    We still do because of attrition.  We
5  still will until they, by attrition, you know, those
6  cases are settled, dismissed or resolved some other
7  way.
8    Q.    Okay.  And if those counties are in
9  other districts, do you share the workload with
10  public defenders, say, in District 6 or in a district
11  that also covers those counties?
12    A.    Well, probably the best way, easiest
13  way I can explain it would be by example.  The Kansas
14  City Trial Office, Area 16, and our office, Liberty,
15  we will share.  If two young men are accused of a
16  crime and they wind up being co-defendants and there
17  would thus be inherent conflicts, we would send our
18  second young man to the Kansas City office to
19  represent him.  If they had two folks charged with
20  stealing a car, for example, they would send their
21  second one to us.  That's the way it went on for
22  years and years and years, frankly, as long as I've
23  known it, until recently, approximately a year.
24    Q.    How would that be handled now?
25    A.    Now, instead of conflicting out -- and

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-14   Filed 02/09/18   Page 5 of 107

Page 17

1  this is all electronically through a form on a
2  computer, you know, so things can be kept track of,
3  now, instead of sending it to Kansas City, we send it
4  to the transfer agent and they locate, contract
5  public defender attorneys who have -- who are
6  interested in providing criminal indigent defense to
7  people accused of crimes.
8      Q.   Are these people who work for the
9  public defender system like you do or are they
10 private attorneys?
11     A.   They are private attorneys who, for
12 whatever reason, have agreed to do that for whatever
13 duration and for whatever selected counties.
14     Q.   Do you know who pays them or if they
15 are paid?
16     A.   My understanding is the public
17 defender budget pays them.
18     Q.   What judicial circuit is District 7 in
19 or if it's in multiple circuits?
20     A.   I should have been more clear on that.
21 Clay County is Judicial Circuit 7 and Platte County
22 is Judicial Circuit 6.
23     Q.   And Clinton County is 43rd?
24     A.   43rd, yes.
25     Q.   So you now work -- your office works

Page 18

1  in these three counties, you said, as of recently,
2  that's your main area?
3      A.   Those have always been our main area.
4  They are now the only cases we receive indigent
5  applications from, but we still have a large amount
6  of remaining conflict counties that we have a
7  caseload with.
8      Q.   Okay.  How big of a geographic area is
9  it where your office currently takes cases from?
10     A.   Well, Platte County is -- the
11 courthouse is not too far from the KCI airport.  The
12 downtown Liberty Courthouse is where -- our Clay
13 County cases, and then Clinton County is in -- the
14 courthouse is in Plattsburg, Missouri, if that
15 describes anything.
16     Q.   Maybe the easier way to do this -- so
17 your office is in Liberty?
18     A.   Yes.
19     Q.   Which is where the attorneys are
20 based?
21     A.   Yes.
22     Q.   How far of a driving distance is it to
23 get to the respective courthouses?
24     A.   Approximately 30 miles.
25     Q.   To each one?

Page 19

1      A.   Approximately.
2      Q.   Okay.
3      A.   That might be slightly -- might be
4  slightly farther for Clinton County, Plattsburg,
5  Missouri.  It's more rural, so not really a direct
6  route, if you will.
7      Q.   Do each of those -- if you have a case
8  in one of those counties or courthouses, is it likely
9  that then your client is going to be in custody near
10 that courthouse?
11     A.   Well, unfortunately, let me begin,
12 it's far more likely that our clients are going to be
13 in custody.  It does not necessarily mean that
14 they're going to be in custody close to our home
15 office of Liberty, Missouri, or in the jurisdiction
16 where they're charged.
17         For example, for quite a -- quite a
18 few years the people who are charged with crimes in
19 Clinton County, where the courthouse is located in
20 Plattsburg, Missouri, are not -- they have an archaic
21 jail in the bowels of their basement which probably
22 house, I'm told, you know, a dozen, 15 people,
23 maximum.  And I use that term "house" generously
24 because it's not fit for -- it shouldn't be used.
25 But because they have far, far more people accused of

Page 20

1  crimes and far, far more people in custody, they farm
2  them out -- "they," Clinton County, farms them out to
3  other jurisdictions.  And for the last several years
4  they farm those inmates out to another city, another
5  county, Andrew County, so we have to drive quite a
6  bit farther north to see an inmate in custody.
7      Q.   Whose hearings will actually be in
8  Clinton County?
9      A.   If they're lucky enough to be brought
10 to court, yes, if it's not by, for example, you know,
11 video court.
12     Q.   Okay.  And I'm going to touch on that
13 in a little bit.
14     A.   I'm sure you are.
15     Q.   So just to make sure I understand,
16 your office is not currently covering conflict cases
17 by assignment?
18     A.   That's right.  And we hope that to be
19 the case forever and ever, amen.
20     Q.   Okay.
21     A.   I don't have any confidence in that.
22     Q.   And you say you hope that to be the
23 case because it is --
24     A.   It provides a miniscule amount of
25 relief.

5 (Pages 17 to 20)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-14   Filed 02/09/18   Page 6 of 107

## Page 21

1    Q.    Got it.  As to your workload, correct?
2    A.    Yes.
3    Q.    How many attorneys work in your
4  office?
5    A.    Including myself, a total of 12.
6    Q.    Are you currently fully staffed with
7  12 attorneys?
8    A.    The phrase I prefer to use is we're
9  currently fully understaffed because I don't think
10  we're properly staffed, but, yes, of the full-time
11  employees that are allocated to the office I manage,
12  we're fully staffed.
13    Q.    How many attorneys do you think your
14  office would need to be what you might call fully
15  staffed?
16    A.    Under my definition?
17    Q.    Yes.
18    A.    Twice as many.
19    Q.    With your current caseload --
20    A.    Well, yeah.
21    Q.    -- right?
22    A.    That's presumably part of the
23  question, yeah.
24    Q.    Is there a high turnover in your
25  office for attorneys?

## Page 22

1    A.    I mean, statistically, I haven't done
2  the math.  I know that we keep track of, gosh, no one
3  left recently, and every day that that happens,
4  that's a day to celebrate.
5    Q.    When is the last time you had to hire
6  a new attorney?
7    A.    Probably approximately 12 months ago
8  or so.  That's the best of my recollection.  Might
9  have been slightly longer.
10    Q.    12 is -- I don't want you to go
11  through every one, but is there a way that you could
12  tell me, maybe, the average level of experience the
13  attorneys in your office have?
14    A.    Well, that changes with transition,
15  but I can tell what -- you know, approximate what it
16  is now.
17    Q.    Sure.
18    A.    We have probably -- I can think of one
19  attorney with probably an extensive amount of
20  criminal defense experience, 15 to 20 years, I'm
21  estimating, and we have another attorney with about
22  10 to 12 years of experience, another attorney with
23  probably that same amount of experience, my own
24  experience, as I've already detailed, and I think we
25  have about -- I think the last time I thought about

## Page 23

1  that with any degree of seriousness, we have
2  approximately half of us, so I think six attorneys
3  that are relatively -- what I would call relatively
4  new to criminal defense.
5    Q.    When an attorney does leave your
6  office, how are that attorney's cases transitioned to
7  someone else?
8    A.    Well, I mean, more times than not,
9  they're absorbed.  That's not always the case.  By
10  that I mean redistributed to the existing full-time
11  attorneys that remain.  It always creates a burden,
12  and it's an unfair reality to any of the clients that
13  are losing their attorney.
14    Q.    I guess let's go back to the last
15  position you filled when an attorney left.  Was it
16  easy to find someone to fill that position or was it
17  difficult?
18    A.    Well, understand I barely had time to
19  come here, so we really despise having to list
20  positions and take time out of an otherwise
21  incredibly busy week to stop everything and review
22  applications, schedule interviews, conduct
23  interviews, do the things that we're required to do
24  in order to document the interviews, conduct second
25  interviews, check references, et cetera.  It's a huge

## Page 24

1  amount of time commitment, so I'm happy when that
2  doesn't happen.  I prefer working with and attempting
3  to train the attorneys that we presently have, but
4  sometimes, you know, I get the notice anyway.
5    Q.    Are you solely responsible, in your
6  position, for filling the -- if someone leaves, you
7  do the interviewing and the hiring involved with a
8  new attorney?
9    A.    I involve my assistant, my co-manager,
10  to a great extent, yes.
11    Q.    If you could give me an explanation of
12  what other staff, besides the 12 attorneys, work in
13  your Area 7 office.
14    A.    Sure.  Everyone is full time.  The
15  attorneys, of course, are full-time salary, so that
16  slightly creates a different predicament.  Then we
17  have two full-time investigators.  We have one
18  full-time legal assistant, and then we have, I
19  believe, four office specialists that we used to call
20  them clerks for decades, so, frankly, I can't even
21  remember what they're called now.
22    Q.    A position that's not technically a
23  paralegal or legal assistant, but provides support to
24  the attorneys in the office?
25    A.    Absolutely, yes.

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

Page 25

1      Q.    You've been at your office for over
2  ten years?
3      A.    Yes.
4      Q.    Can you talk about how the size of
5  your office has grown or not grown over that time?
6      A.    I think since I came to the Liberty
7  office as the manager, transferring from the
8  St. Joe, I think the office was -- has been given, I
9  think, another two or three full-time attorneys.
10  There's been some transition with the positions over
11  the years.  There was a period of time where we had
12  no investigators, and those were instead, by
13  attrition, legal assistants for a brief period, and
14  then we -- yeah, I convinced management to have some
15  investigators again.
16      Q.    I think I know the answer to this, but
17  do you believe your office is sufficiently staffed?
18      A.    Of course not.
19      Q.    And just explain a little bit of why
20  not.
21      A.    How much time do you have?  Well, I
22  mean, it's a pretty simple equation of the law of
23  supply and demand.  The supply is endless, it is
24  absolutely endless.  As many cases that prosecutorial
25  authorities can file are filed.  There's no limit.

Page 26

1  And the prosecutorial discretion is absolutely
2  unfettered, so with that hypothetical number and with
3  the population and economy with a greater number of
4  people not being able to afford expensive attorneys,
5  our numbers have skyrocketed.  You take that, and
6  legislators that continue to pass more onerous
7  provisions, continue to make additional acts illegal,
8  create mounting and duplicative punishments and
9  extended punishments for periods of incarceration in
10  our adult prisons and juvenile facilities, the stakes
11  have just risen.  And the courts rely on the public
12  defender system to put it all on their back like a
13  burro, and it's not working.
14      Q.    I'm going to go through a list of
15  resources, and first just tell me whether they're
16  available to the attorneys in your office.
17      A.    Okay.
18      Q.    Maybe with a yes or no, and then after
19  that, we can talk about the process of how they're
20  available.
21      A.    Okay.
22      Q.    The ability to locate witnesses?
23      A.    And this part of your question is
24  whether or not it's available to the attorneys?
25      Q.    Yes.

Page 27

1      A.    Well, with a ratio of 12 attorneys to
2  two investigators, I don't know that that's always
3  available.  I mean, it is in theory, but get in line.
4      Q.    Right.  Do you ever use outside
5  investigators?
6      A.    It is -- I can think of only one
7  occasion where we did something like that.  It's so
8  rare.  It was a unique circumstance that involved a
9  conflict.  I think that's about the only time I can
10  think of having ever used that.
11      Q.    And if that is used, that's an
12  additional cost, correct?  Because the investigators
13  you have are on staff, and paid a salary?
14      A.    That's correct.
15      Q.    So if you have to go use an outside
16  investigator, then that's an additional cost that's
17  being spent on top of the salaries that are
18  already --
19      A.    It necessarily would be, sure.
20      Q.    Are there social workers available?
21      A.    I'm not -- honestly I don't know
22  whether they are social workers.  I know the public
23  defender system had looked into a program or had
24  begun one or two interns in the system.  I think one
25  may have been located in Columbia, Missouri, but I'm

Page 28

1  not certain of that.  I haven't heard anything about
2  the social workers, anything recent, so I have no
3  reason to believe that we have a division of social
4  workers, none that we rely on.
5      Q.    Your attorneys are not regularly using
6  social workers that are available to you?
7      A.    We sometimes joke and say that we are
8  the social worker, too.
9      Q.    What about experts in cases?
10      A.    Assuming that an attorney had some
11  time to think about what expert, there would be a
12  mechanism by which he or she could request funds,
13  justify the use of them, because it's the taxpayers'
14  money, and then lay those things out for a funding
15  request.  So it is, in theory, available.
16      Q.    And I'm going to get back to the time
17  that it takes to think about that.
18      A.    Sure.  I just don't want any of my
19  questions and answers being taken out of context.
20  That's probably why you're not going to get a "yes"
21  or "no."
22      Q.    That's fair.
23           What about taking depositions?
24      A.    Same thing.  We have the funding
25  available with the funding requests, specific

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

Page 29

1  details, different levels of review before the money
2  is finally released.  It's available.
3      Q.    Okay.  In theory, again?
4      A.    Everything is available, in theory,
5  because there's not time to do it, nor is there
6  sufficient staff.
7      Q.    Okay.  What about the use of
8  translators?
9      A.    Well, we have -- of course, the court
10  pays for the translators in the courtroom, so unless
11  there's a glitch, the court should have the
12  appropriate translator there for the person accused
13  of the crime who are, quite often, in custody, more
14  often times than not.
15          Independent of the courtroom setting,
16  the attorneys in our office and our system have the
17  ability to seek funding for a translator in order to
18  communicate with their client.  You know, it's
19  cumbersome, but it can be done.
20      Q.    So if a defendant needs a translator
21  to speak with their attorney, that attorney, in order
22  to go meet with their client, say, in a jail, would
23  have to request the funds for a translator, schedule
24  the translator to go have the meeting; is that an
25  accurate --

Page 30

1      A.    Sure, sure.  I mean, the attorney may
2  not do that himself or herself but, yes, that's how
3  it plays out, yes.
4      Q.    Okay.
5      A.    Probably ask a support staff member to
6  help do that, but the attorney -- he or she will
7  request the funding, and the funding has to be
8  approved before you can utilize the resource, of
9  course.
10      Q.    Do you approve or reject expense
11  requests in your office, or does that go to someone
12  else?
13      A.    I approve or review them for approval,
14  and then, you know, if they need to be clarified,
15  obviously, that occurs, and then it's passed on for
16  further review.  I don't -- I'm not quite sure how
17  much monetary approval I have, independent of my
18  supervisors, but that really doesn't create much of
19  an issue, I mean, if there's a need to clarify, that
20  obviously has to happen.
21      Q.    So someone other than you has the
22  final say of whether --
23      A.    On most things, yes.
24      Q.    Okay.  Is there ever a reason -- if an
25  attorney has the time to decide they need an expert,

Page 31

1  has the time to find an expert, and makes a request,
2  is there ever a reason why that might be rejected
3  by -- if you're not making the final decision, I
4  guess, then whoever you pass it on to?
5      A.    No, that's never been rejected.
6      Q.    Okay.  So the reason that an expert
7  wouldn't be utilized more often than not is not
8  because the request would be rejected, but because
9  there wouldn't be time for the attorney to even get
10  that far?
11      A.    I thought -- I understood your
12  question to relate to translators, so I may have
13  misunderstood you, so could you state that part
14  again?
15      Q.    Yes.  My question was actually broad,
16  and that probably is what made it confusing.
17      A.    Okay.
18      Q.    So the question is if there's an
19  expense request, which is a broad question.
20      A.    Sure.
21      Q.    So if it helps, I can narrow it into
22  the different categories.  What I'm trying to get at
23  is it ever -- is an expense request ever rejected for
24  lack of funding?
25      A.    I don't think so, no.  I mean, you

Page 32

1  know, there's clarification that's sought.
2      Q.    Okay.
3      A.    And there may be -- ultimately, my
4  supervisor has the last call on that, but I don't
5  think it's based on funding.  I'm assuming it's -- I
6  assume that part of what is considered is the wise
7  use of funds, but that's speculation on my part.
8      Q.    Do you encourage attorneys in your
9  office to think about the budget or the funding
10  before they make requests for the types of resources,
11  experts, taking depositions, using a translator to
12  visit a client?
13      A.    I encourage them to use resources, but
14  the reality is they don't have time to do that so, I
15  mean, I'm not going to insult their intelligence.
16      Q.    Okay.  But you would never instruct
17  them to not request it because of budgetary reasons?
18  If they feel like they need it for a case, you would
19  support their request for it?
20      A.    Oh, absolutely, sure, certainly.
21  Because if the system didn't have the funding, should
22  we reach that point, then we seek relief from the
23  courts.
24      Q.    You touched on this, so I would like
25  to talk about it a little bit, the use of

8 (Pages 29 to 32)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-14    Filed 02/09/18    Page 9 of 107

1    investigators.  So there are two investigators in
2    your office?
3         A.    Yes.
4         Q.    How does an attorney utilize the
5    investigator?  You made a comment "get in line."  So
6    if you could just kind of give maybe an example, a
7    day-to-day example of how that plays out in your
8    office.
9         A.    Our procedure is in order to track and
10   monitor workload and progress in a case, action items
11   are initiated through the software of our computer
12   system, action item to Investigator A or Investigator
13   B that spells out what you want him or her to do with
14   a theoretical due date.  And, obviously, the task
15   could be multiple variety, so it may well be just
16   running someone's criminal history or maybe trying to
17   locate a witness.  Those are going to be something
18   that's more in flux.  Sometimes it could be scene
19   investigation, could be schedule a meeting, and then
20   be present when the attorney is conducting an
21   interview, for example.  So, I mean, there's endless
22   number of things that we would use an investigator
23   for.
24        Q.    Is it up to the investigator to
25   schedule and prioritize the requests that come in?

1         A.    Well, every action item is given a due
2    date by the attorney assigned, and the way we like to
3    do it in our office is the -- now, it's not a
4    perfect system because everybody is too busy, but
5    what we like is if the due date for the action item
6    needs to be extended or monitored, I would like for
7    them to come to me so that we can see.  I want to
8    make sure that there's not one attorney hogging all
9    the investigators, and there's not, but, you know,
10   not everything can be done in two days because you
11   think it's an emergency because, frankly, it may not
12   be.
13        Q.    So given the capacity of the in-house
14   investigators you have and the number of cases your
15   attorneys have, are there times when an
16   investigator -- where it would be helpful for them to
17   do something, but they just can't get the task
18   accomplished?
19        A.    Well, each investigator -- each of the
20   two investigators I have, they're not salaried
21   people, so they only are allowed to work 40 hours a
22   week, so, I mean, that's -- even the most industrious
23   folks are able to accomplish so much, so many tasks,
24   even in the most efficient manner, in 40 hours.
25        Q.    Does your office have standard

1    litigation practices?
2         A.    Can you tell me what you mean?
3         Q.    Is there anything in your office that
4    maybe would be, like, a written standard litigation
5    practice or a manual that attorneys would refer to?
6         A.    The only thing, theoretically, I could
7    reference would be the Guidelines for Representation
8    by the Missouri Public Defenders System, but I'm
9    certain -- I'm virtually certain there's no attorneys
10   who have done anything except, perhaps, glanced at
11   that.  You know, they are -- they are the ideal.
12   They're a good set of what things that should be
13   done, but with the workload, that's an impossibility.
14   With the workload, i.e., especially with the existing
15   resources, people, it's an impossibility to do
16   everything you need to do on a case.
17        Q.    And we're going to move into workload
18   now, so we're going to start talking more in detail
19   about those issues.
20             Can you describe your role as district
21   defender, your -- this is going to be a hard question
22   to answer, but your day-to-day responsibilities?
23        A.    Well, I'm not proud of this, but I
24   think the first thing a lot of what the managers do,
25   including myself, is to put out the next day's fire,

1    and that could be practically anything.
2         Q.    Is it fair to say that you're
3    responsible for managing your office, assigning cases
4    and managing the budget?  Are those three things
5    you're responsible for?
6         A.    At least.  And it's not an exhaustive
7    list.
8         Q.    If you were to add other things to
9    that list that could be generally --
10        A.    I have a caseload.
11        Q.    Yes.  And we are going to get to that.
12        A.    Okay.
13        Q.    Yes.  And maybe -- maybe you explained
14   this as well as you can, but you do manage the budget
15   in your office, to some extent?  Does that fall on
16   you or does it usually fall on someone -- a
17   supervisor of yours?
18        A.    As I understand it, the comptroller
19   allocates the budget to the individual offices, so
20   we're given notice of that.  I have a longstanding
21   clerk assistant who was, frankly, doing that long
22   before I got to the office in terms of keeping track
23   of the money spent on the funding for professional
24   expenses, for translators, things like that, for
25   purchasing office supplies so, I mean, I do not -- I

Case 2:17-cv-04057-NKL   Document 153-14   Filed 02/09/18   Page 10 of 107

## Page 37

1  do not sit and subtract -- when we get an order of
2  staples, subtract it from the budget. I don't do
3  that, but she'll track that for me.
4      **Q.   Okay.**
5      A.   And does a good job of it.
6      **Q.   And you've already said that your**
7  **office does not have the staff it needs and the**
8  **support it needs. Is there ever a time when there's**
9  **not enough money to meet the demands that your office**
10 **has now, if that's a question you can answer?**
11     A.   I'm not sure I understand it. I mean,
12 it could be -- that could be broadly interpreted to
13 mean funding, and I'm sure that's not your question.
14     **Q.   I understand you need more attorneys.**
15 **Is there -- working in the budget that you have right**
16 **now, have you ever made a request for your office of**
17 **something -- like, a position to fill or something**
18 **that normally is paid for, and that has not happened**
19 **because of the budget?**
20     A.   I'll give you an example. I mean, I
21 could, the first thing I do every morning is shoot an
22 e-mail that says please give me more lawyers. But I
23 don't do that. I think that's presumed. Everyone
24 across the state would be sending out the same
25 e-mail, I presume. If what you're saying is have I

## Page 38

1  asked to utilize funds, and been told no? No, I
2  haven't been turned down.
3      **Q.   Can you talk a little bit about the**
4  **day-to-day responsibilities of the other attorneys in**
5  **your office who are not managers?**
6      A.   Well, each of the attorneys, the 10
7  are not -- that don't fulfill a management role, have
8  a caseload, of course, of their own, so as any --
9  their responsibilities would mimic any attorney with
10 clients, specifically criminal defense clients, so
11 they spend an inordinate amount of time in court,
12 some of them an inordinate amount of time getting to
13 court for far, far away places, visiting clients at
14 jails, communicating with clients through letters or
15 phone calls, if not personal visits, opening the file
16 or opening the electronic file or the physical file,
17 and reviewing discovery, creating to-do lists and
18 then, you know, as it goes. If it's creating action
19 items to investigators, of course, a large amount of
20 time is going to be utilized in negotiating with the
21 prosecuting authorities. It's a large number of
22 tasks and it would -- a lot of those would be
23 consistent, whatever file you pick up, but some of
24 those, depending on what the nature of the charge is,
25 it might be more limited or it may be more expansive.

## Page 39

1      **Q.   How much time would you say is spent**
2  **on administrative tasks versus substantive legal**
3  **work, by the attorneys?**
4      A.   Again, we're talking about
5  nonmanagement attorneys?
6      **Q.   Let's talk about them separately.**
7      A.   Okay.
8      **Q.   Talk about the line attorneys first,**
9  **nonmanagement.**
10     A.   Well, they would -- they have daily
11 time sheets, they have expense reports. Anytime any
12 funding is requested there's a -- you know, there's a
13 form for that, as the phrase goes, in order to make
14 sure we're closely monitoring our expenses. There's
15 action items for any requests that they want staff to
16 do. You know, outside of hey, would you copy this or
17 make three copies of that, there's going to be a form
18 that asks an investigator to do something or a legal
19 assistant that asks for a letter of incarceration or
20 to contact and get -- go to the jail, get a medical
21 release from this client, go to the provider, get an
22 estimate for the dollars so the attorney can then ask
23 for the estimate of the dollars to be approved. I
24 guess some of those are administrative because we
25 have to account for, you know, guardians of the

## Page 40

1  taxpayers' funds, so in order to just get the ball to
2  roll, those steps have to be made.
3      **Q.   Could you say how much, you know, if a**
4  **hundred percent of their day, what percentage of it**
5  **is spent doing that type of work, on average, for an**
6  **attorney?**
7      A.   I would be guessing.
8      **Q.   Okay.**
9      A.   And it would differ from attorney to
10 attorney because, frankly, some of them are better at
11 filling out their time sheets than others are. Some
12 of them are better at filling out the request to do a
13 depo than others are. Some of them are still
14 learning.
15     **Q.   How much time do you think you,**
16 **personally, spend on administrative tasks versus**
17 **substantive legal work?**
18     A.   Not enough and yet too much.
19     **Q.   If your office had more support staff,**
20 **would that alleviate some of that work for the**
21 **attorneys?**
22     A.   Of course.
23     **Q.   Can you describe or explain how cases**
24 **get assigned to the public defender system and then,**
25 **specifically, to your office, how that process works?**

10 (Pages 37 to 40)

**ALARIS LITIGATION SERVICES**
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-14   Filed 02/09/18   Page 11 of 107

## Page 41

1  A.  The statutory scheme is that an
2  indigent accused of a crime fills out an application
3  for an attorney from the public defender system.
4  That may be a judge or a judge's clerk handing it
5  over to someone who is being read their initial
6  charges.  It may be someone who is arrested in a
7  facility, and asks for an application, but it --
8  everything commences with that application for --
9  application and affidavit of indigence.
10  We receive those through a variety of
11  mechanisms.  Could be through the mail, we pick them
12  up from the jail, some jails every day, some jails
13  not every day.  And then those are processed.  Those
14  people that are deemed to be indigent, files are
15  created, attorneys are assigned, and then the
16  commencement of the pleadings begin.
17  There are times, obviously,
18  statutorily, the applicant has the right to appeal
19  our finding to the judge, so the judge may appoint
20  us, so we'll get it post-appeal, if you will, where a
21  person accused of a crime that filled out an
22  application then says, "No, I really don't have
23  enough money.  I know they said that I don't qualify,
24  but I don't have any money.  I've got this rent, I've
25  got this bill, I lost my job," et cetera.  And then

## Page 42

1  the judge considers and appoints us, in a lot of
2  cases, so -- and I probably didn't finish my answer,
3  but I'm not sure what -- does that generally address
4  your question?
5  Q.  Yeah.
6  A.  Okay.
7  Q.  So the applications for your -- for
8  Area 7 are processed in your office?
9  A.  Yes.
10  Q.  Okay.  How do you decide which
11  attorney takes a case?  How are they assigned to
12  attorneys one someone is either, I guess, appointed
13  by the court, if there's some appeal of the finding
14  in your office, or your office just decides yes, they
15  qualify?
16  A.  Is your question how do we know which
17  attorney is going to be assigned?
18  Q.  How are the cases assigned?
19  A.  I assign them, and there's a scheme
20  that we use to assign them, and that may be impacted
21  by jurisdiction, experience.  So that's the way it
22  works.
23  Q.  Is it a scheme that you've developed
24  in your office or does it come from a command at
25  central office how to do it?

## Page 43

1  A.  There's no commandment on that and,
2  frankly, there couldn't be no more than I can have
3  one set scheme because if I lose an attorney with 20
4  years' worth of experience, I better hope I get
5  another one.  And that doesn't always happen.
6  Q.  What is your personal caseload right
7  now?
8  A.  I don't have an exact number.  If
9  you're okay with approximations, we can deal with
10  approximations.
11  Q.  Yes, please.
12  A.  Frankly, it may be -- it may be more
13  than the last time I looked or it my be slightly less
14  because, again, part of the limitations of not having
15  sufficient resources means you don't have sufficient
16  resources to keep an accurate count of those things
17  that should be closed, and I don't think it's a
18  mischaracterization to say it's approaching 400.
19  Q.  What types of cases do you have in
20  that 400?
21  A.  Everything from speeding to murder.
22  Q.  In your time at District 7 as the
23  district defender, have you always maintained your
24  own caseload?
25  A.  I've also had a caseload, yes.

## Page 44

1  Q.  Is that by your choice, as a manager
2  in that office, or something that comes from the
3  directive of someone above you?
4  A.  I'm certainly not told what to do in
5  that respect, I mean, I have, over the past -- it's
6  been years and years, but I have been -- it's been
7  suggested to me by supervisors to reduce my caseload
8  in order to, you know, do more of the administrative
9  things.  That's not a bad suggestion.  It just -- in
10  my estimation, it wasn't a practical one because --
11  again, because there is no maximum number of caseload
12  that judges feel that we just have an endless amount
13  of supply and endless number of shelves and endless
14  amount of time.
15  There are people who are going to be
16  accused of crimes who properly qualify and, under the
17  constitution, have the right to an attorney.  And if
18  it's not me representing them, it's going to be
19  another person perhaps with as much experience or
20  Lord forbid, somebody without any experience.  And I
21  don't mean on the speeding ticket.
22  Q.  Right.  Do certain attorneys in your
23  office -- because I know we talked about there are, I
24  think, you said, at least three attorneys who have a
25  significant amount of experience so -- and I know the

11 (Pages 41 to 44)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-14   Filed 02/09/18   Page 12 of 107

Page 45

1    scheme changes how you assign cases, but are there
2    attorneys in your office who handle more felonies?
3    Are there some attorneys who don't handle any
4    felonies? Could you kind of describe how that works,
5    or maybe it's always changing, and you can't.
6         A.   It does change from time to time and,
7    frankly, it -- I like to tell the attorneys when they
8    come in or when I interview them, they may not even
9    be made an offer at some point, but is that we try
10   not to throw them in the deep end without some sort
11   of training. That's the goal. That's not always the
12   reality.
13        Now, we're not going to have them
14   defending the serious cases the minute they come in
15   the door. Even if they want them, they don't get
16   them, but, I mean, invariably what happens is the
17   attorney starts with a slow caseload, and then we
18   percolate it up by necessity, and then they finally
19   get the -- I think they finally begin to wonder and
20   realize the warning I've given them because
21   invariably during an interview with an attorney
22   applicant, they'll ask, "What's your caseload?"
23        And I'll say, "Whatever you think it
24   is, it's higher than that. It doesn't matter what
25   number I give you."

Page 46

1         And part of that is because if they're
2    a new attorney, I'll go so far as to say they really
3    don't have any idea how much work would be involved
4    in one file, much less many, many more than that.
5         Q.   Does your office handle any appeals?
6         A.   Part of the scheme is we don't. Those
7    are given to appellate offices.
8         Q.   Okay.
9         A.   I mean, there may be an extraordinary
10   writ or something, but in terms of -- it's rare.
11        Q.   Okay. But, like, direct appeals and
12   then post-conviction relief, those go to the
13   appellate office?
14        A.   Different departments, yes, yes.
15        Q.   If you can, can you approximate how
16   many cases the other attorneys in your office have?
17        A.   Not really, I mean, without -- no. As
18   I'm sitting here, I won't be able to do that. It
19   varies.
20        Q.   Okay. Are there other attorneys who
21   have a number close to yours?
22        A.   No.
23        Q.   Do you have the most?
24        A.   I do.
25        Q.   Are there other attorneys who might

Page 47

1    have 200 cases?
2         A.   Yes. Oh, yeah. That's not to imply
3    the other attorneys have a soft workload.
4         Q.   I have an exhibit that will help that,
5    I think, that will clarify workload that I'm going to
6    get to in just a minute.
7         So given that you have your own
8    caseload of 400 cases and you're also the managing
9    attorney in your office, can you talk about how you
10   are able to or not able to supervise the substantive
11   work of attorneys in your office?
12        A.   It's virtually impossible. I mean, we
13   do the best we can. "Hey, I've got a question" is
14   usually the way that's dealt, or possibly an e-mail,
15   but it's usually -- I mean, more often times than
16   not, it's, "Sorry. Do you mind if I interrupt your
17   lunch?" And I never mind.
18        Q.   Are they -- do you have performance
19   evaluations of the attorneys in the office, annual
20   evaluations or such?
21        A.   Yeah, we do that. I mean, it's hard
22   to find time to do that, but we do that. We target
23   it so that if they're there for the appropriate
24   amount of time to merit review and to -- and if their
25   performance is there, then we recommend the

Page 48

1    promotion, but reviewing for review sake, we don't
2    have time for that, honestly. We should, but we
3    don't.
4         Q.   So you review, like, for a promotion?
5         A.   Yeah, earmarks in the calendar, sure.
6         Q.   Okay. What kind of a promotion?
7         A.   From an APD, Assistant Public
8    Defender I to II, III, IV. Those are the four
9    levels.
10        Q.   Is that the same in all the district
11   offices, do you know?
12        A.   That demarcation, yes.
13        Q.   Okay. So as a public defender, you
14   start at I?
15        A.   Yes.
16        Q.   The highest you can get to is IV?
17        A.   Uh-huh.
18        Q.   And beyond that would be someone in a
19   manager position?
20        A.   Correct.
21        Q.   And you said you have a co-manager.
22   What's that person's title?
23        A.   It's a deputy district defender.
24        Q.   Okay.
25        A.   I reference her as my co-manager, Ara,

12 (Pages 45 to 48)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL     Document 153-14     Filed 02/09/18     Page 13 of 107

1   A-R-A, Bailey Brown.
2       Q.   Okay.
3       A.   And I think she's been with the public
4   defender system 10 to 12 years, I'm estimating.
5       Q.   And she also maintains a caseload?
6       A.   Yes.
7       Q.   Do you have any idea how big her
8   caseload is?
9       A.   Not off the top of my head.  I know
10  it's too much.  Other than that, if you're looking
11  for a number, I can't give it to you.
12      Q.   Does the central office perform any
13  evaluations on attorneys, that you're aware of?
14      A.   They -- probably the most direct
15  answer is not that I'm aware of.  For example, if we
16  have recommendations for promotion, then we go to our
17  supervisor, and he or she -- at the time, it was he
18  or she -- would review, and if they had any questions
19  or sought any clarification, that's the way that
20  would work.  I mean, we don't have the final approval
21  for that.  Our supervisors do.
22      Q.   Okay.
23      A.   So they may ask you to do some
24  additional case reviews, case file reviews, for
25  example, if you've done X, they may want more.  It

1   just depends.
2       Q.   But they're not actually performing
3   the evaluation?
4       A.   Usually not.
5       Q.   Okay.  Do you, in your office, gather
6   your own statistics on workload, attorney workload?
7   Do you keep -- I mean, I'm sure there's a way to
8   figure out --
9       A.   There's views on our computer, but, I
10  mean, that's just not my expertise.
11      Q.   Okay.
12      A.   I think I know where to find them, but
13  I would probably need a translator for that, or at
14  least some assistant or someone that's more familiar.
15      MS. WILCOX:  All right.  I have the
16  first exhibit I'm going to use, and we are trying to
17  consecutively number exhibits from the last
18  deposition that was taken, so these are going to come
19  slightly oddly numbered, it's going to seem.  This
20  one is going to be Exhibit 14 because I think at that
21  last deposition we left off with 13.
22      (Exhibit 14 was marked for identification.)
23      Q.   (BY MS. WILCOX):  So I'm handing you
24  what's been marked as Exhibit 14.  I will hand a copy
25  to all attorneys in the room.

1       Can you identify what this document
2   is?
3       A.   Well, the schematic of what it is I've
4   seen before, you know, and it's -- obviously, the
5   time frames differ, but it's titled "Missouri State
6   Public Defender Cumulative Caseload Metrics."
7       Q.   So you've seen a report like this
8   before?
9       A.   Sure.
10      Q.   Okay.  And this shows, just to confirm
11  that I'm correct, a date range of 4/1/17 to 6/30/17?
12      A.   It does.
13      Q.   And it looks like -- and you can
14  correct me if I'm wrong -- that these cumulative
15  caseload metrics show a three-month window.
16      Is that common?
17      A.   That's what I interpret it to be.
18      Q.   Okay.  And can you see Area 7?
19      A.   I'm looking.
20      Q.   About halfway down, a little before
21  that.
22      A.   I see it now.
23      Q.   Okay.  And if you follow it over to
24  the almost second one it says percent of capacity.
25  And tell me if we're all reading the same column.  It

1   says 273.1 percent.
2       MS. SHIPMA:  No.
3       Q.   (BY MS. WILCOX):  Is that what we
4   think or am I reading the wrong one?  253.6 percent.
5       A.   Yeah, I believe my eyes are going over
6   to Rank 14, and it appeared to be percent of capacity
7   as you detail it, yeah.
8       Q.   Everybody agrees that that is the
9   correct one, 253.6 percent.
10      So if I understand this correctly,
11  that means that your office is over capacity at 253.6
12  percent?
13      A.   I think whoever loads these metrics,
14  that's their opinion, yes.
15      Q.   Okay.
16      A.   Sure feels like a lot more than that.
17      Q.   How long do you think your office has
18  been working above capacity?
19      A.   From memory, my honest recollection, I
20  believe Area 7, Liberty, has been over capacity for
21  as long as these metrics have been published, but I
22  don't know when that started, so I just know it's
23  been a lot of years.
24      Q.   Do you feel like you've been over
25  capacity the entire time you've been working in

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-14   Filed 02/09/18   Page 14 of 107

## Page 53

1  Area 7?
2      A.    You know, I thought you might ask when
3  things started to heat up, and I'm going to guess
4  around 2005.  Now, that's not a -- to be fair, I also
5  read portions of your petition, and it reminded me of
6  events, telltale events, many of which I didn't like
7  to think through again and remember, but if I'm going
8  to put a general calendar year on there, that's -- I
9  think that's as fair as any others.
10      Q.    And then you've been working above
11  capacity since 2005?
12      A.    I think the system has, but, you know,
13  for example, I don't know how -- I can't tell you
14  exactly -- have a personal opinion about the other
15  offices because I just -- other than what I believe,
16  but I don't work there.  I don't know what sort of
17  experience level they have.  I'll leave that to the
18  deference of those individual managers.
19      Q.    Yeah, we'll talk about your office.
20          So is it a fair summation of what you
21  said that the number of cases currently handled in
22  your office is not manageable?
23      A.    Oh, it's absolutely not manageable by
24  manageable in any definition of the word
25  "manageable."  And it's certainly not fair for the

## Page 54

1  person accused of a crime.
2      Q.    How do you monitor the caseload for
3  attorneys in your office --
4      A.    Not sure what you mean.
5      Q.    -- if you're able to?
6      A.    Well, first off, there's only so much
7  utility in monitoring it, right, because it's really,
8  as your petition indicates, it's just about rationing
9  the justice.  We don't -- we don't ordinarily have a
10  way to tell -- to tell anyone, "We have enough, thank
11  you, you know, pass."  That's not an option.
12          So I'm cognizant of the relevant
13  experience level of the attorneys and try to have
14  some -- try to monitor the degree to which they're
15  likely to go into further hysteria if I give them
16  more things.  My goal every week is not to lose --
17  not to lose anyone, especially an attorney, I don't
18  want anyone to leave, support staff either, but in
19  particular anyone with a bar number.  So we take
20  extreme measures to try to make that goal.
21      Q.    Okay.  And we're going to touch on
22  recent events later, so I don't think we need to get
23  to that now.
24      A.    I understand.
25      Q.    But is there -- from what I

## Page 55

1  understand, the cases come in and they get assigned.
2  That's why everybody is above caseload.  Is that a
3  fair way to say that?  You're not turning away -- you
4  have not historically been turning away cases that
5  come into your office?
6      A.    As a general rule, well, I mean,
7  there's been a period with the public defender system
8  where that's been attempted, of course, your petition
9  mentioned that, but as a rule, no.
10      Q.    Okay.  Is there a way that an attorney
11  can raise a complaint about their caseload, or is it
12  informal?
13      A.    Of course, they can.  They can report
14  me to the bar.  They can report any of their
15  supervisors to the bar.  I think they could probably
16  report the judge to the bar, if you're just talking
17  about could they.  Now, whether or not they know
18  that, you know, I don't know if I knew that when I
19  was a year or two out of law school.  Probably
20  didn't.
21      Q.    Is there any mechanism within your
22  office that when you hire people they're told, you
23  know, if you have a grievance or complaint about your
24  work experience or your caseload, here's the process
25  of how to make that known?

## Page 56

1      A.    When they're hired?  No.  I just give
2  them unadulterated warning that the caseload is
3  beyond belief, and it's not fair to the clients and
4  it's not fair to the attorneys and it's not a 40-hour
5  workweek.  I don't want them coming in and then
6  leaving because that's a disservice to the clients
7  that they represent that I assign to them, a further
8  disservice than already exists.
9      Q.    And with the caveat that we're going
10  to talk about recent events, your letter, later, if
11  an attorney -- and maybe this has never happened, but
12  if they come to you and they say -- I am guessing
13  this has happened -- "I can't manage my caseload.  I
14  have all these cases.  I can't do it," what can be
15  done?  What do you do in that situation if that's
16  happened?
17      A.    Oh, it's definitely happened.
18      Q.    Can you give an example of how that
19  plays out?
20      A.    Well, sometimes they resign.
21  Sometimes they resign shortly after that.  Sometimes
22  they resign in that same meeting.  Sometimes,
23  depending on what the -- what my ability is able to
24  do, sometimes I'll say let's look at your caseload
25  see if I can give you any relief.  It's really -- it

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

Page 57

1    is just -- it's not any relief at all except to that
2    one particular attorney, so there's only so many
3    things we can do with that, assuming that everyone
4    else is overburdened, which is always the case when
5    you consider their experience level.
6         Q.    And if you're giving relief to one
7    attorney, that burden is going to fall on another
8    attorney; is that right?
9         A.    It depends on what kind of relief it
10   is.  It may be something -- it may be more
11   complicated than take these 10 cases and give them to
12   that attorney.  It may be shifting of a docket so
13   that it opens up a pocket of time for them to do jail
14   visits or something like that.
15              I usually -- I like to -- I tell the
16   attorney, "I'm not necessarily going to be able to do
17   it, but what do you think might help you the most?"
18   And they have -- sometimes they don't have an idea;
19   sometimes they do.  I know that in terms of
20   retention, it's probably going to do -- I'm going to
21   try to -- if it's possible for me to do what they
22   think is best, I'm going to try to do that if it's
23   doable.  It depends if it's doable.  I might just
24   lose the lawyer.
25         Q.    How often do lawyers in your office

Page 58

1    raise concerns about their caseloads?
2         A.    Well, they're a pretty resilient
3    group.  I mean, if they don't have a sense of humor,
4    they don't work for us.  All the time.  But, I mean,
5    you know, it's not woe is me, it's woe is the client.
6         Q.    Uh-huh.  But -- so it's fair to say
7    that everyone has too many cases --
8         A.    Yes.
9         Q.    -- your office?
10        A.    Yes.
11        Q.    Everyone is aware of that all the
12   time?
13        A.    I think that's accurate.
14        Q.    Is your personal caseload now higher
15   than at any point since you've been district
16   defender?
17        A.    I believe it is.
18        Q.    And would you agree that the caseloads
19   in your office by other attorneys are higher now than
20   at any other point that you've been district defender
21   or that you've been at MSPD?
22        A.    Well, I mean, we're talking about
23   different level of crisis, but each one of those is a
24   crisis, so I don't know how you want me to split
25   hairs with that.  And that with the caveat that we're

Page 59

1    going to talk about most recent events in the future,
2    I'm not comfortable about dealing with that in a
3    vacuum.
4         Q.    Okay.  Then we'll just touch on it
5    again when we get to that.
6              We already talked about the discretion
7    you have in your office kind of generally.  Do you
8    have discretion setting policies in the office?
9         A.    Somewhat, sure.
10        Q.    Okay.  What kinds of policies do you
11   set as the district defender?
12        A.    I mean, it could be anything in terms
13   of, you know, where the paper cutter -- what room
14   that goes in, where the copier is.  These are
15   high-level command decisions I make.  Can also be,
16   for example, investigators are not assigned tasks
17   without using the action item through the software.
18   If there's a measure, and there is, a mechanism by
19   which you call in sick or seek annual leave, you
20   know, that's a policy --
21        Q.    That you set in your office?
22        A.    Yes.
23        Q.    Yeah.  But, like, the amount of leave,
24   those policies are set by MSPD?
25        A.    The amount of leave certainly is,

Page 60

1    yeah.  That's through the public defender system.
2         Q.    All right.  I'm going to move on.
3    Now, we're going to talk more about how the court
4    system itself works.
5         A.    Okay.
6         Q.    So starting with initial hearings.
7    Describe to me or explain what happens after an
8    indigent is arrested, typically.  And what I'm going
9    to get to is at what point are they first brought
10   before a judge?
11        A.    As I understand it, there's an initial
12   arraignment before a judge.  I don't know if that's
13   necessarily -- I have no reason to think that's
14   necessarily always in person, but probably very often
15   through video presentment, and initial bond is set.
16        Q.    So the initial arraignment, the judge
17   goes over the charges with them?
18        A.    That's my understanding.
19        Q.    Okay.  And you just said that's when
20   bail or bond is set, at that hearing?
21        A.    That's my understanding.
22        Q.    Is there an attorney present at that
23   hearing from your office with the defendant, or have
24   they not yet applied?
25        A.    If they're doing video arraignments in

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 61

1  the court, we may be present in the courtroom. We're
2  not involved in that defendant -- in that accused
3  case.
4      Q.   That person has not yet applied for
5  your services?
6      A.   I don't think they've been told they
7  can apply. I mean, I'm assuming it's pretty fresh,
8  in terms of the arrest.
9      Q.   Okay. And is the judge who normally
10  does an arraignment the same judge who sees the case
11  through to the end?
12      A.   I have no reason to think that that
13  consistency applies, especially in a jurisdiction
14  where there are many judges.
15      Q.   Does your jurisdiction have associate
16  circuit courts and circuit courts?
17      A.   Both Platte and Clay does, and so does
18  Clinton.
19      Q.   Correct me if I'm wrong about this.
20  Sometimes is a case assigned to an associate circuit
21  judge, and then it will be transferred over at some
22  point to a circuit judge, depending on decisions that
23  are made about how that case is going to move
24  forward?
25      A.   If it's a felony, it could start in an

## Page 62

1  associate or circuit.
2      Q.   Okay.
3      A.   If it's a misdemeanor, it will begin
4  and conclude in associate.
5      Q.   So bail is set at this initial hearing
6  when an indigent defendant is not represented because
7  they have not filled out an application?
8      A.   I assume that is true, even if they're
9  not indigent.
10      Q.   Okay. The bail is always set at the
11  first hearing. Can a bail not be changed after that
12  point, and how is that done?
13      A.   Through a pleading, oral or written
14  bond modification effort.
15      Q.   In your area, is it difficult to have
16  bail reduced after it's been initially set?
17      A.   I mean, it happens. I mean, if you
18  back up a minute, I think most of the bond amounts
19  are unreasonable, by definition, so I don't know -- I
20  don't know how much the timing affects that, is what
21  I'm saying.
22      Q.   Is the prosecution involved in the
23  initial bail setting or bond amount?
24      A.   I don't know if they're in the room.
25  Again, if they're in the room, they may be -- of

## Page 63

1  course, if they're going to a judge with a warrant,
2  that sort of thing, they may be -- they may have that
3  exchange outside the courtroom, maybe. If -- I don't
4  know if they're always there.
5      Q.   Okay.
6      A.   Yeah.
7      Q.   Is there a certain point in a case
8  when a defendant can move to dismiss charges against
9  him or where they would have to do that?
10      A.   Many of them think that that's such a
11  motion.
12      Q.   And it is not, is that what you're
13  saying?
14      A.   It would be a rare motion where that
15  would be filed. There may be strategic reasons to do
16  that.
17      Q.   Is there a certain point in the case
18  putting aside that maybe you haven't gotten an offer
19  yet, which would preclude this, but when a defendant
20  can plead guilty? Is there any time that's too early
21  for a defendant to plead guilty or too late in the
22  case? I mean, I'm sure you see it up until trial
23  they can plead.
24      A.   Well, let me try to explain. I
25  think -- you know, we've seen -- I've witnessed

## Page 64

1  before where people are being initially arraigned,
2  and the person accused, perhaps before the judge has
3  warned them that they have the right to remain
4  silent, they have the right to an attorney, will
5  blurt out something about -- and it could probably be
6  summarized about how sorry they are and how they want
7  to plead guilty. So I suppose, technically, that's
8  what they've done without counsel, without sufficient
9  early warning by the judiciary, but I don't think
10  that's really your question.
11      Q.   Well, it is, kind of. Have you seen
12  that happen where they've pled guilty that early?
13      A.   Well, you see -- no, they don't plead
14  guilty that way.
15      Q.   Okay.
16      A.   The judge will say, "I'm going to
17  enter a plea of not guilty for you."
18      Q.   Okay.
19      A.   But, you know, the problem is they
20  would have blurted something out.
21      Q.   Are there any defenses, in your
22  experience, that have to be raised at a certain time,
23  or they could be waived?
24      A.   Boy, that's a loaded question. I'm
25  sure you'll come to it later. Well, waived

16 (Pages 61 to 64)

ALARIS LITIGATION SERVICES
www.alaris.us    Phone: 1.800.280.3376    Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-14   Filed 02/09/18   Page 17 of 107

## Page 65

1  procedurally or waived because they're not
2  practically available anymore?
3      For example, waived procedurally,
4  unless we miss a time limit, that's probably not
5  going to happen, but waived from a practical
6  standpoint, you know, a case gets -- a case gets
7  stale, it takes too long to get a lawyer, it takes
8  too long to do the investigation, you lose any real
9  chance of getting any kind of alibi defense, memories
10  fade. And then years later you're in a courtroom,
11  and the prosecutor says, "So this is the first time
12  you've told anybody this."
13      And, frankly, it's never the first
14  time they've told them that, or not likely, but the
15  prosecutor attempts to characterize it as this long,
16  protracted delay, and sometimes it's due to no one's
17  fault except the criminal justice system and the lack
18  of funding. This is assuming the lawyer is not
19  retained privately and you, know, and has a caseload
20  ratio of one to one.
21      Q.  No. All these questions are assuming
22  that these people are in your office. So it is
23  possible that a defense -- so let's not call it
24  waived, but an opportunity could be missed to raise
25  something because of workload because something just

## Page 66

1  isn't done?
2      A.  Of course, yeah, absolutely. Yeah,
3  absolutely. It could be overlooked because someone
4  is untrained, could be overlooked because someone is
5  too weary because they're overworked. It could be
6  because there's not a sufficient communication link
7  set up so that the client really understands what it
8  is you're discussing. Yeah, could be a lot of
9  reasons.
10      Q.  So if I understand you correctly, the
11  defendant may not bring something up, and if memory
12  fades, it's hard to go back and get that information,
13  even if the attorney can find the time to try to get
14  the information?
15      A.  That's one scenario, sure.
16      Q.  Okay.
17      A.  If it sits on an attorney's shelf
18  long enough, too long, before -- before it comes to
19  the top of the pile or because it's going to go to
20  court next week for pretrial motions or whatever,
21  sure, all those things could be. It's hard to
22  resuscitate old evidence, is what I'm trying to
23  say --
24      Q.  Yeah.
25      A.  -- old testimony.

## Page 67

1      Q.  And at what point does the defendant
2  waive any claim, like, a constitutional rights
3  violation claim? Has that happened?
4      A.  You have to be more specific. I'm not
5  sure.
6      Q.  Why don't I tell you my understanding
7  of it.
8      A.  Sure.
9      Q.  And then we'll see if you agree with
10  that.
11      So from my experience, my
12  understanding is that -- and I've seen appellate
13  cases that say, you know, you have to raise this at
14  the earliest possible time, and if it wasn't raised
15  at the earliest possible time, it's waived. Is that
16  a fair understanding of how --
17      A.  That's more of an appellate scheme
18  than trial scheme, but, yes.
19      Q.  So if it's not raised by an attorney
20  in your office, it could be waived later?
21      A.  I mean, you're mixing apples and
22  oranges. If it's not raised in the motion for a new
23  trial, it won't be raised later in the appellate
24  sense, but I'm talking about in terms of pretrial
25  litigation. My head is usually in that realm, but,

## Page 68

1  you know, right to a speedy trial would be a good
2  example.
3      Q.  How often do your clients want you to
4  file a motion for a speedy trial?
5      A.  Pretty often.
6      Q.  And how often can you do that for
7  them?
8      A.  I tell them they don't have a right to
9  a speedy trial from a practical perspective in the
10  State of Missouri. And I always try to tell them,
11  depending if they're still listening, what the case
12  law -- how the case law talks about that because
13  there's really two elements of bad news when it comes
14  to that. The case law is such that, if I'm recalling
15  accurately, it can go as long as 16, 17 months, an
16  insane amount of time, and the courts have found that
17  not to be a violation of a speedy trial. But from a
18  practical standpoint, when you're represented by an
19  attorney whose workload is far, far too excessive,
20  you don't get a right to speedy anything.
21      Q.  How do your clients take that when you
22  have that conversation with them?
23      A.  Well, I try not to have it just like
24  that. I try to explain to them that they can have a
25  speedy trial, but all that means is they'll have

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

1 probably an underprepared or totally unprepared
2 counsel, and I try -- in each and every instance, try
3 to urge them that's probably not the right thing.
4 You know, quick result is not always the result
5 you're going to want. And some listen, and many,
6 many clients file pro se motions for a speedy trial.
7 　　　Q. Even while they're represented, right?
8 　　　A. Of course.
9 　　　Q. You said defendants in your area often
10 attend hearing by video; is that correct?
11 　　　A. Sometimes.
12 　　　Q. Okay.
13 　　　A. It depends. Probably more Clinton
14 County than Platte or Clay.
15 　　　Q. So they're in a jail facility, and
16 they just appear on the video. Is there an attorney
17 present in the courtroom, usually, on their behalf?
18 　　　A. That's why I don't prefer the video --
19 Polycom is what they call it, but the State of
20 Missouri is starting to do it because it saves money,
21 like that should be the guidepost.
22 　　　But, for example, in Clinton County --
23 I don't want you to get the belief that this happens
24 all the time, but it's not unusual for in Clinton
25 County for there to be -- 43rd Judicial Circuit --

1 for there to be a Polycom where the client is in
2 custody in a jail facility, sometimes a prison, and
3 they're brought, ushered, just like I am, before a
4 camera here, and then their case is called, and
5 there's some exchange. Now, it may be something as
6 simple -- it could be something as simple as saying
7 your attorney has requested a new docket call, we're
8 going to call you on the next law day, or it may be
9 something more complicated like the guilty plea
10 itself or, Lord forbid, the sentencing, so...
11 　　　Q. That has happened on video, though?
12 　　　A. I think so.
13 　　　Q. Even when someone is represented by
14 someone in your office?
15 　　　A. I think so.
16 　　　Q. Who makes that choice of whether it's
17 going to be video or in person?
18 　　　A. That word choice is a loaded question.
19 　　　Q. Who decides?
20 　　　A. Again, a loaded question. The judge
21 may encourage that, and then I think, I want to say
22 that it's endorsed so much by the court system, I
23 think there's an OSCA form that waives -- official
24 form that waives presence. I don't know the number,
25 of course, and it's all in the name of saving funding

1 and travel and mileage and everything else.
2 　　　Q. That the state pays for. So the state
3 is trying to save money because they --
4 　　　A. State court system. I don't know who
5 is saving money. I frankly don't care. I think it's
6 wrong, but, yeah.
7 　　　Q. So if you're an attorney on a case,
8 and there's going to be a video hearing, does that --
9 do they run that by you first, or do you sometimes
10 show up in court, and find out that your client is
11 not coming in person?
12 　　　A. Well, if you're familiar with the
13 jurisdiction, you may know that's probably what's
14 coming. It may be called a Polycom day, and then you
15 figure out that's what -- that's all that's going to
16 happen that day. They may interrupt court
17 proceedings to bring in the Polycom unit and have
18 that happen. Sometimes I guess it could be a
19 surprise. Sometimes you know. It's a rare instance
20 where it's really a good idea, I think, but...
21 　　　Q. Yeah. But sometimes -- I mean, if I'm
22 not familiar with the jurisdiction, and I have a
23 client who is in custody, I might show up, as the
24 defense attorney, well, thinking my client --
25 obviously, I can talk to them in person because

1 they're going to come here, and we can have a little
2 conversation before the hearing.
3 　　　A. Right.
4 　　　Q. Then I might show you up, and that
5 might not be the case, but I had no way of knowing
6 that ahead of time?
7 　　　A. Right. I think that does happen.
8 　　　Q. Okay. Because you're saying in your
9 office, you might know, but that's based on
10 experience, knowing the judges, knowing the
11 jurisdiction?
12 　　　A. Right. Once you're shocked by it the
13 first time, if someone hasn't told you about it,
14 yeah.
15 　　　Q. Not because you're agreeing to it
16 ahead of time by some formal mechanism?
17 　　　A. Well, there may be. I mean, again,
18 you're encouraged to agree to it, so -- and there may
19 be an outcome determinative reason why you would.
20 　　　Q. Is it hearing by hearing decided for a
21 person, or do you maybe agree all pretrial hearings
22 could be by video?
23 　　　A. If a judge encourages you to proceed
24 in that matter. You might decide whether or not
25 you're going to keep that judge, or if you have an

18 (Pages 69 to 72)

ALARIS LITIGATION SERVICES
www.alaris.us　　　Phone: 1.800.280.3376　　　Fax: 314.644.1334
Case 2:17-cv-04057-NKL　　Document 153-14　　Filed 02/09/18　　Page 19 of 107

## Page 73

1  alternative.
2      Q.   But they might want --
3      A.   You're probably -- probably going to
4  pick and choose between clients, probably.
5      Q.   But a judge might want every hearing
6  up until trial to be by video?
7      A.   Conceivably.
8      Q.   Okay.  Can you just describe for me
9  what a preliminary hearing is and when that might
10 happen?
11     A.   Sure.  In the instances where your
12 client is charged with one or more felonies, you have
13 the right to a preliminary hearing, and it's -- I
14 equate it with a probable cause hearing, explaining
15 to clients that not all the evidence has to be in or
16 is likely to be presented, but just a portion enough
17 to convince a judge that some felony has occurred in
18 some connection, linking you to one or more crimes.
19 And that's the -- in a nutshell, what a preliminary
20 hearing is.
21     Q.   How often are they held in your --
22 where you practice?
23     A.   I don't know that the question makes
24 sense.  It's a -- what we have -- well, I'll give
25 you -- our three primary counties, Clay County has a

## Page 74

1  grand jury, so when a county has a grand jury, they
2  never have to allow a client to have a preliminary
3  hearing.  And that confuses clients because you tell
4  them they have the right, the judges tell them they
5  have a right, and then it's swept away with a grand
6  jury so Clay County has a sitting grand jury, so you
7  could conceivably never -- could conceivably never
8  have a preliminary hearing.  Sometimes they allow it,
9  sometimes they decide to agree.  There's
10 reason even -- some reasons why a prosecutor might be
11 okay with it, or it might be their idea.
12         Platte County, most recently, has had
13 their grand jury stripped away from them.
14 Historically they didn't have one all the time, and
15 then most recently they were allowed to have one.  I
16 think that was found to -- I don't know why, I don't
17 know why technically it was taken away, but I'm just
18 glad it was because now -- because some jurisdictions
19 abuse it.  So if someone is charged with a felony in
20 Platte County, they get to have a preliminary hearing
21 unless it's waived.
22     Q.   What might a circumstance be where it
23 would be waived?
24     A.   There are a lot of different reasons
25 you would waive a preliminary hearing, some of which

## Page 75

1  clients understand sometimes.  Sometimes they get it,
2  sometimes they don't.  Sometimes they're overly
3  confident that a witness won't show up, and the case
4  will be dismissed, but without revealing too much
5  strategy, a preliminary hearing allows an alleged
6  victim another opportunity to see your client and
7  perhaps better be able to describe physical features,
8  any conceivable physical feature.
9          Additionally, the case law is such
10 that if a preliminary hearing is held, there's the
11 concern that later, down the road, if that witness is
12 unavailable under the legal terms unavailable, their
13 testimony would be allowed in front of your jury and,
14 really, at that point in time, you probably have not
15 had enough chance or certainly not much opportunity
16 to investigate the case or depose the alleged victim,
17 et cetera, and then that strong one-sided evidence
18 comes in in front of your jury.  So a lot of reasons
19 to waive, some reasons to have.  That is a
20 case-by-case basis.
21     Q.   Okay.  After your office is assigned,
22 so someone applies, they qualify, is assigned to your
23 office, does an attorney from your office attend
24 every hearing after they're deemed indigent?
25     A.   If you mean the same attorney, no.

## Page 76

1      Q.   Talk about what you mean with that.
2      A.   Okay.  For example, if I've got -- if
3  I've got Clay County cases assigned to half of our 12
4  attorneys, if that's the layout, then the attorney
5  assigned to a gentleman's case doesn't necessarily
6  mean that that attorney is going to be at every one
7  of their docket calls because they may be -- they may
8  be out sick, they may be sick, they may be on
9  approved leave, they may be conflicted from a
10 calendar perspective, they be somewhere else, they
11 could conceivably be in trial.  But there would be
12 some other assistant public defender, if not myself
13 or the co-manager, present for that proceeding, so
14 they wouldn't be without an attorney, but they might
15 likely be without the attorney that technically
16 represents them in the filing, in the pleading.
17     Q.   Okay.  Let's -- I think this next
18 question is going to be better with an example
19 because it involves how much you prepare for initial
20 hearings, and I'm guessing that varies, depending on
21 the kind of hearing you're showing up to.
22     A.   Sure.
23     Q.   That's fair, right?
24     A.   That's totally fair.
25     Q.   So let's say you have an early hearing

19 (Pages 73 to 76)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-14    Filed 02/09/18    Page 20 of 107

## Page 77

1  where you're going to seek to reduce bail.  How much
2  time would you have -- would you prepare for that
3  hearing?
4       A.   Well, it depends.  You know, the
5  question really is how much time you might wind up
6  preparing or choose to prepare or forced to prepare
7  because sometimes it's the client, you're shoulder to
8  shoulder, they want a bond hearing.  Sometimes,
9  depending on where you are, you may be in front of a
10  judge that you know is going to entertain that oral
11  bond motion.  You also may be, likewise, in front of
12  a judge you know is never going to entertain that
13  with that sort of warning notice.
14       Likewise, same thing with the opposing
15  prosecutor.  You may know that that jurisdiction is
16  never going to allow that sua sponte addressing a
17  bond.  Sometimes you look at the individual case and
18  see if it's a case that has an alleged victim.  If
19  they do, then, statutorily, frankly, the other side
20  is obligated to give them notice or see if they want
21  to attend, that sort of thing.  So there may be
22  obstacles created by statute that preclude the judge
23  and the prosecutor to take up that bond.  But you may
24  still say -- request of the judge to see if they
25  would be willing to take up bond, for a variety of

## Page 78

1  reasons, even though you may know they're not going
2  to.
3       Now, conversely, sometimes you have
4  witnesses that you're going to subpoena to a bond
5  hearing.  Those are the ones where you've had some
6  time to think.  Those are the ones where what you
7  have to say might make a difference or you hope might
8  make a difference.  Sometimes it makes zero
9  difference.  So it varies, but, quite honestly,
10  probably in the majority of our cases, we don't do
11  much except find out about the client's self-divulged
12  criminal history, which is not always accurate.
13  Sometimes through dishonesty, sometimes through
14  actually misunderstanding or not understanding that
15  that was a conviction or "I forgot about that, it was
16  so many years ago."  And sometimes that's honestly
17  their mistaken recollection.
18       So because of the workload, it's all
19  too often not very much preparation at all in terms
20  of the information that you would really like to
21  present, assuming the client had the type of criminal
22  history that you might find to be favorable for a
23  modification of bond, and assuming the client had
24  ties to the community, employment lined up,
25  transportation available for court, a lack of a

## Page 79

1  failure to appear to court appearances, that sort of
2  thing.  But you really need to know all that in order
3  to be well-armed, even if the investigation yields a
4  prediction that the bond is probably not going to be
5  touched.
6       Q.   When did you -- and maybe you need to
7  do this in two different answers -- but you and the
8  attorneys in your office typically first meet with a
9  client?
10       A.   That probably varies.  Some attorneys
11  are better at it than others, and not better because
12  they're more experienced or capable or have a better
13  car.  It may be because of what jurisdictions they
14  represent.  And this -- usually, I'm talking about
15  people who are in custody.
16       Q.   Uh-huh.
17       A.   You know, people who are fortunate
18  enough to be free, either on bond or released on
19  their own recognizance, we encourage to make an
20  appointment, you know, see us as early as you like,
21  assuming our calendar is available.  And sometimes
22  that can be a challenge.  But in terms of custody
23  clients, we don't see them soon enough.  I mean, the
24  public defender guidelines have a theoretical mandate
25  for how quickly to see them.  Sometimes -- I mean, in

## Page 80

1  many instances, that's not possible.
2       Q.   What is that theoretical mandate?
3       A.   I think it's within seven days of
4  being assigned the case.
5       Q.   What --
6       A.   I think that's the way it's phrased.
7       Q.   What percentage -- this is going to be
8  an approximate percentage, but of your -- the current
9  clients that your office represents are in custody
10  right now?
11       A.   I'm going to say I don't think 75
12  percent would be a gross misrepresentation.  I think
13  that's probably about true.  It could be higher.
14       Q.   So how often will an attorney meet
15  with a client within seven days of getting a case?
16       A.   I'm going to suppose probably not very
17  often.
18       Q.   Okay.  Does client contact, initial
19  client contact, ever happen at the first court
20  appearance that an attorney from your office attends?
21       A.   It could, I mean, it probably would
22  be -- might be more times than not by accident, if
23  you're going in and the judge isn't on the bench yet,
24  you're going and you're talking to the folks in
25  custody, and you're trying to figure out if they've

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-14    Filed 02/09/18    Page 21 of 107

## Page 81

1  applied or "Are you Alfred?" or whatever.  And you
2  may just have some human contact with them, and then
3  that happens if there's time, if the court hasn't
4  come out on the bench.
5       Q.    Do you think that you and the
6  attorneys in your office meet with the clients
7  enough?
8       A.    No. I mean, I know I don't, and I'm
9  not faulting my attorneys that I supervise.  You
10 know, it's kind of -- it's hard to blame them when
11 I'm giving them too much to do.
12      Q.    Right.  In a perfect world, how often
13 would you want to meet with a client?
14      A.    Depends on what they're charged with.
15      Q.    Felony.
16      A.    Depends on what felony, too.  Depends
17 on the client, too, regardless of their charge
18 because some need -- some need more assistance and
19 continuation of communication than others, so just
20 depends.
21      Q.    Is client contact most often done in
22 person or do you sometimes have over-the-phone with
23 clients in custody?
24      A.    Clients in custody routinely call all
25 the time that they are allowed to call from the jail

## Page 82

1  facilities.  You know, there's lockdowns and silly
2  rules all the time.  I could go on and on about that.
3  But we have both types of communications, you know,
4  clients that are able to call during business hours
5  and jail visits.
6       Q.    Are the jail visits and the phone
7  calls that you have, are they confidential, to your
8  knowledge, with all your clients?
9       A.    Well, jail settings are certainly
10 confidential if you visit them in the attorney-client
11 area, I mean, where there wouldn't be anywhere else
12 to visit them.  You don't use the -- one facility has
13 a family phone visitation.  You don't use that
14 because they record it, so you can't visit in some of
15 the other rooms because they're recorded
16 surreptitiously, but -- and in terms of the clients
17 calling from the jail to our -- those are understood
18 to be confidential and not recorded.
19      Q.    Okay.  Is it common for your clients
20 in custody to remain in custody until their case is
21 resolved either by a plea or trial?
22      A.    Far, far too often, yes.  And that's
23 assuming they're going to get out of custody, yes,
24 but out of the custody of the jail, yeah.
25      Q.    Right.  Do you feel like you have the

## Page 83

1  time and resources to communicate with your clients
2  in a manner that each of your cases requires?
3       A.    Of course not.
4       Q.    Do you have any cases where you feel
5  like you can communicate with them in the amount and
6  time that the case requires?
7       A.    I have clients who may call a lot,
8  purely by accident, you know, that I wind up talking
9  to them with some frequency --
10      Q.    Okay.
11      A.    -- but other than that, no.
12      Q.    And do you think that's the same for
13 the attorneys in your office?
14      A.    I would presume.  I'd have to be --
15 I'm forced to presume it would be the same because of
16 the workload they have, and commitments.
17      Q.    Without getting into specifics, if you
18 can and, obviously, not compromising attorney-client
19 privilege, can you think of a time when your
20 representation of a client was hampered by the lack
21 of time you had to communicate, if you could give an
22 example, or for someone in your office?
23      A.    Sure, I could probably give an example
24 that we try to use as a learning tool.  Former
25 assistant public defender trying, quite honestly, to

## Page 84

1  do the best job that they could, used a -- a client
2  in custody, used a communication method because the
3  jail visitation rooms were tied up, because that's
4  one of the many problems with having clients in
5  custody is because they don't have sufficient
6  visitation hours or facilities to visit with your
7  attorney.  And it may have been -- it may have been
8  during a trial or it may have been right shortly
9  before some court proceeding, but that attorney, out
10 of a sense of emergency, there was some urgency for
11 communication, communicated with a client through the
12 family visitation phone thing, and that was recorded,
13 and I don't know if there was a whole lot of
14 forethought about that.  There clearly wasn't.  But I
15 think the prosecutor wound up mentioning it or
16 bringing it up in some fashion.  Now, whether or not
17 it impacted the resolution of that case, I don't
18 know, but it was a learning experience for everyone.
19      Q.    If you can -- I know that these are
20 hard approximations, but in the percentage of your
21 cases, if I give kind of a list of things that you
22 feel like you're able to do, could you tell me, like,
23 what percentage of cases, so the first example is to
24 interview the victim and other witnesses?
25      A.    Are you talking about me, personally?

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-14    Filed 02/09/18    Page 22 of 107

## Page 85

Q. Yeah. A lot of these questions --

A. Sure.

Q. -- are you, personally --

A. Okay.

Q. -- and then the attorneys in your office.

A. Sure. You're going to find some similarity in the responses. There's not enough time to do that, so, no, it doesn't get done in a routine fashion.

Q. How about visiting a crime scene?

A. Same answer.

Q. And you're saying the same answer for you and the attorneys in your office?

A. Yeah. I have no reason to think it's different, I mean, on an overall basis. Obviously, if one of us -- me or the attorneys I supervise are targeting a case while everyone else, you know, waits in the wind, then that person is really getting first class service for that period of time when it finally comes to the top of the pile.

Q. How often does that happen?

A. The top of the pile? Not very often because there's only one top.

Q. So some cases will never make it to

## Page 86

the top unless -- or will they if there is an important hearing then, obviously, that will rise it to the top?

A. Well, I mean, we have clients every day that plead guilty to -- plead guilty to things that they didn't do because they see the workload and the lag.

Now, they may have been convicted of those things they didn't do because there may be evidence sufficient or there may not be. You just don't know until you try it to a jury, right? And sometimes they plead guilty in an effort -- we call it pleading to daylight when they're kept unfairly on too high a bond that nobody can make, and then the probation is offered, dangled outside of their cell, then they're probably going to yield to the pressure and say yeah.

Q. So they're pleading guilty to get out of jail?

A. Every day.

Q. Okay. How often, if at all, are you able to identify witnesses not mentioned in a police report?

A. Well, our investigators do a good job of doing that on the cases, you know, if it's

## Page 87

possible, right, talking about a neighborhood canvas, going and interviewing a clerk on the alternate shift. I mean, in terms of how often we're able to do that, I think probably not very often because we're not -- the caseload is such that we're not having the investigators do that sort of thing.

Q. Okay. Same question for investigate an alibi.

A. Well, that's an even more essential question because the timing of the alibi is so critical. You're going to lose alibi witnesses and you're going to lose credibility of the alibi witnesses if you don't -- because you have a prosecutor that will cross-examine them in front of the jury, this is the first time you mentioned that. And what they don't say is "Because your attorney had 400 cases" or "because people kept quitting because of the low pay and high workload" or, most recently, "the fear of being disbarred."

Q. How often can you investigate police conduct?

A. Well, that's probably only going to be done -- most likely going to be done through deposition, so that's the obstacle we face with being able to examine the file enough to know what pressure

## Page 88

points we're going to make on that file and who to investigate and the timing of the depositions of the officers and the scene visits and witnesses interviews or other witness depositions so it all falls into the same category of not enough time, too much stuff to do.

Q. Okay. Are there -- are there things in cases that you see repeatedly coming up that you wish you had time to do that, frequently, you and attorneys in your office don't have time, like, the majority of cases, you wish you could take depositions, and you can't, or you wish you could find an expert, and you can't? Are there certain things that pop up more frequently as things that you just don't have the time or resources to do?

A. Sure. Most things, but, I mean, I could think of -- I would like to be able to -- of the -- and we try to do this, but then we get interrupted because life happens or, more accurately, work happens.

If you have a catalog of depositions of law enforcement officers from a certain jurisdiction, in a perfect world, we would have a brief bank of those depositions so that we would be able to know the things that they did. I can think

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 89

1  of one particular case where the dash cam video,
2  snapshot of the dash cam video, I believe, shows --
3  and it was not my case.  It was one of the
4  investigators that uncovered it as a result of a
5  request from the assigned attorney -- where the car
6  stop was conducted because the vanity light on the
7  rear license plate was out.
8       Well, it wasn't out.  The dash cam
9  showed that.  Had that attorney not looked at that --
10  and we have lots of cases like that.  Well, lots of
11  cases where the vanity light is out, too, and lots of
12  cases where the police officer doesn't -- is trained,
13  I believe, or comes to the conclusion maybe they
14  shouldn't turn that dash cam on yet so the defense
15  counsel will never be able to see that it was lit.
16       So if you're going to negotiate it
17  with the prosecutor, that's a powerful tool.  If
18  you're going to file a motion to suppress and try to
19  seek judicial intervention, that's a powerful tool.
20  If you've got a cop that has done that, what I would
21  like to do, but never would have enough time to do,
22  would be to be able to -- in a perfect world, I would
23  catalog that, I would make sure my entire office knew
24  about it, and I would make sure surrounding offices
25  knew about it that deal, from a conflict, sometimes

## Page 90

1  with that officer because that's plain and simple
2  untruthful testimony and a bad stop.
3       Q.   So you're saying that in a perfect
4  world, you would like to do that, but in your current
5  world, you're not able to do that?
6       A.   Not even come close.  I'm not even
7  sure I've told enough people about that.
8       Q.   Okay.  How often do you think, if it's
9  ever happened that attorneys in your office have the
10  time to work up a case in the manner that the case
11  requires and that that attorney would want to work up
12  that case for a trial?
13       A.   I think they all want to to the extent
14  they have the experience to know what the next steps
15  would be.  Part of the obstacle will be the
16  inability -- because of the workload, the inability
17  to mentor them as to what to do.  A lot of them have
18  great ideas themselves, but they may not know how
19  to put those -- procedurally, how to make that
20  happen.  But, you know, this doesn't mean every one
21  of our clients gets poor representation.  If you pick
22  somebody out, and you ignore everybody else, that
23  person is going to get class A representation.  But
24  it doesn't work like that because you have dockets
25  and you have your inbox with more cases coming in.

## Page 91

1  And even though that attorney may make the effort to
2  work on that client's file every weekend, from a
3  practical standpoint, that just -- that's not a
4  workable solution, and it's not fair to the other --
5  all the other remaining clients.
6       Q.   So it's fair to say that certain
7  things, the things we've been talking about, visiting
8  the crime scene, identifying witnesses, the alibi,
9  investigating police conduct, are not done because of
10  time management, not because they're not necessary
11  for the trial?  The decision is made that there might
12  be not time to do it, or resources, even though an
13  attorney believes that, in a perfect world, it should
14  be done?
15       A.   Right.  I agree with that in a general
16  sense.  Now, part of the problem is if you haven't
17  visited the scene, you don't know, really, what you
18  might have missed, so I may characterize that as
19  something I don't -- now, what I can do is conclude
20  they have sufficient amount of evidence no matter
21  what I find at that scene.  I could conclude that, so
22  I'm probably not going to visit that scene.  But if
23  the scene is important, the scene is important enough
24  to be visited, and it's not getting done.
25       Q.   Okay.  Does the -- in your area, is

## Page 92

1  the discovery that the state is required to disclose
2  frequently disclosed when it should be?
3       A.   Oh, boy.  Short answer, no.  It's a
4  slow drip, and it's not timely.  Let's just say it
5  that way.  It's not timely, it's not complete and
6  it's -- if it weren't about people's lives, it would
7  be comical.
8       Q.   Does it depend on the type of case or
9  is it routinely the same across the board?
10       A.   To a certain extent, it depends on the
11  type of case.
12       Q.   Do you have an example of what
13  you're -- without getting into too many specifics?
14       A.   Sure, right.  With the experience that
15  you develop, you probably have a feeling for what's
16  likely to be being held back, what testing hasn't
17  been done, what testing isn't going to be purposely
18  done until later.  And in some cases you know that
19  that's never going to be within the realm of the
20  evidence, so it's not coming now, it's not coming
21  later, they're not withholding it.  It may be slow,
22  but that just may be because of their insufficiency,
23  not purposeful.
24       Q.   How often do you, in your cases,
25  request discovery from the state, make formal

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 93

1  discovery requests?
2      A.    In every case from the speeding ticket
3  to serious crimes.
4      Q.    And is that the same for the attorneys
5  in your office?
6      A.    Yes.
7      Q.    How frequently do you file
8  discovery-related motions?
9      A.    Can you be more specific?
10     Q.    Yeah.  Do you ever have to -- you
11  know, like a motion to compel to seek something
12  you've asked for that you're not getting?
13     A.    We do it with some frequency.  I mean,
14  it depends on the jurisdiction and, really, the
15  opposing prosecutor.  Part of what you may want is
16  you're more -- you're more interested in getting the
17  information because you may still need to negotiate
18  the file, so you may not want to put it in quite as
19  an adversarial position as you might.  Just depends
20  on when you're going to pull the trigger.
21     Q.    So kind of an overall question.  In
22  your opinion, do you and the attorneys in your office
23  have the time and resources to obtain and review
24  discovery in a manner that each case requires?
25     A.    No.  Not in a timely manner, no.  Not

## Page 94

1  in a complete manner, no.
2      Q.    And do you have -- can you provide any
3  examples of when the inability to do this, because of
4  time and resources, has hampered a case for you or
5  someone else in your office?
6      A.    I can probably give you a general
7  example which has happened, and will happen from time
8  to time.  Because of the -- if you have too few
9  people, too few resources, you know, ideally what you
10  want to do is inventory the information and when you
11  get discovery in case there's a discovery dispute
12  down the road.  And sometimes that's a pretty
13  challenging thing to do because it comes in spurts,
14  and sometimes it comes in through duplication
15  efforts.  So you'll get -- you know, I'll have
16  attorneys all the time that say, "Look, I got 50 more
17  pages, but only three pages were new."  Happens a lot
18  and, quite honestly, it's just easier for the other
19  side to do it that way.  I mean, it takes time on
20  their end and personnel on their side to keep track
21  of what they're going to give, but if they know they
22  can just dump everything on you, and it's going to
23  work, and the case law is going to succumb to that
24  discovery violation, then that's the way they're
25  going to do it.  They're not going to change.

## Page 95

1      But in a short sense that the timely
2  inventorying of discovery, when we get it and what we
3  get, is something I wish we could do so then we could
4  actually challenge it when it comes up new during a
5  trial or shortly before a trial.  But it's got to be
6  thorough or the judge is never going to find --
7  you're not going to have any credible way to explain
8  that and prove it.
9      Q.    Okay.  Back to expert witnesses.  We
10  talked about it briefly, but how often do you use
11  experts in your office, you and the attorneys?
12     A.    From time to time.  I don't know
13  how -- not every case, obviously, needs it, but the
14  key is they have to have -- the attorney has to get
15  into the file early enough to know, and that means
16  reading the discovery a couple of times to be able to
17  figure out what they need, maybe to confer with a
18  more experienced attorney, maybe to question would
19  this help, would this toxicologist help, would this
20  firearms expert help?  If you get a file with DNA
21  doesn't mean you need a DNA expert.  If you get a
22  file with fingerprints, it doesn't mean you're
23  necessarily going to need a fingerprint expert.  It
24  depends.  And needing them, sometimes you're just
25  consulting with them.  You may never call them at

## Page 96

1  trial.  But it is a way to educate the defense team
2  if it becomes an integral part of the state's theory
3  of prosecution.  You know, so the key is we're not
4  early enough into the discovery in order to prepare
5  the next step which would include, among many things,
6  the expert.
7      Q.    So because of time management, there
8  are cases where you might want to gather the
9  information, but just can't?
10     A.    Just hasn't been reviewed sufficiently
11  enough in advance of -- early enough in the case, no.
12     Q.    Are there cases where an attorney
13  thinks an expert might be helpful, but then doesn't
14  have time to actually engage in consulting an expert?
15     A.    I really wouldn't know that, the
16  answer to that.
17     Q.    Okay.
18     A.    I mean, because by the time I would
19  have learned of that, I would have been talking
20  through whether or not they need one with them.
21     Q.    In your current caseload, are you
22  using experts in any of your cases?
23     A.    Any?
24     Q.    You don't have to tell me, like, what
25  the cases are.

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

Page 97

1    A.    Sure, sure.
2    Q.    How many do you think?
3    A.    Understand there's some files I
4    haven't touched, so none in those, but I may come
5    to -- and one we're going to be seeking funds for
6    soon, so it just -- just depends.  I mean, the key is
7    until you digest the contents of the file, you don't
8    have any idea what you might need.  And it's that
9    lack of time to digest the contents of the file
10   that's key to the -- that's the key to the
11   disadvantage that our clients are at.
12   Q.    Okay.  And when you do engage an
13   expert, do you believe that you and the attorneys in
14   your office, once that expert has been engaged, have
15   the time and resources necessary to consult an expert
16   in the manner that the case requires?
17   A.    Well, I mean, there's always the
18   challenge of coordinating calendars with experts.
19   They're really busy.  They may be doing a lot of
20   other things.  And then trying to get back with the
21   attorney who may be -- well, necessarily is in court
22   a lot so, I mean, that's something you can work --
23   that's not our greatest obstacle, by far.
24   Q.    Once you've gotten to that stage?
25   A.    Right.  The question is getting to

Page 98

1    that stage, having sufficient information and
2    investigation of the contents of the file to get to
3    that stage.
4    Q.    So I've been asking for a lot of
5    examples.  Do you have, like, a learning example of
6    when a client could have been helped by the use of an
7    expert, but because of time management, one wasn't
8    engaged, and that that hampered the case?
9    A.    Not a specific example, I mean, not a
10   specific example other than just generally a client's
11   desire to -- you know, whether it's to go home or
12   sometimes to go to prison because they hate the jail,
13   you know, but that's hard to -- there are those
14   examples, but it's hard to tell someone to be patient
15   when they see what's going on with all the other
16   people in the jail because they know it.
17   Q.    Uh-huh.  Do you and the attorneys in
18   your office regularly seek continuances in your
19   cases?
20   A.    Yes.
21   Q.    And if so, is there kind of a common
22   theme to why those are sought that you can discuss?
23   A.    Usually, two main categories.  One is
24   because we haven't had enough time to deal with the
25   discovery that we've referred, and then the other

Page 99

1    most common would be discovery that's received late.
2    Now, how those are interrelated is as
3    follows:  If you -- and this happens all the time.
4    If you don't get into the file early enough and
5    create an inventory of those things you can tell are
6    missing because they say please refer to file report
7    number, and when you're done with the pile, it's not
8    there, and you shoot the prosecutor an e-mail or a
9    note that says we're missing this and this.
10   If you haven't had a chance to do that
11   then, quite honestly, the prosecutor, he or she may
12   not even know that they don't have it, right?  And
13   invariably what will happen is when they interview
14   their witnesses or police officers for trial, they'll
15   bring the file, and then they've got files -- they've
16   got reports that they don't have, and then they'll
17   tell us, "We've got new reports."
18   You know, that may not be anyone's
19   fault, but if we would have had the adequate
20   resources to digest that, the existing discovery, in
21   a timely manner, we could have asked for that a lot
22   sooner.  And we're talking -- we're not talking days
23   here.  We're talking months or years here.
24   Q.    And are those months or years often
25   when someone is going to sit in jail?

Page 100

1    A.    Almost everyone is in jail.  So
2    they're either going to remain in jail or they're
3    going to plead guilty because they're in a rush, or
4    plead guilty to something that there may not be a
5    submissible case for.
6    Q.    Are there any guidelines to when an
7    attorney should move for a continuance or is it more
8    of a case-by-case decision?
9    A.    Well, I mean, I will tell you a
10   phenomenon that I deal with and have for quite awhile
11   is because of the attorneys' workloads, they know
12   their limitations and they know there's always more
13   cases, so what I'll find is somebody just got late
14   discovery, and then they're hampering around, trying
15   to get ready for trial, when that is absolutely not
16   the proper thing that they should do.
17   They should -- easy for me to say --
18   make Father Time stand still, file a continuance
19   request detailing why they need it and when they got
20   it and that sort of thing, and what other
21   investigation they need to do as a result of that.
22   But they also know that if they do that, it may not
23   be granted, and they're forced to go to trial with
24   three to five hours' less preparation because they've
25   been working on the silly continuance motion.

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

1         And they also know that the next
2 Monday and the Monday after that and the Monday after
3 that they may have a trial scheduled, so I have had
4 attorneys tell me, "If I'm not going to be able
5 to work on it now, what makes me think I'm going to
6 be able to work on it in six months or three months
7 from now if the judge boots it over for three
8 months?" Because they see how tied up they are, and
9 they know what their weekly life is like, and most of
10 which a lot of times in court and in jail.
11        Q.    And not doing -- not in their office,
12 able to do substantive legal work?
13        A.    Right.
14        Q.    That's a good segue, actually, because
15 I want to talk about how much time is spent traveling
16 to court and to jail.
17        A.    Okay.
18        Q.    So this is hard, too, because I know
19 there are 12 attorneys, but is there a way to kind of
20 average how many times in a day an attorney might
21 spend just traveling to and from court and then just
22 traveling to and from jail?
23        A.    Not really.  I mean, the only thing
24 that's of any quantitative value would be the expense
25 reports.  Attorneys are going to log their miles, and

1 all that will tell you is how many miles their car
2 has traveled.  It won't tell you how long they waited
3 in a courtroom for their case or cases to be called
4 or in a jail for their client or clients to come to
5 the room.  I don't know how to quantitate that.
6        Q.    That is another question I have, so I
7 will just jump to it.
8        How often do you and attorneys in your
9 office go have a scheduled visit with a client who is
10 in custody, and still have to wait for that client to
11 be made available to you for a visit?
12        A.    All too often, yeah.  I mean, we're
13 happy when it doesn't happen.  We're usually bragging
14 about it when it doesn't happen.  The norm is that
15 there's, yeah, and that's -- it's worse in some
16 jurisdictions, right?
17        Q.    Uh-huh.
18        A.    And there's also, you know, instead
19 of -- there's no way there's no room at the inn.
20 There's no room at the jail.  If they got too few
21 visitation rooms, you're not just competing with --
22 you're not just competing with your other public
23 defender that you have an office down the hall from
24 because that's your competition for that room.  It's
25 also any private lawyer.  It's also any probation

1 officer.  It's also any detective.
2        Q.    Some jails only have one room; is that
3 correct?
4        A.    That's correct.
5        Q.    Clay County?
6        A.    Some only have one.  Clay County is
7 not -- well, Clay County has one contact room, and
8 then four to five noncontact rooms you visit through
9 the glass.
10        Q.    Okay.  Which could still be
11 confidential, but you can't actually look at
12 something with your client?
13        A.    Well, right, I mean, you can pass
14 through the paper.  I mean, it's -- it's a microphone
15 system that's not very efficient, but it beats
16 nothing.  It beats not being able to -- it beats
17 waiting in the waiting room, waiting to see your
18 client, so -- but Platte County, for example, only
19 has one visitation room.  They do have a secondary --
20 they built for an arraignment, video arraignment,
21 that they allow you to go down the hall and use that
22 where you have face-to-face contact with your client.
23 So that's a total of two, and there are lots of times
24 where I go or my other attorneys go, and there's no
25 room.  You'll have to wait.

1        Q.    What's the longest you've had to wait?
2        A.    Well, you don't have to wait.  You
3 wait, you mark it, and you leave because you just
4 can't have that kind of time to kill.  So I'm
5 probably less patient than most.  I'm usually trying
6 to get names and talk to judges before that happens.
7        Q.    And if you leave, then you just don't
8 see your client?
9        A.    Of course.  Not only that client,
10 whatever other client you were going to see that
11 time.  It happens.
12        Q.    Is time spent on travel, would you
13 call that an ongoing issue for you, personally, as
14 far as resources and getting your work done, time
15 spent on travel and waiting for clients?
16        A.    It's really not that big a burden for
17 me, but for some of the attorneys that I supervise,
18 it's an incredible burden because they may have to
19 drive for hours to try to facilitate one file, and
20 then hours back.  Now, that's the sort of thing that
21 we hope to have some relief from, continued relief
22 from, some day.
23        Q.    Okay.  And how would you get relief?
24        A.    Well, the -- without being too
25 specific because I don't want to speculate, we've

26 (Pages 101 to 104)

ALARIS LITIGATION SERVICES
www.alaris.us      Phone: 1.800.280.3376      Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-14   Filed 02/09/18   Page 27 of 107

## Page 105

```
 1   recently had -- been afforded, like I said, a
 2   miniscule -- I don't want to sound like I'm not
 3   grateful for it because I am.  The allocation of the
 4   public defender system's budget that allowed contract
 5   public defenders to be utilized for conflict
 6   surrounding areas saves us that travel.
 7         Q.   Because those might be further away
 8   than the --
 9         A.   They absolutely are further away,
10   yeah.
11         Q.   Okay.  I see.  So, then, you can focus
12   on the cases that are in an area that's closer?
13         A.   Primary counties, yeah.
14         Q.   Okay.
15         A.   And sometimes still be driving way
16   past them to go see the inmate, of course, like
17   Plattsburg because you drive to Andrew County.
18         Q.   How frequently do attorneys in your
19   office file suppression motions?
20         A.   Again, they do it.  They'd probably do
21   more -- I know they would do more if they had more
22   time to get into the file early.  We just know that
23   because we're always discussing things and bouncing
24   ideas off each other's head and stuff.
25         Q.   Can you think of a time when maybe
```

## Page 106

```
 1   that window passed where you -- by the time you
 2   really get into something and figure out that --
 3         A.   Oh, sure.
 4         Q.   -- maybe you should have filed a
 5   suppression motion, but now it's too late for one
 6   reason or another?
 7         A.   Sure.  If you haven't taken that
 8   deposition or conducted a scene visit or done a
 9   witness interview until later in the game, if you
10   have a -- assuming your client is in custody, they're
11   really not going to be inclined to want -- to wait
12   for you to start working -- start working on their
13   case.  Now, sometimes you slap something together,
14   but everything you do takes time.
15         Q.   Uh-huh.
16         A.   You know, if it's the kind of motion
17   where it's your burden, you're going to have to
18   subpoena witnesses.  Just depends on what kind of
19   motion it is.
20         Q.   Are there other pretrial motions that
21   you frequently see that you think could be helpful,
22   but there just isn't time --
23         A.   Sure.
24         Q.   -- to work it up?
25         Can you just give me examples of ones
```

## Page 107

```
 1   that you've seen in your day-to-day practices?
 2         A.   Sure.  There's some precautionary
 3   pretrial motions that might deal with, for example,
 4   from a procedural standpoint, going to trial, you
 5   don't want the prosecutor to mention in the voir dire
 6   or opening statement or witness testimony dealing
 7   with evidence of other uncharged misconduct.  Unless
 8   you take the time to file that pretrial motion, you
 9   may have an issue at trial.  And sometimes you do it
10   to signal to the judge to alert to them this is
11   coming.  It, frankly, gives the judge more time to
12   think if you have a judge that you think this judge
13   might -- has a chance of ruling in our favor, or they
14   may rule against us, and then the appellate lawyer,
15   if the client is convicted, has something on appeal.
16   Because you're always thinking about preservation for
17   appellate error.  That's one thing.
18         The other things would be, you know,
19   with expert -- talk about the subject of expert
20   testimony.  With the landmark cases of Frey or
21   Daubert, you know, I've got cases right now, files of
22   mine, that I know that I've got to file a Frye or
23   Daubert motion, and I just -- I shutter to think when
24   I'm going to have time to do that.  I know I'll go
25   back and I'm going to save a lot of time because I'm
```

## Page 108

```
 1   going to go back to one I filed years ago, and dress
 2   it up better, but in order to do that, first, I've
 3   got to read the newest edition of -- the Daubert case
 4   that everybody is talking about, and I haven't read
 5   that.
 6         I'll give you a perfect example.  I
 7   talked to a private attorney who used to work for us.
 8   He's read the article, and I haven't.  That's the
 9   difference.
10         Q.   How frequently are cases -- and I can
11   divide this into categories if this helps -- taken to
12   trial --
13         A.   Okay.
14         Q.   -- in your office?
15         Does it help if I divide it into
16   categories?
17         A.   Probably makes more sense.
18         Q.   Okay.  So start with noncapital
19   homicide cases.  And maybe a better way to answer
20   that is how frequently do you see those cases, and
21   then of the ones you see, how frequently are they
22   taken to trial?
23         A.   Well, it depends on the jurisdiction,
24   of course, too, because the venue -- the venue is
25   going to decide what sort of fair population cross
```

ALARIS LITIGATION SERVICES
www.alaris.us        Phone: 1.800.280.3376        Fax: 314.644.1334

## Page 109

1 section of a jury panel we're going to get, and in
2 many instances that's going to play a role in the
3 decision and, perhaps, advice of what we give to a
4 client to do. Obviously, it's always the client's
5 decision, but in terms of if there's advice to be
6 given and taken, then that may -- so the jurisdiction
7 matters.
8       Also, quite honestly, there are some
9 jurisdictions where if it's that type of case,
10 noncapital homicide, the offer is never going to
11 be -- never going to be reasonable, or anywhere near
12 reasonable, so you know it's probably going to go to
13 trial. That doesn't create more time for you to work
14 on it. Just because you see a file and you've got
15 the gold sticker on it and you know it's a murder in
16 such and such jurisdiction, you're never going to get
17 an offer. And that's -- that's regardless of whether
18 or not you've had a chance to digest the contents of
19 that file in order to see whether or not there's
20 investigation to be done or a plausible defense.
21       Q.   Do you see charges -- noncapital
22 homicide charges frequently in your district?
23       A.   Oh, yeah.
24       Q.   So then -- so it is common, then, that
25 they would go to trial, like, because of what you're

## Page 110

1 saying you know you're never going to get an offer?
2       A.   Depends on the jurisdiction and many
3 go to trial, yeah.
4       Q.   Okay. Is there a way to average how
5 many in a year might go?
6       A.   Not really.
7       Q.   Okay.
8       A.   I mean, how many a year should go or
9 how many a year do go?
10       Q.   I guess both. Yeah, I mean, because I
11 imagine the more serious the case, often the longer
12 it would take to get it to a trial; is that common?
13       A.   That truism, I believe, is true, but
14 there's also things that don't involve a decedent
15 that's extremely complicated, right? There may be an
16 assault, where all that means is, frankly, there's
17 more witnesses.
18       Q.   So after homicide cases I have, how
19 about for A/B felonies?
20       A.   Depends what sort of case it is. I
21 mean, it's -- those could include rape or kidnapping,
22 or it could be a possession turned into a -- somebody
23 with a -- somebody with a severe record that's got an
24 incredible amount of exposure. So it may be not
25 really a whole lot of drugs, but it may involve a

## Page 111

1 sale or a transfer, a hand to hand or a series of
2 those.
3       Those typically aren't necessarily the
4 kind of cases that are going to scream a great deal
5 of investigation because, frankly, they have
6 professional witnesses, law enforcement officers, and
7 that -- I mean, it is what it is. You'll still need
8 to listen to the tapes, if there are audiotapes, and
9 that sort of thing. You'll need to chase down any
10 leads your client gives you, but sometimes it's more
11 of a how much negotiation you're going to be able to
12 spend trying to approach the prosecutor to try to get
13 some resolution that doesn't, you know, eat up the
14 rest of your client's life.
15       Q.   So is it fair for me to understand
16 what you're saying that the more serious the charge
17 or the more serious the consequences for a defendant,
18 depending on their maybe history or what was going
19 on, those are more likely to go to trial?
20       A.   No.
21       Q.   They're not?
22       A.   That just plays a role. I mean, we
23 could have -- I'll give you an example. We've got
24 more than one case where there's -- it's a
25 misdemeanor file, right, and depending on when we get

## Page 112

1 the discovery and how much we know about it, we may
2 give it to the relatively newer public defender
3 attorney, and then all of a sudden they come and say
4 there was a dead body involved in this. This was a
5 fatal accident and that sort of thing. And it
6 started out as a misdemeanor, and it may end up that
7 way, but we've got to treat it as if it might not.
8 So that isn't pled. That's slowed down. That's not
9 going to be like the -- it was on the traffic docket,
10 so you can't treat it like a traffic case where the
11 client just wants to get their license back and plead
12 guilty, or whatever the situation may be, go to
13 alcohol training.
14       We also have -- and that's not the
15 only case where we've got it's a misdemeanor and
16 there's a dead body in the file. So we've got to be
17 concerned about -- because sometimes the prosecutors
18 are planning their method of prosecution or they're
19 just waiting for additional evidence, whether it's an
20 autopsy or uncovering more witnesses.
21       Q.   Do misdemeanors -- I know there are
22 other cases you're talking about that might be an
23 exception. Do misdemeanor cases often go to trial or
24 are those cases more often pled?
25       A.   It just depends. Overall, I would

28 (Pages 109 to 112)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-14    Filed 02/09/18    Page 29 of 107

## Page 113

1  probably say they're, more oftentimes than not,
2  resolved by resolution other than trial.
3      Q.   Okay.  How about for felony sex
4  offenses?
5      A.   It just depends.  You're probably --
6  you're probably -- you're certainly going to work it
7  up like it's a trial and assume it's going to be a
8  trial because the offers are not going -- it just
9  depends if your client has a history because that's
10 probably going to control whether or not it's going
11 to be resolved by mutual agreement with the other
12 side.
13     Q.   Does your office handle a lot of
14 juvenile cases?
15     A.   We do not at present.
16     Q.   Can you explain that a little bit
17 further?
18     A.   Sure.  Since the Waters -- since
19 approximately the Waters cases.
20     Q.   So around 2012?
21     A.   Roughly.
22          We had -- our management, the public
23 defender management, met with the judges, and as a
24 result of that, I believe our two major counties,
25 Clay and Platte, sort of eased off on the juvenile

## Page 114

1  cases, and assigned them to private attorneys on
2  their list.  And so for Clay and Platte, knock on
3  wood, we don't -- we don't do juvenile.  There's a
4  couple exceptions in there where we might have got
5  briefly involved, but, for the most part, no.  The
6  courts afforded us that relief.  Clinton County did
7  not.
8      Q.   Do you know what -- are you familiar
9  with how Jackson County appoints --
10     A.   A little bit.
11     Q.   -- for juvenile?
12          It's any attorney can be on the list.
13 Is that the same for Clay and Platte County?
14     A.   I think Clay and Platte -- no, I think
15 it's different for Clay and Platte because they don't
16 have the major behemoth law firms to draw from.  I
17 think -- I think Clay and Platte looks for volunteers
18 that want to be on the list.  They may get a nominal
19 fee, with the hope of picking up other cases and
20 expanding their clientele, maybe, but I don't think
21 it's the same way as Jackson.
22     Q.   Okay.  And part of what I'm getting at
23 is that do you think -- do those attorneys usually
24 have some criminal defense experience that are
25 getting appointed to take those cases?

## Page 115

1      A.   We talking the juvenile?
2      Q.   Yes.
3      A.   You know, I don't know, but I'm
4  assuming that they probably have some juvenile
5  exposure which, quite honestly, may be sufficient
6  because of the familiarity with the juvenile
7  prosecutors, staff, that kind of thing.
8      Q.   Okay.  Has an attorney in your office
9  ever waived opening or closing argument at trial?
10 And if so, do you know why they would have done that?
11     A.   I know I have.
12     Q.   Okay.
13     A.   I presume -- I'm certain other lawyers
14 have, but as far as why they might, I assume it's a
15 case-by-case basis.  I mean, there's perfectly valid
16 reasons to do that.
17     Q.   What's a reason that you have done it,
18 if you can share?  And if not, we can move on.
19     A.   Well, I can't talk about this
20 particular client's case.
21     Q.   Right.
22     A.   It's strategic.
23     Q.   Does that happen often in your
24 experience, that you can speak to?
25     A.   It depends on the case.  Because it's

## Page 116

1  guided by strategy, there's really no way to put a
2  number on -- you know, it's on the case, it's on what
3  I think the government's case is going to be, it's on
4  whether or not your client is going to testify, it's
5  on whether or not that's a certainty or not.
6      Q.   Okay.  You know there's been a theme
7  to the answers, so I know I'm asking questions that
8  probably I know how the answer is going to come, but
9  in your opinion, do you have the time and resources
10 to adequately prepare for trial?
11     A.   No.
12     Q.   And do you think the attorneys in your
13 office have the time and resources?
14     A.   I know they don't.
15     Q.   For any of the cases?
16     A.   Well, again, the devil is in the
17 details.  If you have one case, and you prepared the
18 heck out of it, and you pled 99 other people or
19 they've decided to plead because they see by the time
20 you come to us, I can't sit here a year and a half.
21 I mean, we've got specific examples of clients in
22 jail, I mean, they're there together, they see what
23 happens.  They go to court very often together to the
24 same docket calls, and they see how many lawyers
25 there are available.  They can do the math, and that

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 117

1   sometimes frustrates them.
2       Q.   So if there's time to work on one
3   case --
4       A.   You may do an absolute superb job.
5   It's kind of like having a favorite pet, right?  That
6   doesn't mean you're -- if you single somebody out,
7   but it's to the detriment of everyone, that's why
8   there's a concurrent conflict of interest because how
9   do you choose without being unfair to the people you
10  haven't chosen?
11      Q.   Is that the same for sentencing
12  proceedings, too, about having the time and resources
13  to adequately prepare, and if you do find the time
14  and resources for one case, that necessarily is a
15  detriment to other cases?
16      A.   Well, I would like to -- can we talk
17  about the sentencing, then take a break?
18      Q.   Yes.
19      A.   And the reason I give the 2005 line of
20  demarcation is not just a random number, but I think
21  that's when -- I could be wrong about the year.  I
22  could be off a couple years -- Senate Bill 5, I
23  think, was passed around there, might have been '03,
24  not certain, but that was a huge, huge piece of
25  legislation.  And it did a lot of things, but I think

## Page 118

1   chiefly, what I remember it doing, is bifurcating
2   criminal proceedings where otherwise they weren't
3   bifurcated.
4       So, for example, your misdemeanor
5   shoplifting or your misdemeanor drug possession, if
6   it went to a jury, and your client were convicted, it
7   would go immediately into the sentencing phase, just
8   like a capital case, although I don't do capital, so
9   this is all from magazines I read and friends I have,
10  but -- now, when Senate Bill 5 passed, there was, to
11  my knowledge, zero -- absolutely zero dollars
12  allocated, additional dollars, allocated to the
13  Missouri Public Defender System to deal with that
14  enormous burden that Senate Bill 5 passed upon the
15  criminal defense bar.  Because what it meant was you
16  have -- the jury is waiting.  If you plead your
17  client guilty, the judge is going to set sentencing
18  off so you have some time to gather some additional
19  information, witnesses at a future date.  You got a
20  jury waiting, that's never going to happen.  Judges
21  are not going to do that.  Whenever your jury verdict
22  comes back, your sentencing is going to start.  If
23  it's late one evening, that judge may continue on or
24  it may start up first thing the next morning, but
25  you've got to be ready.  And you're no longer talking

## Page 119

1   about -- then you're looking for leniency of a jury
2   which means a whole lot of things, including experts
3   that you might conceivably want to utilize, including
4   family members that you might want to utilize.
5       What I'm saying is the public defender
6   got zero additional dollars to deal with Senate
7   Bill 5.  No more -- to my knowledge, no more funding
8   to have mitigation specialists, no more funding to
9   have sentencing advocacy specialists, anything like
10  that.  Instead, over the course of the years, the
11  alternative sentencing unit, as well as the juvenile
12  unit, had to be absorbed because of the enormity of
13  the other burden on the remaining cases.  I don't
14  know -- I'm not disagreeing with that call.  I'm not
15  saying I would have made a different call.  It's a
16  different -- it's a difficult call.
17      Do I miss the -- do I miss the
18  juvenile unit?  Do I miss the alternative sentencing
19  unit?  Yeah.  But does that mean that one of the
20  trial offices got another lawyer?  Probably did.  It
21  probably would have shifted -- I mean, I know that's
22  what happened, whether appellate or trial got
23  another -- got some kind of relief.  But day-to-day
24  functioning of the trial offices on Senate Bill 5 --
25  and it doesn't affect -- well, doesn't necessarily

## Page 120

1   have its firsthand -- an impact on the appellate side
2   of things.  And capital was already like that with
3   the bifurcated, I mean, we can't even compare
4   ourselves to capital.  But the trial side, when you
5   have a client that's been convicted, they go to jury
6   sentencing, you have to have had all that lead time
7   in preparation what are you going to now present to
8   the jury in terms of leniency to try to mitigate your
9   client's ultimate punishment.
10      And I remember my first jury trial
11  which was after Senate bill 5.  I know what my
12  preparation consisted of.  It consisted of an
13  elevator ride in a Platte County Courthouse.  And had
14  he not been acquitted, by luck, had he not been
15  acquitted, we wouldn't have had a whole lot.  There
16  was nothing planned for the sentencing phase,
17  nothing, but I bet there was on the other side, so --
18  and there's been cases on appeal about that.  In
19  cases some clients have gotten relief on that.
20  Trying to think of my client's name that got relief
21  because of that, as he should have.  But that's a
22  perfect example of, you know, additional legislation
23  pushing down on one side of the teeter-totter, and no
24  relief to the other side.
25      MS. WILCOX:  Take a break?

30 (Pages 117 to 120)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-14    Filed 02/09/18    Page 31 of 107

## Page 121

1    THE WITNESS:  Yeah.

2    MS. WILCOX:  Okay.  Go off the record.

3    THE VIDEOGRAPHER:  We're off the

4  record at 11:26 a.m.

5    (A brief recess was taken.)

6    THE VIDEOGRAPHER:  We're back on the

7  record at 11:40 a.m.

8    Q.    (BY MS. WILCOX):  I think before we

9  took the break, we had just finished talking about

10  prep and time for trials and sentencing.

11    A.    Okay.

12    Q.    We concluded that.  I'm now going to

13  move into guilty pleas.

14    A.    Okay.

15    Q.    I have the same list of kinds of cases

16  that we talked about before for -- starting with

17  noncapital homicides, but I think I'll just -- we'll

18  see how this works, but I'll start going through

19  them.

20    A.    Okay.

21    Q.    How much time do you think it's

22  necessary to spend working up a noncapital homicide

23  case before you would advise a client whether to take

24  a plea?

25    A.    It depends on the charge and -- you

## Page 122

1  know, depends on the charge, depends on the

2  discovery, whether or not it's complete yet.  I'm

3  never going to allow a client to plead without -- if

4  I think there's some discovery that's missing that's

5  obligated to be given.  Some clients will disagree

6  with that.  Some judges, in theory, might, but it

7  doesn't matter until you have all the discovery.  And

8  by "discovery," I deal with that different than

9  investigation.  That just means show me what you've

10  got and what you're going to have by way of evidence.

11  Until I have a way to measure and monitor that, I

12  don't know what sort of investigation this case might

13  merit.

14    Q.    And this takes us back, actually, to

15  something we talked about.  I imagine this is the

16  same across the board, so correct me if I'm wrong,

17  but if you're saying you need to look through the

18  discovery, is it also true that that falls, then, on

19  your time management issues that if you have to look

20  through discovery and make sure you have it, you then

21  can't even consider whether to look at the plea until

22  you've had the time to do that?

23    A.    Right.  I mean, it's not unusual for

24  me to shoot out an e-mail that asks for a plea.  I

25  just do that if I'm, you know, as a matter of course

## Page 123

1  because it's just if I'm there and my hands are at

2  the keyboard, that's what I'm going to do because I

3  want it in writing, et cetera.  But until I've

4  digested all of the discovery and satisfied myself

5  that we have all the discovery that there is; that

6  they've complied with their duty, I'm not going to

7  allow a client to accept a plea.  I'll convey the

8  plea if they're asking, but I'll say, you know,

9  here's what we don't have, the lab report, this

10  officer's report is, you know, not in there.

11    Q.    Is that the same for all kinds of

12  cases?  I mean, from my list it's noncapital, and A/B

13  felony, C/D felony, felony sex offenses and

14  misdemeanors.

15    A.    The incomplete discovery never yields

16  guilty plea in my book.

17    Q.    And how about for the attorneys in

18  your office that you know?

19    A.    Well, yeah, I can do better than know.

20  They know that's my rule.

21    Q.    Okay.

22    A.    Now, the difference may be before

23  electronic discovery, the prosecutor would actually

24  bring a file to court, and if you didn't have the

25  police report, your client's offer was probation,

## Page 124

1  you could look in the prosecutor's file, read through

2  their discovery, and if you're satisfied, I think

3  they have a submissible case, they're going to be

4  able to satisfy their burden, client wants to plead

5  guilty, and there's no investigation that is going to

6  make a difference in the case, that's different.  But

7  that's only with a client that's anxious to get --

8  we're still going to try to shoot for a bond

9  reduction to see if we can get them out to have more

10  time to think about that, but you're in a

11  jurisdiction, depending where you are, you may know

12  what the answer to that is going to be.  But, you

13  know, we have told judges the plea offer is

14  probation.  I haven't had a chance to look through

15  this.  I haven't met with them, that sort of thing,

16  and try to use that as a catapult to get a lower bond

17  to get the client more time to think.

18    Clients are sometimes, quite honestly,

19  in a hurry, in a hurry to make a good decision or a

20  bad decision.  I don't know.  If I haven't examined

21  the file, I don't know if it's a good decision.  They

22  may know something that I don't or, worse yet, they

23  may think they know something that I don't, which

24  happens sometimes.

25    Q.    You said you will ask for a plea

ALARIS LITIGATION SERVICES
www.alaris.us    Phone: 1.800.280.3376    Fax: 314.644.1334

## Page 125

1  offer?
2      A.   Uh-huh.
3      Q.   Do you kind of do that across the
4  board on all cases, early in a case?
5      A.   Almost all cases.  Murder cases, I may
6  not, because I don't want to create the wrong
7  impression on the prosecutor.
8      Q.   Okay.
9      A.   And also because I know what their
10  answer is always going to be, something horrible.
11      Q.   Do they often present you with a plea
12  offer before you ask, is that common?
13      A.   Prosecutors, for the most part, act as
14  if they're surprised every time we ask, like, "Oh,
15  you want a plea offer?"
16          Of course we do.  Everyone you meet
17  does.  Every attorney on the planet does.  But they
18  do that to slow down the process and to not, in my
19  mind, not to do work and to prolong the client's
20  captivity if there's going to be a probation offer.
21      Q.   Can you -- and maybe this is
22  impossible, but can you give me kind of a percent of
23  cases that you have in your office where you get a
24  defendant that wants to take a plea just to get out
25  of jail, how often that comes up, whether they take

## Page 126

1  it or not, how often that comes up?
2      A.   Sure, sure, absolutely.  Well, I'm
3  generalizing, but it's true, I have circumstances,
4  cases now and cases in my past.  Clients from the
5  department of corrections all want to plead guilty to
6  concurrent time.  They probably have an out date or
7  know that they're going to have an out date, and more
8  times than not, not never, but more times than not,
9  that's an unrealistic idea of what's probably going
10  to be offered by the state voluntarily.  So what that
11  means, that creates an environment where the client
12  is mad at you for not resolving it immediately
13  especially if you deliver the news that they're
14  probably not going to offer you concurrent time.  And
15  you say that from experience.  It's not like you're
16  rooting for one side or the other like I know them, I
17  know the judge, they think it's a free case, that's
18  not happening, so instead you say let me talk to them
19  and we'll see, and that kind of stuff.
20      Q.   Explain to me what you mean like
21  concurrent time for something that they're already --
22      A.   Right.  If they're in the DOC --
23      Q.   -- serving?
24      A.   Yeah, if they're in the DOC, serving a
25  sentence, and they've just hit parole, but more times

## Page 127

1  than not they've filed a disposition of detainer and
2  they're writted to the jurisdiction, what they don't
3  want is to serve the remainder of that case they're
4  serving, and then commence this new one because
5  they'll wind up with an overall greater length of
6  incarceration.
7      Q.   Okay.  Are you and the attorneys in
8  your office able to spend the amount of time on a
9  case before you advise a client about taking a plea
10  that you feel is necessary?
11      A.   I mean, I can only tell you what I do
12  and what I hope the others do.
13      Q.   Uh-huh.
14      A.   What I fear the others do is try to
15  juggle an over -- overly burdensome workload, but I
16  know that, ethically, they're resolved and obligated
17  to do otherwise.
18          If I see a file and there's not
19  sufficient notes or not notes, I'm going to -- and,
20  again, I don't have much time to do this, but it
21  should be what I'm doing, as a manager.  If I go and
22  I look at the file and I see some insufficiency, I'm
23  going to put a note on the file, give it to the
24  attorneys, put on it their chair and say, "Give me
25  five minutes."

## Page 128

1      Q.   What would -- because I think what you
2  said is you don't have time to look at all the files
3  like this to review them, so what would -- when would
4  you do that, or is it kind of a one off you just
5  randomly pick files to review sometimes of the
6  attorneys?
7      A.   For me -- well, we have file reviews
8  for purposes of promotion.
9      Q.   Okay.
10      A.   And then the other thing would be if a
11  client calls with a question or a client's family
12  member, that probably precipitates me looking at the
13  electronic file in our computer or maybe pulling the
14  physical file and looking.  It's kind of hard to
15  notice if there's not what you expect to be in the
16  file.  Or if a client calls and they want a copy of
17  their file, and they're looking, it means there's a
18  closed file, perhaps, why there isn't what I think
19  needs to be in there.
20          Now, it's hypocritical of me to be too
21  hard on the lawyer who I've given too many cases,
22  right?  It's like saying why aren't you seeing
23  everybody in seven days?  And the answer is because I
24  know where you've been.  You've got a perfect alibi.
25  I'm sending you all over the place.

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

1    Q.    What -- so aside from asking for an
2  offer and then looking through the file, to some
3  extent, to figure out whether there's something else
4  you need to do, are there other steps that you always
5  take before -- or while you're negotiating on a plea?
6    A.    Typically, what I do is, you know, you
7  take the steps in order to get the discovery in the
8  file.  Automatically, you get a copy to the client.
9  In my review of discovery, I'll look to see for
10  completeness or anything that's missing.  That's the
11  first thing I do.  I may jot down some notes or
12  highlight some things that are critical that I know
13  are going to be really good or possibly openings for
14  a possible defense.  I may also highlight some
15  innocuous things, too, that don't have anything to do
16  with either, but that's the way I begin the file.
17       And many times that will happen before
18  I even have any meaningful meeting with the client or
19  have ever met them.  Quite honestly, many of them now
20  are phone calls and nothing more than that.
21    Q.    Do you and the attorneys in your
22  office always communicate a formal plea offer to your
23  clients?
24    A.    When it exists, sure.
25    Q.    When you get a formal plea offer, you

1    Q.    That it can't expire before you can
2  communicate it?
3    A.    Well, under the Frye and Lauffler
4  cases, I think -- I think I would like to draw an
5  analogy between failing to provide the plea offer and
6  trying, but through no fault of the client, you
7  haven't been able to, so they could have gotten this
8  whether it's reduction or more lenient sentence, et
9  cetera.
10    Q.    So is it typical for the state to
11  offer a plea or give you an offer that will expire?
12  Do they often put deadlines?
13    A.    It depends what mood they're in.  Most
14  recently I've gotten some, but I pay no attention to
15  the expiration date, I mean, because I know the
16  judges.  The judges are not going to punish an
17  overburdened public defender's office.  They're just
18  not.
19       Now, the problem with that is
20  sometimes, because of unfettered prosecutorial
21  discretion, they get to -- if their offer -- I have
22  offers right now where, "Plead to this.  If not, I'm
23  going to file a felony."
24       Well, the judge has no control over
25  that, so I do have to -- I do have to pay some

1  always communicate that, even though your advice
2  might be not take the plea?
3    A.    Oh, absolutely, it's always
4  communicated.  Now, how timely it is is a different
5  issue, right?
6    Q.    Talk about that a little bit.
7    A.    Sure.  Prosecutors like to put
8  deadlines on things sometimes.  What I immediately --
9  my response to that is -- and if we haven't, and
10  we've made records of this, which is, you know, an
11  offer is expired, it doesn't happen a whole lot, but
12  we're not going to let it go unpunished.
13       If a prosecutor sets an artificial
14  deadline to it, and we have things that we really
15  just haven't been able to do that, or whether it
16  means going to visit the client or having a good
17  phone number for the client if they're fortunate
18  enough to be released to come in and to talk to you
19  because, frankly, they may have been picked up on
20  something else, some traffic violation or something,
21  costs, and be whisked away to another jurisdiction.
22  So you haven't been able to communicate it, offer
23  expires, there's case law that supports they can't do
24  that, and that's the position I take, or at least an
25  argument can be made that they can't do that.

1  attention to that deadline.  Now, whether or not I'll
2  be able to meet it, your guess is as good as mine.
3    Q.    How common does that happen where they
4  file charges for misdemeanor, and then it gets --
5  that kind of offer, "Plead to this" --
6    A.    And that's why you say what's your
7  caseload, it's an artificial number because there
8  are -- depending on the jurisdiction, there are a lot
9  of instances, and I do mean a lot, where clients are
10  charged with misdemeanors, and if they don't fold and
11  take what is accepted, the threat is we will file a
12  felony or we will file additional charges.
13       It happens all the time.  So you have
14  that -- and I've got to be mindful of that or attempt
15  to be mindful of that when I'm assigning cases, too,
16  right, because all of a sudden this misdemeanor, I
17  won't necessarily know what the client's criminal
18  history is, it's not an exposure for up to 12 months
19  in jail all of a sudden or maybe four in prison, it
20  could be a lot more than that.  So the attorney
21  assigned needs to be able to deal with a burden like
22  that.
23    Q.    Do you always try to communicate plea
24  offers in person or you were saying that sometimes it
25  probably necessarily happens over the phone?

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-14   Filed 02/09/18   Page 34 of 107

## Page 133

1    A.    I mean, I prefer in person, but, I
2   mean, quite honestly, there's a science, I think, I
3   found to plea offers.  If I have a plea offer, I'm
4   almost never going to communicate that unless it
5   means get out of jail, but many of my plea offers are
6   not you get out of jail.  It's how long you're going
7   to prison.  I'm usually not going to communicate that
8   in the first visit.  And it would be such an offer
9   that would not expire, obviously.
10       Q.    Right.  Any formal offer that's going
11  to -- has some expiration date that you think
12  matters, you would relate?
13       A.    I would attempt to comply with the
14  deadline, but I can't guarantee that I would be able
15  to.
16       Q.    And it's a deadline given by the
17  prosecution --
18       A.    Uh-huh.
19       Q.    -- that they make up?
20       A.    They make up, but if it means
21  elevating charges, it's not an idle threat.
22       Q.    So in your opinion, do you and the
23  attorneys in your office have the time and resources
24  to adequately negotiate plea deals and counsel your
25  clients on whether to accept a plea?

## Page 134

1    A.    It's pretty time-consuming, depending
2   on the jurisdiction that you're dealing with.  Some
3   prosecutors prefer to be courted in person, and some
4   prefer -- are okay with e-mail, so one being more
5   time-consuming than another.
6        Q.    This is the same question, without
7   getting into the specifics or compromising
8   attorney-client privilege, can you think of an
9   example for you, personally, or someone in your
10  office, where there could have been a better plea
11  deal if there had been more time and resources?
12       A.    Sure.  I can't think of an example,
13  but I can think of circumstances where sometimes, at
14  least my philosophy is, if the prosecutor, if they
15  know they're going to have to work harder, they might
16  give a little bit more back.  That's not absolutely
17  true, you know, sometimes if you take a deposition,
18  they're going to pull a plea offer.  They just will,
19  yeah.
20       Q.    What other conditions might -- have
21  you seen in your practice that the prosecution puts
22  on a plea deal, like, what you're saying if you --
23  it's not really a condition, but I guess if you know
24  there are cases where if you want to take a
25  deposition, they're going to pull the plea.

## Page 135

1    A.    Sure.
2        Q.    Are there other examples you can give
3   like that?
4        A.    Sure, sure.  We are all the time or
5   frequently, depending on what it is, depending on
6   which prosecutor it is, depending on how we deal with
7   them, I have attorneys that ask the prosecutor, "If I
8   file a suppression motion, are you going to pull the
9   deal?"
10           Some will say, well, yeah.  Some will
11  say no.  It's the same thing with the preliminary
12  hearing.  If you request a preliminary hearing and
13  they have a grand jury, justice is going to be
14  affected.
15       Q.    How do you communicate that to your
16  client?
17       A.    It causes a lot of frustration when
18  you explain something like that.  Well, I mean, my
19  particular way, it just depends on the client and
20  their level of intelligence, probably.
21       Q.    But you do try to -- I mean, you have
22  to convey to them that I have this plea offer?
23       A.    Oh, sure.
24       Q.    But I also think you have a legitimate
25  suppression argument to be made, and here are the

## Page 136

1   consequences that I'm facing, and you have to try to
2   communicate that to your client?
3        A.    Sure, sure.
4        Q.    Do you and the attorneys in your
5   office -- I guess talk to me about how you visit with
6   your clients about immigration consequences of
7   criminal charges?
8        A.    I would probably say poorly.  We ask
9   if you're a U.S. Citizen.  That's about as deep as it
10  gets.  Beyond that, we delay a case in order to
11  to get additional information.  We have one or more
12  attorneys, I think, that the public defender system
13  has worked out an agreement to take our questions.  I
14  have a friend I went to law school with that I
15  sometimes burden or will give his name to some of the
16  attorneys I supervise.
17           I mean, it's a commonplace issue
18  because we have a lot -- for example, a lot of DWIs
19  where -- this is sort of beside the point, a
20  translator is often involved.  What that does is make
21  it more cumbersome, from a time perspective, and
22  protract things, but then to have the time to be --
23  actually be able to figure out what the ICE hold is
24  about, and overcome the obstacles of that, because
25  it's cumbersome.  And you just don't want to -- I

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

Page 137

1   mean, so, really, what the client often is told is
2   this may impact whether you're deported or whether
3   you're ever able to return.  And that's about the
4   only advice they ever get.  Nothing more specific
5   than that.
6          Now, it's a real complicated subject.
7   I don't pretend to be an expert on it, and I know
8   most of my clients aren't, but there's -- you know,
9   sometimes what that does is cause us to set a DWI
10  trial for jury trial to buy time to look into it or
11  with the hope that the prosecutor might do something.
12  Or if ICE is involved, that ICE happens before they
13  get this conviction because if you have the
14  discovery, you probably can be able to assess whether
15  or not they're going to be able to carry their burden
16  which with the blood alcohol level, they're probably
17  not going to need anything else.
18        Q.   Are there -- so are there any formal
19  steps that are taken within your office or that you
20  know of with MSPD that are required for -- you know,
21  besides asking, "Are you a U.S. citizen?"  And maybe
22  that's just an office policy.
23        A.   Well, it's the result of a landmark
24  case.  That's what caused it, that additional inquiry
25  and precaution.

Page 139

1   who is fortunate enough to be on bond.  He actually
2   has consulted with some or sought to, but couldn't
3   afford it, you know, et cetera.
4         Q.   So he knows more about --
5         A.   He seems to know more than the
6   afternoon person about it.
7         Q.   Okay.  Have you ever seen any special
8   training offered or required to identify immigration
9   consequences for attorneys in your office?
10        A.   I'll say this about training:  The
11  training within the public defender system, they seek
12  to do a good job.  The challenge is creating the time
13  to attend those things is really pretty impossible.
14        Q.   Have you ever seen trainings offered
15  on immigration consequence?
16        A.   I think I have.
17        Q.   Okay.
18        A.   Yeah, I think, in fact, the friend
19  that I mentioned I think even presented at one of the
20  MSPD functions.  I look at the syllabus and I see it,
21  and I don't have time to attend it, but I see it.
22        Q.   So in your opinion, do attorneys in
23  your office, including you, have time and resources
24  to adequately advise your clients on immigration
25  consequences of the decisions they're making in their

Page 138

1         Q.   Okay.
2         A.   And it was only because of that case,
3   the name of which escapes me now.
4         Q.   How long ago was that?
5         A.   The case?
6         Q.   How long have you been asking, "Are
7   you a U.S. citizen?" formally?
8         A.   Since that case law came down.
9         Q.   But you don't remember exactly when
10  that was?
11        A.   I can't remember the name of the case
12  or the year that case came down, but it's the
13  landmark case.
14        Q.   Okay.
15        A.   It may come to me before the end of
16  the day.  If it does, I'll blurt it out.
17        Q.   Is there any -- and then so you'll
18  reach out to any resources that you have about who
19  might know something about immigration law, is what
20  you're saying?
21        A.   Right.  And sometimes if the clients,
22  whether they're in custody or out, the communication
23  may include, "Do you have an immigration attorney?"
24  because sometimes they're working with one, not very
25  often, but sometimes, or sometimes I've got a fellow

Page 140

1   criminal case?
2         A.   Not to an extensive extent, no.  Not
3   to a sufficient extent, I don't believe so.
4         Q.   Can you think of any examples of where
5   maybe someone didn't have time to do the work or
6   didn't understand the consequences, and had a
7   negative result?
8         A.   We probably wouldn't necessarily be
9   aware of the negative result because, frankly, that
10  might not happen till years in the future if it
11  involves re-entry.  I just don't know.  And if
12  there's an ICE hold, that's usually a bad sign.  But,
13  again, I don't know if that means there's defenses to
14  that through immigration, appointed attorney or not.
15        Q.   Okay.  How often do you see competency
16  proceedings happening in your area?
17        A.   Well, let me back up and say that we
18  do a lot of -- we spend a lot of resources and
19  consult a lot of expert concerning competency under
20  552 and 552.02 and .03.  It's an enormous, as you
21  might imagine, time drain because it's so complicated
22  and involves an expert, whether it's the state's
23  expert or privately retained expert, hired through
24  the funds available under the MSPD, and it impacts
25  the negotiation and defenses, but we see it a lot.  I

ALARIS LITIGATION SERVICES

## Page 141

1    mean, there's -- mental health is huge in our
2    caseload, mental health issues.
3        Q.   Could you give it, like, an
4    approximate percentage of cases where either
5    competency becomes an issue whether or not, I guess,
6    it ultimately results in a proceeding?
7        A.   In the higher level cases, I can't
8    give you a percentage, but it frequently comes up
9    where there's an independent examination that's
10   requested. We look at it and, frankly, even the
11   lowest level of criminal events, we look at it in
12   terms of mitigation or negotiation with the state,
13   hoping that they see some leniency side of things.
14       Q.   Does the state ever request
15   psychiatric evaluation?
16       A.   Sometimes.
17       Q.   Not as frequently?
18       A.   Certainly not as frequently as we do
19   privately, no.
20       Q.   If someone has been arrested and
21   charged and is in custody, and then deemed
22   incompetent, I guess, at that time, what happens to
23   them? Where do they go?
24       A.   I think they go to the Department of
25   Mental Health for a stay of six months until another

## Page 142

1    report or update is given to the judge, is the way I
2    understand 552.
3        Q.   And every six months, they would be
4    reassessed to see if they can continue with the case?
5       A.   That's the way it's supposed to
6    function, yeah. I think that -- my understanding is
7    the Department of Mental Health, because of either
8    perhaps legitimate budgetary constraints, takes
9    longer than that or needs longer than that. That's
10   what I've heard.
11       Q.   Okay. Do attorneys attend an
12   evaluation, a psychiatric evaluation, with a client?
13       A.   Typically, I don't believe so.
14       Q.   Okay. Are line-ups common in cases
15   you're handling, police line-ups?
16       A.   Photographic or in person?
17       Q.   I was going to ask both.
18       A.   Okay.
19       Q.   So please talk about both.
20       A.   We have a lot of our cases where there
21   are photos arrays, and also show-up IDs that are
22   involved.
23       Q.   What's a show-up ID?
24       A.   Where the clerk is brought to the
25   person that is arrested around the corner or where

## Page 143

1    the person around the corner is brought to the retail
2    store, and the clerk is -- you know, those are not
3    preferable by either side I don't think.
4        Q.   And they just bring in the one person?
5       A.   Yes.
6       Q.   And say, "Was this the person who
7   committed" --
8       A.   Well, I think that's what they say if
9    it's on a tape, yeah, or they might word it a little
10   more strongly than that.
11       Q.   Do those typically occur early in a
12   case?
13       A.   In the case investigation?
14       Q.   Yeah, how far after charges are filed
15   and you're, I guess, get a case would something like
16   that happen?
17       A.   Well, it would be before we're
18   involved or we have the right to be involved.
19       Q.   That makes sense. So then you're not
20   showing up at those, that's just the --
21       A.   Well, you have to understand when you
22   say "photo array" or a "line-up," those -- I assume
23   you're talking about those that involve a case
24   investigation before someone is charged or the
25   magical words "person of interest." So precharges

## Page 144

1    were not involved in any of that. We don't -- we
2    would have no reason -- we would have no reason to
3    have ever received an application, for example. Now,
4    whether or not those folks, when or if they're ever
5    advised to the right of counsel, I wouldn't know
6    unless I had a chance to look at the reports.
7        Q.   Okay. Presentence investigation, I
8    guess, or PSI reports, are those common before
9    sentencing?
10       A.   Yes. More recently they've changed
11   their name to sentencing assessment reports, so from
12   a PSI went to an SAR, same things only they're
13   not as long.
14       Q.   Okay.
15       A.   I don't know if that's good or bad,
16   but it's common to have that sort of thing. And
17   sometimes that's part of the negotiation, and
18   sometimes there are judges that prefer the
19   involvement of the SAR. Some judges don't care, some
20   judges won't resolve a matter without having one.
21   Now, what that means, from a practical standpoint, is
22   if your client is offered probation, and you're in
23   front of a judge and they're in custody, if they're
24   offered probation, and they elect to plead guilty to
25   the charge or charges, and the judge, if you're in

ALARIS LITIGATION SERVICES
www.alaris.us      Phone: 1.800.280.3376      Fax: 314.644.1334

## Page 145

1  front of a judge that insists on a SAR, and they
2  remain in custody, that's going to take another
3  probably six weeks before their sentencing.  If
4  they're released, it will delay it by six weeks.
5      Q.    So it's always the judge that would
6  request it, or would it be requested by a --
7      A.    Judges like to -- some judges insist
8  on having one, and won't accept to be bound by the
9  plea without the SAR.  Every now and then you get
10  judges that do that, but in order for it to be
11  waived, the judge has to be comfortable that
12  everybody is involved in waiving it, elects to waive
13  it on the record.
14      Q.    Who participates in the assessment
15  besides the person being assessed and the person
16  assessing them, is the attorney -- is anyone else
17  present?
18      A.    You know, it's funny you mention that.
19  I had never participated in one or attended one in
20  decades of practice until a recent client that I had.
21  And I advised the probation officer I wanted to be
22  present, and then -- well, one thing led to another.
23  Eventually I made it up the chain of command, and
24  they provided me the policy they have, state
25  probation and parole, where they suspend the

## Page 146

1  constitution of the United States and say that an
2  attorney is not to be involved in that.  So it's just
3  crazy.  It's just one of their silly rules, but I
4  have it in writing.  It's one of their rules.  It
5  goes to show you not every rule is a rule.
6          So -- and I really wanted to be
7  present for one, I had one particular reason because
8  of the nature of the client.  It was a murder client
9  that -- long history to it, and she knew why I wanted
10  to be present.  So I attended, but I complied with
11  their silly rule of noninvolvement.  I didn't
12  interrupt him.  I know I could have.  It might not
13  have resulted in -- he probably would have tied it
14  out on the client so, once again, someone with an
15  associate's degree in command of the criminal justice
16  system.  So usually don't attend those.
17      Q.    So you just learned about this policy?
18      A.    Yeah, but I could care less about
19  their policy.  If we had time, we would attend them
20  all.
21      Q.    Okay.
22      A.    Absolutely.  We would love to be
23  able -- if we had time, we would attend them all.
24  I'm not saying we would have the interest to attend
25  them all, but there would certainly be a legitimate

## Page 147

1  reason to attend them all because the clients really
2  could benefit, I think.  More clients than not could
3  benefit because many are undereducated.  And, quite
4  honestly, the reason they don't want you there is
5  because then they've got a witness.  So if they're
6  willing to videotape them, I don't need to be there,
7  but I would still probably be there.
8      Q.    But they don't videotape them?
9      A.    No, no, goodness no.
10      Q.    Have you asked them to videotape?
11      A.    No.  I just now thought of that.
12  That's the first time I ever thought of those two
13  things, those two worlds colliding.
14      Q.    Who does the assessment?
15      A.    State probation and parole officer of
16  some sort.
17      Q.    So who is normally in the room, just
18  the probation/parole officer and your client?
19      A.    Well, like, for example, when you go
20  to the jail, they'll be on the phone lines and you'll
21  see them, and that's the way they're conducted, or
22  they may come into the -- they may tie up the only
23  room they have to visit our client doing them, too,
24  doing the interview.
25      Q.    Do you know how long they usually

## Page 148

1  spend, or does it totally depend on the case and the
2  person?
3      A.    Well, I mean, I've heard everything
4  from -- they're not thorough.  When I tell you they
5  went from a PSI to an SAR, same number of initials.
6  Less thorough.  It's really pretty useless.
7      Q.    Okay.
8      A.    I don't know how long they take.  I've
9  heard of circumstances where they are they just drop
10  off the forms to the client, "Fill this out, and I'll
11  come back for it," so I'm not sure that they
12  necessarily have a face-to-face exchange in each and
13  every instance.  I wouldn't know.
14      Q.    Why do you think judges find them so
15  helpful?
16      A.    Cover.  And sometimes they actually do
17  provide some useful information about the -- you
18  know, for those judges that are inclined to, you
19  know, exercise leniency in those cases that are
20  deserving of it, they could theoretically be useful
21  for that purpose.
22      Q.    But more often than not, in your
23  opinion, they are not useful or helpful?
24      A.    Depends on the judge.
25      Q.    How often do clients represented by

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

Page 149

1  your office want to withdraw a plea?
2      A.    It comes up.  I don't know.  I can't
3  give it a -- it doesn't come up so frequently that I
4  would say, oh, that happens a lot.
5      Q.    Okay.
6      A.    But there are circumstances where it
7  does.
8      Q.    What steps do you take if that
9  happens?
10      A.    Well, if I'm aware of it, it's because
11  one of the attorneys have come and said, "Hey, so and
12  so wants to withdraw their plea," and then we talk
13  about -- I try to walk the attorney through why and
14  what's the reason and what stage the case is at and
15  that sort of thing, so -- and then we look to the
16  rule.
17          I'm of the opinion that they don't
18  have the right to withdraw their plea unless, under
19  the rule, there's a manifest reason to do that.  And
20  sometimes, quite honestly, we've got to be concerned
21  with the client shooting themselves in the foot by
22  doing that because it may -- you may be in a
23  jurisdiction where the judge says, "I'll not just
24  withdraw it, I'll withdraw it with pleasure."  And
25  when they do, the prosecutor elevates the charges.

Page 150

1  So, you know, it's all about protecting the client
2  and trying to educate them at the same time.
3      Q.    When does your office's role and
4  representation end, I mean, is there -- just at
5  sentencing, when that is done, is your office done
6  with representation?  Does that question make sense?
7      A.    Sure.  When it's a plea, it's when the
8  judgment and sentence is concluded, the sentencing
9  hearing.  When it's a trial, then there's the
10  obligation to have -- most clients want to appeal.
11  You presume that's the case, you know, after a trial.
12  Every now and then you find one that doesn't, but you
13  can always withdraw that later.  We prepare a motion
14  to proceed in forma pauperis along with the proposed
15  order to present to the judge at sentencing.  After
16  the judge sentences, we present that, and then we
17  coordinate with the appellate division.  Trial side,
18  typically, files the notice of appeal.
19      Q.    So you advise your clients about their
20  rights to appeal separately, and does the court
21  usually do that as well at a sentencing?
22      A.    Well, the right under 24.035, the
23  judge does because they've pled guilty, and that's
24  part of the proceeding.  After a trial, it usually --
25  you know, it usually is part of the explanation you

Page 151

1  make to the client in terms of if you filed a
2  suppression motion or a motion in limine, to talk
3  about -- I always talk about trying to -- if the
4  trial is not successful, protecting them, and giving
5  them all appellate points that are possible to
6  preserve.  How much of that they understand, I don't
7  know, but in terms of, you know, will you be my
8  attorney on appeal, then you explain how the process
9  works and how we're going to file this, and then it
10  will be up to the appellate office to assign you an
11  attorney.
12      Q.    So you help them get there, though?
13      A.    Right.  We sort of serve it -- we tee
14  it up.  We tee up the appeal through the notice of
15  appeal.
16      Q.    Okay.  And how -- I'm told I'm using
17  this term correctly.  Eloucutions done in your
18  district, is that something that you're attending and
19  participating in with your client?
20      A.    I'm pretty sure that's just a phrase
21  at the sentencing, in my experience.
22      Q.    So you're there, and it's just --
23      A.    We're there when the judge says that
24  word.
25      Q.    Okay.  And then so as far as

Page 152

1  post-trial, you would file any post-trial motions in
2  your office, or that would happen before the notice
3  of appeal and you kind of handed it off?
4      A.    The post-trial motion typically would
5  just include the motion for new trial after a jury
6  has convicted then sentencing date set, you attend
7  that sentencing date, argue the motion for new trial,
8  it's typically overruled, of course, and then the
9  sentencing occurs.  It's at the conclusion of that
10  that we file the motion and order to appeal in forma
11  pauperis, and then within 10 days is, I believe, the
12  due date for the notice of appeal for the court of
13  appeals.
14      Q.    And because we already -- your office
15  is not currently taking any juvenile cases unless
16  there's a special circumstance?
17      A.    Clinton County, we do.
18      Q.    Okay.
19      A.    And those are not really special
20  circumstances, it's just whenever the judicial judge
21  in the 43rd Judicial Circuit involves us.
22      Q.    Then I will go through these
23  questions.
24      A.    Okay.
25      Q.    And when you say -- so Clay and Platte

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-14   Filed 02/09/18   Page 39 of 107

## Page 153

1  County, that's a judge decision that they decided --
2      A.    They afforded us that relief around
3  the time of Waters.
4      Q.    Okay.
5      A.    One of them sort of one -- one of them
6  has been continuous.  Platte has been more continuous
7  than Clay, but both, right now, we are relieved of
8  that obligation.
9      Q.    How are those cases assigned within
10  your office, the ones you do get from Clinton County
11  and then I guess --
12      A.    I primarily have one attorney, and
13  only one attorney, covering Clinton County cases, so
14  the attorney that I have covering Clinton County
15  cases is assigned their juvenile cases.
16      Q.    And then also covers many other cases,
17  other dockets, as well?
18      A.    Goodness, yes, and other counties,
19  too, sure.
20      Q.    Okay.  How is indigency determined for
21  juveniles?
22      A.    My understanding is, frankly, every
23  juvenile qualifies unless they have some trust fund
24  that we're going to stumble upon, they're going to
25  qualify.  We're not going to find them to be

## Page 154

1  ineligible because of the wealth of either or both
2  parents.
3      Q.    Okay.  Are they often held in custody
4  and kept in custody in the cases that you see?
5      A.    Yes.
6      Q.    Where are they held?
7      A.    Glad you asked.  From our experiences,
8  those juveniles that are charged in the 43rd Judicial
9  Circuit, the portion, the tiny fraction of the 43rd
10  Judicial Circuit that we cover, which is Clinton
11  County Courthouse in Plattsburg, Missouri, those
12  young men and women are generally housed in
13  Kirksville, Missouri.
14      Q.    How far is that from where they might
15  live?
16      A.    Well, I don't know where they live,
17  but it is hours and hours away from the Plattsburg
18  courthouse.
19      Q.    Which is where they need to show up
20  for their hearings?
21      A.    Yes, and where our lawyers are, yeah,
22  so we drive half a day away and back again for the
23  juvenile cases.
24      Q.    Why are they sent there, is it just
25  because of the facility that --

## Page 155

1      A.    I have inquired of the Clay County
2  juvenile chief detention officer about that because
3  in a conversation with the judiciary, I expressed my
4  frustration over that, why so far.  Because I was
5  thought -- I was led to believe perhaps there was a
6  possibility that they would -- that those juveniles
7  could instead be housed within walking distance from
8  our office at the Clay County Juvenile Justice
9  Center, but the communication was made and,
10  apparently, the 43rd Judicial Circuit contracts with
11  the Kirksville facility, I'm told.
12          In my mind, still not good enough
13  reason to make my staff waste their time because,
14  frankly, they could drive them a shorter distance to
15  the Clinton County jail, juvenile jail.  They have
16  specific -- an entire building dedicated to juvenile
17  justice.
18      Q.    In Clinton County?
19      A.    Clay County.
20      Q.    Clay County.  Sorry.
21      A.    Clinton instead transfers them to
22  Kirksville.
23      Q.    Hours away?
24      A.    Hours away.
25      Q.    Okay.  So if you are an attorney who

## Page 156

1  is assigned this case and wants to visit a client
2  before a hearing in person, they would have to
3  drive --
4      A.    I have had my Clinton County
5  attorneys, over the course of the different attorneys
6  that have covered Clinton County, drive to
7  Kirksville.
8      Q.    And so that -- I mean, that's an
9  entire day just for a visit?
10      A.    Yes.
11      Q.    If your office is conflicted out of a
12  juvenile case, where does that case go in Clinton
13  County?
14      A.    Since we only do Clinton County
15  conflicts in juvenile, I don't know that we've done
16  that.  I can't say that we've done that.  It's
17  happened in Clay or Platte, but those have been years
18  and years ago, so I'm not quite sure where that would
19  go, how that would be handled.
20      Q.    Would a juvenile -- because assuming
21  they would all qualify for representation -- ever
22  have to attend a detention hearing without an
23  attorney?
24      A.    Yes.
25      Q.    What's the circumstances that that

**ALARIS LITIGATION SERVICES**
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

Page 157

1  would happen?
2      A.    The rules require it to be within -- I
3  forget the number of hours, maybe 20.  It's
4  relatively short.  Might be a little longer than
5  that.  And sometimes that occurs prior to their
6  application, I think.  I have more familiarity with
7  Clay County than anything else and, like I said,
8  we've been fortunate enough not to do that for a
9  number of years, but I think there's a possibility
10  that the juvenile in Clinton County would have a
11  detention area without an attorney, but I don't know
12  if that's the normal practice or not.
13      Q.    And that's just because of how quickly
14  it happens and they don't have -- they haven't
15  applied or they don't have an attorney assigned?
16      A.    I mean, they're usually -- of course,
17  the only source they have, generally, is either the
18  judge or the juvenile officer to tell them, usually
19  speaking to the parent, probably, you have the right
20  to fill out an application, so...
21      Q.    Are they usually told that, in your
22  experience?
23      A.    I'm not sure.  Juvenile, especially in
24  the 43rd Judicial District, is a shroud of secrecy.
25  It's unlike anything you see on American TV.

Page 158

1      Q.    Okay.  So that judicial circuit is
2  just particularly its own situation, in your
3  experience, I guess?
4      A.    In a word, yes.
5      Q.    Okay.  Are there frequently
6  certification proceedings for juveniles that your
7  office sees?
8      A.    There have been in the past.  I don't
9  know that recently we've had any certification
10  hearings in the juvenile cases that we handle.
11      Q.    Is it common for the attorney who
12  handles the cases to line up alternatives for
13  detention for the juveniles?
14      A.    I'm sorry.  Let me go back to that
15  first question.  I guess it wasn't all that long ago
16  that I handled a juvenile certification hearing in
17  Jackson County because, as you mentioned, Jackson
18  County has the list, and it was during the transition
19  of the relief afforded our trial offices with
20  contract conflict counsel, and the special way that
21  Jackson County does their juvenile through the
22  private attorney list and law firms assistant, that
23  sort of thing, but there was one lingering that was
24  sort of caught in between where our office was
25  involved.  I handled it, frankly, because I -- all my

Page 159

1  attorneys were -- there's no way that I could cast
2  them into -- have that additional burden, too, and so
3  we had -- that was pretty time-consuming, but we had
4  the hearing down there in Jackson County.
5      Q.    What type of preparation comes -- do
6  you do for a certification hearing?
7      A.    Well, on that particular one, again,
8  he happened to be at the top of the pile which is --
9  you know, you create the pile.  It's not first come,
10  first served or last in line.  It's the triage
11  method.  And there was sufficiently interesting
12  information in the discovery that we received that we
13  wound up subpoenaing probably half a dozen officers.
14      Q.    But that's not always the case?
15      A.    Not typically the case.
16      Q.    So, then, I guess now we're going to
17  jump back to alternatives to detention.  Are there
18  resources available to the attorneys in your office
19  to identify alternatives, or is this just something
20  maybe they know about because they do this type of
21  work regularly?
22      A.    Are we still talking about juvenile?
23      Q.    Yes.
24      A.    Okay.  Other than -- I think, as far
25  as I know, the only alternative to detention would be

Page 160

1  one of the parents or family members.
2           MS. WILCOX:  Okay.  Can we go off the
3  record for a second.
4           THE VIDEOGRAPHER:  We're off the
5  record at 12:27 p.m.
6           (A brief recess was taken.)
7           THE VIDEOGRAPHER:  We're back on the
8  record at 12:30 p.m.
9           MS. WILCOX:  All right.  So we're
10  talking about alternatives, I believe, is where we
11  left off.
12           Could you read back the last question
13  and answer.
14           (The record was read by the Reporter.)
15      Q.    (BY MS. WILCOX):  So if a parent and
16  family member is an alternative to detention, that's
17  something that the attorney would argue for -- would
18  go to a hearing and argue that the child be placed
19  somewhere other than in a detention facility?
20      A.    That would be the argument, yes.
21      Q.    How often is that granted?
22      A.    In the setting of Clinton County, I'm
23  going to -- I think it's safe to believe probably
24  never.
25      Q.    Okay.  And so, then, those juveniles

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 161

1  are housed is Kirksville, pending some outcome of
2  their case?
3      A.   Yes.
4      Q.   Is that where they would stay if their
5  sentence involved a period of time after, like, a
6  conviction or a plea?  Do they stay in that facility?
7      A.   It's a special juvenile facility so,
8  yes.  That could be where they wind up if they were
9  serving juvenile detention after the case is
10  concluded.
11      Q.   Does the attorney in your office ever
12  work with expert witnesses in juvenile cases?
13      A.   I don't have any firsthand knowledge
14  of that, I mean, I'm sure there was a time when we
15  did more juveniles that, perhaps, that came up
16  probably in the Jackson County setting.
17      Q.   Okay.
18      A.   But I don't remember approving any use
19  of those in the Clinton County.  That's where I --
20  that would be my gatekeeper, right, because I didn't
21  approve, so I'm assuming it wasn't utilized.
22      Q.   Are social workers utilized in the
23  juvenile context?
24      A.   I don't believe so.  I know we don't.
25      Q.   These are kind of summation questions,

## Page 162

1  so bear with me because they are things you've said,
2  but I would like to just kind of ask a final
3  question.
4      A.   Sure.
5      Q.   In your opinion, can the attorneys in
6  your office, including you, adequately represent all
7  the clients on their docket?
8      A.   No.
9      Q.   And what's the basis for your opinion?
10      A.   Excessive workload and insufficient
11  resources.
12      Q.   And does your opinion stay the same no
13  matter how expert or the amount of experience an
14  attorney has?
15      A.   It may be impacted by the amount of
16  experience necessarily because, quite honestly, an
17  inexperienced attorney, wherever they work, wouldn't
18  necessarily know what they're missing.
19      Q.   We talked -- we've touched on the
20  Waters case --
21      A.   Yes.
22      Q.   -- from 2012.  So you were in your --
23  the current employment?
24      A.   Yes.
25      Q.   How did the attorneys in your office

## Page 163

1  respond to the Waters decision?
2      A.   Well, the lead-up to the Waters
3  decision, because this is -- I've got a file at the
4  office just of the opinion, but it's been years since
5  I've read it.  Leading up to that and the effort to
6  create -- to impact the workload and create a
7  caseload cap, there was a certain degree of optimism.
8          After Waters, there was legislation
9  pending that sought to privatize the public defender
10  system, and it was received, frankly, with some
11  hysteria on the part of attorney and nonattorney
12  staff members for fear of the system -- that wasn't
13  everyone, but that was a lot of people, for fear of
14  losing their jobs and their income and their health
15  care and that sort of stuff.
16      Q.   How did the judges in the district
17  respond to the Waters decision, was there any change?
18      A.   Well, like I said, Clay and Platte, as
19  a result of the meetings that my supervisors held
20  with Waters -- in connection with the Waters, they
21  continued the relief through the juvenile cases, and
22  we didn't -- sparing us of that obligation.  I don't
23  know how else to explain how they impacted -- how
24  they effected it.  When the prosecutors file the
25  cases, the judges really don't have any control over

## Page 164

1  the number of cases that are charged.
2      Q.   Do you think that your office
3  continually exceeded its caseload capacity for any
4  period of time that spans three months at a time
5  before and after Waters?  Has that been ongoing?
6      A.   Our overcapacity, there's no doubt,
7  has been continuously ongoing.
8      Q.   Since at least 2005?
9      A.   '05?
10      Q.   That was kind of the year we were
11  talking about?
12      A.   Sure, sure, sure.  Well, I mean you're
13  talking about that's the Anthony assessment.  You're
14  talking about metrics in Exhibit 14, so I don't
15  know -- you're talking about what it feels like as a
16  manager and what I believe we were going through with
17  the then period of transition and lack of
18  investigators and relative -- a lot of novice -- new
19  experienced attorneys, yeah.  I mean, I don't have
20  any reason to think that in 2005, it's not a good
21  time to begin to say things were beyond -- began to
22  get beyond control.
23      Q.   And have stayed that way, and gotten
24  worse?
25      A.   They've gotten far worse.

41 (Pages 161 to 164)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-14    Filed 02/09/18    Page 42 of 107

## Page 165

1    Q.    Okay.
2    A.    Worse.
3    Q.    Can attorneys in your office -- let's
4 talk about before Hinkebein.  Am I pronouncing that
5 correctly?
6    A.    Karl Hinkebein.
7    Q.    Hinkebein.  Before that, in the recent
8 events, was there a way for attorneys to refuse to
9 take cases in your office?
10    A.    Before the Karl Hinkebein case opinion
11 was rendered, no one -- we never really discussed
12 about refusing cases.  There was never any discussion
13 of that.  There was always a constant discussion of
14 too many cases, and -- but that was the extent of it.
15 I mean, refusing as in -- frankly, the refusal was --
16 I'm assuming that was with attorney resignations.
17 And I don't know if it's accurate to characterize
18 that as a refusal.  It may have been -- frankly, may
19 have been, unfortunately, been -- and I'm not proud
20 of this -- a surrender.  Or they may have left for
21 other reasons.  They may have left because their
22 student were such that they couldn't afford to pay
23 them, you know, or some combination thereof.  But
24 refusal, that's a magical term that comes from the
25 Karl Hinkebein case.

## Page 166

1    Q.    Okay.  So why don't you tell me about
2 the case, and describe the best you can, I guess, and
3 without going -- and briefly, like, but what the
4 decision was and what that held, what that means for
5 your office.
6    A.    Well, I have some experience with the
7 office of chief disciplinary committee as a result of
8 nonmanagement as well as nonmanagement duties.  I'm
9 certainly not an expert on that.  But over the years,
10 there was always discussion at management meetings
11 that, you know, clients were making bar complaints.
12 And there was never -- there was never an issue
13 with -- unless someone legitimately did something
14 wrong, affirmatively did something wrong, it was
15 never at the forefront of anybody's concern, but the
16 Karl Hinkebein case took an overworked public
17 defender who also had medical issues, according to
18 the published opinions, and faulted him for not being
19 able to perform.  And, essentially, what that did, in
20 my mind, was faulted him for not being able to
21 overperform with a grossly excessive caseload in the
22 appellate setting, which is different than a grossly
23 excessive caseload in the trial setting because
24 there's different duties involved, vastly different.
25 But having worked in appellate for awhile, I do

## Page 167

1 understand there's a lot to be done and a whole lot
2 of preparation and a whole lot of research and
3 writing.
4    But, essentially, my assessment of the
5 Karl Hinkebein case was that the Office of Chief
6 Disciplinary Committee made an issue of specifically
7 making excessive caseload not a defense to the
8 attorney, regardless of whether or not the attorney
9 is a private counsel, and purposely took on too many
10 cases, trying to become a profiteer, essentially, or
11 somebody like Karl Hinkebein, who's been a state
12 employee, undercompensated, overworked for decades,
13 someone who had their supervisor bring them work to
14 the hospital bed to continue to work for their
15 clients.
16    And the Office of Chief Disciplinary
17 Committee made it a point, because it's a point in
18 their brief, to make sure that the Supreme Court did
19 not carve out an exception to public defenders
20 specifically no excuse that you don't have any
21 control over the number of cases that you have an
22 obligation to ethically and zealously defend.
23    It's a mathematical calculation that I
24 could never agree with.  It just doesn't make any
25 sense.  And it sent shock tremors through the public

## Page 168

1 defender system, especially after listening to the
2 oral argument, and I went as far as to read the
3 appellate briefs on either side.  It was very
4 disturbing, and we drew a line in the sand.
5    Q.    When did that decision come down,
6 within the last two months?
7    A.    Well, I think my letter went out
8 October 2nd, so it was shortly -- probably took me a
9 week, only because I was so busy, not through lack of
10 interest, to complete the letter --
11    Q.    Okay.
12    A.    -- my version of the letter.  And as
13 soon as the opinion came out, I sent word to my
14 attorneys that I would be doing everything I could to
15 protect our bar licenses, and I encouraged them to do
16 the same thing, and to listen to the opinion and
17 educate themselves, not just what we were talking
18 about in the lunchroom or, you know, over the
19 watercooler, if we had one.
20    Q.    How did the MSPD central office
21 respond to the decision?
22    A.    Well, I believe it was a supportive
23 response, at least that's the impression I got from
24 the direction I've seen taken by our director, and
25 he, I think, directed a memo or a letter out, I

**ALARIS LITIGATION SERVICES**
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 169

1  haven't read that in quite awhile, educating us about
2  the opinion and that sort of thing.
3         And then thereafter, myself and my
4  co-director, Ms. Brown, as well as our director,
5  Mr. Barrett, scheduled meetings with the presiding
6  judges of Clay County and Platte County, I think it
7  was on the same day, and then inviting any other
8  judge with, albeit, short notice to come to wherever
9  we were holding those meetings, you know, in the
10  relative jurisdiction of Clay and Platte, to discuss
11  public defender concerns.  And that meeting was held
12  on that day and, you know, things were discussed that
13  could possibly try to address the workload concerns.
14      Q.    Did you talk to your staff about what
15  you felt like that decision meant and what maybe
16  precautions they needed to take before you got a memo
17  from the central office?  Did you have discretion,
18  you felt, to do that, just based on your role as the
19  district defender?
20      A.    I didn't think I needed discretion.
21  I've got a bar license, and I did it before I got the
22  memo.
23         MS. WILCOX:  All right.  Since we're
24  talking about it, I'm going to hand you what's going
25  to be marked as Exhibit 15.

## Page 170

1         (Exhibit 15 was marked for identification.)
2      Q.    (BY MS. WILCOX):  Can you identify
3  this document for me?
4      A.    Sure.  Exhibit 15 is a copy of a
5  letter dated October 2nd, 2017, that I directed out
6  to the presiding judges of Clay, Platte and Clinton
7  County in relation to the Karl Hinkebein decision.
8      Q.    Can you summarize what you're telling
9  the judges, what it says?
10      A.    Well, let's see.  Probably no way to
11  quickly summarize that.  It's pretty detailed, but --
12      Q.    And we can read it, so, yeah, I don't
13  want you to --
14      A.    I think -- the only thing I was trying
15  to convey to the judges was how, as a result of the
16  Hinkebein decision, at least as far as I was allowed
17  to proceed, we were going to try to defend our law
18  licenses any way that we thought we needed to.
19      Q.    Have the judges that you directed this
20  letter to continued to appoint public defenders?
21      A.    Well, I should note that I
22  carbon-copied all the other judges and a commissioner
23  in Clay and Platte and Clinton, so not just the
24  presiding judge.  So there have been some -- there
25  have been some judges that have continued to appoint

## Page 171

1  the public defender in both Clay and Platte.  Insofar
2  as Clinton County is concerned, I did not hear back
3  from that judge.
4         Now, in defense of that, I'm not
5  accusing her of anything.  We only cover a tiny
6  fraction of the 43rd Judicial Circuit, and I believe
7  communication was through -- for the Clinton County
8  judiciary was made through, I'm presuming through the
9  Chillicothe trial office that handles the remaining
10  seven, eight counties, the majority of those,
11  obviously, all but one, so -- but because we cover
12  that one, it was my duty to notify him, too.  So I
13  haven't heard from that presiding judge.  I have
14  heard from some of the other judges in Clinton County
15  and 43rd, but not the presiding judge, so -- but,
16  yes, we have continued to be appointed by some of
17  judges in those jurisdictions, after my letter.
18      Q.    Are you aware of communications
19  between other district -- public defender district
20  offices and courts throughout the state regarding the
21  Hinkebein decision?
22      A.    Somewhat aware, I mean, I don't know
23  if I'm aware of every communication that was made,
24  but I've talked to friends and seen the letter
25  directed by the district defender out of Columbia,

## Page 172

1  Missouri.  I think that's the only other letter I've
2  seen, but I can't be certain of that.  All I can
3  recollect right here.  I remember I saw that letter
4  before I composed mine.
5      Q.    And have you gotten any word from
6  people you've spoken with about what other judges who
7  have maybe been alerted to the situation and to the
8  concerns of the public defenders office are doing if
9  they're continuing to appoint attorneys?
10      A.    Well, I think there's been newspaper
11  articles about it, so it's no secret.  The 16th
12  Judicial Circuit has not taken it well, and I think
13  the reaction by the presiding judge, who shall remain
14  nameless in my videotaped deposition, characterized
15  the public defender antics as horse shit, if my
16  recollection serves me.
17      Q.    I think that's correct.
18         Have you, internally, to the extent
19  you can discuss it, have you guys been talking with
20  other offices about the decision and what it means
21  for the attorneys?
22      A.    I know I've had conversations with
23  other managers, but it's just been probably more
24  about the Hinkebein decision than anything else.
25      Q.    Do you know anybody who has resigned

43 (Pages 169 to 172)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-14   Filed 02/09/18   Page 44 of 107

## Page 173

1  because of it or know anybody who has resigned
2  because of it?
3      A.  No one in my office has resigned yet
4  because of it, but every Monday morning is a
5  teetering edge, so -- and I have every reason to
6  believe that's going to happen, but I'll take it
7  as -- I'll take continuity as long as I can.  And I
8  will say this about -- to be fair, some members of
9  the judiciary in Clay and Platte have attempted to be
10  cooperative and considerate.
11      Q.  And you said you met with the two
12  presiding judges for Clay and Platte?
13      A.  Shortly after the letter went out,
14  myself, my Deputy District Defender Ara Bailey Brown
15  and our director, Michael Barrett, met with the
16  presiding judge, Judge Sutton and Judge Van Amburg,
17  and any of the judges that were available in the
18  courthouse there that, you know -- and, again, it was
19  short notice, so there was just one or two available
20  in each jurisdiction in that meeting.  There was a
21  full discussion about our concerns and the Hinkebein
22  decision and what the judges could do to help and
23  that sort of stuff.
24      Q.  What's your takeaway from that
25  meeting?  What did they say they could do to help or

## Page 174

1  what has been done in your opinion to alleviate?
2      A.  Well, it was made clear that my
3  concern would be not only would we be in the
4  situation that we are now, and it's no secret the
5  judges see that our cases linger forever.  They're
6  the ones granting continuances.  They see -- I
7  believe they genuinely see how hard the attorneys are
8  working.  They certainly see the parsement of numbers
9  compared, in a totality sense, to the public defender
10  attorneys that are practicing before them, so I think
11  they're mindful of the fact that my concern is with
12  resignations, and then we will all be in a worse
13  position than we are now, which is a pretty dire
14  position.
15      Q.  Did they have any concrete suggestions
16  of what could be done?
17      A.  Well, each Clay and Platte are --
18  attempted to contact -- sort of sent messages through
19  the private bar to seek out names of attorneys in the
20  private setting that would be willing to take on pro
21  bono -- some pro bono public defender indigent cases,
22  perhaps even at a reduced fee, so I'll say pro
23  bono/reduced fee.
24      Q.  Do you know who would pay the fee,
25  where that would come from, if you know?

## Page 175

1      A.  I really don't know.  I would be
2  speculating.  I think the emphasis was on pro bono.
3      Q.  Not a long-term solution, but kind of
4  a -- it sounds like it was more of a short-term fix
5  to, right now, alleviate the caseload that you have
6  so that you hopefully don't lose all the attorneys
7  you have in your office?
8      A.  That's probably fair.
9      Q.  I have this document that was
10  previously marked as Exhibit 5.  Have you seen this
11  document before or heard of its existence?  And can
12  you kind of identify what it is that you're looking
13  at?
14      A.  Sure.  Exhibit 5 is titled
15  "Suggestions in Support of Writ of Prohibition and/or
16  Mandamus."  I think -- I'm not positive, but I think
17  I've seen this on a database, so if I would have
18  viewed it, in all likelihood, would only have been
19  electronic.  I don't know that I have printed it out.
20      Q.  Okay.
21      A.  But I'm not even certain I've seen it.
22      Q.  Okay.  So it looks like it's a form
23  from the public defender system of a writ that would
24  allow someone to object to an appointment.  Is this
25  something that's ever been filed in your office or by

## Page 176

1  someone in your office?
2      A.  No, not my office.
3      Q.  Okay.  All right.  I have another
4  exhibit that is going to be not previously marked,
5  and this is now going to be exhibit --
6      MS. SHIPMA:  16.
7      MS. WILCOX:  Thank you.  16.
8      (Exhibit 16 was marked for identification.)
9      Q.  (BY MS. WILCOX)  And if you could
10  just identify what it is, it's a similar form
11  document --
12      A.  Sure.
13      Q.  -- and let me know if you've seen it
14  before.
15      A.  Sure.  Exhibit 16 is a motion to
16  withdraw due to excessive caseload.
17      Q.  Have you seen this document before, to
18  your recollection?
19      A.  Again, I may have.  It's possible I
20  saw this on the electronic database but, again, I'm
21  not even sure I printed it.
22      Q.  So to your knowledge, has an attorney
23  in your office ever filed this kind of motion, motion
24  to withdraw due to excessive caseload?
25      A.  No, not to my knowledge.

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-14    Filed 02/09/18    Page 45 of 107

Page 177

1      Q.    We have talked about this, I think, in
2  a lot of your other answers, but we're going to focus
3  on what I'm going to call the triage of cases, so if
4  an attorney in your office spends the amount of time
5  that he or she thinks is necessary to zealously
6  prepare a client's case, what happens to the other
7  clients?
8      A.    Nothing except they're probably put at
9  a more disadvantageous position than they already
10  are.  Conceivably, their witnesses disappear.
11  Conceivably, their alibi goes away.  If they're in
12  custody, they're suffering loss of liberty longer if
13  they wind up not bonding or being, you know,
14  continuously placed in loss of liberty.  Nothing
15  good.
16      Q.    I think you used the term "triage"
17  earlier.  Is that something that -- a word you would
18  use for what attorneys in your office do with their
19  cases?
20      A.    It's a dirty word we use, yeah.  We've
21  been using it for decades.
22      Q.    Explain to me what you mean when you
23  say things are triaged.
24      A.    Well, the analogy is often made to a
25  MASH unit where the sick and wounded come in, you

Page 178

1  deal with them as they come in best you can, and
2  usually there's a waiting period.  And people are not
3  getting better while they're waiting while they're
4  not being treated.  So the triage -- it's also could
5  be -- it's the fires that we put out every day and,
6  significantly, it's also the waiting at the dockets
7  for hours and the probation violation and the traffic
8  dockets.  Because while those attorneys' times are
9  tied up with that, they're not investigating the
10  cases that might have an alibi.  And I say "might"
11  because they haven't determined it yet because they
12  probably haven't read through the discovery.  And
13  they also have clients who are sitting in jail whose
14  bond motions may have never yet been filed, certainly
15  not investigated, probably not investigated, and
16  hearings that haven't been held.
17        Now, from an optimistic sense, maybe
18  they -- maybe the judge reduces their bond, maybe
19  their family locates some money and they're able to
20  have pretrial detention out of custody.  And it's
21  always better for any client, I believe, to work with
22  his or her attorney in an out-of-custody situation.
23  You know, pointing through the glass and trying to
24  demonstrate things, not good.  It's always better to
25  have the client -- it's critical to have the client

Page 179

1  out of custody if it's possible.
2        What happens when you don't is what
3  you, essentially, have is you're creating
4  documentation for the prosecution because clients are
5  making recorded phone calls and writing.  There's no
6  privacy in visiting with family.  All of that is
7  recorded in the jurisdictions that I'm aware of and
8  accessible, fully accessible, by the prosecuting
9  attorney's office.  So what we're left with is we get
10  some late discovery on a client that has been making
11  some jail calls, possibly incriminating information,
12  possibly not.  It may be neutral, but we wouldn't
13  know until we take time to listen to them.  And if
14  you're going to get them the Thursday before your
15  Monday trial, that's not really fair.  But you
16  haven't really filed a motion to make sure that they
17  comply and give that to you in a timely, consistent,
18  within, you know, 48 hours of their recording.  You
19  haven't done that because you've taken the one case
20  at the top of the pile, and you're working it and
21  you're providing -- that client is not getting first
22  class service.  That client is getting service that
23  every client deserves, one lawyer, not a team of
24  lawyers, one lawyer.  And that's what the
25  constitution guarantees.

Page 180

1      Q.    Do you think that the current
2  circumstances with caseload and resources are causing
3  violations of the rules of professional conduct in
4  your district by lawyers?
5      A.    Can we take a break?
6        MS. WILCOX:  Sure.
7        THE VIDEOGRAPHER:  We're off the
8  record at 1:00 p.m.
9        (A brief recess was taken.)
10        THE VIDEOGRAPHER:  We're back on the
11  record at 1:09 p.m.
12      Q.    (BY MS. WILCOX):  I'm going to
13  rephrase the question I asked you.
14      A.    Okay.
15      Q.    In the letter you sent to the court on
16  October 2nd which -- can you remind me the exhibit?
17      A.    15.
18      Q.    15.  It's on the second page.  In that
19  letter you say that you've instructed the assistant
20  public defenders in your office to notify you or your
21  deputy district defender if they believe accepting
22  new cases would materially limit their
23  responsibilities to existing clients so they can
24  ensure compliance with the rules of professional
25  conduct.

45 (Pages 177 to 180)

ALARIS LITIGATION SERVICES
www.alaris.us        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-14   Filed 02/09/18   Page 46 of 107

## Page 181

1    That's true that you've asked the
2  attorneys in your office to do that?
3    A.   That's true.
4    Q.   Okay.  And then can you just tell me
5  what -- how have you been assigning new cases that
6  have been coming in since this letter went out?
7    A.   Since the letter went out, I think it
8  was -- it may have been within a week of the letter
9  going out.  Trying to think.  I think it probably was
10  the letter cutoff date.
11    Well, there's a period of time that we
12  created a waiting list.  Immediately after the
13  letter, October 2nd, 2017, there was a waiting list
14  that was created or begun to be created, and
15  understand with a limited staff, that took a lot of
16  resources and redirecting them to creating the
17  waiting list because we still had to process
18  applications and find whether or not they were deemed
19  indigent, et cetera.
20    And then there was a short period of
21  time where we directed out letters to those folks who
22  were on the waiting list, and after a relatively
23  short period, some of the prosecuting attorney
24  authorities began to file -- either provided me with
25  a sample or actually filed a motion to -- the state's

## Page 182

1  motion in opposition or to show cause, and I think
2  what they were doing is voicing their belief that the
3  letter that I had sent out, perhaps others, was not
4  within -- not in compliance with the statute Chapter
5  600, and instead sought the court's relief to order
6  us to file entry in the case.  And there was a
7  groundswell of information that came in informally
8  through other managers I've talked to and, frankly,
9  the other attorneys throughout the different offices,
10  and it was clear that some -- one or more judges,
11  their intention was to hold somebody in contempt.
12  They were clearly itching to do that.
13    I decided to eliminate the wait list,
14  and continue to assign Clinton County cases to the
15  single attorney that I've assigned to Clinton County
16  duties and clients, and those entries of appearances
17  have been modified.  I can't remember the exact
18  language, but it, I believe, said something along the
19  lines of entry of appearance under duress and in the
20  unintentional violation, contraindication of Rule 4,
21  I think, or words to that effect.
22    It's a form motion.  It is, I
23  believe -- with the exception of clients that we --
24  if we represent John Doe now, and John Doe picks up a
25  new case, we enter in that case because we already

## Page 183

1  represent John Doe's interest, but absent that single
2  exception, all of our other entries of appearances
3  are made under duress and in the unintentional
4  violation of the Rule 4.  So everyone that was on the
5  waiting list is now assigned to me, and my entry of
6  appearance under duress was made.  And then, of
7  course, there was a period of time, since we weren't
8  making the waiting list, still people were applying.
9  They were found to be indigent or they were found to
10  be nonindigent, and appointed by the court, and those
11  were also personally assigned to me under duress.
12  That's why I have nearly -- approaching 400.
13    Q.   So there is no wait list right now.
14  You're just doing the entry under duress?
15    A.   There is technically no wait list.
16  Clients are waiting for me, but they're not on a wait
17  list.
18    Q.   Okay.  When they were on a wait list
19  was it informal within your office, or maybe formal?
20  Informal is not the right way to describe it.
21    A.   Well, I mean, we had a running list on
22  a database, and I think we might have provided a copy
23  of that list to one of the associate circuit judges
24  that, I think, asked for it.  It was no secret.  You
25  know, they just wanted to know.  I think they were

## Page 184

1  concerned with the count, maybe.  I'm not sure what
2  their concerns were but, yeah, I mean, it existed.
3  It no longer exists.
4    Q.   How long do you think that it must
5  have --
6    A.   I mean, there was -- we had letters
7  that were printed that never went out.  That's how
8  short duration of came a waiting list we had.
9    Q.   Okay.
10    A.   But yet some of them got it, and
11  clients told me no, I'm on a waiting list.  Well, you
12  were for a brief period of time.
13    Q.   Anyone who was on it has since now --
14  some entry of appearance has been filed in that case
15  in your office, waiting, but has been assigned?
16    A.   Or they represented themselves,
17  proceeded pro se, or they hired private counsel.
18    Q.   Okay.
19    A.   There's probably a fraction of those
20  that did that.
21    Q.   So the -- in your district, the
22  private bar appointments, are they happening yet or
23  that has not happened yet, that was just a
24  discussion?
25    A.   There's -- we have a list from the

46 (Pages 181 to 184)

ALARIS LITIGATION SERVICES
www.alaris.us            Phone: 1.800.280.3376            Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-14    Filed 02/09/18    Page 47 of 107

## Page 185

1    Clay County and a list from Platte County, and my
2    staff is told that when people apply that are not --
3    people apply that are not qualified, we provide them
4    a list, and explain, number one, that they have a
5    right to appeal our finding; to have the court
6    consider whether they're going to appoint us under
7    the statute. And if you're interested, here is a
8    list of lawyers who have voluntarily put their name
9    on the list that either represent pro bono or at a
10   reduced rate.
11           I didn't change the list as it came
12   from the courts or the court's clerk. If it said
13   "pro bono" on it, I didn't tinker with that language.
14   If it said "reduced rate," I didn't tinker with that
15   language. I didn't tinker with anyone.
16       Q.   But you're saying these are for
17   defendants who your office has found don't qualify
18   for your representation?
19       A.   Right, yeah. Because we can't turn
20   them away and say hey, call pro bono. I mean, under
21   the statute, they have the right to apply. We're
22   obligated to process them to deem -- to see whether
23   or not they fall within the indigent guidelines.
24       Q.   So to date, there is no refusal of
25   cases from your office to the court?

## Page 186

1       A.   When I last left the office, there
2    wasn't any refusal of cases. We've been here awhile.
3       Q.   Are you familiar with the Missouri
4    Coalition for the Right to Counsel?
5       A.   I've heard of it.
6       Q.   Okay. Do you understand it to be in
7    existence?
8       A.   I don't know anybody that's affiliated
9    with it.
10      Q.   Okay.
11      A.   So other than having read the phrase,
12   the title, I don't --
13      Q.   So that program is not alleviating the
14   amount of cases you have in your district; is that
15   fair?
16      A.   Not to my knowledge.
17      Q.   Okay.
18      A.   I'm not even sure what it is. Let's
19   just say this: It's not alleviating it enough.
20      Q.   Okay. That is bringing me to the
21   conclusion. If there's anything else that you think
22   we should know regarding your ability or the ability
23   of your district to provide effective representation,
24   I would open it up for you to share that with me, but
25   I have no other questions.

## Page 187

1       A.   I can't think of anything. I mean, I
2    may think about it later. I still haven't thought of
3    that immigration landmark case.
4              EXAMINATION
5    BY MR. RAMSEY:
6       Q.   Good afternoon.
7       A.   Good afternoon.
8       Q.   My name is Steven Ramsey, again, and I
9    represent the State of Missouri and Governor Eric
10   Greitens.
11           If we could go back to your
12   experience, did you come straight from undergrad into
13   law school or was there a period of time in between?
14      A.   I had a hard time getting into law
15   school, so there was a lapse of time, about five
16   years.
17      Q.   And during that five years, what did
18   you do? What you were employed as or how did you
19   take up that time?
20      A.   I had -- goodness. Goes back a ways.
21   I worked for my family business. I worked for the
22   IRS. I think that's probably it.
23      Q.   And how would you classify your work
24   for the IRS?
25      A.   Started as a seasonal tax examiner,

## Page 188

1    and I showed up, so they kept me.
2       Q.   And then so from that period, you went
3    to law school. Did you immediately -- and I
4    apologize if I missed this. Did you immediately
5    begin in private practice for, I believe, four years?
6       A.   No. My first job was with the
7    Missouri Public Defender System as an attorney.
8       Q.   And then was there a period that you
9    did leave and then went into private practice?
10      A.   Right. About five years with the
11   public defender -- four years, 11 months -- and then
12   two years with private practice, a law firm downtown
13   Kansas City, Missouri, doing insurance defense, and
14   returned to the public defender as a manager in the
15   Saint Joe office and then the Liberty office.
16      Q.   And then just briefly, what were your
17   degrees in or your degree from undergrad?
18      A.   BA in history.
19      Q.   In terms of your preparation, I
20   remember you testifying about the people you spoke
21   to, Counsel, and you reviewed the petition. What
22   other -- this is a big question, that's a broad
23   question. What other broad groups or classes of
24   people have you talked to in regard to your workload
25   and caseload concerns, other district defenders being

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-14   Filed 02/09/18   Page 48 of 107

## Page 189

1  an example or can you give broad classes?

2     A.   Sure. Judges, other members of the

3  bar, you know, we see private members of the bar at

4  the dockets. It's pretty much on our mind. Some may

5  have said, "Hey, I volunteered" in relation to

6  whether it was Clay or Platte, their call for pro

7  bono. I've had a couple of folks do that.

8     Q.   Have you been in contact with any

9  organizations or nonprofits?

10     A.   In connection with the crisis of the

11  public defender system?

12     Q.   Correct.

13     A.   I don't think so.

14     Q.   How about the press, any news, radio,

15  et cetera?

16     A.   I spoke -- I'm trying to think of when

17  I spoke -- I'm trying to actually recall whether or

18  not this was on or off the record.

19     Q.   And if you're unsure, it's okay to not

20  disclose that as well.

21     A.   Well, I will say I have talked to

22  various members of the press, historically, about the

23  public defender crisis, caseload crisis, workload

24  crisis.

25     Q.   How about within the last year or so?

## Page 190

1     A.   They call me sometimes, but I don't

2  have any direct recollection of it being in the last

3  12 months unless it would have been -- I'm recalling

4  something with KCUR, but I'm not sure. They called

5  once about the placement of a judge, and that may

6  be -- which would, of course, have been totally

7  unrelated to the public defender issues.

8     Q.   There was some conversation concerning

9  the funds that were appropriated by the general

10  assembly to the Missouri State Public Defender System

11  for the conflict counsel.

12     Do you recollect that testimony you

13  gave earlier?

14     A.   Yes.

15     Q.   Was I right to hear you or to

16  understand you saying that you were not confident

17  that those funds would still be there in subsequent

18  years?

19     A.   Sure. Can I answer that fully?

20     Q.   Sure.

21     A.   Okay. When I call them conflict

22  counsel money, if you will, it's not up to me how

23  they're spent. I think it's up to our director how

24  it's utilized and funneled out. I'm grateful that

25  it's funneled out for that purpose. The history --

## Page 191

1  my particular history with the governor's office is

2  continual disappointment with the previous governor

3  with vetoing legislation, with withholding funds with

4  Governor Nixon. My only understanding and

5  appreciation for Governor Greitens is that he did not

6  follow in the path of his predecessor, Governor

7  Nixon, and, with our fingers crossed, did not

8  withhold funds. So to that extent, I believe those

9  that can appreciate the budgetary limitations are

10  grateful that those funds haven't been withheld.

11     My understanding is as a result of

12  Governor Greitens not doing what Governor Nixon had

13  done time and time again, allowed that additional

14  funding to the public defender system, and the

15  system, through, I believe, extensive examination of

16  how to maximize resources decided, and I agree, that

17  that could be best utilized by resourcing those to

18  contract private bar who agree to act in the public

19  defender capacity and cover conflict counties to

20  reduce our windshield time and everything else that

21  would be affiliated with driving out to the wild blue

22  yonder and farther and farther away from your offices

23  in order to provide indigent defense.

24     As far as the future, I can only

25  remain hopeful. I'm not an expert on the legislature

## Page 192

1  other than every year they submit a budget. Other

2  than that, I'm used to -- frankly, I'm used to

3  getting bad news. This is the first good news I've

4  gotten in quite a spell.

5     Q.   In your experience and knowledge of

6  the budgetary system who appropriates funds in the

7  Missouri state system?

8     A.   Not an expert on that. Don't care to

9  speculate.

10     Q.   What is your understanding of the

11  withholding process that you mentioned about the

12  governance?

13     A.   There was at least two different

14  times, if not three, that we were -- "we" being the

15  public defender system management, had communicated

16  that this money was requested, this money is in this

17  committee, that committee, that sort of thing.

18  Again, I don't understand it. Until they tell us

19  it's ours, you know, I don't --

20     Q.   I'm sorry. I apologize. Which

21  committees? I interrupted you. I apologize for

22  that.

23     A.   That's okay. I just used that as an

24  example. I don't even know if it goes to committee,

25  so you won't hear me critique the legislature other

ALARIS LITIGATION SERVICES
www.alaris.us    Phone: 1.800.280.3376    Fax: 314.644.1334

## Page 193

1   than to say they need to give us more money.  I won't
2   be more specific than that.
3       Q.   I understand.  So I guess my question
4   is your understanding is that the legislature is the
5   one to appropriate the money?
6       A.   Yeah, I guess so.  I can't disagree
7   with that.
8       Q.   Okay.  Now, you talked a little bit
9   how -- so you have 12 attorneys right now?
10      A.   Including myself, yes, sir.
11      Q.   Including yourself.
12          And you were asked in an ideal world
13  what you need, -- you think you would need to have a
14  reasonable caseload.  And if I remember correctly,
15  your answer was 12 more attorneys or to double what
16  you currently have; is that correct?
17      A.   That's my estimate, yes.
18      Q.   And that basis was on your experience?
19      A.   It's based on two, two factors.  One
20  is my experience over decades and, two, on my
21  reliance on the public defender assessment and the
22  budgets they put out each year and when they talk
23  about we have X number of attorneys which I believe
24  are in excess of 300, and we need in excess of 300
25  more.  So I trust their analysis, but in terms of

## Page 194

1   what I personally believe, sure, we could absolutely
2   use that.  Were we ever going to get that?  No.
3       Q.   And so your understanding of how many
4   attorneys you need comes directly from central office
5   as opposed to being you having a history in
6   statistics or management or some other independent
7   basis?
8       A.   You didn't listen to my question.  I
9   said it came from two factors.
10      Q.   Uh-huh.
11      A.   One was my reliance on the management
12  studies that were done but, more importantly, on my
13  decades of experience.
14      Q.   And as your experience as being a
15  manager and being --
16      A.   Manager, but not a statistician,
17  correct.
18      Q.   Let's take a few steps in a different
19  direction.
20      A.   Okay.
21      Q.   When it comes to the determination of
22  indigency, who makes that determination on your
23  staff, specifically?
24      A.   I have two of my formally titled
25  clerks that are allowed to do that.  I mean, I can

## Page 195

1   make it at any point, my co-manager can make it at
2   any point, but in terms of the nonmanagers, the
3   two -- the two clerks that I -- I don't want everyone
4   making that decision, so I have two that do it.
5       Q.   Do those two have any specific
6   training in that regard or how do you go about
7   trusting those two as opposed to just everyone making
8   that determination?
9       A.   It's only recently been the two, quite
10  honestly.  Primarily, before that, it was the one who
11  preceded me in the office, so she's been there
12  probably around 20 years, and was a court clerk
13  before that.  Again, she's not a statistician, but
14  she's familiar with the poverty guidelines, but
15  that's really probably what we go off, the poverty
16  guidelines, as a starting point in terms of income
17  and assets.
18      Q.   Do you have a sense of -- this isn't a
19  term of art, but do you have a sense of a rejection
20  rate for those who apply for services from the
21  system?
22      A.   Not that I can put a number to.  I
23  could probably just explain it better than that if
24  you want.
25      Q.   Please.

## Page 196

1       A.   I can give that a stab.
2          I think our office, the Liberty
3   office, and I don't know this for a fact, but I get a
4   sense that our office takes more steps to attempt to
5   verify, spot check, income, assets.  We also
6   sometimes -- if for whatever reason we use the phrase
7   smell of money.  If we think there's assets there
8   that they're not telling us about, as good guardians
9   of the taxpayers' pocketbooks, we're going to look a
10  little further, and we're not bashful about telling
11  the courts to wait.  The courts aren't always excited
12  about that, but they have no choice but to wait
13  because under the statutory scheme of Chapter 600, I
14  have the right to conduct an independent
15  investigation.
16          There are at present -- and understand
17  I don't have sufficient staff to do this, but I
18  utilize and take them away from doing other things,
19  important things, to do this.  We have -- we joke in
20  our office that we have a financial investigation
21  unit.  It's not really a unit.  I have one secretary
22  not of which who is authorized to make the
23  determination, but she's the one who is going to do
24  the processing beyond if someone says they apply or
25  if someone says let's -- or they qualify, let's do

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 197

some -- we call it Chapter 600 investigation.  And I
have a document we file with the court that's
entitled "Chapter 600 Investigation Pending," and we
say the aforesaid has made application and is
currently -- the financial investigation is being
performed pursuant to Chapter 600, whatever number
applies.

We have -- we contact the Missouri
Department of Labor.  Again, this is spot check.
This is not on every application.  We wouldn't be
able to -- we would not be able to function to do
anything else because we get so many applications.
Okay.  And when we spot check that, we provide the
name of the applicant, the social security number of
the applicant, and we ask for the past four quarters
or last year's, but nothing more extensive than that
because the recently is what we want because we know
that's all the judge is necessarily going to care
about.  If they made money two years ago, it's gone.
That doesn't -- you know, if they were out of a job
for a year, we're going to be appointed.  We're
trying -- we're trying to limit our involvement, and
not be taken advantage of for somebody who just wants
a free lawyer.

Now, most frankly, most of the people

## Page 198

who apply for us are dirt poor.  They don't have much
money for anything, but even if it's a small fraction
of cases that we can avoid, okay, we want to try to
avoid them because it's wrong to represent them to
give them a free lawyer when they don't deserve one.

The other thing is that motivates
them.  If they're on the curve and they have it, but
it really would be a financial imposition or might
set them back a little bit, which a lawyer should, we
do the best we can to try to motivate them to do
that.

Now, they still have an obligation to
attend every court appearance, whether they're in
custody or out, but what I've seen is for the small
fraction that we spot check -- and we're trying to
make it a larger number, but it's hard to do with the
staff we have -- we have a portion of that that falls
off, and what they do is hire private counsel.
Sometimes they represent themselves.  They're not
doing that in serious cases.  They're doing it in
cases where they have a bad case and they're going to
repay the bad check.  They're doing that sometimes in
driving while suspended or revoked, and sometimes
they're going to get the exact same outcome we do,
but many times they're hiring private lawyers.

## Page 199

Because of the economy, salaries or
fees have taken a dip because of the glut of lawyers,
unfortunately.  The economy has never fully recovered
I don't think.  It's gotten better, but never fully
recovered for members of the bar, but it has
created a -- there's some lowballers out there, and
we're absolutely fine with people charged with
criminal events hiring those members of the bar who
can do a sufficient job to represent them.  We're
trying to encourage them to do that.

The judges see that.  Some of the
judges are very patient with that.  Some are not as
patient, but the ones that aren't as patient, we make
it clear that they really don't have a choice.

Q.    Is it your sense that your district --
forgive me if I'm misunderstanding, but your district
has probably more or potentially more verification of
resources than potentially other districts?

A.    Well, when I look at Exhibit 14,
understand that my assessment is purely speculation
because I have no idea what most of these folks do,
but I just assume that they don't have any more
resources than me to do -- to serve such a function.

As to what they do independently, I
really don't have any firsthand knowledge of it, but

## Page 200

I know that it's a time crunch, and it takes away
from -- because it's not the first time we've been
doing it.  Even something as simple as running a real
estate check and trying to see and doing some
research with that, and even title search with
vehicles, sometimes, every now and then, it saves us
from a case, but it's an inordinate amount of
resources.  It might be easier to handle the case,
but it wouldn't be easier on the attorney.  It's a
burden on the staff, though.

Q.    Would you say it's common to reject an
application?  Is that something that comes through
every day that you see a rejection or -- I'm trying
to get a sense of how often your district turns away
applications.

A.    I know that there's a database that
seeks to record the application, and whether or not
the indigency finding is made by the public defender
system or if it's instead appointed by the court.  So
I would have to defer to the historical accuracy of
that.

Q.    Who has the final say?  So if the
support staff member looks at an application and says
yes, this person is in -- is there an independent
control there, a monitoring, or do you all trust the

50 (Pages 197 to 200)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-14    Filed 02/09/18    Page 51 of 107

## Page 201

1 discretion of that support staff or if it's yourself
2 making that determination?
3      A.   I make it clear to my support staff
4 that their extra effort is there to limit cases and
5 to make sure that people who don't deserve us don't
6 take advantage of taxpayers' funds.  So, if anything,
7 they're going to err on the side of embarrassingly
8 rejecting people.
9      Q.   And so when that support staff rejects
10 a person, hypothetically speaking, does that
11 rejection stand or is there someone else or yourself,
12 for instance, go back and look over the application
13 and verify it?
14      A.   If it's rejected, that's good by me.
15 That's called a good call only because the applicant
16 has the right, and we advise them of the right, or
17 try to remember to advise them of the right every
18 time, and, frankly, if we don't, which we seek to,
19 the courts do and, quite often appoint us.  But that
20 just depends.  And that's going to differ from judge
21 to judge.
22      Q.   You alluded to this potentiality
23 earlier, but say a person has three other cases,
24 criminal cases, and they have private counsel on
25 those three cases --

## Page 202

1      A.   Uh-huh.
2      Q.   -- and they catch a fourth case.  Does
3 the virtue of them having the other three counsel, is
4 that a factor that goes into whether or not they are
5 indigent for that fourth case?
6      A.   Absolutely.  Part of what our process
7 is -- and that's why the judges get frustrated.
8 You've got the application.  What else is there to
9 do?  What our staff does is -- and this I don't know
10 whether or not other offices do.  I would encourage
11 them to do it, but I don't know if they have the time
12 or resources to do it -- is we go to CaseNet, and we
13 don't check every jurisdiction, but we check the ones
14 that are more likely to be involved, and to see if
15 that person has charges.  Okay?  And we also look up
16 the case or cases that they are alluding to -- some
17 of them know, some of them don't -- on their
18 application.
19           If there's a way to connect them with
20 private attorney at present or recently in that case
21 or another, we're going to opt to find them not
22 indigent.  Then they have the right to appeal to a
23 court.
24      Q.   Switching gears a bit.  How would you
25 define a case or a matter?

## Page 203

1      A.   Can you be more specific?
2      Q.   Sure.  So you -- let's say that
3 there's five cases, and I'm trying to get a sense if
4 that means there are five criminal defendants or if
5 that's saying there are five independent charges?
6      A.   Sure.
7      Q.   So I'm trying to understand the
8 categorization of a case.
9      A.   Okay.  As I look on our database, I'll
10 see, you know, John Doe, and see if he has any open
11 cases.  Now, John Doe may have -- and I break out
12 that CR number.  He may have -- he may have several
13 counts on there, and I believe that would be tallied
14 as one case.  He may have -- it may be the kind of
15 case where they threaten to charge additional counts,
16 and that's why the numbers really -- you can't be
17 guided by the numbers, not safely, because if you
18 have one count, and they're threatening the other
19 four, well, the attorney is working the other three.
20 It's not fair to say we're only working the one
21 because they have to be working all three in order --
22 for example, in order to negotiate that case, I
23 require the attorneys -- and I think it's an
24 obligation under the rules -- to get the discovery
25 for the other three controlled buys if they're

## Page 204

1 charged with the one.  Because if part of the benefit
2 of the bargain in pleading guilty is we won't charge
3 you with these others, I want to make sure you've got
4 cases on the others.
5           Now, under that setting, we are
6 working more than the computer reflects because
7 there's uncharged cases.  So it works both ways.
8           Now, conversely, we also have traffic
9 cases where the officer is mad at the person, and
10 they've written every ticket imaginable.  One extreme
11 case that we've had, and it is extreme and it's never
12 been recreated, is the officer wrote 30-plus tickets.
13 Now, it's never happened.  Usually it's more common
14 to have one or two, maybe three or four.
15      Q.   Let's turn to that -- your caseload in
16 particular.
17      A.   Okay.
18      Q.   Did I hear you correctly is that
19 you're testifying that you represent clients that
20 have or -- yeah, clients have felonies, A/B all the
21 way through speeding and traffic?
22      A.   Speeding to murder.
23      Q.   Speeding to murder.
24           Could you give a breakdown -- and I
25 know you probably can't be precise without the

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 205

1  numbers in front of you -- but what percentage is
2  where? How many do you have in the municipal court
3  with the traffic versus a felony or a misdemeanor?
4      A.    We don't have any municipal court, but
5  we do handle -- the public defender system does
6  handle traffic cases in the associate circuit state
7  court setting. We have a lot. The office has a lot.
8  I, in particular, have -- I handle the traffic docket
9  in Platte County, so I'm going to have a high number
10  in there. One of my other attorneys will handle the
11  traffic docket in Clay. She'll have a high number on
12  that. Obviously, that isn't the limit of my
13  caseload, nor is it the limit of her caseload.
14          As far as what sort of cases I'm in
15  right now, I'm embarrassed to tell you I'm not even
16  sure. The secretaries are directed to make my entry
17  of appearance under duress. I then look at them,
18  begin to create memos to file to create some
19  semblance to the madness.
20      Q.    Setting those aside, the ones that you
21  entered duress on, before that, before those rolled
22  in, about how many cases did you have at that point
23  in time, if you can remember? I know it's probably
24  been a few months.
25      A.    I can't recall. I can guess, but I

## Page 206

1  don't want to do that. It was high, but I can't give
2  you a number.
3      Q.    Sure. Let's talk a bit about the
4  triaging that you and your district go through on a
5  day-to-day basis. I think I had heard you testify
6  that it's not simply a first in, first out method,
7  but things rise to the top of the pile in different
8  ways. I'm curious as to those different ways
9  something can rise to the top of the pile.
10      A.    A lot of it -- when we're talking
11  about putting out fires, a lot of it has to do with
12  trial date settings that you scheduled by courts.
13  That becomes -- that trial is on fire -- I mean, that
14  file is on fire because you don't know whether or not
15  you're going to get a continuance. You may have a
16  sense, based upon your experience and whatever
17  jurisdiction and judge it is because it could differ
18  not only by jurisdiction, but by judge. So those are
19  really -- because what you're talking about is, as
20  you know, bringing a jury in is taken serious by a
21  judge. And so it's really -- that's the judge's
22  priority, too, we have found. So if that means
23  that's going to be the judgment day for the client to
24  answer charges, by necessity, we've got to begin to
25  pay the attention that we have available to it.

## Page 207

1      Q.    So impending trial dates would be a
2  factor?
3      A.    Sure.
4      Q.    Are there any other factors in terms
5  of this case has been continued for months or years?
6  Is there any sense of -- yeah, what other reasons
7  would your office have or you have to bring something
8  to the top of the pile?
9      A.    If you look at it and you think the --
10  if you think the discovery is complete, sometimes you
11  get a since -- sometimes you agree with the other
12  side, this is not -- you know, we agree the
13  prosecutor doesn't have this yet. We know we're
14  waiting for it. The court knows that. We know that
15  trial date is probably going to be continued. That's
16  a trial date, the file is not on fire because
17  everybody knows we're going to get it. Now, that's
18  assuming you have the kind of judge that is going to
19  give you the continuance you believe you deserve.
20  You don't always have those kind of judges, so it may
21  still be a flamethrower in that sense.
22          Other reasons might be -- you know,
23  when I talk about a Monday morning MASH, it's every
24  day for clients who either want a bond motion to be
25  filed because when they want it filed, the office of

## Page 208

1  chief disciplinary committee expects you to file it.
2  There's no excuse for not filing it. They take that
3  pretty seriously.
4          Now, that doesn't -- you don't get to
5  factor in whether or not you think the person has
6  money. You don't get to factor in whether or not
7  you've already asked for it a number of times. You
8  don't get to factor in whether or not the judge is
9  going to just say no. That takes time to do it, and
10  you've got to do it in order, frankly, to protect
11  yourself from the bar complaint.
12          Another thing, very frequent thing,
13  would be where the client has a probation officer.
14  Sometimes it takes awhile to get that, but once you
15  get the probation officer, you have an obligation,
16  under the rule, to examine all the state's evidence
17  that they have and that they've given you. If you --
18  if you have it and you haven't looked at it, you need
19  to look at it so that becomes something that comes to
20  the top of the pile. Why? Because this man or woman
21  has an opportunity to get out of jail, especially if
22  they've been telling you, "I want to take the deal."
23  Right? Or even if they haven't been telling you
24  that, if it's probation, you want to maximize the
25  best for your client. So if you can get them out,

52 (Pages 205 to 208)

ALARIS LITIGATION SERVICES
www.alaris.us        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-14    Filed 02/09/18    Page 53 of 107

## Page 209

1  but as a lawyer you have all the obligations to do
2  the things and make the checklist and make sure that
3  it's a submissible case, make sure there isn't any
4  defenses that you have not checked with your client
5  to make sure that that doesn't exist, and whether or
6  not they want to waive those rights, if there's any
7  suppression issues.  Sometimes they're going to say,
8  "I don't care about that."
9       Q.   Do you have any policies or procedures
10  that lay out the triage method, or is it one that you
11  have gained through experience that not necessarily
12  every attorney in your office has access to?
13      A.   By definition, triage is without any
14  rules, so there's no policies.
15      Q.   About how many cases come in per year
16  in your district if you have that off the top of your
17  head?  If not, no worries.
18      A.   I don't.
19      Q.   Do you have a sense of within the past
20  year, either 2017 or 2016, how many cases your office
21  has tried?
22      A.   Not off the top of my head, no, sir.
23  There would be statistics for that, but I wouldn't --
24  I can't recall them.
25      Q.   Do you remember -- I apologize for

## Page 210

1  interrupting you.
2       A.   Sure.
3       Q.   Can you recall your office taking to
4  completion one trial within the past year?
5       A.   Oh, yeah, certainly.  The only reason
6  I'm able to say that with definite is because we
7  got -- my co-manager and I got an e-mail that there's
8  a newsletter, that they wanted feedback on that, so I
9  happened to be there when she was responding, and it
10  was two trials, for example, that hadn't been
11  mentioned in the news, so that was -- but it's all --
12  as that happens, the software picks that up, and
13  there are statistics, indisputable statistics, that
14  would verify whatever trials we've had.
15      Q.   So at least one?
16      A.   Oh, gosh, sure.
17      Q.   At least five?
18      A.   Again, I can't -- I just can't -- I'm
19  not comfortable guessing.
20      Q.   Sure.
21      A.   But I will say this:  The trials
22  itself could be a misleading factor, and here's why I
23  say that:  Lots of things are worked up for trial,
24  and then they don't proceed to trial.  That's an
25  inordinate amount of attorney work hours that's

## Page 211

1  expended for absolutely the appropriate reasons to
2  defend that man or woman's life and liberty, but then
3  it doesn't wind up getting tried.  Some circumstances
4  may change, the plea offer may change, so we don't go
5  just by -- it's called trial division, but conducting
6  trials is absolutely not the only work we do.
7       Q.   You testified earlier that there have
8  been excessive caseload and workload demand on the
9  system and your -- on those that you supervise and
10  yourself.  2005 was mentioned, but it's been there
11  for some time; am I correct in understanding that
12  testimony?
13      A.   I agree with that, yes.
14      Q.   At any point while you've been a
15  district defender, have you put on any trainings or
16  have known of any trainings that deal with workload
17  or caseload concerns?
18      A.   I think our training department may
19  have had -- again, I don't -- quite honestly, I don't
20  have time to attend the training, but I do try to
21  glance at the syllabus, and I do have attorneys that
22  are newer to the system that attend those sometimes,
23  whatever the training are, in order to gain their CLE
24  hours for the year, or attempt to.
25          I think there are syllabus items that

## Page 212

1  deal with workplace stress, stuff like that, but I
2  couldn't say that under oath that it actually
3  existed.  Training department would be the
4  appropriate person to ask about that.
5       Q.   And that's for a systemwide training,
6  like the annual training that various public
7  defenders go through?
8       A.   It would be put on -- if it exists, it
9  would be put on by the Missouri State Public Defender
10  training division or someone that they affiliate
11  with.
12      Q.   But sitting here today, you have not,
13  as a district defender, put on any specialized
14  training for those you supervised?
15      A.   I don't have time to.  I probably
16  have -- let me go back to the earlier question.  I
17  probably have attended management-related meetings
18  that deal with caseload, but it's not limited to just
19  caseload.  It's also dealing with, you know, updates
20  in the case law or procedure and that sort of stuff,
21  but, invariably, caseload comes into the discussion.
22      Q.   I apologize for being all over the
23  place.
24      A.   No problem.
25      Q.   I'm trying to maintain coverage.

53 (Pages 209 to 212)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-14    Filed 02/09/18    Page 54 of 107

Page 213

1    A.    It's no problem.
2    Q.    Continuances, we talked about earlier,
3  and I understand that judges have to grant those
4  continuances.  What is the longest period of time
5  that you can recollect that a case was continued by
6  your district or someone in your district?
7    A.    I probably hold that record outside
8  the capital, I don't know anything about capital.
9  And I'm not boasting about it, but it's frequently
10  mentioned.  Seven years to trial.
11    Q.    Turning to the funds that are
12  available for various requests from assistant public
13  defenders, your testimony earlier, I believe -- and
14  correct me if I'm wrong -- is that you've never been
15  turned down for a deposition when you, personally,
16  requested funds for a deposition?
17    A.    I don't think I have.  I have had to
18  seek further clarification from a supervisor for a
19  meteorologist one time.  I remember that.  And, you
20  know, there's often clarification sought in order to
21  make sure that there's a good record for the use of
22  the taxpayers' funds, but in terms of someone telling
23  me no, it's usually more of a discussion.  I don't
24  think I've -- I don't think I've ever been told no.
25  There may have been a brief -- very brief freeze on

Page 214

1  it years ago, but it really was a bump in the road.
2  It wasn't anything like -- for the most part, the
3  depositions that the attorneys seek the funds to
4  conduct, there's funding there to conduct them.  The
5  real challenge becomes facilitating your workload in
6  an efficient manner in order to get it to that point
7  because that's a whole lot of -- I want them to be --
8  I want them to be done with forethought and some
9  strategy as opposed to I just want to do them to be
10  doing them.
11    Q.    Have you, as a supervisor, ever
12  declined someone who asked for funds for a
13  deposition?
14    A.    Yeah.
15    Q.    What was the basis for that?
16    A.    Sometimes strategic, sometimes case
17  related, sometimes because the attorney -- I didn't
18  think the attorney had thought it out enough.
19  Sometimes I didn't think there was a disadvantage to
20  doing it in an interview setting instead.  I mean,
21  it's not often I do that, but sometimes if strategy
22  is involved, then I'm not hesitant to intervene, but
23  I do think the depositions are a good training tool,
24  not just to find out about the case, but also for the
25  newer lawyer to learn and see all the surprises and,

Page 215

1  frankly, some of the good things and horrible things
2  that come up during a deposition.
3    Q.    Have you ever given as a reason -- or
4  sitting here today, can you recollect a reasoning for
5  declining a request for a deposition solely based on
6  funds and the availability of those funds?
7    A.    Like I said, I think there might have
8  been that one time where there was a freeze or an
9  encouragement, to -- but it was short-lived and a
10  single event or single duration.  It wasn't anything
11  that was longstanding.
12    Q.    I apologize for the duplication of
13  these questions --
14    A.    Sure.
15    Q.    -- but same question for expert
16  testimony.  Have you ever been denied expert
17  testimony that you thought was important to your
18  case?
19    A.    Outside of that meteorologist, which
20  ultimately I gained permission to consult with, that
21  would be the closest thing I could think of.
22    Q.    And have you ever denied -- I guess
23  you just mentioned about how you denied some
24  depositions, but have you denied expert testimony for
25  similar reasons?

Page 216

1    A.    I don't think I did.  We may have
2  discussed whether the case was ready for it, so it
3  may have been a timing issue, but I don't think I
4  said -- I certainly didn't say, "No, you can't do it.
5  We don't have the funding for the expert."  It's more
6  of a teaching tool and to make sure that the money is
7  being used wisely.
8    Q.    Do you have a sense of if more
9  depositions and expert testimony are utilized for
10  felonies or for misdemeanors or sitting here today,
11  do you not have a sense of that?
12    A.    I don't understand the question.
13    Q.    In your experience, do you utilize --
14  do you -- are there more depositions for a felony
15  A/B, for instance, as opposed to for a misdemeanor or
16  is there no discernable difference between how many
17  depositions are taken for a given case?
18    A.    It depends on the contents of the file
19  more than the charge, actually.  Now, there may be
20  more DNA in a murder case overall, but in terms of is
21  that felony going to be a greater expense or greater
22  amount of time invested by the attorney?  Not
23  necessarily because we have some really, really -- we
24  joke in the office about a misdemeanor that all of a
25  sudden, because we're inside of it, it's like wow,

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 217

1  this is worse than -- this is worse than a protracted
2  felony case because it gets so complicated, one thing
3  leads to another, you know. So you can't really
4  tell -- there's no such thing as just a misdemeanor,
5  is what I'm saying.
6      Q.   Is there or are there any policies
7  that prevent assistant public defenders from
8  requesting a deposition or expert based solely on
9  cost, for instance, the meteorologist is $5,000, and
10 we only allow $2,500 for this type of expert? Is
11 there any limiting factors in that sense?
12     A.   I don't -- I can't think of any. I
13 mean, it would go probably beyond me if it was an
14 issue of we've never spent that much on that type of
15 court reporter or expert or translator or something
16 like that. I know that we to utilize -- we try to
17 tend to lean towards the state-authorized contract
18 providers, for example, in the interpretive field, in
19 the court reporter field, that type of thing, to try
20 to maximize the funds.
21     Q.   Let's turn to the timekeeping that
22 you, in your office -- that your district engage in.
23 Is the extent of your timekeeping at this point in
24 time hours worked?
25     A.   Through the -- through the time sheet

## Page 218

1  it's done every two weeks or bimonthly, yes.
2      Q.   So at this point in time, there are no
3  further demanding fields for time-keeping by task or
4  case right now?
5      A.   That is correct.
6      Q.   When was the last time, if you can
7  remember, when the time-keeping was done in almost a
8  billable hours type of context?
9      A.   I'm not sure when that -- I would be
10 guessing, but I want to say a couple years, but
11 that's a guess.
12     Q.   Do you remember any training was --
13 the purpose of the training was to teach assistant
14 public defenders, or any public defender, for that
15 matter, how to keep their time?
16     A.   By our training department, you mean,
17 or just --
18     Q.   Yeah, by the training department or by
19 a district defender by yourself or when you were not
20 a district defender, if anyone had ever put that on?
21     A.   Again, I'm going to presume, but I'm
22 not certain that the training division, perhaps
23 during a new attorney workshop, would have alluded to
24 that, but I'll defer to the training department
25 director to -- again, their syllabus and whether or

## Page 219

1  not they ever conducted anything on that.
2      As far as in office, we had a great
3  deal of discussion about -- I mean, I would have
4  attorneys that would come to me and say, "How should
5  I bill this?" Not bill it, but, you know, "How
6  should I allocate this? Should it be this, this or
7  this?"
8      And I'm like, "Well, I think," you
9  know, so there would be those. It's subject to
10 interpretation even in the private setting.
11     Q.   Is there anyone tasked with monitoring
12 or supervising the current time-keeping system? I'll
13 rephrase.
14     A.   Sure.
15     Q.   Is the extent of approval right now
16 when they fill out their two-week time sheet and it
17 comes to you for ultimate approval?
18     A.   Well, the bimonthly time sheet goes to
19 the district defender. I can only tell you what I do
20 is I check it for accuracy. If I have -- I may be
21 the only one. I may be doing less than others, I
22 don't know, but if someone calls in sick, I save that
23 so that I can -- if there's a need to check that
24 against the time sheet. If there are hours where
25 annual leave has been requested, granted, then I have

## Page 220

1  a note-keeping mechanism for that in order to try to
2  make sure that there aren't honest mistakes made by
3  the employees. And there are times when I send them
4  an e-mail and says, "Hey, let's talk about this time
5  sheet," and then I explain this or remind them of
6  that, and then they adjust accordingly.
7      It doesn't always have to do with a
8  mistaken entry. Sometimes it is, if it's eight hours
9  on a holiday, and they really meant holiday, but it's
10 more expansive than that.
11     Q.   You were tasked with overseeing the
12 budget that's supplied to you by the comptroller of
13 Missouri State System or, essentially, you're given a
14 budget. It doesn't matter from who the budget is
15 given, but are you given a budget?
16     A.   Yes.
17     Q.   Do you find that that budget is
18 sufficient to get you through the fiscal year?
19     A.   More oftentimes than not, it is.
20 Again, I rely on, to a large extent, that
21 longstanding staff member who I trust to do that and
22 helps me oversee it. And if she tells me this looks
23 like there's going to be an issue with it, then I
24 contact the comptroller. I mean, I'm obligated to
25 contact the comptroller and say this looks like it's

**ALARIS LITIGATION SERVICES**
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

Page 221

1 going to be an issue so that they can be aware of it.
2 The last thing they want is something to go over
3 budget. That doesn't happen a lot, but it has
4 happened.
5     Q.   Do you know -- and it's completely
6 fine if you don't -- if your caseload, as a district
7 defender, is substantially different from other
8 district defenders that you know?
9     A.   The only thing I can really speak to
10 of is my understanding is in -- my understanding is
11 that the -- well, I don't know for a fact, but I know
12 that I have some belief that the management at the
13 Kansas City trial office does not carry a caseload,
14 and I would be fully supportive of that type of
15 scheme because of the enormity of the staff and the
16 things that they have to do, the turnover and all
17 those things.
18     Like I said, I've been encouraged to
19 decrease or eliminate mine in the past.
20     Q.   And who was it that was encouraging
21 you to do so, was that management or was that other
22 district defenders as you were talking about how
23 you're operating on a day-to-day basis? Who did
24 those -- where did those recommendations come from?
25     A.   Only from upper management.

Page 222

1     Q.   As an aside, what is your relationship
2 like with upper management?
3     A.   I think I have a cordial relationship
4 with upper management.
5     Q.   And I remember you testifying earlier
6 that there were some things that you would run by
7 upper management, and if there are a lot of
8 things that -- maybe not a lot -- there are some
9 things that you wouldn't; that you had some
10 discretion there. Is there any type of a policy or
11 have you ever been instructed on these five things
12 you need to run by upper management or not?
13     A.   Periodically we get e-mails that talk
14 about -- it's more by subjects, you know, if this is
15 an issue, make sure to check with me or other members
16 of management, but it's usually subject related as
17 opposed to an overall scheme.
18     Q.   Has workload and caseload concerns and
19 actions such as writing a letter, is that one of
20 those subject areas that they want you to check with
21 them about?
22     A.   Well, let me make it perfectly clear.
23 When it comes to my bar license and whether or not I
24 am trying -- whether or not I'm going to comply with
25 the rulings of professional conduct, I have no

Page 223

1 supervisor, not in the public defender system.
2     Q.   Turning to Exhibit 14, which is the MO
3 State Public Defender Cumulative Caseload Metrics
4 chart or grid, if you will.
5     A.   Yes.
6     Q.   Sitting here today, do you know how
7 the cases initiated field is defined?
8     A.   I'm not an expert on this metrics.
9 I'll be honest with you. I mean, there was a time
10 when I looked at it more, but, no, I've never studied
11 it, and I really probably would not be the right
12 person to be able to -- if you want accuracy, to
13 speak to about it.
14     Q.   Sure. And so that same statement I
15 presume would go along with me asking about the
16 percent of capacity. Would you have any basis of
17 knowing whether that number is accurate or not?
18     A.   That's a totally different question.
19     Q.   Okay. How so?
20     A.   Well, management has explained to me
21 how cases are counted. We have different views that
22 deal with -- especially in light of the caseload cap
23 efforts, especially in light of the Karl Hinkebein
24 case and the Rule 4 crisis that's going on right now,
25 but I know there's different ways to measure it, and

Page 224

1 one may be with the NAC standards. One may be with
2 the Ruben Brown standards. I'm not a professional at
3 all those. I will rely upon the stats that are
4 computed by the Missouri State Public Defender
5 System, but I will, quite honestly, have to rely on
6 how they explain the different fields.
7     Q.   In your district, how would a policy
8 become effective? Just say you wanted to, I don't
9 know, at lunchtime there was going to be pizza for
10 everyone every single day. That's a silly example,
11 but how would that go about becoming effective in
12 your district?
13     A.   I mean, unless it's something that I
14 need to check with my managers on, unless it falls
15 outside of my, you know -- and understand my field is
16 relatively narrow. It's my office. I don't get to
17 make decisions about anywhere else, but the district
18 defenders are entrusted with providing supervision
19 for their offices. If we were going to make a policy
20 about various things, it would probably go out
21 through an e-mail or I may just tell people. I mean,
22 it depends on what sort of thing we're talking about.
23 Sick leave, there's an e-mail that describes it.
24 Annual leave, there's a form on a shelf.
25     Now, understand that with our

56 (Pages 221 to 224)

ALARIS LITIGATION SERVICES
www.alaris.us    Phone: 1.800.280.3376    Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-14   Filed 02/09/18   Page 57 of 107

## Page 225

1 transition, there is a risk that the new people may
2 have never gotten that e-mail. All right? So if
3 I've got a rule, which I do, about keeping the sink
4 clean in the kitchen that's, like, way more important
5 than pizza, but pizza is the cause, I sometimes send
6 that out every now and then. And I look at it and
7 I'm, like, oh, my goodness. I've got five new people
8 that have never seen this threat.
9     Q.    So by virtue of sending that e-mail,
10 that is effectively setting a policy? I know we're
11 using that word very broadly.
12     A.    Sure.
13     Q.    I'm going to start jumping around a
14 little bit more than I already have been.
15     A.    Sure.
16     Q.    Concerning the Polycoms, is that the
17 appropriate term?
18     A.    I think that's what they call it.
19     Q.    You had testified that -- my
20 understanding of your testimony was that some public
21 defenders have been surprised before, and some
22 attorneys have been surprised before when they went
23 to the courthouse and they didn't realize that they
24 were not going to be actually visiting with their
25 client. Is that a fair understanding?

## Page 226

1     A.    I know I have.
2     Q.    Okay. So you have --
3     A.    But you only get surprised once, then
4 you see what's going on in the jurisdiction, and then
5 nothing will surprise you.
6     Q.    The reason I ask is because there was
7 some confusion on my end, potentially, of whether or
8 not a judge had to give leave for a Polycom to
9 appear, and the notifications that went into that.
10 So if I'm confused, I apologize.
11     But it has happened to you?
12     A.    Sure.
13     Q.    When you had mentioned that around 75
14 percent -- and I believe that was a general
15 approximation -- of the clients, it was either on
16 your docket or within your representation are
17 currently in custody. What was the basis for that 75
18 percent general rule percentage?
19     A.    Just my experience, I suppose. I
20 would -- most recently, if I were to conduct some
21 sort of examination of most recent cases, when I go
22 to update court dates and I check the outside of a
23 folder and I see custody, custody, custody, it was a
24 really informal poll I took, and that's why I said
25 that's an estimate, but I would be shocked if it was

## Page 227

1 far off.
2     Q.    So it could be more than 75 percent?
3     A.    Could be.
4     Q.    And it could be less than 75 percent?
5     A.    Absolutely.
6     Q.    I want to get a better understanding
7 of the conversation surrounding guilty pleas and your
8 policy or your day-to-day operation of that. My
9 understanding of your testimony, and please correct
10 me if I'm wrong, is that if there is incomplete
11 discovery, you do not allow one of your assistant
12 public defenders to simply plea out somebody without
13 completing that discovery; is that accurate?
14     A.    That's accurate. I mean, I'm not
15 always with them in the courtroom, but they know
16 that's my rule.
17     Q.    And how, exactly, is completion of
18 discovery measured?
19     A.    I'm not talking about investigation.
20 I'm just talking about discovery. So you'll get the
21 initial round of discovery, and you'll see first off
22 is there anything that's mentioned in the portion
23 that you have -- and it may be complete, but I'm
24 always presuming it's not because of experience.
25 Could be, though. And if you know, through

## Page 228

1 experience, that there are other things that exist or
2 that should exist, or it doesn't take experience if
3 you're reading through it from beginning to end and
4 see that it references something that you don't have
5 in your stack, sometimes it may come through a
6 conversation with a client that says, you know, this
7 that or the other. It may be that while the officer,
8 the taller officer, and you look, and all you've got
9 is one report, you become skeptical as to whether or
10 not there's another report.
11     So it could come from a variety of
12 sources. A common example would be you don't have a
13 lab result for a blood alcohol contents, blood or --
14 for possession of a controlled substance lab report.
15     Q.    Do you have or maintain any type of
16 checklist that would suggest when this discovery
17 period has been completed or is it more or less on
18 your experience and their understanding, "their"
19 being your assistant public defenders that work under
20 you, their understanding of your knowledge of what
21 complete discovery is?
22     A.    Well, there wouldn't be any set
23 checklist because there wouldn't be any one always
24 applicable set of standards. For example, in any
25 case, you don't know whether or not -- if you have

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-14   Filed 02/09/18   Page 58 of 107

Page 229

1  two crimes, one of them a sexual offense, then
2  everything is going to change because you're going to
3  have additional potential discovery.
4          If you got body cams, again, it's
5  extrapolated even further. If there's surveillance
6  from retail stores, again -- so there is no -- it's
7  really just an analysis in order to say what's
8  missing. And over that you may say through my
9  experience, I bet this is there, and they just
10 haven't given it to me. You have no idea until the
11 client has told you, "Well, the statement I gave to
12 the officer," and you've looked through, and you
13 don't have the statement, that you probably should be
14 looking for that, as well as the Miranda. So a lot
15 of it has interaction with the client involved that
16 would shed more light on it.
17     Q.    Something to something you had
18 mentioned, I believe, about the probation and for all
19 hearings, I wanted to understand a little bit more
20 about the statement that someone with an associate
21 degree is running the criminal justice system.
22     A.    Uh-huh.
23     Q.    What did you mean by that, just in
24 terms of the person running those hearings or --
25     A.    I mean -- and I used to present on

Page 230

1  this back when there was time, but that's a thing of
2  the past. Probation officer is only required to have
3  an associate's degree. They're also allowed to carry
4  firearms. They are, in my estimation, one of the few
5  members of the criminal justice system that's allowed
6  to reduce their own caseload, virtually having
7  unfettered control over it because when they
8  recommend revocation, and sometimes it's
9  discretionary for the same act, they, by definition,
10 get to reduce the work that they have to do the
11 following Monday. That's what I mean by that.
12     Q.    Now, your support staff that work with
13 you, are they mandated to a bachelor degree in
14 terms of the ones who are making determinations of
15 indigency?
16     A.    I'm not sure what education they have
17 or what they're required to have when they were
18 originally hired on.
19     Q.    We're almost there.
20     A.    Sure. No problem.
21     Q.    Turning to the aftereffects of the
22 Supreme Court decision, the Hinkebein decision, you
23 had sent -- well, you had sat down with your staff
24 before the memo came out from the director of the
25 public system; is that accurate?

Page 231

1      A.    I think it is.
2      Q.    At any point in time after that
3  decision, did the central office provide a bullet
4  point of "If you're worried about caseload concerns,
5  here are four options for you," or any type of
6  suggestions in what district defenders should do?
7      A.    I don't think so. I think there was a
8  single letter or e-mail. I don't think it was beyond
9  that. I could be mistaken, but as we sit here, I
10 don't think so.
11     Q.    And so your decision to draft the
12 letter and communicate with the judges, was that done
13 solely in the vacuum of you looking at and
14 ascertaining what Hinkebein meant for you and your
15 staff, or were there discussions between yourself and
16 other district defenders to come up with your game
17 plan, if you will, or your response?
18     A.    I talked to our director. I did not
19 call Karl, who I know from years ago. We're not
20 close friends, but a couple of decades ago we were at
21 the same poker party. I'm sure I lost money because
22 I don't know the rules.
23          In all likelihood, I would have talked
24 to staff members. More than likely, I may have
25 talked to other managers. Certainly talked to my

Page 232

1  co-manager, but I chiefly listened to the oral
2  argument at least once, and printed and read the
3  briefs on both sides, which I found to be very, very
4  instructive, all three of those.
5      Q.    And just for the record, who is Karl?
6      A.    Hinkebein.
7      Q.    At any point in time, have you made a
8  decision or have you sought approval from upper
9  management to file a Chapter 600 motion -- and that's
10 the Statute 600.063 -- in terms of requesting a
11 conference for a caseload or workload concerns?
12     A.    I have. I have -- permission has been
13 granted. I just haven't had the time to do it yet.
14     Q.    And was that permission granted only
15 after you had asked upper management, or was that
16 something that upper management did for all district
17 defenders, to your knowledge?
18     A.    I mean, the statute says I have to
19 ask. That's all I concern myself with. I didn't
20 even realize I had to ask. Once I read the statute,
21 I realized I better ask.
22     Q.    And how long have you known about the
23 existence of that statute?
24     A.    The Chapter 600?
25     Q.    Uh-huh.

58 (Pages 229 to 232)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-14    Filed 02/09/18    Page 59 of 107

## Page 233

1     A.   Which subsection are we talking about?

2     Q.   063, concerning the hearing for

3  workload or caseload concerns.

4     A.   I think I have a file at the office

5  because this isn't the first time we've marched this

6  fight of a caseload cap, and I think in that file is

7  the Waters opinion and the -- probably the statute in

8  response to the Waters opinion which, I believe, is

9  the Chapter 600 we're referring to, and also the --

10  there's legislation that, thankfully, didn't pass

11  that sought to extinguish and privatize the public

12  defender system that we mentioned earlier in the

13  conversation.  I think my folder talks about that.

14  There's some other things in there, too, about the

15  auditor's reports and that kind of stuff.  I haven't

16  touched it for a while.  This Karl Hinkebein is sort

17  of what made me go back to it.

18     Q.   Do you have a sense for why you

19  decided to send the letter as opposed to ask for

20  permission, and then file the relevant Chapter 600

21  motion?

22     A.   Oh, absolutely.

23     Q.   Why?

24     A.   Do you want to hear why?

25     Q.   I do want to hear why.

## Page 234

1     A.   I think the statute is poorly written.

2  I mean, I thought that when I reviewed it, however

3  many long ago whenever it was first crafted.  It

4  essentially said that I, the manager, needed to

5  consult with the presiding judge, and sought

6  permission.  And, frankly, I found that to be an

7  impractical solution, so -- and it also -- chiefly I

8  found disappointing is that it says I could go and

9  seek relief for a portion of my office, but not the

10  entirety of my office, which I find to be, at a

11  minimum, illogical, beyond that, unworkable and

12  unfair because then I'm assuming that I must express

13  some favoritism among the attorneys that I supervise

14  because I can't -- I can't seek -- I mean, what I

15  could do, I suppose, and it's unclear because it's a

16  poorly written statute, I could divest myself of all

17  my cases, and then seek relief for everybody in the

18  office but me because then there wouldn't be the

19  entire office.  To what end?  Everyone would find

20  that to be peculiar and suspicious and maybe perhaps

21  premeditated.

22     Now, the other thing I have, and I

23  think it's a flaw in the statute, is I think the

24  statute, in terms of statutory interpretation, I

25  think the statute does not allow the public defender

## Page 235

1  system to appeal the finding of the judge.  I think

2  the way it's written, poorly written, the conjunctive

3  is used, and I think we need -- and I anticipate the

4  prosecutors will pull this in their next tool and

5  arsenal, I think the reading of the statute requires

6  us to gain their consent to do that.  Because I

7  think, under a strict reading of the statute, only

8  the public defender authority and, not or, the prosecuting

9  attorney authority may appeal.

10     We don't agree about much, and we

11  certainly don't agree that we have a caseload crisis.

12  There are prosecutors actively working against our

13  best interests because they know if the level field

14  is ever close to level, they'll have to work a lot

15  harder, and justice will be served.

16     So I filed the -- I wrote the letter

17  instead.  It does the exact same thing.  I did not

18  give a copy to the opposing prosecutor, by choice,

19  and I certainly didn't have to, and yet they wrote a

20  nasty response to me and to the court, complaining

21  about the fact that I sought relief through the

22  letter rather than the motion.  I guess we'll just

23  have to live to see how well my motion is successful

24  and what difference it makes.

25     Q.   Turning to Plaintiffs' Exhibit 16 and

## Page 236

1  the previously marked Plaintiffs' Exhibit, I believe

2  it's 5, do you have a sense of when these documents

3  were created, either or, generally speaking?

4     A.   It makes sense to me that they

5  would -- that I would have seen them if I saw them,

6  but they look familiar and probably saw them.  As I

7  think I said before, if I saw them, I think they

8  were -- I glanced at a database, but I don't think I

9  printed them.  I'm assuming it would -- they appear

10  to be around the time frame of when Karl Hinkebein's

11  oral argument and decision was rendered.  I have no

12  reason to think that they predate that, but I suppose

13  it is possible that they do since I'm not recalling

14  seeing them and I haven't really read through,

15  especially, Exhibit 5 fully, I don't -- I haven't

16  analyzed it to see if it would necessarily precede

17  Waters or not.

18     Q.   Last two questions:  At this point in

19  time, have you ever been judicially determined to

20  have provided ineffective assistance of counsel to a

21  client?

22     A.   Yes.

23     Q.   On what occasions and how many?

24     A.   I think a couple.  It may be more.

25  I'm not sure.  The thing I can -- the only case I

59 (Pages 233 to 236)

ALARIS LITIGATION SERVICES
www.alaris.us     Phone: 1.800.280.3376     Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-14   Filed 02/09/18   Page 60 of 107

## Page 237

1  could point to -- well, and I don't -- it was a
2  Platte County case, and it was the case I referenced,
3  or I may have referenced, but I don't know if I can
4  think of his name right now.  I know his nickname,
5  but that won't get us very far.
6          It was a Platte County robbery case
7  that was a post-conviction relief hearing, and I'm
8  not certain if the trial court deemed ineffective or
9  if that was later at the -- on further appeal, but it
10  dealt with the use -- and, again, it was one of the
11  cases post-Senate Bill 5, where they had bifurcated
12  the sentencing proceedings, and one of the
13  allegations was -- I think it was that I should have
14  called an expert at sentencing.  And, again, this has
15  been years, and this is just from memory, so don't --
16  if I'm incorrect about whether or not there was a
17  finding of ineffective, I'll defer to whatever the
18  official court records -- but, for some reason, I
19  recall that gentleman getting a resentencing that the
20  appellate office handled.  It was definitely out of
21  Platte County.  I think there were other occasions,
22  but I -- I can't be certain of that.
23      Q.    Are there any judicially determined
24  instances of ineffective assistance of counsel that
25  have occurred to an employee that you have supervised

## Page 238

1  as a district defender that you can recall?
2      A.    I think so.
3      Q.    Do you have a sense of how many?
4      A.    I can't really -- any specifics, I
5  won't be able to, but I think -- I know when that
6  sort of thing occurs, you know, it's discussed
7  because, frankly, because it's an appellate opinion,
8  usually, although not necessarily.  It could be
9  remedied at the trial division, but often isn't, so
10  it's in my memory bank, but that's about as close as
11  it can get.  I wish I could be more specific.
12      MR. RAMSEY:  No further questions.
13      MS. SHIPMA:  Okay.  Let me look.
14      THE WITNESS:  Can I -- I have recalled
15  the name of that.  Can I go back to that and give you
16  the name, if you would like it?
17      MR. RAMSEY:  If you want, yeah.
18      THE WITNESS:  Vaca, V-A-C-A, but I
19  can't remember the first name, but if you -- that
20  should be enough to...
21          EXAMINATION
22  BY MS. SHIPMA:
23      Q.    Okay.  Anthony, I want to talk about
24  the indigency determination.  You had said that there
25  are situations where your office may determine

## Page 239

1  someone not to be eligible for services, but then the
2  court appoints your office anyway; is that correct?
3      A.    That does occur, yes.
4      Q.    Do you have a -- do you have a sense
5  of how often that occurs or what percentage of times?
6      A.    Nothing with any clarity or
7  specificity but, again, I think there's a database --
8  there should be a database when a case is opened
9  whether the indigency determination is made by the
10  public defender or by the court.
11      Q.    And I'm not looking for a specific,
12  but just in terms of your sense, does it happen more
13  often than not that the court appoints us anyway?
14      A.    Well, we're disappointed every time
15  that happens because, frankly, we think there has not
16  been -- we think we're right when we think that the
17  person is above the poverty guidelines or that there
18  are -- now, I will tell you that there are
19  circumstances where the person appeals, and this
20  happens a lot.  Person appeals, and the judge will
21  inquire or the applicant will volunteer, "I no longer
22  have that job."  Now, that may be true, that may be
23  not true, but an applicant saying that, the judge
24  generally appoints us without any further -- without
25  any type of hearing or verification or inquiry by the

## Page 240

1  judge.
2      Q.    Okay.  Thank you.
3          I want you to look back at Exhibit 15,
4  which was your letter to the presiding judges.
5      A.    Yes.
6      Q.    Were you told by anyone in upper
7  management that you had to write that letter?
8      A.    No.
9      Q.    Did you have to run that letter by
10  upper management to get approval before sending it
11  out?
12      A.    No.
13      Q.    Did you attend this past year's
14  management training or management conference towards
15  the end of September, I think?
16      A.    Sadly, I did not.
17      MS. SHIPMA:  Okay.  That's all I have.
18          FURTHER EXAMINATION
19  BY MS. WILCOX:
20      Q.    I have one follow-up, and I have to
21  make sure I heard correctly because I'm looking for
22  clarification.
23          I think you testified that the budget
24  you get is sufficient for the fiscal year, like the
25  budget you get, I guess, pays the costs that you

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

Page 241

1 request?
2     A.   Well, I don't really request it.  The
3 comptroller dispenses the budgets to the different
4 offices.  I only know about wee hours, and we look,
5 and if we get -- if we have some foreknowledge that,
6 oh, we're going to go past that during the fiscal
7 year, we're told to tell the comptroller, alert the
8 comptroller in advance, and I can only remember doing
9 that a few times or through my secretary that really
10 keeps track of those numbers, so...
11          Now, that being said, that's my really
12 involvement in it.  Over the years, I used to have a
13 library budget.  I haven't had that for a decade,
14 decade or a decade and a half.  When I was in Saint
15 Joe, I had a library budget.  No such thing as a
16 library budget.  My telephone budget was, probably a
17 handful of years ago, maybe five, slashed by 33 1/3
18 percent.  I don't -- I don't control that.
19     Q.   I think the clarification I'm looking
20 for is that --
21     A.   I'm sorry.  It was my postage budget.
22     Q.   -- is that you have a budget, it pays
23 for certain things, but the way that interplays with
24 the caseload crisis, that's what I'm looking for
25 clarification in, if that makes sense.

Page 242

1     A.   Okay.  Sure.
2     Q.   Sure, you get money in, and it pays
3 for things.
4     A.   Right.
5     Q.   But are you still left in a situation
6 where you don't have sufficient funds and resources
7 to do the work you want to do?
8     A.   Of course.  The budget only gives me
9 money, not time.  Nobody I know can create that.
10     Q.   And it doesn't give you enough money
11 to pay for the attorneys that you think you need to
12 do the work?
13     A.   Well, the budget that I'm given,
14 that's -- I don't get to tinker with that dollar
15 figure.  That's salaries.  I'm given a budget for
16 things like inventory and printers and warranties and
17 some supplies, maybe some hand sanitizer.  It's
18 just -- not translators, depositions.  As far as if
19 it were as simple as me saying I would like you to
20 double my budget for my eight assistant public
21 defenders, I would have done that a long time ago --
22     Q.   Okay.
23     A.   -- if I thought it would have done any
24 good.
25          MS. WILCOX:  That helps.  That

Page 243

1 clarifies.
2          I don't have any further questions.
3          THE VIDEOGRAPHER:  We're off the
4 record at 2:35 p.m.
5          (Deposition concluded at 2:35 p.m.)
6                      -o0o-
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 244

1          CERTIFICATE OF REPORTER
2
3       I, Beth A. Kaltenberger, a Certified Court
4 Reporter for the State of Missouri, do hereby certify:
5       That the foregoing proceedings were taken
6 before me at the time and place herein set forth; that
7 any witnesses in the foregoing proceedings, prior to
8 testifying, were placed under oath; that a verbatim
9 record of the proceedings was made by me to the best
10 of my ability, using machine shorthand that was
11 thereafter transcribed under my direction; further,
12 that the foregoing is a true record of the testimony
13 given.
14       Before completion of the deposition, review
15 of the transcript was requested.
16       I further certify that I am not interested
17 in the outcome of the action.
18
19 WITNESS my hand this 23rd day of December, 2017.
20
21
22
23       _____
23       BETH A. KALTENBERGER, RPR
24       MO CCR 1335  KS CCR 1417
25

61 (Pages 241 to 244)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-14   Filed 02/09/18   Page 62 of 107

## Page 245

1        Alaris Litigation Services

2   December 27, 2017

3   Ms. Jacqueline Shipma
    General Counsel
4   Missouri State Public Defender
    1000 West Nifong
5   Building 7, Suite 100
    Columbia, Missouri 65203
6   (573) 526-5212

7   In Re: SHONDEL CHURCH, et al., vs. STATE OF MISSOURI,
    et al.
8   Dear Ms. Shipma:
    Please find enclosed your copy of the deposition
9   transcript of ANTHONY C. CARDARELLA taken on
    December 7, 2017, in the above-referenced case. Also
10   enclosed is the original signature page and errata
    sheets.
11   Please have the witness read your copy of the
    transcript, indicate any changes and/or corrections
12   desired on the errata sheets, and sign the signature
    page before a notary public.
13
14   Please return the errata sheets and notarized
15   signature page to Alaris Litigation Services,
16   Production Department, 1608 Locust Street, Kansas
17   City, Missouri 64108.
18   Thank you for your attention to this matter.
19   Sincerely,
20
21
22   Beth A. Kaltenberger, CCR MO #1335, KS #1714, RPR, CRR
23   Enclosures
24   cc: Ms. Gillian R. Wilcox
25      Mr. Steven Alan Ramsey

## Page 246

1     STATE OF       )

2                )

3     COUNTY OF      )

4

5     I, ANTHONY C. CARDARELLA, do hereby certify:

6       That I have read the foregoing deposition;

7       That I have made such changes in form and/or

8     substance to the within deposition as might be

9     necessary to render the same true and correct;

10      That having made such changes thereon, I hereby

11    subscribe my name to the deposition.

12      I declare under penalty of perjury that the
    foregoing is true and correct.

13

14

         ANTHONY C. CARDARELLA

15

16      Executed this    day of     ,

17   2017, at       .

18

19

20   Notary Public:

21   My Commission Expires:

22

23

24

25

## Page 247

1       WITNESS ERRATA SHEET
    Witness Name: ANTHONY C. CARDARELLA
2   Case Name: SHONDEL CHURCH, et al., vs. STATE OF
          MISSOURI, et al.
3
    Date Taken: December 7, 2017
4
5   Page #_____ Line #_____
    Should Read: _____
6   Reason for Change: _____
7   Page #_____ Line #_____
8   Should Read: _____
9   Reason for Change: _____
10
11   Page #_____ Line #_____
12
13   Should Read: _____
14
15   Reason for Change: _____
16
17   Page #_____ Line #_____
18   Should Read: _____
19   Reason for Change: _____
20
21   Page #_____ Line #_____
22   Should Read: _____
23   Reason for Change: _____
24
25   Witness Signature: _____

ALARIS LITIGATION SERVICES
www.alaris.us     Phone: 1.800.280.3376     Fax: 314.644.1334

## A

**A-R-A** 49:1
**a.m** 1:17 3:14
  5:11,14 121:4,7
**A/B** 110:19
  123:12 204:20
  216:15
**ability** 26:22
  29:17 56:23
  186:22,22
  244:10
**able** 8:10 26:4
  34:23 46:18
  47:10,10 54:5
  56:23 57:16
  75:7 82:4
  84:22 86:22
  87:3,25 88:17
  88:25 89:15
  89:22 90:5
  95:16 101:4,6
  101:12 103:16
  111:11 124:4
  127:8 130:15
  130:22 131:7
  132:2,21
  133:14 136:23
  137:3,14,15
  146:23 166:19
  166:20 178:19
  197:11,11 210:6
  223:12 238:5
**above-refere...**
  245:9
**absent** 183:1
**absolute** 117:4
**absolutely**
  24:25 25:24
  26:1 32:20
  53:23 66:2,3
  100:15 105:9
  118:11 126:2
  130:3 134:16
  146:22 194:1
  199:7 202:6
  211:1,6 227:5

233:22
**absorbed** 23:9
  119:12
**abuse** 74:19
**accept** 123:7
  133:25 145:8
**accepted** 132:11
**accepting**
  180:21
**access** 209:12
**accessible**
  179:8,8
**accident** 80:22
  83:8 112:5
**accomplish**
  34:23
**accomplished**
  34:18
**account** 39:25
**accuracy**
  200:20
  219:20 223:12
**accurate** 29:25
  43:16 58:13
  78:12 165:17
  223:17 227:13
  227:14
  230:25
**accurately**
  68:15 88:19
**accused** 16:15
  17:7 19:25
  29:12 41:2,21
  44:16 54:1
  61:2 64:2
**accusing** 171:5
**ACLU** 4:3 9:3
**acquitted**
  120:14,15
**act** 125:13 191:18
  230:9
**action** 33:10,12
  34:1,5 38:18
  39:15 59:17
  244:17
**actions** 222:19
**actively** 235:12

**acts** 26:7
**add** 36:8
**addition** 9:4
**additional** 15:10
  26:7 27:12,16
  49:24 112:19
  118:12,18 119:6
  120:22 132:12
  136:11 137:24
  159:2 191:13
  203:15 229:3
**Additionally**
  75:9
**address** 42:3
  169:13
**addressing**
  77:16
**adequate** 99:19
**adequately**
  116:10 117:13
  133:24 139:24
  162:6
**adjust** 220:6
**administrative**
  39:2,24 40:16
  44:8
**adult** 26:10
**advance** 96:11
  241:8
**advantage**
  197:23 201:6
**adversarial**
  93:19
**advice** 14:12
  109:3,5 130:1
  137:4
**advise** 121:23
  127:9 139:24
  150:19 201:16
  201:17
**advised** 144:5
  145:21
**advocacy** 119:9
**affect** 119:25
**affidavit** 41:9
**affiliate** 212:10
**affiliated** 186:8

191:21
**affirmatively**
  166:14
**afford** 26:4
  139:3 165:22
**afforded** 105:1
  114:6 153:2
  158:19
**aforesaid** 197:4
**aftereffects**
  230:21
**afternoon** 139:6
  187:6,7
**age** 6:11
**agent** 17:4
**ago** 7:12 22:7
  78:16 108:1
  138:4 156:18
  158:15 197:19
  214:1 231:19
  231:20 234:3
  241:17 242:21
**agree** 58:18
  67:9 72:18,21
  74:9 91:15
  167:24 191:16
  191:18 207:11
  207:12 211:13
  235:10,11
**agreed** 5:1 17:12
**agreeing** 72:15
**agreement**
  113:11 136:13
**agrees** 52:8
**ahead** 72:6,16
**airport** 18:11
**al** 1:4,7 3:4,7,23
  3:23 5:16,17
  245:7,7 247:2
  247:2
**Alan** 4:15 6:4
  245:25
**Alaris** 4:21 5:23
  245:1,15
**albeit** 169:8
**alcohol** 112:13
  137:16 228:13

**alert** 107:10
  241:7
**alerted** 172:7
**Alfred** 81:1
**alibi** 65:9 87:8
  87:10,11,12
  91:8 128:24
  177:11 178:10
**allegations**
  237:13
**alleged** 75:5,16
  77:18
**alleviate** 40:20
  174:1 175:5
**alleviating**
  186:13,19
**allocate** 219:6
**allocated** 21:11
  118:12,12
**allocates** 36:19
**allocation** 105:3
**allow** 74:2,8
  77:16 103:21
  122:3 123:7
  175:24 217:10
  227:11 234:25
**allowed** 34:21
  74:15 75:13
  81:25 105:4
  170:16 191:13
  194:25 230:3
  230:5
**allows** 75:5
**alluded** 201:22
  218:23
**alluding** 202:16
**alternate** 87:2
**alternative** 73:1
  119:11,18
  159:25 160:16
**alternatives**
  158:12 159:17
  159:19 160:10
**Amburg** 173:16
**amen** 20:19
**American** 3:15
  5:20 157:25

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-14   Filed 02/09/18   Page 64 of 107

amount 18:5
20:24 22:19
22:23 24:1
38:11,12,19
44:12,14,25
47:24 59:23
59:25 62:23
68:16 83:5
91:20 110:24
127:8 162:13
162:15 177:4
186:14 200:7
210:25 216:22
amounts 62:18
analogy 131:5
177:24
analysis 193:25
229:7
analyzed
236:16
and/or 2:14
175:15 245:11
246:7
Andrew 20:5
105:17
annual 47:19
59:19 212:6
219:25
224:24
answer 7:23,24
25:16 35:22
37:10 42:2
49:15 85:12,13
92:3 96:16
108:19 116:8
124:12 125:10
128:23 160:13
190:19 193:15
206:24
answers 28:19
79:7 116:7
177:2
Anthony 1:14
2:7,17 3:12
5:15 6:10,19
164:13 238:23
245:9 246:5

246:14 247:1
anticipate
235:3
antics 172:15
anxious 124:7
anybody 9:11
65:12 172:25
173:1 186:8
anybody's
166:15
anymore 65:2
anyone's 99:18
Anytime 39:11
anyway 24:4
239:2,13
APD 48:7
apologize 188:4
192:20,21
209:25
212:22 215:12
226:10
apparently
155:10
appeal 41:18
42:13 107:15
120:18 150:10
150:18,20
151:8,14,15
152:3,10,12
185:5 202:22
235:1,9 237:9
appeals 46:5,11
152:13 239:19
239:20
appear 69:16
79:1 226:9
236:9
appearance
80:20 182:19
183:6 184:14
198:13 205:17
appearances
2:6 79:1
182:16 183:2
appeared 52:6
appellate 12:6
12:11 15:18

46:7,13 67:12
67:17,23
107:14,17
119:22 120:1
150:17 151:5,10
166:22,25
168:3 237:20
238:7
appellate/pos ...
11:7
apples 67:21
applicable
228:24
applicant 41:18
45:22 197:14
197:15 201:15
239:21,23
application 41:2
41:7,8,9,22
62:7 144:3
157:6,20
197:4,10
200:12,17,23
201:12 202:8
202:18
applications
18:5 23:22
42:7 181:18
197:12 200:15
applied 60:24
61:4 81:1
157:15
applies 61:13
75:22 197:7
apply 61:7 185:2
185:3,21
195:20 196:24
198:1
applying 183:8
appoint 41:19
170:20,25
172:9 185:6
201:19
appointed
42:12 114:25
140:14 171:16
183:10 197:21

200:19
appointment
79:20 175:24
appointments
184:22
appoints 42:1
114:9 239:2,13
239:24
appreciate
191:9
appreciation
191:5
approach 111:12
approaching
43:18 183:12
appropriate
29:12 47:23
193:5 211:1
212:4 225:17
appropriated
190:9
appropriates
192:6
approval 14:5
30:13,17
49:20 219:15
219:17 232:8
240:10
approve 30:10
30:13 161:21
approved 30:8
39:23 76:9
approving
161:18
approximate
11:6 22:15
46:15 80:8
141:4
approximately
10:17 16:23
18:24 19:1
22:7 23:2
113:19
approximation
226:15
approximations
43:9,10 84:20

Ara 48:25
173:14
archaic 19:20
area 10:8,11
11:18 12:19
13:24,25
14:25,25 16:14
18:2,3,8 24:13
42:8 51:18
52:20 53:1
62:15 69:9
82:11 91:25
105:12 140:16
157:11
areas 12:7
105:6 222:20
argue 152:7
160:17,18
argument 115:9
130:25 135:25
160:20 168:2
232:2 236:11
arraigned 64:1
arraignment
60:12,16 61:10
103:20,20
arraignments
60:25
array 143:22
arrays 142:21
arrest 61:8
arrested 41:6
60:8 141:20
142:25
arsenal 235:5
art 195:19
article 108:8
articles 172:11
artificial 130:13
132:7
ascertaining
231:14
aside 63:18
129:1 205:20
222:1
asked 38:1
93:12 99:21

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-14   Filed 02/09/18   Page 65 of 107

147:10 154:7
180:13 181:1
183:24 193:12
208:7 214:12
232:15
**asking** 98:4
116:7 123:8
129:1 137:21
138:6 223:15
**asks** 39:18,19
41:7 122:24
**assault** 110:16
**assembly**
190:10
**assess** 137:14
**assessed**
145:15
**assessing**
145:16
**assessment**
144:11 145:14
147:14 164:13
167:4 193:21
199:20
**assets** 195:17
196:5,7
**assign** 42:19,20
45:1 56:7
151:10 182:14
**assigned** 34:2
40:24 41:15
42:11,17,18
55:1 59:16
61:20 75:21
75:22 76:3,5
80:4 89:5
114:1 132:21
153:9,15 156:1
157:15 182:15
183:5,11 184:15
**assigning** 36:3
132:15 181:5
**assignment**
20:17
**assist** 15:18
**assistance**
81:18 236:20

237:24
**assistant** 4:16
12:21 13:3,5,13
24:9,18,23
36:21 39:19
48:7 50:14
76:12 83:25
158:22 180:19
213:12 217:7
218:13 227:11
228:19
242:20
**assistants** 25:13
**associate** 61:15
61:20 62:1,4
183:23 205:6
229:20
**associate's**
146:15 230:3
**assume** 7:2
13:22 32:6
62:8 113:7
115:14 143:22
199:22
**assuming** 28:10
32:5 57:3 61:7
65:18,21 78:21
78:23 79:21
82:23 106:10
115:4 156:20
161:21 165:16
207:18 234:12
236:9
**attempt** 132:14
133:13 196:4
211:24
**attempted** 55:8
173:9 174:18
**attempting**
24:2
**attempts** 65:15
**attend** 69:10
75:23 77:21
139:13,21
142:11 146:16
146:19,23,24
147:1 152:6

156:22 198:13
211:20,22
240:13
**attended** 145:19
146:10 212:17
**attending** 151:18
**attends** 80:20
**attention** 131:14
132:1 206:25
245:18
**attorney** 4:16
7:24 8:24
22:6,19,21,22
23:5,13,15
24:8 28:10
29:21,21 30:1
30:6,25 31:9
33:4,20 34:2
34:8 38:9
39:22 40:6,9
40:10 41:3
42:11,17 43:3
44:17 45:17,21
46:2 47:9
50:6 54:17
55:10 56:11
57:2,7,8,12,16
60:22 64:4
66:13 67:19
68:19 69:16
70:7 71:7,24
75:23,25 76:4
76:6,14,15
80:14,20 84:7
84:9 87:16
89:5,9 90:11
91:1,13 95:14
95:18 96:12
97:21 100:7
101:20 108:7
112:3 114:12
115:8 125:17
132:20 138:23
140:14 145:16
146:2 149:13
151:8,11 153:12
153:13,14

155:25 156:23
157:11,15
158:11,22
160:17 161:11
162:14,17
163:11 165:16
167:8,8
176:22 177:4
178:22 181:23
182:15 188:7
200:9 202:20
203:19 209:12
210:25 214:17
214:18 216:22
218:23 235:9
**attorney's** 23:6
66:17 179:9
**attorney-client**
82:10 83:18
134:8
**attorneys** 5:25
17:5,10,11 18:19
21:3,7,13,25
22:13 23:2,11
24:3,12,15,24
25:9 26:4,16
26:24 27:1
28:5 29:16
32:8 34:15
35:5,9 37:14
38:4,6 39:3,5
39:8 40:21
41:15 42:12
44:22,24 45:2
45:3,7 46:16
46:20,25 47:3
47:11,19 49:13
50:25 54:3,13
56:4 58:19
76:4 79:8,10
81:6,9 83:13
85:5,14,17
88:10 90:9
93:4,22 94:16
95:11 97:13
98:17 101:4,19
101:25 102:8

103:24 104:17
105:18 114:1,23
116:12 123:17
127:7,24
128:6 129:21
133:23 135:7
136:4,12,16
139:9,22
142:11 149:11
156:5,5 159:1
159:18 162:5
162:25 164:19
165:3,8 168:14
172:9,21 174:7
174:10,19
175:6 177:18
181:2 182:9
193:9,15,23
194:4 203:23
205:10 211:21
214:3 219:4
225:22
234:13 242:11
**attorneys'**
100:11 178:8
**attrition** 16:4,5
25:13
**audiotapes**
111:8
**auditor's** 233:15
**August** 10:15,22
**authorities**
25:25 38:21
181:24
**authority** 235:9
**authorized**
196:22
**Automatically**
129:8
**autopsy** 112:20
**availability**
215:6
**available** 26:16
26:20,24 27:3
27:20 28:6,15
28:25 29:2,4
65:2 78:25

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-14   Filed 02/09/18   Page 66 of 107

79:21 102:11
116:25 140:24
159:18 173:17
173:19 206:25
213:12
average 22:12
40:5 101:20
110:4
avoid 198:3,4
aware 49:13,15
58:11 140:9
149:10 171:18
171:22,23
179:7 221:1
awhile 100:10
166:25 169:1
186:2 208:14

**B**

B 33:13
BA 188:18
bachelor
230:13
back 7:9 11:1,14
23:14 26:12
28:16 62:18
66:12 92:16
95:9 97:20
104:20 107:25
108:1 112:11
118:22 121:6
122:14 134:16
140:17 148:11
154:22 158:14
159:17 160:7
160:12 171:2
180:10 187:11
187:20 198:9
201:12 212:16
230:1 233:17
238:15 240:3
bad 44:9 68:13
90:2 124:20
140:12 144:15
192:3 198:21
198:22
bail 60:20 62:5

62:10,11,16,23
77:1
Bailey 49:1
173:14
ball 40:1
bank 7:11 88:24
238:10
bar 54:19 55:14
55:15,16
118:15 166:11
168:15 169:21
174:19 184:22
189:3,3 191:18
199:5,8 208:11
222:23
barely 23:18
bargain 204:2
Barrett 12:17
169:5 173:15
based 14:9
18:20 32:5
72:9 169:18
193:19 206:16
215:5 217:8
basement 19:21
bashful 196:10
basis 75:20
85:16 115:15
162:9 193:18
194:7 206:5
214:15 221:23
223:16 226:17
bear 162:1
beats 103:15,16
103:16
becoming
224:11
bed 167:14
began 8:9 11:7
164:21 181:24
beginning
228:3
begun 27:24
181:14
behalf 1:15 6:11
69:17
behemoth

114:16
belief 56:3
69:23 182:2
221:12
believe 9:3 14:4
24:19 25:17
28:3 52:5,20
53:15 58:17
89:2,13 97:13
110:13 113:24
140:3 142:13
152:11 155:5
160:10,23
161:24 164:16
168:22 171:6
173:6 174:7
178:21 180:21
182:18,23
188:5 191:8,15
193:23 194:1
203:13 207:19
213:13 226:14
229:18 233:8
236:1
believes 91:13
bench 80:23
81:4
benefit 147:2,3
204:1
best 8:2 16:12
22:8 47:13
57:22 84:1
166:2 178:1
191:17 198:10
208:25
235:13 244:9
bet 120:17
229:9
Beth 1:18 3:17
4:20 5:4,21
244:3,23
245:22
better 40:10,12
43:4 75:7
76:18 79:11,11
79:12 108:2,19
123:19 134:10

178:3,21,24
195:23 199:4
227:6 232:21
beyond 48:18
56:3 136:10
164:21,22
196:24 217:13
231:8 234:11
bifurcated 118:3
120:3 237:11
bifurcating 118:1
big 18:8 49:7
104:16 188:22
bill 41:25 117:22
118:10,14 119:7
119:24 120:11
219:5,5 237:11
billable 218:8
bimonthly 218:1
219:18
bit 1:2 20:6,13
25:19 32:25
38:3 113:16
114:10 130:6
134:16 193:8
198:9 202:24
206:3 225:14
229:19
blame 81:10
Blaugh 12:24
13:8
blood 137:16
228:13,13
blue 191:21
blurt 64:5
138:16
blurted 64:20
board 92:9
122:16 125:4
boasting 213:9
body 112:4,16
229:4
bond 60:15,20
62:14,18,23
77:8,11,17,23
77:25 78:4,23
79:4,18 86:14

124:8,16 139:1
178:14,18
207:24
bonding 177:13
bono 174:21,21
175:2 185:9,13
185:20 189:7
bono/reduced
174:23
book 123:16
boots 101:7
bouncing
105:23
bound 145:8
bowels 19:21
boy 15:13 64:24
92:3
bragging 102:13
break 8:3,4
117:17 120:25
121:9 180:5
203:11
breakdown
204:24
brief 25:13
88:24 121:5
160:6 167:18
180:9 184:12
213:25,25
briefly 7:15
95:10 114:5
166:3 188:16
briefs 168:3
232:3
bring 8:21 66:11
71:17 99:15
123:24 143:4
167:13 207:7
bringing 84:16
186:20
206:20
broad 31:15,19
188:22,23
189:1
broadly 37:12
225:11
brought 20:9

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-14    Filed 02/09/18    Page 67 of 107

60:9 70:3
142:24 143:1
**Brown** 49:1
169:4 173:14
224:2
**Buchanan** 11:18
**budget** 15:18
17:17 32:9
36:4,14,19
37:2,15,19
105:4 192:1
220:12,14,14
220:15,17
221:3 240:23
240:25 241:13
241:15,16,16,21
241:22 242:8
242:13,15,20
**budgetary**
32:17 142:8
191:9 192:6
**budgets** 193:22
241:3
**building** 4:11
155:16 245:5
**built** 103:20
**bullet** 231:3
**bump** 214:1
**burden** 23:11
57:7 104:16,18
106:17 118:14
119:13 124:4
132:21 136:15
137:15 159:2
200:10
**burdensome**
127:15
**burro** 26:13
**business** 82:4
187:21
**busy** 23:21 34:4
97:19 168:9
**buy** 137:10
**buys** 203:25

---
**C**
---
**C** 1:14 2:7,17

3:12 4:1 6:10
245:9 246:5
246:14 247:1
**C-A-R-D-A-R-**...
6:20
**C/D** 123:13
**calculation**
167:23
**calendar** 48:5
53:8 76:10
79:21
**calendars** 97:18
**call** 10:8 21:14
23:3 24:19
32:4 59:19
65:23 69:19
70:7,8 81:24
81:25 82:4
83:7 86:12
95:25 104:13
119:14,15,16
177:3 185:20
189:6 190:1,21
197:1 201:15
225:18 231:19
**called** 24:21
70:4 71:14
102:3 190:4
201:15 211:5
237:14
**calling** 82:17
**calls** 38:15 76:7
82:7 116:24
128:11,16
129:20 179:5
179:11 219:22
**cam** 89:1,2,8,14
**camera** 70:4
**cams** 229:4
**cancel** 9:8
**canvas** 87:1
**cap** 163:7
223:22 233:6
**capable** 79:12
**capacity** 34:13
51:24 52:6,11
52:18,20,25

53:11 164:3
191:19 223:16
**capital** 118:8,8
120:2,4 213:8
213:8
**captivity** 125:20
**car** 16:20 79:13
89:5 102:1
**carbon-copied**
170:22
**Cardarella** 1:14
2:7,17 3:13
5:15 6:10,15,19
245:9 246:5
246:14 247:1
**care** 71:5 144:19
146:18 163:15
192:8 197:18
209:8
**career** 10:18
**carry** 137:15
221:13 230:3
**carve** 167:19
**case** 1:6 3:6
5:17 14:16 19:7
20:19,23 23:9
32:18 33:10
35:16 42:11
49:24,24 57:4
61:3,10,20,23
63:7,17,22
65:6,6 68:11
68:12,14 70:4
71:7 72:5 75:3
75:9,16 76:5
77:17,18 80:4
80:15 82:20
83:6 84:17
85:18 89:1,3
90:10,10,12
92:8,11 93:2
93:24 94:4,11
94:23 95:13
96:11 97:16
98:8 100:5
102:3 106:13
108:3 109:9

110:11,20
111:24 112:10
112:15 115:20
115:25 116:2,3
116:17 117:3,14
118:8 121:23
122:12 124:3,6
125:4 126:17
127:3,9
130:23 136:10
137:24 138:2
138:5,8,11,12
138:13 140:1
142:4 143:12
143:13,15,23
148:1 149:14
150:11 156:1,12
156:12 159:14
159:15 161:2,9
162:20 165:10
165:25 166:2
166:16 167:5
177:6 179:19
182:6,25,25
184:14 187:3
198:21 200:7
200:8 202:2
202:5,16,20
202:25 203:8
203:14,15,22
204:11 207:5
209:3 212:20
213:5 214:16
214:24 215:18
216:2,17,20
217:2 218:4
223:24
228:25
236:25 237:2
237:2,6 239:8
245:9 247:2
**case-by-case**
75:20 100:8
115:15
**caseload** 2:16
2:19 18:7 21:19
36:10 38:8

43:6,24,25
44:7,11 45:17
45:22 47:8
49:5,8 51:6,15
54:2 55:2,11
55:24 56:2,13
56:24 58:14
65:19 87:5
96:21 132:7
141:2 163:7
164:3 166:21
166:23 167:7
175:5 176:16
176:24 180:2
188:25 189:23
193:14 204:15
205:13,13
211:8,17 212:18
212:19,21
221:6,13
222:18 223:3
223:22 230:6
231:4 232:11
233:3,6
235:11 241:24
**caseloads** 58:1
58:18
**CaseNet**
202:12
**cases** 16:6 18:4
18:9,13 20:16
23:6 25:24
28:9 34:14
36:3 40:23
42:2,18 43:19
45:1,14 46:16
47:1,8 53:21
55:1,4 56:14
57:11 58:7
67:13 76:3
78:10 83:2,4
84:21,23
85:25 86:25
87:17 88:8,11
89:10,11,12
90:25 92:18
92:24 96:8,12

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-14   Filed 02/09/18   Page 68 of 107

96:22,25
98:19 100:13
102:3 105:12
107:20,21
108:10,19,20
110:18 111:4
112:22,23,24
113:14,19 114:1
114:19,25
116:15 117:15
119:13 120:18
120:19 121:15
123:12 125:4,5
125:5,23
126:4,4 128:21
131:4 132:15
134:24 141:4,7
142:14,20
148:19 152:15
153:9,13,15,15
153:16 154:4
154:23 158:10
158:12 161:12
163:21,25
164:1 165:9,12
165:14 167:10
167:21 174:5
174:21 177:3
177:19 178:10
180:22 181:5
182:14 185:25
186:2,14 198:3
198:20,21
201:4,23,24
201:25 202:16
203:3,11
204:4,7,9
205:6,14,22
209:15,20
223:7,21
226:21 234:17
237:11
**cast** 159:1
**catalog** 88:21
89:23
**catapult** 124:16
**catch** 202:2

**categories**
31:22 98:23
108:11,16
**categorization**
203:8
**category** 88:5
**caught** 158:24
**cause** 3:20
73:14 137:9
182:1 225:5
**caused** 137:24
**causes** 135:17
**causing** 180:2
**caveat** 56:9
58:25
**cc** 245:24
**CCR** 1:18 4:21
244:24,24
245:22
**celebrate** 22:4
**cell** 86:15
**Center** 155:9
**central** 1:2 3:2
3:22 5:19
12:13,14 13:18
14:1 42:25
49:12 168:20
169:17 194:4
231:3
**certain** 3:20
14:7 28:1 35:9
35:9 44:22
63:7,17 64:22
88:13,22 91:6
92:10 115:13
117:24 163:7
172:2 175:21
218:22 237:8
237:22
241:23
**certainly** 32:20
44:4 53:25
59:25 75:15
82:9 113:6
141:18 146:25
166:9 174:8
178:14 210:5

216:4 231:25
235:11,19
**certainty** 116:5
**CERTIFICATE**
2:22 244:1
**certification**
158:6,9,16
159:6
**Certified** 3:17,18
3:19 5:5,5,7
244:3
**certify** 244:4,16
246:5
**cetera** 23:25
41:25 75:17
123:3 131:9
139:3 181:19
189:15
**chain** 145:23
**chair** 127:24
**challenge**
79:22 95:4
97:18 139:12
214:5
**challenging**
94:13
**chance** 65:9
75:15 99:10
107:13 109:18
124:14 144:6
**change** 15:12
45:6 94:25
163:17 185:11
211:4,4 229:2
247:6,9,15,19
247:23
**changed** 15:15
62:11 144:10
**changes** 22:14
45:1 245:11
246:7,10
**changing** 45:5
**Chapter** 182:4
196:13 197:1,3
197:6 232:9
232:24 233:9
233:20

**characterize**
65:15 91:18
165:17
**characterized**
172:14
**charge** 38:24
81:17 111:16
121:25 122:1
144:25 203:15
204:2 216:19
**charged** 16:19
19:16,18 73:12
74:19 81:14
132:10 141:21
143:24 154:8
164:1 199:7
204:1
**charges** 41:6
60:17 63:8
109:21,22
132:4,12
133:21 136:7
143:14 144:25
149:25 202:15
203:5 206:24
**chart** 223:4
**chase** 111:9
**check** 23:25
196:5 197:9,13
198:15,22
200:4 202:13
202:13 219:20
219:23 222:15
222:20
224:14
226:22
**checked** 209:4
**checklist** 209:2
228:16,23
**chief** 155:2
166:7 167:5,16
208:1
**chiefly** 118:1
232:1 234:7
**child** 160:18
**Chillicothe**
171:9

**choice** 44:1
70:16,18
196:12 199:14
235:18
**choose** 13:15
73:4 77:6
117:9
**chosen** 117:10
**Chris** 5:22
**Christopher**
4:25
**Church** 1:4 3:4
3:22 5:16
245:7 247:2
**circuit** 15:2,4
17:18,21,22
61:16,16,20,22
62:1 69:25
152:21 154:9
154:10 155:10
158:1 171:6
172:12 183:23
205:6
**circuits** 17:19
**circumstance**
27:8 74:22
152:16
**circumstances**
126:3 134:13
148:9 149:6
152:20 156:25
180:2 211:3
239:19
**citizen** 136:9
137:21 138:7
**city** 3:16 4:5,17
4:22 11:11,25
12:6,10 13:9
16:14,18 17:3
20:4 188:13
221:13 245:17
**Civil** 3:15 5:20
**claim** 67:2,3
**clarification**
32:1 49:19
213:18,20
240:22 241:19

ALARIS LITIGATION SERVICES
www.alaris.us        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-14   Filed 02/09/18   Page 69 of 107

241:25
clarified 30:14
clarifies 243:1
clarify 30:19
    47:5
clarity 239:6
class 85:20
    90:23 179:22
classes 188:23
    189:1
classify 187:23
Clay 9:22 14:20
    14:23,24 17:21
    18:12 61:17
    69:14 73:25
    74:6 76:3
    103:5,6,7
    113:25 114:2,13
    114:14,15,17
    152:25 153:7
    155:1,8,19,20
    156:17 157:7
    163:18 169:6
    169:10 170:6
    170:23 171:1
    173:9,12
    174:17 185:1
    189:6 205:11
CLE 211:23
clean 225:4
clear 17:20
    174:2 182:10
    199:14 201:3
    222:22
clearly 84:14
    182:12
clerk 36:21 41:4
    87:2 142:24
    143:2 185:12
    195:12
clerks 24:20
    194:25 195:3
client 19:9
    29:18,22
    32:12 39:21
    58:5 66:7 70:1
    71:10,23,24

73:12 74:2
75:6 77:7
78:21,23 79:9
80:15,18,19
81:13,17,21
83:20 84:1,11
98:6 102:4,9
102:10 103:12
103:18,22
104:8,9,10
106:10 107:15
109:4 111:10
112:11 113:9
116:4 118:6,17
120:5 121:23
122:3 123:7
124:4,7,17
126:11 127:9
128:11,16
129:8,18
130:16,17 131:6
135:16,19
136:2 137:1
142:12 144:22
145:20 146:8
146:8,14
147:18,23
148:10 149:21
150:1 151:1,19
156:1 178:21
178:25,25
179:10,21,22
179:23
206:23
208:13,25
209:4 225:25
228:6 229:11
229:15 236:21
client's 78:11
    91:2 98:10
    109:4 111:14
    115:20 120:9
    120:20 123:25
    125:19 128:11
    132:17 177:6
clientele 114:20
clients 19:12

23:12 38:10,10
38:13,14 56:3
56:6 68:3,21
69:6 73:4,15
74:3 75:1
79:23 80:9
81:6,23,24
82:4,8,16,19
83:1,7 84:4
86:4 90:21
91:5 97:11
102:4 104:15
116:21 120:19
122:5 124:18
126:4 129:23
132:9 133:25
136:6 137:8
138:21 139:24
147:1,2 148:25
150:10,19
162:7 166:11
167:15 177:7
178:13 179:4
180:23 182:16
182:23 183:16
184:11 204:19
204:20
207:24
226:15
Clinton 14:24
15:11 17:23
18:13 19:4,19
20:2,8 61:18
69:13,22,24
114:6 152:17
153:10,13,14
154:10 155:15
155:18,21
156:4,6,12,14
157:10 160:22
161:19 170:6
170:23 171:2,7
171:14 182:14
182:15
close 15:11 19:14
46:21 90:6
231:20 235:14

238:10
closed 43:17
128:18
closely 39:14
closer 105:12
closest 215:21
closing 115:9
co-defendants
16:16
co-director
169:4
co-manager 9:7
24:9 48:21,25
76:13 195:1
210:7 232:1
Coalition 186:4
cognizant 54:12
colliding 147:13
Columbia 4:11
12:15 27:25
171:25 245:5
column 51:25
combination
165:23
come 23:19
33:25 34:7
42:24 45:8,14
50:18 55:1,5
56:12 64:25
72:1 81:4 90:6
97:4 102:4
112:3 116:8,20
130:18 138:15
147:22 148:11
149:3,11 159:9
168:5 169:8
174:25 177:25
178:1 187:12
209:15 215:2
219:4 221:24
228:5,11
231:16
comes 44:2
66:18 68:13
75:18 85:21
89:13 94:13,14
95:4 118:22

125:25 126:1
141:8 149:2
159:5 165:24
194:4,21
200:12
208:19 212:21
219:17 222:23
comfortable
59:2 145:11
210:19
comical 92:7
coming 56:5
71:11,14 88:8
90:25 92:20
92:20 107:11
181:6
command
42:24 59:15
145:23 146:15
commandment
43:1
commence
127:4
commenced
5:11
commencem...
41:16
commences
41:8
comment 33:5
Commission
246:21
commissioner
170:22
commitment
24:1
commitments
83:16
committed
143:7
committee
166:7 167:6,17
192:17,17,24
208:1
committees
192:21
common 51:16

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-14   Filed 02/09/18   Page 70 of 107

82:19 98:21 99:1 109:24 110:12 125:12 132:3 142:14 144:8,16 158:11 200:11 204:13 228:12
**commonplace** 136:17
**communicate** 29:18 83:1,5 83:21 129:22 130:1,22 131:2 132:23 133:4,7 135:15 136:2 231:12
**communicated** 84:11 130:4 192:15
**communicating** 38:14
**communication** 66:6 81:19 84:2,11 138:22 155:9 171:7,23
**communicati...** 82:3 171:18
**community** 78:24
**compare** 120:3
**compared** 174:9
**compel** 93:11
**competency** 140:15,19 141:5
**competing** 102:21,22
**competition** 102:24
**complaining** 235:20
**complaint** 55:11 55:23 208:11
**complaints** 166:11
**complete** 92:5 94:1 122:2

168:10 207:10 227:23 228:21
**completed** 228:17
**completely** 221:5
**completeness** 129:10
**completing** 227:13
**completion** 210:4 227:17 244:14
**compliance** 180:24 182:4
**complicated** 57:11 70:9 110:15 137:6 140:21 217:2
**complied** 123:6 146:10
**comply** 133:13 179:17 222:24
**composed** 172:4
**compromising** 83:18 134:7
**comptroller** 36:18 220:12 220:24,25 241:3,7,8
**computed** 224:4
**computer** 17:2 33:11 50:9 128:13 204:6
**conceivable** 75:8
**conceivably** 73:7 74:7,7 76:11 119:3 177:10,11
**concern** 75:11 166:15 174:3,11 232:19
**concerned**

112:17 149:20 171:2 184:1
**concerning** 140:19 190:8 225:16 233:2
**concerns** 58:1 169:11,13 172:8 173:21 184:2 188:25 211:17 222:18 231:4 232:11 233:3
**conclude** 62:4 91:19,21
**concluded** 121:12 150:8 161:10 243:5
**conclusion** 89:13 152:9 186:21
**concrete** 174:15
**concurrent** 117:8 126:6,14 126:21
**condition** 134:23
**conditions** 134:20
**conduct** 23:22 23:24 87:21 91:9 180:3,25 196:14 214:4,4 222:25 226:20
**conducted** 89:6 106:8 147:21 219:1
**conducting** 33:20 211:5
**confer** 95:17
**conference** 232:11 240:14
**confidence** 20:21
**confident** 75:3 190:16
**confidential** 82:7,10,18

103:11
**confirm** 51:10
**conflict** 15:19,19 18:6 20:16 27:9 89:25 105:5 117:8 158:20 190:11 190:21 191:19
**conflicted** 76:9 156:11
**conflicting** 16:25
**conflicts** 16:17 156:15
**confused** 226:10
**confuses** 74:3
**confusing** 31:16
**confusion** 226:7
**conjunctive** 235:2
**connect** 202:19
**connection** 73:18 163:20 189:10
**consecutively** 50:17
**consent** 235:6
**consequence** 139:15
**consequences** 111:17 136:1,6 139:9,25 140:6
**consider** 57:5 122:21 185:6
**considerate** 173:10
**considered** 13:6 32:6
**considers** 42:1
**consisted** 120:12,12
**consistency** 61:13
**consistent**

38:23 179:17
**constant** 165:13
**constitution** 44:17 146:1 179:25
**constitutional** 67:2
**constraints** 142:8
**consult** 97:15 140:19 215:20 234:5
**consulted** 139:2
**consulting** 95:25 96:14
**contact** 14:5 39:20 80:18 80:19 81:2,21 103:7,22 174:18 189:8 197:8 220:24 220:25
**contempt** 182:11
**contents** 97:7,9 98:2 109:18 216:18 228:13
**context** 28:19 161:23 218:8
**continual** 191:2
**continually** 164:3
**continuance** 100:7,18,25 206:15 207:19
**continuances** 98:18 174:6 213:2,4
**continuation** 81:19
**continue** 26:6,7 118:23 142:4 167:14 182:14
**continued** 104:21 163:21 170:20,25 171:16 207:5 207:15 213:5

ALARIS LITIGATION SERVICES
www.alaris.us    Phone: 1.800.280.3376    Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-14    Filed 02/09/18    Page 71 of 107

continuing
  172:9
continuity 173:7
continuous
  153:6,6
continuously
  164:7 177:14
contract 17:4
  105:4 158:20
  191:18 217:17
contracts
  155:10
contraindicati ...
  182:20
control 113:10
  131:24 163:25
  164:22 167:21
  200:25 230:7
  241:18
controlled
  203:25
  228:14
conversation
  68:22 72:2
  155:3 190:8
  227:7 228:6
  233:13
conversations
  172:22
conversely
  78:3 204:8
convey 123:7
  135:22 170:15
convicted 86:8
  107:15 118:6
  120:5 152:6
conviction
  78:15 137:13
  161:6
convince 73:17
convinced
  25:14
cooperative
  173:10
coordinate
  150:17
coordinating

97:18
cop 89:20
copier 59:14
copies 39:17
copy 39:16
  50:24 128:16
  129:8 170:4
  183:22 235:18
  245:8,11
cordial 222:3
corner 142:25
  143:1
correct 11:23
  14:11,18 21:1
  27:12,14
  48:20 51:11,14
  52:9 61:19
  69:10 103:3,4
  122:16 172:17
  189:12 193:16
  194:17 211:11
  213:14 218:5
  227:9 239:2
  246:9,12
corrections
  126:5 245:11
correctly 52:10
  66:10 151:17
  165:5 193:14
  204:18 240:21
cost 27:12,16
  217:9
costs 130:21
  240:25
counsel 4:9 5:2
  5:2 64:8 69:2
  89:15 133:24
  144:5 158:20
  167:9 184:17
  186:4 188:21
  190:11,22
  198:18 201:24
  202:3 236:20
  237:24 245:3
count 43:16
  184:1 203:18
counted 223:21

counties 9:21
  14:20,22,23
  15:3,6,9,10,19
  16:2,8,11 17:13
  18:1,6 19:8
  73:25 105:13
  113:24 153:18
  171:10 191:19
counting 11:9
counts 203:13
  203:15
county 9:21
  11:19 14:20,24
  14:24,24,25
  14:25 15:1
  17:21,21,23
  18:10,13,13
  19:4,19 20:2,5
  20:5,8 69:14
  69:22,25
  73:25 74:1,6
  74:12,20 76:3
  103:5,6,7,18
  105:17 114:6,9
  114:13 120:13
  152:17 153:1,10
  153:13,14
  154:11 155:1,8
  155:15,18,19
  155:20 156:4
  156:6,13,14
  157:7,10
  158:17,18,21
  159:4 160:22
  161:16,19
  169:6,6 170:7
  171:2,7,14
  182:14,15 185:1
  185:1 205:9
  237:2,6,21
  246:3
couple 95:16
  114:4 117:22
  189:7 218:10
  231:20
  236:24
course 24:15

25:18 29:9
  30:9 38:8,19
  40:22 55:8,13
  63:1 66:2
  69:8 70:25
  83:3 104:9
  105:16 108:24
  119:10 122:25
  125:16 152:8
  156:5 157:16
  183:7 190:6
  242:8
court 1:1 3:1,18
  3:21 4:19 5:5
  5:18 6:8 20:10
  20:11 29:9,11
  38:11,13 42:13
  60:3 61:1
  66:20 70:22
  71:4,10,16
  78:25 79:1
  80:19 81:3
  84:9 97:21
  101:10,16,21
  116:23 123:24
  150:20 152:12
  167:18 180:15
  183:10 185:5
  185:25 195:12
  197:2 198:13
  200:19
  202:23 205:2
  205:4,7
  207:14 217:15
  217:19 226:22
  230:22
  235:20 237:8
  237:18 239:2
  239:10,13
  244:3
court's 182:5
  185:12
courted 134:3
courthouse
  18:11,12,14
  19:10,19
  120:13 154:11

154:18 173:18
  225:23
courthouses
  15:23 18:23
  19:8
courtroom
  29:10,15 61:1
  63:3 65:10
  69:17 102:3
  227:15
courts 26:11
  32:23 61:16,16
  68:16 114:6
  171:20 185:12
  196:11,11
  201:19 206:12
cover 9:20
  15:21 148:16
  154:10 171:5,11
  191:19
coverage
  212:25
covered 14:22
  156:6
covering 16:3
  20:16 153:13
  153:14
covers 16:11
  153:16
CR 203:12
crafted 234:3
crazy 146:3
create 26:8
  30:18 99:5
  109:13 125:6
  159:9 163:6,6
  205:18,18
  242:9
created 41:15
  77:22 181:12
  181:14,14 199:6
  236:3
creates 23:11
  24:16 126:11
creating 38:17
  38:18 139:12
  179:3 181:16

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-14   Filed 02/09/18   Page 72 of 107

credibility 87:12
credible 95:7
crime 16:16
    29:13 41:2,21
    54:1 85:11 91:8
crimes 17:7
    19:18 20:1
    44:16 73:18
    93:3 229:1
criminal 17:6
    22:20 23:4
    33:16 38:10
    65:17 78:12,21
    114:24 118:2,15
    132:17 136:7
    140:1 141:11
    146:15 199:8
    201:24 203:4
    229:21 230:5
crisis 58:23,24
    189:10,23,23
    189:24
    223:24 235:11
    241:24
critical 87:11
    129:12 178:25
critique 192:25
cross 108:25
cross-examine
    87:14
crossed 191:7
CRR 1:18 4:21
    245:22
crunch 200:1
CSR 1:18 4:21
cumbersome
    29:19 136:21
    136:25
cumulative 2:16
    51:6,14 223:3
curious 206:8
current 9:14
    21:19 80:8
    90:4 96:21
    162:23 180:1
    219:12
currently 18:9

20:16 21:6,9
    53:21 152:15
    193:16 197:5
    226:17
curve 198:7
custody 19:9,13
    19:14 20:1,6
    29:13 70:2
    71:23 79:15
    79:22 80:9
    80:25 81:23
    81:24 82:20
    82:20,23,24
    84:2,5 102:10
    106:10 138:22
    141:21 144:23
    145:2 154:3,4
    177:12 178:20
    179:1 198:14
    226:17,23,23
    226:23
cutoff 181:10
cutter 59:13

## D

D 2:1
daily 39:10
dangled 86:15
dash 89:1,2,8,14
database 175:17
    176:20 183:22
    200:16 203:9
    236:8 239:7,8
date 5:13 10:18
    33:14 34:2,5
    51:11 118:19
    126:6,7 131:15
    133:11 152:6,7
    152:12 181:10
    185:24 206:12
    207:15,16
    247:3
dated 170:5
dates 207:1
    226:22
Daubert 107:21
    107:23 108:3

day 3:15 22:3,4
    40:4 41:12,13
    70:8 71:14,16
    86:5,20
    101:20 104:22
    138:16 154:22
    156:9 169:7,12
    178:5 200:13
    206:23
    207:24
    224:10 244:19
    246:16
day's 35:25
day-to-day 14:6
    33:7 35:22
    38:4 107:1
    119:23 206:5
    221:23 227:8
daylight 86:13
days 34:10 80:3
    80:15 99:22
    128:23 152:11
dead 112:4,16
deadline 130:14
    132:1 133:14,16
deadlines 130:8
    131:12
deal 43:9 89:25
    98:24 100:10
    107:3 111:4
    118:13 119:6
    122:8 132:21
    134:11,22
    135:6,9 178:1
    208:22 211:16
    212:1,18 219:3
    223:22
dealing 15:18
    59:2 107:6
    134:2 212:19
deals 133:24
dealt 14:13
    47:14 237:10
Dear 245:8
decade 241:13
    241:14,14
decades 24:20

145:20 167:12
    177:21 193:20
    194:13 231:20
decedent 110:14
December 1:16
    3:14 5:13
    244:19 245:2
    245:9 247:3
decide 30:25
    42:10 72:24
    74:9 108:25
decided 72:20
    116:19 153:1
    182:13 191:16
    233:19
decides 42:14
    70:19
decision 31:3
    91:11 100:8
    109:3,5 124:19
    124:20,21
    153:1 163:1,3
    163:17 166:4
    168:5,21
    169:15 170:7
    170:16 171:21
    172:20,24
    173:22 195:4
    230:22,22
    231:3,11 232:8
    236:11
decisions 59:15
    61:22 139:25
    224:17
declare 246:12
declined 214:12
declining 215:5
decrease
    221:19
dedicated
    155:16
deem 185:22
deemed 41:14
    75:24 141:21
    181:18 237:8
deep 45:10
    136:9

defend 167:22
    170:17 211:2
defendant 4:7
    29:20 60:23
    61:2 62:6
    63:8,19,21
    66:11 67:1
    111:17 125:24
defendants 1:8
    3:8,24 4:14
    5:3 6:7 15:23
    69:9 185:17
    203:4
defender 2:15
    4:8,10 9:17,18
    10:1 11:4,6,17
    11:18,22 12:19
    12:22 13:17
    14:10 15:17
    17:5,9,17
    26:12 27:23
    35:21 40:24
    41:3 43:23
    49:4 51:6 55:7
    58:16,20 59:11
    60:1 76:12
    79:24 83:25
    102:23 105:4
    112:2 113:23
    118:13 119:5
    136:12 139:11
    163:9 166:17
    168:1 169:11,19
    171:1,19,25
    172:15 173:14
    174:9,21
    175:23 180:21
    188:7,11,14
    189:11,23
    190:7,10 191:14
    191:19 192:15
    193:21 200:18
    205:5 211:15
    212:9,13
    218:14,19,20
    219:19 221:7

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-14   Filed 02/09/18   Page 73 of 107

223:1,3 224:4
233:12
234:25 235:8
238:1 239:10
245:4
**defender's**
131:17
**defenders** 16:10
35:8 105:5
167:19 170:20
172:8 180:20
188:25 212:7
213:13 217:7
218:14 221:8
221:22 224:18
225:21 227:12
228:19 231:6
231:16 232:17
242:21
**defending**
45:14
**defense** 17:6
22:20 23:4
38:10 65:9,23
71:24 89:14
96:1 109:20
114:24 118:15
129:14 167:7
171:4 188:13
191:23
**defenses** 64:21
140:13,25
209:4
**defer** 200:20
218:24 237:17
**deference**
53:18
**define** 202:25
**defined** 223:7
**definite** 210:6
**definitely** 56:17
237:20
**definition** 21:16
53:24 62:19
209:13 230:9
**degree** 23:1
54:14 146:15

163:7 188:17
229:21 230:3
230:13
**degrees** 188:17
**delay** 65:16
136:10 145:4
**deliver** 126:13
**demand** 25:23
211:8
**demanding**
218:3
**demands** 37:9
**demarcation**
48:12 117:20
**demonstrate**
178:24
**denied** 215:16
215:22,23,24
**department**
126:5 141:24
142:7 197:9
211:18 212:3
218:16,18,24
245:16
**departments**
46:14
**depend** 92:8
148:1
**depending**
38:24 56:23
61:22 68:11
76:20 77:9
111:18,25
124:11 132:8
134:1 135:5,5
135:6
**depends** 50:1
57:9,23 69:13
77:4 81:14,16
81:16,20 92:10
93:14,19
95:24 97:6
106:18 108:23
110:2,20
112:25 113:5,9
115:25 121:25
122:1,1 131:13

135:19 148:24
201:20 216:18
224:22
**depo** 40:13
**deponent** 7:10
**deported** 137:2
**depose** 75:16
**deposed** 6:21
7:6,7 9:3
**deposes** 6:12
**deposition** 1:14
2:4,7,13 3:12
5:3,11,15,19
8:8,16,20 9:1
50:18,21
87:24 106:8
134:17,25
172:14 213:15
213:16 214:13
215:2,5 217:8
243:5 244:14
245:8 246:6
246:8,11
**depositions** 7:3
28:23 32:11
88:2,4,12,21
88:24 214:3
214:23 215:24
216:9,14,17
242:18
**deputy** 48:23
173:14 180:21
**describe** 35:20
40:23 45:4
60:7 73:8
75:7 166:2
183:20
**describes** 18:15
224:23
**deserve** 198:5
201:5 207:19
**deserves**
179:23
**deserving**
148:20
**desire** 98:11
**desired** 245:12

**despise** 23:19
**detail** 35:18
52:7
**detailed** 22:24
170:11
**detailing** 100:19
**details** 29:1
116:17
**detainer** 127:1
**detective** 103:1
**detention** 155:2
156:22 157:11
158:13 159:17
159:25 160:16
160:19 161:9
178:20
**determination**
194:21,22
195:8 196:23
201:2 238:24
239:9
**determinations**
230:14
**determinative**
72:19
**determine**
238:25
**determined**
153:20 178:11
236:19
237:23
**detriment** 117:7
117:15
**develop** 92:15
**developed**
42:23
**devil** 116:16
**differ** 40:9 51:5
201:20 206:17
**difference** 78:7
78:8,9 108:9
123:22 124:6
216:16 235:24
**different** 12:2
24:16 29:1
31:22 46:14
58:23 74:24

79:7 85:16
114:15 119:15
119:16 122:8
124:6 130:4
156:5 166:22
166:24,24
182:9 192:13
194:18 206:7
206:8 221:7
223:18,21,25
224:6 241:3
**difficult** 23:17
62:15 119:16
**digest** 97:7,9
99:20 109:18
**digested** 123:4
**dip** 199:2
**dire** 107:5
174:13
**direct** 19:5 46:11
49:14 190:2
**directed** 168:25
170:5,19
171:25 181:21
205:16
**direction** 13:16
168:24 194:19
244:11
**directions** 13:24
**directive** 44:3
**directly** 12:18
12:25 13:19
194:4
**director** 12:17,21
13:13 168:24
169:4 173:15
190:23 218:25
230:24 231:18
**dirt** 198:1
**dirty** 177:20
**disadvantage**
97:11 214:19
**disadvantage ...**
177:9
**disagree** 122:5
193:6
**disagreeing**

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-14   Filed 02/09/18   Page 74 of 107

119:14
disappear
177:10
disappointed
239:14
disappointing
234:8
disappointme...
191:2
disbarred 87:19
discernable
216:16
disciplinary
166:7 167:6,16
208:1
disclose 92:1
189:20
disclosed 92:2
discovery 38:17
92:1,25 93:1
93:24 94:11,11
94:24 95:2,16
96:4 98:25
99:1,20 100:14
112:1 122:2,4,7
122:8,18,20
123:4,5,15,23
124:2 129:7,9
137:14 159:12
178:12 179:10
203:24
207:10 227:11
227:13,18,20
227:21 228:16
228:21 229:3
discovery-rel...
93:8
discretion 13:22
14:2 26:1 59:6
59:8 131:21
169:17,20
201:1 222:10
discretionary
230:9
discuss 98:22
169:10 172:19
discussed

165:11 169:12
216:2 238:6
discussing 66:8
105:23
discussion
165:12,13
166:10 173:21
184:24 212:21
213:23 219:3
discussions
231:15
dishonesty
78:13
dismiss 63:8
dismissed 16:6
75:4
dispenses
241:3
disposition
127:1
dispute 94:11
disservice 56:6
56:8
distance 18:22
155:7,14
distances 15:21
district 1:1,1 3:1,1
3:21,21 5:18,18
9:17,25 10:6,11
11:4,18,18,22
11:22,24 12:19
13:17 14:10,19
16:10,10 17:18
35:20 43:22
43:23 48:10
48:23 58:15
58:20 59:11
109:22 151:18
157:24 163:16
169:19 171:19
171:19,25
173:14 180:4
180:21 184:21
186:14,23
188:25 199:15
199:16 200:14
206:4 209:16

211:15 212:13
213:6,6
217:22 218:19
218:20 219:19
221:6,8,22
224:7,12,17
231:6,16
232:16 238:1
districts 12:3
16:9 199:18
disturbing
168:4
divest 234:16
divide 108:11,15
division 1:2 3:2
3:22 5:19 9:19
11:10 12:21,24
13:13 28:3
150:17 211:5
212:10 218:22
238:9
DNA 95:20,21
216:20
doable 57:23
57:23
DOC 126:22,24
docket 57:12
70:7 76:7
112:9 116:24
162:7 205:8,11
226:16
dockets 90:24
153:17 178:6,8
189:4
document
23:24 51:1
170:3 175:9,11
176:11,17 197:2
documentation
179:4
documents 8:7
8:21 236:2
Doe 182:24,24
203:10,11
Doe's 183:1
doing 36:21
40:5 60:25

86:25 97:19
101:11 118:1
127:21 147:23
147:24 149:22
168:14 172:8
182:2 183:14
188:13 191:12
196:18 198:20
198:20,22
200:3,4
214:10,20
219:21 241:8
dollar 242:14
dollars 39:22
39:23 118:11,12
119:6
door 45:15
double 193:15
242:20
doubt 164:6
downtown 18:12
188:12
dozen 19:22
159:13
draft 231:11
drain 140:21
draw 114:16
131:4
dress 108:1
drew 168:4
drip 92:4
drive 20:5
104:19 105:17
154:22 155:14
156:3,6
driving 18:22
105:15 191:21
198:23
drop 148:9
drug 118:5
drugs 110:25
due 2:18 33:14
34:1,5 65:16
152:12 176:16
176:24
dump 94:22
duplication

94:14 215:12
duplicative
26:8
duration 17:13
184:8 215:10
duress 182:19
183:3,6,11,14
205:17,21
duties 166:8,24
182:16
duty 123:6
171:12
DWI 137:9
DWIs 136:18

_____
E
_____
E 2:1 4:1,1
e-mail 13:5
37:22,25
47:14 99:8
122:24 134:4
210:7 220:4
224:21,23
225:2,9 231:8
e-mails 222:13
earlier 8:12
177:17 190:13
201:23 211:7
212:16 213:2
213:13 222:5
233:12
earliest 67:14,15
early 63:20
64:9,12 76:25
79:20 95:15
96:4,11 99:4
105:22 125:4
143:11
earmarks 48:5
eased 113:25
easier 18:16
94:18 200:8,9
easiest 16:12
easy 23:16
100:17
eat 111:13
economy 26:3

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-14   Filed 02/09/18   Page 75 of 107

edge 173:5
edition 108:3
educate 96:1
    150:2 168:17
educating 169:1
education 9:13
    230:16
effect 182:21
effected 163:24
effective 186:23
    224:8,11
effectively
    225:10
efficient 34:24
    103:15 214:6
effort 62:14
    86:12 91:1
    163:5 201:4
efforts 94:15
    223:23
eight 171:10
    220:8 242:20
either 14:16
    42:12 54:18
    79:18 82:21
    100:2 129:16
    141:4 142:7
    143:3 154:1
    157:17 168:3
    181:24 185:9
    207:24
    209:20
    226:15 236:3
elect 144:24
electronic 38:16
    123:23 128:13
    175:19 176:20
electronically
    17:1
elects 145:12
elements 68:13
elevates 149:25
elevating 133:21
elevator 120:13
eligible 239:1
eliminate 182:13
    221:19

Ellen 12:24 13:8
Elocutions
    151:17
embarrassed
    205:15
embarrassingly
    201:7
emergency
    34:11 84:10
emphasis 175:2
employed 9:18
    187:18
employee
    167:12 237:25
employees
    21:11 220:3
employment
    9:14,14 78:24
    162:23
enclosed 245:8
    245:10
Enclosures
    245:23
encourage
    32:8,13 70:21
    79:19 199:10
    202:10
encouraged
    72:18 168:15
    221:18
encouragem...
    215:9
encourages
    72:23
encouraging
    221:20
endless 25:23
    25:24 33:21
    44:12,13,13
endorsed
    70:22
enforcement
    88:22 111:6
engage 96:14
    97:12 217:22
engaged 97:14
    98:8

enormity 119:12
    221:15
enormous
    118:14 140:20
ensure 180:24
enter 64:17
    182:25
entered 205:21
entertain 77:10
    77:12
entire 8:12
    52:25 89:23
    155:16 156:9
    234:19
entirely 8:11
entirety 10:18
    234:10
entitled 197:3
entries 182:16
    183:2
entrusted
    224:18
entry 182:6,19
    183:5,14
    184:14 205:16
    220:8
environment
    126:11
equate 73:14
equation 25:22
Eric 4:14 187:9
err 201:7
errata 245:10,12
    245:14 247:1
error 107:17
escapes 138:3
especially
    35:14 54:17
    61:13 126:13
    157:23 168:1
    208:21
    223:22,23
    236:15
essential 87:9
essentially
    166:19 167:4
    167:10 179:3

220:13 234:4
estate 200:4
estimate 10:5
    39:22,23
    193:17 226:25
estimating
    22:21 49:4
estimation
    44:10 230:4
et 1:4,7 3:4,7,22
    3:23 5:16,16
    23:25 41:25
    75:17 123:3
    131:8 139:3
    181:19 189:15
    245:7,7 247:2
    247:2
ethically 127:16
    167:22
evaluation 50:3
    141:15 142:12
    142:12
evaluations
    47:19,20
    49:13
evening 118:23
event 215:10
events 53:6,6
    54:22 56:10
    59:1 141:11
    165:8 199:8
Eventually
    145:23
everybody 34:4
    52:8 55:2
    90:22 108:4
    128:23 145:12
    207:17 234:17
evidence 66:22
    73:15 75:17
    86:10 91:20
    92:20 107:7
    112:19 122:10
    208:16
exact 43:8
    182:17 198:24
    235:17

exactly 53:14
    138:9 227:17
examination
    2:9,9,10,10
    6:13 141:9
    187:4 191:15
    226:21 238:21
    240:18
examine 87:25
    208:16
examined 3:13
    6:11 124:20
examiner
    187:25
example 16:13
    16:20 19:17
    20:10 33:6,7
    33:21 37:20
    49:15,25
    53:13 56:18
    59:16 65:3
    68:2 69:22
    76:2,18 83:22
    83:23 84:23
    92:12 94:7
    98:5,9,10
    103:18 107:3
    108:6 111:23
    118:4 120:22
    134:9,12
    136:18 144:3
    147:19 189:1
    192:24
    203:22 210:10
    217:18 224:10
    228:12,24
examples 94:3
    98:5,14
    106:25 116:21
    135:2 140:4
exceeded
    164:3
exception 10:16
    112:23 167:19
    182:23 183:2
exceptions
    114:4

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-14   Filed 02/09/18   Page 76 of 107

excess 193:24 193:24
excessive 2:19 68:19 162:10 166:21,23 167:7 176:16 176:24 211:8
exchange 63:3 70:5 148:12
excited 196:11
excuse 167:20 208:2
Executed 246:16
exercise 148:19
exhaustive 36:6
exhibit 2:14,15 2:17,18 47:4 50:16,20,22 50:24 164:14 169:25 170:1,4 175:10,14 176:4,5,8,15 180:16 199:19 223:2 235:25 236:1,15 240:3
exhibits 2:13 50:17
exist 209:5 228:1,2
existed 184:2 212:3
existence 175:11 186:7 232:23
existing 23:10 35:14 99:20 180:23
exists 56:8 129:24 184:3 212:8
expanding 114:20
expansive 38:25 220:10
expect 128:15

expects 208:1
expended 211:1
expense 30:10 31:19,23 39:11 101:24 216:21
expenses 36:24 39:14
expensive 26:4
experience 14:10 22:12,20 22:22,23,24 42:21 43:4 44:19,20,25 53:17 54:13 55:24 57:5 64:22 67:11 72:10 84:18 90:14 92:14 114:24 115:24 126:15 151:21 157:22 158:3 162:13,16 166:6 187:12 192:5 193:18 193:20 194:13 194:14 206:16 209:11 216:13 226:19 227:24 228:1 228:2,18 229:9
experienced 79:12 95:18 164:19
experiences 154:7
expert 28:11 30:25 31:1,6 88:13 95:9,20 95:21,23 96:6 96:13,14 97:13 97:14,15 98:7 107:19,19 137:7 140:19 140:22,23,23 161:12 162:13 166:9 191:25

192:8 215:15 215:16,24 216:5,9 217:8 217:10,15 223:8 237:14
expertise 50:10
experts 28:9 32:11 95:11 96:22 97:18 119:2
expiration 131:15 133:11
expire 131:1,11 133:9
expired 130:11
expires 130:23 246:21
explain 16:13 25:19 40:23 60:7 63:24 68:24 95:7 113:16 126:20 135:18 151:8 163:23 177:22 185:4 195:23 220:5 224:6
explained 36:13 223:20
explaining 73:14
explanation 24:11 150:25
exposure 110:24 115:5 132:18
express 234:12
expressed 155:3
expressly 5:9
extended 26:9 34:6
extensive 22:19 140:2 191:15 197:16
extent 24:10 36:15 90:13 92:10 129:3

140:2,3 165:14 172:18 191:8 217:23 219:15 220:20
extinguish 233:11
extra 201:4
extraordinary 46:9
extrapolated 229:5
extreme 54:20 204:10,11
extremely 110:15
eyes 52:5

—— F ——
face 87:24
face-to-face 103:22 148:12
facilitate 104:5
facilitating 214:5
facilities 26:10 82:1 84:6
facility 41:7 69:15 70:2 82:12 154:25 155:11 160:19 161:6,7
facing 136:1
fact 139:18 174:11 196:3 221:11 235:21
factor 202:4 207:2 208:5 208:6,8 210:22
factors 193:19 194:9 207:4 217:11
fade 65:10
fades 66:12
failing 131:5
failure 79:1
fair 28:22 36:2

53:4,9,20,25 55:3 56:3,4 58:6 67:16 76:23,24 91:4 91:6 108:25 111:15 173:8 175:8 179:15 186:15 203:20 225:25
fairly 15:7
fall 36:15,16 57:7 185:23
falls 88:5 122:18 198:17 224:14
familiar 50:14 71:12,22 114:8 186:3 195:14 236:6
familiarity 115:6 157:6
family 82:13 84:12 119:4 128:11 160:1,16 178:19 179:6 187:21
far 18:11,22 19:12,25,25 20:1,1 31:10 38:13,13 46:2 68:19,19 82:22,22 97:23 104:14 115:14 143:14 151:25 154:14 155:4 159:24 164:25 168:2 170:16 191:24 205:14 219:2 227:1 237:5 242:18
farm 20:1,4
farms 20:2
farther 7:9 15:22,22,23 15:24 19:4 20:6 191:22 191:22

ALARIS LITIGATION SERVICES
www.alaris.us      Phone: 1.800.280.3376      Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-14   Filed 02/09/18   Page 77 of 107

fashion 84:16 85:10
fatal 112:5
Father 100:18
fault 65:17 99:19 131:6
faulted 166:18 166:20
faulting 81:9
favor 107:13
favorable 78:22
favorite 117:5
favoritism 234:13
fear 87:19 127:14 163:12 163:13
feature 75:8
features 75:7
fee 114:19 174:22,23,24
feedback 210:8
feel 32:18 44:12 52:24 82:25 83:4 84:22 127:10
feeling 92:15
feels 52:16 164:15
fees 199:2
fellow 138:25
felonies 45:2,4 73:12 110:19 204:20 216:10
felony 61:25 73:17 74:19 81:15,16 113:3 123:13,13,13 131:23 132:12 205:3 216:14 216:21 217:2
felt 169:15,18
field 217:18,19 223:7 224:15 235:13
fields 218:3 224:6

fight 233:6
figure 50:8 71:15 80:25 95:17 106:2 129:3 136:23 242:15
figured 10:3
file 25:25 38:15 38:16,16,23 46:4 49:24 68:4 69:6 87:25 88:1 89:18 91:2 93:7,18 95:15 95:20,22 97:7 97:9 98:2 99:4,6,15 100:18 104:19 105:19,22 107:8,22 109:14,19 111:25 112:16 123:24 124:1 124:21 127:18 127:22,23 128:7,13,14,16 128:17,18 129:2,8,16 131:23 132:4,11 132:12 135:8 151:9 152:1,10 163:3,24 181:24 182:6 197:2 205:16 205:18 206:14 207:16 208:1 216:18 232:9 233:4,6,20
filed 25:25 63:15 106:4 108:1 127:1 143:14 151:1 175:25 176:23 178:14 179:16 181:25 184:14 207:25,25 235:16

files 41:14 97:3 99:15 107:21 128:2,5 150:18
filing 76:16 208:2
fill 12:22 23:16 37:17 148:10 157:20 219:16
filled 13:11 23:15 41:21 62:7
filling 24:6 40:11 40:12
fills 41:2
final 30:22 31:3 49:20 162:2 200:22
finally 29:2 45:18,19 85:21
financial 196:20 197:5 198:8
find 23:16 31:1 47:22 50:12 66:13 71:10 78:11,22 85:7 88:13 91:21 95:6 100:13 117:13 148:14 150:12 153:25 181:18 202:21 214:24 220:17 234:10,19 245:8
finding 41:19 42:13 185:5 200:18 235:1 237:17
fine 199:7 221:6
fingerprint 95:23
fingerprints 95:22
fingers 191:7
finish 8:10 42:2
finished 121:9
fire 35:25 206:13,14 207:16

firearms 95:20 230:4
fires 178:5 206:11
firm 10:17 11:13 11:15,16 188:12
firms 114:16 158:22
first 11:5 26:15 35:24 37:21 39:8 50:16 54:6 60:9 62:11 65:11,13 71:9 72:13 79:8 80:19 84:23 85:20 87:15 108:2 118:24 120:10 129:11 133:8 147:12 158:15 159:9,10 179:21 188:6 192:3 200:2 206:6,6 227:21 233:5 234:3 238:19
firsthand 120:1 161:13 199:25
fiscal 220:18 240:24 241:6
fit 19:24
five 7:12 11:6,12 100:24 103:8 127:25 187:15 187:17 188:10 203:3,4,5 210:17 222:11 225:7 241:17
fix 175:4
flamethrower 207:21
flaw 234:23
flux 33:18
focus 105:11 177:2
fold 132:10
folder 226:23

233:13
folks 16:19 34:23 80:24 144:4 181:21 189:7 199:21
follow 51:23 191:6
follow-up 240:20
following 230:11
follows 99:3
foot 149:21
forbid 44:20 70:10
forced 77:6 83:15 100:23
forefront 166:15
foregoing 244:5,7,12 246:6,12
foreknowledge 241:5
forethought 84:14 214:8
forever 20:19 174:5
forget 157:3
forgive 199:16
forgot 78:15
forgotten 9:24
form 17:1 39:13 39:17 70:23 70:24 175:22 176:10 182:22 224:24 246:7
forma 150:14 152:10
formal 72:16 92:25 129:22 129:25 133:10 137:18 183:19
formally 138:7 194:24
Former 83:24
forms 148:10
forth 244:6
fortunate 79:17

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-14   Filed 02/09/18   Page 78 of 107

130:17 139:1
157:8
**forward** 61:24
**found** 68:16
74:16 133:3
183:9,9 185:17
206:22 232:3
234:6,8
**Foundation** 4:3
5:21
**four** 10:23 24:19
48:8 103:8
132:19 188:5,11
197:15 203:19
204:14 231:5
**fourth** 202:2,5
**fraction** 154:9
171:6 184:19
198:2,15
**frame** 10:19
236:10
**frames** 51:5
**frankly** 16:22
24:20 34:11
36:21 40:10
43:2,12 45:7
65:13 71:5
77:19 107:11
110:16 111:5
130:19 140:9
141:10 153:22
155:14 158:25
163:10 165:15
165:18 182:8
192:2 197:25
201:18 208:10
215:1 234:6
238:7 239:15
**free** 79:18
126:17 197:24
198:5
**freeze** 213:25
215:8
**frequency** 83:9
93:13
**frequent** 208:12
**frequently** 88:9

88:14 92:2
93:7 105:18
106:21 108:10
108:20,21
109:22 135:5
141:8,17,18
149:3 158:5
213:9
**fresh** 61:7
**Frey** 107:20
**friend** 136:14
139:18
**friends** 118:9
171:24 231:20
**front** 75:13,18
77:9,11 87:14
144:23 145:1
205:1
**frustrated**
202:7
**frustrates** 117:1
**frustration**
135:17 155:4
**Frye** 107:22
131:3
**fulfill** 38:7
**full** 24:14 173:21
**full-time** 21:10
23:10 24:15,17
24:18 25:9
**fully** 21:6,9,12,14
179:8 190:19
199:3,4 221:14
236:15
**function** 142:6
197:11 199:23
**functioning**
119:24
**functions**
139:20
**fund** 153:23
**funding** 28:14
28:24,25
29:17 30:7,7
31:24 32:5,9
32:21 36:23
37:13 39:12

65:18 70:25
119:7,8 191:14
214:4 216:5
**funds** 15:17
28:12 29:23
32:7 38:1 40:1
97:5 140:24
190:9,17 191:3
191:8,10 192:6
201:6 213:11
213:16,22
214:3,12 215:6
215:6 217:20
242:6
**funneled**
190:24,25
**funny** 145:18
**further** 2:10
30:16 54:15
56:7 105:7,9
113:17 196:10
213:18 218:3
229:5 237:9
238:12
239:24
240:18 243:2
244:11,16
**future** 59:1
118:19 140:10
191:24

_____
**G**

**gain** 211:23
235:6
**gained** 209:11
215:20
**game** 106:9
231:16
**gatekeeper**
161:20
**gather** 50:5
96:8 118:18
**gears** 202:24
**general** 4:9,16
53:8 55:6
91:15 94:6
190:9 226:14

226:18 245:3
**generalizing**
126:3
**generally** 36:9
42:3 59:7
98:10 154:12
157:17 236:3
239:24
**generously**
19:23
**gentleman**
237:19
**gentleman's**
76:5
**genuinely** 174:7
**geographic**
18:8
**getting** 38:12
65:9 80:15
83:17 85:19
91:24 92:13
93:12,16
97:25 104:14
114:22,25
134:7 178:3
179:21,22
187:14 192:3
211:3 237:19
**Gillian** 4:3 6:2
245:24
**give** 24:11 33:6
37:20,22
45:25 49:11
54:15 56:1,18
56:25 57:11
73:24 77:20
83:21,23
84:21 94:6,21
106:25 108:6
109:3 111:23
112:2 117:19
125:22 127:23
127:24 131:11
134:16 135:2
136:15 141:3,8
149:3 179:17
189:1 193:1

196:1 198:5
204:24 206:1
207:19 226:8
235:18 238:15
242:10
**given** 15:8 25:8
34:1,13 36:20
45:20 46:7
47:7 109:6
122:5 128:21
133:16 142:1
208:17 215:3
216:17 220:13
220:15,15
229:10 242:13
242:15 244:13
**gives** 107:11
111:10 242:8
**giving** 57:6 81:11
151:4
**glad** 74:18 154:7
**glance** 211:21
**glanced** 35:10
236:8
**glass** 103:9
178:23
**glitch** 29:11
**glut** 199:2
**go** 7:15 13:4
14:8,9 22:10
23:14 26:14
27:15 29:22
29:24 30:11
39:20,21 46:2
46:12 49:16
54:15 66:12,19
68:15 82:2
98:11,12
100:23 102:9
103:21,24,24
105:16 107:24
108:1 109:12
109:25 110:3,5
110:8,9 111:19
112:12,23
116:23 118:7
120:5 121:2

ALARIS LITIGATION SERVICES
www.alaris.us    Phone: 1.800.280.3376    Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-14   Filed 02/09/18   Page 79 of 107

127:21 130:12
141:23,24
147:19 152:22
156:12,19
158:14 160:2
160:18 187:11
195:6,15
201:12 202:12
206:4 211:4
212:7,16
217:13 221:2
223:15 224:11
224:20
226:21 233:17
234:8 238:15
241:6
**goal** 15:25 45:11
54:16,20
**goes** 38:18
39:13 59:14
60:17 146:5
177:11 187:20
192:24 202:4
219:18
**going** 9:2 10:4
19:9,12,14
20:12 26:14
28:16,20
32:15 33:17
35:17,18,21
36:11 38:20
39:17 42:17
44:15,18 45:13
47:5 50:16,18
50:19,20 52:5
53:3,7 54:21
56:9 57:7,16
57:20,20,22
59:1 60:2,3,8
61:23 63:1
64:16 65:5
66:19 69:5
70:8,17 71:8,15
72:1,25 73:3
76:6,18 77:1,10
77:12,16 78:1,4
79:4 80:7,11

80:16,23,24
82:23 85:7
86:16 87:2,11
87:12,22,23
88:1 89:16,18
90:23 91:22
92:17,19
93:20 94:21
94:22,23,25
94:25 95:6,7
95:23 97:5
98:15 99:25
100:2,3 101:4
101:5,25
104:10 106:11
106:17 107:4
107:24,25
108:1,25 109:1
109:2,10,11,12
109:16 110:1
111:4,11,18
112:9 113:6,7,8
113:10,10 116:3
116:4,8 118:17
118:20,21,22
120:7 121:12,18
122:3,10 123:2
123:6 124:3,5
124:8,12
125:10,20
126:7,9,14
127:19,23
129:13 130:12
130:16 131:16
131:23 133:4,6
133:7,10
134:15,18,25
135:8,13
137:15,17
142:17 145:2
151:9 153:24
153:24,25
159:16 160:23
164:16 166:3
169:24,24
170:17 173:6
176:4,5 177:2

177:3 179:14
180:12 181:9
185:6 194:2
196:9,23
197:18,21
198:21,24
201:7,20
202:21 205:9
206:15,23
207:15,17,18
208:9 209:7
216:21 218:21
220:23 221:1
222:24
223:24 224:9
224:19 225:13
225:24 226:4
229:2,2 241:6
**gold** 109:15
**good** 6:16 35:12
37:5 68:1
71:20 86:24
101:14 124:19
124:21 129:13
130:16 132:2
139:12 144:15
155:12 164:20
177:15 178:24
187:6,7 192:3
196:8 201:14
201:15 213:21
214:23 215:1
242:24
**goodness** 147:9
153:18 187:20
225:7
**gosh** 22:2
210:16
**gotten** 63:18
97:24 120:19
131:7,14
164:23,25
172:5 192:4
199:4 225:2
**governance**
192:12
**government's**

116:3
**governor** 4:14
6:5 187:9
191:2,4,5,6,12
191:12
**governor's** 191:1
**grand** 74:1,1,5,6
74:13 135:13
**grant** 213:3
**granted** 100:23
160:21 219:25
232:13,14
**granting** 174:6
**grateful** 105:3
190:24 191:10
**great** 24:10
90:18 111:4
219:2
**greater** 15:21
26:3 127:5
216:21,21
**greatest** 97:23
**Greitens** 4:14
6:5 187:10
191:5,12
**grid** 223:4
**grievance**
55:23
**gross** 80:12
**grossly** 166:21
166:22
**ground** 7:15
**groundswell**
182:7
**group** 58:3
**groups** 188:23
**grown** 25:5,5
**guarantee**
133:14
**guarantees**
179:25
**guardians**
39:25 196:8
**guess** 23:14
31:4 39:24
42:12 53:3
71:18 110:10

132:2 134:23
136:5 141:5,22
143:15 144:8
153:11 158:3,15
159:16 166:2
193:3,6
205:25
215:22 218:11
235:22
240:25
**guessing** 40:7
56:12 76:20
210:19 218:10
**guided** 116:1
203:17
**guidelines** 35:7
79:24 100:6
185:23 195:14
195:16 239:17
**guidepost**
69:21
**guilty** 63:20,21
64:7,12,14,17
70:9 86:5,5
86:12,18 100:3
100:4 112:12
118:17 121:13
123:16 124:5
126:5 144:24
150:23 204:2
227:7
**guys** 172:19
**gwilcox@aclu ...**
4:6

**H**

**hairs** 58:25
**half** 23:2 76:3
116:20 154:22
159:13 241:14
**halfway** 51:20
**hall** 102:23
103:21
**hampered**
83:20 94:4
98:8
**hampering**

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-14   Filed 02/09/18   Page 80 of 107

100:14
hand 50:24 111:1
111:1 169:24
242:17 244:19
handed 152:3
handful 6:25
241:17
handing 41:4
50:23
handle 45:2,3
46:5 113:13
158:10 200:8
205:5,6,8,10
handled 16:24
53:21 156:19
158:16,25
237:20
handles 15:2
158:12 171:9
handling 142:15
hands 123:1
happen 24:2
30:20 43:5
64:12 65:5
71:16,18 72:7
73:10 80:19
85:22 90:20
94:7 99:13
102:13,14
115:23 118:20
129:17 130:11
132:3 140:10
143:16 152:2
157:1 173:6
221:3 239:12
happened
37:18 56:11,13
56:16,17 67:3
70:11 90:9
94:7 119:22
156:17 159:8
184:23 204:13
210:9 221:4
226:11
happening
126:18 140:16
184:22

happens 22:3
45:16 60:7
62:17 69:23
81:3 88:19,20
94:17 99:3
104:6,11 116:23
124:24 132:13
132:25 137:12
141:22 149:4,9
157:14 177:6
179:2 210:12
239:15,20
happy 24:1
102:13
hard 35:21
47:21 66:12,21
81:10 84:20
98:13,14 101:18
128:14,21
174:7 187:14
198:16
harder 134:15
235:15
hate 98:12
head 12:23
49:9 67:25
105:24 209:17
209:22
health 141:1,2
141:25 142:7
163:14
hear 171:2
190:15 192:25
204:18
233:24,25
heard 28:1
142:10 148:3,9
171:13,14 175:11
186:5 206:5
240:21
hearing 7:8
60:20,23
62:5,11 69:10
71:8 72:2,20
72:20 73:5,9
73:13,14,20
74:3,8,20,25

75:5,10,24
76:21,25 77:3
77:8 78:5
86:2 135:12,12
150:9 156:2
156:22 158:16
159:4,6 160:18
233:2 237:7
239:25
hearings 20:7
60:6 72:21
76:20 154:20
158:10 178:16
229:19,24
heat 53:3
heck 116:18
held 5:19 73:21
75:10 92:16
154:3,6 163:19
166:4 169:11
178:16
help 30:6 47:4
57:17 95:19,19
95:20 108:15
151:12 173:22
173:25
helped 98:6
helpful 34:16
96:13 106:21
148:15,23
helps 31:21
108:11 220:22
242:25
hesitant 214:22
hey 39:16 47:13
149:11 185:20
189:5 220:4
Hi 6:17
hierarchy 12:20
high 4:16 21:24
86:14 87:18
205:9,11 206:1
high-level 59:15
higher 45:24
58:14,19 80:13
141:7
highest 48:16

highlight 129:12
129:14
Hinkebein
165:4,6,7,10
165:25 166:16
167:5,11 170:7
170:16 171:21
172:24 173:21
223:23
230:22 231:14
232:6 233:16
Hinkebein's
236:10
hire 22:5 55:22
198:18
hired 56:1
140:23 184:17
230:18
hiring 24:7
198:25 199:8
historical
200:20
historically
55:4 74:14
189:22
history 33:16
78:12,22 111:18
113:9 132:18
146:9 188:18
190:25 191:1
194:5
hit 126:25
hogging 34:8
hold 136:23
140:12 182:11
213:7
holding 169:9
holiday 220:9,9
home 19:14
98:11
homicide
108:19 109:10
109:22 110:18
121:22
homicides
121:17
honest 52:19

220:2 223:9
honestly 27:21
48:2 78:9,16
83:25 94:18
99:11 109:8
115:5 124:18
129:19 133:2
147:4 149:20
162:16 195:10
211:19 224:5
hope 20:18,22
43:4 78:7
104:21 114:19
127:12 137:11
hopeful 191:25
hopefully 175:6
hoping 141:13
horrible 125:10
215:1
horse 172:15
hospital 167:14
hours 3:14
34:21,24 82:4
84:6 104:19
104:20 154:17
154:17 155:23
155:24 157:3
178:7 179:18
210:25 211:24
217:24 218:8
219:24 220:8
241:4
hours' 100:24
house 19:22,23
housed 154:12
155:7 161:1
huge 23:25
117:24,24 141:1
human 81:2
humor 58:3
hundred 40:4
hurry 124:19,19
hypocritical
128:20
hypothetical
26:2
hypothetically

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-14    Filed 02/09/18    Page 81 of 107

201:10
hysteria 54:15
163:11

**I**

i.e 35:14
ICE 136:23
137:12,12
140:12
ID 142:23
idea 46:3 49:7
57:18 71:20
74:11 97:8
126:9 199:21
229:10
ideal 35:11
193:12
ideally 94:9
ideas 90:18
105:24
identification
50:22 170:1
176:8
identify 51:1
86:22 139:8
159:19 170:2
175:12 176:10
identifying 91:8
idle 133:21
IDs 142:21
ignore 90:22
II 48:8
III 48:8
illegal 26:7
illogical 234:11
imaginable
204:10
imagine 110:11
122:15 140:21
immediately
118:7 126:12
130:8 181:12
188:3,4
immigration
136:6 138:19
138:23 139:8
139:15,24

140:14 187:3
impact 120:1
137:2 163:6
impacted 42:20
84:17 162:15
163:23
impacts 140:24
impending
207:1
imply 47:2
important 7:21
86:2 91:23,23
196:19 215:17
225:4
importantly
194:12
imposition
198:8
impossibility
35:13,15
impossible
47:12 125:22
139:13
impractical
234:7
impression
125:7 168:23
in-house 34:13
inability 90:16
90:16 94:3
inbox 90:25
incarceration
26:9 39:19
127:6
inclined 106:11
148:18
include 96:5
110:21 138:23
152:5
including 21:5
35:25 119:2,3
139:23 162:6
193:10,11
income 163:14
195:16 196:5
incompetent
141:22

incomplete
123:15 227:10
inconsequent...
9:11
incorrect
237:16
incredible
104:18 110:24
incredibly 23:21
incriminating
179:11
independent
29:15 30:17
141:9 194:6
196:14 200:24
203:5
independently
199:24
indicate 245:11
indicates 54:8
indigence 41:9
indigency
153:20 194:22
200:18 230:15
238:24 239:9
indigent 17:6
18:4 41:2,14
60:8 62:6,9
75:24 174:21
181:19 183:9
185:23 191:23
202:5,22
indisputable
210:13
individual 36:19
53:18 77:17
industrious
34:22
ineffective
236:20 237:8
237:17,24
ineligible 154:1
inexperienced
162:17
informal 55:12
183:19,20
226:24

informally 182:7
information 2:4
66:12,14
78:20 93:17
94:10 96:9
98:1 118:19
136:11 148:17
159:12 179:11
182:7
inherent 16:17
initial 41:5 60:6
60:11,15,16
62:5,23 76:19
80:18 227:21
initially 62:16
64:1
initials 148:5
initiated 33:11
223:7
inmate 20:6
105:16
inmates 20:4
inn 102:19
innocuous
129:15
inordinate 38:11
38:12 200:7
210:25
inquire 239:21
inquired 155:1
inquiry 137:24
239:25
insane 68:16
inside 15:13
216:25
insist 145:7
insists 145:1
Insofar 171:1
instance 69:2
71:19 148:13
201:12 216:15
217:9
instances 73:11
80:1 109:2
132:9 237:24
instruct 32:16
instructed 7:23

180:19 222:11
instructive
232:4
insufficiency
92:22 127:22
insufficient
162:10
insult 32:15
insurance
188:13
integral 96:2
intelligence
32:15 135:20
intention 182:11
interaction
229:15
interest 117:8
143:25 146:24
168:10 183:1
interested 17:6
93:16 185:7
244:16
interesting
159:11
interests 235:13
internally 172:18
interns 27:24
interplays
241:23
interpret 51:17
interpretation
219:10 234:24
interpreted
37:12
interpretive
217:18
interrelated
99:2
interrupt 7:19
47:16 71:16
146:12
interrupted
88:19 192:21
interrupting
210:1
intervene
214:22

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-14   Filed 02/09/18   Page 82 of 107

89:19
interview 33:21
  45:8,21 84:24
  99:13 106:9
  147:24 214:20
interviewing
  24:7 87:2
interviews
  23:22,23,24
  23:25 88:4
introduce 6:1
invariably 45:16
  45:21 99:13
  212:21
inventory 94:10
  99:5 242:16
inventorying
  95:2
invested
  216:22
investigate
  75:16 87:7,20
  88:2
investigated
  178:15,15
investigating
  91:9 178:9
investigation
  33:19 65:8
  79:3 98:2
  100:21 109:20
  111:5 122:9,12
  124:5 143:13
  143:24 144:7
  196:15,20
  197:1,3,5
  227:19
investigator
  27:16 33:5,12
  33:12,22,24
  34:16,19 39:18
investigators
  24:17 25:12,15
  27:2,5,12 33:1
  33:1 34:9,14
  34:20 38:19
  59:16 86:24

87:6 89:4
  164:18
inviting 169:7
involve 24:9
  110:14,25
  143:23
involved 24:7
  27:8 46:3 61:2
  62:22 112:4
  114:5 136:20
  137:12 142:22
  143:18,18 144:1
  145:12 146:2
  158:25 161:5
  166:24 202:14
  214:22 229:15
involvement
  144:19 197:22
  241:12
involves 76:19
  140:11,22
  152:21
IRS 187:22,24
issue 30:19
  104:13 107:9
  130:5 136:17
  141:5 166:12
  167:6 216:3
  217:14 220:23
  221:1 222:15
issues 35:19
  122:19 141:2
  166:17 190:7
  209:7
itching 182:12
item 33:12 34:1
  34:5 59:17
items 33:10
  38:19 39:15
  211:25
IV 48:8,16

_____ J _____

Jackson 114:9
  114:21 158:17
  158:17,21
  159:4 161:16

Jacqueline 4:9
  6:6 245:3
jacqueline.shi …
  4:12
jail 19:21 29:22
  39:20 41:12
  57:13 69:15
  70:2 81:25
  82:5,6,9,17,24
  84:3 86:19
  98:12,16
  99:25 100:1,2
  101:10,16,22
  102:4,20
  116:22 125:25
  132:19 133:5,6
  147:20 155:15
  155:15 178:13
  179:11 208:21
jails 15:21 38:14
  41:12,12 103:2
Jefferson 4:17
job 37:5 41:25
  84:1 86:24
  117:4 139:12
  188:6 197:20
  199:9 239:22
jobs 163:14
Joe 25:8 188:15
  241:15
John 182:24,24
  183:1 203:10,11
joke 28:7
  196:19 216:24
Joseph 11:19
jot 129:11
judge 41:4,19,19
  42:1 55:16
  60:10,12,16
  61:9,10,21,22
  63:1 64:2,16
  70:20 72:23
  72:25 73:5,17
  77:10,12,22
  77:24 80:23
  95:6 101:7
  107:10,11,12,12

118:17,23
  126:17 131:24
  142:1 144:23
  144:25 145:1,5
  145:11 148:24
  149:23 150:15
  150:16,23
  151:23 152:20
  153:1 157:18
  169:8 170:24
  171:3,13,15
  172:13 173:16
  173:16,16
  178:18 190:5
  197:18 201:20
  201:21 206:17
  206:18,21
  207:18 208:8
  226:8 234:5
  235:1 239:20
  239:23 240:1
judge's 41:4
  206:21
judges 2:17
  44:12 61:14
  72:10 74:4
  104:6 113:23
  118:20 122:6
  124:13 131:16
  131:16 144:18
  144:19,20
  145:7,7,10
  148:14,18
  163:16,25
  169:6 170:6,9
  170:15,19,22
  170:25 171:14
  171:17 172:6
  173:12,17,22
  174:5 182:10
  183:23 189:2
  199:11,12
  202:7 207:20
  213:3 231:12
  240:4
judgment 150:8
  206:23

judicial 15:1,4
  17:18,21,22
  69:25 89:19
  152:20,21
  154:8,10
  155:10 157:24
  158:1 171:6
  172:12
judicially
  236:19
  237:23
judiciary 64:9
  155:3 171:8
  173:9
juggle 127:15
jump 102:7
  159:17
jumping 225:13
jurisdiction
  19:15 42:21
  61:13,15 71:13
  71:22 72:11
  77:15 88:23
  93:14 108:23
  109:6,16 110:2
  124:11 127:2
  130:21 132:8
  134:2 149:23
  169:10 173:20
  202:13 206:17
  206:18 226:4
jurisdictions
  20:3 74:18
  79:13 102:16
  109:9 171:17
  179:7
jury 74:1,1,6,6,13
  75:13,18 86:11
  87:15 109:1
  118:6,16,20,21
  119:1 120:5,8
  120:10 135:13
  137:10 152:5
  206:20
justice 54:9
  65:17 135:13
  146:15 155:8

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-14   Filed 02/09/18   Page 83 of 107

155:17 229:21
230:5 235:15
justify 28:13
juvenile 26:10
113:14,25 114:3
114:11 115:1,4,6
119:11,18
152:15 153:15
153:23 154:23
155:2,8,15,16
156:12,15,20
157:10,18,23
158:10,16,21
159:22 161:7,9
161:12,23
163:21
juveniles 153:21
154:8 155:6
158:6,13
160:25 161:15

**K**

Kaltenberger
1:18 3:17 4:20
5:4,22 244:3
244:23
245:22
Kansas 3:16 4:5
4:22 11:11,24
12:6,10 13:9
16:13,18 17:3
188:13 221:13
245:16
Karl 165:6,10,25
166:16 167:5,11
170:7 223:23
231:19 232:5
233:16 236:10
KCI 18:11
KCUR 190:4
keep 22:2
43:16 50:7
72:25 94:20
218:15
keeping 36:22
225:3
keeps 241:10

kept 17:2 86:13
87:17 154:4
188:1
key 95:14 96:3
97:6,10,10
keyboard 123:2
kidnapping
110:21
kill 104:4
kind 33:6 45:4
48:6 57:9
59:7 64:11
65:9 76:21
81:10 84:21
93:21 98:21
101:19 104:4
106:16,18 111:4
115:7 117:5
119:23 125:3
125:22 126:19
128:4,14 152:5
152:3 161:25
162:2 164:10
175:3,12
176:23 203:14
207:18,20
233:15
kinds 59:10
121:15 123:11
Kirksville 154:13
155:11,22
156:7 161:1
kitchen 225:4
knew 55:18
89:23,25
146:9
knock 114:2
know 7:14 8:1,4
10:2,24 13:10
14:12 15:15
16:5 17:2,14
19:22 20:10
22:2,15 24:4
25:16 27:2,21
27:22 29:18
30:14 32:1
34:9 35:11

38:18 39:12,16
39:25 40:3
41:23 42:16
44:8,23,25
48:11 49:9
50:12 51:4
52:22,22
53:2,12,13,16
54:11 55:17,18
55:18,23
57:19 58:5,24
59:13,20
60:12 62:19
62:20,24
63:4,25 64:19
65:6,19 67:13
68:1 69:4
70:24 71:4,13
71:19 72:9
73:23 74:16,17
77:4,10,12,15
78:1 79:2,17
79:20 81:8,10
82:1,3 83:8
84:13,18,19
85:18 86:11,25
87:25 88:25
90:14,18,20
91:17 92:18
93:11 94:9,15
94:21 95:12,15
96:3,15 98:11
98:13,16 99:12
99:18 100:11
100:12,22
101:1,9,18
102:5,18
105:21,22
106:16 107:18
107:21,22,24
109:12,15 110:1
111:13 112:1,21
114:8 115:3,3
115:10,11 116:2
116:6,7,8,14
119:14,21
120:11,22

122:1,12,25
123:8,10,18,19
123:20 124:11
124:13,20,21
124:22,23
125:9 126:7,16
126:17 127:16
128:24 129:6
129:12 130:10
131:15 132:17
134:15,17,23
137:7,8,20,20
138:19 139:3,5
140:11,13 143:2
144:5,15
145:18 146:12
147:25 148:8
148:13,18,19
149:2 150:1,11
150:25 151:7,7
154:16 156:15
157:11 158:9
159:9,20,25
161:24 162:18
163:23 164:15
165:17,23
166:11 168:18
169:9,12
171:22 172:22
172:25 173:1
173:18 174:24
174:25 175:1
175:19 176:13
177:13 178:23
179:13,18
183:25,25
186:8,22
189:3 192:19
192:24 196:3
197:17,20
200:1,16
202:9,11,17
203:10
204:25
205:23
206:14,20
207:12,13,14

207:22 212:19
213:8,20
217:3,16 219:5
219:9,22
221:5,8,11,11
222:14 223:6
223:25 224:9
224:15 225:10
226:1 227:15
227:25 228:6
228:25 231:19
231:22 235:13
237:3,4 238:5
238:6 241:4
242:9
knowing 72:5
72:10,10
223:17
knowledge
13:14 82:8
118:11 119:7
161:13 176:22
176:25 186:16
192:5 199:25
228:20
232:17
known 16:23
55:25 211:16
232:22
knows 139:4
207:14,17
KS 4:21 244:24
245:22

**L**

lab 123:9
228:13,14
Labor 197:9
lack 31:24 65:17
78:25 83:20
97:9 164:17
168:9
lag 86:7
landmark
107:20 137:23
138:13 187:3
language

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL     Document 153-14     Filed 02/09/18     Page 84 of 107

182:18 185:13
185:15
lapse 187:15
large 18:5 38:19
38:21 220:20
larger 198:16
late 63:21 99:1
100:13 106:5
118:23 179:10
Lauffler 131:3
law 10:17 11:13
11:14,16 25:22
55:19 68:12,12
68:14 70:8
75:9 88:22
94:23 111:6
114:16 130:23
136:14 138:8
138:19 158:22
170:17 187:13
187:14 188:3
188:12 212:20
lawful 6:11
lawyer 57:24
65:7,18
102:25 107:14
119:20 128:21
179:23,24
197:24 198:5
198:9 209:1
214:25
lawyers 37:22
57:25 115:13
116:24 154:21
179:24 180:4
185:8 198:25
199:2
lay 28:14
209:10
layout 76:4
lead 120:6
lead-up 163:2
Leading 163:5
leads 111:10
217:3
lean 217:17
learn 214:25

learned 96:19
146:17
learning 40:14
83:24 84:18
96:25,25
leave 23:5
53:17 54:18
59:19,23,25
76:9 104:3,7
188:9 219:25
224:23,24
226:8
leaves 24:6
leaving 56:6
led 145:22
155:5
left 22:3 23:15
50:21 160:11
165:20,21
179:9 186:1
242:5
legal 5:23 14:11
24:18,23
25:13 39:2,18
40:17 75:12
101:12
legislation
117:25 120:22
163:8 191:3
233:10
legislators 26:6
legislature
191:25 192:25
193:4
legitimate
135:24 142:8
146:25
legitimately
166:13
length 127:5
leniency 119:1
120:8 141:13
148:19
lenient 131:8
Leon 13:3,9,13
let's 11:2 23:14
39:6 56:24

65:23 76:17
76:25 92:4
165:3 170:10
186:18 194:18
196:25,25
203:2 204:15
206:3 217:21
220:4
letter 2:17 39:19
56:10 168:7,10
168:12,25
170:5,20
171:17,24 172:1
172:3 173:13
180:15,19
181:6,7,8,10,13
182:3 222:19
231:8,12
233:19 235:16
235:22 240:4
240:7,9
letters 38:14
181:21 184:6
level 22:12
53:17 54:13
57:5 58:23
135:20 137:16
141:7,11 235:13
235:14
levels 29:1 48:9
Liberties 3:15
5:20
liberty 9:20
16:14 18:12,17
19:15 25:6
52:20 177:12
177:14 188:15
196:2 211:2
library 241:13,15
241:16
license 89:7
112:11 169:21
222:23
licenses 168:15
170:18
life 88:19 101:9
111:14 211:2

light 89:6,11
223:22,23
229:16
lighten 15:24
likelihood 7:8
175:18 231:23
likewise 77:11,14
limine 151:2
limit 25:25 65:4
180:22 197:22
201:4 205:12
205:13
limitations
43:14 100:12
191:9
limited 38:25
181:15 212:18
limiting 217:11
line 27:3 33:5
39:8 117:19
158:12 159:10
168:4 247:5,7
247:11,17,21
line-up 143:22
line-ups 142:14
142:15
lined 78:24
lines 147:20
182:19
linger 174:5
lingering
158:23
link 66:6
linking 73:18
list 9:6,10 23:19
26:14 36:7,9
84:21 114:2,12
114:18 121:15
123:12 158:18
158:22 181:12
181:13,17,22
182:13 183:5,8
183:13,15,17,18
183:21,23
184:8,11,25
185:1,4,8,9,11
listen 69:5 111:8

168:16 179:13
194:8
listened 232:1
listening 68:11
168:1
lists 38:17
lit 89:15
litigation 4:21
5:23 35:1,4
67:25 245:1
245:15
little 11:2 20:13
25:19 32:25
38:3 51:20
72:1 113:16
114:10 130:6
134:16 143:9
157:4 193:8
196:10 198:9
225:14 229:19
live 154:15,16
235:23
lives 92:6
load 15:24
loaded 64:24
70:18,20
loads 52:13
locate 17:4
26:22 33:17
located 9:19
13:7 19:19
27:25
locates 178:19
location 11:11
lockdowns 82:1
Locust 4:22
245:16
log 101:25
long 9:6,15,25
10:13 16:22
36:21 52:17,21
65:7,8,15
66:18,18 68:15
102:2 133:6
138:4,6 144:13
146:9 147:25
148:8 158:15

ALARIS LITIGATION SERVICES
www.alaris.us        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-14   Filed 02/09/18   Page 85 of 107

173:7 184:4
232:22 234:3
242:21
**long-term** 175:3
**longer** 9:10
22:9 110:11
118:25 142:9,9
157:4 177:12
184:3 239:21
**longest** 104:1
213:4
**longstanding**
36:20 215:11
220:21
**look** 8:9,18
56:24 77:17
94:16 103:11
122:17,19,21
124:1,14
127:22 128:2
129:9 137:10
139:20 141:10
141:11 144:6
149:15 196:9
199:19 201:12
202:15 203:9
205:17 207:9
208:19 225:6
228:8 236:6
238:13 240:3
241:4
**looked** 27:23
43:13 89:9
208:18 223:10
229:12
**looking** 49:10
51:19 119:1
128:12,14,17
129:2 175:12
229:14 231:13
239:11 240:21
241:19,24
**looks** 51:13
114:17 175:22
200:23
220:22,25
**Lord** 44:20

70:10
**lose** 43:3 54:16
54:17 57:24
65:8 87:11,12
175:6
**losing** 23:13
163:14
**loss** 177:12,14
**lost** 41:25
231:21
**lot** 13:22 14:2
16:2 35:24
38:22 42:1
52:16,23 66:8
74:24 75:18
83:7 84:13
85:1 90:17
94:17 97:19
97:22 98:4
99:21 101:10
107:25 110:25
113:13 117:25
119:2 120:15
130:11 132:8,9
132:20 135:17
136:18,18
140:18,18,19
140:25 142:20
149:4 163:13
164:18 167:1,1
167:2 177:2
181:15 205:7,7
206:10,11
214:7 221:3
222:7,8
229:14 235:14
239:20
**lots** 89:10,10,11
103:23 210:23
**Louis** 13:8
**love** 146:22
**low** 87:18
**lowballers**
199:6
**lower** 124:16
**lowest** 141:11
**luck** 120:14

**lucky** 20:9
**lunch** 47:17
**lunchroom**
168:18
**lunchtime**
224:9

---

**M**

**machine** 5:4
244:10
**mad** 126:12
204:9
**madness**
205:19
**magazines**
118:9
**magical** 143:25
165:24
**mail** 41:11
**main** 18:2,3
98:23
**maintain** 212:25
228:15
**maintained**
43:23
**maintains** 49:5
**major** 113:24
114:16
**majority** 15:3
78:10 88:11
171:10
**making** 31:3
139:25 166:11
167:7 179:5,10
183:8 195:4,7
201:2 230:14
**man** 16:18
208:20 211:2
**manage** 21:11
36:14 56:13
**manageable**
53:22,23,24
53:25
**management**
11:1 12:9,10
14:4 25:14
38:7 91:10

96:7 98:7
113:22,23
122:19 166:10
192:15 194:6,11
221:12,21,25
222:2,4,7,12
222:16
223:20 232:9
232:15,16
240:7,10,14,14
**management-...**
212:17
**manager** 11:17
25:7 44:1
48:19 127:21
164:16 188:14
194:15,16
234:4
**managers**
12:20 13:6
35:24 38:5
53:18 172:23
182:8 224:14
231:25
**managing** 36:3
36:4 47:8
**Mandamus** 2:14
175:16
**mandate** 79:24
80:2
**mandated**
230:13
**manifest** 149:19
**manner** 34:24
83:2 90:10
93:24,25 94:1
97:16 99:21
214:6
**manual** 35:5
**marched** 233:5
**mark** 104:3
**marked** 50:22
50:24 169:25
170:1 175:10
176:4,8 236:1
**MASH** 177:25
207:23

**materially**
180:22
**math** 22:2
116:25
**mathematical**
167:23
**matter** 5:15
45:24 72:24
91:20 122:7
122:25 144:20
162:13 202:25
218:15 220:14
245:18
**matters** 109:7
133:12
**maximize** 191:16
208:24
217:20
**maximum** 19:23
44:11
**mean** 14:3 19:13
22:1 23:8,10
25:22 27:3
30:1,19 31:25
32:15 33:21
34:22 35:2
36:25 37:11,13
37:20 44:5,21
45:16 46:9,17
47:12,15,21
49:20 50:7,10
54:4 55:6
58:3,4,22
59:12 61:7
62:17,17
63:22 67:21
71:21 72:17
75:25 76:1,6
79:23,25
80:21 81:8
82:11 85:16
86:4 87:3
88:16 90:20
93:13 94:19
95:21,22
96:18 97:6,17
97:22 98:9

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-14   Filed 02/09/18   Page 86 of 107

100:9 101:23
102:12 103:13
103:14 110:8
110:10,21 111:7
111:22 115:15
116:21,22 117:6
119:19,21
120:3 122:23
123:12 126:20
127:11 131:15
132:9 133:1,2
135:18,21
136:17 137:1
141:1 148:3
150:4 156:8
157:16 161:14
164:12,19
165:15 171:22
177:22 183:21
184:2,6
185:20 187:1
194:25 206:13
214:20 217:13
218:16 219:3
220:24 223:9
224:13,21
227:14
229:23,25
230:11 232:18
234:2,14
**meaningful**
129:18
**means** 43:15
52:11 68:25
95:15 110:16
119:2 122:9
126:11 128:17
130:16 133:5
133:20 140:13
144:21 166:4
172:20 203:4
206:22
**meant** 15:20
118:15 169:15
220:9 231:14
**measure** 59:18
122:11 223:25

**measured**
227:18
**measures**
54:20
**mechanism**
28:12 55:21
59:18 72:16
220:1
**mechanisms**
41:11
**medical** 39:20
166:17
**meet** 29:22
37:9 79:8
80:14 81:6,13
125:16 132:2
**meeting** 29:24
33:19 56:22
129:18 169:11
173:20,25
**meetings**
163:19 166:10
169:5,9 212:17
**member** 30:5
128:12 160:16
200:23
220:21
**members** 119:4
160:1 163:12
173:8 189:2,3
189:22 199:5
199:8 222:15
230:5 231:24
**memo** 168:25
169:16,22
230:24
**memories** 65:9
**memory** 52:19
66:11 237:15
238:10
**memos** 205:18
**men** 16:15
154:12
**mental** 141:1,2
141:25 142:7
**mention** 107:5
145:18

**mentioned**
55:9 86:22
87:15 139:19
158:17 192:11
210:11 211:10
213:10 215:23
226:13
227:22
229:18 233:12
**mentioning**
84:15
**mentor** 90:17
**merit** 47:24
122:13
**messages**
174:18
**met** 8:25 113:23
124:15 129:19
173:11,15
**meteorologist**
213:19 215:19
217:9
**method** 84:2
112:18 159:11
206:6 209:10
**metrics** 2:16
51:6,15 52:13
52:21 164:14
223:3,8
**Michael** 12:17
173:15
**microphone**
103:14
**mileage** 71:1
**miles** 18:24
101:25 102:1
**mimic** 38:9
**mind** 47:16,17
125:19 155:12
166:20 189:4
**mindful** 132:14
132:15 174:11
**mine** 107:22
132:2 172:4
221:19
**minimum** 234:11
**miniscule**

20:24 105:2
**minute** 45:14
47:6 62:18
**minutes** 127:25
**Miranda** 229:14
**mischaracteri ...**
43:18
**misconduct**
107:7
**misdemeanor**
62:3 111:25
112:6,15,23
118:4,5 132:4
132:16 205:3
216:15,24
217:4
**misdemeanors**
112:21 123:14
132:10 216:10
**misleading**
210:22
**misrepresent ...**
80:12
**missed** 65:24
91:18 188:4
**missing** 99:6,9
122:4 129:10
162:18 229:8
**Missouri** 1:1,7
2:15 3:1,7,16,17
3:22,23 4:3,5
4:7,10,11,14,16
4:17,22 5:16
5:18,20 6:5
9:18,20 11:11
11:19 12:15 13:8
13:9 18:14 19:5
19:15,20
27:25 35:8
51:5 68:10
69:20 118:13
154:11,13 172:1
186:3 187:9
188:7,13
190:10 192:7
197:8 212:9
220:13 224:4

244:4 245:4,5
245:7,17
247:2
**mistaken** 78:17
220:8 231:9
**mistakes** 220:2
**misunderstan ...**
78:14 199:16
**misunderstood**
31:13
**mitigate** 120:8
**mitigation** 119:8
141:12
**mixing** 67:21
**MO** 4:21 223:2
244:24
245:22
**modification**
62:14 78:23
**modified** 182:17
**Monday** 101:2,2
101:2 173:4
179:15 207:23
230:11
**monetary** 30:17
**money** 14:3
28:14 29:1
36:23 37:9
41:23,24
69:20 71:3,5
178:19 190:22
192:16,16 193:1
193:5 196:7
197:19 198:2
208:6 216:6
231:21 242:2
242:9,10
**monitor** 33:10
54:2,14 122:11
**monitored** 34:6
**monitoring**
39:14 54:7
200:25 219:11
**months** 10:17,24
10:25 22:7
68:15 99:23
99:24 101:6,6

ALARIS LITIGATION SERVICES
www.alaris.us        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-14   Filed 02/09/18   Page 87 of 107

101:8 132:18
141:25 142:3
164:4 168:6
188:11 190:3
205:24 207:5
**mood** 131:13
**morning** 6:16
10:3 37:21
118:24 173:4
207:23
**motion** 2:18
63:11,14 67:22
68:4 77:11
89:18 93:11
100:25 106:5
106:16,19
107:8,23
135:8 150:13
151:2,2 152:4
152:5,7,10
176:15,23,23
179:16 181:25
182:1,22
207:24 232:9
233:21
235:22,23
**motions** 66:20
69:6 93:8
105:19 106:20
107:3 152:1
178:14
**motivate** 198:10
**motivates** 198:6
**mounting** 26:8
**move** 8:2 35:17
60:2 61:23
63:8 100:7
115:18 121:13
**MSPD** 6:7 10:13
11:4 12:13
58:21 59:24
137:20 139:20
140:24 168:20
**multiple** 17:19
33:15
**Munday** 13:3,9
13:13

**municipal**
205:2,4
**murder** 43:21
109:15 125:5
146:8 204:22
204:23
216:20
**mutual** 113:11

### N

**N** 2:1 4:1
**NAC** 224:1
**name** 5:21,22
6:2,17,18,19
70:25 120:20
136:15 138:3,11
144:11 185:8
187:8 197:14
237:4 238:15
238:16,19
246:11 247:1,2
**nameless**
172:14
**names** 104:6
174:19
**narrow** 31:21
224:16
**nasty** 235:20
**nature** 38:24
146:8
**near** 19:9 109:11
**nearly** 7:4
183:12
**necessarily**
15:20,20 19:13
27:19 57:16
60:13,14 76:5
95:23 97:21
111:3 117:14
119:25 132:17
132:25 140:8
148:12 162:16
162:18 197:18
209:11 216:23
236:16 238:8
**necessary** 91:10
97:15 121:22

127:10 177:5
246:9
**necessity** 45:18
206:24
**need** 8:3 21:14
30:14,19,25
32:18 35:16
37:14 50:13
54:22 79:2,6
81:18,18 93:17
95:17,21,23
96:20 97:8
100:19,21 111:7
111:9 122:17
129:4 137:17
147:6 154:19
193:1,13,13,24
194:4 208:18
219:23 222:12
224:14 235:3
242:11
**needed** 169:16
169:20 170:18
234:4
**needing** 95:24
**needs** 8:3
29:20 34:6
37:7,8 95:13
128:19 132:21
142:9
**negative** 140:7
140:9
**negotiate** 89:16
93:17 133:24
203:22
**negotiating**
38:20 129:5
**negotiation**
111:11 140:25
141:12 144:17
**neighborhood**
87:1
**neutral** 179:12
**never** 12:12 31:5
32:16 47:17
56:11 65:13
74:2,7,7 77:12

77:16 85:25
89:15,21 92:19
95:6,25
109:10,11,16
110:1 118:20
122:3 123:15
126:8 133:4
145:19 160:24
165:11,12
166:12,12,15
167:24 178:14
184:7 199:3,4
204:11,13
213:14 217:14
223:10 225:2
225:8
**new** 22:6 23:4
24:8 46:2
67:22 70:7
94:17 95:4
99:17 127:4
152:5,7 164:18
180:22 181:5
182:25 218:23
225:1,7
**newer** 112:2
211:22 214:25
**newest** 108:3
**news** 68:13
126:13 189:14
192:3,3 210:11
**newsletter**
210:8
**newspaper**
172:10
**nickname**
237:4
**Nifong** 4:10
245:4
**Nixon** 191:4,7,12
**nominal** 114:18
**nonattorney**
163:11
**noncapital**
108:18 109:10
109:21 121:17
121:22 123:12

**noncontact**
103:8
**nonindigent**
183:10
**noninvolvem...**
146:11
**nonmanagem...**
39:5,9 166:8
166:8
**nonmanagers**
195:2
**nonprofits**
189:9
**norm** 102:14
**normal** 157:12
**normally** 37:18
61:9 147:17
**north** 20:6
**notarized**
245:14
**notary** 245:12
246:20
**note** 99:9
127:23 170:21
**note-keeping**
220:1
**notes** 127:19,19
129:11
**notice** 24:4
36:20 77:13
77:20 128:15
150:18 151:14
152:2,12 169:8
173:19
**notifications**
226:9
**notify** 171:12
180:20
**novice** 164:18
**number** 5:17
10:6 26:2,3
33:22 34:14
38:21 43:8
44:11,13 45:25
46:21 49:11
50:17 53:21
54:19 70:24

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-14    Filed 02/09/18    Page 88 of 107

99:7 116:2
117:20 130:17
132:7 148:5
157:3,9 164:1
167:21 185:4
193:23 195:22
197:6,14
198:16 203:12
205:9,11
206:2 208:7
223:17
**numbered**
50:19
**numbers** 26:5
174:8 203:16
203:17 205:1
241:10
**nutshell** 73:19

---

**O**

**o0o-** 243:6
**oath** 212:2
244:8
**object** 175:24
**objection** 7:25
**obligated** 77:20
122:5 127:16
185:22
220:24
**obligation**
150:10 153:8
163:22 167:22
198:12 203:24
208:15
**obligations**
209:1
**obstacle** 87:24
90:15 97:23
**obstacles**
77:22 136:24
**obtain** 93:23
**obviously** 13:6
30:15,20
33:14 41:17
51:4 71:25
83:18 85:16
86:2 95:13

109:4 133:9
171:11 205:12
**occasion** 27:7
**occasions**
236:23
237:21
**occur** 143:11
239:3
**occurred** 73:17
237:25
**occurs** 30:15
152:9 157:5
238:6 239:5
**October** 2:17
168:8 170:5
180:16 181:13
**oddly** 50:19
**offense** 229:1
**offenses** 113:4
123:13
**offer** 45:9 63:18
109:10,17 110:1
123:25 124:13
125:1,12,15,20
126:14 129:2
129:22,25
130:11,22 131:5
131:11,11,21
132:5 133:3,8
133:10 134:18
135:22 211:4
**offered** 86:15
126:10 139:8
139:14 144:22
144:24
**offers** 113:8
131:22 132:24
133:3,5
**office** 9:19 12:13
12:14,16 13:18
13:23 14:1,17
15:2 16:14,14
16:18 17:25
18:9,17 19:15
20:16 21:4,11
21:14,25 22:13
23:6 24:13,19

24:24 25:1,5,7
25:8,17 26:16
29:16 30:11
32:9 33:2,8
34:3,25 35:3
36:3,15,22,25
37:7,9,16 38:5
40:19,25 42:8
42:14,14,24
42:25 44:2,23
45:2 46:5,13
46:16 47:9,11
47:19 49:12
50:5 52:11,17
53:19,22 54:3
55:5,22
57:25 58:9,19
59:7,8,21
60:23 65:22
67:20 70:14
72:9 75:21,23
75:23 79:8
80:9,20 81:6
83:13,22 85:6
85:14 88:10
89:23 90:9
93:5,22 94:5
95:11 97:14
98:18 101:11
102:9,23
105:19 108:14
113:13 115:8
116:13 123:18
125:23 127:8
129:22 131:17
133:23 134:10
136:5 137:19
137:22 139:9
139:23 149:1
150:5 151:10
152:2,14
153:10 155:8
156:11 158:7
158:24 159:18
161:11 162:6
162:25 163:4
164:2 165:3,9

166:5,7 167:5
167:16 168:20
169:17 171:9
172:8 173:3
175:7,25 176:1
176:2,23 177:4
177:18 179:9
180:20 181:2
183:19 184:15
185:17,25
186:1 188:15,15
191:1 194:4
195:11 196:2,3
196:4,20
205:7 207:7
207:25
209:12,20
210:3 216:24
217:22 219:2
221:13 224:16
231:3 233:4
234:9,10,18,19
237:20
238:25 239:2
**office's** 150:3
**officer** 89:12
90:1 103:1
145:21 147:15
147:18 155:2
157:18 204:9
204:12 208:13
208:15 228:7
228:8 229:12
230:2
**officer's** 123:10
**officers** 88:3,22
99:14 111:6
159:13
**offices** 13:7
15:18 36:19
46:7 48:11
53:15 89:24
119:20,24
158:19 171:20
172:20 182:9
191:22 202:10
224:19 241:4

**official** 70:23
237:18
**oftentimes** 113:1
220:19
**oh** 6:25 9:6
10:12 15:13
32:20 47:2
53:23 56:17
92:3 106:3
109:23 125:14
130:3 135:23
149:4 210:5,16
225:7 233:22
241:6
**okay** 7:2,5,12,14
7:20 8:6,14
9:5,13,17 10:10
11:2,5,24 12:5
12:8 13:10 14:7
16:8 18:8 19:2
20:12,20
26:17,21 29:3
29:7 30:4,24
31:6,17 32:2
32:16 36:12
37:4 39:7
40:8 42:6,10
43:9 46:8,11
46:20 48:6,13
48:24 49:2,22
50:5,11 51:10
51:18,23 52:15
54:21 55:10
59:4,10 60:5
60:19 61:9
62:2,10 63:5
64:15,18 66:16
69:12 72:8
73:8 74:11
75:21 76:2,17
80:18 82:19
83:10 85:4
86:21 87:7
88:7 90:8
91:25 95:9
96:17 97:12
101:17 103:10

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-14   Filed 02/09/18   Page 89 of 107

104:23 105:11
105:14 108:13
108:18 110:4,7
113:3 114:22
115:8,12 116:6
121:2,11,14,20
123:21 125:8
127:7 128:9
134:4 138:1,14
139:7,17
140:15 142:11
142:14,18
144:7,14
146:21 148:7
149:5 151:16
151:25 152:18
152:24 153:4
153:20 154:3
155:25 158:1,5
159:24 160:2
160:25 161:17
165:1 166:1
168:11 175:20
175:22 176:3
180:14 181:4
183:18 184:9
184:18 186:6
186:10,17,20
189:19 190:21
192:23 193:8
194:20 197:13
198:3 202:15
203:9 204:17
223:19 226:2
238:13,23
240:2,17
242:1,22
**old** 66:22,25
**once** 8:11 72:12
97:14,24
146:14 190:5
208:14 226:3
232:2,20
**one's** 65:16
**one-sided** 75:17
**onerous** 26:6
**ones** 78:5,6

106:25 108:21
153:10 174:6
199:13 202:13
205:20
230:14
**ongoing** 104:13
164:5,7
**open** 186:24
203:10
**opened** 239:8
**opening** 38:15
38:16 107:6
115:9
**openings**
129:13
**opens** 57:13
**operating**
221:23
**operation**
227:8
**opinion** 52:14
53:14 93:22
116:9 133:22
139:22 148:23
149:17 162:5,9
162:12 163:4
165:10 168:13
168:16 169:2
174:1 233:7,8
238:7
**opinions** 166:18
**opportunity**
65:24 75:6,15
208:21
**opposed** 194:5
195:7 214:9
216:15 222:17
233:19
**opposing** 77:14
93:15 235:18
**opposition**
182:1
**opt** 202:21
**optimism** 163:7
**optimistic**
178:17
**option** 54:11

**options** 231:5
**oral** 62:13 77:10
168:2 232:1
236:11
**oranges** 67:22
**order** 23:24
29:17,21 33:9
37:1 39:13
40:1 44:8 79:2
96:4 108:2
109:19 129:7
136:10 145:10
150:15 152:10
182:5 191:23
203:21,22
208:10 211:23
213:20 214:6
220:1 229:7
**ordinarily** 54:9
**organizations**
189:9
**original** 245:10
**originally**
230:18
**OSCA** 70:23
**other's** 105:24
**out-of-custody**
178:22
**outcome** 72:19
161:1 198:24
244:17
**outside** 27:4,15
39:16 63:3
86:15 213:7
215:19 224:15
226:22
**over-calendar ...**
9:9
**over-the-phone**
81:22
**overall** 85:16
93:21 112:25
127:5 216:20
222:17
**overburdened**
57:4 131:17
**overcapacity**

164:6
**overcome**
136:24
**overlooked**
66:3,4
**overly** 75:2
127:15
**overperform**
166:21
**overruled** 152:8
**oversee**
220:22
**overseeing**
220:11
**overworked**
66:5 166:16
167:12

———— P ————

**P** 4:1,1
**p.m** 1:17 3:15
160:5,8 180:8
180:11 243:4,5
**page** 2:3 180:18
245:10,12,15
247:5,7,11,17
247:21
**pages** 94:17,17
**paid** 17:15 27:13
37:18
**panel** 109:1
**paper** 59:13
103:14
**paralegal** 24:23
**parent** 157:19
160:15
**parents** 154:2
160:1
**parole** 126:25
145:25 147:15
**parsement**
174:8
**part** 15:1,17
21:22 26:23
31:13 32:6,7
43:14 46:1,6
90:15 91:16

93:15 96:2
114:5,22
125:13 144:17
150:24,25
163:11 202:6
204:1 214:2
**participated**
145:19
**participates**
145:14
**participating**
151:19
**particular** 54:19
57:2 89:1
115:20 135:19
146:7 159:7
191:1 204:16
205:8
**particularly**
158:2
**partly** 7:15
**party** 231:21
**pass** 26:6 31:4
54:11 103:13
233:10
**passed** 30:15
106:1 117:23
118:10,14
**path** 191:6
**patient** 98:14
104:5 199:12
199:13,13
**pauperis** 150:14
152:11
**pay** 87:18 131:14
131:25 165:22
174:24
206:25 242:11
**pays** 17:14,17
29:10 71:2
240:25
241:22 242:2
**peculiar** 234:20
**penalty** 246:12
**pending** 3:20
8:5 161:1 163:9
197:3

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-14    Filed 02/09/18    Page 90 of 107

people 9:2,6
13:11,18 17:7,8
19:18,22,25
20:1 26:4
34:21 35:15
41:14 44:15
55:22 64:1
65:22 79:15
79:17 87:17
90:7 94:9
98:16 116:18
117:9 163:13
172:6 178:2
183:8 185:2,3
188:20,24
197:25 199:7
201:5,8
224:21 225:1
225:7
people's 92:6
percent 40:4
51:24 52:1,4,6
52:9,12 80:12
125:22 223:16
226:14,18
227:2,4
241:18
percentage
40:4 80:7,8
84:20,23
141:4,8 205:1
226:18 239:5
percolate 45:18
perfect 34:4
81:12 88:23
89:22 90:3
91:13 108:6
120:22 128:24
perfectly 115:15
222:22
perform 49:12
166:19
performance
47:18,25
performed
197:6
performing

50:2
period 10:20
25:11,13 55:7
85:20 161:5
164:4,17 178:2
181:11,20,23
183:7 184:12
187:13 188:2,8
213:4 228:17
Periodically
222:13
periods 26:9
perjury 246:12
permission
215:20 232:12
232:14
233:20 234:6
person 13:1,12
29:12 41:21
44:19 54:1
60:14 61:4
64:2 70:17
71:11,25 72:21
81:22 85:19
90:23 132:24
133:1 134:3
139:6 142:16
142:25 143:1,4
143:6,25
145:15,15
148:2 156:2
200:24
201:10,23
202:15 204:9
208:5 212:4
223:12
229:24
239:17,19,20
person's 48:22
personal 13:14
38:15 43:6
53:14 58:14
personally
40:16 84:25
85:3 104:13
134:9 183:11
194:1 213:15

personnel
94:20
perspective
68:9 76:10
136:21
pet 117:5
petition 8:10,17
53:5 54:8
55:8 188:21
phase 118:7
120:16
phenomenon
100:10
philosophy
134:14
phone 38:15
82:6,13 84:12
129:20 130:17
132:25 147:20
179:5
photo 143:22
Photographic
142:16
photos 142:21
phrase 21:8
39:13 151:20
186:11 196:6
phrased 80:6
physical 38:16
75:7,8 128:14
physically 9:19
pick 38:23 41:11
73:4 90:21
128:5
picked 130:19
picking 114:19
picks 182:24
210:12
piece 117:24
pile 66:19 85:21
85:23 99:7
159:8,9
179:20 206:7
206:9 207:8
208:20
pizza 224:9
225:5,5

place 128:25
212:23 244:6
placed 160:18
177:14 244:8
placement
190:5
places 38:13
plain 90:1
plaintiffs 1:5,15
3:5,23 4:2 5:2
6:3,12
Plaintiffs'
235:25 236:1
plan 10:24
231:17
planet 125:17
planned 120:16
planning 112:18
plate 89:7
Platte 14:24,25
17:21 18:10
61:17 69:14
74:12,20
103:18 113:25
114:2,13,14,15
114:17 120:13
152:25 153:6
156:17 163:18
169:6,10 170:6
170:23 171:1
173:9,12
174:17 185:1
189:6 205:9
237:2,6,21
Plattsburg 18:14
19:4,20 105:17
154:11,17
plausible
109:20
play 109:2
plays 30:3 33:7
56:19 111:22
plea 64:17 70:9
82:21 121:24
122:21,24
123:7,8,16
124:13,25

125:11,15,24
127:9 129:5
129:22,25
130:2 131:5,11
132:23 133:3
133:3,5,24,25
134:10,18,22
134:25 135:22
145:9 149:1,12
149:18 150:7
161:6 211:4
227:12
plead 63:20,21
63:23 64:7,13
86:5,5,12
100:3,4 112:11
116:19 118:16
122:3 124:4
126:5 131:22
132:5 144:24
pleading 62:13
76:16 86:13,18
204:2
pleadings 41:16
pleas 121:13
227:7
please 5:25 6:9
37:22 43:11
99:6 142:19
195:25 227:9
245:8,11,14
pleasure
149:24
pled 64:12 112:8
112:24 116:18
150:23
pocket 57:13
pocketbooks
196:9
point 32:22
45:9 58:15,20
60:9 61:22
62:12 63:7,17
67:1 75:14
136:19 167:17
167:17 195:1,2
195:16 205:22

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-14   Filed 02/09/18   Page 91 of 107

211:14 214:6 217:23 218:2 231:2,4 232:7 236:18 237:1
pointing 178:23
points 88:1 151:5
poker 231:21
police 86:22 87:20 89:12 91:9 99:14 123:25 142:15
policies 59:8,10 59:24 209:9 209:14 217:6
policy 59:20 137:22 145:24 146:17,19 222:10 224:7 224:19 225:10 227:8
poll 226:24
Polycom 69:19 70:1 71:14,17 226:8
Polycoms 225:16
poor 90:21 198:1
poorly 136:8 234:1,16 235:2
pop 88:14
population 26:3 108:25
portion 73:16 154:9 198:17 227:22 234:9
portions 8:16 53:5
position 11:15,21 11:22 12:23 23:15,16 24:6 24:22 37:17 48:19 93:19 130:24 174:13 174:14 177:9

positions 13:11 23:20 25:10
positive 175:16
possession 110:22 118:5 228:14
possibility 155:6 157:9
possible 57:21 65:23 67:14 67:15 80:1 87:1 129:14 151:5 176:19 179:1 236:13
possibly 47:14 129:13 169:13 179:11,12
post-appeal 41:20
post-conviction 46:12 237:7
post-Senate 237:11
post-trial 152:1,1 152:4
postage 241:21
postconviction 7:8
potential 229:3
potentiality 201:22
potentially 199:17,18 226:7
poverty 195:14 195:15 239:17
powerful 89:17 89:19
practical 44:10 65:5 68:9,18 91:3 144:21
practically 36:1 65:2
practice 10:17 10:21 35:5 73:22 134:21 145:20 157:12

188:5,9,12
practices 35:1 107:1
practicing 174:10
precaution 137:25
precautionary 107:2
precautions 169:16
precede 236:16
preceded 195:11
precharges 143:25
precipitates 128:12
precise 204:25
preclude 63:19 77:22
predate 236:12
predecessor 191:6
predicament 24:16
prediction 79:4
prefer 21:8 24:2 69:18 133:1 134:3,4 144:18
preferable 143:3
preliminary 73:9,13,19 74:2,8,20,25 75:5,10 135:11 135:12
premeditated 234:21
prep 8:15 121:10
preparation 8:8 8:19 9:1 78:19 100:24 120:7 120:12 159:5 167:2 188:19
prepare 76:19 77:2,6,6 96:4

116:10 117:13 150:13 177:6
prepared 116:17
preparing 77:6
presence 70:24
present 5:25 33:20 60:22 61:1 69:17 76:13 78:21 113:15 120:7 125:11 145:17 145:22 146:7 146:10 150:15 150:16 196:16 202:20 229:25
presented 73:16 139:19
Presentence 144:7
presently 24:3
presentment 60:15
preservation 107:16
preserve 151:6
presiding 169:5 170:6,24 171:13,15 172:13 173:12 173:16 234:5 240:4
press 189:14,22
pressure 86:16 87:25
presumably 21:22
presume 37:25 83:14,15 115:13 150:11 218:21 223:15
presumed 37:23
presuming 171:8 227:24
pretend 137:7
pretrial 66:20

67:24 72:21 106:20 107:3 107:8 178:20
pretty 25:22 58:2 61:7 68:5 94:12 134:1 139:13 148:6 151:20 159:3 170:11 174:13 189:4 208:3
prevent 217:7
previous 191:2
previously 175:10 176:4 236:1
primarily 153:12 195:10
primary 14:23 15:6,9 73:25 105:13
printed 175:19 176:21 184:7 232:2 236:9
printers 242:16
prior 15:7 157:5 244:7
prioritize 33:25
priority 206:22
prison 70:2 98:12 132:19 133:7
prisons 15:22 26:10
privacy 179:6
private 10:16,21 17:10,11 102:25 108:7 114:1 158:22 167:9 174:19,20 184:17,22 188:5,9,12 189:3 191:18 198:18,25 201:24 202:20 219:10

ALARIS LITIGATION SERVICES
www.alaris.us        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-14   Filed 02/09/18   Page 92 of 107

privately 65:19 140:23 141:19
privatize 163:9 233:11
privilege 83:19 134:8
pro 69:6 174:20 174:21,22 175:2 184:17 185:9,13,20 189:6
probable 73:14
probably 6:25 7:21 8:12 9:6,7 9:10 15:8,13 16:12 19:21 22:7,18,19,23 28:20 30:5 31:16 42:2 49:14 50:13 55:15,19 57:20 60:14 64:5 65:4 69:1,3,13 71:13 73:3,3,4 75:14 78:10 79:4,10 80:13,16,21 83:23 86:16 87:4,22 91:22 92:15 94:6 104:5 105:20 108:17 109:12 113:1,5,6,10 115:4 116:8 119:20,21 126:6,9,14 128:12 132:25 135:20 136:8 137:14,16 140:8 145:3 146:13 147:7 157:19 159:13 160:23 161:16 168:8 170:10 172:23 175:8 177:8 178:12 178:15 181:9

184:19 187:22 195:12,15,23 199:17 204:25 205:23 207:15 212:15 212:17 213:7 217:13 223:11 224:20 229:13 233:7 236:6 241:16
probation 86:15 102:25 123:25 124:14 125:20 144:22,24 145:21,25 147:15 178:7 208:13,15,24 229:18 230:2
probation/par... 147:18
problem 64:19 91:16 131:19 212:24 213:1 230:20
problems 84:4
procedural 107:4
procedurally 65:1,3 90:19
procedure 33:9 212:20
procedures 209:9
proceed 72:23 150:14 170:17 210:24
proceeded 184:17
proceeding 76:13 84:9 141:6 150:24
proceedings 71:17 117:12 118:2 140:16 158:6 237:12 244:5,7,9
process 26:19

40:25 55:24 125:18 151:8 181:17 185:22 192:11 202:6
processed 41:13 42:8
processing 196:24
produced 3:13 6:11
Production 245:16
professional 3:19 5:6 36:23 111:6 180:3,24 222:25 224:2
profiteer 167:10
program 27:23 186:13
progress 33:10
Prohibition 2:14 175:15
prolong 125:19
promotion 48:1 48:4,6 49:16 128:8
pronouncing 165:4
proper 100:16
properly 21:10 44:16
proposed 150:14
prosecuting 38:21 179:8 181:23 235:8
prosecution 62:22 96:3 112:18 133:17 134:21 179:4
prosecutor 65:11,15 74:10 77:15,23 84:15 87:14 89:17 93:15 99:8,11 107:5 111:12

123:23 125:7 130:13 134:14 135:6,7 137:11 149:25 207:13 235:18
prosecutor's 124:1
prosecutorial 25:24 26:1 131:20
prosecutors 112:17 115:7 125:13 130:7 134:3 163:24 235:4,12
protect 168:15 208:10
protecting 150:1 151:4
protract 136:22
protracted 65:16 217:1
proud 35:23 165:19
prove 95:8
provide 7:24 94:2 131:5 148:17 185:3 186:23 191:23 197:13 231:3
provided 145:24 181:24 183:22 236:20
provider 39:21
providers 217:18
provides 20:24 24:23
providing 17:6 179:21 224:18
provisions 26:7
proximity 15:11
PSI 144:8,12 148:5
psychiatric 141:15 142:12

public 2:15 4:8 4:10 9:18 11:6 11:17 12:22 15:16 16:10 17:5,9,16 26:11 27:22 35:8 40:24 41:1 48:7,13 49:3 51:6 55:7 60:1 76:12 79:24 83:25 102:22 105:4,5 112:2 113:22 118:13 119:5 131:17 136:12 139:11 163:9 166:16 167:19,25 169:11 170:20 171:1,19 172:8 172:15 174:9 174:21 175:23 180:20 188:7 188:11,14 189:11,23 190:7,10 191:14 191:18 192:15 193:21 200:18 205:5 212:6,9 213:12 217:7 218:14,14 223:1,3 224:4 225:20 227:12 228:19 230:25 233:11 234:25 235:8 239:10 242:20 245:4 245:12 246:20
published 52:21 166:18
pull 93:20 134:18,25 135:8 235:4
pulling 128:13
punish 131:16
punishment

ALARIS LITIGATION SERVICES
www.alaris.us       Phone: 1.800.280.3376       Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-14   Filed 02/09/18   Page 93 of 107

120:9
**punishments**
26:8,9
**purchasing**
36:25
**purely** 83:8
199:20
**purpose** 148:21
190:25 218:13
**purposeful**
92:23
**purposely** 92:17
167:9
**purposes** 128:8
**pursuant** 197:6
**pushing** 120:23
**put** 26:12 35:25
53:8 90:19
93:18 116:1
127:23,24
130:7 131:12
177:8 178:5
185:8 193:22
195:22 211:15
212:8,9,13
218:20
**puts** 134:21
**putting** 63:18
206:11

—————————

**Q**
**qualified** 185:3
**qualifies** 153:23
**qualify** 41:23
42:15 44:16
75:22 153:25
156:21 185:17
196:25
**quantitate**
102:5
**quantitative**
101:24
**quarters** 197:15
**question** 7:24
8:1,5 9:24
13:21 21:23
26:23 31:12,15

31:18,19 35:21
37:10,13 42:4
42:16 47:13
64:10,24
70:18,20
73:23 76:18
77:5 87:7,10
93:21 95:18
97:25 102:6
128:11 134:6
150:6 158:15
160:12 162:3
180:13 188:22
188:23 193:3
194:8 212:16
215:15 216:12
223:18
**questions** 10:4
28:19 49:18
65:21 85:1
116:7 136:13
152:23 161:25
186:25 215:13
236:18 238:12
243:2
**quick** 69:4
**quickly** 79:25
157:13 170:11
**quite** 19:17,17
20:5 29:13
30:16 78:9
83:25 93:18
94:18 99:11
100:10 109:8
115:5 124:18
129:19 133:2
147:3 149:20
156:18 162:16
169:1 192:4
195:9 201:19
211:19 224:5
**quitting** 87:17

—————————

**R**
**R** 4:1,3 245:24
**radio** 189:14
**raise** 55:11 58:1

65:24 67:13
**raised** 64:22
67:14,19,22
67:23
**Ramsey** 2:9
4:15 6:4,4
187:5,8
238:12,17
245:25
**random** 117:20
**randomly** 128:5
**range** 51:11
**Rank** 52:6
**rape** 110:21
**rare** 27:8 46:10
63:14 71:19
**rate** 185:10,14
195:20
**ratio** 27:1 65:20
**rationing** 54:8
**re-entry** 140:11
**reach** 32:22
138:18
**reaction** 172:13
**read** 8:12 41:5
53:5 108:3,4,8
118:9 124:1
160:12,14
163:5 168:2
169:1 170:12
178:12 186:11
232:2,20
236:14 245:11
246:6 247:5,8
247:13,18,22
**reading** 51:25
52:4 95:16
228:3 235:5,7
**ready** 100:15
118:25 216:2
**real** 65:8 137:6
200:3 214:5
**reality** 23:12
32:14 45:12
**realize** 45:20
225:23
232:20

**realized** 232:21
**really** 9:10 19:5
23:19 30:18
41:22 46:2,17
54:7 56:25
64:10 66:7
68:13 71:20
75:14 77:5
78:20 79:2
85:19 91:17
93:14 96:15
97:19 101:23
104:16 106:2
106:11 110:6
110:25 116:1
129:13 130:14
134:23 137:1
139:13 146:6
147:1 148:6
152:19 163:25
165:11 175:1
179:15,16
195:15 196:21
198:8 199:14
199:25 203:16
206:19,21
214:1 216:23
216:23 217:3
220:9 221:9
223:11 226:24
229:7 236:14
238:4 241:2,9
241:11
**realm** 67:25
92:19
**Realtime** 3:20
5:7
**rear** 89:7
**reason** 17:12
28:3 30:24
31:2,6 60:13
61:12 72:19
74:10 85:15
106:6 115:17
117:19 144:2,2
146:7 147:1,4
149:14,19

155:13 164:20
173:5 196:6
210:5 215:3
226:6 236:12
237:18 247:6
247:9,15,19
247:23
**reasonable**
109:11,12
193:14
**reasoning**
215:4
**reasons** 32:17
63:15 66:9
74:10,24 75:18
75:19 78:1
115:16 165:21
207:6,22 211:1
215:25
**reassessed**
142:4
**recall** 189:17
205:25
209:24 210:3
237:19 238:1
**recalled** 238:14
**recalling** 68:14
190:3 236:13
**receive** 13:17,24
18:4 41:10
**received** 8:11
99:1 144:3
159:12 163:10
**recess** 121:5
160:6 180:9
**recognizance**
79:19
**recollect** 172:3
190:12 213:5
215:4
**recollection**
22:8 52:19
78:17 172:16
176:18 190:2
**recommend**
47:25 230:8
**recommenda ...**

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-14   Filed 02/09/18   Page 94 of 107

record 5:13 6:18 82:14 110:23 121:2,4,7 145:13 160:3,5 160:8,14 180:8 180:11 189:18 200:17 213:7 213:21 232:5 243:4 244:9 244:12
recorded 82:15 82:18 84:12 179:5,7
recording 179:18
records 130:10 237:18
recovered 199:3,5
recreated 204:12
redirecting 181:16
redistributed 23:10
reduce 44:7 77:1 191:20 230:6,10
reduced 62:16 174:22 185:10 185:14
reduces 178:18
reduction 124:9 131:8
refer 10:10 35:5 99:6
reference 35:7 48:25
referenced 237:2,3
references 23:25 228:4
referred 98:25
referring 233:9
reflects 204:6
refusal 165:15 165:18,24

185:24 186:2
refuse 165:8
refusing 165:12 165:15
regard 188:24 195:6
regarding 171:20 186:22
regardless 81:17 109:17 167:8
Registered 3:19 5:6
regularly 28:5 98:18 159:21
reject 30:10 200:11
rejected 31:2,5 31:8,23 201:14
rejecting 201:8
rejection 195:19 200:13 201:11
rejects 201:9
relate 31:12 133:12
related 7:11 13:16 214:17 222:16
relation 170:7 189:5
relationship 222:1,3
relative 164:18 169:10
relatively 23:3 23:3 112:2 157:4 181:22 224:16
release 39:21
released 29:2 79:18 130:18 145:4
relevant 54:12 233:20
reliance 193:21 194:11
relief 7:8 11:7

20:25 32:22 46:12 56:25 57:1,6,9 104:21,21,23 114:6 119:23 120:19,20,24 153:2 158:19 163:21 182:5 234:9,17 235:21 237:7
relieved 153:7
rely 26:11 28:4 220:20 224:3 224:5
remain 14:23 23:11 64:3 82:20 100:2 145:2 172:13 191:25
remainder 127:3
remained 11:11 11:19
remaining 15:3 18:6 91:5 119:13 171:9
remedied 238:9
remember 7:5 7:16 24:21 53:7 118:1 120:10 138:9 138:11 161:18 172:3 182:17 188:20 193:14 201:17 205:23 209:25 213:19 218:7,12 222:5 238:19 241:8
remind 180:16 220:5
reminded 53:5
render 246:9
rendered 165:11 236:11
rent 41:24

repay 198:22
repeatedly 88:8
rephrase 8:2 180:13 219:13
report 12:18,24 13:1 51:7 55:13 55:14,16 86:23 99:6 123:9,10,25 142:1 228:9,10 228:14
reported 13:19
reporter 2:22 3:18,18,19,20 4:19 5:5,6,6,7 6:9 160:14 217:15,19 244:1,4
reporter's 5:21
reports 39:11 99:16,17 101:25 144:6,8 144:11 233:15
represent 16:19 56:7 79:14 162:6 182:24 183:1 185:9 187:9 198:4,19 199:9 204:19
representation 35:7 83:20 90:21,23 150:4,6 156:21 185:18 186:23 226:16
represented 62:6 68:18 69:7 70:13 148:25 184:16
representing 44:18
represents 76:16 80:9
request 28:12 28:15 29:23 30:7 31:1,8,19

31:23 32:17,19 37:16 40:12 77:24 89:5 92:25 100:19 135:12 141:14 145:6 215:5 241:1,2
requested 39:12 70:7 141:10 145:6 192:16 213:16 219:25 244:15
requesting 217:8 223:10
requests 28:25 30:11 32:10 33:25 39:15 93:1 213:12
require 157:2 203:23
required 23:23 92:1 137:20 139:8 230:2 230:17
requires 14:4 83:2,6 90:11 93:24 97:16 235:5
research 167:2 200:5
resentencing 237:19
reserved 5:9
resides 9:21
resign 56:20,21 56:22
resignations 165:16 174:12
resigned 172:25 173:1,3
resilient 58:2
resolution 84:17 111:13 113:2
resolve 144:20
resolved 16:6 82:21 113:2,11 127:16

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-14   Filed 02/09/18   Page 95 of 107

resolving
126:12
resource 30:8
resources
26:15 32:10,13
35:15 43:15,16
83:1 88:15
91:12 93:23
94:4,9 97:15
99:20 104:14
116:9,13 117:12
117:14 133:23
134:11 138:18
139:23 140:18
159:18 162:11
180:2 181:16
191:16 199:18
199:23 200:8
202:12 242:6
resourcing
191:17
respect 44:5
respective
18:23
respond 163:1
163:17 168:21
responding
210:9
response 130:9
168:23 231:17
233:8 235:20
responses 7:16
85:8
responsibilities
35:22 38:4,9
180:23
responsible
15:7 24:5 36:3
36:5
rest 14:15 111:14
result 14:14
69:4,4 89:4
100:21 113:24
137:23 140:7,9
163:19 166:7
170:15 191:11
228:13

resulted 146:13
results 141:6
resuscitate
66:22
retail 9:11 143:1
229:6
retained 65:19
140:23
retention 57:20
retired 12:22
13:2,4,11,12
return 137:3
245:14
returned 11:1,17
188:14
revealing 75:4
review 8:7 14:5
23:21 29:1
30:13,16
47:24 48:1,4
49:18 93:23
128:3,5 129:9
244:14
reviewed 8:16
96:10 188:21
234:2
reviewing 38:17
48:1
reviews 49:24
49:24 128:7
revocation
230:8
revoked 198:23
ride 120:13
right 20:18 21:21
27:4 37:15
41:18 43:6
44:17,22
50:15 54:7
57:8 60:2
64:3,4 68:1,8
68:20 69:3,7
72:3,7,12
73:13 74:4,5
76:23 80:10
81:12 82:25
84:8 86:11

87:1 91:15
92:14 97:25
99:12 101:13
102:16 103:13
107:21 110:15
111:25 115:21
117:5 122:23
126:22 128:22
130:5 131:22
132:16 133:10
138:21 143:18
144:5 149:18
150:22 151:13
153:7 157:19
160:9 161:20
169:23 172:3
175:5 176:3
183:13,20
185:5,19,21
186:4 188:10
190:15 193:9
196:14 201:16
201:16,17
202:22
205:15
208:23 218:4
219:15 223:11
223:24 225:2
237:4 239:16
242:4
rights 67:2
150:20 209:6
rise 86:2 206:7
206:9
risen 26:11
risk 225:1
road 75:11 94:12
214:1
robbery 237:6
role 35:20 38:7
109:2 111:22
150:3 169:18
roles 11:3
roll 40:2
rolled 205:21
room 50:25
59:13 62:24

62:25 102:5
102:19,20,24
103:2,7,17,19
103:25 147:17
147:23
rooms 82:15
84:3 102:21
103:8
rooting 126:16
Roughly 113:21
round 227:21
route 19:6
routine 85:9
routinely 81:24
92:9
RPR 1:18 4:21
244:23
245:22
Ruben 224:2
rule 55:6,9
107:14 123:20
146:5,5,11
149:16,19
182:20 183:4
208:16
223:24 225:3
226:18 227:16
rules 7:14,15
82:1 146:3,4
157:2 180:3
180:24
203:24
209:14 231:22
ruling 107:13
rulings 222:25
run 13:23 71:9
222:6,12
240:9
running 33:16
183:21 200:3
229:21,24
runs 12:16
rural 19:5
rush 100:3

Sadly 240:16
safe 7:2 160:23
safely 203:17
Saint 188:15
241:14
sake 48:1
salaried 34:20
salaries 27:17
199:1 242:15
salary 24:15
27:13
sale 111:1
sample 181:25
sand 168:4
sanitizer 242:17
SAR 144:12,19
145:1,9 148:5
sat 230:23
satisfied 123:4
124:2
satisfy 124:4
save 71:3
107:25 219:22
saves 69:20
105:6 200:6
saving 70:25
71:5
saw 172:3
176:20 236:5
236:6,7
saying 37:25
62:21 63:13
70:6 72:8
85:13 90:3
110:1 111:16
119:5,15 122:17
128:22 132:24
134:22 138:20
146:24 185:16
190:16 203:5
217:5 239:23
242:19
says 6:12 37:22
41:22 51:24
52:1 65:11
99:9 149:23
151:23 170:9

---

**S**

S 4:1

ALARIS LITIGATION SERVICES
www.alaris.us        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-14    Filed 02/09/18    Page 96 of 107

196:24,25
200:23 220:4
228:6 232:18
234:8
scenario 66:15
scene 33:18
85:11 88:3
91:8,17,21,22
91:23,23
106:8
schedule 23:22
29:23 33:19
33:25
scheduled
101:3 102:9
169:5 206:12
schematic 51:3
scheme 41:1
42:19,23 43:3
45:1 46:6
67:17,18
196:13 221:15
222:17
school 55:19
136:14 187:13
187:15 188:3
science 133:2
scream 111:4
se 69:6 184:17
search 200:5
seasonal
187:25
second 16:18,21
23:24 51:24
160:3 180:18
secondary
103:19
secrecy 157:24
secret 172:11
174:4 183:24
secretaries 9:8
205:16
secretary
196:21 241:9
section 109:1
security 197:14
see 20:6 34:7

51:18,22
56:25 63:22
64:13 67:9
75:6 77:18,20
77:24 79:20
79:23,25 86:6
88:8 89:15
98:15 101:8
103:17 104:8
104:10 105:11
105:16 106:21
108:20,21
109:14,19,21
116:19,22,24
121:18 124:9
126:19 127:18
127:22 129:9
139:20,21
140:15,25
141:13 142:4
147:21 154:4
157:25 170:10
174:5,6,7,8
185:22 189:3
199:11 200:4
200:13 202:14
203:10,10
214:25 226:4
226:23
227:21 228:4
235:23
236:16
seeing 128:22
236:14
seek 29:17
32:22 59:19
77:1 89:19
93:11 98:18
139:11 174:19
201:18 213:18
214:3 234:9
234:14,17
seeking 97:5
seeks 200:17
seen 51:4,7
63:25 64:11
67:12 107:1

134:21 139:7
139:14 168:24
171:24 172:2
175:10,17,21
176:13,17
198:14 225:8
236:5
sees 61:10 158:7
segue 101:14
selected 17:13
self-divulged
78:11
semblance
205:19
Senate 117:22
118:10,14 119:6
119:24 120:11
send 16:17,20
17:3 220:3
225:5 233:19
sending 17:3
37:24 128:25
225:9 240:10
sense 58:3
67:24 73:24
84:10 91:16
95:1 108:17
143:19 150:6
167:25 174:9
178:17 195:18
195:19 196:4
199:15 200:14
203:3 206:16
207:6,21
209:19 216:8
216:11 217:11
233:18 236:2
236:4 238:3
239:4,12
241:25
sent 154:24
167:25 168:13
174:18 180:15
182:3 230:23
sentence
126:25 131:8
150:8 161:5

sentences
150:16
sentencing
70:10 117:11,17
118:7,17,22
119:9,11,18
120:6,16
121:10 144:9,11
145:3 150:5,8
150:15,21
151:21 152:6,7
152:9 237:12
237:14
separately 39:6
150:20
September
240:15
series 111:1
serious 45:14
93:3 110:11
111:16,17
198:20
206:20
seriously 208:3
seriousness
23:1
serve 127:3
151:13 199:23
served 159:10
235:15
serves 172:16
service 85:20
179:22,22
services 4:21
5:24 61:5
195:20 239:1
245:1,15
serving 126:23
126:24 127:4
161:9
set 35:12 43:3
59:11,21,24
60:15,20 62:5
62:10,16 66:7
118:17 137:9
152:6 198:9
228:22,24

244:6
sets 130:13
setting 29:15
59:8 62:23
160:22 161:16
166:22,23
174:20 204:5
205:7,20
214:20 219:10
225:10
settings 82:9
206:12
settled 16:6
seven 11:20
80:3,15
128:23 171:10
213:10
severe 110:23
sex 113:3 123:13
sexual 229:1
share 16:9,15
115:18 186:24
she'll 37:3
205:11
shed 229:16
sheet 217:25
219:16,18,24
220:5 247:1
sheets 39:11
40:11 245:10
245:12,14
shelf 66:17
224:24
shelves 44:13
shift 87:3
shifted 119:21
shifting 57:12
Shipma 2:10
4:9 6:6,6 8:24
52:2 176:6
238:13,22
240:17 245:3
245:8
shit 172:15
shock 167:25
shocked 72:12
226:25

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-14   Filed 02/09/18   Page 97 of 107

Shondel 1:4 3:4 3:22 5:16 245:7 247:2
shoot 37:21 99:8 122:24 124:8
shooting 149:21
shoplifting 118:5
short 92:3 95:1 157:4 169:8 173:19 181:20 181:23 184:8
short-lived 215:9
short-term 175:4
shorter 155:14
shorthand 3:18 5:4,5 244:10
shortly 56:21 84:8 95:5 168:8 173:13
shoulder 77:7,8
show 51:15 71:10,23 72:4 75:3 122:9 146:5 154:19 182:1
show-up 142:21 142:23
showed 89:9 188:1
showing 76:21 143:20
shows 51:10 89:2
Shrader 9:20
shroud 157:24
shutter 107:23
shy 11:12
sick 59:19 76:8 76:8 177:25 219:22 224:23
side 77:19 94:19 94:20 113:12 120:1,4,17,23

120:24 126:16 141:13 143:3 150:17 168:3 201:7 207:12
sides 232:3
sign 140:12 245:12
signal 107:10
signature 5:8 245:10,12,15 247:25
significant 44:25
significantly 178:6
silent 64:4
silly 82:1 100:25 146:3,11 224:10
similar 176:10 215:25
similarity 85:8
simple 25:22 70:6,6 90:1 200:3 242:19
simply 206:6 227:12
Sincerely 245:19
single 117:6 182:15 183:1 215:10,10 224:10 231:8
sink 225:3
sir 193:10 209:22
sit 37:1 99:25 116:20 231:9
sits 66:17
sitting 46:18 74:6 178:13 212:12 215:4 216:10 223:6
situation 56:15 112:12 158:2 172:7 174:4 178:22 242:5

situations 238:25
six 11:20 23:2 101:6 141:25 142:3 145:3,4
size 25:4
skeptical 228:9
skyrocketed 26:5
slap 106:13
slashed 241:17
slightly 19:3,4 22:9 24:16 43:13 50:19
slow 45:17 92:4 92:21 125:18
slowed 112:8
small 198:2,14
smell 196:7
snapshot 89:2
social 27:20,22 28:2,3,6,8 161:22 197:14
soft 47:3
software 33:11 59:17 210:12
solely 24:5 215:5 217:8 231:13
solution 91:4 175:3 234:7
somebody 44:20 90:22 100:13 110:22 110:23 117:6 167:11 182:11 197:23 227:12
someone's 33:16
Somewhat 59:9 171:22
soon 79:23 97:6 168:13
sooner 99:22
sorry 47:16 64:6 155:20 158:14 192:20 241:21

sort 45:10 53:16 63:2 77:13,21 79:1 87:6 100:20 104:20 108:25 110:20 111:9 112:5 113:25 122:12 124:15 136:19 144:16 147:16 149:15 151:13 153:5 158:23,24 163:15 169:2 173:23 174:18 192:17 205:14 212:20 224:22 226:21 233:16 238:6
sought 32:1 49:19 98:22 139:2 163:9 182:5 213:20 232:8 233:11 234:5 235:21
sound 105:2
sounds 175:4
source 157:17
sources 228:12
spans 164:4
sparing 163:22
speak 29:21 115:24 221:9 223:13
speaking 157:19 201:10 236:3
special 139:7 152:16,19 158:20 161:7
specialists 24:19 119:8,9
specialized 212:13
specialty 14:12
specific 28:25 67:4 93:9 98:9,10

104:25 116:21 137:4 155:16 193:2 195:5 203:1 238:11 239:11
specifically 38:10 40:25 167:6,20 194:23
specificity 239:7
specifics 83:17 92:13 134:7 238:4
speculate 13:15 104:25 192:9
speculating 175:2
speculation 32:7 199:20
speeding 43:21 44:21 93:2 204:21,22,23
speedy 68:1,4,9 68:17,20,25 69:6
spell 6:18 192:4
spelled 6:20
spells 33:13
spend 14:3 38:11 40:16 101:21 111:12 121:22 127:8 140:18 148:1
spends 177:4
spent 27:17 36:23 39:1 40:5 101:15 104:12,15 190:23 217:14
split 58:24
spoke 188:20 189:16,17
spoken 172:6
sponte 77:16
spot 196:5 197:9,13

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-14    Filed 02/09/18    Page 98 of 107

198:15
spurts 94:13
St 11:19 13:8
  25:8
stab 196:1
stack 228:5
staff 24:12 27:13
  29:6 30:5
  37:7 39:15
  40:19 54:18
  115:7 155:13
  163:12 169:14
  181:15 185:2
  194:23 196:17
  198:17 200:10
  200:23 201:1
  201:3,9 202:9
  220:21 221:15
  230:12,23
  231:15,24
staffed 21:6,10
  21:12,15 25:17
stage 97:24
  98:1,3 149:14
stakes 26:10
stale 65:7
stand 100:18
  201:11
standard 34:25
  35:4
standards 224:1
  224:2 228:24
standpoint 65:6
  68:18 91:3
  107:4 144:21
staples 37:2
start 11:15 35:18
  48:14 61:25
  106:12,12
  108:18 118:22
  118:24 121:18
  225:13
started 10:15,22
  52:22 53:3
  112:6 187:25
starting 60:6
  69:20 121:16

195:16
starts 45:17
state 1:7 2:15
  3:7,23 4:7,10
  4:14,16 5:16
  6:5,17 9:18
  14:15 31:13
  37:24 51:5
  68:10 69:19
  71:2,2,4 92:1
  92:25 126:10
  131:10 141:12
  141:14 145:24
  147:15 167:11
  171:20 187:9
  190:10 192:7
  205:6 212:9
  220:13 223:3
  224:4 244:4
  245:4,7 246:1
  247:2
state's 96:2
  140:22 181:25
  208:16
state-authoriz...
  217:17
statement 107:6
  223:14 229:11
  229:13,20
States 1:1 3:1,21
  146:1
statistically 22:1
statistician
  194:16 195:13
statistics 50:6
  194:6 209:23
  210:13,13
stats 224:3
statute 77:22
  182:4 185:7,21
  232:10,18,20
  232:23 233:7
  234:1,16,23
  234:24,25
  235:5,7
statutorily 41:18
  77:19

statutory 41:1
  196:13 234:24
stay 141:25
  161:4,6 162:12
stayed 164:23
stealing 16:20
step 96:5
steps 40:2
  90:14 129:4,7
  137:19 149:8
  194:18 196:4
Steven 4:15 6:4
  187:8 245:25
steven.ramse...
  4:18
sticker 109:15
STIPULATED
  5:1
stop 23:21 89:6
  90:2
store 9:12 143:2
stores 229:6
straight 187:12
strategic 63:15
  115:22 214:16
strategy 75:5
  116:1 214:9,21
Street 3:16 4:4
  4:16,22
  245:16
stress 212:1
strict 235:7
stripped 74:13
strong 75:17
strongly 143:10
student 165:22
studied 223:10
studies 194:12
stuff 88:6
  105:24 126:19
  163:15 173:23
  212:1,20
  233:15
stumble 153:24
sua 77:16
subject 107:19
  137:6 219:9

222:16,20
subjects 222:14
submissible
  100:5 124:3
  209:3
submit 192:1
subpoena 78:4
  106:18
subpoenaing
  159:13
subscribe
  246:11
subsection
  233:1
subsequent
  190:17
substance
  228:14 246:8
substantially
  221:7
substantive
  39:2 40:17
  47:10 101:12
subtract 37:1,2
successful
  151:4 235:23
succumb 94:23
sudden 112:3
  132:16,19
  216:25
suffering 177:12
sufficient 29:6
  43:15,15 64:8
  66:6 84:5
  86:10 91:20
  98:1 115:5
  127:19 140:3
  196:17 199:9
  220:18
  240:24 242:6
sufficiently
  25:17 96:10
  159:11
suggest 228:16
suggested 44:7
suggestion
  44:9

suggestions
  2:14 174:15
  175:15 231:6
suing 7:11
Suite 4:4,11
  245:5
summarize
  170:8,11
summarized
  64:6
summation
  53:20 161:25
superb 117:4
supervise 47:10
  81:9 85:17
  104:17 136:16
  211:9 234:13
supervised
  212:14 237:25
supervising
  14:14 219:12
supervision
  224:18
supervisor 32:4
  36:17 49:17
  167:13 213:18
  214:11 223:1
supervisors
  30:18 44:7
  49:21 55:15
  163:19
supplied
  220:12
supplies 36:25
  242:17
supply 25:23
  25:23 44:13
support 2:14
  24:23 30:5
  32:19 37:8
  40:19 54:18
  175:15 200:23
  201:1,3,9
  230:12
supportive
  168:22 221:14
supports

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-14   Filed 02/09/18   Page 99 of 107

130:23
suppose 64:7
  80:16 226:19
  234:15 236:12
supposed 142:5
suppress 89:18
suppression
  105:19 106:5
  135:8,25 151:2
  209:7
Supreme 167:18
  230:22
sure 6:19 8:4
  9:9 13:20 14:3
  20:14,15 22:17
  24:14 27:19
  28:18 30:1,1,16
  31:20 32:20
  34:8 37:11,13
  39:14 42:3
  48:5 50:7
  51:9 52:16
  54:4 59:9
  63:22 64:25
  66:15,21 67:5
  67:8 73:11
  76:22 83:23
  85:2,7 88:16
  89:23,24 90:7
  92:14 97:1,1
  106:3,7,23
  107:2 113:18
  122:20 126:2
  126:2 129:24
  130:7 134:12
  135:1,4,4,23
  136:3,3 148:11
  150:7 151:20
  153:19 156:18
  157:23 161:14
  162:4 164:12
  164:12,12
  167:18 170:4
  175:14 176:12
  176:15,21
  179:16 180:6
  184:1 186:18

189:2 190:4,19
190:20 194:1
201:5 203:2,6
204:3 205:16
206:3 207:3
209:2,3,5
210:2,20
213:21 215:14
216:6 218:9
219:14 220:2
222:15 223:14
225:12,15
226:12 230:16
230:20 231:21
236:25
240:21 242:1
242:2
surprise 71:19
  226:5
surprised
  125:14 225:21
  225:22 226:3
surprises
  214:25
surrender
  165:20
surreptitiously
  82:16
surrounding
  15:10 89:24
  105:6 227:7
surveillance
  229:5
suspend 145:25
suspended
  198:23
suspicious
  234:20
Sutton 173:16
swear 6:9
swept 74:5
Switching
  202:24
sworn 3:13 6:11
syllabus 139:20
  211:21,25
  218:25

system 10:9,16
  10:23 11:7,17
  12:22 15:17
  17:9 26:12
  27:23,24
  29:16 32:21
  33:12 34:4
  35:8 40:24
  41:3 49:4
  53:12 55:7
  60:1,4 65:17
  70:22 71:4
  103:15 118:13
  136:12 139:11
  146:16 163:10
  163:12 168:1
  175:23 188:7
  189:11 190:10
  191:14,15 192:6
  192:7,15
  195:21 200:19
  205:5 211:9
  211:22 219:12
  220:13 223:1
  224:5 229:21
  230:5,25
  233:12 235:1
system's 105:4
systemwide
  212:5

_____

T

take 8:9 11:21
  23:20 26:5
  54:19 57:11
  68:21 77:23
  77:25 88:11
  107:8 110:12
  114:25 117:17
  120:25 121:23
  125:24,25
  129:5,7 130:2
  130:24 132:11
  134:17,24
  136:13 145:2
  148:8 149:8
  165:9 169:16

173:6,7 174:20
179:13 180:5
187:19 194:18
196:18 201:6
208:2,22
228:2
takeaway
  173:24
taken 1:15 5:3
  7:3 28:19
  50:18 74:17
  106:7 108:11
  108:22 109:6
  121:5 137:19
  146:13 160:6
  168:24 172:12
  179:19 180:9
  197:23 199:2
  206:20 216:17
  244:5 245:9
  247:3
takes 18:9 28:17
  42:11 65:7,7
  94:19 106:14
  122:14 142:8
  196:4 200:1
  208:9,14
talk 9:13 11:2
  25:4 26:19
  32:25 38:3
  39:6,8 47:9
  53:19 56:10
  59:1 60:3
  71:25 76:1
  101:15 104:6
  107:19 115:19
  117:16 126:18
  130:6,18 136:5
  142:19 149:12
  151:2,3 165:4
  169:14 193:22
  206:3 207:23
  220:4 222:13
  238:23
talked 8:25
  44:23 59:6
  95:10 108:7

121:16 122:15
162:19 171:24
177:1 182:8
188:24 189:21
193:8 213:2
231:18,23,25
231:25
talking 35:18
  39:4 55:16
  58:22 67:24
  79:14 80:24
  83:8 84:25
  87:1 91:7
  96:19 99:22
  99:22,23
  108:4 112:22
  115:1 118:25
  121:9 143:23
  159:22 160:10
  164:11,13,14,15
  168:17 169:24
  172:19 206:10
  206:19 221:22
  224:22
  227:19,20
  233:1
talks 68:12
  233:13
taller 228:8
tallied 203:13
tape 143:9
tapes 111:8
target 47:22
targeting 85:18
task 33:14 34:17
  218:3
tasked 219:11
  220:11
tasks 34:23
  38:22 39:2
  40:16 59:16
tax 187:25
taxpayers'
  28:13 40:1
  196:9 201:6
  213:22
teach 218:13

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-14   Filed 02/09/18   Page 100 of 107

teaching 216:6
team 96:1
  179:23
technically
  24:22 64:7
  74:17 76:15
  183:15
tee 151:13,14
teeter-totter
  120:23
teetering 173:5
telephone
  241:16
tell 9:11,14 22:12
  22:15 26:15
  35:2 45:7
  51:25 53:13
  54:10,10 57:15
  67:6 68:8,10
  74:3,4 84:22
  96:24 98:14
  99:5,17 100:9
  101:4 102:1,2
  127:11 148:4
  157:18 166:1
  181:4 192:18
  205:15 217:4
  219:19 224:21
  239:18 241:7
telling 9:2 170:8
  196:8,10
  208:22,23
  213:22
tells 220:22
telltale 53:6
ten 25:2
tend 217:17
term 19:23
  151:17 165:24
  177:16 195:19
  225:17
terms 8:15 9:8
  14:6 36:22
  46:10 57:19
  59:12 61:8
  67:24 75:12
  78:19 79:22

82:16 87:3
109:5 120:8
141:12 151:1,7
188:19 193:25
195:2,16
207:4 213:22
216:20
229:24
230:14 232:10
234:24
239:12
testified 211:7
  225:19
  240:23
testify 116:4
  206:5
testifying
  188:20 204:19
  222:5 244:8
testimony
  66:25 75:13
  90:2 107:6,20
  190:12 211:12
  213:13 215:16
  215:17,24
  216:9 225:20
  227:9 244:12
testing 92:16,17
thank 6:21
  54:10 176:7
  240:2 245:18
thankfully
  233:10
theme 98:22
  116:6
theoretical
  33:14 79:24
  80:2
theoretically
  35:6 148:20
theory 27:3
  28:15 29:3,4
  96:2 122:6
thereof 165:23
thereon 246:10
They'd 105:20
thing 8:12

28:24 35:6,24
37:21 63:2
69:3 77:14,21
79:2 84:12
87:6 94:13
100:16,20
101:23 104:20
107:17 111:9
112:5 115:7
118:24 124:15
128:10 129:11
135:11 144:16
145:22 149:15
158:23 168:16
169:2 170:14
192:17 198:6
208:12,12
215:21 217:2,4
217:19 221:2,9
224:22 230:1
234:22
235:17
236:25 238:6
241:15
things 9:8 13:23
14:7,8 17:2
23:23 28:14
30:23 33:22
35:12 36:4,8
36:24 43:16
44:9 53:3
54:16 57:3
66:21 84:21
86:5,9 88:7,14
88:14,16,25
91:7,7 96:5
97:20 99:5
105:23 107:18
110:14 117:25
119:2 120:2
129:12,15
130:8,14
136:22 139:13
141:13 144:12
147:13 162:1
164:21 169:12
177:23 178:24

196:18,19
206:7 209:2
210:23 215:1,1
221:16,17
222:6,8,9,11
224:20 228:1
233:14 241:23
242:3,16
think 6:24 7:10
7:13 8:11,13
10:2,9 15:14
21:9,13 22:18
22:24,25
23:2 25:6,8,9
25:16 27:6,9
27:10,24 28:11
28:17 31:25
32:5,9 34:11
35:24 37:23
40:15 43:17
44:24 45:19
45:23 47:5
49:3 50:12,20
52:4,13,17
53:7,9,12
54:22 55:15
57:17,22
58:13 60:13
61:6,12 62:18
63:10,25 64:9
70:12,15,21,23
71:5,20 72:7
74:16 76:17
78:6 80:3,6,11
80:12 81:5
83:12,19 84:15
85:15 87:4
88:17,25 90:8
90:13 97:2
101:5 105:25
106:21 107:12
107:12,23
114:14,14,17,17
114:20,23
116:3,12 117:20
117:23,25
120:20 121:8

121:17,21 122:4
124:2,10,17,23
126:17 128:1,18
131:4,4 133:2
133:11 134:8,12
134:13 135:24
136:12 139:16
139:18,19
140:4 141:24
142:6 143:3,8
147:2 148:14
157:6,9
159:24 160:23
164:2,20
168:7,25
169:6,20
170:14 172:1,10
172:12,17
174:10 175:2
175:16,16 177:1
177:16 180:1
181:7,9,9 182:1
182:21 183:22
183:24,25
184:4 186:21
187:1,2,22
189:13,16
190:23 193:13
196:2,7 199:4
203:23 206:5
207:9,10
208:5 211:18
211:25 213:17
213:24,24
214:18,19,23
215:7,21 216:1
216:3 217:12
219:8 222:3
225:18 231:1,7
231:7,8,10
233:4,6,13
234:1,23,23
234:25 235:1
235:3,5,7
236:7,7,8,12
236:24 237:4
237:13,21

ALARIS LITIGATION SERVICES
www.alaris.us   Phone: 1.800.280.3376   Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-14   Filed 02/09/18   Page 101 of 107

238:2,5 239:7
239:15,16,16
240:15,23
241:19 242:11
**thinking** 71:24
107:16
**thinks** 96:13
177:5
**thorough** 95:6
148:4,6
**thought** 22:25
31:11 53:2
147:11,12 155:5
170:18 187:2
214:18 215:17
234:2 242:23
**threat** 132:11
133:21 225:8
**threaten** 203:15
**threatening**
203:18
**three** 11:8 12:2
14:23 15:6 18:1
25:9 36:4
39:17 44:24
73:25 94:17
100:24 101:6,7
164:4 192:14
201:23,25
202:3 203:19
203:21,25
204:14 232:4
**three-month**
51:15
**throw** 45:10
**Thursday** 179:14
**ticket** 44:21
93:2 204:10
**tickets** 204:12
**tie** 147:22
**tied** 84:3 101:8
178:9
**ties** 78:24
**till** 140:10
**time** 5:14 7:5
10:18 15:8
22:5,25 23:18

23:20 24:1,14
25:5,11,21
27:9 28:11,16
29:5 30:25
31:1,9 32:14
37:8 38:11,12
38:20 39:1,11
40:11,15 43:13
43:22 44:14
45:6,6 47:22
47:24 48:2
49:17 51:5
52:25 57:13
58:4,12 63:20
64:22 65:4,11
65:14 66:13
67:14,15 68:16
69:24 72:6,13
72:16 74:14
75:14 77:2,5
78:6 81:3,25
82:2 83:1,6,19
83:21 85:8,20
87:15 88:5,9
88:10,15 89:21
90:10 91:10,12
93:23 94:4,7
94:8,16,19
95:12,12 96:7
96:14,18 97:9
97:15 98:7,24
99:3 100:18
101:15 104:4,11
104:12,14
105:22,25
106:1,14,22
107:8,11,24,25
109:13 116:9,13
116:19 117:2,12
117:13 118:18
120:6 121:10
121:21 122:19
122:22 124:10
124:17 125:14
126:6,14,21
127:8,20
128:2 132:13

133:23 134:11
135:4 136:21
136:22 137:10
139:12,21,23
140:5,21
141:22 146:19
146:23 147:12
150:2 153:3
155:13 161:5,14
164:4,4,21
177:4 179:13
181:11,21 183:7
184:12 187:13
187:14,15,19
191:13,13,20
200:1,2 201:18
202:11 205:23
208:9 211:11
211:20 212:15
213:4,19 215:8
216:22 217:24
217:25 218:2
218:6,15
219:16,18,24
220:4 223:9
230:1 231:2
232:7,13
233:5 236:10
236:19 239:14
242:9,21
244:6
**time-consumi...**
134:1,5 159:3
**time-keeping**
218:3,7 219:12
**timekeeping**
217:21,23
**timely** 92:4,5
93:25 95:1
99:21 130:4
179:17
**times** 6:24 23:8
29:14 34:15
41:17 47:15
80:22 95:16
101:10,20
103:23 126:8

126:8,25
129:17 178:8
192:14 198:25
208:7 220:3
239:5 241:9
**timing** 62:20
87:10 88:2
216:3
**tinker** 185:13,14
185:15 242:14
**tiny** 154:9 171:5
**title** 9:15,17
48:22 186:12
200:5
**titled** 51:5
175:14 194:24
**to-do** 38:17
**today** 8:22
10:10 212:12
215:4 216:10
223:6
**today's** 5:13 8:8
9:1
**told** 9:5,9 19:22
38:1 44:4
55:22 61:6
65:12,14 72:13
90:7 124:13
137:1 151:16
155:11 157:21
184:11 185:2
213:24 229:11
240:6 241:7
**tool** 83:24
89:17,19
214:23 216:6
235:4
**top** 27:17 49:9
66:19 85:21
85:23,24 86:1
86:3 159:8
179:20 206:7
206:9 207:8
208:20
209:16,22
**total** 10:14 21:5
103:23

**totality** 174:9
**totally** 69:1
76:24 148:1
190:6 223:18
**touch** 20:12
54:21 59:4
**touched** 32:24
79:5 97:4
162:19 233:16
**toxicologist**
95:19
**track** 17:2 22:2
33:9 36:22
37:3 94:20
241:10
**traffic** 112:9,10
130:20 178:7
204:8,21
205:3,6,8,11
**train** 24:3
**trained** 89:12
**training** 45:11
112:13 139:8,10
139:11 195:6
211:18,20,23
212:3,5,6,10
212:14 214:23
218:12,13,16,18
218:22,24
240:14
**trainings** 139:14
211:15,16
**transcribed** 5:8
244:11
**transcript**
244:15 245:9
245:11
**transfer** 17:4
111:1
**transferred** 11:9
61:21
**transferring**
25:7
**transfers** 155:21
**transition** 22:14
25:10 158:18
164:17 225:1

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-14   Filed 02/09/18   Page 102 of 107

transitioned
  23:6
translator 29:12
  29:17,20,23
  29:24 32:11
  50:13 136:20
  217:15
translators 29:8
  29:10 31:12
  36:24 242:18
transportation
  78:25
travel 71:1
  104:12,15
  105:6
traveled 102:2
traveling 101:15
  101:21,22
treat 112:7,10
treated 178:4
tremors 167:25
triage 159:10
  177:3,16 178:4
  209:10,13
triaged 177:23
triaging 206:4
trial 9:19 11:10
  12:6,7,11,21,23
  13:13 15:2,18
  16:14 63:22
  67:18,23 68:1
  68:4,9,17,25
  69:6 73:6
  76:11 82:21
  84:8 90:12
  91:11 95:5,5
  96:1 99:14
  100:15,23
  101:3 107:4,9
  108:12,22
  109:13,25
  110:3,12 111:19
  112:23 113:2,7
  113:8 115:9
  116:10 119:20
  119:22,24
  120:4,10

137:10,10
150:9,11,17,24
151:4 152:5,7
158:19 166:23
171:9 179:15
206:12,13
207:1,15,16
210:4,23,24
211:5 213:10
221:13 237:8
238:9
trials 121:10
  210:10,14,21
  211:6
tried 209:21
  211:3
trigger 93:20
true 62:8 80:13
  110:13 122:18
  126:3 134:17
  181:1,3 239:22
  239:23
  244:12 246:9
  246:12
truism 110:13
trust 153:23
  193:25
  200:25
  220:21
trusting 195:7
try 7:18 45:9
  54:13,14,20
  57:21,22
  63:24 66:13
  68:10,23,24
  69:2,2 83:24
  86:11 88:18
  89:18 104:19
  111:12 120:8
  124:8,16
  127:14 132:23
  135:21 136:1,10
  149:13 169:13
  170:17 198:3
  198:10 201:17
  211:20 217:16
  217:19 220:1

trying 10:2
  31:22 33:16
  50:16 66:22
  71:3 80:25
  83:25 97:20
  100:14 104:5
  111:12 120:20
  131:6 150:2
  151:3 167:10
  170:14 178:23
  181:9 189:16,17
  197:22,22
  198:15 199:10
  200:4,13
  203:3,7
  212:25
  222:24
turn 89:14
  185:19 204:15
  217:21
turned 38:2
  110:22 213:15
turning 55:3,4
  213:11 223:2
  230:21
  235:25
turnover 21:24
  221:16
turns 200:14
TV 157:25
Twice 21:18
two 11:8,16 16:15
  16:19 24:17
  25:9 27:2,24
  33:1 34:10,20
  55:19 68:13
  79:7 98:23
  103:23 113:24
  147:12,13
  168:6 173:11,19
  188:12 192:13
  193:19,19,20
  194:9,24
  195:3,3,4,5,7
  195:9 197:19
  204:14 210:10
  218:1 229:1

236:18
two-week
  219:16
two-year 10:20
type 40:5 78:21
  92:8,11 109:9
  159:5,20
  217:10,14,19
  218:8 221:14
  222:10 228:15
  231:5 239:25
types 32:10
  43:19 82:3
typewriting 5:8
typical 131:10
typically 13:4
  60:8 79:8
  111:3 129:6
  142:13 143:11
  150:18 152:4,8
  159:15

_____

**U**

U.S 5:17 136:9
  137:21 138:7
Uh-huh 48:17
  58:6 79:16
  98:17 102:17
  106:15 125:2
  127:13 133:18
  194:10 202:1
  229:22
  232:25
ultimate 120:9
  219:17
ultimately 32:3
  141:6 215:20
unadulterated
  56:2
unavailable
  75:12,12
uncharged
  107:7 204:7
unclear 234:15
uncovered
  89:4
uncovering

112:20
undercompe...
  167:12
undereducated
  147:3
undergrad
  187:12 188:17
underprepared
  69:1
understaffed
  21:9
understand 8:1
  12:15 13:20
  14:9 20:15
  23:18 36:18
  37:11,14 52:10
  54:24 55:1
  60:11 66:10
  75:1 97:3
  111:15 140:6
  142:2 143:21
  151:6 167:1
  181:15 186:6
  190:16 192:18
  193:3 196:16
  199:20 203:7
  213:3 216:12
  224:15,25
  229:19
understanding
  15:16 17:16
  60:18,21 67:6
  67:12,16 78:14
  142:6 153:22
  191:4,11 192:10
  193:4 194:3
  211:11 221:10
  221:10 225:20
  225:25 227:6
  227:9 228:18
  228:20
understands
  66:7
understood
  31:11 82:17
unfair 23:12
  117:9 234:12

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-14   Filed 02/09/18   Page 103 of 107

unfairly 86:13
unfettered 26:2
  131:20 230:7
unfortunately
  19:11 165:19
  199:3
unintentional
  182:20 183:3
Union 3:16 5:20
unique 27:8
unit 71:17 119:11
  119:12,18,19
  177:25 196:21
  196:21
United 1:1 3:1,21
  146:1
unprepared
  69:1
unpunished
  130:12
unrealistic
  126:9
unreasonable
  62:19
unrelated 190:7
unsure 189:19
untrained 66:4
untruthful 90:2
unusual 69:24
  122:23
unworkable
  234:11
update 142:1
  226:22
updates 212:19
upper 221:25
  222:2,4,7,12
  232:8,15,16
  240:6,10
urge 69:3
urgency 84:10
use 19:23 21:8
  27:4,15 28:13
  29:7 32:7,13
  32:25 33:22
  42:20 50:16
  82:12,13

83:24 95:10
  98:6 103:21
  124:16 161:18
  177:18,20
  194:2 196:6
  213:21 237:10
useful 148:17,20
  148:23
useless 148:6
ushered 70:3
usually 36:16
  47:14,15 50:4
  57:15 67:25
  69:17 79:14
  98:23 102:13
  104:5 114:23
  133:7 140:12
  146:16 147:25
  150:21,24,25
  157:16,18,21
  178:2 204:13
  213:23 222:16
  238:8
utility 54:7
utilize 30:8
  33:4 38:1
  119:3,4 196:18
  216:13 217:16
utilized 15:17
  31:7 38:20
  105:5 161:21
  161:22 190:24
  191:17 216:9

——————
**V**
V-A-C-A 238:18
Vaca 238:18
vacuum 59:3
  231:13
valid 115:15
value 101:24
Van 173:16
vanity 89:6,11
varies 46:19
  76:20 78:9
  79:10
variety 33:15

41:10 77:25
  228:11
various 189:22
  212:6 213:12
  224:20
vastly 166:24
vehicles 200:6
venue 108:24
  108:24
Verbal 7:16
verbatim 244:8
verdict 118:21
verification
  199:17 239:25
verify 196:5
  201:13 210:14
version 168:12
versus 5:16
  39:2 40:16
  205:3
vesting 10:24
vetoing 191:3
victim 75:6,16
  77:18 84:24
video 20:11
  60:15,25
  69:10,16,18
  70:11,17 71:8
  72:22 73:6
  89:1,2 103:20
video-recorded
  5:14
videographer
  4:24 5:12,23
  6:8 121:3,6
  160:4,7 180:7
  180:10 243:3
videotape 147:6
  147:8,10
videotaped 1:14
  2:7 3:12 172:14
viewed 175:18
views 50:9
  223:21
violation 67:3
  68:17 94:24
  130:20 178:7

182:20 183:4
violations 180:3
virtually 35:9
  47:12 230:6
virtue 202:3
  225:9
visit 32:12 82:10
  82:12,14 84:6
  91:22 102:9,11
  103:8 106:8
  130:16 133:8
  136:5 147:23
  156:1,9
visitation 82:13
  84:3,6,12
  102:21 103:19
visited 91:17,24
visiting 38:13
  85:11 91:7
  179:6 225:24
visits 38:15
  57:14 82:5,6
  88:3
voicing 182:2
voir 107:5
voluntarily
  126:10 185:8
volunteer
  239:21
volunteered
  189:5
volunteers
  114:17
vs 1:6 3:6 245:7
  247:2

——————
**W**
wait 102:10
  103:25 104:1,2
  104:3 106:11
  182:13 183:13
  183:15,16,18
  196:11,12
waited 102:2
waiting 103:17
  103:17,17
  104:15 112:19

118:16,20
  178:2,3,6
  181:12,13,17,22
  183:5,8,16
  184:8,11,15
  207:14
waits 85:19
waive 67:2
  74:25 75:19
  145:12 209:6
waived 64:23
  64:25 65:1,3
  65:5,24 67:15
  67:20 74:21
  74:23 115:9
  145:11
waives 70:23
  70:24
waiving 145:12
walk 149:13
walking 155:7
want 22:10
  28:18 33:13
  34:7 39:15
  45:15 49:25
  54:18 56:5
  58:24 64:6
  68:3 69:5,23
  70:21 73:2,5
  77:8,20 81:13
  90:11,13 93:15
  93:18 94:10
  96:8 101:15
  104:25 105:2
  106:11 107:5
  114:18 119:3,4
  123:3 125:6,15
  126:5 127:3
  128:16 134:24
  136:25 147:4
  149:1 150:10
  170:13 195:3
  195:24 197:17
  198:3 204:3
  206:1 207:24
  207:25
  208:22,24

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-14   Filed 02/09/18   Page 104 of 107

209:6 214:7,8
214:9 218:10
221:2 222:20
223:12 227:6
233:24,25
238:17,23
240:3 242:7
**wanted** 145:21
146:6,9
183:25 210:8
224:8 229:19
**wants** 112:11
124:4 125:24
149:12 156:1
197:23
**warned** 64:3
**warning** 45:20
56:2 64:9
77:13
**warrant** 63:1
**warranties**
242:16
**wasn't** 8:10
44:10 67:14
84:14 89:8
98:7 158:15
161:21 163:12
186:2 214:2
215:10
**waste** 155:13
**watercooler**
168:19
**Waters** 113:18,19
153:3 162:20
163:1,2,8,17
163:20,20
164:5 233:7,8
236:17
**way** 16:7,12,13
16:21 18:16
22:11 34:2
42:21 47:14
49:19 50:7
54:10 55:3,10
64:14 72:5
80:6 92:5
94:19,24 95:7

96:1 101:19
102:19 105:15
108:19 110:4
112:7 114:21
116:1 122:10,11
129:16 135:19
142:1,5 147:21
158:20 159:1
164:23 165:8
170:10,18
183:20 202:19
204:21 225:4
235:2 241:23
**ways** 187:20
204:7 206:8
206:8 223:25
**we'll** 9:13 41:20
53:19 59:4
67:9 121:17
126:19 235:22
**we're** 5:12,23
21:8,10,12
23:23 35:17
35:18 36:20
39:4,14 45:13
51:25 54:21
56:9 58:22
58:25 60:3
61:1 70:7 87:3
87:5,5 88:1
96:3 97:5
99:9,22,22
99:23 102:12
102:13 105:23
109:1 121:3,6
124:8 130:12
143:17 151:9
151:23 153:24
153:25 159:16
160:4,7,9
169:23 177:2
179:9 180:7,10
185:21 196:9
196:10 197:21
197:21,22
198:15 199:7,9
202:21

203:20
206:10 207:13
207:17 216:25
224:22
225:10 230:19
231:19 233:9
239:14,16
241:6,7 243:3
**we've** 63:25
91:7 98:25
99:17 104:25
111:23 112:7,15
112:16 116:21
130:10 149:20
156:15,16
157:8 158:9
162:19 177:20
186:2 200:2
204:11 206:24
210:14 217:14
233:5
**wealth** 154:1
**weary** 66:5
**wee** 241:4
**week** 23:21
34:22 54:16
66:20 168:9
181:8
**weekend** 91:2
**weekly** 101:9
**weeks** 11:8
145:3,4 218:1
**well-armed**
79:3
**went** 11:12 16:21
118:6 136:14
144:12 148:5
168:2,7 173:13
181:6,7 184:7
188:2,9
225:22 226:9
**weren't** 92:6
118:2 183:7
**West** 3:16 4:4
4:10,16 9:20
245:4
**Western** 1:1 3:1

3:21 5:18
**whisked** 130:21
**wife** 9:9
**Wilcox** 2:9,10
4:3 6:2,2,14
50:15,23 52:3
120:25 121:2,8
160:2,9,15
169:23 170:2
176:7,9 180:6
180:12 240:19
242:25
245:24
**wild** 191:21
**willing** 77:25
147:6 174:20
**wind** 16:16 77:5
83:8 85:19
127:5 161:8
177:13 211:3
**window** 51:15
106:1
**windshield**
191:20
**wise** 32:6
**wisely** 216:7
**wish** 88:9,11,12
95:3 238:11
**withdraw** 2:18
149:1,12,18,24
149:24 150:13
176:16,24
**withheld** 191:10
**withhold** 191:8
**withholding**
92:21 191:3
192:11
**witness** 5:9 6:9
33:17 75:3,11
88:4 106:9
107:6 121:1
147:5 238:14
238:18 244:19
245:11 247:1,1
247:25
**witnessed**
63:25

**witnesses**
26:22 78:4
84:24 86:22
87:11,13 88:3
91:8 95:9
99:14 106:18
110:17 111:6
112:20 118:19
161:12 177:10
244:7
**woe** 58:5,5
**woman** 208:20
**woman's** 211:2
**women** 154:12
**wonder** 45:19
**wood** 114:3
**word** 53:24
70:18 143:9
151:24 158:4
168:13 172:5
177:17,20
225:11
**words** 143:25
182:21
**work** 7:11 9:15
13:17,24 17:8
17:25 21:3
24:12 34:21
39:3 40:5,17
40:20 46:3
47:11 49:20
53:16 55:24
58:4 88:20
90:10,11,24
91:2 94:23
97:22 101:5,6
101:12 104:14
106:24 108:7
109:13 113:6
117:2 125:19
134:15 140:5
159:21 161:12
162:17 167:13
167:14 178:21
187:23 210:25
211:6 228:19
230:10,12

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-14   Filed 02/09/18   Page 105 of 107

235:14 242:7
242:12
**workable** 91:4
**worked** 10:13
12:2 136:13
166:25 187:21
187:21 210:23
217:24
**worker** 28:8
**workers** 27:20
27:22 28:2,4
28:6 161:22
**working** 14:16
24:2 26:13
37:15 52:18
52:25 53:10
100:25 106:12
106:12 121:22
138:24 174:8
179:20 203:19
203:20,21
204:6 235:12
**workload** 16:9
21:1 33:10
35:13,14,17
47:3,5 50:6,6
65:25 68:19
78:18 83:16
86:6 87:18
90:16 127:15
162:10 163:6
169:13 188:24
189:23 211:8
211:16 214:5
222:18 232:11
233:3
**workloads**
100:11
**workplace** 212:1
**works** 17:25
40:25 42:22
45:4 60:4
121:18 151:9
204:7
**workshop**
218:23
**workweek** 56:5

**world** 81:12
88:23 89:22
90:4,5 91:13
193:12
**worlds** 147:13
**worried** 231:4
**worries** 209:17
**worse** 102:15
124:22 164:24
164:25 165:2
174:12 217:1,1
**worth** 43:4
**wouldn't** 31:7,9
76:14 82:11
96:15 120:15
140:8 144:5
148:13 162:17
179:12 197:10
200:9 209:23
222:9 228:22
228:23
234:18
**wound** 84:15
159:13
**wounded**
177:25
**wow** 216:25
**Wright** 4:25
5:22
**writ** 2:14 46:10
175:15,23
**write** 240:7
**writing** 123:3
146:4 167:3
179:5 222:19
**writted** 127:2
**written** 35:4
62:13 204:10
234:1,16
235:2,2
**wrong** 51:14
52:4 61:19
71:6 117:21
122:16 125:6
166:14,14
198:4 213:14
227:10

**wrote** 204:12
235:16,19
**www.alarisliti ...**
4:23

**X**

**X** 2:1 49:25
193:23

**Y**

**yeah** 21:20,23
25:14 42:5
47:2,21 48:5
52:5,7 53:19
59:23 60:1
63:6 66:2,2,8
66:24 71:6,21
72:14 82:24
85:1,15 86:17
93:10 102:12
102:15 105:10
105:13 109:23
110:3,10 119:19
121:1 123:19
126:24 134:19
135:10 139:18
142:6 143:9,14
146:18 154:21
164:19 170:12
177:20 184:2
185:19 193:6
204:20 207:6
210:5,16
214:14 218:18
238:17
**year** 15:13 16:23
53:8 55:19
110:5,8,9
116:20 117:21
138:12 164:10
189:25 192:1
193:22 197:21
209:15,20
210:4 211:24
220:18
240:24 241:7
**year's** 197:16

240:13
**years** 7:12 10:4
10:23 11:6,8,12
11:16,20 16:22
16:22,22 19:18
20:3 22:20
22:22 25:2,11
44:6,6 49:4
52:23 65:10
78:16 99:23
99:24 108:1
117:22 119:10
140:10 156:17
156:18 157:9
163:4 166:9
187:16,17
188:5,10,11,12
190:18 195:12
197:19 207:5
213:10 214:1
218:10 231:19
237:15 241:12
241:17
**years'** 43:4
**yield** 86:16
**yields** 79:3
123:15
**yonder** 191:22
**young** 16:15,18
154:12

**Z**

**zealously**
167:22 177:5
**zero** 78:8 118:11
118:11 119:6

**0**

**03** 117:23
140:20
**05** 164:9
**063** 233:2
**07** 10:7

**1**

**1/3** 241:17
**1:00** 180:8

**1:09** 180:11
**10** 15:9 22:22
38:6 49:4
57:11 152:11
**100** 4:11 245:5
**1000** 4:10
245:4
**11** 10:23 188:11
**11:26** 121:4
**11:40** 121:7
**12** 15:10 21:5,7
22:7,10,22
24:12 27:1
49:4 76:3
101:19 132:18
190:3 193:9,15
**12:27** 160:5
**12:30** 160:8
**13** 50:21
**1335** 4:21
244:24
245:22
**14** 2:15 50:20
50:22,24
52:6 164:14
199:19 223:2
**1417** 244:24
**15** 2:17 10:4
15:10 19:22
22:20 169:25
170:1,4 180:17
180:18 240:3
**16** 2:18 12:1
16:14 68:15
176:6,7,8,15
235:25
**1608** 4:22
245:16
**16th** 172:11
**17** 68:15
**17-0405-CV- ...**
5:17
**17-04057-CV- ...**
1:6 3:6
**170** 2:17
**1714** 4:21
245:22

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-14   Filed 02/09/18   Page 106 of 107

**175** 2:14
**176** 2:18
**187** 2:9
**1989** 10:15,23

**2**

**2** 2:17
**2,500** 217:10
**2:35** 1:17 3:15
   243:4,5
**20** 22:20 43:3
   157:3 195:12
**200** 47:1
**2005** 53:4,11
   117:19 164:8
   164:20 211:10
**2012** 113:20
   162:22
**2016** 209:20
**2017** 1:16 2:17
   3:14 5:13
   170:5 181:13
   209:20
   244:19 245:2
   245:9 246:17
   247:3
**221** 4:16
**221-1160** 4:23
**234** 9:20
**238** 2:10
**23rd** 244:19
**24** 10:17,25
**24.035** 150:22
**240** 2:10
**244** 2:22
**253.6** 52:4,9,11
**27** 245:2
**273.1** 52:1
**2nd** 168:8 170:5
   180:16 181:13

**3**

**3** 2:4
**30** 18:24
**30-plus** 204:12
**300** 193:24,24
**33** 241:17

**34th** 3:16 4:4

**4**

**4** 2:6 182:20
   183:4 223:24
**4/1/17** 51:11
**40** 34:21,24
**40-hour** 56:4
**400** 43:18,20
   47:8 87:17
   183:12
**406** 3:16 4:4
**420** 4:4
**43rd** 15:1,3
   17:23,24
   69:25 152:21
   154:8,9 155:10
   157:24 171:6
   171:15
**470-9938** 4:5
**48** 179:18

**5**

**5** 2:14 11:18 12:7
   117:22 118:10
   118:14 119:7,24
   120:11 175:10
   175:14 236:2
   236:15 237:11
**5,000** 217:9
**50** 2:15 94:16
**526-5212** 4:12
   245:6
**552** 140:20
   142:2
**552.02** 140:20
**573** 4:12,17
   245:6

**6**

**6** 2:9 14:25
   16:10 17:22
**6/30/17** 51:11
**600** 182:5
   196:13 197:1,3
   197:6 232:9
   232:24 233:9

   233:20
**600.063**
   232:10
**64108** 4:22
   245:17
**64111** 4:5
**65101** 4:17
**65203** 4:11
   245:5

**7**

**7** 1:16 3:14 4:11
   10:8,11,11 11:22
   12:7,19 14:19
   14:25,25 17:18
   17:21 24:13
   42:8 43:22
   51:18 52:20
   53:1 245:5,9
   247:3
**75** 80:11 226:13
   226:17 227:2
   227:4
**751-9167** 4:17
**7th** 5:13

**8**

**816** 4:5,23

**9**

**9:01** 1:17 3:14
   5:11,14
**99** 116:18

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-14   Filed 02/09/18   Page 107 of 107