# Exhibit V

Page 1

```
 1              UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF MISSOURI
 2                   CENTRAL DIVISION
 3
 4   SHONDEL CHURCH, et al.,    )
                               )
 5         Plaintiffs,    )
                               )
 6     vs.                ) Case No.
                          ) 17-04057-CV-C-NKL
 7   STATE OF MISSOURI, et al., )
                               )
 8         Defendants.    )
 9
10
11
12
13
14      VIDEO-RECORDED DEPOSITION OF JOEL R. ELMER
15        TAKEN ON BEHALF OF THE PLAINTIFFS
16                  OCTOBER 4, 2017
17
18
19
20      (Starting time of the deposition:  1:10 p.m.)
21
22
23
24
25
```

Page 2

```
 1               I N D E X
 2   QUESTIONS BY:                    PAGE
 3   MR. SHAHABIAN                     8
 4   MR. RAMSEY                      115
 5   MS. SHIPMA                      127
 6   MR. SHAHABIAN                   129
 7
 8               E X H I B I T S
 9   EXHIBIT                        PAGE
10   Exhibit 1   Previously marked exhibit     12
11   Exhibit 6   Panel attorney circuit court   31
12               criminal disposition form
13   Exhibit 7   Panel attorney memorandum of   32
14               understanding
15   Exhibit 8   Protocols                40
16   Exhibit 9   All staff survey response     47
17               summary
18   Exhibit 4   Previously marked exhibit     48
19   Exhibit 10  List of public defenders      55
20               spreadsheet
21   Exhibit 11  List of public defenders      58
22               spreadsheet
23   Exhibit 12  11-16-15 Blau e-mail          61
24   Exhibit 13  District 12 Trial Observation 66
25               Form
```

Page 3

```
 1   Exhibit 14  District 12 Case Review       67
 2   Exhibit 15  District 12 Guilty plea or    69
 3               sentencing observation form
 4   Exhibit 16  District 12 Motion hearing    70
 5               observation form
 6   Exhibit 17  1-16-13 Kelly e-mail          87
 7   Exhibit 18  12-29-16 Winfrey e-mail chain   90
 8   Exhibit 19  4-28-17 Barrett letter to     98
 9               Pratzel
10   Exhibit 2   Previously marked exhibit    100
11   Exhibit 3   Previously marked exhibit    102
12   Exhibit 20  Missouri Bar President       103
13               announcement
14
15   (The original exhibits were retained by the court
16   reporter to be attached to the original and copies
     of the transcript.)
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1              UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF MISSOURI
 2                   CENTRAL DIVISION
 3
 4   SHONDEL CHURCH, et al.,    )
                               )
 5         Plaintiffs,    )
                               )
 6     vs.                ) Case No.
                          ) 17-04057-CV-C-NKL
 7   STATE OF MISSOURI, et al., )
                               )
 8         Defendants.    )
 9
10        VIDEO-RECORDED DEPOSITION OF JOEL R. ELMER,
11   produced, sworn and examined on October 4, 2017,
12   between the hours of one o'clock in the afternoon
13   and five o'clock in the afternoon of that day, at
14   ACLU of Missouri Foundation, Suite 1130, 906 Olive
15   Street, St. Louis, Missouri 63101, before William L.
16   DeVries, a Certified Court Reporter (MO), Registered
17   Diplomate Reporter, and Certified Realtime Reporter,
18   in a certain cause now pending in the United States
19   District Court, Western District of Missouri,
20   Central Division, between SHONDEL CHURCH, et al.,
21   Plaintiffs, vs. STATE OF MISSOURI, et al.,
22   Defendants; on behalf of the Plaintiffs.
23
24
25
```

1 (Pages 1 to 4)

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com      Phone: 1.800.280.3376      Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-23   Filed 02/09/18   Page 2 of 58

## Page 5

```
 1          A P P E A R A N C E S
 2
 3   For the Plaintiffs:
 4      Mr. Matthew R. Shahabian
        Orrick
 5      51 West 52nd Street
        New York, New York 10019
 6      (212) 506-3750
        mshahabian@orrick.com
 7
 8      Mr. James J. Maune
        Orrick
 9      2050 Main Street, Suite 1100
        Irvine, California 92614
10      (949) 491-5616
        jmaune@orrick.com
11
12      Mr. Jason D. Williamson
        American Civil Liberties Union
13      Foundation
        125 Broad Street, 18th Floor
14      New York, New York 10004-2400
        (212) 284-7340
15      jwilliamson@aclu.org
16
17
        For the Public Defender Defendants:
18
        Ms. Jacqueline Shipma
19      Missouri State Public Defender
        Woodrail Center
20      1000 West Nifong
        Building 7, Suite 100
21      Columbia, Missouri 65203
        (573) 525-5212
22      jacqueline.shipma@mspd.mo.gov
23
24
25
```

## Page 6

```
 1   For the State of Missouri and
     Governor Greitens:
 2
        Mr. Michael Quinlan
 3      State of Missouri
        Attorney General's Office
 4      815 Olive Street, Suite 200
        St. Louis, Missouri 63101
 5      (314) 340-7861
        michael.quinlan@ago.mo.gov
 6
 7      Mr. Steven R. Ramsey
        State of Missouri
 8      Attorney General's Office
        221 West High
 9      Jefferson City, Missouri 65102
        (573) 751-1024
10      steven.ramsey@ago.mo.gov
11
12      Also present:
13      Mr. John Niehaus, Videographer
        Midwest Litigation Services
14      711 North Eleventh Street
        St. Louis, Missouri 63101
15      (314) 644-2191
        1-800-280-3376
16
17
18
19
20
21
        Court Reporter:
22      William L. DeVries, RDR/CRR
        Missouri CCR #566
23      Midwest Litigation Services
        711 North Eleventh Street
24      St. Louis, Missouri 63101
        (314) 644-2191
25      1-800-280-3376
```

## Page 7

```
 1          IT IS HEREBY STIPULATED AND AGREED by
 2   and between counsel for the Plaintiffs and counsel
 3   for the Defendants that this deposition may be taken
 4   in shorthand by William L. DeVries, RDR/CRR, a
 5   Certified Court Reporter and Certified Shorthand
 6   Reporter, and afterwards transcribed into
 7   typewriting; and the signature of the witness is
 8   expressly reserved.
 9          *    *    *    *    *
10          JOEL R. ELMER,
11   of lawful age, produced, sworn and examined on
12   behalf of the Plaintiffs, deposes and says:
13      (Starting time of the deposition:  1:10 p.m.)
14          VIDEOGRAPHER:  We're on the record.
15   Today's date is October 4th, 2017, and the time is
16   approximately 1:10 p.m.  This is the video-recorded
17   deposition of Joel R. Elmer in the matter of Shondel
18   Church, et al., versus State of Missouri, et al.,
19   Case Number 17-04057-CV-C-NKL, in the United States
20   District Court for the Western District of Missouri,
21   Central Division.
22          This deposition is being held at ACLU
23   of Missouri Foundation in St. Louis, Missouri.  The
24   reporter's name is Bill DeVries.  My name is John
25   Niehaus.  I'm the legal videographer.  We are with
```

## Page 8

```
 1   Midwest Litigation Services.
 2          Will counsel please introduce yourself
 3   for the record?
 4          MR. SHAHABIAN:  Matt Shahabian for the
 5   plaintiffs.
 6          MR. WILLIAMSON:  Jason Williamson for
 7   the plaintiffs.
 8          MR. RAMSEY:  Steven Ramsey for the
 9   State of Missouri and Governor Eric Greitens.
10          MR. QUINLAN:  Michael Quinlan for the
11   State of Missouri and Governor Eric Greitens.
12          MS. SHIPMA:  Jacqueline Shipma for
13   MSPD.
14          VIDEOGRAPHER:  Can you please swear in
15   the witness?
16          COURT REPORTER:  Do you swear or affirm
17   that the testimony you are about to give in this
18   proceeding will be the truth, the whole truth, and
19   nothing but the truth?
20          THE WITNESS:  Yes.
21          EXAMINATION
22   QUESTIONS BY MR. SHAHABIAN:
23      Q.  Good morning, Mr. Elmer.  I know we met
24   outside, but just introduce myself again, my name is
25   Matt Shahabian.  I'm an attorney representing the
```

2 (Pages 5 to 8)

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-23   Filed 02/09/18   Page 3 of 58

1   plaintiffs in this case, and I'll be asking you some
2   questions for your deposition here today.  Have you
3   ever been deposed before?
4       A.  I don't believe so.
5       Q.  Okay.  So let's just go over a few
6   ground rules.  If you could listen to my question
7   and wait for me to finish before answering, that
8   would be great for both me and for our court
9   reporter here.  If you do not understand my
10  questions, please ask me to clarify.
11      If you would like, we have seven hours
12  scheduled for this deposition.  I do not think we're
13  going to need anywhere near seven hours, but if
14  you'd like to take any breaks as we progress, please
15  let me know.  I just ask that if there's a question
16  pending, you answer the question before we take a
17  break.  Do you understand those ground rules?
18      A.  Yes.
19      Q.  Great.  Could you please tell us your
20  title?
21      A.  Deputy director, Missouri State Public
22  Defender system.
23      Q.  What is your role as the deputy
24  director of the Missouri State Public Defender
25  system?

1       A.  I am one of two deputy directors.  The
2   trial division director reports to me.  Our
3   operations director reports to me.  Our IT director
4   reports to me.  And our case contracting manager
5   director reports to me.  So I oversee those persons.
6   And I also handle any special projects assigned by
7   the director.
8       Q.  Who is the trial division director?
9       A.  Ellen Blau.
10      Q.  Who's the operations director?
11      A.  Jane Duncan.
12      Q.  And who is your IT director?
13      A.  John Mullin.
14      Q.  And the case contracting manager?
15      A.  Maggie Johnston.
16      Q.  How long have you been the deputy
17  director of the Missouri State Public Defender
18  system?
19      A.  Since July 1st of 2014.
20      Q.  What did you do before that?
21      A.  I was a division director.
22      Q.  What does it mean to be a division
23  director?
24      A.  At the time we had multiple division
25  directors before our current structure.  I had

1   approximately ten offices that I oversaw the
2   district defenders of those offices.
3       Q.  How long were you a division director?
4       A.  For about three and a half years.
5       Q.  And you said that was before your
6   current structure.  Is there no longer a division
7   director role at the MSPD?
8       A.  Well, there's one division director.
9   That's Ellen Blau.
10      Q.  Okay.  And how long have you been
11  employed with the MSPD in any capacity?
12      A.  First as a law student beginning in
13  1983 for a couple of years, and then beginning as an
14  assistant public defender in 1987.
15      Q.  So you've been there for over 30 years?
16      A.  Yes.
17      Q.  Congratulations.  Do you have any other
18  experience in criminal defense outside of your role
19  as MSPD employee?
20      A.  No.  I mean, I was -- right after law
21  school I clerked for the Missouri Supreme Court for
22  two years, and of course criminal cases came before
23  us, but obviously I wasn't practicing criminal
24  defense.
25      Q.  Do you understand that you're being

1   deposed today as a representative of the Missouri
2   State Public Defender system pursuant to Federal
3   Rule 30(b)(6)?
4       A.  Yes.
5       Q.  What is your understanding of what it
6   means to be a representative of the MSPD for
7   purposes of this deposition?
8       A.  My role is to answer the questions
9   truthfully that are asked of me.
10      Q.  Have you reviewed the notice of
11  deposition in this case seeking a 30(b)(6)
12  deposition of the MSPD?
13      A.  I -- yeah, I reviewed it.
14  (Exhibit 1, Previously marked exhibit.)
15      Q.  (By Mr. Shahabian)  I'm handing you
16  what's been premarked as Plaintiffs' 1.  Is that the
17  notice of deposition you reviewed?
18      A.  Yes.
19      Q.  And my understanding is you are
20  prepared to testify to -- if you look at attachment
21  A, you'll see a list of deposition topics, 13 of
22  them numbered?
23      A.  Yes.
24      Q.  My understanding is you've been
25  designated to testify on all but number 13, relating

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-23   Filed 02/09/18   Page 4 of 58

Page 13

1  to the budget.  Is that your understanding?
2      A.  Yes.
3      Q.  What did you do to prepare for your
4  deposition today?
5      A.  I did a little bit of review and I met
6  with Ms. Shipma.
7      Q.  Did you meet with anybody else?
8      A.  Greg Mermelstein and Jane Duncan, and I
9  believe that was it.
10     Q.  Who is Jane Duncan?
11     A.  She's the operations director.
12     Q.  Apologies.  My memory is a little slow
13  at this age.  Did you review any documents in
14  preparation for this?
15     A.  There's also a brief discussion that
16  Michael Barrett was involved in too.
17     Q.  Was anyone else involved in that
18  discussion?
19     A.  Ms. Shipma, Mr. Mermelstein.
20     Q.  Did you review any documents in
21  preparation for your testimony today?
22     A.  I looked over our last annual report,
23  the Missouri Project Report prepared by Missouri --
24  by RubinBrown.  I looked at our last workload
25  capacity reports.  A couple of turnover reports that

Page 14

1  have been prepared by Jane Duncan.  And I looked at
2  some expenditure dollar numbers in our management
3  databases.
4      Q.  Do you know if the documents you
5  reviewed have been produced to the plaintiffs in
6  this case as part of discovery?
7      A.  I -- I know some of them have.  I can't
8  tell you for sure if all of those have.
9      Q.  Okay.  So let's turn to some of the
10  topics you're here to testify about.  I'll try to
11  run through these as quickly as possible.  I'd like
12  to start with the policies and procedures regarding
13  the use of conflict counsel by the Missouri State
14  Public Defender's office.  Could you tell us
15  generally how con -- the appointment of conflict
16  counsel works in the Missouri State Public Defender
17  system?
18     A.  If an assistant public defender
19  believes they have a conflict of interest, then
20  they -- that goes to their district defender, and
21  ultimately if the district defender agrees then it
22  is transferred to case contracting, and unless I
23  have questions it's assigned to someone on our
24  panel, a private attorney on our panel.
25     Q.  Do all conflict cases go to attorneys

Page 15

1  on the panel?
2      A.  Since July 1st, except for rare
3  exceptions, they all go to panel attorneys.
4      Q.  Prior to July 1st, did all conflict
5  cases go to panel attorneys?
6      A.  No.
7      Q.  What was the system prior to July 1st?
8      A.  What we called the first-level conflict
9  we'd go to a nearby office.  In the urban areas,
10  even what we considered a second-level conflict
11  would go to a different nearby office.  Beyond that,
12  all the other conflicts came to case contracting to
13  be assigned to a panel of attorneys.
14     Q.  And to clarify, when you said July 1st,
15  you meant July 1st, 2017?
16     A.  Correct.
17     Q.  What's the difference between a
18  first-level conflict and a second-level conflict?
19     A.  Well, if an office represents A and
20  there is another client who has a conflict with a
21  client A, say client B has a conflict with client A,
22  then client B would be a first-level conflict.  If
23  there's yet another client who had a conflict with
24  client A, we'll call him client C, then that would
25  be a second-level conflict.

Page 16

1      Q.  So a second-level conflict would be two
2  or more conflicts or am I misunderstanding?
3      A.  That's correct.  For instance -- well,
4  that's correct.
5          MR. QUINLAN:  Like if there were
6  multiple defendants in the same case.
7      A.  Yes.  If there were three
8  co-defendants, then there would be one for the local
9  office, there would be a first-level conflict, and
10  there would be a second-level conflict.
11     Q.  (By Mr. Shahabian)  And then for
12  conflicts of third level or higher, would those go
13  to panel attorneys?
14     A.  Yes.  Most of the second-level
15  conflicts went to panel attorneys, and third-level
16  and beyond all went to panel attorneys.
17     Q.  How is the panel attorney system
18  administered?
19     A.  Could you clarify what you mean by
20  administered?  It's a pretty broad term.
21     Q.  Sure.  It is a broad term.  I'll try to
22  be more specific.  How does an attorney end up on
23  the panel attorney list?
24     A.  They make application.  They fill out a
25  panel attorney application.

4 (Pages 13 to 16)

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-23   Filed 02/09/18   Page 5 of 58

1    **Q.  What does that application require them**
2  **to provide?**
3       A.  Name, address, other personal
4  identification such as bar number, years of
5  practice, recent jury trial experience, a couple of
6  references for us to check, and if they want
7  anything beyond misdemeanors and C and D felonies,
8  then they have to outline their experience in those
9  other areas, such as A and B felonies, homicides,
10  appeals, etc.
11       **Q.  Do all panel attorneys have criminal**
12  **defense experience prior to becoming panel**
13  **attorneys?**
14       A.  No.
15       **Q.  Do all panel attorneys have jury trial**
16  **experience prior to becoming panel attorneys?**
17       A.  No.
18       **Q.  Roughly what percentage would you say**
19  **of panel attorneys have criminal defense experience**
20  **prior to becoming panel attorneys?**
21       A.  The large majority, but I can't tell
22  you beyond that.
23       **Q.  Roughly what percentage would you say**
24  **of panel attorneys have jury trial experience prior**
25  **to becoming panel attorneys?**

1       A.  I can't really say.  I couldn't answer
2  that question.
3       **Q.  How often are panel attorney**
4  **applications rejected by the MSPD?**
5       A.  Probably, you know, five to ten
6  percent.
7       **Q.  And are those rejections generally new**
8  **applicants or reapplications by existing panel**
9  **attorneys?**
10       A.  Well, they would be new applicants.
11  Existing panel attorneys don't have to reapply
12  unless they leave our panel and then apply again.
13       **Q.  Why would a new applicant be rejected**
14  **for the panel?**
15       A.  Either because of concerns raised by
16  reference checks.  Sometimes concerns about their
17  prior performance that we're aware of.
18       **Q.  Once someone is on the panel, how are**
19  **they assigned a case?**
20       A.  On the -- I forgot to mention, on the
21  panel attorney application they also indicate what
22  circuits they're willing to handle cases in.  Our
23  general rule is that you have to take an entire
24  circuit.  You can't choose county by county.
25       We do make a few exceptions when it's

1  in our -- in our interest to do so because of our
2  desperate need for attorneys in those counties that
3  they'd be willing to go to without the entire
4  circuit.
5       So then we have our panel attorneys
6  broke up by counties that -- that they're eligible
7  for, and presumably it is a rotating assignment
8  with a -- with a preference for what we call a home
9  county preference.  By home county, we don't mean
10  where their home is, we mean where their office is.
11       So we would first go to, you know --
12  for instance, if there's a case in Crawford County
13  and, you know, our presumptive pick would be whoever
14  is up next in line who has an office in Crawford
15  County who is eligible for the type of case that
16  we're assigning based upon what types of cases they
17  apply for and that they were approved for.  There
18  are exceptions, but that's the general rule.
19       **Q.  Are panel attorneys free to turn down**
20  **assignments or is there a requirement that they**
21  **accept a certain number of cases?**
22       A.  Certainly not a requirement that they
23  accept a certain number of cases, but they are
24  expected to accept assignments.  We -- we
25  occasionally make exceptions, but no, the

1  expectation is they take the assignment.  We don't
2  ask them will you take this assignment.
3       **Q.  Does MSPD require conflict counsel**
4  **to -- for panel attorneys specifically to report the**
5  **nature and quantity of their caseloads outside of**
6  **panel attorney appointments?**
7       A.  No.
8       **Q.  Does MSPD track the workload or**
9  **caseload of panel attorneys based on their panel**
10  **attorney assignments?**
11       A.  To an extent, yes.
12       **Q.  What is that extent?**
13       A.  Well, we either have -- the cases
14  originally we would refer to as an open case, which
15  means it's pending.  They're supposed to advise us
16  when that case has been disposed of and we close the
17  case and it's designated as closed.
18       And if we also learn some other fashion
19  that the case has been disposed of before we learn
20  from them, then we would close the case.  So we have
21  open cases and we have closed cases, and so we can
22  view what someone's open caseload is.  It's not
23  entirely accurate, but we do try to check against
24  Case.net every six months to keep as accurate as we
25  can.

**MIDWEST LITIGATION SERVICES**
**www.midwestlitigation.com**     **Phone: 1.800.280.3376**     **Fax: 314.644.1334**
Case 2:17-cv-04057-NKL   Document 153-23   Filed 02/09/18   Page 6 of 58

Page 21

1      Q.   Once a panel attorney has a case, if
2  they -- how would they request payment for
3  litigation expenses or expert witnesses or other
4  case-associated expenses?
5      A.   They use an Excel spreadsheet that we
6  provide to them on-line and they submit that to our
7  contracts assistant, and she works with them to get
8  that and the proper information that we require, and
9  then that is submitted to me for my either -- for my
10  consideration.
11      Q.   Are those requests generally approved
12  as submitted or are there rejections or
13  modifications?
14      A.   They're generally approved.  I mean,
15  there are modifications.  There are denials, but
16  they're generally approved.
17      Q.   How often do panel attorneys request to
18  use expert witnesses, investigators, or other
19  assistance on cases?
20      A.   I don't have a percentage number.  It's
21  not unusual.
22      Q.   How are panel attorneys paid for the
23  cases they accept?
24      A.   They are paid a flat fee at the
25  beginning of the case.  How much the flat fee is

Page 22

1  depends upon the case type.  There is a mechanism
2  for them to request additional compensation for --
3  for complex or extraordinary cases beyond what would
4  normally be expected in that type of case.  They are
5  also paid a per diem fee for days spent in trial.
6      Q.   How often do panel attorneys request
7  additional compensation for complex or extraordinary
8  cases?
9      A.   Not very often.
10      Q.   When those requests are made, how often
11  are they approved?
12      A.   I don't have a percentage, but
13  certainly a lot of them are denied.  I have granted
14  some.
15      Q.   Would you say in a given year it's more
16  or less than ten?
17      A.   Less.
18           MS. SHIPMA:  More or less than ten that
19  are --
20           MR. SHAHABIAN:  Ten cases.
21           MR. QUINLAN:  That are?
22           MS. SHIPMA:  The requests that are
23  made.
24           MR. SHAHABIAN:  Sorry.  Let me clarify.
25      Q.   (By Mr. Shahabian)  Would you say in a

Page 23

1  given year it's more or less than ten requests for
2  payment?
3      A.   Less.
4      Q.   Just taking a step back, is the panel
5  attorney program also referred to as the Code 49
6  program?
7      A.   No.  Code 49 is one part of the case
8  contracting program.  It has to do with disposition
9  codes we use in our case management system.
10      Q.   What are the -- so could you explain
11  what the Code 49 program is?
12      A.   Sure.  Code 49, we began using that
13  code when we first began conflicting out some
14  first-level conflicts, which was prior to July 1st,
15  2017.  We -- we had enough funding that in some
16  areas we were able to contract out first-level
17  conflicts.
18           So those -- our offices, when they sent
19  those to us, would use disposition code 49 to
20  identify them as first-level conflicts.  Since
21  July 1st we've continued to use code 49 for all the
22  first-level conflicts, so it's a first-level
23  conflict that's been contracted out.
24      Q.   There are other codes for conflicts
25  other than first-level conflicts?

Page 24

1      A.   There are.
2      Q.   So Code 49, it's fair to say, is a
3  subset of the overall panel attorney program?
4      A.   Correct.
5      Q.   Have conflict counsel commented to you
6  or to your knowledge anyone in the MSPD on the rates
7  that are paid for conflict counsel cases?
8      A.   Yes.
9      Q.   What to your knowledge have those
10  comments been?
11      A.   That they're ridiculously low.
12      Q.   Is that a frequent comment that's made?
13      A.   Pretty frequent.
14      Q.   How often are the fee payments
15  adjusted, the fee schedule adjusted?
16      A.   You mean the overall fee schedule?
17  I've been doing this since July 1st of 2014.  I can
18  tell you they haven't been adjusted since then.
19      Q.   Generally speaking, what is the
20  experience level of a typical panel attorney?
21      A.   I can't say there's a typical
22  experience level.
23      Q.   Are you aware of a voluntary pro bono
24  program that has started to assist the MSPD with
25  criminal cases?

6 (Pages 21 to 24)

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-23   Filed 02/09/18   Page 7 of 58

1       A.   Yes, if you're referring to the
2   Missouri Coalition For the Right to Counsel.
3       Q.   I am.  Could you describe what that
4   program is?
5       A.   It is a law firm initiative where the
6   law firms -- where the law firms identify certain
7   attorneys within their firm to take assignments from
8   us for pro bono, and -- and they will work with our
9   local district defender and identify cases to send
10  to those associates and -- and we will assign them
11  to them.
12      Q.   The cases are assigned to associates at
13  law firms?
14      A.   Yes.  It depends upon the model.
15  Ultimately that's who handles them.  Some law firms
16  have us assign them to a partner who then
17  distributes them within the firm, but --
18      Q.   The expectation is associates will be
19  handling the cases?
20      A.   As far as I know, yes.
21      Q.   Is there an experience threshold for an
22  associate to handle these cases?
23      A.   No.
24      Q.   How many cases have been referred to
25  pro bono attorneys this way?

1       A.   I think approximately 60.
2       Q.   What kinds of cases have been referred
3   to pro bono attorneys?
4       A.   I think all levels.  Sitting right here
5   today I can't tell you whether or not we've assigned
6   a homicide case to one, but other than that I think
7   we've assigned all levels.
8       Q.   Does the MSPD supervise the associates
9   in the performance of those cases?
10      A.   No.
11      Q.   Does the MSPD supervise the performance
12  of panel attorneys who are assigned cases?
13      A.   No.
14      Q.   Does the MSPD train the pro bono
15  attorneys?
16      A.   MCR, pro bono attorneys, we did conduct
17  MCR training several months ago when it was kicked
18  off and we're doing some training again later this
19  week, two-day training.
20      Q.   About how many hours of training would
21  a pro bono attorney have before getting a case
22  assignment?
23      A.   Approximately 16 from us.
24      Q.   Does the MSPD provide training to panel
25  attorneys?

1       A.   Occasionally.  We have had training on
2   post-conviction matters that we've invited panel
3   attorneys to.  We also at our last annual training
4   that's available to all of our in-house attorneys,
5   we call it spring training, but we also invited a
6   certain number of panel attorneys to that.
7       Q.   Are panel attorneys required to attend
8   those trainings?
9       A.   No.
10      Q.   How often do panel attorneys leave the
11  panel?
12      A.   Frequently.
13      Q.   Do they provide reasons when they
14  decide to leave the panel?
15      A.   Sometimes.
16      Q.   What kinds of reasons are given for
17  leaving the panel?
18      A.   Could be because of the fees are too
19  low.  Could be because they're retiring from the
20  practice of law.  Could be because they're going to
21  a job where they aren't allowed to take assignments
22  from us.
23           They might be unhappy with a particular
24  practice of ours, such as our requirement that they
25  take an entire circuit, and just decide that they're

1   not in a position to do that anymore.  I mean, those
2   would be the most common that I can think of.
3       Q.   Does the MSPD keep statistics on how
4   frequently -- on how much turnover there is in the
5   panel attorney system?
6       A.   No.  But -- no, we don't keep
7   statistics.
8       Q.   Can you give a ballpark estimate?
9       A.   I was going to say is they leave about
10  the same rate they come on.  People come and go, but
11  the level of panel attorneys stays pretty level.
12      Q.   Do panel attorneys ever withdraw from
13  cases they have been assigned to?
14      A.   They do occasionally.
15      Q.   What happens when they decide to move
16  to withdraw from a case?
17      A.   We ask them to consult with us before
18  moving to withdraw.  That may or may not happen.  If
19  they haven't consulted with us and we agreed to it,
20  then we might ask them to do a resume representation
21  and that might happen, but ultimately if -- if
22  they're allowed to withdraw and they don't resume
23  representation, then we would reassign it to someone
24  else generally.
25           But you know, we also sometimes take

7 (Pages 25 to 28)

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com       Phone: 1.800.280.3376       Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-23   Filed 02/09/18   Page 8 of 58

Page 29

1  the position that if it's done at a client's
2  request, that the client has chosen to -- to proceed
3  pro se or hire private counsel, then he doesn't get
4  to select what -- which public defender or which
5  special public defender, which are panel attorneys,
6  are assigned to them.  I can't think of a particular
7  situation where the client has actually ended up
8  going pro se, but --
9      Q.  When you say that the cases are
10 reassigned to someone else generally, do you mean
11 another panel attorney or an MSPD public defender?
12     A.  Another panel attorney.
13     Q.  Does the MSPD ever take back cases that
14 have previously been assigned to panel attorneys?
15     A.  Rarely, but I'm sure it's happened.
16     Q.  And just to clarify, you used the term
17 special public defender.  That refers to a panel
18 attorney?
19     A.  Yes.
20     Q.  What happens to the fees that are paid
21 to a panel attorney who withdraws from a case?
22     A.  Depends upon their reason for the
23 withdrawal.  Sometimes it results in us believing
24 that the -- the entire fee needs to be returned to
25 us.  Sometimes we feel like they may have earned a

Page 30

1  portion of the fee and we'll determine which -- what
2  portion of that, and any unearned portion we'd
3  expect it to be returned to us.
4      And when I say returned, our preference
5  is that -- that we recoup the money through reduced
6  fee assignments rather than literally have the money
7  returned to us.
8      But if they're not able to do that for
9  either they leave the panel -- well, if they leave
10 the panel for some reason and so can't take any
11 additional assignments, then we ask them to return
12 the money, which goes to general revenue.  It does
13 not go to the Missouri State Public Defender system.
14     Q.  So to break that down, if a panel
15 attorney withdraws from a case and has been paid a
16 fee, the first resort of the MSPD is to pay them a
17 reduced amount on future cases?
18     A.  Yes.
19     Q.  But if the panel attorney leaves the
20 panel before the MSPD is able to recoup through
21 reduced future payments, then the MSPD does not
22 receive money back from the panel attorney?
23     A.  Missouri State Public Defender system
24 does not return money -- does not get the money,
25 that's correct.

Page 31

1      Q.  The panel attorney may be asked to
2  return the actual money paid to them, but that is
3  returned to the general revenue fund for the state
4  of Missouri?
5      A.  Yes.
6      Q.  Is that right?  And that money is not
7  disbursed back to the MSPD?
8      A.  Correct.
9          (WHEREIN, Exhibit 6, Panel attorney
10 circuit court criminal disposition form, was marked
11 for identification.)
12     Q.  (By Mr. Shahabian)  So I'm showing you
13 what's been marked Plaintiffs' Exhibit 6.  Do you
14 recognize this document?
15     A.  Yes.
16     Q.  What is it?
17     A.  It's our panel attorney circuit court
18 criminal disposition form.
19     Q.  Is this the form you were referring
20 earlier to when you mentioned that the MSPD attempts
21 to keep track of which cases are opened or closed?
22     A.  Yes.
23     Q.  Is this an accurate copy of this form?
24     A.  I believe so.  We revise it
25 occasionally.  And this one at the bottom shows this

Page 32

1  one was last revised on April 21st, 2016 as sitting
2  right here.  I mean, I assume that's our most recent
3  one.
4      Q.  So this form is sent to panel attorneys
5  to fill out upon when a case is disposed of?
6      A.  They access it on our panel attorney
7  website.
8      Q.  Are there any other forms that MS --
9  I'm sorry, that panel attorneys are required to
10 submit to the MSPD to inform the MSPD of the
11 progress of ongoing cases?
12     A.  There is a different form for -- I
13 believe for appeals and PCRs, post-conviction relief
14 cases.
15     Q.  For trial-level cases are there any
16 other forms that panel attorneys must submit?
17     A.  No, not for disposition of the case.
18         (WHEREIN, Exhibit 7, Panel attorney
19 memorandum of understanding, was marked for
20 identification.)
21     Q.  (By Mr. Shahabian)  So I'm showing you
22 now what's been marked Plaintiffs' Exhibit 7.  Do
23 you recognize this document?
24     A.  Yes.
25     Q.  What is it?

8 (Pages 29 to 32)

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com      Phone: 1.800.280.3376      Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-23   Filed 02/09/18   Page 9 of 58

Page 33

1     A.  It's our panel attorney memorandum of
2 agreement.
3          Q.  Is that the same as the panel attorney
4 contract?
5     A.  Yes.  Yes, that combined with a
6 notification of case assignment I would consider the
7 contract.
8          Q.  Is this an accurate copy of that
9 memorandum of agreement?
10     A.  Yes.
11          Q.  If you look at the last page of the
12 document, do you see what appears to be a fee
13 schedule?
14     A.  I do.
15          Q.  Is that an accurate statement of the
16 current fee schedule for panel attorneys?
17     A.  The fees are correct because of the
18 revision of the criminal code we now refer to what's
19 identified as C, D felony, drug, etc., where it says
20 C, D, we now refer to it as CDE.
21          Q.  But otherwise the fees are accurate?
22     A.  Yes.
23          Q.  Do panel attorneys need to renew this
24 memorandum of agreement once they've signed it?
25     A.  No.

Page 34

1          Q.  You mentioned that in addition to the
2 fee schedule panel attorneys can request
3 extraordinary compensation in special cases.  What
4 would constitute an extraordinary case to deviate
5 from this fee schedule?
6     A.  Well, I can remember one for example
7 recently.  I -- I approved where we had to assign an
8 attorney from a long distance, and the person was in
9 the department of corrections and he was traveling
10 those long distances both to visit the client and to
11 attend multiple hearings, something that was, you
12 know, it was very unusual because of the distance
13 from where the client was located.
14          There's also been times when -- when
15 we've asked panel attorneys to take cases for
16 counties they're not assigned to because we had
17 nobody else to assign them to, and -- and I have
18 paid additional fee for that.
19          Q.  The contract also references
20 extraordinary expenses as opposed to payment to
21 counsel.  What would constitute an extraordinary
22 litigation expense?
23     A.  Can you refer to me -- tell me where
24 you're referring to that?
25          Q.  Sure.  If you look at the third page

Page 35

1 under attorneys and staff, section five, the second
2 sentence says (quote as read):
3          Where extraordinary expenses are
4          necessary to provide effective
5          assistance of counsel, the panel
6          attorney may submit a request for
7          extraordinary expenditure approval to
8          MSPD.
9          Do you see that there?
10     A.  I do.
11          Q.  What would that mean?  What would
12 constitute an extraordinary expense?
13     A.  I think that's referring to litigation
14 expenses.
15          Q.  What in your opinion would be an
16 example of an extraordinary litigation expense?
17     A.  Well, I think it's -- I mean it's
18 what -- it's referring to litigation expenses.  I
19 wouldn't say extraordinary litigation expenses.
20 It's simply referring to litigation expenses, and
21 that could include depositions or hiring of various
22 types of experts.
23          Q.  So just to make sure I understand what
24 you're saying, generally litigation expenses are to
25 be paid for by the panel attorney.  However, in

Page 36

1 extraordinary cases they can submit for
2 reimbursement.  Is that correct?
3     A.  No.  No, they're not expected to pay
4 the litigation expenses.  We will pay for any
5 necessary litigation expenses.  They don't have to
6 be extraordinary litigation expenses.
7          Q.  Okay.  Are cases ever reassigned from
8 one panel attorney to another?
9     A.  Without going through us?
10          Q.  Correct.
11     A.  No.  I mean, they will have someone
12 appear for them, but to my knowledge they -- they
13 don't hand off cases.  They're not -- that would be
14 contrary to our policies and practices.
15          Q.  So let's shift topics away from
16 conflict counsel for a bit and talk about MSPD
17 public defenders and how they perform their cases.
18 Does the MSPD have written policies and procedures
19 relating to requests for expert witnesses?
20     A.  There is not a lot in terms of written.
21 There is a -- a memo I think probably from around
22 2008 or so stating what sort of information to be
23 included in requests for -- for different types of
24 litigation expenses.
25          Q.  How would an MSPD attorney request a --

9 (Pages 33 to 36)

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com     Phone: 1.800.280.3376     Fax: 314.644.1334
Case 2:17-cv-04057-NKL     Document 153-23     Filed 02/09/18     Page 10 of 58

Page 37

1    the use of an expert witness?
2        A.   They complete an encumbrance request.
3    That's an electronic form.  It first goes to their
4    district defender for first-level approval.  I mean,
5    that's how it's submitted.
6        Q.   What limits, if any, are placed on MSPD
7    attorneys who are requesting expert witnesses?
8        A.   There's no -- what kind of limits,
9    dollar limits?
10       Q.   Are there monetary limits?
11       A.   No.
12       Q.   Does the availability of funds affect
13   the ability of the MSPD to pay for expert witnesses?
14       A.   Yes, I think that's fair to say.
15       Q.   Who makes the ultimate decision on
16   whether an expert witness will be hired?
17       A.   For noncapital cases where the request
18   is for less than $500, the district defender makes
19   that decision, ultimate decision.  For any capital
20   case -- I say capital case.  I really mean for any
21   homicide case.
22            For any homicide case or for any
23   expense request that's for $500 or more, that
24   ultimately requires division director approval.  Or
25   in the instance of the divisions that

Page 38

1    Mr. Mermelstein supervises, the deputy director, his
2    ultimate approval since there aren't division
3    directors in his divisions.
4        Q.   How often are requests for expert
5    witnesses rejected?
6        A.   I can't say at the district defender
7    level.  It's pretty infrequent at the division
8    director level.  I don't know at the district
9    defender level because they have to either give the
10   ultimate approval on some or the first-level
11   approval on others.  Those denials don't come to us.
12       Q.   Is that process any different for other
13   expert witnesses or -- I'm sorry, strike that.
14            How would an MSPD attorney request the
15   use of an investigator for their case?
16       A.   Well, we have in-house investigators in
17   every office, so how a particular investigator is
18   assigned to a case would be up to the practice of
19   the local district defender.  In theory they could
20   request funds for outside investigators the process
21   I just described for litigation expenses.
22       Q.   To your knowledge, do MSPD attorneys
23   request funds for an outside investigator?
24       A.   Not to my knowledge.
25       Q.   For the in-house investigators, who

Page 39

1    decides whether they are available to work on a
2    specific case?
3        A.   That would be the district defender.
4        Q.   Do resource constraints affect the
5    availability of investigators to assist on cases?
6            MR. QUINLAN:  Object to the vague form
7    of the question.
8        A.   Certainly it can.  It probably affects
9    more on when they'll be gotten to than whether or
10   not they're available, but I'm sure that it impacts
11   and you end up having attorneys do some of their own
12   investigation or in theory some investigation may
13   not get done, but yes, yes, it would impact it.
14       Q.   (By Mr. Shahabian)  To your knowledge,
15   have district defenders requested more resources to
16   either hire additional investigators or for
17   investigators to be assigned to their offices?
18       A.   Yes.
19       Q.   How would an MSPD attorney request the
20   use of a social worker?
21       A.   Through litigation expense request.  We
22   do have mitigation specialists for our capital
23   cases, but other than that, through hiring of
24   outside social worker.
25       Q.   So for noncapital cases, if an MSPD

Page 40

1    attorney requests the use of a social worker, it's
2    an outside litigation expenditure?
3        A.   Yes.  They may occasionally if one of
4    our mitigation specialists had time in the capital
5    division, there might -- we might ask them to work
6    on it, on noncapital requests, but that's rare.
7            MR. QUINLAN:  Did you say mitigation
8    specialist?
9        A.   Yes.
10       Q.   (By Mr. Shahabian)  How would an MSPD
11   attorney request the use of an interpreter?
12       A.   Through the encumbrance request process
13   I've described.
14       Q.   Does the MSPD have interpreters on
15   staff?
16       A.   No.
17            (WHEREIN, Exhibit 8, Protocols, was
18   marked for identification.)
19       Q.   (By Mr. Shahabian)  I'm handing you
20   what's been marked Plaintiffs' Exhibit 8.  Do you
21   recognize this document?  To be clear, it's
22   double-sided.
23       A.   No, specifically I don't.
24       Q.   Can you tell from reviewing the
25   document what it appears to be?

10 (Pages 37 to 40)

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com       Phone: 1.800.280.3376       Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-23    Filed 02/09/18    Page 11 of 58

Page 41

1    A.  Well, it states its protocols for
2  various things, such as indictments, investigative
3  requests --
4        (Court reporter interruption.)
5    A.  Indictments, investigation requests,
6  expense requests.
7    Q.  (By Mr. Shahabian)  Does this appear to
8  you to be a document produced by someone in the
9  MSPD?
10   A.  Yes.
11   Q.  You see the second page of the document
12 is investigation requests?
13   A.  Yes.
14   Q.  If you want to take a minute and -- and
15 review that page before I ask you any questions
16 about it.  So the top of this page under the heading
17 it says (quote as read):
18        Effective immediately, please follow
19        the below referenced new procedure
20        whenever making investigation requests
21        in your cases.
22        Do you see that?
23   A.  Yes.
24   Q.  And then the document outlines a set of
25 steps to follow that involves documentation of

Page 42

1  investigation requests.  Do you see that?
2    A.  Yes.
3    Q.  Does this appear to be an accurate
4  statement of MSPD procedures for requesting an
5  investigator?
6    A.  From paragraph four under section two,
7  this states address the e-mail to LaDonna and cc
8  myself.  I can only assume this is a document
9  prepared by a particular office, though I'm not sure
10 who LaDonna is, but -- I think that's why I wasn't
11 familiar with it, but -- and also just scanning
12 it -- well, that's the one name I see.
13   Q.  If you look at the first page, the
14 names are Betty or Heather.  Does that refresh your
15 recollection on -- on what office may have prepared
16 this?
17   A.  No.
18   Q.  Setting aside the names referenced in
19 the document, does the general procedure of how to
20 request an investigator appear to be accurate
21 reflection of MSPD practices for requesting an
22 investigator?
23   A.  No.  I would say it would -- varies
24 widely from office to office.  This may be the
25 procedure.  It may not be for a particular office.

Page 43

1    Q.  Particular offices can set varying
2  procedures on how to request investigators?
3    A.  Yeah, and it may not be -- yes.
4    Q.  If you look at page three of the
5  document, the heading is expense request.  Do you
6  see that?
7    A.  Yes.
8    Q.  And then the document sets out how
9  electronic encumbrances works.  Do you see that?
10   A.  On page three, yes.
11   Q.  On page three.
12   A.  Uh-huh.
13   Q.  Does that appear to you to be
14 referencing the encumbrance expenditure process you
15 referenced earlier for requesting things like expert
16 witnesses or social workers?
17   A.  If I could have one minute to read it.
18 Yes.
19   Q.  Does this appear to be an accurate
20 statement of MSPD's policies or practices for making
21 an encumbrance request?
22   A.  Yes.  I mean, there is the additional
23 memo I referenced earlier that states certain
24 information that should be included, but --
25   Q.  So certain districts may require

Page 44

1  additional information above and beyond what the
2  MSPD generally requires; is that fair to say?
3    A.  That might happen.
4    Q.  But generally this appears to be a
5  correct statement of the -- the policies or
6  practices to request an encumbrance?
7    A.  Yes.
8    Q.  Taking a step back to general
9  oversight, how does the MSPD central office oversee
10 districts?
11   A.  I guess I need more clarification of
12 your question.
13   Q.  Do district defenders have to check in
14 with the central office before issuing district
15 specific policies?
16   A.  Local policies I believe still, you
17 know, are supposed to be approved by division
18 directors, but not everything would we consider a
19 local policy.  There's quite a bit of autonomy given
20 to our district defenders.
21   Q.  Does the central office impose
22 reporting requirements on individual districts to
23 report statistics or case information back to the
24 central office?
25   A.  No.  Most of it's there in our

11 (Pages 41 to 44)

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com     Phone: 1.800.280.3376     Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-23   Filed 02/09/18   Page 12 of 58

1  databases that they use, so we can generate reports
2  from that.  They aren't expected to send in reports.
3      Q.   The database that districts use to
4  compile case information is accessible by the
5  central office as well?
6      A.   Yes.
7      Q.   What are some of the metrics that the
8  central office may look at to oversee district
9  offices?
10     A.   I can't give you an exclusive list, but
11 depends upon what we're looking at, but if we're
12 looking at caseload, we'll look at number of cases,
13 we'll look at type of cases, we'll look at number of
14 clients, we'll look at miles covered, we'll look at
15 how many counties they're covering, we'll look at
16 number of staff they have and what types of staff.
17 We look at expenditures.
18     Q.   You mentioned miles covered.  What do
19 you mean by miles covered?
20     A.   Work-related travel.
21     Q.   What kinds of work-related travel are
22 MSPD attorneys expected to perform?
23     A.   Going to court, investigating cases,
24 meeting with clients, attending training.
25     Q.   Are there auditing practices that the

1  central office uses to oversee districts?
2      A.   Our comptroller is considered our
3  internal auditor, Kathleen Lear.
4      Q.   Does the MSPD impose timekeeping
5  requirements on MSPD attorneys?
6      A.   There is a time sheet that has to be
7  completed every pay period indicating the number of
8  total hours worked each day, and then if there are
9  insufficient number of hours worked, then
10 appropriate use of either annual or sick leave.
11     Q.   Is there any more detailed timekeeping
12 that MSPD attorneys are required to perform, such as
13 specific tasks performed that day?
14     A.   Not currently.
15     Q.   At any time were MSPD -- to your
16 knowledge MSPD attorneys required to keep such time
17 statistics?
18     A.   Yes, we had time logging, which is the
19 sort of detailed timekeeping that you're referring
20 to.
21     Q.   When did the MSPD do that time logging?
22     A.   You know, I think it ended
23 approximately a year and a half ago.  I would have
24 to look to tell you for sure, but -- and it -- I
25 think we had done it up to that point for around

1  three and a half years or so.
2      Q.   Why did the MSPD do time logging for
3  that three and a half years?
4      A.   Well, both in terms of providing us
5  necessary data for the RubinBrown report and then
6  after that for legislative request.  But also for
7  resource allocation within offices by district
8  defenders, resource allocation statewide by -- by
9  the director and the performance monitoring by -- by
10 supervisors to see what sort of work and how much
11 work in certain areas was being done.
12     Q.   Why did the MSPD stop doing time
13 logging?
14     A.   That was director Barrett's decision.
15 I think he could best answer that question, but --
16 but I think it's fair to say that the primary reason
17 was -- was the amount of time that it was -- was
18 taking.  It couldn't be justified given our
19 workload.
20         (WHEREIN, Exhibit 9, All staff survey
21 response summary, was marked for identification.)
22     Q.   (By Mr. Shahabian)  I'm handing you
23 what's been marked Plaintiffs' Exhibit 9, and I
24 apologize for the ridiculously small font size on
25 this document.  Do you recognize this document?

1      A.   Yeah, I believe I know what it is.
2      Q.   What is it?
3      A.   It's entitled All Staff Survey Response
4  Summary.  I believe it was a time sufficiency survey
5  that was conducted as part of the RubinBrown report,
6  the Missouri project to come up with the appropriate
7  rates.
8      Q.   Do you know approximately when this
9  document was produced?
10     A.   No, I don't remember.  I wouldn't want
11 to guess.
12     Q.   Do you know how it was -- how this
13 survey was conducted?
14     A.   I was not part of senior management at
15 that time, but I don't remember.  As I remember, it
16 was sent to everyone to -- fill out.  I don't
17 remember if it was from MSPD or if it was from
18 RubinBrown that sent it.
19     Q.   Do you know if the MSPD has any more
20 recent surveys similar to this one?
21     A.   Not to my knowledge.
22 (Exhibit 4, Previously marked exhibit.)
23     Q.   (By Mr. Shahabian)  I'm showing you now
24 what's been marked Plaintiffs' Exhibit 4.  Do you
25 recognize this document?

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com      Phone: 1.800.280.3376      Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-23   Filed 02/09/18   Page 13 of 58

1      A.   It's our workload capacity report.
2  Specifically what we call the Missouri State Public
3  Defender cumulative caseload metrics.
4      Q.   What does this report show?
5      A.   This report is a three-month report for
6  January through March of 2017.  It shows the percent
7  of capacity for -- for each office's caseload.  By
8  percent of capacity, I mean as compared to the
9  RubinBrown standard.
10      Q.   So capacity refers to the RubinBrown
11  standards for -- for workload?
12      A.   Yes.
13      Q.   Do you know who prepared this document?
14      A.   Anthony Johnson of our IT department.
15      Q.   Do you know how this document was
16  created?
17      A.   Not the specifics of it, no.  That
18  would be an IT function, but it's -- you know, the
19  case numbers are -- are pulled out of our case
20  management databases.  The -- the travel time
21  currently is pulled from our -- our expense reports.
22  In-court time is pulled from averages from when we
23  were keeping time log data.
24      Q.   So I just want to make sure I
25  understand this document.  So I apologize for the

1  excruciating detail upon which we are about to
2  embark.  What does the report mean when it refers to
3  cumulative caseload metrics?
4      A.   I didn't -- it existed before me as far
5  as what title was given.  I don't know why the word
6  cumulative is necessarily included.
7      Q.   So let me ask it a different way.  To
8  your knowledge, do the case numbers on this document
9  reflect only cases that were opened between March --
10  between January 1st, 2017 and March 31st, 2017 or
11  are these all cases on the docket of the MSPD
12  between those dates?
13      A.   They are cases in which we commenced
14  representation during that period of time.
15      Q.   So these are -- this spreadsheet
16  reflects only cases where representation was
17  commenced between January 1st, 2017 and March 31st,
18  2017?
19      A.   Correct.
20      Q.   Is that what the fourth column cases
21  initiated refers to?
22      A.   Yes.
23      Q.   What does minus cases withdrawn mean?
24      A.   For purposes of our percent of
25  capacity, we do not count cases in which we withdrew

1  within I believe 30 days.  That's correct.
2      Q.   And those -- and that column is
3  subtracted from the cases initiated column to create
4  the net new cases column; is that right?
5      A.   Yes.  And actually looking closer at
6  the top at the time of the preparation in this
7  report, withdrawn conflict cases closed in the same
8  month they were open.  We now do it based upon
9  30 days, but at the time it was if they were -- if
10  we withdrew within the same month.
11      Q.   What is the next column net case units
12  opened (RB) mean?
13      A.   That -- that is the net new cases
14  multiplied by the RubinBrown weight given the
15  different case types.  So in other words, that 441
16  has a lot of different case types in it.  And each
17  of those case types has a specific RubinBrown number
18  of hours, and -- and so you know, in the background
19  IT is through a formula multiplying each of those
20  number of case type codes by the RubinBrown numbers
21  that -- that are associated with that case type code
22  and arriving at that net case units.
23      Q.   Next column is -- excuse me, the next
24  column is attorney court time (estimated).  What
25  does that mean?

1      A.   That is an estimation of the time that
2  -- that attorneys spend in court where if you read
3  the RubinBrown report, specifically footnote 14 is
4  an uncontrollable task, and RubinBrown said that
5  their standards do not include any time spent in
6  court.  So to accurately determine a percent
7  capacity, you have to add that time in.
8      Q.   The next column is attorney travel time
9  (estimated).  What does that mean?
10      A.   That's an estimation of the travel time
11  the attorneys spent, and again, according to the
12  RubinBrown report, that time is not considered in
13  arriving at their -- at their weight.  So that --
14  that time has to be added in.
15      Q.   Next column is workload (units plus
16  court time plus travel).  What does that column
17  mean?
18      A.   Well, that's net case units plus
19  attorney court time plus attorney travel time.
20      Q.   The next column is capacity.  What does
21  that mean?
22      A.   That is the number of attorneys
23  times -- trying to make sure I get this, understand
24  this correctly.  I'm looking at the numbers.  Give
25  me one minute.  Yeah, that would be the number of

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com     Phone: 1.800.280.3376     Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-23   Filed 02/09/18   Page 14 of 58

1  attorneys times two hundred -- 2,080 hours per year,
2  but this is a three-month report so that would have
3  to be divided by four.
4      **Q.  So capacity in that column refers to**
5  **the capacity for the three months of this report?**
6      A.  Yes.
7      **Q.  What does percent of capacity refer to?**
8      A.  That would be essentially the capacity
9  divided by, you know, the number of hours for those
10 three months, which would be 2,080 divided by four,
11 which is approximately 520.
12     So I think that's, you know,
13 probably -- well, I would have to sit down and do
14 the math, but it's -- it's how much they -- you
15 know, how many -- out of the workload -- I'm sorry.
16 Give me a minute.  It's the workload divided by the
17 capacity is -- is what it is.
18     **Q.  And so that is the capacity utilization**
19 **for new cases in the three months January 1st to**
20 **March 31st, 2017?**
21     A.  Yes.
22     **Q.  Stepping back to the travel time column**
23 **for a minute, does travel time include the time**
24 **spent visiting clients?**
25     A.  If they had to -- if it was travel time

1  that appeared on their expense reports, yes,
2  associated with that client visit.
3      **Q.  What about to cover conflict cases**
4  **prior to July 1st of this year?**
5      A.  Yes.
6      **Q.  Are there other kinds of travel that**
7  **this may refer to?**
8      A.  Yes, anything that would appear on the
9  expense reports, which is work-related travel.  So
10 it could be travel time to investigate cases.  It
11 could be travel time for training.
12     **Q.  And you see the report breaks down each**
13 **area name and provides statistics for each area**
14 **name?**
15     A.  I do.
16     **Q.  And then below that there's a row that**
17 **says trial division total?**
18     A.  Correct.
19     **Q.  Do you see that?**
20     A.  Yes.
21     **Q.  Is it your understanding that the area**
22 **names that precede that refer to cases in the trial**
23 **division for those area names?**
24     A.  Yes.
25     **Q.  How often is this report updated?**

1      A.  Every three months.  At the end of each
2  quarter.
3      **Q.  Could you provide us with copies of**
4  **more recent reports than March 31st, 2017?**
5      A.  We have done the one for -- for
6  April 1st through June 30th would be the last one
7  that was done, so yes, we could provide that.
8      **Q.  Does the MSPD prepare reports that**
9  **compile not only new cases for the time period, but**
10 **also existing caseloads?**
11     A.  I mean, in our case management database
12 it shows open cases and -- and closed cases, which
13 is the same terminology I use when describing -- or
14 conflict database, whether or not a case has been
15 disposed of or not.
16     **Q.  Is a report like this prepared using**
17 **that data?**
18     A.  No.
19     (WHEREIN, Exhibit 10, List of public
20 defenders spreadsheet, was marked for
21 identification.)
22     **Q.  (By Mr. Shahabian)  I'm showing you now**
23 **what's been marked Plaintiffs' Exhibit 10.  This one**
24 **is a little more readable, but a lot longer.  Do you**
25 **recognize this document?  And if it would perhaps**

1  **reflesh -- excuse me, refresh your recollection, I**
2  **would encourage you to flip towards the back where**
3  **there's a sheet that starts with the column with the**
4  **row last name, first name, etc., and the first name**
5  **listed is Daniel Radke.  I believe that may be --**
6      A.  Which page are you referring to?
7      **Q.  So the document unfortunately as**
8  **produced is not page numbered.  It is the --**
9      MR. QUINLAN:  It's not in alphabetical
10 order?
11     MR. SHAHABIAN:  It is -- so it was
12 produced -- this is a compilation of spreadsheets
13 that are sorted by fiscal year from fiscal years '09
14 through '17.  The --
15     MR. QUINLAN:  Looks like the names on
16 this are by bar number.
17     MR. SHAHABIAN:  Correct.  But for each
18 fiscal year the sheet starts over.
19     MR. QUINLAN:  I see.
20     MR. SHAHABIAN:  And the way we printed
21 from Excel, there's no way to reflect those sheet
22 names, so ...
23     MR. QUINLAN:  Okay.
24     A.  So which page are you referencing?
25     **Q.  (By Mr. Shahabian)  So it is -- if you**

14 (Pages 53 to 56)

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com      Phone: 1.800.280.3376      Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-23   Filed 02/09/18   Page 15 of 58

1    flip back one, two, three, four, the fifth page from
2    the end of the document.
3        A.   I do see that, yes.
4        Q.   And the first row is last name, first
5    name, bar number, caseload, workload, and the first
6    entry is Radke, Daniel.  Do you see that?
7        A.   Yes.
8        Q.   Does that perhaps refresh your
9    recollection as to what this document may be?
10       A.   To the best of my recollection, this
11   was a report prepared as a result of a discovery
12   request in this litigation, I think.
13       Q.   If you flip through starting from the
14   page with Daniel Radke to the end of this document
15   and scan the list of names, do these names mean
16   anything to you?
17       A.   Well, I recognize a lot of the names.
18   I think for whatever period of time this is for it
19   is attorneys who handled cases for us during that
20   period.
21       Q.   And by handle cases, are you referring
22   to employees of the MSPD or --
23       A.   Yes.
24       MR. SHAHABIAN:  Just to help in terms
25   of identification purposes, I'm also going to show

1    you what's been premarked Plaintiffs' Exhibit 11.
2        (WHEREIN, Exhibit 11, List of public
3    defenders spreadsheet, was marked for
4    identification.)
5        Q.   (By Mr. Shahabian)  A similar, but much
6    shorter document.  If you go to the last page, which
7    is double-sided, and the first side of that page,
8    that may refresh your recollection.  Similar to the
9    other document, this was produced as a series of
10   spreadsheets dated fiscal years '09 to '17.  '17 is
11   at the end here.  Do you recognize this list of
12   names?
13       A.   Yes.  Again, I think it's attorneys who
14   handled cases for us during whichever period of
15   time.  This is in-house attorneys, and I recognize
16   these names as attorneys within our appellate PCR
17   division, which makes me think that probably the
18   prior exhibit, Exhibit 10, were probably attorneys
19   within our trial division, but Exhibit 11 I think is
20   attorneys within our appellate PCR division.
21       Q.   So to be clear, your understanding is
22   the names on the last two pages of Exhibit 11 refer
23   to appellate and PCR attorneys of the MSPD?
24       A.   Yes.
25       Q.   And turning back to Plaintiffs'

1    Exhibit 10, those last five pages, that list of
2    names you believe refers to attorneys within the
3    trial division, employed within the trial division
4    of the MSPD?
5        A.   Yes.
6        Q.   So let's look at Plaintiffs'
7    Exhibit 10.  What does caseload, the column caseload
8    refer to?
9        A.   You know, if my memory serves me
10   correctly, that is in a case that they handled
11   during that -- by any case they handled, I mean that
12   was assigned to them at any particular time during
13   that year.
14       It may have a case that carried over
15   from a prior fiscal year but was still pending at
16   the beginning of that fiscal year, or it may mean a
17   case in which they actually commenced representation
18   during that fiscal year, but ...
19       Q.   But you're not sure sitting here today
20   whether it's just new cases commenced that year or
21   total docket for that year?
22       A.   I'm fairly confident it's both.
23       Q.   Okay.  What does workload refer to?
24       A.   I think that's probably a comparison of
25   the caseload to the -- to the workload capacity of

1    that attorney.
2        Q.   How would that workload --
3        A.   By use of the RubinBrown weights.
4        Q.   So workload incorporates the RubinBrown
5    metrics?
6        A.   I believe so.
7        Q.   Do you see going down about a quarter
8    of the way on that fifth page starting Daniel Radke
9    an entry for Nancy Pew?
10       A.   I do.
11       Q.   And for Nancy Pew the caseload 1.00.
12   Do you see that?
13       A.   That's what it indicates, yes.
14       Q.   And it says the workload is
15   1.20 percent.  Do you see that?
16       A.   Yes.
17       Q.   Do you have an understanding of why an
18   MSPD trial attorney might have a caseload of one or
19   a workload of 1.2 percent?
20       A.   I'd assume she either left right after
21   the beginning of the -- the reporting period or --
22   or was hired right before the end of the reporting
23   period.
24       Q.   So the attorneys on this list to your
25   understanding reflect attorneys employed by the MSPD

15 (Pages 57 to 60)

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com      Phone: 1.800.280.3376      Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-23    Filed 02/09/18    Page 16 of 58

Page 61

1    at any point during the fiscal year for which this
2    is reporting?
3         A.   Yes.
4              (WHEREIN, Exhibit 12, 11-16-15 Blau
5    e-mail, was marked for identification.)
6         Q.   (By Mr. Shahabian)  I'm handing you
7    what's been marked Plaintiffs' Exhibit 12.  Do you
8    recognize this document?
9         A.   In general, yes.  I don't remember
10   seeing this specific e-mail, but yes.
11        Q.   What does it appear to you to be?
12        A.   A guide for certain information for
13   district defenders to -- to look at in appraising
14   attorneys in line for promotion, the assistant
15   public defender three or assistant public defender
16   four.
17        Q.   What is a assistant public defender
18   three?
19        A.   Well, our assistant public defender
20   classification level, it's a -- it's a merit-based
21   promotion system with minimum tenure requirement.
22   So an APD III for instance means someone who has met
23   the minimum tenure requirement of two years as an
24   assistant public defender two and who meets the --
25   mirror requirements for the promotion.

Page 62

1         Q.   What is an assistant public defender
2    four?
3         A.   That would be someone who has met the
4    minimum tenure requirements, which for an assistant
5    public defender four is two years as an assistant
6    public defender three and meets the -- the
7    performance requirements.
8         Q.   What is an assistant public defender
9    two?
10        A.   That is someone who has met the minimum
11   tenure requirement as one year as an assistant
12   public defender one and meets the performance
13   requirements for the position.
14        Q.   And apologies for going out of order,
15   but what is an assistant public defender one?
16        A.   A brand-new attorney.
17        Q.   Are there --
18        A.   Brand-new public defender.
19   They may not be a brand-new attorney.
20        Q.   Are there assistant public defender
21   classifications above four?
22        A.   Not for assistant public defenders, no.
23        Q.   What would be the next promotion after
24   assistant public defender four?
25        A.   There would be no further promotions

Page 63

1    after that.
2         Q.   How would an assistant public defender
3    become a managerial-level public defender such as a
4    district defender?
5         A.   To apply for a vacancy when it occurs
6    and be selected.
7         Q.   If there is no vacancy or they are not
8    selected, assistant public defenders do not progress
9    past assistant public defender four?
10        A.   Correct.  We pay differentials for
11   capital work, but that's not a promotion, just a
12   different pay scale.
13        Q.   This document Plaintiffs' Exhibit 11 is
14   from --
15        A.   You mean 12?
16        Q.   I'm sorry, 12.  Thank you.  Appears to
17   be from Ellen Blau.  Do you see that?
18        A.   I do.
19        Q.   And could you refresh my recollection
20   as to who Ellen Blau is?
21        A.   She's our trial division director.
22        Q.   So these standards for promotion to
23   assistant public defender three and public --
24   assistant public defender four apply throughout the
25   MSPD system?

Page 64

1         A.   I would not refer to these as the
2    standards.  These are the metrics that they -- that
3    Ellen would like to see in the appraisal, things to
4    be looked at.
5         Q.   What do you mean by metrics?
6         A.   Well, client contact, you know, the
7    substance, how is the client contact, how frequently
8    it's occurring.  Trials, what trials have they had,
9    what types of dispositions are they getting, what's
10   the quality and extent of their motion practice,
11   etc.
12        Q.   Do these metrics apply throughout the
13   MSPD system for purposes of promotions from -- to
14   assistant public defender three and assistant public
15   defender four?
16        A.   This is a trial division document.
17        Q.   Do these metrics apply throughout the
18   MSPD trial division system for purposes of promotion
19   to assistant public defender three and four?
20        A.   This was sent in 2015.  Whether or not
21   Ellen has -- has altered it somewhat as far as her
22   guidance of what to put in an appraisal, you would
23   -- I -- I wouldn't want to say for sure, but it
24   generally does.
25        Q.   For a promotion from assistant public

16 (Pages 61 to 64)

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com     Phone: 1.800.280.3376     Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-23    Filed 02/09/18    Page 17 of 58

1  defender one to assistant public defender two, is
2  that promotion based solely on the attorney's tenure
3  with the MSPD?
4      A.  No, there's also performance standard,
5  but it's obviously a lot lower than for a three or
6  four.
7      Q.  What sort of performance standard is?
8      A.  Successful performance in C and D
9  felonies.
10      Q.  What would a successful performance in
11  a C and D felony look like?
12      A.  An attorney that can -- you know,
13  essentially I'm just sort of summarizing, but an
14  attorney who successfully -- you know, providing the
15  necessary representation that should be provided in
16  cases up to and including C and D felonies.
17      Q.  Is it often for an assistant public
18  defender one who meets the tenure requirements for
19  assistant public defender two not to be promoted to
20  assistant public defender two?
21      A.  That would be rare.
22      Q.  Is it fair to say that promotions to
23  assistant public defender three and assistant public
24  defender four are more merit-based than those to
25  assistant public defender two?

1      A.  I think that's fair to say.
2          (WHEREIN, Exhibit 13, District 12 Trial
3  Observation Form, was marked for identification.)
4      Q.  (By Mr. Shahabian)  I'm handing you
5  what's been marked Plaintiffs' Exhibit 13.  Do you
6  recognize that document?
7      A.  Yes.
8      Q.  What is it?
9      A.  It is a trial observation form.  This
10  specific one is one that obviously came from our
11  Fulton trial office, District 12.
12      Q.  Is it a -- is the trial observation
13  form used only in District 12 or is it used
14  throughout the MSPD system?
15      A.  It's not necessarily used everywhere,
16  but it's used more than at District 12.  It depends
17  upon if a district defender finds it useful and
18  decides to use it.
19      Q.  Do you know who prepared this document?
20      A.  I did.
21      Q.  Why is this document used more at
22  District 12?
23      A.  I don't know that it is used more in
24  District 12.  I prepared it when I was a district
25  defender in the Kansas City trial office, and I

1  think it's been shared by the division directors for
2  district defenders to use if they wanted to.
3      Q.  Is there any systemic review of the use
4  of this form to your knowledge?
5      A.  I'm not sure what you mean by systemic
6  review.
7      Q.  Is there -- let me rephrase.
8          Is there a practice to how this form is
9  used in District 12 or more generally?
10      A.  No.
11      Q.  What could it be used for?
12      A.  Well, it could be used at any time
13  someone has a trial in District 12, that most likely
14  their supervisor or more senior attorney would fill
15  out when they either second-chaired the trial or
16  observed the trial.
17          (WHEREIN, Exhibit 14, District 12 Case
18  Review, was marked for identification.)
19      Q.  (By Mr. Shahabian)  I'm handing you now
20  what's been marked Plaintiffs' Exhibit 14.  Do you
21  recognize that document?
22      A.  Yes.
23      Q.  What is it?
24      A.  It's district defender -- District 12's
25  case review form.

1      Q.  What is the difference between
2  Exhibit 14, the case review form, and Exhibit 13,
3  the trial observation form?
4      A.  The trial observation form would be
5  limited to cases that were tried.  A case review
6  might be performed in any particular case during the
7  pendency of the case.
8      Q.  What is a case review?
9      A.  That's when a district defender or
10  senior attorney sits down with an attorney and it
11  reviews the case with them, including what
12  preparation has been done and needs to be done.
13      Q.  Who prepared this document?
14      A.  The form itself?
15      Q.  Yes.
16      A.  I did.
17      Q.  To your knowledge, is it used outside
18  of District 12?
19      A.  I used it in a Kansas City trial
20  office.  Truthfully this form wasn't used nearly as
21  much as the trial observation form.  I can't -- I
22  don't know which other offices are using it or how
23  frequently they're using it if they do use it.
24      Q.  Is there a standardized MSPD policy to
25  conduct a case review?

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-23    Filed 02/09/18    Page 18 of 58

1   A. No.
2    (WHEREIN, Exhibit 15, District 12
3 Guilty plea or sentencing observation form, was
4 marked for identification.)
5   **Q. (By Mr. Shahabian)  I'm handing you**
6 **what's been marked Plaintiffs' Exhibit 15.  Do you**
7 **recognize that document?**
8   A. Yes.
9   **Q. What is it?**
10   A. District 12's guilty plea or sentencing
11 observation form.
12   (Court reporter interruption.)
13   A. District 12's guilty plea or sentencing
14 observation form.
15   **Q. (By Mr. Shahabian)  Do you know who**
16 **prepared this document?**
17   A. I did.
18   **Q. What would this guilty plea or**
19 **sentencing observation form be used for?**
20   A. Again, it's something that would be
21 filled out most likely by a manager or a senior
22 attorney for a guilty plea or sentencing that --
23 that they witnessed.
24   **Q. To your knowledge, is this document**
25 **used outside of District 12?**

1   A. I don't know.
2   **Q. Is there any MSPD policy that districts**
3 **use to form similar to this form for purposes of**
4 **guilty plea or sentencing observations?**
5   A. No.
6   (WHEREIN, Exhibit 16, District 12
7 Motion hearing observation form, was marked for
8 identification.)
9   **Q. (By Mr. Shahabian)  I'm handing you**
10 **what's been marked Plaintiffs' Exhibit 16.  Last**
11 **one, I promise.  Do you recognize this document?**
12   A. I do.
13   **Q. What is it?**
14   A. District 12's motion hearing
15 observation form.
16   **Q. What would this motion hearing**
17 **observation form be used for?**
18   A. Completed again most likely by a
19 manager or a senior attorney who observed an
20 attorney handle a motion hearing.
21   **Q. Do you know who prepared this document?**
22   A. I did.
23   **Q. To your knowledge, is it used outside**
24 **of District 12?**
25   A. I don't know.

1   **Q. Does the MSPD have a policy or practice**
2 **for how districts should document observing a motion**
3 **hearing?**
4   A. No.
5   **Q. I want to go back to Exhibit 13 just**
6 **for a minute to clean up a question I missed.**
7 **That's the trial observation form.  To your**
8 **knowledge, is there a policy or practice of the MSPD**
9 **in how districts should document observing a trial?**
10   A. No.
11   MR. SHAHABIAN:  I think it's a good
12 time for a break.
13   THE WITNESS:  If you'd like.
14   VIDEOGRAPHER:  We're going off the
15 record at approximately 2:34 p.m.
16   (WHEREIN, a recess was taken.)
17   VIDEOGRAPHER:  We're back on the record
18 at approximately 2:45 p.m.
19   MR. SHAHABIAN:  Mr. Elmer, thanks for
20 coming back.
21   THE WITNESS:  You're welcome.
22   **Q. (By Mr. Shahabian)  I want to turn a**
23 **bit more to the topic of training and supervision of**
24 **MSPD attorneys.  Are there centralized policies**
25 **within the MSPD for how new attorneys are trained?**

1   A. Only in the sense that there is certain
2 training events that they're required to attend.
3   **Q. What -- what events are they required**
4 **to attend?**
5   A. They attend a new employee orientation.
6 Normally the first one that occurs after they begin
7 employment.  They have to attend new defender
8 workshop, which is usually sometime within their
9 first year of employment.  They attend a trial
10 skills workshop that usually occurs within their
11 first year of employment.
12   I think that was trial skills I had
13 said there.  And then finally we have an annual
14 training available to all attorneys which I
15 mentioned earlier we call spring training.  They're
16 required to attend that for their first three years
17 and it's optional after that.
18   **Q. How long is the new defender workshop?**
19   A. Several days.  Less than a week.  Or no
20 more than a week.
21   **Q. What topics does the new defender**
22 **workshop cover?**
23   A. I haven't attended one for a few years,
24 but specifically I think things like probation
25 violations, preliminary hearings, client contact,

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com  Phone: 1.800.280.3376  Fax: 314.644.1334
Case 2:17-cv-04057-NKL  Document 153-23  Filed 02/09/18  Page 19 of 58

Page 73

1  things like that.
2      Q.   How long is the new employee
3  orientation?  Apologies.  I missed that.
4      A.   One day.
5      Q.   What is covered in the new employee
6  orientation?
7      A.   Things like indigency determination,
8  policies, promotions, the path of the case through
9  the criminal justice system, and then various
10 operations, personnel make presentations.  Our
11 general counsel and I think our HR manager covers
12 things within their -- their areas, HR practices.
13     Q.   How long is the trial skills workshop?
14     A.   I think that's again several days.  No
15 more than a week.
16     Q.   This may be an obvious question, but
17 what topics are covered in the trial skills
18 workshop?
19     A.   Trial skills, from voir dire through --
20 through closing and everything in-between.
21     Q.   How long is spring training?
22     A.   I believe that's usually two or
23 three days.
24     Q.   What topics are covered in spring
25 training?

Page 74

1      A.   That varies from year to year.  It's
2  more advanced training and then very specific.
3  There might be something on, you know, immigration
4  one year, there might be something on motion
5  practice another year.  There will be several topics
6  covered.  Usually multiple tracks where folks can
7  choose which presentations to -- to attend.
8      Q.   Is there special training for juvenile
9  defense?
10     A.   We do try to do juvenile training.  It
11 usually occurs about once a year.
12     Q.   Is that for all MSPD attorneys or for
13 attorneys focused on juvenile cases?
14     A.   It's generally focused on attorneys
15 handling juvenile cases.  We request that offices
16 send at least one person.
17     Q.   Is at least one person from each office
18 required to attend a juvenile training?
19     A.   I wouldn't say required, no.
20     Q.   Is there training for handling
21 defendants with mental health issues?
22     A.   You know, occasionally we may have --
23 we may have held specialty training.  I couldn't say
24 for sure.  Certainly that might be a presentation in
25 spring training.

Page 75

1      Q.   You mentioned immigration concerns.
2  Are new attorneys required to receive training on
3  immigration concerns in providing defense?
4      A.   No.  Let me say I'm referring to
5  statewide training.  I can't tell you what the
6  requirements of particular district defenders would
7  be within their office.
8      Q.   Do district defenders add additional
9  requirements on top of the statewide training?
10     A.   They may.  Something within their
11 control such as undergoing training within their own
12 office.
13     Q.   Aside from these statewide training
14 workshops you've mentioned, are there other forms of
15 training that are offered on a statewide basis?
16     A.   Well, as I said, different
17 presentations given in spring training.  You know,
18 there's probably given, you know, single focused
19 training that are periodically put on, such as
20 appellate training or post-conviction training or on
21 some other subject that's more -- more periodic than
22 annual.
23     Q.   Who is charged with training new
24 attorneys?
25     A.   Well, statewide we have a training

Page 76

1  director, and the district defenders certainly also
2  have that responsibility.
3      Q.   District -- what is the role of a
4  district defender?
5      A.   They are the managing attorney for
6  their local district office.
7      Q.   What are their responsibilities as the
8  managing attorney for the local district office?
9      A.   Well, to train the attorneys, to assign
10 the workload, to monitor the performance of the
11 attorneys, to do -- make -- to do appraisals, to
12 make promotion requests, to work with general
13 counsel and our HR manager and division director
14 with any performance concerns.  Manage their budget.
15     Q.   Are district defenders expected to take
16 on case assignments?
17     A.   That is a decision the district
18 defender makes in consultation with the division
19 director, but generally, yes, our district defenders
20 handle caseload.
21          (Court reporter interruption.)
22     A.   Handles caseload, personal caseload.
23     Q.   (By Mr. Shahabian)  How are new MSPD
24 attorneys recruited?
25     A.   You know, for specifics I'd want to

19 (Pages 73 to 76)

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-23    Filed 02/09/18    Page 20 of 58

Page 77

1    defer to our HR manager, but in general we -- we do
2    on-campus recruiting at the law schools.  Generally
3    the law schools within Missouri.
4          I know they -- I think they do some
5    posting of vacancies in publications or on the
6    Missouri Bar website.  Certainly by -- by word of
7    mouth.  We also have a website.  I believe our
8    employment application is on it.
9          Q.  Does the MSPD face any problems in
10   recruiting new attorneys?
11         A.  We do.
12         Q.  What kinds of problems?
13         A.  Not enough.  Oftentimes don't have --
14   don't have any or any sufficiently qualified
15   attorneys to -- fill a vacancy with.  It's not
16   unusual.  Frequently is a vague term, but it's not
17   unusual, especially in rural areas.
18         Q.  Why is that?
19         A.  Why don't we get enough?  Pay.  Their
20   particular interest, whether or not they want to do
21   the work.  How many people want to live in that
22   area.  I mean, it could be for various reasons, but
23   certainly the pay has a lot to do with it.
24         Q.  Who decides when MSPD attorneys are
25   promoted?

Page 78

1          A.  Well, I described the promotion process
2    and the -- the minimum requirements.  Within the
3    confines of that, the district defender makes a
4    recommendation.  That ultimate decision lies with
5    the district defender for promotion to APD II.
6          For APD III the ultimate decision lies
7    with the division director, or in the case of Greg
8    Mermelstein's division, with him as a deputy
9    director.  With assistant public defender four after
10   the district defender recommends it and a district
11   defender approves, then -- then for the trial
12   division I have to approve it.  For the appellate
13   PCR division, capital division, CDU, that would be
14   Mr. Mermelstein.
15         Q.  How often is -- strike that.
16         You mentioned it is rare for an
17   assistant public defender one to not -- who meets
18   the tenure requirements to not be promoted to
19   assistant public defender two.  How frequently does
20   an assistant public defender two not get promoted to
21   assistant public defender three?
22         A.  Depends upon which time frame you're
23   meaning.  Ultimately, I mean, I -- I suppose we have
24   people who obviously have left the system who -- and
25   before they're promoted to APD III, even though they

Page 79

1    met the minimum time and tenure requirements, but I
2    don't -- I'm not sure how to answer your question.
3          But certainly there are assistant
4    public defender twos who are not promoted to three
5    at their minimum tenure eligibility date, but we
6    certainly strive to get them to that point by then.
7          Q.  Just going back to our -- our last
8    topic, you mentioned that part of the reason the
9    MSPD has trouble recruiting is pay, but I didn't ask
10   you to be specific.  What do you mean by pay?
11         A.  Our low salaries.
12         Q.  What is the starting salary for a new
13   public defender?
14         A.  I think it's approximately 39,000.
15         Q.  Is there adjustments for locality?
16         A.  No.
17         Q.  So for any public -- new public
18   defender placed in any office in the state of
19   Missouri, the starting salary is approximately
20   39,000?
21         A.  Yes.  I mean, they're in the process
22   for -- for requesting tenure credit, but -- but yes,
23   that's the starting salary.
24         Q.  And by tenure credit, you mean credit
25   for experience as an attorney prior to joining the

Page 80

1    public defender's office?
2          A.  Yes.
3          Q.  How often is that tenure credit
4    granted?
5          A.  I don't have a number.  It's not very
6    often.
7          Q.  Approximately how many years of
8    experience would an attorney have before the MSPD
9    would consider granting tenure credit?
10         A.  There's no particular number.  I mean,
11   we would certainly -- sort of compare it to our --
12   to our in-house promotion criteria.
13         Q.  So I'd like to turn now to a new topic,
14   the process by which MSPD attorneys are permitted or
15   required to refuse case appointments.  Are you
16   familiar with the Missouri Supreme Court's decision
17   in I believe it's Missouri Public Defender
18   Commission v. Waters?
19         A.  Yes.
20         Q.  What is your understanding generally?
21   Not asking for recitation of the specific holding,
22   but generally what that case meant?
23         A.  They upheld our caseload rule that we
24   had promulgated at the time under the -- our power
25   to adopt rules under the code of state regulations.

20 (Pages 77 to 80)

**MIDWEST LITIGATION SERVICES**
**www.midwestlitigation.com      Phone: 1.800.280.3376      Fax: 314.644.1334**
Case 2:17-cv-04057-NKL    Document 153-23    Filed 02/09/18    Page 21 of 58

1    They upheld that rule, which allowed us to certify
2    an office as overloaded and -- and not take on new
3    cases.
4        Q.   After that decision came down, how
5    often did MSPD offices certify that they were
6    overloaded and could not take on new cases?
7        A.   I don't have a certain number.  There
8    were -- there were several, but it was short-lived.
9        Q.   Why was it short-lived?
10       A.   Because of the statutory change and the
11   legislative push leading up to that statutory
12   change.
13       Q.   What was the statutory change?
14       A.   In essence that -- that we could not
15   use that rule that we had promulgated under the code
16   of state regulations as a basis for turning away
17   cases.
18       Q.   You also mentioned the legislative push
19   leading up to that change.  What did you mean by
20   legislative push?
21       A.   There was legislation that would --
22   required us to contract out certain of our cases.
23       Q.   What do you mean by require to contract
24   out certain cases?
25       A.   Well, specifically as I -- the best I

1    could remember them, the legislation would have
2    required us to contract out all C and D felonies and
3    below, but given us no more money to do it.  So we
4    would have to find the money to do it.
5        Q.   So the legislation would have sent C
6    and D felonies to panel attorneys or something
7    similar?
8        A.   It would have -- it would have required
9    as I remember for us to essentially go through a
10   process of letting -- letting contract attorneys
11   submit bids for -- for bulk contracts to handle
12   cases of certain parts of the state.
13       Q.   In your opinion, would that have been
14   an effective way to provide indigent defense in the
15   state of Missouri?
16       A.   It would not have been.
17       Q.   Why not?
18       A.   Well, first of all, it wouldn't have
19   solved our problem because no more money would have
20   been given us.  So we would have had to lay off
21   staff in order to pay for it, and whatever staff was
22   left would have had to handle all the A, B felonies
23   and homicides.  And it wouldn't have been enough.
24           We still -- our staff would have been
25   in the same position.  There would have been fewer,

1    but individually they would have been in the same
2    position.  So the clients that we handled through
3    in-house representation still would have been
4    working with overloaded attorneys.
5           As far as using contract attorneys for
6    the rest of the cases it was -- it was fraught with
7    problems.  I think it would have been more
8    expensive.  I think, you know, we wouldn't have been
9    able to provide training for those attorneys.
10          I think because they likely would have
11   been trying to, you know, get the winning bid, they
12   would have been very low.  You know, they would have
13   been low bids.  They couldn't justify them spending
14   much time on the -- on the cases.
15          Flat fees -- certainly flat fees such
16   as in this which would have been an agreement to
17   handle any -- a indefinite number of cases that
18   came, an unlimited number of cases that came in for
19   a certain price, but it's looked down upon by the
20   ABA as not -- not a good practice.
21          In many areas of the state I don't
22   think there would have been either any attorneys or
23   attorneys qualified to be handling those cases.  For
24   all sorts of reasons.
25       Q.   One of the reasons you mentioned is

1    that it would have been more expensive.  Could you
2    elaborate on that concern a little bit?
3        A.   I believe that within the trial
4    division our average cost per case annually is I
5    think $325.  The cases that we contract out
6    currently to private attorneys, the average is
7    approximately $700.  So it costs us more than twice
8    the dollar amount to handle a case to contract a
9    case privately as opposed to handling it in-house.
10       Q.   Is it your understanding that following
11   Waters MSPD officials in some districts agreed not
12   to assign attorneys to cases where prosecutors
13   promise that defendants would face no jail time?
14       A.   I think when -- if the case became a
15   fine-only case, then we would not handle the case,
16   and so I don't think it was just a matter of the
17   prosecutor agreeing not to -- not to seek jail time.
18   The judge would have to agree up-front the case
19   would be a fine-only case, that nothing more than a
20   fine would be imposed on the case ever.
21       Q.   And was that for certain districts or
22   statewide?
23       A.   If you -- you know, it was by district.
24       Q.   Do you know which districts entered
25   into such agreements?

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-23    Filed 02/09/18    Page 22 of 58

Page 85

1     A.   There were various for lack of a better
2  term Waters agreements entered into.  I don't know
3  how many or any -- if any of them included declaring
4  certain classes of cases as fine-only.  I don't
5  remember.
6     Q.   Regardless of the specifics of the
7  agreements, to use your term Waters agreements, do
8  you know which MSPD districts entered into Waters
9  type agreements?
10     A.   Not as I sit here today.
11     Q.   Do you know of any cases where the MSPD
12  agreed not to take a representation because of a
13  promise of no jail time only to learn later that
14  the -- that the defendant received jail time?
15     A.   I don't remember the specifics, but
16  that would not surprise me.
17     Q.   Why would it not surprise you?
18     A.   There was frequently confusion over
19  what fine-only meant.  For instance, you know,
20  suspended imposition of sentence or a suspended
21  execution of sentence does not meet the terminology
22  of fine-only even though the person is given
23  probation at that time, unless the judge says if he
24  gets revoked I will never impose anything more than
25  a fine.

Page 86

1        If he's leaving jail on the table at
2  that time, even up-front the person is entitled to
3  counsel because he ultimately may get jail, and
4  there was often confusion over that.
5     Q.   What is the source of your knowledge
6  for that confusion?
7     A.   Just general recollection at the time.
8     Q.   Recollection based on your work in the
9  MSPD?
10     A.   Yes.
11     Q.   Are you aware that the -- so the then
12  head of the MSPD was Cat Kelly; is that correct?
13     A.   Correct.
14     Q.   Are you aware that Cat Kelly was told
15  that if local offices continued to turn away cases,
16  the legislature would privatize the entire indigent
17  defense system?
18     A.   I -- yes.
19     Q.   What is the source of your knowledge
20  for that?
21     A.   Working with Cat at the time at the --
22  at the capitol and there were legislators sponsoring
23  the bill there.
24     Q.   What -- do you recall in any more
25  detail what specifically was said either to you or

Page 87

1  to Cat or other MSPD officials by legislators about
2  privatizing the system?
3     A.   Not specifics, no.
4     Q.   What about generally?
5     A.   Well, generally that, you know, they
6  were sponsoring bills and appeared they very well
7  might have the votes to do it.  Then that was in the
8  House, and then the Senate substitute bill was
9  offered that -- that took out that language and
10  added ultimately what became language in the new
11  statute.
12        But once the Senate did that then --
13  then the House member amended other bills to include
14  his language that had been taken out of the Senate
15  bill.  So it was -- it ended up being in various
16  pieces of legislation.
17     Q.   Do you remember which legislators those
18  were?
19     A.   It was Representative Stanley Cox who
20  -- who was sponsoring the language.
21        (WHEREIN, Exhibit 17, 1-16-13 Kelly
22  e-mail, was marked for identification.)
23     Q.   (By Mr. Shahabian)  I'm handing you
24  what's been marked Plaintiffs' Exhibit 17.  Do you
25  recognize this document?

Page 88

1     A.   Yes.
2     Q.   What does it appear to you to be?
3     A.   An an e-mail from director Cat Kelly to
4  the district defenders regarding timekeeping.
5     Q.   Approximately when was this e-mail
6  sent?
7     A.   January 16th, 2013.
8     Q.   Did you receive this e-mail?
9     A.   Yes, I would have received it.
10     Q.   If you could please turn to page two of
11  this document.  Do you see the heading in the e-mail
12  that says caseload relief, about halfway down the
13  page?
14     A.   I do.
15     Q.   Could you read the first paragraph
16  following that heading out loud, for the record out
17  loud, please?
18     A.   (Quote as read):
19        I know there is a fair amount of angst,
20        anger, frustration, fill in the blank
21        here about the current state of our
22        efforts to obtain caseload relief.
23        When we won the Supreme Court ruling
24        last summer, we all thought we'd be
25        well on our way to reasonable caseload

22 (Pages 85 to 88)

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com     Phone: 1.800.280.3376     Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-23   Filed 02/09/18   Page 23 of 58

Page 89

1       by this time.  That of course hasn't
2   turned out to be the case.
3       Q.  Do you know what Cat Kelly may have
4   been referring to here in saying that hasn't
5   turned out to be the case?
6       MR. QUINLAN:  Object to form, calling
7   for speculation.
8       A.  I think she's referring both to the
9   legislative efforts to -- to keep us from using our
10  rulemaking authority and to require us to contract
11  out certain of our cases, as well as the fact that
12  the Waters meetings that were required under the
13  Waters decision were not bearing any useful fruit.
14      Q.  (By Mr. Shahabian)  Is that under -- is
15  that consistent with your understanding of the state
16  of affairs at the time?
17      A.  Yes.
18      Q.  Could you read the next sentence out
19  loud, please?
20      A.  The next sentence or paragraph?
21      Q.  Just the next sentence.
22      A.  (Quote as read):
23          There are quite a few who argue we
24          should have forged ahead and not pulled
25          back on certification when we did

Page 90

1           regardless of the pushback from
2           policymakers.
3       Q.  Do you have an understanding of what
4   certification refers to?
5       A.  Yes.
6       Q.  What does it refer to?
7       A.  The process under our -- our caseload
8   rule that had been upheld by the Waters decision
9   that allowed us to certify an office and therefore
10  not take on new cases.
11      Q.  Do you have an understanding of what
12  pull back refers to?
13      A.  That we abandon the certification
14  process.
15      Q.  Do you have an understanding of what
16  pushback from policymakers refers to?
17      A.  I think he's referring to the
18  legislative efforts.
19          (WHEREIN, Exhibit 18, 12-29-16 Winfrey
20  e-mail chain, was marked for identification.)
21      Q.  (By Mr. Shahabian)  I'm handing you
22  what's been marked Plaintiffs' Exhibit 18.  Do you
23  recognize this document?
24      A.  Without reading the entire document,
25  no, I -- I don't remember seeing it, but I may have.

Page 91

1       Q.  If I could focus your attention on the
2   e-mail from Justin Carver starting at the bottom of
3   page two and continuing to pages three and four.
4   Does that e-mail look familiar to you?
5       A.  I don't remember it specifically.
6       Q.  Who is Justin Carver?
7       A.  He's our district defender in our
8   Jefferson City office.
9       Q.  And if you look at the bottom of page
10  two, who does it appear he is sending this e-mail
11  to?
12      A.  I would say it looks like he's sending
13  it to judges and courts where Jefferson City is
14  responsible for the handling of public defender
15  cases.
16      Q.  If you look at page three --
17      A.  Along with the -- some prosecuting
18  attorneys, or attorney.
19      Q.  If you look at page three, the second
20  full paragraph says (quote as read):
21          The struggles of the public defender
22          office remain.  Every single one of my
23          lawyers has expressed to me that their
24          caseload is too high and that they
25          cannot effectively handle the cases

Page 92

1           that they have.
2           Is that statement consistent with your
3   understanding of the caseload in the Jefferson City
4   office?
5       A.  Yes.
6       Q.  Is that statement unique to the
7   Jefferson City office?
8       A.  No.
9       Q.  Is that a statement that could be
10  applied more generally to the MSPD system?
11      A.  Yes.
12      Q.  The next sentence says (quote as read):
13          I have lawyers threatening to quit if I
14          don't get their caseloads down to a
15          level where they can be effective.
16          Do you see that sentence?
17      A.  Yes.
18      Q.  To your understanding, is that
19  statement consistent with the state of affairs of
20  the Jefferson City public defender's office?
21      A.  Yes.
22      Q.  Is that unique to the Jefferson City
23  public defender's office?
24      A.  No.
25      Q.  Are lawyers threatening to quit

23 (Pages 89 to 92)

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com       Phone: 1.800.280.3376       Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-23    Filed 02/09/18    Page 24 of 58

Page 93

1　throughout the MSPD system due to high caseloads?
2　　A.　Yes.
3　　Q.　To your knowledge, have lawyers quit
4　the MSPD due to high caseloads?
5　　A.　Yes.
6　　Q.　The next sentence says (quote as read):
7　　　　Director Barrett tells me that agency
8　　　　turnover is now at 22 percent.
9　　　　Does that appear to you to be an
10　accurate statement of where total MSPD turnover
11　stood at that time?
12　　A.　Yes.
13　　Q.　And to be clear, going back to page
14　two, this e-mail was sent near the end of
15　December 2016?
16　　A.　Yes.
17　　Q.　If you look down at the -- near the end
18　of the page, the largest full paragraph says (quote
19　as read):
20　　　　Starting in January when I receive a
21　　　　qualifying application for public
22　　　　defender services I will do one of two
23　　　　things.  If the applicant is in jail, I
24　　　　will assign the applicant a lawyer
25　　　　immediately until all of my lawyers

Page 94

1　　　　have become overloaded.  If the
2　　　　applicant is not in jail, I will hold
3　　　　the application until the end of the
4　　　　month.  If I have available lawyers at
5　　　　the end of the month, I will assign it
6　　　　to one of my lawyers.  If I don't have
7　　　　available lawyers, I will be filing a
8　　　　motion to appoint a lawyer who is
9　　　　employed by the state of Missouri.
10　　　　Do you see that?
11　　A.　Yes.
12　　Q.　Did Justin Carver discuss his plan with
13　the central MSPD office before sending this e-mail?
14　　A.　Before sending the e-mail, I don't
15　know.
16　　Q.　Did the MSPD office become aware of
17　this plan after this e-mail was sent?
18　　A.　Either before or after, yes.
19　　Q.　Do you have an understanding of why
20　Justin Carver refused cases for applicants not in
21　jail?
22　　A.　Yes, for the reasons stated in his
23　e-mail.
24　　Q.　To your understanding, are the reasons
25　in this e-mail for refusing cases unique to the

Page 95

1　Jefferson City office?
2　　A.　They are not unique.
3　　Q.　Could they be applied to the rest of
4　the MSPD system?
5　　A.　Yes.
6　　Q.　If you could turn back to page two of
7　this e-mail, e-mail chain, sorry, do you see an
8　e-mail from PeggyRichardson@courts.mo.gov?
9　　A.　I do.
10　　Q.　Do you know who Peggy Richardson is?
11　　A.　I believe she's a judge.
12　　Q.　Looking at the e-mail she sent, it says
13　starting with the sentence in any event, it says
14　(quote as read):
15　　　　In any event, here is what I wish you
16　　　　could do.  Instead of holding back on
17　　　　applications, go ahead and let us know
18　　　　if the defendant qualifies.  After all,
19　　　　the fact of his or her qualification
20　　　　will not change.  It is much easier to
21　　　　manage the cases with the lawyer in the
22　　　　case and then grant continuances due to
23　　　　the caseload.  We know that on any
24　　　　given jury week there is no way the
25　　　　public defender can prepare for the

Page 96

1　　　　number of cases that get set, so at
2　　　　least for me continuances will be
3　　　　pretty freely given.  It is a whole
4　　　　different ball game however when the
5　　　　case is just sitting there spinning on
6　　　　a return with counsel date.  Perhaps
7　　　　what I'm asking doesn't fit what you're
8　　　　thinking, but please consider it.
9　　　　Do you see that suggestion by Peggy
10　Richardson?
11　　A.　I do.
12　　Q.　Is it consistent with your
13　understanding of an attorney's ethical
14　responsibilities to accept appointment to a case
15　that they cannot handle and seek continuances?
16　　A.　No.
17　　Q.　Would an MSPD attorney be risking their
18　bar license to accept an appointment to a case they
19　cannot handle and seek continuances?
20　　A.　Yes.
21　　Q.　What makes you think an MSPD attorney
22　would be risking their bar license for doing that?
23　　A.　Well, for one, the specific rules of
24　professional conduct regarding competence,
25　diligence, and communication.  Two, ABA formal

24 (Pages 93 to 96)

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com　　Phone: 1.800.280.3376　　Fax: 314.644.1334
Case 2:17-cv-04057-NKL　　Document 153-23　　Filed 02/09/18　　Page 25 of 58

Page 97

1  opinion, which has been cited favorably by the
2  Missouri Supreme Court.
3          Three, the Pratt and Water decisions
4  where they've stated that bar licenses would be at
5  risk.  Four, various bar complaints that are being
6  made against our attorneys both by judges, clients,
7  and perhaps prosecutors.  And four, the recent
8  decision regarding one of our attorneys named Karl
9  Hinkebein.
10         Q.   What was that recent decision?
11         A.   It was an order.  It wasn't a written
12  opinion.  It was an order suspending his license for
13  one year, but staying that suspension for a period
14  of probation of either one or two years.
15             I might have the exact specifics wrong,
16  but suspend his license, stayed it, and put him on
17  probation.  And I should add that not only the
18  complaints, but the recommendations being made by
19  the Office of Chief Disciplinary Counsel in light of
20  those complaints.
21         Q.   What recommendations are you referring
22  to?
23         A.   Well, for example, in the Hinkebein
24  case, ultimately their recommendation was Missouri
25  Supreme Court was that his license be suspended.

Page 98

1          (WHEREIN, Exhibit 19, 4-28-17 Barrett
2  letter to Pratzel, was marked for identification.)
3          Q.   (By Mr. Shahabian) I'm handing you
4  what's been marked Plaintiffs' Exhibit 19.  Do you
5  recognize this document?
6          A.   Yes.
7          Q.   What is it?
8          A.   It's a letter dated April 28th, 2017 to
9  Alan Pratzel, chief disciplinary counsel, from our
10  director Michael Barrett regarding request for
11  guidance.
12         Q.   To your knowledge, was this sent --
13  letter sent before or after the chief disciplinary
14  counsel recommended that Mr. Hinkebein's bar license
15  be suspended?
16         A.   I believe it was before.
17         Q.   To your knowledge, did the chief
18  disciplinary counsel provide Mr. Barrett or the MSPD
19  with a response to this letter?
20         A.   I believe after a long while there was
21  technically a response, but I believe the response
22  was I can provide you no guidance.
23         Q.   Was that response documented?
24         A.   I don't know.
25         Q.   So to your knowledge, you don't know if

Page 99

1  the MSPD received a written response from the chief
2  disciplinary counsel to this request for guidance?
3          A.   No, I don't know for sure.
4          Q.   How have MSPD offices reacted to the
5  Supreme Court's decision in Hinkebein?
6          A.   Alarm, fear.  Attorneys quitting.  And
7  ultimately with district defenders reviewing
8  caseloads with their attorneys and finding out from
9  their attorneys whether or not they would think that
10  continuing -- continuing to accept new assignments
11  would violate their duties under the rules of
12  professional conduct, and that if that is the case,
13  to -- to alert the local judges to that fact and
14  that they would not be accepting new cases.
15         Q.   Are you aware of any counties that have
16  alerted judges to the fact that they will not be
17  accepting new cases?
18         A.   Yes.
19         Q.   Which counties?
20         A.   You know, I can tell you our district
21  offices.  If I start naming counties I'll get them
22  wrong, but it's our --
23         Q.   District offices are fine too.
24         A.   Our District 13, which is our Columbia
25  trial office.  Our West Plains office, which I think

Page 100

1  is District 37.  Our Kennett office, which I think
2  is District 35.  Our Rolla office, which I believe
3  is District 25.  Our Nevada office, which I believe
4  is District 28.  And I believe that's the list --
5  those are the offices that I'm aware of.
6          Q.   And those are offices that have
7  communicated to judges that they will not be
8  accepting new cases?
9          A.   Yes.
10         Q.   Do you know of any other offices that
11  are considering communicating to judges that they
12  will be no longer accepting new cases?
13         A.   Yes.
14         Q.   What offices are those?
15         A.   I don't specifically -- I can't recall
16  those, but I know I've seen e-mails from other
17  offices who are engaging in the process with their
18  attorneys to sit down with them and educate them on
19  the rules of professional conduct and hear from them
20  whether or not they can.
21  (Exhibit 2, Previously marked exhibit.)
22         Q.   (By Mr. Shahabian) I'm handing you
23  what's been marked Plaintiffs' Exhibit 2.  Do you
24  recognize that document?
25         A.   Yes.

25 (Pages 97 to 100)

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com      Phone: 1.800.280.3376      Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-23    Filed 02/09/18    Page 26 of 58

Page 101

1    Q.   What is it?
2    A.   It is a letter dated September 11th,
3    2017 from our director Michael Barrett that was sent
4    to all of our attorneys regarding the Hinkebein
5    order.
6    Q.   What is your general understanding of
7    the intent of this letter?
8    A.   To let them know of the Hinkebein
9    decision, and that the Supreme Court expected them
10   and rules of professional conduct require them to
11   follow the rules of professional conduct.
12   Q.   If you look about halfway down that
13   letter, do you see a reference to, quote, materials
14   for withdrawing due to excessive caseload?
15   MS. SHIPMA:   End of the third
16   paragraph.
17   A.   Yes, uh-huh.
18   Q.   (By Mr. Shahabian)   Do you know what
19   that is referring to?
20   A.   To material that's posted on our
21   litigation resource board.
22   Q.   What sorts of materials?
23   A.   Sample motions or materials for drawing
24   due to excessive caseload, and the ABA opinion I
25   think is probably posted there.  Mister --

Page 102

1    Mr. Mermelstein, who moderates litigation resource
2    board, would be -- you know, best be able to tell
3    you exactly what's on there.
4    Q.   If you haven't yet produced those
5    documents, could you produce those?
6    MS. SHIPMA:   Uh-huh.  We've been
7    preparing a supplemental response to you for a
8    couple of weeks now.
9    MR. SHAHABIAN:   Thanks for letting me
10   know.
11   (Exhibit 3, Previously marked exhibit.)
12   Q.   (By Mr. Shahabian)   I'm handing you
13   what's been marked Plaintiffs' Exhibit 3.  Do you
14   recognize this document?
15   A.   Yes.
16   Q.   What is it?
17   A.   It is a e-mail sent by presiding Judge
18   Crane in Boone County to the Boone County Bar
19   Association alerting them to the fact that our
20   public defender office, our Columbia trial office
21   specifically had stated that they could no longer
22   accept new cases under the rules of professional
23   conduct, and as a result Boone County judges would
24   be appointing private counsel to handle indigent
25   representation in those cases.

Page 103

1    Q.   Does the MSPD have any role in
2    overseeing private counsel appointed to handle cases
3    by Judge Crane in Boone County?
4    A.   No.
5    (WHEREIN, Exhibit 20, Missouri Bar
6    President announcement, was marked for
7    identification.)
8    Q.   (By Mr. Shahabian)   I'm handing you
9    Plaintiffs' Exhibit 20.  Do you recognize this
10   document?
11   A.   Yes.
12   Q.   What is it?
13   A.   It is an announcement sent out I
14   believe to all the Boone County attorneys alerting
15   them to what was happening in Boone County and as
16   set forth in Judge Crane's e-mail essentially, and
17   also outlines other efforts the Missouri Bar has
18   undertaken and will undertake.
19   Q.   If you look at the fourth full
20   paragraph starting with the second sentence, it says
21   (quote as read):
22       That's why I met with the Missouri
23       State Public Defender system director
24       to discuss these challenges two weeks
25       ago immediately following the board

Page 104

1        meeting where I was elected president
2        of the State Bar.  Then I met with the
3        deputy director.
4        Is that referring to a meeting with
5    you?
6    A.   It is.
7    Q.   What did you discuss at that meeting?
8    A.   Our hope that the Missouri Bar could --
9    could work with us in solving our caseload problem.
10   Q.   What if anything did Morry Cole,
11   Missouri Bar President, say to you in response to
12   that?
13   A.   That they would -- they would take back
14   our ideas.  They had -- the meeting he was referring
15   to, they had -- they announced they were forming a
16   public defender committee within the bar to help
17   look at the problem and come up with the ideas, and
18   any ideas that Michael Barrett or I had given them,
19   that, you know, they would -- they would take those
20   under consideration and look at them along with any
21   other ideas that they came up with.
22   Q.   If you look at the first paragraph of
23   this letter, the last full sentence says (quote as
24   read):
25       To assist lawyers appointed in these

26 (Pages 101 to 104)

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com     Phone: 1.800.280.3376     Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-23   Filed 02/09/18   Page 27 of 58

1     cases, the Missouri Bar is providing
2     educational resources and sample forms
3     in the members-only section of
4     mobardot.org. under criminal defense
5     appointment resources.
6         Did the MSPD have any role in the -- in
7     the preparation or providing of those materials to
8     attorneys appointed in Boone County?
9         A.  You know, some of them -- I haven't
10    looked to see what's there recently.  Some of them
11    may be left over from when we were certifying
12    offices under the Waters decision.  Some of them may
13    be new.
14        You might ask Mr. Mermelstein.  It
15    seems like I heard either him or our training
16    director state that they had been contacted about
17    supplying some materials, but I'm not sure.  You'd
18    want to check with Mr. Mermelstein.
19        Q.  Did the MSPD oversee how the Missouri
20    Bar provides resources to lawyers appointed to
21    represent clients in Boone County?
22        A.  No.
23        Q.  We've talked about district offices and
24    lawyers in the MSPD refusing new cases.  To your
25    knowledge, since the Hinkebein decision, have any

1     MSPD attorneys filed motions to withdraw from
2     existing cases due to excessive caseloads?
3         A.  I don't think so.
4         Q.  So I want to go back for a second to
5     something that we talked about at the beginning of this
6     deposition.  You mentioned that on July 1st of this
7     year the MSPD began using panel attorneys almost
8     exclusively for conflict cases.  Is that an accurate
9     statement of what your prior testimony?
10        A.  For new conflict cases that came to us
11    after July 1st.
12        Q.  What precipitated that change?
13        A.  Increase in our appropriation from the
14    legislature that -- that allowed us to do that.
15        Q.  Do you expect that change to be
16    permanent?
17        A.  We hope.  I mean, there's an
18    appropriation process every year.
19        Q.  If the resources are not there, would
20    the MSPD go back to using MSPD attorneys from other
21    districts as conflict counsel in conflict cases?
22        A.  To the extent that we could provide
23    them and -- and those offices were accepting new
24    cases as far as I know.  And we haven't really
25    talked about that.

1         Q.  You mentioned earlier that the
2     timekeeping requirement was suspended by
3     Mr. Barrett.  Do you know if that requirement is
4     suspended indefinitely?
5         A.  Yeah, it's suspended indefinitely, but
6     -- but I say that, it's suspended.  It could start
7     up again, but suspended indefinitely.
8         Q.  But there are no plans to reimpose
9     timekeeping requirements?
10        A.  No.
11        Q.  I know we're jumping around a bit, but
12    going back to the Waters agreements we talked about
13    earlier, in a case where the prosecutor's office had
14    agreed not to seek jail time, would it be your
15    understanding within the experience of those
16    agreements for courts to still require defendants to
17    post bail?
18        A.  I'm not sure I understand the question.
19        Q.  Let me rephrase.  You testified that
20    Waters agreements covered generally cases where the
21    prosecutor and the judge agreed not to impose jail
22    as a sentence?
23        A.  Correct.
24        Q.  Or fine-only to use your words.
25    Setting aside sentencing, would it have been

1     within -- would the MSPD still have agreed not to
2     take a representation in a case like that where even
3     though there was no threat of jail at the sentencing
4     phase, the judge imposed a bail requirement that
5     required the defendant to remain in pretrial custody
6     until bail had been posted?
7         A.  That may very well have been the case,
8     but I don't have any specific recollection.
9         Q.  Are there any policies or procedures
10    from the state office, from the central MSPD office
11    on how MSPD attorneys should use depositions in
12    representing clients?
13        A.  No.
14        Q.  If an MSPD attorney wanted to take a
15    deposition, how would they do that?
16        A.  Through the encumbrance request process
17    that -- that I've described.
18        Q.  And that encumbrance request process
19    would be used to pay for a court reporter --
20        A.  Yes.
21        Q.  -- or videographer?  Are there any
22    monetary limits that govern the use of depositions?
23        A.  We -- we have a list of court reporters
24    who have agreed to the state contract, and by state
25    contract I don't -- I'm not referring to a public

27 (Pages 105 to 108)

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com     Phone: 1.800.280.3376     Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-23   Filed 02/09/18   Page 28 of 58

Page 109

1  defender contract, but a state contract rates.  And
2  unless there's a reason to deviate from that, to use
3  those court reporters as the most cost effective.
4      Q.   Are there any other limits placed on
5  MSPD attorneys who are requesting depositions?
6      A.   No.
7      Q.   Are there differences in how districts
8  supervise the use of depositions?
9      A.   I believe so.
10     Q.   What kinds of differences?
11     A.   Well, I mean, I can't say specifically,
12  but certainly there are offices that submit more --
13  more deposition encumbrance requests than other
14  offices, and that could be because of district
15  defender policies or -- or practices.  It could be
16  by the culture of the -- the offices.
17     Q.   Does the central office of the MSPD
18  track the number of requests for depositions?
19     A.   We have an encumbrance number database
20  that would have that information.
21     Q.   Is that database broken down by
22  district?
23     A.   Yes.
24     MR. SHAHABIAN:  If you haven't provided
25  that information previously, could you provide that

Page 110

1  in your forthcoming supplemental production?
2      MS. SHIPMA:  I think I did provide it.
3      MR. SHAHABIAN:  Okay.  And I may have
4  missed it.
5      MS. SHIPMA:  There were only 23,000
6  pages of documents.  How you missed it ...
7      Q.   (By Mr. Shahabian)  Are there policies
8  and procedures governing travel cost reimbursements
9  by MSPD attorneys or investigators?
10     A.   Well, they have to fill out a monthly
11  expense report to -- to get reimbursed.  There are
12  statewide travel regulations that apply to the
13  state, not just to the public defender system.
14     We -- you know, where it's practical
15  and cheaper we -- we ask attorneys to use rental car
16  rather than drive their own vehicles.  Beyond that,
17  if there's any other policies it would be at the
18  local level.
19     Q.   Does the MSPD reduce caseloads for
20  attorneys that have to travel great distances?
21     A.   That would be a district defender
22  decision about how to allocate caseload within their
23  own offices.
24     Q.   Isn't it your understanding the
25  district defenders generally would adjust caseloads

Page 111

1  for attorneys who have to travel great distances for
2  a case?
3      A.   It could happen.
4      Q.   But you don't have an understanding of
5  a general practice one way or another?
6      A.   No.
7      Q.   Are there policies and procedures
8  relating to how often MSPD trial attorneys meet with
9  their clients?
10     A.   We have guidelines for representation
11  addressing client contact.
12     Q.   What do those guidelines state
13  generally?
14     A.   The initial contact is to occur within
15  seven days of commencement of representation.  The
16  ongoing contact is to occur monthly.
17     Q.   And that's a statewide policy?
18     A.   It's a guideline.
19     Q.   That's a statewide guideline?
20     A.   Yes.
21     Q.   Does the MSPD track how often trial
22  attorneys meet those guidelines?
23     A.   It's reviewed through the appraisal
24  process.
25     Q.   How is that information collected for

Page 112

1  the appraisal process?
2      A.   File reviews.  And by file reviews I
3  mean review of both physical files and electronic
4  files in our case management database.
5      Q.   So MSPD attorneys should mark when they
6  visit clients in the files?
7      A.   Yes.  It should be documented.
8      Q.   Does the MSPD have any immigration
9  expert attorneys on staff?
10     A.   Currently no.  I don't believe we do.
11     Q.   Does the MSPD have agreements with
12  outside attorneys who specialize in immigration
13  matters for consulting purposes?
14     A.   I wouldn't say agreements.  I mean,
15  there are particularly in the urban area, at least
16  Kansas City, a particular immigration law firm that
17  requests would most often go to, I believe.
18     Q.   Do you know how often requests are sent
19  to that law firm?
20     A.   Only if there's an encumbrance request.
21     Q.   Do any districts in the state of
22  Missouri have sizable immigrant communities?
23     A.   Yes.
24     Q.   Which districts?
25     A.   I don't know specifically.  Certainly

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com     Phone: 1.800.280.3376     Fax: 314.644.1334

Page 113

1  the urban areas, but it's not confined to that.  I
2  mean, I think numerous rural areas do.
3      Q.  Do you know roughly how many public
4  defenders are employed in the trial division right
5  now?
6      A.  In the trial division, no.  I mean,
7  within the -- with the system attorneys, including
8  assistant public defenders and district defenders
9  and deputy district defenders I think it's around
10  378, somewhere around there, attorneys in the public
11  defender system.
12      Q.  378 refers to not just trial division
13  attorneys, but also appellate and PCR attorneys?
14      A.  Right.
15      Q.  Do you know roughly the average number
16  of years that a trial division attorney has been
17  employed by the MSPD?
18      A.  No.
19      Q.  When an MSPD attorney decides to leave
20  the MSPD or is terminated, is it the practice of the
21  MSPD to have an exit interview?
22      A.  We provide them with an exit interview
23  and offer them to schedule a discussion with the HR
24  manager to go over the -- the exit interview.
25      Q.  Roughly how -- how often do MSPD

Page 114

1  attorneys who are leaving the MSPD's employment go
2  through an exit interview?
3      A.  I don't know.
4      Q.  During those exit interviews do the
5  public defenders explain why they are leaving if
6  they are leaving voluntarily?
7      A.  They're asked and they frequently
8  provide that answer.
9      Q.  What sorts of answers do MSPD attorneys
10  give for leaving?
11      A.  Well, by far the majority are caseload
12  and salaries.
13      Q.  And by caseload and salaries, you mean
14  caseloads are too high?
15      A.  And salaries are too low, yes.
16      Q.  Do you know how many public defenders
17  leave the MSPD to join district attorney's offices?
18      A.  Not specifically, no.
19      Q.  Does it happen?
20      A.  Yes.
21      Q.  Would you say it's rare, infrequent,
22  occasional?
23      A.  Occasional would probably be the best
24  word?
25      Q.  Why would an MSPD attorney leave for

Page 115

1  the district attorney's office?
2      A.  Well, again, I think it's frequently
3  because their caseloads there would be lower,
4  salaries would be higher.  Might be for other
5  reasons.
6      MR. SHAHABIAN:  Can we go off the
7  record?
8      VIDEOGRAPHER:  We're going off the
9  record at approximately 3:45 p.m.
10      (WHEREIN, a recess was taken.)
11      VIDEOGRAPHER:  We're back on the record
12  at approximately 3:52 p.m.
13      MR. SHAHABIAN:  Thanks very much for
14  your time, Mr. Elmer.  I have no further questions
15  at this time.
16      EXAMINATION
17  QUESTIONS BY MR. RAMSEY:
18      Q.  Mr. Elmer, my name is Steven Ramsey.  I
19  represent the State of Missouri and Governor Eric
20  Greitens, and I have a handful of questions.
21      A.  All right.
22      Q.  I apologize for being mildly sporadic,
23  but we're going to jump around just a bit.  Okay.
24  If I understood your testimony correctly, you've
25  been in the system for over 30 years, the MSPD

Page 116

1  system for over 30 years?
2      A.  Correct.
3      Q.  Now, in that time when it comes to
4  written policies and procedures, it sounds as if
5  it's very much a discretionary system in terms of
6  the various districts have discretion to -- to
7  promote guidelines.  Is that accurate?
8      A.  I would describe it as very
9  decentralized with a lot of autonomy to our district
10  offices.
11      Q.  So my question concerns the types of
12  procedures and policies that are centralized.  At
13  this point in time are you aware of any policies and
14  procedures that deal with attorney supervision?
15      A.  You know, the -- not specifically.
16  Appraisal process and promotion process and
17  promotion criteria, but --
18      Q.  But none as to the actual supervision
19  of how attorneys tasked with supervisor should go
20  about that process?
21      A.  Correct.
22      Q.  Are there any policies and procedures
23  concerning ensuring the effective assistance of
24  counsel of assistant public defenders?
25      A.  Our guidelines are representation.

29 (Pages 113 to 116)

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com       Phone: 1.800.280.3376       Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-23    Filed 02/09/18    Page 30 of 58

Page 117

1      Q.  I don't quite follow.
2      A.  Well, the point of them is to -- is to
3  make sure that by following those guidelines that
4  our clients will be effectively represented.
5      Q.  Let me ask this question a different
6  way.  In terms of the various training opportunities
7  that you have throughout the course of the year,
8  whether it's the spring training or the new employee
9  orientation, are any of those geared at just
10  ensuring the effective assistance of counsel,
11  like --
12      A.  In the sense that they're providing the
13  attorneys with some of the training they need in
14  order to do that.
15      Q.  And are there any trainings -- are
16  there any trainings tasked with teaching supervision
17  or -- or helping those who are managing other
18  attorneys to -- to supervise attorneys underneath
19  them?
20      A.  We have defender management workshop
21  that's normally held once a year.
22      Q.  About how long is that training?
23      A.  Approximately three days.
24      Q.  Okay.  And is it mandatory or
25  discretionary?

Page 118

1      A.  It's mandatory.
2      Q.  Who all is -- who all is required to go
3  to that?
4      A.  District defenders and deputy district
5  defenders.
6      Q.  At this point in time are you familiar
7  with any instances within your tenure at the
8  Missouri State Public Defender's system where
9  there's been a judicial determination of ineffective
10  assistance of counsel?
11      A.  Sure.
12      Q.  How many would you say, like one?
13  Would you say ten?
14      A.  Over what period of time?  30 years?
15      Q.  Yeah, let's go with that, over
16  30 years.
17      A.  A lot.
18      Q.  And would that normally come in a PCR
19  motion, a post-conviction?
20      A.  Usually a post-conviction motion.  They
21  frequently never find their way to the appellate
22  courts.  It will be a trial court ruling.  That's
23  why if you just look at appellate court decisions it
24  may not seem as many as there actually are.
25      Q.  But your sense is that there's quite a

Page 119

1  few?
2      A.  Yeah, over a 30 period -- 30-year
3  period, yes.
4      Q.  Would you be able to ballpark figure
5  that in terms of --
6      A.  No.
7      Q.  Is it 50 or what do you mean by quite a
8  few?
9      A.  Not infrequent.
10      Q.  Not infrequent.  So you would not be
11  able to -- in any way to put a number on that in
12  terms of just like a hundred, 200, you just -- it's
13  not infrequent, but you can't put a figure on it?
14      A.  Correct.
15      Q.  Would there be any records kept in your
16  Missouri State Public Defender system in terms of
17  there's one judicial determination, there's two, is
18  there any recordkeeping of that?
19      A.  No.
20      Q.  Okay.  So this is all from your vantage
21  point of view 30-year career?
22      A.  Yeah, from being specifically aware of
23  some at the time of having to conflict off cases
24  because of allegations or finding of
25  ineffectiveness, which may have occurred at a

Page 120

1  post-conviction level or sometimes occurs at motions
2  to withdraw before a sentencing.
3            A judge allows an attorney or client to
4  withdraw his plea based upon claims of ineffective
5  assistance of counsel, and then those that come to
6  me to be conflicted off.
7      Q.  Are you aware -- same vein, just a
8  different part of the office question.  Are you
9  aware of any ethical complaints against Missouri
10  state public defenders?
11      A.  Yes.
12      Q.  Would you say -- so there's the one
13  obvious example that was -- that's been referenced
14  today.  Are you familiar with more than that?
15      A.  Yes.
16      Q.  And are you familiar with any of those
17  complaints that have risen to the level that we've
18  seen in the Supreme Court case recently?
19      A.  Do I remember a public defender
20  being -- his license having been suspended, not
21  right offhand, no.
22      Q.  Slightly different topic.  Turning more
23  towards the caseloads.  Are you familiar with the
24  state statute that allows for public defenders to
25  motion to the court to have a conference concerning

30 (Pages 117 to 120)

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com     Phone: 1.800.280.3376     Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-23    Filed 02/09/18    Page 31 of 58

1  caseload concerns?
2      A.  Yes.
3      Q.  In your recollection and in your
4  experience, has that statute ever been used to -- to
5  consider workload concerns?
6      A.  What do you mean by consider?  Has it
7  ever been used?
8      Q.  Yeah.  Have you all ever filed a motion
9  to your knowledge to have a conference with the
10  judge to have a conversation about having too much
11  workloads for a public defender or set of public
12  defenders?
13      A.  Not that I'm aware of.
14      Q.  Concerning the communication from the
15  various districts to the various judges saying we're
16  not going to be taking any more cases, are all of
17  those to your knowledge e-mails or just informal
18  conversations with -- with the judge to your
19  knowledge?
20      A.  I think they've all been letters to the
21  judges, probably mixed with conversations along with
22  the letters.
23      Q.  But no motions?
24      A.  No.
25      Q.  Okay.

1      A.  They're not in the case, there's no
2  motion to be filed -- to be filed.
3      Q.  Turning to the time logging system, at
4  any point before -- I think it was said about three
5  and a half year period where you all kept time
6  logs, did that ever occur before that time period?
7      A.  Yes.
8      Q.  Do you know about when did that occur?
9      A.  A few years before that there was a
10  short sort of -- I would refer to it as -- I know it
11  was designed to be short.  It was done for one of
12  the studies that was being -- was happening at the
13  time, I think.
14      Q.  So it happened for a short stint before
15  that three and a half year period?
16      A.  Yes.
17      Q.  Then it happened for that three and a
18  half year period?
19      A.  Yes.
20      Q.  And then it's been discontinued
21  indefinitely at this point in time?
22      A.  Correct.
23      Q.  During any of those periods did the
24  system keep track of the time spent per the system
25  public defender?

1      A.  Yeah.
2      Q.  Did it keep track per case?
3      A.  Yeah.  There were -- there were some
4  tasks that were case related, case specific.  Some
5  tasks were not case specific.  So some of the time
6  showed up under our case, yes.
7      Q.  And then per task?
8      A.  Yes.
9      Q.  Was it on a daily basis similar to the
10  time entry system you alluded to earlier in terms of
11  each two-week period?
12      A.  Yes.
13      Q.  Was it separate from that system?
14      A.  Yes.
15      Q.  Do you know the precise time that the
16  logging system was discontinued?
17      A.  Not offhand.
18      Q.  Do you know who would know that?
19      A.  Offhand, I -- you know, I could easily
20  figure it out.
21      Q.  It's just not in front of you right
22  now?
23      A.  I think it was about a year and a half
24  ago, but I don't have the date in my mind.
25      Q.  Is there currently a repository of raw

1  data from that system?
2      A.  Yeah.  There's a database.
3      Q.  And is that historical data available
4  in terms of the per day, per task, per case written
5  down?
6      A.  It's there.
7      Q.  And currently even though that system
8  has been discontinued, are you all still tracking
9  that data in any way, the per case, per defender,
10  per task?
11      A.  No.
12      Q.  So not at all?
13      (Court reporter interruption.)
14      A.  No.
15      Q.  (By Mr. Ramsey)  Are you familiar with
16  any constitutional requirement for the public
17  defender system to represent those in immigration
18  cases?  Pardon me.
19      A.  As an immigration court?  Or in --
20      Q.  Either/or.
21      A.  I'm not sure what you mean by
22  immigration cases.
23      Q.  Well, I -- the question was very
24  general, but sure, immigration court or a case that
25  touches immigration.

31 (Pages 121 to 124)

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com     Phone: 1.800.280.3376     Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-23    Filed 02/09/18    Page 32 of 58

## Page 125

1          MR. SHAHABIAN:  Objection to vague as
2    to any case that touches immigration.
3          Q.  (By Mr. Ramsey)  Any case that occurs
4    in an immigration court?
5          A.  No, we don't provide representation in
6    immigration court.
7          Q.  Now, I apologize for my sporadic
8    questions, but I'm going to jump back into the
9    conflict realm.  Just so I understand, so the
10   conflict system is much broader than simply the Code
11   49 system.  Is that accurate?  Or Code 49 is a
12   subsection of the conflict?
13         A.  It's a subsection.
14         Q.  So at this point in time are all
15   conflicts being handled or being contracted out to
16   contract attorneys or these panel attorneys?
17         A.  New cases coming in, virtually all of
18   them absent a rare exception.
19         Q.  And at this point in time in terms of
20   contract attorneys, is the only purpose or the only
21   use of contract attorneys conflict cases or is there
22   any other way that the MSPD system utilizes contract
23   attorneys?
24         A.  We -- if there's sufficient money in
25   our budget, we will do some what we call overload

## Page 126

1    contracting of nonconflict cases.
2          Q.  Do you have a sense for how often that
3    occurs when you have that excess budgetary
4    allocation to do that?
5          A.  It varies from year to year.  We've
6    done it a little bit this year already, this fiscal
7    year.  It's a small percent of our budget.
8          Q.  Would you take a stab at maybe two or
9    three percent or how would you --
10         A.  I'd have to look.
11         Q.  Okay.  Now, just a clarification on
12   Exhibits 10 and 11, and those were the exhibits -- I
13   believe they're still in front of you with the
14   various list of attorneys by bar number, caseload,
15   and workload.  And I believe one was alluded to as
16   being from the trial --
17         A.  Yes.
18         Q.  -- department, the other was from the
19   PCR.  Was it your understanding that that -- those
20   figures came from the aggregate sum of all cases
21   handled by those attorneys in-between the years 2009
22   and 2017?
23         A.  I don't know the time period.  I don't
24   know over what period of time.  I mean, there's
25   various documents it looks like all stapled together

## Page 127

1    which I can only guess have to do with different
2    time periods.
3          MR. RAMSEY:  Just wanted to clarify if
4    we were talking about the same thing on that matter.
5    No further questions.
6          MS. SHIPMA:  I have a couple of
7    questions.
8               EXAMINATION
9    QUESTIONS BY MS. SHIPMA:
10         Q.  Joel, are the RubinBrown numbers used
11   in any way with respect to the cases that you send
12   through the contract system?
13         A.  Yes.
14         Q.  Can you explain how that is?
15         A.  I'm aware of any -- at any given time
16   that for the current fiscal year what -- you know,
17   what is the RubinBrown weight of the cases we have
18   assigned to a panel attorney for that fiscal year.
19         Q.  Okay.  Are you familiar with an
20   attorney by the name of Richard Scherrer?
21         A.  Yes.
22         Q.  And what is his relationship with MSPD?
23         A.  He spearheads our Missouri Coalition
24   For Right to Counsel.  I think actually he's a
25   volunteer member of our St. Louis city staff.

## Page 128

1          Q.  And what is his function there on the
2    St. Louis city staff?
3          A.  I think the liaison with the Missouri
4    Coalition of Right to Counsel attorneys and firms.
5          Q.  Does he supervise any of the attorneys
6    who are providing that representation?
7          A.  Oh, I don't think so.
8          Q.  Okay.
9          MR. QUINLAN:  How do you spell his last
10   name.
11         MS. SHIPMA:  S-C-H-E-R-E-R [sic], I
12   believe.  Not the same Richard Sher who was our
13   mediator.
14         MR. QUINLAN:  Right.
15         Q.  (By Ms. Shipma)  I want to ask a
16   question about management training.  When new
17   district defenders are brought on, is there any type
18   of training for them other than the three-day yearly
19   management training?
20         A.  Some one-on-one coaching and mentoring
21   by their division directors.
22         Q.  Is there a systemwide training?
23         A.  There is also, I forgot, a periodic new
24   district defender training that I think usually is
25   one day of the newest district defenders.  I say

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-23   Filed 02/09/18   Page 33 of 58

1    periodic.  It's essentially a handful of new
2    district defenders will schedule them.
3         MS. SHIPMA:  Okay.  That's all the
4    questions I have.
5         MR. SHAHABIAN:  Just have a few more
6    follow-up questions based on those questions.  I'll
7    be really short.
8              FURTHER EXAMINATION
9    QUESTIONS BY MR. SHAHABIAN:
10        Q.  Mr. Elmer, you mentioned that in your
11   30 years at the MSPD you had seen cases involving a
12   judicial finding of ineffective assistance of
13   counsel.  To the best of your recollection, did any
14   -- did excessive caseloads factor into the finding
15   of ineffective assistance in any of those cases?
16        A.  I don't know.
17        Q.  You mentioned something about overload
18   contracting for panel attorneys.  Why would the MSPD
19   use overload contracting to assign cases to panel
20   attorneys?
21        A.  To help alleviate our caseload problem.
22        Q.  You mentioned that it fluctuates from
23   year to year.  Why would the caseload -- why would
24   that -- could you help me understand why it
25   fluctuates year to year if the goal is to relieve

1    caseloads?
2         A.  Because there's only a certain amount
3    of money available.  I go into each fiscal year
4    knowing my -- my working budget for case
5    contracting.  We may be coming in under budget
6    because there are fewer conflicts than we
7    anticipated so that will free up money.
8              On the other hand there may be other
9    areas within the public defender system such as
10   litigation expenses that are going over budget, so I
11   need to come in under budget to -- to help fund
12   litigation expenses.
13             And -- and so, you know, once that
14   first scenario would allow us to do more overload
15   contracting, the second scenario would allow us to
16   do less overload contracting or no overload
17   contracting.
18        Q.  And you mentioned the Missouri
19   Coalition Right to Counsel pro bono attorneys.  In
20   your opinion, how impactful is that program to the
21   ability of the MSPD to meet its mission to provide
22   indigent defense?
23        A.  Well, as far as alleviating our
24   caseload issue, it's not effective at all.  I mean,
25   60 cases out of 85,000 doesn't make much of a dent.

1         MR. SHAHABIAN:  I have no further
2    questions at this time.
3         VIDEOGRAPHER:  We're going off the
4    record at approximately 4:10 p.m.
5              (WHEREIN, the deposition was concluded
6    at 4:10 p.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1              CERTIFICATE OF REPORTER
2
3         I, William L. DeVries, a Certified
4    Court Reporter (MO), Certified Shorthand Reporter
5    (IL), Registered Diplomate Reporter, and a Certified
6    Realtime Reporter, do hereby certify that the
7    witness whose testimony appears in the foregoing
8    deposition was duly sworn by me pursuant to Section
9    492.010 RSMo; that the testimony of said witness was
10   taken by me to the best of my ability and thereafter
11   reduced to typewriting under my direction; that I am
12   neither counsel for, related to, nor employed by any
13   of the parties to the action in which this
14   deposition was taken, and further that I am not a
15   relative or employee of any attorney or counsel
16   employed by the parties thereto, nor financially or
17   otherwise interested in the outcome of the action.
18
19
20   _____
21        Certified Court Reporter
22        within and for the State of Missouri
23
24
25

**MIDWEST LITIGATION SERVICES**
**www.midwestlitigation.com      Phone: 1.800.280.3376      Fax: 314.644.1334**
Case 2:17-cv-04057-NKL    Document 153-23    Filed 02/09/18    Page 34 of 58

## Page 133

```
1              MIDWEST LITIGATION SERVICES

2     October 9, 2017

3     Ms. Jacqueline Shipma
      Missouri State Public Defender
4     Woodrail Center
      1000 West Nifong
5     Building 7, Suite 100
      Columbia, Missouri 65203

6
      IN RE: SHONDEL CHURCH, et al. vs. STATE OF
7          MISSOURI, et al.
8
      Dear Ms. Shipma,
9
      Please find enclosed your copies of the deposition of
10    JOEL R. ELMER taken on October 4, 2017 in the
      above-referenced case. Also enclosed is the original
11    signature page and errata sheets.
12
      Please have the witness read your copy of the
13    transcript, indicate any changes and/or corrections
14    desired on the errata sheets, and sign the signature
      page before a notary public.
15
      Please return the errata sheets and notarized
16    signature page within 30 days to our office at 711 N
17    11th Street, St. Louis, MO 63101 for filing.
18
19    Sincerely,
20
21
22    William L. DeVries, RDR/CRR
23
24    35446
25
```

## Page 134

```
1                ERRATA SHEET
      Witness Name: JOEL R. ELMER
2     Case Name: SHONDEL CHURCH, et al. vs. STATE OF
                 MISSOURI, et al.
3     Date Taken: OCTOBER 4, 2017

4     Page #_____  Line #_____
5     Should read: _____
6     Reason for change: _____
7
8     Page #_____  Line #_____
9     Should read: _____
10    Reason for change: _____
11
12    Page #_____  Line #_____
13    Should read: _____
14    Reason for change: _____
15
16    Page #_____  Line #_____
17    Should read: _____
18    Reason for change: _____
19
20    Page #_____  Line #_____
21    Should read: _____
22    Reason for change: _____
23
24    Witness Signature: _____
25
```

## Page 135

```
1     STATE OF _____)

2
3     COUNTY OF _____)

4
5     I, JOEL R. ELMER, do hereby certify:
6          That I have read the foregoing deposition;
7          That I have made such changes in form
8     and/or substance to the within deposition as might
9     be necessary to render the same true and correct;
10         That having made such changes thereon, I
11    hereby subscribe my name to the deposition.
12         I declare under penalty of perjury that the
13    foregoing is true and correct.
14         Executed this _____ day of _____,
15    20___, at _____.
16
17
18
19         _____
20         JOEL R. ELMER
21
22         _____
23         NOTARY PUBLIC
24    My Commission Expires:
25
```

**MIDWEST LITIGATION SERVICES**
**www.midwestlitigation.com       Phone: 1.800.280.3376            Fax: 314.644.1334**

# A

**ABA** 83:20
  96:25 101:24
**abandon** 90:13
**ability** 37:13
  130:21 132:10
**able** 23:16 30:8
  30:20 83:9
  102:1 119:4,11
**above-referen...**
  133:10
**absent** 125:18
**accept** 19:21,23
  19:24 21:23
  96:14,18 99:10
  102:22
**accepting** 99:14
  99:17 100:8,12
  106:23
**access** 32:6
**accessible** 45:4
**accurate** 20:23
  20:24 31:23
  33:8,15,21
  42:3,20 43:19
  93:10 106:8
  116:7 125:11
**accurately** 52:6
**ACLU** 4:14 7:22
**action** 132:13,17
**actual** 31:2
  116:18
**add** 52:7 75:8
  97:17
**added** 52:14
  87:10
**addition** 34:1
**additional** 22:2
  22:7 30:11
  34:18 39:16
  43:22 44:1
  75:8
**address** 17:3
  42:7
**addressing**
  111:11

**adjust** 110:25
**adjusted** 24:15
  24:15,18
**adjustments**
  79:15
**administered**
  16:18,20
**adopt** 80:25
**advanced** 74:2
**advise** 20:15
**affairs** 89:16
  92:19
**affect** 37:12 39:4
**affirm** 8:16
**afternoon** 4:12
  4:13
**age** 7:11 13:13
**agency** 93:7
**aggregate**
  126:20
**ago** 26:17 46:23
  103:25 123:24
**agree** 84:18
**agreed** 7:1 28:19
  84:11 85:12
  107:14,21
  108:1,24
**agreeing** 84:17
**agreement** 33:2
  33:9,24 83:16
**agreements**
  84:25 85:2,7,7
  85:9 107:12,16
  107:20 112:11
  112:14
**agrees** 14:21
**ahead** 89:24
  95:17
**al** 1:4,7 4:4,7,20
  4:21 7:18,18
  133:6,7 134:2
  134:2
**Alan** 98:9
**Alarm** 99:6
**alert** 99:13
**alerted** 99:16

**alerting** 102:19
  103:14
**allegations**
  119:24
**alleviate** 129:21
**alleviating**
  130:23
**allocate** 110:22
**allocation** 47:7,8
  126:4
**allow** 130:14,15
**allowed** 27:21
  28:22 81:1
  90:9 106:14
**allows** 120:3,24
**alluded** 123:10
  126:15
**alphabetical**
  56:9
**altered** 64:21
**amended** 87:13
**American** 71:6
**amount** 30:17
  47:17 84:8
  88:19 130:2
**and/or** 133:13
  135:8
**anger** 88:20
**angst** 88:19
**announced**
  104:15
**announcement**
  3:13 103:6,13
**annual** 13:22
  27:3 46:10
  72:13 75:22
**annually** 84:4
**answer** 9:16
  12:8 18:1
  47:15 79:2
  114:8
**answering** 9:7
**answers** 114:9
**Anthony** 49:14
**anticipated**
  130:7

**anybody** 13:7
**anymore** 28:1
**APD** 61:22 78:5
  78:6,25
**apologies** 13:12
  62:14 73:3
**apologize** 47:24
  49:25 115:22
  125:7
**appeals** 17:10
  32:13
**appear** 36:12
  41:7 42:3,20
  43:13,19 54:8
  61:11 88:2
  91:10 93:9
**appeared** 54:1
  87:6
**appears** 33:12
  40:25 44:4
  63:16 132:7
**appellate** 58:16
  58:20,23 75:20
  78:12 113:13
  118:21,23
**applicant** 18:13
  93:23,24 94:2
**applicants** 18:8
  18:10 94:20
**application**
  16:24,25 17:1
  18:21 77:8
  93:21 94:3
**applications**
  18:4 95:17
**applied** 92:10
  95:3
**apply** 18:12
  19:17 63:5,24
  64:12,17
  110:12
**appoint** 94:8
**appointed** 103:2
  104:25 105:8
  105:20
**appointing**

  102:24
**appointment**
  14:15 96:14,18
  105:5
**appointments**
  20:6 80:15
**appraisal** 64:3
  64:22 111:23
  112:1 116:16
**appraisals** 76:11
**appraising**
  61:13
**appropriate**
  46:10 48:6
**appropriation**
  106:13,18
**approval** 35:7
  37:4,24 38:2
  38:10,11
**approve** 78:12
**approved** 19:17
  21:11,14,16
  22:11 34:7
  44:17
**approves** 78:11
**approximately**
  7:16 11:1 26:1
  26:23 46:23
  48:8 53:11
  71:15,18 79:14
  79:19 80:7
  84:7 88:5
  115:9,12
  117:23 131:4
**April** 32:1 55:6
  98:8
**area** 54:13,13,21
  54:23 77:22
  112:15
**areas** 15:9 17:9
  23:16 47:11
  73:12 77:17
  83:21 113:1,2
  130:9
**argue** 89:23
**arriving** 51:22

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-23   Filed 02/09/18   Page 36 of 58

52:13
aside 42:18
  75:13 107:25
asked 12:9 31:1
  34:15 114:7
asking 9:1 80:21
  96:7
assign 25:10,16
  34:7,17 76:9
  84:12 93:24
  94:5 129:19
assigned 10:6
  14:23 15:13
  18:19 25:12
  26:5,7,12
  28:13 29:6,14
  34:16 38:18
  39:17 59:12
  127:18
assigning 19:16
assignment 19:7
  20:1,2 26:22
  33:6
assignments
  19:20,24 20:10
  25:7 27:21
  30:6,11 76:16
  99:10
assist 24:24 39:5
  104:25
assistance 21:19
  35:5 116:23
  117:10 118:10
  120:5 129:12
  129:15
assistant 11:14
  14:18 21:7
  61:14,15,17,19
  61:24 62:1,4,5
  62:8,11,15,18
  62:20,22,24
  63:2,8,9,23,24
  64:14,14,19,25
  65:1,17,19,20
  65:23,23,25
  78:9,17,19,20

78:21 79:3
  113:8 116:24
associate 25:22
associated 51:21
  54:2
associates 25:10
  25:12,18 26:8
Association
  102:19
assume 32:2
  42:8 60:20
attached 3:15
attachment
  12:20
attempts 31:20
attend 27:7
  34:11 72:2,4,5
  72:7,9,16 74:7
  74:18
attended 72:23
attending 45:24
attention 91:1
attorney 2:11,13
  6:3,8 8:25
  14:24 16:17,22
  16:23,25 18:3
  18:21 20:6,10
  21:1 23:5 24:3
  24:20 26:21
  28:5 29:11,12
  29:18,21 30:15
  30:19,22 31:1
  31:9,17 32:6
  32:18 33:1,3
  34:8 35:6,25
  36:8,25 38:14
  39:19 40:1,11
  51:24 52:8,19
  52:19 60:1,18
  62:16,19 65:12
  65:14 67:14
  68:10,10 69:22
  70:19,20 76:5
  76:8 79:25
  80:8 91:18
  96:17,21

108:14 113:16
  113:19 114:25
  116:14 120:3
  127:18,20
  132:15
attorneys 14:25
  15:3,5,13
  16:13,15,16
  17:11,13,15,16
  17:19,20,24,25
  18:9,11 19:2,5
  19:19 20:4,9
  21:17,22 22:6
  25:7,25 26:3
  26:12,15,16,25
  27:3,4,6,7,10
  28:11,12 29:5
  29:14 32:4,9
  32:16 33:16,23
  34:2,15 35:1
  37:7 38:22
  39:11 45:22
  46:5,12,16
  52:2,11,22
  53:1 57:19
  58:13,15,16,18
  58:20,23 59:2
  60:24,25 61:14
  71:24,25 72:14
  74:12,13,14
  75:2,24 76:9
  76:11,24 77:10
  77:15,24 80:14
  82:6,10 83:4,5
  83:9,22,23
  84:6,12 91:18
  97:6,8 99:6,8,9
  100:18 101:4
  103:14 105:8
  106:1,7,20
  108:11 109:5
  110:9,15,20
  111:1,8,22
  112:5,9,12
  113:7,10,13,13
  114:1,9 116:19

117:13,18,18
  125:16,16,20
  125:21,23
  126:14,21
  128:4,5 129:18
  129:20 130:19
attorney's 65:2
  96:13 114:17
  115:1
auditing 45:25
auditor 46:3
authority 89:10
autonomy 44:19
  116:9
availability
  37:12 39:5
available 27:4
  39:1,10 72:14
  94:4,7 124:3
  130:3
average 84:4,6
  113:15
averages 49:22
aware 18:17
  24:23 86:11,14
  94:16 99:15
  100:5 116:13
  119:22 120:7,9
  121:13 127:15

——————
B
B 2:8 15:21,22
  17:9 82:22
back 23:4 29:13
  30:22 31:7
  44:8,23 53:22
  56:2 57:1
  58:25 71:5,17
  71:20 79:7
  89:25 90:12
  93:13 95:6,16
  104:13 106:4
  106:20 107:12
  115:11 125:8
background
  51:18

bail 107:17
  108:4,6
ball 96:4
ballpark 28:8
  119:4
bar 3:12 17:4
  56:16 57:5
  77:6 96:18,22
  97:4,5 98:14
  102:18 103:5
  103:17 104:2,8
  104:11,16
  105:1,20
  126:14
Barrett 3:8
  13:16 93:7
  98:1,10,18
  101:3 104:18
  107:3
Barrett's 47:14
based 19:16
  20:9 51:8 65:2
  86:8 120:4
  129:6
basis 75:15
  81:16 123:9
bearing 89:13
becoming 17:12
  17:16,20,25
began 23:12,13
  106:7
beginning 11:12
  11:13 21:25
  59:16 60:21
  106:5
behalf 1:15 4:22
  7:12
believe 9:4 13:9
  31:24 32:13
  44:16 48:1,4
  51:1 56:5 59:2
  60:6 73:22
  77:7 80:17
  84:3 95:11
  98:16,20,21
  100:2,3,4

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-23    Filed 02/09/18    Page 37 of 58

103:14 109:9
112:10,17
126:13,15
128:12
**believes** 14:19
**believing** 29:23
**best** 47:15 57:10
81:25 102:2
114:23 129:13
132:10
**better** 85:1
**Betty** 42:14
**beyond** 15:11
16:16 17:7,22
22:3 44:1
110:16
**bid** 83:11
**bids** 82:11 83:13
**bill** 7:24 86:23
87:8,15
**bills** 87:6,13
**bit** 13:5 36:16
44:19 71:23
84:2 107:11
115:23 126:6
**blank** 88:20
**Blau** 2:23 10:9
11:9 61:4
63:17,20
**board** 101:21
102:2 103:25
**bono** 24:23 25:8
25:25 26:3,14
26:16,21
130:19
**Boone** 102:18,18
102:23 103:3
103:14,15
105:8,21
**bottom** 31:25
91:2,9
**brand-new**
62:16,18,19
**break** 9:17
30:14 71:12
**breaks** 9:14

54:12
**brief** 13:15
**broad** 5:13
16:20,21
**broader** 125:10
**broke** 19:6
**broken** 109:21
**brought** 128:17
**budget** 13:1
76:14 125:25
126:7 130:4,5
130:10,11
**budgetary** 126:3
**Building** 5:20
133:5
**bulk** 82:11

_____
**C**
**C** 5:1 15:24 17:7
33:19,20 65:8
65:11,16 82:2
82:5
**California** 5:9
**call** 15:24 19:8
27:5 49:2
72:15 125:25
**called** 15:8
**calling** 89:6
**capacity** 11:11
13:25 49:1,7,8
49:10 50:25
52:7,20 53:4,5
53:7,8,17,18
59:25
**capital** 37:19,20
39:22 40:4
63:11 78:13
**capitol** 86:22
**car** 110:15
**career** 119:21
**carried** 59:14
**Carver** 91:2,6
94:12,20
**case** 1:6 3:1 4:6
7:19 9:1 10:4
10:14 12:11

14:6,22 15:12
16:6 18:19
19:12,15 20:14
20:16,17,19,20
21:1,25 22:1,4
23:7,9 26:6,21
28:16 29:21
30:15 32:5,17
33:6 34:4
37:20,20,21,22
38:15,18 39:2
44:23 45:4
49:19,19 50:8
51:11,15,16,17
51:20,21,22
52:18 55:11,14
59:10,11,14,17
67:17,25 68:2
68:5,6,7,8,11
68:25 73:8
76:16 78:7
80:15,22 84:4
84:8,9,14,15
84:15,18,19,20
89:2,5 95:22
96:5,14,18
97:24 99:12
107:13 108:2,7
111:2 112:4
120:18 122:1
123:2,4,4,5,6
124:4,9,24
125:2,3 130:4
133:10 134:2
**caseload** 20:9,22
45:12 49:3,7
50:3 57:5 59:7
59:7,25 60:11
60:18 76:20,22
76:22 80:23
88:12,22,25
90:7 91:24
92:3 95:23
101:14,24
104:9 110:22
114:11,13

121:1 126:14
129:21,23
130:24
**caseloads** 20:5
55:10 92:14
93:1,4 99:8
106:2 110:19
110:25 114:14
115:3 120:23
129:14 130:1
**cases** 11:22
14:25 15:5
18:22 19:16,21
19:23 20:13,21
20:21 21:19,23
22:3,8,20 24:7
24:25 25:9,12
25:19,22,24
26:2,9,12
28:13 29:9,13
30:17 31:21
32:11,14,15
34:3,15 36:1,7
36:13,17 37:17
39:5,23,25
41:21 45:12,13
45:23 50:9,11
50:13,16,20,23
50:25 51:3,4,7
51:13 53:19
54:3,10,22
55:9,12,12
57:19,21 58:14
59:20 65:16
68:5 74:13,15
81:3,6,17,22
81:24 82:12
83:6,14,17,18
83:23 84:5,12
85:4,11 86:15
89:11 90:10
91:15,25 94:20
94:25 95:21
96:1 99:14,17
100:8,12
102:22,25

103:2 105:1,24
106:2,8,10,21
106:24 107:20
119:23 121:16
124:18,22
125:17,21
126:1,20
127:11,17
129:11,15,19
130:25
**case-associated**
21:4
**Case.net** 20:24
**Cat** 86:12,14,21
87:1 88:3 89:3
**cause** 4:18
**cc** 42:7
**CCR** 6:22
**CDE** 33:20
**CDU** 78:13
**Center** 5:19
133:4
**central** 1:2 4:2
4:20 7:21 44:9
44:14,21,24
45:5,8 46:1
94:13 108:10
109:17
**centralized**
71:24 116:12
**certain** 4:18
19:21,23 25:6
27:6 43:23,25
47:11 61:12
72:1 81:7,22
81:24 82:12
83:19 84:21
85:4 89:11
130:2
**certainly** 19:22
22:13 39:8
74:24 76:1
77:6,23 79:3,6
80:11 83:15
109:12 112:25
**CERTIFICA...**

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-23    Filed 02/09/18    Page 38 of 58

132:1
**certification**
89:25 90:4,13
**Certified** 4:16
4:17 7:5,5
132:3,4,5,21
**certify** 81:1,5
90:9 132:6
135:5
**certifying**
105:11
**chain** 3:7 90:20
95:7
**challenges**
103:24
**change** 81:10,12
81:13,19 95:20
106:12,15
134:6,10,14,18
134:22
**changes** 133:13
135:7,10
**charged** 75:23
**cheaper** 110:15
**check** 17:6
20:23 44:13
105:18
**checks** 18:16
**chief** 97:19 98:9
98:13,17 99:1
**choose** 18:24
74:7
**chosen** 29:2
**Church** 1:4 4:4
4:20 7:18
133:6 134:2
**circuit** 2:11
18:24 19:4
27:25 31:10,17
**circuits** 18:22
**cited** 97:1
**city** 6:9 66:25
68:19 91:8,13
92:3,7,20,22
95:1 112:16
127:25 128:2

**Civil** 5:12
**claims** 120:4
**clarification**
44:11 126:11
**clarify** 9:10
15:14 16:19
22:24 29:16
127:3
**classes** 85:4
**classification**
61:20
**classifications**
62:21
**clean** 71:6
**clear** 40:21
58:21 93:13
**clerked** 11:21
**client** 15:20,21
15:21,21,22,23
15:24,24 29:2
29:7 34:10,13
54:2 64:6,7
72:25 111:11
120:3
**clients** 45:14,24
53:24 83:2
97:6 105:21
108:12 111:9
112:6 117:4
**client's** 29:1
**close** 20:16,20
**closed** 20:17,21
31:21 51:7
55:12
**closer** 51:5
**closing** 73:20
**coaching** 128:20
**Coalition** 25:2
127:23 128:4
130:19
**code** 23:5,7,11
23:12,13,19,21
24:2 33:18
51:21 80:25
81:15 125:10
125:11

**codes** 23:9,24
51:20
**Cole** 104:10
**collected** 111:25
**Columbia** 5:21
99:24 102:20
133:5
**column** 50:20
51:2,3,4,11,23
51:24 52:8,15
52:16,20 53:4
53:22 56:3
59:7
**combined** 33:5
**come** 28:10,10
38:11 48:6
104:17 118:18
120:5 130:11
**comes** 116:3
**coming** 71:20
125:17 130:5
**commenced**
50:13,17 59:17
59:20
**commencement**
111:15
**comment** 24:12
**commented** 24:5
**comments** 24:10
**Commission**
80:18 135:24
**committee**
104:16
**common** 28:2
**communicated**
100:7
**communicating**
100:11
**communication**
96:25 121:14
**communities**
112:22
**compare** 80:11
**compared** 49:8
**comparison**
59:24

**compensation**
22:2,7 34:3
**competence**
96:24
**compilation**
56:12
**compile** 45:4
55:9
**complaints** 97:5
97:18,20 120:9
120:17
**complete** 37:2
**completed** 46:7
70:18
**complex** 22:3,7
**comptroller**
46:2
**con** 14:15
**concern** 84:2
**concerning**
116:23 120:25
121:14
**concerns** 18:15
18:16 75:1,3
76:14 116:11
121:1,5
**concluded** 131:5
**conduct** 26:16
68:25 96:24
99:12 100:19
101:10,11
102:23
**conducted** 48:5
48:13
**conference**
120:25 121:9
**confident** 59:22
**confined** 113:1
**confines** 78:3
**conflict** 14:13,15
14:19,25 15:4
15:8,10,18,18
15:20,21,22,23
15:25 16:1,9
16:10 20:3
23:23 24:5,7

36:16 51:7
54:3 55:14
106:8,10,21,21
119:23 125:9
125:10,12,21
**conflicted** 120:6
**conflicting**
23:13
**conflicts** 15:12
16:2,12,15
23:14,17,20,22
23:24,25
125:15 130:6
**confusion** 85:18
86:4,6
**Congratulatio...**
11:17
**consider** 33:6
44:18 80:9
96:8 121:5,6
**consideration**
21:10 104:20
**considered**
15:10 46:2
52:12
**considering**
100:11
**consistent** 89:15
92:2,19 96:12
**constitute** 34:4
34:21 35:12
**constitutional**
124:16
**constraints** 39:4
**consult** 28:17
**consultation**
76:18
**consulted** 28:19
**consulting**
112:13
**contact** 64:6,7
72:25 111:11
111:14,16
**contacted**
105:16
**continuances**

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-23    Filed 02/09/18    Page 39 of 58

96:19
**continued** 23:21
86:15
**continuing** 91:3
99:10,10
**contract** 23:16
33:4,7 34:19
81:22,23 82:2
82:10 83:5
84:5,8 89:10
108:24,25
109:1,1 125:16
125:20,21,22
127:12
**contracted**
23:23 125:15
**contracting** 10:4
10:14 14:22
15:12 23:8
126:1 129:18
129:19 130:5
130:15,16,17
**contracts** 21:7
82:11
**contrary** 36:14
**control** 75:11
**conversation**
121:10
**conversations**
121:18,21
**copies** 3:15 55:3
133:9
**copy** 31:23 33:8
133:12
**correct** 15:16
16:3,4 24:4
30:25 31:8
33:17 36:2,10
44:5 50:19
51:1 54:18
56:17 63:10
86:12,13
107:23 116:2
116:21 119:14
122:22 135:9
135:13

**corrections** 34:9
133:13
**correctly** 52:24
59:10 115:24
**cost** 84:4 109:3
110:8
**costs** 84:7
**counsel** 7:2,2 8:2
14:13,16 20:3
24:5,7 25:2
29:3 34:21
35:5 36:16
73:11 76:13
86:3 96:6
97:19 98:9,14
98:18 99:2
102:24 103:2
106:21 116:24
117:10 118:10
120:5 127:24
128:4 129:13
130:19 132:12
132:15
**count** 50:25
**counties** 19:2,6
34:16 45:15
99:15,19,21
**county** 18:24,24
19:9,9,12,15
102:18,18,23
103:3,14,15
105:8,21 135:3
**couple** 11:13
13:25 17:5
102:8 127:6
**course** 11:22
89:1 117:7
**court** 1:1 2:11
3:15 4:1,16,19
6:21 7:5,20
8:16 9:8 11:21
31:10,17 41:4
45:23 51:24
52:2,6,16,19
69:12 76:21
88:23 97:2,25

101:9 108:19
108:23 109:3
118:22,23
120:18,25
124:13,19,24
125:4,6 132:4
132:21
**courts** 91:13
107:16 118:22
**Court's** 80:16
99:5
**cover** 54:3 72:22
**covered** 45:14
45:18,19 73:5
73:17,24 74:6
107:20
**covering** 45:15
**covers** 73:11
**Cox** 87:19
**co-defendants**
16:8
**Crane** 102:18
103:3
**Crane's** 103:16
**Crawford** 19:12
19:14
**create** 51:3
**created** 49:16
**credit** 79:22,24
79:24 80:3,9
**criminal** 2:12
11:18,22,23
17:11,19 24:25
31:10,18 33:18
73:9 105:4
**criteria** 80:12
116:17
**culture** 109:16
**cumulative** 49:3
50:3,6
**current** 10:25
11:6 33:16
88:21 127:16
**currently** 46:14
49:21 84:6
112:10 123:25

124:7
**custody** 108:5

_____

**D**

**D** 2:1 5:12 17:7
33:19,20 65:8
65:11,16 82:2
82:6
**daily** 123:9
**Daniel** 56:5 57:6
57:14 60:8
**data** 47:5 49:23
55:17 124:1,3
124:9
**database** 45:3
55:11,14
109:19,21
112:4 124:2
**databases** 14:3
45:1 49:20
**date** 7:15 79:5
96:6 123:24
134:3
**dated** 58:10 98:8
101:2
**dates** 50:12
**day** 4:13 46:8,13
73:4 124:4
128:25 135:14
**days** 22:5 51:1,9
72:19 73:14,23
111:15 117:23
133:16
**deal** 116:14
**Dear** 133:8
**December** 93:15
**decentralized**
116:9
**decide** 27:14,25
28:15
**decides** 39:1
66:18 77:24
113:19
**decision** 37:15
37:19,19 47:14
76:17 78:4,6

80:16 81:4
89:13 90:8
97:8,10 99:5
101:9 105:12
105:25 110:22
**decisions** 97:3
118:23
**declare** 135:12
**declaring** 85:3
**defendant** 85:14
95:18 108:5
**defendants** 1:8
4:8,22 5:17 7:3
16:6 74:21
84:13 107:16
**defender** 5:17
5:19 9:22,24
10:17 11:14
12:2 14:16,18
14:20,21 25:9
29:4,5,11,17
30:13,23 37:4
37:18 38:6,9
38:19 39:3
49:3 61:15,15
61:17,19,24
62:1,5,6,8,12
62:15,18,20,24
63:2,3,4,9,23
63:24 64:14,15
64:19 65:1,1
65:18,19,20,23
65:24,25 66:17
66:25 67:24
68:9 72:7,18
72:21 76:4,18
78:3,5,9,10,11
78:17,19,20,21
79:4,13,18
80:17 91:7,14
91:21 93:22
95:25 102:20
103:23 104:16
109:1,15
110:13,21
113:11 117:20

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-23    Filed 02/09/18    Page 40 of 58

119:16 120:19
121:11 122:25
124:9,17
128:24 130:9
133:3
**defenders** 2:19
2:21 11:2
36:17 39:15
44:13,20 47:8
55:20 58:3
61:13 62:22
63:8 67:2 75:6
75:8 76:1,15
76:19 88:4
99:7 110:25
113:4,8,8,9
114:5,16
116:24 118:4,5
120:10,24
121:12 128:17
128:25 129:2
**defender's** 14:14
80:1 92:20,23
118:8
**defense** 11:18,24
17:12,19 74:9
75:3 82:14
86:17 105:4
130:22
**defer** 77:1
**denials** 21:15
38:11
**denied** 22:13
**dent** 130:25
**department**
34:9 49:14
126:18
**depends** 22:1
25:14 29:22
45:11 66:16
78:22
**deposed** 9:3
12:1
**deposes** 7:12
**deposition** 1:14
1:20 4:10 7:3

7:13,17,22 9:2
9:12 12:7,11
12:12,17,21
13:4 106:6
108:15 109:13
131:5 132:8,14
133:9 135:6,8
135:11
**depositions**
35:21 108:11
108:22 109:5,8
109:18
**deputy** 9:21,23
10:1,16 38:1
78:8 104:3
113:9 118:4
**describe** 25:3
116:8
**described** 38:21
40:13 78:1
108:17
**describing** 55:13
**designated**
12:25 20:17
**designed** 122:11
**desired** 133:14
**desperate** 19:2
**detail** 50:1 86:25
**detailed** 46:11
46:19
**determination**
73:7 118:9
119:17
**determine** 30:1
52:6
**deviate** 34:4
109:2
**DeVries** 4:16
6:22 7:4,24
132:3 133:22
**diem** 22:5
**difference** 15:17
68:1
**differences**
109:7,10
**different** 15:11

32:12 36:23
38:12 50:7
51:15,16 63:12
75:16 96:4
117:5 120:8,22
127:1
**differentials**
63:10
**diligence** 96:25
**Diplomate** 4:17
132:5
**dire** 73:19
**direction** 132:11
**director** 9:21,24
10:2,3,3,5,7,8
10:10,12,17,21
10:23 11:3,7,8
13:11 37:24
38:1,8 47:9,14
63:21 76:1,13
76:19 78:7,9
88:3 93:7
98:10 101:3
103:23 104:3
105:16
**directors** 10:1
10:25 38:3
44:18 67:1
128:21
**disbursed** 31:7
**disciplinary**
97:19 98:9,13
98:18 99:2
**discontinued**
122:20 123:16
124:8
**discovery** 14:6
57:11
**discretion** 116:6
**discretionary**
116:5 117:25
**discuss** 94:12
103:24 104:7
**discussion** 13:15
13:18 113:23
**disposed** 20:16

20:19 32:5
55:15
**disposition** 2:12
23:8,19 31:10
31:18 32:17
**dispositions**
64:9
**distance** 34:8,12
**distances** 34:10
110:20 111:1
**distributes**
25:17
**district** 1:1,1
2:24 3:1,2,4
4:1,1,19,19
7:20,20 11:2
14:20,21 25:9
37:4,18 38:6,8
38:19 39:3,15
44:13,14,20
45:8 47:7
61:13 63:4
66:2,11,13,16
66:17,22,24,24
67:2,9,13,17
67:24,24 68:9
68:18 69:2,10
69:13,25 70:6
70:14,24 75:6
75:8 76:1,3,4,6
76:8,15,17,19
78:3,5,10,10
84:23 88:4
91:7 99:7,20
99:23,24 100:1
100:2,3,4
105:23 109:14
109:22 110:21
110:25 113:8,9
114:17 115:1
116:9 118:4,4
128:17,24,25
129:2
**districts** 43:25
44:10,22 45:3
46:1 70:2 71:2

71:9 84:11,21
84:24 85:8
106:21 109:7
112:21,24
116:6 121:15
**divided** 53:3,9
53:10,16
**division** 1:2 4:2
4:20 7:21 10:2
10:8,21,22,24
11:3,6,8 37:24
38:2,7 40:5
44:17 54:17,23
58:17,19,20
59:3,3 63:21
64:16,18 67:1
76:13,18 78:7
78:8,12,13,13
84:4 113:4,6
113:12,16
128:21
**divisions** 37:25
38:3
**docket** 50:11
59:21
**document** 31:14
32:23 33:12
40:21,25 41:8
41:11,24 42:8
42:19 43:5,8
47:25,25 48:9
48:25 49:13,15
49:25 50:8
55:25 56:7
57:2,9,14 58:6
58:9 61:8
63:13 64:16
66:6,19,21
67:21 68:13
69:7,16,24
70:11,21 71:2
71:9 87:25
88:11 90:23,24
98:5 100:24
102:14 103:10
**documentation**

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com     Phone: 1.800.280.3376     Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-23   Filed 02/09/18   Page 41 of 58

41:25
**documented** 98:23 112:7
**documents** 13:13,20 14:4 102:5 110:6 126:25
**doing** 24:17 26:18 47:12 96:22
**dollar** 14:2 37:9 84:8
**double-sided** 40:22 58:7
**drawing** 101:23
**drive** 110:16
**drug** 33:19
**due** 93:1,4 95:22 101:14,24 106:2
**duly** 132:8
**Duncan** 10:11 13:8,10 14:1
**duties** 99:11

**————— E —————**
**E** 2:1,8 5:1,1
**earlier** 31:20 43:15,23 72:15 107:1,13 123:10
**earned** 29:25
**easier** 95:20
**easily** 123:19
**educate** 100:18
**educational** 105:2
**effective** 35:4 41:18 82:14 92:15 109:3 116:23 117:10 130:24
**effectively** 91:25 117:4
**efforts** 88:22 89:9 90:18

103:17
**either** 18:15 20:13 21:9 30:9 38:9 39:16 46:10 60:20 67:15 83:22 86:25 94:18 97:14 105:15
**Either/or** 124:20
**elaborate** 84:2
**elected** 104:1
**electronic** 37:3 43:9 112:3
**Eleventh** 6:14 6:23
**eligibility** 79:5
**eligible** 19:6,15
**Ellen** 10:9 11:9 63:17,20 64:3 64:21
**Elmer** 1:14 4:10 7:10,17 8:23 71:19 115:14 115:18 129:10 133:10 134:1 135:5,20
**embark** 50:2
**employed** 11:11 59:3 60:25 94:9 113:4,17 132:12,16
**employee** 11:19 72:5 73:2,5 117:8 132:15
**employees** 57:22
**employment** 72:7,9,11 77:8 114:1
**enclosed** 133:9 133:10
**encourage** 56:2
**encumbrance** 37:2 40:12 43:14,21 44:6 108:16,18

109:13,19 112:20
**encumbrances** 43:9
**ended** 29:7 46:22 87:15
**engaging** 100:17
**ensuring** 116:23 117:10
**entered** 84:24 85:2,8
**entire** 18:23 19:3 27:25 29:24 86:16 90:24
**entirely** 20:23
**entitled** 48:3 86:2
**entry** 57:6 60:9 123:10
**Eric** 8:9,11 115:19
**errata** 133:11,14 133:15 134:1
**especially** 77:17
**essence** 81:14
**essentially** 53:8 65:13 82:9 103:16 129:1
**estimate** 28:8
**estimated** 51:24 52:9
**estimation** 52:1 52:10
**et** 1:4,7 4:4,7,20 4:21 7:18,18 133:6,7 134:2 134:2
**ethical** 96:13 120:9
**event** 95:13,15
**events** 72:2,3
**exact** 97:15
**exactly** 102:3
**EXAMINATI...** 8:21 115:16

127:8 129:8
**examined** 4:11 7:11
**example** 34:6 35:16 97:23 120:13
**Excel** 21:5 56:21
**exception** 125:18
**exceptions** 15:3 18:25 19:18,25
**excess** 126:3
**excessive** 101:14 101:24 106:2 129:14
**exclusive** 45:10
**exclusively** 106:8
**excruciating** 50:1
**excuse** 51:23 56:1
**Executed** 135:14
**execution** 85:21
**exhibit** 2:9,10,10 2:11,13,15,16 2:18,18,19,21 2:23,24 3:1,2,4 3:6,7,8,10,10 3:11,11,12 12:14,14 31:9 31:13 32:18,22 40:17,20 47:20 47:23 48:22,22 48:24 55:19,23 58:1,2,18,18 58:19,22 59:1 59:7 61:4,7 63:13 66:2,5 67:17,20 68:2 68:2 69:2,6 70:6,10 71:5 87:21,24 90:19 90:22 98:1,4 100:21,21,23 102:11,11,13

103:5,9
**exhibits** 3:15 126:12,12
**existed** 50:4
**existing** 18:8,11 55:10 106:2
**exit** 113:21,22 113:24 114:2,4
**expect** 30:3 106:15
**expectation** 20:1 25:18
**expected** 19:24 22:4 36:3 45:2 45:22 76:15 101:9
**expenditure** 14:2 35:7 40:2 43:14
**expenditures** 45:17
**expense** 34:22 35:12,16 37:23 39:21 41:6 43:5 49:21 54:1,9 110:11
**expenses** 21:3,4 34:20 35:3,14 35:18,19,20,24 36:4,5,6,24 38:21 130:10 130:12
**expensive** 83:8 84:1
**experience** 11:18 17:5,8 17:12,16,19,24 24:20,22 25:21 79:25 80:8 107:15 121:4
**expert** 21:3,18 36:19 37:1,7 37:13,16 38:4 38:13 43:15 112:9
**experts** 35:22

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com     Phone: 1.800.280.3376     Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-23   Filed 02/09/18   Page 42 of 58

explain 23:10
  114:5 127:14
expressed 91:23
expressly 7:8
extent 20:11,12
  64:10 106:22
extraordinary
  22:3,7 34:3,4
  34:20,21 35:3
  35:7,12,16,19
  36:1,6
e-mail 2:23 3:6,7
  42:7 61:5,10
  87:22 88:3,5,8
  88:11 90:20
  91:2,4,10
  93:14 94:13,14
  94:17,23,25
  95:7,7,8,12
  102:17 103:16
e-mails 100:16
  121:17

F

face 77:9 84:13
fact 89:11 95:19
  99:13,16
  102:19
factor 129:14
fair 24:2 37:14
  44:2 47:16
  65:22 66:1
  88:19
fairly 59:22
familiar 42:11
  80:16 91:4
  118:6 120:14
  120:16,23
  124:15 127:19
far 25:20 50:4
  64:21 83:5
  106:24 114:11
  130:23
fashion 20:18
favorably 97:1
fear 99:6

Federal 12:2
fee 21:24,25
  22:5 24:14,15
  24:16 29:24
  30:1,6,16
  33:12,16 34:2
  34:5,18
feel 29:25
fees 27:18 29:20
  33:17,21 83:15
  83:15
felonies 17:7,9
  65:9,16 82:2,6
  82:22
felony 33:19
  65:11
fewer 82:25
  130:6
fifth 57:1 60:8
figure 119:4,13
  123:20
figures 126:20
file 112:2,2
filed 106:1 121:8
  122:2,2
files 112:3,4,6
filing 94:7
  133:17
fill 16:24 32:5
  48:16 67:14
  77:15 88:20
  110:10
filled 69:21
finally 72:13
financially
  132:16
find 82:4 118:21
  133:9
finding 99:8
  119:24 129:12
  129:14
finds 66:17
fine 84:20 85:25
  99:23
fine-only 84:15
  84:19 85:4,19

85:22 107:24
finish 9:7
firm 25:5,7,17
  112:16,19
firms 25:6,6,13
  25:15 128:4
first 11:12 19:11
  23:13 30:16
  37:3 42:13
  56:4,4 57:4,4,5
  58:7 72:6,9,11
  72:16 82:18
  88:15 104:22
  130:14
first-level 15:8
  15:18,22 16:9
  23:14,16,20,22
  23:22,25 37:4
  38:10
fiscal 56:13,13
  56:18 58:10
  59:15,16,18
  61:1 126:6
  127:16,18
  130:3
fit 96:7
five 4:13 18:5
  35:1 59:1
flat 21:24,25
  83:15,15
flip 56:2 57:1,13
Floor 5:13
fluctuates
  129:22,25
focus 91:1
focused 74:13
  74:14 75:18
folks 74:6
follow 41:18,25
  101:11 117:1
following 84:10
  88:16 103:25
  117:3
follow-up 129:6
font 47:24
footnote 52:3

foregoing 132:7
  135:6,13
forged 89:24
forgot 18:20
  128:23
form 2:12,25 3:3
  3:5 31:10,18
  31:19,23 32:4
  32:12 37:3
  39:6 66:3,9,13
  67:4,8,25 68:2
  68:3,4,14,20
  68:21 69:3,11
  69:14,19 70:3
  70:3,7,15,17
  71:7 89:6
  135:7
formal 96:25
forming 104:15
forms 32:8,16
  75:14 105:2
formula 51:19
forth 103:16
forthcoming
  110:1
Foundation 4:14
  5:13 7:23
four 42:6 53:3
  53:10 57:1
  61:16 62:2,5
  62:21,24 63:9
  63:24 64:15,19
  65:6,24 78:9
  91:3 97:5,7
fourth 50:20
  103:19
frame 78:22
fraught 83:6
free 19:19 130:7
freely 96:3
frequent 24:12
  24:13
frequently 27:12
  28:4 64:7
  68:23 77:16
  78:19 85:18

114:7 115:2
  118:21
front 123:21
  126:13
fruit 89:13
frustration
  88:20
full 91:20 93:18
  103:19 104:23
Fulton 66:11
function 49:18
  128:1
fund 31:3
  130:11
funding 23:15
funds 37:12
  38:20,23
further 62:25
  115:14 127:5
  129:8 131:1
  132:14
future 30:17,21

G

game 96:4
geared 117:9
general 18:23
  19:18 30:12
  31:3 42:19
  44:8 61:9
  73:11 76:12
  77:1 86:7
  101:6 111:5
  124:24
generally 14:15
  18:7 21:11,14
  21:16 24:19
  28:24 29:10
  35:24 44:2,4
  64:24 67:9
  74:14 76:19
  77:2 80:20,22
  87:4,5 92:10
  107:20 110:25
  111:13
General's 6:3,8

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-23    Filed 02/09/18    Page 43 of 58

generate 45:1
getting 26:21
  64:9
give 8:17 28:8
  38:9 45:10
  52:24 53:16
  114:10
given 22:15 23:1
  27:16 44:19
  47:18 50:5
  51:14 75:17
  82:3,20 85:22
  95:24 96:3
  104:18 127:15
go 9:5 14:25
  15:3,5,9,11
  16:12 19:3,11
  28:10 30:13
  58:6 71:5 82:9
  95:17 106:4,20
  112:17 113:24
  114:1 115:6
  116:19 118:2
  118:15 130:3
goal 129:25
goes 14:20 30:12
  37:3
going 9:13 27:20
  28:9 29:8 36:9
  45:23 57:25
  60:7 62:14
  71:14 79:7
  93:13 107:12
  115:8,23
  121:16 125:8
  130:10 131:3
good 8:23 71:11
  83:20
gotten 39:9
govern 108:22
governing 110:8
Governor 6:1
  8:9,11 115:19
grant 95:22
granted 22:13
  80:4

granting 80:9
great 9:8,19
  110:20 111:1
Greg 13:8 78:7
Greitens 6:1 8:9
  8:11 115:20
ground 9:6,17
guess 44:11
  48:11 127:1
guidance 64:22
  98:11,22 99:2
guide 61:12
guideline 111:18
  111:19
guidelines
  111:10,12,22
  116:7,25 117:3
guilty 3:2 69:3
  69:10,13,18,22
  70:4

——— H ———

H 2:8
half 11:4 46:23
  47:1,3 122:5
  122:15,18
  123:23
halfway 88:12
  101:12
hand 36:13
  130:8
handful 115:20
  129:1
handing 12:15
  40:19 47:22
  61:6 66:4
  67:19 69:5
  70:9 87:23
  90:21 98:3
  100:22 102:12
  103:8
handle 10:6
  18:22 25:22
  57:21 70:20
  76:20 82:11,22
  83:17 84:8,15

91:25 96:15,19
  102:24 103:2
handled 57:19
  58:14 59:10,11
  83:2 125:15
  126:21
handles 25:15
  76:22
handling 25:19
  74:15,20 83:23
  84:9 91:14
happen 28:18,21
  44:3 111:3
  114:19
happened 29:15
  122:14,17
happening
  103:15 122:12
happens 28:15
  29:20
head 86:12
heading 41:16
  43:5 88:11,16
health 74:21
hear 100:19
heard 105:15
hearing 3:4 70:7
  70:14,16,20
  71:3
hearings 34:11
  72:25
Heather 42:14
held 7:22 74:23
  117:21
help 57:24
  104:16 129:21
  129:24 130:11
helping 117:17
high 6:8 91:24
  93:1,4 114:14
higher 16:12
  115:4
Hinkebein 97:9
  97:23 99:5
  101:4,8 105:25
Hinkebein's

98:14
hire 29:3 39:16
hired 37:16
  60:22
hiring 35:21
  39:23
historical 124:3
hold 94:2
holding 80:21
  95:16
home 19:8,9,10
homicide 26:6
  37:21,22
homicides 17:9
  82:23
hope 104:8
  106:17
hours 4:12 9:11
  9:13 26:20
  46:8,9 51:18
  53:1,9
House 87:8,13
HR 73:11,12
  76:13 77:1
  113:23
hundred 53:1
  119:12

——— I ———

ideas 104:14,17
  104:18,21
identification
  17:4 31:11
  32:20 40:18
  47:21 55:21
  57:25 58:4
  61:5 66:3
  67:18 69:4
  70:8 87:22
  90:20 98:2
  103:7
identified 33:19
identify 23:20
  25:6,9
II 78:5
III 61:22 78:6,25

IL 132:5
immediately
  41:18 93:25
  103:25
immigrant
  112:22
immigration
  74:3 75:1,3
  112:8,12,16
  124:17,19,22
  124:24,25
  125:2,4,6
impact 39:13
impactful
  130:20
impacts 39:10
impose 44:21
  46:4 85:24
  107:21
imposed 84:20
  108:4
imposition
  85:20
include 35:21
  52:5 53:23
  87:13
included 36:23
  43:24 50:6
  85:3
including 65:16
  68:11 113:7
incorporates
  60:4
Increase 106:13
indefinite 83:17
indefinitely
  107:4,5,7
  122:21
indicate 18:21
  133:13
indicates 60:13
indicating 46:7
indictments
  41:2,5
indigency 73:7
indigent 82:14

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL     Document 153-23     Filed 02/09/18     Page 44 of 58

86:16 102:24
130:22
**individual** 44:22
**individually**
83:1
**ineffective** 118:9
120:4 129:12
129:15
**ineffectiveness**
119:25
**inform** 32:10
**informal** 121:17
**information**
21:8 36:22
43:24 44:1,23
45:4 61:12
109:20,25
111:25
**infrequent** 38:7
114:21 119:9
119:10,13
**initial** 111:14
**initiated** 50:21
51:3
**initiative** 25:5
**instance** 16:3
19:12 37:25
61:22 85:19
**instances** 118:7
**insufficient** 46:9
**intent** 101:7
**interest** 14:19
19:1 77:20
**interested**
132:17
**internal** 46:3
**interpreter**
40:11
**interpreters**
40:14
**interruption**
41:4 69:12
76:21 124:13
**interview**
113:21,22,24
114:2

**interviews** 114:4
**introduce** 8:2,24
**investigate**
54:10
**investigating**
45:23
**investigation**
39:12,12 41:5
41:12,20 42:1
**investigative**
41:2
**investigator**
38:15,17,23
42:5,20,22
**investigators**
21:18 38:16,20
38:25 39:5,16
39:17 43:2
110:9
**invited** 27:2,5
**involved** 13:16
13:17
**involves** 41:25
**involving**
129:11
**in-between**
73:20 126:21
**In-court** 49:22
**in-house** 27:4
38:16,25 58:15
80:12 83:3
84:9
**Irvine** 5:9
**issue** 130:24
**issues** 74:21
**issuing** 44:14

_____

**J**

**J** 5:8
**Jacqueline** 5:18
8:12 133:3
**jacqueline.shi...**
5:22
**jail** 84:13,17
85:13,14 86:1
86:3 93:23

94:2,21 107:14
107:21 108:3
**James** 5:8
**Jane** 10:11 13:8
13:10 14:1
**January** 49:6
50:10,17 53:19
88:7 93:20
**Jason** 5:12 8:6
**Jefferson** 6:9
91:8,13 92:3,7
92:20,22 95:1
**jmaune@orri...**
5:10
**job** 27:21
**Joel** 1:14 4:10
7:10,17 127:10
133:10 134:1
135:5,20
**John** 6:13 7:24
10:13
**Johnson** 49:14
**Johnston** 10:15
**join** 114:17
**joining** 79:25
**judge** 84:18
85:23 95:11
102:17 103:3
103:16 107:21
108:4 120:3
121:10,18
**judges** 91:13
97:6 99:13,16
100:7,11
102:23 121:15
121:21
**judicial** 118:9
119:17 129:12
**July** 10:19 15:2
15:4,7,14,15
23:14,21 24:17
54:4 106:6,11
**jump** 115:23
125:8
**jumping** 107:11
**June** 55:6

**jury** 17:5,15,24
95:24
**justice** 73:9
**justified** 47:18
**justify** 83:13
**Justin** 91:2,6
94:12,20
**juvenile** 74:8,10
74:13,15,18
**jwilliamson@...**
5:15

_____

**K**

**Kansas** 66:25
68:19 112:16
**Karl** 97:8
**Kathleen** 46:3
**keep** 20:24 28:3
28:6 31:21
46:16 89:9
122:24 123:2
**keeping** 49:23
**Kelly** 3:6 86:12
86:14 87:21
88:3 89:3
**Kennett** 100:1
**kept** 119:15
122:5
**kicked** 26:17
**kind** 37:8
**kinds** 26:2 27:16
45:21 54:6
77:12 109:10
**know** 8:23 9:15
14:4,7 18:5
19:11,13 25:20
28:25 34:12
38:8 44:17
46:22 48:1,8
48:12,19 49:13
49:15,18 50:5
51:18 53:9,12
53:15 59:9
64:6 65:12,14
66:19,23 68:22
69:15 70:1,21

70:25 74:3,22
75:17,18 76:25
77:4 83:8,11
83:12 84:23,24
85:2,8,11,19
87:5 88:19
89:3 94:15
95:10,17,23
98:24,25 99:3
99:20 100:10
100:16 101:8
101:18 102:2
102:10 104:19
105:9 106:24
107:3,11
110:14 112:18
112:25 113:3
113:15 114:3
114:16 116:15
122:8,10
123:15,18,18
123:19 126:23
126:24 127:16
129:16 130:13
**knowing** 130:4
**knowledge** 24:6
24:9 36:12
38:22,24 39:14
46:16 48:21
66:7:4
68:17 69:24
70:23 71:8
86:5,19 93:3
98:12,17,25
105:25 121:9
121:17,19

_____

**L**

**L** 4:15 6:22 7:4
132:3 133:22
**lack** 85:1
**LaDonna** 42:7
42:10
**language** 87:9
87:10,14,20
**large** 17:21

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-23    Filed 02/09/18    Page 45 of 58

largest 93:18
law 11:12,20
  25:5,6,6,13,15
  27:20 77:2,3
  112:16,19
lawful 7:11
lawyer 93:24
  94:8 95:21
lawyers 91:23
  92:13,25 93:3
  93:25 94:4,6,7
  104:25 105:20
  105:24
lay 82:20
leading 81:11,19
Lear 46:3
learn 20:18,19
  85:13
leave 18:12
  27:10,14 28:9
  30:9,9 46:10
  113:19 114:17
  114:25
leaves 30:19
leaving 27:17
  86:1 114:1,5,6
  114:10
left 60:20 78:24
  82:22 105:11
legal 7:25
legislation 81:21
  82:1,5 87:16
legislative 47:6
  81:11,18,20
  89:9 90:18
legislators 86:22
  87:1,17
legislature 86:16
  106:14
letter 3:8 98:2,8
  98:13,19 101:2
  101:7,13
  104:23
letters 121:20,22
letting 82:10,10
  102:9

let's 9:5 14:9
  36:15 59:6
  118:15
level 16:12
  24:20,22 28:11
  28:11 38:7,8,9
  61:20 92:15
  110:18 120:1
  120:17
levels 26:4,7
liaison 128:3
Liberties 5:12
license 96:18,22
  97:12,16,25
  98:14 120:20
licenses 97:4
lies 78:4,6
light 97:19
limited 68:5
limits 37:6,8,9
  37:10 108:22
  109:4
line 19:14 61:14
  134:4,8,12,16
  134:20
list 2:19,21
  12:21 16:23
  45:10 55:19
  57:15 58:2,11
  59:1 60:24
  100:4 108:23
  126:14
listed 56:5
listen 9:6
literally 30:6
litigation 6:13
  6:23 8:1 21:3
  34:22 35:13,16
  35:18,19,20,24
  36:4,5,6,24
  38:21 39:21
  40:2 57:12
  101:21 102:1
  130:10,12
  133:1
little 13:5,12

55:24 84:2
  126:6
live 77:21
local 16:8 25:9
  38:19 44:16,19
  76:6,8 86:15
  99:13 110:18
locality 79:15
located 34:13
log 49:23
logging 46:18,21
  47:2,13 122:3
  123:16
logs 122:6
long 10:16 11:3
  11:10 34:8,10
  72:18 73:2,13
  73:21 98:20
  117:22
longer 11:6
  55:24 100:12
  102:21
look 12:20 33:11
  34:25 42:13
  43:4 45:8,12
  45:13,13,14,14
  45:15,17 46:24
  59:6 61:13
  65:11 91:4,9
  91:16,19 93:17
  101:12 103:19
  104:17,20,22
  118:23 126:10
looked 13:22,24
  14:1 64:4
  83:19 105:10
looking 45:11,12
  51:5 52:24
  95:12
looks 56:15
  91:12 126:25
lot 22:13 36:20
  51:16 55:24
  57:17 65:5
  77:23 116:9
  118:17

loud 88:16,17
  89:19
Louis 4:15 6:4
  6:14,24 7:23
  127:25 128:2
  133:17
low 24:11 27:19
  79:11 83:12,13
  114:15
lower 65:5 115:3

——————
M
——————
Maggie 10:15
Main 5:9
majority 17:21
  114:11
making 41:20
  43:20
manage 76:14
  95:21
management
  14:2 23:9
  48:14 49:20
  55:11 112:4
  117:20 128:16
  128:19
manager 10:4
  10:14 69:21
  70:19 73:11
  76:13 77:1
  113:24
managerial-le...
  63:3
managing 76:5
  76:8 117:17
mandatory
  117:24 118:1
March 49:6 50:9
  50:10,17 53:20
  55:4
mark 112:5
marked 2:10,18
  3:10,11 12:14
  31:10,13 32:19
  32:22 40:18,20
  47:21,23 48:22

48:24 55:20,23
  58:3 61:5,7
  66:3,5 67:18
  67:20 69:4,6
  70:7,10 87:22
  87:24 90:20,22
  98:2,4 100:21
  100:23 102:11
  102:13 103:6
material 101:20
materials
  101:13,22,23
  105:7,17
math 53:14
Matt 8:4,25
matter 7:17
  84:16 127:4
matters 27:2
  112:13
Matthew 5:4
Maune 5:8
MCR 26:16,17
mean 10:22
  11:20 16:19
  19:9,10 21:14
  24:16 28:1
  29:10 32:2
  35:11,17 36:11
  37:4,20 43:22
  45:19 49:8
  50:2,23 51:12
  51:25 52:9,17
  52:21 55:11
  57:15 59:11,16
  63:15 64:5
  67:5 77:22
  78:23 79:10,21
  79:24 80:10
  81:19,23
  106:17 109:11
  112:3,14 113:2
  113:6 114:13
  119:7 121:6
  124:21 126:24
  130:24
meaning 78:23

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-23    Filed 02/09/18    Page 46 of 58

means 12:6
20:15 61:22
meant 15:15
80:22 85:19
mechanism 22:1
mediator 128:13
meet 13:7 85:21
111:8,22
130:21
meeting 45:24
104:1,4,7,14
meetings 89:12
meets 61:24 62:6
62:12 65:18
78:17
member 87:13
127:25
members-only
105:3
memo 36:21
43:23
memorandum
2:13 32:19
33:1,9,24
memory 13:12
59:9
mental 74:21
mention 18:20
mentioned
31:20 34:1
45:18 72:15
75:1,14 78:16
79:8 81:18
83:25 106:6
107:1 129:10
129:17,22
130:18
mentoring
128:20
merit-based
61:20 65:24
Mermelstein
13:8,19 38:1
78:14 102:1
105:14,18
Mermelstein's

78:8
met 8:23 13:5
61:22 62:3,10
79:1 103:22
104:2
metrics 45:7
49:3 50:3 60:5
64:2,5,12,17
Michael 6:2
8:10 13:16
98:10 101:3
104:18
michael.quinl...
6:5
Midwest 6:13,23
8:1 133:1
mildly 115:22
miles 45:14,18
45:19
mind 123:24
minimum 61:21
61:23 62:4,10
78:2 79:1,5
minus 50:23
minute 41:14
43:17 52:25
53:16,23 71:6
mirror 61:25
misdemeanors
17:7
missed 71:6 73:3
110:4,6
mission 130:21
Missouri 1:1,7
3:12 4:1,7,14
4:15,19,21
5:19,21 6:1,3,4
6:7,9,14,22,24
7:18,20,23,23
8:9,11 9:21,24
10:17 11:21
12:1 13:23,23
14:13,16 25:2
30:13,23 31:4
48:6 49:2 77:3
77:6 79:19

80:16,17 82:15
94:9 97:2,24
103:5,17,22
104:8,11 105:1
105:19 112:22
115:19 118:8
119:16 120:9
127:23 128:3
130:18 132:22
133:3,5,7
134:2
Mister 101:25
misunderstan...
16:2
mitigation 39:22
40:4,7
mixed 121:21
MO 4:16 132:4
133:17
mobardot.org
105:4
model 25:14
moderates 102:1
modifications
21:13,15
monetary 37:10
108:22
money 30:5,6,12
30:22,24,24
31:2,6 82:3,4
82:19 125:24
130:3,7
monitor 76:10
monitoring 47:9
month 51:8,10
94:4,5
monthly 110:10
111:16
months 20:24
26:17 53:5,10
53:19 55:1
morning 8:23
Morry 104:10
motion 3:4
64:10 70:7,14
70:16,20 71:2

74:4 94:8
118:19,20
120:25 121:8
122:2
motions 101:23
106:1 120:1
121:23
mouth 77:7
move 28:15
moving 28:18
mshahabian@...
5:6
MSPD 8:13 11:7
11:11,19 12:6
12:12 18:4
20:3,8 24:6,24
26:8,11,14,24
28:3 29:11,13
30:16,20,21
31:7,20 32:10
32:10 35:8
36:16,18,25
37:6,13 38:14
38:22 39:19,25
40:10,14 41:9
42:4,21 44:2,9
45:22 46:4,5
46:12,15,16,21
47:2,12 48:17
48:19 50:11
55:8 57:22
58:23 59:4
60:18,25 63:25
64:13,18 65:3
66:14 68:24
70:2 71:1,8,24
71:25 74:12
76:23 77:9,24
79:9 80:8,14
81:5 84:11
85:8,11 86:9
86:12 87:1
92:10 93:1,4
93:10 94:13,16
95:4 96:17,21
98:18 99:1,4

103:1 105:6,19
105:24 106:1,7
106:20,20
108:1,10,11,14
109:5,17 110:9
110:19 111:8
111:21 112:5,8
112:11 113:17
113:19,20,21
113:25 114:9
114:17,25
115:25 125:22
127:22 129:11
129:18 130:21
MSPD's 43:20
114:1
Mullin 10:13
multiple 10:24
16:6 34:11
74:6
multiplied 51:14
multiplying
51:19

—— N ——
N 2:1 5:1 133:16
name 7:24,24
8:24 17:3
42:12 54:13,14
56:4,4,4 57:4,5
115:18 127:20
128:10 134:1,2
135:11
named 97:8
names 42:14,18
54:22,23 56:15
56:22 57:15,15
57:17 58:12,16
58:22 59:2
naming 99:21
Nancy 60:9,11
nature 20:5
near 9:13 93:14
93:17
nearby 15:9,11
nearly 68:20

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-23   Filed 02/09/18   Page 47 of 58

necessarily 50:6
66:15
necessary 35:4
36:5 47:5
65:15 135:9
need 9:13 19:2
33:23 44:11
117:13 130:11
needs 29:24
68:12
neither 132:12
net 51:4,11,13
51:22 52:18
Nevada 100:3
never 85:24
118:21
new 5:5,5,14,14
18:7,10,13
41:19 51:4,13
53:19 55:9
59:20 71:25
72:5,7,18,21
73:2,5 75:2,23
76:23 77:10
79:12,17 80:13
81:2,6 87:10
90:10 99:10,14
99:17 100:8,12
102:22 105:13
105:24 106:10
106:23 117:8
125:17 128:16
128:23 129:1
newest 128:25
Niehaus 6:13
7:25
Nifong 5:20
133:4
noncapital
37:17 39:25
40:6
nonconflict
126:1
normally 22:4
72:6 117:21
118:18

North 6:14,23
notarized
133:15
notary 133:14
135:23
notice 12:10,17
notification 33:6
number 7:19
12:25 17:4
19:21,23 21:20
27:6 45:12,13
45:16 46:7,9
51:17,20 52:22
52:25 53:9
56:16 57:5
80:5,10 81:7
83:17,18 96:1
109:18,19
113:15 119:11
126:14
numbered 12:22
56:8
numbers 14:2
49:19 50:8
51:20 52:24
127:10
numerous 113:2

O
Object 39:6 89:6
Objection 125:1
observation
2:24 3:3,5 66:3
66:9,12 68:3,4
68:21 69:3,11
69:14,19 70:7
70:15,17 71:7
observations
70:4
observed 67:16
70:19
observing 71:2,9
obtain 88:22
obvious 73:16
120:13
obviously 11:23

65:5 66:10
78:24
occasional
114:22,23
occasionally
19:25 27:1
28:14 31:25
40:3 74:22
occur 111:14,16
122:6,8
occurred 119:25
occurring 64:8
occurs 63:5 72:6
72:10 74:11
120:1 125:3
126:3
October 1:16
4:11 7:15
133:2,10 134:3
offer 113:23
offered 75:15
87:9
offhand 120:21
123:17,19
office 6:3,8
14:14 15:9,11
15:19 16:9
19:10,14 38:17
42:9,15,24,24
42:25 44:9,14
44:21,24 45:5
45:8 46:1
66:11,25 68:20
74:17 75:7,12
76:6,8 79:18
80:1 81:2 90:9
91:8,22 92:4,7
92:20,23 94:13
94:16 95:1
97:19 99:25,25
100:1,2,3
102:20,20
107:13 108:10
108:10 109:17
115:1 120:8
133:16

offices 11:1,2
23:18 39:17
43:1 45:9 47:7
68:22 74:15
81:5 86:15
99:4,21,23
100:5,6,10,14
100:17 105:12
105:23 106:23
109:12,14,16
110:23 114:17
116:10
office's 49:7
officials 84:11
87:1
Oftentimes
77:13
Oh 128:7
Okay 9:5 11:10
14:9 36:7
56:23 59:23
110:3 115:23
117:24 119:20
121:25 126:11
127:19 128:8
129:3
Olive 4:14 6:4
once 18:18 21:1
33:24 74:11
87:12 117:21
130:13
one-on-one
128:20
ongoing 32:11
111:16
on-campus 77:2
on-line 21:6
open 20:14,21
20:22 51:8
55:12
opened 31:21
50:9 51:12
operations 10:3
10:10 13:11
73:10
opinion 35:15

82:13 97:1,12
101:24 130:20
opportunities
117:6
opposed 34:20
84:9
optional 72:17
order 56:10
62:14 82:21
97:11,12 101:5
117:14
orientation 72:5
73:3,6 117:9
original 3:15,15
133:10
originally 20:14
Orrick 5:4,8
outcome 132:17
outline 17:8
outlines 41:24
103:17
outside 8:24
11:18 20:5
38:20,23 39:24
40:2 68:17
69:25 70:23
112:12
overall 24:3,16
overload 125:25
129:17,19
130:14,16,16
overloaded 81:2
81:6 83:4 94:1
oversaw 1:1
oversee 10:5
44:9 45:8 46:1
105:19
overseeing
103:2
oversight 44:9
o'clock 4:12,13

P
P 5:1,1
page 2:2,9 33:11
34:25 41:11,15

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-23    Filed 02/09/18    Page 48 of 58

41:16 42:13
43:4,10,11
56:6,8,24 57:1
57:14 58:6,7
60:8 88:10,13
91:3,9,16,19
93:13,18 95:6
133:11,14,16
134:4,8,12,16
134:20
pages 58:22 59:1
91:3 110:6
paid 21:22,24
22:5 24:7
29:20 30:15
31:2 34:18
35:25
panel 2:11,13
14:24,24 15:1
15:3,5,13
16:13,15,16,17
16:23,25 17:11
17:12,15,16,19
17:20,24,25
18:3,8,11,12
18:14,18,21
19:5,19 20:4,6
20:9,9 21:1,17
21:22 22:6
23:4 24:3,20
26:12,24 27:2
27:6,7,10,11
27:14,17 28:5
28:11,12 29:5
29:11,12,14,17
29:21 30:9,10
30:14,19,20,22
31:1,9,17 32:4
32:6,9,16,18
33:1,3,16,23
34:2,15 35:5
35:25 36:8
82:6 106:7
125:16 127:18
129:18,19
paragraph 42:6

88:15 89:20
91:20 93:18
101:16 103:20
104:22
Pardon 124:18
part 14:6 23:7
48:5,14 79:8
120:8
particular 27:23
29:6 38:17
42:9,25 43:1
59:12 68:6
75:6 77:20
80:10 112:16
particularly
112:15
parties 132:13
132:16
partner 25:16
parts 82:12
path 73:8
pay 30:16 36:3,4
37:13 46:7
63:10,12 77:19
77:23 79:9,10
82:21 108:19
payment 21:2
23:2 34:20
payments 24:14
30:21
PCR 58:16,20
58:23 78:13
113:13 118:18
126:19
PCRs 32:13
Peggy 95:10
96:9
PeggyRichard...
95:8
penalty 135:12
pendency 68:7
pending 4:18
9:16 20:15
59:15
people 28:10
77:21 78:24

percent 18:6
49:6,8 50:24
52:6 53:7
60:15,19 93:8
126:7,9
percentage
17:18,23 21:20
22:12
perform 36:17
45:22 46:12
performance
18:17 26:9,11
47:9 62:7,12
65:4,7,8,10
76:10,14
performed
46:13 68:6
period 46:7
50:14 55:9
57:18,20 58:14
60:21,23 97:13
118:14 119:2,3
122:5,6,15,18
123:11 126:23
126:24
periodic 75:21
128:23 129:1
periodically
75:19
periods 122:23
127:2
perjury 135:12
permanent
106:16
permitted 80:14
person 34:8
74:16,17 85:22
86:2
personal 17:3
76:22
personnel 73:10
persons 10:5
Pew 60:9,11
phase 108:4
physical 112:3
pick 19:13

pieces 87:16
placed 37:6
79:18 109:4
Plains 99:25
plaintiffs 1:5,15
4:5,21,22 5:3
7:2,12 8:5,7
9:1 12:16 14:5
31:13 32:22
40:20 47:23
48:24 55:23
58:1,25 59:6
61:7 63:13
66:5 67:20
69:6 70:10
87:24 90:22
98:4 100:23
102:13 103:9
plan 94:12,17
plans 107:8
plea 3:2 69:3,10
69:13,18,22
70:4 120:4
please 8:2,14
9:10,14,19
41:18 88:10,17
89:19 96:8
133:9,12,15
plus 52:15,16,18
52:19
point 46:25 61:1
79:6 116:13
117:2 118:6
119:21 122:4
122:21 125:14
125:19
policies 14:12
36:14,18 43:20
44:5,15,16
71:24 73:8
108:9 109:15
110:7,17 111:7
116:4,12,13,22
policy 44:19
68:24 70:2
71:1,8 111:17

policymakers
90:2,16
portion 30:1,2,2
position 28:1
29:1 62:13
82:25 83:2
possible 14:11
post 107:17
posted 101:20
101:25 108:6
posting 77:5
post-conviction
27:2 32:13
75:20 118:19
118:20 120:1
power 80:24
practical 110:14
practice 17:5
27:20,24 38:18
64:10 67:8
71:1,8 74:5
83:20 111:5
113:20
practices 36:14
42:21 43:20
44:6 45:25
73:12 109:15
practicing 11:23
Pratt 97:3
Pratzel 3:9 98:2
98:9
precede 54:22
precipitated
106:12
precise 123:15
preference 19:8
19:9 30:4
preliminary
72:25
premarked
12:16 58:1
preparation
13:14,21 51:6
68:12 105:7
prepare 13:3
55:8 95:25

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL     Document 153-23     Filed 02/09/18     Page 49 of 58

**prepared** 12:20
13:23 14:1
42:9,15 49:13
55:16 57:11
66:19,24 68:13
69:16 70:21
**preparing** 102:7
**present** 6:12
**presentation**
74:24
**presentations**
73:10 74:7
75:17
**president** 3:12
103:6 104:1,11
**presiding**
102:17
**presumptive**
19:13
**presumptively**
19:7
**pretrial** 108:5
**pretty** 16:20
24:13 28:11
38:7 96:3
**previously** 2:10
2:18 3:10,11
12:14 29:14
48:22 100:21
102:11 109:25
**price** 83:19
**primary** 47:16
**printed** 56:20
**prior** 15:4,7
17:12,16,20,24
18:17 23:14
54:4 58:18
59:15 79:25
106:9
**private** 14:24
29:3 84:6
102:24 103:2
**privately** 84:9
**privatize** 86:16
**privatizing** 87:2
**pro** 24:23 25:8

25:25 26:3,14
26:16,21 29:3
29:8 130:19
**probably** 18:5
36:21 39:8
53:13 58:17,18
59:24 75:18
101:25 114:23
121:21
**probation** 72:24
85:23 97:14,17
**problem** 82:19
104:9,17
129:21
**problems** 77:9
77:12 83:7
**procedure** 41:19
42:19,25
**procedures**
14:12 36:18
42:4 43:2
108:9 110:8
111:7 116:4,12
116:14,22
**proceed** 29:2
**proceeding** 8:18
**process** 38:12,20
40:12 43:14
78:1 79:21
80:14 82:10
90:7,14 100:17
106:18 108:16
108:18 111:24
112:1 116:16
116:16,20
**produce** 102:5
**produced** 4:11
7:11 14:5 41:8
48:9 56:8,12
58:9 102:4
**production**
110:1
**professional**
96:24 99:12
100:19 101:10
101:11 102:22

**program** 23:5,6
23:8,11 24:3
24:24 25:4
130:20
**progress** 9:14
32:11 63:8
**project** 13:23
48:6
**projects** 10:6
**promise** 70:11
84:13 85:13
**promote** 116:7
**promoted** 65:19
77:25 78:18,20
78:25 79:4
**promotion**
61:14,21,25
62:23 63:11,22
64:18,25 65:2
76:12 78:1,5
80:12 116:16
116:17
**promotions**
62:25 64:13
65:22 73:8
**promulgated**
80:24 81:15
**proper** 21:8
**prosecuting**
91:17
**prosecutor**
84:17 107:21
**prosecutors**
84:12 97:7
**prosecutor's**
107:13
**protocols** 2:15
40:17 41:1
**provide** 17:2
21:6 26:24
27:13 35:4
55:3,7 82:14
83:9 98:18,22
106:22 109:25
110:2 113:22
114:8 125:5

130:21
**provided** 65:15
109:24
**provides** 54:13
105:20
**providing** 47:4
65:14 75:3
105:1,7 117:12
128:6
**public** 2:19,21
5:17,19 9:21
9:24 10:17
11:14 12:2
14:14,16,18
29:4,5,11,17
30:13,23 36:17
49:2 55:19
58:2 61:15,15
61:17,19,24
62:1,5,6,8,12
62:15,18,20,22
62:24 63:2,3,8
63:9,23,23,24
64:14,14,19,25
65:1,17,19,20
65:23,23,25
78:9,17,19,20
78:21 79:4,13
79:17,17 80:1
80:17 91:14,21
92:20,23 93:21
95:25 102:20
103:23 104:16
108:25 110:13
113:3,8,10
114:5,16
116:24 118:8
119:16 120:10
120:19,24
121:11,11
122:25 124:16
130:9 133:3,14
135:23
**publications**
77:5
**pull** 90:12

**pulled** 49:19,21
49:22 89:24
**purpose** 125:20
**purposes** 12:7
50:24 57:25
64:13,18 70:3
112:13
**pursuant** 12:2
132:8
**push** 81:11,18
81:20
**pushback** 90:1
90:16
**put** 64:22 75:19
97:16 119:11
119:13
**p.m** 1:20 7:13,16
71:15,18 115:9
115:12 131:4,6

---

**Q**

**qualification**
95:19
**qualified** 77:14
83:23
**qualifies** 95:18
**qualifying** 93:21
**quality** 64:10
**quantity** 20:5
**quarter** 55:2
60:7
**question** 9:6,15
9:16 18:2 39:7
44:12 47:15
71:6 73:16
79:2 107:18
116:11 117:5
120:8 124:23
128:16
**questions** 2:2
8:22 9:2,10
12:8 14:23
41:15 115:14
115:17,20
125:8 127:5,7
127:9 129:4,6

**MIDWEST LITIGATION SERVICES**
**www.midwestlitigation.com**     **Phone: 1.800.280.3376**     **Fax: 314.644.1334**
Case 2:17-cv-04057-NKL   Document 153-23   Filed 02/09/18   Page 50 of 58

129:6,9 131:2
**quickly** 14:11
**Quinlan** 6:2
8:10,10 16:5
22:21 39:6
40:7 56:9,15
56:19,23 89:6
128:9,14
**quit** 92:13,25
93:3
**quite** 44:19
89:23 117:1
118:25 119:7
**quitting** 99:6
**quote** 35:2 41:17
88:18 89:22
91:20 92:12
93:6,18 95:14
101:13 103:21
104:23

_____
**R**
**R** 1:14 4:10 5:1
5:4 6:7 7:10,17
133:10 134:1
135:5,20
**Radke** 56:5 57:6
57:14 60:8
**raised** 18:15
**Ramsey** 2:4 6:7
8:8,8 115:17
115:18 124:15
125:3 127:3
**rare** 15:2 40:6
65:21 78:16
114:21 125:18
**Rarely** 29:15
**rate** 28:10
**rates** 24:6 48:7
109:1
**raw** 123:25
**RB** 51:12
**RDR/CRR** 6:22
7:4 133:22
**reacted** 99:4
**read** 35:2 41:17

43:17 52:2
88:15,18 89:18
89:22 91:20
92:12 93:6,19
95:14 103:21
104:24 133:12
134:5,9,13,17
134:21 135:6
**readable** 55:24
**reading** 90:24
**really** 18:1
37:20 106:24
129:7
**realm** 125:9
**Realtime** 4:17
132:6
**reapplications**
18:8
**reapply** 18:11
**reason** 29:22
30:10 47:16
79:8 109:2
134:6,10,14,18
134:22
**reasonable**
88:25
**reasons** 27:13
27:16 77:22
83:24,25 94:22
94:24 115:5
**reassign** 28:23
**reassigned**
29:10 36:7
**recall** 86:24
100:15
**receive** 30:22
75:2 88:8
93:20
**received** 85:14
88:9 99:1
**recess** 71:16
115:10
**recitation** 80:21
**recognize** 31:14
32:23 40:21
47:25 48:25

55:25 57:17
58:11,15 61:8
66:6 67:21
69:7 70:11
87:25 90:23
98:5 100:24
102:14 103:9
**recollection**
42:15 56:1
57:9,10 58:8
63:19 86:7,8
108:8 121:3
129:13
**recommendati...**
78:4 97:24
**recommendati...**
97:18,21
**recommended**
98:14
**recommends**
78:10
**record** 7:14 8:3
71:15,17 88:16
115:7,9,11
131:4
**recordkeeping**
119:18
**records** 119:15
**recoup** 30:5,20
**recruited** 76:24
**recruiting** 77:2
77:10 79:9
**reduce** 110:19
**reduced** 30:5,17
30:21 132:11
**refer** 20:14
33:18,20 34:23
53:7 54:7,22
58:22 59:8,23
64:1 90:6
122:10
**reference** 18:16
101:13
**referenced**
41:19 42:18
43:15,23

120:13
**references** 17:6
34:19
**referencing**
43:14 56:24
**referred** 23:5
25:24 26:2
**referring** 25:1
31:19 34:24
35:13,18,20
46:19 56:6
57:21 75:4
89:4,8 90:17
97:21 101:19
104:4,14
108:25
**refers** 29:17
49:10 50:2,21
53:4 59:2 90:4
90:12,16
113:12
**reflect** 50:9
56:21 60:25
**reflection** 42:21
**reflects** 50:16
**reflesh** 56:1
**refresh** 42:14
56:1 57:8 58:8
63:19
**refuse** 80:15
**refused** 94:20
**refusing** 94:25
105:24
**regarding** 14:12
88:4 96:24
97:8 98:10
101:4
**regardless** 85:6
90:1
**Registered** 4:16
132:5
**regulations**
80:25 81:16
110:12
**reimbursed**
110:11

**reimbursement**
36:2
**reimbursements**
110:8
**reimpose** 107:8
**rejected** 18:4,13
38:5
**rejections** 18:7
21:12
**related** 123:4
132:12
**relating** 12:25
36:19 111:8
**relationship**
127:22
**relative** 132:15
**relief** 32:13
88:12,22
**relieve** 129:25
**remain** 91:22
108:5
**remember** 34:6
48:10,15,15,17
61:9 82:1,9
85:5,15 87:17
90:25 91:5
120:19
**render** 135:9
**renew** 33:23
**rental** 110:15
**rephrase** 67:7
107:19
**report** 13:22,23
20:4 44:23
47:5 48:5 49:1
49:4,5,5 50:2
51:7 52:3,12
53:2,5 54:12
54:25 55:16
57:11 110:11
**reporter** 3:15
4:16,17,17
6:21 7:5,6 8:16
9:9 41:4 69:12
76:21 108:19
124:13 132:1,4

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL     Document 153-23     Filed 02/09/18     Page 51 of 58

132:4,5,6,21
**reporters**
  108:23 109:3
**reporter's** 7:24
**reporting** 44:22
  60:21,22 61:2
**reports** 10:2,3,4
  10:5 13:25,25
  45:1,2 49:21
  54:1,9 55:4,8
**repository**
  123:25
**represent**
  105:21 115:19
  124:17
**representation**
  28:20,23 50:14
  50:16 59:17
  65:15 83:3
  85:12 102:25
  108:2 111:10
  111:15 116:25
  125:5 128:6
**representative**
  12:1,6 87:19
**represented**
  117:4
**representing**
  8:25 108:12
**represents** 15:19
**request** 21:2,17
  22:2,6 29:2
  34:2 35:6
  36:25 37:2,17
  37:23 38:14,20
  38:23 39:19,21
  40:11,12 42:20
  43:2,5,21 44:6
  47:6 57:12
  74:15 98:10
  99:2 108:16,18
  112:20
**requested** 39:15
**requesting** 37:7
  42:4,21 43:15
  79:22 109:5

**requests** 21:11
  22:10,22 23:1
  36:19,23 38:4
  40:1,6 41:3,5,6
  41:12,20 42:1
  76:12 109:13
  109:18 112:17
  112:18
**require** 17:1
  20:3 21:8
  43:25 81:23
  89:10 101:10
  107:16
**required** 27:7
  32:9 46:12,16
  72:2,3,16
  74:18,19 75:2
  80:15 81:22
  82:2,8 89:12
  108:5 118:2
**requirement**
  19:20,22 27:24
  61:21,23 62:11
  107:2,3 108:4
  124:16
**requirements**
  44:22 46:5
  61:25 62:4,7
  62:13 65:18
  75:6,9 78:2,18
  79:1 107:9
**requires** 37:24
  44:2
**reserved** 7:8
**resort** 30:16
**resource** 39:4
  47:7,8 101:21
  102:1
**resources** 39:15
  105:2,5,20
  106:19
**respect** 127:11
**response** 2:16
  47:21 48:3
  98:19,21,23
  99:1 102:7

104:11
**responsibilities**
  76:7 96:14
**responsibility**
  76:2
**responsible**
  91:14
**rest** 83:6 95:3
**result** 57:11
  102:23
**results** 29:23
**resume** 28:20,22
**retained** 3:15
**retiring** 27:19
**return** 30:11,24
  31:2 96:6
  133:15
**returned** 29:24
  30:3,4,7 31:3
**revenue** 30:12
  31:3
**review** 3:1 13:5
  13:13,20 41:15
  67:3,6,18,25
  68:2,5,8,25
  112:3
**reviewed** 12:10
  12:13,17 14:5
  111:23
**reviewing** 40:24
  99:7
**reviews** 68:11
  112:2,2
**revise** 31:24
**revised** 32:1
**revision** 33:18
**revoked** 85:24
**Richard** 127:20
  128:12
**Richardson**
  95:10 96:10
**ridiculously**
  24:11 47:24
**right** 11:20 25:2
  26:4 31:6 32:2
  51:4 60:20,22

113:4,14
  115:21 120:21
  123:21 127:24
  128:4,14
  130:19
**risen** 120:17
**risk** 97:5
**risking** 96:17,22
**role** 9:23 11:7,18
  12:8 76:3
  103:1 105:6
**Rolla** 100:2
**rotating** 19:7
**roughly** 17:18
  17:23 113:3,15
  113:25
**row** 54:16 56:4
  57:4
**RSMo** 132:9
**RubinBrown**
  13:24 47:5
  48:5,18 49:9
  49:10 51:14,17
  51:20 52:3,4
  52:12 60:3,4
  127:10,17
**rule** 12:3 18:23
  19:18 80:23
  81:1,15 90:8
**rulemaking**
  89:10
**rules** 9:6,17
  80:25 96:23
  99:11 100:19
  101:10,11
  102:22
**ruling** 88:23
  118:22
**run** 14:11
**rural** 77:17
  113:2

---
**S**

**S** 2:8 5:1
**salaries** 79:11
  114:12,13,15

115:4
**salary** 79:12,19
  79:23
**sample** 101:23
  105:2
**saying** 35:24
  89:4 121:15
**says** 7:12 33:19
  35:2 41:17
  54:17 60:14
  85:23 88:12
  91:20 92:12
  93:6,18 95:12
  95:13 103:20
  104:23
**scale** 63:12
**scan** 57:15
**scanning** 42:11
**scenario** 130:14
  130:15
**schedule** 24:15
  24:16 33:13,16
  34:2,5 113:23
  129:2
**scheduled** 9:12
**Scherrer** 127:20
**school** 11:21
**schools** 77:2,3
**se** 29:3,8
**second** 35:1
  41:11 91:19
  103:20 106:4
  130:15
**second-chaired**
  67:15
**second-level**
  15:10,18,25
  16:1,10,14
**section** 35:1
  42:6 105:3
  132:8
**see** 12:21 33:12
  35:9 41:11,22
  42:1,12 43:6,9
  47:10 54:12,19
  56:19 57:3,6

**MIDWEST LITIGATION SERVICES**
**www.midwestlitigation.com**      **Phone: 1.800.280.3376**      **Fax: 314.644.1334**
Case 2:17-cv-04057-NKL    Document 153-23    Filed 02/09/18    Page 52 of 58

60:7,12,15
63:17 64:3
88:11 92:16
94:10 95:7
96:9 101:13
105:10
**seeing** 61:10
90:25
**seek** 84:17 96:15
96:19 107:14
**seeking** 12:11
**seen** 100:16
120:18 129:11
**select** 29:4
**selected** 63:6,8
**Senate** 87:8,12
87:14
**send** 25:9 45:2
74:16 127:11
**sending** 91:10
91:12 94:13,14
**senior** 48:14
67:14 68:10
69:21 70:19
**sense** 72:1
117:12 118:25
126:2
**sent** 23:18 32:4
48:16,18 64:20
82:5 88:6
93:14 94:17
95:12 98:12,13
101:3 102:17
103:13 112:18
**sentence** 35:2
85:20,21 89:18
89:20,21 92:12
92:16 93:6
95:13 103:20
104:23 107:22
**sentencing** 3:3
69:3,10,13,19
69:22 70:4
107:25 108:3
120:2
**separate** 123:13

**September**
101:2
**series** 58:9
**serves** 59:9
**services** 6:13,23
8:1 93:22
133:1
**set** 41:24 43:1
96:1 103:16
121:11
**sets** 43:8
**Setting** 42:18
107:25
**seven** 9:11,13
111:15
**Shahabian** 2:3,6
5:4 8:4,4,22,25
12:15 16:11
22:20,24,25
31:12 32:21
39:14 40:10,19
41:7 47:22
48:23 55:22
56:11,17,20,25
57:24 58:5
61:6 66:4
67:19 69:5,15
70:9 71:11,19
71:22 76:23
87:23 89:14
90:21 98:3
100:22 101:18
102:9,12 103:8
109:24 110:3,7
115:6,13 125:1
129:5,9 131:1
**shared** 67:1
**sheet** 46:6 56:3
56:18,21 134:1
**sheets** 133:11,14
133:15
**Sher** 128:12
**shift** 36:15
**Shipma** 2:5 5:18
8:12,12 13:6
13:19 22:18,22

101:15 102:6
110:2,5 127:6
127:9 128:11
128:15 129:3
133:3,8
**Shondel** 1:4 4:4
4:20 7:17
133:6 134:2
**short** 122:10,11
122:14 129:7
**shorter** 58:6
**shorthand** 7:4,5
132:4
**short-lived** 81:8
81:9
**show** 49:4 57:25
**showed** 123:6
**showing** 31:12
32:21 48:23
55:22
**shows** 31:25
49:6 55:12
**sic** 128:11
**sick** 46:10
**side** 58:7
**sign** 133:14
**signature** 7:7
133:11,14,16
134:24
**signed** 33:24
**similar** 48:20
58:5,8 70:3
82:7 123:9
**simply** 35:20
125:10
**Sincerely** 133:19
**single** 75:18
91:22
**sit** 53:13 85:10
100:18
**sits** 68:10
**sitting** 26:4 32:1
59:19 96:5
**situation** 29:7
**six** 20:24
**sizable** 112:22

**size** 47:24
**skills** 72:10,12
73:13,17,19
**Slightly** 120:22
**slow** 13:12
**small** 47:24
126:7
**social** 39:20,24
40:1 43:16
**solely** 65:2
**solved** 82:19
**solving** 104:9
**someone's** 20:22
**somewhat** 64:21
**sorry** 22:24 32:9
38:13 53:15
63:16 95:7
**sort** 36:22 46:19
47:10 65:7,13
80:11 122:10
**sorted** 56:13
**sorts** 83:24
101:22 114:9
**sounds** 116:4
**source** 86:5,19
**speaking** 24:19
**spearheads**
127:23
**special** 10:6 29:5
29:17 34:3
74:8
**specialist** 40:8
**specialists** 39:22
40:4
**specialize**
112:12
**specialty** 74:23
**specific** 16:22
39:2 44:15
46:13 51:17
61:10 66:10
74:2 79:10
80:21 96:23
108:8 123:4,5
**specifically** 20:4
40:23 49:2

52:3 72:24
81:25 86:25
91:5 100:15
102:21 109:11
112:25 114:18
116:15 119:22
**specifics** 49:17
76:25 85:6,15
87:3 97:15
**speculation** 89:7
**spell** 128:9
**spend** 52:2
**spending** 83:13
**spent** 22:5 52:5
52:11 53:24
122:24
**spinning** 96:5
**sponsoring**
86:22 87:6,20
**sporadic** 115:22
125:7
**spreadsheet**
2:20,22 21:5
50:15 55:20
58:3
**spreadsheets**
56:12 58:10
**spring** 27:5
72:15 73:21,24
74:25 75:17
117:8
**St** 4:15 6:4,14,24
7:23 127:25
128:2 133:17
**stab** 126:8
**staff** 2:16 35:1
40:15 45:16,16
47:20 48:3
82:21,21,24
112:9 127:25
128:2
**standard** 49:9
65:4,7
**standardized**
68:24
**standards** 49:11

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com       Phone: 1.800.280.3376       Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-23    Filed 02/09/18    Page 53 of 58

52:5 63:22
64:2
**Stanley** 87:19
**stapled** 126:25
**start** 14:12
99:21 107:6
**started** 24:24
**starting** 1:20
7:13 57:13
60:8 79:12,19
79:23 91:2
93:20 95:13
103:20
**starts** 56:3,18
**state** 1:7 4:7,21
5:19 6:1,3,7
7:18 8:9,11
9:21,24 10:17
12:2 14:13,16
30:13,23 31:3
49:2 79:18
80:25 81:16
82:12,15 83:21
88:21 89:15
92:19 94:9
103:23 104:2
105:16 108:10
108:24,24
109:1 110:13
111:12 112:21
115:19 118:8
119:16 120:10
120:24 132:22
133:3,6 134:2
135:1
**stated** 94:22
97:4 102:21
**statement** 33:15
42:4 43:20
44:5 92:2,6,9
92:19 93:10
106:9
**states** 1:1 4:1,18
7:19 41:1 42:7
43:23
**statewide** 47:8

75:5,9,13,15
75:25 84:22
110:12 111:17
111:19
**stating** 36:22
**statistics** 28:3,7
44:23 46:17
54:13
**statute** 87:11
120:24 121:4
**statutory** 81:10
81:11,13
**stayed** 97:16
**staying** 97:13
**stays** 28:11
**step** 23:4 44:8
**Stepping** 53:22
**steps** 41:25
**Steven** 6:7 8:8
115:18
**steven.ramsey...**
6:10
**stint** 122:14
**STIPULATED**
7:1
**stood** 93:11
**stop** 47:12
**Street** 4:15 5:5,9
5:13 6:4,14,23
133:17
**strike** 38:13
78:15
**strive** 79:6
**structure** 10:25
11:6
**struggles** 91:21
**student** 11:12
**studies** 122:12
**subject** 75:21
**submit** 21:6
32:10,16 35:6
36:1 82:11
109:12
**submitted** 21:9
21:12 37:5
**subscribe**

135:11
**subsection**
125:12,13
**subset** 24:3
**substance** 64:7
135:8
**substitute** 87:8
**subtracted** 51:3
**successful** 65:8
65:10
**successfully**
65:14
**sufficiency** 48:4
**sufficient**
125:24
**sufficiently**
77:14
**suggestion** 96:9
**Suite** 4:14 5:9,20
6:4 133:5
**sum** 126:20
**summarizing**
65:13
**summary** 2:17
47:21 48:4
**summer** 88:24
**supervise** 26:8
26:11 109:8
117:18 128:5
**supervises** 38:1
**supervision**
71:23 116:14
116:18 117:16
**supervisor**
67:14 116:19
**supervisors**
47:10
**supplemental**
102:7 110:1
**supplying**
105:17
**suppose** 78:23
**supposed** 20:15
44:17
**Supreme** 11:21
80:16 88:23

97:2,25 99:5
101:9 120:18
**sure** 14:8 16:21
23:12 29:15
34:25 35:23
39:10 42:9
46:24 49:24
52:23 59:19
64:23 67:5
74:24 79:2
99:3 105:17
107:18 117:3
118:11 124:21
124:24
**surprise** 85:16
85:17
**survey** 2:16
47:20 48:3,4
48:13
**surveys** 48:20
**suspend** 97:16
**suspended**
85:20,20 97:25
98:15 107:2,4
107:5,6,7
120:20
**suspending**
97:12
**suspension**
97:13
**swear** 8:14,16
**sworn** 4:11 7:11
132:8
**system** 9:22,25
10:18 12:2
14:17 15:7
16:17 23:9
28:5 30:13,23
61:21 63:25
64:13,18 66:14
73:9 78:24
86:17 87:2
92:10 93:1
95:4 103:23
110:13 113:7
113:11 115:25

116:1,5 118:8
119:16 122:3
122:24,24
123:10,13,16
124:1,7,17
125:10,11,22
127:12 130:9
**systemic** 67:3,5
**systemwide**
128:22
**S-C-H-E-R-E-R**
128:11

---

**T**

**T** 2:8
**table** 86:1
**take** 9:14,16
18:23 20:1,2
25:7 27:21,25
28:25 29:13
30:10 34:15
41:14 76:15
81:2,6 85:12
90:10 104:13
104:19 108:2
108:14 126:8
**taken** 1:15 7:3
71:16 87:14
115:10 132:10
132:14 133:10
134:3
**talk** 36:16
**talked** 105:23
106:5,25
107:12
**talking** 127:4
**task** 52:4 123:7
124:4,10
**tasked** 116:19
117:16
**tasks** 46:13
123:4,5
**teaching** 117:16
**technically**
98:21
**tell** 9:19 14:8,14

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL     Document 153-23     Filed 02/09/18     Page 54 of 58

17:21 24:18
26:5 34:23
40:24 46:24
75:5 99:20
102:2
**tells** 93:7
**ten** 11:1 18:5
22:16,18,20
23:1 118:13
**tenure** 61:21,23
62:4,11 65:2
65:18 78:18
79:1,5,22,24
80:3,9 118:7
**term** 16:20,21
29:16 77:16
85:2,7
**terminated**
113:20
**terminology**
55:13 85:21
**terms** 36:20 47:4
57:24 116:5
117:6 119:5,12
119:16 123:10
124:4 125:19
**testified** 107:19
**testify** 12:20,25
14:10
**testimony** 8:17
13:21 106:9
115:24 132:7,9
**Thank** 63:16
**thanks** 71:19
102:9 115:13
**theory** 38:19
39:12
**thereon** 135:10
**thereto** 132:16
**they'd** 19:3
**thing** 127:4
**things** 41:2
43:15 64:3
72:24 73:1,7
73:12 93:23
**think** 9:12 26:1

26:4,6 28:2
29:6 35:13,17
36:21 37:14
42:10 46:22,25
47:15,16 53:12
57:12,18 58:13
58:17,19 59:24
66:1 67:1
71:11 72:12,24
73:11,14 77:4
79:14 83:7,8
83:10,22 84:5
84:14,16 89:8
90:17 96:21
99:9,25 100:1
101:25 106:3
110:2 113:2,9
115:2 121:20
122:4,13
123:23 127:24
128:3,7,24
**thinking** 96:8
**third** 16:12
34:25 101:15
**third-level** 16:15
**thought** 88:24
**threat** 108:3
**threatening**
92:13,25
**three** 11:4 16:7
43:4,10,11
47:1,3 53:5,10
53:19 55:1
57:1 61:15,18
62:6 63:23
64:14,19 65:5
65:23 72:16
73:23 78:21
79:4 91:3,16
91:19 97:3
117:23 122:4
122:15,17
126:9
**three-day**
128:18
**three-month**

49:5 53:2
**threshold** 25:21
**time** 1:20 7:13
7:15 10:24
40:4 46:6,15
46:16,18,21
47:2,12,17
48:4,15 49:20
49:22,23 50:14
51:6,9,24 52:1
52:5,7,8,10,12
52:14,16,19,19
53:22,23,23,25
54:10,11 55:9
57:18 58:15
59:12 67:12
71:12 78:22
79:1 80:24
83:14 84:13,17
85:13,14,23
86:2,7,21 89:1
89:16 93:11
107:14 115:14
115:15 116:3
116:13 118:6
118:14 119:23
122:3,5,5,6,13
122:21,24
123:5,10,15
125:14,19
126:23,24
127:2,15 131:2
**timekeeping**
46:4,11,19
88:4 107:2,9
**times** 34:14
52:23 53:1
**title** 9:20 50:5
**today** 9:2 12:1
13:4,21 26:5
59:19 85:10
120:14
**Today's** 7:15
**told** 86:14
**top** 41:16 51:6
75:9

**topic** 71:23 79:8
80:13 120:22
**topics** 12:21
14:10 36:15
72:21 73:17,24
74:5
**total** 46:8 54:17
59:21 93:10
**touches** 124:25
125:2
**track** 20:8 31:21
109:18 111:21
122:24 123:2
**tracking** 124:8
**tracks** 74:6
**train** 26:14 76:9
**trained** 71:25
**training** 26:17
26:18,19,20,24
27:1,3,5 45:24
54:11 71:23
72:2,14,15
73:21,25 74:2
74:8,10,18,20
74:23,25 75:2
75:5,9,11,13
75:15,17,19,20
75:20,23,25
83:9 105:15
117:6,8,13,22
128:16,18,19
128:22,24
**trainings** 27:8
117:15,16
**transcribed** 7:6
**transcript** 3:16
133:13
**transferred**
14:22
**travel** 45:20,21
49:20 52:8,10
52:16,19 53:22
53:23,25 54:6
54:9,10,11
110:8,12,20
111:1

**traveling** 34:9
**trial** 2:24 10:2,8
17:5,15,24
22:5 54:17,22
58:19 59:3,3
60:18 63:21
64:16,18 66:2
66:9,11,12,25
67:13,15,16
68:3,4,19,21
71:7,9 72:9,12
73:13,17,19
78:11 84:3
99:25 102:20
111:8,21 113:4
113:6,12,16
118:22 126:16
**trials** 64:8,8
**trial-level** 32:15
**tried** 68:5
**trouble** 79:9
**true** 135:9,13
**truth** 8:18,18,19
**truthfully** 12:9
68:20
**try** 14:10 16:21
20:23 74:10
**trying** 52:23
83:11
**turn** 14:9 19:19
71:22 80:13
86:15 88:10
95:6
**turned** 89:2,4
**turning** 58:25
81:16 120:22
122:3
**turnover** 13:25
28:4 93:8,10
**twice** 84:7
**two** 10:1 11:22
16:1 42:6 53:1
57:1 58:22
61:23,24 62:5
62:9 65:1,19
65:20,25 73:22

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-23    Filed 02/09/18    Page 55 of 58

78:19,20 88:10
91:3,10 93:14
93:22 95:6
96:25 97:14
103:24 119:17
126:8
**twos** 79:4
**two-day** 26:19
**two-week**
123:11
**type** 19:15 22:1
22:4 45:13
51:20,21 85:9
128:17
**types** 19:16
35:22 36:23
45:16 51:15,16
51:17 64:9
116:11
**typewriting** 7:7
132:11
**typical** 24:20,21

___

**U**

**uh-huh** 43:12
101:17 102:6
**ultimate** 37:15
37:19 38:2,10
78:4,6
**ultimately** 14:21
25:15 28:21
37:24 78:23
86:3 87:10
97:24 99:7
**uncontrollable**
52:4
**undergoing**
75:11
**underneath**
117:18
**understand** 9:9
9:17 11:25
35:23 49:25
52:23 107:18
125:9 129:24
**understanding**

2:14 12:5,19
12:24 13:1
32:19 54:21
58:21 60:17,25
80:20 84:10
89:15 90:3,11
90:15 92:3,18
94:19,24 96:13
101:6 107:15
110:24 111:4
126:19
**understood**
115:24
**undertake**
103:18
**undertaken**
103:18
**unearned** 30:2
**unfortunately**
56:7
**unhappy** 27:23
**Union** 5:12
**unique** 92:6,22
94:25 95:2
**United** 1:1 4:1
4:18 7:19
**units** 51:11,22
52:15,18
**unlimited** 83:18
**unusual** 21:21
34:12 77:16,17
**updated** 54:25
**upheld** 80:23
81:1 90:8
**up-front** 84:18
86:2
**urban** 15:9
112:15 113:1
**use** 14:13 21:5
21:18 23:9,19
23:21 37:1
38:15 39:20
40:1,11 45:1,3
46:10 55:13
60:3 66:18
67:2,3 68:23

70:3 81:15
85:7 107:24
108:11,22
109:2,8 110:15
125:21 129:19
**useful** 66:17
89:13
**uses** 46:1
**usually** 72:8,10
73:22 74:6,11
118:20 128:24
**utilization** 53:18
**utilizes** 125:22

___

**V**

**v** 80:18
**vacancies** 77:5
**vacancy** 63:5,7
77:15
**vague** 39:6
77:16 125:1
**vantage** 119:20
**varies** 42:23
74:1 126:5
**various** 35:21
41:2 73:9
77:22 85:1
87:15 97:5
116:6 117:6
121:15,15
126:14,25
**varying** 43:1
**vehicles** 110:16
**vein** 120:7
**versus** 7:18
**videographer**
6:13 7:14,25
8:14 71:14,17
108:21 115:8
115:11 131:3
**video-recorded**
1:14 4:10 7:16
**view** 20:22
119:21
**violate** 99:11
**violations** 72:25

**virtually** 125:17
**visit** 34:10 54:2
112:6
**visiting** 53:24
**voir** 73:19
**voluntarily**
114:6
**voluntary** 24:23
**volunteer**
127:25
**votes** 87:7
**vs** 1:6 4:6,21
133:6 134:2

___

**W**

**wait** 9:7
**want** 17:6 41:14
48:10 49:24
64:23 71:5,22
76:25 77:20,21
105:18 106:4
128:15
**wanted** 67:2
108:14 127:3
**wasn't** 11:23
42:10 68:20
97:11
**Water** 97:3
**Waters** 80:18
84:11 85:2,7,8
89:12,13 90:8
105:12 107:12
107:20
**way** 25:25 50:7
56:20,21 60:8
82:14 88:25
95:24 111:5
117:6 118:21
119:11 124:9
125:22 127:11
**website** 32:7
77:6,7
**week** 26:19
72:19,20 73:15
95:24
**weeks** 102:8

103:24
**weight** 51:14
52:13 127:17
**weights** 60:3
**welcome** 71:21
**went** 16:15,16
**West** 5:5,20 6:8
99:25 133:4
**Western** 1:1 4:1
4:19 7:20
**we'll** 15:24 30:1
45:12,13,13,14
45:14,15
**we're** 7:14 9:12
18:17 19:16
26:18 45:11,11
71:14,17
107:11 115:8
115:11,23
121:15 131:3
**we've** 23:21 26:5
26:7 27:2
34:15 102:6
105:23 120:17
126:5
**whichever** 58:14
**widely** 42:24
**William** 4:15
6:22 7:4 132:3
133:22
**Williamson** 5:12
8:6,6
**willing** 18:22
19:3
**Winfrey** 3:7
90:19
**winning** 83:11
**wish** 95:15
**withdraw** 28:12
28:16,18,22
106:1 120:2,4
**withdrawal**
29:23
**withdrawing**
101:14
**withdrawn**

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 153-23    Filed 02/09/18    Page 56 of 58

50:23 51:7
**withdraws**
29:21 30:15
**withdrew** 50:25
51:10
**witness** 7:7 8:15
8:20 37:1,16
71:13,21 132:7
132:9 133:12
134:1,24
**witnessed** 69:23
**witnesses** 21:3
21:18 36:19
37:7,13 38:5
38:13 43:16
**won** 88:23
**Woodrail** 5:19
133:4
**word** 50:5 77:6
114:24
**words** 51:15
107:24
**work** 25:8 39:1
40:5 47:10,11
63:11 76:12
77:21 86:8
104:9
**worked** 46:8,9
**worker** 39:20,24
40:1
**workers** 43:16
**working** 83:4
86:21 130:4
**workload** 13:24
20:8 47:19
49:1,11 52:15
53:15,16 57:5
59:23,25 60:2
60:4,14,19
76:10 121:5
126:15
**workloads**
121:11
**works** 14:16
21:7 43:9
**workshop** 72:8

72:10,18,22
73:13,18
117:20
**workshops**
75:14
**work-related**
45:20,21 54:9
**wouldn't** 35:19
48:10 64:23
74:19 82:18,23
83:8 112:14
**written** 36:18,20
97:11 99:1
116:4 124:4
**wrong** 97:15
99:22

**X**

**X** 2:1,8

**Y**

**yeah** 12:13 43:3
48:1 52:25
107:5 118:15
119:2,22 121:8
123:1,3 124:2
**year** 22:15 23:1
46:23 53:1
54:4 56:13,18
59:13,15,16,18
59:20,21 61:1
62:11 72:9,11
74:1,1,4,5,11
97:13 106:7,18
117:7,21 122:5
122:15,18
123:23 126:5,5
126:6,7 127:16
127:18 129:23
129:23,25,25
130:3
**yearly** 128:18
**years** 11:4,13,15
11:22 17:4
47:1,3 56:13
58:10 61:23
62:5 72:16,23

80:7 97:14
113:16 115:25
116:1 118:14
118:16 122:9
126:21 129:11
**York** 5:5,5,14
5:14

**$**

**$325** 84:5
**$500** 37:18,23
**$700** 84:7

**#**

**#566** 6:22

**0**

**09** 56:13 58:10

**1**

**1** 2:10 12:14,16
**1st** 10:19 15:2,4
15:7,14,15
23:14,21 24:17
50:10,17 53:19
54:4 55:6
106:6,11
**1-16-13** 3:6
87:21
**1-800-280-3376**
6:15,25
**1.00** 60:11
**1.2** 60:19
**1.20** 60:15
**1:10** 1:20 7:13
7:16
**10** 2:19 55:19,23
58:18 59:1,7
126:12
**100** 3:10 5:20
133:5
**1000** 5:20 133:4
**10004-2400** 5:14
**10019** 5:5
**102** 3:11
**103** 3:12
**11** 2:21 58:1,2

58:19,22 63:13
126:12
**11th** 101:2
133:17
**11-16-15** 2:23
61:4
**1100** 5:9
**1130** 4:14
**115** 2:4
**12** 2:10,23,24
3:1,2,4 61:4,7
63:15,16 66:2
66:11,13,16,22
66:24 67:9,13
67:17 68:18
69:2,25 70:6
70:24
**12's** 67:24 69:10
69:13 70:14
**12-29-16** 3:7
90:19
**125** 5:13
**127** 2:5
**129** 2:6
**13** 2:24 12:21,25
66:2,5 68:2
71:5 99:24
**14** 3:1 52:3
67:17,20 68:2
**15** 3:2 69:2,6
**16** 3:4 26:23
70:6,10
**16th** 88:7
**17** 3:6 56:14
58:10,10 87:21
87:24
**17-04057-CV-...**
1:6 4:6 7:19
**18** 3:7 90:19,22
**18th** 5:13
**19** 3:8 98:1,4
**1983** 11:13
**1987** 11:14

**2**

**2** 3:10 100:21,23

**2,080** 53:1,10
**2:34** 71:15
**2:45** 71:18
**20** 3:12 103:5,9
135:15
**200** 6:4 119:12
**2008** 36:22
**2009** 126:21
**2013** 88:7
**2014** 10:19
24:17
**2015** 64:20
**2016** 32:1 93:15
**2017** 1:16 4:11
7:15 15:15
23:15 49:6
50:10,10,17,18
53:20 55:4
98:8 101:3
126:22 133:2
133:10 134:3
**2050** 5:9
**21st** 32:1
**212** 5:6,14
**22** 93:8
**221** 6:8
**23,000** 110:5
**25** 100:3
**28** 100:4
**28th** 98:8
**284-7340** 5:14

**3**

**3** 3:11 102:11,13
**3:45** 115:9
**3:52** 115:12
**30** 11:15 51:1,9
115:25 116:1
118:14,16
119:2 129:11
133:16
**30th** 55:6
**30(b)(6)** 12:3,11
**30-year** 119:2
119:21
**31** 2:11

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 153-23   Filed 02/09/18   Page 57 of 58

53:20 55:4
**314** 6:5,15,24
**32** 2:13
**340-7861** 6:5
**35** 100:2
**35446** 133:24
**37** 100:1
**378** 113:10,12
**39,000** 79:14,20

---
**4**
---

**4** 1:16 2:18 4:11
  48:22,24
  133:10 134:3
**4th** 7:15
**4-28-17** 3:8 98:1
**4:10** 131:4,6
**40** 2:15
**441** 51:15
**47** 2:16
**48** 2:18
**49** 23:5,7,11,12
  23:19,21 24:2
  125:11,11
**491-5616** 5:10
**492.010** 132:9

---
**5**
---

**50** 119:7
**506-3750** 5:6
**51** 5:5
**52nd** 5:5
**520** 53:11
**525-5212** 5:21
**55** 2:19
**573** 5:21 6:9
**58** 2:21

---
**6**
---

**6** 2:11 31:9,13
**60** 26:1 130:25
**61** 2:23
**63101** 4:15 6:4
  6:14,24 133:17
**644-2191** 6:15
  6:24
**65102** 6:9

**65203** 5:21
  133:5
**66** 2:24
**67** 3:1
**69** 3:2

---
**7**
---

**7** 2:13 5:20
  32:18,22 133:5
**70** 3:4
**711** 6:14,23
  133:16
**751-1024** 6:9

---
**8**
---

**8** 2:3,15 40:17
  40:20
**815** 6:4
**85,000** 130:25
**87** 3:6

---
**9**
---

**9** 2:16 47:20,23
  133:2
**90** 3:7
**906** 4:14
**92614** 5:9
**949** 5:10
**98** 3:8

**MIDWEST LITIGATION SERVICES**
**www.midwestlitigation.com**    **Phone: 1.800.280.3376**    **Fax: 314.644.1334**
Case 2:17-cv-04057-NKL   Document 153-23   Filed 02/09/18   Page 58 of 58