# Exhibit A

## Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
            WESTERN DISTRICT OF MISSOURI
 2                CENTRAL DIVISION
 3
 4   SHONDEL CHURCH, et al.,    )
                                )
 5        Plaintiffs,    )
                                )
 6   vs.              ) Case No.
                      ) 17-04057-CV-C-NKL
 7                      )
     STATE OF MISSOURI, et al.,   )
 8                                )
            Defendants.    )
 9
10
11
12
13
14
15
16
17       VIDEOTAPED DEPOSITION OF JUSTIN CARVER
18        TAKEN ON BEHALF OF THE PLAINTIFFS
19              DECEMBER 11th, 2017
20
21
22
23
24
25
```

## Page 2

```
 1            INDEX OF EXAMINATION
 2
 3   Examination by Mr. Scherzer          7
 4   Cross-Examination by Mr. Ramsey    191
 5   Cross-Examination by Ms. Shipma    233
 6   Redirect Examination by Mr. Scherzer  240
 7
 8            INDEX OF EXHIBITS
 9   EXHIBITS:
10   Exhibit No. 17  (Case Conference Transcript)   13
11   Exhibit No. 18  (12/29/16 E-mail String)    89
12   Exhibit No. 19  (October '17 E-mail String)   133
13   Exhibit No. 20  (Rule 4-5.1)          141
14   Exhibit No. 21  (Budget Request)      142
15   Exhibit No. 22  (Senate Committee Report)   147
16   Exhibit No. 23  (Representation Motion)   153
17   Exhibit No. 24  (Motion Re: Conference)   156
18   Exhibit No. 25  (Suggestions Attachment)   157
19   Exhibit No. 26  (Williams Conference)   171
20   Exhibit No. 27  (Administrative Office E-mails)  180
21   Reporter's Note:  The original exhibits were attached
22   to the original transcript.
23
24
25
```

## Page 3

```
 1      IN THE UNITED STATES DISTRICT COURT
          WESTERN DISTRICT OF MISSOURI
 2              CENTRAL DIVISION
 3   SHONDEL CHURCH, et al.,   )
                                )
 4       Plaintiffs,    )
                                )
 5   vs.              ) Case No.
                      ) 17-04057-CV-C-NKL
 6                      )
 7   STATE OF MISSOURI, et al.,   )
                                )
          Defendants.    )
 8
 9      VIDEOTAPED DEPOSITION OF JUSTIN CARVER,
10   produced, sworn, and examined on the 11th day of
11   December, 2017, between the hours of nine o'clock in
12   the morning and four o'clock in the afternoon of that
13   date at the law offices of ALARIS LITIGATION SERVICES,
14   2511 Broadway Bluffs, Suite 201, Columbia, Missouri
15   65201, before LISA BALLALATAK, a Certified Court
16   Reporter within and for the State of Missouri, in a
17   certain cause now pending IN THE UNITED STATES
18   DISTRICT COURT, WESTERN DISTRICT OF MISSOURI, CENTRAL
19   DIVISION, wherein SHONDEL CHURCH, et al. are the
20   Plaintiffs and STATE OF MISSOURI, et al. are the
21   Defendants.
22
23
24
25
```

## Page 4

```
 1            APPEARANCES
 2   For the Plaintiffs:
 3   MR. AARON SCHERZER
     ORRICK, HERRINGTON & SUTCLIFFE, LLP
 4   51 West 52nd Street
     New York, New York 10019
     (212) 506-5000
     ascherzer@orrick.com
 5
 6
 7   MR. ANTHONY TARTAGLIO
     ORRICK, HERRINGTON & SUTCLIFFE, LLP
 8   1000 Marsh Road
     Menlo Park, California 94025
 9   (650) 614-7478
     ttartaglio@orrick.com
10
11   For the Defendants MSPD System:
12   MS. JACQUELINE D. SHIPMA
     MISSOURI STATE PUBLIC DEFENDER SYSTEM
13   1000 W Nifong Boulevard, Suite 100
     Columbia, Missouri 65203
14   573-777-9977
15
16   For The State of Missouri and
     Governor Greitens:
17   MR. STEVEN ALAN RAMSEY
     ASSISTANT ATTORNEY GENERAL
18   MISSOURI ATTORNEY GENERAL'S OFFICE
     P. O. Box 899
19   221 West High Street
     Jefferson City, Missouri 65101
20   (573) 751-2590
     steven.ramsey@ago.mo.gov
21
22   Also present:
23   Mr. Chris Tobin, Videographer
24   The Court Reporter:
25   MS. LISA BALLALATAK, CCR
```

ALARIS LITIGATION SERVICES
www.alaris.us        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-2   Filed 02/21/18   Page 2 of 107

## Page 5

1      (The deposition commenced at 8:59 a.m.)
2      VIDEOGRAPHER:  We're on the record.
3   Today's date is December 12th, 2017, and the time is
4   8:59 a.m.  This is the video-recorded deposition of
5   Justin Carver in the matter of Shondel Church, et
6   al. v. State of Missouri, et al., Case No.
7   1704057-CV-C-NKL in the United States District Court
8   for the Western District of Missouri, Central
9   Division.  This deposition is being held at Alaris
10  Litigation Services at 2511 Broadway Bluffs Drive,
11  Columbia, Missouri.  The court reporter's name is
12  Lisa Ballalatak.  My name is Chris Tobin.  I'm the
13  legal videographer, and we are with
14  Alaris Litigation Services.
15     Would the attorneys present please state
16  their names for the record.
17     MR. SCHERZER:  Aaron Scherzer for the
18  plaintiffs.
19     MR. TARTAGLIO:  Anthony Tartaglio, also
20  for plaintiffs.
21     MR. RAMSEY:  Steven Alan Ramsey for the
22  State of Missouri and Governor Greitens.
23     MS. SHIPMA:  Jacqueline Shipma for the
24  MSPD defendants.
25     VIDEOGRAPHER:  Would the court reporter

## Page 6

1   please swear in the witness.
2      JUSTIN CARVER,
3   of lawful age, being produced, sworn, and examined on
4   behalf of the Plaintiffs deposes and says:
5      EXAMINATION
6   BY MR. SCHERZER:
7      Q.  Good morning, Mr. Carver.
8      A.  Good morning.
9      Q.  My name is Aaron Scherzer, and, as you
10  know, I represent the plaintiffs in this case.  How
11  are you doing?
12     A.  Fine.  Thank you.
13     Q.  Other than when we just met in the
14  hallway, have we met previously?
15     A.  Not to my knowledge.
16     Q.  Okay.  Have you ever been deposed before?
17     A.  Yes.
18     Q.  And how many times?
19     A.  Just once.
20     Q.  And what kind of case was that?
21     A.  It was a civil case in the late 1990s in
22  the city of Chicago.  I was dating a gal who had
23  been -- who had a major, like, jaw reconstructive
24  surgery, was afterwards injured in a vehicle
25  accident, all of which occurred before I knew her.

## Page 7

1   My understanding is that the reason that I was
2   sought to be deposed was I could testify to
3   limitations that she might have had as a result of,
4   you know, kind of the injuries in the accident.
5      Q.  Got it.  And you haven't been deposed in
6   your role at the MSPD, though?
7      A.  Correct.
8      Q.  Have you testified in any other cases at
9   trial?
10     A.  I don't believe I've testified at trial.
11  I've certainly testified in court a number of times.
12     Q.  Got it.  And we'll get to that later.  I'm
13  aware of one particular instance we'll certainly
14  talk about later.
15     A.  Okay.
16     Q.  And have you taken depositions yourself?
17     A.  Yes.
18     Q.  Okay.  About approximately how many?
19     A.  No idea.  More than I can count on my
20  fingers and toes.
21     Q.  Got it.  So more than ten or 20?
22     A.  Yes.
23     Q.  Okay.  So then you're very familiar with
24  how this works.  I'm going to ask you questions
25  relevant to the case.  You're required to answer

## Page 8

1   truthfully and to the best of your ability.
2   Remember, obviously, that you're here under oath.
3   Does that all --
4      A.  I understand.
5      Q.  -- make sense?  Okay.
6      A.  Yes, sir.
7      Q.  As you know, there's a court reporter here
8   transcribing the deposition, so just for ease of the
9   record, and, obviously, there's video as well,
10  please wait until I finish the question, if you can,
11  and -- before you answer, and if you have any
12  questions about my questions, don't hesitate to make
13  that clear.  If you need to take a break, obviously,
14  feel free to do so; I just ask that you try to
15  answer the pending question before you do so.
16     A.  Understand.
17     Q.  Your attorney might object -- Ms. Shipma
18  might object.  Unless, of course, she instructs you
19  not to answer, you should still go ahead and answer
20  the question.  Does that make sense?
21     A.  Yes.
22     Q.  Okay.  And, of course, if you need a break
23  at -- like I said, at any time, just let me know,
24  and we can take one.
25     Okay.  So how did you prepare for this

2 (Pages 5 to 8)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-2   Filed 02/21/18   Page 3 of 107

## Page 9

1 deposition?
2    A. I met with Ms. Shipma, and I reviewed the
3 data from my office, in terms of cases -- how many
4 cases did we open, how many cases do we have open
5 now.
6    Q. Okay. And when -- for how long did you
7 meet with Ms. Shipma?
8    A. About two hours.
9    Q. Okay. And you said you reviewed data.
10 What -- in what form were those --
11    A. Electronic.
12    Q. Electronic data. Okay. Did you review
13 any other documents?
14    A. After I had received the notice of
15 depositions and before I met with Ms. Shipma, I
16 reviewed items that I had submitted to Ms. Shipma
17 that I understand were disclosed to the parties as a
18 part of the discovery process.
19    Q. Got it. Any items in particular that you
20 recall that you reviewed?
21    A. There was an e-mail thread that was
22 initially an e-mail that I sent to the court late
23 December of 2016 with a couple of responses. There
24 were -- there was a motion for caseload conference.
25 There's a transcript in relationship to that. There

## Page 10

1 was a motion to decline representation. There may
2 have been something else. I can't remember. Those
3 are the items that come to my mind.
4    Q. That's very helpful. And did those
5 documents refresh your recollection about what's
6 transpired?
7    A. Yes.
8    Q. And when you say "electronic data," just
9 to return to that, can you just tell me more about
10 that?
11    A. Sure. All of our case work is conducted
12 in software called Lotus Notes. It's a case
13 management database -- or system, and, you know,
14 within that, say, client Joe Blow, certainly, he'll
15 have all of the pleadings associated with this case,
16 court dates, memos of the case, file action items to
17 the investigator. So there's that -- specific
18 case-related items with regard to specific clients,
19 but then there are also views that I can access that
20 will tell me how many cases does this lawyer have
21 open now? How many cases did we open last year?
22 How many cases did we close last year? There are --
23 you know, probably guesstimate, two dozen different
24 views that I can access to slice down our case data
25 more specifically. How many per venue, by case

## Page 11

1 type.
2    Q. Got it. And does all of that data pertain
3 to your district or is it statewide?
4    A. Purely my district.
5    Q. Okay.
6    A. There are -- there's kind of a wall setup
7 so that I cannot access data for another district.
8    Q. Got it.
9    A. But I can access my district only.
10    Q. And your understanding is that each
11 district defender has access to the data for his or
12 her district?
13    A. Correct.
14    Q. Do other attorneys in your office have
15 access to that data or just the district defender?
16    A. Everybody in my office has access to the
17 same data.
18    Q. Got it. Okay.
19    A. Well -- if I can qualify that.
20    Q. Sure.
21    A. There are certain management views that I
22 can see kind of over and above case data that
23 employees would not be able to access, personnel
24 records, things of that kind. But purely in terms
25 of the case data, what I have access to is what my

## Page 12

1 employees have access to.
2    Q. And --
3    A. Does that make sense?
4    Q. Yes.
5    A. Okay.
6    Q. And is it your understanding that that
7 data, then, is transmitted to the central office
8 from time to time or daily or ...
9    A. My understanding is that the central
10 office has access to all of it at any given point in
11 time.
12    Q. Okay.
13    A. Well, I say that -- some people within the
14 central office have access to it at any given point
15 in time. For example, my supervisor -- my direct
16 supervisor is Ellen Blau. I understand that she is
17 able to access the data from my office for the
18 Columbia trial office for all of the other offices
19 that she supervises. There may be people in our
20 administrative office who don't have access to that
21 information because they don't need it.
22    Q. Got it.
23    A. Does that make sense?
24    Q. Yes. Perfect. Thank you. In terms of
25 the documents that you reviewed, did you bring any

3 (Pages 9 to 12)

ALARIS LITIGATION SERVICES
www.alaris.us    Phone: 1.800.280.3376    Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-2   Filed 02/21/18   Page 4 of 107

## Page 13

1   of those documents or any other documents with you
2   here today?
3       A.  No, sir.
4       Q.  Okay.  I want to turn -- I'll just do this
5   slightly out of order, given the documents that
6   we're discussing.  I want to turn to what I'm going
7   to mark as Plaintiff's Exhibit 17.
8       (Deposition Exhibit No. 17 was marked for
9   identification.)
10      Q.  (By Mr. Scherzer)  I'll give you a chance
11  to just glance at it.  Obviously, not read the whole
12  thing, since it's 60 pages.
13      A.  Yes.  I'm with you.  Thank you.
14      Q.  Okay.  Do you recognize this document?
15      A.  I do.
16      Q.  And what is it?
17      A.  This is the transcript of a -- sort of a
18  part 1 of a case conference hearing that was held in
19  Cole County in November 2017.
20      Q.  Okay.  And do you see the date on the
21  middle of the first page?
22      A.  I do.  It says November 7.
23      Q.  And the case name is State of Missouri v.
24  Quentin Williams; is that right?
25      A.  Yes, sir.

## Page 14

1       Q.  And do you see the judge on the top of the
2   page?
3       A.  Yes, sir.  Judge Joyce.
4       Q.  Okay.  So I want to get much more into
5   detail on this later on -- and, obviously, I haven't
6   asked you background questions first, but I'm asking
7   you about this now for the following reason.  Can
8   you turn to page 8- -- see the Bates page numbers on
9   the bottom, page 82.  It's Bates 4.
10      A.  Yeah, I'm sorry.  I was looking at the --
11  82.
12      Q.  Yes.
13      A.  Yes.
14      Q.  So you see there are a number of
15  exhibits --
16      A.  Yes?
17      Q.  -- affidavits and caseload printouts.
18      A.  Yes.
19      Q.  Do you -- I'm asking you about this early
20  on in the deposition on the chance that --
21  obviously, you don't have it with you.  Would
22  someone in your office be able to get this -- these
23  documents before the end of the day, by chance,
24  or -- if not, it's fine.
25      MS. SHIPMA:  Can we go off the record for

## Page 15

1   a second?
2       MR. SCHERZER:  Sure.
3       VIDEOGRAPHER:  The time is 9:11 a.m.
4   We're off the record.
5       (Discussion off the record.)
6       VIDEOGRAPHER:  The time is 9:13 a.m., and
7   we're back on the record.
8       Q.  (By Mr. Scherzer)  Okay.  Mr. Carver, by
9   who are you employed?
10      A.  The State of Missouri.  Specifically, the
11  Missouri State Public Defender System.
12      Q.  And what's your current title?
13      A.  District defender of Area 19.
14      Q.  And how long have you been in that
15  position?
16      A.  Since the end of September 2014.
17      Q.  Okay.  And prior to that, did you serve
18  with the MSPD in another capacity?
19      A.  I did.  I was the district defender in the
20  Fulton office, which I think was Area 12, and I was
21  the district defender there -- I started as an
22  assistant public defender in Fulton in 2002 --
23  either in 2005 or 2006 -- I can't remember -- I was
24  promoted to district defender, and so from that --
25  2005 to 2006, up until 2014, I was the district

## Page 16

1   defender in Fulton.
2       Q.  Okay.  And then in 2014, you switched and
3   became district defender in Area 14?
4       A.  Nineteen.
5       Q.  Nineteen.  Sorry.
6       A.  Yes, sir.
7       Q.  And why did you make that switch?
8       A.  The entire time I had been working in
9   Fulton, I lived in Jefferson City and just drove to
10  Fulton, and, you know, the vacancy came open in
11  Jefferson City, and I took the anecdote [sic] of,
12  you know, I could drive five minutes to the office
13  or I could drive 30 minutes to the office.  Driving
14  five minutes to the office sounds great.  So -- and,
15  you know, as a practical matter, all of the time I
16  had been working in Fulton, if the kid got sick at
17  school, all of that fell on my wife.  So for the
18  family dynamic perspective, it would be more helpful
19  to have me in Jefferson City.
20      Q.  Got it.  And which counties are included
21  in District 19?
22      A.  Cole County, Miller County, and Moniteau
23  County.
24      Q.  Okay.  And what does it mean to be a
25  district defender?

4 (Pages 13 to 16)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-2   Filed 02/21/18   Page 5 of 107

## Page 17

1    A.  It means that I am the supervisor in that
2  office and that I'm responsible for hiring, for
3  doing in-house training, for, you know, any employee
4  discipline issues.  I deal with those in
5  coordination with our human resource office and with
6  general counsel.  Invoices, budgets -- you know,
7  there are administrative components to the thing.
8  In addition to that, I'm a lawyer, and, you know,
9  the reality of our caseload situation is, I have to
10  carry a caseload, and so as part of that, I go to
11  court and do my best to work on my cases.
12    Q.  And you mentioned that you report to
13  Ellen Blau; is that correct?
14    A.  Correct.
15    Q.  And what is her title?  Do you know?
16    A.  I believe she is -- her official title is
17  the trial division director.
18    Q.  Okay.  And she's located in the central
19  office?
20    A.  She -- she supervises the entire state,
21  and so commonly when I call her, she's in her car
22  driving, so -- I know that from time to time, she
23  does work out of the Columbia office.  You know,
24  primarily, I think that there's an administrative
25  office in St. Louis -- or there's at least a desk

## Page 18

1  that she utilizes in St. Louis, but she spends a lot
2  of time on the road.
3    Q.  And you mentioned some of this previously,
4  but as the district defender, do you have
5  discretionary authority over some things that your
6  line attorneys don't have discretion over, in terms
7  of day-to-day management of the office?
8    A.  Are you talking about, like, you know, how
9  things work within the office and stuff like that?
10    Q.  Uh-huh.  Yes.
11    A.  Yes.
12    Q.  Are you familiar with the standard
13  litigation practices in your office?
14    A.  What do you mean?
15    Q.  Are you familiar with either -- with, say,
16  policies and procedures that you've set up or team
17  members in your office have set up for how your
18  office operates and how the line attorneys operate?
19    A.  We don't have, like, any sort of formal
20  policies or procedures that are Area 19 specific.
21    Q.  Okay.
22    A.  You know, there are -- the agency has sort
23  of standards and guidelines that all employees are
24  sort of directed to follow.  I have my own, you
25  know, sort of supplementary or additional

## Page 19

1  expectations for the lawyers that are not, like,
2  reduced to writing in some sort of formal document.
3  You know what I mean?
4    Q.  Uh-huh.  So you communicate those verbally
5  with your line attorneys?
6    A.  Right.  Right.  Yeah.
7    Q.  Do you do that individually, or are there
8  team meetings?
9    A.  In a variety of formats.  I mean, you
10  know -- for example, last week we had an office
11  meeting, and, you know, as a part of that, there's
12  sort of administrative issues that were coming up in
13  the context of Cole County, so I -- we talked about
14  what those issues were, and I gave the lawyers
15  several ways that they can handle the issue.  But,
16  ultimately, I didn't mandate that they handle it in
17  any specific manner but gave them, you know, kind of
18  some -- Hey, these are the different ways that you
19  can deal with it.  You know, deal with it one way or
20  another, but don't just ignore it.
21    Q.  Got it.  Got it.  Do you talk to most of
22  the line attorneys in your office every day?
23    A.  No.  Part of that is -- you know, right
24  now my caseload is in Miller County, and so I
25  spend -- right now I'm spending a considerable

## Page 20

1  amount of time outside of the office going to court
2  in Miller County, going to the Miller County jail,
3  and so there are lawyers who I may see once a week.
4    Q.  Got it.  How many days a week do you
5  estimate you're spending in Miller County?
6    A.  Hmm.  That's hard to say.  I'm going to
7  say one or two, just for court.  In addition, there
8  are other things that take me down there, jail
9  visits, things come up, I need to go, so ...
10    Q.  So with court and the jail visits, do you
11  think two or three days a week?  Does that seem
12  right?
13    A.  Probably.  But it -- you know, certainly,
14  it's going to vary.
15    Q.  It depends.
16    A.  There may be a week where I don't go there
17  at all, but then there may be other weeks where I
18  may be there four times, so -- right.  But that's --
19  two or three is probably a decent rough estimate.
20    Q.  Okay.  Does your -- you mentioned the
21  Lotus Notes program for attorney workload.
22    A.  Uh-huh.
23    Q.  Does your office gather statistics about
24  how many hours attorneys spend on various tasks, or
25  did it at any point?

5 (Pages 17 to 20)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-2   Filed 02/21/18   Page 6 of 107

## Page 21

1    A.  It did.  For a considerable period of
2    time, every lawyer in the agency was required to log
3    their time in five-minute increments.  And over --
4    sort of in the time that I've been with the agency,
5    there was a time where we started and we continued
6    it, and then it stopped.  And then we started it
7    again, and it continued, and then it stopped.  I
8    can't -- I can't recall, you know, when we started,
9    when we stopped; when we started, when we stopped.
10   Q.  Okay.  And do you have any knowledge of
11   why you stopped this most recent time?
12   A.  What I was told by Director Barrett was
13   that we had been doing it long enough that we
14   accumulated, you know, a substantial body of data,
15   and if -- what he articulated was, he felt like we
16   have all of the data we need.  You know, right now
17   additional data would not be beneficial, and logging
18   the time just gives the lawyers one more thing to
19   do, and, frankly, their time is short.  Personally,
20   I was finding it would take me 20 minutes a day to
21   log all of my time, and when you're trying to
22   squeeze every hour out of every day, you know, if
23   you aggregate that, you know, 330 lawyers or
24   whatever we have, you know, 300 working days of the
25   year or whatever, that's a pretty good amount of

## Page 22

1    productivity that's lost just typing in data that's
2    really not -- that we're really not getting anything
3    out of -- any additional benefit out of.
4    Q.  Since you'd already logged it for such a
5    long period --
6    A.  Correct.
7    Q.  Got it.  And so, in other words, the --
8    your understanding of the rationale is that it was
9    taking time away from cases and representing
10   clients?
11   A.  Correct.
12   Q.  Okay.  Okay.  I'll move on away from the
13   background section, just to note that any remaining
14   questions that I ask, unless I indicate otherwise,
15   are about your district and -- rather than the state
16   as a whole.  And by "your district," I mean,
17   obviously, District 19, not the Fulton office.
18   A.  Fair enough.
19   Q.  All right.
20   A.  Okay.
21   Q.  So you mentioned that in addition to all
22   of your responsibilities as district defender, you
23   also have your own caseload; is that right?
24   A.  Correct.
25   Q.  And about how many cases a year do you,

## Page 23

1    yourself, handle?
2    A.  Off the top of my head, I couldn't tell
3    you how many cases a year.  I did look at my
4    caseload yesterday, and I can tell you that as of
5    yesterday, I had 213 open cases.
6    Q.  Okay.
7    A.  And that would include everything from --
8    I had seven misdemeanor cases that were open, all
9    the way up to one murder case.
10   Q.  Got it.
11   A.  Predominantly, those are felony cases.
12   About 150 are felonies.
13   Q.  150 felonies, and does that mean 63
14   misdemeanors, or is there some other category?
15   A.  Probation violation cases.  Some of the
16   probation violation cases are probation violations
17   cases on felony charges.  There are some misdemeanor
18   cases.
19   Q.  Okay.  But you don't have in your head an
20   exact breakdown of the remaining 63 how many are
21   probation violations, how many are misdemeanors?
22   A.  I want to say about 30 to 35 of the 213
23   are probation violations.
24   Q.  Okay.
25   A.  As of yesterday, I had seven misdemeanor

## Page 24

1    cases.
2    Q.  All right.
3    A.  So now I'm trying to do math in my head
4    while we're talking.
5    Q.  Right.
6    A.  So I would say -- I said, you know, sort
7    of initially as a ballpark, 150 would be felony
8    cases.  Trying to do the math, about 170, it sounds
9    like, is a better estimate of how many open felonies
10   I have right now.
11   Q.  And is that 213 that you have open as of
12   yesterday, is that atypical of what your caseload
13   has been in the last, say, three months, or does
14   that seem -- does your caseload seem about what it's
15   been for the past three months?
16   A.  A couple of months ago, about September or
17   October, somewhere in there, it had spiked up to
18   300, and so it's actually been -- it's been a little
19   bit higher, at least within this calendar year.
20   This calendar year has been a complete mess for my
21   office.
22   Q.  And when you say it spiked to 300 cases,
23   was that just for a one-month period or for longer?
24   A.  Yeah, about a month -- about a month, give
25   or take.

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-2   Filed 02/21/18   Page 7 of 107

## Page 25

1     Q.   And what was the cause of that spike?
2     A.   We've had an unusual amount of turnover in
3  the Area 19 office in calendar year 2017.  We
4  lost -- thus far this year, we've lost five lawyers.
5  In -- you know, we've been hiring replacements as we
6  go.  One of the replacement lawyers that I hired,
7  he's Army Reserves.  We had him, you know, kind of
8  on staff for two months, and then he got mobilized.
9  And so as of July, he went out on military duty, and
10  we're not expecting him back until July 2018.
11        So -- and, frankly, even preceding
12  January 2017, we had a lawyer go out on leave in
13  September of 2016.  So, I mean, effectively, we've
14  been shorthanded at least one lawyer, sometimes two,
15  since 2016, and so the turnover has substantially
16  contributed to my caseload.  The other thing that
17  has contributed to my caseload is -- you know, we've
18  sort of changed how we're doing things in  Area 19
19  in an attempt to manage the caseload of the
20  assistant public defenders.  And, you know, you note
21  kind of through the documents that you received in
22  discovery that the -- about the only plan that we
23  could cook up was to communicate the situation to
24  the courts, and if they were going to order the
25  public defenders to represent, what I told the

## Page 26

1  judges is, Look, if we're telling you we can't take
2  any more cases and you put us in it anyway, I'm
3  going to assign it to myself and not continue to
4  assign cases to an assistant public defender who has
5  already got too many.  And so it -- that has been an
6  additional factor in my caseload sort of spiraling
7  in 2017.
8     Q.   Got it.  And you said you had five
9  attorneys leave in the past year.  Do you mean in
10  calendar year in 2017?
11     A.   Correct.  Yes, sir.
12     Q.   And how many attorneys total --
13  line attorneys, not counting yourself, does the
14  office have?
15     A.   There's seven line attorneys not counting
16  myself.
17     Q.   So five of the seven left within the past
18  year?
19     A.   Correct.
20     Q.   Okay.  Is that -- what was the basis for
21  that turnover?
22     A.   A variety of reasons.  The first two to
23  leave in early 2017 both had babies, and Grandma and
24  Grandpa lived in other parts of the state, and so
25  they -- each of those lawyers transferred to public

## Page 27

1  defender offices in other parts of the state for
2  family reasons.  The lawyer that left in June, I
3  believe it was, retired.  He had a good number of
4  years of service in and was eligible to retire, and
5  he did.  The lawyers that left more recently in
6  August or September, one went to work for the
7  attorney general's office, another went into private
8  practice.  Both -- in spite of the caseload controls
9  that we implemented in January, both remained
10  concerned about their caseload and didn't feel like
11  they were practicing law the way they wanted to, had
12  other opportunities, and took them.
13     Q.   Okay.  And that -- do you talk to each of
14  those attorneys -- did you talk to each of those
15  attorneys before they left the office?
16     A.   Yes.
17     Q.   And is that the basis for your knowledge
18  of why they left?
19     A.   Yes.
20     Q.   Okay.  Are you concerned by this turnover?
21     A.   Oh, absolutely.  Yeah.  Absolutely.  And
22  the turnover -- you know, the turnover has been a
23  problem with the agency as long as I've been around.
24  And, you know, there's turnover that's just going to
25  happen, that you really can't avoid, but there's

## Page 28

1  turnover that absolutely is avoidable.  And, you
2  know, the most common reasons lawyers cite in
3  leaving is either pay or caseload or both.  And, you
4  know, the problem is, is that there's so many --
5  there's so many problems.  You know, we --
6  typically, the lawyers that come to the public
7  defender's office are coming with little legal
8  experience, because, frankly, we pay bottom dollar.
9  You know, I've never had a senior partner at a major
10  law firm apply for a job as a public defender.
11  Likewise, I've never had a sitting circuit judge
12  apply for a job as a public defender.  It just -- I
13  mean, it's not happened in the entire time I've been
14  doing this, at least in my office.  You know,
15  typically, we get people who are looking for some
16  experience.  We spend a substantial amount of time
17  and money training those lawyers to get them up to
18  speed as quickly as possible.  You know, when they
19  leave and go on to private practice or go into other
20  public service positions or what have you, you know,
21  all of the investment in that lawyer is effectively
22  lost.  Also, that lawyer is going to leave behind a
23  block of cases.  Those have to get reassigned,
24  typically, within the office, and that causes, then,
25  for the lawyers that remain that are already

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 29

1  struggling with their caseload, now we're giving
2  them that many more cases.  It causes a significant
3  interruption in the representation, in terms of the
4  client relationship.
5      You know, right now we've got clients who
6  are on their fourth or fifth lawyer.  And, you know,
7  from -- you know, frankly, if it were my kid who
8  kept getting a new lawyer every two or three months
9  and the lawyer says, Look, hey, give me some time;
10  I've got to get up to speed.  You know, I'll look at
11  the thing, I'll come talk to your child in jail, and
12  they get up to speed, and they go talk to the child
13  in jail, and then they leave, and then the case gets
14  reassigned -- I mean, if that had been my child, I
15  would be furious.  And we see that happening, like,
16  over and over and over again.  You know, for -- a
17  lot of our clients have distrust in the legal system
18  and have distrust in public defenders, and so we
19  kind of start with the -- you know, sort of with a
20  creditability gap in the eyes of a lot of our
21  clients anyway, and when they have that experience
22  with the public defender's office, they don't have
23  any faith in their representation.
24      You know, from an efficiency perspective,
25  the new lawyer has to duplicate all of the work that

## Page 30

1  was done before.  You know, the fact that the old
2  lawyer read the police reports doesn't help the new
3  lawyer; the new lawyer has got to read them all over
4  again.  You know, all the videos, they've got to
5  watch them all over again.  Got to go meet with the
6  client, talk to them all over again.  So there's a
7  significant inefficiency there.
8      You know, we've had clients who end up
9  saying, To heck with it; I'll just cut a deal with
10  the prosecutor and go to prison pro se.  I mean, the
11  turnover is -- it creates significant issues, sort
12  of in a number of different areas.  And I spend a
13  ton of time hiring, just -- so ...
14      Q.  Because you're responsible for the hiring
15  for the district office?
16      A.  Correct.
17      Q.  Okay.  And that's something you need to do
18  on top of all of your other responsibilities?
19      A.  Right.
20      Q.  Okay.  And when you say -- you said the
21  two primary reasons, based on what these folks are
22  telling you for why they leave, is pay and caseload;
23  is that right?
24      A.  Correct.
25      Q.  And I assume that means low pay and high

## Page 31

1  caseload?
2      A.  Right.
3      Q.  And you said that your office pays bottom
4  dollar.  Are you -- first of all, is the salary for,
5  say, a -- you know, a first-year, lowest level
6  assistant public defender, is that the same across
7  the state, or does it vary office by office?
8      A.  Same statewide.
9      Q.  Okay.  And do you know what that rate is?
10      A.  $39,000 a year and change.
11      Q.  Okay.  And the -- do you know what the
12  rate is for even the most senior assistant public
13  defender?
14      A.  I want to say -- and I'm just going off
15  memory.  This is a ballpark.  About 64, 65,000.
16      Q.  Okay.
17      A.  And under our existing sort of structure,
18  you know, once they hit that amount, there's no room
19  for advancement, unless they go into management or,
20  like, the death penalty division or the commitment
21  defense unit.
22      Q.  Okay.  So someone could be an attorney for
23  30 years and still be making --
24      A.  They could have tried a hundred murder
25  cases, and we'll still pay them $65,000 a year or

## Page 32

1  whatever it is.
2      Q.  Okay.  And then the other thing that you
3  mentioned was that some individual defendants could
4  have four or five lawyers during the course of the
5  case.  I understand how that is, but just for the
6  record, could you explain how that is that that
7  happens based on the turnover?
8      A.  Absolutely.  So say the client, Bob, is
9  assigned Public Defender No. 1, and Public Defender
10  No. 1 then quits.  I've got to hire a replacement
11  for Public Defender No. 1 and try to find a new
12  lawyer within the office for Client Bob.  Client Bob
13  now gets Public Defender 2, whoever that is -- maybe
14  it's the new person; maybe it's somebody else.  If
15  No. 2 quits, I got to do it all over again.  And so
16  on and so forth.
17      The other thing that happens is -- at
18  least in the Area 19 office, you know, we try to
19  assign our cases geographically, in that we've got
20  one lawyer that does Moniteau County.  Right now the
21  only lawyer getting new Miller County cases is me,
22  and everybody else is getting new cases out of
23  Cole County.  And that's an efficiency thing.  You
24  know, from a client-relationship perspective, you
25  know, it would be better if Bob had one lawyer in

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 33

1    Cole, Miller, and Moniteau, in the event that Bob
2    had cases in all three.  But, frankly, we're just
3    not able to do that because of the volume of cases
4    that we've brought.  So if Bob's got charges in all
5    three counties, Bob is going to have three different
6    public defenders from my office.  If two lawyers in
7    Cole County quit, for example, I will seek to hire
8    replacements, but at that point, the question of
9    which lawyer goes to what county is going to be up
10   for grabs, and I may take a lawyer out of Moniteau
11   County, put them in Cole County, and then place the
12   new person in Moniteau County.
13          It's sort of -- frankly, it depends on a
14   million and one different things, but every now and
15   then, we have to move a lawyer from one jurisdiction
16   to another, and that, then, can interrupt -- I mean,
17   that just -- that will cause an interruption in the
18   relationships for the clients whose lawyer quit, but
19   it's also, then, going to interrupt the cases in
20   which the lawyer was sort of pulled out and
21   transferred back in.
22          Does that make sense?
23       Q.  No, that makes sense.
24       A.  Okay.  Fair enough.  I'm not sure if I
25   explained that very well.

## Page 34

1        Q.  No, no.
2        A.  Okay.
3        Q.  And have you either received directly or
4    heard about complaints from individual defendants,
5    when they -- or their family, when they have re- --
6    have four or five different attorneys that -- from
7    your office that have been on their cases during the
8    pendency of the case?
9        A.  Absolutely.  Yes.
10       Q.  Okay.  And just in -- all right.  Well,
11   I'll scratch that.  I'll move on.
12          And when someone leaves -- I'm sorry.  To
13   go back to what you were saying, about how you
14   divide up based on geography.  You said that's for
15   efficiency sake.  Can you just explain for the
16   record why that is?
17       A.  Sure.  The lawyers and myself spend a
18   considerable amount of time in court, and the court
19   dockets -- the judges in county -- in Cole County,
20   for example, don't coordinate their dockets with
21   themselves very well.  They definitely don't
22   coordinate their dockets with judges in
23   Miller County and Moniteau County.  And if I
24   assigned cases by client instead of by county, the
25   lawyer would find themselves double- and

## Page 35

1    triple-booked on a regular basis, in that I've got
2    to be in Moniteau County at nine o'clock and I've
3    got to be in Cole County at nine o'clock, for
4    example.
5        Q.  Got it.  And when someone leaves your
6    office, is their position filled right away?
7        A.  Filled as quickly as I can do anything,
8    but right away, no.  I mean, it may take -- you
9    know, understand when a lawyer leaves -- hopefully,
10   we get 30 days' notice.  That's what we ask for.
11   Generally -- generally, lawyers have been good about
12   giving it.  You know, when -- so I've got to -- as
13   soon as I receive a notice, the first thing I do is
14   request permission to post that vacancy, which,
15   generally, is approved right away.  The position
16   will get posted the following Wednesday.  We leave
17   it open for two weeks to allow all applicants to
18   apply, and then we start the interview process.
19   And, you know, realistically, as a practical matter,
20   I never have the replacement on board, you know,
21   at -- on the -- on or by the lawyer that's leaving,
22   on or by the next day.  Generally, we'll go a couple
23   of weeks or a month before the replacement starts.
24   Sometimes that's because they have to move and
25   relocate; sometimes that's because it takes me

## Page 36

1    forever to finish the hiring process.  Sometimes
2    that's -- you know, it could be a variety of
3    reasons.
4        Q.  Okay.  And during that time -- in between
5    when an attorney has left and when you've hired
6    their replacement, your office is obviously
7    short-staffed; is that correct?
8        A.  Correct.
9        Q.  And who picks up the cases from the
10   attorney who has left in that interim period?
11       A.  Well, prior to January 1, 2017, we would
12   reassign the cases internally as best as we could.
13   As of January 1, 2017, we sort of changed that.
14   What we would do is assign out those cases, to the
15   extent that we could, without making -- without
16   having the individual lawyers take more cases than
17   they could.  Invariably, there was always a gap of
18   cases that we could not reassign internally, and on
19   those cases, we would file a motion to decline
20   representation or a motion for caseload conference
21   or whatever.
22       Q.  Okay.  And I'll certainly get into much
23   more detail on that --
24       A.  Sure.
25       Q.  -- later on.  And even just given the

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

Page 37

1  logistical delays in posting, do -- putting that
2  aside, do you sometimes have difficulty finding
3  someone to take the position?
4      A.  Absolutely.  Yes.  Especially this year.
5  Hiring has gotten much more difficult within the
6  public defender's office.  The applicant pools are
7  shrinking and the applicants within the pool is less
8  than what it had been in years past.
9      Q.  And you said hiring within the public
10 defender's office.  Do you mean your office or
11 statewide or both?
12     A.  Well, that's been my experience in my
13 office, and in talking to other district defenders
14 in other offices, that's what they tell me too.
15     Q.  Got it.  And when someone applies, are
16 they applying to Area or District 19, or are they
17 applying to the MSPD system overall?
18     A.  Whichever they like.  So on our
19 application for employment, on the bottom of the
20 first page, the applicant is given the opportunity
21 to check geographic regions of preference.  So they
22 could check Jefferson City, Columbia, St. Louis,
23 Kansas City, or they could check all, or if they
24 want to go work in West Plains, they could just
25 check the West Plains box.  So, I mean, it's sort of

Page 38

1  up to the applicant.  And it's my understanding that
2  HR will forward that application to the offices
3  within the geographic preference that are hiring,
4  you know, within the period of time relevant to the
5  application.
6      Q.  And you mentioned there's often difficulty
7  finding applicants and qualified applicants.  Do you
8  have a sense of why that is?
9      A.  Well -- yes.  I mean, pay, caseload.  The
10 legal market has certainly turned around since, you
11 know, the crash in 2008 or whenever it was, and my
12 impression is that the public defender's office is
13 not the pick of most graduates right now.  And, you
14 know, there's been a lot of adverse publicity about
15 the public defender's office.  You know, I mean,
16 it's sort of in the media that we're declining
17 cases, that we're all overwhelmed, that -- you know,
18 the Hinkebein decision certainly caused quite a
19 stir.  So it's an agency that's not getting a lot of
20 positives out there in the community right now.
21     Q.  And so to clarify, it's -- the same
22 reasons that cause -- many of the same reasons that
23 cause your attorneys to leave -- low pay, high
24 caseload -- are the same reasons that you have
25 difficulty recruiting new folks to come to the

Page 39

1  office?
2      A.  That's my impression.
3      Q.  And you said within -- this has gotten
4  much worse within the past year; is that right?  In
5  terms of recruiting?
6      A.  Yes.  Absolutely.
7      Q.  Okay.
8      A.  Yeah.  I mean, it's kind of funny, you
9  know, like, back in 2008, when the economy, you
10 know, completely fell apart, I remember hiring in
11 those times, and everybody wanted to be a public
12 defender.  You know, we'd get a hundred applicants
13 for a position, even in Fulton, you know?
14     Q.  Uh-huh.
15     A.  And now the economy has certainly turned
16 around, and, you know, sort of as -- as this year
17 has unfolded and the public defender struggles have
18 sort of become more known in the community, you
19 know, I -- I had fewer applicants for the position
20 that we just filled than the ones that we had
21 even -- even, say, like, in January of this year --
22 of 2017, so ...
23     Q.  Got it.
24     A.  And there's not been -- in my opinion,
25 there has not been, like, a huge economic swing in

Page 40

1  those intervening months.
2      Q.  Okay.  So I want to go back to some basic
3  questions about your office.
4      A.  Uh-huh.
5      Q.  So you have seven attorneys in the office,
6  although one of them is on leave in the Army
7  Reserves; is that right?
8      A.  Correct.
9      Q.  Okay.  And you mentioned that there's
10 another -- there was another individual who was on
11 leave, but is that individual back or ...
12     A.  In September of 2016, one of my lawyers
13 went on leave, was scheduled to return in January of
14 2017.  Instead of returning to my office, he
15 actually ended up transferring to another office,
16 and so he left my office.
17     Q.  Okay.
18     A.  That's one of the lawyers that ended up
19 leaving.
20     Q.  Got it.  Okay.  So you currently have six
21 line attorneys plus yourself in the office?
22     A.  Correct.
23     Q.  With -- plus this individual who is on
24 leave in the Army Reserves?
25     A.  Correct.  Tangentially, my investigator

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-2   Filed 02/21/18   Page 11 of 107

## Page 41

1  has been on leave.
2      Q.  Got it.  And how many of those -- you
3  mentioned already that you handle felony cases.  How
4  many of those six line attorneys handle felony
5  cases?
6      A.  All of them.
7      Q.  Okay.  And how many of them handle
8  misdemeanors?
9      A.  I believe all of them do.
10     Q.  How many of those attorneys handle
11 juvenile cases?
12     A.  Just one.
13     Q.  Does that attorney handle only juvenile
14 cases or ...
15     A.  No.  Also handles a regular mix of
16 felonies, misdemeanors, probation violations.  When
17 I say "regular mix," not serious felonies, though.
18 That lawyer has been practicing -- she passed the
19 February bar, joined us in about June.
20     Q.  Okay.  And so she then picked --
21 immediately picked up all of the juvenile cases that
22 were in the office or ...
23     A.  Right.  But, typically, we've got two to
24 three open at any given point in time.
25     Q.  Okay.  And that's two or three cases in

## Page 42

1  all three -- some in all three counties?
2      A.  Generally, the juvenile cases that we get
3  are in Miller County only.  In Cole County, we do
4  not receive a single juvenile case, and the reason
5  for that is that the county actually has a contract
6  with some private lawyers where they pay the private
7  lawyer, you know, like, a reduced rate, and the
8  private lawyer will represent an indigent juvenile.
9  And so as a result, we get zero juvenile cases in
10 Cole County.
11     Q.  And when you say "contract with a private
12 lawyer," are those private lawyers who are at law
13 firms or ...
14     A.  Yes.  Yes.
15     Q.  And are those private lawyers who do
16 solely juvenile cases, or it's a mix of -- it's part
17 of their caseload?
18     A.  Generally, it's a mix of whatever.  You
19 know, like -- they'll do some family, they'll do
20 some criminal, maybe they'll do a little bit of
21 civil stuff, and then some juvenile appointments.
22     Q.  I'm sorry.  When I -- my question earlier
23 wasn't clear.  When I said that -- I mean, are these
24 individuals at medium-sized law firms in
25 Jefferson City, or are they solo practitioners at

## Page 43

1  smaller law firms?
2      A.  So the one I can think of -- I think he's
3  a solo now.  Another one that I can think of is a
4  partner in a firm, but it's a -- you know, it's
5  Jeff City, like, every firm is kind of small, you
6  know what I mean?  You know, I would be surprised if
7  the entire firm had five lawyers.  Like, I -- I
8  don't think that they have that many people.
9      Q.  Okay.  And just to tie up this juvenile
10 piece, when you said there -- there are two or three
11 cases at any given time in Miller County --
12     A.  Correct.
13     Q.  -- is that -- is your sense that that's
14 the total number of juvenile cases in Miller County
15 at any time, or is someone else receiving some of
16 those cases?
17     A.  My sense is that there are probably a
18 bunch of other cases out there that we're not seeing
19 and we're not getting.
20     Q.  Okay.
21     A.  And, likewise, in Moniteau County, I can't
22 think of the juvenile case that we've had out there.
23 Maybe we've had one.  Surely at some point they've
24 detained a juvenile.  I have no idea what, if any,
25 counsel that juvenile had.

## Page 44

1      Q.  Okay.
2      A.  And, you know, even in the Cole County
3  world where, you know -- I had a case in Cole County
4  where a 16-year-old had been certified, and I did
5  not do the certification because it was, you know,
6  the appointed lawyer, and the certification hearing
7  was not well done.
8      Q.  Okay.  So just speaking about
9  Moniteau County, you're not aware of who, if anyone,
10 is representing the juveniles in that county?
11     A.  Correct.
12     Q.  Okay.
13     A.  I mean, certainly, if a juvenile applied
14 for public defender services and they qualified, we
15 would represent them.  I don't recall having
16 received any Moniteau juvenile cases.
17     Q.  And when you say that, you mean since the
18 time that you took over the district defender
19 position in 2014?
20     A.  Correct.
21     Q.  Okay.
22     A.  I mean, there may be one or two out there.
23 I'd have to go back and look, but I can't think of a
24 name or a charge or a face or even the memory of the
25 existence of one of them.

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

Case 2:17-cv-04057-NKL   Document 160-2   Filed 02/21/18   Page 12 of 107

## Page 45

1    Q.   Okay.  Other than yourself, how long has
2  the most experienced attorney in your office been
3  practicing?
4    A.   The most experienced attorney started
5  practicing approximately 2010.  And then after that,
6  the next most experienced attorney has been
7  practicing a little over three years.
8    Q.   Okay.  And how long has the least
9  experienced attorney in your office been practicing?
10    A.   He started practicing November 13th.
11    Q.   Okay.  So less than a month?
12    A.   Correct.
13    Q.   And is that attorney carrying felony
14  cases?
15    A.   Yes.
16    Q.   Okay.  Do you -- I'm not holding you to an
17  exact number, but do you have an estimate of how
18  many cases that attorney is handling?
19    A.   He's got about 70 cases open right now.  I
20  couldn't tell you off the top of my head how many
21  are felonies or misdemeanors or probation
22  violations.
23    Q.   And are those primarily cases -- new cases
24  that were opened within the past month or cases that
25  he took over from someone else in your office?

## Page 46

1    A.   Typically, the bulk of them -- say, 50 --
2  were cases that had been sort of -- that he took
3  over from somebody else who had left or were ones
4  that came in after somebody left and we filed a
5  motion on but then were able to open up when he
6  started.  I would say approximately 20 were, like,
7  brand-spanking-new cases that came in after he
8  started.
9    Q.   So those 50 cases -- going to the 50 cases
10  that were already existing in your office, how long
11  after he started did he pick up those -- did he pick
12  up all those 50 -- sorry.  Scratch that.
13         Did he pick up all of those 50 cases at
14  once?
15    A.   Yes.
16    Q.   Okay.  And how long after he started did
17  he pick up those cases?
18    A.   We started assigning him cases out of
19  those 50 the very first day.  And it probably took a
20  few days for staff to click all of the buttons and
21  make -- you know, do all of the stuff that we have
22  to do to transfer a file, but, effectively, within
23  the first week, he had received all of those 50
24  cases.
25    Q.   Okay.  And, again, this is within his

## Page 47

1  first week of practicing anywhere as a lawyer?
2    A.   Correct.
3    Q.   Okay.  And then in the next two or three
4  weeks, since it's only been three or four weeks, he
5  received an additional 20 cases?
6    A.   Correct.
7    Q.   And you have said you're not aware of the
8  exact number of felony cases, which is certainly
9  fine.  Do you know if he's receiving -- if he has
10  any cases that are A, B felonies, or is it just --
11    A.   He does have one.  And I think it was a
12  situation where he had been assigned the client on a
13  misdemeanor or C and D felony, and then an A or B
14  drug case arose after he had already entered on
15  behalf of the client and did something to engage in
16  the representation.  For continuity purposes, we
17  made the decision to assign him to A and B drug
18  case, too.
19    Q.   Are you aware of any other A and B case
20  that he has?
21    A.   No.
22    Q.   Are you concerned about the fact that this
23  brand new attorney has 70 open cases within his
24  first three and a half weeks in the office?
25    A.   Including some felonies?

## Page 48

1    Q.   Yes.
2    A.   And an A or B drug felony that could
3  incarcerate his client for up to 15 years in prison?
4  Yeah.  Absolutely.  And, you know, I've got another
5  lawyer -- the lawyer who has three-plus years of
6  experience, and she's got 120 cases.  I've got 213.
7  I mean, we're doing the best we can to keep brand
8  new lawyer's caseload down.  I'm concerned about his
9  caseload situation.  I'm concerned about everybody's
10  caseload situation.  And that's about the best that
11  we can do at this particular moment to keep his
12  caseload down.  I certainly don't want it to grow
13  any larger.  I would like him to have more time
14  under his belt learning how to practice law, but, as
15  I mentioned, things are a mess right now, so ...
16    Q.   Right.  So I take it, obviously, if you --
17  if you could, you would give him -- you would give
18  him many fewer cases to start; is that fair?
19    A.   Yes.  Yes.  Yes.
20    Q.   Okay.  But the reason -- you started to
21  say this, but just -- if you could explain the
22  reason you can't do so is because everyone in your
23  office is overloaded; is that right?
24    A.   Everybody is -- I don't believe that
25  there's a single lawyer in my office right now who

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 49

1  can take more cases.  And, you know, all year we've
2  been filing motions to decline representation or a
3  motion to appoint -- we filed motions to appoint a
4  state lawyer who is employed by the Public Service
5  Commission or Department of Revenue or motions to
6  withdraw based on our caseload or motions for
7  caseload conference, and we've received a lot of
8  sympathy and a lot of moral support.  And, you know,
9  there are judges who are talking about doing
10 something and contemplating doing something, and at
11 this point, we haven't received significant caseload
12 relief.  We've received some.
13      Judge Joyce in Cole County told us, You're
14 not taking any more criminal nonsupport cases until
15 we can get some representation on these people
16 charged with A and B felony cases first.  So for
17 months in Cole County we've not been representing
18 people in criminal nonsupport cases, some of which
19 are felonies.
20      And, you know, there are other things --
21 there are sort of smaller things that have been done
22 to try and help us.  You know, frankly, it's sort of
23 like -- and I appreciate all of the help that we can
24 get, because I will take all of the help that I can
25 get.  You know, you can take an ice cream scoop to

## Page 50

1  the iceberg that sank the Titanic, and the ship is
2  still probably going to go down.  It might go down
3  slower, I don't know, but that's kind of where we
4  are.  I mean, the -- really, what it would take to
5  get our office caseload down to a rational level
6  would be very dramatic, and at this point in time,
7  at least in the legal communities that I run in, we
8  don't have anybody talking about -- or we don't have
9  anybody doing the dramatic relief that would be
10 necessary.
11      Q.  Okay.
12      A.  Interestingly, on the Cole County
13 nonsupport cases, effectively, those litigants are
14 forced to proceed pro se.
15      VIDEOGRAPHER:  Excuse me one moment.
16      THE WITNESS:  Yes, sir.
17      VIDEOGRAPHER:  Can you move your -- could
18 you move your tie over?
19      THE WITNESS:  It's hidden.  I apologize.
20      VIDEOGRAPHER:  Yeah.  No problem.  No
21 problem.  Thank you.
22      THE WITNESS:  You're welcome.
23      Q.  (By Mr. Scherzer)  What is a criminal
24 nonsupport case?
25      A.  In Missouri, failing to pay child support

## Page 51

1  that one is ordered to pay can be dealt with in a
2  couple of different ways.  One is in the form of a
3  contempt at proceeding.  Alternatively, a person can
4  be charged with a crime of failing to pay child
5  support.  There's a misdemeanor offense of failing
6  to pay child support and a felony offense of failing
7  to pay child support.  If it's a civil contempt
8  proceeding, under Chapter 600, they're ineligible
9  for public defender services, even though they may
10 have a right to counsel.  If it's a criminal
11 proceeding, provided that they meet the financial
12 criteria, they would be eligible for public defender
13 services, certainly; the right to counsel would
14 attach, but at least in Cole County right now,
15 there's sort of this informal administrative order
16 that's not written down on any piece of paper that's
17 basically a judge saying, You guys aren't doing any
18 more criminal nonsupport cases until I tell you
19 otherwise.
20      Q.  And what's the most severe penalty that
21 someone facing a criminal nonsupport case could
22 face?
23      A.  Four years in the department of
24 corrections, if they have no prior felony
25 convictions.  If they have prior felony convictions,

## Page 52

1  even if they're unrelated, it could carry up to
2  seven years in the department of corrections and a
3  fine or probation or a combination thereof.
4      Q.  And approximately how many criminal
5  nonsupport cases are there in Cole County?
6      A.  I don't know because we're not doing them
7  anymore.  I mean -- and I'm not trying to be flip
8  about it or anything.
9      Q.  I understand.
10      A.  Off the top of my head, I can't tell you.
11 But, you know, commonly, the -- you know, typically,
12 in a criminal nonsupport case on a first offense,
13 typically, the state is not requesting and the court
14 is not inclined to place the person in prison.
15 Typically, the judge is going to place the person on
16 probation with the condition that they pay, and so
17 then there are, invariably, on some cases, probation
18 violations related to the person's alleged failure
19 to pay.  If you were to combine the criminal
20 nonsupport charges plus the probation violations,
21 there would be a substantial number, but I cannot
22 give you an estimate off the top of my head.
23      Q.  Just to get a ballpark, during the -- do
24 you think there are more than 50 a year in
25 Cole County?

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 53

1    A.  This is a wild ballpark -- and talking
2  only about ones in which my office -- you know,
3  which they requested and received a public defender.
4  Wild ballpark, I would say, in a year, there may be
5  50 cases that we would do.  Some folks in those
6  cases are going to retain private counsel.  And, you
7  know, sort of one of the limitations -- at least,
8  when I get a criminal nonsupport case, I can only
9  deal with the criminal side of the case; I can't do
10 anything on the family domestic relations side of
11 the case.  So I cannot get in the family case and
12 request a modification of the child support amount,
13 for example, or an alteration of the custody
14 arrangement or any of the stuff, I can only deal
15 with the criminal nonsupport charge.  I don't even
16 know if that was responsive to the question, but it
17 was tangential -- a lot of clients because of that,
18 if they can find a way to borrow some money from Mom
19 or whatever, may hire a lawyer on the private side
20 who can do both, kind of, dynamics of the case.
21    Q.  Okay.  So when you -- but your wild
22 ballpark -- I'm not holding you to this -- you think
23 there are 50 cases or there would be 50 cases in a
24 given year that would have gone to the public
25 defender --

## Page 54

1    A.  Correct.
2    Q.  -- that now aren't going to the public
3  defender?
4    A.  Correct.  Be it a criminal nonsupport
5  charge or a probation violation on a criminal
6  nonsupport charge.
7    Q.  Got it.  Because they're also not doing
8  their probation violations on the criminal
9  nonsupport charges?
10    A.  Correct.
11    Q.  And how much time could someone face,
12 maximum, on the probation violation on the criminal
13 nonsupport charge?
14    A.  It depends on how the probation was set
15 up.  If the imposition of the sentence were
16 suspended, the range of punishment on the probation
17 violation is the range of punishment on the
18 underlying charge.  So say it's a felony criminal
19 nonsupport charge charged as a first felony offense;
20 the range of punishment would be one day to one year
21 in the county jail or two to four years in the
22 department of corrections or a fine or probation.
23 That would be the range of punishment on the
24 suspended position of the sentence.  If the court
25 were to impose a prison sentence but then suspend

## Page 55

1  the execution of the sentence and place the person
2  on probation, on a probation violation, the court
3  can't change that three-year sentence.  The court
4  could either execute the three-year sentence,
5  continue the probation, continue the probation with
6  additional special conditions, continue the
7  probation with a period of shock detention in the
8  county jail, or there are a couple of other
9  sentencing statutes that the court could implement.
10 The court could place the person in the department
11 of corrections for 120 days, retain jurisdiction for
12 120 days, then consider releasing them on probation.
13 There are a couple of other squirrely sentencing
14 statutes such as that.
15    Q.  Okay.  But, in general, the -- is it
16 correct that individuals facing probation violations
17 on these criminal nonsupport charges could face up
18 to four or seven years, as you described previously?
19    A.  Correct.
20    Q.  Okay.  Would it be possible for them to
21 face more than seven years on a probation violation
22 on a criminal nonsupport case?
23    A.  If the imposition of the sentence had been
24 suspended on a criminal nonsupport case -- and is
25 going to be an exceeding rare sentence, but say the

## Page 56

1  judge suspended the imposition of sentence on the
2  criminal nonsupport case, but the client had a
3  suspended execution of the sentence in another
4  county or a suspended imposition of sentence in
5  another county -- probation is revoked in the other
6  county, and a five-year sentence is executed in the
7  other county.  On the probation violation on the
8  criminal nonsupport, if no sentence has been fixed,
9  if the court suspended the imposition of the
10 sentence, that court could take that four- or
11 seven-year sentence and run it consecutive to the
12 previously imposed sentence, such that four plus
13 five would be nine or seven plus five would be 12.
14 If the court had suspended the execution of the
15 sentence, whether it would be concurrent or
16 consecutive would be driven by what the judge said
17 at the time of sentencing, when the execution was
18 suspended.  That is a pretty rare circumstance, but
19 that's the only thing that comes to mind, in terms
20 of whether the court could increase -- have a
21 consequence that carries bigger than seven years.
22 And in no event could -- I mean, the range of
23 punishment fixed by the legislature is up to four or
24 seven, if they're a persistent felony offender, and
25 so the judge can't change that; the only thing that

14 (Pages 53 to 56)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-2   Filed 02/21/18   Page 15 of 107

## Page 57

1  the judge could do would be to tack it on and run it
2  consecutive to something else.
3      Q.  Got it.  And you said that typically in
4  these cases the defendant is -- first-time felony
5  offender wouldn't be necessarily facing prison time.
6  I assume when you meant "typically," you mean in the
7  cases that your office had taken previously; is that
8  right?
9      A.  Right.  Yeah.  I mean, usually -- and it's
10  been my experience on criminal nonsupport cases,
11  really, what the prosecutor wants is, they want the
12  person to pay.  The prosecutor knows if the
13  prosecutor puts in them in prison, they're not going
14  to be able to pay, and so, typically, in most cases,
15  generally -- this is gross generalization, but, you
16  know, generally, what the state is going to seek to
17  do is request probation with the condition that the
18  person pay such that if down the road they don't
19  pay, then they're in danger of going to prison.
20      Q.  Got it.  And to clarify, you -- your
21  office, then, isn't -- wouldn't represent them at
22  this point now, even on that probation violation --
23      A.  Correct.
24      Q.  -- that might occur?
25      A.  Correct.

## Page 59

1  the prosecutor may be like, Look, we're not going to
2  do probation on this.  And in another sort of more
3  rare instance, you know, if the accused wants to go
4  to trial, I've practiced in front of at least one
5  judge who would say, You know, look, never.  Only
6  once did he say it on the record, I'm not inclined
7  to grant probation after trial.  And so I -- in kind
8  of thinking back in time, I can think of one client
9  who went to trial on a criminal nonsupport charge.
10  The first trial resulted in a hung jury; second
11  trial, he was convicted, court imposed a four-year
12  prison sentence, and he went and served the time.
13      Q.  All right.  And if an individual now in
14  Cole County wanted to exercise his or her right to
15  trial, and if they weren't able to afford a private
16  lawyer, your understanding is they would need to
17  represent themselves?
18      A.  Yes.
19      Q.  Okay.
20      A.  I -- if -- I specifically heard the judge
21  doing that docket tell someone, Look, you're not
22  getting an appointed lawyer.  You can represent
23  yourself or you can hire someone.  And that's me
24  paraphrasing his words, but those were the options
25  that that judge had laid out.

## Page 58

1      Q.  Okay.
2      A.  Unless some judge somewhere tells me I'm
3  going to, that's kind of the standing order is, that
4  I'm to not.
5      Q.  And, obviously, you're not aware, since
6  your office now isn't representing, of what's
7  happening -- whether that practice of not seeking
8  prison time initially is still happening for those
9  who are now representing themselves pro se.  Is
10  that --
11      A.  I don't have personal knowledge as to
12  whether that practice has changed.  My -- I mean, if
13  I had to guess, I would say that it probably has
14  not, but I don't know.
15      Q.  Okay.  Are you aware of criminal
16  nonsupport cases that your office had either
17  initially or probation violations of criminal
18  nonsupport cases where the individual was facing
19  time in prison?
20      A.  I can think of a couple of situations --
21  you know, one, if the person had a prior or prior
22  convictions for criminal nonsupport, you know,
23  then -- you know, if the prosecutor had been dealing
24  with this person for the last 15 years, and they've
25  consistently failed to pay on multiple cases, then

## Page 60

1      Q.  And that was to an individual, as you
2  said, who was facing either four or perhaps seven
3  years in prison?
4      A.  Correct.
5      Q.  And did the -- did that judge explain the
6  reason for there not being a public defender
7  available to that individual?
8      A.  He's -- I've heard him explain it a couple
9  of different ways.  I've heard him say, Well, the
10  public defenders say they're too busy, sort of in a
11  condescending type of manner, or the public
12  defenders just don't want to take your case or
13  the -- you know, but I've also heard him say
14  something to the effect of, you know, the public
15  defenders are not available for new cases.  And,
16  again, that's me paraphrasing his words, but I've
17  heard him sort of explain that a couple of different
18  ways.
19      Q.  And so you've been in the courtroom,
20  obviously, when this has happened on at least some
21  of the occasions when this has happened?
22      A.  Correct.
23      Q.  Okay.  And when did this -- I know it's
24  not a written policy.  When did this practice in
25  Cole County of your office not taking criminal

15 (Pages 57 to 60)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-2   Filed 02/21/18   Page 16 of 107

## Page 61

1  nonsupport cases begin?
2     A.  I'm going to say April or May. And the
3  reason that that comes to my mind was, I recall
4  sitting in Judge Joyce's courtroom next to a lawyer
5  who left us in June, and that was when
6  Judge Joyce -- she asked, What are you guys doing
7  here? We said, We're here for the nonsupport. She
8  said, Why are you doing nonsupport when we've got
9  all of these people charged with, like, you know,
10  real felonies, real crimes that we can't get public
11  defender representation on? You guys aren't taking
12  any more nonsupport cases. Because I know that that
13  lawyer left us in about June. I want to say this
14  was in April or May. And so the only way that we
15  would have taken any additional nonsupport cases
16  since then is if Judge Joyce or Judge Schollmeyer
17  told us specifically, I'm now ordering you to take
18  this one. But, generally, as a rule, we are not
19  doing them.
20     Q.  And that was something, it sounds like,
21  suggested and instituted by Judge Joyce?
22     A.  Correct.
23     Q.  And that was -- just to clarify, that was
24  in response to concerns about the -- about the
25  case -- Judge Joyce's concerns about the caseload

## Page 62

1  overload in your office?
2     A.  Well -- yes. So it was an overload thing
3  and it was -- you know, we were filing motions to
4  decline representation or to appoint counsel on --
5  even serious cases, A and B felonies. There were
6  people in jail at that point who we filed these
7  motions on. And, you know, the -- kind of the
8  response of most of our Cole County judges was they
9  said, Well, we're neither going to grant or deny the
10  motion; we're just going to continue it out and hope
11  that your staffing situation resolves.
12     So there were all of these cases that
13  floated for months and months and months and months,
14  and we weren't entering, but then judge saw us,
15  you know, on this nonsupport docket on cases that we
16  had already entered in, and judge told us, Yeah,
17  you're not -- no more of those, so ...
18     Q.  Okay. And in the times that you've been
19  in the courtroom, which sounds like several times,
20  do you recall what -- when a defendant is told he or
21  she doesn't have access to the public defender in
22  this criminal nonsupport case, what they've said in
23  response?
24     A.  A lot of times the prosecutor will go up
25  to them and talk to them and say, Hey, look, I'm

## Page 63

1  just looking for probation with the condition that
2  you pay, or the judge may say, Hey, look, why don't
3  you talk to the prosecutor, see if you guys can work
4  something out. Or the judge will just ask the
5  prosecutor in the court, Prosecutor, what's your
6  recommendation? Well, we're looking for probation.
7  And then that -- and then the accused decides to go
8  forward on their own, is sort of how that generally
9  unfolds.
10     Was that responsive to your question?
11     Q.  Yes. And when you say "decides to go
12  forward on their own," you mean decides if they
13  can't afford an attorney, they don't have a choice,
14  other than to go forward on their own; is that
15  right?
16     A.  Right.
17     Q.  Okay. And you're mostly in court in
18  Miller County; is that right?
19     A.  Yes. Yes.
20     Q.  Okay. So -- and this is happening in
21  Cole County?
22     A.  Yes.
23     Q.  But you can recall several instances, even
24  in the limited time that you're in Cole County
25  court, where you've witnessed an individual in a

## Page 64

1  criminal nonsupport being told that they don't have
2  access to a public defender; is that right?
3     A.  Correct. Correct.
4     Q.  All right.
5     A.  And, you know, right now what I'm seeing
6  in Miller County is, I'm filing these motions for
7  caseload conference and -- you know, so cases are
8  sort of dragging on. Also -- and kind of preceding
9  that, I filed motions to withdraw, citing my
10  caseload or motions to decline representation citing
11  my caseload. You know, so clients -- or applicants
12  for public defender services have been in jail for
13  months. Now in Miller County, we're seeing people
14  decide to, just on their own, talk to the prosecutor
15  pro se, strike a deal, and go to prison.
16     There was a fellow just the other day in
17  Miller County who I represented on a criminal charge
18  and had a probation violation. I entered on the
19  criminal charge way before all of this unfolded. He
20  picked up the probation violation; we filed, you
21  know, a motion of some kind or another. He sat in
22  jail a couple of months. Eventually he decided that
23  he just wanted to go to prison. He talked to the
24  prosecutor on his own, ended up waiving counsel on
25  the probation violation, waived counsel on the

16 (Pages 61 to 64)

ALARIS LITIGATION SERVICES
www.alaris.us    Phone: 1.800.280.3376    Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-2   Filed 02/21/18   Page 17 of 107

## Page 65

1    criminal charge that I was in, went to prison.
2        There's another fellow -- been in jail for
3    a couple of months in Miller County.  We filed the
4    caseload motions.  Again, he decided after sitting
5    in jail for a couple of months, I just want to have
6    my probation revoked and go to prison.  There's
7    another fellow who appeared in the associate docket
8    within the last week or two, charged with a new
9    offense, and we either filed a motion or told him we
10   were going to file a motion, and he's like -- he
11   just went over and talked to the prosecutor, and
12   they cut a deal, he waived his preliminary hearing,
13   he sat on an arraignment docket for a plea with --
14   either tomorrow or the 19th.
15       Q.   So I'm going to ask some more questions
16   about that.
17       A.   Sure.
18       Q.   So going back to the first individual you
19   mentioned who you represented on the criminal and
20   then the probation violation.  Had you entered
21   appearances on both of those?
22       A.   Only the criminal, not on the probation
23   violation.
24       Q.   Okay.  And then that individual engaged in
25   a -- plea negotiations with the prosecutor pro se --

## Page 66

1    was that in court that that happened?
2        A.   Yes.
3        Q.   And you or someone from your office was in
4    that courtroom or --
5        A.   Yes, I was.
6        Q.   Okay.  Tell me more about the logistics of
7    how that --
8        A.   The gentleman appeared in jail on the
9    probation violation.  Again, sort of my announcement
10   to the court was that we either had filed a motion
11   for caseload conference or were filing a motion for
12   caseload conference, and we'd not entered it on the
13   probation violation.  And so I asked that that case
14   been set over to some date after what we anticipated
15   the case conference hearing date to be.  And -- you
16   know, and at that point on the probation violation,
17   I think he had been in jail for two months on the
18   probation violation.  And that's -- and so he -- you
19   know, the judge did, the gentleman sat back down,
20   and he called me back over, and he's like, Look, I
21   want to go to prison on this right now.  I'm like,
22   I'm not going to enter my appearance and send you to
23   prison right now.  And he expressed that he wanted
24   to waive counsel and wanted to talk to the
25   prosecutor, and so, you know -- I mean, that's --

## Page 67

1    you can.  I'm not sure -- I don't know that that's a
2    good idea, but that's what he ended up doing.  The
3    prosecutor here -- and he, you know, sort of struck
4    this deal in court, they had the case recalled, they
5    added the other criminal case to the docket.  He
6    admitted on the probation violation and pled guilty
7    pro se.
8        Q.   All in that same courtroom?
9        A.   Yes.
10       Q.   On that day while you were there?
11       A.   Yes.
12       Q.   And so did he turn to the prosecutor and
13   discuss the -- a plea deal --
14       A.   Yes.
15       Q.   -- at the counsel table or --
16       A.   Well -- I mean, the way that that
17   courtroom is laid out, you know, the table where the
18   prosecutor sits is not far away from where the
19   inmate sits.  For example, behind you there's a
20   glass window.  If instead of that window there were
21   a wooden half wall, and that's where the jury box
22   was, that's where he was seated.  So the prosecutor
23   could turn around and engage with the person right
24   there.
25       Q.   And where were you located in that

## Page 68

1    courtroom?
2        A.   Well, I was probably sitting at the other
3    table on the far side of the thing or, you know, up
4    in front of the judge.  Once they started talking --
5    once he told me, Hey, I -- you know, I -- I've
6    changed my mind, I don't really want you right now;
7    I want to talk to the prosecutor on my own.  At that
8    point, I stepped out of the thing.
9        Q.   And did he say why it was that he, as you
10   just said, didn't want you right now?
11       A.   My impression was he didn't want to sit in
12   jail for another who knows how many months.  In this
13   county, this circuit judge only comes to town every
14   two months, and so -- and that -- and that sort of
15   presents its own issue because say he comes into
16   town on the 1st of July, for example.  His next date
17   is going to be September 1.  So if on July 2 someone
18   gets arrested on one of his warrants, they're going
19   to sit in jail until September 1, and then he'll
20   bring them up to court, you know, if they want to --
21   if they'll -- they can apply for a public defender
22   right then.  If the case gets set over, it's going
23   to be November 1.
24       Q.   This judge -- is there only one judge in
25   Miller County?

17 (Pages 65 to 68)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-2   Filed 02/21/18   Page 18 of 107

## Page 69

1    A.   There are now three.
2    Q.   Okay.
3    A.   And the presiding judge is Judge Hayden.
4  You know, so he'll come every other month.  New
5  circuit judge is Judge Hamner.  He will come on his
6  cases on the months that Judge Hayden is not there.
7  So, for example, if Judge Hayden is July 1,
8  September 1; Judge Hamner will come August 1,
9  October 1.  Does that make sense?
10   Q.   Uh-huh.
11   A.   Okay.  They within the last couple of
12 years added a third circuit judge to that circuit,
13 and that judge has a docket anyway.  It'll be
14 towards the end of the month.  But depending on who
15 you happen to be on probation in front of -- you
16 know, if you happen to be on probation in front of
17 one of the judges who comes only every other month,
18 that's going to have pretty substantial impact on --
19 for how long you're incarcerated in the event of a
20 violation.
21        THE WITNESS:  I'm going to need a break at
22 some point, so when you get to a segue --
23        MR. SCHERZER:  We can take a break now.
24        THE WITNESS:  Okay.  Thank you.
25        VIDEOGRAPHER:  The time is 10:35 a.m., and

## Page 70

1  we are off the record.
2        (A recess was taken.)
3        VIDEOGRAPHER:  The time is 10:54 a.m. and
4  we're back on the record.
5    Q.   (By Mr. Scherzer)  So, Mr. Carver, I just
6  want to go back to that individual that you were
7  just speaking about.  Do you know how much time he
8  got in prison as a result of his negotiations with
9  the prosecutor?
10   A.   I do not.
11   Q.   Is that because he was sentenced on a
12 different day other than the day that you were there
13 in court?
14   A.   No.  I think he was -- I think he was
15 sentenced that day, but once he resolved to go pro
16 se and it was clear that he was in accord with the
17 arrangement that he and the prosecutor had entered
18 into, I turned my attention to, you know, the other
19 30-some-odd cases that I had on the docket.
20   Q.   Got it.  And you said you had represented
21 him for a couple of months -- or you had entered
22 appearance at least on his behalf a couple of months
23 prior on the criminal case; is that correct?
24   A.   I think that my entry on the criminal case
25 was sometime in 2016.  Now, if memory serves, it was

## Page 71

1  another one of those cases that I picked up from
2  some other lawyer who picked it up from another
3  lawyer -- I can't recall off the top of my head.
4  But I had been in the criminal case for quite a
5  while.  The probation case was much newer.
6    Q.   And you said you picked it up from
7  somebody else.  You mean another lawyer in your
8  office?
9    A.   Correct.
10   Q.   Okay.  Was that a lawyer -- if you recall,
11 was that a lawyer who had left the office that you
12 picked it up from?
13   A.   Yes.
14   Q.   Okay.  And so the probation case-ballpark,
15 not an exact number, do you -- about how old was the
16 probation case?  Do you know -- at the time?
17   A.   Ballpark?
18   Q.   Yeah.
19   A.   Two months, maybe a little more.
20   Q.   Okay.  And had you been able to visit this
21 individual since he had picked up the probation
22 case?
23   A.   No.
24   Q.   And was that -- and why was that?
25   A.   I am drowning in cases and I'm horribly

## Page 72

1  behind on jail visits.
2    Q.   Okay.  So given your other -- given your
3  very high caseload, as you've indicated previously,
4  and your responsibilities to those clients, you
5  hadn't been able to visit him in prison?
6    A.   Correct.  Correct.
7    Q.   And had you been able to communicate with
8  him in some other fashion other than an in-prison
9  visit?
10   A.   Well, he had been in jail for the two
11 months preceding this very recent court date.  I
12 don't believe I visited with him at all during these
13 two months.  He had been free for a period of time,
14 and during that period of time that he was free, I
15 had no substantive contact with him himself.  Before
16 that, he had been incarcerated, I believe, on the
17 criminal case, and then I did have contact with
18 him -- but it had probably been -- estimate,
19 probably a year since I had substantive private
20 contact with him outside of a courtroom.
21   Q.   Okay.
22   A.   And that's -- frankly, that's not unusual
23 right now for my caseload.
24   Q.   Okay.  And during that year, some of which
25 he was incarcerated and some of which he was not, he

18 (Pages 69 to 72)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-2   Filed 02/21/18   Page 19 of 107

## Page 73

1  was facing -- what kind of criminal charge was he
2  facing?
3      A.  It was a drug charge.  I can't remember if
4  it was a simple possession charge or a possession
5  with the intent to distribute.  Simple possession
6  would be a Class C felony that carries up to 7 years
7  in the department of corrections.  Possession with
8  the intent at the time relevant to his case would
9  have carried five to 15 years in the department of
10  corrections.  That since changed on January 1, 2017,
11  but his case preceded that.
12      Q.  Okay.  And so what was happening with his
13  criminal case during that year?
14      A.  There was work that I had identified that
15  I needed to do:  Depositions, investigation --
16  didn't do it.
17      Q.  And that was because of the tremendous
18  caseload that you have discussed previously?
19      A.  Correct.  It -- I mean, right now I am --
20  even when I can get to talk to a client, commonly, I
21  will identify work that needs to be done on the
22  case, investigation, things to pursue.  Actually
23  doing it is a whole other matter.
24      Q.  Okay.  And is that represented -- is that
25  experience that you're describing, to your

## Page 74

1  knowledge, as their supervisor, is that
2  representative of the other attorneys in your
3  office?
4      A.  No.  And that's because I'm attempting to
5  control their caseload.  But the consequence to me
6  controlling their caseload and the consequence to me
7  telling the judges I'm not going to keep dumping it
8  on an assistant public defender, I'm going to give
9  it to myself.  You know, consequence is that my
10  caseload has spiraled out of control.  I've got more
11  cases now than anybody in the office by a
12  considerable number.
13      Q.  Prior to the time that you've instituted
14  the case control, which I believe -- that was
15  January 2017?
16      A.  Yes.
17      Q.  Prior to that time, with this experience,
18  that you -- when there were no caseload -- or not
19  these caseload controls for the line attorneys in
20  your office, was the experience you're now
21  describing representative of what was happening with
22  your line attorneys?
23      A.  My line attorneys were experiencing
24  exactly what I'm experiencing.  You know, we had --
25  goodness.  There had been a fellow who was

## Page 75

1  incarcerated in the Cole County jail, sat there for
2  three years with no contact with his lawyer.
3      Q.  Sorry to interrupt.  When you say "his
4  lawyer," do you mean an attorney -- a line attorney
5  from your office?
6      A.  Yes.
7      Q.  Okay.
8      A.  Since that case has been reassigned to
9  me -- and it's probably been a year since I've
10  talked to him -- he's no longer in the Cole County
11  jail; he's in the department of corrections on
12  another matter.
13          You know, circling back before January 1,
14  2017, there was a client who was in the
15  Miller County jail for four years, tells us he saw
16  his lawyer once, and I believe him, because there
17  are no notes of any kind in the file.  When I look
18  at the file, it would appear that no work was done
19  in those four years.  Subsequently, that lawyer
20  left; it was reassigned to another lawyer in my
21  office.  That lawyer, after getting in the case and
22  getting involved in the thing -- ultimately, that
23  case ended up being dismissed on a speedy trial
24  violation five years and nine months after the
25  gentleman was incarcerated.  You know, it's one of

## Page 76

1  these cases where, frankly, the work that my office
2  did -- I would describe it as grossly ineffective,
3  but that's forever going to escape any Strickland
4  Review because there was never any sentence to the
5  department of corrections that was imposed.
6          There are a significant number of cases
7  like this where clients have just languished for a
8  year or two years without substantive work being
9  done on their case or without any contact with their
10  lawyer, without knowing what's going on with the
11  case.  And that was something that was going on, you
12  know, when I took over the Jeff City office at the
13  end of 2014.  You know, we've done a variety of
14  things to address that and try to prevent that from
15  happening.  You know, right now, I don't believe
16  that that is happening with regard to my individual
17  lawyers and their caseload, but, you know, right
18  now, I'm absolutely not doing what I need to be
19  doing for my clients.
20      Q.  And so going to this individual who spent
21  five years and nine months waiting in jail, what was
22  happening at the court dates, if you -- if you know
23  during that time?
24      A.  What the docket entry says was trial
25  stricken and reset.  Nine months later, there'd be

19 (Pages 73 to 76)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-2   Filed 02/21/18   Page 20 of 107

## Page 77

1    another docket entry, trial stricken and reset.  One
2    of the reasons it was dismissed on a speedy trial
3    violation was the docket entries did not articulate
4    who was requesting a continuance or why, and when
5    the new lawyer took over four years into the case,
6    ultimately, at some point thereafter was reassigned
7    to a different judge as well.  The judge that had it
8    at the time of the dismissal had no history with the
9    case and couldn't tell what the continuances were
10   for.  But the docket entries were exceedingly
11   sparse.
12        Q.   And you said there are a number of other
13   cases that you can think of just off the top of your
14   head that are similar in nature, in terms of what
15   happened to individual defendants?
16        A.   There was another client in the Miller
17   County jail when I took over the Jeff City office at
18   the end of 2014 who had been in jail for 16 months,
19   never talked with his lawyer.  You know -- even
20   right now, you know, circling back to kind of my
21   personal experience -- yesterday I was in the office
22   trying to put files together for my Tuesday docket
23   in Miller County, because I've got to have somebody
24   cover because I'm tied up with something else.  You
25   know, in going through those, most of the cases, I

## Page 78

1    had not talked with the client.  There was one that
2    I found where the client had been in jail at least
3    two months, maybe more, maybe three or four on a
4    probation violation matter.  I've never been able to
5    get to the jail to see her.  So the note that I
6    wrote to my lawyer is, Please tell the judge I'm
7    wildly ineffective.  I don't know what's going to
8    happen with it.  You know, right now, just sort of
9    understanding my schedule and stuff like that, the
10   best time I found to get to the Miller County jail
11   to meet with clients is on a Sunday, you know?  But
12   you can only see so many people in one day, and, you
13   know, when you've got dozens and dozens and dozens
14   of people that are there, you are not going to be
15   able to meet with them all in a day.  And if you go
16   back in another two weeks, you can meet with more of
17   them, but, you know, I've got clients scattered in
18   Miller County jail and most of the major
19   correctional settings and other county jails.
20   There's -- I'm working as much overtime as I can,
21   but I can't keep up.
22        Q.   And so just to -- without -- you've given
23   some helpful details about some of these stories.
24   Without going into more detail about any of them,
25   you mentioned that this is representative -- the

## Page 79

1    couple examples you've just given about long periods
2    of time with no work and no client contact is
3    representative of what your office is -- what
4    attorneys in your office were forced to do in the
5    years prior to when you instituted this caseload
6    control; is that right?
7        A.   Correct.
8        Q.   And it's now representative of what you're
9    forced to do on your own cases, given the number of
10   cases you've taken on; is that right?
11        A.   Correct.
12        Q.   And you mentioned that your office -- you
13   described your office in that case and how these
14   similar cases as grossly ineffective.  And is that
15   because of the caseload that your line attorneys are
16   experiencing or were experiencing prior to the
17   caseload controls?
18        A.   Yes.  I mean, I don't know how you could
19   describe a guy sitting in jail for four years with
20   no work being done on the case.  I mean, I don't
21   know how else you can describe that.  It was a
22   serious case.  That client deserved representation.
23        Q.   And effective -- what you're describing is
24   that client just wasn't receiving any representation
25   at all?

## Page 80

1        A.   Nope.
2        Q.   And that was because of the case overload
3    that your line attorneys were facing?
4        A.   Yes.
5        Q.   And that's representative of other cases
6    in your office prior to the caseload controls?
7        A.   We had other cases not as dramatic, not
8    four years old, but we had other cases where clients
9    sat in jail for 12 months or more not having talked
10   to their client -- not having talked to their
11   lawyer.
12        Q.   And that individual that you were
13   mentioning previously, the individual with the five
14   years and nine months, do you recall what charge or
15   charges he was facing?
16        A.   Sodomy, rape, assault one of an infant --
17   I can't recall if it was charged to statutory or
18   forceable sodomy, but those were the charges.  And
19   sort of the charges evolved.  At one point the
20   assault was dismissed voluntarily.  Since the
21   assault has been -- so it was the -- the rape,
22   sodomy that were dismissed on speedy trial
23   violations.  Since the assault has been refiled and
24   that case is now pending.
25        Q.   And that's because the assault had been

20 (Pages 77 to 80)

ALARIS LITIGATION SERVICES
www.alaris.us            Phone: 1.800.280.3376            Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-2   Filed 02/21/18   Page 21 of 107

## Page 81

1 voluntarily dismissed in the interim or what?
2    A.   Yes.  And I -- and I understand -- and --
3 yes.  Yes.
4    Q.   And so what class of offense are those
5 sodomy, rape -- what class of offense is that?
6    A.   This gentleman is charged with
7 unclassified ones that could carry an unlimited
8 number of years.  A million years would be a
9 permissible sentence or life -- times two, because
10 there was one of each.  I think it was one rape, one
11 sodomy.  Maybe it was two sodomies.  Facing
12 significant charges.
13    Q.   Facing up to his entire life in prison?
14    A.   Correct.  Yes.
15    Q.   And didn't -- effectively didn't have any
16 representation for five years?
17    A.   For at least four.
18    Q.   At least four.
19    A.   At least four.  And then that lawyer left
20 and it got reassigned.  And, actually, the lawyer
21 that it was reassigned to then did eventually get
22 into the thing and start doing good substantive
23 work.  When I say "eventually," you know, 2017 was a
24 bad year for my specific office.  The year that the
25 initial counsel left was 2014.  That was another bad

## Page 82

1 year for my office.  I can think of at least three
2 lawyers off the top of my head who left the Area 19
3 public defender's office right about the same time.
4 And so all of those cases -- you know, when I came
5 in at the end of 2014, it was a train wreck.
6 Everybody had 2- or 300 cases each, and it took
7 forever to dig out from under that.
8    Q.   And so the other cases that you were
9 speaking of prior to the caseload controls, that
10 your line attorneys had similar experiences with
11 clients going long stretches without any work being
12 done on their cases, that wasn't confined to just
13 one attorney in your office?
14    A.   It was not.
15    Q.   Was that, to your knowledge, every
16 attorney in the office or most attorneys?
17    A.   It was -- there were several lawyers who
18 I -- I saw that happened.
19    Q.   Okay.  Have you told other -- you
20 mentioned that you instructed your -- one of the
21 attorneys in your office who is covering for you
22 tomorrow to tell the judge that you were wildly
23 ineffective on that case due to your other caseload?
24    A.   Uh-huh.
25    Q.   Have you told other judges that you have

## Page 83

1 been ineffective on cases due to your caseload?
2    A.   I've been telling my judges that
3 consistently all year as my caseload has grown.
4 And, you know, generally, they express sympathy and
5 tell me to do the best I can, and I do, but, you
6 know, at least in Miller County, I've been
7 articulating that on a regular basis, you know,
8 Judge, I can't possibly take more cases; I'm not
9 doing a good job with the cases I've got.  I'm not
10 talking to my clients now; don't give me more, and,
11 consistently, I'm ordered in over my objection.
12    Q.   And what do the judges say, if anything,
13 about the rationale for ordering you in, despite you
14 telling them that you would be ineffectively
15 representing that client?
16    A.   That -- they've sort of expressed
17 different things at different times.  You know,
18 the -- one of the judges there has expressed that he
19 doesn't feel like he has any other good options.  He
20 feels like it's not the responsibility of the
21 private bar, and that the private bar did not make
22 this mess and -- I've asked him to appoint
23 state-employed lawyers.  You know, pick on some
24 someone from the department of revenue, legislative
25 research.  His concern there is that he's got to

## Page 84

1 make sure that they're competent, and if you appoint
2 a tax lawyer on a case, they aren't going to know
3 anything about the criminal side of it.  They aren't
4 going to know anything about criminal law.  My
5 response to that is, Judge, if the person can read
6 the file and take the time to talk to the client,
7 they've got a leg up over me now.  I can do all of
8 the criminal law in the world, but I don't have time
9 to work the case.
10            At other points in time, he said, Well,
11 I'm not going to implement that remedy because
12 that's going to be bad for the agency or it's going
13 to cause you more problems or the legislature will
14 never find you.  At other points in times he's said,
15 Really, the remedy is legislative; it's not
16 judicial, and that tends to be a commonality.  I
17 mean, other judges have expressed to me that, you
18 know, Look, I don't have the tools to solve this
19 mess.  Really, it's the legislature.
20    Q.   Okay.  And just going to the -- to that --
21 to the tax lawyer that you were speaking of or
22 someone from -- you know, as an example, if you had
23 to actually -- if you had time to adequately work on
24 your cases, presumably -- or do you agree with the
25 judge that you would be more effective for that

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 85

1    criminal defendant since you have long practiced
2    criminal law and are experienced in criminal law?
3        A.   I think I would have a head start --
4    understanding I've been practicing now criminal law
5    15 years, I would certainly have a head start over a
6    lawyer who has not touched anything criminal
7    law-related since criminal law class in law school,
8    okay?  Yes.  But that sort of assumes a rational
9    caseload.  I mean, right now, you can know
10   everything that there is to know about criminal law,
11   but when you've got more than 200 cases, it's not
12   going to do you any good, because you're not going
13   to have time to talk to the clients, you're not
14   going to have time to do the legal research, to file
15   the motions, to visit the investigation, to visit
16   the crime scene, to go look at the physical
17   evidence, to effectively advise the client.  I mean,
18   you know, right now, my knowledge of criminal law on
19   your average day is generally useless because I
20   don't have time to -- I don't have time to pursue
21   it.
22       Q.   And how does that make you feel as someone
23   who has been practicing for -- for 15 years,
24   criminal law?
25       A.   2017 has certainly made me consider other

## Page 86

1    employment options.  Yeah.  I mean, I'm not -- I'm
2    certainly not practicing the way I want to be.  My
3    clients are given the short end of the stick.  It's
4    not fair to them.  I would not want me as a lawyer
5    right now.  And -- I'm not sure how long I'm going
6    to do this.  Give me a rational caseload, I'll
7    retire with the agency.  200 cases, I don't know how
8    much longer ...
9        Q.   And to follow up on that, you're -- you've
10   taken on all of those cases in order to protect your
11   line attorneys from the massive overloads that they
12   were facing prior to your taking on all of those
13   extra cases?
14       A.   Yeah.  And, you know, sort of what they'd
15   expressed to me if I didn't, they were all going to
16   quit.  And, historically, what we've done in the
17   public defender's office is the district defender
18   has a reduced caseload -- typically, significantly
19   reduced because of the management responsibilities,
20   and we're going to flood the assistant public
21   defender with an impossible number of cases, and
22   we'll tell them to swim.  And what I've seen in my
23   time is that invariably we burn out lawyers and they
24   quit.  Part of the thought process behind this
25   strategy was sort of -- it was an attempt to allow

## Page 87

1    my five lawyers -- or my -- sorry -- seven lawyers
2    to practice ethically in hopes that it would stop
3    the bleeding and prevent some of the rampant
4    turnover.  You know, I can't -- I can't build
5    anything in terms of a well-functioning office if
6    the foundation is always being taken out from
7    underneath me.  I've got to find a way to retain
8    lawyers so that I can teach them how to try
9    complicated cases and do a good job at it.  You
10   know, we've got murder cases, we've got rape cases,
11   we've got complex cases where the client deserves a
12   lawyer with significant experience.  You know, right
13   now I'm assigning murder cases to lawyers who have
14   been practicing for two or three years.  If I can't
15   find a way to retain the lawyers I've got, then I'm
16   going to be assigning murder cases to a lawyer
17   that's been practicing less than a year.
18       Q.   And you're assigning it that way because
19   the second senior line attorney has been practicing
20   for two years?  Is that --
21       A.   Right.  I've got one that's been
22   practicing since 2010, but the second most senior
23   lawyer has got three years under their belt.
24       Q.   And you said that your hope is that after
25   you instituted the caseload controls in January of

## Page 88

1    2017, that your lawyers would be able to practice
2    ethically?
3        A.   Uh-huh.
4        Q.   Is your opinion that prior to those
5    caseload controls being implemented, your attorneys
6    were not being able to practice according to their
7    ethical responsibilities?
8        A.   Well, I mean, that's -- they told me they
9    felt like they were not.  And when they brought that
10   concern to my attention, yeah, we took a number of
11   steps to deal with it.  You know, and, frankly, when
12   I took over the course in 2014, it was clear that
13   there were problems then.  How much of it was a
14   caseload issue as compared to a -- you know, we've
15   got positions we need to field issue, as compared to
16   we're taking cases that we shouldn't be taking.
17   That, it took some time for me to sort things out.
18   It kind of was my impression when I took over in
19   2014 that there were a number of things going on,
20   and so we -- we hired to fill the vacant positions,
21   and that certainly helped.  But that was one of the
22   reasons that we were not -- not handling cases that
23   we ought to be.
24           We also changed how we screened
25   applications for public defender services.  As a

22 (Pages 85 to 88)

ALARIS LITIGATION SERVICES
www.alaris.us            Phone: 1.800.280.3376            Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-2   Filed 02/21/18   Page 23 of 107

## Page 89

1    result, that did reduce our caseload, and that
2    certainly helped.  You know, and even after that, it
3    struck me that there was still a problem then, and
4    so at different points in time, I was in contact
5    with our management and was allocated some money to
6    contract out some of the cases.  At another point in
7    time, when that didn't do the trick, I was allocated
8    an additional staff member, and that certainly
9    helped.  And when all of those things did not prove
10   effective, you know, that was kind of when the
11   lawyers came to me at the end of 2016 and said, Hey,
12   this is a problem.
13        Q.  And so even after you tightened the
14   requirements for indigency determinations and got an
15   additional step and the other things you've
16   described, the problems still persisted in your
17   office in terms of caseload?
18        A.  Correct.  Our head was still underwater;
19   it was just less so.
20        Q.  Okay.  I'd like to show you what I'll mark
21   as exhibit-- Plaintiff's Exhibit 18.
22        (Deposition Exhibit No. 18 was marked for
23   identification.)
24        Q.  (By Mr. Scherzer)  Let me know when you've
25   had a chance to glance at this.

## Page 90

1        A.  Okay.  I'm familiar with it.
2        Q.  Okay.  Do you recognize this?
3        A.  Yes.
4        Q.  And what is it?
5        A.  This is an e-mail thread that started with
6    an e-mail that I sent to the courts and the
7    prosecutors December 29, 2016, with follow-up
8    responses from some of the various parties.
9        Q.  And I believe this -- when you say --
10   earlier, when we were discussing which documents you
11   reviewed, you said you reviewed an e-mail chain from
12   December of 2016.  Is this the e-mail chain that you
13   were referring to that you recently reviewed?
14        A.  Yes.
15        Q.  All right.
16        A.  Tangentially, prior to this e-mail, I had
17   a number of other e-mails from me to the court
18   starting the end of 2014 telling them what was going
19   on with our caseload and staffing situation.  I did
20   not save any of those e-mails, and, to my knowledge,
21   they're long gone.  Like, when I received the
22   discovery request from Ms. Shipma, I went back
23   through to look for them.  I deleted them quite some
24   time ago, but I will tell you there were a number
25   of -- this -- the December 29 e-mail is not the

## Page 91

1    first time I communicated our caseload staffing
2    problems to the courts.
3        Q.  Okay.  So you believe you sent similar
4    e-mails for at least the two years prior to this
5    e-mail?
6        A.  Yes.
7        Q.  Okay.  And to the -- to the judges and
8    prosecutors in District 19?
9        A.  Yes.
10        Q.  Okay.  I'd like to turn to -- and looking
11   again at the Bates numbers in the bottom middle of
12   the page to 39421.
13        A.  Yes.
14        Q.  Okay.  Can you read out for us the
15   first -- I guess it's two paragraphs -- starting
16   with, "I wish had I better news."
17        A.  Sure.
18        "I wish I had better news.  The struggles
19   of the public defender office remain.  Every single
20   one of my lawyers has expressed to me that their
21   caseload is too high and that they cannot
22   effectively handle the cases that they have.  I have
23   lawyers threatening to quit if I don't get their
24   caseloads down to a level where they can be
25   effective.  Director Barrett tells me that the

## Page 92

1    agency turnover is now at 22 percent.  I agree that
2    my lawyers are all overloaded.  As they are all
3    overloaded, I can't reassign cases from one lawyer
4    to another to fix the problem.  Ethically, I can't
5    ignore the problem, and neither can my lawyers.  As
6    a practical matter, if I don't deal with the
7    problem, my lawyers will find their own solution by
8    finding new employment.  I have to do something to
9    get my lawyers' caseloads down to a level where they
10   can be effective."
11        Q.  Okay.  And I want to just track back to
12   the two -- the "to" line on this e-mail.  Can you
13   just tell me who these individuals are in this "to"
14   Line?
15        A.  Sure.  Stan Moore was a circuit judge in
16   the 26th Judicial Circuit that serves Miller,
17   Moniteau Counties, also Camden, Laclede, and Morgan
18   Counties.  Judge Moore has since retired.  Kenneth
19   Hayden is the presiding judge of the 26th Circuit.
20   Jon Kaltenbronn is associate court judge in
21   Miller County.  At the time, those were the only
22   judges serving my part of the 26th Circuit in
23   Miller County.  Later in that header you see
24   Peggy Richardson.  She was, at the time, the
25   associate judge in Moniteau County.  She has since

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 93

1    been made third circuit judge in the 26th Judicial
2    Circuit.  Judge Joyce is a circuit judge in the
3    19th Judicial Circuit, which is Cole County.
4    Judge Beetem, circuit judge, Cole County.
5    Thomas Sodergren, associate judge in Cole County.
6    Dan Green is a circuit judge in Cole County.
7    Judge Schollmeyer is an associate judge in
8    Osage County.  He comes to Cole County on some
9    special judge cases and criminal nonsupport cases.
10   Markrichardson@colcopa.com, he is the elected
11   prosecutor of Cole County.  Benjamin Winfrey, the
12   elected prosecutor of Miller county.  The e-mail
13   address prosecutor@moniteaucounty.org is the e-mail
14   address that the elected prosecutor Shane Healea
15   uses for Case.net notifications and filings and
16   stuff like that, so I use that as an e-mail for him.
17   His last name, to my knowledge, is H-a-e-l-a-e
18   [sic] -- or H-e-a-l-e-a -- I can't remember which.
19       Q.  (By Mr. Scherzer)  And -- sorry.  Just
20   shifting over on the page prior to that, 39420.
21   There's a "from," and is that your e-mail address?
22       A.  That is -- I'm looking --
23       Q.  Sorry.  The bottom of 39420.
24       A.  Bottom of 39420.  There's a from
25   Judge Richardson to myself cc'ing in the other

## Page 94

1    people who were in on that thread.
2        Q.  Oh, I'm sorry.  The very, very bottom.
3        A.  Oh, I apologize.  Yes, I see that.
4        Q.  That just tracked over that page, but this
5    is obviously an e-mail that you sent to all of these
6    individuals?
7        A.  Yes.
8        Q.  Is that effectively every judge and head
9    prosecutor in the relevant counties that you
10   represent individuals in?
11       A.  Yes.  With the sole exception of if there
12   was some random case that happened to have a special
13   judge out of some random county that I wasn't aware,
14   they were not included on this e-mail.  But these
15   were the judges who we would have seen for
16   99.5 percent of our cases.
17       Q.  Okay.
18       A.  Perhaps all of them.
19       Q.  And so in that -- now we're returning to
20   the body of the e-mail.  The second sentence saying,
21   "The struggles of the public defender office
22   remain."  And was that referring to the other e-mail
23   that you sent previously indicating case overloads
24   and problems in your office?
25       A.  Yes.

## Page 95

1        Q.  Okay.  And you mentioned this previously,
2    but what precipitated this particular e-mail, if
3    anything?
4        A.  The December 29, 2016, e-mail was
5    precipitated by a number of lawyers walking into my
6    office and saying, in very colorful language, we've
7    got too many cases, and if you don't stop giving us
8    this many cases, we're all going to quit.
9        Q.  And how many of your attorneys, if you
10   recall, came into your office and said that?
11       A.  Three, perhaps, four.
12       Q.  So at -- half or more than half of the
13   attorneys in your office?
14       A.  About half.
15       Q.  Okay.  And was that something that you had
16   heard from them previously -- not that -- that they
17   had -- sorry.  Scratch that.
18           Was the fact that they had too many cases
19   something that you heard from the line attorneys in
20   your office previously?
21       A.  Well, certainly, when it started in 2014,
22   everybody expressed that they had too many cases.
23   And, you know, at that point, like I said, there
24   were a number of things going on, and so we tried to
25   deal with each of the things to get the caseloads

## Page 96

1    down, and we did.  And, understand, all of these
2    things sort of unfolded over time.  You know, from
3    2014 to 2016, we made significant progress in
4    reducing the caseload of every single one of the
5    lawyers.  You know -- so we were certainly -- so,
6    yes.  I mean, as a part of all of this, there was
7    kind of a dialogue of, you know, we've got too many
8    cases.  Well, I -- you know, these are the things
9    that we're doing to deal with it.  But we did not
10   have sort of the formal caseload restriction until
11   the time period surrounding this e-mail.
12           I don't know if that was responsive to
13   your question.  I'm sorry.  Did that answer --
14       Q.  Yeah.
15       A.  I mean, certainly, between 2014 and 2016,
16   lawyers complained to me about their caseload; we
17   were doing other things to address it that weren't
18   necessarily in this e-mail.
19       Q.  Okay.  But, obviously, at least from your
20   line attorneys' perspective, you hadn't addressed
21   the problem because half of them -- or more than
22   half of them said they were going to quit if
23   something further wasn't done?
24       A.  Right.  It had not -- certainly had not
25   fully addressed the problem.  It was not as bad as

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

Case 2:17-cv-04057-NKL   Document 160-2   Filed 02/21/18   Page 25 of 107

1    it was in 2014, but it was not where it needed to be
2    either.
3        Q.   Okay.  And then can you just read the --
4    just the first sentence of the paragraph that
5    begins, "As an agency."
6        A.   "As an agency, the public defender's
7    office has tried everything it can think of to get
8    its caseload under control."
9        Q.   Okay.  And I -- and in that -- you're
10   referring to the steps that you have taken
11   previously in your district office?
12       A.   Over and above that.  So the public
13   defender's office, in the time I've been with the
14   agency, we've gone to the legislature and asked
15   nicely for more money and gone to the governor and
16   asked nicely for more money and we've gone to the
17   Supreme Court and asked to be exempted from time
18   standards and we've gone to the Supreme Court and
19   asked for caseload controls and we've passed an
20   administrative rule, and that was challenged in
21   court, and then we passed another administrative
22   rule.  And then we -- there was -- you know, there
23   was a statute that was passed.  And, you know, there
24   was the Senate interim committee that got together
25   to study the thing.  We've been studied by the

1    Spangenberg Group at least twice in the time we've
2    been here.  We had RubinBrown come in and study us
3    because the legislature said, Give us the Missouri
4    specific standard; give us some data; we need
5    something other than your professional judgment.  So
6    we did the work; we got the data.  And, you know, at
7    least as an agency, you know, in terms of having had
8    court hearings, having gone to the Supreme Court,
9    having gone to the legislature, having gone to the
10   governor -- I mean, you know, this is something that
11   we've been dealing with for -- as long as I've been
12   around.  And so that sentence was really more
13   intended to be a reference to all of the things that
14   the -- the agency has done in the preceding decade,
15   plus to try to deal with the caseload problem.
16       Q.   Okay.  And, obviously, you indicated that
17   your -- you, in your capacity as district defender
18   in Area 19, had also taken a number of steps to try
19   to address the caseload problem as well?
20       A.   Yes.  And, actually, it -- you know,
21   further down in that paragraph there's a sentence
22   that begins with, "Internally, I have done
23   everything I can think of."  And that's -- you know,
24   that's sort of a reference to me telling them, Hey,
25   look, I've done everything I can do, too.  You know,

1    it's not ...
2        Q.   Okay.  And then just in the paragraph
3    above that, it -- there's a reference to the
4    Jeff City office, which I assume is the Area 19 --
5        A.   Yes.
6        Q.   -- office's current caseload is about 250
7    percent of its capacity.
8        A.   Yes.
9        Q.   And that's from the ABA RubinBrown study;
10   is that right?
11       A.   Yes.
12       Q.   Okay.  So then in the paragraph beginning
13   with, "Starting in January," towards the bottom of
14   that page -- can you -- can you read out that
15   paragraph?
16       A.   Sure.
17           "Starting in January, when I receive a
18   qualifying application for public defender service,
19   I will do one of two things.  If the applicant is in
20   jail, I will assign the applicant a lawyer
21   immediately until all of my lawyers have become
22   overloaded.  If the applicant is not in jail, I will
23   hold the application until the end of the month.  If
24   I have available lawyers at the end of the month, I
25   will assign it to one of my lawyers.  If I don't

1    have available lawyers, I will be filing a motion to
2    appoint a lawyer who is employed by the State of
3    Missouri, such as a lawyer for DNR or the PSC, et
4    cetera.  After all, it is the state's responsibility
5    to provide counsel for those who cannot afford it;
6    it is not the responsibility of the private bar.  In
7    the event that the motion is overruled, we will not
8    refuse to provide representation.  Instead, I will
9    exercise my discretion to assign the case to myself.
10   I will not assign additional cases to an already
11   overburdened assistant public defender.  If
12   qualifying cases continue to come into my office at
13   the same rate, my personal caseload will increase
14   significantly.  I am not Superman, and I know I
15   can't do it all.  I could be forced to file
16   continuance motions and/or motions to withdraw.  The
17   immediate impact on your courts will be that when an
18   applicant is not in custody, I will not be able to
19   give you an immediate answer as to whether that
20   person qualifies.  Obviously, this impacts the
21   administration of your courts and the handling of
22   your dockets.  This presents an inconvenience for
23   the courts and the applicants.  For that reason, I
24   feel that you deserve a heads up.  Nonetheless, as a
25   supervisory lawyer, I have a specific ethical

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-2   Filed 02/21/18   Page 26 of 107

1  obligation to monitor and control the caseloads of
2  my assistants. I simply can't keep assigning my
3  lawyer cases at the rate that I have been assigning
4  them."
5      Q.  Okay. And then can you read that -- just
6  the last sentence on that -- the last two sentences,
7  sorry, on that page?
8      A.  Sure.
9         "It seems worth mentioning that I don't
10 really love this plan. Frankly, I don't know what
11 else to do."
12     Q.  And so you've described some or previously
13 what you are thinking when you sent this e-mail, but
14 anything else you haven't said previously about your
15 feelings about this e-mail or why it is you felt the
16 need to send it?
17     A.  Well, there are sort of a number of things
18 that precipitated it. You know, the immediate spark
19 was the lawyers walking into my office. Preceding
20 that, in September of 2016, there was a management
21 meeting that all of the district defenders in the
22 state went to, along with senior management, and at
23 least previously -- preceding this September 2016
24 management meeting, the directive that we had
25 received as a line district defender was that, you

1  underwater; it's just a matter of how far underwater
2  they are. Not hearing -- in this, sort of, meeting
3  with the local office, the assistant public
4  defenders, and with senior management, not hearing
5  any other solution that would really get my lawyer's
6  caseloads down, this was sort of the decision that I
7  made following the meeting -- well, the solution,
8  frankly, kind of stinks, but I don't know what else
9  to do.
10        And so that was sort of what had preceded
11 this e-mail to the courts. My fear was -- one of
12 the options that we talked about in the meeting was
13 lawyers on an individual caseload just litigating
14 their caseload, filing motions to decline or motions
15 to withdraw or what have you. You know, my
16 impression was none of those were going to get
17 granted, and it wasn't going to bring the lawyers
18 any effective caseload relief, and then they'd all
19 end up just quitting, and then -- you know? It
20 wouldn't fix the problem.
21        The thought was, at least with this
22 remedy, at least the assistant public defenders can
23 practice consistent with the rules of professional
24 conduct, or at least they have a fair shake of doing
25 it, or we can all not, so. As between all of us

1  know, we're going to -- that management will sort of
2  figure out the strategy for dealing with caseload
3  going forward; don't you all go rogue and do your
4  own things; we want to do this on a statewide basis
5  to be consistent. The upshot of the message from
6  the September 2016 management meeting was, as I took
7  it to be, we've exhausted all of our options; we
8  don't know what else to do; we now wish to empower
9  local offices to come up with their own solution to
10 the situation.
11        When, you know, the lawyers came into my
12 office and said, Hey, you keep giving us all of
13 these cases, we're all going to quit, the first
14 thing I did was contacted senior management -- well,
15 I -- we called a meeting, we talked about it, and
16 then I contacted senior management, and there was an
17 additional meeting in the Jefferson City office
18 preceding that September 29 e-mail where we kicked
19 around a number of different options. And, frankly,
20 my impression of the thing was nobody had any great
21 options. Nobody -- I mean, really, this is
22 something we've been dealing with for forever. The
23 state public defender system doesn't have more
24 lawyers in their back pocket that they can
25 reallocate to Jefferson City. Every office is

1  practicing ineffectively or just me, I'd rather it
2  just be me.
3      Q.  So prior to January 2017, before you
4  instituted these caseload controls, your opinion was
5  that the rest of the attorneys in your office were
6  practicing ineffectively?
7      A.  Yes. In talking to him, I felt like they
8  had too many cases, and so we had to -- and it --
9  you know, it wasn't a thing on their part. I think
10 that it was -- even in spite of all of the things
11 that we had done internally, in spite of all of the
12 things that the agency had done since, you know,
13 2004 or whenever, they still had too many cases, and
14 I had to address it; I had to do something to deal
15 with it. And so immediately, come January 1, we put
16 everybody on sort of a caseload diet where we
17 limited the number of incoming cases every month,
18 and when we believed they could not take additional
19 cases, we cut them off.
20     Q.  Okay. And what happened to it?
21 Obviously, you didn't -- sorry. I'll rephrase.
22        Was your office -- sorry. I'll rephrase
23 again.
24        What happened to the other cases that you
25 would have previously been receiving in your office?

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-2   Filed 02/21/18   Page 27 of 107

## Page 105

1    A.  We filed motions to decline representation
2  or motions to appoint a state lawyer or -- the
3  motion was sort of an evolving thing over time, but,
4  ultimately, it was some sort of motion to appoint
5  somebody else, a motion to decline representation,
6  or, Judge, you've got other options, too:  You can
7  take jail off the table or you can let the person --
8  let the accused out of jail or you can continue the
9  case or -- I can't remember all of the remedies that
10  were in there.  It was kind of a kitchen sink.  Some
11  of the affected applicants ultimately were able to
12  retain counsel.  Some of the affected applicants
13  waived counsel and proceeded on their own.  Some of
14  the affected applicants we were able to get into
15  their case at a later point in time.
16    Q.  When you say "get into their case at a
17  later point in time," what -- can you tell me what
18  that means?
19    A.  Enter an appearance, assign them a lawyer,
20  and initiate representation.
21    Q.  Sorry.  My question wasn't clear.  And
22  what would happen in the interim before you entered
23  an appearance?
24    A.  Probably nothing.  I'd certainly -- we
25  would not engage in representation.

## Page 106

1    Q.  Okay.  And was there a waiting list of
2  individuals waiting for representation from your
3  office?
4    A.  Well, we'd had applicants who had applied,
5  and we'd filed a motion to decline or a motion to
6  appoint somebody or what have you.  I've gone round
7  and round with people as to whether that would be --
8  whether you call in a wait list or not -- I mean, I
9  don't know what you want to call it, but what was
10  happening, was some people would apply, and we could
11  not take their case, so we would file a motion.
12  Sometimes we'd be able to get into it later;
13  sometimes the issue would sort of become moot from
14  my perspective, in that they may hire a lawyer.  But
15  that was what was going on.
16    Q.  Or it could become moot in some sense that
17  they -- if they represented themselves, having
18  waited too long, in their opinion, for a public
19  defender to be assigned?
20    A.  It would no longer be -- I mean, we would
21  no longer have to get in the case, if the case was
22  then closed.
23    Q.  Right.
24    A.  It would not become moot from a
25  perspective of, you know, was this person deprived

## Page 107

1  of their right to counsel.  So it sort of depends
2  on -- yeah.
3    Q.  Right.  Right.  And do you have any sense
4  of how many -- in how many cases you've filed one of
5  these motions to decline representation or appoint
6  another attorney?
7    A.  In various formats, whether it's a motion
8  to decline representation or a motion to decline
9  representation and appoint a state lawyer -- or now
10  we're filing motions for caseload conference.  There
11  have been literally hundreds.  As of yesterday, we
12  had filed 120 about -- approximately -- caseload
13  conference motions that were pending.  And those --
14  so these are people who meet the financial criteria
15  for public defender and have an eligible case, but
16  instead of entering, we filed a motion for caseload
17  conference.
18    Q.  Okay.  So 120 motions for caseload
19  conferences and more than 100 motions for -- to
20  decline representation or less than 100?
21    A.  More than 1500.  The motions to decline
22  representation or the motions to decline
23  representation and appoint a state lawyer, I would
24  estimate, ballpark, between 2- and 300 motions we've
25  filed.

## Page 108

1    Q.  Okay.  Is there any other broad -- so
2  there's 2- and 300 of those motions; 120ish of the
3  caseload conference motions.  Any other broad
4  category of motions you've filed in a similar event,
5  or does that cover the waterfront, pretty much?
6    A.  On my existing cases, we filed a number of
7  motions to withdraw from representation based on
8  caseload after we have entered.  Does that make
9  sense?
10    Q.  Uh-huh.
11    A.  Okay.
12    Q.  And you said "my cases."  You mean cases
13  where you, yourself, were appointed -- or have
14  entered appearances in, not other attorneys in your
15  office?
16    A.  Correct.
17    Q.  And those were clients that you were
18  already representing that you filed a motion to
19  withdraw due to your excessive caseloads?
20    A.  There were motions that I entered
21  previously.  Following the entry, I received all of
22  these additional appointments that were over my
23  objection, and so then I sought to withdraw from
24  cases that I had already entered into.
25    Q.  And move to withdraw and appoint a private

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

1   attorney or move to withdraw and provide remedy as
2   the court sees fit or ...
3       A.   Appoint a private lawyer, appoint a state
4   lawyer, take jail off the jail.  I mean, it's a
5   kitchen sink of proposed remedy.
6       Q.   Okay.  And in those motions to withdraw,
7   approximately how many, ballpark, of those motions
8   to withdraw have you filed?
9       A.   I'm not sure off the top of my head.  I
10  really don't know.
11      Q.   Okay.  Do you think more than 30?
12      A.   Yes.
13      Q.   All right.  More than 50, do you think?
14      A.   Fifty is a good starting guesstimate.  One
15  of the things I've got on my staff's to-do list is
16  go back and file them on all of the cases that I've
17  not previously filed one on.  So depending on when
18  they can get that done, you know, they may be filing
19  more as we speak.  I don't know.
20      Q.   When you say "all of the cases," do you
21  mean each and every one of your 213 cases?
22      A.   Except for ones that I had just been
23  appointed on within the last month or two, yes.
24  And, you know, my approach with that is going to
25  be -- you know, I don't -- the situation being what

1   it is, I'm never going to convince one of my judges
2   that I should not have a caseload.  And, frankly, I
3   should probably have some small caseload.  I would
4   never expect my courts to let me out of every single
5   one of my cases, but I do think that I -- at this
6   point, my caseload being what it is, I think I'm
7   obliged to seek leave to withdraw from all of my
8   cases, and if that motion were granted as to 211 of
9   my cases, I might not need to pursue it on the last
10  two, but, you know, as a practical matter, I filed
11  that motion a number of times; I've not successfully
12  had it be granted ever, so I'm not anticipating that
13  it be granted on any of my -- in any of the future
14  cases in which I file it.
15      Q.   And is the basis for that motion --
16  because I don't think we have one of those here, but
17  is the basis for that saying that in that motion
18  it's due to my excessive caseload?
19      A.   Yes.
20      Q.   Okay.  And so since you either have or are
21  planning to file it, essentially, in every one of
22  your cases, that includes cases that you have done
23  substantive work on for however -- for months or
24  perhaps years?
25      A.   Yes.

1       Q.   Okay.  And, obviously, since you've
2   already described it, you understand that that's
3   deleterious to the clients in that case, but you
4   have no choice, given your excessive caseload?
5       A.   Absolutely.  But, you know, frankly, it
6   would be deleterious to the client to have their
7   lawyer switched around a year into a case, for
8   example, and be assigned someone who knows nothing
9   about it.  What I am telling my courts right now,
10  Judge, if you put me in this case, my representation
11  is going to be deleterious to this client.  I cannot
12  do this client justice right now.  I am not doing
13  justice on my existing cases.  I'm not doing the
14  work that I ought to be doing.  And it's not a
15  willful thing.  I'm working overtime.  I can't keep
16  up.  There are only so many hours in the day.
17      Q.   And you're describing, for example, going
18  to jail visits on Sundays and the like.
19      A.   Yes.
20      Q.   You're working on the weekends, as well,
21  but you can't handle 213 cases?
22      A.   I cannot.
23      Q.   And that's in addition to the numerous
24  responsibilities you have as a district defender and
25  that we've discussed previously, in terms of running

1   the office and hiring and budget and administration
2   and supervision?
3       A.   Correct.
4       Q.   Okay.  And just to tie up that last piece
5   about supervisor, in addition to all of the
6   administrative tasks you have, you're also
7   responsible for supervising and training the
8   line attorneys in your office; is that right?
9       A.   Yes.  Some of whom are brand-spanking-new
10  to the practice of law.  Like I said, I've got one
11  lawyer that's been practicing less than a month.
12  I've got another lawyer who took the February bar,
13  got the results in April or May or whenever, and
14  started with us over the summer, and she's a very
15  good lawyer.  She is very new to the practice of
16  law, and I should be spending much more time
17  training those two lawyers and the other lawyers
18  that I have.
19      Q.   Are there other supervisors in the office
20  who are responsible for supervising those two
21  younger attorneys?
22      A.   I'm the only supervisor in the Area 19
23  office.  We do have -- from time to time, there's
24  some informal mentoring that goes on.  More
25  experienced lawyers will help the lesser -- not the

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-2   Filed 02/21/18   Page 29 of 107

## Page 113

1  lesser but the more junior lawyers.  As I mentioned,
2  my most experienced lawyers really aren't that
3  experienced.
4      Q.  Right.  Okay.  So just to sum up this --
5  these motions, there are about -- just doing -- not
6  asking to do heavy math here, but if there are about
7  2- to 300 motions to decline and/or appoint counsel,
8  and there's 120-plus motions to -- for a caseload
9  conference, and there are 50-ish motions to
10  withdraw, my rough calculations are it's close to
11  500 cases in which you've moved in one fashion or
12  another to either get out -- not take a case or to
13  withdraw from a case that you or your office is
14  currently -- would otherwise be representing a
15  defendant?
16      A.  That sounds about right.
17      Q.  In fact, that number -- once your staff
18  gets around to filing a motion to withdraw in the
19  other 163 cases that you have is going to be 6- or
20  700 cases?
21      A.  Absolutely.
22      Q.  Okay.  And so, broadly speaking -- we can
23  talk about some specific examples, but what is
24  happening in those 500, soon to be 6- to 700 cases
25  that you've moved to decline or withdraw from in

## Page 114

1  some fashion?
2      A.  On the cases in which we'd filed the
3  motion to decline, most of those, as in all but a
4  small number, either the courts ordered us -- denied
5  the motion to decline and ordered us to represent.
6  If we were ordered to do so, we did.  Now, you know,
7  my representation at this point is exceedingly
8  limited.  I mean -- you know?  The -- let's see.
9  There are motions for caseload conference that are
10  sort of out there that are pending.  You know,
11  there's a hearing in Miller County on December 22.
12  Most -- so what -- I mean, those are sort of out
13  there and they're floating.
14          The motions to decline representation,
15  generally, those have either been assigned somebody
16  from my office or some have become moot, either in
17  that the individual goes pro se or that they retain
18  a private lawyer.  I can think of a couple of cases
19  in which, in response to that motion, a judge did
20  appoint a private lawyer.  As I'm sitting here
21  thinking about it, I can think of three private
22  lawyers in Cole County who were appointed in
23  response to motions that we filed, one of who was my
24  wife.
25      Q.  And where does your wife work -- not

## Page 115

1  location, sorry, but what's her -- what firm or
2  organization does she work for?
3      A.  Her firm is Carver & Michael in
4  Jefferson City, Missouri.
5      Q.  Okay.  And was that appointment upon her
6  request or was --
7      A.  No.
8      Q.  Okay.  And do you think that -- was that a
9  coincidence or -- as one of three lawyers not a
10  coincidence?
11      A.  I don't have personal knowledge as to the
12  judge's thought process behind that.
13      Q.  Okay.
14      A.  We could speculate.
15      Q.  Yes.  Fair enough.  Okay.
16          Have any attorneys from the state -- you
17  mentioned one of the options was appointing someone
18  who is employed by the State of Missouri.  To your
19  knowledge, has anyone employed by the State of
20  Missouri been appointed as a result of these
21  motions?
22      A.  Not to my knowledge.
23      Q.  Okay.  So other than the three private
24  attorneys, no other attorneys, to your knowledge,
25  have been appointed --

## Page 116

1      A.  Correct.
2      Q.  -- as a result of these motions?
3      A.  Correct.  Judge Joyce is contemplating
4  appointing private counsel but has been
5  contemplating that for many months.  Preceding the
6  conference with her, if you can give me something
7  that says I can do it, I'll do it.  I did provide
8  her a proposed order in May or June, and she did not
9  make any appointments.
10      Q.  Okay.  And in those -- in the cases where
11  you or your office is entering appearances over an
12  objection, are you then engaging in active
13  representation of those clients or simply entering
14  an appearance and waiting until your office has some
15  time to actually work on those cases?
16      A.  Well -- I mean, if we're ordered to
17  represent, we're going to do the level best that we
18  can.  I mean, understand right now my level best, I
19  would rate as pretty terrible.  The -- there are
20  times where we've been ordered by the court to
21  enter, and I've entered, but I really haven't been
22  able to do anything with the case.  And as another
23  lawyer in my office was able to take on additional
24  cases, I would then reassign that case to the lawyer
25  that was actually able to work on the thing.  So

29 (Pages 113 to 116)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-2   Filed 02/21/18   Page 30 of 107

## Page 117

1  that, I know -- that has happened, certainly, a
2  number of times.  Other times, you know, in -- for
3  example, in Miller County, I'm the only lawyer
4  taking new cases in Miller County, so I'm simply not
5  going to be reassigning it to anybody else.  If I'm
6  ordered to represent over my objection, I will file
7  an entry; I will do the best I can, but, you know --
8  I mean, right now, active representation, a client
9  may sit in jail for two months before I can get down
10  to see them.  I mean, I don't consider that active
11  representation.  It's not a willful refusal thing on
12  my part; it's -- if you look at the list of people
13  that I need to see and their corresponding court
14  dates, I -- you know, it -- it's going to take
15  forever for me to get to people.
16      Q.  And as you described, it's not just
17  meeting with your clients; it's also doing all of
18  the investigative work that would be needed on any
19  individual case.  You're unable to do that either?
20      A.  Oh, absolutely.  Or legal research or
21  filing motions or -- you know, there's so many
22  things.  In Miller County, our judges tend to fix
23  fairly high bonds, but they will consider, like, a
24  furlough for treatment, so if your client wants to
25  go to in-patient treatment for drugs or alcohol or

## Page 118

1  what have you -- which is fine, except that my
2  ability to coordinate that is -- I mean, it's
3  virtually zero.  Basically, I dedicate it to a staff
4  member who has got other responsibilities, and she
5  does the best that she can.  That's -- you know,
6  there are clients who have simply asked the family
7  to do it because their family will do it faster.
8  Even when they get a furlough, there have been dates
9  that they have not been able to get to simply
10  because I can't get a motion in front of the judge
11  that fast.  You know, getting and reviewing full
12  discovery.  On my desk, I've got a stack of CDs and
13  DVDs that have been sitting there for a couple of
14  weeks; haven't looked at them, don't know what's on
15  them.  Not going to have a chance to look at them
16  anytime soon.  I mean, any of the substantive legal
17  work that I should be doing, right now, there isn't
18  time to get it done.
19      Q.  And that's the -- what are the effects of
20  continuances and delays and cases on the individual
21  defendants and their cases?
22      A.  Well -- I mean, if they're in jail --
23  we're already seeing in Miller County people saying,
24  Forget it, I don't want a public defender; I'll just
25  go to prison pro se; I'll just represent myself.  If

## Page 119

1  they don't take that approach, then they sit in jail
2  that much longer until I can get around to doing the
3  work that needs to be done.  Miller County is one of
4  the counties that will impose payment of a board
5  bill as a condition of probation.  So every day that
6  they sit in jail, they're getting a bill for 38
7  bucks a day.  And if they sit in jail for six months
8  because it takes me that long to work on the case,
9  that's -- $38 times 180 days, that's going to be
10  added to their board bill, and, of course, my
11  clients are completely destitute.  If they're
12  free -- well, whether they're free or whether
13  they're in jail -- you know, a lot of times our
14  clients, their life -- their whole life is on hold
15  because of the criminal charges that they're facing.
16  Obviously, if they're in jail, they're at risk of
17  losing their housing, their car is likely to get
18  repo'd, they may lose custody of their kids, they're
19  likely to lose their job.  When the landlord goes
20  and evicts them, they're just going to throw all of
21  their stuff out in the street; there's no one to
22  pick it up you know; it's all going to get taken.
23  So when a client, after sitting in jail four to six
24  to 12 months or whatever, and they come out and they
25  have absolutely nothing, I think they're much more

## Page 120

1  likely to get back into trouble and reoffend, and it
2  makes it that much harder for them -- if they're
3  granted probation, it's going to make it that much
4  harder to succeed on probation.  You know, if
5  they're not in custody, a lot of times -- again, the
6  case has dramatic effect on them in that -- you
7  know, in Missouri, everything is -- all of our court
8  records are all in Case.net; it's on the Internet.
9  You know, a lot of employers have caught on to that,
10  and when an employer sees that guy has got a charge
11  for possession of a controlled substance, that is
12  going to impact the accused's employment prospects,
13  even though they're presumed innocent they're
14  going to court on the charge.  You know, right now
15  drug tests at the crime lab are taking -- I don't
16  know -- eight to 12 months for the drug test to get
17  complete.  You know, you set a trial in Miller
18  County right now, the trial is going to be in the
19  summer of 2018.  And, you know, you throw in an
20  overloaded public defender in all of this, you know,
21  for our client -- I mean, just that pending charge,
22  for it to go on that long, 18 months, has a horrible
23  dramatic effect.  I mean, it can affect the custody
24  of their kids; it can affect -- may get kicked out
25  of public housing, if they're in public housing; it

30 (Pages 117 to 120)

ALARIS LITIGATION SERVICES
www.alaris.us        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-2   Filed 02/21/18   Page 31 of 107

Page 121

may affect their job. You know -- and they've got to show up for all of these court dates. In some counties, they require bond supervision. So in addition to showing up to court dates, they may have to show up at a private probation office every week and pay a supervision fee and -- you know, obviously, if transportation is hard, it's going to be difficult to do that. Man -- I mean, you know, the -- you know, the consequences that are -- there's a huge list of the consequences, whether you're in jail or not, you know, just because of the delay associated with the public defender's office.

So I don't even know if I -- I started talking, and then I lost track of your original question. I apologize.

**Q. No, no. That's -- so those are all tremendous personal consequences that these individuals can face, and then the other piece I'm hoping you can speak to is what consequences it has for their legal case continuance of months or years, in terms of the evidence and witnesses and all of those things.**

A. Well, if it takes me two months to get the client in the county jail, and there's a video recording that they think is important to their case

Page 122

from the quickie store or from Walmart or from what have you, you know, most businesses only hold onto those videos for so long. If I don't contact them, you know, shortly after the thing, it may be erased and rerecorded over. So there's certainly the possibility that, you know, material evidence on the case could be lost. I've got a case right now where it's a very important part of the case that blood be tested. Preceding the -- I -- well, let me back up to the beginning.

It's a serious charge. I had to find an expert -- took me forever because of my schedule and because there's a shortage in this specialty, but you put the two together, it took me six months to find an expert on the case, possibly longer. And then in talking to the expert, we identified, Hey, there's blood that needs to be tested, then we had to find a lab to test it. The lab that we found to test it, by the time I got done playing phone tag with the people I needed to talk to, told me, You know what, at this point, blood is going to be too old; can't test it. As the thing stands now, we think we have found another lab who can work with the sample and then run the test that we need to be run, but, frankly, if for some reason they get into

Page 123

it and they find that they're going to be unable to do that, we're going to be up the creek without a paddle. That is a very important part of this case, but we have no ability to get any additional samples. I mean, that -- you know, just over and above the legal consequences of witnesses going into the wind or video being lost. You know, this one client, if the blood is too old to test, it's going to be a real problem in the case.

**Q. And what charge is that individual facing?**

A. Murder.

**Q. You mentioned individual -- the other thing that is a result of these continuances and delays these individuals deciding to take plea deals pro se and go to prison rather than waiting longer for representation. It sounds like you're aware of multiple cases where that's happened.**

A. Yes. Yes.

**Q. Okay.**

A. And even in Miller County now, we're seeing some applicants -- some people come into court, and in lieu of filling out a public defender application, they say, Judge, I just want to represent myself. So even before I'm filing a caseload conference motion in some cases, people are

Page 124

saying, You know what, I'm not even going to go there.

**Q. And is that because they've heard about the delays in public defender representation?**

A. Most of the Miller County jail has received from me a motion to withdraw citing my caseload, a motion to decline representation citing my caseload, or a motion for caseload conference, and there's been a good amount of media about the thing. So between all of those sources, they're certainly aware of the situation.

**Q. And do these individuals representing themselves and/or negotiating plea deals pro se to go to prison, does that raise sixth-amendment concerns for you as a public defender?**

A. Oh, absolutely. And, frankly, the cases where I'm in them and representing people now.

**Q. And that all stems from the case and work overload that you and your office is facing?**

A. Yes.

MR. SCHERZER: Do you want to take a break for a little while?

THE WITNESS: We can. And can I see if the affidavits came in, if you'd like.

MR. SCHERZER: Okay.

Page 125

1    VIDEOGRAPHER:  The time is 12:21 p.m. and
2  we're off the record.
3        (A lunch recess was taken.)
4    VIDEOGRAPHER:  The time is 1:03 p.m. and
5  we're back on the record.
6    Q.  (By Mr. Scherzer)  Mr. Carver, I want to
7  just return to Plaintiff's Exhibit 18 that we had
8  been discussing, and we'll move through it quickly
9  because we have a lot more to discuss, but if you
10  could turn to that page 39420 that we were looking
11  at previously, and let me know when you've gotten
12  there.
13    A.  Okay.
14    Q.  So that e-mail that you had been
15  referencing previously, the e-mail from
16  Judge Richardson to you, the bottom of that page, do
17  you see that e-mail?
18    A.  From Judge Richardson to me?
19    Q.  Yes.
20    A.  Yes.
21    Q.  Which is dated December 29th, 2016, at
22  10:16 a.m.?
23    A.  Yes.
24    Q.  And the subject, again, is Re: Public
25  defender struggles; is that right?

Page 126

1    A.  Yes.
2    Q.  And it looks like it's in response to the
3  e-mail that we had been reading earlier?  It's her
4  response to your e-mail?
5    A.  Yes.
6    Q.  Okay.  And, in fact, she wrote back right
7  away because you sent that e-mail at 9:54 a.m., and
8  she responded 22 minutes later; is that right?
9    A.  Yes.  That's about right.
10    Q.  Okay.  So just if you could read the
11  sentence that begins sort of on the four or five
12  lines up from the bottom, the sentence, "We all know
13  that."
14    A.  "We all know that on any given jury week,
15  there is no way the public defender can prepare for
16  the number of cases that get set, so at least for
17  me, continuances will be pretty freely given."
18    Q.  Okay.  So it seems like the response --
19  and I won't ask you to read the whole e-mail into
20  the record, given the time, but the response from
21  Judge Richardson, is it fair to sum up, was, I agree
22  you're too busy and -- but I want you to at least
23  file appearances, and I'll give you as many
24  continuances as you need?  Is that a fair summary of
25  her response?

Page 127

1    A.  Yes.
2    Q.  Okay.  And we've discussed already the
3  problems that can result as a result of all of those
4  continuances, but --
5    A.  Right.
6    Q.  -- worst -- you know, the best of the
7  worst possible worlds, perhaps?
8    A.  Right.
9    Q.  Okay.  And then just turning to the e-mail
10  above that on that same page, 39420.
11    A.  Yes.
12    Q.  Which, I guess, if you turn to the page
13  before, 39419, you see at the bottom, that looks
14  like it's from Ben Winfrey?
15    A.  Yes.
16    Q.  And can you remind us who Ben Winfrey is?
17    A.  The Miller County prosecutor.
18    Q.  And it's addressed -- it's addressed to
19  many or all of the same individuals who were on your
20  initial e-mail?
21    A.  Yes.
22    Q.  And it was sent -- if you're looking at
23  39419, that same day, December 29, 2016?
24    A.  Yes.
25    Q.  Okay.  And can you read the second

Page 128

1  paragraph, "I do not -- " or sorry -- can you read
2  the first clause, "In a related vein"?
3    A.  "In a related vein of woe is us, the
4  Miller County prosecutor's office regrets to
5  announce the resignation of assistant prosecutor
6  Derek K, who has been granted a very gracious offer
7  by the Morgan County prosecuting attorney to vastly
8  improve his situation in a county with less crime
9  than Miller.
10    Q.  And can you read the next paragraph?
11    A.  Sure.
12    "I do not have an ABA-designated study.
13  The ABA does not care enough to perform a study
14  about whether the prosecution is adequately funded
15  to perform its official duties as the minister of
16  justice.  Nonetheless, this prosecutor has
17  determined, based upon my expert opinion and
18  anecdotal evidence, that my office is at
19  approximately 100,000 percent, our recommended
20  carrying capacity by any standard.  Please keep this
21  in mind as we venture out together in the new year,
22  and please be understanding of the state's own
23  limitations in counties other than Morgan."
24    Q.  Okay.  And then if you could turn to
25  39419, a page prior to that, there's another e-mail

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

Case 2:17-cv-04057-NKL   Document 160-2   Filed 02/21/18   Page 33 of 107

## Page 129

1  from Ben Winfrey just to you later in the day that
2  same day, six or seven hours later, where he says he
3  was joking and says I was not mocking or minimizing
4  your problem, we have both asked to do more with
5  less; is that right?
6      A.  Yes.
7      Q.  Okay.  And then if you could turn to
8  39416.  The bottom of that page, it looks like
9  there's an e-mail from Judge Schollmeyer to
10 Ashley Lute?
11     A.  Yes.
12     Q.  And it looks like just above that it says
13 Ashley Lute is associate circuit judge's secretary;
14 is that right?
15     A.  Yes.  I mean, I think officially she's one
16 of the court clerks, but she serves as his
17 secretary.
18     Q.  Okay.  And she forwarded that e-mail,
19 also, to you on December 29th at 4:26; is that
20 right?
21     A.  Yes.
22     Q.  And so, essentially, it looks like -- oh,
23 I see.  Sorry.  Because on -- just -- on 39417, it
24 looks like you ended up writing to Ashley Lute
25 because your e-mail to the judge directly bounced

## Page 130

1  back; is that right?
2      A.  Correct.
3      Q.  Do you see that sort of at the top?
4      A.  Yes.
5      Q.  So then, essentially, this e-mail from
6  Judge Schollmeyer was to you, just passed through
7  Ashley Lute; right?
8      A.  Correct.
9      Q.  Okay.  And he said -- can you read us what
10 he said -- his short e-mail?
11     A.  "I'm not going to appoint your office in
12 Class A DWRs, if they're eligible for reinstatement,
13 until I see that they aren't going to get
14 reinstated."
15     "DWR" is -- tangentially, it's driving
16 while revoked.
17     Q.  Okay.
18     A.  "Also, at the first of the year,
19 first-offense stealing will have no possibility of
20 jail, so I can't appoint.  These things might help a
21 little."
22     Q.  Okay.  And so when he says -- so is that
23 referring to -- there was some statutory change in
24 January 2017 about first -- the first offense for
25 stealing; is that right?

## Page 131

1      A.  That's how I read that, yes.
2      Q.  Okay.  And are you aware of that
3  particular statutory change or ...
4      A.  In memory serves, I think it's just under
5  a certain dollar amount.
6      Q.  Okay.
7      A.  I think it's less than 150 bucks.
8      Q.  Okay.  And so when he says, "I can't
9  appoint," what is he referring to?
10     A.  So when he says -- if it's -- if there is
11 no risk of incarceration -- you know, there's
12 certain statutes that say you can get a fine only
13 under Chapter 600; they are not -- persons charged
14 with that are not eligible for a public defender.
15     Q.  Okay.  If they're not -- if there's no
16 possibility of jail time, they're ineligible for a
17 public defender?
18     A.  Correct.
19     Q.  Okay.
20     A.  Tangentially -- I don't mean to
21 interrupt -- I just got a text from my office
22 indicating they tried to send an e-mail to the staff
23 up front, so I don't know if someone wants to step
24 out and check on that or not.
25     MR. SCHERZER:  Sure.  Yeah.  We can take a

## Page 132

1  two-second break to do that.
2      VIDEOGRAPHER:  The time is 1:12 p.m., and
3  we're off the record.
4      (A recess was taken.)
5      VIDEOGRAPHER:  The time is 1:16 p.m., and
6  we're back on the record.
7      Q.  (By Mr. Scherzer)  Okay.  And then just the
8  last e-mail in this chain, if you don't mind,
9  Mr. Carver, that starts on that page 39415.  At the
10 bottom of that page -- sorry.  When I said the first
11 e-mail, the first e-mail, if you look at the top, is
12 an e-mail from you to Ms. Shipma in October of this
13 year forwarding this e-mail chain; is that right?
14     A.  Yes.
15     Q.  Okay.  But the second e-mail and the first
16 one, you know, in this chain from -- in 2016, is
17 this e-mail from -- at the bottom of the page on
18 39415 from Daniel Green to you?
19     A.  Yes.
20     Q.  And can you remind us who Daniel Green is?
21     A.  Circuit judge in Cole County.
22     Q.  Okay.  And if you turn to the -- to 39416
23 at the top of the page, can you just read a few
24 sentences that start with, "At any rate" on the
25 second line there?  "At any rate I would ..."

ALARIS LITIGATION SERVICES
www.alaris.us        Phone: 1.800.280.3376        Fax: 314.644.1334

## Page 133

1     A.  "At any rate, I would go so far as to
2  suggest you figure out the maximum number of active
3  cases for your folks, and we call these green cases.
4  The rest we call red.  When the case comes on the
5  docket, and I ask you what action, you respond with,
6  This is a red case, and we continue for 90 days, or,
7  This is a green case, and we set it accordingly."
8     Q.  Okay.  And is that -- has that been
9  happening, the green or red or some similar type of
10  code word?
11     A.  No.
12     Q.  Okay.  But what Judge Green is suggesting
13  here is -- was, at least, that you set up two
14  classes of cases, one class of which you would just
15  continue, perhaps, ad infinitum, but at least for 90
16  day clips at a time?
17     A.  Correct.
18     Q.  All right.  I'm done with that exhibit for
19  now.  I want to turn now to 8286.
20     (Deposition Exhibit No. 19 was marked for
21  identification.)
22     Q.  (By Mr. Scherzer)  So, Mr. Carver, I'm
23  showing you what's been marked as Exhibit 19.  Let
24  me know when you've had a chance to glance at it.
25     A.  Yes.

## Page 134

1     Q.  Okay.  Do you recognize this?
2     A.  Yes.
3     Q.  And what is it?
4     A.  This is an e-mail thread.  The substantive
5  e-mail would appear on Bates stamp 39414, which is
6  an e-mail I'd sent to the courts in October of this
7  year, and it wasn't addressed to all of the judges
8  that I practice in front of, but it was addressed to
9  those who had been continuing to order us to
10  represent, even after we had been telling them we're
11  drowning and we can't take more cases.
12     Q.  Got it.  So just to that subset of judges
13  who were ordering you to continue representing,
14  despite your concerns about your ability to
15  effectively represent those clients they were
16  ordering you to represent?
17     A.  Correct.
18     Q.  Okay.  And can you read us that e-mail on
19  39414?
20     A.  Sure.
21     "As you know, I have been filing motions
22  to appoint counsel for some time.  In the event
23  those motions are overruled, I'm now sending notice
24  of the court's order to my supervisors with the
25  request that they respond.  I simply do not have any

## Page 135

1  ability to assign these cases internally within my
2  office.  Frankly, I don't know what my supervisors
3  will tell you.  They don't have extra lawyers on
4  hand to take additional cases, and I'm told that
5  they are receiving notices of appointment from local
6  public defender offices all over the state.  I
7  assume it may take some time to receive a response.
8  Your patience is much appreciated.  If you do not
9  receive any response after you have ordered the
10  public defender to provide representation, feel free
11  to let me know.  Tangentially, I will remind you
12  under State ex rel. Robinson v. Franklin, the court
13  cannot appoint specific public defenders; the court
14  can only order the agency to provide representation.
15  As always --"
16     It's supposed to say "feel free," but
17  there's a typographical error --
18     "-- feel free to get in touch with
19  questions or concerns.  Thanks, Justin."
20     Q.  And what, if any, response did you receive
21  as a result of this e-mail?
22     A.  From the courts?  None.
23     Q.  Okay.
24     A.  I sent a number of cases to my supervisor,
25  Ellen Blau, and I think that she asked -- I cc'd in

## Page 136

1  other members of senior management on it.  Sometime
2  later I got a call from Ms. Blau saying, Don't do
3  that anymore.  We don't have any lawyers to give
4  these -- to assign these cases to.
5     Q.  Don't do what anymore?  Sorry.
6     A.  Send the cases to the administrative
7  office with the request that they provide
8  representation.
9     Q.  Okay.  So, initially, she told you to send
10  those -- to copy other individuals after you had
11  sent it, but eventually came back to you and saying
12  sending these cases to us is frivolous because we
13  have no one to take them?
14     A.  Correct.
15     Q.  And what did she suggest that you do
16  instead?
17     A.  Have evidentiary hearings on my motions to
18  decline representation or motions to withdraw.
19     Q.  Okay.  And have you been able to have
20  those hearings?
21     A.  Yes.
22     Q.  Okay.
23     A.  And I've had zero success.
24     Q.  Okay.  So tell us about that, if you
25  could.

ALARIS LITIGATION SERVICES
www.alaris.us     Phone: 1.800.280.3376     Fax: 314.644.1334

Case 2:17-cv-04057-NKL   Document 160-2   Filed 02/21/18   Page 35 of 107

## Page 137

1    A.  Sure.  There was -- I can think of two
2  right now off the top of my head, evidentiary
3  hearings on motions to decline representation and/or
4  motions to withdraw representation.  One was in
5  Miller County in front of Judge Kaltenbronn where we
6  took up a number of cases simultaneously, as in --
7  when I say "a number," I mean more than a dozen,
8  maybe two dozen -- cases in which essentially the
9  same issues was there, and I testified as to my
10  caseload and what I was able to do and what I was
11  not able to do.  The judge overruled all of the
12  motions and ordered me to remain in the case or
13  enter into the case as the case may be.  Likewise,
14  there was another hearing on a conflict case in
15  Laclede County in front of Judge Richardson where,
16  again, I testified and the judge ordered the public
17  defender to represent.
18    Q.  Okay.  So -- and those are the only two
19  evidentiary hearings that you've had?
20    A.  That I can think of off of the top of my
21  head.  There may have been more -- I want to say
22  there was at least one more in circuit court in
23  Miller County.  I can't recall for sure for sure.
24  We've also had the case conference hearings in
25  Cole County.  We had a hearing on motions to -- for

## Page 138

1  the caseload conference in Miller County, and the
2  conference is scheduled in Miller County.
3    Q.  Okay.  And what, if any, reasons or
4  rationales did the judges in these evidentiary
5  hearings give for denying your motions?
6    A.  In the Lebanon -- in the Laclede County
7  case -- I use Lebanon and Laclede County
8  interchangeably.
9    Q.  Right.
10    A.  In the Laclede County case, the judge
11  said, Well, I'm not ordering you to take it,
12  Mr. Carver; I'm just ordering the public defender to
13  take it.  If your office can't do it, find another
14  public defender from another public defender office.
15  I talked to my boss, who told me there aren't any
16  other public defenders in any other public defender
17  offices that -- they're all overloaded, and because
18  of the division of labor, the case was my office's
19  case.  It had initially started -- the reason it was
20  my case was it initially started in Miller County,
21  and the venue was changed to Laclede County, sort of
22  the administrative division of labor is it gets
23  assigned to the office in the county where the case
24  started.  You know, in -- with regard to some of the
25  other things that courts have told me over time,

## Page 139

1  basically, the same things I told you to before.
2  You know, Judge Kaltenbronn in response to the
3  motion -- the evidentiary hearing basically said,
4  You know, look the real remedy is not judicial; the
5  real remedy is legislative.  And he didn't feel like
6  he had any good options other than appointing the
7  public defender, was sort of what he articulated.
8    Q.  I'd like to just -- to close this loop
9  here, just return to Plaintiff's Exhibit 18 for one
10  second.  When you have that in front of you, that's
11  the eight-page chain of e-mails.
12    A.  Okay.
13    Q.  On -- and going back to 39421 -- sorry.  I
14  wanted to do this before the break, but I will just
15  come back to it quickly now.
16    The four lines up from the bottom says --
17  you read this earlier -- that, "Nonetheless, as a
18  supervisory lawyer, I have a specific ethical
19  obligation to monitor and control the caseloads of
20  my assistants."
21    A.  Yes.
22    Q.  "I simply can't keep assigning my lawyers
23  cases at the rate that I have been assigning them."
24    A.  Yes.
25    Q.  Can you just tell us a little bit more

## Page 140

1  about that special ethical obligation that you have
2  as a supervisor?
3    A.  I'm obliged to make sure that all of my
4  lawyers practice consistent with Rule 4 of the
5  Missouri Supreme Court Rules.  One of those rules
6  specifically, if you look at Comment 2 relating to
7  diligence, says that a lawyer's caseload must be
8  controlled so that they can practice each case
9  competently.  Over and above that, if you look at
10  the rule relating to competence, competence is
11  knowledge and skill, but it's also preparation.
12  It's a conjunctive test.  It's not sufficient -- you
13  are not competent if you have only knowledge and
14  skill but you do not do the preparation to provide
15  competent representation within the meaning of
16  Rule 4.  You have to have the knowledge, the skill,
17  and the preparation.  So those are just some -- sort
18  of some of the obligations that come to mind as you
19  ask that question.
20    Q.  So that's over and above your ethical
21  responsibilities to your own cases, you have these
22  additional ethical responsibilities as a supervisor?
23    A.  I have to make sure my lawyers are being
24  ethical in their practice as well.
25    Q.  Okay.  And are the rules that you're

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 141

1  referring to 4-1.3 is diligence -- is that --
2      A.   That sounds correct.
3      Q.   -- correct?  Okay.  And then 4-5.1 is
4  responsibilities of partners, managers, and
5  supervisory lawyers?
6      A.   That sounds correct, yes.
7      Q.   And does that -- does that rule say
8  something to the effect of a lawyer having direct
9  supervisory authority over another lawyer shall make
10 reasonable efforts to ensure that the other lawyer
11 conforms to the rules of professional conduct?
12     A.   Yes.
13     Q.   Okay.  And, in fact -- well, I'll just --
14 let me just submit this quickly so I don't force you
15 to try to guess on what the ...
16         (Deposition Exhibit No. 20 was marked for
17 identification.)
18     A.   Yes.
19     Q.   (By Mr. Scherzer)  Do you recognize what I
20 put in front of you as Exhibit 20?
21     A.   Yes.
22     Q.   And this is Rule 4-5.1?
23     A.   Yes.
24     Q.   And do you see Letters -- C under that?
25     A.   Yes.

## Page 142

1      Q.   And it says, "A lawyer shall be
2  responsible for another lawyer's violation of the
3  rules of professional conduct if, one, the lawyer
4  orders or with knowledge of the specific conduct
5  ratifies the conduct involved"?
6      A.   Yes.
7      Q.   Okay.  And is that one of the things that
8  you're talking about, about your special ethical
9  responsibilities as a supervisor?
10     A.   Yes.
11     Q.   Okay.  So, indeed, you could be ethically
12 responsible for the conduct of your line attorneys
13 if you either order or even ratify their conduct
14 conducting ineffective for unethical representation
15 of the defendants your office is assigned to
16 represent; is that right?
17     A.   Yes.
18     Q.   Okay.  I'd like to mark this as
19 Plaintiff's Exhibit 21.
20         (Deposition Exhibit No. 21 was marked for
21 identification.)
22     Q.   (By Mr. Scherzer)  Have you seen this
23 document before, Mr. Carver?
24     A.   It looks like there's some formatting
25 errors that may have occurred --

## Page 143

1      Q.   Yes.
2      A.   -- when the thing was printed.
3      Q.   Yes.
4      A.   Setting aside those formatting errors,
5  this would be appear to be a supplemental budget
6  request relating to the public defender's office.  I
7  presume I have seen this at some point in time.  I
8  mean ...
9      Q.   And it's okay if not.  I'm asking you
10 about one specific page, which I'll refer to you.
11     A.   Okay.
12     Q.   But it does say -- although, yes, this is
13 something in the file that has occurred, but on the
14 front it says, "Supplemental --" what looks like
15 "Supplemental Legislative Budget Request."
16     A.   Yes.
17     Q.   Is that right?
18     A.   Yes.
19     Q.   Approved October 25th, 2017?  Is that
20 right?
21     A.   Yes.
22     Q.   And it says, "Michael Barrett, director."
23 Underneath it has the Missouri State Public Defender
24 commission seal?
25     A.   Yes.

## Page 144

1      Q.   Okay.  So I just want to turn to the last
2  page of that document, 38976.
3      A.   Okay.
4      Q.   And it says, "State Public Defender
5  Cumulative caseload Metric Fiscal Year 2017" on the
6  top.  Do you see that?
7      A.   Yes.
8      Q.   And it says, "Start date, July 1st, 2016,
9  end date June 30th, 2017"?
10     A.   Yes.
11     Q.   Okay.  And do you see it -- it looks like
12 the 33 districts or areas in the Missouri State
13 Public Defender System are listed here in rows.
14     A.   Yes.
15     Q.   And they're ranked 1 to 33 in the far
16 right-hand column?
17     A.   Yes.
18     Q.   And this is a percent of capacity chart
19 for the 33 area offices of the Missouri public
20 defender system?  Is that a fair --
21     A.   Yes.
22     Q.   -- statement?
23     A.   Yes.  Based on the RubinBrown metric.
24     Q.   Based on the RubinBrown metric.  Okay.
25 And so it has attorney time and capacity, and then

36 (Pages 141 to 144)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-2   Filed 02/21/18   Page 37 of 107

## Page 145

1    in that second-to-last column, it has percent of
2    capacity; is that right?
3        A.  Yes.
4        Q.  And do you see Area 19, Jefferson City, in
5    this chart?
6        A.  I do.
7        Q.  Okay.  And if you go across -- it says,
8    "Percent of capacity, 210.3 percent"?
9        A.  Yes.
10        Q.  And can you tell us what that means, to
11    your understanding?
12        A.  That would mean that we would have
13    210 percent of open cases as compared to the number
14    of lawyers to handle those cases, and that
15    210 percent presumes that the office is fully
16    staffed with all of its lawyers, and as of
17    June 30, 2017, we were not.  We had actually been
18    shorthanded for all of calendar year 2017.  And so
19    that -- you know, if you based our percentage based
20    on the number of lawyers we had on hand, it would
21    change and it would probably increase, but what that
22    number would be, I couldn't tell you off the top of
23    my head.
24        Q.  And it would certainly increase because
25    you have six on staff instead of seven?

## Page 146

1        A.  Agreed.
2        Q.  So it would increase one-tenth or
3    one-sixth or whatever.
4        A.  However that math works out.
5        Q.  Some complicated fraction.
6        A.  Right.
7        Q.  Okay.  And so, effectively, it would be
8    fair to say what this means is that your office
9    would be twice as many attorneys as it currently is
10    even authorized for -- much less has, but is even
11    authorized for in order to adequately represent the
12    defendants to whom it's been assigned to represent?
13        A.  At least twice, yes.
14        Q.  Okay.  And is that consistent with your
15    experience and understanding, having worked in the
16    system for 15 years and been in charge of this
17    office for three-plus years?
18        A.  Yes.
19        Q.  That your evaluation is you would need
20    twice as many lawyers?
21        A.  Yes.
22        Q.  And then do you see on that last column
23    where I mention before the rank Jefferson City --
24    can you tell us what rank Jefferson City is?
25        A.  Twenty-eight.

## Page 147

1        Q.  Okay.  So that's -- and you see at the
2    bottom here there are 33 areas or districts in the
3    MSPD system; is that right?
4        A.  Yes.
5        Q.  So your -- so for fiscal year 2017, your
6    office was 28th out of 33 offices; is that correct?
7        A.  Yes.  Yes.
8        Q.  Okay.  So even with this 210 percent
9    overload and all of the problems that you've been
10    identifying, 27 of the 33 offices have a greater
11    numerical overload than your office; is that
12    correct?
13        A.  That's correct.
14        Q.  And, perhaps, that -- might that explain
15    Ellen Blau's response that -- and your previous
16    acknowledgment there aren't other attorneys to come
17    in and -- as knights in shining armor to represent
18    these individuals in your district?
19        A.  That's correct.
20        Q.  Okay.  I'd like to turn quickly to what
21    I'm going to mark as Plaintiff's Exhibit 22.
22        (Deposition Exhibit No. 22 was marked for
23    identification.)
24        A.  Yes.
25        Q.  Do you recognize this document?

## Page 148

1        A.  Yes.
2        Q.  What is it?
3        A.  This is a report of the Senate interim
4    committee following a series of hearings at the
5    state capitol.
6        Q.  A series of hearings on?
7        A.  Public defender caseload, staffing status
8    of the public defender's office.
9        Q.  Okay.  And do you see the date on the
10    bottom of this cover page?
11        A.  The report was prepared, according to the
12    cover page, in January of 2007.  The hearings were
13    in the summer of 2006.
14        Q.  And do you recall these hearings?
15        A.  I do.
16        Q.  Okay.  And is that because you testified
17    at at least one of them?
18        A.  Yes.
19        Q.  Okay.  So if you go to -- well, if you
20    look very briefly at 18328.
21        A.  Yes.
22        Q.  Do you see that?  Is it says, "Summary of
23    the August 25th meeting."
24        A.  Yes.
25        Q.  And it talks about August 25th, 2006.

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-2   Filed 02/21/18   Page 38 of 107

## Page 149

1  A.  Yes.
2  Q.  And if you turn to 18330.
3  A.  Yes.
4  Q.  Which looks like it's describing that same
5  meeting.
6  A.  Yes.
7  Q.  Do you see your name there?
8  A.  I do.  It lists me as an assistant public
9  defender.  My memory is that I was the district
10  defender at the time.
11  Q.  Right.  And actually the first line does
12  say, "As a supervising attorney in his office."
13  A.  Uh-huh.
14  Q.  So that was when you were -- you testified
15  as the district defender in the Fulton office; is
16  that right?
17  A.  Yes.
18  Q.  And this was 11 -- almost 11 and a half
19  years ago; is that right?
20  A.  Yes.
21  Q.  Okay.  And can you read the first sentence
22  under your name?
23  A.  "As the supervising attorney in his
24  office, Mr. Carver's testimony focused on the
25  difficulties of maintaining his own heavy caseload

## Page 150

1  while attempting to mentor, supervise, and evaluate
2  the other attorneys in his office."
3  Q.  Okay.  So fair to say this is a problem
4  that you testified to the Senate about yourself 11
5  and a half years ago?
6  A.  Correct.
7  Q.  Okay.  And much the same problem that
8  you're describing today?
9  A.  Yes.
10  Q.  You're laughing, and I don't blame you.
11  Why is it that you're laughing?
12  A.  It's -- it has been a problem that has
13  persisted the entire time I've been in the public
14  defender's office.  And it's not funny.  It's been
15  going on for forever.
16  Q.  Okay.  And you've testified to the
17  Senate -- I mean, other individuals here testifying
18  as well, but you, yourself, testified to the Senate
19  about this 11 and a half years ago?
20  A.  Yes.
21  Q.  And, if anything, would you say -- has the
22  problem gotten better or worse since that time?
23  A.  You know, one of the results -- so one of
24  the results of the Senate interim committee is that
25  they did raise the salaries some, which certainly

## Page 151

1  helped.  And I think they did allocate us an
2  additional number of lawyers or support staff
3  statewide.  You know, I don't know -- the little bit
4  that the Senate interim committee did -- it's sort
5  of a Band-Aid on a gushing wound that did not fix
6  the problem.  There was probably -- there was
7  certainly some help that came out of the Senate
8  interim committee.  Now, whether the additional
9  resources that we got out of that process, whether
10  that has kept pace with sort of the change in our
11  caseload, that, I couldn't speak to.  And, frankly,
12  whether the pay raises now would keep pace with
13  inflation, that, I couldn't speak to either.  We're
14  still struggling with the same problems we had back
15  then, I mean, is sort of the short summary.  This
16  did not fix or end the problem by any means; it just
17  placed a Band-Aid on a very serious wound.
18  Q.  Okay.  And at the end of that first
19  paragraph under your name, it says, "Last year
20  office closed 1,664 cases, including 298 cases
21  closed by Mr. Carver."
22  A.  Yes.
23  Q.  And what does that mean?  Just -- can you
24  tell us what the "298 cases closed by you" means.
25  A.  That means I pled or tried some or

## Page 152

1  something -- there was some dismissals, but that
2  would be the number of cases that I would have
3  closed that year.
4  Q.  Okay.  And then on the -- can you just
5  read the second paragraph of that testimony?
6  A.  Sure.
7  "Mr. Carver expressed the frustration of
8  trying to balance management and representing
9  clients.  If he focuses on his own cases and does
10  not supervise the new attorneys, clients suffer from
11  their inexperience.  If he focuses on management
12  issues, his own clients do not receive proper
13  representation; however, Mr. Carver expressed that
14  proper management and feedback are essential
15  elements that would help with attorney retention and
16  improved performance."
17  Q.  Okay.  And do you still agree with those
18  sentiments today?
19  A.  Absolutely.
20  Q.  And, in fact, is that the same sort of
21  internal conflict that you face as a supervisor,
22  trying to do what's best for your clients and for
23  your attorneys and the clients that those attorneys
24  represent that you're facing every day now in
25  Area 19?

38 (Pages 149 to 152)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-2   Filed 02/21/18   Page 39 of 107

## Page 153

1    A.  Yes.
2    Q.  Okay.  And, again, this is something you
3  testified to the Senate about 11 and a half years
4  ago; is that right?
5    A.  Yes.
6    Q.  Okay.  All right.  I'd like to turn to
7  what I'll mark as Exhibit 23.
8    (Deposition Exhibit No. 23 was marked for
9  identification.)
10   Q.  (By Mr. Scherzer)  Plaintiff's Exhibit 23,
11  do you recognize this document?
12   A.  Yes.
13   Q.  What is it?
14   A.  This would be one form of the motions to
15  decline representation and to -- you know, to
16  appoint counsel that I spoke of earlier.
17   Q.  Okay.  I know this looks like it was in a
18  particular case, the case of State of Missouri v.
19  Quentin Williams; is that right?
20   A.  Yes.
21   Q.  And who drafted this -- who wrote and
22  filed this motion?
23   A.  I did.  Much of it I borrowed from
24  something somebody else did previously, but I did
25  this, and I also did all of the other motions I've

## Page 154

1  been alluding to earlier.
2    Q.  Okay.  And can you read just the first --
3  well, the first sentence but just until the -- until
4  451, so the one, two, three, four -- the first five
5  and a half lines?
6    A.  Yes.
7    "Comes now Justin Carver, district
8  defender of Area 19 of the Missouri State public
9  Defender System, and informs the court that he has
10  found the defendant to be indigent but that he has
11  no lawyers able to take this case, as every lawyer
12  in the Area 19 office is already overloaded with
13  cases and cannot accept additional cases without
14  violating the Missouri Rules of Professional Conduct
15  4-1.1, 4-1.3, 4-1.4, 4-1.7, 4-1.16(a), and 4-5.1."
16   Q.  Okay.  And, essentially, you asked the
17  court to decline -- to allow you to decline
18  representation and to appoint a lawyer employed by
19  the State of Missouri or some other remedy to get
20  the person adequate representation?
21   A.  Yes.
22   Q.  And what was the result of that motion?
23   A.  It was neither granted nor denied.
24  Mr. Williams is the gentleman who we had a case
25  conference on in Cole County sometime after this

## Page 155

1  motion was filed.  After the first hearing on the
2  case conference and before the second, one of the
3  lawyers in my office was able to take additional
4  cases, and so Mr. Williams' case was assigned to the
5  lawyer who then entered and began representation.
6    Q.  Okay.  And we'll get to that a little bit
7  more in a minute, that conference.
8    So was this -- is this essentially a --
9  this motion -- because you mentioned you filed
10  hundreds of these types of motions, is this, then,
11  what became a form motion that you filed in several
12  different cases?
13   A.  It was a template that we set up in the
14  computer, and any time that the situation arose
15  where we needed it, we just pulled up the template
16  and used it.
17   Q.  And was this the filings of this kind of
18  motion -- the motions that you mentioned filing in
19  early 2017; is that right?
20   A.  Yes.
21   Q.  Okay.
22   A.  And through middle 2017.
23   Q.  Right.
24   A.  Up until Hazel v. Meyer, the writ decision
25  was decided by the Missouri Supreme Court, then we

## Page 156

1  switched to the case conference motions.
2    Q.  Okay.  I'll show you one of those motions.
3  I'm marking this as Plaintiff's Exhibit 24.
4    (Deposition Exhibit No. 24 was marked for
5  identification.)
6    Q.  (By Mr. Scherzer)  And do you recognize
7  this -- what I've marked as Plaintiff's Exhibit 24?
8    A.  Yes.
9    Q.  And what is it?
10   A.  This was a motion requesting conference to
11  discuss caseload issues that was filed on behalf --
12  on Mr. Williams' case.
13   Q.  Okay.  And so that's the -- this is the
14  motion that you -- the type of motion that you
15  mentioned previously that you're now filing instead
16  of this motion to decline representation; is that
17  right?
18   A.  Correct.  My memory is that, also, in
19  conjunction with this memory on Mr. Williams' case,
20  there were suggestions and support that was filed.
21  After his case went to conference, we took the
22  motion requesting conference and the suggestions and
23  condensed them into one big giant motion requesting
24  conference that we've been using since.
25   Q.  Okay.  And I'll show you what's been --

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-2   Filed 02/21/18   Page 40 of 107

## Page 157

1   what I'll mark as Plaintiff's Exhibit 25.
2       (Deposition Exhibit No. 25 was marked for
3   identification.)
4       Q.  (By Mr. Scherzer)  And do you recognize
5   this document?
6       A.  I do.  This was the suggestions and
7   support.
8       Q.  The one that you were just referring to?
9       A.  Yes.
10      Q.  And this has now become a form that you're
11  now attaching to Plaintiff's Exhibit 24, the
12  motions, and filing in many of your new cases?
13      A.  We've condensed Exhibits 24 and 25 into
14  one big giant filing and using the one big giant
15  filing.
16      Q.  And, again, are you filing this in every
17  new case or just in the cases that -- once you've
18  allocated however many cases your attorneys can take
19  at any given time, then in each additional case
20  after that, you're filing this motion?
21      A.  We're filing it only in the additional
22  cases that we feel that we cannot ethically take.
23      Q.  Okay.  And you're determining that --
24  which cases you -- when you've reached that point at
25  any given moment by consulting with the attorneys in

## Page 158

1   your office?
2       A.  Right.  So the system that we have set up
3   internally is when support staff assigns out cases
4   to a lawyer, Bob, they're going to track how many of
5   which case type they've assigned to Bob, you know,
6   as they assign out cases, and they're going to put
7   that information in a spreadsheet that has all of
8   the RubinBrown numbers built into it.  When the
9   lawyer gets to 100 percent of their RubinBrown
10  capacity or just slightly above, 102 percent, what
11  have you, that triggers an e-mail from support staff
12  to me and to the lawyer, Hey, Lawyer Bob is at
13  103 percent of capacity or what have you.  I then
14  either talk or e-mail with the lawyer, and,
15  generally, the conversation is, Hey, can you take
16  more cases and still provide ethical, competent
17  representation on all of your cases, or no?  And if
18  the lawyer says, Man, I think I can take one or two
19  more, I'm probably going to give the lawyer one or
20  two more, as long as they're providing me a rational
21  reason for believing so.  If they say No, I
22  absolutely cannot take additional cases, then we cut
23  them off and do not assign any additional cases, at
24  least until the start of the next month.
25      Q.  And just quickly, if you could, tell me

## Page 159

1   about the other nonattorney staff in your office.
2   You mention support staff -- at one point, you
3   mentioned an investigator.  If you could just tell
4   me what additional staff there is other than
5   attorneys in your office.
6       A.  I have three support staff members.  One,
7   the official job title is office support assistant.
8   I have two legal assistants.  In addition to those
9   three support staff members, there is one
10  investigator.
11      Q.  Okay.  And that investigator was on leave
12  but is now back from leave?
13      A.  Went out October 1 or very early October
14  and is due to come back on January 2, I think, is
15  the date he comes back.
16      Q.  Okay.  And so currently in the office, you
17  don't have any investigator?
18      A.  Right now we have a legal assistant who
19  had other responsibilities who is attempting to fill
20  that gap and to serve subpoenas and visit crime
21  scenes and do evidence views and that kind, and --
22  yes.  Our investigator is out, so we're trying to
23  cover that with other support staff right now.
24      Q.  Okay.  And so you mentioned the RubinBrown
25  numbers, but it sounds like -- the system you have

## Page 160

1   set up is the RubinBrown numbers, but, also -- not
2   just a strict adherence to those numbers, but, also,
3   based on your own experience, having done this for
4   15 years, and your attorneys' experience with their
5   own caseloads, coming up to a holistic evaluation of
6   going to the absolute maximum that someone could
7   take and still provide ethical representation.  Is
8   that fair?
9       A.  Yes.
10      Q.  Okay.  And you mentioned in this motion
11  and suggestions Rule 4 for the rules of professional
12  conduct, and you mentioned that a couple of times in
13  this deposition.  And is it your understanding that
14  that rule governs public defenders -- you and the
15  other public defenders in your office, just as it
16  governs every other attorney in the state of
17  Missouri?
18      A.  Yes.
19      Q.  Okay.  And so if you could turn -- so what
20  we were just looking at, Plaintiff's Exhibit 25, the
21  suggestions and support, and page 151.
22      A.  Yes.
23      Q.  And if you could just read that -- the
24  main -- the first paragraph under Roman Numeral 3.
25      A.  Yes.  The title heading is, "Area 19

40 (Pages 157 to 160)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-2   Filed 02/21/18   Page 41 of 107

## Page 161

1  attorneys must be permitted to assert and rely upon
2  the rules of professional conduct."  The body of the
3  paragraph reads:
4      "There is no exception in the rules of
5  professional conduct, Rule 4, for public defender
6  attorneys."  And it's got the citations.
7      "To the contrary, as the American Bar
8  Association has aptly noted, there is an implicit
9  premise that governments, which establish and fund
10 providers of public defense, never intended that the
11 lawyers who furnish the representation would be
12 asked to do so if it meant violating the ethical
13 duties pursuant to professional conduct rules."  And
14 then there's a citation.
15     "For this reason public defenders are
16 risking their own professional lives when appointed
17 to an excessive number of cases."  Citation.
18     Q.  Okay.  And those – the last two sentences
19 you read, the "due to the contrary" sentence and the
20 "for this reason sentence," those are, in fact, just
21 full, direct quotes from the Waters case from the
22 Missouri Supreme Court; is that right?
23     A.  Correct.
24     Q.  Okay.  And is this consistent with your
25 understanding --

## Page 162

1      A.  Yes.
2      Q.  -- of what rules and responsibilities
3  govern you and the attorneys in your office?
4      A.  Yes.
5      Q.  And I want to focus strictly on that last
6  sentence, the "For this reason, public defenders are
7  risking their own professional lives when appointed
8  to an excessive number of cases."  Do you agree with
9  that sentiment expressed by the Missouri Supreme
10 Court?
11     A.  Yeah.  Everybody in the public defender's
12 office that has too many cases is very concerned
13 about their professional licensure at this point.
14     Q.  And is that something you've heard from
15 the attorneys in your office?
16     A.  Yes.
17     Q.  And from attorneys in other offices around
18 the state with whom you've spoken?
19     A.  Yes.
20     Q.  And is that something you're concerned
21 about yourself for your own professional license?
22     A.  Maybe I should be.  I feel like I've done
23 everything I could realistically do at this point.
24 I mean, when I read the rules, it says, if you've
25 got too many cases, move to decline, I've done

## Page 163

1  that -- or move to withdraw, and I've done that.
2  You know, we're doing the Chapter 600 conferences as
3  well.  And -- you know, and I self-reported because
4  I've got too many cases, and I know it.  You know --
5  and -- you know, every time I've been ordered to
6  take a case, I've done it.  And, like I said, I'm
7  working overtime.  I'm doing the best I can.  So I
8  don't know.  I mean, I feel like I have done what
9  the rules require me to do when I've got too many
10 cases, but I also feel like because I've -- I feel
11 like I've tried to take action early before a lot of
12 people I knew in other offices were doing anything
13 to address the thing.  I feel like I'm probably in a
14 better situation so far as my professional licensure
15 is concerned.
16     Q.  Okay.  But despite the fact that you've
17 moved to decline and withdraw on hundreds of your
18 own cases, in addition to hundreds of cases for the
19 office, you've been ordered to appear in many of
20 those cases; is that right?
21     A.  Yes.
22     Q.  And so, therefore, you end up with the
23 213-plus cases that you mentioned earlier?
24     A.  Correct.
25     Q.  And you have said you don't feel like

## Page 164

1  you're able to ethically represent many of those
2  individuals who are -- who you've currently entered
3  appearance for; is that right?
4      A.  I'm definitely not providing competent
5  representation to those 213 clients.
6      Q.  Despite your every intention and best
7  effort to do so?
8      A.  Correct.
9      Q.  And despite the fact that you're a 15-year
10 veteran of the Missouri State Public Defender
11 System?
12     A.  Correct.
13     Q.  And, therefore, are -- obviously, by
14 virtue of that, have much more experience than
15 anyone -- twice as much experience as anyone else in
16 your office, five times as much experience as the
17 second-most experienced person -- you know, the
18 third most -- second-most experienced line defender
19 in your office; is that correct?
20     A.  Correct.
21     Q.  And whatever 12 times 15 -- you know,
22 almost 100 times more experience than the individual
23 who started November 13th and already has 78 cases?
24     A.  I'll trust your math on that.  I don't
25 know.

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-2   Filed 02/21/18   Page 42 of 107

## Page 165

1    Q.  Yeah.  Much, much more experience than he
2  does and many of the people in your office?
3    A.  Correct.
4    Q.  And you mentioned you self-reported.  Can
5  you tell me about that?
6    A.  At some point a few months ago it became
7  clear to me that I felt like I had done everything I
8  could think to do to address this situation, and yet
9  my caseload was not in compliance with what I felt
10  like it ought to be with any of our ABA, NAC
11  standards, RubinBrown metric, whatever.  I mean, I
12  had kind of blown all of those out of the water.
13  And, bottom line, I was not providing competent,
14  ethical representation, in spite of the fact I've
15  been telling my courts that I am not providing
16  competent, ethical representation; please don't put
17  me on another case.  So I self-reported to OCDC.
18    Q.  How did you do so?
19    A.  I just sent them a fax.
20    Q.  You sent them a fax?
21    A.  Yeah.
22    Q.  Okay.  All right.
23      MR. SCHERZER:  I'd like, if possible,
24  Jackie, at some point, if we could get that.
25    Q.  (By Mr. Scherzer)  And what's the -- do you

## Page 166

1  know what, if anything, have you heard about that
2  self-reporting?
3    A.  I've heard nothing.
4    Q.  Do you know what the process is for -- the
5  ordinary process for such a report?
6    A.  No.
7    Q.  And you said OCDC.  Can you just tell us
8  what that is?
9    A.  Office of the Chief Disciplinary Counsel.
10    Q.  Was that the same office that prosecuted
11  Karl -- I don't know if "prosecute" is the right
12  word, but brought the case against Karl Hinkebein?
13    A.  Yes.
14    Q.  And is that the Hinkebein decision that
15  you referenced earlier; is that right?
16    A.  Yes.
17    Q.  And can you just tell us briefly what your
18  understanding of that case is?
19    A.  Sure.  There was a Missouri public
20  defender who had clients pursue complaint or
21  complaints relating to lack of client contact and
22  misfiling deadlines.  And as I understand, there had
23  been at least one complaint or a series of
24  complaints in the past.  OCDC began an investigation
25  and pursued -- you used the word "prosecution," and

## Page 167

1  I can't think of any word better, but it's not a
2  criminal prosecution, but took action against Mr.
3  Hinkebein's license.  It ended up going to the
4  Missouri Supreme Court, and the Missouri Supreme
5  Court put Mr. Hinkebein on probation.
6    Q.  Okay.  And is that a case that everyone in
7  your office is aware of?
8    A.  Yes.
9    Q.  And it sounds like you've had discussions
10  with other individuals in the MSPD about that case
11  as well.
12    A.  Yes.
13    Q.  Okay.  And has that caused other attorneys
14  in your office to be concerned about their own
15  license and possible ethical cases against them?
16    A.  Yes.  In fact, it was after that decision
17  that came down I had two lawyers leave.  And I asked
18  them point-blank, What, if any, impact did the
19  Hinkebein decision have on your decision to leave?
20  One described it as a consideration; the other
21  described it as the straw that broke the camel's
22  back.  Tangentially, you had asked me earlier about
23  how courts have responded to my -- the various
24  motions that I've filed.  I had an additional
25  thought.  One of my judges in Miller County told me

## Page 168

1  that the right remedy is for me to quit.
2    Q.  And did he or she explain how that would
3  possibly be a remedy for either you or your clients?
4    A.  His thought was that that would be a
5  remedy for me because then I would not have a
6  caseload problem.
7    Q.  Okay.  And what is your opinion about what
8  repercussions that would have for the other
9  individuals in your office and the clients that you
10  and they represent?
11    A.  Well, you know, the -- it means the
12  clients, eventually, at some point, when someone
13  hired a replacement for me, they would get another
14  lawyer; it might be their fifth or their sixth at
15  that point.  I mean, I think that -- you know, and
16  at that point, the experience level of the lawyers
17  in my office would be cut pretty dramatically.
18    Q.  And you mentioned, nonetheless, despite
19  your -- the concerns that you have for not only your
20  colleagues and the individuals you supervise, but
21  your and their clients that you're considering doing
22  that at some point because of the -- of the
23  tremendous caseload and overwhelming caseload that
24  you're experiencing?
25    A.  Yes.

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

Case 2:17-cv-04057-NKL   Document 160-2   Filed 02/21/18   Page 43 of 107

## Page 169

1    Q.   And if it weren't for that overwhelming
2    caseload, is that something that you would be
3    considering otherwise?  Would you be consider
4    quitting or resigning?
5        A.   No.  I love -- I love the mission.  I love
6    my clients.  I like doing the work that we do.  I'm
7    in a convenient place in that my wife gets paid like
8    a real lawyer, and so I -- you know, I don't have to
9    go make more money somewhere else.  The only thing
10   that I think would drive me away would be the
11   caseload.
12       Q.   Okay.  All right.  I want to just turn
13   back quickly to Plaintiff's Exhibit 17, which is
14   that transcript that we talked about at the very
15   beginning of the deposition.
16       A.   Yes.
17       Q.   Do you remember that?  And so that is a
18   transcript of this hearing -- the Quentin Williams
19   caseload hearing; is that right?
20       A.   Yes.
21       Q.   Okay.  And if you could turn to
22   page 125. -- or excuse me -- the very bottom of 124.
23       A.   Yes.
24       Q.   Can you just read starting three lines up,
25   "if I'm appointed on Mr. Williams' case -- " down to

## Page 170

1    the end of that paragraph.
2        A.   Yes.
3        Q.   And by -- onto the end of that paragraph,
4    I mean, on 125.
5        A.   Understood.
6        "If I'm appointed on Mr. Williams' case,
7    I'm caught in a Catch-22, in that I can't -- I can't
8    frankly represent him, too, with all of the people
9    that I've already got.  And if I assign it to a
10   junior lawyer, who I believe already has too many
11   cases as I can possibly give them, then I'm going to
12   be violating my responsibilities as a supervisor.
13   So I'm kind of caught in a Catch-22, Judge.  I'm
14   either going to force the lawyer to take the case,
15   which would violate my responsibilities as a
16   supervisor, and cause them to violate their
17   responsibilities under the court rules, or I can
18   just take it myself, and then it's just me."
19       Q.   Okay.  And so the Catch-22 you're
20   describing -- and are you still -- this was months
21   ago, but are you -- I suspect I know the answer to
22   this, but are you still feeling like you're in --
23   you're still experiencing that Catch-22?
24       A.   Absolutely.  It's a question of which
25   ethical rule that I'm going to end up breaking:  One

## Page 171

1    that applies to me as an individual lawyer or one
2    that applies to my responsibilities as a supervisor.
3        Q.   And fair to say that your current belief
4    is that you have -- that is, in fact, the nature of
5    a Catch-22:  You have no other choice.  Either you
6    can violate your own ethical responsibilities as a
7    lawyer to your own clients, or you can violate your
8    ethical responsibilities as a supervisor by
9    assigning that case to the other individuals in your
10   office; is that right?
11       A.   Correct.
12       Q.   You don't have any other option that would
13   fully comply with your ethical responsibilities?
14       A.   Correct.
15       Q.   Okay.  And so tell -- I guess, then,
16   quickly, while we're doing this --
17       MR. SCHERZER:  Can we go off the record
18   for one second?
19       VIDEOGRAPHER:  The time is 2:15 p.m., and
20   we're off the record.
21       (A recess was taken.)
22       (Deposition Exhibit No. 26 was marked for
23   identification.)
24       VIDEOGRAPHER:  The time is 2:20 p.m., and
25   we're back on the record.

## Page 172

1        Q.  (By Mr. Scherzer)  So, Mr. Carver, I'm
2    showing you what's been marked as Plaintiff's
3    Exhibit 26.  Do you recognize that?
4        A.   Yes.  These would be -- contained within
5    Exhibit 26 are the various exhibits that I submitted
6    to the court in relation to the case conference
7    hearing on Mr. Quentin Williams' case.
8        Q.   And we unfortunately don't have time to go
9    through in this any detail, but fair to say, if you
10   turn to Plaintiff's Exhibit 17, back to the
11   transcript again --
12       A.   Yes.
13       Q.   -- and look at the second page of that,
14   which is 82 --
15       A.   Yes.
16       Q.   -- Bates stamp 82.
17       A.   Yes.
18       Q.   And there's an exhibit index there with
19   Exhibits A through H.
20       A.   Yes.
21       Q.   Fair to say that Exhibit 26 is -- are
22   those one, two, three, four, five, six, seven --
23   eight exhibits that you submitted at the caseload
24   conference?
25       A.   Yes.

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

Page 173

1    Q.   Okay.  And, in short, those -- that was
2  the affidavits were and are affidavits that
3  attorneys, current and former, in your office
4  prepared and you submitted on their behalf about
5  their caseload and other related issues?
6    A.   Yes.
7    Q.   And the caseload printout is a printout of
8  cases that you -- well, tell us what that caseload
9  printout is so I don't characterize it inaccurately.
10    A.   That was a printout of cases that I had
11  open at the time.  You'll see on the top of it and
12  then in the body of it there are -- you know, on the
13  top it's got 224, and it's crossed out, and it's
14  written 220, and then there's a couple, you know, of
15  people who are crossed off of the list.  Very
16  shortly before the case conference, I had closed
17  those cases, but staff hadn't mechanically closed
18  them in the computer.  So when I submitted what's
19  marked Exhibit H, I sort of did it with the caveat
20  that it says 224 but my current caseloads is 220
21  because I know those four cases had been closed.
22    Q.   So at that time, you had 220 cases?
23    A.   Correct.
24    Q.   So fair to say that Exhibit H, the
25  caseload printout, is a printout of every open or

Page 174

1  active case on your docket; is that right?
2    A.   As of 11/7/17, yes.
3    Q.   Okay.  Great.  Since that's the only
4  one -- you're done looking at it.  Since that's the
5  only one, do you mind if I take a gander at it?
6    A.   Oh, sorry.
7    Q.   I'll move on to other things, but ...
8        So turning to Exhibit 17, the transcript
9  of the caseload conference.
10    A.   Yes.
11    Q.   If you could turn to 137.
12    A.   Yes.
13    Q.   And do you see in the middle of that page
14  there's a long quote -- two-sentence statement from
15  the court?
16    A.   Yes.
17    Q.   And the court, again, is -- was which
18  judge?
19    A.   Judge Joyce.
20    Q.   Okay.  And can you just read that -- those
21  three sentences.
22    A.   Yes.  So it starts on Line 10.
23        "The Court:  I'm going to take it.
24        Counsel, you are all aware that we're
25  trying to work with the public defender and that

Page 175

1  their caseloads are such that they can't provide
2  competent representation.  So I'm going to find that
3  they cannot be asked to take cases that would
4  violate the -- more importantly, the clients' right
5  to effective assistance of counsel.  So I'm going to
6  make that finding."
7    Q.   Okay.  So what's your understanding of
8  what the judge found there?
9    A.   That our caseloads are such that we cannot
10  take additional cases and provide competent
11  representation, and so she's going to make a finding
12  to that effect.
13    Q.   Okay.  And what's the result been of that
14  finding?
15    A.   So we had a second hearing on the case
16  conference, and by then our situation had changed
17  some because we had hired at least one more lawyer,
18  maybe two -- I can't remember off the top of my
19  head, but we were able to assign a significant
20  number of cases that had been awaiting counsel to
21  counsel -- including Mr. Williams.  At the time of
22  the November 7 hearing, Mr. Williams had been in the
23  Cole County jail for five or six months.  Between
24  the November 7 hearing and the subsequent hearing,
25  we were able to enter on his cases, and almost all

Page 176

1  of the other cases who -- people who are confined in
2  the Cole County jail.  There was still a substantial
3  block of 71 cases that we didn't know what to do
4  with.  We didn't have a lawyer who could possibly
5  take those cases, too, or we couldn't divide those
6  cases up any more.  In Phase 2 of the conference,
7  the judge asked me to submit that list to her and to
8  Mr. Richardson, the prosecutor, and they were going
9  to take a look at it to figure out what, if
10  anything, they could do; take jail off the table,
11  appoint a private lawyer, what have you.  I
12  submitted that list to the court and to
13  Mr. Richardson.  I have not received any sort of
14  response one way or another as to what the court
15  intended to do with those 71 cases.
16    Q.   And so those 71 cases are 71 individuals
17  who qualify for public defender services?
18    A.   There are 71 cases.  Some individuals had
19  more than one case.
20    Q.   And how many of those individuals, if you
21  know, are or were in custody?
22    A.   Of the 71, I think, maybe one or two.
23    Q.   Got it.
24    A.   And I think at this point, if they were in
25  custody, they probably have been assigned out by

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-2   Filed 02/21/18   Page 45 of 107

## Page 177

1    now.
2        Q.   Okay.  And to be clear, on some of those
3    cases that are being assigned, you aren't -- you --
4    I guess, primarily, you -- you aren't able to --
5    well, as we've termed, conduct active representation
6    for a period of, at least, months before starting on
7    the case?
8        A.   I am not voluntarily entering on anything,
9    and I haven't been for months.  The only way I'm
10   getting in a case is if the court orders me to take
11   a case.  With Cole County cases, you know, what
12   we're doing is at the start of every month, support
13   staff is going to open up and assign as many cases
14   as they can, you know, starting with in-custody
15   clients first, and then if we can't assign more,
16   then we start filing motions.
17       Q.   Okay.  And I just want to turn back
18   quickly to -- just for one second to Plaintiff's
19   Exhibit 26, which I'll pass back to you.  In
20   Exhibit H, the case level report that you mentioned
21   previously in that Exhibit 26.
22       A.   Yes.
23       Q.   So that's -- that caseload report, your
24   caseload is broken down in there by type of case A
25   and B felony, murders, drug felony, et cetera; is

## Page 178

1    that right?
2        A.   Yes.
3        Q.   And it lists a number of -- next to those
4    categories, it lists a number for each of those
5    categories.  Fair to say that's the number of cases
6    in each of those categories there was at that time,
7    at least on your docket?
8        A.   Yes.  Except, you know, as corrected.
9        Q.   As corrected by the court?
10       A.   Yes.
11       Q.   Okay.  And then it has a date next to
12   that.
13       A.   Yes.
14       Q.   Can you tell me what that date is?  I
15   mean, what that date --
16       A.   I believe that that is the date when the
17   case was opened in our system.
18       Q.   And when is a case opened in your system?
19   Is that opened at the first appearance or the first
20   appearance that you enter an appearance?
21       A.   So when we receive an application for
22   public defender services -- well, it's -- things
23   have been -- things are a little weird now, so this
24   is going to be kind of complicated to explain.  I'm
25   going to do the best I can.  You know, like, for

## Page 179

1    example, right now, in Miller County, on my cases,
2    when a person wants a public defender to represent
3    them, they're going to fill out a formal application
4    for a public defender.  I'll take that to the
5    responsible staff member, they'll review the
6    application, they'll check Case.net, and they
7    sometimes will have to call the applicant back or
8    call a bondsman or ask some basic questions to
9    figure out if the person meets the criteria for a
10   public defender.  Once support staff makes the
11   determination that the applicant qualifies, you
12   know, if we had an available lawyer, we'd just open
13   up a case file, file an entry of appearance, and ask
14   for discovery.  You know, right now, it's not quite
15   working like that.  On my cases in Miller County
16   right now, instead of filing an entry and a request
17   for discovery, I'm filing a motion for caseload
18   conference or, previously, a motion to decline
19   representation or something along those lines.
20           On Cole County and Moniteau County cases,
21   it's a little bit different, in that if we've got a
22   lawyer we can assign to the thing, you know, right
23   away, certainly, we will.  If we're not able to,
24   then we would be filing a motion for caseload
25   conference.

## Page 180

1        Q.   I have one more exhibit, and then some
2    questions, and then we'll be finished.  The last
3    exhibit -- I believe we're up to Exhibit 27.
4            (Deposition Exhibit No. 27 was marked for
5    identification.)
6        Q.   (By Mr. Scherzer)  Do you recognize this --
7        A.   Yes.
8        Q.   -- document?  And what is it?
9        A.   These would be -- there was a brief period
10   of time when we couldn't take cases, I was sort of
11   sending them to the administrative office, and this
12   would be the e-mails associated with the cases that
13   we had sort of attempted to send.
14       Q.   And if you could turn to Bates stamp 14,
15   the last page.  And so just to clarify, this is --
16   is this the set of -- or at least a set of the
17   e-mails that you've mentioned earlier that you had
18   sent to Ellen Blau, and then she eventually
19   responded that there was not going to be any magical
20   help coming from another office?
21       A.   Correct.
22       Q.   Okay.  And so it looks like there were --
23   who is Kalie Campbell?
24       A.   She is the office support assistant in
25   Area 19.

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

1     Q.  Okay.  And it looks like in these previous
2  pages, she sent a -- sort of a form e-mail saying
3  the Area 19 office is overloaded and cannot possibly
4  accept additional cases without violating our
5  ethical obligations?
6     A.  Yes.  That was language that I typed up
7  and sent to her and asked that she paste into the
8  body of an e-mail when sending the cases to the
9  Columbia administrative office.
10     Q.  Okay.  So these were all -- it looks
11  like -- and for attachment reasons, those individual
12  e-mails didn't go through.  And then at the end here
13  on 14, those e-mail sent October 12th, 2017 at
14  3:01 p.m., she sent a number of -- it looks like 11
15  cases with that line, the Area 19 office is
16  overloaded and cannot possibly accept additional
17  cases without violating our ethical obligations?
18     A.  Yes.
19     Q.  And that was, as you said, language that
20  instructed her to send?
21     A.  Yes.
22     Q.  And the response from the central office
23  was, We don't have any way of handling these cases
24  from anyone outside your office; your office is
25  going to have to try to take other steps to try to

1  remedy this situation?
2     A.  Yes.
3     Q.  Okay.  I just want to go quickly to
4  initial hearings, when someone is first brought
5  before the judge.
6     A.  Yes.
7     Q.  Is your office present at those -- does
8  your office enter an appearance and represent
9  individuals at those hearings?
10     A.  Generally, no.
11     Q.  Okay.  And is it at those hearings that
12  bond is set, generally?
13     A.  Generally, in most cases, there will be
14  some bond that has been fixed before that hearing.
15  Certainly, that hearing would be an opportunity to
16  seek reduction of bond, if we were there.  But,
17  generally, we are not there.
18     Q.  And why is it that you're not there?
19     A.  The -- we simply -- I mean, at the end of
20  the day, what it boils down to is, we simply do not
21  have enough people to even think about stationing
22  them in a courtroom, you know, in the event that
23  somebody had gotten arrested, you know, the night
24  before or, you know, whatever.  I mean, we -- there
25  just simply aren't people -- we don't have that kind

1  of time.
2     Q.  Okay.  Given your -- given the caseload
3  issues that we've discussed at length today?
4     A.  Correct.
5     Q.  Okay.  All right.  I'll just run through
6  and try to be as quick as I can.  Just some
7  summation questions about many of the things we've
8  discussed today.
9     In your opinion, do you have the time and
10  resources to communicate with clients in the manner
11  that each case requires?
12     A.  Absolutely not.
13     Q.  In your opinion -- and speaking now about
14  the time prior to when you instituted these caseload
15  controls that caused your own caseload to jump so
16  dramatically, in your opinion, do the attorneys in
17  your office -- did the attorneys in your office at
18  that time, in 2016, let's say, have the time and
19  resources to communicate with clients in the manner
20  that each case required?
21     A.  In 2016, I do not.
22     Q.  You do not believe they did have that
23  time?
24     A.  Correct.
25     Q.  In your opinion today, do you have the

1  time and resources to investigate each case of your
2  cases in the manner that it requires?
3     A.  No.
4     Q.  And in 2016, before you instituted these
5  caseload controls that caused your own caseload to
6  spike so dramatically, did the attorneys in your
7  office have the time and resources to investigate
8  each case in the manner that it required?
9     A.  No.  Complicating all of this is, we have
10  one investigator.  So in addition to the lawyer --
11  being short staffed on lawyers, we're also short
12  investigators.
13     Q.  Okay.  And you've mentioned this
14  previously, but without getting into specifics or
15  compromising attorney-client privilege, can you
16  think of a time when your representation of a client
17  was hampered by a lack of time to investigate the
18  case?
19     A.  Yes.
20     Q.  And, again, same question in 2016, without
21  getting -- for the attorneys in your office, without
22  compromising attorney-client privilege, can you
23  think of a time when the representation of a client
24  by an attorney in your office was hampered by a lack
25  of time to investigate a case?

ALARIS LITIGATION SERVICES
www.alaris.us    Phone: 1.800.280.3376    Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-2   Filed 02/21/18   Page 47 of 107

1     A.  I'm confident that it happened.  I
2  couldn't -- I mean, as I'm sitting here now, I
3  couldn't think of a case, even in my mind, without
4  speaking the name, which -- but, yes.  Understanding
5  the caseload we were carrying in 2016, yes.
6     Q.  Okay.  In your opinion, do you have the
7  time and resources to obtain and review discovery in
8  the manner each case requires?
9     A.  No.
10    Q.  In 2016, for the attorneys in your office,
11 did they have the time and resources to obtain and
12 review discovery in the manner each case requires?
13    A.  No.
14    Q.  Speaking of your caseload, can you,
15 without getting into specifics, think of a time when
16 your representation of a client was hampered by a
17 lack of time to obtain and review discovery?
18    A.  Yes.
19    Q.  In your opinion, do you have the time and
20 resources to consult with experts in the manner each
21 case requires?
22    A.  No.
23    Q.  In 2016, speaking of the attorneys in your
24 office, did they have the time and resources to
25 consult with experts in the manner each case

1     A.  No.
2     Q.  In your opinion, speaking about 2016,
3  before the caseload controls, did the attorneys in
4  your office have the time and resources to
5  adequately prepare for trial?
6     A.  No.
7     Q.  Okay.  In your opinion, do you have the
8  time and resources to adequately negotiate plea
9  deals and counsel your clients on whether or not to
10 accept a plea deal?
11    A.  No.
12    Q.  In your opinion, speaking about 2016, did
13 the attorneys in your office have the time and
14 resources to negotiate plea deals and counsel your
15 clients on whether or not to accept a plea deal?
16    A.  No.
17    Q.  Without getting into specifics, can you
18 think of a time when you could have gotten your
19 client a better plea deal with more time and
20 appropriate resources?
21    A.  Yes.
22    Q.  In your opinion, do you have the time and
23 resources to adequately advise your clients on the
24 immigration consequences of the decisions they make
25 about their criminal cases?

1  requires?
2     A.  No.
3     Q.  Without getting into specifics, and you
4  mentioned one already, can you think of a time when
5  your representation of a client was hampered by a
6  lack of time to consult with an expert?
7     A.  Yes.
8     Q.  In your opinion, do you have the time and
9  resources to file and research pretrial motions in
10 the manner each case requires?
11    A.  No.
12    Q.  In your opinion, speaking about 2016,
13 before you instituted these caseload controls, did
14 the attorneys in your office have the time and
15 resources to research and file pretrial motions in
16 the manner each case requires?
17    A.  They did not.
18    Q.  Without getting into specifics, can you
19 think of a time when your representation of a client
20 was hampered by a lack of time to research and file
21 pretrial motions?
22    A.  No.
23    Q.  In your opinion, getting to the -- do you
24 have the time and resources to adequately prepare
25 for trial?

1     A.  I -- well, I don't feel, generally, I have
2  enough time to counsel my clients.  I'm trying to
3  think of a situation in which I felt I didn't have
4  time to discuss an immigration issue.  I'm not
5  thinking of one, but, you know, to be able to think
6  of one, I have to be aware of the issue, and to be
7  aware of the issue, I really need to talk to my
8  client.
9        And as I mentioned earlier, my client
10 contact right now is atrocious.  I've got people who
11 have been in jail for two months.  Somewhere there's
12 probably an immigration issue.  So I'm thinking out
13 loud in response to your question.
14    Q.  Understood.
15    A.  And now I've lost track of your initial
16 question.  I apologize.
17    Q.  No.  I think that -- I think you've
18 answered it.
19    A.  Okay.
20    Q.  Is it reasonable to say you very well may
21 not even be aware of an immigration consequence
22 because of your inability, due to your caseload, to
23 even contact or regularly speak with your clients?
24    A.  Correct.
25    Q.  And you mentioned Mr. Williams.  You said

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-2   Filed 02/21/18   Page 48 of 107

## Page 189

1 he had been in jail for five or six months.  Had you
2 been able to speak with him in that time?
3      A.  I had talked with him very quickly over
4 the phone a couple of times to explain the case
5 conference motion and our inability to assign him a
6 lawyer.  I certainly engaged in no substantive legal
7 representation, and, to my knowledge, nobody from
8 the office did either.
9      Q.  For at least five and, perhaps, six or
10 more months that he had been waiting for
11 representation?
12      A.  Correct.
13      Q.  Okay.  In your -- just some -- a few --
14 three or four final questions.
15           In your opinion, can the attorneys -- if
16 you had not instituted the caseload controls, could
17 the attorneys in your office adequately represent
18 all of the clients on their docket?
19      A.  No.
20      Q.  And that's true no matter how experienced
21 that lawyer might be?
22      A.  Correct.
23      Q.  In your opinion, now that you have
24 instituted the caseload controls and have 213 open
25 cases yourself, could any attorney adequately

## Page 190

1 represent clients, given the constraints you're
2 facing?
3      A.  No.  Not on these cases.  There's some
4 very serious cases in these 213.
5      Q.  And, again, that's 213 cases, in addition
6 to the numerous administrative, supervisory, hiring,
7 budgeting, training --
8      A.  Correct.
9      Q.  -- requirements that you have as the
10 district defender?
11      A.  Yes.
12      Q.  Okay.  Is there anything else you think we
13 should know regarding your ability or the ability of
14 your office to provide effective representation?
15      A.  I can't think of anything.
16      Q.  Okay.
17           MR. SCHERZER:  Thank you very much for
18 your testimony here today.  That's all I have for
19 now.
20           CROSS-EXAMINATION
21 BY MR. RAMSEY:
22      Q.  Would you like to take a break at this
23 point, or would you like to push on through?
24      A.  I'm okay.  If you ...
25      Q.  I'm okay as well.

## Page 191

1      A.  Okay.  I'll stop you if I need a break.
2      Q.  Excellent.  Please do.
3           Again, my name is Steven Alan Ramsey, and
4 I represent the state of Missouri and Governor
5 Greitens in this matter.  I will attempt not to
6 interrupt you --
7      A.  Okay.
8      Q.  -- while you are answering my questions.
9 If I do, the reason will be twofold:  One is simply
10 because I'm impatient, which I apologize for in
11 advance, but the second is because you're answering
12 a question that I did not ask.
13      A.  Okay.
14      Q.  To begin, going back to your background,
15 did you start at the Missouri State Public Defender
16 System right out of law school, or did you have a
17 job prior to joining the public defender system?
18      A.  I worked at a private firm.
19      Q.  Okay.  What firm was that?
20      A.  Mariea -- M-a-r-i-e-a -- & Sigmund --
21 S-i-g-m-u-n-d -- in Jefferson City, Missouri.
22      Q.  About how long were you there?
23      A.  One year.
24      Q.  One year.  And then did you hold any other
25 positions before that after law school?

## Page 192

1      A.  No.
2      Q.  Did you go straight from undergrad into
3 law school?
4      A.  Yes.
5      Q.  What did you study in undergrad?  What was
6 your major?
7      A.  I majored in international business with a
8 minor in Spanish.
9      Q.  Turning to your preparation -- not
10 necessarily for this deposition, but in regard to
11 the workload and the caseload concerns.  So what I'm
12 gathering is you've talked to a number of judges.
13      A.  Yes.
14      Q.  Have you spoken to organizations as well?
15      A.  So there was -- let's see.  In
16 Jefferson City there was sort of a community
17 forum -- on a completely different issue.  In the
18 context of that issue, public defender caseloads did
19 come up.  I've certainly spoken with a number of
20 different media organizations.  Those are the two
21 things that come to mind in response to your
22 question, but I -- were those responsive to what you
23 asked?
24      Q.  Yes.
25      A.  Okay.  Okay.

48 (Pages 189 to 192)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-2   Filed 02/21/18   Page 49 of 107

## Page 193

1    Q.   And I understand it's a very broad
2    question --
3        A.   Right.  Right.
4        Q.   -- being with the system for 15 years.  So
5    say in the past year or so -- a couple of years,
6    what members of the press or what press
7    organizations -- pardon me -- have you spoken to, if
8    you can recollect?
9        A.   KOMU, KRCG, the Jefferson City News
10   Tribune.  There have been a couple of different
11   student reporters majoring in journalism who were
12   affiliated with one of the major news sources, but I
13   can't remember the names of these students or the
14   media source that they were affiliated with.  I may
15   have spoken to the Lake Expo.  One of the students
16   was associated with KBIA.  I know I've talked to a
17   reporter with the Columbia Tribune, but I can't
18   remember if it was about caseloads or something
19   else.  There's an Ozark radio.  That's all I can
20   remember off of the top of my head.
21       Q.   I failed to mention this, but a number of
22   my questions will be twofold.
23       A.   Okay.
24       Q.   Not those beginning ones, but when we get
25   into more or less your role as the district

## Page 194

1    defender, one, it's in your personal experience,
2    your personal caseload, and then the second question
3    will be regarding the attorneys that you supervise
4    and the staff that you supervise.  So that
5    bifurcation will be present almost throughout the
6    course of this line of questioning.
7        A.   Okay.
8        Q.   Do you have a sense at this point in time
9    how many cases --
10       A.   I didn't mean to interrupt you.  You can
11   finish the question if you want, but I had an
12   additional thought about your earlier question.
13       Q.   Please.
14       A.   You asked me about organizations I had
15   spoken to.  The Senate interim committee, the
16   Spangenberg Group.  Very distinctly, I remember
17   meeting with them in 2009.  I don't recall if I
18   spoke with them in 2005.  I don't know if you would
19   consider -- yeah, I suppose it was an organization.
20   When RubinBrown was developing their protocol, I was
21   one of the panel members involved in that process.
22       I don't know if that was responsive to
23   your question; I'm just still trying to think of
24   other organizations.
25       Q.   It was responsive.

## Page 195

1        A.   Okay.
2        Q.   At this point in time, do you have a sense
3    for how many cases total your district has opened in
4    2017?
5        A.   Yes.  As of yesterday, I believe it was
6    1,788.
7        Q.   Do you have a sense for how many -- let me
8    rephrase.
9        Do you have a sense for the percentage of
10   criminal cases that arise in Cole, Miller, and
11   Moniteau Counties that the public defender system
12   takes in, as opposed to the private bar?
13       A.   Ballpark, probably we have about
14   80 percent of the cases, but that's a very rough
15   approximation.
16       Q.   Sure.  It could be more --
17       A.   It could be more; it could be less.
18       Q.   -- and it could be less?
19       A.   Yup.
20       Q.   Have you noticed any trends in how your
21   district defend cases?  And what I mean by that,
22   have you noticed that, say, in 2005, you would take
23   maybe two depositions versus 2017, where per case
24   you're taking, I don't know, five depositions.  Have
25   you seen an increase in depositions?

## Page 196

1        A.   I really don't know.  I would have to go
2    back and play with some numbers.  I couldn't tell
3    you off the top of my head.
4        Q.   Would your answer be the same for the
5    usage of experts?
6        A.   I couldn't tell you off the top of my
7    head.
8        Q.   Would your answer be the same for the
9    amount of plea deals that the -- you see come
10   through your office?
11       A.   It's hard to speak to that, and there are
12   a couple of reasons why:  One was is I was in a
13   different office in 2005, and -- plea deals are very
14   jurisdictional, you know?  One elected prosecutor is
15   going to decide he's going to get very tough on
16   crime; you may get more trials.  I would have a hard
17   time speaking to that.
18       Q.   And that's more than fine.  As we proceed,
19   if you simply can't answer, that's fine?
20       A.   If I think of something, I'll pause you,
21   if that's all right.
22       Q.   Sounds good.
23       A.   All right.
24       Q.   Sitting here today, how would you define a
25   case or a matter within your system?

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

Page 197

```
 1        A.   Sure.  I would define a proceeding under
 2   one case number as a case.  So, for example,
 3   Case 123, I have eight counts of wildly unrelated
 4   things all filed under one case number, I would call
 5   that one case.  If under Case No. 125, I have a
 6   probation violation -- even if the issues are going
 7   to overlap the primary case, I would count that
 8   probation violation as a second case, in large part
 9   because even if the issues overlap, the issues may
10   be slightly different, and there's going to be
11   additional court dates, additional things I need to
12   do, different legal issues, so on and so forth.
13        Q.   Would that same logic -- so let's say the
14   case is 127 --
15        A.   Yes.
16        Q.   -- and that case went from an associate
17   circuit into a circuit.  When they receive that new
18   number, would that be a separate case as well?
19        A.   I would count that as one continuous case.
20        Q.   Okay.
21        A.   The only change in the number in that
22   hypothetical would be they add the 01 on the end.
23   We would consider that the same case.
24        Q.   And would the same hold true if additional
25   files were charged onto that original case?
```

Page 198

```
 1        A.   Yes.  So say my Case No. 123, pretend I'm
 2   initially charged with stealing.  It goes to the
 3   grand jury, and the grand jury indicts me for
 4   robbery, armed criminal action, everything under the
 5   sun, and stealing all out of the same incident, I
 6   would still consider that one case.
 7        Q.   And when you're saying you would consider
 8   it, it would be considered like that in your
 9   district and in how you allocate cases as one case
10   versus another case?
11        A.   Correct.
12        Q.   Okay.  Now --
13        A.   Now, hypothetically speaking, pretend I'm
14   charged in associate court.  That case is then
15   dismissed and refiled -- or I'm charged in circuit
16   court and it's dismissed and refiled and it's
17   refiled under a new case number out of the same
18   incident, I would call that a second case.
19        Q.   Understood.  Now, as the district
20   defender, you have the task of allocating how cases
21   are distributed amongst your staff?
22        A.   Yes.
23        Q.   And you do not shift that responsibility
24   onto any other of your staff members?
25        A.   Well, I give my -- the staff that assigns
```

Page 199

```
 1   the case I give her my directions, in terms of how I
 2   want her to do it.  She manually does it, kind of
 3   within the parameters that I have given her.
 4        Q.   And would that be your office assistant or
 5   would that be one of your legal assistants?
 6        A.   That would be one of the legal assistants.
 7        Q.   And are those directions written down
 8   anywhere?  I know you testified earlier as to
 9   geographic location playing a large role.
10        A.   Uh-huh.
11        Q.   Are there any other, I guess,
12   considerations that go into which cases are assigned
13   where?  I know you mentioned, as well, that your
14   least experienced attorney has about 70.  So I
15   imagine experience plays into that role as well.
16        A.   Yes.
17        Q.   What other factors, if any?
18        A.   You know, certainly, the case type.  The
19   lawyer that's been practicing law for 29 days, I
20   would not assign him a murder, rape, robbery,
21   kidnapping, complex case with DNA or -- you know,
22   something along those lines.  So, you know, there's
23   that kind of component to the thing, how much
24   experience does the lawyer have as compared to the
25   case?  For example, in Cole County, we've got a
```

Page 200

```
 1   couple of lawyers who have got, you know, two or
 2   three years under their belt in experience.  As far
 3   as I'm concerned, for the more serious cases, those
 4   are going to be the lawyers that I'm going to look
 5   to, as compared to the lawyer that's been practicing
 6   for six months.  For that kind of core group of the
 7   three more experienced lawyers, you know, we try to
 8   assign the bigger cases roughly equitably so that we
 9   don't have one lawyer with all of the murder cases,
10   for example.
11             Was that responsive?
12        Q.   It was.
13        A.   Okay.  Thank you.
14        Q.   Are there any policies or procedures,
15   aside from your instructions to this legal assistant
16   to inform your district how cases are distributed,
17   or is it simply your directions to that legal
18   assistant that would do that?  So said another way,
19   are there any actual policies and procedures just
20   flat out?
21        A.   Like, written down on a piece of paper?
22        Q.   Uh-huh.
23        A.   Typically, it's a -- me walking over to
24   her and saying, Hey, let's do this different or
25   something like that.
```

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-2   Filed 02/21/18   Page 51 of 107

## Page 201

1      Q.   Sure.  Just curious, are any public
2  defenders within your district, including yourself,
3  ever on a 24/7-hour duty, if you will?
4      A.   In terms of getting phone calls from
5  courts or judges come to the court in the middle of
6  the night, we need to arraign somebody --
7      Q.   Never heard of that, but --
8      A.   Okay.
9      Q.   Sure.
10     A.   Okay.
11     Q.   Along with that hypothetical, is there
12  anyone assigned for 24/7-hour-type duty or
13  responsibilities?
14     A.   No.  And I -- no.  And, you know, like in
15  my jurisdiction, we don't have nighttime, weekend
16  arrangements.  I've heard that's a thing, like, in
17  big cities.  I don't know.  I mean, if something
18  came up in the middle of the night, I assume it
19  would be me that dealt with it.
20     Q.   Referring to the standard operating
21  procedure, if you will, that was referenced before,
22  I thought I heard there was no such thing as a
23  standard operating procedure at the district level
24  but there was -- or that there are general policies
25  at the statewide level.  Was that your testimony?

## Page 202

1      A.   For my district?
2      Q.   For your district, yes.
3      A.   I don't -- now, I can't speak to other
4  offices.  My understanding is that some may have
5  some formal policies of some kind or another.  In my
6  district, we don't have any formal written policies,
7  procedures, things.
8      Q.   Turning a bit to your district's
9  determination of indigence.
10     A.   Yes.
11     Q.   Who makes that determination in your
12  office?  Is it your legal assistants or every single
13  attorney?
14     A.   Right now it's the legal assistant, and
15  that's sort of changed over time.
16     Q.   You mentioned the change in your screening
17  procedure --
18     A.   Correct.
19     Q.   -- from, I guess, what it was before to
20  what it is now.
21     A.   Correct.
22     Q.   Would you describe what it was like
23  before --
24     A.   Yes.
25     Q.   -- and then also describe the transition

## Page 203

1  you made and what it's like now.
2      A.   Yes.  My -- and this is me sort of
3  paraphrasing or -- but my -- as I understand, my
4  predecessor took the approach of, if you're asking
5  for a public defender, you probably need one; so
6  you're probably going to qualify.  And, you know,
7  when I took over the office at the end of 2014 --
8  you know, when I looked at the written pieces of
9  paper, the application for public defender services,
10  you know, I'd look at the things and I'd see -- it
11  looked to me like it might be incomplete, or we
12  would have information indicating that the client
13  had posted a significant bond or several significant
14  bonds or that they'd had a really expensive private
15  lawyer on another case or something of that kind.
16  And I felt like we were entering on cases that --
17  where the applicant was outside of the guidelines
18  that we're required to follow under the code of
19  state regulations.
20         And so one of the things I did when I took
21  over that office was totally altered
22  administratively the process that we go through when
23  we receive an application for public defender
24  services, and we sort of changed who does the
25  screening over time.  You know, at the time, it was

## Page 204

1  the office support assistant -- she's actually not
2  with us anymore -- and then for a while, it was some
3  of the lawyers, and now it's all centralized into
4  the legal assistant.  Now -- you know, what we're
5  doing is trying to be much more conservative in
6  approving applications for public defender services
7  to the extent humanly possible.  We try and do some
8  due diligence, such as by checking in Case.net
9  before we enter to see if, in fact, the fancy-pants
10  private lawyer had been in on this case or a big,
11  ginormous bond had been posted.  That's something we
12  would rather know ahead of time, you know, than find
13  out after we enter.  And it may be that there's some
14  sort of innocent explanation behind the thing.
15         You know, I've got one client back in the
16  day that went to high school with the bondsman.
17  Well, I mean, he paid him, like, next to nothing on
18  a really big bond.  Okay.  I understand that the
19  money he paid to the bondsman wasn't going to be
20  enough to hire a lawyer.  Generally, though, that's
21  not the case.  And one of the things that we're
22  required to look at is the accused's ability to post
23  a bond.  That is a consideration in determining
24  indigence.
25     Q.   So presently that diligence is on the

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 205

1  shoulders of your legal assistants, the two that you
2  have?
3        A.   Correct.  And -- you know, it's kind of
4  one of those things with -- sort of the expectation
5  is, if the lawyer receives information that would be
6  relevant.  You know, like there are times when I'm
7  in court and I hear something that is relevant, and
8  I'll throw that on the face of the application so
9  that that gets communicated back to the legal
10  assistant.  But, generally, by and large, an
11  overwhelming bulk of the cases, the due diligence is
12  being done by the legal assistants.
13        Q.   Sitting here today in your district, do
14  you have a sense for how often applications for
15  public defender services are denied?
16        A.   I don't know off the top of my head.
17  Certainly, they're denied at a much higher rate now
18  than they were in 2014.
19        Q.   So if I understand your testimony
20  correctly, caseloads and workloads have always been
21  high since you've been with the public defender
22  system?
23        A.   Yes.  And they've fluctuated.  Some points
24  higher than others, but, yes.
25        Q.   And -- go ahead.

## Page 206

1        A.   I was going to say, with one exception, if
2  you don't mind.  There was a period of time in 2012
3  where one of the administrative rules was in effect,
4  and courts were fine with it.  And so there was, I
5  want to say, six months where our caseloads were all
6  controlled -- everybody in the office.  And I
7  finally got to that point -- you know, kind of at
8  the tail end of that six-month window where -- Oh,
9  my God, I can see the light of day, I can actually
10  work on all of my cases, not just throw a stack of
11  them in the file drawer.  And then very quickly that
12  whole regime kind of fell apart and caseloads when
13  through the roof again.
14             When I look back at my time in the public
15  defender's office, you know, the tail end of that
16  six-month period when we had a caseload control
17  environment, that was like the one time when I felt
18  like everybody was -- everybody was able to do
19  everything.
20        Q.   Do you have a sense for how many cases you
21  had on your docket, if you will, at that point in
22  time?
23        A.   Oh, I couldn't tell you off the top of my
24  head now.  Sorry.  It's been a few years.  Sorry.
25        Q.   No worries.

## Page 207

1             And you were a district defender in the
2  Fulton office before coming down to Jefferson City?
3        A.   Correct.
4        Q.   While you've been in the Jefferson City
5  office, if you will, what have you done, as far as
6  additional trainings -- and you already mentioned
7  that there are no real formal policies that you've
8  kind of, I guess, promulgated, for lack of a better
9  word.  Have you established any type of trainings at
10  the local level in your district to deal with
11  workload and caseload concerns?
12        A.   Well, in terms of training for workload
13  and caseload concerns, you know, right now, we're
14  trying to manage all of the lawyers caseloads.  I
15  mean, so, really, the training that consists of sort
16  of them seeing the bigger picture, but, you know,
17  kind of the theory behind this process that I've
18  come up with is, this should remove the individual
19  lawyers from being assigned 200 or more cases
20  simultaneously.  At least for the assistant public
21  defenders, it has; it's just been me that has taken
22  a pinch, so ...
23        Q.   Speaking of, what is the threshold for the
24  attorneys that you supervise, in terms of they are
25  working at a reasonable level -- I think you said --

## Page 208

1  according the RubinBrown study, is that 80 cases or
2  is that 100 cases, or at what level do you prevent
3  them from receiving more cases?
4        A.   Well -- so how many cases they can get
5  sort of depends on the complexity of the case
6  because a driving on a suspended misdemeanor case is
7  not as complicated as a murder case, for example.
8  And -- you know, and if you get down, like, into the
9  weeds of, like, the RubinBrown metric, you'll see
10  that, and it's sort of expanded.  You know, sex
11  cases are more complicated than drug cases, which
12  are less complicated than regular run-of-the-mill
13  felony cases.  And so -- you know, like I've
14  mentioned, you know, what we're doing is at the
15  start of every month, assigning out that lawyer as
16  many cases as we think they can possibly take.  How
17  many that is is going to vary, depending on the case
18  type.  Like, for example, if you take -- and my math
19  is a little bit shaky, so don't hold me to specific
20  numbers, but the RubinBrown metric is based on 2080
21  hours a year -- 40 hours a week for 52 weeks of the
22  year.  If you divide that by 12, you get about,
23  what, 170-something, 180-something hours.  If I were
24  to assign a lawyer a murder case, that's going to
25  put them at or slightly above that RubinBrown

52 (Pages 205 to 208)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-2   Filed 02/21/18   Page 53 of 107

## Page 209

1    metric.
2         On the other hand, if I give them -- and,
3    again, my math is a little bit -- don't hold me to
4    the specific numbers.  Potentially, I could give
5    them 27 misdemeanor traffic cases, which -- this is
6    a really long way of saying the number of cases they
7    may get is going to vary depending on the complexity
8    of the thing, and so there's not a hard and fast,
9    I'm going to cut you off at 70 cases --
10        Q.  Sure.  It depends.
11        A.  Because it depends.  And I apologize.
12   That was probably a longer explanation than you
13   needed.
14        Q.  No worries.  So the -- I'll ask the same
15   question a different way.
16        A.  Okay.
17        Q.  The lawyer with the least experience
18   currently has around 70 cases?
19        A.  Correct.
20        Q.  Do you have a sense for the average or the
21   most aside from yourself?
22        A.  The most aside from myself as of yesterday
23   was 127.  The average is, I'm going to say, about 80
24   or 90ish.  And I didn't, like, you know, actually
25   sit down and average that out before answering that

## Page 210

1    question, but that's -- I'm trying to give you a
2    ballpark.
3         Q.  Now, with the references to the RubinBrown
4    report and with your participation in the RubinBrown
5    report, you have a background in business?
6         A.  Yes.
7         Q.  And you are an attorney?
8         A.  Yes.
9         Q.  Do you have any independent experience or
10   expertise as a statistician?
11        A.  I took a stats class in college --
12        Q.  So you know what standard deviation is,
13   but that's --
14        A.  It's been -- don't even ask me to describe
15   that right now, sir.
16        I have not taken any follow-up stats
17   classes since college, and I do not wish to take
18   additional stats classes now.
19        Q.  So to be clear, you do not have any
20   prior --
21        A.  Correct.
22        Q.  Okay.
23        A.  And I would not consider myself an expert
24   in statistics based on one stats class 20 years ago.
25        Q.  Now, the conversations concerning the -- I

## Page 211

1    believe you testified that five attorneys have left
2    your office this year.
3         A.  Yes.
4         Q.  Within 2017?
5         A.  Yes.
6         Q.  And two of them had children?
7         A.  Yes.
8         Q.  And they transferred to different offices?
9         A.  Yes.
10        Q.  One of them retired?
11        A.  Yes.
12        Q.  And then the other two, they moved --
13   well, I guess, one moved into private practice?
14        A.  Yes.
15        Q.  And the other also moved into private
16   practice?  What did that fifth person --
17        A.  Went to the attorney general's office.
18        Q.  Went to the attorney general's office.
19        Have you ever been refused a deposition
20   that you have requested personally while you've been
21   with the Missouri public defender system?
22        A.  No.  I've been told I needed to better
23   justify why I wanted to the deposition, but then
24   when I did, I was authorized to take it.
25        Q.  And have you ever denied -- ultimately

## Page 212

1    denied a request from an attorney you supervised to
2    take a deposition?
3         A.  If I can walk that back -- I take that
4    back.  There were instances in which before
5    Ellen Blau -- I've had a number of supervisors over
6    the years.  One of my supervisors was
7    Peter Sterling.  As I'm sitting here thinking about
8    it, there were some times in which he -- so there
9    was a deposition request that I had made.  He
10   contacted me and said, You know, can't your
11   investigator do this?  Well, my answer was, I think
12   my investigator could do this, but the context of
13   the thing with what I'm trying to do in the case, I
14   think what would be more effective would be a
15   deposition, and his response was, Look, if your
16   investigator can do it, then your investigator needs
17   to go do it.  And sort of for a period of time in
18   his tenure, up until he retired, sort of what he
19   kind of told everybody was, Look, from here on out,
20   if you want a deposition, it better be because your
21   investigator cannot do it.  And there could be a
22   variety of reasons why your investigator might not
23   be able to do it.  Some witnesses simply refuse to
24   talk to us voluntarily, and the only way that we can
25   talk to them is if we subpoena them to a deposition.

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-2   Filed 02/21/18   Page 54 of 107

## Page 213

1  Other times there are just situations that really do
2  not hold themself well to a deposition.
3  Interviewing a six-year-old on a child sex case by
4  the investigator without the lawyer present -- in my
5  opinion, the better practice would be for the lawyer
6  to take a deposition if they need to interview the
7  youth.
8      Q.   And have any of those times been
9  specifically because there were not funds to fund
10  the deposition, or, at least, was that ever a reason
11  given?
12      A.   That was never given to me as a reason,
13  like, as in, We don't have money for this right now.
14  What was given to me was a, We need to conserve the
15  few dollars that we have, which is a slightly
16  different concern.
17      Q.   Are there any policies or procedures that
18  you have in your district or that you are aware of
19  within the system that you've utilized to limit the
20  total amount of dollars available for any particular
21  deposition?  Said in a succinct way, are there any
22  limiting factors in terms of how many dollars can be
23  spent on a particular deposition?
24      A.   In terms of, like, a formal policy?
25      Q.   Yes.

## Page 214

1      A.   Okay.  I'm not aware of any rule that says
2  you cannot spend more than, you know, $5,000 for
3  depositions on a felony case, for example.  The --
4  you know, when I request money from my supervisor
5  for authorization to extend funds for depositions,
6  you know, I've got to list the witnesses that I wish
7  to depose, why I wish to depose them, and then
8  provide kind of a cost estimate based on what I
9  think the length of the depositions to be.  And so,
10  like, each -- I've got to justify the ultimate
11  dollar amount that I've asked for.  But to my
12  knowledge, there's not necessarily, like, a cap on
13  what that dollar amount might be.
14      Was that responsive?
15      Q.   It was.
16      A.   Okay.
17      Q.   And forgive me if you've already answered
18  this question --
19      A.   Okay.
20      Q.   I'm a little bit confused whether or not
21  we've answered this question or not --
22      A.   Okay.
23      Q.   -- but have you ever denied an attorney
24  that you supervise funds for a deposition?
25      A.   I suspect that I probably have at some

## Page 215

1  point in time, but I -- as I'm sitting here now, I
2  certainly could not cite to you a case or the
3  rationale.  I -- it would be -- probably, it
4  would -- it would have been a very rare instance.
5      Q.   Do you have a sense for how many of the
6  depositions that you have taken or any of the
7  attorneys that you supervise have taken that have
8  been out of state?
9      A.   Can I answer the first part?
10      Q.   Sure.
11      A.   Okay.  In my 15 years, I can think of a
12  case that caused me to go to Florida for
13  depositions.  I can think of -- and it was a child
14  witness on a child sex allegation, so, like, a phone
15  deposition I didn't think would work well.  I can
16  think of another case where I went to Arkansas and
17  Colorado for depositions.  The Colorado deposition,
18  likewise, an alleged victim of a child sex offense
19  or a -- or something of that kind.  In terms of me
20  personally going out of state for depositions, those
21  are the only two times I can think of.
22      The other part of your question was
23  lawyers in my office, so let me kind of wrap my head
24  around that for a second, if I can, please.  I know
25  one of my lawyers recently went to Texas for a

## Page 216

1  deposition.  On another case, Wisconsin or
2  Michigan -- some place north and some place cold --
3  and those are the only ones I can think of off of
4  the top of my head.
5      Q.   And with those, is there -- is the
6  procedure similar, or are there some different
7  procedures for how one goes about getting an
8  out-of-state deposition approved?
9      A.   For me, my procedure is, the lawyer better
10  have a really good reason to spend the time and the
11  money.  That's not a formal written policy, but
12  that's a -- but that's a -- you better really want
13  it.  And so, typically, what it would involve is me
14  talking to the lawyer beforehand and having them
15  justify it to me before I click the button that says
16  approved.
17      Q.   How about funds for experts?  Have you
18  ever been personally denied a request to utilize
19  expert testimony or consult an expert at your time
20  at the Missouri State Public Defender System?
21      A.   I can't think of a situation in which I
22  had been -- in which I had -- in which it had been
23  told to me, Look, no, that's totally off limits.
24  There have been times where I've been told, No, you
25  need to find a cheaper expert or someone closer so

54 (Pages 213 to 216)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-2   Filed 02/21/18   Page 55 of 107

## Page 217

1  there's less travel, or instead of paying someone to
2  do this computer forensic stuff, how about we have
3  our IT department look at it?  But, generally, one
4  way or the other, I was able to get whatever
5  information needed -- I cannot think of a situation
6  in which there was an outright refusal.
7      Q.  Can you think of a situation where you as
8  a supervisor denied a request for expert testimony
9  from an employee that you supervised?
10     A.  I cannot think of such a situation.
11     Q.  Are there any written policies or
12 procedures governing how much money can be spent
13 upon a particular expert, or is it all
14 discretionary?
15     A.  There is -- I don't know if it's written
16 down anywhere or not.  It may be in a e-mail or it
17 may be -- I don't know if it's a policy or
18 something.  I don't know.  But there's a preference
19 for if you take two experts of comparable quality,
20 pick the cheaper one.  You know, likewise, for
21 example, in the deposition context, the expectation
22 is that we use the state contract to go with the low
23 cost provider.
24       And now I've forgotten your initial
25 question.  I'm sorry, sir.

## Page 218

1      Q.  No worries.  I think I forgot my initial
2  question as well.
3        Well, the initial question was if you had
4  ever denied expert testimony -- the funds for expert
5  testimony to an attorney that you supervise, I
6  think, was along the lines.
7      A.  I don't think -- I cannot think of a time
8  in which I had.  Oh, and then I think you asked me
9  about policy.
10     Q.  Oh.  Whether there was any policy or
11 procedure limiting how much may be spent on a
12 particular expert.
13     A.  Correct.
14     Q.  Yeah.
15     A.  I'm not aware of a policy saying X is the
16 cutoff.
17     Q.  Sure.
18     A.  But sort of, again, the expectation is
19 that we go with the cheapest -- with the experience
20 and expertise necessary.
21     Q.  Turning to trial --
22     A.  Yes.
23     Q.  -- generally, for a second.  Do you have a
24 sense of how many trials your district tried to
25 completion, if you will, within the past calendar

## Page 219

1  year or so?
2      A.  I'd have to look at some numbers.  So let
3  me -- I'd have to give you a wild ballpark.
4      Q.  A wild ballpark is fine.
5      A.  About ten, give or take.  And it sort of
6  fluctuated over time.  In years past, sometimes we
7  try more, sometimes we try less; it just -- it tends
8  to -- for the last 12 months, ten is a reasonable
9  guess.
10     Q.  And when there is a trial, is it -- if
11 there are no policies or procedures, is it the
12 custom of your district to send multiple assistant
13 public defenders to that trial?  Said another way,
14 do you send a number of second chairs or third
15 chairs, or how do you go about assigning coverage
16 for trials?
17     A.  There will be a second chair.  Sometimes
18 it's an active second chair that -- and I'm talking
19 jury trials; I'm not talking bench trials.  On a
20 jury trial, there will be a second chair.  Sometimes
21 it's an active second chair who takes parts of the
22 cases.  You know, I'm going to cross these
23 witnesses, I'll direct this witness, I'll do
24 closing, you do open -- you know, something along
25 those lines.  Other times it's a passive second

## Page 220

1  chair whose basic role is to take notes, be a
2  gopher, you know, sometimes serve as a buffer
3  between the client and the lawyer trying the case,
4  just kind of depends.  There is never any sort of --
5  right now there is not any sort of third chair
6  unless there's, like, an unpaid intern, so -- trying
7  to get some experience or something like that.  But,
8  usually -- you know, frankly, in the Cole County
9  courthouse, the courtrooms are set up so there's not
10 room for that extra person at the table anyway,
11 so ...
12       Long answer to a short question.  I
13 apologize.
14     Q.  No worries.
15     A.  There's always going to be some sort of
16 second chair.
17     Q.  Turning to plea deals.
18     A.  Yes.
19     Q.  What is the earliest in your district an
20 assistant public defender can counsel their client
21 to accept a plea deal?
22     A.  I have no hard rule on that, and so -- you
23 know, hypothetically speaking, the lawyer can plead
24 the client as quickly as the client wants that to
25 happen, provided that the lawyer has done what due

55 (Pages 217 to 220)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-2   Filed 02/21/18   Page 56 of 107

## Page 221

1  diligence is reasonable in the context of the case.
2  You know, so -- I mean, hypothetically speaking, in
3  terms of my policies and my expectation, if a lawyer
4  gets in on a case on Monday, has full discovery on
5  Tuesday, meets with the client in jail on Tuesday or
6  at the office on Tuesday, does whatever works needs
7  to happen, and the client is adamant that may want
8  to plead guilty in the near future, as long as the
9  lawyer has met with the client, done what the lawyer
10  needs to do, in terms of case preparation, or if the
11  client says, Look, we've talked about doing XYZ,
12  123, I don't want you to do XYZ, 123, I want to go
13  ahead and do this today.  You know, I'm not going to
14  criticize the lawyer, provided that the client is
15  fully counseled, sort of, as to the consequences of
16  the thing.
17          At some point when you get to a segue, if
18  I could take a break, that would be great.
19          MR. RAMSEY:  Let's go off the record.
20          THE WITNESS:  Okay.
21          VIDEOGRAPHER:  The time is 3:35 p.m., and
22  we're off the record.
23          (A recess was taken.)
24          VIDEOGRAPHER:  The time is 3:45 p.m., and
25  we're back on the record.

## Page 222

1          Q.  (By Mr. Ramsey)  Turning to probation
2  revocation proceedings.  I believe the RubinBrown
3  report gives some amount of time that it thinks is
4  necessary to complete those.  I don't know if it's
5  nine hours or however many hours there are.  In your
6  experience, what needs to happen, specifically, to
7  adequately prepare for a probation revocation
8  hearing?
9          A.  The lawyer needs to review not just
10  incident probation violation reports but other
11  historical probation violation reports.  If there's
12  a sentencing assessment report, the lawyer needs to
13  review that as well.  In addition -- and have copies
14  and be familiar with the things.  In addition, the
15  lawyer needs to meet with the client.  In my office,
16  there's an intake form that we expect every lawyer
17  to complete with every client, ask basic questions
18  about their personal situation, about their legal
19  situation, citizenship status, alcohol drug issues,
20  physical mental health issues, things of that kind.
21  And that is rock bottom, bare minimum, but depending
22  on the issues that exist with regard to the
23  probation violation, how it is the client is alleged
24  to have violated probation and what the issues are
25  in the client's sort of personal life and their

## Page 223

1  legal situation.  Invariably, there's going to be
2  follow-up activity that should happen, and what that
3  follow-up activity is going to be is just going to
4  vary dramatically depending on, you know, are we
5  talking about a probation violation where the
6  allegation is that the client failed to pay, you
7  know, restitution or is it a -- the client has been
8  kicked out of treatment or is it going to be, you
9  know, some other violation.  There may be witnesses
10  that may need to be interviewed.  There is --
11  certainly, the bond should be addressed as quickly
12  as humanly possible, you know, and kind of -- those
13  strike me as sort of, like, the bare minimum.  What
14  exists beyond that would just depend on the nature
15  of the case and the client situation.
16          Q.  Turning to timekeeping, I understood your
17  testimony to be that at one point in time -- at
18  least one point in time, there was a period where
19  you and your district that you were working in were
20  tracking time by five-minute increments or by task,
21  if you will.  When was the last time you can
22  remember keeping track of time like that?
23          A.  At some point when I was in the Area 19
24  office.  We were tracking time when I came to that
25  office.  At some point in my tenure there, we

## Page 224

1  stopped.  It would have been, if memory serves,
2  before January 1, 2017, but when between January 1,
3  2017 and September 2014, somewhere in there.
4          Q.  And when you were tracking time -- well,
5  strike that.
6          Currently, is the extent of your
7  timekeeping tracking, if you will, the I work ten
8  hours per day or I work 12 hours per day?
9          A.  Yes.
10          Q.  At any point during the actual tracking of
11  time in the five-minute increments was there ever a
12  person assigned to manage or oversee that
13  timekeeping process?
14          A.  The district defender in each office.
15          Q.  And so to the extent that you were tasked
16  with maintaining or overseeing that task, were you
17  ever provided any additional training in
18  timekeeping?
19          A.  Yes.
20          Q.  Where did that training come from?
21          A.  It -- there was -- and I -- I can't recall
22  if it was in the first time that we time logged or
23  the second time that we time logged, but somewhere
24  in there -- it was at our annual management meeting,
25  there was a presentation on that topic.  There may

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-2   Filed 02/21/18   Page 57 of 107

## Page 225

1   have been additional presentations on that topic.
2   In addition, there is a database -- we call it the
3   MSPD help database.  It provides instructions on how
4   to do a million and one different things, open a
5   case, close a case, but there was also a number of
6   tutorials on how to do time logging.
7      Q.  Switching gears a bit, when you were
8   testifying concerning the nonsupport matters,
9   whether it's being held in contempt or was a
10   misdemeanor or -- I don't know if you mentioned that
11   it could also be a felony, but in that scheme of
12   conversation and testimony, I believe you testified
13   that the judge had ultimately said that she was
14   going to stop appointing your district to represent
15   in those matters.  Am I understanding that
16   correctly?
17      A.  Judge Joyce told us we are not to be
18   entering on criminal nonsupport cases anymore until
19   such time as our caseload situation resolves.
20      Q.  Could you help me understand, I guess, the
21   difference between you all -- someone applying to
22   your office independently, being directed to by the
23   court, and the court directing you not to accept any
24   particular type of case?  I'm trying to understand,
25   I guess, perhaps, your understanding of the judge's

## Page 226

1   power to tell you and your district not to accept
2   those cases.
3      A.  So under the Waters decision, the trial
4   courts have sort of inherit authority to control or
5   manage my caseload in a way that I cannot, and so
6   when Judge Joyce told me, Hey, you know, you guys
7   don't take any more criminal nonsupport cases until
8   all of this gets fixed, I sort of took that to be
9   the judge -- you know, she didn't specify the Waters
10   name, but I kind of took that to be her exercising
11   her inherent authority to tell me to stay out of
12   that class of cases.
13      Q.  And sitting here today, is it your
14   understanding that if someone applied that was in
15   that realm of cases and you accepted that, that
16   would be going against that order or that directive
17   from the judge?
18      A.  Correct.
19      Q.  Okay.
20      A.  What we would do is we would file a denial
21   for public defender services saying we've been told
22   not to take criminal nonsupport cases.
23      Q.  I'm going to start jumping all over the
24   place a little bit, and I apologize for that.
25      Concerning the caseloads, specifically,

## Page 227

1   the cases that have been continued for one reason or
2   another for years on end, do you have a custom --
3   and I presume -- I'm starting to assume that there's
4   not a policy or procedure, but do you have some type
5   of a custom of first-in, first-out or some way to
6   get the cases that have been on your dockets longer
7   out the door faster?
8      A.  I don't have a policy in that regard.  I
9   mean, you know, generally, the longer the case is on
10   the judge's docket, the more the judge is going to
11   push to resolve that case.
12      Q.  Is it your understanding that you were the
13   first -- you were either the first or one of the
14   first district defenders to start exercising control
15   or asking for different mechanisms to control your
16   caseload and workload well before the Hinkebein
17   decision, in terms of -- I think you had mentioned
18   it was January 1 of this year that you started
19   really, I guess, pushing the envelope, so to speak.
20      A.  Yes.
21      Q.  And in your decision to do so, why did you
22   decide to proceed as you did, as opposed to -- I
23   don't know what the other district defenders were
24   doing, and I'm not asking you to testify on their
25   behalf, but what led you to act, I guess, is my

## Page 228

1   question.
2      A.  Well, I mean, essentially, what -- sort of
3   the things that I articulated earlier --
4      Q.  As in your attorneys coming to you in a
5   conservative effort?
6      A.  That was the immediate spark.
7      Q.  Uh-huh.
8      A.  Also, I had done everything
9   administratively I could think of to make our office
10   more efficient.  And, sort of, in a number of
11   different ways, I had hit my boss up for money a
12   couple of different times, a couple of different
13   ways, and she told me pretty clearly that the well
14   was dry, and we had been, you know, sort of -- there
15   was that September 2016 meeting where, basically,
16   senior management said, Hey, we're now shifting
17   gears, and we're going to allow the local offices to
18   kind of chart your own course, and then all of my
19   lawyers came to me and said, You better find a
20   different course.  So there was kind of a confluence
21   of things.
22      Q.  Is it fair to characterize your testimony
23   as after you started to work with the criminal
24   justice system, whether that be the judges or the
25   prosecutors, that you saw marked improvement in that

ALARIS LITIGATION SERVICES
www.alaris.us     Phone: 1.800.280.3376     Fax: 314.644.1334

Page 229

1  time, in terms of caseload and workload concerns,
2  whether that was from January 1 up until the
3  Hinkebein decision -- or whatever span we're talking
4  about.  Is that fair to characterize that while you
5  were working together with the system, your caseload
6  improved?
7      A.  I don't know that I would characterize it
8  that way.  If you go from 2014 to December 29, 2016,
9  you know, the things that I was doing -- I was
10  asking for help, you know, routinely from the
11  judges, but, you know, as you can see from the
12  e-mail thread, you know, the help was, frankly, very
13  small.  Well, the statute changed so, I won't put
14  you in this small case type anymore.  You know,
15  really, most of the things that I was doing between
16  2014 and 2016 was trying to run my ship as
17  efficiently and cleanly as possible.  And when it
18  was clear that I couldn't, you know, make it any
19  leaner, more efficient, couldn't be any stricter on
20  applications, that was sort of when I told the
21  courts, Hey, look, this is what we've got to do.
22      Q.  Turning generally to the Chapter 600.063
23  conferences and the motions that you filed, did you
24  receive broad authority to file those motions
25  whenever you felt you had to, or have you asked for

Page 230

1  permission from upper management every time you were
2  going to file one of those motions?
3      A.  I had received authority, and then the
4  content of the conversation, I understood that to
5  be, pursue it as you need to.  I did not understand
6  it to be, But call me every time before you file an
7  individual motion.  I'm pretty sure my boss doesn't
8  want that.
9      Q.  Would you turn with me to Exhibit 21 on
10  Plaintiff's Exhibit 21.
11      A.  Certainly.  Yes.
12      Q.  Now, the various typos and other issues
13  have been noted in this document previously.  Is
14  that your understand that from earlier testimony?
15      A.  Yes.
16      Q.  So you've never seen a document that quite
17  looks like this --
18      A.  I would have --
19      Q.  -- in terms of -- well, you've never seen
20  this exact document with the typos noted.
21      A.  I would have seen it in a format that did
22  not have the typos or the formatting issues or
23  whatever you call them.
24      Q.  And with that, you were referred to this
25  last page, Bates stamp 38976, I believe; is that

Page 231

1  correct?
2      A.  Yes.
3      Q.  And so on there, could you tell me how
4  cases initiated or defined on that graph?
5      A.  Yes.  When -- in any case management
6  software, when staff goes through to
7  administratively click the buttons to create a case
8  and open it, that, then, as I understand, will -- it
9  is sort of what triggers that case is initiated.
10      Q.  Two steps back.  Did you have any hand in
11  creating this particular graph?
12      A.  No.
13      Q.  And are you familiar with any of the, for
14  lack of a better word, metadata that's underlying
15  the graph, if you will?
16      A.  You lost me, I apologize.
17      Q.  Are you -- do you understand, I guess, all
18  of the various components of this graph?
19      A.  I don't understand -- I don't -- well --
20  it's been a while since I got down in the weeds of
21  the RubinBrown thing.  I understand some of it,
22  probably not all of it.
23      Q.  Okay.
24      MR. RAMSEY:  I think that's going to
25  conclude my line of questioning.

Page 232

1      MS. SHIPMA:  I have a few questions, Just.
2      CROSS-EXAMINATION
3  BY MS. SHIPMA:
4      Q.  I think I'll go backwards, just to make it
5  interesting.
6      Mr. Ramsey asked you about kind of the
7  numbers that you were using to determine when your
8  attorneys have a reasonable caseload, and you talked
9  about how that varied on the case type.  Are there
10  other factors that go into that determination of
11  what an individual attorney can carry as a
12  reasonable caseload?
13      A.  Their experience level as well.  You know,
14  a lawyer with 30 days of experience could not carry
15  the same caseload as a lawyer whose got eight years
16  of experience in criminal defense, all else being
17  equal.  And when I say -- that lawyer with 30 days
18  of experience would need a need a smaller caseload,
19  in terms of volume but also in complexity.
20      Q.  Do you talk to the attorneys about what
21  they feel they can ethically handle?
22      A.  Yes.
23      Q.  And do you take that into consideration
24  when you're deciding whether they're available to
25  take more cases?

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 233

1    A.  Yes.
2    Q.  You talked about there was a time in 2012
3  when there was an administrative rule in effect and
4  you felt like toward the end, sort of, the
5  six-month period, you were starting, I think you
6  said, to see the light at the end of the tunnel.  I
7  think that was maybe the --
8    A.  Yes.
9    Q.  -- phrase that you used.  What caused that
10  six-month period to end, if you know?
11    A.  What I was told was that members of the
12  legislature had communicated to our director,
13  You-all need to pull the plug on this, or we're
14  going to privatize the system.  And so -- and there
15  were a whole lot of other things that were taking
16  place at the same time.  Bob McCullough was the
17  prosecutor in St. Louis County; he was going to sue.
18  There was an audit report criticizing alliance on
19  the National Advisory Counsel standard or guideline.
20  And so as I understand, senior management kind of,
21  when faced with this sort of battery of problems,
22  decided that they were no longer going to implement
23  the administrative rule or the -- you know, the
24  caseload metric or whatever you want to call it at
25  that point in time.

## Page 234

1    Q.  Is that administrative rule still in
2  existence, if you know?
3    A.  I can't recall.
4    Q.  Okay.
5    A.  We've had a couple of them.  Some of them
6  have been struck down.
7    Q.  Let's go back to your process for
8  determining indigency?
9    A.  Yes.
10    Q.  And let's talk about prior to this year,
11  when you've been doing this different experiment
12  with the caseloads.
13        What would happen when you deny an
14  applicant's request for public defender services?
15    A.  Prior to January 1, the only reason we
16  would deny an applicant would be because it was an
17  ineligible case or they did not meet the financial
18  criteria for a public defender.  When we were going
19  to deny an applicant, there's a written denial that
20  we would file setting out the reason or reasons, as
21  the case may be.  We would mail a copy of that
22  denial to that applicant, file the denial with the
23  court, and that would be that.  If the applicant
24  chose to appeal that decision to the court,
25  certainly, they could.  Sometimes people do,

## Page 235

1  sometimes they just ask for more time to hire a
2  lawyer, other times they go pro se.
3    Q.  Did you ever find that applicants you had
4  denied became PD clients anyway?
5    A.  Yes.
6    Q.  And how would that happen?
7    A.  It could be because down the road they
8  would reapply and convince us that their situation
9  at the time of the new application was such that we
10  should be entering.  They had been working, now they
11  lost their job, for example, or if they appealed our
12  denial to the court and the court ordered us to
13  represent, then we would do so.
14    Q.  Did you ever experience a situation where
15  there wasn't an appeal but the defendant just
16  repeatedly appeared without counsel and the judge
17  would appoint us in that situation?
18    A.  Yes.
19    Q.  Is it typical for the attorneys in your
20  office to work weekends?
21    A.  It certainly happens, yes.
22    Q.  So while they may not be assigned a 24/7
23  work assignment, there is work occurring beyond the
24  normal nine to five, Monday through Friday, as far
25  as the attorneys in the public defender system go?

## Page 236

1    A.  Absolutely.
2    Q.  Would you say that happens rarely?
3    A.  Consistently, my lawyers are working
4  overtime.
5    Q.  And not really true overtime because they
6  are exempt under the Fair Labor Standards Act; is
7  that correct.
8    A.  Correct.
9    Q.  Sorry.  My labor law -- employment law
10  attorney.
11    A.  We don't pay them for the time that they
12  work in excess of the 40 hours a week that they
13  perpetually work.
14    Q.  And I believe Mr. Ramsey also asked you
15  about the number of plea deals that come through the
16  office.
17    A.  Yes.
18    Q.  Are most of the cases pled out?
19    A.  Yes.
20    Q.  So you would have almost as many plea
21  deals coming into the office as the number of cases
22  that are coming into the office; is that correct?
23    A.  Generally, in all but the rarest of cases,
24  there is a plea offer.
25    Q.  And so there would be an increase in the

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

Page 237

```
 1    number of plea deals coming into the office based on
 2    the number of the cases that are coming into the
 3    office; is that correct?
 4        A.  Right.  If our caseload rises, so would
 5    our incoming plea offers.
 6        Q.  I want to take you back to Exhibit 21 just
 7    for a moment.  And I know that you just testified
 8    that you did not participate in any way in the
 9    preparation of the chart that's shown on
10    Bates 38976, but you did testify about some of it
11    earlier, and I just want to point out -- or I just
12    want to make sure I understand one point.
13        You were talking earlier about there being
14    33 offices in the Missouri State Public Defender
15    System.
16        A.  In the trial division.
17        Q.  The trial division, that's correct.  So
18    these first lines deal with the trial division only;
19    is that correct?
20        A.  Correct.
21        Q.  There are other divisions, as well, within
22    MSPD?
23        A.  Correct.
24        Q.  And some of those are shown on here, the
25    appellant PCR division; is that correct?
```

Page 239

```
 1    have a lawyer experienced in criminal law like you,
 2    or just any old lawyer will do?
 3        A.  Can you repeat that?
 4        Q.  Yeah.  Given a reasonable caseload --
 5        A.  Okay.
 6        Q.  -- is it better for a criminal defendant
 7    to have someone who is experienced in criminal law
 8    like you, or just any old lawyer from the public
 9    service commission or the department of natural
10    resources?
11        A.  Definitely better for the accused to have
12    a lawyer who is trained in criminal law and
13    proficient, as compared to some other random lawyer
14    who doesn't know anything about it.
15        Q.  Okay.
16        MS. SHIPMA:  That's all of the questions I
17    have.
18            REDIRECT EXAMINATION
19    BY MR. SCHERZER:
20        Q.  I have just a few.
21        A.  Absolutely.
22        Q.  Do you need a break?
23        A.  No.
24        Q.  Okay.  It won't be long.
25        Just -- I'll pick up right where
```

Page 238

```
 1        A.  Correct.
 2        Q.  And I think you also mentioned earlier
 3    capital division?
 4        A.  Correct.
 5        Q.  And a CD -- Civil --
 6        A.  Commitment Defense Unit.
 7        Q.  -- Commitment Defense Unit.  Thank you.
 8    Yes.  That's another division; is that correct?
 9        A.  Yes.
10        Q.  In your opinion, have you -- has the
11    quality of representation changed for the clients of
12    your attorneys since you've implemented this
13    caseload control --
14        A.  Yes.
15        Q.  -- in 2017?
16        A.  Yes.
17        Q.  And how has that quality changed?
18        A.  My lawyers have more time to talk to the
19    clients, more time to do the legal research, to file
20    the motions, to do the depositions.  I think that
21    the quality of the legal services they are providing
22    has increased.
23        Q.  Okay.  Given an appropriate caseload, an
24    attorney with an appropriate caseload, in your
25    opinion, is it better for criminal defendants to
```

Page 240

```
 1    Ms. Shipma left off.
 2        In additional -- of course, given a
 3    reasonable caseload, would you also say -- and you
 4    said -- assuming that it's better for someone to
 5    have -- it's better for a criminal defendant to have
 6    an attorney who is experienced in criminal law, is
 7    it also better for the criminal defendant to have an
 8    attorney who works with other criminal lawyers and
 9    is supervised by someone who is experienced in
10    criminal law?
11        A.  Yes.
12        Q.  And not only experienced in criminal law
13    but also has training in criminal law?
14        A.  Yes.
15        Q.  And has someone who they -- in their
16    office, colleagues and supervisors, who they can ask
17    for advice and support based on their experience in
18    criminal law?
19        A.  Yes.
20        Q.  And if you actually had resources for
21    investigators and experts and the like, someone who
22    has access to investigators and experts and,
23    perhaps, social workers as well.
24        A.  Yes.
25        Q.  Okay.  And -- okay.  Move on from that.
```

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 160-2    Filed 02/21/18    Page 61 of 107

## Page 241

1    Is it fair to say -- so you've talked
2 about two periods where there's strict caseload
3 limits; one for this six-month period in 2012 and
4 one now -- you've sort of created this, fair to say,
5 sort of, pilot project in your office where you're
6 causing yourself to be ineffective in a -- in an
7 effort to try to save your line attorneys.
8    A.   Correct.
9    Q.   Is it fair to say, with those strict
10 caseloads limits in place, you and your attorneys
11 are or would be able to provide something at least
12 approaching effective representation for your
13 criminal defendants?
14    A.   Yes.
15    Q.   And without those caseload -- strict
16 caseload limits, as was the case for your attorneys
17 in, say, 2016 and for you in 2017, you aren't
18 able -- you and your attorneys aren't able to
19 provide that effective representation?
20    A.   Correct.
21    Q.   Okay.  You talked about 1,788 cases, is
22 that right, that you have open in your --
23    A.   Yes.
24    Q.   Okay.  That you have opened in Area 19?
25    A.   No.  That we opened thus far in calendar,

## Page 242

1 not open now.
2    Q.   Do you know how many are open now?
3    A.   About 750.
4    Q.   750.  Okay.  Just a few more questions.
5    Mr. Ramsey was asking you about
6 depositions and whether those were denied -- whether
7 those had been denied, and you talked about some
8 examples where they were.  Could one of the reasons
9 for denying a deposition -- that you were denied a
10 deposition or that your -- Ellen Blau or the other
11 supervisors in the central were denying a deposition
12 be time, as well as money?  In other words, that
13 you -- it's not necessarily the cost of the
14 deposition but time you're taking away from -- you
15 or your attorneys are taking away from other cases?
16    A.   I've never had that offered as a reason
17 for denying the deposition.  And, you know,
18 generally, my lawyers and myself self-screen that
19 out.  I mean, I don't have time to waste.  I'm not
20 going to ask for a deposition that I think is going
21 to be fruitless, and my lawyers are in the same
22 both.
23    Q.   Got it.  Okay.  That was getting to
24 exactly what I was asking.
25    A.   Okay.

## Page 243

1    Q.   You're jumping ahead, so --
2    A.   Sorry.
3    Q.   No, no, no.  That's perfect.
4    So in other words, you don't even ask for
5 depositions in many of the cases you might
6 otherwise -- you don't even -- you wouldn't
7 necessarily have to ask, but -- because you're the
8 district defender, but you don't even consider doing
9 depositions in many of the cases you would like to
10 because you don't possibly -- you couldn't possibly
11 have the time to do so; is that right?
12    A.   Agreed.  I would love to do more
13 depositions than what I'm actually doing, and I
14 think there are cases in which it would be helpful.
15 It's a time limitation, not a money limitation.
16    Q.   And is that the same -- it sounds like you
17 were saying that's the same for your line attorneys
18 as well.  There are numerous cases that they would
19 like to be doing depositions in but do not, simply
20 because they don't have the time?
21    A.   They may have more time now, but at least
22 historically, that has absolutely been a limitation.
23    Q.   And they might have time now because of
24 the strict caseload limits that you've imposed?
25    A.   Correct.

## Page 244

1    Q.   All right.  And because, of course, any
2 time spent taking -- a day spent taking a deposition
3 is an entire day away from the other 212 cases that
4 you have or the other numerous cases that
5 your line attorneys have?
6    A.   Correct.
7    Q.   And for experts, it -- is -- could part of
8 the reason that experts are used less frequently be
9 a similar reason, that it takes lots of time to find
10 the right expert, to talk to that expert, to gather
11 the resources needed to have a fruitful expert
12 report, and, thus, that's also time that would
13 ideally be available to you and your attorneys but
14 isn't, and, therefore, you don't make expert
15 requests?
16    A.   Absolutely.  And the youthfulness and
17 general inexperience of the lawyers in my office.
18 If they don't know to ask for an expert, they won't
19 ask for an expert.  And I won't know that the need
20 is there, necessarily.
21    Q.   So is it fair to say that your office
22 should be -- in an ideal world, should be taking
23 depositions in many more cases than it currently
24 does?
25    A.   I think so.  Certainly on my cases now,

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-2   Filed 02/21/18   Page 62 of 107

## Page 245

1  absolutely, yes.
2      **Q.  And also fair to say that your office**
3  **should be use experts much more frequently than it**
4  **does?**
5      A.  Yes.
6      **Q.  Okay.  I just have two more questions.**
7      **Just going back to the five people who**
8  **left your office in 2017, two for family reasons,**
9  **two quit for caseload and money reasons, and then**
10  **you mentioned one retired.  Was one -- was part of**
11  **the reason that he or she retired for the same**
12  **caseload and money reasons, or was he just retiring?**
13      A.  What he articulated to me was that he sat
14  down and did the math, and he could get paid the
15  same to work or not work, and so he said, I'll take
16  the same amount of money to not work, and, you know,
17  if I do some private stuff on the side, I'll be
18  money ahead for less work.
19      **Q.  Got it.  And did he express at that time**
20  **any frustration with the caseload or his other**
21  **recent experience with -- as a public defender at**
22  **the time he retired?**
23      A.  He did not express.
24      **Q.  Okay.  Just one last question about the**
25  **criminal nonsupport cases, those -- you estimated**

## Page 246

1  **are there about 50 criminal nonsupport cases that**
2  **might come up over the course of the year.  The**
3  **judge's decision to say that you cannot or should**
4  **not enter appearances in any of those cases, has**
5  **that significantly reduced, in any meaningful way,**
6  **your -- the caseload of your office?**
7      A.  Well, I mean, at least for my individual
8  assistant public defenders -- I mean, no, because if
9  they couldn't have taken those cases, I was not
10  going to assign them to them.  You know what I mean?
11      **Q.  Uh-huh.**
12      A.  And, you know, in the context of 1,788
13  cases a year, you know, 50 is -- frankly, it's sort
14  of a drop in the bucket, at least in terms of the
15  bigger impact, you know, kind of office wide.
16      **Q.  Especially, presumably, because the point**
17  **of these 50 is there should be 50 of the easiest,**
18  **shortest cases they have.  It's not 50 murder cases**
19  **that are being taken away or 50 A, B felony, it's --**
20      A.  Right.  You're talking about either
21  misdemeanors or probation violations or low-level
22  felonies.
23      **Q.  Not to say they're not serious, but,**
24  **presumably, that you would be spending less time on**
25  **them than you would be on a murder case.**

## Page 247

1      A.  Correct.
2      MR. SCHERZER:  And that's all of the
3  questions I have.
4      VIDEOGRAPHER:  The time is 4:21 p.m., and
5  we're off the record.
6      (The deposition concluded at 4:21 p.m.)

## Page 248

1          CERTIFICATE OF REPORTER
2
3      I, Lisa Ballalatak, a Certified Court
4  Reporter for the State of Missouri, do hereby certify
5  that the witness whose testimony appears in the
6  foregoing deposition was duly sworn by me; the
7  testimony of said witness was taken by me to the best
8  of my ability and thereafter reduced to typewriting
9  under my direction; that I am neither counsel for,
10  related to, nor employed by any of the parties to the
11  action in which this deposition was taken, and further
12  that I am not a relative or employee of any attorney
13  or counsel employed by the parties thereto, nor
14  financially or otherwise interested in the outcome of
15  the action.
16
17
18         _____
19         Lisa Ballalatak
20         Missouri Supreme Court
21         Certified Court Reporter
22
23
24
25

ALARIS LITIGATION SERVICES
www.alaris.us    Phone: 1.800.280.3376    Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-2   Filed 02/21/18   Page 63 of 107

## Page 249

1     ALARIS LITIGATION SERVICES

2     December 28, 2017

3     MS. JACQUELINE D. SHIPMA
4     MISSOURI STATE PUBLIC DEFENDER SYSTEM
      1000 W Nifong Boulevard, Suite 100
5     Columbia, Missouri 65203

6     IN RE: SHONDEL CHURCH, et al. v. STATE OF
7         MISSOURI, et al.

8     Dear Ms. Shipma,

9     Please find enclosed your copies of the deposition of
      JUSTIN CARVER taken on December 11, 2017 in the
10    above-referenced case. Also enclosed is the original
      signature page and errata sheets.
11
12    Please have the witness read your copy of the
      transcript, indicate any changes and/or corrections
13    desired on the errata sheets, and sign the signature
14    page before a notary public.
15
16    Please return the errata sheets and notarized
17    signature page within 30 days to our office at 711 N
18    11th Street, St. Louis, MO 63101 for filing.
19
20    Sincerely,
21
22
23    LISA BALLALATAK, CCR
24
25    39564

## Page 251

1     STATE OF _____)

2

3     COUNTY OF _____)

4

5     I, JUSTIN CARVER, do hereby certify:

6         That I have read the foregoing deposition;

7         That I have made such changes in form

8     and/or substance to the within deposition as might

9     be necessary to render the same true and correct;

10        That having made such changes thereon, I

11    hereby subscribe my name to the deposition.

12        I declare under penalty of perjury that the

13    foregoing is true and correct.

14        Executed this _____ day of _____,

15    20____, at _____.

16

17

18

19    _____

20    JUSTIN CARVER

21

22    _____

23    NOTARY PUBLIC

24    My Commission Expires:

25

## Page 250

1     ERRATA SHEET
      Witness Name: JUSTIN CARVER
2     Case Name: SHONDEL CHURCH, et al. v. STATE OF
          MISSOURI, et al.
3     Date Taken: DECEMBER 11, 2017

4

5     Page #_____  Line #_____
6     Should read: _____
7     Reason for change: _____

8

9     Page #_____  Line #_____
10    Should read: _____
11    Reason for change: _____

12

13    Page #_____  Line #_____
14    Should read: _____
15    Reason for change: _____

16

17    Page #_____  Line #_____
18    Should read: _____
19    Reason for change: _____

20

21    Page #_____  Line #_____
22    Should read: _____
23    Reason for change: _____

24

25    Witness Signature: _____

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-2   Filed 02/21/18   Page 64 of 107

**A**

a.m 5:1,4 15:3,6
  69:25 70:3
  125:22 126:7
Aaron 4:3 5:17
  6:9
ABA 99:9
  128:13 165:10
ABA-designat ...
  128:12
ability 8:1 118:2
  123:4 134:14
  135:1 190:13,13
  204:22 248:8
able 11:23 12:17
  14:22 33:3
  46:5 57:14
  59:15 71:20
  72:5,7 78:4,15
  88:1,6 100:18
  105:11,14
  106:12 116:22
  116:23,25
  118:9 136:19
  137:10,11
  154:11 155:3
  164:1 175:19
  175:25 177:4
  179:23 188:5
  189:2 206:18
  212:23 217:4
  241:11,18,18
above-refere ...
  249:10
absolute 160:6
absolutely
  27:21,21 28:1
  32:8 34:9
  37:4 39:6
  48:4 76:18
  111:5 113:21
  117:20 119:25
  124:16 152:19
  158:22 170:24
  183:12 236:1
  239:21

243:22
  244:16 245:1
accept 154:13
  181:4,16 187:10
  187:15 220:21
  225:23 226:1
accepted
  226:15
access 10:19,24
  11:7,9,11,15,16
  11:23,25 12:1
  12:10,14,17,20
  62:21 64:2
  240:22
accident 6:25
  7:4
accord 70:16
accumulated
  21:14
accused 59:3
  63:7 105:8
  239:11
accused's
  120:12 204:22
acknowledg ...
  147:16
act 227:25
  236:6
action 10:16
  133:5 163:11
  167:2 198:4
  248:11,15
active 116:12
  117:8,10 133:2
  174:1 177:5
  219:18,21
activity 223:2,3
actual 200:19
  224:10
ad 133:15
adamant 221:7
add 197:22
added 67:5
  69:12 119:10
addition 17:8
  20:7 22:21
  111:23 112:5

121:4 159:8
  163:18 184:10
  190:5 222:13
  222:14 225:2
additional
  18:25 21:17
  22:3 26:6
  47:5 55:6
  61:15 89:8,15
  100:10 102:17
  104:18 108:22
  116:23 123:4
  135:4 140:22
  151:2,8 154:13
  155:3 157:19
  157:21 158:22
  158:23 159:4
  167:24 175:10
  181:4,16 194:12
  197:11,11,24
  207:6 210:18
  224:17 225:1
  240:2
address 76:14
  93:13,14,21
  96:17 98:19
  104:14 163:13
  165:8
addressed
  96:20,25
  127:18,18
  134:7,8 223:11
adequate
  154:20
adequately
  84:23 128:14
  146:11 186:24
  187:5,8,23
  189:17,25
  222:7
adherence
  160:2
administration
  100:21 112:1
administrative
  2:20 12:20
  17:7,24 19:12

51:15 97:20,21
  112:6 136:6
  138:22 180:11
  181:9 190:6
  206:3 233:3
  233:23 234:1
administrativ ...
  203:22 228:9
  231:7
admitted 67:6
advance 191:11
advancement
  31:19
adverse 38:14
advice 240:17
advise 85:17
  187:23
Advisory
  233:19
affect 120:23
  120:24 121:1
affidavits 14:17
  124:24 173:2
  173:2
affiliated 193:12
  193:14
afford 59:15
  63:13 100:5
afternoon 3:12
age 6:3
agency 18:22
  21:2,4 27:23
  38:19 84:12
  86:7 92:1 97:5
  97:6,14 98:7
  98:14 104:12
  135:14
aggregate
  21:23
ago 24:16
  90:24 149:19
  150:5,19 153:4
  165:6 170:21
  210:24
agree 84:24
  92:1 126:21
  152:17 162:8

Agreed 146:1
  243:12
ahead 8:19
  204:12
  205:25 221:13
  243:1 245:18
al 1:4,7 3:3,6,19
  3:20 5:6,6
  249:6,7
  250:2,2
Alan 4:17 5:21
  191:3
Alaris 3:13 5:9
  5:14 249:1
alcohol 117:25
  222:19
allegation
  215:14 223:6
alleged 52:18
  215:18 222:23
alliance 233:18
allocate 151:1
  198:9
allocated 89:5
  89:7 157:18
allocating
  198:20
allow 35:17
  86:25 154:17
  228:17
alluding 154:1
alteration 53:13
altered 203:21
Alternatively
  51:3
American 161:7
amount 20:1
  21:25 25:2
  28:16 31:18
  34:18 53:12
  124:9 131:5
  196:9 213:20
  214:11,13
  222:3 245:16
and/or 100:16
  113:7 124:13
  137:3 249:12

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-2   Filed 02/21/18   Page 65 of 107

251:8
anecdotal
   128:18
anecdote 16:11
announce
   128:5
announcement
   66:9
annual 224:24
answer 7:25
   8:11,15,19,19
   96:13 100:19
   170:21 196:4,8
   196:19 212:11
   215:9 220:12
answered
   188:14 214:17
   214:21
answering 191:8
   191:11 209:25
Anthony 4:7
   5:19
anticipated
   66:14
anticipating
   110:12
anybody 50:8,9
   74:11 117:5
anymore 52:7
   136:3,5 204:2
   225:18 229:14
anytime 118:16
anyway 26:2
   29:21 220:10
   235:4
apart 39:10
   206:12
apologize
   50:19 94:3
   121:15 188:16
   191:10 209:11
   220:13
   226:24 231:16
appeal 234:24
   235:15
appealed
   235:11

appear 75:18
   134:5 143:5
   163:19
appearance
   66:22 70:22
   105:19,23
   116:14 164:3
   178:19,20,20
   179:13 182:8
appearances
   4:1 65:21
   108:14 116:11
   126:23 246:4
appeared 65:7
   66:8 235:16
appears 248:5
appellant
   237:25
applicant 37:6
   37:20 38:1
   99:19,20,22
   100:18 179:7,11
   203:17 234:16
   234:19,22,23
applicant's
   234:14
applicants
   35:17 37:7
   38:7,7 39:12
   39:19 64:11
   100:23 105:11
   105:12,14
   106:4 123:21
   235:3
application
   37:19 38:2,5
   99:18,23
   123:23 178:21
   179:3,6 203:9
   203:23 205:8
   235:9
applications
   88:25 204:6
   205:14
   229:20
applied 44:13
   106:4 226:14

applies 37:15
   171:1,2
apply 28:10,12
   35:18 68:21
   106:10
applying 37:16
   37:17 225:21
appoint 49:3,3
   62:4 83:22
   84:1 100:2
   105:2,4 106:6
   107:5,9,23
   108:25 109:3
   109:3 113:7
   114:20 130:11
   130:20 131:9
   134:22 135:13
   153:16 154:18
   176:11 235:17
appointed 44:6
   59:22 108:13
   109:23 114:22
   115:20,25
   161:16 162:7
   169:25 170:6
appointing
   115:17 116:4
   139:6 225:14
appointment
   115:5 135:5
appointments
   42:21 108:22
   116:9
appreciate
   49:23
appreciated
   135:8
approach
   109:24 119:1
   203:4
approaching
   241:12
appropriate
   187:20
   238:23,24
approved 35:15
   143:19 216:8

216:16
approving
   204:6
approximately
   7:18 45:5 46:6
   52:4 107:12
   109:7 128:19
approximation
   195:15
April 61:2,14
   112:13
aptly 161:8
area 15:13,20
   16:3 18:20
   25:3,18 32:18
   37:16 82:2
   98:18 99:4
   112:22 144:19
   145:4 152:25
   154:8,12
   160:25 180:25
   181:3,15
   223:23
   241:24
areas 30:12
   144:12 147:2
Arkansas
   215:16
armed 198:4
armor 147:17
Army 25:7 40:6
   40:24
arose 47:14
   155:14
arraign 201:6
arraignment
   65:13
arrangement
   53:14 70:17
arrangements
   201:16
arrested 68:18
   182:23
articulate 77:3
articulated
   21:15 139:7
   228:3 245:13

articulating
   83:7
ascherzer@or...
   4:5
Ashley 129:10
   129:13,24
   130:7
aside 37:2
   143:4 200:15
   209:21,22
asked 14:6 61:6
   66:13 83:22
   97:14,16,17,19
   118:6 129:4
   135:25 154:16
   161:12 167:17
   167:22 175:3
   176:7 181:7
   192:23 194:14
   214:11 218:8
   229:25 232:6
   236:14
asking 14:6,19
   113:6 143:9
   203:4 227:15
   227:24
   229:10 242:5
   242:24
assault 80:16
   80:20,21,23
   80:25
assert 161:1
assessment
   222:12
assign 26:3,4
   32:19 36:14
   47:17 99:20
   99:25 100:9
   100:10 105:19
   135:1 136:4
   158:6,23
   170:9 175:19
   177:13,15
   179:22 189:5
   199:20 200:8
   208:24
   246:10

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-2   Filed 02/21/18   Page 66 of 107

assigned 32:9
34:24 47:12
106:19 111:8
114:15 138:23
142:15 146:12
155:4 158:5
176:25 177:3
199:12 201:12
207:19 224:12
235:22
assigning 46:18
87:13,16,18
101:2,3 139:22
139:23 171:9
208:15 219:15
assignment
235:23
assigns 158:3
198:25
assistance
175:5
assistant 4:17
15:22 25:20
26:4 31:6,12
74:8 86:20
100:11 103:3
103:22 128:5
149:8 159:7,18
180:24 199:4
200:15,18
202:14 204:1
204:4 205:10
207:20 219:12
220:20 246:8
assistants 101:2
139:20 159:8
199:5,6
202:12 205:1
205:12
associate 65:7
92:20,25
93:5,7 129:13
197:16 198:14
associated
10:15 121:12
180:12 193:16
Association

161:8
assume 30:25
57:6 99:4
135:7 201:18
227:3
assumes 85:8
assuming
240:4
atrocious
188:10
attach 51:14
attached 2:21
attaching 157:11
attachment
2:18 181:11
attempt 25:19
86:25 191:5
attempted
180:13
attempting 74:4
150:1 159:19
attention 70:18
88:10
attorney 4:17,18
8:17 20:21
27:7 31:22
36:5,10 41:13
45:2,4,6,9,13
45:18 47:23
63:13 75:4,4
82:13,16 87:19
107:6 109:1
128:7 144:25
149:12,23
152:15 160:16
184:24 189:25
199:14 202:13
210:7 211:17,18
212:1 214:23
218:5 232:11
236:10
238:24 240:6
240:8 248:12
attorney-client
184:15,22
attorneys 5:15
11:14 18:6,18

19:5,22 20:24
26:9,12,13,15
27:14,15 34:6
38:23 40:5,21
41:4,10 74:2
74:19,22,23
79:4,15 80:3
82:10,16,21
86:11 88:5
95:9,13,19
104:5 108:14
112:8,21 115:16
115:24,24
142:12 146:9
147:16 150:2
152:10,23,23
157:18,25
159:5 161:1,6
162:3,15,17
167:13 173:3
183:16,17
184:6,21
185:10,23
186:14 187:3
187:13 189:15
189:17 194:3
207:24 211:1
215:7 228:4
232:8,20
235:19,25
238:12 241:7
241:10,16,18
242:15 243:17
244:5,13
attorneys'
96:20 160:4
atypical 24:12
audit 233:18
August 27:6
69:8 148:23
148:25
authority 18:5
141:9 226:4,11
229:24 230:3
authorization
214:5
authorized

146:10,11
211:24
available 60:7
60:15 99:24
100:1 179:12
213:20
232:24
244:13
average 85:19
209:20,23,25
avoid 27:25
avoidable 28:1
awaiting 175:20
aware 7:13 44:9
47:7,19 58:5
58:15 94:13
123:16 124:11
131:2 167:7
174:24 188:6,7
188:21 213:18
214:1 218:15

B
B 47:10,13,17,19
48:2 49:16
62:5 177:25
246:19
babies 26:23
back 15:7 25:10
33:21 34:13
39:9 40:2,11
44:23 59:8
65:18 66:19
66:20 70:4,6
75:13 77:20
78:16 90:22
92:11 102:24
109:16 120:1
122:9 125:5
126:6 130:1
132:6 136:11
139:13,15
151:14 159:12
159:14,15
167:22 169:13
171:25 172:10
177:17,19 179:7

191:14 196:2
204:15 205:9
206:14 212:3
212:4 221:25
231:10 234:7
237:6 245:7
background
14:6 22:13
191:14 210:5
backwards
232:4
bad 81:24,25
84:12 96:25
balance 152:8
Ballalatak 3:15
4:25 5:12
248:3,19
249:23
ballpark 24:7
31:15 52:23
53:1,4,22 71:17
107:24 109:7
195:13 210:2
219:3,4
Band-Aid 151:5
151:17
bar 41:19 83:21
83:21 100:6
112:12 161:7
195:12
bare 222:21
223:13
Barrett 21:12
91:25 143:22
based 30:21
32:7 34:14
49:6 108:7
128:17 144:23
144:24 145:19
145:19 160:3
208:20
210:24 214:8
237:1 240:17
basic 40:2
179:8 220:1
222:17
basically 51:17

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-2   Filed 02/21/18   Page 67 of 107

118:3 139:1,3
228:15
basis 26:20
27:17 35:1
83:7 102:4
110:15,17
Bates 14:8,9
91:11 134:5
172:16 180:14
230:25
237:10
battery 233:21
Beetem 93:4
began 155:5
166:24
beginning
99:12 122:10
169:15 193:24
begins 97:5
98:22 126:11
behalf 1:18 6:4
47:15 70:22
156:11 173:4
227:25
belief 171:3
believe 7:10
17:16 27:3 41:9
48:24 72:12
72:16 74:14
75:16 76:15
90:9 91:3
170:10 178:16
180:3 183:22
195:5 211:1
222:2 225:12
230:25
236:14
believed 104:18
believing
158:21
belt 48:14 87:23
200:2
Ben 127:14,16
129:1
bench 219:19
beneficial 21:17
benefit 22:3

Benjamin 93:11
best 8:1 17:11
36:12 48:7,10
78:10 83:5
116:17,18 117:7
118:5 127:6
152:22 163:7
164:6 178:25
248:7
better 24:9
32:25 91:16,18
150:22 163:14
167:1 187:19
207:8 211:22
212:20 213:5
216:9,12
228:19 231:14
238:25 239:6
239:11 240:4
240:5,7
beyond 223:14
235:23
bifurcation
194:5
big 156:23
157:14,14
201:17 204:10
204:18
bigger 56:21
200:8 207:16
246:15
bill 119:5,6,10
bit 24:19 42:20
139:25 151:3
155:6 179:21
202:8 208:19
209:3 214:20
225:7 226:24
blame 150:10
Blau 12:16 17:13
135:25 136:2
180:18 212:5
242:10
Blau's 147:15
bleeding 87:3
block 28:23
176:3

blood 122:8,17
122:21 123:8
Blow 10:14
blown 165:12
Bluffs 3:14 5:10
board 35:20
119:4,10
Bob 32:8,12,12
32:25 33:1,5
158:4,5,12
233:16
Bob's 33:4
body 21:14
94:20 161:2
173:12 181:8
boils 182:20
bond 121:3
182:12,14,16
203:13 204:11
204:18,23
223:11
bondman
204:19
bonds 117:23
203:14
bondsman
179:8 204:16
borrow 53:18
borrowed
153:23
boss 138:15
228:11 230:7
bottom 14:9
28:8 31:3
37:19 91:11
93:23,24 94:2
99:13 125:16
126:12 127:13
129:8 132:10
132:17 139:16
147:2 148:10
165:13 169:22
222:21
Boulevard 4:13
249:4
bounced
129:25

box 4:18 37:25
67:21
brand 47:23
48:7
brand-spanki...
46:7 112:9
break 8:13,22
69:21,23
124:21 132:1
139:14 190:22
191:1 221:18
239:22
breakdown
23:20
breaking
170:25
brief 180:9
briefly 148:20
166:17
bring 12:25
68:20 103:17
broad 108:1,3
193:1 229:24
broadly 113:22
Broadway 3:14
5:10
broke 167:21
broken 177:24
brought 33:4
88:9 166:12
182:4
bucket 246:14
bucks 119:7
131:7
budget 2:14
112:1 143:5,15
budgeting
190:7
budgets 17:6
buffer 220:2
build 87:4
built 158:8
bulk 46:1 205:11
bunch 43:18
burn 86:23
business 192:7
210:5

businesses
122:2
busy 60:10
126:22
button 216:15
buttons 46:20
231:7

---
### C

C 47:13 73:6
141:24
calculations
113:10
calendar 24:19
24:20 25:3
26:10 145:18
218:25 241:25
California 4:8
call 17:21 106:8
106:9 133:3,4
136:2 179:7,8
197:4 198:18
225:2 230:6
230:23
233:24
called 10:12
66:20 102:15
calls 201:4
Camden 92:17
camel's 167:21
Campbell
180:23
cap 214:12
capacity 15:18
98:17 99:7
128:20 144:18
144:25 145:2
145:8 158:10
158:13
capital 238:3
capitol 148:5
car 17:21 119:17
care 128:13
carried 73:9
carries 56:21
73:6
carry 17:10 52:1

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-2   Filed 02/21/18   Page 68 of 107

81:7 232:11,14
**carrying** 45:13
128:20 185:5
**Carver** 1:17 3:9
5:5 6:2,7 15:8
70:5 115:3
125:6 132:9
133:22 138:12
142:23 151:21
152:7,13 154:7
172:1 249:9
250:1 251:5
251:20
**Carver's** 149:24
**case** 1:6 2:10
3:5 5:6 6:10
6:20,21 7:25
10:11,12,15,16
10:24,25 11:22
11:25 13:18,23
23:9 29:13
32:5 34:8
42:4 43:22
44:3 47:14,18
47:19 50:24
51:21 52:12
53:8,9,11,11,20
55:22,24
56:2 60:12
61:25 62:22
66:13,15 67:4
67:5 68:22
70:23,24 71:4
71:5,16,22
72:17 73:8,11
73:13,22 74:14
75:8,21,23
76:9,11 77:5,9
79:13,20,22
80:2,24
82:23 84:2,9
94:12,23
100:9 105:9,15
105:16 106:11
106:21,21
107:15 111:3,7
111:10 113:12,13

116:22,24
117:19 119:8
120:6 121:20
121:25 122:7,7
122:8,15 123:3
123:9 124:18
133:4,6,7
137:12,13,13,14
137:24 138:7
138:10,18,19
138:20,23
140:8 153:18
153:18 154:11
154:24 155:2
155:4 156:1,12
156:19,21
157:17,19
158:5 161:21
163:6 165:17
166:12,18
167:6,10
169:25 170:6
170:14 171:9
172:6,7 173:16
174:1 175:15
176:19 177:7
177:10,11,20
177:24 178:17
178:18 179:13
183:11,20 184:1
184:8,18,25
185:3,8,12,21
185:25 186:10
186:16 189:4
195:23 196:25
197:2,2,3,4,5
197:5,7,8,14,16
197:18,19,23
197:25 198:1,6
198:9,10,14,17
198:18 199:1,18
199:21,25
203:15 204:10
204:21 208:5
208:6,7,17,24
212:13 213:3
214:3 215:2,12

215:16 216:1
220:3 221:1,4
221:10 223:15
225:5,5,24
227:9,11
229:14 231:5
231:7,9 232:9
234:17,21
241:16 246:25
249:10 250:2
**case-ballpark**
71:14
**case-related**
10:18
**Case.net** 93:15
120:8 179:6
204:8
**caseload** 9:24
14:17 17:9,10
19:24 22:23
23:4 24:12,14
25:16,17,19
26:6 27:8,10
28:3 29:1
30:22 31:1
36:20 38:9
38:24 42:17
48:8,9,10,12
49:6,7,11 50:5
61:25 64:7,10
64:11 65:4
66:11,12 72:3
72:23 73:18
74:5,6,10,18
74:19 76:17
79:5,15,17
80:6 82:9,23
83:1,3 85:9
86:6,18 87:25
88:5,14 89:1
89:17 90:19
91:1,21 96:4,10
96:16 97:8,19
98:15,19 99:6
100:13 102:2
103:13,14,18
104:4,16

107:10,12,16,18
108:3,8 110:2
110:3,6,18 111:4
113:8 114:9
123:25 124:7
124:8,8 137:10
138:1 140:7
144:5 148:7
149:25 151:11
156:11 165:9
168:6,23,23
169:2,11,19
172:23 173:5,7
173:8,25 174:9
177:23,24
179:17,24
183:2,14,15
184:5,5 185:5
185:14 186:13
187:3 188:22
189:16,24
192:11 194:2
206:16 207:11
207:13 225:19
226:5 227:16
229:1,5 232:8
232:12,15,18
233:24 237:4
238:13,23,24
239:4 240:3
241:2,15,16
243:24 245:9
245:12,20
246:6
**caseloads**
91:24 92:9
95:25 101:1
103:6 108:19
139:19 160:5
173:20 175:1,9
192:18 193:18
205:20 206:5
206:12 207:14
226:25
234:12 241:10
**cases** 7:8 9:3,4
9:4 10:20,21

10:22 17:11
22:9,25 23:3
23:5,8,11,15,16
23:17,18 24:1
24:8,22 26:2
26:4 28:23
29:2 31:25
32:19,21,22
33:2,3,19 34:7
34:24 36:9,12
36:14,16,18,19
38:17 41:3,5,11
41:14,21,25
42:2,9,16
43:11,14,16,18
44:16 45:14,18
45:19,23,23
45:24 46:2,7
46:9,9,13,17,18
46:24 47:5,8
47:10,23 48:6
48:18 49:1,14
49:16,18 50:13
51:18 52:5,17
53:5,6,23,23
57:4,7,10,14
58:16,18,25
60:15 61:1,12
61:15 62:5,12
62:15 64:7
69:6 70:19
71:1,25 74:11
76:1,6 77:13
77:25 79:9,10
79:14 80:5,7,8
82:4,6,8,12
83:1,8,9 84:24
85:11 86:7,10
86:13,21 87:9
87:10,10,11,13
87:16 88:16
88:22 89:6
91:22 92:3
93:9,9 94:16
95:7,8,18,22
96:8 100:10,12
101:3 102:13

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-2   Filed 02/21/18   Page 69 of 107

104:8,13,17,19
104:24 107:4
108:6,12,12,24
109:16,20,21
110:5,8,9,14
110:22,22
111:13,21 113:11
113:19,20,24
114:2,18 116:10
116:15,24 117:4
118:20,21
123:17,25
124:16 126:16
133:3,3,14
134:11 135:1,4
135:24 136:4
136:6,12 137:6
137:8 139:23
140:21 145:13
145:14 151:20
151:20,24
152:2,9 154:13
154:13 155:4
155:12 157:12
157:17,18,22
157:24 158:3
158:6,16,17,22
158:23 161:17
162:8,12,25
163:4,10,18,18
163:20,23
164:23 167:15
170:11 173:8,10
173:17,21,22
175:3,10,20
175:25 176:1,3
176:5,6,15,16
176:18 177:3,11
177:13 178:5
179:1,15,20
180:10,12
181:4,8,15,17
181:23 182:13
184:2 187:25
189:25 190:3
190:4,5 194:9
195:3,10,14,21

198:9,20
199:12 200:3
200:8,9,16
203:16 205:11
206:10,20
207:19 208:1
208:2,3,4,11,11
208:13,16
209:5,6,9,18
219:22 225:18
226:2,7,12,15
226:22 227:1
227:6 231:4
232:25
236:18,21,23
237:2 241:21
242:15 243:5
243:9,14,18
244:3,4,23,25
245:25 246:1
246:4,9,13,18
246:18
Catch-22 170:7
170:13,19,23
171:5
categories
178:4,5,6
category 23:14
108:4
caught 120:9
170:7,13
cause 3:17 25:1
33:17 38:22
38:23 84:13
170:16
caused 38:18
167:13 183:15
184:5 215:12
233:9
causes 28:24
29:2
causing 241:6
caveat 173:19
cc'd 135:25
cc'ing 93:25
CCR 4:25
249:23

CD 238:5
CDs 118:12
central 1:2 3:2
3:18 5:8 12:7,9
12:14 17:18
181:22 242:11
centralized
204:3
certain 3:17
11:21 131:5,12
certainly 7:11,13
10:14 20:13
36:22 38:10
38:18 39:15
44:13 47:8
48:12 51:13
85:5,25 86:2
88:21 89:2,8
95:21 96:5,15
96:24 105:24
117:1 122:5
124:11 145:24
150:25 151:7
179:23 182:15
189:6 192:19
199:18 205:17
215:2 223:11
230:11 234:25
235:21
244:25
CERTIFICATE
248:1
certification
44:5,6
certified 3:15
44:4 248:3,21
certify 248:4
251:5
cetera 100:4
177:25
chain 90:11,12
132:8,13,16
139:11
chair 219:17,18
219:20,21
220:1,5,16
chairs 219:14,15

challenged
97:20
chance 13:10
14:20,23
89:25 118:15
133:24
change 31:10
55:3 56:25
130:23 131:3
145:21 151:10
197:21 202:16
250:7,11,15,19
250:23
changed 25:18
36:13 58:12
68:6 73:10
88:24 138:21
175:16 202:15
203:24
229:13 238:11
238:17
changes 249:12
251:7,10
Chapter 51:8
131:13 163:2
229:22
characterize
173:9 228:22
229:4,7
charge 44:24
53:15 54:5,6
54:13,18,19
59:9 64:17,19
65:1 73:1,3,4
80:14 120:10
120:14,21
122:11 123:10
146:16
charged 49:16
51:4 54:19
61:9 65:8
80:17 81:6
131:13 197:25
198:2,14,15
charges 23:17
33:4 52:20
54:9 55:17

80:15,18,19
81:12 119:15
chart 144:18
145:5 228:18
237:9
cheaper 216:25
217:20
cheapest
218:19
check 37:21,22
37:23,25
131:24 179:6
checking 204:8
Chicago 6:22
Chief 166:9
child 29:11,12,14
50:25 51:4,6,7
53:12 213:3
215:13,14,18
children 211:6
choice 63:13
111:4 171:5
chose 234:24
Chris 4:23 5:12
Church 1:4 3:3
3:19 5:5
249:6 250:2
circling 75:13
77:20
circuit 28:11
68:13 69:5,12
69:12 92:15,16
92:19,22 93:1
93:2,2,3,4,6
129:13 132:21
137:22 197:17
197:19 198:15
circumstance
56:18
citation 161:14
161:17
citations 161:6
cite 28:2 215:2
cities 201:17
citing 64:9,10
124:6,7
citizenship

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-2   Filed 02/21/18   Page 70 of 107

222:19
city 4:19 6:22
  16:9,11,19
  37:22,23
  42:25 43:5
  76:12 77:17
  99:4 102:17
  102:25 115:4
  145:4 146:23
  146:24 191:21
  192:16 193:9
  207:2,4
civil 6:21 42:21
  51:7 238:5
clarify 38:21
  57:20 61:23
  180:15
class 73:6 81:4
  81:5 85:7
  130:12 133:14
  210:11,24
  226:12
classes 133:14
  210:17,18
clause 128:2
cleanly 229:17
clear 8:13 42:23
  70:16 88:12
  105:21 165:7
  177:2 210:19
  229:18
clearly 228:13
clerks 129:16
click 46:20
  216:15 231:7
client 10:14 29:4
  30:6 32:8,12
  32:12 34:24
  47:12,15 48:3
  56:2 59:8
  73:20 75:14
  77:16 78:1,2
  79:2,22,24
  80:10 83:15
  84:6 85:17
  87:11 111:6,11
  111:12 117:8,24

119:23 120:21
  121:24 123:8
  166:21 184:16
  184:23 185:16
  186:5,19
  187:19 188:8,9
  203:12 204:15
  220:3,20,24
  220:24 221:5
  221:7,9,11,14
  222:15,17,23
  223:6,7,15
client's 222:25
client-relation ...
  32:24
clients 10:18
  22:10 29:5,17
  29:21 30:8
  33:18 53:17
  64:11 72:4
  76:7,19 78:11
  78:17 80:8
  82:11 83:10
  85:13 86:3
  108:17 111:3
  116:13 117:17
  118:6 119:11,14
  134:15 152:9
  152:10,12,22
  152:23 164:5
  166:20 168:3
  168:9,12,21
  169:6 171:7
  177:15 183:10
  183:19 187:9
  187:15,23
  188:2,23
  189:18 190:1
  235:4 238:11
  238:19
clients' 175:4
clips 133:16
close 10:22
  113:10 139:8
  225:5
closed 106:22
  151:20,21,24

152:3 173:16
  173:17,21
closer 216:25
closing 219:24
code 133:10
  203:18
coincidence
  115:9,10
cold 216:2
Cole 13:19
  16:22 19:13
  32:23 33:1,7,11
  34:19 35:3
  42:3,10 44:2,3
  49:13,17 50:12
  51:14 52:5,25
  59:14 60:25
  62:8 63:21,24
  75:1,10 93:3,4
  93:5,6,8,11
  114:22 132:21
  137:25 154:25
  175:23 176:2
  177:11 179:20
  195:10 199:25
  220:8
colleagues
  168:20 240:16
college 210:11
  210:17
Colorado
  215:17,17
colorful 95:6
Columbia 3:14
  4:13 5:11 12:18
  17:23 37:22
  181:9 193:17
  249:5
column 144:16
  145:1 146:22
combination
  52:3
combine 52:19
come 10:3 20:9
  28:6 29:11
  38:25 69:4,5
  69:8 98:2

100:12 102:9
  104:15 119:24
  123:21 139:15
  140:18 147:16
  159:14 192:19
  192:21 196:9
  201:5 207:18
  224:20
  236:15 246:2
comes 56:19
  61:3 68:13,15
  69:17 93:8
  133:4 154:7
  159:15
coming 19:12
  28:7 160:5
  180:20 207:2
  228:4 236:21
  236:22 237:1
  237:2
commenced 5:1
Comment 140:6
commission
  49:5 143:24
  239:9 251:24
commitment
  31:20 238:6,7
committee 2:15
  97:24 148:4
  150:24 151:4,8
  194:15
common 28:2
commonality
  84:16
commonly 17:21
  52:11 73:20
communicate
  19:4 25:23
  72:7 183:10,19
communicated
  91:1 205:9
  233:12
communities
  50:7
community
  38:20 39:18
  192:16

comparable
  217:19
compared
  88:14,15
  145:13 199:24
  200:5 239:13
competence
  140:10,10
competent 84:1
  140:13,15
  158:16 164:4
  165:13,16
  175:2,10
competently
  140:9
complained
  96:16
complaint
  166:20,23
complaints
  34:4 166:21
  166:24
complete
  24:20 120:17
  222:4,17
completely
  39:10 119:10
  192:17
completion
  218:25
complex 87:11
  199:21
complexity
  208:5 209:7
  232:19
compliance
  165:9
complicated
  87:9 146:5
  178:24 208:7
  208:11,12
Complicating
  184:9
comply 171:13
component
  199:23
components

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-2   Filed 02/21/18   Page 71 of 107

compromising
184:15,22
computer
155:14 173:18
217:2
concern 83:25
88:10 213:16
concerned
27:10,20
47:22 48:8,9
162:12,20
163:15 167:14
200:3
concerning
210:25 225:8
226:25
concerns 61:24
61:25 124:15
134:14 135:19
168:19 192:11
207:11,13
229:1
conclude
231:25
concluded
247:6
concurrent
56:15
condensed
156:23 157:13
condescending
60:11
condition 52:16
57:17 63:1
119:5
conditions 55:6
conduct 103:24
141:11 142:3,4
142:5,12,13
154:14 160:12
161:2,5,13
177:5
conducted 10:11
conducting
142:14
conference
2:10,17,19

9:24 13:18
36:20 49:7
64:7 66:11,12
66:15 107:10
107:13,17
108:3 113:9
114:9 116:6
123:25 124:8
137:24 138:1,2
154:25 155:2
155:7 156:1,10
156:21,22,24
172:6,24
173:16 174:9
175:16 176:6
179:18,25
189:5
conferences
107:19 163:2
229:23
confident 185:1
confined 82:12
176:1
conflict 137:14
152:21
confluence
228:20
conforms 141:11
confused
214:20
conjunction
156:19
conjunctive
140:12
consecutive
56:11,16 57:2
consequence
56:21 74:5,6,9
188:21
consequences
121:9,10,17,19
123:6 187:24
221:15
conservative
204:5 228:5
conserve 213:14
consider 55:12

85:25 117:10
117:23 169:3
194:19 197:23
198:6,7
210:23 243:8
considerable
19:25 21:1
34:18 74:12
consideration
167:20
204:23
232:23
considerations
199:12
considered
198:8
considering
168:21 169:3
consistent
102:5 103:23
140:4 146:14
161:24
consistently
58:25 83:3,11
236:3
consists 207:15
constraints
190:1
consult 185:20
185:25 186:6
216:19
consulting
157:25
contact 72:15,17
72:20 75:2
76:9 79:2
89:4 122:3
166:21 188:10
188:23
contacted
102:14,16
212:10
contained 172:4
contemplating
49:10 116:3,5
contempt 51:3,7
225:9

content 230:4
context 19:13
192:18 212:12
217:21 221:1
246:12
continuance
77:4 100:16
121:20
continuances
77:9 118:20
123:13 126:17
126:24 127:4
continue 26:3
55:5,5,6
62:10 100:12
105:8 133:6,15
134:13
continued 21:5
21:7 227:1
continuing
134:9
continuity 47:16
continuous
197:19
contract 42:5,11
89:6 217:22
contrary 161:7
161:19
contributed
25:16,17
control 74:5,10
74:14 79:6
97:8 101:1
139:19 206:16
226:4 227:14
227:15 238:13
controlled
120:11 140:8
206:6
controlling 74:6
controls 27:8
74:19 79:17
80:6 82:9
87:25 88:5
97:19 104:4
183:15 184:5
186:13 187:3

189:16,24
convenient
169:7
conversation
158:15 225:12
230:4
conversations
210:25
convicted 59:11
convictions
51:25,25
58:22
convince 110:1
235:8
cook 25:23
coordinate
34:20,22
118:2
coordination
17:5
copies 222:13
249:9
copy 136:10
174:5 234:21
249:12
core 200:6
correct 7:7 11:13
17:13,14 22:6
22:11,24 26:11
26:19 30:16
30:24 36:7,8
40:8,22,25
43:12 44:11,20
45:12 47:2,6
54:1,4,10
55:16,19
57:23,25 60:4
60:22 61:22
64:3,3 70:23
71:9 72:6,6
73:19 79:7,11
81:14 89:18
108:16 112:3
116:1,3 130:2,8
131:18 133:17
134:17 136:14
141:2,3,6

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-2   Filed 02/21/18   Page 72 of 107

147:6,12,13,19
150:6 156:18
161:23 163:24
164:8,12,19,20
165:3 171:11,14
173:23 180:21
183:4,24
188:24 189:12
189:22 190:8
198:11 202:18
202:21 205:3
207:3 209:19
210:21 218:13
226:18 231:1
236:7,8,22
237:3,17,19,20
237:23,25
238:1,4,8
241:8,20
243:25 244:6
247:1 251:9,13
**corrected** 178:8
178:9
**correctional**
78:19
**corrections**
51:24 52:2
54:22 55:11
73:7,10 75:11
76:5 249:12
**correctly**
205:20
225:16
**corresponding**
117:13
**cost** 214:8
217:23 242:13
**counsel** 17:6
43:25 51:10,13
53:6 62:4
64:24,25
66:24 67:15
81:25 100:5
105:12,13 107:1
113:7 116:4
134:22 153:16
166:9 174:24

175:5,20,21
187:9,14 188:2
220:20
233:19 235:16
248:9,13
**counseled**
221:15
**count** 7:19 197:7
197:19
**counties** 16:20
33:5 42:1
92:17,18 94:9
119:4 121:3
128:23 195:11
**counting** 26:13
26:15
**counts** 197:3
**county** 13:19
16:22,22,23
19:13,24 20:2
20:2,5 22:20
32:21,23 33:7
33:9,11,11,12
34:19,19,23
34:23,24 35:2
35:3 42:3,3,5
42:10 43:11,14
43:21 44:2,3,9
44:10 49:13,17
50:12 51:14
52:5,25 54:21
55:8 56:4,5,6
56:7 59:14
60:25 62:8
63:18,21,24
64:6,13,17
65:3 68:13,25
75:1,10,15
77:17,23 78:10
78:18,19 83:6
92:21,23,25
93:3,4,5,6,8,8
93:11,12 94:13
114:11,22 117:3
117:4,22
118:23 119:3
120:18 121:24

123:20 124:5
127:17 128:4,7
128:8 132:21
137:5,15,23
137:25 138:1,2
138:6,7,10,20
138:21,23
154:25 167:25
175:23 176:2
177:11 179:1,15
179:20,20
199:25 220:8
233:17 251:3
**couple** 9:23
24:16 35:22
51:2 55:8,13
58:20 60:8,17
64:22 65:3,5
69:11 70:21,22
79:1 114:18
118:13 160:12
173:14 189:4
193:5,10
196:12 200:1
228:12,12
234:5
**course** 8:18,22
32:4 88:12
119:10 194:6
228:18,20
240:2 244:1
246:2
**court** 1:1 3:1,15
3:18 4:24 5:7
5:11,25 7:11
8:7 9:22 10:16
17:11 20:1,7,10
34:18,18 52:13
54:24 55:2,3
55:9,10 56:9
56:10,14,20
59:11 63:5,17
63:25 66:1,10
67:4 68:20
70:13 72:11
76:22 90:17
92:20 97:17

97:18,21 98:8
98:8 109:2
116:20 117:13
120:7,14 121:2
121:4 123:22
129:16 135:12
135:13 137:22
140:5 154:9,17
155:25 161:22
162:10 167:4,5
170:17 172:6
174:15,17,23
176:12,14
177:10 178:9
197:11 198:14
198:16 201:5
205:7 225:23
225:23
234:23,24
235:12,12
248:3,20,21
**court's** 134:24
**courthouse**
220:9
**courtroom**
60:19 61:4
62:19 66:4
67:8,17 68:1
72:20 182:22
**courtrooms**
220:9
**courts** 25:24
90:6 91:2
100:17,21,23
103:11 110:4
111:9 114:4
134:6 135:22
138:25 165:15
167:23 201:5
206:4 226:4
229:21
**cover** 77:24
108:5 148:10
148:12 159:23
**coverage**
219:15
**covering** 82:21

**crash** 38:11
**cream** 49:25
**create** 231:7
**created** 241:4
**creates** 30:11
**creating** 231:11
**creditability**
29:20
**creek** 123:2
**crime** 51:4
85:16 120:15
128:8 159:20
196:16
**crimes** 61:10
**criminal** 42:20
49:14,18
50:23 51:10,18
51:21 52:4,12
52:19 53:8,9
53:15 54:4,5,8
54:12,18 55:17
55:22,24
56:2,8 57:10
58:15,17,22
59:9 60:25
62:22 64:1,17
64:19 65:1,19
65:22 67:5
70:23,24 71:4
72:17 73:1,13
84:3,4,8 85:1
85:2,4,6,7
85:10,18,24
93:9 119:15
167:2 187:25
195:10 198:4
225:18 226:7
226:22
228:23
232:16
238:25 239:1
239:6,7,12
240:5,6,7,8,10
240:12,13,18
241:13 245:25
246:1
**criteria** 51:12

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-2   Filed 02/21/18   Page 73 of 107

107:14 179:9
234:18
criticize 221:14
criticizing
233:18
cross 219:22
Cross-Examin ...
2:4,5 190:20
232:2
crossed 173:13
173:15
Cumulative
144:5
curious 201:1
current 15:12
99:6 171:3
173:3,20
currently 40:20
113:14 146:9
159:16 164:2
209:18 224:6
244:23
custody 53:13
100:18 119:18
120:5,23
176:21,25
custom 219:12
227:2,5
cut 30:9 65:12
104:19 158:22
168:17 209:9
cutoff 218:16

**D**

D 4:12 47:13
249:3
daily 12:8
Dan 93:6
danger 57:19
Daniel 132:18
132:20
data 9:3,9,12
10:8,24 11:2,7
11:11,15,17,22
11:25 12:7,17
21:14,16,17
22:1 98:4,6

database 10:13
225:2,3
date 3:13 5:3
13:20 66:14,15
68:16 72:11
144:8,9 148:9
159:15 178:11
178:14,15,16
250:3
dated 125:21
dates 10:16
76:22 117:14
118:8 121:2,4
197:11
dating 6:22
day 3:10 14:23
19:22 21:20
21:22 35:22
46:19 54:20
64:16 67:10
70:12,12,15
78:12,15 85:19
111:16 119:5,7
127:23 129:1,2
133:16 152:24
182:20 204:16
206:9 224:8
224:8 244:2,3
251:14
day-to-day 18:7
days 20:4,11
21:24 46:20
55:11,12 119:9
133:6 199:19
232:14,17
249:17
days' 35:10
deadlines
166:22
deal 17:4 19:19
19:19 30:9
53:9,14 64:15
65:12 67:4,13
88:11 92:6
95:25 96:9
98:15 104:14
187:10,15,19

207:10 220:21
237:18
dealing 58:23
98:11 102:2,22
deals 123:14
124:13 187:9
187:14 196:9
196:13 220:17
236:15,21
237:1
dealt 51:1 201:19
Dear 249:8
death 31:20
decade 98:14
December 1:19
3:11 5:3 9:23
90:7,12,25
95:4 114:11
125:21 127:23
129:19 229:8
249:2,9
250:3
decent 20:19
decide 64:14
196:15 227:22
decided 64:22
65:4 155:25
233:22
decides 63:7,11
63:12
deciding 123:14
232:24
decision 38:18
47:17 103:6
155:24 166:14
167:16,19,19
226:3 227:17
227:21 229:3
234:24 246:3
decisions
187:24
declare 251:12
decline 10:1
36:19 49:2
62:4 64:10
103:14 105:1,5
106:5 107:5,8

107:8,20,21
107:22 113:7
113:25 114:3,5
114:14 124:7
136:18 137:3
153:15 154:17
154:17 156:16
162:25 163:17
179:18
declining 38:16
dedicate 118:3
defend 195:21
defendant 57:4
62:20 85:1
113:15 154:10
235:15 239:6
240:5,7
defendants 1:8
3:7,21 4:11
5:24 32:3
34:4 77:15
118:21 142:15
146:12 238:25
241:13
defender 4:12
11:11,15 15:11,13
15:19,21,22,24
16:1,3,25 18:4
22:22 26:4
27:1 28:10,12
31:6,13 32:9,9
32:11,13 39:12
39:17 44:14,18
51:9,12 53:3
53:25 54:3
60:6 61:11
62:21 64:2,12
68:21 74:8
86:17,21
88:25 91:19
94:21 98:17
99:18 100:11
101:25 102:23
106:19 107:15
111:24 118:24
120:20 123:22
124:4,15

125:25 126:15
131:14,17 135:6
135:10 137:17
138:12,14,14,16
139:7 143:23
144:4,13,20
148:7 149:9,10
149:15 154:8,9
161:5 164:10
164:18 166:20
174:25 176:17
178:22 179:2
179:4,10
190:10 191:15
191:17 192:18
194:1 195:11
198:20 203:5
203:9,23
204:6 205:15
205:21 207:1
211:21 216:20
220:20
224:14 226:21
234:14,18
235:25
237:14 243:8
245:21 249:4
defender's 28:7
29:22 37:6,10
38:12,15 82:3
86:17 97:6,13
121:12 143:6
148:8 150:14
162:11 206:15
defenders
25:20,25
29:18 33:6
37:13 60:10,12
60:15 101:21
103:4,22
135:13 138:16
160:14,15
161:15 162:6
201:2 207:21
219:13 227:14
227:23 246:8
defense 31:21

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-2   Filed 02/21/18   Page 74 of 107

161:10 232:16
238:6,7
define 196:24
197:1
defined 231:4
definitely 34:21
164:4 239:11
delay 121:12
delays 37:1
118:20 123:14
124:4
deleted 90:23
deleterious
111:3,6,11
denial 226:20
234:19,22,22
235:12
denied 114:4
154:23 205:15
205:17 211:25
212:1 214:23
216:18 217:8
218:4 235:4
242:6,7,9
deny 62:9
234:13,16,19
denying 138:5
242:9,11,17
department
49:5 51:23
52:2 54:22
55:10 73:7,9
75:11 76:5
83:24 217:3
239:9
depend 223:14
depending
69:14 109:17
208:17 209:7
222:21 223:4
depends 20:15
33:13 54:14
107:1 208:5
209:10,11
220:4
depose 214:7,7
deposed 6:16

7:2,5
deposes 6:4
deposition 1:17
3:9 5:1,4,9 8:8
9:1 13:8 14:20
89:22 133:20
141:16 142:20
147:22 153:8
156:4 157:2
160:13 169:15
171:22 180:4
192:10 211:19
211:23 212:2,9
212:15,20,25
213:2,6,10,21
213:23 214:24
215:15,17 216:1
216:8 217:21
242:9,10,11,14
242:17,20
244:2 247:6
248:6,11
249:9 251:6,8
251:11
depositions
7:16 9:15
73:15 195:23
195:24,25
214:3,5,9
215:6,13,17,20
238:20 242:6
243:5,9,13,19
244:23
deprived
106:25
Derek 128:6
describe 76:2
79:19,21
202:22,25
210:14
described
55:18 79:13
89:16 101:12
111:2 117:16
167:20,21
describing
73:25 74:21

79:23 111:17
149:4 150:8
170:20
deserve 100:24
deserved 79:22
deserves 87:11
desired 249:13
desk 17:25
118:12
despite 83:13
134:14 163:16
164:6,9 168:18
destitute 119:11
detail 14:5
36:23 78:24
172:9
details 78:23
detained 43:24
detention 55:7
determination
179:11 202:9,11
232:10
determinations
89:14
determine
232:7
determined
128:17
determining
157:23
204:23 234:8
developing
194:20
deviation
210:12
dialogue 96:7
diet 104:16
difference
225:21
different 10:23
19:18 30:12
33:5,14 34:6
51:2 60:9,17
70:12 77:7
83:17,17 89:4
102:19 155:12
179:21 192:17

192:20 193:10
196:13 197:10
197:12 200:24
209:15 211:8
213:16 216:6
225:4 227:15
228:11,12,12
228:20 234:11
difficult 37:5
121:8
difficulties
149:25
difficulty 37:2
38:6,25
dig 82:7
diligence 140:7
141:1 204:8,25
205:11 221:1
direct 12:15
141:8 161:21
219:23
directed 18:24
225:22
directing
225:23
direction 248:9
directions 199:1
199:7 200:17
directive 101:24
226:16
directly 34:3
129:25
director 17:17
21:12 91:25
143:22 233:12
Disciplinary
166:9
discipline 17:4
disclosed 9:17
discovery 9:18
25:22 90:22
118:12 179:14
179:17 185:7
185:12,17
221:4
discretion 18:6
100:9

discretionary
18:5 217:14
discuss 67:13
125:9 156:11
188:4
discussed 73:18
111:25 127:2
183:3,8
discussing 13:6
90:10 125:8
Discussion 15:5
discussions
167:9
dismissal 77:8
dismissals 152:1
dismissed
75:23 77:2
80:20,22 81:1
198:15,16
distinctly 194:16
distribute 73:5
distributed
198:21 200:16
district 1:1,1 3:1,1
3:18,18 5:7,8
11:3,4,7,9,11,12
11:15 15:13,19
15:21,24,25
16:3,21,25
18:4 22:15,16
22:17,22
30:15 37:13,16
44:18 86:17
91:8 97:11
98:17 101:21
101:25 111:24
147:18 149:9
149:15 154:7
190:10 193:25
195:3,21 198:9
198:19 200:16
201:2,23
202:1,2,6
205:13 207:1
207:10 213:18
218:24 219:12
220:19 223:19

ALARIS LITIGATION SERVICES
www.alaris.us     Phone: 1.800.280.3376     Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-2   Filed 02/21/18   Page 75 of 107

224:14 225:14
226:1 227:14
227:23 243:8
district's 202:8
districts 144:12
147:2
distrust 29:17,18
divide 34:14
176:5 208:22
division 1:2 3:2
3:19 5:9 17:17
31:20 138:18
138:22 237:16
237:17,18,25
238:3,8
divisions
237:21
DNA 199:21
DNR 100:3
docket 59:21
62:15 65:7,13
67:5 69:13
70:19 76:24
77:1,3,10,22
133:5 174:1
178:7 189:18
206:21 227:10
dockets 34:19
34:20,22
100:22 227:6
document 13:14
19:2 142:23
144:2 147:25
153:11 157:5
180:8 230:13
230:16,20
documents 9:13
10:5 12:25 13:1
13:1,5 14:23
25:21 90:10
doing 6:11 17:3
21:13 25:18
28:14 48:7
49:9,10 50:9
51:17 52:6
54:7 59:21
61:6,8,19 67:2

73:23 76:18,19
81:22 83:9
96:9,17
103:24 111:12
111:13,14 113:5
117:17 118:17
119:2 163:2,7
163:12 168:21
169:6 171:16
177:12 204:5
208:14 221:11
227:24 229:9
229:15 234:11
243:8,13,19
dollar 28:8 31:4
131:5 214:11,13
dollars 213:15
213:20,22
domestic 53:10
door 227:7
double- 34:25
dozen 10:23
137:7,8
dozens 78:13,13
78:13
drafted 153:21
dragging 64:8
dramatic 50:6,9
80:7 120:6,23
dramatically
168:17 183:16
184:6 223:4
drawer 206:11
drive 5:10 16:12
16:13 169:10
driven 56:16
driving 16:13
17:22 130:15
208:6
drop 246:14
drove 16:9
drowning 71:25
134:11
drug 47:14,17
48:2 73:3
120:15,16
177:25 208:11

222:19
drugs 117:25
dry 228:14
due 82:23 83:1
108:19 110:18
159:14 161:19
188:22 204:8
205:11 220:25
duly 248:6
dumping 74:7
duplicate 29:25
duties 128:15
161:13
duty 25:9 201:3
201:12
DVDs 118:13
DWR 130:15
DWRs 130:12
dynamic 16:18
dynamics
53:20

**E**

e-mail 2:11,12
9:21,22 90:5
90:6,11,12,16
90:25 91:5
92:12 93:12,13
93:16,21 94:5
94:14,20,22
95:2,4 96:11
96:18 101:13
101:15 102:18
103:11 125:14
125:15,17
126:3,4,7,19
127:9,20
128:25 129:9
129:18,25
130:5,10
131:22 132:8,11
132:11,12,13,15
132:17 134:4,5
134:6,18
135:21 158:11
158:14 181:2,8
181:13 217:16

229:12
e-mails 2:20
90:17,20 91:4
139:11 180:12
180:17 181:12
earlier 42:22
90:10 126:3
139:17 153:16
154:1 163:23
166:15 167:22
180:17 188:9
194:12 199:8
228:3 230:14
237:11,13
238:2
earliest 220:19
early 14:19
26:23 155:19
159:13 163:11
ease 8:8
easiest 246:17
economic
39:25
economy 39:9
39:15
effect 60:14
120:6,23 141:8
175:12 206:3
233:3
effective 79:23
84:25 89:10
91:25 92:10
103:18 175:5
190:14 212:14
241:12,19
effectively
25:13 28:21
46:22 50:13
81:15 85:17
91:22 94:8
134:15 146:7
effects 118:19
efficiency
29:24 32:23
34:15
efficient 228:10
229:19

efficiently
229:17
effort 164:7
228:5 241:7
efforts 141:10
eight 120:16
172:23 197:3
232:15
eight-page
139:11
either 15:23
18:15 28:3
34:3 55:4
58:16 60:2
65:9,14 66:10
97:2 110:20
113:12 114:4,15
114:16 117:19
142:13 151:13
158:14 168:3
170:14 171:5
189:8 227:13
246:20
elected 93:10
93:12,14
196:14
electronic 9:11
9:12 10:8
elements
152:15
eligible 27:4
51:12 107:15
130:12 131:14
Ellen 12:16 17:13
135:25 147:15
180:18 212:5
242:10
employed 15:9
49:4 100:2
115:18,19
154:18 248:10
248:13
employee 17:3
217:9 248:12
employees
11:23 12:1
18:23

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-2   Filed 02/21/18   Page 76 of 107

employer
120:10
employers
120:9
employment
37:19 86:1
92:8 120:12
236:9
empower 102:8
enclosed 249:9
249:10
ended 40:15,18
64:24 67:2
75:23 129:24
167:3
engage 47:15
67:23 105:25
engaged 65:24
189:6
engaging 116:12
ensure 141:10
enter 66:22
105:19 116:21
137:13 175:25
178:20 182:8
204:9,13
246:4
entered 47:14
62:16 64:18
65:20 66:12
70:17,21
105:22 108:8
108:14,20,24
116:21 155:5
164:2
entering 62:14
107:16 116:11
116:13 177:8
203:16 225:18
235:10
entire 16:8
17:20 28:13
43:7 81:13
150:13 244:3
entries 77:3,10
entry 70:24
76:24 77:1

108:21 117:7
179:13,16
envelope
227:19
environment
206:17
equal 232:17
equitably
200:8
erased 122:4
errata 249:10,13
249:16 250:1
error 135:17
errors 142:25
143:4
escape 76:3
Especially 37:4
246:16
essential 152:14
essentially
110:21 129:22
130:5 137:8
154:16 155:8
228:2
establish 161:9
established
207:9
estimate 20:5
20:19 24:9
45:17 52:22
72:18 107:24
214:8
estimated
245:25
et 1:4,7 3:3,6,19
3:20 5:5,6
100:3 177:25
249:6,7
250:2,2
ethical 88:7
100:25 139:18
140:1,20,22
140:24 142:8
158:16 160:7
161:12 165:14
165:16 167:15
170:25 171:6,8

171:13 181:5,17
ethically 87:2
88:2 92:4
142:11 157:22
164:1 232:21
evaluate 150:1
evaluation
146:19 160:5
event 33:1
56:22 69:19
100:7 108:4
134:22 182:22
eventually
64:22 81:21
81:23 136:11
168:12 180:18
everybody 11:16
32:22 39:11
48:24 82:6
95:22 104:16
162:11 206:6
206:18,18
212:19
everybody's
48:9
evicts 119:20
evidence 85:17
121:21 122:6
128:18 159:21
evidentiary
136:17 137:2
137:19 138:4
139:3
evolved 80:19
evolving 105:3
ex 135:12
exact 23:20
45:17 47:8
71:15 230:20
exactly 74:24
242:24
Examination 2:1
2:3,6 6:5
239:18
examined 3:10
6:3
example 12:15

19:10 33:7
34:20 35:4
53:13 67:19
68:16 69:7
84:22 111:8,17
117:3 179:1
197:2 199:25
200:10 208:7
208:18 214:3
217:21 235:11
examples 79:1
113:23 242:8
exceeding
55:25
exceedingly
77:10 114:7
Excellent 191:2
exception 94:11
161:4 206:1
excess 236:12
excessive
108:19 110:18
111:4 161:17
162:8
excuse 50:15
169:22
execute 55:4
executed 56:6
251:14
execution 55:1
56:3,14,17
exempt 236:6
exempted 97:17
exercise 59:14
100:9
exercising
226:10 227:14
exhausted
102:7
exhibit 2:10,11
2:12,13,14,15
2:16,17,18,19
2:20 13:7,8
89:21,22
125:7 133:18
133:20,23
139:9 141:16

141:20 142:19
142:20 147:21
147:22 153:7,8
153:10 156:3,4
156:7 157:1,2
157:11 160:20
169:13 171:22
172:3,5,10,18
172:21 173:19
173:24 174:8
177:19,20,21
180:1,3,3,4
230:9,10
237:6
exhibit-- 89:21
exhibits 2:8,9
2:21 14:15
157:13 172:5
172:19,23
exist 222:22
existence
44:25 234:2
existing 31:17
46:10 108:6
111:13
exists 223:14
expanded
208:10
expect 110:4
222:16
expectation
205:4 217:21
218:18 221:3
expectations
19:1
expecting
25:10
expensive
203:14
experience
28:8,16 29:21
37:12 48:6
57:10 73:25
74:17,20 77:21
87:12 146:15
160:3,4 164:14
164:15,16,22

ALARIS LITIGATION SERVICES
www.alaris.us        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-2   Filed 02/21/18   Page 77 of 107

165:1 168:16
194:1 199:15
199:24 200:2
209:17 210:9
218:19 220:7
222:6 232:13
232:14,16,18
235:14 240:17
245:21
**experienced**
45:2,4,6,9
85:2 112:25
113:2,3 164:17
164:18 189:20
199:14 200:7
239:1,7 240:6
240:9,12
**experiences**
82:10
**experiencing**
74:23,24
79:16,16
168:24 170:23
**experiment**
234:11
**expert** 122:12,15
122:16 128:17
186:6 210:23
216:19,19,25
217:8,13 218:4
218:4,12
244:10,10,11,14
244:18,19
**expertise**
210:10 218:20
**experts** 185:20
185:25 196:5
216:17 217:19
240:21,22
244:7,8 245:3
**Expires** 251:24
**explain** 32:6
34:15 48:21
60:5,8,17
147:14 168:2
178:24 189:4
**explained**

33:25
**explanation**
204:14 209:12
**Expo** 193:15
**express** 83:4
245:19,23
**expressed**
66:23 83:16
83:18 84:17
86:15 91:20
95:22 152:7
152:13 162:9
**extend** 214:5
**extent** 36:15
204:7 224:6
224:15
**extra** 86:13
135:3 220:10
**eyes** 29:20

---

## F

**face** 44:24
51:22 54:11
55:17,21 121:18
152:21 205:8
**faced** 233:21
**facing** 51:21
55:16 57:5
58:18 60:2
73:1,2 80:3,15
81:11,13 86:12
119:15 123:10
124:19 152:24
190:2
**fact** 30:1 47:22
95:18 113:17
126:6 141:13
152:20 161:20
163:16 164:9
165:14 167:16
171:4 204:9
**factor** 26:6
**factors** 199:17
213:22 232:10
**failed** 58:25
193:21 223:6
**failing** 50:25

51:4,5,6
**failure** 52:18
**fair** 22:18 33:24
48:18 86:4
103:24 115:15
126:21,24
144:20 146:8
150:3 160:8
171:3 172:9,21
173:24 178:5
228:22 229:4
236:6 241:1,4
241:9 244:21
245:2
**fairly** 117:23
**faith** 29:23
**familiar** 7:23
18:12,15 90:1
222:14 231:13
**family** 16:18
27:2 34:5
42:19 53:10,11
118:6,7 245:8
**fancy-pants**
204:9
**far** 25:4 67:18
68:3 103:1
133:1 144:15
163:14 200:2
207:5 235:24
241:25
**fashion** 72:8
113:11 114:1
**fast** 118:11 209:8
**faster** 118:7
227:7
**fax** 165:19,20
**fear** 103:11
**February** 41:19
112:12
**fee** 121:6
**feedback**
152:14
**feel** 8:14 27:10
83:19 85:22
100:24 135:10
135:16,18

139:5 157:22
162:22 163:8
163:10,10,13
163:25 188:1
232:21
**feeling** 170:22
**feelings** 101:15
**feels** 83:20
**fell** 16:17 39:10
206:12
**fellow** 64:16
65:2,7 74:25
**felonies** 23:12
23:13 24:9
41:16,17 45:21
47:10,25
49:19 61:10
62:5 246:22
**felony** 23:11,17
24:7 41:3,4
45:13 47:8,13
48:2 49:16
51:6,24,25
54:18,19
56:24 57:4
73:6 177:25
177:25 208:13
214:3 225:11
246:19
**felt** 21:15 88:9
101:15 104:7
165:7,9 188:3
203:16 206:17
229:25 233:4
**fewer** 39:19
48:18
**field** 88:15
**fifth** 29:6 168:14
211:16
**Fifty** 109:14
**figure** 102:2
133:2 176:9
179:9
**file** 10:16 36:19
46:22 65:10
75:17,18 84:6
85:14 100:15

106:11 109:16
110:14,21 117:6
126:23 143:13
179:13,13
186:9,15,20
206:11 226:20
229:24 230:2
230:6 234:20
234:22
238:19
**filed** 46:4 49:3
62:6 64:9,20
65:3,9 66:10
105:1 106:5
107:4,12,16,25
108:4,6,18
109:8,17
110:10 114:2
114:23 153:22
155:1,9,11
156:11,20
167:24 197:4
229:23
**files** 77:22
197:25
**filing** 49:2 62:3
64:6 66:11
100:1 103:14
107:10 109:18
113:18 117:21
123:24 134:21
155:18 156:15
157:12,14,15,16
157:20,21
177:16 179:16
179:17,24
249:18
**filings** 93:15
155:17
**fill** 88:20 159:19
179:3
**filled** 35:6,7
39:20
**filling** 123:22
**final** 189:14
**finally** 206:7
**financial** 51:11

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-2   Filed 02/21/18   Page 78 of 107

107:14 234:17
**financially**
  248:14
**find** 32:11 34:25
  53:18 84:14
  87:7,15 92:7
  122:11,15,18
  123:1 138:13
  175:2 204:12
  216:25 228:19
  235:3 244:9
  249:9
**finding** 21:20
  37:2 38:7
  92:8 175:6,11
  175:14
**fine** 6:12 14:24
  47:9 52:3
  54:22 118:1
  131:12 196:18
  196:19 206:4
  219:4
**fingers** 7:20
**finish** 8:10 36:1
  194:11
**finished** 180:2
**firm** 28:10 43:4
  43:5,7 115:1,3
  191:18,19
**firms** 42:13,24
  43:1
**first** 13:21 14:6
  26:22 31:4
  35:13 37:20
  46:19,23 47:1
  47:24 49:16
  52:12 54:19
  59:10 65:18
  91:1,15 97:4
  102:13 128:2
  130:18,24,24
  132:10,11,15
  149:11,21
  151:18 154:2,3
  154:4 155:1
  160:24 177:15
  178:19,19

182:4 215:9
  224:22
  227:13,13,14
  237:18
**first-in** 227:5
**first-offense**
  130:19
**first-out** 227:5
**first-time** 57:4
**first-year** 31:5
**fiscal** 144:5
  147:5
**fit** 109:2
**five** 16:12,14
  25:4 26:8,17
  32:4 34:6
  43:7 56:13,13
  73:9 75:24
  76:21 80:13
  81:16 87:1
  126:11 154:4
  164:16 172:22
  175:23 189:1,9
  195:24 211:1
  235:24 245:7
**five-minute** 21:3
  223:20 224:11
**five-year** 56:6
**fix** 92:4 103:20
  117:22 151:5,16
**fixed** 56:8,23
  182:14 226:8
**flat** 200:20
**flip** 52:7
**floated** 62:13
**floating** 114:13
**flood** 86:20
**Florida** 215:12
**fluctuated**
  205:23 219:6
**focus** 162:5
**focused** 149:24
**focuses** 152:9,11
**folks** 30:21
  38:25 53:5
  133:3
**follow** 18:24

86:9 203:18
**follow-up** 90:7
  210:16 223:2
  223:3
**following** 14:7
  35:16 103:7
  108:21 148:4
**force** 141:14
  170:14
**forceable** 80:18
**forced** 50:14
  79:4,9 100:15
**foregoing**
  248:6 251:6
  251:13
**forensic** 217:2
**forever** 36:1
  76:3 82:7
  102:22 117:15
  122:12 150:15
**Forget** 118:24
**forgive** 214:17
**forgot** 218:1
**forgotten**
  217:24
**form** 9:10 51:2
  153:14 155:11
  157:10 181:2
  222:16 251:7
**formal** 18:19
  19:2 96:10
  179:3 202:5,6
  207:7 213:24
  216:11
**format** 230:21
**formats** 19:9
  107:7
**formatting**
  142:24 143:4
  230:22
**former** 173:3
**forth** 32:16
  197:12
**forum** 192:17
**forward** 38:2
  63:8,12,14
  102:3

**forwarded**
  129:18
**forwarding**
  132:13
**found** 78:2,10
  122:18,23
  154:10 175:8
**foundation** 87:6
**four** 3:12 20:18
  32:4 34:6
  47:4 51:23
  54:21 55:18
  56:12,23 60:2
  75:15,19 77:5
  78:3 79:19
  80:8 81:17,18
  81:19 95:11
  119:23 126:11
  139:16 154:4
  172:22 173:21
  189:14
**four-** 56:10
**four-year** 59:11
**fourth** 29:6
**fraction** 146:5
**Franklin** 135:12
**frankly** 21:19
  25:11 28:8
  29:7 33:2,13
  49:22 72:22
  76:1 88:11
  101:10 102:19
  103:8 110:2
  111:5 122:25
  124:16 135:2
  151:11 170:8
  220:8 229:12
  246:13
**free** 8:14 72:13
  72:14 119:12,12
  135:10,16,18
**freely** 126:17
**frequently**
  244:8 245:3
**Friday** 235:24
**frivolous** 136:12
**front** 59:4 68:4

69:15,16
  118:10 131:23
  134:8 137:5,15
  139:10 141:20
  143:14
**fruitful** 244:11
**fruitless** 242:21
**frustration**
  152:7 245:20
**full** 118:11 161:21
  221:4
**fully** 96:25
  145:15 171:13
  221:15
**Fulton** 15:20,22
  16:1,9,10,16
  22:17 39:13
  149:15 207:2
**fund** 161:9 213:9
**funded** 128:14
**funds** 213:9
  214:5,24
  216:17 218:4
**funny** 39:8
  150:14
**furious** 29:15
**furlough** 117:24
  118:8
**furnish** 161:11
**further** 96:23
  98:21 248:11
**future** 110:13
  221:8

---
**G**
**gal** 6:22
**gander** 174:5
**gap** 29:20
  36:17 159:20
**gather** 20:23
  244:10
**gathering**
  192:12
**gears** 225:7
  228:17
**general** 4:17
  17:6 55:15

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-2   Filed 02/21/18   Page 79 of 107

201:24 244:17
general's 4:18
27:7 211:17,18
generalization
57:15
generally 35:11
35:11,15,22
42:2,18 57:15
57:16 61:18
63:8 83:4
85:19 114:15
158:15 182:10
182:12,13,17
188:1 204:20
205:10 217:3
218:23 227:9
229:22
236:23
242:18
gentleman 66:8
66:19 75:25
81:6 154:24
geographic
37:21 38:3
199:9
geographically
32:19
geography
34:14
getting 22:2
29:8 32:21,22
38:19 43:19
59:22 75:21
75:22 118:11
119:6 177:10
184:14,21
185:15 186:3
186:18,23
187:17 201:4
216:7 242:23
giant 156:23
157:14,14
ginormous
204:11
give 13:10
24:24 29:9
48:17,17

52:22 74:8
83:10 86:6
98:3,4 100:19
116:6 126:23
136:3 138:5
158:19 170:11
198:25 199:1
209:2,4 210:1
219:3,5
given 12:10,14
13:5 36:25
37:20 41:24
43:11 53:24
72:2,2 78:22
79:1,9 86:3
111:4 126:14,17
126:20 157:19
157:25 183:2
183:2 190:1
199:3 213:11,12
213:14 238:23
239:4 240:2
gives 21:18
222:3
giving 29:1
35:12 95:7
102:12
glance 13:11
89:25 133:24
glass 67:20
go 8:19 14:25
17:10 20:9,16
25:6,12 28:19
28:19 29:12
30:5,10 31:19
34:13 35:22
37:24 40:2
44:23 50:2,2
59:3 62:24
63:7,11,14
64:15,23 65:6
66:21 70:6,15
78:15 85:16
102:3 109:16
117:25 118:25
120:22 123:15
124:1,14 133:1

145:7 148:19
169:9 171:17
172:8 181:12
182:3 192:2
196:1 199:12
203:22
205:25 212:17
215:12 217:22
218:19 219:15
221:12,19
229:8 232:4
232:10 234:7
235:2,25
God 206:9
goes 33:9
112:24 114:17
119:19 198:2
216:7 231:6
going 7:24 13:6
20:1,2,6,14
25:24 26:3
27:24 28:22
31:14 32:10
33:5,9,19 46:9
50:2 52:15
53:6 54:2
55:25 57:13
57:16,19 58:3
59:1 61:2 62:9
62:10 65:10,15
65:18 66:22
68:17,18,22
69:18,21 74:7
74:8 76:3,10,11
76:20 77:25
78:7,14,24
82:11 84:2,4,11
84:12,12,20
85:12,12,14
86:5,15,20
87:16 88:19
90:18 95:8,24
96:22 102:1,3
102:13 103:16
103:17 106:15
109:24 110:1
111:11,17 113:19

116:17 117:5,14
118:15 119:9
119:20,22
120:3,12,14,18
121:7 122:21
123:1,2,6,8
124:1 130:11,13
139:13 147:21
150:15 158:4,6
158:19 160:6
167:3 170:11,14
170:25 174:23
175:2,5,11
176:8 177:13
178:24,25
179:3 180:19
181:25 191:14
196:15,15
197:6,10
200:4,4
203:6 204:19
206:1 208:17
208:24 209:7
209:9,23
215:20 219:22
220:15 221:13
223:1,3,3,8
225:14 226:16
226:23
227:10 228:17
230:2 231:24
233:14,17,22
234:18
242:20,20
245:7 246:10
good 6:7,8
21:25 27:3
35:11 67:2
81:22 83:9,19
85:12 87:9
109:14 112:15
124:9 139:6
196:22 216:10
goodness
74:25
gopher 220:2
gotten 37:5

39:3 125:11
150:22 182:23
187:18
govern 162:3
governing
217:12
governments
161:9
governor 4:16
5:22 97:15
98:10 191:4
governs 160:14
160:16
grabs 33:10
gracious 128:6
graduates
38:13
grand 198:3,3
Grandma 26:23
Grandpa 26:24
grant 59:7 62:9
granted 103:17
110:8,12,13
120:3 128:6
154:23
graph 231:4,11
231:15,18
great 16:14
102:20 174:3
221:18
greater 147:10
green 93:6
132:18,20
133:3,7,9,12
Greitens 4:16
5:22 191:5
gross 57:15
grossly 76:2
79:14
group 98:1
194:16 200:6
grow 48:12
grown 83:3
guess 58:13
91:15 127:12
141:15 171:15
177:4 199:11

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-2   Filed 02/21/18   Page 80 of 107

202:19 207:8
211:13 219:9
225:20,25
227:19,25
231:17
guesstimate
10:23 109:14
guideline
233:19
guidelines
18:23 203:17
guilty 67:6
221:8
gushing 151:5
guy 79:19
120:10
guys 51:17 61:6
61:11 63:3
226:6

**H**

H 172:19 173:19
173:24 177:20
H-a-e-l-a-e
93:17
H-e-a-l-e-a
93:18
half 47:24 67:21
95:12,12,14
96:21,22
149:18 150:5
150:19 153:3
154:5
hallway 6:14
Hamner 69:5,8
hampered
184:17,24
185:16 186:5
186:20
hand 135:4
145:20 209:2
231:10
handle 19:15,16
23:1 41:3,4,7
41:10,13 91:22
111:21 145:14
232:21

handles 41:15
handling 45:18
88:22 100:21
181:23
happen 27:25
69:15,16 78:8
105:22
220:25 221:7
222:6 223:2
234:13 235:6
happened
28:13 60:20
60:21 66:1
77:15 82:18
94:12 104:20
104:24 117:1
123:17 185:1
happening
29:15 58:7,8
63:20 73:12
74:21 76:15,16
76:22 106:10
113:24 133:9
happens 32:7
32:17 235:21
236:2
hard 20:6 121:7
196:11,16
209:8 220:22
harder 120:2,4
Hayden 69:3,6
69:7 92:19
Hazel 155:24
he'll 10:14 68:19
69:4
head 23:2,19
24:3 45:20
52:10,22 71:3
77:14 82:2
85:3,5 89:18
94:8 109:9
137:2,21
145:23 175:19
193:20 196:3
196:7 205:16
206:24
215:23 216:4

header 92:23
heading 160:25
heads 100:24
Healea 93:14
health 222:20
hear 205:7
heard 34:4
59:20 60:8,9
60:13,17 95:16
95:19 124:3
162:14 166:1,3
201:7,16,22
hearing 13:18
44:6 65:12
66:15 103:2,4
114:11 137:14
137:25 139:3
155:1 169:18
169:19 172:7
175:15,22,24
175:24 182:14
182:15 222:8
hearings 98:8
136:17,20
137:3,19,24
138:5 148:4,6
148:12,14
182:4,9,11
heavy 113:6
149:25
heck 30:9
held 5:9 13:18
225:9
help 30:2
49:22,23,24
112:25 130:20
151:7 152:15
180:20 225:3
225:20
229:10,12
helped 88:21
89:2,9 151:1
helpful 10:4
16:18 78:23
243:14
HERRINGTON
4:3,7

hesitate 8:12
hey 19:18 29:9
62:25 63:2
68:5 89:11
98:24 102:12
122:16 158:12
158:15 200:24
226:6 228:16
229:21
hidden 50:19
high 4:19 30:25
38:23 72:3
91:21 117:23
204:16 205:21
higher 24:19
205:17,24
Hinkebein
38:18 166:12
166:14 167:5
167:19 227:16
229:3
Hinkebein's
167:3
hire 32:10 33:7
53:19 59:23
106:14 204:20
235:1
hired 25:6 36:5
88:20 168:13
175:17
hiring 17:2 25:5
30:13,14 36:1
37:5,9 38:3
39:10 112:1
190:6
historical 222:11
historically
86:16 243:22
history 77:8
hit 31:18 228:11
Hmm 20:6
hold 99:23
119:14 122:2
191:24 197:24
208:19 209:3
213:2
holding 45:16

53:22
holistic 160:5
hope 62:10
87:24
hopefully 35:9
hopes 87:2
hoping 121:19
horrible 120:22
horribly 71:25
hour 21:22
hours 3:11 9:8
20:24 111:16
129:2 208:21
208:21,23
222:5,5
224:8,8
236:12
housing 119:17
120:25,25
HR 38:2
huge 39:25
121:10
human 17:5
humanly 204:7
223:12
hundred 31:24
39:12
hundreds 107:11
155:10 163:17
163:18
hung 59:10
hypothetical
197:22 201:11
hypothetically
198:13 220:23
221:2

**I**

ice 49:25
iceberg 50:1
idea 7:19 43:24
67:2
ideal 244:22
ideally 244:13
identification
13:9 89:23
133:21 141:17

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-2   Filed 02/21/18   Page 81 of 107

142:21 147:23
153:9 156:5
157:3 171:23
180:5
identified 73:14
122:16
identify 73:21
identifying
147:10
ignore 19:20
92:5
imagine 199:15
immediate
100:17,19
101:18 228:6
immediately
41:21 99:21
104:15
immigration
187:24 188:4
188:12,21
impact 69:18
100:17 120:12
167:18 246:15
impacts 100:20
impatient 191:10
implement 55:9
84:11 233:22
implemented
27:9 88:5
238:12
implicit 161:8
important
121:25 122:8
123:3
importantly
175:4
impose 54:25
119:4
imposed 56:12
59:11 76:5
243:24
imposition
54:15 55:23
56:1,4,9
impossible
86:21

impression
38:12 39:2
68:11 88:18
102:20 103:16
improve 128:8
improved
152:16 229:6
improvement
228:25
in-custody
177:14
in-house 17:3
in-patient
117:25
in-prison 72:8
inability 188:22
189:5
inaccurately
173:9
incarcerate
48:3
incarcerated
69:19 72:16
72:25 75:1,25
incarceration
131:11
incident 198:5
198:18 222:10
inclined 52:14
59:6
include 23:7
included 16:20
94:14
includes 110:22
including 47:25
151:20 175:21
201:2
incoming 104:17
237:5
incomplete
203:11
inconvenience
100:22
increase 56:20
100:13 145:21
145:24 146:2
195:25

236:25
increased
238:22
increments 21:3
223:20 224:11
independent
210:9
independently
225:22
index 2:1,8
172:18
indicate 22:14
249:12
indicated 72:3
98:16
indicating
94:23 131:22
203:12
indicts 198:3
indigence
202:9 204:24
indigency 89:14
234:8
indigent 42:8
154:10
individual 32:3
34:4 36:16
40:10,11,23
58:18 59:13
60:1,7 63:25
65:18,24 70:6
71:21 76:16,20
77:15 80:12,13
103:13 114:17
117:19 118:20
123:10,12
164:22 171:1
181:11 207:18
230:7 232:11
246:7
individually 19:7
individuals
42:24 55:16
92:13 94:6,10
106:2 121:18
123:14 124:12
127:19 136:10

147:18 150:17
164:2 167:10
168:9,20 171:9
176:16,18,20
182:9
ineffective 76:2
78:7 79:14
82:23 83:1
142:14 241:6
ineffectively
83:14 104:1,6
inefficiency
30:7
ineligible 51:8
131:16 234:17
inexperience
152:11 244:17
infant 80:16
infinitum 133:15
inflation 151:13
inform 200:16
informal 51:15
112:24
information
12:21 158:7
203:12 205:5
217:5
informs 154:9
inherent 226:11
inherit 226:4
initial 81:25
127:20 182:4
188:15 217:24
218:1,3
initially 9:22
24:7 58:8,17
136:9 138:19
138:20 198:2
initiate 105:20
initiated 231:4,9
injured 6:24
injuries 7:4
inmate 67:19
innocent 120:13
204:14
instance 7:13
59:3 215:4

instances
63:23 212:4
instituted 61:21
74:13 79:5
87:25 104:4
183:14 184:4
186:13 189:16
189:24
instructed
82:20 181:20
instructions
200:15 225:3
instructs 8:18
intake 222:16
intended 98:13
161:10 176:15
intent 73:5,8
intention 164:6
interchangea...
138:8
interested
248:14
interesting
232:5
Interestingly
50:12
interim 36:10
81:1 97:24
105:22 148:3
150:24 151:4,8
194:15
intern 220:6
internal 152:21
internally 36:12
36:18 98:22
104:11 135:1
158:3
international
192:7
Internet 120:8
interrupt 33:16
33:19 75:3
131:21 191:6
194:10
interruption
29:3 33:17
intervening

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-2   Filed 02/21/18   Page 82 of 107

40:1
interview 35:18
  213:6
interviewed
  223:10
Interviewing
  213:3
invariably 36:17
  52:17 86:23
  223:1
investigate
  184:1,7,17,25
investigation
  73:15,22
  85:15 166:24
investigative
  117:18
investigator
  10:17 40:25
  159:3,10,11,17
  159:22 184:10
  212:11,12,16,16
  212:21,22
  213:4
investigators
  184:12 240:21
  240:22
investment
  28:21
Invoices 17:6
involve 216:13
involved 75:22
  142:5 194:21
issue 19:15
  68:15 88:14,15
  106:13 188:4,6
  188:7,12
  192:17,18
issues 17:4
  19:12,14 30:11
  137:9 152:12
  156:11 173:5
  183:3 197:6,9
  197:9,12
  222:19,20,22
  222:24
  230:12,22

It'll 69:13
items 9:16,19
  10:3,16,18

_____
         J
_____

Jackie 165:24
Jacqueline 4:12
  5:23 249:3
jail 20:2,8,10
  29:11,13 54:21
  55:8 62:6
  64:12,22 65:2
  65:5 66:8,17
  68:12,19 72:1
  72:10 75:1,11
  75:15 76:21
  77:17,18 78:2
  78:5,10,18
  79:19 80:9
  99:20,22
  105:7,8 109:4
  109:4 111:18
  117:9 118:22
  119:1,6,7,13,16
  119:23 121:11
  121:24 124:5
  130:20 131:16
  175:23 176:2
  176:10 188:11
  189:1 221:5
jails 78:19
January 25:12
  27:9 36:11,13
  39:21 40:13
  73:10 74:15
  75:13 87:25
  99:13,17 104:3
  104:15 130:24
  148:12 159:14
  224:2,2
  227:18 229:2
  234:15
jaw 6:23
Jeff 43:5 76:12
  77:17 99:4
Jefferson 4:19
  16:9,11,19

37:22 42:25
  102:17,25
  115:4 145:4
  146:23,24
  191:21 192:16
  193:9 207:2,4
job 28:10,12
  83:9 87:9
  119:19 121:1
  159:7 191:17
  235:11
Joe 10:14
joined 41:19
joining 191:17
joking 129:3
Jon 92:20
journalism
  193:11
Joyce 14:3
  49:13 61:6,16
  61:21 93:2
  116:3 174:19
  225:17 226:6
Joyce's 61:4,25
judge 14:1,3
  28:11 49:13
  51:17 52:15
  56:1,16,25
  57:1 58:2
  59:5,20,25
  60:5 61:4,6,16
  61:16,21,25
  62:14,16 63:2
  63:4 66:19
  68:4,13,24,24
  69:3,3,5,5,6,7
  69:8,12,13
  77:7,7 78:6
  82:22 83:8
  84:5,25 92:15
  92:18,19,20
  92:25 93:1,2
  93:2,4,4,5,6,7
  93:7,9,25
  94:8,13 105:6
  111:10 114:19
  116:3 118:10

123:23 125:16
  125:18 126:21
  129:9,25
  130:6 132:21
  133:12 137:5,11
  137:15,16
  138:10 139:2
  170:13 174:18
  174:19 175:8
  176:7 182:5
  225:13,17
  226:6,9,17
  227:10 235:16
judge's 115:12
  129:13 225:25
  227:10 246:3
judges 26:1
  34:19,22 49:9
  62:8 69:17
  74:7 82:25
  83:2,12,18
  84:17 91:7
  92:22 94:15
  110:1 117:22
  134:7,12 138:4
  167:25 192:12
  201:5 228:24
  229:11
judgment 98:5
judicial 84:16
  92:16 93:1,3
  139:4
July 25:9,10
  68:16,17 69:7
  144:8
jump 183:15
jumping 226:23
  243:1
June 27:2 41:19
  61:5,13 116:8
  144:9 145:17
junior 113:1
  170:10
jurisdiction
  33:15 55:11
  201:15
jurisdictional

196:14
jury 59:10 67:21
  126:14 198:3,3
  219:19,20
justice 111:12,13
  128:16 228:24
justify 211:23
  214:10 216:15
Justin 1:17 3:9
  5:5 6:2 135:19
  154:7 249:9
  250:1 251:5
  251:20
juvenile 41:11,13
  41:21 42:2,4,8
  42:9,16,21
  43:9,14,22,24
  43:25 44:13
  44:16
juveniles 44:10

_____
         K
_____

K 128:6
Kalie 180:23
Kaltenbronn
  92:20 137:5
  139:2
Kansas 37:23
Karl 166:11,12
KBIA 193:16
keep 48:7,11
  74:7 78:21
  101:2 102:12
  111:15 128:20
  139:22 151:12
keeping
  223:22
Kenneth 92:18
kept 29:8 151:10
kicked 102:18
  120:24 223:8
kid 16:16 29:7
kidnapping
  199:21
kids 119:18
  120:24
kind 6:20 7:4

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-2   Filed 02/21/18   Page 83 of 107

19:17 25:7,21
29:19 39:8
43:5 50:3
53:20 58:3
59:7 62:7
64:8,21 73:1
75:17 77:20
88:18 89:10
96:7 103:8
105:10 155:17
159:21 165:12
170:13 178:24
182:25 199:2
199:23 200:6
202:5 203:15
205:3 206:7
206:12 207:8
207:17 212:19
214:8 215:19
215:23 220:4
222:20
223:12 226:10
228:18,20
232:6 233:20
246:15
**kitchen** 105:10
109:5
**knew** 6:25
163:12
**knights** 147:17
**know** 6:10 7:4
8:7,23 10:13
10:23 16:10,12
16:15 17:3,6,8
17:15,22,23
18:8,22,25
19:3,10,11,17,19
19:23 20:13
21:8,14,16,22
21:23,24 24:6
25:5,7,11,20
27:22,24 28:2
28:4,5,9,14,18
28:20 29:5,6
29:7,10,16,19
29:24 30:1,4,8
31:5,9,11,18

32:18,24,25
35:9,12,19,20
36:2 38:4,11
38:14,15,17
39:9,10,12,13
39:16,19 42:7
42:19 43:4,6,6
44:2,3,5 46:21
47:9 48:4 49:1
49:8,20,22
49:25 50:3
52:6,11,11 53:2
53:7,16 57:16
58:14,21,22
58:23 59:3,5
60:13,14,23
61:9,12 62:3,7
62:15 64:5,7
64:11,21 66:16
66:19,25 67:1
67:3,17 68:3,5
68:20 69:4,16
70:7,18 71:16
74:9,24 75:13
75:25 76:12
76:13,15,17,22
77:19,20,25
78:7,8,11,13,17
79:18,21 81:23
82:4 83:4,6,7
83:17,23 84:2
84:4,18,22
85:9,10,18
86:7,14 87:4
87:10,12 88:11
88:14 89:2,10
89:24 95:23
96:2,5,7,8,12
97:22,23 98:6
98:7,10,20,23
98:25 100:14
101:10,18 102:1
102:8,11 103:8
103:15,19
104:9,12 106:9
106:25 109:10
109:18,19,24

109:25 110:10
111:5 114:6,8,10
117:1,2,7,14,21
118:5,11,14
119:13,22
120:4,7,9,14
120:16,17,19
120:20 121:1,6
121:8,9,11,13
122:2,4,6,21
123:5,7 124:1
125:11 126:12
126:14 127:6
131:11,23
132:16 133:24
134:21 135:2,11
138:24 139:2
139:4 145:19
150:23 151:3,3
153:15,17
158:5 163:2,3
163:4,4,5,8
164:17,21,25
166:1,4,11
168:11,15
169:8 170:21
173:12,14,21
176:3,21 177:11
177:14 178:8
178:25 179:12
179:14,22
182:22,23,24
188:5 190:13
193:16 194:18
194:22 195:24
196:1,14 199:8
199:13,18,21
199:22 200:1
200:7 201:14
201:17 203:6
203:8,10,25
204:4,12,12,15
205:3,6,16
206:7,15
207:13,16
208:8,10,13,14
209:24 210:12

212:10 214:2,4
214:6 215:24
217:15,17,18
217:20 219:22
219:24 220:2
220:8,23
221:2,13
222:4 223:4,7
223:9,12
225:10 226:6
226:9 227:9
227:23
228:14 229:7
229:9,10,11,12
229:14,18
232:13 233:10
233:23 234:2
237:7 239:14
242:2,17
244:18,19
245:16 246:10
246:12,13,15
**knowing** 76:10
**knowledge** 6:15
21:10 27:17
58:11 74:1
82:15 85:18
90:20 93:17
115:11,19,22,24
140:11,13,16
142:4 189:7
214:12
**known** 39:18
**knows** 57:12
68:12 111:8
**KOMU** 193:9
**KRCG** 193:9

_____ L _____

**lab** 120:15
122:18,18,23
**labor** 138:18,22
236:6,9
**lack** 166:21
184:17,24
185:17 186:6
186:20 207:8

231:14
**Laclede** 92:17
137:15 138:6,7
138:10,21
**laid** 59:25 67:17
**Lake** 193:15
**landlord** 119:19
**language** 95:6
181:6,19
**languished**
76:7
**large** 197:8
199:9 205:10
**larger** 48:13
**late** 6:21 9:22
**laughing** 150:10
150:11
**law** 3:13 27:11
28:10 42:12
42:24 43:1
48:14 84:4,8
85:2,4,7,7
85:10,18,24
112:10,16
191:16,25
192:3 199:19
236:9,9 239:1
239:7,12
240:6,10,12,13
240:18
**law-related**
85:7
**lawful** 6:3
**lawyer** 10:20
17:8 21:2
25:12,14 27:2
28:21,22 29:6
29:8,9,25
30:2,3,3 32:12
32:20,21,25
33:9,10,15,18
33:20 34:25
35:9,21 41:18
42:7,8,12 44:6
47:1 48:5,5,25
49:4 53:19
59:16,22 61:4

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-2   Filed 02/21/18   Page 84 of 107

61:13 71:2,3,7
71:10,11 75:2,4
75:16,19,20,21
76:10 77:5,19
78:6 80:11
81:19,20 84:2
84:21 85:6
86:4 87:12,16
87:23 92:3
99:20 100:2,3
100:25 101:3
105:2,19
106:14 107:9
107:23 109:3
109:4 111:7
112:11,12,15
114:18,20
116:23,24
117:3 139:18
141:8,9,10
142:1,3 154:11
154:18 155:5
158:4,9,12,12
158:14,18,19
168:14 169:8
170:10,14 171:1
171:7 175:17
176:4,11 179:12
179:22 184:10
189:6,21
199:19,24
200:5,9
203:15 204:10
204:20 205:5
208:15,24
209:17 213:4
213:5 216:9,14
220:3,23,25
221:3,9,9,14
222:9,12,15,16
232:14,15,17
235:2 239:1,2
239:8,12,13
**lawyer's** 48:8
103:5 140:7
142:2
**lawyers** 19:1,14

20:3 21:18,23
25:4,6 26:25
27:5 28:2,6,17
28:25 32:4
33:6 34:17
35:11 36:16
40:12,18 42:6
42:12,15 43:7
76:17 82:2,17
83:23 86:23
87:1,1,8,13,15
88:1 89:11
91:20,23 92:2
92:5,7 95:5
96:5,16 99:21
99:24,25
100:1 101:19
102:11,24
103:13,17
112:17,17,25
113:1,2 114:22
115:9 135:3
136:3 139:22
140:4,23 141:5
145:14,16,20
146:20 151:2
154:11 155:3
161:11 167:17
168:16 184:11
200:1,4,7
204:3 207:14
207:19 215:23
215:25 228:19
236:3 238:18
240:8 242:18
242:21 244:17
**lawyers'** 92:9
**leaner** 229:19
**learning** 48:14
**leave** 25:12
26:9,23 28:19
28:22 29:13
30:22 35:16
38:23 40:6,11
40:13,24 41:1
110:7 159:11,12
167:17,19

**leaves** 34:12
35:5,9
**leaving** 28:3
35:21 40:19
**Lebanon** 138:6
138:7
**led** 227:25
**left** 26:17 27:2,5
27:15,18 36:5
36:10 40:16
46:3,4 61:5,13
71:11 75:20
81:19,25 82:2
211:1 240:1
245:8
**leg** 84:7
**legal** 5:13 28:7
29:17 38:10
50:7 85:14
117:20 118:16
121:20 123:6
159:8,18 189:6
197:12 199:5,6
200:15,17
202:12,14
204:4 205:1,9
205:12 222:18
223:1 238:19
238:21
**legislative**
83:24 84:15
139:5 143:15
**legislature**
56:23 84:13
84:19 97:14
98:3,9 233:12
**length** 183:3
214:9
**lesser** 112:25
113:1
**let's** 114:8
183:18 192:15
197:13 200:24
221:19 234:7
234:10
**Letters** 141:24
**level** 31:5 50:5

91:24 92:9
116:17,18
168:16 177:20
201:23,25
207:10,25
208:2 232:13
**license** 162:21
167:3,15
**licensure** 162:13
163:14
**lieu** 123:22
**life** 81:9,13
119:14,14
222:25
**light** 206:9
233:6
**likewise** 28:11
43:21 137:13
215:18 217:20
**limit** 213:19
**limitation**
243:15,15,22
**limitations** 7:3
53:7 128:23
**limited** 46:24
104:17 114:8
**limiting** 213:22
218:11
**limits** 216:23
241:3,10,16
243:24
**line** 18:6,18 19:5
19:22 26:13,15
40:21 41:4
74:19,22,23
75:4 79:15
80:3 82:10
86:11 87:19
92:12,14 95:19
96:20 101:25
112:8 132:25
142:12 149:11
164:18 165:13
174:22 181:15
194:6 231:25
241:7 243:17
244:5 250:5

250:9,13,17,21
**lines** 126:12
139:16 154:5
169:24 179:19
199:22 218:6
219:25 237:18
**Lisa** 3:15 4:25
5:12 248:3,19
249:23
**list** 106:1,8
109:15 117:12
121:10 173:15
176:7,12 214:6
**listed** 144:13
**lists** 149:8 178:3
178:4
**literally** 107:11
**litigants** 50:13
**litigating** 103:13
**litigation** 3:13
5:10,14 18:13
249:1
**little** 24:18 28:7
42:20 45:7
71:19 124:22
130:21 139:25
151:3 155:6
178:23 179:21
208:19 209:3
214:20
226:24
**lived** 16:9 26:24
**lives** 161:16
162:7
**LLP** 4:3,7
**local** 102:9
103:3 135:5
207:10 228:17
**located** 17:18
67:25
**location** 115:1
199:9
**log** 21:2,21
**logged** 22:4
224:22,23
**logging** 21:17
225:6

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-2   Filed 02/21/18   Page 85 of 107

logic 197:13
logistical 37:1
logistics 66:6
long 9:6 15:14
    21:13 22:5
    27:23 45:1,8
    46:10,16 69:19
    79:1 82:11 85:1
    86:5 90:21
    98:11 106:18
    119:8 120:22
    122:3 158:20
    174:14 191:22
    209:6 220:12
    221:8 239:24
longer 24:23
    75:10 86:8
    106:20,21
    119:2 122:15
    123:15 209:12
    227:6,9
    233:22
look 23:3 26:1
    29:9,10 44:23
    59:1,5,21
    62:25 63:2
    66:20 75:17
    84:18 85:16
    90:23 98:25
    117:12 118:15
    132:11 139:4
    140:6,9
    148:20 172:13
    176:9 200:4
    203:10
    204:22
    206:14 212:10
    212:15,19
    216:23 217:3
    219:2 221:11
    229:21
looked 118:14
    203:8,11
looking 14:10
    28:15 63:1,6
    91:10 93:22
    125:10 127:22

160:20 174:4
looks 126:2
    127:13 129:8
    129:12,22,24
    142:24 143:14
    144:11 149:4
    153:17 180:22
    181:1,10,14
    230:17
loop 139:8
lose 119:18,19
losing 119:17
lost 22:1 25:4,4
    28:22 121:14
    122:7 123:7
    188:15 231:16
    235:11
lot 18:1 29:17,20
    38:14,19 49:7
    49:8 53:17
    62:24 119:13
    120:5,9 125:9
    163:11 233:15
lots 244:9
Lotus 10:12
    20:21
loud 188:13
Louis 17:25 18:1
    37:22 233:17
    249:18
love 101:10
    169:5,5,5
    243:12
low 30:25
    38:23 217:22
low-level
    246:21
lowest 31:5
lunch 125:3
Lute 129:10,13
    129:24 130:7

_____
M
_____

M-a-r-i-e-a
    191:20
magical 180:19
mail 234:21

main 160:24
maintaining
    149:25 224:16
major 6:23
    28:9 78:18
    192:6 193:12
majored 192:7
majoring 193:11
making 31:23
    36:15
Man 121:8
    158:18
manage 25:19
    207:14 224:12
    226:5
management
    10:13 11:21 18:7
    31:19 86:19
    89:5 101:20
    101:22,24
    102:1,6,14,16
    103:4 136:1
    152:8,11,14
    224:24
    228:16 230:1
    231:5 233:20
managers 141:4
mandate 19:16
manner 19:17
    60:11 183:10
    183:19 184:2,8
    185:8,12,20
    185:25 186:10
    186:16
manually 199:2
Mariea 191:20
mark 13:7 89:20
    142:18 147:21
    153:7 157:1
marked 13:8
    89:22 133:20
    133:23 141:16
    142:20 147:22
    153:8 156:4,7
    157:2 171:22
    172:2 173:19
    180:4 228:25

market 38:10
marking 156:3
Markrichards ...
    93:10
Marsh 4:8
massive 86:11
material 122:6
math 24:3,8
    113:6 146:4
    164:24 208:18
    209:3 245:14
matter 5:5 16:15
    35:19 73:23
    75:12 78:4
    92:6 103:1
    110:10 189:20
    191:5 196:25
matters 225:8
    225:15
maximum 54:12
    133:2 160:6
McCullough
    233:16
mean 16:24
    18:14 19:3,9
    22:16 23:13
    25:13 26:9
    28:13 29:14
    30:10 33:16
    35:8 37:10,25
    38:9,15 39:8
    42:23 43:6
    44:13,17,22
    48:7 50:4
    52:7 56:22
    57:6,9 58:12
    63:12 66:25
    67:16 71:7
    73:19 75:4
    79:18,20
    84:17 85:9,17
    86:1 88:8
    96:6,15 98:10
    102:21 106:8
    106:20 108:12
    109:4,21 114:8
    114:12 116:16

116:18 117:8,10
    118:2,16,22
    120:21,23
    121:8 123:5
    129:15 131:20
    137:7 143:8
    145:12 150:17
    151:15,23
    162:24 163:8
    165:11 168:15
    170:4 178:15
    182:19,24
    185:2 194:10
    195:21 201:17
    204:17 207:15
    221:2 227:9
    228:2 242:19
    246:7,8,10
meaning 140:15
meaningful
    246:5
means 17:1
    30:25 105:18
    145:10 146:8
    151:16,24,25
    168:11
meant 57:6
    161:12
mechanically
    173:17
mechanisms
    227:15
media 38:16
    124:9 192:20
    193:14
medium-sized
    42:24
meet 9:7 30:5
    51:11 78:11,15
    78:16 107:14
    222:15 234:17
meeting 19:11
    101:21,24
    102:6,15,17
    103:2,7,12
    117:17 148:23
    149:5 194:17

ALARIS LITIGATION SERVICES
www.alaris.us    Phone: 1.800.280.3376    Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-2   Filed 02/21/18   Page 86 of 107

224:24
228:15
meetings 19:8
meets 179:9
221:5
member 89:8
118:4 179:5
members 18:17
136:1 159:6,9
193:6 194:21
198:24 233:11
memory 31:15
44:24 70:25
131:4 149:9
156:18,19
224:1
memos 10:16
Menlo 4:8
mental 222:20
mention 146:23
159:2 193:21
mentioned
17:12 18:3
20:20 22:21
32:3 38:6
40:9 41:3
48:15 65:19
78:25 79:12
82:20 95:1
113:1 115:17
123:12 155:9
155:18 156:15
159:3,24
160:10,12
163:23 165:4
168:18 177:20
180:17 184:13
186:4 188:9
188:25 199:13
202:16 207:6
208:14 225:10
227:17 238:2
245:10
mentioning
80:13 101:9
mentor 150:1
mentoring

112:24
mess 24:20
48:15 83:22
84:19
message 102:5
met 6:13,14 9:2
9:15 221:9
metadata
231:14
metric 144:5,23
144:24 165:11
208:9,20
209:1 233:24
Meyer 155:24
Michael 115:3
143:22
Michigan 216:2
middle 13:21
91:11 155:22
174:13 201:5
201:18
military 25:9
Miller 16:22
19:24 20:2,2
20:5 32:21
33:1 34:23
42:3 43:11,14
63:18 64:6,13
64:17 65:3
68:25 75:15
77:16,23 78:10
78:18 83:6
92:16,21,23
93:12 114:11
117:3,4,22
118:23 119:3
120:17 123:20
124:5 127:17
128:4,9 137:5
137:23 138:1,2
138:20 167:25
179:1,15 195:10
million 33:14
81:8 225:4
mind 10:3 56:19
61:3 68:6
128:21 132:8

140:18 174:5
185:3 192:21
206:2
minimizing
129:3
minimum
222:21 223:13
minister 128:15
minor 192:8
minute 155:7
minutes 16:12
16:13,14 21:20
126:8
misdemeanor
23:8,17,25
47:13 51:5
208:6 209:5
225:10
misdemeanors
23:14,21 41:8
41:16 45:21
246:21
misfiling 166:22
mission 169:5
Missouri 1:1,7
3:1,6,14,16,18
3:20 4:12,13
4:15,18,19 5:6
5:8,11,22
13:23 15:10,11
50:25 98:3
100:3 115:4,18
115:20 120:7
140:5 143:23
144:12,19
153:18 154:8
154:14,19
155:25 160:17
161:22 162:9
164:10 166:19
167:4,4 191:4
191:15,21
211:21 216:20
237:14 248:4
248:20 249:4
249:5,7
250:2

mix 41:15,17
42:16,18
MO 249:18
mobilized 25:8
mocking 129:3
modification
53:12
Mom 53:18
moment 48:11
50:15 157:25
237:7
Monday 221:4
235:24
money 28:17
53:18 89:5
97:15,16 169:9
204:19 213:13
214:4 216:11
217:12 228:11
242:12 243:15
245:9,12,16,18
Moniteau 16:22
32:20 33:1,10
33:12 34:23
35:2 43:21
44:9,16 92:17
92:25 179:20
195:11
monitor 101:1
139:19
month 24:24,24
35:23 45:11
45:24 69:4,13
69:14,17
99:23,24
104:17 109:23
112:11 158:24
177:12 208:15
months 24:13
24:15,16 25:8
29:8 40:1
49:17 62:13,13
62:13,13 64:13
64:22 65:3,5
66:17 68:12,14
69:6 70:21,22
71:19 72:11,13

75:24 76:21
76:25 77:18
78:3 80:9,14
110:23 116:5
117:9 119:7,24
120:16,22
121:20,23
122:14 165:6
170:20 175:23
177:6,9 188:11
189:1,10 200:6
206:5 219:8
Moore 92:15,18
moot 106:13,16
106:24 114:16
moral 49:8
Morgan 92:17
128:7,23
morning 3:12
6:7,8
motion 2:16,17
9:24 10:1
36:19,20 46:5
49:3 62:10
64:21 65:9,10
66:10,11 100:1
100:7 105:3,4
105:5 106:5,5
106:11 107:7,8
107:16 108:18
110:8,11,15,17
113:18 114:3,5
114:19 118:10
123:25 124:6
124:7,8 139:3
153:22 154:22
155:1,9,11,18
156:10,14,14,16
156:22,23
157:20 160:10
179:17,18,24
189:5 230:7
motions 49:2,3
49:5,6 62:3,7
64:6,9,10
65:4 85:15
100:16,16

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-2   Filed 02/21/18   Page 87 of 107

103:14,14 105:1
105:2 107:5,10
107:13,18,19,21
107:22,24
108:2,3,4,7,20
109:6,7 113:5
113:7,8,9 114:9
114:14,23
115:21 116:2
117:21 134:21
134:23 136:17
136:18 137:3,4
137:12,25
138:5 153:14
153:25 155:10
155:18 156:1,2
157:12 167:24
177:16 186:9
186:15,21
229:23,24
230:2 238:20
move 22:12
33:15 34:11
35:24 50:17
50:18 108:25
109:1 125:8
162:25 163:1
174:7 240:25
moved 113:11,25
163:17 211:12
211:13,15
MSPD 4:11 5:24
7:6 15:18 37:17
147:3 167:10
225:3 237:22
multiple 58:25
123:17 219:12
murder 23:9
31:24 87:10,13
87:16 123:11
199:20 200:9
208:7,24
246:18,25
murders 177:25

N

N 249:17

NAC 165:10
name 5:11,12
6:9 13:23
44:24 93:17
149:7,22
151:19 185:4
191:3 226:10
250:1,2 251:11
names 5:16
193:13
National 233:19
natural 239:9
nature 17:14
171:4 223:14
near 221:8
necessarily
57:5 96:18
192:10 214:12
242:13 243:7
244:20
necessary
50:10 218:20
222:4 251:9
need 8:13,22
12:21 20:9
21:16 30:17
59:16 69:21
76:18 88:15
98:4 101:16
110:9 117:13
122:24 126:24
146:19 188:7
191:1 197:11
201:6 203:5
213:6,14
216:25 223:10
230:5 232:18
232:18 233:13
239:22
244:19
needed 73:15
97:1 117:18
122:20 155:15
209:13 211:22
217:5 244:11
needs 73:21
119:3 122:17

212:16 221:6
221:10 222:6
222:9,12,15
negotiate 187:8
187:14
negotiating
124:13
negotiations
65:25 70:8
neither 62:9
92:5 154:23
248:9
never 28:9,11
35:20 59:5
76:4 77:19
78:4 84:14
110:1,4 161:10
201:7 213:12
220:4 230:16
230:19 242:16
new 4:4,4 29:8
29:25 30:2,3
32:11,14,21,22
33:12 38:25
45:23 47:23
48:8 60:15
65:8 69:4
77:5 92:8
112:15 117:4
128:21 152:10
157:12,17
197:17 198:17
235:9
newer 71:5
news 91:16,18
193:9,12
nicely 97:15,16
Nifong 4:13
249:4
night 182:23
201:6,18
nighttime
201:15
nine 3:11 35:2,3
56:13 75:24
76:21,25
80:14 222:5

235:24
Nineteen 16:4,5
nonattorney
159:1
nonsupport
49:14,18 50:13
50:24 51:18,21
52:5,12,20
53:8,15 54:4,6
54:9,13,19
55:17,22,24
56:2,8 57:10
58:16,18,22
59:9 61:1,7,8
61:12,15 62:15
62:22 64:1
93:9 225:8,18
226:7,22
245:25 246:1
Nope 80:1
normal 235:24
north 216:2
notarized
249:16
notary 249:14
251:23
note 2:21 22:13
25:20 78:5
noted 161:8
230:13,20
notes 10:12
20:21 75:17
220:1
notice 9:14
35:10,13
134:23
noticed 195:20
195:22
notices 135:5
notifications
93:15
November
13:19,22 45:10
68:23 164:23
175:22,24
number 7:11
14:14 27:3

30:12 43:14
45:17 47:8
52:21 71:15
74:12 76:6
77:12 79:9
81:8 86:21
88:10,19 90:17
90:24 95:5
95:24 98:18
101:17 102:19
104:17 108:6
110:11 113:17
114:4 117:2
126:16 133:2
135:24 137:6,7
145:13,20,22
151:2 152:2
161:17 162:8
175:20 178:3,4
178:5 181:14
192:12,19
193:21 197:2,4
197:18,21
198:17 209:6
212:5 219:14
225:5 228:10
236:15,21
237:1,2
numbers 14:8
91:11 158:8
159:25 160:1,2
196:2 208:20
209:4 219:2
232:7
Numeral 160:24
numerical 147:11
numerous
111:23 190:6
243:18 244:4

O

O 4:18
o'clock 3:11,12
35:2,3
oath 8:2
object 8:17,18
objection 83:11

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-2   Filed 02/21/18   Page 88 of 107

108:23 116:12
117:6
**obligation** 101:1
139:19 140:1
**obligations**
140:18 181:5,17
**obliged** 110:7
140:3
**obtain** 185:7,11
185:17
**obviously** 8:2,9
8:13 13:11 14:5
14:21 22:17
36:6 48:16
58:5 60:20
94:5 96:19
98:16 100:20
104:21 111:1
119:16 121:7
164:13
**occasions**
60:21
**occur** 57:24
**occurred** 6:25
142:25 143:13
**occurring**
235:23
**OCDC** 165:17
166:7,24
**October** 2:12
24:17 69:9
132:12 134:6
143:19 159:13
159:13 181:13
**offender** 56:24
57:5
**offense** 51:5,6
52:12 54:19
65:9 81:4,5
130:24 215:18
**offer** 128:6
236:24
**offered** 242:16
**offers** 237:5
**office** 2:20 4:18
9:3 11:14,16
12:7,10,14,17

12:18,20 14:22
15:20 16:12,13
16:14 17:2,5,19
17:23,25 18:7
18:9,13,17,18
19:10,22 20:1
20:23 22:17
24:21 25:3
26:14 27:7,15
28:7,14,24
29:22 30:15
31:3,7,7 32:12
32:18 33:6
34:7 35:6
36:6 37:6,10
37:10,13 38:12
38:15 39:1
40:3,5,14,15
40:16,21 41:22
45:2,9,25
46:10 47:24
48:23,25
50:5 53:2
57:7,21 58:6
58:16 60:25
62:1 66:3 71:8
71:11 74:3,11
74:20 75:5,21
76:1,12 77:17
77:21 79:3,4
79:12,13 80:6
81:24 82:1,3
82:13,16,21
86:17 87:5
89:17 91:19
94:21,24 95:6
95:10,13,20
97:7,11,13 99:4
100:12 101:19
102:12,17,25
103:3 104:5
104:22,25
106:3 108:15
112:1,8,19,23
113:13 114:16
116:11,14,23
121:5,12 124:19

128:4,18 130:11
131:21 135:2
136:7 138:13
138:14,23
142:15 143:6
145:15 146:8
146:17 147:6,11
148:8 149:12
149:15,24
150:2,14
151:20 154:12
155:3 158:1
159:1,5,17
160:15 162:3
162:12,15
163:19 164:16
164:19 165:2
166:9,10 167:7
167:14 168:9
168:17 171:10
173:3 180:11
180:20,24
181:3,9,15,22
181:24,24
182:7,8 183:17
183:17 184:7
184:21,24
185:10,24
186:14 187:4
187:13 189:8
189:17 190:14
196:10,13
199:4 202:12
203:7,21
204:1 206:6
206:15 207:2
207:5 211:2,17
211:18 215:23
221:6 222:15
223:24,25
224:14
225:22 228:9
235:20
236:16,21,22
237:1,3
240:16 241:5
244:17,21

245:2,8
246:6,15
249:17
**office's** 99:6
138:18
**offices** 3:13
12:18 27:1
37:14 38:2
102:9 135:6
138:17 144:19
147:6,10
162:17 163:12
202:4 211:8
228:17 237:14
**official** 17:16
128:15 159:7
**officially** 129:15
**oh** 27:21 94:2,3
117:20 124:16
129:22 174:6
206:8,23
218:8,10
**okay** 6:16 7:15
7:18,23 8:5,22
8:25 9:6,9,12
11:5,18 12:5,12
13:4,14,20
14:4 15:8,17
16:2,24 17:18
18:21 20:20
21:10 22:12,12
22:20 23:6,19
23:24 26:20
27:13,20
30:17,20 31:9
31:11,16,22
32:2 33:24
34:2,10 36:4
36:22 39:7
40:2,9,17,20
41:7,20,25
43:9,20 44:1,8
44:12,21 45:1
45:8,11,16
46:16,25 47:3
48:20 50:11
53:21 55:15

55:20 58:1,15
59:19 60:23
62:18 63:17
63:20 65:24
66:6 69:2,11
69:24 71:10,14
71:20 72:2,21
72:24 73:12
73:24 75:7
82:19 84:20
85:8 89:20
90:1,2 91:3,7
91:10,14 92:11
94:17 95:1,15
96:19 97:3,9
98:16 99:2,12
101:5 104:20
106:1 107:18
108:1,11 109:6
109:11 110:20
111:1 112:4
113:4,22 115:5
115:8,13,15,23
116:10 123:19
124:25 125:13
126:6,10,18
127:2,9,25
128:24 129:7
129:18 130:9
130:17,22
131:2,6,8,15,19
132:7,15,22
133:8,12 134:1
134:18 135:23
136:9,19,22
136:24 137:18
138:3 139:12
140:25 141:3
141:13 142:7,11
142:18 143:9,11
144:1,3,11,24
145:7 146:7,14
147:1,8,20
148:9,16,19
149:21 150:3,7
150:16 151:18
152:4,17 153:2

ALARIS LITIGATION SERVICES
www.alaris.us    Phone: 1.800.280.3376    Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-2   Filed 02/21/18   Page 89 of 107

153:6,17 154:2
154:16 155:6
155:21 156:2
156:13,25
157:23 159:11
159:16,24
160:10,19
161:18,24
163:16 165:22
167:6,13 168:7
169:12,21
170:19 171:15
173:1 174:3,20
175:7,13 177:2
177:17 178:11
180:22 181:1
181:10 182:3,11
183:2,5 184:13
185:6 187:7
188:19 189:13
190:12,16,24
190:25 191:1,7
191:13,19
192:25,25
193:23 194:7
195:1 197:20
198:12 200:13
201:8,10
204:18 209:16
210:22 214:1
214:16,19,22
215:11 221:20
226:19 231:23
234:4 238:23
239:5,15,24
240:25,25
241:21,24
242:4,23,25
245:6,24
old 30:1 71:15
80:8 122:22
123:8 239:2,8
once 6:19 20:3
31:18 46:14
59:6 68:4,5
70:15 75:16
113:17 157:17

179:10
one-month
24:23
one-sixth 146:3
one-tenth 146:2
ones 39:20
46:3 53:2 81:7
109:22 193:24
216:3
open 9:4,4
10:21,21 16:10
23:5,8 24:9,11
35:17 41:24
45:19 46:5
47:23 145:13
173:11,25
177:13 179:12
189:24 219:24
225:4 231:8
241:22 242:1
242:2
opened 45:24
178:17,18,19
195:3 241:24
241:25
operate 18:18
operates 18:18
operating
201:20,23
opinion 39:24
88:4 104:4
106:18 128:17
168:7 183:9,13
183:16,25
185:6,19 186:8
186:12,23
187:2,7,12,22
189:15,23
213:5 238:10
238:25
opportunities
27:12
opportunity
37:20 182:15
opposed 195:12
227:22
option 171:12

options 59:24
83:19 86:1
102:7,19,21
103:12 105:6
115:17 139:6
order 13:5
25:24 51:15
58:3 86:10
116:8 134:9,24
135:14 142:13
146:11 226:16
ordered 51:1
83:11 114:4,5,6
116:16,20 117:6
135:9 137:12
137:16 163:5
163:19 235:12
ordering 61:17
83:13 134:13
134:16 138:11
138:12
orders 142:4
177:10
ordinary 166:5
organization
115:2 194:19
organizations
192:14,20
193:7 194:14
194:24
original 2:21,22
121:14 197:25
249:10
ORRICK 4:3,7
Osage 93:8
ought 88:23
111:14 165:10
out-of-state
216:8
outcome
248:14
outright 217:6
outside 20:1
72:20 181:24
203:17
overall 37:17
overburdened

100:11
overlap 197:7,9
overload 62:1,2
80:2 124:19
147:9,11
overloaded
48:23 92:2,3
99:22 120:20
138:17 154:12
181:3,16
overloads 86:11
94:23
overruled 100:7
134:23 137:11
oversee 224:12
overseeing
224:16
overtime 78:20
111:15 163:7
236:4,5
overwhelmed
38:17
overwhelming
168:23 169:1
205:11
Ozark 193:19

P

P 4:18
p.m 125:1,4
132:2,5 171:19
171:24 181:14
221:21,24
247:4,6
pace 151:10,12
paddle 123:3
page 13:21 14:2
14:8,8,9 37:20
91:12 93:20
94:4 99:14
101:7 125:10,16
127:10,12
128:25 129:8
132:9,10,17,23
143:10 144:2
148:10,12
160:21 169:22

172:13 174:13
180:15 230:25
249:10,14,17
250:5,9,13,17
250:21
pages 13:12
181:2
paid 169:7
204:17,19
245:14
panel 194:21
paper 51:16
200:21 203:9
paragraph 97:4
98:21 99:2,5
99:15 128:1,10
151:19 152:5
160:24 161:3
170:1,3
paragraphs
91:15
parameters
199:3
paraphrasing
59:24 60:16
203:3
pardon 193:7
Park 4:8
part 9:18 13:18
17:10 19:11,23
42:16 86:24
92:22 96:6
104:9 117:12
122:8 123:3
197:8 215:9
215:22 244:7
245:10
participate
237:8
participation
210:4
particular 7:13
9:19 48:11
95:2 131:3
153:18 213:20
213:23 217:13
218:12 225:24

ALARIS LITIGATION SERVICES
www.alaris.us       Phone: 1.800.280.3376       Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-2   Filed 02/21/18   Page 90 of 107

231:11
parties 9:17
    90:8 248:10
    248:13
partner 28:9
    43:4
partners 141:4
parts 26:24
    27:1 219:21
pass 177:19
passed 41:18
    97:19,21,23
    130:6
passive 219:25
paste 181:7
patience 135:8
pause 196:20
pay 28:3,8
    30:22,25
    31:25 38:9,23
    42:6 50:25
    51:1,4,6,7
    52:16,19 57:12
    57:14,18,19
    58:25 63:2
    121:6 151:12
    223:6 236:11
paying 217:1
payment 119:4
pays 31:3
PCR 237:25
PD 235:4
Peggy 92:24
penalty 31:20
    51:20 251:12
pendency 34:8
pending 3:17
    8:15 80:24
    107:13 114:10
    120:21
people 12:13,19
    28:15 43:8
    49:15,18 61:9
    62:6 64:13
    78:12,14 94:1
    106:7,10
    107:14 117:12

117:15 118:23
122:20 123:21
123:25 124:17
163:12 165:2
170:8 173:15
176:1 182:21
182:25 188:10
234:25 245:7
percent 92:1
    94:16 99:7
    128:19 144:18
    145:1,8,8,13,15
    147:8 158:9,10
    158:13 195:14
percentage
    145:19 195:9
perfect 12:24
    243:3
perform 128:13
    128:15
performance
    152:16
period 21:1 22:5
    24:23 36:10
    38:4 55:7
    72:13,14 96:11
    177:6 180:9
    206:2,16
    212:17 223:18
    233:5,10
    241:3
periods 79:1
    241:2
perjury 251:12
permissible
    81:9
permission
    35:14 230:1
permitted 161:1
perpetually
    236:13
persisted 89:16
    150:13
persistent
    56:24
person 32:14
    33:12 51:3

52:14,15 55:1
55:10 57:12,18
58:21,24
67:23 84:5
100:20 105:7
106:25 154:20
164:17 179:2,9
211:16 220:10
224:12
person's 52:18
personal 58:11
    77:21 100:13
    115:11 121:17
    194:1,2 222:18
    222:25
personally 21:19
    211:20 215:20
    216:18
personnel 11:23
persons 131:13
perspective
    16:18 29:24
    32:24 96:20
    106:14,25
pertain 11:2
Peter 212:7
Phase 176:6
phone 122:19
    189:4 201:4
    215:14
phrase 233:9
physical 85:16
    222:20
pick 38:13 46:11
    46:11,13,17
    83:23 119:22
    217:20
    239:25
picked 41:20,21
    64:20 71:1,2,6
    71:12,21
picks 36:9
picture 207:16
piece 43:10
    51:16 112:4
    121:18 200:21
pieces 203:8

pilot 241:5
pinch 207:22
place 33:11
    52:14,15 55:1
    55:10 169:7
    216:2,2
    226:24
    233:16 241:10
placed 151:17
Plains 37:24,25
Plaintiff's 13:7
    89:21 125:7
    139:9 142:19
    147:21 153:10
    156:3,7 157:1
    157:11 160:20
    169:13 172:2
    172:10 177:18
    230:10
plaintiffs 1:5,18
    3:4,20 4:2
    5:18,20 6:4,10
plan 25:22
    101:10
planning 110:21
play 196:2
playing 122:19
    199:9
plays 199:15
plea 65:13,25
    67:13 123:14
    124:13 187:8
    187:10,14,15,19
    196:9,13
    220:17,21
    236:15,20,24
    237:1,5
plead 220:23
    221:8
pleadings 10:15
please 5:15 6:1
    8:10 78:6
    128:20,22
    165:16 191:2
    194:13 215:24
    249:9,12,16
pled 67:6

151:25 236:18
plug 233:13
plus 40:21,23
    52:20 56:12
    56:13 98:15
pocket 102:24
point 12:10,14
    20:25 33:8
    41:24 43:23
    49:11 50:6
    57:22 62:6
    66:16 68:8
    69:22 77:6
    80:19 89:6
    95:23 105:15
    105:17 110:6
    114:7 122:21
    143:7 157:24
    159:2 162:13
    162:23 165:6
    165:24 168:12
    168:15,16,22
    176:24 190:23
    194:8 195:2
    206:7,21 215:1
    221:17 223:17
    223:18,23,25
    224:10
    233:25 237:11
    237:12 246:16
point-blank
    167:18
points 84:10,14
    89:4 205:23
police 30:2
policies 18:16
    18:20 200:14
    200:19 201:24
    202:5,6 207:7
    213:17 217:11
    219:11 221:3
policy 60:24
    213:24 216:11
    217:17 218:9
    218:10,15
    227:4,8
pool 37:7

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-2   Filed 02/21/18   Page 91 of 107

pools 37:6
position 15:15
35:6,15 37:3
39:13,19 44:19
54:24
positions 28:20
88:15,20
191:25
positives 38:20
possession
73:4,4,5,7
120:11
possibility
122:6 130:19
131:16
possible 28:18
55:20 127:7
165:23 167:15
204:7 223:12
229:17
possibly 83:8
122:15 168:3
170:11 176:4
181:3,16
208:16 243:10
243:10
post 35:14
204:22
posted 35:16
203:13 204:11
posting 37:1
Potentially
209:4
power 226:1
practical 16:15
35:19 92:6
110:10
practice 27:8
28:19 48:14
58:7,12 60:24
87:2 88:1,6
103:23 112:10
112:15 134:8
140:4,8,24
211:13,16 213:5
practiced 59:4
85:1

practices 18:13
practicing 27:11
41:18 45:3,5,7
45:9,10 47:1
85:4,23 86:2
87:14,17,19,22
104:1,6 112:11
199:19 200:5
practitioners
42:25
preceded 73:11
103:10
preceding 25:11
64:8 72:11
98:14 101:19
101:23 102:18
116:5 122:9
precipitated
95:2,5 101:18
predecessor
203:4
Predominantly
23:11
preference
37:21 38:3
217:18
preliminary
65:12
premise 161:9
preparation
140:11,14,17
192:9 221:10
237:9
prepare 8:25
126:15 186:24
187:5 222:7
prepared 148:11
173:4
present 4:22
5:15 182:7
194:5 213:4
presentation
224:25
presentations
225:1
presently
204:25

presents 68:15
100:22
presiding 69:3
92:19
press 193:6,6
presumably
84:24 246:16
246:24
presume 143:7
227:3
presumed
120:13
presumes
145:15
pretend 198:1,13
pretrial 186:9,15
186:21
pretty 21:25
56:18 69:18
108:5 116:19
126:17 168:17
228:13 230:7
prevent 76:14
87:3 208:2
previous 147:15
181:1
previously 6:14
18:3 55:18
56:12 57:7
72:3 73:18
80:13 94:23
95:1,16,20
97:11 101:12,14
101:23 104:25
108:21 109:17
111:25 125:11
125:15 153:24
156:15 177:21
179:18 184:14
230:13
primarily 17:24
45:23 177:4
primary 30:21
197:7
printed 143:2
printout 173:7,7
173:9,10,25

173:25
printouts 14:17
prior 15:17 36:11
51:24,25
58:21,21
70:23 74:13,17
79:5,16 80:6
82:9 86:12
88:4 90:16
91:4 93:20
104:3 128:25
183:14 191:17
210:20 234:10
234:15
prison 30:10
48:3 52:14
54:25 57:5,13
57:19 58:8,19
59:12 60:3
64:15,23 65:1
65:6 66:21,23
70:8 72:5
81:13 118:25
123:15 124:14
private 27:7
28:19 42:6,6
42:8,11,12,15
53:6,19 59:15
72:19 83:21,21
100:6 108:25
109:3 114:18
114:20,21
115:23 116:4
121:5 176:11
191:18 195:12
203:14 204:10
211:13,15
245:17
privatize 233:14
privilege 184:15
184:22
pro 30:10 50:14
58:9 64:15
65:25 67:7
70:15 114:17
118:25 123:15
124:13 235:2

probably 10:23
20:13,19 43:17
46:19 50:2
58:13 68:2
72:18,19 75:9
105:24 110:3
145:21 151:6
158:19 163:13
176:25 188:12
195:13 203:5
203:6 209:12
214:25 215:3
231:22
probation 23:15
23:16,16,21,23
41:16 45:21
54:5,8,12,14
54:16,22 55:2
55:2,5,5,7,12
55:16,21 56:5
56:7 57:17,22
58:17 59:2,7
63:1,6 64:18
64:20,25
65:6,20,22
66:9,13,16,18
67:6 69:15,16
71:5,14,16,21
78:4 119:5
120:3,4 121:5
167:5 197:6,8
222:1,7,10,11
222:23,24
223:5 246:21
problem 27:23
28:4 50:20,21
89:3,12 92:4
92:5,7 96:21
96:25 98:15
98:19 103:20
123:9 129:4
150:3,7,12,22
151:6,16 168:6
problems 28:5
84:13 88:13
89:16 91:2

ALARIS LITIGATION SERVICES
www.alaris.us    Phone: 1.800.280.3376    Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-2   Filed 02/21/18   Page 92 of 107

94:24 127:3
147:9 151:14
233:21
procedure
201:21,23
202:17 216:6
216:9 218:11
227:4
procedures
18:16,20
200:14,19
202:7 213:17
216:7 217:12
219:11
proceed 50:14
196:18 227:22
proceeded
105:13
proceeding
51:3,8,11 197:1
proceedings
222:2
process 9:18
35:18 36:1
86:24 115:12
151:9 166:4,5
194:21 203:22
207:17 224:13
234:7
produced 3:10
6:3
productivity
22:1
professional
98:5 103:23
141:11 142:3
154:14 160:11
161:2,5,13,16
162:7,13,21
163:14
proficient
239:13
program 20:21
progress 96:3
project 241:5
promoted 15:24
promulgated

207:8
proper 152:12
152:14
proposed 109:5
116:8
prosecute
166:11
prosecuted
166:10
prosecuting
128:7
prosecution
128:14 166:25
167:2
prosecutor
30:10 57:11,12
57:13 58:23
59:1 62:24
63:3,5,5 64:14
64:24 65:11
65:25 66:25
67:3,12,18,22
68:7 70:9,17
93:11,12,14
94:9 127:17
128:5,16 176:8
196:14 233:17
prosecutor's
128:4
prosecutor@...
93:13
prosecutors
90:7 91:8
228:25
prospects
120:12
protect 86:10
protocol 194:20
prove 89:9
provide 100:5,8
109:1 116:7
135:10,14
136:7 140:14
158:16 160:7
175:1,10 190:14
214:8 241:11,19
provided 51:11

220:25 221:14
224:17
provider 217:23
providers 161:10
provides 225:3
providing
158:20 164:4
165:13,15
238:21
PSC 100:3
public 4:12 15:11
15:22 25:20
25:25 26:4
26:25 28:6,10
28:12,20
29:18,22 31:6
31:12 32:9,9,11
32:13 33:6
37:6,9 38:12
38:15 39:11,17
44:14 49:4
51:9,12 53:3
53:24 54:2
60:6,10,11,14
61:10 62:21
64:2,12 68:21
74:8 82:3
86:17,20
88:25 91:19
94:21 97:6,12
99:18 100:11
102:23 103:3
103:22 106:18
107:15 118:24
120:20,25,25
121:12 123:22
124:4,15
125:24 126:15
131:14,17 135:6
135:10,13
137:16 138:12
138:14,14,16,16
139:7 143:6,23
144:4,13,19
148:7,8 149:8
150:13 154:8
160:14,15

161:5,10,15
162:6,11
164:10 166:19
174:25 176:17
178:22 179:2
179:4,10 191:15
191:17 192:18
195:11 201:1
203:5,9,23
204:6 205:15
205:21 206:14
207:20 211:21
216:20 219:13
220:20
226:21 234:14
234:18
235:25
237:14 239:8
245:21 246:8
249:4,14
251:23
publicity 38:14
pull 233:13
pulled 33:20
155:15
punishment
54:16,17,20
54:23 56:23
purely 11:4,24
purposes 47:16
pursuant 161:13
pursue 73:22
85:20 110:9
166:20 230:5
pursued 166:25
push 190:23
227:11
pushing 227:19
put 26:2 33:11
77:22 104:15
111:10 122:14
141:20 158:6
165:16 167:5
208:25
229:13
puts 57:13
putting 37:1

**Q**

qualified 38:7
44:14
qualifies 100:20
179:11
qualify 11:19
176:17 203:6
qualifying 99:18
100:12
quality 217:19
238:11,17,21
Quentin 13:24
153:19 169:18
172:7
question 8:10
8:15,20 33:8
42:22 53:16
63:10 96:13
105:21 121:15
140:19 170:24
184:20 188:13
188:16 191:12
192:22 193:2
194:2,11,12,23
209:15 210:1
214:18,21
215:22 217:25
218:2,3
220:12 228:1
245:24
questioning
194:6 231:25
questions 7:24
8:12,12 14:6
22:14 40:3
65:15 135:19
179:8 180:2
183:7 189:14
191:8 193:22
222:17 232:1
239:16 242:4
245:6 247:3
quick 183:6
quickie 122:1
quickly 28:18
35:7 125:8

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-2   Filed 02/21/18   Page 93 of 107

139:15 141:14
147:20 158:25
169:13 171:16
177:18 182:3
189:3 206:11
220:24 223:11
**quit** 33:7,18
86:16,24
91:23 95:8
96:22 102:13
168:1 245:9
**quite** 38:18 71:4
90:23 179:14
230:16
**quits** 32:10,15
**quitting** 103:19
169:4
**quote** 174:14
**quotes** 161:21

**R**
**radio** 193:19
**raise** 124:14
150:25
**raises** 151:12
**rampant** 87:3
**Ramsey** 2:4
4:17 5:21,21
190:21 191:3
221:19 222:1
231:24 232:6
236:14 242:5
**random** 94:12
94:13 239:13
**range** 54:16,17
54:20,23
56:22
**rank** 146:23,24
**ranked** 144:15
**rape** 80:16,21
81:5,10 87:10
199:20
**rare** 55:25
56:18 59:3
215:4
**rarely** 236:2
**rarest** 236:23

**rate** 31:9,12
42:7 100:13
101:3 116:19
132:24,25
133:1 139:23
205:17
**ratifies** 142:5
**ratify** 142:13
**rational** 50:5
85:8 86:6
158:20
**rationale** 22:8
83:13 215:3
**rationales** 138:4
**re-** 34:5
**reached** 157:24
**read** 13:11 30:2
30:3 84:5
91:14 97:3
99:14 101:5
126:10,19
127:25 128:1
128:10 130:9
131:1 132:23
134:18 139:17
149:21 152:5
154:2 160:23
161:19 162:24
169:24 174:20
249:12 250:6
250:10,14,18
250:22 251:6
**reading** 126:3
**reads** 161:3
**real** 61:10,10
123:9 139:4,5
169:8 207:7
**realistically**
35:19 162:23
**reality** 17:9
**reallocate**
102:25
**really** 22:2,2
27:25 50:4
57:11 68:6
84:15,19 98:12
101:10 102:21

103:5 109:10
113:2 116:21
188:7 196:1
203:14 204:18
207:15 209:6
213:1 216:10
216:12 227:19
229:15 236:5
**realm** 226:15
**reapply** 235:8
**reason** 7:1 14:7
42:4 48:20
48:22 60:6
61:3 100:23
122:25 138:19
158:21 161:15
161:20 162:6
191:9 213:10
213:12 216:10
227:1 234:15
234:20
242:16 244:8
244:9 245:11
250:7,11,15,19
250:23
**reasonable**
141:10 188:20
207:25 219:8
221:1 232:8,12
239:4 240:3
**reasons** 26:22
27:2 28:2
30:21 36:3
38:22,22,24
77:2 88:22
138:3 181:11
196:12 212:22
234:20 242:8
245:8,9,12
**reassign** 36:12
36:18 92:3
116:24
**reassigned**
28:23 29:14
75:8,20 77:6
81:20,21
**reassigning**

117:5
**recall** 9:20 21:8
44:15 61:3
62:20 63:23
71:3,10 80:14
80:17 95:10
137:23 148:14
194:17 224:21
234:3
**recalled** 67:4
**receive** 35:13
42:4 99:17
135:7,9,20
152:12 178:21
197:17 203:23
229:24
**received** 9:14
25:21 34:3
44:16 46:23
47:5 49:7,11,12
53:3 90:21
101:25 108:21
124:6 176:13
230:3
**receives** 205:5
**receiving** 43:15
47:9 79:24
104:25 135:5
208:3
**recess** 70:2
125:3 132:4
171:21 221:23
**recognize** 13:14
90:2 134:1
141:19 147:25
153:11 156:6
157:4 172:3
180:6
**recollect** 193:8
**recollection**
10:5
**recommenda...**
63:6
**recommended**
128:19
**reconstructive**
6:23

**record** 5:2,16
8:9 14:25 15:4
15:5,7 32:6
34:16 59:6
70:1,4 125:2,5
126:20 132:3
132:6 171:17
171:20,25
221:19,22,25
247:5
**recording**
121:25
**records** 11:24
120:8
**recruiting**
38:25 39:5
**red** 133:4,6,9
**Redirect** 2:6
239:18
**reduce** 89:1
**reduced** 19:2
42:7 86:18,19
246:5 248:8
**reducing** 96:4
**reduction**
182:16
**refer** 143:10
**reference** 98:13
98:24 99:3
**referenced**
166:15 201:21
**references**
210:3
**referencing**
125:15
**referred**
230:24
**referring** 90:13
94:22 97:10
130:23 131:9
141:1 157:8
201:20
**refiled** 80:23
198:15,16,17
**refresh** 10:5
**refusal** 117:11
217:6

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-2   Filed 02/21/18   Page 94 of 107

refuse 100:8
212:23
refused 211:19
regard 10:18
76:16 138:24
192:10 222:22
227:8
regarding
190:13 194:3
regime 206:12
regions 37:21
regrets 128:4
regular 35:1
41:15,17 83:7
208:12
regularly
188:23
regulations
203:19
reinstated
130:14
reinstatement
130:12
rel 135:12
related 52:18
128:2,3 173:5
248:10
relating 140:6
140:10 143:6
166:21
relation 172:6
relations 53:10
relationship
9:25 29:4
relationships
33:18
relative 248:12
releasing 55:12
relevant 7:25
38:4 73:8
94:9 205:6,7
relief 49:12
50:9 103:18
relocate 35:25
rely 161:1
remain 28:25
91:19 94:22

137:12
remained 27:9
remaining
22:13 23:20
remedies 105:9
remedy 84:11,15
103:22 109:1,5
139:4,5 154:19
168:1,3,5 182:11
remember 8:2
10:2 15:23
39:10 73:3
93:18 105:9
169:17 175:18
193:13,18,20
194:16 223:22
remind 127:16
132:20 135:11
remove 207:18
render 251:9
reoffend 120:1
repeat 239:3
repeatedly
235:16
repercussions
168:8
rephrase 104:21
104:22 195:8
replacement
25:6 32:10
35:20,23
36:6 168:13
replacements
25:5 33:8
repo'd 119:18
report 2:15
17:12 148:3,11
166:5 177:20
177:23 210:4
210:5 222:3
222:12 233:18
244:12
reporter 3:16
4:24 5:25 8:7
193:17 248:1,4
248:21
reporter's 2:21

5:11
reporters 193:11
reports 30:2
222:10,11
represent 6:10
25:25 42:8
44:15 57:21
59:17,22
94:10 114:5
116:17 117:6
118:25 123:24
134:10,15,16
137:17 142:16
146:11,12
147:17 152:24
164:1 168:10
170:8 179:2
182:8 189:17
190:1 191:4
225:14 235:13
representation
2:16 10:1 29:3
29:23 36:20
47:16 49:2,15
61:11 62:4
64:10 79:22
79:24 81:16
100:8 105:1,5
105:20,25
106:2 107:5,8
107:9,20,22
107:23 108:7
111:10 114:7,14
116:13 117:8,11
123:16 124:4,7
135:10,14
136:8,18 137:3
137:4 140:15
142:14 152:13
153:15 154:18
154:20 155:5
156:16 158:17
160:7 161:11
164:5 165:14
165:16 175:2,11
177:5 179:19
184:16,23

185:16 186:5
186:19 189:7,11
190:14 238:11
241:12,19
representative
74:2,21 78:25
79:3,8 80:5
represented
64:17 65:19
70:20 73:24
106:17
representing
22:9 44:10
49:17 58:6,9
83:15 108:18
113:14 124:12
124:17 134:13
152:8
request 2:14
35:14 53:12
57:17 90:22
115:6 134:25
136:7 143:6,15
179:16 212:1,9
214:4 216:18
217:8 234:14
requested 53:3
211:20
requesting
52:13 77:4
156:10,22,23
requests
244:15
require 121:3
163:9
required 7:25
21:2 183:20
184:8 203:18
204:22
requirements
89:14 190:9
requires 183:11
184:2 185:8,12
185:21 186:1
186:10,16
rerecorded
122:5

research 83:25
85:14 117:20
186:9,15,20
238:19
Reserves 25:7
40:7,24
reset 76:25 77:1
resignation
128:5
resigning 169:4
resolve 227:11
resolved 70:15
resolves 62:11
225:19
resource 17:5
resources 151:9
183:10,19 184:1
184:7 185:7,11
185:20,24
186:9,15,24
187:4,8,14,20
187:23 239:10
240:20 244:11
respond 133:5
134:25
responded
126:8 167:23
180:19
response 61:24
62:8,23 84:5
114:19,23
126:2,4,18,20
126:25 135:7
135:9,20
139:2 147:15
176:14 181:22
188:13 192:21
212:15
responses 9:23
90:8
responsibilities
22:22 30:18
72:4 86:19
88:7 111:24
118:4 140:21
140:22 141:4
142:9 159:19

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-2   Filed 02/21/18   Page 95 of 107

162:2 170:12
170:15,17 171:2
171:6,8,13
201:13
**responsibility**
83:20 100:4,6
198:23
**responsible**
17:2 30:14
112:7,20 142:2
142:12 179:5
**responsive**
53:16 63:10
96:12 192:22
194:22,25
200:11 214:14
**rest** 104:5 133:4
**restitution**
223:7
**restriction**
96:10
**result** 7:3 42:9
70:8 89:1
115:20 116:2
123:13 127:3,3
135:21 154:22
175:13
**resulted** 59:10
**results** 112:13
150:23,24
**retain** 53:6
55:11 87:7,15
105:12 114:17
**retention** 152:15
**retire** 27:4 86:7
**retired** 27:3
92:18 211:10
212:18 245:10
245:11,22
**retiring** 245:12
**return** 10:9
40:13 125:7
139:9 249:16
**returning** 40:14
94:19
**revenue** 49:5
83:24

review 9:12
76:4 179:5
185:7,12,17
222:9,13
**reviewed** 9:2,9
9:16,20 12:25
90:11,11,13
**reviewing** 118:11
**revocation**
222:2,7
**revoked** 56:5
65:6 130:16
**Richardson**
92:24 93:23
125:16,18
126:21 137:15
176:8,13
**right** 13:24 19:6
19:6,23,25
20:12,18 21:16
22:19,23 24:2
24:5,10 29:5
30:19,23 31:2
32:20 34:10
35:6,8,15
38:13,20 39:4
40:7 41:23
45:19 48:15,16
48:23,25
51:10,13,14
57:8,9 59:13
59:14 63:15,16
63:18 64:2,4,5
66:21,23
67:23 68:6,10
68:22 72:23
73:19 76:15,17
77:20 78:8
79:6,10 82:3
85:9,18 86:5
87:12,21 90:15
96:24 99:10
106:23 107:1,3
107:3 109:13
111:9,12 112:8
113:4,16 116:18
117:8 118:17

120:14,18
122:7 125:25
126:6,8,9
127:5,8 129:5
129:14,20
130:1,7,25
132:13 133:18
137:2 138:9
142:16 143:17
143:20 145:2
146:6 147:3
149:11,16,19
153:4,6,19
155:19,23
156:17 158:2
159:18,23
161:22 163:20
164:3 165:22
166:11,15 168:1
169:12,19
171:10 174:1
175:4 178:1
179:1,14,16,22
183:5 188:10
191:16 193:3,3
196:21,23
202:14 207:13
210:15 213:13
220:5 237:4
239:25
241:22 243:11
244:1,10
246:20
**right-hand**
144:16
**rises** 237:4
**risk** 119:16 131:11
**risking** 161:16
162:7
**road** 4:8 18:2
57:18 235:7
**robbery** 198:4
199:20
**Robinson**
135:12
**rock** 222:21
**rogue** 102:3

role 7:6 193:25
199:9,15 220:1
**Roman** 160:24
**roof** 206:13
**room** 31:18
220:10
**rough** 20:19
113:10 195:14
**roughly** 200:8
**round** 106:6,7
**routinely**
229:10
**rows** 144:13
**RubinBrown**
98:2 99:9
144:23,24
158:8,9
159:24 160:1
165:11 194:20
208:1,9,20,25
210:3,4 222:2
231:21
**rule** 2:13 61:18
97:20,22
140:4,10,16
141:7,22 160:11
160:14 161:5
170:25 214:1
220:22 233:3
233:23 234:1
**rules** 103:23
140:5,5,25
141:11 142:3
154:14 160:11
161:2,4,13
162:2,24
163:9 170:17
206:3
**run** 50:7 56:11
57:1 122:24
122:25 183:5
229:16
**run-of-the-mill**
208:12
**running** 111:25

_____
**S**

**S-i-g-m-u-n-d**
191:21
**sake** 34:15
**salaries** 150:25
**salary** 31:4
**sample** 122:24
**samples** 123:5
**sank** 50:1
**sat** 64:21 65:13
66:19 75:1
80:9 245:13
**save** 90:20
241:7
**saw** 62:14 75:15
82:18 228:25
**saying** 30:9
34:13 51:17
94:20 95:6
110:17 118:23
124:1 136:2,11
181:2 198:7
200:24 209:6
218:15 226:21
243:17
**says** 6:4 13:22
29:9 76:24
116:7 129:2,3
129:12 130:22
131:8,10 139:16
140:7 142:1
143:14,22
144:4,8 145:7
148:22 151:19
158:18 162:24
173:20 214:1
216:15 221:11
**scattered** 78:17
**scene** 85:16
**scenes** 159:21
**schedule** 78:9
122:12
**scheduled**
40:13 138:2
**scheme** 225:11
**Scherzer** 2:3,6
4:3 5:17,17 6:6
6:9 13:10 15:2

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-2   Filed 02/21/18   Page 96 of 107

15:8 50:23
69:23 70:5
89:24 93:19
124:21,25
125:6 131:25
132:7 133:22
141:19 142:22
153:10 156:6
157:4 165:23
165:25 171:17
172:1 180:6
190:17 239:19
247:2
Schollmeyer
61:16 93:7
129:9 130:6
school 16:17
85:7 191:16,25
192:3 204:16
scoop 49:25
scratch 34:11
46:12 95:17
screened 88:24
screening
202:16
203:25
se 30:10 50:14
58:9 64:15
65:25 67:7
70:16 114:17
118:25 123:15
124:13 235:2
seal 143:24
seated 67:22
second 15:1
59:10 87:19
87:22 94:20
127:25 132:15
132:25 139:10
152:5 155:2
171:18 172:13
175:15 177:18
191:11 194:2
197:8 198:18
215:24 218:23
219:14,17,18
219:20,21,25

220:16
224:23
second-most
164:17,18
second-to-last
145:1
secretary
129:13,17
section 22:13
see 11:22 13:20
14:1,8,14 20:3
29:15 63:3
78:5,12 92:23
94:3 114:8
117:10,13
124:23 125:17
127:13 129:23
130:3,13
141:24 144:6,11
145:4 146:22
147:1 148:9,22
149:7 173:11
174:13 192:15
196:9 203:10
204:9 206:9
208:9 229:11
233:6
seeing 43:18
64:5,13 118:23
123:21 207:16
seek 33:7 57:16
110:7 182:16
seeking 58:7
seen 86:22
94:15 142:22
143:7 195:25
230:16,19,21
sees 109:2
120:10
segue 69:22
221:17
self-reported
163:3 165:4,17
self-reporting
166:2
self-screen
242:18

Senate 2:15
97:24 148:3
150:4,17,18,24
151:4,7 153:3
194:15
send 66:22
101:16 131:22
136:6,9 180:13
181:20 219:12
219:14
sending 134:23
136:12 180:11
181:8
senior 28:9
31:12 87:19,22
101:22 102:14
102:16 103:4
136:1 228:16
233:20
sense 8:5,20
12:3,23 33:22
33:23 38:8
43:13,17 69:9
106:16 107:3
108:9 194:8
195:2,7,9
205:14
206:20
209:20 215:5
218:24
sent 9:22 90:6
91:3 94:5,23
101:13 126:7
127:22 134:6
135:24 136:11
165:19,20
180:18 181:2,7
181:13,14
sentence 54:15
54:24,25 55:1
55:3,4,23,25
56:1,3,4,6,8,10
56:11,12,15
59:12 76:4
81:9 94:20
97:4 98:12,21
101:6 126:11,12

149:21 154:3
161:19,20
162:6
sentenced
70:11,15
sentences 101:6
132:24 161:18
174:21
sentencing
55:9,13 56:17
222:12
sentiment
162:9
sentiments
152:18
separate 197:18
September
15:16 24:16
25:13 27:6
40:12 68:17,19
69:8 101:20
101:23 102:6
102:18 224:3
228:15
series 148:4,6
166:23
serious 41:17
62:5 79:22
122:11 151:17
190:4 200:3
246:23
serve 15:17
159:20 220:2
served 59:12
serves 70:25
92:16 129:16
131:4 224:1
service 27:4
28:20 49:4
99:18 239:9
services 3:13
5:10,14 44:14
51:9,13 64:12
88:25 176:17
178:22 203:9
203:24 204:6
205:15 226:21

234:14 238:21
249:1
serving 92:22
set 18:16,17
54:14 66:14
68:22 120:17
126:16 133:7
133:13 155:13
158:2 160:1
180:16,16
182:12 220:9
setting 143:4
234:20
settings 78:19
setup 11:6
seven 23:8,25
26:15,17 40:5
52:2 55:18,21
56:13,21,24
60:2 87:1
129:2 145:25
172:22
seven-year
56:11
severe 51:20
sex 208:10
213:3 215:14
215:18
shake 103:24
shaky 208:19
Shane 93:14
SHEET 250:1
sheets 249:10
249:13,16
shift 198:23
shifting 93:20
228:16
shining 147:17
ship 50:1
229:16
Shipma 2:5 4:12
5:23,23 8:17
9:2,7,15,16
14:25 90:22
132:12 232:1,3
239:16 240:1
249:3,8

ALARIS LITIGATION SERVICES
www.alaris.us    Phone: 1.800.280.3376    Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-2   Filed 02/21/18   Page 97 of 107

shock 55:7
Shondel 1:4 3:3
   3:19 5:5
   249:6 250:2
short 21:19 86:3
   130:10 151:15
   173:1 184:11,11
   220:12
short-staffed
   36:7
shortage 122:13
shortest 246:18
shorthanded
   25:14 145:18
shortly 122:4
   173:16
shoulders
   205:1
show 89:20
   121:2,5 156:2
   156:25
showing 121:4
   133:23 172:2
shown 237:9
   237:24
shrinking 37:7
sic 16:11 93:18
sick 16:16
side 53:9,10,19
   68:3 84:3
   245:17
Sigmund 191:20
sign 249:13
signature
   249:10,13,17
   250:25
significant 29:2
   30:7,11 49:11
   76:6 81:12
   87:12 96:3
   175:19 203:13
   203:13
significantly
   86:18 100:14
   246:5
similar 77:14
   79:14 82:10

91:3 108:4
   133:9 216:6
   244:9
simple 73:4,5
simply 101:2
   116:13 117:4
   118:6,9 134:25
   139:22 182:19
   182:20,25
   191:9 196:19
   200:17 212:23
   243:19
simultaneously
   137:6 207:20
Sincerely
   249:20
single 42:4
   48:25 91:19
   96:4 110:4
   202:12
sink 105:10
   109:5
sir 8:6 13:3,25
   14:3 16:6 26:11
   50:16 210:15
   217:25
sit 68:11,19 117:9
   119:1,6,7
   209:25
sits 67:18,19
sitting 28:11
   61:4 65:4
   68:2 79:19
   114:20 118:13
   119:23 185:2
   196:24 205:13
   212:7 215:1
   226:13
situation 17:9
   25:23 47:12
   48:9,10 62:11
   90:19 102:10
   109:25 124:11
   128:8 155:14
   163:14 165:8
   175:16 182:1
   188:3 216:21

217:5,7,10
   222:18,19
   223:1,15
   225:19 235:8
   235:14,17
situations
   58:20 213:1
six 40:20 41:4
   119:7,23
   122:14 129:2
   145:25 172:22
   175:23 189:1,9
   200:6 206:5
six-month
   206:8,16
   233:5,10
   241:3
six-year-old
   213:3
sixth 168:14
sixth-amend...
   124:14
skill 140:11,14,16
slice 10:24
slightly 13:5
   158:10 197:10
   208:25 213:15
slower 50:3
small 43:5 110:3
   114:4 229:13
   229:14
smaller 43:1
   49:21 232:18
social 240:23
Sodergren 93:5
sodomies 81:11
sodomy 80:16
   80:18,22 81:5
   81:11
software 10:12
   231:6
sole 94:11
solely 42:16
solo 42:25 43:3
solution 92:7
   102:9 103:5,7
solve 84:18

somebody
   32:14 46:3,4
   71:7 77:23
   105:5 106:6
   114:15 153:24
   182:23 201:6
soon 35:13
   113:24 118:16
sorry 14:10 16:5
   34:12 42:22
   46:12 75:3
   87:1 93:19,23
   94:2 95:17
   96:13 101:7
   104:21,22
   105:21 115:1
   128:1 129:23
   132:10 136:5
   139:13 174:6
   206:24,24
   217:25 236:9
   243:2
sort 13:17 18:19
   18:22,24,25
   19:2,12 21:4
   24:6 25:18
   26:6 29:19
   30:11 31:17
   33:13,20
   36:13 37:25
   38:16 39:16,18
   46:2 49:21,22
   51:15 53:7
   59:2 60:10,17
   63:8 64:8
   66:9 67:3
   68:14 78:8
   80:19 83:16
   85:8 86:14,25
   88:17 96:2,10
   98:24 101:17
   102:1 103:2,6
   103:10 104:16
   105:3,4 106:13
   107:1 114:10,12
   126:11 130:3
   138:21 139:7

140:17 151:4,10
   151:15 152:20
   173:19 176:13
   180:10,13
   181:2 192:16
   202:15 203:2
   203:24
   204:14 205:4
   207:15 208:5
   208:10 212:17
   212:18 218:18
   219:5 220:4,5
   220:15 221:15
   222:25
   223:13 226:4
   226:8 228:2
   228:10,14
   229:20 231:9
   233:4,21
   241:4,5
   246:13
sought 7:2
   108:23
sounds 16:14
   24:8 61:20
   62:19 113:16
   123:16 141:2,6
   159:25 167:9
   196:22 243:16
source 193:14
sources 124:10
   193:12
span 229:3
Spangenberg
   98:1 194:16
Spanish 192:8
spark 101:18
   228:6
sparse 77:11
speak 109:19
   121:19 151:11,13
   188:23 189:2
   196:11 202:3
   227:19
speaking 44:8
   70:7 82:9
   84:21 113:22

ALARIS LITIGATION SERVICES
www.alaris.us        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-2   Filed 02/21/18   Page 98 of 107

183:13 185:4
185:14,23
186:12 187:2
187:12 196:17
198:13 207:23
220:23 221:2
**special** 55:6
93:9 94:12
140:1 142:8
**specialty** 122:13
**specific** 10:17,18
18:20 19:17
81:24 98:4
100:25 113:23
135:13 139:18
142:4 143:10
208:19 209:4
**specifically**
10:25 15:10
59:20 61:17
140:6 213:9
222:6 226:25
**specifics** 184:14
185:15 186:3
186:18 187:17
**specify** 226:9
**speculate**
115:14
**speed** 28:18
29:10,12
**speedy** 75:23
77:2 80:22
**spend** 19:25
20:24 28:16
30:12 34:17
214:2 216:10
**spending** 19:25
20:5 112:16
246:24
**spends** 18:1
**spent** 76:20
213:23 217:12
218:11 244:2,2
**spike** 25:1 184:6
**spiked** 24:17,22
**spiraled** 74:10
**spiraling** 26:6

**spite** 27:8
104:10,11
165:14
**spoke** 153:16
194:18
**spoken** 162:18
192:14,19
193:7,15
194:15
**spreadsheet**
158:7
**squeeze** 21:22
**squirrely** 55:13
**St** 17:25 18:1
37:22 233:17
249:18
**stack** 118:12
206:10
**staff** 25:8 46:20
89:8 113:17
118:3 131:22
145:25 151:2
158:3,11 159:1
159:2,4,6,9,23
173:17 177:13
179:5,10 194:4
198:21,24,25
231:6
**staff's** 109:15
**staffed** 145:16
184:11
**staffing** 62:11
90:19 91:1
148:7
**stamp** 134:5
172:16 180:14
230:25
**Stan** 92:15
**standard** 18:12
98:4 128:20
201:20,23
210:12 233:19
**standards** 18:23
97:18 165:11
236:6
**standing** 58:3
**stands** 122:22

**start** 29:19
35:18 48:18
81:22 85:3,5
132:24 144:8
158:24 177:12
177:16 191:15
208:15
226:23
227:14
**started** 15:21
21:5,6,8,9
45:4,10 46:6,8
46:11,16,18
48:20 68:4
90:5 95:21
112:14 121:13
138:19,20,24
164:23 227:18
228:23
**starting** 90:18
91:15 99:13,17
109:14 169:24
177:6,14 227:3
233:5
**starts** 35:23
132:9 174:22
**state** 1:7 3:6,16
3:20 4:12,15
5:6,15,22
13:23 15:10,11
17:20 22:15
26:24 27:1
31:7 49:4
52:13 57:16
100:2 101:22
102:23 105:2
107:9,23
109:3 115:16
115:18,19 135:6
135:12 143:23
144:4,12 148:5
153:18 154:8
154:19 160:16
162:18 164:10
191:4,15
203:19 215:8
215:20 216:20

217:22 237:14
248:4 249:4,6
250:2 251:1
**state's** 100:4
128:22
**state-employ…**
83:23
**statement**
144:22 174:14
**States** 1:1 3:1,17
5:7
**statewide** 11:3
31:8 37:11
102:4 151:3
201:25
**stationing**
182:21
**statistician**
210:10
**statistics** 20:23
210:24
**stats** 210:11,16
210:18,24
**status** 148:7
222:19
**statute** 97:23
229:13
**statutes** 55:9,14
131:12
**statutory** 80:17
130:23 131:3
**stay** 226:11
**stealing** 130:19
130:25 198:2
198:5
**stems** 124:18
**step** 89:15
131:23
**stepped** 68:8
**steps** 88:11
97:10 98:18
181:25 231:10
**Sterling** 212:7
**Steven** 4:17
5:21 191:3
**steven.ramse…**
4:20

**stick** 86:3
**stinks** 103:8
**stir** 38:19
**stop** 87:2 95:7
191:1 225:14
**stopped** 21:6,7
21:9,9,11 224:1
**store** 122:1
**stories** 78:23
**straight** 192:2
**strategy** 86:25
102:2
**straw** 167:21
**street** 4:4,19
119:21 249:18
**stretches** 82:11
**stricken** 76:25
77:1
**Strickland** 76:3
**strict** 160:2
241:2,9,15
243:24
**stricter** 229:19
**strictly** 162:5
**strike** 64:15
223:13 224:5
**String** 2:11,12
**struck** 67:3
89:3 234:6
**structure** 31:17
**struggles** 39:17
91:18 94:21
125:25
**struggling** 29:1
151:14
**student** 193:11
**students** 193:13
193:15
**studied** 97:25
**study** 97:25
98:2 99:9
128:12,13
192:5 208:1
**stuff** 18:9 42:21
46:21 53:14
78:9 93:16
119:21 217:2

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-2   Filed 02/21/18   Page 99 of 107

245:17
subject 125:24
submit 141:14
176:7
submitted 9:16
172:5,23 173:4
173:18 176:12
subpoena
212:25
subpoenas
159:20
subscribe
251:11
subsequent
175:24
Subsequently
75:19
subset 134:12
substance
120:11 251:8
substantial
21:14 28:16
52:21 69:18
176:2
substantially
25:15
substantive
72:15,19 76:8
81:22 110:23
118:16 134:4
189:6
succeed 120:4
success 136:23
successfully
110:11
succinct 213:21
sue 233:17
suffer 152:10
sufficient 140:12
suggest 133:2
136:15
suggested
61:21
suggesting
133:12
suggestions
2:18 156:20

156:22 157:6
160:11,21
Suite 3:14 4:13
249:4
sum 113:4
126:21
summary
126:24 148:22
151:15
summation
183:7
summer 112:14
120:19 148:13
sun 198:5
Sunday 78:11
Sundays 111:18
Superman
100:14
supervise 150:1
152:10 168:20
194:3,4
207:24
214:24 215:7
218:5
supervised
212:1 217:9
240:9
supervises
12:19 17:20
supervising
112:7,20
149:12,23
supervision
112:2 121:3,6
supervisor
12:15,16 17:1
74:1 112:5,22
135:24 140:2
140:22 142:9
152:21 170:12
170:16 171:2,8
214:4 217:8
supervisors
112:19 134:24
135:2 212:5,6
240:16 242:11
supervisory

100:25 139:18
141:5,9 190:6
supplemental
143:5,14,15
supplementary
18:25
support 49:8
50:25 51:5,6
51:7 53:12
151:2 156:20
157:7 158:3,11
159:2,6,7,9,23
160:21 177:12
179:10 180:24
204:1 240:17
suppose 194:19
supposed
135:16
Supreme 97:17
97:18 98:8
140:5 155:25
161:22 162:9
167:4,4
248:20
sure 10:11 11:20
15:2 33:24
34:17 36:24
65:17 67:1
84:1 86:5
91:17 92:15
99:16 101:8
109:9 128:11
131:25 134:20
137:1,23,23
140:3,23
152:6 166:19
195:16 197:1
201:1,9 209:10
215:10 218:17
230:7 237:12
Surely 43:23
surgery 6:24
surprised 43:6
surrounding
96:11
suspect 170:21
214:25

suspend 54:25
suspended
54:16,24
55:24 56:1,3,4
56:9,14,18
208:6
SUTCLIFFE 4:3
4:7
swear 6:1
swim 86:22
swing 39:25
switch 16:7
switched 16:2
111:7 156:1
Switching
225:7
sworn 3:10 6:3
248:6
sympathy 49:8
83:4
system 4:11,12
10:13 15:11
29:17 37:17
102:23 144:13
144:20 146:16
147:3 154:9
158:2 159:25
164:11 178:17
178:18 191:16
191:17 193:4
195:11 196:25
205:22 211:21
213:19 216:20
228:24 229:5
233:14
235:25
237:15 249:4

—————————
T
—————————
table 67:15,17
68:3 105:7
176:10 220:10
tack 57:1
tag 122:19
tail 206:8,15
take 8:13,24
20:8 21:20

24:25 26:1
33:10 35:8
36:16 37:3
48:16 49:1,24
49:25 50:4
56:10 60:12
61:17 69:23
83:8 84:6
104:18 105:7
106:11 109:4
113:12 116:23
117:14 119:1
123:14 124:21
131:25 134:11
135:4,7 136:13
138:11,13
154:11 155:3
157:18,22
158:15,18,22
160:7 163:6,11
170:14,18
174:5,23 175:3
175:10 176:5,9
176:10 177:10
179:4 180:10
181:25 190:22
195:22 208:16
208:18 210:17
211:24 212:2,3
213:6 217:19
219:5 220:1
221:18 226:7
226:22
232:23,25
237:6 245:15
taken 1:18 7:16
57:7 61:15
70:2 79:10
86:10 87:6
97:10 98:18
119:22 125:3
132:4 171:21
207:21 210:16
215:6,7
221:23 246:9
246:19 248:7
248:11 249:9

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-2   Filed 02/21/18   Page 100 of 107

250:3
takes 35:25
  119:8 121:23
  195:12 219:21
  244:9
talk 7:14 19:21
  27:13,14 29:11
  29:12 30:6
  62:25 63:3
  64:14 66:24
  68:7 73:20
  84:6 85:13
  113:23 122:20
  158:14 188:7
  212:24,25
  232:20
  234:10 238:18
  244:10
talked 19:13
  64:23 65:11
  75:10 77:19
  78:1 80:9,10
  102:15 103:12
  138:15 169:14
  189:3 192:12
  193:16 221:11
  232:8 233:2
  241:1,21 242:7
talking 18:8
  24:4 37:13
  49:9 50:8
  53:1 68:4
  83:10 104:7
  121:14 122:16
  142:8 216:14
  219:18,19
  223:5 229:3
  237:13
  246:20
talks 148:25
tangential 53:17
tangentially
  40:25 90:16
  130:15 131:20
  135:11 167:22
Tartaglio 4:7
  5:19,19

task 198:20
  223:20
  224:16
tasked 224:15
tasks 20:24
  112:6
tax 84:2,21
teach 87:8
team 18:16 19:8
tell 10:9,20
  23:2,4 37:14
  45:20 51:18
  52:10 59:21
  66:6 77:9
  78:6 82:22
  83:5 86:22
  90:24 92:13
  105:17 135:3
  136:24 139:25
  145:10,22
  146:24 151:24
  158:25 159:3
  165:5 166:7,17
  171:15 173:8
  178:14 196:2,6
  206:23 226:1
  226:11 231:3
telling 26:1
  30:22 74:7
  83:2,14 90:18
  98:24 111:9
  134:10 165:15
tells 58:2 75:15
  91:25
template 155:13
  155:15
ten 7:21 219:5,8
  224:7
tend 117:22
tends 84:16
  219:7
tenure 212:18
  223:25
termed 177:5
terms 9:3 11:24
  12:24 18:6
  29:3 39:5

56:19 77:14
87:5 89:17
98:7 111:25
121:21 199:1
201:4 207:12
207:24
213:22,24
215:19 221:3
221:10 227:17
229:1 230:19
232:19 246:14
terrible 116:19
test 120:16
  122:18,19,22
  122:24 123:8
  140:12
tested 122:9,17
testified 7:8,10
  7:11 137:9,16
  148:16 149:14
  150:4,16,18
  153:3 199:8
  211:1 225:12
  237:7
testify 7:2
  227:24
  237:10
testifying 150:17
  225:8
testimony
  149:24 152:5
  190:18 201:25
  205:19 216:19
  217:8 218:4,5
  223:17 225:12
  228:22
  230:14 248:5
  248:7
tests 120:15
Texas 215:25
text 131:21
Thank 6:12
  12:24 13:13
  50:21 69:24
  190:17 200:13
  238:7
Thanks 135:19

themself 213:2
theory 207:17
thereof 52:3
thereon 251:10
thereto 248:13
they'd 86:14
  103:18 203:14
thing 13:12 17:7
  21:18 25:16
  29:11 32:2,17
  32:23 35:13
  56:19,25 62:2
  68:3,8 75:22
  81:22 97:25
  102:14,20
  104:9 105:3
  111:15 116:25
  117:11 122:4,22
  123:13 124:10
  143:2 163:13
  169:9 179:22
  199:23 201:16
  201:22 204:14
  209:8 212:13
  221:16 231:21
things 11:24
  18:5,9 20:8,9
  25:18 33:14
  48:15 49:20
  49:21 73:22
  76:14 83:17
  88:17,19 89:9
  89:15 95:24
  95:25 96:2,8
  96:17 98:13
  99:19 101:17
  102:4 104:10
  104:12 109:15
  117:22 121:22
  130:20 138:25
  139:1 142:7
  174:7 178:22
  178:23 183:7
  192:21 197:4,11
  202:7 203:10
  203:20
  204:21 205:4

222:14,20
225:4 228:3
228:21 229:9
229:15 233:15
think 15:20
  17:24 20:11
  43:2,2,3,8,22
  44:23 47:11
  52:24 53:22
  58:20 59:8
  66:17 70:14,14
  70:24 77:13
  81:10 82:1
  85:3 97:7
  98:23 104:9
  109:11,13 110:5
  110:6,16 114:18
  114:21 115:8
  119:25 121:25
  122:23 129:15
  131:4,7 135:25
  137:1,20 151:1
  158:18 159:14
  165:8 167:1
  168:15 169:10
  176:22,24
  182:21 184:16
  184:23 185:3
  185:15 186:4
  186:19 187:18
  188:3,5,17,17
  190:12,15
  194:23 196:20
  207:25
  208:16 212:11
  212:14 214:9
  215:11,13,15,16
  215:21 216:3
  216:21 217:5,7
  217:10 218:1,6
  218:7,7,8
  227:17 228:9
  231:24 232:4
  233:5,7 238:2
  238:20
  242:20
  243:14

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-2   Filed 02/21/18   Page 101 of 107

244:25
thinking 59:8
101:13 114:21
188:5,12 212:7
thinks 222:3
third 69:12 93:1
164:18 219:14
220:5
Thomas 93:5
thought 86:24
103:21 115:12
167:25 168:4
194:12 201:22
thread 9:21
90:5 94:1
134:4 229:12
threatening
91:23
three 20:11,19
24:13,15 29:8
33:2,5,5 41:24
41:25 42:1,1
43:10 45:7
47:3,4,24 69:1
75:2 78:3 82:1
87:14,23 95:11
114:21 115:9,23
154:4 159:6,9
169:24 172:22
174:21 189:14
200:2,7
three-plus 48:5
146:17
three-year 55:3
55:4
threshold
207:23
throw 119:20
120:19 205:8
206:10
tie 43:9 50:18
112:4
tied 77:24
tightened 89:13
time 5:3 8:23
12:8,8,11,15
15:3,6 16:8,15

17:22,22 18:2
20:1 21:2,3,4
21:5,11,18,19,21
22:9 28:13,16
29:9 30:13
34:18 36:4
38:4 41:24
43:11,15 44:18
48:13 50:6
54:11 56:17
57:5 58:8,19
59:8,12 63:24
69:25 70:3,7
71:16 72:13,14
73:8 74:13,17
76:23 77:8
78:10 79:2
82:3 84:6,8
84:10,23
85:13,14,20
85:20 86:23
88:17 89:4,7
90:24 91:1
92:21,24 96:2
96:11 97:13,17
98:1 105:3,15
105:17 112:16
112:23,23
116:15 118:18
122:19 125:1,4
126:20 131:16
132:2,5 133:16
134:22 135:7
138:25 143:7
144:25 149:10
150:13,22
155:14 157:19
163:5 171:19
171:24 172:8
173:11,22
175:21 178:6
180:10 183:1,9
183:14,18,18
183:23 184:1,7
184:16,17,23
184:25 185:7
185:11,15,17,19

185:24 186:4
186:6,8,14,19
186:20,24
187:4,8,13,18
187:19,22
188:2,4 189:2
194:8 195:2
196:17 202:15
203:25,25
204:12 206:2
206:14,17,22
212:17 215:1
216:10,19
218:7 219:6
221:21,24
222:3 223:17
223:18,20,21
223:22,24
224:4,11,22
224:22,23,23
225:6,19
229:1 230:1,6
233:2,16,25
235:1,9 236:11
238:18,19
242:12,14,19
243:11,15,20
243:21,23
244:2,9,12
245:19,22
246:24 247:4
timekeeping
223:16 224:7
224:13,18
times 6:18 7:11
20:18 39:11
62:18,19,24
81:9 83:17
84:14 110:11
116:20 117:2,2
119:9,13 120:5
160:12 164:16
164:21,22
189:4 205:6
212:8 213:1,8
215:21 216:24
219:25 228:12

235:2
Titanic 50:1
title 15:12 17:15
17:16 159:7
160:25
to-do 109:15
Tobin 4:23 5:12
today 13:2
150:8 152:18
183:3,8,25
190:18 196:24
205:13 221:13
226:13
Today's 5:3
toes 7:20
told 21:12 25:25
49:13 61:17
62:16,20 64:1
65:9 68:5
82:19,25 88:8
122:20 135:4
136:9 138:15
138:25 139:1
167:25 211:22
212:19 216:23
216:24 225:17
226:6,21
228:13
229:20 233:11
tomorrow 65:14
82:22
ton 30:13
tools 84:18
top 14:1 23:2
30:18 45:20
52:10,22 71:3
77:13 82:2
109:9 130:3
132:11,23
137:2,20
144:6 145:22
173:11,13
175:18 193:20
196:3,6
205:16
206:23 216:4
topic 224:25

225:1
total 26:12
43:14 195:3
213:20
totally 203:21
216:23
touch 135:18
touched 85:6
tough 196:15
town 68:13,16
track 92:11
121:14 158:4
188:15 223:22
tracked 94:4
tracking
223:20,24
224:4,7,10
traffic 209:5
train 82:5
trained 239:12
training 17:3
28:17 112:7,17
190:7 207:12
207:15 224:17
224:20
240:13
trainings 207:6
207:9
transcribing 8:8
transcript 2:10
2:22 9:25
13:17 169:14,18
172:11 174:8
249:12
transfer 46:22
transferred
26:25 33:21
211:8
transferring
40:15
transition
202:25
transmitted 12:7
transpired 10:6
transportation
121:7
travel 217:1

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-2   Filed 02/21/18   Page 102 of 107

treatment
  117:24,25
  223:8
tremendous
  73:17 121:17
  168:23
trends 195:20
trial 7:9,10 12:18
  17:17 59:4,7,9
  59:10,11,15
  75:23 76:24
  77:1,2 80:22
  120:17,18
  186:25 187:5
  218:21 219:10
  219:13,20
  226:3 237:16
  237:17,18
trials 196:16
  218:24 219:16
  219:19,19
Tribune 193:10
  193:17
trick 89:7
tried 31:24
  95:24 97:7
  131:22 151:25
  163:11 218:24
triggers 158:11
  231:9
triple-booked
  35:1
trouble 120:1
true 189:20
  197:24 236:5
  251:9,13
trust 164:24
truthfully 8:1
try 8:14 32:11,18
  49:22 76:14
  87:8 98:15,18
  141:15 181:25
  181:25 183:6
  200:7 204:7
  219:7,7 241:7
trying 21:21
  24:3,8 52:7

77:22 152:8
152:22 159:22
174:25 188:2
194:23 204:5
207:14 210:1
212:13 220:3
220:6 225:24
229:16
ttartaglio@orr...
  4:9
Tuesday 77:22
  221:5,5,6
tunnel 233:6
turn 13:4,6 14:8
  67:12,23 91:10
  125:10 127:12
  128:24 129:7
  132:22 133:19
  144:1 147:20
  149:2 153:6
  160:19 169:12
  169:21 172:10
  174:11 177:17
  180:14 230:9
turned 38:10
  39:15 70:18
turning 127:9
  174:8 192:9
  202:8 218:21
  220:17 222:1
  223:16
  229:22
turnover 25:2
  25:15 26:21
  27:20,22,22
  27:24 28:1
  30:11 32:7
  87:4 92:1
tutorials 225:6
Twenty-eight
  146:25
twice 98:1 146:9
  146:13,20
  164:15
two 9:8 10:23
  20:7,11,19
  25:8,14 26:22

29:8 30:21
33:6 35:17
41:23,25
43:10 44:22
47:3 54:21
65:8 66:17
68:14 71:19
72:10,13 76:8
78:3,16 81:9,11
87:14,20 91:4
91:15 92:12
99:19 101:6
109:23 110:10
112:17,20 117:9
121:23 122:14
133:13 137:1,8
137:18 154:4
158:18,20
159:8 161:18
167:17 172:22
175:18 176:22
188:11 192:20
195:23 200:1
205:1 211:6,12
215:21 217:19
231:10 241:2
245:6,8,9
two-second
  132:1
two-sentence
  174:14
twofold 191:9
  193:22
type 11:1 60:11
  133:9 156:14
  158:5 177:24
  199:18 207:9
  208:18
  225:24 227:4
  229:14 232:9
typed 181:6
types 155:10
typewriting
  248:8
typical 235:19
typically 28:6
  28:15,24

41:23 46:1
52:11,13,15
57:3,6,14
86:18 200:23
216:13
typing 22:1
typographical
  135:17
typos 230:12
  230:20,22
_____
U
Uh-huh 18:10
  19:4 20:22
  39:14 40:4
  69:10 82:24
  88:3 108:10
  149:13 199:10
  200:22 228:7
  246:11
ultimate 214:10
ultimately 19:16
  75:22 77:6
  105:4,11
  211:25 225:13
unable 117:19
  123:1
unclassified
  81:7
undergrad
  192:2,5
underlying
  54:18 231:14
underneath
  87:7 143:23
understand 8:4
  8:16 9:17 12:16
  32:5 35:9
  52:9 81:2 96:1
  111:2 116:18
  166:22 193:1
  203:3 204:18
  205:19
  225:20,24
  230:5,14
  231:8,17,19,21
  233:20

237:12
understanding
  7:1 11:10 12:6,9
  22:8 38:1
  59:16 78:9
  85:4 128:22
  145:11 146:15
  160:13 161:25
  166:18 175:7
  185:4 202:4
  225:15,25
  226:14 227:12
understood
  170:5 188:14
  198:19 223:16
  230:4
underwater
  89:18 103:1,1
unethical 142:14
unfolded 39:17
  64:19 96:2
unfolds 63:9
unfortunately
  172:8
unit 31:21 238:6
  238:7
United 1:1 3:1,17
  5:7
unlimited 81:7
unpaid 220:6
unrelated 52:1
  197:3
unusual 25:2
  72:2
upper 230:1
upshot 102:5
usage 196:5
use 93:16 138:7
  217:22 245:3
useless 85:19
uses 93:15
usually 57:9
  220:8
utilize 216:18
utilized 213:19
utilizes 18:1

ALARIS LITIGATION SERVICES
www.alaris.us        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-2   Filed 02/21/18   Page 103 of 107

---

**V**

v 5:6 13:23
   135:12 153:18
   155:24 249:6
   250:2
vacancy 16:10
   35:14
vacant 88:20
varied 232:9
variety 19:9
   26:22 36:2
   76:13 212:22
various 20:24
   90:8 107:7
   167:23 172:5
   230:12 231:18
vary 20:14 31:7
   208:17 209:7
   223:4
vastly 128:7
vehicle 6:24
vein 128:2,3
venture 128:21
venue 10:25
   138:21
verbally 19:4
versus 195:23
   198:10
veteran 164:10
victim 215:18
video 8:9
   121:24 123:7
video-recorded
   5:4
videographer
   4:23 5:2,13,25
   15:3,6 50:15
   50:17,20
   69:25 70:3
   125:1,4 132:2
   132:5 171:19
   171:24 221:21
   221:24 247:4
videos 30:4
   122:3
VIDEOTAPED

1:17 3:9
views 10:19,24
   11:21 159:21
violate 170:15
   170:16 171:6,7
   175:4
violated 222:24
violating 154:14
   161:12 170:12
   181:4,17
violation 23:15
   23:16 54:5,12
   54:17 55:2,21
   56:7 57:22
   64:18,20,25
   65:20,23
   66:9,13,16,18
   67:6 69:20
   75:24 77:3
   78:4 142:2
   197:6,8
   222:10,11,23
   223:5,9
violations 23:16
   23:21,23 41:16
   45:22 52:18
   52:20 54:8
   55:16 58:17
   80:23 246:21
virtually 118:3
virtue 164:14
visit 71:20 72:5
   72:9 85:15,15
   159:20
visited 72:12
visits 20:9,10
   72:1 111:18
volume 33:3
   232:19
voluntarily
   80:20 81:1
   177:8 212:24
vs 1:6 3:5

---

**W**

W 4:13 249:4
wait 8:10 106:8

waited 106:18
waiting 76:21
   106:1,2 116:14
   123:15 189:10
waive 66:24
waived 64:25
   65:12 105:13
waiving 64:24
walk 212:3
walking 95:5
   101:19 200:23
wall 11:6 67:21
Walmart 122:1
want 13:4,6 14:4
   23:22 31:14
   37:24 40:2
   48:12 57:11
   60:12 61:13
   65:5 66:21
   68:6,7,10,11
   68:20 70:6
   86:2,4 92:11
   102:4 106:9
   118:24 123:23
   124:21 125:6
   126:22 133:19
   137:21 144:1
   162:5 169:12
   177:17 182:3
   194:11 199:2
   206:5 212:20
   216:12 221:7
   221:12,12
   230:8 233:24
   237:6,11,12
wanted 27:11
   39:11 59:14
   64:23 66:23
   66:24 139:14
   211:23
wants 57:11
   59:3 117:24
   131:23 179:2
   220:24
warrants 68:18
wasn't 42:23
   79:24 82:12

94:13 96:23
   103:17 104:9
   105:21 134:7
   204:19 235:15
waste 242:19
watch 30:5
water 165:12
waterfront
   108:5
Waters 161:21
   226:3,9
way 19:19 23:9
   27:11 53:18
   61:14 64:19
   67:16 86:2
   87:7,15,18
   126:15 176:14
   177:9 181:23
   200:18 209:6
   209:15 212:24
   213:21 217:4
   219:13 226:5
   227:5 229:8
   237:8 246:5
ways 19:15,18
   51:2 60:9,18
   228:11,13
we'll 7:12,13
   31:25 35:22
   86:22 125:8
   155:6 180:2
we're 5:2 13:6
   15:4,7 22:2
   24:4 25:10,18
   26:1 29:1 33:2
   38:16,17 43:18
   43:19 48:7
   52:6 59:1 61:7
   62:9,10 63:6
   64:13 70:4
   86:20 88:16
   94:19 95:8
   96:9 102:1,13
   107:10 116:16
   116:17 118:23
   123:2,20
   125:2,5 132:3

132:6 134:10
   151:13 157:21
   159:22 163:2
   171:16,20,25
   174:24 177:12
   179:23 180:3
   184:11 203:18
   204:4,21
   207:13 208:14
   221:22,25
   228:16,17
   229:3 233:13
   247:5
we've 25:2,4,5
   25:13,17 29:5
   30:8 32:19
   33:4 41:23
   43:22,23 49:1
   49:7,12,17 61:8
   76:13 86:16
   87:10,10,11
   88:14 95:6
   96:7 97:14,16
   97:18,19,25
   98:1,11 102:7
   102:22 107:24
   111:25 116:20
   127:2 137:24
   156:24 157:13
   177:5 179:21
   183:3,7
   199:25 214:21
   221:11 226:21
   229:21 234:5
Wednesday
   35:16
weeds 208:9
   231:20
week 19:10
   20:3,4,11,16
   46:23 47:1
   65:8 121:5
   126:14 208:21
   236:12
weekend
   201:15
weekends

---

ALARIS LITIGATION SERVICES
www.alaris.us            Phone: 1.800.280.3376            Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-2   Filed 02/21/18   Page 104 of 107

111:20 235:20
**weeks** 20:17
35:17,23 47:4
47:4,24 78:16
118:14 208:21
**weird** 178:23
**welcome** 50:22
**well-functioni ...**
87:5
**went** 25:9 27:6
27:7 40:13
59:9,12 65:1,11
90:22 101:22
156:21 159:13
197:16 204:16
211:17,18
215:16,25
**weren't** 59:15
62:14 96:17
169:1
**West** 4:4,19
37:24,25
**Western** 1:1 3:1
3:18 5:8
**Whichever**
37:18
**wide** 246:15
**wife** 16:17
114:24,25
169:7
**wild** 53:1,4,21
219:3,4
**wildly** 78:7
82:22 197:3
**willful** 111:15
117:11
**Williams** 2:19
13:24 153:19
154:24 169:18
175:21,22
188:25
**Williams'** 155:4
156:12,19
169:25 170:6
172:7
**wind** 123:7
**window** 67:20

67:20 206:8
**Winfrey** 93:11
127:14,16 129:1
**Wisconsin** 216:1
**wish** 91:16,18
102:8 210:17
214:6,7
**withdraw** 49:6
64:9 100:16
103:15 108:7
108:19,23,25
109:1,6,8 110:7
113:10,13,18,25
124:6 136:18
137:4 163:1,17
**witness** 6:1
50:16,19,22
69:21,24
124:23 215:14
219:23 221:20
248:5,7
249:12 250:1
250:25
**witnessed**
63:25
**witnesses**
121:21 123:6
212:23 214:6
219:23 223:9
**woe** 128:3
**wooden** 67:21
**word** 133:10
166:12,25
167:1 207:9
231:14
**words** 22:7
59:24 60:16
242:12 243:4
**work** 10:11 17:11
17:23 18:9
27:6 29:25
37:24 63:3
73:14,21 75:18
76:1,8 79:2,20
81:23 82:11
84:9,23 98:6
110:23 111:14

114:25 115:2
116:15,25
117:18 118:17
119:3,8 122:23
124:18 169:6
174:25 206:10
215:15 224:7
224:8 228:23
235:20,23,23
236:12,13
245:15,15,16
245:18
**worked** 146:15
191:18
**workers** 240:23
**working** 16:8,16
21:24 78:20
111:15,20 163:7
179:15 207:25
223:19 229:5
235:10 236:3
**workload** 20:21
192:11 207:11
207:12 227:16
229:1
**workloads**
205:20
**works** 7:24
146:4 221:6
240:8
**world** 44:3 84:8
244:22
**worlds** 127:7
**worries** 206:25
209:14 218:1
220:14
**worse** 39:4
150:22
**worst** 127:6,7
**worth** 101:9
**wouldn't** 57:5
57:21 103:20
243:6
**wound** 151:5,17
**wrap** 215:23
**wreck** 82:5
**writ** 155:24

**writing** 19:2
129:24
**written** 51:16
60:24 173:14
199:7 200:21
202:6 203:8
216:11 217:11
217:15 234:19
**wrote** 78:6
126:6 153:21

---

**X**

**X** 218:15
**XYZ** 221:11,12

---

**Y**

**yeah** 14:10 19:6
24:24 27:21
39:8 48:4
50:20 57:9
62:16 71:18
86:1,14 88:10
96:14 107:2
131:25 162:11
165:1,21 194:19
218:14 239:4
**year** 10:21,22
21:25 22:25
23:3 24:19,20
25:3,4 26:9
26:10,18 31:10
31:25 37:4
39:4,16,21
49:1 52:24
53:4,24 54:20
72:19,24 73:13
75:9 76:8
81:24,24 82:1
83:3 87:17
111:7 128:21
130:18 132:13
134:7 144:5
145:18 147:5
151:19 152:3
191:23,24
193:5 208:21
208:22 211:2

219:1 227:18
234:10 246:2
246:13
**years** 27:4
31:23 37:8
45:7 48:3,5
51:23 52:2
54:21 55:18,21
56:21 58:24
60:3 69:12
73:6,9 75:2,15
75:19,24 76:8
76:21 77:5
79:5,19 80:8
80:14 81:8,8
81:16 85:5,23
87:14,20,23
91:4 110:24
121:20 146:16
146:17 149:19
150:5,19 153:3
160:4 193:4,5
200:2 206:24
210:24 212:6
215:11 219:6
227:2 232:15
**yesterday** 23:4
23:5,25 24:12
77:21 107:11
195:5 209:22
**York** 4:4,4
**You-all** 233:13
**younger** 112:21
**youth** 213:7
**youthfulness**
244:16
**Yup** 195:19

---

**Z**

**zero** 42:9 118:3
136:23

---

**0**

**01** 197:22

---

**1**

**1** 13:18 32:9,10,11

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-2   Filed 02/21/18   Page 105 of 107

36:11,13 68:17
68:19,23 69:7
69:8,8,9 73:10
75:13 104:15
144:15 159:13
224:2,2
227:18 229:2
234:15
**1,664** 151:20
**1,788** 195:6
241:21 246:12
**1:03** 125:4
**1:12** 132:2
**1:16** 132:5
**10** 174:22
**10:16** 125:22
**10:35** 69:25
**10:54** 70:3
**100** 4:13 107:19
107:20 158:9
164:22 208:2
249:4
**100,000** 128:19
**1000** 4:8,13
249:4
**10019** 4:4
**102** 158:10
**103** 158:13
**11** 149:18,18
150:4,19 153:3
181:14 249:9
250:3
**11/7/17** 174:2
**11th** 1:19 3:10
249:18
**12** 15:20 56:13
80:9 119:24
120:16 164:21
208:22 219:8
224:8
**12/29/16** 2:11
**12:21** 125:1
**120** 48:6 55:11
55:12 107:12
107:18
**120-plus** 113:8
**120ish** 108:2

**123** 197:3 198:1
221:12,12
**124** 169:22
**125** 169:22
170:4 197:5
**127** 197:14
209:23
**12th** 5:3 181:13
**13** 2:10
**133** 2:12
**137** 174:11
**13th** 45:10
164:23
**14** 16:3 180:14
181:13
**141** 2:13
**142** 2:14
**147** 2:15
**15** 48:3 58:24
73:9 85:5,23
146:16 160:4
164:21 193:4
215:11
**15-year** 164:9
**150** 23:12,13
24:7 131:7
**1500** 107:21
**151** 160:21
**153** 2:16
**156** 2:17
**157** 2:18
**16** 77:18
**16-year-old**
44:4
**163** 113:19
**17** 2:10,12 13:7,8
169:13 172:10
174:8
**17-04057-CV-...**
1:6 3:5
**170** 24:8
**170-something**
208:23
**1704057-CV-...**
5:7
**171** 2:19
**18** 2:11 89:21,22

120:22 125:7
139:9
**180** 2:20 119:9
**180-something**
208:23
**18328** 148:20
**18330** 149:2
**19** 2:12 15:13
16:21 18:20
22:17 25:3,18
32:18 37:16
82:2 91:8
98:18 99:4
112:22 133:20
133:23 145:4
152:25 154:8
154:12 160:25
180:25 181:3
181:15 223:23
241:24
**191** 2:4
**1990s** 6:21
**19th** 65:14 93:3
**1st** 68:16 144:8

_____
**2**
**2** 32:13,15 68:17
140:6 159:14
176:6
**2-** 82:6 107:24
108:2 113:7
**2:15** 171:19
**2:20** 171:24
**20** 2:13 7:21
21:20 46:6
47:5 141:16,20
210:24 251:15
**200** 85:11 86:7
207:19
**2002** 15:22
**2004** 104:13
**2005** 15:23,25
194:18 195:22
196:13
**2006** 15:23,25
148:13,25
**2007** 148:12

**2008** 38:11 39:9
**2009** 194:17
**201** 3:14
**2010** 45:5
87:22
**2012** 206:2
233:2 241:3
**2014** 15:16,25
16:2 44:19
76:13 77:18
81:25 82:5
88:12,19 90:18
95:21 96:3,15
97:1 203:7
205:18 224:3
229:8,16
**2016** 9:23 25:13
25:15 40:12
70:25 89:11
90:7,12 95:4
96:3,15 101:20
101:23 102:6
125:21 127:23
132:16 144:8
183:18,21
184:4,20
185:5,10,23
186:12 187:2
187:12 228:15
229:8,16
241:17
**2017** 1:19 3:11
5:3 13:19 25:3
25:12 26:7,10
26:23 36:11,13
39:22 40:14
73:10 74:15
75:14 81:23
85:25 88:1
104:3 130:24
143:19 144:5,9
145:17,18
147:5 155:19
155:22 181:13
195:4,23 211:4
224:2,3
238:15 241:17

245:8 249:2
249:9 250:3
**2018** 25:10
120:19
**2080** 208:20
**21** 2:14 142:19
142:20 230:9
230:10 237:6
**210** 145:13,15
147:8
**210.3** 145:8
**211** 110:8
**212** 4:5 244:3
**213** 23:5,22
24:11 48:6
109:21 111:21
164:5 189:24
190:4,5
**213-plus** 163:23
**22** 2:15 92:1
114:11 126:8
147:21,22
**220** 173:14,20
173:22
**221** 4:19
**224** 173:13,20
**23** 2:16 153:7,8
153:10
**233** 2:5
**24** 2:17 156:3,4
156:7 157:11,13
**24/7** 235:22
**24/7-hour** 201:3
**24/7-hour-type**
201:12
**240** 2:6
**25** 2:18 157:1,2
157:13 160:20
**250** 99:6
**2511** 3:14 5:10
**25th** 143:19
148:23,25
**26** 2:19 171:22
172:3,5,21
177:19,21
**26th** 92:16,19
92:22 93:1

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-2   Filed 02/21/18   Page 106 of 107

**27** 2:20 147:10
  180:3,4 209:5
**28** 249:2
**28th** 147:6
**29** 90:7,25
  95:4 102:18
  127:23 199:19
  229:8
**298** 151:20,24
**29th** 125:21
  129:19

**3**

**3** 160:24
**3:01** 181:14
**3:35** 221:21
**3:45** 221:24
**30** 16:13 23:22
  31:23 35:10
  109:11 145:17
  232:14,17
  249:17
**30-some-odd**
  70:19
**300** 21:24 24:18
  24:22 82:6
  107:24 108:2
  113:7
**30th** 144:9
**33** 144:12,15,19
  147:2,6,10
  237:14
**330** 21:23
**35** 23:22
**38** 119:6,9
**38976** 144:2
  230:25
  237:10
**39,000** 31:10
**39414** 134:5,19
**39415** 132:9,18
**39416** 129:8
  132:22
**39417** 129:23
**39419** 127:13,23
  128:25
**39420** 93:20

93:23,24
  125:10 127:10
**39421** 91:12
  139:13
**39564** 249:25

**4**

**4** 14:9 140:4,16
  160:11 161:5
**4-1.1** 154:15
**4-1.16(a)** 154:15
**4-1.3** 141:1
  154:15
**4-1.4** 154:15
**4-1.7** 154:15
**4-5.1** 2:13 141:3
  141:22 154:15
**4:21** 247:4,6
**4:26** 129:19
**40** 208:21
  236:12
**451** 154:4

**5**

**5,000** 214:2
**50** 46:1,9,9,12
  46:13,19,23
  52:24 53:5
  53:23,23
  109:13 246:1
  246:13,17,17
  246:18,19
**50-ish** 113:9
**500** 113:11,24
**506-5000** 4:5
**51** 4:4
**52** 208:21
**52nd** 4:4
**573** 4:20
**573-777-9977**
  4:14

**6**

**6-** 113:19,24
**60** 13:12
**600** 51:8 131:13
  163:2

**600.063**
  229:22
**614-7478** 4:9
**63** 23:13,20
**63101** 249:18
**64** 31:15
**65,000** 31:15
  31:25
**650** 4:9
**65101** 4:19
**65201** 3:15
**65203** 4:13
  249:5

**7**

**7** 2:3 13:22 73:6
  175:22,24
**70** 45:19 47:23
  199:14 209:9
  209:18
**700** 113:20,24
**71** 176:3,15,16,16
  176:18,22
**711** 249:17
**750** 242:3,4
**751-2590** 4:20
**78** 164:23

**8**

**8-** 14:8
**8:59** 5:1,4
**80** 195:14 208:1
  209:23
**82** 14:9,11 172:14
  172:16
**8286** 133:19
**89** 2:11
**899** 4:18

**9**

**9:11** 15:3
**9:13** 15:6
**9:54** 126:7
**90** 133:6,15
**90ish** 209:24
**94025** 4:8
**99.5** 94:16

**ALARIS LITIGATION SERVICES**
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-2   Filed 02/21/18   Page 107 of 107