# Exhibit C

## Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT FOR THE
               WESTERN DISTRICT OF MISSOURI
 2                   CENTRAL DIVISION
 3
 4    SHONDEL CHURCH, et al,      )
                                  )
 5         Plaintiffs,     )
                                  )
 6         vs.         ) Case No. 17-04057-CV-C-NKL
                                  )
 7    STATE OF MISSOURI, et al,   )
                                  )
 8         Defendants.     )
                                  )
 9                                )
                                  )
10                                )
11
12
13
14
15
16         VIDEOTAPED DEPOSITION OF ROD HACKATHORN
17          TAKEN ON BEHALF OF THE PLAINTIFFS
18               DECEMBER 20, 2017
19
20
21
22
23
24
25
```

## Page 2

```
 1                  I N D E X
 2    WITNESS: Rod Hackathorn
      Direct Examination ...................................6
 3    Cross Examination...............................104
      Cross Examination...............................127
 4    Redirect Examination ................................131
 5
 6
 7
 8                 E X H I B I T S
 9    Exhibit 47 .........................................10
      Exhibit 48 .........................................27
10    Exhibit 49 .........................................34
      Exhibit 50 .......................................120
11    Exhibit 51 .........................................76
      Exhibit 52 .........................................76
12    Exhibit 53 .........................................82
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1          UNITED STATES DISTRICT COURT FOR THE
               WESTERN DISTRICT OF MISSOURI
 2                   CENTRAL DIVISION
 3
 4    SHONDEL CHURCH, et al,      )
                                  )
 5         Plaintiffs,     )
                                  )
 6         vs.         ) Case No. 17-04057-CV-C-NKL
                                  )
 7    STATE OF MISSOURI, et al,   )
                                  )
 8         Defendants.     )
                                  )
 9                                )
                                  )
10                                )
11
12         VIDEOTAPED DEPOSITION OF ROD HACKATHORN,
13    produced, sworn, and examined on December 20, 2017, between
14    the hours of 9:00 o'clock in the forenoon and 1:00 o'clock
15    in the afternoon of that day, at Alaris Litigation
16    Services, 2422 East Madrid Street, Springfield, Missouri
17    65084, before Jenna Petree, in a certain cause now pending
18    UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF
19    MISSOURI CENTRAL DIVISION, wherein SHONDEL CHURCH, et al
20    are the Plaintiffs, and STATE OF MISSOURI, et al are the
21    Defendants.
22
23
24
25
```

## Page 4

```
 1                 A P P E A R A N C E S
 2    For the Plaintiffs:
 3    Matthew R. Shahabian
      Anjali Prasad
 4    ORRICK, HERRINGTON & SUTCLIFFE, LLP
      51 West 52nd Street
 5    New York, NY 10019
      mshahabian@orrick.com
 6    aprasad@orrick.com
 7    For the Defendants:
 8    Steven Alan Ramsey
      STATE OF MISSOURI
 9    Attorney General's Office
      221 West High Street
10    Jefferson City, MO 65101
      573-751-9167
11    Steven.Ramsey@ago.mo.gov
12    For the Public Defenders:
13    Jacqueline Shipma
      MISSOURI STATE PUBLIC DEFENDER
14    General Counsel
      Woodrail Centre
15    1000 West Nifong
      Building 7, Suite 100
16    Columbia, MO 65203
      573-526-5212
17    Jacqueline.Shipma@mspd.mo.gov
18
19    The Court Reporter:
20    Jenna Petree
      Alaris Litigation Services
21    2511 Broadway Bluffs
      Columbia, MO 65201
22    573-449-0561
23    The Videographer:
24    Bethany Scutti - Alaris Litigation Services
25
```

1 (Pages 1 to 4)

**ALARIS LITIGATION SERVICES**
www.alaris.us        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-4   Filed 02/21/18   Page 2 of 60

## Page 5

1	THE VIDEOGRAPHER: We are on the record.
2	Today's date is December 20, 2017 and the time is 8:57 a.m.
3	This is the video recorded deposition of Rod Hackathorn in
4	the matter of Shondel Church et al. versus State of
5	Missouri et al, Case No. 17-04057-CV-C-NKL in the U.S.
6	District Court for the Western District of Missouri,
7	Central Division.
8	This deposition is being held at Alaris
9	Litigation Services, 2422 East Madrid Street, Springfield,
10	Missouri 65804.
11	The reporter's name, Jenna Petree. My name is
12	Bethany Scutti. I'm the legal videographer. We are with
13	Alaris Litigation Services.
14	Would the attorneys please introduce
15	themselves.
16	MR. SHAHABIAN: Matt Shahabian from Orrick for
17	the plaintiffs.
18	MS. PRASAD: Anjali Prasad from Orrick for the
19	plaintiffs.
20	MR. RAMSEY: Steven Alan Ramsey. I'm for the
21	State of Missouri and Governor Greitens.
22	MS. SHIPMA: Jacqueline Shipma for the MSPD
23	defendants.
24	THE VIDEOGRAPHER: Would the court reporter
25	please swear in the witness.

## Page 6

1	IT IS HEREBY STIPULATED AND AGREED, by and
2	between counsel for the Plaintiffs and counsel for the
3	Defendants, that the deposition of ROD HACKATHORN may be
4	taken in shorthand by Jenna Petree, and afterwards
5	transcribed into typewriting; and the signature of the
6	witness is expressly reserved.
7	* * * * *
8	ROD HACKATHORN,
9	of lawful age, produced, sworn, and examined on behalf of
10	the Plaintiffs, deposes and says:
11	QUESTIONS BY MR. SHAHABIAN:
12	Q	Could you please introduce yourself for the
13	record?
14	A	My name is Rod Hackathorn.
15	Q	Good morning, Mr. Hackathorn. How are you?
16	A	I'm good. How are you?
17	Q	Good. I'm Matt Shahabian. I'm one of the
18	plaintiff -- counsel for the plaintiffs. And I wanted to
19	thank you for taking the time to answer some questions
20	today.
21	A	Certainly.
22	Q	Have you ever been deposed before?
23	A	Don't believe I've ever been deposed.
24	Q	So, let's go over some ground rules how this
25	deposition will proceed. So there is a court reporter here

## Page 7

1	who will be transcribing the deposition. So because she'll
2	be writing everything down, you'll need to answer with
3	verbal responses to every question; shaking your head won't
4	get picked up on the record, even though it will get picked
5	up in the video. So yes or no, complete sentence is fine,
6	but nonverbal responses won't work.
7	A	I understand.
8	Q	Wait for me to finish the question before you
9	begin the answer. It's a little more difficult for the
10	court reporter if we are talking over each other. Either
11	your counsel or counsel for the State may have objections
12	to my questions. Unless you're instructed not to answer
13	the question, you should still answer even if there is an
14	objection. If you don't understand any of my questions,
15	please let me know. I will try to rephrase and make it
16	more comprehensible, and if you need a break at any time,
17	just let me know. The only rule is you can't have a break
18	if there is a question pending. So after you answer the
19	question, if you would like a break, just let me know.
20	A	Okay.
21	Q	Anything unclear about my instructions?
22	A	Not at all.
23	Q	What did you to prepare for this deposition
24	today?
25	A	I did meet last week with Jacqueline Shipma.

## Page 8

1	Q	And is that counsel present here today?
2	A	Yes.
3	Q	Did you review any documents in preparation
4	for the deposition?
5	A	I didn't necessarily review any documents. I
6	reviewed some of our data that's on the computer.
7	Q	What kind of data did you review?
8	A	I looked back at our numbers concerning cases
9	that had been initiated over the last couple of fiscal
10	years and where we were at in the number of cases -- excuse
11	me -- number of cases that we had initiated so far this
12	year.
13	Q	Did you review anything else in preparation
14	for this deposition?
15	A	I don't think.
16	Q	Did you talk to anybody else in preparation
17	for this deposition?
18	A	No.
19	Q	Could you please tell us your title?
20	A	My title is district defender.
21	Q	Is that a general title or is that specific to
22	a particular region?
23	A	It's a specific title. It's a -- it pertains
24	to the managing attorney of a trial office or any of our
25	appellate offices.

2 (Pages 5 to 8)

ALARIS LITIGATION SERVICES
www.alaris.us	Phone: 1.800.280.3376	Fax: 314.644.1334
Case 2:17-cv-04057-NKL	Document 160-4	Filed 02/21/18	Page 3 of 60

## Page 9

1  Q   And who are you employed by?
2  A   The Missouri State Public Defender System.
3  Q   What trial offices do you cover as district
4  defender?
5  A   I supervise the Springfield Area 31 trial
6  office.
7  Q   Is Springfield the only geographic locality
8  covered by Area 31?
9  A   No.  Our office is located in Springfield,
10 Missouri, but we handle Greene, Christian, and Taney
11 counties.
12 Q   And those three counties make up area 31?
13 A   Yes, sir.
14 Q   How long have you been district defender?
15 A   Right -- well, come January 1, I believe it
16 will be 15 years.
17 Q   Congratulations.
18 A   Thank you.
19 Q   Could you briefly describe your employment
20 history prior to becoming district defender?
21 A   Well, I started with the Missouri State Public
22 Defender System right out of law school.  And I have
23 actually been with the Springfield office the entire time,
24 of course starting as an assistant public defender.
25 Q   When did you graduate law school?

## Page 10

1  A   1997.
2  Q   Have you ever been recognized professionally
3  for your accomplishments as an attorney?
4  A   I did receive an award from the Missouri Bar,
5  the Charles East Shaw award.  Actually, I'm sorry, that's
6  the Missouri Association of Criminal Defense Lawyers, I
7  received an award from them.
8  Q   Were you ever named one of the ten best
9  lawyers in Missouri?
10 A   I don't believe so, no.
11 Q   I'm showing you, I will ask the court reporter
12 to mark this exhibit.  We'll call it Hackathorn 1.
13 MS. SHIPMA:  We left off at Exhibit 46 was the
14 last one we used.
15 MR. SHAHABIAN:  Okay.  So let's call it
16 Exhibit 47.  Thank you, Jackie.
17 MS. SHIPMA:  Your welcome.
18 (EXHIBIT NO. 47 WAS MARKED FOR IDENTIFICATION
19 BY THE COURT REPORTER.)
20 A   Sorry, if you bear with me a minute.
21 Q   Please take your time.
22 A   Pretty small print you got there.
23 Q   I apologize for the print.  These internet
24 documents don't always print the best.  If you can just
25 take a minute and review this document and let me know when

## Page 11

1  you've had a chance.
2  A   It appears I stand corrected.  It's been a
3  while back but, yes, apparently I was named one of the ten
4  best lawyers.
5  Q   Does this refresh your recollection at all?
6  A   It does.
7  Q   You were named one of the ten best lawyers in
8  Missouri?
9  A   Yes, sir.
10 Q   You can put that aside.  So what are your
11 responsibilities as district defender?
12 A   Just all the various duties?
13 Q   General duties.
14 A   Okay.  It involves supervising the attorneys.
15 So I spend a lot of time with them talking about their
16 cases, especially the newer attorneys, and make sure that
17 things are getting done that need to be done.  Even the
18 more experienced attorneys, I help them brainstorm on
19 issues of complex cases.  I'm responsible for approving
20 time sheets, expense reports, expense requests to get money
21 to hire experts and that sort of thing.  I sign off on all
22 the bills.  I'm responsible for the hiring.  Any personnel
23 matters that arise, in a large office like ours, there is
24 inevitably conflict between a couple people every now and
25 then and we have to get involved with that.  I assign all

## Page 12

1  of the felony cases and review the probable cause
2  statements for potential conflicts.  I'm probably missing
3  something, but that's the bulk of it.
4  Q   Okay.  How many people are employed by the
5  area 31 offices?
6  A   Counting myself, if we are at full staff, it
7  would be 22 attorneys and I have eight support staff and
8  then one part-time support staff person.
9  Q   What do you mean if you would be at full
10 staff?
11 A   Over the last few years, it seems like the
12 bulk of the time we are not at full staff.  We always -- it
13 seems like we have an open position.  Right now I have
14 three open attorney positions.
15 Q   Why are there open positions as opposed to
16 being at full staff?
17 A   Well, for the three that we have open right
18 now, I had two attorneys that resigned over the last few
19 months, and the third position is actually a position that
20 has been granted to us by the director.  I don't know where
21 that money comes from or, you know, if that came at the
22 expense of another office, but I know our office has always
23 had higher numbers than a lot of other offices in the state
24 as far as the number of cases that we handle so we were
25 given an additional position.

3 (Pages 9 to 12)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-4   Filed 02/21/18   Page 4 of 60

## Page 13

1   Q   So you said full staff would be 22 attorneys,
2  but there are currently 19 attorneys in the office; is that
3  right?
4     A   That would be correct.
5     Q   And on average what is the experience level of
6  an attorney in your office?
7     A   We have fared pretty well over the last
8  several years as far as turnover on attorneys.  So we do
9  have quite a few attorneys who have either what we call
10  APD 3 or APD 4, which is our top two assistant public
11  defender positions.  Right now, I think we only have three
12  attorneys that have only maybe a year of experience or
13  less.
14     Q   Do you report to anybody as district defender?
15     A   Yes.
16     Q   Who do you report to?
17     A   My direct supervisor would be Ellen Blau.  She
18  is our trial division director.
19     Q   Where does she work?
20     A   All over the state.  She's constantly on the
21  move.
22     Q   Would it be fair to say she's in the central
23  office for the state defender?
24     A   Yes.
25     Q   What directions do you receive from Ellen Blau

## Page 14

1  or anybody else in the central office about how to run your
2  office?
3     A   Well, we have our guidelines for
4  representation.  We have our Employee Handbook that states
5  a lot of our MSPD policies.  I mean, that's pretty much.
6  Then I can -- whenever there are issues as to how to handle
7  situations, then I go to her or Michael Barrett, who is our
8  director.
9     Q   Do you -- is it fair to say you have a lot of
10  discretion over how the attorneys in your office handle
11  their cases?
12     A   I think that's fair to say.
13     Q   Is there anything that you lack discretion
14  over in terms of how cases are handled?
15     A   Well, as far as how cases are handled, we
16  should be going by our guidelines for representation.  But
17  depending on how overworked I guess an office is, there
18  some discretion there on, I guess for lack of a better
19  term, fudge some of the expectations.  And so I do have
20  some discretion there and I have had to at times,
21  especially with contact with clients, our expectation is
22  that they would see their clients with you, you know, that are
23  incarcerated at least every month.  That gets almost
24  impossible to do with the number of cases we've had over
25  the last few years, so I've had to decrease that

## Page 15

1  expectation and go to more like 45 to 60 days.
2     Q   And we'll come back to client contact in a
3  bit.  Just starting with a more general picture of the
4  office; what is the current workload based on your review
5  of the data?
6     A   Right at this moment in time, most of our
7  attorneys are hovering right around hundred cases open.
8     Q   Would you say that in your experience that's
9  above average, that's typical, or that's below average?
10     A   That is below average.
11     Q   How far below average?
12     A   Ordinarily, a typical caseload would be
13  anywhere from 150 to 200 cases.
14     Q   Why is the caseload so much lower below
15  average right now?
16     A   Over last three months we have been
17  waitlisting a lot of potential clients who would qualify
18  for our services and because of that, the numbers have went
19  down.
20     Q   So when you say the average caseload is about
21  hundred cases, that's not including indigent defendants who
22  would qualify for representation by your office but are on
23  a waitlist?
24     A   Correct.
25     Q   How are cases assigned to defenders in your

## Page 16

1  office?
2     A   Ordinarily -- now things have changed over the
3  last three months because of the whole waitlist issue --
4  but ordinarily cases would be assigned by -- I have some
5  attorneys that are assigned specifically to Taney County.
6  I have some attorneys that are assigned specifically to
7  Christian County, and then in Greene County because it's so
8  much larger and we have many more courts.  We have actually
9  four associate courts, we split up our Greene County
10  attorneys where they receive -- they are assigned to a
11  specific associate court and they received all of our cases
12  that arise out of that division and then they follow them
13  on through to circuit court.  Misdemeanors and probation
14  violations, I gave -- I give basically a list to our clerks
15  of who to assign those to and as they come in, they rotate
16  through that list and assign those out.  All felony cases
17  are given to either me or the deputy district defender.
18  Because we split up the attorneys as far as who assigns
19  cases to who, our deputy district defender assigns the
20  felonies out to attorneys in Taney County and half of the
21  attorneys in Greene County; and then I assign the felonies
22  out for Christian County and half of the attorneys in
23  Greene County.
24     Q   Who is this deputy district director?
25     A   Chris Hatley.

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 17

1    Q    Roughly how much of your time would you say is
2  spent on administrative tasks?
3    A    At least 75 to 80 percent.
4    Q    Do you have your own caseload in addition to
5  your administrative responsibilities?
6    A    I do, but it's a much lower caseload than what
7  our assistant public defenders handle.
8    Q    How many case do you handle roughly per year?
9    A    On average -- I couldn't tell you exactly by
10  year -- but on average I usually have around 25 to 30 open
11  cases at a time.
12    Q    And what kinds of cases do you typically
13  handle?
14    A    I only assign myself felony cases.  Now if
15  that client also has a pending misdemeanor or probation
16  violation, I will take that as well, but they would have
17  some pending felony.  I try to give myself some sort of
18  variation, but I have murder.  I try to take a lot of
19  complex cases, sex cases, murder case, but also some of the
20  lower grade C,D grade felonies.
21    Q    Could you walk-through typically how a public
22  defender approaches a new case that they are brought on, a
23  felony-level case?
24    A    Well, they would usually start by having that
25  initial meeting with the client.

## Page 18

1    Q    Where would that take place?
2    A    Well, that would depend.  If the client is
3  incarcerated, it would take place at the jail.  If they are
4  not incarcerated, that meeting sometimes doesn't take place
5  at all because the client -- well, we basically have to
6  rely on the clients to contact us to schedule a meeting.
7  We just don't have the time track people down.  A lot of
8  times that initial contact information we get on the
9  application changes quickly.  So even if we tried to
10  contact them at that address or that phone number, a lot of
11  times it's not good anymore.  So for the most part that
12  initial meeting is really usually with incarcerated
13  clients.
14    Q    So in a criminal process, when does that
15  initial meeting occur?  Is it before arraignment?  Before
16  initial appearance?
17    A    Ideally, it happens within a week of them
18  getting the file.  That doesn't always happen because a lot
19  of times they are in court every day of the week.  But
20  definitely we try to make sure that it happens prior to the
21  preliminary hearing.  You asked about arraignment; I will
22  just say most of the time in the counties we handle,
23  especially in Greene County on felonies, they will have
24  been arraigned before we are ever in the case.
25    Q    Are there any negative consequences to

## Page 19

1  arraigning defendants before counsel is assigned?
2    A    I'm sorry, could you ask that question again?
3    Q    Sure.  Are there negative consequences to
4  defendants having an arraignment before they are assigned
5  counsel?
6    A    There certainly can be.  They can say things
7  that they shouldn't be saying in open court.  But I can't
8  give you an example of where that's necessarily come back
9  to haunt one of our clients.
10    Q    And you mentioned that the goal is to get
11  counsel to meet the client before the preliminary hearing;
12  why is that the goal?
13    A    Well, at the preliminary hearing, although we
14  would rarely ever have our clients testify at a prelim, we
15  do want to have some idea of what our clients have to say
16  about the situation before we go into a hearing because
17  also, a lot of times we don't have any discovery before we
18  go into a preliminary hearing.  The only thing we have to
19  base off what we are going to prepare is what our clients
20  have to say.
21    Q    And is -- are there cases where you're not
22  able to meet with the client before the preliminary
23  hearing?
24    A    Like I said, especially with those that aren't
25  incarcerated, yeah, that happens a lot.  You know, we try

## Page 20

1  to rush and have a quick meeting out in the hall if they
2  are not incarcerated and they haven't scheduled an
3  appointment beforehand, but those are rushed and they are
4  not very meaningful conversations.  With those in custody,
5  I think for the most part, we succeed in seeing them before
6  the preliminary hearing.
7    Q    What happens after the preliminary hearing?
8  Actually, strike that.  What happens at the preliminary
9  hearing?
10    A    Well, when one of attorneys comes in for a
11  preliminary hearing, first thing they would do is check to
12  see if the State is prepared.  Do they have the witnesses
13  that they need to proceed.  If they don't, then the next
14  step is we are asking for the case to be dismissed.  If
15  they do have the witnesses that they need, then the next
16  thing we do is ask if there is any kind of offer on the
17  case.  If there is an offer, with then meet with the
18  client.  Let them relay that offer to them.  Then the
19  attorney and the client would discuss whether or not to
20  have the preliminary hearing or whether they should waive
21  the preliminary hearing based upon that offer.
22    Q    In your experience do you have adequate time
23  to prepare for a preliminary hearings?
24    A    That's hard to say.  I think probably for our
25  complex cases, no; for others, probably.  I mean,

5 (Pages 17 to 20)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 160-4    Filed 02/21/18    Page 6 of 60

## Page 21

1  considering.
2      Q    Why would it differ?
3      A    Because just the lack of time available and it
4  takes more time to prepare for any stage of proceeding on a
5  complex case and time is a precious commodity that we have
6  very little of in the public defender business.
7      Q    What typically happens after the preliminary
8  hearing?
9      A    Well, if the State has been able to either --
10  if we have waived the preliminary hearing or the if State
11  has shown probable cause then the case would proceed on to
12  circuit court for arraignment.
13      Q    I'm going to step back from the criminal
14  process for a minute.  Let's go back to client contact.
15  You mentioned that in your experience it's typically easier
16  to contact clients when they are incarcerated.  Where does that
17  client contact take place?
18      A    Can you be more specific?
19      Q    Where does the first time meeting with an
20  incarcerated client take place?
21      A    Well, it would take place at the jail and we
22  have meeting rooms at the jail.  Now, that -- for Greene
23  County, that's always the case that it would take place at
24  the jail, that first meeting.  And it's easy to have that
25  first -- easier to have that first meeting with them

## Page 22

1  because they are almost always at our Greene County jail
2  prior to the preliminary hearing.  Now, later on, that gets
3  more difficult and that's not always the case because the
4  Greene County jail is -- well, we are told it's
5  overcrowded.  So inmates get farmed out to counties
6  sometimes two hours away.  But generally speaking, prior to
7  the preliminary hearing, they are here.  Christian and
8  Taney County; Taney County, it's easier.  Yeah, they are
9  always there in the jail.  There are meeting rooms there.
10  It's easy to see them.  Christian County has been a very
11  difficult place to get our jail visits done.  They had one
12  small meeting room at that jail that really wasn't very
13  private.  It was difficult to communicate with the clients.
14  They -- I had a meeting with the sheriff.  They had two
15  rooms over at the courthouse that they cleaned out and made
16  available for our attorneys to visit privately with
17  clients, but we have to rely on a bailiff being available.
18  So if courts going on in every one of the courtrooms, they
19  can't do a visit.  And if the rooms are being used, they
20  can't have a visit.  So it does get difficult there.
21      Q    So you mentioned the rooms aren't that private
22  in Christian County?
23      A    The one over at the jail --
24      Q    At the jail.
25      A    -- wasn't, yes.

## Page 23

1      Q    Are the rooms in which you meet clients in
2  Greene and Taney counties confidential?
3      A    Yes.
4      Q    In your opinion, do you have the time you need
5  to effectively communicate with your clients throughout
6  their cases?
7      A    No.
8      Q    Why do you say that?
9      A    Client communication is an area where we have
10  constant downfall.  And as a supervisor, I get the majority
11  of the complaint letters I get from clients all stems from
12  lack of communication.  Once again, most of our attorneys,
13  they are in court Monday through Friday.  As best as I try
14  to assign cases and try to work out some sort of system
15  where they will have a day in the office or a day to go to
16  the jail.  Inevitably with the number of judges courts we
17  have here, it seems like they are in court everyday no
18  matter what we do.  We have worked with the jails to try to
19  extend visiting hours and we have had some success with
20  that.  It used to be in Greene County they had visiting
21  hours only from 8:00 to 11:00 in the morning and then 1:00
22  to 4:00 in the afternoon.  So all the times they were in
23  court, it made it impossible.  We have gotten that extended
24  now all the way from 8:00 solidly through 6:00 p.m.  So
25  they are able to, you know, during lunch or later in the

## Page 24

1  afternoon or right after they get out of court go and do
2  some of those visits.  But even at that, when you have got
3  the majority of your clients are incarcerated, you just
4  can't get them all seen every month.  So, yeah, no, there
5  is not enough time to communicate with folks.
6      Q    What are the negative consequences of not
7  having enough time to communicate with your clients?
8      A    First and foremost a poor attorney-client
9  relationship.  It suffers right off the bat.  Other
10  problems is being able to properly prepare the case.  To be
11  able to know, you know, what's the right avenue to take.
12  Is this a case we need to negotiate.  Is this a case we
13  need to take to trial.  Being able to reasonably explain
14  matters to your clients so that they can make an informed
15  decision about things about whether to plead or whether to
16  take an offer.  Whether -- if they are going to trial,
17  whether or not to testify.  The majority of our clients are
18  uneducated.  A lot of them have difficulty reading and
19  writing.  Many of them have mental health issues.  It takes
20  so much more time to explain complex legal matters to them.
21  Sometimes yes need to reexplain, reexplain, and reexplain
22  to them and they deserve that kind of attention and they do
23  not -- they do not get it.
24      Q    Without getting into specifics or compromising
25  attorney-client privilege, can you think of a time when a

6 (Pages 21 to 24)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL     Document 160-4     Filed 02/21/18     Page 7 of 60

## Page 25

1 representation of a client in your office was hampered by
2 lack of communication?
3     A  Yeah.
4     Q  Could you elaborate being as vague as you feel
5 necessary to protect the privilege?
6     A  I mean, there is just -- it's -- there are
7 numerous. I'm trying to be general and it stems more from
8 me knowing through the letters I get from clients and then
9 having to talk with the attorneys and understanding. You
10 know, sometimes there have been issues where clients have
11 pled guilty and not fully understood what was in the plea
12 agreement. Not understood the conditions that were going
13 to be on them. Not understanding some of the collateral
14 consequences of that plea. Especially with sex offenses;
15 if that's not fully explained to them, they are devastated
16 when they find out some of the things that go along with
17 pleading to a sex offense.
18     Q  What are some of those collateral
19 consequences?
20     A  Well, now would be lifetime supervision,
21 lifetime GPS monitoring, registering as a sex offender for
22 the rest of your life.
23     Q  I'm handing you a copy of an exhibit that was
24 previously marked Petsch Exhibit 1. I'm not going to
25 remark that. Can you just take a minute and look that

## Page 26

1 over?
2     A  Sure.
3     Q  Do you recognize this document?
4     A  No.
5     Q  Can you tell me what it appears to be?
6     A  It appears to be an e-mail that was sent out
7 by Joel Elmer to -- I'm assuming all of what would have
8 been at the time the assistant public defenders in the
9 Kansas City trial office.
10     Q  And do you see the first sentence in that
11 e-mail?
12     A  Yes.
13     Q  Could you read it for the record?
14     A  "As you know, you are to have contact with
15 trial caseload clients within seven days of assignment and
16 thereafter at least every 30 days."
17     Q  Does that statement reflect your understanding
18 of client contact guidelines in the MSPD?
19     A  Yes.
20     Q  Is that still the guideline?
21     A  Yes.
22     Q  And in your opinion, are attorneys in your
23 office able to meet those guidelines routinely?
24     A  More often than not, no.
25     Q  I'm handing you a document that I'm going to

## Page 27

1 ask the court reporter to mark Exhibit 48. Can you just
2 take a minute to look that over.
3     A  Sure. Did you want me to review the whole
4 thing or just the client counseling section?
5     Q  Just the client counseling section is fine.
6     A  Okay.
7     Q  Do you recognize this document?
8     A  Yes.
9     Q  What is it?
10     A  It is a performance evaluation form that we
11 use for promotions. This one was written out by me
12 concerning an employee named Dawn Calvin.
13     Q  Who is Dawn Calvin?
14     A  Dawn Calvin is an assistant public defender
15 with the Springfield trial office.
16     Q  At the time you prepared this document, how
17 long had she been a public defender?
18     A  This would have been for her promotion to APD
19 2, so she would have been with us a year.
20     Q  Could you read for the record the box starting
21 "comments" or it says, "in reviewing her files."
22     A  Yes. "In reviewing her files, it appeared
23 that for the six months or so Dawn did quite well at
24 staying close to guidelines for client contact with her
25 incarcerated clients. During that time, she was being

## Page 28

1 assigned misdemeanors and PV's only in Greene County. When
2 she was added to the C,D felony rotation and her caseload
3 began to rise, as well as her number of incarcerated
4 clients, she encountered more difficulty in keeping up with
5 client contact. The worse instance of this I saw was a
6 case where initial contact at the jail did not occur until
7 102 days. There were short visits before court appearances
8 at court. Also, it was noted in that file that she
9 attempted a jail visit 30 days in, but client had been sent
10 to another facility due to overcrowding. Regardless,
11 further attempts should have been made to visit client
12 sooner. When I met with Dawn to discuss this, she agreed
13 this is an area she needs to improve on. She brought with
14 her a list of her incarcerated clients she had created that
15 she was now using to keep track of their last visit and
16 when another was needed. She currently has 34 clients in
17 custody. We also talked about maintaining control during
18 client meetings. She usually lets the client talk as long
19 as they want at every meeting, which means most of her jail
20 visits are 45 minutes or longer each which make it
21 difficult to get more people seen. For out-of-custody
22 clients, she briefly meets with them at their first court
23 dates and ask them to call and schedule an office visit.
24 For the half or so that do, Dawn lets the clerks know when
25 she is available and they schedule those appointments. For

ALARIS LITIGATION SERVICES
www.alaris.us    Phone: 1.800.280.3376    Fax: 314.644.1334

1 the half or so that don't call, Dawn tries to reach out to
2 them by phone. There were notes in several of her files
3 detailing contact with the client's family members."
4     Q So going back to the beginning of this comment
5 box, you note that Ms. Calvin was able to maintain client
6 contact when she was assigned misdemeanors and PV's only in
7 Greene County; is that accurate?
8     A Yes.
9     Q You say that changed once she was added to the
10 C,D felony rotation and her caseload began to rise. Why
11 would that make it more difficult for a defender to
12 maintain client contact?
13     A Misdemeanors and probation violations -- well,
14 I should say just misdemeanors. Misdemeanors, most of
15 those clients are out of custody. Once you get into C, D
16 felony rotation, much more -- many more of your clients are
17 actually going to be incarcerated. Also, you're going to
18 be in court more often once you're added to felony rotation
19 because going to the felony rotation doesn't mean she
20 stopped getting misdemeanors and probation violations. She
21 was still getting those. It's just now she was added into
22 that rotation. So more court appearances, less time to get
23 over to the jail, more clients who are in jail. So it does
24 make it more difficult. I believe when we started Dawn
25 out -- being a larger office we can do this sometimes -- we

1 started her out basically at a zero caseload and she was
2 able to build it up. So, yeah, once we got into the C,D
3 felony rotation, it made it much more difficult because
4 also the number of cases she was handling was going up as
5 well.
6     Q So once she reached a caseload more typical of
7 attorneys in your office, it became difficult for her to
8 maintain client contact?
9     A Correct.
10     Q You noted in this comment box that the worse
11 instance of this I saw was a case where initial contact at
12 the jail did not occur until 102 days. Would you describe
13 that as aberrational, occasional, routine?
14     A 102 days would be aberrational, especially for
15 initial contact client. Let me add that.
16     Q What was the reason for the 102 days before
17 the initial contact, if you know?
18     A This may have been -- I don't recall off the
19 top of my head, but considering something else I added
20 there right after that. This may have been one of those
21 rare instances where the jail had shipped them out to
22 another facility right away once they were incarcerated.
23     Q And you noted that later in this box it says,
24 "Also it noted in that file she attempted jail visit 30
25 days in but client had been sent to another facility due to

1 overcrowding."
2     A Yes.
3     Q Is that what you mentioned before that in
4 Christian County, clients are sent to other jails or is
5 that frequent in any jail?
6     A It's mainly actually in Greene County. Now, I
7 will say Christian County just started doing that.
8     Q Okay.
9     A But I think the majority of clients that they
10 are farming out they are actually sending down to the Taney
11 County jail which is a jail, you know, it's a county that
12 we cover so it's not as difficult to see them. But it does
13 add for an increased trip for those attorneys that are
14 assigned to Christian County because Taney County is
15 further away.
16     Q How far away is it?
17     A Round trip to Forsythe from our office here
18 is, I believe, 94 miles
19     Q And would you say that based on what you have
20 written here it looks like Ms. Calvin went to the jail and
21 learned that her client had been moved somewhere else?
22     A Yes.
23     Q Does that happen frequently when clients are
24 moved?
25     A Used to happen all the time. Anymore, it

1 seems because of that, our attorneys have -- we have been
2 asking the jail to send us a census each morning, which
3 they do. So our attorneys have now been looking at that
4 census before they go over to the jail to see if they are
5 actually there or not or if they have been sent somewhere
6 else.
7     Q Is that census always accurate?
8     A For the most part, yeah.
9     Q Looking to the second page of this document.
10 You wrote that you talked with Dawn about maintaining
11 control during client meetings. She usually lets the
12 client talk as long as they want at every meeting, which
13 means most of her jail visits are 45 minutes or longer each
14 which make it's difficult to get more people seen. So is
15 it fair to say based on this that you talked about in order
16 for Ms. Calvin to talk with more of her clients, she would
17 reduce the amount of time she was spending talking to each
18 of her clients?
19     A Yes, but that conversation was focused on
20 making sure that the client stayed focused on talking about
21 the case as opposed to going off on a tangent and just
22 wanting to talk about their family and whatever else.
23 Making sure they stayed focused so that those meetings did
24 get shorter, yes.
25     Q And your ultimate recommendation on this

ALARIS LITIGATION SERVICES
www.alaris.us    Phone: 1.800.280.3376    Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-4   Filed 02/21/18   Page 9 of 60

## Page 33

1  client counseling factor you had checked the box "ie",
2  which is improvement expected; is that accurate?
3      A  Yes.
4      Q  So you expected Ms. Calvin to improve her
5  contact with clients?
6      A  I do.
7      Q  How is Ms. Calvin's performance otherwise?
8      A  Very good.
9      Q  Was she promoted to the next level?
10     A  Yes.
11     Q  Would you say her inability to meet your
12  expectations on client contact was caused by any lack in
13  skills in her as an attorney?
14     A  Well, because I put improvement expected I
15  would have to say to some degree, yes.  She was a brand new
16  attorney.  So there was ways that she could improve in that
17  area despite all of the obstacles we have being a public
18  defender.  So to some degree, yes, but she has made strides
19  to improve in that area.
20     Q  Would you say to any degree this was due to
21  factors not in her control?
22     A  Yes.  There were some factors that were beyond
23  her control.
24     Q  What would those factors be?
25     A  Once again, clients that get farmed out making

## Page 34

1  it more difficult to get them seen.  As her caseload
2  increased, having the time to get over to the jail to see
3  those clients; that sort of thing.
4      Q  What about her caseload?
5      A  Yeah.  As the number of cases increased as
6  well, yes.
7      Q  So I'm handing you a document that I'll ask
8  our court reporter to mark Exhibit 49.  If you could just
9  take a minute and review that.
10     A  Sure.  Okay.
11     Q  Do you recognize this document?
12     A  Yes.
13     Q  What is it?
14     A  This would be an entry out of our employee
15  performance log.  It would have been created by my Deputy
16  District Defender Chris Hatley concerning an assistant
17  public defender for Paul Duchscherer.
18     Q  Have you seen this document before?
19     A  I reviewed it after briefly after Mr. Hatley
20  wrote it.
21     Q  Who is Paul Duchscherer?
22     A  He is an APD IV in the Springfield office.
23     Q  What is an APD IV?
24     A  That is our highest level of promotion for an
25  assistant public defender.

## Page 35

1      Q  How long has he been employed at the MSPD?
2      A  Paul, I think he's been with us right at
3  between 15 and 16 years.
4      Q  So it's fair to say he's an experienced
5  attorney?
6      A  Yes.
7      Q  And if you look at the first paragraph "Under
8  description of event or issue, " it says "We are conducting
9  performance reviews of all the APD IV's in our office
10  starting with those who have been in that position the
11  longest.  Paul is one of our longest tenured fours.  Our
12  predominate concern in conducting these reviews are client
13  contact unless we have noticed performance related issues
14  in other areas."  Is that statement consistent with your
15  understanding of the purpose of this review with
16  Mr. Duchscherer?
17     A  Yes.
18     Q  Why was the predominant concern in doing
19  review of APD IV's client contact?
20     A  Once somebody is promoted to APD IV, really
21  there is no evaluation that ever occur for the most part,
22  at least that are required.  And knowing that client
23  contact is one of our biggest problems, once again we see
24  it all the time in complaint letters from clients.  I
25  wanted to address that with some of our attorneys who had

## Page 36

1  not been evaluated in a very long time and making sure that
2  they were seeing their clients as they should be as best as
3  they could possibly be seeing them.
4      Q  If you look at the next full paragraph under
5  "counseling."  The first sentence says, "In the file
6  reviews I did, there were gaps of 3 months,  3 months, 5
7  months, 6 months, 6 months, 8 months, and even 13 months
8  between qualifying contacts."  Do you see that?
9      A  Yes.
10     Q  What does that mean?
11     A  That would mean as Chris reviewed Paul's
12  files, he was looking to see the documented contact in the
13  file.  Using our guidelines that the initial contact in
14  seven days and the follow-up contact at least once every 30
15  days; there were gaps longer than that.  That's why he is
16  taking note over there.  So this would mean -- this would
17  not necessarily mean this all occurred in one file -- but
18  of the files he reviewed, this was at least gaps between
19  visits at the jail for that particular client of that
20  amount of months that he's listed there.
21     Q  What is a qualifying contact?
22     A  A qualifying contact would actually be a sit
23  down visit over at the jail.  Not a quick, here is what's
24  going to happen in court right when they are brought over
25  to the courthouse or a letter.  It's a face-to-face sit

9 (Pages 33 to 36)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 160-4    Filed 02/21/18    Page 10 of 60

## Page 37

1   down at the jail contact.
2       Q   The next sentence says, "I discussed with
3   David that this method simply is not working and is in
4   opposition to our guidelines for representation."  Would
5   you agree with that statement.
6       A   I would agree except that he made a mistake
7   there and put David a couple times in here.  I don't know
8   why he had David on the mind, but it should be Paul.  But
9   other than that, yes, the gist of that I agree with it.
10      Q   The next sentence says, "I also told him that
11  given the huge caseloads we understood that every 30 days
12  may not be attainable."  What does that mean?
13      A   This goes back to something I had said to you
14  earlier where we kind of -- especially for promotion
15  purposes, we kind of fudged those numbers a little bit.
16  And our expectations really for promotion and such as been
17  had to stretch out beyond that 30 days because we know we
18  can't always actually get over there.  We expect better
19  than one of these gaps that he's mentioned up here, but
20  we're not oblivious to the fact that you can't -- might not
21  be able to see every one of your incarcerated clients every
22  30 days.
23      Q   Would you say that the issues noted in this
24  review of Paul applied to other APD IV's or just Paul?
25      A   No, it applied to others.  We haven't went

## Page 38

1   through all of our APD IV reviews yet.  But on another one
2   that I have done, yes, I have seen similar.
3       Q   Similar?
4       A   Types of gaps, yes.
5       Q   And in response to this, Paul suggested that
6   he could do every 60-day client meetings or could likely do
7   that; do you see that?
8       A   Yes.
9       Q   Is there a disadvantage in representing a
10  client in going from meeting once every 30 days to once
11  every 60 days?
12      A   Yes.
13      Q   What disadvantages would there be?
14      A   Once again, I think it hurts your
15  attorney-client relationship.  If they are not seeing you,
16  if you're not responding to their letters, they don't trust
17  you.  A lot of our clients we already start out with a
18  level of distrust because, you know, it gets around hey,
19  they are paid by the state.  They're in cahoots with the
20  prosecution.  So we already start out with a lot of times
21  with distrust.  You can't build trust if you're seeing
22  people every 60 days.  It also hurts in your ability to
23  once again properly inform your client about the decisions
24  that they have to make, some life-changing decisions.  It
25  hurts in your ability to properly prepare the case.  It

## Page 39

1   hurts in your ability to negotiate with the prosecutor.  It
2   hurts in a lot of ways.
3       Q   You started with trust; why is trust important
4   in the attorney-client relationship in defending an
5   indigent client?
6       A   Well, because there are times when there is a
7   right road and there is a wrong road on a case and how you
8   should proceed.  If the client doesn't trust you about
9   which way you need to go, they might make the wrong choice
10  and it will affect them forever.
11      Q   And how would developing more trust aid in
12  picking the right road?
13      A   Because if they trust the attorney, then they
14  are more likely to listen to them about what the attorney
15  thinks they should do in a case.
16      Q   Can you think of a time where a client not
17  trusting you or someone in your office hampered your
18  office's ability to provide effective -- an effective
19  defense?
20      A   Well, I can think of times where I have seen
21  people plead to an offer I didn't think that they should
22  take or I thought maybe they should go to trial, but
23  because there is a lack of trust, they wanted to go with
24  the guarantee in writing.
25      Q   Turning back to this document, if you go to

## Page 40

1   the next paragraph it says, "Christian County is a bit odd
2   when it comes to client contact.  The jail is an absolute
3   hellhole and they do everything they can to discourage
4   attorney-client meetings."  Can you elaborate on what that
5   means?
6       A   Well, once again, I didn't write this.
7       Q   Right.
8       A   But this goes back to I think earlier we were
9   discussing the jail situations in the different counties.
10  This would have -- this would have -- yeah, this was
11  written prior to the meeting I had with the sheriff in
12  Christian County where they changed it where they have
13  those two rooms now available over at the courthouse for us
14  to visit.  Yeah, prior to that, it was so difficult to get
15  clients seen there.  Yeah, if you went over to the jail --
16  and I experienced this myself -- where you go over to the
17  jail itself to try to see a client and because they are so
18  apparently understaffed there, you just wait out in the
19  lobby.  You know, they would come.  They would ask you for
20  your bar card.  Then they would just disappear and you
21  would sit there for a half an hour or 45 minutes just
22  waiting on somebody to come back so you could tell them who
23  you needed to see.  Then you go into this little room
24  that's right off the lobby that, once again, is not very
25  private.  Anybody sitting in the lobby can hear everything

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

Case 2:17-cv-04057-NKL   Document 160-4   Filed 02/21/18   Page 11 of 60

## Page 41

1  that's being said and there was only the one room there.
2  It's a little metal stool for the attorney to sit on for --
3  and same way on the other side through the glass for the
4  client. It was difficult to hear through the glass each
5  other; there was no phone. It was very problematic.
6      Q   Are there still difficulties in meeting
7  clients in jail, either in Christian County or other
8  counties in Area 31?
9      A   Yes. As I stated earlier in Christian County,
10  although they have made some accommodations to make things
11  better so that we can see clients, I mean there is still
12  problems. Like a bailiff not being available because court
13  is in session to bring a client over. If the two rooms --
14  there is only two rooms -- and if they are filled up, you
15  are out of luck. You can't see somebody. So, yeah, there
16  is still issues.
17      Q   You can put that document to the side for now,
18  but we will come back to it in a bit. You mentioned
19  earlier that lack of time can affect the ability to prepare
20  the case. In what fraction of cases do you typically do a
21  pretrial investigation?
22      A   I would say -- we talked about this recently
23  at a management meeting -- I think we average right around
24  maybe 10 percent.
25      Q   In your opinion, does your office have the

## Page 42

1  time and resources to investigate each case in the manner
2  required?
3      A   I've got two investigators in my office.
4  Right now they are able to get everything done that's asked
5  of them. Sometimes they need a little extra time. We have
6  had to continue some cases because they didn't have enough
7  time to look into something. Once again, that's only
8  because we are only looking into only 10 percent of our
9  cases. If we were to truly investigate all of our cases,
10  no. I don't have the support staff for that at all.
11      Q   Do you think your -- if your office had the
12  time they would be investigating more than 10 percent of
13  the cases?
14      A   Yes.
15      Q   In your opinion what would be a better
16  percentage or what -- strike that. In your opinion, what
17  percentage of cases should be investigated to be
18  providing -- strike that. Let's move on. Can you think of
19  a time where a specific case was hampered because of the --
20  strike that. Without getting into specifics or
21  compromising privilege, can you think of a time where your
22  representation of a client was hampered by the lack of time
23  to investigate a case?
24      A   Well, I mean we've had situations where we
25  weren't been able to track down all of the witnesses that

## Page 43

1  our client has told us about. So we have had that issue
2  before. Once again, this is just going as to
3  investigation?
4      Q   Yes.
5      A   I mean, that would be the main thing I could
6  think of.
7      Q   So due to lack of time, you can think of cases
8  where not every potential witness has been contacted?
9      A   Yes.
10      Q   In your opinion, should attorneys generally be
11  contacting every potential witness in preparing defense?
12      A   Especially the witnesses that our client is
13  telling us about that are potential defense witnesses,
14  absolutely.
15      Q   How frequently do you request discovery from
16  the State?
17      A   We request it on every case.
18      Q   In your opinion, do the attorneys in your
19  office have time to effectively review that discovery?
20      A   Depends on the type of case. If we are
21  talking about a misdemeanor or probation violation, almost
22  never. I would say 95 to 99 percent of the time, that's
23  being looked at on the day of the hearing or the trial or
24  the day before at best.
25      Q   And for those misdemeanors and probation

## Page 44

1  violations cases, is jail a potential consequence of a
2  conviction or plea?
3      A   Absolutely.
4      Q   What about felony cases?
5      A   Felony cases, I think that gets reviewed much
6  more. And once again, depending on the complexity of the
7  case or the severity of the case, it gets more time.
8  That's the real problem here is, you know, I think at least
9  in our office, I think people that are charged with crimes
10  where they're facing potential life sentence, they get a
11  lot of attorney time and their cases are really looked into
12  and looked through. But to do that on all of those cases
13  because we handle a lot of A and B felonies, a lot of
14  people that are charged as prior and persistent offenders;
15  in doing that, it leaves little to no time for all of those
16  folks that are charged with a lower grade felony or those
17  charged with PV's or misdemeanors.
18      Q   So you would separate the ability to review
19  discovery in A and B felonies from C and D felonies?
20      A   I would say so, yes.
21      Q   Do you think attorneys in your office have
22  sufficient time to review discovery in C and D felony
23  cases?
24      A   Once again, it depends on the type of case
25  because there are C and D sex offenses I think that more

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 45

1  time is definitely spent on those.  But if you're talking
2  about a C or D stealing or tampering; it's probably given
3  one quick reading and that's about it.
4      Q   How frequently do attorneys in your office
5  gather information to evaluate whether an expert would be
6  necessary in the case?
7      A   Can you ask that again?
8      Q   Sure.  How frequently do attorneys in your
9  office determine whether an expert would be necessary in a
10  case?
11      A   What do you mean by how often?
12      Q   Let me rephrase.  Do you think the attorneys
13  in your office have adequate time to consider retaining and
14  using experts in cases where they would be necessary?
15      A   Well, on the complex cases, yes; other cases,
16  no, generally not.
17      Q   What kinds of cases would there not be
18  sufficient time?
19      A   Well, certainly if you were thinking of using
20  an expert on a misdemeanor, I never see that at all or any
21  kind of request there.  Once again, a C or D felony that's
22  not a sex case; I see it very rarely then too, request for
23  funds for experts.
24      Q   Can you think of a C or D felony where expert
25  testimony could have been useful or necessary and wasn't

## Page 46

1  requested?
2      A   I can't tell you an example of -- no, I can't.
3  But I can tell you for instance like a low grade felony
4  DWI, I have -- hardly ever do I get request for funds for
5  an expert on something like that.  But in the one or two
6  times I have actually gotten those request and I have
7  approved it, it's been to the client's benefit.  It worked
8  out well for them.
9      Q   Why would expert evidence be useful in the DWI
10  case?
11      A   Well, it was a DWI I had pertained to an
12  accident and it was -- both of them were.  It was as to
13  whether or not the intoxication actually played any role in
14  it whatsoever.
15      Q   How is an expert approved for a particular
16  case?  What is the process for that?
17      A   When the attorney determines that they need to
18  use an expert or think they need to use an expert; first,
19  they will determine what expert they want to use.
20  Sometimes that's done by going through our -- we have an
21  expert witness database; or, also, sometimes they will go
22  on our -- we have a discussion database and they will go on
23  there and ask other public defenders around the state, you
24  know, who have you used for this type of situation.  Once
25  they have determined who they want to use, they will

## Page 47

1  contact that person to determine what the cost will be.
2  And then they will fill out what we call an E-request
3  and that will list the expert, the cost, the anticipated start
4  date of the service, and then the reason for the request.
5  That will be sent to me for approval.  If it's under
6  $500.00, then once I've approved it, that's it.  If it's
7  over $500.00, then once I've approved it, it goes on up to
8  either Ellen Blau or Marshall Plane for approval.
9      Q   Are there any cases you can think of where an
10  expense request was rejected?
11      A   Yes.
12      Q   What would be the reason an expense request is
13  rejected?
14      A   More often than not it's rejected usually
15  because the attorney maybe has not picked the right kind of
16  expert and we need to talk about, you know, who maybe might
17  be a better expert to use.  That might be because of the
18  specialty of the expert or sometimes it's because of the
19  cost of the expert.  Maybe there is somebody closer or
20  that -- or doesn't charge such a high price that might be
21  the better person to use.
22      Q   So cost is a factor in determining which
23  experts to use?
24      A   It can be, yes.
25      Q   How often do attorneys in your office take

## Page 48

1  depositions in cases?
2      A   You know, I would say we probably -- and
3  this -- I'm just ball parking it here, but I would guess it
4  probably corresponds pretty close to our percentage that we
5  investigate.  So I would say around 10 percent of the
6  cases.
7      Q   Do you think attorneys in your office have
8  sufficient time to take depositions in cases where it would
9  be necessary?
10      A   It gets difficult to get those scheduled.
11  I'll tell you, most of the time those depositions are done
12  within a month or two months out from a trial date.
13      Q   What would be the advantage of doing a
14  deposition more than a month or two before trial?
15      A   Well, people's memories fail.  So closer in
16  time sometimes is better, depending on who that witness is,
17  whether you really want a fresh memory or not.  And also
18  whether or not you can even locate a witness too.
19  Sometimes witnesses disappear on you.
20      Q   This might be difficult to answer given --
21  knowing the absence of the negative, but can you think of a
22  case where a deposition was not taken in a case where it
23  would have been useful to have taken one?
24      A   Nothing comes to mind right off the bat.
25      Q   Do you have translators on staff in your

12 (Pages 45 to 48)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-4   Filed 02/21/18   Page 13 of 60

## Page 49

1  office?
2      A   No.
3      Q   What do you do when a client doesn't speak
4  English.
5      A   We have to hire a translator.
6      Q   How do you hire a translator?
7      A   It's similar to the way we do with the
8  experts.  Our attorney has to fill out an expense request
9  and I have to approve it.
10     Q   Are there difficulties in communicating with
11 clients who do not speak English?
12     A   Sure.
13     Q   Are any of those difficulties related to the
14 time it takes to find a translator?
15     A   Not the time that it takes to find the
16 translator, but then the time to be able to coordinate your
17 schedule with that translator and get over to the jail, and
18 the increased time of that jail visit because it's going to
19 take twice as long as an ordinary jail visit.
20     Q   Roughly, what percentage of your clients do
21 not speak English?
22     A   I don't have any idea.
23     Q   You mentioned earlier that occasionally
24 attorneys in your office seek continuances.  Could you
25 elaborate a little more on why an attorney would seek a

## Page 50

1  continuance in a case?
2      A   Usually it's because they're not prepared.
3      Q   Why wouldn't they be prepared?
4      A   Because they haven't had time to prepare.
5      Q   Do attorneys in your district regularly seek
6  continuances?
7      A   Regularly?  It happens a lot.  It would happen
8  more frequently in our areas, our jurisdictions, if judges
9  pushed harder for cases to go to trial quickly, but they
10 don't.  It's not uncommon for us to get a trial date set a
11 year out from the first pretrial conference.  So -- and
12 very often, that's not the No. 1 case on that jury trial
13 week; there would be 30 or 40 other cases.  So it might not
14 even go that month when it's set that far out.  So we would
15 have to ask for them a lot more than we do, but because of
16 how cases proceed here, we don't have to ask for them as
17 much as they might have to elsewhere.
18     Q   Are there negative consequences in
19 representing a client to pushing the trial out further with
20 a continuance or due to scheduling?
21     A   Well, if the client is out of custody they
22 usually don't mind at all; but when they are in custody,
23 yeah, absolutely.  You have extended their jail stay.
24     Q   How frequently do attorneys in your office
25 file pretrial motions?

## Page 51

1      A   I'd say we could probably fall around that 10
2  percent number.  Depending on what -- I mean, bond request
3  and such are filed, you know, formerly.  But as far as a
4  significant pretrial motion, like a motion to suppress,
5  yeah, I would say around 10 percent.
6      Q   In your opinion should there be more
7  suppression motions -- or more pretrial motions like
8  suppression motions filed in cases in your district?
9      A   Yes.
10     Q   Why aren't more being filed?
11     A   Once again, I think it's a matter of time and
12 number of cases and being able to properly look through
13 everything and prepare.
14     Q   Can you think of a time where a case in your
15 office could have benefited from filing a pretrial motion
16 but a lack of time to prepare hampered the ability to file?
17     A   That would be one of those things where unless
18 I read every case's discovery in our office, there is just
19 no way for me to answer that.
20     Q   Sure.  If you could turn back to the Exhibit
21 49 the Paul Duchscherer evaluation.
22     A   Yes.
23     Q   If you flip to the second page.
24     A   Yes.
25     Q   And as you previously noted, the evaluation

## Page 52

1  flips between David and Paul at some points, but I will
2  read it as it's written here.  It says, "David wishes he
3  had more time available for creative motion practice.  His
4  caseload and busy court schedule usually only allow for the
5  doctoring of our boilerplate motions.  He also only has
6  time to prepare and submit suggestions in support when
7  specifically requested by the judge."  So would you say
8  that that wish to have more time available for creative
9  motion practice is unique to Paul or David or is that
10 something that applies more generally in your office?
11     A   No, I would say that applies to most of the
12 folks in our office.  I've got at least a couple of
13 attorneys that they do a lot more of the suggestions.  They
14 do a lot more writing of writs and such, but I mean, they
15 are working all the time.  I mean, I get to the office
16 early and, you know, they beat me there.  They put in a lot
17 of hours to do that.
18     Q   What time do you get into the office?
19     A   I generally get in around 7:00 a.m.
20     Q   The second sentence referring to the doctoring
21 of our boilerplate motions; do you know what that means?
22     A   Yeah.  We have a motion database that we keep
23 and for things like -- there is things like motions to
24 suppress on there.  A lot of our attorneys rely -- a lot of
25 them rely strictly on that and there is little variation or

13 (Pages 49 to 52)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-4   Filed 02/21/18   Page 14 of 60

## Page 53

1  case-specific information that gets put into those.  They
2  just get filed.
3      Q   In your opinion, does that hamper the ability
4  to effectively defend clients?
5      A   Well, it probably puts a judge on notice that
6  you haven't really maybe looked into it as much as you
7  should.  I think if you've got more case-specific like on a
8  motion to suppress, you've also educated the judge before
9  you ever come in for the hearing at all.  I think that's
10  beneficial to the client.
11      Q   It says, "In addition to the boilerplate
12  motion," it also says, "he only has time to prepare and
13  submit suggestions in support when specifically requested
14  by the judge."  Do you know what that means?
15      A   Yes.  Sometimes judges when you file a Motion
16  to Suppress or something similar, sometimes the judges will
17  ask for written suggestions from both the State and the
18  defense.  At least one of our attorneys I can think of
19  likes to request -- whether or not -- this is one of the
20  ones I was talking about a little bit ago -- request to
21  file suggestions regardless of whether the judge has asked
22  for it or not.  And what Chris is writing here about Paul
23  is that, you know, he just doesn't have the time to do that
24  at all as far as requesting to do that unless the judge has
25  specifically ordered it.

## Page 54

1      Q   Why would an attorney want a request to file
2  suggestions even if the judge doesn't ask for them?
3      A   Gives you one more whack at it in explaining
4  why the judge should rule in your favor.
5      Q   The next sentence says, "I noticed while doing
6  the file reviews that the request for discovery was either
7  filed late or not at all in several cases."  Do you know
8  what that means?
9      A   Yes.
10      Q   What does that mean in your opinion?
11      A   Well, that means a request for discovery in a
12  felony case should always be filed within 20 days from
13  arraignment, circuit court arraignment.  We have a method
14  set up in the office where our office assistants will
15  actually file those for the attorneys.  They just have to
16  get the arraignment paperwork to her to get that filed and
17  that wasn't done here.
18      Q   And when you say they have to be filed, is
19  that an internal guideline or is that a court rule?
20      A   It's Supreme Court rule as to when that needs
21  to be filed.
22      Q   What are the consequences of filing a late
23  request for discovery?
24      A   Well, potentially if some discovery was not
25  turned over and you found out about it after the fact, the

## Page 55

1  court could possibly not grant you relief on that.  For
2  instance, say somebody went to trial, lost, and during
3  their appeal there was this discovery that you didn't get
4  all the reports.  The appellate court might say too bad so
5  sad.  You didn't file your discovery request.
6      Q   Is it -- in your opinion, is Paul the only
7  attorney in your office to have filed late discovery
8  request?
9      A   Ever, no.  I mean, but once again, I mean, the
10  way our office is set up, they don't have to file it
11  themselves if they'll just follow the procedure I have set
12  up in the office.
13      Q   Why would someone not follow the procedure?
14      A   Once again, it goes to lack of time and
15  just -- Paul was assigned to Christian County as it states
16  there.  They would have -- at that time, they would have
17  three Law Days a month.  It would not be unusual for them
18  to be there on those Law Days from like 9:00 a.m. until
19  10:00 at night.  And so then you come back in on Friday and
20  there would be -- there is another court date on Friday for
21  the changes of judge.  Once again, just as things get
22  going, the number of arraignments that he was handling,
23  it's possible he just forgot to get some into the basket
24  for our office assistant to get done because he was trying
25  to take care of all these other things he was trying to

## Page 56

1  take care of.
2      Q   How often do cases go to trial in your office?
3      A   Not as often as they should, but I can't give
4  you an exact number of how many jury trials we have had
5  over like the last year or so.  I don't know.
6      Q   Why do you say they don't go to trial as often
7  as they should?
8      A   I just know we don't go to trial as often as I
9  think we should.  For the number of cases that come through
10  our office, yeah, there should be more.  There should be
11  more trials.
12      Q   In your opinion, why aren't there more trials?
13      A   Once again, I think it goes to having the time
14  to prepare.
15      Q   If these cases -- if not enough cases are
16  going to trial, is it because they are being delayed or is
17  it because they are being resolved through guilty pleas or
18  other methods?
19      A   I think a lot of times they are guilty pleas.
20      Q   So in your opinion, there are cases that
21  should -- you can think of cases that should be going to
22  trial, but are being resolved through guilty pleas?
23      A   I'm just talking statistically.  I can't think
24  of an exact case where -- because if I knew of an exact
25  case, I would talk with that attorney and say no, we need

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

Case 2:17-cv-04057-NKL   Document 160-4   Filed 02/21/18   Page 15 of 60

## Page 57

1  to go trial.  I just know statistically we have very few
2  trials for the number of cases that we have.
3      Q    In your opinion, do attorneys in your office
4  have sufficient time to prepare for trial?
5      A    No.
6      Q    Why not?
7      A    Once again, being in court five days a week,
8  to trying -- when they are not in court to get some of
9  these jail visits done that I'm hampering them about they
10  need to go get done, office appointments for those clients
11  that are out of custody.  It just doesn't leave a lot of
12  time.
13      Q    Has an attorney in your office ever waived an
14  opening or closing argument at trial?
15      A    I can't think of anybody that's ever waived a
16  closing argument.  I believe we had an instance at least
17  once there is one time I can think of where they held off
18  on their opening until the State had rested, but yes.
19      Q    What goes into preparing for trial?
20      A    Well, as we have talked about before,
21  utilizing your investigator to track down any possible
22  defense witnesses, speak to them, look through and see if
23  first of all if there are also any pretrial motions that
24  need to be filed, depositions of the State's witnesses
25  possibly, preparing your client for the trial, deciding

## Page 58

1  whether or not they are going to testify.  If they are
2  going to testify, prepare them for that and for the
3  potential cross examination.  Preparing your opening, your
4  closing, your directs, your crosses, preparing voir dire.
5      Q    In your opinion, do attorneys in your office
6  have time -- adequate time to talk with their clients about
7  testifying and about preparing to testify?
8      A    Excuse me.  When you've hit that point of,
9  yes, this is definitely going to be a trial, you know,
10  those cases do get more of our attorney's time and
11  attention.  So those conversations I know definitely get
12  had.  They do have that conversation with them about
13  whether or not to testify and they usually have at least
14  one conversation with them trying to prep them for that and
15  the cross.  But it's usually, I would say probably just one
16  conversation.  If they needed more to really talk about it,
17  they probably don't get that.
18      Q    So in your opinion -- strike that.  When an
19  attorney in office -- in your office is preparing for
20  trial, would you say they have adequate time to continue
21  effective representation on their other cases?
22      A    No.
23      Q    Why not?
24      A    Again, in properly trying to prepare for a
25  trial, it comes at the cost of effective representation for

## Page 59

1  all their other clients at that time, at least in that
2  period of time in that they are prepping.
3      Q    Can you be more specific in how preparing for
4  trial in one case detracts from the ability to represent
5  clients in other cases?
6      A    Well, you have got to find that time to do
7  those depositions that we talked about.  You have got to
8  have time to talk with your investigator about what she has
9  been able to -- who she has been able to locate and what
10  those statements are.  If those statements are good, asking
11  your investigator to have those witnesses come in, you
12  know, to the office and talk.  So you have got to find time
13  for all of this.  That means you're not focusing on your
14  other cases and -- because if you're not prepared for
15  trial, you're always on the go for all of these other
16  things you're supposed to be doing for everybody else.  So
17  a lot of times our attorneys will cover each other cases
18  when you're prepping.  So you basically tune everybody else
19  out.  You know that your fellow attorneys in the office
20  will cover your cases for you.  If they are covering for
21  you, it's not like you're prepping what needs to be done on
22  those court dates.  You're basically just telling that
23  attorney go and tell the judge I'm prepping for trial and
24  punt them and so they just get reset.  Nothing is getting
25  done on those cases at all.  And also other clients aren't

## Page 60

1  getting seen at the jail too.
2      Q    So when you say other attorneys in your office
3  cover cases when one attorney is on trial, that's mainly
4  for court appearances and to push those cases down the
5  road?
6      A    Correct.
7      Q    How much time do you spend working on case
8  before you advise a client on whether to take a guilty
9  plea?
10      A    Me personally?
11      Q    Yes, you personally.
12      A    I try to spend a significant amount.  I can't
13  give you an exact amount of time because every case is
14  different on how much time you really need to do.  But once
15  again, I mean, I have a reduced caseload.  It's much more
16  difficult for our assistant public defenders in that area.
17      Q    Do you think your assistant public defenders
18  have sufficient time to advise their clients on pleading
19  guilty?
20      A    Not all the time, no.
21      Q    What are -- what steps do attorneys in your
22  office take to negotiate pleas for clients?
23      A    The average negotiation, I would say, for most
24  cases -- once again, we are not talking about the complex
25  cases -- I would say most negotiation occurs right on the

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 61

1  date that potentially the client is going to plead guilty.
2  That's when most of the negotiation occurs.
3      Q   How are plea offers communicated to clients?
4      A   Could you be more specific?
5      Q   So if an assistant public defender negotiates
6  a plea or is informed of a plea offer by the DA's office,
7  how would they communicate that to their client?
8      A   Well, I mean, if it's occurring in court, they
9  would take them into a conference room -- take their client
10 into a conference room and let them know what that offer is
11 and, you know, have a brief conversation about the ins and
12 outs of that offer and ask them, you know, the client if
13 they have any questions about it.  If it occurs outside of
14 the courtroom and the client is incarcerated, we would go
15 over to the jail and let the client know.  If they are out
16 of custody, we would try to make contact with the client.
17 That's, as I stated earlier, it's not always easy to do,
18 and relay that offer.
19     Q   Without getting into specifics of particular
20 cases, can you think of times where a client could have
21 gotten a better plea deal if the attorney had -- if your
22 attorney had more time or resources to work on that case?
23     A   I can't think of an example, no.
24     Q   In your opinion do attorneys in your office
25 generally have sufficient time to negotiate plea deals?

## Page 62

1      A   No, because like I said, I think most of them
2  are taking place on the date of disposition.
3      Q   Are you aware of cases in your area where
4  defendants plead guilty pro se?
5      A   Ask that again, please.
6      Q   Are you aware of cases in your area where
7  defendants plead guilty pro se, without the advice of
8  counsel?
9      A   Yes.
10     Q   What kinds of cases would that occur?
11     A   It happens a lot on misdemeanor cases.
12     Q   Would those defendants be eligible for
13 representation by the MSPD?
14     A   Sometimes.
15     Q   Why would someone who is eligible for
16 representation by your office plead guilty without the
17 advice of counsel?
18     A   Well, right now they might do that because
19 they knew they would be on a waitlist and it could be a
20 very long time before they got an attorney anyways.  Before
21 we started the waitlist, I'm not sure why someone would do
22 that other than they think they can just expedite it and
23 get it done quickly.
24     Q   At any point did your office have an agreement
25 with the prosecutor's office that they would not take cases

## Page 63

1  where there was no jail time involved in the plea
2  agreement?
3      A   An agreement with the State that we would not
4  take cases -- we already don't.  Unless jail time is a
5  possibility, we don't take any of those cases.
6      Q   Let me be more specific.  A case where -- are
7  you aware of any cases where jail time is a theoretical
8  possibility, but the State agreed not to seek jail time
9  and so your office did not enter an appearance in the case?
10     A   There has.  Especially we went through some
11 issues of trying to reduce caseload back in 2012 and there
12 were a lot of meetings I went to with judges and
13 prosecutors.  And I know that was one of the things that we
14 had talked about that if the State would agree to waive
15 jail time on some misdemeanors, that would keep us out of
16 the case and help reduce caseload, yes.
17     Q   You said there were conversations; do you know
18 if that actually occurred in 2012?
19     A   I believe it did happen to some degree.
20     Q   Are there any immigration specialists in your
21 office?
22     A   No.
23     Q   In your opinion, do attorneys in your office
24 have adequate time to advise your clients on the
25 immigration consequences or decisions they make in their

## Page 64

1  criminal cases?
2      A   No.  In fact, I just had an attorney come into
3  my office just the other day on an immigration issue
4  because none of us are immigration experts.  We have had in
5  the past some who were who would agree to pro bono would
6  allow us to call them and kind of pick their brain on some
7  of these topics.  But the name and number that we had
8  given -- this particular attorney we would call, apparently
9  had never gotten with her.  So this was causing some stress
10 on how to counsel this client because she didn't know what
11 to tell them.
12     Q   Do attorneys in your office receive adequate
13 training on immigration consequences?
14     A   I believe there have been some tracks.  I think
15 there have been some classes on that at some of our
16 statewide training.
17     Q   But there are no immigration specialist who
18 work in your office?
19     A   No.
20         MR. SHAHABIAN:  I think this is good time to
21 take a break.  Let's go off the record.
22         THE VIDEOGRAPHER:  Going off the record.  The
23 time is 10:33.  This ends Media 1.
24         (A recess was taken.)
25         THE VIDEOGRAPHER:  Going back on the record.

16 (Pages 61 to 64)

ALARIS LITIGATION SERVICES
www.alaris.us    Phone: 1.800.280.3376    Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-4   Filed 02/21/18   Page 17 of 60

## Page 65

1  The time is 10:43 a.m.  This begins Media 2.
2       Q   (By Mr. Shahabian)  Welcome back,
3  Mr. Hackathorn.
4       A   Thank you.
5       Q   I wanted to turn to some of the more
6  administrative tasks you handle.  Are you responsible for
7  the management of the budget of your office?
8       A   We have an office budget but, I mean,
9  that's -- no.  For the most part, we are told how much
10  money we have for certain things.  But if that money runs
11  short, I just give a call to our comptroller and she is the
12  one that moves the money around and makes sure everything
13  is covered.
14       Q   Sounds good.  How do you handle -- is there
15  anyone in your office who is dedicated to handling juvenile
16  cases?
17       A   We did up until about four or five months ago.
18       Q   What changed?
19       A   We had a meeting, a couple of meetings, with
20  the presiding judge here in Greene County; that's the only
21  area that we were currently doing juvenile cases in.  And
22  because of our caseload issues, the county had agreed that
23  they would use some of their surplus to hire attorneys to
24  handle those cases from now on.  Unless it was going to be
25  a certification, in which case they would send the case to

## Page 66

1  us.
2       Q   So when you say the county, you mean Greene
3  County handles non-certification juvenile cases right now?
4       A   They contract out those cases, yes.
5       Q   How does it work in Taney and Christian
6  Counties?
7       A   We have never really been involved in juvenile
8  in those two counties.  I believe those two counties have
9  always kind of done something similar as to what Greene
10  County is doing now, just contracting out with private
11  attorneys in those areas.
12       Q   Do you know any of the attorneys who those
13  cases are contracting out to?
14       A   I know some of them here.  I don't know
15  necessarily who is getting it in Christian and Taney.
16       Q   Who are some of the attorneys who work on
17  those cases here?
18       A   I believe, I'm not 100 percent, but I believe
19  some of them are going to some attorneys who had previously
20  worked in our office and are now private practice.
21       Q   And so presently, is there anyone in your
22  office who specializes in juvenile cases?
23       A   So right at this moment is there?  No, there
24  is not.
25       Q   And just to be clear, in Greene County you're

## Page 67

1  still handling certifications?
2       A   Since we came to this agreement, there has not
3  been a certification case that they have sent our way.  So
4  we have kind of gotten out of the juvenile business
5  completely for the time being.
6       Q   Do you expect that to stay that way?
7       A   I don't expect anything.  You never know.  As
8  budgets change, it could be, you know, next year, we find
9  ourselves back taking juvenile cases again.  For the time
10  being, this is how it is.
11       Q   When your office was handling juvenile cases,
12  were all of those cases being handled by the specialist you
13  mentioned who has left?
14       A   Well, I guess I wouldn't necessarily call her
15  a specialist.  We had one attorney who was assigned to
16  juvenile cases.  But to say that she was a specialist would
17  be a misnomer.  I mean, she was -- that was just a caseload
18  that she was given.
19       Q   Did she have any particular expertise in
20  juvenile matters?
21       A   No.
22       Q   Did she have any specialized training in
23  handling juvenile cases?
24       A   No.
25       Q   Did she carry a non-juvenile caseload in

## Page 68

1  addition to her juvenile caseload?
2       A   Yes.
3       Q   Do you recall roughly what percentage of cases
4  was juvenile versus non-juvenile?
5       A   I would say out of her 120 or so open cases
6  that she had back then, I think around 30 or so would have
7  been juvenile cases.
8       Q   And what kinds of juvenile cases would she
9  handle?
10       A   Any that came our way.
11       Q   So not just certifications?
12       A   Correct.  Now during the time that she was
13  handling juvenile, I don't recall that we got any
14  certification cases.  Now those I do treat a little bit
15  differently.  Depending on -- usually, I mean if they are
16  going to certify a juvenile, it's a very serious case.  So
17  that would likely be assigned to somebody who handles more
18  complex cases, not necessarily her.
19       Q   So she would -- would she handle detention
20  case -- hearings?
21       A   Yes.
22       Q   And she would advocate for informal
23  adjustment?
24       A   I believe so, yes.
25       Q   If your office were to resume handling

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 69

1   juvenile cases in Greene County, would you expect that they
2   would be assigned to someone similar who is not a
3   specialist in juvenile matters?
4        A   Yes.  The way that assignment was usually
5   handled in our office, our attorneys basically took a
6   one-year term at handling the juvenile matters.  When their
7   year was up, that assignment would go to somebody else.
8        Q   And are the cases that the county is
9   contracting out cases where juveniles would otherwise be
10  eligible for representation by the MSPD?
11       A   Yes.
12       Q   How did your office make indigency
13  determinations in juvenile cases?
14       A   We really didn't.  If the court referred them,
15  we took it.
16       Q   So court referrals were how juvenile cases
17  came to your office?
18       A   Correct.
19       Q   I'm handing you an exhibit that I will ask our
20  court reporter to mark as Plaintiff's 50.  We fixed the
21  format on this.
22       MS. SHIPMA:  Yeah, it was marked yesterday too
23  on a fixed format.
24       MR. SHAHABIAN:  Oh, it was?
25

## Page 70

1        MS. SHIPMA:  Yeah.
2        MR. SHAHABIAN:  Oh, okay.
3        Q   Do you recognize this document?
4        A   Yes.  This is the budget request that is
5   prepared by our comptroller.
6        Q   Could you turn to the last page of this
7   document?
8        A   Okay.
9        Q   Do you recognize this spreadsheet?
10       A   It appears to be a caseload metric worksheet
11  ordering the various MSPD offices by percentage of capacity
12  --
13       Q   Have you seen --
14       A   -- and how far over they are percentage of
15  capacity.
16       Q   Have you seen this particular spreadsheet
17  before?
18       A   Yeah.  This is -- budget request is sent out
19  to all the district defenders and I do look at it when it's
20  received by my office.  I do receive also various versions
21  of this before in the past.
22       Q   And you see at the top it says, "Cumulative
23  Caseload Metrics Fiscal Year 2017"?
24       A   Yes.
25       Q   And then it says, "Start date July 1, 2016;

## Page 71

1   end date June 30, 2017"?
2        A   Yes.
3        Q   So is your understanding that these caseload
4   metrics are for the entire fiscal year 2017?
5        A   It appears to be so, yes.
6        Q   I know the font is quite small, but do you see
7   Area 31 Springfield?
8        A   I do.
9        Q   And what rank is it assigned in all the areas
10  for workload capacity?
11       A   If I followed it over correctly I believe
12  ninth.
13       Q   Do you have an understanding of how the MSPD
14  determines workload capacity?
15       A   Well, I didn't prepare this worksheet, but I
16  believe it's done using the RubinBrown Standard and the
17  waited caseload standard.
18       Q   What is your understanding of what the
19  RubinBrown standard is?
20       A   I couldn't go into you in any depth as to how
21  they came to those waited caseloads.  I can just tell you I
22  have used it, even within the office.  You know, various
23  types of cases are given various weights as to how much
24  time it potentially takes to prepare that case.  So, you
25  know, A,B felony is weighted heavier than a misdemeanor by

## Page 72

1   a long shot.  Then that's compared up with the number of
2   hours available -- that an attorney has available to work
3   on all of their cases.  Then that gets you your percentage
4   of how far over capacity you are.
5        Q   You said you use the RubinBrown metrics in
6   your office; how do you use them?
7        A   I use them every so often just to see where my
8   attorneys are at as far as how far over capacity they are.
9        Q   Roughly what percentage of your attorneys are
10  over 100 percent of their capacity?
11       A   Right at this moment in time, I would say
12  probably all but one.  We still have one attorney who is
13  still kind of working up her caseload.
14       Q   How long ago did that attorney start?
15       A   She started in September.
16       Q   So she does not yet have a full caseload?
17       A   Probably not one that gets her over 100
18  percent of capacity yet.
19       Q   According to this spreadsheet it says the
20  Springfield office is 277.5 percent of capacity for fiscal
21  year '17.  I'm not going to ask you to give an opinion on
22  whether you agree with how that number was calculated, but
23  would you agree roughly that your attorney was -- I'm
24  sorry, that your office was well over capacity for fiscal
25  year 2017?

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 73

1    A   Yes.
2        Q   Why would you agree with that?
3        A   Because just as I have done it for individual
4    attorneys, not for the whole office as a whole, I know that
5    in times past where we've had some attorneys that were at
6    300 percent or 400 percent. I had one attorney at one
7    point in time that was at 500 percent. So, yeah, you
8    average it out for the whole office. I would say, yes, our
9    office as a whole has definitely been over capacity.
10       Q   And separate from the percentages and your
11   understanding, for example the attorney who you said was
12   500 percent over capacity, what would that mean in terms of
13   their day-to-day ability to provide adequate defense to
14   their clients?
15       A   It's not adequate defense for probably any of
16   his clients at that point in time. I mean, you're just
17   treading water. Just cases getting continued and
18   continued, pretrial conference after pretrial conference.
19   I know for sure because during that time period for that
20   particular attorney too I was getting a lot of complaint
21   letters about I haven't seen him in ages because he didn't
22   have the time to get over to the jail.
23       Q   What do you do when you receive a complaint
24   letter about an attorney?
25       A   First thing I usually do is I will meet with

## Page 74

1    the attorney and ask them about when their last client
2    contact was. Talk a little bit about how in depth that
3    conversation was. If the contact hadn't been an extreme
4    amount of time ago, we'll just talk about when they can get
5    over then the next time to see them and we'll kind of set a
6    deadline for them to get over and see that client and then
7    I generally just leave it at. Then I follow-up with them
8    to make sure that contact was done. If I think there is
9    more issues there than what the attorney is saying, I might
10   also pull the file and actually do a file review to see how
11   many contacts there has been with the client.
12       Q   In your opinion, so you -- in your opinion,
13   are the issues in your office's ability to effectively
14   represent clients -- strike that. In your opinion, could
15   any attorney, no matter how expert, adequately represent
16   clients given the constraints facing lawyers in your
17   office?
18       A   Depending on what point they are in and how
19   long they have been with the office, if it's one of the
20   attorneys that is just starting out and growing their
21   caseload, yes, they can initially.
22       Q   Why can they initially?
23       A   Because their number of cases is much lower
24   than everybody else's.
25       Q   Could an attorney carrying an average or full

## Page 75

1    caseload in your office?
2        A   Effectively represent every one of those
3    clients, no.
4        Q   Can attorneys refuse cases that have been
5    assigned to your office?
6        A   Up until about a few months ago, no.
7        Q   Let's start with up until a few months ago;
8    had attorneys tried to refuse cases prior to that point?
9        A   No, I never had an attorney come to me and
10   refuse a case.
11       Q   Has your office up -- and still focusing on
12   the period prior to a few months ago -- has your office
13   refused to take cases at any point during your tenure?
14       A   We did have a period I referenced, I think it
15   was around 2012, where it was per a MSPD rule that had been
16   promulgated that we had attempted to refuse cases to try to
17   reduce caseload.
18       Q   How did that rule work?
19       A   Excuse me?
20       Q   How did that rule work, that MSPD rule that
21   you referenced?
22       A   I don't remember the exact reading of the rule
23   at this point in time. Too much water has passed under the
24   bridge.
25       Q   Who did you tell that you would be -- you know

## Page 76

1    what, let's just get the exhibit. Can I get 14 and 15. So
2    I'm handing you a document that I will ask the court
3    reporter to mark Plaintiff's 51 and Plaintiff's 52. Do you
4    recognize these documents, Mr. Hackathorn?
5        A   They look vaguely familiar.
6        Q   What do they appear to be to you?
7        A   These were notices that were sent out by our
8    director at the time, Marty Robinson, to the presiding
9    judges in both 38th and the 31st circuit putting them on
10   notice that our office had exceeded our maximum caseload
11   standard for three consecutive calendar months. I believe
12   that was to then trigger -- triggered meetings with them to
13   try to reduce caseload. And if not, then we potentially
14   refused cases as best my memory recalls.
15       Q   Do you remember whether there were meetings
16   that occurred after you sent these notices?
17       A   Yes.
18       Q   What happened at those meetings?
19       A   A lot of talk. Nothing that would necessarily
20   have resulted in any real caseload relief for our
21   attorneys.
22       Q   Do you recall the Missouri Supreme Court's
23   decision in Waters?
24       A   Yes.
25       Q   Were you a party in that case?

19 (Pages 73 to 76)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-4   Filed 02/21/18   Page 20 of 60

## Page 77

1    A   I was.
2        Q   You were a plaintiff in that case?
3    A   I believe so, yes.
4        Q   Could you briefly state your recollection of
5    what the Waters case was about?
6    A   Well, my role in the Waters case all took
7    place right up front.  After that, it was out of my hands.
8    I went down with my attorneys who were assigned to
9    Christian County that day after we decided we were going to
10   start refusing cases and just to try to take some of the
11   heat off of them and let the judge vent at me.  And we --
12   one of the cases that I refused representation on was the
13   crux of the Waters case because he then went ahead and
14   ordered us in to it and that's what the Waters case was
15   about.  I can't remember the young man's name even now who
16   was the poor defendant that was caught in the middle of all
17   of that.
18       Q   But it's fair to say that the case was about
19   your office's ability to refuse case assignments?
20   A   Yes.
21       Q   Do you recall how the Waters case was
22   resolved?
23   A   The Waters case ultimately said that the rule
24   could be followed.
25       Q   How did attorneys in your office respond to

## Page 78

1    the Waters rule -- to the Waters ruling?
2    A   Initially pretty well.
3        Q   What do you mean?
4    A   Initially, it looked like we had won and that
5    might ultimately result in some real caseload relief.
6        Q   Why do you say initially?
7    A   Well, things kind of went south after that.
8        Q   How did they go south?
9    A   Well, they went south in that legislature
10   tried to basically disband the public defender system.
11   That ended up not happening, thankfully.  And then there
12   were some -- there was some laws that were passed that
13   basically did away with the Waters case.  Basically saying
14   that if we wanted caseload relief, we had to go through the
15   Statute of 600.063 and basically request pretty please to
16   the courts that they would give us some relief.  And it had
17   to be done as an office by the district defender of each
18   office on an individual attorney basis.  I couldn't even go
19   for the office as a whole to the judge.  I had to go
20   attorney, by attorney, by attorney and demonstrate that
21   they were overloaded before any relief could potentially,
22   theoretically, be granted.
23       Q   Did you attempt to go down that road and ask
24   for relief for individual attorneys?
25   A   I did not.

## Page 79

1        Q   Why not?
2    A   Well, for one, for my particular office, we
3    had kind of been ground zero on this whole thing prior to
4    the Waters case.  As I said, I went to meetings.  I went to
5    those meetings and I talked with judges and I talked with
6    prosecutors and it resulted in really nothing.  I didn't
7    expect anything to have changed.  Also, I didn't like the
8    standard being different for our attorneys than for any
9    other attorney that's out there.  And that's kind of what's
10   going on now.
11       Q   And by what's going on now, are you referring
12   to the Hinkebein decision and what's followed from that
13   decision?
14   A   Correct, yes.  You know, our position is that
15   the ethical rules, and certainly by the Hinkebein decision,
16   it shows, I mean, that ethical rules apply equally to our
17   attorneys as they do for any other attorney in this state.
18   Their license is just as much in jeopardy as anybody else.
19   The fact that they should have to jump through more hoops
20   to reduce their caseload than anyone else when their
21   license is just as much in jeopardy seems ridiculous.
22       Q   What is your understanding of what the ethical
23   rules require in terms of accepting cases?
24   A   Well, one of the ethical rules concerns
25   competence.  And are we competently representing all of our

## Page 80

1    clients when you have 150 to 200 cases, no.  As I said
2    before, you know, some of these misdemeanors clients,
3    probation violation clients, they are not getting any real
4    attention.  Basically a warm body in there making an off
5    the cuff argument.  That's not competent representation.
6    There is a rule on diligence as I've also discussed
7    earlier.  A lot of these cases where the client wants a
8    trial and they are sitting in jail, they'll easily sit in
9    jail a year or more to go to trial.  That's not diligent
10   representation.  Communication; we have talked a lot of
11   about communication.  There is an ethical rule on that.  We
12   have always failed in that when we have such a high
13   caseload on two fronts:  One, keeping the client
14   up-to-date; and then on the other front of making sure that
15   they are reasonably -- legal matters are reasonably
16   explained to them so that they can make informed decisions.
17   And then also, I failed on the ethical rule that pertains
18   to me as a supervising attorney in making some reasonable
19   effort to ensure that those other rules are complied with
20   by those under my supervision.
21       Q   Given your understanding of the ethical rules
22   -- actually, let's take a step back.  What is your
23   understanding of what happened in the Hinkebein case?
24   A   My understanding is that some deadlines were
25   missed by Mr. Hinkebein and a complaint was filed against

20 (Pages 77 to 80)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 160-4    Filed 02/21/18    Page 21 of 60

## Page 81

1    him.  He -- as part of his defense when they were going to
2    suspend his license, he stated that had too many cases and
3    was basically told, to some degree, too bad.  That you
4    either needed to quit or you needed to go to your
5    supervisor and say something about this huge caseload,
6    which he had not done.
7        Q    How did attorneys in Area 31 react to the
8    Hinkebein decision?
9        A    They were worried.  They were worried.  They
10   knew that they have a lot of cases too.  That they weren't
11   doing everything in every case that maybe they should be
12   doing.  You know, just like any attorney, they worked hard
13   to get that license.  So there was concern.
14       Q    Did you take any formal actions in response to
15   the Hinkebein decision?
16       A    Not right away.  We had a statewide management
17   meeting, I think a few weeks after the Hinkebein decision.
18   After that management meeting, I did.  I went back and I
19   had individual meetings with all of the attorneys in my
20   office to make sure what I thought was true was in fact
21   true and that the attorneys in fact agreed with me on that
22   and that they were overloaded, that they had too many cases
23   to follow the ethical rules other than, like I said,
24   potentially the one attorney who had just started.  And
25   then based upon that, I sent notice to all of our presiding

## Page 82

1    judges letting them know that we were going to have to
2    start waitlisting some of these clients so I could reduce
3    caseload.
4        Q    I'm handing you a document that I will ask our
5    court reporter to mark as Plaintiff's 52 -- sorry, 53.  Do
6    you recognize this document?
7        A    I do.
8        Q    What is it?
9        A    This is that notice that I said that I sent to
10   all the presiding judges letting them know that we were
11   going to have to start waitlisting some clients.
12       Q    What was the response from -- who did you send
13   this to?
14       A    I sent this to Judge Thomas Mountjoy, who is a
15   presiding judge for the 31st Circuit.  I sent it to --
16   well, actually, I'm incorrect on that.  I thought I had
17   only sent it to the presiding judges.  I actually sent it
18   to every judge that we have cases in front of in all three
19   of our circuits.
20       Q    Did you receive a response from the judges in
21   response to this letter?
22       A    I believe I received a response only from one
23   judge.
24       Q    Do you remember which judge?
25       A    That would be Judge Laura Johnson, the

## Page 83

1    presiding judge for the 38th Circuit.
2        Q    What was Judge Johnson's response?
3        A    Her response at that point right after this
4    notice was to request a meeting with me, the prosecutor,
5    and the other judges in her circuit.
6        Q    Did that meeting take place?
7        A    It did.
8        Q    What happened at that meeting?
9        A    Well, initially I thought that the meeting,
10   based upon the request she sent, was to discuss possibly
11   ways that the court could reduce caseload and maybe make
12   sure that people weren't on a waitlist or weren't on a
13   waitlist for very long.  When I got to the meeting, it did
14   not turn out to be that.  It turned out to be more of a
15   complaint session about what we were doing, what the public
16   defender system was doing.  And then also once the
17   prosecutor had made mention of 600.063, Judge Johnson
18   didn't seem much interested in doing anything else as far
19   as accommodating our attorneys and trying to reduce
20   caseload.  Simply said, well, that's what you should be
21   doing is going through .063.
22       Q    And what would going through .063 have
23   required differently from the letter that you sent to Judge
24   Johnson and the other judges?
25       A    That would have -- if you go strictly by what

## Page 84

1    .063 says, that would have to -- to some degree nobody
2    really knows because it's not really been done -- but it's
3    a matter of giving some sort of notice to the court on each
4    and every individual attorney who I have assigned to that
5    circuit.  And then arranging some sort of meeting, whether
6    that be on the record or not; I don't think that's
7    necessarily clear either.  To some degree, the prosecutor
8    being put on notice and whether or not they participate is
9    still a question as well.  And then some decision being
10   made by the judge, based upon evidence I guess I would
11   present, on each of those attorneys whether or not they are
12   truly overloaded.
13       Q    Did judges other than Judge Johnson react to
14   this letter, either formerly or informally?
15       A    Surprisingly, no.
16       Q    So you've received no response to this letter
17   from judges other than Judge Johnson?
18       A    No.
19       Q    And this letter was sent October 10, 2017?
20       A    That's correct.
21       Q    You stated in this letter that each of the
22   attorneys under your supervision said that their current
23   individual caseloads created a conflict of interest with
24   existing clients because they are forced to choose
25   effective representation of one client to the detriment of

21 (Pages 81 to 84)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-4   Filed 02/21/18   Page 22 of 60

## Page 85

1  other clients?
2  A  Correct.
3  Q  Is that still the case in Area 31?
4  A  Yes.
5  Q  Have you received any reactions from the local
6  bar in your district in response to either Hinkebein or to
7  this e-mail?
8  A  Informally, I have had, yes, members of the
9  private bar talk to me and say, you know, they understood,
10  you know, why we are doing what we are doing.  And I've
11  even had a couple say to me that, you know, they would be
12  willing to take a couple of pro bono cases to try to help
13  us out, but.
14  Q  You mentioned that your office created a
15  waiting list for clients, potential clients, where you
16  would otherwise take representation.  Could you explain
17  more how that waiting list works?
18  A  We have separate a waiting list for each
19  jurisdiction; one for Taney county, one for Christian, and
20  one for Greene.  Ideally, what I wanted to do with that
21  waitlist was have it prioritized with those who are in
22  custody and have been on the waiting list the longest; when
23  I had attorneys who became available to take cases, that
24  those would be the ones that would come off the list first.
25  It hasn't necessarily worked that way.  We now have a color

## Page 86

1  coded waitlist based upon how outraged the judge is and
2  whether they are to the point of ordering us into the case
3  or not.  So when I have ones that are lighted up in red by
4  our clerks where we have been ordered into the case, those
5  are the ones that are coming off the waitlist first.  They
6  are not necessarily the ones that are in custody or been in
7  custody the longest.
8  Q  Roughly, how many people are on the waitlist
9  in each of these counties?
10  A  The last I think yesterday I looked at that
11  and I think the Greene County list was -- it was somewhere
12  around two -- somewhere between 220 or 250 people were on
13  the wait list for Greene County.  Off the top of my head, I
14  don't recall how many are on the waitlist for Christian and
15  Greene.
16  Q  And Taney County?
17  A  I'm sorry, for Christian and Taney, I don't
18  recall.  For Greene, it's somewhere between 220 and 250.
19  Q  Do you know roughly what percentage of those
20  people are incarcerated?
21  A  I don't.
22  Q  Are some of those people incarcerated?
23  A  Oh, yes.
24  Q  You mention that you have prioritized where --
25  based on judge outrage; have judges ordered your office to

## Page 87

1  represent indigent defendants over your objections?
2  A  Yes.
3  Q  I'm going to hand you a document that's
4  already been marked Petsch Exhibit 5.  And while we are
5  doing this, I'll also hand you a document that I'll ask our
6  court reporter to mark Plaintiff's 54.
7  A  Okay.
8  Q  Have you seen these documents before?
9  A  Yes.
10  Q  What are they?
11  A  The one marked Exhibit 5 Petsch is an example
12  of a writ that could be done if a judge was trying to order
13  us into a case, I believe.  This was provided on our --
14  what do you call it?  The legislative database or not --
15  litigation database as something available for us to file.
16  And then Exhibit 54 here was an example of a motion to
17  withdraw due to excessive caseload that our attorneys could
18  file on their individual cases as well.  That was also in
19  the litigation database.
20  Q  So let's start with Petsch Exhibit 5.  Why
21  would the litigation database have a form writ specifically
22  for objecting to appointments by judges?
23  A  Well, I think rightfully so, we had
24  anticipated that not all judges, and probably the majority
25  of judges, were not just simply going to go along with the

## Page 88

1  waitlist idea and would be ordering us into cases and so
2  this was made available for that situation when it arose.
3  Q  Have attorneys in your office used this writ?
4  A  We have not.
5  Q  Why not?
6  A  Because before we could, I believe another
7  jurisdiction or two, or another trial office or two had
8  tried it and to no avail.  It was -- it wasn't heard
9  basically.
10  Q  Turning to the other Exhibit 54.
11  A  Yes.
12  Q  Why would the MSPD have a form motion to
13  withdraw?
14  A  This was done -- well, for two reasons as I
15  understand it.  One would be as an avenue for the
16  individual attorneys to try to reduce caseloads themselves
17  to try to withdraw out of some of their cases.  And two, it
18  was thought that by also filing these motions, even if the
19  judge denied it, it might give them some protection from
20  the Office of Chief Disciplinary Counsel if a complaint was
21  filed on them in that particular case.
22  Q  Do you know if any attorneys in your office
23  have filed a motion to withdraw due to excessive caseload?
24  A  I'm pretty sure none of them have.
25  Q  Do you know why not?

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 89

1   A   It was one of those things where they've
2   already got all of these cases and they already knew they
3   were going to be denied anyways -- pretty well figured
4   they would all be denied.  And so if it was just a matter
5   of protecting themselves, they just figured it wasn't worth
6   they time.  They needed to focus on their cases and
7   preparing their cases.
8       Q   How have your public defenders handled cases
9   where judges are ordering the MSPD appointed over their
10  objection?
11      A   Well, our entry that we file in those
12  particular cases states that it is an entry over objection.
13  But other than that, I'm not sure.
14      Q   Are they assigned -- so if a judge appoints --
15  orders your appointment in a case now, you're entering --
16  attorneys in your office are entering appearances over
17  objection?
18      A   Our office is doing that for them, yes.  We
19  don't have any judges that -- well, they're not necessarily
20  ordering individual attorneys in my office into particular
21  cases.  We had one judge who was ordering me into a
22  particular group of cases because I hadn't assigned them
23  yet.  But once I did assign them, you know, she was fine
24  with whoever they were assigned to.  But, yeah, once a
25  judge has ordered us into a case, I'm kind of treating it

## Page 90

1   like I did before.  I'll look through it and see if there
2   is a conflict and if there is not, I assign it out to
3   whoever is assigned to that county or that particular
4   division.
5       Q   So I want to go back to the e-mail you sent to
6   the judges that's Exhibit 53.
7       A   Okay.
8       Q   And the last full paragraph on the first page,
9   it says" Until one or more of the attorneys in our office
10  are able to fully comply with their ethical obligations
11  under the Rules of Professional Conduct, we will no longer
12  be immediately entering into cases in which a defendant is
13  qualified."  At this point, are there any attorneys in your
14  office who are able to fully comply with their ethical
15  obligations and enter into new cases?
16      A   Since I sent this, we have had a couple who
17  had got to the point to where we could start actually just
18  regularly entering them into cases, yes.
19      Q   Why were they able to reach the point where
20  they could enter into new cases?
21      A   Because I had stopped assigning them cases for
22  a couple of months.  And also these were attorneys who were
23  already -- because they were newer and didn't have the
24  tremendously built up caseloads some of our more long-term
25  attorneys have had.

## Page 91

1       Q   Do you know on average, I know the waitlist
2   hasn't been around for very long, do you know roughly on
3   average how many people are coming off the waitlist and
4   getting assigned counsel?
5       A   I don't.  I couldn't give you an exact on
6   that.
7       Q   Has the waitlist grown since you have started
8   it?  Stayed steady?  Reduced in number?
9       A   It continues to grow.  It's not like we're
10  taking them off at such a rate that it's decreased at all.
11  It grows faster than I can take cases off of it.
12      Q   How do you inform indigent defendants that
13  they've been placed on this waitlist?
14      A   When they fill out their application, as far
15  as in Christian and Taney counties, when they fill out
16  their application, they are informed in person because we
17  have people down there when they fill out the applications.
18  In Greene County if they come into the office to fill out
19  the application, then we inform them when they come in and
20  fill that out.  For those in custody in Greene County, we
21  don't always -- we are not always there in person when they
22  fill out the application; it gets sent to us.  So a lot of
23  those potential clients are informed by letter.
24      Q   What does the letter say?
25      A   I don't recall off the top of my head exactly

## Page 92

1   what I put in that letter.
2       Q   Do you recall, you know, roughly or generally
3   what it said?
4       A   Roughly it's that due to, you know, excessive
5   caseloads we don't have an attorney available at the moment
6   but as soon as we have one available, we'll try to get to
7   them as soon as possible.  And there is language about they
8   will be put on a waitlist until then.  There is also
9   obviously language that they qualify for our services.
10      Q   Do you know of any reaction from people on the
11  waiting list to being placed on the waiting list?
12      A   Yeah.
13      Q   What reactions?
14      A   Well, I have been getting letters, especially
15  from some of our folks that are, you know, they are sitting
16  in custody, you know, basically begging and pleading can
17  you give me some idea exactly how much longer am I going to
18  have to wait for an attorney.  Those who are out of
19  custody, I have gotten some phone calls from.  You know,
20  I've got another court date coming up.  The judge really
21  wanted me to have an attorney.  What am I supposed do.
22  Yeah, so I'm hearing from people.
23      Q   So people on the waiting list, their cases
24  still progress?  They are not on a suspense docket?
25      A   Yeah, no.  They still have court dates that

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 93

1  come around.
2      Q    And they are expected to appear at those court
3  dates without counsel?
4      A    Well, the judge would prefer they were
5  appearing with counsel at the point that he or she has
6  referred them to us.  But, yeah, they are appearing without
7  counsel.
8      Q    Are courts in your area appointing private
9  attorneys to represent indigent -- excuse me, indigent
10 defendants in non-conflict cases?
11     A    I can't recall any of our judges doing that,
12 no.
13     Q    How do you handle conflict cases?
14     A    Now all of our contract -- all of our conflict
15 cases are contracted out to private counsel.
16     Q    Was that always the case?
17     A    It was not.
18     Q    When did it change?
19     A    It changed at the beginning of this fiscal
20 year, so July -- July 1.
21     Q    What was the system prior to July 1?
22     A    Prior to that, for what we call first-level
23 conflicts, we had offices that we would basically cover for
24 each other.  So we had five counties that we don't handle
25 primarily, but if the offices that did handle those cases

## Page 94

1  -- or those counties primarily had a personal conflict,
2  they would send those cases to us.  And then there are
3  offices that would handle our three counties for our
4  conflicts.  We had five conflict counties.  We have Dade,
5  Dallas, Webster, Stone, and Polk counties.
6      Q    Did handling conflict cases internally impact
7  your attorney's ability to handle their other cases?
8      A    It did.  I mean, they were great time
9  consuming things because they -- you wouldn't have a large
10 number of conflict cases, but they would often take several
11 days, a month because you would have to drive to those
12 counties, sit there through sometimes the whole Law Days
13 for those cases.  Then you also had to go to those counties
14 to do your jail visits.  So a small number of clients was
15 getting a large percentage of the time.
16     Q    Do you know whether the system that you have
17 to handle conflict cases after July 1 is permanent?
18     A    As long as the money holds out.  I know that
19 our director would like to make it permanent, but the money
20 has to be there.
21     Q    If the money is not there, do you expect to go
22 back to the prior system of conflict counties?
23     A    I do.
24     Q    Have you heard of the Missouri Coalition for
25 the Right to Counsel?

## Page 95

1      A    I can't say that I have.
2      Q    Have you heard of any pro bono programs to
3  handle indigent defense cases outside of the MSPD?
4      A    For criminal cases?
5      Q    For criminal cases.
6      A    No.
7      Q    What kinds of cases are on the waiting list
8  right now?
9      A    All kinds.  We even had a murder case on the
10 waitlist for a little bit.  So it's everything from
11 misdemeanor up to murder.
12     Q    What are the negative effects on indigent
13 defendants for being put on a waitlist?
14     A    Well, there could be a lot of detrimental
15 effects of being on the waitlist.  One, you still have
16 these court appearances that you've talked about where they
17 are without counsel and that's the potential for them to
18 say something in court that they shouldn't say.  We have
19 had -- we have been in court and seen some folks who were
20 incarcerated who have waived counsel, just so that they
21 could potentially get out of jail or work out something
22 with the prosecutor and represented themselves.  And I'm
23 sure that they did not get an outcome they would have had
24 had they had counsel.
25     Q    So you're aware of indigent defendants who

## Page 96

1  waived their right to counsel after being put on the
2  waitlist?
3      A    I am.
4      Q    Do you know roughly how many people have done
5  that?
6      A    I don't.
7      Q    Were those cases where jail time was a
8  possibility?
9      A    Yes.
10     Q    Do you know if those cases resulted in jail
11 time?
12     A    I don't know what ultimate outcome came of
13 those cases.
14     Q    You mentioned earlier that two attorneys
15 recently resigned from your office.  Do you know why they
16 resigned?
17     A    I'm not exactly sure about one, but I am
18 pretty sure about the other.  The one I'm sure about is
19 kind of came out of -- well, it definitely came out of the
20 situation we were having in Christian County ever since we
21 started the waitlist and that judge's reaction and the
22 difficulty they were having in court because of that; kind
23 of the tension that was coming out of that.  Also, I don't
24 believe he cared for MSPD's response in that particular
25 situation.  To be more specific, I think he thought that a

24 (Pages 93 to 96)

ALARIS LITIGATION SERVICES
www.alaris.us        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-4   Filed 02/21/18   Page 25 of 60

1 complaint should have been filed immediately against that
2 judge by MSPD.
3      Q    What was the judge's reaction that triggered
4 this?
5      A    Well, because we were having difficulties in
6 that area and she did not seem to want to work with us.
7 She was ordering us into more cases than any other judge
8 was ordering us into.  I had taken steps to try on my own
9 to clear up a little bit of our attorney's time.  In
10 Christian County, a situation that had been occurring was
11 even on Law Days, even when our attorneys were done with
12 their cases, they were asked by the court to stay in court
13 and wait until the end of the day and then she would bring
14 up inmates that we were not representing yet but would
15 probably qualify for our services and our attorneys would
16 take those applications in court and then bring them back
17 to the office.  In order to try to clear up some time for
18 them, I informed Judge Johnson that I would no longer have
19 them waiting around until the end of the day to take those
20 applications.  If she wanted to send a list of referrals, I
21 would send a support staff member to take those
22 applications, but I wanted our attorneys to leave court
23 after their cases were completed so that they could work on
24 their cases or maybe do jail visits or office appointments;
25 that sort of thing.  She did not take well to that

1 decision.  It had been circulated around to our attorneys,
2 not necessarily from Judge Johnson, but from people that
3 worked for her, such as the bailiffs, that they were going
4 to be basically ordered to stay there.  Then on a
5 particular Law Day where this all kind of came to a head,
6 she did order them to stay in court even though I told them
7 they needed to come back to the office and leave -- from
8 what I'm told by our attorneys -- that bailiffs were even
9 stationed at the exits of the courtroom to keep them from
10 leaving.
11      Q    How did the attorney who resigned react to
12 that?
13      A    On that particular day?
14      Q    To you.
15      A    To me?  Well, he wrecked me on that day.  He
16 called me and asked what should we do and I told them to go
17 ahead and leave.  They were followed out of the courthouse
18 by bailiff saying, "You're not free to go.  You're not free
19 to go.  We are going to get you."  They actually had a jury
20 trial that following week scheduled in front of that judge.
21 So our trial division director, Ellen Blau, came down and
22 both of us went and sat in that Monday just to see if there
23 was going to be any retaliation against our attorneys for
24 leaving.  There was not.  Fortunately, nothing was done to
25 them.  But his reaction from that point forward was wanting

1 an immediate complaint filed against her and there wasn't
2 one, so.
3      Q    How long had that attorney been working at
4 your office?
5      A    He had been with our office for at least, I'd
6 say ten to twelve years I think.  He had been with the
7 system longer.  He actually transferred from another MSPD
8 office when he came to us.
9      Q    Who was it?
10      A    His name is Morris Mettler.
11      Q    How many attorneys were in the courtroom the
12 day that bailiffs were stationed outside and they were told
13 to fill out these forms?
14      A    Only two of our three attorneys were in the
15 courtroom that day.  The third one had a doctor's
16 appointment, so she wasn't there.
17      Q    How many attorneys total are assigned to the
18 Christian County Courthouse?
19      A    Three.
20           MR. SHAHABIAN:  This is a good time to go off
21 the record and take a break.
22           THE VIDEOGRAPHER:  Going off the record.  The
23 time is 11:43 a.m.  This ends Media 2.
24           (A recess was taken.)
25           THE VIDEOGRAPHER:  Going back on the record.

1 The time is 11:55 a.m.  This begins Media 3
2      Q    Thanks for sticking around, Mr. Hackathorn.
3      A    Certainly.
4      Q    Basic question, just for my edification, what
5 is a Law Day?
6      A    In more rural counties, Christian and Taney
7 County, it's a day that the circuit court has to pretty
8 much cake care of anything that the circuit court does on
9 its cases, you know, whether it be pleas or pretrial
10 conference, or anything other than a trial; bail request,
11 bond reduction request and that sort of thing.  All of
12 those are generally taken up on a Law Day.
13      Q    How often is there a Law Day?
14      A    Well, that's changed, but only recently.  It
15 used to be that each of those counties had three Law Days a
16 month.
17      Q    You mentioned that recently the Greene County
18 agreed to contract out juvenile cases; do you know who in
19 the county is responsible for that?
20      A    I don't.
21      Q    Do you know what office in the county is
22 responsible for that?
23      A    I don't.
24      Q    How are you made aware of that change?
25      A    Well, we initiated the change.  We made the

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-4   Filed 02/21/18   Page 26 of 60

## Page 101

1  request.  We contacted the presiding judge, Tom Mountjoy,
2  and asked if that could be done to try to reduce caseload
3  and they agreed that they could do that.
4      Q   I want to go back to you mentioned the day
5  where Judge Johnson ordered your attorneys to stay in court
6  to take new indigency applications.  You mentioned the
7  reaction of one of your attorneys.  I was wondering what
8  was the reaction of the other attorney who was present, if
9  you know?
10     A   The reaction was that she upset by it.
11     Q   Did she say anything to you?
12     A   Well, yeah.  I mean, I had more than one
13  conversation with her about what had occurred and, you
14  know, how we were -- how she was feeling about it, yeah,
15  and talking about how to deal with this going forward.
16     Q   What did she say?
17     A   I'm not sure what you're asking me.  I mean, I
18  stated she was upset.  I mean, I can't give you verbatim
19  exactly what she said.  I'm sorry.  Are you asking me what
20  she said occurred or how she felt about it?
21     Q   How she felt about it?
22     A   Yeah, I mean, she just said that she was
23  upset.
24     Q   Was there a complaint filed against Judge
25  Johnson?

## Page 102

1      A   I don't know whether Mr. Barrett has filed a
2  complaint or not.  I know that there was a discussion with
3  him about doing that.
4      Q   In your office there was that discussion?
5      A   Yes.
6      Q   Why did your office not file a complaint?
7      A   Well, initially I was going to file a
8  complaint but then we had conversation with Mr. Barrett
9  about whether or not that should come from him and the
10  conversation kind of went that direction that we would do
11  that.  Then, ultimately, Mr. Mettler, the attorney that
12  resigned, sent an e-mail to Mr. Barrett that -- I can't
13  remember exactly how it was phrased -- but it was -- it was
14  blunt as to thinking he needed to get that done and get it
15  done right away and that I think kind of ended that as far
16  as the complaint getting filed.
17     Q   Do you know of any -- can you recall any
18  specific reactions by judges, other than Judge Johnson, to
19  attorneys from your office declining appointments?
20     A   Any negative reactions?
21     Q   Or positive.
22     A   Well, not to me directly and not necessarily
23  to our attorneys directly.  It's just, you know, in the
24  docket entries of -- I had mentioned earlier Judge Palmetto
25  was the judge.  She was the one that after a couple of

## Page 103

1  docket entries of re-referring us and re-referring us, you
2  know, specifically said she is expecting District Defender
3  Rod Hackathorn to enter his appearance by such and such
4  date, which I considered a negative reaction, but, no,
5  nothing other than that.
6      Q   If your attorneys spent the time they thought
7  necessary to zealously prepare a client's case, say a case
8  that was going to trial, what in your opinion would happen
9  to that attorney's other clients?
10     A   They get ignored.
11     Q   Are there times where attorneys in your office
12  have to triage cases doing less on one case so they can do
13  enough on another?
14     A   Happens all the time.
15     Q   How frequently would you say?
16     A   It happens every day.
17     Q   Is there anything else you think we should
18  know regarding the ability of your office to provide
19  effective representation to your clients?
20     A   Not that I can think of.
21         MR. SHAHABIAN:  I have no further questions of
22  this time.
23  QUESTIONS BY MR. RAMSEY:
24     Q   Good afternoon.
25     A   Good afternoon.

## Page 104

1      Q   Again, my name is Steven Alan Ramsey.  I
2  represent Governor Greitens and the State of Missouri.  I
3  also have a handful of questions for you.  But at any time,
4  please if at any time, you need a break, please let me know
5  and we can take a break immediately.
6      A   Okay.
7      Q   All right.  Going back to your background:
8  You came straight from law school into the Missouri State
9  Public Defender System; did I hear you correctly?
10     A   That's correct.
11     Q   And before that, did you go straight from
12  undergrad into law school?
13     A   I had a one-year gap between undergrad and law
14  school.
15     Q   And what did you do at that gap year?
16     A   I worked very briefly at JCPenney.
17     Q   Okay.  And undergrad, what was your degree or
18  degrees in?
19     A   Sociology.
20     Q   Also concerning some of the preparation, not
21  necessarily for this deposition, but just your
22  conversations concerning caseload and workload concerns.  I
23  understand this is a very general question because this has
24  been an ongoing issue for sometime; who all have you spoken
25  to within the past few years concerning a workload and

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

1  caseload concern? I take it the private members of the bar
2  was one group. You have spoken to judges at some point.
3  Have you had any conversations with none for profit
4  organizations or the press?
5      A   No.
6      Q   Sitting here today, do you have a sense of how
7  many cases total your office has open right now?
8      A   Has open right at this moment?
9      Q   Yes, sir.
10     A   I believe we have somewhere around 2,300 open
11 cases.
12     Q   Do you have a sense for how many criminal
13 cases are filed total within the area that your district
14 covers?
15     A   Over what period? I'm not sure I understand
16 your question.
17     Q   Over the past year or so. So say there are
18 100 total cases; how many of those total cases are coming
19 to the public defender system versus the system at large?
20     A   I don't know.
21     Q   A related question but slightly different is
22 how you define a case or a matter in your system?
23     A   A case is a -- goes by case number. It's not
24 by charge. It's however many charges may be in that case.
25 It's still a case no matter how many charges may be in that

1  related to that particular case number.
2      Q   Now if we could turn very briefly to
3  Plaintiff's Exhibit 48, that's the appraisal form.
4      A   Okay.
5      Q   I'm looking at the third page Bates Stamped
6  15898.
7      A   Okay.
8      Q   Do you see that very last line below the graph
9  or the grid?
10     A   Yes.
11     Q   Would you read that out loud for the record?
12     A   "Attached is a breakdown of Dawn's open
13 caseload. She admits it is a bit inflated as there are
14 several recently disposed of cases that need to be closed."
15     Q   How does your office go about deciding when a
16 case is closed?
17     A   A case is closed whenever our representation
18 has ended, whether that be because the defendant has been
19 sentenced or the case has been dismissed or they've had a
20 trial and won or they've had a trial and lost and we've
21 send it onto an appellate's office.
22     Q   And you do have a sense for when those cases
23 are closed, when they are reflected in the system; is that
24 an immediate thing?
25     A   It is not. The attorney, after they have

1  finished their representation, needs to bring that file
2  into our main area where our clerks are at and there is a
3  cabinet for them. Then our clerks go through that every
4  week and try to get those files closed.
5      Q   This is a larger picture question: Has your
6  office seen a dramatic increase in the amount of criminal
7  cases filed in this region --
8      A   Yes.
9      Q   -- than in recent years?
10     A   I'm sorry, yes, absolutely we have.
11     Q   Do you have a sense why that has occurred?
12     A   Our prosecutor's office, especially here in
13 Greene County, they got some additional funding and were
14 able to increase their numbers. From what I understand
15 from our prosecuting attorney, Mr. Patterson, they were
16 able to work through a backload of cases that they said
17 still needed to be filed. Now that's according to him; I
18 don't know. But I know it's around that time that he added
19 people to his staff that our numbers shot up.
20     Q   And if you don't know the answer to this, it's
21 completely fine, but has the population of the Springfield
22 area dramatically increased as well during this time
23 period?
24     A   Our whole general area of Greene, Christian,
25 and Taney; the population has increased significantly down

1  here more than I think any other part of the state.
2      Q   Turning to the makeup of your current office.
3  So at full staff there are 22 attorneys; is that correct?
4      A   At full staff, yes.
5      Q   At full staff. But currently there are 19
6  attorneys including yourself?
7      A   That's correct.
8      Q   And you had mentioned that there are eight
9  support staff or eight full-time support staff?
10     A   That's correct as well.
11     Q   And I think you testified that at least two of
12 those are investigators?
13     A   Yes.
14     Q   What are the other six? How does that
15 breakdown go?
16     A   Sure. We have three office support assistants
17 and then we have three legal assistants.
18     Q   And you also have the one part-time support
19 staff position?
20     A   Yes.
21     Q   What is that position?
22     A   It doesn't really have a title. She is
23 actually a retired clerk from our office and she just comes
24 in to help do some of those things like getting files
25 closed in the system and that sort of thing.

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-4   Filed 02/21/18   Page 28 of 60

## Page 109

1    Q    Now you mentioned that the -- there are two
2  documents, at least if I'm understanding you correctly,
3  that are similar guiding principles for representation.
4  One being the guidelines for representation and the second
5  one being the Employee Handbook if I understand your
6  testimony correctly?
7    A    I think I refer to the Employee Handbook more
8  as when the question was things that guide me and my
9  administrative duties.
10    Q    I see.  Have you supplemented either of those
11  documents with local rules or local policies that you, as a
12  district defender, have discretion to, I guess, enforce or
13  create?
14    A    There is a small handful of local written
15  office policies that we have, yes.
16    Q    Are any of those policies related to workload
17  or caseload concerns or controlling mechanisms?
18    A    I don't believe so.  I think they are all
19  relating to more as just how we function as an office and
20  that sort of thing.
21    Q    Turning to your office's determination for
22  indigency.  I think I understood your testimony to suggest
23  that in juvenile matters when your office was representing
24  juveniles, that was merely a court-appointed function.  So
25  your office didn't have an independent indigency

## Page 110

1  determination mechanism?
2    A    There is a form.  But pretty much if a
3  juvenile was referred, we took the case.  But there is a
4  form for that.
5    Q    Okay.  And that form is that a form that you
6  all still reviewed before the ultimate acceptance; or once
7  the court appointed the MSPD, representation you all
8  accepted it?
9    A    We still went through the motions of having
10  that application filled out, but for the most part it was
11  meaningless.
12    Q    So turning to non-juvenile matters.  Who makes
13  the determination for whether or not an individual is
14  eligible for services?
15    A    That depends on where the application is taken
16  at.  At lot of times with Christian and Taney counties,
17  that determination is made by our attorneys.  In Greene
18  County, more often than not, it is made by support staff.
19    Q    And does your office have any independent
20  checks or verification?  Or do you all simply refer to or
21  rely upon the application itself?
22    A    Unfortunately, we mostly have to rely on the
23  application itself.  I just don't have the support staff
24  needed to try to verify the information that's in that
25  application.

## Page 111

1    Q    Sitting here today, do you have a sense for
2  how often your office rejects applications for services?
3    A    It happens, but I couldn't tell you
4  percentage-wise how often it occurs.
5    Q    So it happens often?  Sparingly?  Or even
6  that?
7    A    Well, I'd say it happens at least probably
8  once a week or so.  Anything that's a close call,
9  especially with the support staff, I have them come to me
10  to make the ultimate determination.
11    Q    Are you aware of any situations or examples --
12  and you don't have to go into any details if you are -- of
13  where you accepted representation, but subsequently to
14  that, something occurred; for instance a large bond was
15  posted in a separate case or a private attorney was hired
16  in a second case or something to the effect that you all
17  questioned the person's indigency status and proceeded to
18  withdraw or I guess modify representation?
19    A    Yes.
20    Q    Does that happen frequently or it happens
21  sparingly?
22    A    That probably happens more sparingly, but it
23  certainly does happen.
24    Q    Has your -- I guess emphasis is maybe not the
25  right word -- but your breakdown of administrative task

## Page 112

1  versus your actual caseload that you carry -- I believe the
2  numbers were around 75 to 25 percent -- has that always
3  been the case since you have been the district defender?
4    A    No.
5    Q    Could you explain that evolution, if you will?
6  Did you start off having more cases?  Did you start off
7  having less cases?  And why have you gotten to this point?
8    A    I started off having more cases.  As this area
9  has continued to grow and the caseloads have increased more
10  and more and more, other offices around the state have lost
11  positions and we have gained positions.  There were far
12  fewer people in my office when I started as district
13  defender than there are now.  So the administrative duties
14  have increased a lot.
15    Q    So would you say that it is a function of
16  simply just having more cases and more work to do that your
17  administrative tasks have grown?  Or have you found that
18  there is a benefit to you being more of a supervisor and a
19  mentor to the attorneys in your office?
20    A    I think it's a little of both.
21    Q    Concerning your supervision of attorneys:  How
22  often would you say you're having mentor-like conversations
23  with the various attorneys in your office?
24    A    Every day.  Every day there is somebody in my
25  office and we are talking about some of their cases.  So it

28 (Pages 109 to 112)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-4   Filed 02/21/18   Page 29 of 60

## Page 113

1  happens a lot.
2  　　Q　　And the various motions, I believe you had
3  testified that there is a motion bank or a draft bank
4  somewhere within your system that your attorneys pick and
5  choose from in their every day representation?
6  　　A　　Yes.
7  　　Q　　Is that something that's local to your office
8  and that's something that you have created as a district
9  defender?  Or how did that bank, I guess, become effective
10 or come into existence?
11 　　A　　There is actually both.  We have one that's
12 local and that kind of boilerplate motions that we have
13 drafted individually within our office and saved for other
14 people to use.  Then there is one that I believe is on for
15 the entire state can access.
16 　　Q　　Do you have a sense -- this is taking two
17 steps back -- if you supervise your attorneys more so than
18 any of the other district defenders that you know of in
19 their various districts?  Do you have a sense if your
20 supervision is more or less than them or?
21 　　A　　I couldn't speak to what other district
22 defenders are doing.
23 　　Q　　You testified earlier that -- I don't know if
24 it was every jail or whether it was in Greene County or
25 Christine County or Taney County sends you a census.  I

## Page 114

1  don't know if it was every day, but that process; is that
2  correct?  They send you a census from time to time?
3  　　A　　Greene County sends us one every morning.
4  Christian County sends us one -- I'm not sure if it's every
5  morning; it might be once a week.  Taney County, I'm not
6  exactly sure about.
7  　　Q　　Has that always been the case or did that come
8  about because of conversations that you or your predecessor
9  had in this role?
10 　　A　　That came about by me requesting to get those.
11 　　Q　　Why did you request that you receive those
12 census reports or files?
13 　　A　　Well, with Greene County -- off the top my
14 head I can't remember why I ended up requesting it for
15 Christian County.  It's been a while back.  But Greene
16 County it came about for a couple of reasons.  One, back
17 when I first requested it, they liked for us to come with
18 our sheets ready for who we wanted to see and that let us
19 know what pod they were in and what cell number so we could
20 fill out the form.  Also let us know if they were in
21 segregation.  It let us know also by the census of what
22 they were being held on.  So if, for instance, we wanted to
23 file a bond reduction request, we could look there and see,
24 well, is that going to do us doing any good.  Maybe there
25 is a hold on them for the Feds or maybe there is a

## Page 115

1  municipal warrant.  We can check that as well.  And now,
2  like I said, you know, it's also being used to see whether
3  or not they are even here or whether Greene County has
4  farmed them out to another jail due to overcrowding.
5  　　Q　　What other -- concessions is not the right
6  word -- but what other results or tools have been created
7  similar to receiving that census report, either every day
8  or every week, to help manage caseload and workload
9  concerns?
10 　　A　　I'm not sure I understand what you're asking
11 me.
12 　　Q　　So would you say that receiving that census
13 report, if it's every morning or every week, helps you know
14 before you get to the jail whether or not someone is there
15 and so on and so forth?
16 　　A　　Yes.
17 　　Q　　Could that also be considered a timesaving
18 mechanism as well so you don't have to drive to courthouse
19 or to the jail cell to find out if they are there or not?
20 　　A　　It is a timesaving measure, yes.
21 　　Q　　So my question is if that came about because
22 you requested it and it was -- I don't know if it's a
23 concession or it's an agreement that was made -- are there
24 other similar cost-saving mechanisms due to your initiative
25 or your conversation that you've had with judges or the

## Page 116

1  prosecutors in the state, generally?
2  　　A　　It's not having to do juvenile cases in Greene
3  County anymore would be one.  Other than that, we haven't
4  really been able to come to a meeting of the minds of
5  anything else that the court or the prosecutor's office
6  could do to help reduce caseload or save time.
7  　　Q　　During some of the conversations that you have
8  had -- and now I'm jumping around and I apologize for
9  that -- conversations you've had with the prosecutors and
10 judges where I believe you testified that some of those
11 meetings had become I guess complaints against you and the
12 Missouri Public Defender System; were there some things
13 that were brought up in some of those meetings, or any of
14 those meetings, that were suggestions by any of those other
15 parties in how you all could improve your workload or
16 caseload concerns?
17 　　A　　Well, outside of that meeting that I referred
18 to with Judge Johnson that was, you know, within the last
19 few months; the other meetings that I was referring to took
20 place years ago and I don't recall.
21 　　Q　　Turning to the performance review, and I
22 actually don't believe I'm going to need to look at the
23 actual exhibit, but how often do you perform performance
24 reviews on the APD III's and IV's?
25 　　A　　Well, the APD III's would get reviewed a

ALARIS LITIGATION SERVICES
www.alaris.us　　　　Phone: 1.800.280.3376　　　　Fax: 314.644.1334

## Page 117

1  couple of years after they made APD III because then they
2  would be eligible for potential APD IV promotion.  APD IV,
3  that's just something that just kind of fell through the
4  cracks for a very long time and that's why I initiated here
5  recently that we needed to go through all of our APD IV's
6  and do file reviews and performance evaluations to see
7  where they were at.
8      Q   I will apologize, I lied when I said I wasn't
9  going to turn to the exhibit.  Turning to Plaintiff's
10 Exhibit 49 now.
11     I lost it somewhere here in the shuffle.  Got
12 it.
13     Q   So my understanding from your testimony
14 earlier was that this particular public defender was having
15 issues meeting the standardized expectation of meeting with
16 clients every 30 days or having those face-to-face
17 conversations every 30 days; is that accurate?
18     A   That's what is written here, yes.
19     Q   And that first full paragraph under client
20 counseling, four lines from the bottom, could you read --
21 or I guess that second to last sentence starting with "we
22 get."
23     A   "We get almost never get a client complaint
24 about lack of contact concerning Paul, which tells me he is
25 keeping good contact with his clients and that he has a

## Page 118

1  good relationship with them."
2      Q   Is it possible to not meet the 30-day
3  face-to-face requirement and to maintain good contact and
4  good relationships with potential clients or I guess with
5  actual clients?
6      A   Well, once again, I didn't write this, my
7  deputy district defender did.  I think what he's getting
8  across here is that when he is meeting with his clients, he
9  is giving them a good amount of devoted time.  You know,
10 file focused or case focused and is doing his best to --
11 given the constraints that we had in Christian County, that
12 he is doing about as good as he could do.  But I would
13 still say you certainly need recurring client contact to
14 have a good attorney-client relationship and to comply with
15 the ethical rules.
16     Q   So to be clear, this 30-day expectation with
17 face-to-face meeting is your testimony that you think that
18 is a requirement to meet that ethical rule or guideline of
19 sorts?
20     A   Well, that's MSPD guideline.  It's certainly
21 not mentioned in the ethical rule itself.  And I think my
22 personal opinion is that's probably a pretty generous
23 amount of time even at that 30 days and we are not meeting
24 that.
25     Q   Turning away from that particular line of

## Page 119

1  questioning, these complaints that you receive as a
2  district defender; is that a system that you set-up where
3  clients -- either current clients or former clients -- are
4  sending you complaints about their various representations?
5  Or talk me through how that process works at least in your
6  district?
7      A   How those complaints get to me?
8      Q   Yes, sir.
9      A   Well, if it's an incarcerated client, I have
10 been doing this long enough know that it's known in all of
11 the counties that we cover that I supervise that office.
12 So there really doesn't seem to need a processing place.
13 They write me.  They write me specifically.  If somebody is
14 out of custody and they call and they are complaining, you
15 know, my staff is instructed to send those calls either to
16 me or the deputy district defender.
17     Q   And are those complaints or those letters
18 maintained in a database that you have?  Or is it
19 maintained in the central office?  Do you send it up to
20 upper management or how does that work?
21     A   It doesn't get up to upper management unless
22 we've got a real performance problem with that attorney
23 that I have not been able to correct.  Other than that,
24 these letters go into the client's file and that's where
25 the letters stay.

## Page 120

1      Q   Continuing to, I believe it was marked as
2  Plaintiff's Exhibit 50, I believe.  It's the Missouri State
3  Public Defender System Fiscal Year Report.
4      A   Yes.
5      Q   I'm going to be looking at that last page when
6  you get to it.
7      A   Okay.
8      Q   Do I understand your testimony earlier to
9  suggest that you did not have a hand in creating this
10 document?
11     A   That's correct.
12     Q   And you also do not have a, I guess, an
13 understanding of the underlying data inputs that went into
14 creating any of these various metrics?
15     A   That's fair to say.
16     Q   Okay.  Turning to expert testimony.  You had
17 mentioned that cost may be a factor in whether or not a
18 particular expert is utilized or allowed to be utilized by
19 an assistant public defender; is that correct?
20     A   Whether they would be allowed to utilize that
21 specific expert or maybe there might be one that is more
22 cost effective, yes.
23     Q   Have you in your practice ever been denied an
24 expert solely because there was not enough funds to pay for
25 that expert?

30 (Pages 117 to 120)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-4   Filed 02/21/18   Page 31 of 60

## Page 121

1      A   No.
2      Q   Have you ever denied someone that you
3   supervise in the public defender system as a district
4   defender an expert testimony because there were solely just
5   not funds available?
6      A   No.
7      Q   For depositions, would your answers be the
8   same?  Have you ever been denied funds for a deposition
9   that you wanted to take?
10     A   No.
11     Q   Have you ever denied a deposition request from
12  an attorney that you supervise because there were not
13  enough funds available?
14     A   No.
15     Q   Speaking about the budget.  You had testified
16  earlier, if I understood you correctly, that when certain,
17  I guess line items for lack of a better phrase, or certain
18  categories are depleted, you would call the comptroller and
19  hey, say this fund is either close to running dry or it's
20  dry.  We need more funds for this.  What are some examples
21  of like the categories where areas would run out?
22     A   The only area that that has ever actually
23  really happened that I can think of is with our travel
24  expenses.
25     Q   And how are the travel expenses policed for

## Page 122

1   lack of a better word?
2      A   I wouldn't say that they are policed.  The
3   attorneys do fill out an expense report at the end of each
4   month as to the mileage they are claiming.  I do go through
5   that and I have them put on there why they went to a
6   location.  Not just that they went to a location, what case
7   they went there for and why they went there and I verify
8   that.  I go through and look at those expense reports.
9   But, you know, ahead of time, nothing but after the fact,
10  that's what I do.
11     Q   You mentioned that you don't go to -- or you
12  or your office don't go to trial as much as you possibly
13  should; is that a correct --
14     A   As much as I think we probably should be, yes,
15  correct.
16     Q   And I remember you saying you don't have a
17  sense of how many trials you tried within your office
18  within the past year.  Can you remember one case that has
19  been tried within the past year?
20     A   Yes.
21     Q   Can you recollect five cases that have been
22  tried within the past year?
23     A   Yes.
24     Q   How about ten?
25     A   Now you're getting close I'd say.

## Page 123

1      Q   And are those trials -- are we only talking
2   about jury trials or are we talking about jury and bench
3   trials?
4      A   I'm just talking about jury trials.
5      Q   At this point in time, is your office tracking
6   time in five minute-increments?
7      A   No.
8      Q   Is your office tracking time by tasks or by
9   cases?
10     A   No.
11     Q   Is the extent of your timekeeping process
12  right now the hours worked per day or per pay period?
13     A   Yes.
14     Q   Okay.  Do you have a sense of when the last
15  period of time was -- not the system at large, but your
16  particular district -- was tracking time in that, I guess,
17  more billable hours type of situation?
18     A   I don't recall the exact date.  It seems like
19  it's been around a year or so ago.
20     Q   Turning to the conversation concerning the
21  example of the late discovery request and how you have a
22  process set up in your office to ensure that that doesn't happen
23  in terms of the attorneys not having to file that
24  themselves, there being a process that's helps them usher
25  that process along.  Is that something that you help create

## Page 124

1   to be a timesaving mechanism or is that something that came
2   from some other location?
3      A   No, it's something we created for our office
4   to try to save a little bit of our attorney's time.
5      Q   Have you found that helps?
6      A   I think it does.  I don't know.  I haven't
7   polled the attorneys to find out.
8      Q   Are there other examples where you have put in
9   place processes like that to save time within your
10  district?
11     A   Similar sort of things in trying to utilize
12  support staff as much as we possibly can.  But once again I
13  don't have near the amount of support staff I would need to
14  take all of the administrative and clerical task off of the
15  attorneys hands, but we try as best we can.
16     Q   Have you as a district defender created or put
17  on any type of internal trainings for your assistant public
18  defenders to help with their caseload or workload concerns?
19     A   Not internal trainings, no.
20     Q   And sitting here today, there were a number of
21  statements made concerning, if I understood you correctly,
22  concerning your office being short-staffed or needing more
23  resources to do -- to provide effective caseload
24  representation or your office needing more resources.  My
25  question is, is that assessment based essentially solely on

31 (Pages 121 to 124)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-4   Filed 02/21/18   Page 32 of 60

## Page 125

1    the RubinBrown report or numbers that -- I will stop there.
2    Is that based solely on the RubinBrown report?
3        A   No.
4        Q   What else is that based upon?
5        A   It's based upon my own observation of what
6    attorneys are able to do and not able to do.  My own
7    experience before I was even a district defender as an
8    assistant public defender with a caseload like they
9    knowing that I was wasn't able to get everything done.  No,
10   it's not strictly based off of the RubinBrown numbers.
11       Q   Have you compared your caseload and workload
12   concerns to say comparable public defender districts in
13   other states?
14       A   I leave that to other people.
15       Q   Okay.  If I understood your testimony
16   correctly, you testified -- I don't know to say that it is
17   the appropriate word, but the Section 600.063 creates
18   additional barriers to public defenders that are not in
19   place for other attorneys; is that pretty accurate?
20       A   That's correct.
21       Q   So with that, that thought process or that
22   feeling or however you want to describe that; instead of
23   filing that Chapter 600 motion, you decided to proceed via
24   letters of communication with the applicable judges in your
25   district?

## Page 126

1        A   Yes.
2        Q   And the waitlist that was created; was that
3    created based upon the conversations you had after the
4    Hinkebein decision?  After that meeting where all the
5    district defenders and upper management got together, or is
6    that something you decided upon, I guess, in isolation or
7    by yourself?
8        A   If you're asking me if we were instructed to
9    create a waitlist at that management meeting, no we
10   weren't.  A lot of various responses were discussed at that
11   management meeting.  But basically because this is not a
12   MSPD policy thing, it's an individual attorney thing, the
13   responses were going to be varied around the state and so
14   that's how we chose to proceed here.
15       Q   Have you ever been judicially determined to
16   have provided ineffective assistance of counsel?
17       A   I don't believe so.
18       Q   Has an attorney that you supervise ever been
19   judicially determined to have provided ineffective
20   assistance of counsel?
21       A   I'm fairly certain, yes, but I'm not 100
22   percent on that.
23            MR. RAMSEY:  I have no further questions.
24            MS. SHIPMA:  I have a few questions for you,
25   Rod.

## Page 127

1    QUESTIONS BY MS. SHIPMA:
2        Q   Did I understand you earlier to say that there
3    are many times that your attorneys go to preliminary
4    hearings without having received discovery?
5        A   Yes, that happens.
6        Q   And why does that happen?
7        A   Well, for one the rules don't provide that the
8    State has to provide that prior to the preliminary hearing.
9    In fact, we filed that request for discovery and it's
10   timely only after the case has reached circuit court.  Now,
11   with our relationship with certain prosecutor's offices,
12   they do sometimes provide that to us upon our e-mailed
13   request.  They will get it to us ahead of time, but not
14   always.
15       Q   Regarding the complaint letters that you get
16   from clients regarding your attorneys, how frequently do
17   you receive complaints letters?
18       A   Every week.
19       Q   Multiple times a week?
20       A   Usually.
21       Q   Multiple letters a week?
22       A   Yes.
23       Q   How long might a completed case remain open in
24   the case management system before it's closed in your
25   office?

## Page 128

1        A   Well, that -- it used to be way longer than I
2    would have wanted.  I mean, they would be in there
3    sometimes for weeks before they would get closed in the
4    system.  With the additional part-time person that we have
5    been able to add on -- I think Sharon came back on
6    part-time right around maybe the start of the fiscal year
7    around July -- we were able to catch up on that.  And
8    another part that was holding us back on getting those
9    cases closed in the system is that's one of those things
10   that the attorneys would back burner getting those files up
11   there to be closed because they were done with it.  They
12   needed to move on to other stuff and they figured that's
13   just an administrative task that could wait.  Especially
14   with doing these waitlists though, I made it clear to the
15   attorneys that that's something that they needed to give a
16   priority to.  I wanted our numbers to be much more accurate
17   and they have done a much better job, especially over the
18   last three or four months, of getting those cases up there
19   to close.
20       Q   How long do you think now, since the beginning
21   of the fiscal year and since the waitlist, how long do they
22   remain open now?
23       A   Within a week I'd say they are being closed in
24   the system.
25       Q   And prior to your getting the part-time

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

Case 2:17-cv-04057-NKL   Document 160-4   Filed 02/21/18   Page 33 of 60

## Page 129

1   person, you said sometimes it might be weeks. Would it be
2   more than a month?
3       A   I'd say it probably happened sometimes, yes.
4       Q   Do you know if that happened with any type of
5   frequency on a regular basis?
6       A   Sometimes, yes. Also depending on certain
7   attorneys too. Some back-burnered that task more than
8   others.
9       Q   Would it be more than two months?
10      A   I'm not sure. I would hope not, but it's
11  possible.
12      Q   I guess anything is possible. Do you believe
13  that there are clients that your attorneys represent who
14  aren't indigent pursuant to our regulations?
15      A   I'm sorry, ask that again.
16      Q   Do you believe that there are clients that
17  your attorneys are representing that don't meet the
18  indigent standards set forth in the regulations?
19      A   I suspect that.
20      Q   Do you think that happens frequently?
21      A   No.
22      Q   Do you think that weeding those out would
23  cause a significant decrease in your caseload?
24      A   Certainly not significant, no.
25      Q   Does Greene County house federal prisoners?

## Page 130

1       A   They do.
2       Q   Is that the reason for their jail
3   overcrowding; do you know?
4       A   I would say it certainly contributes to it.
5       Q   Explain why they would do that?
6       A   Well, they get reimbursed for federal
7   prisoners and the rate they get reimbursed for federal
8   prisoners outweighs the cost of housing the state prisoners
9   elsewhere, so they still end up making money.
10      Q   I want to show you -- refer you back to
11  Exhibit 53. That was the e-mail that you sent to the
12  judges on October 10. Do you have that in front of you?
13      A   Yes, it's right here.
14      Q   Was it solely your concerns regarding the
15  process in Section 600.063 that caused you to write this
16  letter rather than filing an .063 motion?
17      A   Well, it was my concerns about our attorneys
18  saying that they all agreed that they were violating the
19  ethical rule is the only reason why I wrote that letter.
20      Q   So it wasn't just because you didn't like .063
21  that you wrote this letter instead of filing an .063?
22      A   That's correct.
23          MS. SHIPMA:   That's all.
24          MR. SHAHABIAN:   Just a few more follow-up
25  questions.

## Page 131

1   QUESTIONS BY MR. SHAHABIAN:
2       Q   You mentioned during Mr. Ramsey's examination
3   that the Greene County prosecutor's office added more
4   staff, more attorneys. Do you know roughly how many
5   attorneys were added?
6       A   I don't.
7       Q   But caseloads went up after more staff were
8   added to the local prosecutors office?
9       A   Yeah, they went up pretty dramatically.
10      Q   In your opinion, how many more attorneys would
11  you need to get caseloads to manageable standards in light
12  of existing caseloads?
13      A   I would probably need about double the number
14  of attorneys I have right now.
15      Q   You mentioned that you don't have enough
16  support staff to prevent your attorneys from spending
17  significant time on administrative task. Roughly how much
18  time would you say assistant public defenders in your
19  office spend on administrative caseload task versus
20  attorney task?
21      A   I couldn't give you any kind of guess as to
22  percentage. I just know they do have to do a lot of that.
23      Q   Do you have a rough estimate of how many more
24  support staff you would need to free up attorney time spent
25  on administrative caseload task?

## Page 132

1       A   Support staff, I would need more than double
2   easily.
3       Q   What kind of support staff would you need?
4       A   I would need far more office support
5   assistants to do the calendaring and all the e-filing and
6   all that sort of thing; all those clerical tasks. In a
7   perfect world where I also had the additional attorneys and
8   they were focusing on all of their cases as they should be,
9   I would need more investigators too.
10      Q   And you have two investigators currently?
11      A   That's correct.
12      Q   Do you have a sense of how many more
13  investigators you would need to provide adequate
14  investigative assistance?
15      A   In this hypothetical where we had more
16  attorneys and they were focusing on all their cases;
17  more than double number of investigators.
18      Q   Would triple be enough?
19      A   I don't know. In this hypothetical fantasy
20  world, I don't know how to live yet. So, yeah, I would say
21  probably triple.
22      Q   You mentioned in response to questioning from
23  Ms. Shipma that you receive complaints from clients every
24  week, multiple complaints a week. What are the most
25  typical kinds of complaints you receive?

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 133

1    A    The No. 1 complaint across the board is lack
2    of communication.  That predominates.  I'd say, if I'm just
3    ball parking, I'd say 90 percent of the complaint letters I
4    get is just that; I haven't heard from my attorney.
5         Q    Do the complaints offer more specific reasons
6    why they want to talk to their attorneys other than I
7    haven't heard from them?
8         A    Yes.  They will mention things like, you know,
9    has there been any talk of an offer from the State.  When
10   is bond reduction request going to get filed.  All kinds of
11   questions, I mean, you know, that they have about their
12   case that they want answered and only their attorney can
13   really answer that for them.
14        Q    You mentioned bond reduction request.  Do you
15   think attorneys in your office have adequate time to file
16   bond reduction motions?
17        A    File, yes.  Properly prepare for, no.
18        Q    Why not properly prepare for?
19        A    Because I have seen the bond reduction
20   request.  I know -- they haven't spent enough time, not
21   just with their client, but also maybe interviewing the
22   client's family, finding out more about the background of
23   their client, maybe getting some records, school records,
24   military records; that sort of thing.  That sort of thing
25   is not done.  Generally these bond reduction arguments are

## Page 134

1    very quick off-the-cuff arguments and they are not done as
2    elaborately as they should be to paint a full picture for
3    the judge as to whether or not this person is a flight
4    risk -- excuse me -- or danger to the community.
5         Q    Mr. Ramsey asked you if you had any experience
6    or if you knew of any cases from your office where someone
7    was found to have provided ineffective assistance of
8    counsel.  In your experience -- and not just limited to
9    attorneys in your office -- do excessive caseloads
10   contribute to cases where attorneys are unable to be
11   provide effective assistance and are adjudicated to have
12   not provided effective assistance?
13        A    Yes.
14        MR. SHAHABIAN:  I have no further questions.
15        MR. RAMSEY:  Just two.
16   QUESTIONS BY MR. RAMSEY:
17        Q    Have you ever gotten to a point in a filing or
18   in preparing for a particular trial where you have felt 100
19   percent ready and prepared to do whatever it is that you
20   were about to do?
21        A    Hundred percent?
22        Q    Hundred percent.
23        A    No.
24        MR. RAMSEY:  No further questions.
25        MR. SHAHABIAN:  Thank you, Mr. Hackathorn.

## Page 135

1         THE VIDEOGRAPHER:  This concludes the
2    videotaped deposition of Rod Hackathorn at 12:52 p.m.  We
3    are off the record.
4         (Deposition concluded at 12:52 p.m.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 136

1         CERTIFICATE OF REPORTER
2    STATE OF MISSOURI   )
            ) ss.
3    COUNTY OF GREENE   )
4         I, Jenna Petree, do hereby certify that the
5    witness whose testimony appears in the foregoing deposition
6    was taken by me to the best of my ability and thereafter
7    reduced to typewriting under my direction; that I am
8    neither counsel for, related to, nor employed by any of the
9    parties to the action in which this deposition was taken,
10   and further that I am not a relative or employee of any
11   attorney or counsel employed by the parties thereto, nor
12   financially or otherwise interested in the outcome of the
13   action.
14
15
16              Court Reporter
17
18
19
20
21
22
23
24
25

34 (Pages 133 to 136)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-4   Filed 02/21/18   Page 35 of 60

**A**

A,B 71:25
a.m 5:2 52:19
  55:18 65:1
  99:23 100:1
aberrational
  30:13,14
ability 38:22,25
  39:1,18 41:19
  44:18 51:16
  53:3 59:4
  73:13 74:13
  77:19 94:7
  103:18 136:6
able 19:22 21:9
  23:25 24:10,11
  24:13 26:23
  29:5 30:2
  37:21 42:4,25
  49:16 51:12
  59:9,9 90:10
  90:14,19
  107:14,16 116:4
  119:23 125:6,6
  125:9 128:5,7
absence 48:21
absolute 40:2
absolutely
  43:14 44:3
  50:23 107:10
acceptance
  110:6
accepted 110:8
  111:13
accepting
  79:23
access 113:15
accident 46:12
accommodati ...
  83:19
accommodati ...
  41:10
accomplishm ...
  10:3
accurate 29:7
  32:7 33:2

117:17 125:19
  128:16
action 136:9,13
actions 81:14
actual 112:1
  116:23 118:5
add 30:15 31:13
  128:5
added 28:2
  29:9,18,21
  30:19 107:18
  131:3,5,8
addition 17:4
  53:11 68:1
additional
  12:25 107:13
  125:18 128:4
  132:7
address 18:10
  35:25
adequate
  20:22 45:13
  58:6,20
  63:24 64:12
  73:13,15
  132:13 133:15
adequately
  74:15
adjudicated
  134:11
adjustment
  68:23
administrative
  17:2,5 65:6
  109:9 111:25
  112:13,17
  124:14 128:13
  131:17,19,25
admits 106:13
advantage
  48:13
advice 62:7,17
advise 60:8,18
  63:24
advocate 68:22
affect 39:10
  41:19

afternoon 3:15
  23:22 24:1
  103:24,25
age 6:9
ages 73:21
ago 53:20
  65:17 72:14
  74:4 75:6,7,12
  116:20 123:19
agree 37:5,6,9
  63:14 64:5
  72:22,23 73:2
agreed 6:1
  28:12 63:8
  65:22 81:21
  100:18 101:3
  130:18
agreement
  25:12 62:24
  63:2,3 67:2
  115:23
ahead 77:13
  98:17 122:9
  127:13
aid 39:11
al 1:4,7 3:4,7,19
  3:20 5:4,5
Alan 4:8 5:20
  104:1
Alaris 3:15 4:20
  4:24 5:8,13
allow 52:4 64:6
allowed 120:18
  120:20
amount 32:17
  36:20 60:12
  60:13 74:4
  107:6 118:9,23
  124:13
Anjali 4:3 5:18
answer 6:19 7:2
  7:9,12,13,18
  48:20 51:19
  107:20 133:13
answered
  133:12
answers 121:7

anticipated
  47:3 87:24
anybody 8:16
  13:14 14:1
  40:25 57:15
  79:18
anymore 18:11
  31:25 116:3
anyways 62:20
  89:3
APD 13:10,10
  27:18 34:22
  34:23 35:9,19
  35:20 37:24
  38:1 116:24,25
  117:1,2,2,5
apologize 10:23
  116:8 117:8
apparently 11:3
  40:18 64:8
appeal 55:3
appear 76:6
  93:2
appearance
  18:16 63:9
  103:3
appearances
  28:7 29:22
  60:4 89:16
  95:16
appeared
  27:22
appearing 93:5
  93:6
appears 11:2
  26:5,6 70:10
  71:5 136:5
appellate 8:25
  55:4
appellate's
  106:21
applicable
  125:24
application 18:9
  91:14,16,19,22
  110:10,15,21
  110:23,25

applications
  91:17 97:16,20
  97:22 101:6
  111:2
applied 37:24
  37:25
applies 52:10,11
apply 79:16
appointed 89:9
  110:7
appointing 93:8
appointment
  20:3 89:15
  99:16
appointments
  28:25 57:10
  87:22 97:24
  102:19
appoints 89:14
appraisal 106:3
approaches
  17:22
appropriate
  125:17
approval 47:5,8
approve 49:9
approved 46:7
  46:15 47:6,7
approving 11:19
aprasad@orri ...
  4:6
area 9:5,8,12
  12:5 23:9
  28:13 33:17,19
  41:8 60:16
  62:3,6 65:21
  71:7 81:7 85:3
  93:8 97:6
  105:13 107:2
  107:22,24
  112:8 121:22
areas 35:14
  50:8 66:11
  71:9 121:21
argument 57:14
  57:16 80:5
arguments

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-4   Filed 02/21/18   Page 36 of 60

133:25 134:1
arose 88:2
arraigned 18:24
arraigning 19:1
arraignment
   18:15,21 19:4
   21:12 54:13,13
   54:16
arraignments
   55:22
arranging 84:5
aside 11:10
asked 18:21
   42:4 53:21
   97:12 98:16
   101:2 134:5
asking 20:14
   32:2 59:10
   101:17,19
   115:10 126:8
assessment
   124:25
assign 11:25
   16:15,16,21
   17:14 23:14
   89:23 90:2
assigned 15:25
   16:4,5,6,10
   19:1,4 28:1
   29:6 31:14
   55:15 67:15
   68:17 69:2
   71:9 75:5 77:8
   84:4 89:14,22
   89:24 90:3
   91:4 99:17
assigning 90:21
assignment
   26:15 69:4,7
assignments
   77:19
assigns 16:18,19
assistance
   126:16,20
   132:14 134:7,11
   134:12
assistant 9:24

13:10 17:7
26:8 27:14
34:16,25
55:24 60:16
60:17 61:5
120:19 124:17
125:8 131:18
assistants 54:14
108:16,17
132:5
associate 16:9
   16:11
Association
   10:6
assuming 26:7
Attached
   106:12
attainable 37:12
attempt 78:23
attempted 28:9
   30:24 75:16
attempts 28:11
attention 24:22
   58:11 80:4
attorney 4:9
   8:24 10:3
   12:14 13:6
   20:19 33:13,16
   35:5 39:13,14
   41:2 44:11
   46:17 47:15
   49:8,25 54:1
   55:7 56:25
   57:13 58:19
   59:23 60:3
   61:21,22
   62:20 64:2,8
   67:15 72:2,12
   72:14,23 73:6
   73:11,20,24
   74:1,9,15,25
   75:9 78:18,20
   78:20,20 79:9
   79:17 80:18
   81:12,24 84:4
   92:5,18,21
   98:11 99:3

101:8 102:11
106:25 107:15
111:15 119:22
121:12 126:12
126:18 131:20
131:24 133:4
133:12 136:11
attorney's 58:10
   94:7 97:9
   103:9 124:4
attorney-client
   24:8,25 38:15
   39:4 40:4
   118:14
attorneys 5:14
   11:14,16,18 12:7
   12:18 13:1,2,8
   13:9,12 14:10
   15:7 16:5,6,10
   16:18,20,21,22
   20:10 22:16
   23:12 25:9
   26:22 30:7
   31:13 32:1,3
   35:25 43:10
   43:18 44:21
   45:4,8,12
   47:25 48:7
   49:24 50:5
   50:24 52:13
   52:24 53:18
   54:15 57:3
   58:5 59:17,19
   60:2,21 61:24
   63:23 64:12
   65:23 66:11,12
   66:16,19 69:5
   72:8,9 73:4,5
   74:20 75:4,8
   76:21 77:8,25
   78:24 79:8,17
   81:7,19,21
   83:19 84:11,22
   85:23 87:17
   88:3,16,22
   89:16,20 90:9
   90:13,22,25

93:9 96:14
97:11,15,22
98:1,8,23
99:11,14,17
101:5,7 102:19
102:23 103:6
103:11 108:3,6
110:17 112:19
112:21,23 113:4
113:17 122:3
123:23 124:7
124:15 125:6
125:19 127:3
127:16 128:10
128:15 129:7
129:13,17
130:17 131:4,5
131:10,14,16
132:7,16 133:6
133:15 134:9
134:10
avail 88:8
available 21:3
   22:16,17
   28:25 40:13
   41:12 52:3,8
   72:2,2 85:23
   87:15 88:2
   92:5,6 121:5
   121:13
avenue 24:11
   88:15
average 13:5
   15:9,9,10,11,15
   15:20 17:9,10
   41:23 60:23
   73:8 74:25
   91:1,3
award 10:4,5,7
aware 62:3,6
   63:7 95:25
   100:24 111:11

─────────
          B
─────────
B 2:8 44:13,19
back 8:8 11:3
   15:2 19:8 21:13

21:14 29:4
37:13 39:25
40:8,22 41:18
51:20 55:19
63:11 64:25
65:2 67:9
68:6 80:22
81:18 90:5
94:22 97:16
98:7 99:25
101:4 104:7
113:17 114:15,16
128:5,8,10
130:10
back-burnered
   129:7
background
   104:7 133:22
backload
   107:16
bad 55:4 81:3
bail 100:10
bailiff 22:17
   41:12 98:18
bailiffs 98:3,8
   99:12
ball 48:3 133:3
bank 113:3,3,9
bar 10:4 40:20
   85:6,9 105:1
Barrett 14:7
   102:1,8,12
barriers 125:18
base 19:19
based 15:4
   20:21 31:19
   32:15 81:25
   83:10 84:10
   86:1,25
   124:25 125:2
   125:4,5,10
   126:3
Basic 100:4
basically 16:14
   18:5 30:1
   59:18,22 69:5
   78:10,13,13,15

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-4   Filed 02/21/18   Page 37 of 60

80:4 81:3
88:9 92:16
93:23 98:4
126:11
basis 78:18
129:5
basket 55:23
bat 24:9 48:24
Bates 106:5
bear 10:20
beat 52:16
becoming 9:20
began 28:3
29:10
begging 92:16
beginning 29:4
93:19 128:20
begins 65:1
100:1
behalf 1:17 6:9
believe 6:23
9:15 10:10
29:24 31:18
57:16 63:19
64:14 66:8,18
66:18 68:24
71:11,16 76:11
77:3 82:22
87:13 88:6
96:24 105:10
109:18 112:1
113:2,14 116:10
116:22 120:1,2
126:17 129:12
129:16
bench 123:2
beneficial 53:10
benefit 46:7
112:18
benefited 51:15
best 10:8,24
11:4,7 23:13
36:2 43:24
76:14 118:10
124:15 136:6
Bethany 4:24
5:12

better 14:18
37:18 41:11
42:15 47:17,21
48:16 61:21
121:17 122:1
128:17
beyond 33:22
37:17
biggest 35:23
billable 123:17
bills 11:22
bit 15:3 37:15
40:1 41:18
53:20 68:14
74:2 95:10
97:9 106:13
124:4
Blau 13:17,25
47:8 98:21
Bluffs 4:21
blunt 102:14
board 133:1
body 80:4
boilerplate
52:5,21 53:11
113:12
bond 51:2
100:11 111:14
114:23 133:10
133:14,16,19
133:25
bono 64:5
85:12 95:2
bottom 117:20
box 27:20 29:5
30:10,23 33:1
brain 64:6
brainstorm 11:18
brand 33:15
break 7:16,17,19
64:21 99:21
104:4,5
breakdown
106:12 108:15
111:25
bridge 75:24
brief 61:11

briefly 9:19
28:22 34:19
77:4 104:16
106:2
bring 41:13
97:13,16 107:1
Broadway 4:21
brought 17:22
28:13 36:24
116:13
budget 65:7,8
70:4,18 121:15
budgets 67:8
build 30:2
38:21
Building 4:15
built 90:24
bulk 12:3,12
burner 128:10
business 21:6
67:4
busy 52:4

—————
C
—————
C 4:1 29:15
44:19,22,25
45:2,21,24
C,D 17:20 28:2
29:10 30:2
cabinet 107:3
cahoots 38:19
cake 100:8
calculated
72:22
calendar 76:11
calendaring
132:5
call 10:12,15
13:9 28:23
29:1 47:2 64:6
64:8 65:11
67:14 87:14
93:22 111:8
119:14 121:18
called 98:16
calls 92:19
119:15

Calvin 27:12,13
27:14 29:5
31:20 32:16
33:4
Calvin's 33:7
capacity 70:11
70:15 71:10,14
72:4,8,10,18
72:20,24 73:9
73:12
card 40:20
care 55:25 56:1
100:8
cared 96:24
carry 67:25
112:1
carrying 74:25
case 1:6 3:6 5:5
17:8,19,22,23
18:24 20:14,17
21:5,11,23
22:3 24:10,12
24:12 28:6
30:11 32:21
38:25 39:7,15
41:20 42:1,19
42:23 43:17
43:20 44:7,7
44:24 45:6,10
45:22 46:10
46:16 48:22
48:22 50:1,12
51:14 54:12
56:24,25
59:4 60:7,13
61:22 63:6,9
63:16 65:25
65:25 67:3
68:16,20
71:24 75:10
76:25 77:2,5
77:6,13,14,18
77:19,21,23
78:13 79:4
80:23 81:11
85:3 86:2,4
87:13 88:21

89:15,25
93:16 95:9
103:7,7,12
105:22,23,23
105:24,25
106:1,16,17,19
110:3 111:15,16
112:3 114:7
118:10 122:6
122:18 127:10
127:23,24
133:12
case's 51:18
case-specific
53:1,7
caseload 15:12
15:14,20 17:4
17:6 26:15
28:2 29:10
30:1,6 34:1,4
52:4 60:15
63:11,16 65:22
67:17,25 68:1
70:10,23 71:3
71:17 72:13,16
74:21 75:1,17
76:10,13,20
78:5,14 79:20
80:13 81:5
82:3 83:11,20
87:17 88:23
101:2 104:22
105:1 106:13
109:17 112:1
115:8 116:6,16
124:18,23
125:8,11
129:23 131:19
131:25
caseloads 37:11
71:21 84:23
88:16 90:24
92:5 112:9
131:7,11,12
134:9
cases 8:8,10,11
11:16,19 12:1,24

ALARIS LITIGATION SERVICES
www.alaris.us        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-4   Filed 02/21/18   Page 38 of 60

14:11,14,15,24
15:7,13,21,25
16:4,11,16,19
17:11,12,14,19
17:19 19:21
20:25 23:6,14
30:4 34:5
41:20 42:6,9
42:9,13,17
43:7 44:1,4,5
44:11,12,23
45:14,15,15,17
47:9 48:1,6,8
50:9,13,16
51:8,12 54:7
56:2,9,15,15
56:20,21 57:2
58:10,21 59:5
59:14,17,20
59:25 60:3,4
60:24,25
61:20 62:3,6
62:10,11,25
63:4,5,7 64:1
65:16,21,24
66:3,4,13,17
66:22 67:9,11
67:12,16,23
68:3,5,7,8,14
68:18 69:1,8,9
69:13,16 71:23
72:3 73:17
74:23 75:4,8
75:13,16 76:14
77:10,12 79:23
80:1,7 81:2,10
81:22 82:18
85:12,23
87:18 88:1,17
89:2,6,7,8,12
89:21,22
90:12,15,18,20
90:21 91:11
92:23 93:10
93:13,15,25
94:2,6,7,10,13
94:17 95:3,4,5

95:7 96:7,10
96:13 97:7,12
97:23,24
100:9,18
103:12 105:7,11
105:13,18,18
106:14,22
107:7,16 112:6
112:7,8,16,25
116:2 122:21
123:9 128:9,18
132:8,16 134:6
134:10
catch 128:7
categories
121:18,21
caught 77:16
cause 3:17 12:1
21:11 129:23
caused 33:12
130:15
causing 64:9
cell 114:19 115:19
census 32:2,4,7
113:25 114:2,12
114:21 115:7,12
central 1:2 3:2
3:19 5:7 13:22
14:1 119:19
Centre 4:14
certain 3:17
65:10 121:16,17
126:21 127:11
129:6
certainly 6:21
19:6 45:19
79:15 100:3
111:23 118:13
118:20 129:24
130:4
CERTIFICATE
136:1
certification
65:25 67:3
68:14
certifications
67:1 68:11

certify 68:16
136:4
chance 11:1
change 67:8
93:18 100:24
100:25
changed 16:2
29:9 40:12
65:18 79:7
93:19 100:14
changes 18:9
55:21
Chapter 125:23
charge 47:20
105:24
charged 44:9
44:14,16,17
charges 105:24
105:25
Charles 10:5
check 20:11
115:1
checked 33:1
checks 110:20
Chief 88:20
choice 39:9
choose 84:24
113:5
chose 126:14
Chris 16:25
34:16 36:11
53:22
Christian 9:10
16:7,22 22:7
22:10,22 31:4
31:7,14 40:1,12
41:7,9 55:15
66:5,15 77:9
85:19 86:14,17
91:15 96:20
97:10 99:18
100:6 107:24
110:16 114:4,15
118:11
Christine 113:25
Church 1:4 3:4
3:19 5:4

circuit 16:13
21:12 54:13
76:9 82:15
83:1,5 84:5
100:7,8 127:10
circuits 82:19
circulated 98:1
City 4:10 26:9
claiming 122:4
classes 64:15
cleaned 22:15
clear 66:25
84:7 97:9,17
118:16 128:14
clerical 124:14
132:6
clerk 108:23
clerks 16:14
28:24 86:4
107:2,3
client 15:2 17:15
17:25 18:2,5
19:11,22 20:18
20:19 21:14,17
21:20 23:9
25:1 26:18
27:4,5,24
28:5,9,11,18,18
29:5,12 30:8
30:15,25 31:21
32:11,12,20
33:1,12 35:12
35:19,22
36:19 38:6,10
38:23 39:5,8
39:16 40:2,17
41:4,13 42:22
43:1,12 49:3
50:19,21 53:10
57:25 60:8
61:1,7,9,12,14
61:15,16,20
64:10 74:1,6,11
80:7,13 84:25
117:19,23
118:13 119:9
133:21,23

client's 29:3
46:7 103:7
119:24 133:22
clients 14:21,22
15:17 18:6,13
19:9,14,15,19
21:16 22:13,17
23:1,5,11 24:3
24:7,14,17
25:8,10 26:15
27:25 28:4,14
28:16,22
29:15,16,23
31:4,9,23
32:16,18 33:5
33:25 34:3
35:24 36:2
37:21 38:17
40:15 41:7,11
49:11,20 53:4
57:10 58:6
59:1,5,25
60:18,22 61:3
63:24 73:14,16
74:14,16 75:3
80:1,2,3 82:2
82:11 84:24
85:1,15,15
91:23 94:14
103:9,19 117:16
117:25 118:4,5
118:8 119:3,3,3
127:16 129:13
129:16 132:23
close 27:24
48:4 111:8
121:19 122:25
128:19
closed 106:14
106:16,17,23
107:4 108:25
127:24 128:3
128:9,11,23
closer 47:19
48:15
closing 57:14,16
58:4

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-4   Filed 02/21/18   Page 39 of 60

Coalition 94:24
coded 86:1
collateral 25:13
    25:18
color 85:25
Columbia 4:16
    4:21
come 9:15 15:2
    16:15 19:8
    40:19,22 41:18
    53:9 55:19
    56:9 59:11
    64:2 75:9
    85:24 91:18,19
    93:1 98:7
    102:9 111:9
    113:10 114:7,17
    116:4
comes 12:21
    20:10 40:2
    48:24 58:25
    108:23
coming 86:5
    91:3 92:20
    96:23 105:18
comment 29:4
    30:10
comments
    27:21
commodity 21:5
communicate
    22:13 23:5
    24:5,7 61:7
communicated
    61:3
communicating
    49:10
communication
    23:9,12 25:2
    80:10,11
    125:24 133:2
community
    134:4
comparable
    125:12
compared 72:1
    125:11

competence
    79:25
competent
    80:5
competently
    79:25
complaining
    119:14
complaint 23:11
    35:24 73:20
    73:23 80:25
    83:15 88:20
    97:1 99:1
    101:24 102:2,6
    102:8,16
    117:23 127:15
    133:1,3
complaints
    116:11 119:1,4,7
    119:17 127:17
    132:23,24,25
    133:5
complete 7:5
completed
    97:23 127:23
completely
    67:5 107:21
complex 11:19
    17:19 20:25
    21:5 24:20
    45:15 60:24
    68:18
complexity
    44:6
complied 80:19
comply 90:10
    90:14 118:14
comprehensi...
    7:16
compromising
    24:24 42:21
comptroller
    65:11 70:5
    121:18
computer 8:6
concern 35:12
    35:18 81:13

105:1
concerning 8:8
    27:12 34:16
    104:20,22,25
    112:21 117:24
    123:20 124:21
    124:22
concerns 79:24
    104:22 109:17
    115:9 116:16
    124:18 125:12
    130:14,17
concession
    115:23
concessions
    115:5
concluded
    135:4
concludes 135:1
conditions
    25:12
Conduct 90:11
conducting
    35:8,12
conference
    50:11 61:9,10
    73:18,18
    100:10
confidential
    23:2
conflict 11:24
    84:23 90:2
    93:13,14 94:1
    94:4,6,10,17
    94:22
conflicts 12:2
    93:23 94:4
Congratulatio...
    9:17
consecutive
    76:11
consequence
    44:1
consequences
    18:25 19:3
    24:6 25:14,19
    50:18 54:22

63:25 64:13
consider 45:13
considered
    103:4 115:17
considering
    21:1 30:19
consistent
    35:14
constant 23:10
constantly
    13:20
constraints
    74:16 118:11
consuming
    94:9
contact 14:21
    15:2 18:6,8,10
    21:14,16,17
    26:14,18
    27:24 28:5,6
    29:3,6,12
    30:8,11,15,17
    33:5,12 35:13
    35:19,23
    36:12,13,14,21
    36:22 37:1
    40:2 47:1
    61:16 74:2,3,8
    117:24,25
    118:3,13
contacted 43:8
    101:1
contacting 43:11
contacts 36:8
    74:11
continuance
    50:1,20
continuances
    49:24 50:6
continue 42:6
    58:20
continued 73:17
    73:18 112:9
continues 91:9
Continuing
    120:1
contract 66:4

93:14 100:18
contracted
    93:15
contracting
    66:10,13 69:9
contribute
    134:10
contributes
    130:4
control 28:17
    32:11 33:21,23
controlling
    109:17
conversation
    32:19 58:12,14
    58:16 61:11
    74:3 101:13
    102:8,10
    115:25 123:20
conversations
    20:4 58:11
    63:17 104:22
    105:3 112:12
    114:8 116:7,9
    117:17 126:3
conviction 44:2
coordinate
    49:16
copy 25:23
correct 13:4
    15:24 30:7
    60:6 68:12
    69:18 79:14
    84:20 85:2
    104:10 108:3,7
    108:10 114:2
    119:23 120:11
    120:19 122:13
    122:15 125:20
    130:22 132:11
corrected 11:2
correctly 71:11
    104:9 109:2,6
    121:16 124:21
    125:16
corresponds
    48:4

ALARIS LITIGATION SERVICES
www.alaris.us        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-4   Filed 02/21/18   Page 40 of 60

cost 47:1,3,19
  47:22 58:25
  120:17,22
  130:8
cost-saving
  115:24
counsel 4:14
  6:2,2,18 7:11,11
  8:1 19:1,5,11
  62:8,17 64:10
  88:20 91:4
  93:3,5,7,15
  94:25 95:17
  95:20,24 96:1
  126:16,20
  134:8 136:8,11
counseling
  27:4,5 33:1
  36:5 117:20
counties 9:11,12
  18:22 22:5
  23:2 40:9
  41:8 66:6,8,8
  86:9 91:15
  93:24 94:1,3,4
  94:5,12,13,22
  100:6,15
  110:16 119:11
Counting 12:6
county 16:5,7,7
  16:9,20,21,22
  16:23 18:23
  21:23 22:1,4,8
  22:8,10,22
  23:20 28:1
  29:7 31:4,6,7
  31:11,11,14,14
  40:1,12 41:7,9
  55:15 65:20
  65:22 66:2,3
  66:10,25 69:1
  69:8 77:9
  85:19 86:11,13
  86:16 90:3
  91:18,20
  96:20 97:10
  99:18 100:7,17

100:19,21
107:13 110:18
113:24,25,25
114:3,4,5,13,15
114:16 115:3
116:3 118:11
129:25 131:3
136:3
couple 8:9
  11:24 37:7
  52:12 65:19
  85:11,12 90:16
  90:22 102:25
  114:16 117:1
course 9:24
court 1:1 3:1,18
  4:19 5:6,24
  6:25 7:10 10:11
  10:19 16:11,13
  18:19 19:7
  21:12 23:13,17
  23:23 24:1
  27:1 28:7,8,22
  29:18,22 34:8
  36:24 41:12
  52:4 54:13,19
  54:20 55:1,4
  55:20 57:7,8
  59:22 60:4
  61:8 69:14,16
  69:20 76:2
  82:5 83:11
  84:3 87:6
  92:20,25
  93:2 95:16,18
  95:19 96:22
  97:12,12,16,22
  98:6 100:7,8
  101:5 110:7
  116:5 127:10
  136:16
Court's 76:22
court-appoint...
  109:24
courthouse
  22:15 36:25
  40:13 98:17

99:18 115:18
courtroom 61:14
  98:9 99:11,15
courtrooms
  22:18
courts 16:8,9
  22:18 23:16
  78:16 93:8
cover 9:3 31:12
  59:17,20 60:3
  93:23 119:11
covered 9:8
  65:13
covering 59:20
covers 105:14
cracks 117:4
create 109:13
  123:25 126:9
created 28:14
  34:15 84:23
  85:14 113:8
  115:6 124:3,16
  126:2,3
creates 125:17
creating 120:9
  120:14
creative 52:3,8
crimes 44:9
criminal 10:6
  18:14 21:13
  64:1 95:4,5
  105:12 107:6
cross 2:3,3
  58:3,15
crosses 58:4
crux 77:13
cuff 80:5
Cumulative
  70:22
current 15:4
  84:22 108:2
  119:3
currently 13:2
  28:16 65:21
  108:5 132:10
custody 20:4
  28:17 29:15

50:21,22 57:11
61:16 85:22
86:6,7 91:20
92:16,19 119:14

_____

**D**

D 2:1 29:15
  44:19,22,25
  45:2,21,24
DA's 61:6
Dade 94:4
Dallas 94:5
danger 134:4
data 8:6,7 15:5
  120:13
database 46:21
  46:22 52:22
  87:14,15,19,21
  119:18
date 5:2 47:4
  48:12 50:10
  55:20 61:1
  62:2 70:25
  71:1 92:20
  103:4 123:18
dates 28:23
  59:22 92:25
  93:3
David 37:3,7,8
  52:1,2,9
Dawn 27:12,13
  27:14,23
  28:12,24 29:1
  29:24 32:10
Dawn's 106:12
day 3:15 18:19
  23:15,15
  43:23,24 64:3
  77:9 97:13,19
  98:5,13,15
  99:12,15 100:5
  100:7,12,13
  101:4 103:16
  112:24,24
  113:5 114:1
  115:7 123:12
day-to-day

73:13
days 15:1 26:15
  26:16 28:7,9
  30:12,14,16,25
  36:14,15 37:11
  37:17,22 38:10
  38:11,22 54:12
  55:17,18 57:7
  94:11,12 97:11
  100:15 117:16
  117:17 118:23
deadline 74:6
deadlines
  80:24
deal 61:21
  101:15
deals 61:25
December 1:18
  3:13 5:2
decided 77:9
  125:23 126:6
deciding 57:25
  106:15
decision 24:15
  76:23 79:12,13
  79:15 81:8,15
  81:17 84:9
  98:1 126:4
decisions
  38:23,24
  63:25 80:16
declining
  102:19
decrease 14:25
  129:23
decreased
  91:10
dedicated
  65:15
defend 53:4
defendant
  77:16 90:12
  106:18
defendants 1:8
  3:8,21 4:7
  5:23 6:3 15:21
  19:1,4 62:4,7

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-4   Filed 02/21/18   Page 41 of 60

62:12 87:1
91:12 93:10
95:13,25
defender 4:13
8:20 9:2,4,14
9:20,22,24
11:11 13:11,14
13:23 16:17,19
17:22 21:6
27:14,17 29:11
33:18 34:16,17
34:25 61:5
78:10,17 83:16
103:2 104:9
105:19 109:12
112:3,13 113:9
116:12 117:14
118:7 119:2,16
120:3,19 121:3
121:4 124:16
125:7,8,12
defenders 4:12
15:25 17:7
26:8 46:23
60:16,17 70:19
89:8 113:18,22
124:18 125:18
126:5 131:18
defending 39:4
defense 10:6
39:19 43:11,13
53:18 57:22
73:13,15 81:1
95:3
define 105:22
definitely 18:20
45:1 58:9,11
73:9 96:19
degree 33:15,18
33:20 63:19
81:3 84:1,7
104:17
degrees 104:18
delayed 56:16
demonstrate
78:20
denied 88:19

89:3,4 120:23
121:2,8,11
depend 18:2
depending
14:17 44:6
48:16 51:2
68:15 74:18
129:6
depends 43:20
44:24 110:15
depleted 121:18
deposed 6:22
6:23
deposes 6:10
deposition 1:16
3:12 5:3,8 6:3
6:25 7:1,23
8:4,14,17 48:14
48:22 104:21
121:8,11 135:2
135:4 136:5,9
depositions
48:1,8,11
57:24 59:7
121:7
depth 71:20
74:2
deputy 16:17,19
16:24 34:15
118:7 119:16
describe 9:19
30:12 125:22
description
35:8
deserve 24:22
despite 33:17
detailing 29:3
details 111:12
detention 68:19
determination
109:21 110:1,13
110:17 111:10
determinations
69:13
determine 45:9
46:19 47:1
determined

46:25 126:15
126:19
determines
46:17 71:14
determining
47:22
detracts 59:4
detriment
84:25
detrimental
95:14
devastated
25:15
developing
39:11
devoted 118:9
differ 21:2
different 40:9
60:14 79:8
105:21
differently
68:15 83:23
difficult 7:9
22:3,11,13,20
28:21 29:11,24
30:3,7 31:12
32:14 34:1
40:14 41:4
48:10,20
60:16
difficulties 41:6
49:10,13 97:5
difficulty 24:18
28:4 96:22
diligence 80:6
diligent 80:9
dire 58:4
direct 2:2 13:17
direction 102:10
136:7
directions 13:25
directly 102:22
102:23
director 12:20
13:18 14:8
16:24 76:8
94:19 98:21

directs 58:4
disadvantage
38:9
disadvantages
38:13
disappear
40:20 48:19
disband 78:10
Disciplinary
88:20
discourage
40:3
discovery 19:17
43:15,19 44:19
44:22 51:18
54:6,11,23,24
55:3,5,7
123:21 127:4,9
discretion 14:10
14:13,18,20
109:12
discuss 20:19
28:12 83:10
discussed 37:2
80:6 126:10
discussing 40:9
discussion
46:22 102:2,4
dismissed
20:14 106:19
disposed
106:14
disposition
62:2
district 1:1,1 3:1,1
3:18,18 5:6,6
8:20 9:3,14
9:20 11:11 13:14
16:17,19,24
34:16 50:5
51:8 70:19
78:17 85:6
103:2 105:13
109:12 112:3
112:12 113:8,18
113:21 118:7
119:2,6,16

121:3 123:16
124:10,16
125:7,25
126:5
districts 113:19
125:12
distrust 38:18
38:21
division 1:2 3:2
3:19 5:7 13:18
16:12 90:4
98:21
docket 92:24
102:24 103:1
doctor's 99:15
doctoring 52:5
52:20
document
10:25 26:3,25
27:7,16 32:9
34:7,11,18
39:25 41:17
70:3,7 76:2
82:4,6 87:3,5
120:10
documented
36:12
documents 8:3
8:5 10:24 76:4
87:8 109:2,11
doing 31:7
35:18 44:15
48:13 54:5
59:16 65:21
66:10 81:11,12
83:15,16,18,21
83:15,10 87:5
89:18 93:11
102:3 103:12
113:22 114:24
118:10,12
119:10 128:14
double 131:13
132:1,17
downfall 23:10
draft 113:3
drafted 113:13

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-4   Filed 02/21/18   Page 42 of 60

dramatic 107:6
dramatically
    107:22 131:9
drive 94:11
    115:18
dry 121:19,20
Duchscherer
    34:17,21 35:16
    51:21
due 28:10
    30:25 33:20
    43:7 50:20
    87:17 88:23
    92:4 115:4,24
duties 11:12,13
    109:9 112:13
DWI 46:4,9,11

E

E 2:1,8 4:1,1
e-filing 132:5
e-mail 26:6,11
    85:7 90:5
    102:12 130:11
e-mailed 127:12
E-request 47:2
earlier 37:14
    40:8 41:9,19
    49:23 61:17
    80:7 96:14
    102:24 113:23
    117:14 120:8
    121:16 127:2
early 52:16
easier 21:15,25
    22:8
easily 80:8
    132:2
East 3:16 5:9
    10:5
easy 21:24
    22:10 61:17
edification
    100:4
educated 53:8
effect 111:16
effective 39:18

39:18 58:21
58:25 84:25
103:19 113:9
120:22 124:23
134:11,12
effectively 23:5
43:19 53:4
74:13 75:2
effects 95:12,15
effort 80:19
eight 12:7 108:8
108:9
either 7:10 13:9
16:17 21:9 41:7
47:8 54:6 81:4
84:7,14 85:6
109:10 115:7
119:3,15 121:19
elaborate 25:4
40:4 49:25
elaborately
134:2
eligible 62:12
62:15 69:10
110:14 117:2
Ellen 13:17,25
47:8 98:21
Elmer 26:7
else's 74:24
emphasis 111:24
employed 9:1
12:4 35:1
136:8,11
employee 14:4
27:12 34:14
109:5,7 136:10
employment
9:19
encountered
28:4
ended 78:11
102:15 106:18
114:14
ends 64:23
99:23
enforce 109:12
English 49:4,11

49:21
ensure 80:19
123:22
enter 63:9
90:15,20
103:3
entering 89:15
89:16 90:12,18
entire 9:23 71:4
113:15
entries 102:24
103:1
entry 34:14
89:11,12
equally 79:16
especially 11:16
14:21 18:23
19:24 25:14
30:14 37:14
43:12 63:10
92:14 107:12
111:9 128:13,17
essentially
124:25
estimate 131:23
et 1:4,7 3:4,7,19
3:20 5:4,5
ethical 79:15,16
79:22,24
80:11,17,21
81:23 90:10,14
118:15,18,21
130:19
evaluate 45:5
evaluated 36:1
evaluation
27:10 35:21
51:21,25
evaluations
117:6
event 35:8
everybody
59:16,18
74:24
everyday 23:17
evidence 46:9
84:10

evolution 112:5
exact 56:4,24
56:24 60:13
75:22 91:5
123:18
exactly 17:9
91:25 92:17
96:17 101:19
102:13 114:6
examination
2:2,3,3,4 58:3
131:2
examined 3:13
6:9
example 19:8
46:2 61:23
73:11 87:11,16
123:21
examples 111:11
121:20 124:8
exceeded
76:10
excessive 87:17
88:23 92:4
134:9
excuse 8:10
58:8 75:19
93:9 134:4
exhibit 2:9,9,10
2:10,11,11,12
10:12,13,16,18
25:23,24 27:1
34:8 51:20
69:19 76:1
87:4,11,16,20
88:10 90:6
106:3 116:23
117:9,10 120:2
130:11
existence 113:10
existing 84:24
131:12
exits 98:9
expect 37:18
67:6,7 69:1
79:7 94:21
expectation

14:21 15:1
117:15 118:16
expectations
14:19 33:12
37:16
expected 33:2
33:4,14 93:2
expecting
103:2
expedite 62:22
expense 11:20
11:20 12:22
47:10,12 49:8
122:3,8
expenses
121:24,25
experience 13:5
13:12 15:8
20:22 21:15
125:7 134:5,8
experienced
11:18 35:4
40:16
expert 45:5,9
45:20,24
46:5,9,15,18
46:18,19,21
47:3,16,17,18
47:19 74:15
120:16,18,21
120:24,25
121:4
expertise 67:19
experts 11:21
45:14,23
47:23 49:8
64:4
explain 24:13
24:20 85:16
112:5 130:5
explained 25:15
80:16
explaining 54:3
expressly 6:6
extend 23:19
extended
23:23 50:23

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-4   Filed 02/21/18   Page 43 of 60

extent 123:11
extra 42:5
extreme 74:3

**F**

face-to-face
36:25 117:16
118:3,17
facility 28:10
30:22,25
facing 44:10
74:16
fact 37:20
54:25 64:2
79:19 81:20,21
122:9 127:9
factor 33:1
47:22 120:17
factors 33:21,22
33:24
fail 48:15
failed 80:12,17
fair 13:22 14:9
14:12 32:15
35:4 77:18
120:15
fairly 126:21
fall 51:1
familiar 76:5
family 29:3
32:22 133:22
fantasy 132:19
far 8:11 12:24
13:8 14:15 15:11
16:18 31:16
50:14 51:3
53:24 70:14
72:4,8,8 83:18
91:14 102:15
112:11 132:4
fared 13:7
farmed 22:5
33:25 115:4
farming 31:10
faster 91:11
favor 54:4
federal 129:25

130:6,7
Feds 114:25
feel 25:4
feeling 101:14
125:22
fell 117:3
fellow 59:19
felonies 16:20
16:21 17:20
18:23 44:13,19
44:19
felony 12:1 16:16
17:14,17 28:2
29:10,16,18,19
30:3 44:4,5,16
44:22 45:21
45:24 46:3
54:12 71:25
felony-level
17:23
felt 101:20,21
134:18
fewer 112:12
figured 89:3,5
128:12
file 18:18 28:8
30:24 36:5,13
36:17 50:25
51:16 53:15,21
54:1,6,15 55:5
55:10 74:10,10
87:15,18 89:11
102:6,7 107:1
114:23 117:6
118:10 119:24
123:23 133:15
133:17
filed 51:3,8,10
53:2 54:7,12
54:16,18,21
55:7 57:24
80:25 88:21
88:23 97:1
99:1 101:24
102:1,16
105:13 107:7
107:17 127:9

133:10
files 27:21,22
29:2 36:12,18
107:4 108:24
114:12 128:10
filing 51:15
54:22 88:18
125:23 130:16
130:21 134:17
fill 47:2 49:8
91:14,15,17,18
91:20,22
99:13 114:20
122:3
filled 41:14
110:10
financially
136:12
find 25:16 49:14
49:15 59:6,12
67:8 115:19
124:7
finding 133:22
fine 7:5 27:5
89:23 107:21
finish 7:8
finished 107:1
first 20:11 21:19
21:24,25,25
24:8 26:10
28:22 35:7
36:5 46:18
50:11 57:23
73:25 85:24
86:5 90:8
114:17 117:19
first-level 93:22
fiscal 8:9 70:23
71:4 72:20,24
93:19 120:3
128:6,21
five 57:7 65:17
93:24 94:4
122:21 123:6
fixed 69:20,23
flight 134:3
flip 51:23

flips 52:1
focus 89:6
focused 32:19
32:20,23
118:10,10
focusing 59:13
75:11 132:8,16
folks 24:5 44:16
52:12 92:15
95:19
follow 16:12
55:11,13 81:23
follow-up 36:14
74:7 130:24
followed 71:11
77:24 79:12
98:17
following 98:20
font 71:6
forced 84:24
foregoing 136:5
foremost 24:8
forenoon 3:14
forever 39:10
forgot 55:23
form 27:10
87:21 88:12
106:3 110:2,4
110:5,5 114:20
formal 81:14
format 69:21,23
former 119:3
formerly 51:3
84:14
forms 99:13
Forsythe 31:17
forth 115:15
129:18
Fortunately
98:24
forward 98:25
101:15
found 54:25
112:17 124:5
134:7
four 16:9 65:17
117:20 128:18

fours 35:11
fraction 41:20
free 98:18,18
131:24
frequency
129:5
frequent 31:5
frequently
31:23 43:15
45:4,8 50:8
50:24 103:15
111:20 127:16
129:20
fresh 48:17
Friday 23:13
55:19,20
front 77:7 80:14
82:18 98:20
130:12
fronts 80:13
fudge 14:19
fudged 37:15
full 12:6,9,12,16
13:1 36:4
72:16 74:25
90:8 108:3,4
108:5 117:19
134:2
full-time 108:9
fully 25:11,15
90:10,14
function 109:19
109:24 112:15
fund 121:19
funding 107:13
funds 45:23
46:4 120:24
121:5,8,13,20
further 28:11
31:15 50:19
103:21 126:23
134:14,24
136:10

**G**

gained 112:11
gap 104:13,15

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-4   Filed 02/21/18   Page 44 of 60

gaps 36:6,15,18
    37:19 38:4
gather 45:5
general 4:14
    8:21 11:13 15:3
    25:7 104:23
    107:24
General's 4:9
generally 22:6
    43:10 45:16
    52:10,19 61:25
    74:7 92:2
    100:12 116:1
    133:25
generous
    118:22
geographic 9:7
getting 11:17
    18:18 24:24
    29:20,21
    42:20 59:24
    60:1 61:19
    66:15 73:17
    73:20 80:3
    91:4 92:14
    94:15 102:16
    108:24 118:7
    122:25 128:8
    128:10,18,25
    133:23
gist 37:9
give 16:14 17:17
    19:8 56:3
    60:13 65:11
    72:21 78:16
    88:19 91:5
    92:17 101:18
    128:15 131:21
given 12:25
    16:17 37:11
    45:2 48:20
    64:8 67:18
    71:23 74:16
    80:21 118:11
Gives 54:3
giving 84:3
    118:9

glass 41:3,4
go 6:24 14:7
    15:1 19:16,18
    21:14 23:15
    24:1 25:16
    32:4 39:9,22
    39:23,25
    40:16,23
    46:21,22 50:9
    50:14 56:2,6
    56:8 57:1,10
    59:15,23 61:14
    64:21 69:7
    71:20 78:8,14
    78:18,19,23
    80:9 81:4
    83:25 87:25
    90:5 94:13,21
    98:16,18,19
    99:20 101:4
    104:11 106:15
    107:3 108:15
    111:12 117:5
    119:24 122:4,8
    122:11,12 127:3
goal 19:10,12
goes 37:13 40:8
    47:7 55:14
    56:13 57:19
    105:23
going 14:16
    19:19 21:13
    22:18 24:16
    25:12,24
    26:25 29:4,17
    29:17,19 30:4
    32:21 36:24
    38:10 43:2
    46:20 49:18
    55:22 56:16
    56:21 58:1,2,9
    61:1 64:22,25
    65:24 66:19
    68:16 72:21
    77:9 79:10,11
    81:1 82:1,11
    83:21,22 87:3

87:25 89:3
    92:17 98:3,19
    98:23 99:22
    99:25 101:15
    102:7 103:8
    104:7 114:24
    116:22 117:9
    120:5 126:13
    133:10
good 6:15,16,17
    18:11 33:8
    59:10 64:20
    65:14 99:20
    103:24,25
    114:24 117:25
    118:1,3,4,9,12
    118:14
gotten 23:23
    46:6 61:21
    64:9 67:4
    92:19 112:7
    134:17
Governor 5:21
    104:2
GPS 25:21
grade 17:20,20
    44:16 46:3
graduate 9:25
grant 55:1
granted 12:20
    78:22
graph 106:8
great 94:8
Greene 9:10
    16:7,9,21,23
    18:23 21:22
    22:1,4 23:2
    23:20 28:1
    29:7 31:6
    65:20 66:2,9
    66:25 69:1
    85:20 86:11,13
    86:15,18 91:18
    91:20 100:17
    107:13,24
    110:17 113:24
    114:3,13,15

115:3 116:2
    129:25 131:3
    136:3
Greitens 5:21
    104:2
grid 106:9
ground 6:24
    79:3
group 89:22
    105:2
grow 91:9 112:9
growing 74:20
grown 91:7
    112:17
grows 91:11
guarantee
    39:24
guess 14:17,18
    48:3 67:14
    84:10 109:12
    111:18,24 113:9
    116:11 117:21
    118:4 120:12
    121:17 123:16
    126:6 129:12
    131:21
guide 109:8
guideline
    26:20 54:19
    118:18,20
guidelines 14:3
    14:16 26:18,23
    27:24 36:13
    37:4 109:4
guiding 109:3
guilty 25:11
    56:17,19,22
    60:8,19 61:1
    62:4,7,16

─────────
H
─────────
H 2:8
Hackathorn 1:16
    2:2 3:12 5:3
    6:3,8,14,15
    10:12 65:3
    76:4 100:2

103:3 134:25
    135:2
half 16:20,22
    28:24 29:1
    40:21
hall 20:1
hamper 53:3
hampered 25:1
    39:17 42:19
    42:22 51:16
hampering 57:9
hand 87:3,5
    120:9
Handbook 14:4
    109:5,7
handful 104:3
    109:14
handing 25:23
    26:25 34:7
    69:19 76:2
    82:4
handle 9:10
    12:24 14:6,10
    17:7,8,13 18:22
    44:13 65:6,14
    65:24 68:9,19
    93:13,24,25
    94:3,7,17 95:3
handled 14:14
    14:15 67:12
    69:5 89:8
handles 66:3
    68:17
handling 30:4
    55:22 65:15
    67:1,11,23
    68:13,25 69:6
    94:6
hands 77:7
    124:15
happen 18:18
    31:23,25
    36:24 50:7
    63:19 103:8
    111:20,23
    123:22 127:6
happened

ALARIS LITIGATION SERVICES
www.alaris.us        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-4   Filed 02/21/18   Page 45 of 60

76:18 80:23
83:8 121:23
129:3,4
**happening**
78:11
**happens** 18:17
18:20 19:25
20:7,8 21:7
50:7 62:11
103:14,16 111:3
111:5,7,20,22
113:1 127:5
129:20
**hard** 20:24
81:12
**harder** 50:9
**Hatley** 16:25
34:16,19
**haunt** 19:9
**head** 7:3 30:19
86:13 91:25
98:5 114:14
**health** 24:19
**hear** 40:25 41:4
104:9
**heard** 88:8
94:24 95:2
133:4,7
**hearing** 18:21
19:11,13,16,18
19:23 20:6,7,9
20:11,20,21
21:8,10 22:2,7
43:23 53:9
92:22 127:8
**hearings** 20:23
68:20 127:4
**heat** 77:11
**heavier** 71:25
**held** 5:8 57:17
114:22
**hellhole** 40:3
**help** 11:18 63:16
85:12 108:24
115:8 116:6
123:25 124:18
**helps** 115:13

123:24 124:5
**HERRINGTON**
4:4
**hey** 38:18 121:19
**high** 4:9 47:20
80:12
**higher** 12:23
**highest** 34:24
**Hinkebein**
79:12,15
80:23,25 81:8
81:15,17 85:6
126:4
**hire** 11:21 49:5,6
65:23
**hired** 111:15
**hiring** 11:22
**history** 9:20
**hit** 58:8
**hold** 114:25
**holding** 128:8
**holds** 94:18
**hoops** 79:19
**hope** 129:10
**hour** 40:21
**hours** 3:14 22:6
23:19,21 52:17
72:2 123:12,17
**house** 129:25
**housing** 130:8
**hovering** 15:7
**huge** 37:11 81:5
**hundred** 15:7,21
134:21,22
**hurts** 38:14,22
38:25 39:1,2
**hypothetical**
132:15,19

———————
**I**
**idea** 19:15
49:22 88:1
92:17
**Ideally** 18:17
85:20
**IDENTIFICATI...**
10:18

**ignored** 103:10
**III** 117:1
**III's** 116:24,25
**immediate** 99:1
106:24
**immediately**
90:12 97:1
104:5
**immigration**
63:20,25
64:3,4,13,17
**impact** 94:6
**important** 39:3
**impossible**
14:24 23:23
**improve** 28:13
33:4,16,19
116:15
**improvement**
33:2,14
**inability** 33:11
**incarcerated**
14:23 18:3,4
18:12 19:25
20:2 21:16,20
24:3 27:25
28:3,14 29:17
30:22 37:21
61:14 86:20
86:22 95:20
119:9
**including** 15:21
108:6
**incorrect** 82:16
**increase** 107:6
107:14
**increased** 31:13
34:2,5 49:18
107:22,25
112:9,14
**independent**
109:25 110:19
**indigency** 69:12
101:6 109:22
109:25 111:17
**indigent** 15:21
39:5 87:1

91:12 93:9,9
95:3,12,25
129:14,18
**individual** 73:3
78:18,24 81:19
84:4,23 87:18
88:16 89:20
110:13 126:12
**individually**
113:13
**ineffective**
126:16,19
134:7
**inevitably** 11:24
23:16
**inflated** 106:13
**inform** 38:23
91:12,19
**informal** 68:22
**informally** 84:14
85:8
**information**
18:8 45:5 53:1
110:24
**informed** 24:14
61:6 80:16
91:16,23 97:18
**initial** 17:25 18:8
18:12,15,16
28:6 30:11,15
30:17 36:13
**initially** 74:21
74:22 78:2,4
78:6 83:9
102:7
**initiated** 8:9,11
100:25 117:4
**initiative** 115:24
**inmates** 22:5
97:14
**inputs** 120:13
**ins** 61:11
**instance** 28:5
30:11 46:3
55:2 57:16
111:14 114:22
**instances** 30:21

**instructed** 7:12
119:15 126:8
**instructions**
7:21
**interest** 84:23
**interested**
83:18 136:12
**internal** 54:19
124:17,19
**internally** 94:6
**internet** 10:23
**interviewing**
133:21
**intoxication**
46:13
**introduce** 5:14
6:12
**investigate** 42:1
42:9,23 48:5
**investigated**
42:17
**investigating**
42:12
**investigation**
41:21 43:3
**investigative**
132:14
**investigator**
57:21 59:8,11
**investigators**
42:3 108:12
132:9,10,13,17
**involved** 11:25
63:1 66:7
**involves** 11:14
**isolation** 126:6
**issue** 16:3 35:8
43:1 64:3
104:24
**issues** 11:19 14:6
24:19 25:10
35:13 37:23
41:16 63:11
65:22 74:9,13
117:15
**items** 121:17
**IV** 34:23 35:20

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-4   Filed 02/21/18   Page 46 of 60

**IV's** 35:9,19
  37:24 116:24
  117:5
**IVin** 34:22

—————— **J** ——————
**Jackie** 10:16
**Jacqueline** 4:13
  5:22 7:25
**Jacqueline.S ...**
  4:17
**jail** 18:3 21:21,22
  21:24 22:1,4,9
  22:11,12,23,24
  23:16 28:6,9
  28:19 29:23
  29:23 30:12
  30:21,24 31:5
  31:11,11,20
  32:2,4,13 34:2
  36:19,23 37:1
  40:2,9,15,17
  41:7 44:1 49:17
  49:18,19
  50:23 57:9
  60:1 61:15 63:1
  63:4,7,8,15
  73:22 80:8,9
  94:14 95:21
  96:7,10 97:24
  113:24 115:4,14
  115:19 130:2
**jails** 23:18 31:4
**January** 9:15
**JCPenney**
  104:16
**Jefferson** 4:10
**Jenna** 3:17 4:20
  5:11 6:4 136:4
**jeopardy** 79:18
  79:21
**job** 128:17
**Joel** 26:7
**Johnson** 82:25
  83:17,24 84:13
  84:17 97:18
  98:2 101:5,25

102:18 116:18
**Johnson's** 83:2
**judge** 52:7 53:5
  53:8,14,21,24
  54:2,4 55:21
  59:23 65:20
  77:11 78:19
  82:14,15,18,23
  82:24,25 83:1
  83:2,17,23
  84:10,13,17
  86:1,25 87:12
  88:19 89:14,21
  89:25 92:20
  93:4 97:2,7,18
  98:2,20 101:1
  101:5,24
  102:18,24,25
  116:18 134:3
**judge's** 96:21
  97:3
**judges** 23:16
  50:8 53:15,16
  63:12 76:9
  79:5 82:1,10
  82:17,20 83:5
  83:24 84:13,17
  86:25 87:22
  87:24,25 89:9
  89:19 90:6
  93:11 102:18
  105:2 115:25
  116:10 125:24
  130:12
**judicially** 126:15
  126:19
**July** 70:25
  93:20,20,21
  94:17 128:7
**jump** 79:19
**jumping** 116:8
**June** 71:1
**jurisdiction**
  85:19 88:7
**jurisdictions**
  50:8
**jury** 50:12 56:4

98:19 123:2,2
  123:4
**juvenile** 65:15
  65:21 66:3,7
  66:22 67:4,9
  67:11,16,20,23
  68:1,4,7,8,13
  68:16 69:1,3,6
  69:13,16
  100:18 109:23
  110:3 116:2
**juveniles** 69:9
  109:24

—————— **K** ——————
**Kansas** 26:9
**keep** 28:15
  52:22 63:15
  98:9
**keeping** 28:4
  80:13 117:25
**kind** 8:7 20:16
  24:22 37:14
  37:15 45:21
  47:15 64:6
  66:9 67:4
  72:13 74:5
  78:7 79:3,9
  89:25 96:19
  96:22 98:5
  102:10,15
  113:12 117:3
  131:21 132:3
**kinds** 17:12
  45:17 62:10
  68:8 95:7,9
  132:25 133:10
**knew** 56:24
  81:10 89:2
  134:6
**know** 7:15,17,19
  10:25 12:20,21
  12:22 14:22
  19:25 23:25
  24:11,11 25:10
  26:14 28:24
  30:17 31:11

37:7,17 38:18
  40:19 44:8
  46:24 47:16
  48:2 51:3
  52:16,21 53:14
  53:23 54:7
  56:5,8 57:1
  58:9,11 59:12
  59:19 61:10,11
  61:12,15 62:19
  63:13,17 64:10
  66:12,14,14
  67:7,8 71:6,22
  71:25 73:4,19
  75:25 79:14
  80:2 81:12
  82:1,10 85:9
  85:10,11 86:19
  88:22,25
  89:23 91:1,1,2
  92:2,4,10,15
  92:16,19 94:16
  94:18 96:4,10
  96:12,15 100:9
  100:18,21
  101:9,14 102:1
  102:2,17,23
  103:2,18 104:4
  105:20 107:18
  107:18,20
  113:18,23 114:1
  114:19,20,21
  115:2,13,22
  116:18 118:9
  119:10,15
  122:9 124:6
  125:16 129:4
  130:3 131:4,22
  132:19,20
  133:8,11,20
**knowing** 25:8
  35:22 48:21
  125:9
**known** 119:10
**knows** 84:2

—————— **L** ——————

**lack** 14:13,18
  21:3 23:12
  25:2 33:12
  39:23 41:19
  42:22 43:7
  51:16 55:14
  117:24 121:17
  122:1 133:1
**language** 92:7
  92:9
**large** 11:23 94:9
  94:15 105:19
  111:14 123:15
**larger** 16:8
  29:25 107:5
**late** 54:7,22
  55:7 123:21
**Laura** 82:25
**law** 9:22,25
  55:17,18 94:12
  97:11 97:25
  100:5,12,13,15
  104:8,12,13
**lawful** 6:9
**laws** 78:12
**lawyers** 10:6,9
  11:4,7 74:16
**learned** 31:21
**leave** 57:11 74:7
  97:22 98:17
  125:14
**leaves** 44:15
**leaving** 98:10
  98:24
**left** 10:13 67:13
**legal** 5:12
  24:20 80:15
  108:17
**legislative** 87:14
**legislature** 78:9
**let's** 6:24 10:15
  21:14 42:18
  64:21 75:7
  76:1 80:22
  87:20
**letter** 36:25
  73:24 82:21

ALARIS LITIGATION SERVICES
www.alaris.us        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-4   Filed 02/21/18   Page 47 of 60

83:23 84:14
84:16,19,21
91:23,24 92:1
130:16,19,21
**letters** 23:11
25:8 35:24
38:16 73:21
92:14 119:17
119:24,25
125:24 127:15
127:17,21
133:3
**letting** 82:1,10
**level** 13:5 33:9
34:24 38:18
**license** 79:18,21
81:2,13
**lied** 117:8
**life** 25:22 44:10
**life-changing**
38:24
**lifetime** 25:20
25:21
**light** 131:11
**lighted** 86:3
**liked** 114:17
**likes** 53:19
**limited** 134:8
**line** 106:8
118:25 121:17
**lines** 117:20
**list** 16:14,16
28:14 47:3
85:15,17,18,22
85:24 86:11,13
92:11,11,23
95:7 97:20
**listed** 36:20
**listen** 39:14
**litigation** 3:15
4:20,24 5:9
5:13 87:15,19
87:21
**little** 7:9 21:6
37:15 40:23
41:2 42:5
44:15 49:25

52:25 53:20
68:14 74:2
95:10 97:9
112:20 124:4
**live** 132:20
**LLP** 4:4
**lobby** 40:19,24
40:25
**local** 85:5
109:11,11,14
113:7,12 131:8
**locality** 9:7
**locate** 48:18
59:9
**located** 9:9
**location** 122:6,6
124:2
**log** 34:15
**long** 9:14 27:17
28:18 32:12
35:1 36:1
49:19 62:20
72:1,14 74:19
83:13 91:2
94:18 99:3
117:4 119:10
127:23 128:20
128:21
**long-term**
90:24
**longer** 28:20
32:13 36:15
90:11 92:17
97:18 99:7
128:1
**longest** 35:11,11
85:22 86:7
**look** 25:25 27:2
35:7 36:4
42:7 51:12
57:22 70:19
76:5 90:1
114:23 116:22
122:8
**looked** 8:8
43:23 44:11,12
53:6 78:4

86:10
**looking** 32:3,9
36:12 42:8
106:5 120:5
**looks** 31:20
**lost** 55:2
106:20 112:10
117:11
**lot** 11:15 12:23
14:5,9 15:17
17:18 18:7,10
18:18 19:17,25
24:18 38:17
38:20 39:2
44:11,13,13
50:7,15 52:13
52:14,16,24
52:24 56:19
57:11 59:17
62:11 63:12
73:20 76:19
80:7,10 81:10
91:22 95:14
110:16 112:14
113:1 126:10
131:22
**loud** 106:11
**low** 46:3
**lower** 15:14 17:6
17:20 44:16
74:23
**luck** 41:15
**lunch** 23:25

————————
**M**
**Madrid** 3:16 5:9
**main** 43:5 107:2
**maintain** 29:5
29:12 30:8
118:3
**maintained**
119:18,19
**maintaining**
28:17 32:10
**majority** 23:10
24:3,17 31:9
87:24

**makeup** 108:2
**making** 32:20
32:23 33:25
36:1 80:4,14
80:18 130:9
**man's** 77:15
**manage** 115:8
**manageable**
131:11
**management**
41:23 65:7
81:16,18
119:20,21
126:5,9,11
127:24
**managing** 8:24
**manner** 42:1
**mark** 10:12 27:1
34:8 69:20
76:3 82:5
87:6
**marked** 10:18
25:24 69:22
87:4,11 120:1
**Marshall** 47:8
**Marty** 76:8
**Matt** 5:16 6:17
**matter** 5:4
23:18 51:11
74:15 84:3
89:4 105:22
105:25
**matters** 11:23
24:14,20
67:20 69:3,6
80:15 109:23
110:12
**Matthew** 4:3
**maximum** 76:10
**mean** 12:9 14:5
20:25 25:6
29:19 36:10,11
36:16,17 37:12
41:11 42:24
43:5 45:11
51:2 52:14,15
54:10 55:9,9

60:15 61:8
65:8 66:2
67:17 68:15
73:12,16 78:3
79:16 94:8
101:12,17,18,22
128:2 133:11
**meaningful**
20:4
**meaningless**
110:11
**means** 28:19
32:13 40:5
52:21 53:14
54:8,11 59:13
**measure** 115:20
**mechanism**
110:1 115:18
124:1
**mechanisms**
109:17 115:24
**Media** 64:23
65:1 99:23
100:1
**meet** 7:25 19:11
19:22 20:17
23:1 26:23
33:11 73:25
118:2,18 129:17
**meeting** 17:25
18:4,6,12,16
20:1 21:19,22
21:24,25 22:9
22:12,14 28:19
32:12 38:10
40:11 41:6,23
65:19 81:17,18
83:4,6,8,9,13
84:5 116:4,17
117:15,15 118:8
118:17,23
126:4,9,11
**meetings** 28:18
32:11,23 38:6
40:4 63:12
65:19 76:12,15
76:18 79:4,5

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-4   Filed 02/21/18   Page 48 of 60

81:19 116:11,13 116:14,19
meets 28:22
member 97:21
members 29:3 85:8 105:1
memories 48:15
memory 48:17 76:14
mental 24:19
mention 83:17 86:24 133:8
mentioned 19:10 21:15 22:21 31:3 37:19 41:18 49:23 67:13 85:14 96:14 100:17 101:4,6 102:24 108:8 109:1 118:21 120:17 122:11 131:2,15 132:22 133:14
mentor 112:19
mentor-like 112:22
merely 109:24
met 28:12
metal 41:2
method 37:3 54:13
methods 56:18
metric 70:10
metrics 70:23 71:4 72:5 120:14
Mettler 99:10 102:11
Michael 14:7
middle 77:16
mileage 122:4
miles 31:18
military 133:24
mind 37:8 48:24 50:22
minds 116:4

minute 10:20 10:25 21:14 25:25 27:2 34:9
minute-incre ... 123:6
minutes 28:20 32:13 40:21
misdemeanor 17:15 43:21 45:20 62:11 71:25 95:11
misdemeanors 16:13 28:1 29:6,13,14,14 29:20 43:25 44:17 63:15 80:2
misnomer 67:17
missed 80:25
missing 12:2
Missouri 1:1,7 3:1,7,16,19,20 4:8,13 5:5,6 5:10,21 9:2,10 9:21 10:4,6,9 11:8 76:22 94:24 104:2,8 116:12 120:2 136:2
mistake 37:6
MO 4:10,16,21
modify 111:18
moment 15:6 66:23 72:11 92:5 105:8
Monday 23:13 98:22
money 11:20 12:21 65:10,10 65:12 94:18,19 94:21 130:9
monitoring 25:21
month 14:23 24:4 48:12,14 50:14 55:17

94:11 100:16 122:4 129:2
months 12:19 15:16 16:3 27:23 36:6,6 36:7,7,7,7,7 36:20 48:12 65:17 75:6,7 75:12 76:11 90:22 116:19 128:18 129:9
morning 6:15 23:21 32:2 114:3,5 115:13
Morris 99:10
motion 51:4,4 51:15 52:3,9 52:22 53:8,12 53:15 87:16 88:12,23 113:3 125:23 130:16
motions 50:25 51:7,7,8 52:5 52:21,23 57:23 88:18 110:9 113:2,12 133:16
Mountjoy 82:14 101:1
move 13:21 42:18 128:12
moved 31:21,24
moves 65:12
mshahabian ... 4:5
MSPD 5:22 14:5 26:18 35:1 62:13 69:10 70:11 71:13 75:15,20 88:12 89:9 95:3 97:2 99:7 110:7 118:20 126:12
MSPD's 96:24
multiple 127:19 127:21 132:24

municipal 115:1
murder 17:18,19 95:9,11

### N

N 2:1 4:1
name 5:11,11 6:14 64:7 77:15 99:10 104:1
named 10:8 11:3 11:7 27:12
near 124:13
necessarily 8:5 19:8 36:17 66:15 67:14 68:18 76:19 84:7 85:25 86:6 89:19 98:2 102:22 104:21
necessary 25:5 45:6,9,14,25 48:9 103:7
need 7:2,16 11:17 20:13,15 23:4 24:12,13 24:21 39:9 42:5 46:17,18 47:16 56:25 57:10,24 60:14 104:4 106:14 116:22 118:13 119:12 121:20 124:13 131:11,13,24 132:1,3,4,9,13
needed 28:16 40:23 58:16 81:4,4 89:6 98:7 102:14 107:17 110:24 117:5 128:12,15
needing 124:22 124:24
needs 28:13 54:20 59:21

107:1
negative 18:25 19:3 24:6 48:21 50:18 95:12 102:20 103:4
negotiate 24:12 39:1 60:22 61:25
negotiates 61:5
negotiation 60:23,25 61:2
neither 136:8
never 43:22 45:20 64:9 66:7 67:7 75:9 117:23
new 4:5 17:22 33:15 90:15 90:20 101:6
newer 11:16 90:23
Nifong 4:15
night 55:19
ninth 71:12
non-certificati ... 66:3
non-conflict 93:10
non-juvenile 67:25 68:4 110:12
nonverbal 7:6
note 29:5 36:16
noted 28:8 30:10,23,24 37:23 51:25
notes 29:2
notice 53:5 76:10 81:25 82:9 83:4 84:3,8
noticed 35:13 54:5
notices 76:7,16
number 8:10,11 12:24 14:24

ALARIS LITIGATION SERVICES
www.alaris.us        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-4   Filed 02/21/18   Page 49 of 60

18:10 23:16
28:3 30:4
34:5 51:2,12
55:22 56:4,9
57:2 64:7 72:1
72:22 74:23
91:8 94:10,14
105:23 106:1
114:19 124:20
131:13 132:17
numbers 8:8
12:23 15:18
37:15 107:14
107:19 112:2
125:1,10
128:16
numerous 25:7
NY 4:5

O

o'clock 3:14,14
objecting 87:22
objection 7:14
89:10,12,17
objections 7:11
87:1
obligations
90:10,15
oblivious 37:20
observation
125:5
obstacles 33:17
obviously 92:9
occasional
30:13
occasionally
49:23
occur 18:15
28:6 30:12
35:21 62:10
occurred 36:17
63:18 76:16
101:13,20
107:11 111:14
occurring 61:8
97:10
occurs 60:25

61:2,13 111:4
October 84:19
130:12
odd 40:1
off-the-cuff
134:1
offender 25:21
offenders 44:14
offense 25:17
offenses 25:14
44:25
offer 20:16,17,18
20:21 24:16
39:21 61:6,10
61:12,18 133:5
133:9
offers 61:3
office 4:9 8:24
9:6,9,23 11:23
12:22,22 13:2
13:6,23 14:1,2
14:10,17 15:4
15:22 16:1
23:15 25:1
26:9,23 27:15
28:23 29:25
30:7 31:17
34:22 35:9
39:17 41:25
42:3,11 43:19
44:9,21 45:4,9
45:13 47:25
48:7 49:1,24
50:24 51:15,18
52:10,12,15,18
54:14,14 55:7
55:10,12,24
56:2,10 57:3
57:10,13 58:5
58:19,19 59:12
59:19 60:2,22
61:6,24 62:16
62:24,25
63:9,21,23
64:3,12,18
65:7,8,15
66:20,22

67:11 68:25
69:5,12,17
70:20 71:22
72:6,20,24
73:4,8,9 74:17
74:19 75:1,5,11
75:12 76:10
77:25 78:17,18
78:19 79:2
81:20 85:14
86:25 88:3,7
88:20,22
89:16,18,20
90:9,14 91:18
96:15 97:17
97:24 98:7
99:4,5,8
100:21 102:4,6
102:19 103:11
103:18 105:7
106:15,21
107:6,12 108:2
108:16,23
109:15,19,23
109:25 110:19
111:2 112:12,19
112:23,25
113:7,13 116:5
119:11,19
122:12,17
123:5,8,22
124:3,22,24
127:25 131:3,8
131:19 132:4
133:15 134:6,9
office's 39:18
74:13 77:19
109:21
offices 8:25 9:3
12:5,23 70:11
93:23,25 94:3
112:10 127:11
Oh 69:24 70:2
86:23
okay 7:20 10:15
11:14 12:4 27:6
31:8 34:10

70:2,8 87:7
90:7 104:6,17
106:4,7 110:5
120:7,16
123:14 125:15
once 23:12
29:9,15,18
30:2,6,22
33:25 35:20
35:23 36:14
38:10,10,14,23
40:6,24 42:7
43:2 44:6,24
45:21 46:24
47:6,7 51:11
55:9,14,21
56:13 57:7,17
60:14,24
83:16 89:23
89:24 110:6
111:8 114:5
118:6 124:12
one-year 69:6
104:13
ones 53:20
85:24 86:3,5
86:6
ongoing 104:24
open 12:13,14,15
12:17 15:7
17:10 19:7
68:5 105:7,8
105:10 106:12
127:23 128:22
opening 57:14
57:18 58:3
opinion 23:4
26:22 41:25
42:15,16 43:10
43:18 51:6
53:3 54:10
55:6 56:12,20
57:3 58:5,18
61:24 63:23
72:21 74:12,12
74:14 103:8
118:22 131:10

opposed 12:15
32:21
opposition 37:4
order 32:15
87:12 97:17
98:6
ordered 53:25
77:14 86:4,25
89:25 98:4
101:5
ordering 70:11
86:2 88:1
89:9,20,21
97:7,8
orders 89:15
ordinarily 15:12
16:2,4
ordinary 49:19
organizations
105:4
Orrick 4:4 5:16
5:18
out-of-custody
28:21
outcome 95:23
96:12 136:12
outrage 86:25
outraged 86:1
outs 61:12
outside 61:13
95:3 99:12
116:17
outweighs
130:8
overcrowded
22:5
overcrowding
28:10 31:1
115:4 130:3
overloaded
78:21 81:22
84:12
overworked
14:17

P

P 4:1,1

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-4   Filed 02/21/18   Page 50 of 60

p.m 23:24
135:2,4
page 32:9
51:23 70:6
90:8 106:5
120:5
paid 38:19
paint 134:2
Palmetto
102:24
paperwork
54:16
paragraph 35:7
36:4 40:1
90:8 117:19
parking 48:3
133:3
part 18:11 20:5
32:8 35:21
65:9 81:1 108:1
110:10 128:8
part-time 12:8
108:18 128:4,6
128:25
participate 84:8
particular 8:22
36:19 46:15
61:19 64:8
67:19 70:16
73:20 79:2
88:21 89:12
89:20,22
90:3 96:24
98:5,13 106:1
117:14 118:25
120:18 123:16
134:18
parties 116:15
136:9,11
party 76:25
passed 75:23
78:12
Patterson
107:15
Paul 34:17,21
35:2,11 37:8
37:24,24 38:5

51:21 52:1,9
53:22 55:6,15
117:24
Paul's 36:11
pay 120:24
123:12
pending 3:17
7:18 17:15,17
people 11:24
12:4 18:7
28:21 32:14
38:22 39:21
44:9,14 83:12
86:8,12,20,22
91:3,17 92:10
92:22,23
96:4 98:2
107:19 112:12
113:14 125:14
people's 48:15
percent 17:3
41:24 42:8,12
43:22 48:5
51:2,5 66:18
72:10,18,20
73:6,6,7,12
112:2 126:22
133:3 134:19
134:21,22
percentage
42:16,17 48:4
49:20 68:3
70:11,14 72:3,9
86:19 94:15
131:22
percentage-w...
111:4
percentages
73:10
perfect 132:7
perform 116:23
performance
27:10 33:7
34:15 35:9,13
116:21,23 117:6
119:22
period 59:2

73:19 75:12,14
105:15 107:23
123:12,15
permanent
94:17,19
persistent 44:14
person 12:8
47:1,21 91:16
91:21 128:4
129:1 134:3
person's 111:17
personal 94:1
118:22
personally
60:10,11
personnel 11:22
pertained 46:11
pertains 8:23
80:17
Petree 3:17
4:20 5:11 6:4
136:4
Petsch 25:24
87:4,11,20
phone 18:10
29:2 41:5
92:19
phrase 121:17
phrased 102:13
pick 64:6 113:4
picked 7:4,4
47:15
picking 39:12
picture 15:3
107:5 134:2
place 18:1,3,4
21:17,20,21,23
22:11 62:2
77:7 83:6
116:20 119:12
124:9 125:19
placed 91:13
92:11
plaintiff 6:18
77:2
Plaintiff's 69:20
76:3,3 82:5

87:6 106:3
117:9 120:2
plaintiffs 1:5,17
3:5,20 4:2
5:17,19 6:2,10
6:18
Plane 47:8
played 46:13
plea 25:11,14
44:2 60:9
61:3,6,6,21,25
63:1
plead 24:15
39:21 61:1
62:4,7,16
pleading 25:17
60:18 92:16
pleas 56:17,19
56:22 60:22
100:9
please 5:14,25
6:12 7:15 8:19
10:21 62:5
78:15 104:4,4
pled 25:11
pod 114:19
point 58:8
62:24 73:7,16
74:18 75:8,13
75:23 83:3
86:2 90:13,17
90:19 93:5
98:25 105:2
112:7 123:5
134:17
points 52:1
policed 121:25
122:2
policies 14:5
109:11,15,16
policy 126:12
Polk 94:5
polled 124:7
poor 24:8 77:16
population
107:21,25
position 12:13

12:19,19,25
35:10 79:14
108:19,21
positions 12:14
12:15 13:11
112:11,11
positive 102:21
possibility 63:5
63:8 96:8
possible 55:23
57:21 92:7
118:2 129:11,12
possibly 36:3
55:1 57:25
83:10 122:12
124:12
posted 111:15
potential 12:2
15:17 43:8,11
43:13 44:1,10
58:3 85:15
91:23 95:17
117:2 118:4
potentially
54:24 61:1
71:24 76:13
78:21 81:24
95:21
practice 52:3,9
66:20 120:23
Prasad 4:3 5:18
5:18
precious 21:5
predecessor
114:8
predominant
35:18
predominate
35:12
predominates
133:2
prefer 93:4
prelim 19:14
preliminary
18:21 19:11,13
19:18,22 20:6
20:7,8,11,20

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-4   Filed 02/21/18   Page 51 of 60

20:21,23 21:7
21:10 22:2,7
127:3,8
prep 58:14
preparation 8:3
8:13,16 104:20
prepare 7:23
19:19 20:23
21:4 24:10
38:25 41:19
50:4 51:13,16
52:6 53:12
56:14 57:4
58:2,24 71:15
71:24 103:7
133:17,18
prepared 20:12
27:16 50:2,3
59:14 70:5
134:19
preparing 43:11
57:19,25 58:3
58:4,7,19 59:3
89:7 134:18
prepping 59:2
59:18,21,23
present 8:1
84:11 101:8
presently 66:21
presiding
65:20 76:8
81:25 82:10,15
82:17 83:1
101:1
press 105:4
pretrial 41:21
50:11,25 51:4
51:7,15 57:23
73:18,18 100:9
pretty 10:22
13:7 14:5 48:4
78:2,15 88:24
89:3 96:18
100:7 110:2
118:22 125:19
131:9
prevent 131:16

previously
25:24 51:25
66:19
price 47:20
primarily 93:25
94:1
principles 109:3
print 10:22,23
10:24
prior 9:20 18:20
22:2,6 40:11
40:14 44:14
75:8,12 79:3
93:21,22
94:22 127:8
128:25
prioritized
85:21 86:24
priority 128:16
prisoners
129:25 130:7
130:8,8
private 22:13,21
40:25 66:10
66:20 85:9
93:8,15 105:1
111:15
privately 22:16
privilege 24:25
25:5 42:21
pro 62:4,7 64:5
85:12 95:2
probable 12:1
21:11
probably 12:2
20:24,25
45:2 48:2,4
51:1 53:5
58:15,17 72:12
72:17 73:15
87:24 97:15
111:7,22 118:22
122:14 129:3
131:13 132:21
probation 16:13
17:15 29:13,20
43:21,25 80:3

problem 44:8
119:22
problematic
41:5
problems 24:10
35:23 41:12
procedure 55:11
55:13
proceed 6:25
20:13 21:11
39:8 50:16
125:23 126:14
proceeded
111:17
proceeding
21:4
process 18:14
21:14 46:16
114:1 119:5
123:11,22,24
123:25 125:21
130:15
processes
124:9
processing
119:12
produced 3:13
6:9
Professional
90:11
professionally
10:2
profit 105:3
programs 95:2
progress 92:24
promoted 33:9
35:20
promotion
27:18 34:24
37:14,16 117:2
promotions
27:11
promulgated
75:16
properly 24:10
38:23,25
51:12 58:24

133:17,18
prosecuting
107:15
prosecution
38:20
prosecutor 39:1
83:4,17 84:7
95:22
prosecutor's
62:25 107:12
116:5 127:11
131:3
prosecutors
63:13 79:6
116:1,9 131:8
protect 25:5
protecting 89:5
protection
88:19
provide 39:18
73:13 103:18
124:23 127:7,8
127:12 132:13
134:11
provided 87:13
126:16,19
134:7,12
providing 42:18
public 4:12,13
9:2,21,24
13:10 17:7,21
21:6 26:8
27:14,17 33:17
34:17,25
46:23 60:16
60:17 61:5
78:10 83:15
89:8 104:9
105:19 116:12
117:14 120:3,19
121:3 124:17
125:8,12,18
131:18
pull 74:10
punt 59:24
purpose 35:15
purposes 37:15

pursuant 129:14
push 60:4
pushed 50:9
pushing 50:19
put 11:10 33:14
37:7 41:17
52:16 53:1
84:8 92:1,8
95:13 96:1
122:5 124:8,16
puts 53:5
putting 76:9
PV's 28:1 29:6
44:17

___ Q ___

qualified 90:13
qualify 15:17,22
92:9 97:15
qualifying 36:8
36:21,22
question 7:3,8
7:13,18,19 19:2
84:9 100:4
104:23 105:16
105:21 107:5
109:8 115:21
124:25
questioned
111:17
questioning
119:1 132:22
questions 6:11
6:19 7:12,14
61:13 103:21
103:23 104:3
126:23,24
127:1 130:25
131:1 133:11
134:14,16,24
quick 20:1
36:23 45:3
134:1
quickly 18:9
50:9 62:23
quit 81:4
quite 13:9 27:23

ALARIS LITIGATION SERVICES
www.alaris.us     Phone: 1.800.280.3376     Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-4   Filed 02/21/18   Page 52 of 60

71:6

**R**

R 4:1,3
Ramsey 4:8
    5:20,20
    103:23 104:1
    126:23 134:5
    134:15,16,24
Ramsey's 131:2
rank 71:9
rare 30:21
rarely 19:14
    45:22
rate 91:10 130:7
re-referring
    103:1,1
reach 29:1
    90:19
reached 30:6
    127:10
react 81:7 84:13
    98:11
reaction 92:10
    96:21 97:3
    98:25 101:7,8
    101:10 103:4
reactions 85:5
    92:13 102:18
    102:20
read 26:13
    27:20 51:18
    52:2 106:11
    117:20
reading 24:18
    45:3 75:22
ready 114:18
    134:19
real 44:8 76:20
    78:5 80:3
    119:22
really 18:12
    22:12 35:20
    37:16 44:11
    48:17 53:6
    58:16 60:14
    66:7 69:14

79:6 84:2,2
    92:20 108:22
    116:4 119:12
    121:23 133:13
reason 30:16
    47:4,12 130:2
    130:19
reasonable
    80:18
reasonably
    24:13 80:15,15
reasons 88:14
    114:16 133:5
recall 30:18
    68:3,13 76:22
    77:21 86:14,18
    91:25 92:2
    93:11 102:17
    116:20 123:18
recalls 76:14
receive 10:4
    13:25 16:10
    64:12 70:20
    73:23 82:20
    114:11 119:1
    127:17 132:23
    132:25
received 10:7
    16:11 70:20
    82:22 84:16
    85:5 127:4
receiving 115:7
    115:12
recess 64:24
    99:24
recognize 26:3
    27:7 34:11
    70:3,9 76:4
    82:6
recognized
    10:2
recollect 122:21
recollection
    11:5 77:4
recommenda...
    32:25
record 5:1 6:13

7:4 26:13
    27:20 64:21
    64:22,25
    84:6 99:21,22
    99:25 106:11
    135:3
recorded 5:3
records 133:23
    133:23,24
recurring 118:13
red 86:3
Redirect 2:4
reduce 32:17
    63:11,16 75:17
    76:13 79:20
    82:2 83:11,19
    88:16 101:2
    116:6
reduced 60:15
    91:8 136:7
reduction 100:11
    114:23 133:10
    133:14,16,19
    133:25
reexplain 24:21
    24:21,21
refer 109:7
    110:20 130:10
referenced
    75:14,21
referrals 69:16
    97:20
referred 69:14
    93:6 110:3
    116:17
referring 52:20
    79:11 116:19
reflect 26:17
reflected
    106:23
refresh 11:5
refuse 75:4,8,10
    75:16 77:19
refused 75:13
    76:14 77:12
refusing 77:10
regarding

103:18 127:15
    127:16 130:14
regardless
    28:10 53:21
region 8:22
    107:7
registering
    25:21
regular 129:5
regularly 50:5,7
    90:18
regulations
    129:14,18
reimbursed
    130:6,7
rejected 47:10
    47:13,14
rejects 111:2
related 35:13
    49:13 105:21
    106:1 109:16
    136:8
relating 109:19
relationship
    24:9 38:15
    39:4 118:1,14
    127:11
relationships
    118:4
relative 136:10
relay 20:18
    61:18
relief 55:1
    76:20 78:5,14
    78:16,21,24
rely 18:6 22:17
    52:24,25
    110:21,22
remain 127:23
    128:22
remark 25:25
remember
    75:22 76:15
    77:15 82:24
    102:13 114:14
    122:16,18
rephrase 7:15

45:12
report 13:14,16
    115:7,13 120:3
    122:3 125:1,2
reporter 4:19
    5:24 6:25
    7:10 10:11,19
    27:1 34:8
    69:20 76:3
    82:5 87:6
    136:1,16
reporter's 5:11
reports 11:20
    55:4 114:12
    122:8
represent 59:4
    74:14,15 75:2
    87:1 93:9
    104:2 129:13
representation
    14:4,16 15:22
    25:1 37:4
    42:22 58:21
    58:25 62:13
    62:16 69:10
    77:12 80:5,10
    84:25 85:16
    103:19 106:17
    107:1 109:3,4
    110:7 111:13,18
    113:5 124:24
representatio...
    119:4
represented
    95:22
representing
    38:9 50:19
    79:25 97:14
    109:23 129:17
request 43:15
    43:17 45:21
    45:22 46:4,6
    47:4,10,12
    49:8 51:2
    53:19,20 54:1
    54:6,11,23
    55:5,8 70:4,18

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-4   Filed 02/21/18   Page 53 of 60

78:15 83:4,10
100:10,11 101:1
114:11,23 121:11
123:21 127:9
127:13 133:10
133:14,20
requested 46:1
52:7 53:13
114:17 115:22
requesting
53:24 114:10
114:14
requests 11:20
require 79:23
required 35:22
42:2 83:23
requirement
118:3,18
reserved 6:6
reset 59:24
resigned 12:18
96:15,16 98:11
102:12
resolved 56:17
56:22 77:22
resources 42:1
61:22 124:23
124:24
respond 77:25
responding
38:16
response 38:5
81:14 82:12,20
82:21,22 83:2
83:3 84:16
85:6 96:24
132:22
responses 7:3
7:6 126:10,13
responsibilities
11:11 17:5
responsible
11:19,22 65:6
100:19,22
rest 25:22
rested 57:18
result 78:5

resulted 76:20
79:6 96:10
results 115:6
resume 68:25
retaining 45:13
retaliation
98:23
retired 108:23
review 8:3,5,7
8:13 10:25 12:1
15:4 27:3 34:9
35:15,19
37:24 43:19
44:18,22
74:10 116:21
reviewed 8:6
34:19 36:11,18
44:5 110:6
116:25
reviewing 27:21
27:22
reviews 35:9,12
36:6 38:1
54:6 116:24
117:6
ridiculous 79:21
right 9:15,22
12:13,17 13:3,11
15:6,7,15 24:1
24:9,11 30:20
30:22 35:2
36:24 39:7,12
40:7,24 41:23
42:4 47:15
48:24 60:25
62:18 66:3,23
72:11 77:7
81:16 83:3
94:25 95:8
96:1 102:15
104:7 105:7,8
111:25 115:5
123:12 128:6
130:13 131:14
rightfully 87:23
rise 28:3 29:10
risk 134:4

road 39:7,7,12
60:5 78:23
Robinson 76:8
Rod 1:16 2:2
3:12 5:3 6:3,8
6:14 103:3
126:25 135:2
role 46:13 77:6
114:9
room 22:12
40:23 41:1
61:9,10
rooms 21:22
22:9,15,19,21
23:1 40:13
41:13,14
rotate 16:15
rotation 28:2
29:10,16,18,19
29:22 30:3
rough 131:23
roughly 17:1,8
49:20 68:3
72:9,23 86:8
86:19 91:2
92:2,4 96:4
131:4,17
Round 31:17
routine 30:13
routinely 26:23
RubinBrown
71:16,19 72:5
125:1,2,10
rule 7:17 54:4,19
54:20 75:15
75:18,20,20
75:22 77:23
78:1 80:6,11,17
118:18,21
130:19
rules 6:24 79:15
79:16,23,24
80:19,21 81:23
90:11 109:11
118:15 127:7
ruling 78:1
run 14:1 121:21

running 121:19
runs 65:10
rural 100:6
rush 20:1
rushed 20:3

S

S 2:8 4:1
sad 55:5
sat 98:22
save 116:6 124:4
124:9
saved 113:13
saw 28:5 30:11
saying 19:7
74:9 78:13
98:18 122:16
130:18
says 6:10 27:21
30:23 35:8
36:5 37:2,10
40:1 52:2
53:11,12 54:5
70:22,25
72:19 84:1
90:9
schedule 18:6
28:23,25
49:17 52:4
scheduled 20:2
48:10 98:20
scheduling
50:20
school 9:22,25
104:8,12,14
133:23
Scutti 4:24 5:12
se 62:4,7
second 32:9
51:23 52:20
109:4 111:16
117:21
section 27:4,5
125:17 130:15
see 14:22 20:12
22:10 26:10
31:12 32:4

34:2 35:23
36:8,12 37:21
38:7 40:17,23
41:11,15 45:20
45:22 57:22
70:22 71:6
72:7 74:5,6,10
90:1 98:22
106:8 109:10
114:18,23 115:2
117:6
seeing 20:5
36:2,3 38:15
38:21
seek 49:24,25
50:5 63:8
seen 24:4 28:21
32:14 34:1,18
38:2 39:20
40:15 60:1
70:13,16 73:21
87:8 95:19
107:6 133:19
segregation
114:21
send 32:2
65:25 82:12
94:2 97:20,21
106:21 114:2
119:15,19
sending 31:10
119:4
sends 113:25
114:3,4
sense 105:6,12
106:22 107:11
111:1 113:16,19
122:17 123:14
132:12
sent 26:6 28:9
30:25 31:4
32:5 47:5
67:3 70:18
76:7,16 81:25
82:9,14,15,17
82:17 83:10
83:23 84:19

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-4   Filed 02/21/18   Page 54 of 60

90:5,16 91:22
102:12 130:11
sentence 7:5
26:10 36:5
37:2,10 44:10
52:20 54:5
117:21
sentenced
106:19
separate 44:18
73:10 85:18
111:15
September
72:15
serious 68:16
service 47:4
services 3:16
4:20,24 5:9
5:13 15:18
92:9 97:15
110:14 111:2
session 41:13
83:15
set 50:10,14
54:14 55:10,11
74:5 123:22
129:18
set-up 119:2
seven 26:15
36:14
severity 44:7
sex 17:19 25:14
25:17,21
44:25 45:22
Shahabian 4:3
5:16,16 6:11,17
10:15 64:20
65:2 69:24
70:2 99:20
103:21 130:24
131:1 134:14,25
shaking 7:3
Sharon 128:5
Shaw 10:5
she'll 7:1
sheets 11:20
114:18

sheriff 22:14
40:11
Shipma 4:13
5:22,22 7:25
10:13,17 69:22
70:1 126:24
127:1 130:23
132:23
shipped 30:21
Shondel 1:4 3:4
3:19 5:4
short 28:7 65:11
short-staffed
124:22
shorter 32:24
shorthand 6:4
shot 72:1 107:19
show 130:10
showing 10:11
shown 21:11
shows 79:16
shuffle 117:11
side 41:3,17
sign 11:21
signature 6:5
significant 51:4
60:12 129:23
129:24 131:17
significantly
107:25
similar 38:2,3
49:7 53:16
66:9 69:2
109:3 115:7,24
124:11
simply 37:3
83:20 87:25
110:20 112:16
sir 9:13 11:9
105:9 119:8
sit 36:22,25
40:21 41:2
80:8 94:12
sitting 40:25
80:8 92:15
105:6 111:1
124:20

situation 19:16
46:24 88:2
96:20,25
97:10 123:17
situations 14:7
40:9 42:24
111:11
six 27:23 108:14
skills 33:13
slightly 105:21
small 10:22
22:12 71:6
94:14 109:14
Sociology
104:19
solely 120:24
121:4 124:25
125:2 130:14
solidly 23:24
somebody
35:20 40:22
41:15 47:19
55:2 68:17
69:7 112:24
119:13
soon 92:6,7
sooner 28:12
sorry 10:5,20
19:2 72:24
82:5 86:17
101:19 107:10
129:15
sort 11:21 17:17
23:14 34:3
84:3,5 97:25
100:11 108:25
109:20 124:11
132:6 133:24
133:24
sorts 118:19
Sounds 65:14
south 78:7,8,9
sparingly 111:5
111:21,22
speak 49:3,11,21
57:22 113:21
speaking 22:6

121:15
specialist 64:17
67:12,15,16
69:3
specialists
63:20
specialized
67:22
specializes
66:22
specialty 47:18
specific 8:21,23
16:11 21:18
42:19 59:3
61:4 63:6
96:25 102:18
120:21 133:5
specifically 16:5
16:6 52:7
53:13,25
87:21 103:2
119:13
specifics 24:24
42:20 61:19
spend 11:15
60:7,12 131:19
spending 32:17
131:16
spent 17:2 45:1
103:6 131:24
133:20
split 16:9,18
spoken 104:24
105:2
spreadsheet
70:9,16 72:19
Springfield 3:16
5:9 9:5,7,9,23
27:15 34:22
71:7 72:20
107:21
ss 136:2
staff 12:6,7,8,10
12:12,16 13:1
42:10 48:25
97:21 107:19
108:3,4,5,9,9

108:19 110:18
110:23 111:9
119:15 124:12
124:13 131:4,7
131:16,24 132:1
132:3
stage 21:4
Stamped 106:5
stand 11:2
standard 71:16
71:17,19 76:11
79:8
standardized
117:15
standards
129:18 131:11
start 17:24 38:17
38:20 47:3
70:25 72:14
75:7 77:10
82:2,11 87:20
90:17 112:6,6
128:6
started 9:21
29:24 30:1
31:7 39:3
62:21 72:15
81:24 91:7
96:21 112:8,12
starting 9:24
15:3 27:20
35:10 74:20
117:21
state 1:7 3:7,20
4:8,13 5:4,21
7:11 9:2,21
12:23 13:20
13:23 20:12
21:9,10 38:19
43:16 46:23
53:17 57:18
63:3,8,14 77:4
79:17 104:2,8
108:1 112:10
113:15 116:1
120:2 126:13
127:8 130:8

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-4   Filed 02/21/18   Page 55 of 60

133:9 136:2
State's 57:24
stated 41:9
    61:17 81:2
    84:21 101:18
statement 26:17
    35:14 37:5
statements 12:2
    59:10,10
    124:21
states 1:1 3:1,18
    14:4 55:15
    89:12 125:13
statewide 64:16
    81:16
stationed 98:9
    99:12
statistically
    56:23 57:1
status 111:17
Statute 78:15
stay 50:23 67:6
    97:12 98:4,6
    101:5 119:25
stayed 32:20
    32:23 91:8
staying 27:24
steady 91:8
stealing 45:2
stems 23:11
    25:7
step 20:14 21:13
    80:22
steps 60:21
    97:8 113:17
Steven 4:8
    5:20 104:1
Steven.Rams...
    4:11
sticking 100:2
STIPULATED
    6:1
Stone 94:5
stool 41:2
stop 125:1
stopped 29:20
    90:21

straight 104:8,11
Street 3:16 4:4
    4:9 5:9
stress 64:9
stretch 37:17
strictly 52:25
    83:25 125:10
strides 33:18
strike 20:8
    42:16,18,20
    58:18 74:14
stuff 128:12
submit 52:6
    53:13
subsequently
    111:13
succeed 20:5
success 23:19
suffers 24:9
sufficient 44:22
    45:18 48:8
    57:4 60:18
    61:25
suggest 109:22
    120:9
suggested 38:5
suggestions
    52:6,13 53:13
    53:17,21 54:2
    116:14
Suite 4:15
supervise 9:5
    113:17 119:11
    121:3,12 126:18
supervising
    11:14 80:18
supervision
    25:20 80:20
    84:22 112:21
    113:20
supervisor 13:17
    23:10 81:5
    112:18
supplemented
    109:10
support 12:7,8
    42:10 52:6

53:13 97:21
108:9,9,16,18
110:18,23 111:9
124:12,13
131:16,24 132:1
132:3,4
supposed
    59:16 92:21
suppress 51:4
    52:24 53:8,16
suppression
    51:7,8
Supreme 54:20
    76:22
sure 11:16 18:20
    19:3 26:2 27:3
    32:20,23
    34:10 36:1
    45:8 49:12
    51:20 62:21
    65:12 73:19
    74:8 80:14
    81:20 83:12
    88:24 89:13
    95:23 96:17
    96:18,18 101:17
    105:15 108:16
    114:4,6 115:10
    129:10
surplus 65:23
Surprisingly
    84:15
suspect 129:19
suspend 81:2
suspense
    92:24
SUTCLIFFE 4:4
swear 5:25
sworn 3:13 6:9
system 9:2,22
    23:14 78:10
    83:16 93:21
    94:16,22 99:7
    104:9 105:19
    105:19,22
    106:23 108:25
    113:4 116:12

119:2 120:3
121:3 123:15
127:24 128:4
128:9,24

---

**T**

T 2:8
take 10:21,25
    17:16,18 18:1,3
    18:4 21:17,20
    21:21,23 24:11
    24:13,16
    25:25 27:2
    34:9 39:22
    47:25 48:8
    49:19 55:25
    56:1 60:8,22
    61:9,9 62:25
    63:4,5 64:21
    75:13 77:10
    80:22 81:14
    83:6 85:12,16
    85:23 91:11
    94:10 97:16,19
    97:21,25
    99:21 101:6
    104:5 105:1
    121:9 124:14
taken 1:17 6:4
    48:22,23
    64:24 97:8
    99:24 100:12
    110:15 136:6,9
takes 21:4 24:19
    49:14,15 71:24
talk 8:16 25:9
    28:18 32:12,16
    32:22 47:16
    56:25 58:6,16
    59:8,12 74:2,4
    76:19 85:9
    119:5 133:6,9
talked 28:17
    32:10,15 41:22
    57:20 59:7
    63:14 79:5,5
    80:10 95:16

talking 7:10
    11:15 32:17,20
    43:21 45:1
    53:20 56:23
    60:24 101:15
    112:25 123:1,2
    123:4
tampering 45:2
Taney 9:10 16:5
    16:20 22:8,8
    23:2 31:10,14
    66:5,15 85:19
    86:16,17 91:15
    100:6 107:25
    110:16 113:25
    114:5
tangent 32:21
task 111:25
    124:14 128:13
    129:7 131:17,19
    131:20,25
tasks 17:2 65:6
    112:17 123:8
    132:6
tell 8:19 17:9
    26:5 40:22
    46:2,3 48:11
    59:23 64:11
    71:21 75:25
    111:3
telling 43:13
    59:22
tells 117:24
ten 10:8 11:3,7
    99:6 122:24
tension 96:23
tenure 75:13
tenured 35:11
term 14:19 69:6
terms 14:14
    73:12 79:23
    123:23
testified 108:11
    113:3,23 116:10
    121:15 125:16
testify 19:14
    24:17 58:1,2,7

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-4   Filed 02/21/18   Page 56 of 60

58:13
testifying 58:7
testimony
    45:25 109:6
    109:22 117:13
    118:17 120:8,16
    121:4 125:15
    136:5
thank 6:19 9:18
    10:16 65:4
    134:25
thankfully 78:11
Thanks 100:2
theoretical 63:7
theoretically
    78:22
thereto 136:11
thing 11:21 19:18
    20:11,16 27:4
    34:3 43:5
    73:25 79:3
    97:25 100:11
    106:24 108:25
    109:20 126:12
    126:12 132:6
    133:24,24
things 11:17 16:2
    19:6 24:15
    25:16 41:10
    51:17 52:23
    52:23 55:21
    55:25 59:16
    63:13 65:10
    78:7 89:1 94:9
    108:24 109:8
    116:12 124:11
    128:9 133:8
think 8:15 13:11
    14:12 20:5,24
    24:25 31:9
    35:2 38:14
    39:16,20,21
    40:8 41:23
    42:11,18,21
    43:6,7 44:5,8
    44:9,21,25
    45:12,24

46:18 47:9
48:7,21 51:11
51:14 53:7,9
53:18 56:9,13
56:19,21,23
57:15,17 60:17
61:20,23 62:1
62:22 64:14
64:20 68:6
74:8 75:14
81:17 84:6
86:10,11 87:23
96:25 99:6
102:15 103:17
103:20 108:1
108:11 109:7,18
109:22 112:20
118:7,17,21
121:23 122:14
124:6 128:5
128:20 129:20
129:22 133:15
thinking 45:19
    102:14
thinks 39:15
third 12:19 99:15
    106:5
Thomas 82:14
thought 39:22
    81:20 82:16
    83:9 88:18
    96:25 103:6
    125:21
three 9:12 12:14
    12:17 13:11
    15:16 16:3
    55:17 76:11
    82:18 94:3
    99:14,19
    100:15 108:16
    108:17 128:18
time 5:2 6:19
    7:16 9:23
    10:21 11:15,20
    12:12 15:6 17:1
    17:11 18:7,22
    20:22 21:3,4

21:5,19 23:4
24:5,7,20,25
26:8 27:16,25
29:22 31:25
32:17 34:2
35:24 36:1
39:16 41:19
42:1,5,7,12,19
42:21,22 43:7
43:19,22 44:7
44:11,15,22
45:1,13,18
48:8,11,16
49:14,15,16,18
50:4 51:11,14
51:16 52:3,6,8
52:15,18 53:12
53:23 55:14
55:16 56:13
57:4,12,17
58:6,6,10,20
59:1,2,6,8,12
60:7,13,14,18
60:20 61:22
61:25 62:20
63:1,4,7,8,15
63:24 64:20
64:23 65:1
67:5,9 68:12
71:24 72:11
73:7,16,19,22
74:4,5 75:23
76:8 89:6
94:8,15 96:7
96:11 97:9,17
99:20,23
100:1 103:6,14
103:22 104:3
104:4 107:18
107:22 114:2,2
116:6 117:4
118:9,23 122:9
123:5,6,8,15
123:16 124:4,9
127:13 131:17
131:18,24
133:15,20

timekeeping
    123:11
timely 127:10
times 14:20 18:8
    18:11,19 19:17
    23:22 37:7
    38:20 39:6
    39:20 46:6
    56:19 59:17
    61:20 73:5
    103:11 110:16
    127:3,19
timesaving
    115:17,20 124:1
title 8:19,20,21
    8:23 108:22
today 6:20 7:24
    8:1 105:6 111:1
    124:20
Today's 5:2
told 22:4 37:10
    43:1 65:9 81:3
    98:6,8,16
    99:12
Tom 101:1
tools 115:6
top 13:10 30:19
    70:22 86:13
    91:25 114:13
topics 64:7
total 99:17
    105:7,13,18,18
track 18:7 28:15
    42:25 57:21
tracking 123:5,8
    123:16
tracks 64:14
training 64:13
    64:16 67:22
trainings 124:17
    124:19
transcribed 6:5
transcribing 7:1
transferred
    99:7
translator 49:5
    49:6,14,16,17

translators
    48:25
travel 121:23,25
treading 73:17
treat 68:14
treating 89:25
tremendously
    90:24
triage 103:12
trial 8:24 9:3,5
    13:18 24:13,16
    26:9,15 27:15
    39:22 43:23
    48:12,14 50:9
    50:10,12,19
    55:2 56:2,6,8
    56:16,22 57:1
    57:4,14,19,25
    58:9,20,25
    59:4,15,23
    60:3 80:8,9
    88:7 98:20,21
    100:10 103:8
    106:20,20
    122:12 134:18
trials 56:4,11,12
    57:2 122:17
    123:1,2,3,4
tried 18:9 75:8
    78:10 88:8
    122:17,19,22
tries 29:1
trigger 76:12
triggered 76:12
    97:3
trip 31:13,17
triple 132:18,21
true 81:20,21
truly 42:9 84:12
trust 38:16,21
    39:3,3,8,11,13
    39:23
trusting 39:17
try 7:15 17:17,18
    18:20 19:25
    23:13,14,18
    40:17 60:12

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-4   Filed 02/21/18   Page 57 of 60

61:16 75:16
76:13 77:10
85:12 88:16,17
92:6 97:8,17
101:2 107:4
110:24 124:4
124:15
trying 25:7
55:24,25 57:8
58:14,24 63:11
83:19 87:12
124:11
tune 59:18
turn 51:20 65:5
70:6 83:14
106:2 117:9
turned 54:25
83:14
turning 39:25
88:10 108:2
109:21 110:12
116:21 117:9
118:25 120:16
123:20
turnover 13:8
twelve 99:6
twice 49:19
two 12:18 13:10
22:6,14 40:13
41:13,14 42:3
46:5 48:12,14
66:8,8 80:13
86:12 88:7,7
88:14,17 96:14
99:14 108:11
109:1 113:16
129:9 132:10
134:15
type 43:20
44:24 46:24
123:17 124:17
129:4
types 38:4
71:23
typewriting 6:5
136:7
typical 15:9,12

30:6 132:25
typically 17:12
17:21 21:7,15
41:20

——— U ———
U.S 5:5
ultimate 32:25
96:12 110:6
111:10
ultimately 77:23
78:5 102:11
unable 134:10
unclear 7:21
uncommon
50:10
undergrad
104:12,13,17
underlying
120:13
understaffed
40:18
understand 7:7
7:14 88:15
104:23 105:15
107:14 109:5
115:10 120:8
127:2
understanding
25:9,13 26:17
35:15 71:3,13
71:18 73:11
79:22 80:21
80:23,24
109:2 117:13
120:13
understood
25:11,12 37:11
85:9 109:22
121:16 124:21
125:15
uneducated
24:18
Unfortunately
110:22
unique 52:9
UNITED 1:1 3:1

3:18
unusual 55:17
up-to-date
80:14
upper 119:20,21
126:5
upset 101:10,18
101:23
use 27:11 46:18
46:18,19,25
47:17,21,23
65:23 72:5,6
72:7 113:14
useful 45:25
46:9 48:23
usher 123:24
usually 17:10,24
18:12 28:18
32:11 47:14
50:2,22 52:4
58:13,15 68:15
69:4 73:25
127:20
utilize 120:20
124:11
utilized 120:18
120:18
utilizing 57:21

——— V ———
vague 25:4
vaguely 76:5
variation 17:18
52:25
varied 126:13
various 11:12
70:11,20 71:22
71:23 112:23
113:2,19 119:4
120:14 126:10
vent 77:11
verbal 7:3
verbatim 101:18
verification
110:20
verify 110:24
122:7

versions 70:20
versus 5:4 68:4
105:19 112:1
131:19
video 5:3 7:5
videographer
4:23 5:1,12,24
64:22,25
99:22,25
135:1
videotaped 1:16
3:12 135:2
violating 130:18
violation 17:16
43:21 80:3
violations 16:14
29:13,20 44:1
visit 22:16,19,20
28:9,11,15,23
30:24 36:23
40:14 49:18,19
visiting 23:19
23:20
visits 22:11 24:2
28:7,20 32:13
36:19 57:9
94:14 97:24
voir 58:4
vs 1:6 3:6

——— W ———
wait 7:8 40:18
86:13 92:18
97:13 128:13
waited 71:17,21
waiting 40:22
85:15,17,18,22
92:11,11,23
95:7 97:19
waitlist 15:23
16:3 62:19,21
83:12,13 85:21
86:1,5,8,14
88:1 91:1,3,7,13
92:8 95:10,13
95:15 96:2,21
126:2,9 128:21

waitlisting 15:17
82:2,11
waitlists 128:14
waive 20:20
63:14
waived 21:10
57:13,15
95:20 96:1
walk-through
17:21
want 19:15 27:3
28:19 32:12
46:19,25
48:17 54:1
90:5 97:6
101:4 125:22
130:10 133:6
133:12
wanted 6:18
35:25 39:23
65:5 78:14
85:20 92:21
97:20,22
114:18,22 121:9
128:2,16
wanting 32:22
98:25
wants 80:7
warm 80:4
warrant 115:1
wasn't 22:12,25
45:25 54:17
88:8 89:5
99:1,16 117:8
125:9 130:20
water 73:17
75:23
Waters 76:23
77:5,6,13,14,21
77:23 78:1,1,13
79:4
way 23:24 39:9
41:3 49:7
51:19 55:10
67:3,6 68:10
69:4 85:25
128:1

ALARIS LITIGATION SERVICES
www.alaris.us    Phone: 1.800.280.3376    Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-4   Filed 02/21/18   Page 58 of 60

ways 33:16 39:2 83:11
we'll 10:12 15:2 74:4,5 92:6
we're 37:20 91:9
we've 14:24 42:24 73:5 106:20 119:22
Webster 94:5
weeding 129:22
week 7:25 18:17 18:19 50:13 57:7 98:20 107:4 111:8 114:5 115:8,13 127:18,19,21 128:23 132:24 132:24
weeks 81:17 128:3 129:1
weighted 71:25
weights 71:23
welcome 10:17 65:2
went 15:18 31:20 37:25 40:15 55:2 63:10,12 77:8 77:13 78:7,9 79:4,4 81:18 98:22 102:10 110:9 120:13 122:5,6,7,7 131:7,9
weren't 42:25 81:10 83:12,12 126:10
West 4:4,9,15
Western 1:1 3:1 3:18 5:6
whack 54:3
whatsoever 46:14
willing 85:12
wish 52:8

wishes 52:2
withdraw 87:17 88:13,17,23 111:18
witness 2:2 5:25 6:6 43:8 43:11 46:21 48:16,18 136:5
witnesses 20:12,15 42:25 43:12 43:13 48:19 57:22,24 59:11
won 78:4 106:20
wondering 101:7
Woodrail 4:14
word 111:25 115:6 122:1 125:17
work 7:6 13:19 23:14 61:22 64:18 66:5,16 72:2 75:18,20 95:21 97:6,23 107:16 112:16 119:20
worked 23:18 46:7 66:20 81:12 85:25 98:3 104:16 123:12
working 37:3 52:15 60:7 72:13 99:3
workload 15:4 71:10,14 104:22,25 109:16 115:8 116:15 124:18 125:11
works 85:17 119:5
worksheet 70:10 71:15

world 132:7,20
worried 81:9,9
worse 28:5 30:10
worth 89:5
wouldn't 50:3 67:14 94:9 122:2
wrecked 98:15
writ 87:12,21 88:3
write 40:6 118:6 119:13,13 130:15
writing 7:2 24:19 39:24 52:14 53:22
writs 52:14
written 27:11 31:20 40:11 52:2 53:17 109:14 117:18
wrong 39:7,9
wrote 32:10 34:20 130:19 130:21

———————

**X**

X 2:1,8

———————

**Y**

yeah 19:25 22:8 24:4 25:3 30:2 32:8 34:5 40:10,14,15 41:15 50:23 51:5 52:22 56:10 69:22 70:1,18 73:7 89:24 92:12 92:22,25 93:6 101:12,14 101:22 131:9 132:20
year 8:12 13:12 17:8,10 27:19

50:11 56:5 67:8 69:7 70:23 71:4 72:21,25 80:9 93:20 104:15 105:17 120:3 122:18,19,22 123:19 128:6 128:21
years 8:10 9:16 12:11 13:8 14:25 35:3 99:6 104:25 107:9 116:20 117:1
yesterday 69:22 86:10
York 4:5
young 77:15

———————

**Z**

zealously 103:7
zero 30:1 79:3

———————

**0**

063 83:21,22 84:1 130:16,20 130:21

———————

**1**

1 9:15 10:12 25:24 50:12 64:23 70:25 93:20,21 94:17 133:1
1:00 3:14 23:21
10 2:9 41:24 42:8,12 48:5 51:1,5 84:19 130:12
10:00 55:19
10:33 64:23
10:43 65:1
100 4:15 66:18 72:10,17 105:18 126:21 134:18

1000 4:15
10019 4:5
102 28:7 30:12 30:14,16
104 2:3
11:00 23:21
11:43 99:23
11:55 100:1
12:52 135:2,4
120 2:10 68:5
127 2:3
13 36:7
131 2:4
14 76:1
15 9:16 35:3 76:1
150 15:13 80:1
15898 106:6
16 35:3
17 72:21
17-04057-CV-... 1:6 3:6 5:5
19 13:2 108:5
1997 10:1

———————

**2**

2 27:19 65:1 99:23
2,300 105:10
20 1:18 3:13 5:2 54:12
200 15:13 80:1
2012 63:11,18 75:15
2016 70:25
2017 1:18 3:13 5:2 70:23 71:1 71:4 72:25 84:19
22 12:7 13:1 108:3
220 86:12,18
221 4:9
2422 3:16 5:9
25 17:10 112:2
250 86:12,18
2511 4:21

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-4   Filed 02/21/18   Page 59 of 60

**27** 2:9
**277.5** 72:20

---
**3**

**3** 13:10 36:6,6
  100:1
**30** 17:10 26:16
  28:9 30:24
  36:14 37:11,17
  37:22 38:10
  50:13 68:6
  71:1 117:16,17
  118:23
**30-day** 118:2,16
**300** 73:6
**31** 9:5,8,12 12:5
  41:8 71:7 81:7
  85:3
**31st** 76:9 82:15
**34** 2:10 28:16
**38th** 76:9 83:1

---
**4**

**4** 13:10
**4:00** 23:22
**40** 50:13
**400** 73:6
**45** 15:1 28:20
  32:13 40:21
**46** 10:13
**47** 2:9 10:16,18
**48** 2:9 27:1
  106:3
**49** 2:10 34:8
  51:21 117:10

---
**5**

**5** 36:6 87:4,11
  87:20
**50** 2:10 69:20
  120:2
**500** 73:7,12
**500.00** 47:6,7
**51** 2:11 4:4 76:3
**52** 2:11 76:3
  82:5
**52nd** 4:4

**53** 2:12 82:5
  90:6 130:11
**54** 87:6,16
  88:10
**573-449-0561**
  4:22
**573-526-5212**
  4:16
**573-751-9167**
  4:10

---
**6**

**6** 2:2 36:7,7
**6:00** 23:24
**60** 15:1 38:11,22
**60-day** 38:6
**600** 125:23
**600.063** 78:15
  83:17 125:17
  130:15
**65084** 3:17
**65101** 4:10
**65201** 4:21
**65203** 4:16
**65804** 5:10

---
**7**

**7** 4:15
**7:00** 52:19
**75** 17:3 112:2
**76** 2:11,11

---
**8**

**8** 36:7
**8:00** 23:21,24
**8:57** 5:2
**80** 17:3
**82** 2:12

---
**9**

**9:00** 3:14 55:18
**90** 133:3
**94** 31:18
**95** 43:22
**99** 43:22

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-4   Filed 02/21/18   Page 60 of 60