# Exhibit E

## Page 1

```
 1      IN THE UNITED STATES DISTRICT COURT FOR THE
            WESTERN DISTRICT OF MISSOURI
 2                 CENTRAL DIVISION
 3
 4   SHONDEL CHURCH, et al,        )
                                   )
 5          Plaintiffs,     )
                                   )
 6          vs.             ) Case No. 17-04057-CV-C-NKL
                                   )
 7   STATE OF MISSOURI, et al,     )
                                   )
 8          Defendants.     )
                                   )
 9                                 )
                                   )
10                                 )
11
12
13
14
15
16     VIDEOTAPED DEPOSITION OF MATTHEW CROWELL
17        TAKEN ON BEHALF OF THE PLAINTIFFS
18              DECEMBER 20, 2017
19
20
21
22
23
24
25
```

## Page 3

```
 1      UNITED STATES DISTRICT COURT FOR THE
            WESTERN DISTRICT OF MISSOURI
 2                 CENTRAL DIVISION
 3
 4   SHONDEL CHURCH, et al,        )
                                   )
 5          Plaintiffs,     )
                                   )
 6          vs.             ) Case No. 17-04057-CV-C-NKL
                                   )
 7   STATE OF MISSOURI, et al,     )
                                   )
 8          Defendants.     )
                                   )
 9                                 )
                                   )
10                                 )
11
12       VIDEOTAPED DEPOSITION OF MATTHEW CROWELL,
13   produced, sworn, and examined on December 20, 2017, between
14   the hours of 1:30 o'clock in the afternoon and 6:00 o'clock
15   in the afternoon of that day, at Alaris Litigation
16   Services, 2422 East Madrid Street, Springfield, Missouri
17   65084, before Jenna Petree, in a certain cause now pending
18   UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF
19   MISSOURI CENTRAL DIVISION, wherein SHONDEL CHURCH, et al
20   are the Plaintiffs, and STATE OF MISSOURI, et al are the
21   Defendants.
22
23
24
25
```

## Page 2

```
 1              I N D E X
 2   WITNESS: Matthew Crowell
     Direct Examination                  6
 3   Cross Examination                 123
     Cross Examination                 152
 4   Redirect Examination              153
 5
 6           E X H I B I T S
 7   Exhibit 54 ........................103
     Exhibit 55 .........................85
 8   Exhibit 56 .........................85
     Exhibit 57 ........................157
 9   Exhibit 58 ........................110
     Exhibit 59 ........................110
10   Exhibit 60 ........................155
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1           A P P E A R A N C E S
 2   For the Plaintiffs:
 3   Matthew R. Shahabian
     Anjali Prasad
 4   ORRICK, HERRINGTON & SUTCLIFFE, LLP
     51 West 52nd Street
 5   New York, NY 10019
     mshahabian@orrick.com
 6   aprasad@orrick.com
 7   For the Defendants:
 8   Steven Alan Ramsey
     STATE OF MISSOURI
 9   Attorney General's Office
     221 West High Street
10   Jefferson City, MO 65101
     573-751-9167
11   Steven.Ramsey@ago.mo.gov
12   For the Public Defenders:
13   Jacqueline Shipma
     MISSOURI STATE PUBLIC DEFENDER
14   General Counsel
     Woodrail Centre
15   1000 West Nifong
     Building 7, Suite 100
16   Columbia, MO 65203
     573-526-5212
17   Jacqueline.Shipma@mspd.mo.gov
18
19   The Court Reporter:
20   Jenna Petree
     Alaris Litigation Services
21   2511 Broadway Bluffs
     Columbia, MO 65201
22   573-449-0561
23   The Videographer:
24   Bethany Scutti - Alaris Litigation Services
25
```

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 5

1　　　　THE VIDEOGRAPHER: We are on the record.
2　Today's date is December 20, 2017 and the time is 1:36 p.m.
3　This is the video recorded deposition of Matthew Crowell in
4　the matter of Shondel Church, et al versus State of
5　Missouri, et al, Case No. 17-04057-CV-C-NKL in the U.S.
6　District Court for the Western District of Missouri,
7　Central Division.
8　　　　This deposition is being held at Alaris
9　Litigation Services, 2422 East Madrid street, Springfield,
10　Missouri 65804. The reporter's name, Jenna Petree. My
11　name is Bethany Scutti. I'm the legal videographer. We
12　are with Alaris Litigation Services.
13　　　　Would the attorney present please introduce
14　themselves.
15　　　　MR. SHAHABIAN: Matt Shahabian for the
16　plaintiffs.
17　　　　MS. PRASAD: Anjali Prasad for the plaintiffs.
18　　　　MR. RAMSEY: Steven Alan Ramsey for the State
19　of Missouri and Governor Greitens.
20　　　　MS. SHIPMA: Jacqueline Shipma for the MSDP
21　defendants.
22　　　　THE VIDEOGRAPHER: Will the court reporter
23　please swear in the witness.
24　　　　IT IS HEREBY STIPULATED AND AGREED, by and
25　between counsel for the Plaintiffs and counsel for the

## Page 6

1　Defendants, that the deposition of MATTHEW CROWELL may be
2　taken in shorthand by Jenna Petree, and afterwards
3　transcribed into typewriting; and the signature of the
4　witness is expressly reserved.
5　　　　* * * * *
6　　　　MATTHEW CROWELL,
7　of lawful age, produced, sworn, and examined on behalf of
8　the Plaintiffs, deposes and says:
9　　　　THE VIDEOGRAPHER: You may proceed.
10　QUESTIONS BY MR. SHAHABIAN:
11　　　　Q　Good afternoon, Mr. Crowell.
12　　　　A　Good afternoon.
13　　　　Q　Thanks for taking the time to be here. My
14　name is Matt Shahabian. I'm an attorney for the
15　plaintiffs. Before we get started, have you ever been
16　deposed before?
17　　　　A　No.
18　　　　Q　Okay. So I will start by laying out the
19　ground rules basically how the deposition will work so we
20　are all on the same page. So there is a court reporter
21　here who is transcribing the deposition, as well as a video
22　court reporter. Because we have a transcript, I would ask
23　that you answer questions with verbal responses; yes, no,
24　or whatever you want to elaborate. A head nod or shake of
25　your head isn't going to get picked up by the transcript.

## Page 7

1　Wait for me to finish the question before you begin your
2　answer. It's more difficult for the court reporter to
3　transcribe if we are talking over each other. Your counsel
4　or counsel for the State defendants may have objections to
5　some of my questions. Unless your counsel instructs you
6　not to answer my question, you should answer even if there
7　is an objection lodged. If you don't understand one of my
8　questions, just tell me and I will rephrase the question
9　and hopefully make it clear. We can take breaks whenever
10　you like. So if you need a break, restroom, or just to
11　catch your breath; just let me know. The only rule is you
12　can't take a break when there is a question pending. I
13　just ask that you finish the answer to the question that's
14　pending and then we can take a break. Sound good?
15　　　　A　Sounds great.
16　　　　Q　So what did you do prepare for this deposition
17　today?
18　　　　A　I met with Jackie Shipma, my general counsel,
19　and we discussed kind of what to expect.
20　　　　Q　Did you review any documents?
21　　　　A　I don't believe we did. I don't recall
22　reviewing any documents.
23　　　　Q　Did you review any other data or materials in
24　preparation for this deposition?
25　　　　A　No.

## Page 8

1　　　　Q　Did you talk to anybody besides Ms. Shipma in
2　preparation for this deposition?
3　　　　A　I told other people I would be here, but I
4　didn't talk to anybody else about preparing for today's
5　deposition.
6　　　　Q　And how many times did you meet with
7　Ms. Shipma in preparation?
8　　　　A　Just once.
9　　　　Q　What do you do for a living?
10　　　　A　I'm the district defender for the Area 25
11　office of the public defender. In that capacity, I
12　function as the supervising attorney and I also represent
13　clients charged with criminal offenses.
14　　　　Q　What is Area 25?
15　　　　A　Area 25 is a branch of Missouri State Public
16　Defender Office. It encompasses six counties in the state
17　of Missouri including Phelps, Pulaski, Maries, Texas,
18　Crawford, and Dent counties.
19　　　　Q　How long have you been the district defender
20　for Area 25?
21　　　　A　I believe I'm going on my third year.
22　　　　Q　What did you do before you were the district
23　defender?
24　　　　A　I was the deputy district defender.
25　　　　Q　Also in Area 25?

2 (Pages 5 to 8)

ALARIS LITIGATION SERVICES
www.alaris.us　　Phone: 1.800.280.3376　　Fax: 314.644.1334
Case 2:17-cv-04057-NKL　Document 160-6　Filed 02/21/18　Page 3 of 74

1    A   Yes.
2        Q   How long were you the deputy district
3    defender?
4        A   Two years.
5        Q   Could you describe your employment experience
6    aside from being defender and deputy district defender?
7        A   I was assistant public defender prior to that
8    for approximately five years.  Do you want me to go beyond
9    that?
10       Q   Let's keep going.
11       A   Okay.  Prior to that I was a law student.  In
12   law school and in college I worked at Sonic Drive-In both
13   in Harrisonville, Missouri and in Kirksville, Missouri
14   where I attended school.  That position I was an assistant
15   manager of the restaurant.
16       Q   When did you graduate law school?
17       A   2008.
18       Q   Did you have any legal internships during law
19   school?
20       A   I did.  I worked as an intern for
21   Harrisonville Missouri's public defender office.  I don't
22   remember the area.  I also -- I guess I also did an
23   internship with Christopher Bird that was paid, so.
24       Q   What is Christopher Bird?
25       A   He was a solo practitioner in the Kansas City

1    area.  He did mainly civil law, civil litigation.  He was
2    briefly with the law firm of Hazelton and Laner when I went
3    to work for him, but I had no affiliation with them.
4        Q   So moving back to your employment at MSPD;
5    what is your responsibilities -- what are your
6    responsibilities as the district defender?
7        A   My responsibilities as the district defender
8    are to manage the attorneys in the office and the support
9    staff to ensure that clients that we represent receive the
10   best representation possible based upon the MSPD guidelines
11   and also to represent clients.
12       Q   What are the MSPD guidelines?
13       A   They are the -- I guess they're not really --
14   well, they are rules by which we represent our clients.
15   They are somewhat aspirational in the sense that, you know,
16   I think they anticipate adequate resources, but they are
17   quite voluminous, so I don't know specifically what you're
18   asking.  I don't know --
19       Q   Just generally.
20       A   Generally speak, they are the guidelines that
21   dictate how we are to represent our clients.
22       Q   And so is it fair to say that you have
23   administrative tasks, supervisory tasks, and your own
24   caseload as the district defender?
25       A   That's correct.

1        Q   Roughly how much of your time is spent on
2    administrative tasks?
3        A   It varies.  Recently, maybe 10 percent because
4    of ongoing caseload issues.  Probably prior to the
5    Hinkebein decision, I was probably closer to 30 to
6    40 percent maybe.
7        Q   And what kind of tasks would you put into the
8    administrative task bucket?
9        A   Hiring, firing, making sure that people are
10   doing their time sheets, that they are coming to work.  I
11   would probably throw in that bucket the training and time
12   spent with the younger attorneys, newer attorneys, and
13   getting them up to speed.
14       Q   How much of your time would you say you spend
15   on the supervisory portion of your docket, so-to-speak?
16       A   So out of that 10 percent?
17       Q   So would you put your supervisory
18   responsibilities in the administrative component?  Or would
19   you -- I think one way to go back and this may be my fault
20   for being unclear, but I had split it into three buckets;
21   administrative, supervisory, and your caseload.  Would you
22   say it's more accurate to put supervisory in the
23   administrative bucket?
24       A   Yeah, I guess I have trouble distinguishing
25   between the two.

1        Q   That's fine.
2        A   Administrative in my mind is what
3    administrative tasks do I have to do like my own time
4    sheets, my own expense report and following-up on e-mails
5    and that sort of thing.  Supervisory is when I'm monitoring
6    the attorneys and staff doing those things.  And so that's
7    how I distinguish between the two.  I would spend probably
8    --
9        Q   So let me ask it this way:  What percentage of
10   your time would you say is spent doing both administrative
11   and supervisory tasks?
12       A   Currently probably 10 to 15 percent.  But,
13   again, if I include training in that and supervising new
14   attorneys, it's much higher.  It's probably 50 to 60, maybe
15   even 70 percent of my time spent helping new attorneys.
16       Q   So you would say helping new attorneys
17   including training, could be anywhere from 40 to 50 percent
18   of your time?
19       A   Or much more than that depending on the day.
20       Q   How many attorneys are in your office?
21       A   Including me, 14.
22       Q   And how many non-attorney employees do you
23   have?
24       A   Six-and-a-half.
25       Q   What are their responsibilities?

3 (Pages 9 to 12)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-6   Filed 02/21/18   Page 4 of 74

1    A  The non-attorneys?

2    Q  Yes.

3    A  I have two investigators. Their job is to

4  assist the attorneys in investigating the case and

5  collecting evidence and interviewing witnesses, subpoena

6  witnesses. I have two legal assistants. Their job is

7  to -- similar to investigators. They do a lot of the same

8  sort of things, but also they assist in filing motions,

9  preparing motions; kind of the more administrative tasks

10  that an attorney might be responsible for. They also are

11  responsible for assisting in jail visits and in court. And

12  at court they would do things like do intakes for potential

13  new clients, meet with the defendants and their families.

14  Then I have two-and-a-half clerical positions. Their jobs

15  are primarily to answer the phone, maintaining the office

16  supplies, ordering; that sort of thing.

17    Q  What would you say the average experience

18  level of the attorneys in your office is?

19    A  Maybe a year. I have one attorney in my

20  office with 15 years experience. I'm the next highest; I

21  have nine years under me. The next highest is an attorney

22  and I think he has six years and then it drops off from

23  there.

24    Q  And by drops off from there, would you say

25  more or less than two years?

1    A  I have one attorney that has I believe three

2  years of experience and another attorney with four or five

3  years experience, but I think a year of that was prior to

4  being criminal defense. Then almost every other attorney

5  after that is less than two. In fact every other attorney

6  after that is less than two.

7    Q  How many attorneys in your office have one

8  year of experience or less?

9    A  You put me on the spot.

10    Q  Roughly, I won't hold you to it.

11    A  I would saw eight or nine attorneys.

12    Q  How do you assign cases that come into your

13  office to those attorneys?

14    A  To the new attorneys?

15    Q  To any of the attorneys in the office.

16    A  The cases are primarily assigned by county.

17  So the attorneys are assigned to a particular county and

18  the cases that come into that county would go to those

19  attorneys. That's traditionally what we have done. More

20  recently, because of my concern over attorney's caseloads,

21  I have been -- the cases have been coming in. When the

22  judge orders us into the case, I have been entering those

23  cases. And then through discussions with attorneys and

24  reviewing their caseload and that sort of thing, I would

25  then assign cases to the attorneys based on their workload.

1    Q  Would you say you, as the district defender,

2  you have a lot of discretion in the day-to-day management

3  of your office?

4    A  No.

5    Q  Why not?

6    A  Well, I don't have any control over the

7  resources. That really controls how you manage your

8  office. So the resources that are given to me, I have to

9  distribute between six counties. I can't really control,

10  you know, much about what how those resources are spent

11  because they are so limited.

12    Q  And so you're not responsible for setting the

13  budget for your office?

14    A  My office has a budget. It is not set by me.

15  It is set by our main office in Columbia. I do have some

16  control over some items in that budget. So I could refuse

17  to order certain types of pens. I could deny what we call

18  a local E-request. So if somebody wanted to spend less

19  than $500.00 on something, I could say you're not going to

20  do that. But realistically I don't have much control over

21  it because those are things that we need and we have to do.

22    Q  How big is the current caseload in your area?

23    A  Right now I would say roughly our office is

24  handling about a 1,000 cases.

25    Q  And on average how many cases does each

1  attorney in your office carry?

2    A  Typically somewhere between 100 and 150.

3  Right now it's a little bit lower, again, because we have

4  been waitlisting and I have taken on more cases because of

5  the appointments.

6    Q  How many cases are on your docket currently?

7    A  On my personal?

8    Q  Yes.

9    A  Last I checked it was 133.

10    Q  And that's a case docket you carry in addition

11  to your administrative and supervisory responsibilities?

12    A  That's correct.

13    Q  Are there any local policies, formal or

14  informal, that you have set as district defender that, you

15  know, are not imposed by the central office?

16    A  I have decided to waitlist cases or clients;

17  that was not imposed. I'm sure there are other minor

18  policies, but that's a big one. I mean, that's just me

19  deciding to -- not refuse clients, but delay us entering

20  into their cases.

21    Q  I certainly want to talk about that, but I may

22  just -- I'm not ignoring you. We'll push it off until a

23  little later in the deposition. You said there are about

24  1,000 cases in your office right now. Would you say that

25  that is typical, above average, below average in your

## Page 17

1  experience as director -- district defender and deputy
2  district defender?
3      A  I would say it's slightly below average.
4      Q  What would the average be around?
5      A  In a year's time we typically handle like I
6  think last fiscal year we handled 3,700 cases.  I think by
7  this point last year, we were a couple hundred cases ahead
8  of where we are.  It's lower because of the waitlist.  So I
9  think right now we have -- and I know you said you wanted
10  to get into this later.
11      Q  Please answer completely.
12      A  -- to show you where we are at, the reason I
13  think we are about 200 behind last year is because the
14  numbers last year show we were about 200 ahead.  But also
15  there are roughly 200 people on our waitlist.
16      Q  So when you say a 1,000 cases -- and I may
17  have misunderstood -- when you say a 1,000 cases, you're
18  not counting cases on the waitlist?
19      A  Right.  If we were to open those cases today,
20  we would be roughly 1,200.
21      Q  Okay.  Could you describe generally after an
22  indigent defendant is arrested, at what point in the
23  criminal process is your office contacted to represent
24  them?
25      A  It depends on the individual defendant.  So if

## Page 18

1  they were arrested and they are sitting in jail, all the
2  jails in my area provide applications to them.  All they
3  have to do is fill out the application and it gets faxed or
4  we pick it up.  So the delay in receiving applications in
5  that sense, if they were to file it the minute they got
6  into the jail would probably be, we would receive it within
7  a day or two, typically.  If they are not in custody, if
8  they are released on a summons, we probably wouldn't get an
9  application from them for quite some time.
10      Q  Are there any stages in the criminal process
11  that occur in courts in your area prior to you entering --
12  your office entering an appearance?
13      A  There would be counsel status hearing, bond
14  appearance hearings.  In some courts, arraignments.
15      Q  So in some courts in your area, arraignments
16  can occur for indigent defendants who have not yet been
17  appointed counsel?
18      A  Yes, happens all the time.
19      Q  Are you aware of any negative consequences
20  that can happen to clients in that situation -- or not to
21  clients, indigent defendants in that situation?
22      A  Certainly.  I think a lot of indigent clients
23  in that situation sometimes they pled guilty without the
24  advice of counsel and they don't understand the
25  consequences.  In some courts that can have very serious

## Page 19

1  consequences.  A lot of times they will say things about
2  their innocence or guilt that probably they shouldn't be
3  saying in open court.  If they had an attorney, the
4  attorney could at least advise them to remain silent.  I
5  don't think the courts do a very good -- the courts try to
6  keep them quiet, but it's just not the same as having an
7  attorney there, so.
8      Q  Could defendants waive constitutional rights
9  during any of these hearings?
10      A  Yes, they do.  They often, I think, waive
11  their right to an attorney.  They waive their right to
12  remain silent.  I just had one that came to mind.  Often
13  times -- I don't know if it's necessarily a constitutional
14  right -- but they with inadvertently waive their right to
15  change of venue or change of judge because of the time
16  beginning, you know, when they go to arraignment, that
17  starts their window of opportunity to change judge or
18  change venue.  If they don't have an attorney at that
19  stage, obviously they may not have one ten days down the
20  road, so they will waive that right as well.
21      Q  And that may be an inadvertent waiver, but it
22  happens as a result of the criminal process continuing
23  without counsel?
24      A  It's inadvertent.  I think some judges
25  purposely avoid having counsel in cases to facilitate that.

## Page 20

1      Q  What makes you say that?
2      A  In some of our counties, judges -- we would
3  change judge routinely off of a particular judge because of
4  the way they treat our clients, their dispositions, their
5  bonds; that sort of thing.  So it was always in our
6  client's interest to change judge.  Well, judges would get
7  annoyed with that, or at least in my belief they would get
8  annoyed.  So they would stop appointing counsel or having
9  us be present at court dates so that way they could go
10  ahead and arraign the individual and then they would set a
11  court date beyond the ten-day window.  So I can't say that,
12  yes, they were being vindictive or something, but it
13  certainly appeared based on their actions and what they
14  were doing, they were trying to circumvent our ability to
15  change judge or venue.
16      Q  And in a case like that where the defendant is
17  arraigned without counsel, at what point after that would
18  your office come into the case?
19      A  Well, again, if they are in jail, you know,
20  it's really kind of up to the client to take -- or the
21  defendant to take action to get us an application.  At some
22  point, the courts become a little more active.  After they
23  have been sitting for about a month, they will often bring
24  them up to the courtroom while we are there so we will give
25  them an application and have them fill it out.  If they

5 (Pages 17 to 20)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-6   Filed 02/21/18   Page 6 of 74

## Page 21

1    aren't in custody, then usually it will be the courtroom
2    center where they will come to their next court date, we
3    will be present. The judge will ask them have they applied
4    for the public defender. Most of the time that will be a
5    negative and so they will say go see the public defender.
6    They are right over there and they will give you an
7    application. So that decision is made in court.
8        Q    When you are appointed to represent clients
9    prior to an arraignment taking place, what steps would
10   attorneys -- would you or attorneys in your office take to
11   prepare for arraignments or other preliminary hearings?
12       A    Generally speaking the main thing you would do
13   is meet with the client. In almost all of our counties we
14   are not getting discovery prior to arraignment in circuit
15   court. So this would be an associate court when we
16   normally get in a case. So the main thing you would do is
17   meet with the client, beyond that not much else I think
18   happens.
19       Q    What sort of information would you try to ask
20   a client in order to be able to effectively advocate for
21   them?
22       A    Well, we have a whole intake sheet that we
23   encourage the attorneys to use that covers pretty much all
24   the basis that we believe are important. So it guess
25   through their education, their physical mental health

## Page 22

1    problems, kind of their story of the case. You know, are
2    they a citizen. Are there any immigration issues we need
3    to be aware of. Is there any evidence that exists or
4    witnesses that exists that we need to get a hold of, you
5    know, as soon as possible so the information doesn't become
6    stale or the witness disappears; that sort of thing. It
7    has a whole host of things. I encourage the attorneys to
8    use it because like me here today, I may not remember
9    everything single thing that I need to cover.
10       Q    In your opinion, do you have the time and
11   resources to communicate with your clients in the manner
12   that each case requires?
13       A    No.
14       Q    Why do you say that?
15       A    Because I have way too many clients to
16   communicate in an effective manner. Most of my
17   communication with my clients occurs on the day of court.
18   It occurs in a back hallway of a courtroom or, you know, in
19   the back of the courtroom in a less than ideal
20   attorney-client confident -- confidential setting. We try
21   to maintain confidentiality as best as possible. I'm not
22   saying I don't do jail visits and I'm not saying I don't
23   meet with clients in my office, but when you have 130
24   clients continuously and growing, it's just not possible.
25   If I were to spend one hour with every client, I would

## Page 23

1    spend every three weeks just meeting with clients. And I
2    have to spend most of my time in court. A large time in
3    the office doing day-to-day office duties. I spend a great
4    deal of time on the road. So obviously, you know, when
5    you're prioritizing, you're cutting corners.
6        Q    Why is it important to your ability to
7    effectively represent clients to have adequate time to
8    communicate with them?
9        A    Well, if the goal is client-centered
10   representation and if your goal is to try to get your
11   client what they want, all right, it's difficult to know
12   what they want or they don't even know what they want
13   initially. They may say I want probation or I may want
14   this, but they don't understand the criminal process. You
15   have to explain to them. They don't understand how
16   the case progresses. They don't understand what evidence
17   may be relevant, what evidence we need to obtain, what
18   witnesses we can call. There is a whole host of things
19   that you get from meeting with a client. Probably one of
20   the most important things you get from meeting with the
21   clients on a more than irregular basis is you get their
22   trust. You don't get anywhere in a case without a client's
23   trust because if they don't trust you they are not going to
24   open up to you about, you know, the evidence in a case,
25   what they really want. Often times, it's very adversarial

## Page 24

1    proceeding with the client because the client think you
2    work for the State or you don't care about them and, you
3    know, I don't blame them because it's reflected in the
4    amount of time we spend with them. So there is a whole
5    host of things that go with, you know, meeting with the
6    client and spending time with them. Especially more than,
7    you know, the 10 or 15 minutes or so that we spend with a
8    client. Probably the bulk of the time you spend with the
9    client is when you're talking about a plea deal.
10       Q    And when you're talking to client about a plea
11   deal, does that typically take place in the courthouse or
12   at a jail visit?
13       A    I try to do that at a jail visit because it
14   generally requires more than, you know, ten minutes and you
15   want to give them time to think about it before they
16   actually have to do it. That being said, there is the
17   initial conversation at the jail. They are brought to
18   court, you know, the next day or a week later; whenever it
19   may be. At that point, that's when, you know, there may
20   have been some renegotiations or second thoughts and I
21   think you want to have a conversation the day of as well.
22   But that, again, ideally that would be in a confidential
23   setting where you have more time, but it's typically in the
24   back of a courtroom.
25       Q    When you do a jail visit are those done in

6 (Pages 21 to 24)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-6   Filed 02/21/18   Page 7 of 74

## Page 25

1  confidential settings?
2      A   It varies based upon the jail.  In our most
3  populated jail in Phelps County, they have two rooms.  One
4  room is a bond -- we call it the bond room.  It used to be
5  just a wall with a glass window.  Because they didn't like
6  the attorneys using the actual attorney room, they decided
7  to build this sheetrock wall around the bond window and to
8  provide us some sort of privacy.  The problem is, is not
9  insulated and it's not or soundproof.  So if you're talking
10  to your client, anything you say if you talk at a normal
11  voice, like I think I am now, it can be heard in the
12  waiting area.  So that's a big problem in Phelps County.
13  In Texas County, we have a confidential room.  In Pulaski
14  County we -- -- they have a phone that you pick up and
15  there is a glass wall.  When you pick up the phone it tells
16  you this is being recorded.  They tell us it's not, but,
17  you know, it's hard.  Again, when we are talking about a
18  client trusting us and wanting to open up to us and that's
19  the first thing they hear, it really impedes, I think, that
20  safety that they feel that they would have if they could
21  actually have some sort of contact visit.  Prior to that,
22  it was a broom closet that we met in but apparently
23  somebody hid a shive in that room so they wouldn't let us
24  use that anymore.  They said it was for our safety.  In
25  Dent County, there is no real confidential area.  They put

## Page 26

1  you down in the jail.  You know, again, if you talk at a
2  whisper maybe.  Crawford County, you have a confidential
3  area and in Maries County there is a confidential area.  So
4  about 50/50 there is confidence.
5      Q   If you had more time to communicate with your
6  clients, do you think you would be able to secure a
7  confidential locations for them to talk to you?
8      A   Yes.
9      Q   Why do you think that?
10     A   Because in most counties if you have the time
11  and you arrange it, you can get a conference room or you
12  can get some sort of other arrangement worked out where you
13  can actually meet with a client in a confidential setting.
14  So in Phelps County, I have no problem if I request to have
15  a conference room.  And I say I have no problem because I
16  don't ask very often.  I suspect if I ask very frequently
17  that that would end very quickly because they have to
18  station a guard outside the door.  That's a similar thing
19  in Pulaski County.  If we ask, they will bring our clients
20  up to a conference room and they will station a bailiff
21  outside the door so that we can have a confidential
22  meeting.  Again, there are just ways that we can -- through
23  motion practice, through simple request, we can get those
24  things.  But we don't ask very often so that's why I think
25  we can get them when we ask.

## Page 27

1      Q   But if you had more time, do you think you
2  would be able to ask more?
3      A   I would make it a much bigger issue if I had
4  more time, so yes.
5      Q   So far we have been talking primarily about
6  your caseload.  In your opinion, do you think the attorneys
7  in your office have sufficient time and resources to
8  communicate effectively with their clients?
9      A   It's gotten better in the last couple of
10  months since I started waitlisting.  The average attorney
11  caseload I think I said was 100 to 150.  We are probably
12  down to more like 75 now.  So it's gotten better.  Again,
13  with my attorney experience, they really need I think
14  somebody with them more often than not until they get more
15  experienced to meet with those clients and they don't have
16  somebody with them.  Those are scary.  So that I
17  still think their caseload is too high and they are not
18  able to meet with their clients as much as possible, but
19  it's getting better.
20     Q   Prior to initiating the waiting list, do you
21  think they had adequate time and resources to communicate
22  effectively with their clients?
23     A   No.
24     Q   Why not?
25     A   Because, again, they had way too many clients.

## Page 28

1  There -- like I said, even if you were to spend an hour
2  with every client it becomes impossible.  To meet a client
3  at almost any of our jails, you're waiting.  You go to the
4  jail and you wait to meet with the client.  So one client,
5  even if you only have a quick thing to say to them, it's
6  probably going to take about an hour for one client.  So
7  you might be able to see eight clients in a day, you know.
8  So it's not really -- you just can't do it with that many
9  clients.
10     Q   On average, how often would you say you are
11  able to meet with your clients, with each client?
12     A   Well, would you include court appearances?
13     Q   Let's leave out court appearances.  Let me ask
14  you this first:  Would a court appearance be considered a
15  qualifying contact as that term is used in the MSPD?
16     A   No.
17     Q   On average how often would you say you're able
18  to have a qualifying contact with one of your clients?
19     A   I'm probably being generous if I said
20  25 percent of the time.
21     Q   In what percentage of your cases do you
22  conduct what you believe to be an adequate pretrial
23  investigation?
24     A   Less than 25 percent.
25     Q   What would constitute an adequate pretrial

7 (Pages 25 to 28)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-6   Filed 02/21/18   Page 8 of 74

## Page 29

1 investigation in your opinion?
2     A   It depends on the case, but obviously meeting
3 with the client, investigating their leads; in many cases
4 depositions.  In every case a scene view and an evidence
5 view.  Consulting with experts in appropriate cases,
6 potentially hiring experts for toxicology and things like
7 that in the proper case.  Interviewing favorable witnesses
8 and reaching out to favorable witnesses.  Gathering
9 evidence that might exist, like surveillance or that sort
10 of thing.  So it really kind of depends on the case, but,
11 you know, all of those things should be evaluated in every
12 case.
13     Q   Why aren't you able to do that in 100 of
14 percent of your cases?
15     A   There is not enough hours in the day.
16     Q   In your opinion, are the attorneys -- separate
17 from your caseload -- are the attorneys in your office able
18 to do the kinds of pretrial investigation that you think
19 cases typically require?
20     A   No.
21     Q   Why not?
22     A   They don't have enough time.
23     Q   Without getting into specifics or I certainly
24 don't want you to waive attorney-client privilege, can you
25 think of a time where your representation of a case was

## Page 30

1 hampered by a lack of time to investigate a case?
2     A   Yes.
3     Q   Can you speak vaguely about such a
4 circumstance?
5     A   Sure.  So we just had a trial yesterday.  One
6 of the witnesses that was called was a key witness for the
7 State.  I inherited this case from an attorney who left,
8 who inherited it from an attorney who left, who inherited
9 it from an attorney who left, who inherited from the
10 original attorney.  Depositions had been done of two of the
11 witnesses, none of the others.  It became only apparent to
12 me during the trial that probably this witness should have
13 been deposed.  But that's -- I would have deposed him if I
14 had the adequate time, I think I would have but I couldn't
15 even make that analysis because of the time constraints.
16 And so I think this client's case maybe was impacted by the
17 lack of investigation.
18     Q   And so to break that down, in your opinion you
19 lacked sufficient time to even determine whether a
20 deposition would have been useful or necessary in this
21 prior to trial?
22     A   That's correct.
23     Q   And you realized that at trial?
24     A   That is correct.
25     Q   And sitting here today knowing that ideally

## Page 31

1 this witness would have been deposed, you're not sure if
2 even had you known that you would have had the time to do a
3 deposition?
4     A   I certainly would have tried, but I don't --
5 everything you do is sacrificing time for another client.
6 So would I have fit it in somehow, possibly, but that would
7 be sacrificing time spent on another case.
8     Q   How frequently do you request discovery from
9 the state in your cases?
10     A   Every case.
11     Q   How frequently do you file discovery related
12 motions?
13     A   Rarely.
14     Q   In your opinion, do you have the time and
15 resources to obtain and review discovery in the manner each
16 case requires?
17     A   I can say that I do not plead clients or go to
18 trial without obtaining discovery.  Now, whether that's
19 complete is another question, but I always obtain
20 discovery.  I always file a discovery request.  I always
21 obtain at least some basic discovery.  If I believe there
22 is something missing I will always do an informal request
23 and that's why I don't file a whole lot of motions, but I
24 have a decent amount of experience.  I would guess, you
25 know, based on how the questions are going -- and sorry if

## Page 32

1 I'm wrong -- but I would assume the next question is what
2 about your attorneys.  Again, based on the age of my staff
3 and the experience level, I don't think most of them even
4 understand what might be in a case.  So they may receive
5 discovery and sometimes discovery is nothing more than a
6 probable cause statement and the indictment or the
7 information.  I would say many of my attorneys at that
8 point don't even know what they are missing to ask for it
9 or to file a supplemental request for discovery or motion
10 to compel.
11     Q   In your opinion, if you or your attorneys had
12 more time to spend on a particular case, would that assist
13 in the ability of your younger attorneys to understand when
14 discovery is missing and when they should be going back for
15 more discovery?
16     A   Absolutely.
17     Q   Why do you say that?
18     A   Because I have seen the impact that the
19 waitlist and relieving some stress off the attorneys has
20 had.  I have seen many more motions filed.  I have seen a
21 lot more evidentiary hearings.  I have had a lot more
22 complaints from the prosecutors about the number of
23 depositions they've had to do.  And these are new attorneys
24 who are doing these really exciting things and making good
25 challenges to cases and getting good results for clients

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 33

1  that prior to this, I mean, we weren't seeing.  They
2  weren't able to do it.  They weren't doing it.  The
3  unfortunate part of that is, I think is that they don't
4  really have somebody who can really mentor them along
5  because now I am too overworked and I don't really have the
6  staff or the experienced attorneys to fill in that gap.
7      Q   How frequently do you determine whether an
8  expert witness would be necessary in a particular case?
9      A   Every case where I feel like one is needed.  I
10  guess I don't understand your question.
11      Q   It's a bad question.  How often do you use an
12  expert witness in your cases?
13      A   If it's a mental health issue, it's pretty
14  frequent.  So if I look at a case and I believe there is
15  some sort of mental health issue that's needs to be
16  evaluated, I will nearly always reach out to hire an
17  expert.
18      Q   And by mental health issue do you mean for
19  competency?
20      A   Primarily competency because certainly we
21  would -- it's kind of a two-step process.  You would have
22  them evaluated first for competency.  If they are currently
23  competent, then you would have them look at could it be
24  NGRI.
25      Q   I'm sorry what would it -- it could be?

## Page 34

1      A   Not guilty by reason of insanity.  Typically
2  you're not going to have an expert get into NGRI unless the
3  client is competent.  Most of the time, you know, if you
4  believe they are not competent that ends up being correct.
5      Q   Outside of competency and insanity issues, do
6  you use experts for other cases?
7      A   Yes.  In fact, let me just on competency and
8  NGRI we would also -- one of the reasons I would also want
9  it in those situations is for mitigation purposes.  Even if
10  I think they might be competent or even if I don't know and
11  they come back competent, an expert would be great to
12  explain some of the reasons why they may have done what
13  they did even though they are completely functional.  I
14  also use experts, you know, a whole host of experts:
15  fingerprint experts, blood experts, canine experts, field
16  sobriety test experts.
17      Q   Does your caseload or lack of time impact your
18  ability to work with experts where you think it's
19  necessary?
20      A   Yes.
21      Q   How does it do -- how is it impacted?
22      A   One of the most difficult things about getting
23  an expert in my area is locating one.  I'm in a rural
24  jurisdiction.  There are no experts in my little area, so
25  we always have to go to St. Louis or some other urban area

## Page 35

1  and then get them to come to us, which is difficult.  So
2  that's a big factor that impedes the ability to hire
3  experts.  So you spend a lot of time trying to track them
4  down.  That's one of the big factors.  It takes lot of time
5  to hire an expert.  I think I've lost track where the
6  question was going.
7      Q   That is definitely an answer to question, but
8  I'll ask it again in case there is anything here.  In
9  addition to the time spent locating and retaining an
10  expert, does your caseload and lack of time impact your
11  ability to work with an expert or use an expert effectively
12  in your cases?
13      A   Yes.
14      Q   How?
15      A   Because we don't have the time to devote to a
16  case, we don't have the time to get experts early enough.
17  It's not uncommon where we end up being forced by the
18  courts to proceed even though we have informed them they
19  with are trying to locate an expert.  And even though I do
20  blame the courts, it usually is later in the process when
21  we get around to actually evaluating the case.  So you get
22  a case and you may not be able to evaluate it until a week
23  before trial at which point you start scrambling.  You
24  know, as I mentioned earlier it takes a lot of time to find
25  an expert.  Experts have dates that they are available and

## Page 36

1  not available.  Usually that's not going to be within the
2  timeframe that we have.  So it's our delay or our inability
3  to prepare a case early on that causes us to miss the
4  opportunity to having an expert later.
5      Q   And would you say your difficulties in
6  retaining and utilizing experts effectively apply not only
7  to your cases but also the cases of attorneys in your
8  office?
9      A   Yes.
10      Q   Without going into specifics or compromising
11  privilege, can you think of a time where your
12  representation of a client was hampered by a lack of time
13  to effectively use an expert?
14      A   Yes.
15      Q   Are you comfortable providing any further
16  details on a case in, you know, vague, general terms?
17      A   So yes.  We had a case recently where we
18  needed an expert to evaluate a client regarding PTSD.  She
19  was charged with statutory rape and one of our theory of
20  defense was she was actually the victim of the rape.  So
21  the assailant was this young man who was 17 or -- 16 or 17.
22  He was a football player.  He was a big guy.  So we were
23  saying because of her PTSD that is what she confessed to.
24  She was confessing to being a victim when she was younger.
25  So we had consulted with an expert and we're trying to get

ALARIS LITIGATION SERVICES
www.alaris.us            Phone: 1.800.280.3376            Fax: 314.644.1334

## Page 37

1    him in the case, but we had anticipated getting a
2    continuance.  Again, this is kind of a late preparation and
3    we were denied the continuance.  So because we didn't have
4    the time to devote to the case because our expert couldn't
5    get involved soon enough, we did not have the expert for
6    the trial.  We'll have him for mitigation, but it hurt our
7    theory I think or it hurt the ability to present that
8    theory to the jury.
9        Q    Is funding a constraint on your ability to
10   hirer or retain outside services in cases where you think
11   it's necessary?
12       A    I have never been denied a request for funds.
13   At least I may have initially been denied because I -- they
14   needed more explanation.  Whenever I needed an expert, I
15   have always been provided the resources to obtain the
16   expert.
17       Q    Do attorneys in your area frequently request
18   continuances?
19       A    Yes.
20       Q    Why is that?
21       A    Because they are not ready for whatever the
22   case may be.
23       Q    Why wouldn't they be ready for whatever the
24   next hearing may be?
25       A    Because they haven't had adequate time.  Well,

## Page 38

1    there is two reasons.  One is the judges have time
2    standards that they religiously follow that are ridiculous
3    and don't take into consideration the individual case.  So,
4    you know, cases get from the date of arraignment to the
5    date of trial is three months on any case.  So that's a big
6    part of the reason that I don't think any attorney, even
7    one that is not overworked, could be ready in the amount of
8    time that's given.  But even if judges who are more lenient
9    and who are more understanding of the workload issues, we
10   still have to ask for continuances in those cases because,
11   again, you just can't get the work done in the time
12   allotted.  It doesn't matter if you're given a month or a
13   year because in the interim you're handling hundreds of
14   cases and you just kind of keep shoveling everything down
15   the road.
16       Q    You mentioned travel earlier.  How much time
17   do you spend traveling for case related?
18       A    It varies based on the county you're in.  So
19   our furthest county is about 50 miles.  It's about an hour
20   drive to get to court or to do a jail visit; that's our
21   furthest.  The closest is to our office is Phelps County.
22   It's maybe a mile and maybe about seven or eight minute
23   drive.  We do -- because we have a prison in our
24   jurisdiction and the cases that occur within that prison,
25   the criminal cases, typically take two to three years to

## Page 39

1    where they actually get charged.  And by that time usually
2    those defendants have moved to different facilities across
3    the state.  And so in those instances, the travel time
4    could be anywhere from four to five hours to an hour.
5        Q    Roughly what percentage of your current docket
6    are cases coming out of the prison?
7        A    It's relatively small.  I think at any given
8    time we have 20 to 30 cases out of the prison, but those
9    are very time consuming cases.
10       Q    What kinds of cases are those?
11       A    They are usually committing violence on an
12   inmate or committing violence on a prison guard.
13       Q    Has time spent on travel been an issue for
14   attorneys in your office in terms of their ability to
15   effectively represent their clients?
16       A    I believe so.
17       Q    Why do you say that?
18       A    Well, it's part of the whole picture.  All but
19   one county in my six counties requires significant travel
20   time.  So every other county is at least a 30-minute drive.
21   So if you're going to go to court or you're going to go to
22   jail, an hour of your day is gone just sitting in your car
23   on the road at a minimum unless you're in Phelps County.
24   So the impact is pretty high especially when most attorneys
25   have court five days a week or are expected to see their

## Page 40

1    clients.  If you're going to Texas County, which is an hour
2    one way, every day two hours a day, you know, ten hours a
3    week, gone.  So over a day, you know, of their time is
4    wasted driving.
5        Q    On average how frequently do you file
6    suppression motions?
7        A    Not very often.  As needed.  I don't handle a
8    lot of low level -- well, I used to not handle a lot of the
9    drug cases and that's typically where you see the most
10   suppression issues.
11       Q    In your opinion, do you have sufficient time
12   to investigate when suppression motion may be needed?
13       A    Most suppression issues I file are based off
14   of my experience.  They are not based upon research.  So
15   the research follows the filing of the motion.  So, again,
16   that's something different between I think a more senior
17   attorney versus a newer attorney.  A newer attorney sees a
18   traffic stop and they have to research is there a case on
19   point and then they learn that as they grow as an attorney.
20   Ideally, I would spend more time doing legal research but
21   that's a luxury that we don't have.
22       Q    Do you think the attorneys in your office have
23   adequate time to research and file suppression motions?
24       A    No.
25       Q    Why do you say that?

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 41

1     A   They don't have the time.
2         Q   Are there other kinds of pretrial motions that
3     you typically file?
4         A   So if the case is actually trial bound,
5     typically we would file motions in limine, various kinds of
6     things on what the case needed.  More recently we have been
7     filing motions to dismiss due to probable cause issues,
8     which have been kind of a new thing that we have been
9     attacking.
10        Q   Why have you newly been filing motions to
11    dismiss?
12        A   One, the attorneys have time to actually
13    litigate these issues.  One of the problems that we have is
14    that in many jurisdictions they have gone to indictments.
15    So we don't have a preliminary hearing to determine
16    probable cause.  We have a grand jury determining probable
17    cause.  The joke is a grand jury would indict a ham
18    sandwich.  Everybody kind of hears that and it's true.  So
19    we have to be creative in how we try to dispose of these
20    cases and be efficient so that they don't end up going to
21    trial.  The biggest examples of these are assaults and
22    domestic assaults.  Most of those cases are never going to
23    go to trial because the victim is never going to corporate
24    or the victim said it didn't happen or something to that
25    effect.  So we have challenged -- the only way we have

## Page 42

1     figured out how is to, you know, getting the victim in on a
2     challenging the probable cause saying there is no probable
3     cause because the victim said it didn't happen.  And if the
4     law enforcement or the prosecutor brought the victim into
5     the grand jury, the grand jury have indicted.
6         Q   And that is a motion that requires time in
7     your opinion?
8         A   Yes.  I mean, you have to first you have to
9     meet with the client and kind of get a feel for the
10    circumstances of the case.  Then you have -- if they inform
11    you that this didn't happen or he or she doesn't want to
12    pursue it or whatever the case may be, then you have to
13    investigate that claim and contact the witnesses and speak
14    with them and you have to get them subpoenaed to come to
15    court.  And then you actually have to have a hearing and
16    present the evidence to the court and make an argument as
17    to why it should be dismissed.
18        Q   Does lack of time or resources impact your
19    attorneys ability to prepare and file these motions?
20        A   Absolutely, which is why we never saw any up
21    until the last two months.
22        Q   When you say up until the last two months,
23    you're referring to the waiting list reducing caseloads for
24    your other attorneys?
25        A   That's correct.

## Page 43

1         Q   How often do you take cases to trial?
2         A   I would say one percent of the cases maybe go
3     to trial, if that.
4         Q   Do you think enough of your cases are going to
5     trial?
6         A   No.
7         Q   Why not?
8         A   When you have the time to dedicate to a case,
9     it always gets better -- well, almost always gets better.
10    You know, you begin to poke holes in the State's evidence.
11    You begin to find your own evidence.  You consult with
12    experts.  The case gets better.  The prosecutor gets tired,
13    they don't want to move forward with it.  You know, so
14    going, you know, forcing a case to go to trial and being
15    able to prepare it like you should for trial, you know,
16    ultimately ends up getting to trial.  The other thing that
17    will help, you know, the more effort you put into a case,
18    more likely you're able to get your client out on bond.  If
19    your clients out on bond, they are more likely to go to
20    trial.  So that's another thing that if you have time, you
21    can litigate the bond and get them out of jail.  If they
22    are not in jail, they are just like just get me out of
23    here.  I don't care, I'll plead to whatever.  That's the
24    kind of thing you see a lot.
25        Q   So I want to just unpack that a little more.

## Page 44

1         A   Okay.
2         Q   Why do clients who are out on bond -- why are
3     clients out on bond more likely to go to trial?
4         A   Because even though their freedom is still
5     impacted by the fact they have criminal charges pending
6     against them, they have their freedom.  They are out of
7     custody.  They are able to be with family and friends and
8     they are able to work and they are able to kind of maintain
9     some normal life even though they have to occasionally
10    appear in court even though they have this charge hanging
11    over them.  When they are in jail, the jails are miserable.
12    They're overcrowded.  They mistreat these people.  They
13    don't even treat them like people.  So all that -- their
14    whole being is how do I get out of this situation.  What's
15    the fastest route to get me out of custody.  If that's
16    pleading guilty, they'll pled guilty.
17        Q   Just lost my train of thought for a second,
18    sorry.  Do you have adequate time to prepare and file bond
19    motions?
20        A   No.
21        Q   Why not?
22        A   Filing bond motions, I mean, it's one thing --
23    I file bond motions in most cases, but it's just a
24    paragraph that kind of references the law.  To file a bond
25    motion that actually has impact, is to actually investigate

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

1  the facts of the case and your client's history.  You want
2  to know things like where does your client live, how long
3  has he lived there, does he have transportation, does he
4  have family in the area, does he have a criminal history
5  that is maybe not what the prosecutor says it is.  You
6  know, what are the strengths and weaknesses of the State's
7  case.  Maybe it's not as strong, so there should be more
8  lenience given.  Those are the things I would want to put
9  in my motion.  And then I would also want to get witnesses
10  to come to court to testify about the virtues of my client.
11  Maybe the alleged victim if it's, again, the domestic case
12  where she or he is saying it didn't happen.  That takes a
13  lot of time and that is again something we don't have a lot
14  of.  So you sacrifice that a lot of times to get the case
15  ready for trial or, quite honestly, you don't even really
16  have time to even consider it because, again, you have 15
17  minutes maybe with the client.  You file your basic motion.
18  You make your basic argument to the court and, you know,
19  the court has their predetermined bonds that they just
20  throw out there.
21      Q    What are the predetermined bonds?
22      A    Well, it varies by the judge.  But in my
23  jurisdictions for most lower-level felonies, it's going to
24  be 25,000.  For B and A felonies and unclassified felonies,
25  it's going to be probably somewhere between $100,000.00 to

1  $1 million.  The most extreme examples in one county the
2  judge will set drug cases usually at $500,000, even
3  misdemeanor marijuana, which is fine only.  So it varies,
4  but the minimum typically on felonies is going to be
5  $25,000.00 across the spectrum.
6      Q    And just to make sure I understand right,
7  there are misdemeanor marijuana cases in your area where
8  defendants are held on $500,000.00 bonds?
9      A    It happens and they are fined only to begin
10  with.
11      Q    In your opinion if you had adequate time and
12  resources would that assist in your ability to advocate for
13  bond reductions?
14      A    Yes.
15      Q    In your opinion, do the attorneys in your
16  office have adequate time to prepare and advocate for bond
17  motions and bond reductions?
18      A    No.
19      Q    Why not?
20      A    Lack of resources.
21      Q    So coming back to trials.  In your opinion, do
22  you have sufficient time and resources to adequately
23  prepare for trial?
24      A    No.
25      Q    Why not?

1      A    There are not enough hours in the day.
2      Q    What are the kinds of things that you would
3  want to do to effectively prepare for trial?
4      A    Well, the first thing would be to meet with
5  the client, go through what we have already kind of talked
6  about.  I would want to make sure that I have evaluated the
7  State's discovery.  That I had done my own independent
8  investigation.  That I had evaluated the necessity of
9  experts.  That I had done depositions in most cases of the
10  main witnesses for the State.  That I had prepped my
11  witnesses for their cross exam and direct examinations.
12  That I have adequately prepared my client for knowing what
13  the trial process is and whether or not he wants judge or
14  jury or jury or judge sentencing, whether or not he or she
15  wants to testify.  I would want to make sure that I spent
16  ample time preparing my direct and cross examinations.
17  That I spend time preparing an open and closing argument,
18  my voir dire.
19      Q    Without violating privilege or getting too
20  deep into specifics, can you think of a time where your
21  representation of a client was hampered by a lack of time
22  to prepare for trial?
23      A    Yes.
24      Q    Could you give vague generalities and the
25  kinds of things that you were unable to prepare for?

1      A    Well, again I gave the example of the trial I
2  had yesterday.  I had a trial last Monday and that trial
3  ate up a bulk of the time.  I finished that -- well, the
4  prosecutor dismissed it during the trial.  The next day I
5  spent the day in court.  The next day, I spent the day at a
6  district defender meeting.  The next day I spent the day in
7  court.  The next day I spent I believe -- I'm trying to
8  think that would have been Friday, not sure what I did
9  Friday.  I spent Saturday with my family for Christmas
10  event.  I spend Sunday prepping this trial.  I spent Monday
11  in court; that was supposed to be the start of the trial.
12  It got -- we didn't have enough jurors show up, so we had
13  to reset to yesterday.  So from the time of the last trial,
14  a week later to this trial, I wasn't able really to prepare
15  at all except for Sunday.  So what I ended up doing,
16  knowing that was going to happen, I assigned the case.  I
17  remained second chair, but I assigned it to an attorney in
18  my office to basically be able to prep it.  The only reason
19  that attorney was able to kind of do it -- and this was a
20  stat rape first, so unclassified felony where the range of
21  punishment is ten years to life or 30, was because he is
22  leaving our office at the end of the week.  So we haven't
23  given him any new cases in the last month.  But he has less
24  than a year and half experience, so he did a great job.
25  But, again, I mean, is somebody who is looking at life in

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-6   Filed 02/21/18   Page 13 of 74

1    prison, should they have an attorney as their first chair
2    who only has a year -- little over a year experience. And
3    the only reason I gave it to him was because I just
4    couldn't do it.
5         MR. SHAHABIAN:  I think now is a good time to
6    go off the record and take a break.  Say five minutes.
7         MS. SHIPMA:  Matt, what did you do Friday?
8    A    Oh, right.
9         MS. SHIPMA:  You spent Friday with me.
10   A    That's why I couldn't remember.
11        THE VIDEOGRAPHER:  We are going off the
12   record.  The time is 2:41 p.m.  This ends Media 1.
13        (A recess was taken.)
14        THE VIDEOGRAPHER:  Going back on the record.
15   The time is 2:49 p.m.  This begins Media 2.
16        Q    (By Mr. Shahabian) Thanks for coming back,
17   Mr. Crowell.
18   A    You're welcome.
19        Q    I would like to turn to guilty pleas.  How do
20   you typically approach a case where a client is considering
21   a plea offer?
22   A    So the offer has already been conveyed?
23        Q    Well, let's take a step back.  How do you
24   approach a case where the case may result in a guilty plea?
25   A    If it looks like that's the direction the case

1    is going, I would first I want to consult with the client
2    to make sure that I'm reading that correctly.  Then if
3    that's correct, I would go to the prosecutor, obtain an
4    offer, take that offer back to the client and begin the
5    negotiation process.  Well, I guess the negotiation process
6    really begins the first time you approach the prosecutor,
7    but.  So from there, once the offer has been conveyed and
8    potentially accepted by the client, that pretty much ends
9    the guilty plea process.  But if the client refuses the
10   offer, that then again you do negotiations.
11        Q    Do you have adequate time and resources to
12   negotiate and consult with your client for guilty pleas?
13   A    I think in order to adequately consult with
14   the client about a guilty plea you have to have already
15   done all the work.  So it's not a simple answer as yes or
16   no because it would assume that you've already investigated
17   the case.  You have interviewed the witnesses.  You have
18   done everything that an attorney should do in the case to
19   be competent.  So if I were competent in my representation,
20   then yes.
21        Q    Do you think you -- you said if you were
22   competent in the representation, your answer would be yes.
23   In your experience, are you able to do all of those things
24   that you think are necessary to provide adequate advice on
25   a guilty plea?

1    A    Sometimes, but rarely.
2         Q    Why do you say rarely?
3    A    Because most of the time we are rushing
4    through the case.  And I think any time, you know, an
5    attorney shouldn't be rushing through a case.  You should
6    be taking the time the case deserves and the client
7    deserves.  But because we rush, we are inevitably going to
8    miss things, potentially.  So it's hard to know.  I mean,
9    there are some cases where you're rushed and it's fine, but
10   I think that's the exception not the norm.
11        Q    In your opinion, do the attorneys in your
12   office have adequate time and resources to prepare their
13   cases to the point where they can advise and negotiate
14   effectively for guilty pleas?
15   A    No.
16        Q    Why not?
17   A    Most of them don't have the experience to know
18   whether or not a client should plea or not to a particular
19   case.
20        Q    Why is experience important to determining
21   whether to plea?
22   A    Because you have to know whether or not that
23   case and the facts of that case if you pushed it to trial,
24   you would get a different outcome.  The other factor is an
25   inexperienced attorney is at a great disadvantage of

1    negotiation with the prosecutor.  If they've never tried a
2    case, the prosecutor can use that to their advantage.  It's
3    a scary thing to try a case for the first time.  And so I
4    think a lot of young attorneys will oversell a plea deal
5    because they don't -- they are afraid of a trial or they
6    are afraid they will screw something up.  So rather than
7    take that risk and put forth that effort, they kind of
8    force the plea deal.  That being said, if they had the time
9    or if they had a mentor or somebody who could help them
10   long the way, I think that prevents a lot of that.
11        Q    So in your opinion even for cases with
12   inexperienced lawyers, having more time and more resources
13   would assist in their ability to effectively advocate and
14   negotiate guilty pleas?
15   A    Yes.  And one of the resources I think that is
16   missing a lot of times is to have a mentorship at least in
17   my office.  I can't speak for other places.
18        Q    Without getting into specifics or compromising
19   privilege, can you think of a time where a client may have
20   received a better plea deal had you or one of your
21   attorneys had more time to devote to the case?
22   A    Hard to say because you don't know that they
23   would have.
24        Q    Fair.
25   A    I can say that I have intervened in cases

13 (Pages 49 to 52)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-6   Filed 02/21/18   Page 14 of 74

## Page 53

1  where I felt the client wasn't getting the best offer
2  because the prosecutors are taking advantage of the
3  inexperience of my younger attorneys. I can -- there are
4  many instances where I have been able to get better deals.
5      Q  In your opinion, if they had more time and
6  resources would you have to intervene as frequently?
7      A  No.
8      Q  I'm going to hand you a document that I'll ask
9  the court reporter to mark Plaintiff's Exhibit 55 -- never
10  mind. Are any of your attorney's specialist at immigration
11  law?
12      A  No.
13      Q  Do you or your attorneys have training in
14  immigration consequences of criminal convictions?
15      A  I have had very minimal training and I suspect
16  probably my APD IV has had training, minimal training.
17      Q  What steps do attorneys in your office take to
18  evaluate the immigration consequences a client may be
19  facing?
20      A  In my office we don't have a lot of
21  immigrants. We always -- like I mentioned the intake
22  sheet. One of the things the questions that we ask as part
23  of the intake is are you a U.S. citizen, were you born in
24  the United States. That's also a question on the
25  Acknowledgment of Rights form that we have to use for

## Page 54

1  guilty pleas; are you a U.S. citizen. It is very rare to
2  get someone who is not a U.S. citizen in my jurisdiction.
3  If we get somebody who is not a U.S. citizen, I would
4  generally, I would advise the attorney to consult with an
5  expert outside of our office. So I think, I don't remember
6  their name, but MSPD used to and may still have an attorney
7  out of St. Louis that is a specialist in immigration law.
8  If they didn't or if that person no longer is there or that
9  position no longer exists, then I would advise my attorneys
10  to consult a private attorney. But that being said, it is
11  rare that we get an immigrant.
12      Q  Are you aware of any cases where a lack of
13  time or resources hindered the ability to advise a client
14  on immigration consequences?
15      A  Yes.
16      Q  Can you recall generally what the
17  circumstances of that case were?
18      A  I can and let me preface it by I'm not a 100
19  percent sure they were an immigrant but I know they were
20  Spanish speaking. So any time you get somebody that
21  English is not their first language, you know, you need to
22  decide whether or not to bring in a translator. That
23  creates a lot of problems in terms of, again time is always
24  an issue. So that takes a lot more time when you have to
25  go through a translator. So I suspect, even though not

## Page 55

1  consciously, but certainly subconsciously you're going to
2  limit the number of visits you do because of the time. But
3  I know in that particular instance I'm not hundred percent
4  sure it was an immigrant or not but I remember because they
5  were Spanish speaking, that there was a lot of issues
6  getting a translator to come to the rural part, rural
7  county, Crawford county. The attorney, because of their
8  schedule, had great difficulty in arranging times that
9  would work for everyone. Court was a major issue getting a
10  translator to sit next to the attorney and that sort of
11  thing.
12      Q  So the caseload and time constraints affect
13  the ability to obtain outside resources like translators?
14      A  Yes.
15      Q  Do your attorneys ever consult with social
16  workers for sentencing or other aspects of their cases?
17      A  I can tell you in my practice, I have
18  consulted with a sentencing mitigation specialist twice.
19      Q  In your opinion, if you had adequate time and
20  resources would you consult with a sentencing mitigation
21  expert more frequently?
22      A  If I had the resources, I would do it in every
23  case where I did not have a plea agreement.
24      Q  Why would you do it in every case?
25      A  Because I have seen the impact it has. Part

## Page 56

1  of what those mitigation specialist can do is they know the
2  resources available. They know the right questions to ask.
3  They can do a lot more than I know how to do. Part of that
4  is they have the time. So I suppose if I had unlimited
5  time, I probably wouldn't need one very often because I
6  could do it myself. But when I have consulted with them
7  it's amazing what they can do and the way it impacts the
8  outcome of the sentencing hearing. Things that I just
9  couldn't do it on my own. The other issue is, again,
10  because of their experience and their knowledge, they can
11  take an issue that we have in a rural areas where there is
12  no halfway homes. We don't even have a homeless shelter in
13  any of my counties. We don't have any real good treatment
14  programs. There is none of that. So it's very difficult
15  for us to find those facilities and get our clients into
16  them to help assist them with, you know, better outcomes in
17  their case and hopefully rehabilitation, drug counseling,
18  and that sort of thing. Those mitigating specialist,
19  again, they know the whole state and they know other states
20  and they can provide those resources.
21      Q  And those mitigation specialist are not MSPD
22  employees?
23      A  I think there used to be mitigation
24  specialists. I never known them and when I have used them
25  in the past they are private individuals.

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 57

1  Q  Do other attorneys in your office use
2  mitigation specialists for sentencing?
3  A  I think I have approved one request that's
4  because there has only been one request.
5  Q  In your opinion, do resource and time
6  constraints impact your attorneys ability to use resources
7  like mitigation sentencing consultants?
8  A  Yes.  Again, I would use them all the time if
9  I had the ability and the time to do it.  The younger
10  attorneys, I don't think they know what they are or that
11  they even are a possibility.
12  Q  If you had the time would you advise, and if
13  your attorneys had the time, would you advise them to be
14  using sentencing mitigation specialists?
15  A  Absolutely.
16  Q  How does your office handle juvenile cases?
17  A  Just like any other.
18  Q  What kind of juvenile cases do you receive?
19  A  We don't receive very many.  I think there is
20  kind of a reluctance by the juvenile division to encourage
21  the use of attorneys in our area.  They do not like us to
22  get involved so they find ways to avoid getting us
23  involved.
24  Q  How can they avoid getting the MSPD involved
25  in the juvenile --

## Page 58

1  A  I don't know if they still do this, but it was
2  about a year ago or so they were telling the juveniles that
3  if they could take the deal or they could get an attorney,
4  but if they got an attorney it would be worse for them.
5  Q  And would these deals involve detention?
6  A  I think typically the way it works -- and this
7  is just from anecdotal type evidence -- is typically it's
8  going to be probation first.  Then it's going to be
9  detention if probation fails.  We almost never get involved
10  at the probation level.  If we get involved, it's to stand
11  there as they go to detention.  And then we also do
12  certification hearing.
13  Q  Are there any attorneys in your office who
14  specialize in juvenile proceedings?
15  A  No.
16  Q  Do any attorneys in your office have
17  specialized training or have any training in juvenile
18  proceeding?
19  A  Minimal.
20  Q  How do you assign juvenile cases to attorneys
21  in your office?
22  A  Generally speaking I assign them to the
23  experienced attorneys.  So myself, my deputy district
24  defender and two other attorneys.
25  Q  Why do you assign them to the more experienced

## Page 59

1  attorneys?
2  A  Because what's at stake.  So generally
3  speaking, we're only getting involved if it's a
4  certification hearing.  If it's just a detention hearing,
5  you know, I might assign that to someone else.  But the
6  certification hearing, because of the severity and what's
7  at risk for that young person, I want it to go to an
8  experienced attorney.
9  Q  And for the record, what is at risk for a
10  juvenile?
11  A  Well, if they are being certified, it means
12  they are going to be removed from the juvenile system and
13  tried as an adult in the adult court.
14  Q  How often does your office handle a
15  certification hearing?
16  A  A couple a year.
17  Q  Does your caseload or lack of resources impact
18  your office's ability to effectively represent juveniles in
19  certification hearings?
20  A  Yes.
21  Q  How?
22  A  Well, like I said, we treat them like any
23  other case other than I try to assign them to more senior
24  attorneys, but the time constraints still apply to those
25  cases.  The other issue when you're dealing with

## Page 60

1  certification is generally the children are going to be in
2  DYS custody at that point.  So they are going to be held
3  pending the hearing.  That generally means that they are
4  going to be shipped to some far corner of the state and so
5  it's very difficult to have communication with them.  And
6  with a juvenile, they require, in some instances, a lot
7  more face-to-face time because of their detention.  And
8  so it ends up taking a great deal of time to meet with the
9  client more regularly than say somebody who is, you know,
10  on their fourth or fifth felony who has been through the
11  system and they understand it.  So that impacts the ability
12  to represent them because, again, we just don't have the
13  time or resources to meet with them on a regular basis.
14  The charges are usually very severe.  So we are usually
15  dealing with murder or rape or something to that effect.
16  Same challenges with those; you just don't have the
17  resources to devote, you know, a hundred hours or whatever
18  it takes to handle a murder case.  You do your best with
19  what you got, but at the end of the day you're probably not
20  doing enough.
21  Q  In your opinion, can the attorneys in your
22  office currently adequately represent all of the clients on
23  their docket?
24  A  No.
25  Q  Why not?

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

1    A   There is too many.
2        Q   In your opinion, could any attorney, no matter
3    how expert, adequately represent clients given the
4    constraints facing lawyers in your office?
5        A   No, there is -- well, no.
6        Q   Why not?
7        A   The idea that you could handle 150 felonies or
8    150 misdemeanors at one point in time effectively, I think
9    if you have experience and you know what you can do in
10   those cases and the impacts that you can have if you devote
11   the time necessary to those; I think any experienced
12   attorney would say that's not possible.  There are
13   attorneys certainly who say I can do it.  But I think if
14   you got down to it and we talked about the guidelines; if
15   you went through the guidelines and said well, have you
16   done everything that's in the guidelines, I don't think
17   that's possible.  I don't know what the number would be,
18   but I can tell you that the numbers in my office I don't
19   think it would be possible for even the best attorney to
20   handle the caseload.
21       Q   I'm going to hand you an exhibit that's
22   previously been marked Plaintiff 50.  If you can just take
23   a second and flip through that.  Do you recognize this
24   document?
25       A   I recognize what's contained -- well, I

1    recognize most of it.  I don't recognize -- individually, I
2    don't recognize the document itself.
3        Q   Could you flip to the last page?
4        A   Yes.
5        Q   Do you recognize this page?
6        A   I do.
7        Q   What is it?
8        A   It is the caseload metrics for the system and
9    it appears to be for the period of July 2016 to June 30,
10   2017.  So I guess fiscal year 2017.
11       Q   Do you see Area 25 on here?
12       A   I do.
13       Q   What rank is it listed on this document?  I
14   think it's over on the right-hand side.
15       A   We are ranked it appears to be 17th.
16       Q   What percentage -- what does it say on this
17   document for percentage of capacity for Area 25?
18       A   It says 252.2 percent.
19       Q   Do you have an understanding of what that
20   percentage reflects?
21       A   My understanding is it reflects the amount we
22   are over capacity.  So if we had adequate staff -- and I
23   believe it's based on the RubinBrown Missouri Project -- if
24   we had adequate staff -- or we are 252.2 percent over the
25   amount of cases we should have based on that analysis by

1    RubinBrown.
2        Q   Setting aside the RubinBrown metrics, I'm not
3    asking you to give me an exact percentage of how far over
4    capacity you are, but roughly would you say this accurately
5    reflects that your office is over capacity?
6        A   It reflects my office is over capacity, but I
7    don't think it's completely accurate.
8        Q   Why not?
9        A   Well, it expects or I think it takes into
10   consideration that I have 14 attorneys and 14 attorneys is
11   what I would have if I'm fully staffed.  In the last year I
12   have had to hire ten attorneys, so I have had -- I don't
13   know what percent over -- I'm constantly hiring.  In fact,
14   I have an interview with an attorney tomorrow afternoon --
15   yeah, tomorrow afternoon for an opening.  The other thing I
16   think that the RubinBrown numbers, why I think it may be
17   actually a little low based on that, is because I think it
18   takes into account experienced attorneys that you know what
19   you're doing.  Again, most of my attorneys are brand new.
20   So they don't necessarily know what they are doing.  So I
21   have to spend a lot of time with them and the other
22   experienced attorneys are spending a lot of time with them
23   and that's time they are not actually spending on their
24   cases.  So I think that is probably also not reflected in
25   the 252.2 percent.

1        Q   And so in your opinion this is a more
2    conservatives estimate of the overwork in your office than
3    you think would be fairly reflected?
4        A   I do.  And it's conservative also because it
5    doesn't take into account, at least my understanding is it
6    doesn't take into account administrative tasks and
7    training.  It also expects that you're working 50 -- yeah,
8    50 weeks out of the year, which, you know, my attorneys
9    probably do.  I have attorneys that lose time every year.
10   But we get three weeks of vacation and so, it doesn't take
11   into account that.  It doesn't take into account the fact
12   we get, I think, 11 or 12 paid holidays.  So I mean, from
13   that standpoint -- again, I'm not expecting my attorneys to
14   complain about that, but nevertheless, it reflects 50 weeks
15   of work, which, you know, as a state employee that's a
16   little offensive.  We don't expect other state employees to
17   work on their weeks off or their days off, so.
18       Q   And to unpack a bit of what you said; so you
19   pointed out that this anticipates 14 attorneys.  You're
20   referring to the column right next to area named "Rolla"
21   that says number of attorneys 14?
22       A   Yes.
23       Q   And you said for the time period that this
24   covers fiscal year '17, you have hired 11 new attorneys
25   if I heard correctly?

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-6   Filed 02/21/18   Page 17 of 74

## Page 65

1    A    In the last 18 months, I think we have hired
2  ten new attorneys and I believe we will be hiring our
3  eleventh hopefully soon, if we can find somebody.
4        Q    What goes into training the new attorneys that
5  you're hired -- that you have been hiring?
6        A    Well, MSPD as a system has training for new
7  attorneys.  A week-long trial skills program that teaches
8  the basics of how to try a case.  A week-long what we call
9  New Defender Workshop, which kinds of teaches them the
10  basics of how to meet with the client, how to do your
11  deposition, how to do kind of the more nuts and bolts
12  day-to-day operations.  We also do a new employee
13  orientation, which is a day where they basically get their
14  sexual harassment training and kind of familiarized with
15  the -- our case management system and our HR division and
16  that sort of thing.  So a new attorney is going to spend
17  two weeks in learning how to do litigation, a day in kind
18  of learning, you know, not to be sexual harassing people
19  and that sort of thing.  And then we also have a
20  requirement that the first three years of employment they
21  go to our spring training, which is your more typical CLE
22  training where you would have -- there is different
23  breakout type sessions that cover different things
24  depending on what the attorney feels they need to work on,
25  so there is three more days.  So two weeks and four days as

## Page 66

1  a system.
2        Q    What about the training that you do in your
3  office?
4        A    The training that we do is really more
5  hands-on.  I mean, we used -- we have tried several times
6  to implement more in-house training but getting people to
7  find time to do that is almost impossible.  We have done
8  some and, you know, I usually will sit down with the new
9  attorneys and go through some of the basics with them.  We
10  try to pair new attorneys with more senior attorneys, but
11  that is beginning to fail because a senior attorney in my
12  office is someone with maybe a year experience.  It's
13  basically it's the last person remaining, not so much the
14  most experienced attorney.  So I have several attorneys who
15  are training new attorneys who have less than a year
16  experience, but it's hands-on in my office.
17        Q    And could you remind me roughly what
18  percentage of your time is spent training or supervising
19  new attorneys?
20        A    I think I said somewhere between -- I can't
21  remember, either 40, 50, 60, 70.  The more I think about
22  it, the more I think is more time really.  It's the bulk of
23  my time is spent with new attorneys.
24        Q    What do you do to train and supervise new
25  attorneys?

## Page 67

1        A    When attorneys -- so in my office I maintain
2  sort of an open door where I encourage attorneys to come to
3  me with questions.  So a lot of it is hey, I have got this
4  case and we kind of walk through the case together.  And
5  throughout that process you kind of identify areas where
6  okay you need to meet with this client in seven days and
7  every 30 days and kind of go through what the requirements
8  of the system are with them.  That's the bulk of it.  Like
9  I said, it's kind of hands-on just walking through the
10  cases that they have.
11        Q    Why is that important for new attorneys?
12        A    New attorneys have a great deal of difficulty
13  issue spotting.  They also have a great deal of difficulty
14  knowing the procedure and the process.  You know, law
15  school doesn't teach you how court goes in the 25th
16  Judicial Circuit.  It may teach you civil procedure and
17  criminal procedure, but that doesn't mean anything when you
18  step into a courtroom.  And so a lot of the questions are
19  really basic questions about like, you know, where is court
20  or how do I get to the jail or what's the pass code to get
21  back in chambers to talk to the judge.  I mean, it's that
22  basic with these new attorneys.  And then as, you know,
23  usually, you know, that first year the questions start to
24  get more advanced and we start to work on case specific,
25  suppression issues and things like that and then we start

## Page 68

1  over because they leave.
2        Q    Does your existing caseload impact your
3  ability to mentor and supervise other attorneys in your
4  office?
5        A    It does.  I mean, that's the difficulty trying
6  to find the balance.  What time do I spend on my cases
7  versus what time do I spend on theirs.  And so when I'm in
8  the office I try to make myself available to help the new
9  attorneys because my goal is to get them trained and get
10  them where they can be independent because that's going to
11  be the most value to me.  What that means though is that
12  I'm spending more time outside typical office hours working
13  on my own cases.
14        Q    You mentioned you have hired a lot of new
15  attorneys recently.  Is that typical in your experience?
16        A    I think MSPD has always had high turnover.  My
17  office has gotten progressively worse and the pools of
18  candidates have gotten worse.  So now it's not only do we
19  have the high turnover, but the candidates we are getting
20  are not as good.
21        Q    Why do you think that turnover has gotten
22  higher?
23        A    I think the recession had a great impact on
24  the quality of candidates and the amount of time they stick
25  around, but that no longer is an issue so we have seen

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 69

1   people getting hired out more frequently.  I think there is
2   also maybe fewer graduates.  I don't know what the issue
3   is, but we have a high turnover.  And in addition, the
4   prosecutor's offices, they continue to grow and so I train
5   attorneys to go become prosecutor's.  Not intentionally,
6   but that's the effect.
7        Q   So attorneys from your office have left to
8   join the prosecutors office?
9        A   Yes.
10       Q   Why were their reasons for leaving and join
11  the prosecutors office?
12       A   Well, the one that's leaving at the end of the
13  week is becoming a prosecutor.  He is leaving because he is
14  tired -- this is what he told me yesterday -- he is tired
15  of taking the cases home with him at night.  He didn't mean
16  working on them at night; he meant the fact that he knew he
17  had a client sitting in jail that he hadn't seen who is
18  just kind of wasting away in jail.  It wears on these new
19  attorneys.  Well, it wears on every attorney I think when
20  you know that you have clients.  You have people because
21  these aren't just cases, these aren't just numbers, these
22  are people.  When you can't do things to help them that
23  you know you should be able to do, I think that really
24  wears people down over time and you get burned out.  That's
25  what he tells me.  I believe him.  I think a lot of the

## Page 70

1   people that we hire are passionate about this.  They really
2   do believe there is injustice and they want to help the
3   clients.  There is other realities too though.  He is
4   leaving the job with us where he's making a $39,000.00 a year
5   and he's going to get paid $45,000.00 a year, at least I
6   believe.  He's also going to have freedom.  He can control
7   his caseload.  He can't control it with us.  He's also
8   going to get respect.  So he's going to be able to, you
9   know, get respect from not only the judges and other
10  prosecutors but the people in the community because nobody
11  likes a public defender.  So I think all those things kind
12  of come together and it's very difficult to want to do this
13  job long-term when nobody has any respect for what you do.
14  You don't get paid very well for what you do and you lose
15  that fire that you had when you were in law school about
16  wanting to help people or fight injustice or, you know,
17  defend the Constitution or whatever it was that motivated
18  you to become a public defender in the first place.
19       Q   Would you say the reasons that this attorney
20  gave you or that you think may have motivated him are
21  particular to him or do they apply to other attorneys who
22  have left your office recently?  Let me ask it in a more
23  basic way:  What have other attorneys told you are the
24  reasons for why they have left the office?
25       A   It's almost universally the same.  One

## Page 71

1   attorney left after in court the judge -- he asked for a
2   continuance.  The judge said no, I'm not giving it to you.
3   You're never ready.  He said that in open court.  And so
4   that was kind of the last straw for that attorney that he
5   was berated in court and told he was never ready, when it's
6   true, but it's not his fault.  So he put in his notice
7   three weeks later when he became a prosecutor and he loves
8   his job now.
9        Q   In your opinion, how many more attorneys would
10  you need to bring caseloads down to levels where you could
11  adequately represent your clients?
12       A   It a difficult question to answer because I
13  have never been in a system where we had adequate
14  attorneys.  So I think my judgment is colored by the fact
15  that, you know, when I started I had 200 cases and I
16  handled them or thought I handled them well  it turns out
17  that's probably not true.  So what do you go off of?  There
18  is the RubinBrown Missouri Project, there is the NACS
19  standards, there is my own personal views.  I will say
20  this, I think realistically if I'm going to do the things
21  that I want to do, if I'm going to meet the guidelines I
22  would need double.
23       Q   How many additional investigators would you
24  need to support your attorneys in being able to effectively
25  represent their clients?

## Page 72

1        A   I currently have two.  Again, it's hard to say
2   because if my attorneys were able to do more and get more
3   invested in their case and do more work, they would
4   certainly be requesting more.  Right now, my investigators
5   only have time to serve subpoenas.  So I would say we would
6   need at least double, so four, but probably more than that.
7   But again, it's hard to know.
8        Q   How do you supervise your new attorneys as
9   they manage their ongoing cases?
10       A   So we track caseload through our internal
11  database called Lotus Notes.  That's the predominate way
12  that I would keep an eye on their caseload because it lists
13  it out for me.  I also have regular conversations with the
14  attorneys to determine, you know, are they comfortable with
15  where they are at, do they think they can handle more.
16  This has been a more recent development based on the
17  waitlisting.  Prior to that, it was just as the cases came
18  into your county, you take them and, you know, their
19  caseload may be 200 cases, it may be 100.  It just depends.
20       Q   So let's turn to how things have changed
21  recently.  Are you familiar with the Hinkebein decision?
22       A   I am.
23       Q   What is your understanding of what happened in
24  that case?
25       A   My understanding is that Mr. Hinkebein, he was

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 73

1  being sanctioned -- or that the Office of Chief
2  Disciplinary Council was moving to sanction him because he
3  was unable to meet the requirements that were set forth in
4  his particular case.  I don't remember the exact details of
5  what it is was, but I think he missed some deadlines and
6  filings or something to that effect.  And that the OCDC had
7  decided to file a complaint against him and that he was
8  eventually sanctioned by the Supreme Court and put on
9  probation.  The defense in that case was that he had cancer
10  or that he had a medical condition and that he had a
11  caseload that was far in excessive of any reasonably
12  caseload and that he believed he would be fired if he
13  didn't handle it.  So that's kind of my general
14  understanding.  I have listened to the oral arguments.  But
15  beyond that, I don't know Mr. Hinkebein personally.  I
16  don't know any of the parties.
17       **Q  Did that decision have an impact on attorneys**
18  **in your office?**
19       A  Yes.
20       **Q  What was that impact?**
21       A  Well, in terms of myself and my deputy, it
22  made our job miserable.  Before that, you know, we got by.
23  But we thought we were -- we thought at a minimum, you
24  know, we thought Strickland v. Washington was the standard.
25  We thought we were at least meeting that standard that, you

## Page 74

1  know, we were providing -- if we did that, we were
2  providing ethical representation even though it wasn't the
3  representation we thought clients deserved.  When Hinkebein
4  happened, we realized that there was this gap between what
5  is ineffective assistance of counsel and ethical
6  representation and that Strickland is ineffective
7  assistance of counsel, but you can still be unethically
8  representing your clients if you're following that
9  standard.  So we realized all along we have been unethical.
10  That's what Hinkebein told us that we were unethical
11  attorneys because of the conflicts of interest that we had
12  between our clients when we took on additional clients.  So
13  that way very -- that was an eyeopener I should say.  It
14  brought to attention the problem in a different light.  And
15  it was kind of scary in the sense that, you know, with
16  Hinkebein they looked back I think three or four years and
17  how many clients had I represented in, you know, the last
18  three or four years, hundreds, and what have I messed up.
19  So it really bothered us because it also said in the
20  ethical rules that as a supervisor, I have a responsibility
21  to the people I supervise to ensure their caseloads are
22  maintained in an ethical manner.  That's why we started
23  waitlisting.  I know of attorneys who have decided
24  Hinkebein is kind of the last straw who have left.  I can't
25  say anybody in my office has left for that reason, but I

## Page 75

1  certainly think it's impacted their decision at least in a
2  couple of instances.
3       **Q  When you said that you'd previously been**
4  **viewing it through the Strickland standard; in your opinion**
5  **what was the Strickland standard prior to Hinkebein?  I'm**
6  **not trying to put you on the spot.**
7       A  I think the idea in Strickland is that you do
8  some basic things.  I don't remember the opinion verbatim.
9  I don't have that kind of memory.  My understanding
10  basically was like, look, if you're going to represent
11  someone, you meet with them.  You get discovery before you
12  plead them and you review that discovery.  You do some
13  basic things that we expect attorneys to do in every case.
14  But I never viewed it as something where, okay, if I can't
15  get to this client today because I have client "x" because
16  of client "y" that that was an issue.  It was just what we
17  had to do.  Ultimately, you know, we would do the bear
18  minimum, get the discovery and meet with the client.  So
19  that was kind of my view of Strickland.
20       **Q  So in your view, Hinkebein, by focusing on the**
21  **ethical rules, brought into view things like conflicts of**
22  **interest between existing clients; is that fair to say?**
23       A  Well, not only that, it brought in, you know,
24  I think we always try to be -- we always tried to meet the
25  diligence, communication, and that sort of thing.  The

## Page 76

1  rules for Missouri Supreme Court Rules IV says you have to
2  do.  But it was always kind of like -- at least in my
3  mind -- there was always some understanding, we'll we're
4  public defenders so there is going to be some leeway given
5  because everybody understands that we are overworked.  That
6  we have too many cases and that if they didn't feel that
7  way, then something would change.  But when Hinkebein came
8  along, they said you have too many cases and you have to be
9  proactive in doing something about it or you'll lose your
10  job.  So that -- that's what really brought to attention
11  those ethical rules that said look these aren't just
12  aspirational.  These apply to public defenders too.  So we
13  have a duty of diligence, which means we have to be prompt.
14  We have a duty of communication, which I think our
15  guidelines are ridiculous in that regard.  You have to meet
16  with a client within seven days if they are in custody, you
17  know, and every 30 days thereafter.  That's not the
18  representation I would want for myself, but that's our
19  guideline.
20       **Q  You would want more communication than that?**
21       A  I would certainly want more that.  The
22  idea that I could be sitting in jail for seven days and not
23  be -- not see an attorney, that's crazy.  That's absolutely
24  crazy, but that's what we have accepted as okay.  In my
25  office, it's probably rare that we get -- that we meet that

19 (Pages 73 to 76)

ALARIS LITIGATION SERVICES
www.alaris.us    Phone: 1.800.280.3376    Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-6   Filed 02/21/18   Page 20 of 74

## Page 77

1  deadline. I mean, I think all the attorneys try really
2  hard to be diligent in that respect and to communicate with
3  their clients as best they can. But, again, it's not just
4  possible with the number of clients that we have. And then
5  the other issue that's come up as a supervisor as I have to
6  look at competency. Are my attorneys competent. I can't
7  give a brand new attorney a murder first unless I really
8  hover over them and supervise them. And so we have a huge
9  problem in my office of competency. You know, I have a
10  bunch of new attorneys who don't know what they are doing.
11  And so as their supervisor, I have to manage their caseload
12  appropriately and make sure that they are doing the things
13  that that case requires.
14      Q   Did any attorneys in your office talk to you
15  about the Hinkebein decision or how it affected their
16  ability to do their jobs?
17      A   I met with every attorney in my office after
18  the Hinkebein decision to talk with them about their
19  caseload and every one of them indicated that they could
20  not ethically handle the caseload they had.
21      Q   What did you do after meeting with the
22  attorneys in your office about Hinkebein?
23      A   That's when I began a waitlist. So I sent an
24  e-mail to all the judges basically stating that because of
25  our workload, because of the fact that my attorneys can't

## Page 78

1  ethically represent the clients that they have, I'm going
2  to be begin waitlisting clients. We are not going to
3  refuse them, but we are only going to be able to handle the
4  ones that we can at any given time and still be following
5  the rules of professional conduct.
6      Q   I'm going to hand you a document that we're
7  going to ask the court reporter to mark Exhibit 55. Do are
8  you recognize this document?
9      A   I do.
10      Q   What is it?
11      A   It is the letter that I sent to the judges
12  after I met with the attorneys in my office regarding their
13  caseload and workload.
14      Q   So you've referenced a waitlist both in this
15  document and in your deposition testimony today. Could you
16  explain what you mean by creating a waitlist?
17      A   So when we receive an application from a
18  potential client, normally we would enter our appearance in
19  that case and begin, you know, file a request for discovery
20  or whatever work needed to be done. Once I implemented the
21  waitlist, the way that worked was when we would receive the
22  application we would notify the court and say we have
23  received the application, this person either qualifies or
24  they don't. If they qualify, they would go on our
25  waitlist. Basically what that is we create an Excel sheet

## Page 79

1  that had each county and the judge and had different
2  columns for what information we thought was pertinent for
3  the judges to have. We would send that out on a daily
4  basis just to let the courts and the prosecutors know these
5  are the people that have applied. These are the people
6  that qualify and this is where they are at on our waitlist.
7      Q   How many people are on that waitlist?
8      A   Currently?
9      Q   Currently.
10      A   I don't know currently off the top of my head.
11  Last time I looked it was over 200.
12      Q   Since you began the waitlist has that number
13  grown, stayed steady or dropped?
14      A   Well, the waitlist started with zero. We did
15  not add anybody to it who we already represented. So, you
16  know, as of September 29 or maybe probably really
17  October 1, I don't remember the first day we would have
18  actually sent it out, you know, there would have been two
19  or three people. It's just continually grown. Cases have
20  come off. So as I have regular meetings with the attorneys
21  and as they inform me that they are able to take more cases
22  and as I review their caseload and as I believe they are
23  able to take more cases, I assign cases to them. I may be
24  getting beyond the scope of your question, so if you want
25  me to continue I will, but --

## Page 80

1      Q   Feel free.
2      A   So the judges throughout this process the ones
3  that have -- there has been some judges that have given it
4  some credibility and have kind of followed it. Those
5  judges requested that I prioritize by people in jail
6  because I don't believe I can create a priority list. I
7  think there is case law that suggest that I can't pick
8  types of cases. The judges ask can you please take people
9  off the list that are in jail first; so we have done that.
10  Some judges basically said that the waitlist was in
11  violation of 600.062 and 600.063. Those judges have been
12  ordering myself and the public defender system into the
13  cases. We originally filed a writ of prohibition to the
14  court of appeals and the Supreme Court. It was denied. It
15  was sent back because they said we need to do 600.063. So
16  some of the cases are not included in that 200 because they
17  have been open to me. And that's a separate category on
18  the waitlist. Again, I have roughly 30 or 40 cases before
19  the waitlist; now I have 130.
20      Q   So when you testified earlier that you have
21  130 cases on your docket, that includes cases that
22  otherwise would have been on this waitlist but where judges
23  have ordered you to appear over objection?
24      A   Yes.
25      Q   And have you been treating those cases

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 81

1  separately from the other cases on your docket?
2  A.  No.  Except to the extent that because the
3  judge has specifically ordered me into them, I have
4  prioritize them when I assign cases out because it's my
5  interpretation that if a judge specifically orders me in a
6  case, it must be a priority.  So when new attorneys have
7  case availability, I give them those cases first, whether
8  they are in jail or not.  In terms of handling the cases
9  differently than the cases I had prior to this, it's kind
10  of difficult to answer that.  I don't -- I mean, I'm given
11  deadlines by the court and court dates.  So if a case is on
12  for a hearing, I don't really have the luxury of saying
13  well, I'm going to push it aside and just handle my
14  original 30.  The same ethical rules apply to those cases
15  where the judge I believe has ordered me in.  I think the
16  judge is violating the rule by appointing me knowing I
17  can't handle it, but I can't challenge it because the
18  Supreme Court has said file 600.063.
19  Q.  Before you were being ordered into these
20  cases, you said your docket was roughly 30 cases?
21  A.  It ranged between 30 and 50.
22  Q.  What kinds of cases are on the waitlist?
23  A.  All kinds.
24  Q.  Murder cases?
25  A.  I don't think there is currently a murder.

## Page 82

1  There was and then the judge ordered us in.
2  Q.  A, B felony case?
3  A.  Yes.  There are definitely A.B.  They are
4  robbery first.  There are serious cases on there.
5  Q.  And you said that some of the people on the
6  waiting list are currently in custody?
7  A.  Yes.
8  Q.  Do you know roughly how many people?
9  A.  Probably close to maybe 50 percent.  In
10  Crawford County, one of our counties that was probably the
11  most overloaded, we created the waitlist.  No cases have
12  come off that waitlist except for two or three where the
13  judge has specifically ordered us in.  So there is a lot of
14  people in jail in that county who are on the waitlist.  So
15  that kind of probably increases the average.  The other
16  counties we have been able to pull people out of jail and
17  get them off the waitlist a little faster.
18  Q.  Have you received any reaction from people who
19  are on the waitlist?
20  A.  Yes.  I have a stack of letters of -- I would
21  call them complaint letters, but I don't know that that's
22  really the right word.  They are saying, you know, I need
23  an attorney or you're my attorney, how come I haven't seen
24  you; that kind of thing.  But that pile just grows, it
25  doesn't every shrink.

## Page 83

1  Q.  For the people who are on the waitlist, what
2  happens to their criminal cases while they are on that
3  waitlist?
4  A.  Most of them, the judges have been passing
5  counsel status hearings.
6  Q.  Do you know of any people on the waitlist who
7  have pleaded guilty without counsel?
8  A.  I don't know any specific examples.  I'm sure
9  it's happened.  A lot of the judges are reluctant to do
10  anything with the case since they have applied for the
11  public defender and we have indicated to the court they
12  qualify.  So the judges -- I think most judges are
13  reluctant to do anything with them.  But I know or at least
14  I'm fairly confident that in at least a couple of
15  circumstances people have pled guilty.
16  Q.  What circumstances were those?
17  A.  Well, the circumstances would be the county
18  that they were in.  So Texas County, I would guess that a
19  number of those people who were in jail, especially on
20  lower-level charges like misdemeanors and probably
21  low-level felonies, the prosecutor probably got them to
22  plead because it was probably the promise of probation.
23  Q.  And you said probably because you have no
24  personal knowledge of those cases?
25  A.  Right.  And I have just seen this happen in

## Page 84

1  Texas County, so I know it happens and I wouldn't be
2  surprised if people on the waitlist.  One of the weaknesses
3  of the waitlist is that it would expect, or at least I
4  would expect that we would go through and evaluate it from
5  time to time to make sure that these people haven't hired
6  counsel or pled.  I haven't really had the luxury to
7  reevaluate it.  So 200 cases on the waitlist or 200 clients
8  on the waitlist, you know, it may be slightly less because
9  some of those people have maybe they have hired counsel or
10  maybe they have pled, but I have no way to -- well, I have
11  a way to do it, but I don't have the time to do it.
12  Q.  How have judges in your area responded to this
13  letter that you e-mailed them?
14  A.  Well, most of them ignored it.  We met with
15  all the judges.  So I sent this letter and then we then met
16  with all of them to talk with them about it.  One of them
17  threatened or made a veiled threat of holding me in
18  contempt.  A couple of them were in agreement that, I think,
19  something needed to be done and they actually, I think,
20  made attempts to assist us and that would have been the
21  42nd Judicial Circuit.  So they did things like basically
22  abided by the waitlist.  They didn't order us in any cases.
23  They made some minor attempts to appoint private counsel.
24  But that's the exception, so.
25  Q.  What do you mean when you say minor attempts

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 85

1   to appoint private counsel?
2      A   Well, if there is -- I know of at least one
3   instance where a private attorney was in the courtroom and
4   it was a probation matter and we had indicated this
5   particular person was on the waitlist. The judge looks
6   around and sees this private attorney and says to the
7   attorney, "Welcome to court today. I'm appointing you in
8   this case."
9      Q   Do you know who that attorney was?
10     A   Yes.
11     Q   Did they have prior criminal experience?
12     A   Yes.
13     Q   Do you have any supervision over that case
14   that otherwise would have been assigned to the MSPD?
15     A   No.
16     Q   So I'm going to hand you another document that
17   we'll mark -- we'll ask the court reporter to mark Exhibit
18   56. Do you recognize this document?
19     A   I do.
20     Q   What is it?
21     A   Again, it's the correspondence I sent to the
22   judges. I think it's -- well, at least the first two pages
23   are the same document that was Exhibit 55, I believe.
24     Q   What about the rest of this exhibit?
25     A   This was correspondence with one of the

## Page 86

1   judges -- well, it looks like it's e-mails that I sent in
2   regards to the waitlists and the caseload issues in general.
3   There is an e-mail I sent to one of the prosecuting
4   attorneys and then correspondence between one of the
5   circuit judges and one of the attorneys who is no longer in
6   my office.
7     Q   Let's -- I think this is how it's produced but
8   I think as you indicated it's a few different e-mail
9   threads. So let's start on the second to last page that's
10   Bates Stamped and dated 39446.
11     A   Okay.
12     Q   What e-mail does this appear to be to you?
13     A   This was an email that I sent to Kevin Hillman
14   kind of letting him -- updating him on what we were doing
15   regarding the waitlist.
16     Q   Who is Kevin Hillman?
17     A   He is the elected prosecutor of Pulaski
18   County.
19     Q   Why were you sending the e-mail to Kevin
20   Hillman about the waitlist?
21     A   I think -- I'm having difficulty remembering
22   because I had a lot of conversations. We met with Mr.
23   Hillman and talked with him about the issue. I think at
24   this point in time there was a document circulating amongst
25   the prosecutors that was an objection to the waitlist and

## Page 87

1   it was saying that we were violating 600.063 and 600.062.
2   And so I think he was asking, you know, was this something
3   going on. Were we being ordered to do this or was I doing
4   this on my own. I said no, this is coming my attorneys and
5   me and not Columbia.
6     Q   And by Columbia, you mean the central MSPD
7   office?
8     A   Right.
9     Q   So your understanding is he had expressed
10   concern that this was an order coming from the MSPD central
11   office?
12     A   Right.
13     Q   And you were explaining to him that this was
14   the decision your office and your attorneys had made?
15     A   Right. Because we had -- I think one of my
16   attorneys had told him that this was coming from Columbia,
17   and I just think they didn't understand who was actually
18   creating the waitlist. It had nothing to do with Columbia.
19   I didn't ask for permission. I don't even think I
20   notified -- I probably sent them a copy of it. I don't
21   think I said hey Jackie is it okay that I do this. I'm
22   pretty sure I just did it.
23     Q   Do you see in here a reference to a meeting
24   with Judge Long and Judge Hedrick?
25     A   Hedrick.

## Page 88

1     Q   Hedrick.
2     A   Yes.
3     Q   It says you were planning to go to meet with
4   them. Do you know if that meeting took place?
5     A   It took place with Judge Long, not with Judge
6   Hedrick. I don't think Judge Hedrick was available that
7   day. He -- honestly, I don't know that we actually ever
8   met with Judge Hedrick now that I think about it. He is
9   the family court judge and the civil judge and he doesn't
10   really handle criminal cases except for maybe a few change
11   of judges. Judge Long is the main judge for criminal cases
12   in Pulaski County. Sorry.
13     Q   No go ahead.
14     A   That meeting with Judge Long did occur.
15     Q   What happened at that meeting?
16     A   The judge in chambers acknowledged more or
17   less that yeah, you guys got a problem. But like most
18   judges, they are not really able to do anything about it or
19   at least they feel like they can't and that it's our
20   problem, not theirs. He kind of had a let's wait and see
21   approach to the waitlist. It was a cordial meeting. One
22   of the prosecutors was there. I don't remember if Kevin
23   was there. I know Brice Crowly and one of the assistant
24   prosecutors was at that meeting in chambers. We just kind
25   of outlined where we were at and why we were there and how

ALARIS LITIGATION SERVICES
www.alaris.us      Phone: 1.800.280.3376      Fax: 314.644.1334

## Page 89

1    we got there.  This judge, Judge Long, it wasn't long
2    before he adopted the policy of appointing me, so he's one
3    of the judges who disregarded the waitlist.
4        Q    If you look at the prior two pages ending in
5    Bates Stamped 44 and 45, what does this e-mail chain appear
6    to refer to you?
7        A    This was in reference to Michael Jacobs, an
8    attorney who was in my office at the time, but who got
9    hired as the district defender of our Troy office.  And Mr.
10   Jacobs when he got that position, I told him that I would
11   not be reassigning his cases to another attorney in my
12   office because I didn't believe I had any attorney who
13   could take those cases until we got somebody to replace
14   him.  And so this is kind of -- this was his attempt to see
15   if he could get the judges to let him out of those cases.
16   Judge Hickle would not let him out without another attorney
17   entering.
18       Q    And if you turn back to Bates -- the prior
19   page ending in Bates Stamp 43 I think that e-mail from you,
20   does it appear that e-mail from you to Judge Hickle is also
21   part of this e-mail chain?
22       A    Yes.
23       Q    So this e-mail says that you would be happy to
24   meet with Judge Hickle to discuss Mr. Jacobs cases.  You
25   indicated that Judge Hickle would not allow him to simply

## Page 90

1    withdraw from those cases.  So what was the result of this
2    exchange?
3        A    Mr. Jacobs still has one or maybe two cases.
4    When I -- after -- I could not keep Michael Jacobs in
5    Rolla.  That became very clear.  I could not -- he could
6    not keep the cases and be the district defender in Troy.
7    It's just not logistically possible.
8        Q    How far is Troy from Rolla?
9        A    It's maybe 150-miles.  It's over a two-hour
10   drive.  Michael was handling Texas County, which is another
11   50-miles, an hour down the road.  So it would be over three
12   hours for him to go to court and meet with clients one way.
13   What happened as a result of that is that again the judge
14   would not let Michael out, which I was okay with because I
15   didn't have anybody to give the cases to.  But through
16   discussions with our director, trial division director and
17   our contract, our deputy director, Joel Elmer and Ellen
18   Blau, they were able to find some money to provide to my
19   office to contract out cases and so we were able to
20   contract out about half of Michael's cases.  The other half
21   he disposed of over the course of the month or so that he
22   knew he would be leaving.  I took a few of his cases, the
23   ones that we wouldn't be able to contract out.  Then, like
24   I said, he's left with maybe one or two cases, a murder
25   first and a couple others.  I don't remember what they are.

## Page 91

1        Q    Why don't you try to contract out more cases
2    given the waitlist?
3        A    I send every single case that I have been
4    ordered to enter since I began the waitlist, I have sent a
5    conflict form, our standard conflict form, and it's been
6    filled in with the case information, kind of the court
7    dates, the client.  I send every one of those to Joel
8    Elmer, our deputy director, who is in charge of contracts
9    saying it's a conflict.  Every one of those have been
10   denied.  I have -- I don't have a budget within my own
11   office to contract out conflicts.
12       Q    When you have indicated that they have been
13   conflicts, in what sense are they conflicts?
14       A    I may get the rule wrong, but I think it's
15   4-1.16 or 17.  In the sense that by taking that
16   representation, that is going to take away time that I need
17   to spend on my other cases.  I can't represent them both
18   because of the time constraints.
19       Q    You said that these request were denied.  Were
20   you given any other explanation for why they wouldn't be
21   contracted out?
22       A    I think realistically -- well, there is a
23   number of reasons I suspect and this would be speculation
24   because I don't think Joel Elmer ever gave me anything more
25   than denied.  But I do know this, that you know, the

## Page 92

1    contract budget of MSPD is limited.  But probably more
2    importantly, in my geographic area, that we are have very
3    few panel attorneys.  The panel attorneys we have handle a
4    huge caseload of ours.  I don't know how many cases we
5    contract out a year, but I would guess it's probably at
6    least 200.  My understanding that our conflict division
7    attempts to keep these attorneys at a reasonable level.
8    What level that is, I don't know, but they won't give them
9    400 cases.  You know, they are not going to give them ten
10   murders.  They are going to try and make sure clients
11   receive adequate representation.  I lost my train of
12   thought.
13       Q    That's all right.
14       A    I don't remember what it was.  The other thing
15   they try to do is that, again, you have to have an attorney
16   who is competent in handling a case and private attorneys,
17   generally speaking, they don't have an advantage of having
18   a system of attorneys.  There is a lot of solo
19   practitioners in our area.  So for example, this murder
20   first case that Michael Jacobs had to keep, we really
21   wanted to contract it out.  But the only attorneys that
22   would be competent to handle it refused to take it.  So
23   even if we had $10,000.00 to pay someone to take it,
24   because that's that rate for a murder first, nobody wanted
25   it.  So even if theoretically, you know, we have the money,

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 93

1  but nobody wants to handle our cases.
2      Q   In your opinion why do you think nobody wanted
3  to handle it?
4      A   Because of the time it takes.  In fact, one of
5  the attorneys I actually e-mailed because I thought he
6  might be interested said he doesn't have the time to invest
7  in it.  That would it take way too much time and it would
8  be better handled by a public defender who has the time.
9      Q   Do you think the payment schedule for conflict
10 cases impacts the ability to refer cases out?
11     A   Well, certainly.  I mean, if we were offering
12 $30,000.00 for a murder first, you'd probably more people
13 would be inclined to take it, but $10,000.00 for a murder
14 first is kind of a joke.  I mean, I wouldn't want it as a
15 private attorney.
16     Q   Why?
17     A   That's way too much work.  I mean, the fact
18 that, you know, this person is facing potential of a death
19 sentence, you know, that's a case where you generally
20 probably don't want to leave any stone unturned to ensure
21 they get the best representation possible because of the
22 finality in the outcome.  So the hours you would spend, you
23 know, there is no limit.  You know, murder first where they
24 are none death take tons of time, probably, you know well
25 over hundred hours easy when you take a death penalty case.

## Page 94

1  So I'm not going to take a case and get paid pennies on the
2  dollar.  So I think our capital division, I don't know but
3  they have limits on how many they handle and I think it's
4  six at a time or six a year or something like that.  So if
5  that's their limit, if you're a private attorney, you got
6  to pay the bills.
7      Q   So the capital division doesn't handle
8  necessarily every capital case in the MSPD system in your
9  understanding?
10     A   No, they handle every capital case, but not
11 every murder first goes capital.  So every murder first has
12 the ability if the prosecutor chooses to file aggravators
13 and go death, they can do so.  This particular case I'm
14 talking about right now the prosecutor has not filed
15 aggravators and has not sought the death penalty.  Although
16 yesterday he indicated he wanted this guy to get the
17 needle, so that may change.  If that changes, it will go to
18 our capital division but right now it remains ours.
19     Q   So a case could proceed to trial without
20 aggravators and remain with a trial division area until
21 aggravators are filed, then it switches to the capital
22 division?
23     A   Right.  And we handle several murder first at
24 any given time where they are none death.
25     Q   When is the latest a prosecutor can file

## Page 95

1  aggravators, if you know?
2      A   I don't know but I know I had a prosecutor on
3  a defendant murder first case say this last week that he
4  could file up to the day of trial.
5      Q   Do you recognize this document?
6      A   Yes.
7      Q   What is it?
8      A   It is an e-mail I sent to our trial director
9  Ellen Blau, regarding some of my concern with how things
10 were moving.
11     Q   Why did you send her this e-mail?
12     A   I think I already said that this job has
13 become miserable.  This was kind of in response to that to
14 say we need resources.  We need something to happen.  I can
15 only do so much.  So to the extent that my office is short
16 of resources, I'm asking Ellen Blau, or whoever above me to
17 give me resources to address this problem.  That's the same
18 as me sending the conflict forms to Joel Elmer, the deputy
19 director.  It is an attempt to say I can't represent these
20 people.  Please give me some help.  I'm really thinking in
21 this particular case, I'm telling Ellen I'm seriously
22 thinking of quitting.  You know, figure something out so I
23 can keep doing this work.
24     Q   Why were you seriously thinking of quitting?
25     A   Because I want to do a good job.  I want to be

## Page 96

1  able to represent my clients.  I want my attorneys to be
2  able to represent their clients to the best of their
3  ability.  I want these clients to get their fair -- to get
4  justice, whatever that may be.  When the files continue to
5  pile up and people continue to sit in jail and you're not
6  doing anything about it and can't do anything about it, it
7  leads you to start thinking about alternatives like why do
8  I do this.  Why do I continue to try to fight this
9  injustice when nobody seems to care.  Maybe I'm wrong.
10 Maybe all that this really needs is a suit to stand up next
11 to this person.  Anyway, you begin to question why it is
12 you do what you do and why do you put up with it everyday.
13 I can get a job somewhere else and in fact I did start
14 looking for other work.
15     Q   What led you to join the MSPD in the first
16 place?
17     A   Well, like I said, I did the two internships
18 in law school.  I did the public defender internship.  I
19 did a civil internship.  I certainly liked the money aspect
20 of the civil, but I enjoy the public defender practice and
21 I prefer rural area.  So I didn't really want to live in a
22 city.  So between those two things, I really liked the idea
23 of being a public defender.
24     Q   In this e-mail, you said, "The words of Zell
25 Fisher ring louder to me every day."  Do you recall what

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 97

1　you were referring to?
2　　　A　Yes.  In the Hinkebein decision, Zell Fisher,
3　he's on the Supreme Court.  He basically said -- I never
4　get it right, but he said something along the lines like
5　"Sometimes you do something" -- I don't remember exactly
6　but sometimes you take a different job and that's what I'm
7　referring to is the take a different job.  If I can't
8　provide ethical representation; if I can't do the things
9　that I'm required to do as a lawyer that I swore to do when
10　I took the oath and that I just signed my bar form the
11　other day to get my new bar card, you know, and I had to
12　reaffirm the oath.  If I can't live by that doing this job,
13　then maybe it's time to look at taking a different job
14　because I don't want to be suspended.  I don't want to lose
15　my license.  But probably more importantly, again, I think
16　Hinkebein opened my eyes to the fact that I haven't been
17　providing ethical representation.
18　　　Q　Do you think the lawyers in your office are
19　able to provide ethical representation?
20　　　A　No.
21　　　Q　I'm going to show you another set of e-mails
22　I'll ask the court reporter to mark as Plaintiff's 58.  If
23　you just take a minute and review this document.
24　　　A　Okay.
25　　　Q　What does it appear to be to you?

## Page 98

1　　　A　This -- back when we initiated the waitlist,
2　we received -- or I received this response from Judge
3　Pearson, the presiding judge in the 42nd circuit.  He was
4　very concerned that people would be sitting in jail and
5　would not receive an attorney early enough in the process.
6　And so he had requested that we arrange a meeting to
7　discuss what can be done.  I think Judge Pearson recognized
8　there was a problem and was trying to find ways to address
9　the problem and so this was the back and forth to try to
10　get together and meet.
11　　　Q　Did you meet with Judge Pearson?
12　　　A　I did.  We had a meeting with Judge Pearson
13　and Judge Bernstein and the assistant prosecutor of
14　Crawford County.
15　　　Q　How did that meeting go?
16　　　A　We received a muted favorable reception from
17　the judges.  Again, Judge Pearson I think he will
18　acknowledge and he has.  He has provided a 600.063 order
19　and I think he said something along the lines like they
20　aren't able to provide effective representation.  So he
21　acknowledges that, but he want us to provide solutions to
22　that problem and he was asking us at the meeting what
23　solutions do we have.
24　　　Q　Did you have solutions to offer him?
25　　　A　We did.  You know, we asked him to allow us to

## Page 99

1　waitlist.  We asked him to appoint private attorneys and we
2　asked for him to be lenient on continuances with people out
3　of custody.
4　　　Q　Did he allow you to use the waitlist?
5　　　A　He did.
6　　　Q　Has he appointed private counsel in cases?
7　　　A　I don't believe he has.  But the associate
8　judges in the 42nd; one associate judge has and the other
9　circuit judge has.
10　　　Q　Do you have an understanding of how the
11　private bar has reacted to being appointed cases?
12　　　A　Well, they do not like being appointed.  I
13　have only spoken to one who was appointed and he just kind
14　of joked about it.  But also in that same conversation, he
15　liked the waitlist because it was generating clients for
16　him.
17　　　Q　Do you know roughly how many cases in your
18　area have been referred to private attorneys that are --
19　that would otherwise be on your waitlist?
20　　　A　I think two.
21　　　Q　And has Judge Pearson or other judges in Texas
22　County been granting continuances to people or been more
23　lenient with continuances, I believe is what you said?
24　　　A　I don't think we have got to the point where
25　we have asked for continuances on cases that are cases that

## Page 100

1　we have been appointed that were on the waitlist because we
2　really haven't been appointed to very many cases.  The 42nd
3　Circuit, the judges there, it's a very relaxed circuit.  So
4　cases kind of sit forever.  I mean, so at this point with
5　these being brand new cases, they are probably getting set
6　for trial a year from now.  So it's not really something
7　where you're saying we need anything continued.  You know,
8　time will tell.
9　　　Q　Are there judicial circuits other than the
10　ones we have talked about through these documents that I
11　haven't mentioned that you're responsible believe for?
12　　　A　The only two circuits we are responsible for
13　are 25th and the 42nd.
14　　　Q　So I'm going to show you a document that's
15　previously been marked Petsch Exhibit 5.  Do you recognize
16　this document?
17　　　A　I'm sure I have seen it, but I don't.
18　　　Q　What does it appear to be to you?
19　　　A　Well, it's a suggestions for a writ of
20　prohibition that looks like it was drafted I'm guessing
21　probably by Greg Mermelstein to be used when a court
22　appoints us.
23　　　Q　You mentioned earlier that you had filed a
24　writ to try to object to an appointment by judges in your
25　area.  Did that writ look similar to this motion or was it

ALARIS LITIGATION SERVICES
www.alaris.us　　　Phone: 1.800.280.3376　　　Fax: 314.644.1334

## Page 101

1  different?

2  A  I'm sure it was similar.  We did not receive

3  any assistance from our offices, our main office in

4  Columbia, in doing our writ.  We did that on our own.

5  Q  And that writ was denied?

6  A  It was denied at the Court of Appeals and the

7  Supreme Court.

8  Q  Have you filed any other writ since that writ

9  was denied by the Supreme Court?

10  A  The Supreme Court, although they did not issue

11  an opinion, they checked a box that said due to 600.063

12  hearing because they did not deny it with prejudice.  So

13  they hinted at that we could re-file it after we do

14  600.063.

15  Q  What is a 600.063 hearing?

16  A  Well, 600.063 is a statute whereby it is our

17  remedy when we believe that we have too many cases, we are

18  supposed to file a motion with the court to ask the court

19  to review our caseload.  Not of all of attorneys, but just

20  of one or some for the court to determine whether or not

21  one, we are over worked; and two, if so, what remedies.

22  Q  Have you filed any 600.063 motions?

23  A  Yes.

24  Q  How many?

25  A  Two.

## Page 102

1  Q  What was the result of the filing of those

2  motions?

3  A  I filed one in the 42nd Circuit and one in the

4  25th Circuit.  In the 42nd Circuit we had a hearing.  That

5  was with Judge Pearson.  He -- I don't know if grant is the

6  right word, but he issued an Order basically saying that

7  yes, he believed that the attorneys that I had suggested in

8  the motion could not handle effectively their cases and he

9  listed out a number of remedies that mirrored the statute.

10  Q  What are those remedies?

11  A  That the judge can waitlist.  That he can be

12  lenient with continuances.  That he can appoint private

13  counsel.  That he can -- those are the three I remember.  I

14  believe there is maybe six, five or six.  I don't remember

15  what the other ones are.  But he basically listed those out

16  as potential remedies.

17  Q  What happened in the other judicial circuit?

18  A  The other circuit the judge has scheduled a

19  hearing for Wednesday of next week.

20  Q  Why did you first send the e-mail saying that

21  you were creating a waitlist before filing a 600.063

22  motion?

23  A  Well, as I expected, the 600.063 motion would

24  not provide relief and it doesn't allow us to address an

25  entire office, so it didn't really seem like there was a

## Page 103

1  whole lot of point in following the statute in that

2  particular instance.  So I created a waitlist.  I believe

3  it's 600.062 says we cannot refuse cases.  It was never my

4  intention to refuse representing any client; that we would

5  represent all of them.  It just meant we would represent

6  them as an attorney was available, so that was the purpose

7  of the waitlist.  So that's why I went that route.

8  Q  I'm going to show you a document that's

9  previously been marked Exhibit 54 -- or actually you can

10  put that aside for one second.  Finishing on 600.063; you

11  mentioned that 600.063 doesn't apply office-wide.  What was

12  the scope of the Order that Judge Pearson entered for

13  600.063?

14  A  It applied to -- in my mind it applies to

15  Crawford and Dent County only and the attorneys in those

16  counties.  So I don't -- it's again, it's a difficult

17  statute to understand and even though it's short, it's not

18  technically difficult, but application-wise it was written

19  by a legislature who doesn't really understand know court

20  proceedings and how things happen.  So they didn't even

21  really tell you how to file it or, you know, do you file it

22  in an individual case.  I did it by just e-mailing the

23  judge and said here is my motion.  But I think Ruth filed

24  it in a case and I don't know that neither way is wrong

25  necessarily.  So I don't know at this point whether it

## Page 104

1  applies only to the three attorneys that I have in Crawford

2  and Dent County.  Does it apply to the counties?  I don't

3  know.  Does it apply to other attorneys if they transfer

4  in?  Time will tell.

5  Q  If you could look at Exhibit 54 now.  Do you

6  recognize this document?

7  A  I do.

8  Q  What is it?

9  A  It is a suggested motion to withdraw that was

10  created by, I believe, Greg Mermelstein to provide some

11  guidance should an attorney feel that they cannot meet the

12  demands of their caseload.

13  Q  Why would an attorney in the MSPD use this

14  document?

15  A  Well, because I think probably every attorney

16  in MSPD has an excessive caseload and probably should be

17  moving to withdraw on cases because they are unable to

18  provide ethical representation.

19  Q  Have any attorneys in your area moved to

20  withdraw from existing cases?

21  A  One has.

22  Q  Who is that?

23  A  Me.  I actually filed this -- I believe this

24  motion.  It's a lot of work.  I spent a lot of time putting

25  it together and it was summarily denied.

26 (Pages 101 to 104)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-6   Filed 02/21/18   Page 27 of 74

## Page 105

1    Q    There was no hearing over the motion?
2    A    The court called it up and I said, "Judge, I
3    filed a motion." You know, we had a little discussion on
4    it, but that was -- that was it.
5    Q    Do you know of any other MSPD attorneys that
6    have filed similar motions?
7    A    No one in my office I believe has filed this
8    motion.
9    Q    Do you know what the Missouri Coalition for
10   the Right to Counsel is?
11   A    I do not.
12   Q    Are you aware of any pro bono programs that
13   have been created to take criminal cases that would
14   otherwise be handled by the MSPD?
15   A    Yes. It may be that, I just don't remember
16   the name. My understanding is that in St. Louis and Kansas
17   City that some of the law firms there have agreed to take
18   cases to help train their young attorneys in litigation.
19   Q    But those programs are limited to, in your
20   understanding, Kansas City and St. Louis?
21   A    I don't think they are limited to that but in
22   rural Missouri there are not law firms that have excess
23   capability, I think, to take on cases like that pro bono.
24   Q    So there are no, as far as you're aware, pro
25   bono programs or representation in counties that your area

## Page 106

1    covers?
2    A    There are certainly no programs.
3    Q    We talked earlier about the high rate of
4    turnover in your office. What kinds of problems are caused
5    by high turnover rate?
6    A    Clients go through multiple attorneys. Every
7    time an attorney gets a case, they have to get up to speed
8    on a case and that takes a lot of time. So cases take much
9    longer than they should to get to some disposition. It
10   creates training problems. I mean, the biggest impact of
11   the constant turnover is that, you know, it's a huge time
12   waste to get attorneys up to speed. And then the other
13   issue is when I'm hiring attorneys, I lose, you know, a day
14   every time I have to do interviews.
15   Q    How are cases transitioned when someone leaves
16   the office?
17   A    Traditionally, when somebody would leave the
18   office, typically at that point they are handling more
19   serious cases. So those cases would probably have to be
20   given to an experienced attorney, the higher level
21   felonies. So you would shift the caseload. So the person
22   leaving cases would then go to next most senior attorney
23   and that attorney would then shift their cases to the
24   incoming attorney.
25   Q    Does that affect the ability of attorneys in

## Page 107

1    your office to provide effective representation?
2    A    Yes.
3    Q    How?
4    A    Well, ideally, a client would have I think
5    horizontal -- or vertical representation. So they have the
6    same attorney from the date that, you know, they are
7    charged when they first get their attorney through trial or
8    plea. I think that goes -- that's for a whole host of
9    reasons that I have already talked about like, you know,
10   developing trust, understanding the case, you know, what
11   discovery is needed, what experts are needed, why certain
12   things have happened. You know, the memory that you get
13   from doing a preliminary hearing or something just knowing
14   whether a witness is credible or not. There is a whole
15   host of things. Every time you transfer a new attorney
16   into the case, that's lost and they don't have that same
17   frame of reference that the other attorney had. And so you
18   lose that every time and I think you just lose more and
19   more every time you change attorneys. But also the
20   client's right. I mean, the clients have a right to a
21   speedy trial. And, you know, even if we are not asserting
22   it, the idea that most clients that I have, you know, if
23   they are in custody will be custody if they go to trial for
24   a year or more, awaiting trial is in large part of a
25   function of the fact that they have gone through four or

## Page 108

1    five different attorneys by the time it gets to trial. And
2    the only reason it's getting to trial is because now it's
3    my case because the judge refuses to grant any further
4    continuances and I cannot give it to a brand new attorney.
5    Q    You said four or five attorneys for a single
6    case; how common is it for a case in your office to be
7    transferred to four or five attorneys over the life of the
8    case?
9    A    On the more serious cases, that's probably the
10   norm. On the -- misdemeanor or C, D, E felonies that don't
11   take a year. You know, if it's a case that only takes six
12   months, you're probably going to have the same attorney.
13   You know, you might go through two attorneys. But on like,
14   you know, murder, rape, unclassified felonies, you are
15   going to have four or five until it gets to me.
16   Q    How long does it take you to fill a position
17   after somebody leaves your office?
18   A    Historically it would take a month to a
19   month-and-a-half. Right now we have an opening. I had
20   four applicants that were qualified. And when I say
21   qualified, it used to mean that they at least had a
22   license. Now qualified means that they are capable of
23   getting a license.
24   Q    By capable of getting a license, do you mean
25   they are recent law school graduates who haven't passed the

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 109

1  bar yet?
2      A    The last person I hired, he had a license out
3  of Oklahoma, so he had to get a temporary license and he
4  has to take the bar in February.  The two people prior to
5  that were Rule 13.  So they were law clerks in my office
6  until they -- and I hired them in August.  So they were
7  basically practicing under my supervision up until October
8  when they got their results.
9      Q    And in terms of the available attorney
10  positions that you have to fill, did those attorneys still
11  count against those slots even though they were unable to
12  practice --
13      A    Yes.
14      Q    -- by themselves?
15      A    Yes.
16      MR. SHAHABIAN:  I think now is a good time for
17  a break.  Go off the record.
18      THE VIDEOGRAPHER:  Going off the record.  The
19  time is 4:25 p.m.  This ends Media 2.
20      (A recess was taken.)
21      THE VIDEOGRAPHER:  Going back on the record.
22  The time is 4:34 p.m.  This being Media 3.
23      Q    (By Mr. Shahabian) Thank you for sticking
24  around, Mr. Crowell.
25      A    You're welcome.

## Page 110

1      Q    I wanted to just touch on a few -- we are
2  going to jump a little bit and clean up a few random
3  things.  So I want to show you a document that I will ask
4  our court reporter to mark Plaintiff's 59.  Do you
5  recognize this document?
6      A    I can see that I received it at some point,
7  but I don't have an independent recollection of it.
8      Q    What does it appear to be to you?
9      A    An e-mail chain between Chad Picker, who would
10  have been the district defender of my office, and I
11  would have been the deputy district defender, regarding
12  judges appointing us.
13      Q    And if you look on the second page of the
14  document ending in Bates Stamp 59, do you see there is an
15  e-mail from Ellen Blau that asks you to look at a
16  spreadsheet and explain why the numbers of cases coded as
17  judge determining indigency are above average in your area
18  as compared to the rest of the MSPD?
19      A    Yes, I see that.
20      Q    What does she mean -- do you know what she
21  means by a case coded as the judge determining indigency?
22      A    Yes.  So whenever -- whenever we receive an
23  application we make a determination of whether or not they
24  qualify for our services.  If they qualify, it would be
25  coded as -- I'm not sure what it would be coded as, but it

## Page 111

1  would basically be that we entered the case because they
2  met our qualifications.  What this is saying is that we
3  denied them for some reason and so we had a determination
4  made by the judge that we needed to enter the case.
5      Q    So these are cases where your office denied an
6  indigency determination, but over your denial the judge
7  independently determined the defendant to be indigent and
8  appointed the MSPD to represent them?
9      A    Yes.
10      Q    And if you turn to the first page ending in
11  Bates Stamp 58.  Do you see the e-mail from Chad Picker?
12      A    Yes, I do.
13      Q    He says, "Ellen, it is part of the HB215
14  agreement with the judges to help with our caseload.  If
15  the indigent PV and misdemeanor cases cannot be resolved
16  with the PA, judge, and defendant we are appointed."  Do
17  you have an understanding of what he's referring to in this
18  e-mail?
19      A    I do.
20      Q    Could you explain what your understanding is?
21      A    So I don't remember the year, but I believe it
22  was sometime after the Waters decision.  The legislature
23  came out with House Bill 215, which basically kind of
24  clarified the cases we could enter.  Chad and I met with
25  the judges and it was agreed that we would only enter into

## Page 112

1  misdemeanors or probation violations if we were
2  specifically ordered into the issue.  So a lot of the cases
3  probably why our numbers looked higher than the rest of the
4  state was because of that agreement that the judges made
5  with us.
6      Q    Do you know what Mr. Picker is referring to
7  when he says "if the indigent PV and misdemeanor cases
8  cannot be resolved with the PA, judge, and defendant"?
9      A    Yes.  What that refers to is in a misdemeanor
10  or probation violation, that's what PV means, it's expected
11  in the 25th and 42nd circuit that prior to appointment of
12  public defender in a case, that the judge -- well, that the
13  prosecutor is going to meet with the defendant and say here
14  is my offer in your case.  So, for example, let's say it's
15  a misdemeanor DWI.  The prosecutor would meet the with the
16  defendant and say my offer to you is a suspended imposition
17  of sentence, you know, if you want it, you can take it; if
18  you don't, you know, whatever.  So if they agree, if the
19  defendant takes that offer, then he would plead and that
20  would be the end of it.  If the defendant doesn't plead or
21  does not want the offer, then the judge would consider
22  whether or not he needs to appoint us, assuming they
23  qualify.
24      Q    Was jail time a possibility in these cases?
25      A    Yes.

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 160-6    Filed 02/21/18    Page 29 of 74

## Page 113

1    Q    And so to be clear, at this point prosecutors
2    would meet with defendants who potentially qualified for
3    MSPD representation but had not been appointed counsel?
4    A    Right.
5    Q    In your understanding, were those meetings --
6    in those meetings, did the defendants have other counsel?
7    A    They would not have had counsel.
8    Q    So they would meet with the prosecutors pro
9    se?
10   A    Yes.
11   Q    And they would be offered sentences -- deals
12   on charges that potentially implicated jail time?
13   A    Yes.
14   Q    Do you know if the deals offered included jail
15   time as a possibility?
16   A    I would say most of them had jail time as a
17   possibility.
18   Q    What kinds of sentences -- sentences would be
19   imposed in those cases?
20   A    I think generally speaking these agreements
21   that are made and are still done on these misdemeanors
22   cases are SIS probations and SES probations. So the
23   defendant, if they accept the offer, they're going to be
24   placed on probation. So jail time is a possibility, but
25   only if they violate the probation. So that's what I think

## Page 114

1    most of these were. Now, it does happen where a person
2    maybe is in custody and the prosecutor say my offer is ten
3    days, credit for time served or ten days or whatever, and
4    the defendant may choose to take that. In the probation
5    violation cases, those are misdemeanors and felonies. So
6    the prosecutor would tell the defendant what their offer is
7    for them to admit it, to the violation. And if the
8    defendant wants it, then same sort of scenario, but
9    obviously at that point since it's a probation violation,
10   we are not talking fine only probation. That doesn't
11   happen, at least not that I have ever seen. So we are
12   always talking jail or prison time.
13   Q    And it's only if the defendant doesn't agree
14   to whatever the plea offer is that your office would be
15   appointed in those cases?
16   A    In most of those cases.
17   Q    In what cases would you not be appointed?
18   A    Sometimes judges, rightfully so, don't feel
19   comfortable with this arrangement. It's usually on
20   felonies and so they just kind of do away with this
21   agreement, this kind of loose agreement. They say I'm
22   appointing the public defender assuming we have already
23   notified the court that they qualify. To give you an
24   example, I had email yesterday where the prosecutor had
25   offered an individual probation. The client or the

## Page 115

1    defendant wanted to accept that offer and the judge refused
2    it because he wanted the person to be represented so and he
3    ordered me in case.
4    Q    So these kind -- these agreements are still in
5    effect today?
6    A    Yes. Well, in most of my counties. We
7    stopped doing it in Texas County because the judge there
8    routinely violated the spirit of the agreement, which was
9    that they would not seek jail time, and the judge routinely
10   gives very lengthy jail sentences. So we just said, you
11   know, don't feel -- we're not comfortable with that
12   anymore.
13   Q    I'm not sure I understand. Could you explain
14   how the judge would impose jail sentences in these cases
15   where the negotiations involved probation or the idea of no
16   jail time?
17   A    So obviously the judge does not have to accept
18   any agreed-to disposition between a prosecutor and a
19   defendant. The prosecutor in Texas County, he would say
20   I'm offering you probation. Let's say the DWI example; the
21   defendant is like I will take it. And so he pleads and the
22   judge says okay, that's great. I know you want probation,
23   but I'm not inclined to do that. So do you want to
24   proceed? And, you know, often because these people aren't
25   represented, they don't understand as the judge, as he's

## Page 116

1    smiling at them telling them telling them do you want to
2    proceed, they think he's going to be lenient and he gives
3    them a six-month sentence in jail. So that happened once
4    or twice and we realized, okay, this is not what we had
5    intended. So in Texas County, we -- because it's clear
6    that the judge is seeking jail time even if the prosecutor
7    is not, we just enter the cases.
8    Q    Why did your office enter into these
9    agreements?
10   A    I think at the time it was our belief that
11   that's what House Bill 215 required. We had hoped that it
12   would reduce caseload and so that we could focus on the
13   more serious cases, the felonies. This rule, although it's
14   still in effect, it really only applies anymore to the
15   probation violations. In a couple counties, some
16   misdemeanors still kind of go along this way. But for the
17   most part because everybody was violating it and people
18   were going to jail, it became quite clear that
19   constitutional rights were being violated and we decided
20   that I think the courts basically decided that we need
21   attorneys in these cases. Because nobody wants to say that
22   jail time is off the table except for us; we would be okay
23   with that, but none of the parties that matter in this
24   situation.
25   Q    What were the downsides -- and I think you

29 (Pages 113 to 116)

ALARIS LITIGATION SERVICES
www.alaris.us            Phone: 1.800.280.3376            Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 160-6    Filed 02/21/18    Page 30 of 74

## Page 117

1  mentioned some of them already -- but what were the
2  downsides for defendants who were charged with the kinds of
3  cases that were implicated by this agreement?
4      A  I think probably one of the biggest
5  downside -- I mean, I think a lot of times prosecutors
6  really were trying to be fair and give the offer that they
7  would have given regardless.  But I know of situations
8  where it doesn't really matter if the offer is what the
9  offer would have been to the attorney if there is a
10  suppression issue.  If there is some other mitigation that
11  the prosecutor should be aware of, especially with the
12  younger or the mentally challenged clients.  So there is
13  some serious disadvantages to this policy of allowing
14  defendants to plead in misdemeanors, or any case without an
15  attorney, to advise them of their rights and advise them of
16  collateral consequences.  A lot of people pled guilty to
17  those cases and you, know, you see them today and, like,
18  maybe it's a marijuana charge and that's impacted them
19  somehow.  In my little neck of the woods, maybe they pled
20  to a misdemeanor domestic assault and they go to get their
21  hunting permit and they can no longer own a firearm or
22  possess a firearm, so they can't hunt.  They may not seem
23  like a big deal to someone who lives in a city, but in
24  rural Missouri, that's huge.  That's huge.  So, you know,
25  there are collateral consequences even with misdemeanors

## Page 118

1  that I think the prosecutors weren't advising these people
2  of, nor should they, but it was an impact of these people
3  not having representation.  And on top of that, I think a
4  lot of them went on probation and then later on we're
5  dealing with probation violations where jail time became a
6  real possibility.
7      Q  You mentioned that judges in your area have
8  been appointing you to cases on the waiting list over your
9  objection.  Have they appointed any other attorneys in your
10  district -- in your area besides you?
11      A  You mean other public defenders?
12      Q  Other public defenders.
13      A  Just today.  They started doing that today.
14  Well, one did.
15      Q  Who -- I know you have been here, but do you
16  know who was appointed?
17      A  Yes.
18      Q  Who was that?
19      A  Brandon Schwartze and Tom Moser.
20      Q  And who are they?
21      A  Brandon Schwartze is an APD III in my office
22  and Tom Moser is an APD I.
23      Q  An APD III is a more experienced attorney?
24      A  Yes.  Brandon, I think he has three years
25  maybe four; somewhere in there.

## Page 119

1      Q  APD I would be a first-year attorney?
2      A  Yes.
3      Q  Do you have any understanding of why a judge
4  would appoint someone other than you into these cases?
5      A  I have a hunch.
6      Q  What is your hunch?
7      A  So yesterday I got an e-mail from the
8  prosecuting attorney of Pulaski County saying the jail was
9  rioting.  And I think he was -- not literally, but the
10  people in jail were getting upset because they did not have
11  attorneys or attorneys had not entered their case, or maybe
12  I'm in their case and I haven't been by to see them because
13  I have too many cases.  And so the -- I think he was very
14  concerned about the situation in jail and the sheriff has
15  contacted the prosecutor and said we have to do something
16  about the people in jail.  So the prosecutor told me that
17  he was going to tell the judge today that this has become a
18  big problem.  So my hunch is that he talked to the judge
19  and the judge probably is aware of the fact that I'm not
20  actually appointing -- or entering attorneys in my office
21  unless they are able to take more cases and I'm the one
22  entering.  And, you know, unfortunately I'm not able to
23  provide the representation that these people deserve and so
24  the judge, you know, he's not a fool.  He's an intelligent
25  person.  He probably thinks, okay, well I will appoint

## Page 120

1  individual attorneys because now these people will probably
2  get faster representation or he can order them to go see
3  them or do whatever the judge feels is appropriate.
4      Q  If you spent the time you thought necessary to
5  effectively prepare one of your client's cases, say one
6  that was going to trial; what would happen to your other
7  clients?
8      A  Nothing.
9      Q  What do you mean by nothing?
10      A  Well, nothing is happening in their cases
11  that's what I mean.  They get pushed aside.
12      Q  Do you think the same would happen for other
13  attorneys in your office if they were able to focus on a
14  particular case, complex case, and give it the time that it
15  deserved?
16      A  With their current caseload, yes, I still
17  think that would happen.  It does happen.
18      Q  Are there times you have to triage cases doing
19  less on one to do more on others?
20      A  Every day.
21      Q  Do other attorneys in your office have to
22  triage their caseloads?
23      A  Yes.
24      Q  Doing less on one so they can be more
25  effective on others?

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 121

1     A   Yes.

2         Q   Is there anything else you think we should

3   know about your office's ability or difficulty in providing

4   effective representation to people eligible for

5   representation?

6         A   I think we have covered a lot of it.  But I

7   would say the problem is getting worse as people continue

8   to leave and as the quality of candidates we get continues

9   to decline.  One of the complaints that we haven't talked

10  about but that's made, and Judge Pearson put this in his

11  Order, is that the resources in the system are not spread

12  equally.  I don't know if that's true or not.  I don't know

13  what's going on in other offices.  My experience has been

14  that everybody thinks that their office is the worst and

15  really it sounds like when I meet with other attorneys, we

16  are all equally bad.  So I can only speak to my office.

17  But in my office, if things don't change things are only

18  going to get worse.  And we are not gonna -- I say that

19  like it's not -- we're not going to maintain the bad

20  representation we provided.  It is getting worse.  Our

21  caseloads are going up and the quality of our attorneys is

22  going down and the ability to train them and mentor them is

23  decreasing.

24        Q   Why do you think it will continue to get

25  worse?

## Page 122

1         A   Because the experience level of the attorneys

2   continues to go down and we used to be get some

3   really quality candidates.  I have been very lucky in the

4   people I have been able to hire in the last year.  But

5   every week we get a list of new openings and every week it

6   seems it grows and, you know, every couple of months I have

7   an opening.  And every time there is an opening, there is

8   fewer and fewer candidates and the ones that are there are

9   really, quite honestly, terrible.

10        Q   What do you mean by terrible?

11        A   There are people I would never consider hiring

12  for a position but that I'm considering now because there

13  is nobody else.

14        Q   Why wouldn't you consider them for a position?

15        A   Well, for one, I generally would want somebody

16  who is already licensed in the state of Missouri.  So that

17  would be -- most of the people I consider now don't even

18  have a license.  It's hard to say specifics but, you know,

19  when you do a lot of interviews you begin to, you know,

20  notice things about the person.  Are they able to -- do you

21  believe, you know, you're making kind of instant judgments

22  about people, but do you believe they can handle your

23  jurisdiction.  Can they stand up to judges.  Do they care

24  about, you know, what we do and our mission or are they

25  just looking for a job because, you know, private practice

## Page 123

1   hasn't worked out for them and, you know, this provides a

2   steady income.  I think we are seeing the few applicants I

3   have, either they don't have licenses or they are the

4   people who couldn't cut it in private practice and are

5   looking for a paycheck.  They really don't have any drive

6   to do what this job requires.  They, just like I said,

7   looking for a paycheck; a steady paycheck.

8         MR. SHAHABIAN:  Thank you, Mr. Crowell.  I

9   have no further questions at this time.

10  QUESTIONS BY MR. RAMSEY:

11        Q   Good evening.

12        A   Evening.  Is it evening already?

13        Q   It's getting close, five minutes away.

14        Q   Again, my name is Steven Ramsey and I

15  represent the State of Missouri and Governor Eric Greitens.

16  I have a handful of questions.  If at any time, again, if

17  you need a break, just let me know and we can take that

18  break but I will try to power on through.  To begin, to

19  fill in a few of the gaps that I may have missed or may

20  have not been asked. You came straight from undergrad into

21  law school; is that correct?

22        A   Yes.

23        Q   What were your degrees in in undergrad?

24        A   I had a political science degree.

25        Q   And you have been with the public defender

## Page 124

1   system since around 2008; is that correct?

2         A   I got hired in the fall of 2008.

3         Q   And within the past year or two or so, or as

4   far as you can remember, who all have you spoken to

5   concerning workload and caseload concerns?  I presume

6   judges from your earlier testimony.  I presume some members

7   of the private bar from earlier testimony.  Have you spoken

8   to nonprofit organizations or the press?

9         A   Nonprofit, I'm not sure they are nonprofit,

10  but I would say I have spoken to commissioners and I have

11  spoken to city councilmen and I have spoken to the New York

12  Times.

13        Q   And by commissioners you mean county

14  commissioners?

15        A   Yes.  Part of our funding comes from the

16  commissioners.  They provide the rent and utilities for our

17  office.  So I have spoke to them, you know, about our

18  facilities and, you know, of course I talked to them about

19  some of the problems we are facing.

20        Q   And concerning the amount of expertise and the

21  level of experience that you testified earlier to; when you

22  started was in the heart of the recession or the beginning

23  of the recession, 2008 or so?

24        A   Yeah.  I mean, yes.

25        Q   And would it be fair to say that as the

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 125

1  economy has improved, the quality of your candidates has
2  decreased?
3      A   I can't speak to what the quality of
4  candidates were when I was hired up until, you know, I
5  didn't get into management, I think until, 2013 or '14. I
6  can't remember which. I think I was a good candidate. But
7  no, I would say this, the people that I started with and
8  that I saw for the first four or five years and my first
9  couple of years in management were excellent candidates and
10 went on to do great things. We used to have -- it wasn't
11 uncommon to 20 or 30 applicants to kind of go through to
12 determine who we were going to interview. We used to be
13 able to screen out people. There is no screening anymore
14 because if we screen, we wouldn't have any candidates. So,
15 yes, the quality has gone down, but also the number.
16      Q   And so the period of time since you have been
17 in management has been relatively brief in terms of the
18 quality candidates coming in and out of the door?
19      A   Well, I can say yes. I mean, it's been about
20 four years, but I can say I have seen a change over the
21 four years.
22      Q   Sitting here today how would you define a case
23 as it's relatable to your district?
24      A   A case is a client who has a criminal charge.
25      Q   And how does a case become closed within your

## Page 126

1  system -- or in your district? Pardon me.
2      A   We close our cases based upon on the
3  conclusion of the case. So whether that's through a guilty
4  plea or if we go to trial after sentencing. When we close
5  out a case -- so the only exception to that is when we have
6  a client who goes up on a 120, so 559.115 or some other
7  120. We close the file at that time but we enter the
8  hearing date for the 559 review because if the client is
9  not going to get released, we will represent them at that
10 hearing.
11      Q   And for the record, what is a 559 review?
12      A   So when a client, you know, when a client is
13 sent to prison sometimes the court retains jurisdiction
14 under Section 559.115 RSMo. Basically the client goes up.
15 He does 120-days shock. He may get treatment; he may not
16 in the Department of Corrections. As long as his behavior
17 is good, he typically will get released, but that's up to
18 the judge who sentenced him. So it allows the court to
19 retain jurisdiction for that 120 days. The hearing would
20 be if -- the only time there is a hearing if the defendant
21 does something inappropriate or violates the rules of the
22 120. While in the prison, they are entitled to a hearing
23 and we would represent them at that hearing, which is a
24 farce, but we still do it.
25      Q   Now am I correct in understanding your

## Page 127

1  previous testimony to suggest that before Hinkebein, the
2  decision, Missouri Supreme Court decision, you dedicated a
3  substantially more amount of time to supervising and
4  administrative tasks versus after Hinkebein?
5      A   Yes. I mean, before Hinkebein, I was -- I
6  allowed attorneys in the office to have much higher
7  caseloads. So, again, the average case -- the highest
8  caseload in my office was somewhere around 200 and the
9  lowest would have been probably 120, maybe a little lower
10 depending on how new they were. Since Hinkebein, I decided
11 that I could no longer allow attorneys to have such
12 caseloads. So that's the purpose of the waitlist and then
13 not entering the attorneys on the case but entering myself.
14      Q   And am I understanding your testimony is
15 that before Hinkebein when the caseloads were substantially
16 larger, there was an issue effective assistance of counsel
17 there and even after your caseload control mechanisms of
18 waitlist in place that there is still a dramatic issue
19 that's getting worse as opposed to -- I will stop there,
20 yeah.
21      A   Well, you said it's getting worse. I would
22 say it's getting worse for me and I would say that if we --
23 as the judges become -- or as the waitlist fades away and
24 as we go back to business as usual, as that seems to be
25 what's probably going to happen despite my best efforts.

## Page 128

1  The caseload is going to get worse because, generally
2  speaking, over the last, you know, twenty years or so there
3  has been a steady increase in the number of cases across
4  our jurisdiction and across Missouri. So I suspect the
5  numbers, even if the plateau they are still extremely high,
6  but I don't see that happening. But more importantly, and
7  I think as it impacts my office, is the constant turnover
8  that I have and the lack of experience that I have and the
9  quality of candidates that I'm able to hire; those are the
10 things that are going to make it continue to get worse.
11      Q   You testified about an intake sheet. And I
12 believe it was in the conversation of bond arguments and
13 ascertaining whether or not there was a strong argument to
14 argue for reduction of bond. Are there other, I guess one
15 pagers, that would help train or alert your newer attorneys
16 to the expectations of various levels of representation?
17      A   I know I have seen different, you know,
18 checklist-type things throughout my career as a public
19 defender that various people use. So they probably exist.
20 The intake sheet we use is actually I think three or four
21 pages because there is so much information that you really
22 need to get in that initial interview. I can't remember
23 everything and so this just -- even me with experience, I
24 would use this sheet. Are there other sheets that we could
25 probably give to attorneys, yes, but sometimes it's only as

32 (Pages 125 to 128)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-6   Filed 02/21/18   Page 33 of 74

## Page 129

1  good as the, you know, the user.  And if user doesn't know
2  what the words mean, like for example, you asked what's a
3  559.  If I put on there, you know, 559 and they have no
4  idea what that is, it's not going to be any use to them.
5      Q   So you testified -- and I think the phrase you
6  used was something to the effect of younger or newer
7  attorneys don't know what they don't know or something
8  along those lines.  In what ways as their district defender
9  have you gone about educating or training them to teach
10  them what they don't know?
11      A   Well, I try to lead by example.  So, you know,
12  when they are in court, I show by example.  I would also
13  tried to educate them when they are in court.  When they
14  bring cases to me, I would talk to them about the things
15  they need to be doing.  The guidelines I make sure usually
16  on their first day or first day or two, I would make sure
17  they have a copy of the guidelines and that they have gone
18  through them.  The guidelines give some guidance on how to
19  work up a case.  It's not really a how-to guide, but it
20  does -- it gives you an idea.  There is also an attorney
21  workbook, a new attorney workbook, that I think was created
22  by Wayne Williams in I think it's the 24th -- Area 24
23  Office of Public Defender.  I give them a copy of that and
24  that is kind of a how-to guide of how to work a case
25  through the judicial system.  So those would be the main

## Page 130

1  ways.  That and I guess I would pair them -- I try to pair
2  them with a more senior attorney.
3      Q   Have you noticed any trends in the cases that
4  you're seeing and how they are being represented?  What I
5  mean by that are you taking more depositions now than say
6  at the beginning of your tenure as district defender?  Are
7  you personally or attorneys that you supervise?
8      A   So you're asking me as my tenure as a district
9  defender not as a public defender?
10      Q   Correct.
11      A   I don't think the number of depositions I have
12  had has.  It's probably decreased for me personally.  For
13  my attorneys and in what timeframe are you looking at?
14      Q   It can be within the past year or past two
15  years.  You have been district defender for around three
16  years; is that correct?
17      A   Yes.  And then I was a deputy for two before
18  that.
19      Q   Yeah.  Well, within the three years that you
20  have been the district defender and if you have that's more
21  than five, I'm just trying to get a sense.
22      A   So I would say that it was pretty even
23  throughout that period until the last couple of months and
24  there has been an uptake in the number of depositions being
25  taken.

## Page 131

1      Q   How about the usage of experts?
2      A   So with experts I would distinguish between
3  mental health experts and other experts.  The reason I do
4  that is because I think they kind of cover two different
5  areas.  Mental health experts I'd say has been pretty
6  level.  Other experts, it's almost nonexistent.  And
7  that's, I guess, that's also stayed about the same.
8      Q   And did I understand you correctly in that the
9  way you assign your cases in your district is one by
10  geography in terms of what counties the various assistant
11  public defenders are in, but also by expertise or
12  experience?
13      A   Yes.  So we would not -- I would not want to
14  give a serious case to a new attorney.
15      Q   And is the assignment totally done by yourself
16  or do you, I guess, field that out to the deputy director
17  or someone else within your office?
18      A   Right now, there is kind of a mixed system.
19  So I have one APD IV, that attorney has, like I said, 15
20  years experience.  He is in one county and he's handling
21  every case that comes into that county, which is at any
22  given time 150 cases.  So that -- every case that comes
23  into Dent County, he gets.  In all the other counties,
24  since I have waitlisted, all the cases that are open to me,
25  are being assigned out by me.  And so I would determine

## Page 132

1  what cases they should get based upon the priorities that
2  the judge has already determined, which is basically are
3  they in custody or not.  The cases that I don't assign out,
4  they come into my clerks and my clerks are tasked or I
5  delegate the authority to them to kind of make that
6  determination of whether or not the murder should go to
7  this APD or this APD.  Generally speaking, when a serious
8  case comes in, they are going to let me know and I'm going
9  to give them some feedback.
10      Q   And when you say your clerks, are you using
11  legal assistants or your clerical staff?
12      A   Clerical staff.
13      Q   And how many trials, say within the past year,
14  has your -- have you yourself tried or your office tried?
15  So that's a two-prong question.
16      A   In the last year, I have probably tried maybe
17  a half dozen.  I say my office -- and it's a rough guess,
18  but I would say probably maybe 20.  That might be a little
19  high, 15 to 20.
20      Q   And are these jury cases?
21      A   Yes.
22      Q   Do you have a sense for how many bench trials
23  are tried every year in your district?
24      A   Maybe half a dozen.  There is not a lot of
25  incentive to do a bench trial.

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

1    Q   Turning to your offices determination of
2  indigency; who makes that determination in your office?
3    A   It varies.  So my clerical staff, if it comes
4  into the office from our front window or over the fax
5  machine, they are going to do it.  If it's in court, it's
6  typically going to be -- if the legal assistant is there,
7  it's going to be the legal assistant.  A lot of our
8  counties, you know, there are one or two attorneys and we
9  only have two legal assistants, so there is not really
10  enough to send a legal assistant every time.  So if it's
11  just an attorney, then the attorney in court will make that
12  determination.
13    Q   Do you have any external or independent
14  controls or verification procedures in place to verify
15  whether or not someone is actually eligible for services or
16  do you rely mostly on that application itself?
17    A   Well, they are required by law to be truthful
18  on the application, but that's obviously, you know, open to
19  interpretation whether they are being truthful or not.
20  It's rare that we would do an independent verification, but
21  here is what we do.  So when I get an application and I
22  encourage everyone in my office to do this, if they put all
23  zeros for income and, you know, everything is zero or if
24  they write, you know, no income and whatever; I asked them
25  follow-up questions.  I do do follow-up with them.  Like

1  where do you live?  How do you get by with no money?  How
2  do you eat?  You know, I ask them those types of questions.
3  Did you drive a car to court today?  I lean on the side of
4  denying.  So, you know, generally speaking, if they posted
5  bond, I'm going to deny them because, you know, I want to
6  be a steward of taxpayer money and I think that at least
7  some of these people might be able to hire counsel.  I
8  don't know.  So that's kind of where -- we don't do
9  independent verification.  I have done it.  I do it in rare
10  cases, especially as the case moves forward.  To give you
11  an example, I had a case where an individual was
12  appointed -- we were appointed.  He posted a $100,000.00
13  bond.  He was on GPS monitoring and paying for that somehow
14  every day.  As we were developing the case he kept telling
15  me he owned the property that the alleged victim was living
16  on.  So once I finally got record of that, I filed a motion
17  to withdraw based on the fact that he owned property.  It
18  was denied.  We do -- where it's apparent that there may be
19  some discrepancy with the application, we will investigate.
20    Q   Do you have a sense of how often you reject
21  applicants?  And I understand your testimony earlier to be
22  that even when you reject them, the court still sometimes
23  appoints them.  But how often would you say you reject
24  applications?
25    A   Well, most of our applicants are truly

1  indigent, so it's not -- I don't know what percent.  Like I
2  said, when I'm in court and they are not in custody, it's
3  pretty common to reject because, generally speaking, they
4  have posted bond.  But I don't know.  I don't have a
5  percentage or I don't have a number.  Most of the people in
6  jail are going to qualify.
7    Q   And did I understand your testimony earlier to
8  be that you had never been denied an expert that you
9  thought you needed on the sole basis of funds?
10    A   I have always gotten whatever expert I believe
11  I needed.  I may have had to have some additional
12  discussion with the person -- the people that hold the
13  purse strings.  But generally speaking, I can't think of an
14  incident where they cut right denied me.
15    Q   Have you ever denied an attorney that you
16  supervised funds that you had discretion for or prevented
17  them from moving onto the upper management?
18    A   I have.
19    Q   And have you done that for the sole basis of
20  funds or for the similar reason that you were denied
21  earlier?
22    A   I would deny them because I would want --
23  again newer attorneys don't understand a lot of times when
24  it's appropriate to do a deposition.  So if they send a
25  request and say I would like to depose this witness and I

1  asked them well, who is that witness and it turns out it's
2  a witness for them, for the defendant.  Well, I would deny
3  that request because that's foolish.  Go interview them.
4  They are a favorable witnesses.  But generally speaking,
5  the types of money that I control are for medical records.
6  I can control that.  I can say you can't get the medical
7  records.  I don't think I have ever denied that.  Clothing
8  for clients for trial, you know, Good Will, Wal-Mart, I
9  approved those.  I approve deposition request if it's under
10  $500.00.  I generally approve those except for what I was
11  just talking about where they don't really understand when
12  they can send an investigator out to interview.  That's the
13  -- those are the main things I have control over in my
14  local budget.
15    Q   Have you ever ran out of funds in your local
16  budget and requested more for any of those various
17  categories that you just listed?
18    A   I don't believe I have.  I will say this, I
19  probably will this year because of the number of deposition
20  request.  In the past, there used to be a policy in my
21  office for whatever reason that we were encouraged to --
22  not by Columbia, I don't think but by the former district
23  defender to exceed $500.00 on a deposition request.  That
24  was so that the money would come out of the different
25  budget than our local budget for fear of running out of

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-6   Filed 02/21/18   Page 35 of 74

## Page 137

1  money out of the local budget. I have never done that
2  since I have been district defender. I have always used
3  the local budget and I don't think I have ever run out. At
4  least Kathy Leer, my comptroller, has never notified me of
5  such. We have run out of postage before, but we got more
6  money for that.
7      Q   And when that happens, did you just request
8  like hey, we are out of postage we need "x" amount more?
9      A   Yeah.
10      Q   When your attorneys go to trial or when you go
11  to trial, do you normally send your attorneys with a second
12  chair or third chair or do they try cases by themselves?
13      A   I don't think I have ever had a third chair.
14  Generally, the practice in my office is that when you go to
15  trial that the deputy district defender or myself should be
16  a second chair. For my trials, personally, I will often
17  bring along a second chair, but there are cases where I
18  don't. It just depends on the case. There is a few
19  reasons for that. The main reason is, again, these
20  attorneys don't have any experience. It's often their
21  first trial and so I want to make sure that they don't miss
22  anything important. They make the proper objections, that
23  the record is preserved; that sort of thing. But -- and
24  then with the experienced attorneys, I usually have a
25  second chair who is, again, you know they are learning. So

## Page 138

1  they go and they learn kind of how to do a trial.
2  Generally speaking, we make them do portions of the trial
3  like, you know, the instruction conference or, you know,
4  maybe they cross a witness. So that's where they get their
5  experience by second chairing.
6      Q   And there was some conversation concerning
7  continuances. My question is if there are any policies or
8  customs within your local district that would be akin to a
9  first in first out or this case has been on our docket for
10  two-and-a- half years and we need to expedite this. Is
11  there any controlling policy to expedite those cases that
12  have been lingering?
13      A   Well, the judges. I mean, they -- personal to
14  my office or to the jurisdiction?
15      Q   Personal to your office?
16      A   When -- sort of. And the reason I say sort of
17  is after a client has gone through so many attorneys,
18  eventually it ends up on my desk because I know we can't
19  push it any further for the client's sake but also because
20  the courts aren't going to push it any further. The courts
21  don't seem too interested in really protecting the client's
22  rights. They are more interested in moving cases. So when
23  it comes to that point where I can no longer pass it and I
24  know the judge is going to make it go to trial, it goes to
25  me.

## Page 139

1      Q   Would that be after the third attorney?
2      A   Typically, yes.
3      Q   As on the side, do the attorneys that you
4  supervise have laptops so when they are at their law days
5  and they were waiting or if they are waiting to meet with a
6  client where they can work remotely or is it all done back
7  at the district office?
8      A   The attorneys have laptops and they take them
9  to court where there is WiFi. So we have basically three
10  courts that have WiFi; three that do not. The laptop is
11  useless where there is no WiFi. We can't access our
12  network. The courts that have WiFi is sporadic and we
13  borrow the prosecutor's WiFi in two of the three. So if
14  they are new and they don't have the relationship with the
15  prosecutor, they also don't have access to WiFi. But where
16  there is WiFi, they do take their laptops. They do -- I
17  mean, there is only so much you can do when you're in court
18  and you're constantly being called up by the judge. But
19  yeah, they do. None of the jails have WiFi. So the we
20  don't -- the only time a laptop goes to a jail usually is
21  if we are showing a video or some other discovery, pictures
22  or things like that.
23      Q   And does every attorney in your office have a
24  laptop?
25      A   Yes.

## Page 140

1      Q   Turning to your district's timekeeping
2  history, if you will. Currently is your office tracking
3  time in five-minute increments?
4      A   No.
5      Q   Currently is your office tracking time by
6  tasks or by case?
7      A   No. We stopped tracking time, I believe last
8  year when Michael Barrett indicating we could stop.
9      Q   And so currently the extent of your time
10  keeping is how many hours per day or per case session --
11      A   Sure.
12      Q   -- your attorneys have worked?
13      A   That's correct.
14      Q   Did you ever receive training on how to
15  effectively track your time when you were tracking your
16  time in the five-minute increments?
17      A   I don't know that we had. I remember at our
18  spring training there was. It seems like Peter Sterling,
19  then our general counsel, gave us training, but it's been a
20  long time and I don't remember. I remember their being
21  confusion over how to categorize time because there was
22  some areas that overlap, so they changed I think some of
23  the categories over time. But once the RubinBrown stuff
24  came about, it became very -- they narrowed the categories.
25  It was pretty clear, I think, from that point forward.

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 141

1    Q    Turning to that I want to draw your attention
2  to Plaintiff's Exhibit marked 50.  I believe it's the
3  Missouri State Public Defender system Fiscal Year Budget
4  Request.
5    A    Okay.
6    Q    Now you had testified earlier that you felt
7  that some of these numbers or potentially all of these
8  numbers were fairly conservative; is that correct?
9    A    For Rolla, I don't know about the rest.
10    Q    For Rolla.
11    A    Yeah.
12    Q    Are you familiar or did you have any hand in
13  the creation of the underlying RubinBrown data?
14    A    Yes.
15    Q    What was the extent of that?
16    A    Well, I was the timekeeper.  I was also part
17  of the Delphi Group.
18    Q    And do you have any history aside from your, I
19  guess law degree or undergraduate degree, concerning
20  statistics or sociology?
21    A    No.
22    Q    Is it your understanding that the capacity in
23  some of the hours per assigned task, if you will, were
24  averages under the RubinBrown study?
25    A    It's my understanding they are all averages.

## Page 142

1    Q    So --
2    A    Are you talking about the categories like,
3  murder, C, D?
4    Q    Yes
5    A    Yes, those were all averages.
6    Q    And your contention earlier is that they may
7  or may not have taken into account the differences of
8  experience of various attorneys?
9    A    I don't know for sure how RubinBrown
10  calculated, but it wouldn't be a very useful number if it
11  didn't say that you understood how to actually handle a
12  case.  Maybe not that you can handle every case, but that
13  you have some basic criminal experience.  Like I don't
14  think that these numbers are like well, if you're any
15  attorney, if you are a tax attorney these percentage
16  applies to you because obviously it's going to take you a
17  lot more time than it is someone like a public defender.
18    Q    And this is -- this or these are your
19  assumptions sitting here looking at the numbers?
20    A    No, not really.  I mean, because the Delphi
21  Group was both public defenders and criminal defense
22  attorneys.  It was not private attorneys -- or private
23  civil attorneys or other government attorneys.  So the
24  averages that they came up with were averages for
25  experienced -- because they were all experienced criminal

## Page 143

1  defense attorneys, either private or public defender.  So I
2  can't imagine -- I know personally when I was there and we
3  were coming up with averages, I was thinking in my practice
4  how much time would this case take.  That was what we were
5  instructed.  To you personally, how much time would you or
6  if you had the ideal amount of time, how much time would
7  you spend.
8    Q    And that was your experience as a member of
9  the Delphi Group that put data into the ultimate RubinBrown
10  study?
11    A    I don't understand the question.
12    Q    Said another way; you're speaking from your
13  experience of being a firsthand participant in the study
14  itself?
15    A    Yes.
16    Q    But you didn't ultimately have a hand in the
17  collection of the data after the fact -- after the fact?
18  Pardon me.
19    A    I think the data was collected when we were
20  the Delphi Group.  They gave us the averages and the
21  numbers in the group and as the Delphi panel, we adjusted
22  those based upon our experience.
23    Q    That was after each round?
24    A    Yes.  But I don't sit here and say that I
25  understand the statistics and the whole Delphi process.  I

## Page 144

1  was just part of it.
2    Q    I see.  Turning to the individual attorneys
3  who have left your office.  Did you conduct exit interviews
4  for each one of them?
5    A    Informally.  Our HR division conducts the exit
6  interviews, so I try not to interfere with that process.
7    Q    The HR department for your district or for
8  your system at large?  Or a different question is do you
9  have a HR, a local HR person within your district?
10    A    We have two HR employees at least my
11  understanding, maybe three if you count Ms. Shipma, for the
12  entire MSPD.  I don't have anybody local in my office.
13    Q    So the extent of your knowledge of why people
14  were leaving was based on the informal conversations you
15  had with them prior to their departure?
16    A    Well and after.
17    Q    And after.
18    A    They are still around most of them.  They are
19  just prosecutors.
20    Q    So you still see them?
21    A    I go against them now.  So I train them to
22  become prosecutors and hopefully they become a little more
23  human in the process.
24    Q    Turning to the waitlist:  My understanding
25  from your testimony was that this was not something that

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 145

1  came down from central office, rather it was something that
2  you had made a decision upon after speaking with the
3  attorneys in your office and your deputy director; is that
4  accurate?
5      A   Yes.  My office -- our offices in Columbia had
6  nothing to do with my decision to waitlist.
7      Q   And that had mixed results across the judges?
8      A   Yes.
9      Q   Within your area.  Here is a question
10 concerning the letter that you -- the e-mail that you
11 wrote to upper management concerning your potential
12 departure from the Missouri State Public Defender System.
13 Would you say or how would you describe your relationship
14 with upper management?
15     A   I think it's good.  It was a little tumultuous
16 before I became district defender.  When I became district
17 defender, I had to supervise two prior district defenders.
18 One that had been removed from the district defender
19 position.  Well, both had been removed from their position
20 and I had to supervise them.  So there was very much an
21 anti-Columbia feel to the office.  Since that time, I think
22 they have been very helpful.  Very supportive.  Since I
23 have started waitlisting and I have been harassing them on
24 a regular basis for resources, I have become much more
25 familiar with them.  I get phone calls more often for

## Page 146

1  better or worse.
2      Q   Would you say that you are or have been 100
3  percent satisfied with the support from upper management in
4  terms of addressing this workload or caseload alleged
5  crisis?
6      A   No, it's not 100 percent.
7      Q   In what ways do you think they have come up
8  short, if you will?
9      A   Well, I have sent a lot of conflicts to them
10 and they have not resolved them.  I need more resources,
11 they have not provided them.  They may not have them or
12 have the resources, but that's not really my concern.  I
13 don't really care.  I just want the resources.  I feel that
14 Rolla and my office has been left to fend for ourselves in
15 some instances.  Especially when I see that, you know, in
16 the Kansas City office that Rick Petsch had Greg
17 Mermelstein help her on a writ.  So that bothers me because
18 a writ is very time consuming process.  Now to be fair, I
19 didn't ask for help, but nevertheless.  So, but I will say
20 this every time I have asked for assistance or I have
21 reached out to them, they have gotten back to me.  They
22 have responded.  It's not always a response I like, but
23 they are available.  And I don't really have any major
24 complaints.  I think based in reality, like I said, I want
25 more resources.  I need more resources.  That's my common

## Page 147

1  complaint, but they don't have the purse strings,
2  so-to-speak.
3      Q   Turning to two exhibits.  One is Petsch 5 and
4  one is Plaintiff's Exhibit marked 54.
5      A   Got them.
6      Q   Did you -- looking at Petsch 5 first.  Did you
7  utilize this template when you drafted your writ or did you
8  create it from scratch?
9      A   We did not -- I don't know that we had access
10 to this at the time.  Greg Mermelstein prepared a lot of --
11 I think it was Greg Mermelstein -- prepared a lot of
12 guidance material.  Not necessarily writs, but I mean I
13 think, like I said, I think he prepared Exhibit 54.  He
14 prepared a power point that he provided after the
15 management conference we had back in late September that
16 had a lot of the, you know, case law summarized and that
17 sort of thing.  But we did not have a template that we
18 followed in our writ.  We did it on our own.
19     Q   This was -- these documents to your
20 understanding were created after the Hinkebein decision and
21 after, I guess, the meeting with the various district
22 defenders and upper management?
23     A   I'm sure that this Exhibit 5 was created
24 after.  I don't know when Greg prepared the rest of this.
25 It just -- he brought it to our attention at the management

## Page 148

1  meeting.  You know, I think we have a database that he puts
2  motions on and these were all added at some point.  I don't
3  know when.
4      Q   Throughout your testimony, if I understood you
5  correctly, a reason that you or your office have been
6  unable to do various tasks is because you lack resources
7  and the time to accomplish those tasks; is that a fair
8  assessment?
9      A   Yes.
10     Q   What tasks, if any, have you been able to
11 complete to a reasonable degree, whether it was before or
12 after the waitlist was instituted?
13     A   Nothing as it related to the clients.  We get
14 our time sheets turned in, expense reports; administrative
15 things.  I would say that nothing that matters.
16     Q   And I hate to toss a potential hypo at you.
17 This isn't law school.  But let's say you only had two
18 cases and one case was coming up for trial, would your
19 preparation for that one case going to trial hinder your
20 representation of that other case, hypothetically speaking?
21     A   Well, now you got me thinking like a law
22 student.  The answer is no.  I mean, does it have the
23 potential, yes.  If one was set for trial on Monday and one
24 was set for trial on Tuesday obviously the one on Monday is
25 going to affect the one on Tuesday.  But this isn't -- what

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 149

1  we are talking about is not something where we are saying
2  well, yeah, theoretically you could spend, you know, 100
3  hours on every case. You know, you could turn over every
4  stone. I mean, you really got to look to the rule of what
5  is being diligent? What is being competent? What is
6  communication? Those are the things you have to look at
7  and are we able to do that with our current caseload and
8  the answer is no.
9      Q   So your understanding and response to the
10 question is not in a two case situation?
11     A   Right.
12     Q   Not currently at the level that you are
13 representing cases, which I believe you said you have
14 average about 75 cases for the attorneys that you're
15 supervising right now?
16     A   I would say probably somewhere around there,
17 yeah.
18     Q   So it's not two. It's also not 75 -- or I
19 mean, I'm sorry, two would be fine, 75 is not fine?
20     A   Yes. And of course it's not as simple as
21 saying a number because the reality is, you know, maybe it
22 would be okay if it were 75 misdemeanors, maybe. You know,
23 but our caseload is not predominately misdemeanors. It is
24 predominantly felonies. And a serious felony -- maybe two
25 capital cases would be too much. I don't know. I don't do

## Page 150

1  capital cases. But you can't -- it's hard to say what the
2  right number would be because it varies depending the type
3  of case, their experience level. There are so many factors
4  that go in. That's why I don't use -- when I talk to my
5  attorneys, I don't say you're over 50 cases, you're
6  overworked. I would say something along the lines like,
7  you know, your caseload is at 50. Do you feel that you can
8  handle additional cases, if so let me know. And then the
9  other thing I would look at is, okay, well they are 50
10 misdemeanors. They can handle another ten. Or whatever,
11 I'm just throwing out numbers. But if it's 50 A, B
12 felonies, you know, that's a big caseload in my opinion and
13 those cases where you're looking at up to 15 years or life.
14 Those people deserve -- they don't deserve better
15 representation, but they take more time.
16     Q   Even with them -- would you agree that even
17 with then those higher felonies, if you will, so let's say
18 a Class A, that there are different time requirements
19 depending on the particulars of that particular case?
20     A   Each case is unique, so I can't tell you that
21 if I got one indictment on a Class A felony and another
22 indictment on a Class A felony, they are not -- I'm not
23 saying that's ten hours on each one or whatever. One
24 client may say I want to plead. Let's try to get this done
25 as quickly as possible. I'm guilty and the evidence is

## Page 151

1  very strong against them. The other may be more iffy or --
2  you know, there is so many different permutations that you
3  can think of that I really can't give you an answer on
4  that. I don't know how much time an A felony is going to
5  take until you finish the case.
6      Q   Sure. Have you ever been judicially
7  determined to have provided ineffective assistance of
8  counsel?
9      A   No.
10     Q   Has an attorney that you have supervised been
11 judicially determined to provide ineffective assistance of
12 counsel?
13     A   Not since I have been supervising.
14     Q   Almost there. So you started off in
15 responding to the Hinkebein decision with various letters
16 and reaching out to the various judges that you work with
17 in your district. You also sought a writ, which was denied
18 by the Southern District Court of Appeals or are you in the
19 Eastern District?
20     A   Southern.
21     Q   Southern. And that was also denied by the
22 Supreme Court of Missouri; is that correct?
23     A   That's correct.
24     Q   And then you decided to file two chapter
25 600.063 motions?

## Page 152

1      A   I filed -- well first what I did after the
2  writ was denied by the Supreme Court, I filed -- I don't
3  know what you call it, but I call it a notice of 600.062 to
4  the judge saying my whole office is overworked. I can't do
5  600.063, so I'm going to waitlist basically. Then I had a
6  conversation with the presiding judge of the 26th Circuit,
7  John Beger and he said look, if you want any relief at all,
8  you've got to do 600.063 because that's the only way I can
9  consider your waitlist. So based on that conversation, I
10 went ahead that same day I filed a .063 in each circuit.
11     Q   I just want to be clear that it was in the
12 42nd Circuit that relief was granted?
13     A   Yes.
14     Q   And in the 25th Circuit, it's pending for
15 Wednesday?
16     A   Yes.
17         MR. RAMSEY: No further questions.
18         MS. SHIPMA: I just have one -- well, one
19 topic.
20 QUESTIONS BY MS. SHIPMA:
21     Q   I think that I heard you say earlier that if
22 you have a case where client has a 120, did you say that
23 you close the file? So the system shows it closed but you
24 schedule -- you're nodding your head. So do you close the
25 case file; is that correct?

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

Page 153

1    A   Yes.
2    Q   But you schedule the hearing date on the
3  calendar?
4    A   Yes.
5    Q   Then if it needs to go to hearing, you reopen
6  the case; is that correct?
7    A   I don't know that we reopen it.  I mean, it
8  would not be -- you would not see an additional case in our
9  database.  Like it would not be like okay, now we have a
10  new case number.  The file would stay closed.  We would
11  just take that closed file with us to court and say hi,
12  Judge, I'm here representing so and so.
13    Q   So those 120 cases aren't showing out there as
14  open files on your system for that period of four months
15  that the client is in treatment?
16    A   That's correct.
17    MS. SHIPMA:  Nothing further.
18    MR. SHAHABIAN:  I just have a few follow-up
19  questions.  I will try not to be too much longer.
20  QUESTIONS BY MR. SHAHABIAN:
21    Q   You mentioned in response to questions from
22  the State that you thought the waitlist would fade away.
23  What did you mean by that?
24    A   You know, we are trying to be optimistic and
25  hope that something changes and that the clients we

Page 154

1  represent get the representation they deserve.  So you do
2  things to facilitate that process, like waitlisting.  But
3  as you progress and as the courts deny your relief and as
4  you fail to get any relief from upper management and as the
5  court slowly chip away at what you have done by appointing
6  you and as of today appointing individual attorneys in
7  violation of the Supreme Court -- Missouri Supreme Court
8  precedent; you see it fading.  You know, what's a waitlist
9  if it doesn't really matter if the judge is just going to
10  appoint you anyway.  You're just wasting time on a
11  waitlist.  So that's what I meant by fading is that the
12  things that we are doing to show or to try to reduce our
13  workload so that we can be ethical; nobody seems to care
14  about.  They don't really care that we are saying that we
15  are unable to provide ethical representation.  Probably
16  more importantly, they don't really care whether or not a
17  defendant receives representation at all.  They just know
18  that they have to have an attorney sitting there next to
19  him to process him or her.  So that's what I mean by fading
20  is that at the end of the day, I think Hinkebein should
21  have been a wake-up call to everyone that something needed
22  to change, but it didn't wake anybody up.
23    Q   You mentioned an attorney workbook.  I'm going
24  to hand you a document.  I'm just curious if this is the
25  workbook you're referring to.  I'll ask the court reporter

Page 155

1  to mark it Plaintiff's 60.  Do you recognize this document?
2    A   I do.
3    Q   What is it?
4    A   It is the workbook that we provide to new
5  attorneys.
6    Q   Is that the document you're referring to
7  during State's examination?
8    A   It is.
9    Q   You can put that aside.  I was just making
10  sure I understood what was going on.  You mentioned that
11  you were a member of the Delphi Group.  Could you explain
12  what that was and what your role was?
13    A   So the way I understood the process of the
14  whole RubinBrown study was that first they did a
15  timekeeping -- well, first they had to identify categories
16  to keep track of time.  Once they identified those
17  categories, they then asked the attorneys in the system to
18  keep track of their time.  I wasn't part of any of that.  I
19  just kept track of my time.  Once they had enough time or
20  they had the time that they needed to kind of reflect what
21  we were spending our time on, they brought together a
22  group -- and I don't remember how many of us there were,
23  maybe 30, but it was half public defenders, half private
24  attorneys and I don't know how they selected them, but
25  anyway.  They were all experienced attorneys.  In fact, I

Page 156

1  was probably one of the less experienced in the panel and I
2  had been around for maybe five years.  We all came together
3  several times, spent the day going through the averages of
4  the times that they've collected, including the outliers.
5  They asked us in the group, they said, "Do you think that
6  the average is right or do you think it's low or do you
7  think it's high?  How should we adjust it?  So we would
8  adjust it however the group believed it should go up or
9  down.  And then if I remember correctly, we would go back
10  and they would send another survey out and say like here is
11  the new high; here is the new low and that sort of thing.
12  Anyway, after we did that several times, that came up with
13  -- that's how they came up the number to reflect the amount
14  of time on average that an attorney should expect to spend
15  on those case types.
16    Q   And by -- when you refer to experienced
17  private attorneys, were those attorneys experienced in
18  criminal cases?
19    A   Yes.  Exclusively.
20    Q   Exclusively in criminal cases?
21    A   And they may have done other -- they may have
22  had other practice, but they were brought in because they
23  were criminal defense attorneys.
24    Q   And when you were responding to questions from
25  the State on hypothetical, you mentioned that you don't

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 157

1  just look at the number of cases that an attorney has
2  because the complexity of the case, such as whether it's a
3  misdemeanor or an A, B felony affects the impact that that
4  case has on an attorney's workload.  Is your understanding
5  that the metrics the RubinBrown study was attempting to
6  establish to adjust for differences in the complexity of
7  cases?
8      A   Yes.  They were meant to be averages taking
9  into consideration some cases are going to take a lot of
10  time and some cases aren't going to take as much time.  So
11  you try to come up with some number that reflects how much
12  time, on average, you would spend on a particular case.
13      Q   And when you say a particular case, you mean a
14  particular kind of case, like an A, B felony?
15      A   Yes.  Based on the case types within the
16  RubinBrown.
17      Q   Do you remember what those case types were
18  roughly?
19      A   Murder, sex cases, C -- or A, B felonies, C,D
20  felonies, misdemeanors, probation violations, appeals, and
21  I think special sex cases like -- I can't.
22      Q   That's fine.
23      A   Yes, special sex cases, the civil ones.
24      Q   If you could turn back to Plaintiff's 57.
25  That's the e-mail you sent to upper management.  You were

## Page 158

1  discussing in the State's examination your request to upper
2  management and responses from them and your relationship
3  with them.  If you would look at the first page of Exhibit
4  57.  Do you see where Ellen Blau says, "I'm including
5  Michael, Joel, Leon, Greg, and Jackie in your e-mail."
6  She also says, "I will give you a call on Monday."  Do you
7  see where it says that?
8      A   Yes, I do.
9      Q   Did you speak with Ellen after sending her
10  this e-mail?
11      A   I'm sure I did.
12      Q   Do you recall what if anything upper
13  management told you in response to this e-mail?
14      A   I know I have had several conversations with
15  Ellen and Michael kind of related to this.  They are, you
16  know, they are concerned.  They are supportive.  They
17  always let me know they'll do whatever they can for me.
18  Obviously, the resource issue is really what this boils
19  down to and that there is just not the resources available.
20  In fact, Michael has even indicated to me in conversations,
21  you know, when I say look I need more attorneys.  He has
22  indicated, he's like well, what if I gave you another spot.
23  Could you fill it?  Implying that he might give me another
24  spot and the answer is no.  I had to tell him no and I
25  hated doing it because I would love another attorney spot,

## Page 159

1  but we don't -- we didn't have -- we don't have the
2  applicants.
3      Q   So you wouldn't be able to fill that attorney
4  spot because you don't have qualified applicants for it?
5      A   Right.
6      Q   What in your opinion would be ways to get more
7  qualified applications?
8      A   Well, I can think about what keeps people
9  around.  That's -- people generally don't become public
10  defenders to get rich.  They become public defenders
11  because they want to make a difference and they want to
12  help the least fortunate in society; those charged with
13  crimes.  When they are not able to do that and it's quite
14  apparent that we are not able to do that, it's just -- you
15  are not going to attract those people.  I don't know where
16  they go, but they go somewhere else.  A lot of -- they go
17  to the prosecutor's office.  I have several friends that
18  were public defenders that are now at the Attorney
19  General's office.  They don't stick around and they don't
20  apply.  In my area, you know, obviously money is an issue;
21  $39,000.00 is a low -- you're not going to attract very
22  many people when you're only making $39,000.00 a year and
23  you're expected to work upwards of 60 hours a week or more.
24  That's outrageous.  You're -- I don't know if -- you're
25  barely making $15.00 an hour.  People make more than that

## Page 160

1  working at restaurants and, you know, doing tasks that
2  don't weigh on their mind all night long.  That they can't
3  sleep at night because they feel bad that their client is
4  sitting in jail and they could have done more if they had
5  only worked longer.  So pay is a factor.  The hours is a
6  big factor.  The lack of respect; nobody wants to be a
7  public defender.  It's not like it's a prestigious
8  position.  You know, if you want to be a judge some day,
9  you're not going to be a public defender; you're going to
10  be a prosecutor.  All of the judges in my neck of the woods
11  were prosecutors.  They weren't public defenders.  So there
12  is a prestige issue.  You know, some people overcome that.
13  I don't necessarily care but for a lot of young people, you
14  know it's difficult.  There is not just a lot of pros to
15  being a public defender.  If you don't have the drive,
16  you're not going to be able to do it.  Even if you have the
17  drive, we will stamp it out of you pretty quickly when you
18  realize you can't do the work that you want to do.
19          MR. SHAHABIAN:  I have no further questions.
20          THE VIDEOGRAPHER:  This concludes the
21  videotaped deposition of Matthew Crowell at 5:53 p.m.  We
22  are off the record.
23          (Deposition concluded at 5:53 p.m.)
24
25

40 (Pages 157 to 160)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-6   Filed 02/21/18   Page 41 of 74

Page 161

```
 1              CERTIFICATE OF REPORTER
 2     STATE OF MISSOURI   )
                           ) ss.
 3     COUNTY OF GREENE    )
 4          I, Jenna Petree, do hereby certify that the
 5     witness whose testimony appears in the foregoing deposition
 6     was taken by me to the best of my ability and thereafter
 7     reduced to typewriting under my direction; that I am
 8     neither counsel for, related to, nor employed by any of the
 9     parties to the action in which this deposition was taken,
10     and further that I am not a relative or employee of any
11     attorney or counsel employed by the parties thereto, nor
12     financially or otherwise interested in the outcome of the
13     action.
14
15
16                         Court Reporter
17
18
19
20
21
22
23
24
25
```

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-6   Filed 02/21/18   Page 42 of 74

**A**

A,B 82:3
abided 84:22
ability 20:14
  23:6 32:13
  34:18 35:2,11
  37:7,9 39:14
  42:19 46:12
  52:13 54:13
  55:13 57:6,9
  59:18 60:11
  68:3 77:16
  93:10 94:12
  96:3 106:25
  121:3,22 161:6
able 21:20 26:6
  27:2,18 28:7
  28:11,17 29:13
  29:17 33:2
  35:22 43:15
  43:18 44:7,8,8
  48:14,18,19
  50:23 53:4
  69:23 70:8
  71:24 72:2
  78:3 79:21,23
  82:16 88:18
  90:18,19,23
  96:1,2 97:19
  98:20 119:21
  119:22 120:13
  122:2,4,20
  125:13 128:9
  134:7 148:10
  149:7 159:3,13
  159:14 160:16
absolutely
  32:16 42:20
  57:15 76:23
accept 113:23
  115:1,17
accepted 50:8
  76:24
access 139:11,15
  147:9
accomplish

148:7
account 63:18
  64:5,6,11,11
  142:7
accurate 11:22
  63:7 145:4
accurately 63:4
acknowledge
  98:18
acknowledged
  88:16
acknowledges
  98:21
Acknowledg...
  53:25
action 20:21
  161:9,13
actions 20:13
active 20:22
actual 25:6
add 79:15
added 148:2
addition 16:10
  35:9 69:3
additional 71:23
  74:12 135:11
  150:8 153:8
address 95:17
  98:8 102:24
addressing
  146:4
adequate 10:16
  23:7 27:21
  28:22,25
  30:14 37:25
  40:23 44:18
  46:11,16 50:11
  50:24 51:12
  55:19 62:22
  62:24 71:13
  92:11
adequately
  46:22 47:12
  50:13 60:22
  61:3 71:11
adjust 156:7,8
  157:6

adjusted 143:21
administrative
  10:23 11:2,8,18
  11:21,23 12:2,3
  12:10 13:9
  16:11 64:6
  127:4 148:14
admit 114:7
adopted 89:2
adult 59:13,13
advanced
  67:24
advantage 52:2
  53:2 92:17
adversarial
  23:25
advice 18:24
  50:24
advise 19:4
  51:13 54:4,9
  54:13 57:12,13
  117:15,15
advising 118:1
advocate 21:20
  46:12,16 52:13
affect 55:12
  106:25 148:25
affiliation 10:3
afraid 52:5,6
afternoon 3:14
  3:15 6:11,12
  63:14,15
age 6:7 32:2
aggravators
  94:12,15,20,21
  95:1
ago 58:2
agree 112:18
  114:13 150:16
agreed 5:24
  105:17 111:25
agreed-to
  115:18
agreement
  55:23 84:18
  111:14 112:4
  114:21,21 115:8

117:3
agreements
  113:20 115:4
  116:9
ahead 17:7,14
  20:10 88:13
  152:10
akin 138:8
al 1:4,7 3:4,7,19
  3:20 5:4,5
Alan 4:8 5:18
Alaris 3:15 4:20
  4:24 5:8,12
alert 128:15
alleged 45:11
  134:15 146:4
allotted 38:12
allow 89:25
  98:25 99:4
  102:24 127:11
allowed 127:6
allowing 117:13
allows 126:18
alternatives
  96:7
amazing 56:7
amount 24:4
  31:24 38:7
  62:21,25
  68:24 124:20
  127:3 137:8
  143:6 156:13
ample 47:16
analysis 30:15
  62:25
anecdotal 58:7
Anjali 4:3 5:17
annoyed 20:7,8
answer 6:23
  7:2,6,6,13
  13:15 17:11
  35:7 50:15,22
  71:12 81:10
  148:22 149:8
  151:3 158:24
anti-Columbia
  145:21

anticipate 10:16
anticipated 37:1
anticipates
  64:19
anybody 8:1,4
  74:25 79:15
  90:15 144:12
  154:22
anymore 25:24
  115:12 116:14
  125:13
anyway 96:11
  154:10 155:25
  156:12
APD 53:16
  118:21,22,23
  119:1 131:19
  132:7,7
apparent 30:11
  134:18 159:14
apparently
  25:22
appeals 80:14
  101:6 151:18
  157:20
appear 44:10
  80:23 86:12
  89:5,20
  97:25 100:18
  110:8
appearance
  18:12,14 28:14
  78:18
appearances
  28:12,13
appeared 20:13
appears 62:9
  62:15 161:5
applicants
  108:20 123:2
  125:11 134:21
  134:25 159:2
  159:4
application 18:3
  18:9 20:21,25
  21:7 78:17,22
  78:23 110:23

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-6   Filed 02/21/18   Page 43 of 74

133:16,18,21
134:19
application-w ...
103:18
applications
18:2,4 134:24
159:7
applied 21:3
79:5 83:10
103:14
applies 103:14
104:1 116:14
142:16
apply 36:6
59:24 70:21
76:12 81:14
103:11 104:2,3
159:20
appoint 84:23
85:1 99:1
102:12 112:22
119:4,25
154:10
appointed 18:17
21:8 99:6,11,12
99:13 100:1,2
111:8,16 113:3
114:15,17 118:9
118:16 134:12
134:12
appointing
20:8 81:16
85:7 89:2
110:12 114:22
118:8 119:20
154:5,6
appointment
100:24 112:11
appointments
16:5
appoints
100:22 134:23
approach
49:20,24
50:6 88:21
appropriate
29:5 120:3

135:24
appropriately
77:12
approve 136:9
136:10
approved 57:3
136:9
approximately
9:8
aprasad@orri ...
4:6
area 8:10,14,15
8:20,25 9:22
10:1 15:22 18:2
18:11,15 25:12
25:25 26:3,3
34:23,24,25
37:17 45:4
46:7 57:21
62:11,17 64:20
84:12 92:2,19
94:20 96:21
99:18 100:25
104:19 105:25
110:7 118:7,10
129:22 145:9
159:20
areas 56:11
67:5 131:5
140:22
argue 128:14
argument 42:16
45:18 47:17
128:13
arguments
73:14 128:12
arraign 20:10
arraigned 20:17
arraignment
19:16 21:9,14
38:4
arraignments
18:14,15 21:11
arrange 26:11
98:6
arrangement
26:12 114:19

arranging 55:8
arrested 17:22
18:1
ascertaining
128:13
aside 9:6 63:2
81:13 103:10
120:11 141:18
155:9
asked 71:1
98:25 99:1,2
99:25 123:20
129:2 133:24
136:1 146:20
155:17 156:5
asking 10:18
63:3 87:2
95:16 98:22
130:8
asks 110:15
aspect 96:19
aspects 55:16
aspirational
10:15 76:12
assailant 36:21
assault 117:20
assaults 41:21
41:22
asserting 107:21
assessment
148:8
assign 14:12,25
58:20,22,25
59:5,23 79:23
81:4 131:9
132:3
assigned 14:16
14:17 48:16,17
85:14 131:25
141:23
assignment
131:15
assist 13:4,8
32:12 46:12
52:13 56:16
84:20
assistance 74:5

74:7 101:3
127:16 146:20
151:7,11
assistant 9:7,14
88:23 98:13
131:10 133:6,7
133:10
assistants 13:6
132:11 133:9
assisting 13:11
associate 21:15
99:7,8
assume 32:1
50:16
assuming
112:22 114:22
assumptions
142:19
ate 48:3
attacking 41:9
attempt 89:14
95:19
attempting
157:5
attempts 84:20
84:23,25 92:7
attended 9:14
attention 74:14
76:10 141:1
147:25
attorney 4:9
5:13 6:14 8:12
13:10,19,21 14:1
14:2,4,5 16:1
19:3,4,7,11,18
25:6 27:10,13
30:7,8,9,10
38:6 40:17,17
40:17,19 48:17
48:19 49:1
50:18 51:5,25
54:4,6,10 55:7
55:10 58:3,4
59:8 61:2,12
61:19 63:14
65:16,24 66:11
66:14 69:19

70:19 71:1,4
76:23 77:7,17
82:23,23 85:3
85:6,7,9 89:8
89:11,12,16
92:15 93:15
94:5 98:5
103:6 104:11,13
104:15 106:7
106:20,22,23
106:24 107:6
107:7,15,17
108:4,12 109:9
117:9,15 118:23
119:1,8 129:20
129:21 130:2
131:14,19 133:11
133:11 135:15
139:1,23
142:15,15
151:10 154:18
154:23 156:14
157:1 158:25
159:3,18 161:11
attorney's 14:20
53:10 157:4
attorney-client
22:20 29:24
attorneys 10:8
11:12,12 12:6,14
12:15,16,20
13:4,18 14:7,11
14:13,14,15,17
14:19,23,25
21:10,10,23
22:7 25:6
27:6 29:16,17
32:2,7,11,13,19
32:23 33:6
36:7 37:17
39:14,24
40:22 41:12
42:19,24
46:15 51:11
52:4,21 53:3
53:13,17 54:9
55:15 57:1,6

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-6   Filed 02/21/18   Page 44 of 74

57:10,13,21
58:13,16,20
58:23,24 59:1
59:24 60:21
61:13 63:10,10
63:12,18,19,22
64:8,9,13,19
64:21,24 65:2
65:4,7 66:9,10
66:10,14,15,19
66:23,25 67:1
67:2,11,12,22
68:3,9,15
69:5,7,19
70:21,23 71:9
71:14,24 72:2
72:8,14 73:17
74:11,23 75:13
77:1,6,10,14,22
77:25 78:12
79:20 81:6
86:4,5 87:4,14
87:16 92:3,3,7
92:16,18,21
93:5 96:1 99:1
99:18 101:19
102:7 103:15
104:1,3,19
105:5,18 106:6
106:12,13,25
107:19 108:1,5
108:7,13
109:10 116:21
118:9 119:11,11
119:20 120:1
120:13,21
121:15,21 122:1
127:6,11,13
128:15,25
129:7 130:7,13
133:8 135:23
137:10,11,20
137:24 138:17
139:3,8 140:12
142:8,22,22
142:23,23
143:1 144:2

145:3 149:14
150:5 154:6
155:5,17,24
155:25 156:17
156:17,23
158:21
attract 159:15,21
August 109:6
authority 132:5
availability 81:7
available 35:25
36:1 56:2
68:8 88:6
103:6 109:9
146:23 158:19
average 13:17
15:25 16:25
16:25 17:3,4
27:10 28:10,17
40:5 82:15
110:17 127:7
149:14 156:6
156:14 157:12
averages
141:24,25
142:5,24,24
143:3,20
156:3 157:8
avoid 19:25
57:22,24
awaiting 107:24
aware 18:19
22:3 54:12
105:12,24
117:11 119:19

---
**B**
---

B 2:6 45:24
82:2 150:11
157:3,14,19
back 10:4 11:19
22:18,19
24:24 32:14
34:11 46:21
49:14,16,23
50:4 67:21
74:16 80:15

89:18 98:1,9
109:21 127:24
139:6 146:21
147:15 156:9
157:24
bad 33:11 121:16
121:19 160:3
bailiff 26:20
balance 68:6
bar 97:10,11
99:11 109:1,4
124:7
barely 159:25
Barrett 140:8
based 10:10
14:25 20:13
25:2 31:25
32:2 38:18
40:13,14
62:23,25
63:17 72:16
126:2 132:1
134:17 143:22
144:14 146:24
152:9 157:15
basic 31:21
45:17,18 67:19
67:22 70:23
75:8,13 142:13
basically 6:19
48:18 65:13
66:13 75:10
77:24 78:25
80:10 84:21
97:3 102:6,15
109:7 111:1,23
116:20 126:14
132:2 139:9
152:5
basics 65:8,10
66:9
basis 21:24
23:21 60:13
79:4 135:9,19
145:24
Bates 86:10
89:5,18,19

110:14 111:11
bear 75:17
becoming
69:13
began 77:23
79:12 91:4
Beger 152:7
beginning 19:16
66:11 124:22
130:6
begins 49:15
50:6
behalf 1:17 6:7
behavior 126:16
beings 109:22
belief 20:7
116:10
believe 7:21
8:21 14:1 21:24
28:22 31:21
33:14 34:4
39:16 48:7
62:23 65:2
69:25 70:2,6
79:22 80:6
81:15 85:23
89:12 99:7,23
100:11 101:17
102:14 103:2
104:10,23
105:7 111:21
122:21,22
128:12 135:10
136:18 140:7
141:2 149:13
believed 73:12
102:7 156:8
bench 132:22
132:25
berated 71:5
Bernstein 98:13
best 10:10 22:21
53:1 60:18
61:19 77:3
93:21 96:2
127:25 161:6
Bethany 4:24

5:11
better 27:9,12
27:19 43:9,9
43:12 52:20
53:4 56:16
93:8 146:1
150:14
beyond 9:8
20:11 21:17
73:15 79:24
big 15:22 16:18
25:12 35:2,4
36:22 38:5
117:23 119:18
150:12 160:6
bigger 27:3
biggest 41:21
106:10 117:4
Bill 111:23 116:11
bills 94:6
Bird 9:23,24
bit 16:3 64:18
110:2
blame 24:3
35:20
Blau 90:18 95:9
95:16 110:15
158:4
blood 34:15
Bluffs 4:21
boils 158:18
bolts 65:11
bond 18:13 25:4
25:4,7 43:18
43:19,21 44:2
44:3,18,22,23
44:24 46:13
46:16,17
128:12,14
134:5,13 135:4
bonds 20:5
45:19,21 46:8
bono 105:12,23
105:25
born 53:23
borrow 139:13
bothered 74:19

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-6   Filed 02/21/18   Page 45 of 74

bothers 146:17
bound 41:4
box 101:11
branch 8:15
brand 63:19
    77:7 100:5
    108:4
Brandon 118:19
    118:21,24
break 7:10,12,14
    30:18 49:6
    109:17 123:17
    123:18
breakout 65:23
breaks 7:9
breath 7:11
Brice 88:23
brief 125:17
briefly 10:2
bring 20:23
    26:19 54:22
    71:10 129:14
    137:17
Broadway 4:21
broom 25:22
brought 24:17
    42:4 74:14
    75:21,23
    76:10 147:25
    155:21 156:22
bucket 11:8,11
    11:23
buckets 11:20
budget 15:13,14
    15:16 91:10
    92:1 136:14,16
    136:25,25
    137:1,3 141:3
build 25:7
Building 4:15
bulk 24:8 48:3
    66:22 67:8
bunch 77:10
burned 69:24
business
    127:24

**C**

C 4:1 108:10
    142:3 157:19
C,D 157:19
calculated
    142:10
calendar 153:3
call 15:17 23:18
    25:4 65:8
    82:21 152:3,3
    154:21 158:6
called 30:6
    72:11 105:2
    139:18
calls 145:25
cancer 73:9
candidate
    125:6
candidates
    68:18,19,24
    121:8 122:3,8
    125:1,4,9,14,18
    128:9
canine 34:15
capability
    105:23
capable 108:22
    108:24
capacity 8:11
    62:17,22 63:4
    63:5,6 141:22
capital 94:2,7,8
    94:10,11,18,21
    149:25 150:1
car 39:22 134:3
card 97:11
care 24:2 43:23
    96:9 122:23
    146:13 154:13
    154:14,16
    160:13
career 128:18
carry 16:1,10
case 1:6 3:6 5:5
    13:4 14:22
    16:10 20:16,18

21:16 22:1,12
23:16,22,24
29:2,4,7,10,12
29:25 30:1,7
30:16 31:7,10
31:16 32:4,12
33:8,9,14 35:8
35:16,21,22
36:3,16,17 37:1
37:4,22 38:3
38:5,17 40:18
41:4,6 42:10
42:12 43:8,12
43:14,17 45:1,7
45:11,14 48:16
49:20,24,24
49:25 50:17
50:18 51:4,5,6
51:19,23,23
52:2,3,21
54:17 55:23
55:24 56:17
59:23 60:18
65:8,15 67:4,4
67:24 72:3,24
73:4,9 75:13
77:13 78:19
80:7 81:6,7,11
82:2 83:10
85:8,13 91:3,6
92:16,20
93:19,25 94:1
94:8,10,13,19
95:3,21
103:22,24
106:7,8 107:10
107:16 108:3,6
108:6,8,11
110:21 111:1,4
112:12,14 115:3
117:14 119:11,12
120:14,14
125:22,24,25
126:3,5 127:7
127:13 129:19
129:24 131:14
131:21,22

132:8 134:10,11
134:14 137:18
138:9 140:6,10
142:12,12
143:4 147:16
148:18,19,20
149:3,10 150:3
150:19,20
151:5 152:22
152:25 153:6
153:8,10
156:15 157:2,4
157:12,13,14,15
157:17
caseload 10:24
    11:4,21 14:24
    15:22 27:6,11
    27:17 29:17
    34:17 35:10
    55:12 59:17
    61:20 62:8
    68:2 70:7
    72:10,12,19
    73:11,12 77:11
    77:19,20 78:13
    79:22 86:2
    92:4 101:19
    104:12,16
    106:21 111:14
    116:12 120:16
    124:5 127:8,17
    128:1 146:4
    149:7,23
    150:7,12
caseloads
    14:20 42:23
    71:10 74:21
    120:22 121:21
    127:7,12,15
cases 14:12,16
    14:18,21,23,25
    15:24,25 16:4
    16:6,16,20,24
    17:6,7,16,17,18
    17:19 19:25
    28:21 29:3,5
    29:14,19 31:9

32:25 33:12
34:6 35:12
36:7,7 37:10
38:4,10,14,24
38:25 39:6,8
39:9,10 40:9
41:20,22 43:1
43:2,4 44:23
46:2,7 47:9
48:23 51:9,13
52:11,25 54:12
55:16 57:16,18
58:20 59:25
61:10 62:25
63:24 67:10
68:6,13 69:15
69:21 71:15
72:9,17,19
76:6,8 79:19
79:21,23,23
80:8,13,16,18
80:21,21,25
81:1,4,7,8,9,14
81:20,20,22
82:14 82:4,11
83:2,24 84:7
84:22 88:10,11
89:11,13,15,24
90:1,3,6,15,19
90:20,22,24
91:1 92:4,9
93:1,10,10
99:6,11,17,25
99:25 100:2,4
100:5 101:17
102:8 103:3
104:17,20
105:13,18,23
106:8,15,19,19
106:22,23
108:9 110:16
111:5,15,24
112:2,7,24
113:19,22 114:5
114:15,16,17
115:14 116:7,13
116:21 117:3,17

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-6   Filed 02/21/18   Page 46 of 74

118:8 119:4,13
119:21 120:5
120:10,18
126:2 128:3
129:14 130:3
131:9,22,24
132:1,3,20
134:10 137:12
137:17 138:11
138:22 148:18
149:13,14,25
150:1,5,8,13
153:13 156:18
156:20 157:1,7
157:9,10,19,21
157:23
catch 7:11
categories
136:17 140:23
140:24 142:2
155:15,17
categorize
140:21
category 80:17
cause 3:17 32:6
41:7,16,17 42:2
42:3
caused 106:4
causes 36:3
center 21:2
central 1:2 3:2
3:19 5:7 16:15
87:6,10 145:1
Centre 4:14
certain 3:17
15:17 107:11
certainly 16:21
18:22 20:13
29:23 31:4
33:20 55:1
61:13 72:4 75:1
76:21 93:11
96:19 106:2
CERTIFICATE
161:1
certification
58:12 59:4,6

59:15,19 60:1
certified 59:11
certify 161:4
Chad 110:9 111:11
111:24
chain 89:5,21
110:9
chair 48:17 49:1
137:12,12,13,16
137:17,25
chairing 138:5
challenge 81:17
challenged
41:25 117:12
challenges
32:25 60:16
challenging
42:2
chambers 67:21
88:16,24
change 19:15,15
19:17,18 20:3
20:6,15 76:7
88:10 94:17
107:19 121:17
125:20 154:22
changed 72:20
140:22
changes 94:17
153:25
chapter 151:24
charge 44:10
91:8 117:18
125:24
charged 8:13
36:19 39:1
107:7 117:2
159:12
charges 44:5
60:14 83:20
113:12
checked 16:9
101:11
checklist-type
128:18
Chief 73:1
children 60:1

chip 154:5
choose 114:4
chooses 94:12
Christmas 48:9
Christopher
9:23,24
Church 1:4 3:4
3:19 5:4
circuit 21:14
67:16 84:21
86:5 98:3
99:9 100:3,3
102:3,4,4,17,18
112:11 152:6,10
152:12,14
circuits 100:9,12
circulating
86:24
circumstance
30:4
circumstances
42:10 54:17
83:15,16,17
circumvent
20:14
citizen 22:2
53:23 54:1,2,3
city 4:10 9:25
96:22 105:17
105:20 117:23
124:11 146:16
civil 10:1,1 67:16
88:9 96:19,20
142:23 157:23
claim 42:13
clarified 111:24
Class 150:18,21
150:22
CLE 65:21
clean 110:2
clear 7:9 90:5
113:1 116:5,18
140:25 152:11
clerical 13:14
132:11,12 133:3
clerks 109:5
132:4,4,10

client 20:20
21:13,17,20
22:25 23:11,19
24:1,1,6,8,9,10
25:10,18 26:13
28:2,2,4,4,6,11
29:3 31:5 34:3
36:12,18 42:9
43:18 45:2,10
45:17 47:5,12
47:21 49:20
50:1,4,8,9,12
50:14 51:6,18
52:19 53:1,18
54:13 60:9
65:10 67:6
69:17 75:15,15
75:16,18 76:16
78:18 91:7
103:4 107:4
114:25 125:24
126:6,8,12,12
126:14 138:17
139:6 150:24
152:22 153:15
160:3
client's 20:6
23:22 30:16
45:1 107:20
120:5 138:19
138:21
client-centered
23:9
clients 8:13 10:9
10:11,14,21
13:13 16:16,19
18:20,21,22
20:4 21:8
22:11,15,17,23
22:24 23:1,7
23:21 26:6,19
27:8,15,18,22
27:25 28:7,9
28:11,18 31:17
32:25 39:15
40:1 43:19
44:2,3 56:15

60:22 61:3
69:20 70:3
71:11,25 74:3,8
74:12,12,17
75:22 77:3,4
78:1,2 84:7
90:12 91:17
92:10 96:1,2,3
99:15 106:6
107:20,22
117:12 120:7
136:8 148:13
153:25
close 82:9
123:13 126:2,4
126:7 152:23
152:24
closed 125:25
152:23 153:10
153:11
closer 11:5
closest 38:21
closet 25:22
closing 47:17
Clothing 136:7
Coalition 105:9
code 67:20
coded 110:16,21
110:25,25
collateral 117:16
117:25
collected 143:19
156:4
collecting 13:5
collection
143:17
college 9:12
colored 71:14
Columbia 4:16
4:21 15:15
87:5,6,16,18
101:4 136:22
145:5
column 64:20
columns 79:2
come 14:12,18
20:18 21:2

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-6   Filed 02/21/18   Page 47 of 74

34:11 35:1
42:14 45:10
55:6 67:2
70:12 77:5
79:20 82:12
82:23 132:4
136:24 146:7
157:11
comes 124:15
131:21,22
132:8 133:3
138:23
comfortable
36:15 72:14
114:19 115:11
coming 11:10
14:21 39:6
46:21 49:16
87:4,10,16
125:18 143:3
148:18
commissioners
124:10,13,14,16
committing
39:11,12
common 108:6
135:3 146:25
communicate
22:11,16 23:8
26:5 27:8,21
77:2
communication
22:17 60:5
75:25 76:14
76:20 149:6
community
70:10
compared
110:18
compel 32:10
competency
33:19,20,22
34:5,7 77:6,9
competent
33:23 34:3,4
34:10,11 50:19
50:19,22 77:6

92:16,22
149:5
complain 64:14
complaint 73:7
82:21 147:1
complaints
32:22 121:9
146:24
complete 31:19
148:11
completely 17:11
34:13 63:7
complex 120:14
complexity
157:2,6
component
11:18
compromising
36:10 52:18
comptroller
137:4
concern 14:20
87:10 95:9
146:12
concerned
98:4 119:14
158:16
concerning
124:5,20
138:6 141:19
145:10,11
concerns 124:5
concluded
160:23
concludes
160:20
conclusion
126:3
condition 73:10
conduct 28:22
78:5 144:3
conducts 144:5
conference
26:11,15,20
138:3 147:15
confessed
36:23

confessing
36:24
confidence
26:4
confident
22:20 83:14
confidential
22:20 24:22
25:1,13,25
26:2,3,7,13,21
confidentiality
22:21
conflict 91:5,5,9
92:6 93:9
95:18
conflicts 74:11
75:21 91:11,13
91:13 146:9
confusion
140:21
consciously
55:1
consequences
18:19,25 19:1
53:14,18 54:14
117:16,25
conservative
64:4 141:8
conservatives
64:2
consider 45:16
112:21 122:11
122:14,17
152:9
consideration
38:3 63:10
157:9
considered
28:14
considering
49:20 122:12
constant 106:11
128:7
constantly
63:13 139:18
constitute
28:25

Constitution
70:17
constitutional
19:8,13 116:19
constraint 37:9
constraints
30:15 55:12
57:6 59:24
61:4 91:18
consult 43:11
50:1,12,13
54:4,10 55:15
55:20
consultants
57:7
consulted
36:25 55:18
56:6
Consulting
29:5
consuming
39:9 146:18
contact 25:21
28:15,18 42:13
contacted 17:23
119:15
contained
61:25
contempt 84:18
contention
142:6
continually
79:19
continuance
37:2,3 71:2
continuances
37:18 38:10
99:2,22,23
99:25 102:12
108:4 138:7
continue 69:4
79:25 96:4,5
96:8 121:7,24
128:10
continued
100:7
continues 121:8

122:2
continuing
19:22
continuously
22:24
contract 90:17
90:19,20,23
91:1,11 92:1,5
92:21
contracted
91:21
contracts 91:8
control 15:6,9
15:16,20 70:6
70:7 127:17
136:5,6,13
controlling
138:11
controls 15:7
133:14
conversation
24:17,21 99:14
128:12 138:6
152:6,9
conversations
72:13 86:22
144:14 158:14
158:20
conveyed
49:22 50:7
convictions
53:14
copy 87:20
129:17,23
cordial 88:21
corner 60:4
corners 23:5
corporate 41:23
correct 10:25
16:12 30:22
30:24 34:4
42:25 50:3
123:21 124:1
126:25 130:10
130:16 140:13
141:8 151:22
151:23 152:25

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-6   Filed 02/21/18   Page 48 of 74

153:6,16
**Corrections**
126:16
**correctly** 50:2
64:25 131:8
148:5 156:9
**corresponde...**
85:21,25 86:4
**Council** 73:2
**councilmen**
124:11
**counsel** 4:14
5:25,25 7:3,4
7:5,18 18:13,17
18:24 19:23
19:25 20:8,17
74:5,7 83:5,7
84:6,9,23 85:1
99:6 102:13
105:10 113:3,6
113:7 127:16
134:7 140:19
151:8,12 161:8
161:11
**counseling**
56:17
**count** 109:11
144:11
**counties** 8:16,18
15:9 20:2
21:13 26:10
39:19 56:13
82:10,16
103:16 104:2
105:25 115:6
116:15 131:10
131:23 133:8
**counting** 17:18
**county** 14:16,17
14:18 25:3,12
25:13,14,25
26:2,3,14,19
38:18,19,21
39:19,20,23
40:1 46:1 55:7
55:7 72:18
79:1 82:10,14

83:17,18 84:1
86:18 88:12
90:10 98:14
99:22 103:15
104:2 115:7,19
116:5 119:8
124:13 131:20
131:21,23 161:3
**couple** 17:7
27:9 59:16
75:2 83:14
84:18 90:25
116:15 122:6
125:9 130:23
**course** 90:21
124:18 149:20
**court** 1:1 3:1,18
4:19 5:6,22
6:20,22 7:2
13:11,12 19:3
20:9,11 21:2,7
21:15,15 22:17
23:2 24:18
28:12,13,14
38:20 39:21
39:25 42:15
42:16 44:10
45:10,18,19
48:5,7,11 53:9
55:9 59:13
67:15,19 71:1,3
71:5 73:8 76:1
78:7,22 80:14
80:14 81:11,11
81:18 83:11
85:7,17 88:9
90:12 91:6
97:3,22
100:21 101:6,7
101:9,10,18,18
101:20 103:19
105:2 110:4
114:23 126:13
126:18 127:2
129:12,13
133:5,11 134:3
134:22 135:2

139:9,17 151:18
151:22 152:2
153:11 154:5,7
154:7,25
161:16
**courthouse**
24:11
**courtroom**
20:24 21:1
22:18,19
24:24 67:18
85:3
**courts** 18:11,14
18:15,25 19:5
19:5 20:22
35:18,20 79:4
116:20 138:20
138:20 139:10
139:12 154:3
**cover** 22:9
65:23 131:4
**covered** 121:6
**covers** 21:23
64:24 106:1
**Crawford** 8:18
26:2 55:7
82:10 98:14
103:15 104:1
**crazy** 76:23,24
**create** 78:25
80:6 147:8
**created** 82:11
103:2 104:10
105:13 129:21
147:20,23
**creates** 54:23
106:10
**creating** 78:16
87:18 102:21
**creation** 141:13
**creative** 41:19
**credibility** 80:4
**credible** 107:14
**credit** 114:3
**crimes** 159:13
**criminal** 8:13
14:4 17:23

18:10 19:22
23:14 38:25
44:5 45:4
53:14 67:17
83:2 85:11
88:10,11
105:13 125:24
142:13,21,25
156:18,20,23
**crisis** 146:5
**cross** 2:3,3
47:11,16 138:4
**Crowell** 1:16 2:2
3:12 5:3 6:1,6
6:11 49:17
109:24 123:8
160:21
**Crowly** 88:23
**curious** 154:24
**current** 15:22
39:5 120:16
149:7
**currently** 12:12
16:6 33:22
60:22 72:1
79:8,9,10
81:25 82:6
140:2,5,9
149:12
**custody** 18:7
21:1 44:7,15
60:2 76:16
82:6 99:3
107:23,23
114:2 132:3
135:2
**customs** 138:8
**cut** 123:4
**cutting** 23:5

---
**D**
---
**D** 2:1 108:10
142:3
**daily** 79:3
**data** 7:23 141:13
143:9,17,19
**database** 72:11

148:1 153:9
**date** 5:2 20:11
21:2 38:4,5
107:6 126:8
153:2
**dated** 86:10
**dates** 20:9
35:25 81:11
91:7
**day** 3:15 12:19
18:7 22:17
24:18,21 28:7
29:15 39:22
40:2,2,3 47:1
48:4,5,5,5,6,6
48:7 60:19
65:13,17 79:17
88:7 95:4
96:25 97:11
106:13 120:20
129:16,16
134:14 140:10
152:10 154:20
156:3 160:8
**day-to-day** 15:2
23:3 65:12
**days** 19:19
39:25 64:17
65:25,25
67:6,7 76:16
76:17,22 114:3
114:3 126:19
139:4
**deadline** 77:1
**deadlines** 73:5
81:11
**deal** 23:4 24:9
24:11 52:4,8
52:20 58:3
60:8 67:12,13
117:23
**dealing** 59:25
60:15 118:5
**deals** 53:4 58:5
113:11,14
**death** 93:18,24
93:25 94:13

ALARIS LITIGATION SERVICES
www.alaris.us        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-6   Filed 02/21/18   Page 49 of 74

94:15,24
**December** 1:18
3:13 5:2
**decent** 31:24
**decide** 54:22
**decided** 16:16
25:6 73:7
74:23 116:19
116:20 127:10
151:24
**deciding** 16:19
**decision** 11:5
21:7 72:21
73:17 75:1
77:15,18 87:14
97:2 111:22
127:2,2 145:2
145:6 147:20
151:15
**decline** 121:9
**decreased**
125:2 130:12
**decreasing**
121:23
**dedicate** 43:8
**dedicated**
127:2
**deep** 47:20
**defend** 70:17
**defendant**
17:22,25
20:16,21 95:3
111:7,16 112:8
112:13,16,19,20
113:23 114:4,6
114:8,13 115:1
115:19,21
126:20 136:2
154:17
**defendants** 1:8
3:8,21 4:7 5:21
6:1 7:4 13:13
18:16,21 19:8
39:2 46:8
113:2,6 117:2
117:14
**defender** 4:13

8:10,11,16,19
8:23,24 9:3,6
9:6,7,21 10:6,7
10:24 15:1
16:14 17:1,2
21:4,5 48:6
58:24 65:9
70:11,18 80:12
83:11 89:9
90:6 93:8
96:18,20,23
110:10,11 112:12
114:22 123:25
128:19 129:8
129:23 130:6
130:9,9,15,20
136:23 137:2
137:15 141:3
142:17 143:1
145:12,16,17,18
160:7,9,15
**defenders** 4:12
76:4,12 118:11
118:12 131:11
142:21 145:17
147:22 155:23
159:10,10,18
160:11
**defense** 14:4
36:20 73:9
142:21 143:1
156:23
**define** 125:22
**definitely** 35:7
82:3
**degree** 123:24
141:19,19
148:11
**degrees** 123:23
**delay** 16:19 18:4
36:2
**delegate** 132:5
**Delphi** 141:17
142:20 143:9
143:20,21,25
155:11
**demands**

104:12
**denial** 111:6
**denied** 37:3,12
37:13 80:14
91:10,19,25
101:5,6,9
104:25 111:3,5
134:18 135:8
135:14,15,20
136:7 151:17,21
152:2
**Dent** 8:18 25:25
103:15 104:2
131:23
**deny** 15:17
101:12 134:5
135:22 136:2
154:3
**denying** 134:4
**department**
126:16 144:7
**departure**
144:15 145:12
**depending**
12:19 65:24
127:10 150:2
150:19
**depends** 17:25
29:2,10 72:19
137:18
**depose** 135:25
**deposed** 6:16
30:13,13 31:1
**deposes** 6:8
**deposition** 1:16
3:12 5:3,8 6:1
6:19,21 7:16
7:24 8:2,5
16:23 30:20
31:3 65:11
78:15 135:24
136:9,19,23
160:21,23
161:5,9
**depositions**
29:4 30:10
32:23 47:9

130:5,11,24
**deputy** 8:24 9:2
9:6 17:1 58:23
73:21 90:17
91:8 95:18
110:11 130:17
131:16 137:15
145:3
**describe** 9:5
17:21 145:13
**deserve** 119:23
150:14,14 154:1
**deserved** 74:3
120:15
**deserves** 51:6,7
**desk** 138:18
**despite** 127:25
**details** 36:16
73:4
**detention** 58:5
58:9,11 59:4
**determination**
110:23 111:3,6
132:6 133:1,2
133:12
**determine**
30:19 33:7
41:15 72:14
101:20 125:12
131:25
**determined**
111:7 132:2
151:7,11
**determining**
41:16 51:20
110:17,21
**developing**
107:10 134:14
**development**
60:7 72:16
**devote** 35:15
37:4 52:21
60:17 61:10
**dictate** 10:21
**difference**
159:11
**differences**

142:7 157:6
**different** 39:2
40:16 51:24
65:22,23
74:14 79:1
86:8 97:6,7,13
101:1 108:1
128:17 131:4
136:24 144:8
150:18 151:2
**differently** 81:9
**difficult** 7:2
23:11 34:22
35:1 56:14
60:5 70:12
71:12 81:10
103:16,18
160:14
**difficulties** 36:5
**difficulty** 55:8
67:12,13 68:5
86:21 121:3
**diligence** 75:25
76:13
**diligent** 77:2
149:5
**dire** 47:18
**direct** 2:2 47:11
47:16
**direction** 49:25
161:7
**director** 17:1
90:16,16,17
91:8 95:8,19
131:16 145:3
**disadvantage**
51:25
**disadvantages**
117:13
**disappears**
22:6
**Disciplinary**
73:2
**discovery** 21:14
31:8,11,15,18
31:20,20,21
32:5,5,9,14,15

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-6   Filed 02/21/18   Page 50 of 74

47:7 75:11,12
75:18 78:19
107:11 139:21
discrepancy
134:19
discretion 15:2
135:16
discuss 89:24
98:7
discussed 7:19
discussing
158:1
discussion
105:3 135:12
discussions
14:23 90:16
dismiss 41:7,11
dismissed 42:17
48:4
dispose 41:19
disposed 90:21
disposition
106:9 115:18
dispositions
20:4
disregarded
89:3
distinguish 12:7
131:2
distinguishing
11:24
distribute 15:9
district 1:1,1 3:1,1
3:18,18 5:6,6
8:10,19,22,24
9:2,6 10:6,7
10:24 15:1
16:14 17:1,2
48:6 58:23
89:9 90:6
110:10,11 118:10
125:23 126:1
129:8 130:6,8
130:15,20
131:9 132:23
136:22 137:2
137:15 138:8

139:7 144:7,9
145:16,16,17,18
147:21 151:17
151:18,19
district's 140:1
division 1:2 3:2
3:19 5:7 57:20
65:15 90:16
92:6 94:2,7,18
94:20,22
144:5
docket 11:15
16:6,10 39:5
60:23 80:21
81:1,20 138:9
document 53:8
61:24 62:2,13
62:17 78:6,8
78:15 85:16,18
85:23 86:24
95:5 97:23
100:14,16
103:8 104:6,14
110:3,5,14
154:24 155:1,6
documents
7:20,22
100:10 147:19
doing 11:10 12:6
12:10 20:14
23:3 32:24
33:2 40:20
48:15 60:20
63:19,20 76:9
77:10,12 86:14
87:3 95:23
96:6 97:12
101:4 107:13
115:7 118:13
120:18,24
129:15 154:12
158:25 160:1
dollar 94:2
domestic 41:22
45:11 117:20
door 26:18,21
67:2 125:18

double 71:22
72:6
downside 117:5
downsides
116:25 117:2
dozen 132:17
132:24
drafted 100:20
147:7
dramatic 127:18
draw 141:1
drive 38:20,23
39:20 90:10
123:5 134:3
160:15,17
Drive-In 9:12
driving 40:4
dropped 79:13
drops 13:22,24
drug 40:9 46:2
56:17
due 41:7 101:11
duties 23:3
duty 76:13,14
DWI 112:15
115:20
DYS 60:2

_____
E

E 2:1,6 4:1,1
108:10
e-mail 77:24
86:3,8,12,19
89:5,19,20,21
89:23 95:8,11
96:24 102:20
110:9,15 111:11
111:18 119:7
145:10 157:25
158:5,10,13
e-mailed 84:13
93:5
e-mailing
103:22
e-mails 12:4
86:1 97:21
E-request 15:18

earlier 35:24
38:16 80:20
100:23 106:3
124:6,7,21
134:21 135:7
135:21 141:6
142:6 152:21
early 35:16 36:3
98:5
East 3:16 5:9
Eastern 151:19
easy 93:25
eat 134:2
economy 125:1
educate 129:13
educating
129:9
education
21:25
effect 41:25
60:15 69:6
73:6 115:5
116:14 129:6
effective 22:16
98:20 107:1
120:25 121:4
127:16
effectively
21:20 23:7
27:8,22 35:11
36:6,13 39:15
47:3 51:14
52:13 59:18
61:8 71:24
102:8 120:5
140:15
efficient 41:20
effort 43:17
52:7
efforts 127:25
eight 14:11 28:7
38:22
either 66:21
78:23 123:3
143:1
elaborate 6:24
elected 86:17

eleventh 65:3
eligible 121:4
133:15
Ellen 90:17
95:9,16,21
110:15 111:13
158:4,9,15
Elmer 90:17
91:8,24 95:18
email 86:13
114:24
employed 161:8
161:11
employee
64:15 65:12
161:10
employees
12:22 56:22
64:16 144:10
employment
9:5 10:4
65:20
encompasses
8:16
encourage
21:23 22:7
57:20 67:2
133:22
encouraged
136:21
ended 48:15
ends 34:4 43:16
49:12 50:8
60:8 109:19
138:18
enforcement
42:4
English 54:21
enjoy 96:20
ensure 10:9
74:21 93:20
enter 78:18 91:4
111:4,24,25
116:7,8 126:7
entered 103:12
111:1 119:11
entering 14:22

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-6   Filed 02/21/18   Page 51 of 74

16:19 18:11,12
89:17 119:20
119:22 127:13
127:13
entire 102:25
144:12
entitled 126:22
equally 121:12
121:16
Eric 123:15
especially 24:6
39:24 83:19
117:11 134:10
146:15
establish 157:6
estimate 64:2
et 1:4,7 3:4,7,19
3:20 5:4,5
ethical 74:2,5
74:20,22
75:21 76:11
81:14 97:8,17
97:19 104:18
154:13,15
ethically 77:20
78:1
evaluate 35:22
36:18 53:18
84:4
evaluated 29:11
33:16,22 47:6
47:8
evaluating
35:21
evening 123:11
123:12,12
event 48:10
eventually 73:8
138:18
everybody
41:18 76:5
116:17 121:14
everyday 96:12
evidence 13:5
22:3 23:16,17
23:24 29:4,9
42:16 43:10,11

58:7 150:25
evidentiary
32:21
exact 63:3 73:4
exactly 97:5
exam 47:11
examination
2:2,3,3,4
155:7 158:1
examinations
47:11,16
examined 3:13
6:7
example 48:1
92:19 112:14
114:24 115:20
129:2,11,12
134:11
examples 41:21
46:1 83:8
exceed 136:23
Excel 78:25
excellent 125:9
exception 51:10
84:24 126:5
excess 105:22
excessive 73:11
104:16
exchange 90:2
exciting 32:24
Exclusively
156:19,20
exhibit 2:7,7,8,8
2:9,9,10 53:9
61:21 78:7
85:17,23,24
100:15 103:9
104:5 141:2
147:4,13,23
158:3
exhibits 147:3
exist 29:9
128:19
existing 68:2
75:22 104:20
exists 22:3,4
54:9

exit 144:3,5
expect 7:19
64:16 75:13
84:3,4 156:14
expectations
128:16
expected
39:25 102:23
112:10 159:23
expecting 64:13
expects 63:9
64:7
expedite 138:10
138:11
expense 12:4
148:14
experience 9:5
13:17,20 14:2
14:3,8 17:1
27:13 31:24
32:3 40:14
48:24 49:2
50:23 51:17
51:20 56:10
61:9 66:12,16
68:15 85:11
121:13 122:1
124:21 128:8
128:23 131:12
131:20 137:20
138:5 142:8,13
143:8,13,22
150:3
experienced
27:15 33:6
58:23,25
59:8 61:11
63:18,22
66:14 106:20
118:23 137:24
142:25,25
155:25 156:1
156:16,17
expert 33:8,12
33:17 34:2,11
34:23 35:5,10
35:11,11,19,25

36:4,13,18,25
37:4,5,14,16
54:5 55:21
61:3 135:8,10
expertise
124:20 131:11
experts 29:5,6
34:6,14,14,15
34:15,15,16,18
34:24 35:3,16
35:25 36:6
43:12 47:9
107:11 131:1,2,3
131:3,5,6
explain 23:15
34:12 78:16
110:16 111:20
115:13 155:11
explaining
87:13
explanation
37:14 91:20
expressed 87:9
expressly 6:4
extent 81:2
95:15 140:9
141:15 144:13
external 133:13
extreme 46:1
extremely
128:5
eye 72:12
eyeopener
74:13
eyes 97:16

─── F ───
face-to-face
60:7
facilitate 19:25
154:2
facilities 39:2
56:15 124:18
facing 53:19
61:4 93:18
124:19
fact 14:5 34:7

44:5 63:13
64:11 69:16
71:14 77:25
93:4,17 96:13
97:16 107:25
119:19 134:17
143:17,17
155:25 158:20
factor 35:2
51:24 160:5,6
factors 35:4
150:3
facts 45:1 51:23
fade 153:22
fades 127:23
fading 154:8,11
154:19
fail 66:11 154:4
fails 58:9
fair 10:22 52:24
75:22 96:3
117:6 124:25
146:18 148:7
fairly 64:3 83:14
141:8
fall 124:2
familiar 72:21
141:12 145:25
familiarized
65:14
families 13:13
family 44:7 45:4
48:9 88:9
far 27:5 60:4
63:3 73:11
90:8 105:24
124:4
farce 126:24
faster 82:17
120:2
fastest 44:15
fault 11:19 71:6
favorable 29:7
29:8 98:16
136:4
fax 133:4
faxed 18:3

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-6   Filed 02/21/18   Page 52 of 74

fear 136:25
February 109:4
feedback 132:9
feel 25:20 33:9
42:9 76:6
80:1 88:19
104:11 114:18
115:11 145:21
146:13 150:7
160:3
feels 65:24
120:3
felonies 45:23
45:24,24 46:4
61:7 83:21
106:21 108:10
108:14 114:5
114:20 116:13
149:24 150:12
150:17 157:19
157:20
felony 48:20
60:10 82:2
149:24 150:21
150:22 151:4
157:3,14
felt 53:1 141:6
fend 146:14
fewer 69:2
122:8,8
field 34:15
131:16
fifth 60:10
fight 70:16 96:8
figure 95:22
figured 42:1
file 18:5 31:11,20
31:23 32:9
40:5,13,23
41:3,5 42:19
44:18,23,24
45:17 73:7
78:19 81:18
94:12,25 95:4
101:18 103:21
103:21 126:7
151:24 152:23

152:25 153:10
153:11
filed 32:20
80:13 94:14,21
100:23 101:8
101:22 102:3
103:23 104:23
105:3,6,7
134:16 152:1,2
152:10
files 96:4 153:14
filing 13:8 40:15
41:7,10 44:22
102:1,21
filings 73:6
fill 18:3 20:25
33:6 108:16
109:10 123:19
158:23 159:3
filled 91:6
finality 93:22
finally 134:16
financially
161:12
find 35:24 43:11
56:15 57:22
65:3 66:7
68:6 90:18
98:8
fine 12:1 46:3
51:9 114:10
149:19,19
157:22
fined 46:9
fingerprint
34:15
finish 7:1,13
151:5
finished 48:3
Finishing 103:10
fire 70:15
firearm 117:21
117:22
fired 73:12
firing 11:9
firm 10:2
firms 105:17,22

first 25:19 28:14
33:22 42:8
47:4 48:20
49:1 50:1,6
52:3 54:21
58:8 65:20
67:23 70:18
77:7 79:17
80:9 81:7 82:4
85:22 90:25
92:20,24
93:12,14,23
94:11,11,23
95:3 96:15
102:20 107:7
111:10 125:8,8
129:16,16
137:21 138:9,9
147:6 152:1
155:14,15
158:3
first-year 119:1
firsthand 143:13
fiscal 17:6 62:10
64:24 141:3
Fisher 96:25
97:2
fit 31:6
five 9:8 14:2
39:4,25 49:6
102:14 108:1,5
108:7,15
123:13 125:8
130:21 156:2
five-minute
140:3,16
flip 61:23 62:3
focus 116:12
120:13
focusing 75:20
follow 38:2
follow-up
133:25,25
153:18
followed 80:4
147:18
following 74:8

78:4 103:1
following-up
12:4
follows 40:15
fool 119:24
foolish 136:3
football 36:22
force 52:8
forced 35:17
forcing 43:14
foregoing 161:5
forever 100:4
form 53:25 91:5
91:5 97:10
formal 16:13
former 136:22
forms 95:18
forth 52:7 73:3
98:9
fortunate 159:12
forward 43:17
134:10 140:25
four 14:2 39:4
65:25 72:6
74:16,18
107:25 108:5
108:7,15,20
118:25 125:8
125:20,21
128:20 153:14
fourth 60:10
frame 107:17
free 80:1
freedom 44:4,6
70:6
frequent 33:14
frequently
26:16 31:8,11
33:7 37:17
40:5 53:6
55:21 69:1
Friday 48:8,9
49:7,9
friends 44:7
159:17
front 133:4
fully 63:11

function 8:12
107:25
functional 34:13
funding 37:9
124:15
funds 37:12
135:9,16,20
136:15
further 36:15
108:3 123:9
138:19,20
152:17 153:17
160:19 161:10
furthest 38:19
38:21

---

**G**

gap 33:6 74:4
gaps 123:19
Gathering 29:8
general 4:14
7:18 36:16
73:13 86:2
140:19
General's 4:9
159:19
generalities
47:24
generally 10:19
10:20 17:21
21:12 24:14
54:4,16 58:22
59:2 60:1,3
92:17 93:19
113:20 122:15
128:1 132:7
134:4 135:3,13
136:4,10
137:14 138:2
159:9
generating
99:15
generous 28:19
geographic
92:2
geography
131:10

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-6   Filed 02/21/18   Page 53 of 74

getting 11:13
21:14 27:19
29:23 32:25
34:22 37:1
42:1 43:16
47:19 52:18
53:1 55:6,9
57:22,24 59:3
66:6 68:19
69:1 79:24
100:5 108:2
108:23,24
119:10 121:7,20
123:13 127:19
127:21,22
give 20:24 21:6
24:15 47:24
63:3 77:7 81:7
90:15 92:8,9
95:17,20
108:4 114:23
117:6 120:14
128:25 129:18
129:23 131:14
132:9 134:10
151:3 158:6,23
given 15:8 38:8
38:12 39:7
45:8 48:23
61:3 76:4 78:4
80:3 81:10
91:2,20 94:24
106:20 117:7
131:22
gives 115:10
116:2 129:20
giving 71:2
glass 25:5,15
go 9:8 11:19
14:18 19:16
20:9 21:5
24:5 28:3
31:17 34:25
39:21,21 41:23
43:2,14,19
44:3 47:5
49:6 50:3

54:25 58:11
59:7 65:21
66:9 67:7
69:5 71:17
78:24 84:4
88:3,13 90:12
94:13,17 98:15
106:6,22
107:23 108:13
109:17 116:16
117:20 120:2
122:2 125:11
126:4 127:24
132:6 136:3
137:10,10,14
138:1,24
144:21 150:4
153:5 156:8,9
159:16,16,16
goal 23:9,10
68:9
goes 65:4 67:15
94:11 107:8
126:6,14
138:24 139:20
going 6:25 8:21
9:10 15:19
23:23 28:6
31:25 32:14
34:2 35:6 36:1
36:10 39:21,21
40:1 41:20,22
41:23 43:4,14
45:23,25 46:4
48:16 49:11,14
50:1 51:7 53:8
55:1 58:8,8
59:12 60:1,2,4
61:21 65:16
68:10 70:5,6
70:8,8 71:20
71:21 75:10
76:4 78:1,2,3
78:6,7 81:13
85:16 87:3
91:16 92:9,10
94:1 97:21

100:14 103:8
108:12,15
109:18,21
110:2 112:13
113:23 116:2,18
119:17 120:6
121:13,18,19,21
121:22 125:12
126:9 127:25
128:1,10 129:4
132:8,8 133:5
133:6,7 134:5
135:6 138:20
138:24 142:16
148:19,25
151:4 152:5
154:9,23
155:10 156:3
157:9,10
159:15,21
160:9,9,16
gonna 121:18
good 6:11,12
7:14 19:5
32:24,25
49:5 56:13
68:20 95:25
109:16 123:11
125:6 126:17
129:1 136:8
145:15
gotten 27:9,12
68:17,18,21
135:10 146:21
government
142:23
Governor 5:19
123:15
GPS 134:13
graduate 9:16
graduates 69:2
108:25
grand 41:16,17
42:5,5
grant 102:5
108:3
granted 152:12

granting 99:22
great 7:15 23:3
34:11 48:24
51:25 55:8
60:8 67:12,13
68:23 115:22
125:10
GREENE 161:3
Greg 100:21
104:10 146:16
147:10,11,24
158:5
Greitens 5:19
123:15
ground 6:19
group 141:17
142:21 143:9
143:20,21
155:11,22
156:5,8
grow 40:19
69:4
growing 22:24
grown 79:13,19
grows 82:24
122:6
guard 26:18
39:12
guess 9:22
10:13 11:24
21:24 31:24
33:10 50:5
62:10 83:18
92:5 128:14
130:1 131:7,16
132:17 141:19
147:21
guessing
100:20
guidance 104:11
129:18 147:12
guide 129:19,24
guideline 76:19
guidelines
10:10,12,20
61:14,15,16
71:21 76:15

129:15,17,18
guilt 19:2
guilty 18:23 34:1
44:16,16 49:19
49:24 50:9,12
50:14,25 51:14
52:14 54:1
83:7,15 117:16
126:3 150:25
guy 36:22
94:16
guys 88:17

___

**H**

H 2:6
half 48:24
90:20,20
132:17,24
138:10 155:23
155:23
halfway 56:12
hallway 22:18
ham 41:17
hampered 30:1
36:12 47:21
hand 53:8 61:21
78:6 85:16
141:12 143:16
154:24
handful 123:16
handle 17:5
40:7,8 57:16
59:14 60:18
61:7,20 72:15
73:13 77:20
78:3 81:13,17
88:10 92:3,22
93:1,3 94:3,7
94:10,23
102:8 122:22
142:11,12
150:8,10
handled 17:6
71:16,16 93:8
105:14
handling 15:24
38:13 81:8

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-6   Filed 02/21/18   Page 54 of 74

90:10 92:16 106:18 131:20
hands-on 66:5 66:16 67:9
hanging 44:10
happen 18:20 41:24 42:3,11 45:12 48:16 83:25 95:14 103:20 114:1,11 120:6,12,17,17 127:25
happened 72:23 74:4 83:9 88:15 90:13 102:17 107:12 116:3
happening 120:10 128:6
happens 18:18 19:22 21:18 46:9 83:2 84:1 137:7
happy 89:23
harassing 65:18 145:23
harassment 65:14
hard 25:17 51:8 52:22 72:1,7 77:2 122:18 150:1
Harrisonville 9:13,21
hate 148:16
hated 158:25
Hazelton 10:2
HB215 111:13
head 6:24,25 79:10 152:24
health 21:25 33:13,15,18 131:3,5
hear 25:19
heard 25:11 64:25 152:21
hearing 18:13

37:24 41:15 42:15 56:8 58:12 59:4,4 59:6,15 60:3 81:12 101:12,15 102:4,19 105:1 107:13 126:8 126:10,19,20 126:22,23 153:2,5
hearings 18:14 19:9 21:11 32:21 59:19 83:5
hears 41:18
heart 124:22
Hedrick 87:24 87:25 88:1,6,6 88:8
held 5:8 46:8 60:2
help 43:17 52:9 56:16 68:8 69:22 70:2,16 95:20 105:18 111:14 128:15 146:17,19 159:12
helpful 145:22
helping 12:15,16
HERRINGTON 4:4
hey 67:3 87:21 137:8
hi 153:11
Hickle 89:16,20 89:24,25
hid 25:23
high 4:9 27:17 39:24 68:16 68:19 69:3 106:3,5 128:5 132:19 156:7,11
higher 12:14 68:22 106:20 112:3 127:6 150:17

highest 13:20 13:21 127:7
Hillman 86:13 86:16,20,23
hinder 148:19
hindered 54:13
Hinkebein 11:5 72:21,25 73:15 74:3,10 74:16,24 75:5 75:20 76:7 77:15,18,22 97:2,16 127:1,4 127:5,10,15 147:20 151:15 154:20
hinted 101:13
hire 33:16 35:2 35:5 63:12 70:1 122:4 128:9 134:7
hired 64:24 65:1,5 68:14 69:1 84:5,9 89:9 109:2,6 124:2 125:4
hirer 37:10
hiring 11:9 29:6 63:13 65:2,5 106:13 122:11
Historically 108:18
history 45:1,4 140:2 141:18
hold 14:10 22:4 135:12
holding 84:17
holes 43:10
holidays 64:12
home 69:15
homeless 56:12
homes 56:12
honestly 45:15 88:7 122:9
hope 153:25
hoped 116:11
hopefully 7:9

56:17 65:3 144:22
horizontal 107:5
host 22:7 23:18 24:5 34:14 107:8,15
hour 22:25 28:1 28:6 38:19 39:4,22 40:1 90:11 159:25
hours 3:14 29:15 39:4 40:2,2 47:1 60:17 68:12 90:12 93:22 93:25 140:10 141:23 149:3 150:23 159:23 160:5
House 111:23 116:11
hover 77:8
how-to 129:19 129:24
HR 65:15 144:5 144:7,9,9,10
huge 77:8 92:4 106:11 117:24 117:24
human 144:23
hunch 119:5,6 119:18
hundred 17:7 55:3 60:17 93:25
hundreds 38:13 74:18
hunt 117:22
hunting 117:21
hurt 37:6,7
hypo 148:16
hypothetical 156:25
hypothetically 148:20

idea 61:7 75:7 76:22 96:22 107:22 115:15 129:4,20
ideal 22:19 143:6
ideally 24:22 30:25 40:20 107:4
identified 155:16
identify 67:5 155:15
iffy 151:1
ignored 84:14
ignoring 16:22
III 118:21,23
imagine 143:2
immigrant 54:11 54:19 55:4
immigrants 53:21
immigration 22:2 53:10,14 53:18 54:7,14
impact 32:18 34:17 35:10 39:24 42:18 44:25 55:25 57:6 59:17 68:2,23 73:17 73:20 106:10 118:2 157:3
impacted 30:16 34:21 44:5 75:1 117:18
impacts 56:7 60:11 61:10 93:10 128:7
impedes 25:19 35:2
implement 66:6
implemented 78:20
implicated 113:12 117:3
Implying 158:23

---

I

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-6   Filed 02/21/18   Page 55 of 74

important 21:24
  23:6,20 51:20
  67:11 137:22
importantly
  92:2 97:15
  128:6 154:16
impose 115:14
imposed 16:15
  16:17 113:19
imposition
  112:16
impossible
  28:2 66:7
improved 125:1
in-house 66:6
inability 36:2
inadvertent
  19:21,24
inadvertently
  19:14
inappropriate
  126:21
incentive
  132:25
incident 135:14
inclined 93:13
  115:23
include 12:13
  28:12
included 80:16
  113:14
includes 80:21
including 8:17
  12:17,21 156:4
  158:4
income 123:2
  133:23,24
incoming
  106:24
increase 128:3
increases 82:15
increments
  140:3,16
independent
  47:7 68:10
  110:7 133:13
  133:20 134:9

independently
  111:7
indicated 77:19
  83:11 85:4
  86:8 89:25
  91:12 94:16
  158:20,22
indicating 140:8
indict 41:17
indicted 42:5
indictment 32:6
  150:21,22
indictments
  41:14
indigency 110:17
  110:21 111:6
  133:2
indigent 17:22
  18:16,21,22
  111:7,15 112:7
  135:1
individual 17:25
  20:10 38:3
  103:22 114:25
  120:1 134:11
  144:2 154:6
individually
  62:1
individuals
  56:25
ineffective 74:5
  74:6 151:7,11
inevitably 51:7
inexperience
  53:3
inexperienced
  51:25 52:12
inform 42:10
  79:21
informal 16:14
  31:22 144:14
Informally 144:5
information
  21:19 22:5
  32:7 79:2 91:6
  128:21
informed 35:18

inherited 30:7,8
  30:8,9
initial 24:17
  128:22
initially 23:13
  37:13
initiated 98:1
initiating 27:20
injustice 70:2
  70:16 96:9
inmate 39:12
innocence 19:2
insanity 34:1,5
instance 55:3
  85:3 103:2
instances 39:3
  53:4 60:6
  75:2 146:15
instant 122:21
instituted
  148:12
instructed 143:5
instruction
  138:3
instructs 7:5
insulated 25:9
intake 21:22
  53:21,23
  128:11,20
intakes 13:12
intelligent
  119:24
intended 116:5
intention 103:4
intentionally
  69:5
interest 20:6
  74:11 75:22
interested 93:6
  138:21,22
  161:12
interfere 144:6
interim 38:13
intern 9:20
internal 72:10
internship 9:23
  96:18,19

internships 9:18
  96:17
interpretation
  81:5 133:19
intervene 53:6
intervened
  52:25
interview 63:14
  125:12 128:22
  136:3,12
interviewed
  50:17
interviewing
  13:5 29:7
interviews
  106:14 122:19
  144:3,6
introduce 5:13
invest 93:6
invested 72:3
investigate 30:1
  40:12 42:13
  44:25 134:19
investigated
  50:16
investigating
  13:4 29:3
investigation
  28:23 29:1,18
  30:17 47:8
investigator
  136:12
investigators
  13:3,7 71:23
  72:4
involve 58:5
involved 37:5
  57:22,23,24
  58:9,10 59:3
  115:15
irregular 23:21
issue 27:3
  33:13,15,18
  39:13 54:24
  55:9 56:9,11
  59:25 67:13
  68:25 69:2

75:16 77:5
  86:23 101:10
  106:13 112:2
  117:10 127:16
  127:18 158:18
  159:20 160:12
issued 102:6
issues 11:4 22:2
  34:5 38:9
  40:10,13 41:7
  41:13 55:5
  67:25 86:2
items 15:16
IV 53:16 76:1
  131:19

_____

J

Jackie 7:18
  87:21 158:5
Jacobs 89:7,10
  89:24 90:3,4
  92:20
Jacqueline 4:13
  5:20
Jacqueline.S...
  4:17
jail 13:11 18:1,6
  20:19 22:22
  24:12,13,17,25
  25:2,3 26:1
  28:4 38:20
  39:22 43:21
  43:22 44:11
  67:20 69:17
  69:18 76:22
  80:5,9 81:8
  82:14,16 83:19
  96:5 98:4
  112:24 113:12
  113:14,16,24
  114:2 115:9,10
  115:14,16 116:3
  116:6,18,22
  118:5 119:8,10
  119:14,16 135:6
  139:20 160:4
jails 18:2 28:3

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-6   Filed 02/21/18   Page 56 of 74

44:11 139:19
Jefferson 4:10
Jenna 3:17 4:20
    5:10 6:2 161:4
job 13:3,6 48:24
    70:4,13 71:8
    73:22 76:10
    95:12,25
    96:13 97:6,7
    97:12,13
    122:25 123:6
jobs 13:14 77:16
Joel 90:17 91:7
    91:24 95:18
    158:5
John 152:7
join 69:8,10
    96:15
joke 41:17 93:14
joked 99:14
judge 14:22
    19:15,17 20:3
    20:3,6,15 21:3
    45:22 46:2
    47:13,14 67:21
    71:1,2 79:1 81:3
    81:5,15,16 82:1
    82:13 85:5
    87:24,24 88:5
    88:5,6,8,9,9,11
    88:11,14,16
    89:1,1,16,20
    89:24,25
    90:13 98:2,3,7
    98:11,12,13,17
    99:8,9,21
    102:5,11,18
    103:12,23
    105:2 108:3
    110:17,21 111:4
    111:6,16 112:8
    112:12,21 115:1
    115:7,9,14,17
    115:22,25
    116:6 119:3,17
    119:18,19,24
    120:3 121:10

126:18 132:2
138:24 139:18
152:4,6 153:12
154:9 160:8
judges 19:24
    20:2,6 38:1,8
    70:9 77:24
    78:11 79:3
    80:2,3,5,8,10
    80:11,22 83:4
    83:9,12,12
    84:12,15
    85:22 86:1,5
    88:11,18 89:3
    89:15 98:17
    99:8,21 100:3
    100:24 110:12
    111:14,25 112:4
    114:18 118:7
    122:23 124:6
    127:23 138:13
    145:7 151:16
    160:10
judgment 71:14
judgments
    122:21
judicial 67:16
    84:21 100:9
    102:17 129:25
judicially 151:6
    151:11
July 62:9
jump 110:2
June 62:9
jurisdiction
    34:24 38:24
    54:2 122:23
    126:13,19
    128:4 138:14
jurisdictions
    41:14 45:23
jurors 48:12
jury 37:8 41:16
    41:17 42:5,5
    47:14,14
    132:20
justice 96:4

K

juvenile 57:16
    57:18,20,25
    58:14,17,20
    59:10,12 60:6
juveniles 58:2
    59:18

_____

Kansas 9:25
    105:16,20
    146:16
Kathy 137:4
keep 9:10 19:6
    38:14 72:12
    90:4,6 92:7
    92:20 95:23
    155:16,18
keeping 140:10
keeps 159:8
kept 134:14
    155:19
Kevin 86:13,16
    86:19 88:22
key 30:6
kind 7:19 11:7
    13:9 20:20
    22:1 29:10
    33:21 37:2
    38:14 41:8,18
    42:9 43:24
    44:8,24 47:5
    48:19 52:7
    57:18,20 65:11
    65:14,17 67:4
    67:5,7,9 69:18
    70:11 71:4
    73:13 74:15,24
    75:9,19 76:2
    80:4 81:9
    82:15,24
    86:14 88:20
    88:24 89:14
    91:6 93:14
    95:13 99:13
    100:4 111:23
    114:20,21 115:4
    116:16 122:21

125:11 129:24
131:4,18 132:5
134:8 138:1
155:20 157:14
158:15
kinds 29:18
    39:10 41:2,5
    47:2,25 65:9
    81:22,23
    106:4 113:18
    117:2
Kirksville 9:13
knew 69:16
    90:22
know 7:11 10:15
    10:17,18 15:10
    16:15 17:9
    19:13,16 20:19
    22:1,5,18 23:4
    23:11,12,24
    24:3,5,7,14,18
    24:19 25:17
    26:1 28:7
    29:11 31:25
    32:8 34:3,10
    34:14 35:24
    36:16 38:4
    40:2,3 42:1
    43:10,13,14,15
    43:17 45:2,6
    45:18 51:4,8
    51:17,22
    52:22 54:19
    54:21 55:3
    56:1,2,3,16,19
    56:19 57:10
    58:1 59:5
    60:9,17 61:9
    61:17 63:13,18
    63:20 64:8,15
    65:18 66:8
    67:14,19,22
    67:23 69:2
    69:20,23
    70:9,16 71:15
    72:7,14,18
    73:15,16,22

73:24 74:1,15
74:17,23 75:17
75:23 76:17
77:9,10 78:19
79:4,10,16,18
82:8,21,22
83:6,8,13 84:1
84:8 85:2,9
87:2 88:4,7
88:23 91:25
91:25 92:4,8
92:9,25 93:18
93:19,23,23
93:24 94:2
95:1,2,2,22
97:11 98:25
99:17 100:7
102:5 103:19
103:21,24,25
104:3 105:3,5
105:9 106:11
106:13 107:6,9
107:10,12,21
107:22 108:11
108:13,14
110:20 112:6,17
112:18 113:14
115:11,22,24
117:7,17,24
118:15,16
119:22,24
121:3,12,12
122:6,18,19,21
122:24,25
123:1,17 124:17
124:18 125:4
126:12 128:2
128:17,17 129:1
129:1,3,7,7,10
129:11 132:8
133:8,18,23
133:24 134:2
134:4,5,8
135:1,4 136:8
137:25 138:3,3
138:18,24
140:17 141:9

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-6   Filed 02/21/18   Page 57 of 74

142:9 143:2
146:15 147:9
147:16,24
148:1,3 149:2
149:3,21,22
149:25 150:7
150:8,12 151:2
151:4 152:3
153:7,24
154:8,17
155:24 158:14
158:16,17,21
159:15,20,24
160:1,8,12,14
**knowing** 30:25
47:12 48:16
67:14 81:16
107:13
**knowledge**
56:10 83:24
144:13
**known** 31:2
56:24

— L —
**lack** 30:1,17
34:17 35:10
36:12 42:18
46:20 47:21
54:12 59:17
128:8 148:6
160:6
**lacked** 30:19
**Laner** 10:2
**language** 54:21
**laptop** 139:10
139:20,24
**laptops** 139:4,8
139:16
**large** 23:2
107:24 144:8
**larger** 127:16
**late** 37:2 147:15
**latest** 94:25
**law** 9:11,12,16,18
10:1,2 42:4
44:24 53:11

54:7 67:14
70:15 80:7
96:18 105:17
105:22 108:25
109:5 123:21
133:17 139:4
141:19 147:16
148:17,21
**lawful** 6:7
**lawyer** 97:9
**lawyers** 52:12
61:4 97:18
**laying** 6:18
**lead** 129:11
**leads** 29:3 96:7
**lean** 134:3
**learn** 40:19
138:1
**learning** 65:17
65:18 137:25
**leave** 28:13 68:1
93:20 106:17
121:8
**leaves** 106:15
108:17
**leaving** 48:22
69:10,12,13
70:4 90:22
106:22 144:14
**led** 96:15
**Leer** 137:4
**leeway** 76:4
**left** 30:7,8,9
69:7 70:22,24
71:1 74:24,25
90:24 144:3
146:14
**legal** 5:11 9:18
13:6 40:20
132:11 133:6,7
133:9,10
**legislature**
103:19 111:22
**lengthy** 115:10
**lenience** 45:8
**lenient** 38:8
99:2,23

102:12 116:2
**Leon** 158:5
**let's** 9:10 28:13
49:23 72:20
86:7,9 88:20
112:14 115:20
148:17 150:17
150:24
**letter** 78:11
84:13,15
145:10
**letters** 82:20,21
151:15
**letting** 86:14
**level** 13:18 32:3
40:8 58:10
92:7,8 106:20
122:1 124:21
131:6 149:12
150:3
**levels** 71:10
128:16
**license** 97:15
108:22,23,24
109:2,3 122:18
**licensed** 122:16
**licenses** 123:3
**life** 44:9 48:21
48:25 108:7
150:13
**light** 74:14
**liked** 96:19,22
99:15
**likes** 70:11
**limine** 41:5
**limit** 55:2 93:23
94:5
**limited** 15:11
92:1 105:19,21
**limits** 94:3
**lines** 97:4 98:19
129:8 150:6
**lingering** 138:12
**list** 27:20 42:23
80:6,9 82:6
118:8 122:5
**listed** 62:13

102:9,15
136:17
**listened** 73:14
**lists** 72:12
**literally** 119:9
**litigate** 41:13
43:21
**litigation** 3:15
4:20,24 5:9
5:12 10:1 65:17
105:18
**little** 16:3,23
20:22 34:24
43:25 49:2
63:17 64:16
82:17 105:3
110:2 117:19
127:9 132:18
144:22 145:15
**live** 45:2 96:21
97:12 134:1
**lived** 45:3
**lives** 117:23
**living** 8:9 134:15
**LLP** 4:4
**local** 15:18 16:13
136:14,15,25
137:1,3 138:8
144:9,12
**locate** 35:19
**locating** 34:23
35:9
**locations** 26:7
**lodged** 7:7
**logistically** 90:7
**long** 8:19 9:2
45:2 52:10
87:24 88:5,11
88:14 89:1,1
108:16 126:16
140:20 160:2
**long-term** 70:13
**longer** 54:8,9
68:25 86:5
106:9 117:21
127:11 138:23
153:19 160:5

**look** 33:14,23
75:10 76:11
77:6 89:4
97:13 100:25
104:5 110:13
110:15 149:4,6
150:9 152:7
157:1 158:3,21
**looked** 74:16
79:11 112:3
**looking** 48:25
96:14 122:25
123:5,7 130:13
142:19 147:6
150:13
**looks** 49:25
85:5 86:1
100:20
**loose** 114:21
**lose** 64:9 70:14
76:9 97:14
106:13 107:18
107:18
**lost** 35:5 44:17
92:11 107:16
**lot** 13:7 15:2
18:22 19:1
31:23 32:21,21
35:3,4,24
40:8,8 43:24
45:13,13,14
52:4,10,16
53:20 54:23
54:24 55:5
56:3 60:6
63:21,22 67:3
67:18 68:14
69:25 82:13
83:9 86:22
92:18 103:1
104:24,24
106:8 112:2
117:5,16 118:4
121:6 122:19
132:24 133:7
135:23 142:17
146:9 147:10,11

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-6   Filed 02/21/18   Page 58 of 74

147:16 157:9
159:16 160:13
160:14
**Lotus** 72:11
**louder** 96:25
**Louis** 34:25
54:7 105:16
105:20
**love** 158:25
**loves** 71:7
**low** 40:8 63:17
156:6,11
159:21
**low-level** 83:21
**lower** 16:3 17:8
127:9
**lower-level**
45:23 83:20
**lowest** 127:9
**lucky** 122:3
**luxury** 40:21
81:12 84:6

**M**
**machine** 133:5
**Madrid** 3:16 5:9
**main** 15:15 21:12
21:16 47:10
88:11 101:3
129:25 136:13
137:19
**maintain** 22:21
44:8 67:1
121:19
**maintained**
74:22
**maintaining**
13:15
**major** 55:9
146:23
**making** 11:9
32:24 70:4
122:21 155:9
159:22,25
**man** 36:21
**manage** 10:8
15:7 72:9 77:11

**management**
15:2 65:15
125:5,9,17
135:17 145:11
145:14 146:3
147:15,22,25
154:4 157:25
158:2,13
**manager** 9:15
**manner** 22:11,16
31:15 74:22
**Maries** 8:17
26:3
**marijuana** 46:3
46:7 117:18
**mark** 53:9 78:7
85:17,17 97:22
110:4 155:1
**marked** 61:22
100:15 103:9
141:2 147:4
**material** 147:12
**materials** 7:23
**Matt** 5:15 6:14
49:7
**matter** 5:4
38:12 61:2
85:4 116:23
117:8 154:9
**matters** 148:15
**Matthew** 1:16
2:2 3:12 4:3
5:3 6:1,6
160:21
**mean** 16:18 33:1
33:18 42:8
44:22 48:25
51:8 64:12
66:5 67:17,21
68:5 69:15
77:1 78:16
81:10 84:25
87:6 93:11,14
93:17 100:4
106:10 107:20
108:21,24
110:20 117:5

118:11 120:9,11
122:10 124:13
124:24 125:19
127:5 129:2
130:5 138:13
139:17 142:20
147:12 148:22
149:4,19 153:7
153:23 154:19
157:13
**means** 59:11
60:3 68:11
76:13 108:22
110:21 112:10
**meant** 69:16
103:5 154:11
157:8
**mechanisms**
127:17
**Media** 49:12,15
109:19,22
**medical** 73:10
136:5,6
**meet** 8:6 13:13
21:13,17 22:23
26:13 27:15,18
28:2,4,11 42:9
47:4 60:8,13
65:10 67:6
71:21 73:3
75:11,18,24
76:15,25 88:3
89:24 90:12
98:10,11 104:11
112:13,15 113:2
113:8 121:15
139:5
**meeting** 23:1,19
23:20 24:5
26:22 29:2
48:6 73:25
77:21 87:23
88:4,14,15,21
88:24 98:6,12
98:15,22
147:21 148:1
**meetings** 79:20

113:5,6
**member** 143:8
155:11
**members** 124:6
**memory** 75:9
107:12
**mental** 21:25
33:13,15,18
131:3,5
**mentally** 117:12
**mentioned**
35:24 38:16
53:21 68:14
100:11,23
103:11 117:1
118:7 153:21
154:23 155:10
156:25
**mentor** 33:4
52:9 68:3
121:22
**mentorship**
52:16
**Mermelstein**
100:21 104:10
146:17 147:10
147:11
**messed** 74:18
**met** 7:18 25:22
77:17 78:12
84:14,15
86:22 88:8
111:2,24
**metrics** 62:8
63:2 157:5
**Michael** 89:7
90:4,10,14
92:20 140:8
158:5,15,20
**Michael's**
90:20
**mile** 38:22
**miles** 38:19
**million** 46:1
**mind** 12:2 19:12
53:10 76:3
103:14 160:2

**minimal** 53:15
53:16 58:19
**minimum** 39:23
46:4 73:23
75:18
**minor** 16:17
84:23,25
**minute** 18:5
38:22 97:23
**minutes** 24:7,14
45:17 49:6
123:13
**mirrored** 102:9
**misdemeanor**
46:3,7 108:10
111:15 112:7,9
112:15 117:20
157:3
**misdemeanors**
61:8 83:20
112:1 113:21
114:5 116:16
117:14,25
149:22,23
150:10 157:20
**miserable** 44:11
73:22 95:13
**missed** 73:5
123:19
**missing** 31:22
32:8,14 52:16
**mission** 122:24
**Missouri** 1:1,7
3:1,7,16,19,20
4:8,13 5:5,6
5:10,19 8:15,17
9:13,13 62:23
71:18 76:1
105:9,22
117:24 122:16
123:15 127:2
128:4 141:3
145:12 151:22
154:7 161:2
**Missouri's** 9:21
**mistreat** 44:12
**misunderstood**

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-6   Filed 02/21/18   Page 59 of 74

17:17
mitigating 56:18
mitigation 34:9
  37:6 55:18,20
  56:1,21,23
  57:2,7,14
  117:10
mixed 131:18
  145:7
MO 4:10,16,21
Monday 48:2,10
  148:23,24
  158:6
money 90:18
  92:25 96:19
  134:1,6 136:5
  136:24 137:1,6
  159:20
monitoring 12:5
  134:13
month 20:23
  38:12 48:23
  90:21 108:18
month-and-a-...
  108:19
months 27:10
  38:5 42:21,22
  65:1 108:12
  122:6 130:23
  153:14
Moser 118:19,22
motion 26:23
  32:9 40:12,15
  42:6 44:25
  45:9,17
  100:25 101:18
  102:8,22,23
  103:23 104:9
  104:24 105:1,3
  105:8 134:16
motions 13:8,9
  31:12,23
  32:20 40:6
  40:23 41:2,5,7
  41:10 42:19
  44:19,22,23
  46:17 101:22

102:2 105:6
  148:2 151:25
motivated 70:17
  70:20
move 43:13
moved 39:2
  104:19
moves 134:10
moving 10:4
  73:2 95:10
  104:17 135:17
  138:22
MSDP 5:20
mshahabian ...
  4:5
MSPD 10:4,10
  10:12 28:15
  54:6 56:21
  57:24 65:6
  68:16 85:14
  87:6,10 92:1
  94:8 96:15
  104:13,16
  105:5,14
  110:18 111:8
  113:3 144:12
multiple 106:6
murder 60:15,18
  77:7 81:24,25
  90:24 92:19
  92:24 93:12
  93:13,23 94:11
  94:11,23 95:3
  108:14 132:6
  142:3 157:19
murders 92:10
muted 98:16

———— N ————
N 2:1 4:1
NACS 71:18
name 5:10,11
  6:14 54:6
  105:16 123:14
named 64:20
narrowed
  140:24

nearly 33:16
necessarily
  19:13 63:20
  94:8 103:25
  147:12 160:13
necessary
  30:20 33:8
  34:19 37:11
  50:24 61:11
  120:4
necessity 47:8
neck 117:19
  160:10
need 7:10 15:21
  22:2,4,9 23:17
  27:13 54:21
  56:5 65:24
  67:6 71:10,22
  71:24 72:6
  80:15 82:22
  91:16 95:14,14
  100:7 116:20
  123:17 128:22
  129:15 137:8
  138:10 146:10
  146:25 158:21
needed 33:9
  36:18 37:14,14
  40:7,12 41:6
  78:20 84:19
  107:11,11 111:4
  135:9,11 154:21
  155:20
needle 94:17
needs 33:15
  96:10 112:22
  153:5
negative 18:19
  21:5
negotiate 50:12
  51:13 52:14
negotiation
  50:5,5 52:1
negotiations
  50:10 115:15
neither 103:24
  161:8

network 139:12
never 37:12
  41:22,23
  42:20 52:1
  53:9 56:24
  58:9 71:3,5,13
  75:14 97:3
  103:3 122:11
  135:8 137:1,4
nevertheless
  64:14 146:19
new 4:5 12:13,15
  12:16 13:13
  14:14 32:23
  41:8 48:23
  63:19 64:24
  65:2,4,6,9,12
  65:16 66:8,10
  66:15,19,23
  66:24 67:11,12
  67:22 68:8,14
  69:18 72:8
  77:7,10 81:6
  97:11 100:5
  107:15 108:4
  122:5 124:11
  127:10 129:21
  131:14 139:14
  153:10 155:4
  156:11,11
newer 11:12
  40:17,17
  128:15 129:6
  135:23
newly 41:10
NGRI 33:24
  34:2,8
Nifong 4:15
night 69:15,16
  160:2,3
nine 13:21 14:11
nod 6:24
nodding 152:24
non-attorney
  12:22
non-attorneys
  13:1

nonexistent
  131:6
nonprofit 124:8
  124:9,9
norm 51:10
  108:10
normal 25:10
  44:9
normally 21:16
  78:18 137:11
Notes 72:11
notice 71:6
  122:20 152:3
noticed 130:3
notified 87:20
  114:23 137:4
notify 78:22
number 32:22
  55:2 61:17
  64:21 77:4
  79:12 83:19
  91:23 102:9
  125:15 128:3
  130:11,24
  135:5 136:19
  142:10 149:21
  150:2 153:10
  156:13 157:1,11
numbers 17:14
  61:18 63:16
  69:21 110:16
  112:3 128:5
  141:7,8 142:14
  142:19 143:21
  150:11
nuts 65:11
NY 4:5

———— O ————
o'clock 3:14,14
oath 97:10,12
object 100:24
objection 7:7
  80:23 86:25
  118:9
objections 7:4
  137:22

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-6   Filed 02/21/18   Page 60 of 74

obtain 23:17
31:15,19,21
37:15 50:3
55:13
obtaining 31:18
obviously 19:19
23:4 29:2
114:9 115:17
133:18 142:16
148:24 158:18
159:20
occasionally
44:9
occur 18:11,16
38:24 88:14
occurs 22:17,18
OCDC 73:6
October 79:17
109:7
offenses 8:13
offensive 64:16
offer 49:21,22
50:4,4,7,10
53:1 98:24
112:14,16,19,21
113:23 114:2,6
114:14 115:1
117:6,8,9
offered 113:11,14
114:25
offering 93:11
115:20
office 4:9 8:11
8:16 9:21 10:8
12:20 13:15,18
13:20 14:7,13
14:15 15:3,8,13
15:14,15,23
16:1,15,24
17:23 18:12
20:18 21:10
22:23 23:3,3
27:7 29:17
36:8 38:21
39:14 40:22
46:16 48:18
48:22 51:12

52:17 53:17
53:20 54:5
57:1,16 58:13
58:16,21 59:14
60:22 61:4,18
63:5,6 64:2
66:3,12,16
67:1 68:4,8,12
68:17 69:7,8
69:11 70:22
70:24 73:1,18
74:25 76:25
77:9,14,17,22
78:12 86:6
87:7,11,14 89:8
89:9,12 90:19
91:11 95:15
97:18 101:3
102:25 105:7
106:4,16,18
107:1 108:6,17
109:5 110:10
111:5 114:14
116:8 118:21
119:20 120:13
120:21 121:14
121:16,17
124:17 127:6,8
128:7 129:23
131:17 132:14
132:17 133:2,4
133:22 136:21
137:14 138:14
138:15 139:7
139:23 140:2
140:5 144:3,12
145:1,3,5,21
146:14,16
148:5 152:4
159:17,19
office's 59:18
121:3
office-wide
103:11
offices 69:4
101:3 121:13
133:1 145:5

Oh 49:8
okay 6:18 9:11
17:21 44:1 67:6
75:14 76:24
86:11 87:21
90:14 97:24
115:22 116:4
116:22 119:25
141:5 149:22
150:9 153:9
Oklahoma
109:3
once 8:8 50:7
78:20 116:3
134:16 140:23
155:16,19
ones 78:4 80:2
90:23 100:10
102:15 122:8
157:23
ongoing 11:4
72:9
open 17:19 19:3
23:24 25:18
47:17 67:2
71:3 80:17
131:24 133:18
153:14
opened 97:16
opening 63:15
108:19 122:7,7
openings 122:5
operations
65:12
opinion 22:10
27:6 29:1,16
30:18 31:14
32:11 40:11
42:7 46:11,15
46:21 51:11
52:11 53:5
55:19 57:5
60:21 61:2
64:1 71:9 75:4
75:8 93:2
101:11 150:12
159:6

opportunity
19:17 36:4
opposed 127:19
optimistic
153:24
oral 73:14
order 15:17
21:20 50:13
84:22 87:10
98:18 102:6
103:12 120:2
121:11
ordered 80:23
81:3,15,19 82:1
82:13 87:3
91:4 112:2
115:3
ordering 13:16
80:12
orders 14:22
81:5
organizations
124:8
orientation
65:13
original 30:10
81:14
originally 80:13
ORRICK 4:4
outcome 51:24
56:8 93:22
161:12
outcomes
56:16
outliers 156:4
outlined 88:25
outrageous
159:24
outside 26:18
26:21 34:5
37:10 54:5
55:13 68:12
overcome
160:12
overcrowded
44:12
overlap 140:22

overloaded
82:11
oversell 52:4
overwork 64:2
overworked
33:5 38:7
76:5 150:6
152:4
owned 134:15
134:17

P

P 4:1,1
p.m 5:2 49:12
49:15 109:19
109:22 160:21
160:23
PA 111:16 112:8
page 6:20 62:3
62:5 86:9
89:19 110:13
111:10 158:3
pagers 128:15
pages 85:22
89:4 128:21
paid 9:23 64:12
70:5,14 94:1
pair 66:10 130:1
130:1
panel 92:3,3
143:21 156:1
paragraph
44:24
Pardon 126:1
143:18
part 33:3 38:6
39:18 53:22
55:6,25 56:3
89:21 107:24
111:13 116:17
124:15 141:16
144:1 155:18
participant
143:13
particular 14:17
20:3 32:12
33:8 51:18

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-6   Filed 02/21/18   Page 61 of 74

55:3 70:21
73:4 85:5
94:13 95:21
103:2 120:14
150:19 157:12
157:13,14
**particulars**
150:19
**parties** 73:16
116:23 161:9,11
**pass** 67:20
138:23
**passed** 108:25
**passing** 83:4
**passionate** 70:1
**pay** 92:23 94:6
160:5
**paycheck** 123:5
123:7,7
**paying** 134:13
**payment** 93:9
**Pearson** 98:3,7
98:11,12,17
99:21 102:5
103:12 121:10
**penalty** 93:25
94:15
**pending** 3:17
7:12,14 44:5
60:3 152:14
**pennies** 94:1
**pens** 15:17
**people** 8:3 11:9
17:15 44:12,13
65:18 66:6
69:1,20,22,24
70:1,10,16
74:21 79:5,5,7
79:19 80:5,8
82:5,8,14,16
82:18 83:1,6
83:15,19 84:2
84:5,9 93:12
95:20 96:5
98:4 99:2,22
109:4 115:24
116:17 117:16

118:1,2 119:10
119:16,23
120:1 121:4,7
122:4,11,17,22
123:4 125:7,13
128:19 134:7
135:5,12
144:13 150:14
159:8,9,15,22
159:25 160:12
160:13
**percent** 11:3,6
11:16 12:12,15
12:17 28:20
28:24 29:14
43:2 54:19
55:3 62:18,24
63:13,25 82:9
135:1 146:3,6
**percentage**
12:9 28:21
39:5 62:16,17
62:20 63:3
66:18 135:5
142:15
**period** 62:9
64:23 125:16
130:23 153:14
**permission**
87:19
**permit** 117:21
**permutations**
151:2
**person** 54:8
59:7 66:13
78:23 85:5
93:18 96:11
106:21 109:2
114:1 115:2
119:25 122:20
135:12 144:9
**personal** 16:7
71:19 83:24
138:13,15
**personally**
73:15 130:7,12
137:16 143:2,5

**pertinent** 79:2
**Peter** 140:18
**Petree** 3:17
4:20 5:10 6:2
161:4
**Petsch** 100:15
146:16 147:3,6
**Phelps** 8:17
25:3,12 26:14
38:21 39:23
**phone** 13:15
25:14,15
145:25
**phrase** 129:5
**physical** 21:25
**pick** 18:4 25:14
25:15 80:7
**picked** 6:25
**Picker** 110:9
111:11 112:6
**picture** 39:18
**pictures** 139:21
**pile** 82:24 96:5
**place** 21:9 24:11
70:18 88:4,5
96:16 127:18
133:14
**placed** 113:24
**places** 52:17
**Plaintiff** 61:22
**Plaintiff's** 53:9
97:22 110:4
141:2 147:4
155:1 157:24
**plaintiffs** 1:5,17
3:5,20 4:2
5:16,17,25 6:8
6:15
**planning** 88:3
**plateau** 128:5
**player** 36:22
**plea** 24:9,10
49:21,24 50:9
50:14,25 51:18
51:21 52:4,8
52:20 55:23
107:8 114:14

126:4
**plead** 31:17
43:23 75:12
83:22 112:19
112:20 117:14
150:24
**pleaded** 83:7
**pleading** 44:16
**pleads** 115:21
**pleas** 49:19
50:12 51:14
52:14 54:1
**please** 5:13,23
17:11 80:8
95:20
**pled** 18:23
44:16 83:15
84:6,10 117:16
117:19
**point** 17:7,22
20:17,22
24:19 32:8
35:23 40:19
51:13 60:2
61:8 86:24
99:24 100:4
103:1,25
106:18 110:6
113:1 114:9
138:23 140:25
147:14 148:2
**pointed** 64:19
**poke** 43:10
**policies** 16:13,18
138:7
**policy** 89:2
117:13 136:20
138:11
**political** 123:24
**pools** 68:17
**populated** 25:3
**portion** 11:15
**portions** 138:2
**position** 9:14
54:9 89:10
108:16 122:12
122:14 145:19

145:19 160:8
**positions** 13:14
109:10
**possess** 117:22
**possibility** 57:11
112:24 113:15
113:17,24 118:6
**possible** 10:10
22:5,21,24
27:18 61:12,17
61:19 77:4
90:7 93:21
150:25
**possibly** 31:6
**postage** 137:5,8
**posted** 134:4,12
135:4
**potential** 13:12
78:18 93:18
102:16 145:11
148:16,23
**potentially** 29:6
50:8 51:8
113:2,12 141:7
**power** 123:18
147:14
**practice** 26:23
55:17 96:20
109:12 122:25
123:4 137:14
143:3 156:22
**practicing** 109:7
**practitioner**
9:25
**practitioners**
92:19
**Prasad** 4:3 5:17
5:17
**precedent**
154:8
**predetermined**
45:19,21
**predominantly**
149:24
**predominate**
72:11
**predominately**

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-6   Filed 02/21/18   Page 62 of 74

149:23
preface 54:18
prefer 96:21
prejudice 101:12
preliminary
  21:11 41:15
  107:13
prep 48:18
preparation
  7:24 8:2,7
  37:2 148:19
prepare 7:16
  21:11 36:3
  42:19 43:15
  44:18 46:16
  46:23 47:3,22
  47:25 48:14
  51:12 120:5
prepared 47:12
  147:10,11,13,14
  147:24
preparing 8:4
  13:9 47:16,17
prepped 47:10
prepping 48:10
present 5:13
  20:9 21:3 37:7
  42:16
preserved
  137:23
presiding 98:3
  152:6
press 124:8
prestige 160:12
prestigious
  160:7
presume 124:5
  124:6
pretrial 28:22
  28:25 29:18
  41:2
pretty 21:23
  33:13 39:24
  50:8 87:22
  130:22 131:5
  135:3 140:25
  160:17

prevented
  135:16
prevents 52:10
previous 127:1
previously
  61:22 75:3
  100:15 103:9
primarily 13:15
  14:16 27:5
  33:20
prior 9:7,11 11:4
  14:3 18:11 21:9
  21:14 25:21
  27:20 30:21
  33:1 72:17
  75:5 81:9
  85:11 89:4,18
  109:4 112:11
  144:15 145:17
priorities 132:1
prioritize 80:5
  81:4
prioritizing 23:5
priority 80:6
  81:6
prison 38:23,24
  39:6,8,12 49:1
  114:12 126:13
  126:22
privacy 25:8
private 54:10
  56:25 84:23
  85:1,3,6 92:16
  93:15 94:5
  99:1,6,11,18
  102:12 122:25
  123:4 124:7
  142:22,22
  143:1 155:23
  156:17
privilege 29:24
  36:11 47:19
  52:19
pro 105:12,23
  105:24 113:8
proactive 76:9
probable 32:6

41:7,16,16
  42:2,2
probably 11:4,5
  11:11 12:7,12,14
  18:6,8 19:2
  23:19 24:8
  27:11 28:6,19
  30:12 45:25
  53:16 56:5
  60:19 63:24
  64:9 71:17
  72:6 76:25
  79:16 82:9,10
  82:15 83:20
  83:21,22,23
  87:20 92:1,5
  93:12,20,24
  97:15 100:5,21
  104:15,16
  106:19 108:9
  108:12 112:3
  117:4 119:19,25
  120:1 127:9,25
  128:19,25
  130:12 132:16
  132:18 136:19
  149:16 154:15
  156:1
probation 23:13
  58:8,9,10 73:9
  83:22 85:4
  112:1,10 113:24
  113:25 114:4,9
  114:10,25
  115:15,20,22
  116:15 118:4,5
  157:20
probations
  113:22,22
problem 25:8
  25:12 26:14,15
  74:14 77:9
  88:17,20
  95:17 98:8,9
  98:22 119:18
  121:7
problems 22:1

41:13 54:23
  106:4,10
  124:19
procedure
  67:14,16,17
procedures
  133:14
proceed 6:9
  35:18 94:19
  115:24 116:2
proceeding
  24:1 58:18
proceedings
  58:14 103:20
process 17:23
  18:10 19:22
  23:14 33:21
  35:20 47:13
  50:5,5,9 67:5
  67:14 80:2
  98:5 143:25
  144:6,23
  146:18 154:2
  154:19 155:13
produced 3:13
  6:7 86:7
professional
  78:5
program 65:7
programs 56:14
  105:12,19,25
  106:2
progress 154:3
progresses
  23:16
progressively
  68:17
prohibition
  80:13 100:20
Project 62:23
  71:18
promise 83:22
prompt 76:13
proper 29:7
  137:22
property 134:15
  134:17

pros 160:14
prosecuting
  86:3 119:8
prosecutor
  42:4 43:12
  45:5 48:4
  50:3,6 52:1,2
  69:13 71:7
  83:21 86:17
  94:12,14,25
  95:2 98:13
  112:13,15 114:2
  114:6,24 115:18
  115:19 116:6
  117:11 119:15,16
  139:15 160:10
prosecutor's
  69:4,5 139:13
  159:17
prosecutors
  32:22 53:2
  69:8,11 70:10
  79:4 86:25
  88:22,24 113:1
  113:8 117:5
  118:1 144:19,22
  160:11
protecting
  138:21
provide 18:2
  25:8 50:24
  56:20 90:18
  97:8,19 98:20
  98:21 102:24
  104:10,18 107:1
  119:23 124:16
  151:11 154:15
  155:4
provided 37:15
  98:18 121:20
  146:11 147:14
  151:7
provides 123:1
providing 36:15
  74:1,2 97:17
  121:3
PTSD 36:18,23

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-6   Filed 02/21/18   Page 63 of 74

public 4:12,13
8:11,15 9:7,21
21:4,5 70:11,18
76:4,12 80:12
83:11 93:8
96:18,20,23
112:12 114:22
118:11,12
123:25 128:18
129:23 130:9
131:11 141:3
142:17,21 143:1
145:12 155:23
159:9,10,18
160:7,9,11,15
Pulaski 8:17
25:13 26:19
86:17 88:12
119:8
pull 82:16
punishment
48:21
purpose 103:6
127:12
purposely
19:25
purposes 34:9
purse 135:13
147:1
pursue 42:12
push 16:22
81:13 138:19
138:20
pushed 51:23
120:11
put 11:7,17,22
14:9 25:25
43:17 45:8
52:7 71:6 73:8
75:6 96:12
103:10 121:10
129:3 133:22
143:9 155:9
puts 148:1
putting 104:24
PV 111:15 112:7
112:10

**Q**

qualifications
111:2
qualified
108:20,21,22
113:2 159:4,7
qualifies 78:23
qualify 78:24
79:6 83:12
110:24,24
112:23 114:23
135:6
qualifying 28:15
28:18
quality 68:24
121:8,21 122:3
125:1,3,15,18
128:9
question 7:1,6,8
7:12,13 31:19
32:1 33:10,11
35:6,7 53:24
71:12 79:24
96:11 132:15
138:7 143:11
144:8 145:9
149:10
questions 6:10
6:23 7:5,8
31:25 53:22
56:2 67:3,18
67:19,23
123:9,10,16
133:25 134:2
152:17,20
153:19,20,21
156:24 160:19
quick 28:5
quickly 26:17
150:25 160:17
quiet 19:6
quite 10:17 18:9
45:15 116:18
122:9 159:13
quitting 95:22
95:24

**R**

R 4:1,3
Ramsey 4:8
5:18,18 123:10
123:14 152:17
ran 136:15 137:3
137:5
random 110:2
range 48:20
ranged 81:21
rank 62:13
ranked 62:15
rape 36:19,20
48:20 60:15
108:14
rare 54:1,11
76:25 133:20
134:9
rarely 31:13 51:1
51:2
rate 92:24
106:3,5
re-file 101:13
reach 33:16
reached 146:21
reaching 29:8
151:16
reacted 99:11
reaction 82:18
reading 50:2
ready 37:21,23
38:7 45:15
71:3,5
reaffirm 97:12
real 25:25
56:13 118:6
realistically
15:20 71:20
91:22
realities 70:3
reality 146:24
149:21
realize 160:18
realized 30:23
74:4,9 116:4
really 10:13 15:7

15:9 20:20
23:25 25:19
27:13 28:8
29:10 32:24
33:4,4,5 45:15
48:14 50:6
66:4,22 67:19
69:23 70:1
74:19 76:10
77:1,7 79:16
81:12 82:22
84:6 88:10,18
92:20 95:20
96:10,21,22
100:2,6
102:25 103:19
103:21 116:14
117:6,8 121:15
122:3,9 123:5
128:21 129:19
133:9 136:11
138:21 142:20
146:12,13,23
149:4 151:3
154:9,14,16
158:18
reason 17:12
34:1 38:6
48:18 49:3
74:25 108:2
111:3 131:3
135:20 136:21
137:19 138:16
148:5
reasonable
92:7 148:11
reasonably
73:11
reasons 34:8,12
38:1 69:10
70:19,24
91:23 107:9
137:19
reassigning
89:11
recall 7:21 54:16
96:25 158:12

receive 10:9
18:6 32:4
57:18,19 78:17
78:21 92:11
98:5 101:2
110:22 140:14
received 52:20
78:23 82:18
98:2,2,16
110:6
receives 154:17
receiving 18:4
reception 98:16
recess 49:13
109:20
recession
68:23 124:22
124:23
recognize
61:23,25 62:1
62:1,2,5 78:8
85:18 95:5
100:15 104:6
110:5 155:1
recognized
98:7
recollection
110:7
record 5:1 49:6
49:12,14 59:9
109:17,18,21
126:11 134:16
137:23 160:22
recorded 5:3
25:16
records 136:5,7
Redirect 2:4
reduce 116:12
154:12
reduced 161:7
reducing 42:23
reduction
128:14
reductions
46:13,17
reevaluate 84:7
refer 89:6 93:10

ALARIS LITIGATION SERVICES
www.alaris.us       Phone: 1.800.280.3376       Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-6   Filed 02/21/18   Page 64 of 74

156:16
reference 87:23 89:7 107:17
referenced 78:14
references 44:24
referred 99:18
referring 42:23 64:20 97:1,7 111:17 112:6 154:25 155:6
refers 112:9
reflect 155:20 156:13
reflected 24:3 63:24 64:3
reflects 62:20 62:21 63:5,6 64:14 157:11
refuse 15:16 16:19 78:3 103:3,4
refused 92:22 115:1
refuses 50:9 108:3
regard 76:15
regarding 36:18 78:12 86:15 95:9 110:11
regardless 117:7
regards 86:2
regular 60:13 72:13 79:20 145:24
regularly 60:9
rehabilitation 56:17
reject 134:20 134:22,23 135:3
relatable 125:23
related 31:11 38:17 148:13

relationship 139:14 145:13 158:2
relative 161:10
relatively 39:7 125:17
relaxed 100:3
released 18:8 126:9,17
relevant 23:17
relief 102:24 152:7,12 154:3 154:4
relieving 32:19
religiously 38:2
reluctance 57:20
reluctant 83:9 83:13
rely 133:16
remain 19:4,12 94:20
remained 48:17
remaining 66:13
remains 94:18
remedies 101:21 102:9,10,16
remedy 101:17
remember 9:22 22:8 49:10 54:5 55:4 66:21 73:4 75:8 79:17 88:22 90:25 92:14 97:5 102:13,14 105:15 111:21 124:4 125:6 128:22 140:17 140:20,20 155:22 156:9 157:17
remembering 86:21
remind 66:17

remotely 139:6
removed 59:12 145:18,19
renegotiations 24:20
rent 124:16
reopen 153:5,7
rephrase 7:8
replace 89:13
report 12:4
reporter 4:19 5:22 6:20,22 7:2 53:9 78:7 85:17 97:22 110:4 154:25 161:1,16
reporter's 5:10
reports 148:14
represent 8:12 10:9,11,14,21 17:23 21:8 23:7 39:15 59:18 60:12 60:22 61:3 71:11,25 75:10 78:1 91:17 95:19 96:1,2 103:5,5 111:8 123:15 126:9 126:23 154:1
representation 10:10 23:10 29:25 36:12 47:21 50:19 50:22 74:2,3 74:6 76:18 91:16 92:11 93:21 97:8,17 97:19 98:20 104:18 105:25 107:1,5 113:3 118:3 119:23 120:2 121:4,5 121:20 128:16 148:20 150:15 154:1,15,17
represented

74:17 79:15 115:2,25 130:4
representing 74:8 103:4 149:13 153:12
request 26:14 26:23 31:8,20 31:22 32:9 37:12,17 57:3 57:4 78:19 91:19 135:25 136:3,9,20,23 137:7 141:4 158:1
requested 80:5 98:6 136:16
requesting 72:4
require 29:19 60:6
required 97:9 116:11 133:17
requirement 65:20
requirements 67:7 73:3 150:18
requires 22:12 24:14 31:16 39:19 42:6 77:13 123:6
research 40:14 40:15,18,20 40:23
reserved 6:4
reset 48:13
resolved 111:15 112:8 146:10
resource 57:5 158:18
resources 10:16 15:7,8,10 22:11 27:7,21 31:15 37:15 42:18 46:12,20,22 50:11 51:12 52:12,15 53:6 54:13 55:13

55:20,22 56:2,20 57:6 59:17 60:13,17 95:14,16,17 121:11 145:24 146:10,12,13 146:25,25 148:6 158:19
respect 70:8,9 70:13 77:2 160:6
responded 84:12 146:22
responding 151:15 156:24
response 95:13 98:2 146:22 149:9 153:21 158:13
responses 6:23 158:2
responsibilities 10:5,6,7 11:18 12:25 16:11
responsibility 74:20
responsible 13:10,11 15:12 100:11,12
rest 85:24 110:18 112:3 141:9 147:24
restaurant 9:15
restaurants 160:1
restroom 7:10
result 19:22 49:24 90:1,13 102:1
results 32:25 109:8 145:7
retain 37:10 126:19
retaining 35:9 36:6
retains 126:13
review 7:20,23

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-6   Filed 02/21/18   Page 65 of 74

rooms 25:3
rough 132:17
roughly 11:1
  14:10 15:23
  17:15,20 39:5
  63:4 66:17
  80:18 81:20
  82:8 99:17
  157:18
round 143:23
route 44:15
  103:7
routinely 20:3
  115:8,9
RSMo 126:14
RubinBrown
  62:23 63:1,2
  63:16 71:18
  140:23 141:13
  141:24 142:9
  143:9 155:14
  157:5,16
rule 7:11 81:16
  91:14 109:5
  116:13 149:4
rules 6:19 10:14
  74:20 75:21
  76:1,1,11 78:5
  81:14 126:21
running 136:25
rural 34:23
  55:6,6 56:11
  96:21 105:22
  117:24
rush 51:7
rushed 51:9
rushing 51:3,5
Ruth 103:23

31:15 75:12
79:22 97:23
101:19 126:8,11
reviewing 7:22
  14:24
rich 159:10
Rick 146:16
ridiculous 38:2
  76:15
right 15:23 16:3
  16:24 17:9,19
  19:11,11,14,14
  19:20 21:6
  23:11 46:6
  49:8 56:2
  64:20 72:4
  82:22 83:25
  87:8,12,15
  92:13 94:14,18
  94:23 97:4
  102:6 105:10
  107:20,20
  108:19 113:4
  131:18 135:14
  149:11,15
  150:2 156:6
  159:5
right-hand
  62:14
rightfully 114:18
rights 19:8
  53:25 116:19
  117:15 138:22
ring 96:25
rioting 119:9
risk 52:7 59:7,9
road 19:20 23:4
  38:15 39:23
  90:11
robbery 82:4
role 155:12
Rolla 64:20
  90:5,8 141:9
  141:10 146:14
room 25:4,4,6
  25:13,23 26:11
  26:15,20

## S

S 2:6 4:1
sacrifice 45:14
sacrificing 31:5
  31:7
safety 25:20,24
sake 138:19
sanction 73:2

sanctioned 73:1
  73:8
sandwich 41:18
satisfied 146:3
Saturday 48:9
saw 14:11 42:20
  125:8
saying 19:3
  22:22,22
  36:23 42:2
  45:12 81:12
  82:22 87:1
  91:9 100:7
  102:6,20 111:2
  119:8 149:1,21
  150:23 152:4
  154:14
says 6:8 45:5
  62:18 64:21
  76:1 85:6 88:3
  89:23 103:3
  111:13 112:7
  115:22 158:4,6
  158:7
scary 52:3
  74:15
scenario 114:8
scene 29:4
schedule 55:8
  93:9 152:24
  153:2
scheduled
  102:18
school 9:12,14
  9:16,19 67:15
  70:15 96:18
  108:25 123:21
  148:17
Schwartze
  118:19,21
science 123:24
scope 79:24
  103:12
scrambling
  35:23
scratch 147:8
screen 125:13

125:14
screening
  125:13
screw 52:6
Scutti 4:24 5:11
se 113:9
second 24:20
  44:17 48:17
  61:23 86:9
  103:10 110:13
  137:11,16,17,25
  138:5
Section 126:14
secure 26:6
see 21:5 28:7
  39:25 40:9
  43:24 62:11
  76:23 87:23
  88:20 89:14
  110:6,14,19
  111:11 117:17
  119:12 120:2
  128:6 144:2
  144:20 146:15
  153:8 154:8
  158:4,7
seeing 33:1
  123:2 130:4
seek 115:9
seeking 116:6
seen 32:18,20
  32:20 55:25
  68:25 69:17
  82:23 83:25
  100:17 114:11
  125:20 128:17
sees 40:17 85:6
selected 155:24
send 79:3 91:3
  91:7 95:11
  102:20 133:10
  135:24 136:12
  137:11 156:10
sending 86:19
  95:18 158:9
senior 40:16
  59:23 66:10,11

106:22 130:2
sense 10:15
  18:5 74:15
  91:13,15 130:21
  132:22 134:20
sent 77:23 78:11
  79:18 80:15
  84:15 85:21
  86:1,3,13
  87:20 91:4
  95:8 126:13
  146:9 157:25
sentence 93:19
  112:17 116:3
sentenced
  126:18
sentences
  113:11,18,18
  115:10,14
sentencing
  47:14 55:16,18
  55:20 56:8
  57:2,7,14
  126:4
separate 29:16
  80:17
separately 81:1
September
  79:16 147:15
serious 18:25
  82:4 106:19
  108:9 116:13
  117:13 131:14
  132:7 149:24
seriously 95:21
  95:24
serve 72:5
served 114:3
services 3:16
  4:20,24 5:9
  5:12 37:10
  110:24 133:15
SES 113:22
session 140:10
sessions 65:23
set 15:14,15
  16:14 20:10

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-6   Filed 02/21/18   Page 66 of 74

46:2 73:3
97:21 100:5
148:23,24
**setting** 15:12
22:20 24:23
26:13 63:2
**settings** 25:1
**seven** 38:22
67:6 76:16,22
**severe** 60:14
**severity** 59:6
**sex** 157:19,21,23
**sexual** 65:14,18
**Shahabian** 4:3
5:15,15 6:10,14
49:5,16 109:16
109:23 123:8
153:18,20
160:19
**shake** 6:24
**sheet** 21:22
53:22 78:25
128:11,20,24
**sheetrock** 25:7
**sheets** 11:10
12:4 128:24
148:14
**shelter** 56:12
**sheriff** 119:14
**shift** 106:21,23
**Shipma** 4:13
5:20,20 7:18
8:1,7 49:7,9
144:11 152:18
152:20 153:17
**shipped** 60:4
**shive** 25:23
**shock** 126:15
**Shondel** 1:4 3:4
3:19 5:4
**short** 95:15
103:17 146:8
**shorthand** 6:2
**shoveling** 38:14
**show** 17:12,14
48:12 97:21
100:14 103:8

110:3 129:12
154:12
**showing** 139:21
153:13
**shows** 152:23
**shrink** 82:25
**side** 62:14 134:3
139:3
**signature** 6:3
**signed** 97:10
**significant**
39:19
**silent** 19:4,12
**similar** 13:7
26:18 100:25
101:2 105:6
135:20
**simple** 26:23
50:15 149:20
**simply** 89:25
**single** 22:9 91:3
108:5
**SIS** 113:22
**sit** 55:10 66:8
96:5 100:4
143:24
**sitting** 18:1
20:23 30:25
39:22 69:17
76:22 98:4
125:22 142:19
154:18 160:4
**situation** 18:20
18:21,23 44:14
116:24 119:14
149:10
**situations** 34:9
117:7
**six** 8:16 13:22
15:9 39:19
94:4,4 102:14
102:14 108:11
**Six-and-a-half**
12:24
**six-month** 116:3
**skills** 65:7
**sleep** 160:3

**slightly** 17:3
84:8
**slots** 109:11
**slowly** 154:5
**small** 39:7
**smiling** 116:1
**so-to-speak**
11:15 147:2
**sobriety** 34:16
**social** 55:15
**society** 159:12
**sociology**
141:20
**sole** 135:9,19
**solo** 9:25 92:18
**solutions** 98:21
98:23,24
**somebody**
15:18 25:23
27:14,16 33:4
48:25 52:9
54:3,20 60:9
65:3 89:13
106:17 108:17
122:15
**somewhat** 10:15
**Sonic** 9:12
**soon** 22:5 37:5
65:3
**sorry** 31:25
33:25 44:18
88:12 149:19
**sort** 12:5 13:8,16
14:24 20:5
21:19 22:6
25:8,21 26:12
29:9 33:15
55:10 56:18
65:16,19 67:2
75:25 114:8
137:23 138:16
138:16 147:17
156:11
**sought** 94:15
151:17
**Sound** 7:14
**soundproof**

25:9
**sounds** 7:15
121:15
**Southern** 151:18
151:20,21
**Spanish** 54:20
55:5
**speak** 10:20
30:3 42:13
52:17 121:16
125:3 158:9
**speaking** 21:12
54:20 55:5
58:22 59:3
92:17 113:20
128:2 132:7
134:4 135:3,13
136:4 138:2
143:12 145:2
148:20
**special** 157:21
157:23
**specialist** 53:10
54:7 55:18
56:1,18,21
**specialists**
56:24 57:2,14
**specialize**
58:14
**specialized**
58:17
**specific** 67:24
83:8
**specifically**
10:17 81:3,5
82:13 112:2
**specifics** 29:23
36:10 47:20
52:18 122:18
**spectrum** 46:5
**speculation**
91:23
**speed** 11:13
106:7,12
**speedy** 107:21
**spend** 11:14 12:7
15:18 22:25

23:1,2,3 24:4
24:7,8 28:1
32:12 35:3
38:17 40:20
47:17 48:10
63:21 65:16
68:6,7 91:17
93:22 143:7
149:2 156:14
157:12
**spending** 24:6
63:22,23
68:12 155:21
**spent** 11:1,12
12:10,15 15:10
31:7 35:9
39:13 47:15
48:5,5,6,7,9
48:10 49:9
66:18,23
104:24 120:4
156:3
**spirit** 115:8
**split** 11:20
**spoke** 124:17
**spoken** 99:13
124:4,7,10,11,11
**sporadic** 139:12
**spot** 14:9 75:6
158:22,24,25
159:4
**spotting** 67:13
**spread** 121:11
**spreadsheet**
110:16
**spring** 65:21
140:18
**Springfield** 3:16
5:9
**ss** 161:2
**St** 34:25 54:7
105:16,20
**stack** 82:20
**staff** 10:9 12:6
32:2 33:6
62:22,24
132:11,12 133:3

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-6   Filed 02/21/18   Page 67 of 74

staffed 63:11
stage 19:19
stages 18:10
stake 59:2
stale 22:6
stamp 89:19
  110:14 111:11
  160:17
Stamped 86:10
  89:5
stand 58:10
  96:10 122:23
standard 73:24
  73:25 74:9
  75:4,5 91:5
standards 38:2
  71:19
standpoint
  64:13
start 6:18 35:23
  48:11 67:23
  67:24,25 86:9
  96:7,13
started 6:15
  27:10 71:15
  74:22 79:14
  118:13 124:22
  125:7 145:23
  151:14
starts 19:17
stat 48:20
state 1:7 3:7,20
  4:8,13 5:4,18
  7:4 8:15,16
  24:2 30:7 31:9
  39:3 47:10
  56:19 60:4
  64:15,16 112:4
  122:16 123:15
  141:3 145:12
  153:22 156:25
  161:2
State's 43:10
  45:6 47:7
  155:7 158:1
statement 32:6
states 1:1 3:1,18

53:24 56:19
stating 77:24
station 26:18
  26:20
statistics 141:20
  143:25
status 18:13
  83:5
statute 101:16
  102:9 103:1,17
statutory 36:19
stay 153:10
stayed 79:13
  131:7
steady 79:13
  123:2,7 128:3
step 49:23
  67:18
steps 21:9 53:17
Sterling 140:18
Steven 4:8 5:18
  123:14
Steven.Rams...
  4:11
steward 134:6
stick 68:24
  159:19
sticking 109:23
STIPULATED
  5:24
stone 93:20
  149:4
stop 20:8 40:18
  127:19 140:8
stopped 115:7
  140:7
story 22:1
straight 123:20
straw 71:4
  74:24
street 3:16 4:4,9
  5:9
strengths 45:6
stress 32:19
Strickland
  73:24 74:6
  75:4,5,7,19

strings 135:13
  147:1
strong 45:7
  128:13 151:1
student 9:11
  148:22
study 141:24
  143:10,13
  155:11 157:5
stuff 140:23
subconsciously
  55:1
subpoena 13:5
subpoenaed
  42:14
subpoenas
  72:5
substantially
  127:3,15
sufficient 27:7
  30:19 40:11
  46:22
suggest 80:7
  127:1
suggested
  102:7 104:9
suggestions
  100:19
suit 96:10
Suite 4:15
summarily
  104:25
summarized
  147:16
summons 18:8
Sunday 48:10
  48:15
supervise
  66:24 68:3
  72:8 74:21
  77:8 130:7
  139:4 145:17
  145:20
supervised
  135:16 151:10
supervising
  8:12 12:13

66:18 127:3
  149:15 151:13
supervision
  85:13 109:7
supervisor
  74:20 77:5,11
supervisory
  10:23 11:15,17
  11:21,22 12:5
  12:11 16:11
supplemental
  32:9
supplies 13:16
support 10:8
  71:24 146:3
supportive
  145:22 158:16
suppose 56:4
supposed 48:11
  101:18
suppression
  40:6,10,12,13
  40:23 67:25
  117:10
Supreme 73:8
  76:1 80:14
  81:18 97:3
  101:7,9,10
  127:2 151:22
  152:2 154:7,7
sure 11:9 16:17
  30:5 31:1 46:6
  47:6,15 48:8
  50:2 54:19
  55:4 77:12
  83:8 84:5
  87:22 92:10
  100:17 101:2
  110:25 115:13
  124:9 129:15
  129:16 137:21
  140:11 142:9
  147:23 151:6
  155:10 158:11
surprised 84:2
surveillance
  29:9

survey 156:10
suspect 26:16
  53:15 54:25
  91:23 128:4
suspended
  97:14 112:16
SUTCLIFFE 4:4
swear 5:23
switches 94:21
swore 97:9
sworn 3:13 6:7
system 59:12
  60:11 62:8
  65:6,15 66:1
  67:8 71:13
  80:12 92:18
  94:8 121:11
  124:1 126:1
  129:25 131:18
  141:3 144:8
  145:12 152:23
  153:14 155:17

---

**T**

T 2:6
table 116:22
take 7:9,12,14
  20:20,21 21:10
  24:11 28:6
  38:3,25 43:1
  49:6,23 50:4
  52:7 53:17
  56:11 58:3
  61:22 64:5,6
  64:10,11 72:18
  79:21,23 80:8
  89:13 91:16
  92:22,23 93:7
  93:13,24,25
  94:1 97:6,7,23
  105:13,17,23
  106:8 108:11
  108:16,18
  109:4 112:17
  114:4 115:21
  119:21 123:17
  139:8,16

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-6   Filed 02/21/18   Page 68 of 74

142:16 143:4
150:15 151:5
153:11 157:9,10
**taken** 1:17 6:2
16:4 49:13
109:20 130:25
142:7 161:6,9
**takes** 35:4,24
45:12 54:24
60:18 63:9,18
93:4 106:8
108:11 112:19
**talk** 8:1,4 16:21
25:10 26:1,7
67:21 77:14,18
84:16 129:14
150:4
**talked** 47:5
61:14 86:23
100:10 106:3
107:9 119:18
121:9 124:18
**talking** 7:3 24:9
24:10 25:9,17
27:5 94:14
114:10,12
136:11 142:2
149:1
**task** 11:8 141:23
**tasked** 132:4
**tasks** 10:23,23
11:2,7 12:3,11
13:9 64:6
127:4 140:6
148:6,7,10
160:1
**tax** 142:15
**taxpayer** 134:6
**teach** 67:15,16
129:9
**teaches** 65:7,9
**technically**
103:18
**tell** 7:8 25:16
55:17 61:18
100:8 103:21
104:4 114:6

119:17 150:20
158:24
**telling** 58:2
95:21 116:1,1
134:14
**tells** 25:15
69:25
**template** 147:7
147:17
**temporary**
109:3
**ten** 19:19 24:14
40:2 48:21
63:12 65:2
92:9 114:2,3
150:10,23
**ten-day** 20:11
**tenure** 130:6,8
**term** 28:15
**terms** 36:16
39:14 54:23
73:21 81:8
109:9 125:17
131:10 146:4
**terrible** 12:9,10
**test** 34:16
**testified** 80:20
124:21 128:11
129:5 141:6
**testify** 45:10
47:15
**testimony** 78:15
124:6,7 127:1
127:14 134:21
135:7 144:25
148:4 161:5
**Texas** 8:17
25:13 40:1
83:18 84:1
90:10 99:21
115:7,19 116:5
**Thank** 109:23
123:8
**Thanks** 6:13
49:16
**theirs** 68:7
88:20

**theoretically**
92:25 149:2
**theory** 36:19
37:7,8
**thereto** 161:11
**thing** 12:5 13:16
14:24 20:5
21:12,16 22:6
22:9 25:19
26:18 28:5
29:10 41:8
43:16,20,24
44:22 47:4
52:3 55:11
56:18 63:15
65:16,19
75:25 82:24
92:14 137:23
147:17 150:9
156:11
**things** 12:6 13:8
13:12 15:21
19:1 22:7
23:18,20 24:5
26:24 29:6,11
32:24 34:22
41:6 45:2,8
47:2,25 50:23
51:8 53:22
56:8 65:23
67:25 69:22
70:11 71:20
72:20 75:8,13
75:21 77:12
84:21 95:9
96:22 97:8
103:20 107:12
107:15 110:3
121:17,17
122:20 125:10
128:10,18
129:14 136:13
139:22 148:15
149:6 154:2,12
**think** 10:16 11:19
13:22 14:3
17:6,6,9,13

18:22 19:5,10
19:24 21:17
24:1,15,21
25:11,19 26:6
26:9,24 27:1,6
27:11,13,17,21
29:18,25
30:14,16 32:3
33:3 34:10,18
35:5 36:11
37:7,10 38:6
39:7 40:16,22
43:4 47:20
48:8 49:5
50:13,21,24
51:4,10 52:4
52:10,15,19
54:5 56:23
57:3,10,19
58:6 61:8,11,13
61:16,19 62:14
63:7,9,16,16,17
63:24 64:3,12
65:1 66:20,21
66:22 68:16
68:21,23 69:1
69:19,23,25
70:11,20 71:14
71:20 72:15
73:5 74:16
75:1,7,24
76:14 77:1
80:7 81:15,25
83:12 84:19
85:22 86:7,8
86:21,23 87:2
87:15,17,19,21
88:6,8 89:19
91:14,22,24
93:2,9 94:2,3
95:12 97:15,18
98:7,17,19
99:20,24
103:23 104:15
105:21,23
107:4,8,18
109:16 113:20

113:25 116:2
116:10,20,25
117:4,5 118:1,3
118:24 119:9,13
120:12,17 121:2
121:6,24 123:2
125:5,6 128:7
128:20 129:5
129:21,22
130:11 131:4
134:6 135:13
136:7,22 137:3
137:13 140:22
140:25 142:14
143:19 145:15
145:21 146:7
146:24 147:11
147:13,13 148:1
151:3 152:21
154:20 156:5
156:6,7 157:21
159:8
**thinking** 95:20
95:22,24 96:7
143:3 148:21
**thinks** 119:25
121:14
**third** 8:21 137:12
137:13 139:1
**thought** 44:17
71:16 73:23,23
73:24,25 74:3
79:2 92:12
93:5 120:4
135:9 153:22
**thoughts** 24:20
**threads** 86:9
**threat** 84:17
**threatened**
84:17
**three** 11:20 14:1
23:1 38:5,25
64:10 65:20
65:25 71:7
74:16,18 79:19
82:12 90:11
102:13 104:1

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-6   Filed 02/21/18   Page 69 of 74

| | | | | |
|---|---|---|---|---|
| 118:24 128:20 | 64:9,23 66:7 | 23:25 45:14 | 53:15,16,16 | 52:5 65:7 |
| 130:15,19 | 66:18,22,23 | 52:16 55:8 | 58:17,17 64:7 | 90:16 94:19 |
| 139:9,10,13 | 68:6,7,12,24 | 66:5 117:5 | 65:4,6,14,21 | 94:20 95:4,8 |
| 144:11 | 69:24 72:5 | 120:18 124:12 | 65:22 66:2,4 | 100:6 107:7,21 |
| throw 11:11 | 78:4 79:11 | 135:23 156:3 | 66:6,15,18 | 107:23,24 |
| 45:20 | 84:5,5,11 | 156:4,12 | 106:10 129:9 | 108:1,2 120:6 |
| throwing 150:11 | 86:24 89:8 | tired 43:12 | 140:14,18,19 | 126:4 132:25 |
| time 5:2 6:13 | 91:16,18 93:4 | 69:14,14 | transcribe 7:3 | 136:8 137:10,11 |
| 11:1,10,11,14 | 93:6,7,8,24 | today 7:17 17:19 | transcribed 6:3 | 137:15,21 138:1 |
| 12:3,10,15,18 | 94:4,24 97:13 | 22:8 30:25 | transcribing | 138:2,24 |
| 17:5 18:9,18 | 100:8 104:4 | 75:15 78:15 | 6:21 | 148:18,19,23 |
| 19:15 21:4 | 104:24 106:7 | 85:7 115:5 | transcript 6:22 | 148:24 |
| 22:10 23:2,2 | 106:8,11,14 | 117:17 118:13,13 | 6:25 | trials 46:21 |
| 23:4,7 24:4,6 | 107:15,18,19 | 119:17 125:22 | transfer 104:3 | 132:13,22 |
| 24:8,15,23 | 108:1 109:16 | 134:3 154:6 | 107:15 | 137:16 |
| 26:5,10 27:1,4 | 109:19,22 | today's 5:2 8:4 | transferred | tried 31:4 52:1 |
| 27:7,16,21 | 112:24 113:12 | told 8:3 69:14 | 108:7 | 59:13 66:5 |
| 28:20 29:22 | 113:15,16,24 | 70:23 71:5 | transitioned | 75:24 129:13 |
| 29:25 30:1,14 | 114:3,12 115:9 | 74:10 87:16 | 106:15 | 132:14,14,16 |
| 30:15,19 31:2 | 115:16 116:6,10 | 89:10 119:16 | translator | 132:23 |
| 31:5,7,14 | 116:22 118:5 | 158:13 | 54:22,25 | trouble 11:24 |
| 32:12 34:3,17 | 120:4,14 122:7 | Tom 118:19,22 | 55:6,10 | Troy 89:9 90:6 |
| 35:3,4,9,10,15 | 123:9,16 | tomorrow 63:14 | translators | 90:8 |
| 35:16,24 36:11 | 125:16 126:7 | 63:15 | 55:13 | true 41:18 71:6 |
| 36:12 37:4,25 | 126:20 127:3 | tons 93:24 | transportation | 71:17 121:12 |
| 38:1,8,11,16 | 131:22 133:10 | top 79:10 118:3 | 45:3 | truly 134:25 |
| 39:1,3,8,9,13 | 139:20 140:3 | topic 152:19 | travel 38:16 | trust 23:22,23 |
| 39:20 40:3,11 | 140:5,7,9,15 | toss 148:16 | 39:3,13,19 | 23:23 107:10 |
| 40:20,23 41:1 | 140:16,20,21 | totally 131:15 | traveling 38:17 | trusting 25:18 |
| 41:12 42:6,18 | 140:23 142:17 | touch 110:1 | treat 20:4 44:13 | truthful 133:17 |
| 43:8,20 44:18 | 143:4,5,6,6 | toxicology 29:6 | 59:22 | 133:19 |
| 45:13,16 46:11 | 145:21 146:18 | track 35:3,5 | treating 80:25 | try 19:5 21:19 |
| 46:16,22 | 146:20 147:10 | 72:10 140:15 | treatment 56:13 | 22:20 23:10 |
| 47:16,17,20,21 | 148:7,14 | 155:16,18,19 | 126:15 153:15 | 24:13 41:19 |
| 48:3,13 49:5 | 150:15,18 | tracking 140:2 | trends 130:3 | 52:3 59:23 |
| 49:12,15 50:6 | 151:4 154:10 | 140:5,7,15 | triage 120:18,22 | 65:8 66:10 |
| 50:11 51:3,4,6 | 155:16,18,19,19 | traditionally | trial 30:5,12,21 | 68:8 75:24 |
| 51:12 52:3,8 | 155:20,21 | 14:19 106:17 | 30:23 31:18 | 77:1 91:1 92:10 |
| 52:12,19,21 | 156:14 157:10 | traffic 40:18 | 35:23 37:6 | 92:15 96:8 |
| 53:5 54:13,20 | 157:10,12 | train 44:17 | 38:5 41:4,21 | 98:9 100:24 |
| 54:23,24 | timeframe 36:2 | 66:24 69:4 | 41:23 43:1,3,5 | 123:18 129:11 |
| 55:2,12,19 | 130:13 | 92:11 105:18 | 43:14,15,16,20 | 130:1 137:12 |
| 56:4,5 57:5,8 | timekeeper | 121:22 128:15 | 44:3 45:15 | 144:6 150:24 |
| 57:9,12,13 | 141:16 | 144:21 | 46:23 47:3,13 | 153:19 154:12 |
| 59:24 60:7,8 | timekeeping | trained 68:9 | 47:22 48:1,2,2 | 157:11 |
| 60:13 61:8,11 | 140:1 155:15 | training 11:11 | 48:4,10,11,13 | trying 20:14 |
| 63:21,22,23 | times 8:6 19:1,13 | 12:13,17 53:13 | 48:14 51:23 | 35:3,19 36:25 |

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-6   Filed 02/21/18   Page 70 of 74

48:7 68:5
75:6 98:8
117:6 130:21
153:24
**Tuesday** 148:24
148:25
**tumultuous**
145:15
**turn** 49:19
72:20 89:18
111:10 149:3
157:24
**turned** 148:14
**Turning** 133:1
140:1 141:1
144:2,24 147:3
**turnover** 68:16
68:19,21 69:3
106:4,5,11
128:7
**turns** 71:16 136:1
**twenty** 128:2
**twice** 55:18
116:4
**two** 9:4 11:25
12:7 13:3,6,25
14:5,6 18:7
25:3 30:10
38:1,25 40:2
42:21,22
58:24 65:17
65:25 72:1
79:18 82:12
85:22 89:4
90:3,24 96:17
96:22 99:20
100:12 101:21
101:25 108:13
109:4 124:3
129:16 130:14
130:17 131:4
133:8,9 139:13
144:10 145:17
147:3 148:17
149:10,18,19
149:24 151:24
**two-and-a-**

138:10
**two-and-a-half**
13:14
**two-hour** 90:9
**two-prong**
132:15
**two-step** 33:21
**type** 58:7 65:23
150:2
**types** 15:17 80:8
134:2 136:5
156:15 157:15
157:17
**typewriting** 6:3
161:7
**typical** 16:25
65:21 68:12,15
**typically** 16:2
17:5 18:7 24:11
24:23 29:19
34:1 38:25
40:9 41:3,5
46:4 49:20
58:6,7 106:18
126:17 133:6
139:2

---

## U

**U.S** 5:5 53:23
54:1,2,3
**ultimate** 143:9
**ultimately** 43:16
75:17 143:16
**unable** 47:25
73:3 104:17
109:11 148:6
154:15
**unclassified**
45:24 48:20
108:14
**unclear** 11:20
**uncommon**
35:17 125:11
**undergrad**
123:20,23
**undergraduate**
141:19

**underlying**
141:13
**understand** 7:7
18:24 23:14,15
23:16 32:4,13
33:10 46:6
60:11 87:17
103:17,19
115:13,25 131:8
134:21 135:7
135:23 136:11
143:11,25
**understanding**
38:9 62:19,21
64:5 72:23,25
73:14 75:9
76:3 87:9
92:6 94:9
99:10 105:16
105:20 107:10
111:17,20 113:5
119:3 126:25
127:14 141:22
141:25 144:11
144:24 147:20
149:9 157:4
**understands**
76:5
**understood**
142:11 148:4
155:10,13
**unethical** 74:9
74:10
**unethically** 74:7
**unfortunate**
33:3
**unfortunately**
119:22
**unique** 150:20
**United** 1:1 3:1,18
53:24
**universally**
70:25
**unlimited** 56:4
**unpack** 43:25
64:18
**unturned** 93:20

**updating** 86:14
**upper** 135:17
145:11,14 146:3
147:22 154:4
157:25 158:1
158:12
**upset** 119:10
**uptake** 130:24
**upwards** 159:23
**urban** 34:25
**usage** 131:1
**use** 21:23 22:8
25:24 33:11
34:6,14 35:11
36:13 52:2
53:25 57:1,6,8
57:21 99:4
104:13 128:19
128:20,24
129:4 150:4
**useful** 30:20
142:10
**useless** 139:11
**user** 129:1,1
**usual** 127:24
**usually** 21:1
35:20 36:1
39:1,11 46:2
60:14,14 66:8
67:23 114:19
129:15 137:24
139:20
**utilities** 124:16
**utilize** 147:7
**utilizing** 36:6

---

## V

**v** 73:24
**vacation** 64:10
**vague** 36:16
47:24
**vaguely** 30:3
**value** 68:11
**varies** 11:3 25:2
38:18 45:22
46:3 133:3
150:2

**various** 41:5
128:16,19
131:10 136:16
142:8 147:21
148:6 151:15,16
**veiled** 84:17
**venue** 19:15,18
20:15
**verbal** 6:23
**verbatim** 75:8
**verification**
133:14,20
134:9
**verify** 133:14
**versus** 5:4
40:17 68:7
127:4
**vertical** 107:5
**victim** 36:20,24
41:23,24 42:1
42:3,4 45:11
134:15
**video** 5:3 6:21
139:21
**videographer**
4:23 5:1,11,22
6:9 49:11,14
109:18,21
160:20
**videotaped** 1:16
3:12 160:21
**view** 29:4,5
75:19,20,21
**viewed** 75:14
**viewing** 75:4
**views** 71:19
**vindictive** 20:12
**violate** 113:25
**violated** 115:8
116:19
**violates** 126:21
**violating** 47:19
81:16 87:1
116:17
**violation** 80:11
112:10 114:5,7
114:9 154:7

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-6   Filed 02/21/18   Page 71 of 74

violations 112:1
116:15 118:5
157:20
violence 39:11
39:12
virtues 45:10
visit 24:12,13,25
25:21 38:20
visits 13:11
22:22 55:2
voice 25:11
voir 47:18
voluminous
10:17
vs 1:6 3:6

**W**

wait 7:1 28:4
88:20
waiting 25:12
27:20 28:3
42:23 82:6
118:8 139:5,5
waitlist 16:16
17:8,15,18
32:19 77:23
78:14,16,21,25
79:6,7,12,14
80:10,18,19,22
81:22 82:11,12
82:14,17,19
83:1,3,6 84:2
84:3,7,8,22
85:5 86:2,15
86:20,25
87:18 88:21
89:3 91:2,4
98:1 99:1,4,15
99:19 100:1
102:11,21
103:2,7 127:12
127:18,23
144:24 145:6
148:12 152:5,9
153:22 154:8
154:11
waitlisted

131:24
waitlisting 16:4
27:10 72:17
74:23 78:2
145:23 154:2
waive 19:8,10,11
19:14,20
29:24
waiver 19:21
wake 154:22
wake-up 154:21
Wal-Mart 136:8
walk 67:4
walking 67:9
wall 25:5,7,15
want 6:24 9:8
16:21 23:11,12
23:12,13,13,25
24:15,21
29:24 34:8
42:11 43:13,25
45:1,8,9 47:3
47:6,15 50:1
59:7 70:2,12
71:21 76:18,20
76:21 79:24
93:14,20
95:25,25 96:1
96:3,21 97:14
97:14 98:21
110:3 112:17,21
115:22,23 116:1
122:15 131:13
135:22 137:21
141:1 146:13,24
150:24 152:7
152:11 159:11,11
160:8,18
wanted 15:18
17:9 92:21,24
93:2 94:16
110:1 115:1,2
wanting 25:18
70:16
wants 47:13,15
93:1 114:8
116:21 160:6

Washington
73:24
wasn't 48:14
53:1 74:2 89:1
125:10 155:18
waste 106:12
wasted 40:4
wasting 69:18
154:10
Waters 111:22
way 11:19 12:9
20:4,9 22:15
27:25 40:2
41:25 52:10
56:7 58:6
70:23 72:11
76:7 78:21
84:10,11 90:12
93:7,17 103:24
116:16 131:9
143:12 152:8
155:13
Wayne 129:22
ways 26:22
57:22 98:8
129:8 130:1
146:7 159:6
we'll 16:22 37:6
76:3 85:17,17
we're 36:25
59:3 76:3
78:6 115:11
118:4 121:19
weaknesses
45:6 84:2
wears 69:18,19
69:24
Wednesday
102:19 152:15
week 24:18
35:22 39:25
40:3 48:14,22
69:13 95:3
102:19 122:5,5
159:23
week-long 65:7
65:8

weeks 23:1
64:8,10,14,17
65:17,25 71:7
weigh 160:2
welcome 49:18
85:7 109:25
went 10:2 61:15
103:7 118:4
125:10 152:10
weren't 33:1,2,2
118:1 160:11
West 4:4,9,15
Western 1:1 3:1
3:18 5:6
whisper 26:2
WiFi 139:9,10,11
139:12,13,15,16
139:19
Williams 129:22
window 19:17
20:11 25:5,7
133:4
withdraw 90:1
104:9,17,20
134:17
witness 2:2
5:23 6:4 22:6
30:6,12 31:1
33:8,12 107:14
135:25 136:1,2
138:4 161:5
witnesses 13:5
13:6 22:4
23:18 29:7,8
30:6,11 42:13
45:9 47:10,11
50:17 136:4
Woodrail 4:14
woods 117:19
160:10
word 82:22
102:6
words 96:24
129:2
work 6:19 10:3
11:10 24:2
34:18 35:11

38:11 44:8
50:15 55:9
64:15,17
65:24 67:24
72:3 78:20
93:17 95:23
96:14 104:24
129:19,24
139:6 151:16
159:23 160:18
workbook
129:21,21
154:23,25
155:4
worked 9:12,20
26:12 78:21
101:21 123:1
140:12 160:5
workers 55:16
working 64:7
68:12 69:16
160:1
workload 14:25
38:9 77:25
78:13 124:5
146:4 154:13
157:4
works 58:6
Workshop 65:9
worse 58:4
68:17,18 121:7
121:18,20,25
127:19,21,22
128:1,10 146:1
worst 121:14
wouldn't 18:8
25:23 37:23
56:5 84:1
90:23 91:20
93:14 122:14
125:14 142:10
159:3
writ 80:13
100:19,24,25
101:4,5,8,8
146:17,18 147:7
147:18 151:17

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-6   Filed 02/21/18   Page 72 of 74

152:2
write 133:24
writs 147:12
written 103:18
wrong 32:1
91:14 96:9
103:24
wrote 145:11

X
x 2:1,6 75:15
137:8

Y
y 75:16
yeah 11:24
63:15 64:7
88:17 124:24
127:20 130:19
137:9 139:19
141:11 149:2,17
year 8:21 13:19
14:3,8 17:6,7
17:13,14 38:13
48:24 49:2,2
58:2 59:16
62:10 63:11
64:8,9,24
66:12,15
67:23 70:4,5
92:5 94:4
100:6 107:24
108:11 111:21
122:4 124:3
130:14 132:13
132:16,23
136:19 140:8
141:3 159:22
year's 17:5
years 9:4,8
13:20,21,22
13:25 14:2,3
38:25 48:21
65:20 74:16
74:18 118:24
125:8,9,20,21
128:2 130:15

130:16,19
131:20 138:10
150:13 156:2
yesterday 30:5
48:2,13 69:14
94:16 114:24
119:7
York 4:5 124:11
young 36:21
52:4 59:7
105:18 160:13
younger 11:12
32:13 36:24
53:3 57:9
117:12 129:6

Z
Zell 96:24 97:2
zero 79:14
133:23
zeros 133:23

0
063 152:10

1
1 46:1 49:12
79:17
1,000 15:24
16:24 17:16,17
1,200 17:20
1:30 3:14
1:36 5:2
10 11:3,16 12:12
24:7
10,000.00
92:23 93:13
100 4:15 16:2
27:11 29:13
54:18 72:19
146:2,6 149:2
100,000.00
45:25 134:12
1000 4:15
10019 4:5
103 2:7
11 64:12,24

110 2:9,9
12 64:12
120 126:6,7,19
126:22 127:9
152:22 153:13
120-days 126:15
123 2:3
13 109:5
130 22:23 80:19
80:21
133 16:9
14 12:21 63:10
63:10 64:19,21
125:5
15 12:12 13:20
24:7 45:16
131:19 132:19
150:13
15.00 159:25
150 16:2 27:11
61:7,8 131:22
150-miles 90:9
152 2:3
153 2:4
155 2:10
157 2:8
16 36:21
17 36:21,21
64:24 91:15
17-04057-CV-...
1:6 3:6 5:5
17th 62:15
18 65:1

2
2 49:15 109:19
2:41 49:12
2:49 49:15
20 1:18 3:13 5:2
39:8 125:11
132:18,19
200 17:13,14,15
71:15 72:19
79:11 80:16
84:7,7 92:6
127:8
2008 9:17 124:1

124:2,23
2013 125:5
2016 62:9
2017 1:18 3:13
5:2 62:10,10
215 111:23 116:11
221 4:9
24 129:22
2422 3:16 5:9
24th 129:22
25 8:10,14,15,20
8:25 28:20
28:24 62:11,17
25,000 45:24
25,000.00
46:5
2511 4:21
252.2 62:18,24
63:25
25th 67:15
100:13 102:4
112:11 152:14
26th 152:6
29 79:16

3
3 109:22
3,700 17:6
30 11:5 39:8
48:21 62:9
67:7 76:17
80:18 81:14,20
81:21 125:11
155:23
30-minute
39:20
30,000.00
93:12
39,000.00 70:4
159:21,22
39446 86:10

4
4-1.16 91:15
4:25 109:19
4:34 109:22
40 11:6 12:17

66:21 80:18
400 92:9
42nd 84:21
98:3 99:8
100:2,13 102:3
102:4 112:11
152:12
43 89:19
44 89:5
45 89:5
45,000.00 70:5

5
5 100:15 147:3,6
147:23
5:53 160:21,23
50 12:14,17
38:19 61:22
64:7,8,14
66:21 81:21
82:9 141:2
150:5,7,9,11
50-miles 90:11
50/50 26:4
500,000 46:2
500,000.00
46:8
500.00 15:19
136:10,23
51 4:4
52nd 4:4
54 2:7 103:9
104:5 147:4,13
55 2:7 53:9
78:7 85:23
559 126:8,11
129:3,3
559.115 126:6
126:14
56 2:8 85:18
57 2:8 157:24
158:4
573-449-0561
4:22
573-526-5212
4:16
573-751-9167

ALARIS LITIGATION SERVICES
www.alaris.us        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-6   Filed 02/21/18   Page 73 of 74

  4:10
**58** 2:9 97:22
  111:11
**59** 2:9 110:4,14

_____ **6** _____
**6** 2:2
**6:00** 3:14
**60** 2:10 12:14
  66:21 155:1
  159:23
**600.062** 80:11
  87:1 103:3
  152:3
**600.063** 80:11
  80:15 81:18
  87:1 98:18
  101:11,14,15,16
  101:22 102:21
  102:23 103:10
  103:11,13
  151:25 152:5,8
**65084** 3:17
**65101** 4:10
**65201** 4:21
**65203** 4:16
**65804** 5:10

_____ **7** _____
**7** 4:15
**70** 12:15 66:21
**75** 27:12 149:14
  149:18,19,22

_____ **8** _____
**85** 2:7,8

ALARIS LITIGATION SERVICES
www.alaris.us        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-6   Filed 02/21/18   Page 74 of 74