# Exhibit I

## Page 1

```
 1    UNITED STATES DISTRICT COURT FOR THE
            WESTERN DISTRICT OF MISSOURI
 2                CENTRAL DIVISION
 3
 4    SHONDEL CHURCH, et al.,    )
                                 )
 5          Plaintiffs,    )
                           )
 6    vs.              ) Case No.
                       ) 17-04057-CV-C-NKL
 7                     )
      STATE OF MISSOURI, et al.,   )
 8                     )
            Defendants.    )
 9
10
11
12
13
14
15
16
17       VIDEOTAPED DEPOSITION OF EDWARD GUINN
18       TAKEN ON BEHALF OF THE PLAINTIFFS
19              DECEMBER 12th, 2017
20
21
22
23
24
25
```

## Page 2

```
 1          INDEX OF EXAMINATION
 2
 3    Direct Examination by Mr. Scherzer      6
 4    Cross-Examination by Mr. Ramsey       102
 5    Cross-Examination by Ms. Shipma       122
 6    Redirect Examination by Mr. Scherzer  123
 7
 8          INDEX OF EXHIBITS
 9    EXHIBITS:
10    Exhibit No. 29  (Judge Hayes Letter)      41
11    Exhibit No. 30  (Judge Tucker Letter)     53
12    Exhibit No. 31  (Judge Tschannen Letter)  54
13
14    Reporter's Note:  The original exhibits were attached
15    to the original transcript.
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1    IN THE UNITED STATES DISTRICT COURT
            WESTERN DISTRICT OF MISSOURI
 2                CENTRAL DIVISION
 3    SHONDEL CHURCH, et al.,    )
                                 )
 4          Plaintiffs,    )
                           )
 5    vs.              ) Case No.
                       ) 17-04057-CV-C-NKL
 6                     )
 7    STATE OF MISSOURI, et al.,   )
                       )
 8          Defendants.    )
 9         VIDEOTAPED DEPOSITION OF EDWARD GUINN,
10    produced, sworn, and examined on the 12th day of
11    December, 2017, between the hours of eight o'clock in
12    the morning and twelve o'clock in the afternoon of
13    that date at the law offices of ALARIS LITIGATION
14    SERVICES,  2511 Broadway Bluffs, Suite 201, Columbia,
15    Missouri 65201, before LISA BALLALATAK, a Certified
16    Court Reporter within and for the State of Missouri,
17    in a certain cause now pending IN THE UNITED STATES
18    DISTRICT COURT, WESTERN DISTRICT OF MISSOURI, CENTRAL
19    DIVISION, wherein SHONDEL CHURCH, et al. are the
20    Plaintiffs and STATE OF MISSOURI, et al. are the
21    Defendants.
22
23
24
25
```

## Page 4

```
 1          APPEARANCES
 2    For the Plaintiffs:
 3    MR. AARON SCHERZER
      ORRICK, HERRINGTON & SUTCLIFFE, LLP
 4    51 West 52nd Street
      New York, New York 10019
 5    (212) 506-5000
      ascherzer@orrick.com
 6
 7    MR. ANTHONY TARTAGLIO
      ORRICK, HERRINGTON & SUTCLIFFE, LLP
 8    1000 Marsh Road
      Menlo Park, California 94025
 9    (650) 614-7478
      ttartaglio@orrick.com
10
11    For the Defendants MSPD System:
12    MS. JACQUELINE D. SHIPMA
      MISSOURI STATE PUBLIC DEFENDER SYSTEM
13    1000 W Nifong Boulevard, Suite 100
      Columbia, Missouri 65203
14    573-777-9977
15
16    For The State of Missouri and
      Governor Greitens:
17    MR. STEVEN ALAN RAMSEY
      ASSISTANT ATTORNEY GENERAL
18    MISSOURI ATTORNEY GENERAL'S OFFICE
      P. O. Box 899
19    221 West High Street
      Jefferson City, Missouri 65102
20    (573) 751-2590
      steven.ramsey@ago.mo.gov
21
22    Also present:
23    Mr. Chris Tobin, Videographer
24    The Court Reporter:
25    MS. LISA BALLALATAK, CCR
```

1 (Pages 1 to 4)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-10   Filed 02/21/18   Page 2 of 56

## Page 5

1      (The deposition commenced at 8:38 a.m.)
2      VIDEOGRAPHER:  We're on the record.
3  Today's date is December 12, 2017, and the time is
4  8:38 a.m.  This is the deposition of Ed Guinn in the
5  matter of Shondel Church et al. v. State of
6  Missouri, et al., Case No. 1704057-CV-C-NKL  in the
7  United States District Court for the Western
8  District of Missouri, Central Division.  This
9  deposition is being held at Alaris Litigation
10  Services at 2511 Broadway Bluffs Drive, Columbia,
11  Missouri.  The court reporter's name is
12  Lisa Ballatak.  My name is Chris Tobin.  I'm the
13  legal videographer.  We are with Alaris Litigation
14  Services.
15      Would the attorneys present please state
16  their name for the record.
17      MR. SCHERZER:  Aaron Scherzer for the
18  plaintiffs.
19      MR. TARTAGLIO:  Anthony Tartaglio also for
20  the plaintiffs.
21      MR. RAMSEY:  Steven Alan Ramsey for the
22  State of Missouri and Governor Greitens.
23      MS. SHIPMA:  Jacqueline Shipma for the
24  MSPD defendants.
25      VIDEOGRAPHER:  Would the court reporter

## Page 6

1  please swear in the witness.
2      EDWARD GUINN,
3  of lawful age, being produced, sworn, and examined on
4  behalf of the Plaintiffs deposes and says:
5      DIRECT EXAMINATION
6  BY MR. SCHERZER:
7      Q.  So, Mr. Guinn, my name is Aaron Scherzer.
8  I represent the plaintiffs in this case.  Other than
9  just when I introduced myself five minutes ago, have
10  we ever met before?
11      A.  No.
12      Q.  Have you ever been deposed before?
13      A.  Yes.
14      Q.  How many times?
15      A.  I think twice.
16      Q.  And on what kind of cases?
17      A.  They were civil litigation cases.
18      Q.  Okay.  Related to your job at the MSPD
19  or ...
20      A.  No.
21      Q.  Okay.  And have you taken depositions
22  yourself?
23      A.  Yes.
24      Q.  About how many, ballpark?
25      A.  More than a hundred.

## Page 7

1      Q.  Okay.  Great.  So you're obviously very
2  familiar, then, with, the course of depositions
3  and how everything works.  I'll just go over it
4  quickly -- not to bore you with things you already
5  know, but just for the record.  I'm going to ask you
6  questions relevant to this case; you'll do your best
7  to answer them truthfully and accurately, and
8  remember that, of course, your testimony here is
9  under oath.  Does that all make sense?
10      A.  Yes.
11      Q.  There's a court reporter here, obviously,
12  transcribing the deposition.  If you could answer
13  verbally rather than with hand gestures or
14  headshakes so the court reporter can record your
15  responses, that would be very helpful.  Please just
16  wait for me to finish my question before answering,
17  and I'll, of course, wait for you to finish your
18  answer before asking a follow-up question.  Any of
19  the attorneys here may have an objection.  Unless
20  they direct you not to answer, please just go ahead
21  and answer the question.  Of course, if you don't
22  understand the question that I'm asking, feel free
23  to just let me know that, and I'll rephrase or
24  explain.  You can take a break whenever you need it.
25  Just let me know.  The only thing I ask is if

## Page 8

1  there's a question pending, just answer that
2  question before we take a break.
3      Does that all make sense?
4      A.  Yes.
5      Q.  Great.  How did you prepare for this
6  deposition, Mr. Guinn?
7      A.  I reviewed the case numbers on cases
8  initiated in the last fiscal year and in this fiscal
9  year so that I would have some familiarity with the
10  case numbers that are coming through our office, and
11  that's really about all I looked at.  I did meet
12  with counsel to discuss having my deposition taken,
13  but that's all of the preparation I've done.
14      Q.  Okay.  When you say with "counsel," you
15  mean with Ms. Shipma?
16      A.  Correct.
17      Q.  Did you bring any documents with you here
18  today?
19      A.  No.
20      Q.  Okay.  Mr. Guinn, by whom are you
21  employed?
22      A.  By the Missouri State Public Defender.
23      Q.  And what's your current title?
24      A.  District defender of Area 14.
25      Q.  Okay.  And how long have you been in that

2 (Pages 5 to 8)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-10   Filed 02/21/18   Page 3 of 56

## Page 9

1  position?
2      A.  Three years.
3      Q.  Okay.  Since 2014?
4      A.  Approximately.
5      Q.  Okay.  And before that what -- what
6  position did you hold?
7      A.  I was an assistant public defender.
8      Q.  In which office?
9      A.  In the Area 14 office.
10     Q.  In the Area 14?  Okay.  And when did you
11 join that office?
12     A.  In 2011.
13     Q.  From 2011 to 2014, you were assistant
14 public defender in Area 14, and from 2014 to the
15 present, you're the district defender in that
16 office?
17     A.  Correct.
18     Q.  And before 2011, what was your job?
19     A.  I was a partner in the law firm of Ford
20 Parshall & Baker.
21     Q.  Sorry.  Can you spell those last two
22 names?
23     A.  Parshall is P-a-r-s-h-a-l-l, and Baker is
24 B-a-k-e-r.
25     Q.  Okay.  And for what time period were

## Page 10

1  you --
2      A.  I started working at Ford Parshall &
3  Baker, I believe, in 1992 or '3 and retired from
4  there in 2011.
5      Q.  And were you a partner during that entire
6  time period?
7      A.  Not the entire time period.  I --
8  honestly, today, I couldn't tell you when I became a
9  partner.  I'm guessing it would have been 2002 or
10 '3.
11     Q.  Okay.  And before you worked -- you were
12 first -- I presume before that, you were an
13 associate?
14     A.  Yes.
15     Q.  And so before you joined Ford Parshall &
16 Baker as an associate in 1992, what job did you
17 have?
18     A.  When I graduated from law school in 1991,
19 I worked for Cullen Klein & Milt Harper, and went
20 from Milt Harper's office to Ford Parshall & Baker.
21 So I was with Cullen & -- I worked as a law clerk
22 while I was in law school, and then was in their
23 office a year, year and a half.
24     Q.  And who are those -- Cullen Klein & Milt
25 Harper, just for the record.

## Page 11

1      A.  They were lawyers here in Columbia,
2  Missouri.
3      Q.  Got it.  Okay.  So you worked for them for
4  a year, and then you joined Ford Parshall & Baker as
5  an associate?
6      A.  Correct.
7      Q.  And so then you said you retired in 2011
8  from Ford Parshall & Baker; is that right?
9      A.  Uh-huh.
10     Q.  And what made you join the Area 14
11 assistant -- the Area 14 office as an assistant
12 public defender at that time?
13     A.  I did -- I did not like being retired, and
14 I had always wanted to do more public interest type
15 law, and I've always practiced criminal law, so
16 there -- there was an opening, and I applied, and
17 I'm very pleased that I was selected to work there.
18     Q.  So you decided to come out of retirement
19 to become a public defender?
20     A.  I did.
21     Q.  And for how many months were you retired,
22 approximately?
23     A.  I'm guessing maybe four.
24     Q.  Okay.  So you realized pretty quickly that
25 you -- retirement wasn't for you?

## Page 12

1      A.  I had some assistance from my wife in
2  making that decision.
3      Q.  Fair enough.  And so -- thank you for
4  explaining that.
5         So during the time that you were the --
6  the almost 20 years that you were at Ford Parshall &
7  Baker, you were practicing criminal law?
8      A.  I did criminal law and civil litigation.
9      Q.  Some of each?
10     A.  Yes.
11     Q.  And in terms of the criminal law, was it
12 all kinds of criminal law or anything in particular?
13     A.  I think it would best be described as a
14 general practice in a small town.  I would classify
15 Columbia as a small town.  I did not do any murder
16 cases -- what I would classify as serious felony
17 offenses.  We did do the lower-level felony and
18 misdemeanor offenses.
19     Q.  Got it.  Okay.  And was all of that work
20 in the state courts in Columbia or was it around the
21 state or ...
22     A.  Civil litigation was all over the state.
23 The criminal representation was primarily in Boone,
24 Randolph, and Cooper County, which would be central
25 Missouri.

3 (Pages 9 to 12)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-10   Filed 02/21/18   Page 4 of 56

Page 13

1    Q.  Got it.  Okay.  So you mentioned you work
2  in the -- or you're the district defender in the
3  Area 14 office.  Which counties are included in
4  Area 14?
5    A.  Randolph, Howard, Macon, Linn, and
6  Chariton Counties.
7    Q.  Okay.  And that -- well, I'll come back to
8  that in a second.
9       That covers a fair amount of geographical
10  distance; is that right -- those five counties?
11    A.  Yes.
12    Q.  Okay.  And your office represents people
13  in each of those five counties at any given moment;
14  is that correct?
15    A.  Correct.
16    Q.  And are the courthouses in -- is there
17  one -- how many courthouses do the attorneys in your
18  office practice in?
19    A.  Each primary county -- Randolph, Macon,
20  Chariton, Howard, and Linn County, each one of those
21  counties has one courthouse.  They're all rural
22  counties.  The courthouses are situate at the county
23  seat for each county.
24    Q.  Okay.  And where is your office located?
25    A.  Our office is located in Moberly,

Page 14

1  Missouri.
2    Q.  Okay.  And the furthest -- what is the
3  furthest courthouse from your office?
4    A.  Well --
5    Q.  Of the five that you practice in.
6    A.  Of the primary counties, Linn County --
7  the courthouse is located in Linneus.  That's
8  approximately a 150-mile round trip from our office.
9    Q.  Got it.
10    A.  There are -- and just to expand slightly,
11  there are additional travel requirements because of
12  changes of venue and conflict representation in
13  other counties.  The farthest counties we service,
14  as far as conflicts are concerned, we go to
15  Chillicothe to the west and Kirksville to the north.
16  Chillicothe is an additional approximately 30 miles
17  from Linneus, so it's about a 180-mile round trip,
18  maybe a little more.
19    Q.  And have those conflict cases slowed down
20  as a result of the recent budget allocation for
21  conflict cases?
22    A.  Yes, they have.  We still have some cases
23  that are still being resolved, but it has
24  significantly reduced in the last year.
25    Q.  Okay.  Prior to this most recent year,

Page 15

1  when there was a specific allocation for conflict
2  cases, what percentage of your docket was conflict
3  cases, approximately?
4    A.  I don't think I -- I can't give you a
5  number because I've never really looked at that
6  number.  I can tell you anecdotally that depending
7  on where the conflict came from -- in other words,
8  from Livingston County, you would average
9  approximately five to ten conflict cases all of the
10  time.  Adair County would be generally less, maybe
11  five on average.
12    Q.  Okay.  So given -- does that geographical
13  distance create additional -- putting aside for the
14  moment the conflict cases but just the geographical
15  distance that your office has to cover that you just
16  described, does that create any obstacles for you or
17  your line attorneys' representation of clients?
18    A.  Well, certainly, it involves more time
19  because of the travel.  It does not just include
20  going to court, because the clients themselves live
21  in smaller rural counties -- Linn County, for
22  example.  Our clients come from towns of Brookfield
23  and Marceline, who are very small.  And, generally,
24  the clients don't have adequate transportation, as a
25  general rule, so it requires that the attorney go

Page 16

1  to -- typically, would go to the courthouse in
2  Linneus or the library in Brookfield to actually
3  meet with clients to try and accommodate their
4  ability to travel and meet with their lawyer.  It
5  gets a little more complicated with clients that are
6  in custody because Linn County does not have their
7  own jail facility, so they house our clients and
8  other -- that are in custody in other jails.  It may
9  be in Macon or it may be in Keytesville, Missouri,
10  or it can be as far west as Pattonsburg, Missouri,
11  which is about an hour and 45 minutes to two-hour
12  drive from our office.
13    Q.  Okay.  And in those -- so you mentioned a
14  few places.  The -- even just putting aside for a
15  second the individuals who are in custody, but the
16  individuals who are not in custody and the
17  individual -- the attorneys in your office need to
18  meet with them at -- you mentioned the library or
19  the courthouse.  Are there confidential places there
20  where your attorneys can meet with clients?
21    A.  Yes.  Yes.
22    Q.  And are there confidential places -- now,
23  turning to those who are in custody, are there
24  confidential places where your attorneys can meet
25  with clients who are in custody in those areas?

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 17

1    A.  The county jails do have confidential
2  meeting areas.
3    Q.  Okay.  And just while we're on the topic
4  of client communication, what about phone calls for
5  those who are -- for those of your clients who are
6  incarcerated?  Do they have ready access to phone
7  calls to your office?
8    A.  Typically, no.  There is -- there are some
9  exceptions to that in a couple of the counties.  The
10  typical arrangement in the jails in central Missouri
11  are that they have a pay-to-call system that is not
12  secure; it's recorded by the sheriff's office.  It
13  also requires our clients to spend anywhere from $2
14  to $5 per call for them to call out -- to call our
15  office, if they're in custody, and they simply can't
16  afford that.
17    Q.  And even if they could afford it, it would
18  be a recorded phone call and not a confidential
19  attorney-client communication?
20    A.  That's correct.  And most of the
21  facilities that we deal with do not have the ability
22  for us to call in through a secure line to speak
23  with our clients.
24    Q.  Okay.  So if for those -- speaking now to
25  those of your clients who are in custody, if your --

## Page 18

1  if you or your attorneys want to have confidential
2  communication with them, you need to visit them in
3  prison; you don't have another means of
4  communicating with them?
5    A.  Correct.
6    Q.  Okay.  And, obviously, as you described,
7  that requires sometimes quite lengthy travel times
8  in order to make those visits?
9    A.  Depending on where the individual is being
10  held, certainly, there -- it has -- the lawyer has
11  to leave our office and drive to the jail to meet
12  with them.
13    Q.  And it could be for up to a two-hour round
14  trip?
15    A.  That would be the longest drive time.
16    Q.  Okay.  So, Mr. Guinn, I want to ask you --
17  you're a district defender, as you've described.
18  Tell me about your day-to-day responsibilities.
19    A.  Well, I'm responsible for the running of
20  the office, the supervision of the assistant public
21  defenders that are in my office and the office
22  staff.  I also carry a caseload, so I have
23  responsibilities of representing clients and meeting
24  and maintaining contact with my clients.
25    Q.  Okay.  And I'll come back to your caseload

## Page 19

1  in a minute.  Can you describe your oversight and
2  supervision of the attorneys in your office, in
3  terms of how frequent it is, what that looks like?
4    A.  Since we are a smaller rural office, we
5  have six total lawyers, including myself.  Since
6  we're a smaller office, we have what I would call
7  more of an open-door policy, so far as the
8  attorney's access to me.  We're all -- since we're
9  so close in proximity to each other -- I mean, my
10  attorneys come in and ask me questions, you know, as
11  they have them daily -- sometimes more than once
12  daily.  We also -- as far as contact with the
13  attorneys, we have staff meetings monthly where we
14  look at cases, talk about cases, we try to have a
15  component of reviewing current decisions that may
16  have come out of the court of appeals and also
17  discussions of problems that they are having either
18  with their caseload numbers or just clients and
19  cases in general.
20    Q.  Got it.  So it sounds like at least one of
21  the topics that comes up fairly frequently is
22  caseload and workload is that fair to say?
23    A.  Correct.
24    Q.  And that's both in the monthly meetings
25  and in your individual contact with the

## Page 20

1  line attorneys in your office?
2    A.  Yes.  I send an e-mail -- or try to send
3  an e-mail out once a week talking to -- you know,
4  asking, Do you have too many cases?  Where are you
5  at in the process of -- you know -- and, also,
6  looking at the new applications that are coming in,
7  trying to keep some idea of how many cases each
8  individual -- each lawyer has and, kind of more
9  importantly, what kind of cases they have.
10    Q.  And when you say "what kind of cases," do
11  you mean what class, in terms of seriousness of
12  cases?
13    A.  Yes.  I think there -- I think it's
14  important that we keep a handle on the -- how many
15  serious felony offenses each lawyer has in their
16  inventory of cases because of the time that's
17  required to effectively represent someone in a
18  serious felony case.
19    Q.  Got it.  And when you say you send an
20  e-mail once a week, do you mean to the other five
21  attorneys in your office?
22    A.  Yes.
23    Q.  Is that a group e-mail or an individual
24  e-mail to each of them?
25    A.  It's a group.

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 21

1    Q.   Okay.  And do each of them respond just to
2  you or to everyone?
3    A.   Just -- no.  Just to me.
4    Q.   Okay.  So you ask them, Just let me know
5  what you're --
6    A.   I ask them to let me know how -- if you've
7  had too many cases, if you need to have some
8  assistance in the current caseload you have, or if
9  you're in a position to be able to take new cases.
10   Q.   And do you ask them, Are you in a position
11 to take new cases, like, say, for this upcoming week
12 or ...
13   A.   Yes.
14   Q.   Okay.  And what is typically -- I'm sure,
15 obviously, it depends week by week, since you're
16 sending this every week, but what is typically the
17 response from your attorneys?
18   A.   For the most part, I think the -- well,
19 for the most part, the response is that, I'm okay.
20 From time to time, lawyers will say, you know, I've
21 got a lot on my plate, I need -- you know, I need
22 some -- not be assigned some new cases.  It
23 really -- it's not something that you can determine,
24 this is going to happen every week.  There are other
25 factors.  How many cases are the prosecutors filing?

## Page 22

1  I mean, there's -- so it's kind of the dynamic.  And
2  it also changes if -- you know, if a murder case
3  comes in the door, that changes how many cases an
4  individual lawyer can take at one time.
5    Q.   Got it.  Understood.  And if someone says
6  they are unable to take cases for any -- for either
7  the next week or another time period for -- a longer
8  time period, what actions, if any, do you take?
9    A.   Well, we talk to other lawyers.  I look at
10 their case numbers, I look at how many cases each
11 person -- each lawyer in our office has.  I will ask
12 other lawyers, Are you free to take the case?  It
13 sometimes depends on where it is.  Since we have
14 multiple counties that are a fairly good distance
15 between courthouses, we can't always assign a case
16 to another lawyer because of conflicting law days
17 and because of the distances, they can't get from
18 one court to another court to cover a case.  Then,
19 ultimately, I may take the case, if no one else is
20 available.
21   Q.   So when you said that -- at least a fair
22 amount of the time, your attorneys respond, I'm
23 okay, do you mean that they say, I'm okay to take
24 more cases for this upcoming week?  Is that --
25   A.   Well, yes.  I mean, that's --

## Page 23

1    Q.   That's the gist of it?
2    A.   That's the gist of it.  Even having them
3  say that, it's not that I don't trust their
4  judgment, but I do look at their numbers because I
5  think it's human nature not to want to admit that
6  you have more than you can handle or more than you
7  can do.
8    Q.   Is it also fair to say -- I mean, since
9  it's such a small office, and it sounds like, you
10 know, a pretty tight-knit office, given the close
11 proximity you mentioned before, that the
12 line attorneys in your office realize that if they
13 say they can't take cases for a given week, that's
14 putting cases on to either you or another attorney
15 in your office?
16   A.   Sure.  I understand that.
17   Q.   So there's not some -- if they say, I'm
18 not available to take a case, there's not some
19 knight in shining armor who can come and do
20 something with that case, other than someone in your
21 office.  Is that right?
22   A.   Correct.
23   Q.   Okay.  Do you think that may be part of
24 the reason why they often say -- or some -- you
25 know, in some frequency say that they are available

## Page 24

1  to take at least some more cases for that upcoming
2  time period?
3    A.   I think that the lawyers in my office are
4  very dedicated, and, certainly, they want to do
5  their job and they're very diligent in how they do
6  their job.  And, again, as I said, I think it's
7  human nature not to want to say, I can't -- I can't
8  work as hard as someone else.  There again, that's
9  why I look at their cases and their case types so
10 that they know that it's not a negative action if a
11 case is assigned to someone else, it's because
12 we're -- we need to do the best for the client --
13 what's in the client's best interest.
14   Q.   So is it correct, then, that at least some
15 of the time when someone says, I am able to take on
16 some more cases for this week, you look at their
17 caseload and determine that actually they aren't
18 able to in order to provide effective representation
19 for a client?
20   A.   And that would be my opinion, of course.
21   Q.   Right.
22   A.   Because I look at them, and if the
23 combination of the type of cases, the location, and
24 the number of cases are such that I think they need
25 help, I'm going to assign it to someone else.

6 (Pages 21 to 24)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-10   Filed 02/21/18   Page 7 of 56

## Page 25

1  Again, that's my -- that's my best judgment of the
2  situation as it is at that time.  Again, it's very
3  dynamic, because two or three days later, those
4  numbers may change.
5      Q.  Got it.  Understood.  And is it correct --
6  it sounds like you've testified, but just to confirm
7  this for the record, it's correct that at least part
8  of the time, even despite the human nature that you
9  talked about and despite, you know, not wanting to
10 put cases on others in the office, et cetera, that
11 attorneys do write back, at least some of the time,
12 and say, I'm not available to take further cases
13 given my already high caseload at this time?
14     A.  Yes.
15     Q.  Okay.  So you mentioned you have five
16 line attorneys in your office other than yourself;
17 is that right?
18     A.  Correct.
19     Q.  And is that the total number of
20 positions -- attorney positions allocated to your
21 office?
22     A.  Yes.
23     Q.  So there's not currently a vacancy in the
24 office?
25     A.  No.

## Page 26

1      Q.  What other staff do you have in the office
2  other than the five attorneys -- line attorneys,
3  plus yourself?
4      A.  We have an investigator and we have two
5  legal assistants.
6      Q.  And what do the legal assistants do?
7      A.  Open files.  They also assist with filing.
8  They do some of the initial e-filings with the court
9  when they're opening cases, and they assist with --
10 I would call -- since I'm an older lawyer, I would
11 call what were traditionally legal secretarial work.
12 They will schedule depositions, they will call
13 clients to set up appointments, if we ask them to.
14 One of the more important functions is that they
15 assist in getting our clients into drug or alcohol
16 treatment programs.  Again, they work at scheduling
17 depositions and -- you know, pretty much most legal
18 secretary functions.
19     Q.  Great.  Any other staff in the office
20 other than those individuals that you've already
21 identified?
22     A.  No.
23     Q.  Okay.  Given your daily interaction with
24 the other -- with the line attorneys in your office,
25 would you say you're familiar with the standard

## Page 27

1  litigation practices in your office?
2      A.  Yes.
3      Q.  So just for the remainder of the
4  deposition, unless I indicate otherwise, if I'm
5  asking a question, I'm asking it about your practice
6  and the practice of the attorneys in your office in
7  Area 14, rather than the statewide practice of the
8  Missouri Public Defenders.  Is that clear?
9      A.  Yes.
10     Q.  Okay.  And you mention that you had a
11 caseload.  About how many cases do you handle a
12 year?
13     A.  Well, I don't -- I can't answer you how
14 many cases I handle a year.  Currently, I have my --
15 I have 80 cases that I'm representing individuals
16 on.  That will vary.  I would estimate my average
17 would be 55 to 65.
18     Q.  Got it.  So it's -- at least -- so you
19 said 80 cases, so that means 80 open cases?
20     A.  Eighty open cases.
21     Q.  As of yesterday?
22     A.  Yes.
23     Q.  And that's sounds significantly higher
24 than what you -- you said your average is about 55
25 to 65.  Is there a reason for this -- that it's 80

## Page 28

1  as of yesterday or ...
2      A.  Because -- well, because in about or
3  November of this year, we were looking at the case
4  numbers for individual lawyers.  I had a couple of
5  lawyers say, We're maxed out, we need some relief,
6  and so I've -- I took a lot of cases not from them
7  but the new cases that were coming in the door out
8  of Randolph County so that they would be given the
9  opportunity to work through their case numbers and
10 work through their cases without getting more new
11 cases.
12     Q.  Got it.  So you said "a couple."  Is that
13 two or three?
14     A.  It was two lawyers out of -- it was out of
15 Randolph County, because there had been a big influx
16 of filings.
17     Q.  Got it.  And so -- you sorted of mentioned
18 this earlier, but are there certain attorneys in
19 your office who are assigned to each of the five
20 counties that your office covers?
21     A.  Yes.
22     Q.  Okay.  And how many attorneys are assigned
23 to Randolph?
24     A.  There are two lawyers that are primarily
25 assigned to Randolph County.

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 29

1   Q.  And so both of those lawyers that you said
2   in October or November of this year said, We can't
3   handle any more cases, at least for the time being?
4       A.  Yes.
5       Q.  And so then you took on -- did you take on
6   all of the additional cases in Randolph County for a
7   time period -- all of the new cases?  Sorry.
8       A.  Yes.
9       Q.  Okay.  And are you -- has that -- are you
10  still continuing to take on all of the new cases?
11      A.  No.
12      Q.  Okay.  For about how long did you take on
13  the new cases, approximately?
14      A.  About a month.
15      Q.  Okay.  And then they indicated that they
16  were able to take on some more cases for the time
17  being?
18      A.  Yes.
19      Q.  Okay.  And you mentioned you looked at the
20  fiscal year numbers for your office.  If you recall,
21  about how many cases from the last fiscal year --
22  and I'm speaking of fiscal year '17 now, which is
23  July 1st 2016 to June 30th, 2017 -- did your office
24  handle?
25      A.  It was -- well, initiated in that time

## Page 30

1   period was something over 1,500.
2       Q.  Okay.  And can you explain for the record
3   what "initiated" means?
4       A.  That would be opening a new case -- a new
5   file for an individual.
6       Q.  Okay.  And, obviously, you come in on the
7   day -- June 1st -- scratch that -- on the day
8   July 1st, 2016, you don't come in -- your office
9   doesn't come into that day with a caseload of zero,
10  correct, you have all of your cases from -- all of
11  your open cases that were existing on the day prior
12  to that?
13      A.  Yes.
14      Q.  And do you have -- you mentioned, perhaps,
15  that you had looked at an additional year back, is
16  that right or ...
17      A.  I looked at fiscal year '17 and looked at
18  this fiscal -- 2018 fiscal year.
19      Q.  Got it.  So the fiscal year to date, the
20  first six-ish months of the fiscal year?
21      A.  Uh-huh.  Yes.
22      Q.  And do you recall the numbers for that?
23      A.  I didn't total them up.  I can tell you
24  that so far, it's -- the numbers are less compared
25  to the fiscal year of 2017.  How much less, I

## Page 31

1   honestly can't tell you a number.  I'm going to
2   guess 30 percent, maybe, right now.
3       Q.  Got it.  Any reason why -- that you know
4   of for why that figure is --
5       A.  Well, I can speculate as to some of the
6   reasons why.  Each county has its own prosecutor.
7   The prosecutors file cases at different rates.  I
8   can't tell you the why of how it happens.  Some
9   prosecutors hold files until the end of the year,
10  or, for some reason, don't file cases until the end
11  of the year, and then you'll get inundated with a
12  lot of new filings.
13      In Randolph County, there's been a fairly
14  substantial decrease in filings, really, September,
15  October, November, but I -- based on history, I
16  fully expect that to change.  Some of that could be
17  attributed to -- the prosecutor of Randolph County
18  has made an application for being a judge, and he's
19  a little bit distracted right now.
20      Q.  Got it.  Okay.  So you don't think this is
21  some -- from your experience, it doesn't appear that
22  this is some broader trend that's going to relieve
23  the burden on your office?
24      A.  I don't believe so, based on the history
25  of the office.

## Page 32

1   Q.  Got it.  And you had mentioned that the
2   two attorneys in Randolph have gotten an influx of
3   cases.  Was that in the time -- but then you also
4   said that in September, October, November in
5   Randolph, there was a decrease.  So just when did
6   they get the increase and --
7       A.  Well, it would have -- I won't say it was
8   necessarily an increase, but with their carryover
9   the prior fiscal year, they had just built up a
10  large number of case that needed -- they needed time
11  to work through.
12      Q.  Okay.  And when you say -- so you mention
13  that often, for whatever reason, the prosecutors
14  will file a number of cases at the very end of the
15  year.  So does that mean that you expect that in the
16  next -- obviously, it's December -- almost the
17  middle of the December, that you expect in the next
18  couple of weeks, there'll be an influx of new cases?
19      A.  I think it's very possible that could
20  happen, but it -- but it also -- I can't say that
21  with any certainty because -- because it could
22  easily happen later on, too.  It depends, really, on
23  the prosecutors.
24      Q.  And what is this -- the election for the
25  judicial seat that you were mentioning earlier?

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 33

1    A.  Well, I think they expect that to be an
2  appointment made before the end of the year.
3    Q.  Got it.  Okay.  At which time there'll be
4  a new prosecutor in Randolph County, assuming he's
5  appointed?
6    A.  Yes.
7    Q.  How many of the attorneys in your office
8  handle felony cases?
9    A.  All of the attorneys handle felony cases.
10    Q.  And how many of them -- and that's all of
11  the attorneys in -- all six of them -- five
12  line attorneys, plus yourself?
13    A.  Yes.
14    Q.  And how many of them handle misdemeanor
15  cases?
16    A.  All of them handle misdemeanor cases.
17    Q.  And how many of the attorneys handle
18  juvenile cases?
19    A.  All of them do.  I have one attorney
20  that -- she likes doing the juvenile work, and I
21  give -- and she wants the opportunity to do juvenile
22  cases as often as she can, and so we've migrated
23  toward, if possible, allowing her to enter into all
24  of the juvenile cases.
25    Q.  But other attorneys in your office still

## Page 34

1  have at least some juvenile cases?
2    A.  I think at this time there's only one
3  other lawyer that has a juvenile case that's
4  pending.  It's a little different in the rural
5  counties.  We don't always get appointed into
6  juvenile cases.  It's not a high volume part of our
7  practice, as opposed to some of the larger
8  metropolitan areas, where it's a big part of the
9  practice.
10    Q.  And do you know who does get appointed, if
11  your office is not appointed to those juvenile
12  cases?
13    A.  Many times the court will appoint local
14  lawyers into juvenile cases.
15    Q.  Okay.  Other than yourself -- obviously,
16  you've been practicing for almost 30 years -- or 26
17  years.  How long has the -- other than yourself, how
18  long has the most experienced attorney in your
19  office been practicing?
20    A.  Robert Flemming in my office has worked
21  for the state public defenders for 25 years.  When
22  Rob started practicing law, I can't tell you -- I'm
23  guessing four or five years before he started with
24  the public defender's office.  Then the next two
25  lawyers would have approximately three and a half to

## Page 35

1  four years of experience, and then I have two
2  lawyers that have two years of experience.
3    Q.  Got it.  So after Robert Fleming, who,
4  obviously, has a couple of decades of experience,
5  the next most experienced attorney -- line attorney
6  in your office has three and a half to four years of
7  experience?
8    A.  Yes.
9    Q.  Got it.  Are there any other -- other than
10  yourself, you mentioned you have supervisory
11  responsibilities.  Are there any other supervisors
12  in the office -- supervisor attorneys?
13    A.  No.
14    Q.  I just want to talk for a second about
15  initial appearances.  Can you describe -- and I know
16  you -- I understand that you represent -- that you
17  represent individuals in five counties, so the
18  practice may differ, but in the line run of cases,
19  what the practice is at initial appearances, in
20  terms of when an individual is arrested, what
21  happens next?
22    And let me know if that question doesn't
23  make sense, and I can clarify.
24    A.  Well, the question makes sense, but it --
25  it varies from county to county.  I will give -- I

## Page 36

1  can give you a general scenarios for a couple of
2  different ways.
3    In certain counties, an individual when
4  they're arrested and are in -- and they can't post
5  bond, the jails will fax to our office an
6  application for services, and we'll review that
7  application and determine whether or not the
8  individual qualifies.  That person may not have a
9  court date for another week, or it could be two
10  weeks before they will actually go in front of the
11  judge, because the rural counties schedule
12  differently.  They don't have a -- necessarily have
13  a law day every week.  In those counties, we
14  certainly would appear with that individual when
15  they have their next court date.
16    In other counties that have a higher
17  volume, the jails will either fax us the
18  applications, or when we go to the jail seeing other
19  clients, we will pick up those applications.  Again,
20  making the determination as to whether or not they
21  qualify.  And in those cases in those counties,
22  generally, they would, depending on what day of the
23  week the individual was arrested, they would go in
24  front of a judge within five or six days.
25    Q.  Got it.  Okay.

9 (Pages 33 to 36)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-10   Filed 02/21/18   Page 10 of 56

## Page 37

1       And when is bail set, for the most part?
2       A.   At the time that the judge issues a
3   warrant, they will issue a bond -- they will set a
4   bond amount.
5       Q.   At the time the judge issues a warrant for
6   someone's arrest?
7       A.   Yes.
8       Q.   So before they're even arrested?
9       A.   Well, someone could have been arrested on
10  view and brought to jail, and then they'll apply,
11  but, typically, the bonds are set before they go to
12  their first court appearance.
13      Q.   Okay.  And are those bonds set, then,
14  before your office represents the individual?
15      A.   Yes.
16      Q.   Okay.  And when -- again, in a typical
17  case, understanding that there are some geographical
18  and other differences -- when is your first contact
19  with your clients?  When and where does that occur?
20      A.   I'm going say, generally, it would be at
21  their first appearance in court.
22      Q.   Okay.  And is that, generally, again --
23  forgive me for the general question, but, generally,
24  does that contact mean that the communication is
25  occurring at counsel table or in the well of the

## Page 38

1   court or something while court is in session -- and
2   court is in session on other cases, not necessarily
3   on that -- on the case --
4       A.   I think that's relatively fair to say,
5   that a lot of communication goes on that way.  Some
6   of the courthouses do have available rooms where you
7   can meet with an attorney, but, certainly, it is a
8   brief contact, at best.
9       Q.   Okay.  What -- and when you say "brief
10  contact at best" -- sorry -- does that mean that
11  sometimes there's very little contact before that
12  initial appearance?
13      A.   Yes.
14      Q.   The initial time at least -- forget the
15  initial appearance, because you could not have been
16  there for that, but the first time you're
17  appearing --
18      A.   Again, it varies, but I think for the most
19  part, it's fair to say that the first appearance at
20  court -- when you're first having first contact with
21  the client is brief, just because the court is --
22  the judge is on the bench, the court is moving at
23  that time, and there's not an opportunity to have a
24  lengthy conversation with the client.
25      Q.   Okay.  And what -- is it at that first

## Page 39

1   hearing -- the first hearing that you're describing
2   now, at least the first time that your office
3   traditionally appears on the case for a client, is
4   that at that hearing that bond reduction
5   applications are made?
6       A.   We would ask for -- we would make an oral
7   application for bond reduction.  Depending on what
8   type of case, it may not be heard at that time, but,
9   certainly, for some of the lower-level misdemeanor
10  and felonies, the judges generally will take it up,
11  but -- by oral motion.
12      Q.   Okay.  So, obviously, at that time, you
13  and the attorneys in your office haven't had much
14  time to investigate the details of the case
15  or the background --
16      A.   We would have had no time to investigate
17  the details of the case at that time.
18      Q.   Would you have had time to investigate the
19  background of the individual --
20      A.   No.  It would be based on what they were
21  able to tell us and what was on their application.
22      Q.   What they were able to tell you in that
23  brief conversation you described earlier?
24      A.   Correct.
25      Q.   Okay.  What resources are available to the

## Page 40

1   attorneys in your office for social work help, if
2   any?
3       A.   Well, what we try to do for the clients
4   is, primarily, individuals that express a desire for
5   drug treatment, that we will assist them in making
6   applications for treatment, we will call treatment
7   providers, get people on wait lists to try to get
8   them into either in-patient -- to an in-patient
9   treatment program.  And it's primarily only
10  substance abuse, because in Missouri, there's just
11  not any available good sources for mental health
12  treatment.
13      Q.   All right.  And in terms of experts, what
14  resources are available for the attorneys in your
15  office?
16      A.   Do you mean, like, for use at trial
17  experts or ...
18      Q.   We can start with that, sure.  For use at
19  trial or for use at any stage.  My general question
20  is for use at any stage, you know, for pretrial
21  motions or at trial.
22      A.   I mean, we do have access to an expert
23  database that we can look at, if we determine
24  there's a need for an expert in the case to locate
25  experts to hire to use in cases.

10 (Pages 37 to 40)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-10   Filed 02/21/18   Page 11 of 56

Page 41

1    Q.   Okay.  On average, how frequently do the
2  attorneys in your office file pretrial motions,
3  would you say?
4    A.   I believe we're pretty aggressive on
5  filing motions to dismiss, motions to suppress, and
6  bond reduction motions.
7    Q.   Okay.  I want to show you an exhibit which
8  I'll mark Plaintiff's Exhibit 29.
9         (Deposition Exhibit No. 29 was marked for
10  identification.)
11    Q.  (By Mr. Scherzer)  Let me know when you've
12  had a chance to look this over.
13    A.   Yes.
14    Q.   Okay.  Do you recognize this exhibit I've
15  marked Plaintiff's Exhibit 29?
16    A.   Yes.
17    Q.   And what is it?
18    A.   It's a letter that I sent out in October
19  to -- this letter is addressed to the circuit judge
20  of Randolph County, Scott Hayes, and it -- and the
21  purpose of the letter was to alert Judge Hayes that
22  we may have issues with the number of cases and
23  accepting new cases in the months to come.
24    Q.   Okay.  And is Judge Hayes the only judge
25  in Randolph County?

Page 42

1    A.   Well, Judge Hayes is the circuit judge.
2  There is an associate judge.  At that time, there is
3  Cynthia Suter in Randolph County, and there's an
4  associate judge in Howard County, Mason Gephardt.
5    Q.   Okay.  And you see at the top the letter
6  is dated October 2nd, 2017; is that right?
7    A.   Yes.
8    Q.   And if you turn to the -- looking now at
9  the Bates stamp numbers at the bottom, it's
10  MSPD39410.  Do you see that -- the last page of the
11  letter?
12    A.   Yes.
13    Q.   And who is the letter signed by?
14    A.   It's mine -- well, it's my electronic
15  signature.
16    Q.   Your electronic signature.  Fair enough.
17  And that's -- under your -- above the caption,
18  "Edward L. Guinn Area 14 District Defender"?
19    A.   Yes.
20    Q.   Okay.  And who drafted this letter, if you
21  know?
22    A.   Well, I drafted it.  Quite honestly, it
23  was -- another office had sent out a letter that --
24  here's an example of what we sent out to alert the
25  judges in their circuit, and rather than reinvent

Page 43

1  the wheel, I just redrafted that letter.
2    Q.   So you adapted it for your office, but the
3  general template was one used by another office
4  previously?
5    A.   Yes.
6    Q.   Okay.  And do you recall which office that
7  was?
8    A.   I believe that this was the letter that
9  came out of the Boone County Area 13 office.
10    Q.   Okay.  All right.  So I'd like to refer
11  you, then, to a few portions of the letter, if I
12  might.
13         So you talk in the first paragraph
14  about -- in the seconds sentence, I'm sure you're
15  aware of the recent action taken by OCDC against a
16  public defender."  Do you see?
17    A.   Yes.
18    Q.   And is that referring to the Hinkebein
19  decision?
20    A.   Yes.
21    Q.   And the Hinkebein case -- not just the
22  decision, obviously, since you're talking about
23  OCDC's recommendation, et cetera?
24    A.   Yes.
25    Q.   Okay.  And then you see in the second

Page 44

1  paragraph -- can you read the first two sentences in
2  that paragraph for us?
3    A.   "The Supreme Court referenced Rule 4-1.7,
4  which states, in part, that it is a conflict of
5  interest if there is a significant risk that the
6  representation of one or more clients will be
7  materially limited by the lawyer's responsibilities
8  to another client.  MSPD recognizes that while each
9  attorney is employed by the office of the Missouri
10  State Public Defender, it is the individual and
11  personal responsibility of each attorney to comply
12  with the rules of professional conduct."
13    Q.   And, obviously, you -- you know, you sent
14  this letter.  I presume you agree with this -- the
15  statements expressed.  You still agree with the
16  statements expressed in the first two sentences in
17  that paragraph?
18    A.   I do.
19    Q.   And at the bottom of that page, you'll see
20  that it says, "Attorneys violate those rules --"
21  meaning the rules of professional conduct -- "-- if
22  they accept a case that results in -- " I presume
23  there's an "in missing -- "-- that results in
24  representation to act with reasonable diligence and
25  to keep the client reasonably informed."  Do you see

11 (Pages 41 to 44)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-10   Filed 02/21/18   Page 12 of 56

## Page 45

1    that?
2      A.  Yes.
3      Q.  Okay.  And then if you turn to the -- on
4    the next page -- again, I'm talking now about 39409.
5    Do you see the paragraph in the middle of the page
6    that begins with "As of today's date"?
7      A.  Yes.
8      Q.  Can you just read that paragraph for us?
9      A.  "As of today's date, I believe the
10   attorneys assigned to Randolph County are currently
11   violating the rules of the professional conduct.
12   Their current individual caseloads reflect a
13   conflict of interest with existing clients because
14   they are forced to choose effective representation
15   of one client to the detriment of other clients.  I
16   believe assigning any new cases to any individual
17   attorneys would create a conflict of interest
18   because they would have no ability to adequately
19   represent either their current or prospective
20   clients."
21      Q.  Okay.  And do you still agree with the
22   sentiments expressed in that letter -- in that
23   paragraph?
24      A.  Well, yes.  Again, based on -- this was
25   based on the case levels at that time.

## Page 46

1      Q.  Got it.
2      A.  The sent -- I mean, the -- and I believe
3    the interpretation of law remains the same.
4      Q.  Okay.  And -- so what motivated you to
5    send this letter?
6      A.  Well, primarily, the Hinkebein decision
7    was the primary motivating factor.
8      Q.  And can you tell us your understanding of
9    the Hinkebein case and decision?
10     A.  Well, I suppose in a nutshell, is that the
11   rules of professional responsibility apply to
12   lawyers employed by the state public defender's
13   office, and that we have to comply with those rules,
14   and that it's each individual attorney's obligation
15   to conduct themselves in a way that follows the
16   rules of professional conduct.
17     Q.  Got it.  Okay.  And so your opinion, based
18   on your many years of experience, at least at the
19   time you sent this letter, was that the attorneys in
20   your office weren't able to ethically take on
21   additional cases?
22     A.  At that time, yes.
23     Q.  Okay.  And then if you look at the next
24   paragraph, also still on 39409, the next sentence
25   after the one you read said, "The Randolph County

## Page 47

1    Public Defender will no longer be immediately
2    entering into cases in which a defendant has
3    qualified."
4      A.  Correct.
5      Q.  And then a couple of sentences later it
6    says:
7         "If the perspective client qualifies, I
8    will not assign an attorney until there is an
9    attorney who can assume the representation without
10   violating the rules of professional conduct."
11        Is that right?
12     A.  Correct.
13     Q.  Okay.  And then the next sentence:
14        "We cannot file an entry with individual
15   attorneys bar number if we and the attorneys know
16   that doing so violates the rules of professional
17   conduct."
18        Is that right?
19     A.  Correct.
20     Q.  Okay.  And I'll just read the rest of the
21   paragraph, actually .
22        "To be clear, there are not hidden agendas
23   or motivations with regard to this decision.  This
24   is simply about ensuring all Area 14 public
25   defenders are able to maintain their license to

## Page 48

1    practice law without threat of discipline by OCDC."
2    Is that right?
3      A.  Correct.
4      Q.  Okay.  And so you wanted to ensure that
5    the -- you and the line attorneys in your office for
6    whom you're responsible were not threatened -- that
7    their bar licenses were not threatened by virtue of
8    their representation of additional new clients that
9    they weren't able to represent?
10     A.  Yes.
11     Q.  Okay.  And then I want to look at 39410,
12   the next page of that letter.  The first full
13   paragraph on that page says:
14        "We have started an internal wait list for
15   defendants who qualify for representation but who do
16   not yet have an attorney assigned to them."
17        And then the -- skipping a sentence.
18        "We will be providing defendants on the
19   wait list with a letter advising them they qualify
20   and that we will notify them as soon as an attorney
21   is available to take their case."  Is that right?
22     A.  Yes.
23     Q.  Did your office at any point have such a
24   wait list?
25     A.  We did.

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

Page 49

1    Q.  Okay.  Can you tell me about that -- how
2 it was set up, who was on it, and the like?  I'll
3 have some follow-up questions, but ...
4    A.  I can't tell you who -- what clients were
5 on it.  I can tell you that after this letter was
6 sent out, that as applications came in, they were
7 reviewed to determine eligibility.  And the
8 hierarchy for placing people on the list was
9 individuals that were in custody were at the top of
10 the list.  Cases where the individuals were not in
11 custody were still on the list, but they had a lower
12 priority, and that's how it was maintained.  Also, I
13 was very concerned about individuals that were in
14 custody and moving them off of that wait list as
15 quickly as possible.  I quite honestly think that
16 the longest anyone was on the wait list was a little
17 over a week at that time.
18    Q.  Okay.  And is that -- was that wait list
19 limited to Randolph County?
20    A.  Yes.
21    Q.  Okay.  And does your office still have a
22 wait list?
23    A.  We do not.
24    Q.  Okay.  And is that because -- is that at
25 least in part because you took on a number of -- a

Page 50

1 fair number of additional cases to your own
2 caseload?
3    A.  Yes.  And the fact that, as we discussed
4 earlier, the prosecutor in Randolph has not been
5 filing as many cases the last month or so.
6    Q.  Got it.  And, again, your opinion, based
7 on your many years, both in this office and practice
8 generally, is that that's a time limited caseload
9 slowdown due to some -- the vagaries of that
10 particular prosecutor's office?
11    A.  I believe, based on the history of how
12 cases come into our office, that this is a temporary
13 slowdown.
14    Q.  Certainly, the prosecutor -- either an
15 individual prosecutor or the head prosecutor in that
16 office hasn't indicated to you that he now believes
17 fewer criminal defendants should be charged and
18 brought to court for any reason?
19    A.  We have not had a discussion like that at
20 all.
21    Q.  And if there's a time when the caseload,
22 as you expect it to, picks up again, is -- is
23 you -- is a wait list something that you are
24 contemplating as a possibility for the future, if
25 and when that occurs?

Page 51

1    A.  Yes.  I mean, this is a dynamic process.
2 I -- next -- you know, the next time we have a wait
3 list, it may not be Randolph County, it may be
4 another county.  Again, it depends on how many cases
5 are filed, what type of cases each attorney has in
6 their inventory of cases, and what their
7 individual -- I mean, this is -- it has to be an
8 individual determination by each lawyer that -- are
9 they meeting their obligations in the representation
10 of their clients?
11    Q.  Okay.  And I just -- I would like you to
12 just read one final sentence, if you could, on
13 39410.  It's the sentence in the second-to-last
14 paragraph, "The only ends."
15    A.  "The only ends I am aspiring to achieve is
16 the effective zealous and diligent representation of
17 poor persons by counsel who are not under threat of
18 bar discipline by OCDC."
19    Q.  Okay.  Thank you.  And what was the
20 response, if any, from the judges or the court
21 system in Randolph County to this letter?
22    A.  I believe it was very positive.  Judge
23 Hayes contacted me, and we scheduled a meeting, and
24 Judge Hayes and I met and talked about the caseloads
25 and moving cases through the court and what the

Page 52

1 court could do to help with the caseloads and -- and
2 it was kind of a far ranging discussion about
3 bonding and aspects of court procedure that might
4 make things more efficient for lawyers to alleviate
5 some of this burden.
6    Q.  And what -- if you can give -- you don't
7 have to give every example, but an example or two of
8 things that were discussed at that time.
9    A.  Well, the judge certainly had ideas of how
10 he wants his court run, and he was -- had -- was
11 making suggestions about how he would schedule cases
12 and utilize other judges to perhaps move dockets,
13 make them more efficient, and that's probably the --
14 a primary discussion with the judge as to how to
15 make his court more efficient so that lawyers aren't
16 sitting for extended periods of time on long all-day
17 dockets.
18    Q.  And what, if any, was the response of the
19 prosecutor in the prosecutor's office in Randolph
20 County to this letter?
21    A.  There was no conversation with the
22 prosecutor about the letter.
23    Q.  Okay.  And you mentioned, again, the
24 waiting list and that you were concerned about
25 moving those in custody off the waiting list as soon

13 (Pages 49 to 52)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-10   Filed 02/21/18   Page 14 of 56

Page 53

1    as possible.  I take it, therefore, that there were
2    at least some individuals who were in custody who
3    were on the waiting list for at least some short
4    period of time.
5        A.  Yes.
6        Q.  Okay.  I'd like to show you what I'll now
7    mark as Plaintiff's Exhibit 30.
8        (Deposition Exhibit No. 30 was marked for
9    identification.)
10       Q.  (By Mr. Scherzer)  Let me know when you've
11   had a chance to look it over.
12       A.  I have.
13       Q.  And do you recognize this letter?
14       A.  I do.
15       Q.  And what is it?
16       A.  It a letter, again, dated October 2nd that
17   was sent to Judge Fred Tucker in -- who is the
18   circuit judge of Macon County.
19       Q.  Okay.  And, again, if we turn to the last
20   page, 39407, there's your electronic signature
21   there; is that right?
22       A.  That's correct.
23       Q.  And, again, over the signature caption of
24   "Edward L. Guinn Area 14 District Defender"?
25       A.  Correct.

Page 54

1        Q.  And if you recall, is this letter -- other
2    than substituting in Macon County for
3    Randolph County and similar changes for attorneys
4    and the like, is this, in all substantive respects,
5    otherwise identical to the letter that you sent to
6    Judge Hayes in Randolph County, Plaintiff's
7    Exhibit 29?
8        A.  Yes.
9        Q.  Okay.  And you explained before why you
10   were motivated to send the Randolph County letter.
11   I presume, since this was sent on the same day, that
12   similar motivations inspired you to send this
13   letter -- the Macon County letter.  Is that fair?
14       A.  Yes.  And -- but I suppose I'll have a
15   caveat.  When this letter was sent to Macon County,
16   I had not had a discussion with the attorney that's
17   primarily responsible for Macon County to determine
18   his -- whether or not he believed that he was in
19   need of help or in need of case relief.
20       Q.  Okay.  I'll show you one additional
21   letter, if I could, which I'll mark Plaintiff's
22   Exhibit 31.
23       (Deposition Exhibit No. 31 was marked for
24   identification.)
25       Q.  (By Mr. Scherzer)  Let me know when you've

Page 55

1    had a chance to look at that.
2        A.  Yes.
3        Q.  And do you recognize this letter?
4        A.  I do.
5        Q.  And what is it?
6        A.  This is also a letter dated October 2nd,
7    2017.  It was sent to Judge Terry Tschannen, who is
8    the circuit judge of the Ninth Judicial Circuit of
9    Linn -- which is Linn County and Chariton County.
10       Q.  Got it.  And, again, other than
11   substituting in Linn County and any related
12   ministerial or logistical changes to account for
13   that, is this letter, in all substantive respects,
14   otherwise identical to Exhibits 29 and 30?
15       A.  It is the same letter, yes.
16       Q.  And, again, it's signed -- if you look at
17   page 39404, it has your electronic signature above
18   the caption, "Edward L. Guinn Area 14 District
19   Defender"; is that right?
20       A.  Yes.
21       Q.  All right.  And were the same reasons that
22   motivated you to send the -- Plaintiff's Exhibit 29
23   to Judge Hayes in Randolph County the reasons that
24   you sent this letter to Judge Tschannen in Linn
25   County?

Page 56

1        A.  Yes.
2        Q.  Okay.  You mentioned -- forgive me -- that
3    Judge Tschannen covers Linn and Chariton Counties.
4    Do these three letters, given which judges cover
5    which counties, cover all five counties that your
6    office is responsible for?
7        A.  Yes.
8        Q.  Okay.  And what, if any, changes -- I
9    guess we can go look back to Plaintiff's Exhibit 30,
10   the letter to Judge Tucker in Macon County.  What,
11   if any, changes occurred in your office's practice
12   in Macon County as a result of this letter?
13       A.  There was not a wait list instituted in
14   Macon County because the attorney that was handling
15   that county believed that he was in compliance with
16   the rule.  I did meet with Judge Tucker and had the
17   same kind of discussion about what things could the
18   court do to make the court dockets more efficient
19   and to assist in making, I guess, court appearances
20   easier and assist in not necessarily appointing the
21   public defender's office in certain types of cases
22   that weren't, perhaps, necessary for an individual
23   to have a lawyer appointed:  Namely, probation
24   cases.  Because Judge Tucker acknowledged that he
25   had a bad habit of appointing the public defender's

14 (Pages 53 to 56)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-10   Filed 02/21/18   Page 15 of 56

## Page 57

1　office in cases where there really wasn't a
2　constitutional need for a lawyer. He was appointing
3　the public defender's office to assist people -- to
4　use them as a social agency to assist people to get
5　into drug treatment.
6　　　Q. Got it. When you say "probation cases,"
7　do you mean probation revocation cases?
8　　　A. Probation revocation cases, yes.
9　　　Q. Okay. And do some of the individuals in
10　probation -- who are facing probation revocation
11　cases face jail time as a result of -- as a possible
12　result of that probation violation?
13　　　A. They do. Our discussion with Judge Tucker
14　is that they were -- he acknowledged that there were
15　certain cases he had no intention of sending someone
16　to prison. He wanted the individuals into a drug
17　treatment program, and since he had been a former
18　public defender many years ago, he believed that the
19　public defender's office had an ability to get
20　people into drug treatment much faster than
21　probation and parole officers did.
22　　　Q. And was the agreement that you came to
23　with Judge Tucker that your office would not be
24　appointed in any probation revocation cases going
25　forward, or just in a subset of probation revocation

## Page 58

1　cases or ...
2　　　A. No. There was -- I mean, there was no
3　agreement. The judge indicated to me that he would
4　do his best efforts. If it was, again, an
5　individual that he had no intention of sending to
6　prison, that he would use other avenues to get them
7　into drug treatment and not just always appoint the
8　public defender's office as a stopgap, that he would
9　rely more on probation and parole officers to do
10　what, you know, we believed to be their job, to
11　assist their -- people that are on probation to get
12　into treatment programs.
13　　　Q. Okay. Now, turning back to Plaintiff's
14　Exhibit 31, the letter to Judge Tschannen in Linn
15　County -- or responsible for Linn and Chariton
16　Counties. What, if any, changes occurred in your
17　office's practice in those counties as a result of
18　this letter?
19　　　A. Really, no changes in our practices.
20　Again, the lawyer that's assigned to that -- to
21　Linn County has indicated that he's able to meet his
22　obligations. That's true to an extent. I have
23　taken some of the serious felony cases from that
24　area, so -- in order to alleviate his case numbers.
25　We did -- I did meet with Judge Tschannen and

## Page 59

1　Judge Othic at their request, and, again, the
2　conversation was, What can we do to assist, what can
3　we do in terms of court procedure to help your
4　lawyers -- because they understand the distance that
5　we're traveling -- and we had a discussion about
6　bonds and the court setting bonds and talked about
7　potential changes into their local court practice.
8　　　Q. So did -- it sounds like in addition to
9　the cases you've talked about previously that you
10　took in Randolph County to -- because the attorneys
11　there weren't ethically able to take on new cases,
12　you also, then, took on cases -- some serious cases,
13　you mentioned, in Linn County because you -- sorry.
14　That was a long preface.
15　　　Was the reason that you took on those
16　additional cases -- serious cases in Linn County
17　because you didn't think that -- in your opinion,
18　that the attorney in Linn County could ethically
19　handle those additional cases?
20　　　A. Correct. The attorney that is currently
21　assigned Linn County is two years out of law school,
22　and even though he is working very hard and does a
23　good job, there was an incident back in October in
24　which the prosecutor filed five, what I would call,
25　serious felony, sex crime cases, and that lawyer

## Page 60

1　would not be able to work his current caseload and
2　effectively represent five individuals with those
3　type of serious felony charges.
4　　　Q. Got it. So as a result, you took on --
5　how many of those cases did you take on? How
6　many -- of those five that you're speaking of.
7　　　A. There's -- I have three of them.
8　　　Q. And he took the remaining two?
9　　　A. No. The other -- they were conflicted out
10　because there were conflicts in the office.
11　　　Q. Got it. And so those were sent to a
12　private attorney?
13　　　A. Uh-huh.
14　　　Q. So all of the cases of those ones, at
15　least, that you're just speaking of that remained in
16　your office, you took all of them onto your own
17　docket?
18　　　A. Yes.
19　　　Q. Okay. Any other cases from Linn County
20　that you took on recently that you otherwise would
21　not have?
22　　　A. No.
23　　　Q. Okay. And where are the bulk of your
24　cases? I mean, you've described that each of the
25　other attorneys sort of have their geographic areas

ALARIS LITIGATION SERVICES
www.alaris.us　　　Phone: 1.800.280.3376　　　Fax: 314.644.1334

1   of expertise, but -- that they're responsible for.
2   Are your cases limited to a particular geographic
3   area or not?
4       A.  No.  I have cases in Randolph, Linn, and
5   Adair County and Shelby County, and that's -- yeah,
6   that's all.
7       Q.  Okay.  And I take it, again, you read
8   the -- the letter about Rule 4-1.7, which the
9   Supreme Court referred to in the Hinkebein decision,
10  which talks about a conflict of interest, if there's
11  a significant risk that the representation of one or
12  more clients will be materially limited by the
13  lawyer's responsibilities to another client.  Do you
14  recall --
15      A.  Yes.
16      Q.  -- that sentence from your letters?  And I
17  take it that was your ethical concern with this
18  attorney in Linn County, that he wouldn't be -- it
19  would be a conflict of interest if he took on
20  those -- these additional serious cases, given his
21  ethical responsibilities to his existing clients?
22      A.  I think that's -- certainly, that is part
23  of it.  The other part is, he's a new lawyer, and he
24  will be involved with this case, he will be second
25  chairing, if the cases go to trial, he will be

1   involved with the cases, but he could not, I don't
2   believe, ethically represent these individuals
3   because of the combination of inexperience and his
4   case numbers.
5       Q.  Okay.  And for the attorneys in
6   Randolph County -- the two attorneys you mentioned
7   who -- for which you took on a number of cases to
8   your own docket because of the your ethical concerns
9   about their caseload, was that also because of a
10  conflict of interest rule and other rules of
11  professional conflict that we're talking about here?
12      A.  Yes.
13      Q.  Okay.  It sounds like -- because you said
14  that the -- other than -- and I believe his name
15  was -- was his name Mr. Flemming?
16      A.  Rob Flemming, yes.
17      Q.  Rob Flemming.  Other than Mr. Flemming,
18  the other four attorneys -- line attorneys in your
19  office, none of them have been there longer than
20  four years; is that right -- or four and a half
21  years, I think you said?
22      A.  Correct.
23      Q.  So in the time that you've been at the
24  Area 14 office, first as an assistant public
25  defender, and now as the district defender, which is

1   since 2011, four of the five line attorneys have
2   left the office and been replaced by new attorneys.
3   Is that fair to say?
4       A.  Yes.  I was counting the numbers of --
5   trying to remember who is coming on in that time.
6   We've been very fortunate in that we haven't had a
7   huge turnover in the last two years.
8       Q.  But in the last four years?
9       A.  Yes.  There's been four lawyers that have
10  left.
11      Q.  Out of five?
12      A.  Yes.
13      Q.  Okay.  And where, if you know, did those
14  attorneys go?
15      A.  One lawyer transferred to the -- what's
16  designated as the SVP unit in the public defender
17  system.  One lawyer left to go -- move back to
18  St. Louis to work -- I believe he went to work in
19  the juvenile court in some way in St. Louis.  A
20  third lawyer left and went to Springfield to the
21  prosecutor's office, and then a fourth lawyer, she
22  left and moved with her husband to be to
23  Milwaukee -- no, Detroit, and she works in the state
24  juvenile system.  It's the Division -- it's kind of
25  like the Missouri State Public Defender, but she

1   represents juvenile clients.
2       Q.  Got it.  Okay.  And what effect on
3   clients, if any, is there when there's turnover in
4   the office and the individuals -- the line attorneys
5   who are working in the office on that -- on the
6   previous individual's clients, what effect, if any,
7   is there?
8       A.  Well, I think -- it's never good to have a
9   change in representation in the course of the
10  representation of a client.  It makes the clients
11  uneasy, it -- you know, a new lawyer has to spend
12  time familiarizing themselves, and so it -- more
13  than anything, it just adds time.  If it's an
14  individual that's in custody, that means they stay,
15  potentially, in custody longer.  I think ultimately
16  there's not a negative impact but for the increase
17  in time and the increase in workload on the other
18  lawyers in the office.
19      Q.  Got it.  Okay.  How many of your --
20  approximately what percentage of cases in your
21  office are resolved by plea deals or agreements?
22      A.  I'm going to estimate that it's probably
23  at least 90 percent.
24      Q.  Okay.  Do you know how many trials your
25  office did in the -- say the last fiscal year --

ALARIS LITIGATION SERVICES
www.alaris.us            Phone: 1.800.280.3376            Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-10   Filed 02/21/18   Page 17 of 56

Page 65

1 fiscal year '17?
2   A.  I believe there was ten.
3   Q.  Approximately.
4   A.  Yeah.
5   Q.  Okay.  And remind me, again, if you could
6 of the -- you said the total case number was about
7 15- --
8   A.  It was -- it's over 1,500.  I want to say
9 it was 1,560, somewhere around that number.
10   Q.  Okay.  So without getting into heavy math
11 here --
12   A.  The bench trials -- I can't tell you how
13 many bench trials were done because I don't really
14 look at those.
15   Q.  Got it.
16   A.  There would have been some number of bench
17 trials done also.
18   Q.  As an estimate, do you think more than 50
19 bench trials?
20   A.  I don't think it would be that high.  I
21 don't think that trials -- it isn't always the
22 measure of what happens in the life of cases.
23 There's a -- you know, there's a substantial number
24 of cases that are dismissed.  I mean, they all
25 don't -- all cases aren't pled out, is what I'm

Page 66

1 getting to.  But all of them are not tried, either,
2 because you do have dismissals, you have alternate
3 dispositions, and I don't keep track of dismissals.
4 At that time -- I don't keep track of dismissals or
5 deferred prosecutions, those type of dispositions.
6   Q.  Got it.  Okay.  And, typically, when in
7 the life of a case would your office file motions?
8 Would it be closer to the eve of trial or early in
9 the case, or does it depend?
10   A.  It certainly depends on what motions
11 you're talking about.  Bond reduction motions are
12 filed early on in the case.  Suppression motions,
13 something of that sort would be filed -- they might
14 be filed prior to preliminary hearings, or they
15 might be filed after preliminary hearings.  Motions
16 to dismiss, though -- there's not truly a motion to
17 dismiss provided for in the rules -- are filed,
18 typically, after preliminary hearings.
19     So it's -- it's an ongoing process.  I
20 can't give you a hard and fast rule because every
21 case is so fact dependent.
22   Q.  Got it.  That's fair.  What steps, if any,
23 do you take -- do you or the attorneys in your
24 office take to evaluate the immigration consequences
25 a client might be facing as a result of a criminal

Page 67

1 prosecution recommendation?
2   A.  That's part of our intake when we meet
3 with a client, is we always ask if they are a United
4 States citizen or if they can tell us what their
5 immigration status is.  If we have clients -- and we
6 do from time to time, though our area is not --
7 doesn't have a large population of immigrants, but
8 when we do have that issue arise, there are
9 resources within the state public defender system
10 that we can access to evaluate that person's status
11 and how these -- our particular case that we're
12 representing them on will affect their immigration
13 status up to -- ultimately, if necessary, trying to
14 get them counsel to represent them regarding their
15 immigration status with INS.
16   Q.  Got it.  Okay.  Have any -- just jumping
17 around for one second, have any private attorneys
18 been -- other than in conflict cases like you've
19 described, have there been any private attorneys
20 appointed to represent clients who -- appointed by
21 the courts in the five counties that you work in --
22 any private attorneys been appointed to represent
23 individuals who are otherwise qualified to --
24 qualified for public defender services?
25   A.  No.

Page 68

1   Q.  Okay.
2   MR. SCHERZER:  I think actually -- should
3 we take -- I'm going to pull up another couple of
4 exhibits, but should we take a break for a couple of
5 minutes -- five minutes?
6   VIDEOGRAPHER:  The time is 10:08 a.m., and
7 we're off the record.
8   (A recess was taken.)
9   VIDEOGRAPHER:  The time is 10:19 a.m., and
10 we're back on the record.
11   Q.  (By Mr. Scherzer)  Okay.  So, Mr. Guinn,
12 I'm going to show you what's been previously marked
13 as Plaintiff's Exhibit 21, which is this -- we're
14 laughing because the cover page to -- there's some
15 corruption in the files, and the cover page is a
16 little messed up.  I guess I'll show you the cover
17 page.
18     So if you could, at the top of the page,
19 do you see this seal starting in the middle of the
20 page -- or the top third of the page, I guess, to be
21 fair?
22   A.  Yes.
23   Q.  And does that say "Missouri State Public
24 Defender Commission"?
25   A.  Yes.

17 (Pages 65 to 68)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-10   Filed 02/21/18   Page 18 of 56

## Page 69

1  Q.  And then underneath it, it says, "Fiscal
2  year 2018"; is that right?
3  A.  Yes.
4  Q.  And it says, "Approved, October 25th,
5  2017"?
6  A.  Yes.
7  Q.  And then there's a star, but it looks like
8  it's saying, "Supplemental Legislative Letter
9  Request.  Is that right?
10  A.  Yes.
11  Q.  Okay.  And underneath it says, "Michael
12  Barrett, Director, Commission Meeting October 25,
13  2017"?
14  A.  Yes.
15  Q.  Prepared by Kathleen Lear, comptroller?
16  A.  Yes.
17  Q.  And that is all on page 38970; is that
18  right?
19  A.  Yes.
20  Q.  And then if you don't mind turning to page
21  38976, if you could -- the last page of that
22  exhibit.  And do you -- maybe not this particular
23  chart, but do you -- have you seen a chart that
24  looks like this for the 33 areas or districts in the
25  Missouri State Public Defender System previously?

## Page 70

1  A.  I have seen it, yes.
2  Q.  Okay.  And do you -- and do you see at the
3  top it says, "State public Defender Cumulative
4  Caseload Metrics, Fiscal Year 2017"?
5  A.  Yes.
6  Q.  And then start date, July 1st, 2016, just
7  below that?
8  A.  Yes.
9  Q.  And end date June 30th, 2017?
10  A.  Yes.
11  Q.  And do you see -- sort of in the lower
12  third of the page, you see Area 14, Moberly?
13  A.  Yes.
14  Q.  And it says number of attorneys, six in
15  the next column?
16  A.  Yes.
17  Q.  And number of case initiated, 1,547 --
18  1,547?
19  A.  Yes.
20  Q.  And then it says, "Minus cases withdrawn."
21  What does that mean, if you know?
22  A.  I don't know.
23  Q.  Okay.  And then it says, "Net new cases,
24  1,367."  Is that right?
25  A.  Yes.

## Page 71

1  Q.  And then if you go to the percent of
2  capacity, do you see that in the second-to-last
3  column?
4  A.  Yes.
5  Q.  And that says -- or what percentage does
6  it say -- or I can tell you, I guess, because it's a
7  little hard to trace the line.  It's 247.5 percent.
8  A.  Yes.
9  Q.  Is that right?  Okay.  And what does that
10  mean, if you -- if you know?
11  A.  I don't know.
12  Q.  Okay.  If I -- so this chart, if I -- if I
13  were to represent to you that this chart is based on
14  the RubinBrown numbers, do you -- do you know what
15  the RubinBrown -- are you familiar with the
16  RubinBrown study?
17  A.  I know there was a RubinBrown study, but
18  outside of just the general knowledge that it
19  occurred, I know nothing else about the RubinBrown
20  study.
21  Q.  Got it.  Fair enough.  I think I'm done
22  with that for now.
23      I want to talk, then, about your caseload,
24  and, in particular, the caseload that you have taken
25  on recently in order to try to ensure that your

## Page 72

1  line attorneys meet their ethical obligations.  You
2  said it was about 80 cases; is that right?
3  A.  Yes.
4  Q.  And that's in addition to the other
5  responsibilities that you have in the office, in
6  terms of supervision, budget, hiring, and the like?
7  A.  Yes.
8  Q.  Is that right?  Okay.  And you mentioned
9  that it's significantly higher than your caseloads
10  have been previously; is that right?
11  A.  Yes.
12  Q.  And when we say that, is that -- have
13  there been any other times, since you were the
14  district defender, where your caseload was higher
15  than 80 cases, other than this most recent time
16  period that we're talking about?
17  A.  Yes.
18  Q.  And what was that time period?
19  A.  During fiscal year 2017, I had a lawyer
20  that was on Family Medical Leave, and so I took over
21  the Macon County docket for the time period that he
22  was gone, and at that time, I would have had in
23  excess -- you know, had been around the hundred
24  cases, maybe a little more.  During times when --
25  if -- we've been -- I've been fortunate that I've

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-10   Filed 02/21/18   Page 19 of 56

1  not had a large turnover in attorneys, but whenever
2  there is a turnover attorney, at those times, I
3  typically will take over that county until I am able
4  to hire another lawyer.
5      Q.  Got it.  Okay.  So other than times where
6  you're taking over an additional load, either
7  because of ethical concerns for your line attorneys
8  or because someone has left the office or is on
9  leave, your caseload is typically around 55 or so
10  cases; is that right?
11     A.  Yeah.  In that area.  I -- my criteria for
12  taking cases has to do with the seriousness of the
13  felony, and sometimes there is -- not so much now,
14  but there used to be a geographic consideration,
15  because I would try to save the assistant public
16  defenders from being tied up driving extended
17  distances, if that was at all possible.
18     Q.  Okay.  And when you said not so much now,
19  can you explain that?
20     A.  Because of the funding for conflict
21  attorneys, that has alleviated some of those cases.
22     Q.  So you -- prior to that, which is -- for
23  this fiscal year, 2018, additional funding, prior to
24  that, you took on more than your share of conflict
25  cases?

1      A.  Well, I don't know that I would describe
2  it as more than my share, but I took conflict cases
3  that required -- that weren't in -- venued in our
4  normal counties or that were not venued close to
5  where an assigned attorney was already practicing.
6      Q.  Got it.  Okay.  And when -- what
7  percentage, if you know -- or what portion -- of
8  your caseload -- not speaking of your office's
9  caseload but your individual caseload, are
10  serious -- let me ask it this way:  Are felony cases
11  versus misdemeanor or other, you know, probation
12  revocation cases?  And a ballpark is fine.
13     A.  I'm going to say 90 percent or more.
14     Q.  Okay.  So is it fair to say, then, that
15  you -- for your individual caseload -- again, not
16  the caseload of your office but your individual
17  caseload, you take on a higher percentage of the
18  more serious cases than the general percentage for
19  the line attorneys in your office?
20     A.  Yes.
21     Q.  Okay.  And it sounds like we've already --
22  you have already testified to this, that that's
23  because you want to ensure that your line attorneys
24  are able to meet their ethical demand -- the ethical
25  requirements to their other clients and, thus, not

1  have many -- you know, too high a number of more
2  serious cases?
3      A.  Correct.
4      Q.  Okay.  And do you have any sense of what
5  fraction, portion of your cases -- you said more
6  than 90 percent are felony, but what portion of
7  those are A and B felony or murder or the more
8  serious types of felony charges?
9      A.  Percentage-wise, I don't.  I mean, I -- I
10  can tell you how many -- I have -- currently have
11  two murder cases and I have six or seven multi-count
12  A and B -- well, actually, now ten multi-count --
13  what I would classify as serious felony child sex
14  cases.
15     Q.  Got it.  So you're not saying you have ten
16  A and B felonies, you're saying just -- you have two
17  murder cases and ten multi-count child sex cases?
18     A.  Yes.
19     Q.  And, obviously, each of those ten cases
20  is, as you've said, very serious?
21     A.  Yes.
22     Q.  What's the maximum penalty that the
23  individual in those cases is facing, if you know?
24     A.  Life in prison.
25     Q.  Okay.  In each of those ten cases?

1      A.  Well, not in every case, but --
2      Q.  Okay.
3      A.  -- certainly, in the -- as the murder
4  cases are charged right now, there could be a
5  maximum penalty of life.  In a couple of the -- of
6  the child sex cases, they're facing -- they could
7  potentially face a life sentence.
8      Q.  Okay.  And so that's 12 cases, which is
9  already a significant portion of your docket, but
10  other than those cases, do you have a general sense
11  of how many A, B felonies you have?
12     A.  Well, B felonies, the -- no.  In real
13  numbers, I do not.  Certainly, the vast majority of
14  my caseload, once you exclude out the serious --
15  what I would classify as serious felony cases would
16  be drug-related crimes, which could be -- well,
17  typically -- what used to be called a B felony, drug
18  distribution or -- but, primarily, I think a larger
19  majority would be drug-related crimes that have to
20  deal with possession.
21     Q.  Got it.  Okay.
22         And when your caseload spikes, as it has
23  now, to 80 or in previous times where it spiked to,
24  like, as you said, a hundred, what effect, if any,
25  does that have on -- let's start with on your time

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 160-10    Filed 02/21/18    Page 20 of 56

## Page 77

1 and ability to communicate with your clients.
2     A.  It's a true struggle to maintain
3 communication.  My view is that numbers in excess of
4 80 cases are not sustainable for long-term periods
5 of time, because I believe that you'll -- that the
6 individual lawyer will start falling below the
7 standard of care for representation of clients.
8     Q.  Okay.  And that's 80 cases, generally,
9 and, of course, as you've described you have a
10 higher percentage of more serious cases on your
11 docket than is normal?
12     A.  Yes.
13     Q.  Okay.  So it sounds, then, like you have
14 serious concerns that you either are at or are
15 approaching a level at which you may not be able to
16 meet your ethical obligations to your clients?
17     A.  My current caseload is not sustainable.
18     Q.  When you say -- sorry.
19     A.  I don't believe that the caseload that I
20 have right now should be carried and still meet the
21 standard of representation.
22     Q.  Okay.  So to clarify, if you were to
23 continue carrying this caseload for any lengthy
24 period of time, you would feel like you could not
25 meet your ethical obligations to your clients?

## Page 78

1     A.  If I -- yes.  I would feel that, and I
2 would be put in a position that I would have to
3 self-report --
4     Q.  Okay.
5     A.  -- to the Office of Disciplinary Counsel.
6     Q.  Okay.
7     A.  In all fairness, to the clients.
8     Q.  Understood.  And are you aware that others
9 of your colleagues -- other district defenders I'm
10 speaking of now -- have self-reported?
11     A.  I don't know if they have or not.  I mean,
12 I suppose that's an option, but I've not talked to
13 any other district defender or, in fact, talked to
14 anyone else about self-reporting.  To me, that's an
15 individual lawyer's obligation to do.
16     Q.  Okay.  But it's something that you have at
17 least -- is at least something that you are aware of
18 as a possibility you would need to do, if your
19 caseload continues --
20     A.  If I'm not able to provide effective
21 representation to my clients, I will do that.
22     Q.  Got it.  And, as you've indicated already,
23 if your caseload continues as it is currently, at 80
24 cases, you feel like you will not be able to provide
25 effective representation to your clients?

## Page 79

1     A.  I believe that that is not a sustainable
2 number, yes.
3     Q.  And tell me about -- let's say -- in the
4 world in which your caseload does continue at 80
5 cases, tell me about some of the repercussions that
6 that has for -- we talked about client contact.
7 What other repercussions does that have for your
8 clients -- or would that have for your clients?  And
9 I can break it down, if that's helpful or ...
10     A.  Well, I can't -- I mean, here -- I can't
11 really give you an answer to that question, but to
12 see that the -- that the -- each individual case is
13 fact dependent.  The work that needs to be done and
14 the -- and the representation that the clients are
15 entitled to, that doesn't change.  And so what needs
16 to be done on an individual case will vary from
17 person to person to person.  While I am -- what I am
18 saying is, that I believe that I -- that as a
19 lawyer, I've got an obligation to provide each
20 client with effective representation.  When my case
21 numbers are too high or when any lawyer's case
22 numbers are too high, they do not have the time to
23 physically provide effective representation to every
24 client, and that is -- I believe that's a violation
25 of the rules, and I don't believe that it's

## Page 80

1 fundamentally fair to the individual client.
2     Q.  And the rules that you're speaking of --
3     A.  The Missouri Rules of Professional
4 Responsibility.
5     Q.  Okay.  Also known -- the Missouri Rules of
6 Professional Conduct, same thing; is that right?
7     A.  Yes.
8     Q.  And, in particular, Rule 4, is that --
9     A.  Correct.
10     Q.  -- fair?  And is your understanding that
11 that -- that those rules and Rule 4, in
12 particular -- as well as all the other rules, but
13 including Rule 4 governs public defenders --
14 district defenders and line defenders, just as it
15 governs other attorneys in Missouri?
16     A.  Well -- and I don't mean to be
17 argumentative, but there is no difference between a
18 public defender and a private lawyer in the State of
19 Missouri as the rules of professional conduct are
20 applied.  We have the same rules.  And I believe
21 that my opinion is that it is inaccurate to say and
22 say there's one set of rules for public defenders
23 and another set of rules for private attorneys.
24     Q.  Your opinion is that those rules govern
25 you -- the --

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 81

1    A.  It is irrelevant who you are employed by.
2  That you are -- if you are a lawyer licensed in the
3  State of Missouri, the rules of professional
4  responsibility apply to you, and you have an ethical
5  obligation to each client to provide them with
6  effective representation.  And if you're unable to
7  do so, then you need to protect the client in any
8  way -- by any means necessary.
9    Q.  And do you have a duty as a supervisor to
10  ensure that your -- under the rules of professional
11  conduct, that your line attorneys can meet
12  their ethical obligations to their clients as well?
13    A.  I believe that I do, yes.
14    Q.  Okay.  And -- so we were talking about
15  some of the ways that a caseload that's too high can
16  impact your ability to represent your clients, and
17  we talked about client contact, which is,
18  obviously -- or perhaps you could explain why client
19  contact is so important not just to the client but
20  to the actual legal -- the legal case that each
21  client faces.  Why is client contact important?
22    A.  Well, client contact is important on
23  several different levels.  I mean, first and
24  foremost, if you are representing an individual who
25  is in custody, that person has to have some

## Page 82

1  confidence, they have to have some trust in their
2  lawyer, and the only way that you develop a good
3  attorney-client relationship is by having contact
4  with your client.  You can't do that -- and I
5  believe it has to be in-person, face-to-face
6  contact.  I don't believe that you can do that by
7  written letter, and I don't believe that you can do
8  that by telephone to be effective -- to effectively
9  represent your client.
10    So, first and foremost, contact, so you
11  can have a positive attorney-client relationship.
12  The other is communicating with your client about
13  all aspects of his case.  Explaining to them his
14  complicated court system and the complicated
15  environment of a criminal lawsuit is difficult for
16  people to understand, and it can't -- and, again, I
17  don't believe that it can be done by writing a
18  letter or by telephone, and it takes a series of
19  meetings with individuals before they have some
20  confidence in the system and in their
21  representation.
22    Q.  Okay.  And are there also things -- and
23  you touched on this a bit, but there are things that
24  you can learn from the client, not just in terms of
25  what you can explain to them, but that you can learn

## Page 83

1  that are critical to their case?
2    A.  Sure.  You have to have contact with the
3  clients in order to be able to effectively
4  investigate their cases.  The information that you
5  receive from your clients through face-to-face
6  meetings is invaluable, and it takes -- it's always
7  a process.  Some clients are more forthcoming,
8  others, it takes more time.
9    Q.  Okay.  Is one of the other ways that your
10  representation of clients can be impaired when your
11  caseload approaches an unethical level, that you
12  don't have time to conduct investigation into the
13  facts and circumstances of what the offense charged?
14    A.  I believe that there's a real possibility
15  that that could occur, yes.
16    Q.  And is that something that you're
17  concerned about -- is that one of the things that
18  you're concerned about, if your caseload were to
19  continue at its current level going forward?
20    A.  That is one of the areas that I am
21  concerned with, as I am with the lawyers -- other
22  lawyers in the office as a supervisory position.  I
23  mean, the policies of the state public defender's
24  office and the policies within our office is that we
25  investigate cases, that we -- and that there are

## Page 84

1  certain minimum standards that I personally impose
2  on my lawyers on how they conduct their
3  investigations and contacts with their client.
4    Q.  Okay.  And there have been -- it sounds
5  like there have been times, at least where you -- I
6  mean, you've said already there have been times
7  where you've been concerned that the attorneys in
8  your office were not able to meet their ethical
9  requirements as to their individual caseload, if
10  they were to take on new cases?
11    A.  It is -- yes.  And as a supervisor, I am
12  going to do my level best not to put my attorneys in
13  that position.  I -- you know, I have young lawyers
14  on my staff, they are starting their careers, and
15  they need an opportunity to practice law and develop
16  those skills and habits so they can be effective
17  lawyers.  It takes time to do that, and I am -- my
18  personal opinion is that I'm going to do everything
19  that I can do to make sure that that happens and
20  that they are successful in their career.
21    Q.  Okay.  Just give me one second, if you
22  could, Mr. Guinn.
23    Let's go to Exhibit 20.
24    I'm showing you, Mr. Guinn what's been
25  marked previously as Exhibit 20.  Do you recognize

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

1  that document?
2      A.  Yes.
3      Q.  Okay.  And what is it?
4      A.  Well, this would be labeled as Rule 4-5.1,
5  "Responsibility as partners managers and supervisory
6  lawyers."
7      Q.  Okay.  And is that one of the rules of
8  professional conduct that we -- one of the portions
9  of Rule 4 of the rules of professional conduct that
10  we were discussing earlier?
11      A.  Yes.
12      Q.  And that, as we have already established,
13  is a rule that governs public defenders, just as it
14  does every other attorney in the State of Missouri?
15      A.  Yes.
16      Q.  And that rule, in particular, applies to
17  you, is that right, because you're a supervisor in
18  the district -- you are the supervisor in the
19  Area 14 office; is that right.
20      A.  Yes.
21      Q.  Could you read Subsection B out loud for
22  us, the sentence there?
23      A.  "A lawyer having direct supervisory
24  authority over another lawyer shall make reasonable
25  efforts to ensure that the lawyer -- other lawyer

1  conforms to the rules of professional conduct."
2      Q.  And then if you could, could you read C
3  and -- Subsection C and Subsection C(1), the one
4  underneath C, just those two sentences?
5      A.  "A lawyer shall be responsible for another
6  lawyer's violation of the rules of professional
7  conduct if (1) the lawyer orders, or with knowledge
8  of the specific conduct, ratifies the conduct
9  involved."
10      Q.  Okay.  So is it fair to say that -- and so
11  do you believe that this -- is it your opinion that
12  this rule applies to you -- every portion of this
13  rule applies to you as director of -- district
14  defender of --
15      A.  This rule does apply to me as a supervisor
16  of other attorneys.
17      Q.  Okay.  And is it fair to say that one of
18  the reasons that you've taken on this additional too
19  high of caseload for yourself is because you're
20  concerned that, otherwise, you would violate your
21  role as a supervisor -- your duties and
22  responsibilities as a supervisor to ensure that your
23  line attorneys comply with the rules of professional
24  conduct?
25      A.  Yes.

1      Q.  Okay.  Is there -- other than giving
2  additional -- you've described this caseload of 80
3  that you have currently and your concerns that if
4  that continues, you will have to self-report as
5  committing an ethical violation.  Other than
6  assigning those cases to -- or new additional cases
7  back to your line attorneys, do you have any other
8  means of meeting the caseload in your counties?
9          And I can rephrase, if that's confusing.
10      A.  No.  I think I understand your question.
11  And the answer would be, I would have to assign
12  cases to other lawyers in my office.
13      Q.  Great.  Okay.  So there -- and so another
14  way of saying it is, there aren't attorneys --
15  public defender attorneys from outside of your
16  district that could come in and take a good portion
17  of the cases from your office's hands and represent
18  clients in those cases, other than -- you know, an
19  occasional conflict case or something, but in terms
20  of any significant number of cases in your office?
21      A.  I don't believe there is, but that would
22  be a discussion that would have to be with the upper
23  management.
24      Q.  Certainly, you don't have the authority to
25  ask an attorney from another office to come in and

1  take those cases?
2      A.  I do not have the authority to send cases
3  to another office.
4      Q.  And are you generally aware of caseload
5  concerns and problems in other district offices in
6  MSPD?
7      A.  Yes.
8      Q.  Okay.  So then just circling back to the
9  choice you're faced with, is it fair to say that
10  that choice is -- you can either take on cases for
11  yourself -- additional cases to your own caseload,
12  which cause you to be concerned about violating your
13  ethical responsibilities to your clients, or you can
14  assign those cases to your line attorneys, in which
15  case you're concerned about them violating their
16  ethical obligations to their clients?
17      A.  I think both of those are potential
18  options.  Also, what we originally did in
19  Randolph County was putting people on wait lists
20  until case note -- until lawyers were able to work
21  through cases already assigned to them so that they
22  had -- their time would be freed up to take new
23  cases.
24      Q.  Okay.  Is there any -- other -- so that's
25  an additional option.  Any other option available to

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-10   Filed 02/21/18   Page 23 of 56

## Page 89

1  you on a regular basis, other than those -- taking
2  on too many cases for yourself, giving your
3  line attorneys too many cases, or a wait list that
4  would be available to you in your role as a district
5  defender in Area 14?
6      A.   At this time, I don't know of any other
7  options available.
8      Q.   Okay.  And what concerns, if any -- I
9  mean, you mentioned some concerns, especially about
10  folks who are in custody being on a wait list.  What
11  concerns, if any -- if you could explain them
12  further -- do you have about putting additional
13  people -- additional defendants who are eligible for
14  public defender services on wait lists to receive
15  those services?
16      A.   Well -- I mean, as far as practical
17  considerations are concerned, the longer that cases
18  lie without representation -- I mean, you run the
19  risk of witnesses favorable to our clients leaving,
20  disappearing.  You know, any number of practical
21  things can occur, which would be detrimental to
22  the -- to our client's ability to have a fair trial.
23  It's never good to allow -- you know, for people to
24  go for weeks or months without having anyone working
25  on their case.  So I -- that's a big concern to me,

## Page 90

1  that we're not meeting our -- the constitutional
2  standard to provide effective representation for
3  people, when we have to put them on a wait list, and
4  they -- if they're having to wait for an extended
5  period of time.
6      Q.   And, obviously, despite that concern, you
7  created a wait list, which was just for a short
8  period of time, presumably -- was that because you
9  felt like you had no other option?
10      A.   Well, I don't believe we had any other
11  option, and I -- again, you know, my -- the two
12  lawyers involved came to me and said, We're at our
13  max right now; we can't take anything new.  And I
14  have to represent their evaluation of their
15  situation.
16      Q.   And did they say, We can't take anything
17  new, because if we do, we'll violate our ethical
18  obligations to our clients?
19      A.   I think -- was it phrased in those?
20  Terms?  No.
21      Q.   Okay.
22      A.   But that -- I mean, that was our
23  discussion, is how many -- you know, we were -- we
24  looked at how many cases they had, we looked at what
25  type of cases they had going, we looked at what

## Page 91

1  their circumstances were in those cases, and there
2  was a discussion as to, Are you really overloaded?
3  And after that discussion, we made the determination
4  that they legitimately did not feel they could meet
5  their ethical obligations with their current case
6  numbers.
7      Q.   And you've described daily interaction
8  with the attorneys in your office.  It sounds like
9  you're a hands-on supervisor; is that fair?
10      A.   I believe so, yes.
11      Q.   So in addition to their telling you that
12  they felt like they couldn't ethically take on more
13  cases, did you have an independent knowledge or
14  opinion about their caseload and whether or not they
15  were accurate in their representation about their
16  ability to take on more cases?
17      A.   I looked at their caseload, I looked at
18  the type -- the number -- not just the number but
19  the type of cases they had, and after looking at it
20  and in talking with them, I had to agree that at
21  that time, they shouldn't take on new cases.
22      Q.   So, in other words, you didn't just take
23  their word for it that they were busy -- I mean, you
24  believed them because you knew them and their
25  experience, but you also independent -- you also

## Page 92

1  looked at their case numbers and came to a
2  determination that they were correct that they could
3  not ethically take on more cases.  Is that fair?
4      A.   Yes.  I looked at their inventory of cases
5  and -- I mean, it's -- the protocol is that we --
6  it's not just the number of cases, it's the type.
7  And, also, I have to look at the age of the cases,
8  that if the case -- if the cases are getting
9  chronological age on them, that they've been -- you
10  know, they're six months, eight months into the
11  cases, I mean, that's a big consideration also.
12      Q.   And you touched on some of this
13  previously, but what is the problem if the case
14  is -- has been going on for six or eight or more
15  months?
16      A.   Well, again -- I mean, there could be any
17  number of -- as a practical matter, I mean, you run
18  the risk of evidence favorable to the client
19  evaporating, you know, witnesses being unavailable.
20  I mean, there's just any number of negative aspects
21  that can happen to the client.  And I suppose
22  emotionally it's not good for the clients to have
23  these cases hanging over their heads for long
24  periods of time.  They become dissatisfied and
25  it's -- and it's just -- I look at it as if my

23 (Pages 89 to 92)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-10   Filed 02/21/18   Page 24 of 56

Page 93

1    mother or my brother or sister was in the same
2    position.  Would I want them to be treated in such a
3    way, that they are waiting for months to have a
4    resolution of their matter?  And I have to believe
5    that's not how I would want my family to be treated.
6        Q.  And as part of the concern -- of course,
7    in addition to your general concern about your
8    client's satisfaction -- which, of course, any
9    lawyer would be concerned about it.  Is part of the
10   concern, if your -- about the rapport and
11   relationship that you have with your clients, which
12   is necessary to conduct -- to fully advocate on
13   their behalf at pretrial and at trial?
14       A.  Yes.
15       Q.  Okay.  And so it sounds like one of the --
16   is one of the ways that attorneys handle --
17   attorneys in your office, yourself and the
18   line attorneys, handle caseloads that are quite
19   large, is to seek continuances in order to gather
20   more information and do the investigation necessary
21   to work up the case?
22       A.  Yes.
23       Q.  And your concern is that those
24   continuances can lead to adverse results for your
25   clients or --

Page 94

1        A.  I believe that -- I believe that they
2    contribute -- can contribute to negative outcomes
3    for the client.
4        Q.  And it's not that your attorneys are
5    seeking continuances because they feel like it just
6    for fun.  I mean, the reason that they're doing so
7    is because their caseload is too high.  Is that
8    correct?
9        A.  Well -- yes.  I think it's -- you know,
10   certainly, it is a combination of caseload, and,
11   also, it's -- again, this is a dynamic process.
12   When you are trying to prepare a case for trial,
13   there is more to it -- I mean, investigation is one
14   aspect of it, but there are -- you know, there are
15   depositions, there is preparation -- you know, for
16   trial, there's pretrial motions -- there's a whole
17   series of work that needs to be done, and if you
18   have too many cases, you are unable to effectively
19   do all of the steps necessary to effectively
20   represent your client.
21       Q.  Is surveillance video something that is
22   important in a number of your cases?  And I'm
23   talking about, like, store video -- you know, videos
24   from store surveillance and the like.
25       A.  I mean, it plays a part in some cases.  I

Page 95

1    mean, it's -- the use of video as a police
2    technique, yeah, it's more common now.  There are
3    body cams, there is in-car cameras, there are
4    miniaturized cameras that the confidential
5    informants are being given to use.  So, yes, video
6    is a very important part of many different kinds of
7    cases.
8        Q.  Okay.  Just give me a second here.
9        I want to ask you about lineups,
10   Mr. Guinn, if I could.  I know it depends, in part,
11   on the geographic differences in the five counties
12   that you work in, but, typically, are there
13   lineups -- are there in-person lineups held, at
14   least in some cases in your district?
15       A.  Typically, no.
16       Q.  Okay.  And so how are identifications
17   done?
18       A.  Normally, photo arrays are given to
19   individuals.  I can only recall maybe one instance
20   where -- and it really wasn't even a lineup, it was
21   a sheriff's deputy driving someone by.  I mean --
22   and them looking out the window.  They don't do
23   in-person lineups.
24       Q.  Okay.  I want to ask you about post trial
25   if I could.  In your district -- at what point does

Page 96

1    representation by the trial attorneys in your office
2    end?
3        A.  After -- well -- in a trial context, we
4    would go through trial, through sentencing.  We
5    would file a post-trial motion for new trial, and
6    then if those are denied, then the case would -- a
7    notice of appeal would be filed, and that case would
8    be sent to the appellant division.
9        Q.  Okay.  And who files the notice of appeal?
10       A.  The trial attorney does.
11       Q.  Okay.  And then your office sends the case
12   on to the appellant division; is that right?
13       A.  Yes.
14       Q.  And if there were a motion for a new
15   trial, who would file that motion?
16       A.  The trial attorney.
17       Q.  Okay.  I want to talk about sentencing for
18   a minute.  Is that something that your office spends
19   time preparing for, sentencing of your clients?
20       A.  In the entire trial sequence, as a general
21   rule, the preparation for a final sentencing is --
22   probably the least amount of time is spent on that.
23   Most of our cases have a -- sentencing assessment
24   report is ordered by the court, and the individual
25   attorney will go over with the client what to expect

24 (Pages 93 to 96)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 160-10    Filed 02/21/18    Page 25 of 56

1  in the sentencing assessment report phase, but
2  outside of that, it's pretty limited as to the
3  other -- any other work being done to prepare for
4  sentencing.
5      Q.   Would you -- in an ideal world, would you
6  like to spend more time, you and the attorneys in
7  your office, on preparing for sentencing?
8      A.   I think it would be helpful, yes.
9      Q.   And do you think that could have positive
10 results for the sentences that your clients would
11 receive?
12     A.   I think that it would -- there's a great
13 probability that that would help in final
14 sentencings of clients.
15     Q.   And is one of the concerns -- when either
16 your caseload or the caseload of your attorneys gets
17 to this unethical or borderline unethical area that
18 we've been discussing, is one of the concerns that
19 you then have even less time for preparing for
20 sentencing proceedings?
21     A.   I think that's a consideration, yes.
22     Q.   Okay.  Now, you talked about the -- your
23 80 cases, and just returning to that for a second.
24 And you said -- we discussed at length about your
25 concerns, that if that continues, you'll need to

1  fair to say?
2      A.   I think that's a fair statement, yes.
3      Q.   In other words, if the attorneys in your
4  office who have two to four years of experience, as
5  four of the five line attorneys do, if they had your
6  caseload -- not just the number, as you said, but
7  80, and many of which are serious cases, you would
8  be even more concerned about their ability to handle
9  that caseload ethically; is that fair?
10     A.   I would be very concerned about their
11 ability to handle a large caseload of serious felony
12 offenses.
13     Q.   Okay.  Which is part of the reason you
14 have taken on these additional cases for yourself?
15     A.   That is the reason, yes.
16     Q.   Okay.  Do you know -- and it's okay if you
17 don't -- the number of open cases your office has
18 currently?  I may have asked that already, so
19 forgive me if I did, but ...
20     A.   And I looked at the number before -- I
21 believe that -- and this is kind of a guess on my
22 part, but I believe that it's around -- it's a
23 little over -- it's around 500, I'm pretty sure.
24     Q.   Okay.  So if it's around 500, and you have
25 80, that means that there are 420, approximately,

1  self-report and you won't be able to ethically
2  represent your clients.  And, obviously, that's --
3  that's despite the fact that you have almost 30
4  years of experience as a criminal attorney in a law
5  firm setting, and then as -- in a public defender's
6  office; is that right?
7      A.   Yes.
8      Q.   In other words, you're an extraordinarily
9  experienced attorney --
10     A.   Well, I don't know if I would say
11 "extraordinarily," but I am -- I am an experienced
12 attorney, and I think that I -- because of my
13 experience, I do have the ability to look at the
14 cases that are -- that come into our office and that
15 I can make decisions about, Are we being effective
16 in how we are representing our clients?
17     Q.   Got it.  And I appreciate that.  I'm not
18 trying to -- your humility.  I -- in addition to
19 knowing -- for that experience, being that you have
20 a good understanding of what your office is and is
21 not able to ethically handle, is it also fair to say
22 that you, with those almost three decades of
23 experience, you -- individuals with only two years
24 of experience would be able to handle ethically
25 fewer cases than you're able to handle?  Is that

1  cases split among the other attorneys your office;
2  is that right?
3      A.   Yes.
4      Q.   Which means that each of those
5  attorneys -- if they're divided -- on average, those
6  five attorneys then have 84 or more than 80 cases on
7  their dockets?
8      A.   I would say that's pretty close.
9      Q.   Okay.  So even with your taking these
10 additional cases to the level where you're concerned
11 about your own compliance with the ethical rules,
12 the attorneys in your office still have about 80
13 cases on their own dockets?
14     A.   I think that's pretty close across the
15 board.  And understanding that this is a mixture of
16 cases.  It's not -- they're not all serious
17 felonies.  Primarily, they are felony grade
18 offenses, but there are a mixture of misdemeanor and
19 probation violation cases in those numbers.
20     Q.   And those numbers, the 80-plus cases on
21 each of those attorneys dockets, you know, on
22 average, would actually be significantly higher if
23 the Randolph County -- if there weren't this sort of
24 vague -- what's happening in the Randolph County
25 prosecutor's office?

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-10   Filed 02/21/18   Page 26 of 56

## Page 101

1    A.  If -- and I would -- if Randolph County
2  was filing cases at the rate in which has typically
3  historically been done, we would be in a very
4  different situation.  We would probably be back to
5  the wait list and looking at ways to handle the
6  volume.
7    Q.  And, again, you -- although you can't
8  predict because you don't charge me, you
9  anticipate that that is going to -- that the
10  Randolph County prosecutors are going to pick up
11  cases at some point?
12    A.  I think historically it would -- I would
13  agree that the numbers are going to increase.
14    Q.  Okay.
15    MR. SCHERZER:  Can we go off the record,
16  just take a quick break for a second?
17    VIDEOGRAPHER:  The time is 11:13 a.m., and
18  we are off the record.
19    (A recess was taken.)
20    VIDEOGRAPHER:  The time is 11:21 a.m., and
21  we're back on the record.
22    MR. SCHERZER:  So thank you very much, Mr.
23  Guinn.  That's all of the questions I have for you.
24
25

## Page 102

1    CROSS-EXAMINATION
2  BY MR. RAMSEY:
3    Q.  I have a handful of questions.  Again, my
4  name is Steven Alan Ramsey, and I represent
5  Governor Greitens and the State of Missouri.  I will
6  try not to interrupt you as you're answering various
7  questions.  Sometimes I get impatient, so I
8  apologize in advance for that.
9    Before you attended law school, was there
10  a gap between your undergraduate degree and law
11  school, or did you go straight through?
12    A.  There was a gap.
13    Q.  And what did you do during that gap?
14    A.  I worked for Brady's Columbia Glass and
15  Paint Company.
16    Q.  What type of work was that?
17    A.  I ran construction jobs for Brady's.  They
18  were a commercial glass installation company.
19    Q.  And your undergraduate degrees, what was
20  it in?
21    A.  Agriculture economics.  I actually did law
22  school and undergrad at the same time.
23    Q.  Wow.  I wish they had that nowadays.
24    Turning to your history of supervision, if
25  you will, as a partner at the firm, I presume you

## Page 103

1  supervised a number of attorneys that were in the
2  firm?
3    A.  Actually, I did not.  I had my own
4  practice.  I did supervise -- I had four legal
5  assistants, so I -- they were who I supervised.
6    Q.  And if I understood your testimony
7  correctly, in your current position as a district
8  defender, you're more of a hands-on supervisor.
9    A.  I think that's fair, yes.
10    Q.  In what ways would you describe yourself
11  as being hands-on?  I know you mentioned that you
12  have a very open-door policy in a small office.  Are
13  there any other ways that you train or mentor the
14  attorneys that you supervise?
15    A.  We do have monthly staff meetings.  In
16  those staff meetings, we look at cases, we talk
17  about -- if they have upcoming trials, where they're
18  at in their trial preparation, and we also try to
19  review what we believe to be important cases that
20  might have come out of the court of appeals.  So far
21  as my observations of the lawyers, I think -- it's
22  fortunate that I do have a large number of cases,
23  because I'm in court with most of them at least once
24  or twice a month because we have the same dockets.
25  So I get to have the opportunity to see how

## Page 104

1  individual attorneys are handing a specific docket
2  or how their -- kind of how their cases are
3  progressing through a docket.
4    Q.  And if you do not have an answer to this
5  next question, that's fine.  Do you have a sense of
6  whether the way you supervise attorneys in your
7  offices differ similar to any district defenders
8  that you know?
9    A.  I don't know.
10    Q.  Turning to the e-mail that you sent -- I
11  believe it was mentioned about once a week -- when
12  did that process begin?  Was that alongside the
13  October letters that you sent out, or has that been
14  a process that you've done for some time?
15    A.  The e-mails to the lawyers regarding their
16  caseloads, that started in October.
17    Q.  And it's still going on today -- or
18  currently presently?
19    A.  Yes.
20    Q.  And in your office, are you the one to
21  decide how cases are assigned, or do you give that
22  responsibility to another staff member?
23    A.  Each lawyer is assigned a county.  The
24  lawyer that is assigned that county is responsible
25  for reviewing the applications that are presented in

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 105

1    that county, and then they give those applications
2    to the legal assistant who opens the cases and
3    enters their appearance. The only time that I
4    become involved, generally, in that practice has to
5    do if it's a sex offense or if it's a B felony
6    offense that's a violent felony or a murder, then
7    the attorneys will come and talk to me about the
8    case so that I'm aware of it, and then a decision is
9    made as to who will be assigned that case.
10    **Q.   And so if I understood you correctly, your**
11    **attorneys in the various counties, they're the first**
12    **line, if you will, in terms of the screening for the**
13    **applications for public defender services?**
14    A.   That's correct.  And I will caveat that.
15    There will be times when applications are faxed into
16    the office or people may come into the office, and
17    then the legal assistants will review those.  If
18    they have questions, they'll come see me or some
19    other attorney, but since the legal assistants have
20    been trained as to the guides for determining
21    representation, they are allowed to make a
22    determination if we're going to accept a case, and
23    if they don't know, then they will come and ask a
24    lawyer.
25    **Q.   Aside from the application itself -- and I**

## Page 106

1    **believe I've seen a second sheet that provides some**
2    **guidelines on determining indigency.  Does your**
3    **office or do you personally have any type of an**
4    **independent verification system, or do you, by and**
5    **large, rely on the application itself?**
6    A.   Well, the process we use -- and I guess
7    the short answer is, yes, we rely on the
8    application.  The application is reviewed.  If it is
9    incomplete, then the client is contacted.  If
10    it's -- if it is a situation where they simply just
11    sign their name and sign the application, that will
12    probably be denied, since they've not -- they're not
13    filing out the application completely.  If the
14    individual completes the application, primarily, and
15    signs it that they have done so, then I'm going to
16    rely on what they've put in their application, and
17    further investigation is not going to happen,
18    probably.
19    **Q.   And do you have a sense for -- this isn't**
20    **a term of art, but the rejection rate for applicants**
21    **or the indigency rate -- do you have a sense of how**
22    **often your office rejects applications?**
23    A.   I don't have numbers or percentages.  Do
24    we accept -- I can say we accept more applications
25    than we reject.  We do reject applications, again,

## Page 107

1    primarily based on the criteria that they will
2    either list an asset that takes -- that makes them
3    ineligible or they will list an income that makes
4    them ineligible.  And in those situations, we will
5    send a -- a rejection letter, denial letter to that
6    individual advising them that they do have the right
7    to request an indigency hearing with the circuit
8    judge, and many times, people do, and then the judge
9    will make a determination as to whether or not he's
10    going to appoint in some case.
11    **Q.   Switching gears slightly, the two**
12    **attorneys that you have assigned to Randolph County,**
13    **those two attorneys came to you, whether it was --**
14    **it was shortly after the Hinkebein decision, or**
15    **whenever the date occurred, they came to you and**
16    **said, Hey, we're really slammed, could you not**
17    **provide us any more cases.**
18    A.   In -- that's not exactly how it happened.
19    I -- I sent an e-mail out to all of the lawyers to
20    say, you know, they've all -- they had all seen the
21    Hinkebein decision, and I said, you know, we need
22    to -- I need to know from you if you are in a
23    position where you don't feel that you can meet the
24    standards of representation, and you need to tell
25    me, and I -- and I -- as part of that e-mail, I

## Page 108

1    said, you know, don't do it by this e-mail; you'll
2    come and see me individually.  Because I -- I didn't
3    want to be in the position where people didn't
4    feel -- or they felt it would be a negative impact
5    on their employment if they said, Hey, I need some
6    help.  And so those lawyers individually came and
7    talked to me.
8    **Q.   And was that before or after these letters**
9    **that were sent to the various judges in your**
10    **district?**
11    A.   I believe that I sent the e-mails pretty
12    close to the same time.  So I'm going to say that
13    they were probably -- the letters to the courts were
14    probably sent out first, and then the e-mails were
15    sent -- or contemporaneously.  I mean, it was all
16    very close in time, but which came first, I can't
17    tell you.
18    **Q.   And so turning to Plaintiff's Exhibits 29,**
19    **30, and 31, I'm going to be speaking about them**
20    **generally.  So you sent these letters around the**
21    **same time you sent the e-mail to your attorneys**
22    **asking -- or at least in the hindsight of the**
23    **Hinkebein decision?**
24    A.   Correct.
25    **Q.   And am I understanding each of these**

ALARIS LITIGATION SERVICES
www.alaris.us    Phone: 1.800.280.3376    Fax: 314.644.1334

## Page 109

1  letters -- and we can look at them one at a time, if
2  we have to, but at the time you sent these letters,
3  there was a belief by yourself or by the attorneys
4  that you supervise that they were all operating
5  outside of the rules of professional conduct.
6      A.  There was a belief on my part that they
7  were.  Quite frankly, I expected every lawyer in my
8  office to come into me and say, I've got a problem.
9  That didn't happen, but didn't change the fact that
10  I still met and talked with them about their
11  caseloads.  One of the motivating factors behind
12  this was my belief that there was -- that I was
13  going to have every lawyer in my office contact me,
14  and I believe that my office is a part of the court
15  system and that we've got an obligation to be up
16  front with the judges, and I've always maintained
17  that -- tried to maintain that kind of relationship.
18      So these letters were sent out to the
19  judges so -- for want of a better way to describe
20  it -- we didn't blindside them that we have a
21  problem.  I was very pleased that the judges, for
22  the most part, were pretty positive in their
23  response in wanting to accomplish a couple of goals.
24  I think one is to treat the clients fairly, but,
25  also, to make their courts as efficient as they

## Page 110

1  could to try to accommodate.
2      Q.  And you mentioned that you utilize -- I
3  believe it was the Boone County letter as a template
4  of sorts while you were drafting this letter.  And I
5  don't have the Boone County letter in front of me,
6  but what would you say were the major changes?  Was
7  there a change in tone that you thought was more
8  appropriate for your counties or ...
9      A.  I think there -- and, honestly, I don't
10  remember the Boone County letter either.  I think
11  there was a change -- a slight change in tone.  I
12  think that there was some aspects of the
13  Boone County letter that just didn't apply to the
14  courts that my office services, so we took it out.
15      Q.  And turning to your relationship with the
16  Randolph prosecutor, was -- am I understanding your
17  testimony correct to suggest that after this letter
18  was sent, there were no conversations with the
19  Randolph prosecuting attorney in relation to this
20  letter or relation to the caseload work concerns?
21      A.  No.  And we didn't meet -- if there was
22  any kind of conversation, it certainly would have
23  been in passing.  It wasn't something where we were
24  discussing that there was any kind of problem with
25  case levels between the offices or there was no

## Page 111

1  discussion about how many cases he was filing -- the
2  prosecutor's office in Randolph County was filing.
3      Q.  Switching gears again, you testified that
4  your office -- you and your office, pardon me, have
5  been fairly aggressive in filing pretrial motions,
6  and I'm curious where that trend comes from, if you
7  will.  Is that something that you as a district
8  defender has placed an emphasis on, the pretrial
9  motions, or is it just something that the attorneys
10  are doing on their own?
11      A.  It's me.
12      Q.  Okay.  And how have you gone about, I
13  guess, effectuating that custom or that expectation?
14      A.  Early on when a new lawyer -- I mean, I
15  guess it's -- some of it stems from our monthly
16  staff meetings, some of it is generated there.  When
17  new lawyers come into our office, certainly, they
18  receive very good training from the state public
19  defender's office, but I have expectations about --
20  I want them to look at cases and to evaluate that we
21  have a basis for filing a motion to suppress or to
22  do the work necessary to do -- because I believe
23  that's very important in the representation of
24  criminal cases.  We win more cases based on motion
25  work than we do on jury trial work.  And -- so

## Page 112

1  that's where it's come from.  I believe that it's a
2  very important aspect of the cases and that that's
3  work that has to be done.
4      Q.  And, again, if you do not have a sense,
5  it's completely fine, but do you have a sense of
6  whether or not your office is more aggressive in
7  pretrial motions than any other district defender's
8  office --
9      A.  Oh, I don't know.
10      Q.  Okay.
11      A.  I don't know that.
12      Q.  Do you have any rules in place or any
13  expectations concerning the earliest point in
14  representation when you or your attorneys that you
15  supervise may counsel a defendant to accept a plea
16  deal?
17      A.  Yes.  I mean -- and I have to speak in
18  generality.  The general rule is that we don't do --
19  talk about pleas until we have discovery from the
20  state and that discovery has been reviewed and
21  reviewed with the client, and we're not going to
22  talk about offers until we do that.  Sometimes that
23  involves the preliminary hearing.  I'm not big on
24  waving preliminary hearings because I think it's an
25  opportunity for the client to hear the evidence,

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 113

1   it's an opportunity to see the strength of the
2   state's case.  So the general rule is, is that we
3   don't talk about doing any pleas prior to receiving
4   discovery in some form.  There is times when the
5   clients don't want to do that.  There are times when
6   clients have been sitting in jail, and they want to
7   get out, they want to take a deal.  We try to avoid
8   those situations, but, ultimately, it is the
9   client's choice.  And so I do believe that it's
10  necessary that we at least explain what the deal is,
11  what it means before they actually enter into a
12  plea, so I think that is the exception more than the
13  rule.
14      Q.  And out of the ten or so trials that you
15  could recollect within the last fiscal year that
16  your office has tried, do you have a sense or a
17  policy or custom of never sending an attorney into a
18  trial alone?  Said in another way, do you send
19  second chairs to trial?
20      A.  We do, except I'm the one who breaks the
21  rule on that.  I don't typically have a second chair
22  with me because I take my -- I do take the
23  investigator with me.  Again, it depends on the
24  case, but, yes, all of the other lawyers will always
25  have a second chair.

## Page 114

1       Q.  Is that the same for bench trials as well?
2       A.  No.  Bench trials, typically, they will
3   not have a second chair.
4       Q.  Could you help me understand a bit more of
5   the substantial nature of how many cases are
6   dismissed or ultimately disposed of?  I think you
7   testified that a substantial number are dismissed
8   but ...
9       A.  And I do not know statistics on that.
10  It's not something that has been tracked.  I think
11  that's going to change in the future, but we just
12  never tracked it before.
13      Q.  Turning briefly to the previously marked
14  Plaintiff's Exhibit 21.  I believe it's the Missouri
15  State Public Defender Commission fiscal year report
16  type of -- yeah.
17          I'm sorry.  Did you testify that you had
18  seen this document before?
19      A.  I don't think that was -- I don't think
20  that's what I was asked.  They showed me page -- it
21  would be your page 38976 and asked if I had seen
22  that.  I had seen this -- a form of this before.  I
23  can't tell you that it was from 2017, but I've seen
24  it before.
25      Q.  Okay.  And so you've seen information that

## Page 115

1   appears to be like this before?
2       A.  Yes.
3       Q.  But not necessarily for the time listed?
4       A.  It could have been, I'm just not sure.
5       Q.  And in addition, opposing counsel had you
6   look at a number of the numbers in the Moberly
7   column -- or row, pardon me.  Is it my
8   understanding -- did I understand your testimony
9   correctly that you cannot independently verify what,
10  you know, cases initiated means or the percent of
11  capacity is, et cetera?
12      A.  The cases initiated, I understand what
13  that is.  The rest of the criteria here, since I
14  don't -- quite honestly, I don't deal with that, so
15  I don't know what that really means.  Of the cases
16  initiated by fiscal year, I understand what that
17  is -- I mean, because I look at that quite
18  frequently.
19      Q.  Okay.  Now I'm going to shift more into
20  form questions.  Those are my free willing
21  questions, if you will, and so I'm going to take
22  probably 20 steps back.
23          Not in preparation for this deposition,
24  but in terms of conversations you've had concerning
25  caseload or workload concerns, have you spoken to

## Page 116

1   any organizations about those concerns?
2       A.  You mean outside of the Missouri State
3   Public Defender System?
4       Q.  Yes, sir.
5       A.  No.
6       Q.  And I presume, after reviewing the
7   letters, that you've spoken to a number of judges
8   concerning workload and caseload concerns?
9       A.  Yes.
10      Q.  Have you talked to the press at all?
11      A.  No.
12      Q.  Okay.  Do you have any public defenders
13  that are on call 24/7?
14      A.  No.
15      Q.  Have you, while being at the Missouri
16  State Public Defender System, ever been denied a
17  deposition that you felt was necessary for your case
18  due to funding?
19      A.  No.
20      Q.  Have you as a supervisor ever denied a
21  deposition request from one of the attorneys that
22  you supervise on the account of lack of funding?
23      A.  No.
24      Q.  Are the same answers true for expert
25  testimony?  Have you ever been denied an expert when

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 117

1    you thought an expert was necessary for your case?
2        A.  No.
3        Q.   Have you ever denied an expert testimony
4    to one of the attorneys that you supervise that they
5    felt were necessary to their case?
6        A.  Based on funding?
7        Q.   Based on funding.
8        A.  Not based on funding.
9        Q.   Since joining the public defender system,
10   caseloads and workloads have been a persistent
11   concern.  Am I understanding your testimony
12   correctly on that front?
13       A.  Yes.
14       Q.   And as a district defender, it's my
15   understanding that you have discretion to implement
16   local policies or local trainings or things to
17   supervise and run your office.  Is that also
18   correct?
19       A.  Yes.
20       Q.   Have you instituted any new policy -- any
21   new local policies for your office since becoming
22   the district defender?
23       A.  No.  I mean, all of our policies are based
24   off of the policies and procedures manuals that --
25   from the -- that the state office has put together.

## Page 118

1    Any policies in my office, so far as individuals,
2    you know, would be something like, you know, you
3    have to be at work at 8:30, you take -- you know,
4    when you go to lunch, those kind of things, but
5    those aren't written policies because -- I mean, we
6    use the state guidelines as the basis.
7        Q.   And turning to timekeeping.  When you were
8    at the private firm, were you under a billable hours
9    type of a system where you would track time, you
10   know, in either five-minute increments or by task or
11   10-minute increments?
12       A.  Yes.
13       Q.   And so you have some experience with that
14   timekeeping -- or timekeeping to that extent?
15       A.  Yes.
16       Q.   Since being the district defender, it's my
17   understanding that the public defender system has
18   gone through periods of tracking time.
19       A.  Yes.
20       Q.   Aside from yourself, was there anyone else
21   who was tracking or managing how the attorneys were
22   tracking time while you were in the timekeeping
23   periods?
24       A.  I'm not sure how that information was
25   used.  When we were tracking time, we -- everyone in

## Page 119

1    the office -- I mean, lawyer-wise did track their
2    time.  How that information was used after our --
3    after we tracked the time, I do not know how --
4    what -- how it was used.
5        Q.   Currently, are you tracking time in
6    five-minute increments?
7        A.  No.
8        Q.   And so the extent of your timekeeping now,
9    is it simply just the -- how many hours an attorney
10   has worked per day, essentially?
11       A.  Yes.
12       Q.   Do you have a sense for when the last
13   period of the five-minute tracking of time occurred?
14   And if you don't, that's more than fine.
15       A.  I can't tell you when we stopped doing
16   that.  My recollection is it was, like, December of
17   2016, but I could be way off.  I know we're not
18   doing it now.
19       Q.   Got it.  And this is a foundational
20   question I should have asked a long time ago.  What
21   is your understanding of how your district and how
22   your office measures a case?  And so when I say "a
23   case," what does that entail to you?
24       A.  It's based primarily on the court cases.
25   Each individual -- in other words, an individual, if

## Page 120

1    they have three cases -- what I would call three
2    cases, that's because they have three different case
3    numbers assigned to the court, there are three
4    separate cases.  So that's when we open a case
5    for -- if an individual has multiple charges filed,
6    then they have multiple cases in my office.
7        Q.   Are you aware of the Chapter 600.063
8    motion for caseload conference?
9        A.  I'm aware of it.  We have not utilized
10   that.
11       Q.   And is there a particular reason why you
12   haven't utilized that, or is the reason because you
13   sent the letters and the issue was resolved shortly
14   thereafter?
15       A.  Well, we haven't -- I don't -- in my
16   opinion, I don't believe we have got to that point
17   where we would do that.  I can't predict what the
18   future will bring, but it -- but I did not do that
19   initially because I wanted -- we were trying to
20   handle it, I suppose, informally with the courts.
21       Q.   How many times have you as a district
22   defender been judicially determined to have provided
23   ineffective assistance of counsel?
24       A.  I don't think I have yet.
25       Q.   And do you have a sense for any of the

**ALARIS LITIGATION SERVICES**
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-10   Filed 02/21/18   Page 31 of 56

## Page 121

1  attorneys that you've supervised while being a
2  district defender have been judicially determined to
3  have provided ineffective assistance of counsel?
4      A.  I know that Robert Flemming has.  I don't
5  believe any -- and none of the other lawyers in my
6  office have had that determination made yet.
7      Q.  And Mr. Flemming was the person who has
8  the most experience aside from yourself?
9      A.  Yes.
10     Q.  You're also tasked with managing the
11 budget overall of your district; is that correct?
12     A.  That's not correct.
13     Q.  That's not correct.  Have you ever run out
14 of money that's been -- I don't know if appropriate
15 is using the appropriate word, word but it's been
16 given to your district?
17     A.  I don't know.  I have -- I know we track
18 the office budget, and to the best of my
19 recollection, we've never ran over, but I really --
20 certain items like phones and those type of
21 things -- I mean, I don't have any control over
22 that -- those budget amounts.  So I suppose it could
23 be a possibility that those went over budget.
24     Q.  And you've never had to request a
25 supplemental budget to get through the fiscal year?

## Page 122

1      A.  No.  No.
2      MR. RAMSEY:  No further questions.
3          CROSS-EXAMINATION
4  BY MS. SHIPMA:
5      Q.  I just have a couple of ...
6      Ed, so what does your local office budget
7  cover?  What items are included in that?
8      A.  Well, telephones, rent, you know, postage.
9  There is a local item for Internet service, there
10 is -- I mean, that budget is compiled by, I believe,
11 Kathy Lear, and that's based on, I think, historical
12 numbers.  And most of it is items that I have no --
13 the local office doesn't have any control over
14 because they're -- I don't want to use the word
15 "fixed expenses," but they -- rent is a number
16 that -- it is what it is, and it doesn't change with
17 the passage of time.
18     Q.  Okay.  And with respect to rent, does the
19 county not provide your office space?
20     A.  They do.  And I just put -- I'm assuming
21 that the county -- yes.  The county pays for it, but
22 I -- you know, I'm assuming that's just part of the
23 overall budget.
24     Q.  Okay.  And is there some system whereby
25 funds are transferred to your office from Kathy Lear

## Page 123

1  or from the state office?
2      A.  There's not --
3      Q.  Let me ask you -- do you get any cash?
4      A.  No.  There's -- no money comes into our
5  office.  No funds -- any funds that are expended by
6  our office I -- such as depositions, expert
7  expenses, those type of expenses are reviewed by the
8  attorney that requested them, then reviewed by me
9  and approved, and then those bills are sent to
10 the -- to the -- as I call it, the home office, and
11 they're reviewed by management and then paid out of
12 there.  We have -- the local office has no funds
13 with which they pay for anything.
14     Q.  So to ask if you ever run out of funds,
15 you may overspend in an item that's allocated to
16 you, but you don't have any funds, really, to run
17 out of; is that correct?
18     A.  That's a better description than how I
19 described it, yes.  We have no funds to run out of.
20     MS. SHIPMA:  Okay.  Thanks.
21         REDIRECT EXAMINATION
22 BY MR. SCHERZER:
23     Q.  I just have a couple of questions,
24 Mr. Guinn.
25     In terms of the indigency determinations,

## Page 124

1  is it fair to say that time spent -- time that you
2  or your -- the attorneys in your office spend on
3  investigating whether someone has stated their
4  income accurately, as an example, is time that you
5  then couldn't spend on existing client's cases?
6      A.  Yeah.  I think that's fair to say.  I
7  mean, we do not do extra investigation if a client
8  completely fills out the application because that
9  individual is saying that I have accurately stated
10 and completed this -- the information in the
11 application, so I rely on that.
12     Q.  And because -- just by the nature of time
13 being a finite measure in this world, we -- any time
14 you spend on investigating that is time you could
15 not -- you would not spend on --
16     A.  That's true.
17     Q.  -- case work; is that right?
18     All right.  And is the same true for
19 something like depositions?  Say, that time spent --
20 that time spent taking a deposition in one case is,
21 of course, time that you -- if you have 79 other
22 cases, is time that you then cannot devote to those
23 cases, at least on that particular day when you're
24 doing a deposition.  Is that fair?
25     A.  That's true, yes.

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-10   Filed 02/21/18   Page 32 of 56

## Page 125

1   Q. So is that one of the calculations that
2   you need to make -- you and the attorneys in your
3   office need to make when you're thinking about
4   whether to do a day-long deposition, for example, is
5   whether or not that's -- in addition to whether it's
6   good for that client and that case, whether or not
7   you're able to do so without harming the other
8   clients on your caseload or the caseload of your
9   line attorneys?
10      A. I think it's a factor. And, again, that's
11  why we're looking at these case numbers and how many
12  cases, because we are attempting to avoid the
13  situation where we neglect one client because we
14  have too much work to do on another client.
15      Q. And you said that you -- when you said
16  that -- I guess that first e-mail to your
17  line attorneys, that you expected that they would
18  come to you and say, We have a problem -- that each
19  of them would come to them, rather than, you know,
20  two out of the five or -- as it turned out, was that
21  expectation that each of them would say they had a
22  problem based on your understanding of their
23  caseload prior to your sending that e-mail?
24      A. Well, certainly, I'm always concerned
25  about the number of cases they had. I thought that

## Page 126

1   I would hear from the other lawyers because of being
2   overwhelmed by the court decision or the -- in the
3   Hinkebein case. I know that they -- the lawyers in
4   my office all read the opinion and were concerned
5   that were they measuring up correctly.
6       Q. Okay. And that was something that was
7   discussed in the office?
8       A. Yes. Yes.
9       Q. Was that directly after the Hinkebein
10  decision?
11      A. Yes.
12      Q. Okay. And how do you know that each of
13  them read that -- the decision there?
14      A. Because I printed it off, and they -- each
15  one of them -- and they had to read it and initial.
16      Q. Got it. Okay. So you instructed them to
17  do so?
18      A. Yeah. Because I suppose I was as -- I
19  didn't know anything about the Hinkebein case before
20  that opinion came out, and when I got it and read
21  it, I was quite frankly very concerned about the
22  entire situation, and so that's why -- and I was
23  concerned about the opinion, and I wanted to make
24  sure that all of the lawyers were aware of it.
25      Q. You were concerned about it because of

## Page 127

1   your own concerns about whether the line attorneys
2   in your office were able to comply were their
3   ethical obligations?
4       A. Yes.
5       Q. And how did you hear about the opinion, if
6   you recall?
7       A. I believe the way I heard about it was by
8   e-mail, either from Greg Mermelstein or Michael
9   Barrett. I don't remember which.
10      Q. Okay. And when you -- it sounds like when
11  you got that, what you're saying, sort of, shortly
12  after reading that, your immediate concern was, I'm
13  concerned that the attorneys in my office are not
14  complying with their ethical obligations?
15      A. Yes.
16      Q. Okay.
17      MR. SCHERZER: That's all of the questions
18  I have.
19      VIDEOGRAPHER: The time is 12:02 p.m., and
20  we're off the record.
21      (The deposition concluded at 12:02 p.m.)
22
23
24
25

## Page 128

1               CERTIFICATE OF REPORTER
2
3       I, Lisa Ballalatak, a Certified Court
4   Reporter for the State of Missouri, do hereby certify
5   that the witness whose testimony appears in the
6   foregoing deposition was duly sworn by me; the
7   testimony of said witness was taken by me to the best
8   of my ability and thereafter reduced to typewriting
9   under my direction; that I am neither counsel for,
10  related to, nor employed by any of the parties to the
11  action in which this deposition was taken, and further
12  that I am not a relative or employee of any attorney
13  or counsel employed by the parties thereto, nor
14  financially or otherwise interested in the outcome of
15  the action.
16
17
18  _____
19  Lisa Ballalatak
20  Missouri Supreme Court
21  Certified Court Reporter
22
23
24
25

32 (Pages 125 to 128)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-10   Filed 02/21/18   Page 33 of 56

## Page 129

1
ALARIS LITIGATION SERVICES
2511 Broadway Bluffs, Suite 201
2
Columbia, Missouri 65201
Phone: (573) 449-0561 * Fax (816) 221-1151
3
4
December 28th, 2017
5
MS. JACQUELINE D. SHIPMA
MISSOURI STATE PUBLIC DEFENDER SYSTEM
6
1000 W Nifong Boulevard, Suite 100
Columbia, Missouri 65203
7
8
SHONDEL CHURCH, et al. v. STATE OF MISSOURI, et al.
9
Dear Ms. Shipma:
10
Please find enclosed a copy of the deposition of
Edward Guinn, taken on December 12th, 2017, in the
11
above-referenced case.  Also enclosed is the original
signature page and errata sheet.
12
Please have the witness read this copy of the
13
transcript, indicate any changes and/or corrections
desired on the errata sheet, and sign the signature
14
page before a notary public.
15
Please return the executed signature page and errata
sheet to the Alaris Litigation production department
16
at the addresses listed above within 30 days after
receiving the transcript.
17
Thank you for your attention to this matter.
18
19
Sincerely,
20
21
Lisa Ballalatak
22
cc: Mr. Scherzer
23
24
25

## Page 131

1
STATE OF          )
                  )
2
COUNTY OF         )
3
I, Edward Guinn, do hereby certify:
4
That I have read the foregoing deposition;
5
That I have made such changes in form and/or
6
substance to the within deposition as might
7
be necessary to render the same true and
8
correct;
That having made such changes thereon, I
9
10
hereby subscribe my name to the deposition.
11
I declare, under penalty of perjury, that
12
the foregoing is true and correct.
13
Executed this _____ day of _____,
14
20___, at _____.
15
16
_____
17
Notary Public
18
My commission expires: _____
19
20
_____
21
Edward Guinn
22
23
24
25

## Page 130

1
ERRATA SHEET
2
Witness:  Edward Guinn
3
SHONDEL CHURCH, et al. v. STATE OF MISSOURI, et al.
4
Date Taken:  December 12th, 2017
5
Page #_____  Line #_____
6
Should read: _____
7
Reason for change: _____
8
9
Page #_____  Line #_____
10
Should read: _____
11
Reason for change: _____
12
13
Page #_____  Line #_____
14
Should read: _____
15
Reason for change: _____
16
17
Page #_____  Line #_____
18
Should read: _____
19
Reason for change: _____
20
21
Page #_____  Line #_____
22
Should read: _____
23
Reason for change: _____
24
25
Witness Signature: _____

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-10   Filed 02/21/18   Page 34 of 56

## A

a.m 5:1,4 68:6,9
  101:17,20
Aaron 4:3 5:17
  6:7
ability 16:4 17:21
  45:18 57:19
  77:1 81:16
  89:22 91:16
  98:13 99:8,11
  128:8
able 21:9 24:15
  24:18 29:16
  39:21,22
  46:20 47:25
  48:9 58:21
  59:11 60:1
  73:3 74:24
  77:15 78:20
  78:24 81:11
  83:3 84:8
  88:20 98:1,21
  98:24,25
  125:7 127:2
above-refere...
  129:11
abuse 40:10
accept 44:22
  105:22 106:24
  106:24 112:15
accepting 41:23
access 17:6 19:8
  40:22 67:10
accommodate
  16:3 110:1
accomplish
  109:23
account 55:12
  116:22
accurate 91:15
accurately 7:7
  124:4,9
achieve 51:15
acknowledged
  56:24 57:14
act 44:24

action 24:10
  43:15 128:11,15
actions 22:8
actual 81:20
Adair 15:10 61:5
adapted 43:2
addition 59:8
  72:4 91:11 93:7
  98:18 115:5
  125:5
additional 14:11
  14:16 15:13
  29:6 30:15
  46:21 48:8
  50:1 54:20
  59:16,19 61:20
  73:6,23 86:18
  87:2,6 88:11
  88:25 89:12
  89:13 99:14
  100:10
addressed
  41:19
addresses
  129:16
adds 64:13
adequate 15:24
adequately
  45:18
admit 23:5
advance 102:8
adverse 93:24
advising 48:19
  107:6
advocate 93:12
affect 67:12
afford 17:16,17
afternoon 3:12
age 6:3 92:7,9
agency 57:4
agendas 47:22
aggressive 41:4
  111:5 112:6
ago 6:9 57:18
  119:20
agree 44:14,15
  45:21 91:20

101:13
agreement
  57:22 58:3
agreements
  64:21
Agriculture
  102:21
ahead 7:20
al 1:4,7 3:3,6,19
  3:20 5:5,6
  129:8,8 130:3
  130:3
Alan 4:17 5:21
  102:4
Alaris 3:13 5:9
  5:13 129:1,15
alcohol 26:15
alert 41:21
  42:24
all-day 52:16
alleviate 52:4
  58:24
alleviated 73:21
allocated 25:20
  123:15
allocation 14:20
  15:1
allow 89:23
allowed 105:21
allowing 33:23
alongside
  104:12
alternate 66:2
amount 13:9
  22:22 37:4
  96:22
amounts 121:22
and/or 129:13
  131:5
anecdotally
  15:6
answer 7:7,12
  7:18,20,21 8:1
  27:13 79:11
  87:11 104:4
  106:7
answering 7:16

102:6
answers 116:24
Anthony 4:7
  5:19
anticipate 101:9
apologize 102:8
appeal 96:7,9
appeals 19:16
  103:20
appear 31:21
  36:14
appearance
  37:12,21 38:12
  38:15,19 105:3
appearances
  4:1 35:15,19
  56:19
appearing 38:17
appears 39:3
  115:1 128:5
appellant 96:8
  96:12
applicants
  106:20
application
  31:18 36:6,7
  39:7,21
  105:25 106:5
  106:8,8,11,13
  106:14,16
  124:8,11
applications
  20:6 36:18,19
  39:5 40:6
  49:6 104:25
  105:1,13,15
  106:22,24,25
applied 11:16
  80:20
applies 85:16
  86:12,13
apply 37:10
  46:11 81:4
  86:15 110:13
appoint 34:13
  58:7 107:10
appointed 33:5

34:5,10,11
  56:23 57:24
  67:20,20,22
appointing
  56:20,25
  57:2
appointment
  33:2
appointments
  26:13
appreciate
  98:17
approaches
  83:11
approaching
  77:15
appropriate
  110:8 121:14,15
approved 69:4
  123:9
approximately
  9:4 11:22 14:8
  14:16 15:3,9
  29:13 34:25
  64:20 65:3
  99:25
area 8:24 9:9
  9:10,14 11:10,11
  13:3,4 27:7
  42:18 43:9
  47:24 53:24
  55:18 58:24
  61:3 62:24
  67:6 70:12
  73:11 85:19
  89:5 97:17
areas 16:25 17:2
  34:8 60:25
  69:24 83:20
argumentative
  80:17
armor 23:19
arrangement
  17:10
arrays 95:18
arrest 37:6
arrested 35:20

ALARIS LITIGATION SERVICES
www.alaris.us        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-10   Filed 02/21/18   Page 35 of 56

36:4,23 37:8
37:9
art 106:20
ascherzer@or...
4:5
aside 15:13
16:14 105:25
118:20 121:8
asked 99:18
114:20,21
119:20
asking 7:18,22
20:4 27:5,5
108:22
aspect 94:14
112:2
aspects 52:3
82:13 92:20
110:12
aspiring 51:15
assessment
96:23 97:1
asset 107:2
assign 22:15
24:25 47:8
87:11 88:14
assigned 21:22
24:11 28:19,22
28:25 45:10
48:16 58:20
59:21 74:5
88:21 104:21
104:23,24
105:9 107:12
120:3
assigning 45:16
87:6
assist 26:7,9,15
40:5 56:19,20
57:3,4 58:11
59:2
assistance 12:1
21:8 120:23
121:3
assistant 4:17
9:7,13 11:11,11
18:20 62:24

73:15 105:2
assistants 26:5
26:6 103:5
105:17,19
associate 10:13
10:16 11:5 42:2
42:4
assume 47:9
assuming 33:4
122:20,22
attached 2:14
attempting
125:12
attended 102:9
attention 129:17
attorney 4:17,18
15:25 23:14
25:20 33:19
34:18 35:5,5
38:7 44:9,11
47:8,9 48:16
48:20 51:5
54:16 56:14
59:18,20
60:12 61:18
73:2 74:5
85:14 87:25
96:10,16,25
98:4,9,12
105:19 110:19
113:17 119:9
123:8 128:12
attorney's 19:8
46:14
attorney-client
17:19 82:3,11
attorneys 5:15
7:19 13:17
16:17,20,24
18:1 19:2,10,13
20:1,21 21:17
22:22 23:12
25:11,16 26:2
26:2,24 27:6
28:18,22 32:2
33:7,9,11,12,17
33:25 35:12

39:13 40:1,14
41:2 44:20
45:10,17 46:19
47:15,15 48:5
54:3 59:10
60:25 62:5,6
62:18,18 63:1
63:2,14 64:4
66:23 67:17
67:19,22
70:14 72:1 73:1
73:7,21 74:19
74:23 80:15
80:23 81:11
84:7,12 86:16
86:23 87:7,14
87:15 88:14
89:3 91:8
93:16,17,18
94:4 96:1 97:6
97:16 99:3,5
100:1,5,6,12,21
103:1,14 104:1
104:6 105:7,11
107:12,13
108:21 109:3
111:9 112:14
116:21 117:4
118:21 121:1
124:2 125:2,9
125:17 127:1,13
attorneys' 15:17
attributed 31:17
authority 85:24
87:24 88:2
available 22:20
23:18,25
25:12 38:6
39:25 40:11,14
48:21 88:25
89:4,7
avenues 58:6
average 15:8,11
27:16,24 41:1
100:5,22
avoid 113:7
125:12

aware 43:15
78:8,17 88:4
105:8 120:7,9
126:24

_____

**B**

B 75:7,12,16
76:11,12,17
85:21 105:5
B-a-k-e-r 9:24
back 13:7 18:25
25:11 30:15
56:9 58:13
59:23 63:17
68:10 87:7
88:8 101:4,21
115:22
background
39:15,19
bad 56:25
bail 37:1
Baker 9:20,23
10:3,16,20 11:4
11:8 12:7
Ballalatak 3:15
4:25 5:12
128:3,19
129:21
ballpark 6:24
74:12
bar 47:15 48:7
51:18
Barrett 69:12
127:9
based 31:15,24
39:20 45:24
45:25 46:17
50:6,11 71:13
107:1 111:24
117:6,7,8,23
119:24 122:11
125:22
basis 89:1 111:21
118:6
Bates 42:9
becoming
117:21

begins 45:6
behalf 1:18 6:4
93:13
belief 109:3,6
109:12
believe 10:3
31:24 41:4
43:8 45:9,16
46:2 50:11
51:22 62:2,14
63:18 65:2
77:5,19 79:1,18
79:24,25
80:20 81:13
82:5,6,7,17
83:14 86:11
87:21 90:10
91:10 93:4
94:1,1 99:21
99:22 103:19
104:11 106:1
108:11 109:14
110:3 111:22
112:1 113:9
114:14 120:16
121:5 122:10
127:7
believed 54:18
56:15 57:18
58:10 91:24
believes 50:16
bench 38:22
65:12,13,16,19
114:1,2
best 7:6 12:13
24:12,13 25:1
38:8,10 58:4
84:12 121:18
128:7
better 109:19
123:18
big 28:15 34:8
89:25 92:11
112:23
billable 118:8
bills 123:9
bit 31:19 82:23

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-10   Filed 02/21/18   Page 36 of 56

114:4
blindside 109:20
Bluffs 3:14 5:10 129:1
board 100:15
body 95:3
bond 36:5 37:3 37:4 39:4,7 41:6 66:11
bonding 52:3
bonds 37:11,13 59:6,6
Boone 12:23 43:9 110:3,5 110:10,13
borderline 97:17
bore 7:4
bottom 42:9 44:19
Boulevard 4:13 129:6
Box 4:18
Brady's 102:14 102:17
break 7:24 8:2 68:4 79:9 101:16
breaks 113:20
brief 38:8,9,21 39:23
briefly 114:13
bring 8:17 120:18
broader 31:22
Broadway 3:14 5:10 129:1
Brookfield 15:22 16:2
brother 93:1
brought 37:10 50:18
budget 14:20 72:6 121:11,18 121:22,23,25 122:6,10,23

built 32:9
bulk 60:23
burden 31:23 52:5
busy 91:23

--- C ---

C 86:2,3,4
C(1) 86:3
calculations 125:1
California 4:8
call 17:14,14,14 17:18,22 19:6 26:10,11,12 40:6 59:24 116:13 120:1 123:10
called 76:17
calls 17:4,7
cameras 95:3,4
cams 95:3
capacity 71:2 115:11
caption 42:17 53:23 55:18
care 77:7
career 84:20
careers 84:14
carried 77:20
carry 18:22
carrying 77:23
carryover 32:8
case 1:6 3:5 5:6 6:8 7:6 8:7,10 20:18 22:2,10 22:12,15,18,19 23:18,20 24:9 24:11 28:3,9 30:4 32:10 34:3 37:17 38:3 39:3,8,14 39:17 40:24 43:21 44:22 45:25 46:9 48:21 54:19 58:24 61:24

62:4 65:6 66:7,9,12,21 67:11 70:17 76:1 79:12,16 79:20,21 81:20 82:13 83:1 87:19 88:15,20 89:25 91:5 92:1,8,13 93:21 94:12 96:6,7,11 105:8,9,22 107:10 110:25 113:2,24 116:17 117:1,5 119:22 119:23 120:2,4 124:17,20 125:6,11 126:3 126:19 129:11
caseload 18:22 18:25 19:18,22 21:8 24:17 25:13 27:11 30:9 50:2,8 50:21 60:1 62:9 70:4 71:23,24 72:14 73:9 74:8,9,9 74:15,16,17 76:14,22 77:17 77:19,23 78:19 78:23 79:4 81:15 83:11,18 84:9 86:19 87:2,8 88:4,11 91:14,17 94:7 94:10 97:16,16 99:6,9,11 110:20 115:25 116:8 120:8 125:8,8,23
caseloads 45:12 51:24 52:1 72:9 93:18 104:16 109:11 117:10

cases 6:16,17 8:7 12:16 14:19 14:21,22 15:2 15:3,9,14 19:14 19:14,19 20:4 20:7,9,10,12 20:16 21:7,9,11 21:22,25 22:3 22:6,10,24 23:13,14 24:1 24:9,16,23,24 25:10,12 26:9 27:11,14,15,19 27:19,20 28:6 28:7,10,11 29:3,6,7,10,13 29:16,21 30:10 30:11 31:7,10 32:3,14,18 33:8,9,15,16 33:18,22,24 34:1,6,12,14 35:18 36:21 38:2 40:25 41:22,23 45:16 46:21 47:2 49:10 50:1,5,12 51:4 51:5,6,25 52:11 56:21,24 57:1,6,7,8,11,15 57:24 58:1,23 59:9,11,12,12 59:16,16,19,25 60:5,14,19,24 61:2,4,20,25 62:1,7 64:20 65:22,24,25 67:18 70:20 70:23 72:2,15 72:24 73:10 73:12,21,25 74:2,10,12,18 75:2,5,11,14,17 75:17,19,23,25 76:4,6,8,10,15 77:4,8,10

78:24 79:5 83:4,25 84:10 87:6,6,12,17,18 87:20 88:1,2 88:10,11,14,21 88:23 89:2,3 89:17 90:24 90:25 91:1,13 91:16,19,21 92:3,4,6,7,8,11 92:23 94:18 94:22,25 95:7,14 96:23 97:23 98:14 98:25 99:7,14 99:17 100:1,6 100:10,13,16 100:19,20 101:2,8,11 103:16,19,22 104:2,21 105:2 107:17 111:1,20 111:24,24 112:2 114:5 115:10,12 115:15 119:24 120:1,2,4,6 124:5,22,23 125:12,25
cash 123:3
cause 3:17 88:12
caveat 54:15 105:14
cc 129:22
CCR 4:25
central 1:2 3:2 3:18 5:8 12:24 17:10
certain 3:17 28:18 36:3 56:21 57:15 84:1 121:20
certainly 15:18 18:10 24:4 36:14 38:7 39:9 50:14 52:9 61:22

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-10   Filed 02/21/18   Page 37 of 56

66:10 76:3,13
87:24 94:10
110:22 111:17
125:24
certainty 32:21
**CERTIFICATE**
128:1
**Certified** 3:15
128:3,21
certify 128:4
131:3
cetera 25:10
43:23 115:11
chair 113:21,25
114:3
chairing 61:25
chairs 113:19
chance 41:12
53:11 55:1
change 25:4
31:16 64:9
79:15 109:9
110:7,11,11
114:11 122:16
130:7,11,15,19
130:23
changes 14:12
22:2,3 54:3
55:12 56:8,11
58:16,19 59:7
110:6 129:13
131:5,9
**Chapter** 120:7
charge 101:8
charged 50:17
76:4 83:13
charges 60:3
75:8 120:5
**Chariton** 13:6
13:20 55:9
56:3 58:15
chart 69:23,23
71:12,13
child 75:13,17
76:6
**Chillicothe** 14:15
14:16

**choice** 88:9,10
113:9
**choose** 45:14
**Chris** 4:23 5:12
chronological
92:9
**Church** 1:4 3:3
3:19 5:5 129:8
130:3
circling 88:8
circuit 41:19 42:1
42:25 53:18
55:8,8 107:7
circumstances
83:13 91:1
citizen 67:4
**City** 4:19
civil 6:17 12:8
12:22
clarify 35:23
77:22
class 20:11
classify 12:14,16
75:13 76:15
clear 27:8
47:22
clerk 10:21
client 17:4 24:12
24:19 38:21
38:24 39:3
44:8,25 45:15
47:7 61:13
64:10 66:25
67:3 79:6,20
79:24 80:1
81:5,7,17,18,19
81:21,21,22
82:4,9,12,24
84:3 92:18,21
94:3,20
96:25 106:9
112:21,25
124:7 125:6,13
125:14
client's 24:13
89:22 93:8
113:9 124:5

**clients** 15:17,20
15:22,24 16:3
16:5,7,20,25
17:5,13,23,25
18:23,24 19:18
26:13,15 36:19
37:19 40:3
44:6 45:13,15
45:20 48:8
49:4 51:10
61:12,21 64:1,3
64:6,10 67:5
67:20 74:25
77:1,7,16,25
78:7,21,25
79:8,8,14
81:12,16 83:3
83:5,7,10
87:18 88:13,16
89:19 90:18
92:22 93:11
93:25 96:19
97:10,14 98:2
98:16 109:24
113:5,6 125:8
close 19:9 23:10
74:4 100:8,14
108:12,16
closer 66:8
colleagues
78:9
**Columbia** 3:14
4:13 5:10 11:1
12:15,20
102:14 129:2,6
column 70:15
71:3 115:7
combination
24:23 62:3
94:10
come 11:18 13:7
15:22 18:25
19:10,16 23:19
30:6,8,9 41:23
50:12 87:16
87:25 98:14
103:20 105:7

105:16,18,23
108:2 109:8
111:17 112:1
125:18,19
comes 19:21
22:3 111:6
123:4
coming 8:10
20:6 28:7
63:5
commenced 5:1
commercial
102:18
commission
68:24 69:12
114:15 131:18
committing
87:5
common 95:2
communicate
77:1
communicating
18:4 82:12
communication
17:4,19 18:2
37:24 38:5
77:3
company
102:15,18
compared
30:24
compiled
122:10
completed
124:10
completely
106:13 112:5
124:8
completes
106:14
compliance
56:15 100:11
complicated
16:5 82:14,14
comply 44:11
46:13 86:23
127:2

**complying**
127:14
component
19:15
comptroller
69:15
concern 61:17
89:25 90:6
93:6,7,10,23
117:11 127:12
concerned
14:14 49:13
52:24 83:17
83:18,21 84:7
86:20 88:12
88:15 89:17
93:9 99:8,10
100:10 125:24
126:4,21,23
126:25 127:13
concerning
112:13 115:24
116:8
concerns 62:8
73:7 77:14
87:3 88:5
89:8,9,11
97:15,18,25
110:20 115:25
116:1,8 127:1
concluded
127:21
conduct 44:12
44:21 45:11
46:15,16 47:10
47:17 80:6,19
81:11 83:12
84:2 85:8,9
86:1,7,8,8,24
93:12 109:5
conference
120:8
confidence 82:1
82:20
confidential
16:19,22,24
17:1,18 18:1

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-10   Filed 02/21/18   Page 38 of 56

95:4
confirm 25:6
conflict 14:12,19
   14:21 15:1,2,7
   15:9,14 44:4
   45:13,17 61:10
   61:19 62:10,11
   67:18 73:20
   73:24 74:2
   87:19
conflicted 60:9
conflicting
   22:16
conflicts 14:14
   60:10
conforms 86:1
confusing 87:9
consequences
   66:24
consideration
   73:14 92:11
   97:21
considerations
   89:17
constitutional
   57:2 90:1
construction
   102:17
contact 18:24
   19:12,25 37:18
   37:24 38:8,10
   38:11,20 79:6
   81:17,19,21,22
   82:3,6,10
   83:2 109:13
contacted 51:23
   106:9
contacts 84:3
contemplating
   50:24
contemporan...
   108:15
context 96:3
continuances
   93:19,24 94:5
continue 77:23
   79:4 83:19

continues 78:19
   78:23 87:4
   97:25
continuing
   29:10
contribute 94:2
   94:2
control 121:21
   122:13
conversation
   38:24 39:23
   52:21 59:2
   110:22
conversations
   110:18 115:24
Cooper 12:24
copy 129:10,12
correct 8:16
   9:17 11:6 13:14
   13:15 17:20
   18:5 19:23
   23:22 24:14
   25:5,7,18
   30:10 39:24
   47:4,12,19
   48:3 53:22,25
   59:20 62:22
   75:3 80:9
   92:2 94:8
   105:14 108:24
   110:17 117:18
   121:11,12,13
   123:17 131:8,12
corrections
   129:13
correctly 103:7
   105:10 115:9
   117:12 126:5
corruption
   68:15
counsel 8:12,14
   37:25 51:17
   67:14 78:5
   112:15 115:5
   120:23 121:3
   128:9,13
counties 13:3,6

13:10,13,21,22
   14:6,13,13
   15:21 17:9
   22:14 28:20
   34:5 35:17
   36:3,11,13,16
   36:21 56:3,5
   56:5 58:16,17
   67:21 74:4
   87:8 95:11
   105:11 110:8
counting 63:4
county 12:24
   13:19,20,22
   13:23 14:6
   15:8,10,21 16:6
   17:1 28:8,15
   28:25 29:6
   31:6,13,17 33:4
   35:25,25
   41:20,25 42:3
   42:4 43:9
   45:10 46:25
   49:19 51:3,4
   51:21 52:20
   53:18 54:2,3,6
   54:10,13,15,17
   55:9,9,11,23
   55:25 56:10
   56:12,14,15
   58:15,21 59:10
   59:13,16,18,21
   60:19 61:5,5
   61:18 62:6
   72:21 73:3
   88:19 100:23
   100:24 101:1
   101:10 104:23
   104:24 105:1
   107:12 110:3,5
   110:10,13 111:2
   122:19,21,21
   131:2
couple 17:9
   28:4,12 32:18
   35:4 36:1 47:5
   68:3,4 76:5

109:23 122:5
   123:23
course 7:8,17,21
   24:20 64:9
   77:9 93:6,8
   124:21
court 1:1 3:1,16
   3:18 4:24 5:7
   5:11,25 7:11,14
   15:20 19:16
   22:18,18 26:8
   34:13 36:9,15
   37:12,21 38:1,1
   38:2,20,21,22
   44:3 50:18
   51:20,25 52:1
   52:3,10,15
   56:18,18,19
   59:3,6,7 61:9
   63:19 82:14
   96:24 103:20
   103:23 109:14
   119:24 120:3
   126:2 128:3
   128:20,21
courthouse
   13:21 14:3,7
   16:1,19
courthouses
   13:16,17,22
   22:15 38:6
courts 12:20
   67:21 108:13
   109:25 110:14
   120:20
cover 15:15
   22:18 56:4,5
   68:14,15,16
   122:7
covers 13:9
   28:20 56:3
create 15:13,16
   45:17
created 90:7
crime 59:25
crimes 76:16,19
criminal 11:15

12:7,8,11,12,23
   50:17 66:25
   82:15 98:4
   111:24
criteria 73:11
   107:1 115:13
critical 83:1
Cross-Examin...
   2:4,5 102:1
   122:3
Cullen 10:19,21
   10:24
Cumulative
   70:3
curious 111:6
current 8:23
   19:15 21:8
   45:12,19 60:1
   77:17 83:19
   91:5 103:7
currently 25:23
   27:14 45:10
   59:20 75:10
   78:23 87:3
   99:18 104:18
   119:5
custody 16:6,8
   16:15,16,23,25
   17:15,25 49:9
   49:11,14 52:25
   53:2 64:14,15
   81:25 89:10
custom 111:13
   113:17
Cynthia 42:3

---

D

D 4:12 129:5
daily 19:11,12
   26:23 91:7
database 40:23
date 3:13 5:3
   30:19 36:9,15
   45:6,9 70:6,9
   107:15 130:4
dated 42:6
   53:16 55:6

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-10   Filed 02/21/18   Page 39 of 56

day 3:10 30:7,7 30:9,11 36:13 36:22 54:11 119:10 124:23 131:13
day-long 125:4
day-to-day 18:18
days 22:16 25:3 36:24 129:16
deal 17:21 76:20 112:16 113:7,10 115:14
deals 64:21
Dear 129:9
decades 35:4 98:22
December 1:19 3:11 5:3 32:16 32:17 119:16 129:4,10 130:4
decide 104:21
decided 11:18
decision 12:2 43:19,22 46:6 46:9 47:23 61:9 105:8 107:14,21 108:23 126:2 126:10,13
decisions 19:15 98:15
declare 131:11
decrease 31:14 32:5
dedicated 24:4
defendant 47:2 112:15
defendants 1:8 3:7,21 4:11 5:24 48:15,18 50:17 89:13
defender 4:12 8:22,24 9:7,14 9:15 11:12,19 13:2 18:17 42:18 43:16

44:10 47:1 53:24 55:19 57:18 62:25 62:25 63:16 63:25 67:9,24 68:24 69:25 70:3 72:14 80:18 86:14 87:15 89:5,14 103:8 105:13 111:8 114:15 116:3,16 117:9 117:14,22 118:16,17 120:22 121:2 129:5
defender's 34:24 46:12 56:21,25 57:3 57:19 58:8 83:23 98:5 111:19 112:7
defenders 18:21 27:8 34:21 47:25 73:16 78:9,13 80:13 80:14,14,22 85:13 104:7 116:12
deferred 66:5
degree 102:10
degrees 102:19
demand 74:24
denial 107:5
denied 96:6 106:12 116:16 116:20,25 117:3
department 129:15
depend 66:9
dependent 66:21 79:13
depending 15:6 18:9 36:22 39:7
depends 21:15

22:13 32:22 51:4 66:10 95:10 113:23
deposed 6:12
deposes 6:4
deposition 1:17 3:9 5:1,4,9 7:12 8:6,12 27:4 41:9 53:8 54:23 115:23 116:17,21 124:20,24 125:4 127:21 128:6,11 129:10 131:4,6 131:10
depositions 6:21 7:2 26:12 26:17 94:15 123:6 124:19
deputy 95:21
describe 19:1 35:15 74:1 103:10 109:19
described 12:13 15:16 18:6,17 39:23 60:24 67:19 77:9 87:2 91:7 123:19
describing 39:1
description 123:18
designated 63:16
desire 40:4
desired 129:13
despite 25:8,9 90:6 98:3
details 39:14,17
determination 36:20 51:8 91:3 92:2 105:22 107:9 121:6
determinations 123:25

determine 21:23 24:17 36:7 40:23 49:7 54:17
determined 120:22 121:2
determining 105:20 106:2
detriment 45:15
detrimental 89:21
Detroit 63:23
develop 82:2 84:15
devote 124:22
differ 35:18 104:7
difference 80:17
differences 37:18 95:11
different 31:7 34:4 36:2 81:23 95:6 101:4 120:2
differently 36:12
difficult 82:15
diligence 44:24
diligent 24:5 51:16
direct 2:3 6:5 7:20 85:23
direction 128:9
directly 126:9
director 69:12 86:13
disappearing 89:20
Disciplinary 78:5
discipline 48:1 51:18
discovery 112:19 112:20 113:4
discretion 117:15
discuss 8:12

discussed 50:3 52:8 97:24 126:7
discussing 85:10 97:18 110:24
discussion 50:19 52:2,14 54:16 56:17 57:13 59:5 87:22 90:23 91:2,3 111:1
discussions 19:17
dismiss 41:5 66:16,17
dismissals 66:2 66:3,4
dismissed 65:24 114:6,7
disposed 114:6
dispositions 66:3,5
dissatisfied 92:24
distance 13:10 15:13,15 22:14 59:4
distances 22:17 73:17
distracted 31:19
distribution 76:18
district 1:1,1 3:1,1 3:18,18 5:7,8 8:24 9:15 13:2 18:17 42:18 53:24 55:18 62:25 72:14 78:9,13 80:14 85:18 86:13 87:16 88:5 89:4 95:14,25 103:7 104:7 108:10 111:7 112:7 117:14,22 118:16 119:21

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-10   Filed 02/21/18   Page 40 of 56

120:21 121:2,11
121:16
**districts** 69:24
**divided** 100:5
**division** 1:2 3:2
3:19 5:8
63:24 96:8,12
**docket** 15:2
60:17 62:8
72:21 76:9
77:11 104:1,3
**dockets** 52:12
52:17 56:18
100:7,13,21
103:24
**document** 85:1
114:18
**documents** 8:17
**doing** 33:20
47:16 94:6
111:10 113:3
119:15,18
124:24
**door** 22:3 28:7
**drafted** 42:20
42:22
**drafting** 110:4
**drive** 5:10 16:12
18:11,15
**driving** 73:16
95:21
**drug** 26:15 40:5
57:5,16,20
58:7 76:17
**drug-related**
76:16,19
**due** 50:9 116:18
**duly** 128:6
**duties** 86:21
**duty** 81:9
**dynamic** 22:1
25:3 51:1 94:11

— **E** —

**e-filings** 26:8
**e-mail** 20:2,3
20:20,23,24

104:10 107:19
107:25 108:1
108:21 125:16
125:23 127:8
**e-mails** 104:15
108:11,14
**earlier** 28:18
32:25 39:23
50:4 85:10
**earliest** 112:13
**early** 66:8,12
111:14
**easier** 56:20
**easily** 32:22
**economics**
102:21
**Ed** 5:4 122:6
**Edward** 1:17 3:9
6:2 42:18
53:24 55:18
129:10 130:2
131:3,20
**effect** 64:2,6
76:24
**effective** 24:18
45:14 51:16
78:20,25
79:20,23 81:6
82:8 84:16
90:2 98:15
**effectively**
20:17 60:2
82:8 83:3
94:18,19
**effectuating**
111:13
**efficient** 52:4,13
52:15 56:18
109:25
**efforts** 58:4
85:25
**eight** 3:11 92:10
92:14
**Eighty** 27:20
**either** 19:17
22:6 23:14
36:17 39:14

40:8 45:19
50:14 66:1
73:6 77:14
88:10 97:15
107:2 110:10
118:10 127:8
**election** 32:24
**electronic** 42:14
42:16 53:20
55:17
**eligibility** 49:7
**eligible** 89:13
**emotionally**
92:22
**emphasis** 111:8
**employed** 8:21
44:9 46:12
81:1 128:10,13
**employee**
128:12
**employment**
108:5
**enclosed**
129:10,11
**ends** 51:14,15
**ensure** 48:4
71:25 74:23
81:10 85:25
86:22
**ensuring** 47:24
**entail** 119:23
**enter** 33:23
113:11
**entering** 47:2
**enters** 105:3
**entire** 10:5,7
96:20 126:22
**entitled** 79:15
**entry** 47:14
**environment**
82:15
**errata** 129:11,13
129:15 130:1
**especially** 89:9
**essentially**
119:10
**established**

85:12
**estimate** 27:16
64:22 65:18
**et** 1:4,7 3:3,6,19
3:20 5:5,6
25:10 43:23
115:11 129:8,8
130:3,3
**ethical** 61:17,21
62:8 72:1 73:7
74:24,24
77:16,25 81:4
81:12 84:8
87:5 88:13,16
90:17 91:5
100:11 127:3,14
**ethically** 46:20
59:11,18 62:2
91:12 92:3
98:1,21,24
99:9
**evaluate** 66:24
67:10 111:20
**evaluation**
90:14
**evaporating**
92:19
**eve** 66:8
**evidence** 92:18
112:25
**exactly** 107:18
**Examination** 2:1
2:3,6 6:5
123:21
**examined** 3:10
6:3
**example** 15:22
42:24 52:7,7
124:4 125:4
**exception**
113:12
**exceptions** 17:9
**excess** 72:23
77:3
**exclude** 76:14
**executed**
129:15 131:13

**exhibit** 2:10,11
2:12 41:7,8,9
41:14,15 53:7,8
54:7,22,23
55:22 56:9
58:14 68:13
69:22 84:23
84:25 114:14
**exhibits** 2:8,9
2:14 55:14
68:4 108:18
**existing** 30:11
45:13 61:21
124:5
**expand** 14:10
**expect** 31:16
32:15,17 33:1
50:22 96:25
**expectation**
111:13 125:21
**expectations**
111:19 112:13
**expected** 109:7
125:17
**expended**
123:5
**expenses**
122:15 123:7,7
**experience**
31:21 35:1,2,4
35:7 46:18
91:25 98:4,13
98:19,23,24
99:4 118:13
121:8
**experienced**
34:18 35:5
98:9,11
**expert** 40:22
40:24 116:24
116:25 117:1,3
123:6
**expertise** 61:1
**experts** 40:13,17
40:25
**expires** 131:18
**explain** 7:24

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-10   Filed 02/21/18   Page 41 of 56

30:2 73:19
81:18 82:25
89:11 113:10
explained 54:9
explaining 12:4
82:13
express 40:4
expressed
44:15,16
45:22
extended 52:16
73:16 90:4
extent 58:22
118:14 119:8
extra 124:7
extraordinarily
98:8,11

**F**

face 57:11 76:7
face-to-face
82:5 83:5
faced 88:9
faces 81:21
facilities 17:21
facility 16:7
facing 57:10
66:25 75:23
76:6
fact 50:3 66:21
78:13 79:13
98:3 109:9
factor 46:7
125:10
factors 21:25
109:11
facts 83:13
fair 12:3 13:9
19:22 22:21
23:8 38:4,19
42:16 50:1
54:13 63:3
66:22 68:21
71:21 74:14
80:1,10 86:10
86:17 88:9
89:22 91:9

92:3 98:21
99:1,2,9 103:9
124:1,6,24
fairly 19:21
22:14 31:13
109:24 111:5
fairness 78:7
falling 77:6
familiar 7:2
26:25 71:15
familiarity 8:9
familiarizing
64:12
family 72:20
93:5
far 14:14 16:10
19:7,12 30:24
52:2 89:16
103:20 118:1
farthest 14:13
fast 66:20
faster 57:20
favorable 89:19
92:18
fax 36:5,17
129:2
faxed 105:15
feel 7:22 77:24
78:1,24 91:4
94:5 107:23
108:4
felonies 39:10
75:16 76:11,12
100:17
felony 12:16,17
20:15,18 33:8
33:9 58:23
59:25 60:3
73:13 74:10
75:6,7,8,13
76:15,17 99:11
100:17 105:5,6
felt 90:9 91:12
108:4 116:17
117:5
fewer 50:17
98:25

figure 31:4
file 30:5 31:7,10
32:14 41:2
47:14 66:7
96:5,15
filed 51:5 59:24
66:12,13,14,15
66:17 96:7
120:5
files 26:7 31:9
68:15 96:9
filing 21:25 26:7
41:5 50:5
101:2 106:13
111:1,2,5,21
filings 28:16
31:12,14
fills 124:8
final 51:12 96:21
97:13
financially
128:14
find 129:10
fine 74:12 104:5
112:5 119:14
finish 7:16,17
finite 124:13
firm 9:19 98:5
102:25 103:2
118:8
first 10:12 30:20
37:12,18,21
38:16,19,20
38:20,25 39:1
39:2 43:13
44:1,16 48:12
62:24 81:23
82:10 105:11
108:14,16
125:16
fiscal 8:8,8
29:20,21,22
30:17,18,18,19
30:20,25
32:9 64:25
65:1 69:1 70:4
72:19 73:23

113:15 114:15
115:16 121:25
five 6:9 13:10,13
14:5 15:9,11
20:20 25:15
26:2 28:19
33:11 34:23
35:17 36:24
56:5 59:24
60:2,6 63:1,11
67:21 68:5
95:11 99:5
100:6 125:20
five-minute
118:10 119:6,13
fixed 122:15
Fleming 35:3
Flemming
34:20 62:15
62:16,17,17
121:4,7
folks 89:10
follow-up 7:18
49:3
follows 46:15
forced 45:14
Ford 9:19 10:2
10:15,20 11:4,8
12:6
foregoing 128:6
131:4,12
foremost 81:24
82:10
forget 38:14
forgive 37:23
56:2 99:19
form 113:4
114:22 115:20
131:5
former 57:17
forthcoming
83:7
fortunate 63:6
72:25 103:22
forward 57:25
83:19
foundational

119:19
four 11:23 34:23
35:1,6 62:18
62:20,20 63:1
63:8,9 99:4,5
103:4
fourth 63:21
fraction 75:5
frankly 109:7
126:21
Fred 53:17
free 7:22 22:12
115:20
freed 88:22
frequency
23:25
frequent 19:3
frequently 19:21
41:1 115:18
front 36:10,24
109:16 110:5
117:12
full 48:12
fully 31:16 93:12
fun 94:6
functions 26:14
26:18
fundamentally
80:1
funding 73:20
73:23 116:18
116:22 117:6,7
117:8
funds 122:25
123:5,5,12,14
123:16,19
further 25:12
89:12 106:17
122:2 128:11
furthest 14:2,3
future 50:24
114:11 120:18

**G**

gap 102:10,12,13
gather 93:19
gears 107:11

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-10   Filed 02/21/18   Page 42 of 56

111:3
general 4:17
  12:14 15:25
  19:19 36:1
  37:23 40:19
  43:3 71:18
  74:18 76:10
  93:7 96:20
  112:18 113:2
GENERAL'S
  4:18
generality
  112:18
generally 15:10
  15:23 36:22
  37:20,22,23
  39:10 50:8
  77:8 88:4
  105:4 108:20
generated
  111:16
geographic
  60:25 61:2
  73:14 95:11
geographical
  13:9 15:12,14
  37:17
Gephardt 42:4
gestures 7:13
getting 26:15
  28:10 65:10
  66:1 92:8
gist 23:1,2
give 15:4 33:21
  35:25 36:1
  52:6,7 66:20
  79:11 84:21
  95:8 104:21
  105:1
given 13:13
  15:12 23:10,13
  25:13 26:23
  28:8 56:4
  61:20 95:5,18
  121:16
giving 87:1 89:2
glass 102:14,18

go 7:3,20 14:14
  15:25 16:1
  36:10,18,23
  37:11 56:9
  61:25 63:14,17
  71:1 84:23
  89:24 96:4
  96:25 101:15
  102:11 118:4
goals 109:23
goes 38:5
going 7:5 15:20
  21:24 24:25
  31:1,22 37:20
  57:24 64:22
  68:3,12 74:13
  83:19 84:12,18
  90:25 92:14
  101:9,10,13
  104:17 105:22
  106:15,17
  107:10 108:12
  108:19 109:13
  112:21 114:11
  115:19,21
good 22:14
  40:11 59:23
  64:8 82:2
  87:16 89:23
  92:22 98:20
  111:18 125:6
gotten 32:2
govern 80:24
Governor 4:16
  5:22 102:5
governs 80:13
  80:15 85:13
grade 100:17
graduated 10:18
great 7:1 8:5
  26:19 87:13
  97:12
Greg 127:8
Greitens 4:16
  5:22 102:5
ground 7:2
group 20:23,25

guess 31:2 56:9
  56:19 68:16
  68:20 71:6
  99:21 106:6
  111:13,15
  125:16
guessing 10:9
  11:23 34:23
guidelines
  106:2 118:6
guides 105:20
Guinn 1:17 3:9
  5:4 6:2,7 8:6
  8:20 18:16
  42:18 53:24
  55:18 68:11
  84:22,24
  95:10 101:23
  123:24 129:10
  130:2 131:3,20

## H

habit 56:25
habits 84:16
half 10:23 34:25
  35:6 62:20
hand 7:13
handful 102:3
handing 104:1
handle 20:14
  23:6 27:11,14
  29:3,24 33:8
  33:9,14,16,17
  59:19 93:16,18
  98:21,24,25
  99:8,11 101:5
  120:20
handling 56:14
hands 87:17
hands-on 91:9
  103:8,11
hanging 92:23
happen 21:24
  32:20,22
  92:21 106:17
  109:9
happened

107:18
happening
  100:24
happens 31:8
  35:21 65:22
  84:19
hard 24:8
  59:22 66:20
  71:7
harming 125:7
Harper 10:19,25
Harper's 10:20
Hayes 2:10
  41:20,21,24
  42:1 51:23,24
  54:6 55:23
head 50:15
heads 92:23
headshakes
  7:14
health 40:11
hear 112:25
  126:1 127:5
heard 39:8
  127:7
hearing 39:1,1,4
  107:7 112:23
hearings 66:14
  66:15,18
  112:24
heavy 65:10
held 5:9 18:10
  95:13
help 24:25 40:1
  52:1 54:19
  59:3 97:13
  108:6 114:4
helpful 7:15
  79:9 97:8
HERRINGTON
  4:3,7
Hey 107:16
  108:5
hidden 47:22
hierarchy 49:8
high 4:19 25:13
  34:6 65:20

75:1 79:21,22
  81:15 86:19
  94:7
higher 27:23
  36:16 72:9,14
  74:17 77:10
  100:22
hindsight
  108:22
Hinkebein
  43:18,21 46:6
  46:9 61:9
  107:14,21
  108:23 126:3
  126:9,19
hire 40:25 73:4
hiring 72:6
historical 122:11
historically
  101:3,12
history 31:15,24
  50:11 102:24
hold 9:6 31:9
home 123:10
honestly 10:8
  31:1 42:22
  49:15 110:9
  115:14
hour 16:11
hours 3:11 118:8
  119:9
house 16:7
Howard 13:5,20
  42:4
huge 63:7
human 23:5
  24:7 25:8
humility 98:18
hundred 6:25
  72:23 76:24
husband 63:22

## I

idea 20:7
ideal 97:5
ideas 52:9
identical 54:5

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-10   Filed 02/21/18   Page 43 of 56

55:14
identification 41:10 53:9 54:24
identifications 95:16
identified 26:21
immediate 127:12
immediately 47:1
immigrants 67:7
immigration 66:24 67:5,12 67:15
impact 64:16 81:16 108:4
impaired 83:10
impatient 102:7
implement 117:15
important 20:14 26:14 81:19,21 81:22 94:22 95:6 103:19 111:23 112:2
importantly 20:9
impose 84:1
in-car 95:3
in-patient 40:8 40:8
in-person 82:5 95:13,23
inaccurate 80:21
incarcerated 17:6
incident 59:23
include 15:19
included 13:3 122:7
including 19:5 80:13
income 107:3 124:4
incomplete

106:9
increase 32:6,8 64:16,17 101:13
increments 118:10,11 119:6
independent 91:13,25 106:4
independently 115:9
INDEX 2:1,8
indicate 27:4 129:13
indicated 29:15 50:16 58:3,21 78:22
indigency 106:2 106:21 107:7 123:25
individual 16:17 18:9 19:25 20:8,23 22:4 28:4 30:5 35:20 36:3,8 36:14,23 37:14 39:19 44:10 45:12,16 46:14 47:14 50:15 51:7,8 56:22 58:5 64:14 74:9,15,16 75:23 77:6 78:15 79:12,16 80:1 81:24 84:9 96:24 104:1 106:14 107:6 119:25 119:25 120:5 124:9
individual's 64:6
individually 108:2,6
individuals 16:15,16 26:20 27:15 35:17 40:4 49:9,10 49:13 53:2

57:9,16 60:2 62:2 64:4 67:23 82:19 95:19 98:23 118:1
ineffective 120:23 121:3
ineligible 107:3 107:4
inexperience 62:3
influx 28:15 32:2,18
informally 120:20
informants 95:5
information 83:4 93:20 114:25 118:24 119:2 124:10
informed 44:25
initial 26:8 35:15,19 38:12 38:14,15 126:15
initially 120:19
initiated 8:8 29:25 30:3 70:17 115:10,12 115:16
INS 67:15
inspired 54:12
installation 102:18
instance 95:19
instituted 56:13 117:20
instructed 126:16
intake 67:2
intention 57:15 58:5
interaction 26:23 91:7
interest 11:14 24:13 44:5 45:13,17 61:10

61:19 62:10
interested 128:14
internal 48:14
Internet 122:9
interpretation 46:3
interrupt 102:6
introduced 6:9
inundated 31:11
invaluable 83:6
inventory 20:16 51:6 92:4
investigate 39:14,16,18 83:4,25
investigating 124:3,14
investigation 83:12 93:20 94:13 106:17 124:7
investigations 84:3
investigator 26:4 113:23
involved 61:24 62:1 86:9 90:12 105:4
involves 15:18 112:23
irrelevant 81:1
issue 37:3 67:8 120:13
issues 37:2,5 41:22
item 122:9 123:15
items 121:20 122:7,12

**J**
Jacqueline 4:12 5:23 129:5
jail 16:7 18:11 36:18 37:10 57:11 113:6

jails 16:8 17:1,10 36:5,17
Jefferson 4:19
job 6:18 9:18 10:16 24:5,6 58:10 59:23
jobs 102:17
join 9:11 11:10
joined 10:15 11:4
joining 117:9
judge 2:10,11,12 31:18 36:11,24 37:2,5 38:22 41:19,21,24,24 42:1,1,2,4 51:22,24 52:9 52:14 53:17,18 54:6 55:7,8 55:23,24 56:3,10,16,24 57:13,23 58:3 58:14,25 59:1 107:8,8
judges 39:10 42:25 51:20 52:12 56:4 108:9 109:16 109:19,21 116:7
judgment 23:4 25:1
judicial 32:25 55:8
judicially 120:22 121:2
July 29:23 30:8 70:6
jumping 67:16
June 29:23 30:7 70:9
jury 111:25
juvenile 33:18 33:20,21,24 34:1,3,6,11,14 63:19,24 64:1

**K**
Kathleen 69:15

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-10   Filed 02/21/18   Page 44 of 56

Kathy 122:11,25
keep 20:7,14
    44:25 66:3,4
Keytesville 16:9
kind 6:16 20:8
    20:9,10 22:1
    52:2 56:17
    63:24 99:21
    104:2 109:17
    110:22,24
    118:4
kinds 12:12 95:6
Kirksville 14:15
Klein 10:19,24
knew 91:24
knight 23:19
know 7:5,23,25
    19:10 20:3,5
    21:4,6,20,21
    22:2 23:10,25
    24:10 25:9
    26:17 31:3
    34:10 35:15
    35:22 40:20
    41:11 42:21
    44:13 47:15
    51:2 53:10
    54:25 58:10
    63:13 64:11,24
    65:23 70:21
    70:22 71:10,11
    71:14,17,19
    72:23 74:1,7,11
    75:1,23 78:11
    84:13 87:18
    89:6,20,23
    90:11,23 92:10
    92:19 94:9,14
    94:15,23
    95:10 98:10
    99:16 100:21
    103:11 104:8,9
    105:23 107:20
    107:21,22
    108:1 112:9,11
    114:9 115:10,15
    118:2,2,3,10

119:3,17 121:4
    121:14,17,17
    122:8,22
    125:19 126:3
    126:12,19
knowing 98:19
knowledge
    71:18 86:7
    91:13
known 80:5

---

## L

L 42:18 53:24
    55:18
labeled 85:4
lack 116:22
large 32:10 67:7
    73:1 93:19
    99:11 103:22
    106:5
larger 34:7
    76:18
laughing 68:14
law 3:13 9:19
    10:18,21,22
    11:15,15 12:7,8
    12:11,12 22:16
    34:22 36:13
    46:3 48:1
    59:21 84:15
    98:4 102:9,10
    102:21
lawful 6:3
lawsuit 82:15
lawyer 16:4
    18:10 20:8,15
    22:4,11,16
    26:10 34:3
    51:8 56:23
    57:2 58:20
    59:25 61:23
    63:15,17,20,21
    64:11 72:19
    73:4 77:6
    79:19 80:18
    81:2 82:2
    85:23,24,25

85:25 86:5,7
    93:9 104:23
    104:24 105:24
    109:7,13 111:14
lawyer's 44:7
    61:13 78:15
    79:21 86:6
lawyer-wise
    119:1
lawyers 11:1 19:5
    21:20 22:9,12
    24:3 28:4,5,14
    28:24 29:1
    34:14,25 35:2
    46:12 52:4,15
    59:4 63:9
    64:18 83:21
    83:22 84:2,13
    84:17 85:6
    87:12 88:20
    90:12 103:21
    104:15 107:19
    108:6 111:17
    113:24 121:5
    126:1,3,24
lead 93:24
Lear 69:15
    122:11,25
learn 82:24,25
leave 18:11
    72:20 73:9
leaving 89:19
left 63:2,10,17
    63:20,22 73:8
legal 5:13 26:5
    26:6,11,17
    81:20,20
    103:4 105:2,17
    105:19
Legislative 69:8
legitimately
    91:4
length 97:24
lengthy 18:7
    38:24 77:23
let's 76:25 79:3
    84:23

letter 2:10,11,12
    41:18,19,21
    42:5,11,13,20
    42:23 43:1,8
    43:11 44:14
    45:22 46:5,19
    48:12,19 49:5
    51:21 52:20
    52:22 53:13
    53:16 54:1,5
    54:10,13,13,15
    54:21 55:3,6
    55:13,15,24
    56:10,12 58:14
    58:18 61:8
    69:8 82:7,18
    107:5,5 110:3
    110:4,5,10,13
    110:17,20
letters 56:4
    61:16 104:13
    108:8,13,20
    109:1,2,18
    116:7 120:13
level 77:15 83:11
    83:19 84:12
    100:10
levels 45:25
    81:23 110:25
library 16:2,18
license 47:25
licensed 81:2
licenses 48:7
lie 89:18
life 65:22 66:7
    75:24 76:5,7
likes 33:20
limited 44:7
    49:19 50:8
    61:2,12 97:2
line 15:17 17:22
    20:1 23:12
    25:16 26:2,24
    33:12 35:5,18
    48:5 62:18
    63:1 64:4 71:7
    72:1 73:7

74:19,23
    80:14 81:11
    86:23 87:7
    88:14 89:3
    93:18 99:5
    105:12 125:9
    125:17 127:1
    130:5,9,13,17
    130:21
lineup 95:20
lineups 95:9,13
    95:13,23
Linn 13:5,20
    14:6 15:21 16:6
    55:9,9,11,24
    56:3 58:14,15
    58:21 59:13,16
    59:18,21 60:19
    61:4,18
Linneus 14:7,17
    16:2
Lisa 3:15 4:25
    5:12 128:3,19
    129:21
list 48:14,19,24
    49:8,10,11,14
    49:16,18,22
    50:23 51:3
    52:24,25
    53:3 56:13
    89:3,10 90:3,7
    101:5 107:2,3
listed 115:3
    129:16
lists 40:7 88:19
    89:14
litigation 3:13
    5:9,13 6:17
    12:8,22 27:1
    129:1,15
little 14:18 16:5
    31:19 34:4
    38:11 49:16
    68:16 71:7
    72:24 99:23
live 15:20
Livingston 15:8

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-10   Filed 02/21/18   Page 45 of 56

LLP 4:3,7
load 73:6
local 34:13 59:7
  117:16,16,21
  122:6,9,13
  123:12
locate 40:24
located 13:24
  13:25 14:7
location 24:23
logistical 55:12
long 8:25 29:12
  34:17,18 52:16
  59:14 92:23
  119:20
long-term 77:4
longer 22:7 47:1
  62:19 64:15
  89:17
longest 18:15
  49:16
look 19:14 22:9
  22:10 23:4
  24:9,16,22
  40:23 41:12
  46:23 48:11
  53:11 55:1,16
  56:9 65:14
  92:7,25 98:13
  103:16 109:1
  111:20 115:6,17
looked 8:11 15:5
  29:19 30:15,17
  30:17 90:24
  90:24,25
  91:17,17 92:1,4
  99:20
looking 20:6
  28:3 42:8
  91:19 95:22
  101:5 125:11
looks 19:3 69:7
  69:24
lot 21:21 28:6
  31:12 38:5
loud 85:21
Louis 63:18,19

lower 49:11
  70:11
lower-level
  12:17 39:9
lunch 118:4

## M

Macon 13:5,19
  16:9 53:18
  54:2,13,15,17
  56:10,12,14
  72:21
maintain 47:25
  77:2 109:17
maintained
  49:12 109:16
maintaining
  18:24
major 110:6
majority 76:13
  76:19
making 12:2
  36:20 40:5
  52:11 56:19
management
  87:23 123:11
managers 85:5
managing
  118:21 121:10
manuals 117:24
Marceline 15:23
mark 41:8 53:7
  54:21
marked 41:9,15
  53:8 54:23
  68:12 84:25
  114:13
Marsh 4:8
Mason 42:4
materially 44:7
  61:12
math 65:10
matter 5:5
  92:17 93:4
  129:17
max 90:13
maxed 28:5

maximum
  75:22 76:5
mean 8:15 19:9
  20:11,20 22:1
  22:23,25
  23:8 32:15
  37:24 38:10
  40:16,22 46:2
  51:1,7 57:7
  58:2 60:24
  65:24 70:21
  71:10 75:9
  78:11 79:10
  80:16 81:23
  83:23 84:6
  89:9,16,18
  90:22 91:23
  92:5,11,16,17
  92:20 94:6,13
  94:25 95:1,21
  108:15 111:14
  112:17 115:17
  116:2 117:23
  118:5 119:1
  121:21 122:10
  124:7
meaning 44:21
means 18:3
  27:19 30:3
  64:14 81:8
  87:8 99:25
  100:4 113:11
  115:10,15
measure 65:22
  124:13
measures
  119:22
measuring
  126:5
Medical 72:20
meet 8:11 16:3,4
  16:18,20,24
  18:11 38:7
  56:16 58:21
  58:25 67:2
  72:1 74:24
  77:16,20,25

81:11 84:8 91:4
  107:23 110:21
meeting 17:2
  18:23 51:9,23
  69:12 87:8
  90:1
meetings 19:13
  19:24 82:19
  83:6 103:15,16
  111:16
member 104:22
Menlo 4:8
mental 40:11
mention 27:10
  32:12
mentioned 13:1
  16:13,18 23:11
  25:15 28:17
  29:19 30:14
  32:1 35:10
  52:23 56:2
  59:13 62:6
  72:8 89:9
  103:11 104:11
  110:2
mentioning
  32:25
mentor 103:13
Mermelstein
  127:8
messed 68:16
met 6:10 51:24
  109:10
Metrics 70:4
metropolitan
  34:8
Michael 69:11
  127:8
middle 32:17
  45:5 68:19
migrated 33:22
miles 14:16
Milt 10:19,20,24
Milwaukee
  63:23
mind 69:20
mine 42:14

miniaturized
  95:4
minimum 84:1
ministerial
  55:12
Minus 70:20
minute 19:1
  96:18
minutes 6:9
  16:11 68:5,5
misdemeanor
  12:18 33:14,16
  39:9 74:11
  100:18
missing 44:23
Missouri 1:1,7
  3:1,6,15,16,18
  3:20 4:12,13
  4:15,18,19 5:6
  5:8,11,22 8:22
  11:2 12:25 14:1
  16:9,10 17:10
  27:8 40:10
  44:9 63:25
  68:23 69:25
  80:3,5,15,19
  81:3 85:14
  102:5 114:14
  116:2,15 128:4
  128:20 129:2
  129:5,6,8
  130:3
mixture 100:15
  100:18
Moberly 13:25
  70:12 115:6
moment 13:13
  15:14
money 121:14
  123:4
month 29:14
  50:5 103:24
monthly 19:13
  19:24 103:15
  111:15
months 11:21
  30:20 41:23

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-10   Filed 02/21/18   Page 46 of 56

89:24 92:10
92:10,15 93:3
morning 3:12
mother 93:1
motion 39:11
66:16 96:5,14
96:15 111:21
111:24 120:8
motions 40:21
41:2,5,5,6
66:7,10,11,12
66:15 94:16
111:5,9 112:7
motivated 46:4
54:10 55:22
motivating 46:7
109:11
motivations
47:23 54:12
move 52:12
63:17
moved 63:22
moving 38:22
49:14 51:25
52:25
MSPD 4:11 5:24
6:18 44:8
88:6
MSPD39410
42:10
multi-count
75:11,12,17
multiple 22:14
120:5,6
murder 12:15
22:2 75:7,11,17
76:3 105:6

——————

N

name 5:11,12,16
6:7 62:14,15
102:4 106:11
131:10
names 9:22
nature 23:5
24:7 25:8
114:5 124:12

necessarily
32:8 36:12
38:2 56:20
115:3
necessary
56:22 67:13
81:8 93:12,20
94:19 111:22
113:10 116:17
117:1,5 131:7
need 7:24 16:17
18:2 21:7,21,21
24:12,24 28:5
40:24 54:19
54:19 57:2
78:18 81:7
84:15 97:25
107:21,22,24
108:5 125:2,3
needed 32:10
32:10
needs 79:13,15
94:17
negative 24:10
64:16 92:20
94:2 108:4
neglect 125:13
neither 128:9
Net 70:23
never 15:5 64:8
89:23 113:17
114:12 121:19
121:24
new 4:4,4 20:6
21:9,11,22
28:7,10 29:7
29:10,13 30:4
30:4 31:12
32:18 33:4
41:23 45:16
48:8 59:11
61:23 63:2
64:11 70:23
84:10 87:6
88:22 90:13
90:17 91:21
96:5,14 111:14

111:17 117:20,21
Nifong 4:13
129:6
Ninth 55:8
normal 74:4
77:11
Normally 95:18
north 14:15
notary 129:14
131:16
note 2:14 88:20
notice 96:7,9
notify 48:20
November 28:3
29:2 31:15
32:4
nowadays
102:23
number 15:5,6
24:24 25:19
31:1 32:10,14
41:22 47:15
49:25 50:1
62:7 65:6,9
65:16,23
70:14,17 75:1
79:2 87:20
89:20 91:18,18
92:6,17,20
94:22 99:6,17
99:20 103:1
103:22 114:7
115:6 116:7
122:15 125:25
numbers 8:7,10
19:18 22:10
23:4 25:4
28:4,9 29:20
30:22,24
42:9 58:24
62:4 63:4
71:14 76:13
77:3 79:21,22
91:6 92:1
100:19,20
101:13 106:23
115:6 120:3

122:12 125:11
nutshell 46:10

——————

O

O 4:18
o'clock 3:11,12
oath 7:9
objection 7:19
obligation 46:14
78:15 79:19
81:5 109:15
obligations 51:9
58:22 72:1
77:16,25 81:12
88:16 90:18
91:5 127:3,14
observations
103:21
obstacles 15:16
obviously 7:1,11
18:6 21:15
30:6 32:16
34:15 35:4
39:12 43:22
44:13 75:19
81:18 90:6
98:2
occasional
87:19
occur 37:19
83:15 89:21
occurred 56:11
58:16 71:19
107:15 119:13
occurring 37:25
occurs 50:25
OCDC 43:15
48:1 51:18
OCDC's 43:23
October 29:2
31:15 32:4
41:18 42:6
53:16 55:6
59:23 69:4,12
104:13,16
offense 83:13
105:5,6

offenses 12:17
12:18 20:15
99:12 100:18
offers 112:22
office 4:18 8:10
9:8,9,11,16
10:20,23 11:11
13:3,12,18,24
13:25 14:3,8
15:15 16:12,17
17:7,12,15 18:11
18:20,21,21
19:2,4,6 20:1
20:21 22:11
23:9,10,12,15
23:21 24:3
25:10,16,21,24
26:1,19,24
27:1,6 28:19
28:20 29:20
29:23 30:8
31:23,25 33:7
33:25 34:11,19
34:20,24 35:6
35:12 36:5
37:14 39:2,13
40:1,15 41:2
42:23 43:2,3
43:6,9 44:9
46:13,20 48:5
48:23 49:21
50:7,10,12,16
52:19 56:6,21
57:1,3,19,23
58:8 60:10,16
62:19,24 63:2
63:21 64:4,5
64:18,21,25
66:7,24 72:5
73:8 74:16,19
78:5 83:22,24
83:24 84:8
85:19 87:12
87:20,25 88:3
91:8 93:17
96:1,11,18 97:7
98:6,14,20

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 160-10    Filed 02/21/18    Page 47 of 56

99:4,17 100:1
100:12,25
103:12 104:20
105:16,16
106:3,22
109:8,13,14
110:14 111:2,4,4
111:17,19 112:6
112:8 113:16
117:17,21,25
118:1 119:1,22
120:6 121:6,18
122:6,13,19,25
123:1,5,6,10,12
124:2 125:3
126:4,7 127:2
127:13
office's 56:11
58:17 74:8
87:17
officers 57:21
58:9
offices 3:13
88:5 104:7
110:25
Oh 112:9
okay 6:18,21 7:1
8:14,20,25
9:3,5,10,25
10:11 11:3,24
12:19 13:1,7,12
13:24 14:2,25
15:12 16:13
17:3,24 18:6
18:16,25 21:1,4
21:14,19 22:23
22:23 23:23
25:15 26:23
27:10 28:22
29:9,12,15,19
30:2,6 31:20
32:12 33:3
34:15 36:25
37:13,16,22
38:9,25 39:12
39:25 41:1,7
41:14,24 42:5

42:20 43:6,10
43:25 45:3,21
46:4,17,23
47:13,20 48:4
48:11 49:1,18
49:21,24 51:11
51:19 52:23
53:6,19 54:9
54:20 56:2,8
57:9 58:13
60:19,23 61:7
62:5,13 63:13
64:2,19,24
65:5,10 66:6
67:16 68:1,11
69:11 70:2,23
71:9,12 72:8
73:5,18 74:6
74:14,21 75:4
75:25 76:2,8
76:21 77:8,13
77:22 78:4,6
78:16 80:5
81:14 82:22
83:9 84:4,21
85:3,7 86:10
86:17 87:1,13
88:8,24 89:8
90:21 93:15
95:8,16,24
96:9,11,17
97:22 99:13
99:16,16,24
100:9 101:14
111:12 112:10
114:25 115:19
116:12 122:18
122:24 123:20
126:6,12,16
127:10,16
older 26:10
once 19:11 20:3
20:20 76:14
103:23 104:11
ones 60:14
ongoing 66:19
open 26:7

27:19,20 30:11
99:17 120:4
open-door 19:7
103:12
opening 11:16
26:9 30:4
opens 105:2
operating 109:4
opinion 24:20
46:17 50:6
59:17 80:21
80:24 84:18
86:11 91:14
120:16 126:4
126:20,23
127:5
opportunity
28:9 33:21
38:23 84:15
103:25 112:25
113:1
opposed 34:7
opposing 115:5
option 78:12
88:25,25
90:9,11
options 88:18
89:7
oral 39:6,11
order 18:8 24:18
58:24 71:25
83:3 93:19
ordered 96:24
orders 86:7
organizations
116:1
original 2:14,15
129:11
originally 88:18
ORRICK 4:3,7
Othic 59:1
outcome 128:14
outcomes 94:2
outside 71:18
87:15 97:2
109:5 116:2
overall 121:11

122:23
overloaded
91:2
oversight 19:1
overspend
123:15
overwhelmed
126:2

_____

**P**

P 4:18
P-a-r-s-h-a-l-l
9:23
p.m 127:19,21
page 42:10
44:19 45:4,5
48:12,13
53:20 55:17
68:14,15,17,18
68:20,20
69:17,20,21
70:12 114:20
114:21 129:11
129:14,15
130:5,9,13,17
130:21
paid 123:11
Paint 102:15
paragraph
43:13 44:1,2,17
45:5,8,23
46:24 47:21
48:13 51:14
pardon 111:4
115:7
Park 4:8
parole 57:21
58:9
Parshall 9:20
9:23 10:2,15
10:20 11:4,8
12:6
part 21:18,19
23:23 25:7
34:6,8 37:1
38:19 44:4
49:25 61:22

61:23 67:2
93:6,9 94:25
95:6,10 99:13
99:22 107:25
109:6,14,22
122:22
particular 12:12
50:10 61:2
67:11 69:22
71:24 80:8,12
85:16 120:11
124:23
parties 128:10
128:13
partner 9:19
10:5,9 102:25
partners 85:5
passage 122:17
passing 110:23
Pattonsburg
16:10
pay 123:13
pay-to-call 17:11
pays 122:21
penalty 75:22
76:5 131:11
pending 3:17 8:1
34:4
people 13:12
40:7 49:8
57:3,4,20
58:11 82:16
88:19 89:13
89:23 90:3
105:16 107:8
108:3
percent 31:2
64:23 71:1,7
74:13 75:6
115:10
percentage
15:2 64:20
71:5 74:7,17,18
77:10
Percentage-w...
75:9
percentages

ALARIS LITIGATION SERVICES
www.alaris.us        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 160-10    Filed 02/21/18    Page 48 of 56

106:23
period 9:25
  10:6,7 22:7,8
  24:2 29:7 30:1
  53:4 72:16,18
  72:21 77:24
  90:5,8 119:13
periods 52:16
  77:4 92:24
  118:18,23
perjury 131:11
persistent
  117:10
person 22:11
  36:8 79:17,17
  79:17 81:25
  121:7
person's 67:10
personal 44:11
  84:18
personally 84:1
  106:3
persons 51:17
perspective
  47:7
phase 97:1
phone 17:4,6,18
  129:2
phones 121:20
photo 95:18
phrased 90:19
physically
  79:23
pick 36:19
  101:10
picks 50:22
place 112:12
placed 111:8
places 16:14,19
  16:22,24
placing 49:8
Plaintiff's 41:8
  41:15 53:7
  54:6,21 55:22
  56:9 58:13
  68:13 108:18
  114:14

plaintiffs 1:5,18
  3:4,20 4:2
  5:18,20 6:4,8
plate 21:21
plays 94:25
plea 64:21
  112:15 113:12
pleas 112:19
  113:3
please 5:15 6:1
  7:15,20 129:10
  129:12,15
pleased 11:17
  109:21
pled 65:25
plus 26:3 33:12
point 48:23
  95:25 101:11
  112:13 120:16
police 95:1
policies 83:23
  83:24 117:16
  117:21,23,24
  118:1,5
policy 19:7
  103:12 113:17
  117:20
poor 51:17
population 67:7
portion 74:7
  75:5,6 76:9
  86:12 87:16
portions 43:11
  85:8
position 9:1,6
  21:9,10 78:2
  83:22 84:13
  93:2 103:7
  107:23 108:3
positions 25:20
  25:20
positive 51:22
  82:11 97:9
  109:22
possession
  76:20
possibility

50:24 78:18
  83:14 121:23
possible 32:19
  33:23 49:15
  53:1 57:11
  73:17
post 36:4 95:24
post-trial 96:5
postage 122:8
potential 59:7
  88:17
potentially
  64:15 76:7
practical 89:16
  89:20 92:17
practice 12:14
  13:18 14:5
  27:5,6,7 34:7
  34:9 35:18,19
  48:1 50:7
  56:11 58:17
  59:7 84:15
  103:4 105:4
practiced 11:15
practices 27:1
  58:19
practicing 12:7
  34:16,19,22
  74:5
predict 101:8
  120:17
preface 59:14
preliminary
  66:14,15,18
  112:23,24
preparation
  8:13 94:15
  96:21 103:18
  115:23
prepare 8:5
  94:12 97:3
Prepared 69:15
preparing 96:19
  97:7,19
present 4:22
  5:15 9:15
presented

104:25
presently
  104:18
press 116:10
presumably
  90:8
presume 10:12
  44:14,22 54:11
  102:25 116:6
pretrial 40:20
  41:2 93:13
  94:16 111:5,8
  112:7
pretty 11:24
  23:10 26:17
  41:4 97:2
  99:23 100:8
  100:14 108:11
  109:22
previous 64:6
  76:23
previously 43:4
  59:9 68:12
  69:25 72:10
  84:25 92:13
  114:13
primarily 12:23
  28:24 40:4,9
  46:6 54:17
  76:18 100:17
  106:14 107:1
  119:24
primary 13:19
  14:6 46:7
  52:14
printed 126:14
prior 14:25 30:11
  32:9 66:14
  73:22,23 113:3
  125:23
priority 49:12
prison 18:3
  57:16 58:6
  75:24
private 60:12
  67:17,19,22
  80:18,23 118:8

probability
  97:13
probably 52:13
  64:22 96:22
  101:4 106:12
  106:18 108:13
  108:14 115:22
probation
  56:23 57:6,7
  57:8,10,10,12
  57:21,24,25
  58:9,11 74:11
  100:19
problem 92:13
  109:8,21
  110:24 125:18
  125:22
problems 19:17
  88:5
procedure 52:3
  59:3
procedures
  117:24
proceedings
  97:20
process 20:5
  51:1 66:19
  83:7 94:11
  104:12,14
  106:6
produced 3:10
  6:3
production
  129:15
professional
  44:12,21 45:11
  46:11,16 47:10
  47:16 62:11
  80:3,6,19 81:3
  81:10 85:8,9
  86:1,6,23
  109:5
program 40:9
  57:17
programs 26:16
  58:12
progressing

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-10   Filed 02/21/18   Page 49 of 56

104:3
prosecuting
110:19
prosecution
67:1
prosecutions
66:5
prosecutor 31:6
31:17 33:4
50:4,14,15,15
52:19,22
59:24 110:16
prosecutor's
50:10 52:19
63:21 100:25
111:2
prosecutors
21:25 31:7,9
32:13,23
101:10
prospective
45:19
protect 81:7
protocol 92:5
provide 24:18
78:20,24
79:19,23 81:5
90:2 107:17
122:19
provided 66:17
120:22 121:3
providers 40:7
provides 106:1
providing 48:18
proximity 19:9
23:11
public 4:12 8:22
9:7,14 11:12,14
11:19 18:20
27:8 34:21,24
43:16 44:10
46:12 47:1,24
56:21,25 57:3
57:18,19 58:8
62:24 63:16
63:25 67:9,24
68:23 69:25

70:3 73:15
80:13,18,22
83:23 85:13
87:15 89:14
98:5 105:13
111:18 114:15
116:3,12,16
117:9 118:17
129:5,14 131:16
pull 68:3
purpose 41:21
put 25:10 78:2
84:12 90:3
106:16 117:25
122:20
putting 15:13
16:14 23:14
88:19 89:12

**Q**

qualified 47:3
67:23,24
qualifies 36:8
47:7
qualify 36:21
48:15,19
question 7:16,18
7:21,22 8:1,2
27:5 35:22,24
37:23 40:19
79:11 87:10
104:5 119:20
questions 7:6
19:10 49:3
101:23 102:3,7
105:18 115:20
115:21 122:2
123:23 127:17
quick 101:16
quickly 7:4
11:24 49:15
quite 18:7
42:22 49:15
93:18 109:7
115:14,17
126:21

**R**

Ramsey 2:4
4:17 5:21,21
102:2,4 122:2
ran 102:17
121:19
Randolph 12:24
13:5,19 28:8
28:15,23,25
29:6 31:13,17
32:2,5 33:4
41:20,25 42:3
45:10 46:25
49:19 50:4
51:3,21 52:19
54:3,6,10
55:23 59:10
61:4 62:6
88:19 100:23
100:24 101:1
101:10 107:12
110:16,19 111:2
ranging 52:2
rapport 93:10
rate 101:2
106:20,21
rates 31:7
ratifies 86:8
read 44:1 45:8
46:25 47:20
51:12 61:7
85:21 86:2
126:4,13,15,20
129:12 130:6
130:10,14,18
130:22 131:4
reading 127:12
ready 17:6
real 76:12 83:14
realize 23:12
realized 11:24
really 8:11 15:5
21:23 31:14
32:22 57:1
58:19 65:13
79:11 91:2

95:20 107:16
115:15 121:19
123:16
reason 23:24
27:25 31:3,10
32:13 50:18
59:15 94:6
99:13,15
120:11,12 130:7
130:11,15,19,23
reasonable
44:24 85:24
reasonably
44:25
reasons 31:6
55:21,23
86:18
recall 29:20
30:22 43:6
54:1 61:14
95:19 127:6
receive 83:5
89:14 97:11
111:18
receiving 113:3
129:16
recess 68:8
101:19
recognize 41:14
53:13 55:3
84:25
recognizes
44:8
recollect 113:15
recollection
119:16 121:19
recommendat...
43:23 67:1
record 5:2,16
7:5,14 10:25
25:7 30:2
68:7,10 101:15
101:18,21
127:20
recorded 17:12
17:18
Redirect 2:6

123:21
redrafted 43:1
reduced 14:24
128:8
reduction 39:4
39:7 41:6
66:11
refer 43:10
referenced
44:3
referred 61:9
referring 43:18
reflect 45:12
regard 47:23
regarding 67:14
104:15
regular 89:1
reinvent 42:25
reject 106:25
106:25
rejection
106:20 107:5
rejects 106:22
related 6:18
55:11 128:10
relation 110:19
110:20
relationship
82:3,11 93:11
109:17 110:15
relative 128:12
relatively 38:4
relevant 7:6
relief 28:5
54:19
relieve 31:22
rely 58:9 106:5
106:7,16 124:11
remainder 27:3
remained 60:15
remaining 60:8
remains 46:3
remember 7:8
63:5 110:10
127:9
remind 65:5
render 131:7

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-10   Filed 02/21/18   Page 50 of 56

79:5,7
rephrase 7:23
  87:9
replaced 63:2
report 96:24
  97:1 114:15
reporter 3:16
  4:24 5:25 7:11
  7:14 128:1,4,21
reporter's 2:14
  5:11
represent 6:8
  20:17 35:16,17
  45:19 48:9
  60:2 62:2
  67:14,20,22
  71:13 81:16
  82:9 87:17
  90:14 94:20
  98:2 102:4
representation
  12:23 14:12
  15:17 24:18
  44:6,24 45:14
  47:9 48:8,15
  51:9,16 61:11
  64:9,10 77:7
  77:21 78:21,25
  79:14,20,23
  81:6 82:21
  83:10 89:18
  90:2 91:15
  96:1 105:21
  107:24 111:23
  112:14
representing
  18:23 27:15
  67:12 81:24
  98:16
represents
  13:12 37:14
  64:1
request 59:1
  69:9 107:7
  116:21 121:24
requested
  123:8

required 20:17
  74:3
requirements
  14:11 74:25
  84:9
requires 15:25
  17:13 18:7
resolution 93:4
resolved 14:23
  64:21 120:13
resources
  39:25 40:14
  67:9
respect 122:18
respects 54:4
  55:13
respond 21:1
  22:22
response 21:17
  21:19 51:20
  52:18 109:23
responses 7:15
responsibilities
  18:18,23 35:11
  44:7 61:13,21
  72:5 86:22
  88:13
responsibility
  44:11 46:11
  80:4 81:4
  85:5 104:22
responsible
  18:19 48:6
  54:17 56:6
  58:15 61:1
  86:5 104:24
rest 47:20
  115:13
result 14:20
  56:12 57:11,12
  58:17 60:4
  66:25
results 44:22
  44:23 93:24
  97:10
retired 10:3 11:7
  11:13,21

retirement 11:18
  11:25
return 129:15
returning 97:23
review 36:6
  103:19 105:17
reviewed 8:7
  49:7 106:8
  112:20,21
  123:7,8,11
reviewing 19:15
  104:25 116:6
revocation 57:7
  57:8,10,24,25
  74:12
right 11:8 13:10
  23:21 24:21
  25:17 30:16
  31:2,19 40:13
  42:6 43:10
  47:11,18 48:2
  48:21 53:21
  55:19,21
  62:20 69:2,9
  69:18 70:24
  71:9 72:2,8,10
  73:10 76:4
  77:20 80:6
  85:17,19 90:13
  96:12 98:6
  100:2 107:6
  124:17,18
risk 44:5 61:11
  89:19 92:18
Road 4:8
Rob 34:22
  62:16,17
Robert 34:20
  35:3 121:4
role 86:21 89:4
rooms 38:6
round 14:8,17
  18:13
row 115:7
RubinBrown
  71:14,15,16,17
  71:19

rule 15:25 44:3
  56:16 61:8
  62:10 66:20
  80:8,11,13
  85:4,9,13,16
  86:12,13,15
  96:21 112:18
  113:2,13,21
rules 7:2 44:12
  44:20,21 45:11
  46:11,13,16
  47:10,16 62:10
  66:17 79:25
  80:2,3,5,11,12
  80:19,20,22
  80:23,24 81:3
  81:10 85:7,9
  86:1,6,23
  100:11 109:5
  112:12
run 35:18 52:10
  89:18 92:17
  117:17 121:13
  123:14,16,19
running 18:19
rural 13:21 15:21
  19:4 34:4
  36:11

_____
S

satisfaction
  93:8
save 73:15
saying 69:8
  75:15,16 79:18
  87:14 124:9
  127:11
says 6:4 22:5
  24:15 44:20
  47:6 48:13
  69:1,4,11 70:3
  70:14,20,23
  71:5
scenarios 36:1
schedule 26:12
  36:11 52:11
scheduled

51:23
scheduling
  26:16
Scherzer 2:3,6
  4:3 5:17,17 6:6
  6:7 41:11 53:10
  54:25 68:2,11
  101:15,22
  123:22 127:17
  129:22
school 10:18,22
  59:21 102:9,11
  102:22
Scott 41:20
scratch 30:7
screening
  105:12
seal 68:19
seat 13:23
  32:25
second 13:8
  16:15 35:14
  43:25 61:24
  67:17 84:21
  95:8 97:23
  101:16 106:1
  113:19,21,25
  114:3
second-to-last
  51:13 71:2
seconds 43:14
secretarial 26:11
secretary 26:18
secure 17:12,22
see 42:5,10
  43:16,25
  44:19,25 45:5
  68:19 70:2,11
  70:12 71:2
  79:12 103:25
  105:18 108:2
  113:1
seeing 36:18
seek 93:19
seeking 94:5
seen 69:23 70:1
  106:1 107:20

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-10   Filed 02/21/18   Page 51 of 56

114:23,25
**selected** 11:17
**self-report** 78:3
  87:4 98:1
**self-reported**
  78:10
**self-reporting**
  78:14
**send** 20:2,2,19
  46:5 54:10,12
  55:22 88:2
  107:5 113:18
**sending** 21:16
  57:15 58:5
  113:17 125:23
**sends** 96:11
**sense** 7:9 8:3
  35:23,24 75:4
  76:10 104:5
  106:19,21
  112:4,5 113:16
  119:12 120:25
**sent** 41:18
  42:23,24
  44:13 46:2,19
  49:6 53:17
  54:5,11,15
  55:7,24 60:11
  96:8 104:10,13
  107:19 108:9,11
  108:14,15,20
  108:21 109:2
  109:18 110:18
  120:13 123:9
**sentence** 43:14
  46:24 47:13
  48:17 51:12,13
  61:16 76:7
  85:22
**sentences** 44:1
  44:16 47:5
  86:4 97:10
**sentencing**
  96:4,17,19,21
  96:23 97:1,4,7
  97:20
**sentencings**

97:14
**sentiments**
  45:22
**separate** 120:4
**September**
  31:14 32:4
**sequence**
  96:20
**series** 82:18
  94:17
**serious** 12:16
  20:15,18
  58:23 59:12
  59:16,25 60:3
  61:20 74:10,18
  75:2,8,13,20
  76:14,15 77:10
  77:14 99:7,11
  100:16
**seriousness**
  20:11 73:12
**service** 14:13
  122:9
**services** 3:14
  5:10,14 36:6
  67:24 89:14
  89:15 105:13
  110:14 129:1
**session** 38:1,2
**set** 26:13 37:1,3
  37:11,13 49:2
  80:22,23
**setting** 59:6
  98:5
**seven** 75:11
**sex** 59:25 75:13
  75:17 76:6
  105:5
**share** 73:24
  74:2
**sheet** 106:1
  129:11,13,15
  130:1
**Shelby** 61:5
**sheriff's** 17:12
  95:21
**shift** 115:19

**shining** 23:19
**Shipma** 2:5 4:12
  5:23,23 8:15
  122:4 123:20
  129:5,9
**Shondel** 1:4 3:3
  3:19 5:5 129:8
  130:3
**short** 53:3 90:7
  106:7
**shortly** 107:14
  120:13 127:11
**show** 41:7 53:6
  54:20 68:12
  68:16
**showed** 114:20
**showing** 84:24
**sign** 106:11,11
  129:13
**signature** 42:15
  42:16 53:20
  53:23 55:17
  129:11,13,15
  130:25
**signed** 42:13
  55:16
**significant** 44:5
  61:11 76:9
  87:20
**significantly**
  14:24 27:23
  72:9 100:22
**signs** 106:15
**similar** 54:3,12
  104:7
**simply** 17:15
  47:24 106:10
  119:9
**Sincerely**
  129:19
**sir** 116:4
**sister** 93:1
**sitting** 52:16
  113:6
**situate** 13:22
**situation** 25:2
  90:15 101:4

106:10 125:13
  126:22
**situations** 107:4
  113:8
**six** 19:5 33:11
  36:24 70:14
  75:11 92:10,14
**six-ish** 30:20
**skills** 84:16
**skipping** 48:17
**slammed** 107:16
**slight** 110:11
**slightly** 14:10
  107:11
**slowdown** 50:9
  50:13
**slowed** 14:19
**small** 12:14,15
  15:23 23:9
  103:12
**smaller** 15:21
  19:4,6
**social** 40:1 57:4
**someone's** 37:6
**soon** 48:20
  52:25
**sorry** 9:21 29:7
  38:10 59:13
  77:18 114:17
**sort** 60:25
  66:13 70:11
  100:23 127:11
**sorted** 28:17
**sorts** 110:4
**sounds** 19:20
  23:9 25:6
  27:23 59:8
  62:13 74:21
  77:13 84:4
  91:8 93:15
  127:10
**sources** 40:11
**space** 122:19
**speak** 17:22
  112:17
**speaking** 17:24
  29:22 60:6,15

74:8 78:10
  80:2 108:19
**specific** 15:1
  86:8 104:1
**speculate** 31:5
**spell** 9:21
**spend** 17:13
  64:11 97:6
  124:2,5,14,15
**spends** 96:18
**spent** 96:22
  124:1,19,20
**spiked** 76:23
**spikes** 76:22
**split** 100:1
**spoken** 115:25
  116:7
**Springfield**
  63:20
**St** 63:18,19
**staff** 18:22 19:13
  26:1,19 84:14
  103:15,16
  104:22 111:16
**stage** 40:19,20
**stamp** 42:9
**standard** 26:25
  77:7,21 90:2
**standards** 84:1
  107:24
**star** 69:7
**start** 40:18 70:6
  76:25 77:6
**started** 10:2
  34:22,23
  48:14 104:16
**starting** 68:19
  84:14
**state** 1:7 3:6,16
  3:20 4:12,15
  5:5,15,22
  8:22 12:20,21
  12:22 34:21
  44:10 46:12
  63:23,25 67:9
  68:23 69:25
  70:3 80:18

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-10   Filed 02/21/18   Page 52 of 56

81:3 83:23
85:14 102:5
111:18 112:20
114:15 116:2,16
117:25 118:6
123:1 128:4
129:5,8 130:3
131:1
state's 113:2
stated 124:3,9
statement 99:2
statements
44:15,16
states 1:1 3:1,17
5:7 44:4 67:4
statewide 27:7
statistics 114:9
status 67:5,10
67:13,15
stay 64:14
stems 111:15
steps 66:22
94:19 115:22
Steven 4:17
5:21 102:4
steven.ramse...
4:20
stopgap 58:8
stopped 119:15
store 94:23,24
straight 102:11
Street 4:4,19
strength 113:1
struggle 77:2
study 71:16,17
71:20
subscribe 131:10
Subsection
85:21 86:3,3
subset 57:25
substance
40:10 131:6
substantial
31:14 65:23
114:5,7
substantive
54:4 55:13

substituting
54:2 55:11
successful
84:20
suggest 110:17
suggestions
52:11
Suite 3:14 4:13
129:1,6
supervise 103:4
103:14 104:6
109:4 112:15
116:22 117:4,17
supervised
103:1,5 121:1
supervision
18:20 19:2
72:6 102:24
supervisor
35:12 81:9
84:11 85:17,18
86:15,21,22
91:9 103:8
116:20
supervisors
35:11
supervisory
35:10 83:22
85:5,23
supplemental
69:8 121:25
suppose 46:10
54:14 78:12
92:21 120:20
121:22 126:18
suppress 41:5
111:21
Suppression
66:12
Supreme 44:3
61:9 128:20
sure 21:14 23:16
40:18 43:14
83:2 84:19
99:23 115:4
118:24 126:24
surveillance

94:21,24
sustainable
77:4,17 79:1
SUTCLIFFE 4:3
4:7
Suter 42:3
SVP 63:16
swear 6:1
Switching 107:11
111:3
sworn 3:10 6:3
128:6
system 4:11,12
17:11 51:21
63:17,24 67:9
69:25 82:14
82:20 106:4
109:15 116:3
116:16 117:9
118:9,17
122:24 129:5

— T —
table 37:25
take 7:24 8:2
21:9,11 22:4,6
22:8,12,19,23
23:13,18 24:1
24:15 25:12
29:5,10,12,16
39:10 46:20
48:21 53:1
59:11 60:5
61:7,17 66:23
66:24 68:3,4
73:3 74:17
84:10 87:16
88:1,10,22
90:13,16 91:12
91:16,21,22
92:3 101:16
113:7,22,22
115:21 118:3
taken 1:18 6:21
8:12 43:15
58:23 68:8
71:24 86:18

99:14 101:19
128:7,11 129:10
130:4
takes 82:18
83:6,8 84:17
107:2
talk 19:14 22:9
35:14 43:13
71:23 96:17
103:16 105:7
112:19,22 113:3
talked 25:9
51:24 59:6,9
78:12,13 79:6
81:17 97:22
108:7 109:10
116:10
talking 20:3
43:22 45:4
62:11 66:11
72:16 81:14
91:20 94:23
talks 61:10
Tartaglio 4:7
5:19,19
task 118:10
tasked 121:10
technique 95:2
telephone 82:8
82:18
telephones
122:8
tell 10:8 15:6
18:18 30:23
31:1,8 34:22
39:21,22 46:8
49:1,4,5 65:12
67:4 71:6
75:10 79:3,5
107:24 108:17
114:23 119:15
telling 91:11
template 43:3
110:3
temporary
50:12
ten 15:9 65:2

75:12,15,17,19
75:25 113:14
term 106:20
terms 12:11 19:3
20:11 35:20
40:13 59:3
72:6 82:24
87:19 90:20
105:12 115:24
123:25
Terry 55:7
testified 25:6
74:22 111:3
114:7
testify 114:17
testimony 7:8
103:6 110:17
115:8 116:25
117:3,11 128:5
128:7
thank 12:3 51:19
101:22 129:17
Thanks 123:20
thereon 131:9
thereto 128:13
thing 7:25 80:6
things 7:4 52:4
52:8 56:17
82:22,23
83:17 89:21
117:16 118:4
121:21
think 6:15 12:13
15:4 20:13,13
21:18 23:5,23
24:3,6,24
31:20 32:19
33:1 34:2 38:4
38:18 49:15
59:17 61:22
62:21 64:8,15
65:18,20,21
68:2 71:21
76:18 87:10
88:17 90:19
94:9 97:8,9,12
97:21 98:12

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-10   Filed 02/21/18   Page 53 of 56

99:2 100:14
101:12 103:9
103:21 109:24
110:9,10,12
112:24 113:12
114:6,10,19,19
120:24 122:11
124:6 125:10
**thinking** 125:3
**third** 63:20
68:20 70:12
**thought** 110:7
117:1 125:25
**threat** 48:1 51:17
**threatened**
48:6,7
**three** 9:2 25:3
28:13 34:25
35:6 56:4
60:7 98:22
120:1,1,2,3
**tied** 73:16
**tight-knit** 23:10
**time** 5:3 9:25
10:6,7 11:12
12:5 15:10,18
18:15 20:16
21:20,20 22:4
22:7,8,22
24:2,15 25:2
25:8,11,13
29:3,7,16,25
32:3,10 33:3
34:2 37:2,5
38:14,16,23
39:2,8,12,14
39:16,17,18
42:2 45:25
46:19,22
49:17 50:8,21
51:2 52:8,16
53:4 57:11
62:23 63:5
64:12,13,17
66:4 67:6,6
68:6,9 72:15
72:18,21,22

76:25 77:5,24
79:22 83:8,12
84:17 88:22
89:6 90:5,8
91:21 92:24
96:19,22 97:6
97:19 101:17
101:20 102:22
104:14 105:3
108:12,16,21
109:1,2 115:3
118:9,18,22,25
119:2,3,5,13
119:20 122:17
124:1,1,4,12,13
124:14,19,20
124:21,22
127:19
**timekeeping**
118:7,14,14,22
119:8
**times** 6:14 18:7
34:13 72:13,24
73:2,5 76:23
84:5,6 105:15
107:8 113:4,5
120:21
**title** 8:23
**Tobin** 4:23 5:12
**today** 8:18 10:8
104:17
**today's** 5:3
**tone** 110:7,11
**top** 42:5 49:9
68:18,20 70:3
**topic** 17:3
**topics** 19:21
**total** 19:5 25:19
30:23 65:6
**touched** 82:23
92:12
**town** 12:14,15
**towns** 15:22
**trace** 71:7
**track** 66:3,4
118:9 119:1

121:17
**tracked** 114:10
114:12 119:3
**tracking** 118:18
118:21,22,25
119:5,13
**traditionally**
26:11 39:3
**train** 103:13
**trained** 105:20
**training** 111:18
**trainings** 117:16
**transcribing**
7:12
**transcript** 2:15
129:13,16
**transferred**
63:15 122:25
**transportation**
15:24
**travel** 14:11 15:19
16:4 18:7
**traveling** 59:5
**treat** 109:24
**treated** 93:2,5
**treatment** 26:16
40:5,6,6,9,12
57:5,17,20
58:7,12
**trend** 31:22
111:6
**trial** 40:16,19,21
61:25 66:8
89:22 93:13
94:12,16
95:24 96:1,3,4
96:5,10,15,16
96:20 103:18
111:25 113:18
113:19
**trials** 64:24
65:12,13,17,19
65:21 103:17
113:14 114:1,2
**tried** 66:1 109:17
113:16
**trip** 14:8,17 18:14

**true** 58:22 77:2
116:24 124:16
124:18,25
131:7,12
**truly** 66:16
**trust** 23:3 82:1
**truthfully** 7:7
**try** 16:3 19:14
20:2 40:3,7
71:25 73:15
80:21 102:6
103:18 110:1
113:7
**trying** 20:7 63:5
67:13 94:12
98:18 120:19
**Tschannen** 2:12
55:7,24 56:3
58:14,25
**ttartaglio@orri...**
4:9
**Tucker** 2:11
53:17 56:10,16
56:24 57:13
57:23
**turn** 42:8 45:3
53:19
**turned** 125:20
**turning** 16:23
58:13 69:20
102:24 104:10
108:18 110:15
114:13 118:7
**turnover** 63:7
64:3 73:1,2
**twelve** 3:12
**twice** 6:15
103:24
**two** 9:21 25:3
26:4 28:13,14
28:24 32:2
34:24 35:1,2
36:9 44:1,16
52:7 59:21
60:8 62:6
63:7 75:11,16
86:4 90:11

98:23 99:4
107:11,13
125:20
**two-hour** 16:11
18:13
**type** 11:14 24:23
39:8 51:5
60:3 66:5
90:25 91:18,19
92:6 102:16
106:3 114:16
118:9 121:20
123:7
**types** 24:9
56:21 75:8
**typewriting**
128:8
**typical** 17:10
37:16
**typically** 16:1
17:8 21:14,16
37:11 66:6,18
73:3,9 76:17
95:12,15 101:2
113:21 114:2

---

**U**

**Uh-huh** 11:9
30:21 60:13
**ultimately** 22:19
64:15 67:13
113:8 114:6
**unable** 22:6
81:6 94:18
**unavailable**
92:19
**undergrad**
102:22
**undergraduate**
102:10,19
**underneath**
69:1,11 86:4
**understand**
7:22 23:16
35:16 59:4
82:16 87:10
114:4 115:8,12

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-10   Filed 02/21/18   Page 54 of 56

115:16
understanding
  37:17 46:8
  80:10 98:20
  100:15 108:25
  110:16 115:8
  117:11,15 118:17
  119:21 125:22
understood
  22:5 25:5
  78:8 103:6
  105:10
uneasy 64:11
unethical 83:11
  97:17,17
unit 63:16
United 1:1 3:1,17
  5:7 67:3
upcoming 21:11
  22:24 24:1
  103:17
upper 87:22
use 40:16,18,19
  40:20,25
  57:4 58:6
  95:1,5 106:6
  118:6 122:14
utilize 52:12
  110:2
utilized 120:9,12

V
v 5:5 129:8
  130:3
vacancy 25:23
vagaries 50:9
vague 100:24
varies 35:25
  38:18
various 102:6
  105:11 108:9
vary 27:16 79:16
vast 76:13
venue 14:12
venued 74:3,4
verbally 7:13
verification

106:4
verify 115:9
versus 74:11
video 94:21,23
  95:1,5
videographer
  4:23 5:2,13,25
  68:6,9 101:17
  101:20 127:19
videos 94:23
VIDEOTAPED
  1:17 3:9
view 37:10 77:3
violate 44:20
  86:20 90:17
violates 47:16
violating 45:11
  47:10 88:12,15
violation 57:12
  79:24 86:6
  87:5 100:19
violent 105:6
virtue 48:7
visit 18:2
visits 18:8
volume 34:6
  36:17 101:6
vs 1:6 3:5

W
W 4:13 129:6
wait 7:16,17
  40:7 48:14,19
  48:24 49:14
  49:16,18,22
  50:23 51:2
  56:13 88:19
  89:3,10,14
  90:3,4,7 101:5
waiting 52:24
  52:25 53:3
  93:3
want 18:1,16
  23:5 24:4,7
  35:14 41:7
  48:11 65:8
  71:23 74:23

93:2,5 95:9
95:24 96:17
108:3 109:19
111:20 113:5,6
113:7 122:14
wanted 11:14
  48:4 57:16
  120:19 126:23
wanting 25:9
  109:23
wants 33:21
  52:10
warrant 37:3,5
wasn't 11:25
  57:1 95:20
  110:23
waving 112:24
way 38:5 46:15
  63:19 74:10
  81:8 82:2
  87:14 93:3
  104:6 109:19
  113:18 119:17
  127:7
ways 36:2 81:15
  83:9 93:16
  101:5 103:10
  103:13
we'll 36:6 90:17
we're 5:2 17:3
  19:6,8,8 24:12
  28:5 41:4
  59:5 62:11
  67:11 68:7,10
  68:13 72:16
  90:1,12 101:21
  105:22 107:16
  112:21 119:17
  125:11 127:20
we've 33:22
  63:6 72:25
  74:21 97:18
  109:15 121:19
week 20:3,20
  21:11,15,15,16
  21:24 22:7,24
  23:13 24:16

36:9,13,23
49:17 104:11
weeks 32:18
  36:10 89:24
went 10:19
  63:18,20
  121:23
weren't 46:20
  48:9 56:22
  59:11 74:3
  100:23
west 4:4,19
  14:15 16:10
Western 1:1 3:1
  3:18 5:7
wheel 43:1
wife 12:1
willing 115:20
win 111:24
window 95:22
wish 102:23
withdrawn
  70:20
witness 6:1
  128:5,7 129:12
  130:2,25
witnesses 89:19
  92:19
word 91:23
  121:15,15
  122:14
words 15:7
  91:22 98:8
  99:3 119:25
work 11:17 12:19
  13:1 24:8 26:11
  26:16 28:9,10
  32:11 33:20
  40:1 60:1
  63:18,18 67:21
  79:13 88:20
  93:21 94:17
  95:12 97:3
  102:16 110:20
  111:22,25,25
  112:3 118:3
  124:17 125:14

worked 10:11,19
  10:21 11:3
  34:20 102:14
  119:10
working 10:2
  59:22 64:5
  89:24
workload 19:22
  64:17 115:25
  116:8
workloads
  117:10
works 7:3
  63:23
world 79:4 97:5
  124:13
wouldn't 61:18
Wow 102:23
write 25:11
writing 82:17
written 82:7
  118:5

X

Y
yeah 61:5 65:4
  73:11 95:2
  114:16 124:6
  126:18
year 8:8,9
  10:23,23 11:4
  14:24,25
  27:12,14 28:3
  29:2,20,21,22
  30:15,17,18,19
  30:20,25 31:9
  31:11 32:9,15
  33:2 64:25
  65:1 69:2
  70:4 72:19
  73:23 113:15
  114:15 115:16
  121:25
years 9:2 12:6
  34:16,17,21,23
  35:1,2,6 46:18

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-10   Filed 02/21/18   Page 55 of 56

50:7 57:18
59:21 62:20
62:21 63:7,8
98:4,23 99:4
**yesterday** 27:21
28:1
**York** 4:4,4
**young** 84:13

_____
**Z**
**zealous** 51:16
**zero** 30:9

_____
**0**

_____
**1**
**1** 86:7
**1,367** 70:24
**1,500** 30:1 65:8
**1,547** 70:17,18
**1,560** 65:9
**10-minute** 118:11
**10:08** 68:6
**10:19** 68:9
**100** 4:13 129:6
**1000** 4:8,13
129:6
**10019** 4:4
**102** 2:4
**11:13** 101:17
**11:21** 101:20
**12** 5:3 76:8
**12:02** 127:19,21
**122** 2:5
**123** 2:6
**12th** 1:19 3:10
129:10 130:4
**13** 43:9
**14** 8:24 9:9,10
9:14 11:10,11
13:3,4 27:7
42:18 47:24
53:24 55:18
62:24 70:12
85:19 89:5
**15-** 65:7
**150-mile** 14:8

**17** 29:22 30:17
65:1
**17-04057-CV-...**
1:6 3:5
**1704057-CV-...**
5:6
**180-mile** 14:17
**1991** 10:18
**1992** 10:3,16
**1st** 29:23 30:7,8
70:6

_____
**2**
**2** 17:13
**20** 12:6 84:23
84:25 115:22
131:14
**2002** 10:9
**201** 3:14 129:1
**2011** 9:12,13,18
10:4 11:7 63:1
**2014** 9:3,13,14
**2016** 29:23
30:8 70:6
119:17
**2017** 1:19 3:11
5:3 29:23
30:25 42:6
55:7 69:5,13
70:4,9 72:19
114:23 129:4
129:10 130:4
**2018** 30:18 69:2
73:23
**21** 68:13 114:14
**212** 4:5
**221** 4:19
**221-1151** 129:2
**24/7** 116:13
**247.5** 71:7
**25** 34:21 69:12
**2511** 3:14 5:10
129:1
**25th** 69:4
**26** 34:16
**28th** 129:4
**29** 2:10 41:8,9

41:15 54:7
55:14,22
108:18
**2nd** 42:6 53:16
55:6

_____
**3**
**3** 10:3,10
**30** 2:11 14:16
31:2 34:16
53:7,8 55:14
56:9 98:3
108:19 129:16
**30th** 29:23
70:9
**31** 2:12 54:22
54:23 58:14
108:19
**33** 69:24
**38970** 69:17
**38976** 69:21
114:21
**39404** 55:17
**39407** 53:20
**39409** 45:4
46:24
**39410** 48:11
51:13

_____
**4**
**4** 80:8,11,13
85:9
**4-1.7** 44:3 61:8
**4-5.1** 85:4
**41** 2:10
**420** 99:25
**449-0561** 129:2
**45** 16:11

_____
**5**
**5** 17:14
**50** 65:18
**500** 99:23,24
**506-5000** 4:5
**51** 4:4
**52nd** 4:4
**53** 2:11

**54** 2:12
**55** 27:17,24
73:9
**573** 4:20 129:2
**573-777-9977**
4:14

_____
**6**
**6** 2:3
**600.063** 120:7
**614-7478** 4:9
**65** 27:17,25
**650** 4:9
**65102** 4:19
**65201** 3:15
129:2
**65203** 4:13
129:6

_____
**7**
**751-2590** 4:20
**79** 124:21

_____
**8**
**8:30** 118:3
**8:38** 5:1,4
**80** 27:15,19,19
27:25 72:2,15
76:23 77:4,8
78:23 79:4
87:2 97:23
99:7,25 100:6
100:12
**80-plus** 100:20
**816** 129:2
**84** 100:6
**899** 4:18

_____
**9**
**90** 64:23 74:13
75:6
**94025** 4:8

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-10   Filed 02/21/18   Page 56 of 56