# Exhibit J

## Page 1

```
 1    UNITED STATES DISTRICT COURT FOR THE
            WESTERN DISTRICT OF MISSOURI
 2                CENTRAL DIVISION
 3
      SHONDEL CHURCH, et al.,    )
 4                               )
          Plaintiffs,            )
 5                               ) Case No.
      vs.                        ) 17-04057-CV-C-NKL
 6                               )
      STATE OF MISSOURI, et al., )
 7                               )
          Defendants.            )
 8
 9
10
11              VOLUME I
12
13
14    VIDEO DEPOSITION OF JEFFREY MARTIN
15    TAKEN ON BEHALF OF THE PLAINTIFFS
      
15           December 5, 2017
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1    UNITED STATES DISTRICT COURT FOR THE
            WESTERN DISTRICT OF MISSOURI
 2                CENTRAL DIVISION
 3
      SHONDEL CHURCH, et al.,    )
 4                               )
          Plaintiffs,            )
 5                               ) Case No.
      vs.                        ) 17-04057-CV-C-NKL
 6                               )
      STATE OF MISSOURI, et al., )
 7                               )
          Defendants.            )
 8
 9        VIDEO DEPOSITION OF JEFFREY MARTIN,
10    produced, sworn and examined on December 5, 2017, at
11    the offices of the American Civil Liberties Union of
12    Missouri Foundation, 406 West 34th Street, Suite 420,
13    Kansas City, Missouri 64111, before Emily S. Hughes,
14    Certified Court Reporter and Notary Public within and
15    for the State of Missouri, in a certain cause now
16    pending in the United States District Court, Western
17    District of Missouri, between SHONDEL CHURCH, et al.,
18    Plaintiffs, vs. STATE OF MISSOURI, et al., Defendants;
19    on behalf of the Plaintiffs.
20
21
22
23
24
25
```

## Page 2

```
 1              I N D E X
 2    WITNESS:                   PAGE
 3    JEFFREY MARTIN
 4    EXAMINATION BY MR. WILLIAMSON        6
 5    EXAMINATION BY MR. RAMSEY           96
 6
 7           E X H I B I T S
 8    NO.    DESCRIPTION         PAGE
 9    Exhibit 13 Interim Administrative Order   73
10
11    (Original exhibit attached to original transcript.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1
 2           A P P E A R A N C E S
 3
      APPEARING FOR THE PLAINTIFFS:
 4        Mr. Jason D. Williamson
          ACLU FOUNDATION
 5        125 Broad Street
          18th Floor
 6        New York, New York 10004
          212.607.3300
 7        jwilliamson@aclu.org
 8
      APPEARING FOR THE STATE OF MISSOURI
 9    AND GOVERNOR GREITENS:
10        Mr. Steven Alan Ramsey
          STATE OF MISSOURI ATTORNEY GENERAL'S OFFICE
11        207 West High Street
          P.O. Box 899
12        Jefferson City, Missouri 65102
          573.751.3321
13        Steven.Ramsey@ago.mo.gov
14    APPEARING FOR THE MSPD DEFENDANTS:
15        Ms. Jacqueline Shipma
          MISSOURI STATE PUBLIC DEFENDER'S OFFICE
16        1000 West Nifong
          Building 7, Suite 100
17        Columbia, Missouri 65203
          573.526.5212
18        jacqueline.shipma@mspd.mo.gov
19
      Videographer:
20    Ryan Gray
      Court Reporter:
21    Emily S. Hughes, RPR, CRR, MO CCR #1353
22
      Alaris Litigation Services
23    1608 Locust Street
      Kansas City, Missouri 64108
24    816.221.1160
      1.800.280.3376
25
```

1 (Pages 1 to 4)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-11   Filed 02/21/18   Page 2 of 52

Page 5

1    IT IS HEREBY STIPULATED AND AGREED by and between
2  counsel for the Plaintiffs and counsel for the
3  Defendants that this deposition may be taken in
4  shorthand by Emily S. Hughes, RPR, CRR, MO CCR #1353,
5  and Missouri Notary Public, and afterwards transcribed
6  into typewriting; and the signature of the witness is
7  expressly reserved.
8         *    *    *    *    *
9    (Deposition commenced at 2:49 p.m.)
10    VIDEOGRAPHER:  We are on the record.
11  Today's date is December 5, 2017, and the time is
12  2:49 p.m.  This is the video recorded deposition of
13  Jeffrey Martin in the matter of Shondel Church,
14  et al., versus State of Missouri, et al., Case
15  Number 17-04057-CV-C-NKL in the United States District
16  Court for the Western District of Missouri, Central
17  Division.  This deposition is being held at the
18  American Civil Liberties Union of Missouri Foundation.
19    The reporter's name is Emily Hughes.  My
20  name is Ryan Gray.  I'm the legal videographer.  We
21  were with Alaris Litigation Services.
22    Would the attorneys present please
23  introduce themselves.
24    MR. WILLIAMSON:  Jason Williamson from the
25  ACLU for the plaintiffs.

Page 6

1    MR. RAMSEY:  Steven Alan Ramsey for the
2  State of Missouri and Governor Greitens.
3    MS. SHIPMA:  Jacqueline Shipma for the
4  Missouri State Public Defender defendants.
5    VIDEOGRAPHER:  Would the court reporter
6  please swear in the witness?
7    JEFFREY MARTIN,
8  of lawful age, produced, sworn and examined on behalf
9  of the Plaintiffs, deposes and says:
10    EXAMINATION
11  BY MR. WILLIAMSON:
12    Q.  Good afternoon, Mr. Martin.
13    A.  Good afternoon.
14    Q.  My name is Jason Williamson.  I am one of
15  the attorneys for the plaintiffs in this case.  Have
16  you ever been deposed before?
17    A.  Maybe once or twice.
18    Q.  Do you remember when that was?
19    A.  Oh, no.  It would have been during the
20  course of working for the public defender's office.
21    Q.  So in the context of a criminal case?
22    A.  Yes.
23    Q.  Okay.  Today, I'm going to ask you a number
24  of questions relevant to the case.  You are required
25  to answer those questions truthfully and to the best

Page 7

1  of your abilities.  Please remember that your
2  testimony here is under oath, so it's just as if you
3  were testifying in court.  You understand that?
4    A.  Yes, sir.
5    Q.  And your attorney may object to one or more
6  of my questions, but in limited circumstances, you are
7  still required to answer the question; okay?
8    A.  Sure.
9    Q.  If you don't hear my question or you don't
10  understand my question, just please let me know
11  immediately so that I can repeat or rephrase the
12  question.
13    And a few things that I wanted to make sure
14  we keep in mind for the benefit of our -- our court
15  reporter:  One is to make sure that you're speaking
16  clearly and loudly enough for her to record.  I have a
17  feeling that won't be a problem.
18    A.  Not a problem.
19    Q.  Also, make sure that you answer all
20  questions verbally as opposed to using any kind of
21  body movements; okay?
22    A.  Sure.
23    Q.  And I'd like for us to -- to try to let one
24  another finish before we -- we move on, so please, let
25  me finish my question before you answer, even if you

Page 8

1  can anticipate the question that's coming.  And I'm
2  going to -- to do my best to -- to let you finish your
3  answer before I ask another question; okay?
4    A.  Okay.
5    Q.  Did you prepare for the deposition today?
6    A.  I spoke with Ms. Shipma I think twice.
7  First when she notified me that I was going to be
8  included on the list, and then actually, I think
9  yesterday, she touched base with me to see if I had
10  any questions.
11    Q.  And did you talk with -- talk with anyone
12  else in preparation for the deposition?
13    A.  In preparation, no.  I mean, I, let, like,
14  my staff and you, know, my wife and a few other people
15  know that I was going to be coming down here but --
16    Q.  Okay.
17    A.  -- not otherwise.
18    Q.  Did you review any documents in preparation
19  for today?
20    A.  I don't know that I reviewed them.  I
21  didn't have -- I had a few documents that I had
22  forwarded to Ms. Shipma, which I think were e-mails to
23  me from the Court that I couldn't remember whether I
24  had forwarded them to her, so I wanted to make sure
25  that I had -- that I had done that.  I may have re --

2 (Pages 5 to 8)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-11   Filed 02/21/18   Page 3 of 52

1  in essence, resent them again, but -- but other than
2  that, there wasn't a bunch of documents that I
3  reviewed or anything like that.
4      Q.  And did you do anything else that you can
5  think of to prepare for today?
6      A.  No.
7      Q.  In all of your spare time?
8      A.  Correct.  No.
9      Q.  Who is your current employer?
10     A.  Missouri State Public Defender.
11     Q.  And what is your title?
12     A.  I am the Area 17 district defender.
13     Q.  And how long have you served as district
14 defender?
15     A.  District defender -- I have been the
16 district defender there since '99, I believe,
17 something about like that.
18     Q.  And have you served the with MSPD in any
19 other capacity?
20     A.  I served at -- I mean, I was an assistant
21 public defender prior to becoming the district
22 defender.  I've been with MSPD since 1996.  I mean,
23 January will -- will be 22 years.
24     Q.  And what other positions did you hold
25 within the office prior to becoming district defender?

1      A.  I was an assistant public defender until I
2  became district defender.
3      Q.  And did you start as an APD 1?
4      A.  Yes.  I -- well, yes.  I'm trying to
5  remember.  There used to be -- when I first started,
6  there was a designation, APD 1, and APD 1P, and I
7  don't remember which one was first.
8      Q.  Okay.
9      A.  But in essence, I started at what would be
10 the beginning position.
11     Q.  And from there, you -- you moved up the
12 ranks to APD 2, 3, and 4?
13     A.  I became -- I was an APD 3 at the time I
14 became a district defender, so I never actually became
15 an APD 4.  I became district defender before that
16 occurred.
17     Q.  Were you an APD also in Area 17?
18     A.  Yes.  That's the office I started in, and
19 I've always been there.
20     Q.  Okay.  Got it.  And did you have any -- did
21 you do any other legal work prior to coming to the
22 MSPD?
23     A.  I worked privately for about three years, I
24 would say.  About three years before coming to MSPD.
25     Q.  And was that as a criminal defense

1  attorney?
2      A.  For the most part, yes.
3      Q.  Did you do other kinds of legal work?
4      A.  I did some.  Most of it was, like,
5  municipal court, traffic work, criminal work, did some
6  bankruptcy work, but it was mostly limited to that.
7      Q.  So can you tell me which counties are
8  included in Area 17?
9      A.  Area 17 has primary coverage in two
10 circuits.  Those two circuits are the 17th Circuit,
11 which is Cass County and Johnson County, Missouri, and
12 then the 27th Circuit, which is Henry County,
13 Bates County, and Saint Clair County.  Our office also
14 covers conflict cases for counties that are -- for the
15 offices basically that are to the north and the south
16 of us, so for the Area 16, the Kansas City office; for
17 the Area 7 office, which is Liberty; and then for the
18 Area 28 office, which is Nevada.  We, over the years,
19 have done conflict cases from those offices, so when
20 they have multiple codefendants or conflict witnesses
21 or situations like that, then we would end up getting
22 those conflict cases from those offices.
23     Q.  Now, is your office presently still
24 handling conflict cases?
25     A.  We still have conflict cases assigned in

1  our office.  We are currently not receiving conflict
2  cases from the Kansas City office or the Liberty
3  office.  As far as new conflicts arriving, we have had
4  a few come from the Nevada office, but for the most
5  part, those were getting contracted out as well.  They
6  were contracting out the conflict cases here over the
7  last number of months.
8      Q.  And is it your understanding that the
9  public defender's office received additional funding
10 this -- this fiscal year to cover conflict cases?
11     A.  Yes.
12     Q.  But your testimony is that there are
13 still -- notwithstanding that additional funding,
14 there are still conflict cases that are being handled
15 by your office?
16     A.  We were -- we are generally not receiving
17 new conflict cases, but I still have conflict -- I
18 have two attorneys right now that are still -- part of
19 their caseload are conflict cases that they're doing
20 the -- one attorney, that is primarily what he does,
21 our cases from Jackson County and Clay County and
22 Platte County.
23     Q.  But those are all cases that were opened
24 prior to --
25     A.  Previous.

3 (Pages 9 to 12)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-11   Filed 02/21/18   Page 4 of 52

## Page 13

1   Q.  Do you expect that trend to continue?
2       A.  I would be hopeful, but no.  Based on my
3   experience with budgets and the State for the last
4   22 years, my experience would be that while we had
5   that this year, and we're -- my office is certainly
6   grateful to have had that, I would fully expect that
7   when the next fiscal year rolls around, in all
8   likelihood, that will not be the case, and that I will
9   start getting conflict cases from Jackson County and
10  Clay County and Platte County and Nevada and that sort
11  of thing again.
12      Q.  Okay.  How many attorneys do you have on
13  staff right now in your office?
14      A.  Okay.  My overall -- my overall staff right
15  now is 12.
16      Q.  12 attorneys?
17      A.  No.  That's -- my overall staff is 12.
18  That includes the office support assistant, which is
19  the person up front that answers phones and opens
20  files and that sort of thing.  I have two legal
21  assistants, one investigator, and then there's an
22  eight-attorney staff total.  Now, I have been
23  designated another position, attorney position, which
24  I have been trying to fill for the last six months, so
25  I have a position that is open right now.

## Page 14

1       Q.  Okay.  And that -- the eight attorneys
2   includes yourself?
3       A.  Oh, yes.  That includes me.
4       Q.  Okay.  And you said you have -- there's --
5   there's funding for an additional attorney?
6       A.  Yes.  I would end up with a staff of
7   13 total.
8       Q.  Okay.  How soon would you expect to be able
9   to fill that position?
10      A.  I have offered the position, I believe, at
11  least three times now that I can think of.  The first
12  person did not pass the bar -- strike that.
13          I think four times, because then the next
14  three people have all declined the position, declined
15  the offer to work somewhere else, accept offers
16  somewhere else.
17      Q.  We'll talk in a bit about the -- the
18  Hinkebein decision.  But were -- is it your
19  understanding that the -- the decisions to turn down
20  those offers had anything to do with those recent
21  events?
22      A.  As a matter of fact, I can tell you that
23  during my interview process, one of the last questions
24  that I ask people during the interview process is,
25  would you have any -- other than asking them if they

## Page 15

1   have questions for me --
2       Q.  Uh-huh.
3       A.  -- about various things, I ask them, "Do
4   you have any concerns about joining the public
5   defender's office?  Is there anything that would, you
6   know, concern you, or what worries would you have?"
7       Q.  Uh-huh.
8       A.  Every single person that I've interviewed
9   almost to a T, at least one of the questions that
10  they've asked has been about the caseload and what
11  kind of caseload they would have, and you know, what
12  that -- what that looked like.  And my impression of
13  that was not from a -- just an interest standpoint of,
14  you know, well, what does my caseload look like?
15  Like, what is my average day look?
16      Q.  Right.
17      A.  There were a number of them, many of them
18  that that question was a specific question that was
19  geared towards, like, how heavy is my caseload going
20  to be the day I start?
21      Q.  And what -- when were those four offers
22  made and what -- and in what time frame?
23      A.  I have been -- the position has been open,
24  I believe, since July, so it has been during that
25  context at that time frame.  The person that obviously

## Page 16

1   didn't pass the bar I think found out in -- whenever
2   bar results come out.  I want to say -- I forget
3   whether it's September or -- but it -- that person
4   found out about bar results.  And I should correct one
5   thing.  There was one person that we were in -- that I
6   was going to offer the position to that accepted an
7   offer with another office, with actually an MSPD
8   office.
9       Q.  Okay.
10      A.  But then the other people declined the
11  offers.  Those offers then took place after -- after
12  making -- after the one person not passing the bar --
13      Q.  Uh-huh.
14      A.  -- then I simply, you know, started
15  checking references on what -- who would have been the
16  next person on my list --
17      Q.  Right.
18      A.  -- moved down from there.  If we didn't
19  have applicants that I felt would meet the criteria
20  at -- which I have done, I basically reopened my
21  process and started rescreening applicants and am
22  still doing that now.
23      Q.  What kind of turnover rate do you have in
24  your office?  And we can start with turnover rate
25  among the lawyers.

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-11   Filed 02/21/18   Page 5 of 52

1     A.  Yeah.  Because it has -- it has varied.
2  I'd say on average, I probably lose an attorney
3  somewhere around -- I'd lose one probably once every,
4  if I had to kind of average it out, like, nine -- nine
5  months to a year, somewhere around in there, you know.
6  And -- and that kind of accounts for there's sometimes
7  where I'll have people, and maybe they'll -- I'll be
8  fully staffed for a year and a half and, you know,
9  that sort of thing or, you know, up to two years; and
10  then all of a sudden, I'm down two attorneys.  In an
11  office like mine, when you start losing more than one
12  attorney, that becomes a real problem.
13     Q.  Now, to the extent that you can recall
14  this, of the other seven attorneys in your office,
15  what is the range of experience that they have as
16  attorneys, as criminal defense attorneys?
17     A.  Right now -- right now, I have a fairly
18  experienced staff with the exception of one attorney,
19  which is a -- a new hire.  I've been able to hire a
20  person, but I had a person leave, so still have the
21  position that I was trying to originally fill is still
22  open.  That person is a -- is a brand new licensed
23  attorney.  He was just sworn in.  Other than him, most
24  of the attorneys in my office are fairly experienced
25  attorneys.  Some of them have been at -- with my

1  office -- let me think here.  One of them has been
2  in -- bee with my office since she started and has
3  been with me probably nine years or so, something like
4  that.  The other attorneys that I have have
5  transferred -- many of them have transferred in from
6  another office, so they weren't, like, a direct hire
7  for me as a new attorney.
8     Q.  Okay.
9     A.  They transferred in from somewhere else,
10  but many of them have -- have a pretty good -- I'm
11  blessed to have a number of attorneys that have
12  experience right now.  I've had the converse of that.
13     Q.  Uh-huh.  What would you say are the primary
14  differences between having experienced attorneys on
15  staff versus young lawyers?
16     A.  Well, having an experienced attorney on
17  staff, the benefit of having an experienced attorney
18  is that if somebody's gone, if someone's sick, if they
19  have to cover a docket, if they have to do something
20  that's out of the ordinary, it -- it's a lot easier
21  for them to do it, to walk into an unfamiliar
22  jurisdiction.  Since our office covers so many
23  counties, there would be places that people might have
24  to go that they haven't ever been there before as
25  opposed to working in one courthouse generally.  So

1  other than figuring out, you know, how to get from
2  point A to point B, for them, you know, it might not
3  be that big of a deal to do.  There are other kinds of
4  logistics that they're familiar with that they know,
5  you know, I'm going -- if I'm going to do this, I'm
6  going to probably be deposing, you know, a certain
7  number of people.  Here's the kind of case I have.  I
8  might need an expert for that, so I need to kind of be
9  planning, you know, what I'm tong to do.  Recognizing
10  mental health issues in clients, some of those kinds
11  of things.  Experienced attorneys have a better grasp
12  of -- of some of -- some of those things and being
13  able to recognize it or know those things early on as
14  opposed to later on.
15     Q.  Do you -- how long does it generally take
16  for you to fill a position?  And I know you've talked
17  about trying to fill this --
18     A.  Uh-huh.
19     Q.  -- sort of new position, but when someone
20  leaves, generally, how long is it between the time
21  that person leaves and the time you're able to replace
22  them?
23     A.  Oh, at best, usually the turnaround is
24  about 90 days or so, at best.  And it depends on how
25  it gets fills.  Because, for example, like, one of

1  those experienced attorneys, if they're transferring
2  from somewhere, if that attorney is transferring from
3  an office that they, themselves, might -- obviously,
4  they're going to be losing someone, if it's a smaller
5  office, they might have to really go through a hiring
6  process before that attorney can leave, because
7  otherwise, it might leave them in a real hole.  So I
8  may operate -- because I have more attorneys than they
9  do, I might operate with that hole for a while at my
10  end until they can try to get their situation taken
11  care of.  Other times, it's had to do with just the
12  time of year and -- and various other kinds of things.
13  For example, in this round of stuff, I've had nobody
14  apply transfer-wise throughout the entire course of
15  this.  All of this has been people that would be
16  new-hire scenarios.
17     Q.  How -- how do you think that this -- that
18  the -- the turnover rate and the difficulty in
19  replacing attorneys who leave impacts your office's
20  ability to provide the kind of representation that you
21  think is necessary for your clients?
22     A.  Well, it creates a number of problems, not
23  the least of which is, people basically are just
24  filling in.  They're covering something in some way.
25  And so from a client standpoint, they were talking

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-11   Filed 02/21/18   Page 6 of 52

## Page 21

1  with person A; they're now talking with person B.  For
2  some clients, that -- you know, they may be okay with
3  that, and it doesn't bother them.  For other clients,
4  it's a -- it -- you have to spend time developing
5  trust with a client in order to be able to talk to
6  them about certain aspects of cases, what the outcomes
7  might be, those kinds of things.  So from that
8  standpoint, it creates logistic problems that way.
9         For us, the other logistic problem that it
10  creates is, we've got a number of counties we go to,
11  and I only have so many people that can do stuff.  And
12  court, based on what days you have court and how many
13  people you have, people can't be in two places at
14  once.  They also can't -- it inhibits their ability to
15  go the jail and visit clients.  It inhibits their
16  ability to do other things that would help them be
17  able to investigate or move a case forward because
18  they're filling those days with other court dates.
19  You know, even if it's just to reset something or to
20  try to get somebody out of jail or whatever it might
21  be, you've taken a day that would have been -- or days
22  that would have been constructive workdays and turned
23  those into another court day.  And so you know, while
24  people can go to court and can cover court, that might
25  be all they're doing.

## Page 22

1         Q.  Can you talk to me a little bit about your
2  day-to-day responsibilities as district defender?
3         A.  Well, I have -- generally, I have two
4  functions.  I am the -- as a supervisor of the office,
5  I have all of the managerial duties, so I'm
6  supervising attorneys, supervising other staff,
7  dealing with families and other individuals outside
8  the office that might be calling in or contacting the
9  office, people with general questions that can't be
10  answered by support staff that need to be answered by
11  somebody else.  Generally, I would be the person that
12  a number of those things get directed to.  Dealing
13  with Courts and jails and other kinds of
14  responsibilities that -- that you have, from a
15  management standpoint.
16         Q.  Uh-huh.
17         A.  I then also, because of our office and
18  staffing, I have my own caseload, and so I have a
19  caseload responsibility like everybody else in my
20  office.  And while I've had to reassign that in
21  various ways at various times, that also requires me
22  to go to jails, to be able to go to court, to be able
23  to, you know, deal with my own clients.  To be able to
24  work on their cases as well along with the other
25  aspects of the office.

## Page 23

1         Q.  How does your caseload compare to the
2  caseload of the other attorneys?
3         A.  I've tried at times to do various things
4  with -- with my caseload, in -- either limiting it,
5  rearranging it.  I've tried things to adjust it in
6  various ways, but as a practical matter, my caseload
7  is very comparable to other people in the office.
8  There's no -- there's no good way not to be able --
9  there's no good way not to be able to do that.  It's
10  just an impossibility.
11         Q.  And I assume you mean there's no good way
12  to do that with the current number of attorneys --
13         A.  Correct, right.
14         Q.  -- you have on staff?
15         A.  Right.  Everything -- yeah.  Everything is
16  in the context of what I -- with what I have right
17  now, there's no way for me to -- me to be able to
18  functionally do that.  I -- it would dump enough cases
19  on other attorneys that they wouldn't -- it -- they
20  have too many as it is.
21         Q.  Do you have a sense of how many cases you
22  have right now?
23         A.  How many I, personally, have?
24         Q.  Individually, yeah.
25         A.  If I opened up my laptop and logged on, I

## Page 24

1  could tell you exactly, but the exact number, I
2  wouldn't be able to tell you.  I would venture to say
3  at any given time right now, I've floated anywhere
4  between 120 and 150 cases.
5         Q.  You, personally?
6         A.  Me personally.
7         Q.  And is -- is that range the same for the
8  other seven attorneys?
9         A.  It is, with the exception of the -- there's
10  two exceptions in that, and -- and I'll explain some
11  with mine as well.
12         My caseload, I have tried to limit to what
13  would be -- what would be lower class felony cases,
14  and they're primarily in the county that our office is
15  in, is in Cass County, so that way, I'm able to better
16  control being able to go to the jail, being able to go
17  to court, and being able to come back to the office,
18  rather than, in essence, being in court or going to
19  the jail, basically removing me from the office for a
20  day or multiple days.
21         The youngest -- and I say "youngest."  The
22  less -- the least experienced attorney, the newest one
23  that I have, youngest from the standpoint of when he
24  started.
25         Q.  Right.

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-11   Filed 02/21/18   Page 7 of 52

## Page 25

1   A.  He's actually the youngest too.  He -- his
2  caseload, it primarily consists of -- there's a
3  large number of cases that are misdemeanor,
4  probation violation, he does have lower level C, D,
5  and E felonies, but -- and that he doesn't have any upper
6  class felony cases as of yet.
7      Q.  So when you say that you try to limit your
8  caseload to lower level felonies, in Cass County,
9  those are C, D felonies?
10  A.  Yes.
11  Q.  And E felonies?
12  A.  C, D, and E.  Yeah.  There's a new
13  classification this year now, E felonies, which I
14  still am trying to get ingrained in bread -- in my
15  head.  For so long, it was C and D felonies.
16  Q.  Right.
17  A.  And I did -- and you had answered -- and to
18  go back to the question before --
19  Q.  Uh-huh.
20  A.  -- the other attorney from a numbers
21  standpoint that has a lower number is the attorney
22  that does the conflict cases up here in Jackson County
23  and in Clay County, Platte.  Part of the reason is
24  because the logistics of the travel with all of those
25  cases, and many of those cases are also very serious

## Page 26

1  homicides, multiple count robbery cases, things like
2  that that require him to have different logistics as
3  far as travel and jails and that sort of thing, so his
4  numbers have been solely ris -- restricted in relation
5  to that just because, as a practical matter, he can't
6  do -- he wouldn't be able to do other stuff.
7      Q.  Okay.  Is it your testimony that all of
8  your cases -- your personal cases are lower level
9  felonies, or do you also have some misdemeanors?
10  A.  I have -- well, and I also have probation
11  violations in that -- in that context as well.  I'm
12  trying to think if I actually have misdemeanor cases.
13  In Cass County, it's a separate misdemeanor docket, so
14  if I have a misdemeanor case on there in my caseload,
15  it would be a random misdemeanor case simply because
16  that person has other cases going on, and I just have
17  that case assigned to me.  But on the whole, it's not
18  a misdemeanor caseload that I have assigned myself.
19  Q.  And any particular rationale for that?
20  A.  The rationale for that at the time was I --
21  I didn't have another attorney to be able to assign to
22  do that, and it -- prior to that, I had myself
23  assigned the smallest county caseload, which was also
24  the county furthest away from the office, and -- which
25  was Saint Clair County.  And while in numbers --

## Page 27

1  that -- that kept numbers down more, the logistics of
2  the jail and the logistics of my travel constantly had
3  me out of the office where I was not able to
4  effectively deal with other things I needed to deal
5  with like family members who might call in or things
6  like that.  The logistics of that had me out of the
7  office -- might have me out of the office for a couple
8  of days as a practical matter, and you weren't able to
9  deal with other things that you needed to be able to
10  deal with.  Which it also includes just super --
11  supervision of the office and being there for the
12  staff and answering questions and implementing policy
13  and things like that, so that's why I -- I had to
14  change that to where it put me in the office, and that
15  was the only way that -- at that time to be able to do
16  it.
17      Q.  And there's no one else in your office who
18  is able to do the kind of supervision that -- that
19  you're responsible for -- for doing?
20  A.  Right.
21  Q.  That's not something you can hand to
22  someone else?
23  A.  No.
24  Q.  Do you all -- do you second chair any
25  cases, trials?

## Page 28

1  A.  Yes.
2  Q.  How often do you do that?
3  A.  I try to as much as I can, especially with
4  the last -- one of the attorneys -- well, actually,
5  the last two attorneys that left my office were both
6  attorneys that I had hired in the last three years,
7  and one of them had almost no experience, and the
8  other one had a slight bit of practice experience, but
9  basically had very little experience as well.  I tried
10  to put myself in the position of certainly for people
11  who have first trials or for certain types of cases
12  making myself have available to be able to second
13  chair those individuals, because part of my
14  responsibility as a supervisor and to recommend them
15  in relation to a promotion process is to be able to
16  have observed them demonstrating trial skills.  We're
17  a trial office.  People, you know, are expected to be
18  able to demonstrate those -- those skills to some
19  degree, and the only way for me to effectively
20  evaluate those is for me to at least be able to
21  observe that, so second chairing was a great way to be
22  able to do -- to do that, because you're involved with
23  all aspects.
24  Q.  How often do you interact with your
25  attorneys on a one-on-one basis for supervision

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 29

1 purposes?
2     A.   Well, I'm not sure exactly how to answer
3 that.  I mean, I interact with them on a daily basis,
4 the attorneys that -- for example, that are there in
5 the office, or if I'm over in -- in court, and they're
6 over in court, I interact with them.  I am I think --
7 I actively try to talk to my attorneys and you, know,
8 find out what's going on with them, what are -- you
9 know, what are their issues, what kind of case
10 problems do they have going on.  You know, that being
11 said, there are routinely times where, you know, you
12 might not see somebody for, you know, a week, just
13 because of the way schedules --
14     Q.   Right.
15     A.   -- are.  You know, you just don't see them.
16     Q.   Now, are the attorneys in your office
17 subject to performance evaluations?
18     A.   Yes.
19     Q.   How often are those done?
20     A.   The reality of when those are done
21 initially are when they're required.  And when I say,
22 "required," when someone starts initially with the
23 public defender's office, there's a time frame that
24 they're going through where you're doing an initial
25 evaluation of their work product and how they're

## Page 30

1 doing, and they're with the court and with staff and
2 following policies and things like that.  Through the
3 first couple levels of -- of being a -- an assistant
4 public defender, there's some time frames on that,
5 especially with the first promotion process.
6          After that, the time frames become more --
7 or at least they had been more suggested, but not --
8 not like a bright line.  In other words, it wasn't a
9 specific time frame.  And I can tell you over the --
10 over the years, when there wasn't a specific time
11 frame of something, it's very easy to go along and do
12 stuff, and wake up one day, and you're three years
13 down the road and, you know, trying to figure out if
14 somebody needs to be evaluated for something.
15 That's -- that's really easy.
16     Q.   And -- and are -- I assume you're the one
17 who's conducting these evaluations?
18     A.   Yes, yeah.  I'm the only person that does
19 that --
20     Q.   Right.
21     A.   in my office.
22     Q.   And on what criteria are your lawyers
23 evaluated?
24     A.   We have an actual -- there's an evaluation
25 form that goes -- that has a breakdown of different

## Page 31

1 areas.  Off the top of my head, I don't remember what
2 they are, but there's probably, oh, I don't know,
3 eight or nine or ten of them, something like that,
4 that describe given -- given areas.  Like I said,
5 trial skills, for example, is one -- one of those
6 areas, but others will include things as far as, you
7 know, client -- dealing more with things like client
8 contact and client rapport building, providing
9 discovery to clients, those kinds of things.  Part --
10 some of it may involve just your review of their
11 interactions with staff and other members of MSPD and
12 the Courts in general and how to -- you know, how they
13 follow policy, those kinds of things.
14          We do have a -- MSPD has a guidelines for
15 representation, and the trial division has, you know,
16 guidelines that describe what those things would be
17 that would constitute those areas that you're
18 evaluating, so it would give expectations of certain
19 things that you might do.  For example, in pretrial
20 status with your client's case, meeting with your
21 client, discussing any pretrial motion, perhaps
22 pursuing bond issues those -- those kinds of things.
23 All of those things are listed there.  You might not
24 do every single thing on a given case or with a given
25 client, but it gives you examples of what those things

## Page 32

1 would be.
2          In my evaluation process, I have to be able
3 to evaluate as best I can how the attorneys perform
4 under those given areas and how they -- you know, how
5 are they -- how they are doing.  Some people are
6 better people people -- or they're better with people.
7 You know, some people are much more -- you know, might
8 be more research and litigation oriented type folks,
9 but might have more difficulty interacting with, you
10 know, clients, especially certain clients.  They might
11 have, you know, just difficulty sometimes, you know,
12 being able to develop rapport, so it's evaluating
13 those kinds of things.
14     Q.   And when you're doing these evaluations, to
15 what extent do your consider your attorneys'
16 workloads, respective workloads in trying to figure
17 out, you know, how to assess their performance?
18     A.   Well, you have to try to take it into
19 account.  I mean, the reality is, if I'm looking at
20 someone's caseload, and the expectation on someone's
21 caseload is that they're supposed to have contact with
22 clients -- you know, try to have contact with clients
23 every 30 days or 31 days, and, you know, specifically,
24 if we have people that are in jail, being able to go
25 and see those people, you know, obviously, if they see

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

1  them at day 42 or day 45, or, you know, day 51, well,
2  that's outside of that guideline. But if I also know
3  that that attorney basically has, you know, a caseload
4  of 150 cases or 217 cases -- which I have two
5  attorneys that have over 200 cases right now -- as a
6  practical matter, I'm not going to penalize that
7  attorney. I don't think it's fair for me to penalize
8  that attorney for some of the things that are beyond
9  their control. They -- they can't -- they can't
10 control how many cases show up in Bates County. The
11 prosecutor controls how many cases show up in
12 Bates County.
13     Q. How many lawyers do you think you need in
14 your office to -- in order to represent your clients
15 adequate -- in order to represent every client
16 adequately, how many lawyers do you -- do you need?
17     A. Well, I could easily -- right now, I have
18 eight. In theory, I'll have nine when I get somebody
19 hired. I could easily add -- I could easily add four
20 or five attorneys to that, and they'd be -- they'd be
21 plenty busy. I mean, I -- I have an attorney right
22 now who is in Henry County who has -- who has had the
23 highest caseload in the office, and there's been no
24 way for me to change that. Period. Because it's a
25 lone county. She currently has a homicide case right

1  now, along with those over 200 cases, that involves
2  the shooting death of an officer in Clinton.
3      Q. Uh-huh.
4      A. Needless to say, could be -- it might end
5  up being a capital case. We don't know that because
6  the prosecutor won't say anything about anything about
7  what he's going to do with it; although, he added
8  another count to the case the other day. So she still
9  has representation in that case. In other words, it
10 hasn't gone to our capital unit or something like
11 that. Now, we try to get help from them and get
12 assistance in some way, but for all practical
13 purposes, she has that case. We have a capital unit
14 that deals solely with those cases.
15     Q. Uh-huh.
16     A. That attorney is currently having to deal
17 with that case along with the other 200 and whatever
18 cases that she has.
19     Q. And why is that as far as you know? I
20 mean, why wasn't the case sent to the capital unit?
21     A. Because it's not filed as a capital case.
22     Q. I see.
23     A. It's a -- it's -- it's just -- right now,
24 it's just a murder 1.
25     Q. Okay.

1      A. And we handle every -- we handle everything
2  from, you know, misdemeanor -- you know, misdemeanors,
3  probation violations, up through homicides, which
4  include murder 1s, unless it gets filed as -- unless
5  they file aggravators to make it a death case.
6      Q. You also said you have one investigator on
7  staff; correct?
8      A. Correct.
9      Q. Is that enough for the eight attorneys that
10 you have on -- on staff?
11     A. I would say no. I would say that my
12 attorneys wouldn't have a clue as to whether it's
13 enough.
14     Q. Why do you say that?
15     A. Because I think that they -- I think
16 because of some of the caseload, they have a hard time
17 figuring how to actually be able to assign stuff to do
18 for an investigator to really go and do what
19 investigators do.
20     Q. How many cases would you say your
21 investigator is actively working on right now?
22     A. I don't know. I mean, I -- I mean, I -- I
23 truly don't know. The -- the reason I say that is,
24 cases -- the way our process works is we have --
25 there's a functionality within our case management

1  system called action items. Action items are a way
2  for an attorney to assign a specific type of thing.
3  It could be very, very specific, or it could be a more
4  generalized type of thing, to someone else in the
5  office; generally, that -- an investigator or a legal
6  assistant, perhaps. And that could be everything from
7  getting somebody's letter of incarceration from a
8  couple of different jails because we're trying to
9  establish what jail time they might have, you know,
10 been in jail in working out a deal in a case. But it
11 could also be as general as being able to give an
12 action item to the investigator that says, I want you
13 to review the discovery in this case. Go to talk to
14 the client at the jail. He's got a list of witnesses
15 already he wants you to be able to talk to. Go figure
16 out, you know, who those people are, and then let me
17 know what that is. That's a pretty big item. And you
18 know, like every office, you know, some attorneys are
19 able to make better use of -- some attorneys are
20 better delegators than others.
21     Q. Are you involved at all in the process of
22 determining which cases get that investigator and
23 which --
24     A. No.
25     Q. -- don't?

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-11   Filed 02/21/18   Page 10 of 52

Page 37

```
 1        A.  No.  I don't -- I encourage my attorneys
 2   to -- whatever you think you need, you ask for it, and
 3   then we'll figure out if we can't do it.  And/or if my
 4   investigator has, you know, multiple different
 5   requests coming at the same time, then she will come
 6   into my office and say, hey, I -- you know, I've got,
 7   you know, these four requests.  How do you want me to,
 8   you know, organize -- how do you want me to organize
 9   this?  Because like everything else, sometimes -- you
10   know, sometimes you're able to get to the things.
11   This is part of -- part of the built-in problem.  Part
12   of built-in problem is you're not able to effectively
13   go and meet and deal with clients such that you are
14   able to get ahead of investigations.  So what happens
15   is, you end up a month out, three weeks out, and then
16   suddenly, you're trying to get -- from a trial, and
17   suddenly, you're trying to get various kinds of
18   investigation done, and maybe you need to get this
19   person served, or we need to go find, you know,
20   whoever it might be that we're trying to find.  And
21   then suddenly, you have three attorneys making the
22   same kind of requests all in that time period.  That's
23   what creates, you know, that kind of problem.  And
24   frankly, there's times where I have my legal
25   assistants able to help with serving subpoenas on
```

Page 38

```
 1   people and other kinds of stuff, because, you know,
 2   frankly, my investigator needs go do other stuff.  And
 3   my investigator also oftentimes will help people in
 4   trial with taking notes and, you know, being able to
 5   assist trial-wise, so there's time incorporated with
 6   that as well.
 7        Q.  What do you -- what do you -- in your
 8   opinion, what is the ideal ratio of attorneys to
 9   investigators, or what would it be in your office?
10        A.  It would be nice to have an investigator --
11   frankly, have an investigator working with every two
12   to three attorneys, so if you break that out, that
13   would be -- I mean, in my office, about, at least
14   three investigators, so having a couple more
15   investigators.
16        One of the issues that we -- that we've
17   had, and I -- and I say, "we've had."  For years, I've
18   had -- and I love having a -- the attorneys.  I'll
19   take every attorney I can get.  But everywhere that we
20   deal with, the court system, the prosecutor's office,
21   their support staff is an inverse flip.  So when I go
22   to court or when I deal with someone's office, they
23   have three or four support staff for every attorney
24   that's in that -- in that office.  Ours is almost just
25   the opposite.  And so you have multiple attorneys
```

Page 39

```
 1   trying to occupy -- you know, carve out some niche of
 2   time with given -- you know, with given support staff.
 3   And that's assuming that those people aren't, you
 4   know, on some sort of leave, that, you know, people --
 5   that people go on or that people leave or that people
 6   are sick or that people that have babies or the people
 7   that do other kinds of things that, you know, they're
 8   gone for a period of time.
 9        Q.  Right.  How do you -- assuming it's you --
10   go about assigning cases to individual attorneys?
11        A.  Cases in my office are primarily assigned
12   two ways.  They're assigned first by county.  I have
13   three attorneys that they're the only attorney in that
14   county.  And then I have the one attorney that all he
15   did was conflicts for a long period of time.  He's
16   doing some cases in -- in Cass County as we whittle
17   that down.  But the other two large counties I have,
18   Johnson County and Cass County, those two counties
19   each have at least -- Johnson County has two attorneys
20   in it.  Cass County has three attorneys operating in
21   it, which includes me.  And those, we divide the cases
22   more up by, in essence, case number.  And when I say,
23   "case number," it's a way to sort of divide out the
24   cases such that it -- it, for the most part, fairly,
25   you know, evens out.  Every now and then, you'll have
```

Page 40

```
 1   an attorney that'll -- you know, one attorney will
 2   have more cases than another attorney, and, you know,
 3   vice versa, but the way they assign the cases and
 4   stuff there, it's a way to be able to kind of divide
 5   that out.
 6        Right now, in Johnson County, the attorney
 7   that's the younger attorney has the lower level felony
 8   cases over there and misdemeanor cases.  The senior
 9   attorney I have over there has all the upper level A,
10   B felony cases in Johnson County.  The -- that same
11   younger attorney has the misdemeanor only case -- he
12   has a misdemeanor docket in Cass County that he does.
13        Q.  Okay.
14        A.  And then myself and another attorney have
15   divided up the felony -- the felony caseload with the
16   exception of that attorney doing A, B felony cases,
17   which I'm not doing in Cass County, because that --
18   it -- from a standpoint of trying to make some
19   tradeoff in relation to numbers versus seriousness of
20   cases and that sort of thing, that's the way I've been
21   able to -- to do that.
22        Q.  Okay.  Now, in addition to all of these
23   other responsibilities, do you also do any kind of --
24   do you have to do any kind of administrative work?
25        A.  Oh, yeah.  I mean -- I mean, part of
```

10 (Pages 37 to 40)

ALARIS LITIGATION SERVICES
www.alaris.us        Phone: 1.800.280.3376              Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-11   Filed 02/21/18   Page 11 of 52

## Page 41

1  administrative work is, like I said, review process,
2  because all of those things are form oriented,
3  electric -- you know, elect -- whether they're
4  electronic, they used to be just more handwritten
5  forms, but -- but there's still a form process,
6  administrative process to that.
7          But I also have the other administration of
8  the office reviewing basically the invoicing that
9  comes in.  And when I say "reviewing" it, my office
10  support assistant gathers all that stuff, she opens
11  all the things, she documents all those.  But I then
12  have to review those because I'm the one that signs
13  off on all those.  I also review everybody's time
14  sheets and everybody's expense reports and have to
15  approve those.  And time sheets are time sensitive.
16  You have to approve them within a given time frame
17  because it's through whatever the State processing is.
18  It's called Sam something.  I don't know.  But -- but
19  in any event, it's their computer system has to -- has
20  to swing through and process it in a given time, so I
21  have to have everybody's time sheets to me for me to
22  be able to approve those within a given time frame.
23  And that's twice -- twice a month that I have to do
24  that.
25          Q.  Do you think your office is in need of more

## Page 42

1  administrative staff?
2          A.  Yeah.  Support staff, absolutely.  I
3  mean -- well, let me back up, when you say
4  "administrative staff," meaning, like, support staff.
5          Q.  Right.  Meaning, I think you mentioned you
6  have two legal assistants, and then one --
7          A.  The office support is --
8          Q.  -- office support assistant; right?
9          A.  Correct.  The office support assistant --
10  and I keep trying to remember that name.  That
11  designation came in this last year.  It used to be
12  what was designated as a clerk typist or a clerk.  And
13  generally, I always described it, it was the person up
14  front that basically ran the front end of the office.
15          Q.  Right.
16          A.  That answered the phones, when people came
17  in, and did other kinds of administrative stuff,
18  getting the mail, opening stuff up, processing
19  billing.
20          The legal assistants work more specifically
21  with the attorneys and go to jails, deal with
22  clients, and then, like, some of the other things that
23  I was talking about as far as, you know, it's
24  sometimes interviewing family members, sometimes
25  helping set up treatment programs for people, those

## Page 43

1  kinds of things.
2          Do I need more of those people?  Yeah.  I
3  could -- I could use a whole handful of those -- of
4  those folks, because those people make -- when I don't
5  have those people, then I have attorneys doing all of
6  that.  And I consider that an -- while it's important
7  for clients and it's valuable for clients, I consider
8  it an incredible waste of attorney time when they're
9  trying to get, you know, things done for treatment
10  programs to get somebody into a treatment program.
11          Q.  How much time would you say a typical
12  attorney in your office has to spend on administrative
13  tasks, ballpark?
14          A.  Wow.  The best answer I can give you is it
15  depends on the county that they're working in and how
16  much legal assistant help they have, and here's why
17  I'll give you that answer.
18          Q.  Okay.
19          A.  Because in our case management system, you,
20  for example, can enter court dates, like, upcoming
21  court dates and things like that; okay?
22          Q.  Right.
23          A.  If you're operating in a scenario where you
24  have a legal assistant sitting there with you, like,
25  sitting there in court, they can enter those court

## Page 44

1  dates right then, and that's done; okay?  If you're
2  operating in an out county, and you don't have a legal
3  assistant to do that, then you're bringing your
4  caseload back, and sometimes you're doing that, and so
5  that dramatically increases that time frame.
6          It also increases the time that you spend
7  doing some of those other things I was talking about
8  as far as trying to get people into treatment
9  programs, trying to do other kinds of stuff.  If I
10  have an administrative -- if I have a legal assistant
11  sitting in court, and a client appears in court, and
12  we can tell by talking with the judge, the judge would
13  let that client out of jail if we can get that client
14  into an inpatient legal program, I can turn to the
15  legal assistant who's there, and say, "Let's talk with
16  him before he gets out of the room.  Let's get some
17  things signed.  Let's get some stuff done, and we see
18  about trying to get him into a program."  And they
19  can -- and maybe they can talk with family or whoever
20  else might be there that can help facilitate that.
21          If someone is in an out county, and they
22  don't have that legal assistant there, they're having
23  to get ready to go up on the very next case that's
24  going to get called, because they're the only attorney
25  that's there handling cases, primarily.  And so once

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 45

1  they get done with client A, client B's case is
2  getting ready to get called. Their follow-up with
3  that is going to have to all take place after the
4  fact, which means they have to either do it
5  themselves, or they're going to have to coordinate
6  with a legal assistant in the office to basically say,
7  "Hey, I've got this guy. I need to have this done.
8  Can you help me, you know, get this?"
9      So, you know, from a time frame standpoint,
10  I don't know that I can really give you a good answer,
11  but that gives you a description of the -- of the
12  differences.
13      Q.  Understood. You mentioned that you right
14  now have somewhere between 150 and 200 -- or 120 and
15  150 cases. How many cases do you think you handle
16  personally over the course of a year?
17      A.  Oh, I easily end up assigned -- I would
18  easily end up assigned probably over 300 cases over --
19  over a year time frame.
20      Q.  How --
21      A.  Again, I could -- again, I could -- I -- I
22  could look at my database, and I could tell you the
23  exact number, because I've -- I've got a screenshot
24  that will -- that will tell me over the last 365 days,
25  exactly how many cases I've assigned to me or anyone

## Page 46

1  else. But that gives you -- my office, itself, opens
2  anywhere from 2100 to 2600 cases a year. That's, you
3  know, going within that time frame, sometimes down
4  around, you know, 2100, you know, upper, you know,
5  2,075 or, you know, somewhere like that --
6      Q.  Uh-huh.
7      A.  -- up to 2600 cases in any given year. We
8  obviously conflict other cases out to other offices,
9  so that wouldn't -- you know, while we open that case,
10  that's not a case that we end up assigning in our
11  office, so that would come off of that number some.
12  But generally, we've had conflict cases assigned to
13  us, so that -- that's just --
14      Q.  Uh-huh.
15      A.  That's moving -- it's moving chairs
16  around the -- around the table, you know, in the grand
17  scheme of things. So that number, that's probably,
18  you know, a -- 2400 would be a safe number on any
19  given year between eight attorneys.
20      Q.  And -- and that's -- that number is typical
21  for over the last, what would you say --
22      A.  20 years.
23      Q.  20 years. Okay.
24      A.  I mean, like I said, I've -- you know, I
25  could -- I can go back, and I can look at -- look at

## Page 47

1  our stuff, and I could tell you, you know, that one
2  year we had 2,100 cases, and another year, we'll have
3  2700 case. But 2400 is prob -- 2300 is a probably a
4  pretty good average --
5      Q.  Got it.
6      A.  -- over the last couple decades.
7      Q.  Okay. You mentioned contact with clients?
8      A.  Yes.
9      Q.  How often are your -- you and your
10  attorneys supposed to meet with clients, as far as you
11  understand?
12      A.  Supposed to meet with the client within
13  seven days of initially opening the case. Once --
14  once they've -- you know, when someone has been
15  approved for representation, when we open that case
16  up, they're supposed to get met within seven days of
17  that. On an ongoing basis, supposed to be every 30 --
18  basically, every 30 days.
19      Obviously, there's some -- you know, I
20  would consider some exceptions to that. We have
21  clients that are in mental health facilities. We have
22  clients that are out on bond that generally, all
23  you're doing is kind of waiting to see, for example,
24  in a probation case, is the client basically going to
25  keep doing what they're supposed to be doing so the

## Page 48

1  case may get set out, you know, a couple, three
2  months? And the idea is they're just supposed to keep
3  things kind of on line, and then they might get
4  continued on probation. So that one, you might not be
5  as -- you know, looking at it and going, I -- you
6  know, I'm worried about someone having, you know, that
7  specific contact every -- you know, every 30 days.
8      Everybody that's in jail is supposed to get
9  seen at least, in person, at the jail, every 30 days.
10  Which is a different problem.
11      Q.  Is that happening consistently?
12      A.  No. And I can give you reasons for that.
13  That -- that have -- I currently have, at one point --
14  and this was one of the problems I had when you had
15  asked earlier about caseload. I had assigned myself
16  the Saint Clair County caseload because it was the
17  smallest caseload in the office. And I'm like, it's a
18  small county, has the fewest number of court days,
19  smallest caseload.
20      That county, as a result of -- that county
21  also houses federal inmates in their jail. Whenever
22  they increase their federal inmate population, because
23  it makes them more money than our clients do, then
24  they ship our clients out to other jails, so my
25  Saint Clair County caseload with clients in jail are

ALARIS LITIGATION SERVICES
www.alaris.us            Phone: 1.800.280.3376            Fax: 314.644.1334

1  not in the Saint Clair County jail.  They're currently
2  in -- at least at one point, I had clients in four
3  different jails.  So when I'm talking about logistics
4  of being able to go see people, it's not that just
5  that you have to go to the Saint Clair County jail in
6  Osceola to go see all of your clients, and you could
7  map that out on one day, and say I'm going to go see
8  all these guys in jail.  We'll just schedule the day,
9  and I can go see them, and they'll just bring guys in,
10  and I can talk to all of them.  Guys in Saint Clair
11  County, Henry County, Bates County, Vernon County, and
12  Cedar County.  So when you start talking about going
13  and seeing people, that then creates, well, now,
14  you've got multiple places to go and multiple
15  logistics problems with that in seeing folks.
16        They also had the added benefit of, even
17  though they're housed in that county, if the
18  Saint Clair County jail decides to go come get that
19  person for some reason; say they're in Henry County,
20  and Henry County, Clinton, is closer to my office.  So
21  actually, if have someone in Clinton, it might be a
22  shorter trip for me to go see them.  But the problem
23  is the people in Henry County don't have control of
24  that inmate.  That's a Saint Clair County inmate.  So
25  if Saint Clair County decides to come get that guy,

1  they don't have to notify Henry County.  They just
2  drive up there, and they show up at the sally port and
3  they say, "Hey, we need to pick up so and so, and
4  we're going to transport him back, you know, for
5  whatever reason."  Okay?
6        Q.  Uh-huh.
7        A.  So if you've planned to go see that
8  individual -- and I know this, and I say this because
9  I've had this happen.  You plan to go see that
10  individual, you drive to the Henry County jail, you go
11  there and say, "I'm here to see Jones," and they go,
12  "Well, he's not here."  And I'm like, "Well, where is
13  he?"  "Well, the people in Saint Clair County came and
14  picked him up, so they transported him back to
15  somewhere else."  You have that kind of problem.
16        I currently have -- and I know this, and I
17  can speak for another office just because I know this:
18  We currently have Greene County inmates in the
19  Johnson County jail.  Now, I know you don't know
20  necessarily where Greene County is.  Greene County
21  is --
22        Q.  Springfield?
23        A.  -- Springfield, yes.  So we have people
24  from Springfield up in Centerview, which is where the
25  Johnson County jail is, which is basically in the

1  middle of nowhere besides some railroad tracks.  We
2  currently have a number of Greene County inmates on a
3  regular basis up in the Johnson County jail.  I can't
4  envision how the people from Springfield go see any of
5  those people.
6        Q.  And do you know -- do you know is that
7  because the jails in Springfield are full?
8        A.  Sure.
9        Q.  Are they -- do you know whether they're
10  housing federal inmates there as well?
11        A.  I have no idea whether they house federal
12  inmates there.  I know that, in our current jails,
13  Saint Clair County houses federal inmates,
14  Bates County houses federal inmates.  So we have that
15  influx problem routinely with -- with them.  Cass
16  County does not house federal inmates, so we don't
17  have that issue with the Cass County jail as far as
18  that's concerned.
19        Q.  How long is the -- if you know, how long is
20  the drive from Johnson County to Springfield?
21        A.  Let me think here.  Springfield is a half
22  hour from Warrensburg.  Half hour, half hour -- at
23  least an hour and a half to two hours to there,
24  because it's -- I know that both my boys went to
25  school down in Springfield, so I'm just trying to

1  adjust where the map is.  It's going to at least -- it
2  would at least be an hour and a half at the very
3  least, and it's probably more closer to two.
4        Q.  Okay.  So just a -- a couple of procedural
5  questions before we kind of jump into the -- what's
6  happening currently.  But after defendants are
7  arrested, the first time they go before the Court is
8  for their initial hearing; correct?
9        A.  Uh-huh.
10        Q.  Are lawyers from your office present for
11  those initial hearings?
12        A.  Generally, no.  It depends -- frankly, it
13  just depends on when you get arrested and what county
14  you're in.  And -- because if you get arrested close
15  enough to a court date that we would normally be
16  there, then they might just bring them over when we're
17  there in any event, and have their initial appearance
18  that -- you know, that day.  Other times, in a number
19  of these counties, they will do an initial appearance,
20  and we're not there.  They just do the initial
21  appearance, arraign them on whatever charges they have
22  or probation violation that they have, and then set
23  their case for some court date where it would be the
24  Court's normal docket for whatever -- whatever Court
25  they would be appearing in front of.

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-11   Filed 02/21/18   Page 14 of 52

## Page 53

1    Q.   Okay.  And so in instances where lawyers
2  from your office are at the initial appearance, it's
3  not because of any proactive steps you've taken.  It's
4  just you -- the lawyer happens to be there --
5    A.   The lawyer is there are for the docket.
6    Q.   Okay.
7    A.   Now, we've -- we have had -- and my legal
8  assistants, over the years, we have -- we have
9  attempted to do things proactively to be able to --
10  you know, they -- they've gone through the jail list.
11  They know who's been recently picked up, especially
12  people that we have represented before that might
13  have, you know, various kinds of things.  They will
14  attempt to go see those people prior to the court date
15  in order to be able to at least start the application
16  process.  And when I say, "prior to the court date,"
17  prior to the court date that gets assigned.  So it
18  still may not be, you know, in -- in relation to that
19  other initial appearance date, but in relation to an
20  actual court date where we would be there.
21    I'll -- and I'll give you a for instance.
22  In Cass County, we have court on -- this Thursdays is
23  the associate docket -- the felony associate docket
24  where people would initially be appearing on new
25  felony charges that they've been arrested on.  Some of

## Page 54

1  those people may have appeared, you know, yesterday,
2  or they might have, you know, appeared today in front
3  of Judge Rumley had an initial arraignment on what
4  their charge is.  Now, the question is what court date
5  do they get set to, to be brought up for a regular
6  court appearance where they would expect that our
7  staff might be there on -- or would be there normally
8  on that docket; okay?  So if we know that person's
9  court date -- if we can look at the jail list and see
10  that person's court date is going to be this Thursday,
11  my legal assistant, Julie, will try to go over -- will
12  try to go over to the jail if possible to be able to,
13  you know, get an application, be able to talk to that
14  person to see what we can do about trying to get that
15  person out of jail.
16    Now, the flip side of that is there's a lot
17  of that that can't take place and doesn't take place,
18  and so -- and it certainly doesn't in, you know, rural
19  counties -- in the more rural counties, because the
20  legal assistants aren't out there, you know, doing
21  that.  Then what happens is that person waits until
22  the upcoming court date in order for us to be there in
23  order for us to do the application process at that
24  point in court.
25    Q.   And is -- is bond usually set at that

## Page 55

1  initial hearing?
2    A.   Yes.
3    Q.   Do you know -- and in Area 17, are the
4  judges using bail schedules or --
5    A.   And in fact, let me back up from that a
6  second.  In fact, here's what happens when they set
7  their -- they -- the Court may review bond.  And I
8  should -- should correct that.  The Court may review
9  bond at that initial appearance; although, they
10  generally don't.  The bond actually originally gets
11  set when they file the probable cause statement and
12  file the complaint, and they'll make a bond request on
13  that -- on that complaint.  And there are various
14  Counties that will -- just based on the nature of it,
15  if it's a C felony charge -- in Bates County, if it's
16  a C felony drug charge, they're going to have a
17  $10,000 bond.  That's -- that's what -- that's just
18  what they set their -- set their bonds at.
19    Q.   But does the judge have the authority to
20  alter that bond amount at -- at the initial
21  appearance?
22    A.   If they're interested in doing it.
23    Q.   And there's no lawyer there to advocate for
24  them to do it; correct?
25    A.   Correct.  At that -- yes.

## Page 56

1    Q.   When -- when the -- when -- when your
2  lawyers happen to be there, are they there
3  representing the client at that hearing, or are they
4  just there to be assigned the case if the person
5  qualifies?
6    A.   It -- if our -- our practice has been, and
7  it's the reason I tried to get our legal assistants
8  being able to be proactive and going over to those
9  jails, because the more that we could get ourselves
10  with an application in hand, and more specifically,
11  with bond information in hand for a client, then when
12  the day that they appeared in court, we were in a
13  better position to be able to say, you know, this
14  person has a job.  If he'd -- if we could get his bond
15  reduced, here's where he's going to be living, all the
16  usual bond kind of arguments that you would be able to
17  make.
18    In a number of these places where you don't
19  necessarily have that, it depends upon what I would
20  describe as the Court's patience in relation to
21  whether they're going to listen to that or deal with
22  that on that given day.  And frankly, what you're in
23  the position of doing is basically then making what I
24  would describe as the ad hoc bond argument, which is,
25  well, my client is in jail.  He doesn't have anything

ALARIS LITIGATION SERVICES
www.alaris.us                Phone: 1.800.280.3376                Fax: 314.644.1334

## Page 57

1  else pending anywhere right now.  This is a drug
2  charge.  Please, let him out.  And that -- and you
3  could just fill in the name of you know, client
4  whoever at the top of that, and basically start making
5  that bond argument for most everybody that's in jail.
6  And you just know that the guy who's charged with the
7  multiple count sex case probably isn't going to get
8  anything heard that day.  But that's -- that's kind of
9  the nature -- you're not in a situation where you're
10  going to be able to actively say, I'm going to -- I'm
11  going to make sure this guy's employer sends a -- you
12  know, gives a letter or something that just says,
13  "Hey, yeah.  If you let the guy out, he's working for
14  me."
15      Q.  Right.
16      A.  Or that some family members specifically
17  show up to say -- like Grandma or Mom to say, "Yes,
18  he's going to be living at my house."  And the judge
19  in some of these rural areas, they know those people,
20  they know who they are, so you might be able to get
21  that person out.  That doesn't happen at those initial
22  appearances where we're not at at all.  And the ones
23  where we are at, our problem is, if we're not able to
24  do that, then yeah, you're not in the position to be
25  able to do that.  So at best, you're then trying to

## Page 58

1  request the shortest turnaround time that you can for
2  your client in order to then be in the position of
3  being able to try to argue the bond situation.
4      Q.  All right.  Do lawyers ever request
5  hearings specifically to deal with bond reduction
6  motions?
7      A.  Yes.  The ones that are -- but they're --
8  there are few, and when I say, "few," the ones that
9  are the -- the full-on bond hearing, written motions,
10  calling witnesses type deal, those are few and
11  generally revolve around situations where you perhaps
12  have, you know, serious cases.  They're going to --
13  under the -- under the Missouri Constitution, the
14  ability to be able to have victims present at those
15  hearings, and oftentimes -- and I know in one county
16  in particular, the State complains about every single time
17  we make a request in relation to a bond about being
18  able to notify somebody being there, and this might
19  even be in a -- you know, in a drug case.  Like, there
20  isn't anybody to -- to notify in that case, but -- but
21  that -- that's the kind of thing that doesn't
22  generally go on.  We're not in a position to be able
23  to -- to do that.
24      Q.  And that's a function primarily of the --
25  the timing of the appointment?

## Page 59

1      A.  Yeah.  I mean, it's a -- I mean, it's a
2  function primarily of a number of those kinds of
3  things, but that -- but that is a -- that's a -- a
4  huge factor in it, and it's a factor of when the next
5  court dates might be.
6          Some places are more amenable to listening
7  to -- oral bond motions.  And frankly, I've
8  encouraged -- I've always encouraged every attorney in
9  my office, and I've always done it.  It's like, I -- I
10  don't care -- frankly, I don't care what the
11  prosecutor objects to, and I don't care what the judge
12  says they're going to listen to or not listen to.  I'm
13  going to make that request for my client regardless,
14  because at least, if nothing else, you're going to
15  deny it -- you're going to have to at least deny it.
16      Q.  Right.
17      A.  And I'm going to make that -- I'm going to
18  make that request.  And part of that goes back to what
19  I was talking about in relation to clients to begin
20  with.  At least they know that you tried to ask for
21  something.  Even if you're not in a good position to
22  do it, you've at least tried to do it.
23      Q.  Are there -- are there ever situations
24  where your office is appointed later than at the
25  initial appearance?

## Page 60

1      A.  Oh, yeah.
2      Q.  Or is that --
3          And two questions:  One, how often does
4  that happen?
5      A.  It depends, and -- and I say "it depends."
6  It's just -- it occurs for different reasons, and
7  it -- not so much to do with the Court usually as it
8  does with the client.  Clients sometimes create
9  scenarios where our involvement ends up being somehow
10  at a later -- just ends up being at a later point.
11  Someone ends up out of -- and -- and this is, you
12  know, for people out of custody.  For example, people
13  out of custody, they've posted bond, they don't hire
14  an attorney, they don't hire an attorney, they show up
15  to court three or four times, the judge yells at them
16  and then eventually says, "You go over and talk to
17  those people over there.  You know, I'm tired of the
18  fooling around with this."  So we end up with those
19  scenarios.
20          I also end with scenarios where private
21  attorneys have communication issues with their clients
22  where then they request to withdraw from a case.  They
23  end up bailing out of a case, and then the judge goes,
24  "Well, who are you going to hire?"  And then it's,
25  "Well, I don't have any.  All the money I had, I

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 61

1  spent -- you know, I gave to that deadbeat that, you
2  know, I just fired."  And so now, they're filling out
3  an application for our services, so we end up with
4  those situations.  That's down the road, you know,
5  from where they originally had something going on.
6  **Q.  Okay.  You mentioned that there are --**
7  **often, there's no lawyer present for the initial**
8  **appearance.  Are there other pretrial proceedings**
9  **where your lawyers are not able to be present for a**
10  **client's hearing?**
11  A.  No.  I mean, our Courts are -- are -- all
12  the Courts that we deal with are -- are good about --
13  whether or not the client's there, we're there.  We
14  have situations where the client may not be there.
15  They're either off at DOC, they may be at some -- you
16  know, some other facility or, you know, some -- and
17  frankly, we've had scenarios where they've had issues
18  transporting people from a given jail, and so then --
19  you know, then we're, you know, trying to do things
20  without the client there.  But -- but I think from a
21  standpoint of other proceedings without attorneys
22  there, all of our judges, I think, have a pretty good
23  concept of the fact that that shouldn't -- that
24  shouldn't happen.
25  **Q.  Are there situations where the attorneys --**

## Page 62

1  **where you have to substitute one attorney for the**
2  **other to make sure someone is present?**
3  A.  Oh, sure.
4  **Q.  How -- how often does that happen?**
5  A.  It's -- well, it's going to happen Monday.
6  It would have happened yesterday, but frankly, I was
7  at home sick.  That's the reason it's going to happen
8  next Monday is because one of the attorneys in my
9  office, the one who does conflict work, has to be
10  involved in, I think, Clay County with a judge up
11  there who refuses to do something minus a whole bunch
12  of things, and so we have a case where a client has
13  posted a huge bond that we filed a motion to with --
14  to withdraw as counsel in the case.  That's going to
15  have to actually be heard this next Monday, and I'm
16  going to be there in relation to that, because he's
17  going to be in Clay County.
18  **Q.  All right.**
19  A.  But that happens on a routine kind of
20  basis.  That happens with -- you know, if attorneys
21  are sick and out.  It also happens when people are in
22  trial, because oftentimes, I mean, we will try to
23  substitute or try to have people stand in.  In
24  particular, if they've got people in jail, if they're
25  in trial, and then there's some other thing that would

## Page 63

1  be happening where that attorney would normally be at
2  that docket for that person, and there's something
3  that we could do to be able to try to facilitate
4  getting somebody out, we'll try to do that.  Because
5  frankly, I don't want people sitting in jail just
6  because -- just because they've got to sit in jail
7  because the attorney is trying to represent somebody
8  else.  That being said, that goes back to what I was
9  talking about earlier in that's great for the
10  attorneys and -- and helping out with other people.
11  That's one more day they don't have to do something
12  because they're doing that.
13  **Q.  Okay.  I want to skip to -- you're familiar**
14  **with the recent Hinkebein decision; correct?**
15  A.  Yes.
16  **Q.  What do you know about the -- the**
17  **decision -- the implications of that decision?**
18  A.  To me, the implications of the decision are
19  that, ethically, my attorneys and myself have been
20  told that they have no -- their caseload is not an
21  excuse for not doing things, and their option, which I
22  remember listening to the arguments in relation to it,
23  a suggestion that the attorney just walk in and quit,
24  which I thought I was kind of -- well, I have a lot of
25  opinions on that, but I'll -- I won't venture into

## Page 64

1  those.
2  But let's just say that -- that basically,
3  what it said -- there are two things that come from
4  that.  My attorneys have an obligation themselves to
5  recognize that they can only ethically handle what
6  they believe they can ethically handle; and that's
7  not, like, a magic number or something like that.
8  That's based on their experience, based on their
9  logistics, based on, you know, a number of different
10  things.  They look at their caseload and say, "I think
11  this is all that I can do."
12  It also tells me that I as an -- as a
13  supervisor -- because I have a separate ethical
14  obligation under the rules, under the ethical rules.
15  I as supervisor have an obligation to make sure that
16  that attorney -- that -- that all of my attorneys in
17  my office are not violating ethical rules as a
18  supervising manager, and so it's my duty to also not
19  assign them cases and to tell them, "No, you're not
20  going -- you're not going to take cases."
21  **Q.  Prior to the Hinkebein decision, were**
22  **attorneys in your office permitted to refuse cases if**
23  **they thought they couldn't ethically handle any more?**
24  A.  I don't think anybody knew what that
25  actually meant.  I think the reality -- the reality of

**ALARIS LITIGATION SERVICES**
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

1    that -- as I said, in January, I'll have been doing
2    this 22 years.  I don't know what the -- the day I
3    started -- you ask about reviewing stuff.  I remember
4    this number only because I remember it from when I
5    started.  I had 166 cases the day I started with the
6    public defender's office.  But I -- I haven't known
7    another reality.  I don't know that I would be able
8    to -- I don't know whether I would be able to
9    effectively assess that because I'm just one of those
10   people, I'm going to -- you hand me whatever, and I'm
11   going to go in and I'm going -- I'm going to go do it.
12       Q.  Well, you would --
13       A.  That's just -- that -- that's my -- my
14   personality.  I've never had -- I've had attorneys
15   come to me over the years stressed out, very stressed
16   out about, you know, either their caseload, the trials
17   they have coming up, that's usually in conjunction
18   with caseload.  Whether they're going to be able to
19   go -- whether, basically, they're going to be punished
20   for going on vacations.  And when I mean "punished,"
21   not by me.
22       Q.  Right.
23       A.  Not by management, but by the caseload,
24   because none of it goes away; it just gets continued.
25   So when you come back, you've got the caseload you

1    haven't done plus new caseload.
2        And so I've never had anybody walk in my
3    office and say -- and cite to me, you know, well, I --
4    you know, I have this ethical rule that I'm not
5    supposed to do this, and I'm not supposed to do that,
6    and I don't think that I can do that.  I don't think
7    they would have known what it was.  And frankly, I
8    don't know that I would know what it was.
9        Q.  How did your attorneys respond to the
10   decision?
11       A.  Varying degrees of panic.  I think that
12   they -- some of them felt like they've been told
13   something that -- and, to tell people that they
14   should just walk in and quit, these are with people
15   with families, with student loans, with other kinds of
16   obligations that they've put themselves in that
17   everybody does in the course of normal life.  And to
18   basically tell somebody, well, your obligation is to
19   basically give up your job, you know, good luck with
20   that.  They were -- they -- and then you follow that
21   up with, I think, your stress of the reflection a few
22   days afterwards, which is, now, they suddenly realize
23   that every potential letter that they get, every phone
24   call that they get is potentially the next person that
25   is going to file a Bar complaint that could end up

1    with them losing their license, and they've now been
2    actively put on notice, you could lose your license
3    for this.  You could get reprimanded, you could get
4    suspended, you could -- what -- whatever.  A number of
5    things could happen to you, but the bottom line is you
6    could basically be -- at the very least, become
7    marginally employable, and you might lose your license
8    altogether.  And every day you come to the office,
9    you've still got that caseload.
10       And guess what?  When you go to court
11   Wednesday, there's going to be 12 people that are
12   going to fill out applications that are going to want
13   you to represent them, and the Court is going to ask
14   whether those people qualify as indigent, and when you
15   tell them, "yes," then the judge is going to expect
16   that you represent them.  And even when I tell the
17   Court, "I don't have an attorney to assign to
18   represent them," the judge says, "Well, I'm appointing
19   the public defender's office to represent them.
20   That's up to you all."
21       Q.  Did you talk with your staff as a whole
22   about the decision or about the implications of the
23   decision?
24       A.  Yes, yeah.  I had a staff meeting -- I had
25   a staff meeting -- I arranged a staff meeting the

1    Friday -- we found out about the decision while I was
2    actually at a training program, and I got my staff
3    together that Friday when I got back, and I think
4    there was only one attorney that was not going to be
5    able to be there because of a prior court obligation,
6    and that attorney was actually the one that was going
7    to end up leaving my office in any event.
8        But I got them all together, I printed out
9    what those rules were, and I forwarded them the
10   information in relation to the actual -- the -- the
11   recording of that hearing, and I said, "Here's what's
12   come down.  You need to listen to -- everybody in this
13   office should listen to this.  Everybody.  Not just
14   attorneys; everybody in this office should listen to
15   this.  And here's what those rules are.  And I want
16   you to know what those are, and I want to you to take
17   that in."  And I told them that I was going to be
18   immediately contacting the Courts and that, you know,
19   whatever -- whatever happened from that point forward,
20   this is -- this is the world that we're in.
21       Q.  Did you get questions, concerns from your
22   staff in response to this?
23       A.  Oh, yeah.  I mean, their -- I mean their --
24   you know, some of the questions are basic logistic
25   like, well, what do -- what do I -- you know, what I

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-11   Filed 02/21/18   Page 18 of 52

## Page 69

1    do I do?
2        Q.  Right.
3        A.  I mean, what do I -- what do I tell the
4    judge when I go to court?  What -- what -- what do I
5    tell a client when, you know, they fill out an
6    application, and we're getting applications on a daily
7    basis from the jail?  Or what do I tell, you know,
8    people's, you know, family when they call in and say,
9    "Hey, you know, so and so got picked up.  He's in
10   jail.  You know, we need you to be able to get him
11   out.  We need you to do whatever."  You know, but what
12   do we -- what do we tell those people?  So you had
13   logistics questions, and you also had, like I said,
14   the -- what I would describe as the stress/panic
15   questions, which are the ones of, well, wait a minute.
16   You know, I don't -- I don't mean to thinking about
17   me, but what about me?  I mean, you know.
18       Q.  Right.  The training you mentioned that you
19   were at, this was the management training --
20       A.  Yes.
21       Q.  -- that was -- that was happening at that
22   time?
23       A.  Yep.
24       Q.  Does your office -- so post Hinkebein, did
25   your office establish a waiting list for defendants?

## Page 70

1        A.  Yes.
2        Q.  And can you talk to me about how that
3    waiting list works?
4        A.  I have two different things going on in the
5    two circuits that I have.  The 17th Circuit, which is
6    Cass County and Johnson County, that circuit, a number
7    of yeas ago, when we were going through -- the public
8    defender system was going through caseload litigation,
9    that circuit actually -- and the presiding young judge
10   is there right now, Judge Collins, who's -- who's the
11   PJ, they developed an administrative order in relation
12   to, specifically Cass County.  Now, he's taken that
13   over now to Johnson County as well, which is a
14   different animal.
15       But basically, that administrative order,
16   for lack of a -- a better thing is this:  They will
17   take -- they developed a list of private attorneys.
18   The judge went and talked to the private Bar and met
19   with them and said, you know, we're going to need to
20   start assigning some cases to you people.  And what
21   they did is they used our fee guidelines, our fee
22   structure as the fee structure for those attorneys.
23   So if you had people posting, you know, a $5 00 cash
24   bond, our fee structure is, I think on a -- you know,
25   on a number of felony cases was $375 or something like

## Page 71

1    that.  Basically, they were telling -- they were --
2    they were -- the judges were telling clients -- what
3    we would do is we would approve someone
4    representation-wise.  Say we approve them
5    representation-wise as indigent.  The judge would say,
6    if you've posted a bond, like one -- like the $400
7    cash bond or whatever, that bond is going to be
8    assignable to the attorney that I'm going to appoint
9    to represent you.  I'm going to appoint Mr. Jones here
10   to represent you, and if that attorney is in court,
11   the judge, you know, will waive them over and -- and
12   assign them the case.  If the attorney is not in
13   court, they'll say, "Here's the attorney that is going
14   to get assigned to you.  The fee for that attorney is
15   going to be this based on that amount."  If they
16   haven't posted a bond, the judge will tell them,
17   "You're going to have to come up with the $375 or
18   whatever to pay attorney so and so as -- as the fee;
19   okay?  The -- that attorney is going to be appointed
20   to your case, and they're going to represent you, and
21   that's going to be the fee for them to represent you."
22       Q.  Is that a fee that would have otherwise
23   been --
24       A.  To the public defender.
25       Q.  -- provided to the public defender's

## Page 72

1    office?
2        A.  Yes.  And I say -- and I say "a fee
3    provided."  We don't get any of those -- we're not --
4    not getting any of those fees up front or any --
5    anything like that.  I mean, we enter cases, we
6    make -- we file a fee notice with the Court saying
7    that, you know, we ultimately are assessing what would
8    be that fee to the individual, and sometimes, those
9    get collected through income tax refunds with the
10   state.  Sometimes people send them -- you know, I
11   mean, people will contact us and say, "Hey, you know,
12   can I go ahead and pay that now?"  Or, "Can my family
13   pay that," or you know, whatever.  We don't premise
14   our representation on -- whether we enter a case based
15   on whether they've paid that.  They just know that
16   that's the fee, unless the fee gets waived for some
17   reason.
18       I have a number of cases that when we
19   assign these cases out -- and when I say "we" assign
20   them, when the Court assigns a private attorney to
21   represent them under that administrative order, then
22   what we do is I -- we -- if we have that open case on
23   a -- on a waiting list in our office, then what we do
24   is we close that case out, and we do not -- I waive
25   the fee in that case, so we collect no -- we -- we

18 (Pages 69 to 72)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 160-11    Filed 02/21/18    Page 19 of 52

## Page 73

1    don't assign any fee to that because that was going go
2    to that private attorney --
3        Q.  Uh-huh.
4        A.  -- okay?  Now, the Court is not doing that
5    in all of those cases, but they are assigning some of
6    our cases -- what would be our cases to private
7    attorneys under that administrative order.  They're
8    doing it much more in Cass County than they are in
9    Johnson County.  That's partly because the associate
10   judges in Cass County are much more proactive in
11   basically doing this, and -- and in essence, following
12   that kind of process.
13       That's all initiated by client fills out
14   application, and we approve them as indigent, and if
15   they're approved as indigent, then we're advising the
16   Court, this would be an indigent person that we would
17   otherwise represent, and the Court then is doing that
18   under that administrative order.
19       Q.  Now --
20       A.  That's in the 17th Circuit.
21           (Martin Exhibit 13 was marked for
22   identification.)
23       Q.  And I'm going to hand you what I think is
24   now Exhibit 13.  I apologize I don't have extra copies
25   of this.  I'll send it across so you can take a look

## Page 74

1    at it.
2            Is that the administrative order that
3    you're referring to?
4        A.  That looks like exactly it.
5        Q.  Okay.
6        A.  That is correct.  And yep, that's signed by
7    Judge Collins.
8        Q.  Now you said that there is a -- a different
9    setup in the other circuit; correct?
10           MR. WILLIAMSON:  Let me --
11       Q.  (By Mr. Williamson)  Now, before we get to
12   that other circuit, other than, I guess, talking with
13   the Court about private attorneys who might be able
14   to -- to fill in, did you have any other involvement
15   in developing this order?
16       A.  Well, I did originally.  And like I said,
17   this is -- this is basically a renewal of -- with some
18   modifications to it, of the original administrative
19   order that Judge Collins did back a few years back,
20   whenever that was, in being able to -- it's a little
21   bit different version of it.
22       Q.  Uh-huh.
23       A.  We did -- we had a different referral
24   system -- a little bit different referral system that
25   we did back under the original order.  There were two

## Page 75

1    attorneys, basically, we were dealing with at that
2    point.  One of them is actually the prosecutor down
3    there in Cass County now.  And that dealt almost
4    exclusively with -- for the most part, misdemeanor
5    cases, probation violations.  It didn't have as much
6    other, you know, felony cases involved.  This time,
7    there's a larger list of attorneys that -- that
8    they're working with that have agreed to, you know, be
9    able to take some of these -- some of these cases.
10   And so it's not just to two -- two attorneys that
11   you're dealing with.
12       Q.  Okay.  And what's happening in the other
13   judicial circuit?
14       A.  Well, in the other circuit, I actually
15   filed our notice for conference requests under
16   Chapter 600.  The associate judge in Bates County,
17   which is Judge Hopkins, when she initially found
18   out -- before I had ever filed a notice, but when she
19   found out basically that I had indicated to the
20   attorney heading down there that we're not -- we're
21   going to have to do something about not taking cases,
22   she literally just started assigning attorneys in
23   court.  She didn't even -- She didn't have an
24   administrative order.  She didn't care about fees or
25   anything.  She just started naming attorneys that were

## Page 76

1    in court down there on her docket and started
2    assigning cases to them.
3            In Henry County and in Saint Clair County,
4    that did not happen.  The judge in Henry County,
5    Judge Strothmann, basically gave some more time for
6    clients; in other words, kind of what I would describe
7    as tried to give them more time to -- a little bit
8    more time to, you know, maybe hire somebody.  Said,
9    "Well, you need to work at, you know, trying to hire
10   someone in same fashion."
11           But then it wasn't long after that in
12   filing our request that Judge Journey in -- basically
13   saying that based upon the -- my initial notice to
14   them that we weren't going to take cases,
15   Judge Journey said that -- and sent me a notice
16   basically saying that they didn't recognize that, and
17   he was going to order us into cases.  And so he
18   created basically a blanket form that is an order form
19   that they simply sign in court, fill in the client's
20   name, case number, and scanned it into their system
21   that says, the, you know, public defender's office
22   under Chapter 600 is being appointed to this case.
23           I appeared in court.  I've entered a few of
24   those cases under objection.  I have now advised
25   Judge Strothmann last Friday when I was in court, and

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

Case 2:17-cv-04057-NKL   Document 160-11   Filed 02/21/18   Page 20 of 52

## Page 77

1  I advised Judge Journey, who is the circuit judge and
2  is the presiding judge, that I'm not assigning an
3  attorney to any case at this point.  And so while he
4  may be assigning cases to the public defender's office
5  in general, I'm not assigning any attorney to any
6  case, and that includes me.
7      Q.  And are those the cases that are then
8  ending up on a wait -- wait list?
9      A.  Yes.  I currently have -- when I had looked
10 at it, I think there's about 100 and -- and I say, "on
11 a wait list," there's also Cass County -- I mean, I
12 still have a wait list of people in -- from any of
13 these counties.  The -- we currently have about 100
14 and -- I think when I saw it last, it was around 105
15 or 110, something like that, people on a wait list.
16     Q.  How many -- do you recall when that wait
17 list was started?
18     A.  We started really being able to -- we've
19 had a couple things in our -- in our case management
20 system to try to be able to track it, and -- but I
21 will say that we started doing that literally
22 October -- it would have been right around whenever I
23 had -- and you may have a copy of the e-mail that I
24 got from -- from -- from Judge Journey indicating his
25 feelings about my notice to them.

## Page 78

1      And I'll explain my process.  After I got
2  back, and I met with my attorneys, over the weekend, I
3  contacted both of my presiding judges.  I called both
4  of them on the phone, and I told them exactly what we
5  were going to do; that I was go I think to stop
6  assigning cases to attorneys, that I felt it was a
7  Rule 4 violation, and that I had obligations under my
8  own supervisory ethical rules not to appoint these
9  cases.  Judge Collins asked whether -- and both of
10 them asked whether I was going to be filing something
11 under the Chapter 600.  With Judge Collins, because
12 they were trying -- he was trying to reestablish this
13 administrative order, I told him I wouldn't file
14 anything that -- if they were going try to work at
15 doing stuff, I wasn't going to file something there.
16 Judge Journey had no such plan with that, and so I
17 eventually went ahead and filed a Chapter 600 motion,
18 and that's where we stand right now.
19     Q.  Has Judge Journey ruled on that --
20     A.  No.
21     Q.  -- Chapter 600 --
22     A.  He's -- he is -- we have a conference
23 currently verbally scheduled for the 15th, Friday the
24 15th.  He has not sent -- he has not sent an actual
25 order, written order out in relation to it, because I

## Page 79

1  filed a number of things in my request.  He's going to
2  deny a number of those things, which we'll see where
3  that ends up.
4      Q.  And of -- of those roughly 105 defendants
5  who are on the waiting list, do you know approximately
6  how many of them are in custody?
7      A.  No, I don't.
8      Q.  Some of them are in custody?
9      A.  Oh, yeah.  Some of them are definitely in
10 custody.  Oh, absolutely.
11     Q.  Okay.  And to be clear, the -- the
12 Chapter 600 motion is just an order to schedule a
13 conference; right?
14     A.  Correct.
15     Q.  I mean, there's no -- no conference has
16 happened at this point?
17     A.  No conference.  I -- again, I'll look at it
18 in two different -- two different settings.  I had a
19 meeting.  Judge Collins scheduled for all practical
20 purposes what I would describe as a conference with
21 myself and the two prosecutors from Johnson County and
22 Cass County.  This wasn't under me filing a motion or
23 anything like that.  This was us having this meeting.
24 Other than talking about some of the things
25 administrative order-wise, I basically sat through

## Page 80

1  what I would describe as about three hours of meeting
2  where I had prosecutors lecture me about work habits
3  and whether SIS offers -- whether I expected that
4  offers would get any better than an SIS offer and
5  what -- you know, what did I want.  So I've moved on
6  from that.  Although, I remember it.
7      Q.  Okay.
8      A.  Judge Journey verbally scheduled this
9  conference initially for the 1st, and then because he
10 hadn't issued his order, when I was in this court with
11 him on Monday -- I want to say November 20 -- the end
12 of November, whatever that Monday was after
13 Thanksgiving.
14     Q.  Uh-huh.
15     A.  20-something, whatever it was.  It was the
16 Monday after Thanksgiving.
17     Q.  27th?
18     A.  I was in court in front of Judge Journey
19 and was still objecting about cases, and he had --
20 went ahead to reschedule the hearing for the -- for
21 the 15th.  Had also asked whether I had seen the order
22 that Judge Torrence had issued out of Jackson County.
23 I told him that I had seen that order, that I was
24 personally offended by the language in some of that
25 order referring to our caseload situation, I think, as

20 (Pages 77 to 80)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-11   Filed 02/21/18   Page 21 of 52

Page 81

1 a saga of some sort, which I found offensive, and
2 Judge Journey indicated to me that while he agreed
3 with some of the practical aspects of the ruling, as
4 far as what he was going to allow or not, he didn't
5 necessarily agree with the tone of the order. I have
6 yet to see an order. We have a meeting scheduled for
7 the 15th. We'll see what -- what happens at that --
8 and yes, that is only a conference.
9     Q. Uh-huh. And are the judges, as far as you
10 know, aware of the fact that you have this -- this
11 waiting list in place?
12     A. Yes.
13     Q. When you shared your plans with the two
14 judges prior to actually moving forward with your --
15 with your -- with your plan, what -- what was their
16 response?
17     A. Well, like I said, I think Judge Collins
18 has always indicated his intent to kind of reactivate
19 or reinvigorate this -- a modified version of this
20 order that he had. And I think that his -- my
21 impression with it was that he was -- he had indicated
22 he was going to talk to the Bar in both counties and
23 try to get, you know, what cooperation he could out of
24 them.
25         Judge Journey had indicated to me before

Page 82

1 he, you know, knew what our situation was. He knows
2 the attorneys I have working there, and he knows
3 exactly what their caseloads are and -- because I've
4 reiterated it with him a number of times over a long
5 period of time. The -- his -- he expressed what I
6 would describe as, I think, more frustration with not
7 so much us, but with the local Bar in general just
8 because there are -- there's not going to be as much
9 cooperation -- first of all, there's not as many
10 defense attorneys; and second, there's just not going
11 to be as much cooperation in -- in general in relation
12 to what we would have out there given the numbers of
13 what we have out there.
14         And there's an added complicated factor in
15 Henry County that revolves entirely around the
16 prosecutor there, which I could go at length, but I
17 won't.
18     Q. Okay.
19         COURT REPORTER: If you get to a stopping
20 point, I could just use five.
21         MR. WILLIAMSON: Why don't we take five
22 right now?
23         COURT REPORTER: Sure.
24         VIDEOGRAPHER: Off the record, 4:38 p.m.
25         (A brief recess was taken.)

Page 83

1         VIDEOGRAPHER: On the record, 4:46 p.m.
2     Q. (By Mr. Williamson) Mr. Martin, in your
3 opinion, did the attorneys in your office have the
4 time and resources to communicate with their clients
5 in the manner that each case requires?
6     A. No.
7     Q. Does that include yourself?
8     A. Yes.
9     Q. In your opinion, do the attorneys in your
10 office have the time and recess -- resources to
11 investigate each case in the manner that it requires?
12     A. No.
13     Q. Okay. And is it -- does that include you?
14     A. Yes.
15     Q. What's the basis for your opinion?
16     A. Because I think that what we've become good
17 at is shortcuts, and rather than doing the things that
18 you should do, you do the things that expedite things
19 as best as you can expedite them. It's a triage
20 process, and you look at cases, and you go, this is
21 your average drug case, but it's got a few pages of
22 discovery. It's got a lab report. I can go talk to
23 my guy. I can do this or that. Done. And that's the
24 amount of time I'm going to spend on it. And if my
25 guy's sitting in jail, he just wants to get out. And

Page 84

1 if the prosecutor's making a probation offer, he's
2 like, why can't we do that yesterday? I should
3 already be out this afternoon. And nobody -- as a
4 practical matter, nobody is going to turn and tell a
5 client, well -- and especially if they're stuck in
6 jail, "What you need to do is sit in the jail so I can
7 investigate further your case." That -- as a reality,
8 people aren't -- people aren't going to do that. If
9 your client is out of jail, you can have a little bit
10 different discussion with them.
11         But from my experience with our clients,
12 one of the things that also happens is you're dealing
13 with people that are indigent. They have driver's
14 license problems, they have transportation issues,
15 they have family issues, they have over kinds of
16 things. And the more court dates you set, the more
17 likely it is they're not going appear at some point,
18 and then that runs the risk of them ending up right
19 back in the jail, and then the case that you were
20 trying to look at, they're ready to now -- they just
21 want to be done with it so they can get out of the
22 jail. And that -- you know, that -- that happens in
23 cases.
24         And you -- when I say "triage," you then
25 start looking at cases that you go, this case is a sex

21 (Pages 81 to 84)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-11   Filed 02/21/18   Page 22 of 52

## Page 85

1  case. I know -- I already know in my head I'm going
2  have to depose a number of people. I'm going to be
3  getting school records. I'm going to be getting DFS
4  records. I'm going to be, you know, talking to the
5  people at Children's Mercy, and they don't like to
6  cooperate, so I'm going to have to try to fight
7  getting deposition times with those folks. I know
8  the -- the level of litigation that's going to be
9  involved in that case, and so you just start devoting
10  resources. You go, I got so much time. I can do so
11  much stuff. I'm going to devote this to this, and I'm
12  not going to devote that to that.
13      Q.  So -- and you talked earlier about the --
14  the level of experience among your attorneys. And you
15  testified that there are things that those attorneys
16  are able to manage that younger attorneys may not be
17  able to; correct?
18      A.  Sure, yes.
19      Q.  And yet, even with that experience, you
20  don't believe that your attorneys are able to cover
21  all of their bases?
22      A.  Yeah. I don't think their -- I -- I don't
23  think that they can do that in the way that they
24  should do that. I think they have to make do with
25  what they have and what you can do. You have -- you

## Page 86

1  have what you have. You -- you do what you do with
2  what you have.
3      Q.  So the -- their experience makes them
4  better at triaging --
5      A.  Yes.
6      Q.  -- than younger attorneys?
7      A.  Oh, yeah.
8      Q.  But triaging is not the standard?
9      A.  No. Triaging is not a standard. Triaging
10  is, I recognize -- I better recognize shortcuts.
11      Q.  How often do your attorneys employ experts?
12      A.  All of them do. I would say the vast
13  majority of the experts that we hire -- and I say
14  "vast majority." I don't know that I could put a
15  percentage on it, but I just know from approving the
16  requests for money, the vast majority of the experts
17  revolve around mental health issues, being -- being
18  able to have people evaluated for mental health
19  purposes, competency purposes, sometimes NGRI
20  purposes, but there's a lot that revolves that. Some
21  involving other kinds of issues, but very little that
22  I would describe as the kind of experts that people
23  read about in the news and get all excited about.
24      Q.  Are there cases for which you think experts
25  or an expert would be appropriate where your lawyers

## Page 87

1  are not able to retain an expert or don't retain an
2  expert for whatever reason?
3      A.  I -- well, there's two different -- there's
4  two different things there. I have -- I don't think,
5  other than asking them to clarify something that I
6  know somebody further along the management line would
7  want to have clarified to approve the request for the
8  money, something within the actual request, itself, I
9  don't think I've denied anybody's request for
10  anything. I mean, I've basically approved those as
11  long as they've got it structurally the way they
12  should have to be able to get it approved. I think
13  the real question there is, knowing what it is that
14  you need get.
15      And here's the example of what I was
16  talking earlier. When you're triaging, you're
17  basically saying, I know I'm going to have to put the
18  work into this case first because it's going to
19  require the most logistics, and so I'm going to work
20  on that, and I'll put this off until then because I
21  don't have to. The case that you put off until then
22  now is three weeks before trial, you're deposing
23  witnesses, you find out something that you go, holy
24  crap, I'd really -- I'd like love to have somebody be
25  able to tell me if you can actually do that, you know.

## Page 88

1  Maybe I need a guy that could look at X and tell me
2  that. Well, now, they're two weeks out from trial,
3  and they're trying to figure out, can I actually get
4  an expert to be able to do that? And so it -- that's
5  how you run into the problems of, well, maybe I -- you
6  know, can't get an expert, because then, my -- my --
7  my big sneaking hunch -- because I haven't seen a
8  whole bunch of things kind of things, my big sneaking
9  hunch is they look at it, they think about it, then
10  they look at the case, then they talk to the guy, then
11  they talk to the prosecutor about maybe a different
12  offer or some other kind of thing, and the reality is
13  they never hire anybody to look at any of it. They
14  basically say, well, I don't know that I'd really be
15  able to do that anyway. I don't know what that would
16  amount to, and so then they -- you've backed yourself
17  into the corner of having to proceed.
18      Q.  Okay.
19      A.  Or you get into a really ugly fight with
20  the Court about, well, I now recognize that I need to
21  have an expert in this case, which the judge may grant
22  that continuance. But now, in essence, what you've
23  told the judge is, I didn't do anything as a practical
24  matter to prepare this case until short enough period
25  of time that now I know I need an expert in this case,

22 (Pages 85 to 88)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-11   Filed 02/21/18   Page 23 of 52

## Page 89

1  and now, I'm asking you for time to get the expert; so
2  now, you've lost credibility with your judge in
3  relation to what you do in relation to preparing your
4  case. That -- it's a -- it's a vicious cycle that
5  feeds on itself.
6      Q. So in light of that testimony, in your
7  opinion, do you believe that the attorneys in your
8  office have the time and resources to consult with
9  experts in the manner that each case requires?
10     A. I don't think they have the time to be able
11 to do that. I think MSPD tries to encourage and
12 provide the money available to do that as much as
13 they -- as much as they can. And again, I've never
14 had some request that I forwarded turned down, other
15 than the logistics of this -- we need this clearer, or
16 we need something clarified in this request. I think
17 it's just the time that people don't -- they don't
18 have, so they don't do it, or they don't recognize it,
19 so it never gets done.
20     Q. How often do your attorneys take
21 depositions?
22     A. It depends on the attorney. There are some
23 attorneys that are pretty active about doing it.
24 There are other attorneys that, you know, take some
25 depositions. But not near as many as what I would

## Page 90

1  routinely want. I -- I look at this, and I think
2  anybody should look at this and say, if this was -- if
3  this was me, if this was my kid, and my kid was
4  looking at seven years in prison or ten years or
5  fifteen or however much it is, or being registered on
6  a sex offender list for the rest of their life, I
7  would want somebody to do this. I'd want them to look
8  at everything and be able to figure out what it is
9  that they're doing and know what they're doing before
10 any substantive thing happens that jeopardizes their
11 case, their ability to get something done, and I don't
12 think that they have the time to be able to do that.
13     Q. Okay. Do you know by chance how many --
14 roughly, how many of your cases go to trial in a year?
15     A. Oh, it's less than -- it would be less than
16 five percent, maybe less than one percent. I mean, we
17 have 20 -- we open up 2400 cases, ten percent would
18 be, what, 240? So one percent would be 24. I bet we
19 don't have 24 trials.
20     Q. Okay.
21     A. So less than one.
22     Q. And -- and is that -- what -- what do you
23 think the reason is for that or reasons?
24     A. Well, I think there's two -- I think
25 there's -- I think there's a couple reasons for that.

## Page 91

1  One of the reasons is, as a practical matter in some
2  of these jurisdictions, you're only going to be able
3  to -- there's only so many people. You got one
4  prosecutor, you got one judge, you got one attorney.
5  You're only going to try so many cases, even if they
6  schedule the cases. But as a practical matter, like I
7  said, with the logistics of -- of the way some of
8  these cases work and things you don't find out or
9  things that you -- you're only able to push and pursue
10 because you're able to push and pursue them or maybe
11 research a legal matter or have a suppression hearing
12 that you go, hey, guess what we found out. We finally
13 found out this, and we were able to have a hearing.
14 You force the issue such that the case that should
15 have either, one, never gotten filed or, two, should
16 have been reduced to a misdemeanor or some other thing
17 happen to it a year ago doesn't happen until a week
18 before trial, when you've been able to basically force
19 everybody's hand to be in a situation where they all
20 have to legitimately look at it, and they go, oh, wow,
21 this case sucks, and then they -- you know, and then
22 the case goes away. So some of it are, cases aren't
23 going to go to trial because they actually are forced
24 to a position where they recognize that the case might
25 not really be a good case.

## Page 92

1      Q. Right.
2      A. And they either offer something that makes
3  it go away, or they dismiss it, or something else
4  happens that changes the logistic.
5          I think as a practical matter too, there's
6  a lot of resources from the standpoint of the time of
7  an attorney in relation to getting a case ready for
8  trial and doing all of those things that you were
9  talking about in relation to investigating, talking to
10 witnesses, doing requests, deposing people, reviewing
11 discovery, all those kinds of things that you go to,
12 realistically do all of that and do all those -- all
13 of those things is an enormous time investment, and
14 the reality is, you know, I think that it'll happen
15 with certain cases, but there's a whole bunch of other
16 cases that it isn't going to happen with.
17         MR. WILLIAMSON: Okay. Can we go off the
18 record for two minutes?
19         VIDEOGRAPHER: Off the record, 5:01 p.m.
20         (A brief recess was taken.)
21         VIDEOGRAPHER: On the record, 5:03 p.m.
22     Q. (By Mr. Williamson) What steps, if any, do
23 your attorneys take to evaluate the immigration
24 consequences that a client might be facing?
25     A. Basically, there -- it's simply a

23 (Pages 89 to 92)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-11   Filed 02/21/18   Page 24 of 52

## Page 93

1  questioning process of determining whether someone is
2  a citizen, whether they're a US citizen, or if they
3  have some other immigration implication. I would say
4  that, in our office, we're actually -- no matter how
5  you'd want to look at it, we don't have that many
6  clients in our office that fall into that category,
7  simply because we don't have either the work
8  situations or population areas where you tend to have
9  an immigrant population where you would have a lot of
10 that occurring. We do have it but not -- but not very
11 often, and usually, when we do, it's -- it's pretty
12 self-evident when you start talking with people and --
13 and you find out pretty quickly that, you know, they
14 don't have -- just through our application process.
15     Q.  Do you think your lawyers have the
16 knowledge and expertise to -- to decipher what the
17 consequences might be based on what the client is
18 telling them?
19     A.  Oh, no. Every time we have it happen, we
20 usually are trying to consult with someone. I mean,
21 they -- usually, they'll find their way into my office
22 and ask me, and then I will tell them that I don't
23 know, and that -- that we need to talk with somebody
24 who does know, and they'll, you know, try to consult
25 with, you know, Counsel. I know that they know

## Page 94

1  someone that we actually -- someone in our office that
2  was friends with someone who does that kind of work,
3  and so they actually are able to contact that person
4  and get a lot of good information without having to
5  hire people to -- to do that.
6      Q.  Okay. Does your office handle juvenile
7  cases?
8      A.  Not as a matter of course, no. Now, we do
9  end up with them at times on a conflict basis, usually
10 because -- it used to be that Jackson County and
11 Clay County, for example, had juvenile situations, and
12 when they had conflict situations, then we would end
13 up with sometimes a juvenile out of that.
14     Q.  Okay.
15     A.  Which was always a frightening situation.
16     Q.  So who handles the juvenile cases that come
17 through Area 17?
18     A.  Right now, we don't have any, but
19 generally, it would probably end up being me, simply
20 because I've done it in the past. I don't know that
21 anybody else in our office actually really knows
22 anything about it, and what I know is probably scary,
23 so --
24     Q.  All right. And is that just -- is the
25 volume just a matter of there not being a lot of

## Page 95

1  juvenile cases coming through?
2      A.  No. Actually, what happens is -- in both
3  of the circuits that we work in, the Courts there
4  actually have -- they assign private attorneys to
5  represent juveniles in cases, and they almost -- the
6  caseload that -- that arises out there, they are not
7  certifying individuals as adults in cases out there.
8  They just -- they don't --
9      Q.  I see.
10     A.  They don't do that. So we, from that
11 standpoint, have not actively gone in and tried to get
12 into the middle of those. I've had the Court, over
13 the years, contact me at times where we had cases
14 where the Court felt like that might very well happen
15 or that that request might happen.
16     Q.  Uh-huh.
17     A.  Given the nature of the charge, if it was a
18 sex charge or some kind of thing -- I know we had a
19 homicide in Cass County a number of years ago
20 involving a juvenile being involved in the case, and
21 the judge basically contacted me immediately and said,
22 you know, you guys are going to end up in this case; I
23 want you in right from the beginning rather than, you
24 know, later on. But -- but generally, we don't handle
25 them.

## Page 96

1      Q.  Okay. Okay. In your opinion, generally
2  speaking, can the attorneys in your office adequately
3  represent all -- all of the clients on their dockets?
4      A.  No.
5      Q.  And does that include yourself?
6      A.  Yes.
7      Q.  And that also includes very experienced
8  attorneys; correct?
9      A.  Correct.
10         MR. WILLIAMSON: That's all I have.
11              EXAMINATION
12 BY MR. RAMSEY:
13     Q.  Good afternoon.
14     A.  Hi.
15     Q.  My name is Steven Alan Ramsey, and again, I
16 represent the State of Missouri and Governor Greitens.
17 I have a handful -- a little more than a handful of
18 questions for you if we can get through them.
19     To begin, do you have a sense of what
20 percentage of criminal cases in the counties that you
21 are over, that you represent -- so you said you
22 brought in about 2400. Do you know total about how
23 many there are?
24     A.  Sure. I -- I don't know what the -- what
25 the overall criminal numbers are, but I can give you

24 (Pages 93 to 96)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 160-11    Filed 02/21/18    Page 25 of 52

1  an idea kind of how our office shapes up.  So if
2  you're looking at a place like Saint Clair County,
3  Saint Clair County, we probably handle 90 percent of
4  the criminal caseload out there easily.  I mean,
5  there's one or two attorneys that do some defense
6  work, but that's -- that -- it -- it's not many.
7  Bates County and Henry County, there's more defense
8  bar there, but relatively speaking, we still easily --
9  I would say we probably still easily do 70 to
10  80 percent of the docket there.  When you get to --
11  and that's probably fairly true with Johnson County as
12  well.  Cass County is a little bit different because
13  you -- because we're -- that's near the metro area.
14  You have a lot more defense bar involved.  I don't
15  know that I'd -- I don't know that I'd be comfortable
16  giving you a good percentage on that, but there's a
17  lot more defense bar there, and so the -- the overall
18  breakdown of that caseload could be, you know, a lot
19  closer to, you know, say 50 percent of the caseload or
20  something like that, but I -- I -- I wouldn't feel as
21  comfortable about that number as a percentage, but
22  that gives you an idea of how that changes as you come
23  towards -- more towards the metro.
24      Q.  And when you track cases that are in your
25  system, is it done by criminal defendant, or is it

1  done by overall charges?
2      A.  When you say, "tracking," meaning how?
3      Q.  Well, so when you look to determine how
4  many cases you have right now, is it viewable in -- by
5  criminal defendant, or is it, you know, there are
6  36 felony As in this particular type, and so and so
7  forth?
8      A.  It's -- you can -- our -- our case
9  management database actually is really good at being
10  able to separate it out various different ways.  I can
11  separate it out by county.  I can separate it out by
12  type of case charged, meaning breaking it down by, you
13  know, A, B felony, A, B felony drug, you know, A, B
14  felony sex case, C, D, E felony, C, D, E sex case,
15  I -- I can break them out it that way.
16      They are entered in our system each -- you
17  can pull cases up by client, and then under that
18  client we'll have every open case that currently --
19  that client currently has, and it will actually also
20  show you the closed cases as well.  But I mean, those
21  aren't active cases.  It will also pull up if cases
22  are inactive on those cases, so when we have people go
23  into a warrant status, they fail to appear for court,
24  we put those cases in what's considered an inactive
25  status, and they will show that way in our system as

1  well.  If they're inactive for over a year, then at
2  that point, we close the case as inactive over a year,
3  because, you know, that person -- something else may
4  have happened with that person.
5      You can also look it up just by case number
6  as well.
7      Q.  Switching gears a bit, in terms of the
8  determination of indigent -- indigency, pardon me --
9      A.  It's okay.
10      Q.  -- how does that occur within your
11  district?
12      A.  In the areas where I have legal assistants
13  able to operate, the legal assistants try to do
14  that for the most part.  So for example, client --
15  either they will -- either meeting people at the
16  jail --
17      And let me back up and -- and answer this
18  way:  We get applications by people filling them out
19  in court, filling them out at the jail, faxing or
20  e-mailing them to us, or sometimes we will simply get
21  a letter request from an inmate that is in DOC
22  somewhere that says, "Can you guys help me dispose of
23  my case?"  And then we'll send an application to them,
24  and then they'll send it back.  So those are the
25  different processes.

1      The places where I have legal assistants
2  that can go actively meet with someone, I try to have
3  them do that because it helps get the case open in our
4  system sooner, which allows us to deal with those
5  bonding issues sooner.
6      In a couple of -- excuse me.  In a couple
7  of the counties where attorneys are operating
8  basically without that legal assistant help, the
9  attorneys, themselves, are taking the applications,
10  generally in court, and you know, screening -- in
11  essence, screening clients themselves in court.
12      Q.  And when you say, "screening," so they fill
13  out the application, the legal assistant or the
14  attorney will look at that and say, "Oh, yeah, this
15  person, you know, is under the federal poverty
16  guidelines; therefore, they are eligible."  Is that
17  essentially the screening process?
18      A.  There -- the screening process has to do
19  with their indigency status, which in -- which can
20  include different things.  There are different things
21  that are evidence of.  If you have people, for
22  example, that are receiving State benefits, those
23  individuals will qualify.  If -- because they've
24  already been determined by the State to be indigent.
25  They're receiving benefits of some -- of some sort,

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-11   Filed 02/21/18   Page 26 of 52

## Page 101

1  you know, either housing benefits or food stamps,
2  those kinds of things, people that are on disability.
3       If we have -- and then we use the federal
4  poverty guide -- guidelines as a benchmark for people
5  who aren't generally receiving those other benefits.
6  If they say they're employed or not employed.  If they
7  are employed, then using that and figuring out, you
8  know, how many people are in the household, you know,
9  as far as dependents that they would have that -- that
10  would count towards that, what other types of things
11  that might impact that.
12       Our ultimate indigency determination has to
13  do with the ability of that person to be able to
14  acquire representation for themselves, and we don't
15  use that as a basis of, well, they're going to go out
16  and, you know, try to hire the, you know, best legal
17  team in the state or something like that to represent
18  them on a case.  What I mean is, is that person might
19  be right near the borderline of, you know, federal,
20  you know, poverty guideline, and maybe they didn't
21  have to post a bond or anything to get out of jail;
22  but because of the nature of the type of case that
23  they have, they're not going to be able to hire
24  somebody anywhere within a 100=mile radius for less
25  than $20,000.  That person doesn't have $20,000 to be

## Page 102

1  able to do that.  We routinely have that happen, for
2  example, in sex cases and things like that, where it's
3  like, those people are going to get quoted numbers,
4  they're not going to be able to hire somebody.  It's
5  not going happen.  And so we end up -- you know, we
6  end up in those cases.
7       **Q.  Does your office essentially take the word
8  of the applicant on the applications?  Do you
9  essentially take their word for it in terms of, yes,
10  I'm -- I'm receiving public assistance, et cetera, or
11  is there -- pardon me, I'm sorry.**
12       A.  No.  That's okay.  In essence, if you're
13  asking me whether we investigate people's indigency
14  requests, as a practical matter, I don't have the
15  resources to represent people the way I think we need
16  to represent them.  From an indigency standpoint, I do
17  not have the resources or the ability to do active
18  investigations of people as to their indigency status.
19       But I'll answer also answer this -- this
20  way:  I do not -- in my experience, I do not routinely
21  have people coming into court asking for us to
22  represent them and filling out applications for us to
23  represent them that appear to me that they would
24  otherwise be able to go out and hire counsel.  They're
25  not pulling up in their Lexus outside, and then

## Page 103

1  walking into the courthouse and filling out an
2  application saying, I have nothing, I make nothing,
3  and that's the way this is.  That's -- that's not what
4  occurs.
5       Now, we will oftentimes -- and we do have
6  situations where we have looked at things where people
7  will say something about a house or some other kind of
8  asset that they might have, and we'll look into that.
9  We'll ask the judge to, you know, hold off, set a case
10  over that we're reviewing, you know, the indigency
11  situation.  We have situations where people post cash
12  bonds that we will, you know, tell the Court, "This
13  person has posted a cash bond.  They would be able to
14  use that to go hire somebody.  We're going to decline
15  representing them."  I don't know how many people we
16  decline, but we decline representation to, you know, a
17  number of people.
18       **Q.  That was my next question, if you had a
19  sense of, like, a rejection rate of how many people
20  are applying and how many people are being rejected.**
21       A.  A rate, I don't know.  I mean, again, it's
22  probably something that I could find out, but off the
23  top of my head, I don't know what it would be.  I know
24  that we decline people for a number of different
25  reasons, which include everything from they're

## Page 104

1  currently being represented by a private attorney;
2  although, they still might qualify, even if they're
3  represented by a private attorney because the -- the
4  case they have might be a new matter that's totally
5  different than the kind of matter that they have or
6  much more serious than -- the private attorney may
7  have been representing them on a misdemeanor case, and
8  now, they're charged with multiple felony charges or
9  something like that, they're not going to be able to
10  hire that attorney to represent them in that case.  I
11  mean, we -- we have situations like that occur.
12  We -- I'm trying to think if there's anything else I
13  could add to it one way or another.
14       **Q.  Well, that -- that's an interesting point,
15  that, if I'm understanding you correctly, a particular
16  criminal defendant may become eligible if there are
17  two or three other cases or maybe one other case that
18  they have where they're spending resources on that,
19  and they may not be able to afford representation in
20  the current case, the case in chief that they're
21  applying for the public for; is that -- am I correct
22  in understanding that situation?**
23       A.  Well -- well, let me -- I -- let me clarify
24  what that is.  And, first of all, it's not the norm
25  that we have happen.  I mean, generally, if people are

**ALARIS LITIGATION SERVICES**
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

1  represented by someone, oftentimes, they're trying to
2  talk to that same attorney to represent them in
3  relation to something else they have.
4       The far more common occurrence, frankly, is
5  just the reverse. What happens is not that we're
6  representing them on one case, and the private
7  attorney is representing them on, you know, one or two
8  other cases. What happens is they get charged in a
9  different case, the private attorney then bails on
10 that case, thereby dumping all of the cases in what
11 would be our direction. And at that point, given the
12 nature of the case that they may have, they may be in
13 custody at that point, so now, they're in jail, they
14 don't have a job, they don't -- they've lost the job
15 maybe that they had, and so they're -- at that point,
16 they are indigent, because they've lost their job, and
17 they're in jail, so that -- I mean, it becomes that
18 kind of circumstance. We don't generally have
19 circumstances where people are -- are doing the
20 reverse.
21      Q.  Am I correct in understanding your
22 testimony currently is that there's no independent
23 control or -- or check on whether someone is indigent
24 or not; but your testimony is suggesting that you
25 don't have people who are applying who have

1  significantly more resources than -- that would make
2  them ineligible? Am I understanding that correctly?
3  I know that was a convoluted way of articulating that,
4  and I can break it up if necessary.
5       A.  Well, I think I understand the question
6  that you're trying to ask. I don't believe that our
7  office is approving individuals on a routine basis
8  that wouldn't otherwise qualify as indigent, and I
9  think that we do the things that we can do to try to
10 screen people. They fill out the applications. As
11 part of our intake process, we have a separate sheet
12 that we use that asks about bonding information, where
13 they're going to be living, phone numbers, type -- you
14 know, job, their prior record, other kinds of things,
15 mental health status, stuff like that. Those are
16 things that, when you start asking those things, they
17 will give you more of an indication of the indigence
18 of that individual, because you will find out that
19 they don't have a place to stay or that the place that
20 they're staying at is their cousin's trailer, they
21 don't have a driver's license, they're currently on
22 probation, they currently have other kinds of things
23 going on that you will find that that tells you the
24 other information that you would -- that you would
25 need to have in relation to that -- in relation to

1  that person.
2       I have -- and I've always told the people
3  in my office, and I think everybody in my office has
4  always operated with the -- if they're concerned or
5  suspicious of something, it's like, you know, there --
6  this guy has applied, but, you know, there's something
7  about, you know, the circumstance, you know, people in
8  my office will come to me, and it's like, yeah. Go
9  ahead and, you know, do what you need to do to look at
10 it, you know, try to check it out, see if there's, you
11 know, something else going on that we need to know
12 about. It's just my experience that we don't have --
13 we don't have a flood of -- of people coming to us in
14 order -- let's put it this way: I don't have a bunch
15 of people filling out applications in order to be put
16 on a waiting list.
17      Q.  And speaking about that waiting list -- and
18 this will jump around a bit. Is there a legal
19 justification for that, or is that a mechanism that
20 was, I guess, discerned or thought up by particular
21 district defenders?
22      A.  Well, when you say, "a legal
23 justification," I -- my justification is I have
24 ethical rules that I have to comply with as an
25 attorney, and that I'm supposed to require my

1  attorneys to comply with. And so as a practical
2  matter, it's just -- it's kind of the reality of what
3  happens. People apply to us. They are indigent. I'm
4  going to tell the Court they're indigent. I'm also
5  going to tell the Court, as I have, "I'm not assigning
6  an attorney to represent this individual because I
7  don't have anyone that I think is available to be able
8  do it because their caseloads are already too large as
9  it is."
10      As a matter of function, it creates what
11 amounts to a waiting list. And we have explained that
12 to clients, and we've explained it to families who
13 are, you know, frustrated and don't know what that
14 means. And that's usually the first thing they ask,
15 is, "Well, what does that mean?" Well, it means
16 you're going to have to wait until I have someone that
17 I think is available to be able to represent your kid
18 or your husband or your boyfriend or your daughter in
19 a manner that they deserve to be represented.
20      Q.  Am I correct in recalling that you
21 said you -- coming -- this upcoming January will be
22 20 years in the Missouri public defender system?
23      A.  22.
24      Q.  22. I apologize.
25      A.  That's okay.

ALARIS LITIGATION SERVICES
www.alaris.us        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-11   Filed 02/21/18   Page 28 of 52

## Page 109

1    Q.  In those almost 22 years, has there ever
2  been another time where these wait lists have been
3  utilized, or is that a pure function of the Hinkebein
4  decision and the aftereffects of that?
5    A.  I'm trying to remember from when we had --
6  there was caseload litigation that went on in the
7  Waters decision, and -- but -- I'm trying to remember
8  whether there was specifically -- we had a
9  functionality to be able to do that, but that was
10  specifically -- it had to do with certification of
11  offices as the overall office.  I -- I'm not -- I -- I
12  don't have any kind of certification in relation to my
13  overall office or saying, you know, my office, itself,
14  is like, on some certification list or something like
15  that.  I've basically told the judges that I have this
16  number of attorneys in my office, they have these
17  number of cases that have been assigned to them over
18  the last number of months and currently in the course
19  of their representation that I consider them not
20  available, and I'm not going to assign cases to them.
21    Q.  I'll circle back to that in just a bit, or
22  maybe I won't depending on if this ends shortly.
23        Moving towards depositions and discovery --
24    A.  Uh-huh.
25    Q.  -- your testimony, was it that you had

## Page 110

1  never personally been denied a request for a
2  deposition in terms of funds or the availability?
3    A.  As far as funding?
4    Q.  Uh-huh.
5    A.  Yeah.  I don't -- I don't think that -- I
6  mean, I don't recall times where requests from the
7  funding mechanism have been denied, other than just to
8  try to clarify something, but not as an overall denial
9  of, no, you're not going to get the ability to be able
10  to do it.
11    Q.  And you also testified that you have
12  never -- pardon me.  You have never denied a request
13  from those who are -- who you supervise for a
14  deposition?
15    A.  Right.  Other -- other than the --
16    Q.  Aside from clarification?
17    A.  Right.  Other than the clarification
18  aspect, that's correct.
19    MR. RAMSEY:  Do we need to end?
20    MR. WILLIAMSON:  Five minutes.
21    MR. RAMSEY:  Five minutes.  Okay.
22    Q.  (By Mr. Ramsey)  And the same for experts
23  in terms of, you have never been denied funds or
24  denied the ability to use an expert that you thought
25  was necessary in a case?

## Page 111

1    A.  I've never been denied one that I have
2  asked for.
3    Q.  And you have never denied one to someone
4  you were supervising, or in your -- or at your point
5  in the process, you haven't denied anyone that?
6    A.  Right.  That they've come and asked for
7  me -- for one or, in essence, filled out the
8  electronic process, that's correct.  I'm not -- again,
9  the only reason denial-wise usually has been something
10  in relation to, from the mechanics of it, what they
11  needed to clarify better in the -- in the request, not
12  the general nature of a request, itself.
13    Q.  And is there any limitation on how much --
14  how much a particular expert can cost?  Is there any
15  particular policy in your district that you establish
16  or one that you know of?
17    A.  I don't have a -- I don't have a particular
18  policy.  The request in relation to funding is
19  particular to the type of expert you're hiring, what
20  you're hiring them for.  They have to indicate -- one
21  of the things that attorneys have to do is indicate a
22  per-hour cost; and generally, the indication is
23  usually something that -- that quantifies how you're
24  going to get to that cost.
25        I've been a -- I've been doing these for a

## Page 112

1  long time, so for example, if I had somebody make a
2  request that said, I need $50,000 in order to hire an
3  expert to determine whether somebody's competent, that
4  isn't going to happen, because I know that I don't
5  need to approve that kind of money to get that to
6  happen.  That's -- it -- it would be an extremely out
7  of the ordinary, ridiculous kind of request that I
8  know would not be within the realm of what we would
9  normally need for someone to be able to -- to get that
10  done, the number of hours it would require, the kind
11  of time frame.  Even if we -- and -- and for
12  example -- and it's usually amount a lot of mental
13  health experts that we have.  But for example, if
14  someone has a long mental health history, and that --
15  and that expert is going have to go through lots of
16  mental health records, they're going to have to review
17  lots of records in order to be able to ultimately
18  reach the kind of assessment that they need to be able
19  to reach and have the opinion that they're going to
20  need to be able to have in -- in a case, you might
21  request more money for that individual, but that would
22  be any individual, based on being able to do that kind
23  of request.  But for example, that kind of request
24  is -- is -- is still not going to be something that I
25  wouldn't recognize as something that -- that you go,

28 (Pages 109 to 112)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 160-11    Filed 02/21/18    Page 29 of 52

## Page 113

1  that's within the well -- realm of what this person or
2  anybody would be doing in relation to that kind of --
3  that kind of evaluation.
4     **Q. Do you maintain a list of experts that can**
5  **be utilized for your assistant public defenders, or**
6  **are they expected to kind of do their own research and**
7  **bring that to you?**
8     A. There are -- well, there are certainly
9  people that we have -- there are people that have been
10  used before for various kinds of expertise, and so
11  oftentimes, individuals, if they're -- it they're
12  wanting to have, for example, a basic competency
13  evaluation done on someone, you might look at a given
14  area of the state and say, well, here's, you know,
15  people that have been used in relation to that
16  circumstance. But, you know, there might be a
17  different circumstance that would be a -- a different
18  kind of expert that maybe you haven't had to deal with
19  before or haven't had to look at before. Sometimes
20  you're contacting other offices. Sometimes you're
21  contacting an office, for example, a capital unit or
22  something like that, which tends to have made use of
23  a -- a number of different experts in different --
24  differing circumstances. They might know who some of
25  those people are or be able to refer you to someone

## Page 114

1  for a particular type of -- of request.
2     My concern, which I expressed earlier, is
3  that oftentimes, I -- I think people don't know --
4  they wouldn't even know what they would need to look
5  for because they're -- they don't have the time to be
6  able to assess -- even assess that.
7     MR. WILLIAMSON: Can we go off the record?
8     VIDEOGRAPHER: Off the record 5:34 p.m.
9     (Off the record.)
10     (Deposition suspended at 5:34 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 115

1         CERTIFICATE OF REPORTER
2
3     I, Emily S. Hughes, a Certified Court
4  Reporter within and for the State of Missouri, do
5  hereby certify that the witness whose testimony
6  appears in the foregoing deposition was duly sworn by
7  me; that the testimony of said witness was taken by me
8  to the best of my ability and thereafter reduced to
9  typewriting under my direction; that I am neither
10  counsel for, related to, nor employed by any of the
11  parties to the action in which this deposition was
12  taken, and further that I am not a relative or
13  employee of any attorney or counsel employed by the
14  parties thereto, nor financially or otherwise
15  interested in the outcome of the action.
16
17     _____
18     Emily S. Hughes, RPR, CRR, CCR #1353
19
20
21
22
23
24
25

## Page 116

1       Alaris Litigation Services
2        1608 Locust Street
3       Kansas City, Missouri 64108
4  December 19, 2017
5
6  Ms. Jacqueline Shipma
7  MISSOURI STATE PUBLIC DEFENDER'S OFFICE
8  1000 West Nifong
   Building 7, Suite 100
9  Columbia, Missouri 65203
10  In Re: SHONDEL CHURCH, et.al., v.
     STATE OF MISSOURI, et al.
11
   Dear Ms. Shipma:
12
13  Please find enclosed your copy of the deposition of
   JEFFREY MARTIN, Volume I, taken on December 5, 2017,
   in the above-referenced case. Also enclosed is the
14  original signature page and errata sheet.
15  Please have the witness read your copy of the
   transcript, indicate any changes and/or corrections
16  desired on the errata sheet, and sign the signature
   page before a notary public.
17
   Please return the errata sheet and notarized signature
18  page to Alaris Litigation Services for filing prior to
   trial date.
19
   Thank you for your attention to this matter.
20
   Sincerely,
21
22
   Emily S. Hughes, RPR, CRR, MO CCR #1353
23  Enclosures
   cc: Mr. Jason D. Williamson
24
25

ALARIS LITIGATION SERVICES
www.alaris.us     Phone: 1.800.280.3376     Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-11   Filed 02/21/18   Page 30 of 52

## Page 117

```
 1      STATE OF          )
 2                        )
 3      COUNTY OF         )
 4
 5      I, JEFFREY MARTIN, do hereby certify:
 6          That I have read the foregoing deposition;
 7          That I have made such changes in form and/or
 8      substance to the within deposition as might be
        necessary to render the same true and correct;
 9          That having made such changes thereon, I hereby
        subscribe my name to the deposition.
10          I declare under penalty of perjury that the
        foregoing is true and correct.
11
12
                    JEFFREY MARTIN
13
14          Executed this      day of          ,
15      2017, at                 .
16
17
18      Notary Public:
19      My Commission Expires:
20
21      Signature page to:  Ms. Jacqueline Shipma
22
23
24
25
```

## Page 118

```
 1            WITNESS ERRATA SHEET
        Witness Name:  JEFFREY MARTIN, Volume I
 2      Case Name:  SHONDEL CHURCH, et al., v.
              STATE OF MISSOURI, et al.
 3
        Date Taken:  DECEMBER 5, 2017
 4
        Page #_____ Line #_____
 5      Should Read: _____
        Reason for Change: _____
 6
        Page #_____ Line #_____
 7
        Should Read: _____
 8
        Reason for Change: _____
 9
10      Page #_____ Line #_____
11
12      Should Read: _____
13
14      Reason for Change: _____
15
16      Page #_____ Line #_____
17      Should Read: _____
18      Reason for Change: _____
19
20      Page #_____ Line #_____
21      Should Read: _____
22      Reason for Change: _____
23
24      Witness Signature: _____
25
```

30 (Pages 117 to 118)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-11   Filed 02/21/18   Page 31 of 52

## A

abilities 7:1
ability 20:20
  21:14,16 58:14
  90:11 101:13
  102:17 110:9
  110:24 115:8
able 14:8 17:19
  19:13,21 21:5
  21:17 22:22
  22:22,23
  23:8,9,17 24:2
  24:15,16,16,17
  26:6,21 27:3,8
  27:9,15,18
  28:12,15,18,20
  28:22 32:2,12
  32:24 35:17
  36:11,15,19
  37:10,12,14,25
  38:4 40:4,21
  41:22 49:4
  53:9,15 54:12
  54:13 56:8,13
  56:16 57:10
  57:20,23,25
  58:3,14,18,22
  61:9 63:3 65:7
  65:8,18 68:5
  69:10 74:13
  74:20 75:9
  77:18,20
  85:16,17,20
  86:18 87:1,12
  87:25 88:4,15
  89:10 90:8,12
  91:2,9,10,13,18
  94:3 98:10
  99:13 101:13
  101:23 102:1,4
  102:24 103:13
  104:9,19 108:7
  108:17 109:9
  110:9 112:9,17
  112:18,20,22
  113:25 114:6

above-refere...
  116:13
absolutely 42:2
  79:10
accept 14:15
accepted 16:6
account 32:19
accounts 17:6
ACLU 4:4 5:25
acquire 101:14
action 36:1,1,12
  115:11,15
active 89:23
  98:21 102:17
actively 29:7
  35:21 57:10
  67:2 95:11
  100:2
actual 30:24
  53:20 68:10
  78:24 87:8
ad 56:24
add 33:19,19
  104:13
added 34:7
  49:16 82:14
addition 40:22
additional 12:9
  12:13 14:5
adequate 33:15
adequately
  33:16 96:2
adjust 23:5 52:1
administration
  41:7
administrative
  2:9 40:24 41:1
  41:6 42:1,4,17
  43:12 44:10
  70:11,15 72:21
  73:7,18 74:2
  74:18 75:24
  78:13 79:25
adults 95:7
advised 76:24
  77:1
advising 73:15

advocate 55:23
afford 104:19
aftereffects
  109:4
afternoon 6:12
  6:13 84:3
  96:13
age 6:8
aggravators
  35:5
ago 70:7 91:17
  95:19
agree 81:5
agreed 5:1 75:8
  81:2
ahead 37:14
  72:12 78:17
  80:20 107:9
al 1:3,6 3:3,6,17
  3:18 5:14,14
  116:10,10 118:2
  118:2
Alan 4:10 6:1
  96:15
Alaris 4:22 5:21
  116:1,18
allow 81:4
allows 100:4
alter 55:20
altogether 67:8
amenable 59:6
American 3:11
  5:18
amount 55:20
  71:15 83:24
  88:16 112:12
amounts 108:11
and/or 37:3
  116:15 117:7
animal 70:14
answer 6:25
  7:7,19,25 8:3
  29:2 43:14,17
  45:10 99:17
  102:19,19
answered
  22:10,10 25:17

42:16
answering
  27:12
answers 13:19
anticipate 8:1
anybody 58:20
  64:24 66:2
  88:13 90:2
  94:21 113:2
anybody's 87:9
anyway 88:15
APD 10:3,6,6,12
  10:13,15,17
apologize
  73:24 108:24
appear 84:17
  98:23 102:23
appearance
  52:17,19,21
  53:2,19 54:6
  55:9,21 59:25
  61:8
appearances
  57:22
appeared 54:1
  54:2 56:12
  76:23
appearing 4:3,8
  4:14 52:25
  53:24
appears 44:11
  115:6
applicant 102:8
applicants 16:19
  16:21
application
  53:15 54:13
  54:23 56:10
  61:3 69:6
  73:14 93:14
  99:23 100:13
  103:2
applications
  67:12 69:6
  99:18 100:9
  102:8,22
  106:10 107:15

applied 107:6
apply 20:14
  108:3
applying
  103:20 104:21
  105:25
appoint 71:8,9
  78:8
appointed
  59:24 71:19
  76:22
appointing
  67:18
appointment
  58:25
appropriate
  86:25
approve 41:15
  41:16,22 71:3
  71:4 73:14
  87:7 112:5
approved 47:15
  73:15 87:10,12
approving
  86:15 106:7
approximately
  79:5
area 9:12 10:17
  11:8,9,16,17,18
  55:3 94:17
  97:13 113:14
areas 31:1,4,6,17
  32:4 57:19
  93:8 99:12
argue 58:3
argument
  56:24 57:5
arguments
  56:16 63:22
arises 95:6
arraign 52:21
arraignment
  54:3
arranged 67:25
arrested 52:7
  52:13,14
  53:25

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-11   Filed 02/21/18   Page 32 of 52

arriving 12:3
articulating
    106:3
**Aside** 110:16
asked 15:10
    48:15 78:9,10
    80:21 111:2,6
asking 14:25
    87:5 89:1
    102:13,21
    106:16
asks 106:12
aspect 110:18
aspects 21:6
    22:25 28:23
    81:3
assess 32:17
    65:9 114:6,6
assessing 72:7
assessment
    112:18
asset 103:8
assign 26:21
    35:17 36:2
    40:3 64:19
    67:17 71:12
    72:19,19 73:1
    95:4 109:20
assignable 71:8
assigned 11:25
    26:17,18,23
    39:11,12 45:17
    45:18,25
    46:12 48:15
    53:17 56:4
    71:14 109:17
assigning 39:10
    46:10 70:20
    73:5 75:22
    76:2 77:2,4,5
    78:6 108:5
assigns 72:20
assist 38:5
assistance
    34:12 102:10
assistant 9:20
    10:1 13:18 30:3

36:6 41:10
42:8,9 43:16
43:24 44:3,10
44:15,22 45:6
54:11 100:8,13
113:5
assistants 13:21
    37:25 42:6,20
    53:8 54:20
    56:7 99:12,13
    100:1
associate
    53:23,23 73:9
    75:16
assume 23:11
    30:16
assuming 39:3
    39:9
attached 2:11
attempt 53:14
attempted 53:9
attention 116:19
attorney 4:10
    7:5 11:1 12:20
    13:23 14:5
    17:2,12,18,23
    18:7,16,17
    20:2,6 24:22
    25:20,21
    26:21 33:3,7,8
    33:21 34:16
    36:2 38:19,23
    39:13,14 40:1,1
    40:2,6,7,9,11
    40:14,16 43:8
    43:12 44:24
    59:8 60:14,14
    62:1 63:1,7,23
    64:16 67:17
    68:4,6 71:8,10
    71:12,13,14,18
    71:19 72:20
    73:2 75:20
    77:3,5 89:22
    91:4 92:7
    100:14 104:1,3
    104:6,10 105:2

105:7,9
107:25 108:6
115:13
attorneys 5:22
    6:15 12:18
    13:12,16 14:1
    17:10,14,16,16
    17:24,25 18:4
    18:11,14 19:11
    20:1,8,19 22:6
    23:2,12,19
    24:8 28:4,5,6
    28:25 29:4,7
    29:16 32:3
    33:5,20 35:9
    35:12 36:18,19
    37:1,21 38:8
    38:12,18,25
    39:10,13,19,20
    42:21 43:5
    46:19 47:10
    60:21 61:21,25
    62:8,20 63:10
    63:19 64:4,16
    64:22 65:14
    66:9 68:14
    70:17,22 73:7
    74:13 75:1,7,10
    75:22,25 78:2
    78:6 82:2,10
    83:3,9 85:14
    85:15,16,20
    86:6,11 89:7
    89:20,23,24
    92:23 95:4
    96:2,8 97:5
    100:7,9 108:1
    109:16 111:21
attorneys' 32:15
authority 55:19
availability
    110:2
available 28:12
    89:12 108:7,17
    109:20
average 15:15
    17:2,4 47:4

83:21
aware 81:10

**B**

**B** 2:7 19:2 21:1
    40:10,16 98:13
    98:13,13
**B's** 45:1
babies 39:6
back 24:17
    25:18 42:3
    44:4 46:25
    50:4,14 55:5
    59:18 63:8
    65:25 68:3
    74:19,19,25
    78:2 84:19
    99:17,24
    109:21
backed 88:16
bail 55:4
bailing 60:23
bails 105:9
ballpark 43:13
bankruptcy 11:6
bar 14:12 16:1,2
    16:4,12 66:25
    70:18 81:22
    82:7 97:8,14
    97:17
base 8:9
based 13:2
    21:12 55:14
    64:8,8,9 71:15
    72:14 76:13
    93:17 112:22
bases 85:21
basic 68:24
    113:12
basically 11:15
    16:20 20:23
    24:19 28:9
    33:3 41:8
    42:14 45:6
    47:18,24
    50:25 56:23
    57:4 64:2

65:19 66:18,19
67:6 70:15
71:1 73:11 74:17
75:1,19 76:5
76:12,16,18
79:25 87:10,17
88:14 91:18
92:25 95:21
100:8 109:15
basis 28:25
    29:3 47:17
    51:3 62:20
    69:7 83:15
    94:9 101:15
    106:7
**Bates** 11:13
    33:10,12 49:11
    51:14 55:15
    75:16 97:7
becoming 9:21
    9:25
bee 18:2
beginning 10:10
    95:23
behalf 1:14 3:19
    6:8
believe 9:16
    14:10 15:24
    64:6 85:20
    89:7 106:6
benchmark
    101:4
benefit 7:14
    18:17 49:16
benefits 100:22
    100:25 101:1,5
best 6:25 8:2
    19:23,24 32:3
    43:14 57:25
    83:19 101:16
    115:8
bet 90:18
better 19:11
    24:15 32:6,6
    36:19,20
    56:13 70:16
    80:4 86:4,10

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 160-11    Filed 02/21/18    Page 33 of 52

111:11
beyond 33:8
big 19:3 36:17
  88:7,8
billing 42:19
bit 14:17 22:1
  28:8 74:21,24
  76:7 84:9
  97:12 99:7
  107:18 109:21
blanket 76:18
blessed 18:11
body 7:21
bond 31:22
  47:22 54:25
  55:7,9,10,12
  55:17,20 56:11
  56:14,16,24
  57:5 58:3,5,9
  58:17 59:7
  60:13 62:13
  70:24 71:6,7,7
  71:16 101:21
  103:13
bonding 100:5
  106:12
bonds 55:18
  103:12
borderline
  101:19
bother 21:3
bottom 67:5
Box 4:11
boyfriend
  108:18
boys 51:24
brand 17:22
bread 25:14
break 38:12
  98:15 106:4
breakdown
  30:25 97:18
breaking 98:12
brief 82:25
  92:20
bright 30:8
bring 49:9

52:16 113:7
bringing 44:3
Broad 4:5
brought 54:5
  96:22
budgets 13:3
building 4:16
  31:8 116:8
built-in 37:11,12
bunch 9:2 62:11
  88:8 92:15
  107:14
busy 33:21

**C**

C 4:1 25:4,9,12
  25:15 55:15,16
  98:14,14
call 27:5 66:24
  69:8
called 36:1 41:18
  44:24 45:2
  78:3
calling 22:8
  58:10
capacity 9:19
capital 34:5,10
  34:13,20,21
  113:21
care 20:11 59:10
  59:10,11 75:24
carve 39:1
case 1:5 3:5
  5:14 6:15,21
  6:24 13:8 19:7
  21:17 26:14,15
  26:17 29:9
  31:20,24
  33:25 34:5,8
  34:9,13,17,20
  34:21 35:5,25
  36:10,13
  39:22,23
  40:11 43:19
  44:23 45:1
  46:9,10 47:3
  47:13,15,24

48:1 52:23
  56:4 57:7
  58:19,20
  60:22,23
  62:12,14 71:12
  71:20 72:14
  72:22,24,25
  76:20,22 77:3
  77:6,19 83:5,11
  83:21 84:7,19
  84:25 85:1,9
  87:18,21 88:10
  88:21,24,25
  89:4,9 90:11
  91:14,21,22,24
  91:25 92:7
  95:20,22
  98:8,12,14,14
  98:18 99:2,5
  99:23 100:3
  101:18,22
  103:9 104:4,7
  104:10,17,20
  104:20 105:6
  105:9,10,12
  110:25 112:20
  116:13 118:2
caseload 12:19
  15:10,11,14,19
  22:18,19 23:1
  23:2,4,6 24:12
  25:2,8 26:14
  26:18,23
  32:20,21 33:3
  33:23 35:16
  40:15 44:4
  48:15,16,17,19
  48:25 63:20
  64:10 65:16,18
  65:23,25 66:1
  67:9 70:8
  80:25 95:6
  97:4,18,19
  109:6
caseloads 82:3
  108:8
cases 11:14,19

11:22,24,25
  12:2,6,10,14,17
  12:19,21,23
  13:9 21:6
  22:24 23:18
  23:21 24:4,13
  25:3,6,22,25
  25:25 26:1,8
  26:8,12,16
  27:25 28:11
  33:4,4,5,10,11
  34:1,14,18
  35:20,24
  36:22 39:10,11
  39:16,21,24
  40:2,3,8,8,10
  40:16,20
  44:25 45:15
  45:15,18,25
  46:2,7,8,12
  47:2 58:12
  64:19,20,22
  65:5 70:20
  70:25 72:5,18
  72:19 73:5,6,6
  75:5,6,9,21
  76:2,14,17,24
  77:4,7 78:6,9
  80:19 83:20
  84:23,25
  86:24 90:14
  90:17 91:5,6,8
  91:22 92:15,16
  94:7,16 95:1,5
  95:7,13 96:20
  97:24 98:4,17
  98:20,21,21
  98:22,24
  102:2,6 104:17
  105:8,10
  109:17,20
cash 70:23 71:7
  103:11,13
Cass 11:11 24:15
  25:8 26:13
  39:16,18,20
  40:12,17 51:15

51:17 53:22
  70:6,12 73:8
  73:10 75:3
  77:11 79:22
  95:19 97:12
category 93:6
cause 3:15 55:11
cc 116:23
CCR 4:21 5:4
  115:18 116:22
Cedar 49:12
Centerview
  50:24
Central 1:2 3:2
  5:16
certain 3:15
  19:6 21:6 28:11
  31:18 32:10
  92:15
certainly 13:5
  28:10 54:18
  113:8
CERTIFICATE
  115:1
certification
  109:10,12,14
Certified 3:14
  115:3
certify 115:5
  117:5
certifying 95:7
cetera 102:10
chair 27:24
  28:13
chairing 28:21
chairs 46:15
chance 90:13
change 27:14
  33:24 118:5,8
  118:14,18,22
changes 92:4
  97:22 116:15
  117:7,9
Chapter 75:16
  76:22 78:11,17
  78:21 79:12
charge 54:4

ALARIS LITIGATION SERVICES
www.alaris.us        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 160-11    Filed 02/21/18    Page 34 of 52

55:15,16 57:2
95:17,18
charged 57:6
98:12 104:8
105:8
charges 52:21
53:25 98:1
104:8
check 105:23
107:10
checking 16:15
chief 104:20
Children's 85:5
Church 1:3 3:3
3:17 5:13
116:10 118:2
circle 109:21
circuit 11:10,12
70:5,6,9
73:20 74:9,12
75:13,14 77:1
circuits 11:10,10
70:5 95:3
circumstance
105:18 107:7
113:16,17
circumstances
7:6 105:19
113:24
cite 66:3
citizen 93:2,2
City 3:13 4:12
4:23 11:16 12:2
116:3
Civil 3:11 5:18
Clair 11:13 26:25
48:16,25 49:1
49:5,10,18,24
49:25 50:13
51:13 76:3
97:2,3
clarification
110:16,17
clarified 87:7
89:16
clarify 87:5
104:23 110:8

111:11
class 24:13
25:6
classification
25:13
Clay 12:21 13:10
25:23 62:10
62:17 94:11
clear 79:11
clearer 89:15
clearly 7:16
clerk 42:12,12
client 20:25
21:5 31:7,7,8
31:21,25 33:15
36:14 44:11,13
44:13 45:1,1
47:12,24 56:3
56:11,25 57:3
58:2 59:13
60:8 61:14,20
62:12 69:5
73:13 84:5,9
92:24 93:17
98:17,18,19
99:14
client's 31:20
61:10,13 76:19
clients 19:10
20:21 21:2,3
21:15 22:23
31:9 32:10,10
32:22,22
33:14 37:13
42:22 43:7,7
47:7,10,21,22
48:23,24,25
49:2,6 59:19
60:8,21 71:2
76:6 83:4
84:11 93:6
96:3 100:11
108:12
Clinton 34:2
49:20,21
close 52:14
72:24 99:2

closed 98:20
closer 49:20
52:3 97:19
clue 35:12
codefendants
11:20
collect 72:25
collected 72:9
Collins 70:10
74:7,19 78:9,11
79:19 81:17
Columbia 4:17
116:9
come 12:4 16:2
24:17 37:5
46:11 49:18,25
64:3 65:15,25
67:8 68:12
71:17 94:16
97:22 107:8
111:6
comes 41:9
comfortable
97:15,21
coming 8:1,15
10:21,24 37:5
65:17 95:1
102:21 107:13
108:21
commenced
5:9
Commission
117:19
common 105:4
communicate
83:4
communication
60:21
comparable
23:7
compare 23:1
competency
86:19 113:12
competent
112:3
complains
58:16

complaint 55:12
55:13 66:25
complicated
82:14
comply 107:24
108:1
computer 41:19
concept 61:23
concern 15:6
114:2
concerned
51:18 107:4
concerns 15:4
68:21
conducting
30:17
conference
75:15 78:22
79:13,15,17,20
80:9 81:8
conflict 11:14,19
11:20,22,24
11:25 12:1,6,10
12:14,17,17,19
13:9 25:22
46:8,12 62:9
94:9,12
conflicts 12:3
39:15
conjunction
65:17
consequences
92:24 93:17
consider 32:15
43:6,7 47:20
109:19
considered
98:24
consistently
48:11
consists 25:2
constantly 27:2
constitute 31:17
Constitution
58:13
constructive
21:22

consult 89:8
93:20,24
contact 31:8
32:21,22 47:7
48:7 72:11
94:3 95:13
contacted 78:3
95:21
contacting 22:8
68:18 113:20
113:21
context 6:21
15:25 23:16
26:11
continuance
88:22
continue 13:1
continued 48:4
65:24
contracted 12:5
contracting
12:6
control 24:16
33:9,10 49:23
105:23
controls 33:11
converse 18:12
convoluted
106:3
cooperate 85:6
cooperation
81:23 82:9,11
coordinate
45:5
copies 73:24
copy 77:23
116:12,15
corner 88:17
correct 9:8 16:4
23:13 35:7,8
42:9 52:8
55:8,24,25
63:14 74:6,9
79:14 85:17
96:8,9 104:21
105:21 108:20
110:18 111:8

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-11   Filed 02/21/18   Page 35 of 52

117:8,10
corrections
  116:15
correctly 104:15
  106:2
cost 111:14,22
  111:24
counsel 5:2,2
  62:14 93:25
  102:24 115:10
  115:13
count 26:1 34:8
  57:7 101:10
counties 11:7,14
  18:23 21:10
  39:17,18 52:19
  54:19,19 55:14
  77:13 81:22
  96:20 100:7
county 11:11,11,12
  11:13,13 12:21
  12:21,22 13:9
  13:10,10 24:14
  24:15 25:8,22
  25:23 26:13
  26:23,24,25
  33:10,12,22
  33:25 39:12
  39:14,16,18,18
  39:19,20 40:6
  40:10,12,17
  43:15 44:2,21
  48:16,18,20
  48:20,25 49:1
  49:5,11,11,11,11
  49:12,17,18,19
  49:20,23,24
  49:25 50:1,10
  50:13,18,19,20
  50:20,25 51:2
  51:3,13,14,16
  51:17,20 52:13
  53:22 55:15
  58:15 62:10,17
  70:6,6,12,13
  73:8,9,10 75:3
  75:16 76:3,3,4

77:11 79:21,22
  80:22 82:15
  94:10,11 95:19
  97:2,3,7,7,11
  97:12 98:11
  117:3
couple 27:7
  30:3 36:8
  38:14 47:6
  48:1 52:4
  77:19 90:25
  100:6,6
course 6:20
  20:14 45:16
  66:17 94:8
  109:18
court 1:1 3:1,14
  3:16 4:21 5:16
  6:5 7:3,14
  8:23 11:5 21:12
  21:12,18,23,24
  21:24 22:22
  24:17,18 29:5
  29:6 30:1
  38:20,22
  43:20,21,25
  43:25 44:11,11
  48:18 52:7,15
  52:23,24
  53:14,16,17,20
  53:22 54:4,6
  54:9,10,22,24
  55:7,8 56:12
  59:5 60:7,15
  67:10,13,17
  68:5 69:4
  71:10,13 72:6
  72:20 73:4,16
  73:17 74:13
  75:23 76:1,19
  76:23,25
  80:10,18 82:19
  82:23 84:16
  88:20 95:12
  95:14 98:23
  99:19 100:10
  100:11 102:21

103:12 108:4,5
  115:3
Court's 52:24
  56:20
courthouse
  18:25 103:1
Courts 22:13
  31:12 61:11,12
  68:18 95:3
cousin's 106:20
cover 12:10
  18:19 21:24
  85:20
coverage 11:9
covering 20:24
covers 11:14
  18:22
crap 87:24
create 60:8
created 76:18
creates 20:22
  21:8,10 37:23
  49:13 108:10
credibility 89:2
criminal 6:21
  10:25 11:5
  17:16 96:20
  96:25 97:4,25
  98:5 104:16
criteria 16:19
  30:22
CRR 4:21 5:4
  115:18 116:22
current 9:9
  23:12 51:12
  104:20
currently 12:1
  33:25 34:16
  48:13 49:1
  50:16,18 51:2
  52:6 77:9,13
  78:23 98:18
  98:19 104:1
  105:22 106:21
  106:22 109:18
custody 60:12
  60:13 79:6,8

79:10 105:13
cycle 89:4

———————

**D**

D 2:1 4:4 25:4,9
  25:12,15 98:14
  98:14 116:23
daily 29:3 69:6
database 45:22
  98:9
date 5:11 52:15
  52:23 53:14
  53:16,17,19,20
  54:4,9,10,22
  116:18 118:3
dates 21:18
  43:20,21 44:1
  59:5 84:16
daughter 108:18
day 15:15,20
  21:21,23
  24:20 30:12
  33:1,1,1 34:8
  49:7,8 52:18
  56:12,22 57:8
  63:11 65:2,5
  67:8 117:14
day-to-day
  22:2
days 19:24
  21:12,18,21
  24:20 27:8
  32:23,23
  45:24 47:13,16
  47:18 48:7,9
  48:18 66:22
deadbeat 61:1
deal 19:3 22:23
  27:4,4,9,10
  34:16 36:10
  37:13 38:20
  38:22 56:21
  58:5,10 61:12
  100:4 113:18
dealing 22:7,12
  31:7 75:1,11
  84:12

deals 34:14
dealt 75:3
Dear 116:11
death 34:2 35:5
decades 47:6
December 1:15
  3:10 5:11 116:4
  116:13 118:3
decides 49:18
  49:25
decipher 93:16
decision 14:18
  63:14,17,17,18
  64:21 66:10
  67:22,23 68:1
  109:4,7
decisions 14:19
declare 117:10
decline 103:14
  103:16,16,24
declined 14:14
  14:14 16:10
defendant
  97:25 98:5
  104:16
defendants 1:7
  3:7,18 4:14 5:3
  6:4 52:6
  69:25 79:4
defender 6:4
  9:10,12,14,15
  9:16,21,22,25
  10:1,2,14,15
  22:2 30:4
  70:8 71:24
  108:22
defender's 4:15
  6:20 12:9 15:5
  29:23 65:6
  67:19 71:25
  76:21 77:4
  116:7
defenders
  107:21 113:5
defense 10:25
  17:16 82:10
  97:5,7,14,17

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-11   Filed 02/21/18   Page 36 of 52

definitely 79:9
degree 28:19
degrees 66:11
delegators 36:20
demonstrate 28:18
demonstrating 28:16
denial 110:8
denial-wise 111:9
denied 87:9 110:1,7,12,23 110:24 111:1,3,5
deny 59:15,15 79:2
dependents 101:9
depending 109:22
depends 19:24 43:15 52:12,13 56:19 60:5,5 89:22
depose 85:2
deposed 6:16
deposes 6:9
deposing 19:6 87:22 92:10
deposition 1:13 3:9 5:3,9,12,17 8:5,12 85:7 110:2,14 114:10 115:6,11 116:12 117:6,8,9
depositions 89:21,25 109:23
describe 31:4 31:16 56:20 56:24 69:14 76:6 79:20 80:1 82:6 86:22
described 42:13

description 2:8 45:11
deserve 108:19
designated 13:23 42:12
designation 10:6 42:11
desired 116:16
determination 99:8 101:12
determine 98:3 112:3
determined 100:24
determining 36:22 93:1
develop 32:12
developed 70:11,17
developing 21:4 74:15
devote 85:11,12
devoting 85:9
DFS 85:3
differences 18:14 45:12
different 26:2 30:25 36:8 37:4 48:10 49:3 60:6 64:9 70:4,14 74:8,21,23,24 79:18,18 84:10 87:3,4 88:11 97:12 98:10 99:25 100:20 100:20 103:24 104:5 105:9 113:17,17,23 113:23
differing 113:24
difficulty 20:18 32:9,11
direct 18:6
directed 22:12
direction 105:11 115:9

disability 101:2
discerned 107:20
discovery 31:9 36:13 83:22 92:11 109:23
discussing 31:21
discussion 84:10
dismiss 92:3
dispose 99:22
district 1:1,1 3:1,1 3:16,17 5:15,16 9:12,13,15,16 9:21,25 10:2 10:14,15 22:2 99:11 107:21 111:15
divide 39:21,23 40:4
divided 40:15
division 1:2 3:2 5:17 31:15
DOC 61:15 99:21
docket 18:19 26:13 40:12 52:24 53:5 53:23,23 54:8 63:2 76:1 97:10
dockets 96:3
documents 8:18 8:21 9:2 41:11
doing 12:19 16:22 21:25 27:19 29:24 30:1 32:5,14 39:16 40:16,17 43:5 44:4,7 47:23,25,25 54:20 55:22 56:23 63:12 63:21 65:1 73:4,8,11,17 77:21 78:15

83:17 89:23 90:9,9 92:8 92:10 105:19 111:25 113:2
dramatically 44:5
drive 50:2,10 51:20
driver's 84:13 106:21
drug 55:16 57:1 58:19 83:21 98:13
duly 115:6
dump 23:18
dumping 105:10
duties 22:5
duty 64:18

**E**
E 2:1,7 4:1,1 25:5 25:11,12,13 98:14,14
e-mail 77:23
e-mailing 99:20
e-mails 8:22
earlier 48:15 63:9 85:13 87:16 114:2
early 19:13
easier 18:20
easily 33:17,19 33:19 45:17,18 97:4,8,9
easy 30:11,15
effectively 27:4 28:19 37:12 65:9
eight 14:1 31:3 33:18 35:9 46:19
eight-attorney 13:22
either 23:4 45:4 61:15 65:16 91:15 92:2 93:7 99:15,15

101:1
elect 41:3
electric 41:3
electronic 41:4 111:8
eligible 100:16 104:16
Emily 3:13 4:21 5:4,19 115:3,18 116:22
employ 86:11
employable 67:7
employed 101:6 101:6,7 115:10 115:13
employee 115:13
employer 9:9 57:11
enclosed 116:12 116:13
Enclosures 116:23
encourage 37:1 89:11
encouraged 59:8,8
ends 60:9,10,11 79:3 109:22
enormous 92:13
enter 43:20,25 72:5,14
entered 76:23 98:16
entire 20:14
entirely 82:15
envision 51:4
errata 116:14,16 116:17 118:1
especially 28:3 30:5 32:10 53:11 84:5
essence 9:1 10:9 24:18 39:22 73:11

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-11   Filed 02/21/18   Page 37 of 52

88:22 100:11
102:12 111:7
essentially
100:17 102:7,9
establish 36:9
69:25 111:15
et 1:3,6 3:3,6,17
3:18 5:14,14
102:10 116:10
116:10 118:2,2
ethical 64:13,14
64:17 66:4
78:8 107:24
ethically 63:19
64:5,6,23
evaluate 28:20
32:3 92:23
evaluated 30:14
30:23 86:18
evaluating 31:18
32:12
evaluation
29:25 30:24
32:2 113:3,13
evaluations
29:17 30:17
32:14
evens 39:25
event 41:19
52:17 68:7
events 14:21
eventually
60:16 78:17
everybody
22:19 48:8
57:5 66:17
68:12,13,14
107:3
everybody's
41:13,14,21
91:19
evidence
100:21
exact 24:1
45:23
exactly 24:1
29:2 45:25

74:4 78:4
82:3
EXAMINATION
2:4,5 6:10
96:11
examined 3:10
6:8
example 19:25
20:13 29:4
31:5,19 43:20
47:23 60:12
87:15 94:11
99:14 100:22
102:2 112:1,12
112:13,23
113:12,21
examples 31:25
exception 17:18
24:9 40:16
exceptions
24:10 47:20
excited 86:23
exclusively
75:4
excuse 63:21
100:6
Executed 117:14
exhibit 2:9,11
73:21,24
expect 13:1,6
14:8 54:6
67:15
expectation
32:20
expectations
31:18
expected 28:17
80:3 113:6
expedite 83:18
83:19
expense 41:14
experience 13:3
13:4 17:15
18:12 28:7,8,9
64:8 84:11
85:14,19 86:3
102:20 107:12

experienced
17:18,24 18:14
18:16,17 19:11
20:1 24:22
96:7
expert 19:8
86:25 87:1,2
88:4,6,21,25
89:1 110:24
111:14,19 112:3
112:15 113:18
expertise 93:16
113:10
experts 86:11,13
86:16,22,24
89:9 110:22
112:13 113:4,23
Expires 117:19
explain 24:10
78:1
explained
108:11,12
expressed 82:5
114:2
expressly 5:7
extent 17:13
32:15
extra 73:24
extremely 112:6

F
facilitate 44:20
63:3
facilities 47:21
facility 61:16
facing 92:24
fact 14:22 45:4
55:5,6 61:23
81:10
factor 59:4,4
82:14
fail 98:23
fair 33:7
fairly 17:17,24
39:24 97:11
fall 93:6
familiar 19:4

63:13
families 22:7
66:15 108:12
family 27:5
42:24 44:19
57:16 69:8
72:12 84:15
far 12:3 26:3
31:6 34:19
42:23 44:8
47:10 51:17
81:4,9 101:9
105:4 110:3
fashion 76:10
faxing 99:19
federal 48:21
48:22 51:10,11
51:13,14,16
100:15 101:3
101:19
fee 70:21,21,22
70:24 71:14,18
71:21,22 72:2
72:6,8,16,16
72:25 73:1
feeds 89:5
feel 97:20
feeling 7:17
feelings 77:25
fees 72:4 75:24
felonies 25:5,8
25:9,11,13,15
26:9
felony 24:13
25:6 40:7,10
40:15,15,16
53:23,25
55:15,16
70:25 75:6
98:6,13,13,14
98:14 104:8
felt 16:19 66:12
78:6 95:14
fewest 48:18
fifteen 90:5
fight 85:6 88:19
figure 30:13

32:16 36:15
37:3 88:3
90:8
figuring 19:1
35:17 101:7
file 35:5 55:11
55:12 66:25
72:6 78:13,15
filed 34:21 35:4
62:13 75:15,18
78:17 79:1
91:15
files 13:20
filing 76:12
78:10 79:22
116:18
fill 13:24 14:9
17:21 19:16,17
57:3 67:12
69:5 74:14
76:19 100:12
106:10
filled 111:7
filling 20:24
21:18 61:2
99:18,19
102:22 103:1
107:15
fills 19:25 73:13
finally 91:12
financially
115:14
find 29:8 37:19
37:20 87:23
91:8 93:13,21
103:22 106:18
106:23 116:12
finish 7:24,25
8:2
fired 61:2
first 8:7 10:5,7
14:11 28:11
30:3,5 39:12
52:7 82:9
87:18 104:24
108:14
fiscal 12:10 13:7

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 160-11    Filed 02/21/18    Page 38 of 52

five 33:20
82:20,21
90:16 110:20
110:21
flip 38:21 54:16
floated 24:3
flood 107:13
Floor 4:5
folks 32:8 43:4
49:15 85:7
follow 31:13
66:20
follow-up 45:2
following 30:2
73:11
food 101:1
fooling 60:18
force 91:14,18
forced 91:23
foregoing 115:6
117:6,10
forget 16:2
form 30:25 41:2
41:5 76:18,18
117:7
forms 41:5
forth 98:7
forward 21:17
68:19 81:14
forwarded 8:22
8:24 68:9
89:14
found 16:1,4
68:1 75:17,19
81:1 91:12,13
Foundation
3:12 4:4 5:18
four 14:13 15:21
33:19 37:7
38:23 49:2
60:15
frame 15:22,25
29:23 30:9,11
41:16,22 44:5
45:9,19 46:3
112:11
frames 30:4,6

frankly 37:24
38:2,11 52:12
56:22 59:7,10
61:17 62:6
63:5 66:7
105:4
Friday 68:1,3
76:25 78:23
friends 94:2
frightening
94:15
front 13:19 42:14
42:14 52:25
54:2 72:4
80:18
frustrated
108:13
frustration 82:6
full 51:7
full-on 58:9
fully 13:6 17:8
function 58:24
59:2 108:10
109:3
functionality
35:25 109:9
functionally
23:18
functions 22:4
funding 12:9,13
14:5 110:3,7
111:18
funds 110:2,23
further 84:7
87:6 115:12
furthest 26:24

────── G ──────

gathers 41:10
geared 15:19
gears 99:7
general 22:9
31:12 36:11
77:5 82:7,11
111:12
GENERAL'S
4:10

generalized
36:4
generally 12:16
18:25 19:15,20
22:3,11 36:5
42:13 46:12
47:22 52:12
55:10 58:11,22
94:19 95:24
96:1 100:10
101:5 104:25
105:18 111:22
getting 11:21
12:5 13:9 36:7
42:18 45:2
63:4 69:6
72:4 85:3,3,7
92:7
give 31:18 36:11
43:14,17 45:10
48:12 53:21
66:19 76:7
96:25 106:17
given 24:3 31:4
31:4,24,24
32:4 39:2,2
41:16,20,22
46:7,19 56:22
61:18 82:12
95:17 105:11
113:13
gives 31:25
45:11 46:1
57:12 97:22
giving 97:16
go 18:24 20:5
21:10,15,24
22:22,22
24:16,16 25:18
30:11 32:24
35:18 36:13,15
37:13,19 38:2
38:21 39:5,10
42:21 44:23
46:25 49:4,5
49:6,7,9,14,18
49:22 50:7,9

50:10,11 51:4
52:7 53:14
54:11,12 58:22
60:16 65:11,11
65:19 67:10
69:4 72:12
73:1 78:5
82:16 83:20
83:22 84:25
85:10 87:23
90:14 91:12,20
91:23 92:3,11
92:17 98:22
100:2 101:15
102:24 103:14
107:8 112:15
112:25 114:7
goes 30:25
59:18 60:23
63:8 65:24
91:22
going 6:23 8:2
8:7,15 15:19
16:6 19:5,5,6
20:4 24:18
26:16 29:8,10
29:24 33:6
34:7 44:24
45:3,5 46:3
47:24 48:5
49:7,12 50:4
52:1 54:10
55:16 56:8,15
56:21 57:7,10
57:10,11,18
58:12 59:12,13
59:14,15,17,17
60:24 61:5
62:5,7,14,16,17
64:20,20
65:10,11,11,11
65:18,19,20
66:25 67:11,12
67:12,13,15
68:4,6,17 70:4
70:7,8,19 71:7
71:8,9,13,15,17

71:19,20,21
73:1,23 75:21
76:14,17 78:5
78:10,14,15
79:1 81:4,22
82:8,10 83:24
84:4,8,17 85:1
85:2,3,4,6,8,11
85:12 87:17,18
87:19 91:2,5
91:23 92:16
95:22 101:15
101:23 102:3,4
102:5 103:14
104:9 106:13
106:23 107:11
108:4,5,16
109:20 110:9
111:24 112:4,15
112:16,19,24
good 6:12,13
18:10 23:8,9,11
45:10 47:4
59:21 61:12,22
66:19 83:16
91:25 94:4
96:13 97:16
98:9
gotten 91:15
Governor 4:9
6:2 96:16
grand 46:16
Grandma 57:17
grant 88:21
grasp 19:11
grateful 13:6
Gray 4:20 5:20
great 28:21
63:9
Greene 50:18
50:20,20 51:2
Greitens 4:9
6:2 96:16
guess 67:10
74:12 91:12
107:20
guide 101:4

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-11   Filed 02/21/18   Page 39 of 52

guideline 33:2
  101:20
guidelines 31:14
  31:16 70:21
  100:16 101:4
guy 45:7 49:25
  57:6,13 83:23
  88:1,10 107:6
guy's 57:11
  83:25
guys 49:8,9,10
  95:22 99:22

**H**

H 2:7
habits 80:2
half 17:8 51:21
  51:22,22,23
  52:2
hand 27:21
  56:10,11 65:10
  73:23 91:19
handful 43:3
  96:17,17
handle 35:1,1
  45:15 64:5,6
  64:23 94:6
  95:24 97:3
handled 12:14
handles 94:16
handling 11:24
  44:25
handwritten
  41:4
happen 50:9
  56:2 57:21
  60:4 61:24
  62:4,5,7 67:5
  76:4 91:17,17
  92:14,16 93:19
  95:14,15 102:1
  102:5 104:25
  112:4,6
happened 62:6
  68:19 79:16
  99:4
happening

48:11 52:6
  63:1 69:21
  75:12
happens 37:14
  53:4 54:21
  55:6 62:19,20
  62:21 81:7
  84:12,22
  90:10 92:4
  95:2 105:5,8
  108:3
hard 35:16
head 25:15 31:1
  85:1 103:23
heading 75:20
health 19:10
  47:21 86:17,18
  106:15 112:13
  112:14,16
hear 7:9
heard 57:8
  62:15
hearing 52:8
  55:1 56:3
  58:9 61:10
  68:11 80:20
  91:11,13
hearings 52:11
  58:5,15
heavy 15:19
held 5:17
help 21:16 34:11
  37:25 38:3
  43:16 44:20
  45:8 99:22
  100:8
helping 42:25
  63:10
helps 100:3
Henry 11:12
  33:22 49:11,19
  49:20,23 50:1
  50:10 76:3,4
  82:15 97:7
hey 37:6 45:7
  50:3 57:13
  69:9 72:11

91:12
Hi 96:14
High 4:11
highest 33:23
Hinkebein 14:18
  63:14 64:21
  69:24 109:3
hire 17:19,19
  18:6 60:13,14
  60:24 76:8,9
  86:13 88:13
  94:5 101:16,23
  102:4,24
  103:14 104:10
  112:2
hired 28:6
  33:19
hiring 20:5
  111:19,20
history 112:14
hoc 56:24
hold 9:24 103:9
hole 20:7,9
holy 87:23
home 62:7
homicide 33:25
  95:19
homicides 26:1
  35:3
hopeful 13:2
Hopkins 75:17
hour 51:22,22
  51:22,23 52:2
hours 51:23
  80:1 112:10
house 51:11,16
  57:18 103:7
housed 49:17
household
  101:8
houses 48:21
  51:13,14
housing 51:10
  101:1
huge 59:4
  62:13
Hughes 3:13

4:21 5:4,19
  115:3,18 116:22
hunch 88:7,9
husband 108:18

**I**

idea 48:2 51:11
  97:1,22
ideal 38:8
identification
  73:22
immediately
  7:11 68:18
  95:21
immigrant 93:9
immigration
  92:23 93:3
impact 101:11
impacts 20:19
implementing
  27:12
implication
  93:3
implications
  63:17,18
  67:22
important 43:6
impossibility
  23:10
impression
  15:12 81:21
inactive 98:22
  98:24 99:1,2
incarceration
  36:7
include 31:6
  35:4 83:7,13
  96:5 100:20
  103:25
included 8:8
  11:8
includes 13:18
  14:2,3 27:10
  39:21 77:6
  96:7
income 72:9
incorporated

38:5
increase 48:22
increases 44:5
  44:6
incredible 43:8
independent
  105:22
indicate 111:20
  111:21 116:15
indicated 75:19
  81:2,18,21,25
indicating
  77:24
indication
  106:17 111:22
indigence
  106:17
indigency 99:8
  100:19 101:12
  102:13,16,18
  103:10
indigent 67:14
  71:5 73:14,15
  73:16 84:13
  99:8 100:24
  105:16,23
  106:8 108:3,4
individual 39:10
  50:8,10 72:8
  106:18 108:6
  112:21,22
Individually
  23:24
individuals 22:7
  28:13 95:7
  100:23 106:7
  113:11
ineligible 106:2
influx 51:15
information
  56:11 68:10
  94:4 106:12
  106:24
ingrained 25:14
inhibits 21:14,15
initial 29:24
  52:8,11,17,19

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-11   Filed 02/21/18   Page 40 of 52

52:20 53:2,19
54:3 55:1,9
55:20 57:21
59:25 61:7
76:13
**initially** 29:21
29:22 47:13
53:24 75:17
80:9
**initiated** 73:13
**inmate** 48:22
49:24,24
99:21
**inmates** 48:21
50:18 51:2,10
51:12,13,14,16
**inpatient** 44:14
**instance** 53:21
**instances** 53:1
**intake** 42:21
106:11
**intent** 81:18
**interact** 28:24
29:3,6
**interacting** 32:9
**interactions**
31:11
**interest** 15:13
**interested**
55:22 115:15
**interesting**
104:14
**Interim** 2:9
**interview** 14:23
14:24
**interviewed**
15:8
**interviewing**
42:24
**introduce** 5:23
**inverse** 38:21
**investigate**
21:17 83:11
84:7 102:13
**investigating**
92:9
**investigation**

37:18
**investigations**
37:14 102:18
**investigator**
13:21 35:6,18
35:21 36:5,12
36:22 37:4
38:2,3,10,11
**investigators**
35:19 38:9,14
38:15
**investment**
92:13
**invoicing** 41:8
**involve** 31:10
**involved** 28:22
36:21 62:10
75:6 85:9
95:20 97:14
**involvement**
60:9 74:14
**involves** 34:1
**involving** 86:21
95:20
**issue** 51:17 91:14
**issued** 80:10,22
**issues** 19:10
29:9 31:22
38:16 60:21
61:17 84:14,15
86:17,21 100:5
**it'll** 92:14
**item** 36:12,17
**items** 36:1,1
_____
**J**
**Jackson** 12:21
13:9 25:22
80:22 94:10
**Jacqueline** 4:15
6:3 116:6
117:21
**jacqueline.shi ...**
4:18
**jail** 21:15,20
24:16,19 27:2
32:24 36:9,10

36:14 44:13
48:8,9,21,25
49:1,5,8,18
50:10,19,25
51:3,17 53:10
54:9,12,15
56:25 57:5
61:18 62:24
63:5,6 69:7,10
83:25 84:6,6
84:9,19,22
99:16,19
101:21 105:13
105:17
**jails** 22:13,22
26:3 36:8
42:21 48:24
49:3 51:7,12
56:9
**January** 9:23
65:1 108:21
**Jason** 4:4 5:24
6:14 116:23
**Jefferson** 4:12
**Jeffrey** 1:13 2:3
3:9 5:13 6:7
116:13 117:5,12
118:1
**jeopardizes**
90:10
**job** 56:14 66:19
105:14,14,16
106:14
**Johnson** 11:11
39:18,19 40:6
40:10 50:19
50:25 51:3,20
70:6,13 73:9
79:21 97:11
**joining** 15:4
**Jones** 50:11 71:9
**Journey** 76:12
76:15 77:1,24
78:16,19 80:8
80:18 81:2,25
**judge** 44:12,12
54:3 55:19

57:18 59:11
60:15,23
62:10 67:15,18
69:4 70:9,10
70:18 71:5,11
71:16 74:7,19
75:16,17 76:4
76:5,12,15,25
77:1,1,2,24
78:9,11,16,19
79:19 80:8,18
80:22 81:2,17
81:25 88:21
88:23 89:2
91:4 95:21
103:9
**judges** 55:4
61:22 71:2
73:10 78:3
81:9,14 109:15
**judicial** 75:13
**Julie** 54:11
**July** 15:24
**jump** 52:5
107:18
**jurisdiction**
18:22
**jurisdictions**
91:2
**justification**
107:19,23,23
**juvenile** 94:6,11
94:13,16 95:1
95:20
**juveniles** 95:5
**jwilliamson@ ...**
4:7
_____
**K**
**Kansas** 3:13
4:23 11:16 12:2
116:3
**keep** 7:14 42:10
47:25 48:2
**kept** 27:1
**kid** 90:3,3
108:17

**kind** 7:20 15:11
16:23 17:4,6
19:7,8 20:20
27:18 29:9
37:22,23 40:4
40:23,24
47:23 48:3
50:15 52:5
56:16 57:8
58:21 62:19
63:24 73:12
76:6 81:18
86:22 88:12
94:2 95:18
97:1 103:7
104:5 105:18
108:2 109:12
112:5,7,10,18
112:22,23
113:2,3,6,18
**kinds** 11:3 19:3
19:10 20:12
21:7 22:13
31:9,13,22
32:13 37:17
38:1 39:7
42:17 43:1
44:9 53:13
59:2 66:15
84:15 86:21
88:8 92:11
101:2 106:14
106:22 113:10
**knew** 64:24
82:1
**know** 7:10 8:14
8:15,20 15:6,11
15:14 16:14
17:5,8,9 19:1,2
19:4,5,6,9,13
19:16 21:2,19
21:23 22:23
28:17 29:7,9
29:10,11,12,15
30:13 31:2,7
31:12,15 32:4
32:7,7,10,11,11

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 160-11    Filed 02/21/18    Page 41 of 52

32:17,22,23
32:25 33:1,2,3
34:5,19 35:2,2
35:22,23
36:9,16,17,18
36:18 37:4,6,7
37:8,10,19,23
38:1,4 39:1,2,4
39:4,7,25 40:1
40:2 41:3,18
42:23 43:9
45:8,9,10 46:3
46:4,4,4,5,9
46:16,18,24
47:1,14,19 48:1
48:5,6,6,7
50:4,8,16,17
50:19,19 51:6
51:6,9,12,19
51:24 52:18
53:10,11,13,18
54:1,2,8,13,18
54:20 55:3
56:13 57:3,6
57:12,19,20
58:12,15,19
59:20 60:12
60:17 61:1,2,4
61:16,16,19,19
62:20 63:16
64:9 65:2,7,8
65:16 66:3,4
66:8,8,19
68:16,18,24
68:25 69:5,7
69:8,9,10,11,16
69:17 70:19
70:23,24 71:11
72:7,10,11,13
72:15 75:6,8
76:8,9,21 79:5
80:5 81:10,23
82:1 84:22
85:1,1,4,7
86:14,15 87:6
87:17,25 88:6
88:14,15,25

89:24 90:9,13
91:21 92:14
93:13,23,24
93:24,25,25
93:25 94:20
94:22 95:18
95:22,24
96:22,24
97:15,15,18,19
98:5,13,13
99:3 100:10,15
101:1,8,8,16,16
101:19,20
102:5 103:9,10
103:12,15,16,21
103:23,23
105:7 106:3,14
107:5,6,7,7,9
107:10,11,11
108:13,13
109:13 111:16
112:4,8 113:14
113:16,24 114:3
114:4
**knowing** 87:13
**knowledge**
93:16
**known** 65:6
66:7
**knows** 82:1,2
94:21

_____

**L**

**lab** 83:22
**lack** 70:16
**language**
80:24
**laptop** 23:25
**large** 25:3
39:17 108:8
**larger** 75:7
**lawful** 6:8
**lawyer** 53:4,5
55:23 61:7
**lawyers** 16:25
18:15 30:22
33:13,16 52:10

53:1 56:2
58:4 61:9
86:25 93:15
**leave** 17:20
20:6,7,19 39:4
39:5
**leaves** 19:20,21
**leaving** 68:7
**lecture** 80:2
**left** 28:5
**legal** 5:20 10:21
11:3 13:20
36:5 37:24
42:6,20 43:16
43:24 44:2,10
44:14,15,22
45:6 53:7
54:11,20 56:7
91:11 99:12,13
100:1,8,13
101:16 107:18
107:22
**legitimately**
91:20
**length** 82:16
**let's** 44:15,16,17
64:2 107:14
**letter** 36:7
57:12 66:23
99:21
**level** 25:4,8
26:8 40:7,9
85:8,14
**levels** 30:3
**Lexus** 102:25
**Liberties** 3:11
5:18
**Liberty** 11:17
12:2
**license** 67:1,2,7
84:14 106:21
**licensed** 17:22
**life** 66:17 90:6
**light** 89:6
**likelihood** 13:8
**limit** 24:12 25:7
**limitation** 111:13

**limited** 7:6 11:6
**limiting** 23:4
**line** 30:8 48:3
67:5 87:6
118:4,6,10,16
118:20
**list** 8:8 16:16
36:14 53:10
54:9 69:25
70:3,17 72:23
75:7 77:8,11,12
77:15,17 79:5
81:11 90:6
107:16,17
108:11 109:14
113:4
**listed** 31:23
**listen** 56:21
59:12,12 68:12
68:13,14
**listening** 59:6
63:22
**lists** 109:2
**literally** 75:22
77:21
**litigation** 4:22
5:21 32:8
70:8 85:8
109:6 116:1,18
**little** 22:1 28:9
74:20,24 76:7
84:9 86:21
96:17 97:12
**living** 56:15
57:18 106:13
**loans** 66:15
**local** 82:7
**Locust** 4:23
116:2
**logged** 23:25
**logistic** 21:8,9
68:24 92:4
**logistics** 19:4
25:24 26:2
27:1,2,6 49:3
49:15 64:9
69:13 87:19

89:15 91:7
**lone** 33:25
**long** 9:13 19:15
19:20 25:15
39:15 51:19,19
76:11 82:4
87:11 112:1,14
**look** 15:14,15
45:22 46:25
46:25 54:9
64:10 73:25
79:17 83:20
84:20 88:1,9
88:10,13 90:1
90:2,7 91:20
93:5 98:3
99:5 100:14
103:8 107:9
113:13,19 114:4
**looked** 15:12
77:9 103:6
**looking** 32:19
48:5 84:25
90:4 97:2
**looks** 74:4
**lose** 17:2,3 67:2
67:7
**losing** 17:11 20:4
67:1
**lost** 89:2 105:14
105:16
**lot** 18:20 54:16
63:24 86:20
92:6 93:9
94:4,25 97:14
97:17,18 112:12
**lots** 112:15,17
**loudly** 7:16
**love** 38:18
87:24
**lower** 24:13
25:4,8,21
26:8 40:7
**luck** 66:19

_____

**M**

**magic** 64:7

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-11   Filed 02/21/18   Page 42 of 52

mail 42:18
maintain 113:4
majority 86:13
    86:14,16
making 16:12
    28:12 37:21
    56:23 57:4
    84:1
manage 85:16
management
    22:15 35:25
    43:19 65:23
    69:19 77:19
    87:6 98:9
manager 64:18
managerial
    22:5
manner 83:5,11
    89:9 108:19
map 49:7 52:1
marginally 67:7
marked 73:21
Martin 1:13 2:3
    3:9 5:13 6:7,12
    73:21 83:2
    116:13 117:5,12
    118:1
matter 5:13
    14:22 23:6
    26:5 27:8
    33:6 84:4
    88:24 91:1,6,11
    92:5 93:4
    94:8,25
    102:14 104:4,5
    108:2,10
    116:19
mean 8:13 9:20
    9:22 23:11
    29:3 32:19
    33:21 34:20
    35:22,22
    38:13 40:25
    40:25 42:3
    46:24 59:1,1
    61:11 62:22
    65:20 68:23

68:23 69:3,16
    69:17 72:5,11
    77:11 79:15
    87:10 90:16
    93:20 97:4
    98:20 101:18
    103:21 104:11
    104:25 105:17
    108:15 110:6
meaning 42:4,5
    98:2,12
means 45:4
    108:14,15
meant 64:25
mechanics
    111:10
mechanism
    107:19 110:7
meet 16:19
    37:13 47:10,12
    100:2
meeting 31:20
    67:24,25,25
    79:19,23 80:1
    81:6 99:15
members 27:5
    31:11 42:24
    57:16
mental 19:10
    47:21 86:17,18
    106:15 112:12
    112:14,16
mentioned
    42:5 45:13
    47:7 61:6
    69:18
Mercy 85:5
met 47:16 70:18
    78:2
metro 97:13,23
middle 51:1
    95:12
mind 7:14
mine 17:11 24:11
minus 62:11
minute 69:15
minutes 92:18

110:20,21
misdemeanor
    25:3 26:12,13
    26:14,15,18
    35:2 40:8,11
    40:12 75:4
    91:16 104:7
misdemeanors
    26:9 35:2
Missouri 1:1,6
    3:1,6,12,13,15
    3:17,18 4:8,10
    4:12,15,17,23
    5:5,14,16,18
    6:2,4 9:10 11:11
    58:13 96:16
    108:22 115:4
    116:3,7,9,10
    118:2
MO 4:21 5:4
    116:22
modifications
    74:18
modified 81:19
Mom 57:17
Monday 62:5,8
    62:15 80:11,12
    80:16
money 48:23
    60:25 86:16
    87:8 89:12
    112:5,21
month 37:15
    41:23
months 12:7
    13:24 17:5
    48:2 109:18
motion 31:21
    62:13 78:17
    79:12,22
motions 58:6,9
    59:7
move 7:24 21:17
moved 10:11
    16:18 80:5
movements
    7:21

moving 46:15
    46:15 81:14
    109:23
MSPD 4:14 9:18
    9:22 10:22,24
    16:7 31:11,14
    89:11
multiple 11:20
    24:20 26:1
    37:4 38:25
    49:14,14 57:7
    104:8
municipal 11:5
murder 34:24
    35:4

_____

**N**

N 2:1 4:1
name 5:19,20
    6:14 42:10
    57:3 76:20
    96:15 117:9
    118:1,2
naming 75:25
nature 55:14
    57:9 95:17
    101:22 105:12
    111:12
near 89:25
    97:13 101:19
necessarily
    50:20 56:19
    81:5
necessary
    20:21 106:4
    110:25 117:8
need 19:8,8
    22:10 33:13,16
    37:2,18,19
    41:25 43:2
    45:7 50:3
    68:12 69:10,11
    70:19 76:9
    84:6 87:14
    88:1,20,25
    89:15,16
    93:23 102:15

106:25 107:9
    107:11 110:19
    112:2,5,9,18
    112:20 114:4
needed 27:4,9
    111:11
Needless 34:4
needs 30:14
    38:2
neither 115:9
Nevada 11:18
    12:4 13:10
never 10:14
    65:14 66:2
    88:13 89:13,19
    91:15 110:1,12
    110:12,23 111:1
    111:3
new 4:6,6 12:3
    12:17 17:19,22
    18:7 19:19
    25:12 53:24
    66:1 104:4
new-hire 20:16
newest 24:22
news 86:23
NGRI 86:19
nice 38:10
niche 39:1
Nifong 4:16
    116:8
nine 17:4,4 18:3
    31:3 33:18
norm 104:24
normal 52:24
    66:17
normally 52:15
    54:7 63:1
    112:9
north 11:15
notarized 116:17
notary 3:14 5:5
    116:16 117:18
notes 38:4
notice 67:2
    72:6 75:15,18
    76:13,15 77:25

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 160-11    Filed 02/21/18    Page 43 of 52

**notified** 8:7
**notify** 50:1
58:18,20
**notwithstandi ...**
12:13
**November**
80:11,12
**number** 5:15
6:23 12:7
15:17 18:11 19:7
20:22 21:10
22:12 23:12
24:1 25:3,21
39:22,23
45:23 46:11,17
46:18,20
48:18 51:2
52:18 56:18
59:2 64:7,9
65:4 67:4
70:6,25 72:18
76:20 79:1,2
82:4 85:2
95:19 97:21
99:5 103:17
103:24 109:16
109:17,18
112:10 113:23
**numbers** 25:20
26:4,25 27:1
40:19 82:12
96:25 102:3
106:13

---

**O**

**oath** 7:2
**object** 7:5
**objecting** 80:19
**objection** 76:24
**objects** 59:11
**obligation** 64:4
64:14,15 66:18
68:5
**obligations**
66:16 78:7
**observe** 28:21
**observed** 28:16

**obviously** 15:25
20:3 32:25
46:8 47:19
**occupy** 39:1
**occur** 99:10
104:11
**occurred** 10:16
**occurrence**
105:4
**occurring** 93:10
**occurs** 60:6
103:4
**October** 77:22
**offended** 80:24
**offender** 90:6
**offensive** 81:1
**offer** 14:15 16:6
16:7 80:4 84:1
88:12 92:2
**offered** 14:10
**offers** 14:15,20
15:21 16:11,11
80:3,4
**office** 4:10,15
6:20 9:25
10:18 11:13,16
11:17,18,23 12:1
12:2,3,4,9,15
13:5,13,18 15:5
16:7,8,24 17:11
17:14,24 18:1,2
18:6,22 20:3
20:5 22:4,8,9
22:17,20,25
23:7 24:14,17
24:19 26:24
27:3,7,7,11,14
27:17 28:5,17
29:5,16,23
30:21 33:14
33:23 36:5,18
37:6 38:9,13
38:20,22,24
39:11 41:8,9
41:25 42:7,8,9
42:14 43:12
45:6 46:1,11

48:17 49:20
50:17 52:10
53:2 59:9,24
62:9 64:17,22
65:6 66:3
67:8,19 68:7
68:13,14
69:24,25 72:1
72:23 76:21
77:4 83:3,10
89:8 93:4,6,21
94:1,6,21 96:2
97:1 102:7
106:7 107:3,3
107:8 109:11,13
109:13,16
113:21 116:7
**office's** 20:19
**officer** 34:2
**offices** 3:11 11:15
11:19,22 46:8
109:11 113:20
**oftentimes** 38:3
58:15 62:22
103:5 105:1
113:11 114:3
**oh** 6:19 14:3
19:23 31:2
40:25 45:17
60:1 62:3
68:23 79:9,10
86:7 90:15
91:20 93:19
100:14
**okay** 6:23 7:7
7:21 8:3,4,16
10:8,20 13:12
13:14 14:1,4,8
16:9 18:8 21:2
26:7 34:25
40:13,22
43:18,21 44:1
46:23 47:7
50:5 52:4
53:1,6 54:8
61:6 63:13
71:19 73:4

74:5 75:12
79:11 80:7
82:18 83:13
88:18 90:13
90:20 92:17
94:6,14 96:1,1
99:9 102:12
108:25 110:21
**once** 6:17 17:3
21:14 44:25
47:13,14
**one-on-one**
28:25
**ones** 57:22
58:7,8 69:15
**ongoing** 47:17
**open** 13:25
15:23 17:22
46:9 47:15
72:22 90:17
98:18 100:3
**opened** 12:23
23:25
**opening** 42:18
47:13
**opens** 13:19
41:10 46:1
**operate** 20:8,9
99:13
**operated** 107:4
**operating**
39:20 43:23
44:2 100:7
**opinion** 38:8
83:3,9,15 89:7
96:1 112:19
**opinions** 63:25
**opposed** 7:20
18:25 19:14
**opposite** 38:25
**option** 63:21
**oral** 59:7
**order** 2:9 21:5
33:14,15 53:15
54:22,23
58:2 70:11,15
72:21 73:7,18

74:2,15,19,25
75:24 76:17,18
78:13,25,25
79:12 80:10,21
80:23,25 81:5
81:6,20 107:14
107:15 112:2,17
**order-wise**
79:25
**ordinary** 18:20
112:7
**organize** 37:8,8
**oriented** 32:8
41:2
**original** 2:11,11
74:18,25
116:14
**originally** 17:21
55:10 61:5
74:16
**Osceola** 49:6
**outcome** 115:15
**outcomes** 21:6
**outside** 22:7
33:2 102:25
**overall** 13:14,14
13:17 96:25
97:17 98:1
109:11,13 110:8

---

**P**

**P** 4:1,1
**p.m** 5:9,12
82:24 83:1
92:19,21 114:8
114:10
**P.O** 4:11
**page** 2:2,8
116:14,16,18
117:21 118:4,6
118:10,16,20
**pages** 83:21
**paid** 72:15
**panic** 66:11
**pardon** 99:8
102:11 110:12
**part** 11:2 12:5,18

ALARIS LITIGATION SERVICES
www.alaris.us        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-11   Filed 02/21/18   Page 44 of 52

25:23 28:13 31:9 37:11,11,11 39:24 40:25 59:18 75:4 99:14 106:11

particular 26:19 58:16 62:24 98:6 104:15 107:20 111:14 111:15,17,19 114:1

parties 115:11,14

partly 73:9

pass 14:12 16:1

passing 16:12

patience 56:20

pay 71:18 72:12 72:13

penalize 33:6,7

penalty 117:10

pending 3:16 57:1

people 8:14 14:14,24 16:10 17:7 18:23 19:7 20:15,23 21:11 21:13,13,24 22:9 23:7 28:10,17 32:5 32:6,6,6,7,24 32:25 36:16 38:1,3 39:3,4 39:5,5,5,6,6 42:16,25 43:2 43:4,5 44:8 49:4,13,23 50:13,23 51:4 51:5 53:12,14 53:24 54:1 57:19 60:12,12 60:17 61:18 62:21,23,24 63:5,10 65:10 66:13,14 67:11 67:14 69:12 70:20,23 72:10,11 77:12

77:15 84:8,8 84:13 85:2,5 86:18,22 89:17 91:3 92:10 93:12 94:5 98:22 99:15,18 100:21 101:2,4 101:8 102:3,15 102:18,21 103:6,11,15,17 103:19,20,24 104:25 105:19 105:25 106:10 107:2,7,13,15 108:3 113:9,9 113:15,25 114:3

people's 69:8 102:13

per-hour 111:22

percent 90:16 90:16,17,18 97:3,10,19

percentage 86:15 96:20 97:16,21

perform 32:3

performance 29:17 32:17

period 33:24 37:22 39:8,15 82:5 88:24

perjury 117:10

permitted 64:22

person 13:19 14:12 15:8,25 16:3,5,12,16 17:20,20,22 19:21 21:1,1 22:11 26:16 30:18 37:19 42:13 48:9 49:19 54:14,15 54:21 56:4,14 57:21 63:2 66:24 73:16

94:3 99:3,4 100:15 101:13 101:18,25 103:13 107:1 113:1

person's 54:8 54:10

personal 26:8

personality 65:14

personally 23:23 24:5,6 45:16 80:24 110:1

phone 66:23 78:4 106:13

phones 13:19 42:16

pick 50:3

picked 50:14 53:11 69:9

PJ 70:11

place 16:11 45:3 54:17,17 81:11 97:2 106:19,19

places 18:23 21:13 49:14 56:18 59:6 100:1

plaintiffs 1:4,14 3:4,18,19 4:3 5:2,25 6:9,15

plan 50:9 78:16 81:15

planned 50:7

planning 19:9

plans 81:13

Platte 12:22 13:10 25:23

please 5:22 6:6 7:1,10,24 57:2 116:12,15,17

plenty 33:21

plus 66:1

point 19:2,2 48:13 49:2 54:24 60:10

68:19 75:2 77:3 79:16 82:20 84:17 99:2 104:14 105:11,13,15 111:4

policies 30:2

policy 27:12 31:13 111:15,18

population 48:22 93:8,9

port 50:2

position 10:10 13:23,23,25 14:9,10,14 15:23 16:6 17:21 19:16,19 28:10 56:13 56:23 57:24 58:2,22 59:21 91:24

positions 9:24

possible 54:12

post 69:24 101:21 103:11

posted 60:13 62:13 71:6,16 103:13

posting 70:23

potential 66:23

potentially 66:24

poverty 100:15 101:4,20

practical 23:6 26:5 27:8 33:6 34:12 79:19 81:3 84:4 88:23 91:1,6 92:5 102:14 108:1

practice 56:6

premise 72:13

preparation 8:12,13,18

prepare 8:5 9:5 88:24

preparing 89:3

present 5:22 52:10 58:14 61:7,9 62:2

presently 11:23

presiding 70:9 77:2 78:3

pretrial 31:19,21 61:8

pretty 18:10 36:17 47:4 61:22 89:23 93:11,13

Previous 12:25

primarily 12:20 24:14 25:2 39:11 44:25 58:24 59:2

primary 11:9 18:13

printed 68:8

prior 9:21,25 10:21 12:24 26:22 53:14 53:16,17 64:21 68:5 81:14 106:14 116:18

prison 90:4

private 28:8 60:20 70:17 70:18 72:20 73:2,6 74:13 95:4 104:1,3,6 105:6,9

privately 10:23

proactive 53:3 56:8 73:10

proactively 53:9

prob 47:3

probable 55:11

probably 17:2,3 18:3 19:6 31:2 45:18 46:17 47:3 52:3 57:7 94:19,22 97:3,9,11

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 160-11    Filed 02/21/18    Page 45 of 52

103:22
probation 25:4
26:10 35:3
47:24 48:4
52:22 75:5
84:1 106:22
problem 7:17,18
17:12 21:9
37:11,12,23
48:10 49:22
50:15 51:15
57:23
problems
20:22 21:8
29:10 48:14
49:15 84:14
88:5
procedural
52:4
proceed 88:17
proceedings
61:8,21
process 14:23
14:24 16:21
20:6 28:15
30:5 32:2
35:24 36:21
41:1,5,6,20
53:16 54:23
73:12 78:1
83:20 93:1,14
100:17,18
106:11 111:5,8
processes
99:25
processing
41:17 42:18
produced 3:10
6:8
product 29:25
program 43:10
44:14,18 68:2
programs
42:25 43:10
44:9
promotion
28:15 30:5

prosecutor
33:11 34:6
59:11 75:2
82:16 88:11
91:4
prosecutor's
38:20 84:1
prosecutors
79:21 80:2
provide 20:20
89:12
provided 71:25
72:3
providing 31:8
public 3:14 4:15
5:5 6:4,20
9:10,21 10:1
12:9 15:4
29:23 30:4
65:6 67:19
70:7 71:24,25
76:21 77:4
102:10 104:21
108:22 113:5
116:7,16 117:18
pull 98:17,21
pulling 102:25
punished 65:19
65:20
pure 109:3
purposes 29:1
34:13 79:20
86:19,19,20
pursue 91:9,10
pursuing 31:22
push 91:9,10
put 27:14 28:10
66:16 67:2
86:14 87:17
87:20,21
98:24 107:14
107:15

**Q**

qualifies 56:5
qualify 67:14
100:23 104:2

106:8
quantifies
111:23
question 7:7,9
7:10,12,25 8:1
8:3 15:18,18
25:18 54:4
87:13 103:18
106:5
questioning
93:1
questions 6:24
6:25 7:6,20
8:10 14:23 15:1
15:9 22:9
27:12 52:5
60:3 68:21,24
69:13,15 96:18
quickly 93:13
quit 63:23
66:14
quoted 102:3

**R**

R 4:1
radius 101:24
railroad 51:1
Ramsey 2:5
4:10 6:1,1
96:12,15
110:19,21,22
ran 42:14
random 26:15
range 17:15
24:7
ranks 10:12
rapport 31:8
32:12
rate 16:23,24
20:18 103:19
103:21
ratio 38:8
rationale 26:19
26:20
reach 112:18,19
reactivate 81:18
read 86:23

116:15 117:6
118:5,7,12,17
118:21
ready 44:23
45:2 84:20
92:7
real 17:12 20:7
87:13
realistically
92:12
reality 29:20
32:19 64:25
64:25 65:7
84:7 88:12
92:14 108:2
realize 66:22
really 20:5
30:15 35:18
45:10 77:18
87:24 88:14
88:19 91:25
94:21 98:9
realm 112:8 113:1
rearranging
23:5
reason 25:23
35:23 49:19
50:5 56:7
62:7 72:17
87:2 90:23
111:9 118:5,8,14
118:18,22
reasons 48:12
60:6 90:23
90:25 91:1
103:25
reassign 22:20
recall 17:13
77:16 110:6
recalling
108:20
received 12:9
receiving 12:1
12:16 100:22
100:25 101:5
102:10
recess 82:25

83:10 92:20
recognize 19:13
64:5 76:16
86:10,10
88:20 89:18
91:24 112:25
Recognizing
19:9
recommend
28:14
record 5:10 7:16
82:24 83:1
92:18,19,21
106:14 114:7,8
114:9
recorded 5:12
recording 68:11
records 85:3,4
112:16,17
reduced 56:15
91:16 115:8
reduction 58:5
reestablish
78:12
refer 113:25
references
16:15
referral 74:23
74:24
referring 74:3
80:25
reflection 66:21
refunds 72:9
refuse 64:22
refuses 62:11
regardless
59:13
registered 90:5
regular 51:3
54:5
reinvigorate
81:19
reiterated 82:4
rejected 103:20
rejection 103:19
related 115:10
relation 26:4

ALARIS LITIGATION SERVICES
www.alaris.us      Phone: 1.800.280.3376      Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-11   Filed 02/21/18   Page 46 of 52

28:15 40:19
53:18,19
56:20 58:17
59:19 62:16
63:22 68:10
70:11 78:25
82:11 89:3,3
92:7,9 105:3
106:25,25
109:12 111:10
111:18 113:2,15
**relative** 115:12
**relatively** 97:8
**relevant** 6:24
**remember** 6:18
7:1 8:23 10:5,7
31:1 42:10
63:22 65:3,4
80:6 109:5,7
**removing** 24:19
**render** 117:8
**renewal** 74:17
**reopened** 16:20
**repeat** 7:11
**rephrase** 7:11
**replace** 19:21
**replacing** 20:19
**report** 83:22
**reporter** 3:14
4:21 6:5 7:15
82:19,23 115:1
115:4
**reporter's** 5:19
**reports** 41:14
**represent** 33:14
33:15 63:7
67:13,16,18,19
71:9,10,20,21
72:21 73:17
95:5 96:3,16
96:21 101:17
102:15,16,22
102:23 104:10
105:2 108:6,17
**representation**
20:20 31:15
34:9 47:15

72:14 101:14
103:16 104:19
109:19
**representatio...**
71:4,5
**represented**
53:12 104:1,3
105:1 108:19
**representing**
56:3 103:15
104:7 105:6,7
**reprimanded**
67:3
**request** 55:12
58:1,4,17
59:13,18
60:22 76:12
79:1 87:7,8,9
89:14,16 95:15
99:21 110:1,12
111:11,12,18
112:2,7,21,23
112:23 114:1
**requests** 37:5,7
37:22 75:15
86:16 92:10
102:14 110:6
**require** 26:2
87:19 107:25
112:10
**required** 6:24
7:7 29:21,22
**requires** 22:21
83:5,11 89:9
**reschedule**
80:20
**rescreening**
16:21
**research** 32:8
91:11 113:6
**resent** 9:1
**reserved** 5:7
**reset** 21:19
**resources** 83:4
83:10 85:10
89:8 92:6
102:15,17

104:18 106:1
**respective**
32:16
**respond** 66:9
**response**
68:22 81:16
**responsibilities**
22:2,14 40:23
**responsibility**
22:19 28:14
**responsible**
27:19
**rest** 90:6
**restricted** 26:4
**result** 48:20
**results** 16:2,4
**retain** 87:1,1
**return** 116:17
**reverse** 105:5
105:20
**review** 8:18
31:10 36:13
41:1,12,13 55:7
55:8 112:16
**reviewed** 8:20
9:3
**reviewing** 41:8
41:9 65:3
92:10 103:10
**revolve** 58:11
86:17
**revolves** 82:15
86:20
**ridiculous** 112:7
**right** 12:18 13:13
13:14,25 15:16
16:17 17:17,17
18:12 23:13,15
23:16,22 24:3
24:25 25:16
27:20 29:14
30:20 33:5,17
33:21,25
34:23 35:21
39:9 40:6
42:5,8,15
43:22 44:1

45:13 57:1,15
58:4 59:16
62:18 65:22
69:2,18 70:10
77:22 78:18
79:13 82:22
84:18 92:1
94:18,24
95:23 98:4
101:19 110:15
110:17 111:6
**ris** 26:4
**risk** 84:18
**road** 30:13 61:4
**robbery** 26:1
**rolls** 13:7
**room** 44:16
**roughly** 79:4
90:14
**round** 20:13
**routine** 62:19
106:7
**routinely** 29:11
51:15 90:1
102:1,20
**RPR** 4:21 5:4
115:18 116:22
**rule** 66:4 78:7
**ruled** 78:19
**rules** 64:14,14,14
68:9,15 78:8
107:24
**ruling** 81:3
**Rumley** 54:3
**run** 88:5
**runs** 84:18
**rural** 54:18,19
57:19
**Ryan** 4:20 5:20

_____
**S**
**S** 2:7 3:13 4:1,21
5:4 115:3,18
116:22
**safe** 46:18
**saga** 81:1
**Saint** 11:13

26:25 48:16
48:25 49:1,5
49:10,18,24
49:25 50:13
51:13 76:3
97:2,3
**sally** 50:2
**Sam** 41:18
**sat** 79:25
**saw** 77:14
**saying** 72:6
76:13,16 87:17
103:2 109:13
**says** 6:9 36:12
57:12 59:12
60:16 67:18
76:21 99:22
**scanned** 76:20
**scary** 94:22
**scenario** 43:23
**scenarios** 20:16
60:9,19,20
61:17
**schedule** 49:8
79:12 91:6
**scheduled**
78:23 79:19
80:8 81:6
**schedules**
29:13 55:4
**scheme** 46:17
**school** 51:25
85:3
**screen** 106:10
**screening**
100:10,11,12,17
100:18
**screenshot**
45:23
**second** 27:24
28:12,21 55:6
82:10
**see** 8:9 29:12
29:15 32:25
32:25 34:22
44:17 47:23
49:4,6,7,9,22

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-11   Filed 02/21/18   Page 47 of 52

50:7,9,11 51:4
53:14 54:9,14
79:2 81:6,7
95:9 107:10
seeing 49:13,15
seen 48:9
80:21,23 88:7
self-evident
93:12
send 72:10
73:25 99:23
99:24
sends 57:11
senior 40:8
sense 23:21
96:19 103:19
sensitive 41:15
sent 34:20
76:15 78:24
78:24
separate 26:13
64:13 98:10,11
98:11 106:11
September 16:3
serious 25:25
58:12 104:6
seriousness
40:19
served 9:13,18
9:20 37:19
services 4:22
5:21 61:3 116:1
116:18
serving 37:25
set 42:25 48:1
52:22 54:5
54:25 55:6,11
55:18,18 84:16
103:9
settings 79:18
setup 74:9
seven 17:14
24:8 47:13,16
90:4
sex 57:7 84:25
90:6 95:18
98:14,14 102:2

shapes 97:1
shared 81:13
sheet 106:11
116:14,16,17
118:1
sheets 41:14,15
41:21
ship 48:24
Shipma 4:15 6:3
6:3 8:6,22
116:6,11 117:21
Shondel 1:3 3:3
3:17 5:13
116:10 118:2
shooting 34:2
short 88:24
shortcuts 83:17
86:10
shorter 49:22
shortest 58:1
shorthand 5:4
shortly 109:22
show 33:10,11
50:2 57:17
60:14 98:20
98:25
sick 18:18 39:6
62:7,21
side 54:16
sign 76:19
116:16
signature 5:6
116:14,16,17
117:21 118:24
signed 44:17
74:6
significantly
106:1
signs 41:12
simply 16:14
26:15 76:19
92:25 93:7
94:19 99:20
Sincerely
116:20
single 15:8
31:24 58:16

sir 7:4
SIS 80:3,4
sit 63:6 84:6
sitting 43:24,25
44:11 63:5
83:25
situation 20:10
57:9 58:3
80:25 82:1
91:19 94:15
103:11 104:22
situations 11:21
58:11 59:23
61:4,14,25
93:8 94:11,12
103:6,11 104:11
six 13:24
skills 28:16,18
31:5
skip 63:13
slight 28:8
small 48:18
smaller 20:4
smallest 26:23
48:17,19
sneaking 88:7
88:8
solely 26:4
34:14
somebody
21:20 22:11
29:12 30:14
33:18 43:10
58:18 63:4,7
66:18 76:8
87:6,24 90:7
93:23 101:24
102:4 103:14
112:1
somebody's
18:18 36:7
112:3
someone's
18:18 32:20
32:20 38:22
soon 14:8
sooner 100:4,5

sorry 102:11
sort 13:10,20
17:9 19:19
26:3 39:4,23
40:20 81:1
100:25
south 11:15
spare 9:7
speak 50:17
speaking 7:15
96:2 97:8
107:17
specific 15:18
30:9,10 36:2
36:3 48:7
specifically
32:23 42:20
56:10 57:16
58:5 70:12
109:8,10
spend 21:4
43:12 44:6
83:24
spending
104:18
spent 61:1
spoke 8:6
Springfield
50:22,23,24
51:4,7,20,21
51:25
staff 8:14 13:13
13:14,17,22
14:6 17:18
18:15,17 22:6
22:10 23:14
27:12 30:1
31:11 35:7,10
38:21,23 39:2
42:1,2,4,4
54:7 67:21,24
67:25,25
68:2,22
staffed 17:8
staffing 22:18
stamps 101:1
stand 62:23

78:18
standard 86:8
86:9
standpoint
15:13 20:25
21:8 22:15
24:23 25:21
40:18 45:9
61:21 92:6
95:11 102:16
start 10:3 13:9
15:20 16:24
17:11 49:12
53:15 57:4
70:20 84:25
85:9 93:12
106:16
started 10:5,9
10:18 16:14,21
18:2 24:24
65:3,5,5
75:22,25 76:1
77:17,18,21
starts 29:22
state 1:6 3:6,15
3:18 4:8,10,15
5:14 6:2,4
9:10 13:3 41:17
58:16 72:10
96:16 100:22
100:24 101:17
113:14 115:4
116:7,10 117:1
118:2
statement 55:11
States 1:1 3:1,16
5:15
status 31:20
98:23,25
100:19 102:18
106:15
stay 106:19
staying 106:20
steps 53:3
92:22
Steven 4:10 6:1
96:15

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-11   Filed 02/21/18   Page 48 of 52

Steven.Rams ...
4:13
STIPULATED
5:1
stop 78:5
stopping 82:19
Street 3:12 4:5
4:11,23 116:2
stress 66:21
stress/panic
69:14
stressed 65:15
65:15
strike 14:12
Strothmann
76:5,25
structurally
87:11
structure 70:22
70:22,24
stuck 84:5
student 66:15
stuff 20:13 21:11
26:6 30:12
35:17 38:1,2
40:4 41:10
42:17,18 44:9
44:17 47:1
65:3 78:15
85:11 106:15
subject 29:17
subpoenas
37:25
subscribe 117:9
substance 117:8
substantive
90:10
substitute 62:1
62:23
sucks 91:21
sudden 17:10
suddenly 37:16
37:17,21
66:22
suggested 30:7
suggesting
105:24

suggestion
63:23
Suite 3:12 4:16
116:8
super 27:10
supervise
110:13
supervising
22:6,6 64:18
111:4
supervision
27:11,18 28:25
supervisor 22:4
28:14 64:13,15
supervisory
78:8
support 13:18
22:10 38:21
38:23 39:2
41:10 42:2,4,7
42:8,9
supposed 32:21
47:10,12,16,17
47:25 48:2,8
66:5,5 107:25
suppression
91:11
sure 7:8,13,15,19
7:22 8:24
29:2 51:8
57:11 62:2,3
64:15 82:23
85:18 96:24
suspended
67:4 114:10
suspicious
107:5
swear 6:6
swing 41:20
Switching 99:7
sworn 3:10 6:8
17:23 115:6
system 36:1
38:20 41:19
43:19 70:8
74:24,24
76:20 77:20

97:25 98:16
98:25 100:4
108:22

_____

T

T 2:7 15:9
table 46:16
take 19:15 32:18
38:19 45:3
54:17,17
64:20 68:16
70:17 73:25
75:9 76:14
82:21 89:20
89:24 92:23
102:7,9
taken 1:1 5:3
20:10 21:21
53:3 70:12
82:25 92:20
115:7,12 116:13
118:3
talk 8:11,11 14:17
21:5 22:1 29:7
36:13,15 44:15
44:19 49:10
54:13 60:16
67:21 70:2
81:22 83:22
88:10,11 93:23
105:2
talked 19:16
70:18 85:13
talking 20:25
21:1 42:23
44:7,12 49:3
49:12 59:19
63:9 74:12
79:24 85:4
87:16 92:9,9
93:12
tasks 43:13
tax 72:9
team 101:17
tell 11:7 14:22
24:1,2 30:9
44:12 45:22

45:24 47:1
64:19 66:13,18
67:15,16 69:3
69:5,7,12
71:16 84:4
87:25 88:1
93:22 103:12
108:4,5
telling 71:1,2
93:18
tells 64:12
106:23
ten 31:3 90:4,17
tend 93:8
tends 113:22
terms 99:7
102:9 110:2,23
testified 85:15
110:11
testifying 7:3
testimony 7:2
12:12 26:7
89:6 105:22
105:24 109:25
115:5,7
Thank 116:19
Thanksgiving
80:13,16
theory 33:18
thereon 117:9
thereto 115:14
they'd 33:20,20
thing 13:11,20
16:5 17:9 26:3
31:24 36:2,4
40:20 58:21
62:25 70:16
88:12 90:10
91:16 95:18
108:14
things 7:13 15:3
19:11,12,13
20:12 21:7,16
22:12 23:3,5
26:1 27:4,5,9
27:13 30:2
31:6,7,9,13,16

31:19,22,23
31:25 32:13
33:8 37:10
39:7 41:2,11
42:22 43:1,9
43:21 44:7,17
46:17 48:3
53:9,13 59:3
61:19 62:12
63:21 64:3,10
67:5 70:4
77:19 79:1,2
79:24 83:17,18
83:18 84:12,16
85:15 87:4
88:8 91:8,9
92:8,11,13
100:20,20
101:2,10 102:2
103:6 106:9,14
106:16,16,22
111:21
think 8:6,8,22
9:5 14:11,13
16:1 18:1 20:17
20:21 26:12
29:6 33:7,13
35:15,15 37:2
41:25 42:5
45:15 51:21
61:20,22
62:10 64:10
64:24,25
66:6,6,11,21
68:3 70:24
73:23 77:10,14
78:5 80:25
81:17,20 82:6
83:16 85:22
85:23,24
86:24 87:4,9
87:12 88:9
89:10,11,16
90:1,12,23,24
90:24,25
92:5,14 93:15
102:15 104:12

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-11   Filed 02/21/18   Page 49 of 52

106:5,9 107:3 108:7,17 110:5 114:3
**thinking** 69:16
**thought** 63:24 64:23 107:20 110:24
**three** 10:23,24 14:11,14 28:6 30:12 37:15,21 38:12,14,23 39:13,20 48:1 60:15 80:1 87:22 104:17
**Thursday** 54:10
**Thursdays** 53:22
**time** 5:11 9:7 10:13 15:22,25 19:20,21 20:12 21:4 24:3 26:20 27:15 29:23 30:4,6 30:9,10 35:16 36:9 37:5,22 38:5 39:2,8,15 41:13,15,15,16 41:20,21,22 43:8,11 44:5,6 45:9,19 46:3 52:7 58:1,16 69:22 75:6 76:5,7,8 82:5 83:4,10,24 85:10 88:25 89:1,8,10,17 90:12 92:6,13 93:19 109:2 112:1,11 114:5
**times** 14:11,13 20:11 22:21 23:3 29:11 37:24 52:18 60:15 82:4 85:7 94:9 95:13 110:6
**timing** 58:25

**tired** 60:17
**title** 9:11
**today** 6:23 8:5 8:19 9:5 54:2
**Today's** 5:11
**told** 63:20 66:12 68:17 78:4,13 80:23 88:23 107:2 109:15
**tone** 81:5
**tong** 19:9
**top** 31:1 57:4 103:23
**Torrence** 80:22
**total** 13:22 14:7 96:22
**totally** 104:4
**touched** 8:9
**track** 77:20 97:24
**tracking** 98:2
**tracks** 51:1
**tradeoff** 40:19
**traffic** 11:5
**trailer** 106:20
**training** 68:2 69:18,19
**transcribed** 5:5
**transcript** 2:11 116:15
**transfer-wise** 20:14
**transferred** 18:5 18:5,9
**transferring** 20:1,2
**transport** 50:4
**transportation** 84:14
**transported** 50:14
**transporting** 61:18
**travel** 25:24 26:3 27:2
**treatment**

42:25 43:9,10 44:8
**trend** 13:1
**triage** 83:19 84:24
**triaging** 86:4,8 86:9,9 87:16
**trial** 28:16,17 31:5,15 37:16 38:4 62:22 62:25 87:22 88:2 90:14 91:18,23 92:8 116:18
**trial-wise** 38:5
**trials** 27:25 28:11 65:16 90:19
**tried** 23:3,5 24:12 28:9 56:7 59:20 59:22 76:7 95:11
**tries** 89:11
**trip** 49:22
**true** 97:11 117:8 117:10
**truly** 35:23
**trust** 21:5
**truthfully** 6:25
**try** 7:23 20:10 21:20 25:7 28:3 29:7 32:18,22 34:11 54:11,12 58:3 62:22,23 63:3,4 77:20 78:14 81:23 85:6 91:5 93:24 99:13 100:2 101:16 106:9 107:10 110:8
**trying** 10:4 13:24 17:21 19:17 25:14 26:12 30:13

32:16 36:8 37:16,17,20 39:1 40:18 42:10 43:9 44:8,9,18 51:25 54:14 57:25 61:19 63:7 76:9 78:12,12 84:20 88:3 93:20 104:12 105:1 106:6 109:5,7
**turn** 14:19 44:14 84:4
**turnaround** 19:23 58:1
**turned** 21:22 89:14
**turnover** 16:23 16:24 20:18
**twice** 6:17 8:6 41:23,23
**two** 11:9,10 12:18 13:20 17:9,10 21:13 22:3 24:10 28:5 33:4 38:11 39:12,17,18,19 42:6 51:23 52:3 60:3 64:3 70:4,5 74:25 75:10 75:10 79:18,18 79:21 81:13 87:3,4 88:2 90:24 91:15 92:18 97:5 104:17 105:7
**type** 32:8 36:2 36:4 58:10 98:6,12 101:22 106:13 111:19 114:1
**types** 28:11 101:10
**typewriting** 5:6

115:9
**typical** 43:11 46:20
**typist** 42:12

---

## U

**ugly** 88:19
**Uh-huh** 15:2,7 16:13 18:13 19:18 22:16 25:19 34:3,15 46:6,14 50:6 52:9 73:3 74:22 80:14 81:9 95:16 109:24 110:4
**ultimate** 101:12
**ultimately** 72:7 112:17
**understand** 7:3 7:10 47:11 106:5
**understanding** 12:8 14:19 104:15,22 105:21 106:2
**Understood** 45:13
**unfamiliar** 18:21
**Union** 3:11 5:18
**unit** 34:10,13,20 113:21
**United** 1:1 3:1,16 5:15
**upcoming** 43:20 54:22 108:21
**upper** 25:5 40:9 46:4
**use** 36:19 43:3 82:20 101:3,15 103:14 106:12 110:24 113:22
**usual** 56:16
**usually** 19:23 54:25 60:7 65:17 93:11,20

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-11   Filed 02/21/18   Page 50 of 52

93:21 94:9
108:14 111:9,23
112:12
**utilized** 109:3
113:5

---

**V**

**v** 116:10 118:2
**vacations**
65:20
**valuable** 43:7
**varied** 17:1
**various** 15:3
20:12 22:21,21
23:3,6 37:17
53:13 55:13
98:10 113:10
**Varying** 66:11
**vast** 86:12,14,16
**venture** 24:2
63:25
**verbally** 7:20
78:23 80:8
**Vernon** 49:11
**versa** 40:3
**version** 74:21
81:19
**versus** 5:14
18:15 40:19
**vice** 40:3
**vicious** 89:4
**victims** 58:14
**video** 1:13 3:9
5:12
**videographer**
4:19 5:10,20
6:5 82:24
83:1 92:19,21
114:8
**viewable** 98:4
**violating** 64:17
**violation** 25:4
52:22 78:7
**violations** 26:11
35:3 75:5
**visit** 21:15
**volume** 1:11

94:25 116:13
118:1
**vs** 1:5 3:5,18

---

**W**

**wait** 69:15 77:8
77:8,11,12,15
77:16 108:16
109:2
**waiting** 47:23
69:25 70:3
72:23 79:5
81:11 107:16,17
108:11
**waits** 54:21
**waive** 71:11
72:24
**waived** 72:16
**wake** 30:12
**walk** 18:21
63:23 66:2,14
**walking** 103:1
**want** 16:2 36:12
37:7,8 63:5,13
67:12 68:15,16
80:5,11 84:21
87:7 90:1,7,7
93:5 95:23
**wanted** 7:13
8:24
**wanting** 113:12
**wants** 36:15
83:25
**warrant** 98:23
**Warrensburg**
51:22
**wasn't** 9:2 30:8
30:10 34:20
76:11 78:15
79:22
**waste** 43:8
**Waters** 109:7
**way** 20:24 21:8
23:8,9,11,17
24:15 27:15
28:19,21 29:13
33:24 34:12

35:24 36:1
39:23 40:3,4
40:20 85:23
87:11 91:7
93:21 98:15
98:25 99:18
102:15,20
103:3 104:13
106:3 107:14
**ways** 22:21
23:6 39:12
98:10
**we'll** 14:17 37:3
47:2 49:8
63:4 79:2 81:7
98:18 99:23
103:8,9
**we're** 13:5
28:16 36:8
37:20 50:4
52:16,20
57:22,23
58:22 61:13,19
68:20 69:6
70:19 72:3
73:15 75:20
75:20 93:4
97:13 103:10
103:14 105:5
**we've** 21:10
38:16,17 46:12
53:7 61:17
77:18 83:16
108:12
**Wednesday**
67:11
**week** 29:12
91:17
**weekend** 78:2
**weeks** 37:15
87:22 88:2
**went** 51:24
70:18 78:17
80:20 109:6
**weren't** 18:6
27:8 76:14
**West** 3:12 4:11

4:16 116:8
**Western** 1:1 3:1
3:16 5:16
**whittle** 39:16
**wife** 8:14
**Williamson** 2:4
4:4 5:24,24
6:11,14 74:10,11
82:21 83:2
92:17,22
96:10 110:20
114:7 116:23
**withdraw** 60:22
62:14
**witness** 2:2 5:6
6:6 115:5,7
116:15 118:1,1
118:24
**witnesses** 11:20
36:14 58:10
87:23 92:10
**word** 102:7,9
**words** 30:8
34:9 76:6
**work** 10:21 11:3
11:5,5,6 14:15
22:24 29:25
40:24 41:1
42:20 62:9
76:9 78:14
80:2 87:18,19
91:8 93:7 94:2
95:3 97:6
**workdays** 21:22
**worked** 10:23
**working** 6:20
18:25 35:21
36:10 38:11
43:15 57:13
75:8 82:2
**workloads**
32:16,16
**works** 35:24
70:3
**world** 68:20
**worried** 48:6
**worries** 15:6

**wouldn't** 23:19
24:2 26:6
35:12 46:9
78:13 97:20
106:8 112:25
114:4
**wow** 43:14
91:20
**written** 58:9
78:25

---

**X**

**X** 2:1,7 88:1

---

**Y**

**yeah** 17:1 23:15
23:24 25:12
30:18 40:25
42:2 43:2
57:13,24 59:1
60:1 67:24
68:23 79:9
85:22 86:7
100:14 107:8
110:5
**year** 12:10 13:5
13:7 17:5,8
20:12 25:13
42:11 45:16,19
46:2,7,19 47:2
47:2 90:14
91:17 99:1,2
**years** 9:23
10:23,24 11:18
13:4 17:9 18:3
28:6 30:10,12
38:17 46:22
46:23 53:8
65:2,15 74:19
90:4,4 95:13
95:19 108:22
109:1
**yeas** 70:7
**yells** 60:15
**yep** 69:23 74:6
**yesterday** 8:9
54:1 62:6

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-11   Filed 02/21/18   Page 51 of 52

84:2
**York** 4:6,6
**young** 18:15
70:9
**younger** 40:7,11
85:16 86:6
**youngest** 24:21
24:21,23 25:1

---
**Z**
---

---
**0**
---
**00** 70:23

---
**1**
---
**1** 10:3,6 34:24
**1.800.280.33** ...
4:24
**10,000** 55:17
**100** 4:16 77:10
77:13 116:8
**100=mile** 101:24
**1000** 4:16 116:8
**10004** 4:6
**105** 77:14 79:4
**110** 77:15
**12** 13:15,16,17
67:11
**120** 24:4 45:14
**125** 4:5
**13** 2:9 14:7
73:21,24
**1353** 4:21 5:4
115:18 116:22
**150** 24:4 33:4
45:14,15
**15th** 78:23,24
80:21 81:7
**16** 11:16
**1608** 4:23 116:2
**166** 65:5
**17** 9:12 10:17 11:8
11:9 55:3
94:17
**17-04057-CV-** ...
1:5 3:5 5:15
**17th** 11:10 70:5

73:20
**18th** 4:5
**19** 116:4
**1996** 9:22
**1P** 10:6
**1s** 35:4
**1st** 80:9

---
**2**
---
**2** 10:12
**2,075** 46:5
**2,100** 47:2
**2:49** 5:9,12
**20** 46:22,23
80:11 90:17
108:22
**20-something**
80:15
**20,000** 101:25
101:25
**200** 33:5 34:1
34:17 45:14
**2017** 1:15 3:10
5:11 116:4,13
117:15 118:3
**207** 4:11
**2100** 46:2,4
**212.607.3300**
4:6
**217** 33:4
**22** 9:23 13:4
65:2 108:23
108:24 109:1
**2300** 47:3
**24** 90:18,19
**240** 90:18
**2400** 46:18
47:3 90:17
96:22
**2600** 46:2,7
**2700** 47:3
**27th** 11:12 80:17
**28** 11:18

---
**3**
---
**3** 10:12,13
**30** 32:23 47:17

47:18 48:7,9
**300** 45:18
**31** 32:23
**34th** 3:12
**36** 98:6
**365** 45:24
**375** 70:25 71:17

---
**4**
---
**4** 10:12,15 78:7
**4:38** 82:24
**4:46** 83:1
**400** 71:6
**406** 3:12
**42** 33:1
**420** 3:12
**45** 33:1

---
**5**
---
**5** 1:15 3:10 5:11
70:23 116:13
118:3
**5:01** 92:19
**5:03** 92:21
**5:34** 114:8,10
**50** 97:19
**50,000** 112:2
**51** 33:1
**573.526.5212**
4:17
**573.751.3321**
4:12

---
**6**
---
**6** 2:4
**600** 75:16
76:22 78:11,17
78:21 79:12
**64108** 4:23
116:3
**64111** 3:13
**65102** 4:12
**65203** 4:17
116:9

---
**7**
---
**7** 4:16 11:17 116:8

**70** 97:9
**73** 2:9

---
**8**
---
**80** 97:10
**816.221.1160**
4:24
**899** 4:11

---
**9**
---
**90** 19:24 97:3
**96** 2:5
**99** 9:16

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-11   Filed 02/21/18   Page 52 of 52