# Exhibit Y

## Page 1

```
1              UNITED STATES DISTRICT COURT
              WESTERN DISTRICT OF MISSOURI
2                    CENTRAL DIVISION
3
4     SHONDEL CHURCH, et al.,  )
                              )
5        Plaintiffs,    )
                              )
6        vs.         ) Case No.
                  ) 17-04057-CV-C-NKL
7     STATE OF MISSOURI, et al., )
                              )
8        Defendants.    )
9
10
11
12
13
14    VIDEO-RECORDED DEPOSITION OF STEPHEN P. REYNOLDS
15       TAKEN ON BEHALF OF THE PLAINTIFFS
16            DECEMBER 19, 2017
17
18
19
20     (Starting time of the deposition:  1:48 p.m.)
21
22
23
24
25
```

## Page 2

```
1                I N D E X
2     QUESTIONS BY:              PAGE
3     MS. ROSCA                    8
4     MR. MOORE                  156
5     MS. SHIPMA                 229
6     MR. MOORE                  233
7
8
9              E X H I B I T S
10    EXHIBIT                     PAGE
11    Exhibit 35  St. Louis Public Radio article    32
12    Exhibit 36  The New York Times article    37
13    Exhibit 4  Previously marked exhibit    40
14    Exhibit 37  Cumulative caseload metrics    41
15       spreadsheet
16    Exhibit 38  FY 2018 Supplemental    46
17       legislative budget request
18    Exhibit 39  10-12-17 Reynolds message to    77
19       Judges Beach and Burton
20    Exhibit 40  10-12-17 Reynolds letter to    78
21       Judges Beach and Burton
22    Exhibit 41  10-14-17 Reynolds letter to    94
23       Barrett
24    Exhibit 42  10-14-17 Reynolds letter to    98
25       Pratzel
```

## Page 3

```
1     Exhibit 43  10-25-17 Reynolds message to    103
2       various
3     Exhibit 32  Previously marked exhibit    105
4     Exhibit 44  10-31-17 e-mail chain    114
5     Exhibit 45  MSPD improved case flow plan    115
6     Exhibit 6  Previously marked exhibit    120
7     Exhibit 46  11-20-17 McCulloch letter to    128
8       Reynolds
9
10    (The original exhibits were retained by the court
       reporter to be attached to the original and copies
11    of the transcript.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
1              UNITED STATES DISTRICT COURT
              WESTERN DISTRICT OF MISSOURI
2                    CENTRAL DIVISION
3
4     SHONDEL CHURCH, et al.,  )
                              )
5        Plaintiffs,    )
                              )
6        vs.         ) Case No.
                  ) 17-04057-CV-C-NKL
7     STATE OF MISSOURI, et al., )
                              )
8        Defendants.    )
9
10     VIDEO-RECORDED DEPOSITION OF STEPHEN P. REYNOLDS,
11    produced, sworn and examined on December 19, 2017,
12    between the hours of one o'clock in the afternoon
13    and eight o'clock in the evening of that day, at the
14    ACLU of Missouri Foundation, Suite 1130, 906 Olive
15    Street, St. Louis, Missouri 63101, before William L.
16    DeVries, a Certified Court Reporter (MO), Registered
17    Diplomate Reporter, and Certified Realtime Reporter,
18    in a certain cause now pending in the United States
19    District Court, Western District of Missouri,
20    Central Division, between SHONDEL CHURCH, et al.,
21    Plaintiffs, vs. STATE OF MISSOURI, et al.,
22    Defendants: on behalf of the Plaintiffs.
23
24
25
```

1 (Pages 1 to 4)

**ALARIS LITIGATION SERVICES**
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-26   Filed 02/21/18   Page 2 of 100

## Page 5

```
 1              A P P E A R A N C E S
 2   For the Plaintiffs:
 3       Mr. James J. Maune
         Orrick, Herrington & Sutcliffe LLP
 4       2050 Main Street, Suite 1100
         Irvine, California 92614
 5       (949) 491-5616
         jmaune@orrick.com
 6
 7       Ms. Camille Joanne Rosca
         Orrick, Herrington & Sutcliffe LLP
 8       51 West 52nd Street
         New York, New York 10019
 9       (212) 506-3750
         crosca@orrick.com
10
11
     For the Public Defender Defendants:
12
         Ms. Jacqueline Shipma
13       Missouri State Public Defender
         Woodrail Center
14       1000 West Nifong
         Building 7, Suite 100
15       Columbia, Missouri 65203
         (573) 525-5212
16       jacqueline.shipma@mspd.mo.gov
17
18   For the State of Missouri and
     Governor Greitens:
19
         Mr. Justin C. Moore
20       State of Missouri
         Attorney General's Office
21       815 Olive Street, Suite 200
         St. Louis, Missouri 63101
22       (314) 340-3447
         justin.moore@ago.mo.gov
23
24
25
```

## Page 6

```
 1            Also present:
 2            Mr. David Doell, Videographer
              Alaris Litigation Services
 3            711 North Eleventh Street
              St. Louis, Missouri 63101
 4            (314) 644-2191
              1-800-280-3376
 5
 6
 7
 8
 9
10
11
12   Court Reporter:
     William L. DeVries, RDR/CRR
13   Missouri CCR #566
     Alaris Litigation Services
14   711 North Eleventh Street
     St. Louis, Missouri 63101
15   (314) 644-2191
     1-800-280-3376
16
17
18
19
20
21
22
23
24
25
```

## Page 7

```
 1        IT IS HEREBY STIPULATED AND AGREED by
 2   and between counsel for the Plaintiffs and counsel
 3   for the Defendants that this deposition may be taken
 4   in shorthand by William L. DeVries, RDR/CRR, a
 5   Certified Court Reporter and Certified Shorthand
 6   Reporter, and afterwards transcribed into
 7   typewriting: and the signature of the witness is
 8   expressly reserved.
 9              *  *  *  *  *
10        STEPHEN P. REYNOLDS,
11   of lawful age, produced, sworn and examined on
12   behalf of the Plaintiffs, deposes and says:
13      (Starting time of the deposition:  1:48 p.m.)
14        VIDEOGRAPHER:  We are now on the
15   record.  Today's date is December the 19th, 2017.
16   The time is approximately 1:48 p.m.  This is the
17   video-recorded deposition of Stephen Reynolds in the
18   matter of Church, et al., versus the State of
19   Missouri, et al., Case Number 17-04057-CV-C-NKL, in
20   the United States District Court for the Western
21   District of Missouri.
22        This deposition is being held at the
23   St. Louis ACLU.  The reporter's name is Bill
24   DeVries.  My name is David Doell, and I'm the legal
25   videographer.  We are here with Alaris Litigation
```

## Page 8

```
 1   Services.
 2        Would the attorneys present please
 3   introduce yourselves?
 4        MS. ROSCA:  Camille Rosca from Orrick,
 5   Herrington & Sutcliffe on behalf of the plaintiffs.
 6        MR. MAUNE:  James Maune for Orrick,
 7   Herrington & Sutcliffe on behalf of plaintiffs.
 8        MR. MOORE:  Justin Moore for the State
 9   and Governor Greitens.
10        MS. SHIPMA:  Jacqueline Shipma on
11   behalf of MSPD defendants.
12        VIDEOGRAPHER:  The court reporter
13   please swear in the witness and we may proceed.
14        COURT REPORTER:  Do you swear or affirm
15   that the testimony you are about to give in this
16   proceeding will be the truth, the whole truth, and
17   nothing but the truth?
18        THE WITNESS:  Yes.
19        EXAMINATION
20   QUESTIONS BY MS. ROSCA:
21      Q.  Good afternoon, Mr. Reynolds.  Have you
22   ever been deposed before?
23      A.  Yes.
24      Q.  Okay.  So I -- I assume you understand
25   how the rules work, but I'm just going to give you
```

**ALARIS LITIGATION SERVICES**
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-26   Filed 02/21/18   Page 3 of 100

## Page 9

1 some reminders if that's okay.  Could you please
2 answer my questions in verbal responses?
3         A.  Yes.
4         Q.  And please wait to hear my question and
5 then respond so we're not speaking over each other?
6         A.  Yes.
7         Q.  And if you don't understand one of my
8 questions, just please let me know and I'll be happy
9 to rephrase them.  And if you need a break, just let
10 us know and I'm happy to give you a break.  But I
11 just ask that we respond to the question -- we not
12 take breaks while a question is pending.  Do you
13 understand that?
14         A.  Yes.
15         Q.  Great.  What did you do to prepare for
16 this deposition?
17         A.  I met with the public defender legal
18 counsel.
19         Q.  And is that counsel present at this
20 table?
21         A.  Yes.
22         Q.  And who is that counsel?
23         A.  Ms. Shipma.
24         Q.  And was there anyone else present at
25 this meeting?

## Page 10

1         A.  No.
2         Q.  Did you review any documents during
3 this meeting?
4         A.  No.
5         Q.  Did you review any documents in
6 preparation for this -- the deposition in general?
7         A.  After the meeting with Ms. Shipma I
8 reviewed some statistics in our computer case
9 management system.
10         Q.  And what statistics were you reviewing?
11         A.  Caseload numbers, open cases per fiscal
12 year.
13         Q.  And you mentioned you read them on the
14 system.  Can you explain what that system you're
15 referring to is?
16         A.  It's the Lotus Notes case management
17 system that's used in every office.
18         Q.  Do you have any of those statistics
19 with you right now?
20         A.  I have what I looked at in my head.
21         Q.  Okay.  And did reviewing those
22 statistics refresh your recollection about any of
23 the issues with respect to this case or this
24 deposition?
25         A.  Yes.

## Page 11

1         Q.  And what specifically did it remind you
2 of?
3         A.  The number of cases opened per fiscal
4 year.
5         Q.  And what is that number?
6         A.  Fiscal '17 I believe was around 4700.
7         Q.  Is that total for the office?
8         A.  For the Clayton trial office.
9         Q.  Could you state your title for the
10 record?
11         A.  I am the district defender of the
12 St. Louis County trial office.
13         Q.  And does the St. Louis County trial
14 office have other counties within it?
15         A.  Not at this time.
16         Q.  So it's just the St. Louis County?
17         A.  Correct.
18         Q.  Okay.  Can you provide your employment
19 history since you graduated law school?
20         A.  I graduated law school in 1998 and
21 started as an assistant public defender in the city
22 of St. Louis in the trial division.  In 2004 I left
23 the city of St. Louis trial division and was in
24 private practice from 2004 to 2007.
25             In 2007 I returned to the Missouri

## Page 12

1 public defender in the position of assistant
2 district defender in the city of St. Louis.  In
3 March of 2010 I transferred to St. Louis County
4 where I became the district defender of the
5 St. Louis County trial office.
6         Q.  Okay.  And when you became a public
7 defender in 1998 you said in the city of St. Louis,
8 what was your roles -- roles and responsibilities
9 coming into the public defenders office?
10         A.  I was a trial attorney.
11         Q.  And what would a trial attorney be --
12 typically would have to do?  What were your
13 responsibilities?
14         A.  Representing clients in criminal
15 matters.
16         Q.  Did you -- did you get assigned certain
17 types of cases when you started as a trial attorney?
18         A.  In my first years I was assigned less
19 serious felonies.  After two years I believe I was
20 assigned all ranges of felonies.
21         Q.  And then when you moved up -- when you
22 came back to the public defenders office in 2007; is
23 that correct?
24         A.  Yes.
25         Q.  Were you assigned more serious cases

3 (Pages 9 to 12)

**ALARIS LITIGATION SERVICES**
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-26   Filed 02/21/18   Page 4 of 100

## Page 13

1  then?
2       A.   I had a small caseload that depending
3  upon the needs of the office would either be serious
4  felonies or not serious felonies.
5       Q.   Okay.  And then in 2010 that's when you
6  became the district defender for the St. Louis
7  County office?
8       A.   Correct.
9       Q.   Okay.  And has your roles and
10 responsibilities changed since you became district
11 defender?
12      A.   Yes.
13      Q.   And how have they changed?
14      A.   I'm now manager of that office.
15      Q.   And what does that mean?  What do you
16 manage?
17      A.   I manage 20 lawyers, three
18 investigators, one office management specialist,
19 three clerks, and two legal assistants.
20      Q.   Okay.  So you said 20 lawyers, three
21 investigators, one office management specialist,
22 three clerks, and two legal assistants.  Do you have
23 any paralegals in your office?
24      A.   We do not.
25      Q.   Do you have any other staff in your

## Page 14

1  office aside from the ones you've mentioned?
2       A.   No.
3       Q.   Okay.  Do you personally still have a
4  full caseload?
5       A.   I do not have a full caseload, but I do
6  have a caseload.
7       Q.   And how is the ratio between -- or what
8  is the percentage of time dedicated to your caseload
9  would you say?
10      A.   Nearly 50 percent.
11      Q.   Okay.  And is your caseload, does it
12 typically include certain kinds of cases or do you
13 get the same range of cases as you did prior to
14 being district defender?
15      A.   It largely consists of complicated
16 serious felonies and/or mentally ill clients or
17 clients who have mental illness and are very
18 difficult for lawyers to interact with and manage.
19      Q.   And then what is the other 50 percent
20 of your time dedicated to?
21      A.   Management.
22      Q.   How do you supervise your attorneys?
23      A.   Meaning?
24      Q.   Meaning do you evaluate them?  Is there
25 a process by reviewing their work?  Do they come to

## Page 15

1  you and have discussions about their -- their
2  caseloads?
3       A.   Would it be okay to answer as to how
4  lawyers are managed in the office and trained?
5       Q.   Sure.
6       A.   Is that what you're asking?
7       Q.   Yes.  We'll start with that.
8       A.   So myself and the assistant district
9  defender, we manage the office.  And new lawyers,
10 both myself and the deputy district defender train
11 the lawyers.  Certainly in their first six months to
12 a year.  We're responsible for reviewing all the
13 lawyers' work throughout the year and for
14 promotions.  And there's four step promotions for
15 attorneys.
16      We handle client complaints, client
17 problems with the lawyers.  We work with them on
18 specific cases.  We second chair lawyers.  We
19 brainstorm with lawyers.  We handle hostile
20 workplace issues, both within the office and within
21 the courthouse.
22      Q.   Do you have a human resource manager in
23 your office that assists with any of that or is it
24 just --
25      A.   We have a state human resource manager.

## Page 16

1       Q.   Okay.  But no one internally?
2       A.   Correct.
3       Q.   Okay.  And you were saying -- is there
4  anything else aside from hostile work environment?
5       A.   And then the same applies to the
6  investigators, the clerk staff, and the legal
7  assistants, we train them and manage them.
8       Q.   Okay.  Can we talk about how your
9  office is organized?  You said you had 20 attorneys.
10      A.   Yes.
11      Q.   What -- who is the -- or what is the
12 most experienced attorney, what year are they
13 essentially?  How long have they been in practice?
14      A.   We have one lawyer who's close to
15 having 25 years' experience.
16      Q.   Okay.
17      A.   We have two lawyers, including myself,
18 who have close to 20.  We have another lawyer who
19 has between 25 and 30 years' experience.  We have
20 two or three with ten years' experience.  We have
21 three to four right around the five-year experience.
22 And then everyone else is less than five years.
23      Q.   So you said one who has 25.  That's --
24 and then you follow after that.  So that's two.
25      A.   We have two with right around 25.  Two

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

Case 2:17-cv-04057-NKL   Document 160-26   Filed 02/21/18   Page 5 of 100

## Page 17

1  with right around 20.
2      Q.  Oh, okay.  So would you say about
3  ten -- ten of your lawyers have less than ten years'
4  experience?
5      A.  Oh, certainly, yes.
6      Q.  Okay.  And how many lawyers have the
7  least amount, like less than a year?
8      A.  Right now I believe we have three
9  lawyers who have less than a year experience.
10      Q.  And how are the attorneys organized?
11  So do the attorneys with less than a year experience
12  get a certain -- or less -- less serious cases or
13  does everyone get the same batch?  How does it work?
14      A.  For your first year if you're a lawyer
15  in our office, meaning first year of experience as a
16  criminal defense lawyer, and even if you're a
17  transfer from another jurisdiction we will -- for
18  the first six months we give a reduced caseload,
19  which in our office is around 50 cases, and those
20  50 cases are low-level nonviolent felonies.
21          We will make some exceptions for some
22  transfers, but not all.  At around a year mark we
23  will -- just because the number of cases are so
24  high, the cases -- the number of cases go up to what
25  everybody else has, which range from a hundred to

## Page 18

1  200 cases generally speaking.
2          And then for the less experienced
3  lawyers, right around the year mark we introduce
4  more serious felonies, and depending upon that
5  lawyer's ability we slowly add serious felonies to
6  their caseload.
7      Q.  Does -- so the attorneys with less than
8  a year, would they handle felony cases?
9      A.  Yes.
10      Q.  Would they -- would they work on any
11  trials?
12      A.  Yes.
13      Q.  And -- but they would be nonviolent?
14      A.  Generally speaking.
15      Q.  Okay.  And then --
16      A.  With the exception of domestic
17  violence.
18      Q.  Meaning that they would handle domestic
19  violence cases?
20      A.  They would handle domestic violence.
21      Q.  Okay.  And what about juvenile cases,
22  is there someone in your office that's specialized
23  to handle those types of cases?
24      A.  Yes.
25      Q.  And how many attorneys are -- are

## Page 19

1  equipped to handle those kind of cases?
2      A.  One.
3      Q.  And do they get funneled to this one
4  attorney?
5      A.  Yes.
6      Q.  Okay.  And probation -- probation
7  revocation cases, are they also handled by everyone?
8      A.  Yes.
9      Q.  Are there other cases that I haven't
10  mentioned that are handled by your attorneys
11  generally speaking?
12      A.  It's probation revocations, felonies,
13  juvenile cases.  We have very few misdemeanors.
14      Q.  Okay.  You mentioned 100 to 200, your
15  more experienced attorneys' caseload number.  Is
16  there attorneys in your office that are actually at
17  the 200 mark?
18      A.  In certainly in November, yes.
19      Q.  Of this year?
20      A.  Yes.
21      Q.  And why was that the case?
22      A.  We distribute cases evenly at the same
23  rate.  The lawyers who had more than 200 cases are
24  highly experienced lawyers who tend to set more
25  cases for trial, so their cases move more slowly.

## Page 20

1  Their caseload moves more slowly because of that.
2      Q.  So as the district defender you -- you
3  stated that you have 50 percent of your time to your
4  personal caseload and then you have 50 percent to
5  managing your attorneys.  Do you spend other time on
6  other administrative tasks like budget requests, for
7  example?
8      A.  Budgeting is generally done statewide,
9  and the requests for money that we have for
10  litigation expenses are all done electronically.
11  I'm in charge of that, but I -- I sort of wrap that
12  up into administrative tasks in working with
13  lawyers.  It's a very quick process.
14      Q.  Okay.  Do you set any policies for your
15  office in terms of how they should be litigating
16  their cases?
17      A.  We train them to litigate their cases
18  and we work with people to litigate pretrial motions
19  and push cases to trial.  There's nothing in
20  writing, though.
21      Q.  Okay.  Would you have the discretion,
22  though, as the district defender to set what those
23  policies would be to reach whatever goals your
24  office might have with respect to getting a case to
25  trial?

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

Page 21

1    A.  I mean, one could write a policy, but
2   whether something goes to trial is so dependent upon
3   the specific case and the clients' needs that I
4   don't know if a policy would change anything.
5       Q.  Okay.
6       A.  It's really learning how to work with
7   clients and achieve their goals and taking risks
8   with clients who want to take risks.
9       Q.  Okay.  Can we talk about the -- you
10  said you had three investigators in your office?
11      A.  Yes.
12      Q.  Okay.  And how -- how does the
13  investigators work with your attorneys, are they --
14  are they assigned to specific attorneys or do they
15  work for the office as a whole?
16      A.  They're assigned to specific attorneys.
17      Q.  And what about the other attorneys that
18  aren't assigned to an investigator?
19      A.  All attorneys are assigned an
20  investigator.  So we have three investigators.  And
21  each investigator works with roughly seven -- six or
22  seven lawyers.
23      Q.  Okay.  And does the investigator assist
24  as soon as an attorney is assigned a case or do they
25  have to request that kind of assistance from their

Page 22

1   primary investigator?
2       A.  Both.  It depends on the working
3   relationship.  Some lawyers and investigators have a
4   working relationship where the investigator
5   automatically reads all the police reports and
6   discovery for that lawyer's case and then the two
7   collaborate.  Other lawyers prefer to assign items.
8       Q.  Okay.  So it's not working with them
9   through the start and finish of a case, but
10  piecemeal as needed essentially?
11      A.  It depends on the lawyer.
12      Q.  Okay.
13      A.  But even if it's piecemeal, and I don't
14  know if that's the best word, if there's an
15  assignment to do something and three months later
16  there's another assignment, that investigator is
17  sticking with the case and the lawyer.
18      Q.  Okay.  And you said it's one -- one for
19  every seven?
20      A.  Approximately.
21      Q.  Okay.  And then you said you had five
22  legal assistants?
23      A.  Two legal assistants.
24      Q.  Oh, two legal assistants.  And three
25  clerks?

Page 23

1       A.  Correct.
2       Q.  Clerks.
3       A.  Two clerks and then one office
4   management specialist.
5       Q.  And -- and how does the work or
6   assignments to the legal assistants be -- or are
7   assigned?  Are they also for -- you know, one for
8   every seven or --
9       A.  The legal assistants we use in
10  associate court to manage the intake of new clients
11  and to organize the associate dockets for the entire
12  office.  The associate dockets are quite busy and
13  logistically complicated, and that's where we get
14  most of our new cases.
15          So we have two associate divisions, and
16  each legal assistant works in one of those divisions
17  and manages all the paperwork, client intake, and
18  opening up cases for new clients.  In addition, the
19  legal assistants will play discovery for video
20  discovery for clients on occasion when requested by
21  lawyers.
22          They also are largely in charge of
23  ordering and gathering all records, whether they be
24  employment records or medical records or school
25  records, and we divide the office in half based upon

Page 24

1   the associate division.  So each legal assistant
2   roughly has ten lawyers.
3       Q.  Would you say that -- you said the
4   legal assistants manage the intake of new clients
5   and organizing the docket.  Would you say that
6   that's a daily job?
7       A.  Yes.
8       Q.  And then on top of that they also
9   assist with discovery?
10      A.  Yes.
11      Q.  Has there been a time or an instance
12  when a legal assistant was too busy to assist an
13  attorney with discovery requests?
14      A.  Yes.
15      Q.  How often does that occur?
16      A.  It happens I would say with some degree
17  of frequency because given the number of cases that
18  need to be opened, the incoming clients, that takes
19  priority sometimes, and then the -- the records can
20  be delayed, ordering the records.  So then the
21  investigators have to step in and help.  Vice versa,
22  sometimes the investigators can be out finding
23  witnesses and overloaded.
24      Q.  Uh-huh.
25      A.  And they also play discovery for

6 (Pages 21 to 24)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 160-26    Filed 02/21/18    Page 7 of 100

Page 25

1  clients, and then the legal assistants have to step
2  in.
3       Q.  What do you mean by play discovery for
4  clients?  Just not familiar with the term.
5       A.  There is a lot of video discovery now
6  in criminal cases.  It could be video recordings of
7  witness interviews by the police.  It could be 911
8  calls.  It could be videotapes of interrogations.
9  It could be videos of the crime scene.  It could be
10  surveillance footage.
11       It could be recorded phone calls from
12  the jail.  Some cases may have 50 hours of this
13  material.  And it's impossible for the lawyer to
14  meet with the client to -- and view all the
15  discovery together, so we have to break it up and
16  have assistants help out.
17       Q.  Okay.  And then you have the two
18  clerks, and what -- what are their functions and how
19  do they get their assignments?
20       A.  The two clerks manage the -- the phones
21  up front.
22       Q.  Okay.
23       A.  And they are also opening up cases,
24  probation revocation cases.  They are reviewing
25  applications that come from the jail and determining

Page 26

1  indigency.  They are opening up applications that we
2  get at the circuit arraignment docket.
3       This is when a case moves from
4  associate court to circuit court.  There's a formal
5  proceeding where the client appears before a judge
6  and enters a plea of not guilty.  We do pick up new
7  cases at this docket for various reasons.
8       Q.  So are both the clerks and the -- the
9  legal assistants making indigency determinations?
10       A.  Yes.
11       Q.  Okay.  And then the office manager,
12  what -- what are their functions?
13       A.  The office manager helps open cases.
14  She's also in charge of conflicting all cases.  She
15  helps manage the phones.  She does all the IT work.
16  She also fills in for legal assistants and clerks as
17  needed.
18       Q.  So --
19       A.  And all billing.  She also is in charge
20  of all billing.
21       Q.  So when you say the office manager
22  helps open cases, does that also mean that there's
23  indigency determinations by the office manager?
24       A.  Correct.
25       Q.  So does your attorneys spend any time

Page 27

1  doing administrative tasks aside from pursuing their
2  -- their individual cases?  Like aside from
3  researching cases or going to court, do they send
4  out their letters themselves, do they prepare the
5  templates themselves?
6       A.  Most letters are created and generated
7  and printed and mailed by the attorneys.  We do have
8  a system where discovery on low-level cases will be
9  copied by the two clerks and mailed to the clients
10  automatically as it comes in.
11       Administratively one of the -- the
12  problems is there's no interface between the court's
13  computer system of Case.net and our Lotus
14  management.  So all court dates have to be manually
15  entered to keep up in our system, and most lawyers
16  fall behind in that administrative task just given
17  the caseload.
18       Q.  And there's -- is there any time
19  available on the part of the legal assistants or the
20  clerks to take on that role?
21       A.  No.
22       Q.  And being the district defender and
23  managing your attorneys in your office, on average
24  how much time percentage wise do you think your
25  attorneys are spending on administrative work?

Page 28

1       A.  I would say if you were to count
2  checking your voicemail, updating the computer,
3  meaning you visited a client in the jail, you have
4  to put notes into the computer, you've been to
5  court, you have to put notes into the computer, put
6  in a new court date, I would say it would at least
7  have to be an hour a day if you were on top of it.
8       Q.  And how many hours does your attorneys
9  generally work in a day?
10       A.  Eight to ten.
11       MR. MOORE:  That was eight a.m. to
12  ten p.m.?
13       THE WITNESS:  Eight hours to ten hours.
14       MR. MOORE:  Okay.
15       Q.  (By Ms. Rosca)  Would you say that your
16  office would benefit from having more administrative
17  staff?
18       A.  It could.
19       Q.  What's your basis for that?
20       A.  I would say more investigation would
21  help cases move through the system more equitably
22  and more quickly.  And I don't know if there's a
23  tech solution or if it's a personnel solution to the
24  administrative tasks would be helpful.
25       Q.  Would your office benefit if they had

7 (Pages 25 to 28)

ALARIS LITIGATION SERVICES
www.alaris.us        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-26   Filed 02/21/18   Page 8 of 100

Page 29

1   more investigators?
2       A.  Yes.
3           Q.  And what is your basis for that?
4       A.  More investigation I think would show
5   earlier what was going on with a case and what needs
6   to be litigated.
7           Q.  Can you think of an instance -- and I'm
8   not trying to pry into any attorney-client privilege
9   communications.  But can you think of an instance, a
10  specific one where a case was hampered because it
11  just didn't have an investigator assistance just
12  because the investigators were not available?
13      A.  That's tough because you learn about it
14  on the back end.  There have been cases -- I can --
15  there have been cases where lawyers have realized
16  early on that surveillance video needed to be
17  obtained quite quickly or certain records needed to
18  be obtained quite quickly and that resulted in a
19  better result for the client.  I think the fear is
20  just given the flood of cases that those instances
21  cannot be seen by a lawyer that's overloaded with
22  cases.
23          Q.  Is that -- would you say that's true --
24  well, strike that.
25          Do you think your office would benefit

Page 30

1   from more legal assistants?
2       A.  Yes.
3           Q.  And what is your basis for that?
4       A.  Discovery could be shown to clients
5   much more quickly and efficiently.  I think it would
6   increase the problems with diligence and
7   communication that the Hinkebein case has raised for
8   the whole system.  And so I -- I think that would be
9   very helpful.
10          Q.  You said that discovery would be shown
11  much more quickly.  At the going rate right now,
12  when are these discovery videos being shown?
13      A.  I would say after the discovery is
14  received it can take two to four months for the
15  discovery to be shown to the client.
16          Q.  And does that impact at all do you
17  think the amount of time that the -- that the case
18  gets resolved?
19      A.  Yes.
20          Q.  And what is your basis for that?
21      A.  I think a lot of the serious violent
22  felonies -- this is the dynamic in our office is the
23  C and D and E felonies, those are the low-level
24  felonies in Missouri.  Those are the majority of our
25  cases.

Page 31

1           The time to disposition is 79 days,
2   which is quite short for that large of a caseload.
3   And so the lawyers are focusing on visiting those
4   clients, getting them out on bond, perhaps resolving
5   the case a little bit too quickly.
6           And then what happens with the 30 or 40
7   violent felonies that the lawyer has, those get
8   neglected, and those are the cases where there could
9   be 50 hours of discovery, where the case lingers in
10  court for nine months before getting set for trial,
11  which is another nine months off.
12          So it's the serious crimes that get
13  neglected, the clients don't get visited, discovery
14  doesn't get reviewed, it doesn't get played.  That's
15  the most serious problem in our office at this time
16  due to the number of cases.
17          Q.  So just so I understand, the attorneys
18  in your office are trying to move as many cases as
19  they can so they'll focus on the lower-level
20  felonies, and that will take away from the time from
21  the more serious offenses?
22      A.  Partially correct.  The flood of the
23  low level is intense and moves quickly.
24          Q.  Okay.
25      A.  And the demand and the need, it's a

Page 32

1   legitimate need, to have those clients released and
2   do bond hearings, that's taking up a huge amount of
3   time and there's no problem with that.  But because
4   that part of the caseload is moving quickly, that's
5   where the river so to speak is -- where the lawyer
6   is standing in the river.
7           Q.  Right.
8       A.  The -- the murders, the rapes, the
9   robberies, the things that are generally going to
10  move slower tend to move much more slower and get
11  neglected because the focus is always on the
12  incoming case.
13          MS. ROSCA:  I'm going to hand you what
14  I think is -- are we on 35?
15          (WHEREIN, Exhibit 35, St. Louis Public
16  Radio article, was marked for identification by the
17  Court Reporter.)
18          Q.  (By Ms. Rosca)  So the court reporter
19  is going to mark this document Reynolds Exhibit 35.
20  If you could just review that document and let me
21  know when you finish reviewing it.  Are you finished
22  reviewing it?
23      A.  Yes.
24          Q.  Have you seen this document before?
25      A.  Yes.

8 (Pages 29 to 32)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-26   Filed 02/21/18   Page 9 of 100

1      Q.  Can you state for the record what -- or
2  can you describe what this document is?
3      A.  This appears to be the web version of a
4  news story on St. Louis Public Radio from 2012.
5      Q.  And just for the record, the title of
6  the news article is "Missouri public defenders take
7  problem of high caseloads to high court."
8      A.  Yes.
9      Q.  So if you turn to the second page of
10  that printout, do you see where your last name seems
11  to appear sort of middle of the page, or your full
12  name actually?
13      A.  Yes.
14      Q.  Did you provide statements for this
15  radio interview?
16      A.  Yes.
17      Q.  And do you have any -- do you have any
18  concerns about the accuracy of the statements you
19  provided in this radio interview.
20      A.  No.
21      (WHEREIN, a discussion was held off the
22  record.)
23      Q.  (By Ms. Rosca)  So what was the subject
24  matter of this interview?
25      A.  Caseloads in our office, and at the

1  time there was litigation regarding public defender
2  caseloads across the state.
3      Q.  And you see on the -- again the second
4  page of the printout it says that (quote as read):
5      Missouri's public defenders have argued
6      for years that they have too many
7      cases.
8      Or it's at the top of the second page,
9  I guess.  Do you agree with that statement?
10      A.  Yes.
11      Q.  And what's your basis for that
12  agreement?
13      A.  To my knowledge, since 2007 caseload
14  numbers have been a high priority of the public
15  defender system, and there's been numerous efforts
16  in the legislature and the courts to reduce those
17  numbers.
18      Q.  And does that caseload issue -- has
19  that caseload issue also affected your office in
20  particular?
21      A.  Yes.
22      Q.  And it says if you look further down
23  that St. Louis County is the biggest county in
24  Missouri, and at that time it said that the public
25  defenders office has more than 18,000 cases pending

1  and just 12 full-time lawyers.  Do you see where
2  that statement is written?
3      A.  Yes.
4      Q.  And since that time you've increased to
5  20 attorneys?
6      A.  I would say 18.  I cannot recall if at
7  the time the 12 lawyers -- I can tell you the 12
8  lawyers did not include myself and Pat Brayer.
9      Q.  Okay.
10      A.  It did not include management lawyers
11  when I made that statement.
12      Q.  Does -- does that 18,000 cases strike
13  you as a particularly high number?
14      A.  I believe it's 1800 cases.
15      Q.  1800, excuse me.
16      A.  And I would say it's -- it's a high
17  number for 12 lawyers full-time caseload dedicated
18  lawyers to handle.  Currently our live caseload,
19  meaning our pending caseload, is 2,200.  So that
20  number is not unfamiliar.
21      Q.  And then later in that same page it
22  says one of the attorneys has 118 cases.  That
23  appears from this article that you were looking at a
24  screen that tracks the caseload; is that correct?
25      A.  Correct.

1      Q.  And you testified earlier that your
2  more experienced attorneys have about 100 to
3  200 cases per attorney; is that correct?
4      A.  Correct.
5      Q.  So would you agree that your caseload
6  per attorney at least for the experienced ones have
7  increased since this article was written or this
8  interview was taken?
9      A.  It very well could have.  Because this
10  article only references one lawyer with 118 cases, I
11  don't recall what the numbers were for the other 11
12  lawyers at that time.  I can tell you right now just
13  every one but two full-time dedicated lawyers has
14  over a hundred cases in our office right now.
15      Q.  And does that figure strike you as
16  particularly high?
17      A.  Yes.
18      Q.  And what is your basis for that
19  opinion?
20      A.  I think once cases go above 60, I think
21  it's incredibly difficult for even the most trained
22  lawyer to maintain communication and diligence on a
23  caseload over 60.
24      MS. ROSCA:  Okay.  And the article also
25  says that -- I will introduce another exhibit.  So

Case 2:17-cv-04057-NKL   Document 160-26   Filed 02/21/18   Page 10 of 100

## Page 37

1   the court reporter is going to mark this Exhibit 36,
2   Reynolds Exhibit 36.
3      (WHEREIN, Exhibit 36, The New York
4   Times article, was marked for identification by the
5   Court Reporter.)
6      Q.  (By Ms. Rosca)  Could you please review
7   this document and let me know when you've finished
8   reviewing it?
9      A.  Yes.
10      Q.  Have you seen this document before?
11      A.  Yes.
12      Q.  And can you state for the record or
13   describe what the document is?
14      A.  This is a computer printout of a
15   article from February 19th of 2014 that was
16   published in The New York Times about public
17   defender caseloads.
18      Q.  And just for the record, the article is
19   titled "Public Defenders, Bolstered by a Work
20   Analysis and Rulings, Push Back Against a Tide of
21   Cases?"
22      A.  Correct.
23      Q.  If you turn to the second page of the
24   printout, it's the backside of the first page
25   towards the bottom, do you see your name stated

## Page 38

1   there?
2      A.  Yes.
3      Q.  Did you provide comments for this
4   article?
5      A.  Yes.
6      Q.  And do you have any concerns or doubt
7   as to the accuracy of those comments?
8      A.  No.
9      Q.  You state in the article that, quote
10   (quote as read):
11        Until recently lawyers here were
12        carrying more than 200 felony cases
13        from drugs to rape and murder.
14        Do you see that?
15      A.  Yes.
16      Q.  Is that -- was that true for your
17   office just before 2014?
18      A.  Yes.
19      Q.  Has that number continued this year?
20      A.  Not to the extent -- still a problem,
21   but it's not as intense as it was shortly before
22   this article was written.
23      Q.  And what was the reason for I guess the
24   reduction in intensity of cases?
25      A.  It's -- I don't know if I can give a

## Page 39

1   cause.  In 2012 and 2013 the prosecutor's office
2   switched the head of the warrants office and there
3   were more filings, and those filings increased our
4   numbers where across the board nearly every lawyer
5   in our office had 200 or more.  And then that number
6   dropped, but as recently as this summer we had
7   several lawyers over -- we had two lawyers over 200
8   and several approaching 200.
9      Q.  And just to be clear, the Exhibits 35
10   and 36, they -- they both reference a ruling.  Do
11   you know what -- what was happening at the time the
12   Supreme Court case that they're describing in both
13   articles, do you know what that's in reference to?
14   You can also look at Exhibit 35.  That would help
15   too.
16      A.  I don't remember the -- the style of
17   the case, but it was the case that was being
18   litigated in the Missouri Supreme Court about
19   whether public defenders could manage their caseload
20   numbers.
21      Q.  Was it the Waters decision, would
22   that --
23      A.  Yes.
24      Q.  Okay.  And just back to Exhibit 36, you
25   also state right under the comment that we just read

## Page 40

1   that the burden has eased, but it's still more than
2   we can probably -- properly handle.  Do you still
3   agree with that statement?
4      A.  Yes.
5      Q.  And what do you mean by what your
6   office can properly handle?
7      A.  Communication, diligence, litigating
8   cases, all of those three areas, particularly
9   communication and diligence our lawyers struggle
10   with, and do not make reasonable -- I guess they do
11   not meet reasonable standards.
12      Q.  Are you -- when you say reasonable
13   standards, are you referring to ethical standards?
14      A.  Yes.
15      Q.  And the term communications, diligence
16   are -- is that a term of art that you're
17   referencing?
18      A.  I believe those are terms also used in
19   the ethical rules.
20      MS. ROSCA:  I am going to introduce --
21   this one exhibit has been previously marked, so this
22   is Plaintiffs' Exhibit 4.
23   (Exhibit 4, Previously marked exhibit.)
24      MS. ROSCA:  And then with that I am
25   also going to introduce Reynolds Exhibit 37.

ALARIS LITIGATION SERVICES
www.alaris.us      Phone: 1.800.280.3376      Fax: 314.644.1334

## Page 41

1     (WHEREIN, Exhibit 37, Cumulative
2  caseload metrics spreadsheet, was marked for
3  identification by the Court Reporter.)
4     Q.  (By Ms. Rosca)  Have you seen these
5  documents before?  I know one is hard to read.  I
6  apologize.
7     A.  I do not believe I've seen 4.  And I do
8  not believe I have seen 37 either.
9     Q.  Okay.  So I'll represent to you that
10  these documents were produced by the public
11  defenders office to our office, and they list
12  cumulative caseload metrics.  And if you look at row
13  21 or area 21 it lists the St. Louis County.  Do you
14  see that?
15     A.  Yes.
16     MR. MOORE:  I'll also object to the
17  form of the question as it's leading and
18  argumentative as to what the exhibits show, but
19  subject to that you can continue.
20     Q.  (By Ms. Rosca)  Mr. Reynolds, could you
21  just describe for the record what you see on these
22  exhibits, what you think these documents are?
23     A.  My understanding of these documents,
24  and I've seen these doc -- not these specific
25  documents, but iterations of statistics in the past

## Page 42

1  because they were distributed to district defenders
2  as they were produced, these -- this shows caseload
3  metrics for each office.
4     Q.  And just looking at Plaintiffs' Exhibit
5  4, can you see is there any date on this document?
6     A.  It appears to be January 1, 2017 to
7  March 31st of 2017.
8     Q.  And you mentioned that you've seen
9  iterations of these documents before.  Have you seen
10  any prior metrics from prior time periods?
11     A.  Yes.  The last time that I -- I saw
12  documents similar to these would be probably 2014,
13  somewhere around there I believe they stopped being
14  distributed to the district defenders unless you
15  specifically requested it.
16     Q.  All right.  Is there a reason why you
17  wouldn't request sort of the caseload metrics for
18  your -- for your office?
19     A.  Nothing's changed.  I mean, you can
20  tell just by the number of cases that come into our
21  office that the metrics would not be changing much.
22     Q.  Okay.  So let's look -- let's start
23  with Plaintiffs' Exhibit 4.  So it says you have 20
24  attorneys.  Is that -- that's still accurate,
25  correct?

## Page 43

1     A.  Correct.
2     Q.  Okay.  And do you have any
3  understanding of what these columns mean?
4     A.  Yes.
5     Q.  So for example, the column that
6  says net new cases, what -- what does that -- what
7  is your understanding of what that column is
8  displaying?
9     A.  The number of cases that were opened in
10  that quarter minus cases that we withdrew from.
11     Q.  Okay.  And then do you see that
12  figure for Plaintiffs' Exhibit 4 says 1,118?
13     A.  Yes.
14     Q.  Okay.  And then if you look at the
15  column that says workload, it's sort of the last --
16  fourth to -- fourth to the last?
17     A.  Workload units plus count time plus
18  travel?
19     Q.  Yes.  Do you have an understanding of
20  what the information in that column is conveying?
21     A.  Yes.
22     Q.  And do you see that it says 27,352?
23     A.  Yes.
24     Q.  Okay.  Just going back to the net new
25  cases, the 1118, does that seem accurate to you for

## Page 44

1  the first three months of this year?
2     A.  Yes.
3     Q.  And for the -- do you see the column
4  that says percent of capacity?
5     A.  Yes.
6     Q.  And what is your understanding of that
7  column?
8     A.  Based upon the number of lawyers and
9  the formula devised by RubinBrown, there's an hour
10  capacity assigned to an office, and then based upon
11  the cases that come in there's an hour number
12  assigned to those cases, and then they come up with
13  a percentage which shows how much over or under the
14  target is for lawyers and work hours for the given
15  caseload in an office.
16     Q.  And do you see that the percentage for
17  the Plaintiffs' Exhibit 4 is 263 percent?
18     A.  Yes.
19     Q.  Would you agree or do you think that's
20  an accurate portrayal of how much capacity your
21  office has to take on cases?
22     MR. MOORE:  Also object to the
23  foundation, but subject to that you can respond.
24     A.  Yes.
25     Q.  (By Ms. Rosca)  If we now move to -- is

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-26   Filed 02/21/18   Page 12 of 100

## Page 45

1  it Exhibit 37?

2     A.  Yes.

3        Q.  Okay.  To Reynolds Exhibit 37.  Is

4  there a date for this document?

5     A.  April 1, 2017 to June 30th, 2017.

6        Q.  And would you agree that the columns

7  that you described earlier are the same with respect

8  to meaning for this document?

9     A.  Yes.

10       Q.  And do you see if we go to net new

11 cases, which we discussed in the prior exhibit, that

12 the number is 1,062?

13    A.  Yes.

14       Q.  And that the workload is 25,866?

15    A.  Yes.

16       Q.  So do you -- and also the percent of

17 capacity is 240 -- 240.7 percent.  Do you see that?

18    A.  Yes.

19       Q.  Do you have an understanding as to why

20 the percent of capacity and the net new cases has

21 decreased within just the six-month time period?

22    A.  No.

23       Q.  Do you still think that that's -- do

24 these figures still strike you as -- as high in

25 terms of workload capacity?

## Page 46

1     A.  Yes.

2        Q.  And what is your basis for that?

3     A.  I think any reasonable and experienced

4  attorney would not be able to handle the number of

5  cases that came into our office during that period

6  as divided among the staff that we have.

7        MS. ROSCA:  Okay.  And I'm going to

8  introduce another -- actually, it's previously been

9  introduced.

10       MR. MOORE:  So that was Plaintiffs' 4

11 and Reynolds Exhibit 37, right?

12       MS. ROSCA:  I'm going to introduce one

13 more and then we can take a break.  The court

14 reporter is marking what is Reynolds Exhibit 38, and

15 it starts with Bates number MSPD0038970.

16       (WHEREIN, Exhibit 38, FY 2018

17 Supplemental legislative budget request, was marked

18 for identification by the Court Reporter.)

19       Q.  (By Ms. Rosca)  Could you review the

20 document and let me know when you've reviewed it?

21 I'm going to really only ask you about the last

22 page, so -- have you seen this document before?

23    A.  No.

24       Q.  If we turn to the last page, have you

25 seen iterations of this spreadsheet before?

## Page 47

1     A.  Yes.

2        Q.  In what ways have you seen it?

3     A.  In the same way that I described for 37

4  and 4.

5        Q.  Okay.  You can look at page seven of

6  this document or this exhibit.  It says St. Louis

7  County.  Again, area 21.

8     A.  Yes.

9        Q.  Can you describe what you think this

10 spreadsheet is providing in terms of information?

11    A.  I take back my answer.  I have seen

12 this document for the fiscal year 2017.

13       Q.  And in what instance have you seen it?

14    A.  I saw it in anticipation of this

15 deposition.

16       Q.  Okay.  And what -- what is this

17 spreadsheet providing in terms of information?

18    A.  It's the cumulative caseload metrics

19 for fiscal year 2017.

20       Q.  And do you see -- strike that.

21       Are the columns that are listed here

22 similar to the columns that you were seeing in

23 Exhibits 37 and Plaintiffs' Exhibit 4?

24    A.  Yes.

25       Q.  Would you agree that the columns have

## Page 48

1  the same meaning as in those exhibits?

2     A.  Yes.

3        Q.  Okay.  So for net new cases it says

4  4,372.

5     A.  Yes.

6        Q.  Do you understand that to mean -- sorry

7  for speaking over you.  Do you understand that to

8  mean that there's four hundred -- 4,372 cases for

9  that fiscal year that were new?

10    A.  Yes.

11       Q.  Okay.  And then it says that you still

12 had 20 attorneys?

13    A.  Yes.

14       Q.  So just by dividing that total number

15 by the 20 attorneys, that's about 218.6 cases per

16 attorney?

17    A.  I will accept that calculation.

18       Q.  Would you -- does that strike you as

19 high to have over 200 cases per one attorney in a

20 given year?

21    A.  Yes.

22       Q.  And what's your basis for thinking

23 that's a high number?

24    A.  They're all felonies.  Many of those

25 felonies are violent felonies.  And I think it's

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-26   Filed 02/21/18   Page 13 of 100

Page 49

1  unusual for lawyers to have that many cases in one
2  year, and then when you consider the number of
3  violent felonies, I think it's extremely unusual.
4  And I can't think of anybody in private practice who
5  would handle that number of cases and particularly
6  the seriousness of those cases.
7      Q.  You said they're particularly violent
8  cases.  In your experience as a district defender
9  and a public defender, do violent cases take up more
10  time?
11     A.  Yes.
12     Q.  And why is that?
13     A.  They're more complicated.  The stakes
14  are higher.  There's more witnesses.  There's more
15  discovery.  Often there's more issues with mental
16  health.  There's more client communication needed.
17  There's more investigation needed.  There's more
18  depositions needed.  There's more discovery review
19  needed.
20     Q.  So by that answer do you also think
21  that violent cases require more resources?
22     A.  Correct.
23     Q.  At the moment right now at your office,
24  is it your opinion that your office is getting the
25  -- the sufficient amount of resources it needs to be

Page 50

1  able to litigate a case to the ethical standards
2  that are required?
3      MR. MOORE:  I'll just -- sorry.  Just
4  object to the form.  I think it's vague.  Subject to
5  that, you can respond.
6      A.  No.
7      Q.  (By Ms. Rosca)  And why -- what is your
8  basis for your opinion on that?
9      A.  Our office needs five to ten more
10  lawyers at least to ethically handle the cases that
11  come into our office each year.
12     MS. ROSCA:  Have you -- strike that.
13  We have been going I think for over an hour.  Would
14  you like to take a break?
15     THE WITNESS:  Sure.
16     MS. ROSCA:  Okay.  Off the record.
17     VIDEOGRAPHER:  The time is 2:46.  We
18  are off the record.
19     (WHEREIN, a recess was taken.)
20     VIDEOGRAPHER:  The time is 2:51.  We
21  are back on the record.
22     Q.  (By Ms. Rosca)  Hi, Mr. Reynolds.  Can
23  we talk about case assignment?  Can you walk through
24  how your office gets a case?
25     A.  We get cases in a variety of ways.

Page 51

1  Would you like me to list them?
2      Q.  Please.
3      A.  We get cases through the associate
4  division when people are first arrested on a case.
5  We will get cases where clients in the Department of
6  Correction mail in applications because there's
7  outstanding warrants.
8      We get cases of what's called the
9  circuit arraignment docket, which is where a case is
10  transferred from associate to circuit court.  We get
11  walk-ins, people who have been released and are
12  looking for a lawyer.
13     We get applications from the jail
14  across the board, any type of case and wherever it
15  is in the system.  We get referrals from the court,
16  meaning clients have shown up in court without a
17  lawyer.
18     We get e-mails from family members
19  looking to get a lawyer for a family member.  We get
20  telephone calls from potential clients or family
21  members looking for a lawyer.  That would be the
22  basic overview.  There may be other instances, but
23  that pretty much covers it.
24     Q.  So when a case comes to you through any
25  of those avenues that you just listed, what happens

Page 52

1  next?  Is there a determination as to whether you're
2  going to take the case?
3      A.  Once we get an application.  And how we
4  get an application is going to vary based upon all
5  those different ways we take in cases.
6      Q.  And so can we start with maybe through
7  the associate division as an example when a
8  defendant is just arrested you mentioned; is that
9  correct?
10     A.  Correct.
11     Q.  Okay.  So how -- can you walk me
12  through essentially how that case that you received
13  from the associate division then gets assigned to an
14  attorney in your office?
15     A.  So in the associate division there's
16  what's called a confined docket each morning, and
17  those are defendants who have been arrested anywhere
18  24 to 72 hours prior to that court date.  The judge
19  does a -- what's called an initial arraignment where
20  he informs the defendant of the charges and inquires
21  how the defendant is going to acquire an attorney.
22     If the defendant requests a public
23  defender or indicates that they have no resources to
24  hire a private attorney, an application is filled
25  out in court and given to our legal assistants who

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 53

1 review the application in court or after court and
2 make an indigency determination.
3       Q.  And then once this indigency
4 determination is made, what happens next?
5       A.  A case is created in our computer
6 system and at the same time it's assigned to an
7 attorney.
8       Q.  And who makes the determination as to
9 which attorney gets that assignment?
10       A.  The legal assistant.
11       Q.  Does the legal assistant have any
12 information as to -- or strike that.
13             Does the legal assistant consider the
14 attorney's caseload at all when it gives the
15 assignment of a case?
16       A.  Yes.  So we have a spreadsheet that we
17 use for assigning all cases in the office and
18 assignments are largely made by scheduling
19 availability so we can achieve vertical
20 representation.  So that's one major factor in the
21 case assignments.  The other major factor is the
22 attorney's experience level.
23       Q.  Okay.  And the more experienced
24 attorneys would get the more serious cases.  Is that
25 how it works?

## Page 54

1       A.  Correct.  And we make categorical
2 determinations on the difficulty of the case and the
3 lawyer's experience level so that the legal
4 assistant can assign the case according to those
5 parameters.
6       Q.  Okay.  Is there ever an instance where
7 a case was assigned to an attorney in your office by
8 a legal assistant after making an indigency
9 determination where the attorney said he can't
10 handle the case?
11       A.  No.
12       Q.  If there was a situation that that
13 would occur, what would the attorney's recourse
14 would be?  Could he talk to someone about that?
15       A.  Oh, it would be quite easy.  If a
16 lawyer cannot handle a particular case or certainly
17 in this post-Hinkebein landscape if an attorney said
18 there are too many cases, they would talk to me and
19 we would figure out a resolution.
20       Q.  And what would happen to that case if
21 the resolution was this particular attorney cannot
22 handle that case?
23       A.  In what capacity?
24       Q.  Like internally, would it go to another
25 attorney?

## Page 55

1       A.  No.  I meant is it because the case is
2 too difficult for the lawyer or the lawyer's
3 caseload is too high and the lawyer can't have a new
4 case?
5       Q.  The -- the latter.
6       A.  We have not encountered that as an
7 office, although all lawyers know that they're
8 overloaded.  And we are working with the courts to
9 try to resolve that, but as of yet no lawyer has
10 said no more cases.
11       Q.  What about in the prior situation where
12 they just don't have the experience to take on that
13 particular case?
14       A.  We'd reassign it.
15       Q.  Can we talk a little bit about initial
16 hearings?  At what point -- can you describe what
17 happens after the indigent defendant is arrested?
18 Do they get an initial hearing?  You mentioned
19 before that they can request the PD after they get
20 arrested, but after that point if they're not
21 assigned a PD is there an initial hearing?
22       A.  Initial hearing is not a term that's
23 really used --
24       Q.  Okay.
25       A.  -- in our jurisdiction.

## Page 56

1       Q.  What would you -- how would you
2 describe the process?  What terms would you use?
3       A.  Can I describe the process?
4       Q.  Sure.
5       A.  So the confine docket is the arrested
6 person's first appearance in court where charges are
7 read.  The case is then continued by the court for
8 one or two weeks for entry of counsel.
9             If we enter on the case generally
10 speaking, particularly for low-level felonies, the
11 case is given two court dates.  One for preliminary
12 hearing and one for a bond hearing.
13             The bond hearing is generally within a
14 week of that second appearance in court and then the
15 preliminary hearing is scheduled by the court and is
16 usually six weeks out.
17       Q.  Has there been an instance where the PD
18 has been unable to enter as counsel after those
19 first two weeks after being arrested?
20       A.  I'm not understanding the question.
21       Q.  Let me rephrase.  That was vague.  You
22 mentioned that after they are arrested and appear
23 for the first time there's one to two weeks in which
24 the -- your office may enter as counsel; is that
25 correct?

14 (Pages 53 to 56)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-26   Filed 02/21/18   Page 15 of 100

Page 57

1    A.  Yes.
2    Q.  Okay.  Has there been a situation where
3  your office was unable to have an attorney present
4  to enter as counsel?
5    A.  No.
6    Q.  Okay.  After you've entered as counsel
7  for a particular case, you stated that there are two
8  other court dates that are usually set, the
9  preliminary hearing and the bond hearing?
10    A.  Correct.
11    Q.  Has there been a situation where an
12  attorney in your office has been unable to attend
13  either of those hearings?
14    A.  No.
15    Q.  Okay.  Has the -- do the attorneys in
16  your office typically meet with their client prior
17  to these hearings?
18    A.  As much as possible.
19    Q.  And what does as much as possible mean?
20    A.  Given the number of cases that come in,
21  many attorneys find it difficult to have an initial
22  visit within statewide public defender standards of
23  seven days.  Because of the number of cases and the
24  -- the flow of those cases are so quick, we expanded
25  our initial visit to ten business days for our

Page 58

1  office.  As much as possible the lawyers try to
2  achieve that, but it doesn't happen in every case.
3    Q.  So -- go ahead.
4    A.  And just to finish, before the
5  preliminary hearing which is usually six weeks after
6  we've entered, most lawyers have met with their
7  confined clients, but there are exceptions given the
8  caseload where that does not occur.
9    Q.  So there's a possibility then that a
10  client would be confined for at least six weeks and
11  have not met with their counsel yet?
12    A.  It has happened.
13    Q.  And -- and what is the frequency of
14  that happening in your office?
15    A.  I don't have an exact percentage.
16    Q.  Uh-huh.
17    A.  The computer does not track that.  It
18  would have to be hand calculated.  But when we do
19  promotion reviews I hand calculate that, and notice
20  that in a percentage of cases some lawyers have
21  missed those marks.
22    Q.  Would you say it was more than
23  30 percent?
24    A.  Some lawyers more than 30 percent,
25  other lawyers less than five percent.

Page 59

1    Q.  Okay.  Do you -- is there a trend as to
2  the lawyers missing it being less experienced
3  attorneys?
4    A.  No.
5    Q.  Okay.  So you're saying even the more
6  experienced attorneys may be missing the six-week
7  client contact?
8    A.  In our office it would be counted as
9  have you seen the client within the first ten days.
10    Q.  Okay.
11    A.  And then we've deviated from every
12  30 days, which is the statewide standard, to every
13  60 days just given the speed of cases and the number
14  of cases, and there are lawyers who miss both of
15  those marks.  There are some lawyers who meet their
16  clients within seven days and then every 30 days
17  also.
18    Q.  For the instances where they have
19  missed the mark on the 30 days or the 60 days, in
20  your opinion do you think that it -- that it impacts
21  the relationship with the client?
22    A.  Yes.
23    Q.  And what is your basis for that
24  conclusion?
25    A.  The 60-day mark is usually being missed

Page 60

1  in the serious and violent felonies because as I've
2  mentioned in this deposition, the focus is on the
3  flow of cases, the C, D's, and E's which move quite
4  quickly.
5    So what happens with some degree of
6  frequency is the more serious clients are neglected
7  because of caseload problems and rightfully become
8  worried and anxious, and that contributes to
9  deteriorating attorney-client relations.
10    Q.  And to prepare for the preliminary
11  hearings, what if anything does your attorneys do to
12  prepare for these hearings?
13    A.  In our jurisdiction generally speaking
14  a case set for preliminary hearing discovery will be
15  provided.  However, the timing of that discovery
16  when it's released varies because there are probably
17  12 prosecutors who are individually responsible for
18  disclosing discovery, and some of them are more
19  diligent than others.
20    So an attorney can meet with a client
21  with the discovery and prepare for the preliminary
22  hearing if the discovery is provided in time.  If
23  it's provided two or three days before the
24  preliminary hearing, the attorney will have met with
25  the client, but not necessarily with the discovery.

15 (Pages 57 to 60)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-26   Filed 02/21/18   Page 16 of 100

## Page 61

1    Q.  Okay.  We're talking about how the
2  attorneys would meet with the client.  Where does
3  the client contact generally take place?
4    A.  If the client is confined, in the jail.
5  If the client is released, usually over the phone.
6  Although office appointments are offered, I think a
7  lot of released clients do not -- sometimes just
8  don't take that opportunity.
9    Q.  And when they meet in the jail, is it
10  usually a confidential place?
11    A.  Yes.
12    Q.  Are there ways for the clients to call
13  your office I think you mentioned?
14    A.  Yes.
15    Q.  And that's where the legal assistants
16  take the calls, right, or the clerks?
17    A.  We all -- the jail, all of the inmates
18  in the jail can make free phone calls to our office
19  several times a day.  Our phone system is provided
20  by the county.  So it has to go through the
21  operator.
22    Q.  And then after the preliminary hearing
23  and a case is set for -- or is going through the
24  litigation, what is the percentage of client contact
25  by your attorneys?

## Page 62

1    A.  I'm not understanding the question.
2    Q.  Does your attorneys have any
3  difficulties meeting with clients after the
4  preliminary hearing because --
5    A.  Because of -- because of caseload
6  problems?
7    Q.  Yes.
8    MR. MOORE:  Also object to the form of
9  the question because it's vague, but you can
10  respond.
11    A.  Because of the caseload numbers,
12  keeping up with visitation with the clients in the
13  jail is difficult for every attorney in my office.
14    Q.  (By Ms. Rosca)  Is there a policy --
15  you mentioned that ten days after you've -- you've
16  entered as counsel.  Is there a policy after the
17  preliminary hearing as to how many times the
18  attorney should meet with their client?
19    A.  The policy is meet with the client
20  within ten days of assignment --
21    Q.  Uh-huh.
22    A.  -- and every 60 days thereafter.
23    Q.  And has your attorneys been able to
24  meet the every 60 days thereafter?
25    A.  Our attorneys struggle with that and do

## Page 63

1  not make that number a hundred percent.
2    Q.  And in your opinion, do you attribute
3  that to the caseload problems?
4    A.  Yes.
5    Q.  You said that they had -- they meet
6  with the -- the client at the jail for the first
7  meeting.  Do they need to meet with their client at
8  the jail for any subsequent meetings, those 60 days?
9    A.  Yes.
10    Q.  Does that -- does that have any impact
11  on their time to travel to the jail?
12    A.  No.
13    Q.  The jail is fairly close?
14    A.  The jail is in the same building as the
15  courthouse.
16    Q.  Okay.  What about for clients that are
17  in state prison or in federal prison?
18    A.  That is a challenge.
19    Q.  Can you explain why that's a challenge?
20    A.  Phone calls are not readily set up.
21  Each Missouri state prison seems to have a different
22  policy for setting up phone calls, whether they're
23  collect, who dials in, what hours can be used.
24    Each Missouri state prison also has
25  varying hours when attorneys can set up in-person

## Page 64

1  visits.  For example, Potosi Correctional Center,
2  it's Friday afternoon, Saturdays, and Sundays.
3    So you cannot see somebody in Potosi
4  Correctional Center Monday, Tuesday, Wednesday,
5  Thursday, Friday morning.  And that involves a huge
6  amount of travel obviously.
7    Q.  And what about clients that may face
8  any immigration consequences, do your attorneys have
9  a lot of clients with that issue?
10    A.  Our jurisdiction does not have a very
11  high percentage of clients with that issue.
12    Q.  Okay.
13    A.  Attorneys inquire of every client about
14  nationality, place of birth, immigration status, and
15  are very aware of the issue.
16    Q.  Okay.  Let's talk about the resources
17  that your office has apart from just the staff that
18  work there.  Do you -- do you have any social
19  workers working in your office?  I don't think you
20  mentioned.
21    A.  No.
22    Q.  Has that had any impact on how your
23  attorneys defend their cases?
24    A.  I would say that because -- and this is
25  a national trend, and our office is part of this, is

16 (Pages 61 to 64)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-26   Filed 02/21/18   Page 17 of 100

1  many cases are negotiated even through litigation.
2  And that mitigation at sentencing is crucial, and
3  the lack of social workers to create mitigation
4  reports is I would say -- it's sort of unimaginable
5  that Missouri State Public Defender has no social
6  workers.  It's just -- it seems like that's just
7  what's done in criminal defense across the board.
8      Q.  And have you tried to request any
9  resources for social worker reports either to the
10  central office?
11      A.  What our lawyers tends to do is in
12  certain cases we try to hire psychiatrists to create
13  those reports, but it's very expensive and it's very
14  selective.
15      Q.  Would these psychiatrists be acting as
16  experts then?
17      A.  Yes.
18      Q.  What resources are available to your
19  attorneys to then -- to hire these experts?  Can you
20  go through the process of how they would obtain an
21  expert for their case?
22      A.  They would contact the expert, talk
23  about the background of the case, get an estimate,
24  and then submit an E request for money.
25      Q.  Do they submit it to you?

1      A.  Yes.
2      Q.  And what do you consider in approving
3  those requests?
4      A.  Meaning?
5      Q.  Meaning are there any factors you
6  consider as to whether you should approve a request
7  for an expert?
8      A.  Usually it's self-explanatory in the
9  request that the -- the attorney has done enough
10  investigation that there's certain school records,
11  medical records, health history, social histories
12  that indicate that a social mitigation report would
13  be helpful, and the state of negotiations, that that
14  mitigation report could help with sentencing, either
15  persuading the prosecutor or the court.
16      Q.  Have you ever denied an expert request?
17      A.  No.
18      Q.  You said they were very expensive.
19  Does it have an impact on your local office budget?
20      A.  Not to my knowledge.
21      Q.  What about taking depositions, what
22  resources are available to your attorneys for taking
23  depositions?
24      A.  They can request to take a deposition
25  in cases.

1      Q.  Is that request made to you?
2      A.  Yes.
3      Q.  Have you ever denied taking a
4  deposition?
5      A.  No.
6      Q.  Is there a certain point in -- in any
7  case, and I understand there are very different
8  cases so it would run differently, but generally is
9  there a certain point where the attorneys are
10  requesting these resources, is it usually, you know,
11  prior -- like a month or two prior before trial or
12  are they working to request these resources at the
13  outset of the case?
14      A.  I would say the trend is to request
15  depositions closer to trial than probably is in the
16  best interest of the client in the case.
17      Q.  And why do you think the attorneys are
18  delaying their requests for depositions to closer to
19  trial?
20      A.  I don't know --
21          MR. MOORE:  Just object to -- go ahead.
22  I'll object to the form of the question.  I think it
23  misstates prior testimony, but it sounds like you
24  were kind of going there, so go ahead.
25      A.  I don't think it's an intentional

1  delay.  I think what's happening is the request is
2  not happening until that 60-day window because of
3  the caseload numbers.
4      Q.  (By Ms. Rosca)  In your opinion, if you
5  had extra attorneys and extra staff, do you think
6  that these resources, like experts, availability of
7  deposition would occur earlier in the case?
8      A.  Certain --
9          MR. MOORE:  I'm sorry.  Again, just
10  calls for speculation, but you can go ahead.
11      A.  Yes.
12      Q.  (By Ms. Rosca)  How about translators,
13  do you run into request -- do your attorneys
14  generally need to request translators for their
15  cases?
16      A.  For certain percentage, yes.
17      Q.  And what resources are available to
18  them to request translators?
19      A.  There are several agencies in St. Louis
20  that provide translation services that we'll hire on
21  an hourly basis.
22      Q.  And does the request go to you to
23  approve for obtaining a translator?
24      A.  Yes.
25      Q.  And have you ever denied providing a

ALARIS LITIGATION SERVICES
www.alaris.us        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-26   Filed 02/21/18   Page 18 of 100

## Page 69

1   translator for any of the attorneys?
2      A.  No.
3      Q.  Is there any -- does the central office
4   have any policy or guideline as to how much your
5   office can spend on these resources?
6      A.  To my knowledge, no.
7      Q.  Okay.
8      A.  I know there's a number in our office
9   budget, but I don't think that number is ever
10  actually ever used for depositions and experts. I
11  think it's something like ten or $20,000, but it's
12  always exceeded.
13     Q.  So what about pretrial investigations,
14  do your -- I assume your attorneys engage in
15  pretrial investigations?
16     A.  Yes.
17     Q.  Do you -- in your opinion, do you think
18  they're spending enough time conducting pretrial
19  investigations?
20     A.  I would say that they're not because
21  attorneys have mentioned to me that they're not.
22     Q.  And what is the reason for being unable
23  to do so?
24     A.  Caseload numbers.
25     Q.  Would you say that's true specifically

## Page 70

1   for interviewing witnesses?
2      A.  Yes.
3      Q.  How about visiting the crime scene?
4      A.  Yes.
5      Q.  How about investigating the police
6   conduct?
7      A.  Yes.
8      Q.  Can you think of a situation where --
9   and you don't have to disclose or compromise any
10  attorney-client privilege, but a time where either
11  your representation or that of the attorneys in your
12  office was hampered by the inability to investigate
13  a case sufficiently?
14     MR. MOORE:  Just object to the form of
15  the question.  It's vague.  Subject to that, you can
16  respond.
17     A.  Yes.
18     Q.  (By Ms. Rosca)  Could you provide the
19  details of that instance?
20     A.  This is an instance that's currently
21  being litigated in a PCR hearing, and it was
22  litigated on appeal, so I don't think it affects
23  much confidentiality.  There was a lawyer in our
24  office that was in this period of 2014 where they
25  were -- the caseload was 200 cases.

## Page 71

1      It was an assault trial where he was
2   unable to investigate witnesses that the client had
3  asked him to investigate that the client said would
4  be witnesses in his favor that he did not commit the
5  assault.
6      Q.  Is that an atypical case or does that
7  typically happen for other attorneys in your office
8  since 2014?
9      A.  I'm sure it happens.
10     Q.  And why do you say you're sure it
11  happens?  What's your basis for that conclusion?
12     A.  Two reasons.  The attorneys in my
13  office are saying that people are pleading guilty
14  because they've been in jail and they're waiting too
15  long.  And the attorneys are concerned that people
16  are pleading guilty to get out of jail, not because
17  they're actually guilty, and are unable -- and the
18  attorneys are unable to work on those cases.
19      So attorneys have reported that problem
20  to me.  And then we will get complaint calls and
21  complaint letters from clients and it goes to the
22  diligence problem of these things have not been done
23  on my case, these witnesses have not been contacted.
24     Q.  Okay.  Can we talk about motions for a
25  moment?  Just particularly discovery motions.

## Page 72

1   Attorneys in your office file discovery motions I
2  assume?
3      A.  Yes.
4      Q.  Have you -- has any attorney in your
5  office provided concern about not having enough time
6  to prepare for these discovery motions?
7      A.  Discovery motions in Missouri are pro
8  forma, meaning they're filed.  It's based upon a
9  Supreme Court rule.
10     Q.  Uh-huh.
11     A.  So there's really not much time
12  involved in filing the motion where the -- the time
13  in discovery takes place is making sure that the
14  prosecutor has disclosed everything that's
15  discoverable.
16     Q.  And how has the trend been with
17  requesting discovery from the prosecutor's office in
18  your district?  Has it been difficult to get the
19  discovery in a timely manner?
20     A.  Generally not.  There are some
21  prosecutors that are more difficult to get
22  discovery from than others.
23     Q.  Are the requests for the discovery from
24  the prosecutor's office made at a later point in the
25  case by your attorneys?

ALARIS LITIGATION SERVICES
www.alaris.us      Phone: 1.800.280.3376      Fax: 314.644.1334

## Page 73

1    A.  They're made in associate court.
2    Q.  Okay.
3    A.  When we had her on the case.
4    Q.  So early on?
5    A.  Yes.
6    Q.  What about reviewing the discovery that
7  you receive from the prosecutor's office, has
8  attorneys in your office expressed concern that
9  they've been unable to fully and sufficiently review
10  the discovery they receive?
11    A.  Yes.
12    Q.  Do you have any examples of that
13  happening?
14    A.  Last month an attorney when we were
15  discussing caseload numbers and how to approach the
16  courts and reach a resolution for the Hinkebein
17  problem mentioned that she was worried that she had
18  plead clients to cases where she had not adequately
19  reviewed the discovery, but the client just wanted
20  to get out of jail and plead guilty.
21    Q.  When you do the evaluations of the
22  attorneys in your office, is that something that you
23  consider?  Is that -- whether or not they're
24  reviewing discovery and in a timely manner?
25    A.  That is not one of the -- the factors

## Page 74

1  because I think that's very hard to measure unless
2  you interview the lawyer.
3    Q.  Do attorneys in your district regularly
4  seek continuances?
5    A.  Yes.
6    Q.  And what do you think the reason for
7  regularly seeking it is?
8    A.  The case is not ready for disposition.
9    Q.  And what typically are the reasons that
10  it would not be ready for disposition?
11    A.  More investigation for mitigation
12  before a plea.  More trial preparation if it's a
13  case headed to trial.
14    Q.  You've been mentioning the Hinkebein
15  decision through your testimony today, so I'd like
16  to sort of turn to that.  The first question before
17  getting there is you said that there hasn't been an
18  instance where an attorney has refused an
19  assignment; is that correct?
20    A.  Correct.
21    Q.  Okay.  And by that logic your office
22  hasn't refused assignments?
23    A.  Correct.
24    Q.  Okay.  How has the Hinkebein decision
25  impacted the attorneys in your district with respect

## Page 75

1  to caseload concerns?
2    MR. MOORE:  Just object to the form of
3  the question.  Calls for speculation.  It's also
4  vague.  Subject to that, you can respond.
5    A.  They are concerned -- previous to the
6  Hinkebein they were concerned about the caseload and
7  their ability to ethically represent clients.  Post
8  decision they're concerned that they on top of not
9  being able to do a good job for their clients, that
10  their law license may be jeopardized for something
11  beyond their control.
12    Q.  (By Ms. Rosca)  And knowing these
13  concerns has -- has your office taken any formal
14  action in response to the Hinkebein decision?
15    A.  Our office sent a conditional letter to
16  the judges saying that pretty much at any moment we
17  could start that process, but before starting that
18  process we wanted to engage in constructive dialogue
19  with the courts for solutions.
20    And so for the past two months we have
21  been meeting with the judges regularly to try to
22  reach a resolution.  So we -- that's how we
23  approached it.
24    Q.  When you say you're meeting with the
25  judges regularly, what are -- what's being discussed

## Page 76

1  at these meetings?
2    A.  Wait lists, private appointments to the
3  St. Louis County Bar.  Judges rethinking how they do
4  probation violations.
5    Q.  Can we start with wait lists?  Is there
6  currently a wait list in your district?
7    A.  No.
8    Q.  And so what would be the proposal with
9  respect to the wait list?
10    A.  What is being considered is a wait list
11  would be generated of clients who were released and
12  then a number of what is an appropriate, reasonable
13  amount of cases would be assigned per attorney, and
14  unless the -- unless the attorney was below that
15  number everybody on bond would be on a wait list.
16    Q.  So those who are confined or in jail
17  would not be on the wait list, they would still get
18  a public defender?
19    A.  That's what's being contemplated right
20  now.
21    Q.  Okay.  You said private appointments.
22  Can you explain a little bit about what that
23  proposal is considering?
24    A.  In order to get our numbers where each
25  lawyer would be under a hundred cases -- and we're

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

Case 2:17-cv-04057-NKL   Document 160-26   Filed 02/21/18   Page 20 of 100

## Page 77

1  just using that number as an arbitrary number right
2  now.  We would have to shed 700 cases -- 500 to a
3  thousand cases.  That can only be achieved through
4  private appointments.
5      Also, there's a concern if a wait list
6  is generated that speedy trial rights would be
7  violated from the defendants.  So the court is
8  thinking of private appointments.  How to appoint
9  that number of cases is exceedingly difficult and
10  it's expected that the private bar will be
11  resistant.
12      Q.  Now, these private appointments, would
13  they be mandatory I would assume?
14      A.  To be decided.
15      MS. ROSCA:  I'm going to introduce an
16  exhibit.  Are we on 39?  The court reporter is going
17  to mark this document as Exhibit 39, or Reynolds
18  Exhibit 39.  And the Bates number for this document
19  is MSPD0039427.
20      (WHEREIN, Exhibit 39, 10-12-17 Reynolds
21  message to Judges Beach and Burton, was marked for
22  identification by the Court Reporter.)
23      MS. ROSCA:  Could you review the
24  document and let me know when you finish reviewing
25  it?  I'm going to introduce Exhibit 40 as well in

## Page 78

1  conjunction.
2      (WHEREIN, Exhibit 40, 10-12-17 Reynolds
3  letter to Judges Beach and Burton, was marked for
4  identification by the Court Reporter.)
5      Q.  (By Ms. Rosca)  But just first the big
6  -- Reynolds Exhibit 39, have you seen this document
7  before?
8      A.  Yes.
9      Q.  How have you seen this document before?
10      A.  I created it.
11      Q.  And what is it?
12      A.  It's an e-mail that I sent to Judge
13  Beach and Judge Burton.
14      Q.  And when did you send it?
15      A.  October 12th, 2017.
16      Q.  And what is the substance of the
17  e-mail?
18      A.  It's a request to meet with them to
19  talk about our caseload and the Hinkebein decision.
20      Q.  And if you look at the first sentence
21  of the e-mail, it says that I met with -- or I met
22  informally with Judge Burton this week; is that
23  correct?
24      A.  Correct.
25      Q.  And what did you discuss with Judge

## Page 79

1  Burton?
2      A.  Our caseload and the Hinkebein
3  decision.
4      Q.  What about your caseload?
5      A.  That it was ethically unmanageable due
6  to its size.
7      Q.  And what was his response?
8      A.  He agreed.
9      Q.  Is that all that he said?
10      A.  He believes that the Hinkebein decision
11  should be taken seriously and he wanted -- he was
12  reaching out to us to meet and try to come up with
13  solutions.
14      Q.  So he reached out to you?
15      A.  Yes.  At the same time that I was going
16  to reach out to the judges.  I had heard that he
17  wanted to reach out to us.
18      Q.  And how did you hear that he wanted to
19  reach out to you?
20      A.  I forget.
21      Q.  Okay.  It says in the e-mail that -- so
22  this e-mail also has Judge Beach copied on to it; is
23  that correct?
24      A.  Correct.
25      Q.  And it says (quote as read):

## Page 80

1          I have attached a formal letter
2          outlining our ethical dilemma in the
3          wake of in re Hinkebein.
4          Can you describe what the ethical
5  dilemma is?
6      A.  It's outlined in the letter.
7      Q.  Okay.  So if you turn to Reynolds
8  Exhibit 40, is this the letter that was attached to
9  this e-mail?
10      A.  Correct.
11      Q.  And just for the record, this is
12  MSPD0039433.  Did you write this letter?
13      A.  I did.
14      Q.  And what is the substance of this
15  letter?
16      MR. MOORE:  Just object -- also object.
17  I mean, it calls for a narrative and I think the
18  document speaks for itself, but subject to that you
19  can continue.
20      Q.  (By Ms. Rosca)  What is this letter
21  about?
22      A.  The caseload numbers in our office and
23  the ethical obligations under in re Hinkebein.
24      Q.  If you see the first paragraph of your
25  letter, it says (quote as read):

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

1       Hinkebein's discipline occurred within
2       the context of a high caseload beyond
3       his control, a reality familiar to all
4       Missouri public defenders.
5       Is this reality also true for your
6  office?
7       A.  Yes.
8       Q.  Then you write in the next line that
9  (quote as read):
10      I am writing to you today about the
11      caseload problems in our office and --
12      and the ethical dilemma we currently
13      face with regard to our current and
14      future clients.
15      Could you explain what you meant by
16  that sentence?
17      A.  Our lawyers want to provide ethical
18  representation to all of the clients.  Because of
19  the caseload numbers, that's impossible to do.  And
20  there's no way for our office to control the
21  caseload numbers.
22      Q.  And did you reach that conclusion
23  because you've spoken to the attorneys in your
24  office about this?
25      A.  Yes, and just the number of cases

1  coming into the office.
2       Q.  You also write that in the middle the
3  second paragraph it says (quote or read):
4       I'm asking you to collaborate with us
5       in solving not only the problem of high
6       public defender caseloads but also the
7       quality of justice in Missouri.
8       What do you mean by the quality of
9  justice in Missouri?
10      A.  Because public defenders handle like --
11  something like 80 percent of all criminal cases and
12  do not have enough time to work on the cases I think
13  that calls -- calls into question the quality of
14  justice across the state.
15      Q.  And then in the footnote on the bottom,
16  footnote one, you cite to Missouri rules, ethic
17  rules.  Do you see that?
18      A.  Yes.
19      Q.  Can you -- what is your understanding
20  of the rules that you're citing here?  What do they
21  require?
22      A.  That an attorney be attentive to what
23  issues the case presents and follow up on those
24  issues as a reasonable lawyer would do.
25      Q.  In your opinion based on how you

1  evaluate the attorneys in your office, do you
2  believe the attorneys in your office are meeting
3  those standards?
4       A.  Not in every case.
5       Q.  And is that because of the high
6  caseload issue for your office?
7       A.  Yes.
8       Q.  And footnote three you say that (quote
9  as read):
10      Managers also have a duty to make sure
11      that no attorney under their
12      supervision violates the rules,
13      Missouri Supreme Court Rule 4-5.1(c).
14      Do you see that?
15      A.  Yes.
16      Q.  In your opinion, do you think this rule
17  applies to you as the district defender?
18      A.  Yes.
19      Q.  And what have you been doing to ensure
20  that the attorneys in your office don't violate the
21  ethics rules?
22      A.  Since Hinkebein I've been working with
23  the judges to try to come up with a solution for
24  caseload relief.
25      Q.  Does that include just the

1  conversations with the judiciary?
2       A.  To date that's largely been what we are
3  doing.
4       Q.  And what are your plans if that is
5  unsuccessful?
6       A.  That is still to be decided.  The
7  problem is if this is not successful then we end up
8  in litigation.  Litigation is -- I don't know if
9  that would be any more successful.
10      Q.  Litigation in terms of --
11      A.  The procedure under Chapter 600.
12      Q.  Okay.  In the second page of your
13  letter you said that (quote as read):
14      Many attorneys in my office carry a
15      caseload of 100 to 175 pending
16      felonies.
17      Is that an accurate statement?
18      A.  Yes.  That is based off of the live
19  caseload at the time I created this letter.
20      Q.  Has it increased since you've created
21  this letter?
22      A.  It has slightly decreased.
23      Q.  What is the reason for the decrease do
24  you think?
25      A.  I do not know.

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-26   Filed 02/21/18   Page 22 of 100

## Page 85

1    Q.   You say that at the end of the sentence
2  that (quote as read):
3            Within this caseload most attorneys
4            have two to five murders, five to ten
5            sex offenses, and five to 20 violent
6            felonies.  By any standard this is an
7            ethically unmanageable caseload.
8            Do you see that statement?
9    A.   Yes.
10   Q.   What do you mean by ethically
11  unmanageable caseload?
12   A.   I think and I believe that whenever
13  that amount of serious violent felonies are
14  concentrated in one lawyer, even the most
15  experienced practitioner, whether they be public
16  defender or in private practice, would struggle and
17  not be able to achieve ethical representation.
18   Q.   And then the paragraph after that you
19  say (quote as read):
20            All public defenders in St. Louis
21            County are one phone call or one letter
22            away from a complaint to the
23            disciplinary counsel, an investigation
24            and a finding that clients were not
25            communicated with for months and cases

## Page 86

1            were left untouched for the same period
2            or longer.
3            Do you see that?
4    A.   Yes.
5    Q.   Do you still believe that this
6  statement is accurate?
7    A.   It is accurate today.
8    Q.   What do you mean by they're one phone
9  call or one letter away from a complaint to the
10  disciplinary counsel?
11   A.   There are many clients in our office
12  represented by lawyers who have not been seen in
13  months and their cases have not been worked on in
14  months.  I receive those complaint calls.  The
15  Woodrail office receives those complaint calls.
16       We receive letters.  If the letter was
17  directed to disciplinary counsel, the -- the lack of
18  diligence would still be there and we would be
19  dealing with a disciplinary counsel rather than an
20  internal complaint.
21   Q.   When you receive these complaints from
22  your clients, what do you -- do you have a
23  conversation with the attorneys being complained of?
24   A.   Yes.
25   Q.   And what is the response from the

## Page 87

1  attorneys?
2    A.   They do their best to resolve the
3  problem.
4    Q.   And what is the difficulty in not being
5  able to see their clients according to them?
6    A.   The number of cases, the speed of the
7  cases, the number of court appearances required.
8    Q.   You said that an investigation in
9  finding the clients were not communicated with for
10  months.  Is that true that clients would not be
11  communicated with for months?
12   A.   That is true for clients represented in
13  our office.
14   Q.   Does that include clients that are
15  detained?
16   A.   Yes.
17   Q.   Are you aware of the -- the longest
18  amount of time a client has been detained and has
19  not communicated with their attorney, what length of
20  period of time is the longest?
21   A.   May I break that question into two?
22   Q.   Absolutely.  It's a compound question
23  anyway.
24   A.   There have been clients who have not
25  been communicated with counsel in nine months to a

## Page 88

1  year in my office.
2    Q.   Are those clients detained or confined?
3    A.   Detained.
4    Q.   Okay.  And then what about for others
5  who are released?
6    A.   Most clients who are released, they are
7  part of the C, D's, and E's that move very quickly
8  within -- disposed of within a hundred days or less.
9  I'm sure that occurs, but we don't get complaints
10  from those clients.
11   Q.   Yes.  Understandably.
12   A.   So I don't know the numbers.
13   Q.   So the one that's -- the clients that
14  are detained or confined for you said nine months at
15  least and not receiving client contact, what is
16  happening to their cases?  Are attorneys still -- go
17  ahead.
18   A.   One of two things.  They tend to be the
19  more serious cases where the trial -- because of the
20  St. Louis County dockets are very busy, trial may
21  have been set a year to 18 months out, and then the
22  client became neglected.
23       It could be it's still a serious case
24  and it's popping up on the docket every 30 to
25  60 days and the attorney because they're overloaded

22 (Pages 85 to 88)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-26   Filed 02/21/18   Page 23 of 100

## Page 89

1  is substituting talking to the client in court
2  rather than visiting the client.
3      Q.  So for example, a client has been
4  detained for nine months, there's -- there's a court
5  appearance set and the attorney has not spoken to
6  that client for those nine months and speaks to that
7  client for the first time at that court appearance?
8      A.  What would be more likely is that the
9  -- the case has been continued three times within a
10  nine-month period, but the only client contact has
11  been between the attorney and the client when the
12  client is appearing for those court dates in court.
13  There hasn't been a confidential visit and along
14  with the confidential visit there hasn't been work
15  done on the case.
16      Q.  How has that impacted the relationship
17  with those clients?
18      A.  The attorney-client relationship is
19  highly damaged and it takes a lot of effort to
20  repair it.
21      Q.  And when you say that the attorney is
22  not working on that -- on the case, why would they
23  not be working on the case?
24      A.  They have too many cases.
25          MR. MOORE:  I'll also object, note my

## Page 90

1  objection because it calls for speculation.  But
2  your answer is on the record, so --
3      Q.  (By Ms. Rosca)  Just finally on this
4  letter you also say -- you also say that this
5  problem has been in existence for years.  Is that
6  correct?
7      A.  Yes.
8      Q.  How -- how long would you say this has
9  been going on?
10      A.  When I came back to the public defender
11  in 2007 caseload numbers were a priority for
12  management in all offices.
13      Q.  And you also say in this letter that
14  (quote as read):
15          At some point in the near future at the
16          request of an attorney under the
17          ethical rules I will stop assigning
18          cases to that attorney until their
19          caseload issue is resolved.
20          Do you see that?
21      A.  Yes.
22      Q.  Is that an option you're willing to
23  take if it comes to that situation?
24      A.  That is what the whole office is going
25  to do at some point if a resolution is not worked

## Page 91

1  out with the court.
2      Q.  And if you stop assigning cases, what
3  will happen to those potential clients?
4      A.  This letter was written before the most
5  recent decision in the Hinkebein matter.  So it has
6  to be read in that context.
7      Q.  Can you give some -- can you explain
8  what you mean by the most recent decision in the
9  Hinkebein matter?
10      A.  I don't know the case style, but early
11  on the public defender was under the assumption that
12  because of the ethical rule we could stop assigning
13  cases without going through the procedure in Chapter
14  600.
15      Q.  Uh-huh.
16      A.  Shortly after this letter was written
17  there was an appellate decision saying the public
18  defender cannot stop assigning cases based upon the
19  ethical rules.  They have to go through the Chapter
20  600 procedure.  So this letter was written before
21  that appellate decision.
22      Q.  Got it.  These two -- this e-mail --
23  the e-mail and the letter, what has been the
24  communication with the judiciary since you sent this
25  letter?

## Page 92

1      A.  Judiciary has set up a subcommittee
2  chaired by Judge Kerr, co-chaired by Judge Ribaudo,
3  and I have met with both of them five or six times.
4  There's also been meetings with the larger
5  stakeholders in St. Louis County.  There's been two
6  of those meetings.  And --
7      Q.  What do you mean -- I'm sorry.  What do
8  you mean by the larger stakeholders?
9      A.  Probation and parole, prosecutors
10  office, clerks office, St. Louis County jail.
11      Q.  Okay.  Does the subcommittee have a
12  goal as to when this would be resolved?
13      A.  I've told the subcommittee that we need
14  an answer sooner rather than later, and early on
15  said I'd like an answer in January.  Because
16  St. Louis County is seriously considering private
17  appointments that would be ongoing for potentially
18  years, that may -- process to figure out how to do
19  that may take longer than January.
20      Q.  Is there any incentive for the
21  judiciary or the stakeholders to promptly resolve
22  this issue?
23      A.  The stakeholders -- the judiciary that
24  I've spoken to takes Hinkebein very seriously and
25  wants to resolve it as quickly as possible.  Their

23 (Pages 89 to 92)

ALARIS LITIGATION SERVICES
www.alaris.us        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-26   Filed 02/21/18   Page 24 of 100

## Page 93

1    timeline perhaps differs than our timeline.
2        Q.  Are you aware of how other judiciaries
3    or other districts are reacting to Hinkebein?
4        A.  Yes.
5        Q.  Have they had the same response as the
6    judiciary in your district?
7        A.  No.
8        Q.  Can you explain the difference?
9        A.  My understanding is Kansas City, which
10   is similarly situated, has been actively hostile.
11   So the fact that we can actually talk to judges
12   about solutions I think at this point is productive
13   even though the remedy may not be forthcoming within
14   60 days.
15       Q.  So is the solution to the caseload
16   problem in your office dependent on whether the
17   judiciary wants to cooperate or be hostile to the
18   district defenders office?
19       A.  I believe it is because I think the
20   alternative to go into litigation is not going to
21   solve any problems.
22       MS. ROSCA:  We've been going for
23   another hour.  Would you like to take another
24   five-minute break?
25       THE WITNESS:  Sure.

## Page 94

1        MS. ROSCA:  Okay.  Off the record.
2        VIDEOGRAPHER:  The time is 3:48.  We
3    are off the record.
4        (WHEREIN, a recess was taken.)
5        VIDEOGRAPHER:  The time is 3:53.  We
6    are back on the record.
7        MS. ROSCA:  Mr. Reynolds, I'm going to
8    have the court reporter mark this document
9    Exhibit 41.
10       (WHEREIN, Exhibit 41, 10-14-17 Reynolds
11   letter to Barrett, was marked for identification by
12   the Court Reporter.)
13       Q.  (By Ms. Rosca)  Would you please review
14   the document and let me know when you're finished?
15       A.  I reviewed it.
16       Q.  Have you seen this document before?
17       A.  Yes.
18       Q.  What is this document?
19       A.  It's a letter I wrote to Michael
20   Barrett.
21       Q.  And just for the record, the Bates
22   stamp on this is MSPD0039435.  When did you write
23   this letter?
24       A.  October 14th.
25       Q.  What was the purpose of writing this

## Page 95

1    letter to Mr. Barrett?
2        A.  To inform him that under the ethical
3    rules in the in re Hinkebein case that caseloads in
4    our office were unethically high.
5        Q.  You write (quote as read):
6            That caseloads for nearly all attorneys
7            violate ethical standards.
8            Do you see that?
9        A.  Yes.
10       Q.  Do you agree with that statement?
11       A.  Yes.
12       Q.  And what is the basis for that
13   statement?
14       A.  The caseload numbers and the
15   seriousness of the cases in our office.
16       Q.  In your -- in the second paragraph of
17   the letter you say that you're requesting additional
18   staff, about five to ten additional attorneys, for
19   individual cases.  Do you see that?
20       A.  Yes.
21       Q.  Is that statement still accurate?
22       A.  Yes.
23       Q.  Why do you think your office needs an
24   additional five to ten attorneys?
25       A.  I think that would give a live caseload

## Page 96

1    per attorney of somewhere between 50 and 70 cases.
2        Q.  You say in your letter that you've
3    initiated dialogue with the St. Louis County
4    judiciary.  Do you see that?
5        A.  Yes.
6        Q.  Is the dialogue that you're referring
7    to in this letter the same as we've been discussing
8    in the prior exhibits?
9        A.  Yes.
10       Q.  You ask that -- you're requesting that
11   Mr. Barrett be available to assist in these
12   discussions if called upon.  Do you see that?
13       A.  Yes.
14       Q.  Has Mr. Barrett been involved in -- in
15   the discussions with regards to caseload issues?
16       A.  Yes.
17       Q.  And how has he been involved?
18       A.  He appeared at one meeting with the
19   St. Louis County judiciary, and he has spoken with
20   Judge Kerr.
21       Q.  Did he participate in the meeting?
22       A.  Yes.
23       Q.  And what -- what did he say at the
24   meeting?
25       A.  That he would like to work with

24 (Pages 93 to 96)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 160-26    Filed 02/21/18    Page 25 of 100

Page 97

1  St. Louis County and he would like St. Louis County
2  to come up with solutions to this problem with the
3  public defender.
4       Q.  Did he express -- strike that.
5       The last part of the paragraph you said
6  that you alerted the Office of Disciplinary Counsel
7  that the ethical problems within my office are
8  systemic.  Do you see that?
9       A.  Yes.
10      Q.  What do you mean by systemic?
11      A.  That they're systemic, meaning that the
12  number of cases that come in to our office exceed
13  what our office can handle and it's not due -- those
14  numbers aren't due to anything that the attorneys
15  are doing.
16      Q.  In your opinion, do you think the
17  attorneys are doing all they can to sufficiently
18  work on their cases?
19      MR. MOORE:  Just object to the form of
20  the question as vague.  Subject to that, you can
21  respond.
22      A.  The attorneys are doing the best they
23  can under the circumstances.
24      MS. ROSCA:  I'm going to have the court
25  reporter mark Exhibit 42.

Page 98

1       (WHEREIN, Exhibit 42, 10-14-17 Reynolds
2  letter to Pratzel, was marked for identification by
3  the Court Reporter.)
4       Q.  (By Ms. Rosca)  Can you please review
5  that document and let me know when you finished
6  reviewing it?
7       A.  I've reviewed it.
8       Q.  Have you seen this document before?
9       A.  Yes.
10      Q.  Did you prepare this letter?
11      A.  I did.
12      Q.  What is this document?
13      A.  It's a letter to the chief disciplinary
14  counsel.
15      Q.  In Exhibit 41, which you also still
16  have in front of you, you mention that you alerted
17  the disciplinary counsel.  Do you see that?
18      A.  Yes.
19      Q.  Is this the letter that was referenced
20  in the letter to Mr. Barrett?
21      A.  Yes.
22      Q.  And what -- what was the purpose of
23  writing this letter to the disciplinary counsel?
24      A.  Alerting him that the lawyers in our
25  office have caseloads that are ethically

Page 99

1  unmanageable.
2       Q.  Are the same issues that you raise in
3  your letter to Mr. Barrett the same as the issues
4  you are raising in this letter to Mr. Pratzel?
5       A.  Yes.
6       Q.  You also mention in this letter to
7  Mr. Pratzel that you've notified your supervisor
8  Michael Barrett in order to resolve this problem.
9  Do you see that?
10      A.  Yes.
11      Q.  And is the letter from Exhibit 41 the
12  letter that you're referencing in this letter to
13  Mr. Pratzel?
14      A.  Yes.
15      Q.  You say at the end that (quote as
16  read):
17      Since public defender caseloads in my
18      office and throughout --
19      (Court reporter interruption.)
20      Q.  (By Ms. Rosca)  (Quote as read):
21      Since public defender caseloads in my
22      office and throughout the state have
23      been repeat -- repeatedly verified to
24      exceed ethical bounds.
25      Do you see that?

Page 100

1       A.  Yes.
2       Q.  How have they been verified?
3       A.  I think going back ten years -- I
4  forget the names of all the studies, but there's
5  been several studies by outside agencies.  There's
6  been the RubinBrown standards and the exhibits that
7  you've been referencing.  There's just been numerous
8  instances of metrics and outside studies that have
9  commented and said that the caseloads are too high.
10      Q.  And these studies and metrics, what
11  are -- what is the data that is provided to these
12  studies and metrics to come up with this conclusion?
13      A.  My understanding, that its been
14  internal public defender statistics.  One of these
15  studies or two of these studies if I'm recalling
16  correctly, it's been almost ten years ago, have
17  visited at offices, observed and interviewed public
18  defenders.
19      Q.  Do you recall during the time you were
20  either a district defender or working for the public
21  defenders office these study -- or the people
22  conducting the studies visiting your office?
23      A.  Certainly when I was assistant district
24  defender in the city of St. Louis.
25      Q.  What about in St. Louis County?

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-26   Filed 02/21/18   Page 26 of 100

## Page 101

1    A.  I don't know if there was an outside
2   agency that visited us.  I can't recall.
3    Q.  You might have told me this, but do you
4   input any statistics into a database for your
5   internal office with respect to caseload?
6    A.  The computer generates the information.
7    Q.  Can you explain how it generates the
8   information?  Does the attorneys put in their amount
9   of cases they have manually or --
10    A.  It's programmed through Columbia to
11   collect the information based upon whatever is
12   entered into the computer.
13    Q.  Into Lotus?
14    A.  Yes.
15    Q.  Okay.  Do you ever review the
16   statistics entered into the computer just to see how
17   the attorneys in your office are doing with respect
18   to caseload?
19    A.  Occasionally.
20    Q.  And have you reviewed it recently?
21    A.  Yes.
22    Q.  And what conclusions have you drawn
23   from reviewing the -- the statistics from those
24   spreadsheets I assume?
25    A.  The most useful metric is the live

## Page 102

1   caseload, what each lawyer is handling at the moment
2   you look at the screen.  So that would be what I've
3   referred to attorneys in our office are handling a
4   hundred to 200 cases, that's -- that's the most
5   useful metric for day-to-day management of the
6   office.
7    Q.  And you testified previously that's a
8   hundred to 200 felony cases, correct?
9    A.  Correct.
10    Q.  Okay.  Have you had any further
11   conversations with Mr. Barrett regarding the issues
12   you raised in your letter to him?
13    A.  I've spoken to Mr. Barrett four or five
14   times since that letter.
15    Q.  And what has your discussions been
16   about?
17    A.  Updating him on what has been happening
18   with my discussions with the St. Louis County
19   judiciary.
20    Q.  And what has been his response?
21    A.  He wants a solution, as do I, sooner
22   rather than later, but at the same time appreciates
23   that the St. Louis County judiciary is talking about
24   this issue and talking about actual solutions to the
25   problem.

## Page 103

1    Q.  With respect to Exhibit 42, the one
2   with Mr. Pratzel; is that right?
3    A.  Yes.
4    Q.  Had you -- did you have a response from
5   Mr. Pratzel after sending this letter?
6    A.  No.
7    Q.  Did you have a response from anyone at
8   the chief disciplinary counsel with respect to the
9   caseload issue post-Hinkebein?
10    A.  No.
11    Q.  I take it then that the chief
12   disciplinary counsel's office is not part of the
13   discussions you're having with the judiciary and the
14   stakehold -- stakeholders in your district?
15    A.  Correct.
16    MS. ROSCA:  I'm going to hand the court
17   reporter another document, and I'm going to ask that
18   he mark it Reynolds Exhibit 43.
19    (WHEREIN, Exhibit 43, 10-25-17 Reynolds
20   message to various, was marked for identification by
21   the Court Reporter.)
22    Q.  (By Ms. Rosca)  Could you please review
23   document and let me know when you're finished
24   reviewing it?
25    A.  Yes.

## Page 104

1    Q.  Have you seen this before?
2    A.  Yes.
3    Q.  What is it?
4    A.  It's an e-mail that I sent to judges
5   who were part of this committee to address public
6   defender caseload issues.
7    Q.  Did you prepare this e-mail?
8    A.  I did.
9    Q.  Do you see the date on this e-mail?
10    A.  Yes.
11    Q.  What's the date?
12    A.  October 25th, 2017.
13    Q.  And for the record, this is Bates
14   number MSPD0039430.  You said that this was in
15   regards to the committee that you testified about
16   earlier?
17    A.  Yes.
18    Q.  It says here that Mary Fox, the
19   district defender of the city of St. Louis, has
20   reported that this measure significantly decreased
21   her office caseload numbers.  Are you -- are you
22   familiar with Ms. Fox?
23    A.  Yes.
24    Q.  And how do you know her?
25    A.  She's the district defender in the city

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-26   Filed 02/21/18   Page 27 of 100

## Page 105

1   of St. Louis.
2        Q.  It appears from this e-mail that you
3   are using some approaches she's used in her office
4   as suggestions for your committee; is that correct?
5        A.  Yes.
6        Q.  And why -- why are you using -- what
7   are the approaches in this -- in Mrs. Fox's district
8   that you think would be helpful for your district?
9        A.  The city of St. Louis several years
10  ago, I don't know exactly when, adopted a screening
11  tool for when public defenders would be required in
12  probation cases, and it's my understanding that that
13  screening tool, which is implemented by the judges,
14  reduced the number of probation cases that her
15  office handles.
16  (Exhibit 32, Previously marked exhibit.)
17        Q.  (By Ms. Rosca)  I'm going to present to
18  you Exhibit Fox -- Exhibit 32, Fox Exhibit 32.  This
19  is the same from the prior.  Is that the screening
20  tool that you're referring to?
21        A.  That is the order resulting from the
22  screening tool, yes.
23        Q.  And why do you think that this would be
24  helpful for your district?
25        A.  It would be helpful based upon the

## Page 106

1   experience in the city of St. Louis that this order
2   based upon the screening tool reduce the number of
3   probation cases that the city of St. Louis handled.
4        Q.  Currently how are probation cases
5   handled in your district?
6        A.  If the person qualifies for indigency
7   we open a probation case.
8        Q.  Is there a determination as to due
9   process?
10        A.  No.
11        Q.  So do attorneys in your office have to
12  appear for probation cases every time there's a
13  probation revocation hearing?
14        A.  If the client qualifies for services,
15  yes.
16        Q.  For indigency determinations?
17        A.  Correct.
18        Q.  Then there's no subsequent
19  determination like this order discusses?
20        A.  At this time, no.
21        Q.  And how has -- has there been a
22  response from the judiciary in your subcommittee
23  meetings about this screening tool?
24        A.  Yes.
25        Q.  And what has the response been?

## Page 107

1        A.  The judges are considering implementing
2   this tool along with other reforms of how probation
3   hearings are handled.
4        Q.  Can you go through this e-mail that you
5   sent regarding this subcommittee meeting, could you
6   just explain what the expanded pretrial release
7   proposal would be?
8        A.  Right now the St. Louis County jail has
9   a very small pretrial release program, and that
10  program involves a pretrial release officer
11  supervising a defendant when they're released from
12  custody with various conditions of -- of the
13  release, but no money is required.
14        So if more clients were released from
15  custody without public defender involvement, there's
16  the possibility that clients would be able to be
17  reengaged with work and able to hire private
18  counsel.
19        Q.  What was the response to this proposal
20  by the judiciary?
21        A.  I believe that coincident with the
22  Hinkebein issue and the public defender crisis the
23  St. Louis County judiciary was in the process of
24  forming a committee to reevaluate bond and release.
25  These instances happened to coincide.

## Page 108

1        Q.  Right now is there a bond schedule for
2   your district?
3        A.  There is.
4        Q.  The second proposal that you discuss in
5   this e-mail is the wait list.  Is this the same wait
6   list you were testifying about earlier?
7        A.  That -- the second paragraph under
8   pending cases that begins one of the measures --
9        Q.  Uh-huh.
10        A.  -- that is technically not a wait list.
11        Q.  What -- what is it then?
12        A.  The city of St. Louis public defender
13  at some point in the past seven to eight years
14  stopped taking applications in associate circuit
15  court upon a client's first appearance.  And that
16  action reduced caseloads.
17        Q.  What do you mean that they stopped
18  taking applications?  What happens to those clients
19  that want or need counsel?
20        A.  Because I have not worked down there
21  when this policy was implemented, I don't have
22  direct knowledge.  My understanding is unlike the
23  county where we have legal assistants who will take
24  applications from clients at that first appearance
25  after they've been arrested, that does not happen in

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

1  the city, and that applications travel to their
2  office in a different manner.
3      And at some point during that process
4  more people are hiring private counsel than applying
5  to the public defender, and as a result caseloads
6  have dropped.  Now, how that actually works since
7  I'm not down there, I don't know beyond what I've
8  just described just from hearing the effects.
9      Q.  Who at the subcommittee meeting
10  proposed comparisons to the city of St. Louis
11  approaches that are now reflected in this e-mail?
12      A.  This e-mail was actually in response to
13  concrete ideas, just throw everything possible on
14  the table.  And it might have been Judge Beach when
15  I was meeting with him informally in the hallway
16  just saying throw out ideas beyond private
17  appointments.  Not that private appointment wasn't
18  being considered.
19      Q.  Uh-huh.
20      A.  So this is a laundry list of various
21  ideas, a brainstorming session.
22      Q.  You do mention in your e-mail that
23  given St. Louis's -- St. Louis County's fiscal need
24  to reduce the jail population, what worked in the
25  city may not necessarily work in St. Louis County.

1  What do you mean by that?
2      A.  If the public defender does not take
3  applications at that first appearance in associate
4  court, it is likely and probable that more clients
5  will remain confined.  If more clients remain
6  confined, the jail population increases.
7      In St. Louis County for the past ten
8  years there's been a huge concern of the jail
9  population and it exceeding somewhere around 1,200,
10  and that goes into overtime costs for jail
11  personnel, which impacts St. Louis County
12  financially quite significantly.
13      Q.  So the wait list then is being referred
14  to in this third paragraph, correct?  However, if
15  more defendants, that one.  In the alternative wait
16  list --
17      A.  Yes.
18      Q.  Okay.  Is there a difference between a
19  wait list and an appointment list?
20      A.  At this point in the discussions with
21  the court a -- a wait list was not a prominent
22  option being discussed.  So those terms are being
23  used rather loosely in this e-mail.
24      Since then the idea of a wait list
25  has -- because it's being contemplated in other

1  jurisdictions in Missouri and judges are talking to
2  one another, you know, this was almost two months
3  ago, that the idea of a wait list as it exists now
4  is perhaps different than what's trying to be
5  articulated in this e-mail.
6      Q.  Can you describe the proposal for the
7  wait list now?
8      A.  I think conceivably in this St. Louis
9  County and other jurisdictions there's talk about
10  people who were released out of custody being placed
11  on a wait list until the public defender office has
12  capacity to take them.
13      Q.  The e-mail also talks about the private
14  counsel appointment?
15      A.  Yes.
16      Q.  Can you explain what that proposal
17  would be?
18      A.  This e-mail in particular is not
19  talking about a large scale appointment process
20  across the bar.  What it is referencing at the
21  bottom of the page is there are cases in St. Louis
22  County where a client will have multiple cases and
23  will hire a private lawyer on one of those cases,
24  and the public defender will end up having to
25  represent the client on the other cases because the

1  person can't afford the private counsel for all the
2  cases.
3      Q.  You mentioned that following that same
4  thought onto the second page of the e-mail, quote
5  (quote as read):
6      We also mentioned encouraging private
7      counsel to resolve all pending matters
8      for a particular defendant.
9      Do you see that?
10      A.  That's -- that's just another way of
11  saying what I just mentioned.
12      Q.  Meaning they don't have the option of
13  giving it back to the public defenders office once
14  they are appointed the case.  Is that what that
15  means?
16      A.  What it means is a client will have
17  let's say three cases and will hire a private lawyer
18  on one of the three.  We would encourage the courts
19  to consider encouraging that private counsel to
20  resolve all three rather than just one out of three.
21      Q.  I see.  Okay.  Does the court or the
22  subcommittee discuss what the requirements would be
23  for the private counsel taking on criminal cases?
24      A.  It's a touchy matter because you're
25  interfering with the financial relationship between

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-26   Filed 02/21/18   Page 29 of 100

Page 113

1  private counsel and the client, so I don't know if
2  there's a resolution to this, but it's -- it's being
3  discussed.
4      Q. What do you mean by your interfering
5  with the financial relationship?
6      A. The -- the attorney is saying I've only
7  been paid for one case. You can't force me to work
8  on these other two cases for free.
9      Q. So the private counsel are actually
10 getting a fee for doing this?
11     A. Correct. This has nothing to do with
12 appointment.
13     Q. Okay. So this is not a pro bono?
14     A. No.
15     Q. Okay.
16     A. This is the marketplace.
17     Q. Okay. Has there been talk of having a
18 pro bono requirement for private counsel taking on
19 criminal cases?
20     A. Not that I know of.
21     Q. Just quickly on the wait list again,
22 the proposal for having a wait list, even if the
23 defendants would be released and then placed on a
24 wait list, theoretically if this plan goes through
25 what happens or how is their pretrial motions

Page 114

1  affected if they don't have representation?
2      A. There would be no pretrial motions
3  while they're on the wait list.
4      Q. Has this been a concern or topic that's
5  been discussed?
6      A. People are aware of that problem. I
7  suppose there's a tradeoff.
8      Q. Okay. And even if they're released
9  just again on the wait list, is there a talk of
10 certain types of cases that would go on the wait
11 list versus others?
12     A. Low-level felonies, largely simple
13 possessions and child support.
14     Q. Okay. Thank you. Has there ever been
15 a wait list in your district?
16     A. No.
17     MS. ROSCA: I'm going to have the court
18 reporter mark a document. Exhibit 44. Reynolds
19 Exhibit 44.
20     (WHEREIN, Exhibit 44, 10-31-17 e-mail
21 chain, was marked for identification by the Court
22 Reporter.)
23     Q. (By Ms. Rosca) Would you please review
24 the document and let me know when you've reviewed
25 it? I'm also going to introduce Reynolds Exhibit 45

Page 115

1  with that.
2      (Court reporter interruption.)
3      MS. SHIPMA: It's not privileged. This
4  was -- I asked him to send me this so I could
5  forward this.
6      MR. MOORE: Okay. I just wanted to
7  find out that before we started.
8      MS. SHIPMA: Thank you.
9      (WHEREIN, Exhibit 45, MSPD improved
10 case flow plan, was marked for identification by the
11 Court Reporter.)
12     Q. (By Ms. Rosca) Did you have a chance
13 to review Reynolds Exhibit 44?
14     A. Yes.
15     Q. Have you seen this document before?
16     A. I have.
17     Q. And what is this document?
18     A. This is another e-mail sent to the
19 judges who are on the committee for the public
20 defender issues, prosecutor representative, the
21 lawyer for the courts or the clerk of court, and
22 somebody from probation and parole.
23     Q. Do you see that this e-mail has an
24 attachment that says MSPD improved case flow plan?
25     A. Yes.

Page 116

1      Q. Could you take a look at Reynolds
2  Exhibit 45, which is over here, and tell me if that
3  is the exhibit being referenced in this e-mail?
4      A. Yes.
5      Q. Okay. Could you talk a little bit
6  about what this improved docketing proposal is?
7      A. At the same time Hinkebein appeared the
8  court was meeting with representatives from the
9  jail, probation and parole, and the prosecutor's
10 office about improvements to court processes.
11     And so as part of the conversations in
12 the beginning there was discussion about whether
13 improved docketing and court processes would help
14 the public defender caseload issue. So this e-mail
15 addresses those concerns and questions and has some
16 ideas.
17     Q. In your opinion, if these -- this
18 improved docketing proposal was in effect but your
19 attorneys are still assigned the same number of
20 cases they are and you have not increased the number
21 of attorneys in your office, would it have a
22 significant effect in reducing the caseload in your
23 office?
24     A. I don't think that it would affect the
25 caseload. It could affect -- it could create more

29 (Pages 113 to 116)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-26   Filed 02/21/18   Page 30 of 100

## Page 117

1  time for lawyers to address the caseload as it
2  exists now.
3      Q.  What do you mean that it could create
4  more time to address the caseload as it exists now?
5      A.  A scheduling in St. Louis County is
6  extremely difficult.  There are two associate
7  divisions and 13 circuit divisions that handle
8  criminal matters.
9          Vertical representation is
10 administratively better and ethically better for the
11 client.  But to achieve that our lawyers are in
12 court nearly every day of the week and sometimes
13 both mornings and afternoons.
14         If there was a coordinated scheduling
15 and docketing, that would reduce the amount of time
16 that our attorneys are in court and therefore they
17 could devote more time to client communication and
18 case preparation.
19     Q.  Based on your communications with the
20 judiciary and your circuit court, how likely is this
21 improved docketing system going to be put into
22 effect?
23     A.  It's not going to be put into effect.
24     Q.  And what is your basis for that
25 conclusion?

## Page 119

1  private counsel, there would be a financial issue
2  because they would be paid a fee; is that correct or
3  no?
4      A.  If I said that or implied that, it
5  would be incorrect.  I don't know if I said that.
6      Q.  Well, then let's start again.  What --
7  what is the proposed plan for appointments to
8  private counsel?  Is it the same as this e-mail?
9      A.  There is no concrete plan.  This is an
10 outline of a -- rough outline of a plan.
11     Q.  Okay.  Can we discuss -- can you
12 discuss what the plan would be?
13     A.  Now or in the e-mail?
14     Q.  What is the plan now?
15     A.  The judges are considering how to
16 approach the St. Louis County Bar and/or lawyers who
17 live in St. Louis County to talk about the need for
18 private appointments, and then what's under
19 consideration is appointing child support and drug
20 cases.
21     Q.  And just to be clear, the private
22 appointments would be pro bono on the part of the
23 counsel?
24     A.  Correct.
25     Q.  Is there currently a pro bono

## Page 118

1      A.  The judges have said so.
2      Q.  Okay.  So they've decided on this
3  already?
4      A.  Correct.
5      Q.  Okay.  What is the reason why they
6  don't want to put it into effect, did they say?
7      A.  I think there's -- it's too difficult
8  of a task to achieve given the number of
9  stakeholders.  So efforts are addressed at the
10 caseload issue as opposed to -- which I said this
11 docketing issue came at the same time as Hinkebein.
12 So that's docketing and court processes are just
13 being pushed to the side.
14     Q.  This e-mail also lists again the
15 appointments to the private bar.  I think it
16 discusses it in a little bit more detail.  Do you
17 see that?
18     A.  Yes.
19     Q.  You said before that the private bar
20 would be paid a fee, but then it says here that this
21 could be presented as a pro bono requirement.  Is
22 that a consideration now as well?
23     A.  Did I -- I'm sorry, did I reference a
24 fee?
25     Q.  I thought you said that appointments to

## Page 120

1  requirement in the district?
2      A.  No.
3      Q.  Would the judiciary have to set one?
4      A.  I do not know.
5      Q.  What about training, has training been
6  discussed for private counsel taking on criminal
7  cases?
8      A.  Yes.
9      Q.  And what is the training that will be
10 involved?
11     A.  Specific training would be devised for
12 those types of cases and made available to people
13 who are appointed to those types of cases.
14     Q.  Is there a screening process as to how
15 the private counsel would be appointed?
16     A.  I -- nothing has reached that point.
17     Q.  Okay.  Currently is the private bar
18 involved in your district to alleviate caseload
19 issues?
20     A.  I would say other than MCRC to the
21 extent that they're involved, no.
22     Q.  I would actually like to talk about
23 that.  I'm going to present you with an exhibit that
24 was previously marked.
25 (Exhibit 6, Previously marked exhibit.)

**ALARIS LITIGATION SERVICES**

## Page 121

1    Q.  (By Ms. Rosca)  Mr. Reynolds, this is
2  an exhibit, Exhibit 6 of the Petsch deposition, from
3  the Petsch deposition.  Have you seen this document
4  before?
5    A.  I've seen something similar to this.  I
6  think I've seen it, it's just not formatting as it
7  appears on my computer screen.
8    Q.  Do you see that on page six of this
9  exhibit that your name is on the top, Stephen
10  Reynolds?  Page two.
11    A.  Yes.
12    Q.  Okay.  Why are you listed on this --
13  well, strike that.
14      What is this exhibit?
15    A.  This appears to be a copy of the
16  electronic notification from the Missouri State
17  Public Defender to an attorney participating in the
18  MCRC program.  And if a case is originating out of
19  my office, I am listed as the contact person.
20    Q.  And can you describe what the MCRC
21  program provides?
22    A.  It is a group of firms that have come
23  together and volunteered to take cases that are
24  likely to go to trial.
25    Q.  So do they come in after the case has

## Page 122

1  already been commenced or initiated?
2    A.  To date that is how the program has
3  worked in our office.
4    Q.  And how do these private counsel
5  receive training to handle those types of cases?
6    A.  Yes.  That's my understanding.
7    Q.  And how -- how do they get the
8  training?
9    A.  I believe that there's been specialized
10  training events, two to date, and interested
11  volunteers are required to attend those trainings
12  before taking cases is my understanding.
13    Q.  And who runs the trainings, does the
14  MSPD run them?
15    A.  Yes.  That's my understanding.
16    Q.  Has your district office at all been
17  involved in running the training programs?
18    A.  A little bit.
19    Q.  How have they been involved?
20    A.  I gave an introductory presentation and
21  I believe at the next training the deputy district
22  defender is one of the scheduled trainers that's
23  going to do in-depth training to whatever extent
24  that is for that program.
25    Q.  When did you give the introductory

## Page 123

1  presentation?
2    A.  Sometime over the summer.
3    Q.  And when did this program begin?
4    A.  Late spring, early summer.
5    Q.  Of this year?
6    A.  Yeah.
7    Q.  And how many cases from your office
8  have gone to the MCRC?
9    A.  Five.  Five to ten.  I don't know the
10  exact number.  Somewhere in that range.
11    Q.  How long are the trainings for the
12  private counsel taking on these cases?
13    A.  The training that was in St. Louis, my
14  understanding was that it was two days.  I believe
15  there's been a training in Kansas City, but I wasn't
16  part of that.
17    Q.  Are the trials that the MCRC private
18  counsel taking, are they for violent cases?
19    A.  They are -- we have offered a variety
20  of cases from low-level felonies to high-level
21  felonies.
22    Q.  Okay.  So it's possible then for a
23  high-level felony case, a violent high-level felony
24  case to be assigned to the MCRC private counsel?
25    A.  Yes.

## Page 124

1    Q.  But they only receive two days of
2  training to take on that trial; is that correct?
3    A.  I don't know what training the lawyers
4  have in addition to the public defender training.
5    Q.  Do they have to be criminal attorneys
6  to be participating in this program?
7    A.  I don't know.
8    Q.  Okay.  You can put that aside.  Just --
9  just going back to the e-mail with the various
10  proposals and the appointments to the private bar, I
11  think it's Exhibit 44, did the committee or the
12  judges discuss sort of the list of private counsel
13  that they would choose from to make these
14  appointments?
15    A.  I think that's one of the issues that
16  they are trying to resolve is how to generate that
17  list.
18    Q.  Okay.  And what about you said that it
19  would be pro bono for the attorney.  What about the
20  expenses associated with handling a case like
21  depositions or getting experts, did they discuss who
22  would be funding that aspect of it?
23    A.  My understanding is that the public
24  defender would fund those --
25    Q.  Okay.

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 125

1  A. -- costs, and that's based upon Michael
2  Barrett telling the judges that during some point in
3  the discussions.
4      Q.  And is there a discussion about whether
5  the attorneys can refuse the appointment?
6      A.  The appointment process is not that far
7  down.
8      Q.  Okay.
9      A.  It's in the generative stages.  It's a
10  serious intended commitment, but no details have
11  been worked out.
12     Q.  Okay.  And I'm just going to keep
13  asking questions about it --
14     A.  Right.
15     Q.  -- just to know the scope.  Is there
16  any discussion about the oversight of the private
17  counsel on the part of the MSPD?
18     A.  Not to date.
19     Q.  Is that something that is being
20  considered by the judiciary or by the MSPD?
21     A.  I don't know.
22     Q.  Are there -- are you aware of any other
23  districts that are doing this, that are appointing
24  private counsel to reduce caseload?
25     A.  I'm aware that at one point the

## Page 126

1  Columbia office, I don't know which county, there
2  were appointments.  I don't know if those are still
3  continuing.  I'm aware that the Harrisonville office
4  at one point there were appointments, but I don't
5  know if that's still continuing.
6      Q.  And are you aware if -- for the offices
7  that did participate in having appointments, was it
8  successful in reducing their caseload?
9      A.  I don't know.
10     Q.  Okay.  When is your next follow-up
11  communication with the judiciary or the
12  subcommittee?
13     A.  It was to be today, but I'm taking a
14  deposition.
15     Q.  Understandable.  Is it being
16  rescheduled?
17     A.  It will be.
18     Q.  You said how frequently do you -- does
19  this committee meet?
20     A.  The committee itself is not meeting
21  until January, but I am in frequent communication
22  with judges on the committee.  So work can be
23  done -- you know, work doesn't necessarily have to
24  be done at the meeting.
25     Q.  What do you mean work doesn't have to

## Page 127

1  be done at the meeting?  What other work is involved
2  in this process?
3      A.  Talking to judges about formulating a
4  plan and then being able to present it at a meeting
5  for other judges to consider and then how to
6  approach the private bar, talking about just the
7  logistics and the administrative necessities of a
8  wait list.  You know, the details of these -- both
9  proposals can be worked out without having an
10  official meeting.
11     Q.  You mentioned how to approach the
12  private bar.  Have you had any discussions from the
13  private bar about this issue?
14     A.  Judge Kerr met with MCRC.
15     Q.  And do you know what the discussion
16  involved in that meeting?
17     A.  Yes.
18     Q.  What did they talk about?
19     A.  Judge Kerr was inquiring whether MCRC
20  could be a vehicle for large-scale appointments.
21     Q.  And what was the response by the
22  private bar?
23     A.  The representative of the MCRC said
24  that that organization was not created to take
25  large-scale appointments.

## Page 128

1      MS. ROSCA:  So I'm going to have the
2  court reporter mark this Exhibit 46, Reynolds
3  Exhibit 46.  Can you please review this document and
4  let me know when you have finished reviewing it?
5      (WHEREIN, Exhibit 46, 11-20-17
6  McCulloch letter to Reynolds, was marked for
7  identification by the Court Reporter.)
8      A.  I recognize it.
9      Q.  (By Ms. Rosca)  What is this document?
10     A.  It is a letter sent to me by Robert
11  McCulloch of the St. Louis County Prosecuting
12  Attorney.
13     Q.  Just for the record, it is dated
14  November 20th, 2017, correct?
15     A.  Yes.
16     Q.  And why is the Office of Prosecuting
17  Attorney sending you this letter?
18     A.  You'd have to ask Mr. McCulloch.
19     Q.  It says on the first line that this is
20  a follow-up on our discussions with the circuit
21  court.  Was he present at those subcommittee
22  meetings?
23     A.  He was present I believe at the first
24  one.
25     Q.  Okay.  And did he provide any

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

1    statements at that first meeting?
2        A.   He did.
3        Q.   What did he say?
4        A.   He suggested that the court appoint the
5    private bar as the court back in 1980 did, which
6    resulted in the creation of an improved public
7    defender system.
8        Q.   Do you agree with that alternative?
9        A.   Under the circumstances I think that is
10   a good suggestion because he also pointed out that
11   the appointments to the private bar resulted in the
12   private bar speaking directly with the legislature
13   for improved funding of a public defender system.
14       Q.   Just so I understand, you're saying
15   that appointments to the private bar would prompt
16   more discussions or -- yeah, would prompt more
17   discussions with the legislature for funding for the
18   MSPD?
19       A.   That is what he suggested.
20       Q.   Do you have any concerns about
21   appointing private counsel to these criminal cases?
22       A.   Meaning?
23       Q.   Do you think that they would have the
24   sufficient experience that your attorneys have at
25   your office, do you think that there's any issues

1    with the client relationship having private counsel
2    appointed to them, just any concerns generally by
3    having them represent the clients versus your
4    office?
5        A.   I mean --
6            MR. MOORE:  Just real quick I'll object
7    to the form.  I feel like it's leading, also kind of
8    vague.  Go ahead.
9        Q.   (By Ms. Rosca)  Strike that.  I'll
10   rephrase.
11           Do you have any concerns that
12   private -- or appointment of private counsel would
13   be less effective than attorneys representing
14   clients in these criminal cases?
15       A.   If I'm trying to understand your
16   question, and correct me if I'm wrong, you're asking
17   me will the appointment of private counsel
18   jeopardize the quality of representation for a given
19   client.
20       Q.   Yes.  I'm specifically thinking of a
21   situation where a civil attorney who doesn't handle
22   criminal matters is now appointed a criminal case
23   and how effective they would be in representation.
24       A.   That could be an issue.
25       Q.   Is that something that the judges are

1    considering at all?
2        A.   You would have to ask them.
3            MR. MOORE:  Okay.
4        A.   But I'm sure it's an issue.
5        Q.   (By Ms. Rosca)  Can we go back to this
6    exhibit with the letter from the prosecution --
7    prosecutor's office?
8        A.   Yes.
9        Q.   Since that first meeting where he was
10   present, has he or anyone in his office been
11   involved in these discussions with the judiciary and
12   your office?
13       A.   There was a meeting in the last week of
14   November where two representatives of his office
15   appeared.
16       Q.   Based on your observations from the
17   meeting and what if anything they have stated, have
18   they been amenable to trying to help resolve the
19   caseload issue for this district?
20       A.   I can only interpret what I -- I can
21   only interpret their actions.  I can't -- I don't
22   know exactly what their thoughts are, but they have
23   expressed through Bob McCulloch and his idea for
24   appointment of the private bar that they recognize
25   that there is a caseload problem.

1        Q.   So in particular in this letter he
2    offers another proposal it seems like in addition to
3    just the private bar.  He says (quote as read):
4            You select one deputy defender and
5            provide this office with a list of all
6            pending cases assigned to that deputy
7            and we will pull the files, make
8            certain all discovery has been
9            provided.
10           Do you see that?
11       A.   Yes.
12       Q.   What is your opinion of this suggestion
13   by the prosecutor's office?
14       A.   Operationally I don't think that this
15   is going to help the caseload issue.
16       Q.   And why not?
17       A.   C, D, and E felonies already move
18   through our office in less than a hundred days.  The
19   time to disposition does not solve the number of
20   cases in our office.
21       Q.   Just because you're receiving so many
22   C, D, and E cases that it doesn't matter how quickly
23   they're resolved.  Is that why?
24       A.   This letter suggests that moving cases
25   more quickly will solve caseload problems.  Our

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-26   Filed 02/21/18   Page 34 of 100

## Page 133

1  office already moves cases extremely quickly.
2      Q.  But not quickly on the serious and
3  violent felonies, correct?
4      A.  Those aren't going to move quickly
5  regardless.
6      Q.  Okay.
7      A.  This letter is referencing low-level
8  easily resolved cases.
9      Q.  Okay.
10      A.  Those cases are already moving under a
11  hundred days.
12      Q.  So just so I'm clear, this suggestion
13  would not reduce the caseload problem in your
14  office?
15      A.  Correct.
16      Q.  Has the prosecutor's office provided
17  any other suggestions to reduce the caseload issue
18  aside from what has been suggested in this letter
19  and the private appointment of counsel suggestion?
20      A.  I believe those are the two suggestions
21  that they've had.
22      Q.  Are you aware of other districts that
23  have been working with prosecutors' offices to
24  reduce caseload issues in their offices?
25      A.  No.

## Page 134

1      MS. ROSCA:  Can we take a ten-minute
2  break?  Thanks.
3      VIDEOGRAPHER:  The time is 4:47.  We
4  are off the record.
5      (WHEREIN, a recess was taken.)
6      VIDEOGRAPHER:  The time is 4:54.  We
7  are back on the record.
8      Q.  (By Ms. Rosca)  Mr. Reynolds, just to
9  tie up the questioning about the subcommittee and
10  the judiciary meetings that you've had, just to
11  be clear, even if the judiciary in your circuit went
12  with private appointments, would that alone reduce
13  the caseload issues in your office absent adding new
14  attorneys to your office?
15      A.  Highly unlikely.
16      Q.  Why do you say that?
17      A.  The amount of cases needed to be
18  offloaded we estimate between 500 and a thousand
19  just to get our lawyers below a hundred cases.  To
20  appoint that many cases would be exceedingly
21  difficult even if you had a cooperative, willing
22  private bar.
23      Q.  So you testified earlier that the
24  prosecutor's suggestion in the letter that was sent
25  to you was not going to reduce the caseload issue on

## Page 135

1  its own; is that correct?
2      A.  Correct.
3      Q.  And now you've just testified again and
4  clarified that the private appointments plan being
5  contemplated by the judiciary circuit will not
6  reduce caseload issues on its own; is that correct?
7      A.  It is highly unlikely to do so, yes.
8      Q.  And so what would be the solution to
9  reducing the caseload issue in your office?
10      A.  The easiest and best solution is to
11  hire more public defenders.
12      Q.  Okay.  Thank you.  Can we just go back
13  and talk about just the turnover rate in your
14  office?  How many attorneys have you hired this
15  year?
16      A.  I'm going to say five to seven.
17      Q.  Out of the 20?
18      A.  Yes.
19      Q.  So does that mean that five to seven
20  prior attorneys left last year?
21      A.  Correct.
22      Q.  Is that on average what the turnover
23  rate is per year since you've been a district
24  defender?
25      A.  I would have to access those

## Page 136

1  statistics, which are not -- in views that I have
2  are not tabulated automatically.  It's a hand count,
3  but I would say turnover has increased in the past
4  four years.
5      Q.  And why do you think there is such a
6  high turnover rate or why -- strike that.
7      Why do you think turnover rate has
8  increased in the past four years?
9      A.  My view would be high caseloads, low
10  pay, an extremely difficult job that very few people
11  are suited to do, have the qualifications and the
12  aptitude to do.  I would say that public defender
13  jobs, the skill level is highly underestimated what
14  it takes to be successful and also to be able to
15  practice over the long term.
16      Q.  Of the five to seven you've hired this
17  year, what is their experience level with respect to
18  representing indigent clients?
19      A.  Three had no experience.  Two -- one
20  had ten years' experience, one had five to
21  seven years' experience.  The other hire that we had
22  that puts us in this five to seven range was a
23  transfer from a rural jurisdiction with two years'
24  experience who only lasted in our office for six
25  months.

ALARIS LITIGATION SERVICES
www.alaris.us    Phone: 1.800.280.3376    Fax: 314.644.1334

Case 2:17-cv-04057-NKL   Document 160-26   Filed 02/21/18   Page 35 of 100

Page 137

1    Q.   She left already?
2    A.   It was a man.  He left.
3    Q.   Oh, he left already?
4    A.   He left within six months.
5    Q.   Why did he leave?
6    A.   You would have to ask him.
7    Q.   Okay.  You don't do like a post -- like
8  a post discussion after they give their notice as
9  to --
10   A.   Human resources conducts --
11   Q.   Okay.
12   A.   -- that interview.
13   Q.   Okay.
14   A.   What I think is what I think.
15   Q.   What do you think?
16   A.   I don't think he could handle the
17 caseload and I don't think he liked the job.
18   Q.   Of the -- the ones that had, you know,
19 ten years' experience, five to seven years'
20 experience, is this experience with the public
21 defenders office?
22   A.   Those two, yes.
23   Q.   Okay.  And then the three that had no
24 experience, what are their backgrounds?
25   A.   One is a recent law grad from Fordham

Page 138

1  University who really wanted to do trial work and
2  did a national job search.  One is a recent graduate
3  of Suffolk University and was similarly positioned,
4  wanted to do trial work, wanted to work for the
5  public defender and did a national job search.
6        The other was working with a sole
7  practitioner for maybe a year or so after graduation
8  from law school.  We considered based upon his
9  interview that his experience, although we're
10 fortunate that he had a job, was really not
11 substantial in any way.
12   Q.   Okay.  Would you say -- you said that
13 you don't know the specific, but generally would it
14 be less than five that would leave per year or more
15 than five?
16   A.   I think the trend is towards the
17 numbers I described for the past 12 months.
18   Q.   Which is five to seven?
19   A.   Yes.
20   Q.   Okay.  Thank you.  Traveling, I just
21 want to talk about how much time the attorneys in
22 your office travel for their cases?
23   A.   Currently, other than investigation,
24 very little.  All of our lawyers have cases in
25 St. Louis County, but for one who is finishing up a

Page 139

1  conflicts assignment in the city of St. Louis and
2  that's just left over from when conflicts have been
3  contracted out.  He still has a conflict caseload.
4    Q.   Can you talk a little bit about
5  conflict cases?  When -- when did it get start --
6  when did it get contracted out?
7    A.   The beginning of this fiscal year.
8    Q.   And what were -- what was your office
9  doing prior to that?
10   A.   We were doing first-level conflicts
11 in -- from St. Louis City, and I believe -- I don't
12 know if it was first or second level from
13 St. Charles.
14   Q.   So could you explain, you know, how the
15 attorney -- prior to it being contracted out, how
16 the attorney was assigned a conflicts case?
17   A.   We had one attorney assigned to do the
18 conflicts cases in the city of St. Louis.  Normally
19 we would have two.  Because we knew that the
20 contract money was likely to be forthcoming in
21 December of last year, that particular attorney
22 volunteered to take all of the city conflict cases,
23 which were lower in number than the St. Louis County
24 cases per attorney, but required more work and more
25 preparation for trial because St. Louis City is a

Page 140

1  trial-rich environment.  And then the St. Charles
2  County cases we would assign as they came in to the
3  lawyer that was best suited to handle it.
4    Q.   So just so I understand, there was one
5  designated -- one attorney designated for conflict
6  cases stemming out of the city of St. Louis; is that
7  correct?
8    A.   For the past year.
9    Q.   For the past year.  And then prior to
10 that how were the conflict cases from St. Louis
11 being apportioned?
12   A.   There were two attorneys doing city of
13 St. Louis conflict cases prior to then.
14   Q.   And then the only other conflict cases
15 you receive was from St. Charles; is that correct?
16   A.   Correct.
17   Q.   Okay.
18   A.   In the -- in the past two to
19 three years.
20   Q.   Past two to three.  And then that would
21 be apportioned out to everyone?
22   A.   Those numbers were quite small.  I
23 think it was probably less than 20 cases a year.  So
24 we would find the person best suited to handle that
25 case given their caseload.

35 (Pages 137 to 140)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-26   Filed 02/21/18   Page 36 of 100

## Page 141

1    Q.   And then can you just describe what you
2  mean by the conflict cases being contracted out in
3  the beginning of this year?
4    A.   The legislature apportioned money for
5  all conflict cases to be contracted out through a
6  centralized contracting office in Columbia, Missouri
7  run by the public defender.
8    Q.   Has that decision significantly
9  impacted caseload issues for your office?
10   A.   At some point in the next six months we
11  will be able to reassign our one conflicts attorney
12  to take a St. Louis County caseload.
13   Q.   So it only really affected that one
14  attorney?
15   A.   We will gain the equivalent of one FTE
16  to devote to the St. Louis County caseload.  As soon
17  as that attorney's caseload is reduced enough to
18  make the transfer.
19   Q.   And when -- prior to the contracting
20  out of these cases, were the two designated
21  St. Louis City attorneys also handling cases that
22  were not conflict cases at all?
23   A.   No.  They were entirely dedicated to
24  city of St. Louis conflict cases.
25   Q.   But the ones that were handling the

## Page 142

1  St. Charles cases also had additional nonconflict
2  cases they were handling?
3    A.   Other than one or two cases their
4  caseload would be all St. Louis County cases.
5    Q.   Oh, I mean the St. Charles?
6    A.   Correct.
7    Q.   Oh, okay.  They would be -- they would
8  do both?
9    A.   So -- yes.
10   Q.   Okay.
11   A.   The St. Charles numbers, we only got
12  ten to 20 of those cases a year.  The numbers were
13  quite low.
14   Q.   Okay.
15   A.   So somebody in St. Louis County would
16  be handling 150 cases and then they would have one
17  St. Charles case.
18   Q.   Got it.  Thank you.  Just guilty pleas,
19  do you -- do you guys have plea negotiations --
20   A.   Yes.
21   Q.   -- in your district?  Okay.  Can you
22  just talk about how that works?
23   A.   The prosecutor's office delegates a
24  considerable amount of authority to the individual
25  prosecutor to negotiate the case.  So each case is

## Page 143

1  negotiated with the individual prosecutor who has
2  wide discretion.
3    Q.   And how much time do the attorneys in
4  your office spend negotiating plea deals?
5    A.   Meaning?
6    Q.   Meaning for one case, for example, what
7  percentage of their time is spent negotiating a plea
8  deal?
9    A.   I mean, the reason I'm hesitating is
10  you could count that as minutes spent on the phone,
11  in court, and add it up, or you could count it as
12  what work the lawyer is putting into the case to
13  then present information to the prosecutor to
14  achieve a better negotiated result.  I don't know
15  which measurement you're asking.
16   Q.   Could you combine the two, just in
17  general?
18   A.   It would depend on the case then.
19   Q.   What about for nonhomicide cases, like
20  C, D felonies?
21   A.   I mean, the reason I'm hesitating is if
22  -- if the client in a particular case and there's
23  not much negotiation to take place, there -- it can
24  be very quick.  If it's -- even if it's a low-level
25  case and the lawyer has been working up the case and

## Page 144

1  talking to the prosecutor over a period of months,
2  it can be hours.  I mean, it really varies on the
3  case.
4    Q.   So the ones that you testified earlier
5  that were being completed in a hundred days, were
6  those C, D felonies?
7    A.   Those were C, D's and E's.
8    Q.   Okay.  Would those negotiations be much
9  quicker then?
10   A.   Some of them can be.  Some of them can
11  be extended also.
12   Q.   Okay.  And then I assume the ones that
13  are the more serious violent offenses, they're
14  longer times spent on negotiations?
15   A.   Yes.  Those negotiations often persist
16  up until you're picking a jury.
17   Q.   Now, you testified earlier that the
18  reason why because of the flow of the C, D felony
19  cases and how expedited the dispositions of those
20  cases are, not a lot of time is spent on the serious
21  violent cases; is that correct?
22   A.   Correct.
23   Q.   Does that include time spent with
24  negotiation of plea deals with the prosecutor's
25  office?

36 (Pages 141 to 144)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-26   Filed 02/21/18   Page 37 of 100

## Page 145

1   A.  You could put that in there.
2       Q.  Okay.  And do you know of an instance
3   where that has been the case for one of your
4   attorneys?
5       A.  Meaning?
6       Q.  Meaning they did not have enough time
7   to negotiate a plea deal with the prosecutor's
8   office for a serious violent offense because they
9   had too much on their plate?
10      A.  I think the problem is the attorney has
11  not investigated and litigated the serious case to
12  have a better negotiating position.  Not that they
13  don't have time to negotiate.  One can negotiate
14  with a prosecutor quite easily, but if you're not
15  bringing anything to the table, the negotiations are
16  not maximized for the client.
17      Q.  So just so I understand, the issue then
18  is that the time it takes to research and work on
19  the case in preparation for the negotiation of the
20  prosecutor's office; is that correct?
21      A.  Correct.
22      Q.  And do you think that the clients would
23  be benefited if the attorney had more time to
24  research and investigate in preparation of these
25  plea -- plea deal negotiations?

## Page 146

1       A.  Yes.
2       MR. MOORE:  Object to form, calls for
3   speculation, but it's on the record.
4       Q.  (By Ms. Rosca)  What is your basis for
5   thinking that?
6       A.  What is my basis for thinking that?
7       Q.  Yes.
8       A.  Concerns that the lawyers have
9   expressed to me when I'm reviewing cases because of
10  client complaints or promotions.  You know, I notice
11  that some cases need to be worked on more.
12      Q.  Can we sort of quantify or qualify what
13  the serious cases are that's not getting the
14  attention in terms of time that your attorneys can
15  provide to these cases?  Does this include felony
16  sex offenses?
17      A.  Yes.
18      Q.  And then homicides I assume?
19      A.  Yes.
20      Q.  And what other types of cases that I
21  haven't mentioned would it include?
22      A.  Robberies and assaults.
23      Q.  Okay.  How much -- you have to then
24  communicate with a client prior to negotiating with
25  a prosecutor over a plea deal?

## Page 147

1       A.  Negotiations have to originate with a
2   client.
3       Q.  Meaning that they would have to request
4   it?
5       A.  Meaning like in any attorney-client
6   relationship the client makes the primary
7   fundamental decisions, including whether or not the
8   client wants to negotiate and what the parameters of
9   the negotiation will be.
10      Q.  And for -- you testified earlier that
11  there are instances where there is no client
12  communication for nine months for these serious
13  cases.  Would that affect whether they -- the client
14  has enough information to make a decision about plea
15  negotiations?
16      A.  It can.
17      Q.  What do you mean by it can?  Do you
18  know of an instance where this has occurred in your
19  office?
20      A.  Well, I would -- I would imagine if a
21  client has not been met for that period that they
22  are not fully knowledgeable about the case and it
23  could affect their thoughts about how to proceed and
24  they've not had enough time to meet with a lawyer,
25  collaborate with a lawyer and figure out a case

## Page 148

1   plan, whether it be trial or negotiation or
2   preparation for trial to advance a better
3   negotiating position.  Obviously none of that has
4   taken place.
5       Q.  If a client has been detained or
6   confined for a period of time and -- could they
7   request a plea deal even before the attorney has had
8   time to adequately investigate and prepare for a
9   plea -- plea deal negotiations?
10      A.  I'm not understanding the question.
11      Q.  You said -- you testified earlier that
12  the client has to be the one to initiate whether
13  they want to engage in plea deal negotiations; is
14  that correct?
15      A.  Correct.
16      Q.  Is there an instance where they
17  requested to accept a plea deal even before the
18  attorney working on the case has had adequate time
19  to -- to research and investigate whether that was a
20  sufficient offer on the table by the prosecutor's
21  office?
22      A.  I think the way this actually works is
23  clients who have not met with their lawyer have
24  serious concerns and express, hey, I need to meet
25  with my lawyer, nothing's been done on my case, and

37 (Pages 145 to 148)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-26   Filed 02/21/18   Page 38 of 100

## Page 149

1  it's usually those expressions of concern which are
2  legitimate are usually directed at investigating the
3  case.
4           It is very rare for a client to say I
5  just want to plead.  My lawyer won't let me into
6  court and plead.  I mean, I just haven't encountered
7  that unless somebody is seriously mentally ill.
8       **Q.  I guess my question is a little**
9  **different.  Has there been a situation where a**
10 **client has been in custody and to get out of custody**
11 **faster has just opted to take a plea deal even**
12 **before the attorney has had adequate time to**
13 **research and investigate whether that would be the**
14 **best solution for that client?**
15      A.  Yes.
16      **Q.  And how often do you think that occurs**
17 **in your office?**
18      A.  Lawyers have reported that it happens
19 with enough frequency that they are personally
20 concerned about that phenomena.
21      **Q.  Do you think that the lawyers'**
22 **inability to attend to researching the scope of a**
23 **plea deal or a negotiation impacts the time at which**
24 **the client requests to just plead guilty to get out**
25 **of custody?**

## Page 150

1           MR. MOORE:  Object to the form.  I
2  think it's vague.  Also I think it might be leading
3  and calls for speculation, but you can go ahead.
4       A.  Yes.
5       **Q.  (By Ms. Rosca)  Do you have an instance**
6  **in mind where this has occurred with one of your**
7  **attorneys?**
8       A.  I think I mentioned it's probably the
9  same example, but in the past month when we've been
10 discussing caseload numbers and the Hinkebein
11 problem, several lawyers have mentioned this to me
12 as being a problem.
13      **Q.  Okay.  Does the attorneys in your**
14 **office attend lineups for their clients?**
15      A.  No.
16      **Q.  So your clients are in these lineups**
17 **without representation?**
18      A.  Yes.
19      **Q.  Does that strike you as a concern?**
20      A.  I need to give a long answer to this.
21      **Q.  Please.**
22      A.  So certainly there are physical lineups
23 conducted in the jail, and the police in many of
24 these instances are following the Constitution,
25 informing the client that they have a right to a

## Page 151

1  lawyer to be present at those lineups.  We have not
2  been contacted to appear at those lineups.  Were we
3  contacted, we would appear at those lineups.
4       **Q.  If you are contacted to appear at those**
5  **lineups, how would that affect the time that your**
6  **attorneys spend on cases?**
7           MR. MOORE:  This calls for speculation.
8  Go ahead.
9       A.  Unknown because in eight years we have
10 not received such a call.
11      **Q.  (By Ms. Rosca)  Does your attorneys**
12 **make any psychiatric evaluations when determining**
13 **client's competency?**
14      A.  Yes.
15      **Q.  How does that process work?**
16      A.  When a attorney learns or suspects that
17 there's a serious mental illness that affects
18 competence, the policy, even though it's not written
19 but it's clearly communicated to the lawyers, it's
20 better to investigate competency even if you're in
21 doubt, and the preference is to investigate it
22 through a private evaluation.  Not always.  So they
23 will contact a psychiatrist, make an E request, and
24 I will approve it and submit it to Columbia.
25      **Q.  Do these competency determinations ever**

## Page 152

1  **go to court?**
2       A.  Yes.
3       **Q.  Are the attorneys in your office**
4  **present during these competency evaluations?**
5       A.  When I answered yes the competency
6  evaluations go to court, meaning, you know, the
7  result of the evaluation will be dealt with in
8  court.  Lawyers are generally not present during the
9  competency evaluation.
10      **Q.  Is there a reason for that?  Strike**
11 **that.**
12          Are the -- the competency evaluations
13 **are not done in court?**
14      A.  No, they're -- either the private
15 evaluation, the evaluator will go to the jail and
16 conduct the evaluation in the jail.  If the client
17 is released, the client will go to the office of the
18 evaluator.
19          In some instances where we are going
20 through the Department of Mental Health first, and
21 those are carefully screened, the person is
22 transported to the Department of Mental Health for
23 the evaluation.
24      **Q.  Do your clients ever participate in**
25 **interviews for presentence investigation reports?**

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 153

1  A.  In our jurisdiction we try to avoid
2  what are called sentencing assessment reports, and
3  that's -- that's what you're referring to because
4  they're usually unhelpful for our clients.  And if
5  we're in a situation where a judge is requesting it,
6  we try to do our own mitigation case to counteract
7  the sentencing assessment report.
8  Q.  Your attorneys attend voir dire, I
9  assume?
10  A.  Yes.
11  Q.  Do you know of an instance where any
12  attorney in your office has ever waived a voir dire?
13  A.  No.
14  Q.  Is there any instance where they've
15  skipped a voir dire?
16  A.  That would never happen.
17  Q.  Why is that?
18  A.  Because we monitor the trials, and
19  every lawyer in the Missouri State Public Defender
20  knows that in a jury trial voir dire is one of the
21  most important parts.  It would be inconceivable
22  that anybody would do that.  I don't think they'd be
23  employed if they did.
24  Q.  That's fair.  At the moment given that
25  we've discussed that you have an ethical duty under

## Page 154

1  the rules as a manager to report -- or ensure that
2  your attorneys are complying with the ethical
3  standards, are there any attorneys in your office
4  that are not complying with those standards?
5  A.  I mean, I think given the caseload, all
6  of our lawyers, their caseloads are unethical.  We
7  have decided rather than to litigate to try to work
8  with the courts to resolve these issues.  I think if
9  we had just decided to litigate no productive
10  discussions would have resulted.
11  Q.  And by that answer have you filed any
12  formal motion to the court with respect to
13  withdrawing as -- as representation or not accepting
14  any more representation?
15  A.  Not to date because we're in the middle
16  of discussions.  We don't want to end up like some
17  of the other jurisdictions.  Now, if it gets to that
18  we'll do it, but at this point we're not there.
19  Q.  What do you mean by some of the other
20  jurisdictions?
21  A.  Kansas City.
22  Q.  Can you explain what has happened there
23  that you've been aware about?
24  A.  It's been very hostile from the bench
25  and I've -- my understanding is they've attempted to

## Page 155

1  file the 600 motion and it's been rejected on
2  trivialities.
3  Q.  And you said that if it gets to that
4  point your office is willing to do that as well?
5  A.  Right.  But we don't want it to be a
6  dead end.  We just don't want to file a motion, go
7  through a needless hearing and have no relief.  Why
8  not talk to judges and even though the relief may be
9  imperfect as you've pointed out in this deposition,
10  it's better than anything to date.
11  Q.  And just to be clear, the relief is
12  dependent on how amenable the judges are in speaking
13  with the public defenders office with respect to the
14  caseload issue?
15  A.  Well, the relief on the horizon is
16  private appointments and a wait list, which has
17  never happened before in Missouri.  It's an
18  imperfect solution, but it's -- it's a step in the
19  right direction.  And why shut down that possibility
20  by filing a motion tomorrow.
21  Q.  And you've testified that the private
22  appointments and wait lists, even if they went
23  forward, would not have a significant impact on
24  reducing the caseload issue for your office if no
25  other attorneys were added to your office?

## Page 156

1  MR. MOORE:  Again, calls for
2  speculation, but go ahead.
3  A.  I mean conceivably, yeah.  I mean, it's
4  a lot of cases to offload.
5  Q.  (By Ms. Rosca)  Okay.
6  A.  And it's as you've pointed out, the
7  wait list is -- is an imperfect solution to people's
8  rights under the Constitution, whether it's speedy
9  trial or due process.
10  MS. ROSCA:  Okay.
11  MR. MAUNE:  That's it.
12  MS. ROSCA:  That is it for me.  I'm
13  passing the witness.
14  EXAMINATION
15  QUESTIONS BY MR. MOORE:
16  Q.  Very good.  My name is Justin Moore.
17  I'm with the Attorney General's Office.  I'm here on
18  behalf of the State of Missouri and Governor
19  Greitens.  I'd like to ask some follow-up questions.
20  Okay.  So just going to backfill a
21  little bit here.  Tell me a little bit about your
22  educational background.  Where did you go to school,
23  starting with undergrad?
24  A.  Bowdoin College.
25  Q.  Where is that at?

39 (Pages 153 to 156)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-26   Filed 02/21/18   Page 40 of 100

Page 157

1    A.  Brunswick, Maine.
2        Q.  Okay.  Are you from Maine?
3    A.  No.
4        Q.  Where are you from originally?
5    A.  Colorado.
6        Q.  Okay.  So did you go to high school in
7    Colorado, I guess?
8    A.  I did.
9        Q.  And how did you end up in St. Louis?
10   A.  After I graduated from Bowdoin College
11   I had a friend who worked for the public defender in
12   Seattle.  The job interested me and I found a job in
13   St. Louis as an investigator.
14       Q.  Okay.  You started off as an
15   investigator in St. Louis?
16   A.  Yes.
17       Q.  So take me through like the timeline, I
18   guess.  So you graduated from undergrad and then
19   from there you start working as an investigator in
20   the public defender in St. Louis?
21   A.  Yes.
22       Q.  Where did you go to law school?
23   A.  UCLA.
24       Q.  So how long did you work as an
25   investigator prior to going to law school?

Page 158

1    A.  One year.
2        Q.  Okay.  And when did you graduate from
3    law school?
4    A.  1998.  I also -- I went from -- just so
5    you -- everything is clear, I was investigator for a
6    year, and then I was a student at UCSC in the
7    anthropology program, and then I went to law school
8    at UCLA.
9        Q.  Okay.  So you were a student of
10   anthropology initially at UCSC?
11   A.  Yes.
12       Q.  And did you ever complete that -- that
13   would have been like a master's or something like
14   that?
15   A.  Master's.
16       Q.  Did you ever complete that?
17   A.  Yes.
18       Q.  Okay.  So were you doing that at the
19   same time you were going to law school?
20   A.  No, I went to UCSC, completed the
21   master's, worked on a Ph.D., then decided to go to
22   law school.
23       Q.  Okay.  Very good.  How long was that
24   master's program with UCSC?
25   A.  I was there three years.

Page 159

1        Q.  Okay.  And you worked on a Ph.D. you
2    said, right?
3    A.  Yes.
4        Q.  How many years did you work on that?
5    A.  Three years altogether.
6        Q.  Okay.  But you never completed the
7    Ph.D.?
8    A.  No.
9        Q.  And then you decided to go to law
10   school after that?
11   A.  Correct.
12       Q.  Is there a reason you never did finish
13   the Ph.D.?
14   A.  I didn't want to be a professor.
15       Q.  Ah.  Now, you went to law school.  And
16   how did you end up back in St. Louis then after
17   that?
18   A.  My wife is from here.
19       Q.  Okay.  Is she an attorney as well?
20   A.  Yes.
21       Q.  Okay.  How is she employed?
22   A.  Missouri Public Defender.
23       Q.  Okay.  And where is she employed at?
24   A.  Eastern Capital.
25       Q.  Okay.  And in what capacity?

Page 160

1    A.  She is the district defender for
2    Eastern Capital.
3        Q.  Okay.  Very good.  And any other
4    degrees or institutions that you've attended since
5    your undergraduate degree that we haven't discussed?
6    A.  No.
7        Q.  Have you noticed any recent trends in
8    how your district is defending cases?  And by that I
9    mean an increase or decrease in like the number of
10   depositions or experts you're utilizing, anything
11   that you've noticed?
12   A.  No.
13       Q.  And you may have gone over this
14   already, but can you just kind of walk me through
15   how you oversee your defenders whenever they're
16   working on these cases?
17   A.  We have one-on-one meetings with
18   lawyers periodically.  Just go into their office,
19   talk about their caseload.  We have brainstorming
20   sessions.  We have a formal review process for
21   promotion.
22       During the first six months the deputy
23   district defender is in charge of training, which
24   includes all aspects of training.  We have newer
25   lawyers second chair so they can understand how to

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

Page 161

1    do a trial.
2        We try to find cases that will go to
3    trial so a lawyer will get a trial within the first
4    six months if at all possible.  Sometimes we
5    succeed.  Sometimes we don't.
6        Q.  Okay.  And anything else?
7        A.  That's an overview.
8        Q.  Okay.  Do you have any kind of like
9    computer system whereby you can monitor your
10   defenders' cases, how they're progressing?
11       A.  Yes.  I've referenced that as the Lotus
12   Notes case management system.
13       Q.  And I understand Lotus Notes includes
14   -- basically it's like the file stored digitally; is
15   that correct?
16       A.  Correct.
17       Q.  So you can see like the pleadings and
18   discovery and all that kind of thing on the system,
19   right?
20       A.  We scan discovery into nearly every
21   case.  The pleadings will not be a complete
22   reflection of the court file because there's no
23   interface between Case.net and our internal
24   database.
25       Q.  Okay.  Anything else that it would not

Page 162

1    be included in the Lotus Notes?
2        A.  Any handwritten notes that would be in
3    a physical file.
4        Q.  Okay.  How about like e-mail
5    correspondences or correspondence from your office
6    to prosecutor's office or to your clients, are those
7    on Lotus Notes?
8        A.  Generally speaking, but because it's --
9    the system is manually intensive, so if you're
10   sending an e-mail, if you want it preserved, you
11   also have to manually enter it into Lotus Notes.
12   That sort of administrative burden is not always met
13   by the lawyers.
14       Q.  Okay.  It falls on the lawyers to
15   retain their e-mails on the Lotus Notes system?
16       A.  Yes.
17       Q.  Have you ever had a situation where
18   they would ask their administrative staff to assist
19   in that task?
20       A.  No.
21       Q.  They just haven't asked them to do that
22   you don't think?
23       A.  There's no time for the administrative
24   staff to do it.
25       Q.  Okay.

Page 163

1        A.  So there's no point in asking.
2        Q.  So you're saying that they have not
3    asked the administrative staff to attempt to to your
4    knowledge?
5        A.  Correct.  I haven't either.
6        Q.  Okay.  Now, as far as when cases come
7    into your office, is it you that decides how to
8    divvy up the cases between your defenders?
9        A.  Because the amount of cases and
10   scheduling needs, I have created parameters for case
11   assignments, but the case assignments are primarily
12   done by our office manager and the legal assistant.
13       Q.  Okay.
14       A.  The two legal assistants.
15       Q.  And how do they decide who gets what?
16       A.  The legal assistants assign cases by
17   the day that the case will appear in associate
18   circuit.  There are two associate circuits Monday
19   through Thursday.  Each day in each division there
20   are two lawyers.
21       So the case if it's designated a
22   Wednesday Division 41 case will go to one of two
23   lawyers.  There are parameters in place for the
24   lawyers' experience, and also we assign cases evenly
25   so that one lawyer does not receive more cases than

Page 164

1    another.  With regard to sex and murder cases, those
2    are specifically assigned by me or the deputy
3    district defender.
4        Q.  And they're assigned on the basis of
5    what exactly?
6        A.  Whether the lawyer is capable of
7    handling that particular case in terms of experience
8    and skill.
9        Q.  Okay.  And are there any local policies
10   or procedures that are specific to your district
11   that you've created that are not system wide?
12       A.  A few.
13       Q.  Okay.  And what would those be?
14       A.  Primarily our office emphasizes and
15   requires that attorneys are very prompt and diligent
16   in returning all phone calls and inquiries from
17   family members more so than other offices.
18       We've also had to deviate from the
19   statewide client contact standards given the case
20   flow issues in our office combined with the caseload
21   number issue in our office.
22       Q.  Okay.  Yeah, I did remember you talking
23   about that earlier.  So I think there was some
24   standards promulgated where it was initial visit
25   after seven days and then follow-ups every 30 days

41 (Pages 161 to 164)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-26   Filed 02/21/18   Page 42 of 100

Page 165

1  after that; is that correct?
2      A.   That is the statewide standard.
3      Q.   But you've changed that for your
4  district to be initial visit within ten days and
5  then follow-up every 60 days after that?
6      A.   Correct.
7      Q.   Okay.  And what was the reason for that
8  change?
9      A.   It was impossible for the lawyers given
10  the caseload flow and numbers to meet the statewide
11  standard, and it was causing extreme morale problems
12  where departures from our office would have
13  increased beyond the numbers that I've mentioned.
14      Q.   So people were telling you they were
15  going to quit over those standards.  Is that
16  basically the gist of it?
17      A.   Implying.
18      Q.   They were implying they were going to
19  quit?
20      A.   Yes.
21      Q.   And how did they imply that to you?
22      A.   The caseload's too much.  I can't take
23  this job anymore.
24      Q.   Okay.  Did they specifically cite these
25  standards whenever they were telling that to you or

Page 166

1  is that not something that they specifically
2  identified?
3      A.   This was the result of a very large
4  office discussion that Michael Barrett initiated and
5  that I assisted in where there were discussions with
6  all the lawyers about caseloads, client complaints
7  and visitation.
8      Q.   Okay.  And so I guess it was in that
9  meeting where you felt that it was implied that the
10  standards needed to be changed for your district; is
11  that right?
12      A.   That -- those conversations resulted in
13  us changing the standards, and there may have been
14  information in the exit interviews that I don't know
15  about that Michael Barrett may have known about.
16      Q.   Okay.  So it seems like in your
17  particular office that you have a lot of attorneys
18  with kind of a good amount of experience.  Would you
19  say that's true?
20      A.   I mean, there's -- there's a number,
21  yes.
22      Q.   Okay.  I mean, earlier you were
23  testifying I think that many of them had at least
24  two years' experience and some of them had up to 25
25  years of experience?

Page 167

1      A.   Yeah, I'm trying to give you a number.
2      Q.   Okay.
3      A.   If you wanted a number.
4      Q.   Oh, no, sure.  Yeah.
5      A.   I think there's -- there's two lawyers
6  with close to 25 or more than 25.  There's two with
7  20.  There's two with ten.  There's two or three
8  with five.  And then everybody else is below that.
9      Q.   And how many -- we already went over
10  this, I apologize, but how many would the remaining
11  below five be?  How many attorneys are below five?
12      A.   Seven to ten.
13      Q.   Okay.  Let me take a look at my notes
14  because we did go over that already.  I think you
15  said there were only three that had less than one
16  year.  Does that sound right?
17      A.   Yes.
18      Q.   Okay.  So do you know whether having
19  attorneys with that level of experience is typical
20  or atypical for other districts?
21      A.   I don't know.  I know there's high
22  turnover in the public defender, but I don't know
23  the numbers in other districts.
24      Q.   Okay.  So we talked to you earlier
25  about like tasks that would be considered

Page 168

1  administrative tasks, right, that would be handled
2  by assistants.  Do you recall that conversation?
3      A.   Yes.
4      Q.   And you stated that you don't have any
5  paralegals in your office, right?
6      A.   Correct.
7      Q.   I just kind of want to pin down, I
8  guess, the type of tasks that would be considered
9  administrative versus the ones that would be like
10  attorney tasks.  So if you could go ahead and tell
11  me what tasks you consider to be administrative
12  ones.
13      A.   Copying, obtaining records some degree,
14  presentation of discovery to some degree.  I think
15  that's a gray area.  A lot of the computer entry.
16  Printing and mailing letters.  Things of that
17  nature.
18      Q.   And so nonadministrative tasks would
19  include things like drafting pleadings; is that
20  correct?
21      A.   Anything that's not a -- an entry of
22  appearance or a discovery which are really the only
23  two form pleadings, those would be administrative
24  tasks.
25      Q.   Used the term earlier was it pro forma

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

Case 2:17-cv-04057-NKL   Document 160-26   Filed 02/21/18   Page 43 of 100

1  for certain pleadings that are pretty standard?
2     A.  The only two are entry of appearance
3  and a discovery motion.  Everything else should be
4  case specific.
5     Q.  Okay.  Now, to what extent are the
6  attorneys performing these administrative tasks?
7     A.  I think a lot of the computer entry,
8  particularly of court dates, is done by the
9  attorneys.  Because of the number of cases there's
10  some copying of discovery that needs to be done by
11  attorneys, particularly as it comes in over a course
12  of time.
13     Q.  And do you know whether it's typical
14  for other practice areas or other private firms to
15  have attorneys, you know, manage their own calendars
16  or make their own copies, do you know?
17     A.  Depends on the firm.
18     Q.  So you were in private practice for a
19  period of time, right?
20     A.  Correct.
21     Q.  How long was that?
22     A.  Three years.
23     Q.  And where were you at during those
24  three years?
25     A.  Berg, Borgmann, Wilson, Wolk &

1  Reynolds.
2     Q.  And what kind of -- what area do they
3  practice in?
4     A.  It was a general practice.
5     Q.  Okay.  And during your years in private
6  practice did you ever have to manage your own
7  calendar or make your own copies?
8     A.  Occasionally.
9     Q.  I think there was some discussion about
10  what would happen if there were more investigators
11  or more administrative staff.  Do you recall that
12  conversation?
13     A.  Correct.
14     Q.  And then I think that you said
15  something like things would be better if you had
16  more, right?
17     A.  Generally.
18     Q.  But that's like speculation, correct?
19  I mean, you're just kind of speculating that it
20  would be better because there's no -- you didn't
21  have any like studies or anything that you're basing
22  this opinion on, correct?
23     A.  In terms of investigation, I think
24  statistically -- and I don't have the number at my
25  fingertips, but in terms of investigations per case

1  that number is available, and I believe it's pretty
2  low.  What it is for my office, I don't know.
3     So I think if you were to look at those
4  numbers, that would be something number based, and
5  then based upon lawyers saying I don't have time to
6  investigate cases so I'm not assigning
7  investigations, that would be another source of
8  information.
9     And the fact that our investigators are
10  limited to 40 hours and will come to me and say I
11  can't work more this week, I'm capped at 40, so I
12  don't think it's complete speculation.  Those would
13  be the three flows of information as to why more
14  investigators would be helpful and beneficial.
15     Q.  So some resources where we could
16  determine whether it would have an impact of any
17  kind, or positive or negative impact, but you've not
18  performed any analysis of those sources or to your
19  knowledge has anybody else performed analysis of
20  those sources?
21     A.  Not to my knowledge.
22     Q.  Okay.  And so any impact it would have
23  on the cases it would be speculative, right?
24     MS. SHIPMA:  I object.  These questions
25  are argumentative.  He's given his answer and if you

1  want to argue that later, you can.  Move on.
2     Q.  (By Mr. Moore)  Fair enough.  Just
3  question is on the record.  So you can provide a
4  response.
5     A.  I mean, I think the problem is nobody's
6  seen a public defender system in Missouri or many
7  other places where cases are adequately investigated
8  and what results that would have.
9     Q.  So you're saying that no cases are
10  investigated adequately?
11     A.  I did not say that.
12     Q.  Okay.
13     A.  I did not say that -- I don't think
14  that study has been conducted, but I think there's
15  enough concern out there that it's a problem.
16     Q.  Can you think of a specific instance
17  where, you know, an investigator would have had some
18  kind of measurable impact on a case where there was
19  no investigator?
20     A.  I mentioned the case that was in
21  litigation that was not investigated and witnesses
22  at the scene were not located and it's subject of a
23  PCR.  The problem with the PCR as a remedy is it --
24  many witnesses need to be found within a short time
25  period.

ALARIS LITIGATION SERVICES
www.alaris.us      Phone: 1.800.280.3376      Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-26   Filed 02/21/18   Page 44 of 100

## Page 173

1      When the PCR hits the court five to
2  ten years later, it's even more exceedingly
3  difficult to find those witnesses, and that's
4  reflected in a lot of case law that raises Sixth
5  Amendment speedy trial concerns, loss of witnesses
6  to the defense or even due process cases, which is a
7  parallel track to argue that problem, the
8  disappearance of witnesses over time.
9      Q.  So is there a reason given in that case
10  for why the investigation didn't take place?
11      A.  The lawyer had over 200 cases and was
12  struggling to keep his head above water.  It's still
13  in litigation.
14      Q.  Is that what the lawyer said that's why
15  or was -- what was the reason given, if any, for
16  lack of investigation?
17      A.  That was -- that was the reason the
18  lawyer gave.
19      Q.  He just cited that he had a lot of
20  cases?
21      A.  That's what he told me, that reflected
22  in his caseload, which was over 200.
23      Q.  Okay.  But he could have had an
24  investigator perform the investigation, right?
25      A.  I think the problem that I've been

## Page 174

1  describing is when you have that number of cases,
2  any reasonable lawyer cannot stay on top of that
3  caseload, which includes finding the time to send
4  out that investigation request.
5      It may even include not being able to
6  adequately visit with the client where the client
7  can express, hey, you need to find these witnesses.
8  You need to do it quickly.
9      Q.  What is involved in the investigation
10  request, is it like a form that they fill out or
11  something?
12      A.  It's an electronic message to an
13  investigator to do a certain assignment on a case,
14  usually to find witnesses.
15      Q.  And what does that electronic message
16  look like, it's just kind of like an e-mail or --
17      A.  It's built into the system.  It's
18  called an action item.
19      Q.  Okay.  And so is it just like a
20  one-page kind of form that people would fill out or
21  what would be involved in filling out this action
22  item?
23      A.  You click on the scene that says action
24  item.  You assign it to an investigator.  You
25  describe the task to be done.  You click on the

## Page 175

1  button and it sends it to the investigator.  That's
2  also how we track how much work investigators are
3  doing.
4      Q.  Okay.  And so this attorney claimed
5  that there was no time to do that because of his
6  caseload?
7      A.  That was the condition at the time this
8  case went to trial.
9      Q.  Other than that one situation where we
10  have, you know, this investigation that is claiming
11  should have been performed, are you aware of any
12  other instances specifically where an investigator
13  would have had a measurable impact if only they had
14  been assigned that you can point out with
15  specificity?
16      A.  Not at this deposition at this time.
17      Q.  Take a look at some of these exhibits
18  regarding the caseload metrics that we went over at
19  the beginning of the deposition.  So I'm looking at
20  Plaintiffs' Exhibit 4, Reynolds 37, and then the
21  fiscal year 2018 supplemental legislative budget
22  request document.
23      MS. SHIPMA:  It's Exhibit 21.
24      MR. MOORE:  Thank you.  Yes.
25      Q.  (By Mr. Moore)  Can start with

## Page 176

1  Plaintiffs' 4.
2      A.  I don't think it's in this stack,
3  Plaintiffs' 4.
4      Q.  How about Reynolds 37 or Exhibit 21,
5  any of them are good really if you're able to find
6  them.
7      MS. SHIPMA:  Well, choose one that you
8  want him to look at.  Any of them are good.  They're
9  not all the same, right?
10      MR. MOORE:  Probably going to go over
11  all of them, so whatever he's able to pull up most
12  expediently.
13      THE WITNESS:  37 and 4 must have been
14  placed somewhere.
15      MR. MOORE:  I only have copies.
16      MS. SHIPMA:  Can we go off the record
17  for a moment while we find those?
18      MR. MOORE:  Yeah.
19      VIDEOGRAPHER:  The time is 5:48.  We
20  are off the record.
21      (WHEREIN, a recess was taken.)
22      VIDEOGRAPHER:  The time is 5:49.  We're
23  back on the record.
24      Q.  (By Mr. Moore)  Very good.  So we've
25  located some of the exhibits, and just to correct

44 (Pages 173 to 176)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 160-26    Filed 02/21/18    Page 45 of 100

## Page 177

1  the record, we're looking at Plaintiffs' Exhibit 4,
2  Reynolds 37, and Exhibit 38.  So do you have those
3  three exhibits in front of you?
4      A.  Yes.
5      Q.  Okay.  So we can just start with 37,
6  which appears to be a pretty clear printout.  Are
7  you looking at 37?
8      A.  Yes.
9      Q.  Okay.  And you know, just for the
10  record, I mean, all these exhibits appear to be
11  largely the same just with different years and
12  figures.  Is that accurate?
13      A.  Two are quarters.  One is a fiscal
14  year.
15      Q.  Okay.  And they all purportedly deal
16  with caseload metrics, would you agree?
17      A.  Yes.
18      Q.  Okay.  So do you have any background in
19  statistical analysis?
20      A.  No.
21      Q.  Sociological studies, psychological
22  studies of any kind?
23      A.  Yes.
24      Q.  And that's in relation to your
25  anthropology studies I believe, right?

## Page 178

1      A.  Yes.
2      Q.  So to what extent have you had any
3  experience with sociological or psychological
4  studies?
5      A.  I was in graduate school for
6  anthropology, and those three fields are
7  interrelated.
8      Q.  Did you actually conduct such studies?
9      A.  During my work I had classes in
10  psychological anthropology.  My particular research
11  was historical.
12      Q.  Okay.  So any collection or analysis of
13  datasets from a statistical standpoint on
14  psychological or sociological topics in your
15  educational background?
16      A.  Yes.
17      Q.  You actually collected data and
18  analyzed data; is that correct?
19      A.  I understood your question had I
20  received training in it.  I had taken coursework in
21  it, but it was 20 years ago.  I'm not claiming to be
22  a statistical expert on these metrics.
23      Q.  Okay.  Yeah, we'll just go -- we'll
24  just move along then.  So in any event, for these
25  studies in front of you, right, are you aware of the

## Page 179

1  method they used to collect the data that was
2  analyzed in these studies?
3      A.  Just the general formula.
4      Q.  Okay.  And when you say the general
5  formula, what do you mean specifically?
6      A.  Well, there was a RubinBrown group that
7  in order to create a workload metric organized a
8  group of public defenders and private attorneys to
9  figure out what is a reasonable workload for
10  different types of cases, and then that metric was
11  created and compiled by a national accounting firm
12  using their standards, and then it was adopted into
13  this formula to compare to the number of lawyers in
14  an office, and the number of cases and a weighted
15  case, homicide would be weighted differently than a
16  possession case.  And that's a general overview of
17  what these are.
18      Q.  Okay.  But you would not be in a
19  position to establish, you know, the veracity or the
20  robustness of their methods of collecting the data
21  or analyzing the data in the RubinBrown report,
22  would you?
23      A.  I'm not understanding your question.
24      Q.  So I guess first question is you
25  understand -- I think you stated earlier that these

## Page 180

1  are based on numbers from the RubinBrown study; is
2  that right?
3      A.  Part of the numbers in here, my
4  understanding, involve that metric created by the
5  RubinBrown group.
6      Q.  Okay.  And so these numbers based on
7  the RubinBrown group's report, however, you would
8  not be in a position to analyze or testify as to the
9  robustness or accuracy of the RubinBrown report and
10  its methodology, would you?
11      A.  I have not been asked to and -- yeah.
12      Q.  You said that you would be able to or
13  you --
14      A.  I have not been asked to and I would
15  not be able to.
16      Q.  Okay.
17      A.  Yeah.
18      Q.  And so, you know, you're kind of taking
19  these metrics at face value I guess given that they
20  are based on this RubinBrown report; is that right?
21      A.  I'm acknowledging that these exist.
22      Q.  Okay.  If you could look at Reynolds
23  37.  Looking like five and six columns from the
24  right, attorney court time and attorney travel time.
25  Do you see those two columns?

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-26   Filed 02/21/18   Page 46 of 100

Page 181

1    A.  Yes.
2    Q.  And underneath of that it says
3  estimated.  Do you see that?
4    A.  Yes.
5    Q.  Do you have any idea what that -- how
6  they came to those estimates or by what methodology
7  they determined those numbers would be accurate
8  estimates?
9    A.  There are two asterisks that refer to
10  the bottom of the page which reads court time
11  estimated using fiscal year 26 [sic] time log data,
12  travel time estimated using fiscal year 2018 expense
13  report data.
14    Q.  I think that was 2016 expense report
15  data, right, not 2018?
16    A.  2016, yes.
17    Q.  And so -- so what would that mean
18  specifically then for the numbers that are contained
19  in those columns, do you know?
20    A.  Whoever created this spreadsheet is
21  referencing the source of the data.
22    Q.  And do you know by what method they
23  estimated the numbers specifically?
24    A.  It indicates that there was a 2016 time
25  log data.

Page 182

1    Q.  Do you know what that time log data is?
2    A.  I would imagine that it's a time log
3  data that was created through the Lotus Notes
4  system.
5    Q.  But that would be speculation, right?
6    A.  I didn't create this spreadsheet.
7    Q.  Fair enough.  And how about the next
8  sentence?  Travel time estimated using the fiscal
9  year 2016 expense report data --
10    (Court reporter interruption.)
11    Q.  (By Mr. Moore)  I'll just go with how
12  about the next sentence, do you know what that
13  sentence really means?
14    A.  I read it in plain English, but I think
15  the answer to your question is I didn't create this
16  spreadsheet.
17    Q.  Okay.  And so because you didn't create
18  the spreadsheet and because you're not familiar with
19  the RubinBrown methodology and analysis, it's
20  possible that these numbers could be incorrect,
21  right?
22    A.  I don't know.  It's speculation.  I --
23  I didn't create this spreadsheet.  I'm not -- I'm
24  not the witness to comment on the veracity of this
25  spreadsheet.

Page 183

1    Q.  Right.  You'd be unable to do so,
2  right?  I mean, is that correct, you would be unable
3  to testify as to the veracity of the data contained
4  in these reports?
5    A.  No.
6    Q.  So you are able to testify as to the
7  veracity of the data?
8    MS. SHIPMA:  No.  He said he is not the
9  witness that would be able to testify as to the
10  veracity of the information in the report.  I
11  believe he said it a couple of times now.  This has
12  been asked and answered.
13    MR. MOORE:  Could you read my question
14  to him back?
15    COURT REPORTER:  Question:  So you are
16  able to testify as to the veracity of the data?
17    MR. MOORE:  Did he give an answer to
18  that one or -- okay, the one before then.
19    COURT REPORTER:  Question:  You'd be
20  unable to do so, right?  I mean, is that correct,
21  you would be unable to testify as to the veracity of
22  the data contained in these reports?
23    Answer:  No.
24    Q.  (By Mr. Moore)  So then he's saying
25  that he can testify as to the veracity of the data,

Page 184

1  right?  I mean, if I'm misunderstanding the answer
2  that's fine too.  I'm just trying to clarify on the
3  record.
4    MS. SHIPMA:  Stephen, can you testify
5  as to the veracity of the information in that
6  report?
7    A.  I can testify that the case numbers
8  appear to reflect accurately what's in our system.
9  I have no reason to disbelieve these numbers.  I
10  have no information to say that they're inaccurate,
11  but I have no specialized knowledge of the formulas
12  used to actually create the numbers.
13    Q.  (By Mr. Moore)  And so you said which
14  information as to the cases appears to be accurate?
15  Look at Reynolds 37 first.  You can reference it by
16  columns I suppose.
17    A.  Cases initiated minus cases withdrawn,
18  net new cases.
19    Q.  And so those are numbers that you feel
20  look correct, right?
21    A.  Those are numbers that I have access to
22  in the Lotus Notes system and they appear to be the
23  same numbers that's in my system.  The calculations,
24  they appear to be correct, but I'm not the one who
25  did the calculations.

46 (Pages 181 to 184)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-26   Filed 02/21/18   Page 47 of 100

## Page 185

1    Q.   So as to the cases initiated,
2  withdrawn, and net new cases, are those numbers that
3  you reviewed just prior to this deposition, is that
4  how you verified those numbers?
5    A.   I did look at our fiscal year numbers
6  for 2017 and 28 [sic] prior to this deposition that
7  as exist in the computer system at my office.
8    Q.   And so you feel that those three appear
9  to be accurate, right?
10   A.   Right.
11   Q.   But as to the remainder, you would not
12 be the person to testify about whether those
13 calculations were performed correctly or whether
14 those are accurate, right?
15   A.   Correct.  I have no reason to
16 disbelieve them, but talk to the person who created
17 the spreadsheet.
18   Q.   All right.  And as to what's going on
19 in these other offices, divisions, you wouldn't be
20 able to give testimony about whether those numbers
21 are accurate or inaccurate; is that right?
22   A.   I can't testify about anything going on
23 in another office.
24   Q.   Okay.  I think earlier there was a
25 discussion about problems involving getting

## Page 186

1  discovery from prosecutors.  Do you remember that
2  conversation?
3    A.   I remember discussions about discovery.
4    Q.   And specifically about the length of
5  time it could take to get certain discovery from
6  prosecutors, right?  Or do you not recall that?
7  That's fine too.
8    A.   I don't recall the discussion in those
9  terms.
10   Q.   Okay.  I think maybe it was in the
11 context of problems with discovery, and you said
12 some prosecutors are better than others about
13 getting you what you need prior to trial.  Does that
14 sound more in line with our discussions?
15   A.   Correct.
16   Q.   Okay.  But I mean, your -- the
17 financial status of public defender and the number
18 of attorneys, you know, the number of administrative
19 staff, none of that would change what the prosecutor
20 is doing with the discovery, would it?
21   A.   Incorrect.
22   Q.   Okay.  So explain.
23   A.   The best practice for discovery is for
24 an attorney to keep a detailed discovery log or for
25 a paralegal or a legal assistant to keep a detailed

## Page 187

1  discovery log to review the discovery, to discern
2  what has been disclosed, what is probably out there
3  and has yet to be disclosed, and to communicate on a
4  regular basis about the outstanding discovery.
5          And then when the outstanding discovery
6  is not delivered to promptly litigate that similar
7  to what civil lawyers would do with interrogatories
8  and production of documents.  That is certainly not
9  taking place in our office at this time.
10   Q.   So you just described what you would
11 consider to be the best possible practice, right,
12 with regards to the discovery issue?
13   A.   That is the best practice and it's also
14 the reasonable practice for any lawyer conducting
15 criminal work.  Just as it would be the same for a
16 civil lawyer to stay on top of interrogatories and
17 request for documents.
18   Q.   But it would be up to the prosecutor to
19 comply with your requests, right?
20   A.   And if they don't, you need to litigate
21 it just as in civil litigation in a diligent manner.
22   Q.   And so you're saying that this issue
23 has not been litigated in a diligent manner by your
24 office?
25   A.   Not across the caseload because of the

## Page 188

1  caseload numbers.
2    Q.   And you say because of the caseload
3  numbers.  Do you have any specific instances that
4  you can cite or evidence where that's the case?
5    A.   You can go into the database and you
6  can see that the -- the letters of the discovery
7  inventory and outstanding discovery and motions to
8  compel are not being filed.  It's quite easy to
9  discern, and if -- you can also go into Case.net and
10 that happens when you're reviewing caseloads and
11 attorney performance.
12   Q.   Sorry.  So you can see that it's not
13 getting filed, but is there anything showing that
14 it's not getting filed because of caseloads?
15   A.   If it's not getting filed across a
16 large section of cases, what else would it be?  And
17 if there's last minute discovery, what else would it
18 be?  And if attorneys are complaining about it, what
19 else would it be?
20   Q.   But you're saying that, you know, you
21 can't think of anything specifically showing that,
22 you know, these issues are caused by caseloads,
23 right?
24   A.   I'm telling you they're caused by
25 caseloads.

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

Page 189

1      Q.   And as far as evidence goes, do you
2   have any sort of evidence that would back that claim
3   up?
4           MS. SHIPMA:  Again, I object.  It's
5   argumentative.
6           MR. MOORE:  Just asked if -- what
7   evidence he had in support of his description.
8           MS. SHIPMA:  And he's told you.
9       A.   What I've described is the answer to
10  your question.
11      Q.   (By Mr. Moore)  So I don't think that
12  quite answers the question because, I mean, we see
13  what you would consider to be a result the lack of
14  these motions getting filed, and you have identified
15  what you believe to be a cause, which is caseloads.
16  I'm looking for something that would connect those
17  two, some objective evidence.  Do you have anything
18  like that, like -- like a study or something, some
19  kind of data or anything that would connect those
20  two issues?
21      A.   I'm referring you to what exists in our
22  Lotus information system that that type of activity
23  is not taking place.
24      Q.   So would there be like correspondence
25  in there, stuff saying like we can't get what we

Page 190

1   need because of caseloads or anything of that
2   nature?
3       A.   I'm saying there's an absence of those
4   requests, and that's standard practice.
5       Q.   Okay.  So there's been some discussion
6   about various investigative techniques and things
7   that could be done.  For example, visiting a crime
8   scene, filing motions regarding police conduct, etc.
9   Do you recall those conversations earlier in this
10  deposition?
11      A.   Yes.
12      Q.   Now, it's true, though, that, you know,
13  these aren't going to be required in every single
14  case that comes before you, correct?
15      A.   Not every single case.
16      Q.   For example, you know, visiting crime
17  scene, not going to be required in every single
18  case, right?
19      A.   I just said that.
20      Q.   Right.  And filing anything regarding
21  police conduct, not going to be required in every
22  single case.  For example, cases where there is no
23  police misconduct, right?
24      A.   The question is has the case been
25  reviewed enough to make that determination.

Page 191

1       Q.   But as to my question it would be
2   correct that you, know, not every case requires the
3   same list of, you know, investigative things to be
4   done to it, cases just don't require the same
5   things, right?
6           MS. SHIPMA:  Asked and answered.
7       Q.   (By Mr. Moore)  You can respond.
8       A.   Each case requires an analysis as to
9   what that case requires.  The problem is that
10  analysis as to what each case requires is not taking
11  place because of the caseload numbers.
12      Q.   And so again, what evidence do you have
13  that, you know, it's not taking place because of
14  caseload?
15      A.   Attorney reports and attorney reviews.
16      Q.   And so what kind of reports are we
17  talking about, are these written reports where
18  they're saying that it's due to caseloads that
19  they're not able to engage in investigative
20  techniques?
21      A.   It's what I mentioned in the first part
22  of the deposition where attorneys are telling me
23  that they are unable to do things and that they've
24  worried that they've plead people too quickly and
25  they're also worried that clients are pleading to

Page 192

1   get out of jail because the lawyer has not had
2   enough time to work on the case and it's dragging
3   and they just want to get out of jail rather than
4   address the merits of the case.
5       Q.   And so these would just be
6   conversations that you've had with your defenders,
7   right?
8       A.   It's part of my management.  It's my
9   job to talk to my lawyers about their work on their
10  cases.
11      Q.   Okay.  But there wouldn't be anything
12  in writing where they're discussing their inability
13  to visit a crime scene because of their caseloads or
14  anything, right?
15      A.   We talk about it.  I've not required
16  that they put it in an e-mail also.
17      Q.   So we discussed also that this issue of
18  defendants being in jail and then I think you said
19  that some of them feel a greater pressure to plea --
20  to plead so they can get out of jail, right?
21      A.   Yes.
22      Q.   So do you have or maintain any kind of
23  a system whereby you can track how long somebody has
24  been in jail on these cases?
25      A.   Those numbers are easily obtained.

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

Page 193

1    Q.   And so what do you mean?  Does your
2  office track those numbers or are they located
3  somewhere else?
4    A.   Jail keeps a list of days confined.
5    Q.   Okay.
6    A.   And that's e-mailed to us on a daily
7  basis.
8    Q.   Okay.  So then your office would be
9  aware of how long these people have been in jail; is
10  that accurate?
11    A.   Yes.
12    Q.   So is there any system in place
13  whereby, you know, you're -- what you do on a case
14  is -- would be dictated in any way by how long
15  they've been in jail?
16    A.   No.
17    Q.   So why is that?
18    A.   Each case is being worked on to the
19  best of the lawyer's ability.  Some cases even if
20  they're worked on as they should be are going to
21  take a while, longer than others.  The phenomena I
22  described is happening.  It could be tracked if we
23  were asked to track it.
24    Q.   Do you think it would be helpful to,
25  you know, track that so you could avoid the outcomes

Page 194

1  that you discussed earlier?
2    A.   No.
3    Q.   Why is that?
4    A.   Given the resources -- and as I
5  described in one of my letters to the court, lawyers
6  are concentrating their efforts on representing
7  clients, not collecting statistics for a problem
8  that is relatively obvious and has been heavily
9  studied by outside agencies for the past ten years.
10    Q.   I think you mentioned earlier that some
11  of the less serious felonies will kind of go through
12  the system faster than the more serious ones, right?
13    A.   Yes.
14    Q.   So don't you think some kind of a
15  tracking system for how long somebody has been in
16  jail could help the attorneys prioritize the cases
17  that they're working on as opposed to just working
18  on the less serious ones first?
19    A.   No.
20    Q.   Why is that?
21    A.   The flow of cases is immense.  The
22  number of complaints are immense.  And attorneys are
23  spreading themselves thin across a very high
24  caseload in trying to do the best they can.  The
25  clients that are neglected are neglected because the

Page 195

1  clients don't have -- you know, the attorneys don't
2  have time for those clients.
3    Q.   So you're saying that even if the
4  attorneys were apprised of how long their client had
5  been in jail at your office, that wouldn't affect
6  how they litigate the files at all?
7    A.   No.  They already know the problem.
8    Q.   Okay.  So you don't think it would be
9  important to work on the bigger stuff and try to get
10  the clients out of jail or dispose of those matters
11  quicker than the smaller matters?
12    A.   They're both important.
13    Q.   But it sounds kind of like the smaller
14  ones go first; is that right?
15    A.   That's the way the flow is occurring.
16    Q.   Tell me again why that takes place.
17    A.   The flow of the lower-level felonies is
18  at a higher volume.  They move through the case, the
19  system more quickly.  The lawyers are overwhelmed
20  with that flow of the cases and they devote their
21  attention to get people out of jail.
22    Q.   Are any metrics kept about the number
23  of cases attorneys have closed in a year?
24    A.   Yes.
25    Q.   Are there any like rewards based on how

Page 196

1  many cases they close in a year?
2    A.   No.
3    Q.   Or any incentives -- I'm sorry, I
4  talked over you there.  Your answer was no?
5    A.   No.
6    Q.   Is it considered whenever they're up
7  for a promotion or for raises of any kind?
8    A.   No.
9    Q.   So to what extent is it utilized if
10  you're keeping track of it?
11    A.   I don't keep track of it.  I don't -- I
12  don't know if there's much value to that particular
13  metric.
14    Q.   Oh, okay.  So who does track it then?
15    A.   It's tracked in the computer.
16    Q.   But it doesn't have any relevance in
17  the hiring or retention or promotion process you're
18  saying?
19    A.   I'll tell you why.  One of the largest
20  complaints is that somebody is coerced into a plea.
21  I don't think you want to incentivize coerced pleas,
22  and coerced pleas would be if you incentivize
23  closing cases quickly, the by-product of that could
24  be coercing pleas, and you'll create more 24.035
25  problems, more client complaint problems, more

49 (Pages 193 to 196)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-26   Filed 02/21/18   Page 50 of 100

Page 197

1  request for change of counsel.
2           It's not how you counsel a client.  The
3  fact is most of the cases are being disposed of
4  within a hundred days anyways.  There's no need to
5  speed up the process.
6        Q.  That's fair enough.  I'm trying to
7  understand why, you know, there would be this
8  incentive to -- or why the attorneys would turn over
9  these low-level felonies constantly and why that
10  would affect the bigger felonies, why -- why does
11  that take place exactly?  I know you've talked about
12  the flow, but I mean, is there any other reason, is
13  there --
14        A.  Yeah.
15        Q.  -- psychological or --
16        A.  If you have 150 cases and a hundred of
17  them are calling you to get out of jail and a
18  hundred of them are working towards a probation
19  recommendation, and if those cases are the majority
20  of cases that are constantly flowing to the office,
21  that's just where most of the attention gets
22  directed.  I've answered the question that way
23  several times.  I don't think there's anything else
24  I can tell you.
25        Q.  Do you think like a first-in, first-out

Page 198

1  type system would be of use?
2        A.  No.
3        Q.  Why is that?
4        A.  It's unethical.
5        Q.  And why is that?
6        A.  You're supposed to represent a client
7  based upon the client's needs and the dynamics of
8  the case.
9        Q.  And so just kind of flesh that out, I
10  guess.  Why would that be unethical if you're, you
11  know, trying to get the oldest cases out before the
12  newer cases?
13        A.  So you have five cases.  Five people
14  come in and want a bond reduction.  You work on the
15  other five cases and ignore those five cases for
16  three months.  How is that not -- not unethical?
17        Q.  You're saying the current practice of
18  just kind of dealing with the low-level felonies is
19  more ethical than leaving the more serious felonies
20  to I guess kind of sit in the background?
21        A.  I think the whole point of this
22  litigation is the caseload is unethical.
23        Q.  More -- my question is more about the
24  way the cases are prioritized.  It seems like
25  some reason lower-level ones are prioritized over

Page 199

1  the bigger ones.  I'm trying to figure out why that
2  would be.
3        A.  I've given you the answer.
4        Q.  So in these cases, in these felonies, I
5  think you testified earlier that there can be some
6  discovery that needs to be reviewed that your
7  attorneys don't have time to review; is that right?
8        A.  Yes.
9        Q.  So what kind of discovery are we
10  talking about for these cases?  What would be
11  contained in that file?
12        A.  As I mentioned, many cases involve
13  electronic discovery, which can involve crime scene
14  videos, witness videos, interrogation videos,
15  surveillance videos, phone calls from the jail, cell
16  phone records.
17        Q.  And anything else that, you know, would
18  typically be in these files?
19        A.  Including police reports, the other
20  thing that comes to mind is electronic analysis of
21  cell phones and computers.
22        Q.  And so are we talking like will there
23  ever be a situation where you have like thousands
24  and thousands of pages of medical records or
25  anything of that nature in the files?

Page 200

1        A.  Yes.
2        Q.  And when would that be?
3        A.  Many of the mental health cases.
4        Q.  And other than mental health cases, you
5  know, any kind of voluminous documentation like
6  that?
7        A.  Victims with serious injuries.
8        Q.  And other than those, anything else?
9        A.  Mitigation.
10        Q.  Mitigation?  What do you mean
11  specifically?
12        A.  Most cases are resolved through a plea,
13  but those pleas involve presentation of mitigation
14  evidence, either to the prosecutor or to the court.
15  Mitigation evidence is often documentary reaching
16  back to the client's childhood.  It could be school
17  records, medical records, work records.
18        Q.  So earlier on you also made a statement
19  that it was expected that the private bar would be
20  resistant to these cases being appointed.  Do you
21  recall making that statement?
22        A.  Yes.
23        Q.  And what's your basis for that?
24        A.  My basis for that is that that is the
25  expected result.  Now, if the private bar is

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

Page 201

1    appointed and is not resistant, no problems.  But I
2    think to go into a large-scale appointment process
3    thinking that the private bar is going to be
4    pleased, I think most people would find that to be a
5    bad strategy and some communication strategy needs
6    to be implemented if that program is to be
7    successful.
8         Q.   So had you talked to private attorneys
9    who said they would be resistant to it?
10        A.   The head of the MCRC.
11        Q.   That's the Missouri Coalition for --
12   what was the rest of it?
13        A.   Right to Counsel.
14        Q.   So he said he would be resistant to
15   receiving these cases?
16        A.   Yes.
17        Q.   Even though he started the MCRC?
18        A.   The goal of that organization is to
19   find cases for trial for the participants, not to
20   engage in a very large appointment process.
21        Q.   And anyone else tell you that they
22   would be resistant to the appointment process?
23        A.   Everybody else on the MCRC board when
24   it was being created.
25        Q.   They all told you the same thing?

Page 202

1         A.   Yes.  That was part of the reason why
2    they wanted to focus on trial cases rather than
3    widespread appointments.
4         Q.   Okay.  And can you just list for me who
5    was on that board at the time?
6         A.   I don't know the names, but
7    representatives from Bryan Cave and Thompson Coburn
8    and other large firms in St. Louis.
9         Q.   Okay.  And so earlier I think you
10   pretty much headed this question off, but you can
11   only really speak to the goings on in your district,
12   right, not the other districts in Missouri?
13        A.   Correct.
14        Q.   Okay.  So you stated multiple times in
15   this deposition that you believe the caseload in
16   your district for your attorneys is too high, right?
17        A.   Correct.
18        Q.   What would be an acceptable caseload
19   for each attorney?
20        A.   The federal public defenders cap their
21   caseload at 40.  This area has a large area of
22   debate, but I think that's one metric that is in use
23   and is approved by a court system.
24        Q.   Do you personally have a number in
25   mind?

Page 203

1         A.   Somewhere between 50 and 80.
2         Q.   And so then how did you come to that
3    range?
4         A.   Federal public defender numbers,
5    American Bar Association numbers, experience of the
6    difficulty through personal experience of when a
7    case becomes unmanageable, whether as a public
8    defender or in private practice.  What I know of the
9    RubinBrown study and the metrics used there.
10        Q.   And so these numbers are just kind of
11   an amalgamation of this kind of like zeitgeist of
12   information out there that includes all the studies
13   and your own experience, right?
14        A.   Yes.
15        Q.   It's not based on any study that you've
16   personally conducted, right?
17        A.   Correct.
18        Q.   So there's a situation earlier where
19   you discuss that there was a nine to 12-month
20   period of time where a defendant had not had any
21   contact from the attorney, right?
22        A.   Correct.
23        Q.   I think you noted that one of the
24   reasons for that was because a trial had been set
25   like 18 months out, right, by the court?

Page 204

1         A.   What I said is that situation occurs
2    and sometimes it occurs when a trial date has been
3    set out that far.  It can also occur on a serious
4    case even though there's regular court appearances
5    over that same period where the attorney is meeting
6    with the clients in court very briefly, but never
7    having any substantive conversation with that client
8    in the jail or doing any substantive work on the
9    case.
10        Q.   So they'd still be seeing the client at
11   like court appearances, though, throughout that
12   period of time?
13        A.   They would visually see the client.
14   They would not consult with the client about the
15   case.  They would make a court announcement.  They
16   would not consult with the client about the case.
17        Q.   But if, you know, you have -- you have
18   the client and the attorney in the same room, right?
19   That's the way the dockets are set up?
20        A.   Yes, and there are usually 12 attorneys
21   and 20 defendants in the courtroom and six other
22   defendants in the jury box who are confined.  So
23   it's impossible to do anything.
24        Q.   And how often do those case management
25   conferences take place?

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

1    A. It depends on the case and the -- and
2  the courtroom.
3       Q. Just generally speaking.
4    A. Every 30 to 60 days.
5       Q. Okay. So it seems like every 30 to
6  60 days you have attorney and client in the same
7  room, right, for most cases you would say?
8    A. In the courtroom with other people.
9       Q. Fair. But the client could, you know,
10  wave the attorney down and say, hey, I need to talk
11  to you at some point, right? That's possible?
12    A. I'm sure that happens.
13       Q. Okay. And they could even, you know,
14  whisper something in their attorney's ear or have a
15  brief conversation with their attorney at those case
16  management conferences, right?
17    A. I would disagree.
18       Q. Why is that?
19    A. If you're talking about a substantive
20  conversation, what your question implies, the answer
21  is no. If you're talking about a client making a
22  simple request, hey, can you visit me, the answer is
23  yes.
24       Q. And the attorney can give them a status
25  update of those case management conferences, right,

1  about just whatever was going on, hey, we're --
2    A. No.
3       Q. -- looking into this, we're looking
4  into that?
5    A. No.
6       Q. Why is that?
7    A. There's no confidentiality.
8       Q. Even if they're like whispering to each
9  other like right next to each other?
10    A. No.
11       Q. And that's I guess because you think
12  that some third party would be able to hear them,
13  right?
14    A. Confined client is seated next to other
15  confined clients closer than the people in this
16  deposition room. If that client is charged with a
17  sex offense, everybody else in the jail who's
18  confined and within a four-foot radius of that
19  client is going to hear your conversation. I doubt
20  that's appropriate.
21       Q. So this particular instance you said
22  within nine to 12 months of no contact, was there
23  other case management conferences going on in that
24  instance, if you know?
25    A. That is not the only instance.

1       Q. Just for that one, though, for right
2  now?
3    A. I don't know. I'd have to check the
4  record.
5       Q. Okay. And in any event, you know, if
6  the court sets a case for trial 18 months out, your
7  client's not going to be getting out in that interim
8  period of time no matter what kind of contact you're
9  having with them, right?
10    A. Highly unlikely.
11       Q. Okay. And your clients are able to
12  make phone calls to your office, right?
13    A. Yes.
14       Q. You don't have any system in place
15  whereby they have no access to you guys from jail,
16  right?
17    A. Correct.
18       Q. And you guys can still send letters
19  back and forth, right?
20    A. Yes.
21       Q. Are there any other ways you can
22  communicate with your clients while they're in jail
23  other than, you know, telephone and in-person
24  meetings and regular mail?
25    A. Those are the three methods.

1       Q. There's no like e-mail or, I don't
2  know, text messaging, anything like that?
3    A. No.
4       Q. So you're familiar -- are you familiar
5  with Chapter 600, the safety valve statute? Does
6  that sound familiar, 600.063?
7    A. Yes.
8       Q. Okay. And what's your understanding of
9  that statute?
10    A. That statute is a procedure where you
11  can address the court about caseload issues.
12       Q. Okay. And I think you stated earlier
13  that you've not utilized that, right?
14    A. Correct.
15       Q. And you gave some reasons for not
16  utilizing that, correct?
17    A. Correct.
18       Q. And can you tell me what those reasons
19  were specifically?
20    A. The judges are willing to engage in
21  productive dialogue and not requiring it, and the
22  remedies being discussed are serious and on the
23  table and would be the same as if we had gone
24  through that procedure and that procedure allows for
25  a hearing on the record, but to solve these problems

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-26   Filed 02/21/18   Page 53 of 100

1  is going to take extensive discussions and so it's
2  form over substance.  We're doing the same thing.
3  We're being collaborative.
4      Q.  So why wouldn't you proceed via both
5  methods then, the informal and the formal with, you
6  know, the rule 600 requirements?
7      A.  Because it was initiated before that
8  was required by the court of appeals and we're deep
9  into the discussions, and at some point we may do
10  that, but it's not going to make a difference if
11  we're already productively discussing things.  It's
12  form over substance.
13      Q.  I think you also mentioned some other
14  disincentives and you reference something that
15  happened in Kansas City; is that right?
16      A.  Yes.
17      Q.  So I guess Kansas City had attempted to
18  use the section 600 remedy?
19      A.  That's my understanding.
20      Q.  So what's your understanding of what
21  took place I guess specifically in Kansas City?
22      A.  It's acrimonious and the judges are not
23  engaging with the public defender about the caseload
24  issue and the Hinkebein decision.
25      Q.  And so specifically what kind of

1  acrimony are we talking about?
2      MS. SHIPMA:  I object.  His testimony
3  on this is just based on his understanding.  We had
4  a whole deposition of Ruth Patch, the public -- the
5  district defender in Kansas City who talked at
6  length for hours and was questioned for hours by
7  your colleague Stephen Ramsey about this issue.
8      I would just refer you to her
9  deposition to get your answers on that.  They're
10  going to be much more valuable than Stephen's
11  recollection or understanding of what may or may not
12  have happened there.
13      MR. MOORE:  Right.  No, I do understand
14  that, and I appreciate that.  But his understanding
15  of what's happened in Kansas City has affected
16  his --
17      MS. SHIPMA:  I don't understand what
18  his understanding of what happened in Kansas City is
19  adding to this deposition other than time.
20      MR. MOORE:  Well, we're going to get
21  there.
22      MS. SHIPMA:  Are you going to ask a
23  specific -- well, get there quickly.
24      MR. MOORE:  Okay.  I appreciate your
25  patience.

1      Q.  (By Mr. Moore)  So what is your
2  understanding of specifically what took place in
3  Kansas City?  Because my understanding is that has
4  affected your opinion of approaching this in your
5  district; is that accurate?
6      A.  Which question do you want me to
7  answer?
8      Q.  Both.  You can start with your
9  understanding of what happened in Kansas City first.
10      MS. SHIPMA:  And he has answered that
11  for you already.
12      MR. MOORE:  Well, I don't think
13  specifically he's had a --
14      A.  What I've -- what I've said is -- is
15  the extent of my understanding.
16      Q.  (By Mr. Moore)  Okay.  So that's all
17  that you've heard about the Kansas City issue,
18  right?  Just that there was acrimonious -- you don't
19  have any more specifics than that; is that right?
20      A.  What I said is what I know.
21      Q.  Okay.  And sir, are you saying that
22  that knowledge disincentivized you in your district
23  from pursuing section 600?
24      A.  No, I just -- I've -- what I stated
25  previously is why we're not using 600, and I've also

1  stated that if these discussions don't lead anywhere
2  that we will do 600, but the result is going to be
3  determined by these discussions.  And once again,
4  it's form over substance and it's pretty much my
5  answer.
6      Q.  You still think the proceeding pursuant
7  to the statute is necessary because of these
8  informal negotiations?
9      MS. SHIPMA:  Asked and answered.
10      Q.  (By Mr. Moore)  Is that right?
11      A.  I've -- I've answered your question as
12  best as I can.  I mean, I know you keep rephrasing
13  it, but if these discussions don't work we'll do the
14  statute, but these discussions are the substantive
15  equivalent of the statute.
16      Q.  So my question was just why not do both
17  at the same time?  Why not?  Why not proceed through
18  both avenues concurrently now that they're both
19  available so that in case the informal one doesn't
20  work out you have done what is required by statute?
21      A.  And I've said we may do that.
22      Q.  Why not at the same time, though?  Why
23  not concurrently?
24      A.  I've just -- I've answered your
25  question.

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-26   Filed 02/21/18   Page 54 of 100

## Page 213

1    Q.  I don't know that there has been an
2  answer to that question specifically.
3    A.  Just the discussions that we are having
4  are substantive solutions, which would be the same
5  remedies as filing under the statute.
6    Q.  So you feel like it's a waste of time
7  then or I'm trying to -- why not do like both is the
8  question?  You say you're already doing the informal
9  ones, which I understand.  The question really is so
10  why not also the formal section 600?
11    A.  I know.  I've answered your question.
12  I mean, I just -- I don't have anything else to add.
13    Q.  So there are no other reasons then
14  other than what you've already discussed?
15    A.  Correct.
16    Q.  Have you ever given any other
17  interviews with newspapers on these issues or any
18  other news media other than the ones we've gone over
19  today?
20      MS. SHIPMA:  Objection.  The question
21  is vague, time frame.
22    Q.  (By Mr. Moore)  Time frame is
23  unlimited.  Regarding the issues that are at issue
24  in this lawsuit, have you ever given any other
25  interviews or, you know, written articles regarding

## Page 214

1  these issues for any other media outlets other than
2  the ones that we've discussed here today?
3      MS. SHIPMA:  And I would object that
4  the question is overbroad.  He's been working with
5  the public defender system for I don't remember how
6  long, but -- but more than ten years.  You're asking
7  him to recall every instance he's talked with a news
8  outlet regarding caseload issues in the past ten
9  years, 20 years, what time frame?
10      MR. MOORE:  I mean, if it's been that
11  voluminous, I guess we'll need to go through and
12  determine, but my question was just --
13      MS. SHIPMA:  I object.  It's overbroad.
14  Stephen, you can answer if you can.
15    A.  So in terms of caseload, I believe
16  those two articles are the only two.
17    Q.  (By Mr. Moore)  Okay.  Are there other
18  issues in this lawsuit not unrelated to caseload
19  that you would have given other interviews or, you
20  know, prepare articles or participated in articles
21  outside the ones we've talked about today?
22      MS. SHIPMA:  Objection, vague.  What
23  other issues?
24      MR. MOORE:  That's what I'm trying to
25  determine.  He cited caseloads specifically.

## Page 215

1      MS. SHIPMA:  Because --
2    Q.  (By Mr. Moore)  So are there other
3  noncaseload issues that you feel are related to this
4  suit that you've previously given news interviews or
5  participated in news articles in the past that we've
6  not discussed?
7    A.  Not to my knowledge.
8    Q.  Okay.  Have you ever been interviewed
9  or had discussions with anyone at the ACLU regarding
10  this lawsuit?
11    A.  No.
12    Q.  How about anyone else beside from of
13  course your counsel?
14    A.  Meaning?
15    Q.  So attorney-client privilege, don't
16  want to hear about those conversations.  You said
17  nothing with plaintiffs' counsel at the ACLU.  Have
18  there been any other, you know, conversations or
19  interviews that you've had regarding this lawsuit
20  that we've not discussed today?
21    A.  No.
22    Q.  So it sounds like from our prior
23  conversations that you have hopes that this informal
24  collaborative process with the judges and other
25  organizations is going to bear fruit; is that right?

## Page 216

1    A.  I would like to see these conversations
2  produce a temporary measure of relief of the problem
3  that might lead to a more lasting relief of the
4  problem.
5    Q.  So my question was more are you
6  optimistic that those talks are going to be
7  successful?
8    A.  I would like for them to be successful,
9  and I believe they can be successful.
10    Q.  Do you believe that they will be?
11    A.  I have no idea.  We'll find out.
12    Q.  So you have no indication whether those
13  talks are going to be successful one way or the
14  other?
15      MS. SHIPMA:  I object, asked and
16  answered.
17    A.  I mean, that's -- we'll find out.  All
18  of us will find out in the future.  I mean, they're
19  being done in good faith and ideas are on the table
20  and concrete ideas are being discussed.  Let's see
21  what happens.
22    Q.  (By Mr. Moore)  I understand --
23    A.  What else do you want?
24    Q.  I understand nothing is certain, but as
25  party to those talks, I mean, you might have some

54 (Pages 213 to 216)

**ALARIS LITIGATION SERVICES**
**www.alaris.us**          **Phone: 1.800.280.3376**          **Fax: 314.644.1334**
Case 2:17-cv-04057-NKL    Document 160-26    Filed 02/21/18    Page 55 of 100

Page 217

1  kind of indication whether you feel they're going to
2  be successful or not, right?
3       A.  I've just given you my evaluation of
4  the situation.  I'm not in control of the situation.
5       Q.  That's a very lawyerly answer.
6       A.  It's the answer.
7       Q.  So -- so there's just -- you have no
8  indication either way --
9            MS. SHIPMA:  I object.
10      Q.  (By Mr. Moore)  -- whether you feel
11  they're going to be successful?  It's just a simple
12  question.  I mean --
13           MS. SHIPMA:  It is a simple question
14  and you've asked it probably about five times now
15  and he's answered you.  Let's move to another
16  productive, more productive topic.  One that you
17  haven't asked him about five times.
18           MR. MOORE:  Could you please read back
19  his answer to my last question then?
20           COURT REPORTER:  Answer:  I've just
21  given you my evaluation of the situation.  I'm not
22  in control of the situation.
23           MR. MOORE:  I guess we've got to go
24  back to the one prior to that then.
25           COURT REPORTER:  Answer:  I mean,

Page 218

1  that's -- we'll find out.  All of us will find out
2  in the future.  I mean, they're being done in good
3  faith and ideas are on the table and concrete ideas
4  are being discussed.  Let's see what happens.
5       Q.  (By Mr. Moore)  That didn't sound like
6  an answer to me.  That sounds like a not answer.  My
7  question was --
8            MS. SHIPMA:  What was the one before
9  that?
10      Q.  (By Mr. Moore)  The question
11  specifically was do you feel that they're going to
12  be successful, and you can say that you're not sure,
13  you don't know, or I guess no.
14           MS. SHIPMA:  I object for you
15  suggesting answers to him.
16           MR. MOORE:  That's fine too.  I'm
17  just -- very simple --
18           (Court reporter interruption.)
19           MS. ROSCA:  There's an answer before
20  that if you'd like that read back.
21           MR. MOORE:  Well --
22           MS. ROSCA:  Can you read back the
23  question -- the answer before the one you --
24           MR. MOORE:  You know what, let's just
25  stop.  We have enough on that one.  We'll just move

Page 219

1  on.
2            MS. SHIPMA:  I agree.
3       Q.  (By Mr. Moore)  I think you were asked
4  earlier about essentially the competence of the
5  private attorneys being assigned these criminal
6  matters.  Do you recall that conversation?
7       A.  Yes.
8       Q.  I think you said something along the
9  lines of it could be a concern, right?
10      A.  Yes.
11      Q.  So I want to discuss a little bit about
12  what would be concerning about assigning these
13  matters to members of the private bar.  Are you
14  saying generally that any amount of assigning these
15  out is a questionable and could potentially raise
16  issues or are you saying there's specific instances
17  where it could become an issue?
18      A.  I was understanding the question to
19  mean if these cases are assigned to private counsel
20  who are disinterested in taking the case and/or do
21  not have adequate training that the solution of
22  assigning cases to private bar may be equal to the
23  problem that exists in the public defender, the case
24  is not receiving attention, or even potentially
25  worse because some of these appointees may not even

Page 220

1  -- if they have the training, may not want to do the
2  case and work on the case as it should be.
3       Q.  Okay.  Fair enough.  But if the private
4  counsel was interested and had adequate training, do
5  you feel that there would be anything to be
6  concerned about?
7       A.  Under -- if those are true in the
8  immediate term, no, they would not be something that
9  would be concerned about if those two things are
10  true.
11      Q.  Okay.  So I think you said earlier that
12  turnover has increased over the last four years.
13  Does that sound accurate?
14      A.  Yes.
15      Q.  I think as a cause of that you cited
16  high caseload, low pay, and -- and being a hard job
17  generally; is that right?
18      A.  Yes.
19      Q.  So have -- has the caseload or pay or
20  nature of the job changed some way -- in some way in
21  the last four years?
22      A.  No.
23      Q.  Okay.  So could there be some other
24  reason for the turnover that you are aware of?
25      A.  I don't know.

55 (Pages 217 to 220)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-26   Filed 02/21/18   Page 56 of 100

## Page 221

1    Q.  But it might not strictly be related to
2  caseload, right?
3    A.  I think it's -- I've mentioned that
4  it's those three factors are my best estimates of
5  what's causing the caseload.  I mean, the turnover
6  of attorneys.
7    Q.  Okay.  There's a lot of discussion
8  about the negotiations that would be engaged in as
9  part of the plea process.  Do you recall that
10  conversation?
11    A.  Yes.
12    Q.  And I think that, you know, in the end
13  your conclusion was that the negotiations could
14  potentially be hindered by the level of workup the
15  case receives; is that right?  Not so much by the
16  time that they have to negotiate with the
17  prosecutor, correct?
18    A.  Correct.
19    Q.  Okay.  And so can you cite any specific
20  instances where, you know, a specific attorney has
21  told you like I was not able to negotiate as well
22  because I didn't work this case up good enough?
23    A.  Yes.  Cases that are set for trial in
24  our office tend to result in not guilty verdicts or
25  reduced plea offers or nolles.  Those statistics are

## Page 222

1  -- particularly with the jury results are kept and
2  they're beginning to be kept with the nolles.  So
3  that is the basis for applying that analysis across
4  the rest of the caseload.
5    Q.  So was there like a specific instance
6  you're thinking of where somebody told this to you
7  or is it more like just the general trend that
8  you're seeing?
9    A.  Like I said, the jury trial result
10  statistics are kept.  The nolle statistics are in
11  place to start being kept as far as my understanding
12  is.
13    Q.  But --
14    A.  This happens -- once again, part of my
15  job is to talk to lawyers about their caseload and
16  when they're doing their review to learn about their
17  successes.
18    (Phone interruption.)
19    MS. SHIPMA:  So sorry.
20    MR. MOORE:  She's ready to take off.
21    A.  And so I know when lawyers are
22  litigating and getting better results.
23    Q.  (By Mr. Moore)  So you're saying this
24  more from like a bird's eye's view I guess based on
25  results and cases; is that accurate?

## Page 223

1    A.  It's on my day-to-day management
2  duties.  It's not a bird's eye view.  It's my -- my
3  job is to know what's going on in my attorneys'
4  caseload.
5    Q.  So I guess in other words, in bird's
6  eye view --
7    (Court reporter interruption.)
8    A.  It's my day-to-day job to know what's
9  going on in my attorneys' caseload.
10    Q.  (By Mr. Moore)  So just ask you this
11  like negotiation because of workup link, okay.  Has
12  anybody specifically told you that they were not
13  able to negotiate as successfully because of the
14  workup in the case that they performed?  Anyone
15  specifically ever said that to you?
16    A.  Yes.
17    Q.  Okay.
18    A.  And I've mentioned that in my
19  deposition that lawyers have told me that they felt
20  uncomfortable with guilty pleas because the client
21  wanted to get out of jail and the case had not been
22  worked up according to the attorney's estimation of
23  their work input into the case, and those
24  conversations are frequent.
25    Q.  And when you say frequent, what kind of

## Page 224

1  frequency are we talking?
2    A.  Several times a month per attorney.
3    Q.  The same conversation about the -- the
4  plea deals and all that kind of thing.
5    A.  In reference to different cases.
6    Q.  And there is also discussion about
7  attending lineups.  Do you recall that conversation?
8    A.  Yes.
9    Q.  I think you said that the reason that
10  there had been no attendance is because you guys are
11  not contacted, right?
12    A.  That is probably the number one and
13  predominant and sole reason.
14    Q.  Okay.  Just give me a second here.  Do
15  you have any defenders that are on call 24/7?
16    A.  In what capacity?
17    Q.  Any capacity.
18    A.  Formally, no.  Attorneys do work on
19  weekends, but there's no in-call system for
20  notifying lawyers.
21    Q.  Okay.  Has there ever been a situation
22  where an attorney requested some discovery be
23  performed and you said no for financial reasons?
24    A.  No.
25    Q.  Is there any situation where an

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 225

1  attorney had requested an expert and you said no for
2  financial reasons?
3      A.  Yes.
4      Q.  Okay.  And did an expert end up -- did
5  an expert of some kind end up getting retained or
6  utilized in that case?
7      A.  Yes.
8      Q.  And tell me a little bit about how that
9  process went to the best of your recollection.
10     A.  We wanted to do mitigation on a mental
11 health case.  We wanted to hire a local psychiatrist
12 to prepare a mitigation report and treatment
13 alternatives and community placement.
14        That request was denied.  We were asked
15 to use a social worker.  There are no social workers
16 who perform this function in the market in
17 St. Louis.  We were referred to a social worker
18 based out of Springfield.
19        She did a remote report.  It was
20 inadequate and was essentially a waste of money, and
21 we should have hired the psychiatrist in the first
22 place.
23     Q.  Ah.  In that situation it wasn't that
24 no expert was retained, it simply you just had to go
25 with a different expert, right?

## Page 226

1      A.  We were told to use a social worker
2  because it was less expensive than the expert that
3  we requested.
4      Q.  And so to answer my question, you
5  just -- you got a different expert than the one that
6  you initially requested, but you did get an expert,
7  correct?
8      A.  Different type of expert, correct.
9      Q.  Was there ever a situation where you
10 requested an expert and it was flat denied, no
11 expert ended up being appointed in a case?
12     A.  No.
13     Q.  Are there any other kind of like
14 financial requests that you would make for the
15 office, for example, like office supplies or things
16 of that nature, or is that done by some other
17 officer of the public defender?
18     A.  I'm not understanding the question.
19     Q.  So with like supplying your office, you
20 know, with office supplies and things like that, is
21 that something that you do or is that something that
22 somebody else does?
23     A.  There's a budget for office supplies
24 for the fiscal year and that's largely managed by
25 our office management specialist.

## Page 227

1      Q.  Okay.  And do you have any knowledge
2  about that -- the state of that budget or is it
3  mostly just handled by the office manager?
4      A.  The amount of money is determined by
5  Woodrail and then we order supplies within that
6  budget.
7      Q.  Okay.  But that's not something that
8  you like oversee really.  I mean, you're in charge
9  but office manager kind of takes care of staying
10 within budget?
11     A.  I'm responsible for staying in budget.
12 The task of management of that budget is delegated
13 to the office management specialist.  I have to sign
14 off on every expenditure.
15     Q.  Okay.  And have you stayed within
16 budget for the years that you've been the district
17 defender?
18     A.  For office supplies, yes.
19     Q.  And just general like office equipment
20 and maintenance of the office, you know, outside of
21 the number of defenders, printers and office
22 supplies and just whatever other expenses, have you
23 ever exceeded your budget for those things while
24 you've been the district defender?
25     A.  The hardware is not determined by the

## Page 228

1  local office.
2      Q.  Okay.  So that's a budget item that
3  would be dealt with at the state level?
4      A.  Correct.
5      Q.  But for everything else you've been
6  within budget; is that right?
7      A.  There is a number assigned to
8  deposition and expert witnesses.  Where that number
9  comes from, I don't know, but it is usually exceeded
10 very -- within two or three months.
11     Q.  Okay.
12     A.  So you'd have to ask the state office
13 about that number and the actual resources --
14     Q.  Okay.
15     A.  -- available for depositions and
16 experts.
17     Q.  And so for -- as far as who sets that
18 budget for your office, is that done at the state
19 level?
20     A.  Yes.
21        MR. MOORE:  Okay.  I think that's all
22 I've got.
23        MS. SHIPMA:  Okay.  I have a few
24 questions.
25        EXAMINATION

**ALARIS LITIGATION SERVICES**
**www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334**

## Page 229

1  QUESTIONS BY MS. SHIPMA:
2  Q.  Stephen, in your opinion are
3  lower-level cases more easily resolved?
4  A.  In -- I don't understand the question.
5  Q.  Does it take less work to bring a
6  lower-level case to completion than a higher-level
7  case?
8  A.  Yes.
9  Q.  And the stakes are less for a client
10  typically in a lower-level felony than a
11  higher-level felony?
12  A.  In terms of imprisonment, yes.  I think
13  impact on a client's life is something that needs to
14  be taken into consideration and can be significant
15  in a low-level felony.
16  Q.  Do you require your attorneys to
17  document the things that they haven't been able to
18  do in a case?
19  A.  No.
20  Q.  Why not?
21  A.  They don't have enough time to take
22  care of the cases and to do things on cases.  That
23  would be an administrative burden that does not
24  address immediate client needs in the office.
25  Q.  In your opinion, are there times when

## Page 230

1  attorneys may not even realize what they failed to
2  do on a case?
3  MR. MOORE:  I'll object to the form.
4  That calls for speculation.  Also object to
5  foundation.  You can respond.
6  A.  Yes.  And I -- I have an example.  I
7  was on a case in a murder case and I'm being PCR'd
8  for not obtaining AT&T cell phone records, and that
9  may have been something in the course of that case
10  that at the time I was not aware of, and I -- the
11  other case that's being PCR'd that I mentioned is
12  witnesses.
13  I think you may not be aware of
14  witnesses and lawyers learn too late because they're
15  not meeting with the client and the client is
16  saying, hey, I need this witness contacted.  By the
17  time that conversation is taking place, the witness
18  has disappeared.
19  And it can also go with surveillance
20  video, text messages are very hard to recover.  A
21  lot of these things that we're talking about it's
22  very hard for lawyers to perceive what is important
23  to the case unless they have enough time to really
24  delve into it quickly and at the beginning of the
25  case.

## Page 231

1  Q.  (By Ms. Shipma)  You testified earlier
2  about when an attorney wants an investigator to do
3  something they -- they simply do an action item to
4  the investigator; is that correct?
5  A.  Yes.
6  Q.  And that action item I believe you've
7  stated is something that is a function in Lotus
8  Notes; is that correct?
9  A.  Yes.
10  Q.  How would an attorney know that there
11  needed to be some investigation done in order to do
12  the action item?
13  A.  Consultation with a client and review
14  of discovery.
15  Q.  So it's not simply just pushing a
16  button on Lotus Note and filling out a form for an
17  action item?
18  A.  Correct.  There's work that takes place
19  before the investigation request is assigned to --
20  to an investigator.
21  Q.  Do you think that client contact every
22  60 days meets ethical standards?
23  A.  No.
24  Q.  And I just want to clear up something I
25  think that a question was asked and you answered it

## Page 232

1  without maybe listening to the way the question was
2  asked.
3  MR. MOORE:  I'll object to the form.
4  That seems leading, but go ahead.
5  Q.  (By Ms. Shipma)  I believe that the
6  question was asked do the attorneys make psychiatric
7  evaluations.  Now, if I ask you that question do
8  your attorneys make psychiatric evaluations, what's
9  your answer?
10  A.  No.  My understanding of the question
11  was do they investigate and hire appropriate people
12  and collect records to conduct those investigations.
13  Q.  Okay.  Just wanted to make sure we
14  weren't having attorneys out there practicing
15  psychiatry.
16  And I believe you stated earlier that
17  you've had about -- that you've hired or replaced
18  about five to seven attorneys this year?
19  A.  Yes.
20  Q.  Is that calendar year?
21  A.  I am speaking roughly from November,
22  December last year to now.
23  MS. SHIPMA:  That's all I have.
24  MR. MOORE:  Couple, but do you want to
25  circle back around first?

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-26   Filed 02/21/18   Page 59 of 100

Page 233

1        MS. ROSCA:  No, I don't have any.
2            FURTHER EXAMINATION
3   QUESTIONS BY MR. MOORE:
4        Q.   Okay.  Just tying up loose ends here.
5   Did you when you were in private practice bill your
6   time?
7        A.  It depended on the case.
8        Q.   Okay.  And when you did bill your time
9   on those cases, would it be tenths of an hour if you
10  recall?
11       A.  Yeah, it was -- it was either five or
12  ten-minute increments.
13       Q.   Okay.  Do you know whether it's typical
14  for attorneys to bill their time in private
15  practice?
16       A.  The state of private practice right now
17  may be considerably different than the state of
18  private practice before 2007 and the recession, and
19  business models may have changed.
20       Q.   Fair enough.  At the time to your
21  knowledge whenever you were in private practice was
22  it typical for attorneys to bill their time?
23       A.  In our practice we were a general
24  practice.  We had a diverse practice.  And some
25  cases we would bill.  Other cases we would do flat

Page 234

1   fees.
2        Q.   Okay.
3        A.  In other cases we would do retainers,
4   meaning a percentage at the end of the conclusion of
5   the case depending upon the -- the award, whatever
6   was determined.
7        Q.   Okay.  Fair enough.  Have you ever been
8   adjudicated to have rendered an ineffective
9   assistance of counsel?
10       A.  Yes.
11       Q.   You have been?
12       A.  Yes.
13       Q.   When was that?
14       A.  Last year.
15       Q.   Was there a case number associated with
16  that?
17       A.  It's a Eastern District of Missouri
18  federal court case.  It's a death penalty case.
19  It's Carman Deck versus whoever is the
20  superintendent of the Department of Corrections.
21       Q.   Okay.  And you don't recall like a case
22  number or anything, do you?
23       A.  No.  No.
24       Q.   Okay.  Other than that instance, any
25  other instances?

Page 235

1        A.  No.
2        Q.   We discussed a few times how attorneys
3   that you've referenced have failed to investigate or
4   made other mistakes in the course of working up
5   their cases, right?
6        A.  Right.
7        Q.   And you have mostly attributed those
8   mistakes or omissions to the caseload they're
9   working under, right?
10       A.  Yes.
11       Q.   But isn't it true that attorneys and
12  people generally, they make mistakes, right?
13       A.  Yes.
14       Q.   And so it can be kind of difficult to
15  determine or distinguish between a mistake an
16  attorney makes that's just a regular mistake or a
17  mistake that's made because of caseload.  Would you
18  agree?
19       A.  Not necessarily.
20       Q.   Okay.  And so how would you be able to
21  distinguish just a normal omission versus an
22  omission caused by -- caused by caseload?
23       A.  I mean, I think both occur.
24       Q.   So how could you distinguish?
25       A.  You look into the circumstances and you

Page 236

1   make decisions and judgment calls.
2        Q.   So it would be kind of just a judgment
3   call as far as teasing out whether it was caused by
4   caseload or caused by just general human error,
5   right?
6        A.  There would be an analysis, yes.
7        Q.   Okay.  But in the cases you reference,
8   you believe that it was caused by caseload, right?
9        A.  Yes.
10       Q.   And in your mind is it possible that
11  any of those could have been caused by just normal
12  human error?
13       A.  It's always possible.
14           MR. MOORE:  That is all that I have.
15           MS. ROSCA:  That's all I have.
16           VIDEOGRAPHER:  The time is 7:03.  We
17  are off the record.  This concludes the deposition
18  of Stephen Reynolds.
19           (WHEREIN, the deposition was concluded
20  at 7:03 p.m.)
21
22
23
24
25

59 (Pages 233 to 236)

**ALARIS LITIGATION SERVICES**
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-26   Filed 02/21/18   Page 60 of 100

## Page 237

CERTIFICATE OF REPORTER

1
2
3    I, William L. DeVries, a Certified
4    Court Reporter (MO), Certified Shorthand Reporter
5    (IL), Registered Diplomate Reporter, and a Certified
6    Realtime Reporter, do hereby certify that the
7    witness whose testimony appears in the foregoing
8    deposition was duly sworn by me pursuant to Section
9    492.010 RSMo: that the testimony of said witness was
10   taken by me to the best of my ability and thereafter
11   reduced to typewriting under my direction: that I am
12   neither counsel for, related to, nor employed by any
13   of the parties to the action in which this
14   deposition was taken, and further that I am not a
15   relative or employee of any attorney or counsel
16   employed by the parties thereto, nor financially or
17   otherwise interested in the outcome of the action.
18
19
20   _____
21   Certified Court Reporter
22   within and for the State of Missouri
23
24
25

## Page 239

WITNESS ERRATA SHEET

1
2    Witness Name:  STEPHEN P. REYNOLDS
3    Case Name:  SHONDEL CHURCH, et al. vs. STATE OF
     MISSOURI, et al.
4
     Date Taken:  DECEMBER 19, 2017
5
6    Page #_____ Line #_____
7    Should Read: _____
8    Reason for Change: _____
9
     Page #_____ Line #_____
10
     Should Read: _____
11
     Reason for Change: _____
12
13   Page #_____ Line #_____
14   Should Read: _____
15   Reason for Change: _____
16
     Page #_____ Line #_____
17
     Should Read: _____
18
     Reason for Change: _____
19
20   Page #_____ Line #_____
21   Should Read: _____
22   Reason for Change: _____
23
24
25   Witness Signature: _____

## Page 238

1           Alaris Litigation Services
                (314) 644-2191
2
3    December 26, 2017
4    Ms. Jacqueline Shipma
     Missouri State Public Defender
5    1000 West Nifong
     Building 7, Suite 100
6    Columbia, Missouri 65203
     (573) 525-5212
7    jacqueline.shipma@mspd.mo.gov
8    In Re: SHONDEL CHURCH, et al. vs. STATE OF
     MISSOURI, et al.
9
     Dear Ms. Shipma:
10
     Please find enclosed your copy of the deposition of
11   STEPHEN P. REYNOLDS taken on December 19, 2017 in
     the above-referenced case.  Also enclosed is the
12   original signature page and errata sheets.
13   Please have the witness read your copy of the
     transcript, indicate any changes and/or corrections
14   desired on the errata sheets, and sign the signature
     page before a notary public.
15
     Please return the errata sheets and notarized
16   signature page to Alaris Litigation Services, 711
     North Eleventh Street, St. Louis, Missouri 63101
17   within 30 days of receipt.
18
     Thank you for your attention to this matter.
19
     Sincerely,
20
21
     William L. DeVries, CCR(MO)/CSR(IL)/RDR/CRR
22   Enclosures
23
24
25

## Page 240

1    STATE OF            )
                         )
2    COUNTY OF           )
3
     I, STEPHEN P. REYNOLDS, do hereby certify:
4         That I have read the foregoing deposition:
          That I have made such changes in form and/or
5    substance to the within deposition as might be
     necessary to render the same true and correct;
6         That having made such changes thereon, I
     hereby subscribe my name to the deposition.
7         I declare under penalty of perjury that the
     foregoing is true and correct.
8
9
10            STEPHEN P. REYNOLDS
11        Executed this        day of          ,
12   20___, at                        .
13
14
15   Notary Public:
16   My Commission Expires:
17
18
19
20
21
22
23
24
25

**ALARIS LITIGATION SERVICES**
www.alaris.us        Phone: 1.800.280.3376        Fax: 314.644.1334

**A**

**a.m** 28:11
**ability** 18:5 75:7
    193:19 237:10
**able** 46:4 50:1
    62:23 75:9
    85:17 87:5
    107:16,17
    127:4 136:14
    141:11 174:5
    176:5,11 180:12
    180:15 183:6,9
    183:16 185:20
    191:19 206:12
    207:11 221:21
    223:13 229:17
    235:20
**above-refere...**
    238:11
**absence** 190:3
**absent** 134:13
**Absolutely**
    87:22
**accept** 48:17
    148:17
**acceptable**
    202:18
**accepting**
    154:13
**access** 135:25
    184:21 207:15
**accounting**
    179:11
**accuracy** 33:18
    38:7 180:9
**accurate** 42:24
    43:25 44:20
    84:17 86:6,7
    95:21 177:12
    181:7 184:14
    185:9,14,21
    193:10 211:5
    220:13
    222:25
**accurately**
    184:8

**achieve** 21:7
    53:19 58:2
    85:17 117:11
    118:8 143:14
**achieved** 77:3
**acknowledgi...**
    180:21
**ACLU** 4:14 7:23
    215:9,17
**acquire** 52:21
**acrimonious**
    209:22 211:18
**acrimony** 210:1
**acting** 65:15
**action** 75:14
    108:16 174:18
    174:21,23
    231:3,6,12,17
    237:13,17
**actions** 131:21
**actively** 93:10
**activity** 189:22
**actual** 102:24
    228:13
**add** 18:5 143:11
    213:12
**added** 155:25
**adding** 134:13
    210:19
**addition** 23:18
    124:4 132:2
**additional**
    95:17,18,24
    142:1
**address** 104:5
    117:1,4 192:4
    208:11 229:24
**addressed**
    118:9
**addresses**
    116:15
**adequate**
    148:18 149:12
    219:21 220:4
**adequately**
    73:18 148:8

172:7,10 174:6
**adjudicated**
    234:8
**administrative**
    20:6,12 27:1
    27:16,25
    28:16,24 127:7
    162:12,18,23
    163:3 168:1,9
    168:11,23
    169:6 170:11
    186:18 229:23
**administrativ...**
    27:11 117:10
**adopted** 105:10
    179:12
**advance** 148:2
**affect** 116:24,25
    147:13,23
    151:5 195:5
    197:10
**affirm** 8:14
**afford** 112:1
**afternoon** 4:12
    8:21 64:2
**afternoons**
    117:13
**age** 7:11
**agencies** 68:19
    100:5 194:9
**agency** 101:2
**ago** 100:16
    105:10 111:3
    178:21
**agree** 34:9
    36:5 40:3
    44:19 45:6
    47:25 95:10
    129:8 177:16
    219:2 235:18
**agreed** 7:1 79:8
**agreement**
    34:12
**Ah** 159:15
    225:23
**ahead** 58:3

67:21,24
    68:10 88:17
    130:8 150:3
    151:8 156:2
    168:10 232:4
**al** 1:4,7 4:4,7,20
    4:21 7:18,19
    238:8,8 239:3
    239:3
**Alaris** 6:2,13
    7:25 238:1,16
**alerted** 97:6
    98:16
**Alerting** 98:24
**alleviate** 120:18
**allows** 208:24
**alternative**
    93:20 110:15
    129:8
**alternatives**
    225:13
**altogether**
    159:5
**amalgamation**
    203:11
**amenable**
    131:18 155:12
**Amendment**
    173:5
**American**
    203:5
**amount** 17:7
    30:17 32:2
    49:25 64:6
    76:13 85:13
    87:18 101:8
    117:15 134:17
    142:24 163:9
    166:18 219:14
    227:4
**analysis** 37:20
    171:18,19
    177:19 178:12
    182:19 191:8
    191:10 199:20
    222:3 236:6

**analyze** 180:8
**analyzed** 178:18
    179:2
**analyzing**
    179:21
**and/or** 14:16
    119:16 219:20
    238:13 240:4
**announcement**
    204:15
**answer** 9:2 15:3
    47:11 49:20
    90:2 92:14,15
    150:20 154:11
    171:25 182:15
    183:17,23
    184:1 189:9
    196:4 199:3
    205:20,22
    211:7 212:5
    213:2 214:14
    217:5,6,19,20
    217:25 218:6
    218:6,19,23
    226:4 232:9
**answered**
    152:5 183:12
    191:6 197:22
    211:10 212:9,11
    212:24 213:11
    216:16 217:15
    231:25
**answers** 189:12
    210:9 218:15
**anthropology**
    158:7,10
    177:25 178:6
    178:10
**anticipation**
    47:14
**anxious** 60:8
**anybody** 49:4
    153:22 171:19
    223:12
**anymore**
    165:23

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-26   Filed 02/21/18   Page 62 of 100

**anyway** 87:23
**anyways** 197:4
**apart** 64:17
**apologize** 41:6
167:10
**appeal** 70:22
**appeals** 209:8
**appear** 33:11
56:22 106:12
151:2,3,4
163:17 177:10
184:8,22,24
185:8
**appearance**
56:6,14 89:5
89:7 108:15
108:24 110:3
168:22 169:2
**appearances**
87:7 204:4,11
**appeared**
96:18 116:7
131:15
**appearing**
89:12
**appears** 26:5
33:3 35:23
42:6 105:2
121:7,15 177:6
184:14 237:7
**appellate** 91:17
91:21
**application**
52:3,4,24 53:1
**applications**
25:25 26:1
51:6,13 108:14
108:18,24
109:1 110:3
**applies** 16:5
83:17
**applying** 109:4
222:3
**appoint** 77:8
129:4 134:20
**appointed**

112:14 120:13
120:15 130:2
130:22
200:20 201:1
226:11
**appointees**
219:25
**appointing**
119:19 125:23
129:21
**appointment**
109:17 110:19
111:14,19 113:12
125:5,6 130:12
130:17 131:24
133:19 201:2
201:20,22
**appointments**
61:6 76:2,21
77:4,8,12
92:17 109:17
118:15,25 119:7
119:18,22
124:10,14
126:2,4,7
127:20,25
129:11,15
134:12 135:4
155:16,22
202:3
**apportioned**
140:11,21 141:4
**appreciate**
210:14,24
**appreciates**
102:22
**apprised** 195:4
**approach** 73:15
119:16 127:6,11
**approached**
75:23
**approaches**
105:3,7 109:11
**approaching**
39:8 211:4
**appropriate**

76:12 206:20
232:11
**approve** 66:6
68:23 151:24
**approved**
202:23
**approving** 66:2
**approximately**
7:16 22:20
**April** 45:5
**aptitude** 136:12
**arbitrary** 77:1
**area** 41:13 47:7
168:15 170:2
202:21,21
**areas** 40:8
169:14
**argue** 172:1
173:7
**argued** 34:5
**argumentative**
41:18 171:25
189:5
**arraignment**
26:2 51:9
52:19
**arrested** 51:4
52:8,17 55:17
55:20 56:5,19
56:22 108:25
**art** 40:16
**article** 2:11,12
32:16 33:6
35:23 36:7,10
36:24 37:4,15
37:18 38:4,9
38:22
**articulated** 111:5
**aside** 14:1 16:4
27:1,2 124:4
133:18
**asked** 71:3 115:4

162:21 163:3
180:11,14
183:12 189:6
191:6 193:23
212:9 216:15
217:14,17
219:3 225:14
231:25 232:2
232:6
**asking** 15:6
82:4 125:13
130:16 143:15
163:1 214:6
**aspect** 124:22
**aspects** 160:24
**assault** 71:1,5
**assaults** 146:22
**assessment**
153:2,7
**assign** 22:7
54:4 140:2
163:16,24
174:24
**assigned** 12:16
12:18,20,25
21:14,16,18,19
21:24 23:7
44:10,12 52:13
53:6 54:7
55:21 76:13
116:19 123:24
132:6 139:16
139:17 164:2,4
175:14 219:5
219:19 228:7
231:19
**assigning** 53:17
90:17 91:2,12
91:18 171:6
219:12,14,22
**assignment**
22:15,16
50:23 53:9,15
62:20 74:19
139:1 174:13
**assignments**

23:6 25:19
53:18,21
74:22 163:11,11
**assist** 21:23
24:9,12 96:11
162:18
**assistance**
21:25 29:11
234:9
**assistant** 11:21
12:1 15:8 23:16
24:1,12 53:10
53:11,13 54:4
54:8 100:23
163:12 186:25
**assistants** 13:19
13:22 16:7
22:22,23,24
23:6,9,19
24:4 25:1,16
26:9,16 27:19
30:1 52:25
61:15 108:23
163:14,16
168:2
**assisted** 166:5
**assists** 15:23
**associate** 23:10
23:11,12,15
24:1 26:4 51:3
51:10 52:7,13
52:15 73:1
108:14 110:3
117:6 163:17,18
**associated**
124:20 234:15
**Association**
203:5
**assume** 8:24
69:14 72:2
77:13 101:24
144:12 146:18
153:9
**assumption**
91:11
**asterisks** 181:9

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-26   Filed 02/21/18   Page 63 of 100

**AT&T** 230:8
**attached** 3:10
80:1,8
**attachment**
115:24
**attempt** 163:3
**attempted**
154:25 209:17
**attend** 57:12
122:11 149:22
150:14 153:8
**attendance**
224:10
**attended** 160:4
**attending**
224:7
**attention** 146:14
195:21 197:21
219:24 238:18
**attentive** 82:22
**attorney** 5:20
12:10,11,17
16:12 19:4
21:24 24:13
36:3,6 46:4
48:16,19 52:14
52:21,24 53:7
53:9 54:7,9,17
54:21,25 57:3
57:12 60:20
60:24 62:13
62:18 66:9
72:4 73:14
74:18 76:13,14
82:22 83:11
87:19 88:25
89:5,11,21
90:16,18 96:1
113:6 121:17
124:19 128:12
128:17 130:21
139:15,16,17,21
139:24 140:5
141:11,14
145:10,23
148:7,18

149:12 151:16
153:12 156:17
159:19 168:10
175:4 180:24
180:24 186:24
188:11 191:15
191:15 202:19
203:21 204:5
204:18 205:6
205:10,15,24
221:20 224:2
224:22 225:1
231:2,10
235:16 237:15
**attorney's**
53:14,22
54:13 141:17
205:14
223:22
**attorney-client**
29:8 60:9
70:10 89:18
147:5 215:15
**attorneys** 8:2
14:22 15:15
16:9 17:10,11
18:7,25 19:10
19:16 20:5
21:13,14,16,17
21:19 26:25
27:7,23,25
28:8 31:17
35:5,22 36:2
42:24 48:12
48:15 53:24
57:15,21 59:3
59:6 60:11
61:2,25 62:2
62:23,25
63:25 64:8,13
64:23 65:19
66:22 67:9,17
68:5,13 69:1
69:14,21 70:11
71:7,12,15,18
71:19 72:1,25

73:8,22 74:3
74:25 81:23
83:1,2,20
84:14 85:3
86:23 87:1
88:16 95:6,18
95:24 97:14
97:17,22 101:8
101:17 102:3
106:11 116:19
116:21 117:16
124:5 125:5
129:24 130:13
134:14 135:14
135:20 138:21
140:12 141:21
143:3 145:4
146:14 150:7
150:13 151:6,11
152:3 153:8
154:2,3
155:25 164:15
166:17 167:11
167:19 169:6,9
169:11,15 179:8
186:18 188:18
191:22 194:16
194:22 195:1,4
195:23 197:8
199:7 201:8
202:16
204:20 219:5
221:6 224:18
229:16 230:1
232:6,8,14,18
233:14,22
235:2,11
**attorneys'** 19:15
223:3,9
**attribute** 63:2
**attributed**
235:7
**atypical** 71:6
167:20
**authority**
142:24

**automatically**
22:5 27:10
136:2
**availability**
53:19 68:6
**available** 27:19
29:12 65:18
66:22 68:17
96:11 120:12
171:1 212:19
228:15
**avenues** 51:25
212:18
**average** 27:23
135:22
**avoid** 153:1
193:25
**award** 234:5
**aware** 64:15
87:17 93:2
114:6 125:22
125:25 126:3
126:6 133:22
154:23 175:11
178:25 193:9
220:24
230:10,13

---

**B**

**B** 2:9
**back** 12:22
29:14 37:20
39:24 43:24
47:11 50:21
90:10 94:6
100:3 112:13
124:9 129:5
131:5 134:7
135:12 159:16
176:23 183:14
189:2 200:16
207:19 217:18
217:24 218:20
218:22
232:25
**backfill** 156:20

**background**
65:23 156:22
177:18 178:15
198:20
**backgrounds**
137:24
**backside** 37:24
**bad** 201:5
**bar** 76:3 77:10
111:20 118:15
118:19 119:16
120:17 124:10
127:6,12,13,22
129:5,11,12,15
131:24 132:3
134:22 200:19
200:25 201:3
203:5 219:13
219:22
**Barrett** 2:23
94:11,20 95:1
96:11,14 98:20
99:3,8 102:11
102:13 125:2
166:4,15
**based** 23:25
44:8,10 52:4
72:8 82:25
84:18 91:18
101:11 105:25
106:2 117:19
125:1 131:16
138:8 171:4,5
180:1,6,20
195:25 198:7
203:15 210:3
222:24
225:18
**basic** 51:22
**basically** 161:14
165:16
**basing** 170:21
**basis** 28:19
29:3 30:3,20
34:11 36:18
46:2 48:22

ALARIS LITIGATION SERVICES
www.alaris.us     Phone: 1.800.280.3376     Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-26   Filed 02/21/18   Page 64 of 100

50:8 59:23
68:21 71:11
95:12 117:24
146:4,6 164:4
187:4 193:7
200:23,24
222:3
**batch** 17:13
**Bates** 46:15
77:18 94:21
104:13
**Beach** 2:19,21
77:21 78:3,13
79:22 109:14
**bear** 215:25
**beginning**
116:12 139:7
141:3 175:19
222:2 230:24
**begins** 108:8
**behalf** 1:15 4:22
7:12 8:5,7,11
156:18
**believe** 11:6
12:19 17:8
35:14 40:18
41:7,8 42:13
83:2 85:12
86:5 93:19
107:21 122:9
122:21 123:14
128:23 133:20
139:11 171:1
177:25 183:11
189:15 202:15
214:15 216:9
216:10 231:6
232:5,16
236:8
**believes** 79:10
**bench** 154:24
**beneficial**
171:14
**benefit** 28:16
28:25 29:25
**benefited**

145:23
**Berg** 169:25
**best** 22:14
67:16 87:2
97:22 135:10
140:3,24
149:14 186:23
187:11,13
193:19 194:24
212:12 221:4
225:9 237:10
**better** 29:19
117:10,10
143:14 145:12
148:2 151:20
155:10 170:15
170:20 186:12
222:22
**beyond** 75:11
81:2 109:7,16
165:13
**big** 78:5
**bigger** 195:9
197:10 199:1
**biggest** 34:23
**bill** 7:23 233:5
233:8,14,22
233:25
**billing** 26:19,20
**bird's** 222:24
223:2,5
**birth** 64:14
**bit** 31:5 55:15
76:22 116:5
118:16 122:18
139:4 156:21
156:21 219:11
225:8
**board** 39:4
51:14 65:7
201:23 202:5
**Bob** 131:23
**Bolstered** 37:19
**bond** 31:4 32:2
56:12,13 57:9
76:15 107:24

108:1 198:14
**bono** 113:13,18
118:21 119:22
119:25 124:19
**Borgmann**
169:25
**bottom** 37:25
82:15 111:21
181:10
**bounds** 99:24
**Bowdoin**
156:24 157:10
**box** 204:22
**brainstorm**
15:19
**brainstorming**
109:21 160:19
**Brayer** 35:8
**break** 9:9,10
25:15 46:13
50:14 87:21
93:24 134:22
**breaks** 9:12
**brief** 205:15
**briefly** 204:6
**bring** 229:5
**bringing** 145:15
**Brunswick** 157:1
**Bryan** 202:7
**budget** 2:17
20:6 46:17
66:19 69:9
175:21 226:23
227:2,6,10,11
227:12,16,23
228:2,6,18
**Budgeting**
20:8
**building** 5:14
63:14 238:5
**built** 174:17
**burden** 40:1
162:12 229:23
**Burton** 2:19,21
77:21 78:3,13
78:22 79:1

**business** 57:25
233:19
**busy** 23:12
24:12 88:20
**button** 175:1
231:16
**by-product**
196:23

---

## C

**C** 5:1,19 30:23
60:3 88:7
132:17,22
143:20 144:6
144:7,18
**calculate** 58:19
**calculated**
58:18
**calculation**
48:17
**calculations**
184:23,25
185:13
**calendar** 170:7
232:20
**calendars**
169:15
**California** 5:4
**call** 61:12 85:21
86:9 151:10
224:15 236:3
**called** 51:8
52:16,19 96:12
153:2 174:18
**calling** 197:17
**calls** 25:8,11
51:20 61:16,18
63:20,22
68:10 71:20
75:3 80:17
82:13,13 86:14
86:15 90:1
146:2 150:3
151:7 156:1
164:16 199:15
207:12 230:4

236:1
**Camille** 5:7 8:4
**cap** 202:20
**capable** 164:6
**capacity** 44:4
44:10,20
45:17,20,25
54:23 111:12
159:25 224:16
224:17
**Capital** 159:24
160:2
**capped** 171:11
**care** 227:9
229:22
**carefully** 152:21
**Carman** 234:19
**carry** 84:14
**carrying** 38:12
**case** 1:6 3:5 4:6
7:19 10:8,16
10:23 19:21
20:24 21:3,24
22:6,9,17 26:3
29:5,10 30:7
30:17 31:5,9
32:12 39:12,17
39:17 50:1,23
50:24 51:4,9
51:14,24 52:2
52:12 53:5,15
53:21 54:2,4,7
54:10,16,20
54:22 55:1,4
55:13 56:7,9
56:11 57:7
58:2 60:14
61:23 65:21
65:23 67:7,13
67:16 68:7
70:13 71:6,23
72:25 73:3
74:8,13 82:23
83:4 88:23
89:9,15,22,23
91:10 95:3

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-26   Filed 02/21/18   Page 65 of 100

106:7 112:14
113:7 115:10,24
117:18 121:18
121:25 123:23
123:24 124:20
130:22 139:16
140:25 142:17
142:25,25
143:6,12,18,22
143:25,25
144:3 145:3,11
145:19 147:22
147:25 148:18
148:25 149:3
153:6 161:12
161:21 163:10
163:11,17,21,22
164:7,19 169:4
170:25 172:18
172:20 173:4
173:9 174:13
175:8 179:15
179:16 184:7
188:4 190:14
190:15,18,22
190:24 191:2,8
191:9,10 192:2
192:4 193:13
193:18 195:18
198:8 203:7
204:4,9,15,16
204:24 205:1
205:15,25
206:23 207:6
212:19 219:20
219:23 220:2
220:2 221:15
221:22 223:14
223:21,23
225:6,11
226:11 229:6
229:7,18
230:2,7,7,9,11
230:23,25
233:7 234:5
234:15,18,18

234:21 238:11
239:3
**Case.net** 27:13
161:23 188:9
**caseload** 2:14
10:11 13:2 14:4
14:5,6,8,11
17:18 18:6
19:15 20:1,4
27:17 31:2
32:4 34:13,18
34:19 35:17,18
35:19,24 36:5
36:23 39:19
41:2,12 42:2
42:17 44:15
47:18 53:14
55:3 58:8
60:7 62:5,11
63:3 68:3
69:24 70:25
73:15 75:1,6
78:19 79:2,4
80:22 81:2,11
81:19,21 83:6
83:24 84:15
84:19 85:3,7
85:11 90:11,19
93:15 95:14
95:25 96:15
101:5,18 102:1
103:9 104:6,21
116:14,22,25
117:1,4 118:10
120:18 125:24
126:8 131:19
131:25 132:15
132:25 133:13
133:17,24
134:13,25
135:6,9 137:17
139:3 140:25
141:9,12,16,17
142:4 150:10
154:5 155:14
155:24 160:19

164:20 165:10
173:22 174:3
175:6,18
177:16 187:25
188:1,2 191:11
191:14 194:24
198:22 202:15
202:18,21
208:11 209:23
214:8,15,18
220:16,19
221:2,5 222:4
222:15 223:4
223:9 235:8
235:17,22
236:4,8
**caseload's**
165:22
**caseloads** 15:2
33:7,25 34:2
37:17 82:6
95:3,6 98:25
99:17,21 100:9
108:16 109:5
136:9 154:6
166:6 188:10
188:14,22,25
189:15 190:1
191:18 192:13
214:25
**cases** 10:11 11:3
12:17,25 14:12
14:13 15:18
17:12,19,20,23
17:24,24 18:1
18:8,19,21,23
19:1,7,9,13,22
19:23,25,25
20:16,17,19
23:14,18 24:17
25:6,12,23,24
26:7,13,14,22
27:2,3,8 28:21
29:14,15,20
29:22 30:25
31:8,16,18

34:7,25 35:12
35:14,22 36:3
36:10,14,20
37:21 38:12,24
40:8 42:20
43:6,9,10,25
44:11,12,21
45:11,20 46:5
48:3,8,15,19
49:1,5,6,8,9
49:21 50:10
50:25 51:3,5
51:8 52:5
53:17,24
54:18 55:10
57:20,23,24
58:20 59:13
59:14 60:3
64:23 65:1,12
66:25 67:8
68:15 70:25
71:18 73:18
76:13,25 77:2
77:3,9 81:25
82:11,12 85:25
86:13 87:6,7
88:16,19
89:24 90:18
91:2,13,18
95:15,19 96:1
97:12,18 101:9
102:4,8 105:12
105:14 106:3,4
106:12 108:8
111:21,22,23
111:25 112:2,17
112:23 113:8,19
114:10 116:20
119:20 120:7
120:12,13
121:23 122:5
122:12 123:7
123:12,18,20
129:21 130:14
132:6,20,22
132:24 133:1,8

133:10 134:17
134:19,20
138:22,24
139:5,18,22
139:24 140:2
140:6,10,13,14
140:23 141:2,5
141:20,21,22
141:24 142:1,2
142:3,4,12,16
143:19 144:19
144:20,21
146:9,11,13,15
146:20 147:13
151:6 156:4
160:8,16 161:2
161:10 163:6,8
163:9,16,24
163:25 164:1
169:9 171:6,23
172:7,9 173:6
173:11,20 174:1
179:10,14
184:14,17,17,18
185:1,2 188:16
190:22 191:4
192:10,24
193:19 194:16
194:21 195:20
195:23 196:1
196:23 197:3
197:16,19,20
198:11,12,13,15
198:15,24
199:4,10,12
200:3,4,12,20
201:15,19
202:2 205:7
219:19,22
221:23
222:25 224:5
229:3,22,22
233:9,25,25
234:3 235:5
236:7
**categorical**

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-26   Filed 02/21/18   Page 66 of 100

54:1
**cause** 4:18 39:1
  189:15 220:15
**caused** 188:22
  188:24
  235:22,22
  236:3,4,8,11
**causing** 165:11
  221:5
**Cave** 202:7
**CCR** 6:13
**CCR(MO)/CS...**
  238:21
**cell** 199:15,21
  230:8
**Center** 5:13
  64:1,4
**central** 1:2 4:2
  4:20 65:10
  69:3
**centralized**
  141:6
**certain** 4:18
  12:16 14:12
  17:12 29:17
  65:12 66:10
  67:6,9 68:8
  68:16 114:10
  132:8 169:1
  174:13 186:5
  216:24
**certainly** 15:11
  17:5 19:18
  54:16 100:23
  150:22 187:8
**CERTIFICATE**
  237:1
**Certified** 4:16
  4:17 7:5,5
  237:3,4,5,21
**certify** 237:6
  240:3
**chain** 3:4 114:21
**chair** 15:18
  160:25
**chaired** 92:2

**challenge**
  63:18,19
**chance** 115:12
**change** 21:4
  165:8 186:19
  197:1 239:8,11
  239:15,18,22
**changed** 13:10
  13:13 42:19
  165:3 166:10
  220:20
  233:19
**changes** 238:13
  240:4,6
**changing** 42:21
  166:13
**Chapter** 84:11
  91:13,19 208:5
**charge** 20:11
  23:22 26:14
  26:19 160:23
  227:8
**charged**
  206:16
**charges** 52:20
  56:6
**Charles** 139:13
  140:1,15 142:1
  142:5,11,17
**check** 207:3
**checking** 28:2
**chief** 98:13
  103:8,11
**child** 114:13
  119:19
**childhood**
  200:16
**choose** 124:13
  176:7
**Church** 1:4 4:4
  4:20 7:18
  238:8 239:3
**circle** 232:25
**circuit** 26:2,4
  51:9,10 108:14
  117:7,20

128:20 134:11
  135:5 163:18
**circuits** 163:18
**circumstances**
  97:23 129:9
  235:25
**cite** 82:16
  165:24 188:4
  221:19
**cited** 173:19
  214:25 220:15
**citing** 82:20
**city** 11:21,23
  12:2,7 93:9
  100:24 104:19
  104:25 105:9
  106:1,3 108:12
  109:1,10,25
  123:15 139:1,11
  139:18,22,25
  140:6,12 141:21
  141:24 154:21
  209:15,17,21
  210:5,15,18
  211:3,9,17
**civil** 130:21
  187:7,16,21
**claim** 189:2
**claimed** 175:4
**claiming** 175:10
  178:21
**clarified** 135:4
**clarify** 184:2
**classes** 178:9
**Clayton** 11:8
**clear** 39:9
  119:21 133:12
  134:11 155:11
  158:5 177:6
  231:24
**clearly** 151:19
**clerk** 16:6 115:21
**clerks** 13:19,22
  22:25 23:2,3
  25:18,20 26:8
  26:16 27:9,20

61:16 92:10
**click** 174:23,25
**client** 15:16,16
  23:17 25:14
  26:5 28:3
  29:19 30:15
  49:16 57:16
  58:10 59:7,9
  59:21 60:20
  60:25 61:2,3
  61:4,5,24
  62:18,19 63:6
  63:7 64:13
  67:16 71:2,3
  73:19 87:18
  88:15,22 89:1
  89:2,3,6,7,10
  89:11,12
  106:14 111:22
  111:25 112:16
  113:1 117:11,17
  130:1,19
  143:22 145:16
  146:10,24
  147:2,6,8,11,13
  147:21 148:5
  148:12 149:4
  149:10,14,24
  150:25 152:16
  152:17 164:19
  166:6 174:6,6
  195:4 196:25
  197:2 198:6
  204:7,10,13,14
  204:16,18
  205:6,9,21
  206:14,16,19
  223:20 229:9
  229:24
  230:15,15
  231:13,21
**client's** 108:15
  151:13 198:7
  200:16 207:7
  229:13
**clients** 12:14

14:16,17 21:7,8
  23:10,18,20
  24:4,18 25:1,4
  27:9 30:4 31:4
  31:13 32:1 51:5
  51:16,20 58:7
  59:16 60:6
  61:7,12 62:3
  62:12 63:16
  64:7,9,11 71:21
  73:18 75:7,9
  76:11 81:14,18
  85:24 86:11
  86:22 87:5,9
  87:10,12,14,24
  88:2,6,10,13
  89:17 91:3
  107:14,16
  108:18,24
  110:4,5 130:3
  130:14 136:18
  145:22 148:23
  150:14,16
  152:24 153:4
  162:6 191:25
  194:7,25 195:1
  195:2,10
  204:6 206:15
  207:11,22
**clients'** 21:3
**close** 16:14,18
  63:13 167:6
  196:1
**closed** 195:23
**closer** 67:15,18
  206:15
**closing** 196:23
**co-chaired**
  92:2
**Coalition** 201:11
**Coburn** 202:7
**coerced** 196:20
  196:21,22
**coercing**
  196:24
**coincide**

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL  Document 160-26  Filed 02/21/18  Page 67 of 100

107:25
**coincident**
107:21
**collaborate**
22:7 82:4
147:25
**collaborative**
209:3 215:24
**colleague**
210:7
**collect** 63:23
101:11 179:1
232:12
**collected** 178:17
**collecting**
179:20 194:7
**collection**
178:12
**College** 156:24
157:10
**Colorado** 157:5
157:7
**Columbia** 5:15
101:10 126:1
141:6 151:24
238:6
**column** 43:5,7
43:15,20 44:3
44:7
**columns** 43:3
45:6 47:21,22
47:25 180:23
180:25 181:19
184:16
**combine** 143:16
**combined**
164:20
**come** 14:25
25:25 42:20
44:11,12 50:11
57:20 79:12
83:23 97:2,12
100:12 121:22
121:25 163:6
171:10 198:14
203:2

**comes** 27:10
51:24 90:23
169:11 190:14
199:20 228:9
**coming** 12:9
82:1
**commenced**
122:1
**comment**
39:25 182:24
**commented**
100:9
**comments** 38:3
38:7
**Commission**
240:16
**commit** 71:4
**commitment**
125:10
**committee**
104:5,15 105:4
107:24 115:19
124:11 126:19
126:20,22
**communicate**
146:24 187:3
207:22
**communicated**
85:25 87:9,11
87:19,25
151:19
**communicati...**
30:7 36:22
40:7,9 49:16
91:24 117:17
126:11,21
147:12 201:5
**communicati...**
29:9 40:15
117:19
**community**
225:13
**compare** 179:13
**comparisons**
109:10
**compel** 188:8

**competence**
151:18 219:4
**competency**
151:13,20,25
152:4,5,9,12
**compiled** 179:11
**complained**
86:23
**complaining**
188:18
**complaint**
71:20,21
85:22 86:9,14
86:15,20
196:25
**complaints**
15:16 86:21
88:9 146:10
166:6 194:22
196:20
**complete**
158:12,16
161:21 171:12
**completed**
144:5 158:20
159:6
**completion**
229:6
**complicated**
14:15 23:13
49:13
**comply** 187:19
**complying**
154:2,4
**compound**
87:22
**compromise**
70:9
**computer** 10:8
27:13 28:2,4,5
37:14 53:5
58:17 101:6,12
101:16 121:7
161:9 168:15
169:7 185:7
196:15

**computers**
199:21
**conceivably**
111:8 156:3
**concentrated**
85:14
**concentrating**
194:6
**concern** 72:5
73:8 77:5
110:8 114:4
149:1 150:19
172:15 219:9
**concerned**
71:15 75:5,6,8
149:20 220:6
220:9
**concerning**
219:12
**concerns** 33:18
38:6 75:1,13
116:15 129:20
130:2,11 146:8
148:24 173:5
**concluded**
236:19
**concludes**
236:17
**conclusion**
59:24 71:11
81:22 100:12
117:25 221:13
234:4
**conclusions**
101:22
**concrete**
109:13 119:9
216:20 218:3
**concurrently**
212:18,23
**condition** 175:7
**conditional**
75:15
**conditions**
107:12
**conduct** 70:6

152:16 178:8
190:8,21
232:12
**conducted**
150:23 172:14
203:16
**conducting**
69:18 100:22
187:14
**conducts**
137:10
**conferences**
204:25
205:16,25
206:23
**confidential**
61:10 89:13,14
**confidentiality**
70:23 206:7
**confine** 56:5
**confined** 52:16
58:7,10 61:4
76:16 88:2,14
110:5,6 148:6
193:4 204:22
206:14,15,18
**conflict** 139:3,5
139:22 140:5
140:10,13,14
141:2,5,22,24
**conflicting**
26:14
**conflicts** 139:1,2
139:10,16,18
141:11
**conjunction**
78:1
**connect** 189:16
189:19
**consequences**
64:8
**consider** 49:2
53:13 66:2,6
73:23 112:19
127:5 168:11
187:11 189:13

ALARIS LITIGATION SERVICES
www.alaris.us  Phone: 1.800.280.3376  Fax: 314.644.1334
Case 2:17-cv-04057-NKL  Document 160-26  Filed 02/21/18  Page 68 of 100

142:24
**considerably**
233:17
**consideration**
118:22 119:19
229:14
**considered**
76:10 109:18
125:20 138:8
167:25 168:8
196:6
**considering**
76:23 92:16
107:1 119:15
131:1
**consists** 14:15
**constantly**
197:9,20
**Constitution**
150:24 156:8
**constructive**
75:18
**consult** 204:14
204:16
**Consultation**
231:13
**contact** 59:7
61:3,24 65:22
88:15 89:10
121:19 151:23
164:19 203:21
206:22 207:8
231:21
**contacted**
71:23 151:2,3
151:4 224:11
230:16
**contained**
181:18 183:3
183:22 199:11
**contemplated**
76:19 110:25
135:5
**context** 81:2
91:6 186:11
**continuances**

74:4
**continue** 41:19
80:19
**continued**
38:19 56:7
89:9
**continuing**
126:3,5
**contract** 139:20
**contracted**
139:3,6,15
141:2,5
**contracting**
141:6,19
**contributes**
60:8
**control** 75:11
81:3,20 217:4
217:22
**conversation**
86:23 168:2
170:12 186:2
204:7 205:15
205:20
206:19 219:6
221:10 224:3
224:7 230:17
**conversations**
84:1 102:11
116:11 166:12
190:9 192:6
215:16,18,23
216:1 223:24
**conveying**
43:20
**cooperate**
93:17
**cooperative**
134:21
**coordinated**
117:14
**copied** 27:9
79:22
**copies** 3:10
169:16 170:7
176:15

**copy** 121:15
238:10,13
**copying** 168:13
169:10
**correct** 11:17
12:23 13:8
16:2 23:1
26:24 31:22
35:24,25 36:3
36:4 37:22
42:25 43:1
49:22 52:9,10
54:1 56:25
57:10 74:19
74:20,23
78:23,24
79:23,24
80:10 90:6
102:8,9 103:15
105:4 106:17
110:14 113:11
118:4 119:2,24
124:2 128:14
130:16 133:3
133:15 135:1,2
135:6,21 140:7
140:15,16
142:6 144:21
144:22 145:20
145:21 148:14
148:15 159:11
161:15,16
163:5 165:1,6
168:6,20
169:20 170:13
170:18,22
176:25 178:18
183:2,20
184:20,24
185:15 186:15
190:14 191:2
202:13,17
203:17,22
207:17 208:14
208:16,17
213:15 221:17

221:18 226:7
226:8 228:4
231:4,8,18
240:5,7
**Correction** 51:6
**Correctional**
64:1,4
**corrections**
234:20
238:13
**correctly**
100:16 185:13
**corresponde...**
162:5 189:24
**corresponde...**
162:5
**costs** 110:10
125:1
**counsel** 7:2,2
9:18,19,22
56:8,18,24
57:4,6 58:11
62:16 85:23
86:10,17,19
87:25 97:6
98:14,17,23
103:8 107:18
108:19 109:4
111:14 112:1,7
112:19,23 113:1
113:9,18 119:1,8
119:23 120:6
120:15 122:4
123:12,18,24
124:12 125:17
125:24 129:21
130:1,12,17
133:19 197:1,2
201:13 215:13
215:17 219:19
220:4 234:9
237:12,15
**counsel's**
103:12
**count** 28:1
43:17 136:2

143:10,11
**counted** 59:8
**counteract**
153:6
**counties** 11:14
**county** 11:12,13
11:16 12:3,5
13:7 34:23,23
41:13 47:7
61:20 76:3
85:21 88:20
92:5,10,16
96:3,19 97:1,1
100:25 102:18
102:23 107:8
107:23 108:23
109:25 110:7
110:11 111:9,22
117:5 119:16,17
126:1 128:11
138:25 139:23
140:2 141:12,16
142:4,15
240:2
**County's**
109:23
**couple** 183:11
232:24
**course** 169:11
215:13 230:9
235:4
**coursework**
178:20
**court** 1:1 3:10 4:1
4:16,19 6:12
7:5,20 8:12,14
23:10 26:4,4
27:3,14 28:5,6
31:10 32:17,18
33:7 37:1,5
39:12,18 41:3
46:13,18 51:10
51:15,16 52:18
52:25 53:1,1
56:6,7,11,14,15
57:8 66:15

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-26   Filed 02/21/18   Page 69 of 100

77:16,22 78:4
83:13 87:7
89:1,4,7,12,12
91:1 94:8,12
97:24 98:3
99:19 103:16
103:21 108:15
110:4,21 112:21
114:17,21 115:2
115:11,21 116:8
116:10,13
117:12,16,20
118:12 128:2,7
128:21 129:4,5
143:11 149:6
152:1,6,8,13
154:12 161:22
169:8 173:1
180:24 181:10
182:10 183:15
183:19 194:5
200:14
202:23
203:25 204:4
204:6,11,15
207:6 208:11
209:8 217:20
217:25 218:18
223:7 234:18
237:4,21
**court's** 27:12
**courthouse**
15:21 63:15
**courtroom**
204:21 205:2
205:8
**courts** 34:16
55:8 73:16
75:19 112:18
115:21 154:8
**covers** 51:23
**create** 65:3,12
116:25 117:3
179:7 182:6,15
182:17,23
184:12 196:24

**created** 27:6
53:5 78:10
84:19,20
127:24 163:10
164:11 179:11
180:4 181:20
182:3 185:16
201:24
**creation** 129:6
**crime** 25:9 70:3
190:7,16
192:13 199:13
**crimes** 31:12
**criminal** 12:14
17:16 25:6
65:7 82:11
112:23 113:19
117:8 120:6
124:5 129:21
130:14,22,22
187:15 219:5
**crisis** 107:22
**crosca@orric...**
5:9
**crucial** 65:2
**cumulative** 2:14
41:1,12 47:18
**current** 81:13
198:17
**currently** 35:18
70:20 76:6
81:12 106:4
119:25 120:17
138:23
**custody** 107:12
107:15 111:10
149:10,10,25

---

# D

**D** 2:1 30:23
132:17,22
143:20 144:6
144:18
**D's** 60:3 88:7
144:7
**daily** 24:6 193:6

**damaged** 89:19
**data** 100:11
178:17,18 179:1
179:20,21
181:11,13,15,21
181:25 182:1,3
182:9 183:3,7
183:16,22,25
189:19
**database** 101:4
161:24 188:5
**datasets** 178:13
**date** 7:15 28:6
42:5 45:4
52:18 84:2
104:9,11 122:2
122:10 125:18
154:15 155:10
204:2 239:4
**dated** 128:13
**dates** 27:14
56:11 57:8
89:12 169:8
**David** 6:2 7:24
**day** 4:13 28:7,9
61:19 117:12
163:17,19
240:11
**day-to-day**
102:5 223:1,8
**days** 31:1 57:23
57:25 59:9,12
59:13,16,16,19
59:19 60:23
62:15,20,22
62:24 63:8
88:8,25 93:14
123:14 124:1
132:18 133:11
144:5 164:25
164:25 165:4
165:5 193:4
197:4 205:4,6
231:22 238:17
**dead** 155:6
**deal** 143:8

145:7,25
146:25 148:7
148:9,13,17
149:11,23
177:15
**dealing** 86:19
198:18
**deals** 143:4
144:24 224:4
**dealt** 152:7
228:3
**Dear** 238:9
**death** 234:18
**debate** 202:22
**December** 1:16
4:11 7:15
139:21 232:22
238:3,11
239:4
**decide** 163:15
**decided** 77:14
84:6 118:2
154:7,9 158:21
159:9
**decides** 163:7
**decision** 39:21
74:15,24 75:8
75:14 78:19
79:3,10 91:5,8
91:17,21 141:8
147:14 209:24
**decisions** 147:7
236:1
**Deck** 234:19
**declare** 240:7
**decrease**
84:23 160:9
**decreased**
45:21 84:22
104:20
**dedicated** 14:8
14:20 35:17
36:13 141:23
**deep** 209:8
**defend** 64:23
**defendant** 52:8

52:20,21,22
55:17 107:11
112:8 203:20
**defendants** 1:8
4:8,22 5:11 7:3
8:11 52:17 77:7
110:15 113:23
192:18 204:21
204:22
**defender** 5:11
5:13 9:17 11:11
11:21 12:1,2,4,7
13:6,11 14:14
15:9,10 20:2
20:22 27:22
34:1,15 37:17
49:8,9 52:23
57:22 65:5
76:18 82:6
83:17 85:16
90:10 91:11,18
97:3 99:17,21
100:14,20,24
104:6,19,25
107:15,22
108:12 109:5
110:2 111:11,24
115:20 116:14
121:17 122:22
124:4,24
129:7,13 132:4
135:24 136:12
138:5 141:7
153:19 157:11
157:20 159:22
160:1,23 164:3
167:22 172:6
186:17 203:4
203:8 209:23
210:5 214:5
219:23 226:17
227:17,24
238:4
**defenders** 12:9
12:22 33:6
34:5,25 37:19

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-26   Filed 02/21/18   Page 70 of 100

39:19 41:11
42:1,14 81:4
82:10 85:20
93:18 100:18
100:21 105:11
112:13 135:11
137:21 155:13
160:15 163:8
179:9 192:6
202:20
224:15 227:21
**defenders'**
161:10
**defending**
160:8
**defense** 17:16
65:7 173:6
**degree** 24:16
60:5 160:5
168:13,14
**degrees** 160:4
**delay** 68:1
**delayed** 24:20
**delaying** 67:18
**delegated**
227:12
**delegates**
142:23
**delivered** 187:6
**delve** 230:24
**demand** 31:25
**denied** 66:16
67:3 68:25
225:14 226:10
**Department**
51:5 152:20
152:22
234:20
**departures**
165:12
**depend** 143:18
**depended**
233:7
**dependent**
21:2 93:16
155:12

**depending** 13:2
18:4 234:5
**depends** 22:2
22:11 169:17
205:1
**deposed** 8:22
**deposes** 7:12
**deposition** 1:14
1:20 4:10 7:3
7:13,17,22
9:16 10:6,24
47:15 60:2
66:24 67:4
68:7 121:2,3
126:14 155:9
175:16,19
185:3,6 190:10
191:22 202:15
206:16 210:4
210:9,19
223:19 228:8
236:17,19
237:8,14
238:10 240:4
240:5,6
**depositions**
49:18 66:21
66:23 67:15
67:18 69:10
124:21 160:10
228:15
**deputy** 15:10
122:21 132:4,6
160:22 164:2
**describe** 33:2
37:13 41:21
47:9 55:16
56:2,3 80:4
111:6 121:20
141:1 174:25
**described** 45:7
47:3 109:8
138:17 187:10
189:9 193:22
194:5
**describing**

39:12 174:1
**description**
189:7
**designated**
140:5,5 141:20
163:21
**desired** 238:14
**detail** 118:16
**detailed** 186:24
186:25
**details** 70:19
125:10 127:8
**detained** 87:15
87:18 88:2,3
88:14 89:4
148:5
**deteriorating**
60:9
**determination**
52:1 53:2,4,8
54:9 106:8,19
190:25
**determinations**
26:9,23 54:2
106:16 151:25
**determine**
171:16 214:12
214:25 235:15
**determined**
181:7 212:3
227:4,25
234:6
**determining**
25:25 151:12
**deviate** 164:18
**deviated** 59:11
**devised** 44:9
120:11
**devote** 117:17
141:16 195:20
**DeVries** 4:16
6:12 7:4,24
237:3 238:21
**dialogue** 75:18
96:3,6 208:21
**dials** 63:23

**dictated** 193:14
**difference** 93:8
110:18 209:10
**different** 52:5
63:21 67:7
109:2 111:4
149:9 177:11
179:10 224:5
225:25 226:5
226:8 233:17
**differently** 67:8
179:15
**differs** 93:1
**difficult** 14:18
36:21 55:2
57:21 62:13
72:18,21 77:9
117:6 118:7
134:21 136:10
173:3 235:14
**difficulties** 62:3
**difficulty** 54:2
87:4 203:6
**digitally** 161:14
**dilemma** 80:2,5
81:12
**diligence** 30:6
36:22 40:7,9
40:15 71:22
86:18
**diligent** 60:19
164:15 187:21
187:23
**Diplomate** 4:17
237:5
**dire** 153:8,12,15
153:20
**direct** 108:22
**directed** 86:17
149:2 197:22
**direction**
155:19 237:11
**directly** 129:12
**disagree**
205:17
**disappearance**

173:8
**disappeared**
230:18
**disbelieve**
184:9 185:16
**discern** 187:1
188:9
**disciplinary**
85:23 86:10
86:17,19 97:6
98:13,17,23
103:8,12
**discipline** 81:1
**disclose** 70:9
**disclosed** 72:14
187:2,3
**disclosing**
60:18
**discoverable**
72:15
**discovery** 22:6
23:19,20 24:9
24:13,25 25:3
25:5,15 27:8
30:4,10,12,13
30:15 31:9,13
49:15,18 60:14
60:15,18,21,22
60:25 71:25
72:1,6,7,13,17
72:19,22,23
73:6,10,19,24
132:8 161:18
161:20 168:14
168:22 169:3
169:10 186:1,3
186:5,11,20,23
186:24 187:1,1
187:4,5,12
188:6,7,17
199:6,9,13
224:22 231:14
**discretion**
20:21 143:2
**discuss** 78:25
108:4 112:22

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-26   Filed 02/21/18   Page 71 of 100

119:11,12
124:12,21
203:19 219:11
**discussed** 45:11
75:25 110:22
113:3 114:5
120:6 153:25
160:5 192:17
194:1 208:22
213:14 214:2
215:6,20
216:20 218:4
235:2
**discusses**
106:19 118:16
**discussing**
73:15 96:7
150:10 192:12
209:11
**discussion**
33:21 116:12
125:4,16
127:15 137:8
166:4 170:9
185:25 186:8
190:5 221:7
224:6
**discussions**
15:1 96:12,15
102:15,18
103:13 110:20
125:3 127:12
128:20 129:16
129:17 131:11
154:10,16
166:5 186:3,14
209:1,9 212:1
212:3,13,14
213:3 215:9
**disincentives**
209:14
**disincentivized**
211:22
**disinterested**
219:20
**displaying** 43:8

**dispose** 195:10
**disposed** 88:8
197:3
**disposition** 31:1
74:8,10 132:19
**dispositions**
144:19
**distinguish**
235:15,21,24
**distribute** 19:22
**distributed** 42:1
42:14
**district** 1:1,1 4:1,1
4:19,19 7:20
7:21 11:11 12:2
12:4 13:6,10
14:14 15:8,10
20:2,22 27:22
42:1,14 49:8
72:18 74:3,25
76:6 83:17
93:6,18
100:20,23
103:14 104:19
104:25 105:7
105:8,24
106:5 108:2
114:15 120:1,18
122:16,21
131:19 135:23
142:21 160:1,8
160:23 164:3
164:10 165:4
166:10 202:11
202:16 210:5
211:5,22
227:16,24
234:17
**districts** 93:3
125:23 133:22
167:20,23
202:12
**diverse** 233:24
**divide** 23:25
**divided** 46:6
**dividing** 48:14

**division** 1:2 4:2
4:20 11:22,23
24:1 51:4 52:7
52:13,15
163:19,22
**divisions** 23:15
23:16 117:7,7
185:19
**divvy** 163:8
**doc** 41:24
**docket** 24:5
26:2,7 51:9
52:16 56:5
88:24
**docketing** 116:6
116:13,18
117:15,21 118:11
118:12
**dockets** 23:11
23:12 88:20
204:19
**document**
32:19,20,24
33:2 37:7,10
37:13 42:5
45:4,8 46:20
46:22 47:6,12
77:17,18,24
78:6,9 80:18
94:8,14,16,18
98:5,8,12
103:17,23
114:18,24
115:15,17 121:3
128:3,9
175:22 229:17
**documentary**
200:15
**documentation**
200:5
**documents**
10:2,5 41:5,10
41:22,23,25
42:9,12 187:8
187:17
**Doell** 6:2 7:24

**doing** 27:1
83:19 84:3
97:15,17,22
101:17 113:10
125:23 139:9
139:10 140:12
158:18 175:3
186:20 204:8
209:2 213:8
222:16
**domestic** 18:16
18:18,20
**doubt** 38:6
151:21 206:19
**drafting** 168:19
**dragging** 192:2
**drawn** 101:22
**dropped** 39:6
109:6
**drug** 119:19
**drugs** 38:13
**due** 31:16 79:5
97:13,14 106:8
156:9 173:6
191:18
**duly** 237:8
**duties** 223:2
**duty** 83:10
153:25
**dynamic** 30:22
**dynamics** 198:7

---

## E

**E** 2:1,9 5:1,1
30:23 65:24
132:17,22
151:23
**E's** 60:3 88:7
144:7
**e-mail** 3:4 78:12
78:17,21 79:21
79:22 80:9
91:22,23
104:4,7,9
105:2 107:4
108:5 109:11

109:12,22
110:23 111:5,13
111:18 112:4
114:20 115:18
115:23 116:3,14
118:14 119:8,13
124:9 162:4,10
174:16 192:16
208:1
**e-mailed** 193:6
**e-mails** 51:18
162:15
**ear** 205:14
**earlier** 29:5
36:1 45:7 68:7
104:16 108:6
134:23 144:4
144:17 147:10
148:11 164:23
166:22 167:24
168:25 179:25
185:24 190:9
194:1,10 199:5
200:18 202:9
203:18 208:12
219:4 220:11
231:1 232:16
**early** 29:16 73:4
91:10 92:14
123:4
**eased** 40:1
**easiest** 135:10
**easily** 133:8
145:14 192:25
229:3
**Eastern** 159:24
160:2 234:17
**easy** 54:15
188:8
**educational**
156:22 178:15
**effect** 116:18,22
117:22,23
118:6
**effective** 130:13
130:23

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-26   Filed 02/21/18   Page 72 of 100

effects 109:8
efficiently 30:5
effort 89:19
efforts 34:15
  118:9 194:6
eight 4:13 28:10
  28:11,13 108:13
  151:9
either 13:3 41:8
  57:13 65:9
  66:14 70:10
  100:20 152:14
  163:5 200:14
  217:8 233:11
electronic
  121:16 174:12
  174:15 199:13
  199:20
electronically
  20:10
Eleventh 6:3,14
  238:16
emphasizes
  164:14
employed
  153:23 159:21
  159:23 237:12
  237:16
employee
  237:15
employment
  11:18 23:24
enclosed
  238:10,11
Enclosures
  238:22
encountered
  55:6 149:6
encourage
  112:18
encouraging
  112:6,19
ended 226:11
ends 233:4
engage 69:14
  75:18 148:13

191:19 201:20
  208:20
engaged 221:8
engaging
  209:23
English 182:14
ensure 83:19
  154:1
enter 56:9,18
  56:24 57:4
  162:11
entered 27:15
  57:6 58:6
  62:16 101:12
  101:16
enters 26:6
entire 23:11
entirely 141:23
entry 56:8
  168:15,21
  169:2,7
environment
  16:4 140:1
equal 219:22
equipment
  227:19
equipped 19:1
equitably 28:21
equivalent
  141:15 212:15
errata 238:12,14
  238:15 239:1
error 236:4,12
essentially
  16:13 22:10
  52:12 219:4
  225:20
establish 179:19
estimate 65:23
  134:18
estimated 181:3
  181:11,12,23
  182:8
estimates 181:6
  181:8 221:4
estimation

223:22
et 1:4,7 4:4,7,20
  4:21 7:18,19
  238:8,8 239:3
  239:3
ethic 82:16
ethical 40:13,19
  50:1 80:2,4
  80:23 81:12,17
  85:17 90:17
  91:12,19 95:2
  95:7 97:7
  99:24 153:25
  154:2 198:19
  231:22
ethically 50:10
  75:7 79:5
  85:7,10 98:25
  117:10
ethics 83:21
evaluate 14:24
  83:1
evaluation
  151:22 152:7,9
  152:15,16,23
  217:3,21
evaluations
  73:21 151:12
  152:4,6,12
  232:7,8
evaluator
  152:15,18
evening 4:13
evenly 19:22
  163:24
event 178:24
  207:5
events 122:10
everybody
  17:25 76:15
  167:8 201:23
  206:17
evidence 188:4
  189:1,2,7,17
  191:12 200:14
  200:15

exact 58:15
  123:10
exactly 105:10
  131:22 164:5
  197:11
EXAMINATION
  8:19 156:14
  228:25 233:2
examined 4:11
  7:11
example 20:7
  43:5 52:7 64:1
  89:3 143:6
  150:9 190:7,16
  190:22 226:15
  230:6
examples 73:12
exceed 97:12
  99:24
exceeded
  69:12 227:23
  228:9
exceeding
  110:9
exceedingly
  77:9 134:20
  173:2
exception 18:16
exceptions
  17:21 58:7
excuse 35:15
Executed
  240:11
exhibit 2:10,11
  2:12,13,13,14
  2:16,18,20,22
  2:24 3:1,3,3,4
  3:5,6,6,7
  32:15,19
  36:25 37:1,2,3
  39:14,24
  40:21,22,23
  40:23,25 41:1
  42:4,23 43:12
  44:17 45:1,3,11
  46:11,14,16

47:6,23 77:16
  77:17,18,20,25
  78:2,6 80:8
  94:9,10 97:25
  98:1,15 99:11
  103:1,18,19
  105:16,16,18
  105:18,18
  114:18,19,20
  114:25 115:9,13
  116:2,3 120:23
  120:25,25
  121:2,2,9,14
  124:11 128:2,3
  128:5 131:6
  175:20,23
  176:4 177:1,2
exhibits 3:10
  39:9 41:18,22
  47:23 48:1
  96:8 100:6
  175:17 176:25
  177:3,10
exist 180:21
  185:7
existence 90:5
exists 111:3 117:2
  117:4 189:21
  219:23
exit 166:14
expanded
  57:24 107:6
expected 77:10
  200:19,25
expediently
  176:12
expedited
  144:19
expenditure
  227:14
expense 181:12
  181:14 182:9
expenses
  20:10 124:20
  227:22
expensive

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-26   Filed 02/21/18   Page 73 of 100

65:13 66:18
226:2
**experience**
16:15,19,20,21
17:4,9,11,15
49:8 53:22
54:3 55:12
106:1 129:24
136:17,19,20
136:21,24
137:19,20,20
137:24 138:9
163:24 164:7
166:18,24,25
167:19 178:3
203:5,6,13
**experienced**
16:12 18:2
19:15,24 36:2
36:6 46:3
53:23 59:2,6
85:15
**expert** 65:21,22
66:7,16
178:22 225:1
225:4,5,24
225:25 226:2
226:5,6,8,10
226:11 228:8
**experts** 65:16
65:19 68:6
69:10 124:21
160:10 228:16
**Expires** 240:16
**explain** 10:14
63:19 76:22
81:15 91:7
93:8 101:7
107:6 111:16
139:14 154:22
186:22
**express** 97:4
148:24 174:7
**expressed** 73:8
131:23 146:9
**expressions**

149:1
**expressly** 7:8
**extended** 144:11
**extensive**
209:1
**extent** 38:20
120:21 122:23
169:5 178:2
196:9 211:15
**extra** 68:5,5
**extreme** 165:11
**extremely** 49:3
117:6 133:1
136:10
**eye** 223:2,6
**eye's** 222:24

---

**F**

**face** 64:7 81:13
180:19
**fact** 93:11 171:9
197:3
**factor** 53:20,21
**factors** 66:5
73:25 221:4
**failed** 230:1
235:3
**fair** 153:24
172:2 182:7
197:6 205:9
220:3 233:20
234:7
**fairly** 63:13
**faith** 216:19
218:3
**fall** 27:16
**falls** 162:14
**familiar** 25:4
81:3 104:22
182:18 208:4
208:4,6
**family** 51:18,19
51:20 164:17
**far** 125:6 163:6
189:1 204:3
222:11 228:17

236:3
**faster** 149:11
194:12
**favor** 71:4
**fear** 29:19
**February** 37:15
**federal** 63:17
202:20 203:4
234:18
**fee** 113:10
118:20,24
119:2
**feel** 130:7
184:19 185:8
192:19 213:6
215:3 217:1,10
218:11 220:5
**fees** 234:1
**felonies** 12:19
12:20 13:4,4
14:16 17:20
18:4,5 19:12
30:22,23,24
31:7,20 48:24
48:25,25
49:3 56:10
60:1 84:16
85:6,13 114:12
123:20,21
132:17 133:3
143:20 144:6
194:11 195:17
197:9,10
198:18,19
199:4
**felony** 18:8
38:12 102:8
123:23,23
144:18 146:15
229:10,11,15
**felt** 166:9
223:19
**fields** 178:6
**figure** 36:15
43:12 54:19
92:18 147:25

179:9 199:1
**figures** 45:24
177:12
**file** 72:1 155:1,6
161:14,22
162:3 199:11
**filed** 72:8 154:11
188:8,13,14,15
189:14
**files** 132:7 195:6
199:18,25
**filing** 72:12
155:20 190:8
190:20 213:5
**filings** 39:3,3
**fill** 174:10,20
**filled** 52:24
**filling** 174:21
231:16
**fills** 26:16
**finally** 90:3
**financial** 112:25
113:5 119:1
186:17 224:23
225:2 226:14
**financially**
110:12 237:16
**find** 57:21 115:7
140:24 161:2
173:3 174:7,14
176:5,17 201:4
201:19 216:11
216:17,18 218:1
218:1 238:10
**finding** 24:22
85:24 87:9
174:3
**fine** 184:2 186:7
218:16
**fingertips**
170:25
**finish** 22:9
32:21 58:4
77:24 159:12
**finished** 32:21
37:7 94:14

98:5 103:23
128:4
**finishing** 138:25
**firm** 169:17
179:11
**firms** 121:22
169:14 202:8
**first** 12:18 15:11
17:14,15,18
37:24 44:1
51:4 56:6,19
56:23 59:9
63:6 74:16
78:5,20
80:24 89:7
108:15,24
110:3 128:19
128:23 129:1
131:9 139:12
152:20 160:22
161:3 179:24
184:15 191:21
194:18 195:14
211:9 225:21
232:25
**first-in** 197:25
**first-level**
139:10
**first-out** 197:25
**fiscal** 10:11 11:3
11:6 47:12,19
48:9 109:23
139:7 175:21
177:13 181:11,12
182:8 185:5
226:24
**five** 16:22 22:21
50:9 58:25
85:4,4,5 92:3
95:18,24
102:13 123:9,9
135:16,19
136:16,20,22
137:19 138:14
138:15,18
167:8,11,11

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-26   Filed 02/21/18   Page 74 of 100

198:13,13,15,15
217:14,17
232:18 233:11
**five-minute**
93:24
**five-year** 16:21
**flat** 226:10
233:25
**flesh** 198:9
**flood** 29:20
31:22
**flow** 3:5 57:24
60:3 115:10,24
144:18 164:20
165:10 194:21
195:15,17,20
197:12
**flowing** 197:20
**flows** 171:13
**focus** 31:19
32:11 60:2
202:2
**focusing** 31:3
**follow** 16:24
82:23
**follow-up**
126:10 128:20
156:19 165:5
**follow-ups**
164:25
**following** 112:3
150:24
**footage** 25:10
**footnote** 82:15
82:16 83:8
**force** 113:7
**Fordham**
137:25
**foregoing**
237:7 240:4,7
**forget** 79:20
100:4
**form** 41:17 50:4
62:8 67:22
70:14 75:2
97:19 130:7

146:2 150:1
168:23 174:10
174:20 209:2
209:12 212:4
230:3 231:16
232:3 240:4
**forma** 72:8
168:25
**formal** 26:4
75:13 80:1
154:12 160:20
209:5 213:10
**Formally**
224:18
**formatting**
121:6
**forming** 107:24
**formula** 44:9
179:3,5,13
**formulas** 184:11
**formulating**
127:3
**forth** 207:19
**forthcoming**
93:13 139:20
**fortunate**
138:10
**forward** 115:5
155:23
**found** 157:12
172:24
**foundation** 4:14
44:23 230:5
**four** 15:14 16:21
30:14 48:8
102:13 136:4,8
220:12,21
**four-foot**
206:18
**fourth** 43:16,16
105:18,18
**Fox** 104:18,22
105:18,18
**Fox's** 105:7
**frame** 213:21,22
214:9
**free** 61:18 113:8

**frequency**
24:17 58:13
60:6 149:19
224:1
**frequent** 126:21
223:24,25
**frequently**
126:18
**Friday** 64:2,5
**friend** 157:11
**front** 25:21
98:16 177:3
178:25
**fruit** 215:25
**FTE** 141:15
**full** 14:4,5 33:11
**full-time** 35:1,17
36:13
**fully** 73:9
147:22
**function** 225:16
231:7
**functions** 25:18
26:12
**fund** 124:24
**fundamental**
147:7
**funding** 124:22
129:13,17
**funneled** 19:3
**further** 34:22
102:10 233:2
237:14
**future** 81:14
90:15 216:18
218:2
**FY** 2:16 46:16

---

### G

**gain** 141:15
**gathering**
23:23
**general** 10:6
143:17 170:4
179:3,4,16
222:7 227:19

233:23 236:4
**General's** 5:20
156:17
**generally** 18:1
18:14 19:11
20:8 28:9
32:9 56:9,13
60:13 61:3
67:8 68:14
72:20 130:2
138:13 152:8
162:8 170:17
205:3 219:14
220:17 235:12
**generate**
124:16
**generated** 27:6
76:11 77:6
**generates**
101:6,7
**generative**
125:9
**getting** 20:24
31:4,10 49:24
74:17 113:10
124:21 146:13
185:25 186:13
188:13,14,15
189:14 207:7
222:22 225:5
**gist** 165:16
**give** 8:15,25
9:10 17:18
38:25 91:7
95:25 122:25
137:8 150:20
167:1 183:17
185:20
205:24
224:14
**given** 24:17
27:16 29:20
44:14 48:20
52:25 56:11
57:20 58:7
59:13 109:23

118:8 130:18
140:25 153:24
154:5 164:19
165:9 171:25
173:9,15
180:19 194:4
199:3 213:16
213:24 214:19
215:4 217:3,21
**gives** 53:14
**giving** 112:13
**go** 17:24 36:20
45:10 54:24
58:3 61:20
65:20 67:21
67:24 68:10
68:22 88:16
91:19 93:20
107:4 114:10
121:24 130:8
131:5 135:12
150:3 151:8
152:1,6,15,17
155:6 156:2
156:22 157:6
157:22 158:21
159:9 160:18
161:2 163:22
167:14 168:10
176:10,16
178:23 182:11
188:5,9 194:11
195:14 201:2
214:11 217:23
225:24
230:19 232:4
**goal** 92:12
201:18
**goals** 20:23
21:7
**goes** 21:2 71:21
110:10 113:24
189:1
**going** 8:25
27:3 29:5
30:11 32:9,13

**ALARIS LITIGATION SERVICES**
**www.alaris.us**          **Phone: 1.800.280.3376**          **Fax: 314.644.1334**
Case 2:17-cv-04057-NKL   Document 160-26   Filed 02/21/18   Page 75 of 100

32:19 37:1
40:20,25
43:24 46:7,12
46:21 50:13
52:2,4,21
61:23 67:24
77:15,16,25
79:15 90:9,24
91:13 93:20
93:22 94:7
97:24 100:3
103:16,17
105:17 114:17
114:25 117:21
117:23 120:23
122:23 124:9
125:12 128:1
132:15 133:4
134:25 135:16
152:19 156:20
157:25 158:19
165:15,18
176:10 185:18
185:22 190:13
190:17,21
193:20 201:3
206:1,19,23
207:7 209:1
209:10 210:10
210:20,22
212:2 215:25
216:6,13 217:1
217:11 218:11
223:3,9
**goings** 202:11
**good** 8:21 75:9
129:10 156:16
158:23 160:3
166:18 176:5,8
176:24 216:19
218:2 221:22
**Governor** 5:18
8:9 156:18
**grad** 137:25
**graduate** 138:2
158:2 178:5

**graduated** 11:19
11:20 157:10
157:18
**graduation**
138:7
**gray** 168:15
**Great** 9:15
**greater** 192:19
**Greitens** 5:18
8:9 156:19
**group** 121:22
179:6,8 180:5
**group's** 180:7
**guess** 34:9
38:23 40:10
149:8 157:7,18
166:8 168:8
179:24 180:19
198:10,20
206:11 209:17
209:21 214:11
217:23 218:13
222:24 223:5
**guideline** 69:4
**guilty** 26:6
71:13,16,17
73:20 142:18
149:24 221:24
223:20
**guys** 142:19
207:15,18
224:10

---

**H**

**H** 2:9
**half** 23:25
**hallway** 109:15
**hampered**
29:10 70:12
**hand** 32:13
58:18,19
103:16 136:2
**handle** 15:16,19
18:8,18,20,23
19:1 35:18
40:2,6 46:4

49:5 50:10
54:10,16,22
82:10 97:13
117:7 122:5
130:21 137:16
140:3,24
**handled** 19:7,10
106:3,5 107:3
168:1 227:3
**handles** 105:15
**handling** 102:1
102:3 124:20
141:21,25
142:2,16 164:7
**handwritten**
162:2
**happen** 54:20
58:2 71:7 91:3
108:25 153:16
170:10
**happened**
58:12 107:25
154:22 155:17
209:15 210:12
210:15,18
211:9
**happening**
39:11 58:14
68:1,2 73:13
88:16 102:17
193:22
**happens** 24:16
31:6 51:25
53:4 55:17
60:5 71:9,11
108:18 113:25
149:18 188:10
205:12 216:21
218:4 222:14
**happy** 9:8,10
**hard** 41:5 74:1
220:16
230:20,22
**hardware**
227:25
**Harrisonville**

126:3
**head** 10:20
39:2 173:12
201:10
**headed** 74:13
202:10
**health** 49:16
66:11 152:20
152:22 200:3
200:4 225:11
**hear** 9:4 79:18
206:12,19
215:16
**heard** 79:16
211:17
**hearing** 55:18
55:21,22
56:12,12,13,15
57:9,9 58:5
60:14,22,24
61:22 62:4,17
70:21 106:13
109:8 155:7
208:25
**hearings** 32:2
55:16 57:13,17
60:11,12 107:3
**heavily** 194:8
**held** 7:22 33:21
**help** 24:21
25:16 28:21
39:14 66:14
116:13 131:18
132:15 194:16
**helpful** 28:24
30:9 66:13
105:8,24,25
171:14 193:24
**helps** 26:13,15
26:22
**Herrington** 5:3
5:7 8:5,7
**hesitating**
143:9,21
**hey** 148:24
174:7 205:10

205:22 206:1
230:16
**Hi** 50:22
**high** 17:24 33:7
33:7 34:14
35:13,16 36:16
45:24 48:19
48:23 55:3
64:11 81:2
82:5 83:5
95:4 100:9
136:6,9 157:6
167:21 194:23
202:16 220:16
**high-level**
123:20,23,23
**higher** 49:14
195:18
**higher-level**
229:6,11
**highly** 19:24
89:19 134:15
135:7 136:13
207:10
**hindered**
221:14
**Hinkebein** 30:7
73:16 74:14,24
75:6,14 78:19
79:2,10 80:3
80:23 83:22
91:5,9 92:24
93:3 95:3
107:22 116:7
118:11 150:10
209:24
**Hinkebein's**
81:1
**hire** 52:24
65:12,19
68:20 107:17
111:23 112:17
135:11 136:21
225:11 232:11
**hired** 135:14
136:16 225:21

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 160-26    Filed 02/21/18    Page 76 of 100

232:17
**hiring** 109:4
196:17
**historical** 178:11
**histories** 66:11
**history** 11:19
66:11
**hits** 173:1
**homicide** 179:15
**homicides** 146:18
**hopes** 215:23
**horizon** 155:15
**hostile** 15:19
16:4 93:10,17
154:24
**hour** 28:7 44:9
44:11 50:13
93:23 233:9
**hourly** 68:21
**hours** 4:12
25:12 28:8,13
28:13 31:9
44:14 52:18
63:23,25
144:2 171:10
210:6,6
**huge** 32:2 64:5
110:8
**human** 15:22
15:25 137:10
236:4,12
**hundred** 17:25
36:14 48:8
63:1 76:25
88:8 102:4,8
132:18 133:11
134:19 144:5
197:4,16,18

---

**I**

**idea** 110:24 111:3
131:23 181:5
216:11
**ideas** 109:13,16

109:21 116:16
216:19,20
218:3,3
**identification** 32:16 37:4
41:3 46:18
77:22 78:4
94:11 98:2
103:20 114:21
115:10 128:7
**identified** 166:2
189:14
**ignore** 198:15
**IL** 237:5
**ill** 14:16 149:7
**illness** 14:17
151:17
**imagine** 147:20
182:2
**immediate** 220:8 229:24
**immense** 194:21,22
**immigration** 64:8,14
**impact** 30:16
63:10 64:22
66:19 155:23
171:16,17,22
172:18 175:13
229:13
**impacted** 74:25
89:16 141:9
**impacts** 59:20
110:11 149:23
**imperfect** 155:9
155:18 156:7
**implemented** 105:13 108:21
201:6
**implementing** 107:1
**implied** 119:4
166:9
**implies** 205:20
**imply** 165:21

**implying** 165:17
165:18
**important** 153:21 195:9
195:12 230:22
**impossible** 25:13 81:19
165:9 204:23
**imprisonment** 229:12
**improved** 3:5
115:9,24 116:6
116:13,18
117:21 129:6,13
**improvements** 116:10
**in-call** 224:19
**in-depth** 122:23
**in-person** 63:25 207:23
**inability** 70:12
149:22 192:12
**inaccurate** 184:10 185:21
**inadequate** 225:20
**incentive** 92:20 197:8
**incentives** 196:3
**incentivize** 196:21,22
**include** 14:12
35:8,10 83:25
87:14 144:23
146:15,21
168:19 174:5
**included** 162:1
**includes** 160:24 161:13
174:3 203:12
**including** 16:17
147:7 199:19
**incoming** 24:18
32:12
**inconceivable**

153:21
**incorrect** 119:5
182:20 186:21
**increase** 30:6
160:9
**increased** 35:4
36:7 39:3
84:20 116:20
136:3,8 165:13
220:12
**increases** 110:6
**incredibly** 36:21
**increments** 233:12
**indicate** 66:12
238:13
**indicates** 52:23
181:24
**indication** 216:12 217:1,8
**indigency** 26:1
26:9,23 53:2
53:3 54:8
106:6,16
**indigent** 55:17
136:18
**individual** 27:2
95:19 142:24
143:1
**individually** 60:17
**ineffective** 234:8
**inform** 95:2
**informal** 209:5
212:8,19 213:8
215:23
**informally** 78:22 109:15
**information** 43:20 47:10
47:17 53:12
101:6,8,11
143:13 147:14
166:14 171:8,13

183:10 184:5
184:10,14
189:22 203:12
**informing** 150:25
**informs** 52:20
**initial** 52:19
55:15,18,21,22
57:21,25
164:24 165:4
**initially** 158:10
226:6
**initiate** 148:12
**initiated** 96:3
122:1 166:4
184:17 185:1
209:7
**injuries** 200:7
**inmates** 61:17
**input** 101:4
223:23
**inquire** 64:13
**inquires** 52:20
**inquiries** 164:16
**inquiring** 127:19
**instance** 24:11
29:7,9 47:13
54:6 56:17
70:19,20
74:18 145:2
147:18 148:16
150:5 153:11
153:14 172:16
206:21,24,25
214:7 222:5
234:24
**instances** 29:20 51:22
59:18 100:8
107:25 147:11
150:24 152:19
175:12 188:3
219:16 221:20
234:25
**institutions** 160:4

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-26   Filed 02/21/18   Page 77 of 100

intake 23:10,17
24:4
intended
125:10
intense 31:23
38:21
intensity 38:24
intensive 162:9
intentional
67:25
interact 14:18
interest 67:16
interested
122:10 157:12
220:4 237:17
interface 27:12
161:23
interfering
112:25 113:4
interim 207:7
internal 86:20
100:14 101:5
161:23
internally 16:1
54:24
interpret 131:20
131:21
interrelated
178:7
interrogation
199:14
interrogations
25:8
interrogatories
187:7,16
interruption
99:19 115:2
182:10 218:18
222:18 223:7
interview 33:15
33:19,24 36:8
74:2 137:12
138:9
interviewed
100:17 215:8
interviewing

70:1
interviews 25:7
152:25 166:14
213:17,25
214:19 215:4
215:19
introduce 8:3
18:3 36:25
40:20,25
46:8,12 77:15
77:25 114:25
introduced
46:9
introductory
122:20,25
inventory 188:7
investigate
70:12 71:2,3
145:24 148:8
148:19 149:13
151:20,21 171:6
232:11 235:3
investigated
145:11 172:7,10
172:21
investigating
70:5 149:2
investigation
28:20 29:4
49:17 66:10
74:11 85:23
87:8 138:23
152:25 170:23
173:10,16,24
174:4,9 175:10
231:11,19
investigations
69:13,15,19
170:25 171:7
232:12
investigative
190:6 191:3,19
investigator
21:18,20,21,23
22:1,4,16 29:11
157:13,15,19

157:25 158:5
172:17,19
173:24 174:13
174:24 175:1
175:12 231:2,4
231:20
investigators
13:18,21 16:6
21:10,13,20
22:3 24:21,22
29:1,12 170:10
171:9,14 175:2
involve 180:4
199:12,13
200:13
involved 72:12
96:14,17
120:10,18,21
122:17,19 127:1
127:16 131:11
174:9,21
involvement
107:15
involves 64:5
107:10
involving
185:25
Irvine 5:4
issue 34:18,19
64:9,11,15
83:6 90:19
92:22 102:24
103:9 107:22
116:14 118:10,11
119:1 127:13
130:24 131:4
131:19 132:15
133:17 134:25
135:9 145:17
155:14,24
164:21 187:12
187:22 192:17
209:24 210:7
211:17 213:23
219:17
issues 10:23

15:20 49:15
82:23,24
96:15 99:2,3
102:11 104:6
115:20 120:19
124:15 129:25
133:24 134:13
135:6 141:9
154:8 164:20
188:22 189:20
208:11 213:17
213:23 214:1,8
214:18,23
215:3 219:16
item 174:18,22
174:24 228:2
231:3,6,12,17
items 22:7
iterations 41:25
42:9 46:25

_____

**J**

J 5:3
Jacqueline 5:12
8:10 238:4
jacqueline.sh...
5:16 238:7
jail 25:12,25
28:3 51:13
61:4,9,17,18
62:13 63:6,8
63:11,13,14
71:14,16 73:20
76:16 92:10
107:8 109:24
110:6,8,10
116:9 150:23
152:15,16
192:1,3,18,20
192:24 193:4
193:9,15
194:16 195:5
195:10,21
197:17 199:15
204:8 206:17
207:15,22

223:21
James 5:3 8:6
January 42:6
92:15,19
126:21
jeopardize
130:18
jeopardized
75:10
jmaune@orri...
5:5
Joanne 5:7
job 24:6 75:9
136:10 137:17
138:2,5,10
157:12,12
165:23 192:9
220:16,20
222:15 223:3
223:8
jobs 136:13
judge 26:5
52:18 78:12,13
78:22,25
79:22 92:2,2
96:20 109:14
127:14,19
153:5
judges 2:19,21
75:16,21,25
76:3 77:21
78:3 79:16
83:23 93:11
104:4 105:13
107:1 111:1
115:19 118:1
119:15 124:12
125:2 126:22
127:3,5
130:25 155:8
155:12 208:20
209:22
215:24
judgment 236:1
236:2
judiciaries 93:2

ALARIS LITIGATION SERVICES
www.alaris.us     Phone: 1.800.280.3376     Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-26   Filed 02/21/18   Page 78 of 100

judiciary 84:1
91:24 92:1,21
92:23 93:6,17
96:4,19 102:19
102:23 103:13
106:22 107:20
107:23 117:20
120:3 125:20
126:11 131:11
134:10,11 135:5
June 45:5
jurisdiction
17:17 55:25
60:13 64:10
136:23 153:1
jurisdictions
111:1,9 154:17
154:20
jury 144:16
153:20
204:22 222:1
222:9
justice 82:7,9
82:14
Justin 5:19 8:8
156:16
justin.moore...
5:22
juvenile 18:21
19:13

**K**

Kansas 93:9
123:15 154:21
209:15,17,21
210:5,15,18
211:3,9,17
keep 27:15
125:12 173:12
186:24,25
196:11 212:12
keeping 62:12
196:10
keeps 193:4
kept 195:22
222:1,2,10,11

Kerr 92:2
96:20 127:14
127:19
kind 19:1 21:25
67:24 130:7
160:14 161:8
161:18 166:18
168:7 170:2,19
171:17 172:18
174:16,20
177:22 180:18
189:19 191:16
192:22 194:11
194:14 195:13
196:7 198:9,18
198:20 199:9
200:5 203:10
203:11 207:8
209:25 217:1
223:25 224:4
225:5 226:13
227:9 235:14
236:2
kinds 14:12
knew 139:19
know 9:8,10
21:4 22:14
23:7 28:22
32:21 37:7
38:25 39:11,13
41:5 46:20
55:7 67:10,20
69:8 77:24
84:8,25 88:12
91:10 94:14
98:5 101:1
103:23 104:24
105:10 109:7
111:2 113:1,20
114:24 119:5
120:4 123:9
124:3,7 125:15
125:21 126:1,2
126:5,9,23
127:8,15 128:4
131:22 137:18

138:13 139:12
139:14 143:14
145:2 146:10
147:18 152:6
153:11 166:14
167:18,21,21
167:22 169:13
169:15,16 171:2
172:17 175:10
177:9 179:19
180:18 181:19
181:22 182:1,12
182:22 186:18
188:20,22
190:12,16
191:2,3,13
193:13,25
195:1,7 196:12
197:7,11 198:11
199:17 200:5
202:6 203:8
204:17 205:9
205:13
206:24 207:3
207:5,23
208:2 209:6
211:20 212:12
213:1,11,25
214:20 215:18
218:13,24
220:25 221:12
221:20 222:21
223:3,8
226:20
227:20 228:9
231:10 233:13
knowing 75:12
knowledge
34:13 66:20
69:6 108:22
163:4 171:19,21
184:11 211:22
215:7 227:1
233:21
knowledgea...
147:22

known 166:15
knows 153:20

**L**

L 4:15 6:12 7:4
237:3 238:21
lack 65:3 86:17
173:16 189:13
landscape
54:17
large 31:2 111:19
166:3 188:16
201:20 202:8
202:21
large-scale
127:20,25
201:2
largely 14:15
23:22 53:18
84:2 114:12
177:11 226:24
larger 92:4,8
largest 196:19
lasted 136:24
lasting 216:3
late 123:4
230:14
laundry 109:20
law 11:19,20
75:10 137:25
138:8 157:22
157:25 158:3
158:7,19,22
159:9,15 173:4
lawful 7:11
lawsuit 213:24
214:18 215:10
215:19
lawyer 16:14,18
17:14,16 22:11
22:17 25:13
29:21 31:7
32:5 36:10,22
39:4 51:12,17
51:19,21 54:16
55:2,3,9

70:23 74:2
76:25 82:24
85:14 102:1
111:23 112:17
115:21 140:3
143:12,25
147:24,25
148:23,25
149:5 151:1
153:19 161:3
163:25 164:6
173:11,14,18
174:2 187:14
187:16 192:1
lawyer's 18:5
22:6 54:3
55:2 193:19
lawyerly 217:5
lawyers 13:17
13:20 14:18
15:4,9,11,17,18
15:19 16:17
17:3,6,9 18:3
19:23,24
20:13 21:22
22:3,7 23:21
24:2 27:15
29:15 31:3
35:1,7,8,10,17
35:18 36:12,13
38:11 39:7,7
40:9 44:8,14
49:1 50:10
55:7 58:1,6
58:20,24,25
59:2,14,15
65:11 81:17
86:12 98:24
117:1,11 119:16
124:3 134:19
138:24 146:8
147:18 150:11
151:19 152:8
154:6 160:18
160:25 162:13
162:14 163:20

ALARIS LITIGATION SERVICES
www.alaris.us        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-26   Filed 02/21/18   Page 79 of 100

163:23 165:9
166:6 167:5
171:5 179:13
187:7 192:9
194:5 195:19
222:15,21
223:19
224:20
230:14,22
**lawyers'** 15:13
149:21 163:24
**lead** 212:1 216:3
**leading** 41:17
130:7 150:2
232:4
**learn** 29:13
222:16 230:14
**learning** 21:6
**learns** 151:16
**leave** 137:5
138:14
**leaving** 198:19
**left** 11:22 86:1
135:20 137:1,2
137:3,4 139:2
**legal** 7:24 9:17
13:19,22 16:6
22:22,23,24
23:6,9,16,19
24:1,4,12 25:1
26:9,16 27:19
30:1 52:25
53:10,11,13
54:3,8 61:15
108:23 163:12
163:14,16
186:25
**legislative** 2:17
46:17 175:21
**legislature**
34:16 129:12
129:17 141:4
**legitimate** 32:1
149:2
**length** 87:19
186:4 210:6

**let's** 42:22,22
64:16 112:17
119:6 216:20
217:15 218:4
218:24
**letter** 2:20,22
2:24 3:7 75:15
78:3 80:1,6,8
80:12,15,20
80:25 84:13
84:19,21 85:21
86:9,16 90:4
90:13 91:4,16
91:20,23,25
94:11,19,23
95:1,17 96:2,7
98:2,10,13,19
98:20,23
99:3,4,6,11,12
99:12 102:12
102:14 103:5
128:6,10,17
131:6 132:1,24
133:7,18
134:24
**letters** 27:4,6
71:21 86:16
168:16 188:6
194:5 207:18
**level** 31:23
53:22 54:3
136:13,17
139:12 167:19
221:14 228:3
228:19
**license** 75:10
**life** 229:13
**liked** 137:17
**limited** 171:10
**line** 81:8 128:19
186:14 239:6
239:9,13,16
239:20
**lines** 219:9
**lineups** 150:14
150:16,22

151:1,2,3,5
224:7
**lingers** 31:9
**link** 223:11
**list** 41:11 51:1
76:6,9,10,15
76:17 77:5
108:5,6,10
109:20 110:13
110:16,19,19,21
110:24 111:3,7
111:11 113:21,22
113:24 114:3,9
114:11,15
124:12,17
127:8 132:5
155:16 156:7
191:3 193:4
202:4
**listed** 47:21
51:25 121:12
121:19
**listening** 232:1
**lists** 41:13 76:2
76:5 118:14
155:22
**litigate** 20:17,18
50:1 154:7,9
187:6,20
195:6
**litigated** 29:6
39:18 70:21
70:22 145:11
187:23
**litigating** 20:15
40:7 222:22
**litigation** 6:2,13
7:25 20:10
34:1 61:24
65:1 84:8,8,10
93:20 172:21
173:13 187:21
198:22 238:1
238:16
**little** 31:5 55:15
76:22 116:5

118:16 122:18
138:24 139:4
149:8 156:21
156:21 219:11
225:8
**live** 35:18 84:18
95:25 101:25
119:17
**LLP** 5:3,7
**local** 66:19
164:9 225:11
228:1
**located** 172:22
176:25 193:2
**log** 181:11,25
182:1,2 186:24
187:1
**logic** 74:21
**logistically**
23:13
**logistics** 127:7
**long** 16:13 71:15
90:8 123:11
136:15 150:20
157:24 158:23
169:21 192:23
193:9,14
194:15 195:4
214:6
**longer** 86:2
92:19 144:14
193:21
**longest** 87:17
87:20
**look** 34:22
39:14 41:12
42:22 43:14
47:5 78:20
102:2 116:1
167:13 171:3
174:16 175:17
176:8 180:22
184:15,20
185:5 235:25
**looked** 10:20
**looking** 35:23

42:4 51:12,19
51:21 175:19
177:1,7 180:23
189:16 206:3
206:3
**loose** 233:4
**loosely** 110:23
**loss** 173:5
**lot** 25:5 30:21
61:7 64:9
89:19 144:20
156:4 166:17
168:15 169:7
173:4,19 221:7
230:21
**Lotus** 10:16
27:13 101:13
161:11,13 162:1
162:7,11,15
182:3 184:22
189:22 231:7
231:16
**Louis** 2:11 4:15
5:21 6:3,14
7:23 11:12,13
11:16,22,23
12:2,3,5,7 13:6
32:15 33:4
34:23 41:13
47:6 68:19
76:3 85:20
88:20 92:5,10
92:16 96:3,19
97:1,1 100:24
100:25 102:18
102:23 104:19
105:1,9 106:1,3
107:8,23
108:12 109:10
109:23,25
110:7,11 111:8
111:21 117:5
119:16,17
123:13 128:11
138:25 139:1,11
139:18,23,25

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-26   Filed 02/21/18   Page 80 of 100

140:6,10,13
141:12,16,21,24
142:4,15 157:9
157:13,15,20
159:16 202:8
225:17 238:16
**Louis's** 109:23
**low** 31:23 136:9
142:13 171:2
220:16
**low-level** 17:20
27:8 30:23
56:10 114:12
123:20 133:7
143:24 197:9
198:18 229:15
**lower** 139:23
**lower-level**
31:19 195:17
198:25 229:3
229:6,10

___

### M

**mail** 51:6
207:24
**mailed** 27:7,9
**mailing** 168:16
**Main** 5:4
**Maine** 157:1,2
**maintain** 36:22
192:22
**maintenance**
227:20
**major** 53:20,21
**majority** 30:24
197:19
**making** 26:9
54:8 72:13
200:21
205:21
**man** 137:2
**manage** 13:16
13:17 14:18
15:9 16:7
23:10 24:4
25:20 26:15

39:19 169:15
170:6
**managed** 15:4
226:24
**management**
10:9,16 13:18
13:21 14:21
23:4 27:14
35:10 90:12
102:5 161:12
192:8 204:24
205:16,25
206:23 223:1
226:25
227:12,13
**manager** 13:14
15:22,25 26:11
26:13,21,23
154:1 163:12
227:3,9
**Managers**
83:10
**manages** 23:17
**managing** 20:5
27:23
**mandatory**
77:13
**manner** 72:19
73:24 109:2
187:21,23
**manually** 27:14
101:9 162:9,11
**March** 12:3 42:7
**mark** 17:22 18:3
19:17 32:19
37:1 59:19,25
77:17 94:8
97:25 103:18
114:18 128:2
**marked** 2:13
3:3,6 32:16
37:4 40:21,23
41:2 46:17
77:21 78:3
94:11 98:2
103:20 105:16

114:21 115:10
120:24,25
128:6
**market** 225:16
**marketplace**
113:16
**marking** 46:14
**marks** 58:21
59:15
**Mary** 104:18
**master's** 158:13
158:15,21,24
**material** 25:13
**matter** 7:18
33:24 91:5,9
112:24 132:22
207:8 238:18
**matters** 12:15
112:7 117:8
130:22 195:10
195:11 219:6
219:13
**Maune** 5:3 8:6
8:6 156:11
**maximized**
145:16
**McCulloch** 3:7
128:6,11,18
131:23
**MCRC** 120:20
121:18,20
123:8,17,24
127:14,19,23
201:10,17,23
**mean** 13:15 21:1
25:3 26:22
40:5 42:19
43:3 48:6,8
57:19 80:17
82:8 85:10
86:8 91:8
92:7,8 97:10
108:17 110:1
113:4 117:3
126:25 130:5
135:19 141:2

142:5 143:9,21
144:2 147:17
149:6 154:5,19
156:3,3 160:9
166:20,22
170:19 172:5
177:10 179:5
181:17 183:2
183:20 184:1
186:16 189:12
193:1 197:12
200:10 212:12
213:12 214:10
216:17,18,25
217:12,25
218:2 219:19
221:5 227:8
235:23
**meaning** 14:23
14:24 17:15
18:18 28:3
35:19 45:8
48:1 51:16
66:4,5 72:8
97:11 112:12
129:22 143:5
143:6 145:5,6
147:3,5 152:6
215:14 234:4
**means** 112:15,16
182:13
**meant** 55:1
81:15
**measurable**
172:18 175:13
**measure** 74:1
104:20 216:2
**measurement**
143:15
**measures**
108:8
**media** 213:18
214:1
**medical** 23:24
66:11 199:24
200:17

**meet** 25:14
40:11 57:16
59:15 60:20
61:2,9 62:18
62:19,24 63:5
63:7 78:18
79:12 126:19
147:24 148:24
165:10
**meeting** 9:25
10:3,7 62:3
63:7 75:21,24
83:2 96:18,21
96:24 107:5
109:9,15 116:8
126:20,24
127:1,4,10,16
129:1 131:9,13
131:17 166:9
204:5 230:15
**meetings** 63:8
76:1 92:4,6
106:23 128:22
134:10 160:17
207:24
**meets** 231:22
**member** 51:19
**members** 51:18
51:21 164:17
219:13
**mental** 14:17
49:15 151:17
152:20,22
200:3,4
225:10
**mentally** 14:16
149:7
**mention** 98:16
99:6 109:22
**mentioned**
10:13 14:1
19:10,14 42:8
52:8 55:18
56:22 60:2
61:13 62:15
64:20 69:21

**ALARIS LITIGATION SERVICES**
**www.alaris.us**          **Phone: 1.800.280.3376**          **Fax: 314.644.1334**
Case 2:17-cv-04057-NKL   Document 160-26   Filed 02/21/18   Page 81 of 100

73:17 112:3,6
112:11 127:11
146:21 150:8
150:11 165:13
172:20 191:21
194:10 199:12
209:13 221:3
223:18 230:11
**mentioning**
74:14
**merits** 192:4
**message** 2:18
3:1 77:21
103:20 174:12
174:15
**messages**
230:20
**messaging**
208:2
**met** 9:17 58:6,11
60:24 78:21
78:21 92:3
127:14 147:21
148:23 162:12
**method** 179:1
181:22
**methodology**
180:10 181:6
182:19
**methods**
179:20
207:25 209:5
**metric** 101:25
102:5 179:7,10
180:4 196:13
202:22
**metrics** 2:14
41:2,12 42:3
42:10,17,21
47:18 100:8,10
100:12 175:18
177:16 178:22
180:19 195:22
203:9
**Michael** 94:19
99:8 125:1

166:4,15
**middle** 33:11
82:2 154:15
**mind** 150:6
199:20
202:25
236:10
**minus** 43:10
184:17
**minute** 188:17
**minutes** 143:10
**misconduct**
190:23
**misdemeanors**
19:13
**missed** 58:21
59:19,25
**missing** 59:2,6
**Missouri** 1:1,7
4:1,7,14,15,19
4:21 5:13,15,18
5:20,21 6:3,13
6:14 7:19,21
11:25 30:24
33:6 34:24
39:18 63:21
63:24 65:5
72:7 81:4 82:7
82:9,16 83:13
111:1 121:16
141:6 153:19
155:17 156:18
159:22 172:6
201:11 202:12
234:17 237:22
238:4,6,8,16
239:3
**Missouri's** 34:5
**misstates**
67:23
**mistake** 235:15
235:16,17
**mistakes** 235:4
235:8,12
**misundersta...**
184:1

**mitigation** 65:2
65:3 66:12,14
74:11 153:6
200:9,10,13,15
225:10,12
**MO** 4:16 237:4
**models** 233:19
**moment** 49:23
71:25 75:16
102:1 153:24
176:17
**Monday** 64:4
163:18
**money** 20:9
65:24 107:13
139:20 141:4
225:20 227:4
**monitor** 153:18
161:9
**month** 67:11
73:14 150:9
224:2
**months** 15:11
17:18 22:15
30:14 31:10,11
44:1 75:20
85:25 86:13
86:14 87:10,11
87:25 88:14
88:21 89:4,6
111:2 136:25
137:4 138:17
141:10 144:1
147:12 160:22
161:4 198:16
203:25
206:22 207:6
228:10
**Moore** 2:4,6
5:19 8:8,8
28:11,14 41:16
44:22 46:10
50:3 62:8
67:21 68:9
70:14 75:2
80:16 89:25

97:19 115:6
130:6 131:3
146:2 150:1
151:7 156:1,15
156:16 172:2
175:24,25
176:10,15,18
176:24 182:11
183:13,17,24
184:13 189:6,11
191:7 210:13
210:20,24
211:1,12,16
212:10 213:22
214:10,17,24
215:2 216:22
217:10,18,23
218:5,10,16,21
218:24 219:3
222:20,23
223:10 228:21
230:3 232:3
232:24 233:3
236:14
**morale** 165:11
**morning** 52:16
64:5
**mornings** 117:13
**motion** 72:12
154:12 155:1,6
155:20 169:3
**motions** 20:18
71:24,25 72:1
72:6,7 113:25
114:2 188:7
189:14 190:8
**move** 19:25
28:21 31:18
32:10,10
44:25 60:3
88:7 132:17
133:4 172:1
178:24 195:18
217:15 218:25
**moved** 12:21
**moves** 20:1

26:3 31:23
133:1
**moving** 32:4
132:24 133:10
**MSPD** 3:5 8:11
115:9,24
122:14 125:17
125:20 129:18
**MSPD00389...**
46:15
**MSPD00394...**
77:19
**MSPD00394...**
104:14
**MSPD00394...**
80:12
**MSPD00394...**
94:22
**multiple** 111:22
202:14
**murder** 38:13
164:1 230:7
**murders** 32:8
85:4

___

### N

**N** 2:1 5:1
**name** 7:23,24
33:10,12
37:25 121:9
156:16 239:2
239:3 240:6
**names** 100:4
202:6
**narrative** 80:17
**national** 64:25
138:2,5 179:11
**nationality**
64:14
**nature** 168:17
190:2 199:25
220:20
226:16
**near** 90:15
**nearly** 14:10
39:4 95:6

ALARIS LITIGATION SERVICES
www.alaris.us        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-26   Filed 02/21/18   Page 82 of 100

117:12 161:20
**necessarily**
60:25 109:25
126:23 235:19
**necessary**
212:7 240:5
**necessities**
127:7
**need** 9:9 24:18
31:25 32:1
63:7 68:14
92:13 108:19
109:23 119:17
146:11 148:24
150:20 172:24
174:7,8 186:13
187:20 190:1
197:4 205:10
214:11 230:16
**needed** 22:10
26:17 29:16,17
49:16,17,18,19
134:17 166:10
231:11
**needless** 155:7
**needs** 13:3 21:3
29:5 49:25
50:9 95:23
163:10 169:10
198:7 199:6
201:5 229:13
229:24
**negative** 171:17
**neglected** 31:8
31:13 32:11
60:6 88:22
194:25,25
**negotiate**
142:25 145:7
145:13,13
147:8 221:16
221:21 223:13
**negotiated** 65:1
143:1,14
**negotiating**
143:4,7 145:12

**negotiation**
143:23 144:24
145:19 147:9
148:1 149:23
223:11
**negotiations**
66:13 142:19
144:8,14,15
145:15,25
147:1,15 148:9
148:13 212:8
221:8,13
**neither** 237:12
**net** 43:6,24
45:10,20 48:3
184:18 185:2
**never** 153:16
155:17 159:6
159:12 204:6
**new** 2:12 5:8,8
15:9 23:10,14
23:18 24:4
26:6 28:6
37:3,16 43:6
43:24 45:10
45:20 48:3,9
55:3 134:13
184:18 185:2
**newer** 160:24
198:12
**news** 33:4,6
213:18 214:7
215:4,5
**newspapers**
213:17
**Nifong** 5:14
238:5
**nine** 31:10,11
87:25 88:14
89:4,6 147:12
203:19
206:22
**nine-month**
89:10
**nobody's** 172:5

**nolle** 222:10
**nolles** 221:25
222:2
**nonadministr...**
168:18
**noncaseload**
215:3
**nonconflict**
142:1
**nonhomicide**
143:19
**nonviolent**
17:20 18:13
**normal** 235:21
236:11
**Normally** 139:18
**North** 6:3,14
238:16
**notarized**
238:15
**notary** 238:14
240:15
**note** 89:25
231:16
**noted** 203:23
**notes** 10:16
28:4,5 161:12
161:13 162:1,2
162:7,11,15
167:13 182:3
184:22 231:8
**nothing's** 42:19
148:25
**notice** 58:19
137:8 146:10
**noticed** 160:7,11
**notification**
121:16
**notified** 99:7
**notifying**
224:20
**November**
19:18 128:14
131:14 232:21
**number** 7:19
11:3,5 17:23

17:24 19:15
24:17 31:16
35:13,17,20
38:19 39:5
42:20 43:9
44:8,11 45:12
46:4,15 48:14
48:23 49:2,5
57:20,23
59:13 63:1
69:8,9 76:12
76:15 77:1,1,9
77:18 81:25
87:6,7 97:12
104:14 105:14
106:2 116:19
116:20 118:8
123:10 132:19
139:23 160:9
164:21 166:20
167:1,3 169:9
170:24 171:1,4
174:1 179:13,14
186:17,18
194:22 195:22
202:24
224:12 227:21
228:7,8,13
234:15,22
**numbers** 10:11
34:14,17 36:11
39:4,20 62:11
68:3 69:24
73:15 76:24
80:22 81:19,21
88:12 90:11
95:14 97:14
104:21 138:17
140:22 142:11
142:12 150:10
165:10,13
167:23 171:4
180:1,3,6 181:7
181:18,23
182:20 184:7
184:9,12,19,21

184:23 185:2
185:4,5,20
188:1,3 191:11
192:25 193:2
203:4,5,10
**numerous**
34:15 100:7

---

**O**

**o'clock** 4:12,13
**object** 41:16
44:22 50:4
62:8 67:21,22
70:14 75:2
80:16,16
89:25 97:19
130:6 146:2
150:1 171:24
189:4 210:2
214:3,13
216:15 217:9
218:14 230:3
230:4 232:3
**objection** 90:1
213:20 214:22
**objective**
189:17
**obligations**
80:23
**observations**
131:16
**observed**
100:17
**obtain** 65:20
**obtained** 29:17
29:18 192:25
**obtaining**
68:23 168:13
230:8
**obvious** 194:8
**obviously** 64:6
148:3
**occasion** 23:20
**Occasionally**
101:19 170:8
**occur** 24:15

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 160-26    Filed 02/21/18    Page 83 of 100

54:13 58:8
68:7 204:3
235:23
**occurred** 81:1
147:18 150:6
**occurring**
195:15
**occurs** 88:9
149:16 204:1,2
**October** 78:15
94:24 104:12
**offense** 145:8
206:17
**offenses** 31:21
85:5 144:13
146:16
**offer** 148:20
**offered** 61:6
123:19
**offers** 132:2
221:25
**office** 5:20
10:17 11:7,8,12
11:14 12:5,9,22
13:3,7,14,18,21
13:23 14:1 15:4
15:9,20,23
16:9 17:15,19
18:22 19:16
20:15,24 21:10
21:15 23:3,12
23:25 26:11,13
26:21,23
27:23 28:16
28:25 29:25
30:22 31:15,18
33:25 34:19
34:25 36:14
38:17 39:1,2,5
40:6 41:11,11
42:3,18,21
44:10,15,21
46:5 49:23,24
50:9,11,24
52:14 53:17
54:7 55:7

56:24 57:3,12
57:16 58:1,14
59:8 61:6,13
61:18 62:13
64:17,19,25
65:10 66:19
69:3,5,8
70:12,24 71:7
71:13 72:1,5,17
72:24 73:7,8
73:22 74:21
75:13,15
80:22 81:6,11
81:20,24 82:1
83:1,2,6,20
84:14 86:11,15
87:13 88:1
90:24 92:10
92:10 93:16,18
95:4,15,23
97:6,7,12,13
98:25 99:18
99:22 100:21
100:22 101:5
101:17 102:3,6
103:12 104:21
105:3,15
106:11 109:2
111:11 112:13
116:10,21,23
121:19 122:3,16
123:7 126:1,3
128:16 129:25
130:4 131:7,10
131:12,14 132:5
132:13,18,20
133:1,14,16
134:13,14
135:9,14
136:24 137:21
138:22 139:8
141:6,9 142:23
143:4 144:25
145:8,20
147:19 148:21
149:17 150:14

152:3,17
153:12 154:3
155:4,13,24
155:25 156:17
160:18 162:5,6
163:7,12
164:14,20,21
165:12 166:4
166:17 168:5
171:2 179:14
185:7,23
187:9,24
193:2,8 195:5
197:20 207:12
221:24 226:15
226:15,19,20
226:23,25
227:3,9,13,18
227:19,20,21
228:1,12,18
229:24
**officer** 107:10
226:17
**offices** 90:12
100:17 126:6
133:23,24
164:17 185:19
**official** 127:10
**offload** 156:4
**offloaded**
134:18
**Oh** 17:2,5 22:24
54:15 137:3
142:5,7 167:4
196:14
**okay** 8:24 9:1
10:21 11:18
12:6 13:5,9,20
14:3,11 15:3
16:1,3,8,16
17:2,6 18:15,21
19:6,14 20:14
20:21 21:5,9
21:12,23 22:8
22:12,18,21
25:17,22 26:11

28:14 31:24
35:9 36:24
39:24 41:9
42:22 43:2,5
43:11,14,24
45:3 46:7
47:5,16 48:3
48:11 50:16
52:11 53:23
54:6 55:24
57:2,6,15 59:1
59:5,10 61:1
63:16 64:12,16
69:7 71:24
73:2 74:21,24
76:21 79:21
80:7 84:12
88:4 92:11
94:1 101:15
102:10 110:18
112:21 113:13
113:15,17 114:8
114:14 115:6
116:5 118:2,5
119:11 120:17
121:12 123:22
124:8,18,25
125:8,12
126:10 128:25
131:3 133:6,9
135:12 137:7,11
137:13,23
138:12,20
140:17 142:7
142:10,14,21
144:8,12 145:2
146:23 150:13
156:5,10,20
157:2,6,14
158:2,9,18,23
159:1,6,19,21
159:23,25
160:3 161:6,8
161:25 162:4
162:14,25
163:6,13 164:9

164:13,22
165:7,24
166:8,16,22
167:2,13,18,24
169:5 170:5
171:22 172:12
173:23 174:19
175:4 177:5,9
177:15,18
178:12,23
179:4,18 180:6
180:16,22
182:17 183:18
185:24 186:10
186:16,22
190:5 192:11
193:5,8 195:8
196:14 202:4
202:9,14
205:5,13
207:5,11
208:8,12
210:24 211:16
211:21 214:17
215:8 220:3,11
220:23 221:7
221:19 223:11
223:17 224:14
224:21 225:4
227:1,7,15
228:2,11,14,21
228:23
232:13 233:4
233:8,13
234:2,7,21,24
235:20 236:7
**oldest** 198:11
**Olive** 4:14 5:21
**omission**
235:21,22
**omissions**
235:8
**once** 36:20
52:3 53:3
112:13 212:3
222:14

**ALARIS LITIGATION SERVICES**
**www.alaris.us**          **Phone: 1.800.280.3376**          **Fax: 314.644.1334**
Case 2:17-cv-04057-NKL   Document 160-26   Filed 02/21/18   Page 84 of 100

one-on-one
160:17
one-page
174:20
ones 14:1 36:6
137:18 141:25
144:4,12 168:9
168:12 194:12
194:18 195:14
198:25 199:1
213:9,18 214:2
214:21
ongoing 92:17
open 10:11
26:13,22
106:7
opened 11:3
24:18 43:9
opening 23:18
25:23 26:1
Operationally
132:14
operator 61:21
opinion 36:19
49:24 50:8
59:20 63:2
68:4 69:17
82:25 83:16
97:16 116:17
132:12 170:22
211:4 229:2
229:25
opportunity
61:8
opposed 118:10
194:17
opted 149:11
optimistic 216:6
option 90:22
110:22 112:12
order 76:24
99:8 105:21
106:1,19 179:7
227:5 231:11
ordering 23:23
24:20

organization
127:24 201:18
organizations
215:25
organize 23:11
organized 16:9
17:10 179:7
organizing
24:5
original 3:10,10
238:12
originally 157:4
originate 147:1
originating
121:18
Orrick 5:3,7 8:4
8:6
outcome
237:17
outcomes
193:25
outlet 214:8
outlets 214:1
outline 119:10
119:10
outlined 80:6
outlining 80:2
outset 67:13
outside 100:5,8
101:1 194:9
214:21 227:20
outstanding
51:7 187:4,5
188:7
overboard
214:4,13
overloaded
24:23 29:21
55:8 88:25
oversee 160:15
227:8
oversight
125:16
overtime 110:10
overview 51:22
161:7 179:16

overwhelmed
195:19

_____

**P**

P 1:14 4:10 5:1,1
7:10 238:11
239:2 240:3
240:9
p.m 1:20 7:13,16
28:12 236:20
page 2:2,10
33:9,11 34:4,8
35:21 37:23
37:24 46:22
46:24 47:5
84:12 111:21
112:4 121:8,10
181:10 238:12
238:14,16
239:6,9,13,16
239:20
pages 199:24
paid 113:7
118:20 119:2
paperwork
23:17
paragraph
80:24 82:3
85:18 95:16
97:5 108:7
110:14
paralegal
186:25
paralegals
13:23 168:5
parallel 173:7
parameters
54:5 147:8
163:10,23
parole 92:9
115:22 116:9
part 27:19 32:4
64:25 88:7
97:5 103:12
104:5 116:11
119:22 123:16

125:17 180:3
191:21 192:8
202:1 221:9
222:14
Partially 31:22
participants
201:19
participate
96:21 126:7
152:24
participated
214:20 215:5
participating
121:17 124:6
particular
34:20 54:16
54:21 55:13
57:7 111:18
112:8 132:1
139:21 143:22
164:7 166:17
178:10 196:12
206:21
particularly
35:13 36:16
40:8 49:5,7
56:10 71:25
169:8,11 222:1
parties 237:13
237:16
parts 153:21
party 206:12
216:25
passing 156:13
Pat 35:8
Patch 210:4
patience
210:25
pay 136:10
220:16,19
PCR 70:21
172:23,23
173:1
PCR'd 230:7,11
PD 55:19,21
56:17

penalty 234:18
240:7
pending 4:18
9:12 34:25
35:19 84:15
108:8 112:7
132:6
people 20:18
51:4,11 71:13,15
100:21 109:4
111:10 114:6
120:12 136:10
165:14 174:20
191:24 193:9
195:21 198:13
201:4 205:8
206:15 232:11
235:12
people's 156:7
perceive
230:22
percent 14:10
14:19 20:3,4
44:4,17 45:16
45:17,20
58:23,24,25
63:1 82:11
percentage
14:8 27:24
44:13,16 58:15
58:20 61:24
64:11 68:16
143:7 234:4
perform 173:24
225:16
performance
188:11
performed
171:18,19 175:11
185:13 223:14
224:23
performing
169:6
period 45:21
46:5 70:24
86:1 87:20

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-26   Filed 02/21/18   Page 85 of 100

89:10 144:1
147:21 148:6
169:19 172:25
203:20 204:5
204:12 207:8
**periodically**
160:18
**periods** 42:10
**perjury** 240:7
**persist** 144:15
**person** 106:6
112:1 121:19
140:24 152:21
185:12,16
**person's** 56:6
**personal** 20:4
203:6
**personally** 14:3
149:19 202:24
203:16
**personnel**
28:23 110:11
**persuading**
66:15
**Petsch** 121:2,3
**Ph.D** 158:21
159:1,7,13
**phenomena**
149:20 193:21
**phone** 25:11
61:5,18,19
63:20,22
85:21 86:8
143:10 164:16
199:15,16
207:12 222:18
230:8
**phones** 25:20
26:15 199:21
**physical** 150:22
162:3
**pick** 26:6
**picking** 144:16
**piecemeal**
22:10,13
**pin** 168:7

**place** 61:3,10
64:14 72:13
143:23 148:4
163:23 173:10
187:9 189:23
191:11,13
193:12 195:16
197:11 204:25
207:14 209:21
211:2 222:11
225:22
230:17 231:18
**placed** 111:10
113:23 176:14
**placement**
225:13
**places** 172:7
**plain** 182:14
**plaintiffs** 1:5,15
4:5,21,22 5:2
7:2,12 8:5,7
**plaintiffs'** 40:22
42:4,23 43:12
44:17 46:10
47:23 175:20
176:1,3 177:1
215:17
**plan** 3:5 113:24
115:10,24 119:7
119:9,10,12,14
127:4 135:4
148:1
**plans** 84:4
**plate** 145:9
**play** 23:19
24:25 25:3
**played** 31:14
**plea** 26:6 74:12
142:19 143:4,7
144:24 145:7
145:25,25
146:25 147:14
148:7,9,9,13,17
149:11,23
192:19 196:20
200:12 221:9

221:25 224:4
**plead** 73:18,20
149:5,6,24
191:24 192:20
**pleading** 71:13
71:16 191:25
**pleadings**
161:17,21
168:19,23
169:1
**pleas** 142:18
196:21,22,24
200:13
223:20
**please** 8:2,13
9:1,4,8 37:6
51:2 94:13
98:4 103:22
114:23 128:3
150:21 217:18
238:10,13,15
**pleased** 201:4
**plus** 43:17,17
**point** 55:16,20
67:6,9 72:24
90:15,25
93:12 108:13
109:3 110:20
120:16 125:2
125:25 126:4
141:10 154:18
155:4 163:1
175:14 198:21
205:11 209:9
**pointed** 129:10
155:9 156:6
**police** 22:5
25:7 70:5
150:23 190:8
190:21,23
199:19
**policies** 20:14
20:23 164:9
**policy** 21:1,4
62:14,16,19
63:22 69:4

108:21 151:18
**popping** 88:24
**population**
109:24 110:6,9
**portrayal** 44:20
**position** 12:1
145:12 148:3
179:19 180:8
**positioned**
138:3
**positive** 171:17
**possession**
179:16
**possessions**
114:13
**possibility** 58:9
107:16 155:19
**possible** 57:18
57:19 58:1
92:25 109:13
123:22 161:4
182:20 187:11
205:11 236:10
236:13
**post** 75:7 137:7
137:8
**post-Hinkeb...**
54:17 103:9
**potential** 51:20
91:3
**potentially**
92:17 219:15
219:24 221:14
**Potosi** 64:1,3
**practice** 11:24
16:13 49:4
85:16 136:15
169:14,18
170:3,4,6
186:23 187:11
187:13,14
190:4 198:17
203:8 233:5
233:15,16,18
233:21,23,24
233:24

**practicing**
232:14
**practitioner**
85:15 138:7
**Pratzel** 2:25
98:2 99:4,7,13
103:2,5
**predominant**
224:13
**prefer** 22:7
**preference**
151:21
**preliminary**
56:11,15 57:9
58:5 60:10,14
60:21,24
61:22 62:4,17
**preparation**
10:6 74:12
117:18 139:25
145:19,24
148:2
**prepare** 9:15
27:4 60:10,12
60:21 72:6
98:10 104:7
148:8 214:20
225:12
**present** 6:1 8:2
9:19,24 57:3
105:17 120:23
127:4 128:21
128:23 131:10
143:13 151:1
152:4,8
**presentation**
122:20 123:1
168:14 200:13
**presented**
118:21
**presentence**
152:25
**presents** 82:23
**preserved**
162:10
**pressure** 192:19

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-26   Filed 02/21/18   Page 86 of 100

**pretrial** 20:18
69:13,15,18
107:6,9,10
113:25 114:2
**pretty** 51:23
75:16 169:1
171:1 177:6
202:10 212:4
**previous** 75:5
**previously** 2:13
3:3,6 40:21,23
46:8 102:7
105:16 120:24
120:25 211:25
215:4
**primarily** 163:11
164:14
**primary** 22:1
147:6
**printed** 27:7
**printers** 227:21
**Printing** 168:16
**printout** 33:10
34:4 37:14,24
177:6
**prior** 14:13
42:10,10 45:11
52:18 55:11
57:16 67:11,11
67:23 96:8
105:19 135:20
139:9,15 140:9
140:13 141:19
146:24 157:25
185:3,6 186:13
215:22 217:24
**prioritize** 194:16
**prioritized**
198:24,25
**priority** 24:19
34:14 90:11
**prison** 63:17,17
63:21,24
**private** 11:24
49:4 52:24
76:2,21 77:4,8

77:10,12 85:16
92:16 107:17
109:4,16,17
111:13,23 112:1
112:6,17,19,23
113:1,9,18
118:15,19 119:1
119:8,18,21
120:6,15,17
122:4 123:12
123:17,24
124:10,12
125:16,24
127:6,12,13,22
129:5,11,12,15
129:21 130:1
130:12,12,17
131:24 132:3
133:19 134:12
134:22 135:4
151:22 152:14
155:16,21
169:14,18
170:5 179:8
200:19,25
201:3,8 203:8
219:5,13,19,22
220:3 233:5
233:14,16,18
233:21
**privilege** 29:8
70:10 215:15
**privileged** 115:3
**pro** 72:7 113:13
113:18 118:21
119:22,25
124:19 168:25
**probable** 110:4
**probably** 40:2
42:12 60:16
67:15 140:23
150:8 176:10
187:2 217:14
224:12
**probation** 19:6
19:6,12 25:24

76:4 92:9
105:12,14
106:3,4,7,12
106:13 107:2
115:22 116:9
197:18
**problem** 31:15
32:3 33:7
38:20 71:19
71:22 73:17
82:5 84:7
87:3 90:5
93:16 97:2
99:8 102:25
114:6 131:25
133:13 145:10
150:11,12 172:5
172:15,23
173:7,25 191:9
194:7 195:7
216:2,4
219:23
**problems** 15:17
27:12 30:6
60:7 62:6
63:3 81:11
93:21 97:7
132:25 165:11
185:25 186:11
196:25,25
201:1 208:25
**procedure**
84:11 91:13,20
208:10,24,24
**procedures**
164:10
**proceed** 8:13
147:23 209:4
212:17
**proceeding**
8:16 26:5
212:6
**process** 14:25
20:13 56:2,3
65:20 75:17
75:18 92:18

106:9 107:23
109:3 111:19
120:14 125:6
127:2 151:15
156:9 160:20
173:6 196:17
197:5 201:2
201:20,22
215:24 221:9
225:9
**processes**
116:10,13
118:12
**produce** 216:2
**produced** 4:11
7:11 41:10 42:2
**production**
187:8
**productive**
93:12 154:9
208:21 217:16
217:16
**productively**
209:11
**professor**
159:14
**program** 107:9
107:10 121:18
121:21 122:2
122:24 123:3
124:6 158:7
158:24 201:6
**programmed**
101:10
**programs**
122:17
**progressing**
161:10
**prominent**
110:21
**promotion**
58:19 160:21
196:7,17
**promotions**
15:14,14 146:10
**prompt** 129:15

129:16 164:15
**promptly** 92:21
187:6
**promulgated**
164:24
**properly** 40:2,6
**proposal** 76:8
76:23 107:7,19
108:4 111:6,16
113:22 116:6,18
132:2
**proposals**
124:10 127:9
**proposed**
109:10 119:7
**Prosecuting**
128:11,16
**prosecution**
131:6
**prosecutor**
66:15 72:14
115:20 142:25
143:1,13 144:1
145:14 146:25
186:19 187:18
200:14 221:17
**prosecutor's**
39:1 72:17,24
73:7 116:9
131:7 132:13
133:16 134:24
142:23 144:24
145:7,20
148:20 162:6
**prosecutors**
60:17 72:14
92:9 186:1,6
186:12
**prosecutors'**
133:23
**provide** 11:18
33:14 38:3
68:20 70:18
81:17 128:25
132:5 146:15
172:3

**ALARIS LITIGATION SERVICES**
**www.alaris.us**        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-26   Filed 02/21/18   Page 87 of 100

provided 33:19
60:15,22,23
61:19 72:5
100:11 132:9
133:16
provides 121:21
providing 47:10
47:17 68:25
pry 29:8
psychiatric
151:12 232:6,8
psychiatrist
151:23 225:11
225:21
psychiatrists
65:12,15
psychiatry
232:15
psychological
177:21 178:3
178:10,14
197:15
public 2:11 5:11
5:13 9:17 11:21
12:1,6,9,22
32:15 33:4,6
34:1,5,14,24
37:16,19 39:19
41:10 49:9
52:22 57:22
65:5 76:18
81:4 82:6,10
85:15,20
90:10 91:11,17
97:3 99:17,21
100:14,17,20
104:5 105:11
107:15,22
108:12 109:5
110:2 111:11,24
112:13 115:19
116:14 121:17
124:4,23
129:6,13 135:11
136:12 137:20
138:5 141:7

153:19 155:13
157:11,20
159:22 167:22
172:6 179:8
186:17 202:20
203:4,7
209:23 210:4
214:5 219:23
226:17 238:4
238:14 240:15
published
37:16
pull 132:7 176:11
purportedly
177:15
purpose 94:25
98:22
pursuant 212:6
237:8
pursuing 27:1
211:23
push 20:19
37:20
pushed 118:13
pushing 231:15
put 28:4,5,5
101:8 117:21,23
118:6 124:8
145:1 192:16
puts 136:22
putting 143:12

**Q**

qualifications
136:11
qualifies 106:6
106:14
qualify 146:12
quality 82:7,8
82:13 130:18
quantify 146:12
quarter 43:10
quarters 177:13
question 9:4,11
9:12 41:17
56:20 62:1,9

67:22 70:15
74:16 75:3
82:13 87:21
87:22 97:20
130:16 148:10
149:8 172:3
178:19 179:23
179:24 182:15
183:13,15,19
189:10,12
190:24 191:1
197:22 198:23
202:10
205:20 211:6
212:11,16,25
213:2,8,9,11
213:20 214:4
214:12 216:5
217:12,13,19
218:7,10,23
219:18 226:4
226:18 229:4
231:25 232:1
232:6,7,10
questionable
219:15
questioned
210:6
questioning
134:9
questions 2:2
8:20 9:2,8
116:15 125:13
156:15,19
171:24 228:24
229:1 233:3
quick 20:13
57:24 130:6
143:24
quicker 144:9
195:11
quickly 28:22
29:17,18 30:5
30:11 31:5,23
32:4 60:4
88:7 92:25

113:21 132:22
132:25 133:1,2
133:4 174:8
191:24 195:19
196:23 210:23
230:24
quit 165:15,19
quite 23:12
29:17,18 31:2
54:15 60:3
110:12 140:22
142:13 145:14
188:8 189:12
quote 34:4
38:9,10 79:25
80:25 81:9
82:3 83:8
84:13 85:2,19
90:14 95:5
99:15,20 112:4
112:5 132:3

**R**

R 5:1
radio 2:11 32:16
33:4,15,19
radius 206:18
raise 99:2
219:15
raised 30:7
102:12
raises 173:4
196:7
raising 99:4
Ramsey 210:7
range 14:13
17:25 123:10
136:22 203:3
ranges 12:20
rape 38:13
rapes 32:8
rare 149:4
rate 19:23 30:11
135:13,23
136:6,7
ratio 14:7

RDR/CRR 6:12
7:4
reach 20:23
73:16 75:22
79:16,17,19
81:22
reached 79:14
120:16
reaching 79:12
200:15
reacting 93:3
read 10:13 34:4
38:10 39:25
41:5 56:7
79:25 80:14
81:9 82:3
83:9 84:13
85:2,19 90:14
91:6 95:5
99:16,20 112:5
132:3 182:14
183:13 217:18
218:20,22
238:13 239:7
239:10,14,17
239:21 240:4
readily 63:20
reads 22:5
181:10
ready 74:8,10
222:20
real 130:6
reality 81:3,5
realize 230:1
realized 29:15
really 21:6
46:21 55:23
72:11 138:1,10
141:13 144:2
168:22 176:5
182:13 202:11
213:9 227:8
230:23
Realtime 4:17
237:6
reason 38:23

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-26   Filed 02/21/18   Page 88 of 100

42:16 69:22
74:6 84:23
118:5 143:9,21
144:18 152:10
159:12 165:7
173:9,15,17
184:9 185:15
197:12 198:25
202:1 220:24
224:9,13
239:8,11,15,18
239:22
**reasonable**
40:10,11,12
46:3 76:12
82:24 174:2
179:9 187:14
**reasons** 26:7
71:12 74:9
203:24
208:15,18
213:13 224:23
225:2
**reassign** 55:14
141:11
**recall** 35:6
36:11 100:19
101:2 168:2
170:11 186:6,8
190:9 200:21
214:7 219:6
221:9 224:7
233:10 234:21
**recalling** 100:15
**receipt** 238:17
**receive** 73:7,10
86:14,16,21
122:5 124:1
140:15 163:25
**received** 30:14
52:12 151:10
178:20
**receives** 86:15
221:15
**receiving** 88:15
132:21 201:15

219:24
**recess** 50:19
94:4 134:5
176:21
**recession**
233:18
**recognize**
128:8 131:24
**recollection**
10:22 210:11
225:9
**recommenda...**
197:19
**record** 7:15
11:10 33:1,5,22
37:12,18 41:21
50:16,18,21
80:11 90:2
94:1,3,6,21
104:13 128:13
134:4,7 146:3
172:3 176:16
176:20,23
177:1,10 184:3
207:4 208:25
232:17
**recorded** 25:11
**recordings**
25:6
**records** 23:23
23:24,24,25
24:19,20
29:17 66:10,11
168:13 199:16
199:24 200:17
200:17,17
230:8 232:12
**recourse** 54:13
**recover** 230:20
**reduce** 34:16
106:2 109:24
117:15 125:24
133:13,17,24
134:12,25
135:6
**reduced** 17:18

105:14 108:16
141:17 221:25
237:11
**reducing** 116:22
126:8 135:9
155:24
**reduction**
38:24 198:14
**reengaged**
107:17
**reevaluate**
107:24
**refer** 181:9
210:8
**reference**
39:10,13
118:23 184:15
209:14 224:5
236:7
**referenced**
98:19 116:3
161:11 235:3
**references**
36:10
**referencing**
40:17 99:12
100:7 111:20
133:7 181:21
**referrals** 51:15
**referred** 102:3
110:13 225:17
**referring** 10:15
40:13 96:6
105:20 153:3
189:21
**reflect** 184:8
**reflected** 109:11
173:4,21
**reflection**
161:22
**reforms** 107:2
**refresh** 10:22
**refuse** 125:5
**refused** 74:18
74:22
**regard** 81:13

164:1
**regarding** 34:1
102:11 107:5
175:18 190:8
190:20 213:23
213:25 214:8
215:9,19
**regardless**
133:5
**regards** 96:15
104:15 187:12
**Registered** 4:16
237:5
**regular** 187:4
204:4 207:24
235:16
**regularly** 74:3,7
75:21,25
**rejected** 155:1
**related** 215:3
221:1 237:12
**relation** 177:24
**relations** 60:9
**relationship**
22:3,4 59:21
89:16,18
112:25 113:5
130:1 147:6
**relative** 237:15
**relatively** 194:8
**release** 107:6,9
107:10,13,24
**released** 32:1
51:11 60:16
61:5,7 76:11
88:5,6 107:11
107:14 111:10
113:23 114:8
152:17
**relevance**
196:16
**relief** 83:24
155:7,8,11,15
216:2,3
**remain** 110:5,5
**remainder**

185:11
**remaining**
167:10
**remedies**
208:22 213:5
**remedy** 93:13
172:23 209:18
**remember**
39:16 164:22
186:1,3 214:5
**remind** 11:1
**reminders** 9:1
**remote** 225:19
**render** 240:5
**rendered**
234:8
**repair** 89:20
**repeat** 99:23
**repeatedly**
99:23
**rephrase** 9:9
56:21 130:10
**rephrasing**
212:12
**replaced**
232:17
**report** 66:12,14
153:7 154:1
179:21 180:7,9
180:20 181:13
181:14 182:9
183:10 184:6
225:12,19
**reported** 71:19
104:20 149:18
**reporter** 3:10
4:16,17,17 6:12
7:5,6 8:12,14
32:17,18 37:1,5
41:3 46:14,18
77:16,22 78:4
94:8,12 97:25
98:3 99:19
103:17,21
114:18,22 115:2
115:11 128:2,7

**ALARIS LITIGATION SERVICES**
**www.alaris.us**        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-26   Filed 02/21/18   Page 89 of 100

182:10 183:15
183:19 217:20
217:25 218:18
223:7 237:1,4
237:4,5,6,21
**reporter's** 7:23
**reports** 22:5
65:4,9,13
152:25 153:2
183:4,22
191:15,16,17
199:19
**represent** 41:9
75:7 111:25
130:3 198:6
**representation**
53:20 70:11
81:18 85:17
114:1 117:9
130:18,23
150:17 154:13
154:14
**representative**
115:20 127:23
**representativ...**
116:8 131:14
202:7
**represented**
86:12 87:12
**representing**
12:14 130:13
136:18 194:6
**request** 2:17
21:25 42:17
46:17 55:19
65:8,24 66:6
66:9,16,24
67:1,12,14 68:1
68:13,14,18,22
78:18 90:16
147:3 148:7
151:23 174:4
174:10 175:22
187:17 197:1
205:22
225:14 231:19

**requested**
23:20 42:15
148:17 224:22
225:1 226:3,6
226:10
**requesting**
67:10 72:17
95:17 96:10
153:5
**requests** 20:6
20:9 24:13
52:22 66:3
67:18 72:23
149:24 187:19
190:4 226:14
**require** 49:21
82:21 191:4
229:16
**required** 50:2
87:7 105:11
107:13 122:11
139:24 190:13
190:17,21
192:15 209:8
212:20
**requirement**
113:18 118:21
120:1
**requirements**
112:22 209:6
**requires** 164:15
191:2,8,9,10
**requiring**
208:21
**rescheduled**
126:16
**research** 145:18
145:24 148:19
149:13 178:10
**researching**
27:3 149:22
**reserved** 7:8
**resistant** 77:11
200:20 201:1
201:9,14,22
**resolution**

54:19,21 73:16
75:22 90:25
113:2
**resolve** 55:9
87:2 92:21,25
99:8 112:7,20
124:16 131:18
154:8
**resolved** 30:18
90:19 92:12
132:23 133:8
200:12 229:3
**resolving** 31:4
**resource** 15:22
15:25
**resources**
49:21,25
52:23 64:16
65:9,18 66:22
67:10,12 68:6
68:17 69:5
137:10 171:15
194:4 228:13
**respect** 10:23
20:24 45:7
74:25 76:9
101:5,17 103:1
103:8 136:17
154:12 155:13
**respond** 9:5,11
44:23 50:5
62:10 70:16
75:4 97:21
191:7 230:5
**response** 75:14
79:7 86:25
93:5 102:20
103:4,7
106:22,25
107:19 109:12
127:21 172:4
**responses** 9:2
**responsibilities**
12:8,13 13:10
**responsible**
15:12 60:17

227:11
**rest** 201:12
222:4
**result** 29:19
109:5 143:14
152:7 166:3
189:13 200:25
212:2 221:24
222:9
**resulted** 29:18
129:6,11
154:10 166:12
**resulting** 105:21
**results** 172:8
222:1,22,25
**retain** 162:15
**retained** 3:10
225:5,24
**retainers** 234:3
**retention**
196:17
**rethinking** 76:3
**return** 238:15
**returned** 11:25
**returning**
164:16
**review** 10:2,5
32:20 37:6
46:19 49:18
53:1 73:9
77:23 94:13
98:4 101:15
103:22 114:23
115:13 128:3
160:20 187:1
199:7 222:16
231:13
**reviewed** 10:8
31:14 46:20
73:19 94:15
98:7 101:20
114:24 185:3
190:25 199:6
**reviewing** 10:10
10:21 14:25
15:12 25:24

32:21,22 37:8
73:6,24 77:24
98:6 101:23
103:24 128:4
146:9 188:10
**reviews** 58:19
191:15
**revocation** 19:7
25:24 106:13
**revocations**
19:12
**rewards** 195:25
**Reynolds** 1:14
2:18,20,22,24
3:1,8 4:10 7:10
7:17 8:21
32:19 37:2
40:25 41:20
45:3 46:11,14
50:22 77:17
77:20 78:2,6
80:7 94:7,10
98:1 103:18,19
114:18,25
115:13 116:1
121:1,10 128:2
128:6 134:8
170:1 175:20
176:4 177:2
180:22 184:15
236:18 238:11
239:2 240:3
240:9
**Ribaudo** 92:2
**right** 10:19 16:21
16:25 17:1,8
18:3 30:11
32:7 36:12,14
39:25 42:16
46:11 49:23
61:16 76:19
77:1 103:2
107:8 108:1
125:14 150:25
155:5,19 159:2
161:19 166:11

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-26   Filed 02/21/18   Page 90 of 100

167:16 168:1,5
169:19 170:16
171:23 173:24
176:9 177:25
178:25 180:2
180:20,24
181:15 182:5
182:21 183:1,2
183:20 184:1
184:20 185:9
185:10,14,18,21
186:6 187:11,19
188:23 190:18
190:20,23
191:5 192:7,14
192:20 194:12
195:14 199:7
201:13 202:12
202:16 203:13
203:16,21,25
204:18 205:7
205:11,16,25
206:9,13
207:1,9,12,16
207:19 208:13
209:15 210:13
211:18,19
212:10 215:25
217:2 219:9
220:17 221:2
221:15 224:11
225:25 228:6
233:16 235:5
235:6,9,12
236:5,8
**rightfully** 60:7
**rights** 77:6
156:8
**risks** 21:7,8
**river** 32:5,6
**robberies** 32:9
146:22
**Robert** 128:10
**robustness**
179:20 180:9
**role** 27:20

**roles** 12:8,8
13:9
**room** 204:18
205:7 206:16
**Rosca** 2:3 5:7
8:4,4,20
28:15 32:13,18
33:23 36:24
37:6 40:20,24
41:4,20 44:25
46:7,12,19
50:7,12,16,22
62:14 68:4,12
70:18 75:12
77:15,23 78:5
80:20 90:3
93:22 94:1,7
94:13 97:24
98:4 99:20
103:16,22
105:17 114:17
114:23 115:12
121:1 128:1,9
130:9 131:5
134:1,8 146:4
150:5 151:11
156:5,10,12
218:19,22
233:1 236:15
**rough** 119:10
**roughly** 21:21
24:2 232:21
**row** 41:12
**RSMo** 237:9
**RubinBrown**
44:9 100:6
179:6,21 180:1
180:5,7,9,20
182:19 203:9
**rule** 72:9 83:13
83:16 91:12
209:6
**rules** 8:25
40:19 82:16,17
82:20 83:12
83:21 90:17

91:19 95:3
154:1
**ruling** 39:10
**Rulings** 37:20
**run** 67:8 68:13
122:14 141:7
**running** 122:17
**runs** 122:13
**rural** 136:23
**Ruth** 210:4

---
### S

**S** 2:9 5:1
**safety** 208:5
**Saturdays** 64:2
**saw** 42:11 47:14
**saying** 16:3
59:5 71:13
75:16 91:17
109:16 112:11
113:6 129:14
163:2 171:5
172:9 183:24
187:22 188:20
189:25 190:3
191:18 195:3
196:18 198:17
211:21 219:14
219:16 222:23
230:16
**says** 7:12 34:4
34:22 35:22
36:25 42:23
43:6,12,15,22
44:4 47:6
48:3,11 78:21
79:21,25
80:25 82:3
104:18 115:24
118:20 128:19
132:3 174:23
181:2
**scale** 111:19
**scan** 161:20
**scene** 25:9
70:3 172:22

174:23 190:8
190:17 192:13
199:13
**schedule** 108:1
**scheduled**
56:15 122:22
**scheduling**
53:18 117:5,14
163:10
**school** 11:19,20
23:24 66:10
138:8 156:22
157:6,22,25
158:3,7,19,22
159:10,15
178:5 200:16
**scope** 125:15
149:22
**screen** 35:24
102:2 121:7
**screened**
152:21
**screening**
105:10,13,19
105:22 106:2
106:23 120:14
**search** 138:2,5
**seated** 206:14
**Seattle** 157:12
**second** 15:18
33:9 34:3,8
37:23 56:14
82:3 84:12
95:16 108:4,7
112:4 139:12
160:25 224:14
**section** 188:16
209:18 211:23
213:10 237:8
**see** 33:10 34:3
35:1 37:25
38:14 41:14,21
42:5 43:11,22
44:3,16 45:10
45:17 47:20
64:3 80:24

82:17 83:14
85:8 86:3
87:5 90:20
95:8,19 96:4
96:12 97:8
98:17 99:9,25
101:16 104:9
112:9,21 115:23
118:17 121:8
132:17 161:17
180:25 181:3
188:6,12
189:12 204:13
216:1,20 218:4
**seeing** 47:22
204:10 222:8
**seek** 74:4
**seeking** 74:7
**seen** 29:21
32:24 37:10
41:4,7,8,24
42:8,9 46:22
46:25 47:2,11
47:13 59:9
78:6,9 86:12
94:16 98:8
104:1 115:15
121:3,5,6
172:6
**select** 132:4
**selective** 65:14
**self-explanat...**
66:8
**send** 27:3 78:14
115:4 174:3
207:18
**sending** 103:5
128:17 162:10
**sends** 175:1
**sent** 75:15
78:12 91:24
104:4 107:5
115:18 128:10
134:24
**sentence**
78:20 81:16

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-26   Filed 02/21/18   Page 91 of 100

85:1 182:8,12
182:13
**sentencing**
65:2 66:14
153:2,7
**serious** 12:19
12:25 13:3,4
14:16 17:12
18:4,5 30:21
31:12,15,21
53:24 60:1,6
85:13 88:19
88:23 125:10
133:2 144:13
144:20 145:8
145:11 146:13
147:12 148:24
151:17 194:11
194:12,18
198:19 200:7
204:3 208:22
**seriously** 79:11
92:16,24
149:7
**seriousness**
49:6 95:15
**services** 6:2,13
8:1 68:20
106:14 238:1
238:16
**session** 109:21
**sessions**
160:20
**set** 19:24 20:14
20:22 31:10
57:8 60:14
61:23 63:20
63:25 88:21
89:5 92:1
120:3 203:24
204:3,19
221:23
**sets** 207:6
228:17
**setting** 63:22
**seven** 21:21,22

22:19 23:8
47:5 57:23
59:16 108:13
135:16,19
136:16,21,22
137:19 138:18
164:25 167:12
232:18
**sex** 85:5 146:16
164:1 206:17
**shed** 77:2
**SHEET** 239:1
**sheets** 238:12
238:14,15
**Shipma** 2:5
5:12 8:10,10
9:23 10:7
115:3,8 171:24
175:23 176:7
176:16 183:8
184:4 189:4,8
191:6 210:2,17
210:22 211:10
212:9 213:20
214:3,13,22
215:1 216:15
217:9,13 218:8
218:14 219:2
222:19
228:23 229:1
231:1 232:5
232:23 238:4
238:9
**SHONDEL** 1:4
4:4,20 238:8
239:3
**short** 31:2
172:24
**shorthand** 7:4
7:5 237:4
**shortly** 38:21
91:16
**show** 29:4 41:18
**showing** 188:13
188:21
**shown** 30:4,10

30:12,15 51:16
**shows** 42:2
44:13
**shut** 155:19
**sic** 181:11 185:6
**side** 118:13
**sign** 227:13
238:14
**signature** 7:7
238:12,14,16
239:25
**significant**
116:22 155:23
229:14
**significantly**
104:20 110:12
141:8
**similar** 42:12
47:22 121:5
187:6
**similarly** 93:10
138:3
**simple** 114:12
205:22 217:11
217:13 218:17
**simply** 225:24
231:3,15
**Sincerely**
238:19
**single** 190:13,15
190:17,22
**sir** 211:21
**sit** 198:20
**situated** 93:10
**situation** 54:12
55:11 57:2,11
70:8 90:23
130:21 149:9
153:5 162:17
175:9 199:23
203:18 204:1
217:4,4,21,22
224:21,25
225:23 226:9
**six** 15:11 17:18
21:21 56:16

58:5,10 92:3
121:8 136:24
137:4 141:10
160:22 161:4
180:23 204:21
**six-month**
45:21
**six-week** 59:6
**Sixth** 173:4
**size** 79:6
**skill** 136:13
164:8
**skipped** 153:15
**slightly** 84:22
**slower** 32:10,10
**slowly** 18:5
19:25 20:1
**small** 13:2 107:9
140:22
**smaller** 195:11
195:13
**social** 64:18
65:3,5,9 66:11
66:12 225:15
225:15,17
226:1
**sociological**
177:21 178:3,14
**sole** 138:6
224:13
**solution** 28:23
28:23 83:23
93:15 102:21
135:8,10
149:14 155:18
156:7 219:21
**solutions** 75:19
79:13 93:12
97:2 102:24
213:4
**solve** 93:21
132:19,25
208:25
**solving** 82:5
**somebody**
64:3 115:22

142:15 149:7
192:23 194:15
196:20 222:6
226:22
**soon** 21:24
141:16
**sooner** 92:14
102:21
**sorry** 48:6 50:3
68:9 92:7
118:23 188:12
196:3 222:19
**sort** 20:11 33:11
42:17 43:15
65:4 74:16
124:12 146:12
162:12 189:2
**sound** 167:16
186:14 208:6
218:5 220:13
**sounds** 67:23
195:13 215:22
218:6
**source** 171:7
181:21
**sources** 171:18
171:20
**speak** 32:5
202:11
**speaking** 9:5
18:1,14 19:11
48:7 56:10
60:13 129:12
155:12 162:8
205:3 232:21
**speaks** 80:18
89:6
**specialist** 13:18
13:21 23:4
226:25
227:13
**specialized**
18:22 122:9
184:11
**specific** 15:18
21:3,14,16

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-26   Filed 02/21/18   Page 92 of 100

29:10 41:24
120:11 138:13
164:10 169:4
172:16 188:3
210:23 219:16
221:19,20
222:5
**specifically** 11:1
42:15 69:25
130:20 164:2
165:24 166:1
175:12 179:5
181:18,23
186:4 188:21
200:11 208:19
209:21,25
211:2,13 213:2
214:25 218:11
223:12,15
**specificity**
175:15
**specifics** 211:19
**speculating**
170:19
**speculation**
68:10 75:3
90:1 146:3
150:3 151:7
156:2 170:18
171:12 182:5
182:22 230:4
**speculative**
171:23
**speed** 59:13
87:6 197:5
**speedy** 77:6
156:8 173:5
**spend** 20:5
26:25 69:5
143:4 151:6
**spending**
27:25 69:18
**spent** 143:7,10
144:14,20,23
**spoken** 81:23
89:5 92:24

96:19 102:13
**spreading**
194:23
**spreadsheet**
2:15 41:2
46:25 47:10
47:17 53:16
181:20 182:6
182:16,18,23
182:25 185:17
**spreadsheets**
101:24
**spring** 123:4
**Springfield**
225:18
**St** 2:11 4:15 5:21
6:3,14 7:23
11:12,13,16,22
11:23 12:2,3,5
12:7 13:6
32:15 33:4
34:23 41:13
47:6 68:19
76:3 85:20
88:20 92:5,10
92:16 96:3,19
97:1,1 100:24
100:25 102:18
102:23 104:19
105:1,9 106:1,3
107:8,23
108:12 109:10
109:23,23,25
110:7,11 111:8
111:21 117:5
119:16,17
123:13 128:11
138:25 139:1,11
139:13,18,23
139:25 140:1,6
140:10,13,15
141:12,16,21,24
142:1,4,5,11,15
142:17 157:9
157:13,15,20
159:16 202:8

225:17 238:16
**stack** 176:2
**staff** 13:25 16:6
28:17 46:6
64:17 68:5
95:18 162:18
162:24 163:3
170:11 186:19
**stages** 125:9
**stakehold**
103:14
**stakeholders**
92:5,8,21,23
103:14 118:9
**stakes** 49:13
229:9
**stamp** 94:22
**standard** 59:12
85:6 165:2,11
169:1 190:4
**standards** 40:11
40:13,13 50:1
57:22 83:3
95:7 100:6
154:3,4 164:19
164:24 165:15
165:25 166:10
166:13 179:12
231:22
**standing** 32:6
**standpoint**
178:13
**start** 15:7 22:9
42:22 52:6
75:17 76:5
119:6 139:5
157:19 175:25
177:5 211:8
222:11
**started** 11:21
12:17 115:7
157:14 201:17
**starting** 1:20
7:13 75:17
156:23
**starts** 46:15

**state** 1:7 4:7,21
5:13,18,20
7:18 8:8 11:9
15:25 33:1
34:2 37:12
38:9 39:25
63:17,21,24
65:5 66:13
82:14 99:22
121:16 153:19
156:18 227:2
228:3,12,18
233:16,17
237:22 238:4
238:8 239:3
240:1
**stated** 20:3
37:25 57:7
131:17 168:4
179:25 202:14
208:12 211:24
212:1 231:7
232:16
**statement** 34:9
35:2,11 40:3
84:17 85:8
86:6 95:10,13
95:21 200:18
200:21
**statements**
33:14,18 129:1
**States** 1:1 4:1,18
7:20
**statewide** 20:8
57:22 59:12
164:19 165:2
165:10
**statistical**
177:19 178:13
178:22
**statistically**
170:24
**statistics** 10:8
10:10,18,22
41:25 100:14
101:4,16,23

136:1 194:7
221:25 222:10
222:10
**status** 64:14
186:17 205:24
**statute** 208:5,9
208:10 212:7
212:14,15,20
213:5
**stay** 174:2
187:16
**stayed** 227:15
**staying** 227:9,11
**stemming**
140:6
**step** 15:14 24:21
25:1 155:18
**Stephen** 1:14
4:10 7:10,17
121:9 184:4
210:7 214:14
229:2 236:18
238:11 239:2
240:3,9
**Stephen's**
210:10
**sticking** 22:17
**STIPULATED**
7:1
**stop** 90:17 91:2
91:12,18
218:25
**stopped** 42:13
108:14,17
**stored** 161:14
**story** 33:4
**strategy** 201:5
201:5
**Street** 4:15 5:4
5:8,21 6:3,14
238:16
**strictly** 221:1
**strike** 29:24
35:12 36:15
45:24 47:20
48:18 50:12

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-26   Filed 02/21/18   Page 93 of 100

53:12 97:4
121:13 130:9
136:6 150:19
152:10
**struggle** 40:9
62:25 85:16
**struggling**
173:12
**student** 158:6,9
**studied** 194:9
**studies** 100:4,5
100:8,10,12,15
100:15,22
170:21 177:21
177:22,25
178:4,8,25
179:2 203:12
**study** 100:21
172:14 180:1
189:18 203:9
203:15
**stuff** 189:25
195:9
**style** 39:16
91:10
**subcommittee**
92:1,11,13
106:22 107:5
109:9 112:22
126:12 128:21
134:9
**subject** 33:23
41:19 44:23
50:4 70:15
75:4 80:18
97:20 172:22
**submit** 65:24
65:25 151:24
**subscribe**
240:6
**subsequent**
63:8 106:18
**substance**
78:16 80:14
209:2,12
212:4 240:5

**substantial**
138:11
**substantive**
204:7,8
205:19 212:14
213:4
**substituting**
89:1
**succeed** 161:5
**successes**
222:17
**successful** 84:7
84:9 126:8
136:14 201:7
216:7,8,9,13
217:2,11 218:12
**successfully**
223:13
**sufficient** 49:25
129:24 148:20
**sufficiently**
70:13 73:9
97:17
**Suffolk** 138:3
**suggested**
129:4,19
133:18
**suggesting**
218:15
**suggestion**
129:10 132:12
133:12,19
134:24
**suggestions**
105:4 133:17
133:20
**suggests**
132:24
**suit** 215:4
**Suite** 4:14 5:4
5:14,21 238:5
**suited** 136:11
140:3,24
**summer** 39:6
123:2,4
**Sundays** 64:2

**superintende...**
234:20
**supervise** 14:22
**supervising**
107:11
**supervision**
83:12
**supervisor**
99:7
**supplemental**
2:16 46:17
175:21
**supplies** 226:15
226:20,23
227:5,18,22
**supplying**
226:19
**support** 114:13
119:19 189:7
**suppose** 114:7
184:16
**supposed**
198:6
**Supreme** 39:12
39:18 72:9
83:13
**sure** 15:5 50:15
56:4 71:9,10
72:13 83:10
88:9 93:25
131:4 167:4
205:12 218:12
232:13
**surveillance**
25:10 29:16
199:15 230:19
**suspects** 151:16
**Sutcliffe** 5:3,7
8:5,7
**swear** 8:13,14
**switched** 39:2
**sworn** 4:11 7:11
237:8
**system** 10:9,14
10:14,17 27:8
27:13,15 28:21

30:8 34:15
51:15 53:6
61:19 117:21
129:7,13 161:9
161:12,18
162:9,15
164:11 172:6
174:17 182:4
184:8,22,23
185:7 189:22
192:23 193:12
194:12,15
195:19 198:1
202:23
207:14 214:5
224:19
**systemic** 97:8
97:10,11

---

**T**

**T** 2:9
**table** 9:20
109:14 145:15
148:20
208:23 216:19
218:3
**tabulated** 136:2
**take** 9:12 21:8
27:20 30:14
31:20 33:6
44:21 46:13
47:11 49:9
50:14 52:2,5
55:12 61:3,8
61:16 66:24
90:23 92:19
93:23 103:11
108:23 110:2
111:12 116:1
121:23 124:2
127:24 134:1
139:22 141:12
143:23 149:11
157:17 165:22
167:13 173:10
175:17 186:5

193:21 197:11
204:25 209:1
222:20 229:5
229:21
**taken** 1:15 7:3
36:8 50:19
75:13 79:11
94:4 134:5
148:4 176:21
178:20 229:14
237:10,14
238:11 239:4
**takes** 24:18
72:13 89:19
92:24 136:14
145:18 195:16
227:9 231:18
**talk** 16:8 21:9
50:23 54:14
54:18 55:15
64:16 65:22
71:24 78:19
93:11 111:9
113:17 114:9
116:5 119:17
120:22 127:18
135:13 138:21
139:4 142:22
155:8 160:19
185:16 192:9
192:15 205:10
222:15
**talked** 167:24
196:4 197:11
201:8 210:5
214:7,21
**talking** 61:1 89:1
102:23,24 111:1
111:19 127:3,6
144:1 164:22
191:17 199:10
199:22 205:19
205:21 210:1
224:1 230:21
**talks** 111:13
216:6,13,25

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-26   Filed 02/21/18   Page 94 of 100

target 44:14
task 27:16 118:8
  162:19 174:25
  227:12
tasks 20:6,12
  27:1 28:24
  167:25 168:1,8
  168:10,11,18,24
  169:6
teasing 236:3
tech 28:23
technically
  108:10
techniques
  190:6 191:20
telephone
  51:20 207:23
tell 35:7 36:12
  42:20 116:2
  156:21 168:10
  195:16 196:19
  197:24 201:21
  208:18 225:8
telling 125:2
  165:14,25
  188:24 191:22
templates 27:5
temporary
  216:2
ten 16:20 17:3,3
  17:3 24:2
  28:10,12,13
  50:9 57:25
  59:9 62:15,20
  69:11 85:4
  95:18,24
  100:3,16 110:7
  123:9 136:20
  137:19 142:12
  165:4 167:7,12
  173:2 194:9
  214:6,8
ten-minute
  134:1 233:12
tend 19:24
  32:10 88:18

221:24
tends 65:11
tenths 233:9
term 25:4 40:15
  40:16 55:22
  136:15 168:25
  220:8
terms 20:15
  40:18 45:25
  47:10,17 56:2
  84:10 110:22
  146:14 164:7
  170:23,25
  186:9 214:15
  229:12
testified 36:1
  102:7 104:15
  134:23 135:3
  144:4,17
  147:10 148:11
  155:21 199:5
  231:1
testify 180:8
  183:3,6,9,16
  183:21,25
  184:4,7 185:12
  185:22
testifying 108:6
  166:23
testimony 8:15
  67:23 74:15
  185:20 210:2
  237:7,9
text 208:2
  230:20
Thank 114:14
  115:8 135:12
  138:20 142:18
  175:24 238:18
Thanks 134:2
theoretically
  113:24
thereon 240:6
thereto 237:16
they'd 153:22
  204:10

thin 194:23
thing 161:18
  199:20
  201:25 209:2
  224:4
things 32:9
  71:22 88:18
  168:16,19
  170:15 190:6
  191:3,5,23
  209:11 220:9
  226:15,20
  227:23 229:17
  229:22
  230:21
think 27:24
  29:4,7,9,19,25
  30:5,8,17,21
  32:14 36:20
  36:20 41:22
  44:19 45:23
  46:3 47:9
  48:25 49:3,4
  49:20 50:4,13
  59:20 61:6,13
  64:19 67:17
  67:22,25 68:1
  68:5 69:9,11
  69:17 70:8,22
  74:1,6 80:17
  82:12 83:16
  84:24 85:12
  93:12,19
  95:23,25
  97:16 100:3
  105:8,23 111:8
  116:24 118:7,15
  121:6 124:11,15
  129:9,23,25
  132:14 136:5,7
  137:14,14,15,16
  137:17 138:16
  140:23 145:10
  145:22 148:22
  149:16,21
  150:2,2,8

153:22 154:5
  154:8 162:22
  164:23 166:23
  167:5,14
  168:14 169:7
  170:9,14,23
  171:3,12 172:5
  172:13,14,16
  173:25 176:2
  179:25 181:14
  182:14 185:24
  186:10 188:21
  189:11 192:18
  193:24 194:10
  194:14 195:8
  196:21 197:23
  197:25 198:21
  199:5 201:2,4
  202:9,22
  203:23 206:11
  208:12 209:13
  211:12 212:6
  219:3,8 220:11
  220:15 221:3
  221:12 224:9
  228:21 229:12
  230:13 231:21
  231:25
  235:23
thinking 48:22
  77:8 130:20
  146:5,6 201:3
  222:6
third 110:14
  206:12
Thompson
  202:7
thought 112:4
  118:25
thoughts 131:22
  147:23
thousand 77:3
  134:18
thousands
  199:23,24
three 13:17,19

13:20,22
  16:20,21 17:8
  21:10,20 22:15
  22:24 40:8
  44:1 60:23
  83:8 89:9
  112:17,18,20
  112:20 136:19
  137:23 140:19
  140:20 158:25
  159:5 167:7,15
  169:22,24
  171:13 177:3
  178:6 185:8
  198:16 207:25
  221:4 228:10
throw 109:13,16
Thursday 64:5
  163:19
Tide 37:20
tie 134:9
time 1:20 7:13
  7:16 11:15 14:8
  14:20 20:3,5
  24:11 26:25
  27:18,24 30:17
  31:1,15,20
  32:3 34:1,24
  35:4,7 36:12
  39:11 42:10,11
  43:17 45:21
  49:10 50:17
  50:20 53:6
  56:23 60:22
  63:11 69:18
  70:10 72:5,11
  72:12 79:15
  82:12 84:19
  87:18,20 89:7
  94:2,5 100:19
  102:22 106:12
  106:20 116:7
  117:1,4,15,17
  118:11 132:16
  134:3,6 138:21
  143:3,7 144:20

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-26   Filed 02/21/18   Page 95 of 100

144:23 145:6
145:13,18,23
146:14 147:24
148:6,8,18
149:12,23
151:5 158:19
162:23 169:12
169:19 171:5
172:24 173:8
174:3 175:5,7
175:16 176:19
176:22 180:24
180:24 181:10
181:11,12,24
182:1,2,8
186:5 187:9
192:2 195:2
199:7 202:5
203:20
204:12 207:8
210:19 212:17
212:22 213:6
213:21,22
214:9 221:16
229:21 230:10
230:17,23
233:6,8,14,20
233:22
236:16
**timeline** 93:1,1
157:17
**timely** 72:19
73:24
**times** 2:12 37:4
37:16 61:19
62:17 89:9
92:3 102:14
144:14 183:11
197:23 202:14
217:14,17
224:2 229:25
235:2
**timing** 60:15
**title** 11:9 33:5
**titled** 37:19
**today** 74:15

81:10 86:7
126:13 213:19
214:2,21
215:20
**Today's** 7:15
**told** 92:13 101:3
173:21 189:8
201:25 221:21
222:6 223:12
223:19 226:1
**tomorrow**
155:20
**tool** 105:11,13
105:20,22
106:2,23
107:2
**top** 24:8 28:7
34:8 75:8
121:9 174:2
187:16
**topic** 114:4
217:16
**topics** 178:14
**total** 11:7 48:14
**touchy** 112:24
**tough** 29:13
**track** 58:17
173:7 175:2
192:23 193:2
193:23,25
196:10,11,14
**tracked** 193:22
196:15
**tracking** 194:15
**tracks** 35:24
**tradeoff** 114:7
**train** 15:10 16:7
20:17
**trained** 15:4
36:21
**trainers** 122:22
**training** 120:5,5
120:9,11 122:5
122:8,10,17,21
122:23 123:13
123:15 124:2,3

124:4 160:23
160:24 178:20
219:21 220:1,4
**trainings** 122:11
122:13 123:11
**transcribed** 7:6
**transcript** 3:11
238:13
**transfer** 17:17
136:23 141:18
**transferred**
12:3 51:10
**transfers** 17:22
**translation**
68:20
**translator**
68:23 69:1
**translators**
68:12,14,18
**transported**
152:22
**travel** 43:18
63:11 64:6
109:1 138:22
180:24 181:12
182:8
**Traveling**
138:20
**treatment**
225:12
**trend** 59:1
64:25 67:14
72:16 138:16
222:7
**trends** 160:7
**trial** 11:8,12,13
11:22,23 12:5
12:10,11,17
19:25 20:19
20:25 21:2
31:10 67:11,15
67:19 71:1
74:12,13 77:6
88:19,20
121:24 124:2
138:1,4 139:25

148:1,2 153:20
156:9 161:1,3,3
173:5 175:8
186:13 201:19
202:2 203:24
204:2 207:6
221:23 222:9
**trial-rich** 140:1
**trials** 18:11
123:17 153:18
**tried** 65:8
**trivialities** 155:2
**true** 29:23
38:16 69:25
81:5 87:10,12
166:19 190:12
220:7,10
235:11 240:5
240:7
**truth** 8:16,16,17
**try** 55:9 58:1
65:12 75:21
79:12 83:23
153:1,6 154:7
161:2 195:9
**trying** 29:8
31:18 111:4
124:16 130:15
131:18 167:1
184:2 194:24
197:6 198:11
199:1 213:7
214:24
**Tuesday** 64:4
**turn** 33:9 37:23
46:24 74:16
80:7 197:8
**turnover** 135:13
135:22 136:3
136:6,7
167:22 220:12
220:24 221:5
**two** 12:19 13:19
13:22 16:17,20
16:24,25,25
22:6,23,24

23:3,15 25:17
25:20 27:9
30:14 36:13
39:7 56:8,11
56:19,23 57:7
60:23 67:11
71:12 75:20
85:4 87:21
88:18 91:22
92:5 100:15
111:2 113:8
117:6 121:10
122:10 123:14
124:1 131:14
133:20 136:19
136:23 137:22
139:19 140:12
140:18,20
141:20 142:3
143:16 163:14
163:18,20,22
166:24 167:5
167:6,7,7
168:23 169:2
177:13 180:25
181:9 189:17
189:20 214:16
214:16 220:9
228:10
**tying** 233:4
**type** 51:14 168:8
189:22 198:1
226:8
**types** 12:17
18:23 114:10
120:12,13
122:5 146:20
179:10
**typewriting** 7:7
237:11
**typical** 167:19
169:13 233:13
233:22
**typically** 12:12
14:12 57:16
71:7 74:9

**ALARIS LITIGATION SERVICES**
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-26   Filed 02/21/18   Page 96 of 100

199:18 229:10

**U**

**UCLA** 157:23
158:8
**UCSC** 158:6,10
158:20,24
**Uh-huh** 24:24
58:16 62:21
72:10 91:15
108:9 109:19
**unable** 56:18
57:3,12 69:22
71:2,17,18 73:9
183:1,2,20,21
191:23
**uncomfortable**
223:20
**underestimat...**
136:13
**undergrad**
156:23 157:18
**undergraduate**
160:5
**underneath**
181:2
**understand**
8:24 9:7,13
31:17 48:6,7
67:7 129:14
130:15 140:4
145:17 160:25
161:13 179:25
197:7 210:13
210:17 213:9
216:22,24
229:4
**Understanda...**
126:15
**Understanda...**
88:11
**understanding**
41:23 43:3,7
43:19 44:6
45:19 56:20
62:1 82:19

93:9 100:13
105:12 108:22
122:6,12,15
123:14 124:23
148:10 154:25
179:23 180:4
208:8 209:19
209:20 210:3
210:11,14,18
211:2,3,9,15
219:18 222:11
226:18 232:10
**understood**
178:19
**unethical** 154:6
198:4,10,16,22
**unethically**
95:4
**unfamiliar**
35:20
**unhelpful** 153:4
**unimaginable**
65:4
**United** 1:1 4:1,18
7:20
**units** 43:17
**University** 138:1
138:3
**Unknown** 151:9
**unlimited**
213:23
**unmanageable**
79:5 85:7,11
99:1 203:7
**unrelated**
214:18
**unsuccessful**
84:5
**untouched** 86:1
**unusual** 49:1,3
**update** 205:25
**updating** 28:2
102:17
**use** 23:9 53:17
56:2 198:1
202:22

209:18 225:15
226:1
**useful** 101:25
102:5
**usually** 56:16
57:8 58:5
59:25 61:5,10
66:8 67:10
149:1,2 153:4
174:14 204:20
228:9
**utilized** 196:9
208:13 225:6
**utilizing** 160:10
208:16

**V**

**vague** 50:4
56:21 62:9
70:15 75:4
97:20 130:8
150:2 213:21
214:22
**valuable** 210:10
**value** 180:19
196:12
**valve** 208:5
**varies** 60:16
144:2
**variety** 50:25
123:19
**various** 3:2
26:7 103:20
107:12 109:20
124:9 190:6
**vary** 52:4
**varying** 63:25
**vehicle** 127:20
**veracity** 179:19
182:24 183:3,7
183:10,16,21
183:25 184:5
**verbal** 9:2
**verdicts** 221:24
**verified** 99:23
100:2 185:4

**versa** 24:21
**version** 33:3
**versus** 7:18
114:11 130:3
168:9 234:19
235:21
**vertical** 53:19
117:9
**Vice** 24:21
**Victims** 200:7
**video** 23:19
25:5,6 29:16
230:20
**video-record...**
1:14 4:10 7:17
**videographer**
6:2 7:14,25
8:12 50:17,20
94:2,5 134:3,6
176:19,22
236:16
**videos** 25:9
30:12 199:14
199:14,14,15
**videotapes**
25:8
**view** 25:14
136:9 222:24
223:2,6
**views** 136:1
**violate** 83:20
95:7
**violated** 77:7
**violates** 83:12
**violations** 76:4
**violence** 18:17
18:19,20
**violent** 30:21
31:7 48:25
49:3,7,9,21
60:1 85:5,13
123:18,23
133:3 144:13
144:21 145:8
**visit** 57:22,25
89:13,14

164:24 165:4
174:6 192:13
205:22
**visitation** 62:12
166:7
**visited** 28:3
31:13 100:17
101:2
**visiting** 31:3
70:3 89:2
100:22 190:7
190:16
**visits** 64:1
**visually** 204:13
**voicemail** 28:2
**voir** 153:8,12,15
153:20
**volume** 195:18
**voluminous**
200:5 214:11
**volunteered**
121:23 139:22
**volunteers**
122:11
**vs** 1:6 4:6,21
238:8 239:3

**W**

**wait** 9:4 76:2,5
76:6,9,10,15
76:17 77:5
108:5,5,10
110:13,15,19,21
110:24 111:3,7
111:11 113:21,22
113:24 114:3,9
114:10,15 127:8
155:16,22
156:7
**waiting** 71:14
**waived** 153:12
**wake** 80:3
**walk** 50:23
52:11 160:14
**walk-ins** 51:11
**want** 21:8 81:17

ALARIS LITIGATION SERVICES
www.alaris.us    Phone: 1.800.280.3376    Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-26   Filed 02/21/18   Page 97 of 100

108:19 118:6
138:21 148:13
149:5 154:16
155:5,6 159:14
162:10 168:7
172:1 176:8
192:3 196:21
198:14 211:6
215:16 216:23
219:11 220:1
231:24
232:24
**wanted** 73:19
75:18 79:11,17
79:18 115:6
138:1,4,4 167:3
202:2 223:21
225:10,11
232:13
**wants** 92:25
93:17 102:21
147:8 231:2
**warrants** 39:2
51:7
**wasn't** 109:17
123:15 225:23
**waste** 213:6
225:20
**water** 173:12
**Waters** 39:21
**wave** 205:10
**way** 47:3 81:20
112:10 138:11
148:22 193:14
195:15 197:22
198:24 204:19
216:13 217:8
220:20,20
232:1
**ways** 47:2
50:25 52:5
61:12 207:21
**we'll** 15:7 68:20
154:18 178:23
178:23 212:13
214:11 216:11

216:17 218:1
218:25
**we're** 9:5 15:12
61:1 76:25
138:9 153:5
154:15,18
176:22 177:1
206:1,3 209:2
209:3,8,11
210:20 211:25
230:21
**we've** 58:6
59:11 93:22
96:7 150:9
153:25 164:18
176:24 213:18
214:2,21 215:5
215:20 217:23
**web** 33:3
**Wednesday**
64:4 163:22
**week** 56:14
78:22 117:12
131:13 171:11
**weekends**
224:19
**weeks** 56:8,16
56:19,23 58:5
58:10
**weighted**
179:14,15
**went** 134:11
155:22 158:4
158:7,20
159:15 167:9
175:8,18
225:9
**weren't** 232:14
**West** 5:8,14
238:5
**Western** 1:1 4:1
4:19 7:20
**whisper** 205:14
**whispering**
206:8
**wide** 143:2

164:11
**widespread**
202:3
**wife** 159:18
**William** 4:15
6:12 7:4 237:3
238:21
**willing** 90:22
134:21 155:4
208:20
**Wilson** 169:25
**window** 68:2
**wise** 27:24
**withdrawing**
154:13
**withdrawn**
184:17 185:2
**withdrew** 43:10
**witness** 7:7 8:13
8:18 25:7
28:13 50:15
93:25 156:13
176:13 182:24
183:9 199:14
230:16,17
237:7,9
238:13 239:1
239:2,25
**witnesses**
24:23 49:14
70:1 71:2,4,23
172:21,24
173:3,5,8
174:7,14 228:8
230:12,14
**Wolk** 169:25
**Woodrail** 5:13
86:15 227:5
**word** 22:14
**words** 223:5
**work** 8:25
14:25 15:13,17
16:4 17:13
18:10 20:18
21:6,13,15
23:5 26:15

27:25 28:9
37:19 44:14
64:18 71:18
82:12 89:14
96:25 97:18
107:17 109:25
113:7 126:22
126:23,25
127:1 138:1,4,4
139:24 143:12
145:18 151:15
154:7 157:24
159:4 171:11
175:2 178:9
187:15 192:2,9
195:9 198:14
200:17 204:8
212:13,20
220:2 221:22
223:23
224:18 229:5
231:18
**worked** 86:13
90:25 108:20
109:24 122:3
125:11 127:9
146:11 157:11
158:21 159:1
193:18,20
223:22
**worker** 65:9
225:15,17
226:1
**workers** 64:19
65:3,6 225:15
**working** 20:12
22:2,4,8 55:8
64:19 67:12
83:22 89:22
89:23 100:20
133:23 138:6
143:25 148:18
157:19 160:16
194:17,17
197:18 214:4
235:4,9

**workload** 43:15
43:17 45:14
45:25 179:7,9
**workplace**
15:20
**works** 21:21
23:16 53:25
109:6 142:22
148:22
**workup** 221:14
223:11,14
**worried** 60:8
73:17 191:24
191:25
**worse** 219:25
**wouldn't** 42:17
185:19 192:11
195:5 209:4
**wrap** 20:11
**write** 21:1 80:12
81:8 82:2
94:22 95:5
**writing** 20:20
81:10 94:25
98:23 192:12
**written** 35:2
36:7 38:22
91:4,16,20
151:18 191:17
213:25
**wrong** 130:16
**wrote** 94:19

| **X** |
|---|
| **X** 2:1,9 |

| **Y** |
|---|
| **yeah** 123:6 |

129:16 156:3
164:22 167:1,4
176:18 178:23
180:11,17
197:14 233:11
**year** 10:12 11:4
15:12,13 16:12
17:7,9,11,14,15
17:22 18:3,8

**ALARIS LITIGATION SERVICES**
**www.alaris.us**          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-26   Filed 02/21/18   Page 98 of 100

19:19 38:19
44:1 47:12,19
48:9,20 49:2
50:11 88:1,21
123:5 135:15
135:20,23
136:17 138:7
138:14 139:7
139:21 140:8,9
140:23 141:3
142:12 158:1,6
167:16 175:21
177:14 181:11,12
182:9 185:5
195:23 196:1
226:24
232:18,20,22
234:14
**years** 12:18,19
16:22 34:6
90:5 92:18
100:3,16
105:9 108:13
110:8 136:4,8
140:19 151:9
158:25 159:4
159:5 166:25
169:22,24
170:5 173:2
177:11 178:21
194:9 214:6,9
214:9 220:12
220:21 227:16
**years'** 16:15,19
16:20 17:3
136:20,21,23
137:19,19
166:24
**York** 2:12 5:8,8
37:3,16

_____
**Z**
**zeitgeist** 203:11

_____
**0**

_____
**1**

**1** 42:6 45:5
**1-800-280-3...**
6:4,15
**1,062** 45:12
**1,118** 43:12
**1,200** 110:9
**1:48** 1:20 7:13,16
**10-12-17** 2:18,20
77:20 78:2
**10-14-17** 2:22
2:24 94:10
98:1
**10-25-17** 3:1
103:19
**10-31-17** 3:4
114:20
**100** 5:14 19:14
36:2 84:15
238:5
**1000** 5:14
238:5
**10019** 5:8
**103** 3:1
**105** 3:3
**11** 36:11
**11-20-17** 3:7
128:5
**1100** 5:4
**1118** 43:25
**1130** 4:14
**114** 3:4
**115** 3:5
**118** 35:22 36:10
**12** 35:1,7,7,17
60:17 138:17
204:20
206:22
**12-month**
203:19
**120** 3:6
**128** 3:7
**12th** 78:15
**13** 117:7
**14th** 94:24
**150** 142:16
197:16

**156** 2:4
**17** 11:6
**17-04057-CV...**
1:6 4:6 7:19
**175** 84:15
**18** 35:6 88:21
203:25 207:6
**18,000** 34:25
35:12
**1800** 35:14,15
**19** 1:16 4:11
238:11 239:4
**1980** 129:5
**1998** 11:20 12:7
158:4
**19th** 7:15 37:15

_____
**2**
**2,200** 35:19
**2:46** 50:17
**2:51** 50:20
**20** 13:17,20 16:9
16:18 17:1 35:5
42:23 48:12
48:15 85:5
135:17 140:23
142:12 167:7
178:21 204:21
214:9 240:12
**20,000** 69:11
**200** 5:21 18:1
19:14,17,23
36:3 38:12
39:5,7,8 48:19
70:25 102:4,8
173:11,22
**2004** 11:22,24
**2007** 11:24,25
12:22 34:13
90:11 233:18
**2010** 12:3 13:5
**2012** 33:4 39:1
**2013** 39:1
**2014** 37:15
38:17 42:12
70:24 71:8

**2016** 181:14,16
181:24 182:9
**2017** 1:16 4:11
7:15 42:6,7
45:5,5 47:12
47:19 78:15
104:12 128:14
185:6 238:3,11
239:4
**2018** 2:16 46:16
175:21 181:12
181:15
**2050** 5:4
**20th** 128:14
**21** 41:13,13 47:7
175:23 176:4
**212** 5:9
**218.6** 48:15
**229** 2:5
**233** 2:6
**24** 52:18
**24.035** 196:24
**24/7** 224:15
**240** 45:17
**240.7** 45:17
**25** 16:15,19,23
16:25 166:24
167:6,6
**25,866** 45:14
**25th** 104:12
**26** 181:11 238:3
**263** 44:17
**27,352** 43:22
**28** 185:6

_____
**3**
**3:48** 94:2
**3:53** 94:5
**30** 16:19 31:6
58:23,24
59:12,16,19
88:24 164:25
205:4,5
238:17
**30th** 45:5
**314** 5:22 6:4,15

238:1
**31st** 42:7
**32** 2:11 3:3
105:16,18,18
**340-3447** 5:22
**35** 2:11 32:14,15
32:19 39:9,14
**36** 2:12 37:1,2,3
39:10,24
**37** 2:12,14
40:25 41:1,8
45:1,3 46:11
47:3,23
175:20 176:4
176:13 177:2,5
177:7 180:23
184:15
**38** 2:16 46:14,16
177:2
**39** 2:18 77:16,17
77:18,20 78:6

_____
**4**
**4** 2:13 40:22,23
41:7 42:5,23
43:12 44:17
46:10 47:4,23
175:20 176:1,3
176:13 177:1
**4-5.1(c)** 83:13
**4,372** 48:4,8
**4:47** 134:3
**4:54** 134:6
**40** 2:13,20 31:6
77:25 78:2
80:8 171:10,11
202:21
**41** 2:14,22 94:9
94:10 98:15
99:11 163:22
**42** 2:24 97:25
98:1 103:1
**43** 3:1 103:18,19
**44** 3:4 114:18,19
114:20 115:13
124:11

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-26   Filed 02/21/18   Page 99 of 100

**45** 3:5 114:25
  115:9 116:2
**46** 2:16 3:7
  128:2,3,5
**4700** 11:6
**491-5616** 5:5
**492.010** 237:9

---
**5**

**5:48** 176:19
**5:49** 176:22
**50** 14:10,19
  17:19,20 20:3
  20:4 25:12
  31:9 96:1
  203:1
**500** 77:2 134:18
**506-3750** 5:9
**51** 5:8
**525-5212** 5:15
  238:6
**52nd** 5:8
**566** 6:13
**573** 5:15 238:6

---
**6**

**6** 3:6 120:25
  121:2
**60** 36:20,23
  59:13,19
  62:22,24
  63:8 88:25
  93:14 165:5
  205:4,6
  231:22
**60-day** 59:25
  68:2
**600** 84:11 91:14
  91:20 155:1
  208:5 209:6
  209:18 211:23
  211:25 212:2
  213:10
**600.063** 208:6
**63101** 4:15 5:21
  6:3,14 238:16
**644-2191** 6:4,15

  238:1
**65203** 5:15
  238:6

---
**7**

**7** 5:14 238:5
**7:03** 236:16,20
**70** 96:1
**700** 77:2
**711** 6:3,14
  238:16
**72** 52:18
**77** 2:18
**78** 2:20
**79** 31:1

---
**8**

**8** 2:3
**80** 82:11 203:1
**815** 5:21

---
**9**

**906** 4:14
**911** 25:7
**92614** 5:4
**94** 2:22
**949** 5:5
**98** 2:24

**ALARIS LITIGATION SERVICES**
**www.alaris.us**          **Phone: 1.800.280.3376**          **Fax: 314.644.1334**
Case 2:17-cv-04057-NKL   Document 160-26   Filed 02/21/18   Page 100 of 100