# Exhibit JJ

## Page 1

```
 1        UNITED STATES DISTRICT COURT
       FOR THE WESTERN DISTRICT OF MISSOURI
 2              CENTRAL DIVISION
 3
 4   SHONDEL CHURCH, et al.,  )
                              )
 5       Plaintiffs,          )
                              )
 6       vs.                  ) Case No.
                              ) 17-04057-CV-C-NKL
 7   STATE OF MISSOURI, et al., )
                              )
 8       Defendants.          )
 9
10
11
12
13
14      VIDEO-RECORDED DEPOSITION OF SARAH K. JOHNSON
15        TAKEN ON BEHALF OF THE PLAINTIFFS
16             OCTOBER 6, 2017
17
18
19
20      (Starting time of the deposition:  9:06 a.m.)
21
22
23
24
25
```

## Page 3

```
 1        UNITED STATES DISTRICT COURT
       FOR THE WESTERN DISTRICT OF MISSOURI
 2              CENTRAL DIVISION
 3
 4   SHONDEL CHURCH, et al.,  )
                              )
 5       Plaintiffs,          )
                              )
 6       vs.                  ) Case No.
                              ) 17-04057-CV-C-NKL
 7   STATE OF MISSOURI, et al., )
                              )
 8       Defendants.          )
 9
10      VIDEO-RECORDED DEPOSITION OF SARAH K. JOHNSON,
11   produced, sworn and examined on October 6, 2017,
12   between the hours of nine o'clock in the forenoon
13   and one o'clock in the afternoon of that day, at the
14   ACLU of Missouri Foundation, Suite 1130, 906 Olive
15   Street, St. Louis, Missouri 63101, before William L.
16   DeVries, a Certified Court Reporter (MO), Registered
17   Diplomate Reporter, and Certified Realtime Reporter,
18   in a certain cause now pending in the United States
19   District Court, Western District of Missouri,
20   Central Division, between SHONDEL CHURCH, et al.,
21   Plaintiffs, vs. STATE OF MISSOURI, et al.,
22   Defendants; on behalf of the Plaintiffs.
23
24
25
```

## Page 2

```
 1              I N D E X
 2   QUESTIONS BY:              PAGE
 3   MS. QUINN                    7
 4   MR. MOORE                  142
 5   MS. SHIPMA                 185
 6   MS. QUINN                  192
 7   MR. MOORE                  195
 8
 9
10            E X H I B I T S
11   EXHIBIT                    PAGE
12   Exhibit 1   Previously marked exhibit      9
13   Exhibit 21  Exhibit 6 of complaint        27
14   Exhibit 22  Exhibit 9 of complaint        30
15   Exhibit 23  Exhibit 11 of complaint       34
16   Exhibit 24  Exhibit 8 of complaint        41
17   Exhibit 25  Exhibit 12 of complaint       42
18   Exhibit 26  Exhibit 7 of complaint        47
19   Exhibit 27  New Attorney Toolbox          59
20   Exhibit 28  Memorandum of understanding   71
21   Exhibit 29  Exhibit 1 of complaint       127
22
23   (The original exhibits were retained by the court
     reporter to be attached to the original and copies
24   of the transcript.)
25
```

## Page 4

```
 1            A P P E A R A N C E S
 2   For the Plaintiffs:
     Ms. Mae C. Quinn
 3   Roderick & Solange
     MacArthur Justice Center
 4   315 South Grand Boulevard, Suite 300
     St. Louis, Missouri 63118
 5   (314) 254-8540
 6   mae.quinn@macarthurjustice.org
 7   Ms. Easha Anand
     Orrick, Herrington & Sutcliffe LLP
 8   405 Howard Street
     San Francisco, California 94105-2669
 9   (240) 888-8857
     eanand@orrick.com
10
11   For the Public Defender Defendants:
12   Ms. Jacqueline Shipma
     Missouri State Public Defender
13   1000 West Nifong
     Building 7, Suite 100
14   Columbia, Missouri 65203
     (573) 525-5212
15   jacqueline.shipma@mspd.mo.gov
16
17   For the State of Missouri and
     Governor Greitens:
18   Mr. Justin C. Moore
     State of Missouri
19   Attorney General's Office
     815 Olive Street, Suite 200
20   St. Louis, Missouri 63101
     (314) 340-3447
21   justin.moore@ago.mo.gov
22   Mr. Steven R. Ramsey
     State of Missouri
23   Attorney General's Office
     221 West High
24   Jefferson City, Missouri 65102
     (573) 751-1024
25   steven.ramsey@ago.mo.gov
```

1 (Pages 1 to 4)

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-37   Filed 02/21/18   Page 2 of 83

Page 5

```
 1          Also present:
 2              Mr. John Niehaus, Videographer
                Midwest Litigation Services
 3              711 North Eleventh Street
                St. Louis, Missouri 63101
 4              (314) 644-2191
                1-800-280-3376
 5
 6
 7
 8
 9
10          Court Reporter:
            William L. DeVries, RDR/CRR
11          Missouri CCR #566
            Illinois CSR #084-003893
12          Midwest Litigation Services
            711 North Eleventh Street
13          St. Louis, Missouri 63101
            (314) 644-2191
14          1-800-280-3376
15
16
17
18
19
20
21
22
23
24
25
```

Page 6

```
 1              IT IS HEREBY STIPULATED AND AGREED by
 2      and between counsel for the Plaintiffs and counsel
 3      for the Defendants that this deposition may be taken
 4      in shorthand by William L. DeVries, RDR/CRR, a
 5      Certified Court Reporter and Certified Shorthand
 6      Reporter, and afterwards transcribed into
 7      typewriting; and the signature of the witness is
 8      expressly reserved.
 9              *   *   *   *   *
10              SARAH K. JOHNSON,
11      of lawful age, produced, sworn and examined on
12      behalf of the Plaintiffs, deposes and says:
13         (Starting time of the deposition:  9:06 a.m.)
14         VIDEOGRAPHER:  We're on the record.
15      Today's date is October 6th, 2017, and the time is
16      approximately 9:06 a.m.  This is the video-recorded
17      deposition of Sarah Johnson, in the matter of
18      Shondel Church, et al., versus State of Missouri,
19      et al., Case Number 17-04057-CV-C-NKL, in the United
20      States District Court for the Western District of
21      Missouri, Central Division.
22              This deposition is being held at ACLU
23      of Missouri Foundation in St. Louis, Missouri.  The
24      reporter's name is Bill DeVries.  My name is John
25      Niehaus.  I'm the legal videographer.  We are with
```

Page 7

```
 1      Midwest Litigation Services.
 2              Will counsel please introduce yourself
 3      for the record?
 4          MS. QUINN:  Sure.  I'm Mae Quinn,
 5      M-A-E, Q-U-I-N-N, from the MacArthur Justice Center
 6      on behalf of plaintiffs.
 7          MS. ANAND:  And I'm Easha Anand, that's
 8      E-A-S-H-A, last name A-N-A-N-D, and I'm from Orrick
 9      Herrington & Sutcliffe also for plaintiffs.
10          MR. RAMSEY:  Steven Ramsey on behalf of
11      the State of Missouri and on behalf of Governor Eric
12      Greitens.
13          MR. MOORE:  Justin Moore on behalf of
14      the State of Missouri.
15          MS. SHIPMA:  Jacqueline Shipma on
16      behalf of the public defenders.
17          VIDEOGRAPHER:  Could you please swear
18      in the witness?
19          COURT REPORTER:  Do you swear or affirm
20      that the testimony you are about to give in this
21      proceeding will be the truth, the whole truth, and
22      nothing but the truth?
23          THE WITNESS:  I do.
24              EXAMINATION
25      QUESTIONS BY MS. QUINN:
```

Page 8

```
 1          Q.  Good morning, Ms. Johnson.
 2          A.  Good morning.
 3          Q.  Thank you for being here today.  So we
 4      know each other from our work in the community here;
 5      is that right?
 6          A.  Yes.
 7          Q.  Okay.  And would you state your full
 8      name for the record, please?
 9          A.  Sarah Kennedy Johnson.
10          Q.  And what is your current title,
11      Ms. Johnson?
12          A.  Sure.  So I have two of them.  I am the
13      director of juvenile defense and policy for the
14      public defender system.  I am also the deputy
15      district defender for the city of St. Louis trial
16      office.
17          Q.  Congratulations --
18          A.  Thank you.
19          Q.  -- about the second.  All right.  And
20      how long have you been with the public defender
21      service?
22          A.  So I have been with the public defender
23      service since 2009, October.  So approximately eight
24      years.
25          Q.  Okay.  And so you have been asked to be
```

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-37   Filed 02/21/18   Page 3 of 83

Page 9

```
1    here today to represent the public defender's
2    office.
3           (Exhibit 1, Previously marked exhibit.)
4           Q.  (By Ms. Quinn)  I'm going to show to
5    you Plaintiff's Exhibit 1.  It was previously
6    marked.  I don't know if the other folks in the room
7    have a copy or need a copy.  Would you mind taking a
8    look there at Exhibit 1?
9           A.  Okay.
10          Q.  And have you seen that document before?
11          A.  Yes, I have.
12          Q.  And you recognize that as the 30(b)(6)
13   notice for deposition for the public defender's
14   office, correct?
15          A.  Yes.
16          Q.  And you were asked to be here today to
17   testify about the subjects on the attachment to that
18   notice, correct?
19          A.  Yes, ma'am.
20          Q.  And you are prepared to do that today?
21          A.  I am.
22          Q.  And as you noted earlier, your focus
23   seems to be on juvenile matters in the public
24   defender system; is that right?
25          A.  Yes.
```

Page 10

```
1           Q.  And so with regard to the notice, your
2    focus then would be policies, practices, procedures
3    relating to juvenile cases?
4           A.  That's right.
5           Q.  All right.  And did you do anything in
6    preparation for your testimony today?
7           A.  I did.  I spoke with our general
8    counsel Ms. Shipma.  I also reviewed the National
9    Juvenile Defender Center Justice Rationed article
10   that was created on Missouri.  I also reviewed the
11   Department of Justice report and I reviewed the
12   Department of Justice agreement.
13          Q.  All right.  And you named a number of
14   documents that I think have already been introduced
15   into this suit by way of exhibits to our complaint.
16   Was there any document beyond those that you
17   reviewed that perhaps we do not have?
18          A.  I reviewed -- there is a memorandum of
19   understanding that was created between the public
20   defender system and the 22nd Judicial Circuit Family
21   Court.  It is a contract attorney -- providing a
22   contract attorney for juvenile cases in the city of
23   St. Louis.
24          Q.  All right.  And by chance did you bring
25   that MOU with you today?
```

Page 11

```
1           A.  I did.  There are five copies.
2           Q.  Terrific.  Let the record reflect that
3    Ms. Johnson has shared with us a copy of this MOU
4    relating to services of contract attorneys in the
5    city of St. Louis for the public defender service
6    and the juvenile court of St. Louis city and with
7    permission of Ms. Shipma I will distribute these to
8    everyone here.
9           MS. SHIPMA:  Uh-huh.  Are you going to
10   have those marked?
11          MS. QUINN:  Yeah.  I think we'll get to
12   these later on.  Yeah.  So I'll turn to this later
13   if that's all right.
14          Q.  (By Ms. Quinn)  Was there any other
15   document that you reviewed in preparation for today?
16          A.  I reviewed the complaint that was
17   filed.
18          Q.  All right.  And I noted that you
19   earlier mentioned something called the National
20   Juvenile Defender Center Justice Rationed report.
21   Do you have any objection for today's conversation
22   if when we talk about materials from the National
23   Juvenile Defender Center that we use the term NJDC?
24          A.  I do not.
25          Q.  Okay.  And same with regard to the
```

Page 12

```
1    Department of Justice's report, I think you
2    mentioned, I assume you mean there the St. Louis
3    County investigation of the juvenile court, correct?
4           A.  Yes, ma'am.
5           Q.  And do you have any objection as -- as
6    we talk about that set of materials that we use the
7    term the DOJ report?
8           A.  No, I do not.
9           Q.  Or maybe the DOJ investigation to be
10   clear; is that all right?
11          A.  That's just fine.
12          Q.  And then the DOJ agreement is the
13   second related document --
14          A.  That's fine.
15          Q.  -- does that work?  Okay.  Have you
16   ever testified under oath before?
17          A.  I have not.
18          Q.  Okay.  It's not --
19          A.  You know what, yes.  I -- I take that
20   back.  Yes, I did once previously.
21          Q.  Okay.  And was it in a deposition?
22          A.  No, it was not.  It was in a trial.
23          Q.  All right.  And -- but you were under
24   oath?
25          A.  I was.
```

3 (Pages 9 to 12)

**MIDWEST LITIGATION SERVICES**
**www.midwestlitigation.com      Phone: 1.800.280.3376      Fax: 314.644.1334**
Case 2:17-cv-04057-NKL   Document 160-37   Filed 02/21/18   Page 4 of 83

Page 13

1       Q.  So you know to tell the truth?
2       A.  Yes.
3       Q.  You also know if I ask a question and
4   it's not clear, just to seek clarification from me?
5       A.  Yes.
6       Q.  And I'm frequently unclear, so I will
7   not take it personally if you need me to restate the
8   question.
9       A.  Okay.
10      Q.  I'm from New York as you know, and I
11  tend to interrupt people.  I'll try not to interrupt
12  you, and maybe you can do the same.  We'll try not
13  to speak over each other so that we get a good
14  record.  And if you need a break, of course you can
15  just ask for a break and Jacquie, your attorney of
16  course knows to do the same.  I guess the one thing
17  is if there's a question on the table that you
18  answer it first before we take the break.
19      A.  Okay.
20      Q.  Does that all work for you?
21      A.  Yes, ma'am.
22      Q.  Terrific.  All right.  So let us then
23  talk about information that we sought by way of the
24  30(b)(6) notice.  As the designated juvenile expert
25  for the public defenders system, can you tell us a

Page 14

1   little bit about your -- your education and
2   background?
3       A.  Sure.  So I went to St. Louis
4   University and I got my undergraduate degree there.
5   I went to St. Louis University Law School and I
6   graduated there in 2009, and then I began with the
7   public defender system in 2009 and have been there
8   ever since.
9       MS. QUINN:  Okay.  And then are you
10  able -- is everyone getting Ms. Johnson loud enough?
11      VIDEOGRAPHER:  Yeah.
12      Q.  (By Ms. Quinn)  Okay.  And after
13  joining the public defender's system -- and forgive
14  me, I'll often say the public defender's service
15  from working at other places, but the public
16  defender system, what roles have you played in -- in
17  your job there?
18      A.  Sure.  So I have always been in the
19  St. Louis city trial office, so from 2009 to 2010 I
20  was downtown representing adults in misdemeanors and
21  low level felonies.  From 2010 to 2011 I worked in
22  the St. Louis city juvenile division and I
23  represented youth.
24      I also had some adult misdemeanor cases
25  at that time.  From 2011 to 2014 I was representing

Page 15

1   adults back downtown in the St. Louis city trial
2   office.  And then from 2014 to present I have
3   represented youth in St. Louis city, St. Louis
4   County, St. Charles County, St. Francois County, and
5   Jefferson County.
6       Q.  So you've anticipated my next question,
7   and that was, you know, how many counties have you
8   handled juvenile matters in, and so it sounds like
9   talking a total of five at this point?
10      A.  Yes.  And that was for conflict cases.
11  So St. Louis County, St. Charles County,
12  St. Francois County, Jefferson County, those were
13  all for conflict cases.
14      Q.  Have you handled any juvenile appeals?
15      A.  I've handled one.
16      Q.  And what about juvenile postconviction
17  matters separate from appeals?
18      A.  No.
19      Q.  And through your many years of
20  experience with the public defender service in both
21  adult and juvenile matters, have you had the
22  opportunity to interact with other public defenders
23  who handle juvenile cases?
24      A.  I have.
25      Q.  And you've mentioned some of the

Page 16

1   counties where you do conflict cases.  In addition
2   to that set of interactions, how else have you
3   interacted with juvenile defenders across the state?
4       A.  Sure.  So in a couple of different
5   ways.  First through phone conversations.  So if
6   someone from the public defender system has a
7   question regarding juvenile matters, they're often
8   directed to me.  So I speak with individuals who
9   have represented youth or are -- or who are
10  currently representing youth.
11      The second is through juvenile
12  training.  So we have a once-a-year juvenile
13  training.  That has traditionally been held in
14  Columbia, Missouri or in St. Louis where individuals
15  who represent youth in the public defender system
16  are encouraged to come and be trained.  And then the
17  last interaction would be in court settings where I
18  would run into individuals representing youth.
19      Q.  All right.  And we may unpack some of
20  those interactions a little bit -- bit more as -- as
21  we talk today.  You also mention beyond handling
22  juvenile matters and interacting with juvenile
23  attorneys that you've also handled adult matters in
24  the system?
25      A.  I have.

4 (Pages 13 to 16)

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-37   Filed 02/21/18   Page 5 of 83

Page 17

1      Q.   And so is it fair to say then that you
2  have a good sense of the differences between adult
3  defense practice and juvenile defense practice?
4      A.   I do.
5      Q.   And when we're talking about juvenile
6  defense practice we might use the term delinquency.
7  Is that right?
8      A.   Yes.
9      Q.   Can you explain for folks, especially
10 who maybe don't do juvenile practice, what the term
11 delinquency means?
12     A.   Sure.  So when a youth under the age of
13 17 in Missouri is charged with an offense, it is
14 called a delinquent offense.  It is not an actual
15 felony charge.  So when a child is charged with an
16 offense, there are allegations filed in a petition
17 and they are felony -- they would be either felonies
18 or misdemeanors if an adult was charged with them.
19     Q.   Okay.  Now, when you say they're not
20 actual felonies, in fact they are felonies with all
21 of the same elements as an adult felony charge,
22 correct?
23     A.   They are, yes.
24     Q.   I think perhaps you're talking about
25 whether or not it's an open record like an ordinary

Page 18

1  felony adult case?
2      A.   And -- and whether it's a conviction.
3  So they are not considered convictions under the
4  juvenile code.
5      Q.   And in terms of the young people who
6  are charged in juvenile court, do we call them
7  defendants?
8      A.   No.
9      Q.   What do we refer to them as?
10     A.   They're referred to as juveniles, but
11 the practice has -- is shifting towards youth.
12 They're trying to use the word youth.
13     Q.   Yeah.  And what about the term
14 respondent, does that mean anything to you in the
15 context of juvenile practice?
16     A.   It does.  That is the -- the respondent
17 is the youth or the juvenile.
18     Q.   All right.  And you have talked already
19 a little bit about the range of matters or charges
20 that a young person might face.  Might you unpack
21 that a little bit more for us?
22     A.   Sure.  So there are the criminal
23 offenses that a youth can face, so those could be
24 anywhere from very low level misdemeanors all the
25 way up into murder in the first degree.  So those

Page 19

1  would be the -- under the criminal code.  There are
2  also the 211.031 subsection two charges, which are
3  the status offenses.
4          So those are the offenses that adults
5  would not be charged with.  So that is truancy,
6  behavior injurious, not -- not following their
7  parents' rules, curfew, those kinds of violations,
8  status offenses.
9      Q.   All right.  So it sounds like in
10 essence there are three possibilities for a young
11 person to face in terms of charges in juvenile
12 court:  Status offenses, misdemeanor offenses or
13 felony offenses?
14     A.   Yes.
15     Q.   And just so that everybody is clear,
16 when you -- the status offense list that you spelled
17 out for us, those are things that a person is
18 charged with given their status as a young person; a
19 grown person could not be charged with those, those
20 are not considered wrongdoings for fully grown
21 adults?
22     A.   That is correct.
23     Q.   And you did touch on this already, but
24 just so the record is clear, can you talk again
25 about the cutoff between childhood and adult for

Page 20

1  purposes of juvenile delinquency charges in the
2  State of Missouri?
3      A.   Sure.  So in Missouri any child --
4  anyone is considered a child if they are under the
5  age of 17.
6      Q.   How does that compare to other case --
7  other states?
8      A.   So Missouri is currently one of five
9  states left that has that age of under 18.  So there
10 are -- they are one of five left.
11     Q.   All right.  So the default -- the
12 majority rule across the country is 18 is the
13 cutoff, but we're in the minority because we use 17
14 as the cutoff before you go to adult court; is that
15 right?
16     A.   That's correct.
17     Q.   Now, do young people under the age of
18 17 ever go to adult court to face charges?
19     A.   Yes, they do.  But the court in -- the
20 juvenile court first has to make a determination
21 pursuant to section 211.071 to determine under the
22 certification statute if they should stay in trial
23 as an adult.
24     Q.   Okay.  Can you explain a little bit
25 about that process and what that means?

5 (Pages 17 to 20)

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com      Phone: 1.800.280.3376      Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-37   Filed 02/21/18   Page 6 of 83

1    A.  Sure.  So if a child is charged with a
2    list of offenses under 211.071 including murder in
3    the first degree, robbery, assault first, rape,
4    there are some other -- arson, that is called a
5    mandatory certification review.
6         So the judge has to look at those ten
7    factors under section 211.071 to determine whether
8    the child can be rehabilitated in the juvenile
9    system or whether they should stand trial as an
10   adult.
11        There -- the statute also provides,
12   though, that a child can be certified for any felony
13   as well as if it is their third subsequent felony.
14   **Q.  All right.  So now you have used the**
15   **term mandatory to refer to some transfer or**
16   **certification cases.  That does not mean that the**
17   **child must necessarily go to adult court, correct?**
18   A.  It does not.  It means that there must
19   be a mandatory review by the court.
20   **Q.  Okay.  And you mentioned ten factors**
21   **under the statute I think you meant -- said that the**
22   **judge must look at.  Are those the only factors the**
23   **court might look at during certification?**
24   A.  No.  No.  That -- that is not an
25   exhaustive list.

1    **Q.  And in terms of nonmandatory**
2    **certifications, can you talk a little bit about the**
3    **process there and what the court might look at in**
4    **those cases?**
5    A.  So when you mean nonmandatory
6    certifications, you mean just permissive?
7    **Q.  Yeah, or discretionary.  Yeah.**
8    A.  Okay.  So these would be offenses
9    that -- offenses that would not be listed in that
10   list under 211.071.  The procedure is the same.  The
11   court still has to look at those factors to make a
12   determination whether the child should be sent to
13   adult court.
14   **Q.  And how is it determined if a case will**
15   **be processed with a discretionary type certification**
16   **request?**
17   A.  Sure.  So the request can either be
18   made by the legal officer, who is the prosecutor.
19   It can be made by the child or the child's parents
20   or any interested party.  It could also be the court
21   that makes that recommendation or request.
22   **Q.  And these processes we've just spoken**
23   **about in terms of certification and transfer, you**
24   **noted they are in section 211; is that right?**
25   A.  Yes.

1    **Q.  What is section 211?**
2    A.  That is the family code and the
3    juvenile code for Missouri.
4    **Q.  And that is one of the central bodies**
5    **of law that controls juvenile cases in Missouri; is**
6    **that right?**
7    A.  That is correct.
8    **Q.  Outside -- it's outside of the criminal**
9    **code entirely?**
10   A.  Yes.
11   **Q.  So now, since you have practiced both**
12   **on the adult side of the docket and the juvenile**
13   **side of the docket, do you have any opinion about**
14   **juvenile defense being a specialized type of**
15   **practice?**
16   A.  Absolutely.
17   **Q.  Can you tell us more about that?**
18   A.  Juvenile defense is an absolute
19   specialty.  It requires knowledge in adolescent
20   brain development.  It requires knowledge in
21   specific laws.  It requires knowledge in procedural
22   rules that are different.  It requires an ability to
23   work with families to a greater extent in my opinion
24   than in other cases.  It also requires a knowledge
25   of dispositional resources and -- and it requires an

1    ability to work with and understand children.
2    **Q.  And it sounds like given what you**
3    **mentioned earlier that a juvenile defense lawyer to**
4    **be able to do their job must know the criminal side**
5    **of the docket for those possible certification cases**
6    **as well as all of these things on the juvenile code**
7    **and juvenile practice side?**
8    A.  Absolutely.  And -- and I failed to
9    mention including Supreme Court case law and the
10   bodies of research that surround juvenile practice.
11   **Q.  Now, you mentioned some of the things**
12   **that make the job of a juvenile defender or someone**
13   **who's defending a juvenile to be particularly**
14   **challenging.  What about communicating with**
15   **juveniles, what's that like?**
16   A.  Sure.  So communicating with youth is a
17   lot different than -- than communicating with adults
18   for several reasons.  First, many youth have never
19   been in the juvenile justice system before and so
20   they don't have an understanding of the process and
21   the procedures.  Second, youth don't have an
22   understanding necessarily or they might lack the
23   necessary communication skills or language skills to
24   understand the terminology that you're saying to
25   them, so you have to break it down and make the

**MIDWEST LITIGATION SERVICES**
**www.midwestlitigation.com       Phone: 1.800.280.3376       Fax: 314.644.1334**
Case 2:17-cv-04057-NKL   Document 160-37   Filed 02/21/18   Page 7 of 83

1   system understandable to them.
2       Q.   And maybe we'll make it a little more
3   concrete.  In juvenile court, as an adult court, are
4   young people ever presented with plea offers?
5       A.   Absolutely.
6       Q.   And in your experience, just as a very
7   singular example, in conveying a plea offer to a
8   grown adult versus conveying a plea offer to a young
9   person in juvenile court, what are the differences
10  or perhaps challenges that you confront?
11      A.   Sure.  So a youth's first question and
12  their final goal if they're detained is when am I
13  going to get out, and so a lot of times that desire
14  over -- that desire outweighs any collateral
15  consequence or any foreseeable consequence for a
16  youth admitting to an offense.
17           And so that is one difficulty.  The
18  other difficulty I see in conveying plea offers to
19  youth is while their -- their parent might not be in
20  the room, parents have a big influence on what
21  happens to a child and whether or not they plead
22  guilty or admit to the allegation -- or do not admit
23  to the allegations.
24      Q.   Yeah.  And just from what you have
25  described, it sounds like perhaps it takes more time

1   to convey to a young person a plea offer and ensure
2   that what they're doing is knowing, intelligent, and
3   voluntary.  Is that a fair assessment of what you
4   just conveyed?
5       A.   Yes, it is.
6       Q.   All right.  We may return to some of
7   those topics later, but I want to shift our
8   attention a little bit here to the history of
9   juvenile practice in the State of Missouri and
10  within the public defender's system.
11      A.   Okay.
12      Q.   Are you familiar with the different
13  studies or assessments that have been undertaken to
14  evaluate the public defender system in the State of
15  Missouri?
16      A.   Are you referring to juvenile
17  assessments or just assessments in general?
18      Q.   Actually, general.  General at this
19  point.
20      A.   Okay.  Yes, I'm familiar with some of
21  them.
22      Q.   All right.  Are you familiar with
23  something that is referred to as the Spangenberg
24  report or Spangenberg report?
25      A.   I mean, I've heard of it, but I've not

1   read it.
2       Q.   Okay.
3           (WHEREIN, Exhibit 21, Exhibit 6 of
4   complaint, was marked for identification.)
5       Q.   (By Ms. Quinn)  I'm going to show to
6   you what we're going to mark as Plaintiff's
7   Exhibit 21, which confusingly has on its cover
8   Exhibit 6, and that is because this is Exhibit 6 to
9   our complaint.  All right, and if you wouldn't mind,
10  just take a few moments to familiarize yourself with
11  that document.  Have you had an opportunity just to
12  scan some of the document that I've presented to
13  you?
14      A.   Yes, I have.
15      Q.   All right.  And I'm actually going to
16  direct your attention to some specific sections --
17      A.   Okay.
18      Q.   -- in this report if you don't mind.
19  Can we look together at page one, the footnote two
20  on page one in particular, and if you wouldn't mind
21  reading into the record what that footnote says?
22      A.   You said footnote one?
23      Q.   I'm sorry, page one, footnote two.
24      A.   (Quote as read):
25           The statutes do not distinguish between

1           juveniles and adults.  As discussed --
2           discussed in section 3C of this report,
3           we are deeply concerned about the few
4           juveniles represented by the MSPD.  We
5           have been unable to determine why this
6           is the case, and we strongly urge that
7           the issue receive further inquiry and
8           attention.
9       Q.   All right.  So even though perhaps you
10  haven't spent a lot of time with this report
11  previously, the Spangenberg report, does that
12  footnote in some ways ring true to you?
13      A.   Yes, it does.
14      Q.   All right.  Let's then turn to what
15  they're referring to in this footnote on page 57,
16  and I'll just say I think what they mean is 2C, not
17  3C, but let's take a look at page 57 at the end, and
18  then heading into page 58 as it -- the report talks
19  about juveniles.  And here I'll direct your
20  attention to the very last line on page 57 that
21  starts more surprising still.  And if you would just
22  to yourself take a look at that next section.  All
23  right.  So the -- the section I've directed your
24  attention to indicates that (quote as read):
25           More surprisingly still is that the

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-37   Filed 02/21/18   Page 8 of 83

Page 29

1    MSPD represented only 35 percent of the
2    juvenile delinquency and status offense
3    cases filed in Missouri courts in 2007,
4    down from 40 percent in 2004,
5    38 percent in 2005, 37 percent in 2006.
6    Does this information ring true to you
7    given your experience?
8        A.  I don't know the -- the percentages.  I
9    don't question this report, but I don't know the
10   percentages of youth represented currently in
11   Missouri, but it would not surprise me that -- that
12   this is the -- the state of representation.
13       Q.  Okay.  And we'll -- again, we'll unpack
14   this maybe a little bit more later on in our
15   conversation, but is it your understanding that MSPD
16   represents all young people who need counsel in
17   juvenile courts?
18       A.  No.
19       Q.  And is it your understanding that some
20   young people are going without counsel who need
21   counsel in juvenile courts?
22       A.  Absolutely.
23       Q.  And that some young people who are
24   entitled to counsel are going without counsel in our
25   juvenile courts?

Page 30

1        A.  Absolutely.
2        Q.  All right.  So turning then from the
3    Spangenberg report that I marked as Exhibit 21, I
4    want to turn your attention to the report you --
5    you've mentioned earlier in your testimony and
6    that's the NJDC assessment entitled Justice
7    Rationed.  And here too confusingly you'll see that
8    this exhibit that I'm marking as Plaintiff's
9    Exhibit 22 for purposes of our deposition, has the
10   cover Exhibit 9.
11       (WHEREIN, Exhibit 22, Exhibit 9 of
12   complaint, was marked for identification.)
13       A.  Okay.
14       Q.  (By Ms. Quinn)  Exhibit 9 refers to it
15   being Exhibit 9 in our complaint.  All right.  So as
16   to Exhibit 22, are you familiar with that document?
17       A.  Yes, I am.
18       Q.  Tell us what you know about this
19   document.
20       A.  So this was conducted or written in
21   2013.  I know that NJDC came and interviewed defense
22   attorneys, juvenile attorneys, looked at and talked
23   with the Office of State Courts Administrator Scott
24   Data regarding representation in Missouri and then
25   made an assessment of the quality of representation

Page 31

1    that youth were receiving in our state.
2        Q.  And can you tell us a bit about the
3    main findings of this report with regard to the
4    quality and quantity of defense services provided to
5    juveniles in Missouri?
6        A.  Sure.  So it was very troubling.  They
7    found that youth were routinely waiving the right to
8    counsel.  They found that many youth did not have
9    the ability to receive counsel for important
10   offenses, and that -- also that the structure of
11   Missouri's juvenile court system is very conflicted
12   and that children were not receiving adequate
13   representation throughout all of the stages of their
14   offense.
15       Q.  Okay.  On that last point that children
16   were not receiving adequate representation
17   throughout all the stages of their case, can you
18   unpack that a little more for us in terms of NJDC's
19   findings?
20       A.  Sure.  So first youth were not
21   receiving counsel for detention hearings or pre --
22   pretrial representation.  Additionally, not
23   receiving adequate representation throughout the
24   process and then were not receiving
25   postdispositional services from an attorney.

Page 32

1        Q.  And do you remember anything in the
2    report about its findings with regard to the
3    quantity of youth who were receiving defense
4    representation from the public defender service or
5    maybe said another way the percentage of youth who
6    were going without representation in the juvenile
7    courts?
8        A.  I don't remember the exact number, but
9    I know that it was alarmingly high.
10       Q.  All right.  You'd indicated this was a
11   report that was put together by NJDC, the National
12   Juvenile Defender Center in 2013.  Do you have a
13   sense of how they came to these conclusions?
14       A.  So they came to the conclusions by
15   interviewing defenders in Missouri and in -- in
16   talking to individuals in the court system as well
17   as looking at data.
18       Q.  Okay.  And based on your experience
19   with the public defender system and working within
20   our juvenile courts, do you disagree with any of
21   their findings?
22       A.  I do not.
23       Q.  And even though this report was from
24   2013, as you sit here today, do you feel like much
25   has changed with regard to their findings?

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334

Page 33

1      A.  I think that for the most part, no, I
2  think that there -- there is some inching along that
3  has done and maybe some good intentions, but no, for
4  the most part this report rings true.
5      Q.  Maybe you could flag for us a few of
6  the good intention items and how you have
7  characterized them as just inching along.
8      A.  Sure.  So one of the things is that we
9  in the public defender system have identified that
10  yes, this is an issue, and I am somebody who is
11  supposed to start to create juvenile specialty as --
12  as something of importance in our system.  We want
13  to do trainings, we want to make sure that juvenile
14  defenders are receiving adequate training.  But this
15  is just a small step, and so that is one thing.  The
16  other thing is there are organizations and groups
17  trying to move forward, so I am a part of the
18  Juvenile Justice Advisory Board.  And so that is
19  also trying to move the ball forward with regard to
20  juvenile representation in the state.
21      Q.  And the Juvenile Justice Advisory
22  Board, that's a state-appointed position; is that
23  right?
24      A.  It is.
25      Q.  All right.  And we'll return to some of

Page 34

1  the topics that we just lifted up to unpack them a
2  little bit more, but let me turn your attention if I
3  can to another document that you have previously
4  mentioned.
5      (WHEREIN, Exhibit 23, Exhibit 11 of
6  complaint, was marked for identification.)
7      Q.  (By Ms. Quinn)  This will be Exhibit 23
8  for purposes of the deposition with a cover
9  indicating Exhibit 11 because it's Exhibit 11 to our
10  complaint.  All right.  Would you mind taking a look
11  at Exhibit 23, please?
12      A.  Sure.
13      Q.  Okay.  And are you familiar with this
14  document?
15      A.  Yes, I am.
16      Q.  Can you tell us what it is and why
17  you're familiar with it?
18      A.  So this is the investigation of the
19  St. Louis County Family Court from 2015.  I am
20  familiar with it having been in practice and
21  practicing as a juvenile attorney during that time.
22  I've read it and used it in motions.
23      Q.  All right.  And are you at all familiar
24  with what the Department of Justice did to come to
25  these conclusions?

Page 35

1      A.  I don't know the exact steps that they
2  use, but I know that they went into St. Louis County
3  Family Court, they spoke with defenders, they spoke
4  with deputy juvenile officers, they spoke with legal
5  officers and they also looked at individual files.
6      Q.  All right.  And can you share with us
7  your understanding of the findings of the Department
8  of Justice with regard to the St. Louis County
9  juvenile court?
10      A.  Sure.  So they made several findings.
11  They found that there was not adequate
12  representation with regard to youth primarily
13  because the -- there was only one defender that was
14  representing all of the youth.  She had represented
15  over 400 youth in the time period that they looked
16  at.  They also looked at children waiving counsel.
17      They looked at children admitting in
18  informal -- informal offenses, admitting to the
19  allegations, which is something that was
20  problematic.  They were admitting to those
21  allegations without representation.  They looked at
22  representation of children pretrial.  They looked at
23  motion practice.  They found the motion practice
24  problematic.
25      They looked at post -- postdisposition

Page 36

1  practice.  They found that there was not
2  postdisposition representation.  They also found
3  that there were equal protection violations.  So
4  youth of color were being detained, they were being
5  filed, petitions were being filed more frequently,
6  they were being sent out of home placement, and they
7  were also being certified more frequently than youth
8  of other races.
9      Q.  Now, you've indicated that the report
10  found that there was only one public defender
11  assigned to the county of St. Louis's juvenile
12  court, correct?
13      A.  Yes.
14      Q.  Can you explain to us based on your
15  experience in that setting how many courtrooms in a
16  given day that a defender might have cases in or how
17  many courtrooms are processing cases each day there?
18      A.  Sure.  So there are two judges.  So
19  there could -- those would be two courtrooms.  And
20  then there are currently two commissioners and I
21  believe that -- there have always been only two
22  commissioners.  So four courtrooms.
23      Q.  Four courtrooms.  And then what about
24  detention hearings, is that another docket that
25  might take place on a given day over there at the

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com      Phone: 1.800.280.3376      Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 160-37    Filed 02/21/18    Page 10 of 83

Page 37

1    county juvenile court?
2       A.  Sure.  So that different -- is a
3    different practice from St. Louis City, but in
4    St. Louis County there are detention hearings every
5    morning at 8:30 a.m.
6       Q.  All right.  So a total of five
7    different dockets that a defender might be called
8    upon to participate in in a given day at the county
9    juvenile court?
10       A.  Yes.
11       Q.  And then in each one of those court
12    settings, how many prosecutors -- and we'll clarify
13    what that term means, prosecutors are there assigned
14    to handle those dockets?
15       A.  I don't know specifically, but I know
16    that there is one assigned to each courtroom, at
17    least one assigned to each courtroom.  There might
18    be more.
19       Q.  And I'll try -- I've shifted us to the
20    future or the -- the present, but let me -- I'll --
21    I'll keep our attention back on 2015.  In 2015 when
22    the DOJ report was written, was it the practice of
23    the county juvenile court to assign a juvenile
24    prosecutor to each of those five different
25    courtrooms to cover the dockets?

Page 38

1       A.  Yes.
2       Q.  And in contrast, there was a single
3    public defender assigned to cover those five
4    dockets?
5       A.  That's correct.
6       Q.  And I've used the word prosecutor to
7    talk about persons who are filing and prosecuting
8    cases in juvenile court.  Is that the usual term we
9    use here in Missouri?
10       A.  No.  The usual term is either legal
11    officer or attorney for the deputy juvenile officer.
12       Q.  And just so the record is clear for
13    folks who maybe don't know this practice, can you
14    explain that a little bit more?
15       A.  Sure.  So the attorney who is
16    prosecuting cases is also the attorney for -- who is
17    a person who is called the deputy juvenile officer.
18    They are the individual who can help file the case,
19    question the youth, make a recommendation as to the
20    placement of the youth, and then supervise the youth
21    once the disposition has completed.
22       Q.  Okay.  And so deputy juvenile officer
23    might be seen as akin to a probation officer?
24       A.  Yes.
25       Q.  So these prosecutors are actually

Page 39

1    representing the probation officers essentially in
2    all of these proceedings?
3       A.  That's correct.
4       Q.  And this set of findings that the
5    Department of Justice made relating to the county
6    juvenile court, in your opinion based on your
7    experience practicing across the state, were those
8    findings unique to St. Louis County?
9       A.  No.
10       Q.  Can you tell us more about that?
11       A.  With regard to representation, I can't
12    speak to every single county in Missouri, but I know
13    that the representation for youth is not necessarily
14    done by a juvenile specialist.  I don't know how
15    many children are waiving the right to counsel and
16    admitting, so I think that's another thing that is a
17    problem across the state, as well as admitting to
18    informal allegations without an attorney present.
19       With regard to the equal protection
20    violations, I have only practiced in the city and I
21    only know the statistics in the city, but I would
22    believe that those statistics ring true across the
23    state.
24       Q.  And just to clarify, you just there
25    said that you only practiced in the city, but you

Page 40

1    practiced in -- in other counties as well?
2       A.  I have, but I do not know the number,
3    the statistical numbers with regard to the equal
4    protection violations.
5       Q.  Got you.  So you've just now indicated
6    that in terms of the quality of representation
7    provided in St. Louis County's juvenile court as
8    described by DOJ in 2015 is consistent with your
9    impressions of the quality of practice across the
10    state in 2015; is that correct?
11       A.  Yes, and I -- and I believe -- to
12    clarify a little bit, I believe that the number of
13    cases, I believe that if the attorney had had less
14    cases that she would have been able to adequately
15    represent the youth.
16       Q.  Yes.  And I will turn to that.
17       A.  Right.
18       Q.  So there's the -- the quality which
19    sounds like in your opinion is greatly impacted by
20    the quantity?
21       A.  Yes.
22       Q.  And the, for instance, needing to cover
23    five courtrooms to defend against five prosecutors
24    on your own?
25       A.  Correct.

10 (Pages 37 to 40)

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com    Phone: 1.800.280.3376    Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-37   Filed 02/21/18   Page 11 of 83

1    Q.   In terms of the quantity and the
2  expectations for defenders in other counties, would
3  you in your opinion say that that disparity in terms
4  of what's provided to the defender as compared to
5  the prosecution exists across the state?
6    A.   Absolutely.  And I think with a little
7  bit of a difference.  I think a lot of jurisdictions
8  have a lot of adult cases, and only a handful of
9  juvenile cases.  And so the disparity exists not in
10 the number of juvenile cases, but in the lack of
11 time and the ability to spend focusing on those
12 juvenile cases, as well as the specialization.
13   Q.   All right.  So let me turn your
14 attention to what I'm going to call for purposes of
15 this deposition Plaintiff's Exhibit 24 --
16        (WHEREIN, Exhibit 24, Exhibit 8 of
17 complaint, was marked for identification.)
18   Q.   (By Ms. Quinn)  -- which has a cover
19 indicating Exhibit 8 because it's Exhibit 8 for our
20 complaint.  Can you take a look at Exhibit 24 and
21 tell us if you recognize it?
22   A.   I do.
23   Q.   And what is this document?
24   A.   It is a letter that our director,
25 Michael Barrett, wrote to the then governor of

1  Missouri.
2    Q.   And you've seen this before?
3    A.   I have.
4    Q.   And what is it that Director Barrett is
5  telling the governor in this letter?
6    A.   He outlines the Department of Justice,
7  the -- the problems that were found in that report.
8  He talks about the resources and the fact that we do
9  not have the ability to represent indigent persons
10 given the current budget.
11   Q.   And in reviewing this letter, is there
12 anything about it that you believe to be untrue or
13 that you disagree with?
14   A.   No.
15   Q.   And is the position of Director Barrett
16 in particular with regard to the problem of the
17 juvenile defender system being in crisis, do you
18 agree with that?
19   A.   I do.
20        (WHEREIN, Exhibit 25, Exhibit 12 of
21 complaint, was marked for identification.)
22   Q.   (By Ms. Quinn)  All right.  So I'd like
23 to turn your attention now to Plaintiff's Exhibit 25
24 for purposes of the deposition.  You'll note the
25 cover says Exhibit 12 because it's Exhibit 12 to our

1  complaint.  Do you recognize that document?
2    A.   I do.
3    Q.   And what is it?
4    MS. SHIPMA:   Could we go off the record
5  for just a moment?
6    MS. QUINN:   Sure, uh-huh.
7    VIDEOGRAPHER:   We're going off the
8  record at approximately 9:48 a.m.
9        (WHEREIN, a discussion was held off the
10 record.)
11   VIDEOGRAPHER:   We're back on the record
12 at approximately 9:50 a.m.
13   Q.   (By Ms. Quinn)  All right.  We just
14 took a break so that I could correct an imperfection
15 in our exhibit, and before we took a break we were
16 talking about Exhibit 25, and I think I asked you if
17 you recognize that document.
18   A.   I do.
19   Q.   Notice I didn't use this scrolly thing.
20 I'm sorry.  And -- and what is Exhibit 25?
21   A.   It is the memorandum of agreement
22 between the U.S. DOJ and St. Louis County Family
23 Court.
24   Q.   And what is your understanding of the
25 meaning of that agreement and what it does?

1    A.   So -- so it was an agreement reached by
2  a number of parties including St. Louis County
3  Family Court and it lays out specific findings and
4  agreements between the parties.
5    Q.   And with regard to defense services, is
6  there anything in that document that speaks to that
7  topic?
8    A.   Sure.  So several different things.
9  One is that for any youth who is detained and not
10 represented, the public defender system shall be
11 appointed.  If they are not detained and they are
12 not deemed indigent, they can go to a number of
13 contract attorneys.  There is one specific contract
14 attorney who has been hired by the county to
15 represent youth and there is also a panel of
16 contract attorneys who are also able to represent
17 youth.
18   Q.   And so is the upshot of this agreement
19 with regard to defender services that one more
20 defender has been assigned to assist with juvenile
21 cases in St. Louis County?
22   A.   Correct.  At least one.  And I don't
23 know the numbers of -- or how many youth the
24 other contract attorneys are representing.
25   Q.   But prior to the agreement there was

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334

1    also a panel of -- of conflict or contract attorneys
2    that existed?
3        A.  Sure.
4        Q.  And is that any different now?
5        A.  Just a little bit because these are not
6    necessarily conflict attorneys.  So these are
7    attorneys for youth who don't qualify for the public
8    defender's services.  So in practice they could be
9    representing more youth, but I don't know the answer
10   to how many youth they're representing.
11       Q.  Okay.  And we might be getting kind of
12   deep into the weeds on this one, but I reference a
13   single attorney who seems to be designated as an
14   additional defender for delinquency cases in the
15   county.
16       A.  Correct.  Yes.
17       Q.  And that person's name is Quinn Grimes?
18       A.  That's right.
19       Q.  And does Quinn handle cases of kids who
20   are indigent?
21       A.  I believe so, yes.
22       Q.  Okay.  And the panel is for folks who
23   would not otherwise qualify for the public defender
24   services?
25       A.  You are correct.

1        Q.  So the public defender's services
2    essentially have been expanded one fold or you have
3    one additional attorney assigned in the county to
4    assist with those five dockets we talked about
5    earlier?
6        A.  Correct.  But that person is not hired
7    by the public defender's office and she does not
8    work with the public defender system.
9        Q.  And she's receiving funds from
10   elsewhere; is that right?
11       A.  That is correct.
12       Q.  Do you know much about what she handles
13   in terms of cases or what she's assigned?
14       A.  Sure.  I know a little bit.  I know
15   that she does delinquency cases and I know that she
16   also handles the informal adjustments.
17       Q.  And the informal adjustments are those
18   matters that you referenced earlier where youth
19   might be diverted off the ordinary prosecution
20   track, but there are concerns about admission being
21   made in the context of those informal cases?
22       A.  That's correct.
23       Q.  And by Missouri law, youth are entitled
24   to counsel at those proceedings, correct?
25       A.  That is correct.

1        Q.  And previously they were not receiving
2    access to counsel on a regular basis?
3        A.  That is correct.
4        Q.  So Quinn's time sounds like is a fair
5    amount spent on those informal cases?
6        A.  I don't know the answer to that
7    question.
8        Q.  Okay.  Do you know if she's handling
9    certifications?
10       A.  I don't know the answer to that
11   question.
12       Q.  All right.  With regard to Exhibit 25,
13   does that agreement impact any other county in the
14   State of Missouri other than St. Louis County?
15       A.  It does not.
16       Q.  And so while we now have one additional
17   attorney with -- so a total of two public
18   defender-type attorneys handling five dockets in the
19   county, there's been no similar change in other
20   counties?
21       A.  That's correct.
22           (WHEREIN, Exhibit 26, Exhibit 7 of
23   complaint, was marked for identification.)
24       Q.  (By Ms. Quinn)  All right.  I'd like to
25   share with you what we're going to call Exhibit 26

1    for purposes of the deposition.  It has a cover
2    indicating Exhibit 7 because it's Exhibit 7 to our
3    complaint.  Can you look at this document and let us
4    know if you recognize it?
5        A.  Yes, I do.
6        Q.  All right.  And what is this document?
7        A.  This is the RubinBrown study done of
8    the Missouri public defender's system.
9        Q.  And did you participate in the
10   timekeeping required for this study?
11       A.  Yes, I did.
12       Q.  Can you explain a little bit to us
13   about what timekeeping entailed?
14       A.  Sure.  So there was a system on our
15   computer where you could document how much time you
16   spent for a particular task, and you did it in
17   five-minute increments.
18       Q.  And this was a change in practice in
19   terms of how you might record your time previously,
20   yes?
21       A.  Yes.
22       Q.  More detailed?
23       A.  Yes.
24       Q.  More onerous?
25       A.  Yes.

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-37   Filed 02/21/18   Page 13 of 83

1     Q.  Did it take time to keep your time?
2     A.  Absolutely.
3     Q.  Are you aware of any similar system
4  ever imposed on the prosecutors in the State of
5  Missouri?
6     A.  I am not.
7     Q.  Have you ever heard of the legal
8  officers over there in juvenile court being forced
9  to keep track of their time to justify their
10  existence?
11    A.  I have not.
12    Q.  Okay.  So in terms of findings this
13  RubinBrown study made findings relating to cases
14  across the criminal and juvenile justice systems in
15  Missouri, correct?
16    A.  Yes.
17    Q.  With regard to juveniles, what is your
18  understanding of the finding relating to -- to
19  juvenile defense matters?
20    A.  Could you be a little bit more
21  specific.
22    Q.  Sure.  On page 15 in the section with a
23  title here I think it's time study in section C --
24    A.  Sure.
25    Q.  -- it has a list of average reportable

1  controllable case task hours per case.  Do you see
2  that section?
3     A.  I do.
4     Q.  And what findings were made with regard
5  to how much time on average in the State of Missouri
6  is being spent on juvenile matters?
7     A.  4.6 hours.
8     Q.  So -- and to be clear, 4.6 matters on
9  juvenile delinquency defense cases, yes?
10    A.  That's correct.
11    Q.  And are you aware of what this study
12  suggested as a appropriate amount of time to be
13  spent on -- as a -- an appropriate amount of time to
14  be spent on such matters?
15    A.  The study or the AB --
16    Q.  The study.
17    A.  Okay.
18       (Court reporter interruption.)
19    A.  ABA standard.  19.5.
20    Q.  (By Ms. Quinn)  All right.  And you
21  mentioned another standard.  Will you share some
22  about that?
23    A.  Sure.  So the ABA standards require
24  approximately ten hours, I believe, on a -- on a
25  juvenile case.

1     Q.  On a -- on a juvenile case.  And do you
2  know if there are any differences on how the ABA
3  measured juvenile case time on average versus this
4  study?
5     A.  I do not.
6     Q.  So for instance, if we take a look at
7  the RubinBrown study, you know, it suggests
8  19.5 hours for a juvenile case, but a juvenile case
9  might wind up in adult court, correct?
10    A.  Yes.
11    Q.  And so if a juvenile case moved from
12  juvenile court into adult court and we were dealing
13  with a homicide charge, what is the number of hours
14  the report, RubinBrown report says should be spent
15  on a homicide case?
16    A.  106.6.
17    Q.  And then how much time on page 15 is
18  it -- does RubinBrown study suggest is being spent
19  on a homicide case on average in Missouri?
20    A.  84.5.
21    Q.  And now reviewing this report, is there
22  anything about it that seems inaccurate to you in
23  terms of the amount of time being spent on average
24  by colleagues across the state on these cases?
25       MR. MOORE:  Just object to the

1  foundation of the question.  Subject to that, you
2  can answer.
3     A.  I -- say -- would you ask the question
4  again?
5     Q.  (By Ms. Quinn)  Yes.  Does it seem
6  about right to you that such a limited amount of
7  time is being spent on juvenile cases across the
8  state?
9        MR. MOORE:  Same objection.  Go ahead.
10    A.  I can tell you I do not disagree with
11  the findings of the -- of the report.
12    Q.  (By Ms. Quinn)  All right.  So we're
13  going to talk a little bit now about policies and
14  procedures generally, maybe a little less about
15  these documents.  Do you -- do you want to take a
16  break?
17    A.  No, I'm okay.
18       MS. QUINN:  Anyone?  Okay.
19    Q.  (By Ms. Quinn)  So in terms of juvenile
20  practice you did mention earlier there are some
21  trainings that are now taking place.  What about
22  juvenile case policy manuals, is there any statewide
23  policy manual for juvenile defense cases?
24    A.  Not currently.
25    Q.  What about a case procedures manual?

Case 2:17-cv-04057-NKL   Document 160-37   Filed 02/21/18   Page 14 of 83

1  So say separately from policies about how the system
2  might process cases or document cases. What about
3  procedures for actually handling such matters, the
4  attorney actions and tasks, is there a manual for
5  that?
6      MS. SHIPMA: And Mae, could I just --
7  and you mean MSPD manuals?
8      MS. QUINN: Yes, yes.
9      MS. SHIPMA: Thank you for clarifying.
10     MS. QUINN: Uh-huh. Statewide.
11  A. Not currently. Not currently.
12  Q. (By Ms. Quinn) Is there a training
13  manual for new attorneys who may be handling
14  juvenile cases statewide?
15  A. Not currently.
16  Q. What kind of training do new hires to
17  MSPD receive?
18  A. You mean generally?
19  Q. Generally.
20  A. Sure. So there are two trainings.
21  There is a new defender workshop. It's a week-long
22  workshop that is given. There is also trial skills
23  that's usually -- one is usually in the summer and
24  one is usually around mid-year.
25  Q. All right. And -- and let me back up a

1  bit. No one is hired at this point as a designated
2  juvenile defender in the State of Missouri, correct?
3  A. Aside from myself?
4  Q. Yes.
5  A. And Katrina Jones would be the other
6  juvenile defender.
7  Q. Well, when you post for jobs --
8  A. Oh, sure.
9  Q. -- it's public defender for Hannibal or
10  public defender for wherever, but no designation of
11  a specialized juvenile defender, correct?
12  A. You are correct.
13  Q. And so someone is hired on and they go
14  through some upfront training to learn the job?
15  A. Yes.
16  Q. You've mentioned two possible trainings
17  they would attend?
18  A. Yes.
19  Q. Do defenders before they hit the ground
20  and receive cases necessarily participate in both of
21  those trainings you've just mentioned?
22  A. Not right away. They are required as a
23  new attorney, but they don't -- it's not the first
24  week on the job that they necessarily receive that
25  training.

1  Q. So you might be in court handling
2  matters, but you've not participated in any kind of
3  specialized training relating to your job?
4  A. Potentially, yes.
5  Q. Now, in either one of these two
6  trainings that are provided as a matter of course,
7  is there any component that relates to juvenile
8  practice?
9  A. Not currently.
10  Q. So just so -- so we're clear, there's
11  an annual defender training that takes place that
12  any defender can attend?
13  A. Any new.
14  Q. Any new defender can attend?
15  A. Yes.
16  Q. And it has no information about
17  juvenile cases?
18  A. Not to my knowledge.
19  Q. And then a trial skills training is a
20  different training, yes?
21  A. Yes.
22  Q. And it too does not at all relate to
23  juvenile practice?
24  A. Not to my knowledge.
25  Q. And a trial in an adult court is quite

1  different from a trial in a juvenile court, correct?
2  A. Absolutely.
3  Q. Tell us a little bit about why.
4  A. So a juvenile trial is going to be in
5  front of a judge, so it's going to be a bench trial.
6  So there are differences in strategy that you would
7  use. Also, there is the element of having a parent
8  sitting at counsel table with you, so that's a
9  difference between juvenile court and adult court.
10  Also, knowledge of adolescent brain development, the
11  potential to use juvenile-specific jury
12  instructions, case law is going to be different,
13  just to name a few differences.
14  Q. Okay. Now, beyond trainings for new
15  defenders, is -- is there any kind of training that
16  might be offered relating to juvenile practice?
17  A. Yes.
18  Q. And -- and what is that training?
19  A. So that is the once-a-year juvenile
20  training put on by the public defender system.
21  Q. Now, that training is relatively new,
22  correct?
23  A. It is.
24  Q. Do you know how long ago MSPD began to
25  put on juvenile-focused trainings for its lawyers?

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 160-37    Filed 02/21/18    Page 15 of 83

Page 57

```
 1        A.  I believe it began in the winter of
 2   2014.
 3        Q.  So when we're saying every year, it's
 4   only been two years or three years, correct?
 5        A.  Yes.
 6        Q.  And do you have any sense how many
 7   people attended that first winter 2014 training?
 8        A.  I don't.
 9        Q.  Were you present?
10        A.  I was on maternity leave.
11        Q.  That is right.  And what about the next
12   training after that?
13        A.  So the training in 2015, approximately
14   30 attorneys.
15        Q.  And what about the most recent?  I
16   think it would be the most recent, 2016 training?
17        A.  No, 2017 would be the most recent
18   training.
19        Q.  Okay.
20        A.  Probably 20 to 25 attorneys.
21        Q.  And how many attorneys total, if you
22   know, practice as public defenders in the State of
23   Missouri?
24        A.  I don't know the exact number.
25        Q.  Would it be safe to say only a small
```

Page 58

```
 1   percentage of the attorneys in the state of
 2   Missouri's public defender system have been trained
 3   specifically relating to juvenile practices?
 4        A.  Yes.
 5        Q.  Are you familiar with a program called
 6   JTIP?
 7        A.  I am.
 8        Q.  And what is JTIP?
 9        A.  JTIP is the Juvenile Training Immersion
10   Program.
11        Q.  And do you know who came up with this
12   program and what it entails?
13        A.  Sure.  It is a collaboration between
14   Kris Henning from Georgetown University and the
15   National Juvenile Defender Center, and it is a set
16   of training specifically related to topics in
17   juvenile law.
18        Q.  And is it a training that individuals
19   from any state might be able to participate in?
20        A.  Yes.
21        Q.  Are you familiar with the number of
22   Missouri defenders who have been trained in JTIP
23   best practices?
24        A.  Yes.
25        Q.  How many?
```

Page 59

```
 1        A.  Myself, Katrina Jones, so that's two.
 2   Sue Rinne, that's three.  Mary Fox, that's four.
 3   Courtney Goodwin, that's five.  And yourself, so
 4   six.
 5        Q.  And are you familiar with Katrina Jones
 6   being unable to participate in the JTIP program at
 7   some point?
 8        A.  I don't -- I don't know.
 9        Q.  Okay.  Did you find the JTIP program to
10   be helpful to you?
11        A.  Absolutely.
12        Q.  Are you aware of any other
13   juvenile-focused opportunities -- well, strike that.
14        I'm going to turn to another document.
15   I think we're on Exhibit 27 at this point?
16        MS. SHIPMA:  Uh-huh.
17        (WHEREIN, Exhibit 27, New Attorney
18   Toolbox, was marked for identification.)
19        Q.  (By Ms. Quinn)  Would you mind taking a
20   look at Exhibit 27, please?
21        A.  Okay.
22        Q.  Have you seen this document before?
23        A.  No.
24        Q.  All right.  The cover of this document,
25   would you mind indicating for the record what --
```

Page 60

```
 1   what it's -- how it's labeled?
 2        A.  It says New Attorney Toolbox: Guide to
 3   Area Ten and Other Important Stuff.
 4        Q.  And then on the bottom of it, where is
 5   it -- where is area ten?
 6        A.  Hannibal.
 7        Q.  Are you familiar with practices in
 8   Hannibal or area ten?
 9        A.  No, I am not.
10        Q.  Have you ever seen one of these
11   toolbox-type training documents before?
12        A.  No, I have not.
13        Q.  So let's if we can walk through this
14   together.  If you would turn to page -- I don't
15   think the pages are numbered, but it is two, three,
16   four, five, at the bottom it's MSPD 5668 Bates stamp
17   on the bottom.
18        A.  Okay.
19        Q.  Here on this page it appears the
20   Hannibal area ten office is providing information
21   about poverty guidelines, correct?
22        A.  That's what it looks like.
23        Q.  And it says public defender guidelines
24   and there are some charts or there is a chart on
25   this page, yes?
```

15 (Pages 57 to 60)

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com    **Phone: 1.800.280.3376**    Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 160-37    Filed 02/21/18    Page 16 of 83

Page 61

```
1        A.  Yes.
2        Q.  Have you seen this chart before?
3        A.  I -- I have no idea if I've seen this
4   chart before.  It doesn't look familiar to me.
5        Q.  Okay.  I'll direct your attention to a
6   section that says towards the bottom (quote as
7   read):
8             Parents' income considered if D is
9             under 18, a full-time student, or
10            dependent on parents or if parents or a
11            relative post bond.
12            Have you seen that kind of terminology
13   before?
14       A.  No.
15       Q.  Can you tell us if this is the practice
16   across the state?
17       A.  I can tell you that children file --
18   they fill out -- they fill out an application, but
19   they traditionally are accepted and not based on
20   their parents' income.
21       Q.  All right.
22       A.  And that's based on my practice in
23   St. Louis city.
24       Q.  All right.  So the practice in
25   St. Louis city is that a child actually fills out a
```

Page 62

```
1   form seeking a public defender?
2        A.  No.  So the practice is that they are
3   appointed an attorney with the public defender's
4   office.  We ensure that they want an attorney from
5   the public defender's office and they fill out an
6   application.  But my practice, we have not turned
7   away children based on indigency.
8        Q.  Okay.  So just so I'm clear again, so
9   in the city the court appoints the public defender
10   to a child's case, yes?
11       A.  Yes.
12       Q.  And thereafter an assessment of
13   indigence is undertaken; is that right?
14       A.  Yes.
15       Q.  And is it the child that fills out the
16   form or somebody else?
17       A.  No.  I help the child fill out the
18   form.
19       Q.  But just -- and let me be clear.  So
20   it's not the parent --
21       A.  No.
22       Q.  -- who fills out the form, it's the
23   child in St. Louis city?
24       A.  Yes.
25            MR. MOORE:  I'll object to the form of
```

Page 63

```
1   the question.  I think it misstates her prior
2   testimony that she assists the children in filling
3   out the form, but subject to that the answer is
4   already in the record, so we can continue.
5        Q.  (By Ms. Quinn)  Do you want to clarify
6   anything?
7        A.  No.
8        Q.  Okay.  So in the city all young people
9   in the court system receive appointment at the front
10   end of a case for the public defender's
11   representation?
12       A.  Yes.
13       Q.  Thereafter a screening is done to
14   determine if they qualify for public defender
15   services?
16       A.  And if they want an attorney from the
17   public defender's office.
18       Q.  In terms of the qualifying, it's the
19   policy and practice of the city that all children
20   are deemed indigent because they're under 18 and
21   cannot work to support themselves, correct?
22       A.  Yes.
23       Q.  But that is not the practice across the
24   state?
25       A.  I don't know.
```

Page 64

```
1        Q.  Do you know if that is the practice in
2   St. Louis County?
3        A.  I don't know.  I know that they fill
4   out applications, but I don't know anything beyond
5   that.
6        Q.  Do you know who fills out the
7   application in St. Louis County?
8        A.  I do not.
9        Q.  What about St. Charles County?
10       A.  I do not.
11       Q.  What about those other places you do --
12   do cases?
13       A.  I do not know.  Usually by the time we
14   get the cases in the other jurisdictions, a -- an --
15   a defender from that jurisdiction has entered and
16   deemed it a conflict, so they have at some point
17   determined indigency and then conflicted the case to
18   our office.
19       Q.  You're coming in later so you don't
20   know what happened --
21       A.  Correct.
22       Q.  -- on the front end?
23       A.  That's correct.
24       Q.  So I want to turn our attention back to
25   this area ten tool kit.  Can you, if you would,
```

16 (Pages 61 to 64)

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com      Phone: 1.800.280.3376      Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-37   Filed 02/21/18   Page 17 of 83

1 please, look through the forms that are in here
2 looking at documents such as the penalty worksheet,
3 the case log, client interview form, waiver of
4 preliminary hearing form, protocol form, DWI client
5 questionnaire form.  Look through the whole document
6 really if you don't mind.
7 　　　　MS. SHIPMA:  And Sarah, take your time
8 to look at --
9 　　　　MS. QUINN:  Yeah.
10 　　　　THE WITNESS:  Thank you.
11 　　　　MS. QUINN:  You know, if it's all
12 right, we can go off the record because I wouldn't
13 mind to take a little time to take a look at this
14 and then for me to -- to look at this document as
15 well.  So if it's all right, can we go off the
16 record?
17 　　　　VIDEOGRAPHER:  We're going off the
18 record at approximately 10:15 a.m.
19 　　　　(WHEREIN, a recess was taken.)
20 　　　　VIDEOGRAPHER:  We're back on the record
21 at approximately 10:24 a.m.
22 　　Q.  (By Ms. Quinn)  All right.
23 Ms. Johnson, we just took a break, but before the
24 break I asked you to take a look at this area ten
25 new attorney toolbox document, correct?

1 　　A.  Yes.
2 　　Q.  Having now reviewed that document, did
3 you see anything in there relating to juvenile
4 practice?
5 　　A.  I did not.
6 　　Q.  But to be fair, you don't -- you've
7 never seen this document before?
8 　　A.  I have not.
9 　　Q.  You don't know if this is still the
10 current toolbox tool kit given to Hannibal area
11 attorneys?
12 　　A.  I do not.
13 　　Q.  But if it was, do you have an opinion
14 about whether this is sufficient to bring new
15 attorneys up to speed relating to their
16 responsibilities for juvenile clients?
17 　　　　MR. MOORE:  Also object to the form of
18 the question.  I think it's a little vague.  Subject
19 to that, you can respond.
20 　　A.  As there is nothing with regard to
21 juvenile clients, I would say no, it is not
22 sufficient.
23 　　Q.  (By Ms. Quinn)  Now, I'd like to turn
24 our attention to St. Louis city juvenile court
25 practices.

1 　　A.  Yes.
2 　　Q.  And I think, correct me if I'm wrong,
3 but your opinion might be that St. Louis city as an
4 office tries to set the bar of best practices for
5 the city -- for the state of Missouri's juvenile
6 defenders?
7 　　A.  When you say St. Louis city you mean
8 the public defender's office?
9 　　Q.  Yes.  Uh-huh.
10 　　A.  Yes.
11 　　Q.  It's one of the few offices that has a
12 dedicated juvenile defender?
13 　　A.  Yes.
14 　　Q.  And so therefore you try your best to
15 become a model for other attorneys who are doing
16 juvenile practice across the state?
17 　　A.  I do.
18 　　Q.  But are you able to do everything you
19 think you need to do as a defender on the cases you
20 handle?
21 　　A.  No.
22 　　Q.  Do you have a policy manual in
23 St. Louis city for juvenile defense cases?
24 　　A.  Myself?
25 　　Q.  The office.

1 　　A.  No.
2 　　Q.  Is there a office procedures manual
3 relating to juvenile cases, how somebody should be
4 handling a case in terms of all of the tasks that
5 need to be accomplished in a juvenile case, any kind
6 of manual like that?
7 　　A.  No.
8 　　Q.  Is there any kind of new employees tool
9 kit or training manual for defenders joining the
10 city of St. Louis who might handle juvenile cases?
11 　　A.  You are looking at her.
12 　　Q.  But if you were to hire a new attorney,
13 would they receive any kind of manual or materials
14 that tell them how to handle juvenile cases if they
15 had to cover a case?
16 　　A.  Sure.  So I have done some trainings of
17 attorneys if they're going to do a case, but we
18 don't hand them pieces of paper, no.
19 　　Q.  All right.  And you mentioned trainings
20 that might take place in St. Louis city.  What are
21 those trainings?
22 　　A.  Sure.  So we have -- I have trained
23 some of the newer attorneys with regard to what a
24 juvenile case is, what the processes and procedures
25 are, case law, important Missouri case law, and so

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com　　　Phone: 1.800.280.3376　　　Fax: 314.644.1334
Case 2:17-cv-04057-NKL　　Document 160-37　　Filed 02/21/18　　Page 18 of 83

1  that has taken place a couple of times.
2      Q.  Yeah.  So you say a couple of times.
3  Can you tell us exactly how many times?
4      A.  So we have an attorney -- another
5  attorney Rachel who does some juvenile stuff so I've
6  trained her, and then I trained a group of four
7  other attorneys.  So twice.
8      Q.  All right.  And when did you train
9  those four lawyers?
10     A.  Exact date?
11     Q.  Roundabout.
12     A.  Couple months ago.
13     Q.  And how long did that training last?
14     A.  About an hour.
15     Q.  Beyond that, no other juvenile-specific
16 trainings have been conducted in the St. Louis city
17 office relating to juvenile practice?
18     A.  No.
19     Q.  How many lawyers do you guys have
20 there?
21     A.  Approximately when we were fully
22 staffed 30, but I believe we have about 27 right
23 now.
24     Q.  And of those 27 lawyers, you've
25 indicated you're the only one that's sort of all the

1  time is in juvenile court; is that fair to say?
2      A.  It is fair to say.
3      Q.  You've mentioned Rachel.  What are her
4  duties?
5      A.  So Rachel handled -- before we stopped
6  taking conflicts she handled the St. Louis County
7  conflicts, as well as the St. Charles County
8  conflicts for juvenile court, and she also has an
9  adult caseload in the city.
10     Q.  And does she do any juvenile cases in
11 St. Louis city's juvenile court?
12     A.  Yes, she has done some.
13     Q.  And I'm sorry if you said that and I
14 just missed it.  So then the other 25 attorneys,
15 they are not generally assigned to handle cases in
16 St. Louis city juvenile court; is that right?
17     A.  That's correct.
18     Q.  But every attorney might in some way,
19 shape, or form be involved in a juvenile case if it
20 is certified to adult court; is that fair to say?
21     A.  No.  I take all of the -- if a child is
22 certified in the city of St. Louis, I keep the case.
23     Q.  And you stay on throughout the whole
24 duration of that matter?
25     A.  That is correct.

1      Q.  Do you know if that's the practice
2  around the state?
3      A.  I do not know that.
4      Q.  Do you know anything about the practice
5  around the state?
6      A.  No.
7      Q.  St. Louis County, do you have any
8  sense?
9      A.  I don't.
10         MS. QUINN:  All right.  You have shared
11 with us a document today that we will mark as
12 Exhibit 28.  And I think everyone has a copy of it.
13         (WHEREIN, Exhibit 28, Memorandum of
14 understanding, was marked for identification.)
15     Q.  (By Ms. Quinn)  You have -- you have
16 that document as well?
17     A.  I do.
18     Q.  Can I switch you?
19     A.  Sure.
20     Q.  So now it is marked Exhibit 28.  Can
21 you tell us what that document is?
22     A.  Sure.  It is a memorandum of
23 understanding between the Missouri state public
24 defender and the 22nd Judicial Circuit of Missouri,
25 Family Court, Juvenile Division.

1      Q.  And what does this document seek to
2  accomplish?
3      A.  So it is seeking to appoint a contract
4  attorney in good standing to represent youth in
5  St. Louis city juvenile court.
6      Q.  And so when you say it's seeking to
7  appoint an attorney, is it for -- there's to be now
8  one contract attorney in the city or is this for any
9  number of contract counsel?  I'm just a little
10 confused.
11     A.  Sure.  So currently there is one
12 contract attorney in the city of St. Louis.
13     Q.  And who is that?
14     A.  Cindy Finney.
15     Q.  And has Cindy Finney been trained as a
16 juvenile defender?
17     A.  Yes, she went to the juvenile training
18 in the summer and I am a resource for her.
19     Q.  And how much is Ms. Finney paid per
20 case?
21     A.  So there are two numbers on page two
22 (quote as read):
23         The contract attorney shall be paid
24     $500 for cases involving nonviolent
25     offenses and $750 for cases involving

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com     Phone: 1.800.280.3376     Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 160-37    Filed 02/21/18    Page 19 of 83

Page 73

1        violent offenses, and it will not
2 exceed $20,000.
3        Q.   And do you know how many cases
4 Ms. Finney currently has?
5        A.   Two.
6        Q.   So this is new?
7        A.   Yes, it is.  She began the first week
8 of October.
9        Q.   Oh, I see.  I see it's dated July
10 of '17, yes?
11        A.   Correct.
12        Q.   But it's only taken effect it sounds
13 like this past month, this month?
14        A.   This past week, yes.
15        Q.   And so for a burglary case it sounds
16 like unless there was the use of a weapon, she would
17 be paid $500 no matter what that case entailed?
18        A.   Are you referring to a burglary first,
19 burglary second?
20        Q.   Ah, very good.  We'll go burglary
21 second.
22        A.   Okay.  I believe that would be $500.
23        Q.   All right.  And so even if she had to
24 interview ten different witnesses, yes?
25        A.   Potentially, yes.

Page 74

1        Q.   No matter how many motions needed to be
2 filed in that case?
3        A.   That's correct.
4        Q.   No matter how much mitigation evidence
5 needed to be marshaled?
6        A.   That's correct.
7        Q.   No matter how many times she had to
8 appear in court?
9        A.   That's correct.
10        Q.   Detention review hearings?
11        A.   That's correct.
12        Q.   Is there anything else about this
13 document you think I should know?
14        A.   No.
15        Q.   And is there anything different about
16 that arrangement, $500 no matter how much is asked
17 of the lawyer in a juvenile nonviolent matter?  Is
18 that different from what's taking place across the
19 state for contract counsel?
20        MR. MOORE:  I'll object to the form of
21 the question.  I think it's argumentative and vague.
22 Subject to that, you can respond.
23        A.   Do you mean contract counsel for
24 conflict cases?
25        Q.   (By Ms. Quinn)  Yes.

Page 75

1        A.   As far as the amount of money, I
2 believe it's the same.
3        Q.   Did you feel I was being argumentative?
4        A.   I --
5        MR. MOORE:  Object to the form of the
6 question as well.
7        MS. QUINN:  All right.  I don't want to
8 argue with you, Sarah.
9        Q.   (By Ms. Quinn)  Okay.  So you raised
10 this question of conflict.  Let's talk -- let's talk
11 about conflicts of interest and conflict counsel.
12        A.   Sure.
13        Q.   So you indicated earlier that in the
14 city of St. Louis the court appoints the public
15 defender for any child coming through kind of as a
16 stopgap measure in -- on the front end of a case?
17        A.   That's correct.
18        Q.   And you -- do you know if that -- well,
19 that's not the practice necessarily across the
20 state?
21        A.   No.
22        Q.   So focusing on across the state, do you
23 know then on the front end of a case how youth are
24 being appointed counsel, what the practice or policy
25 is?

Page 76

1        A.   Just generally.  I know that it's
2 either they are appointed subject to 211.211, or
3 they are telling the court when the court first
4 inquires either at a detention hearing or at a
5 status conference whether the child wants counsel
6 and then allows them the opportunity to apply for
7 public defender services.
8        Q.   So there -- there may be instances when
9 a child is appearing before the court let's say at a
10 detention hearing without any attorney on the case?
11        A.   That's correct.
12        Q.   In St. Charles County, for instance,
13 are there any attorneys at the detention hearings?
14        A.   And when you mean attorneys, public
15 defenders?
16        Q.   Public defenders.
17        A.   Not to my knowledge.
18        Q.   And again, across the state at the --
19 at the beginning stage of a case it would be
20 important to discern if there was a conflict of
21 interest, correct?
22        A.   Yes, but by the -- by the defender or
23 who are you --
24        Q.   Just -- just as an ethical matter.
25        A.   Sure.

19 (Pages 73 to 76)

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 160-37    Filed 02/21/18    Page 20 of 83

Page 77

1      Q.  There are concerns about having an
2  attorney on the case who might have a conflict of
3  interest in any adult or juvenile case, yes?
4      A.  Absolutely.
5      Q.  Do you know how conflicts of interest
6  are discerned across the state in juvenile matters?
7      A.  I do not.
8      Q.  Does the public defender system have
9  any policy relating to figuring out if and when
10  there are conflicts of interest at the very
11  beginning of a case?
12      A.  Yes.  There -- there would be a policy.
13      Q.  Do you know what that is?
14      A.  Well, I mean, I think if you -- if
15  there is more than one child or more than one adult
16  charged in an offense, that would be a pretty
17  obvious conflict.  That would be discerned right up
18  front.  There might be more subtle conflicts, so
19  once you get into a case, you might recognize that
20  the child is saying that another individual did it
21  and then realizing that you also represent that
22  individual.
23      Q.  All right.  And so you've kind of
24  identified a classic conflict of interest, and that
25  is co-defendants generally should not be represented

Page 78

1  by the same attorney --
2      A.  Yes.
3      Q.  -- during the course of a case?
4      A.  That's correct.
5      Q.  And so what is the policy or practice
6  with regard to the MSPD system for figuring out when
7  that happens and how to protect against it?
8      MS. SHIPMA:  If you know.
9      Q.  (By Ms. Quinn)  If you know.  Sure.
10  Sure.
11      A.  I guess I'm a little bit confused about
12  your question how to protect against representing
13  multiple defendants.
14      Q.  That's right.
15      A.  So you -- if you -- if a petition
16  charges multiple children are acting as -- acting
17  together, then protecting against it would be to
18  conflict to other offices.
19      Q.  All right.  So let's talk about -- I'll
20  look at St. Louis city practices then.
21      A.  Okay.
22      Q.  So you've already indicated I think
23  that the St. Louis city public defender's office
24  does not represent all indigent youth in the
25  St. Louis city juvenile court, correct?

Page 79

1      A.  Correct.
2      Q.  Some are going to the contract counsel
3  who we just talked about?
4      A.  Correct.
5      Q.  Are there other panel or other
6  attorneys handling juvenile matters in -- in the
7  city for those who are indigent?
8      A.  No.
9      Q.  And who covers detention hearings in
10  the city of St. Louis?
11      A.  I do.
12      Q.  And do you cover all detention dockets?
13      A.  Yes.
14      Q.  And if a case comes in with multiple
15  respondents or juveniles charged in a single
16  offense, do you handle that detention hearing?
17      A.  I do.
18      Q.  And so let's say there are five
19  co-defendants charged in a fight.
20      A.  Sure.
21      Q.  You would stand up for all of those
22  children at the detention hearing as their lawyer?
23      A.  Yes.
24      Q.  And that's a conflict of interest,
25  right?

Page 80

1      A.  Yes.
2      Q.  When, if at all, does a new lawyer come
3  into the case to take some of those co-respondents
4  off your hands?
5      A.  Sure.  So if we are able to get the
6  conflict attorneys to come down and cover the
7  detention hearings, certainly that's something that
8  is an option.  However, if not -- it usually takes a
9  couple weeks to contract the case and for there to
10  be a status conference in order for all of the
11  attorneys to get together.
12      Q.  So for the first few weeks of a case it
13  could be the child is without conflict-free counsel;
14  is that right?
15      A.  No, that's not right.  So once the
16  detention hearing is held, immediately after the
17  cases are conflicted.  So I do not -- after that
18  first initial detention hearing, I am not visiting
19  all five children in the detention center.  I am
20  only visiting the individual who I entered on in the
21  case.
22      Q.  How long does it take from that
23  detention hearing for the new counsel to enter on
24  average to take over the matter?
25      A.  I don't know.

20 (Pages 77 to 80)

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com      Phone: 1.800.280.3376      Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 160-37    Filed 02/21/18    Page 21 of 83

Page 81

1    Q.   And would you agree that the beginning
2  days of a case, juvenile or adult, are some of the
3  most important days on a case to investigate and --
4  and do your job?
5    A.   Yes.
6    Q.   Would you also agree that detention
7  hearings, whether somebody is incarcerated or not
8  incarcerated, detained or not detained, is sometimes
9  one of the most important facets of -- of a case in
10 terms of determining outcome?
11   A.   Absolutely.
12   Q.   Do you feel like when you're standing
13 on a case where there's five co-respondents and
14 you're asked to represent all of them and you know
15 that you're conflicted, that you're able to do your
16 job as -- as you ought to be able to do?
17   A.   Sure.  I think in a perfect world that
18 there would be five different attorneys representing
19 those children, but at the moment of detention
20 hearing my goal is to get all five children
21 released.  And so at that time I want to ensure that
22 those children, because that is their most important
23 question is when am I going to be released is to
24 fight for them to get released.
25   Q.   Are you speaking to each one of those

Page 82

1  five about the facts of the case when you're
2  preparing for the detention hearing?
3    A.   I am not.
4    Q.   But the facts of the case could be
5  important to a detention determination?
6    A.   They are, and I rely on the probable
7  cause document to make any very prima facia
8  arguments.
9    Q.   So it's safe to say you modified what
10 would be considered an appropriate and best practice
11 in order to accommodate the limitations of the
12 system?
13   A.   Yes.
14   Q.   Why don't you have five attorneys
15 standing up on five co-respondent cases?
16   A.   We don't have the ability to with the
17 time to get those five conflict attorneys assigned
18 because by the time -- when the petition is filed
19 and the detention hearing is three days and we don't
20 have enough time to do that.
21   Q.   And -- and let's talk about that
22 predetention hearing period that you've mentioned,
23 three days.  How much work are you doing between
24 when a case is papered or petitioned and when that
25 detention hearing takes place?  How much work or

Page 83

1  investigative time are you spending on that matter?
2    A.   So are you asking generally?
3    Q.   Uh-huh.
4    A.   Okay.  So when a case is petitioned I
5  am visiting with the child, talking with the family,
6  potentially getting any mitigation information,
7  investigation.  I don't have addresses or phone
8  numbers for the witnesses, so usually the
9  investigation piece is just talking to the child and
10 if the parent knows any information.  That's the
11 investigation that's done predetention hearing.
12   Q.   What about lining up alternatives to
13 detention, are you able to do that work?
14   A.   Absolutely.
15   Q.   Tell me more about that.
16   A.   So you -- you're talking to the parents
17 or any kin that would be willing or able to take the
18 child, as well as if there is a schooling issue,
19 potentially arranging alternative schooling.
20   Q.   I mean inpatient drug programming,
21 residential placement, other placements other than
22 the family to provide as an alternative at the
23 detention hearing.
24   A.   Children don't normally -- that's not
25 something that they normally want, so that's -- no,

Page 84

1  I have -- I usually do not look into that option.
2    Q.   So if a child had an option of being
3  detained or going to a treatment program, it's not
4  within your practice to look into that possibility
5  of a treatment program?
6    A.   Well, of course, if the -- if that's
7  what the child wanted, then yes, I would look into
8  the inpatient treatment program.
9    Q.   What is -- do you know anything about
10 the practice across the state in terms of the
11 ability of lawyers handling juvenile matters to use
12 that three days to investigate, obtain, and put into
13 place alternatives to detention?
14   A.   I don't.
15   Q.   You talked a little bit about conflicts
16 of interest and -- and how conflict cases might be
17 reassigned.  Can -- can you unpack a little bit more
18 what that process looks like and who covers what
19 county?
20   A.   So I -- I'm sorry, I'm a little bit
21 confused about your question.
22   Q.   Yeah, me too.  So let me clarify.
23 Focusing on St. Louis city.
24   A.   Sure.
25   Q.   If there's a case with multiple

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com      Phone: 1.800.280.3376      Fax: 314.644.1334

1  respondents and conflict counsel needs to be
2  assigned, what takes place?  What -- what follows
3  after that determination?
4      A.   Currently what takes place is we
5  determine the conflict, and then it is sent to
6  Columbia to be contracted out.
7      Q.   And so Columbia gets this information
8  and then what's the realm of possibilities, to whom
9  may those cases go?
10      A.   I don't know the exact individuals, but
11  they could go to any number of contract attorneys
12  for the -- system.
13      Q.   So is it safe to say there's like a
14  relationship among St. Louis city, St. Louis County,
15  and St. Charles County attorneys doing conflict
16  cases?
17      A.   So that used to be the practice, but
18  that is no longer.  So these are -- St. Louis County
19  and St. Charles County public defender's office is
20  no longer taking conflicts.
21      Q.   Oh, okay.  When did that go into
22  effect?
23      A.   I don't know.  Recently.
24      Q.   Would -- would you say within the last
25  month?

1      A.   I don't know.
2      Q.   Do you know if you any longer will be
3  required to travel out of county personally to -- to
4  cover cases?
5      A.   No.
6      Q.   No, you will not or you don't know?
7      A.   I will not.
8      Q.   Will other attorneys across the state
9  need to travel out of their own counties to cover
10  cases?
11      A.   Potentially if those are cases that
12  they are currently entered on.
13      Q.   But you don't know what the practice
14  will be going forward in terms of who's getting what
15  cases, who's covering what county?
16      A.   No.
17      Q.   Speaking about your practice up until
18  this recent change, is it fair to say as you
19  mentioned earlier that you were covering cases in
20  five different counties?
21      A.   Yes.  I -- I stopped doing that
22  approximately a year and a half ago.
23      Q.   And was that because of your change in
24  role?
25      A.   No.  My change in role was in July of

1  this year, so it's just a new position.  But I
2  was -- I split that duty with Rachel Dowd.  So I
3  think it's been about a year.
4      Q.   So when this change happened, is this
5  intended to improve delivery of services, like do
6  you have a sense of why this is going on?
7      A.   Why I stopped doing the conflict?
8      Q.   Yeah.  Uh-huh.
9      A.   Yes.  Yes, to improve services.  So I
10  could focus my time on St. Louis city youth.
11      Q.   What about the attorneys out in
12  St. Charles County, are they still any of them being
13  asked to travel outside of county to cover cases?
14      A.   I don't know the answer to that
15  question.
16      Q.   And St. Louis County, any of those
17  folks?
18      A.   I don't know.
19      Q.   I want to shift a little bit and talk
20  about expert witnesses if that's okay.
21      A.   Sure.
22      Q.   I assume you have in your experience
23  used expert witnesses in cases, yes?
24      A.   Absolutely.
25      Q.   Do you have any opinions about expert

1  opinions -- about expert witnesses in juvenile
2  matters?  And let me ask do you feel like the use of
3  experts is more important or something that should
4  be relied upon more frequently in juvenile matters
5  than adult matters?
6      A.   I think it depends.  I think expert
7  witnesses are definitely a very important thing for
8  juvenile cases, but I -- they could be just as
9  important for an adult case.
10      Q.   And so in terms of the range of experts
11  one might use in a juvenile case, can you share with
12  us a little bit who some of those folks might be?
13      A.   Sure.  So you might have a mental
14  health expert who is talking either about competency
15  or about learning disabilities or issues with a
16  child understanding maybe verbal language,
17  comprehension of the system.  So you have those --
18  that kind of expert.  Also have an adolescent brain
19  development expert, psychologist, psychiatrist who
20  would be able to -- psychologist who would be able
21  to talk about brain development and why that is
22  important with regard to a case.  You also might
23  have the range of experts that you would use in an
24  adult case, so ballistics or fingerprint DNA, those
25  kinds of experts.

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 160-37    Filed 02/21/18    Page 23 of 83

Page 89

1      Q.  So experts relating to the trial
2  elements or the charge elements might be one area of
3  expertise you're using?
4      A.  Yes.
5      Q.  And a whole other array of experts
6  relating to the youth-specific features in a
7  particular case perhaps?
8      A.  Absolutely.
9      Q.  And what's the process for obtaining an
10 expert witness in a juvenile matter in -- in the
11 Missouri system?
12     A.  Sure.  So you of course have to
13 identify the expert that you're going to use, talk
14 with them, understand how much they are going to
15 charge an hour, and then you have to do an
16 encumbrance request.  So you have to identify the
17 reason why you're going to be using the expert, what
18 expert you want to use, and how much money you are
19 going to be needing for that particular expert.
20     Q.  And so then what is the policy or
21 practice for then turning that information over?
22 Like to whom do you direct that request?
23     A.  Sure.  You direct that request to your
24 district defender and then if it reaches I believe
25 over $500 it goes to another group, another level of

Page 90

1  management who then have to review the request.
2      Q.  Are you aware of any limits on your
3  ability to access experts or use experts?
4      A.  No, I am not.
5      Q.  Do you know anything about the amount
6  of money that has been allocated to the Missouri
7  public defender system for expert witnesses?
8      A.  No, I do not.
9      Q.  You've never made something called an
10 AKE motion or AKE motion to the court directly for
11 expert expenses?
12     A.  I have not.
13     Q.  Do you feel like your ability to -- to
14 access experts is -- are there any -- any limits on
15 your day-to-day practice that impact your ability
16 to -- to access or use expert witnesses?
17     A.  No.
18     Q.  The caseloads and the like don't enter
19 into your thinking around what kind of time you
20 might spend with an expert or otherwise?
21     A.  Ask -- ask that question again.
22     Q.  Yeah.  So it takes time to work with an
23 expert?
24     A.  Absolutely.
25     Q.  Tell us some -- some about what that

Page 91

1  looks like.
2      A.  So you're going to be talking to them
3  about, you know, pre -- using them kind of what --
4  what strategies you have or maybe what -- what you
5  want them to be used for.  Then you're going to be
6  giving them documents.
7          They're going -- they're going to have
8  to do a document review, maybe even a witness
9  review, maybe talk to family members, individuals
10 that that child has interacted with.  Then you're
11 going to be talking to them before they potentially
12 write a report.
13         Do they want to write a report, do they
14 not want to write a report?  Then you're going to be
15 talking to them pretrial or prehearing about what
16 kind of questions you're going to be asking them,
17 what kind of exhibits you're going to be using, what
18 kind of questions the legal officer -- officer is
19 going to be asking them, and then there is the
20 hearing and then any other posthearing issues.
21     Q.  So it sounds like to locate, work with,
22 and deploy an expert well, it could take 4.6 hours
23 alone on that task?
24     A.  It could.
25     Q.  Is it your sense that the practices in

Page 92

1  St. Louis city relating to the use of experts in
2  juvenile cases are different from across the state?
3      A.  I can't speak for certain, but we have
4  youth experts in the city of St. Louis.
5      Q.  And do you know anything about the --
6  your colleagues across the state, how much they're
7  using experts in juvenile cases or --
8      A.  I don't.
9      Q.  -- making requests?  What about
10 investigators, are there policies and procedures
11 statewide with regard to the use of investigators in
12 juvenile matters?
13     A.  Sure.  So each office is assigned
14 investigators.  If you would like an investigator to
15 do something for you, you create what's called an
16 action item.  You send that to the district defender
17 or deputy district defender and then they reassign
18 that action item.
19     Q.  And so what -- how long would you say
20 does it take for you from when you make a request
21 for something to be investigated for it to be
22 assigned and the action item to be acted upon?
23     A.  Same day.
24     Q.  And are you finding that the
25 investigators are dedicating the same amount to

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com     Phone: 1.800.280.3376     Fax: 314.644.1334

Case 2:17-cv-04057-NKL   Document 160-37   Filed 02/21/18   Page 24 of 83

Page 93

1  juvenile cases as adult cases?
2      A.  I don't know specifically, but I do
3  know that they are divided amongst all of the
4  attorneys, so they have a lot of action items and
5  investigative requests to complete.
6      Q.  And do you know how many investigators
7  there are in St. Louis city, the St. Louis city
8  office?
9      A.  I believe four.
10      Q.  And are any specially assigned to the
11  juvenile court?
12      A.  No.
13      MS. QUINN:  Just one moment.
14      Q.  (By Ms. Quinn)  Okay.  So at this time
15  if it's okay, I'd like to talk a little bit about
16  discovery.
17      A.  Okay.
18      Q.  Discovery in juvenile cases in
19  particular.  What are the ways in which a juvenile
20  defender in Missouri -- or I'll -- and I keep saying
21  juvenile defender, an attorney handling a juvenile
22  case or a juvenile court case in Missouri, how did
23  they seek discovery?
24      A.  Through a discovery request.
25      Q.  Okay.  So you can make a request in

Page 94

1  writing?
2      A.  Yes.
3      Q.  You can make an informal request?
4      A.  Sure.  Sure.
5      Q.  Just ask for materials.  Are there
6  other means of gathering information, other
7  discovery mechanisms in juvenile cases?
8      A.  Are you asking through the legal
9  officer or just in general?
10      Q.  In general.
11      A.  Sure.  So you have your own ability to
12  investigate a case.  You can get releases signed
13  from the youth or their family to obtain school
14  records.  You can have the investigator go take
15  pictures, interview witnesses yourself.
16      Q.  Okay.  So investigation versus
17  discovery.  Let me just talk about informal
18  discovery.
19      A.  Okay.
20      Q.  Are you familiar with the informal
21  discovery practice in St. Louis County?
22      A.  Are you talking about the file?
23      Q.  Yes.
24      A.  Okay.
25      Q.  The blue file.

Page 95

1      A.  Sure.  Sure.
2      Q.  Whatever color it is.
3      A.  Yes.  So the practice was -- and I
4  don't know if this is shifted over to the new
5  building.  When I was working in the old -- when I
6  went to the old building they would say if you want
7  the police reports go to a file room and pull out
8  the police reports, make a copy yourself.
9      Q.  Okay.  And the practice then in
10  St. Louis County was to obtain whatever was in the
11  file, but not to make a formal written request; is
12  that right?
13      A.  I don't know that specific instance.
14  We always made a written formal request.
15      Q.  And that's the city office was trained
16  to always make a written request for discovery?
17      A.  Yes.  And that was E filed.
18      Q.  And --
19      (Court reporter interruption.)
20      A.  That was E filed.
21      Q.  (By Ms. Quinn)  What about outside the
22  city of St. Louis, do you know if the attorneys
23  across the state handling juvenile cases are
24  routinely making written discovery requests?
25      A.  I don't know the answer to that.

Page 96

1      Q.  Are you familiar with Rule 25 of the
2  Rules of Criminal Procedure in Missouri?
3      A.  I am.
4      Q.  And how that might impact or come into
5  play in a juvenile case?
6      A.  Well, sure.  There is a Supreme Court
7  rule, I don't know the exact rule, but it says that
8  Supreme Court Rule 25, discovery applies to all
9  juvenile cases.
10      Q.  Okay.  Are you aware of whether across
11  the state all juvenile practitioners are aware of
12  their ability to access discovery under both Rule 25
13  and the rules of juvenile procedure?
14      A.  I don't know that.
15      Q.  Are you aware of whether the
16  prosecutors or legal officers on the other side are
17  aware that they have duties to turn over materials
18  beyond informal discovery under the juvenile rules?
19      A.  I'm not aware of that.
20      Q.  What about Brady materials?  Do you
21  personally make requests for Brady materials in your
22  cases in juvenile court?
23      A.  Yes.
24      Q.  Do you know if all of the defenders
25  across the state who handle juvenile cases are doing

24 (Pages 93 to 96)

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com     Phone: 1.800.280.3376     Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 160-37    Filed 02/21/18    Page 25 of 83

1    so?
2         A.   I don't know.
3         Q.   Do you know if it is the practice of
4    legal officers or juvenile prosecutors to turn over
5    such discovery, Brady discovery?
6         A.   I don't know.
7         Q.   How about depositions?  Tell us about
8    the use of depositions in your practice.
9         A.   Sure.  So if I believe that I need to
10   depose a witness, I will make a request again
11   through an E-Num request, identify how much money I
12   think it will cost to depose a witness and then that
13   goes to -- to the district defender to approve or
14   deny.
15        Q.   And so every time you need to take a
16   deposition it comes out of the sort of state's
17   budget for the public defender generally?
18        A.   I don't know what budget it comes out
19   of.
20        Q.   But you're not making a request to the
21   court directly?
22        A.   I am not.
23        Q.   And you said when you determine that
24   the deposition is appropriate.  The right to depose
25   witnesses exists the same in juvenile cases as it

1    does in adult criminal cases, correct?
2         A.   Absolutely.
3         Q.   On average how -- how many depositions
4    would you say that you take in the course of a
5    month?
6         A.   Gosh, I -- I can't speak specifically.
7    Not -- not more than ten.
8         Q.   Okay.  And in -- would you say you're
9    taking depositions in every case?
10        A.   No.
11        Q.   Half the cases?
12        A.   Probably not.
13        Q.   A quarter of the cases?
14        A.   Maybe.
15        Q.   And do you have a sense of the practice
16   across the state for people handling juvenile cases?
17        A.   I don't.
18        Q.   What about in certification matters, do
19   you take depositions precertification?
20        A.   Generally, no.  But there have been
21   occasions, yes, that I have taken depositions.
22        Q.   And so in certification hearings --
23   well, I'll hold off on that question.  Shifting from
24   discovery and investigation to social workers, how
25   many social workers are employed by the public

1    defender system statewide, if you know?
2         A.   I don't.
3         Q.   Are there any written policies and
4    procedures relating to the use of social workers in
5    juvenile cases?
6         A.   I don't know of any.
7         Q.   What about policies or procedures
8    relating to requesting social workers to assist you
9    with those matters?
10        A.   I don't know of any.
11        Q.   Do you have a social worker assigned in
12   St. Louis city -- well, to the St. Louis city office
13   at all?
14        A.   Yes.
15        Q.   How many social workers?
16        A.   One.
17        Q.   And so safe to say that person's
18   handling all cases, not just juvenile cases?
19        A.   That is correct.
20        Q.   Do you feel like there -- there then is
21   a limit on your ability to access social work
22   support for your juvenile matters?
23        A.   Yes.
24        Q.   Is it -- would you say it is -- is it
25   safe to say that every juvenile case could benefit

1    from the support of a social worker?
2         A.   Absolutely.
3         Q.   Are you able to do that?
4         A.   No.
5         Q.   And you -- again St. Louis city is the
6    best office across the state when it comes to
7    providing juvenile-specific defense services?
8         A.   I don't -- I don't know that -- if
9    it -- if it is the best, but we definitely do our
10   best to provide adequate representation, yes.
11        Q.   What about support staff, let's say
12   paralegals, someone to review documents, or other
13   kinds of attorney support services?  What -- what
14   kind of support do you have for that work?
15        A.   Sure.  I have one legal assistant who
16   helps with that -- that sort of work.
17        Q.   And is the legal assistant assigned to
18   you and you alone?
19        A.   No.
20        Q.   Who does that legal assistant work for?
21        A.   She has several other attorneys that
22   she works for and with.
23        Q.   And how many legal assistants are there
24   for the city of St. Louis office?
25        A.   I believe there are six total.

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 160-37    Filed 02/21/18    Page 26 of 83

1      **Q.   And they handle such things as writing**
2   **letters, making copies, reviewing documents?**
3      A.   Potentially depending on what the
4   attorney requests.
5      **Q.   And are -- do you feel like you're**
6   **sufficiently supported administratively in your**
7   **work?**
8      A.   Yes.
9      **Q.   In terms of support staff, social**
10  **workers, investigators, are they provided with any**
11  **training specifically for juvenile matters?**
12     A.   No.
13     **Q.   How about interpreters?  Does the state**
14  **public defender system have any interpreters on**
15  **staff?**
16     A.   No, but we can hire them.
17     **Q.   Tell us about what that process looks**
18  **like.**
19     A.   It's the same for a deposition or an
20  expert.  You have to do an -- an action item or an
21  E-Num request -- I'm sorry, an E-Num request, and
22  you have to encumber money, talk to the interpreter
23  and then make a request to the boss.
24     **Q.   And the interpreter would -- you could**
25  **access an interpreter for in-office meetings let's**

1   **say with family members who don't speak Spanish?**
2      A.   Yes.
3      **Q.   Or don't speak English, but speak**
4   **Spanish?**
5      A.   Yes.
6      **Q.   Have you worked with family who are**
7   **non-English speaking but used family or others to**
8   **serve as an informal interpreter for your work?**
9      A.   I have not.
10     **Q.   Never?**
11     A.   No.
12     **Q.   What about when sending letters or**
13  **materials to families that are non-English speaking,**
14  **how does that work?**
15     A.   So we have a translator, we can hire a
16  translator to translate police reports, write
17  letters, those things.
18     **Q.   And do they do that as a matter of**
19  **course?**
20     A.   What do you mean by -- when you say --
21     **Q.   In every case where there's an issue of**
22  **a non-English speaker, does every case have a**
23  **translator and interpreter to translate every**
24  **document for -- for the family?**
25     MS. SHIPMA:  You're talking about

1   juvenile cases?
2      MS. QUINN:  Juvenile cases, yeah.
3      A.   In my practice, yes.  I don't know
4   about everywhere else.
5      **Q.   (By Ms. Quinn)  So I mentioned earlier**
6   **we'd come back to certification.  Can you talk a**
7   **little bit more about certification and why it's**
8   **such an important process?**
9      A.   Certification is basically the death
10  penalty for youth.  So when a child is certified,
11  they are forever going to be in the adult system and
12  they could be potentially facing very long prison
13  sentences and so it is important to focus a lot of
14  efforts on certification hearings.
15     **Q.   We talked earlier already about there**
16  **are mandatory certification matters or discretionary**
17  **certification matters.  Do you approach either one**
18  **of those differently?**
19     A.   No.
20     **Q.   Do you know about practices across the**
21  **state in terms of if they're approached differently**
22  **or not?**
23     A.   I don't.
24     **Q.   Are you aware of what the burden of**
25  **proof is in a certification case?**

1      A.   Oh, gosh.  That's a really good
2   question.  I would have to review the statute.  I
3   believe -- I mean, it's up to the judge, and I
4   don't -- but I don't know the -- I can't recall at
5   this time the burden of proof.
6      **Q.   And have you not ever challenged the**
7   **fact that there is no burden of proof listed in the**
8   **statute for certification cases?**
9      A.   I have not.
10     **Q.   What about weight of the evidence with**
11  **regard to elements under the statute?**
12     A.   So -- so I have not challenged that,
13  but I recognize that the court is able to give what
14  weight it will to any of the doctors.
15     **Q.   What about proof presented by the**
16  **defense in a certification case?  In your practice,**
17  **what kind of proof do you try to or tend to present**
18  **in a certification case?**
19     A.   So with regard to the first three
20  factors, challenges to the actual incident itself.
21  So I've put on witnesses, I've put on police
22  officers, potential witnesses for the case,
23  introduced documents with regard to challenging
24  whether or not there's probable cause for the case
25  to proceed.

26 (Pages 101 to 104)

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com      **Phone: 1.800.280.3376**      Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 160-37    Filed 02/21/18    Page 27 of 83

Page 105

1    With regard to the next seven factors
2  I've put on statisticians through the court to talk
3  about the racial disparity on certification.  I've
4  put on family members to talk about the
5  sophistication and maturity of the child.
6    I've put on case managers who have --
7  and residential placement managers who've talked
8  about the services that a child has received.  I
9  have also put on care and protection individuals, so
10 case managers, I've put on guardian ad litems, and
11 then expert witnesses as well, psychologists and the
12 like who talk about a child's history.
13   **Q.  And are you aware of how that practice**
14 **compares with the practice of your colleagues across**
15 **the state who might be handling juvenile**
16 **certification cases?**
17   A.  I do not.
18   **Q.  What about the proof that is presented**
19 **on the other side, proof from the juvenile officer?**
20 **What is your experience in terms of what they**
21 **present?**
22   A.  They traditionally and typically
23 present the testimony of the deputy juvenile
24 officer.
25   **Q.  Do they usually present any other**

Page 106

1  **testimony?**
2    A.  Not usually.
3    **Q.  And that's based in your experience**
4  **across the five different counties you practiced in,**
5  **yes?**
6    A.  And I guess there -- there have been
7  victims who have testified regarding the impact of
8  the -- the crime.
9    **Q.  Okay.  But in terms of the elements**
10 **under the statute for certification, it's almost**
11 **always only the juvenile officer?**
12   A.  Yes.
13   **Q.  Have you ever challenged that practice?**
14   A.  Tell me what you mean by that.
15   **Q.  Based on the lack of expertise or the**
16 **lack of ability of that person to be a competent**
17 **witness in that respect.**
18   A.  Sure.  Through cross-examination, but
19 not through formal motion.
20   **Q.  Have you ever deposed that deputy**
21 **juvenile officer before they testified at a**
22 **certification hearing?**
23   A.  I have not.
24   **Q.  Do you know if your colleagues ever**
25 **depose deputy juvenile officers before a**

Page 107

1  **certification hearing?**
2    A.  I do not know.
3    **Q.  How long if you know do most**
4  **certification hearings last in the State of**
5  **Missouri?**
6    A.  I don't know.
7    **Q.  Are you aware of the standing practice**
8  **in St. Louis County of certification hearings taking**
9  **one hour or less?**
10   A.  No, I'm not aware of that.
11   **Q.  Have you ever had a certification**
12 **hearing in St. Louis County that took longer than an**
13 **hour?**
14   A.  Yes.
15     MS. SHIPMA:  Sarah, your voice is
16 getting softer.
17     THE WITNESS:  Yes.  Sorry.
18   **Q.  (By Ms. Quinn)  Are you aware beyond**
19 **St. Louis city of what happens with a child's case**
20 **upon certification?  If it's a -- if it's a public**
21 **defender case, what happens with that kiddo?**
22   A.  Beyond St. Louis city?
23   **Q.  Yeah.**
24   A.  So I can just talk generally about what
25 happens.  So if a child is certified, then the

Page 108

1  prosecutor has to decide whether or not they're
2  going to issue the case.  If they decide to issue
3  the case, they pick the child up from the detention
4  center and transport them to the adult jail.  And
5  then the child either retains that counsel if they
6  are providing that representation, if the public
7  defender is providing the representation or they
8  have to apply for services.
9    **Q.  Are you aware of the practice**
10 **generally -- so in -- in what percentage of cases**
11 **does the initial assigned defender stay on the case**
12 **postcertification?**
13   A.  I do not know.
14   **Q.  Are you aware of cases where children**
15 **between the moment of certification and when they**
16 **next appear in front of a judge in adult court are**
17 **essentially without counsel?**
18   A.  Am I aware of specific instances?  No,
19 I'm not.
20   **Q.  Based on your understanding of the**
21 **practices across the state, is it your understanding**
22 **that much work is happening between certification**
23 **and when the case is next presented to a judge?**
24   A.  Work done by the defender?
25   **Q.  By the defender.**

27 (Pages 105 to 108)

**MIDWEST LITIGATION SERVICES**
**www.midwestlitigation.com      Phone: 1.800.280.3376      Fax: 314.644.1334**
Case 2:17-cv-04057-NKL    Document 160-37    Filed 02/21/18    Page 28 of 83

1    A. I can't speak to that. I don't know.
2        Q. That too would be an important window
3    for working on a case, yes?
4        A. Absolutely.
5        Q. What about motions to transfer a case
6    from adult court back to juvenile court? Are you
7    familiar with that practice?
8        A. I am.
9        Q. And it's -- do you have any -- have you
10   done it yourself?
11       A. So before the collateral representation
12   from certification to adult court we had an
13   attorney, Bill Marsh, who did those motions. So
14   before we did the continuity of representation if a
15   child was certified he would represent all the
16   17-year-olds. So yes, he has done those motions and
17   I am currently working on a motion right now.
18       Q. And this is in St. Louis city?
19       A. That I am working on a motion, no, it's
20   in St. Louis County.
21       Q. Okay. But -- so across the state, are
22   you aware of how many times when a kid hits adult
23   court a motion is filed to transfer them back to
24   juvenile court?
25       A. I'm not aware.

1        Q. Is -- is that a -- are you -- have you
2    heard of that practice happening frequently?
3        A. I've heard of it happening, but I don't
4    know how often.
5        Q. Let's talk a little bit about
6    collateral consequences.
7        A. Sure.
8        Q. Can you tell us what collateral
9    consequences of a prosecution, what that term means
10   to you?
11       A. Sure. So collateral consequences would
12   mean consequences of a child being adjudicated of an
13   offense. They could include schooling, employment,
14   college, immigration, military service. They impact
15   all aspects of a child's life.
16       Q. And are you familiar with any case law
17   relating to collateral consequences, United States
18   Supreme Court or otherwise, about the duty of a
19   defender and collateral consequences?
20       A. Yes, and as you're asking me this the
21   motion -- the -- the case escapes me, but it is a
22   case about immigration consequences.
23       Q. And there statewide manuals or
24   materials that lay out for defenders in MSPD's
25   system what all the collateral consequences of a

1    prosecution might be?
2        A. Of an adult prosecution?
3        Q. Yes.
4        A. I don't know.
5        Q. Have you ever seen any?
6        A. I've not seen a manual, no.
7        Q. What about for juvenile cases?
8        A. Sure. So we've been collaborating with
9    the National Juvenile Defender Center to create a
10   pamphlet for collateral consequences. So there have
11   been drafts made, but there is no -- currently no
12   pamphlet that is available to -- for distribution.
13       Q. And there has -- it hasn't been the
14   practice in the past for juvenile defenders to be
15   referring to such material then?
16       A. Correct.
17       Q. What about immigration consequences in
18   particular since you've raised that? Do you have in
19   the MSPD system an immigration consequences expert?
20       A. Sure. So I know there are attorneys
21   who have practiced immigration law, so yes, we have
22   the ability to reach out to them. I don't know if
23   they would be deemed as an immigration law expert.
24   But also we reach out to several different
25   organizations in the city of St. Louis with regard

1    to immigration questions.
2        Q. Okay. So just focusing on kind of
3    statewide resources and practices, what is the
4    practice, policy or procedure for finding out about
5    immigration consequences or accessing an immigration
6    expert?
7        A. You're -- you're asking what MSPD's
8    policy is?
9        Q. Yeah, uh-huh.
10       A. I don't know what the policy is for
11   accessing. I can only speak to what -- what I --
12   what we do --
13       Q. Uh-huh.
14       A. -- in the city.
15       Q. Before we get to the city, these folks
16   you'd mentioned, you mentioned maybe there's some
17   people who happen to be public defenders who also
18   happen to in their past life do immigration work.
19       A. Sure.
20       Q. Do they have -- you know, are they
21   designated the go-to for immigration questions?
22       A. Not that I'm aware.
23       Q. Do you know when they last practiced
24   immigration law?
25       A. I believe within a year is the -- is

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 160-37    Filed 02/21/18    Page 29 of 83

1 the person that I'm thinking of.
2     **Q.  And where is that person?**
3     A.  She is in -- now in the St. Charles
4 office.
5     **Q.  And so like did an e-mail go out that**
6 **said, hey, we now have an immigration expert in**
7 **St. Charles, everyone should access this person if**
8 **they have immigration questions?**
9     A.  No.
10     **Q.  And you mentioned sort of differently**
11 **or separately in St. Louis city you guys have some**
12 **practices, yes?**
13     A.  Yes.
14     **Q.  And you mentioned some maybe local**
15 **immigration attorneys who currently practice**
16 **immigration law that you access?**
17     A.  Yes.
18     **Q.  What does that look like?  What do you**
19 **do?**
20     A.  So we call the -- the offices, so
21 it's -- there is the St. Louis Catholic legal
22 society, I think it's part of SLU, and then there's
23 also the MICA Project.  So we reach out to the
24 attorneys, ask them for advice on immigration
25 issues.

1     **Q.  Are you aware in the rural counties**
2 **what the practices are along those lines?**
3     A.  I do not know.
4     MS. QUINN:  You want to take a break or
5 should I keep going?
6     MS. SHIPMA:  How much more have you
7 got?
8     MS. QUINN:  I'm on 11 of 14.
9     MS. SHIPMA:  Keep going.
10     **Q.  (By Ms. Quinn)  All right.  Let's talk**
11 **about motions practice a little bit if that's okay.**
12     A.  Uh-huh.
13     **Q.  So just like in adult criminal cases,**
14 **juvenile defendants or respondents can file pretrial**
15 **motions, correct?**
16     A.  Yes.
17     **Q.  Can you share with us just a range of**
18 **the kinds of motions that -- that could get filed in**
19 **a juvenile prosecution case by the defense lawyer?**
20     A.  Sure.  Motions to suppress statements,
21 motions to suppress evidence, motions to dismiss,
22 motions to exclude witnesses, motions to exclude
23 hearsay.  Could be motions to dismiss based on
24 specific adolescent -- so there's not specific --
25 you know, adolescents could not have this type of

1 intent or could not form this type of intent.
2 Motions to dismiss based on the conflicted system.
3     **Q.  Okay.  And do you have a sense**
4 **statewide what the motion practice is like in**
5 **juvenile court cases?**
6     A.  No, I do not.
7     **Q.  In the conversations you're having with**
8 **fellow attorneys who are handling juvenile cases, is**
9 **it your sense that they're all filing motions that**
10 **are necessary in a case?**
11     A.  I think they want to file all motions
12 that are necessary in a case and that is where I
13 come in to help them talk that through.
14     **Q.  And so are you able to do the work for**
15 **them to -- to file those motions?**
16     A.  What do you mean by that?
17     **Q.  Well, it sounded like there's an**
18 **impediment to their ability to do it, and so I'm**
19 **just trying to understand what that means.**
20     A.  So -- so attorneys will reach out and
21 ask, so for example, if it's a sex case, what types
22 of motions you would file.  So I help with case law,
23 provide relevant case law and talk through potential
24 motions that could be filed.  I'm not writing the
25 motions for them.

1     **Q.  Okay.  And is there any let's say**
2 **resource, you know, a motion section or a group of**
3 **law students who busy public defenders could access**
4 **to write motions they would not otherwise have the**
5 **time to write?**
6     A.  I think it depends on your jurisdiction
7 if you have a law school that's available and that
8 there are interns that are working through the
9 public defender system.
10     **Q.  But it's not the case in every county?**
11     A.  I don't believe so, no.
12     **Q.  How about in St. Louis city cases, are**
13 **you -- are you filing all the motions that -- that**
14 **we just talked about?**
15     A.  I -- I am trying to, yes.
16     **Q.  And is there any impediment to your**
17 **ability to do so in every case?**
18     A.  I think time is an impediment.
19     **Q.  Let's focus specifically on a motion I**
20 **don't think you mentioned, and that is a detention**
21 **review motion.  Are you familiar with what that is?**
22     A.  I am.
23     **Q.  Can you explain what that means?**
24     A.  Sure.  So every 30 days when a child is
25 detained the judge or commissioner has to review

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com    Phone: 1.800.280.3376    Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-37   Filed 02/21/18   Page 30 of 83

1  whether or not there are changed circumstances and
2  whether the child should remain in detention.
3      Q.  Okay.  So that's by statute what the
4  court does automatically, correct?
5      A.  Correct.
6      Q.  In St. Louis city does everyone kind of
7  get around the table in 30 days to review that
8  situation?
9      A.  No.
10     Q.  Isn't it the case that in St. Louis
11 city as well as around the state the judges are
12 making those reviews behind closed doors and then
13 issuing an order about whether the child remains
14 detained or gets released?
15     A.  Yes.
16     Q.  And so in terms of motions, a defense
17 motion to review detention status, that is different
18 from that statutory process we just talked about?
19     A.  Correct.
20     Q.  So what is a detention review motion
21 that might get filed by a -- by a juvenile defender?
22     A.  So if the defender believes that there
23 are a change of circumstances pursuant to Supreme
24 Court Rule 127, then they could file that motion and
25 have the detention reviewed and ask for the release

1  of the child.
2      Q.  Is there anything else that might
3  enable a juvenile defender to seek a review of the
4  detention status other than change in circumstances?
5      A.  Not that's coming to my mind.
6      Q.  In terms of filing detention review
7  motions, is that a regular part of your practice?
8      A.  Not a regular part of my practice I
9  would say, no.
10     Q.  How many detention review motions do
11 you file in a month?
12     A.  Well, there are not very many children
13 detained right now, so I would say right now I
14 haven't filed any in the past couple of months due
15 to the low numbers in detention.
16     Q.  Through the course of your career since
17 2009 how many detention review motions do you think
18 you've filed?
19     A.  I have no idea.
20     Q.  More than ten?
21     A.  Probably.
22     Q.  More than 20?
23     A.  Probably.
24     Q.  More than a hundred?
25     A.  No, probably not.

1      Q.  Fewer than 50?
2      A.  I would say probably between 50 and a
3  hundred.
4      Q.  Okay.  What about your colleagues
5  across the state, do you know if they are filing
6  detention review motions?
7      A.  I don't know the answer to that.
8      Q.  Do you know if they've been trained to
9  file detention review motions?
10     A.  I don't know the answer to that.
11     Q.  What about a motions bank or resource
12 that folks can go to beyond calling you for motions,
13 what's that look like?
14     A.  I know that we have a motions bank in
15 our system, and so if there are juvenile-specific
16 motions they could access them there.
17     Q.  How robust is that juvenile motions
18 part of your motions bank would you say?
19     A.  I don't know.
20     Q.  Have you not been to it?
21     A.  Not recently, no.
22     Q.  Okay.  You've talked about your new
23 role as head of statewide juvenile defense and I
24 want to call it not coordinator, but --
25     A.  The director of juvenile defense and

1  policy.
2      Q.  And as part of that job or new role, do
3  you observe -- as part of your role to go and
4  observe people in court?
5      A.  So I think that will be eventually.
6  I'm handling my own cases, so I have been working on
7  all my own cases.  So I have not observed anyone in
8  court statewide.
9      Q.  And to date there's been no practice of
10 anyone with specific juvenile expertise going into
11 the courts to make sure attorneys are doing what
12 they ought to do with regard to juvenile cases?
13     A.  I can't speak to that, no.
14     Q.  And you mentioned that folks might call
15 you up and ask questions as they're working on a
16 motion.  Do you review draft motions?
17     A.  I have for attorneys that I've worked
18 with in my office, but I've not for other attorneys.
19     Q.  Before you had this position, did
20 anyone hold this position?
21     A.  No.
22     Q.  What was Karen Craft's role as a -- a
23 kind of juvenile go-to person in the State of
24 Missouri?
25     A.  Sure.  So Karen had several roles,

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com     Phone: 1.800.280.3376     Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-37   Filed 02/21/18   Page 31 of 83

1  including dealing with capital offenses.  I believe
2  she was kind of a go-to for that as well, but she --
3  she went to the legislature, she answered juvenile
4  questions, and she served as someone who was well
5  versed in juvenile law.  So I would say yes, she --
6  she was somebody who like me knew juvenile law.
7       Q.  Did Karen ever handle a juvenile case
8  in her practice?
9       A.  I think she did.  I don't think in
10  later years she did, but yes, I believe she handled
11  juvenile cases.
12       Q.  So even though she wasn't practicing in
13  juvenile court, she was the go-to for people to seek
14  advice about juvenile matters for the last several
15  years?
16       A.  She and Mary Fox and myself also.
17       Q.  But statewide Mary Fox is not
18  designated?
19       A.  No.
20       Q.  Were you aware of Karen Craft reviewing
21  motions that were filed by anyone handling juvenile
22  cases?
23       A.  I don't know the answer to that.
24       Q.  Are you aware of Karen Craft doing any
25  trainings for juvenile practice around the state?

1       A.  So she was involved in the trainings
2  that I referred to that have happened in the past
3  couple of years.  She has since retired, so I
4  don't -- I don't remember what year she retired, but
5  she has not -- was not present for this year's
6  training.
7       Q.  And is it safe to say if you know that
8  Karen Craft was put in that position perhaps in
9  reaction to some of the findings of the -- of NJDC
10  and the Department of Justice?
11       A.  I don't know the answer to that.
12       Q.  Was there anyone in Karen Craft's role
13  before Karen Craft?
14       A.  I don't know.
15       Q.  Since you've been with the public
16  defender system, have there ever been specialized
17  juvenile defender offices?
18       A.  So I was an intern in 2007 and 2008 and
19  I know that the juvenile youth advocacy units were
20  present then, but I -- I -- since I've been
21  practicing as an attorney, no.
22       Q.  Can you tell us more about what that
23  looked like then in comparison to now?
24       A.  I -- actually, I don't know what it
25  looked like.  I just know that they were present in

1  the public defender system.  I did not interact with
2  any of the attorneys or go watch any hearings while
3  there were youth advocacy units.
4       Q.  I'm sorry.  So I misunderstood.  I
5  thought you were intern with the specialized units.
6       A.  Nope.  I interned with --
7       (Court reporter interruption.)
8       Q.  (By Ms. Quinn)  The specialized units.
9  So is it safe to say the specialized juvenile
10  defense units have been dismantled?
11       A.  Yes.
12       Q.  And that all of the cases that
13  previously were handled by specially trained
14  juvenile defenders have been dumped into the regular
15  system?
16       A.  Yes.
17       Q.  I want to turn to the question of
18  caseloads and turning away cases.
19       A.  Okay.
20       Q.  Are you aware of any policies or
21  procedures that allow for Missouri public defenders
22  who are handling any kind of matter to turn away a
23  case if their -- if their caseload has become
24  excessive?
25       A.  You said policies and procedures?

1       Q.  Yeah, what is the practice?
2       A.  There is not a practice.  I mean, there
3  is a statute that the legislature created, but at
4  this time I do not believe that there is a
5  practice --
6       Q.  Are you --
7       A.  -- statewide.
8       Q.  I apologize.  I was stepping on your
9  words there.
10       Are you aware of any recent
11  correspondences or communications from Michael
12  Barrett around turning away cases or indicating that
13  your caseload has become too high to accept new
14  matters?
15       A.  Yes.
16       Q.  Can you tell us about what's going on
17  and what your understanding is of the current
18  situation?
19       A.  Sure.  So an attorney, Mr. Hinkebein
20  was disciplined by the office of chief disciplinary
21  counsel for failing to do his -- his due diligence
22  in representing clients, and so some circuits,
23  including Columbia have -- or not circuits, some
24  district defenders have turned away -- determined
25  and their attorneys have determined that they're

## Page 125

1 going to turn away cases due to their ethical
2 obligations.
3        Q.   And are you familiar as you sit here
4 with, you know, which districts or which offices are
5 turning away cases now or seeking to turn away
6 cases?
7        A.   The only one I know of specifically is
8 Columbia.
9        Q.   What about juvenile matters, are you
10 hearing anything about attorneys turning away
11 juvenile appointments or juvenile respondents who
12 are seeking assistance?
13        A.   I -- I am not aware.
14        Q.   Is there any special follow policy or
15 special practice for those kinds of cases to -- to
16 turn them away or seek to close the spigot if you
17 will on those?
18        A.   Not that I know of.
19        Q.   Have you ever turned away a case
20 because your caseload was too high, a case for a
21 juvenile?
22        A.   No, I have not.
23        Q.   Have you handled cases of juveniles
24 while you feel like your caseload was too high for
25 you really to -- to manage effectively?

## Page 126

1        A.   Yes.
2        Q.   Are you familiar with this new pro bono
3 practice group in the city of St. Louis with private
4 lawyers and private firms handling cases?
5        A.   I am.
6        Q.   What do you know about that?
7        A.   It's called the Missouri Coalition for
8 the Right to Counsel, and it is private firms who
9 have offered to take cases on pro bono.
10        Q.   Are you aware of whether they are
11 handling any juvenile court cases?
12        A.   They are not.
13        Q.   So they're doing nothing to alleviate
14 the pressures on those who are handling juvenile
15 cases or to -- I'll just say to handle juvenile
16 cases?
17        A.   They are not handling cases in the city
18 of St. Louis, no.
19        Q.   Okay.  We talked earlier about both the
20 Spangenberg report and the NJDC report indicating
21 that there are high percentages of youth in the
22 State of Missouri who are in need of juvenile
23 defense representation, but are not being provided
24 with counsel; is that fair to say?
25        A.   Yes.

## Page 127

1        Q.   Okay.  I'd like to take a look at
2 another document.  I think this is the last one.
3 Exhibit 29.
4            (WHEREIN, Exhibit 29, Exhibit 1 of
5 complaint, was marked for identification.)
6        Q.   (By Ms. Quinn)  Okay.  And I've marked
7 it as Exhibit 29 for purposes of our deposition, but
8 as you see, it has a cover indicating Exhibit 1
9 because it is Exhibit 1 in our complaint.  Looking
10 at this document, do you recognize it?
11        A.   I -- I don't recognize -- I mean, I
12 know what it is, but I've -- I've not looked through
13 it.
14        Q.   And so in terms of knowing what it is,
15 can you tell us what your understanding is of this
16 document?
17        A.   It is the two -- 2016 fiscal year
18 annual report.
19        Q.   And it's fair to say that the public
20 defender system each year produces a report kind of
21 providing an outline of the services it's provided?
22        A.   Yes.
23        Q.   And taking a look together at page 23
24 of this report, there is a chart.  Are you familiar
25 with this chart?

## Page 128

1        A.   I'm not.
2        Q.   You see here that there's case type
3 50-N, 50-S, 50-V.  Do you know what those numbers
4 and letters mean?
5        A.   So those are the case types for
6 juvenile nonviolent, juvenile status and juvenile
7 violent offenses.
8        Q.   And so is that your own system, kind of
9 you designate things with these numbers and letters
10 internally to make clear what kind of case or matter
11 it is?
12        A.   Yes.
13        Q.   And looking together at these -- these
14 numbers, it appears that in 2016 approximately 1,600
15 juvenile cases were opened by the public defender
16 system.  Is that your understanding of how we should
17 read this report?
18        A.   Without doing the math, I can tell you
19 that there were 912 nonviolent, 81 status, and 625
20 violent.
21        Q.   Okay.  And so that would be like the
22 world of juvenile cases that the MSPD system handled
23 in this year?
24        A.   Yes.
25        Q.   Are you aware of how many actual

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334

1  juvenile cases, juvenile court delinquency cases
2  there were in the State of Missouri in 2016?
3      A.  I'm not aware.
4      Q.  Do you have any sense of like what
5  percentage this is of the world of juvenile cases?
6      A.  I'm not.
7      Q.  And so this -- I'll -- I'll take a
8  guess, around about 1,600 cases handled by the
9  Missouri public defender system for juveniles, are
10  you aware of how frequently in those 1,600 matters
11  defenders might handle pre-petition Miranda
12  engagements?
13      A.  I don't know.
14      Q.  In your own practice, how frequently
15  have you handled a child being Mirandized
16  pre-petition?
17      A.  Only a handful of times.
18      Q.  So fewer than five times since 2009
19  you've been able to assist a child to --
20      A.  Probably.  Sorry.
21      Q.  My fault.  I got these long questions.
22  Fewer than five times since 2009 you worked with a
23  kid who's being Mirandized?
24      A.  Probably.
25      Q.  What about lineups?  How many lineups

1  have you personally covered for juveniles who are --
2  have been taken into custody by police?
3      A.  The practice in the city of St. Louis
4  is they call me whenever there is going to be a
5  lineup.  So probably around 25 I would say lineups
6  I've gone to.  Certainly less than 50.
7      Q.  And this is since 2009?
8      A.  Yes.
9      Q.  And what is your understanding of that
10  practice statewide for juveniles?
11      A.  I don't know the answer to that.
12      Q.  And is it your sense based on
13  everything you know that it is probably far less
14  across the state in terms of juvenile defenders
15  showing up to be with you during lineups?
16      A.  Yes.
17          MR. MOORE:  Also object to the
18  foundation, but the answer is in the record, so go
19  ahead.
20      Q.  (By Ms. Quinn)  You talked earlier
21  about diversion being a process where a youth might
22  be essentially interrogated by government agents,
23  the court staff about an allegation; is that fair to
24  say?
25      A.  Well, I mean diversion is something

1  different than a child being interrogated about the
2  action.  So diversion would be the process in which
3  a petition is not filed, and then services are
4  provided for the kid.  If they are trying to do an
5  informal adjustment conference that's when they
6  could potentially question the kid about what
7  happened.
8      Q.  Okay.  And I think you had raised
9  earlier on this dilemma or problem of -- of children
10  going to diversion conferences or informal
11  adjustment conferences without counsel and then
12  being asked about the facts of the case.
13      A.  Yes.
14      Q.  And that was a -- a problematic
15  practice flagged by the Department of Justice, yes?
16      A.  Yes.
17      Q.  And now that practice has changed it
18  seems to be in St. Louis County with the special
19  attorney present to assist there?
20      A.  As well as in the DJO guidelines.
21      Q.  Okay.
22      A.  And standards, yes.
23      Q.  Has -- do you think across the state
24  that the -- the juvenile -- the defenders handling
25  juvenile cases, are they showing up in every county

1  to assist children in -- in diversionary meetings?
2      A.  Not that I'm aware of.
3      Q.  What about violation of probation
4  proceedings?  In the 1,600 matters that we just
5  talked about for 2016, do you have any sense of what
6  number might have involved violation of probation
7  hearings?
8      A.  I -- I don't know the exact number, but
9  based on looking at the table, I would assume that
10  those would be the juvenile status because they
11  would be -- you know, I don't -- yeah, I -- sorry.
12      Q.  Yeah.  I may be asking you something
13  that you -- you -- don't have the data for --
14      A.  Yeah.
15      Q.  -- but just speaking generally, in a
16  juvenile case just as in an adult case, a young
17  person can face a motion seeking to violate their
18  probation?
19      A.  Yes.
20      Q.  Separately, differently, there's
21  something called a probation review hearing, yes?
22      A.  Correct.
23      Q.  As a matter of course, young people
24  come back to court to see a judge relating to their
25  compliance with probation?

Page 133

```
1        A.   That is correct.
2        Q.   When there are violation of probation
3   hearings, how often are you personally able to
4   handle those cases in St. Louis city?
5        A.   I handle all of the motions to modify.
6        Q.   And what about status, probation status
7   hearings in St. Louis city?
8        A.   Do you mean review hearings?
9        Q.   Review hearings, right.
10       A.   I do not go to the review hearings.
11       Q.   So children are appearing in St. Louis
12  city before a judge to talk about how they're doing
13  on probation sometimes without an attorney with
14  them?
15       A.   Yes.
16       Q.   What about across the state?  Do you
17  have an understanding of the practice for juveniles
18  in other districts with such matters?
19       A.   Sure.  I know that in St. Louis County
20  attorneys are attending the review hearings, but I
21  don't know anywhere else.
22       Q.   What about drug court?  Are you
23  familiar with something called drug court?
24       A.   I am.
25       Q.   What is that?
```

Page 134

```
1        A.   So there are -- is an adult drug court
2   and there's also a juvenile drug court.  A -- in
3   juvenile drug court a child would have to admit to
4   the allegations before going to drug court.  If they
5   successfully complete the term then their petition
6   and the allegations are dismissed and the -- and the
7   child is free to go.
8        Q.   And that process moving from that
9   admission of guilt to the dismissal is a fairly
10  lengthy process; is that fair to say?
11       A.   It can be, yes.
12       Q.   How long can it take?
13       A.   It can some -- sometimes take over a
14  year.
15       Q.   All right.  And during that year these
16  children are appearing in the juvenile drug court
17  before the judge to talk about their compliance,
18  yes?
19       A.   They are.
20       Q.   And they might be asked about drug use?
21       A.   Yes.
22       Q.   They might be asked incriminating
23  questions?
24       A.   Yes.
25       Q.   How frequently are you appearing in the
```

Page 135

```
1   St. Louis city drug court?
2        A.   Not -- not as frequently as I would
3   like to.  So I appear -- I used to appear every
4   Friday, that's when the drug court docket is, but I
5   haven't been able to go recently.
6        Q.   And what about across the state, do you
7   have any sense of whether defenders are covering
8   drug court appearances for youth?
9        A.   I don't know if there are other drug
10  courts for juveniles across the state.
11       Q.   Okay.  And what about other
12  postdispositional advocacy on behalf of youth?  For
13  instance, youth who are in the division of youth
14  services or who want to aside from direct appeals
15  challenge the practice of their attorney, challenge
16  the -- something relating to the -- the
17  representation they received.  What does that look
18  like across the state?
19       A.   I don't know.
20       Q.   Have you provided any representation to
21  any children who have been placed in DYS?
22       A.   No, I have not.
23       Q.   And -- and what about appeals from
24  juvenile cases?  Is it safe to say that juveniles
25  like adults have the right to appeal a juvenile
```

Page 136

```
1   court finding?
2        A.   Yes.
3        Q.   What is the practice or policy across
4   the state for informing youth of their right to
5   appeal and what steps to take?
6        A.   Sure.  So I don't know what other
7   individuals do.  I can speak to what our practice is
8   is --
9        Q.   Okay.  So before we get to your
10  practice --
11       A.   Sure.
12       Q.   -- there's no manual, policy, procedure
13  to ensure best practices around appeals being taken
14  for young people statewide?
15       A.   No.
16       Q.   Okay.  And then your practice?
17       A.   Is to after a child is adjudicated
18  speak with them about what their right is to appeal
19  and talk with them about what that would entail, and
20  then if they want to appeal, filing the notice of
21  appeal and sending it to our juvenile appellate
22  person.
23       Q.   Okay.  And you mentioned you do this
24  after there is an adjudication for a young person,
25  yes?
```

34 (Pages 133 to 136)

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com     Phone: 1.800.280.3376     Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-37   Filed 02/21/18   Page 35 of 83

1      A.  And -- yes.  And disposition.
2      Q.  Okay.  So after a case is resolved with
3  adjudication and disposition or in grown-up speak
4  finding of guilt and sentence, yes?
5      A.  Yes.
6      Q.  You do that in cases where there has
7  been a trial; is that right?
8      A.  That's correct.
9      Q.  What about in all of your plea cases?
10      A.  No.
11      Q.  Do you not in the -- as a matter of
12  course speak to children who have pleaded guilty and
13  had their cases disposed of or had disposition tell
14  them about their right to appeal?
15      A.  No.
16      Q.  Why not?
17      A.  That's a good question.  I don't know.
18      Q.  What is a child's right to appeal
19  following a guilty plea?
20      A.  So I can tell you what -- what an
21  adult -- adult has PCR rights.  I don't know that
22  there is case law in Missouri about whether a child
23  has postconviction rights.
24      Q.  But I mean a direct appeal following
25  the plea of guilty and then an imposition of what

1  grown-ups would call a sentence.
2      A.  Correct.
3      Q.  Is there no direct appeal right from
4  that?
5      A.  I believe there is, but I have -- I
6  have not talked to a child about that.
7      Q.  Do children waive their right to appeal
8  when they take a plea?
9      A.  No.
10      Q.  How many appeals were filed for
11  juveniles across the State of Missouri last year if
12  you know?
13      A.  I don't.
14      Q.  How many appeals were filed by the city
15  of St. Louis office or request to appeal?
16      A.  In 2016?  Probably less than five.
17      Q.  Okay.  Shifting gears a little bit, so
18  I -- do you live in the city or county?
19      A.  I live in St. Louis County.
20      Q.  Okay.  But you're aware of much of
21  what's unfolding in the city of St. Louis around the
22  protests relating to the Stockley verdict, yes?
23      A.  Yes.
24      Q.  Some is happening in the county of
25  St. Louis, but some is happening in the city, yes?

1      A.  Yes.
2      Q.  Are you aware of how many arrests have
3  taken place in the city of St. Louis since you work
4  there relating to protesters?
5      A.  Hundreds.
6      Q.  And are you familiar of any -- familiar
7  with any offer by our attorney general Josh Hawley
8  to the city prosecutor Kim Gardner with regard to
9  those cases?
10      A.  I -- I'm not aware.
11      Q.  Would it surprise you to hear that Josh
12  Hawley has offered Kim Gardner assistance to help
13  prosecute those protest cases in the city of
14  St. Louis?
15      MR. MOORE:  I'll object to -- you can
16  go ahead.
17      MS. SHIPMA:  I was going to object to
18  this.  I mean, she was designated to talk about
19  juvenile matters.
20      MS. QUINN:  Yes, uh-huh.
21      MS. SHIPMA:  And -- and this seems --
22      MS. QUINN:  It's a foundation to --
23  I'll get -- I'll go directly to it then.
24      MS. SHIPMA:  Okay.
25      MS. QUINN:  That's fine.

1      Q.  (By Ms. Quinn)  Has -- has your office,
2  the city of St. Louis's public defender office
3  received any offer of assistance from Josh Hawley's
4  office to defend matters?
5      A.  Not that I'm aware of.
6      Q.  No post-Stockley verdict letters have
7  come to you to assist -- to offer assistance to you
8  or your colleagues in defending any cases in the
9  city of St. Louis?
10      A.  No letters have come to me personally.
11      Q.  Is there anything else you think I
12  should ask you about that I've not asked you about
13  relating to juvenile practices, procedures, and
14  policies for the Missouri public defender system?
15      A.  There is nothing that I can think of.
16  There is one correction, though, that I would like
17  to make, which is I think that I probably made
18  less than 20 of the motions to release the youth.
19  You were talking about the --
20      Q.  Detention review motions?
21      A.  Yes.  Yeah.
22      Q.  Fair enough.  Fair enough.  So before
23  we wrap up, you did indicate earlier that -- that
24  your caseload and -- and some of your
25  responsibilities, the just amount of cases and

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com      Phone: 1.800.280.3376      Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-37   Filed 02/21/18   Page 36 of 83

Page 141

1  responsibilities that you have has prevented you
2  from doing everything you think is necessary in at
3  least some juvenile cases?
4      A.  Yes.
5      Q.  Can you tell us more about that?
6      A.  So I can tell you that I've been
7  practicing juvenile for three years, specifically
8  juvenile.  When I first started I handled both
9  Jefferson County conflicts, adult conflicts as well
10  as juvenile cases.  That was too much.  That was a
11  lot of moving parts of traveling and so I believe
12  that there were youth that I could have impacted
13  more effectively during that time.
14          Also, I believe that while my caseload
15  is significantly lower and I have been able to do a
16  lot of work with regard to youth, I think that time
17  is a big issue.  So doing all of the detention
18  hearings and ensuring that each client receives the
19  effective representation, I think that sometimes the
20  caseloads are too high to be doing every single
21  thing that I would like to do.
22          MS. QUINN:  Okay.  I have nothing
23  further.
24          MR. MOORE:  Yeah, so I mean, do you
25  want to keep going?

Page 142

1          VIDEOGRAPHER:  Do you want to go off
2  the record?
3          MR. MOORE:  Sure.
4          VIDEOGRAPHER:  We're going off the
5  record at approximately 11:43 a.m.
6          (WHEREIN, a recess was taken.)
7          VIDEOGRAPHER:  We're back on the record
8  at approximately 11:51 a.m.
9                  EXAMINATION
10  QUESTIONS BY MR. MOORE:
11      Q.  Good afternoon.  Could you please state
12  your full name for the record with the middle name
13  spelled out as well?
14      A.  Sure.  My name is Sarah with an H,
15  middle name Kennedy, K-E-N-N-E-D-Y, and my last name
16  is Johnson, J-O-H-N-S-O-N.
17      Q.  Okay.  Sarah, my name is Justin Moore.
18  I'm here for the State of Missouri and also now for
19  Governor Greitens.
20          (Court reporter interruption.)
21      Q.  (By Mr. Moore)  So my name is Justin
22  Moore.  I'm here on behalf of the State of Missouri
23  and also for Governor Greitens.  And my entry was
24  filed at the beginning of this deposition.  So I'm
25  just going to be going back to the beginning kind of

Page 143

1  filling in some of the blanks and asking you some
2  follow-up questions if that's all right.
3      A.  Sure.
4      Q.  So we had discussed briefly your
5  educational background and I believe you said you
6  went to Saint Louis University for undergraduate.
7  Is that right?
8      A.  Yes.
9      Q.  And then also SLU Law?
10      A.  Yes.
11      Q.  And any additional schooling after
12  that?
13      A.  No.
14      Q.  Okay.  Now, when you went to Saint
15  Louis University for your undergraduate degree, what
16  was that degree in?
17      A.  I got a bachelor's in political science
18  and a mine -- and a minor in Spanish and I was a
19  prelaw scholar.
20      Q.  Okay.  And did you have any particular
21  specialization or focus when you went to the Saint
22  Louis University School of Law?
23      A.  Yes.  I --
24      Q.  And what was that?
25      A.  Focused on criminal law.

Page 144

1      Q.  Okay.  So is it safe to say that you
2  don't really have any particular specialization in
3  like statistical analysis?
4      A.  No, I do not.
5      Q.  Okay.  No particular specialized
6  background in sociological studies or psychological
7  studies of any kind?
8      A.  No.
9      Q.  Okay.  And you don't have like a major
10  in math or any kind of mathematical background other
11  than general coursework in your undergraduate,
12  right?
13      A.  I do not.
14      Q.  Okay.  So then going back to some of
15  these reports we were looking at earlier, I guess
16  we'll start at the very beginning.  So we can look
17  at Plaintiff's Exhibit 21, the Spangenberg report I
18  think is how it's been pronounced.
19      A.  Okay.
20      Q.  And I'm sorry, heard you say that you
21  had reviewed this report prior to the deposition
22  today?
23      A.  No, I did not.
24      Q.  So this is the first time you're seeing
25  this report; is that correct?

36 (Pages 141 to 144)

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com     Phone: 1.800.280.3376     Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-37   Filed 02/21/18   Page 37 of 83

Page 145

1      A.  Yes.
2      Q.  And so you wouldn't be able to assess
3  with any degree of certainty whether the methodology
4  or statistics that underpin this report were in any
5  way accurate; is that right?
6      A.  I cannot speak to that, no.
7      Q.  Okay.  And you had nothing to do with
8  the production or creation of the data that they use
9  in this report; is that right?
10      A.  No.
11      Q.  And you haven't taken any steps to
12  verify that the findings of this report or that the
13  numbers in this report are accurate, right?
14      A.  I have not.
15      Q.  So any commentary that you would make
16  about the report or whether it's accurate or
17  inaccurate it would just be kind of your personal
18  opinion based on your review here today at the
19  deposition; is that right?
20      A.  Opinions with regard to --
21      Q.  Whether the finding of the report are
22  accurate or inaccurate or whether they I guess jibe
23  with your own experience; it would strictly be based
24  on your review of this report here today and your
25  time as a public defender?

Page 146

1      A.  Yes.
2      Q.  Okay.  And do you know the people who
3  wrote this report?
4      A.  I do not.
5      Q.  Have you ever spoken with any of those
6  people?
7      A.  I have not.
8      Q.  Okay.  I guess I would just have the
9  same questions as to the other reports that were
10  reviewed today.  So we have Plaintiff's Exhibit
11  Number 22.
12      A.  Yes.
13      Q.  And same general questions as to this
14  report.  To the extent there's any kind of analysis
15  of data or, you know, collection of data,
16  methodology, you wouldn't have any experience with
17  those methods, would you?
18      A.  With the methods that were used in this
19  report?
20      Q.  Right.
21      A.  So the -- from my understanding the
22  methods that were used in this report were the
23  numbers from the Office of State Courts
24  Administrator.  So I don't know what -- how they
25  collected that data, no.  And with regard to the --

Page 147

1  what if any data was collected with regard to the
2  public defender system, no, I did not have anything
3  to do with that either.
4      Q.  Okay.  And so you wouldn't know whether
5  the data was accurate or inaccurate -- or
6  inaccurate, correct?
7      A.  That's correct.
8      Q.  You haven't independently reviewed the
9  data in any way?
10      A.  I have not.
11      Q.  Okay.  And was this one that you say
12  you had reviewed prior to the deposition today or
13  had you not?
14      A.  No, I -- I had reviewed that prior to
15  the deposition.
16      Q.  Okay.
17      MS. SHIPMA:  That was affirmative, you
18  had reviewed it?
19      THE WITNESS:  I have, yes.
20      Q.  (By Mr. Moore)  So the same questions
21  as to Exhibit 23, so we're looking at the Department
22  of Justice Civil Rights Division report of
23  July 31st, 2015.
24      A.  Okay.
25      Q.  Again, for this one as to the

Page 148

1  methodology or research that it took to create this
2  report, you are not personally aware of like the
3  methodology that they utilized; is that right?
4      A.  I am not personally -- personally
5  aware, no.
6      Q.  And you didn't have anything to do with
7  the collection of that data personally?
8      A.  I did not.
9      Q.  Do you know who wrote this report?
10      A.  I don't know who wrote this report.
11      Q.  Okay.  And had you reviewed this report
12  prior to the deposition today?
13      A.  Yes, I have.
14      Q.  Okay.
15      (WHEREIN, a discussion was held off the
16  record.)
17      Q.  (By Mr. Moore)  I'm sorry, I may have
18  asked this already, but as far as the data utilized
19  in this report you wouldn't have any knowledge or
20  understanding of like how they generated that data
21  or collected that data; is that right?
22      A.  I mean, I know the -- how they
23  collect -- I mean, I know that they collected data
24  from St. Louis County and through interviews through
25  looking at case files and things like that, but I

37 (Pages 145 to 148)

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com      Phone: 1.800.280.3376      Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 160-37    Filed 02/21/18    Page 38 of 83

Page 149

```
 1   don't know how they then processed those into
 2   numbers.
 3              (Court reporter interruption.)
 4        A.   Processed that into the numbers and the
 5   statistics that they used, correct.  I was not
 6   present for that.
 7        Q.  (By Mr. Moore)  Okay.  And so as far as
 8   you know, these numbers could be accurate,
 9   inaccurate, you just don't know, right?
10        A.   I don't know -- I have not reviewed
11   the -- the statistical analysis of this, no.
12        Q.   Okay.  Okay.  So now looking at
13   Exhibit 26, that's the RubinBrown report.
14        A.   Yes.
15        Q.   And forgive me again I can't recall,
16   had you seen this report prior to the deposition
17   today?
18        A.   No.
19        Q.   So you hadn't reviewed it in any
20   capacity, this is just the first time you've been
21   presented with this report?
22        A.   I -- I've seen portions of this report,
23   but no, I have not read it page to -- from front to
24   back.
25        Q.   Okay.  But again, you know, to the
```

Page 150

```
 1   extent there's any data involved in the generation
 2   of this report, you wouldn't be able to give any
 3   kind of opinion as to whether the methodology was,
 4   you know, the right methodology to use or whether
 5   the numbers are accurate; is that right?
 6        A.   Yes, that is correct.
 7        Q.   Okay.  And you don't know the people
 8   who generated this report, do you?
 9        A.   The -- the individuals?
10        Q.   Right.
11        A.   No, I do not.
12        Q.   You never talked to those individuals
13   before?
14        A.   No, I did not.
15        Q.   Okay.  Now, the -- a number of
16   questions have been asked about procedures in the
17   St. Louis city office which is where I -- I mean, I
18   think you operate out of, right?
19        A.   Yes.
20        Q.   But also as to other counties in the
21   State of Missouri, right?
22        A.   So the questions that were asked, yes,
23   they were asked about this -- other counties as
24   well, yes.
25        Q.   Right.  But you have not practiced in
```

Page 151

```
 1   every county in Missouri, right?
 2        A.   I have not practiced in every county,
 3   no.
 4        Q.   And in fact, earlier I think you said
 5   that it was five counties that you have practiced
 6   in, correct?
 7        A.   I don't know the exact number, but yes,
 8   I listed off those counties.  Yes.
 9        Q.   Okay.  Do you think there were counties
10   that you practiced in that were not listed off
11   earlier?
12        A.   No.  I just don't know the exact
13   number.  I -- I know the counties that I've listed
14   off, but I don't know --
15        Q.   Okay.  No, that's totally fine.
16        A.   Yeah.
17        Q.   But those counties appear to be located
18   generally around the St. Louis area, right?
19        A.   That is correct, yes.
20        Q.   So it's like Jefferson County and
21   St. Louis County, things of that nature, correct?
22        A.   That's correct.
23        Q.   So you wouldn't really have any idea
24   about what's going on, for example, on the -- on the
25   other side of the state, those counties and those
```

Page 152

```
 1   offices; is that right?
 2        A.   So I've corresponded with individuals
 3   across the state, but I don't know the daily ins and
 4   outs, no, of what happens in each circuit.
 5        Q.   Okay.  And when you say you
 6   corresponded, what do you mean exactly?
 7        A.   So if a attorney has a question about a
 8   juvenile matter, then they are directed to me.
 9        Q.   Okay.  So has any attorney from, you
10   know, some of those other counties have they ever
11   sent you a list here -- here are policies that we
12   have in our office and let's compare policies to the
13   St. Louis city office?  Have you ever --
14        A.   No.
15        Q.   And I'm sorry, the answer?
16        A.   No.
17        Q.   Okay.  So as far as you know, they were
18   asking about the daily policies and procedures and
19   whether the offices across the State of Missouri do
20   X or Y thing, you would not really have any
21   knowledge as to what they are doing; is that right?
22        A.   I do not have any knowledge.
23        Q.   Okay.  And that doesn't say anything
24   about whether, you know, their policies are better
25   or worse than St. Louis city, could go either way,
```

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com    Phone: 1.800.280.3376    Fax: 314.644.1334

Page 153

1   you just simply don't know, correct?
2       A.   That is correct.
3       Q.   Okay.  Now, you were asked earlier
4   about having to enter some time for the work that
5   you were doing, right?
6       A.   Yes.
7       Q.   Tell me a little bit more about when
8   that took place.
9       A.   I don't know the exact year, but we
10  were asked to start time logging.
11      Q.   Okay.
12      A.   And we were asked to keep our time in
13  five-minute increments.
14      Q.   Okay.  And do you know whether it's
15  typical in the legal profession to bill your time?
16      A.   I know in the civil world that usually
17  civil defendant attorneys do have to keep their
18  time.
19      Q.   Okay.  But you say in the criminal
20  world people don't usually bill their time in that
21  manner?
22      A.   No, I -- I don't -- I don't know what
23  private attorneys do.  I can't speak to what they
24  do.
25      Q.   Okay.  You've only ever worked as an

Page 154

1   attorney at a public defender's office; is that
2   right?
3       A.   That's correct.
4       Q.   So you've never worked in private
5   practice in any other capacity on any other area
6   of law, just the public defender's office?
7       A.   Yes, sir.
8       Q.   Okay.  There's been some discussion
9   about the average time spent on cases.  Do you
10  remember -- do you recall that discussion?
11      A.   Yes.
12      Q.   Would you say that those numbers are
13  not representative of every single case that you
14  have before you?
15           MS. SHIPMA:  I'm going to object.
16  Which cases are you speaking about?  Which averages?
17      Q.   (By Mr. Moore)  So I believe that there
18  was a number thrown around the public defender has
19  like four hours per a particular type of case.
20           MS. SHIPMA:  That was 4.6 per juvenile
21  case.
22      Q.   (By Mr. Moore)  Okay.  So that's good.
23  We can go with that.  So 4.6 per juvenile case.
24  Does that figure sound familiar?
25      A.   Yes.

Page 155

1       Q.   But that's not the amount of hours that
2   you spend on each juvenile case, right?
3       A.   I can't speak to each case, but each
4   case is going to be different.  So --
5       Q.   Well, exactly, right?  So I mean, each
6   case has different needs and so some cases are going
7   to get more hours and some are going to get less
8   hours; is that fair?
9       A.   I would hope that a juvenile case would
10  not get less than 4.6 hours, but I -- I would
11  definitely say yes, most of my cases get more than
12  4.6 hours.
13      Q.   Right.  I'm just generally speaking,
14  though, so each case has different needs?
15           (Court reporter interruption.)
16      Q.   (By Mr. Moore)  Okay.  Generally
17  speaking, each case has different needs, right?
18      A.   Yes.
19      Q.   So some cases are going to require way
20  more than the 4.6 hours and you give those cases
21  more than 4.6 hours, right?
22      A.   Yes.
23      Q.   And there are cases that sometimes
24  require at 4.6 hours or maybe even less than
25  4.6 hours, right?

Page 156

1       A.   They could potentially.
2       Q.   Right.  So when you're looking at
3   an average of the number of hours you spend on
4   cases, that's not representative necessarily of how
5   much you spend on every particular juvenile case,
6   right?
7       A.   You're asking if 4.6 is representative?
8           MS. SHIPMA:  Of what she spends?
9       Q.   (By Mr. Moore)  Yeah.  So for yourself
10  personally, the 4.6 figure, basically an average is
11  just an average, correct, it doesn't say how much
12  you're spending on every single one of your cases?
13      A.   That number of 4.6 is not indicative of
14  the number of hours I spend on my cases, no.
15      Q.   Okay.  And you think you spend more
16  than 4.6 on your cases probably?
17      A.   I would say yes.
18      Q.   Okay.  So there's also been some
19  discussion of the training that public defenders go
20  through as it pertains to general public defender
21  service and then also as to the juvenile-specific
22  section.  Do you recall that testimony?
23      A.   Yes.
24      Q.   I think you talked about there's like a
25  conference that the public defenders go to each

39 (Pages 153 to 156)

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com    Phone: 1.800.280.3376    Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 160-37    Filed 02/21/18    Page 40 of 83

1  year?
2      A.  With regard to adult or juvenile
3  representation?
4      Q.  I just remember you said there was some
5  like statewide public defender conference that they
6  go to; is that accurate or --
7      A.  So there are -- there are conferences,
8  but I don't know whether you're referring to
9  juvenile or adults representation.
10     Q.  I guess let me just kind of go through
11 again, like is there an annual training of some
12 kind?
13     A.  Sure.  So there is an annual spring
14 training for all public defender attorneys and then
15 we also put on a juvenile-specific training once a
16 year.
17     Q.  Okay.  And tell me a little bit about
18 the annual spring training.  How long does that last
19 and what goes on at those trainings?
20     A.  It's a little bit less than a week.
21 It's usually from a Tuesday to a Friday.  And there
22 is training on and CLE credit on any number of -- of
23 issues.
24     Q.  Okay.  And how about the
25 juvenile-specific training, what does that look

1  like?
2      A.  Sure.  It's about the same, two to
3  three days and it's training on specific juvenile
4  issues.
5      Q.  Okay.  So it's your opinion that
6  juvenile cases involve specific issues that are
7  special to juvenile cases, correct?
8      A.  Absolutely.
9      Q.  And you testified that areas of
10 knowledge would include like brain development and
11 there are some other things as well, but that's a
12 special area of knowledge that a juvenile attorney
13 would require, right?
14     A.  Yes.
15     Q.  Now, do you think there are special
16 areas of knowledge that other public defenders
17 working in other areas of law would also require?
18     A.  I definitely think there are other
19 specialties or other subsets of criminal cases that
20 an attorney could specialize in, yes.
21     Q.  Okay.  So like if somebody is handling
22 murder cases they probably would be dealing with
23 different specialized issues than, you know, the
24 juvenile cases, right?
25     A.  One would think so, yes.

1      Q.  Okay.  And do you know whether, you
2  know, any specific training materials are provided
3  for those other subspecialties?
4      A.  I -- I can't speak to that, no.
5      Q.  Okay.  So you're just not sure one way
6  or another if they provide --
7      A.  That's correct.
8      Q.  Okay.
9          MS. SHIPMA:  Sarah was provided to
10 speak on juvenile matters, not the MSPD system as a
11 whole.
12         MR. MOORE:  Okay.
13         MS. SHIPMA:  Those depositions were
14 Wednesday.
15         MR. MOORE:  Okay.
16     Q.  (By Mr. Moore)  But in any event, as
17 far as, you know, the juvenile-specific attorney
18 materials you're provided, you could be being
19 provided the same amount of materials as other
20 public defenders with their specialties or more or
21 less, you're just not sure I guess; is that right?
22         MS. QUINN:  Objection, form of the
23 question, vague.  I just don't know what you're
24 asking.
25     A.  I don't either.  I apologize.  I have

1  no idea what you're asking.
2      Q.  (By Mr. Moore)  Okay.  So if there's
3  discussion about, you know, if there's any
4  juvenile-specific brochures or, you know, training
5  materials provided regarding juvenile cases, do you
6  recall those questions?
7      A.  Yes.
8      Q.  And so I believe you said that you
9  weren't really aware of any and that you were
10 working on a brochure of some kind at this time as
11 well, amongst other testimony.  Is that familiar?
12     A.  The brochure that you're referring to
13 is the collateral consequences brochure that I'm
14 work -- we're collaborating with the National
15 Juvenile Defender Center.  So --
16     Q.  Right.
17     A.  Yes.  So we are working --
18         (Court reporter interruption.)
19     A.  National Juvenile Defender Center.  I'm
20 providing that to the state.  But no, currently
21 there is not a brochure on collateral consequences.
22     Q.  (By Mr. Moore)  And -- okay, very good.
23 And as to juvenile-specific issues as well, I
24 don't -- I think you said you weren't aware of any
25 specific materials for juvenile cases that are

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com      Phone: 1.800.280.3376      Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-37   Filed 02/21/18   Page 41 of 83

1 provided to public defenders; is that right?
2     A.   That is correct.
3     Q.   Okay.  But you're not sure whether
4 that's typical of other specialities of the public
5 defender's office as well; is that correct?
6     A.   I -- I don't know.
7     Q.   Okay.  Because I mean, it could be
8 that, you know, they do have materials or they don't
9 have materials, you just don't know, you know about
10 the juvenile arena only, right?
11    A.   I -- I know about juvenile-specific,
12 yes.
13    Q.   Okay.  But you know, attorneys that are
14 hired by the public defender's office they've all
15 gone to law school, right?
16    A.   Yes.
17    Q.   And they've all passed the bar exam?
18    A.   Yes.
19    Q.   Public defender's office do you have
20 access to legal research materials of any kind?
21    A.   Yes.
22    Q.   And what are those legal research
23 materials?
24    A.   We have access to Westlaw.
25    Q.   And as far as your Westlaw sub --

1 subscription goes, I mean, are there any significant
2 limitations in that you've noticed or do you
3 pretty much have access to what you need to access?
4     A.   I -- I mean, I think that there --
5 would it be lovely to have all of -- access to the
6 entire Westlaw subscription, absolutely, but I think
7 that generally speaking I have access to the
8 appropriate case law that I need to access.
9     Q.   Okay.  So generally you're able to
10 access the materials that you need for your cases,
11 right?
12    A.   Yes.
13    Q.   And also materials that you would need
14 to apprise yourself of changes in the law, right?
15    A.   With regard to Westlaw access?
16    Q.   Or other research materials or avenues
17 that are provided to you.
18    A.   Yes, we are -- we -- we have the
19 ability to find out what laws have changed, yes.
20    Q.   Okay.  And to learn about new areas of
21 law that maybe you have been assigned to deal with,
22 but have never dealt with before?
23        MS. QUINN:  Objection as to form.  I
24 still don't know kind of what -- are you asking
25 about her specifically, the system?

1        MS. SHIPMA:  Yeah.
2        MR. MOORE:  I'm asking about the access
3 to like legal research materials and whether they
4 are --
5        MS. SHIPMA:  For her --
6        MR. MOORE:  -- adequate.
7        MS. SHIPMA:  -- or for the entire
8 system of attorneys?
9        MS. QUINN:  Juvenile, not juvenile?
10       MR. MOORE:  We're talking about for
11 herself.
12       MS. SHIPMA:  For herself, okay.
13       MR. MOORE:  Right.
14    A.   So you're asking if there's a new type
15 of law that I need to have access to, do I have
16 research materials?
17    Q.   (By Mr. Moore)  I'll just rephrase the
18 question, I guess, right.
19        So you have been given access to
20 Westlaw, correct?
21    A.   Yes.
22    Q.   And are there other like legal research
23 avenues or utilities that you can utilize?
24    A.   I mean, we have interns that we can
25 rely on to get access to documents that we need.  I

1 also can utilize resources such as the National
2 Juvenile Defender Center to provide with documents.
3 Yes, I mean, I have -- I have the ability to go
4 outside of the -- of Westlaw and get legal research,
5 yes.
6     Q.   Okay.  And is that how you trained
7 yourself to be competent in the juvenile
8 representation?
9        MS. SHIPMA:  I object.  This is --
10 you're assuming that she trained herself.  She
11 hasn't said that she trained herself.
12    Q.   (By Mr. Moore)  Okay.  So I guess I'll
13 ask how -- whenever you started at the public
14 defender's office you were not in the juvenile
15 arena; is that right?
16    A.   That's correct.
17    Q.   How did you become competent and train
18 to step into that arena?
19    A.   Sure.  So I think competence is
20 something that you're always continuing to grow
21 upon, so I think that -- I'm not saying that I
22 have -- I'm completely competent in the area of
23 juvenile law, but I have attend the National
24 Juvenile Defender Center trainings for approximately
25 the past five years, since 2012.  I have also been

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 160-37    Filed 02/21/18    Page 42 of 83

1    JTIP-certified.  So I am certified to train others
2    in juvenile law.
3          I have attended the JTIP summer
4    academy, so I have myself been trained.  I attend
5    the juvenile trainings every year since the year
6    2013.  And I help present at those trainings.  I --
7    and I read and I -- I try to do my best to keep up
8    with the new case law that comes through with regard
9    to juvenile-specific issues.
10         **Q.  Okay.  Okay.  And would those same --**
11   **would those same avenues be available for other**
12   **attorneys that are in your office who are looking to**
13   **step into the juvenile arena as well?**
14         A.  Well, they would have to apply through
15   our training division to go to the -- to the
16   trainings.  Just anyone can't go to the training.
17   It -- it's costly, so you have to apply to do those
18   trainings.
19         **Q.  Uh-huh.**
20         A.  Of course, they are able to educate
21   themselves on juvenile law -- law through case law
22   and national standards.  And then they can, yes, go
23   to the trainings that are once a year.
24         **Q.  Okay.  I also understand you testified**
25   **earlier something about a motions bank; is that**

1    **right?**
2          A.  Yes.
3          **Q.  Tell me a little bit about the motions**
4    **bank.**
5          A.  So it's a -- it's a area where
6    defenders can go to look at motions for their cases.
7          **Q.  Okay.  Tell me a little bit more.  So**
8    **is it like case-specific, do you pull up cases in**
9    **there or are they like just a bank of here's a**
10   **motion to dismiss and there's a bunch of examples?**
11   **What does it look like, I guess?**
12         A.  It would not be case-specific in case
13   there would -- are potential conflicts.  I think it
14   would be topic-specific.
15         **Q.  Okay.  So you have this bank of motions**
16   **and do you have any knowledge as to like how far**
17   **back this motions bank goes?**
18         A.  I don't.
19         **Q.  Okay.  Would you say there's like a**
20   **voluminous amount of motions and examples inside the**
21   **bank?**
22         A.  I can't speak to that.
23         **Q.  Okay.  Would you say there's like an**
24   **adequate amount of motions in the bank?**
25         A.  I can't speak to that.

1          **Q.  Okay.  Has there ever been a time when**
2    **you went to the motions bank and were unable to find**
3    **like a basic motion that you were just trying to**
4    **utilize in your practice?**
5          A.  No.
6          **Q.  Okay.  And so all the public defenders**
7    **that deal with parole matters would have access to**
8    **this motions bank?**
9          MS. SHIPMA:  That deal with what kind
10   of matters?
11         MS. QUINN:  I'm sorry, what?
12         MR. MOORE:  The -- I think I said
13   parole.  The --
14         MS. QUINN:  Yeah.
15         MR. MOORE:  Did I say parole or did I
16   say juvenile?
17         MS. QUINN:  You did say parole.
18         THE WITNESS:  Parole.
19         MR. MOORE:  Okay.  Sorry.  So I'll
20   strike that.
21         MS. QUINN:  That's my other case.
22         MR. MOORE:  Right.  Right.
23         **Q.  (By Mr. Moore)  Juvenile matters.  So**
24   **would other attorneys working on juvenile matters**
25   **have access to this motions bank?**

1          A.  Yes.
2          **Q.  Okay.  So let me talk a little bit**
3    **about the detention hearing aspect of this.**
4          A.  Uh-huh.
5          **Q.  I think you said earlier there was like**
6    **a time constraint as it pertains to getting**
7    **counsel -- separate counsel for every single**
8    **juvenile who might be facing this detention hearing**
9    **at the same time.  Do you recall that conversation**
10   **earlier?**
11         A.  Yes.
12         **Q.  Tell me a little bit about the time**
13   **constraints.  I think you said there's like a**
14   **three-day period?**
15         A.  Correct.  So from when the petition is
16   filed until detention hearing, the detention hearing
17   shall be heard within three days of that petition
18   being filed.
19         **Q.  Okay.  And so as far as, you know, the**
20   **restrictions on getting counsel for -- conflicts**
21   **counsel for these hypothetical juveniles, what are**
22   **the -- is it simply a time constraint, there's no**
23   **time to process these claims or what is preventing**
24   **that from taking place in your opinion?**
25         A.  Well, sure.  It's -- it's a number of

**MIDWEST LITIGATION SERVICES**
**www.midwestlitigation.com**      **Phone: 1.800.280.3376**                **Fax: 314.644.1334**
Case 2:17-cv-04057-NKL    Document 160-37    Filed 02/21/18    Page 43 of 83

1  things.  It -- before we had to contract cases
2  through Columbia the defenders who were taking these
3  contract cases might have court.  So three days'
4  notice is not a lot of notice to give someone to
5  then have to appear in court.
6          They could be in other juris -- they
7  are in other jurisdictions, and so it is an
8  impediment to have to come down and -- and do
9  something at a specific time.  So that is one of the
10  constraints.  The other constraint now is that in
11  order to contract a case it has to go through
12  Columbia and then Columbia needs to find the
13  attorneys that are going to be representing those
14  youth.  So that is now the constraint.  So three
15  days is simply not enough time to be able to do
16  that.
17      Q.  So for instance, it sounds like it's
18  just a quick turnaround with three days, and also
19  there's just some administrative things that need to
20  be gone through and it takes time; is that accurate?
21          MS. QUINN:  Objection.  That's not -- I
22  would object to the form of the question as
23  mischaracterizing her testimony.
24          MR. MOORE:  Just a -- just a question.
25  I guess can you read the question back?

1          COURT REPORTER:  Question:  So for
2  instance, it sounds like it's just a quick
3  turnaround with three days, and also there's just
4  some administrative things that need to be gone
5  through and it takes time; is that accurate?
6      Q.  (By Mr. Moore)  I guess I can break it
7  down a little simpler then.  So as far as what is
8  preventing counsel from being appointed for all
9  these hypothetical juveniles at these detention
10  hearings, I think you testified that it's one, a
11  timing issue, the three days is kind of a quick
12  turnaround; is that right?
13      A.  It -- it's an issue for the attorneys
14  who have to represent the children, the conflict --
15  the conflict attorneys.  So they have other cases in
16  other jurisdictions, and so three days is oftentimes
17  not enough time for that attorney to then find
18  coverage for the cases that they are dealing with.
19      Q.  Right.
20      A.  And the current clients that they have
21  to represent.
22      Q.  Okay.  So that kind of sounds like a --
23  like a yes, it is like a timing thing, right, three
24  days is not often enough time to give notice to the
25  proper attorneys or to, you know, recruit the

1  counsel, three days is just kind of quick; is that
2  accurate?
3      A.  It is very quick.
4      Q.  On the other side of that you also said
5  that there were some issues with getting the pieces
6  in line or recruiting counsel, making sure their
7  calendars were cleared, things of that nature; is
8  that right?
9      A.  So that was the first thing that you
10  just -- that we just talked about.  The second thing
11  is that now we refer all cases that are conflicts
12  through Columbia, okay?  And so now Columbia has to
13  then find all of the contract attorneys that are
14  going to represent those youth.  So then that --
15  that is an additional piece of time.  And these are
16  also attorneys who are representing other
17  individuals and so they have time constraints and
18  court hearings that they potentially have to attend
19  as well.
20      Q.  Okay.  Do you know why it all goes
21  through Columbia?
22      A.  That is where we -- how we contract
23  attorneys.  Columbia is the main office.
24      Q.  Okay.  And do you have anything to do
25  with that decision as to base it all in Columbia or

1  how that administratively gets handled?
2      A.  I have nothing to do with that.
3      Q.  Okay.  There was some discussion
4  earlier about the use of experts in juvenile cases.
5  Do you recall that conversation?
6      A.  Yes.
7      Q.  And so, you know, correct me if I'm
8  wrong, but bottom line is you don't necessarily need
9  an expert for every single case that comes your way;
10  is that right?
11      A.  I don't -- I don't think that's a
12  bottom line.  I think that each child comes to you
13  as a unique and different circumstance and so would
14  I love to have an expert to talk about adolescent
15  brain development on every single child, yes.  Do I
16  have that ability, no.
17      Q.  Okay.  But you would agree that the
18  type of experts that you need on a case would be
19  dependent on the specifics of that particular case,
20  right?
21      A.  Absolutely.
22      Q.  But in your opinion you would offer an
23  expert in every single juvenile case about juvenile
24  brain development?
25      A.  Juvenile brain development or mitiga --

43 (Pages 169 to 172)

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com     Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 160-37    Filed 02/21/18    Page 44 of 83

Page 173

1  or mitigation or something to explain how a
2  juvenile's intent for a certain type of case might
3  be different than another, yes.  Some form of
4  expert, whether it be for disposition or
5  adjudication, yes.
6       Q.  Okay.  Has there ever been a
7  circumstance where you had requested experts be
8  utilized in a case, but your request was denied?
9       A.  No.
10      VIDEOGRAPHER:  One moment, please.  Can
11 we go off the record for a second?  We're going off
12 the record at approximately 12:21 p.m.
13      (WHEREIN, a discussion was held off the
14 record.)
15      VIDEOGRAPHER:  We're back on the record
16 at approximately 12:22 p.m.
17      Q.  (By Mr. Moore)  Thanks.  I think the
18 last question that we -- I asked you was whether you
19 had ever been -- you had ever had your request for
20 an expert in a case denied and I think your answer
21 was no, that's never happened?
22      A.  That's correct.
23      Q.  Same question as to investigators in
24 your cases, have you ever requested an investigator
25 and had that request denied?

Page 174

1       A.  No, I have not.
2       Q.  Okay.  There was some discussion
3  earlier about like the number of depositions and
4  motions that you filed in your cases.  Do you recall
5  those questions?
6       A.  I do.
7       Q.  Now, would you agree that the number of
8  depositions and motions you file in a case are going
9  to be highly dependent on the case itself and what's
10 happening in that case?
11      MS. QUINN:  Objection as to form,
12 compound question.
13      A.  So you asked about depositions, so yes,
14 deposition -- it would depend on what kind of case
15 it is.  And then what was the other piece?
16      Q.  (By Mr. Moore)  Motions.
17      A.  Motions.  It would -- it would depend
18 on the case, yes.
19      Q.  Right.  You -- you basically do what
20 the case requires as far as taking depositions and
21 filing motions, right?
22      A.  I -- yes, at the time of -- that I am
23 representing a youth, I do everything that I can to
24 try to represent that youth to the best of my
25 ability.

Page 175

1       Q.  All right.  And so there's also some
2  discussions about like social workers on cases?
3       A.  Yes.
4       Q.  Do you know if there are any like
5  ethical requirements that you utilize social workers
6  on your cases?
7       A.  Ethical requirements imposed upon
8  myself?
9       Q.  Right.
10      A.  I don't know of any.
11      Q.  How about any like legal or statutory
12 requirements for social workers on your cases?
13      A.  I don't know of any.
14      Q.  Are you aware of any constitutional
15 requirements that you util -- you utilize social
16 workers on your cases?
17      A.  No, I do not believe that there is a
18 constitutional requirement that requires me to use a
19 social worker.
20      Q.  Okay.  So you were also asked about
21 support staff earlier.  Do you remember that
22 conversation?
23      A.  I do.
24      Q.  And I think you did end up stating that
25 you felt like you were adequately supported with the

Page 176

1  support staff that you currently have; is that
2  right?
3       A.  Yes, with -- with her current duties.
4  Would I like her to do more, absolutely, but with
5  the duties that I give her, I believe that I am
6  adequately assisted.
7       Q.  Right.  Very good.  And there was a
8  question about whether your staff received a special
9  instruction as to parole matters -- or sorry, not
10 parole.  Juvenile matters.  Do you recall that?
11      A.  Yes.
12      Q.  But as I understand the task that the
13 staff are engaging in include like typing up
14 letters, right?
15      A.  Well, we don't normally do many letters
16 because the youth are either detained or we're --
17 we're calling them on the phone.  So letters is not
18 necessarily juvenile-specific.
19      Q.  Okay.  I mean, do you feel that the
20 staff would need juvenile-specific training in order
21 to perform their duties?
22      A.  Absolutely.
23      Q.  And in what way would they need the
24 additional training?
25      A.  They need to know the rules and the

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334

Case 2:17-cv-04057-NKL   Document 160-37   Filed 02/21/18   Page 45 of 83

1  policies and procedures with regard to juvenile
2  court.  They need to know that the individuals that
3  we're dealing with are different than the adults.
4  So a call from a youth from a facility is -- is
5  going to need some very quick attention.  They need
6  to know about filing practices.  They need to know
7  about timelines and deadlines.  Juvenile cases go
8  very quickly and so they need to understand the
9  urgency with which we deal with juvenile cases.
10      **Q.  And you've worked on adult criminal**
11  **cases as well, right?**
12      A.  I have.
13      **Q.  And are there deadlines for criminal**
14  **cases that involve adults as well?**
15      A.  Yes.
16      **Q.  And you also field phone calls from**
17  **adult -- adults who have been convict -- or accused**
18  **of crimes, right?**
19      A.  Yes.  I -- I think they're important,
20  but I -- children, their understanding of what is
21  happening to them and what is going on and the
22  urgency with which you address those phone calls, I
23  think is very important that support staff
24  understand.  So I'm not placing their lives any
25  higher than an adult defendant's life, but the --

1  the staff needs to understand the urgency with which
2  to treat their requests.
3      **Q.  Okay.  And again, you feel like your**
4  **staff is supporting you adequately as it relates to**
5  **these requirements; is that correct?**
6      A.  With regard to the tasks that I am
7  giving my support staff, I believe that I am
8  adequately assisted.
9      **Q.  Okay.  So as to the certification**
10  **cases, you discussed that process a little bit**
11  **earlier.  Do you recall the conversation?**
12      A.  Yes.
13      **Q.  And I think you were asked about the**
14  **type of evidence that you put on versus the type of**
15  **evidence that the prosecution would put on, right?**
16      A.  Correct.
17      **Q.  And it sounded like the prosecution**
18  **just puts on the deputy juvenile officer; is that**
19  **right?**
20      A.  In most cases, yes.
21      **Q.  And you said yourself you have used**
22  **witnesses of various kinds, you've had officer**
23  **testimony, and other types of evidence as well,**
24  **right?**
25      A.  Yes, I have.

1      **Q.  So kind of sounds like in many cases**
2  **you're presenting more evidence and calling more**
3  **witnesses than the prosecution for these**
4  **certification issues; is that right?**
5      A.  Yes.  In -- in my certification cases
6  usually I am.
7      **Q.  And you definitely feel like you've met**
8  **your ethical responsibilities with regard to these**
9  **certification procedures, right?**
10      A.  I -- I don't think I can -- I can say
11  that.
12      **Q.  You don't feel like you've met your**
13  **ethical obligations to your clients with regard to**
14  **certification procedures?**
15      A.  Not in every case, no.
16      **Q.  And -- okay.  So in -- in what way do**
17  **you feel like you have not?**
18      A.  In what way?  Are you asking for
19  generally or specific cases?
20      **Q.  If you have specifics --**
21      MS. SHIPMA:  I would object to her
22  answering any questions about specific cases.
23      MR. MOORE:  Okay.
24      **Q.  (By Mr. Moore)  So like I said, I'm**
25  **jumping around a little bit.  So you talked a little**

1  bit about the pre-Miranda process.
2      A.  Yes.
3      **Q.  Tell me a little bit about what that**
4  **entails.**
5      A.  If a child is detained and they request
6  counsel before being interrogated by a police
7  officer, then the juvenile court would call me.
8      **Q.  Okay.  And I think you said as far as**
9  **lineups go, you are now called for any lineups prior**
10  **to the lineups taking place in St. Louis city; is**
11  **that right?**
12      A.  Yes, I am.
13      **Q.  Okay.  Now, you were asked earlier**
14  **about your involvement in appeals of juvenile**
15  **matters.  Do you recall that conversation?**
16      A.  I do.
17      **Q.  And I think you said that maybe you had**
18  **worked on a small amount, maybe one appeal or so; is**
19  **that right?**
20      A.  I have written and argued my own
21  appeal, but I have appealed other cases.
22      **Q.  Okay.  But in any event, I mean, you**
23  **have to have a reason to appeal in each case, right?**
24      A.  I do not have to have a reason to
25  appeal.  The child has to indicate that they want to

Page 181

1  appeal the case.
2      Q.  And there has to be, you know, like
3  a -- a legal foundation and -- you know, for the
4  appeals process whenever you're making arguments to
5  the court filing motions, right?
6      A.  I'm a little bit confused by your
7  question.  Every child has a right to an appeal, so
8  I don't have to find a reason for them to appeal.
9  If they want to say they want to appeal a case, a
10 case will be appealed.
11     Q.  Okay.  So if they ask you for the
12 appeal, then you do the appeal, right?
13     A.  That is correct.
14     Q.  And if they don't ask you, then, you
15 know, there's -- you don't have any right to
16 independently pursue an appeal, right?
17     A.  So --
18         MS. QUINN:  Objection.  I don't
19 understand what you're asking.
20         MR. MOORE:  I think it's a pretty
21 straightforward question.
22     Q.  (By Mr. Moore)  I mean, so if they
23 don't ask you for an appeal, then you don't have any
24 independent right to just say, well, we're going to
25 appeal this case whether you like it or not, right?

Page 182

1      A.  So -- so we educate a child about their
2  right to an appeal and part of that education
3  includes also informing the parents that they also
4  can appeal a case -- the case, so that is the
5  process that -- and procedure that we go through
6  with regard to juvenile appeals.
7      Q.  Okay.  So just a couple things and then
8  we'll be done here.  Looking at Exhibit 29,
9  Plaintiff's Exhibit 29, this is the -- actually, you
10 know what, that's not the one I wanted to look at.
11 I want to look at 27, the new attorney toolbox.
12     A.  Okay.
13     Q.  I think you might have said this
14 earlier, but just to clarify, you're not sure
15 whether this is being utilized or in what manner
16 it's being utilized by any public defender --
17     A.  No, I am not.
18     Q.  -- personally, right?  You don't know
19 whether it's been modified or amended or totally
20 done away with in any particular county, right?
21     A.  Correct.
22     Q.  You didn't help draft this report in
23 any way, did you?
24     A.  I did not.
25     Q.  To the extent there's any kind of

Page 183

1  instructions or, you know, mathematical formulas,
2  you had nothing to do with the creation of those
3  things, did you?
4      A.  I did not.
5      Q.  I guess just the last item would be
6  Exhibit 29.  That's the fiscal year 2016 annual
7  report.
8      A.  Okay.
9      Q.  Again, you know, you didn't help with
10 any part of the data collection in this --
11 pertaining to this report, did you?
12     A.  I did not.
13     Q.  You didn't help draft this report?
14     A.  I did not.
15     Q.  Do you know who did draft this report?
16     A.  I do not.
17         MR. MOORE:  Okay.  I think that that is
18 all I have for right now.  I'll look at my notes,
19 but you go ahead.
20         MS. SHIPMA:  Well, no, I'll let you
21 look over your notes and see if you have any other
22 questions before I do my questioning.
23         MR. MOORE:  Okay.  Okay.
24     Q.  (By Mr. Moore)  Do you have any say as
25 to how funds are allocated within the public

Page 184

1  defender system?
2      A.  I do not.
3      Q.  Do you have anything to do with how
4  public defender's budget is allocated or separated
5  out as between the offices?
6      A.  I do not.
7      Q.  Oh, I do have a question about
8  discovery process.  You mentioned something about
9  like a blue file?
10     A.  Yes.
11     Q.  What is the blue file exactly?
12     A.  So in St. Louis County and I can't
13 speak to their current practices, but when I was
14 representing juveniles in St. Louis County they had
15 a series of blue files for each specific case, and
16 so when you wanted to go see the police reports you
17 would go back into the legal officers' area, pull
18 the blue file that pertained to your case and make a
19 copy of the -- the police reports.
20     Q.  Okay.  So as far as like obtaining
21 those records and putting the blue file together, I
22 mean, is that something the attorneys would do
23 themselves or would support staff assist them in
24 creating those files?
25     A.  And when you're saying attorneys, are

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com      Phone: 1.800.280.3376      Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-37   Filed 02/21/18   Page 47 of 83

Page 185

1  you talking about the legal officers?
2      Q.  Not exactly sure.  Like this is the
3  public defenders I guess.  Would they be considered
4  the legal officers or --
5      A.  No.  So the public defenders are not
6  creating those blue files.
7      Q.  Okay.  So I guess -- so who does that,
8  the legal officers you said?
9      A.  Yes, so the -- the prosecutors are --
10 I -- their entity is creating those files.  I don't
11 know exactly who is doing it --
12     Q.  Oh, I see now.
13     A.  -- but I -- but they -- that entity is
14 creating those files.
15     Q.  Okay.  Now I understand.  Have you ever
16 subject -- have you ever been subject to any kind of
17 discipline towards your law license with regard to
18 your handling of cases while you were at the public
19 defender's office?
20     A.  I have not.
21     MR. MOORE:  I think that's all I have.
22 Thanks.
23              EXAMINATION
24 QUESTIONS BY MS. SHIPMA:
25     Q.  All right, Sarah.  I'm not going to

Page 186

1  belabor this.  I'm going to work backwards just for
2  fun.  How does that sound?
3      A.  Okay.
4      Q.  Okay.  The Missouri public defender
5  system has an appellate division, correct?
6      A.  Yes, they do.
7      Q.  Does that appellate division handle
8  juvenile -- juvenile appeals?
9      A.  Yes.
10     Q.  You mentioned -- or you -- you
11 testified a couple of times about the fact that
12 you're called prior to lineups occurring in
13 St. Louis city?
14     A.  Yes.
15     Q.  Do -- are you able to make it to all
16 those lineups?
17     A.  No, I am not.
18     Q.  And why would that be?
19     A.  Sometimes the lineups are late at night
20 or early in the morning and I am already home.
21     Q.  Okay.
22     A.  Or I'm in court, so I'm -- I'm not able
23 to leave court and go to those lineups.
24     Q.  Understood.  Are there tasks that you
25 would like to assign to your support staff but are

Page 187

1  unable to?
2      A.  Yes.
3      Q.  And why are you unable to do that?
4      A.  I'm unable to do that because she in
5  addition to myself has a number of attorneys that
6  she is also working with to provide the best
7  assistance that she can.
8      Q.  Can you give me an example of one kind
9  of task that you would like to assign to a support
10 staff but are unable to do so?
11     A.  Sure.  So there is something called a
12 social file in a juvenile case.  A social file is a
13 file that contains all the documents with regard to
14 a specific youth.  So it could be care and
15 protection case files, it could be school records,
16 it could be mental health records.  It could be
17 previous police reports or previous deputy juvenile
18 officer social investigations.  Sometimes it's
19 hundreds of pages.  Myself, I use a scanner and I
20 scan all of those pages myself.  I would love to
21 delegate that task to her, but I am unable to.
22     Q.  Because of the tasks that she's doing
23 for other attorneys as well?
24     A.  Yes.
25     Q.  Okay.  I think that Mr. Moore asked a

Page 188

1  question that was sort of characterizing that you
2  believe that you do what the case requires when
3  you're handling a case.
4      A.  Sure.
5      Q.  You remember that question?
6      A.  I do.
7      Q.  Are there things that you would like to
8  do in cases, but are unable to do?
9      A.  Yes.
10     Q.  And why are you unable to do things
11 that you would like to do in other cases?
12     A.  Because of time constraints, because of
13 obligations to other clients and -- and limitation.
14 When you are tasked with a child who is sitting in a
15 detention center, a num -- a number of children who
16 are sitting in a detention center, you know, you
17 don't want them to languish.
18     Q.  Can you give me one example of
19 something that you can think of that goes by the
20 wayside because of time?
21     A.  I was asked specifically about
22 placement in inpatient or residential facilities.
23 My ability to investigate options such as those, I'm
24 not able to do on every single case.
25     Q.  Why don't you assign that task to

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com    Phone: 1.800.280.3376    Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 160-37    Filed 02/21/18    Page 48 of 83

1    someone else to investigate?
2       A.   Because they -- the -- either the
3    investigator or the social worker who would be doing
4    that is also overloaded.
5       **Q.   Have you ever requested an outside**
6    **investigator?**
7       A.   Outside of the public defender system?
8       **Q.   Right.**
9       A.   No, I have not.
10      **Q.   Okay.  You -- you testified that you**
11    **had never had a request for an expert denied,**
12    **correct?**
13      A.   That is correct.
14      **Q.   Have you ever had a request for an**
15    **expert modified?**
16      A.   I have not.
17      **Q.   You talked a couple of times about the**
18    **motion bank.  Are you familiar with a resource**
19    **called the litigation resource board?**
20      A.   Yes.
21      **Q.   And that's separate from the motion**
22    **bank?**
23      A.   It is.
24      **Q.   Do you know if that resource has**
25    **juvenile-specific materials on it?**

1       A.   I believe it does, but I'm not for
2    certain.
3       **Q.   You haven't visited that?**
4       A.   Not recently, no.
5       **Q.   Sorry, but I am going to direct you to**
6    **page -- to Exhibit 29, page 23 just because I want**
7    **to make sure we're all using the same terminology**
8    **when we look at this.  You see -- I believe that**
9    **Ms. Quinn asked you about the approximately 600 --**
10    **or 1,600 and I believe she said open cases.**
11      A.   Uh-huh.
12      **Q.   Okay.  Look at the columns at the top,**
13    **the descriptors for the various columns.**
14      A.   Uh-huh.
15      **Q.   You see one that says Case Type, one**
16    **that says Description, and one that says Opened**
17    **Cases rather than open cases?**
18      A.   Correct.
19      **Q.   In -- in your mind, is there a**
20    **distinction between an open case and an opened case?**
21      A.   Yes, there is.
22      **Q.   Do you know what -- do you know if MSPD**
23    **makes a distinction between open cases and opened**
24    **cases?**
25      A.   I believe they do, yes.

1       **Q.   And what is that distinction?**
2       A.   So when a case is open, it is open and
3    assigned to an attorney in our system.  When a case
4    is opened, it could be opened and then a private
5    attorney had entered or it had been dismissed or
6    something else.  So that doesn't necessarily mean
7    that someone is currently representing that
8    individual.
9       **Q.   Do you know in this Opened Cases**
10    **column, does that include cases that were pending**
11    **that were not opened during fiscal year 2016, but**
12    **maybe had carried over from a prior fiscal year?**
13    **And if you don't know that, that's okay.**
14      A.   I don't know that.
15      **Q.   I can get that from someone else.**
16    **Okay.  Thank you.  Do you know if Karen Craft had**
17    **any other job responsibilities other than juvenile**
18    **matters?**
19      A.   Yes.
20      **Q.   What were those?**
21      A.   I know for certain that she had also
22    dealt with capital cases as well as I believe sex
23    cases, and then she was also a manager of several
24    offices or units.
25      **Q.   Okay.  So she wasn't designated**

1    specifically just to juvenile like you had been for
2    a while?
3       A.   Correct.
4       **Q.   You were asked some questions regarding**
5    **a policy on how to determine a conflict.**
6       A.   Sure.
7       **Q.   Do you remember that?  Do you know if**
8    **there's a written policy that MSPD has regarding how**
9    **to spot a conflict?**
10      A.   I believe there is.
11      **Q.   Okay.  Do you know if that policy**
12    **differs in any respect from just the rules of**
13    **professional responsibility, professional conduct?**
14      A.   No, I'm not.
15      MS. SHIPMA:  I have no other questions.
16      MS. QUINN:  We just have a few if it's
17    all right.
18       FURTHER EXAMINATION
19    QUESTIONS BY MS. QUINN:
20      **Q.   I believe earlier you were asked on**
21    **cross-examination about hypothetical juveniles whom**
22    **you might be involved with at detention hearings**
23    **where there's a conflict of interest.  It is in fact**
24    **true that you have represented youth at detention**
25    **hearings and been conflicted while doing so,**

Page 193

1  correct?
2      A.  Yes.
3      Q.  Can you estimate how many children in
4  the last year you have represented at detention
5  hearings while knowing that you were conflicted
6  based on their status as having a co-defendant?
7      A.  I can't.  I'm sorry.  I don't know.  I
8  don't know how many.
9      Q.  More than ten?
10     A.  Probably.
11     Q.  More than 50?
12     A.  I don't think so.
13     Q.  And you were asked about appeals and it
14 sounded like the question posed assumed that
15 you were supposed to cull out when an appeal is an
16 appropriate or inappropriate path for youth.  Do you
17 remember that question?
18     A.  I do.
19     Q.  Is it your understanding that all youth
20 found guilty or adjudicated have a right to appeal?
21     A.  Yes.
22     Q.  And it is in fact true that you have
23 not informed all youth of their right to appeal,
24 correct?
25     A.  All youth after an adjudication

Page 194

1  hearing, trial?
2      Q.  Yes.
3      A.  Yes, all youth after a plea hearing,
4  no.
5      Q.  And the vast majority of your cases are
6  resolved by a guilty plea, correct?
7      A.  I would disagree with that.
8          (Court reporter interruption.)
9      Q.  (By Ms. Quinn)  The vast majority of
10 cases are resolved by a guilty plea?
11     A.  I would say no.  I would say there --
12 we have a lot of trials in the city of St. Louis.
13     Q.  Right.  I think the national average is
14 somewhere around ten percent of cases go to trial
15 and 90 percent are resolved by guilty plea.  Is that
16 about right for your office?
17     A.  I don't think so, no.
18         MS. SHIPMA:  And Mae, are those
19 statistics for juvenile cases?
20         MS. QUINN:  I think so.  I think so.
21         MS. SHIPMA:  Okay.
22     Q.  (By Ms. Quinn)  So in any event, no
23 matter the number, when a child pleads guilty, it
24 has not been the practice to inform them of their
25 right to appeal at that -- at that time?

Page 195

1      A.  No, it has not been the practice.
2      Q.  Now, there was some review of this
3  4.6-hour on average number generated by the
4  RubinBrown study relating to juvenile cases.  Do you
5  recollect that?
6      A.  I do.
7      Q.  And just to be clear, have you ever
8  encountered a juvenile case in your own docket that
9  could be handled in less than 4.6 hours?
10     A.  It would be a very rare circumstance.
11     Q.  And what about any of these attorneys
12 who have called you to seek your assistance, is
13 there any matter that they've called you about that
14 in your opinion could be handled in less than
15 4.6 hours?
16     A.  No.
17         MS. QUINN:  I think that's it.
18         MS. SHIPMA:  I don't have anything
19 further.
20         FURTHER EXAMINATION
21 QUESTIONS BY MR. MOORE:
22     Q.  Just a couple quick follow-ups.  Okay.
23 So you said earlier that you are notified whenever
24 there's going to be a lineup in the city of
25 St. Louis, right?

Page 196

1      A.  Yes.
2      Q.  But you don't always go to those
3  lineups, right?
4      A.  No, I do not.
5      Q.  And what was the reason for not going
6  to lineups?  I think you said some happen in the
7  middle of the night, and were there other reasons?
8      A.  I've never been called in the middle of
9  the night, but there have been some late at night.
10 I have two small children and so I am not able to
11 leave those -- my children and go to the lineups.
12 Also, I have had court constraints, so I've been
13 called in the middle of a court hearing and I've not
14 been able to leave that court hearing and go to the
15 lineup.
16     Q.  Okay.  And so you talked about certain
17 tasks that you would like to assign to your support
18 staff but that you can't.  Remember that?
19     A.  Correct.
20     Q.  I think one of those sounded like it
21 was basically like making copies of the social file;
22 is that right?
23     A.  It's scanning.  We're not allowed to
24 make copies, but we can scan it with a special
25 instrument, yes.

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334

Page 197

1    Q.  Okay.  Any other tasks that you would
2 like to assign to staff that you are unable to
3 because of -- or for whatever reason?
4    A.  I think probably notification of court
5 hearings and coordination of witnesses potentially.
6 Making sure everyone knows the right place,
7 coordinating if people need bus passes or if they
8 need some sort of transportation help.  Potentially
9 drafting some basic form motions.  Not necessarily
10 substance of law motions, but form motions.
11    Q.  And so you're saying these are things
12 that you cannot assign to your support staff?
13    A.  I could, but she is very overworked and
14 overloaded and with the specific time constraints of
15 juvenile cases I don't know that she would be able
16 to accomplish those tasks in the specific time
17 needed.
18    Q.  Okay.  Have you ever tried to assign
19 those tasks to her or is it just something you've
20 never done before?
21    A.  No, I have assigned -- the only thing
22 I've not assigned to her is the scanning of the
23 social file.  I have assigned other tasks to her,
24 yes.
25    Q.  Okay.  Tell me a little bit more about

Page 198

1 the litigation resource board.  What exactly is
2 that?
3    A.  It's a board where there are resources,
4 case -- cases, as well as motions for attorneys
5 across the state.
6    Q.  Is that a -- like an on-line form of
7 some kind or is it like a physical board?
8    A.  No, it's -- it's on-line.  It's -- it's
9 in our system.
10    Q.  Okay.  And so you're able to access
11 that from your computer whenever you want, right?
12    A.  Yes.  Yes.
13    Q.  And other public defenders could
14 presumably do the same thing, right?
15    A.  Yes.
16    MR. MOORE:  I think that's all I have.
17    VIDEOGRAPHER:  We're going off the
18 record at approximately 12:50 p.m.
19    COURT REPORTER:  Counsel, there were
20 orders from the depositions on Wednesday.  Could I
21 just get confirmation that those same orders apply
22 for today?
23    MS. QUINN:  Yes, sir.
24    MS. SHIPMA:  Yes.
25    MR. MOORE:  Yes.

Page 199

1    (WHEREIN, the deposition was concluded
2 at 12:50 p.m.)

Page 200

1    CERTIFICATE OF REPORTER
2
3    I, William L. DeVries, a Certified
4 Court Reporter (MO), Certified Shorthand Reporter
5 (IL), Registered Diplomate Reporter, and a Certified
6 Realtime Reporter, do hereby certify that the
7 witness whose testimony appears in the foregoing
8 deposition was duly sworn by me pursuant to Section
9 492.010 RSMo; that the testimony of said witness was
10 taken by me to the best of my ability and thereafter
11 reduced to typewriting under my direction; that I am
12 neither counsel for, related to, nor employed by any
13 of the parties to the action in which this
14 deposition was taken, and further that I am not a
15 relative or employee of any attorney or counsel
16 employed by the parties thereto, nor financially or
17 otherwise interested in the outcome of the action.
18
19
20
21    _____
22    Certified Court Reporter
23    within and for the State of Missouri
24
25

50 (Pages 197 to 200)

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com    Phone: 1.800.280.3376    Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 160-37    Filed 02/21/18    Page 51 of 83

## Page 201

```
1            MIDWEST LITIGATION SERVICES
2
3    October 12, 2017
4    Ms. Jacqueline Shipma
     Missouri State Public Defender
     1000 West Nifong
5    Building 7, Suite 100
     Columbia, Missouri 65203
6
     IN RE: SHONDEL CHURCH, et al. vs. STATE OF
7        MISSOURI, et al.
8    Dear Ms. Shipma,
9    Please find enclosed your copies of the deposition of
     SARAH K. JOHNSON taken on October 6, 2017 in the
10   above-referenced case. Also enclosed is the original
     signature page and errata sheets.
11
     Please have the witness read your copy of the
12   transcript, indicate any changes and/or corrections
     desired on the errata sheets, and sign the signature
13   page before a notary public.
14
15   Please return the errata sheets and notarized
16   signature page within 30 days to our office at 711 N
17   11th Street, St. Louis, MO 63101 for filing.
18
19   Sincerely,
20
21
22   William L. DeVries, RDR/CRR
23
24   Enclosures
25
```

## Page 202

```
1                 ERRATA SHEET
2    Witness Name: SARAH K. JOHNSON
     Case Name: SHONDEL CHURCH, et al. vs. STATE OF
3        MISSOURI, et al.
     Date Taken: OCTOBER 6, 2017
4
5    Page #_____   Line #_____
6    Should read: _____
     Reason for change: _____
7
8    Page #_____   Line #_____
9    Should read: _____
10   Reason for change: _____
11
12   Page #_____   Line #_____
13   Should read: _____
14   Reason for change: _____
15
16   Page #_____   Line #_____
17   Should read: _____
18   Reason for change: _____
19
20   Page #_____   Line #_____
21   Should read: _____
22   Reason for change: _____
23
24   Witness Signature: _____
25
```

## Page 203

```
1    STATE OF _____)
2
3    COUNTY OF _____)
4
5    I, SARAH K. JOHNSON, do hereby certify:
6        That I have read the foregoing deposition;
7        That I have made such changes in form
8    and/or substance to the within deposition as might
9    be necessary to render the same true and correct;
10       That having made such changes thereon, I
11   hereby subscribe my name to the deposition.
12       I declare under penalty of perjury that the
13   foregoing is true and correct.
14       Executed this _____ day of _____,
15   20___, at _____.
16
17
18
19       _____
20       SARAH K. JOHNSON
21
22       _____
23       NOTARY PUBLIC
24   My Commission Expires:
25
```

51 (Pages 201 to 203)

**MIDWEST LITIGATION SERVICES**
**www.midwestlitigation.com**     **Phone: 1.800.280.3376**          **Fax: 314.644.1334**
Case 2:17-cv-04057-NKL   Document 160-37   Filed 02/21/18   Page 52 of 83

**A**

AB 50:15
ABA 50:19,23
  51:2
ability 23:22
  24:1 31:9
  41:11 42:9
  82:16 84:11
  90:3,13,15
  94:11 96:12
  99:21 106:16
  111:22 115:18
  116:17 162:19
  164:3 172:16
  174:25 188:23
  200:10
able 14:10 24:4
  40:14 44:16
  58:19 67:18
  80:5 81:15,16
  83:13,17 88:20
  88:20 100:3
  104:13 115:14
  129:19 133:3
  135:5 141:15
  145:2 150:2
  162:9 165:20
  169:15 186:15
  186:22 188:24
  196:10,14
  197:15 198:10
above-referen...
  201:10
absolute 23:18
absolutely 23:16
  24:8 25:5
  29:22 30:1
  41:6 49:2 56:2
  59:11 77:4
  81:11 83:14
  87:24 89:8
  90:24 98:2
  100:2 109:4
  158:8 162:6
  172:21 176:4
  176:22

academy 165:4
accept 124:13
accepted 61:19
access 47:2 90:3
  90:14,16 96:12
  99:21 101:25
  113:7,16 116:3
  119:16 161:20
  161:24 162:3,3
  162:5,7,8,10
  162:15 163:2
  163:15,19,25
  167:7,25
  198:10
accessing 112:5
  112:11
accommodate
  82:11
accomplish 72:2
  197:16
accomplished
  68:5
accurate 145:5
  145:13,16,22
  147:5 149:8
  150:5 157:6
  169:20 170:5
  171:2
accused 177:17
ACLU 3:14 6:22
acted 92:22
acting 78:16,16
action 92:16,18
  92:22 93:4
  101:20 131:2
  200:13,17
actions 53:4
actual 17:14,20
  104:20 128:25
ad 105:10
addition 16:1
  187:5
additional 45:14
  46:3 47:16
  143:11 171:15
  176:24

Additionally
  31:22
address 177:22
addresses 83:7
adequate 31:12
  31:16,23 33:14
  35:11 100:10
  163:6 166:24
adequately
  40:14 175:25
  176:6 178:4,8
adjudicated
  110:12 136:17
  193:20
adjudication
  136:24 137:3
  173:5 193:25
adjustment
  131:5,11
adjustments
  46:16,17
administrative
  169:19 170:4
administrativ...
  101:6 172:1
Administrator
  30:23 146:24
admission 46:20
  134:9
admit 25:22,22
  134:3
admitting 25:16
  35:17,18,20
  39:16,17
adolescent 23:19
  56:10 88:18
  114:24 172:14
adolescents
  114:25
adult 14:24
  15:21 16:23
  17:2,18,21
  18:1 19:25
  20:14,18,23
  21:10,17 22:13
  23:12 25:3,8

41:8 51:9,12
  55:25 56:9
  70:9,20 77:3
  77:15 81:2
  88:5,9,24 93:1
  98:1 103:11
  108:4,16 109:6
  109:12,22
  111:2 114:13
  132:16 134:1
  137:21,21
  141:9 157:2
  177:10,17,25
adults 14:20
  15:1 19:4,21
  24:17 28:1
  135:25 157:9
  177:3,14,17
advice 113:24
  121:14
Advisory 33:18
  33:21
advocacy 122:19
  123:3 135:12
affirm 7:19
affirmative
  147:17
afternoon 3:13
  142:11
age 6:11 17:12
  20:5,9,17
agents 130:22
ago 56:24 69:12
  86:22
agree 42:18 81:1
  81:6 172:17
  174:7
AGREED 6:1
agreement
  10:12 12:12
  43:21,25 44:1
  44:18,25 47:13
agreements 44:4
Ah 73:20
ahead 52:9
  130:19 139:16

183:19
AKE 90:10,10
akin 38:23
al 1:4,7 3:4,7,20
  3:21 6:18,19
  201:6,7 202:2
  202:3
alarmingly 32:9
allegation 25:22
  130:23
allegations
  17:16 25:23
  35:19,21 39:18
  134:4,6
alleviate 126:13
allocated 90:6
  183:25 184:4
allow 123:21
allowed 196:23
allows 76:6
alternative
  83:19,22
alternatives
  83:12 84:13
amended 182:19
amount 47:5
  50:12,13 51:23
  52:6 75:1 90:5
  92:25 140:25
  155:1 159:19
  166:20,24
  180:18
analysis 144:3
  146:14 149:11
Anand 4:7 7:7,7
and/or 201:12
  203:8
annual 55:11
  127:18 157:11
  157:13,18
  183:6
answer 13:18
  45:9 47:6,10
  52:2 63:3
  87:14 95:25
  119:7,10

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 160-37    Filed 02/21/18    Page 53 of 83

121:23 122:11
130:11,18
152:15 173:20
**answered** 121:3
**answering**
179:22
**anticipated** 15:6
**apologize** 124:8
159:25
**appeal** 135:25
136:5,18,20,21
137:14,18,24
138:3,7,15
180:18,21,23
180:25 181:1,7
181:8,9,12,12
181:16,23,25
182:2,4 193:15
193:20,23
194:25
**appealed** 180:21
181:10
**appeals** 15:14
15:17 135:14
135:23 136:13
138:10,14
180:14 181:4
182:6 186:8
193:13
**appear** 74:8
108:16 135:3,3
151:17 169:5
**appearances**
135:8
**appearing** 76:9
133:11 134:16
134:25
**appears** 60:19
128:14 200:7
**appellate** 136:21
186:5,7
**application**
61:18 62:6
64:7
**applications**
64:4

**applies** 96:8
**apply** 76:6 108:8
165:14,17
198:21
**appoint** 72:3,7
**appointed** 44:11
62:3 75:24
76:2 170:8
**appointment**
63:9
**appointments**
125:11
**appoints** 62:9
75:14
**apprise** 162:14
**approach**
103:17
**approached**
103:21
**appropriate**
50:12,13 82:10
97:24 162:8
193:16
**approve** 97:13
**approximately**
6:16 8:23 43:8
43:12 50:24
57:13 65:18,21
69:21 86:22
128:14 142:5,8
164:24 173:12
173:16 190:9
198:18
**area** 60:3,5,8,20
64:25 65:24
66:10 89:2
151:18 154:5
158:12 164:22
166:5 184:17
**areas** 158:9,16
158:17 162:20
**arena** 161:10
164:15,18
165:13
**argue** 75:8
**argued** 180:20

**argumentative**
74:21 75:3
**arguments** 82:8
181:4
**arrangement**
74:16
**arranging** 83:19
**array** 89:5
**arrests** 139:2
**arson** 21:4
**article** 10:9
**aside** 54:3
135:14
**asked** 8:25 9:16
43:16 65:24
74:16 81:14
87:13 131:12
134:20,22
140:12 148:18
150:16,22,23
153:3,10,12
173:18 174:13
175:20 178:13
180:13 187:25
188:21 190:9
192:4,20
193:13
**asking** 83:2
91:16,19 94:8
110:20 112:7
132:12 143:1
152:18 156:7
159:24 160:1
162:24 163:2
163:14 179:18
181:19
**aspect** 168:3
**aspects** 110:15
**assault** 21:3
**assess** 145:2
**assessment** 26:3
30:6,25 62:12
**assessments**
26:13,17,17
**assign** 37:23
186:25 187:9

188:25 196:17
197:2,12,18
**assigned** 36:11
37:13,16,17
38:3 44:20
46:3,13 70:15
82:17 85:2
92:13,22 93:10
99:11 100:17
108:11 162:21
191:3 197:21
197:22,23
**assist** 44:20 46:4
99:8 129:19
131:19 132:1
140:7 184:23
**assistance**
125:12 139:12
140:3,7 187:7
195:12
**assistant** 100:15
100:17,20
**assistants**
100:23
**assisted** 176:6
178:8
**assists** 63:2
**assume** 12:2
87:22 132:9
**assumed** 193:14
**assuming**
164:10
**attached** 2:23
**attachment** 9:17
**attend** 54:17
55:12,14
164:23 165:4
171:18
**attended** 57:7
165:3
**attending**
133:20
**attention** 26:8
27:16 28:8,20
28:24 30:4
34:2 37:21

41:14 42:23
61:5 64:24
66:24 177:5
**attorney** 2:19
4:19,23 10:21
10:22 13:15
31:25 34:21
38:11,15,16
39:18 40:13
44:14 45:13
46:3 47:17
53:4 54:23
59:17 60:2
62:3,4 63:16
65:25 68:12
69:4,5 70:18
72:4,7,8,12,23
76:10 77:2
78:1 93:21
100:13 101:4
109:13 122:21
124:19 131:19
133:13 135:15
139:7 152:7,9
154:1 158:12
158:20 159:17
170:17 182:11
191:3,5 200:15
**attorneys** 11:4
16:23 30:22,22
44:13,16,24
45:1,6,7 47:18
53:13 57:14,20
57:21 58:1
66:11,15 67:15
68:17,23 69:7
70:14 76:13,14
79:6 80:6,11
81:18 82:14,17
85:11,15 86:8
87:11 93:4
95:22 100:21
111:20 113:15
113:24 115:8
115:20 120:11
120:17,18

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com    Phone: 1.800.280.3376    Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 160-37    Filed 02/21/18    Page 54 of 83

123:2 124:25
125:10 133:20
153:17,23
157:14 161:13
163:8 165:12
167:24 169:13
170:13,15,25
171:13,16,23
184:22,25
187:5,23
195:11 198:4
**automatically**
117:4
**available** 111:12
116:7 165:11
**avenues** 162:16
163:23 165:11
**average** 49:25
50:5 51:3,19
51:23 80:24
98:3 154:9
156:3,10,11
194:13 195:3
**averages** 154:16
**aware** 49:3
50:11 59:12
90:2 96:10,11
96:15,17,19
103:24 105:13
107:7,10,18
108:9,14,18
109:22,25
112:22 114:1
121:20,24
123:20 124:10
125:13 126:10
128:25 129:3
129:10 132:2
138:20 139:2
139:10 140:5
148:2,5 160:9
160:24 175:14
**A-N-A-N-D** 7:8
**a.m** 1:20 6:13,16
37:5 43:8,12
65:18,21 142:5

142:8

_____
**B**
**B** 2:10
**bachelor's**
143:17
**back** 12:20 15:1
37:21 43:11
53:25 64:24
65:20 103:6
109:6,23
132:24 142:7
142:25 144:14
149:24 166:17
169:25 173:15
184:17
**background**
14:2 143:5
144:6,10
**backwards**
186:1
**ball** 33:19
**ballistics** 88:24
**bank** 119:11,14
119:18 165:25
166:4,9,15,17
166:21,24
167:2,8,25
189:18,22
**bar** 67:4 161:17
**Barrett** 41:25
42:4,15 124:12
**base** 171:25
**based** 32:18
36:14 39:6
61:19,22 62:7
106:3,15
108:20 114:23
115:2 130:12
132:9 145:18
145:23 193:6
**basic** 167:3
197:9
**basically** 103:9
156:10 174:19
196:21

**basis** 47:2
**Bates** 60:16
**began** 14:6
56:24 57:1
73:7
**beginning** 76:19
77:11 81:1
142:24,25
144:16
**behalf** 1:15 3:22
6:12 7:6,10,11
7:13,16 135:12
142:22
**behavior** 19:6
**belabor** 186:1
**believe** 36:21
39:22 40:11,12
40:13 42:12
45:21 50:24
57:1 69:22
73:22 75:2
89:24 93:9
97:9 100:25
104:3 112:25
116:11 121:1
121:10 124:4
138:5 141:11
141:14 143:5
154:17 160:8
175:17 176:5
178:7 188:2
190:1,8,10,25
191:22 192:10
192:20
**believes** 117:22
**bench** 56:5
**benefit** 99:25
**best** 58:23 67:4
67:14 82:10
100:6,9,10
136:13 165:7
174:24 187:6
200:10
**better** 152:24
**beyond** 10:16
16:21 56:14

64:4 69:15
96:18 107:18
107:22 119:12
**big** 25:20 141:17
**bill** 6:24 109:13
153:15,20
**bit** 14:1 16:20,20
18:19,21 20:24
22:2 26:8
29:14 31:2
34:2 38:14
40:12 41:7
45:5 46:14
48:12 49:20
52:13 54:1
56:3 78:11
84:15,17,20
87:19 88:12
93:15 103:7
110:5 114:11
138:17 153:7
157:17,20
166:3,7 168:2
168:12 178:10
179:25 180:1,3
181:6 197:25
**blanks** 143:1
**blue** 94:25 184:9
184:11,15,18
184:21 185:6
**board** 33:18,22
189:19 198:1,3
198:7
**bodies** 23:4
24:10
**bond** 61:11
**bono** 126:2,9
**boss** 101:23
**bottom** 60:4,16
60:17 61:6
172:8,12
**Boulevard** 4:4
**Brady** 96:20,21
97:5
**brain** 23:20
56:10 88:18,21

158:10 172:15
172:24,25
**break** 13:14,15
13:18 24:25
43:14,15 52:16
65:23,24 114:4
170:6
**briefly** 143:4
**bring** 10:24
66:14
**brochure** 160:10
160:12,13,21
**brochures** 160:4
**budget** 42:10
97:17,18 184:4
**building** 4:13
95:5,6 201:5
**bunch** 166:10
**burden** 103:24
104:5,7
**burglary** 73:15
73:18,19,20
**bus** 197:7
**busy** 116:3

_____
**C**
**C** 4:1,3,18 49:23
**calendars** 171:7
**California** 4:8
**call** 18:6 41:14
47:25 113:20
119:24 120:14
130:4 138:1
177:4 180:7
**called** 11:19
17:14 21:4
37:7 38:17
58:5 90:9
92:15 126:7
132:21 133:23
180:9 186:12
187:11 189:19
195:12,13
196:8,13
**calling** 119:12
176:17 179:2

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 160-37    Filed 02/21/18    Page 55 of 83

calls 177:16,22
capacity 149:20
154:5
capital 121:1
191:22
care 105:9
187:14
career 118:16
carried 191:12
case 1:6 3:6 6:19
18:1 20:6
22:14 24:9
28:6 31:17
38:18 50:1,1
50:25 51:1,3,8
51:8,11,15,19
52:22,25 56:12
62:10 63:10
64:17 65:3
68:4,5,15,17
68:24,25,25
70:19,22 72:20
73:15,17 74:2
75:16,23 76:10
76:19 77:2,3
77:11,19 78:3
79:14 80:3,9
80:12,21 81:2
81:3,9,13 82:1
82:4,24 83:4
84:25 88:9,11
88:22,24 89:7
93:22,22 94:12
96:5 98:9
99:25 102:21
102:22 103:25
104:16,18,22
104:24 105:6
105:10 107:19
107:21 108:2,3
108:11,23
109:3,5 110:16
110:21,22
114:19 115:10
115:12,21,22
115:23 116:10

116:17 117:10
121:7 123:23
125:19,20
128:2,5,10
131:12 132:16
132:16 137:2
137:22 148:25
154:13,19,21
154:23 155:2,3
155:4,6,9,14
155:17 156:5
162:8 165:8,21
166:12 167:21
169:11 172:9
172:18,19,23
173:2,8,20
174:8,9,10,14
174:18,20
179:15 180:23
181:1,9,10,25
182:4,4 184:15
184:18 187:12
187:15 188:2,3
188:24 190:15
190:20,20
191:2,3 195:8
198:4 201:10
202:2
caseload 70:9
123:23 124:13
125:20,24
140:24 141:14
caseloads 90:18
123:18 141:20
cases 10:3,22
14:24 15:10,13
15:23 16:1
21:16 22:4
23:5,24 24:5
29:3 36:16,17
38:8,16 40:13
40:14 41:8,9
41:10,12 44:21
45:14,19 46:13
46:15,21 47:5
49:13 50:9

51:24 52:7,23
53:2,2,14
54:20 55:17
64:12,14 67:19
67:23 68:3,10
68:14 70:10,15
72:24,25 73:3
74:24 80:17
82:15 84:16
85:9,16 86:4
86:10,11,15,19
87:13,23 88:8
92:2,7 93:1,1
93:18 94:7
95:23 96:9,22
96:25 97:25
98:1,11,13,16
99:5,18,18
103:1,2 104:8
105:16 108:10
108:14 111:7
114:13 115:5,8
116:12 120:6,7
120:12 121:11
121:22 123:12
123:18 124:12
125:1,5,6,15
125:23 126:4,9
126:11,15,16
126:17 128:15
128:22 129:1,1
129:5,8 131:25
133:4 135:24
137:6,9,13
139:9,13 140:8
140:25 141:3
141:10 154:9
154:16 155:6
155:11,19,20
155:23 156:4
156:12,14,16
158:6,7,19,22
158:24 160:5
160:25 162:10
166:6,8 169:1
169:3 170:15

170:18 171:11
172:4 173:24
174:4 175:2,6
175:12,16
177:7,9,11,14
178:10,20
179:1,5,19,22
180:21 185:18
188:8,11
190:10,17,17
190:23,24
191:9,10,22,23
194:5,10,14,19
195:4 197:15
198:4
case-specific
166:8,12
Catholic 113:21
cause 3:18 82:7
104:24
CCR 5:11
center 4:4 7:5
10:9 11:20,23
32:12 58:15
80:19 108:4
111:9 160:15
160:19 164:2
164:24 188:15
188:16
central 1:2 3:2
3:20 6:21 23:4
certain 3:18
92:3 173:2
190:2 191:21
196:16
certainly 80:7
130:6
certainty 145:3
CERTIFICA...
200:1
certification
20:22 21:5,16
21:23 22:15,23
24:5 98:18,22
103:6,7,9,14
103:16,17,25

104:8,16,18
105:3,16
106:10,22
107:1,4,8,11
107:20 108:15
108:22 109:12
178:9 179:4,5
179:9,14
certifications
22:2,6 47:9
certified 3:16,17
6:5,5 21:12
36:7 70:20,22
103:10 107:25
109:15 165:1
200:3,4,5,22
certify 200:6
203:5
challenge
135:15,15
challenged
104:6,12
106:13
challenges 25:10
104:20
challenging
24:14 104:23
chance 10:24
change 47:19
48:18 86:18,23
86:25 87:4
117:23 118:4
202:6,10,14,18
202:22
changed 32:25
117:1 131:17
162:19
changes 162:14
201:12 203:7
203:10
characterized
33:7
characterizing
188:1
charge 17:15,21
51:13 89:2,15

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-37   Filed 02/21/18   Page 56 of 83

charged 17:13
17:15,18 18:6
19:5,18,19
21:1 77:16
79:15,19
charges 18:19
19:2,11 20:1
20:18 78:16
Charles 15:4,11
64:9 70:7
76:12 85:15,19
87:12 113:3,7
chart 60:24 61:2
61:4 127:24,25
charts 60:24
chief 124:20
child 17:15 20:3
20:4 21:1,8,12
21:17 22:12,19
25:21 61:25
62:15,17,23
70:21 75:15
76:5,9 77:15
77:20 80:13
83:5,9,18 84:2
84:7 88:16
91:10 103:10
105:5,8 107:25
108:3,5 109:15
110:12 116:24
117:2,13 118:1
129:15,19
131:1 134:3,7
136:17 137:22
138:6 172:12
172:15 180:5
180:25 181:7
182:1 188:14
194:23
childhood 19:25
children 24:1
31:12,15 35:16
35:17,22 39:15
61:17 62:7
63:2,19 78:16
79:22 80:19

81:19,20,22
83:24 108:14
118:12 131:9
132:1 133:11
134:16 135:21
137:12 138:7
170:14 177:20
188:15 193:3
196:10,11
child's 22:19
62:10 105:12
107:19 110:15
137:18
Church 1:4 3:4
3:20 6:18
201:6 202:2
Cindy 72:14,15
circuit 10:20
71:24 152:4
circuits 124:22
124:23
circumstance
172:13 173:7
195:10
circumstances
117:1,23 118:4
city 4:24 8:15
10:22 11:5,6
14:19,22 15:1
15:3 37:3
39:20,21,25
61:23,25 62:9
62:23 63:8,19
66:24 67:3,5,7
67:23 68:10,20
69:16 70:9,16
70:22 72:5,8
72:12 75:14
78:20,23,25
79:7,10 84:23
85:14 87:10
92:1,4 93:7,7
95:15,22 99:12
99:12 100:5,24
107:19,22
109:18 111:25

112:14,15
113:11 116:12
117:6,11 126:3
126:17 130:3
133:4,7,12
135:1 138:14
138:18,21,25
139:3,8,13
140:2,9 150:17
152:13,25
180:10 186:13
194:12 195:24
city's 70:11
civil 147:22
153:16,17
claims 168:23
clarification
13:4
clarify 37:12
39:24 40:12
63:5 84:22
182:14
clarifying 53:9
classic 77:24
CLE 157:22
clear 12:10 13:4
19:15,24 38:12
50:8 55:10
62:8,19 128:10
195:7
cleared 171:7
client 65:3,4
141:18
clients 66:16,21
124:22 170:20
179:13 188:13
close 125:16
closed 117:12
Coalition 126:7
code 18:4 19:1
23:2,3,9 24:6
collaborating
111:8 160:14
collaboration
58:13
collateral 25:14

109:11 110:6,8
110:11,17,19
110:25 111:10
160:13,21
colleagues 51:24
92:6 105:14
106:24 119:4
140:8
collect 148:23
collected 146:25
147:1 148:21
148:23
collection
146:15 148:7
183:10
college 110:14
color 36:4 95:2
Columbia 4:14
16:14 85:6,7
124:23 125:8
169:2,12,12
171:12,12,21
171:23,25
201:5
column 191:10
columns 190:12
190:13
come 16:16
34:24 80:2,6
96:4 103:6
115:13 132:24
140:7,10 169:8
comes 79:14
97:16,18 100:6
165:8 172:9,12
coming 64:19
75:15 118:5
commentary
145:15
Commission
203:24
commissioner
116:25
commissioners
36:20,22
communicating

24:14,16,17
communication
24:23
communicatio...
124:11
community 8:4
compare 20:6
152:12
compared 41:4
compares
105:14
comparison
122:23
competence
164:19
competency
88:14
competent
106:16 164:7
164:17,22
complaint 2:13
2:14,15,16,17
2:18,21 10:15
11:16 27:4,9
30:12,15 34:6
34:10 41:17,20
42:21 43:1
47:23 48:3
127:5,9
complete 93:5
134:5
completed 38:21
completely
164:22
compliance
132:25 134:17
component 55:7
compound
174:12
comprehension
88:17
computer 48:15
198:11
concerned 28:3
concerns 46:20
77:1

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-37   Filed 02/21/18   Page 57 of 83

concluded 199:1
conclusions 32:13,14 34:25
concrete 25:3
conduct 192:13
conducted 30:20 69:16
conference 76:5 80:10 131:5 156:25 157:5
conferences 131:10,11 157:7
confirmation 198:21
conflict 15:10,13 16:1 45:1,6 64:16 74:24 75:10,11 76:20 77:2,17,24 78:18 79:24 80:6 82:17 84:16 85:1,5 85:15 87:7 170:14,15 192:5,9,23
conflicted 31:11 64:17 80:17 81:15 115:2 192:25 193:5
conflicts 70:6,7 70:8 75:11 77:5,10,18 84:15 85:20 141:9,9 166:13 168:20 171:11
conflict-free 80:13
confront 25:10
confused 72:10 78:11 84:21 181:6
confusingly 27:7 30:7
Congratulatio... 8:17

consequence 25:15,15
consequences 110:6,9,11,12 110:17,19,22 110:25 111:10 111:17,19 112:5 160:13 160:21
considered 18:3 19:20 20:4 61:8 82:10 185:3
consistent 40:8
constitutional 175:14,18
constraint 168:6 168:22 169:10 169:14
constraints 168:13 169:10 171:17 188:12 196:12 197:14
contains 187:13
context 18:15 46:21
continue 63:4
continuing 164:20
continuity 109:14
contract 10:21 10:22 11:4 44:13,13,16,24 45:1 72:3,8,9 72:12,23 74:19 74:23 79:2 80:9 85:11 169:1,3,11 171:13,22
contracted 85:6
contrast 38:2
controllable 50:1
controls 23:5
conversation

11:21 29:15
168:9 172:5
175:22 178:11
180:15
conversations 16:5 115:7
convey 26:1
conveyed 26:4
conveying 25:7 25:8,18
convict 177:17
conviction 18:2
convictions 18:3
coordinating 197:7
coordination 197:5
coordinator 119:24
copies 2:23 11:1 101:2 196:21 196:24 201:9
copy 9:7,7 11:3 71:12 95:8 184:19 201:11
correct 9:14,18 12:3 17:22 19:22 20:16 21:17 23:7 36:12 38:5 39:3 40:10,25 43:14 44:22 45:16,25 46:6 46:11,22,24,25 47:3,21 49:15 50:10 51:9 54:2,11,12 56:1,22 57:4 60:21 63:21 64:21,23 65:25 67:2 70:17,25 73:11 74:3,6,9 74:11 75:17 76:11,21 78:4 78:25 79:1,4 98:1 99:19

111:16 114:15
117:4,5,19
132:22 133:1
137:8 138:2
144:25 147:6,7
149:5 150:6
151:6,19,21,22
153:1,2 154:3
156:11 158:7
159:7 161:2,5
163:20 164:16
168:15 172:7
173:22 178:5
178:16 181:13
182:21 186:5
189:12,13
190:18 192:3
193:1,24 194:6
196:19 203:9
203:13
correction 140:16
corrections 201:12
corresponded 152:2,6
corresponden... 124:11
cost 97:12
costly 165:17
counsel 6:2,2 7:2 10:8 29:16,20 29:21,24,24 31:8,9,21 35:16 39:15 46:24 47:2 56:8 72:9 74:19,23 75:11 75:24 76:5 79:2 80:13,23 85:1 108:5,17 124:21 126:8 126:24 131:11 168:7,7,20,21 170:8 171:1,6 180:6 198:19

200:12,15
counties 15:7
16:1 40:1 41:2
47:20 86:9,20
106:4 114:1
150:20,23
151:5,8,9,13
151:17,25
152:10
country 20:12
county 12:3 15:4
15:4,4,5,11,11
15:12,12 34:19
35:2,8 36:11
37:1,4,8,23
39:5,8,12
43:22 44:2,14
44:21 45:15
46:3 47:13,14
47:19 64:2,7,9
70:6,7 71:7
76:12 84:19
85:14,15,18,19
86:3,15 87:12
87:13,16 94:21
95:10 107:8,12
109:20 116:10
131:18,25
133:19 138:18
138:19,24
141:9 148:24
151:1,2,20,21
182:20 184:12
184:14 203:3
County's 40:7
couple 16:4 69:1
69:2,12 80:9
118:14 122:3
182:7 186:11
189:17 195:22
course 13:14,16
55:6 78:3 84:6
89:12 98:4
102:19 118:16
132:23 137:12
165:20

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com Phone: 1.800.280.3376 Fax: 314.644.1334
Case 2:17-cv-04057-NKL Document 160-37 Filed 02/21/18 Page 58 of 83

| | | | | |
|---|---|---|---|---|
| coursework | 177:2 180:7 | 148:1 | 146:15,15,25 | defendants 1:8 |
| 144:11 | 181:5 186:22 | created 10:10,19 | 147:1,5,9 | 3:8,22 4:11 6:3 |
| court 1:1 2:23 | 186:23 194:8 | 124:3 | 148:7,18,20,21 | 18:7 78:13 |
| 3:1,16,19 5:10 | 196:12,13,14 | creating 184:24 | 148:23 150:1 | 114:14 |
| 6:5,20 7:19 | 197:4 198:19 | 185:6,10,14 | 183:10 | defendant's |
| 10:21 11:6 | 200:4,22 | creation 145:8 | date 6:15 69:10 | 177:25 |
| 12:3 16:17 | Courtney 59:3 | 183:2 | 120:9 202:3 | defender 4:11 |
| 18:6 19:12 | courtroom | credit 157:22 | dated 73:9 | 4:12 8:14,15 |
| 20:14,18,19,20 | 37:16,17 | crime 106:8 | day 3:13 36:16 | 8:20,22 9:24 |
| 21:17,19,23 | courtrooms | crimes 177:18 | 36:17,25 37:8 | 10:9,20 11:5 |
| 22:3,11,13,20 | 36:15,17,19,22 | criminal 18:22 | 92:23 203:14 | 11:20,23 14:7 |
| 24:9 25:3,3,9 | 36:23 37:25 | 19:1 23:8 24:4 | days 81:2,3 | 14:16 15:20 |
| 31:11 32:16 | 40:23 | 49:14 96:2 | 82:19,23 84:12 | 16:6,15 24:12 |
| 34:19 35:3,9 | courts 29:3,17 | 98:1 114:13 | 116:24 117:7 | 26:14 32:4,12 |
| 36:12 37:1,9 | 29:21,25 30:23 | 143:25 153:19 | 158:3 168:17 | 32:19 33:9 |
| 37:11,23 38:8 | 32:7,20 120:11 | 158:19 177:10 | 169:3,15,18 | 35:13 36:10,16 |
| 39:6 40:7 | 135:10 146:23 | 177:13 | 170:3,11,16,24 | 37:7 38:3 41:4 |
| 43:23 44:3 | cover 27:7 30:10 | crisis 42:17 | 171:1 201:16 | 42:17 44:10,19 |
| 49:8 50:18 | 34:8 37:25 | cross-examina... | day-to-day | 44:20 45:14,23 |
| 51:9,12,12 | 38:3 40:22 | 106:18 192:21 | 90:15 | 46:8 53:21 |
| 55:1,25 56:1,9 | 41:18 42:25 | CSR 5:11 | deadlines 177:7 | 54:2,6,9,10,11 |
| 56:9 62:9 63:9 | 48:1 59:24 | cull 193:15 | 177:13 | 55:11,12,14 |
| 66:24 70:1,8 | 68:15 79:12 | curfew 19:7 | deal 162:21 | 56:20 58:2,15 |
| 70:11,16,20 | 80:6 86:4,9 | current 8:10 | 167:7,9 177:9 | 60:23 62:1,9 |
| 71:25 72:5 | 87:13 127:8 | 42:10 66:10 | dealing 51:12 | 63:14 64:15 |
| 74:8 75:14 | coverage 170:18 | 124:17 170:20 | 121:1 158:22 | 67:12,19 71:24 |
| 76:3,3,9 78:25 | covered 130:1 | 176:3 184:13 | 170:18 177:3 | 72:16 75:15 |
| 90:10 93:11,22 | covering 86:15 | currently 16:10 | dealt 162:22 | 76:7,22 77:8 |
| 95:19 96:6,8 | 86:19 135:7 | 20:8 29:10 | 191:22 | 89:24 90:7 |
| 96:22 97:21 | covers 79:9 | 36:20 52:24 | Dear 201:8 | 92:16,17 93:20 |
| 104:13 105:2 | 84:18 | 53:11,11,15 | death 103:9 | 93:21 97:13,17 |
| 108:16 109:6,6 | co-defendant | 55:9 72:11 | decide 108:1,2 | 99:1 101:14 |
| 109:12,23,24 | 193:6 | 73:4 85:4 | decision 171:25 | 107:21 108:7 |
| 110:18 115:5 | co-defendants | 86:12 109:17 | declare 203:12 | 108:11,24,25 |
| 117:4,24 120:4 | 77:25 79:19 | 111:11 113:15 | dedicated 67:12 | 110:19 111:9 |
| 120:8 121:13 | co-respondent | 160:20 176:1 | dedicating 92:25 | 116:9 117:21 |
| 123:7 126:11 | 82:15 | 191:7 | deemed 44:12 | 117:22 118:3 |
| 129:1 130:23 | co-respondents | custody 130:2 | 63:20 64:16 | 122:16,17 |
| 132:24 133:22 | 80:3 81:13 | cutoff 19:25 | 111:23 | 123:1 127:20 |
| 133:23 134:1,2 | Craft 121:20,24 | 20:13,14 | deep 45:12 | 128:15 129:9 |
| 134:3,4,16 | 122:8,13 | | deeply 28:3 | 140:2,14 |
| 135:1,4,8 | 191:16 | _____ | default 20:11 | 145:25 147:2 |
| 136:1 142:20 | Craft's 120:22 | **D** | defend 40:23 | 154:18 156:20 |
| 149:3 155:15 | 122:12 | D 2:1 61:8 | 140:4 | 157:5,14 |
| 160:18 169:3,5 | create 33:11 | daily 152:3,18 | defendant | 160:15,19 |
| 170:1 171:18 | 92:15 111:9 | data 30:24 32:17 | 153:17 | 164:2,24 |
| | | 132:13 145:8 | | |

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-37   Filed 02/21/18   Page 59 of 83

182:16 184:1
186:4 189:7
201:4
**defenders** 7:16
13:25 15:22
16:3 32:15
33:14 35:3
41:2 54:19
56:15 57:22
58:22 67:6
68:9 76:15,16
96:24 110:24
111:14 112:17
116:3 123:14
123:21 124:24
129:11 130:14
131:24 135:7
156:19,25
158:16 159:20
161:1 166:6
167:6 169:2
185:3,5 198:13
**defender's** 9:1
9:13 14:13,14
26:10 45:8
46:1,7 48:8
62:3,5 63:10
63:17 67:8
78:23 85:19
154:1,6 161:5
161:14,19
164:14 184:4
185:19
**defender-type**
47:18
**defending** 24:13
140:8
**defense** 8:13
17:3,3,6 23:14
23:18 24:3
30:21 31:4
32:3 44:5
49:19 50:9
52:23 67:23
100:7 104:16
114:19 117:16

119:23,25
123:10 126:23
**definitely** 88:7
100:9 155:11
158:18 179:7
**degree** 14:4
18:25 21:3
143:15,16
145:3
**delegate** 187:21
**delinquency**
17:6,11 20:1
29:2 45:14
46:15 50:9
129:1
**delinquent**
17:14
**delivery** 87:5
**denied** 173:8,20
173:25 189:11
**deny** 97:14
**Department**
10:11,12 12:1
34:24 35:7
39:5 42:6
122:10 131:15
147:21
**depend** 174:14
174:17
**dependent** 61:10
172:19 174:9
**depending**
101:3
**depends** 88:6
116:6
**deploy** 91:22
**depose** 97:10,12
97:24 106:25
**deposed** 106:20
**deposes** 6:12
**deposition** 1:14
1:20 3:10 6:3
6:13,17,22
9:13 12:21
30:9 34:8
41:15 42:24

48:1 97:16,24
101:19 127:7
142:24 144:21
145:19 147:12
147:15 148:12
149:16 174:14
199:1 200:8,14
201:9 203:6,8
203:11
**depositions** 97:7
97:8 98:3,9,19
98:21 159:13
174:3,8,13,20
198:20
**deputy** 8:14
35:4 38:11,17
38:22 92:17
105:23 106:20
106:25 178:18
187:17
**described** 25:25
40:8
**Description**
190:16
**descriptors**
190:13
**designate** 128:9
**designated**
13:24 45:13
54:1 112:21
121:18 139:18
191:25
**designation**
54:10
**desire** 25:13,14
**desired** 201:12
**detailed** 48:22
**detained** 25:12
36:4 44:9,11
81:8,8 84:3
116:25 117:14
118:13 176:16
180:5
**detention** 31:21
36:24 37:4
74:10 76:4,10

76:13 79:9,12
79:16,22 80:7
80:16,18,19,23
81:6,19 82:2,5
82:19,25 83:13
83:23 84:13
108:3 116:20
117:2,17,20,25
118:4,6,10,15
118:17 119:6,9
140:20 141:17
168:3,8,16,16
170:9 188:15
188:16 192:22
192:24 193:4
**determination**
20:20 22:12
82:5 85:3
**determine** 20:21
21:7 28:5
63:14 85:5
97:23 192:5
**determined**
22:14 64:17
124:24,25
**determining**
81:10
**development**
23:20 56:10
88:19,21
158:10 172:15
172:24,25
**DeVries** 3:16
5:10 6:4,24
200:3 201:22
**difference** 41:7
56:9
**differences** 17:2
25:9 51:2 56:6
56:13
**different** 16:4
23:22 24:17
26:12 37:2,3,7
37:24 44:8
45:4 55:20
56:1,12 73:24

74:15,18 81:18
86:20 92:2
106:4 111:24
117:17 131:1
155:4,6,14,17
158:23 172:13
173:3 177:3
**differently**
103:18,21
113:10 132:20
**differs** 192:12
**difficulty** 25:17
25:18
**dilemma** 131:9
**diligence** 124:21
**Diplomate** 3:17
200:5
**direct** 27:16
28:19 61:5
89:22,23
135:14 137:24
138:3 190:5
**directed** 16:8
28:23 152:8
**direction** 200:11
**directly** 90:10
97:21 139:23
**director** 8:13
41:24 42:4,15
119:25
**disabilities**
88:15
**disagree** 32:20
42:13 52:10
194:7
**discern** 76:20
**discerned** 77:6
77:17
**disciplinary**
124:20
**discipline**
185:17
**disciplined**
124:20
**discovery** 93:16
93:18,23,24

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com     Phone: 1.800.280.3376     Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-37   Filed 02/21/18   Page 60 of 83

94:7,17,18,21
95:16,24 96:8
96:12,18 97:5
97:5 98:24
184:8
**discretionary**
22:7,15 103:16
**discussed** 28:1,2
143:4 178:10
**discussion** 43:9
148:15 154:8
154:10 156:19
160:3 172:3
173:13 174:2
**discussions**
175:2
**dismantled**
123:10
**dismiss** 114:21
114:23 115:2
166:10
**dismissal** 134:9
**dismissed** 134:6
191:5
**disparity** 41:3,9
105:3
**disposed** 137:13
**disposition**
38:21 137:1,3
137:13 173:4
**dispositional**
23:25
**distinction**
190:20,23
191:1
**distinguish**
27:25
**distribute** 11:7
**distribution**
111:12
**district** 1:1,1 3:1
3:1,19,19 6:20
6:20 8:15
89:24 92:16,17
97:13 124:24
**districts** 125:4

133:18
**diversion** 130:21
130:25 131:2
131:10
**diversionary**
132:1
**diverted** 46:19
**divided** 93:3
**division** 1:2 3:2
3:20 6:21
14:22 71:25
135:13 147:22
165:15 186:5,7
**DJO** 131:20
**DNA** 88:24
**docket** 23:12,13
24:5 36:24
135:4 195:8
**dockets** 37:7,14
37:25 38:4
46:4 47:18
79:12
**doctors** 104:14
**document** 9:10
10:16 11:15
12:13 27:11,12
30:16,19 34:3
34:14 41:23
43:1,17 44:6
48:3,6,15 53:2
59:14,22,24
65:5,14,25
66:2,7 71:11
71:16,21 72:1
74:13 82:7
91:8 102:24
127:2,10,16
**documents**
10:14 52:15
60:11 65:2
91:6 100:12
101:2 104:23
163:25 164:2
187:13
**doing** 26:2 67:15
82:23 85:15

86:21 87:7
96:25 120:11
121:24 126:13
128:18 133:12
141:2,17,20
152:21 153:5
185:11 187:22
189:3 192:25
**DOJ** 12:7,9,12
37:22 40:8
43:22
**doors** 117:12
**Dowd** 87:2
**downtown**
14:20 15:1
**draft** 120:16
182:22 183:13
183:15
**drafting** 197:9
**drafts** 111:11
**drug** 83:20
133:22,23
134:1,2,3,4,16
134:20 135:1,4
135:8,9
**due** 118:14
124:21 125:1
**duly** 200:8
**dumped** 123:14
**duration** 70:24
**duties** 70:4
96:17 176:3,5
176:21
**duty** 87:2
110:18
**DWI** 65:4
**DYS** 135:21

_____
**E**
**E** 2:1,10 4:1,1
95:17,20
**eanand@orric...**
4:9
**earlier** 9:22
11:19 24:3
30:5 46:5,18

52:20 75:13
86:19 103:5,15
126:19 130:20
131:9 140:23
144:15 151:4
151:11 153:3
165:25 168:5
168:10 172:4
174:3 175:21
178:11 180:13
182:14 192:20
195:23
**early** 186:20
**Easha** 4:7 7:7
**educate** 165:20
182:1
**education** 14:1
182:2
**educational**
143:5
**effect** 73:12
85:22
**effective** 141:19
**effectively**
125:25 141:13
**efforts** 103:14
**eight** 8:23
**either** 17:17
22:17 38:10
55:5 76:2,4
88:14 103:17
108:5 147:3
152:25 159:25
176:16 189:2
**element** 56:7
**elements** 17:21
89:2,2 104:11
106:9
**Eleventh** 5:3,12
**employed** 98:25
200:12,16
**employee**
200:15
**employees** 68:8
**employment**
110:13

**enable** 118:3
**enclosed** 201:9
201:10
**Enclosures**
201:24
**encountered**
195:8
**encouraged**
16:16
**encumber**
101:22
**encumbrance**
89:16
**engagements**
129:12
**engaging** 176:13
**English** 102:3
**ensure** 26:1 62:4
81:21 136:13
**ensuring** 141:18
**entail** 136:19
**entailed** 48:13
73:17
**entails** 58:12
180:4
**enter** 80:23
90:18 153:4
**entered** 64:15
80:20 86:12
191:5
**entire** 162:6
163:7
**entirely** 23:9
**entitled** 29:24
30:6 46:23
**entity** 185:10,13
**entry** 142:23
**equal** 36:3 39:19
40:3
**Eric** 7:11
**errata** 201:10,12
201:15 202:1
**escapes** 110:21
**especially** 17:9
**essence** 19:10
**essentially** 39:1

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com     Phone: 1.800.280.3376     Fax: 314.644.1334
Case 2:17-cv-04057-NKL     Document 160-37     Filed 02/21/18     Page 61 of 83

46:2 108:17
130:22
**estimate** 193:3
**et** 1:4,7 3:4,7,20
3:21 6:18,19
201:6,7 202:2
202:3
**ethical** 76:24
125:1 175:5,7
179:8,13
**evaluate** 26:14
**event** 159:16
180:22 194:22
**eventually** 120:5
**everybody** 19:15
**evidence** 74:4
104:10 114:21
178:14,15,23
179:2
**exact** 32:8 35:1
57:24 69:10
85:10 96:7
132:8 151:7,12
153:9
**exactly** 69:3
152:6 155:5
184:11 185:2
185:11 198:1
**exam** 161:17
**EXAMINATI...**
7:24 142:9
185:23 192:18
195:20
**examined** 3:11
6:11
**example** 25:7
115:21 151:24
187:8 188:18
**examples** 166:10
166:20
**exceed** 73:2
**excessive** 123:24
**exclude** 114:22
114:22
**Executed** 203:14
**exhaustive**

21:25
**exhibit** 2:11,12
2:12,13,13,14
2:14,15,15,16
2:16,17,17,18
2:18,19,20,21
2:21 9:3,3,5,8
27:3,3,7,8,8
30:3,8,9,10,11
30:11,14,15,16
34:5,5,7,9,9,11
41:15,16,16,19
41:19,20,42:20
42:20,23,25,25
43:15,16,20
47:12,22,22,25
48:2,2 59:15
59:17,20 71:12
71:13,20 127:3
127:4,4,7,8,9
144:17 146:10
147:21 149:13
182:8,9 183:6
190:6
**exhibits** 2:23
10:15 91:17
**existed** 45:2
**existence** 49:10
**exists** 41:5,9
97:25
**expanded** 46:2
**expectations**
41:2
**expenses** 90:11
**experience**
15:20 25:6
29:7 32:18
36:15 39:7
87:22 105:20
106:3 145:23
146:16
**expert** 13:24
87:20,23,25
88:1,6,14,18
88:19 89:10,13
89:17,18,19

90:7,11,16,20
90:23 91:22
101:20 105:11
111:19,23
112:6 113:6
172:9,14,23
173:4,20
189:11,15
**expertise** 89:3
106:15 120:10
**experts** 88:3,10
88:23,25 89:1
89:5 90:23,4,7
92:1,4,7 172:4
172:18 173:7
**Expires** 203:24
**explain** 17:9
20:24 36:14
38:14 48:12
116:23 173:1
**expressly** 6:8
**extent** 23:23
146:14 150:1
182:25
**E-A-S-H-A** 7:8
**e-mail** 113:5
**E-Num** 97:11
101:21,21

___

**F**

**face** 18:20,23
19:11 20:18
132:17
**facets** 81:9
**facia** 82:7
**facilities** 188:22
**facility** 177:4
**facing** 103:12
168:8
**fact** 17:20 42:8
104:7 151:4
186:11 192:23
193:22
**factors** 21:7,20
21:22 22:11
104:20 105:1

**facts** 82:1,4
131:12
**failed** 24:8
**failing** 124:21
**fair** 17:1 26:3
47:4 66:6 70:1
70:2,20 86:18
126:24 127:19
130:23 134:10
140:22,22
155:8
**fairly** 134:9
**familiar** 26:12
26:20,22 30:16
34:13,17,20,23
58:5,21 59:5
60:7 61:4
94:20 96:1
109:7 110:16
116:21 125:3
126:2 127:24
133:23 139:6,6
154:24 160:11
189:18
**familiarize**
27:10
**families** 23:23
102:13
**family** 10:20
23:2 34:19
35:3 43:22
44:3 71:25
83:5,22 91:9
94:13 102:1,6
102:7,24 105:4
**far** 75:1 130:13
148:18 149:7
152:17 159:17
161:25 166:16
168:19 170:7
174:20 180:8
184:20
**fault** 129:21
**features** 89:6
**feel** 32:24 75:3
81:12 88:2

90:13 99:20
101:5 125:24
176:19 178:3
179:7,12,17
fellow 115:8
felonies 14:21
17:17,20,20
felony 17:15,17
17:21 18:1
19:13 21:12,13
felt 175:25
fewer 119:1
129:18,22
field 177:16
fight 79:19
81:24
figure 154:24
156:10
figuring 77:9
78:6
file 38:18 61:17
94:22,25 95:7
95:11 114:14
115:11,15,22
117:24 118:11
119:9 174:8
184:9,11,18,21
187:12,12,13
196:21 197:23
filed 11:17 17:16
29:3 36:5,5
74:2 82:18
95:17,20
109:23 114:18
115:24 117:21
118:14,18
121:21 131:3
138:10,14
142:24 168:16
168:18 174:4
files 35:5 148:25
184:15,24
185:6,10,14
187:15
filing 38:7 115:9
116:13 118:6

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 160-37    Filed 02/21/18    Page 62 of 83

119:5 136:20
174:21 177:6
181:5 201:17
**fill** 61:18,18
62:5,17 64:3
**filling** 63:2
143:1
**fills** 61:25 62:15
62:22 64:6
**financially**
200:16
**find** 59:9 162:19
167:2 169:12
170:17 171:13
181:8 201:9
**finding** 49:18
92:24 112:4
136:1 137:4
145:21
**findings** 31:3,19
32:2,21,25
35:7,10 39:4,8
44:3 49:12,13
50:4 52:11
122:9 145:12
**fine** 12:11,14
139:25 151:15
**fingerprint**
88:24
**Finney** 72:14,15
72:19 73:4
**firms** 126:4,8
**first** 13:18 16:5
18:25 20:20
21:3,3 24:18
25:11,12 31:20
54:23 57:7
73:7,18 76:3
80:12,18
104:19 141:8
144:24 149:20
171:9
**fiscal** 127:17
183:6 191:11
191:12
**five** 11:1 15:9

20:8,10 37:6
37:24 38:3
40:23,23 46:4
47:18 59:3
60:16 79:18
80:19 81:13,18
81:20 82:1,14
82:15,17 86:20
106:4 129:18
129:22 138:16
151:5 164:25
**five-minute**
48:17 153:13
**flag** 33:5
**flagged** 131:15
**focus** 9:22 10:2
87:10 103:13
116:19 143:21
**Focused** 143:25
**focusing** 41:11
75:22 84:23
112:2
**fold** 46:2
**folks** 9:6 17:9
38:13 45:22
87:17 88:12
112:15 119:12
120:14
**follow** 125:14
**following** 19:6
137:19,24
**follows** 85:2
**follow-up** 143:2
**follow-ups**
195:22
**footnote** 27:19
27:21,22,23
28:12,15
**forced** 49:8
**foregoing** 200:7
203:6,13
**forenoon** 3:12
**foreseeable**
25:15
**forever** 103:11
**forgive** 14:13

149:15
**form** 62:1,16,18
62:22,25 63:3
65:3,4,4,5
66:17 70:19
74:20 75:5
115:1 159:22
162:23 169:22
173:3 174:11
197:9,10 198:6
203:7
**formal** 95:11,14
106:19
**forms** 65:1
**formulas** 183:1
**forward** 33:17
33:19 86:14
**found** 31:7,8
35:11,23 36:1
36:2,10 42:7
193:20
**foundation** 3:14
6:23 52:1
130:18 139:22
181:3
**four** 36:22,23
59:2 60:16
69:6,9 93:9
154:19
**Fox** 59:2 121:16
121:17
**Francisco** 4:8
**Francois** 15:4
15:12
**free** 134:7
**frequently** 13:6
36:5,7 88:4
110:2 129:10
129:14 134:25
135:2
**Friday** 135:4
157:21
**front** 56:5 63:9
64:22 75:16,23
77:18 108:16
149:23

**full** 8:7 142:12
**fully** 19:20
69:21
**full-time** 61:9
**fun** 186:2
**funds** 46:9
183:25
**further** 28:7
141:23 192:18
195:19,20
200:14
**future** 37:20

───────────

## G

**Gardner** 139:8
139:12
**gathering** 94:6
**gears** 138:17
**general** 10:7
26:17,18,18
94:9,10 139:7
144:11 146:13
156:20
**generally** 52:14
53:18,19 70:15
76:1 77:25
83:2 97:17
98:20 107:24
108:10 132:15
151:18 155:13
155:16 162:7,9
179:19
**General's** 4:19
4:23
**generated**
148:20 150:8
195:3
**generation**
150:1
**Georgetown**
58:14
**getting** 14:10
45:11 83:6
86:14 107:16
168:6,20 171:5
**give** 7:20 104:13

150:2 155:20
169:4 170:24
176:5 187:8
188:18
**given** 19:18 24:2
29:7 36:16,25
37:8 42:10
53:22 66:10
163:19
**giving** 91:6
178:7
**go** 20:14,18
21:17 43:4
44:12 52:9
54:13 65:12,15
73:20 85:9,11
85:21 94:14
95:7 113:5
119:12 120:3
123:2 130:18
133:10 134:7
135:5 139:16
139:23 142:1
152:25 154:23
156:19,25
157:6,10 164:3
165:15,16,22
166:6 169:11
173:11 177:7
180:9 182:5
183:19 184:16
184:17 186:23
194:14 196:2
196:11,14
**goal** 25:12 81:20
**goes** 89:25 97:13
157:19 162:1
166:17 171:20
188:19
**going** 9:4 11:9
25:13 27:5,6
27:15 29:20,24
32:6 41:14
43:7 47:25
52:13 56:4,5
56:12 59:14

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 160-37    Filed 02/21/18    Page 63 of 83

65:17 68:17
79:2 81:23
84:3 86:14
87:6 89:13,14
89:17,19 91:2
91:5,7,7,11,14
91:16,17,19
103:11 108:2
114:5,9 120:10
124:16 125:1
130:4 131:10
134:4 139:17
141:25 142:4
142:25,25
144:14 151:24
154:15 155:4,6
155:7,19
169:13 171:14
173:11 174:8
177:5,21
181:24 185:25
186:1 190:5
195:24 196:5
198:17
**good** 8:1,2 13:13
17:2 33:3,6
72:4 73:20
104:1 137:17
142:11 154:22
160:22 176:7
**Goodwin** 59:3
**gosh** 98:6 104:1
**government**
130:22
**governor** 4:17
7:11 41:25
42:5 142:19,23
**go-to** 112:21
120:23 121:2
121:13
**graduated** 14:6
**Grand** 4:4
**greater** 23:23
**greatly** 40:19
**Greitens** 4:17
7:12 142:19,23

**Grimes** 45:17
**ground** 54:19
**group** 69:6
89:25 116:2
126:3
**groups** 33:16
**grow** 164:20
**grown** 19:19,20
25:8
**grown-up** 137:3
**grown-ups**
138:1
**guardian** 105:10
**guess** 13:16
78:11 106:6
129:8 144:15
145:22 146:8
157:10 159:21
163:18 164:12
166:11 169:25
170:6 183:5
185:3,7
**Guide** 60:2
**guidelines** 60:21
60:23 131:20
**guilt** 134:9
137:4
**guilty** 25:22
137:12,19,25
193:20 194:6
194:10,15,23
**guys** 69:19
113:11

___

**H**

**H** 2:10 142:14
**half** 86:22 98:11
**hand** 68:18
**handful** 41:8
129:17
**handle** 15:23
37:14 45:19
67:20 68:10,14
70:15 79:16
96:25 101:1
121:7 126:15

129:11 133:4,5
186:7
**handled** 15:8,14
15:15 16:23
70:5,6 121:10
123:13 125:23
128:22 129:8
129:15 141:8
172:1 195:9,14
**handles** 46:12
46:16
**handling** 16:21
47:8,18 53:3
53:13 55:1
68:4 79:6
84:11 93:21
95:23 98:16
99:18 105:15
115:8 120:6
121:21 123:22
126:4,11,14,17
131:24 158:21
185:18 188:3
**hands** 80:4
**Hannibal** 54:9
60:6,8,20
66:10
**happen** 112:17
112:18
**happened** 64:20
87:4 122:2
131:7 173:21
196:6
**happening**
108:22 110:2,3
138:24,25
174:10 177:21
**happens** 25:21
78:7 107:19,21
107:25 152:4
**Hawley** 139:7
139:12
**Hawley's** 140:3
**heading** 28:18
**health** 88:14
187:16

**hear** 139:11
**heard** 26:25
49:7 110:2,3
144:20 168:17
**hearing** 65:4
76:4,10 79:16
79:22 80:16,18
80:23 81:20
82:2,19,22,25
83:11,23 91:20
106:22 107:1
107:12 125:10
132:21 168:3,8
168:16,16
194:1,3 196:13
196:14
**hearings** 31:21
36:24 37:4
74:10 76:13
79:9 80:7 81:7
98:22 103:14
107:4,8 123:2
132:7 133:3,7
133:8,9,10,20
141:18 170:10
171:18 192:22
192:25 193:5
197:5
**hearsay** 114:23
**held** 6:22 16:13
43:9 80:14
148:15 173:13
**help** 38:18 62:17
115:13,22
139:12 165:6
182:22 183:9
183:13 197:8
**helpful** 59:10
**helps** 100:16
**Henning** 58:14
**Herrington** 4:7
7:9
**hey** 113:6
**high** 4:23 32:9
124:13 125:20
125:24 126:21

141:20
**higher** 177:25
**highly** 174:9
**Hinkebein**
124:19
**hire** 68:12
101:16 102:15
**hired** 44:14 46:6
54:1,13 161:14
**hires** 53:16
**history** 26:8
105:12
**hit** 54:19
**hits** 109:22
**hold** 98:23
120:20
**home** 36:6
186:20
**homicide** 51:13
51:15,19
**hope** 155:9
**hour** 69:14
89:15 107:9,13
**hours** 3:12 50:1
50:7,24 51:8
51:13 91:22
154:19 155:1,7
155:8,10,12,20
155:21,24,25
156:3,14 195:9
195:15
**Howard** 4:8
**hundred** 118:24
119:3
**hundreds** 139:5
187:19
**hypothetical**
168:21 170:9
192:21

___

**I**

**idea** 61:3 118:19
151:23 160:1
**identification**
27:4 30:12
34:6 41:17

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 160-37    Filed 02/21/18    Page 64 of 83

42:21 47:23
59:18 71:14
127:5
**identified** 33:9
77:24
**identify** 89:13
89:16 97:11
**IL** 200:5
**Illinois** 5:11
**immediately**
80:16
**Immersion** 58:9
**immigration**
110:14,22
111:17,19,21
111:23 112:1,5
112:5,18,21,24
113:6,8,15,16
113:24
**impact** 47:13
90:15 96:4
106:7 110:14
**impacted** 40:19
141:12
**impediment**
115:18 116:16
116:18 169:8
**imperfection**
43:14
**importance**
33:12
**important** 31:9
60:3 68:25
76:20 81:3,9
81:22 82:5
88:3,7,9,22
103:8,13 109:2
177:19,23
**imposed** 49:4
175:7
**imposition**
137:25
**impressions**
40:9
**improve** 87:5,9
**inaccurate**

51:22 145:17
145:22 147:5,6
149:9
**inappropriate**
193:16
**incarcerated**
81:7,8
**inching** 33:2,7
**incident** 104:20
**include** 110:13
158:10 176:13
191:10
**includes** 182:3
**including** 21:2
24:9 44:2
121:1 124:23
**income** 61:8,20
**increments**
48:17 153:13
**incriminating**
134:22
**independent**
181:24
**independently**
147:8 181:16
**indicate** 140:23
180:25 201:12
**indicated** 32:10
36:9 40:5
69:25 75:13
78:22
**indicates** 28:24
**indicating** 34:9
41:19 48:2
59:25 124:12
126:20 127:8
**indicative**
156:13
**indigence** 62:13
**indigency** 62:7
64:17
**indigent** 42:9
44:12 45:20
63:20 78:24
79:7
**individual** 35:5

38:18 77:20,22
80:20 191:8
**individuals** 16:8
16:14,18 32:16
58:18 85:10
91:9 105:9
136:7 150:9,12
152:2 171:17
177:2
**influence** 25:20
**inform** 194:24
**informal** 35:18
35:18 39:18
46:16,17,21
47:5 94:3,17
94:20 96:18
102:8 131:5,10
**information**
13:23 29:6
55:16 60:20
83:6,10 85:7
89:21 94:6
**informed** 193:23
**informing** 136:4
182:3
**initial** 80:18
108:11
**injurious** 19:6
**inpatient** 83:20
84:8 188:22
**inquires** 76:4
**inquiry** 28:7
**ins** 152:3
**inside** 166:20
**instance** 40:22
51:6 76:12
95:13 135:13
169:17 170:2
**instances** 76:8
108:18
**instruction**
176:9
**instructions**
56:12 183:1
**instrument**
196:25

**intelligent** 26:2
**intended** 87:5
**intent** 115:1,1,
173:2
**intention** 33:6
**intentions** 33:3
**interact** 15:22
123:1
**interacted** 16:3
91:10
**interacting**
16:22
**interaction**
16:17
**interactions**
16:2,20
**interest** 75:11
76:21 77:3,5
77:10,24 79:24
84:16 192:23
**interested** 22:20
200:17
**intern** 122:18
123:5
**internally**
128:10
**interned** 123:6
**interns** 116:8
163:24
**interpreter**
101:22,24,25
102:8,23
**interpreters**
101:13,14
**interrogated**
130:22 131:1
180:6
**interrupt** 13:11
13:11
**interruption**
50:18 95:19
123:7 142:20
149:3 155:15
160:18 194:8
**interview** 65:3
73:24 94:15

**interviewed**
30:21
**interviewing**
32:15
**interviews**
148:24
**introduce** 7:2
**introduced**
10:14 104:23
**investigate** 81:3
84:12 94:12
188:23 189:1
**investigated**
92:21
**investigation**
12:3,9 34:18
83:7,9,11
94:16 98:24
**investigations**
187:18
**investigative**
83:1 93:5
**investigator**
92:14 94:14
173:24 189:3,6
**investigators**
92:10,11,14,25
93:6 101:10
173:23
**involve** 158:6
177:14
**involved** 70:19
122:1 132:6
150:1 192:22
**involvement**
180:14
**involving** 72:24
72:25
**in-office** 101:25
**issue** 28:7 33:10
83:18 102:21
108:2,2 141:17
170:11,13
**issues** 88:15
91:20 113:25
157:23 158:4,6

**MIDWEST LITIGATION SERVICES**
**www.midwestlitigation.com**          **Phone: 1.800.280.3376**          **Fax: 314.644.1334**
Case 2:17-cv-04057-NKL    Document 160-37    Filed 02/21/18    Page 65 of 83

158:23 160:23
165:9 171:5
179:4
**issuing** 117:13
**item** 92:16,18,22
101:20 183:5
**items** 33:6 93:4

**J**

**Jacqueline** 4:12
7:15 201:3
**jacqueline.shi...**
4:15
**Jacquie** 13:15
**jail** 108:4
**Jefferson** 4:24
15:5,12 141:9
151:20
**jibe** 145:22
**job** 14:17 24:4
24:12 54:14,24
55:3 81:4,16
120:2 191:17
**jobs** 54:7
**John** 5:2 6:24
**Johnson** 1:14
3:10 6:10,17
8:1,9,11 11:3
14:10 65:23
142:16 201:9
202:2 203:5,20
**joining** 14:13
68:9
**Jones** 54:5 59:1
59:5
**Josh** 139:7,11
140:3
**JTIP** 58:6,8,9,22
59:6,9 165:3
**JTIP-certified**
165:1
**judge** 21:6,22
56:5 104:3
108:16,23
116:25 132:24
133:12 134:17

**judges** 36:18
117:11
**Judicial** 10:20
71:24
**July** 73:9 86:25
147:23
**jumping** 179:25
**juris** 169:6
**jurisdiction**
64:15 116:6
**jurisdictions**
41:7 64:14
169:7 170:16
**jury** 56:11
**justice** 4:4 7:5
10:9,11,12
11:20 24:19
30:6 33:18,21
34:24 35:8
39:5 42:6
49:14 122:10
131:15 147:22
**Justice's** 12:1
**justify** 49:9
**Justin** 4:18 7:13
142:17,21
**justin.moore...**
4:21
**juvenile** 8:13
9:23 10:3,9,22
11:6,20,23
12:3 13:24
14:22 15:8,14
15:16,21,23
16:3,7,11,12
16:22,22 17:3
17:5,10 18:4,6
18:15,17 19:11
20:1,20 21:8
23:3,5,12,14
23:18 24:3,6,7
24:10,12,13,19
25:3,9 26:9,16
29:2,17,21,25
30:22 31:11
32:6,12,20

33:11,13,18,20
33:21 34:21
35:4,9 36:11
37:1,9,23,23
38:8,11,17,22
39:6,14 40:7
41:9,10,12
42:17 44:20
49:8,14,19
50:6,9,25 51:1
51:3,8,8,11,12
52:7,19,22,23
53:14 54:2,6
54:11 55:7,17
55:23 56:1,4,9
56:16,19 58:3
58:9,15,17
66:3,16,21,24
67:5,12,16,23
68:3,5,10,14
68:24 69:5,17
70:1,8,10,11
70:16,19 71:25
72:5,16,17
74:17 77:3,6
78:25 79:6
81:2 84:11
88:1,4,8,11
89:10 92:2,7
92:12 93:1,11
93:18,19,21,21
93:22 94:7
95:23 96:5,9
96:11,13,18,22
96:25 97:4,25
98:16 99:5,18
99:22,25
101:11 103:1,2
105:15,19,23
106:11,21,25
109:6,24 111:7
111:9,14
114:14,19
115:5,8 117:21
118:3 119:17
119:23,25

120:10,12,23
121:3,5,6,7,11
121:13,14,21
121:25 122:17
122:19 123:9
123:14 125:9
125:11,11,21
126:11,14,15
126:22 128:6,6
128:6,15,22
129:1,1,5
130:14 131:24
131:25 132:10
132:16 134:2,3
134:16 135:24
135:25 136:21
139:19 140:13
141:3,7,8,10
152:8 154:20
154:23 155:2,9
156:5 157:2,9
158:3,6,7,12
158:24 159:10
160:5,15,19,25
161:10 163:9,9
164:2,7,14,23
164:24 165:2,5
165:13,21
167:16,23,24
168:8 172:4,23
172:23,25
176:10 177:1,7
177:9 178:18
180:7,14 182:6
186:8,8 187:12
187:17 191:17
192:1 194:19
195:4,8 197:15
**juveniles** 18:10
24:15 28:1,4
28:19 31:5
49:17 79:15
125:23 129:9
130:1,10
133:17 135:10
135:24 138:11

168:21 170:9
184:14 192:21
**juvenile's** 173:2
**juvenile-focus...**
56:25 59:13
**juvenile-specific**
56:11 69:15
100:7 119:15
156:21 157:15
157:25 159:17
160:4,23
161:11 165:9
176:18,20
189:25
**J-O-H-N-S-O-N**
142:16

**K**

**K** 1:14 3:10 6:10
201:9 202:2
203:5,20
**Karen** 120:22
120:25 121:7
121:20,24
122:8,12,13
191:16
**Katrina** 54:5
59:1,5
**keep** 37:21 49:1
49:9 70:22
93:20 114:5,9
141:25 153:12
153:17 165:7
**Kennedy** 8:9
142:15
**kid** 109:22
129:23 131:4,6
**kiddo** 107:21
**kids** 45:19
**Kim** 139:8,12
**kin** 83:17
**kind** 45:11
53:16 55:2
56:15 61:12
68:5,8,13
75:15 77:23

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com     Phone: 1.800.280.3376     Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-37   Filed 02/21/18   Page 66 of 83

88:18 90:19
91:3,16,17,18
100:14 104:17
112:2 117:6
119:23 120:23
121:2 123:22
127:20 128:8
128:10 142:25
144:7,10
145:17 146:14
150:3 157:10
157:12 160:10
161:20 162:24
167:9 170:11
170:22 171:1
174:14 179:1
182:25 185:16
187:8 198:7
**kinds** 19:7 88:25
100:13 114:18
125:15 178:22
**kit** 64:25 66:10
68:9
**knew** 121:6
**know** 8:4 9:6
12:19 13:1,3
13:10 15:7
24:4 29:8,9
30:18,21 32:9
35:1,2 37:15
37:15 38:13
39:12,14,21
40:2 44:23
45:9 46:12,14
46:14,15 47:6
47:8,10 48:4
51:2,7 56:24
57:22,24 58:11
59:8 63:25
64:1,3,3,4,6,13
64:20 65:11
66:9 71:1,3,4
73:3 74:13
75:18,23 76:1
77:5,13 78:8,9
80:25 81:14

84:9 85:10,23
86:1,2,6,13
87:14,18 90:5
91:3 92:5 93:2
93:3,6 95:4,13
95:22,25 96:7
96:14,24 97:2
97:3,6,18 99:1
99:6,10 100:8
103:3,20 104:4
106:24 107:2,3
107:6 108:13
109:1 110:4
111:4,20,22
112:10,20,23
114:3,25 116:2
119:5,7,8,10
119:14,19
121:23 122:7
122:11,14,19
122:24,25
125:4,7,18
126:6 127:12
128:3 129:13
130:11,13
132:8,11
133:19,21
135:9,19 136:6
137:17,21
138:12 146:2
146:15,24
147:4 148:9,10
148:22,23
149:1,8,9,10
149:25 150:4,7
151:7,12,13,14
152:3,10,17,24
153:1,9,14,16
153:22 157:8
158:23 159:1,2
159:17,23
160:3,4 161:6
161:8,9,9,11
161:13 162:24
168:19 170:25
171:20 172:7

175:4,10,13
176:25 177:2,6
177:6 181:2,3
181:15 182:10
182:18 183:1,9
183:15 185:11
188:16 189:24
190:22,22
191:9,13,14,16
191:21 192:7
192:11 193:7,8
197:15
**knowing** 26:2
127:14 193:5
**knowledge**
23:19,20,21,24
55:18,24 56:10
76:17 148:19
152:21,22
158:10,12,16
166:16
**knows** 13:16
83:10 197:6
**Kris** 58:14
**K-E-N-N-E-D...**
142:15

---

## L

**L** 3:15 5:10 6:4
200:3 201:22
**labeled** 60:1
**lack** 24:22 41:10
106:15,16
**language** 24:23
88:16
**languish** 188:17
**late** 186:19
196:9
**law** 14:5 23:5
24:9 46:23
56:12 58:17
68:25,25
110:16 111:21
111:23 112:24
113:16 115:22
115:23 116:3,7

121:5,6 137:22
143:9,22,25
154:6 158:17
161:15 162:8
162:14,21
163:15 164:23
165:2,8,21,21
165:21 185:17
197:10
**lawful** 6:11
**laws** 23:21
162:19
**lawyer** 24:3
74:17 79:22
80:2 114:19
**lawyers** 56:25
69:9,19,24
84:11 126:4
**lay** 110:24
**lays** 44:3
**learn** 54:14
162:20
**learning** 88:15
**leave** 57:10
186:23 196:11
196:14
**left** 20:9,10
**legal** 6:25 22:18
35:4 38:10
49:7 91:18
94:8 96:16
97:4 100:15,17
100:20,23
113:21 153:15
161:20,22
163:3,22 164:4
175:11 181:3
184:17 185:1,4
185:8
**legislature** 121:3
124:3
**lengthy** 134:10
**letter** 41:24 42:5
42:11
**letters** 101:2
102:12,17

128:4,9 140:6
140:10 176:14
176:15,17
**let's** 28:14,17
60:13 75:10,10
76:9 78:19
79:18 82:21
100:11 101:25
110:5 114:10
116:1,19
152:12
**level** 14:21
18:24 89:25
**license** 185:17
**life** 110:15
112:18 177:25
**lifted** 34:1
**limit** 99:21
**limitation**
188:13
**limitations**
82:11 162:2
**limited** 52:6
**limits** 90:2,14
**line** 28:20 171:6
172:8,12 202:4
202:8,12,16,20
**lines** 114:2
**lineup** 130:5
195:24 196:15
**lineups** 129:25
129:25 130:5
130:15 180:9,9
180:10 186:12
186:16,19,23
196:3,6,11
**lining** 83:12
**list** 19:16 21:2
21:25 22:10
49:25 152:11
**listed** 22:9 104:7
151:8,10,13
**litems** 105:10
**litigation** 5:2,12
7:1 189:19
198:1 201:1

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-37   Filed 02/21/18   Page 67 of 83

**little** 14:1 16:20
18:19,21 20:24
22:2 25:2 26:8
29:14 31:18
34:2 38:14
40:12 41:6
45:5 46:14
48:12 49:20
52:13,14 56:3
65:13 66:18
72:9 78:11
84:15,17,20
87:19 88:12
93:15 103:7
110:5 114:11
138:17 153:7
157:17,20
166:3,7 168:2
168:12 170:7
178:10 179:25
179:25 180:3
181:6 197:25
**live** 138:18,19
**lives** 177:24
**LLP** 4:7
**local** 113:14
**locate** 91:21
**located** 151:17
**log** 65:3
**logging** 153:10
**long** 8:20 56:24
69:13 80:22
92:19 103:12
107:3 129:21
134:12 157:18
**longer** 85:18,20
86:2 107:12
**look** 9:8 21:6,22
21:23 22:3,11
27:19 28:17,22
34:10 41:20
48:3 51:6
59:20 61:4
65:1,5,8,13,14
65:24 78:20
84:1,4,7

113:18 119:13
127:1,23
135:17 144:16
157:25 166:6
166:11 182:10
182:11 183:18
183:21 190:8
190:12
**looked** 30:22
35:5,15,16,17
35:21,22,25
122:23,25
127:12
**looking** 32:17
65:2 68:11
127:9 128:13
132:9 144:15
147:21 148:25
149:12 156:2
165:12 182:8
**looks** 60:22
84:18 91:1
101:17
**lot** 24:17 25:13
28:10 41:7,8
93:4 103:13
141:11,16
169:4 194:12
**loud** 14:10
**Louis** 3:15 4:5
4:20 5:3,13
6:23 8:15
10:23 11:5,6
12:2 14:3,5,19
14:22 15:1,3,3
15:11 16:14
34:19 35:2,8
37:3,4 39:8
40:7 43:22
44:2,21 47:14
61:23,25 62:23
64:2,7 66:24
67:3,7,23
68:10,20 69:16
70:6,11,16,22
71:7 72:5,12

75:14 78:20,23
78:25 79:10
84:23 85:14,14
85:18 87:10,16
92:1,4 93:7,7
94:21 95:10,22
99:12,12 100:5
100:24 107:8
107:12,19,22
109:18,20
111:25 113:11
113:21 116:12
117:6,10 126:3
126:18 130:3
131:18 133:4,7
133:11,19
135:1 138:15
138:19,21,25
139:3,14 140:9
143:6,15,22
148:24 150:17
151:18,21
152:13,25
180:10 184:12
184:14 186:13
194:12 195:25
201:17
**Louis's** 36:11
140:2
**love** 172:14
187:20
**lovely** 162:5
**low** 14:21 18:24
118:15
**lower** 141:15

_____
**M**
**MacArthur** 4:4
7:5
**Mae** 4:3 7:4 53:6
194:18
**mae.quinn@...**
4:6
**main** 31:3
171:23
**major** 144:9

**majority** 20:12
194:5,9
**making** 92:9
95:24 97:20
101:2 117:12
171:6 181:4
196:21 197:6
**manage** 125:25
**management**
90:1
**manager** 191:23
**managers** 105:6
105:7,10
**mandatory** 21:5
21:15,19
103:16
**manner** 153:21
182:15
**manual** 52:23
52:25 53:4,13
67:22 68:2,6,9
68:13 111:6
136:12
**manuals** 52:22
53:7 110:23
**mark** 27:6 71:11
**marked** 2:12 9:3
9:6 11:10 27:4
30:3,12 34:6
41:17 42:21
47:23 59:18
71:14,20 127:5
127:6
**marking** 30:8
**Marsh** 109:13
marshaled 74:5
**Mary** 59:2
121:16,17
**material** 111:15
**materials** 11:22
12:6 68:13
94:5 96:17,20
96:21 102:13
110:24 159:2
159:18,19
160:5,25 161:8

161:9,20,23
162:10,13,16
163:3,16
189:25
**maternity** 57:10
**math** 128:18
144:10
**mathematical**
144:10 183:1
**matter** 6:17 55:6
70:24 73:17
74:1,4,7,16,17
76:24 80:24
83:1 89:10
102:18 123:22
128:10 132:23
137:11 152:8
194:23 195:13
**matters** 9:23
15:8,17,21
16:7,22,23
18:19 46:18
49:19 50:6,8
50:14 53:3
55:2 77:6 79:6
84:11 88:2,4,5
92:12 98:18
99:9,22 101:11
103:16,17
121:14 124:14
125:9 129:10
132:4 133:18
139:19 140:4
159:10 167:7
167:10,23,24
176:9,10
180:15 191:18
**maturity** 105:5
**ma'am** 9:19 12:4
13:21
**mean** 12:2 18:14
21:16 22:5,6
26:25 28:16
53:7,18 67:7
74:23 76:14
77:14 83:20

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 160-37    Filed 02/21/18    Page 68 of 83

102:20 104:3
106:14 110:12
115:16 124:2
127:11 128:4
130:25 133:8
137:24 139:18
141:24 148:22
148:23 150:17
152:6 155:5
161:7 162:1,4
163:24 164:3
176:19 180:22
181:22 184:22
191:6
**meaning** 43:25
**means** 17:11
20:25 21:18
37:13 94:6
110:9 115:19
116:23
**meant** 21:21
**measure** 75:16
**measured** 51:3
**mechanisms**
94:7
**meetings** 101:25
132:1
**members** 91:9
102:1 105:4
**memorandum**
2:20 10:18
43:21 71:13,22
**mental** 88:13
187:16
**mention** 16:21
24:9 52:20
**mentioned**
11:19 12:2
15:25 21:20
24:3,11 30:5
34:4 50:21
54:16,21 68:19
70:3 82:22
86:19 103:5
112:16,16
113:10,14

116:20 120:14
136:23 184:8
186:10
**met** 179:7,12
**methodology**
145:3 146:16
148:1,3 150:3
150:4
**methods** 146:17
146:18,22
**MICA** 113:23
**Michael** 41:25
124:11
**middle** 142:12
142:15 196:7,8
196:13
**Midwest** 5:2,12
7:1 201:1
**mid-year** 53:24
**military** 110:14
**mind** 9:7 27:9
27:18,20 34:10
59:19,25 65:6
65:13 118:5
190:19
**mine** 143:18
**minor** 143:18
**minority** 20:13
**Miranda** 129:11
**Mirandized**
129:15,23
**mischaracteri...**
169:23
**misdemeanor**
14:24 19:12
**misdemeanors**
14:20 17:18
18:24
**missed** 70:14
**Missouri** 1:1,7
3:1,7,14,15,19
3:21 4:5,12,14
4:16,18,20,22
4:24 5:3,11,13
6:18,21,23,23
7:11,14 10:10

16:14 17:13
20:2,3,8 23:3,5
26:9,15 29:3
29:11 30:24
31:5 32:15
38:9 39:12
42:1 46:23
47:14 48:8
49:5,15 50:5
51:19 54:2
57:23 58:22
68:25 71:23,24
89:11 90:6
93:20,22 96:2
107:5 120:24
123:21 126:7
126:22 129:2,9
137:22 138:11
140:14 142:18
142:22 150:21
151:1 152:19
186:4 200:23
201:4,5,7
202:3
**Missouri's** 31:11
58:2 67:5
**misstates** 63:1
**misunderstood**
123:4
**mitiga** 172:25
**mitigation** 74:4
83:6 173:1
**MO** 3:16 200:4
201:17
**model** 67:15
**modified** 82:9
182:19 189:15
**modify** 133:5
**moment** 43:5
81:19 93:13
108:15 173:10
**moments** 27:10
**money** 75:1
89:18 90:6
97:11 101:22
**month** 73:13,13

85:25 98:5
118:11
**months** 69:12
118:14
**Moore** 2:4,7
4:18 7:13,13
51:25 52:9
62:25 66:17
74:20 75:5
130:17 139:15
141:24 142:3
142:10,17,21
142:22 147:20
148:17 149:7
154:17,22
155:16 156:9
159:12,15,16
160:2,22 163:2
163:6,10,13,17
164:12 167:12
167:15,19,22
167:23 169:24
170:6 173:17
174:16 179:23
179:24 181:20
181:22 183:17
183:23,24
185:21 187:25
195:21 198:16
198:25
**morning** 8:1,2
37:5 186:20
**motion** 35:23,23
90:10,10
106:19 109:17
109:19,23
110:21 115:4
116:2,19,21
117:17,20,24
120:16 132:17
166:10 167:3
189:18,21
**motions** 34:22
74:1 109:5,13
109:16 114:11
114:15,18,20

114:21,21,22
114:22,23
115:2,9,11,15
115:22,24,25
116:4,13
117:16 118:7
118:10,17
119:6,9,11,12
119:14,16,17
119:18 120:16
121:21 133:5
140:18,20
165:25 166:3,6
166:15,17,20
166:24 167:2,8
167:25 174:4,8
174:16,17,21
181:5 197:9,10
197:10 198:4
**MOU** 10:25
11:3
**move** 33:17,19
**moved** 51:11
**moving** 134:8
141:11
**MSPD** 28:4 29:1
29:15 53:7,17
56:24 60:16
78:6 111:19
128:22 159:10
190:22 192:8
**MSPD's** 110:24
112:7
**multiple** 78:13
78:16 79:14
84:25
**murder** 18:25
21:2 158:22
**M-A-E** 7:5

_____

**N**

**N** 2:1 4:1 201:16
**name** 6:24,24
7:8 8:8 45:17
56:13 142:12
142:12,14,15

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com      Phone: 1.800.280.3376      Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-37   Filed 02/21/18   Page 69 of 83

142:15,17,21
202:2,2 203:11
**named** 10:13
**national** 10:8
11:19,22 32:11
58:15 111:9
160:14,19
164:1,23
165:22 194:13
**nature** 151:21
171:7
**necessarily**
21:17 24:22
39:13 45:6
54:20,24 75:19
156:4 172:8
176:18 191:6
197:9
**necessary** 24:23
115:10,12
141:2 203:9
**need** 9:7 13:7,14
29:16,20 67:19
68:5 86:9 97:9
97:15 126:22
162:3,8,10,13
163:15,25
169:19 170:4
172:8,18
176:20,23,25
177:2,5,5,6,8
197:7,8
**needed** 74:1,5
197:17
**needing** 40:22
89:19
**needs** 85:1 155:6
155:14,17
169:12 178:1
**neither** 200:12
**never** 24:18 66:7
90:9 102:10
150:12 154:4
162:22 173:21
189:11 196:8
197:20

**new** 2:19 13:10
53:13,16,21
54:23 55:13,14
56:14,21 59:17
60:2 65:25
66:14 68:8,12
73:6 80:2,23
87:1 95:4
119:22 120:2
124:13 126:2
162:20 163:14
165:8 182:11
**newer** 68:23
**Niehaus** 5:2
6:25
**Nifong** 4:13
201:4
**night** 186:19
196:7,9,9
**nine** 3:12
**NJDC** 11:23
30:6,21 32:11
122:9 126:20
**NJDC's** 31:18
**nonmandatory**
22:1,5
**nonviolent**
72:24 74:17
128:6,19
**non-English**
102:7,13,22
**Nope** 123:6
**normally** 83:24
83:25 176:15
**North** 5:3,12
**notarized**
201:15
**notary** 201:13
203:23
**note** 42:24
**noted** 9:22 11:18
22:24
**notes** 183:18,21
**notice** 9:13,18
10:1 13:24
43:19 136:20

169:4,4 170:24
**noticed** 162:2
**notification**
197:4
**notified** 195:23
**num** 188:15
**number** 6:19
10:13 32:8
40:2,12 41:10
44:2,12 51:13
57:24 58:21
72:9 85:11
132:6,8 146:11
150:15 151:7
151:13 154:18
156:3,13,14
157:22 168:25
174:3,7 187:5
188:15 194:23
195:3
**numbered** 60:15
**numbers** 40:3
44:23 72:21
83:8 118:15
128:3,9,14
145:13 146:23
149:2,4,8
150:5 154:12

_____
**O**
**oath** 12:16,24
**object** 51:25
62:25 66:17
74:20 75:5
130:17 139:15
139:17 154:15
164:9 169:22
179:21
**objection** 11:21
12:5 52:9
159:22 162:23
169:21 174:11
181:18
**obligations**
125:2 179:13
188:13

**observe** 120:3,4
**observed** 120:7
**obtain** 84:12
94:13 95:10
**obtaining** 89:9
184:20
**obvious** 77:17
**occasions** 98:21
**occurring**
186:12
**October** 1:16
3:11 6:15 8:23
73:8 201:2,9
202:3
**offense** 17:13,14
17:16 19:16
25:16 29:2
31:14 77:16
79:16 110:13
**offenses** 18:23
19:3,4,8,12,12
19:13 21:2
22:8,9 31:10
35:18 72:25
73:1 121:1
128:7
**offer** 25:7,8 26:1
139:7 140:3,7
172:22
**offered** 56:16
126:9 139:12
**offers** 25:4,18
**office** 4:19,23
8:16 9:2,14
14:19 15:2
30:23 46:7
60:20 62:4,5
63:17 64:18
67:4,8,25 68:2
69:17 78:23
85:19 92:13
93:8 95:15
99:12 100:6,24
113:4 120:18
124:20 138:15
140:1,2,4

146:23 150:17
152:12,13
154:1,6 161:5
161:14,19
164:14 165:12
171:23 185:19
194:16 201:16
**officer** 22:18
38:11,11,17,22
38:23 91:18,18
94:9 105:19,24
106:11,21
178:18,22
180:7 187:18
**officers** 35:4,5
39:1 49:8
96:16 97:4
104:22 106:25
184:17 185:1,4
185:8
**offices** 67:11
78:18 113:20
122:17 125:4
152:1,19 184:5
191:24
**oftentimes**
170:16
**Oh** 54:8 73:9
85:21 104:1
184:7 185:12
**okay** 8:7,25 9:9
11:25 12:15,18
12:21 13:9,19
14:9,12 17:19
20:24 21:20
22:8 26:11,20
27:2,17 29:13
30:13 31:15
32:18 34:13
38:22 45:11,22
47:8 49:12
50:17 52:17,18
56:14 57:19
59:9,21 60:18
61:5 62:8 63:8
73:22 75:9

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 160-37    Filed 02/21/18    Page 70 of 83

78:21 83:4
85:21 87:20
93:14,15,17,25
94:16,19,24
95:9 96:10
98:8 106:9
109:21 112:2
114:11 115:3
116:1 117:3
119:4,22
123:19 126:19
127:1,6 128:21
131:8,21
135:11 136:9
136:16,23
137:2 138:17
138:20 139:24
141:22 142:17
143:14,20
144:1,5,9,14
144:19 145:7
146:2,8 147:4
147:11,16,24
148:11,14
149:7,12,12,25
150:7,15 151:9
151:15 152:5,9
152:17,23
153:3,11,14,19
153:25 154:8
154:22 155:16
156:15,18
157:17,24
158:5,21 159:1
159:5,8,12,15
160:2,22 161:3
161:7,13 162:9
162:20 163:12
164:6,12
165:10,10,24
166:7,15,19,23
167:1,6,19
168:2,19
170:22 171:12
171:20,24
172:3,17 173:6

174:2 175:20
176:19 178:3,9
179:16,23
180:8,13,22
181:11 182:7
182:12 183:8
183:17,23,23
184:20 185:7
185:15 186:3,4
186:21 187:25
189:10 190:12
191:13,16,25
192:11 194:21
195:22 196:16
197:1,18,25
198:10
**old** 95:5,6
**Olive** 3:14 4:19
**once** 12:20
38:21 77:19
80:15 157:15
165:23
**once-a-year**
16:12 56:19
**onerous** 48:24
**on-line** 198:6,8
**open** 17:25
190:10,17,20
190:23 191:2,2
**opened** 128:15
190:16,20,23
191:4,4,9,11
**operate** 150:18
**opinion** 23:13
23:23 39:6
40:19 41:3
66:13 67:3
145:18 150:3
158:5 168:24
172:22 195:14
**opinions** 87:25
88:1 145:20
**opportunities**
59:13
**opportunity**
15:22 27:11

76:6
**option** 80:8 84:1
84:2
**options** 188:23
**order** 80:10
82:11 117:13
169:11 176:20
**orders** 198:20
198:21
**ordinary** 17:25
46:19
**organizations**
33:16 111:25
**original** 2:23,23
201:10
**Orrick** 4:7 7:8
**ought** 81:16
120:12
**outcome** 81:10
200:17
**outline** 127:21
**outlines** 42:6
**outs** 152:4
**outside** 23:8,8
87:13 95:21
164:4 189:5,7
**outweighs** 25:14
**overloaded**
189:4 197:14
**overworked**
197:13
**o'clock** 3:12,13

———— **P** ————
**P** 4:1,1
**page** 2:2,11
27:19,20,23
28:15,17,18,20
49:22 51:17
60:14,19,25
72:21 127:23
149:23 190:6,6
201:10,13,16
202:4,8,12,16
202:20
**pages** 60:15

187:19,20
**paid** 72:19,23
73:17
**pamphlet**
111:10,12
**panel** 44:15 45:1
45:22 79:5
**paper** 68:18
**papered** 82:24
**paralegals**
100:12
**parent** 25:19
56:7 62:20
83:10
**parents** 19:7
22:19 25:20
61:8,10,10,20
83:16 182:3
**parole** 167:7,13
167:15,17,18
176:9,10
**part** 33:1,4,17
113:22 118:7,8
119:18 120:2,3
182:2 183:10
**participate** 37:8
48:9 54:20
58:19 59:6
**participated**
55:2
**particular** 27:20
42:16 48:16
89:7,19 93:19
111:18 143:20
144:2,5 154:19
156:5 172:19
182:20
**particularly**
24:13
**parties** 44:2,4
200:13,16
**parts** 141:11
**party** 22:20
**passed** 161:17
**passes** 197:7
**path** 193:16

**PCR** 137:21
**penalty** 65:2
103:10 203:12
**pending** 3:18
191:10
**people** 13:11
18:5 20:17
25:4 29:16,20
29:23 57:7
63:8 98:16
112:17 120:4
121:13 132:23
136:14 146:2,6
150:7 153:20
197:7
**percent** 29:1,4,5
29:5 194:14,15
**percentage** 32:5
58:1 108:10
129:5
**percentages**
29:8,10 126:21
**perfect** 81:17
**perform** 176:21
**period** 35:15
82:22 168:14
**perjury** 203:12
**permission** 11:7
**permissive** 22:6
**person** 18:20
19:11,17,18,19
25:9 26:1
38:17 46:6
106:16 113:1,2
113:7 120:23
132:17 136:22
136:24
**personal** 145:17
**personally** 13:7
86:3 96:21
130:1 133:3
140:10 148:2,4
148:4,7 156:10
182:18
**persons** 38:7
42:9

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-37   Filed 02/21/18   Page 71 of 83

person's 45:17
99:17
pertained
184:18
pertaining
183:11
pertains 156:20
168:6
petition 17:16
78:15 82:18
131:3 134:5
168:15,17
petitioned 82:24
83:4
petitions 36:5
phone 16:5 83:7
176:17 177:16
177:22
physical 198:7
pick 108:3
pictures 94:15
piece 83:9
171:15 174:15
pieces 68:18
171:5
place 36:25
52:21 55:11
68:20 69:1
74:18 82:25
84:13 85:2,4
139:3 153:8
168:24 180:10
197:6
placed 135:21
placement 36:6
38:20 83:21
105:7 188:22
placements
83:21
places 14:15
64:11
placing 177:24
plaintiffs 1:5,15
3:5,21,22 4:2
6:2,12 7:6,9
Plaintiff's 9:5

27:6 30:8
41:15 42:23
144:17 146:10
182:9
play 96:5
played 14:16
plea 25:4,7,8,18
26:1 137:9,19
137:25 138:8
194:3,6,10,15
plead 25:21
pleaded 137:12
pleads 194:23
please 7:2,17 8:8
34:11 59:20
65:1 142:11
173:10 201:9
201:11,15
point 15:9 26:19
31:15 54:1
59:7,15 64:16
police 95:7,8
102:16 104:21
130:2 180:6
184:16,19
187:17
policies 10:2
52:13 53:1
92:10 99:3,7
123:20,25
140:14 152:11
152:12,18,24
177:1
policy 8:13
52:22,23 63:19
67:22 75:24
77:9,12 78:5
89:20 112:4,8
112:10 120:1
125:14 136:3
136:12 192:5,8
192:11
political 143:17
portions 149:22
posed 193:14
position 33:22

42:15 87:1
120:19,20
122:8
possibilities
19:10 85:8
possibility 84:4
possible 24:5
54:16
post 35:25 54:7
61:11
postcertificati...
108:12
postconviction
15:16 137:23
postdisposition
35:25 36:2
postdispositio...
31:25 135:12
posthearing
91:20
post-Stockley
140:6
potential 56:11
104:22 115:23
166:13
potentially 55:4
73:25 83:6,19
86:11 91:11
101:3 103:12
131:6 156:1
171:18 197:5,8
poverty 60:21
practice 17:3,3,6
17:10 18:11,15
23:15 24:7,10
26:9 34:20
35:23,23 36:1
37:3,22 38:13
40:9 45:8
48:18 52:20
55:8,23 56:16
57:22 61:15,22
61:24 62:2,6
63:19,23 64:1
66:4 67:16
69:17 71:1,4

75:19,24 78:5
82:10 84:4,10
85:17 86:13,17
89:21 90:15
94:21 95:3,9
97:3,8 98:15
103:3 104:16
105:13,14
106:13 107:7
108:9 109:7
110:2 111:14
112:4 113:15
114:11 115:4
118:7,8 120:9
121:8,25 124:1
124:2,5 125:15
126:3 129:14
130:3,10
131:15,17
133:17 135:15
136:3,7,10,16
154:5 167:4
194:24 195:1
practiced 23:11
39:20,25 40:1
106:4 111:21
112:23 150:25
151:2,5,10
practices 10:2
58:3,23 60:7
66:25 67:4
78:20 91:25
103:20 108:21
112:3 113:12
114:2 136:13
140:13 177:6
184:13
practicing 34:21
39:7 121:12
122:21 141:7
practitioners
96:11
pre 31:21 91:3
precertification
98:19
predetention

82:22 83:11
prehearing
91:15
prelaw 143:19
preliminary
65:4
preparation
10:6 11:15
prepared 9:20
preparing 82:2
present 5:1 15:2
37:20 39:18
57:9 104:17
105:21,23,25
122:5,20,25
131:19 149:6
165:6
presented 25:4
27:12 104:15
105:18 108:23
149:21
presenting
179:2
pressures
126:14
presumably
198:14
pretrial 31:22
35:22 91:15
114:14
pretty 77:16
162:3 181:20
prevented 141:1
preventing
168:23 170:8
previous 187:17
187:17
previously 2:12
9:3,5 12:20
28:11 34:3
47:1 48:19
123:13
pre-Miranda
180:1
pre-petition
129:11,16

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-37   Filed 02/21/18   Page 72 of 83

prima 82:7
primarily 35:12
prior 44:25 63:1
    144:21 147:12
    147:14 148:12
    149:16 180:9
    186:12 191:12
prison 103:12
private 126:3,4
    126:8 153:23
    154:4 191:4
pro 126:2,9
probable 82:6
    104:24
probably 57:20
    98:12 118:21
    118:23,25
    119:2 129:20
    129:24 130:5
    130:13 138:16
    140:17 156:16
    158:22 193:10
    197:4
probation 38:23
    39:1 132:3,6
    132:18,21,25
    133:2,6,13
problem 39:17
    42:16 131:9
problematic
    35:20,24
    131:14
problems 42:7
procedural
    23:21
procedure 22:10
    96:2,13 112:4
    136:12 182:5
procedures 10:2
    24:21 52:14,25
    53:3 68:2,24
    92:10 99:4,7
    123:21,25
    140:13 150:16
    152:18 177:1
    179:9,14

proceed 104:25
proceeding 7:21
proceedings
    39:2 46:24
    132:4
process 20:25
    22:3 24:20
    31:24 53:2
    84:18 89:9
    101:17 103:8
    117:18 130:21
    131:2 134:8,10
    168:23 178:10
    180:1 181:4
    182:5 184:8
processed 22:15
    149:1,4
processes 22:22
    68:24
processing
    36:17
produced 3:11
    6:11
produces 127:20
production
    145:8
profession
    153:15
professional
    192:13,13
program 58:5
    58:10,12 59:6
    59:9 84:3,5,8
programming
    83:20
Project 113:23
pronounced
    144:18
proof 103:25
    104:5,7,15,17
    105:18,19
proper 170:25
prosecute
    139:13
prosecuting
    38:7,16

prosecution
    41:5 46:19
    110:9 111:1,2
    114:19 178:15
    178:17 179:3
prosecutor
    22:18 37:24
    38:6 108:1
    139:8
prosecutors
    37:12,13 38:25
    40:23 49:4
    96:16 97:4
    185:9
protect 78:7,12
protecting 78:17
protection 36:3
    39:19 40:4
    105:9 187:15
protest 139:13
protesters 139:4
protests 138:22
protocol 65:4
provide 83:22
    100:10 115:23
    159:6 164:2
    187:6
provided 31:4
    40:7 41:4 55:6
    101:10 126:23
    127:21 131:4
    135:20 159:2,9
    159:18,19
    160:5 161:1
    162:17
provides 21:11
providing 10:21
    60:20 100:7
    108:6,7 127:21
    160:20
psychiatrist
    88:19
psychological
    144:6
psychologist
    88:19,20

psychologists
    105:11
public 4:11,12
    7:16 8:14,20
    8:22 9:1,13,23
    10:19 11:5
    13:25 14:7,13
    14:14,15 15:20
    15:22 16:6,15
    26:10,14 32:4
    32:19 33:9
    36:10 38:3
    44:10 45:7,23
    46:1,7,8 47:17
    48:8 54:9,10
    56:20 57:22
    58:2 60:23
    62:1,3,5,9
    63:10,14,17
    67:8 71:23
    75:14 76:7,14
    76:16 77:8
    78:23 85:19
    90:7 97:17
    98:25 101:14
    107:20 108:6
    112:17 116:3,9
    122:15 123:1
    123:21 127:19
    128:15 129:9
    140:2,14
    145:25 147:2
    154:1,6,18
    156:19,20,25
    157:5,14
    158:16 159:20
    161:1,4,14,19
    164:13 167:6
    182:16 183:25
    184:4 185:3,5
    185:18 186:4
    189:7 198:13
    201:4,13
    203:23
pull 95:7 166:8
    184:17

purposes 20:1
    30:9 34:8
    41:14 42:24
    48:1 127:7
pursuant 20:21
    117:23 200:8
pursue 181:16
put 32:11 56:20
    56:25 84:12
    104:21,21
    105:2,4,6,9,10
    122:8 157:15
    178:14,15
puts 178:18
putting 184:21
p.m 173:12,16
    198:18 199:2

**Q**

qualify 45:7,23
    63:14
qualifying 63:18
quality 30:25
    31:4 40:6,9,18
quantity 31:4
    32:3 40:20
    41:1
quarter 98:13
question 13:3,8
    13:17 15:6
    16:7 25:11
    29:9 38:19
    47:7,11 52:1,3
    63:1 66:18
    74:21 75:6,10
    78:12 81:23
    84:21 87:15
    90:21 98:23
    104:2 123:17
    131:6 137:17
    152:7 159:23
    163:18 169:22
    169:24,25
    170:1 173:18
    173:23 174:12
    176:8 181:7,21

**MIDWEST LITIGATION SERVICES**
**www.midwestlitigation.com        Phone: 1.800.280.3376              Fax: 314.644.1334**
Case 2:17-cv-04057-NKL    Document 160-37    Filed 02/21/18    Page 73 of 83

184:7 188:1,5
193:14,17
**questioning**
183:22
**questionnaire**
65:5
**questions** 2:2
7:25 91:16,18
112:1,21 113:8
120:15 121:4
129:21 134:23
142:10 143:2
146:9,13
147:20 150:16
150:22 160:6
174:5 179:22
183:22 185:24
192:4,15,19
195:21
**quick** 169:18
170:2,11 171:1
171:3 177:5
195:22
**quickly** 177:8
**Quinn** 2:3,6 4:3
7:4,4,25 9:4
11:11,14 14:9
14:12 27:5
30:14 34:7
41:18 42:22
43:6,13 45:17
45:19 47:24
50:20 52:5,12
52:18,19 53:8
53:10,12 59:19
63:5 65:9,11
65:22 66:23
71:10,15 74:25
75:7,9 78:9
93:13,14 95:21
103:2,5 107:18
114:4,8,10
123:8 127:6
130:20 139:20
139:22,25
140:1 141:22

159:22 162:23
163:9 167:11
167:14,17,21
169:21 174:11
181:18 190:9
192:16,19
194:9,20,22
195:17 198:23
**Quinn's** 47:4
**quite** 55:25
**quote** 27:24
28:24 61:6
72:22
**Q-U-I-N-N** 7:5

— **R** —
**R** 4:1,22
**races** 36:8
**Rachel** 69:5
70:3,5 87:2
**racial** 105:3
**raised** 75:9
111:18 131:8
**Ramsey** 4:22
7:10,10
**range** 18:19
88:10,23
114:17
**rape** 21:3
**rare** 195:10
**Rationed** 10:9
11:20 30:7
**RDR/CRR** 5:10
6:4 201:22
**reach** 111:22,24
113:23 115:20
**reached** 44:1
**reaches** 89:24
**reaction** 122:9
**read** 27:1,24
28:24 34:22
61:7 72:22
128:17 149:23
165:7 169:25
201:11 202:5,9
202:13,17,21

203:6
**reading** 27:21
**realizing** 77:21
**really** 65:6
104:1 125:25
144:2 151:23
152:20 160:9
**realm** 85:8
**Realtime** 3:17
200:6
**reason** 89:17
180:23,24
181:8 196:5
197:3 202:6,10
202:14,18,22
**reasons** 24:18
196:7
**reassign** 92:17
**reassigned**
84:17
**recall** 104:4
149:15 154:10
156:22 160:6
168:9 172:5
174:4 176:10
178:11 180:15
**receive** 28:7
31:9 53:17
54:20,24 63:9
68:13
**received** 105:8
135:17 140:3
176:8
**receives** 141:18
**receiving** 31:1
31:12,16,21,23
31:24 32:3
33:14 46:9
47:1
**recess** 65:19
142:6
**recognize** 9:12
41:21 43:1,17
48:4 77:19
104:13 127:10
127:11

**recollect** 195:5
**recommendati...**
22:21 38:19
**record** 6:14 7:3
8:8 11:2 13:14
17:25 19:24
27:21 38:12
43:4,8,10,11
48:19 59:25
63:4 65:12,16
65:18,20
130:18 142:2,5
142:7,12
148:16 173:11
173:12,14,15
198:18
**records** 94:14
184:21 187:15
187:16
**recruit** 170:25
**recruiting** 171:6
**reduced** 200:11
**refer** 18:9 21:15
171:11
**reference** 45:12
**referenced**
46:18
**referred** 18:10
26:23 122:2
**referring** 26:16
28:15 73:18
111:15 157:8
160:12
**refers** 30:14
**reflect** 11:2
**regard** 10:1
11:25 31:3
32:2,25 33:19
35:8,12 39:11
39:19 40:3
42:16 44:5,19
47:12 49:17
50:4 66:20
68:23 78:6
88:22 92:11
104:11,19,23

105:1 111:25
120:12 139:8
141:16 145:20
146:25 147:1
157:2 162:15
165:8 177:1
178:6 179:8,13
182:6 185:17
187:13
**regarding** 16:7
30:24 106:7
160:5 192:4,8
**Registered** 3:16
200:5
**regular** 47:2
118:7,8 123:14
**rehabilitated**
21:8
**relate** 55:22
**related** 12:13
58:16 200:12
**relates** 55:7
178:4
**relating** 10:3
11:4 39:5
49:13,18 55:3
56:16 58:3
66:3,15 68:3
69:17 77:9
89:1,6 92:1
99:4,8 110:17
132:24 135:16
138:22 139:4
140:13 195:4
**relationship**
85:14
**relative** 61:11
200:15
**relatively** 56:21
**release** 117:25
140:18
**released** 81:21
81:23,24
117:14
**releases** 94:12
**relevant** 115:23

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 160-37    Filed 02/21/18    Page 74 of 83

relied 88:4
rely 82:6 163:25
remain 117:2
remains 117:13
remember 32:1
  32:8 122:4
  154:10 157:4
  175:21 188:5
  192:7 193:17
  196:18
render 203:9
rephrase 163:17
report 10:11
  11:20 12:1,7
  26:24,24 27:18
  28:2,10,11,18
  29:9 30:3,4
  31:3 32:2,11
  32:23 33:4
  36:9 37:22
  42:7 51:14,14
  51:21 52:11
  91:12,13,14
  126:20,20
  127:18,20,24
  128:17 144:17
  144:21,25
  145:4,9,12,13
  145:16,21,24
  146:3,14,19,22
  147:22 148:2,9
  148:10,11,19
  149:13,16,21
  149:22 150:2,8
  182:22 183:7
  183:11,13,15
reportable
  49:25
reporter 2:23
  3:16,17,17
  5:10 6:5,6 7:19
  50:18 95:19
  123:7 142:20
  149:3 155:15
  160:18 170:1
  194:8 198:19

200:1,4,4,5,6
  200:22
reporter's 6:24
reports 95:7,8
  102:16 144:15
  146:9 184:16
  184:19 187:17
represent 9:1
  16:15 40:15
  42:9 44:15,16
  72:4 77:21
  78:24 81:14
  109:15 170:14
  170:21 171:14
  174:24
representation
  29:12 30:24,25
  31:13,16,22,23
  32:4,6 33:20
  35:12,21,22
  36:2 39:11,13
  40:6 63:11
  100:10 108:6,7
  109:11,14
  126:23 135:17
  135:20 141:19
  157:3,9 164:8
representative
  154:13 156:4,7
represented
  14:23 15:3
  16:9 28:4 29:1
  29:10 35:14
  44:10 77:25
  192:24 193:4
representing
  14:20,25 16:10
  16:18 35:14
  39:1 44:24
  45:9,10 78:12
  81:18 124:22
  169:13 171:16
  174:23 184:14
  191:7
represents 29:16
request 22:16,17

22:21 89:16,22
  89:23 90:1
  92:20 93:24,25
  94:3 95:11,14
  95:16 97:10,11
  97:20 101:21
  101:21,23
  138:15 173:8
  173:19,25
  180:5 189:11
  189:14
requested 173:7
  173:24 189:5
requesting 99:8
requests 92:9
  93:5 95:24
  96:21 101:4
  178:2
require 50:23
  155:19,24
  158:13,17
required 48:10
  54:22 86:3
requirement
  175:18
requirements
  175:5,7,12,15
  178:5
requires 23:19
  23:20,21,22,24
  23:25 174:20
  175:18 188:2
research 24:10
  148:1 161:20
  161:22 162:16
  163:3,16,22
  164:4
reserved 6:8
residential
  83:21 105:7
  188:22
resolved 137:2
  194:6,10,15
resource 72:18
  116:2 119:11
  189:18,19,24

198:1
resources 23:25
  42:8 112:3
  164:1 198:3
respect 106:17
  192:12
respond 66:19
  74:22
respondent
  18:14,16
respondents
  79:15 85:1
  114:14 125:11
responsibilities
  66:16 140:25
  141:1 179:8
  191:17
responsibility
  192:13
restate 13:7
restrictions
  168:20
retained 2:23
retains 108:5
retired 122:3,4
return 26:6
  33:25 201:15
review 21:5,19
  74:10 90:1
  91:8,9 100:12
  104:2 116:21
  116:25 117:7
  117:17,20
  118:3,6,10,17
  119:6,9 120:16
  132:21 133:8,9
  133:10,20
  140:20 145:18
  145:24 195:2
reviewed 10:8
  10:10,11,17,18
  11:15,16 66:2
  117:25 144:21
  146:10 147:8
  147:12,14,18
  148:11 149:10

149:19
reviewing 42:11
  51:21 101:2
  121:20
reviews 117:12
right 8:5,19 9:24
  10:4,5,13,24
  11:13,18 12:10
  12:23 13:22
  16:19 17:7
  18:18 19:9
  20:11,15 21:14
  22:24 23:6
  26:6,22 27:9
  27:15 28:9,14
  28:23 30:2,15
  31:7 32:10
  33:23,25 34:10
  34:23 35:6
  37:6 39:15
  40:17 41:13
  42:22 43:13
  45:18 46:10
  47:12,24 48:6
  50:20 52:6,12
  53:25 54:22
  57:11 59:24
  61:21,24 62:13
  65:12,15,22
  68:19 69:8,22
  70:16 71:10
  73:23 75:7
  77:17,23 78:14
  78:19 79:25
  80:14,15 95:12
  97:24 109:17
  114:10 118:13
  118:13 126:8
  133:9 134:15
  135:25 136:4
  136:18 137:7
  137:14,18
  138:3,7 143:2
  143:7 144:12
  145:5,9,13,19
  146:20 148:3

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 160-37    Filed 02/21/18    Page 75 of 83

148:21 149:9
150:4,5,10,18
150:21,25
151:1,18 152:1
152:21 153:5
154:2 155:2,5
155:13,17,21
155:25 156:2,6
158:13,24
159:21 160:16
161:1,10,15
162:11,14
163:13,18
164:15 166:1
167:22,22
170:12,19,23
171:8 172:10
172:20 174:19
174:21 175:1,9
176:2,7,14
177:11,18
178:15,19,24
179:4,9 180:11
180:19,23
181:5,7,12,15
181:16,24,25
182:2,18,20
183:18 185:25
189:8 192:17
193:20,23
194:13,16,25
195:25 196:3
196:22 197:6
198:11,14
**rights** 137:21,23
147:22
**ring** 28:12 29:6
39:22
**rings** 33:4
**Rinne** 59:2
**robbery** 21:3
**robust** 119:17
**Roderick** 4:3
**role** 86:24,25
119:23 120:2,3
120:22 122:12

**roles** 14:16
120:25
**room** 9:6 25:20
95:7
**Roundabout**
69:11
**routinely** 31:7
95:24
**RSMo** 200:9
**RubinBrown**
48:7 49:13
51:7,14,18
149:13 195:4
**rule** 20:12 96:1
96:7,7,8,12
117:24
**rules** 19:7 23:22
96:2,13,18
176:25 192:12
**run** 16:18
**rural** 114:1

───────
**S**
**S** 2:10 4:1
**safe** 57:25 82:9
85:13 99:17,25
122:7 123:9
135:24 144:1
**Saint** 143:6,14
143:21
**San** 4:8
**Sarah** 1:14 3:10
6:10,17 8:9
65:7 75:8
107:15 142:14
142:17 159:9
185:25 201:9
202:2 203:5,20
**saying** 24:24
57:3 77:20
93:20 164:21
184:25 197:11
**says** 6:12 27:21
42:25 51:14
60:2,23 61:6
96:7 190:15,16

190:16
**scan** 27:12
187:20 196:24
**scanner** 187:19
**scanning** 196:23
197:22
**scholar** 143:19
**school** 14:5
94:13 116:7
143:22 161:15
187:15
**schooling** 83:18
83:19 110:13
143:11
**science** 143:17
**Scott** 30:23
**screening** 63:13
**scrolly** 43:19
**second** 8:19
12:13 16:11
24:21 73:19,21
171:10 173:11
**section** 20:21
21:7 22:24
23:1 28:2,22
28:23 49:22,23
50:2 61:6
116:2 156:22
200:8
**sections** 27:16
**see** 25:18 30:7
50:1 66:3 73:9
73:9 127:8
128:2 132:24
183:21 184:16
185:12 190:8
190:15
**seeing** 144:24
**seek** 13:4 72:1
93:23 118:3
121:13 125:16
195:12
**seeking** 62:1
72:3,6 125:5
125:12 132:17
**seen** 9:10 38:23

42:2 59:22
60:10 61:2,3
61:12 66:7
111:5,6 149:16
149:22
**send** 92:16
**sending** 102:12
136:21
**sense** 17:2 32:13
57:6 71:8 87:6
91:25 98:15
115:3,9 129:4
130:12 132:5
135:7
**sent** 22:12 36:6
85:5 152:11
**sentence** 137:4
138:1
**sentences**
103:13
**separate** 15:17
168:7 189:21
**separated** 184:4
**separately** 53:1
113:11 132:20
**series** 184:15
**serve** 102:8
**served** 121:4
**service** 8:21,23
11:5 14:14
15:20 32:4
110:14 156:21
**services** 5:2,12
7:1 11:4 31:4
31:25 44:5,19
45:8,24 46:1
63:15 76:7
87:5,9 100:7
100:13 105:8
108:8 127:21
131:3 135:14
201:1
**set** 12:6 16:2
39:4 58:15
67:4
**setting** 36:15

**settings** 16:17
37:12
**seven** 105:1
**sex** 115:21
191:22
**shape** 70:19
**share** 35:6 47:25
50:21 88:11
114:17
**shared** 11:3
71:10
**SHEET** 202:1
**sheets** 201:10,12
201:15
**shift** 26:7 87:19
**shifted** 37:19
95:4
**shifting** 18:11
98:23 138:17
**Shipma** 2:5 4:12
7:15,15 10:8
11:7,9 43:4
53:6,9 59:16
65:7 78:8
102:25 107:15
114:6,9 139:17
139:21,24
147:17 154:15
154:20 156:8
159:9,13 163:1
163:5,7,12
164:9 167:9
179:21 183:20
185:24 192:15
194:18,21
195:18 198:24
201:3,8
**Shondel** 1:4 3:4
3:20 6:18
201:6 202:2
**shorthand** 6:4,5
200:4
**show** 9:4 27:5
**showing** 130:15
131:25
**side** 23:12,13

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 160-37    Filed 02/21/18    Page 76 of 83

24:4,7 96:16
105:19 151:25
171:4
sign 201:12
signature 6:7
201:10,12,16
202:24
signed 94:12
significant
162:1
significantly
141:15
similar 47:19
49:3
simpler 170:7
simply 153:1
168:22 169:15
Sincerely 201:19
single 38:2
39:12 45:13
79:15 141:20
154:13 156:12
168:7 172:9,15
172:23 188:24
singular 25:7
sir 154:7 198:23
sit 32:24 125:3
sitting 56:8
188:14,16
situation 117:8
124:18
six 59:4 100:25
skills 24:23,23
53:22 55:19
SLU 113:22
143:9
small 33:15
57:25 180:18
196:10
social 98:24,25
99:4,8,11,15
99:21 100:1
101:9 175:2,5
175:12,15,19
187:12,12,18
189:3 196:21

197:23
society 113:22
sociological
144:6
softer 107:16
Solange 4:3
somebody 33:10
62:16 68:3
81:7 121:6
158:21
sophistication
105:5
sorry 27:23
43:20 70:13
84:20 101:21
107:17 123:4
129:20 132:11
144:20 148:17
152:15 167:11
167:19 176:9
190:5 193:7
sort 69:25 97:16
100:16 113:10
188:1 197:8
sought 13:23
sound 154:24
186:2
sounded 115:17
178:17 193:14
196:20
sounds 15:8
19:9 24:2
25:25 40:19
47:4 73:12,15
91:21 169:17
170:2,22 179:1
South 4:4
Spangenberg
26:23,24 28:11
30:3 126:20
144:17
Spanish 102:1,4
143:18
speak 13:13
16:8 39:12
92:3 98:6

102:1,3,3
109:1 112:11
120:13 136:7
136:18 137:3
137:12 145:6
153:23 155:3
159:4,10
166:22,25
184:13
speaker 102:22
speaking 81:25
86:17 102:7,13
132:15 154:16
155:13,17
162:7
speaks 44:6
special 125:14
125:15 131:18
158:7,12,15
176:8 196:24
specialist 39:14
specialities
161:4
specialization
41:12 143:21
144:2
specialize
158:20
specialized
23:14 54:11
55:3 122:16
123:5,8,9
144:5 158:23
specially 93:10
123:13
specialties
158:19 159:20
specialty 23:19
33:11
specific 23:21
27:16 44:3,13
49:21 95:13
108:18 114:24
114:24 120:10
158:3,6 159:2
160:25 169:9

179:19,22
184:15 187:14
197:14,16
specifically
37:15 58:3,16
93:2 98:6
101:11 116:19
125:7 141:7
162:25 188:21
192:1
specifics 172:19
179:20
speed 66:15
spelled 19:16
142:13
spend 41:11
90:20 155:2
156:3,5,14,15
spending 83:1
156:12
spends 156:8
spent 28:10 47:5
48:16 50:6,13
50:14 51:14,18
51:23 52:7
154:9
spigot 125:16
split 87:2
spoke 10:7 35:3
35:3,4
spoken 22:22
146:5
spot 192:9
spring 157:13
157:18
St 3:15 4:5,20
5:3,13 6:23
8:15 10:23
11:5,6 12:2
14:3,5,19,22
15:1,3,3,4,4,11
15:11,12 16:14
34:19 35:2,8
36:11 37:3,4
39:8 40:7
43:22 44:2,21

47:14 61:23,25
62:23 64:2,7,9
66:24 67:3,7
67:23 68:10,20
69:16 70:6,7
70:11,16,22
71:7 72:5,12
75:14 76:12
78:20,23,25
79:10 84:23
85:14,14,15,18
85:19 87:10,12
87:16 92:1,4
93:7,7 94:21
95:10,22 99:12
99:12 100:5,24
107:8,12,19,22
109:18,20
111:25 113:3,7
113:11,21
116:12 117:6
117:10 126:3
126:18 130:3
131:18 133:4,7
133:11,19
135:1 138:15
138:19,21,25
139:3,14 140:2
140:9 148:24
150:17 151:18
151:21 152:13
152:25 180:10
184:12,14
186:13 194:12
195:25 201:17
staff 100:11
101:9,15
130:23 175:21
176:1,8,13,20
177:23 178:1,4
178:7 184:23
186:25 187:10
196:18 197:2
197:12
staffed 69:22
stage 76:19

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 160-37    Filed 02/21/18    Page 77 of 83

stages 31:13,17
stamp 60:16
stand 21:9 79:21
standard 50:19
  50:21
standards 50:23
  131:22 165:22
standing 72:4
  81:12 82:15
  107:7
start 33:11
  144:16 153:10
started 141:8
  164:13
Starting 1:20
  6:13
starts 28:21
state 1:7 3:7,21
  4:12,16,18,22
  6:18 7:11,14
  8:7 16:3 20:2
  26:9,14 29:12
  30:23 31:1
  33:20 39:7,17
  39:23 40:10
  41:5 47:14
  49:4 50:5
  51:24 52:8
  54:2 57:22
  58:1,19 61:16
  63:24 67:5,16
  71:2,5,23
  74:19 75:20,22
  76:18 77:6
  84:10 86:8
  92:2,6 95:23
  96:11,25 98:16
  100:6 101:13
  103:21 105:15
  107:4 108:21
  109:21 117:11
  119:5 120:23
  121:25 126:22
  129:2 130:14
  131:23 133:16
  135:6,10,18

136:4 138:11
142:11,18,22
146:23 150:21
151:25 152:3
152:19 160:20
198:5 200:23
201:4,6 202:2
203:1
statements
  114:20
states 1:1 3:1,18
  6:20 20:7,9
  110:17
statewide 52:22
  53:10,14 92:11
  99:1 110:23
  112:3 115:4
  119:23 120:8
  121:17 124:7
  130:10 136:14
  157:5
state's 97:16
state-appointed
  33:22
stating 175:24
statistical 40:3
  144:3 149:11
statisticians
  105:2
statistics 39:21
  39:22 145:4
  149:5 194:19
status 19:3,8,12
  19:16,18 29:2
  76:5 80:10
  117:17 118:4
  128:6,19
  132:10 133:6,6
  193:6
statute 20:22
  21:11,21 104:2
  104:8,11
  106:10 117:3
  124:3
statutes 27:25
statutory 117:18

175:11
stay 20:22 70:23
  108:11
step 33:15
  164:18 165:13
stepping 124:8
steps 35:1 136:5
  145:11
Steven 4:22 7:10
steven.ramsey...
  4:25
STIPULATED
  6:1
Stockley 138:22
stopgap 75:16
stopped 70:5
  86:21 87:7
straightforward
  181:21
strategies 91:4
strategy 56:6
Street 3:15 4:8
  4:19 5:3,12
  201:17
strictly 145:23
strike 59:13
  167:20
strongly 28:6
structure 31:10
student 61:9
students 116:3
studies 26:13
  144:6,7
study 48:7,10
  49:13,23 50:11
  50:15,16 51:4
  51:7,18 195:4
stuff 60:3 69:5
sub 161:25
subject 52:1
  63:3 66:18
  74:22 76:2
  185:16,16
subjects 9:17
subscribe
  203:11

subscription
  162:1,6
subsection 19:2
  21:13
subsequent
  21:13
subsets 158:19
subspecialties
  159:3
substance
  197:10 203:8
subtle 77:18
successfully
  134:5
Sue 59:2
sufficient 66:14
  66:22
sufficiently
  101:6
suggest 51:18
suggested 50:12
suggests 51:7
suit 10:15
Suite 3:14 4:4,13
  4:19 201:5
summer 53:23
  72:18 165:3
supervise 38:20
support 63:21
  99:22 100:1,11
  100:13,14
  101:9 175:21
  176:1 177:23
  178:7 184:23
  186:25 187:9
  196:17 197:12
supported 101:6
  175:25
supporting
  178:4
supposed 33:11
  193:15
suppress 114:20
  114:21
Supreme 24:9
  96:6,8 110:18
  117:23

sure 7:4 8:12
  14:3,18 16:4
  17:12 18:22
  20:3 21:1
  22:17 24:16
  25:11 31:6,20
  33:8,13 34:12
  35:10 36:18
  37:2 38:15
  43:6 44:8 45:3
  46:14 48:14
  49:22,24 50:23
  53:20 54:8
  58:13 68:16,22
  71:19,22 72:11
  75:12 76:25
  78:9,10 79:20
  80:5 81:17
  84:24 87:21
  88:13 89:12,23
  92:13 94:4,4
  94:11 95:1,1
  96:6 97:9
  100:15 106:18
  110:7,11 111:8
  111:20 112:19
  114:20 116:24
  120:11,25
  124:19 133:19
  136:6,11 142:3
  142:14 143:3
  157:13 158:2
  159:5,21 161:3
  164:19 168:25
  171:6 182:14
  185:2 187:11
  188:4 190:7
  192:6 197:6
surprise 29:11
  139:11
surprising 28:21
surprisingly
  28:25
surround 24:10
Sutcliffe 4:7 7:9
swear 7:17,19

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com    Phone: 1.800.280.3376    Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 160-37    Filed 02/21/18    Page 78 of 83

switch 71:18
sworn 3:11 6:11
  200:8
system 8:14 9:24
  10:20 13:25
  14:7,13,16
  16:6,15,24
  21:9 24:19
  25:1 26:10,14
  31:11 32:16,19
  33:9,12 42:17
  44:10 46:8
  48:8,14 49:3
  53:1 56:20
  58:2 63:9 77:8
  78:6 82:12
  85:12 88:17
  89:11 90:7
  99:1 101:14
  103:11 110:25
  111:19 115:2
  116:9 119:15
  122:16 123:1
  123:15 127:20
  128:8,16,22
  129:9 140:14
  147:2 159:10
  162:25 163:8
  184:1 186:5
  189:7 191:3
  198:9
systems 49:14

**T**

T 2:10
table 13:17 56:8
  117:7 132:9
take 12:19 13:7
  13:18 27:10
  28:17,22 36:25
  41:20 49:1
  51:6 52:15
  65:7,13,13,24
  68:20 70:21
  80:3,22,24
  83:17 91:22

92:20 94:14
97:15 98:4,19
114:4 126:9
127:1 129:7
134:12,13
136:5 138:8
taken 1:15 6:3
  65:19 69:1
  73:12 98:21
  130:2 136:13
  139:3 142:6
  145:11 200:10
  200:14 201:9
  202:3
takes 25:25
  55:11 80:8
  82:25 85:2,4
  90:22 169:20
  170:5
talk 11:22 12:6
  13:23 16:21
  19:24 22:2
  38:7 52:13
  75:10,10 78:19
  82:21 87:19
  88:21 89:13
  91:9 93:15
  94:17 101:22
  103:6 105:2,4
  105:12 107:24
  110:5 114:10
  115:13,23
  133:12 134:17
  136:19 139:18
  168:2 172:14
talked 18:18
  30:22 46:4
  79:3 84:15
  103:15 105:7
  116:14 117:18
  119:22 126:19
  130:20 132:5
  138:6 150:12
  156:24 171:10
  179:25 189:17
  196:16

talking 15:9
  17:5,24 32:16
  43:16 83:5,9
  83:16 88:14
  91:2,11,15
  94:22 102:25
  140:19 163:10
  185:1
talks 28:18 42:8
task 48:16 50:1
  91:23 176:12
  187:9,21
  188:25
tasked 188:14
tasks 53:4 68:4
  178:6 186:24
  187:22 196:17
  197:1,16,19,23
tell 13:1,25
  23:17 30:18
  31:2 34:16
  39:10 41:21
  52:10 56:3
  61:15,17 68:14
  69:3 71:21
  83:15 90:25
  97:7 101:17
  106:14 110:8
  122:22 124:16
  127:15 128:18
  137:13,20
  141:5,6 153:7
  157:17 166:3,7
  168:12 180:3
  197:25
telling 42:5 76:3
ten 21:6,20
  50:24 60:3,5,8
  60:20 64:25
  65:24 73:24
  98:7 118:20
  193:9 194:14
tend 13:11
  104:17
term 11:23 12:7
  17:6,10 18:13

21:15 37:13
38:8,10 110:9
134:5
terminology
  24:24 61:12
  190:7
terms 18:5 19:11
  22:1,23 31:18
  40:6 41:1,3
  46:13 48:19
  49:12 51:23
  52:19 63:18
  68:4 81:10
  84:10 86:14
  88:10 101:9
  103:21 105:20
  106:9 117:16
  118:6 127:14
  130:14
Terrific 11:2
  13:22
testified 12:16
  106:7,21 158:9
  165:24 170:10
  186:11 189:10
testify 9:17
testimony 7:20
  10:6 30:5 63:2
  105:23 106:1
  156:22 160:11
  169:23 178:23
  200:7,9
Thank 8:3,18
  53:9 65:10
  191:16
Thanks 173:17
  185:22
thereon 203:10
thereto 200:16
thing 13:16
  33:15,16 39:16
  43:19 88:7
  141:21 152:20
  170:23 171:9
  171:10 197:21
  198:14

things 19:17
  24:6,11 33:8
  44:8 101:1
  102:17 128:9
  148:25 151:21
  158:11 169:1
  169:19 170:4
  171:7 182:7
  183:3 188:7,10
  197:11
think 10:14
  11:11 12:1
  17:24 21:21
  28:16 33:1,2
  39:16 41:6,7
  43:16 49:23
  57:16 59:15
  60:15 63:1
  66:18 67:2,19
  71:12 74:13,21
  77:14 78:22
  81:17 87:3
  88:6,6 97:12
  113:22 115:11
  116:6,18,20
  118:17 120:5
  121:9,9 127:2
  131:8,23
  140:11,15,17
  141:2,16,19
  144:18 150:18
  151:4,9 156:15
  156:24 158:15
  158:18,25
  160:24 162:4,6
  164:19,21
  166:13 167:12
  168:5,13
  170:10 172:11
  172:12 173:17
  173:20 175:24
  177:19,23
  178:13 179:10
  180:8,17
  181:20 182:13
  183:17 185:21

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-37   Filed 02/21/18   Page 79 of 83

187:25 188:19
193:12 194:13
194:17,20,20
195:17 196:6
196:20 197:4
198:16
**thinking** 90:19
113:1
**third** 21:13
**thought** 123:5
**three** 19:10 57:4
59:2 60:15
82:19,23 84:12
104:19 141:7
158:3 168:17
169:3,14,18
170:3,11,16,23
171:1
**three-day**
168:14
**thrown** 154:18
**time** 1:20 6:13
6:15 14:25
25:25 28:10
34:21 35:15
41:11 47:4
48:15,19 49:1
49:1,9,23 50:5
50:12,13 51:3
51:17,23 52:7
64:13 65:7,13
70:1 81:21
82:17,18,20
83:1 87:10
90:19,22 93:14
97:15 104:5
116:5,18 124:4
141:13,16
144:24 145:25
149:20 153:4
153:10,12,15
153:18,20
154:9 160:10
167:1 168:6,9
168:12,22,23
169:9,15,20

170:5,17,24
171:15,17
174:22 188:12
188:20 194:25
197:14,16
**timekeeping**
48:10,13
**timelines** 177:7
**times** 25:13 69:1
69:2,3 74:7
109:22 129:17
129:18,22
186:11 189:17
**timing** 170:11
170:23
**title** 8:10 49:23
**today** 8:3 9:1,16
9:20 10:6,25
11:15 16:21
32:24 71:11
144:22 145:18
145:24 146:10
147:12 148:12
149:17 198:22
**today's** 6:15
11:21
**tool** 64:25 66:10
68:8
**toolbox** 2:19
59:18 60:2
65:25 66:10
182:11
**toolbox-type**
60:11
**top** 190:12
**topic** 44:7
**topics** 26:7 34:1
58:16
**topic-specific**
166:14
**total** 15:9 37:6
47:17 57:21
100:25
**totally** 151:15
182:19
**touch** 19:23

**track** 46:20 49:9
**traditionally**
16:13 61:19
105:22
**train** 69:8
164:17 165:1
**trained** 16:16
58:2,22 68:22
69:6,6 72:15
95:15 119:8
123:13 164:6
164:10,11
165:4
**training** 16:12
16:13 33:14
53:12,16 54:14
54:25 55:3,11
55:19,20 56:15
56:18,20,21
57:7,12,13,16
57:18 58:9,16
58:18 60:11
68:9 69:13
72:17 101:11
122:6 156:19
157:11,14,15
157:18,22,25
158:3 159:2
160:4 165:15
165:16 176:20
176:24
**trainings** 33:13
52:21 53:20
54:16,21 55:6
56:14,25 68:16
68:19,21 69:16
121:25 122:1
157:19 164:24
165:5,6,16,18
165:23
**transcribed** 6:6
**transcript** 2:24
201:12
**transfer** 21:15
22:23 109:5,23
**translate** 102:16

102:23
**translator**
102:15,16,23
**transport** 108:4
**transportation**
197:8
**travel** 86:3,9
87:13
**traveling** 141:11
**treat** 178:2
**treatment** 84:3,5
84:8
**trial** 8:15 12:22
14:19 15:1
20:22 21:9
53:22 55:19,25
56:1,4,5 89:1
137:7 194:1,14
**trials** 194:12
**tried** 197:18
**tries** 67:4
**troubling** 31:6
**true** 28:12 29:6
33:4 39:22
192:24 193:22
203:9,13
**truth** 7:21,21,22
13:1
**try** 13:11,12
37:19 67:14
104:17 165:7
174:24
**trying** 18:12
33:17,19
115:19 116:15
131:4 167:3
**Tuesday** 157:21
**turn** 11:12 28:14
30:4 34:2
40:16 41:13
42:23 59:14
60:14 64:24
66:23 96:17
97:4 123:17,22
125:1,5,16

**turnaround**
169:18 170:3
170:12
**turned** 62:6
124:24 125:19
**turning** 30:2
89:21 123:18
124:12 125:5
125:10
**twice** 69:7
**two** 8:12 19:2
27:19,23 36:18
36:19,20,21
47:17 53:20
54:16 55:5
57:4 59:1
60:15 72:21,21
73:5 127:17
158:2 196:10
**type** 22:15 23:14
114:25 115:1
128:2 154:19
163:14 172:18
173:2 178:14
178:14 190:15
**types** 115:21
128:5 178:23
**typewriting** 6:7
200:11
**typical** 153:15
161:4
**typically** 105:22
**typing** 176:13

**U**
**uh-huh** 11:9
43:6 53:10
59:16 67:9
83:3 87:8
112:9,13
114:12 139:20
165:19 168:4
190:11,14
**unable** 28:5 59:6
167:2 187:1,3
187:4,10,21

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-37   Filed 02/21/18   Page 80 of 83

188:8,10 197:2
**unclear** 13:6
**undergraduate**
14:4 143:6,15
144:11
**underpin** 145:4
**understand** 24:1
24:24 89:14
115:19 165:24
176:12 177:8
177:24 178:1
181:19 185:15
**understandable**
25:1
**understanding**
2:20 10:19
24:20,22 29:15
29:19 35:7
43:24 49:18
71:14,23 88:16
108:20,21
124:17 127:15
128:16 130:9
133:17 146:21
148:20 177:20
193:19
**Understood**
186:24
**undertaken**
26:13 62:13
**unfolding**
138:21
**unique** 39:8
172:13
**United** 1:1 3:1
3:18 6:19
110:17
**units** 122:19
123:3,5,8,10
191:24
**University** 14:4
14:5 58:14
143:6,15,22
**unpack** 16:19
18:20 29:13
31:18 34:1

84:17
**untrue** 42:12
**upfront** 54:14
**upshot** 44:18
**urge** 28:6
**urgency** 177:9
177:22 178:1
**use** 11:23 12:6
17:6 18:12
20:13 35:2
38:9 43:19
56:7,11 73:16
84:11 88:2,11
88:23 89:13,18
90:3,16 92:1
92:11 97:8
99:4 134:20
145:8 150:4
172:4 175:18
187:19
**usual** 38:8,10
**usually** 53:23,23
53:24 64:13
80:8 83:8 84:1
105:25 106:2
153:16,20
157:21 179:6
**util** 175:15
**utilities** 163:23
**utilize** 163:23
164:1 167:4
175:5,15
**utilized** 148:3,18
173:8 182:15
182:16
**U.S** 43:22

_____

**V**

**vague** 66:18
74:21 159:23
**various** 178:22
190:13
**vast** 194:5,9
**verbal** 88:16
**verdict** 138:22
140:6

**verify** 145:12
**versed** 121:5
**versus** 6:18 25:8
51:3 94:16
178:14
**victims** 106:7
**videographer**
5:2 6:14,25
7:17 14:11
43:7,11 65:17
65:20 142:1,4
142:7 173:10
173:15 198:17
**video-recorded**
1:14 3:10 6:16
**violate** 132:17
**violation** 132:3
132:6 133:2
**violations** 19:7
36:3 39:20
40:4
**violent** 73:1
128:7,20
**visited** 190:3
**visiting** 80:18,20
83:5
**voice** 107:15
**voluminous**
166:20
**voluntary** 26:3
**vs** 1:6 3:6,21
201:6 202:2

_____

**W**

**waive** 138:7
**waiver** 65:3
**waiving** 31:7
35:16 39:15
**walk** 60:13
**want** 26:7 30:4
33:12,13 52:15
62:4 63:5,16
64:24 75:7
81:21 83:25
87:19 89:18
91:5,13,14

95:6 114:4
115:11 119:24
123:17 135:14
136:20 141:25
142:1 180:25
181:9,9 182:11
188:17 190:6
198:11
**wanted** 84:7
182:10 184:16
**wants** 76:5
**wasn't** 121:12
191:25
**watch** 123:2
**way** 10:15 13:23
18:25 32:5
70:18 145:5
147:9 152:25
155:19 159:5
172:9 176:23
179:16,18
182:23
**ways** 16:5 28:12
93:19
**wayside** 188:20
**weapon** 73:16
**Wednesday**
159:14 198:20
**weeds** 45:12
**week** 54:24 73:7
73:14 157:20
**weeks** 80:9,12
**week-long** 53:21
**weight** 104:10
104:14
**went** 14:3,5 35:2
72:17 95:6
121:3 143:6,14
143:21 167:2
**weren't** 160:9
160:24
**West** 4:13,23
201:4
**Western** 1:1 3:1
3:19 6:20
**Westlaw** 161:24

161:25 162:6
162:15 163:20
164:4
**we'll** 11:11
13:12 25:2
29:13,13 33:25
37:12 73:20
144:16 182:8
**we're** 6:14 17:5
20:13 27:6
43:7,11 47:25
52:12 55:10
57:3 59:15
65:17,20 142:4
142:7 147:21
160:14 163:10
173:11,15
176:16,17
177:3 181:24
190:7 196:23
198:17
**we've** 22:22
111:8
**who've** 105:7
**William** 3:15
5:10 6:4 200:3
201:22
**willing** 83:17
**wind** 51:9
**window** 109:2
**winter** 57:1,7
**witness** 6:7 7:18
7:23 65:10
89:10 91:8
97:10,12
106:17 107:17
147:19 167:18
200:7,9 201:11
202:2,24
**witnesses** 73:24
83:8 87:20,23
88:1,7 90:7,16
94:15 97:25
104:21,22
105:11 114:22
178:22 179:3

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 160-37    Filed 02/21/18    Page 81 of 83

197:5
**word** 18:12 38:6
**words** 124:9
**work** 8:4 12:15
13:20 23:23
24:1 46:8
63:21 82:23,25
83:13 90:22
91:21 99:21
100:14,16,20
101:7 102:8,14
108:22,24
112:18 115:14
139:3 141:16
153:4 160:14
186:1
**worked** 14:21
102:6 120:17
129:22 153:25
154:4 177:10
180:18
**worker** 99:11
100:1 175:19
189:3
**workers** 98:24
98:25 99:4,8
99:15 101:10
175:2,5,12,16
**working** 14:15
32:19 95:5
109:3,17,19
116:8 120:6,15
158:17 160:10
160:17 167:24
187:6
**works** 100:22
**worksheet** 65:2
**workshop** 53:21
53:22
**world** 81:17
128:22 129:5
153:16,20
**worse** 152:25
**wouldn't** 27:9
27:20 65:12
145:2 146:16

147:4 148:19
150:2 151:23
**wrap** 140:23
**write** 91:12,13
91:14 102:16
116:4,5
**writing** 94:1
101:1 115:24
**written** 30:20
37:22 95:11,14
95:16,24 99:3
180:20 192:8
**wrong** 67:2
172:8
**wrongdoings**
19:20
**wrote** 41:25
146:3 148:9,10

**X**

**X** 2:1,10 152:20

**Y**

**Y** 152:20
**yeah** 11:11,12
14:11 18:13
22:7,7 25:24
65:9 69:2
84:22 87:8
90:22 103:2
107:23 112:9
124:1 132:11
132:12,14
140:21 141:24
151:16 156:9
163:1 167:14
**year** 57:3 86:22
87:1,3 112:25
122:4 127:17
127:20 128:23
134:14,15
138:11 153:9
157:1,16 165:5
165:5,23 183:6
191:11,12
193:4
**years** 8:24 15:19

57:4,4 121:10
121:15 122:3
141:7 164:25
**year's** 122:5
**York** 13:10
**young** 18:5,20
19:10,18 20:17
25:4,8 26:1
29:16,20,23
63:8 132:16,23
136:14,24
**youth** 14:23
15:3 16:9,10
16:15,18 17:12
18:11,12,17,23
24:16,18,21
25:16,19 29:10
31:1,7,8,20
32:3,5 35:12
35:14,15 36:4
36:7 38:19,20
38:20 39:13
40:15 44:9,15
44:17,23 45:7
45:9,10 46:18
46:23 72:4
75:23 78:24
87:10 92:4
94:13 103:10
122:19 123:3
126:21 130:21
135:8,12,13,13
136:4 140:18
141:12,16
169:14 171:14
174:23,24
176:16 177:4
187:14 192:24
193:16,19,23
193:25 194:3
**youth's** 25:11
**youth-specific**
89:6

**$**

**$20,000** 73:2

**$500** 72:24
73:17,22 74:16
89:25
**$750** 72:25

**#**

**#084-003893**
5:11
**#566** 5:11

**1**

**1** 2:12,21 9:3,5,8
127:4,8,9
**1,600** 128:14
129:8,10 132:4
190:10
**1-800-280-3376**
5:4,14
**10:15** 65:18
**10:24** 65:21
**100** 4:13 201:5
**1000** 4:13 201:4
**106.6** 51:16
**11** 2:15 34:5,9,9
114:8
**11th** 201:17
**11:43** 142:5
**11:51** 142:8
**1130** 3:14
**12** 2:17 42:20,25
42:25 201:2
**12:21** 173:12
**12:22** 173:16
**12:50** 198:18
199:2
**127** 2:21 117:24
**14** 114:8
**142** 2:4
**15** 49:22 51:17
**17** 17:13 20:5,13
20:18 73:10
**17-year-olds**
109:16
**17-04057-CV-...**
1:6 3:6 6:19
**18** 20:9,12 61:9
63:20

**185** 2:5
**19.5** 50:19 51:8
**192** 2:6
**195** 2:7

**2**

**2C** 28:16
**20** 57:20 118:22
140:18 203:15
**200** 4:19
**2004** 29:4
**2005** 29:5
**2006** 29:5
**2007** 29:3
122:18
**2008** 122:18
**2009** 8:23 14:6,7
14:19 118:17
129:18,22
130:7
**2010** 14:19,21
**2011** 14:21,25
**2012** 164:25
**2013** 30:21
32:12,24 165:6
**2014** 14:25 15:2
57:2,7
**2015** 34:19
37:21,21 40:8
40:10 57:13
147:23
**2016** 57:16
127:17 128:14
129:2 132:5
138:16 183:6
191:11
**2017** 1:16 3:11
6:15 57:17
201:2,9 202:3
**21** 2:13 27:3,7
30:3 144:17
**211** 22:24 23:1
**211.031** 19:2
**211.071** 20:21
21:2,7 22:10
**211.211** 76:2

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04057-NKL    Document 160-37    Filed 02/21/18    Page 82 of 83

**22** 2:14 30:9,11
   30:16 146:11
**22nd** 10:20
   71:24
**221** 4:23
**23** 2:15 34:5,7
   34:11 127:23
   147:21 190:6
**24** 2:16 41:15,16
   41:20
**240** 4:9
**25** 2:17 42:20,23
   43:16,20 47:12
   57:20 70:14
   96:1,8,12
   130:5
**254-8540** 4:5
**26** 2:18 47:22,25
   149:13
**27** 2:13,19 59:15
   59:17,20 69:22
   69:24 182:11
**28** 2:20 71:12,13
   71:20
**29** 2:21 127:3,4
   127:7 182:8,9
   183:6 190:6

---
   **3**
**3C** 28:2,17
**30** 2:14 57:14
   69:22 116:24
   117:7 201:16
**30(b)(6)** 9:12
   13:24
**300** 4:4
**31st** 147:23
**314** 4:5,20 5:4
   5:13
**315** 4:4
**34** 2:15
**340-3447** 4:20
**35** 29:1
**37** 29:5
**38** 29:5

---
   **4**

**4.6** 50:7,8 91:22
   154:20,23
   155:10,12,20
   155:21,24,25
   156:7,10,13,16
   195:9,15
**4.6-hour** 195:3
**40** 29:4
**400** 35:15
**405** 4:8
**41** 2:16
**42** 2:17
**47** 2:18
**492.010** 200:9

---
   **5**

**50** 119:1,2 130:6
   193:11
**50-N** 128:3
**50-S** 128:3
**50-V** 128:3
**525-5212** 4:14
**5668** 60:16
**57** 28:15,17,20
**573** 4:14,24
**58** 28:18
**59** 2:19

---
   **6**

**6** 1:16 2:13 3:11
   27:3,8,8 201:9
   202:3
**6th** 6:15
**600** 190:9
**625** 128:19
**63101** 3:15 4:20
   5:3,13 201:17
**63118** 4:5
**644-2191** 5:4,13
**65102** 4:24
**65203** 4:14
   201:5

---
   **7**

**7** 2:3,18 4:13
   47:22 48:2,2
   201:5

**71** 2:20
**711** 5:3,12
   201:16
**751-1024** 4:24

---
   **8**

**8** 2:16 41:16,19
   41:19
**8:30** 37:5
**81** 128:19
**815** 4:19
**84.5** 51:20
**888-8857** 4:9

---
   **9**

**9** 2:12,14 30:10
   30:11,14,15
**9:06** 1:20 6:13
   6:16
**9:48** 43:8
**9:50** 43:12
**90** 194:15
**906** 3:14
**912** 128:19
**94105-2669** 4:8

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com     Phone: 1.800.280.3376     Fax: 314.644.1334
Case 2:17-cv-04057-NKL   Document 160-37   Filed 02/21/18   Page 83 of 83