# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF MISSOURI
# CENTRAL DIVISION

| Randall Lee DALTON, et al., | ) | |
|---|---|---|
| Plaintiffs, | ) | |
| v. | ) | No. 17-cv-04057-NKL |
| Michael BARRETT, et al., | ) | |
| Defendants.[1] | ) | |

**ORDER**

Pending before the Court is Plaintiffs' motion for class certification, Doc. 52. For the following reasons, the motion is denied.

## I.  Background

This lawsuit challenges the adequacy of the Missouri State Public Defender (MSPD), which provides legal representation to all indigent citizens accused or convicted of crimes in Missouri state court. Named Plaintiffs filed this putative class action alleging that Missouri "has failed to meet its constitutional obligation to provide indigent defendants with meaningful representation." Doc. 1-2, p. 2. The crux of Plaintiffs' allegations is that the MSPD is underfunded and overworked, and Plaintiffs seek only injunctive and declaratory relief aimed at correcting the issues.

### A.  Missouri Indigent Defense Overview

The State of Missouri relies almost exclusively on local MSPD offices to provide indigent

---

[1] The caption reflects the current parties. Although originally captioned Church v. State of Missouri, the Court has found that plaintiff Shondel Church lacked standing, Doc. 69, p. 33, and plaintiffs' claims against the State of Missouri and the Governor have been dismissed. Doc. 211.

defense services in all 114 counties and St. Louis City. MSPD comprises three distinct parts: the Trial Division, subdivided into 33 district offices across the State; the Appellate/Post-Conviction Division, subdivided into six offices; and the Capital Division, subdivided into three offices. MSPD employs approximately 376 attorneys—including roughly 313 in the Trial Division—and approximately 200 administrative staff, support staff, paralegals, and investigators. The MSPD represents indigent defendants in over 100,000 cases each year, counting new cases and cases carried over from previous years.

1.  **Funding**

MSPD is funded almost exclusively from Missouri's general revenue. The level of funding provided by the State is less than one half of one percent of the State's general revenue. In fiscal year 2016, the MSPD Trial Division handled more than 75,000 cases; with its funding, the MSPD spent an average of $356 per case. Since the establishment of MSPD in its current form in 1989, there have been at least ten independent evaluations of Missouri's public defense system.[2] One such study, conducted by the Sixth Amendment Center, determined that Missouri's per capita spending on indigent defense is approximately one-third of the average of the 35 states surveyed. According to the study, in fiscal year 2015 Missouri spent $6.20 per resident for indigent defense services, compared to an average of $18.41 per capita among the other States in the study. Missouri currently ranks 49th among the 50 states in funding for indigent defense.

2.  **Workloads**

In 1993, the MSPD Commission sought the assistance of The Spangenberg Group (TSG) in studying the internal operations of the Missouri public defense system, including issues related to budgeting, staffing, and allocation of resources. TSG's report concluded that MSPD "lack[ed]

---

[2] The reports from those studies are in the record at Docs. 1-3, 1-4.

the necessary resources to provide competent representation," and that "[t]he legal staff needs to be increased as soon as possible." Doc. 1-3, pp. 86–106.

In 2005, the Missouri Bar Association formed a Public Defender Task Force to work in conjunction with the MSPD Commission to address those deficiencies. The task force commissioned TSG to conduct another study into the MSPD. The report warned that, despite the best efforts of MSPD's attorneys, many public defenders were routinely failing to comply with MSPD's Public Defender Guidelines for Representation and the Missouri Rules of Professional Conduct. Doc. 1-3, pp. 111–38.

In January 2007, an interim committee of the Missouri Senate released its report on MSPD. The committee found that the caseloads of public defenders were "too large," and recommended that "caseloads . . . be reduced, support staff be increased, the number of public defenders be increased . . . [and] the base salary of public defenders be[ ] increased." Docs. 1-3, pp. 140–50; 1-4, pp. 1–4.

In 2009, the Missouri Bar Association retained TSG for another report. TSG concluded that public defender workloads had worsened since its 2005 report and, as a result of those workloads, public defenders were failing to (1) conduct prompt interviews of their clients following arrest, (2) spend sufficient time interviewing and counseling their clients, (3) advocate effectively for pretrial release, (4) conduct thorough investigations of their cases, (5) pursue formal and informal discovery, (6) file appropriate and essential pleadings and motions, (7) conduct necessary legal research, and (8) prepare adequately for pretrial hearings, trial, and sentencing. Doc. 1-4, pp. 6–73.

In June 2014, the ABA and accounting firm RubinBrown released a study of Missouri's public defender system, which included an assessment of public defender workloads for both adult

and juvenile matters. Doc. 1-7. The researchers calculated the minimum number of hours (excluding court time, travel, and administrative tasks) that an attorney would need to devote to different types of cases in order to provide constitutionally adequate representation. The study determined that a constitutionally adequate attorney would need to spend a minimum of 106.6 hours on a non-capital murder/homicide case; at least 47.6 hours on an A/B felony; at least 25.0 hours on a C/D felony; at least 63.8 hours on a felony sex offense; at least 11.7 hours on a misdemeanor; at least 9.8 hours on a probation violation; and at least 19.5 hours on a juvenile case. Doc. 1-4, pp. 75–121.

In 2015, MSPD attorneys were able to spend, on average, 84.5 hours on each non-capital murder/homicide case; 8.7 hours on each A/B felony; 4.4 hours on each C/D felony; 25.6 hours on each felony sex offense; 2.3 hours on each misdemeanor; 1.4 hours on each probation violation; and 4.6 hours on each juvenile case. *Id.* Under the ABA's analysis, "attorneys in the St. Louis County office [were] at 265% workload capacity," and throughout the state, for example: "239% capacity for the Springfield office, 254% for Jefferson City, and 254% for Farmington." Doc. 1-4, pp. 124–126. MSPD Trial Division attorneys were able to devote the minimum required hours to only 2.4% of all A/B felony cases (or 97 out of 4,127 total A/B felony cases) and 1.4% of C/D felony cases (or 311 out of 21,491 total C/D felony cases). Doc. 1-4, pp. 189–99.

In 2012, the Missouri Supreme Court upheld the validity of a rule promulgated by the MSPD Commission that "permit[ted] a district defender office to decline additional appointments when it ha[d] been certified as being on limited availability after exceeding its caseload capacity for at least three consecutive calendar months." *State ex rel. Missouri Public Defender Commission v. Waters*, 370 S.W.3d 592, 597 (Mo. 2012). After that decision, however, public defenders who attempted to turn away cases faced resistance from prosecutors, judges, and

legislators. In some circuits, cases that were turned away were assigned to non-MSPD attorneys with no criminal defense experience, and who were not compensated for their time.

The then-head of MSPD was told that if local offices continued to turn away cases, the legislature would pass a bill to privatize the entire system. The legislature passed Mo. Rev. Stat. § 600.062, which prevents the director of MSPD or the MSPD Commission from "limit[ing] the availability of a district office or any division director, district defender, deputy district defender, or assistant public defender to accept cases based on a determination that the office has exceeded a caseload standard." Under Section 600.062, MSPD "may not refuse to provide representation" unless it receives "prior approval from a court of competent jurisdiction." Since the legislature's enactment of 600.602, no MSPD office has refused cases in any consistent or systematic way.

## B. Plaintiffs' Proposed Class

Plaintiffs seek certification of a class of similarly situated individuals who currently are or will be represented by MSPD defined as follows:

> All indigent persons who are now or who will be during the pendency of this litigation under formal charge before a state court in Missouri of having committed any offense the penalty for which includes the possibility of confinement, incarceration, imprisonment, or detention (regardless of whether actually imposed), and who are eligible to be represented by MSPD.

Doc. 53, pp. 1–2. Plaintiffs' Class Action Petition for Injunctive and Declaratory Relief, Doc. 1-2, includes five claims for relief: (I) Violation of the Sixth and Fourteenth Amendments to the U.S. Constitution; (II) Violation of Article 1, Section 18(a) of the Missouri Constitution; (III) Violation of the Fifth and Fourteenth Amendments to the United States Constitution; (IV) Violation of Article 1, Section 10 of the Missouri Constitution; and (V) Violation of Missouri Criminal and Juvenile Codes.

Plaintiffs ask this Court to: "Declare that Defendants are obligated to provide

constitutionally adequate representation to indigent criminal defendants and juvenile respondents, including at their initial appearances;" "Declare that the constitutional and statutory rights of Missouri's indigent criminal defendants and juvenile respondents are currently being violated by Defendants on an ongoing basis;" "Enjoin Defendants from continuing to violate the rights of indigent defendants by providing constitutionally deficient representation;" and "Enter an injunction that requires Defendants to propose and implement, subject to this Court's approval and monitoring, a plan to ensure that all indigent criminal defendants and juvenile respondents in the State of Missouri are provided with constitutionally adequate legal representation." *Id.* at 52.

## II. Discussion

Under Federal Rule of Civil Procedure 23, a motion for class certification involves a two-part analysis. First, under Rule 23(a), the proposed class must satisfy the requirements of "numerosity, commonality, typicality, and fair and adequate representation." *Luiken v. Domino's Pizza, LLC*, 705 F.3d 370, 372 (8th Cir. 2013). Second, the proposed class must meet at least one of the three requirements of Rule 23(b). *Comcast Corp. v. Behrend,* 569 U.S. 27, 33 (2013).

Plaintiffs carry the burden to show that the class should be certified. *See Luiken,* 705 F.3d at 372. This burden is met only if, "after a rigorous analysis," the Court is convinced the Rule 23 requirements are satisfied. *Comcast,* 569 U.S. at 33 (quoting *Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 341 (2011)). Rigorous analysis may further "entail some overlap with the merits of the plaintiff's underlying claim," because "[t]he class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Id.* at 33–34 (quoting *Gen. Tel. Co. of Sw. v. Falcon,* 457 U.S. 147, 160 (1982)). However, the Court's inquiry on a motion for class certification is "tentative," "preliminary," and "limited." *In re Zurn Pex Plumbing Prod. Liab. Litig.*, 644 F.3d 604, 613 (8th Cir. 2011). "Rule 23 grants courts no

license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013). "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.*

### A. Plaintiffs Fail to Satisfy Rule 23(a)'s Commonality Requirement

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). However, as "any competently crafted class complaint literally raises common 'questions,'" merely raising common questions—"even in droves"—is insufficient to obtain class certification. *Wal–Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 349–50 (2011) (citation omitted). Plaintiffs must show that their class claims "depend upon a common contention" that "is capable of classwide resolution," such that the "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* at 350. Put another way, "what matters to class certification is not the raising of common questions . . . but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.* (emphasis in original) (internal quotations omitted).

Plaintiffs propose several "questions of law or fact," which they argue are common to the entire class. The "basic, unadorned question," according to Plaintiffs, "is whether the State has met its obligation to provide counsel." Doc. 53, p. 11 (citing *Hurrell-Harring v. State of New York*, 914 N.Y.S.2d 367, 372 (App. Div. 2011)). That overriding question purportedly "breaks down into several sub-questions . . . ." *Id.* at 12. Specifically:

> a) Whether MSPD attorneys' inability to adequately perform the basic tasks of representation stems from MSPD's high workloads;
>
> b) Whether MSPD's high workloads are a result of Defendants' course of conduct;
>
> c) Whether MSPD attorneys are laboring under an actual conflict of

7

interest because of their high workloads, which ensure that any time spent providing constitutionally adequate representation to one client is time not spent providing such representation to another;

d) Whether Defendants have created circumstances such that even where counsel is nominally available, "the likelihood that any lawyer, even a fully competent one, could provide effective assistance is small," constructively depriving Plaintiffs of counsel in violation of *United States v. Cronic*, 466 U.S. 648 (1984);

e) Whether MSPD attorneys are able to adequately perform the basic tasks necessary to meet the minimum requirements for constitutionally sufficient counsel, such as communicating with clients, investigating cases, and counseling clients regarding guilty pleas;

f) Whether Defendants have created a likelihood of constitutionally deficient performance on MSPD's part and resulting prejudice on the part of Plaintiffs; and

g) Whether Defendants have systematically denied Plaintiffs actual representation at critical stages of their cases.

*Id.* Plaintiffs maintain that each of these questions requires an analysis of MSPD at the system-wide level, and does not depend on the particular circumstances of individual cases. The Court disagrees.

None of the questions that Plaintiffs present are apt to generate common answers, and instead the answers may vary depending upon any one of a number of factors, including the Plaintiffs' location and type of criminal charge, and may even vary among individual MSPD attorneys. For instance, the Plaintiffs cannot establish the answer to "whether the State has met its obligation to provide counsel," without providing evidence from each of MSPD's forty-two offices and three divisions. The answer could quite conceivably be yes in one MSPD office, but no in another.

The present matter is similar to *Wal–Mart Stores, Inc. v. Dukes*. There, the U.S. Supreme Court explained that while "commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury,'" that does not mean "merely that they have all suffered

8

a violation of the same provision of law." *Dukes*, 564 U.S. at 350 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 (1982)). In *Dukes*, the Supreme Court concluded that a proposed Title VII class of millions of female employees, challenging discretionary decisions made by managers in 3,400 stores across the country, did not satisfy Rule 23's commonality requirement because there was no common policy that bridged the "conceptual gap" between the individual claims of discrimination, and the existence of a class of persons who all suffered the same injury. *Id.* at 352–53. Likewise, here, Plaintiffs have failed to bridge the conceptual gap between their contention that the MSPD is underfunded and overworked, and their allegation that every putative class member has suffered a common injury of inadequate counsel. Even assuming that the MSPD is underfunded and overworked, Plaintiffs would still need to provide evidence that it causes injury to every class member, which would require individualized evidence.

Plaintiffs attempt to distinguish *Dukes* by offering "the State's policy of underfunding its public defender program" as the "common policy that was missing in *Dukes*." Doc. 68, p. 6. However, the Court is not persuaded. Not every MSPD office receives the same amount of resources, much less requires the same amount. Indeed, while Plaintiffs emphasize that the State of Missouri spends only an average of $356 per assigned case, Defendants point out that in Kansas City, the average cost per assigned case in 2016 was $566.69, and in St. Louis City, the average cost per assigned case was $525.00. Plaintiffs may attempt to prove that all three are underfunded, but that will require evidence from each office, and may also require further narrowing among the types of criminal charge. Moreover, that the MSPD is underfunded is not Plaintiffs' main contention in this lawsuit, and Plaintiffs do not seek an increase in funding.

Plaintiffs rely on three cases to support their position, but each is distinguishable. Two are state court cases, in which *Wal-Mart Stores, Inc. v. Dukes* is inapplicable. *See Hurrel-Harring*,

914 N.Y.S.2d at 367; *Rivera v. Rowland*, No. CV95545629, 1996 WL 677452 (Conn. Super. Ct. Nov. 8, 1996).[3] The third case, *Wilbur v. City of Mount Vernon*, 298 F.R.D. 665 (W.D. Wash 2012), involved a much smaller class than the Plaintiffs propose in the present matter. In *Wilbur*, the class included indigent defendants before only two municipal courts. *Id.* at 666. Moreover, the *Wilbur* plaintiffs challenged a specific policy of the public defender system, which made it impossible for counsel to engage in confidential communications with their clients. *Id.* at 667. Here, the Plaintiffs seek to certify a statewide, 10,000+ member class, with no common policy other than alleged system-wide underfunding.

Accordingly, the Court finds that Plaintiffs fail to establish Rule 23(a)'s commonality requirement.

### B. Plaintiffs Fail to Satisfy Any Rule 23(b) Requirements

#### 1. Rule 23(b)(1)

Plaintiffs first argue for certification under Rule 23(b)(1)(B), which allows certification where separate actions would risk "adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests." Fed. R. Civ. P. 23(b)(1)(B). The Advisory Committee Notes to Rule 23(b)(1)(B) provide:

> [Rule 23(b)(1)(B)] takes in situations where the judgment in a non-class action by or against an individual member of the class, while not technically concluding the other members, might do so as a practical matter. The vice of an individual action

---

[3] Although *Rivera v. Rowland* explains that "Connecticut courts commonly rely on federal case law to aid them in their analysis," it was decided in 1996, nearly fifteen years before *Dukes*. 1996 WL 677452 at *2. *Hurrel-Harring v. State of New York* makes no mention of federal law, and indeed required that the common questions of law or fact "predominate over any questions affecting only individual members," 914 N.Y.S.2d 367 (App. Div. 2011), which is not applicable here.

> would lie in the fact that the other members of the class, thus practically concluded, would have had no representation in the lawsuit . . . [This] reasoning applies to an action which charges a breach of trust by an indenture trustee or other fiduciary similarly affecting the members of a large class of security holders or other beneficiaries, and which requires an accounting or like measures to restore the subject of the trust.

Fed.R.Civ.P. 23(b)(1)(B) Advisory Committee Notes (1966 Amendment). To qualify as a class action under Rule 23(b)(1)(B), it must be shown that "the shared character of rights claimed or relief awarded entails that any individual adjudication by a class member disposes of, or substantially affects, the interests of absent class members." *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 834 (1999). Typically, class actions under Rule 23(b)(1)(B) involve "the presence of property which call[s] for distribution or management," often when claims are made "by numerous persons against a fund insufficient to satisfy all claims." *Id.*

Plaintiffs attempt to argue that the existing pool of public defenders is a limited, finite resource. Plaintiffs also argue that if a plaintiff succeeds on an individual suit for inadequate representation, it necessarily would "substantially impede the ability of other indigent defendants to obtain adequate counsel, because other indigent defendants would then have access to even fewer public defender resources." Doc. 53, p. 16. The Court disagrees. There is no limited fund of public defenders, and the resolution of one indigent defendant's inadequate assistance claim would not preclude others from seeking similar relief. The supply of public defenders can be expanded by the legislature, as can its funding. Indeed, regardless of whether the funding and staffing of MSPD is adequate, both appropriations and the amount of public defenders have increased over the past twenty five years. Accordingly, it follows that if a plaintiff were to succeed on an individual suit for inadequate representation, it would not necessarily impede any other potential plaintiff from raising a similar claim.

Plaintiffs fail to satisfy Rule 23(b)(1)(B).[4]

## 2. Rule 23(b)(2)

Plaintiffs also argue for certification under Rule 23(b)(2), which applies when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Although a Rule 23(b)(2) class is not required to satisfy the additional predominance and superiority requirements of Rule 23(b)(3), "the class claims must be cohesive." *Ebert v. General Mills, Inc.*, 823 F.3d 472, 480 (8th Cir. 2016) (quoting *Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 143 (3d Cir. 1998)). Because a (b)(2) class is mandatory, and class members are not permitted to opt out, "the cohesiveness requirement of Rule 23(b)(2) is more stringent than the predominance and superiority requirements for maintaining a class action under Rule 23(b)(3)." *Id.* For purposes of 23(b)(2), cohesiveness requires that "the relief sought must perforce affect the entire class at once." *Id.* (citing *Dukes*, 564 U.S. at 361–62) In contrast, cohesiveness is lacking where "each individual class member would be entitled to a different injunction or declaratory judgment against the defendant." *Id.* at 480–81.

Plaintiffs' proposed class is not sufficiently cohesive. The class includes indigent defendants charged with everything from first degree murder to passing bad checks and causing personal injury while boating while intoxicated. It includes indigent defendants in major metropolitan areas, such as Kansas City and St. Louis, as well as rural areas, such as Kirksville. The proposed class would require evidence and inquiries into far too many individual circumstances. *See* Rubenstein, 2 Newberg on Class Actions § 4:34 (5th ed.) ("In determining

---

[4] Moreover, "[t]he Supreme Court has cautioned against 'adventurous application of Rule 23(b)(1)(B).'" *Elizabeth M. v. Montenez*, 458 F.3d 779, 786 n.3 (8th Cir. 2006) (quoting *Ortiz*, 527 U.S. at 845).

whether cohesiveness is present, courts tend to focus on whether adjudication is likely to break down into individual inquiries.").

Furthermore, although Plaintiffs maintain that a single injunction would provide relief to each member of the class, their proposal "requires Defendants to propose and implement . . . a plan to ensure that all indigent criminal defendants and juvenile respondents in the State of Missouri are provided with constitutionally adequate legal representation." Doc. 53, p. 17. While that is technically just one injunction, it is not specific, and alone will not provide relief to all class members. Under the injunction, the Defendants' plan could take different forms for different Plaintiffs, depending on a variety of factors. Indeed, there is no certainty that the single injunction would benefit all class members equally, if at all. Furthermore, Plaintiffs have an individual remedy, in that they could bring their claims individually, and obtain an individual injunction or declaratory judgment. Therefore, this is not an instance where Defendants' conduct can only be enjoined as to all class members or none. *See Dukes*, 564 U.S. at 360 ("The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.").

As the proposed class is not sufficiently cohesive, Plaintiffs fail to satisfy Rule 23(b)(2).

### III. Conclusion

For the foregoing reasons, Plaintiffs' Motion to Certify a Class, Doc. 52, is denied.

s/ Nanette K. Laughrey  
NANETTE K. LAUGHREY  
United States District Judge

Dated:  February 26, 2019  
Jefferson City, Missouri