UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | |
|---|---|
| RANDALL LEE DALTON, et al., <br><br> Plaintiffs, <br><br> v. <br><br> MICHAEL BARRETT, et al., <br><br> Defendants. | Case No. 2:17-cv-04057-NKL |

**ORDER**

Before the Court is the joint motion by Plaintiffs Randall Lee Dalton, Viola Bowman, Brian Richman, and Dorian Samuels, and Defendants Michael Barrett, H. Riley Block, Craig Chval, A. Crista Hogan, and Charles R. Jackson, members of the Missouri State Public Defender Commission, for entry of their proposed consent judgment. Doc. 221. For the reasons discussed below, the joint motion is denied.

**I.    BACKGROUND**

    **a.  Missouri Indigent Defense[1]**

The State of Missouri relies extensively on local Missouri State Public Defender (MSPD) offices to provide indigent defense services in all its 114 counties and St. Louis City. MSPD employs approximately 376 attorneys and 200 administrative staff, support staff, paralegals, and Investigators, and represents indigent defendants in over 100,000 cases each year.

Since the establishment of MSPD in its current form in 1989, there have been at least ten independent evaluations of Missouri's public defense system. A 1993 study by The Spangenberg

---

[1] These are the facts as described in Plaintiffs' Complaint, Doc. 1-2, and the exhibits attached thereto, Doc. 1-3, 1-4.

1

Group (TSG) concluded that MSPD "lack[ed] the necessary resources to provide competent representation" and that the "legal staff needs to be increased as soon as possible." Doc. 1-3, pp. 86–105. A second TSG study in 2005, commissioned by the Missouri Bar Association Public Defender Task Force, determined Missouri's public defense system was "on the verge of collapse." Doc. 1-3, pp. 111-138. In 2007, an interim committee of the Missouri Senate released a report finding that public defenders' caseloads were too large and needed to be reduced. Doc. 1-3, pp. 140-50; 1-4, pp. 1–4. A third TSG study in 2009, again commissioned by the Missouri Bar Association, concluded that the workloads had increased since 2005 and that public defenders were unable to adequately meet with clients following arrest, advocate for pretrial release, thoroughly investigate cases, pursue discovery, file appropriate pleadings and motions, conduct necessary research, or prepare for hearings, trial, and sentencing. Doc. 1-4, pp. 6–73. In 2014, the American Bar Association released results of a commissioned report indicating that public defenders across the state were operating well over capacity, including working at 265% capacity in the St. Louis County Office, 254% capacity in the Jefferson City office, and 239% capacity in the Springfield office. Doc. 1-4, pp. 124–26. A 2016 study by the Sixth Amendment Center determined that Missouri's per capita spending on indigent defense is approximately one-third of the average of 25 states surveyed, at $6.20 per resident as compared to the $18.41 average. Doc. 1-4. In 2015, Defendant MSPD Director Michael Barrett requested additional funding from then-Governor Nixon to no avail, and when the legislature subsequently approved additional funding, the funding was vetoed and withheld.

Plaintiffs' factual allegations illustrate the potential consequences of an inundated public defense system. Ms. Bowman was arrested in January 2015, and her public defender, who was also a District Defender of a MSPD District office and therefore had other administrative and

managerial job responsibilities in addition to a 228-case caseload, requested over thirty continuances, including multiple continuances of Ms. Bowman's trial, resulting in her spending over 1,500 days in pre-trial detention. After being arrested in May 2016, Mr. Samuels cycled through three public defenders over the next year who repeatedly requested continuances without consulting Mr. Samuels while Mr. Samuels remained in jail. The last of these public defenders indicated his workload of over 200 cases was making it impossible for him to adequately prepare for the case. Also in 2016, Mr. Richman was arrested, yet over the next year he only met with his attorney on a handful of occasions and always at the courthouse, all while Mr. Richman remained in pre-trial detention without any preliminary hearing. In 2017, Mr. Dalton, a physically disabled and mentally impaired man, was held in jail for over a month without consulting with counsel. When he finally did meet his public defender, it was in the courtroom at his hearing. At this proceeding, because the public defender did not seem familiar with the case, Mr. Dalton's sister requested to approach the bench and she, rather than the public defender, had to make a bond application for her brother.

### b. The Current Litigation

On March 9, 2017, Plaintiffs filed a class action lawsuit in Missouri state court seeking injunctive and declaratory relief from Defendants in their official capacities as members of the MSPD Commission, as well as against the State of Missouri and then-Governor Eric R. Greitens. Plaintiffs alleged Defendants had failed to meet their constitutional obligation to provide indigent defendants with meaningful representation. Plaintiffs and the putative class claimed to "have been denied representation altogether at some critical stages of their proceedings, have been constructively denied counsel at others because MSPD's excessive workloads would hamstring

even the best of lawyers, and have not received the basic investigation and counseling that the Sixth Amendment demands." Doc. 1-2, p. 45.

On April 7, 2017, the Defendants removed the action to federal court. Shortly thereafter on April 21, 2017, the State of Missouri and then-Governor Greitens moved to dismiss, arguing that the doctrine of sovereign immunity barred all claims against these two Defendants, that legislative immunity barred all claims against Defendant Greitens, and that Plaintiffs lacked Article III standing, had adequate alternative legal remedies, and failed to state plausible constitutional claims. Doc. 18, Doc. 20. The Court denied these motions. Order, Doc. 69. Relevant here, the Court found that Missouri was not entitled to sovereign immunity for this suit seeking prospective equitable relief, and that then-Governor Greitens was subject to suit under the *Ex Parte Young* doctrine permitting declaratory and injunctive relief against state officers. *Id*.

On appeal, the Eighth Circuit determined the Governor and the State of Missouri should be dismissed. *Church v. Missouri*, 913 F.3d 736 (8th Cir. 2019). With respect to the Governor, the Eighth Circuit held that the *Ex Parte Young* doctrine did not apply, because the Governor's general enforcement authority, appointment of all MSPD Commissioners, and appropriation-reduction authority did not constitute "some connection" to the State's Sixth Amendment obligation, and therefore the Governor was shielded from suit and liability under sovereign immunity and legislative immunity. *Id*. at 753. Further, the Eighth Circuit found that Missouri's state sovereign immunity did apply, barring all suits against the State, including those seeking prospective equitable relief. *Id*. at 745–46. In finding that no common law exception to Missouri's sovereign immunity applied here, the Eighth Circuit cited the Missouri Supreme

4

Court's rejection of the possibility that "the state itself can be enjoined." *Id*. at 746 (citing *Carson v, Sullivan*, 284 Mo. 353, 223 S.W. 571, 571 (Mo. banc 1920)).

On February 26, 2019, the Court denied Plaintiffs' motion for class certification. Order, Doc. 212. The parties entered mediation, which resulted in a settlement and their proposed consent judgment, which was filed on May 13, 2019. Doc. 221.

On May 14, 2019, the Attorney General of Missouri moved to intervene. Doc. 222. Though the Court denied this motion, Order, Doc. 238, the Attorney General was permitted to file an amicus brief concerning their position on the proposed consent judgment, which they did on July 26, 2019. Doc. 247.

### c. The Proposed Consent Judgement

The terms of the proposed consent judgment impose a variety of obligations on MSPD spanning from the time a defendant applies for public defender services through the appeals process. For example, MSPD must ensure public defenders argue for release at every client's initial appearance and/or for a bail amount that the client can afford to pay, Part VI(e); spend sufficient time meeting with clients prior to a bail hearing, and if bail is set at an amount a client cannot afford and they remain detained, prioritize these clients with motions for a speedy trial unless there is good cause to refrain from doing so, Part VII(c),(f); answer all client correspondence within ten days of receipt and all phone messages within two days of receipt, Part VIII(b); appropriately pursue discovery and train public defenders in proper pre-trial investigation and pre-trial motion practice Part XI, XII; request and review all discovery in the case and conduct any further investigation prior to advising any client to plead guilty, Part XIII.

The proposed consent judgment also provides for a monitor, who on an ongoing basis would assess the extent to which MSPD is complying with the terms of the consent judgment,

5

and a reporting mechanism whereby MSPD must provide the monitor and Plaintiffs' counsel with quarterly data demonstrating compliance. As another enforcement mechanism, indigent persons who are or should be represented by MSPD, yet who have not received counsel at a critical stage or who have been placed on a waiting list for representation, may seek as third-party beneficiaries to enforce the consent judgment. Part XXI(c).

The cornerstone of the entire agreement is the caseload capacity standard. *See* Part XVIII. Using data and analysis by the accounting firm RubinBrown, the proposed consent decree imposes a caseload standard on individual public defenders. The caseload standard operates from a baseline of forty available work hours per week, fifty-two available work weeks per year, with no time allotted for vacation, sick time, training, administrative functions, or holidays. Using RubinBrown data estimating workload averages per type of case (e.g. Murder/Homicide, A/B Felony, Misdemeanor, etc.), MSPD must ensure that, over the course of any given calendar month period, public defenders are not assigned more than 173.3 hours' worth of cases. The proposed consent judgment provides that "if accepting an additional case would mean requiring any public defender's assigned caseload to exceed the MSPD caseload standard, the MSPD office in question shall not accept any additional cases, and shall not process any further indigence applications, until an appropriately experienced public defender with a caseload that falls under the cap becomes available. To do otherwise . . . would violate this Consent Judgment." Part XVIII(k). The proposed consent judgment further provides,

> "In lieu of processing additional indigence applications when this standard has been reached and placing such defendants on a wait list for public defender services, the MSPD shall ensure that the relevant District Defender promptly notifies the circuit court that the caseload standard case been reached in order to promptly allow the court to: (1) appoint private counsel pursuant to *State ex rel. Wolff v. Ruddy*, 617 S.W.2d 64 (1981) and *Willamson v. Vardeman*, 674 F.2d 1211 (1982); (2) engage with the prosecutor regarding the elimination of incarceration as a possible sentence for the offense(s) charged, thus eliminating

the constitutional right to an attorney pursuant to *Scott v. Illinois*, 440 U.S. 367, 373-74 (1979); (3) dismiss the case per the requirements set forth in *Ruddy* and *Williamson*; or (4) take any other actions that are consistent with the constitutions of the United States and Missouri, and that do not violate the requirements and limitations of this Consent Judgment.

Part XVIII(l).

## II. LEGAL STANDARD

"Consent decrees should[] spring from—and serve to resolve—a dispute within the court's subject-matter jurisdiction; come within the general scope of the case from the pleadings; and, further the objectives of the law on which the complaint was based." *E.E.O.C. v. Prod. Fabricators, Inc.*, 666 F.3d 1170, 1172 (8th Cir. 2012) (citing *Local Number 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 525, 106 S.Ct. 3063, 92 L.Ed.2d 405 (1986)).

"When reviewing a proposed consent decree, the trial court is to review the settlement for fairness, reasonableness, and adequacy." *United States v. Metro. St. Louis Sewer Dist. (MSD)*, 952 F.2d 1040, 1044 (8th Cir. 1992). Relevant considerations include, but are not limited to, the interest of the public, federalism, the relative strength of Plaintiff's claim, and whether the consent decree resolves the actual controversy in the complaint. *See, e.g.*, *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437, 124 S. Ct. 899, 903, 157 L. Ed. 2d 855 (2004) ("Consent decrees entered in federal court must be directed to protecting federal interests."); *E.E.O.C.*, 666 F.3d at 1172 (same); *United States v. Akzo Coatings of Am., Inc.*, 949 F.2d 1409, 1435 (6th Cir. 1991) (considering the strength of the parties' respective legal positions); *Nat'l Credit Union Admin. Bd. v. True Yang Vangh*, No. 15-CV-3871 (WMW/KMM), 2018 WL 6437423, at *2 (D. Minn. June 29, 2018) (considering "whether the consent judgment reflects a resolution of the allegations in the complaint," "the relative strength of the parties' positions," and "protecting the public interest"); *United States v. City of Waterloo*, No. 15-CV-2087-LRR, 2016 WL 254725, at

*5 (N.D. Iowa Jan. 20, 2016) (considering "whether the decree reflects a resolution of the actual controversy in the complaint"); *United States v. Telluride Co.*, 849 F. Supp. 1400, 1402 (D. Colo. 1994) (considering whether a consent decree addressing defendant's environmental pollution would accomplish the goal of cleaning the environment, whether it "reflect[ed] the relative strength or weakness of the government's case," and "whether the consent decree is in the public interest").

"Although the law favors settlements, federal courts in adopting consent decrees are not mere 'recorders of contracts' from whom parties can purchase injunctions." *Angela R. by Hesselbein v. Clinton*, 999 F.2d 320, 324 (8th Cir. 1993) (quoting *Local 93, Int'l Ass'n of Firefighters*, 478 U.S. at 525)). "A consent decree is a judicial act. Thus, before entering such a decree, the Court must ensure that it does not 'put the court's sanction on and power behind a decree that violates Constitution, statute, or jurisprudence.'" *Missouri v. Westinghouse Elec., LLC*, 487 F. Supp. 2d 1076, 1088 (E.D. Mo. 2007) (quoting *United States v. City of Miami, Fla.*, 664 F.2d 435, 441 (5th Cir. 1981)).

## III. DISCUSSION

The Missouri Attorney General raises several arguments in his amicus brief as to why the Court should reject the proposed consent judgment. The Attorney General asserts that the

agreement violates Missouri state law provisions § 600.062[2] and § 600.063,[3] that it grants MSPD authority that it does not have under Missouri law to supervise county jails, that the judgment would likely have a deleterious effect on public safety in Missouri, and that the judgment in effect would provide class-wide relief when the Court has already denied Plaintiffs' motion for class certification.  *See* Doc. 247.  However, even if the Court were to find in Plaintiffs' and MSPD's favor on each of the state's arguments, the Court would still deny the parties' request for the consent decree they propose.

---

[2] § 600.062 provides: "Notwithstanding the provisions of sections 600.017 and 600.042 to the contrary, neither the director nor the commission shall have the authority to limit the availability of a district office or any division director, district defender, deputy district defender, or assistant public defender to accept cases based on a determination that the office has exceeded a caseload standard. The director, commission, any division director, district defender, deputy district defender, or assistant public defender may not refuse to provide representation required under this chapter without prior approval from a court of competent jurisdiction."  Mo. Rev. Stat. § 600.062.

[3] § 600.063 provides, in relevant part:
    (1) Upon approval by the director or the commission, any district defender may file a motion to request a conference to discuss caseload issues involving any individual public defender or defenders, but not the entire office, with the presiding judge of any circuit court served by the district office. The motion shall state the reasons why the individual public defender or public defenders will be unable to provide effective assistance of counsel due to caseload concerns. When a motion to request a conference has been filed, the clerk of the court shall immediately provide a copy of the motion to the prosecuting or circuit attorney who serves the circuit court.
    (2) If the presiding judge approves the motion, a date for the conference shall be set within thirty days of the filing of the motion. The court shall provide notice of the conference date and time to the district defender and the prosecuting or circuit attorney.
    (3) Within thirty days of the conference, the presiding judge shall issue an order either granting or denying relief. If relief is granted, it shall be based upon a finding that the individual public defender or defenders will be unable to provide effective assistance of counsel due to caseload issues . . .
    (5) Nothing in this section shall deny any party the right to seek any relief authorized by law nor shall any provisions of this section be construed as providing a basis for a claim for post-conviction relief by a defendant.
Mo. Rev. Stat. § 600.063.

9

The most crucial provision of the proposed consent judgment is the caseload capacity standard. In order for MSPD to meet the numerous other requirements contained in the agreement, including those concerning client communication and visitation, investigation, motion practice, and appearances, public defenders must have the time do so. The studies and allegations reviewed above repeatedly link MSPD's caseload size to the ability to provide adequate counsel. Thus, MSPD's ability to reduce public defenders' current caseload and maintain the specified caseload standard is critical to the operation of the proposed consent judgment as a whole. The importance placed on the caseload standard is demonstrated by the mandatory language used in the proposed consent judgment, including that MSPD "shall not accept any additional cases and shall not process any further indigence applications, until an appropriately experienced public defender with a caseload that falls under the cap becomes available. To do otherwise . . . would violate this Consent Judgment." Part XVIII(k). Given this language, Plaintiffs or a third-party beneficiary would be permitted to bring a contempt motion in this Court against MSPD for failing to adhere to the caseload capacity standard, or for failing to adhere to any of the other obligations imposed by the proposed consent agreement. Such a motion, however, could also affect the MSPD in state court, because the current record suggests there will not be enough public defenders to permit the MSPD to both comply with the consent decree and to comply with Missouri state court orders assigning indigent defendants to the MSPD.

Under Missouri law, Missouri circuit courts assign indigent defendants to the MSPD. *See, e.g.*, Mo. Code Regs. tit. 18, § 10-3.010(1)(B) ("Upon motion by either party, the court in which the case is pending shall have authority to determine whether the services of the public defender may be utilized by the defendant.") Both Plaintiffs and MSPD agree that if entered, the

consent judgment would not require "prosecutors or judges, none of whom are parties to this case, to take any specific action in any specific case," Doc. 228, p. 9, and indeed the Court "may not enter a consent decree that imposes obligations on a party that did not consent to the decree," *Local No. 93, Int'l Ass'n of Firefighters*, 478 U.S. at 529. Thus, the consent decree in this Court would not prevent a state court from ordering the MSPD to represent an indigent defendant even if such representation violates the consent decree. The MSPD would then have to choose between being subject to contempt for violating the consent decree in this Court or being subject to a penalty for failing to represent an indigent defendant as ordered by the state court. Viewed from this enforcement perspective, the proposed consent decree appears illusory because the MSPD is caught between conflicting judicial decrees and there is no practical remedy. Further, to hold otherwise, would seriously implicate federalism concerns,[4] and the Eighth Circuit's immunity findings in this case. *See Church*, 913 F.3d at 742–47.

Finally, the consent decree does not "come within the general scope of . . . the pleadings." *E.E.O.C.*. 666 F.3d at 1172. There is no class certified in this case; the pleadings are limited to the rights of the named Plaintiffs. Yet the remedy proposed covers all indigent persons who are or should be represented by the MSPD, yet have not received counsel at a critical stage or who have been placed on a waitlist. The parties have not explained how such an

---

[4] "The underlying idea is that a federal injunction of ongoing state proceedings is likely to breed resentment and hostility in the state judiciaries and even risk disobedience of the federal court's orders. Therefore, avoiding injunctions of state courts is a way of limiting friction between state and federal courts." Erwin Chemerinsky, *Federal Jurisdiction* 766 (6th ed. 2012). *See also O'Shea v. Littleton*, 414 U.S. 488, 500 (refusing to enter an injunction against state courts where plaintiffs sought "an injunction aimed at controlling or preventing the occurrence of specific events that might take place in the course of future state criminal trials . . . This seems to us nothing less than an ongoing federal audit of state criminal proceedings which would indirectly accomplish the kind of interference that *Younger v. Harris* . . . and related cases sought to prevent.")

expansive remedy is needed to address the rights of the named Plaintiffs or how as a practical matter such a consent decree applicable to so many indigents in the state criminal justice system could effectively be enforced.

The Court is sympathetic to the difficult position the MSPD system and its attorneys are in. Ultimately, the staffing problems identified in the record may result in specific state criminal convictions being set aside because of Sixth Amendment violations and/or additional ethics complaints against public defenders, even though the public defenders are not at fault for the staffing problems. Nonetheless, the proposed consent decree is not the vehicle to ensure that the MSPD and the State of Missouri meet their legal obligation to provide constitutionally adequate representation to indigent defendants.

## IV. CONCLUSION

For the reasons discussed above, the motion for entry of the proposed consent judgment is DENIED.

s/ Nanette K. Laughrey  
NANETTE K. LAUGHREY  
United States District Judge

Dated: January 27, 2020  
Jefferson City, Missouri